1 Bruce L. Simon (State Bar No. 96241)
PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
2 44 Montgomery Street, Suite 1200
San Francisco, CA 94104
3 Telephone: (415) 433-9000
Facsimile: (415) 433-9008
4

5 Richard M. Heimann (State Bar No. 63607)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
6 275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
7 Facsimile: (415) 956-1008

8 *Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs*
[Additional counsel listed on signature page]
9

10

11 **UNITED STATES DISTRICT COURT**

12 **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13

14 IN RE: TFT-LCD (FLAT PANEL) | Master File No. C07-1827 SI
ANTITRUST LITIGATION
15 | MDL No. 1827
16 
17 This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINT**
18 ALL DIRECT PURCHASER ACTIONS
19
20

21 Plaintiffs (1) A.M. Photo & Imaging Center, Inc., (2) Andy Ciaccio d/b/a Art's TV

22 & Appliance, (3) CMP Consulting Services, Inc., (4) Crago, Inc., (5) Home Technologies

23 Bellevue LLC, (6) Nathan Muchnick, Inc., (7) Omnis Computer Supplies, Inc., (8) Orion

24 Home Systems, LLC, (9) Phelps Technologies, Inc., (10) Royal Data Services, Inc.,

25 (11) Univisions-Crimson Holding, Inc., and (12) Weber's World Company, individually

26 and on behalf of a Class of all those similarly situated, bring this action for damages and

27 injunctive relief under the antitrust laws of the United States against the defendants, and

28 allege on information and belief as follows:

## I.    INTRODUCTION

1.    Plaintiffs bring this antitrust class action on behalf of all persons and entities who directly purchased a Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panel, or a product containing a TFT-LCD panel, in the United States from the named defendants, any subsidiaries or affiliates thereof, or any co-conspirators as identified in this Complaint between January 1, 1996 and December 11, 2006 (the "Class Period").  TFT-LCDs are used in a number of products, including but not limited to, computer monitors, televisions, and cellular telephones.  As used herein, "TFT-LCD Product" refers to TFT-LCD panels, and products containing TFT-LCD panels, manufactured by any of the named defendants or their subsidiaries, affiliates, or co-conspirators.

2.    As explained in further detail below, TFT-LCD panels are made by sandwiching liquid crystal compound between two pieces of glass called substrates.  The resulting screen contains hundreds or thousands of electrically charged dots, called pixels, that form an image.  This panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a television, computer monitor, or other product.

3.    TFT-LCDs are manufactured in fabrication plants, or "fabs" as they are known in the industry.  Fabrication plants are very expensive.  The number of panels produced has a direct and significant effect on the price of both raw TFT-LCDs as well as the applications into which they are placed.  Although TFT-LCD panels are used in different applications, the TFT-LCD production process is such that manufacturers' output and prices can be measured in a consistent and homogenous way.  These and other conditions in the TFT-LCD industry enabled the price-fixing conspiracy detailed in this Complaint.  In particular, these conditions enabled defendants to engage in direct discussions about the prices to be charged for TFT-LCD Products.  Additionally, these conditions made it economically feasible to maintain artificially high prices through manipulation of supply.

/ / /

4.      Throughout the Class Period, defendants' conspiracy was effective in moderating the normal downward pressures on prices for TFT-LCD Products caused by periods of oversupply and technological change.  Defendants' conspiracy resulted in unusually long periods of high prices and high profits.  Although there were temporary periods when prices for TFT-LCD Products declined as a result of new entrants being assimilated, or breakdowns in the effectiveness of the conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition.  In addition, prices declined less than what they would have in a competitive market.  As a result of defendants' unlawful conduct, plaintiffs and members of the Class paid higher prices for TFT-LCD Products than what they would have paid in a competitive market.

## II.      JURISDICTION AND VENUE

5.      Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

6.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside in this district.

8.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

/ / /

/ / /

/ / /

# III.    PARTIES

## A.    Plaintiffs

9.      Plaintiff A.M. Photo & Imaging Center, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia.  During the Class Period, plaintiff purchased a TFT-LCD Product directly from one of the defendants and suffered injury as a result of defendants' unlawful conduct.

10.      Plaintiff Andy Ciaccio, d/b/a Art's TV & Appliance, operates a retail business in North Haven, Connecticut.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

11.      Plaintiff CMP Consulting Services, Inc. is a Florida corporation with its principal place of business in Miami, Florida.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

12.      Plaintiff Crago, Inc., formerly known as Dash Computers, Inc., is a Kansas corporation with its principal place of business in Merriam, Kansas.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

13.      Plaintiff Home Technologies Bellevue LLC is a Washington limited liability company with its principal place of business in Bellevue, Washington.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more of the defendants and suffered injury as a result of defendants' unlawful conduct.

14.      Plaintiff Nathan Muchnick, Inc. was a Pennsylvania corporation that had its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and suffered injury as a result of defendants' unlawful conduct.

15.      Plaintiff Omnis Computer Supplies, Inc. is a New York corporation with its principal place of business in Schenectady, New York.  During the Class Period, plaintiff

1  purchased TFT-LCD Products directly from one or more defendants and suffered injury as
2  a result of defendants' unlawful conduct.

3        16.     Plaintiff Orion Home Systems, LLC is a Minnesota limited liability
4  corporation with its principal place of business in Eagen, Minnesota.  During the Class
5  Period, plaintiff purchased TFT-LCD Products directly from one or more defendants and
6  suffered injury as a result of defendants' unlawful conduct.

7        17.     Plaintiff Phelps Technologies, Inc. is a Missouri corporation with its
8  principal place of business in Overland Park, Kansas.  During the Class Period, plaintiff
9  purchased TFT-LCD Products directly from one or more defendants and suffered injury as
10  a result of defendants' unlawful conduct.

11        18.     Plaintiff Royal Data Services, Inc. is a Hawaii corporation with its principal
12  place of business in Honolulu, Hawaii.  During the Class Period, plaintiff purchased TFT-
13  LCD Products directly from one or more defendants and suffered injury as a result of
14  defendants' unlawful conduct.

15        19.     Plaintiff Univisions-Crimson Holding, Inc. is a New York corporation with
16  its principal place of business in Syracuse, New York.  During the Class Period, plaintiff
17  purchased TFT-LCD Products directly from one or more defendants and suffered injury as
18  a result of defendants' unlawful conduct.

19        20.     Plaintiff Weber's World Company is a partnership that operates a retail store
20  in Dana Point, California.  During the Class Period, plaintiff purchased TFT-LCD Products
21  directly from one or more defendants and suffered injury as a result of defendants'
22  unlawful conduct.

23  **B.    Defendants**

24        **1.    AU Optronics**

25        21.     Defendant AU Optronics Corporation is a Taiwanese company with its
26  principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu
27  30078, Taiwan.  AU Optronics Corporation was created in 2001 by the merger of Acer
28  Display Technology, Inc. and Unipac, both of which were involved in the manufacture of

1  TFT-LCD Products.  During the Class Period, AU Optronics Corporation manufactured,

2  sold, and distributed TFT-LCD Products to customers throughout the United States.

3       22.     Defendant AU Optronics Corporation America ("AU America") is a

4  California corporation with its principal place of business at 9720 Cypresswood Drive,

5  Suite 241, Houston, Texas.  AU America was formerly known as Acer Display

6  Technology America, Inc.  AU America is a wholly-owned and controlled subsidiary of

7  defendant AU Optronics Corporation.  In 2006, Hsuan Bin Chen, the president and Chief

8  Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU

9  America.  During the Class Period, AU America sold and distributed TFT-LCD Products

10  manufactured by AU Optronics to customers throughout the United States.

11       23.     Defendants AU Optronics Corporation and AU America are collectively

12  referred to herein as "AU Optronics."

13       **2.     Chi Mei**

14       24.     Defendant Chi Mei Corporation ("CMC") is a Taiwanese company with its

15  principal place of business located at No. 59-1, San Chia, Jen Te, Tainan County, Taiwan

16  71702.  CMC is the parent company for all of the Chi Mei entities herein.  During the

17  Class Period, CMC manufactured, sold, and distributed TFT-LCD Products to customers

18  throughout the United States.

19       25.     Defendant Chi Mei Optoelectronics Corporation ("CMO") is a Taiwanese

20  company with its principal place of business at No. 3, Sec. 1, Huanshi Road, Southern

21  Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.  It is a subsidiary

22  of CMC.  CMO was formed in 1998, and has since become a major manufacturer of TFT-

23  LCD Products.  During the Class Period, CMO manufactured, sold, and distributed TFT-

24  LCD Products to customers throughout the United States.

25       26.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company

26  headquartered at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.

