1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    ALBERT J. BORO, JR. (CA Bar No. 126657)
2   albert.boro@pillsburylaw.com
    FUSAE NARA (*pro hac vice*)
3   fusae.nara@pillsburylaw.com
    TARA M. DESAUTELS (CA Bar No. 191336)
4   tara.desautels@pillsburylaw.com
    RYAN G. KRIGER (*pro hac vice*)
5   ryan.kriger@pillsburylaw.com
    50 Fremont Street
6   San Francisco, CA  94105
    Telephone: (415) 983-1000
7   Facsimile: (415) 983-1200

8   Attorneys for Defendants
    SHARP CORPORATION and
9   SHARP ELECTRONICS CORPORATION

10  **[Additional moving defendants and
    counsel listed on signature pages]**

11

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14

15  IN RE:  TFT-LCD (FLAT PANEL)          Master File No. M:07-1827 SI
    ANTITRUST LITIGATION                  MDL No. 1827
16

17
    This Document Relates To:
18                                        **DEFENDANTS' REPLY**
    ALL DIRECT ACTIONS                    **MEMORANDUM IN SUPPORT OF**
19                                        **JOINT MOTION TO DISMISS**
                                          **DIRECT PURCHASER PLAINTIFFS'**
20                                        **CONSOLIDATED COMPLAINT**

21                                        Date:      April 30, 2008
                                          Time:      2:00 p.m.
22                                        Place:     Courtroom 10, 19th Floor
                                          Judge      Hon. Susan Illston
23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

PAGE

3        INTRODUCTION .................................................................. 1

4        ARGUMENT ..................................................................... 2

5        I.      PLAINTIFFS MISCHARACTERIZE THE *TWOMBLY* PLEADING
                  STANDARD.                                                     2
6
         II.     PLAINTIFFS HAVE NOT ALLEGED FACTS PLAUSIBLY
7                 DEMONSTRATING AN ANTITRUST VIOLATION.                         6

8                A.      Plaintiffs Have Not Alleged Even Parallel Conduct. .................................... 6

9                B.      The Few "Evidentiary Facts" Alleged By Plaintiffs Fatally Undermine Their
                         Conspiracy Claim. .......................................................................................... 7
10
                 C.      Plaintiffs' Remaining Efforts To Save Their Claim Mischaracterize Both
11                       The Law And Their Own Allegations. ............................................................ 9

12       III.    *AGC* BARS CLAIMS BASED ON FINISHED PRODUCTS
                  CONTAINING TFT-LCD PANELS.                                   13
13
                 A.      Plaintiffs' Allegations of Antitrust Injury Based on Purchases of Finished
14                       Goods Are Entirely Conclusory. ................................................................. 13

15               B.      Plaintiffs Do Not Participate in the TFT-LCD Panel Markets. ................... 17

16               C.      Plaintiffs Fail to Satisfy the Other *AGC* Factors. ....................................... 19

17               D.      AGC Standing is Analytically Distinct from *Illinois Brick* and *Sugar*. ...... 20

18       IV.     The Statute of Limitations Bars Plaintiffs' Claims Before December
                  12, 2002, and Plaintiffs Fail To Meet the Requirements for Tolling.           22
19
         CONCLUSION .................................................................... 24
20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

**Cases**

4

5  *American Ad Mgmt., Inc. v. General Telephone Co. of California,*
190 F.3d 1051 (9th Cir. 1999)............................................................................... 15, 17, 19

6  *Assoc. Gen. Contractors v. California State Council of Carpenters,*
459 U.S. 519 (1983) .................................................................................................. 1, 13

7

8  *Bell Atlantic Corp. v. Twombly,*
127 S.Ct. 1955 (2007) ................................................................................................ passim

9  *Bhan v. NME Hospitals, Inc.,*
772 F.2d 1467 (9th Cir. 1985).................................................................................... 15, 17

10

11  *Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
182 F.3d 1096 (9th Cir. 1999).................................................................................... 16

12  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) .................................................................................................. 8, 9

13

14  *California v. ARC America Corp.,*
490 U.S. 93 (1989) .................................................................................................... 20

15  *Conley v. Gibson,*
355 U.S. 41 (1957). ................................................................................................... 2

16

17  *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,*
858 F.2d 499 (9th Cir. 1988)...................................................................................... 22, 23

18  *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.,*
854 F.2d 802 (6th Cir.1988)....................................................................................... 14

19

20  *Crouch v. Crompton Corp.,*
Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004). 19

21  *Dayco Corp. v. Goodyear Tire & Rubber Co.,*
523 F.2d 389 (6th Cir. 1975)...................................................................................... 23

22

23  *DM Research, Inc. v. College of American Pathologists,*
170 F.3d 53 (1st Cir. 1999) ........................................................................................ 14

24  *Flying J Inc. v. TA Operating Corp.,*
No. 1:06CV00030 TC, 2007 WL 3254765 (D. Utah Nov. 2, 2007).................................. 3

25

26  *Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design,*
244 F.3d 521 (6th Cir. 2001)...................................................................................... 14

27  *General Refractories Co. v. Stone Container Corp.,*
Nos. 98 C 3543, 98 C 4612, 98 C 4659, 1999 WL 14498, at *3 (N.D. Ill. Jan. 8, 1999) 21

28

*Glenn Holly Entm't Inc. v. Tektronix, Inc.*,
    343 F.3d 1000 (9th Cir. 2003) .......................................................................... 14, 15, 20

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ..................................................................................................... 20

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ..................................................................................... 12

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    782 F. Supp. 487 (C.D. Cal. 1992) .............................................................................. 24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    516 F.Supp.2d 1072 (N.D. Cal. 2007) ......................................................................... 16

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    No. M 02-21486 PJH, 2008 WL 281109 (N.D. Cal. Jan. 29, 2008) .............................. 18

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ............................................................................................. 4

*In re Graphic Processing Units Antitrust Litig.*,
    No. C 06-07417 WHA, 2007 WL 3342602 (N.D. Cal. Nov. 7, 2007) ("*GPU II*") ........... 5

*In re Graphics Processing Units Antitrust Litig.*,
    527 F.Supp.2d 1011 (N.D. Cal. 2007) ("*GPU I*") ............................................... 4, 5, 9, 12

*In re Hypodermic Products Antitrust Litig.*,
    No. 05-CV-1602, 2007 WL 1959225 (D.N.J. June 29, 2007) ......................................... 6

*In re Late Fee & Over-Time Limit Fee Litig.*,
    528 F.Supp.2d 953 (N.D. Cal. 2007) .......................................................................... 7, 9

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002) ......................................................................................... 21

*In re OSB Antitrust Litig*,
    06-CV-00826 (PSD) (E.D. Pa. Dec. 12, 2006) ............................................................... 6

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 6, 2007) ............................................... 5

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. M:07-cv-01819 CW, 2008 WL 426522 (N.D. Cal.  Feb. 14, 2008) ............ 2, 3, 9, 12

*In re Sugar Indus. Antitrust Litig.*,
    579 F.2d 13 (3d Cir. 1978) ........................................................................................... 21

*In re Tableware Antitrust Litig.*,
    363 F.Supp.2d 1203 (N.D. Cal. 2005) ......................................................................... 12

*Kendall v. Visa, U.S.A.*,
    No. 05-16549, 2008 WL 613924 (9th Cir. Mar. 7, 2008) ...................................... passim

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ........................................................................... 20

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ........................................................................... 16

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002 ............................................................................ 20

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
791 F.2d 1356 (9th Cir. 1986) ......................................................................... 17

*Ogle v. Salamatof Native Ass'n, Inc.*,
906 F.Supp. 1321 (D. Alaska 1995) ................................................................. 22

*Ostrofe v. H.S. Crocker Co., Inc.*,
740 F.2d 739 (9th Cir. 1984) ........................................................................... 17

*Paper Sys. v. Nippon Paper Indus. Co.*,
281 F.3d 629 (7th Cir. 2002) ........................................................................... 21

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
828 F.2d 211 (4th Cir. 1987) ........................................................................... 23

*Royal Printing Co. v. Kimberly Clark Corp.*,
621 F.2d 323 (9th Cir. 1980) ........................................................................... 21

*Rutledge v. Boston Woven Hose & Rubber Co.*,
576 F.2d 248 (9th Cir. 1978) ..................................................................... 23, 24

*Tessera v. Micron Technology*,
No. 2:05CV94, 2005 WL 1661106 (E.D. Tex. July 14, 2005) ....................... 18

*United Klans of America v. McGovern*,
621 F.2d 152 (5th Cir. 1980) ........................................................................... 23

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) ......................................................................... 23

*Weaver v. Cabot Corp.*,
No. 03 CVS 04760, 2004 WL 3406119 (N.C.Super.Ct. Mar. 26, 2004) ......... 16

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir.  2003) ................................................................ 8, 10

**Rules and Regulations**

Federal Rules of Civil Procedure
Rule 8 ............................................................................................................ 3, 6

Federal Rules of Civil Procedure
Rule 8(a) ........................................................................................................... 2

1

Federal Rules of Civil Procedure

Rule 8(a)(2) ................................................................................................................. 2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- iv -

**INTRODUCTION**

Direct Plaintiffs have failed to show why their consolidated complaint does not fail as a matter of law on numerous grounds. For the reasons set forth in Defendants' moving papers and reply briefs, the DP-CC should be dismissed.

