Michael R. Lazerwitz (*pro hac vice*)
Jeremy J. Calsyn (State Bar No. 205062)
Lee F. Berger (State Bar No. 222756)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006
(202) 974-1500 (Phone)
(202) 974-1999 (Facsimile)
*mlazerwitz@cgsh.com*

Attorneys for Defendants LG Display Co.,
Ltd. and LG Display America, Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | CASE NO. M: 07-1827 SI<br>MDL NO. 1827 |
| | **DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| This Document Relates To:<br><br>ALL INDIRECT PURCHASER ACTIONS | |

**FILED UNDER SEAL**

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES TO BE DECIDED ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

STATEMENT OF FACTS .......................................................................................................... 4

I.    PROPOSED CLASS DEFINITIONS ................................................................................. 5

II.   DISTRIBUTION CHANNELS FOR LCD PANELS AND PRODUCTS ...................... 5

ARGUMENT ............................................................................................................................... 7

I.    CLASS CERTIFICATION STANDARDS ...................................................................... 7

II.   NO RULE 23(B)(3) CLASSES SHOULD BE CERTIFIED BECAUSE
COMMON ISSUES DO NOT PREDOMINATE OVER INDIVIDUALIZED
ISSUES AND A CLASS ACTION WOULD NOT BE MANAGEABLE ..................... 9

    A.    Plaintiffs Cannot Establish Subject Matter Jurisdiction Through
Evidence Common To The Class ...................................................................... 11

         1.    Most Panels That Eventually Reach The United States In A
Finished Product Are First Sold In Foreign Markets And Proceed
Through Many Different Distribution Levels And Distribution
Channels ............................................................................................... 12

         2.    Under The FTAIA, The Court Lacks Subject Matter Jurisdiction
Over Claims Based On Purchases Of Foreign-Panel Products ............. 14

         3.    Individual Issues Of Fact And Law Predominate Over Common
Ones With Respect To Subject Matter Jurisdiction .............................. 17

         4.    The FTAIA Bars Antitrust Claims Brought Under State Law .............. 19

    B.    Plaintiffs Cannot Show That Common Issues Will Predominate Because
They Cannot Prove Antitrust Impact With Common Evidence ........................ 21

         1.    Plaintiffs Have Not Proposed A Sufficient Method To Establish
Common Injury In Light Of The Complex LCD Distribution
Channels ............................................................................................... 23

         2.    Plaintiffs Have Not Proposed A Sufficient Method To Control
For Wide Variations In Indirect Purchasers' Market Power And
Negotiation Abilities ............................................................................ 29

         3.    Plaintiffs Have Not Proposed A Sufficient Method That Accounts
For Changes In The LCD Markets Over Time ...................................... 30

         4.    Plaintiffs Have Not Proposed A Sufficient Method That Accounts
For The Significant Variation In Panel Specifications .......................... 31

         5.    Plaintiffs Have Failed To Account For The Value Added To LCD
Products As They Move Through The Supply Chain ........................... 32

         6.    No Inference Of Impact Is Appropriate In This Case ........................... 33

7. Dr. Netz's Analyses Are Deficient ........................................................ 36

    a. Dr. Netz's Regression Analyses, Which Use Average Prices Rather Than Disaggregated Prices, Are Empirically Unsound ........................................................ 36

    b. Dr. Netz's Regression Analyses Rely On Different Variables ........................................................ 38

    c. Dr. Netz's Estimate Of Impact On Direct Purchasers Is Flawed ........................................................ 39

    d. Dr. Netz's Regression Analyses Rely On Competitive Periods Inconsistent With Plaintiffs' Allegations ...................... 40

C. Plaintiffs Fail To Explain How Establishing Damages Will Be Manageable ....... 41

D. Because Plaintiffs Present No Evidence That Shows The Existence Of A Single Conspiracy Involving All Defendants, Common Issues Of Fact Do Not Predominate As To All Class Members ................................................ 45

III. THE PROPOSED CLASSES ARE NOT ASCERTAINABLE UNDER RULE 23(A) ................................................................................................. 50

IV. THE COURT SHOULD DENY PLAINTIFFS' MOTION TO CERTIFY A NATIONWIDE INJUNCTIVE CLASS AND 23 STATEWIDE UNJUST ENRICHMENT CLASSES UNDER RULE 23(B)(2) ................................................. 53

A. Plaintiffs Do Not Have Standing To Seek Injunctive Relief ............................. 54

B. The Court Should Deny Plaintiffs' Request To Certify State Claims For Unjust Enrichment Under Rule 23(b)(2) ........................................................ 56

V. NAMED PLAINTIFFS BAKER, FISHER, GRIFFITH, HANSEN, JOU, MURPHY, MULVEY, NORTHWAY, PAGUIRIGAN, SRIMOUNGCHANH, AND WATSON ARE INADEQUATE AND/OR ATYPICAL CLASS REPRESENTATIVES ........................................................ 58

A. Ms. Baker, Mr. Fisher, Ms. Griffith, Mr. Hansen, Ms. Jou, Mr. Paguirigan, And Mr. Srimoungchanh Are Atypical And Inadequate Because They Are Not Class Members Under The Proposed Class Definition And Are Subject To Unique Standing Defenses .............................. 59

    1. Purchases Outside Class And Alleged Conspiracy Period ................... 60

    2. Purchase Not Made By Plaintiff ........................................................ 61

    3. Purchase Of Panel Not Made By Defendants ....................................... 61

    4. Non-Resident Plaintiffs ........................................................ 62

B. Ms. Mulvey, Mr. Murphy, Mr. Northway, And Mr. Watson Are Compromised By Family Or Business Relationships With Counsel That Make Them Inadequate Representatives ........................................................ 62

CONCLUSION ........................................................ 64

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Abrams v. Interco, Inc.,*
719 F.2d 23 (2d Cir. 1983) ................................................................................................. 42

*Affholder, Inc. v. Southern Rock, Inc.,*
746 F.2d 305 (5th Cir. 1984) .............................................................................................. 34

*Alabama v. Blue Bird Body Co.,*
573 F.2d 309 (5th Cir. 1978) ......................................................................................... 45, 46

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,*
247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................................ 42

*Arabian v. Sony Elecs. Inc.,*
No. 05-1741, 2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ................................................ 58

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ........................................................................................................... 10

*Avritt v. Reliastar Life Ins. Co.,*
No. 07-1817, 2009 WL 455808 (D. Minn. Feb. 23, 2009) ................................................ 56

*Bell Atl. Corp. v. AT&T Corp.,*
339 F.3d 294 (5th Cir. 2003) .............................................................................................. 21

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005) .................................................................................... 9, 22, 31

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ............................................................................................................. 9

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
141 F.R.D. 144 (N.D. Cal. 1991) ............................................................................. 19, 29, 62

*Butt v. Allegheny Pepsi-Cola Bottling Co.,*
116 F.R.D. 486 (E.D. Va. 1987) ......................................................................................... 42

*California v. Infineon Techs. AG,*
No. C 06-4333, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) ................................. 22, 29, 34

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,*
227 F.3d 62 (3d Cir. 2000) ................................................................................................. 14

i

*City of St. Paul v. FMC Corp.*,
No. 3-89-0466, 1990 U.S. WL 259683 (D. Minn. Nov. 14, 1990) ...................................32, 35

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ................................................................................................... 20

*CSR Ltd. v. Cigna Corp.*,
405 F. Supp. 2d 526 (D.N.J. 2005)............................................................................... 21

*Dukes v. Wal-Mart, Inc.*,
509 F.3d 1168 (9th Cir. 2007) ........................................................................... 9, 27, 28

*Dukes v. Walmart*,
556 F.3d 919 (9th Cir. Feb. 13, 2009) ......................................................................9, 28

*Empagran S.A. v. F. Hoffman-LaRoche, Inc.*,
417 F.3d 1267 (D.D.C 2005)....................................................................................... 17

*F. Hoffman La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004) ........................................................................... 12, 14, 15, 19

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004)....................................................................................... 9

*Gasperini v. Center for Humanities, Inc.*,
518 U.S. 415 (1996) .................................................................................................. 33

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982) ................................................................................................... 8

*Hairston v. Pac.-10 Conference*,
893 F. Supp. 1485 (W.D. Wash. 1994) ....................................................................... 54

*Hanna v. Plumer*,
380 U.S. 460 (1965) .................................................................................................. 33

*Hartford Fire Ins. Co. v. California*,
509 U.S. 764 (1993) .................................................................................................. 11

*In re Abbott Labs. Norvir Antitrust Litig.*,
No. C 04-1511, 2007 WL 1689899 (N.D. Cal. June 11, 2007).............................................10

*In re AM Int'l, Inc. Sec. Litig.*,
108 F.R.D. 190 (S.D.N.Y. 1985)................................................................................. 60

*In re Brand Name Prescription Drugs*,
No. 94-C-897, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994)....................................................24

ii

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) ....................................................................................... 23

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 326 (E.D. Mich. 2001) ....................................................................... 10, 11

*In re Citric Acid Antitrust Litig.*,
  No. 95-1092, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ..................................... 22, 46

*In re Ditropan XL Antitrust Litig.*,
  529 F. Supp. 2d 1098 (N.D. Cal. 2007) .......................................................................... 59

*In re Dynamic Random Access Memory Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008) ............................................................................... 15, 16

*In re Dynamic Random Access Memory Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006) ..................... 28, 46

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
  No. 1:04-md-1628, 2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008) ............................. 30

*In re Graphics Processing Units Antitrust Litigation*,
  253 F.R.D. 478, 507 (N.D. Cal. 2008) ............... 2, 3, 11, 21, 22, 24, 27, 28, 31, 34, 37, 39, 46

*In re Hotel Telephone Charges*,
  500 F.2d 86 (9th Cir. 1974) ........................................................................... 10, 42, 43

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ............................................................................................ 8, 9

*In re Industrial Diamonds Antitrust Litig.*,
  167 F.R.D. 374 (S.D.N.Y. 1996) ..................................................................................... 31

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ................................................................................................ 8

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  476 F. Supp. 2d 452 (D. Del. 2007) ........................................................................ 16, 19

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ........................................................................................ 9

*In re Methionine Antitrust Litig.*,
  204 F.R.D. 161 (N.D. Cal. 2001) .................................................... 11, 19, 22, 23, 28

*In re Methionine Antitrust Litig.*,
  No. 00-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) .......................... 26, 32

iii

*In re Microsoft Corp. Antitrust Litig.,*
  214 F.R.D. 371 (D. Md. 2003) ............................................................................. 63

*In re Napster Copyright Litig.,*
  No. C MDL-00-1369, 2005 WL 1287611 (N.D. Cal. June 1, 2005) ....................................... 10

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
  522 F.3d 6 (1st Cir. 2008) ......................................................................... 22, 43, 54

*In re OSB Antitrust Litig.,*
  No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007)..................................................... 34, 35

*In re Parmalat Securities Litig.,*
  No. 04 MD 1653, 2008 WL 389553 (S.D.N.Y. Aug. 21, 2008) ............................................ 17

*In re Paxil Litig.,*
  218 F.R.D. 242 (C.D. Cal. 2003).......................................................................... 56, 57

*In re Polypropylene Carpet Antitrust Litig.,*
  178 F.R.D. 603 (N.D. Ga. 1997) ........................................................................... 46, 60

*In re Potash Antitrust Litig.,*
  159 F.R.D. 682 (D. Minn. 1996) ............................................................................. 22

*In re Quarterdeck Office Sys. Sec. Litig.,*
  No. CV 92-3970, 1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ........................................... 59

*In re Relafen Antitrust Litig.,*
  221 F.R.D. 260 (D. Mass. 2004) ........................................................................... 10, 36

*In re Rubber Chems. Antitrust Litig.,*
  232 F.R.D. 346 (N.D. Cal. 2005) ......................................................................... 28, 46

*In re Sugar Indust. Antitrust Litig.,*
  73 F.R.D. 322 (E.D. Pa. 1976) .............................................................................. 11

*In re Tableware Antitrust Litig.,*
  241 F.R.D. 644 (N.D. Cal. 2007) ........................................................................... 50

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
  586 F. Supp. 2d 1109 (N.D. Cal. 2008)..................................................................... 4, 5

*In re Xcelera.com Sec. Litig.,*
  430 F.3d 503 (1st Cir. 2005)................................................................................... 8

*Japan Line Ltd. v. County of Los Angeles,*
  441 U.S. 434 (1979) .......................................................................................... 20

iv

*Jones v. Nat'l Sec. Fire & Cas. Co.*,
   No. 06-1407, 2006 WL 3228409 (W.D. La. Nov. 3, 2006) ...................................................51

*Jordan v. Paul Fin., LLC*,
   No. 07-04496, 2009 WL 192888 (N.D. Cal. Jan. 27, 2009) (Illston, J.)................8, 58, 59, 60

*Kelley v. Microsoft Corp.*,
   251 F.R.D. 544, 559 (W.D. Wash. 2008)...............................................................................56

*Kramer v. Scientific Control Corp.*,
   534 F.2d 1085 (3rd Cir. 1976)...............................................................................................63

*Kruman v. Christie's Int'l*,
   284 F.3d 384 (2d Cir. 2002) .................................................................................................14

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003)............................................................................................63

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980)..............................................................................................54

*Love v. Turlington*,
   733 F.2d 1562 (11th Cir. 1984) ..............................................................................................9

*Mad Rhino, Inc. v. Best Buy Co.*,
   No. 03-5604, 2008 U.S. Dist. LEXIS 8619 (C.D. Cal. Jan. 14, 2008)....................................51

*Mazur v. eBay Inc.*,
   No. 07-03967, 2009 WL 1203937 (N.D. Cal. May 5, 2009) ..................................8, 50, 51, 52

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) .................................................................................................43

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) ..........................................................................................56, 57

*Monfort of Colo., Inc.*,
   479 U.S. 104 (1986) .............................................................................................................54

*Mowry v. JP Morgan Chase Bank, N.A.*,
   No. 06-4312, 2007 WL 1772142 (N.D. Ill. June 19, 2007) ...................................................63

*Nichols v. Mobile Bd. of Realtors, Inc.*,
   675 F.2d 671 (5th Cir. 1982).................................................................................................22

*O'Connor v. Boeing N. Am., Inc.*,
   184 F.R.D. 311 (C.D. Cal. 1998)..........................................................................................51

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) .................................................................................................. 54

*Panache Broad. of Pa. v. Richardson Elecs.*,
  No. 90-C-6400, 1995 U.S. Dist. LEXIS 14462 (N.D. Ill. Sept. 27, 1995)................................ 46

*Papst Motoren GMbH v. Kanematsu-Goshu (U.S.A.), Inc.*,
  629 F. Supp. 864 (S.D.N.Y. 1986) .......................................................................... 16

*Pierce v. Novastar Mortgage Inc.*,
  489 F. Supp. 2d 1206, 1215 (W.D. Wash. 2007) ....................................................... 60

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp* ,
  100 F. App'x 296, 300 (5th Cir. 2004)...................................................................... 41

*Prado-Steiman v. Bush*,
  221 F.3d 1266 (11th Cir. 2000).............................................................................. 59

*Sanders v. Apple, Inc.*,
  No. C 08-1713, 2009 WL 150950 (N.D. Cal. Jan. 21, 2009)...................................... 17

*Serna v. Big A Drug Stores, Inc.*,
  No. 07-0276, 2007 U.S. Dist. LEXIS 82023 (C.D. Cal. Oct. 9, 2007) ....................... 63

*Sipper v. Capital One Bank*,
  No. 01-9547, 2002 WL 398769 (C.D. Cal. Feb. 28, 2007)......................................... 63

*Somers v. Apple, Inc.*,
  No. 07-06507, 2009 WL 2137148 (N.D. Cal. July 17, 2009) ........................... 9, 11, 27

*Sosna v. Iowa*,
  419 U.S. 393 (1975) ........................................................................................ 54, 59

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003)................................................................................. 62

*Susman v. Lincoln Am. Corp.*,
  561 F.2d 86 (7th Cir. 1977)................................................................................... 63

*Szabo v. Bridgeport Machs., Inc.*,
  249 F.3d 672 (7th Cir. 2001)................................................................................... 9

*Ticor Title Ins  Co. v. Brown*,
  511 U.S. 117, 121 (1994).................................................................................... 56

*Turicentro v. Am. Airlines*,
  303 F.3d 293 (3d Cir. 2002) ................................................................................. 14

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M· 07-1827 SI

*Unger v. Amedisys, Inc.,*
401 F.3d 316 (5th Cir. 2005) ........................................................................ 8

*United Phosphorus, Ltd. v. Angus Chem. Co.,*
131 F. Supp. 1d 1003 (N.D. Ill. 2001) (en banc) .......................................... 16

*United Phosphorus, Ltd. v. Angus Chem. Co.,*
322 F.3d 942 (7th Cir. 2003) (en banc) ....................................................... 14

*United States v. Aluminum Co. of Am.,*
148 F.2d 416 (2d Cir. 1945) ......................................................................... 11

*United States v. LSL Biotechnologies,*
379 F.3d 672 (9th Cir. 2004) ........................................................................ 15

*Valentino v. Carter-Wallace, Inc.,*
97 F.3d 1227 (9th Cir. 1996) .......................................................................... 7

*Vinole v. Countrywide Home Loans, Inc.,*
No. 08-55223, 2009 WL 1926444 (9th Cir. July 7, 2009) ............................. 8

*Weisfeld v. Sun Chem. Corp.,*
84 F. App'x 257 (3d Cir. 2004) .................................................................. 9, 45

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.,*
No. 05-2320, 2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ....................... 50

*Windham v. American Brands, Inc.,*
565 F.2d 57 (4th Cir. 1977) .......................................................................... 41

**STATE CASES**

*Amarel v. Connell,*
202 Cal. App. 3d 137 (1988) ..................................................................... 19, 21

*Anheuser-Busch, Inc. v. Abrahms,*
71 N.Y.2d 327 (1988) .................................................................................... 21

*BWI Custom Kitchen v. Owens-Illinois, Inc.,*
191 Cal. App. 3d 1341 (1987) ................................................................... 34, 35

*Byre v. Chamberlain,*
362 N.W.2d 69 (S.D. 1985) ........................................................................... 21

*Comes v. Microsoft,*
696 N.W.2d 318 (Iowa 2005) ........................................................................ 34

*Execu-Tech Business Sys., Inc. v. Appleton Papers, Inc.,*
743 So. 2d 19 (Fla. 4th Dist. Ct. App. 1999) ............................................... 36

vii

*Gordon v. Microsoft Corp.,*
  No. 00-5994, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001) ........................................... 35

*Grams v. Boss,*
  97 Wis. 2d 332 (1980) ........................................................................................................ 21

*In re Cipro Cases I & II,*
  121 Cal. App. 4th 402 (2004) ........................................................................................ 34, 35

*In re Florida Microsoft Antitrust Litig.,*
  No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002) ........................................ 36

*Keating v. Philip Morris, Inc.,*
  417 N.W.2d 132 (Minn. Ct. App. 1987) ........................................................................ 21, 35

*McCarter v. Abbott Labs., Inc.,*
  No. Civ. A. 91-050, 1993 WL 13011463 (Ala. Cir. Ct. April 9, 1993) ........................... 30, 31

*Melnick v. Microsoft Corp.,*
  Nos. CV-99-709, CV-99-752, 2001 WL 1012261 (Me. Super. Ct. Aug. 24, 2001) .............. 33

*NAACP v. Claiborne Hardware Co.,*
  393 So. 2d 1290 (Miss. 1980) ........................................................................................... 21

*Ren v. Philip Morris Inc.,*
  No. 00-004035-CZ, 2002 WL 1839983 (Mich. Cir. Ct. June 11, 2002) ................................ 33

*Rosack v. Volvo of Am. Corp.,*
  131 Cal. App. 3d 741 (1982) ............................................................................................. 35

*Rose v. Vulcan Materials Co.,*
  282 N.C. 643 (1973) ......................................................................................................... 21

*Sherwood v. Microsoft Corp.,*
  No. M2000-0185-COA-R9-CV, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003) .......... 33

*Tennessee ex rel. Leech v. Levi Strauss & Co.,*
  1980-2 Trade Cas. (CCH) ¶ 63,558 at 76, 972 n.2 (Tenn. Ch. Ct. 1980) ............................. 21

*Wedgewood Inv. Corp. v. Int'l Harvester Co.,*
  126 Ariz. 157 (1979) ........................................................................................................ 21

*Wood v. Abbott Laboratories,*
  No. 96-512561, 1997 WL 824019 (Mich. Cir. Ct. 1997) ...................................................... 29

**FEDERAL STATUTES**

15 U.S.C. § 6a ........................................................................................................................ 12

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M. 07-1827 SI

15 U.S.C. § 26 ................................................................................................................54

**STATE STATUTES**

9 Vt. Stat. Ann. tit. 9, § 2453(b) (2008) ........................................................................21

D.C. Code § 28-4515 (2009) ..........................................................................................21

Fla. Stat. § 542.23 (2008) ...............................................................................................21

Haw. Rev. Stat. § 480-3 (2008) ......................................................................................21

Iowa Code § 553.2 (1999) ..............................................................................................21

Mass. Gen. Laws ch. 93, § 1 (2009) ...............................................................................21

Me. Rev. Stat. Ann. tit. 5, § 207 (2007) .........................................................................21

Mich. Comp. Laws § 445.784(2) (2009) ........................................................................21

N.M. Stat. Ann. § 57-1-15 (2008) ..................................................................................21

Nev. Rev. Stat. § 598A.050 (2009) ................................................................................21

R.I. Gen. Laws § 6-36-2(b) (2009) .................................................................................21

S.D. Codified Laws § 37-1-22 (2009) ............................................................................21

W. Va. Code § 47-18-16 (2008) .....................................................................................21

**RULES**

Fed. R. Civ. P. 23(a) ...............................................................................................*passim*

**OTHER AUTHORITIES**

H.R. Rep. No. 97-686 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2487 .....................19

Louis Altman & Maria Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies*, § 27:30 (4th ed. 2009) ..........................................................................19

William H. Page, *The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick* Antitr. L.J. 1, 33-34 (1999) .........................................29

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No M: 07-1827 SI

**STATEMENT OF THE ISSUES TO BE DECIDED**

1. Whether the proposed state damages classes should be certified under Federal Rule of Civil Procedure 23(b)(3) in light of the individual issues of subject matter jurisdiction, impact, and conspiracy, as well as the manageability of adjudicating alleged damages claims.

