1  David P. Germaine (*Admitted Pro Hac Vice*)
   VANEK, VICKERS & MASINI, P.C.
2  111 South Wacker Drive, Suite 4050
   Chicago, Illinois  60606
3  Telephone: (312) 224-1500
   Facsimile: (312) 224-1510
4  E-mail: dgermaine@vaneklaw.com

5
   *Counsel for Plaintiff, ATS Claim, LLC*
6

7                    UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                      SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M 07-1827 SI-FS |
| | MDL No. 1827 |
| This Document Relates To: Case No.: 09-1115 SI | |
| ATS Claim, LLC | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| Epson Electronics America, Inc., et al | |
| Defendants. | |

17              **<u>FIRST AMENDED COMPLAINT</u>**

18       Plaintiff ATS Claim, LLC (hereinafter "Plaintiff" or "ATS") brings this action for

19  damages and injunctive relief under the antitrust laws of the United States against the

20  defendants, and allege on information and belief as follows:

1   I.    **<u>INTRODUCTION</u>**

2

3        1.      Plaintiff brings this antitrust action on behalf of itself, as the assignee of an

4   antitrust claim from Ricoh Electronics, Inc., a direct purchaser of Thin Film Transistor-

5   Liquid Crystal Display ("TFT-LCD") panels and/or a product containing a TFT-LCD

6   panel, in the United States from one or more of the named defendants identified in this

7   Complaint from as early as January 1, 2004 and continuing until at least December 11,

8   2006 (the "Relevant Period").

9

10       2.      TFT-LCDs are used in a number of products, including but not limited to,

11  computer monitors, television receivers and cellular telephones. As used herein, "TFT-

12  LCD Products" refers to TFT-LCD panels, and products containing TFT-LCD panels,

13  manufactured by any of the named defendants or their subsidiaries, affiliates, or co-

14  conspirators.

15

16       3.      Beginning in at least 1996, defendants located in Japan, including but not

17  limited to Hitachi, Sharp, and Toshiba, met or talked with at least one other defendant in

18  order to agree on TFT-LCD Product prices and the amount of TFT-LCD Products each

19  would produce. As production in Korea began to increase, the Japanese defendants

20  expanded their meetings to involve their Korean competitors, including defendants LG

21  Display and Samsung, which also agreed to fix prices and to control supply. In 2001, the

22  Korean defendants convinced Taiwanese TFT-LCD Product manufacturers, including

23  defendants AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to

24  fix prices and to control product supply. Defendants' conspiracy included agreements on

25  the prices at which defendants would sell TFT-LCD Products to their own corporate

26  subsidiaries and affiliates, as well as their co-conspirators, thereby ensuring TFT-LCD

27

28

- 2 -

Product prices remained consistent among defendants and their customers, which was an attempt to prevent any price discrepancies to consumers.

4.      Throughout the Relevant Period, defendants' conspiracy was effective in moderating the normal downward pressures on prices for TFT-LCD Products caused by periods of oversupply and technological change. Defendants' conspiracy resulted in unusually long periods of high prices and high profits. Although there were periods when prices for TFT-LCD Products temporarily declined as a result of new entrants being assimilated or breakdowns in the effectiveness of the conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition. In addition, prices declined less than they would have in a competitive market. As a result of defendants' unlawful conduct, Plaintiff paid higher prices for TFT-LCD Products than they would have paid in a competitive market.

## II.      <u>JURISDICTION AND VENUE</u>

5.      Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

6.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff' claims occurred in this district, a substantial

portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside in this district.

8.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

III.   **PARTIES**

**Plaintiff**

8A.     Plaintiff ATS Claim, LLC is a corporation organized under the laws of the State of Illinois, with its principal place of business located at 1 North Wacker Drive, Chicago, IL 60606.  ATS is the assignee of certain claims from Ricoh Electronics, Inc., which, during the Relevant Period, purchased TFT-LCDs, including 15" display panels, directly from Defendants in the United States.

**Japanese Defendants**

**Epson America**

9.     Defendant Epson Electronics America, Inc. ("Epson America") is a California corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California. Epson America is a wholly-owned and controlled subsidiary of Seiko Epson Corporation, which is also the ultimate parent company of co-conspirator Epson Imaging Devices Corporation. During the Relevant Period, Epson America sold and distributed TFT-LCD Products manufactured by Epson Imaging Devices Corporation to customers throughout the United States.

**Hitachi**

10. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of TFT-LCDs. In 2002, it spun off its TFT-LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Relevant Period, Hitachi, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

11. Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was formed in 2002 and acquired defendant Hitachi, Ltd.'s TFT-LCD manufacturing business. Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States. Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

12. Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its ultimate parent company is Hitachi, Ltd. During the Relevant Period, Hitachi Electronic Devices (USA), Inc. sold and distributed TFT-LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the United States.

13. Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi."

**Sharp**

14.     Defendant Sharp Corporation is a Japanese company with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. The company was one of the earliest producers of TFT-LCDs. During the Relevant Period, Sharp Corporation manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

15.     Defendant Sharp Electronics Corporation is a New York corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey. Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of defendant Sharp Corporation. During the Relevant Period, Sharp Electronics Corporation sold and distributed TFT-LCD Products manufactured by defendant Sharp Corporation to customers throughout the United States.

