Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

Joseph M Alioto (42980)
Theresa D. Moore (99978)
THE ALIOTO FIRM
555 California Street, 31st Floor
San Francisco, CA 94104
Telephone:    (415) 434-8900
Facsimile:    (415) 434-9200

*Interim Co-Lead Counsel for Indirect-Purchaser Plaintiffs and Class Members*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. C07-1827-SI |
| | MDL No. 1827 |
| This Document Relates to: All Indirect-Purchaser Actions | **INDIRECT-PURCHASER PLAINTIFFS' REQUEST FOR LEAVE TO FILE STATEMENT OF RECENT DECISION** |

Pursuant to Civil Local Rule 7-3(d), Indirect-Purchaser Plaintiffs hereby request leave to file the Statement of Recent Decision attached hereto as Exhibit 1.  The Statement advises the Court of the recent order of the Supreme Court of Iowa affirming a lower state court's certification of an indirect-purchaser class in *Anderson Contracting, Inc. v. DSM Copolymers, Inc., et al.*, No. 07-0722, 2009 Iowa Sup. LEXIS 130 (Dec. 18, 2009).

Dated:  December 29, 2009

Respectfully submitted,

/s/Craig C. Corbitt

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:     (415) 693-0770

Joseph M Alioto (42980)
Theresa D. Moore (99978)
THE ALIOTO FIRM
555 California Street, 31st Floor
San Francisco, CA  94104
Telephone:    (415) 434-8900
Facsimile:     (415) 434-9200

*Interim Co-Lead Counsel for Indirect-Purchaser Plaintiffs and Class Members*

**IT IS SO ORDERED:**

_____
Hon. Susan Illston
United States District Judge

#3219959v1

---

1
INDIRECT-PURCHASER PLAINTIFFS' REQUEST FOR LEAVE TO FILE STATEMENT OF RECENT DECISION
Master File No. C07-1827-SI

# Exhibit 1

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:   (415) 693-0700
Facsimile:   (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

Joseph M Alioto (42980)
Theresa D. Moore (99978)
THE ALIOTO FIRM
555 California Street, 31st Floor
San Francisco, CA  94104
Telephone:   (415) 434-8900
Facsimile:   (415) 434-9200

*Interim Co-Lead Counsel for Indirect-Purchaser Plaintiffs and Class Members*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. C07-1827-SI <br><br> MDL No. 1827 <br><br> **INDIRECT-PURCHASER PLAINTIFFS' STATEMENT OF RECENT DECISION** |
| This Document Relates to: <br><br> All Indirect-Purchaser Actions | |

Pursuant to Civil Local Rule 7-3(d), Indirect-Purchaser Plaintiffs submit this Statement of Recent Decision to advise the Court of the recent order of the Supreme Court of Iowa in *Anderson Contracting, Inc. v. DSM Copolymers, Inc., et al.*, No. 07-0722, 2009 Iowa Sup. LEXIS 130 (Dec. 18, 2009), a copy of which is attached.

Dated: December 29, 2009          Respectfully submitted,

/s/Craig C. Corbitt

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:  (415) 693-0700
Facsimile:  (415) 693-0770

Joseph M Alioto (42980)
Theresa D. Moore (99978)
THE ALIOTO FIRM
555 California Street, 31st Floor
San Francisco, CA 94104
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200

*Interim Co-Lead Counsel for Indirect-Purchaser Plaintiffs and Class Members*

#3219960v1



1 of 1 DOCUMENT

ANDERSON CONTRACTING, INC., Appellee, vs. DSM COPOLYMERS, INC., Appellant, BAYER AG; BAYER POLYMERS, L.L.C. n/k/a BAYER MATERIALSCIENCE, L.L.C.; BAYER CORPORATION; CROMPTON CORPORATION, UNIROYAL CHEMICAL CORPORATION, INC., n/k/a CROMPTON MANUFACTURING COMPANY, INC., THE DOW CHEMICAL COMPANY; E.I. DUPONT DE NEMOURS & COMPANY; DUPONT DOW ELASTOMERS, L.L.C.; DSM ELASTOMERS EUROPE B.V.; and EXXON MOBIL CHEMICAL CORPORATION, d/b/a EXXON MOBIL, INC., Defendants.

