Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com

*Counsel for Plaintiff Motorola, Inc.*
[Additional counsel listed on signature page]

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
Email: jhoward@crowell.com
      jmurphy@crowell.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION

This Document Relates to
Case No. 09-cv-5840-SI

---

MOTOROLA, INC.,

                 Plaintiff,

v.

AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC.; CHI MEI CORPORATION; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS CORPORATION; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO., LTD.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.,

                 Defendants.

MASTER FILE NO. 07-m-1827 SI
CASE NO. 09-cv-5840 SI
MDL NO. 1827

**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

(1)   VIOLATION OF THE SHERMAN ACT PURSUANT TO 15 U.S.C. § 1

(2)   VIOLATION OF THE CARTWRIGHT ACT, CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 16720

(3)   VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILLINOIS CODE 10/3

(4)   VIOLATION OF THE ANTITRUST AND UNFAIR COMPETITION LAWS OF ARIZONA, CALIFORNIA, THE DISTRICT OF COLUMBIA, HAWAII, IOWA, KANSAS, MICHIGAN, MINNESOTA, NEBRASKA, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLINA, PUERTO RICO, TENNESSEE, AND WISCONSIN

**DEMAND FOR JURY TRIAL**

Plaintiff Motorola, Inc., for its complaint against defendants AU Optronics Corporation, AU Optronics Corporation America, Inc, Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co. Ltd., Nexgen Mediatech, Inc., Nexgen Mediatech USA, Inc., Chunghwa Picture Tubes Ltd., Tatung Company of America, Inc., Hannstar Display Corporation, LG Display Co. Ltd., LG Display America, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Samsung Electronics America, Inc., Sharp Corporation, Sharp Electronics Corporation, Toshiba Corporation, Toshiba America Electronics Components, Inc., Toshiba Mobile Display Co., Ltd., Toshiba America Information Systems, Inc., Epson Imaging Devices Corporation, and Epson Electronics America, Inc. hereby alleges as follows:

## A.  INTRODUCTION

1.    Motorola, Inc., brings this action on behalf of itself and its affiliates, including Motorola Asia Limited, Motorola (China) Investment Limited, Hangzhou Motorola Cellular Equipment Co. Ltd., Motorola (China) Electronics Limited, Motorola Electronics Pte. Ltd., Motorola Trading Center Pte. Ltd. (collectively "Motorola") to recover damages incurred as a result of a long-running conspiracy by suppliers of liquid crystal display panels ("LCD Panels").

2.    From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels.  Defendants and their co-conspirators sold LCD Panels at unlawfully inflated prices to Motorola in the United States and around the world.

3.    By communications and meetings in which defendants agreed to eliminate competition and fix prices for LCD Panels, defendants and their co-conspirators illegally restricted competition in the LCD Panel market in the United States and elsewhere.  During the Conspiracy Period, the conspiracy affected billions of dollars of commerce throughout the United States.

4.    At least five LCD Panel manufacturers have admitted in criminal proceedings to participating in this conspiracy: defendants LG Display Co. Ltd. (and its wholly-owned

1  subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd.,
2  Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation.  On or about
3  November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and
4  Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $565 million in criminal
5  fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25,
6  2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal
7  fine for its role in the conspiracy to fix the price of LCD Panels.  And on or about December 9,
8  2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million
9  criminal fine for its role in the conspiracy.

10       5.     In their respective pleas, Sharp and Epson specifically identified Motorola as a
11  customer that was overcharged for LCD Panels.  Sharp admitted to targeting Motorola (and other
12  U.S. companies) and overcharging Motorola for LCD Panels it purchased.  Epson also admitted
13  to targeting Motorola and overcharging Motorola for LCD Panels it purchased.  Both Sharp and
14  Epson further admitted that acts committed in furtherance of its conspiracy were carried out in
15  the United States.

16       6.     Motorola brings this action to recover damages resulting from its LCD Panel
17  purchases made during the Conspiracy Period.  Defendants' and their co-conspirators'
18  conspiracy raised the price of LCD Panels above the price that would have prevailed in a
19  competitive market.  During the Conspiracy Period, hundreds of millions of Motorola's products,
20  such as mobile wireless handsets and two-way radios, contained LCD Panels.  Motorola thus
21  suffered damages as a result of defendants' and their co-conspirators' conspiracy, and is entitled
22  to treble damages and injunctive relief to remedy these injuries.

23       7.     Motorola brings this action seeking federal injunctive relief under Section 16 of
24  the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.
25  Motorola also seeks to recover damages under Section 4 of the Clayton Act, and under state
26  antitrust, consumer protection, unfair trade, and deceptive trade practices laws.  Motorola also
27  seeks to recover the costs of suit, including reasonable attorneys' fees.  These damages, costs,
28

1 and fees are for the injuries that Motorola suffered as a result of the defendants' and their co-
2 conspirators' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

3 **B.   JURISDICTION AND VENUE**

4     8.     Motorola brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1,
5 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain treble damages and
6 injunctive relief against all defendants.

7     9.     Motorola also brings this action pursuant to Section 16750(a) of the California
8 Business and Professions Code, for injunctive relief and treble damages that Motorola sustained
9 due to defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California
10 Business and Professions Code (the "Cartwright Act").  Motorola's claims also are brought
11 pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain
12 restitution from and an injunction against defendants due to their violations of Section 17200 *et*
13 *seq.* of the California Business and Professions Code (the "Unfair Competition Act").

14     10.     Defendants engaged in conspiratorial conduct both within and outside the United
15 States, with Defendants' conduct in the United States centered in California.  Defendants LG
16 Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd.,
17 and Epson Imaging Devices Corporation all admitted during their plea hearings that acts in
18 furtherance of the conspiracy were carried out within California.  In their respective Plea
19 Agreements, LG Display Co. Ltd. (and its wholly-owned subsidiary, LG Display America, Inc.),
20 Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation
21 each agreed that:  "Acts in furtherance of this conspiracy were carried out within the Northern
22 District of California.  TFT-LCD affected by this conspiracy was sold by one or more of the
23 conspirators to customers in this District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-
24 cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854,
25 Document 15-1 at 4.  Defendant LG Display America, Inc., which admitted to participating in
26 the conspiracy, maintains its principal place of business in San Jose, California.  Similarly,
27 defendants Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei
28 Optoelectronics Corporation, which also admitted to participating in the conspiracy, used

California corporations with principal places of business in Long Beach, California (defendants Tatung Company of America, Inc., Epson Electronics American, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as their sales agents in the United States for LCD Products containing LCD Panels which were affected by the conspiracy. Many of the other defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. Communications in furtherance of the conspiracy occurred within California and between California and other states.

11. Motorola also brings this action pursuant to the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq*, for injunctive relief and damages that Motorola sustained due to defendants' and their co-conspirators' violation of Section 3 of the Illinois Antitrust Act (the "Illinois Antitrust Law"). With its headquarters and substantial operations in Illinois, Motorola is entitled to the protection of the Illinois Antitrust Law.

12. Motorola also brings this action pursuant to the antitrust and unfair competition laws of Arizona, the District of Columbia, Hawaii, Iowa, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, Puerto Rico, Tennessee, and Wisconsin, as well as the Unfair Competition Law of California. As a nationwide corporation with operations in all of these states during the relevant period, Motorola is entitled to the protection of the antitrust and unfair competition laws of each of the above-mentioned states.

13. Pursuant to 28 U.S.C. §§ 1331 and 1337, the Court has jurisdiction over Motorola's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

14. Pursuant to 28 U.S.C. §1367, the Court has supplemental jurisdiction over Motorola's claims under the Cartwright Act and, in the alternative, under the Illinois Antitrust Law and the other state antitrust and unfair competition laws set forth below. These state law claims are so related to Motorola's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

15.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce.  In particular, defendants' and their co-conspirators' conspiracy directly and substantially affected the price of LCD Panels and products which contained LCD Panels ("LCD Products") purchased in the United States.  These effects give rise to Motorola's antitrust claims.

