Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email:  jhoward@crowell.com
          jmurphy@crowell.com

*Counsel for Plaintiffs*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | MASTER FILE No. 07-m-1827 SI CASE No. 09-cv-4997 SI MDL No. 1827 |
| This Document Relates to Case No. 09-cv-4997-SI | |

AT&T MOBILITY LLC; AT&T CORP.; AT&T SERVICES, INC.; BELLSOUTH TELECOMMUNICATIONS, INC.; PACIFIC BELL TELEPHONE COMPANY; AT&T OPERATIONS, INC.; AT&T DATACOMM, INC.; SOUTHWESTERN BELL TELEPHONE COMPANY,

                    Plaintiffs,

            v.

AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS

**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**


**DEMAND FOR JURY TRIAL**

CORPORATION; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY TECHNOLOGY CO., LTD.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.,

Defendants.

Plaintiffs AT&T Mobility LLC ("AT&T Mobility"), AT&T Corp., AT&T Services, Inc., Bellsouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc., AT&T Datacomm, Inc., and Southwestern Bell Telephone Company (plaintiffs other than AT&T Mobility are hereinafter referred to as "AT&T") for their Complaint against all defendants named herein, hereby allege as follows:

## I.   **INTRODUCTION**

1.      This case arises out of a long-running conspiracy extending at a minimum from at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), among defendants and their co-conspirators, with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for liquid crystal display panels ("LCD Panels") (defined below).

2.      Defendants and their co-conspirators formed an international cartel illegally to restrict competition in the United States in the market for LCD Panels.  During the Conspiracy Period, the conspiracy affected billions of dollars of commerce in California and throughout the United States.  The conspiracy included communications and meetings in which defendants agreed to eliminate competition and fix the prices of LCD Panels that were ultimately incorporated into LCD Products (defined below) that they knew would be sold in California and the United States.

3.      At least five LCD Panel manufacturers, defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation, have admitted to participating in this conspiracy.  On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture

Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  And on or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.

4.     Defendants engaged in conspiratorial conduct both within and outside the United States.  Defendants' conduct in the United States was centered in California.  Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Each agreed that:  "Acts in furtherance of this conspiracy were carried out within the Northern District of California.  TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4.  Defendant LG Display America, Inc., which admitted to participating in the conspiracy, maintains its principal place of business in San Jose, California.  Similarly, defendants Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation, which also admitted to participating in the conspiracy, used California corporations with principal places of business in Long Beach, California (defendants Tatung Company of America, Inc., Epson Electronics America, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as their sales agents in the United States for LCD Products containing LCD Panels which were affected by the conspiracy.  Many of the other defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc.  Communications in furtherance of the conspiracy occurred within California and between California and other states.

5.     AT&T Mobility is a provider of mobile wireless telecommunications services and

1   sells mobile wireless handsets to its customers.  During the Conspiracy Period, AT&T Mobility

2   purchased more than 300 million mobile wireless handsets for resale to customers.  As a result of

3   defendants' conspiracy to fix the price of LCD Panels, the prices of these handsets containing

4   LCD Panels also were artificially inflated.  Defendants' conspiracy also raised the price of LCD

5   Panels incorporated into the LCD Products AT&T Mobility purchased for its own internal use

6   during the Conspiracy Period, such as desktop computer monitors and notebook computers, and

7   therefore artificially inflated the price of such LCD Products.  AT&T Mobility thus suffered

8   damages as a result of defendants' conspiracy, and brings this action to recover the overcharges

9   paid for the mobile wireless handsets and other LCD Products it purchased during the

10   Conspiracy Period.

11        6.     AT&T is a provider of voice and data communications services, including

12   traditional local and long-distance voice services, internet access services, private enterprise

13   network services, and other telecommunications services.  One of the AT&T companies which

14   was injured as a result of the conspiracy is Pacific Bell Telephone Company, a California

15   corporation, which has provided voice and data telecommunications services to the vast majority

16   of the people of California for nearly a century.  During the Conspiracy Period, AT&T purchased

17   LCD Products, such as desktop computer monitors and notebook computers, for its own internal

18   use.  Defendants' conspiracy raised the price of the LCD Panels incorporated into these LCD

19   Products and therefore artificially inflated the price of the LCD Products.  AT&T thus suffered

20   damages as a result of defendants' conspiracy and brings this action to recover the overcharges

21   paid for LCD Products during the Conspiracy Period.

22        7.     AT&T Mobility and AT&T bring this action seeking injunctive relief under

23   Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15

24   U.S.C. § 1, and to recover damages under Section 4 of the Clayton Act, California's Cartwright

25   Act, and other state laws identified herein, as well as to recover the costs of suit, including

26   reasonable attorneys fees, for the injuries that AT&T Mobility and AT&T suffered as a result of

27   defendants' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

28

II.      **JURISDICTION AND VENUE**

8.      AT&T Mobility brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages for its direct purchases of LCD Panels from certain defendants.  In addition, AT&T Mobility and AT&T bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all defendants.

9.      AT&T Mobility and AT&T also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that AT&T Mobility and AT&T sustained due to defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act").  AT&T Mobility's and AT&T's claims also are brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "Unfair Competition Act").

10.      While all of AT&T Mobility's and AT&T's claims are actionable under the law of California, in the alternative, they also bring this action pursuant to the antitrust and/or unfair competition laws of Arizona, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.  As nationwide corporations doing a substantial volume of business in each of the above-mentioned states, AT&T Mobility and AT&T are, in the alternative, entitled to the protection of the antitrust and/or unfair competition laws of each of these states.

11.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over AT&T Mobility's and AT&T's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  The Court has supplemental jurisdiction over AT&T Mobility's and AT&T's claims under the Cartwright Act and, in the alternative, under the other state antitrust and/or unfair competition laws set forth below under 28 U.S.C. § 1367.  AT&T Mobility's and AT&T's state law claims are so related to their claims under Section 1 of the Sherman Act and Sections 4

1    and 16 of the Clayton Act that they form part of the same case or controversy.

2        12.    The activities of defendants and their co-conspirators, as described herein,

3    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

4    did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

5    import trade or commerce, as well as on commerce in California, and, in the alternative, on

6    commerce within each of the other states identified herein.  This effect gives rise to AT&T

7    Mobility's and AT&T's antitrust claims.  During the Conspiracy Period, defendants' conspiracy

8    affected the price of LCD Panels and LCD Products AT&T Mobility and AT&T purchased in

9    the United States, which moved through, were sold in, or used in California and, in the

10   alternative, in each of the other states identified herein.

11       13.    This court has jurisdiction over each defendant named in this action under both

12   Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each defendant

13   conducts substantial business in the state of California, and a number of defendants maintain

14   their headquarters in this District or elsewhere in California.  In addition, defendants all

15   purposefully availed themselves of the laws of the United States and California insofar as they

16   manufactured LCD Panels and LCD Products for sale in the United States and California and

17   several defendants have admitted that they engaged in conduct in furtherance of the conspiracy

18   in the Northern District of California.

19       14.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C.

20   §22 and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts

21   business in this District, or is otherwise found within this District.  In addition, venue is proper in

22   this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving

23   rise to this claim occurred in this district.

24       15.    Because AT&T Mobility's and AT&T's action is related to the *In re TFT-LCD*

25   *Antitrust Litigation* action, Case No. M:07-cv-1827 SI, the action will be assigned to the San

26   Francisco division, Judge Susan Illston presiding.  This action concerns substantially the same

27   parties, transactions and events as Case No. M:07-cv-1827 SI insofar as it involves a suit for

28   damages and injunctive relief arising out of defendants' conspiracy to fix the price of liquid

crystal display ("LCD") panels in violation of the Sherman Act and the laws of California and other states.  Pursuant to Pretrial Order #1 in M:07-cv-1827 SI, this case is automatically consolidated with M:07-cv-1827 SI for all pretrial proceedings without any further motion or order.

## III.   DEFINITIONS

16.   As used herein, the term "LCD Panel" means liquid crystal display panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  During the Conspiracy Period, LCD Panels used in hand-held devices included three different technologies:  thin film transistor (TFT) panels, color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels.  The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

17.   As used herein, the term "LCD Products" means any product containing an LCD Panel, including without limitation mobile wireless handsets (including voice, data, and combination voice and data devices), computer monitors, notebook and laptop computers, and televisions ("TVs").

18.   As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

19.   As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

## IV.   THE PARTIES

### A.   Plaintiffs

#### 1.   AT&T Mobility

20.   AT&T Mobility is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard in Atlanta, Georgia.  AT&T Mobility is a wholly-owned

1    subsidiary of AT&T Inc.  AT&T Mobility is one of the largest national providers of mobile

2    wireless telecommunications services in the United States, with over 78 million subscribers and a

3    wireless network providing nationwide wireless coverage.  Before 2007, AT&T Mobility was

4    named Cingular Wireless LLC ("Cingular").  During the Conspiracy Period, AT&T Mobility

5    purchased mobile wireless handsets and other LCD Products containing LCD Panels

6    manufactured and sold by defendants, their co-conspirators, and others.  As a result of

7    defendants' conspiracy, AT&T Mobility, has been injured in its business and property because

8    the prices it paid for such LCD Products were artificially inflated by defendants' conspiracy.

9            21.    During and after the Conspiracy Period, AT&T Mobility acquired or received the

10   stock of companies that also purchased mobile wireless handsets and other LCD Products

11   containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others.

12   As a result of defendants' conspiracy, these companies were injured in their business and

13   property because the prices they paid for mobile wireless handsets and other LCD Products were

14   artificially inflated by defendants' conspiracy.  By acquiring or receiving a contribution of the

15   stock of companies that purchased mobile wireless handsets and other LCD Products containing

16   LCD Panels, AT&T Mobility obtained all claims and rights under federal and state laws to

17   recover any overcharges suffered by those companies.  As used herein, "AT&T Mobility" refers

18   to AT&T Mobility LLC, f/k/a Cingular Wireless LLC, as well as any company that purchased

19   mobile wireless handsets during the Conspiracy Period whose stock was acquired or obtained by

20   AT&T Mobility LLC.

21           22.    Throughout the Conspiracy Period, AT&T Mobility conducted a substantial

22   amount of business in California.  During the Conspiracy Period, AT&T Mobility sold mobile

23   wireless handsets containing LCD Panels to consumers in California through its corporate-

24   owned retail stores, through independent retailers located in California, and to California

25   consumers through its website on the Internet.  In addition, AT&T Mobility sold mobile wireless

26   handsets directly to business, government and other customers in California.

27           23.    Throughout the Conspiracy Period, AT&T Mobility maintained in California

28   significant inventories of mobile wireless handsets containing LCD Panels manufactured by

defendants, their co-conspirators, and others.  Beginning in 2001, after the formation of Cingular, AT&T Mobility maintained inventories of mobile wireless handsets in California worth many million of dollars.  During the Conspiracy Period, AT&T Mobility's policy was to maintain mobile wireless handsets amounting to at least 17 days worth of sales in each retail location in California.

24.     In the alternative, AT&T Mobility also conducted substantial business in the other states referred to herein in sales of LCD Products, including through corporate-owned retail stores, through independent retailers located in those states, through its website, and through sales to businesses, government and other customers in those states.

25.     During the Conspiracy Period, all of AT&T Mobility's negotiations for the purchase of mobile wireless handsets took place in the United States and were controlled by procurement organizations based in the United States.  In addition, all AT&T Mobility purchase orders for mobile wireless handsets were issued from the United States and all invoices were sent to AT&T Mobility in the United States.  Moreover, all of the contracts AT&T Mobility entered into for the purchase of mobile wireless handsets were with either providers based in the United States or with the U.S. subsidiaries or affiliates of foreign-based providers.  Further, AT&T Mobility took title for all the mobile wireless handsets it purchased in the United States.

**2.     AT&T**

26.     AT&T Inc. is a holding company organized under the laws of Delaware and having its principal place of business in Dallas, Texas.  AT&T Inc. is the parent corporation of the following subsidiaries and affiliates:  AT&T Corp., a corporation organized under the laws of New York and having its principal place of business in Bedminster, New Jersey; AT&T Services, Inc., f/k/a SBC Services, Inc., a corporation organized under the laws of Delaware and having its principal place of business in Dallas, Texas; BellSouth Telecommunications, Inc., a corporation organized under the laws of Georgia and having its principal place of business in Atlanta, Georgia; Pacific Bell Telephone Company, a corporation organized under the laws of California and having its principal place of business in San Francisco, California; AT&T Operations, Inc., f/k/a SBC Operations, Inc., a corporation organized under the laws of Delaware

1    and having its principal place of business in San Antonio, Texas; AT&T DataComm, Inc. f/k/a

2    SBC DataComm, Inc., a corporation organized under the laws of Delaware and having its

3    principal place of business in Chicago, Illinois; and Southwestern Bell Telephone Company, a

4    corporation organized under the laws of Missouri and having its principal place of business in

5    Dallas, Texas.  These entities are collectively referred to as "AT&T."

6         27.    During the Conspiracy Period, each of the entities described in the preceding

7    paragraph purchased LCD Products, including desktop computer monitors and notebook

8    computers, that contained LCD Panels affected by defendants' price fixing conspiracy.

9         28.    During the Conspiracy Period, BellSouth Affiliates Services Corp., a corporation

10   organized under the laws of Georgia, BellSouth Technology Group, Inc., a corporation organized

11   under the laws of Georgia, and BellSouth Technology Services, Inc., a corporation organized

12   under the laws of Georgia purchased LCD Products that contained LCD Panels affected by

13   defendants' conspiracy.  Since the end of the Conspiracy Period, plaintiff AT&T Services, Inc.