27  Up until 2006, CMO Japan was known as International Display Technology, Ltd.  CMO

28  Japan is a wholly-owned and controlled subsidiary of defendant CMO.  CMO Japan has

1  been in the TFT-LCD business since 2001.  During the Class Period, CMO Japan

2  manufactured, sold, and distributed TFT-LCD Products throughout the United States.

3        27.     Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware

4  corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

5  California.  Up until 2006, CMO USA was known as International Display Technology

6  U.S.A., Inc.  CMO USA is a wholly-owned and controlled subsidiary of defendant CMO

7  Japan.  During the Class Period, CMO USA sold and distributed TFT-LCD Products

8  manufactured by CMO Japan to customers throughout the United States.  The Chairman of

9  CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO Japan's

10  predecessor, and in or about 2007 became Vice President in charge of sales and marketing

11  for CMO.  The President of CMO USA in 2006, Junichi Ishii, was previously the President

12  of CMO Japan's predecessor.

13        28.     Defendant Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese company with

14  its principal place of business at 11F, No. 186, Jinayi Rd., Chung Ho City, Taipei Hsien,

15  Taiwan.  Nexgen is a wholly-owned and controlled subsidiary of CMC.  During the Class

16  Period, Nexgen sold and distributed TFT-LCD Products manufactured by CMO to

17  customers throughout the United States.

18        29.     Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a California

19  corporation with its principal place of business at 14500 Proctor Avenue, City of Industry,

20  California.  Nexgen USA is a wholly-owned and controlled subsidiary of CMC.  During

21  the Class Period, Nexgen USA sold and distributed TFT-LCD Products manufactured by

22  CMO to customers throughout the United States.

23        30.     Defendants CMC, CMO, CMO Japan, CMO USA, Nexgen, and Nexgen

24  USA are collectively referred to herein as "Chi Mei."

25        **3.**      **Chunghwa**

26        31.     Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its

27  principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  It is a

28  subsidiary of Tatung Company, a consolidated consumer electronics and information

1  technolgy company based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors

2  includes representatives from Tatung Company.  The Chairman of Chunghwa Picture

3  Tubes, Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company.

4  During the Class Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and

5  distributed TFT-LCD Products to customers throughout the United States.

6      32.    Tatung Company of America, Inc. ("Tatung America") is a California

7  corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

8  California.  Tatung America is a wholly-owned and controlled subsidiary of Tatung

9  Company.  During the Class Period, Tatung America sold and distributed TFT-LCD

10  Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the

11  United States.

12      33.    Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are

13  collectively referred to herein as "Chunghwa."

14      **4.    Epson**

15      34.    Defendant Epson Imaging Devices Corporation ("Epson Japan") is a

16  Japanese company with its principal place of business at 4F Annex, World Trade Center

17  Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  Up until December

18  28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  During

19  the Class Period, Epson Japan manufactured, sold, and distributed TFT-LCD Products to

20  customers throughout the United States.

21      35.    Defendant Epson Electronics America, Inc. ("Epson America") is a

22  California corporation with its principal place of business at 2580 Orchard Parkway, San

23  Jose, California.  Epson America is a wholly-owned and controlled subsidiary of defendant

24  Seiko Epson Corporation.  During the Class Period, Epson America sold and distributed

25  TFT-LCD Products manufactured by Epson Japan to customers throughout the United

26  States.

27      36.    Defendants Epson Japan and Epson America are collectively referred to

28  herein as "Epson."

**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINT**
Master File No. C07-1827 SI                                                                                8

**5.    HannStar**

37.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  HannStar has been in the business of manufacturing and selling TFT-LCDs since 1998.  During the Class Period, HannStar manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

**6.    Hitachi**

38.    Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company was one of the original producers of TFT-LCDs.  In 2002, it spun off its TFT-LCD manufacturing assets to Hitachi Displays, Ltd., a wholly owned subsidiary.  During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

39.    Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was formed in 2002 and acquired all of defendant Hitachi, Ltd.'s TFT-LCD manufacturing business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the Class Period, Hitachi Displays, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.  Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology.

40.    Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its ultimate parent company is Hitachi, Ltd.  During the Class Period, Hitachi Electronic Devices (USA), Inc. sold and distributed TFT-LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the United States.

41.    Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi."

7. **LG Electronics**

42.     Defendant LG Electronics, Inc. is a Korean company headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-721.  The company first began mass production of TFT-LCD panels in September 1995.  Since then, LG Electronics, Inc. has held, and continues to hold, ownership interests in entities that participate in the TFT-LCD industry, including a joint venture with defendant Koninklijke Philips Electronics N.V. called LG.Philips LCD Co., Ltd.  The Chief Financial Officer for LG Electronics, Inc. in 2006, Young Soo Kwon, was the Co-President and Chief Executive Office for LG.Philips LCD Co., Ltd. in 2007.  LG Electronics, Inc.'s TFT-LCD division operates through LG.Philips Co., Ltd.  During the Class Period, LG Electronics, Inc. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

43.     Defendant LG Electronics USA, Inc. ("LG USA") is a Delaware corporation with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey. LG USA is a wholly-owned and controlled subsidiary of LG Electronics, Inc.  In 2003, the Director of Sales for LG Electronics USA, Inc., Sonny Marak, became the Vice President of Sales for LG Electronics, Inc.  In 2007, the Vice President of Sales of Home Appliances for LG Electronics, Inc., John Herrington, was also the President of the Appliance Division for LG Electronics USA, Inc.  During the Class Period, LG USA sold and distributed TFT-LCD Products manufactured by defendants LG Electronics, Inc. and LG.Philips LCD Co., Ltd. to customers throughout the United States.

44.     Defendants LG Electronics, Inc. and LG USA are referred to collectively herein as "LG Electronics."

8. **NEC**

45.     Defendant NEC LCD Technologies, Ltd. is a Japanese company with its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kangawa, 211-8666, Japan.  It has been in the TFT-LCD business since 1993.  During the Class Period, NEC LCD Technologies, Ltd. manufactured, sold, and distributed TFT-LCD

1   Products to customers throughout the United States.

2          46.     Defendant NEC Electronics America, Inc. is a California corporation with its

3   principal place of business at 2880 Scott Boulevard, Santa Clara, California.  During the

4   Class Period, NEC Electronics America, Inc. sold and distributed TFT-LCD Products

5   manufactured by NEC LCD Technologies, Ltd. to customers throughout the United States.

6          47.     Defendants NEC LCD Technologies, Ltd. and NEC Electronics America,

7   Inc. are referred to collectively herein as "NEC."

8          **9.     Philips**

9          48.     Defendant Koninklijke Philips Electronics N.V. ("Philips"), which translates

10  to Royal Philips Electronics, is a Dutch entity located at Breitner Center, Amstelplein 2,

11  1096 BC Amsterdam, The Netherlands.  In July 1999, Philips entered into a joint venture

12  with defendant LG Electronics creating defendant LG.Philips LCD Co., Ltd.  During the

13  Class Period, Philips manufactured, sold, and distributed TFT-LCD Products through its

14  joint venture to customers throughout the United States.

15         **10.    Samsung**

16         49.     Defendant Samsung Electronics Co., Ltd. is a Korean company with its

17  principal place of business at Samsung Main Building, 250, Taepyeongno 2-ga, Jung-gu,

18  Seoul 100-742, Korea.  It is the world's largest TFT-LCD producer.  During the Class

19  Period, it manufactured, sold, and distributed TFT-LCD Products to customers throughout

20  the United States.

21         50.     Defendant Samsung Electronics America, Inc. ("Samsung America") is a

22  New York corporation with its principal place of business at 105 Challenger Road,

23  Ridgefield Park, New Jersey.  Samsung America is a wholly-owned and controlled

24  subsidiary of defendant Samsung Electronics Company, Ltd.  During the Class Period,

25  Samsung America sold and distributed TFT-LCD Products manufactured by Samsung

26  Electronics Company, Ltd. to customers throughout the United States.

27         51.     Samsung Semiconductor, Inc. is a California corporation with its principal

28  place of business at 3655 N. First Street, San Jose, California.  Samsung Semiconductor,

1  Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics

2  Company, Ltd.  During the Class Period, Samsung Semiconductor, Inc. sold and

3  distributed TFT-LCD Products manufactured by Samsung Electronics Company, Ltd.

4  throughout the United States.

5       52.    Defendants Samsung Electronics Company, Ltd., Samsung America, and

6  Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."