*First*, Direct Plaintiffs' Opposition fails to demonstrate the DP-CC has alleged sufficient "evidentiary facts" to support the plausible inference of an antitrust conspiracy required by *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007), and the Ninth Circuit's recent decision in *Kendall v. Visa U.S.A., Inc.*, No. 05-16549, 2008 WL 613924 (9th Cir. Mar. 7, 2008). Plaintiffs do not dispute the DP-CC's conclusory assertions of "agreement" fail to provide "fair notice" of their claims, nor do they address that the DP-CC fails even to allege parallel conduct by Defendants. And although Plaintiffs now seek to disparage them as "counter facts," Plaintiffs do not seriously dispute the only "evidentiary facts" alleged by the DP-CC show only a normal pattern of competitive business cycles overlaying a deep drop in prices during a period of exploding demand. Finally, Plaintiffs recycle a few truncated public statements by a few Defendants and refer vaguely to certain government investigations, but the statements (made at the end of the putative eleven-year conspiracy) permit inferences equally, if not more, consistent with independent action, and the investigations are a "non-factor" in pleading an antitrust conspiracy under the settled law of this District.

*Second*, Direct Plaintiffs' conclusory allegations fail to establish standing under *Assoc. Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("AGC"). The purchasers of finished goods containing TFT-LCD panels are not participants in the allegedly restrained market for TFT-LCD panels, and the DP-CC's conclusory allegations of antitrust injury are insufficient as a matter of law for pleading standing. The other AGC factors also counsel against standing. Finally, Plaintiffs' reliance on *Illinois Brick* cases to argue the AGC standing issues is misguided.

*Third*, Direct Plaintiffs cannot evade the statute of limitations. A plaintiff on inquiry notice must have diligently investigated his or her claim to assert fraudulent

- 1 -

1  concealment and toll the statute of limitations.  The DP-CC relies on "facts" readily

2  available to Plaintiffs throughout the alleged class period and asserts that these "facts"

3  sufficiently state a claim under *Twombly* – it cannot also be true that the same publicly

4  available information failed to even arouse a suspicion to put Plaintiffs on inquiry notice.

5  Where the allegations upon which Plaintiffs rely were gleaned from public sources

6  available throughout the period at issue but Plaintiffs did nothing to investigate that

7  publicly available information, tolling must be denied as a matter of law.

8

9                                    **ARGUMENT**

10

11  **I.**      **PLAINTIFFS MISCHARACTERIZE THE *TWOMBLY* PLEADING**

12           **STANDARD.**

13           The DP-CC does not allege facts sufficient to satisfy the pleading standard for a

14  Section 1 conspiracy set forth in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007).

15  Plaintiffs do not deny the DP-CC fails to support its assertions of "agreement" with any

16  "evidentiary facts" necessary to provide "fair notice" of their claims.  Instead, plaintiffs

17  mischaracterize *Twombly* and the cases applying it in an apparent effort to minimize the

18  factual showing *Twombly*'s "plausibility" standard demands to support an inference of

19  illegal collusion.

20           *Kendall v. Visa* – which plaintiffs largely ignore – emphasizes *Twombly*'s

21  "plausibility" standard has two fundamental implications for pleading a section 1

22  conspiracy.  2008 WL 613924, at *3-*4.[1]  *First*, a plaintiff may no longer avoid dismissal

23  _____

24  [1]   *Kendall* also holds that "[a]t least for the purposes of adequate pleading in antitrust
       cases, [*Twombly*] specifically abrogated the usual 'notice pleading' rule, found in
25     Rule 8(a)(2)" and *Conley v. Gibson*, 355 U.S. 41 (1957).  *Id.* at *8 n.5 (quoting
       *Twombly*, 127 S.Ct. at 1964).  Accordingly, *Kendall* necessarily limits reliance on Judge
26     Wilken's recent *SRAM* ruling, decided before *Kendall* and without its guidance.  *See In
       re Static Random Access Memory (SRAM) Antitrust Litig.*, No. M:07-cv-01819 CW,
27     2008 WL 426522, at *3 (N.D. Cal.  Feb. 14, 2008) (citing Fed. R. Civ. P. 8(a) as
       standard).

28

1  by alleging "ultimate facts," such as "'conspiracy,' or even 'agreement,'" but must "plead

2  the necessary *evidentiary* facts to support those conclusions." *Id.* at *3. Thus, if a Section

3  1 claim rests on an allegation of the "ultimate fact" of agreement, the complaint must allege

4  sufficient "evidentiary facts" to "answer the basic questions:  who, did what, to whom (or

5  with whom), where, and when?" *Id.* at *3-*4;  MTD DP-CC at 9 & n.7 (citing cases).

6      *Second*, where a plaintiff asserts a Section 1 conspiracy by alleging parallel conduct

7  and other circumstantial evidence, *Twombly* requires a court both to ask whether those

8  allegations allow competing inferences equally suggestive of collusion or independent

9  action, and – despite plaintiffs' argument to the contrary – to resolve ambiguities in

10  *defendant's* favor. *Kendall*, 2008 WL 613924, at *5.  *Kendall* holds that "[a]llegations of

11  facts that could just as easily suggest rational, legal business behavior by the defendants as

12  they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust

13  laws." *Id.* (citing *Twombly*, 127 S.Ct. at 1964-66 & n.5).  Accordingly, a court must ask

14  whether there is "an obvious alternative explanation" other than collusion for the alleged

15  conduct. *Twombly*, 127 S.Ct. at 1972.[2]

16      Plaintiffs try to deflect *Twombly* and *Kendall* by suggesting neither involved

17  "classic Section One allegations."  Dir. Opp. at 14.  But *Twombly*, 127 S.Ct. at 1963,

18  involved an alleged horizontal agreement to allocate customers and markets, and *Kendall*,

19  2008 WL 613924 at *4, an agreement to set prices, both "long … recognized as [] classic

20  *per se* violation[s]."  *Twombly*, 127 S.Ct. at 1974 (Stevens, J. dissenting).  Plaintiffs also

21  incorrectly claim the *Twombly* complaint offered only "bare-bone conclusory allegations of

22  parallel conduct."  Dir. Opp. at 5.  But as explained (MTD DP-CC at 5-7), that complaint

23  included detailed factual allegations demonstrating "parallel conduct unfavorable to

24  _____

[2]  Citing *Flying J Inc. v. TA Operating Corp.*, No. 1:06CV00030 TC, 2007 WL 3254765,
25  at *1 (D. Utah Nov. 2, 2007) and *SRAM*, 2008 WL 426522 at *4, Plaintiffs erroneously
    argue that "under Rule 8, all competing inferences must be drawn in a plaintiff's favor"
26  (Dir. Opp. at 20), but neither case involved merely circumstantial allegations that only
    supported equal inferences of either collusion or independent action.  Unlike here, both
27  included detailed allegations of parallel conduct plus explicit allegations of direct
    communications between competitors specifically regarding the alleged conspiracy.

28

1    competition." *Twombly*, 127 S.Ct. at 1961.  The Supreme Court found the complaint

2    lacking not because plaintiffs offered only conclusory allegations of parallel conduct, but

3    because the many detailed factual allegations (as opposed to assertions of "ultimate facts"

4    or conclusions) showed *only* parallel conduct and failed to provide further "factual context

5    suggesting agreement." *Twombly*, 127 S.Ct. at 1961.

6         Plaintiffs also fail to distinguish Defendants' cases applying *Twombly* to dismiss

7    Section 1 claims based on more extensive factual allegations than plaintiffs allege here.  *See*

8    MTD DP-CC at 7-8.  For example, plaintiffs argue the *In re Elevator Antitrust Litig*., 502

9    F.3d 47 (2d Cir. 2007), complaint contained only "conclusory averments of a conspiracy"

10    (Dir. Opp. at 7), but that complaint included allegations far more detailed and consistent

11    with the purported conspiracy than any plaintiffs offer here.[3]  As in *Twombly,* the Second

12    Circuit affirmed dismissal because the factual allegations purporting directly to show

13    agreement were insufficiently specific as to each defendant, *In re Elevator Antitrust Litig*.,

14    502 F.3d at 50-51, and the substantial allegations of circumstantial evidence were no more

15    suggestive of collusion than independent action, *id.* at 51.