2. Whether plaintiffs' proposed class definitions are sufficiently ascertainable to permit the Court and absentee persons to determine which consumers are part of the proposed classes under Rule 23(a).

3. Whether plaintiffs, who allege a conspiracy ending at the latest in December 2006, have established the necessary threat of future harm to certify a nationwide injunctive class under Rule 23(b)(2).

4. Whether plaintiffs' state unjust enrichment claims are secondary to their proposed federal nationwide injunctive claim under Rule 23(b)(2).

5. Whether named plaintiffs Gladys Baker, William Fisher, Judy Griffith, Chad Hansen, Ling Hahn Jou, Martha Mulvey, Christopher Murphy, Ben Northway, Jai Paguirigan, Kou Srimoungchanh, and Robert Watson are typical of the proposed class members and otherwise adequate to represent absent class members under Rules 23(a)(3) and 23(a)(4).

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Indirect purchaser plaintiffs ("plaintiffs") seek to certify 23 statewide damages classes and a nationwide injunctive class comprised of tens of millions of end-users who allegedly purchased, over at least an eight-year period, televisions, monitors, and notebook computers containing TFT-LCD panels (collectively "LCD Products") defendants manufactured. In doing so, plaintiffs have alleged consumer classes that contain many unknowns and unknowables. The breadth, complexity, and uncertainty of plaintiffs' 24 proposed classes render them uncertifiable under Rule 23.

1

First, none of plaintiffs' 23 proposed statewide damages classes satisfies Rule 23(b)(3)'s predominance and manageability requirements. Plaintiffs cannot establish subject matter jurisdiction, impact, damages, or the existence of a conspiracy with evidence applicable to all class members. Any one of these deficiencies defeats their motion.

*Subject Matter Jurisdiction*: As a threshold matter, the Court should not certify any of plaintiffs' proposed classes because each class includes claims over which the Court lacks subject matter jurisdiction. Plaintiffs' proposed classes include claims based on purchases of both products containing TFT-LCD panels defendants sold directly into the United States ("Domestic-Panel Products") and products containing panels defendants initially sold overseas ("Foreign-Panel Products"). But unlike purchasers of Domestic-Panel Products, purchasers of Foreign-Panel Products must satisfy the Foreign Trade Antitrust Improvement Act's ("FTAIA") demanding jurisdictional test. The FTAIA bars those purchasers' claims because the overseas panel sales (*i.e.*, defendants' conduct) did not have a direct effect on U.S. commerce and any domestic effect of the alleged anticompetitive conduct did not give rise to the Foreign-Panel Product purchasers' claims. Any attempt to prove otherwise would require individualized inquiries that could not be resolved through common evidence. Plaintiffs' proposed classes thus create predominance and manageability problems because they have not proposed a method of identifying who is and is not subject to the FTAIA's jurisdictional bar.

*Impact*: Plaintiffs fail to establish that impact can be shown through common proof on a classwide basis. Plaintiffs disregard the fact that the complex nature of the LCD panel and products markets – their many distribution channels, intermediaries' varying market and negotiating power, the varied uses of LCD panels in many types of LCD Products, changes in the LCD markets over time, LCD panels' numerous customized features, and the value added by each intermediary – does not lend itself to calculating in a systematic or formulaic manner the overcharge (if any) passed on to plaintiffs. Instead, plaintiffs rely on their expert, Dr. Netz, who offers an impact analysis nearly identical to that which Judge Alsup rejected as "fatally flawed" in *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 507 (N.D. Cal.

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M: 07-1827 SI

1  2008) ("*GPU*"). *GPU* involved indirect purchaser classes of end-users that purchased graphics

2  cards through complex distribution channels that rival the complexity of the distribution

3  channels in the LCD panel industry. Once again, "Dr. Netz has presented no class-wide

4  formulae that would be reliable in assessing impact on each consumer" in light of "the large

5  number of manufacturers, resellers, and products at issue here," and "does not adequately

6  explain how her regressions would be applied on a class-wide basis." *Id.* at 504. Rather, Dr.

7  Netz again bases her conclusions on regression analyses that suffer from "serious analytical

8  problems" because they rely on global averages rather than disaggregated transactions, thus

9  hiding the "substantial variation across individual cases." *Id.* at 494 (citation omitted). Besides

10 repeating her previous analytical mistakes, Dr. Netz's methods suffer from inconsistencies in

11 the formulae applied to different customers, a flawed direct overcharge analysis, and reliance on

12 data based on competitive periods that are inconsistent with plaintiffs' allegations.

13 Accordingly, plaintiffs cannot show predominance on the issue of impact.

14        *Damages*: Plaintiffs have not proposed a manageable method for calculating

15 damages. Plaintiffs' proffered "fluid recovery" method is impermissible in the Ninth Circuit

16 and further problematic here due to its reliance on Dr. Netz's flawed impact analysis and lack of

17 necessary data. To calculate plaintiffs' damages (if any) properly, one must account for

18 differences in bargaining power, discounts, local market conditions, the variety of products

19 involved, and other relevant variables, which would require a separate mini-trial for each class

20 member, rendering the class action unmanageable under Rule 23(b)(3).

21        *Conspiracy*: Plaintiffs have not substantively alleged that a single conspiracy

22 affected all class members. As plaintiffs allege and the government has admitted, there were a

23 number of separate conspiracies involving different defendants, customers, and types of panels

24 – not a single, overarching one. This is not surprising, because the nature of the LCD panel

25 industry makes an effective, single, eight-year, all-encompassing conspiracy virtually

26 impossible. Plaintiffs' proposed classes are so broad as to include purchasers allegedly injured

27

28

3

1 by different putative conspiracies, which by definition makes it impossible to prove the

2 existence of a conspiracy on the basis of evidence common to the class.

3        Second, the proposed classes are insufficiently defined, making notice

4 impossible under Rule 23(a).  Rule 23(a) requires that a class be ascertainable, so that the Court

5 knows who should receive the notice, and each recipient knows whether he is a member of the

6 class.  Under plaintiffs' proposed class definitions, a person or entity is a member of a class if

7 that person or entity purchased LCD panels indirectly "from one or more named Defendants."

8 But plaintiffs have neither identified such purchasers (as distinguished from purchasers of LCD

9 Products containing non-defendants' panels) nor offered a method for doing so.  And it is

10 unlikely plaintiffs would be able to develop such a method, given the enormous volume of

11 information involved in tracing the panel in each indirect purchaser's LCD Product back to the

12 panel manufacturer.

13        Third, plaintiffs fare no better under Rule 23(b)(2).  Because plaintiffs admit that

14 the alleged conspiracy ended in 2006 and do not allege the requisite threat of future harm from

15 any "ongoing conspiracy," they lack standing to obtain injunctive relief – a prerequisite to class

16 certification under Rule 23(b)(2).  The Court should also refuse to certify plaintiffs' proposed

17 statewide classes under Rule 23(b)(2) based on their state law unjust enrichment claims,

18 because such monetary claims are not secondary to plaintiffs' claim for injunctive relief.

19        Finally, at least eleven named plaintiffs cannot adequately protect the absentee

20 class members' interests under Rules 23(a)(3) and 23(a)(4).  Some of these plaintiffs are not

21 class members and are subject to unique defenses, rendering them atypical.  Others are

22 inadequate because they have inappropriate business or familial relationships with their

23 counsel, suggesting that they may put their attorneys' interests before the classes' interests.

24                          **STATEMENT OF FACTS**

25        The Court is already familiar with this case and the overall nature of the LCD

26 panel industry.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1113-14

27 (N.D. Cal. 2008); Defs.' Joint Opp. to Direct Purchaser Pls.' Mot. for Class Certification at 3-

28                                    4

16, Dkt. No. 1077 (filed July 1, 2009) ("Defs.' Direct Purchaser Class Opp."). This section discusses only those additional facts pertinent to the proposed indirect purchaser classes.

## I.   PROPOSED CLASS DEFINITIONS

Plaintiffs seek to certify a nationwide indirect purchaser class for injunctive relief and 23 state indirect purchaser classes for damages. Pls.' Mem. of Points and Authorities in Supp. of Indirect-Purchaser Pls.' Mot. for Class Certification, 1-2 (June 2, 2009) ("Pls.' Mem."). Each of the 23 state classes is defined identically, except that each applies only to the state the specific named plaintiff seeks to represent. *Id.* Plaintiffs seek to represent purchasers of three types of LCD Products: televisions, computer monitors, and notebooks. *Id.* at 2-3. Unlike the direct purchaser plaintiffs, plaintiffs seek to represent only the final consumers of these LCD Products; the proposed classes specifically exclude resellers. *Id.*

The operative complaint specifies a "Class Period" extending from January 1, 1996, through December 11, 2006. Pls.' Second Consol. Am. Compl. ¶¶ 1, 15, 128 (December 5, 2008) ("Compl."). This ending date was the day when various investigations of price-fixing in the LCD panel industry, including the U.S. Department of Justice's investigation, were publicly announced. *See id.* ¶ 183. But plaintiffs' class certification motion proposes class periods beginning on January 1, 1999, and extending until "the present" (for the nationwide Class) or until December 31, 2006 (for the statewide classes). Pls.' Mem. at 2-3.

## II.   DISTRIBUTION CHANNELS FOR LCD PANELS AND PRODUCTS

LCD panels may be incorporated into LCD Products by any one of several entities, and they may be resold (by themselves or as components) several times before reaching the final purchaser.[1]  Intermediaries between defendants and final purchasers include, among

---

[1]  To be incorporated into particular customers' LCD Products, LCD panels are typically customized to match the specific features required by different LCD Products' designs. *See* ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ Decl. of Marshall Pinder in Supp. of Defs.' Joint Opp. to Direct Purchaser Pls.' Mot. for Class Certification, Dkt. No. 1106, at ¶ 5 ("Pinder Decl."); ▬▬▬▬▬▬▬

5

1    others, Original Equipment Manufacturers ("OEMs"), Original Design Manufacturers

2    ("ODMs"), systems integrators, contract manufacturers, electronic parts distributors, resellers,

3    and retailers. Expert Report of Edward A. Snyder, Ph.D. ¶¶ 64, 112-13 ("Snyder Decl."). Each

4    intermediary may add value by, among other things, combining an LCD panel with other

5    components to make a finished product. *Id.* ¶ 119.

6          For example, one distribution chain could be as follows. An LCD panel

7    manufacturer sells an LCD panel to an overseas electronic parts distributor that resells the panel

8    to an overseas contract manufacturer. *See* Min Decl. ¶ 23.[2] That contract manufacturer might

9    assemble the panel into a notebook and then sell the notebook to a PC OEM's overseas

10    subsidiary. *See* Min Decl. ¶ 22. This PC OEM might then sell this notebook to a U.S. retailer,

11    who in turn would sell the finished LCD Product to a final consumer. *See id.* ¶ 24. However,

12    this potential distribution chain may diverge at any given point. For instance, the LCD

13    manufacturer may instead sell the panel directly to the contract manufacturer or to the PC OEM

14    instead of to the electronic parts distributor. *See id.* ¶ 21.[3] The PC OEM could also sell the

15    assembled notebook to a reseller or to the final consumer directly. *See* Min Decl. ¶ 24.

16          The diagram below illustrates the many distribution channels through which

17    LCD panels may pass before reaching end-users.

---

25    [2]    *See also* Decl. of Joyce Pan in Supp. of Opp. to Direct Purchaser Pls.' Mot. for Class
Certification, Dkt. No. 1113, at ¶ 4 ("Pan Decl."); Yamada Decl. ¶ 4.

26

27    [3]    *See also* ▓▓▓▓▓▓▓▓▓ Yamada Decl. ¶ 4.

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI



**ARGUMENT**

**I.     CLASS CERTIFICATION STANDARDS**

"[F]or a class action to be certified, the plaintiffs must establish the four prerequisites of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Rule 23(a) requires plaintiffs to demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact are common to the entire class; (3) the plaintiff representatives' claims and defenses are typical of the claims and defenses of the entire

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M 07-1827 SI

1   class; and (4) the plaintiff representatives will fairly and adequately protect the class's interests.

2   Fed. R. Civ. P. 23(a). Additionally, as "a threshold matter, and apart from the explicit

3   requirements of Rule 23(a), the party seeking class certification must demonstrate that an

4   identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, No. 07-03967, 2009 WL

5   1203937, at *4 (N.D. Cal. May 5, 2009).

6           To certify a Rule 23(b)(3) class for monetary relief, plaintiffs also must show

7   "that the questions of law or fact common to class members predominate over any questions

8   affecting only individual members, and that a class action is superior to other available methods

9   for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Alternatively,

10  to certify a Rule 23(b)(2) class for injunctive relief, plaintiffs must show that defendants have

11  acted on grounds that apply generally to the class, so that final injunctive relief is appropriate.

12  Fed. R. Civ. P. 23(b)(2).

13          This Court should conduct a "rigorous analysis" before certifying a class. *Gen.*

14  *Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982). Such a rigorous analysis should

15  include, where necessary, "consider[ing] the merits of the claims to the extent that [they are]

16  related to the Rule 23 analysis." *Vinole v. Countrywide Home Loans, Inc.*, No. 08-55223, 2009

17  WL 1926444, at *6, 10 n.15 (9th Cir. July 7, 2009) (concluding that the district court did not err

18  in "analyzing the merits of the underlying claims," because often the "pleadings alone will not

19  resolve the question of class certification") (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

20  509 (9th Cir. 1992)). The Court "need not blindly rely on conclusory allegations" in the

21  complaint. *Jordan v. Paul Fin., LLC*, No. 07-04496, 2009 WL 192888, at *2 (N.D. Cal. Jan.

22  27, 2009) (Illston, J.) (citation omitted).

23          In performing this rigorous analysis, the Court may weigh each side's class

24  certification evidence to determine whether plaintiffs can satisfy every element of Rule 23. *In*

25  *re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008); *In re Initial Pub.*

26  *Offering Sec. Litig.*, 471 F.3d 24, 27, 40-42 (2d Cir. 2006); *In re Xcelera.com Sec. Litig.*, 430

27  F.3d 503, 512 (1st Cir. 2005); *Unger v Amedisys, Inc.*, 401 F.3d 316, 322-23 (5th Cir. 2005);

28                                      8

1   *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005); *Gariety v. Grant Thornton, LLP*,

2   368 F.3d 356, 366 (4th Cir. 2004); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th

3   Cir. 2001); *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984); *accord In re Live Concert*

4   *Antitrust Litig.*, 247 F.R.D. 98, 115 (C.D. Cal. 2007) (explaining that, but for the Ninth

5   Circuit's decision in *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168 (9th Cir. 2007) (later vacated by

6   556 F.3d 919, and granting the petition for hearing en banc), the court would have followed the

7   *Initial Pub. Offering* standard).  As such, contrary to plaintiffs' intimation, this Court should

8   "weigh the relative credibility" of parties' opposing experts and their evidence before certifying

9   the classes.  *Compare In re Hydrogen Peroxide*, 552 F.3d at 322 (holding that the district court

10  erred by not weighing the relative credibility of the parties' experts); *with* Pls.' Mem. at 9, 22

11  (suggesting that the Court should not engage in a weighing of competing evidence).[5]  Where, as

12  here, plaintiffs' expert has not properly analyzed the relevant facts, the Court should disregard

13  that expert's submission and deny certification.  *See, e.g., Somers v. Apple, Inc.*, -- F.R.D. --,

14  No. 07-06507, 2009 WL 2137148, at *8 (N.D. Cal. July 17, 2009) (denying certification in

15  antitrust case because the court found "the overall testimony of [defendant's expert] far more

16  persuasive than that of [plaintiff's expert]"); *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257,

17  262 (3d Cir. 2004).

18  **II.    NO RULE 23(B)(3) CLASSES SHOULD BE CERTIFIED BECAUSE COMMON**
    **ISSUES DO NOT PREDOMINATE OVER INDIVIDUALIZED ISSUES AND A**
19  **CLASS ACTION WOULD NOT BE MANAGEABLE**

20          The state damages classes should not be certified because plaintiffs cannot show

21  that "questions of law or fact common to class members predominate over any questions

22  affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Here, plaintiffs must

23

24  5   When analyzing expert testimony, the Court should bear in mind that any opinions of
        plaintiffs' experts are not facts and cannot meet the Rule 23 requirements when
25      unsupported by evidence.  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509
        U.S. 209, 242 (1993) (explaining that "[e]xpert testimony is useful as a guide to
26      interpreting market facts, but it is not a substitute for them").

27

28                                                9

demonstrate that common questions predominate as to whether: (i) there was a conspiracy to fix prices in violation of the antitrust laws; (ii) the alleged violations caused plaintiffs injury – "impact"; and (iii) the injury can be identified. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-41 (1990). Plaintiffs incorrectly assert that the Court should assume predominance simply because this is an antitrust case. *See* Pls.' Mem. at 20-21. To the contrary, the Court should assess whether "individual issues will overwhelm the common questions and render the action valueless." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 339 (E.D. Mich. 2001); *see also In re Hotel Telephone Charges*, 500 F.2d 86, 89 (9th Cir. 1974) (reversing class certification; "[plaintiffs'] allegations that a conspiracy existed to violate the antitrust laws does not insure that common issues will predominate").