16.     Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp."

**Toshiba**

17.     Defendant Toshiba Corporation is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. Toshiba Corporation participates in two joint ventures that manufacture, sell, and distribute TFT-LCD Products – Toshiba Matsushita Display Technology Co., Ltd. and IPS Alpha Technology, Ltd.  During the Relevant Period, Toshiba Corporation manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

18.     Defendant Toshiba America Electronic Components, Inc. is a California corporation with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine, California. Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc., a holding company for defendant Toshiba Corporation. Toshiba America Electronic Components, Inc. is the United States sales and marketing representative for defendants Toshiba Corporation and Toshiba Matsushita Display Technology Co., Ltd. During the Relevant Period, Toshiba America Electronic Components, Inc. sold and distributed TFT-LCD Products manufactured by Toshiba Corporation to customers throughout the United States.

19.     Defendant Toshiba America Information Systems, Inc. is a California corporation with its principal place of business at 9470 Irvine Boulevard, Irvine, California. Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc. During the Relevant Period, Toshiba America Information Systems, Inc. sold and distributed TFT-LCD Products manufactured by Toshiba Corporation to customers throughout the United States.

20.     Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc., and Toshiba America Information Systems, Inc. are sometimes referred to collectively herein as "Toshiba."

**Toshiba Matsushita**

21.     Defendant Toshiba Matsushita Display Technology Co., Ltd. ("Toshiba Matsushita") is a Japanese company with its principal place of business at Rivage Shinagawa, 18, Konan c4-chome, Minato-ku, Tokyo 108-0075, Japan. Toshiba Matsushita

is a joint venture between Toshiba Corporation and Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.). Toshiba Matsushita was created for the purpose of manufacturing TFT-LCD Products. During the Relevant Period, Toshiba Matsushita manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

**Korean Defendants**

**LG Display**

22.     Defendant LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd., is a Korean entity with its principal place of business at 17th Floor, West Tower, LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-721. LG Display Co., Ltd. Was created in July 1999 as a joint venture between LG Electronics, Inc. and Koninklijke Philips Electronics N.V. In July 2004, LG Display Co., Ltd. became a public company, with LG Electronics, Inc. and Koninklijke Philips Electronics N.V. as the controlling shareholders. LG Display Co., Ltd. describes itself as "the global leader in the development and manufacture of TFT-LCD panels for televisions, computer monitors, notebooks and emerging mobile applications." During the Relevant Period, LG Display Co., Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

23.     Defendant LG Display America, Inc., formerly known as LG.Philips LCD America, Inc., is a California corporation with its principal place of business at 150 East Brokaw Road, San Jose, California. LG Display America, Inc. is a wholly-owned and controlled subsidiary of LG Display Co., Ltd. During the Relevant Period, LG Display

America, Inc. sold and distributed TFT-LCD Products manufactured by LG Display Co., Ltd. to customers throughout the United States.

24.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes referred to collectively herein as "LG Display."

**Samsung**

25.     Defendant Samsung Electronics Co., Ltd. is a Korean company with its principal place of business at Samsung Main Building, 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. It is the world's largest producer of TFT-LCD Products. During the Relevant Period, it manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

26.     Defendant Samsung Electronics America, Inc. ("Samsung America") is a New York corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey. Samsung America is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. During the Relevant Period, Samsung America sold and distributed TFT-LCD Products manufactured by Samsung Electronics Company, Ltd. to customers throughout the United States.

27.     Samsung Semiconductor, Inc. is a California corporation with its principal place of business at 3655 North First Street, San Jose, California. Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. During the Relevant Period, Samsung Semiconductor, Inc. sold and distributed TFT-LCD Products manufactured by Samsung Electronics Company, Ltd. throughout the United States.

28.     Defendants Samsung Electronics Company, Ltd., Samsung America, and Samsung Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung."

**Taiwanese Defendants**

**AU Optronics**

29.     Defendant AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. AU Optronics Corporation was created in 2001 by the merger of Acer Display Technology, Inc. and Unipac Electronics, both of which were involved in the manufacture of TFT-LCD Products. During the Relevant Period, AU Optronics Corporation manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

30.     Defendant AU Optronics Corporation America ("AU America") is a California corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston, Texas. AU America was formerly known as Acer Display Technology America, Inc. AU America is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation. In 2006, Hsuan Bin Chen, the president and Chief Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU America. During the Relevant Period, AU America sold and distributed TFT-LCD Products manufactured by AU Optronics to customers throughout the United States.

31.     Defendants AU Optronics Corporation and AU America are sometimes collectively referred to herein as "AU Optronics."