No. 07-0722

SUPREME COURT OF IOWA

2009 Iowa Sup. LEXIS 130

December 18, 2009, Filed

**PRIOR HISTORY:** [*1]
Appeal from the Iowa District Court for Polk County, Richard G. Blane II, Judge. Defendant manufacturer of synthetic rubber appeals from the district court's certification of a class action.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** Edward W. Remsburg of Ahlers & Cooney, P.C., Des Moines, Andrew S. Marovitz and Britt M. Miller of Mayer Brown LLP, Chicago, IL, and Richard J. Favretto, Gary A. Winters, and Andrew A. Nicely of Mayer Brown LLP, Washington, D.C., for appellant.

Joseph R. Gunderson and Jason D. Walke of Gunderson, Sharp & Walke, LLP, Des Moines, Rex A. Sharp of Gunderson, Sharp & Walke, LLP, Prairie Village, KS, and Isaac L. Diel of Sharp McQueen, PA, Overland Park, KS, for appellee.

**JUDGES:** HECHT, Justice. All justices concur except Cady, J., who takes no part.

**OPINION BY:** HECHT

**OPINION**

HECHT, Justice.

A manufacturer appeals from the district court's order certifying a class in an action alleging price fixing of the market for ethylene propylene diene monomer (EPDM). We affirm.

**I. Factual and Procedural Background.**

Anderson Contracting, Inc. (Anderson), an Iowa corporation that performs roofing work, brought suit against various manufacturers, marketers, and distributors of EPDM [1] (EPDM manufacturers) for violations of the Iowa Competition [*2] Law.

> [1] The only defendant participating in the appeal is DSM Copolymers, Inc. The other defendants have settled, including Bayer AG; Bayer Polymers, L.L.C., n/k/a Bayer MaterialScience, L.L.C.; Bayer Corporation; Crompton Corporation; Uniroyal Chemical Corporation, Inc. n/k/a Crompton Manufacturing Company, Inc.; The Dow Chemical Company; E.I. Dupont de Nemours & Company; Dupont Dow Elastomers, L.L.C.; DSM Elastomers Europe B.V.; and Exxon Mobil Chemical Company, Inc.

EPDM is a synthetic rubber composed of ethylene, propylene, and diene monomers. EPDM is produced in various grades which exhibit different properties and is then used to make various products. It is most heavily

used in the automobile industry to make weatherstripping, seals, belts, hoses, and tires. It is also used in roofing compounds, electrical insulation, garden hoses, golf club grips, and in gaskets and seals for many household appliances.

Anderson brought suit alleging the EPDM manufacturers conspired to restrain trade and fix the price of EPDM in violation of the Iowa antitrust laws. Anderson claims it purchased various items containing EPDM for a higher price than it would have had the conspiracy not existed and [*3] seeks to represent all end purchasers of products containing EPDM in the state of Iowa.

Anderson moved for class certification in June 2006. A contested hearing was held on December 1, 2006, and the district court granted class certification on March 16, 2007. The district court certified the class to include "all persons who indirectly purchased Defendants' EPDM in the State of Iowa, other than for resale, from January 1994 through December 2002."

The EPDM manufacturers appealed, contending the district court abused its discretion in certifying the class.

## II. Scope of Review.

We review a district court's decision to grant a request to certify a class action for an abuse of discretion. *Luttenegger v. Conseco Fin. Servicing Corp., 671 N.W.2d 425, 436 (Iowa 2003).* "Our class-action rules are remedial in nature and should be liberally construed to favor the maintenance of class actions." *Comes v. Microsoft Corp., 696 N.W.2d 318, 320 (Iowa 2005) (Comes II).* When a district court's grounds for certification are clearly unreasonable, an abuse of discretion can be found. *Varner v. Schwan's Sales Enters., Inc., 433 N.W.2d 304, 305 (Iowa 1988).* However, if the district court "weigh[ed] and consider[ed] [*4] the factors and [came] to a reasoned conclusion as to whether a class action should be permitted for a fair adjudication of the controversy," we will affirm. *Luttenegger, 671 N.W.2d at 437; accord Comes II, 696 N.W.2d at 321.*