16.     The activities of defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in Arizona, California, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, Puerto Rico, Tennessee, and Wisconsin.  In particular, defendants' and their co-conspirators' conspiracy directly and substantially affected the price of LCD Panels and LCD Products purchased in these states.  These effects also give rise to Motorola's antitrust claims.  Motorola maintained operations in these states during the Conspiracy Period.

17.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22, and section 2-209 of the Illinois Code of Civil Procedure, 735 Illinois Code 5/2-209.  Each defendant conducts substantial business in Illinois, as well as in Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, Puerto Rico, Tennessee, and Wisconsin.  In addition, defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured LCD Panels for sale in the United States, including Illinois and the other identified states, or which were incorporated into LCD Products defendants and their co-conspirators knew would be sold to customers in the United States and Illinois and the identified states.  Defendants' and their co-conspirators' conspiracy affected this commerce in LCD Panels and LCD Products in the United States and in Arizona, California, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, Puerto Rico, Tennessee, and Wisconsin.

18.     Venue is proper in the Northern District of Illinois under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. §1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district.  Defendants and their co-conspirators knew that price-fixed LCD Panels and LCD Products containing price-fixed LCD Panels would be sold and shipped into this District.

## C.     DEFINITIONS

19.     "LCD Panel" means liquid crystal display panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image, for applications such as the display screens of mobile wireless handsets.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  During the Conspiracy Period, LCD Panels used in handheld devices included three different technologies: thin film transistor panels ("TFT panels"), color super-twist nematic panels ("CSTN panels"), and monochrome super-twist nematic panels ("MSTN panels").  The defendants' and their co-conspirators' price fixing conspiracy alleged herein had the effect of raising, fixing, maintaining, and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

20.     As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

21.     As used herein, the term "ODM" means any original design manufacturer of an LCD Product.

22.     As used herein, the term "EMS provider" means any electronics manufacturing services provider of an LCD Product.

### D.   THE PARTIES

#### 1.   Motorola

23.   Motorola, Inc., plaintiff, is a Delaware corporation with its principal place of business in Schaumburg, Illinois.  Motorola is a leading manufacturer of mobile wireless devices, creating the first commercial handheld cellular phone in 1983.

24.   Motorola Asia Limited, Motorola (China) Investment Limited, Hangzhou Motorola Cellular Equipment Co. Ltd., Motorola (China) Electronics Limited, Motorola Electronics Pte. Ltd., Motorola Trading Center Pte. Ltd. are subsidiaries of Motorola, Inc.  These companies suffered injury as a result of defendants' antitrust violations.  Each has assigned to Motorola, Inc., all of its rights, title, and interest in and to all claims, demands, and causes of action arising out of or relating to the conduct and transactions that are the subject of this action.  Motorola, Inc., has accepted these assignments and assumed all of the rights and liabilities related to these assigned claims.

25.   During the Conspiracy Period, the domestic U.S. and worldwide purchasing process at Motorola was managed and overseen by a supply chain organization, including procurement and manufacturing teams, based in Motorola's northern Illinois operations.  From its Illinois headquarters, Motorola directed and approved the prices and quantities of LCD Panels purchased throughout the world and incorporated into Motorola mobile wireless devices and two-way radios.  These procurement and manufacturing teams based in the United States were also responsible for all phases of procurement of LCD panels, including at various times, evaluating, qualifying, and selecting LCD Panel suppliers, drafting requests for quotes for LCD Panels, negotiating agreements with LCD Panel suppliers, coordinating purchases of LCD Panels to meet worldwide production goals, overseeing quality control, and managing stocks of LCD Panels.

26.   Motorola also negotiated LCD Panel prices with Defendants on behalf of its ODMs and EMS providers who assembled mobile devices for delivery to Motorola.  The price of those LCD Panels was likewise artificially-elevated, causing damage to Motorola.

27. Defendants' and their co-conspirators' price-fixing was the proximate cause of Motorola and its affiliates paying artificially-elevated prices for LCD Panels delivered throughout the United States and around the world.

### 2. Defendants

#### a. AU Optronics

28. Defendant AU Optronics Corporation is one of the largest manufacturers of LCD Panels. Its corporate headquarters are at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, AU Optronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

29. Defendant AU Optronics Corporation America, Inc., is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation. Its corporate headquarters are at 9720 Cypresswood Drive, Suite 241, Houston, Texas. It also has facilities located in San Diego and Cupertino, California. During the Conspiracy Period, AU Optronics Corporation America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

30. Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc., are referred to collectively herein as "AU Optronics." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant AU Optronics Corporation America, Inc., was a member of the conspiracy because, among other reasons, of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

#### b. Chi Mei

31. Defendant Chi Mei Corporation is one of the world's largest manufacturers of LCD Panels. Its corporate headquarters are at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te,

Tainan 717, Taiwan. During the Conspiracy Period, Chi Mei Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

32.     Defendant Chi Mei Optoelectronics Corporation is one of the world's largest manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation. Its global headquarters are at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. During the Conspiracy Period, Chi Mei Optoelectronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

33.     Defendant Chi Mei Optoelectronics USA, Inc., formerly known as International Display Technology USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its corporate headquarters are at 101 Metro Drive Suite 510, San Jose, California. During the Conspiracy Period, Chi Mei Optoelectronics USA, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

34.     Defendant CMO Japan Co., Ltd., formerly known as International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation. Its principal place of business is at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, CMO Japan Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

35.     Defendant Nexgen Mediatech, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at No. 11-2, Jen Te 4th St., en Te Village Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, Nexgen Mediatech, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

36.     Defendant Nexgen Mediatech USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at 16712 East Johnson Drive, City of Industry, California is hereby named as a defendant. During the Conspiracy

1    Period, Nexgen Mediatech USA, Inc., marketed, sold and/or distributed LCD Products

2    manufactured by Chi Mei Optoelectronics Corporation throughout the world.

3         37.    Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei

4    Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen

5    Mediatech USA, Inc., are referred to collectively herein as "Chi Mei." They participated in the

6    conspiracy through the actions of their respective officers, employees, and representatives acting

7    with actual or apparent authority. Alternatively, defendants Chi Mei Optoelectronics

8    Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc.,

9    and Nexgen Mediatech USA, Inc., were members of the conspiracy by virtue of their status

10   during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation. Chi Mei

11   Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei

12   Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen

13   Mediatech USA, Inc., regarding conspiracy activities and used that domination or control to

14   charge artificially high prices for LCD Panels and/or LCD Products.

15                          **c.    Chunghwa**

16        38.    Defendant Chunghwa Picture Tubes Ltd. is a leading manufacturer of LCD

17   Products. Its global headquarters are at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan. During

18   the Conspiracy Period, Chunghwa Picture Tubes Ltd. manufactured, marketed, sold and/or

19   distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

20        39.    Defendant Tatung Company of America, Inc., ("Tatung America") is a California

21   corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

22   California. During the Conspiracy Period, Tatung America manufactured, marketed, sold and/or

23   distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

24        40.    Defendants Chunghwa Picture Tubes Ltd. and Tatung America are referred to

25   collectively herein as "Chunghwa." They participated in the conspiracy through the actions of

26   their respective officers, employees, and representatives acting with actual or apparent authority.

27   During the Conspiracy Period, Chunghwa Picture Tubes Ltd. and Tatung America were closely

28   affiliated, commonly owned, controlled and dominated by Tatung Corporation, and functioned as

a single enterprise and/or alter egos. Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan. Chunghwa's Board of Directors includes representatives from Tatung Company. The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the Tatung Company. Tatung America is also subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.

### d.    HannStar

41.    Defendant HannStar Display Corporation ("HannStar") has its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period, HannStar manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

### e.    LG Display

42.    Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and/or LCD Products. It was created in 1999 as a joint venture by Royal Philips Electronics NV and LG Electronics. LG Display Co., Ltd. has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. LG Display Co., Ltd. also maintains offices in San Jose, California. During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

43.    Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., with its principal place of business located at 150 East Brokaw Rd., San Jose, California. During the Conspiracy Period, LG Display America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

44.    Defendants LG Display Co., Ltd. and LG Display America, Inc., are referred to collectively herein as "LG Display." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.