14   has acquired all rights of each of these entities, including all rights under federal and state

15   antitrust laws to recover overcharges arising from purchases of LCD Products that contained

16   LCD Panels affected by defendants' conspiracy.  Also during the Conspiracy Period,

17   Southwestern Bell Telephone L.P., a limited partnership organized under the laws of Texas,

18   purchased LCD Products that contained LCD Panels affected by defendants' conspiracy.  Since

19   the end of the Conspiracy Period, plaintiff Southwestern Bell Telephone Company has acquired

20   all rights of Southwestern Bell Telephone L.P., including all rights under federal and state

21   antitrust laws to recover overcharges arising from the purchases of LCD Products that contained

22   LCD Panels affected by defendants' conspiracy.

23        29.    Throughout the Conspiracy Period, AT&T conducted a substantial amount of

24   business in California.  Plaintiff Pacific Bell Telephone Company provided local exchange

25   telecommunications services throughout California and maintained its headquarters in San

26   Francisco for nearly 100 years.  In addition, AT&T provided various wireline

27   telecommunications services to consumers, businesses and government customers in many of the

28   other states listed herein, where AT&T employees used notebook computers and desktop

1     monitors purchased by AT&T.

2          **B.**     **Defendants**

3                **1.**     **AU Optronics**

4          30.     Defendant AU Optronics Corporation is one of the world's largest manufacturers

5     of LCD Panels, with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park,

6     Hsinchu 30078, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed,

7     sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

8          31.     Defendant AU Optronics Corporation America, Inc. is a wholly-owned and

9     controlled subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at

10    9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and

11    Cupertino, California.  During the Conspiracy Period, said defendant manufactured, marketed,

12    sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

13         32.     Defendants AU Optronics Corporation and AU Optronics Corporation America,

14    Inc. are referred to collectively herein as "AU Optronics."  The AU Optronics companies were

15    members of the conspiracy that is the subject of this Complaint by virtue of their participation in

16    the conspiracy through the actions of their respective officers, employees, and representatives

17    acting with actual or apparent authority.  Alternatively, defendant AU Optronics Corporation

18    America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy

19    Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation

20    dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities

21    and used that domination or control to charge artificially high prices for LCD Panels.

22                **2.**     **Chi Mei**

23         33.     Defendant Chi Mei Corporation is another of the world's largest manufacturers of

24    LCD Panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te,

25    Tainan 717, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed,

26    sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

27         34.     Defendant Chi Mei Optoelectronics Corporation is another of the largest

28    manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation, with its

1 global headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih

2 Township, Tainan County, 74147 Taiwan.  During the Conspiracy Period, said defendant

3 manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products

4 sold in the United States.

5         35.      Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display

6 Technology USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Corporation,

7 with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California.  During the

8 Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels

9 incorporated into LCD Products sold in the United States.

10         36.      Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd. is a

11 subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu

12 Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan.  During the Conspiracy Period, said

13 defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

14 Products sold in the United States.

15         37.      Defendant Nexgen Mediatech, Inc. ("Nexgen") is a wholly-owned and controlled

16 subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St.,

17 en Te Village Jen Te, Tainan 717 Taiwan.  During the Conspiracy Period, said defendant

18 marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics

19 Corporation in the United States.

20         38.      Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a wholly-owned and

21 controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East

22 Johnson Drive, City of Industry, California.  During the Conspiracy Period, said defendant

23 marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics

24 Corporation in the United States.

25         39.      Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei

26 Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA are referred to

27 collectively herein as "Chi Mei."  The Chi Mei companies were members of the conspiracy that

28 is the subject of this Complaint by virtue of their participation in the conspiracy through the

1    actions of their respective officers, employees, and representatives acting with actual or apparent

2    authority.  Alternatively, defendants Chi Mei Optoelectronics Corporation, Chi Mei

3    Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA were members of

4    the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of

5    Chi Mei Corporation.  Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics

6    Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen

7    USA regarding conspiracy activities and used that domination or control to charge artificially

8    high prices for LCD Panels.

9                          **3.    <u>Epson</u>**

10           40.    Defendant Epson Imaging Devices Corporation ("Epson Japan") has its

11   principal place of business at 4F Annex, World Trade Center Building, 2-4-1

12   Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  The company was originally

13   formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd.

14   but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December

15   28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.

16   During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or

17   distributed LCD Panels and/or LCD Products throughout the United States and

18   elsewhere.

19           41.    Defendant Epson Electronics America, Inc. ("Epson America") is a

20   wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place

21   of business is at 2580 Orchard Parkway, San Jose, California.  During the Conspiracy

22   Period, Epson America sold and distributed LCD Products containing LCD Panels

23   manufactured by Epson Japan to customers in the United States.

24           42.    Defendants Epson Japan and Epson America are referred to collectively herein as

25   "Epson."  The Epson companies were members of the conspiracy that is the subject of this

26   Complaint by virtue of their participation in the conspiracy through the actions of their respective

27   officers, employees, and representatives acting with actual or apparent authority.  Alternatively,

28   defendant Epson America was a member of the conspiracy by virtue of its status during the

Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

### 4.    Chunghwa

43.    Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa") is a leading manufacturer of LCD Panels, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan. Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa's Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the Tatung Company.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

44.    Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  During the Conspiracy Period, Tatung America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the United States.

45.    Defendants Chunghwa and Tatung America are referred to collectively herein as "Chunghwa."  During the Conspiracy Period, Chunghwa and Tatung were closely affiliated, commonly owned, controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or alter egos.

### 4.    HannStar

46.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

### 5.      **LG Display**

47.      Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd. is a leading manufacturer of LCD Panels and is a joint venture created in 1999 by defendants Royal Philips Electronics NV and LG Electronics.  LG Display Co., Ltd. maintains offices within this District in San Jose, California and has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

48.      Defendant LG Display America, Inc. f/k/a/ LG Philips LCD America, Inc. is located at 150 East Brokaw Rd., San Jose, CA 95112.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

49.      Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG Display America, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 6.      **Samsung**

50.      Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

51.      Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd with its principal place of business

15

1   at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, said

2   defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold

3   in the United States.

4         52.    Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled

5   subsidiary of Samsung Electronics Co., Ltd., with its principal place of business at 3655 North

6   First Street, San Jose, California 95134.  During the Conspiracy Period, said defendant

7   manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products

8   sold in the United States.

9         53.    Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

10  and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."  Defendants

11  Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung

12  Semiconductor, Inc. were members of the conspiracy that is the subject of this Complaint by

13  virtue of the actions of their respective officers, employees, and representatives acting with

14  actual or apparent authority.  Alternatively, defendants Samsung Electronics America, Inc. and

15  Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during

16  the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd.  Samsung

17  Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung

18  Semiconductor, Inc. regarding conspiracy activities and used that domination or control to

19  charge artificially high prices for LCD Panels.

20              **7.    <u>Sharp</u>**

21        54.    Defendant Sharp Corporation, is located at 22-22 Nagaike-cho, Abeno-ku, Osaka

22  545-8522, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold

23  and/or distributed LCD Panels and LCD Products sold in the United States.

24        55.    Defendant Sharp Electronics Corporation is a wholly-owned and controlled

25  subsidiary of Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah,

26  New Jersey, 07430.  During the Conspiracy Period, said defendant manufactured, marketed, sold

27  and/or distributed LCD Panels and LCD Products sold in the United States.

28        56.    Defendants Sharp Corporation and Sharp Electronics Corporation are referred to

1    collectively herein as "Sharp."  Defendants Sharp Corporation and Sharp Electronics

2    Corporation were members of the conspiracy that is the subject of this Complaint by virtue of the

3    actions of their respective officers, employees, and representatives acting with actual or apparent

4    authority.  Alternatively, defendant Sharp Electronics Corporation was a member of the

5    conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp

6    Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation

7    regarding conspiracy activities and used that domination or control to charge artificially high

8    prices for LCD Panels.

9                          **8.    <u>Toshiba</u>**

10          57.    Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku,

11   Tokyo, 105-8001, Japan.  During the Conspiracy Period, said defendant manufactured, marketed,

12   sold and/or distributed LCD Panels and LCD Products sold in the United States.

13          58.    Defendant Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display

14   Technology Co., Ltd. is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo,

15   108-0075, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold

16   and/or distributed LCD Panels and LCD Products sold in the United States.

17          59.    Toshiba America Electronic Components, Inc. is a wholly-owned and controlled

18   subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur

19   Blvd., Ste. 400, Irvine, CA 92612.  During the Conspiracy Period, said defendant manufactured,

20   marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

21          60.    Defendant Toshiba America Information Systems, Inc. is a wholly-owned and

22   controlled subsidiary of Toshiba America, Inc. with its principal place of business at 9470 Irvine

23   Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information

24   Systems, Inc. manufactured, marketed, sold and/or distributed LCD Products in the United

25   States.

26          61.    Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba

27   America Electronic Components, Inc. and Toshiba America Information Systems, Inc. are

28   referred to collectively herein as "Toshiba."  Defendants Toshiba Corporation, Toshiba

1    Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and

2    Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject

3    of this Complaint by virtue of the actions of their respective officers, employees, and

4    representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba

5    Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and

6    Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their

7    status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba

8    Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba

9    America Electronic Components, Inc. and Toshiba America Information Systems, Inc. regarding

10   conspiracy activities and used that domination or control to charge artificially high prices for

11   LCD Panels.

12       **C.     Co-Conspirators**

13       62.     The actions in this Complaint were authorized, ordered, or done by

14   defendants' respective officers, agents, employees, or representatives while actively

15   engaged in the management of each defendant's business or affairs.

16       63.     Each defendant acted as the agent or joint venturer of or for the other defendants

17   with respect to the acts, violations and common course of conduct alleged herein.  Each

18   defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels

19   and/or LCD Products made by its parent company.

20       64.     Various persons and entities participated as co-conspirators in the violations

21   alleged herein and performed acts and made statements in furtherance thereof.  These co-

22   conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics

23   USA, Inc., Hydis Technologies Co., Ltd., NEC LCD Technologies, Ltd., Royal Philips

24   Electronics N.V., Philips Electronics North America Corp., Ltd., IPS Alpha Technology, Ltd.,

25   Mitsui & Co., Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, and Panasonic

26   Corporation of North America.

27       65.     The acts charged in this Complaint have been done by defendants and their co-

28   conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,

1   or representatives while actively engaged in the management of each defendant's business or

2   affairs.

3        66.    Each defendant named herein acted as the agent or joint venturer of or for the

4   other defendants with respect to the acts, violations and common course of conduct alleged

5   herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for

6   LCD Panels made by its parent company.

7   **V.**     **<u>TRADE AND COMMERCE AFFECTED BY CONSPIRACY</u>**

8        **A.**     **<u>LCD Panels</u>**

9        67.    LCD Panels are utilized in televisions, computer monitors, notebook computers,

10  mobile wireless handsets, digital cameras, and numerous other electronic products.  LCD Panels

11  were the principal form of display screen used in desktop computer monitors, laptop computers

12  and mobile wireless handsets during the Conspiracy Period.

13       68.    LCD Panels use liquid crystal to control the passage of light.  More specifically,

14  an LCD Panel is made of two glass sheets sandwiching a layer of liquid crystal.  When voltage is

15  applied, the liquid crystal is bent, allowing light to pass through to form a pixel.  The

16  combination of these pixels forms an image on the panel.

17       **B.**     **<u>Structure of the LCD Panel Industry</u>**

18       69.    The LCD Panel industry has several characteristics that facilitated a conspiracy to

19  fix prices, including high concentration, significant barriers to entry, homogeneity of products,

20  consolidation, multiple interrelated business relationships and ease of information sharing.

21       70.    The LCD Panel industry is highly concentrated and thus conducive to collusion.

22  Throughout the Conspiracy Period, defendants collectively controlled a significant share of the

23  market for LCD Panels, both globally and in the United States.

24       71.    The LCD industry is characterized by high barriers to entry.  New fabrication

25  plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and

26  intellectual property requirements require constant research and development and investment.

27  Thus, firms cannot enter the market for the production and sale of LCD Panels without an

28  enormous capital investment.

72.     LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and TVs, are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

73.     The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by: (a) AU Optronics' acquisition of Quanta Display in 2006; (b) the creation in 2001 of AU Optronics itself through the merger of Acer Display and Unipac Electronics; (c) Fujitsu Limited's transfer of its LCD business to Sharp in 2005; (d) the merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd., in 2002; and (e) the joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita in 2004.

74.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels with the numerous meetings described hereinafter.

75.     There were many opportunities for defendants to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

**C.      The Market For LCD Panels**

76.     LCD Panels have no independent utility, and have value only as components of

1   LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook

2   computer displays and TVs.  The demand for LCD Panels thus derives directly from the demand

3   for LCD Products.

4         77.    The market for LCD Panels is enormous, in part because of the extraordinarily

5   high demand for mobile wireless handsets and other LCD Products.  For example, demand for

6   mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide

7   shipments of mobile wireless handsets totaled approximately 100 million units.  This number

8   ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets

9   drove a similar increase in the demand for LCD Panels during the Conspiracy Period.  Shipments

10  of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in

11  2001 to over a billion panels in 2006.

12        78.    The market for LCD Panels and LCD Products are inextricably linked and

13  intertwined because the LCD Panel market exists to serve the markets for LCD Products.  The

14  market for LCD Panels and for LCD Products are, for all intents and purposes, inseparable in

15  that one would not exist without the other.