7       **11.**    **Sharp**

8       53.    Defendant Sharp Corporation is a Japanese company with its principal place

9  of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  The company was

10 one of the earliest producers of TFT-LCDs.  During the Class Period, Sharp Corporation

11 manufactured, sold, and distributed TFT-LCD Products to customers throughout the

12 United States.

13      54.    Defendant Sharp Electronics Corporation is a New York corporation with its

14 principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics

15 Corporation is a wholly-owned and controlled subsidiary of defendant Sharp Corporation.

16 During the Class Period, Sharp Electronics Corporation sold and distributed TFT-LCD

17 Products manufactured by defendant Sharp Corporation to customers throughout the

18 United States.

19      55.    Defendants Sharp Corporation and Sharp Electronics Corporation are

20 referred to collectively herein as "Sharp."

21      **12.**    **Toshiba**

22      56.    Defendant Toshiba Corporation is a Japanese company with its principal

23 place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba

24 has two joint ventures that manufacture, sell, and distribute TFT-LCD Products – Toshiba

25 Matsushita Display Technology Co., Ltd. and IPS Alpha Technology, Ltd.  During the

26 Class Period, Toshiba manufactured, sold, and distributed TFT-LCD Products to

27 customers throughout the United States.

28 / / /

57.     Defendant Toshiba America Electronics Components, Inc. is a California corporation with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine, California.  Toshiba America Electronics Components, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc.  Toshiba America Electronics Components, Inc. is the United States sales and marketing representative for defendant Toshiba Matsushita Display Technology Co., Ltd.  During the Class Period, Toshiba America Electronics Components, Inc. sold and distributed TFT-LCD Products manufactured by Toshiba Corporation to customers throughout the United States.

58.     Defendant Toshiba America Information Systems, Inc. is a California corporation with its principal place of business at 9470 Irvine Blvd., Irvine, California.  Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc., a holding company for defendant Toshiba Corporation.  During the Class Period, Toshiba America Information Systems, Inc. sold and distributed TFT-LCD Products manufactured by Toshiba Corporation to customers throughout the United States.

59.     Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc., and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."

**13.     Joint Ventures**

60.     Defendant IPS Alpha Technology, Ltd. ("IPS Alpha") is a Japanese entity with its principal place of business at 3732 Hayano, Mobara-shi, Chiba 297-0037, Japan.  IPS Alpha was formed in January 2005 as a joint venture between defendants Hitachi Displays, Ltd., Toshiba Corporation, and Matsushita Electric Industrial Co., Ltd. to manufacture and sell TFT-LCD panels for televisions.  During the Class Period, IPS Alpha manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

61.     Defendant LG.Philips LCD Co., Ltd. is a Korean entity with its principal place of business at 17th Floor, West Tower, LG Twin Towers 20, Yeouido-dong,

1    Yeongdeungpo-gu, Seoul, Korea 150-721.  LG.Philips LCD Co., Ltd. was created in July

2    1999 as a joint venture between defendant LG Electronics and defendant Philips.  In July

3    2004, LG.Philips LCD Co., Ltd.  became a public company, with LG Electronics and

4    Philips as the controlling shareholders.  LG.Philips LCD Co., Ltd. describes itself as "the

5    global leader in the development and manufacture of TFT-LCD panels for televisions,

6    computer monitors, notebooks and emerging mobile applications."  During the Class

7    Period, LG.Philips LCD Co., Ltd. manufactured, sold, and distributed TFT-LCD Products

8    to customers throughout the United States.

9         62.    Defendant LG.Philips LCD America, Inc. is a California corporation with its

10   principal place of business at 150 East Brokaw Road, San Jose, California.  LG.Philips

11   LCD America, Inc. is a wholly-owned and controlled subsidiary of LG.Philips LCD Co.,

12   Ltd.  During the Class Period, LG.Philips LCD America, Inc. sold and distributed TFT-

13   LCD Products manufactured by LG.Philips LCD Co., Ltd. to customers throughout the

14   United States.

15        63.    Defendants LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc. are

16   referred to collectively herein as "LG.Philips."

17        64.    Defendant Toshiba Matsushita Display Technology Co., Ltd. ("Toshiba

18   Matsushita") is a Japanese company with its principal place of business at Rivage

19   Shinagawa, 1-8, Konan c4-chome, Minato-ku, Tokyo 108-0075, Japan.  Toshiba

20   Matsushita is a joint venture between defendant Toshiba Corporation and defendant

21   Matsushita Electric Industrial Co., Ltd. created for the purpose of manufacturing LCD

22   devices.  During the Class Period, Toshiba Matsushita manufactured, sold, and distributed

23   TFT-LCD Products to customers throughout the United States.

24                    **IV.    AGENTS AND CO-CONSPIRATORS**

25        65.    The acts alleged against the defendants in this Complaint were authorized,

26   ordered, or done by their officers, agents, employees, or representatives, while actively

27   engaged in the management and operation of defendants' businesses or affairs.

28   / / /

66.     Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

67.     Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiffs.

## V.     CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Class is defined as follows:

> All persons and entities who, between January 1, 1996 and December 11, 2006, directly purchased a TFT-LCD Product in the United States from any defendant or any subsidiary or affiliate thereof, or any co-conspirator. Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

69.     The Class definition encompasses those who bought a TFT-LCD Product directly from a defendant, even if the TFT-LCD panel contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator.

70.     Plaintiffs do not know the exact size of the Class because such information is in the exclusive control of the defendants.  Due to the nature of the trade and commerce involved, however, plaintiffs believe that the Class members are numerous and geographically dispersed throughout the United States, rendering joinder of all Class members impracticable.

71.     The questions of law or fact common to the Class include but are not limited to:

a.     Whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of TFT-LCD Products sold in the United States;

/ / /

b.  Whether defendants engaged in a contract, combination, and/or conspiracy to restrict output of TFT-LCD Products sold in the United States;

c.  Whether defendants' conduct caused the prices of TFT-LCD Products sold in the United States to be at artificially high and noncompetitive levels;

d.  Whether plaintiffs and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

e.  Whether plaintiffs and the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

72.  These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

73.  Plaintiffs' claims are typical of the claims of the Class because plaintiffs directly purchased TFT-LCD Products from one or more of the defendants.

74.  Plaintiffs will fairly and adequately represent the interests of the Class in that plaintiffs are direct purchasers of TFT-LCD Products and have no conflict with any other members of the Class.  Furthermore, plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

75.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

76.  This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

77.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards

1   of conduct for defendants.

2   ## VI.   TRADE AND COMMERCE

3       78.     During the Class Period, each defendant, or one or more of its subsidiaries,

4   sold TFT-LCD Products in the United States in a continuous and uninterrupted flow of

5   interstate commerce and foreign commerce, including through and into this judicial

6   district.

7       79.     During the Class Period, defendants collectively controlled a vast majority of

8   the market for TFT-LCD Products, both globally and in the United States.

9       80.     The business activities of the defendants substantially affected interstate

10  trade and commerce in the United States and caused antitrust injury in the United States.

11  ## VII.   FACTUAL ALLEGATIONS

12  **A.    TFT-LCD Technology**

13      81.     The technology behind TFT-LCDs is not new.  In the 1950s and 1960s, RCA

14  Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-

15  power display technology.  In the 1970s, after RCA Corp. discontinued its efforts,

16  Japanese companies took the lead in commercializing liquid crystal technology.  These

17  efforts resulted in monochrome calculators and watches.  By the early 1990s, liquid crystal

18  technology was introduced in notebook computers and small, low-resolution televisions.

19  In the mid-1990s, the technology advanced further with the development of TFT-LCDs.

20      82.     As noted above, the basic structure of a TFT-LCD panel is two glass

21  substrates sandwiching a layer of liquid crystal compound.  Liquid crystals change

22  orientation under an applied electric field and can thereby block or pass light.  One glass

23  substrate has thin chemical films that act as transistors, and the other glass substrate is

24  coated with liquid pigments that act as color filters.  When voltage is applied to the

25  transistors, the liquid crystal bends, causing light to pass through the filters to create red,

26  green, or blue pixels.  Pixels are the smallest unit in a picture image, and the density of

27  pixels in a display determines the resolution.

28  / / /

83.     The term "active matrix" describes the ability to switch individually each pixel in a display.  Unlike older LCDs that have one transistor for each row and column of pixels, TFT-LCDs have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used interchangeably with TFT-LCD.  Active matrix displays are brighter and sharper than passive matrix displays of the same size.