16         Nor can plaintiffs distinguish *In re Graphics Processing Units Antitrust Litig.*, 527

17    F.Supp.2d 1011 (N.D. Cal. 2007) ("*GPU I*") by noting the amended complaint survived in

18    *In re Graphic Processing Units Antitrust Litig.*, No. C 06-07417 WHA, 2007 WL 3342602,

19

---

20   [3]  The *Elevator* complaint alleged, *inter alia*, (i) agreements to fix price, allocate markets,
and rig bids; (ii) specific meetings in Europe and the United States to discuss prices for
21   elevators and maintenance contracts; (iii) agreements made at such meetings; (iv)
exchanges of specific price quotations and other competitive information; (v) a highly
22   concentrated industry where four defendants held 75% of the market; (vi) a historically
close-knit industry where many top executives had personal ties and frequently attended
23   the same "industry, trade association, and social functions," enabling exchanges of
information; (vii) adoption of "standardized industry practices" facilitating collusion,
24   including "standard price lists and contracts" using "similar, if not identical, language
and terms"; (viii) "proprietary diagnostic and service tools" and individualized designs
25   that locked-in allocated customers; (ix) use of "nominally independent names" by
defendants' subsidiaries to conceal their affiliations from allocated customers; and (x)
26   antitrust investigations by the European Commission and Italian Antitrust Authority
resulting in fines of nearly EUR 10 million for same anticompetitive conduct.  *See*
27   Second Cons. Am. Compl., *In re Elevator Antitrust Litig.*, 04-CV-01178 at ¶¶ 41-70
(TPG) (Jul. 19, 2005).

28

1   at *7-*9 (N.D. Cal. Nov. 7, 2007) ("*GPU II*").  *See* Dir. Opp. at 7.  A comparison of the

2   cases is instructive.  In *GPU I*, plaintiffs alleged defendants restrained trade in a duopoly by

3   coordinating releases of new products over a four-year period.  *GPU I*, 527 F.Supp.2d at

4   1021-22.  As here, the plaintiffs argued they had shown a "historically unprecedented"

5   change in "pricing structure" that allegedly only collusion could explain, which the court

6   rejected in part because the complaint – again, as here – contained "scant allegations of

7   pricing behavior that came *before* the alleged conspiracy" that would demonstrate such

8   changes.  *Id.* at 1022 (quoting *Twombly*, 127 S.Ct. at 1965 n.4).  Although Judge Alsup did

9   not dismiss the amended complaint in *GPU II*, plaintiffs had alleged extensive new facts

10  showing, among other things, (i) a lack of *any* coordination in the release of products in the

11  six years before the alleged conspiracy *and* after it ended, and (ii) despite having struggled

12  previously to make profits, defendants' "profit margins grew considerably" during the

13  alleged collusion. *GPU II*, 2007 WL 3342602, at *7-*9.  By contrast, the DP-CC alleges *no*

14  "evidentiary facts" about pricing or output decisions *before* or *after* (and virtually none

15  during) the purported conspiracy, much less facts "plausibly" showing "complex and

16  historically unprecedented changes in pricing structure made at the very same time by

17  multiple competitors."  *GPU II*, 2007 WL 3342602, at *5 (quoting *Twombly*, 127 S.Ct. at

18  1965 n.4).

19      Plaintiffs' cases further highlight the deficiencies in the DP-CC.  (Dir. Opp. at 6.)

20  For example, the complaint in *In re OSB Antitrust Litig*., No. 06-826, 2007 WL 2253419

21  (E.D. Pa. Aug. 6, 2007), alleged detailed and extensive "evidentiary facts" showing similar

22  "complex and historically unprecedented changes in pricing structure" explainable only by

23  collusion.  *GPU II*, 2007 WL 3342602, at *8 (quoting *Twombly*, 127 S.Ct. at 1965 n.4).

24  The *OSB* complaint included specific allegations showing, (i) after prices for oriented

25  strand board ("OSB") fell 40% from 1999 to 2002 to a ten-year low, (ii) they increased

26  nearly 300% during the first nine months of 2003 and remained similarly inflated during

27  four-year conspiracy, even though (iii) OSB cost and demand indices, which both had

28  moved in sync with the price index for the *ten years* before the conspiracy, remained

1    relatively flat.  Second Cons. Am. Compl., *In re OSB Antitrust Litig*, 06-CV-00826 (PSD),

2    ¶¶ 3, 41, 47, 59 fig. 1, 94 fig. 4 (E.D. Pa. Dec. 12, 2006).[4]

3    **II.      PLAINTIFFS HAVE NOT ALLEGED FACTS PLAUSIBLY**

4             **DEMONSTRATING AN ANTITRUST VIOLATION.**

5             Plaintiffs do not seriously dispute the repeated assertions of the "ultimate fact" of an

6    "agreement" sprinkled throughout the DP-CC lack sufficient "evidentiary facts" to provide

7    the required "fair notice" of their claims.  *Kendall*, 2008 WL 613924, at *8 n.5.  Instead,

8    plaintiffs argue only that their claims survive because the DP-CC purportedly alleges

9    "parallel conduct plus some small measure of additional facts that supports a 'plausible'

10   inference of concerted activity" adequate "to satisfy Rule 8."  Dir. Opp. at 8.  But plaintiffs

11   nowhere address that (i) the DP-CC fails to allege even parallel conduct, or (ii) the only

12   "evidentiary facts" alleged show only a normal pattern of competitive business cycles

13   completely consistent with competition.  Moreover, none of the "other facts" plaintiffs cite

14   supports a "plausible" inference of conspiracy.

15             **A.      Plaintiffs Have Not Alleged Even Parallel Conduct.**

16            Plaintiffs do not dispute the DP-CC relies almost entirely on *average* prices across

17   markets for medium and large panels, and the only specific allegations of non-average

18   pricing information show significant variation.  MTD DP-CC at 11.  Plaintiffs also do not

19   dispute the DP-CC alleges no lockstep behavior by Defendants regarding production

20   capacity or supply of any TFT-LCD panels.  Instead, plaintiffs mischaracterize Defendants'

21   Motion as attacking the DP-CC solely because it alleges *only* parallel conduct.  Dir. Opp. at

22   4, 18.  But misstating Defendants' position does not eliminate plaintiffs' obligation to plead

23

24   ─────────────────

     [4]   Plaintiffs also cite *In re Hypodermic Products Antitrust Litig.*, No. 05-CV-1602, 2007
25   WL 1959225 (D.N.J. June 29, 2007) (Dir. Opp. at 6), but that case does not involve any
     inference of a purported horizontal conspiracy among competitors from alleged parallel
26   conduct.  Instead, the complaint alleged a *vertical* conspiracy in which a manufacturer,
     *inter alia*, entered into exclusionary contracts with downstream dealers  *Id.* at *1-*5.
27   Notably, the defendant did not even challenge the existence of an agreement in moving
     to dismiss.  *Id.* at *6.
28

1   sufficient "evidentiary facts which if true, will prove" their § 1 conspiracy claim.  *Kendall*,

2   2008 WL 613924, at *3.

3        Asking plaintiffs – who claim to be "direct purchasers" – to plead the minimum

4   parallel conduct on which they purport to base their claims – *e.g.,* the prices they allegedly

5   paid – does not ask them "to do the impossible."  Dir. Opp. at 8.  Indeed, if plaintiffs were

6   actual direct purchasers of *any* panels, they should have actual transaction (and bid and ask)

7   information for the full range of panels purchased  (and not merely "average prices" for a

8   few panel models for a limited time period).  Plaintiffs' failure to allege even parallel

9   conduct is fatal to their claims.  *See In re Late Fee & Over-Time Limit Fee Litig.*, 528

10  F.Supp.2d 953, 962-63 (N.D. Cal. 2007) (dismissing where some defendants allegedly

11  followed similar pricing, but others did not).

12       **B.      The Few "Evidentiary Facts" Alleged By Plaintiffs Fatally Undermine**

13              **Their Conspiracy Claim.**

14       Using *Kendall*'s terminology, plaintiffs have built their Section 1 conspiracy claim

15  almost exclusively from bald assertions of "ultimate facts, such as conspiracy, and legal

16  conclusions," but have "failed to plead the necessary evidentiary facts to support those

17  conclusions."  2008 WL 613924, at *3.  For example, Plaintiffs twice recite the conclusory

18  assertion that panel markets experienced "unnatural and sustained price stability" and

19  "increases in prices" (Dir. Opp. at 8, 15-16 (quoting DP-CC ¶ 107)), and urge the Court to

20  accept these "ultimate facts" at face value.  But doing so would ignore both the absence of

21  any alleged "evidentiary facts" actually supporting plaintiffs' claim, *and* the "evidentiary

22  facts" the DP-CC actually does allege, which directly contradict it.

23       Plaintiffs never seriously dispute that the DP-CC's factual allegations undercut their

24  core conclusory assertions of "sustained price stability" and "increases in price."  As

25  Defendants have explained, the only "evidentiary facts" alleged demonstrate prices dropped

26  dramatically throughout the putative class period even though demand for panels grew

27  exponentially and the industry experienced continuous innovation.  MTD DP-CC at 11-18.