Plaintiffs contend that their claims are premised on a "'shared factual predicate' – Defendants' conspiracy," and that common evidence needed to prove that conspiracy predominates over all other issues. *See* Pls.' Mem. at 21.[6] Putting aside plaintiffs' failure to show the existence of a single conspiracy involving all defendants (*see infra* Argument § II.D), the cases on which plaintiffs rely do not hold that common proof of a conspiracy is sufficient to overcome plaintiffs' inability to show subject matter jurisdiction, impact, or damages on a classwide basis. *See In re Abbott Labs. Norvir Antitrust Litig.*, No. C 04-1511, 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007) (granting class certification of unjust enrichment class only after finding that plaintiffs had demonstrated that impact and damages could be shown through common proof); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 275, 280-87 (D. Mass. 2004) (dismissing state monopolization class claims based on lack of common evidence of

---

[6]  *In re Napster Copyright Litigation*, on which plaintiffs rely, Pls.' Mem. at 21, does not address the question of whether plaintiffs satisfy Rule 23(b)(3) solely by establishing that common proof exists with respect to a single issue – the existence of conspiracy. *Napster* is a copyright case that does not have the separate conspiracy and impact requirements that exist in antitrust cases. *See In re Napster Copyright Litig.*, No. C MDL-00-1369, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005).

10

impact); *In re Sugar Indust. Antitrust Litig.*, 73 F.R.D. 322, 346-48 (E.D. Pa. 1976) (granting certification only after finding that plaintiffs could show impact through common evidence).

The Court should therefore examine each element of plaintiffs' claims to determine whether the individual inquiries necessary to establish them will overwhelm any common issues, such that certifying a class renders the action "valueless" or otherwise eliminates the benefits of the class action mechanism. *In re Cardizem*, 200 F.R.D. at 339. The Court must be assured that a sufficient number of the case's issues predominate across the classes so that the case does not result in hundreds of thousands of individual trials after the limited common issues have been resolved. *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001) ("*Methionine I*"). Furthermore, plaintiffs must propose some way to address all issues: if their case plan addresses common issues first without explaining how individual issues will be resolved, then litigation over the common issues will be a waste of time and resources. *See GPU*, 253 F.R.D. at 507 (denying class certification where individualized inquiries would be required because indirect purchaser plaintiffs did not show a common method of proving impact); *Somers*, 2009 WL 2137148, at *8 (same).

A.     **Plaintiffs Cannot Establish Subject Matter Jurisdiction Through Evidence Common To The Class**

Plaintiffs' proposed classes include purchasers who allegedly bought: (i) Foreign-Panel Products (finished products incorporating panels defendants sold overseas); and (ii) Domestic-Panel Products (finished products incorporating panels defendants sold directly into the United States). Those putative class members who base their claims on purchases of Foreign-Panel Products face a unique and significant jurisdictional hurdle under the FTAIA, because they purchased LCD Products containing panels originally sold in foreign commerce.[7] To satisfy the

---

[7] Plaintiffs who purchased Domestic-Panel Products face a different jurisdictional test under *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 444 (2d Cir. 1945) ("*Alcoa*")). *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) (affirming the continued applicability of *Alcoa*). For the purposes of this motion, defendants assume, without

11

1  FTAIA, Foreign-Panel Product purchasers must show that defendants' conduct involving non-

2  import foreign commerce: (1) had a "direct, substantial and reasonably foreseeable effect" on

3  U.S. domestic or import commerce; and (2) that effect gave rise to their claims. 15 U.S.C. § 6a;

4  *F. Hoffman La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 162 (2004). Plaintiffs fail to meet

5  this burden through common proof; therefore they ask this Court to certify classes that include

6  claims over which it lacks subject matter jurisdiction. The Court should not do so. Plaintiffs

7  cannot remedy this defect by asking the Court simply to exclude claims over which it lacks

8  jurisdiction, because they have not proposed a means of identifying who among them must (or in

9  fact does) satisfy the FTAIA. Moreover, any attempt by plaintiffs to demonstrate that certain

10  purchases of Foreign-Panel Products somehow fall within the jurisdictional scope of the FTAIA

11  would necessarily devolve into complex, individualized inquiries that could not be resolved

12  through common evidence.

                 1.     Most Panels That Eventually Reach The United States In A Finished
                          Product Are First Sold In Foreign Markets And Proceed Through
                          <u>Many Different Distribution Levels And Distribution Channels</u>

15       Defendants manufacture LCD panels exclusively outside the United States.

16  They typically ship the panels either (a) directly to independent ODMs or to contract

17  manufacturers that incorporate the panels into finished products for OEMs or (b) directly to

18  OEM assembly subsidiaries.[8]



23  ──────────────

24     conceding, that the Court may have subject matter jurisdiction over claims brought by
   plaintiffs who purchased Domestic-Panel Products.

25  [8]   Min Decl. ¶ 21;

26                                 Snyder Decl. ¶ 64.

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18



19    The timing of LCD panels' entry into the United States varies, sometimes even

20  for the same customer or the same LCD product.

21

22

23

24

25    Foreign-Panel Products sold into the United States fall into in at least three

26  distinct product groups:  televisions, notebooks, and monitors.  Furthermore, Foreign-Panel

27  Products entered the United States at all distribution channel levels:  sometimes at the OEM

28

DEFENDANTS'  OPPOSITION  TO  INDIRECT  PURCHASER  PLAINTIFFS'  MOTION  FOR  CLASS
CERTIFICATION, Case No  M: 07-1827 SI

1  level, sometimes at distributor levels, sometimes at retailer levels, and sometimes directly at

2  consumer levels. ██████████████████████████████████

3  ████████████████████████████████████████████████████

4  ██████████████████████

5              2.    Under The FTAIA, The Court Lacks Subject Matter Jurisdiction Over
                     Claims Based On Purchases Of Foreign-Panel Products
6

7              Under the FTAIA, there is no subject matter jurisdiction over Foreign-Panel

8  Product purchasers' claims. *See United Phosphorus, Ltd. v Angus Chem. Co.*, 322 F.3d 942,

9  952 (7th Cir. 2003) (en banc) (whether a plaintiff satisfies the FTAIA is an issue of subject

10 matter jurisdiction); Order Denying Indirect Purchasers Pls.' Mot. for Preliminary Injunction,

11 Dkt. No. 630, at 2 (holding that the Court lacks subject-matter jurisdiction under FTAIA to

12 enjoin joint venture in Japan). First, the FTAIA "lays out a general rule" that excludes from

13 U.S. antitrust laws "conduct involving trade or commerce (other than import trade or

14 commerce) with foreign nations." *Empagran*, 542 U.S. at 161-62 (*quoting* 15 U.S.C. § 6a).

15 Therefore, the FTAIA applies only to foreign commerce, *i.e.*, transactions between overseas

16 sellers and buyers, and not to import commerce, *i.e.*, transactions between foreign sellers and

17 U.S. buyers. *Compare Kruman v. Christie's Int'l*, 284 F.3d 384, 395 (2d Cir. 2002) ("When

18 there is conduct directed at reducing the competitiveness of a foreign market . . . such conduct

19 involves foreign trade or commerce"), *abrogated in part on other grounds by Empagran*, 542

20 U.S. at 173, *with Turicentro v. Am. Airlines*, 303 F.3d 293, 303-04 (3d Cir. 2002) (describing

21 import commerce as defendant conduct that involves "directly bring[ing] items or services into

22 the United States"). Whether the FTAIA applies is determined based on the defendant's

23 conduct; it is irrelevant whether a third party sold the product into U.S. commerce or whether a

24 plaintiff purchased the product in U.S. commerce. *Kruman*, 284 F.3d at 395; *Carpet Group*

25 *Int'l v Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 71 (3d Cir. 2000).

26             In this case, the FTAIA applies to those plaintiffs and putative class members

27 who purchased Foreign-Panel Products, because the initial panel sale from an overseas

28
                                          14

1 defendant facility to an overseas purchaser (which is where any alleged overcharge would have

2 originated) involved only foreign commerce, not import commerce. In contrast, claims based

3 on purchases of Domestic-Panel Products are not subject to the FTAIA because a defendant's

4 conduct involved import commerce (*i.e.*, a defendant shipped the panel directly into the United

5 States from abroad) or domestic commerce (*i.e.*, a defendant's U.S. subsidiary shipped the

6 panel to a U.S. customer).

7 Second, the FTAIA "brings such conduct back within the . . . reach" of domestic

8 antitrust laws only if the conduct "both (1) sufficiently affects American commerce, *i.e.,* it has a

9 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or

10 (certain) export commerce, and" (2) that effect "gives rise" to the plaintiffs' antitrust claims.

11 *Empagran*, 542 U.S. at 163 (*quoting* 15 U.S.C. § 6a). An effect is "direct" under the FTAIA

12 only if it is the "*immediate* consequence of the defendant's activity." *United States v. LSL*

13 *Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004) (emphasis added). In *LSL Biotechnologies*,

14 the Ninth Circuit closely examined the legal definition of "direct" in the FTAIA, defining

15 "direct" as "proceeding from one point to another in time or space without deviation or

16 interruption." *Id.* (citation omitted). The Ninth Circuit further relied on "the Supreme Court's

17 interpretation of a nearly identical term in the Foreign Sovereign Immunities Act," regarding

18 which "the Supreme Court unanimously declared that an effect is 'direct' if it follows as an

19 immediate consequence of the defendant's activity." *Id.* (citation omitted).

20 Here, the only "immediate consequences" of the alleged conspiracies were

21 foreign effects experienced by direct purchasers of LCD *panels* from defendants.[10] Foreign-

22

23 ───────────

[10] This is not to say that direct purchasers of panels would necessarily have a claim under the

24 Sherman Act. Foreign direct purchasers' claims would be barred for the same reason that

the claims of U.S. indirect purchasers of Foreign-Panel Products are – they cannot

25 overcome the FTAIA's jurisdictional hurdle and show that defendants' conduct had a

"direct, substantial, and reasonably foreseeable effect" on *U.S.* commerce. Moreover,

26 under *In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d 981, 987 (9th Cir.

2008) (*"DRAM II"*), foreign direct purchasers' claims would fail for a separate reason:

27

28                                        15

1  Panel Product purchasers' alleged injury – paying higher prices for Foreign-Panel Products –

2  occurred well downstream and in completely different product markets from the markets in

3  which defendants' alleged anticompetitive conduct took place. Therefore, defendants' foreign

4  conduct had, at most, an indirect effect on domestic commerce.

5         Courts have held that antitrust plaintiffs cannot show a direct effect on U.S.

6  commerce based on alleged anticompetitive conduct affecting inputs first sold in foreign

7  markets. *See, e.g., In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 456-

8  57 (D. Del. 2007) ("*Intel II*") (dismissing U.S. indirect purchasers' claims that they paid higher

9  prices for products incorporating Intel microprocessors, where Intel's alleged anticompetitive

10 conduct occurred abroad); *United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003,

11 1014 (N.D. Ill. 2001) ("The FTAIA explicitly bars antitrust actions alleging restraints in foreign

12 markets for inputs . . . that are used abroad to manufacture downstream products . . . that may

13 later be imported into the United States. Clearly, the domestic effects in such a case, if any,

14 would obviously not be 'direct,' much less 'substantial' and 'reasonably foreseeable.'"), *aff'd,*

15 322 F.3d 942 (7th Cir. 2003) (en banc); *Papst Motoren GMbH v. Kanematsu-Goshu (U.S.A.),*

16 *Inc.*, 629 F. Supp. 864, 869 (S.D.N.Y. 1986) (concluding that counter-defendant's manufacture

17 and sale of products in Japan did not have "direct, substantial and reasonably foreseeable effect

18 on import trade in the United States," even though products were "eventually sold in [the U.S.]

19 (presumably through [an intermediary])"). The Court therefore lacks subject matter jurisdiction

20 over the claims of plaintiffs or putative class members who purchased Foreign-Panel Products.

21         Furthermore, to the extent the alleged conspiracies had an effect on import sales

22 of LCD panels, *i.e.* the sale of Domestic-Panel Products, Foreign-Panel Product purchasers

23 cannot show that any such effect gave rise to *their* claims. Courts applying the FTAIA have

24 consistently held that an effect will not "give rise to" a plaintiff's claim unless the effect on the

25

_____

26     they would likely not be able to show that any effect on the U.S. commerce from
       defendants' conduct proximately caused their (alleged) foreign injury.

27

28                                                    16

1  target commerce is the "proximate" or direct cause of the particular plaintiff's injury. *See, e.g.,*

2  *DRAM II*, 546 F.3d at 989. Foreign-Panel Product purchasers simply cannot show a direct

3  causal connection between any purported effect on the sale of Domestic-Panel Products and

4  their purchases of Foreign-Panel Products that did not contain imported LCD panels. *See, e.g.,*

5  *Empagran S.A. v. F Hoffman-LaRoche, Inc.*, 417 F.3d 1267, 1270-71 (D.D.C. 2005).

6
7
        3.     Individual Issues Of Fact And Law Predominate Over Common Ones
              With Respect To Subject Matter Jurisdiction

8          The Court may not certify plaintiffs' proposed classes because they include

9  claims over which it lacks subject matter jurisdiction. *See Sanders v. Apple, Inc.*, No. C 08-

10  1713, 2009 WL 150950, at *11 (N.D. Cal. Jan. 21, 2009) ("'[N]o class may be certified that

11  contains members lacking Article III standing . . . The class must therefore be defined in such a

12  way that anyone within it would have standing.'") (quoting *Denney v. Deutsche Bank AG*, 44

13  F.3d 253, 264 (2d Cir. 2006)); *see also In re Parmalat Securities Litig.*, No. 04 MD 1653

14  (LDK), 2008 WL 3895539, at *2 (S.D.N.Y. Aug. 21, 2008). Nor can plaintiffs solve this

15  problem by dividing the proposed classes into groups of Foreign-Panel Product purchasers and

16  Domestic-Panel Product purchasers. Plaintiffs have not offered a classwide means for sorting

17  the purported class members into these two groups,[11] and it would be virtually impossible to do

18  so. Tracing each panel from its initial sale down the distribution chain to each alleged class

19  member presents insurmountable logistical challenges, because it would require collecting data

20  stretching back many years from thousands of third-party manufacturers, distributors, and

21  retailers around the world and millions of U.S. consumers. ████████████████████████████

22  ██ That much of this information is overseas, outside the subpoena power of any U.S. court,

23  ───────────────────────────────

24  11  Plaintiffs cannot circumvent the issue by asserting that every member of the proposed
class can satisfy the heightened FTAIA standard, because this approach would: (a)
25  introduce a class conflict (by subjecting Domestic-Panel Product purchasers to a
heightened burden solely for the benefit of Foreign-Panel Product purchasers) and (b) not
26  address the individualized inquiries necessary under the FTAIA to show that the impact on
the relevant finished product market was substantial.

27
28
                               17

1  would further complicate the tracing. Indeed, plaintiffs have had more than a year to gather

2  evidence about downstream sales, and have served subpoenas on sixty-one third-parties thus

3  far, yet are not close to having collected the necessary data to trace every panel sale on which

4  they base their claims. If the Court certifies any of the proposed classes without a classwide

5  method of sorting the putative class members or necessary classwide evidence, it will have to

6  repeat the same individualized inquiry – whether the putative class member purchased a

7  finished product that incorporated a panel first sold abroad – many times over to determine the

8  threshold question of subject matter jurisdiction.[12]

9          Furthermore, even if it were possible for a direct sale into foreign commerce to

10  give rise to a "direct, substantial, and reasonably foreseeable effect" in domestic commerce, the

11  Court would still have to engage in individualized inquiries to determine whether any given

12  Foreign-Panel Product purchaser can overcome the jurisdictional bar. Despite their burden to

13  do so, plaintiffs have not offered any method or evidence to show that they can meet their

14  burden under the FTAIA on a classwide basis. Nor could they. Because televisions, notebooks,

15  and monitors each comprise a separate product market, *see* Netz Decl. at 12, the Court would

16  have to look at different economic evidence to determine whether the defendants' alleged

17  foreign conduct directly and substantially affected each respective market. And for each

18  product, plaintiffs would have to show that the effect was direct, substantial, and reasonably

19  foreseeable at *every* level of distribution between the defendant and the class member. For

20  example, a putative class member who purchased a monitor directly from Dell's website would

21  be affected very differently (if at all) by defendants' conduct as compared to someone who

22  purchased an Acer notebook from Best Buy, because this latter purchase is several steps further

23

24  12   While defendants maintain that the FTAIA bars all claims based on purchases of Foreign-
       Panel Products, the Court need not resolve the merits of subject matter jurisdiction on this
25     motion. It is proper to deny class certification on the basis that common issues of law and
       fact do not predominate over individual ones with respect to subject matter jurisdiction, as
26     Foreign-Panel Products purchasers (unlike Domestic-Panel Products purchasers) will have
       to overcome this difficult jurisdictional barrier.
27

28                                              18

1  removed from defendants' alleged conduct, is in a different product market, and is subject to

2  different considerations. ███████████████ Even at the *same* distribution channel

3  level, the directness, substantiality, and foreseeability of the effect often differ. ███████████

4         Resolving the issue of subject matter jurisdiction would require the Court to

5  engage in millions of mini-trials, precisely what the predominance requirement is intended to

6  prevent. *Methionine I*, 204 F.R.D. at 165. Indeed, as part of the predominance determination,

7  Rule 23(b)(3) expressly directs courts to evaluate "the likely difficulties in managing a class

8  action." Here, a class action is not manageable because the Court would have to engage in an

9  extraordinary number of individualized inquiries just to resolve the *threshold* issue of subject

10 matter jurisdiction over class members' claims. *See, e.g., Burkhalter Travel Agency v.*

11 *MacFarms Int'l, Inc.*, 141 F.R.D. 144, 152 (N.D. Cal. 1991) (explaining that it is proper to deny

12 class certification where a court determines that a class action would be unmanageable).

13                 4.   The FTAIA Bars Antitrust Claims Brought Under State Law

14        By enacting the FTAIA, Congress sought to establish a "single, clear standard"

15 for the extraterritorial application of American antitrust laws to "promote certainty in assessing

16 the applicability of American antitrust law to international business transactions and proposed

17 transactions." H.R. Rep. No. 97-686 at 6, 8 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2487,

18 2491, 2493. As the Supreme Court recognized, comity was the central principle underlying the

19 statute; by enacting a uniform, national standard, Congress intended that American antitrust law

20 would only regulate extraterritorial conduct that had a substantial effect on U.S. commerce,

21 thereby respecting other sovereigns' economic interests. *See Empagran,* 542 U.S. at 167-69.

22        Allowing state antitrust laws to trump the FTAIA would undermine both

23 uniformity and comity, resulting in divergent jurisdictional tests, with each state imposing its

24 own test in addition to that under federal law. Such a scenario would disrupt Congress's

25 express goals in enacting the FTAIA. Accordingly, courts have recognized that state antitrust

26 claims must satisfy the FTAIA. *See Intel II*, 476 F. Supp. 2d at 457 ("Congress has spoken

27 under the FTAIA. . . . Congress'[s] intent would be subverted if state antitrust laws were

28

19

1   interpreted to reach conduct which the federal law could not."); *see also Amarel v. Connell*, 202

2   Cal. App. 3d 137, 150 (1988) (reconciling the FTAIA and the Cartwright Act by concluding

3   that the FTAIA imposes its "effects" test on state antitrust laws); Louis Altman & Maria

4   Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 27:30 (4th ed. 2009)

5   (explaining that "state antitrust laws are subject to the same limitations that are imposed on

6   federal antitrust laws by" the FTAIA).