1

2

**Chi Mei**

3

4

5

6

7

8

32.     Defendant Chi Mei Corporation ("CMC") is a Taiwanese company with its principal place of business located at No. 59-1, San Chia, Jen Te, Tainan County, Taiwan 71702.CMC is the parent company for all of the Chi Mei entities herein. During the Relevant Period, CMC manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

9

10

11

12

13

14

15

16

33.     Defendant Chi Mei Optoelectronics Corporation ("CMO") is a Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. It is a subsidiary of CMC. CMO was formed in 1998, and has since become a major manufacturer of TFT-LCD Products. During the Relevant Period, CMO manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

17

18

19

20

21

22

23

34.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company headquartered at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan. Prior to 2006, CMO Japan was known as International Display Technology, Ltd. CMO Japan is a wholly-owned and controlled subsidiary of defendant CMO. CMO Japan has been in the TFT-LCD business since 2001. During the Relevant Period, CMO Japan manufactured, sold, and distributed TFT-LCD Products throughout the United States.

24

25

26

27

28

35.     Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose, California. Prior to 2006, CMO USA was known as International Display Technology U.S.A., Inc. CMO USA is a wholly-owned and controlled subsidiary of

defendant CMO Japan. The Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO Japan's predecessor, and in or about 2007 became Vice President in charge of sales and marketing for CMO. Similarly, the President of CMO USA in 2006, Junichi Ishii, was previously the President of CMO Japan's predecessor. During the Relevant Period, CMO USA sold and distributed TFT-LCD Products manufactured by CMO Japan to customers throughout the United States.

36.    Defendant Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese company with its principal place of business at No. 11-2, Jen Te 4th St., en Te Village Jen Te, Tainan 717 Taiwan. Nexgen is a wholly-owned and controlled subsidiary of CMC. During the Relevant Period, Nexgen sold and distributed TFT-LCD Products manufactured by CMO to customers throughout the United States.

37.    Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a California corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California. Nexgen USA is a wholly-owned and controlled subsidiary of CMC. During the Relevant Period, Nexgen USA sold and distributed TFT-LCD Products manufactured by CMO to customers throughout the United States.

38.    Defendants CMC, CMO, CMO Japan, CMO USA, Nexgen, and Nexgen USA are sometimes referred to collectively herein as "Chi Mei."

**Chunghwa**

39.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan. It is a subsidiary of Tatung Company, a consolidated consumer electronics and information

technology company based in Taiwan. Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives from Tatung Company. The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company. During the Relevant Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

40.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. During the Relevant Period, Tatung America sold and distributed TFT-LCD Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the United States.

41.     Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes referred to collectively herein as "Chunghwa."

**HannStar**

42.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. HannStar has been in the business of manufacturing and selling TFT-LCD Products since 1998. During the Relevant Period, HannStar manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

IV.     **AGENTS AND CO-CONSPIRATORS**

43.     The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

44.     Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

45.     Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators include, but are not limited to, the following:

(a)     Epson Imaging Devices Corporation;

(b)     Hydis Technologies Co., Ltd., formerly known as BOE Hydis Technology Co., Ltd.;

(c)     IPS Alpha Technology, Ltd.;

(d)     Mitsubishi Electric Corporation;

(e)     Mitsui & Co., Ltd.;

(f)     NEC LCD Technologies, Ltd.;

(g)     Panasonic Corporation;

(h)     Panasonic Corporation of North America, formerly known as Matsushita Electric Corporation of America.

## V.     TRADE AND COMMERCE

46.     During the Relevant Period, each defendant, or one or more of its subsidiaries, sold TFT-LCD Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

47.     During the Relevant Period, defendants collectively controlled a vast majority of the market for TFT-LCD Products, both globally and in the United States.

48.     The business activities of the defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VI.     FACTUAL ALLEGATIONS

### A.     TFT-LCD Technology

49.     The technology behind TFT-LCDs is not new. In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology. In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology. These efforts resulted in monochrome calculators and watches. By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions. In the mid-1990s, the technology advanced further with the development of TFT-LCDs.

FIRST AMENDED COMPLAINT
MASTER FILE NO. M 07-1827 SI (CASE NO. 09-1115)

50.     A TFT-LCD panel is comprised of two glass substrates sandwiching a layer of liquid crystal compound. Liquid crystals change orientation under an applied electric field and can thereby block or pass light. One glass substrate has thin chemical films with transistors fabricated into it, and the other glass substrate is coated with liquid pigments that act as color filters. When voltage is applied to the transistors, the liquid crystal moves, causing light to pass through the filters to create red, green, or blue pixels. Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

51.     TFT-LCDs are capable of producing the same image as cathode ray tubes ("CRTs"), but in a much smaller package. TFT-LCDs also have lower energy requirements, are generally easier to read, and do not generally flicker like CRTs. TFT-LCD panels of approximately 10 inches or less in diagonal are considered "small" or "medium" displays. They are also referred to as "mobile displays." These displays are commonly used in cell phones, personal digital assistants, and cameras.

52.     TFT-LCDs of 10 inches in diagonal and larger are considered "large-area displays." Large-area displays are most commonly used for desktop computer monitors, notebook computers, and television receivers. The core products during most of the Relevant Period were displays for notebook computers and computer monitors. Although TFT-LCDs were used in many other types of products requiring a visual user interface, such as, for example, cell phones and point of sale terminals.  During much of the Relevant Period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most popular TFT-LCD Products, representing as much as 80 percent of all TFT-LCDs produced for notebook computers or computer monitors.