## III. Discussion.

When determining whether to certify a class action, a district court is guided by *Iowa Rules of Civil Procedure 1.261-1.263.* "[A]s soon as practicable after the commencement of a class action the court shall hold a hearing" and determine whether the action should proceed as a class action. *Iowa R. Civ. P. 1.262(1).* The court may certify a class if it finds three requirements are established: (1) the requirements of *rule 1.261* are met, (2) a class action would provide for the fair and efficient adjudication of the case, and (3) the representative parties will protect the interests of the class. *Iowa R. Civ. P. 1.262(2).* The requirements of *rule 1.261* are established if the class is either so numerous or constituted in such a way that joinder is impracticable and there is a question of law or fact common to the class. *Iowa R. Civ. P. 1.261.* To determine whether a class action will provide a fair and efficient adjudication of the case, *rule 1.263* provides [*5] "the court shall consider and give appropriate weight to [thirteen listed factors] and other relevant factors." *Iowa R. Civ. P. 1.263(1).*

We have recognized that the language of *rule 1.263* indicates the district court has "considerable discretion" in weighing the factors. *Vignaroli v. Blue Cross of Iowa, 360 N.W.2d 741, 744 (Iowa 1985).* The court will determine what weight, if any, to give to each of the listed factors. *Vos v. Farm Bureau Life Ins. Co., 667 N.W.2d 36, 45 (Iowa 2003); Martin v. Amana Refrigeration, Inc., 435 N.W.2d 364, 369 (Iowa 1989).* "Whether or not we agree with the decision arrived at by the trial court is not the issue. The issue is one of abuse of discretion." *Martin, 435 N.W.2d at 369.*

The district court issued a twenty-two page ruling examining each requirement for class certification, as well as each of the thirteen factors relevant to the determination of whether a class action is a fair and efficient method of litigation in this case. The district court described its decision to certify the class as a "close call" and acknowledged several concerns. When considering rule 1.263(1)(e), the court noted the potential difficulties confronting indirect purchasers [*6] when proving injury and damages, but ultimately concluded common questions predominate over individual ones and weigh in favor of certifying the class. When considering rule 1.263(1)(k), the court acknowledged the broad definition of the class coupled with the potential difficulty of identifying specific products containing the defendants' EPDM posed significant manageability problems which could prove insurmountable. Although the court did determine this factor weighed against certification, the court concluded that the requirements of *rule 1.262* were met and certified the class. The district court noted it has the authority to amend the certification order at a later time or even to decertify the class if the circumstances later render such action appropriate. *See Iowa R. Civ. P. 1.265; Vos, 667 N.W.2d at 46.*

Several of the EPDM manufacturers appealed, [2] contending the district court abused its discretion in (1) certifying the class action despite its recognition of the potential manageability problems and (2) concluding common issues predominate over individual issues.

> 2 All of the appellants have since withdrawn their appeal with the exception of DSM Copolymers, Inc.

**A.** [*7] **Manageability.** The EPDM manufacturers allege the district court correctly determined the manageability factor weighs against class certification as a fair and efficient means to litigate the case, but argue the court abused its discretion by certifying the class. The manufacturers argue that because EPDM has a similar appearance to natural rubber, plastic, and vinyl, and because of the wide range of products that use EPDM and these other substances, it will be difficult, if not impossible, for potential class members to establish they are members of the class. Further, the manufacturers contend, even if potential class members can determine they purchased a product containing EPDM during the relevant time period, it will be even more difficult to determine if the EPDM was manufactured by one of the defendants. They also contend the definition of the class is ambiguous and problematic because the limitation to people who have purchased EPDM "other than for resale" is confusing and unclear. The parties agree that because of the prevalence of EPDM products, the class could potentially include every resident of Iowa during the established time frame. Thus, the EPDM manufacturers contend, [*8] the identification of class members will require hundreds of thousands of "mini-trials" for each putative class member to establish his or her membership in the class.