1 Alternatively, defendant LG Display America, Inc., was a member of the conspiracy by virtue of

2 its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG

3 Display Co., Ltd. dominated or controlled LG Display America, Inc., regarding conspiracy

4 activities and used that domination or control to charge artificially high prices for LCD Panels

5 and/or LCD Products.

6 **f.     Samsung**

7        45.     Defendant Samsung Electronics Co., Ltd. has its principal place of business at

8 Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During

9 the Conspiracy Period, Samsung Electronics Co., Ltd. manufactured, marketed, sold and/or

10 distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

11       46.     Defendant Samsung Electronics America, Inc., is a wholly-owned and controlled

12 subsidiary of Samsung Electronics Co., Ltd.  Its principal place of business is at 105 Challenger

13 Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, Samsung Electronics

14 America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD

15 Products throughout the United States and elsewhere.

16       47.     Defendant Samsung Semiconductor, Inc., is a wholly-owned and controlled

17 subsidiary of Samsung Electronics Co., Ltd.  Its principal place of business is at 3655 North First

18 Street, San Jose, California.  During the Conspiracy Period, Samsung Semiconductor, Inc.,

19 manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout

20 the United States and elsewhere.

21       48.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

22 and Samsung Semiconductor, Inc., are referred to collectively herein as "Samsung."  They

23 participated in the conspiracy through the actions of their respective officers, employees, and

24 representatives acting with actual or apparent authority.  Alternatively, defendants Samsung

25 Electronics America, Inc., and Samsung Semiconductor, Inc., were members of the conspiracy

26 by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung

27 Electronics Co., Ltd.  Samsung Electronics Co., Ltd. dominated or controlled Samsung

28 Electronics America, Inc., and Samsung Semiconductor, Inc., regarding conspiracy activities and

used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### g. Sharp

49.     Defendant Sharp Corporation has its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, Sharp Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

50.     Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation.  Its principal place of business is at Sharp Plaza, Mahwah, New Jersey.  During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

51.     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### h. Toshiba

52.     Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, Toshiba Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

53.     Defendant Toshiba Mobile Display Co., Ltd., formerly known as Matsushita Display Technology Co., Ltd., has its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the Conspiracy Period, Toshiba

1   Mobile Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or

2   LCD Products throughout the United States and elsewhere.

3       54.    Defendant Toshiba America Electronic Components, Inc., is a wholly-owned and

4   controlled subsidiary of defendant Toshiba Corporation.  Its corporate headquarters are at 19900

5   MacArthur Blvd., Ste. 400, Irvine, California.  During the Conspiracy Period, Toshiba America

6   Electronic Components, Inc., manufactured, marketed, sold and/or distributed LCD Panels

7   and/or LCD Products throughout the United States and elsewhere.

8       55.    Defendant Toshiba America Information Systems, Inc., is a wholly-owned and

9   controlled subsidiary of Toshiba America, Inc.  Its principal place of business is at 9470 Irvine

10  Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information

11  Systems, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products

12  throughout the United States and elsewhere.

13      56.    Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba

14  America Electronic Components, Inc., and Toshiba America Information Systems, Inc., are

15  referred to collectively herein as "Toshiba."  They participated in the conspiracy through the

16  actions of their respective officers, employees, and representatives acting with actual or apparent

17  authority.  Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba

18  America Electronic Components, Inc., and Toshiba America Information Systems, Inc., were

19  members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos

20  or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba

21  Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and

22  Toshiba America Information Systems, Inc., regarding conspiracy activities and used that

23  domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

24              **i.    Epson**

25      57.    Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal

26  place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku,

27  Tokyo 105-6104 Japan.  The company was originally formed as a joint venture between Seiko

28  Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko

Epson Corporation. Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

58. Defendant Epson Electronics America, Inc., ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation. Its principal place of business is at 2580 Orchard Parkway, San Jose, California. During the Conspiracy Period, Epson America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

59. Defendants Epson Japan and Epson America are referred to collectively herein as "Epson." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan. Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### 3. Agents and Co-Conspirators

60. The actions in this Complaint were authorized, ordered, or done by the defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

61. Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein. Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made by its parent company.

62. Various persons and entities, some identified and some not yet identified, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. When Motorola establishes the identities of such co-conspirators, Motorola will seek leave to amend this complaint to add such co-conspirators as

defendants. These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Philips Electronics North America Corp., Ltd., IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

**E.      TRADE AND COMMERCE AFFECTED BY THE CONSPIRACY**

63.      During the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels in the United States through and into interstate and foreign commerce, including through the Northern District of Illinois.

64.      During the Conspiracy Period, defendants collectively controlled the market for LCD Panels, both globally and in the United States.

65.      Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

**1.      LCD Panels**

66.      LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products. LCD Panels were the principal form of display screen used in mobile wireless handsets and two-way radios manufactured during the Conspiracy Period.

67.      LCD Panels use liquid crystal to control the passage of light. More specifically, an LCD Panel is made of two glass sheets sandwiching a layer of liquid crystal. When voltage is applied, the liquid crystal is bent, allowing light to pass through to form a pixel. The combination of these pixels forms an image on the panel.

**2.      Structure of the LCD Panel Industry**

68.      The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships and ease of information sharing.

69.     The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

70.     The LCD industry is characterized by high barriers to entry.  New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment. Thus, firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

71.     LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and televisions, are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

72.     The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

- the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;
- the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd.;
- the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;
- the 2005 transfer of Fujitsu Limited's LCD business to Sharp in 2005;
- the 2006 AU Optronics acquisition of Quanta Display.

73.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of such arrangements, defendants implemented and policed their

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described hereinafter.

74.     There were many opportunities for defendants to discuss and exchange competitively-sensitive information through their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

### 3.     The Market For LCD Panels

75.     LCD Panels have no independent utility, and have value only as components of other products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays, laptop displays, and televisions.  The demand for LCD Panels thus derives directly from the demand for such products.  In the case of LCD Panels used in mobile wireless handsets, the demand for LCD Panels derives directly from the demand for mobile wireless handsets.

76.     The market for LCD Panels is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units.  This number ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in the demand for LCD Panels during the Conspiracy period.  Shipments of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

77.     The market for LCD Panels and the market for LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for

1  LCD Products, such as mobile wireless handsets.  The market for LCD Panels and the markets

2  for LCD Products such as mobile wireless handsets, desktop computer monitors, notebook

3  computers and televisions are, for all intents and purposes, inseparable in that one would not

4  exist without the other.

5        78.  Motorola participated in the market for LCD Panels during the Conspiracy Period

6  through its purchases of LCD Panels and LCD Products.  Motorola paid a higher price for LCD

7  Panels and LCD Products purchased from defendants, their co-conspirators, and others than it

8  would have absent the conspiracy.

9  **F.  VIOLATIONS ALLEGED**

10        79.  Beginning at a date as yet unknown to Motorola, but at least as early as January 1,

11  1996 and continuing thereafter up to and including December 11, 2006 at a minimum,

12  defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and

13  stabilize at artificial levels the prices at which LCD Panels have been sold throughout the world

14  and the United States, including directly and indirectly to Motorola.

15        80.  Defendants, through their officers, directors and employees, effectuated a

16  contract, combination, trust, or conspiracy between themselves and their co-conspirators by,

17  among other things:

18      A.  Participating in meetings and conversations to discuss the prices and supply of

19          LCD Panels in the global market, including the United States;

20      B.  Agreeing to fix the prices and limit the supply of LCD Panels sold in the

21          global market, including the United States, in a manner that deprived

22          Motorola of free and open competition as a direct and indirect purchaser;

23      C.  Issuing price announcements and quotations in accordance with the

24          agreements reached; and

25      D.  Selling LCD Panels directly and indirectly to Motorola, including in the

26          United States, at fixed, non-competitive prices.

27      **1.  Defendants' and their Co-Conspirators' Agreements To Set
    Prices And Limit Production**

28

81.     The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California and elsewhere in the United States.  In the early years, beginning in at least 1996, representatives of the Japanese defendants such as Sharp and Toshiba met and agreed to fix the prices for LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

82.     In the early years, when the conspiracy was principally limited to the Japanese defendants, bilateral discussions were the preferred method of communication.  As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

83.     As LCD production in South Korea began to increase and become more sophisticated, the Japanese defendants expanded their meetings to include their South Korean competitors, including defendants LG Display and Samsung, both of which also agreed to fix prices and control supply.