16        79.    AT&T Mobility participated in the market for LCD Panels during the Conspiracy

17  Period through its purchases of mobile wireless handsets, notebook computers and desktop

18  computer monitors containing LCD Panels at artificially inflated prices caused by defendants'

19  conspiracy.

20        80.    AT&T participated in the market for LCD Panels through its purchases of desktop

21  computer monitors and notebook computers containing LCD Panels at artificially inflated prices

22  caused by defendants' conspiracy.

23  **VI.**    **<u>VIOLATIONS ALLEGED</u>**

24        81.    Beginning at a date as yet unknown to AT&T Mobility and AT&T, but at least as

25  early as January 1, 1996 and continuing thereafter up to and including December 11, 2006 at a

26  minimum, defendants and their co-conspirators agreed, combined, and conspired to raise,

27  maintain, and stabilize at artificial levels the prices at which LCD Panels were sold directly and

28  indirectly to AT&T Mobility and AT&T in the United States.

82.     Defendants, through their officers, directors and employees, effectuated a contract, combination, trust, or conspiracy between themselves and their co-conspirators by, among other things:

>    a.     Participating in meetings and conversations to discuss the prices and supply of LCD Panels in the United States;
>
>    b.     Agreeing to fix the prices and limit the supply of LCD Panels sold in the United States in a manner that deprived AT&T Mobility and AT&T of free and open competition as direct and indirect purchasers;
>
>    c.     Issuing price announcements and quotations in accordance with the agreements reached; and
>
>    d.     Selling LCD Panels both directly and indirectly to AT&T Mobility and AT&T in the United States at fixed, non-competitive prices.

**A.     Defendants' Agreements To Set Prices And Limit Production**

83.     The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California and elsewhere in the United States.  In the early years, beginning in at least 1996, representatives of the Japanese defendants such as Sharp and Toshiba met and agreed to fix the prices for LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

84.     In the early years, when the conspiracy was principally limited to the Japanese defendants, bilateral discussions were the preferred method of communication.  As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

85.     As LCD Panel production in South Korea began to increase and become more sophisticated, the Japanese defendants expanded their meetings to include their South Korean competitors, including defendants LG Display and Samsung, both of which also agreed to fix prices and control supply.  At or about the same time, the Japanese defendants began to partner with those defendants located in Taiwan and Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan.

86.     At least as early as 2001, the South Korean defendants convinced Taiwanese LCD Panel manufacturers, including defendants AU Optronics, Chi Mei, Chunghwa and HannStar, to join the conspiracy to fix prices and control supply.  Defendants' conspiracy included agreements on the prices at which certain defendants would sell LCD Panels and LCD Products to their own corporate subsidiaries and affiliates that manufactured LCD Products, thereby ensuring that LCD Panel prices remained the same as between defendants and their OEM customers, both of which manufactured and sold LCD Products to AT&T Mobility and AT&T.

### 1.     "Crystal Meetings"

87.     In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information and to fix the price of LCD Panels and limit their production.  From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp, met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production.  The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants during this period.  The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and in California and elsewhere in the United States on a regular basis throughout this period.

88.     The Crystal Meetings were highly organized and followed a set pattern.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.  As described below, the conspiracy also included "working level" meetings and communications.

89.     The "CEO" meetings occurred quarterly from approximately 2001 to 2006.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or

1    whiteboard to show the participants figures relating to the supply, demand, production, and

2    prices of LCD Panels for the group to review.  Those attending the meetings would take turns

3    sharing information concerning prices, monthly and quarterly LCD fab output, production, and

4    supply, until a consensus was reached concerning the participants' prices and production levels

5    of LCD Panels in the coming months or quarter.

6         90.    The structure of "Commercial" meetings was largely the same as "CEO"

7    meetings.  These meetings took place more frequently than "CEO" meetings and occurred

8    approximately monthly.

9         91.    During all of these meetings, defendants exchanged information about current and

10   anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the

11   specific prices to be charged in the coming weeks and months for LCD Panels.  Defendants set

12   these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices,

13   and the price range or differential between different sizes and types of LCD Panels.

14        92.    During these CEO and Commercial meetings, defendants also exchanged

15   information about supply, demand, and their production of LCD Panels, and, thereafter, reached

16   agreement concerning the amounts each would produce.  Defendants limited the production of

17   LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity

18   expansion, shifting their production to different-sized panels, and setting target production levels.

19        93.    During these CEO and Commercial meetings, defendants also agreed to conceal

20   the fact and substance of the meetings, and, in fact, took various steps to do so.  Top executives

21   and other officials attending these meetings were instructed on more than one occasion to not

22   disclose the fact of these meetings to outsiders, or even to other employees of defendants not

23   involved in LCD Panel pricing or production.  On at least one occasion of which AT&T Mobility

24   and AT&T are aware, top executives at a CEO meeting staggered their arrivals and departures at

25   the meeting site so that they would not be seen in the company of each other coming or going to

26   such a meeting.

27        94.    The structure of the so-called "Working Level" meetings was less formal than the

28   CEO or Commercial meetings, and often occurred at restaurants over a meal.  The purpose of the

"Working Level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority, which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

95.     In approximately the summer of 2006, when they began to have concerns about antitrust issues, defendants discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information.  The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least November or December of 2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants to maintain their price-fixing and production-limitation agreement.

### 2        Bilateral Discussions

96.     During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings.  Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings.  Participants at the Crystal meetings contacted Japanese defendants (such as Sharp and Toshiba) to relay the agreed-upon pricing and production limitations.

97.     The Crystal Meetings were also supplemented by additional bilateral discussions between various defendants in which they exchanged information about pricing, shipments, and production.  As is more fully alleged below, defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by defendants during the Crystal Meetings.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered defendants' customers.

### 3.        Defendants' Participation in Group and Bilateral Discussions

98.     Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and Samsung attended multiple CEO, Commercial and working-level meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001 and 2006.  Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings.  At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.

99.     Defendant Chi Mei Optoelectronics has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

100.    Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  LG Display also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

101.    Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.

1   Specifically, Mr. Chung admitted that he participated in meetings, conversations and

2   communications in Taiwan, South Korea and the United States to discuss the prices of LCD

3   Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price

4   quotations in accordance with the agreements reached, exchanged pricing and sales information

5   for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized,

6   ordered, and consented to the participation of subordinate employees in the conspiracy.  In

7   connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a

8   criminal fine of $25,000.

9          102.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in

10  the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and

11  California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon

12  admitted that he participated in meetings, conversations and communications in Taiwan, South

13  Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD

14  Panels at certain predetermined levels, issued price quotations in accordance with the agreements

15  reached, exchanged pricing and sales information for the purpose of monitoring and enforcing

16  adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation

17  of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has

18  agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

19         103.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales

20  Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of

21  LCD Panels sold worldwide, including the United States and California in particular, from

22  December 2001 through December 2005.  Specifically, Mr. Koo has been charged with

23  participating in meetings, conversations and communications in Taiwan, South Korea and the

24  United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place

25  in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at

26  certain predetermined levels, issuing price quotations in accordance with the agreements

27  reached, exchanging pricing and sales information for the purpose of monitoring and enforcing

28  adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of

1   subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold

2   at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal

3   the conspiracy and his conspiratorial contacts.

4          104.   Defendant Chunghwa has admitted and pleaded guilty to participating in the

5   conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold

6   worldwide, including the United States and California in particular, and to participating in

7   meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels,

8   agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the

9   purpose of monitoring and enforcing adherence to agreed-upon prices.  Chunghwa also admitted

10  that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in

11  California.  In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65

12  million.

13         105.   Two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung

14  "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin also pleaded

15  guilty to participating in the conspiracy from September 2001 through December 2006.

16  Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings,

17  conversations and communications in Taiwan, South Korea and the United States to discuss the

18  prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels,

19  issued price quotations in accordance with the agreements reached, exchanged pricing and sales

20  information for the purpose of monitoring and enforcing adherence to the agreed-upon prices,

21  and authorized, ordered, and consented to the participation of subordinate employees in the

22  conspiracy.  In connection with their guilty plea, Mr. Lin has agreed to serve a 9-month prison

23  term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and

24  pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a

25  criminal fine of $20,000.

26         106.   In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun

27  Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold

28  worldwide from December 2001 through December 2005.  Specifically, Mr. Lin and Mr. Cheng

1   have been charged with participating in meetings, conversations and communications in Taiwan,

2   South Korea and the United States to discuss the prices of LCD Panels, including the Crystal

3   Meetings that took place in Taiwan.  Mr. Lin and Mr. Cheng have also been charged with

4   agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations

5   in accordance with the agreements reached, exchanging pricing and sales information for the

6   purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering,

7   and consenting to the participation of subordinate employees in the conspiracy, accepting

8   payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in

9   the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

10       107.    Defendant Epson Japan has admitted and pleaded guilty to participating in

11   the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to

12   Motorola and agreed to pay a criminal fine of $26 million.  Epson Japan has admitted to

13   participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels,

14   and to participating in meetings, conversations and communications in Japan and the

15   United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD

16   Panels, and exchanging pricing and sales information for the purpose of monitoring and

17   enforcing adherence to the agreed-upon prices.  During the Conspiracy Period, Motorola

18   was one of AT&T Mobility's largest suppliers of mobile wireless handsets.

19       108.    Defendant Epson America is a wholly-owned and controlled subsidiary of

20   co-conspirator Epson Japan.  At one of the bilateral meetings described above, Epson

21   Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui").  At that meeting,

22   Mitsui served as an agent of, and under the direction of, both Epson Japan and Epson

23   America.  Epson Japan and Epson America, through their agent, were parties to the

24   agreements made at those meetings and acted as co-conspirators.  In addition, to the

25   extent Epson America sold or distributed LCD Products, it played a significant role in the

26   conspiracy because defendants wished to ensure that the prices for such products did not

27   undercut the pricing agreements reached at these various meetings.  Thus, Epson America

28   was an active, knowing participant in the alleged conspiracy, and acted as Epson Japan's

1    agent for selling LCD Products in the United States.

2          109.    Defendant Sharp has admitted and pleaded guilty to participating in the

3    conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April

4    2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to

5    Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings,

6    conversations and communications in Japan and in the United States with unnamed co-

7    conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels,

8    agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the

9    purpose of monitoring and enforcing adherence to the agreed-upon prices.  Sharp admitted that

10   acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in

11   California.  AT&T Mobility purchased handsets from Motorola that contained LCD Panels for

12   which Sharp admittedly fixed the prices.

13         110.    Defendant Sharp participated in multiple Working Level meetings, as well as

14   bilateral discussions with other defendants, during which it discussed and reached agreements

15   with other defendants on prices for LCD Panels during the Conspiracy Period.

16         111.    Defendant Sharp also participated in multiple bilateral discussions with other

17   defendants, including Toshiba and Epson, during the Conspiracy Period.  Through these

18   discussions, Sharp agreed on prices, price increases, production quotas and production limits for

19   LCD Panels.  Because Toshiba and Epson were Sharp's primary competitors in the sale of LCD

20   Panels used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of

21   LCD Panels incorporated into such handsets – as Sharp admitted it did in its guilty plea – unless

22   it reached agreements with Toshiba and Epson to do the same.

23         112.    Defendant Toshiba also participated in the conspiracy by entering into

24   joint ventures and other arrangements to manufacture or source LCD Panels with one or

25   more defendant that attended the Crystal Meetings.  The purpose and effect of these joint

26   ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of

27   such panels at unreasonably high levels and to aid, abet, notify and facilitate the

28   implementation of the price-fixing and production-limitation agreements reached at the

1    meetings.  During the Conspiracy Period, Toshiba sought and formed strategic

2    partnerships with other LCD manufacturers that allowed it to easily communicate and

3    coordinate prices and production levels with other manufacturers as part of the overall

4    conspiracy alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a

5    manufacturing joint venture.  In 2001, Toshiba and Matsushita formed a joint venture,

6    Advanced Flat Panel Displays, which merged their LCD operations.  In April 2002,

7    Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a Toshiba

8    Matsushita Display Technology Co. Ltd., which combined the two companies' LCD

9    development, manufacturing, and sales operations.  In 2006, Toshiba purchased a 20%

10   stake in LG Display's LCD Panel manufacturing facility in Poland.  The operation and

11   management of these many different joint ventures afforded Toshiba and the other

12   defendant joint-venture partners regular opportunities to communicate with each other to

13   agree on prices, price increases and production limits and quotas for LCD Panels that

14   each defendant manufactured and sold.

15        113.    Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co.,

16   Ltd. ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005.  In

17   addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005.

18   Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

19        114.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in

20   multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac

21   Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and

22   supply levels for LCD Panels.

23        115.    Co-conspirator Mitsui had at least one bilateral meeting, which included a

24   discussion about customers and future pricing, with a Taiwanese defendant in 2001.  Mitsui was

25   acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan

26   agreed on prices and supply levels for LCD Panels.

27        116.    Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings

28   or discussions during the Class Period with at least one other defendant or co-conspirator, which

1    included discussions about prices for LCD Panels.

2        117.    Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture

3    among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"),

4    and one or more of the partners in this joint venture participated in the meetings described above.

5    As a result, IPS Alpha was represented at those meetings and was a party to the agreements

6    entered into by its joint venture partners at these meetings.  As explained above, the agreements

7    at these meetings included agreements on price ranges and output restrictions.  The joint venture

8    partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels

9    the joint ventures sold both to the joint venture partners and other non-affiliated companies.