84.     The glass substrates used for TFT-LCD panels begin with a "motherglass," a sheet of glass that is cut to make multiple panels.  TFT-LCDs are manufactured in fabs that are equipped to handle a particular size motherglass.  Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger and larger size motherglass sheets.  This, in turn, has resulted in the ability to fabricate larger and/or more TFT-LCD panels.  Each increase in motherglass size is described as a generation.  Third generation fabs in the 1998 to 1999 period typically utilized 550 millimeter ("mm") by 650 mm motherglass, while some current (eighth generation) fabs utilize 2160 mm by 2460 mm motherglass.  The use of larger motherglass provides substantial cost savings to manufacturers.

85.     TFT-LCDs are capable of producing the same image as cathode ray tubes ("CRTs"), but in a much smaller package.  TFT-LCDs also have lower energy requirements, are generally easier to read, and do not flicker like CRTs.  TFT-LCD panels of less than 10 inches in diagonal are considered "small" or "medium" displays.  They are also referred to as "mobile displays."  These displays are commonly used in cell phones, personal digital assistants, and cameras.

86.     TFT-LCDs of 10 inches in diagonal and larger are considered "large-area displays."  Large-area displays are most commonly used for desktop computer monitors, notebook computers, and televisions.  The core products during most of the Class Period were displays for notebook computers and computer monitors.  During much of the Class Period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most popular TFT-LCD Products, representing as much as 80 percent of all TFT-LCDs produced for notebook computers or computer monitors.

**B.      Structure of the TFT-LCD Industry**

87.      The TFT-LCD industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

  **1.      Market Concentration**

88.      The market for TFT-LCD Products is very large.  A September 28, 2006 *Reuters* article reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD technology – are expected to reach $US 88 billion this year and $US 100 billion in 2007."

89.      Despite its enormous size, the market for TFT-LCD Products industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by plaintiffs.  In 2005, the top five suppliers – Samsung, LG.Philips, Sharp, AU Optronics, and Chi Mei – collectively shipped 90 percent of all TFT-LCD panels for television use. According to estimates in late 2006 from industry analyst iSuppli Corporation ("iSuppli"), LG.Philips had the greatest share of LCD television shipments in the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei (18.7%), AU Optronics (16.8%), and Sharp (13.9%).  These companies were the five largest producers as measured by market share during much of the Class Period.

  **2.      Information Sharing**

90.      Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for defendants collusively to discuss competitive information.  The ease of communication was facilitated by the use of meetings, telephone conversations, email messages, and text messaging.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for TFT-LCD Products.

91.     Additionally, the TFT-LCD industry is analyzed by several market research firms.  Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity.  The capacity and pricing data reported by these firms comes directly from manufacturers.  Manufacturers typically report historical, current, and perhaps most importantly, prospective information.  Thus, defendants had access to each other's future plans for bringing capacity on line, capacity utilization, market share, pricing, and the advent of new technology.  Because there were very few companies that needed to be analyzed in order to obtain this data, all competitors in the TFT-LCD market had ready and timely access to reliable information about their competition's pricing as well as future supply and capacity decisions.  By monitoring and analyzing this information over time, participants in the conspiracy were able to signal their respective intent, verify that the conspiracy was working, and identify any parties who might be deviating from the conspiracy.

### 3.     Consolidation

92.     The TFT-LCD Products industry experienced significant consolidation during the Class Period, including: (a) the creation of AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; (b) the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Mitsubishi, and Toshiba; and (e) AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD Products.

### 4.     Multiple Interrelated Business Relationships

93.     The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.  AU Optronics, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006.  Chunghwa did likewise with Sharp in December of 2006.  Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.  A diagram illustrating these various licensing arrangements is attached hereto as Exhibit A.

94.     The industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.  These business relationships also created a unity of interest amongst competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.  Exhibit A illustrates these relationships.

### 5.     High Costs of Entry Into the Industry

95.     There are significant manufacturing and technological barriers to entry into the TFT-LCD Products industry.  Efficient fabrication plants are large and costly.  TFT-LCD Products are also subject to technological advances, so that firms within the industry must undertake significant research and development expenses.  DisplaySearch, a research firm in Austin, Texas that covers the TFT-LCD industry, reported in September 2005 that the top TFT-LCD manufacturers collectively spend $30 million a day on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical seventh generation fab can cost more than $3 billion.

96.     During the Class Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  Later in the conspiracy, approximately 70 percent of the cost of TFT-LCD panel production was attributable to the cost of raw materials.  Because the bulk of the costs borne by TFT-LCD manufacturers are variable and assembly-related, there were cost-driven incentives to reduce production.  The fact that variable costs are such a high percentage of the production costs may allow a cartel artificially to boost prices with greater success than where fixed costs are the largest component of production costs.  The combination of price discussions and manipulation of the output of TFT-LCD Products allowed defendants to keep prices above where they would have been but for the conspiracy.

### 6.     The "Crystal Cycle"

97.     Like all markets, the TFT-LCD industry is subject to business cycles of supply and demand.  In the TFT-LCD industry, this cycle is known as the "crystal cycle."

1    This cycle has been described as "boom and bust" periods caused by alternating periods of

2    oversupply and shortages, which create downward and upward pressures on prices for

3    TFT-LCD Products.  One fact that can affect such oversupply is the perceived demand for

4    such products and whether manufacturers have adequately predicted such demand in

5    determining how much capacity to build and how many TFT-LCD Products to produce.

6         98.    Another factor is the entry of new competitors.  Typically, when a new

7    competitor enters a market, it floods the market with supply, and prices drop until an

8    equilibrium is reached.  In the TFT-LCD industry, however, defendants conspired to rein

9    in and discipline these new entrants until the new entrants were assimilated into the

10   conspiracy.  This had the effect of tempering price drops and preventing them from

11   reaching a competitive equilibrium.

12        99.    The conspiracy did not completely eliminate the effects of the crystal cycle

13   in the TFT-LCD industry.  There were periods when defendants' collusive practices drove

14   prices for TFT-LCD Products so high that demand began to fall to the point that

15   defendants lowered prices for short periods of time.  However, defendants' efforts to

16   stabilize prices were effective in moderating the effects of the crystal cycle, including the

17   impact on prices to direct purchasers.  To the extent that prices for TFT-LCD Products fell,

18   they fell from levels that had been set conspiratorially, rather than from levels set by free

19   and open competition.  Additionally, prices did not fall as low as they would have absent

20   the conspiratorial conduct.

21        **7.    Dominant Products**

22        100.    Notwithstanding that there may be different applications for TFT-LCDs,

23   there is a consistent and homogeneous way for defendants to monitor, analyze, discipline,

24   and enforce their conspiracy.  This can be done by looking at the predominant, or most

25   popular, size panels and the applications for those panels that represent the highest

26   percentage of sales.  This can also be accomplished by looking at standardized statistics

27   used in the industry, such as amount of glass produced and revenues per metric ton of

28   glass.  By using these, and other industry analytics, defendants could monitor, analyze,

1  discipline, and enforce their conspiracy.

2      101.    For example, from the fourth quarter of 1999 through mid-2003, half or more

3  of the TFT-LCD monitor shipments were 15-inch monitors.  From mid-2003 to early 2006,

4  17-inch monitors were the predominant size.  As for TFT-LCD televisions, from the fourth

5  quarter of 1999 through the fourth quarter of 2000, shipments were predominantly of 10-

6  inch to 14-inch models.  During 2001 and much of 2002, sales of 13-inch to 15-inch

7  models dominated.  And in 2004 and 2005, the majority of shipments were of 20-inch and

8  32-inch models.  The following chart shows the popularity of 14-inch to 15-inch notebook

9  and 15-inch to 17-inch computer monitors.



**Share of Shipments by Category**
**14-15" Notebook LCDs and 15-17" LCD Monitors**

C.      **Pre-Conspiracy Market**

      102.    Until the mid-1990s, Japanese companies like Hitachi and Sharp were

essentially the exclusive suppliers of TFT-LCD panels.

      103.    In early 1995, the industry faced declining TFT-LCD panel prices, which

industry analysts attributed to advances in technology and improving efficiencies.  One

analyst in this period noted that the "flat panel display industry is following the classic

cyclical business pattern of the semiconductor industry."  The Japanese manufacturers

1    realized that the capacity growth from investing in new plants was weakening the price of

2    TFT-LCDs, and they slowed the rate of their investments.  This, however, provided an

3    opening to Korean manufacturers.

4        104.    In 1995, three Korean companies – Samsung, LG Electronics, and, to a lesser

5    extent, Hyundai Electronics Industries Co. ("Hyundai") – entered the market.  These

6    Korean firms offered comparable products at reduced prices in an effort to quickly gain

7    market share.  This resulted in increased competition in 1995, which contributed to the

8    significant price declines seen during that timeframe.