28  Similarly, although Plaintiffs repeat the conclusory statement that the alleged conspiracy

1   "mitigated" the "natural business cycles" (Dir. Opp. at 18), their own alleged "evidentiary

2   facts" again demonstrate the opposite – *i.e.*, a consistent pattern of normal, competitive

3   business cycles where periods of oversupply and steep price decline alternate with shorter

4   intervals when demand increases, supply tightens, and prices flatten or briefly rise (MTD

5   DP-CC at 11-18).  Although plaintiffs now disparage their allegations as "counter-facts"

6   (Dir. Opp. at 18), and complain they are inconsistent with the DP-CC's conclusory

7   assertions (*id.* at 15-16), they cannot disown them.

8        Nor can Plaintiffs avoid these facts by making unsupported and incorrect statements

9   of economic theory.  For example, Plaintiffs incorrectly argue the chart following paragraph

10   128 of the DP-CC "*supports* the existence of a conspiracy" (Dir. Opp. at 17), despite

11   showing a steady fall in price per square meter of panels from approximately $8,600 in

12   2000 to about $2,100 in early 2005.  DP-CC ¶ 128.  Plaintiffs complain that price and cost

13   do not rigidly track each other in lockstep for the entire five years of data the chart displays,

14   and assert without support that "one would expect price … and cost … to move in sync"

15   absent collusion.  Dir. Opp. at 17.  The data they allege includes no information about

16   demand, but purports only to be a crude average across all panel models and thus says

17   nothing about price-cost relationships for any particular panel model.

18        Moreover, the premise is fundamentally flawed because Plaintiffs' own allegations

19   suggest many "obvious alternative explanation[s]" consistent with lawful competition why

20   panel price and cost might diverge.  For example, it is undisputed that demand grew

21   substantially (*see* MTD DP-CC at 12 (noting panel market grew more than 1200% from

22   2001 to 2005), and where "output is expanding at the same time prices are increasing, rising

23   prices are equally consistent with growing product demand." *Brooke Group Ltd. v. Brown*

24   *& Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).  Moreover, particularly in the

25   context here where Plaintiffs have alleged a highly-concentrated, interdependent industry

26   (DP-CC ¶¶ 87-89), that price and cost diverge may reflect the "rational recognition that the

27   market structure . . . will most easily yield profits by means other than price competition."

28   *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003).  Indeed,

1   "oligopolistic price coordination or conscious parallelism" is a lawful and "common

2   reaction of firms in a concentrated market" in which they "set their prices at a profit-

3   maximizing, supracompetitive level by recognizing their shared economic interests and

4   their interdependence with respect to price and output decisions." *Brooke Group*, 509 U.S.

5   at 227; *see also In re Late Fee*, 528 F. Supp. 2d at 964.

6        **C.**    **Plaintiffs' Remaining Efforts To Save Their Claim Mischaracterize**

7               **Both The Law And Their Own Allegations.**

8       Finally, Plaintiffs' attempt to save their conclusory allegations of conspiracy by

9   combining purported factual allegations of parallel conduct not actually pled in the DP-CC

10   with various other factors, which together they argue tend to show collusion as distinct

11   from independent action.  Plaintiffs in *Twombly* and other cases have made similar

12   arguments to no avail, *see In re Late Fee*, 528 F.Supp.2d at 963, and plaintiffs are no more

13   successful here.

14       *First*, citing *SRAM*, Plaintiffs argue the DP-CC alleges "defendants exchanged

15   numerous types of sensitive competitive information, including information on price."  Dir.

16   Opp. at 11 (citing DP-CC ¶¶ 90-91, 156-69, 194.)  But none of the cited paragraphs contain

17   allegations even remotely comparable to those in *SRAM*, 2008 WL 426522, at *4-*5, where

18   the complaint included "specific allegations of communications" between competitors

19   regarding the subject of the alleged conspiracy.  And while the paragraphs contain general

20   allegations about various trade associations and "interrelated business ventures," such

21   conclusory facts do not support any inference of collusion here.  *GPU I*, 527 F.Supp.2d at

22   1023 ("Attendance at industry trade shows and events is presumed legitimate."); *see also*

23   *Twombly*, 127 S.Ct. at 1966, 1971 n.12.

24       *Second*, Plaintiffs argue the DP-CC's allegations of "a concentrated market"

25   demonstrate an industry "conducive to cartel activity," but *Twombly* itself held such

26   allegations of an oligopolistic structure no more indicative of collusion than independent

27   action.  *See* , 127 S.Ct. at 1964-66.  In fact, taken as a whole the DP-CC's allegations of

28   market structure undermine any inference of collusion because they show a hallmark of

1   vigorous competition:  rapidly and consistently changing market shares.  *See Williamson*

2   *Oil*, 346 F.3d at 1318 ("significant market share shifts during this period of alleged

3   industry-wide collusion strongly undermines appellants' conspiracy allegations").  Here,

4   three of the top six current manufacturers of TFT-LCD panels – AUO, CMO, and

5   Chunghwa Picture Tubes Ltd. – did not participate in the panel markets until more than

6   halfway through the putative class period, and of the two dominant manufacturers before

7   the period, only one (Sharp) remains among the top five, and it is fifth.  DP-CC ¶ 89.

8        In responding, Plaintiffs again resort to unsupported statements of economic theory.

9   Plaintiffs erroneously assert "the entry of the Korean and Taiwanese firms into the TFT-

10   LCD industry may have increased industry capacity says nothing to diminish the

11   plausibility of the cartel, and in fact, is consistent with it."  Dir. Opp. at 19.  But the

12   statement is contradicted by Plaintiffs' own allegations, which admit the new entrants cut

13   prices and competed to gain market share.  *See*, *e.g.*, DP-CC ¶¶ 104, 123.  Moreover,

14   barriers to entry, and the ability to control output (and thereby price), notably absent here,

15   are the *sine qua non* of any functional cartel.

16        *Third*, Plaintiffs mischaracterize excerpts from a few public statements, and wrongly

17   assert the Court may not consider any alternate interpretation. Dir. Opp. 9-11, 19-22.  But

18   *Twombly* itself rejected a "truncated" quote as indicative of collusion where the complete

19   statement equally suggested independent action.  127 S.Ct. at 1972 n.13.  For example,

20   plaintiffs claim a 1998 Samsung presentation constituted an effort "to obtain agreement of

21   competitors to limit production capacity" and publicly "communicat[e] … price changes."

22   Dir. Opp. 9, 20.  But the presentation at most encouraged more vigorous and smarter

23   competition by Korean manufacturers during a broader economic downturn, and in the face

24   of fierce competition from new entrants (Taiwanese firms), by targeting "value added

25   technologies."

26        Plaintiffs also twice recycle the same misleading excerpts purportedly made by an

27   AUO executive in late 2005 and mid-2006, virtually at the end of a purported eleven-year

28   conspiracy.  *See* Dir. Opp. at 9-10, 21-22.  Plaintiffs take the first from a transcript of an

1    earnings call where the Taiwanese executive responds in English to an analyst's follow-up

2    "hypothetical question" about the risk of excess inventory that could result from AUO's

3    decision to "continue to *add* to capacity."  The executive explained AUO had forecasted

4    continued demand growth,  but added (i) AUO had always sought better controls on

5    inventory build up (*i.e.*, days item sits on shelf) to avoid significant oversupply, (ii) he

6    believed the industry would be stronger if other manufacturers would "do[] the same thing,"

7    and (iii) only "in recent months," he had observed that some manufactures had begun to

8    adopt a similar approach.  Plaintiffs argue the Court may interpret this exchange only as

9    "inviting cartel members to agree, or to continue to agree, to reduce capacity or increase

10   price" (Dir. Opp. at 21), but even if that were a permissible inference (and it is not), doing

11   so would ignore other equally, if not more, tenable explanations.  Indeed, the executive's

12   responses are merely an off-the-cuff attempt to address an analyst's persistent doubts about

13   AUO's decision in late 2006 to invest in additional capacity, and do not invite improper

14   collusion.[5]

15          The second "statement" is taken from several articles that paraphrase comments by

16   the same AUO executive at a May 2006 conference where he discussed the impact on

17   industry of excess inventory unwarranted by demand.  One of the articles adds significant

18   context missing from the DP-CC by reporting (i) "prices for TFT-LCD panels" had

19   "dropped sharply . . .  to almost the *same* levels as production costs" in 2006 – the final year

20   of the purported conspiracy – and (ii) global production of panels had increased by "82

21   percent" in 2005 over the prior year and was expected "to shoot up" by another "43

22   percent" in 2006.  LCD Direct 00018.  The AUO executive further acknowledged that panel

23   manufacturers historically had failed "to reduce their capacity utilization rates" even in

24   periods of "oversupply."  While Plaintiffs contend the Court must take the truncated excerpt

25

---

26   [5]   At most, the observation that other manufacturers had also begun to control excess
      inventory indicates only parallel conduct, which would be an expected and entirely
27   lawful development in a maturing, concentrated industry like plaintiffs allege here.  *See
      Twombly*, 127 S.Ct. at 1964.
28

1    only as evidence of "securing, evidencing and bragging about agreements to restrict

2    capacity," just as in *Twombly*, 127 S.Ct. at 1973 n.13, the statements and articles considered

3    in full strongly support other inferences.[6]

4         *Fifth*, Plaintiffs make a final effort to avoid dismissal by pointing repeatedly to

5    government investigations of the TFT-LCD and other technology industries, and incorrectly

6    claiming that the mere "existence" of such investigations constitutes "a significant

7    allegation at the pleadings stage." Dir. Opp. at 13-14. But the law in this District is to the

8    contrary. As Judge Wilken recently held, "the existence of [a government] investigation

9    does not support Plaintiffs' antitrust conspiracy." *SRAM*, 2008 WL 426522, at *5-6; *see*

10   *also* MTD DP-CC at 22-23 (discussing cases). Moreover, that the government has also

11   convened "a grand jury," and sought a stay of discovery to protect the secrecy of those

12   proceedings makes no difference.