7          That the FTAIA does not expressly preempt contrary state law is of no

8   consequence. Federal law preempts state law where compliance with both federal and state rules

9   is impossible or where state law "stands as an obstacle to the accomplishment and execution of

10  the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S.

11  363, 372-73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 132, 142-43 (1941)). These

12  principles apply with particular force in areas of foreign commerce, which is "pre-eminently a

13  matter of national concern." *Japan Line Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979).

14         In *Japan Line*, the Supreme Court held that California violated the Commerce

15  Clause by imposing an *ad valorem* tax on foreign-owned cargo containers. *Id.* at 452-53. The

16  Court reasoned that, "'with respect to foreign intercourse and trade the people of the United States

17  act through a single government with unified and adequate national power.'" *Id.* at 448 (quoting

18  *Bd. of Trustees v. United States*, 289 U.S. 48, 59 (1933)). "'[A] state tax on instrumentalities of

19  foreign commerce may frustrate the achievement of federal uniformity in several ways," most

20  notably by "plainly prevent[ing] the Nation from 'speaking with one voice' in regulating foreign

21  commerce." *Id.* at 450-51. For these reasons, the Court struck down California's tax, even though

22  there was no express federal law to the contrary. *Id.* at 452-53.

23         Similarly, if plaintiffs here proceed with state antitrust claims where the FTAIA

24  would bar federal antitrust claims, the United States could not speak with a single voice on an

25  important dimension of foreign commerce – the extent to which American antitrust law may

26  reach foreign conduct. But unlike in *Japan Line*, where Congress was silent on the tax issue,

27  plaintiffs' claims here also conflict with a federal statute. Congress enacted the FTAIA with the

28

20

1   express purpose of defining the extraterritorial scope of American antitrust law, and in so doing,

2   identified precisely that conduct which American antitrust law reaches and that which it does

3   not. Allowing each state independently to determine whether certain foreign conduct violates

4   its antitrust laws would undermine that purpose. The Supremacy Clause and the Commerce

5   Clause cannot tolerate such discord.

6         Furthermore, most states either incorporate the FTAIA standard as a matter of

7   state law, *see, e.g., CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 552 (D.N.J. 2005); *Amarel*,

8   202 Cal. App. 3d at 150, or interpret state antitrust and consumer protection laws consistently

9   with federal law (including the FTAIA).[13] It makes no difference whether states have adopted

10  *Illinois Brick* repealer statutes, because the FTAIA does not prohibit indirect purchaser claims.

11  Rather, the FTAIA only establishes a jurisdictional test that applies to claims (whether brought

12  by direct or indirect purchasers) based on certain foreign conduct.

13     **B.    Plaintiffs Cannot Show That Common Issues Will Predominate Because**
       **They Cannot Prove Antitrust Impact With Common Evidence**
14

15         To establish predominance, plaintiffs must show, through common evidence,

16  antitrust impact (*i.e.*, injury) on each member of the proposed classes. *See, e.g., Bell Atl. Corp.*

17  *v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]e have repeatedly held that where fact

18  of damage cannot be established for every class member through proof common to the class,

19

20  13   *See, e.g.*, D.C. Code § 28-4515 (2009); Fla. Stat. § 542.23 (2008); Haw. Rev. Stat. § 480-3
21  (2008); Iowa Code § 553.2 (1999); Me. Rev. Stat. Ann. tit. 5, § 207 (2007); Mass. Gen.
     Laws ch. 93, § 1 (2009); Mich. Comp. Laws § 445.784(2) (2009); Nev. Rev. Stat. §
22  598A.050 (2009); N.M. Stat. Ann. § 57-1-15 (2008); R.I. Gen. Laws § 6-36-2(b) (2009);
     S.D. Codified Laws § 37-1-22 (2009); 9 Vt. Stat. Ann. tit. 9, § 2453(b) (2008); W. Va.
23  Code § 47-18-16 (2008); *Wedgewood Inv. Corp. v. Int'l Harvester Co.*, 126 Ariz. 157, 160
     (1979); *Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn. Ct. App. 1987);
24  *NAACP v. Claiborne Hardware Co.*, 393 So. 2d 1290, 1301 (Miss. 1980); *Anheuser-*
     *Busch, Inc. v. Abrahms*, 71 N.Y.2d 327, 334-35 (1988); *Rose v. Vulcan Materials Co.*, 282
25  N.C. 643, 655 (1973); *Byre v. Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985); *Tennessee ex*
     *rel. Leech v. Levi Strauss & Co.*, 1980-2 Trade Cas. (CCH) ¶ 63,558 at 76,972 n.2 (Tenn.
26  Ch. Ct. 1980); *Grams v. Boss*, 97 Wis. 2d 332, 346 (1980).

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

1  the need to establish antitrust liability for individual class members defeats Rule 23(b)(3)

2  predominance.").[14]  Plaintiffs misguidedly assert that "the overriding need to prove antitrust

3  conspiracy in the LCD panel market is alone sufficient to satisfy the Rule 23(b)(3)

4  'predominance' requirement" and common questions of impact are "not required for class

5  certification." Pls.' Mem. at 22, 24.[15]  Such an approach, which would require certification of a

6  class in *every* antitrust class action where a common conspiracy is alleged, is not the law.[16]

7            The actual rule is straightforward:  plaintiffs bear the burden of showing through

8  common proof that every class member paid a higher price than he would have absent the

9  alleged conspiracy. *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19

10 n.18 (1st Cir. 2008); *Blades*, 400 F.3d at 570.  In an indirect purchaser class action, "plaintiffs

11 must demonstrate that defendants overcharged their direct purchasers for [LCD panels] *and* that

12 those direct purchasers passed on the overcharges to plaintiffs.  In so doing, they must find a

---

14  To address impact, plaintiffs rely on federal case law under general federal antitrust
    standards. *See* Pls.' Mem. at 16, 20-21, 22-24.  Except as otherwise noted, defendants
    shall do the same. *See GPU*, 253 F.R.D. at 482, 501-07 (relying on federal case law to
    analyze impact requirement and denying certification of numerous state subclasses).

15  Plaintiffs rely on *In re Citric Acid Antitrust Litigation*, where Judge Smith concluded that
    plaintiffs had presented a classwide method for proving impact. No. 95-1092, 1996 WL
    655791, at *8  (N.D. Cal. Oct. 2, 1996) (citing *In re Potash Antitrust Litig.*, 159 F.R.D.
    682, 693-96 (D. Minn. 1996)).  In both *Citric Acid* and *Potash*, the courts concluded that
    plaintiffs had proffered methods for showing impact on a classwide basis. *Id.*  As a result,
    these cases are not instructive where, as here, plaintiffs have failed to offer a sufficient
    method for showing impact through evidence common to the proposed classes.

16  Plaintiffs repeatedly cite cases under various state laws permitting the use of "generalized
    proof" to demonstrate classwide impact. *See generally* Pls.' Mem. at 31-48.  "Generalized
    proof" does not mean that plaintiffs can presume impact on a classwide basis; instead, it
    merely means that plaintiffs can represent a class if they can offer a method to show
    impact on a classwide basis generally, as opposed to requiring individual proof. *E.g.*,
    *California v. Infineon Techs. AG*, No. C 06-4333, 2008 WL 4155665, at *5 (N.D. Cal.
    Sept. 5, 2008); *Blades*, 400 F.3d at 569-70.  Thus, this "generalized proof" standard is the
    same as the federal impact analysis under Rule 23(b)(3). *Nichols v. Mobile Bd. of
    Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982) (Rule 23(b)(3) requires a showing that
    issues subject to "generalized proof" predominate over issues subject to "individualized
    proof"); *Methionine I*, 204 F.R.D. at 163, 166.

---

22

1   way to account for the decision-making of a variety of resellers and manufacturers." *GPU*, 253

2   F.R.D. at 499 (emphasis added); *Methionine I*, 204 F.R.D. at 164.

3          Here, plaintiffs' impact analysis ignores key characteristics of the LCD panel

4   industry and how these characteristics changed over the putative class period: (i) complex chains of

5   manufacturing and distribution; (ii) different degrees of market power and business know-how of

6   the intermediaries and consumers; (iii) complex and rapidly changing products; (iv) customization

7   of LCD panels for numerous products; and (v) varying amounts of value added by manufacturers to

8   LCD Products. The LCD panel industry's complexity makes it extraordinarily difficult, if not

9   impossible, to trace any alleged overcharge through to indirect purchasers on a classwide basis.

10

11

12   In addition, Dr. Netz has presented no classwide formulas that would reliably assess impact on

13   each end-user in the putative classes. Instead, her flawed regression analyses (i) rely on average

14   – rather than disaggregated – LCD panel prices; (ii) use different variables for different

15   regressions; (iii) ignore price variation both across models and within a model; and (iv) rely on

16   competitive periods that are inconsistent with plaintiffs' allegations.

17          1.   Plaintiffs Have Not Proposed A Sufficient Method To Establish
               Common Injury In Light Of The Complex LCD Distribution Channels

18

19          Courts properly deny class certification under Rule 23(b)(3) where the relevant

20   product is sold through many different intermediaries in complex distribution channels that give

21   rise to too many considerations to be accounted for in a single, classwide method. *See, e.g., In*

22   *re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) ("Tracing

23   a price hike through successive resales is an example of what is called 'incidence analysis,' and

24   is famously difficult."). Varied intermediaries face costs, incentives, and other market forces

25   that differently affect their ability and willingness to pass along any cost increase. *Methionine*

26   *I*, 204 F.R.D. at 165 (rejecting generic pass-through allegations where resellers "operate[d] in

27   different markets with different competitive pressures"). Without a common method that

28

                                        23

1  accounts on a classwide basis for the pricing decisions of each intermediary involved in each

2  putative class member's LCD Product purchase, a court would have to analyze for each

3  purchase all the individual pricing decisions by every reseller at each level of the distribution

4  chain, defeating the point of a class action. *GPU*, 253 F.R.D. at 505 ("Class certification is

5  problematic where a plaintiff's method of proving pass-through requires a reseller-by-reseller

6  analysis."); *In re Brand Name Prescription Drugs*, No. 94-C-897, 1994 WL 663590, at *7

7  (N.D. Ill. Nov. 18, 1994) ("tracing the alleged overcharges from manufacturers, to wholesalers,

8  to retailers, to consumers presents individualized issues which would dominate this litigation

9  and preclude certification under Rule 23(b)(3)"). Here, plaintiffs have not proposed a method

10 that accounts for all of the complexities in the distribution channels for LCD panels and LCD

11 Products.[17]

12        Complex chains of independent companies connect LCD panel manufacturers and

13 indirect plaintiffs. ██████████████████ LCD panel manufacturers sell panels to many

14 different OEMs, ODMs, contract manufacturers, and electronic parts distributors. *Id.* LCD Product

15 manufacturers may purchase panels directly from panel manufacturers, indirectly through

16 distributors, or indirectly through the components manufactured by ODMs and contract

17 manufacturers. *Id.* Once an LCD Product manufacturer (*e.g.*, an ODM, OEM, or vertically

18

19 [17]  This is not a theoretical problem. For example, the testimony of indirect purchaser
20     plaintiff Shawn Stern, who owns a small computer services company that sells LCD
       monitors, underscores the individual nature of such pass-on decisions:

21         If the price [to my company] goes down I may lower my price. If the
           price goes up I may raise the price and in both circumstances, depending
22         on what it is and who it is, I may maintain the price that I have.

23 Lazerwitz Decl. ¶ 24, Ex. 22 (Deposition of Shawn Stern, 134:4-22 (Feb. 12, 2009)); *see
   also* Lazerwitz Decl. ¶ 6, Ex. 4 (Deposition of David Allen (Rule 30(b)(6) Deposition of
24 Crago, Inc.), 107:11-17 (Apr. 6, 2009)) ("Crago Dep.") ("Q. Did your cost ever go up but
25 your competitors' prices stayed the same? A. Oh yeah, we've seen that situation. Not just
   related to monitors but with other products as well. With competitors, sometimes we
26 shaved the prices down and just absorbed the loss, you know, swallow hard and grin and
   bear it.").

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

1  integrated panel manufacturer) has assembled a finished product incorporating a panel, it may then

2  sell that product directly to end-users through the Internet, to electronic products distributors that

3  provide wholesaling services to retailers, to companies that alter the product to add value before

4  reselling it, or to retailers such as Best Buy. *Id.* In addition, any intermediary may bundle the panel

5  or LCD Product with other goods and services – for example by adding extra memory or software

6  to a notebook computer – before it reaches the end-use consumer. *Id.*

7          Many LCD Product manufacturers purchase LCD panels from a variety of

8  sources and regularly change their suppliers.

9

10  Many of those suppliers are not alleged to have participated in any conspiracy.[18]

11

12

13      The use of different suppliers means that any given LCD Product model – even if sold by the

14  same OEM – could contain both defendants' and non-parties' panels.

15          Furthermore, many – but not all – intermediaries have significant bargaining

16  power and can obtain considerable discounts from different LCD panel manufacturers.

17

18                                                        In addition, intermediaries' bargaining power

19  fluctuates over time because of the Crystal Cycle, the alternating periods of oversupply and

20  shortage in the LCD panel industry. *See generally id.* ¶ 91.  But plaintiffs' proposed method of

21  _____

22  [18]                                                         Plaintiffs neither name either of

23  these entities as defendants nor allege their involvement in antitrust violations. Quanta

24  was an independent company until AU Optronics acquired it in late 2006. Lazerwitz Decl.
    ¶ 33, Ex. 31 (Dan Nystedt, *Taiwanese LCD Makers Merge to Take On Koreans*,

25  Infoworld, April 7, 2006). While plaintiffs include a single conclusory allegation that
    Quanta participated in "working-level meetings," plaintiffs do not allege that Quanta

26  entered into any pricing or production agreements or that Quanta was a coconspirator.
    Compl. ¶¶ 98, 144 (alleging agreements only at "CEO and Commercial Meetings").

27

28
                                              25
    _____
    DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION, Case No. M: 07-1827 SI

1  measuring overcharge does not consider the bargaining power of intermediaries, either

2  statically or over time.[19]

3           At each level of the distribution channel, independent intermediaries operate in

4  different product markets and accordingly make pricing decisions in light of economic

5  conditions particular to those markets. For example, LCD monitor manufacturers originally

6  had to overcome competition from CRT technology, while LCD television manufacturers

7  additionally must compete with plasma and rear projection technology. ▮▮▮▮▮▮▮

8  ▮▮▮▮▮▮ Differing competing technologies create pricing pressures that vary based on which

9  consumer electronics products are being sold. *E.g., In re Methionine Antitrust Litig.*, No. 00-

10  1311, 2003 WL 22048232, at *5 (N.D. Cal. Aug. 26, 2003) ("*Methionine II*") (denying

11  certification on predominance grounds where the market involved "a myriad of distribution

12  channels, and hundreds of different products").[20]



19  Lazewitz Decl. ¶ 8, Ex. 6 (Deposition of Jeanne Flanagan,

20  ───────────────────────

21  [19] As previously presented to the Court, it is tremendously difficult to demonstrate a
    consistent overcharge even to direct purchasers, let alone to indirect purchasers. *See*
22  Defs.' Direct Purchaser Class Opp. at 55-57.

23  [20] A related problem is that some class members, while they may not have purchased their
    LCD Products for resale, did in fact resell them. Named plaintiff Jai Paguirigan, who
24  seeks to represent the Wisconsin class, is in this category. Lazerwitz Decl. ¶ 20, Ex. 18
    (Deposition of Jai Paguirigan, 65:18-67:15, 74:1-76:5, 116:6-118:25 (Feb. 9, 2009))
25  ("Paguirigan Dep."). Such class members, proceeding under state antitrust laws that do
    not follow *Illinois Brick*, are subject to the unique defense that some or all of any
26  overcharge to them was passed on to their buyer. *See Methionine I*, 204 F.R.D. at 164-65
    (declining to certify indirect purchaser class under Wisconsin antitrust law).

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

1   83:25-85:14 (Mar. 4, 2009)) ("Flanagan Dep.") (testifying that she saved hundreds of dollars by

2   purchasing an Apple computer bundle online from a competing website rather than from Apple

3   directly).

4

5

6           The indirect purchaser classes proposed here are even more complex than the

7   classes that Judge Alsup refused to certify in *GPU*. 253 F.R.D. at 506-07.  In *GPU*, the named

8   plaintiffs filed an antitrust suit claiming to represent final purchasers of computers that

9   contained defendants' graphics cards. *Id.* at 499.  Like LCD panels and products, graphics

10  cards pass through complex distribution channels and end-users purchase finished products

11  (containing graphics cards) from "potentially thousands of different retailers and manufacturers,

12  some of whom negotiated special prices." *Id.* at 480.  The necessary pass-through analysis

13  would have required "a wholesaler-by-wholesaler and reseller-by-reseller" investigation, further

14  complicated by the fact that some graphics cards were bundled with the finished products. *Id.*

15  at 505-06.  After evaluating Dr. Netz's proposed method of proving classwide impact (which is

16  nearly identical to one she offers here), Judge Alsup refused to certify the class because this

17  method failed to account for the complex distribution network in the GPU industry. *Id.*

18  Additionally, in a recent decision, Judge Ware followed Judge Alsup's lead in refusing to

19  certify an indirect purchaser class in a monopolization case, because "Plaintiff has failed to

20  meet her burden of establishing a 'reliable method for proving common impact'" when

21  employing a method similar to plaintiffs' method here. *Somers*, 2009 WL 2137148, at *8.

22          Plaintiffs' attempts to distinguish *GPU* fall short.  Plaintiffs first assert that *GPU*

23  "is inconsistent with the binding Ninth Circuit authority in *Dukes* [*v. Wal-Mart*, 509 F.3d 1168

24  (9th Cir. 2007)]."  Pls.' Mem. at 24 n. 33.[21]  But plaintiffs' reliance on *Dukes* is improper,

25  ─────────────────────────────────────────

26  21   While plaintiffs do not expressly state in the body of their brief upon which *Dukes* opinion
        they rely, Pls.' Mem. at 24 n.33, this is the only *Dukes* case listed in their Table of
        Authorities. *See id.* at iv.

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

because the Ninth Circuit vacated the panel opinion and reheard the case en banc. *Dukes v. Walmart*, 556 F.3d 919 (9th Cir. Feb. 13, 2009). Regardless, plaintiffs misconstrue the panel opinion, which explicitly affirmed the district court's "'rigorous analysis' of the conflicting evidence." *Dukes*, 509 F.3d at 1177 n.2 (explaining that it would have been error to reject defendant's arguments regarding commonality solely because they overlapped with merits issues).

Plaintiffs also contend that *GPU* is inconsistent with *Rubber Chemicals* and *DRAM I*. Pls.' Mem. at 24, n.33. But the markets for graphics processors in *GPU*, and the LCD panel markets here, are significantly more complicated than the product markets in either *Rubber Chemicals* or *DRAM I*. Moreover, both decisions dealt only with direct purchasers, not indirect purchasers, and therefore did not address the complexity introduced through multiple distribution levels. *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 348 (N.D. Cal. 2005); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *2 (N.D. Cal. June 5, 2006) *("DRAM I")*. Further, *Rubber Chemicals* involved commodity products sold at list prices, *In re Rubber Chems.*, 232 F.R.D at 354, while in *DRAM I* "all pricing [was] dependent on the spot price." *DRAM I*, 2006 WL 1530166, at *9.