53.     TFT-LCDs are manufactured in fabrication plants sometimes referred to as "fabs."

**B.     Structure of the TFT-LCD Industry**

54.     The TFT-LCD industry has several characteristics that have facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.     Market Concentration**

55.     The market for TFT-LCD Products is very large. A September 28, 2006 Reuters article reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD technology – are expected to reach $US 88 billion this year and $US 100 billion in 2007."

56.     Despite its enormous size, the TFT-LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by Plaintiff. In 2005, the top five suppliers – Samsung, LG Display, Sharp, AU Optronics, and Chi Mei – collectively shipped 90 percent of all TFT-LCD panels for television use. According to estimates in late 2006 from industry analyst iSuppli Corporation ("iSuppli"), LG Display had the greatest share of LCD television shipments in the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei (18.7%), AU Optronics (16.8%), and Sharp (13.9%). These companies were the five largest producers as measured by market share during much of the Relevant Period.

1

2

### 2.      Information Sharing

3       57.      Because of common membership in trade associations, interrelated

4  business arrangements such as joint ventures, allegiances between companies in certain

5  countries, and relationships between the executives of certain companies, there were many

6  opportunities for defendants to discuss and exchange competitive information. Defendants

7  took advantage of these opportunities through meetings, telephone calls, e-mails, and

8  instant messages to discuss, and agree upon, their pricing for TFT-LCD Products as

9  alleged below.

10

11       58.      Additionally, the TFT-LCD industry is analyzed by several market

12  research firms. Each of these firms offers, for a fee, monthly market data on pricing,

13  supply, utilization of fabs, and other key indicators of market activity. The capacity and

14  pricing data reported by these firms comes directly from manufacturers. Manufacturers

15  typically report historical, current, and perhaps most importantly, prospective information.

16

17       59.      The Defendants, therefore, had access to each other's future plans for

18  bringing capacity on line, capacity utilization, market share, pricing, and the introduction

19  of new technology. Because there were very few companies that needed to be analyzed in

20  order to obtain this data, all competitors in the TFT-LCD market had ready and timely

21  access to reliable information about their competition's pricing as well as future supply

22  and capacity decisions. By meeting together as herein below alleged as well as monitoring

23  and analyzing this information over time, participants in the conspiracy were able to

24  signal their respective intent, verify that the conspiracy was working, and identify any

25  parties who might be deviating from the conspiracy.

26

27

28

FIRST AMENDED COMPLAINT
MASTER FILE NO. M 07-1827 SI (CASE NO. 09-1115)

### 3.       Consolidation

60.       The TFT-LCD industry experienced significant consolidation during the Relevant Period, including: (a) the creation of AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; (b) the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and (e) AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD Products.

### 4.       Interrelated Business Relationships

61.       The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that facilitate collusion. AU Optronics, for example, entered into licensing arrangements with Sharp in 2005 and with Samsung in 2006. Chunghwa did likewise with Sharp in December of 2006. Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.

62.       The industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude. These business relationships also create a unity of interest among competitors so that a conspiracy is easier to implement and enforce than if such interrelationships did not exist.

FIRST AMENDED COMPLAINT
MASTER FILE NO. M 07-1827 SI (CASE NO. 09-1115)

**5.      High Costs of Entry Into the Industry**

63.      There are significant manufacturing and technological barriers to entry into the TFT-LCD industry. Efficient fabs are large and costly. TFT-LCD Products are also subject to technological advances, so that firms within the industry must spend significant capital on research and development.

64.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, generally declined, and, in some periods, declined at a substantial rate. Later in the conspiracy, approximately 70 percent of the cost of TFT-LCD panel production was attributable to the cost of raw materials. The combination of price discussions and manipulation of the output of TFT-LCD Products allowed defendants to keep prices above where they would have been but for the conspiracy.

**6.      The "Crystal Cycle"**

65.      Like all markets, the TFT-LCD industry is subject to business cycles of supply and demand. In the TFT-LCD industry, this cycle is known as the "crystal cycle." This cycle has been described as "boom and bust" periods caused by alternating periods of oversupply and shortages, which create downward and upward pressures on prices for TFT-LCD Products. One fact that can affect such oversupply is the perceived demand for TFT-LCD Products and whether manufacturers have adequately predicted such demand in determining how much capacity to build and how many TFT-LCD Products to produce.

66.      Another factor is the entry of new competitors. Typically, when a new competitor enters a market, it brings incremental production online thereby adding supply, and prices drop until an equilibrium is reached. In the TFT-LCD industry, however,

defendants conspired to rein in and discipline these new entrants until the new entrants were assimilated into the conspiracy. This had the effect of tempering price drops and preventing them from reaching a competitive equilibrium.

67.     The conspiracy did not completely eliminate the effects of the crystal cycle in the TFT-LCD industry. There were periods when defendants' collusive practices drove prices for TFT-LCD Products so high that demand began to fall to the point that defendants lowered prices for short periods of time. However, defendants' efforts to stabilize prices were successful in moderating the effects of the crystal cycle, including the impact on prices paid by Plaintiff. To the extent that prices for TFT-LCD Products fell, they fell from levels that had been set conspiratorially, rather than from levels set by free and open competition. Additionally, prices did not fall as low as they would have absent the conspiratorial conduct.