The distribution channels of EPDM are complicated and extensive due to the nature of the substance. EPDM is extremely versatile. Because it is manufactured in various grades with different qualities, its uses vary widely, and it tends to be combined with other components to create other products. Often, these products are sold and, in turn, combined with or implemented into other products and again resold. (For example, consider the case of EPDM that is sold to a purchaser who combines it with other products to create a rubber hose which is then sold to a car manufacturer to be used in the assembly of motor vehicles.) The end product will not have "EPDM" or the original manufacturer's identity stamped on it, and indeed the EPDM-containing component part itself may be well-concealed within the final product (an appliance or automobile). Thus, the EPDM manufacturers contend identifying the members of the class will require a mini-trial for each potential class member to establish that he has indeed purchased not only a [*9] product containing EPDM and not another substance, but has purchased a product containing the defendants' EPDM.

Anderson does not dispute that the distribution channels are complicated and widely varied. It contends, however, that because it will prove class-wide injury and damages in the aggregate during trial, there will be no need for mini-trials establishing that each individual class member purchased an EPDM product for an inflated price. Assuming, only for argument's sake, that Anderson is successful at trial and proves one or more of the defendants violated the Iowa Competition Law, *Iowa Code chapter 553*, any potential mini-trials establishing class membership and entitlement to damages will occur during the claims administration process.

Anderson seeks to utilize a "top down" approach in proving class-wide injury and asserts damages should be assessed in the aggregate as established through expert testimony. *See Comes II, 696 N.W.2d at 323-25*. Under this approach advocated by Anderson, there would be no need during the trial to address the potential manageability problems described by the EPDM manufacturers and noted by the district court in its ruling. Instead, such potential [*10] problems would be confronted, if necessary, after the trial of the liability and class-wide injury issues is completed. Further, Anderson contends the manageability problems asserted by the manufacturers could be avoided altogether if any judgment for class-wide injury is distributed *cy pres*. *See* 2 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 4:33 (4th ed. 2002) (explaining *cy pres* distribution of settlement proceeds in antitrust class action litigation).

The EPDM manufacturers cite *In re Phenylpropanolamine Products Liability Litigation (PPA)* to support their argument that the district court should not have certified the class because the class members must establish individual injury and damages. *214 F.R.D. 614, 619-20 (W.D. Wash. 2003)*. In *PPA*, the federal district court's order declined a request for certification of a class because the court concluded the class members would be virtually impossible to identify and that even allowing a "fluid recovery" or *cy pres* procedure would not alleviate the identification problems. *214 F.R.D. at 618-20*. We do not find the court's decision in *PPA* persuasive in this case. First, although the court in *PPA* [*11] determined a "fluid recovery" procedure was unsuitable, this court has already recognized an aggregate approach to injury and damages as appropriate in an antitrust case. *See Comes II, 696 N.W.2d at 323-24*. Further, *PPA* is a case in which a federal district court concluded, in the exercise of its discretion, that a class should not be certified. *PPA, 214 F.R.D. at 614, 623*. In contrast, this court is reviewing for abuse of discretion the district court's determination that a class should be certified.

The EPDM manufacturers next assert the exclusion from the class of indirect purchasers who bought EPDM-containing products "other than for resale" is vague and confusing. Specifically, they argue it is unclear whether purchasers who intended to resell the product when they purchased it, those who did not intend to resell but did ultimately resell, and those who intended to resell but were unable to resell are all excluded from the certified class. We conclude the district court's delineation of the class clearly is intended to exclude persons who resold the EPDM or product containing the substance, no matter

what their intent was at the time of purchase. The definition of the class makes [*12] no mention of the purchasers' intent, and we see no reason the purchasers' intent informs a determination of whether a purchaser has been harmed by the alleged conduct of the defendant manufacturers.