84.     At least as early as 2001, the South Korean defendants convinced Taiwanese LCD Panel manufacturers, including defendants AU Optronics, Chi Mei, Chunghwa and HannStar, to join the conspiracy to fix prices and control supply.  Defendants' conspiracy included agreements on the prices at which certain defendants would sell LCD Panels and LCD Products to their own corporate subsidiaries and affiliates that manufactured LCD Products, such as mobile wireless handsets, thereby ensuring that LCD Panel prices remained the same as between defendants and their OEM customers.

### a.     "Crystal Meetings"

85.     In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information and to fix the price of LCD Panels and limit their production.  From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp, met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting

their production. The group meetings these defendants participated in were called "Crystal Meetings." Each defendant attended multiple meetings with one or more of the other defendants during this period. The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States on a regular basis throughout this period.

86. The Crystal Meetings were highly organized and followed a set pattern. Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

87. The CEO meetings occurred quarterly from approximately 2001 to 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

88. The structure of Commercial meetings was largely the same as CEO meetings. These meetings took place more frequently then CEO meetings and occurred approximately monthly.

89. During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

90. During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreement concerning the amounts each would produce. Defendants limited the production of

LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

91. During these CEO and Commercial meetings, defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of the defendants not involved in LCD Panel pricing or production. On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such meeting.

92. The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the Working Level meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

93. In approximately the summer of 2006, when they began to have concerns about antitrust issues, defendants discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information. The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other. These Round Robin meetings took place until at least November or December of 2006. The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants to maintain their price-fixing and production-limitation agreement.

### b. Bilateral Discussions

94. During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings. Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

1    Crystal Meetings.  Participants at the Crystal Meetings contacted Japanese defendants (such as

2    Sharp and Toshiba) to relay the agreed-upon pricing and production limitations.

3        95.    The Crystal Meetings were also supplemented by additional bilateral discussions

4    between various defendants in which they exchanged information about pricing, shipments, and

5    production.  As is more fully alleged below, defendants had bilateral discussions with one

6    another during price negotiations with customers in order to avoid cutting prices and to

7    implement the fixed prices set by defendants during the Crystal Meetings.  These discussions

8    usually took place between sales and marketing employees in the form of telephone calls, emails

9    and instant messages.  The information gained in these communications was then shared with

10   supervisors and taken into account in determining the price to be offered the defendants'

11   customers.

12                    **2.    Defendants' Participation in Group and Bilateral Discussions**

13       96.    Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and

14   Samsung attended multiple CEO, Commercial and working-level meetings, as well as bilateral

15   discussions during the Conspiracy Period and at least between 2001 and 2006.  These defendants

16   agreed on prices, price increases, and production limits and quotas for LCD Panels.

17   Additionally, defendants Quanta Display and Unipac, which merged with AU Optronics,

18   participated in working-level meetings.  At the CEO and Commercial meetings, these defendants

19   agreed on prices, price increases, and production limits and quotas for LCD Panels.

20       97.    Defendant Chi Mei Optoelectronics has admitted and pleaded guilty to

21   participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD

22   Panels sold worldwide, including the United States and California in particular, and to

23   participating in meetings, conversations and communications in Taiwan to discuss the prices of

24   LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales

25   information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In

26   connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of

27   $220 million.

28

98.     LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the prices of LCD Panels sold worldwide, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

99.     Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide from September 2001 through June 2006.  Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

100.     Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

101. In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from December 2001 through December 2005. Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

102. Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

103. In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin pleaded guilty to participating in the conspiracy from September 2001 through December 2006. Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the

1  conspiracy.  In connection with their guilty pleas, Mr. Lin has agreed to serve a 9-month prison

2  term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and

3  pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a

4  criminal fine of $20,000.

5  104.    In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun

6  Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold

7  worldwide from December 2001 through December 2005.  Specifically, Mr. Lin and Mr. Cheng

8  have been charged with participating in meetings, conversations and communications in Taiwan,

9  South Korea and the United States to discuss the prices of LCD Panels, including the Crystal

10  Meetings that took place in Taiwan.  Mr. Lin and Mr. Cheng have also been charged with

11  agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations

12  in accordance with the agreements reached, exchanging pricing and sales information for the

13  purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering,

14  and consenting to the participation of subordinate employees in the conspiracy, accepting

15  payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in

16  the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

17  105.    Defendant Sharp has admitted and pleaded guilty to participating in the

18  conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Dell from April

19  2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to

20  Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings,

21  conversations and communications in Japan and in the United States with unnamed co-

22  conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and

23  exchanging pricing and sales information for the purpose of monitoring and enforcing adherence

24  to the agreed-upon prices.

25  106.    Defendant Sharp participated in multiple Working Level meetings, as well as

26  bilateral discussions with other defendants, during which it discussed and reached agreements

27  with other defendants on prices for LCD Panels during the Conspiracy Period.

28

107.    Defendant Sharp also participated in multiple bilateral discussions with other defendants, including Toshiba and Epson, during the Conspiracy Period. Through these discussions, Sharp agreed on prices, price increases, production quotas, and production limits for LCD Panels. Because Toshiba and Epson were Sharp's primary competitors in the sale of LCD Panels used in mobile wireless handsets, Sharp knew that it could not have fixed the prices LCD Panels incorporated into such handsets – as Sharp admitted it did in its guilty plea – unless it reached agreements with Toshiba and Epson to do the same.

108.    Defendant Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, formerly known as Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

109.    Defendant Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Motorola. Epson

Japan has admitted and pleaded guilty to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. In connection with its guilty plea, Epson Japan has agreed to pay a fine of $26 million.

110. Defendant Epson America is a wholly-owned and controlled subsidiary of defendant Epson Japan and Epson Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui") at one of the bilateral meetings. Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators. In addition, to the extent Epson America distributed LCD Panels or LCD Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers did not undercut the pricing agreements reached at these various meetings. Epson America was an active, knowing participant in the alleged conspiracy, and acted as Epson Japan's agent for selling LCD Products in the United States.

111. Co-conspirator Hydis Technologies Co. Ltd. ("Hydis") participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

112. Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

113. Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed on prices and supply levels for LCD Panels.

114. Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or discussions during the Conspiracy Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.

115. Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at these meetings. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

116. When Motorola refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that Motorola is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### 3. Market Conditions Demonstrating the Conspiracy

117. Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion. Rather, the behavior in this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of unnaturally stabilizing and raising prices for LCD Panels at supra-competitive levels.

118.    After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends.  However, since at least 1996, the LCD Panel market has been characterized by unnatural price stability and certain periods of substantial upward pricing trends.

119.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

120.    The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

121.    Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity.  Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

122.    In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs.  However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity.  In fact, defendants were fixing the prices.

123.    LCD Panel prices began to increase in early 1996.  Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand.  By May 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller

coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

124.    Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

125.    1996 also brought the advent of third generation fabs.  Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs.  LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998.  Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops.  Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly.  Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards.  These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

126.    The supra-competitive level price of LCD Panels during the Conspiracy Period is demonstrated by, *inter alia*, the fact that costs were decreasing.  One of the most significant costs in producing an LCD Panel is the cost of its component parts.  Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the gap between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

127.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

128.     LCD Panel prices increased by more than 5% in October 2001.  These price increases continued until June of 2002.

129.     At the time, defendants blamed these price increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

130.     These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc., posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

131.     This increase in prices and revenue was unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc., later purchased by AU Optronics) rose 184% from the same period in 2001.