10   Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

11       118.    When AT&T Mobility and AT&T refer to a corporate family or companies by a

12   single name in their allegations of participation in the conspiracy, it is to be understood that they

13   are alleging that one or more employees or agents of entities within the corporate family engaged

14   in conspiratorial meetings on behalf of every company in that family.  In fact, the individual

15   participants in the conspiratorial meetings and discussions did not always know the corporate

16   affiliation of their counterparts, nor did they distinguish between the entities within a corporate

17   family.  The individual participants entered into agreements on behalf of, and reported these

18   meetings and discussions to, their respective corporate families.  As a result, the entire corporate

19   family was represented in meetings and discussions by their agents and were parties to the

20   agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

21   families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played

22   a significant role in the conspiracy because defendants wished to ensure that the prices for such

23   products paid by direct purchasers would not undercut the pricing agreements reached at these

24   various meetings.  Thus, all entities within the corporate families were active, knowing

25   participants in the alleged conspiracy.

26       **B.    Market Conditions Demonstrating the Conspiracy**

27       119.    Since at least 1996, the LCD Panel market has not behaved as would be expected

28   of a competitive market free of collusion.  Rather, the behavior of this market strongly evidences

32

that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

120.    After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends.  However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

121.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

122.    The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

123.    Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity.  Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

124.    In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs.  However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity.  In fact, defendants had begun stabilizing and raising the prices.

125.    LCD Panel prices began to increase in early 1996.  Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

126.    Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

127.    1996 also brought the advent of third generation fabs.  Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs.  LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998.  Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops.  Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly.  Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards.  These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

128.    The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, *inter alia*, the fact that costs were decreasing.  One of the most significant costs in producing an LCD Panel is the cost of its component parts.  Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

129.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003

to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

130.    LCD Panel prices increased by more than 5% in October 2001.  These price increases continued until June of 2002.

131.    At the time, defendants blamed these price increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

132.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc. posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT$ 19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

133.    This increase in prices and revenue was unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics) rose 184% from the same period in 2001.

**C.    Conspiracy's Effect on U.S. Commerce**

134.    The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Measured by value, Defendants and others shipped more than 400 million

LCD Panels, including those incorporated into LCD Products, into the United States during the Conspiracy Period for ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period.  As a result, a substantial portion of defendants' revenues was derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.  Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

135.    Because of the importance of the U.S. market to defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct.  The defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce that lead directly into the United States.  Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States. This conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

136.    During the Conspiracy Period, every defendant shipped LCD Panels directly into the United States.

137.    When high-level executives based at defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States.  Moreover, because LCD Panels are – and were throughout the Conspiracy Period – the most expensive and significant component of LCD Products, defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States.  Many defendants manufactured LCD Products and sold them in the United States.  In fact, defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

138.    Defendants also monitored the prices for LCD Products sold in the United States,

1   which they often referred to as "street prices," because defendants were aware that the

2   conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition,

3   defendants used LCD Product pricing in the United States as a benchmark for establishing,

4   organizing, and tracking their price-fixing of LCD Panels.

5       139.    Defendants have acknowledged that their commercial activities involving

6   intentionally sending LCD Panels and LCD Products into the United States impacted American

7   import trade and import commerce.  In a series of complaints filed with the U.S. International

8   Trade Commission over the past few years, defendants Samsung and Sharp have both alleged

9   infringing conduct based on "[t]he importation into the United States, sale for importation into

10  the United States, and/or sale after importation in the United States of . . . LCD devices" by the

11  other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display*

12  *Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of

13  Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586*); In the Matter of Certain*

14  *Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*,

15  Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No.

16  2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the*

17  *Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1,

18  2009) (Docket No. 2698).

19      140.    Defendants who have entered guilty pleas in connection with the LCD conspiracy

20  have acknowledged that their illegal activities impacted imports into the United States and had a

21  substantial effect on American import trade and import commerce.  Those defendants have

22  expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more

23  of the conspirators to customers in [the Northern District of California]."

24      141.    For the reasons set forth above, defendants' illegal conduct involved import trade

25  or import commerce into the United States.

26      142.    In the alternative, all of the above facts also demonstrate that defendants' illegal

27  activities had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.

28

1    **VII.    GOVERNMENT INVESTIGATIONS OF PRICE-FIXING**

2        143.    In December 2006, authorities in Japan, South Korea, the European Union, and

3    the United States revealed the existence of a comprehensive investigation into anti-competitive

4    activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the Securities

5    and Exchange Commission, defendant LG Display disclosed for the first time that officials from

6    the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the

7    company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ")

8    had issued a subpoena to its San Jose office.

9        144.    On December 12, 2006, news reports indicated that in addition to LG Display,

10   defendants Samsung, Sharp and AU Optronics were also under investigation.

11       145.    The DOJ acknowledged that it was "investigating the possibility of

12   anticompetitive practices and is cooperating with foreign authorities."

13       146.    At least one defendant has approached the DOJ to enter into a leniency agreement

14   with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to enter into a

15   leniency agreement under the Corporate Leniency Policy of the Department of Justice, this

16   defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own

17   participation in defendants' price-fixing conspiracy.

18       147.    On or about November 12, 2008, defendants LG Display, Sharp and Chunghwa

19   agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the

20   conspiracy to fix prices in the sale of LCD Panels.  On or about January 15, 2009, three current

21   and former executives from Chunghwa:  Chieng-Hon "Frank" Lin, Chih-Chun "C.C." Liu, and

22   Hsueh-Lung "Brian" Lee, agreed to plead guilty to participating in the conspiracy from

23   September 2001 to December 2006.  Mr. Lin agreed to serve a 9-month prison sentence and pay

24   a $50,000 criminal fine; Mr. Liu agreed to serve a 7-month prison sentence and pay a $30,000

25   criminal fine; and Mr. Lee agreed to serve a 6-month prison sentence and pay a $20,000 criminal

26   fine.  Also on or about January 15, 2009, Chang Suk "C.S." Chung, an executive from LG

27   Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June

28   2006.  Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine.

On or about February 3, 2009, former LG executive Duk Mo Koo, and two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng were indicted for participating in the global LCD price fixing conspiracy.  On or about April 27, 2009, a high level executive of LG Display, Bock Kwon, agreed to plead guilty to global LCD price fixing.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  And on or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.

148.    The DOJ's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other defendants to this action.

**VIII.   PLAINTIFFS' INJURIES**

149.    AT&T Mobility has suffered a direct, substantial, and reasonably foreseeable injury as both a purchaser of mobile wireless handsets containing LCD Panels and as a purchaser of other LCD Products as a result of defendants' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of LCD Panels incorporated into such mobile wireless handsets, causing AT&T Mobility to pay higher prices than it would have in the absence of defendants' conspiracy.

150.    In some cases, AT&T Mobility purchased mobile wireless handsets directly from defendants.  For example, during the Conspiracy Period, AT&T Mobility purchased mobile wireless handsets directly from defendant Samsung and/or its wholly owned and controlled sales agents in the United States.  As a result of defendants' conspiracy to fix the price of LCD panels, AT&T Mobility purchased mobile "Samsung"-branded wireless handsets from Samsung at artificially-inflated prices and suffered injury in the United States as a direct purchaser from Samsung.

151.    During the Conspiracy Period, AT&T Mobility also purchased mobile wireless handsets directly from LG Electronics, Inc. and its subsidiaries, affiliates or sales agents in the United States (collectively, "LG Electronics").  LG Electronics owned a substantial interest in and exerted control over defendant LG Display, which has already pleaded guilty to having fixed

the price of LCD Panels.  Defendants' conspiracy to fix the price of LCD Panels affected the LCD Panels contained in the mobile wireless handsets AT&T Mobility purchased from LG Electronics.  LG Electronics passed on the overcharge caused by defendants' conspiracy to AT&T Mobility, and as a result, AT&T Mobility suffered injury and paid supra-competitive prices for "LG"-branded mobile wireless handsets it purchased in the United States from LG Electronics.

152.     AT&T Mobility suffered injury in the United States as a direct purchaser as a result of its purchases of mobile wireless handsets from LG Electronics.  During the Conspiracy Period, LG Display was the manufacturing agent and alter ego of LG Electronics, and LG Electronics and LG Display constituted a single entity for purposes of AT&T Mobility's purchases from LG Electronics due to their close affiliation and unity of interest.  Beginning in July 1999, LG Electronics placed its LCD Panel manufacturing operations in LG Display, which LG Electronics organized as a joint venture and which also received a capital contribution from Royal Philips Electronics N.V.  In June 1999, LG Display began manufacturing LCD Panels at the same fabs in Gumi, South Korea previously owned and operated in the name of LG Electronics.  From 1999 through 2006 LG Electronics exerted control over all aspects of LG Display's operations.  Boon Joon Koo, CEO of LG Display, was formerly vice president of LG Electronics.  Hee Gook Lee, president of LG Electronics, served on the board of LG Display.

153.     In addition, due to its financial interest in and control over LG Display, LG Electronics stood to reap substantial financial benefits from LG Display's participation in the conspiracy to fix the price of LCD Panels.  Because LG Electronics profited from the artificially-inflated prices for LCD Panels charged by LG Display, there is no realistic possibility that LG Electronics will attempt to recover any overcharges for LCD Panels that LG Electronics purchased from LG Display or any of LG Display's co-conspirators.

154.     AT&T Mobility also purchased mobile wireless handsets containing LCD Panels from other handset OEMs, which in turn purchased LCD Panels from defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of LCD Panels purchased by these handset OEMs, which paid higher prices for LCD Panels than they would

have absent the conspiracy.  The conspiracy artificially inflated the prices of TFT-LCD Panels included in mobile wireless handsets, as well the price of MSTN and CSTN LCD Panels included in such handsets.

155.    The handset OEMs passed on to their customers, including AT&T Mobility, the overcharges caused by defendants' conspiracy.  AT&T Mobility was not able to pass on to its customers the overcharge caused by defendants' conspiracy.  Thus, AT&T Mobility suffered injury when it purchased mobile wireless handsets containing LCD Panels from the handset OEMs.

156.    In addition, AT&T Mobility and AT&T have suffered a direct, substantial, and reasonably foreseeable injury as a result of defendants' conspiracy to raise, fix, stabilize or maintain the price of LCD Panels at artificial levels as purchasers of LCD Products for their own use.

157.    During the Conspiracy Period, a number of large computer OEMs, such as Dell, IBM, and Hewlett-Packard, sold desktop computer monitors and laptop and notebook computers to AT&T Mobility and AT&T.  In fact, the computer OEM with the largest share of desktop computer monitor and laptop and notebook computer sales in the United States, Dell, sold exclusively to end users, including AT&T Mobility and AT&T.

158.    Defendants' conspiracy artificially inflated the price of the LCD Panels purchased by these computer OEMs for incorporation into the desktop computer monitors and laptop and notebook computers sold to AT&T Mobility and AT&T.  The computer OEMs passed on these artificially-inflated prices for LCD Panels to AT&T Mobility and AT&T, causing AT&T Mobility and AT&T to pay higher prices for the desktop computer monitors and laptop and notebook computers than they would have paid in the absence of the defendants' conspiracy.

159.    Once an LCD Panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  LCD Panels are identifiable, discreet physical objects that do not change form or become an indistinguishable part of an LCD Product. Thus, LCD Panels follow a physical chain from defendants through manufacturers of LCD Products sold to AT&T Mobility and to AT&T.

1      160.    The market for LCD Panels and the market for LCD Products are inextricably

2   linked and cannot be considered separately.  Defendants are well aware of this intimate

3   relationship.

4      161.    The LCD Product OEMs' demand for LCD Panels was relatively inelastic,

5   because there were no reasonable substitutes for LCD Panels to serve as the visual display for

6   products such as mobile wireless handsets, desktop computer monitors and laptop and notebook

7   computers.  The other principal flat panel display technology, plasma, is too big, consumes too

8   much power and is too fragile to be of any practical application in mobile wireless handsets or

9   laptop or notebook computers.  Other competing display technologies, such as OLED displays,

10  were not available during the Conspiracy Period and are only today becoming widely available.

11  In addition, throughout the Conspiracy Period, defendants controlled the market for LCD Panels.

12  Consequently, during the Conspiracy Period, the handset OEMs and computer OEMs had no

13  choice but to purchase LCD Panels from defendants and others at prices that were artificially

14  inflated, fixed, and stabilized by defendants' conspiracy.

15     162.    As a result, AT&T Mobility and AT&T were injured in connection with their

16  purchases of LCD Products for internal use during the Conspiracy Period.

17  **IX.    FRAUDULENT CONCEALMENT**

18     163.    AT&T Mobility and AT&T did not discover and could not have discovered,

19  through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until

20  after December of 2006, when the existence of investigations by the DOJ and other antitrust

21  regulators became public, because defendants and their co-conspirators actively and fraudulently

22  concealed the existence of their contract, combination or conspiracy.  Because defendants'

23  agreement, understanding and conspiracy were kept secret, AT&T Mobility and AT&T were

24  unaware of defendants' unlawful conduct alleged herein and did not know that they were paying

25  artificially high prices for LCD Products.

26     164.    The affirmative acts of defendants alleged herein, including acts in furtherance of

27  the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

28     165.    By its very nature, defendants' price-fixing conspiracy was inherently self-

1   concealing.  As alleged above, defendants had secret discussions about price and output.

2   Defendants agreed not to publicly discuss the existence or the nature of their agreement.  In fact,

3   the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger

4   their arrivals and departures at such meetings to avoid being seen in public with each other and

5   with the express purpose and effect of keeping them secret.  Moreover, when the participants in

6   those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to the

7   one-on-one so-called "Round Robin" sessions.