9        105.    Increases in manufacturing capacity and decreases in manufacturing costs

10   seemed to assure continuing price declines.  By mid-1995, the Japanese companies and the

11   new Korean competitors had a total capacity to supply 14 million TFT-LCD screens, while

12   demand for them was only about three million.  In addition to the surges in capacity during

13   1995, "[costs] were also dropping as production volume increases and manufacturing

14   methods improved."

15       106.    By late 1995, the effect of the entry by Korean suppliers had pushed down

16   the price of some TFT-LCD panels by 50 percent from the previous year.  The origin of

17   the TFT-LCD conspiracy is traceable to this trough in prices.

18   **D.    Defendants' Collusive Pricing and Supply Restriction Practices**

19       107.    After initial introduction into a market, consumer electronics products and

20   their component parts are typically characterized by downward pricing trends.  However,

21   since at least 1996, the TFT-LCD Product market has been characterized by unnatural and

22   sustained price stability, as well as certain periods of substantial increases in prices.

23   Defendants achieved price stability and price increases by agreeing to fix and maintain

24   prices and to restrict supply through decreases in capacity utilization.

25       108.    Defendants controlled prices by manipulating the capacity of various

26   generations of fabs as well as the timing of bringing new capacity on line.  The percentage

27   of a fab's capacity that is being used, sometimes called "fab loading," is maintained by

28   various reporting companies and available to defendants.  Thus, in addition to direct

**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINT**
Master File No. C07-1827 SI                                                                    24

1  discussions, defendants had more than adequate industry data on capacity utilization from

2  which to implement and monitor the conspiracy.

3      **1.      1996**

4      109.    By early 1996, analysts were lamenting the excess supply and drastic price

5  cuts in the TFT-LCD markets.  The downward pressure on prices, which had already fallen

6  40 to 50 percent in 1995, was projected to continue due to lower manufacturing costs.

7  Despite this, TFT-LCD Product prices actually rose in 1996, allegedly due to insufficient

8  production capacity.  In reality, defendants were fixing the prices.

9      110.    During this period, the Japanese defendants herein began to partner with

10  Taiwanese companies to trade technology and collaborate on supply.  Japanese engineers

11  were lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  This mutually

12  beneficial relationship between purported competitors continued into at least 1999.

13      111.    A few months into 1996, there was a reversal in the downward trend in TFT-

14  LCD Product prices and an alleged inability of manufacturers to supply enough TFT-LCD

15  panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-

16  panel-display purchasers are riding a roller coaster of pricing in the display market, with

17  no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the

18  gyrating market can take solace that even vendors are constantly being surprised by the

19  sudden twists and turns."

20      112.    By mid-1996, industry analysts were commenting on an unusual rise in TFT-

21  LCD panel prices that was noted to be "quite rare in the electronics industry."

22      113.    1996 also brought the advent of third generation fabs.  In order to stay

23  current with technology, manufacturers were moving quickly into third generation

24  motherglass.  LG Electronics was scheduled to have its third generation fab online by

25  1997, and Hyundai was scheduled to do so by early 1998.  However, manufacturers falsely

26  claimed to be operating at full capacity and unable to meet demand, despite the millions of

27  units of over-capacity that had supposedly existed months earlier.  This resulted in surging

28  prices.  These price increases were also inconsistent with the fact that production had

1  become more efficient and cost effective.

2  **2.     1997 – 1998**

3  114.    By 1997, Japanese manufacturers were steadily sending engineers to Taiwan

4  to provide the Taiwanese manufacturers with the most up-to-date technology.  In return,

5  the Japanese received output from Taiwanese plants.  In 1998, Chi Mei entered into such a

6  strategic alliance with Fujitsu, a Japanese manufacturer that was acquired by Sharp in

7  2005.  These arrangements between Japanese and Taiwanese companies resulted in

8  cooperative discussions between supposed competitors.  It was also expected to contribute

9  to an increase in supply of TFT-LCD panels.

10  115.    By 1998, the TFT-LCD industry was not running near capacity, due in part

11  to the still recent entry of the Korean companies.  A March 30, 1998 article in *Electronic*

12  *News* reported that Hyundai's production lines were running at only 20 to 50 percent.  The

13  article quoted Rob Harrison, director of marketing for Hyundai's display division, as

14  saying, "There is plenty of inventory and capacity available to suit any shortage . . . You

15  have to get your production up to full capacity again before you can even talk about there

16  being a shortage and I think there are plenty of under-capacity fabs right now to bear the

17  burden."

18  116.    During this period, Samsung made a concerted effort to get other

19  manufacturers in the industry to limit production.  Yoon-Woo Lee, President and CEO of

20  the Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at

21  the Eighteenth International Display Research Conference (known as Asia Display 98).

22  Mr. Lee said:

23  > In order to maintain the tradition of top CRT manufacturer, we need to
24  > capture the high end market [and] deviate from the volume production of
   > CRTs and LCDs.

25  > Taiwan is trying to enter TFT-LCD business because it has the advantage
   > of the large PC production.  To survive in this rapidly changing
26  > environment, we have to revise our previous strategies and redirect our
   > business plans.  It is time for fundamental shift for future decisions, time
27  > for transformation from volume driven to cost driven, time for driving
   > value added strategies.

28

*If we prepare now by shifting from the traditional business approach, to value added new approach, we may be able to deviate from repeating the 'crystal cycle' again.*

[Emphasis added.]

117.    Consistent with Samsung's effort to limit production, capacity restraints and the price-fixing agreement caused decreases in prices of TFT-LCD Products to slow and stop in late 1998.  The chart below depicts the short-lived price fall in 1998 caused by the entry of Korean competitors, as well as the rise and eventual stabilization of prices in the first quarter of 2000, as the new entrants joined the conspiracy.



**Average Selling Price of High-Volume LCD Monitors and Notebook LCDs**

*Source: DisplaySearch.*

### 3.    1999

118.    The efforts commenced by Samsung in 1998 continued to bear fruit.  In 1999, TFT-LCD Product prices surged during that year due to a claimed "massive undersupply."  This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

/ / /

DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. C07-1827 SI

27

119.    At the beginning of 1999, industry publications suggested that the Japanese and Korean manufacturers were going to have the opportunity to recoup previous years' losses:  "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink . . . ."

120.    By mid-1999, a Korean source was reporting: "[w]ith the supply shortage for TFT-LCD panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise."  The lack of supply and attendant price increases were pretextual reports to the market.

121.    Significantly, executives from both LG.Philips and Samsung announced in the same trade publication that they would raise prices and restrict production in 1999. The statements by Boch Kwon, Vice-President of LG.Philips's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, were juxtaposed as follows:

> LG LCD will raise prices across its entire TFT-LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize some time in the second half.  According to Samsung, demand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate.  This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said. The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

122.    Also in 1999, the three major TFT-LCD producers in Korea became two, when LG Electronics merged with Hyundai.  The year 1999 also saw an additional merger involving LG Electronics when that company created a joint venture with Philips that would be known as LG.Philips.

**4.    2000 - 2001**

123.    By January of 2000, prices for TFT-LCD Products were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics).  Taiwanese defendants began their entry into the market in

late 1999 and early 2000, by undercutting the collusively high prices of the other defendants to gain immediate market share.  However, by late 2001 to early 2002, the Taiwanese defendants had increased their market share to the point that it made sense to participate in the conspiracy, and they then moderated the volume of their production.

124.   Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

125.   Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices.  In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, which is comparable to the amount the industry spent in the previous three years combined.

126.   In October 2000, *The Korea Herald* reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

127.   Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of TFT-LCD panels stopped declining in mid-2001, and actually rose.  In late 2001, a senior official at LG.Philips stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand.  However, published data for 2001 showed that several defendants were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display (which later merged with AU Optronics) had a 52 percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply.  Again, defendants reacted to the price trough by conspiring to fix prices.

128.    The rise in prices made no economic sense at this point in time and was the product of defendants setting the price of TFT-LCD Products by agreement.  First, defendants were bringing new plants on line that utilized larger motherglass which was more cost effective.  Second, as reported by an industry source, the variable cost of producing TFT-LCDs was declining during the later part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic sense for defendants to not utilize their full capacity other than agreement by them not to do so.  The chart below compares the variable costs of production per square meter of motherglass with the price per square meter of finished TFT-LCDs during the same period.

### Price/m$^2$ and Cash Cost/m$^2$ Development for a Tier-1 Maker



Source: DisplaySearch, "TFT LCD Business Cycles and Trends".

### 5.    2002 - 2003

129.    Prices continued to rise from the second half of 2001 into the second half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion.