13        It is unknown whether the investigation will result in
          indictments or nothing at all. Because of the grand jury's
14        secrecy requirement, the scope of the investigation is pure
          speculation. . . .The grand jury investigation is a non-factor.

15

16   *GPU I*, 527 F.Supp.2d at 1024; *see also SRAM*, 2008 WL 426522, at *5-*6 (same).[7]

17

18   _____

19   [6]  Plaintiffs argue that the executive's comments persuaded CMO and Quanta Display to
         cut capacity. Dir. Opp. at 10 (quoting DP-CC ¶¶ 151-52). But the article on which the
20       DP-CC relies makes clear the CMO spokesman responded only that CMO might reduce
         capacity utilization, but only "if the demand sagged" and other manufacturers had taken
21       "similar steps." Such a "follow-the-leader" strategy (even if implemented) does not
         support an inference of conspiracy. *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th
22       Cir. 1999); *see also* MTD DP-CC at 20 n.17 (citing cases). And the allegation that, in
         the context of merger discussions, AUO convinced Quanta to adopt similar inventory a
23       few months before that merger closed hardly supports an inference of an industry-wide
         cartel predating that merger by eleven years.

24   [7]  Plaintiffs' reliance on *In re Tableware Antitrust Litig.*, 363 F.Supp.2d 1203 (N.D. Cal.
         2005), is misplaced. (*See* Dir. Opp. at 13.) While Chief Judge Walker acknowledges
25       that a plaintiff "may surely rely on governmental investigations" to reveal and develop
         facts to support his or her claim, *Tableware* makes clear that an investigation, or even an
26       "out-of-court settlement" with the government, are not themselves allegations that
         independently would support any claim to relief. *Tableware*, 363 F.Supp.2d at 1205
27       (plaintiff must "undertake his own reasonable inquiry and frame his complaint with
         allegations of his own design").

28

1    Claiming "unusual circumstances," Plaintiffs ask the Court to ignore these recent

2    decisions, and consider information submitted *in camera* by the government "in

3    determining whether *plaintiffs* have alleged sufficient facts" to state a claim.  But Plaintiffs

4    cite no authority to support this extraordinary request, and the Court should reject it.

5    Neither Plaintiffs nor Defendants know the contents of the governments' confidential

6    submission.  Neither knows what parties, conduct, and time period, if any, it describes, or

7    whether the submission includes allegations of any facts that would support any particular

8    claim or defense of any particular plaintiff or defendant.  Claims simply cannot be litigated

9    on the basis of allegations not pleaded, and of which neither party has any knowledge;

10   plaintiffs would not know what to prove, and defendants what to answer.

11   **III.   *AGC* BARS CLAIMS BASED ON FINISHED PRODUCTS CONTAINING**

12   **TFT-LCD PANELS.**

13   Those so-called "Direct" Plaintiffs who purchased only a finished product

14   containing a TFT-LCD panel lack antitrust standing under *Assoc. Gen. Contractors v.*

15   *California State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC*").  Plaintiffs' claims

16   are based on an alleged price-fixing conspiracy among manufacturers of TFT-LCD panels.

17   Accordingly, whether they purchased finished products with LCD screens (e.g., TVs or cell

18   phones) from an affiliate of any such panel manufacturer or from an unrelated company,

19   they cannot satisfy the requirements of AGC.

20   **A.    Plaintiffs' Allegations of Antitrust Injury Based on Purchases of**

21   **Finished Goods Are Entirely Conclusory.**

22   The DP-CC's claims on behalf of purchasers of finished goods must be dismissed

23   for failure to allege antitrust injury in anything but the most conclusory terms.[8]  But

24   conclusory allegations of injury cannot withstand a motion to dismiss.  *See Glenn Holly*

25   _____

26   [8]   Direct Plaintiffs do not dispute that, based on the DP-CC and court filings, at least four named plaintiffs – Andy Ciaccio d/b/a Art's TV & Appliance, CMP Consulting Services, Inc., Nathan Muchnick, Inc., and Weber's World Company – only bought

27   finished products containing TFT-LCD screens and not raw TFT-LCD panels or modules.  MTD DP-CC at 29-30.

28

1   *Entm't Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1007 (9th Cir. 2003) ("plaintiff must

2   adequately allege and eventually prove 'antitrust *injury*.'") (emphasis in original);

3   *Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244

4   F.3d 521, 530 (6th Cir. 2001) ("a private antitrust claim must be alleged in more than vague

5   and conclusory terms to prevent dismissal of the complaint"); *Crane & Shovel Sales Corp.*

6   *v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988) (same).  "[W]hile the plaintiff's

7   'facts' must be accepted as alleged, this does not automatically extend to bald assertions,

8   subjective characterizations and legal conclusions; further, . . . 'the factual allegations must

9   be specific enough to justify dragging a defendant past the pleading threshold.'"  *DM*

10  *Research, Inc. v. College of American Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999)

11  (citations omitted) (affirming dismissal of Section 1 action for failure to state a claim

12  because the conspiracy alleged in the complaint was conclusory and implausible).  Indeed,

13  *AGC* itself recognized the importance of "insist[ing] upon some specificity in pleading

14  before allowing a potentially massive factual controversy to proceed."  459 U.S. at 528

15  n.17.

16      First, Plaintiffs in their Opposition point only to a few paragraphs in the DP-CC, but

17  none contain any non-conclusory allegations that would support a plausible inference of

18  antitrust injury for purchasers of finished goods.  *See Twombly*, 127 S. Ct. at 1964-65

19  (plaintiff must allege more than "labels and conclusions").  Plaintiffs cite paragraph 4, Dir.

20  Opp. at 30, but it alleges only, "[a]s a result of defendants' unlawful conduct, plaintiffs and

21  members of the Class paid higher prices for TFT-LCD Products than what they would have

22  paid in a competitive market."  Plaintiffs also cite paragraphs 9 through 20, Dir. Opp. at 35,

23  but they likewise contain the same vague and conclusory assertions[9] that simply do not pass

24  muster under *AGC, Twombly*, and other recent cases.

25

26  _____

27  [9]   They each state a boilerplate conclusion that each named plaintiff "purchased TFT-LCD
     Products directly from one or more defendants and suffered injury as a result of
28   defendants' unlawful conduct."

1       The DP-CC's allegations concerning markets for TFT-LCD panels are unhelpful to

2 the question of antitrust injury suffered by purchasers of finished goods.  As explained in

3 Defendants' Opening Brief, through the use of the artificially defined term, "TFT-LCD

4 Products," Plaintiffs attempt to blur the distinction between raw panels and finished

5 products containing panels – a proverbial mixing of apples and oranges − in the hope that

6 allegations about markets for raw panels might slop over to markets for finished goods.

7 MTD DP-CC at 28-30.  In fact, their opposition does not deny that the DP-CC's allegations

8 concerning market factors, pricing, and production concern only TFT-LCD panels, and not

9 finished goods containing TFT-LCD panels.  *Id.* at 28-29 (discussing DP-CC's allegations

10 concerning TFT-LCD panels in paragraphs 88-89, 95-96, 100-06, 108, 111-14, 117, 120-

11 21, 124, 127-28, 129, 133, 139-40, 142, 144-47).  Thus, other than plaintiffs' "say so" there

12 is nothing in the DP-CC to support the plausibility of their claim of antitrust injury.

13       Second, Plaintiffs' argument that paying supra-competitive prices to an alleged

14 conspirator constitutes antitrust injury (Dir. Opp. at 33-37) is similarly unhelpful for

15 plaintiffs who purchased finished goods.  The requirements of antitrust injury are not

16 simply that an anticompetitive act took place that may have tangentially impacted prices in

17 various markets.[10]  The plaintiff must be the injured entity and must have participated in the

18 allegedly restrained market.[11]  *See Glenn Holly*, 343 F.3d at 1008 ("'the party alleging the

19 injury must be either a consumer of the alleged violator's goods or services or a competitor

20 of the alleged violator in the restrained market.' . . . 'Consumers in the market where trade

21 is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.'"

22 (citations omitted).  The Ninth Circuit has recognized "market participants" in narrow

23

---

24  [10]  *See AGC*, 459 U.S. at 535.