Finally, plaintiffs mistakenly contend that Judge Alsup relied on the fact that the government had dropped its investigation into the GPU industry. Pls.' Mem. at 24 n.33. While Judge Alsup's factual recitation mentioned that the government had dropped its investigation, he denied certification of the indirect purchaser class based exclusively on the plaintiffs' failure to offer a way to prove classwide impact. *Compare GPU*, 253 F.R.D. at 482, *with id.* at 501-07. As in *GPU*, plaintiffs here do not offer a classwide method of establishing pass-through that accounts for the realities of the complex distribution channels for LCD Products. As a result, plaintiffs' proposed classes would require countless mini-trials rendering this case unmanageable and unsuitable for class action treatment. *Methionine I*, 204 F.R.D. at 165.

1

     2.      Plaintiffs Have Not Proposed A Sufficient Method To Control For Wide Variations In Indirect Purchasers' Market Power And Negotiation Abilities

2

3              Aggregating indirect purchasers with varying degrees of market power in the

4  same class precludes common proof of injury. *E.g.*, *Burkhalter*, 141 F.R.D. at 154 (finding lack

5  of common proof of injury where "purchasers have varying degrees of leverage" over

6  defendants); *Infineon Techs. AG*, 2008 WL 4155665, at *11 (noting "the near impossibility of

7  demonstrating, *with generalized proof*," that large customers experienced impact just as small

8  customers did) (emphasis in original). Large or sophisticated buyers are in a better position to

9  bargain with suppliers. William H. Page, *The Limits of State Indirect Purchaser Suits: Class*

10  *Certification in the Shadow of Illinois Brick*, 67 Antitr. L.J. 1, 33-34 (1999); *see also Wood v.*

11  *Abbott Laboratories*, No. 96-512561, 1997 WL 824019, at *2 n.1 (Mich. Cir. Ct. 1997) (noting

12  that differences in bargaining power can create differences in prices paid). Plaintiffs who

13  negotiate individual prices may avoid paying any overcharge, thereby avoiding any antitrust

14  injury. *Infineon Techs. AG*, 2008 WL 4155665, at *7 (requiring that plaintiffs show that class

15  members paid artificially high prices). This is precisely the situation here.

16

17

18

19

20              But while plaintiffs' proposed classes include everyone from an individual

21  purchasing an LCD television for home use to a sophisticated corporation purchasing LCD

22  monitors in bulk for use in offices across the country, *see* Compl. ¶ 230, neither Dr. Netz nor

23  plaintiffs do anything to account for dissimilarities among would-be class members. Thus, the

24  proposed classes fail to account for variations in customer market power and negotiating ability.

25    22   *See also* Crago Dep. 239:15-19 ("Q. So does that mean that on occasion you charge

26         different prices to different customers for the same monitor or product that you're selling? A. That's possible, yes.").

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M: 07-1827 SI

1     3.     Plaintiffs Have Not Proposed A Sufficient Method That Accounts
             For Changes In The LCD Markets Over Time

2

3           Where pricing practices vary over time, determining whether even similarly

4    situated indirect purchasers paid an overcharge is challenging. *McCarter v. Abbott Labs., Inc.,*

5    No. Civ. A. 91-050, 1993 WL 13011463, at *2 (Ala. Cir. Ct. April 9, 1993) (rejecting class

6    certification where retail prices varied "even with respect to the same brand, form and size of

7    product depending on when, where, from whom, and in what quantity the product is

8    purchased"). Determining whether a purchaser has paid an overcharge requires "an estimation

9    of the relationship between wholesale price changes and retail price changes across time and

10   location." *In re Fresh Del Monte Pineapples Antitrust Litig.,* No. 1:04-md-1628, 2008 WL

11   5661873, at *5 (S.D.N.Y. Feb. 20, 2008) (citation omitted).

12          Plaintiffs fail to account for tremendous changes in the LCD industry and

13   distribution channels over the asserted class period.

14

15

16

17

18

19

20

21          These and other factors affected the pricing decisions of panel manufacturers and

22   any pass-on decisions of the intermediaries that comprise the distribution channels. But

23   plaintiffs' proposed method of measuring classwide impact does not account for these changing

24   competitive constraints.                              As a result, the Court would have to

25   conduct an individualized inquiry to determine impact that would "necessarily vary from

26   purchaser to purchaser, from product to product, from time to time, from place to place and

27

28
                                                   30

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

1   from store to store," defeating the purpose of the class action vehicle. *McCarter*, 1993 WL

2   13011463, at *3; *see also GPU*, 253 F.R.D. at 505.

3            4.    Plaintiffs Have Not Proposed A Sufficient Method That Accounts
                   For The Significant Variation In Panel Specifications

4

5            Where products are customized to particular purchasers' specifications, courts

6   must scrutinize individual transactions to determine whether the purchase price is attributable to

7   the customized features or to any alleged overcharge. *E.g., In re Industrial Diamonds Antitrust*

8   *Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996) (determining impact in case with distinct products

9   developed for particular customers would be an "enormous undertaking" not susceptible of

10  common proof); *GPU*, 253 F.R.D. at 480.  Defendants manufacture many non-interchangeable

11  panels that are designed according to particular customers' specifications, depending on each

12  customer's intended use of the panel.                                        Pan Decl. ¶

13  5;  Pinder Decl. ¶¶ 4-7;                                        Customized panel features

14  include size, thinness, weight, resolution, brightness, color quality, power consumption,

15  response time, viewing angles, operating temperature range, product lifetime, and others.  Decl.

16  of Janet S. Netz in Supp. of Defs.' Joint Opp. to Direct Purchaser Pls.' Mot. for Class

17  Certification, Dkt. No. 1035, at 10 ("Netz Decl.");

18                 Pinder Decl. ¶ 7;                    Yang Decl. ¶ 7.

19

20

21

22

23

24

25                                                          As a result, the prices they pay may reflect the

26  costs associated with incorporating these performance characteristics, rather than an alleged

27  anticompetitive surcharge. *Blades*, 400 F.3d at 570 (plaintiffs failed to adequately account for

28

31

1  the fact that underlying products were not homogenous).

4  　　　　　　　　　　　Determining whether an alleged overcharge affected all putative

5  class members would require an analysis of how individual product characteristics affect each

6  price paid down each specific distribution chain.  Yet neither plaintiffs nor Dr. Netz propose

7  any method of establishing common pass-through in light of panel variations or the resulting

8  individualized product negotiations.

9  　　　　　5.　　Plaintiffs Have Failed To Account For The Value Added To LCD
           Products As They Move Through The Supply Chain

11  　　　　　　As intermediaries add value to a product, it becomes increasingly difficult to

12  determine whether a price change is attributable to an alleged overcharge for the original

13  product or to differences in value intermediaries add later.  *City of St. Paul v. FMC Corp.,* No.

14  3-89-0466, 1990 U.S. WL 259683, at *2 (D. Minn. Nov. 14, 1990) ("Because substantial value

15  is added to the chlorine at various points in the chain of distribution, the court would have to

16  examine the circumstances of each class member individually to determine whether that

17  member has suffered an overcharge."); *Methionine II*, 2003 WL 22048232, at *4 (decertifying

18  indirect class where "the relationship between the price of methionine to direct purchasers and

19  the price of FM Poultry Mix to the end user will depend on many variables");

21  　　　　　　By the time LCD Products reach end-use customers, they are highly

22  differentiated and are sold at different prices due to a variety of factors, including performance

23  characteristics and brand values.

25  　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　In

26  addition, LCD panels represent significantly different proportions of the costs of different LCD

27  Products.

28  　　　　　　　　　　　　　　　　　32

To analyze properly whether any alleged overcharges were passed on through all stages of all relevant manufacturing and distribution channels and ultimately reached all indirect purchasers, the Court would have to analyze data on thousands of unique LCD panels incorporated into countless unique LCD Products. No method can account for all of these factors, and Dr. Netz does not offer one. *Id.* ¶ 217.

### 6. No Inference Of Impact Is Appropriate In This Case

Plaintiffs incorrectly assert for three state classes (California, Minnesota, and Florida) that "California and other repealer states' laws permit an inference of classwide injury." Pls.' Mem. at 25, 27-28.[23] Rule 23, however, does not allow plaintiffs to presume antitrust impact, and, as discussed below, even assuming state law did apply, California, Minnesota, and Florida do not in fact permit an inference of impact.

Rule 23 governs the predominance issue here. "It is settled that if the Rule in point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 n.7 (1996); *see also Hanna v. Plumer*, 380 U.S. 460, 469-74 (1965). "If the federal rule in question is clearly applicable, . . . the court need not consider whether *Erie*

---

[23] Plaintiffs do not argue that an inference of impact arises under the law of any other state. In fact, many state courts have explicitly rejected such an inference. *See, e.g., Melnick v. Microsoft Corp.*, Nos. CV-99-709, CV-99-752, 2001 WL 1012261, at *6 (Me. Super. Ct. Aug. 24, 2001) (denying certification under Maine antitrust statute and holding that each plaintiff must prove that the antitrust violation "did in fact cause him injury"); *Ren v. Philip Morris Inc.*, No. 00-004035-CZ, 2002 WL 1839983, at *6 (Mich. Cir. Ct. June 11, 2002) (in an indirect purchaser action under the Michigan Antitrust Reform Act, injury in fact cannot be established through the use of presumptions or inferences); *Sherwood v. Microsoft Corp.*, No. M2000-0185-COA-R9-CV, 2003 WL 21780975, at *30 (Tenn. Ct. App. July 31, 2003) (under the Tennessee Trade Practices Act, "plaintiffs will be required to prove they were actually damaged by the alleged monopolistic conduct").

33

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No M: 07-1827 SI

1  commands the enforcement of an allegedly substantive state rule seemingly in conflict."

2  *Affholder, Inc. v. Southern Rock, Inc.*, 746 F.2d 305, 308 (5th Cir. 1984).  As Rule 23(b)(3)

3  applies to determining class action predominance in federal court, any supposedly contrary state

4  rules are beside the point.[24]

5      Accordingly, federal courts routinely deny or limit indirect purchaser class

6  certification in cases brought under state antitrust laws without applying any inference of

7  classwide injury that might be derived from state law.  *E.g.*, *GPU*, 253 F.R.D. at 482, 503-07

8  (rejecting certification of indirect purchaser classes under California and other state laws due to

9  lack of impact through common evidence without applying inference favoring certification);

10  *Infineon Techs.*, 2008 WL 4155665, at *3, 5-12 (same); *In re OSB Antitrust Litig.*, No. 06-826,

11  2007 WL 2253425, at *1, 8-9 (E.D. Pa. Aug. 3, 2007) (rejecting inference of impact and

12  limiting indirect class involving state antitrust provisions).  Rather, such cases reflect a court's

13  duty to conduct a "rigorous analysis" to ensure that class certification is warranted under Rule

14  23, requiring the plaintiffs to offer not just inferences but "specific methodologies that purport

15  to adequately demonstrate impact for all class members across customer, product, and

16  procurement type."  *Infineon Techs.*, 2008 WL 4155665, at *5-10.

17      Even if state law and not Rule 23 governed the class certification analysis here,

18  plaintiffs' interpretation of state law is incorrect.  Under California law, the California Supreme

19  Court has never endorsed this inference.  While California Courts of Appeal have referred to

20  such a presumption in dicta, no California appellate court has relied on it to establish pass-on to

21  indirect purchasers.[25]  Additionally, any inference of injury applies only when "the effects of

---

22  [24] For example, plaintiffs rely on *Comes v. Microsoft*, 696 N.W.2d 318, 323 (Iowa 2005), for

23    the proposition that under Iowa procedural law, "common issues of liability would
      predominate even without a finding of commonality as to impact and damages."  Pls.'

24    Mem. at 34.  But Iowa procedural law does not apply here; federal law interpreting Rule
      23(b)(3) requires that plaintiffs show impact as to all class members on a classwide basis.

25  

26  [25] The cases plaintiffs cite are not to the contrary.  *See In re Cipro Cases I & II*, 121 Cal.
      App. 4th 402, 411 (2004) (finding substantial evidence of common proof of classwide

27    impact from brand name drug monopoly keeping generic drugs off the market); *BWI*

28  

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M. 07-1827 SI

1   the price-fixing were not obscured by substantially altering or adding to the item received from

2   the manufacturer." *BWI Custom Kitchen v. Owens-Illinois*, 191 Cal. App. 3d 1341, 1352

3   (1987). In other words, the inference applies only if the product reaches end-users unchanged

4   from its original sale. *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 415-16 (2004). But

5   here LCD panels are incorporated into a wide variety of different end-use products and are

6   substantially changed as they move through the supply chain, rendering any inference of impact

7   inapplicable. *Supra* § Argument II.B.4 – II.B.5. There is thus no basis, under either federal or

8   California law, for this Court to dispense with the rigorous analysis required by Rule 23(b)(3)

9   and simply assume that plaintiffs can meet their burden on impact.

10         Regarding Minnesota law, while plaintiffs characterize *Gordon v. Microsoft*

11   *Corp.* as "permitting an inference of impact," *see* Pls.' Mem. at 38, *Gordon* only discusses

12   inferring the particular amount of individual damage. *Gordon v. Microsoft Corp.*, No. 00-5994,

13   2001 WL 366432, at *11 (Minn. Dist. Ct. Mar. 30, 2001). Whether each class member was

14   injured to begin with, however, "is an element of liability and must be shown with some

15   certainty." *Id.* Therefore, under Minnesota law a court cannot rely solely on an inference of

16   impact, but instead "must determine whether plaintiffs offer a viable method for determining

17   classwide impact and whether 'a mechanical calculation is available' for determining individual

18   damage amounts." *Id.* (citing *In re Antibiotic Antitrust Actions*, 333 F. Supp. 278, 281

19   (S.D.N.Y 1971)); *see also City of St. Paul*, 1990 WL 259683, at *2; *Keating v. Phillip Morris,*

20   *Inc*, 417 N.W.2d 132, 137 (Minn. Ct. App. 1987).

21         Plaintiffs' assertion that in *In re Florida Microsoft Antitrust Litigation* a Florida

22   trial court applied an inference of antitrust impact despite pricing diversity is wrong – that court

23   _____

24   *Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1352 n.8 (1987)
     (depositions of middlemen established that they pass on overcharges); *Rosack v. Volvo of*

25   *Am. Corp.*, 131 Cal. App. 3d 741, 745-46 (1982) (involved no pass-on; vertical price-
     fixing cases where the class bought directly from coconspirators); *accord In re OSB*, 2007

26   WL 2253425, at *6 (refusing to apply inference of classwide impact to a California state
     antitrust law class).

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

1   actually certified the class based on its finding that plaintiffs had proposed a reasonable method

2   of proving impact and damages through common proof. *Compare* Pls.' Mem. at 32, *with In re*

3   *Florida Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, at *14-*15 (Fla. Cir. Ct.

4   Aug. 26, 2002). More to the point, a Florida appellate court has held that "such presumption

5   should not arise in indirect purchaser cases." *Execu-Tech Business Sys., Inc. v. Appleton*

6   *Papers, Inc.*, 743 So. 2d 19, 22 (Fla. 4th Dist. Ct. App. 1999); *see also In re Relafen*, 221

7   F.R.D. at 280-82 (relying on *Execu-Tech* to deny a Florida state class due to lack of a "precise

8   showing of individual impact").

9                                  7.   Dr. Netz's Analyses Are Deficient

10                                      a.   Dr. Netz's Regression Analyses, Which Use Average Prices
                                           Rather Than Disaggregated Prices, Are Empirically Unsound

11

12                    Dr. Netz relies on regression analyses to conclude that there was a 100% pass-on

13  through each level of the distribution chain of every alleged overcharge on every panel

14  incorporated into every LCD Product purchased by every putative class member over the entire

15  class period, thus supposedly providing a common method for showing impact on all class

16  members. Netz Decl. at 102-14. But Dr. Netz's use of regression analyses here does not

17  demonstrate impact for all putative class members through common evidence. On the

18  contrary, the regression analyses assume that all class members are affected – they are not a tool

19  for testing that assumption. *See* Snyder Decl. ¶¶ 192-93.[26]

20

21  [26]   Lazerwitz Decl. ¶ 39, Ex. 37 (ABA Section of Antitrust Law, *Econometrics: Legal,*
22          *Practical, and Technical Issues* 202, 221 (ABA Publishing 2005)) ("ABA *Econometrics*")
            ("By their very nature, regressions summarize data. In the process of summarizing, they
23          can overlook crucial detail. For example, it is always possible to perform a regression
            with the price as a dependent variable and with a variety of independent variables. The
24          regression can be estimated, and a line can be fitted to the data. This does not mean,
            however, that impact can be shown with common proof, or that damages can be calculated
25          in a formulaic manner. More careful analysis of the data is necessary to make sure that
            when the regression captures trends, it is not missing important information specific to
26          individual customers that runs counter to those trends.")

27

28                                              36

1    Dr. Netz's regressions further mask relevant differences in the individual

2  transaction data because she uses averages rather than disaggregated transaction data. *GPU*,

3  253 F.R.D. at 494. As the American Bar Association has explained:

4       Sometimes the prices used by economists are averages of a number of
        different prices charged to different customers or for somewhat different
5       products. Using such averages can lead to serious analytical problems.
        For example, averages can hide substantial variation across individual
6       cases, which may be key to determining if there is common impact. In
        addition, average prices may combine the prices of different package
7       prices of the same product or of somewhat different products. When this
        happens, the average price paid by a customer can change when the mix of
8       the products that the customer buys changes – even if the price of no
        single product changed.
9

10  ABA *Econometrics* at 220 (quoted in *GPU*, 253 F.R.D. at 494).

11    As a result of her involvement in *GPU*, Dr. Netz was well aware of the analytical

12  perils of data aggregation and the related risk that averaging data could skew her empirical

13  findings. Yet Dr. Netz glosses over this shortcoming by not disclosing or evaluating its

14  dangers. *See* Netz Decl. at 109-10 (relying on averages rather than on disaggregated cases).

15  Dr. Snyder explains that Dr. Netz's average-price regressions yield little insight into the likely

16  increase in the prices of widely different LCD Products for different customers at different

17  times:

18      For example, if one were to apply regression analysis to data on all
        homes in the country between 1999 and 2006 and find that, on
19      average, housing prices went up by 5%, it would say nothing about
        the increase (or decrease) in the price of any given house in the
20      country. This issue of averaging is compounded in this matter
        because the percentage of the cost represented by LCD panels in
21      the finished products at issue varies so much. Suppose that, on
        average, a $100 increase in the cost of lumber required to build an
22      average house increases the average price of a house by $90, this
        would yield little insight about the likely increase in the price of a
23      log cabin in Oregon versus a brick home with much less lumber
        input in San Francisco. Nevertheless, if one were to accept Dr.
24      Netz's methodology for assessing pass on, one would conclude
        that each and every house would increase in price by $90
25      regardless of the nature of the house.

26

27

28
                                   37

1   Snyder Decl. ¶ 194.  In relying on averages, Dr. Netz's analysis inappropriately masks critical

2   differences in prices across models, customers, and time within her aggregated categories.  *Id.* ¶

3   204 ("Dr. Netz imposes a common pass-on rate across products and time periods without first

4   testing whether constraining the pass-on rate in such a way is appropriate . . . .  If she had done

5   so, Dr. Netz would have found that her pass-on analysis supports the predominance of

6   individual factors over common factors in determining pass-on and, therefore, impact.").