**7.     Dominant Products**

68.     Notwithstanding that there may be different applications for TFT-LCDs, there is a consistent and homogeneous way for defendants to monitor, analyze, discipline, and enforce their conspiracy. This can be done by looking at the predominant, or most popular, size panels and the applications for those panels that represent the highest percentage of sales, and by looking at standardized statistics used in the industry, such as the amount of glass produced and revenues per metric ton of glass. By using these, and other industry analytics, defendants could monitor, analyze, discipline, and enforce their conspiracy.

**C.**     **Pre-Conspiracy Market**

69.     Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were essentially the exclusive suppliers of TFT-LCD panels.

70.     In early 1995, the industry faced declining TFT-LCD panel prices, which industry analysts attributed to advances in technology and improving efficiencies. One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry." The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of TFT-LCDs, and they slowed the rate of their investments. This, however, provided an opening to Korean manufacturers.

71.     In 1995, three Korean companies – Samsung, LG Electronics, Inc. and, to a lesser extent, Hyundai – entered the market. These Korean firms offered comparable products at reduced prices in an effort to quickly gain market share. This resulted in increased competition in 1995, which contributed to the significant price declines seen during that timeframe.

72.     Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines. By mid-1995, the Japanese companies and the new Korean competitors had a total capacity to supply 14 million TFT-LCD panels, while demand for them was only about three million. In addition to the surges in capacity during 1995, input and manufacturing costs were dropping.

73.     By late 1995, the effect of the entry by Korean suppliers had pushed down the price of some TFT-LCD panels by 50 percent from the previous year. The origin of the TFT-LCD conspiracy may be traceable to this drop in prices.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

74.     The TFT-LCD conspiracy was effectuated through a combination of group and bilateral discussions. In the formative years, when the Japanese defendants first entered into the conspiracy, bilateral discussions were the primary method of communication. During this period of the conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other defendant about the prices for TFT-LCD Products, and thereby created a model for how the conspiracy would be carried out after the Korean, and later the Taiwanese defendants joined. These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as capacity utilization. As more manufacturers entered the conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings was in place.

**1.     "Crystal Meetings"**

75.     The group meetings among the participants in the TFT-LCD price-fixing conspiracy were referred to as "crystal meetings." Crystal meetings were attended by employees at three different levels of the defendants' corporations. The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings. The second level were management-level meetings, referred to as "commercial" or "operation" meetings. The third level were meetings attended by lower-level sales and marketing personnel.

- 23 -

76.     In a typical crystal meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices. Meeting participants shared information relating to all of these topics so that defendants could agree on what price each would charge for TFT-LCD panels to be sold in the following month. Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for TFT-LCD panels. They also discussed prices of TFT-LCD panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

77.     The purpose of the CEO or top meetings was to stabilize or raise prices. At the CEO meetings, the participants discussed prices and the supply and demand situation. The participants also discussed monthly and quarterly TFT-LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions. Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply and demand and price for the group to review. The attendees would take turns making comments and adjusting the numbers. At some point during the meeting, the participants would reach an agreement on price.

78.     The commercial or operation meetings were attended by the defendants' respective Vice Presidents of sales and marketing and other senior sales employees. The structure and content of the commercial meetings was largely the same as the CEO meetings. The participants discussed price, output, capacity, and the general market situation. These meetings occurred approximately monthly and sometimes quarterly.

79.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of TFT-LCD panels has on the cost of the finished products into which they are placed. Defendants knew that the conspiratorially high prices of TFT-LCD panels would be reflected in the prices for finished TFT-LCD Products, and thus, there was no need to specifically discuss the prices of finished TFT-LCD Products.

80.     The agreements reached at these meetings included: (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; and (6) reaching out to other competitors to encourage them to abide by the agreed-upon pricing.  The meeting participants also agreed to maintain or lower production capacity.

81.     Compared to the CEO and commercial meetings, the lower level meetings were less formal, and typically occurred at restaurants over lunch.  The purpose of the lower level meetings was to exchange market information that would facilitate implementation of the conspiracy and carry out the agreements made at the CEO and commercial meetings.  Participants in the lower level meetings exchanged information relating to past and future prices of TFT-LCD Products and shipment quantities.

82.     In the summer of 2006, defendants discontinued the lower level meetings in favor of coordinated one-on-one meetings.  The meetings were coordinated so that on the same date, two sets of competitors met one-on-one.  After that meeting, each of them met one-on-one with another competitor.  This continued until all competitors met with

each other.  These coordinated meetings took place until about November or December 2006.  It was defendants' specific intent to conceal their meetings and for these coordinated one-on-one meetings to accomplish the same purposes as the group meetings.

### 2.     Bilateral Discussions

83.     The crystal meetings were supplemented by bilateral discussions between various defendants.  The purpose of the bilateral discussions was to exchange information about past and future pricing, as well as information about shipments.