In conclusion, we note the district court did conclude the potential manageability issues weighed against certification of the class. However, manageability is but one of thirteen factors the court considered when it determined a class action is a fair and efficient method of litigating the case. As we have already noted, *rule 1.263* does not require any particular factor be weighed more heavily than another. In fact, the rule gives ample discretion to the district court to weigh the factors as it sees fit. We also observe that a number of courts have concluded manageability issues alone are rarely sufficient to refuse certification. *See In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140-41 (2d Cir. 2001)*; *In re Workers' Compensation, 130 F.R.D. 99, 110 (D. Minn. 1990)*. Further, the district court emphasized that if necessary, it could modify the certification order or decertify the class altogether at a later time. Considering these possible remedies should the class become [*13] unmanageable, and given our belief that any need for individualized determinations will arise, if at all, during the claims administration process after a trial of the liability and class-wide injury issues, we conclude the district court did not abuse its discretion.

**B. Common Issues vs. Individual Issues.** The EPDM manufacturers also take issue with the district court's application of rule 1.263(1)(*e*)--"[w]hether common questions of law or fact predominate over any questions affecting only individual members." *Iowa R. Civ. P. 1.263(1)(e)*. The EPDM manufacturers and Anderson agree that the claim against the manufacturers involves three elements: (1) proof of a conspiracy to fix the price of EPDM, (2) injury to the plaintiffs, and (3) damages. The parties further agree that the first of these elements can be established with common proof and the third element will require some individualized proof. However, they dispute whether the second element may be established with common proof. Both parties offered expert opinions supporting their positions. The district court considered both expert opinions and noted the fighting issue between them was whether a method of establishing class-wide [*14] injury could be devised. The court concluded this issue went to the merits of the case and was "a factual issue for the jury to determine based on expert testimony." It concluded that if Anderson's expert is ultimately unable to provide a method of calculating the alleged conspiracy's effect on pricing, a motion for summary judgment or directed verdict would appropriately address the issue. Concluding the difficulties of proving injury and damages in a class action brought by indirect purchasers are very challenging but not insurmountable, the court determined that common issues predominate over individual issues in this case and rule 1.263(1)(*e*) therefore weighs in favor of certification of the class.

The EPDM manufacturers contend the district court's assessment of this factor was flawed in two respects. First, the manufacturers argue the court should not have applied the low standard articulated in *Comes II* for the evaluation of expert testimony at the class certification stage. Second, they contend the district court abused its discretion by concluding common issues predominated and should have refused to certify the class had it determined otherwise.

The district court acknowledged [*15] that the EPDM manufacturers had offered an expert opinion contradicting Anderson's expert's claimed ability to assess injury on a class-wide basis. The court nonetheless concluded it is inappropriate, during class certification proceedings, to resolve "battles between the experts." Citing *Comes II*, the district court said "[a]t this point the Court is only concerned with ensuring that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law." The EPDM manufacturers contend the district court's application of the "not inadmissible" standard was erroneous because the case *Comes II* relied on for the standard, *Visa Check, 280 F.3d at 135*, has since been disavowed. *See In re Initial Pub. Offerings Secs. Litig., 471 F.3d 24, 42 (2d Cir. 2006)* (*IPO*).

After reviewing Supreme Court authority, as well as decisions from other federal circuits, the Second Circuit Court of Appeals did disavow the "not inadmissible" standard and joined a clear majority of jurisdictions applying a somewhat more searching standard in the determination of whether a class should be certified. The court concluded

> [a] district judge is to assess all of the relevant evidence admitted [*16] at the class certification stage and determine whether each [class certification] requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit.

*Id.*; *see also Blades v. Monsanto Co., 400 F.3d 562, 575 (8th Cir. 2005)* (stating that "in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case" and resolve "expert disputes concerning the import of evidence"); *Unger v. Amedisys, Inc., 401 F.3d 316, 319 (5th Cir. 2005)* (requiring a careful certification inquiry including findings); *Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th*

Cir. 2001) (requiring a judge to make whatever legal and factual inquiries are necessary to determine if class certification is appropriate); *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984) (stating that while the court may not reach the merits of a claim, it also should not artificially limit its review of the class certification requirements in deference to that principle).