### 4.     Conspiracy's Effect on U.S. Commerce

132.     The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Measured by value, Defendants and others shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Conspiracy Period for ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped

millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period. As a result, a substantial portion of defendants' revenues was derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

133. Because of the importance of the U.S. market to defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct. The defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce that lead directly into the United States. Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States. This conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

134. During the Conspiracy Period, every defendant shipped LCD Panels directly into the United States.

135. When high-level executives based at defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States. Moreover, because LCD Panels are – and were throughout the Conspiracy Period – the most expensive and significant component of LCD Products, defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States. Many defendants manufactured LCD Products and sold them in the United States. In fact, defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

136. Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels. In addition,

1   defendants used LCD Product pricing in the United States as a benchmark for establishing,

2   organizing, and tracking their price-fixing of LCD Panels.

3       137.    Defendants have acknowledged that their commercial activities involving

4   intentionally sending LCD Panels and LCD Products into the United States impacted American

5   import trade and import commerce.  In a series of complaints filed with the U.S. International

6   Trade Commission over the past few years, defendants Samsung and Sharp have both alleged

7   infringing conduct based on "[t]he importation into the United States, sale for importation into

8   the United States, and/or sale after importation in the United States of . . . LCD devices" by the

9   other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display*

10  *Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of

11  Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of Certain*

12  *Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*,

13  Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No.

14  2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the*

15  *Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1,

16  2009) (Docket No. 2698).

17      138.    Defendants who have entered guilty pleas in connection with the LCD conspiracy

18  have acknowledged that their illegal activities impacted imports into the United States and had a

19  substantial effect on American import trade and import commerce.  Those defendants have

20  expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more

21  of the conspirators to customers in [the Northern District of California]."

22      139.    For the reasons set forth above, defendants' illegal conduct involved import trade

23  or import commerce into the United States.

24      140.    In the alternative, all of the above facts also demonstrate that defendants' illegal

25  activities had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.

26  **G.    GOVERNMENT INVESTIGATIONS OF PRICE-FIXING**

27      141.    In December 2006, authorities in Japan, South Korea, the European Union, and

28  the United States revealed the existence of a comprehensive investigation into anti-competitive

activity among LCD Panel manufacturers. In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

142.    On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

143.    The DOJ acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

144.    These government investigations have the potential to result in hundreds of millions of dollars in fines. Min Chun Hong, an analyst at Goodmorning Shinhan Securities, stated that "if the companies [Samsung and LG Philips] were convicted, penalties could amount to about 200 billion won, or $216 million, each."

145.    At least one of the defendants has approached the Antitrust Division of the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels. In order to enter into a leniency agreement under the Corporate Leniency Policy of the DOJ, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in defendants' price-fixing conspiracy.

146.    On or about November 12, 2008, defendants LG Display, Sharp and Chunghwa agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices in the sale of LCD Panels. On or about January 15, 2009, three current and former executives from Chunghwa: Chieng-Hon "Frank" Lin, Chih-Chun "C.C." Liu, and Hsueh-Lung "Brian" Lee, agreed to plead guilty to participating in the conspiracy from September 2001 to December 2006. Mr. Lin agreed to serve a 9-month prison sentence and pay a $50,000 criminal fine; Mr. Liu agreed to serve a 7-month prison sentence and pay a $30,000 criminal fine; and Mr. Lee agreed to serve a 6-month prison sentence and pay a $20,000 criminal fine. Also on or about January 15, 2009, Chang Suk "C.S." Chung, an executive from LG Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June

1   2006.  Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine.

2   On or about February 3, 2009, former LG executive Duk Mo Koo, and two former Chunghwa

3   executives, Cheng Yuan Lin and Wen Jun Cheng were indicted for participating in the global

4   LCD price fixing conspiracy.  On or about April 27, 2009, a high level executive of LG Display,

5   Bock Kwon, agreed to plead guilty to global LCD price fixing.  On or about August 25, 2009,

6   Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine

7   for its role in the conspiracy to fix the price of LCD Panels.  And on or about December 9, 2009,

8   Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine

9   for its role in the conspiracy.

10          147.    The DOJ Antitrust Division's investigation of the remaining defendants is

11  ongoing and is expected to result in additional guilty pleas and criminal fines from the other

12  defendants to this action.

13          **H.      PLAINTIFF'S INJURY**

14          148.    Motorola has suffered injury as a result of defendants' conspiracy to raise, fix,

15  stabilize, or maintain the price of LCD Panels at artificial levels.

16          149.    Motorola has suffered a direct, substantial, and reasonably foreseeable injury as a

17  result of defendants' and their co-conspirators' conspiracy to raise, fix, or maintain the price of

18  LCD Panels at artificial levels.  During the Conspiracy Period, defendants' and their co-

19  conspirators' conspiracy artificially inflated the price of LCD Panels purchased by Motorola

20  causing Motorola to pay higher prices for LCD Panels than it would have in the absence of the

21  conspiracy.   The conspiracy artificially inflated the prices of LCD Panels using TFT, CSTN, and

22  MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

23          150.    During the Conspiracy Period, defendants' and their co-conspirators' conspiracy

24  also artificially inflated the price of LCD Panels ultimately incorporated into LCD Products

25  purchased by Motorola causing Motorola to pay higher prices for such LCD Products than it

26  would have in the absence of the conspiracy.

27

28

# I. FRAUDULENT CONCEALMENT

151. Motorola did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006, after the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because defendants' agreement, understanding and conspiracy were kept secret, the plaintiff was unaware of defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for LCD Panels and the products in which they were used.

152. The affirmative acts of defendants and their co-conspirators alleged herein, among others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

153. By its very nature, the conspiracy was inherently self-concealing. As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one for the so-called Round Robin meetings.

154. Moreover, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

155. There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's

Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

156. Another false rationale provided by defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry.

157. A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

158. Increased demand was repeatedly cited by defendants throughout the Conspiracy Period. On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-size LCD televisions than expected, so LCD TV supply is likely to remain tight throughout the year."

159. Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

160. These explanations were all pretextual and each served to cover up the conspiracy. As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiff's claims.

## J.   VIOLATIONS ALLEGED

### First Claim for Relief: Violation of Sherman Act

161.   Motorola incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

162.   Beginning at a time presently unknown to Motorola, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Motorola, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

163.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

> A.  To fix, raise, maintain and stabilize the price of LCD Panels;
>
> B.  To allocate markets for LCD Panels among themselves;
>
> C.  To submit rigged bids for the award and performance of certain LCD Panels contracts; and
>
> D.  To allocate among themselves the production of LCD Panels.

164.   The combination and conspiracy alleged herein has had the following effects, among others:

> A.  Price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the United States;
>
> B.  Prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

C. Those who purchased LCD Panels produced by defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

165.    Motorola has been injured in its business and property by paying more for LCD Panels purchased from defendants, their co-conspirators, and others than it would have paid and will pay in the absence of the combination and conspiracy.

166.    Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by Motorola and gave rise to Motorola's antitrust claims.  As a result, Motorola has suffered injury as a direct, proximate and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels.  Motorola has been injured and will continue to be injured in its business and property by paying more for LCD Panels purchased from defendants, their co-conspirators, and others than it would have paid and will pay in the absence of the combination and conspiracy.

167.    Because Motorola has suffered injury as a direct, proximate and foreseeable result of defendants' conspiracy to fix the price of LCD Panels, Motorola is entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of LCD Panels produced by defendants, their co-conspirators, and others.

168.    Because Motorola faces a serious risk of future injury, Motorola is entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all defendants, preventing and restraining the violations alleged herein.  Defendants all continue to manufacture LCD Panels, and the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion.  Defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, and defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from Motorola.

### Second Claim for Relief: Violation of Cartwright Act

169.    Motorola incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

170.     During the Conspiracy Period, Motorola conducted a substantial volume of business in California.  Motorola sold mobile wireless handsets and other LCD Products to customers in California.  As a result of its presence in California and the substantial business it conducts in California, Motorola is entitled to the protection of the laws of California.