8       166.    In addition, defendants repeatedly gave pretextual justifications for the inflated

9   prices of LCD Panels in furtherance of the conspiracy.

10      167.    There have been a variety of other purportedly market-based explanations for

11  price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing

12  manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted

13  that "prices will continue to increase until a reasonable balance is achieved."  Bock Kwon, Vice

14  President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's

15  Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute"

16  shortages.

17      168.    Another false rationale provided by defendants was undercapitalization.  In 1999,

18  Joel Pollack, a marketing manager for Sharp, stated:

19          Prices have dropped at a steady rate over the past couple of years to the
            point where it was difficult to continue the necessary level of
20          capitalization.  The [low prices] have starved the industry.

21

22      169.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee,

23  CEO of Samsung.  He claimed that the demand for larger panels was reducing the industry's

24  capacity because each display used more square inches of motherglass substrate.

25      170.    Increased demand was repeatedly cited by defendants throughout the Conspiracy

26  Period.  On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted

27  in News.com as saying that price increases were due to shortages.  He claimed, "demand grew so

28  fast that the supply can't keep up."  Koo Duk-Mo, an executive at LG Philips, similarly predicted

1  in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season.

2  In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-

3  size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

4      171.   Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU

5  Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan

6  Economic News in October 2001.  They blamed "component shortages due to the late expansion

7  of 5th generation production lines and new demand from the replacement of traditional cathode

8  ray tubes with LCD monitors."

9      172.   These explanations were all pretextual and each served to cover up the

10  conspiracy.  As a result of defendants' fraudulent concealment of their conspiracy, the running of

11  any statue of limitations has been tolled with respect to AT&T Mobility's and AT&T's claims.

12  **X.     VIOLATIONS ALLEGED**

13  **First Claim for Relief**
   **(Violation of Sherman Act Against All Defendants)**

14

15      173.   AT&T Mobility and AT&T incorporate and reallege, as though fully set forth

16  herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

17      174.   Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least

18  as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates

19  being unknown to AT&T Mobility and AT&T, defendants and their co-conspirators entered into

20  a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise,

21  fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section

22  1 of the Sherman Act, 15 U.S.C. §1.

23      175.   In formulating and carrying out the alleged agreement, understanding, and

24  conspiracy, defendants and their co-conspirators did those things that they combined and

25  conspired to do, including but not limited to the acts, practices, and course of conduct set forth

26  above, and the following, among others:

27          a.      To fix, raise, maintain and stabilize the price of LCD Panels;

28          b.      To allocate markets for LCD Panels among themselves;

    c.  To submit rigged bids for the award and performance of certain LCD

       Panels contracts; and

    d.  To allocate among themselves the production of LCD Panels.

  176.  The combination and conspiracy alleged herein has had the following effects, among others:

    a.  Price competition in the sale of LCD Panels has been restrained,

       suppressed, and/or eliminated in the United States;

    b.  Prices for LCD Panels sold by defendants, their co-conspirators, and

       others have been fixed, raised, maintained and stabilized at artificially

       high, supra-competitive levels throughout the United States; and

    c.  Those who purchased LCD Panels produced by defendants, their co-

       conspirators, and others have been deprived of the benefits of free and

       open competition.

  177.  AT&T Mobility has been injured in its business and property by being forced to pay more for the mobile wireless handsets it purchased from defendants and their co-conspirators than it would have paid in the absence of defendants' conspiracy.

  178.  Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by AT&T Mobility and gave rise to AT&T Mobility's antitrust claims.  As a result, AT&T Mobility suffered injury as a direct, proximate, and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels and are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for their purchases of LCD Products containing LCD Panels sold by defendants, their coconspirators, and others.

  179.  Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, defendants' conspiracy to fix the price of LCD Panels could be easily

1   repeated and concealed from AT&T Mobility and AT&T, AT&T Mobility and AT&T both face

2   a serious risk of future injury, and are thus entitled to an injunction under Section 16 of the

3   Clayton Act, 15 U.S.C. § 26 against all defendants, preventing and restraining the violations

4   alleged herein.

**<u>Second Claim for Relief</u>**
**(<u>Violation of the California Cartwright Act</u>)**

7   180.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth

8   herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

9   181.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

10   substantial volume of business in California.  AT&T Mobility provided wireless communication

11   services and sold mobile wireless handsets containing LCD Panels to customers in California

12   through its corporate-owned retail stores, through independent retailers located in California, and

13   through its website on the Internet.  AT&T Mobility also provided wireless communication

14   services and sold mobile wireless handsets directly to business, government and other customers

15   in California through both its own sales force and independent sales agents.  In addition, AT&T

16   Mobility maintained in California inventories of mobile wireless handsets containing LCD

17   Panels manufactured and sold by defendants, their co-conspirators, and others, and operated

18   offices and operating retail stores in California.  AT&T, including Pacific Bell Telephone

19   Company, provided a variety of wireline telecommunications services to residents, businesses

20   and government customers in California, where AT&T employees used notebook computers and

21   desktop monitors purchased by AT&T.  As a result of their presence in California and the

22   substantial business they conduct in California, AT&T Mobility and AT&T are entitled to the

23   protection of the laws of California.

24   182.    In addition, defendants LG Display, Chunghwa and Sharp all admitted in their

25   plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were

26   carried out in California.  Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and

27   Toshiba all maintained offices in California during the Conspiracy Period.  Employees at

28   defendants' locations in California participated in meetings and engaged in bilateral

1   communications in California and intended and did carry out defendants' anticompetitive

2   agreement to fix the price of LCD Panels.  Defendants' conduct within California thus injured

3   AT&T Mobility and AT&T both in California and throughout the United States.

4       183.   Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least

5   as early as January 1, 1996, and continuing thereafter at least up to and including at least

6   December 11, 2006, defendants and their co-conspirators entered into and engaged in a

7   continuing unlawful trust in restraint of the trade and commerce described above in violation of

8   the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have

9   each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and

10   allocate markets for, LCD Panels at supra-competitive levels.  Defendants' conduct substantially

11   affected California commerce.

12       184.   The aforesaid violations of Section 16720, California Business and Professions

13   Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

14   defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain

15   and stabilize the prices of, and to allocate markets for, LCD Panels.

16       185.   For the purpose of forming and effectuating the unlawful trust, defendants and

17   their co-conspirators have done those things which they combined and conspired to do, including

18   but in no way limited to the acts, practices and course of conduct set forth above and the

19   following:

20       a.   to fix, raise, maintain and stabilize the price of LCD Panels;

21       b.   to allocate markets for LCD Panels amongst themselves;

22       c.   to submit rigged bids for the award and performance of certain LCD

23           Panels contracts; and

24       d.   to allocate among themselves the production of LCD Panels.

25       186.   The combination and conspiracy alleged herein has had, inter alia, the following

26   effects:

27       a.   price competition in the sale of LCD Panels has been restrained,

28           suppressed and/or eliminated in the State of California;

1            b.      prices for LCD Panels sold by defendants, their co-conspirators, and

2                   others have been fixed, raised, maintained and stabilized at artificially

3                   high, non-competitive levels in the State of California; and

4            c.      those who purchased LCD Panels from defendants, their co-conspirators,

5                   and others and LCD Products containing LCD Panels from defendants,

6                   their co-conspirators, and others have been deprived of the benefit of free

7                   and open competition.

8        187.    As a result of the alleged conduct of defendants, AT&T Mobility and AT&T paid

9  supra-competitive, artificially inflated prices for the LCD Products they purchased during the

10 Conspiracy Period.

11       188.    As a direct and proximate result of defendants' conduct, AT&T Mobility and

12 AT&T have been injured in their business and property by paying more for LCD Products sold

13 by the defendants, their coconspirators, and others than they would have paid in the absence of

14 defendants' combination and conspiracy.  As a result of defendants' violation of Section 16720

15 of the California Business and Professions Code, AT&T Mobility and AT&T are entitled to

16 treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section

17 16750(a) of the California Business and Professions Code.

18

19 **<u>Third Claim for Relief</u>**
**(<u>Violation of State Antitrust and Unfair Competition Laws</u>)**

20       189.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth

21 herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

22       190.    All of AT&T Mobility's and AT&T's purchases of LCD Products are actionable

23 pursuant to the federal and the California antitrust laws as alleged in the First and Second Claims

24 For Relief.  In the alternative, AT&T Mobility and AT&T allege this Third Claim For Relief

25 under the laws of the other referenced states as well as under the California Unfair Competition

26 Law.

27       191.    By reason of the foregoing, defendants have entered into agreements in restraint

28

1    of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*:

2         a.    Defendants' conspiracy restrained, suppressed and/or eliminated

3               competition in the sale of LCD Panels in Arizona and fixed, raised,

4               maintained and stabilized LCD Panel prices in Arizona at artificially high,

5               non-competitive levels;

6         b.    As a result, defendants' conspiracy substantially affected Arizona

7               commerce;

8         c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

9               substantial volume of business in Arizona.  AT&T Mobility provided

10              wireless communication services and sold mobile wireless handsets

11              containing LCD Panels to customers in Arizona through its corporate-

12              owned retail stores, through independent retailers located in Arizona, and

13              through its website on the Internet.  AT&T Mobility also provided

14              wireless communication services and sold mobile wireless handsets

15              directly to business, government and other customers in Arizona through

16              both its own sales force and independent sales agents.  In addition, AT&T

17              Mobility maintained in Arizona inventories of mobile wireless handsets

18              containing LCD Panels manufactured and sold by defendants, their co-

19              conspirators, and others, and operated offices and retail stores in Arizona.

20              During the Conspiracy Period, AT&T provided various wireline

21              telecommunications services to businesses and government customers in

22              Arizona, where AT&T employees used notebook computers and desktop

23              monitors purchased by AT&T.  As a result of their presence in Arizona

24              and the substantial business they conduct in Arizona, AT&T Mobility and

25              AT&T are entitled to the protection of the laws of Arizona; and,

26        d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

27              and AT&T have been injured in their business and property by paying

28              more for LCD Products purchased from defendants, their coconspirators

49

1      and others than they would have paid in the absence of defendants'

2      combination and conspiracy, and are entitled to relief under Ariz. Rev.

3      Stat. §§ 44-1401, *et seq.*

4    192. By reason of the foregoing, defendants have engaged in unfair competition in

5 violation of California's Unfair Competition Law, California Business and Professional Code

6 § 17200 et seq.

7      a.  Defendants committed acts of unfair competition, as defined by Section

8        17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of

9        LCD Panels as described above;

10      b.  The acts, omissions, misrepresentations, practices and non-disclosures of

11        defendants, as described above, constitute a common, continuous and

12        continuing course of conduct of unfair competition by means of unfair,

13        unlawful and/or fraudulent business acts or practices with the meaning of

14        Section 17200, *et seq.*, including, but not limited to (1) violation of

15        Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

16      c.  Defendants' acts, omissions, misrepresentations, practices and non-

17        disclosures are unfair, unconscionable, unlawful and/or fraudulent

18        independently of whether they constitute a violation of the Sherman Act or

19        the Cartwright Act;

20      d.  Defendants' acts or practices are fraudulent or deceptive within the

21        meaning of Section 17200, *et seq.*;

22      e.  Defendants' conduct was carried out, effectuated, and perfected within the

23        state of California.  Defendants LG Display, Chunghwa and Sharp all

24        admitted that acts in furtherance of the conspiracy to fix the price of LCD

25        Panels were carried out in California;

26      f.  During the Conspiracy Period, AT&T Mobility and AT&T conducted a

27        substantial volume of business in California.  AT&T Mobility provided

28        wireless communication services and sold mobile wireless handsets

1   containing LCD Panels to customers in California through its corporate-

2   owned retail stores, through independent retailers located in California,

3   and through its website on the Internet.  AT&T Mobility also provided

4   wireless communication services and sold mobile wireless handsets

5   directly to business, government and other customers in California through

6   both its own sales force and independent sales agents.  In addition, AT&T

7   Mobility maintained in California inventories of mobile wireless handsets

8   containing LCD Panels manufactured and sold by defendants, their co-

9   conspirators, and others, and operated offices and retail stores in

10  California.  AT&T provided various wireline telecommunications services

11  to residents, businesses and government customers in California, where

12  AT&T employees used notebook computers and desktop monitors

13  purchased by AT&T.  As a result of their presence in California and the

14  substantial business they conduct in California, AT&T Mobility and

15  AT&T are entitled to the protection of the laws of California; and,

16  g.   By reason of the foregoing, AT&T Mobility and AT&T are entitled to full

17  restitution and/or disgorgement of all revenues, earnings, profits,

18  compensation, and benefits that may have been obtained by defendants as

19  result of such business acts and practices described above.