130.    By the second half of 2002, the cartel's success at propping up prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall. Such downward price trends are not inconsistent with a monopoly or cartel.  For example, the chart below depicts defendant Sharp steadily dropping the prices on 20-inch televisions during a two-year period when it was the only company making that product, and one of only two companies making any TFT-LCD televisions larger than 15.2 inches.

### Quarterly ASP by Manufacturer for 20.0" LCD TVs



131.    Throughout 2002, industry leaders shifted to fifth generation motherglass production technology.  According to officials at Samsung, "[t]he new fifth-generation facilities offer panels that are 11.5 times bigger in size than those of the first-generation production line, while production cost is 20 percent lower than the fourth-generation counterpart because of the decrease in number of necessary parts."

132.    Industry analysts took note of the unusual trends in the pricing of TFT-LCD Products.  In February 2004, CNET.com quoted an analyst from IDC, a market research firm, as saying that, "LCD is one of the few [markets] where things have actually gone up

1   in price."  As described in Section VIII below, defendants explained these prices increases

2   with false statements about market conditions in order to cover up the conspiracy.

3       133.    During five consecutive quarters in 2003 and 2004, TFT-LCD Product prices

4   rose significantly. AU Optronics reported that the price for certain of its TFT-LCD

5   Products increased 28 percent between the second quarter of 2003 and the second quarter

6   of 2004.  Similarly, LG.Philips reported that its pricing increased by 21 percent over the

7   same period.  This price increase can be seen in the chart at paragraph 117 entitled,

8   *Average Selling Price of High-Volume LCD Monitors and Notebook LCDs.*

9       134.    These soaring prices resulted in similar increases in the profits reaped by the

10  TFT-LCD Product manufacturers.  For example, the eight largest TFT-LCD Product

11  manufacturers reported a collective profit increase of 740 percent between the second

12  quarter of 2003 and the second quarter of 2004.  These record profits resulted from

13  defendants' collective action to fix, raise, maintain or stabilize the price of TFT-LCD

14  Products.  Again, the sharing of information about price and production, the under

15  utilization of capacity, and restraints of output drove up the prices of TFT-LCDs.

16      135.    Around this time, industry analysts suggested that there were too many

17  competitors in the TFT-LCD Product marketplace.  Some industry participants went as far

18  as overtly suggesting that the industry should seek to curtail supply through mergers.

19  These suggestions were carried out.  Significant consolidation and collaboration among

20  competitors in the TFT-LCD Product market occurred.

21      136.    While TFT-LCD Product prices were increasing in late 2003, AU Optronics,

22  Chi Mei, and HannStar decreased capacity utilization.

23      137.    As noted above, Toshiba Corporation and Matsushita Electric Industrial Co.,

24  Ltd. merged their TFT-LCD operations.  The joint venture announced plans to solicit

25  investment from other companies involved in the production of TFT-LCD panels,

26  including device manufacturers and material suppliers.  NEC formed an alliance with

27  Casio.  In addition, Taiwanese TFT-LCD manufacturers agreed to supply Matsushita

28  Electric Industrial Co., Ltd. with TFT-LCD panels for use in televisions.

138.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu Display Technology.

139.    Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of TFT-LCD panels.  In order to keep prices artificially high, defendants chose not to operate at full capacity nor take advantage of lower variable costs.

**6.      2004**

140.    Pursuant to defendants' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters.

141.    The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and began to decline in the second half of 2004.  During this period of time, the market for TFT-LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

142.    In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

143.    Consolidation and collaboration among and between competitors continued as Samsung and Sony launched their joint venture, named S-LCD Corp.

**7.      2005**

144.    Based on cartelized prices and the industry's need for next generation fabs, analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

/ / /

145.    By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant product, and the volume of 32-inch panels for televisions took off as well.  In 2005, 32-inch panels represented almost 27 percent of sales.

146.    Around this time, Samsung announced its intention to increase production of 40-inch TFT-LCD panels from 20,000 units in the second quarter to 150,000 units in the fourth quarter.  This increase included an immediate increase to 100,000 units the very next month.  Samsung's ability to immediately increase output so significantly demonstrates how quickly manufacturers could ramp up capacity and increase utilization.

147.    Analysts forecasted excess production capacity in 2005 because of large TFT-LCD plants from Samsung and LG.Philips being brought on line.  However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent.  The shortage came as a surprise to analysts.

148.    This shortage was the result of collusion among defendants.  Dr. Hui Hsiung, Executive Vice-President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for TFT-LCD Products:

> I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower.  And I think in the past we did have some problem convincing our competitors doing the same thing.  *But in recent months, especially this year, actually, it did start to happen.  I think that the industry understand[s] the benefit of keeping the capacity low.*  Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading.  And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs.  So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big. . So, we think the industry become more mature.  That is precisely what our competitors would do.

[Emphasis added.]

149.    Indeed, earlier that year, spokespersons for LG.Philips and Samsung had predicted the market stabilization that Dr. Hsiung subsequently acknowledged, thus indicating that those companies were among those with which AU Optronics had had discussions.

150.    A Samsung presentation from November of 2005 made by Sang-Wan Lee, the President of Samsung's TFT-LCD Products business, noted that it was possible to "secure a reasonable amount of profit while following the industry leaders."

**8.    2006**

151.    A temporary oversupply of TFT-LCD Products occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, defendants fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was reducing production of those products in order to avoid further price erosion.  He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers.  A June 13, 2006 article in *InfoWorld* noted that as a result of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

152.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict the output and increase the prices of TFT-LCD Products.  In May of 2006, in discussions between executives of the two companies, AU Optronics convinced Quanta Display, a company that it acquired in October of 2006, to reduce production of TFT-LCD Products.  By June of 2006, LG.Philips also announced plans to cut production of TFT-LCD Products.

153.    Despite the fact that certain of the defendants may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the conspiracy continued at least through the end of that year.  This carryover in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

/ / /

/ / /

/ / /

1  **E.      Convergence of Prices for Certain TFT-LCD Products**

2        154.    Defendants' TFT-LCD cartel evolved over time.  Defendants' initiated their

3  cartel when TFT-LCD Products were in their relative infancy.  At that time, defendants

4  balanced the desire to set prices collusively with the industry desire to establish their

5  products in the marketplace.  As the cartel matured, new entrants were assimilated, and

6  production costs declined.  At the same time, conspirators learned how they could best

7  mitigate the crystal cycle by collaborating on prices and output.

8        155.    The effect of the conspiracy can be seen both in the way prices followed

9  each other as depicted in the chart at paragraph 117, and also in the manner in which prices

10 for particular products converged as the conspiracy progressed.  The chart below, which

11 relates to 15-inch computer monitors, illustrates how the price dispersion amongst

12 defendants lessened as the conspiracy matured.

13

14        **Dispersion of Manufacturer ASPs for 15.0" LCD Monitors**



27 / / /

28 / / /

**F.     The Role of Trade Associations During the Conspiracy Period**

156.     The TFT-LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year.  These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for defendants to cooperate and discuss prices.

157.     One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar all belong.  Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the]whole display industry."  TILA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD affiliations to visit TTLA."  Thus, TTLA was not merely a trade association that provided an opportunity to conspire, it was a vehicle by which the conspiracy was effectuated and implemented.

158.     South Korean manufacturers, including LG.Philips and Samsung, had similar trade associations during the Class Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association).  EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

159.     Japanese manufacturers of TFT-LCD Products have a similar organization of their own.  The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of TFT-LCD Products.  Its members include Sharp, Toshiba, NEC, Hitachi, and a Japanese subsidiary of Samsung.  Like the KDIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire, it

1 || was a vehicle by which the conspiracy was effectuated and implemented.

2 ||       160.    In addition to these national trade associations, the Society for Information

3 || Display ("SID") put on multiple meetings each year that are attended by executives from

4 || all of the major producers.  One of these meetings had been known as the SID Symposium,

5 || but was renamed the "SID International Symposium and Business Conference."  SID also

6 || puts on a long-running conference called the International Display Research Conference

7 || ("IRDC").  These conferences are held at various locations around the world, and the

8 || IRDC conference moves in a three-year rotation between Asia, North America, and

9 || Europe.

10 ||       161.    The 2004 SID International Symposium and Business Conference ("SID

11 || 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen,

12 || President and CEO of AU Optronics.  This was followed shortly by a presentation entitled

13 || "The FPD Capital Equipment Investment Environment," which told the attendees about

14 || "investments planned at the major display manufacturers."  A representative of

15 || DisplaySearch also spoke about the LCD market.  There were presentations by analysts

16 || from iSuppli/Stanford Resources, and other industry experts.  This was all followed by a

17 || "networking reception – sponsored by LG.Philips LCD," to which all conference attendees

18 || were invited to participate.