25  [11]  "Antitrust injury is made up of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. . . . In addition, we

26 impose a fifth requirement, that the injured party be a participant in the same market as the alleged malefactors."  *Glenn Holly*, 343 F.3d at 1008 (quoting *American Ad Mgmt.,*

27 *Inc. v. General Telephone Co. of California*, 190 F.3d at 1055, 1057 (9th Cir. 1999), *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467 (9th Cir. 1985)).

28

1   circumstances beyond consumers and competitors but still requires participation in the

2   restrained market.  *See* Section II.C., *infra*.

3        Simply arguing this is a *per se* case is not sufficient to satisfy *AGC*'s standing

4   requirement.  *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th

5   Cir. 1999) (upholding dismissal because plaintiffs "failed to allege antitrust injury resulting

6   from all aspects of the alleged price-fixing conspiracy"); *see also Knevelbaard Dairies v.*

7   *Kraft Foods, Inc.,* 232 F.3d 979, 986-87 (9th Cir. 2000) (no need to show market power for

8   per se claim, but plaintiffs must be participants in the relevant market for standing).  The

9   proper question is not whether Plaintiffs have alleged a *per se* violation of the antitrust

10  laws, but whether they have alleged in non-conclusory terms antitrust injury caused by the

11  alleged conspiracy.

12       Allegations that the conspiracy fixed the prices of panels do not make plausible

13  conclusory claims that the prices of finished goods containing panels were affected.  Other

14  than the conclusory allegation that finished goods prices were affected, DP-CC ¶ 4, there

15  are no allegations describing how a conspiracy in markets for TFT-LCD panels caused

16  supra-competitive prices in the disparate markets for finished goods such as televisions, cell

17  phones, notebook computers, and other products.  As the *DRAM* Court recognized,

18  "plaintiffs who are in secondary markets in which they purchase the price-fixed product as

19  a component, would need to allege that the secondary market sellers themselves were in an

20  oligopoly and fixing prices, in order to demonstrate non-speculative damages."  *In re*

21  *Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F.Supp.2d 1072, 1092

22  (N.D. Cal. 2007) ("*DRAM I*") (citing *Weaver v. Cabot Corp.*, No. 03 CVS 04760, 2004 WL

23  3406119, at *1 (N.C.Super.Ct. Mar. 26, 2004)).  Here, the DP-CC has no allegations

24  concerning (1) whether each (or any) of the markets for finished goods are oligopolistic,

25  (2) how many defendants also participate in markets for finished goods and which markets,

26  (3) who are other competitors in those markets, (4) what finished products that do not

27  contain TFT-LCD panels (*e.g.,* traditional cathode-ray tube TVs) compete in such markets,

28  (5) how finished goods are priced in such markets, and (6) what intermediate markets are

1   between the markets for raw panels and each finished goods market.  Other than Plaintiffs'

2   conclusory assertion that they were injured, which this Court need not assume to be true,

3   there are no allegations giving rise to plausible claims of antitrust injury for purchasers of

4   finished goods.

5       **B.    Plaintiffs Do Not Participate in the TFT-LCD Panel Markets.**

6       Applying *AGC*, the Ninth Circuit has held it is necessary that "'the injured party be

7   a participant in the same market as the alleged malefactors.'"  *American Ad Mgmt., Inc. v.*

8   *General Tel. Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999) (quoting *Bhan v. NME*

9   *Hospitals, Inc.,* 772 F.2d 1467, 1470 (9th Cir. 1985)).  In determining whether goods exist

10  within the same market, "the focus is upon the reasonable interchangeability of use or the

11  cross-elasticity of demand between" the goods in question.  *Bhan*, 772 F.2d at 1470-71.

12  "Parties whose injuries, though flowing from that which makes the defendant's conduct

13  unlawful, are experienced in another market do not suffer antitrust injury."  *American Ad*

14  *Mgmt.*, 190 F.3d at 1057.

15      Applying those principles here, if the prices of LCD televisions or cell phones

16  increase, people will not purchase raw TFT-LCD panels as replacements.  There is simply

17  no interchangeability or cross-elasticity of demand between a raw TFT-LCD panel and a

18  finished product like a television, cell phone, or laptop.  Plaintiffs cite four Ninth Circuit

19  cases supposedly for the proposition that standing is "liberally allowed" even for "claims on

20  the periphery."[12]  Dir. Opp. at 35.  In each, the court clearly defined the market at issue:

21  Yellow Pages advertising (*American Ad Mgmt.*); a single anesthesia market (*Bhan*); market

22  for labels (*Ostrofe*); and sports stadiums (*LA Mem'l Coliseum*)), and then concluded the

23  plaintiff participated in the allegedly restrained market, even if not as a traditional

---

[12] *American Ad Mgmt.,* 190 F.3d at 1058; *Los Angeles Mem'l Coliseum Comm'n v. NFL,*
791 F.2d 1356, 1363 (9th Cir. 1986); *Bhan,* 772 F.2d 1467; *Ostrofe v. H.S. Crocker Co.,*
*Inc.*, 740 F.2d 739, 745-46 (9th Cir. 1984).  Direct Plaintiffs' reliance on *Bhan* is
particularly curious because there the Ninth Circuit identified "the crux of the matter
before the court is whether nurses and physicians are participants in a single anesthesia
services market or whether they each participate in their own markets."  772 F.2d at
1470.  Direct Plaintiffs have assiduously sought to avoid addressing that question.

1   "consumer or competitor."  In contrast, here Plaintiffs have not clearly defined the market

2   or markets, have identified disparate goods (raw panels, as well as LCD televisions, cellular

3   telephones, notebook computers, and computer monitors to name some) but have not

4   alleged how any compete in a defined market; and have focused their allegations on

5   markets for panels, they have not alleged how they participated in them.  When the DP-

6   CC's allegations are compared to the four Ninth Circuit cases, the deficiencies become even

7   clearer.

8        Plaintiffs also fail to appreciate the holding in *DRAM II*.  That case is very similar to

9   this one:  DRAM, like raw TFT-LCD panels, was alleged to have "no free-standing use and

10   must be inserted into a device such as a computer to serve any function."  *In re Dynamic*

11   *Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-21486 PJH, 2008 WL 281109,

12   at *3 (N.D. Cal. Jan. 29, 2008) ("*DRAM II*") (internal quotations omitted).  Plaintiffs

13   alleged that the DRAM and finished goods markets were "intimately connected" and could

14   be considered "different stages of a single supply chain." *Id.* at *4.  Furthermore, plaintiffs

15   alleged 90% of the DRAM sold had been used for the finished goods plaintiffs purchased,

16   an allegation missing here.  *Id.* at *9.  Plaintiffs notably omit any allegation of what

17   percentage of raw panels went into finished products sold by Defendants, and what

18   percentage were sold to manufacturers of finished goods for incorporation into third-party

19   products.  Moreover, the Court in *DRAM II* held that although alleged facts that arguably

20   showed the raw input DRAM market and finished goods markets were sufficiently

21   "interlinked, purchasers of finished goods were still not participating in "the same market"

22   as purchasers of raw input *DRAM* under controlling Ninth Circuit law." *Id.*  Plaintiffs

23   respond that *DRAM* concerned indirect purchasers instead of direct purchasers, but that

24   ignores *DRAM*'s application *AGC*.[13]  The precedents from the Ninth Circuit and this

25

─────────────────────

26   [13]  Plaintiffs also misread *Tessera v. Micron Technology*, No. 2:05CV94, 2005 WL
      1661106 (E.D. Tex. July 14, 2005) which permitted plaintiff to proceed as a licensor of
27   the relevant technology in the chip market, but not as a participant in the technology
      market, because, "[b]eing in a subset of a market once removed from alleged anti-
28                                                                        (continued…)

1    District compel the conclusion that the DP-CC does not adequately plead participation in

2    the allegedly restrained market.

3          **C.      Plaintiffs Fail to Satisfy the Other *AGC* Factors.**

4          Plaintiffs' also fail to address the remaining four *AGC* factors.  The second *AGC*

5    factor concerns the directness of the injury.  *American Ad Mgmt.*, 190 F.3d at 1058.  The

6    DP-CC does not allege any injury was direct, and Plaintiffs address this factor in only a

7    conclusory fashion.  They argue, "as direct purchasers, Plaintiffs suffered a 'direct' harm"

8    and there would be "no more immediate victims." Dir. Opp. at 40.  This is wrong.  There is

9    an entire group of purchasers who purchased raw TFT-LCD panels directly from

10   Defendants who, based on the allegations of the DP-CC, would have suffered more "direct

11   harm" and be "more immediate victims" due to their participation in the allegedly

12   restrained markets for TFT-LCD panels.