7              Using Dr. Netz's proposed method, Dr. Snyder has conducted disaggregated

8   analyses of different subsets of the intermediary data sets.  ████████  These disaggregated

9   analyses show that, even under Dr. Netz's method, pass-on rates vary based on characteristics

10  of particular transactions, such as the product and time period involved, and that for some

11  transactions there is no pass-on and therefore no impact on the ultimate purchaser.  ████████

12  ████████████████████████████████████████████████████

13  ████████  Thus, Dr. Netz's proposed regression analyses actually show that "the

14  impact of alleged overcharges at the manufacturer level, when they are alleged to exist, on end

15  users would depend on factors such as the product purchased and the time of the purchase as

16  well as the intermediaries through which the product was purchased by the end user."  *Id.* ¶ 206.

17  Thus, Dr. Netz's conclusion that there was a 100% pass-on rate on all transactions flows from

18  her assumption that all transactions are the same – she assumes the conclusion she is trying to

19  prove.  ████████████████████████████  This circular reasoning

20  does not show classwide impact through a common method.

21              b.    Dr. Netz's Regression Analyses Rely On Different Variables

22              The variables Dr. Netz applies in her various regression models frequently differ.

23  For example, variables such as LCD panel size, resolution, and contrast ratio, or the brand of

24  the finished product, are explanatory variables for some intermediaries but not for others.

25  ████████████████  Dr. Netz fails to provide any justification for selecting any one

26  set of explanatory variables over another, "suggesting that the exclusion of relevant variables is

27  likely to affect any and all of her analyses."  *Id.* ¶ 54.  Thus, Dr. Netz uses a different method to

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M 07-1827 SI

1   show pass-on for each intermediary – necessarily resulting in thousands of individual formulas.

2   Combined with her reliance on averages, Dr. Netz's use of different variables for different

3   regressions leads to the same unacceptable result that justified the denial of class certification in

4   *GPU.* 253 F.R.D. at 504 ("If this class were certified, Dr. Netz's regressions would either be

5   overly reliant on averages and would thus sweep in an unacceptable number of uninjured

6   plaintiffs, or they would be unmanageably individualized.").

c.   Dr. Netz's Estimate Of Impact On Direct Purchasers Is Flawed

8        Dr. Netz uses unreliable methods to reach her conclusion that the alleged

9   conspiracies had an impact on all direct purchasers. *Compare* Netz Decl. at 66-71, *with*

10  . First, Dr. Netz averages defendants' prices for panels sold to direct purchasers

11  without considering difference in prices "for panels of various sizes, resolutions, applications,

12  models, and sold to various customers." Snyder Decl. ¶ 181. This averaging masks variation in

13  individual prices. *See* § Argument II.B.7.a;

22  , are not as reliable as

23  defendants' "more precise" transactional data. Snyder Decl. ¶ 197. In fact, there is no way to

24  know whether the prices companies reported to DisplaySearch even accurately reflect the

25  average transactional price or simply a particular employee's estimation of the average price;

26  the defendants' transactional data does not suffer from this uncertainty. Moreover, when

27  reporting prices to independent publications or otherwise making them available to competitors,

28

39

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M· 07-1827 SI

1  sellers would have various incentives to misreport.

2

3                                                                                    Given

4  these and other limitations, the publicly available DisplaySearch data would less likely reflect

5  actual prices.

6

7

8                                                                                    But

9  plaintiffs have taken 30(b)(6) depositions of all defendants on the topic of "[t]he nature of the

10  records of [their] sale of TFT-LCD Products," *e.g.*, Lazerwitz Decl. ¶ 30, Ex. 28 (Indirect-

11  Purchaser Pls.' Cross-Notice of 30(b)(6) Dep. of Def. Chi Mei Corp., at 5 (Feb. 2, 2009)),

12

13

14

15

16          d.      Dr. Netz's Regression Analyses Rely On Competitive Periods
                    Inconsistent With Plaintiffs' Allegations

17          Plaintiffs assert that a price fixing conspiracy "extend[ed] from at least

18  January 1, 1996" and "continu[ed] through the filing of the Second Amended Complaint" in

19  December 2008. Compl. ¶¶ 1, 251.

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

1

2

3          Dr. Netz's reliance on the periods before 1999 and after 2006 as "competitive

4    period[s]" is therefore inconsistent with plaintiffs' allegations.  Dr. Netz affirmatively relies on

5    the absence of a conspiracy during "the period before 1999 and the period after 2006" for the

6    purpose of her price regressions, which she could not do if there were anticompetitive activity

7    during these periods.  Netz Decl. at 91-92;

8

9                                                          Plaintiffs cannot contend that Dr.

10   Netz's regression analyses are reliable and simultaneously allege that the "competitive

11   period[s]" on which she relies were not, in fact, competitive.[28]

12        **C.    Plaintiffs Fail To Explain How Establishing Damages Will Be Manageable**

13          Plaintiffs' method of proving damages, *see* Pls.' Mem. at 24-25; Netz Decl. at

14   115-16, does not satisfy Rule 23(b)(3)'s manageability requirement.  Where the calculation of

15   damages "requires separate mini-trial(s) of an overwhelming large number of individual claims,

16   courts have found that the staggering problems of logistics thus created . . . render the case

17   unmanageable as a class action."  *Windham v. American Brands, Inc* , 565 F.2d 57, 68 (4th Cir.

18   1977) (internal quotation marks and citations omitted).  For example, in *Piggly Wiggly*

19   *Clarksville, Inc. v. Interstate Brands Corp.*, the court affirmed the denial of class certification in

20   a price fixing case, stating:

21                plaintiffs and their expert did not persuade the district court, and do not
                 persuade us, that a reliable formula for damages can be devised which will
22                yield statistically significant results, that the data that would have to be
                 plugged into such a formula can be assembled, that the relevant variables
23                like negotiating skill can be quantified, and that all of this can be used to

24   _____

25   [28]  If the Court were to deem reliable Dr. Netz's analyses based on data "for the period since
     2006" as untainted by the alleged conspiracy, it should not certify plaintiffs' injunctive
26    class based on their assertion that the alleged conspiracy is "ongoing" today.  *Compare*
     Netz Decl. at 91-92, *with* Pls.' Mem. at 14 *and* Compl. ¶ 251.  *See infra* § Argument IV.A.

27

28                                                  41

     DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
     CERTIFICATION, Case No M. 07-1827 SI

1    reliably measure antitrust damages for each of the many thousands of
     members of the proposed class.

2

3    100 F. App'x 296, 300 (5th Cir. 2004). Similarly, in *Abrams v. Interco, Inc.*, 719 F.2d 23 (2d

4    Cir. 1983), the court affirmed the denial of class certification in a price fixing action, noting the

5    "serious problem of manageability relate[d] to damages . . . complicated by the scores of

6    different products involved, varying local market conditions, fluctuations over time, and the

7    difficulties of proving consumer purchasers [sic] after a lapse of five or ten years." *Id.* at 31, 40

8    (quoting a leading antitrust treatise instructing that "the courts will not permit class actions

9    unless they can devise a practical means for their litigation"); *see also In re Hotel Telephone*

10   *Charges*, 500 F.2d at 89-90 (reversing certification in price fixing action, because determining

11   the "basis for computing damages" and then calculating damages "could require decades of

12   litigation"); *Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 486, 493 (E.D. Va. 1987)

13   (denying certification in a price fixing case, where "it appear[ed] that a class-action suit could

14   well require an overwhelming and unmanageable number of mini-trials, with juries, in order to

15   resolve the issues of injury and damages").

16        Plaintiffs argue that their "burden to qualify even the damages proof as yet

17   another common question is a modest one." Pls.' Mem. at 24. But it is "not enough that

18   Plaintiffs merely promise to develop in the future some unspecified workable damages formula.

19   A concrete, *workable* formula must be described *before* certification is granted." *Allied*

20   *Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 176 (C.D. Cal.

21   2007) (emphasis added); *see In re Hotel Telephone Charges*, 500 F.2d at 90 (district court erred

22   in "rel[ying] on the 'imagination' of [plaintiffs'] counsel to provide solutions that will, at some

23   point in the future, prevent . . . individual issues [including those related to damages and

24   damages calculation] from splintering the action into thousands of individual trials requiring

25   years to litigate").

26        Here, plaintiffs offer the following formula for calculating damages: "Damages

27   to class members, for each product at issue [monitors, notebooks, or televisions] and for each

28

                                        42

year, are then the product of revenues from class members for each product at issue and for each year, multiplied by the appropriate overcharge rate, and multiplied by the appropriate pass-through rate." Netz Decl. at 116. But this simplistic formula is unworkable for several reasons. First, the Ninth Circuit does not "allow[] damages in the form of fluid recovery,"[29] because "allowing gross damages [due to the class as a whole] by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes." *In re Hotel Telephone Charges*, 500 F.2d at 89-90; *accord McLaughlin*, 522 F. 3d at 231 ("Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability."). Plaintiffs' damages formula is a fluid recovery model, because it purports to apportion gross damages due to each subgroup of class members as a whole, but does not give any way to calculate actual damages to each of the millions of members of each subgroup.[30]

Second, plaintiffs' damages formula does not account on a classwide basis for the many variables that influence the intermediaries' pricing and discounting decisions (including rebates and bundling) with respect to the wide variety of differentiated LCD Products. ████████████████████████████████████████

[29]   A fluid recovery method consists of three main steps. "First, defendant's aggregate liability is determined in a single, classwide adjudication and paid into a class fund. Second, 'individual class members are afforded the opportunity to collect their individual shares,' usually through a simplified proof of claim procedure. Third, any residue remaining after individual claims have been paid is distributed to the class'[s] benefit under cy pres or other doctrines." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (citation and footnote omitted).

[30]   Plaintiffs' method addresses only the first step of the three-step fluid recovery method – the calculation of defendants' aggregate liability. *See McLaughlin*, 522 F.3d at 215, 231. Based on plaintiffs' method, the only way to distribute this aggregate sum of money would be to follow steps two and three of the fluid recovery method, *i.e.*, by allowing individual class members to collect damages through a simplified claims procedure and distributing any remaining funds under cy pres or a similar doctrine.



Any of these factors may alter the damages, if any, an individual class member incurred; determining those individual damages would require an individual trial by jury for each class member.[32]

Third, the evidence on which plaintiffs propose to rely to calculate their damages is either demonstrably wrong or irrelevant. Plaintiffs' overcharge and pass-on calculations are flawed in their damages formula for the same reasons they are flawed in their impact formula. Plaintiffs' method for excluding purchases made by governmental entities (as they must do under the class definition), Netz Decl. at 116, is also deficient. Instead of using data on governmental purchases of LCD Products, plaintiffs rely as a "proxy" on the share of computers sold to governmental entities, which Dr. Netz assumes without explaining is comparable to the share of LCD televisions, monitors, and notebooks sold to governmental entities. *Id.* Plaintiffs' "yardstick" method fails because they provide no evidence that the governmental buying patterns for computer systems are substantially similar to those for LCD televisions, monitors,

---

[32]   In addition, plaintiffs' formula does not address the changes in the intermediaries' bargaining power over time. Each intermediary's bargaining power is not constant, but fluctuates with the Crystal Cycle: intermediaries have more negotiating leverage in times of oversupply and less in times of shortage. *See generally* Snyder Decl. ¶ 91. Even if plaintiffs were able to devise a common damages formula that takes account of the many variables and factors involved, it is unlikely that they could ever obtain all the data that reflects those variables to calculate damages to each class member, as in many circumstances such data would be nonexistent or inaccessible. *See id.* ¶¶ 35-40, 221.

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No M. 07-1827 SI

1  or notebooks. *See Weisfeld*, 84 F. App'x at 261 n.3 ("Selection of the yardstick industry is

2  based on its similarity – for example, in terms of structure, product demand, capital, labor and

3  materials input trends and product technology – to the industry being investigated."). Nor do

4  plaintiffs otherwise explain why it is permissible to use anything other than data relating to

5  LCD Products to determine damages.

6        Plaintiffs' formula also purports to eliminate purchases made in states other than

7  the 23 proposed class states by comparing the states' populations. Netz Decl. at 116. But

8  because household income varies by state, the raw relative populations of the states do not

9  indicate the buying pattern of the individual class members. For example, consumers in

10  wealthier but less populous states may buy more LCD Products than consumers in poorer but

11  more populous states. *See* Lazerwitz Decl. ¶ 34, Ex. 32 (U.S. Census Bureau, Income 2005,

12  Two-Year Average Median Household Income By State: 2003-2005) (showing variations in

13  household income by state).[33] Moreover, plaintiffs' calculation does not account for

14  individuals who purchased a product in one state but at the time of class certification live in

15  another,[34] a group that must be excluded under the class definitions. *See* Pls.' Mem. at 2-3.

16  **D. Because Plaintiffs Present No Evidence That Shows The Existence Of A Single Conspiracy Involving All Defendants, Common Issues Of Fact Do**

17  **Not Predominate As To All Class Members**

18        To certify a class against all defendants, plaintiffs must adduce evidence

19  showing a common conspiracy. *See, e.g., Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 323

20

21  [33]  For example, median household income ranged from a low of $34,396 in Mississippi to a high of $58,854 in Hawaii in 2004-2005. *Id.*

22  [34]  *See* Lazerwitz Decl. ¶ 35, Ex. 33 (Michael J. Walsh & Jonathan D. Jones, *More Evidence*

23  *On The "Border Tax" Effect: The Case Of West Virginia, 1979-84*, 41(2) Nat'l Tax J. 261, 264 (1988)) ("sales tax differentials are an effective incentive for consumers to cross state

24  borders to take advantage of lower after-tax prices in low-tax regions if they are near the border"); Lazerwitz Decl. ¶ 36, Ex. 34 (William F. Fox, *Tax Structure And The Location*

25  *of Economic Activity Along State Borders*, 39(4) Nat'l Tax J. Vol. 387, 387 (1986))

26  ("consumers are more likely to change their consumption behavior in response to increases in the easily observable general sales tax than in other taxes that may indirectly raise business costs").

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M: 07-1827 SI

1  (5th Cir. 1978) ("[T]he national class should not have been certified since there would be no

2  evidence linking the different conspiracies to each other in order to establish the one 'common'

3  conspiracy.  Common issues of fact do not predominate in such a situation even though all the

4  plaintiffs might have separate causes of actions against the same defendants based upon similar

5  theories of recovery."); *Panache Broad. of Pa. v. Richardson Elecs.*, No. 90-C-6400, 1995 U.S.

6  Dist. LEXIS 14462, at *41-48 (N.D. Ill. Sept. 27, 1995) (declining to certify a class that

7  included individuals who purchased products not subject to an agreement which gave rise to

8  plaintiffs' antitrust claims).  Federal courts continue to follow *Blue Bird*, holding that "multiple

9  conspiracies" affect different class members differently, thereby undermining any presumption

10  that proof of an unlawful agreement is a common issue.  *See, e.g., In re Polypropylene Carpet*

11  *Antitrust Litig.*, 178 F.R.D. 603, 615-19 (N.D. Ga. 1997); *GPU*, 253 F.R.D. at 484.[35]

12  Accordingly, on a motion for class certification, "[p]laintiffs must show they will prove one

13  common conspiracy to fix prices in all relevant markets," using "common evidence that reveals

14  a common nucleus of operative facts."  *In re Polypropylene Carpet*, 178 F.R.D at 618 (citation

15  omitted).

16  While plaintiffs' complaint contains conclusory allegations of a single

17  overarching conspiracy, Compl. ¶¶ 130, 146, plaintiffs' own more specific allegations, certain

18  defendants' guilty pleas, statements by the government, and the very nature and history of the

19  LCD panel industry all contradict the notion of a single overarching conspiracy.  To the extent

20  that plaintiffs may have been harmed by different, unconnected alleged agreements, common

21  issues of fact regarding liability do not predominate.

22  First, plaintiffs allege that defendants committed the following distinct overt acts

23  in furtherance of a common conspiracy:

24  _____

25  35   These issues were not addressed in the cases plaintiffs cite, because the defendants in
         those cases did not dispute that the existence of a price-fixing agreement as alleged was a
26       common issue.  *See DRAM I*, 2006 WL 1530166, at *4; *In re Rubber Chems.*, 232 F.R.D.
         at 352; *In re Citric Acid*, 1996 WL 655791, at *3.

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

- The "Crystal Meetings," taking place "from early 2001 through at least 2006." *Id.* ¶¶ 133, 142, 144-48;

- A conspiracy between Japanese manufacturers only in "the early years." *Id.* ¶ 131;

- Bilateral discussions between Sharp and other unnamed coconspirators (including a wholly speculative and conclusory allegation that Sharp must have conspired with Toshiba) regarding panels sold to Apple, Dell, and Motorola. *Id.* ¶ 147;[36] and

- A conspiracy by which certain executives' "public statements . . . resulted in, among other things, a temporary halt in the expansion of production capacity among defendants." *Id.* ¶¶ 173, 175, 176, 178.

Plaintiffs do not show that these alleged overt acts relate to one another in any way. Taking plaintiffs' nonconclusory allegations as true, there were at least four separate alleged conspiracies.

Plaintiffs' allegations of a number of separate conspiracies are consistent with the guilty pleas on which plaintiffs rely. *See* Pls.' Mem. at 3 n.10; Compl. ¶¶ 189-91. The pleas describe different conspiracies involving different scopes, time periods, and markets. Chunghwa's and LG Display's plea agreements cover panels sold in the United States and elsewhere from September 2001 to June 2006 and December 2006, respectively, while Sharp's plea agreement covers its specific products sold only to Dell, Motorola, and Apple during segmented periods. *Compare* LG Display Plea Agreement, Dkt. No. 749-2, at 4, *and* Chunghwa Plea Agreement, Dkt.

---

[36] Plaintiffs allege that Toshiba must have participated in a conspiracy because (i) Sharp pleaded guilty; (ii) Toshiba sold LCD panels to Dell and Apple; and (iii) Toshiba had a non-dominant market share of between 14.1% and 14.5% of the market for small and medium sized LCD panels. *Id.* ¶ 147. This sort of speculation by inference lacks any specific factual allegations.

47

1   No. 767-2, at 3, *and* Compl. ¶¶ 189-90; *with* Sharp Corp. Plea Agreement, Dkt. No. 750-2, at 2-4,[37]

2   *and* Compl. ¶ 191.

3         Indeed, the government has acknowledged that its investigation has not revealed

4   the existence of a single conspiracy involving all defendants.  During a November 12, 2008,

5   public announcement of the guilty pleas, Assistant Attorney General Thomas O. Barnett

6   described the alleged Chunghwa and LG Display conspiracy, but then noted that Sharp "has

7   agreed to plead guilty for participating in *other conspiracies* to fix the price of LCD panels to

8   three specific customers – Apple, Dell and Motorola."  Lazerwitz Decl. ¶ 32, Ex. 30 (Thomas

9   O. Barnett, Ass't Attorney Gen., Remarks at a Press Conference Regarding LG, Sharp and

10  Chunghwa's Agreements to Plead Guilty in LCD Price-Fixing Conspiracies, at 1 (Nov. 12,

11  2008)) (emphasis added).  Mr. Barnett added that Sharp's plea involved "*three separate* price-

12  fixing agreements for sales of LCDs to three major purchasers."  *Id.* at 2 (emphasis added).

13        Hitachi Displays' plea agreement is limited in scope as well, as it pertains only

14  to its sales of panels for notebook computers to Dell from April 1, 2001, to March 31, 2004.