84.     Defendants had bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone calls, e-mails, and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

85.     Bilateral discussions were also used to synchronize prices with manufacturers that did not ordinarily attend the group meetings.  For example, HannStar was responsible for notifying Hitachi of the pricing agreements reached at the crystal meetings.  Hitachi implemented the agreed-upon pricing as conveyed by HannStar.  In this way, Hitachi participated in the conspiracy to fix the prices of TFT-LCD products.

**3.        Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

86.        Defendant AU Optronics participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Additionally, Quanta Display Inc. and Unipac Electronics, which merged with AU Optronics, participated in lower level meetings. Through these discussions, AU Optronics agreed on prices and supply levels for TFT-LCD Products.

87.        Defendant Chi Mei participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chi Mei agreed on prices and supply levels for TFT-LCD Products.

88.        Defendant Chunghwa participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chunghwa agreed on prices and supply levels for TFT-LCD Products.

89.        Defendant HannStar participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, HannStar agreed on prices and supply levels for TFT-LCD Products.

90.        Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Panels.

91.        Defendant LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.

FIRST AMENDED COMPLAINT
MASTER FILE NO. M 07-1827 SI (CASE NO. 09-1115)

Through these discussions, LG Display agreed on prices and supply levels for TFT-LCD Products.

92.     Defendant Samsung participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Samsung agreed on prices and supply levels for TFT-LCD Products.

93.     Defendant Sharp participated in multiple group and bilateral meetings during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products.

94.     Defendant Toshiba participated in bilateral discussions during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products.

95.     Co-conspirator Hydis participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for TFT-LCD Products.

96.     Co-conspirator Mitsubishi participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for TFT-LCD Products.

97.     Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001.

Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed on prices and supply levels for TFT-LCD Products.

98.     Co-conspirator NEC participated in meetings or discussions during the Relevant Period with at least one other defendant or co-conspirator, which included discussions about prices for TFT-LCD Products.

99.     When Plaintiff refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that the Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed TFT-LCD Products to direct purchasers, these subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

100.    Defendant Epson America is a wholly-owned and controlled subsidiary of co-conspirator Epson Japan and, as alleged above, Epson Japan was represented by

coconspirator Mitsui at one of the bilateral meetings described above. Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as coconspirators. In addition, to the extent Epson America distributed TFT-LCD Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers did not undercut the pricing agreements reached at these various meetings. Epson America was an active, knowing participant in the alleged conspiracy.

101.    Defendant Toshiba Matsushita is a joint venture between Toshiba Corporation and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above. As a result, Toshiba Matsushita was represented at those meetings by its agents and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners controlled Toshiba Matsushita's production levels and the prices of TFT-LCD Products the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, this defendant was an active, knowing participant in the alleged conspiracy.

102.    Co-conspirator IPS Alpha is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on

price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of TFT-LCD Products the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

E.     **International Government Antitrust Investigations**

103.   Defendants' conspiracy to restrict artificially the output of, and to raise the prices for, TFT-LCD Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the United States Department of Justice ("DOJ") and others in late 2006.

104.   In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among TFT-LCD manufacturers. In a December 11, 2006 filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

105.   On December 12, 2006, news reports indicated that in addition to LG Display, TFT-LCD makers Samsung, Sharp, Epson, and AU Optronics were also under investigation. The JFTC stated that the probe was related to price-fixing. On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-fixing among manufacturers of TFT-LCD Products.

106.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers – LG Display Co. Ltd. (and its U.S. subsidiary, LG Display America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of TFT-LCD panels.

107.     LG Display Co. Ltd and LG Display America Inc. agreed to plead guilty and pay a $400 million fine for their participation in a conspiracy from September 2001 to June 2006 to fix the price of TFT-LCD panels sold in the United States.

108.     Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million fine for its participation in a conspiracy from September 2001 to December 2006 to fix the price of TFT-LCD panels sold in the United States.

109.     The DOJ charged LG Display Co., Ltd., LG Display America Inc., and Chunghwa Picture Tubes, Ltd. with carrying out the conspiracy by:

a.     participating in meetings, conversations, and communications in Taiwan, Korea and the United States to discuss the prices of TFTLCD panels;

b.     agreeing during those meetings, conversations and communications to charge prices for TFT-LCD panels at certain pre-determined levels;

c.     issuing price quotations in accordance with the agreements reached; and

d.  exchanging information on sales of TFT-LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

110.  On January 15, 2009, Chang Suk "C.S." Chang, an LG Display executive, agreed to plead guilty and serve jail time for conspiring with the employees of other TFT-LCD manufacturers to suppress and eliminate competition by fixing the prices of TFT-LCD panels from September 21, 2006 until June 1, 2006.

111.  On January 15, 2009, Chih-Chun "C.C." Liu and Hsuen-Lung "Brian" Lee, current Chunghwa employees, and Chieng-Hon "Frank" Lin, a former Chunghwa executive agreed to plead guilty and serve jail time for conspiring with the employees of other TFT-LCD manufacturers to suppress and eliminate competition by fixing the prices of TFT-LCD panels from September 21, 2006 until June 1, 2006.