The EPDM manufacturers contend we should adopt the more searching standard now applied by the Second Circuit and a majority of jurisdictions. The [*17] manufacturers assert that if such a standard is applied in this case, Anderson's expert's claimed ability to devise a workable formula to assess damages on a class-wide basis will not survive scrutiny.

Although the Second Circuit Court of Appeals' decision in *IPO* was partially based on amendments to the Federal Rules of Civil Procedure which have not been adopted in Iowa, [3] we find the reasoning of *IPO's* rejection of the "not inadmissible" standard persuasive and adopt it. We, however, do not find our disavowal of the "not inadmissible" standard requires us to reverse the decision of the district court in this case.

> 3  The Second Circuit Court of Appeals concluded that
>
> > [t]wo changes arguably combine to permit a more extensive inquiry into whether [class certification] requirements are met than was previously appropriate. First, the amended rule removes . . . the provision that class certification "may be conditional." Second, the amended rule replaces the provision . . . that a class certification decision be made "as soon as practicable" with a provision requiring the decision "at an early practicable time."
>
> *IPO*, 471 F.3d at 39.

First, we do not find the standard articulated in *IPO* to be [*18] radically different from the standards of evaluating a motion for class certification this court has articulated in the past. Although we have cautioned that a certification hearing should not involve a determination of whether the plaintiffs will prevail on the merits, "that is not to say that the court may not require sufficient information to form a reasonable judgment in deciding whether to certify a class." *Martin*, 435 N.W.2d at 367-68. "[T]he question of predominance necessitates a 'close look' at 'the difficulties likely to be encountered in the management of a class action.'" *Vos*, 667 N.W.2d at 46 (quoting *Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25, 28-29 (D.N.H. 1998)). While the decision in *IPO* requires a more searching analysis than earlier Second Circuit precedent, the Second Circuit Court of Appeals also warned courts against engaging in such an extensive analysis of an expert's credibility that it must make a decision on the merits of the case. *471 F.3d at 41*.

Additionally, we conclude the opinion of Anderson's expert survives this more searching scrutiny. Anderson's expert, Dr. Conner, concluded that based on his extensive experience and studies, [4] "all class [*19] members were similarly affected by paying a higher price for the defendants' EPDM during the class period than they otherwise would have paid in the absence of the defendants' anticompetitive conduct." He additionally asserted that "there is a reasonable method sanctioned by orthodox economic principles that will permit the computation of class-wide damages using a common formula." In his affidavit, Dr. Conner described four different methods of calculating the class-wide damages commonly accepted in federal and state courts, which he has used in other class action litigation. In his deposition, Dr. Conner conceded he could not tell at this early juncture which of the four methods would prove to be the most effective and reliable "[b]ecause that would require actual immersion into the data." He explained that while he had not attempted to include calculations of the manufacturers' overcharge in his report because of his limited access to industry pricing records, he had prepared a "back-of-the-envelope" [*20] estimate of the percentage price change during the collusive period and estimated that the direct overcharge amount extracted by the defendants from the market was about nine percent.

> 4  Dr. Conner has been a professor in the Department of Agricultural Economics at Purdue University since 1989 where he teaches price analysis, industrial-organization economics, and quantitative research methods primarily to graduate students. He earned his Ph.D. and M.S. in Agricultural Economics from the University of Wisconsin at Madison. His research has specialized in industrial-organization economics, and in the last ten years, more specifically in cartel studies and antitrust enforcement. He has published or is preparing to publish more than fifty academic publications analyzing various facets of the economics of price-fixing or antitrust enforcement. This research has been stimulated by his involvement as an expert in various class action lawsuits. He has most recently submitted expert reports in cases alleging price-fixing conspiracies in the marketing of lysine, methionine, smokeless tobacco, fed cattle, district heating

pipes, and grocery wholesaling. Dr. Conner has served as a consultant to [*21] the U.S. Subcommittee on Multinational Corporations, the U.S. Congress' Office of Technology Assessment, the Antitrust Division of the U.S. Department of Justice, the National Association of Attorneys General, the Organization of Economic Cooperation and Development, and the United Nations.