171.     In addition, defendants LG Display, Chunghwa and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were carried out in California.  Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and Toshiba all maintained offices in California during the Conspiracy Period.  Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels.  Defendants' conduct within California thus injured Motorola both in California and throughout the United States.

172.     Beginning at a time presently unknown to Motorola, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

173.     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

174.     For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

1        A.  to fix, raise, maintain and stabilize the price of LCD Panels;

2        B.  to allocate markets for LCD Panels amongst themselves;

3        C.  to submit rigged bids for the award and performance of certain LCD Panels

4            contracts; and

5        D.  to allocate among themselves the production of LCD Panels.

6     175.    The combination and conspiracy alleged herein has had, *inter alia*, the following

7  effects:

8        A.  price competition in the sale of LCD Panels has been restrained, suppressed

9            and/or eliminated in the State of California;

10       B.  prices for LCD Panels sold by defendants, their co-conspirators, and others

11           have been fixed, raised, maintained and stabilized at artificially high, non-

12           competitive levels in the State of California; and

13       C.  those who purchased LCD Panels from defendants, their co-conspirators, and

14           others have been deprived of the benefits of free and open competition.

15    176.    As a result of the alleged conduct of defendants, Motorola paid supra-competitive,

16  artificially inflated prices for LCD Panels and LCD Products they purchased during the

17  Conspiracy Period.

18    177.    As a direct and proximate result of defendants' conduct, Motorola has been

19  injured in its business and property by paying more for LCD Products and LCD Panels

20  purchased directly or indirectly from defendants, their co-conspirators and others than they

21  would have paid in the absence of defendants' combination and conspiracy.  As a result of

22  defendants' violation of Section 16720 of the California Business and Professions Code,

23  Motorola is entitled to treble damages and the costs of suit, including reasonable attorneys' fees,

24  pursuant to Section 16750(a) of the California Business and Professions Code.

25           **Third Claim for Relief: Violation of Illinois Antitrust Act**

26    178.    Motorola incorporates and realleges, as though fully set forth herein, each and

27  every allegation set forth in the preceding paragraphs of this Complaint.

28

179. Motorola believes and asserts that all of its purchases of LCD Panels and Products are actionable pursuant to the federal and the California antitrust laws as alleged in the First and Second Claims For Relief. In the alternative, Motorola alleges this Third Claim for Relief under the Illinois Antitrust Act.

180. Throughout the Conspiracy Period, Motorola conducted a substantial volume of business in Illinois, including selling in Illinois mobile wireless handsets and other LCD Products that contained LCD Panels manufactured and sold by defendants and others. Motorola also maintained inventories of LCD Products in Illinois and maintained offices in Illinois. As a result of its presence in Illinois and the substantial business it conducts in Illinois, Motorola is entitled to the protection of the laws of Illinois.

181. Beginning at a time presently unknown to Motorola but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing conspiracy for the unreasonable restraint of trade or commerce, in violation of the Illinois Antitrust Law.

182. The aforesaid violations of the Illinois Antitrust Law, consisted, without limitation, of a continuing unlawful conspiracy among defendants and their co-conspirators, the substantial terms of which were to fix, control and maintain the prices of, and to allocate markets for, LCD Panels.

183. For the purpose of forming and effectuating the unlawful conspiracy, the defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        A. to fix, raise, maintain and stabilize the price of LCD Panels;

        B. to allocate markets for LCD Panels amongst themselves;

        C. to submit rigged bids for the award and performance of certain LCD Panels contracts; and

        D. to allocate among themselves the production of LCD Panels.

184. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    A. price competition in the sale of LCD Panels has been restrained, suppressed and/or eliminated in the State of Illinois and throughout the United States;

    B. prices for LCD Panels have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of Illinois and throughout the United States; and

    C. those who purchased LCD Panels have been deprived of the benefit of free and open competition.

185. As a direct and proximate result of defendants' conduct, Motorola has been injured in its business and property by paying more for LCD Panels and LCD Products than they would have paid in the absence of defendants' combination and conspiracy. As a result of defendants' violation of the Illinois Antitrust Law, Motorola is entitled to damages and the costs of suit, including reasonable attorneys' fees.

**Fourth Claim for Relief: Violation of State Antitrust Laws**

186. Motorola incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

187. Motorola believes and asserts that all of its purchases of LCD Panels and Products are actionable pursuant to the federal and the California antitrust laws as alleged in the First and Second Claims For Relief. In the alternative, Motorola alleges its Third Claim for Relief under the Illinois Antitrust Act. In the further alternative, Motorola alleges this Fourth Claim For Relief under the laws of Arizona, the District of Columbia, Hawaii, Iowa, Kansas, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, Puerto Rico, Tennessee, and Wisconsin, as well as under the California Unfair Competition Law.

188. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 *et seq*:

    A. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Arizona and fixed, raised, maintained and

1    stabilized LCD Panel prices in Arizona at artificially high, non-competitive

2    levels;

3    B.  As a result, defendants' conspiracy substantially affected Arizona commerce;

4    C.  During the Conspiracy Period, Motorola conducted a substantial volume of

5    business in Arizona.  Motorola sold LCD Products to customers in Arizona.

6    As a result of its presence in Arizona and the substantial business it conducts

7    in Arizona, Motorola is entitled to the protection of the laws of Arizona; and,

8    D.  As a direct and proximate result of defendants' conduct, Motorola has been

9    injured in its business and property by paying more for LCD Products and

10    LCD Panels purchased from the defendants, their co-conspirators and others

11    than it would have paid in the absence of defendants' combination and

12    conspiracy, and is entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

13    189.    By reason of the foregoing, defendants have entered into agreements in restraint

14    of trade in violation of District of Columbia Code Ann. §§28-4501 *et seq.*

15    A.  Defendants' conspiracy restrained, suppressed and/or eliminated competition

16    in the sale of LCD Panels in the District of Columbia and fixed, raised,

17    maintained and stabilized LCD Panel prices in the District of Columbia at

18    artificially high, non-competitive levels;

19    B.  As a result, defendants' conspiracy substantially affected District of Columbia

20    commerce;

21    C.  During the Conspiracy Period, Motorola conducted a substantial volume of

22    business in the District of Columbia.  Motorola sold LCD Products to

23    customers in the District of Columbia.  As a result of its presence in the

24    District of Columbia and the substantial business it conducts in the District of

25    Columbia, Motorola is entitled to the protection of the laws of the District of

26    Columbia; and,

27    D.  As a direct and proximate result of defendants' conduct, Motorola has been

28    injured in its business and property by paying more for LCD Products and

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

1      LCD Panels purchased from the defendants, their co-conspirators and others

2      than it would have paid in the absence of defendants' combination and

3      conspiracy, and is entitled to relief under District of Columbia Code Ann. §§

4      28-4501, *et seq.*

5      190.    By reason of the foregoing, defendants have engaged in unfair competition and/or

6      unfair or deceptive acts or practices in restraint of trade in violation of Hawaii Code, H.R.S. §§

7      480-1, *et seq.*

8            A.   Defendants' conspiracy restrained, suppressed and/or eliminated competition

9                 in the sale of LCD Panels in Hawaii and fixed, raised, maintained and

10                stabilized LCD Panel prices in Hawaii at artificially high, non-competitive

11                levels;

12           B.   As a result, defendants' conspiracy substantially affected Hawaii commerce;

13           C.   During the Conspiracy Period, Motorola conducted a substantial volume of

14                business in Hawaii.  Motorola sold LCD Products to customers in Hawaii.  As

15                a result of its presence in Hawaii and the substantial business it conducts in

16                Hawaii, Motorola is entitled to the protection of the laws of Hawaii; and,

17           D.   As a direct and proximate result of defendants' conduct, Motorola has been

18                injured in its business and property by paying more for LCD Products and

19                LCD Panels purchased from the defendants, their co-conspirators and others

20                than it would have paid in the absence of defendants' combination and