20  193.   By reason of the foregoing, defendants have entered into agreements in restraint

21  of trade in violation of District of Columbia Code Ann. §§28-4501 *et seq.*

22  a.   Defendants' conspiracy restrained, suppressed and/or eliminated

23  competition in the sale of LCD Panels in the District of Columbia and

24  fixed, raised, maintained and stabilized LCD Panel prices in the District of

25  Columbia at artificially high, non-competitive levels;

26  b.   As a result, defendants' conspiracy substantially affected District of

27  Columbia commerce;

28  c.   During the Conspiracy Period, AT&T Mobility and AT&T conducted a

1    substantial volume of business in the District of Columbia.  AT&T

2    Mobility provided wireless communication services and sold mobile

3    wireless handsets containing LCD Panels to customers in the District of

4    Columbia through its corporate-owned retail stores, through independent

5    retailers located in the District of Columbia, and through its website on the

6    Internet.  AT&T Mobility also provided wireless communication services

7    and sold mobile wireless handsets directly to business, government and

8    other customers in the District of Columbia through both its own sales

9    force and independent sales agents.  In addition, AT&T Mobility

10    maintained in the District of Columbia inventories of mobile wireless

11    handsets containing LCD Panels manufactured and sold by defendants,

12    their co-conspirators, and others, and operated offices and retail stores in

13    the District of Columbia.  AT&T provided various wireline

14    telecommunications services to businesses and government customers in

15    the District of Columbia, where AT&T employees used notebook

16    computers and desktop monitors purchased by AT&T.  As a result of their

17    presence in the District of Columbia and the substantial business they

18    conduct in the District of Columbia, AT&T Mobility and AT&T are

19    entitled to the protection of the laws of the District of Columbia; and,

20        d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

21    and AT&T have been injured in their business and property by paying

22    more for LCD Products purchased from defendants, their coconspirators

23    and others than they would have paid in the absence of defendants'

24    combination and conspiracy, and are entitled to relief under District of

25    Columbia Code Ann. §§ 28-4501, *et seq.*

26    194.    By reason of the foregoing, defendants have engaged in unfair competition and/or

27    unfair or deceptive acts or practices in restraint of trade in violation of Hawaii Code, H.R.S. §§

28    480-1, *et seq.*

1        a.      Defendants' conspiracy restrained, suppressed and/or eliminated

2                competition in the sale of LCD Panels in Hawaii and fixed, raised,

3                maintained and stabilized LCD Panel prices in Hawaii at artificially high,

4                non-competitive levels;

5        b.      As a result, defendants' conspiracy substantially affected Hawaii

6                commerce;

7        c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

8                substantial volume of business in Hawaii.  AT&T Mobility provided

9                wireless communication services and sold mobile wireless handsets

10             containing LCD Panels to customers in Hawaii through its corporate-

11             owned retail stores, through independent retailers located in Hawaii, and

12             through its website on the Internet.  AT&T Mobility also provided

13             wireless communication services and sold mobile wireless handsets

14             directly to business, government and other customers in Hawaii through

15             both its own sales force and independent sales agents.  In addition, AT&T

16             Mobility maintained in Hawaii inventories of mobile wireless handsets

17             containing LCD Panels manufactured and sold by defendants, their co-

18             conspirators, and others, and operated offices and retail stores in Arizona.

19             During the Conspiracy Period, AT&T provided various wireline

20             telecommunications services to businesses and government customers in

21             Hawaii, where AT&T employees used notebook computers and desktop

22             monitors purchased by AT&T.  As a result of their presence in Hawaii and

23             the substantial business they conduct in Hawaii, AT&T Mobility and

24             AT&T are entitled to the protection of the laws of Hawaii; and,

25        d.      As a direct and proximate result of defendants' conduct, AT&T Mobility

26             and AT&T have been injured in their business and property by paying

27             more for LCD Products purchased from defendants, their coconspirators

28             and others than they would have paid in the absence of defendants'

1    combination and conspiracy, and are entitled to relief under Ariz. Rev.

2    Stat. §§ 44-1401, *et seq.*

3    195.    By reason of the foregoing, defendants have entered into agreements in restraint

4    of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

5    a.    Defendants' conspiracy restrained, suppressed and/or eliminated

6    competition in the sale of LCD Panels in Illinois and fixed, raised,

7    maintained and stabilized LCD Panel prices in Illinois at artificially high,

8    non-competitive levels;

9    b.    As a result, defendants' conspiracy substantially affected Illinois

10   commerce;

11   c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

12   substantial volume of business in Illinois.  AT&T Mobility provided

13   wireless communication services and sold mobile wireless handsets

14   containing LCD Panels to customers in Illinois through its corporate-

15   owned retail stores, through independent retailers located in Illinois, and

16   through its website on the Internet.  AT&T Mobility also provided

17   wireless communication services and sold mobile wireless handsets

18   directly to business, government and other customers in Illinois through

19   both its own sales force and independent sales agents.  In addition, AT&T

20   Mobility maintained in Illinois inventories of mobile wireless handsets

21   containing LCD Panels manufactured and sold by defendants, their co-

22   conspirators, and others, and operated offices and retail stores in Illinois.

23   During the Conspiracy Period, AT&T provided various wireline

24   telecommunications services to residential customers as well as businesses

25   and government customers in Illinois, where AT&T employees used

26   notebook computers and desktop monitors purchased by AT&T.  As a

27   result of their presence in Illinois and the substantial business they conduct

28   in Illinois, AT&T Mobility and AT&T are entitled to the protection of the

54

1    laws of Illinois; and,

2         d.     As a direct and proximate result of defendants' conduct, AT&T Mobility

3         and AT&T have been injured in their business and property by paying

4         more for LCD Products purchased from defendants, their coconspirators

5         and others than they would have paid in the absence of defendants'

6         combination and conspiracy, and are entitled to relief under the Illinois

7         Antitrust Act.

8        196.    By reason of the foregoing, defendants have entered into agreements in restraint

9    of trade in violation of Iowa Code §§553.1 *et seq.*

10         a.     Defendants' conspiracy restrained, suppressed and/or eliminated

11         competition in the sale of LCD Panels in Iowa and fixed, raised,

12         maintained and stabilized LCD Panel prices in Iowa at artificially high,

13         non-competitive levels;

14         b.     As a result, defendants' conspiracy substantially affected Iowa commerce;

15         c.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

16         substantial volume of business in Iowa.  AT&T Mobility provided

17         wireless communication services and sold mobile wireless handsets

18         containing LCD Panels to customers in Iowa through its corporate-owned

19         retail stores, through independent retailers located in Iowa, and through its

20         website on the Internet.  AT&T Mobility also provided wireless

21         communication services and sold mobile wireless handsets directly to

22         business, government and other customers in Iowa through both its own

23         sales force and independent sales agents.  In addition, AT&T Mobility

24         maintained in Iowa inventories of mobile wireless handsets containing

25         LCD Panels manufactured and sold by defendants, their co-conspirators,

26         and others, and operated offices and retail stores in Iowa.  During the

27         Conspiracy Period, AT&T provided various wireline telecommunications

28         services to businesses and government customers in Iowa, where AT&T

1       employees used notebook computers and desktop monitors purchased by

2       AT&T.  As a result of their presence in Arizona and the substantial

3       business they conduct in Iowa, AT&T Mobility and AT&T are entitled to

4       the protection of the laws of Iowa;

5       d.      As a direct and proximate result of defendants' conduct, AT&T Mobility

6               and AT&T have been injured in their business and property by paying

7               more for LCD Products purchased from defendants, their coconspirators

8               and others than they would have paid in the absence of defendants'

9               combination and conspiracy, and are entitled to relief under Iowa Code §§

10              553.1 *et seq.*

11      197.    By reason of the foregoing, defendants have entered into agreements in restraint

12      of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

13      a.      Defendants' conspiracy restrained, suppressed and/or eliminated

14              competition in the sale of LCD Panels in Kansas and fixed, raised,

15              maintained and stabilized LCD Panel prices in Kansas at artificially high,

16              non-competitive levels;

17      b.      As a result, defendants' conspiracy substantially affected Kansas

18              commerce;

19      c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

20              substantial volume of business in Kansas.  AT&T Mobility provided

21              wireless communication services and sold mobile wireless handsets

22              containing LCD Panels to customers in Kansas through its corporate-

23              owned retail stores, through independent retailers located in Kansas, and

24              through its website on the Internet.  AT&T Mobility also provided

25              wireless communication services and sold mobile wireless handsets

26              directly to business, government and other customers in Kansas through

27              both its own sales force and independent sales agents.  In addition, AT&T

28              Mobility maintained in Kansas inventories of mobile wireless handsets

56

1    containing LCD Panels manufactured and sold by defendants, their co-

2    conspirators, and others, and operated offices and retail stores in Kansas.

3    During the Conspiracy Period, AT&T provided various wireline

4    telecommunications services to residential customers as well as businesses

5    and government customers in Kansas, where AT&T employees used

6    notebook computers and desktop monitors purchased by AT&T.  As a

7    result of their presence in Kansas and the substantial business they

8    conduct in Kansas, AT&T Mobility and AT&T are entitled to the

9    protection of the laws of Kansas; and,

10    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

11    and AT&T have been injured in their business and property by paying

12    more for LCD Products purchased from defendants, their coconspirators

13    and others than they would have paid in the absence of defendants'

14    combination and conspiracy, and are entitled to relief under Kansas Stat.

15    Ann. §§50-101 *et seq.*

16    198.    By reason of the foregoing, defendants have entered into agreements in restraint

17    of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

18    a.    Defendants' conspiracy restrained, suppressed and/or eliminated

19    competition in the sale of LCD Panels in Maine and fixed, raised,

20    maintained and stabilized LCD Panel prices in Maine at artificially high,

21    non-competitive levels;

22    b.    As a result, defendants' conspiracy substantially affected Maine

23    commerce;

24    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

25    substantial volume of business in Maine.  AT&T Mobility provided

26    wireless communication services and sold mobile wireless handsets

27    containing LCD Panels to customers in Maine through its corporate-

28    owned retail stores, through independent retailers located in Maine, and

through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Maine through both its own sales force and independent sales agents.  In addition, AT&T Mobility maintained in Maine inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Maine.  During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Maine, where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  As a result of their presence in Maine and the substantial business they conduct in Maine, AT&T Mobility and AT&T are entitled to the protection of the laws of Maine; and,

    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

199.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Michigan and fixed, raised, maintained and stabilized LCD Panel prices in Michigan at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Michigan commerce;

    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

1   substantial volume of business in Michigan.  AT&T Mobility provided

2   wireless communication services and sold mobile wireless handsets

3   containing LCD Panels to customers in Michigan through its corporate-

4   owned retail stores, through independent retailers located in Michigan, and

5   through its website on the Internet.  AT&T Mobility also provided

6   wireless communication services and sold mobile wireless handsets

7   directly to business, government and other customers in Michigan through

8   both its own sales force and independent sales agents.  In addition, AT&T

9   Mobility maintained in Michigan inventories of mobile wireless handsets

10   containing LCD Panels manufactured and sold by defendants, their co-

11   conspirators, and others, and operated offices and retail stores in

12   Michigan.  During the Conspiracy Period, AT&T provided various

13   wireline telecommunications services to residential customers, businesses

14   and government customers in Michigan, where AT&T employees used

15   notebook computers and desktop monitors purchased by AT&T.  As a

16   result of their presence in Michigan and the substantial business they

17   conduct in Michigan, AT&T Mobility and AT&T are entitled to the

18   protection of the laws of Michigan; and,

19   d.   As a direct and proximate result of defendants' conduct, AT&T Mobility

20   and AT&T have been injured in their business and property by paying

21   more for LCD Products purchased from defendants, their coconspirators

22   and others than they would have paid in the absence of defendants'

23   combination and conspiracy, and are entitled to relief under Michigan

24   Comp. Laws. Ann. §§ 445.771 *et seq.*

25   200.   By reason of the foregoing, defendants have entered into agreements in restraint

26   of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.*

27   a.   Defendants' conspiracy restrained, suppressed and/or eliminated

28   competition in the sale of LCD Panels in Minnesota and fixed, raised,

59

1    maintained and stabilized LCD Panel prices in Minnesota at artificially

2    high, non-competitive levels;

3    b.    As a result, defendants' conspiracy substantially affected Minnesota

4    commerce;

5    c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

6    substantial volume of business in Minnesota.  AT&T Mobility provided

7    wireless communication services and sold mobile wireless handsets

8    containing LCD Panels to customers in Minnesota through its corporate-

9    owned retail stores, through independent retailers located in Minnesota,

10    and through its website on the Internet.  AT&T Mobility also provided

11    wireless communication services and sold mobile wireless handsets

12    directly to business, government and other customers in Minnesota

13    through both its own sales force and independent sales agents.  In addition,

14    AT&T Mobility maintained in Minnesota inventories of mobile wireless

15    handsets containing LCD Panels manufactured and sold by defendants,

16    their co-conspirators, and others, and operated offices and retail stores in

17    Minnesota.  During the Conspiracy Period, AT&T provided various

18    wireline telecommunications services to businesses and government

19    customers in Minnesota, where AT&T employees used notebook

20    computers and desktop monitors purchased by AT&T.  As a result of their

21    presence in Minnesota and the substantial business they conduct in

22    Minnesota, AT&T Mobility and AT&T are entitled to the protection of the

23    laws of Minnesota; and,

24    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

25    and AT&T have been injured in their business and property by paying

26    more for LCD Products purchased from defendants, their coconspirators

27    and others than they would have paid in the absence of defendants'

28    combination and conspiracy, and are entitled to relief under Minnesota

1          Stat. §§ 325D.50 *et seq.*

2       201.    By reason of the foregoing, defendants have entered into agreements in restraint

3  of trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

4          a.    Defendants' conspiracy restrained, suppressed and/or eliminated

5                competition in the sale of LCD Panels in Mississippi and fixed, raised,

6                maintained and stabilized LCD Panel prices in Mississippi at artificially

7                high, non-competitive levels;

8          b.    As a result, defendants' conspiracy substantially affected Mississippi

9                commerce;

10         c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

11             substantial volume of business in Mississippi.  AT&T Mobility provided