19 ||       162.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU

20 || Optronics.  This time it was called "2005: Beyond the Crystal Gateway."  A DisplaySearch

21 || representative, again provided "the latest outlook for flat panel displays covering pricing,

22 || demand, and supply . . . and the cost and margin outlook for key FPDs will be projected."

23 || Again, these discussions about the market were followed by a "networking reception."

24 || Among the attendees at SID 2004 were Bruce Berkoff of LG.Philips, Jun Souk and Dong-

25 || Hun Lee of Samsung, H.B. Chen of AU Optronics, Larry Weber of Matsushita, and Joel

26 || Pollack of Sharp.  Senior executives from Sharp and Hitachi also attended.

27 ||       163.    The SID 2005 conference was very similar to SID 2004 but was even more

28 || blatant in its discussion of the crystal cycle.  Jun H. Souk, Executive Vice-President of

Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows: "By reviewing what happened during the business up and down cycles of the LCD in the past, we have learned lessons that will reduce the burden in future cycles.  Efforts made in cost reduction, line-investment timing, and new market generation will be described."

164.    SID 2005 provided a prime opportunity for one of the dominant manufacturers to describe the management of supply in the marketplace tied to "line-investment timing," to all of its key competitors.  Among the attendees at SID 2005 were Bruce Berkoff of LG.Philips and Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding development in LCD technology by officials from AU Optronics, Sharp, LG.Philips, Samsung, and Hitachi.

165.    The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005.  The initial conference was held in March of 2005 in Tokyo and the 2006 conference was held on February 28 - March 3, 2006 in Okinawa, Japan.

166.    Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators:

What people said about GFPC 2006

'The conference provided an excellent opportunity to exchange information and meet people from the global display industry.'

'GFPC 2006 proved to be a good forum overall for open information exchange and networking.'

'The roundtable discussion provided good opportunities to positively participate in the conference.'

'I enjoyed communicating and exchanging information with the conference attendees about the global FPD industry.'

'GFPC is an excellent venue for exchanging information and discussing ideas and opinions with other companies in the FPD industry.'

167.    Or, as Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the

1  supply chain and around the world . . . the GFPC plays a vital part in building those

2  connections and growing our business."

3       168.    Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung

4  of Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba

5  Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Matsushita, and Dr. Hui Hsiung

6  of AU Optronics.

7       169.    As indicated by the public pronouncements, these trade association meetings

8  facilitated the conspiracy by giving defendants further opportunities to discuss prices and

9  output.

10  **G.     International Antitrust Investigations**

11       170.    Defendants' conspiracy to restrict artificially the output of, and raise the

12  prices for, TFT-LCD Products sold in the United States during the Class Period, is

13  demonstrated by a multinational investigation commenced by the United States

14  Department of Justice ("DOJ") and others in late 2006.

15       171.    In December of 2006, authorities in Japan, Korea, the European Union, and

16  the United States revealed the existence of a comprehensive investigation into anti-

17  competitive activity among TFT-LCD manufacturers.  In a December 11, 2006 filing with

18  the Securities and Exchange Commission, defendant LG.Philips disclosed that officials

19  from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC")

20  had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena

21  to its San Jose office.

22       172.    On December 12, 2006, news reports indicated that in addition to

23  LG.Philips, defendants Samsung, Sharp, Epson, and AU Optronics were also under

24  investigation.  The JFTC stated that the probe was related to price-fixing.  On that same

25  date, the European Commission confirmed publicly that it as well was investigating the

26  possibility of a cartel agreement and price-fixing among manufacturers of TFT-LCD

27  Products.

28  / / /

173.    According to a news report from Bloomberg.com, a spokeswoman for the DOJ acknowledged that it was "investigating the possibility of anticompetitive practices" and cooperating with foreign authorities.

174.    In a contemporaneous news report in *The International Herald Tribune*, "Min Chun Hong, an analyst at Goodmorning Shinhan Securities, said that if the companies [Samsung and LG.Philips] were convicted, penalties could amount to about 200 billion won, or $216 million, each."

175.    Michael Min, an analyst at Korea Investment and Securities, was quoted by *The Washington Post* as saying that the investigation may be focused on a period over several years when manufacturers of TFT-LCD Products were charging comparable prices.

176.    Many of the named defendants have been implicated in other investigations of cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among manufacturers of dynamic random access memory ("DRAM") computer chips.  In addition, Samsung, Hitachi, and Toshiba have all acknowledged being contacted by the DOJ as part of an ongoing investigation into collusion among manufacturers of static random access memory ("SRAM") computer chips.  Most recently, the DOJ has commenced an investigation of Samsung, Toshiba, and Hitachi, among others, concerning collusion among manufacturers of NAND flash memory.

177.    The investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities.  In the DRAM case, for example, the DOJ's investigation resulted in multiple guilty pleas, jail time for industry executives, and over $700 million in criminal fines.  As the DOJ's representative told this Court at the September 19, 2007 hearing, the DOJ's investigation into the TFT-LCD industry is premised in part on insider information that presents a detailed "road map" of the conspiracy.  Plaintiffs hereby incorporate by reference the *in camera* submissions made by the DOJ to this Court that have been represented to explain the contours of this conspiracy. Given the information that the DOJ already has from insiders, the investigation is likely to

1   lead to criminal indictments and/or informations and resultant fines, just as occurred with

2   respect to manufacturers of DRAM.

3                              **VIII.  FRAUDULENT CONCEALMENT**

4            178.    Plaintiffs had neither actual or constructive knowledge of the facts

5   constituting their claim for relief despite diligence in trying to discover the pertinent facts.

6   Plaintiffs and members of the Class did not discover, and could not have discovered

7   through the exercise of reasonable diligence, the existence of the conspiracy alleged herein

8   until December 2006, when investigations by the DOJ and other antitrust regulators

9   became public.  Defendants engaged in a secret conspiracy that did not give rise to facts

10  that would put plaintiffs or the Class on inquiry notice that there was a conspiracy to fix

11  prices for LCDs.

12           179.    As alleged above, defendants had secret discussions about price and output.

13  Defendants agreed not to publicly discuss the nature of the scheme and gave pretextual

14  justifications for the inflated prices of LCDs in furtherance of the conspiracy.

15           180.    Defendants have used a variety of other purportedly market-based

16  explanations for price increases in order to conceal their conspiracy.  In 1999, Joel Pollack,

17  a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-

18  capitalization:

19           Prices have dropped at a steady rate over the past couple of years to the
             point where it was difficult to continue the necessary level of capitalization.
20           The [low prices] have starved the industry.

21           181.    Also, in early 1999, Omid Milani, a marketing manager for NEC, stated that

22  "demand by far is outstripping our supply capability" and predicted that "prices will

23  continue to increase until a reasonable balance is achieved."

24           182.    Another rationale for the steep price hikes of 1999 was offered by Yoon-

25  Woo Lee, CEO of Samsung.  He claimed that the demand for larger panels was reducing

26  the industry's capacity because each display ate up more square inches of motherglass

27  substrate.

28  ///

**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINT**
Master File No. C07-1827 SI                                                          42

183.    Also in 1999, Boch Kwon, Vice President of LG.Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division falsely reported that price increases were due to "acute" shortages.

184.    On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG.Philips was quoted by News.com as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."

185.    In the latter half of 2001, Koo Duk-Mo, an executive at LG.Philips, predicted a 10 to 15 percent price hike purportedly due to increased demand for the holiday season.

186.    Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the *Taiwan Economic News* in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

187.    These explanations were pretextual and served to cover up the conspiracy.  Later price increases were explained by industry leaders as coming from new demand for LCD televisions.  In 2005, Koo Duk-Mo of LG.Philips stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

188.    As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this Complaint.

## IX.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

189.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

190.    Beginning in at least January 1, 1996, the exact date being unknown to plaintiffs and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably

1  restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

2  by artificially reducing or eliminating competition in the United States.

3      191.    In particular, defendants have combined and conspired to raise, fix, maintain

4  or stabilize the prices of TFT-LCD Products sold in the United States.

5      192.    As a result of defendants' unlawful conduct, prices for TFT-LCD Products

6  were raised, fixed, maintained and stabilized in the United States.

7      193.    The contract, combination or conspiracy among defendants consisted of a

8  continuing agreement, understanding and concerted action among defendants and their co-

9  conspirators.