13         The third *AGC* factor looks at the speculative measure of the harm, and the fifth

14   concerns the complexity in apportioning damages.  *American Ad Mgmt.*, 190 F.3d at 1059-

15   61; *Crouch v. Crompton Corp.*, Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027, at

16   *25 (N.C. Super. Ct. Oct. 28, 2004) (analyzing the two prongs together).  The damages for

17   purchasers of finished goods would be highly speculative because, as Plaintiffs admit, the

18   panels are combined with other components in the manufacturing of finished goods.  DP-

19   CC ¶¶ 1-2.  Moreover, the DP-CC contains no allegations concerning competition in the

20   finished goods markets, which would also affect pricing of those finished goods.  Plaintiffs

21   also fail to allege how a conspiracy in any market for TFT-LCD panels might have affected

22   prices of the finished goods purchased by Plaintiffs.  In short, the *AGC* analysis shows that

23   the DP-CC fails to plead sufficiently the antitrust standing of Plaintiffs who purchased

24   finished goods containing TFT-LCD screens.

25

26   _____

     (…continued)
        competitive behavior will not suffice to meet the high bar for antitrust standing." *Id.* at
27      *3.  Plaintiffs, however, are correct that Defendants mistakenly reversed the reference to
        the chip market and technology market in the opening brief.
28

**D.**   **AGC Standing is Analytically Distinct from *Illinois Brick* and *Sugar*.**

Direct Plaintiffs' attempt to support the standing of purchasers of finished goods containing LCD screens by invoking *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny, but that line of cases has nothing to do with antitrust standing.[14]   *Illinois Brick* was not a standing case but a statutory construction case, in which the Supreme Court construed Section 4 of the Clayton Act to determine if indirect purchasers were authorized by that section to sue for federal antitrust damages. *Id.* at 728 n.7.  Indeed, the Supreme Court made explicit that its decision did not address the issue of standing:

> we do not address the standing issue, except to note, . . . that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question which persons have sustained injuries too remote to give them standing to sue for damages under § 4.

*Id.*; *see also California v. ARC America Corp.*, 490 U.S. 93, 102-03 (1989) ("As we made clear in *Illinois Brick*, the issue before the Court in both that case and in *Hanover Shoe* was strictly a question of statutory interpretation – what was the proper construction of § 4 of the Clayton Act.").[15]  That Plaintiffs might arguably be within Section 4's damages remedy does not resolve whether they have adequately alleged a sufficient "antitrust injury" to support standing under the Ninth Circuit's AGC principles.  If they "have sustained injuries

---

[14]    Plaintiffs claim that Defendants "concede" that they are "direct purchasers," whose claims are not barred by *Illinois Brick*.  Dir. Opp. at 31 n.14.  That is wrong.  Defendants referred to "plaintiffs' alleged status as direct purchasers under *Illinois Brick*," pointed out that the *AGC* standing motion is analytically distinct from that issue, and do not concede that issue.  Def. Dir. Br. at 25 n.21.  The *Illinois Brick* issue is a matter as to which Direct Plaintiffs bear the burden of pleading and proof, and may be raised at any time by a defendant.  *See Glen Holly*, 343 F.3d at 1014 n.5 ("It is true of course, that an antitrust cause of action is susceptible of dismissal at any stage once it does appear factually that the injury complained of was not antitrust in nature.")  Defendants have not yet even answered the DP-CC and cannot have waived such defense.  Direct Plaintiffs are also wrong to draw any inference from a defendant having not yet filed a joinder in the motion filed by Tatung Company of America, Inc. (which is not even being heard until September 2008)

[15]   The Courts of Appeals have recognized that Illinois Brick is not a standing case but a statutory construction of Section 4's damages remedy.  *Kloth v. Microsoft Corp.*, 444 F.3d 312, 323-24 (4th Cir. 2006) (stating that although courts "sometimes blend" *Illinois Brick*'s indirect purchaser rule and *AGC*'s standing analysis, they are "'analytically distinct,'" quoting *AGC*); *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 475 (7th Cir. 2002) (finding that certain of plaintiffs' claims were barred under *AGC*, but not *Illinois Brick*).

1   too remote to give them standing to sue for damages under § 4," then the Court should

2   dismiss their claims notwithstanding their alleged status as direct purchasers.  *Illinois Brick*,

3   431 U.S. at 728 n.7.

4          The lower court cases cited by Plaintiffs apply *Illinois Brick*, and do not answer the

5   issues raised by Defendants' *AGC* motion.  For example, *In re Sugar Indus. Antitrust Litig.*,

6   579 F.2d 13 (3d Cir. 1978), was decided five years before *AGC* and obviously does not

7   consider the legal issue presented here of *AGC* providing a separate basis for dismissing a

8   remote direct purchaser claim.  *Id.* at 16 (describing the *Illinois Brick* issue as "the question

9   in this case").  Similarly, *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002),

10  only concerns the effect of Illinois Brick on the claims and class certification involving

11  purchasers of corrugated sheets or boxes (which are made out of linerboard), and AGC

12  standing was not raised.  Id. at 158-60 (describing issue as whether class certification

13  should have been denied "under the teachings of *Illinois Brick*").  Plaintiffs also cite

14  *General Refractories Co. v. Stone Container Corp.*, Nos. 98 C 3543, 98 C 4612, 98 C 4659,

15  1999 WL 14498, at *3 (N.D. Ill. Jan. 8, 1999), but that is another case where the Court only

16  considered a challenge to direct purchasers of corrugated sheets under Illinois Brick and did

17  not address *AGC* standing.  Finally, *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d

18  323 (9th Cir. 1980), did not address standing (and also pre-dated *AGC*), and only held that

19  *Illinois Brick* did not bar claims by purchasers of paper product who bought from

20  subsidiaries of defendant paper product manufacturers (but did bar claims where

21  independent middleman made the sales).  *Id.* at 326 & n.6.[16]

22         In addition to these inapposite cases, Plaintiffs spin a conclusory economic theory as

23  to why vertically integrated manufacturers could supposedly succeed in "increase[ing] costs

24

25  [16]  Plaintiffs cite *Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002),
        for its statement that "the first buyer from a conspirator is the right party to sue," but
26      read in context this is unremarkable and of no help to plaintiffs.  It is made in the course
        of summarizing *Hanover Shoe* and *Illinois Brick* and the court's holding that plaintiffs
27      who resold the restrained paper products could still sue for damages under *Hanover
        Shoe*.  And once again, *AGC* standing was not raised.

28

1   to any actual or potential downstream buyers by raising the price of the input." Dir. Op. at

2   37. Of course, this story appears nowhere in the DP-CC, and is not supported with any case

3   citations. In espousing this "pass-on" theory, plaintiffs now seem to admit that there are at

4   least two markets (downstream and upstream), but do not address the obvious fact that there

5   are many markets. It is not plausible to suggest that 50-inch LCD televisions are in the

6   same market (and reasonably interchangeable) with cell phones or with notebook

7   computers, or that any of those finished products are in the same market with raw TFT-

8   LCD panels. MTD DP-CC at 31-32. Also, this "pass-on" theory is inconsistent with the

9   Supreme Court's conclusions supporting its rulings in *Illinois Brick* and *Hanover Shoe* that

10  measuring overcharges passed on to other markets is complex and fraught with difficulties,

11  the economists' "drastic simplifications generally must be abandoned," "[o]vercharged

12  direct purchasers often sell in imperfectly competitive markets," "often compete with other

13  sellers that have not been subject to the overcharge," and "pricing policies often cannot be

14  explained solely by the convenient assumption of profit maximization." 431 U.S. at 742;

15  *see* 392 U.S. at 491-93. Plaintiffs' economic arguments, while raising issues not ripe for

16  decision on a motion to dismiss, do demonstrate the speculative nature of damages for

17  purchasers of finished goods containing LCD screens and support the *AGC* motion.

18
      **IV.     The Statute of Limitations Bars Plaintiffs' Claims Before December 12, 2002,**
19          **and Plaintiffs Fail To Meet the Requirements for Tolling.**

20          Plaintiffs cannot avoid application of the statute of limitations. Due diligence is

21  required "when facts exist that would excite the inquiry of a reasonable person." *Conmar*

22  *Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir. 1988).[17] Plaintiffs do not

23

24  ───────────────

25  [17] Plaintiffs err in conflating constructive and inquiry notice. A plaintiff is on constructive
       notice if such facts exist that he should have been aware of his claim. Inquiry notice is a
       lower threshold – it requires only that there was enough information that the plaintiff
26     should have looked into whether he had a claim. A plaintiff on inquiry notice has a duty
       to diligently investigate whether he has a claim. *See Ogle v. Salamatof Native Ass'n, Inc.*,
27     906 F.Supp. 1321, 1326 (D. Alaska 1995). If the plaintiff is on inquiry notice and does
       not investigate his claim, then the statute is not tolled.

28

1   deny that they did not conduct any acts of diligence or that the supposed "facts" alleged in

2   the DP-CC are all based on information publicly available to Plaintiffs throughout the

3   period of the alleged conspiracy. *See* Pl.'s Opp. 42-45.  Under such circumstances,

4   Plaintiffs cannot reasonably contend the very same facts that they now argue are more than

5   sufficient under the exacting standards of *Twombly* (and demonstrate a plausible

6   conspiracy) are at the same time not sufficient to have put them on inquiry notice.