15  Hitachi Displays Plea Agreement, Dkt. No. 1000-2.  During Hitachi Displays' plea hearing, the

16  government's attorney, David Ward, emphasized that Hitachi Displays' plea addressed a

17  separate conspiracy unconnected to the "Crystal conspiracy" and stated that "[t]he conspiracy to

18  which LG [Display] pled to and CPT pled to was a related, but *separate*, conspiracy that did not

19  involve this defendant."  Lazerwitz Decl. ¶ 29, Ex. 27 (Tr. of Proceedings, *United States v*

20  *Hitachi Displays Ltd.*, No. CR-09-0247 (N.D. Cal. May 22, 2009)) at 16:22-24 (emphasis

21  added).  When the Court asked whether the government developed proof of "many separate

22  little conspiracies," Mr. Ward replied:

23

---

24  37   Specifically, Sharp pleaded to fixing prices, through "bilateral telephone discussions" and

25  "bilateral meetings," of panels sold to:  (1) Dell, from April 1, 2001, to December 1, 2006,
for use in computer monitors and notebooks; (2) Motorola, from the fall of 2005 to the

26  middle of 2006, for use in Razr mobile phones; and (3) Apple, from September 1, 2005, to
December 1, 2006, for use in iPod portable music players.  *Id.*

27

28                                                    48

1   Yes, Your Honor. We believe there was a larger conspiracy involving LG
2   [Display] and CPT and others to fix the price of TFT-LCD sold to many
    manufacturers. The Government does not believe that either Hitachi
3   [Displays] or Sharp were involved in that conspiracy. We believe that
    Hitachi [Displays], Sharp, and other unnamed coconspirators were
4   involved in a separate conspiracy amongst themselves to fix the price of
    TFT-LCD sold only to Dell. So they're related conspiracies, but they're
5   not the same conspiracies.

6   *Id.* at 17:18-18:1. The guilty pleas do not evidence a single conspiracy to fix the prices paid by

7   any class member. As the government told the Court with respect to Hitachi Displays, for

8   example, "the Government does not have evidence to prove a conspiracy to fix prices of TFT[-

9   LCD panels] sold to any other customers other than Dell." *Id.* at 16:3-5. These guilty pleas

10  underscore the absence in the complaint of any allegation that the Japanese defendants (Sharp,

11  Hitachi Displays, and Toshiba) participated in a single overarching conspiracy with other

12  defendants.

13          Plaintiffs' and the government's allegations of different conspiracies are more

14  consistent with economic conditions in the LCD panel industry than the single conspiracy on

15  which the proposed class definitions are premised.



21                                                          Plaintiffs' expert, Dr. Netz, also

22  acknowledges that "the TFT-LCD industry has been characterized by rapid technological

23  advances and frequent changes in panel generations." Netz Decl. at 48. These rapid changes

24  "constrain the ability of the alleged cartel to raise prices across all products, customers and time

25  periods thereby challenging . . . the notion of a uniformly effective conspiracy." Snyder Decl. ¶

26  92.

27

28
                                            49

1    Finally, to the extent there were separate conspiracies, Dr. Netz's assumption of

2   a single conspiracy undermines, from the outset, her attempt to show impact across the class.

3   *Id.* ¶ 182.



## III. THE PROPOSED CLASSES ARE NOT ASCERTAINABLE UNDER RULE 23(A)

13    Class certification should also be denied under Rule 23(a) because plaintiffs

14   failed to define an ascertainable class. "As a threshold matter, and apart from the explicit

15   requirements of Rule 23(a), the party seeking class certification must demonstrate that an

16   identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, No. 07-03967, 2009 WL

17   1203937, at *4 (N.D. Cal. May 5, 2009); *see also In re Tableware Antitrust Litig.*, 241 F.R.D.

18   644, 650 (N.D. Cal. 2007) (stating that, under Rule 23(a), "there must be some evidence that a

19   class . . . may be defined with reasonable specificity"); *Whiteway v. FedEx Kinko's Office &*

20   *Print Servs , Inc.*, No. 05-2320, 2006 WL 2642528, at *3 (N.D. Cal. Sept. 14, 2006) ("An

21   implied prerequisite to certification is that the class must be sufficiently definite.").[38]  Plaintiffs

22   bear the burden "to demonstrate that the proposed class definition is 'precise, objective, and

---

[38]    Although ascertainability is a well-established requirement under Rule 23(a), plaintiffs do not address it in their motion.

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M: 07-1827 SI

1   presently ascertainable.'" *Mad Rhino, Inc. v. Best Buy Co.*, No. 03-5604, 2008 U.S. Dist.

2   LEXIS 8619, at *9 (C.D. Cal. Jan. 14, 2008)).[39]

3   The Court's recent decision in *eBay* is instructive. Plaintiffs in *eBay* sought to

4   certify a class, in part, of "all persons who would have won auctions but for a shill bidder

5   entering the highest bid." *eBay*, 2009 WL 1203937, at *4. The Court found this class "wholly

6   unascertainable," because plaintiffs "neither presented evidence identifying auctions in which a

7   shill bid was the highest bid and the putative 'would-be winner,' nor have plaintiffs suggested a

8   method by which to determine how to identify such persons or such auctions." *Id.* The Court

9   further emphasized that "the class members themselves might not know if they were members

10  of the class." *Id.* The Court rejected this class definition "because it fail[ed] to set forth a class

11  which [was] ascertainable and clearly identifiable." *Id.*

12  Like the proposed class in *eBay*, plaintiffs' proposed classes here are

13  unascertainable. Plaintiffs' proffered class definitions encompass indirect purchasers who

14  bought LCD Products incorporating panels manufactured by "one or more of the named

15  Defendants." Pls.' Mem. at 2-3. In most instances, neither plaintiffs nor defendants will be

16  able to determine whether a particular LCD Product contains a panel manufactured by a

17  defendant, as opposed to a third-party manufacturer. There is no way to determine who

18  manufactured the panel contained in a finished product by looking at the product, and

19

20  39  Two reasons underlie this requirement. First, the judgment in any class action must
21  "specify or describe . . . whom the court finds to be class members," Rule 23(c)(3)(B), and
    therefore the class must be "definite enough so that it is administratively feasible for the
22  court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*,
    184 F.R.D. 311, 319 (C.D. Cal. 1998). Second, a consumer receiving notice under Rule
23  23(c)(2)(B) must be able to determine whether he is a member of the class or not, so as to
    decide whether to opt-out (if he is in the class) or pursue an individual claim (if he is not
24  in the class). *Cf. Jones v. Nat'l Sec. Fire & Cas. Co.*, No. 06-1407, 2006 WL 3228409, at
    *4 (W.D. La. Nov. 3, 2006) (unascertainable "'definitions frustrate efforts to identify class
25  members, contravene the policy against considering the merits of a claim in deciding
26  whether to certify a class, and create potential problems of manageability.'") (quoting
    *Manual for Complex Litigation* (Third) § 30.14 (2003)).

27

28

51

1    defendants are not aware of any sources of information available to end-users that consistently

2    identify the manufacturer of the LCD panel contained in a finished product. The ability to

3    ascertain the identity of the manufacturer of an LCD panel appears to be more the exception

4    than the rule. Snyder Decl. ¶ 35. With the exception of Gladys Baker, none of the 38 named

5    plaintiffs could identify the manufacturer of the LCD panel contained in his LCD Product.[40]

6           Like the plaintiffs in *eBay*, plaintiffs here have not "presented evidence

7    identifying" which LCD Product purchasers are in the class and which are not. *eBay*, 2009 WL

8    1203937, at *4. Nor is it likely that plaintiffs could obtain such evidence, as the distribution

9    channels are so complex and have so many participants that plaintiffs would be required to

10   gather massive amounts of data – much of which likely no longer exists due to the passage of

11   time – from thousands of third parties. ████████████████ In fact, over the past 20

12   months of discovery on the issue, plaintiffs have served subpoenas on 61 third parties and

13   received transactional data from all defendants. Yet, plaintiffs have not even shown that their

14   proposed class representatives purchased products containing panels manufactured by

15   defendants, let alone that other purported class members did so.

16          And like the plaintiffs in *eBay*, plaintiffs here have not "suggested a method by

17   which to determine how to identify" such products. *eBay*, 2009 WL 1203937, at *4.[41] Indeed,

---

18   40   *Compare, e.g.*, Lazerwitz Decl. ¶ 12, Ex. 10 (Deposition of Byron Ho, 58:11-19, 59:23-
19        60:11, 63:19-64:11 (Apr. 27, 2009)) ("I don't think I'm qualified to figure out where any
          of the parts for my monitor came from."); Lazerwitz Decl. ¶ 14, Ex. 12 (Deposition of
20        Joseph Kovacevich, 72:8-74:10 (Feb. 16, 2009)); Lazerwitz Decl. ¶ 15, Ex. 13 (Deposition
          of Steven Martel, 36:18-37:4, 81:21-82:1 (May 1, 2009)) ("I have no knowledge of who
21        manufactured [the panel] and presumed that they were all relatively the same."); *and*
22        Lazerwitz Decl. ¶ 21, Ex. 19 (Deposition of Allan Rotman, 45:3-47:8 (July 13, 2009))
          ("Rotman Dep."), *with* Lazerwitz Decl. ¶ 7, Ex. 5 (Deposition of Gladys Baker, 74:25-
23        75:16 (Jan. 29, 2009)) ("Baker Dep.") (Quanta Display Inc. listed as manufacturer of the
          panel on Dell System Information sheet).

24

25
26
27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

1   any such method would be extraordinarily complex and difficult to apply, as it would have to

2   account for innumerable manufacturers, intermediaries, and variations in distribution channels.

3   Snyder Decl. ¶ 35. Plaintiffs could not even try to show ascertainability on a product-by-

4   product basis, because manufacturers of LCD Products often obtain LCD panels for the same

5   model of product from a variety of manufacturers, some of which are not defendants.

6

7                                                        Even panel manufacturers that are vertically

8   integrated and make finished products source panels from other panel manufacturers.

9

10

11                                              42

12   **IV.   THE COURT SHOULD DENY PLAINTIFFS' MOTION TO CERTIFY A**
          **NATIONWIDE INJUNCTIVE CLASS AND 23 STATEWIDE UNJUST**
13        **ENRICHMENT CLASSES UNDER RULE 23(B)(2)**

14           Plaintiffs seek injunctive relief on behalf of a purported nationwide class under

15   Rule 23(b)(2) for defendants' allegedly ongoing violations of the Sherman Act. Compl. ¶ 3.

16



17

18

19

20

21

22

23

24

25   42   For similar reasons, should the Court decide to exclude Foreign-Panel Product purchases
          from the class definition, plaintiffs will face an even greater challenge of ascertaining the
26        class members by identifying which end-users bought Domestic-Panel Products. *See*
          Snyder Decl. ¶ 38; *supra* § Argument II.A.3.
27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M 07-1827 SI

1   Plaintiffs also seek to certify separate statewide classes under Rule 23(b)(2) for their state-law

2   unjust enrichment claims. Pls.' Mem. at 16. None of these classes should be certified under

3   Rule 23(b)(2). First, plaintiffs lack standing to obtain injunctive relief, which is required to

4   certify a Rule 23(b)(2) class, because they do not – and cannot – allege a threat of future injury

5   from the alleged conspiracies. Second, because plaintiffs' monetary claims are not secondary to

6   their injunctive relief claim, the Court should not certify the proposed unjust enrichment

7   classes.

8   **A.   Plaintiffs Do Not Have Standing To Seek Injunctive Relief**

9           This Court may award injunctive relief under the Clayton Act to protect against

10  "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26; *Cargill, Inc. v.*

11  *Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 (1986). But the Court may not certify an

12  injunctive class if the named plaintiffs do not have standing to seek an injunction under the

13  Clayton Act. *Sosna v. Iowa*, 419 U.S. 393, 402 (1975). To have standing to seek injunctive

14  relief under the Clayton Act, plaintiffs must show that they are currently "threatened . . . with

15  antitrust injury." *Cargill*, 479 U.S. at 113. A "threatened injury" exists if there is "a significant

16  threat of injury from an impending violation of the antitrust laws or from a contemporary

17  violation likely to continue or recur." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football*

18  *League*, 634 F.2d 1197, 1201 (9th Cir. 1980) (concluding that the plaintiff failed to show

19  "immediate threatened injury"). "Past exposure to illegal conduct does not in itself show a present

20  case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present

21  adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *In re New Motor Vehicles*

22  *Canadian Export*, 522 F.3d at 13-16 (denying certification under Rule 23(b)(2) because, even if

23  plaintiffs "had standing to seek injunctive relief at some time in the past," they no longer had

24  standing because there was no ongoing conspiracy).

25          Plaintiffs lack standing to seek injunctive relief because they have not shown an

26  imminent "threat of irreparable injury." *Hairston v. Pac.-10 Conference*, 893 F. Supp. 1485,

27  1493 (W.D. Wash. 1994). While plaintiffs argue that an injunction requiring defendants to

28

54

1  "cease any anticompetitive conduct" is needed to stop defendants' "ongoing" anticompetitive

2  practices, Pls.' Mem. at 14, plaintiffs, their expert, and the government agree that there has been

3  no anticompetitive conduct since 2006. Plaintiffs' operative complaint, filed in December

4  2008, contains no substantive allegations of anticompetitive conduct taking place after 2006.

5  Compl. ¶¶ 1, 15, 128, 141, 183-84.[43] Indeed, Dr. Netz affirmatively relies on the absence of a

6  conspiracy during the post-2006 "competitive period" for the purpose of her price regression,

7  which she could not do if there were ongoing anticompetitive activity after 2006. Netz Decl. at

8  91-92.[44] Moreover, none of the plea agreements on which plaintiffs rely mentions

9  anticompetitive conduct occurring after 2006. *See* Compl. ¶¶ 190-91. Finally, the

10  government's antitrust investigation of the LCD industry became public in December 2006. *Id.*

11  ¶¶ 183-85. It is particularly improbable – and plaintiffs do not allege – that any anticompetitive

12  conduct continued after the government's investigation became public and certain defendants

13  pleaded guilty and paid large fines.[45]

14

15

16  _____

17  [43]  The assertion in plaintiffs' request for injunctive relief that the conspiracy "continu[ed]
        through the filing of the Second Amended Complaint [in December 2008]," *id.* ¶ 251, is
18      therefore inconsistent with the complaint's substantive allegations. In addition, the
        complaint does not allege that plaintiffs intend to buy LCD Products. *In re New Motor*
19      *Vehicles Canadian Export*, 522 F.3d at 15 (emphasizing that plaintiffs' failure to allege
        any intent to purchase the product at issue further weakened their claims of threatened
20      future harm).

21  [44]  If the Court certifies plaintiffs' injunctive class based on their assertion that the alleged
        conspiracy is "ongoing" today, then the Court should reject Dr. Netz's report as it relies on
22      the contrary assumption that data from "the period since 2006" was untainted by the
        alleged conspiracy. *Compare* Netz Decl. at 91-92, *with* Pls.' Mem. at 14 and Compl. ¶
23      251; *see supra* § Argument II.B.7.c.

24  [45]  For these same reasons, plaintiffs' attempt to extend their Nationwide Class beyond the
        December 11, 2006, end date in their complaint to the present should be denied, as
25      plaintiffs do not allege that any harm has arisen beyond that date. *See also infra* §
        Argument V.A.1 (plaintiffs cannot extend the class period of their class definition without
26      the Court's leave to amend their complaint).

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

1

**B.    The Court Should Deny Plaintiffs' Request To Certify State
Claims For Unjust Enrichment Under Rule 23(b)(2)**

2

3          Plaintiffs assert without citation that their "state-law equitable restitutionary

4   claims are subject to Rule 23(b)(2) requirements." Pls.' Mem. at 16.[46]  A claim for monetary

5   relief can be brought under Rule 23(b)(2) only if the monetary damages are secondary to a

6   primary claim for injunctive or declaratory relief. *Molski v. Gleich,* 318 F.3d 937, 949-50 &

7   n.14 (9th Cir. 2003); *In re Paxil Litig* , 218 F.R.D. 242, 247 (C.D. Cal. 2003) ("Plaintiffs' claim

8   for restitution must be merely incidental to the claim for injunctive or declaratory relief.").[47]

9   Here, plaintiffs' state-law unjust enrichment claims cannot be secondary to their injunctive

10  relief claims, because plaintiffs do not seek injunctive relief on behalf of any of the statewide

11  classes. Plaintiffs' injunctive relief claims are limited to their nationwide class. Compl. ¶ 255;

12  Pls.' Mem. at 2.

13         Nor can plaintiffs argue that the state-law unjust enrichment claims are

14  secondary to their claim for injunctive relief on behalf of the nationwide class. Even if such a

15

16

17

18  ─────────────
[46]   Plaintiffs assert that the Court should evaluate their proposed statewide unjust enrichment
claims using the same analysis as that used to assess their nationwide injunctive relief

19  claims. Pls. Mem. at 16. Accordingly, the Court should deny certification of the
statewide unjust enrichment classes for the same reasons it should refuse to certify the

20  nationwide injunctive class.

21  [47]   The Supreme Court has noted that there is "at least a substantial possibility" that actions
seeking monetary damages can be certified only under Rule 23(b)(3), which gives

22  plaintiffs the right to opt out and to receive notice. *Ticor Title Ins. Co. v. Brown*, 511 U.S.
117, 121 (1994). Accordingly, courts usually consider unjust enrichment claims under

23  Rule 23(b)(3), not Rule 23(b)(2). *See, e.g., Kelley v. Microsoft Corp.*, 251 F.R.D. 544,
559 (W.D. Wash. 2008); *Avritt v. Reliastar Life Ins. Co.*, No. 07-1817, 2009 WL 455808,

24  at *5 (D. Minn. Feb. 23, 2009). But here, plaintiffs do not ask the Court to evaluate their
unjust enrichment claims under Rule 23(b)(3), so the Court need not do so. In any event,

25  even if the Court were to evaluate plaintiffs' unjust enrichment classes under Rule
23(b)(3), certification of those classes should be denied for the same reasons discussed

26  above. *See* § Argument II.

27

28                                          56
─────────────
DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI

comparison were permissible,[48] injunctive relief would not predominate over monetary recovery for the statewide class members. To determine whether claims for injunctive relief or damages predominate, the Court should "examine the specific facts and circumstances of each case" and determine the "intent of the plaintiffs in bringing the suit." *See Molski*, 318 F.3d at 950. "As part of this inquiry, the Court may ask whether a reasonable party would bring the suit to obtain the injunctive relief and whether the injunctive relief sought would be both reasonably necessary and appropriate were the party to succeed on the merits." *In re Paxil*, 218 F.R.D. at 247 (citing *Molski*, 318 F.3d at 950).[49] Here, a typical indirect purchaser would seek damages for his past purchase of an LCD Product and would not value injunctive relief over monetary recovery since most indirect purchasers do not buy LCD Products often.[50] Moreover, injunctive relief would not be "reasonably necessary and appropriate," because, as explained above, there is no threat of future harm.

---

[48] Plaintiffs have pursued their 23 statewide classes as separate classes, not as subclasses of the nationwide class. Accordingly, plaintiffs should not be permitted to impute claims in one class to other, separate classes.

[49] Plaintiffs' argument that their injunctive relief claims predominate over monetary damages claims because "the Nationwide Class [is] broader than the Indirect-Purchaser State Classes in terms of numerosity and geography, [and] the long-lasting effects of an injunction would far eclipse the effects of a damages awards" – does not address the *Molski* factors. *Compare* Pls.' Mem. at 15, *with Molski*, 318 F.3d at 950.