112.  On February 3, 2009, two Chungwa executives, Cheng Yuan "C.Y." Lin, Chairman and CEO, and Wen Jun "Tony" Cheng, Assistant Vice President of Sales and marketing, were indicted by a federal grand jury for conspiring to suppress and eliminate competition by fixing the prices of TFT-LCDs.

113.  Also on February 2, 2009, Duk Mo Koo, LG's Executive Vice President and Chief Sales Officer, was indicted by a federal grand jury for conspiring to suppress and eliminate competition by fixing the prices of TFT-LCDs.

114.  Sharp Corporation agreed to pay a $120 million fine for its participation in conspiracies to fix the price of TFT-LCD panels sold to Dell, Inc. from April 2001 to December 2006 for use in computer monitors and laptops; to Motorola, Inc. from autumn

2005 to the middle of 2006 for use in Razr mobile phones; and to Apple Computer, Inc. from September 2005 to December 2006 for use in iPod portable music players.

115. Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD panels sold to Dell between 2001 and 2006 by:

    a. participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD panels to be sold to Dell;

    b. agreeing during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels at certain predetermined levels to Dell;

    c. issuing price quotations in accordance with the agreements reached; and

    d. exchanging information on sales of TFT-LCD panels to be sold to Dell for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

116. Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD panels sold to Motorola and Apple between 2005 and 2006 by:

    a. participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD panels to be sold to Apple and Motorola;

b.      agreeing during those bilateral meetings, conversations and

communications to charge prices of TFT-LCD panels at certain

predetermined levels to Apple and Motorola;

c.      issuing price quotations in accordance with the agreements reached;

and

d.      exchanging information on sales of TFT-LCD panels to be sold to

Apple and Motorola, for the purpose of monitoring and enforcing

adherence to the agreed-upon prices.

117.    Hitachi Display, Ltd. agreed to plead guilty and pay a $31 million fine for

participating in a conspiracy to fix prices in the sale of TFT-LCD's sold to Dell, Inc.

118.    These guilty pleas demonstrate that the investigations into the TFT-LCD

industry are not mere information gathering efforts by regulatory authorities. In fact, as

the DOJ's representative told this Court at the September 19, 2007 hearing, the DOJ's

investigation into the TFT-LCD industry is premised in part on insider information that

presents a detailed "road map" of the conspiracy. Plaintiff hereby incorporates by

reference the in-camera submissions made by the DOJ to this Court that have been

represented to explain the contours of this conspiracy.

119.    The guilty plea by Sharp has significant ramifications for Toshiba. Toshiba

was one of Sharp's principal competitors in the sale of TFT-LCD panels to Dell and

Apple during the periods set forth in the DOJ's information against Sharp. Toshiba sold

TFT-LCD panels to Dell between 2000 and 2006, and it sold TFT-LCD panels for use in

Apple's iPod music players between 2001 and 2006. In fact, Toshiba was one of Apple's

largest, if not largest, supplier of iPod screens for a substantial part of the Relevant Period. In the small-to-medium size TFT-LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in the first half of 2005, holding a 15.4 percent market share during the first quarter and a 14.1 percent market share during the second quarter. Toshiba's high percentage of TFT-LCD revenues dictated that no conspiracy would be effective without its participation. Sharp could not have successfully fixed the prices of the TFT-LCD panels it sold to Dell and Apple unless Toshiba, one of its biggest competitors, agreed not to undersell it.

**F.**     **Market During the Conspiracy**

120.    After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends. However, since at least 1996, the TFT-LCD Products market has been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices. Defendants achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

121.    As described herein, defendants' TFT-LCD cartel evolved over time. Defendants initiated their cartel when TFT-LCD Products were in their relative infancy. At that time, defendants balanced the desire to set prices collusively with the industry goal of establishing their products in the marketplace. As the cartel matured, new entrants were co-opted, and production costs declined. At the same time, conspirators learned how they could best mitigate the crystal cycle by agreeing on prices and output.

1

2

### G.     The Role of Trade Associations During the Conspiracy Period

3     122.    The TFT-LCD industry is served by several major trade organizations that

4  conduct industry-wide meetings several times a year. These meetings have facilitated

5  collusion, and the trade associations have themselves functioned as a means for

6  defendants to cooperate and discuss prices.

7

8     123.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"),

9  to which AU Optronics, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-

10  described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus

11  through various activities, promoting the cooperation within competition, acting as a

12  window for interaction with international organization[s] and promoting the integrated

13  growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to

14  one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and

15  invit[ing] JAPAN and Korea TFT LCD affiliations to visit TTLA." Thus, TTLA was not

16  merely a trade association that provided an opportunity to conspire; it was a vehicle by

17  which the conspiracy was effectuated and implemented.

18

19

20     124.    South Korean manufacturers, including LG Display and Samsung, had

21  similar trade associations during the Relevant Period, known as EDIRAK (the Electronic

22  Display Industrial Research Association of Korea) and KODEMIA (the Korea Display

23  Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-

24  activity with foreign Organizations related to display industries." Since 1996, EDIRAK

25  has had a cooperation pact with the United States Display Consortium ("USDC").