The EPDM manufacturers contend Dr. Conner wavered in his assertion that he could calculate class-wide injury.

> Q: Have you concluded that it would be possible to determine the effect of injury in this case on a class-wide basis? A: I've not yet determined that. I see no impediments to doing such an analysis with further discovery in the future and information from end users, from retailers. I have no reason to suspect that it's not feasible to form such an analysis. But I don't have--I have not yet been provided with--with prices, for example, at lower levels of the EPDM channels that would allow me to make a preliminary conclusion in the matter.
>
> Q: Have you formed a conclusion about whether it would be possible to prove damages to the [putative] class in this case on a class-wide basis? A: I am confident that one or more of the methods that I outlined in this affidavit will permit me or some other [*22] well-trained analyst to do so.

We do not find Dr. Conner's testimony as faltering as the manufacturers would characterize it. Rather we read any hesitation of Dr. Conner to be a reluctance to identify the most appropriate method of calculating the indirect overcharge until he has access to more complete records following thorough discovery. As we noted before, when pressed, Dr. Conner offered a preliminary rough estimate of the direct overcharge, but consistently declined to estimate the indirect overcharge because he did not yet have enough information to calculate it.

The defendants also assert the district court should have considered the opinion of their expert who contradicted Dr. Conner's assertion that it would be possible to calculate damages on a class-wide basis. The EPDM manufacturers' expert, Dr. Snyder, in a well-written and persuasive report, criticized Dr. Conner's conclusions on two key issues. First, Dr. Snyder challenged Dr. Conner's lack of knowledge of the EPDM industry and channels of distribution. Second, Dr. Snyder claimed Dr. Conner's methods are simplistic and insufficient to calculate class-wide damages in an industry as complex and wide-ranging as the EPDM [*23] industry. We conclude the first of these issues would be appropriately considered by the court when making a class certification decision, but the second goes to the heart of the merits of the case, and as such, should be deferred by the trial court, even under the standard articulated in *IPO*. While a court should consider all of the relevant evidence admitted at the class certification stage and resolve any factual disputes necessary to determine if the class certification requirements are met, the court "should not assess any aspect of the merits unrelated to a [class certification] requirement" and has the discretion to limit discovery and the extent of a hearing "to assure that a class certification motion does not become a pretext for a partial trial of the merits." *Id.*

Considering all the evidence admitted in the class certification proceedings, including Dr. Snyder's report, we conclude the trial court did not abuse its discretion in concluding Anderson had submitted sufficient evidence tending to demonstrate that class-wide injury can be quantified in this case. *See Comes II, 696 N.W.2d at 322-23*. Given that the class certification decision must be made "as soon as practicable [*24] after the commencement of a class action," *rule 1.262(1)*, we would expect a district court to consider a plaintiff's expert's limited access to discovery (as well as the defendants' expert's superior access to the defendant's records) when assessing the experts' opinions in the early stages of complex litigation. Dr. Snyder's contention that Dr. Conner's methods are flawed and incapable of calculating injury and damages to the class as a whole constitutes a challenge going directly to the merits of the case and should not be resolved at this preliminary stage. We note, as did the trial court, that "a safety net is provided for cases in which certification is improvidently granted: the court may decertify the class at a later time." *Comes II, 696 N.W.2d at 324*. The trial court may also modify the certification order by narrowing the class or establishing subclasses. [5] *Iowa R. Civ. P. 1.265*.

---

5  Dr. Conner himself suggested, indirectly, that subclasses may be appropriate for this class,

> [b]ecause the pass-on rates may vary according to which channel one is studying. The task of an analyst faced with this problem of determining damages may--it may turn out that the subclasses make more sense [*25] from the point of view of economic analysis than

2009 Iowa Sup. LEXIS 130, *

developing a model for the entire class.

He, however, asserted that he would need "to gather the appropriate data and do the appropriate analysis in order to determine the pass-on rate in the channels as a whole or in individual channels involving EPDM."

### IV. Conclusion.

We find no abuse of discretion in the district court's decision to certify the class action lawsuit.

**AFFIRMED.**

All justices concur except Cady, J., who takes no part.