21                conspiracy, and is entitled to relief under Hawaii Code, H.R.S. §§ 480-1, *et*

22                *seq.*

23     191.    By reason of the foregoing, defendants have entered into agreements in restraint

24     of trade in violation of Iowa Code §§ 553.1 *et seq.*

25           A.   Defendants' conspiracy restrained, suppressed and/or eliminated competition

26                in the sale of LCD Panels in Iowa and fixed, raised, maintained and stabilized

27                LCD Panel prices in Iowa at artificially high, non-competitive levels;

28           B.   As a result, defendants' conspiracy substantially affected Iowa commerce;

C. During the Conspiracy Period, Motorola conducted a substantial volume of business in Iowa. Motorola sold LCD Products to customers in Iowa. As a result of its presence in Iowa and the substantial business it conducts in Iowa, Motorola is entitled to the protection of the laws of Iowa;

D. As a direct and proximate result of defendants' conduct, Motorola has been injured in its business and property by paying more for LCD Products and LCD Panels purchased from the defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under Iowa Code §§ 553.1 *et seq.*

192. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

A. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Kansas and fixed, raised, maintained and stabilized LCD Panel prices in Kansas at artificially high, non-competitive levels;

B. As a result, defendants' conspiracy substantially affected Kansas commerce;

C. During the Conspiracy Period, Motorola conducted a substantial volume of business in Kansas. Motorola sold LCD Products to customers in Kansas. As a result of its presence in Kansas and the substantial business it conducts in Kansas, Motorola is entitled to the protection of the laws of Kansas; and,

D. As a direct and proximate result of defendants' conduct, Motorola has been injured in its business and property by paying more for LCD Products and LCD Panels purchased from the defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under Kansas Stat. Ann. §§ 50-101 *et seq.*

193. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

1    A. Defendants' conspiracy restrained, suppressed and/or eliminated competition

2       in the sale of LCD Panels in Michigan and fixed, raised, maintained and

3       stabilized LCD Panel prices in Michigan at artificially high, non-competitive

4       levels;

5    B. As a result, defendants' conspiracy substantially affected Michigan

6       commerce;

7    C. During the Conspiracy Period, Motorola conducted a substantial volume of

8       business in Michigan.  Motorola sold LCD Products to customers in

9       Michigan.  As a result of its presence in Michigan and the substantial business

10      it conducts in Michigan, Motorola is entitled to the protection of the laws of

11      Michigan; and,

12   D. As a direct and proximate result of defendants' conduct, Motorola has been

13      injured in its business and property by paying more for LCD Products and

14      LCD Panels purchased from the defendants, their co-conspirators and others

15      than it would have paid in the absence of defendants' combination and

16      conspiracy, and is entitled to relief under Michigan Comp. Laws. Ann. §§

17      445.771 *et seq*.

18   194.   By reason of the foregoing, defendants have entered into agreements in restraint

19   of trade in violation of Minnesota Stat. §§ 325D.50 *et seq*.

20   A. Defendants' conspiracy restrained, suppressed and/or eliminated competition

21      in the sale of LCD Panels in Minnesota and fixed, raised, maintained and

22      stabilized LCD Panel prices in Minnesota at artificially high, non-competitive

23      levels;

24   B. As a result, defendants' conspiracy substantially affected Minnesota

25      commerce;

26   C. During the Conspiracy Period, Motorola conducted a substantial volume of

27      business in Minnesota.  Motorola sold LCD Products to customers in

28      Minnesota.  As a result of its presence in Minnesota and the substantial

1    business it conducts in Minnesota, Motorola is entitled to the protection of the

2    laws of Minnesota; and,

3    D.  As a direct and proximate result of defendants' conduct, Motorola has been

4    injured in its business and property by paying more for LCD Products and

5    LCD Panels purchased from the defendants, their co-conspirators and others

6    than it would have paid in the absence of defendants' combination and

7    conspiracy, and is entitled to relief under Minnesota Stat. §§ 325D.50 *et seq.*

8    195.   By reason of the foregoing, defendants have entered into agreements in restraint

9    of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

10   A.  Defendants' conspiracy restrained, suppressed and/or eliminated competition

11   in the sale of LCD Panels in Nebraska and fixed, raised, maintained and

12   stabilized LCD Panel prices in Nebraska at artificially high, non-competitive

13   levels;

14   B.  As a result, defendants' conspiracy substantially affected Nebraska

15   commerce;

16   C.  During the Conspiracy Period, Motorola conducted a substantial volume of

17   business in Nebraska.  Motorola sold LCD Products to customers in Nebraska.

18   As a result of its presence in Nebraska and the substantial business it conducts

19   in Nebraska, Motorola is entitled to the protection of the laws of Nebraska;

20   and,

21   D.  As a direct and proximate result of defendants' conduct, Motorola has been

22   injured in its business and property by paying more for LCD Products and

23   LCD Panels purchased from the defendants, their co-conspirators and others

24   than it would have paid in the absence of defendants' combination and

25   conspiracy, and is entitled to relief under Nebraska Stat. §§ 59-801 *et seq.*

26   196.   By reason of the foregoing, defendants have entered into agreements in restraint

27   of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

28

1      A. Defendants' conspiracy restrained, suppressed and/or eliminated competition

2         in the sale of LCD Panels in Nevada and fixed, raised, maintained and

3         stabilized LCD Panel prices in Nevada at artificially high, non-competitive

4         levels;

5      B. As a result, defendants' conspiracy substantially affected Nevada commerce;

6      C. During the Conspiracy Period, Motorola conducted a substantial volume of

7         business in Nevada. Motorola sold LCD Products to customers in Nevada.

8         As a result of its presence in Nevada and the substantial business it conducts

9         in Nevada, Motorola is entitled to the protection of the laws of Nevada; and,

10      D. As a direct and proximate result of defendants' conduct, Motorola has been

11         injured in its business and property by paying more for LCD Products and

12         LCD Panels purchased from the defendants, their co-conspirators and others

13         than it would have paid in the absence of defendants' combination and

14         conspiracy, and is entitled to relief under Nevada Rev. Stat. Ann. §§ 598A *et*

15         *seq*.

16    197. By reason of the foregoing, defendants have entered into agreements in restraint

17 of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq*.

18      A. Defendants' conspiracy restrained, suppressed and/or eliminated competition

19         in the sale of LCD Panels in New Mexico and fixed, raised, maintained and

20         stabilized LCD Panel prices in New Mexico at artificially high, non-

21         competitive levels;

22      B. As a result, defendants' conspiracy substantially affected New Mexico

23         commerce;

24      C. During the Conspiracy Period, Motorola conducted a substantial volume of

25         business in New Mexico. Motorola sold LCD Products to customers in New

26         Mexico. As a result of its presence in New Mexico and the substantial

27         business it conducts in New Mexico, Motorola is entitled to the protection of

28         the laws of New Mexico; and,

D. As a direct and proximate result of defendants' conduct, Motorola has been injured in its business and property by paying more for LCD Products and LCD Panels purchased from the defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under New Mexico Stat. Ann. §§ 57-1-1 *et seq*.

198. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 *et seq*.

A. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in New York and fixed, raised, maintained and stabilized LCD Panel prices in New York at artificially high, non-competitive levels;

B. As a result, defendants' conspiracy substantially affected New York commerce;

C. During the Conspiracy Period, Motorola conducted a substantial volume of business in New York. Motorola sold LCD Products to customers in New York. As a result of its presence in New York and the substantial business it conducts in New York, Motorola is entitled to the protection of the laws of New York; and,

D. As a direct and proximate result of defendants' conduct, Motorola has been injured in its business and property by paying more for LCD Products and LCD Panels purchased from the defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under New York General Business Law §§ 340 *et seq*.

199. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq*.

A. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in North Carolina and fixed, raised, maintained and stabilized LCD Panel prices in North Carolina at artificially high, non-competitive levels;

B. As a result, Defendants' conspiracy substantially affected North Carolina commerce;

C. During the Conspiracy Period, Motorola conducted a substantial volume of business in North Carolina. Motorola sold LCD Products to customers in North Carolina. As a result of its presence in North Carolina and the substantial business it conducts in North Carolina, Motorola is entitled to the protection of the laws of North Carolina; and,

D. As a direct and proximate result of defendants' conduct, Motorola has been injured in its business and property by paying more for LCD Products and LCD Panels purchased from the defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under North Carolina Gen. Stat. §§ 75-1 *et seq*.

200. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the Puerto Rico Code 10 LPRA §§ 257, *et seq*., and 31 LPRA §§ 5141, *et seq*.

A. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Puerto Rico and fixed, raised, maintained and stabilized LCD Panel prices in Puerto Rico at artificially high, non-competitive levels;

B. As a result, defendants' conspiracy substantially affected Puerto Rico commerce;

C. During the Conspiracy Period, Motorola conducted a substantial volume of business in Puerto Rico. Motorola sold LCD Products to customers in Puerto

1    Rico.  As a result of its presence in Puerto Rico and the substantial business it

2    conducts in Puerto Rico, Motorola is entitled to the protection of the laws of

3    Puerto Rico; and,

4    D.  As a direct and proximate result of defendants' conduct, Motorola has been

5    injured in its business and property by paying more for LCD Products and

6    LCD Panels purchased from the defendants, their co-conspirators and others

7    than it would have paid in the absence of defendants' combination and

8    conspiracy, and is entitled to relief under Puerto Rico Code 10 LPRA §§ 257,

9    *et seq.* and 31 LPRA §§ 5141, *et seq.*

10    201.    By reason of the foregoing, defendants have entered into agreements in restraint

11    of trade in violation of Tennessee Code §§ 47-25-101 *et seq.*

12    A.  Defendants' conspiracy restrained, suppressed and/or eliminated competition

13    in the sale of LCD Panels in Tennessee and fixed, raised, maintained and

14    stabilized LCD Panel prices in Tennessee at artificially high, non-competitive

15    levels;

16    B.  As a result, defendants' conspiracy substantially affected Tennessee

17    commerce;

18    C.  During the Conspiracy Period, Motorola conducted a substantial volume of

19    business in Tennessee.  Motorola sold LCD Products to customers in

20    Tennessee.  As a result of its presence in Tennessee and the substantial

21    business it conducts in Tennessee, Motorola is entitled to the protection of the

22    laws of Tennessee; and,

23    D.  As a direct and proximate result of defendants' conduct, Motorola has been

24    injured in its business and property by paying more for LCD Products and

25    LCD Panels purchased from the defendants, their co-conspirators and others

26    than it would have paid in the absence of defendants' combination and

27    conspiracy, and is entitled to relief under Tennessee Code §§ 47-25-101 *et*

28    *seq.*

1      202.  By reason of the foregoing, defendants have entered into agreements in restraint

2  of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

3            A.  Defendants' conspiracy restrained, suppressed and/or eliminated competition

4                in the sale of LCD Panels in Wisconsin and fixed, raised, maintained and

5                stabilized LCD Panel prices in Wisconsin at artificially high, non-competitive

6                levels;

7            B.  As a result, defendants' conspiracy substantially affected Wisconsin

8                commerce;

9            C.  During the Conspiracy Period, Motorola conducted a substantial volume of

10               business in Wisconsin.  Motorola sold LCD Products to customers in

11               Wisconsin.  As a result of its presence in Wisconsin and the substantial

12               business it conducts in Wisconsin, Motorola is entitled to the protection of the

13               laws of Wisconsin; and,

14           D.  As a direct and proximate result of defendants' conduct, Motorola has been

15               injured in its business and property by paying more for LCD Products and

16               LCD Panels purchased from the defendants, their co-conspirators and others

17               than it would have paid in the absence of defendants' combination and

18               conspiracy, and is entitled to relief under Wisconsin Stat. §§ 133.01 *et seq.*

19     203.  By reason of the foregoing, defendants have engaged in unfair competition in

20  violation of California's Unfair Competition Law, California Business and Professional Code §

21  17200 *et seq.*

22           A.  Defendants committed acts of unfair competition, as defined by Section

23               17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of

24               LCD Panels as described above;

25           B.  The acts, omissions, misrepresentations, practices and non-disclosures of

26               defendants, as described above, constitute a common, continuous and

27               continuing course of conduct of unfair competition by means of unfair,

28               unlawful and/or fraudulent business acts or practices with the meaning of

Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

C. Defendants acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

D. Defendants acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

E. Defendants' conduct was carried out, effectuated, and perfected within the state of California. Defendants LG Display, Chunghwa and Sharp all admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California;

F. During the Conspiracy Period, Motorola conducted a substantial volume of business in California. Motorola sold LCD Products to customers in California. As a result of its presence in California and the substantial business it conducts in California, Motorola is entitled to the protection of the laws of California; and,

G. By reason of the foregoing, Motorola is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as result of such business acts and practices described above.

## K.     PRAYER FOR RELIEF

WHEREFORE, Motorola requests:

A.     That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

  i.     A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

  ii.     An unreasonable restraint of trade or commerce in violation of the Cartwright Act, as alleged in the Second Claim for relief; and

| | |
|---|---|
| 1 | iii. In the alternative, an unreasonable restraint of trade or commerce |
| 2 | in violation of the Illinois Antitrust Act, as alleged in the Third |
| 3 | Claim for relief; and |
| 4 | iv. In the alternative, an unlawful combination, trust, agreement, |
| 5 | understanding, and/or concert of action in violation of the state |
| 6 | antitrust and unfair competition laws of Arizona, the District of |
| 7 | Columbia, Hawaii, Iowa, Kansas, Michigan, Minnesota, Nebraska, |
| 8 | Nevada, New Mexico, New York, North Carolina, Puerto Rico, |
| 9 | Tennessee, and Wisconsin, as well as the Unfair Competition Law |
| 10 | of California, as alleged in the Fourth Claim for relief. |
| 11 | B. That Motorola recover damages, as provided by federal and state antitrust laws, |
| 12 | and that a judgment be entered in favor of Motorola against defendants, jointly and severally, in |
| 13 | an amount to be trebled in accordance with such laws; |
| 14 | C. That Motorola obtain any penalties, punitive or exemplary damages, and/or full |
| 15 | consideration, where the laws of the respective states identified herein so permit; |
| 16 | D. That Motorola recover damages and/or all other available monetary and equitable |
| 17 | remedies under the state unfair competition laws identified above; |
| 18 | E. That defendants, their affiliates, successors, transferees, assignees, and the |
| 19 | officers, directors, partners, agents, and employees thereof, and all other persons acting or |
| 20 | claiming to act on their behalf, be permanently enjoined and restrained from in any manner |
| 21 | continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged |
| 22 | herein, or from entering into any other conspiracy or combination having a similar purpose or |
| 23 | effect, and from adopting or following any practice, plan, program, or device having a similar |
| 24 | purpose or effect; |
| 25 | F. That Motorola be awarded pre- and post-judgment interest, and that such interest |
| 26 | be awarded at the highest legal rate from and after the date of service of the initial complaint in |
| 27 | this action; |
| 28 | |

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

G.     That Motorola recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and,

H.     That Motorola be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Motorola demands a trial by jury for all issues so triable.

Dated:  January 29, 2010

Respectfully submitted,

*/s/ Jason C. Murray*

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA  90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email:  jhoward@crowell.com
            jmurphy@crowell.com

Kenneth L. Adams (*pro hac vice*)
R. Bruce Holcomb (*pro hac vice*)
Christopher T. Leonardo (*pro hac vice*)
Christopher H. Wood (*pro hac vice*)
ADAMS HOLCOMB LLP
1875 Eye Street NW
Washington, DC 20006
Telephone:  202-580-8822
Email:  adams@adamsholcomb.com
            holcomb@adamsholcomb.com
            leonardo@adamsholcomb.com
            wood@adamsholcomb.com