12             wireless communication services and sold mobile wireless handsets

13             containing LCD Panels to customers in Mississippi through its corporate-

14             owned retail stores, through independent retailers located in Mississippi,

15             and through its website on the Internet.  AT&T Mobility also provided

16             wireless communication services and sold mobile wireless handsets

17             directly to business, government and other customers in Mississippi

18             through both its own sales force and independent sales agents.  In addition,

19             AT&T Mobility maintained in Mississippi inventories of mobile wireless

20             handsets containing LCD Panels manufactured and sold by defendants,

21             their co-conspirators, and others, and operated offices and retail stores in

22             Mississippi.  During the Conspiracy Period, AT&T provided various

23             wireline telecommunications services to residential customers, businesses

24             and government customers in Mississippi, where AT&T employees used

25             notebook computers and desktop monitors purchased by AT&T.  As a

26             result of their presence in Mississippi and the substantial business they

27             conduct in Mississippi, AT&T Mobility and AT&T are entitled to the

28             protection of the laws of Mississippi; and,

1          d.      As a direct and proximate result of defendants' conduct, AT&T Mobility

2                    and AT&T have been injured in their business and property by paying

3                    more for LCD Products purchased from defendants, their coconspirators

4                    and others than they would have paid in the absence of defendants'

5                    combination and conspiracy, and are entitled to relief under Mississippi

6                    Code Ann. §§ 75-21-1 *et seq.*

7     202.    By reason of the foregoing, defendants have entered into agreements in restraint

8 of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

9          a.      Defendants' conspiracy restrained, suppressed and/or eliminated

10                    competition in the sale of LCD Panels in Nebraska and fixed, raised,

11                    maintained and stabilized LCD Panel prices in Nebraska at artificially

12                    high, non-competitive levels;

13          b.      As a result, defendants' conspiracy substantially affected Nebraska

14                    commerce;

15          c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

16                    substantial volume of business in Nebraska.  AT&T Mobility provided

17                    wireless communication services and sold mobile wireless handsets

18                    containing LCD Panels to customers in Nebraska through its corporate-

19                    owned retail stores, through independent retailers located in Nebraska, and

20                    through its website on the Internet.  AT&T Mobility also provided

21                    wireless communication services and sold mobile wireless handsets

22                    directly to business, government and other customers in Nebraska through

23                    both its own sales force and independent sales agents.  In addition, AT&T

24                    Mobility maintained in Nebraska inventories of mobile wireless handsets

25                    containing LCD Panels manufactured and sold by defendants, their co-

26                    conspirators, and others, and operated offices and retail stores in

27                    Nebraska.  During the Conspiracy Period, AT&T provided various

28                    wireline telecommunications services to businesses and government

1    customers in Nebraska, where AT&T employees used notebook

2    computers and desktop monitors purchased by AT&T.  As a result of their

3    presence in Nebraska and the substantial business they conduct in

4    Nebraska, AT&T Mobility and AT&T are entitled to the protection of the

5    laws of Nebraska; and,

6    d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

7    and AT&T have been injured in their business and property by paying

8    more for LCD Products purchased from defendants, their coconspirators

9    and others than they would have paid in the absence of defendants'

10   combination and conspiracy, and are entitled to relief under Nebraska Stat.

11   §§ 59-801 *et seq.*

12   203.   By reason of the foregoing, defendants have entered into agreements in restraint

13   of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

14   a.    Defendants' conspiracy restrained, suppressed and/or eliminated

15   competition in the sale of LCD Panels in Nevada and fixed, raised,

16   maintained and stabilized LCD Panel prices in Nevada at artificially high,

17   non-competitive levels;

18   b.    As a result, defendants' conspiracy substantially affected Nevada

19   commerce;

20   c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

21   substantial volume of business in Nevada.  AT&T Mobility provided

22   wireless communication services and sold mobile wireless handsets

23   containing LCD Panels to customers in Nevada through its corporate-

24   owned retail stores, through independent retailers located in Nevada, and

25   through its website on the Internet.  AT&T Mobility also provided

26   wireless communication services and sold mobile wireless handsets

27   directly to business, government and other customers in Nevada through

28   both its own sales force and independent sales agents.  In addition, AT&T

63

1    Mobility maintained in Nevada inventories of mobile wireless handsets

2    containing LCD Panels manufactured and sold by defendants, their co-

3    conspirators, and others, and operated offices and retail stores in Nevada.

4    During the Conspiracy Period, AT&T provided various wireline

5    telecommunications services to residential customers, businesses and

6    government customers in Nevada, where AT&T employees used notebook

7    computers and desktop monitors purchased by AT&T.  Nevada Bell, a

8    wholly-owned subsidiary of the AT&T companies, provided a variety of

9    telecommunications services to a substantial portion of the population of

10   Nevada.  As a result of their presence in Nevada and the substantial

11   business they conduct in Nevada, AT&T Mobility and AT&T are entitled

12   to the protection of the laws of Nevada; and,

13          d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

14                and AT&T have been injured in their business and property by paying

15                more for LCD Products purchased from defendants, their coconspirators

16                and others than they would have paid in the absence of defendants'

17                combination and conspiracy, and are entitled to relief under Nevada Rev.

18                Stat. Ann. §§ 598A *et seq.*

19   204.   By reason of the foregoing, defendants have entered into agreements in restraint

20   of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

21          a.    Defendants' conspiracy restrained, suppressed and/or eliminated

22                competition in the sale of LCD Panels in New Mexico and fixed, raised,

23                maintained and stabilized LCD Panel prices in New Mexico at artificially

24                high, non-competitive levels;

25          b.    As a result, defendants' conspiracy substantially affected New Mexico

26                commerce;

27          c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

28                substantial volume of business in New Mexico.  AT&T Mobility provided

1    wireless communication services and sold mobile wireless handsets

2    containing LCD Panels to customers in New Mexico through its

3    corporate-owned retail stores, through independent retailers located in

4    New Mexico, and through its website on the Internet.  AT&T Mobility

5    also provided wireless communication services and sold mobile wireless

6    handsets directly to business, government and other customers in New

7    Mexico through both its own sales force and independent sales agents.  In

8    addition, AT&T Mobility maintained in New Mexico inventories of

9    mobile wireless handsets containing LCD Panels manufactured and sold

10   by defendants, their co-conspirators, and others, and operated offices and

11   retail stores in New Mexico.  During the Conspiracy Period, AT&T

12   provided various wireline telecommunications services to businesses and

13   government customers in New Mexico, where AT&T employees used

14   notebook computers and desktop monitors purchased by AT&T.  As a

15   result of their presence in New Mexico and the substantial business they

16   conduct in New Mexico, AT&T Mobility and AT&T are entitled to the

17   protection of the laws of New Mexico; and,

18       d.   As a direct and proximate result of defendants' conduct, AT&T Mobility

19        and AT&T have been injured in their business and property by paying

20        more for LCD Products purchased from defendants, their coconspirators

21        and others than they would have paid in the absence of defendants'

22        combination and conspiracy, and are entitled to relief under New Mexico

23        Stat. Ann. §§ 57-1-1 *et seq.*

24   205.   By reason of the foregoing, defendants have entered into agreements in restraint

25   of trade in violation of New York General Business Law §§ 340 *et seq.*

26       a.   Defendants' conspiracy restrained, suppressed and/or eliminated

27        competition in the sale of LCD Panels in New York and fixed, raised,

28        maintained and stabilized LCD Panel prices in New York at artificially

1        high, non-competitive levels;

2        b.     As a result, defendants' conspiracy substantially affected New York

3        commerce;

4        c.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

5        substantial volume of business in New York.  AT&T Mobility provided

6        wireless communication services and sold mobile wireless handsets

7        containing LCD Panels to customers in New York through its corporate-

8        owned retail stores, through independent retailers located in New York,

9        and through its website on the Internet.  AT&T New York also provided

10       wireless communication services and sold mobile wireless handsets

11       directly to business, government and other customers in New York

12       through both its own sales force and independent sales agents.  In addition,

13       AT&T Mobility maintained in New York inventories of mobile wireless

14       handsets containing LCD Panels manufactured and sold by defendants,

15       their co-conspirators, and others, and operated offices and retail stores in

16       New York.  During the Conspiracy Period, AT&T provided various

17       wireline telecommunications services to businesses and government

18       customers in New York, where AT&T employees used notebook

19       computers and desktop monitors purchased by AT&T.  AT  As a result of

20       their presence in New York and the substantial business they conduct in

21       New York, AT&T Mobility and AT&T are entitled to the protection of the

22       laws of New York; and,

23       d.     As a direct and proximate result of defendants' conduct, AT&T Mobility

24       and AT&T have been injured in their business and property by paying

25       more for LCD Products purchased from defendants, their coconspirators

26       and others than they would have paid in the absence of defendants'

27       combination and conspiracy, and are entitled to relief under New York

28       General Business Law §§ 340 *et seq.*

206. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

    a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in North Carolina and fixed, raised, maintained and stabilized LCD Panel prices in North Carolina at artificially high, non-competitive levels;

    b. As a result, defendants' conspiracy substantially affected North Carolina commerce;

    c. During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in North Carolina. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in North Carolina through its corporate-owned retail stores, through independent retailers located in North Carolina, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in North Carolina through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in North Carolina inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in North Carolina. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in North Carolina, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in North Carolina and the substantial business they conduct in North Carolina, AT&T Mobility and AT&T are entitled to the protection of the laws of North Carolina; and,

1               d.      As a direct and proximate result of defendants' conduct, AT&T Mobility

2                      and AT&T have been injured in their business and property by paying

3                      more for LCD Products purchased from defendants, their coconspirators

4                      and others than they would have paid in the absence of defendants'

5                      combination and conspiracy, and are entitled to relief under North

6                      Carolina Gen. Stat. §§ 75-1 *et seq.*

7       207.    By reason of the foregoing, defendants have entered into agreements in restraint

8 of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

9               a.      Defendants' conspiracy restrained, suppressed and/or eliminated

10                      competition in the sale of LCD Panels in North Dakota and fixed, raised,

11                      maintained and stabilized LCD Panel prices in North Dakota at artificially

12                      high, non-competitive levels;

13               b.      As a result, defendants' conspiracy substantially affected North Dakota

14                      commerce;

15               c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

16                      substantial volume of business in North Dakota.  AT&T Mobility

17                      provided wireless communication services and sold mobile wireless

18                      handsets containing LCD Panels to customers in North Dakota through its

19                      corporate-owned retail stores, through independent retailers located in

20                      North Dakota, and through its website on the Internet.  AT&T Mobility

21                      also provided wireless communication services and sold mobile wireless

22                      handsets directly to business, government and other customers in North

23                      Dakota through both its own sales force and independent sales agents.  In

24                      addition, AT&T Mobility maintained in North Dakota inventories of

25                      mobile wireless handsets containing LCD Panels manufactured and sold

26                      by defendants, their co-conspirators, and others, and operated offices and

27                      retail stores in North Dakota.  During the Conspiracy Period, AT&T

28                      provided various wireline telecommunications services to businesses and

1    government customers in North Dakota, where AT&T employees used

2    notebook computers and desktop monitors purchased by AT&T.  As a

3    result of their presence in North Dakota and the substantial business they

4    conduct in North Dakota, AT&T Mobility and AT&T are entitled to the

5    protection of the laws of North Dakota; and,

6        d.    As a direct and proximate result of defendants' conduct, AT&T Mobility

7              and AT&T have been injured in their business and property by paying

8              more for LCD Products purchased from defendants, their coconspirators

9              and others than they would have paid in the absence of defendants'

10             combination and conspiracy, and are entitled to relief under North Dakota

11             Cent. Code §§ 51-08.1-01 *et seq.*

12   208.   By reason of the foregoing, defendants have entered into agreements in restraint

13   of trade in violation of the Puerto Rico Code 10 LPRA §§ 257, *et seq.* and 31 LPRA § 5141.