10      194.    For purposes of formulating and effectuating their contract, combination or

11  conspiracy, defendants and their co-conspirators did those things they contracted,

12  combined, or conspired to do, including:

13          a.    Participating in meetings and conversations to discuss the prices and

14              supply of TFT-LCD Products;

15          b.    Communicating in writing and orally to fix prices;

16          c.    Agreeing to manipulate prices and supply of TFT-LCD Products sold

17              in the United States in a manner that deprived direct purchasers of

18              free and open competition;

19          d.    Issuing price announcements and price quotations in accordance with

20              the agreements reached;

21          e.    Selling TFT-LCD Products to customers in the United States at non-

22              competitive prices; and

23          f.    Providing false statements to the public to explain increased prices for

24              TFT-LCD Products.

25      195.    As a result of defendants' unlawful conduct, plaintiffs and the other members

26  of the Class have been injured in their businesses and property in that they have paid more

27  for TFT-LCD Products than they otherwise would have paid in the absence of defendants'

28  unlawful conduct.

1

## X.    PRAYER FOR RELIEF

2    WHEREFORE, plaintiffs pray that the Court enter judgment on their behalf and on

3    behalf of the Class herein, adjudging and decreeing that:

4    A.    This action may proceed as a class action, with plaintiffs as the designated

5    Class representatives and their counsel as Class Counsel;

6    B.    Defendants have engaged in a contract, combination, and conspiracy in

7    violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiffs and the

8    members of the Class have been injured in their business and property as a result of

9    defendants' violations;

10    C.    Plaintiffs and the members of the Class recover damages sustained by them,

11    as provided by the federal antitrust laws, and that a joint and several judgment in favor of

12    plaintiffs and the Class be entered against the defendants in an amount to be trebled in

13    accordance with such laws;

14    D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees

15    and the respective officers, directors, partners, agents, and employees thereof and all other

16    persons acting or claiming to act on their behalf be permanently enjoined and restrained

17    from continuing and maintaining the combination, conspiracy, or agreement alleged

18    herein;

19    E.    Plaintiffs and members of the Class be awarded pre-judgment and post-

20    judgment interest, and that such interest be awarded at the highest legal rate from and after

21    the date of service of the initial complaint in this action;

22    F.    Plaintiffs and members of the Class recover their costs of this suit, including

23    reasonable attorneys' fees as provided by law; and

24    G.    Plaintiffs and members of the Class receive such other or further relief as

25    may be just and proper.

26    / / /

27    / / /

28    / / /

DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINT
Master File No. C07-1827 SI                                                              45

XII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  November 5, 2007                    By:    /s/ Bruce L. Simon
                                                   Bruce L. Simon
                                                   Gary S. Soter
                                                   Daniel L. Warshaw
                                                   Esther L. Klisura
                                                   Bobby Pouya
                                                   PEARSON, SIMON, SOTER,
                                                   WARSHAW & PENNY, LLP
                                                   44 Montgomery Street, Suite 1200
                                                   San Francisco, CA 94104
                                                   Telephone:   (415) 433-9000
                                                   Facsimile:   (415) 433-9008

                                                   *Interim Co-Lead Counsel for the Direct
                                                   Purchaser Plaintiffs and the Proposed
                                                   Class*

Dated:  November 5, 2007                    By:    /s/ Richard M. Heimann
                                                   Richard M. Heimann
                                                   Joseph R. Saveri
                                                   Eric B. Fastiff
                                                   Rebecca Bedwell-Coll
                                                   Nimish R. Desai
                                                   LIEFF, CABRASER, HEIMANN &
                                                   BERNSTEIN, LLP
                                                   275 Battery Street, 30th Floor
                                                   San Francisco, CA 94111-3339
                                                   Telephone:   (415) 956-1000
                                                   Facsimile:   (415) 956-1008

                                                   *Interim Co-Lead Counsel for the Direct
                                                   Purchaser Plaintiffs and the Proposed
                                                   Class*

Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this document has been obtained from Richard M. Heimann.

Daniel C. Girard
Elizabeth C. Pritzker
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:    (415) 981-4800
Facsimile:    (415) 981-4846

*Interim Liaison Counsel for the Direct
Purchaser Plaintiffs and the Proposed
Class*

H. Laddie Montague
Ruthanne Gordon
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:    (215) 875-3000
Facsimile:    (215) 875-4604

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
BERMAN DEVALERIO PEASE &
TABACCO, PC
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone:    (415) 433-3200
Facsimile:    (415) 433-6382

Manuel Juan Dominguez
BERMAN DEVALERIO PEASE &
TABACCO, PC
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Telephone:    (561) 835-9400
Facsimile:    (561) 835-0322

David Boies, III
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone:    (510) 874-1000
Facsimile:    (510) 874-1460

Anthony J. Bolognese
BOLOGNESE & ASSOCIATES, LLC
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Telephone:    (215) 814-6750
Facsimile:    (215) 814-6764

1

2

3

4

Michael P. Lehmann
COHEN, MILSTEIN, HAUSFELD &
TOLL, PLLC
One Embarcadero Center, Suite 526A
San Francisco, CA 94111
Telephone:    (415) 623-2047
Facsimile:    (415) 433-5994

5

6

7

8

Peter S. Pearlmann
Jeffrey W. Herrmann
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone:    (201) 845-9600
Facsimile:    (201) 845-9423

9

10

11

12

13

Steven A. Kanner
Douglas A. Millen
FREED KANNER LONDON & MILLEN
LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:    (224) 632-4500
Facsimile:    (224) 632-4519

14

15

16

Stephen M. Garcia
GARCIA LAW FIRM
One World Trade Center, Suite 1950
Long Beach, CA 90831
Telephone:    (562) 216-5270
Facsimile:    (562) 216-5271

17

18

19

20

Daniel R. Karon
GOLDMAN SCARLATO & KARON
101 W. Elm Street, Suite 360
Conschohocken, PA 19428
Telephone:    (484) 342-0700
Facsimile:    (484) 342-0701

21

22

23

24

Anthony D. Shapiro
George W. Sampson
HAGENS BERMAN SOBOL SHAPIRO
LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594

25

26

27

28

Kevin B. Love
HANZMAN, CRIDEN & LOVE, P.A.
7301 Southwest 57th Court, Suite 515
South Miami, FL 33143
Telephone:    (305) 357-9000
Facsimile:    (305) 357-9050

1
2
3
4

Vincent J. Esades
HEINS MILLS & OLSON PLC
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:   (612) 338-4605
Facsimile:   (612) 338-4692

5
6
7
8

Robert N. Kaplan
Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Telephone:   (212) 687-1980
Facsimile:   (212) 687-7714

9
10
11
12

Joseph C. Kohn
William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone:   (215) 238-1700
Facsimile:   (215) 238-1968

13
14
15
16

Howard J. Sedran
LEVIN FISHBEIN SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone:   (215) 592-1500
Facsimile:   (215) 592-4663

17
18
19
20

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:   (612) 339-6900
Facsimsile:   (612) 339-0981

21
22
23
24
25

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
Architects Building
117 South 17th Street, 22nd Floor
Philadelphia, PA 19103
Telephone:   (215) 564-5182
Facsimile:   (215) 569-0958

26
27
28

1
2
3
4

Harry Schulman
THE MILLS LAW FIRM
145 Marina Boulevard
San Rafael, CA 94901
Telephone:    (415) 455-1326
Facsimile:    (415) 455-1327

5
6
7
8

Christopher Moscone
James Quadra
MOSCONE, EMBLIDGE & QUADRA,
LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, CA 94104
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

9
10
11
12

Gregory L. Russell
PETERSON RUSSELL KELLY PLLC
1850 Skyline Tower
10900 NE Fourth Street
Bellevue, WA 98004-8341
Telephone:    (425) 462-4700
Facsimile:    (425) 451-0714

13
14
15
16
17

Garrett D. Blanchfield
REINHARDT WENDORF &
BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:    (651) 287-2100
Facsimile:    (651) 287-2103

18
19
20
21

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:    (415) 217-6810
Facsimile:    (415) 217-6813

22
23
24
25
26

P. John Brady
Daniel D. Owen
SHUGHART THOMSON & KILROY,
PC
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1600
Kansas City, MO 64105
Telephone:    (816) 421-3355
Facsimile:    (816) 374-0509

27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Eugene A. Spector
SPECTOR ROSEMAN & KODROFF PC
1818 Market Street, Suite 2500
Philadelphia, PA 19102
Telephone:    (215) 496-0300
Facsimile:     (215) 496-6611

*Counsel for Direct Purchaser Plaintiffs
and the Proposed Class*