7   Accordingly, dismissal of the time-barred claims is appropriate at the motion to dismiss

8   stage. *See Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249-50 (9th Cir.

9   1978).

10        Plaintiffs' reliance on *Conmar* is misplaced.  There the plaintiff sued for alleged

11   dumping of PC-strand steel products "more than four years after the activities that form[ed]

12   the basis for its complaint . . . , but contend[ed] that fraudulent concealment" tolled the

13   statute of limitations. *Conmar*, 858 F.2d at 502.  The information available to Conmar

14   provided few if any hints of its claims. *Id.* at 503 (noting the public information "contained

15   no reference to [defendant-competitor] VSL . . . or PC-strand").  Because the Ninth Circuit

16   found "a genuine issue of material fact whether the facts publicly available" should have

17   excited Conmar's inquiry, the court did not reach the issue of whether Conmar properly

18   pleaded diligence. *Id.* at 504-05.

19        In contrast, in this case Plaintiffs glean the facts that Plaintiffs now contend state a

20   claim from the very same news articles available to them throughout the alleged

21   conspiracy.  As *Conmar* makes explicit, in cases such as this, a court can conclude as a

22   matter of law that sufficient facts exist to trigger inquiry notice. *Id.* at 503.[18]  For example,

23   the *Pocahontas* court held that a plaintiff was on notice of defendants' alleged conspiracy

24   because the "structural interrelationship between the corporate defendants was necessarily

25

26   [18]  Citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987); *Rutledge*, 576
        F.2d at 250; *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218
27      (4th Cir. 1987); *United Klans of America v. McGovern*, 621 F.2d 152, 154-55 (5th Cir.
        1980); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

28

1  discoverable upon simple inquiry and consultation of public records . . . ."  828 F.2d at 218.

2  Under such circumstances, a plaintiff must "state facts showing his due diligence in trying

3  to uncover the facts." *Rutledge*, 576 F.2d at 250.

4      Indeed, none of the cases Plaintiffs cite involve circumstances similar to those here

5  – where the plaintiffs expressly rely on the prior news articles for the facts on which they

6  base their claims years later.  While Plaintiffs may not have been "under a duty continually

7  to scout around to uncover claims which they have no reason to suspect they might have,"

8  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp.

9  487, 498 (C.D. Cal. 1992), they did have a duty at least to inquire into the same facts they

10  now rely upon in their complaint as evidence of their underlying claim.  They cannot ignore

11  those facts and sit on their claims for years.

12                          **CONCLUSION**

13      For all the foregoing reasons, the Direct Plaintiffs' consolidated complaint should be

14  dismissed.

15  Dated:  April 3, 2008

16

17                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                            ALBERT J. BORO, JR.
18                          FUSAE NARA
                            TARA M. DESAUTELS
19                          RYAN G. KRIGER

20
                            By:  */s/ Albert J. Boro, Jr.*
21                               Albert J. Boro, Jr.

22                          Albert J. Boro, Jr. (State Bar No. 126657)
                            50 Fremont Street
23                          San Francisco, CA  94105
                            Telephone:  (415) 983-1000
24                          Facsimile:   (415) 983-1200

25                          *Attorneys for Defendants Sharp Corporation and Sharp
                            Electronics Corporation*
26

27

28

1    SEDGWICK, DETERT, MORAN & ARNOLD LLP

2
     By: /s/ Christopher A. Nedeau
3             Christopher A. Nedeau

4    Michael Healy (State Bar No. 95098)
     One Market Plaza
5    Steuart Tower, 8th Floor
     San Francisco, CA 94105
6    Tel:        (415) 781-7900
     Fax:        (415) 781-2635
7

8    Attorneys for Defendant AU Optronics Corporation
     America
9

10   WILMER CUTLER PICKERING HALE AND DORR
     LLP
11

12   By: /s/ Steven F. Cherry
              Steven F. Cherry
13
     Steven F. Cherry (pro hac vice)
14   1875 Pennsylvania Avenue NW
     Washington, DC 20006
15   Tel:        (202) 663-6000
     Fax:        (202) 663-6363
16

17   Attorneys for Defendants Chi Mei Optoelectronics
     USA, Inc., CMO Japan Co., Ltd., and Nexgen Mediatech
18   U.S.A., Inc.

19

20   PAUL, HASTINGS, JANOFSKY & WALKER LLP

21   By: /s/ Kevin C. McCann
              Kevin C. McCann
22
     Kevin C. McCann (State Bar No. 120874)
23   55 Second Street, 24th Floor
     San Francisco, CA 94105
24   Tel:        (415) 856-7000
     Fax:        (415) 856-7100
25

26   Attorneys for Defendant Epson Electronics America, Inc.

27

28

MORGAN, LEWIS & BOCKIUS LLP


By: */s/ Kent M. Roger*
Kent M. Roger

Kent M. Roger (State Bar No. 95987)
One Market
Spear Street Tower
San Francisco, CA 94105
Tel.:      (415) 442-1140
Fax:      (415) 442-1001

*Attorneys for Defendants Hitachi Electronic Devices (USA), Inc., Hitachi, Ltd., Hitachi Displays, Ltd., and IPS Alpha Technology, Ltd.*

SULLIVAN & CROMWELL LLP


By: */s/ Brendan P. Cullen*
Brendan P. Cullen

Brendan P. Cullen (State Bar No. 194057)
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Tel:      (650) 461-5600
Fax:      (650) 461-5700

Garrard R. Beeney (NY Reg. No. 1656172)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Tel.:      (212) 558-4000
Fax:      (212) 558-3588

*Attorneys for Defendant Koninklijke Philips Electronics N.V.*

With the Reservation of All Rights and Defenses.

1    SIDLEY AUSTIN LLP

2
     By: /s/ Samuel R. Miller
3            Samuel R. Miller

4    Samuel R. Miller (State Bar No. 66871)
     555 California Street, Suite 2000
5    San Francisco, CA 94104
     Tel:      (415) 772-1200
6    Fax:      (415) 772-7400

7    *Attorneys for Defendants LG Electronics USA, Inc. and*
     *LG Electronics, Inc.*
8

9    CLEARY GOTTLIEB STEEN & HAMILTON LLP

10

11   By: /s/ Michael R. Lazerwitz
             Michael R. Lazerwitz
12
     Michael R. Lazerwitz (pro hac vice)
13   2000 Pennsylvania Avenue NW
     Washington, DC 20006
14   Tel.:     (202) 974-1500
     Fax:      (202) 974-1999
15
     *Attorneys for Defendants LG.Philips LCD America, Inc.*
16   *and LG.Philips LCD Co., Ltd.*

17

18   DUANE MORRIS LLP

19
     By: /s/ George D. Niespolo
20           George D. Niespolo

21   George D. Niespolo (State Bar No. 72107)
     One Market Street
22   Spear Tower, 20th Floor
     San Francisco, CA 94105
23   Tel.:     (415) 957-3013
     Fax:      (415) 957-3001
24
     *Attorneys for Defendants NEC Electronics America, Inc.*
25   *and NEC LCD Technologies, Ltd.*

26

27

28

1       SHEPPARD MULLIN RICHTER & HAMPTON LLP

2
        By: */s/ James L. McGinnis*
3            James L. McGinnis

4       James L. McGinnis (State Bar No. 95788)
        4 Embarcadero Center, 17th Floor
5       San Francisco, CA 94111-4109
        Tel:      (415) 434-9100
6       Fax:      (415) 434-3947

7       *Attorneys for Defendants Samsung Electronics America,*
        *Inc., Samsung Semiconductor, Inc. and Samsung*
8       *Electronics Co., Ltd.*

9

10      BAKER & McKENZIE LLP

11
        By: */s/ Bruce H. Jackson*
12           Bruce H. Jackson

13      Bruce H. Jackson (State Bar No. 98118)
        Two Embarcadero Center, 11th Floor
14      San Francisco, CA 94111
        Tel:      (415) 576-3027
15      Fax:      (415) 576-3099

16      *Attorneys for Defendant Tatung Company of America,*
        *Inc.*
17
18      WHITE & CASE LLP

19
        By: */s/ Wayne A. Cross*
20           Wayne A. Cross

21      Wayne A. Cross (pro hac vice)
        1155 Avenue of the Americas
22      New York, NY 10036
        Tel:      (212) 819-8200
23      Fax:      (212) 354-8113

24      *Attorneys for Defendants Toshiba America Electronic*
        *Components, Inc., Toshiba America Information*
25      *Systems, Inc., Toshiba Corporation, and Toshiba*
        *Matsushita Display Technology Co., Ltd.*
26
        With the Reservation of All Rights and Defenses.
27

28

1       Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this document has been obtained from Michael Healy; Steven F. Cherry; Kevin C.

2   McCann; Kent M. Roger; Brendan P. Cullen; Samuel R. Miller; Michael R. Lazerwitz; George D. Niespolo; James L. McGinnis; Bruce H. Jackson; and Wayne Cross.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28