[50] *See, e.g.*, Rotman Dep. 59:24-60:8, July 13, 2009) ("Q. Did you consider – strike that. What would you like to gain from this lawsuit? A. I would like to gain damages. I would like to gain money for myself and the rest of the class that I represent. . . . Q. Anything else? A. No."); Lazerwitz Decl. ¶ 22, Ex. 20 (Deposition of Joe Solo, 35:22-25 (Feb. 11, 2009)) (same); Flanagan Dep. 40:24-41:4 ("Q. Okay. What would you like to gain from this lawsuit? A. Damages. Q. And what do you mean by damages? A. The overpayment for the amount that I had to pay for my monitor."); Lazerwitz Decl. ¶ 9, Ex. 7 (Deposition of William Fisher, 38:1-4 (Feb. 23, 2009)) ("Fisher Dep.") (same); Lazerwitz Decl. ¶ 10, Ex. 8 (Deposition of Robert George, 54:23-55:1 (May 5, 2009)) (same); Lazerwitz Decl. ¶ 16, Ex. 14 (Deposition of John Martich, 48:22-23 (May 29, 2009)) (same).

## V. NAMED PLAINTIFFS BAKER, FISHER, GRIFFITH, HANSEN, JOU, MURPHY, MULVEY, NORTHWAY, PAGUIRIGAN, SRIMOUNGCHANH, AND WATSON ARE INADEQUATE AND/OR ATYPICAL CLASS REPRESENTATIVES

Under Rule 23, putative class representatives must demonstrate that they (i) are able to "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and (ii) have claims that are "typical" of those of absent class members. Fed. R. Civ. P. 23(a)(3). If "'it is predictable that a major focus of the litigation will be on a defense unique' to the named plaintiff, that plaintiff will not satisfy the typicality requirement of Rule 23(a)." *Jordan*, 2009 WL 192888, at *5 (quoting *Hanon*, 976 F.2d at 509). Named plaintiffs' need to litigate unique defenses creates "a significant danger that absent Class members would suffer by the time and preoccupation [that named plaintiffs] would have to devote to the defenses unique to them." *Arabian v. Sony Elecs. Inc.*, No. 05-1741, 2007 WL 627977, at *5 (S.D. Cal. Feb. 22, 2007).

Here, at least 11 of the 38 named plaintiffs are not suited to represent their respective proposed classes. First, plaintiffs Kou Srimoungchanh, William Fisher, Judy Griffith, Chad Hansen, Gladys Baker, and Ling Hahn Jou are atypical plaintiffs because they are not even members of the proposed class and are subject to unique standing defenses: Mr. Fisher, Ms. Griffith, and Mr. Hansen did not purchase their products during the relevant class period; Mr. Srimoungchanh did not purchase the product on which he bases his claim; Ms. Baker bought a product containing an LCD panel manufactured by a company not named as a defendant; and she, Mr. Paguirigan, and Ms. Jou do not fulfill the residency requirement of the proposed class definition. Second, plaintiffs Christopher Murphy, Martha Mulvey, Ben Northway, and Robert Watson have close familial or business relationships with their counsel and lack the fundamental independence required to represent the absent class members adequately.

The following named plaintiffs are the only remaining proposed representatives of their respective Indirect-Purchaser State Class and therefore the listed classes cannot be

58

1  certified.[51]  *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007)

2  (dismissing indirect purchaser claims for states where only named plaintiffs lacked standing to

3  bring claims).

| Indirect Purchaser State Class | Sole Representative(s) Who Are Inadequate/Atypical |
|---|---|
| Iowa | Mr. Northway |
| Massachusetts | Mr. Murphy |
| Michigan | Ms. Baker, Ms. Jou, Ms. Griffith |
| Minnesota | Ms. Mulvey |
| Vermont | Mr. Watson |

**A.    Ms. Baker, Mr. Fisher, Ms. Griffith, Mr. Hansen, Ms. Jou, Mr. Paguirigan, And Mr. Srimoungchanh Are Atypical And Inadequate Because They Are Not Class Members Under The Proposed Class Definition And Are Subject To Unique Standing Defenses**

12         "A litigant must be a member of the class which he or she seeks to represent at

13  the time the class action is certified by the district court."  *Sosna*, 419 U.S. at 403.

14  Furthermore, an individual without standing cannot represent a class.  *Prado-Steiman v. Bush*,

15  221 F.3d 1266, 1279 (11th Cir. 2000); *In re Quarterdeck Office Sys. Sec. Litig.*, No. CV 92-

16  3970, 1993 WL 623310, at *3 (C.D. Cal. Sept. 30, 1993).  The named plaintiff "must possess

17  the same interest and suffer the same injury shared by all members of the class he represents."

18  *Jordan*, 2009 WL 192888, at *3.  Even if this Court were unwilling to hold now that some

19  plaintiffs lack standing, the existence of a material dispute about their right to recovery subjects

20  them to unique defenses that make them atypical.  *See In re Quarterdeck*, 1993 WL 623310, at

21  *2-*3.

---

[51]  *See* Notice of Mot. & Mot. of Indirect-Purchaser Pls. for Class Cert. at 9-10, Dkt. No. 1023 (filed June 2, 2009).  This section also discusses the remaining named plaintiffs who are atypical or inadequate, but who are not the sole representatives of their proposed classes.

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. M 07-1827 SI

1.    Purchases Outside Class And Alleged Conspiracy Period

Mr. Fisher, Ms. Griffith, and Mr. Hansen purchased their LCD Products outside the class period. "[F]or Plaintiffs to possess standing to act as class representatives, Plaintiffs must adduce evidence showing they purchased [the relevant products] from the named Defendants or their co-conspirators during the alleged conspiracy period." *In re Polypropylene Carpet*, 178 F.R.D. at 609. Moreover, "purchasers who bought [the relevant products] . . . outside the class period, are subject to unique defenses, and therefore cannot satisfy the typicality requirement." *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 194 (S.D.N.Y. 1985).

According to the complaint, the class period ended on December 11, 2006. Compl. ¶15.[52] Plaintiffs Fisher, Griffith, and Hansen all purchased the products on which they base their claims after December 11, 2006: Mr. Fisher on February 10, 2007; Ms. Griffith on December 16, 2006; and Mr. Hansen on December 15, 2006, December 29, 2006, and December 31, 2006. Fisher Dep. 66:13-15; Lazerwitz Decl. ¶ 11, Ex. 9 (Deposition of Judith Griffith, 34:1-12 (Feb 19, 2009)); Lazerwitz Decl. ¶ 28, Ex. 26 (Pl. Chad Hansen's First Am. Objections and Resp. to Def. LG Display America Inc.'s First Set of Interrogs., at 7 (June 11, 2009)).[53]

---

[52]  Plaintiffs' unexplained assertion in their class certification brief that the class period extends for an additional 20 days, Pls.' Mem. at 2, does not change the analysis. If plaintiffs want to change the class period, they must seek leave to amend their complaint. *See Jordan*, 2009 WL 192888, at *6 ("Should plaintiff wish to redefine the putative class, he may seek leave to file an amended complaint."); *Pierce v. Novastar Mortgage Inc.*, 489 F. Supp. 2d 1206, 1215 (W.D. Wash. 2007) (declining "to consider whether to redefine the class because this request . . . was not properly filed as a motion [to amend the complaint and was] not timely"). Certification of a class period beyond December 11, 2006, or consideration of purchases beyond that date, is therefore improper because plaintiffs have not sought leave to amend their complaint.

[53]  Chad Hansen claims to have made a fourth purchase sometime in 2000, but has provided no evidence to document his purchase. Hansen Interrog. Resp. at 7.

60

### 2.   Purchase Not Made By Plaintiff

Mr. Srimoungchanh did not purchase the only product on which he bases his claim. Instead, First Secure Data, a limited liability corporation that Mr. Srimoungchanh owns, made the purchase because the retailer would only sell to a company. Lazerwitz Decl. ¶ 23, Ex. 21 (Deposition of Kou Srimoungchanh, 179:7-18, 211:17-20 (Feb. 26, 2009)). As Mr. Srimoungchanh's attorney conceded, "First Secure Data, any purchases that may have been made on behalf of that company are not part of this litigation." *Id.* at 209:11-13. As a result, Mr. Srimoungchanh is not a member of the proposed class, nor does he have standing to sue defendants.[54]

### 3.   Purchase Of Panel Not Made By Defendants

As complex as the alleged conspiracies may be, plaintiffs' claims extend only to "LCD panels incorporated in televisions, monitors, and/or notebook computers, from one or more of the named Defendants." Pls.' Mem. at 2-3. Demonstrating the near impossibility of ascertaining what purchases belong in the class, *see supra* § Argument III, the only plaintiff able to identify the manufacturer of the LCD panel incorporated into her LCD Product bought a Dell monitor containing a panel manufactured by Quanta Display, a non-defendant not alleged to have fixed prices. Baker Dep. 74:25-75:16.[55] Not having made a qualifying purchase, Ms. Baker cannot represent those who did.

---

[54]   Nor could plaintiffs substitute First Secure Data for Mr. Srimoungchanh, as their proposed class definition only includes entities that purchased products "for their own use." Pls. Mem. at 2-3. Because First Secure Data purchased the product for Mr. Srimoungchanh's use and not for its own use, First Secure Data is not a class member.

[55]   Quanta Display is not listed as a defendant. *See* Compl. ¶¶ 67-96. Nor do plaintiffs allege that Quanta Display was a coconspirator or participated in any anticompetitive agreement. *See supra* note 18. Ms. Baker bought the Dell computer in November 2003, Lazerwitz Decl. ¶ 27, Ex. 25 (Pl. Gladys Baker's Objections & Resps. to Def. LG Display America, Inc.'s First Set of Interrogs., at 6 (Sept. 29, 2008)), well before AUO acquired Quanta Display. Thus, there is no allegation that downstream purchasers of Quanta Display's products paid any overcharge stemming from the putative conspiracies.

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No M 07-1827 SI

1                    4.    Non-Resident Plaintiffs

2              Ms. Baker, Ms. Jou, and Mr. Paguirigan are not class members because they do

3    not satisfy the residency requirement of the proposed class definition.  The class includes "[a]ll

4    persons and entities residing in the [Indirect Purchaser State] as of the date notice is first

5    published, who indirectly purchased in [Indirect Purchaser State]."  Pls.' Mem. at 2.  In other

6    words, the class member must currently reside in the state in which she bought the product at

7    issue.  Ms. Baker seeks to represent a class in Michigan, but currently resides in Florida.  Baker

8    Dep. 6:15-18, 13:4-14:21, 19:12-18.[56]  Ms. Jou also seeks to represent a class in Michigan, but

9    has lived in China for the last year.  Lazerwitz Decl. ¶ 13, Ex. 11 (Deposition of Ling-Hahn

10   Jou, 10:16-11:9 (June 23, 2009)).  Mr. Paguirigan seeks to represent a class in Wisconsin, but

11   currently resides in Washington.  Paguirigan Dep. 11:23-12:24, 13:10-25.[57]

12   **B.    Ms. Mulvey, Mr. Murphy, Mr. Northway, And Mr. Watson Are
           Compromised By Family Or Business Relationships With Counsel
13         That Make Them Inadequate Representatives**

14             Four named plaintiffs' conflicting close business and family relationships with

15   counsel compromise their ability to represent the class.  A representative plaintiff must be free

16   of conflicts of interest with other class members and likely to "prosecute the action vigorously

17   on behalf of the class."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  A putative

18   class representative with a close business relationship with her counsel has a strong incentive to

19   value her attorney's financial recovery above the interests of the class that she purportedly

20   [56]  Additionally, Ms. Baker has read none of the documents related to the case and could not
21        even remember whether she had seen her own complaint. *Id.*  47:3-25.  A named plaintiff's
          failure or inability to oversee the litigation can be an independent reason to deny
22        certification. *See, e.g., Burkhalter*, 141 F.R.D. at 153 ("[A] party who is not familiar with
          basic elements of its claim is not considered to be an adequate representative for the class
23        because there is no sense that there is an actual party behind counsel's prosecution of the
          action.").
24
     [57]  Like Ms. Baker, Mr. Paguirigan could not recall whether he had read or even seen the initial
25        complaint before it was filed, nor could he recall reading the consolidated amended complaint
26        except to prepare for his own deposition. *Id.* 91:1-25, 92:1-14, 105:1-19.  For this reason,
          too, Mr. Paguirigan is an inadequate representative.
27

.28
                                                     62

1    represents. *See, e.g., London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003)

2    (attorney's stockbroker was an inadequate representative); *Kramer v. Scientific Control Corp.*,

3    534 F.2d 1085, 1093 (3d Cir. 1976) (shared office space with attorney); *Serna v. Big A Drug*

4    *Stores, Inc.*, No. 07-0276, 2007 U.S. Dist. LEXIS 82023, at *6-7 (C.D. Cal. Oct. 9, 2007)

5    (employee of attorney); *Sipper v. Capital One Bank*, No. 01-9547, 2002 WL 398769, at *4

6    (C.D. Cal. Feb. 28, 2002) (business partner of attorney). Similarly, familial connections

7    undermine the independence required of an adequate class representative. *See, e.g., Mowry v.*

8    *JP Morgan Chase Bank, N.A.*, No. 06-4312, 2007 WL 1772142, at *4 (N.D. Ill. June 19, 2007)

9    (close friendship between attorney and putative representative precluded certification "[e]ven

10    though the relationship . . . does not rise to the level of a familial relationship"); *In re Microsoft*

11    *Corp. Antitrust Litig.*, 214 F.R.D. 371, 374 (D. Md. 2003) (holding that sister-in-law of attorney

12    is not an adequate representative). The risks of conflict are especially pressing where, as here,

13    attorneys' fees are likely to dwarf any individual plaintiff's recovery. *Susman v. Lincoln Am.*

14    *Corp.*, 561 F.2d 86, 91 (7th Cir. 1977).

15         At a minimum, at least four named putative class representatives lack the

16    independence required to protect the interests of the absent class members:

17    ❑    Ben Northway's employment by his class counsel as a systems

18         administrator provides his sole source of income. Lazerwitz Decl. ¶ 19, Ex.

19         17 (Deposition of Ben Northway, 14:11-15:18 (Feb. 13, 2009)). Mr.

20         Northway admitted that he wanted to see his employer maximize its

21         revenue from this case. *Id.* at 19:22-20:7. Dependent on his lawyers for his

22         entire income, Mr. Northway cannot be expected to act independently of

23         them.

24    ❑    Robert Watson's class counsel is a significant customer of Watson's

25         landscaping design business. Lazerwitz Decl. ¶ 25, Ex. 23 (Deposition of

26         Robert Watson, 16:13-17:18; 17:25-18:25 (Mar. 6, 2009)). Mr. Watson has

27         earned around $2,000 since the beginning of this litigation on services

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

1   provided to his counsel and his counsel's law firm. *Id.* at 18:2-15. Mr.

2   Watson is also seeking to be a class representative in two other class

3   actions – in all cases, represented by the same counsel. *Id.* at 16:13-21.

4   ❑   Christopher Murphy's counsel is his brother-in-law. Lazerwitz Decl. ¶ 18,

5   Ex. 16 (Deposition of Christopher Murphy, 2:3-9; 69:7-19 (Feb. 9, 2009)).

6   Mr. Murphy's brother-in-law also represents him in *In re Vitamin C*

7   *Antitrust Litigation. Id.* at 66:21-67:4; 69:7-19.

8   ❑   Martha Mulvey is represented by her nephew. Lazerwitz Decl. ¶ 17, Ex. 15

9   (Deposition of Martha Mulvey, 11:4-13 (Feb 16, 2009)). Ms. Mulvey

10   admitted during her deposition that she offered to be a class representative

11   in case her nephew needed "someone from the State of Minnesota." *Id.* at

12   19:11-20:3. Ms. Mulvey's nephew also represents her in *In re Flash*

13   *Memory Antitrust Litigation. Id.* at 19:2-6. Her abdication to counsel is

14   confirmed by her failure to read any part of the consolidated amended

15   complaint except its listing of attorneys, *id.* at 88:1-20, and her inability to

16   define such terms as "class action," *id.* at 29:4-6, "class representative," *id.*

17   at 36:1-2, or "overcharge," *id.* at 109:4-12.

## CONCLUSION

19   For the foregoing reasons, the Court should deny plaintiffs' motion for class

20   certification under Rule 23 and require that plaintiffs amend their complaint "to eliminate

21   allegations about representation of absent persons" under Rule 23(d)(1)(D).

22   DATED: August 10, 2009

24   By: /s/ Michael R. Lazerwitz
      Michael R. Lazerwitz (*pro hac vice*)
25    Jeremy J. Calsyn (State Bar No. 205062)
      Lee F. Berger (State Bar No. 222756)
26    CLEARY GOTTLIEB STEEN &
      HAMILTON LLP
27    2000 Pennsylvania Ave., NW
      Washington, DC 20006

28                                    64

1
2
(202) 974-1500 (Phone)
(202) 974-1999 (Facsimile)
*mlazerwitz@cgsh.com*

3
Attorneys for Defendants LG Display Co.,
Ltd. and LG Display America, Inc.

4

5
By: /s/ John M. Grenfell
John M. Grenfell (State Bar No. 88500)

6
PILLSBURY WINTHROP SHAW
PITTMAN LLP

7
50 Fremont Street
San Francisco, CA 94105

8
(415) 983-1000 (Phone)
(415) 983-1200 (Fax)

9
Attorneys for Defendants Sharp
Corporation and Sharp Electronics

10
Corporation

11

By: /s/ Kent M. Roger
Kent M. Roger (State Bar No. 95987)
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, CA 94105
(415) 442-1140 (Phone)
(415) 442-1001 (Fax)

Attorneys for Defendants Hitachi Electronic
Devices (USA), Inc., Hitachi, Ltd., and
Hitachi Displays, Ltd.

12
By: /s/ Steven F. Cherry
Steven F. Cherry (*pro hac vice*)

13
WILMER CUTLER PICKERING HALE
AND DORR LLP

14
1875 Pennsylvania Ave., NW
Washington, DC 20006

15
(202) 663-6000 (Phone)
(202) 663-6363 (Fax)

16
Attorneys for Defendants Chi Mei

17
Optoelectronics Corp., Chi Mei
Corporation, Chi Mei Optoelectronics

18
USA, Inc., CMO Japan Co., Ltd., Nexgen
Mediatech Inc. and Nexgen

19
Mediatech U.S.A., Inc.

20

By: /s/ Hugh F. Bangasser

21
Hugh F. Bangasser (*pro hac vice*)
K&L GATES LLP

22
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158

23
(206) 623-7380 (Phone)
(206) 623-7022 (Fax)

24
Attorneys for Hannstar Display Corporation

25

26

27

28

By: /s/ James L. McGinnis
James L. McGinnis (State Bar No. 95788)
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
(415) 434-9100 (Phone)
(415) 434-3947 (Fax)

Attorneys for Defendants Samsung
Electronics America, Inc., Samsung
Semiconductor, Inc. and Samsung Electronics
Co., Ltd.

By: /s/ Wayne A. Cross
Wayne A. Cross (*pro hac vice*)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200 (Phone)
(212) 354-8113 (Fax)

Attorneys for Defendants Toshiba America
Electronic Components, Inc., Toshiba
America Information Systems, Inc., Toshiba
Corporation, and Toshiba Matsushita Display
Technology Co., Ltd.

65

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No M: 07-1827 SI

1  By: /s/ Christopher Nedeau
   Christopher Nedeau
2  NOSSAMAN LLP
   50 California St., 34th Floor
3  San Francisco, CA 94111
4  (415) 398-3600 (Phone)
   (415) 398-2438 (Facsimile)
5
   Attorneys for Defendants AU Optronics
6  Corporation and AU Optronics Corporation America

7              With the Reservation of All Rights and Defenses.

8  Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this
9  document has been obtained from Christopher Nedeau; Steven F. Cherry; Hugh F. Bangasser;
   Kent M. Roger; John M. Grenfell; James L. McGinnis; and Wayne Cross.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, Case No. M: 07-1827 SI