26  Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board,

27  said "[e]ven competitors should cooperate on common issues."

28

FIRST AMENDED COMPLAINT
MASTER FILE NO. M 07-1827 SI (CASE NO. 09-1115)

125.     Japanese manufacturers of TFT-LCD Products have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of TFT-LCD Products. Its members include Sharp, Toshiba, NEC, Hitachi, and a Japanese subsidiary of Samsung. Like the KODEMIA and the TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

126.     In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium, but was renamed the "SID International Symposium and Business Conference." SID also puts on a long-running conference called the International Display Research Conference ("IRDC").

127.     The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa, Japan.

128.     As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving defendants further opportunities to discuss prices and output.

## VII.     FRAUDULENT CONCEALMENT

129.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.

Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until December 2006, when investigations by the DOJ and other antitrust regulators became public. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of TFT-LCD Products.

130.   The participants in the crystal meetings agreed to keep the meetings secret. In some instances, the location of the meeting was circulated only the day before in an effort to avoid detection. Furthermore, the participants agreed on what pretexts they would cite when questioned about rising prices. The participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

131.   Defendants have used a variety of other purportedly market-based explanations for price increases in order to conceal their conspiracy, which have included undercapitalization, supply shortages, and component part availability.

132.   As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of Plaintiff arising from the anticompetitive conduct alleged in this Complaint.

**VIII.   COUNT 1: PRICE FIXING (15 U.S.C. § 1)**

133.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

134.    Beginning no later than January 1, 1996, the exact date being unknown to Plaintiff and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

135.    In particular, defendants combined and conspired to raise, fix, maintain or stabilize the prices of TFT-LCD Products sold in the United States.

136.    As a result of defendants' unlawful conduct, prices for TFT-LCD Products were raised, fixed, maintained and stabilized in the United States.

137.    The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding, and concerted action among defendants and their co-conspirators.

138.    For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a.    participating in meetings and conversations to discuss the prices and supply of TFT-LCD Products;

        b.    communicating in writing and orally to fix target prices, floor prices, and price ranges for TFT-LCD Products;

c.    agreeing to manipulate prices and supply of TFT-LCD Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.    issuing price announcements and price quotations in accordance with the agreements reached;

e.    selling TFT-LCD Products to customers in the United States at noncompetitive prices;

f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

g.    agreeing to maintain or lower production capacity; and

h.    providing false statements to the public to explain increased prices for TFT-LCD Products.

139.    As a result of defendants' unlawful conduct, Plaintiff's assignor was injured in its business and property in that it paid more for TFT-LCD Products than it otherwise would have paid in the absence of defendants' unlawful conduct.

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff was injured in its business and property as a result of defendants' violations;

B.      Plaintiff shall recover damages, as provided by the federal antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the defendants in an amount to be trebled in accordance with such laws;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Plaintiff shall receive such other or further relief as may be just and proper.

1

## X.      **JURY TRIAL DEMANDED**

2

3          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

4   of all of the claims asserted in this Complaint so triable.

5

6   Dated: October 14, 2009          By:     /s/ David P. Germaine
                                              David P. Germaine
7                                             VANEK, VICKERS & MASINI
                                              111 South Wacker Drive, Suite 4050
8                                             Chicago, Illinois  60606
                                              Telephone: (312) 224-1500
9                                             Facsimile: (312) 224-1510
                                              E-mail: dgermaine@vaneklaw.com

10                                            *Counsel for Plaintiff, ATS Claims, L.L.C.*

11                                            *Admitted Pro Hac Vice pursuant to Paragraph 9 of Pretrial
                                              Order No. 1*
12                                            *(Docket No. 180, 07-1827(SI)) (July 3, 2007)*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on October 14, 2009, I electronically filed ATS Claim, LLC's First

3

Amended Complaint with the Clerk of the Court using the CM/ECF System which will send

4

notifications of such filing to all Counsel of Record.

5

6

7    October  14, 2009                    By:    /s/David P. Germaine
                                                  *Counsel for Plaintiff, ATS Claim, LLC*
8                                                 VANEK, VICKERS & MASINI, P.C.
                                                  111 South Wacker Drive, Suite 4050
9                                                 Chicago, Illinois  60606
                                                  Telephone: (312) 224-1500
10                                                Facsimile: (312) 224-1510
                                                  E-mail: dgermaine@vaneklaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
MASTER FILE NO. M 07-1827 SI (CASE NO. 09-1115)

1

## **CERTIFICATE OF SERVICE**

2

  I hereby certify that on October 14, 2009, I electronically filed ATS Claim, LLC's First

3

4 Amended Complaint with the Clerk of the Court using the CM/ECF System which will send

5 notifications of such filing to all Counsel of Record.

6

7 October 14, 2009         By:   /s/David P. Germaine

                  *Counsel for Plaintiff, ATS Claim, LLC*
8                   VANEK, VICKERS & MASINI, P.C.

                  111 S. Wacker Drive, Suite 4050
9                   Chicago, Illinois  60606

                  Telephone: (312) 224-1500
10                  Facsimile: (312) 224-1510

11                  E-mail: dgermaine@vaneklaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28