14       a.    Defendants' conspiracy restrained, suppressed and/or eliminated

15             competition in the sale of LCD Panels in Puerto Rico and fixed, raised,

16             maintained and stabilized LCD Panel prices in Puerto Rico at artificially

17             high, non-competitive levels;

18       b.    As a result, defendants' conspiracy substantially affected Puerto Rico

19             commerce;

20       c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

21             substantial volume of business in Puerto Rico.  AT&T Mobility provided

22             wireless communication services and sold mobile wireless handsets

23             containing LCD Panels to customers in Puerto Rico through its corporate-

24             owned retail stores, through independent retailers located in Puerto Rico,

25             and through its website on the Internet.  AT&T Mobility also provided

26             wireless communication services and sold mobile wireless handsets

27             directly to business, government and other customers in Puerto Rico

28             through both its own sales force and independent sales agents.  In addition,

1   AT&T Mobility maintained in Puerto Rico inventories of mobile wireless

2   handsets containing LCD Panels manufactured and sold by defendants,

3   their co-conspirators, and others, and operated offices and retail stores in

4   Puerto Rico.  During the Conspiracy Period, AT&T provided various

5   wireline telecommunications services to businesses and government

6   customers in Puerto Rico, where AT&T employees used notebook

7   computers and desktop monitors purchased by AT&T.  As a result of their

8   presence in Puerto Rico and the substantial business they conduct in

9   Puerto Rico, AT&T Mobility and AT&T are entitled to the protection of

10  the laws of Puerto Rico; and,

11      d.   As a direct and proximate result of defendants' conduct, AT&T Mobility

12  and AT&T have been injured in their business and property by paying

13  more for LCD Products purchased from defendants, their coconspirators

14  and others than they would have paid in the absence of defendants'

15  combination and conspiracy, and are entitled to relief under Puerto Rico

16  Code 10 LPRA §§ 257, *et seq*. and 31 LPRA § 5141 *et seq.*

17      209.   By reason of the foregoing, defendants have entered into agreements in restraint

18  of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

19      a.   Defendants' conspiracy restrained, suppressed and/or eliminated

20  competition in the sale of LCD Panels in South Dakota and fixed, raised,

21  maintained and stabilized LCD Panel prices in South Dakota at artificially

22  high, non-competitive levels;

23      b.   As a result, defendants' conspiracy substantially affected South Dakota

24  commerce;

25      c.   During the Conspiracy Period, AT&T Mobility and AT&T conducted a

26  substantial volume of business in South Dakota.  AT&T Mobility

27  provided wireless communication services and sold mobile wireless

28  handsets containing LCD Panels to customers in South Dakota through its

70

1          corporate-owned retail stores, through independent retailers located in

2          South Dakota, and through its website on the Internet.  AT&T Mobility

3          also provided wireless communication services and sold mobile wireless

4          handsets directly to business, government and other customers in South

5          Dakota through both its own sales force and independent sales agents.  In

6          addition, AT&T Mobility maintained in South Dakota inventories of

7          mobile wireless handsets containing LCD Panels manufactured and sold

8          by defendants, their co-conspirators, and others, and operated offices and

9          retail stores in South Dakota.  During the Conspiracy Period, AT&T

10         provided various wireline telecommunications services to businesses and

11         government customers in South Dakota, where AT&T employees used

12         notebook computers and desktop monitors purchased by AT&T.  As a

13         result of their presence in South Dakota and the substantial business they

14         conduct in South Dakota, AT&T Mobility and AT&T are entitled to the

15         protection of the laws of South Dakota; and,

16         d.      As a direct and proximate result of defendants' conduct, AT&T Mobility

17         and AT&T have been injured in their business and property by paying

18         more for LCD Products purchased from defendants, their coconspirators

19         and others than they would have paid in the absence of defendants'

20         combination and conspiracy, and are entitled to relief under South Dakota

21         Codified Laws Ann. §§ 37-1 *et seq.*

22     210.    By reason of the foregoing, defendants have entered into agreements in restraint

23  of trade in violation of Tennessee Code §§ 47-25-101 *et seq.*

24         a.      Defendants' conspiracy restrained, suppressed and/or eliminated

25         competition in the sale of LCD Panels in Tennessee and fixed, raised,

26         maintained and stabilized LCD Panel prices in Tennessee at artificially

27         high, non-competitive levels;

28         b.      As a result, defendants' conspiracy substantially affected Tennessee

1      commerce;

2      c.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

3              substantial volume of business in Tennessee.  AT&T Mobility provided

4              wireless communication services and sold mobile wireless handsets

5              containing LCD Panels to customers in Tennessee through its corporate-

6              owned retail stores, through independent retailers located in Tennessee,

7              and through its website on the Internet.  AT&T Mobility also provided

8              wireless communication services and sold mobile wireless handsets

9              directly to business, government and other customers in Tennessee

10             through both its own sales force and independent sales agents.  In addition,

11             AT&T Mobility operates one of its principal distribution centers in

12             Memphis, Tennessee, and thus substantial volumes of mobile wireless

13             handsets containing LCD Panels manufactured and sold by defendants,

14             their co-conspirators, and others were imported into and moved through

15             Tennessee during and after the Conspiracy Period.  AT&T Mobility also

16             operated offices and retail stores in Tennessee.  During the Conspiracy

17             Period, AT&T provided various wireline telecommunications services to

18             residential customers, businesses and government customers in Tennessee,

19             where AT&T employees used notebook computers and desktop monitors

20             purchased by AT&T.  As a result of their presence in Tennessee and the

21             substantial business they conduct in Tennessee, AT&T Mobility and

22             AT&T are entitled to the protection of the laws of Tennessee; and,

23     d.      As a direct and proximate result of defendants' conduct, AT&T Mobility

24             and AT&T have been injured in their business and property by paying

25             more for LCD Products purchased from defendants, their coconspirators

26             and others than they would have paid in the absence of defendants'

27             combination and conspiracy, and are entitled to relief under Tennessee

28             Code §§ 47-25-101 *et seq.*

72

211.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451 *et seq.*

a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Vermont and fixed, raised, maintained and stabilized LCD Panel prices in Vermont at artificially high, non-competitive levels;

b.    As a result, defendants' conspiracy substantially affected Vermont commerce;

c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Vermont.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Vermont through its corporate-owned retail stores, through independent retailers located in Vermont, and through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Vermont through both its own sales force and independent sales agents.  In addition, AT&T Mobility maintained in Vermont inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Vermont. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Vermont, where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  As a result of their presence in Vermont and the substantial business they conduct in Vermont, AT&T Mobility and AT&T are entitled to the protection of the laws of Vermont; and,

d.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying

1    more for LCD Products purchased from defendants, their coconspirators

2    and others than they would have paid in the absence of defendants'

3    combination and conspiracy, and are entitled to relief under Vermont Stat.

4    Ann. 9 §§ 2451 *et seq.*

5    212.    By reason of the foregoing, defendants have entered into agreements in restraint

6    of trade in violation of West Virginia §§ 47-18-1 *et seq.*

7        a.    Defendants' conspiracy restrained, suppressed and/or eliminated

8            competition in the sale of LCD Panels in West Virginia and fixed, raised,

9            maintained and stabilized LCD Panel prices in West Virginia at artificially

10           high, non-competitive levels;

11       b.    As a result, defendants' conspiracy substantially affected West Virginia

12           commerce;

13       c.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

14           substantial volume of business in West Virginia.  AT&T Mobility

15           provided wireless communication services and sold mobile wireless

16           handsets containing LCD Panels to customers in West Virginia through its

17           corporate-owned retail stores, through independent retailers located in

18           West Virginia, and through its website on the Internet.  AT&T Mobility

19           also provided wireless communication services and sold mobile wireless

20           handsets directly to business, government and other customers in West

21           Virginia through both its own sales force and independent sales agents.  In

22           addition, AT&T Mobility maintained in West Virginia inventories of

23           mobile wireless handsets containing LCD Panels manufactured and sold

24           by defendants, their co-conspirators, and others, and operated offices and

25           retail stores in West Virginia.  During the Conspiracy Period, AT&T

26           provided various wireline telecommunications services to residential

27           customers, businesses and government customers in West Virginia, where

28           AT&T employees used notebook computers and desktop monitors

1                                     purchased by AT&T.  As a result of their presence in West Virginia and

2                                     the substantial business they conduct in West Virginia, AT&T Mobility

3                                     and AT&T are entitled to the protection of the laws of West Virginia; and,

4           d.        As a direct and proximate result of defendants' conduct, AT&T Mobility

5                                     and AT&T have been injured in their business and property by paying

6                                     more for LCD Products purchased from defendants, their coconspirators

7                                     and others than they would have paid in the absence of defendants'

8                                     combination and conspiracy, and are entitled to relief under West Virginia

9                                     §§ 47-18-1 *et seq.*

10      213.    By reason of the foregoing, defendants have entered into agreements in restraint

11  of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

12          a.        Defendants' conspiracy restrained, suppressed and/or eliminated

13                                    competition in the sale of LCD Panels in Wisconsin and fixed, raised,

14                                    maintained and stabilized LCD Panel prices in Wisconsin at artificially

15                                    high, non-competitive levels;

16          b.        As a result, defendants' conspiracy substantially affected Wisconsin

17                                    commerce;

18          c.        During the Conspiracy Period, AT&T Mobility and AT&T conducted a

19                                  substantial volume of business in Wisconsin.  AT&T Mobility provided

20                                  wireless communication services and sold mobile wireless handsets

21                                  containing LCD Panels to customers in Wisconsin through its corporate-

22                                  owned retail stores, through independent retailers located in Wisconsin,

23                                  and through its website on the Internet.  AT&T Mobility also provided

24                                  wireless communication services and sold mobile wireless handsets

25                                  directly to business, government and other customers in Wisconsin

26                                  through both its own sales force and independent sales agents.  In addition,

27                                  AT&T Mobility maintained in Wisconsin inventories of mobile wireless

28                                  handsets containing LCD Panels manufactured and sold by defendants,

1  their co-conspirators, and others, and operated offices and retail stores in

2  Wisconsin.  During the Conspiracy Period, AT&T provided various

3  wireline telecommunications services to businesses and government

4  customers in Wisconsin, where AT&T employees used notebook

5  computers and desktop monitors purchased by AT&T.  As a result of their

6  presence in Wisconsin and the substantial business they conduct in

7  Wisconsin, AT&T Mobility and AT&T are entitled to the protection of the

8  laws of Wisconsin; and,

9  d.  As a direct and proximate result of defendants' conduct, AT&T Mobility

10  and AT&T have been injured in their business and property by paying

11  more for LCD Products purchased from defendants, their coconspirators

12  and others than they would have paid in the absence of defendants'

13  combination and conspiracy, and are entitled to relief under Wisconsin

14  Stat. §§ 133.01 *et seq.*

15  **XI.   PRAYER FOR RELIEF**

16  WHEREFORE, AT&T Mobility and AT&T request:

17  A.  That the unlawful agreement, conduct, contract, conspiracy or

18  combination alleged herein be adjudged and decreed to be:

19  i.  A restraint of trade or commerce in violation of Section 1 of the

20  Sherman Act, as alleged in the First Claim for Relief; and

21  ii.  An unreasonable restraint of trade or commerce in violation of the

22  Cartwright Act, as alleged in the Second Claim for relief; and

23  iii.  In the alternative, an unlawful combination, trust, agreement,

24  understanding, concert of action and/or unfair, deceptive or

25  fraudulent trade practice in violation of the state antitrust and

26  unfair competition laws of Arizona, the District of Columbia,

27  Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota,

28  Mississippi, Nebraska, Nevada, New Mexico, New York, North

1               Carolina, North Dakota, Puerto Rico, South Dakota, Tennessee,

2               Vermont, West Virginia and Wisconsin, as well as the Unfair

3               Competition Law of California, as alleged in the Third Claim for

4               relief.

5        B.     That AT&T Mobility and AT&T recover damages, as provided by federal

6 and state antitrust laws, and that a judgment be entered in favor of AT&T Mobility and AT&T

7 against defendants, jointly and severally, in an amount to be trebled in accordance with such

8 laws;

9        C.     That AT&T Mobility and AT&T obtain any penalties, punitive or

10 exemplary damages, and/or full consideration, where the laws of the respective states identified

11 herein so permit;

12        D.     That AT&T Mobility and AT&T recover damages and/or all other

13 available monetary and equitable remedies under the state unfair competition laws identified

14 above;

15        E.     That defendants, their affiliates, successors, transferees, assignees, and the

16 officers, directors, partners, agents, and employees thereof, and all other persons acting or

17 claiming to act on their behalf, be permanently enjoined and restrained from in any manner

18 continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged

19 herein, or from entering into any other conspiracy or combination having a similar purpose or

20 effect, and from adopting or following any practice, plan, program, or device having a similar

21 purpose or effect;

22        F.     That AT&T Mobility and AT&T be awarded pre- and post-judgment

23 interest, and that such interest be awarded at the highest legal rate from and after the date of

24 service of the initial Complaint in this action;

25        G.     That AT&T Mobility and AT&T recover their costs and disbursements of

26 this suit, including reasonable attorneys' fees as provided by law; and,

27

28

1            H.      That AT&T Mobility and AT&T be awarded such other, further, and

2    different relief as the case may require and the Court may deem just and proper under the

3    circumstances.

4    **XII.    JURY TRIAL DEMAND**

5            Pursuant to Federal Rules of Civil Procedure Rule 38(b), AT&T Mobility and

6    AT&T demand a trial by jury for all issues so triable.

7

8    Dated:  January 29, 2010                    Respectfully submitted,

9                                        */s/ Jason C. Murray*

10                                 Jason C. Murray (CA Bar No. 169806)
     CROWELL & MORING LLP
11   515 South Flower St., 40th Floor
     Los Angeles, CA  90071
12   Telephone:  213-443-5582
     Facsimile:  213-622-2690
13   Email: jmurray@crowell.com

14   Jeffrey H. Howard (*pro hac vice*)
     Jerome A. Murphy (*pro hac vice*)
15   CROWELL & MORING LLP
     1001 Pennsylvania Avenue, N.W.
16   Washington, D.C. 20004
     Telephone:  202-624-2500
17   Facsimile:  202-628-5116
     Email:  jhoward@crowell.com
18              jmurphy@crowell.com

19   Kenneth L. Adams (*pro hac vice*)
     R. Bruce Holcomb (*pro hac vice*)
20   Christopher T. Leonardo (*pro hac vice*)
     Christopher H. Wood (*pro hac vice*)
21   ADAMS HOLCOMB LLP
     1875 Eye Street NW
22   Washington, DC 20006
     Telephone:  202-580-8822
23   Email:  adams@adamsholcomb.com
             holcomb@adamsholcomb.com
24           leonardo@adamsholcomb.com
             wood@adamsholcomb.com
25

26   *Counsel for AT&T Mobility, LLC, AT&T Corp.,*
     *AT&T Services, Inc., BellSouth*
27   *Telecommunications, Inc., Pacific Bell Telephone*
     *Company, AT&T Operations, Inc., AT&T*
28   *DataComm, Inc., and Southwestern Bell Telephone*
     *Company*

78