1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8  IN RE: TFT-LCD (FLAT PANEL) ANTITRUST          No. M 07-1827 SI
9  LITIGATION                                     MDL No. 1827
10 _____/      **ORDER GRANTING IN PART AND
                                                  DENYING IN PART DIRECT
11    This Order Relates to:                      PURCHASER PLAINTIFFS' MOTION
                                                  FOR CLASS CERTIFICATION;
12        ALL CASES                               GRANTING DEFENDANTS' MOTION
                                                  TO STRIKE UNTIMELY
13 _____/      DECLARATIONS**
14
15        Now before the Court is the direct purchaser plaintiffs' motion for class certification.  For the
16 reasons set forth below, the motion is GRANTED in part and DENIED in part.  The Court GRANTS
17 defendants' motion to strike certain declarations as untimely.

18
19                                    **BACKGROUND**
20 **I.    The TFT-LCD market**
21        This multidistrict litigation stems from allegations of a global price-fixing conspiracy in the
22 market for Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panels.  TFT-LCD panels are
23 used in a number of products, including but not limited to computer monitors, laptop computers,
24 televisions, and a number of other products.  TFT-LCD panels are made by sandwiching liquid crystal
25 compound between two pieces of glass called substrates.  The resulting screen contains hundreds of
26 thousands of electrically charged dots, called pixels, which form an image.  The panel is then combined
27 with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate
28 and be integrated into a television, computer monitor, or other product.

TFT-LCD panels are sold in a variety of sizes, and vary across a number of technical dimensions.  For example, larger panels used for televisions require high contrast ratios for vibrant colors and wider viewing angles, while smaller panels used in mobile phones require small size and low weight.  TFT-LCD panels have no independent utility, but have value only as components of other products.  When a TFT-LCD panel is incorporated into a finished product, the panel is not modified, and remains a discrete, physical object within the finished product.  TFT-LCD panels are purchased by many different types and sizes of customers through different manufacturing and distribution channels. The parties dispute the complexity of the distribution chain, with defendants contending that it is multi-layered and heterogeneous, and plaintiffs asserting that the distribution chain is relatively simple and not materially different from the distribution chains in other high-tech industries.

Defendants collectively dominated the market for TFT-LCD panels and products during the relevant time period.  Together, defendants controlled between 82% and 95% of the market between 1996 and 2006.  During this period, the TFT-LCD industry experienced significant consolidation, including the creation of defendant AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; the creation of defendant Toshiba Matsushita in 2002; Fujitsu Ltd.'s transfer of its TFT-LCD business to defendant Sharp in 2005; the formation of defendant IPS Alpha in 2005 by defendants Toshiba and Hitachi and named co-conspirator Panasonic; and defendant AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD panels and products.  The TFT-LCD industry is also marked by a number of cross-licensing agreements, joint ventures, and other cooperative arrangements which plaintiffs allege facilitate collusion.  Second Amended Direct Purchaser Consol. Compl. ¶ 92, Ex. A (diagram illustrating industry licensing arrangements).

Although panel prices vary according to the finished product, the panel is usually a significant cost component in finished TFT-LCD products.  Plaintiffs have submitted evidence showing that a panel can constitute as much as 60-80% of the price of computer monitors and other finished products. Necessarily, however, the price-component of a panel in a finished product varies both by product and manufacturer.  Defendants cite different estimates, asserting that TFT-LCD panels represent approximately 35 to 40% of the finished television price, 10 to 15% of the price for notebook

1    computers, and 5 to 10% of the price of cell phones.  *See* Sorensen Decl. Ex. 13.  The complaint[1] alleges

2    that during the class period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer

3    monitors were the most popular TFT-LCD products, representing as much as 80% of all TFT-LCDs

4    produced for notebook computers or computer monitors.  Second Amended Direct Purchaser Consol.

5    Compl. ¶ 85.

6         Plaintiffs allege that during the class period, defendants formed a cartel to interfere with the

7    normal cycle of supply and demand for TFT-LCD panels, known in the TFT-LCD industry as the

8    "crystal cycle."  *Id*. ¶ 96.  According to plaintiffs, defendants agreed on prices, agreed to limit

9    production, and agreed to manipulate the supply of TFT-LCD panels and products so that prices

10   remained artificially high.  Plaintiffs allege that defendants executed their price-fixing scheme by

11   participating in surreptitious group and bilateral meetings, as well as communicating with each other

12   by telephone and e-mail.  Compl. ¶¶ 106-134.

13        Plaintiffs allege that some group meetings were formalized and known as "Crystal Meetings."

14   *Id*. ¶ 107.  These meetings were attended by employees at three levels of defendants' corporations,

15   including "CEO" or "top" meetings, attended by Chief Executive Officers and/or Presidents;

16   "commercial" or "operation" meetings, attended by management-level personnel; and working group

17   meetings attended by lower-level sales and marketing personnel.  *Id*. Plaintiffs allege that at these

18   "Crystal Meetings," as well as in other communications, participants discussed supply and demand and

19   general market conditions for TFT-LCD products; exchanged fabrication plant and production capacity

20   information; reached agreements on target prices, floor prices, and price ranges for TFT-LCD panels

21   and products; planning consistent public statements on anticipated supply and demand; and disciplined

22   new market entrants and pressured them to abide by agreed-upon pricing and production.  Plaintiffs have

23   submitted considerable evidence in the form of detailed meeting reports, e-mails and memoranda

24

25   _____

26        [1]  At the time plaintiffs moved for class certification, the operative complaint was the Second
     Amended Direct Purchaser Consolidated Complaint.  In December 2009, plaintiffs filed a Third
27   Amended Direct Purchaser Consolidated Complaint.  That complaint, *inter alia*, added new defendants
     and new agents and co-conspirators.  The parties agree that the Court's resolution of the motion for class
28   certification is limited to the claims and parties set forth in the Second Amended Direct Purchaser
     Consolidated Complaint.

documenting at least 58 meetings involving various defendants at which defendants shared price information and agreed on pricing and production levels. *See e.g.*, Fastiff Decl. Ex. 1-12.[2]

## II.   The Department of Justice Investigation

In about 2006, the Antitrust Division of the Department of Justice began investigating a number of the defendants' alleged participation in a global conspiracy to fix prices of TFT-LCD panels. The investigation is ongoing. To date, seven corporate defendants in this action have pled guilty to Sherman Act violations relating to suppressing and eliminating competition by fixing the prices of TFT-LCD panels. Those defendants are Sharp Corporation (CR 08-802 SI); LG Display Co. Ltd. and LG Display America, Inc. (CR 08-803 SI), Chunghwa Picture Tubes, Ltd. (CR 08-804 SI); Hitachi Displays Ltd. (CR 09-247 SI); Epson Imaging Devices Corporation (CR 09-854 SI)[3]; and Chi Mei Optoelectronics Corporation (CR 09-1166 SI).[4] The DOJ has also confirmed that it has signed a conditional leniency agreement with a company in the TFT-LCD industry; price-fixing cartel participants may qualify for amnesty under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, P.L. 108-237 ("ACPERA") by providing concrete evidence of a price-fixing agreement. *See* Fastiff Decl. ¶¶ 3-4.

No defendant has, as part of its criminal plea, made or promised any restitutionary payments to entities or individuals injured by the wrongful acts.

Four of the defendants (LG Display Co., Ltd., LG Display America, Inc., Chunghwa Picture Tubes, Ltd., and Chi Mei Optoelectronics Corporation) pled guilty to participating in a conspiracy from 2001 to 2006 among "major TFT-LCD producers, the primary purpose of which was to fix the price of certain TFT-LCD sold in the United States and elsewhere." Three of the defendants (Sharp Corporation,

---

[2] Plaintiffs have submitted extensive evidence in support of their allegations that defendants engaged in a price-fixing conspiracy. This evidence has all been submitted under seal, and is found at the following: Fastiff Decl. Ex. 1-12, 19, 28, 43, 45, 70; Fastiff Decl. Ex. A, D, E, J, O, P, S, T; Supp. Fastiff Decl. Ex. 5-13, 24, 26, 28, 30, 34; Supp. Fastiff Decl. Ex. M. This list is not intended to be exhaustive, as plaintiffs have submitted well over 100 exhibits, all under seal, in support of their motion.

[3] Epson Imaging Devices Corporation was first named as a defendant in the Third Amended Direct Purchaser Plaintiffs' Consolidated Complaint. Docket No. 1416 ¶ 21.

[4] In addition, several individual executives from LG Phillips and Chunghwa Pictures Tubes, Ltd., have pled guilty to criminal violations of the Sherman Act. *See* CR 09-44 SI, CR 09-45 SI and CR 09-437 SI.

United States District Court
For the Northern District of California

Hitachi Displays Ltd., and Epson Imaging Devices Corporation) pled guilty to participating in price-fixing conspiracies with "major TFT-LCD producers" with regard to sales of specific types of products to specific entities. For example, Sharp pled guilty to participating in a conspiracy to fix prices of TFT-LCD panels sold to Dell, Inc. for use in computer monitors and laptops from April 2001 to December 1, 2006; participating in a conspiracy to fix prices of TFT-LCD sold to Apple Computer Inc. for use in iPod portable music players from September 2005 to December 2006; and for participating in a conspiracy to fix prices of TFT-LCD sold to Motorola Inc. for use in Razr mobile phones from the fall of 2005 to the middle of 2006. *See* CR 08-802 SI.

The grand jury investigation is continuing.

## III.    This litigation

The direct purchaser plaintiffs filed this multidistrict antitrust class action on behalf of all persons and entities which purchased TFT-LCD panels or a product containing a TFT-LCD panel in the United States from the named defendants, any subsidiaries or affiliates thereof, or any co-conspirators as identified in the complaint. DP-CC ¶ 1. Plaintiffs allege a horizontal conspiracy among defendants to raise, fix, maintain, and stabilize artificially the price of TFT-LCD panels between January 1, 1996 through December 11, 2006, all in violation of Section 1 of the Sherman Act. The named plaintiffs are eleven[5] corporations and partnerships located throughout the United States that purchased TFT-LCD panels and products during the proposed eleven-year class period. Plaintiffs have moved for certification of the following class:

> All persons and entities who, between January 1, 1996 and December 11, 2006, directly purchased a TFT-LCD Product in the United States from any defendant or any subsidiary or affiliate thereof, or any co-conspirator. Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

Compl. ¶ 67.

---

[5] As discussed *infra*, plaintiffs have withdrawn Phelps Technology as a proposed class representative.

**LEGAL STANDARD**

Plaintiffs bear the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended*, 273 F.3d 1266 (9th Cir. 2001). A district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The court must also find that one of the requirements of Rule 23(b) has been satisfied. Plaintiffs contend the class should be certified pursuant to Rule 23(b)(3), which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Ninth Circuit has recently reaffirmed the principle that "'[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met' and 'nothing in either the language or history of Rule 23 . . . gives the court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhilips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-79 (1974)); *see also Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003). "Although certification inquiries such as commonality, typicality, and predominance might properly call for some substantive inquiry, the court may not go so far as to judge the validity of these claims." *United Steel*, 593 F.3d at 808 (internal quotations omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). However, although the Court may not require preliminary proof of the claim, it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements. Courts may also consider the legal and factual issues presented by plaintiff's complaint." 2 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, 7.26 (4th ed. 2005). Sufficient information must be provided to form a reasonable and informed judgment on each of the requirements of Rule 23. *See Blackie*, 524 F.2d at 901

United States District Court
For the Northern District of California

6

n.17.  In order to safeguard due process interests and the judicial process, the Court conducts an analysis that is as rigorous as necessary to determine whether class certification is appropriate.  *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005); *see also Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

The Supreme Court has long recognized that class actions play an important role in antitrust enforcement.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262, 266 (1972).  "Accordingly, when courts are in doubt as to whether certification is warranted, courts tend to favor class certification."  *In re Static Random Access (SRAM) Antitrust Litig.*, C 07-1819 CW, 2008 WL 4447592, at *2 (Sept. 29, 2008) ("*SRAM*") (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 258 (D.D.C. 2002), and *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 238 (E.D.N.Y. 1998)).  "Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers."  *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (internal quotations and citation omitted).

## I.    Rule 23(a)

### A.    Ascertainability

Defendants object that the inclusion of undefined "affiliates" and "co-conspirators" in the class definition renders the proposed class unclear.  While Rule 23(a) does not expressly require a class to be ascertainable, courts have read the rule to imply this requirement.  *Zapka v. Coca-Cola Co.*, No. 99 CV 8238, 2000 WL 1644539, at *2 (N.D. Ill. Oct. 27, 2000) (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) (quotation marks omitted)).  "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Zapka*, 2000 WL 1644539, at *3 (declining to certify class where definition referred to state of mind: "all individuals who consumed diet Coke *deceived* by marketing practices . . . into *believing* that fountain diet Coke does not contain saccharin").  A class definition is sufficient if the description of the class is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v.*

United States District Court
For the Northern District of California

7

*Boeing North American Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

The Court agrees that the inclusion of unnamed co-conspirators in the class definition presents ascertainability issues. At the hearing on this matter, plaintiffs agreed to limit the "co-conspirators" to those identified in the complaint, namely Epson Imaging Devices Corporation, Hydis Technologies Co., Ltd., IPS Alpha Technology, Ltd., Mitsubishi Electronic Corporation, Mitsui & Co., Ltd., NEC LCD Technologies, Ltd., Panasonic Corporation, and Panasonic Corporation of America. Compl. ¶¶ 59-66. The Court further finds that plaintiffs must specifically identify the affiliates to enable the parties and class members to determine who is in the class. Accordingly, the class definition (and class notice) shall specifically identify the co-conspirators and affiliates.

**B.      Numerosity**

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs assert there are thousands of class members throughout the United States who purchased TFT-LCD products during the class period. Given the nature of the TFT-LCD market and the international scope of the alleged conspiracy, common sense dictates that joinder would be impracticable. Defendants do not contest numerosity, and the Court finds that this requirement is met.

**C.      Commonality**

For a proposed class to be certified, Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2) "Where an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("*DRAM*") (citing *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351). Plaintiffs assert that questions of law and fact common to the class include (1) whether defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of TFT-LCD products sold in the United States; (2) whether the contract, combination, or conspiracy violated Section 1 of the Sherman Act; (3) the duration of the illegal

8

contract, combination, or conspiracy; (4) whether defendants' conduct caused the prices of TFT-LCD products sold in the United States to be set at artificially high, or non-competitive, levels; and (5) whether class members were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages.  Defendants concede that there are some common issues of law and fact, but vigorously contend that plaintiffs cannot meet the Rule 23(b)(3) requirement that common issues predominate over individualized questions.  The Court finds that plaintiffs have established that there are common issues, and will addresses the predominance of those issues *infra*.

### D.    Typicality

The typicality requirement of Rule 23(a)(3) is fulfilled when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Generally, the class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156.  Questions of class typicality focus on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "In evaluating typicality, the court should consider whether the named plaintiffs' 'individual circumstances are markedly different or [. . . if] the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *DRAM*, 2006 WL 1530166, at *4.  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

"In cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is usually considered typical even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class." *DRAM*, 2006 WL 1530166, at *4.  Instead, "[t]he overarching scheme is the linchpin of plaintiffs'. . . complaint, regardless of the product purchased, the market involved or the

price ultimately paid.  Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong."  *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999).

Defendants challenge the typicality of the proposed class representatives on a number of grounds.  First, defendants argue that the Court cannot assess plaintiffs' typicality because plaintiffs' motion does not include any specific information about the proposed class representatives' purchases. Second, defendants challenge the length of the class period. Third, defendants argue that the absence of large-volume purchasers as class representatives defeats typicality.  Fourth, defendants challenge the typicality of including both TFT-LCD panels and finished products within the proposed class.  Fifth, defendants argue that *Illinois Brick* defeats typicality for proposed class members who purchased finished products. Finally, defendants argue that members of the proposed class who purchased finished products will face unique jurisdictional defenses under the Foreign Trade Antitrust Improvements Act ("FTAIA").[6]

### 1.        Information about named plaintiffs

In the initial briefing on this motion, plaintiffs asserted that the claims of these named plaintiffs are typical of the class because the named plaintiffs were injured by defendants' TFT-LCD cartel when they purchased TFT-LCD products from defendants, and their claims are based on the same legal theories: price fixing in violation of 15 U.S.C. § 1.  Defendants objected that plaintiffs did not offer any specific information about the named plaintiffs' purchases of TFT-LCD Products, such as the volumes purchased, whether their purchases were individually negotiated, the number of purchases they made, and whether the panels or products they purchased were customized.

After the hearing on this matter, the Court directed plaintiffs to file declarations from the named plaintiffs providing information about the dates of plaintiffs' purchases, a description of the products

---

[6]  Defendants also challenge the typicality and adequacy of proposed named plaintiff Texas Digital Systems.  The Court addresses defendants' arguments *infra* in the adequacy section. Defendants' challenges to proposed named plaintiff Phelps Technologies have been mooted by plaintiffs' withdrawal of Phelps Technologies as a class representative.

(or panels) purchased, and the names of the defendants from whom the products or panels were purchased. Plaintiffs submitted these declarations, which state:

Between October 19, 2004 and February 2, 2007, Orion Home Systems LLC purchased at least 57 LCD television sets from LG Electronics USA Inc.[7]

On or around August 17, 2004, Omnis Computer Supplies, Inc. purchased two LG computer monitors from LG Electronics USA Inc. via a faxed order. On or around February 15, 2005, Omnis purchased two Samsung computer monitors from defendant Samsung via a faxed order. These purchases were made pursuant to a program set up by defendant Samsung Electronics America, Inc., according to which Omnis was directed by Samsung to send payment to a third party for processing.

Between 1999 and 2001, Texas Digital Systems, Inc. purchased 1,108 raw TFT-LCD panels from defendant Sharp. The panels were used for incorporation into quick-serve restaurant order confirmation displays.

Between 2001 and 2005, Royal Data Services, Inc. purchased 52 LCD products from defendant Tatung Company of America. From the information supplied, it appears most of these purchases were of computer monitors.

Between 2004 and 2005, Home Technologies Bellevue LLC purchased 21 LCD television sets from defendant Sharp Electronics Corporation.

In 2005, Cargo Inc. purchased 64 LCD monitors from defendant NexGen Mediatech USA, Inc., a wholly-owned and controlled subsidiary of defendant Chi Mei Optoelectronics Corporation.

In 2006, CMP Consulting Services, Inc. purchased four LCD computer notebooks from defendant Toshiba America as a member of its "Preferred Partner Reseller Program." According to CMP's declaration, the "Preferred Partner Reseller Program" is a tiered incentive program offered to Toshiba's most valued customers.

In 2002 and 2006, A.M. Photo & Imaging Center, Inc. purchased a total of two LCD notebook computers from an American affiliate of defendant Toshiba Corporation.

_____

[7] LG Electronics USA Inc. is not a named defendant, and presumably plaintiffs assert that LG Electronics USA Inc. is an affiliate of defendants LG Display Co., Ltd. and LG Display America, Inc.

1    Between 2001 and 2006, Weber's World Company purchased 1,127 LCD televisions and

2   monitors from defendant Sharp Electronics Corporation, an American affiliate of defendant LG Display

3   Co., Ltd., and an American affiliate of co-conspirator Mitsubishi Electric Corporation.

4    Between 2001 and 2003, Nathan Muchnick, Inc. purchased 22 LCD television sets from named

5   co-conspirator Panasonic Consumer Electronics Company, a unit of Matsushita Electric Company of

6   America (now known as Panasonic Corporation of North America).

7    Between 1998 and 2006, Univisions-Crimson Holding, Inc. purchased 9,354 LCD products and

8   3 LCD panels.  Univisions-Crimson Holding, Inc. purchased the products from defendant Sharp

9   Electronics Corporation, and American affiliates of defendants Epson, LG Display, Hitachi, Samsung,

10  and Toshiba.  Univisions-Crimson Holding, Inc. also purchased LCD products from American affiliates

11  of named co-conspirators Mitsubishi, NEC, and Panasonic.  Based upon the chart submitted by

12  Univisions-Crimson Holding, Inc., it appears most of the purchases were of projectors, televisions, and

13  monitors.  Univisions-Crimson Holding, Inc. also purchased 3 panels from defendant Sharp Electronics

14  Corporation and an American affiliate of named co-conspirator NEC.

15    The Court finds that the supplemental declarations provide information sufficient to assess the

16  named plaintiffs' typicality.  The Court will now turn to defendants' specific challenges to typicality.

17

18          **2.      Class period**

19    Defendants raise a number of related challenges to the proposed 11 year class period.  As a

20  matter of typicality, defendants note that the class representatives did not purchase panels or products

21  during the first several years of the alleged conspiracy.  According to the information provided by the

22  class representatives, it appears that the earliest purchases are Univisions-Crimson Holding, Inc.'s

23  purchases of monitors in the latter half of 1998.[8]  The earliest purchases of panels were those of Texas

24  Digital Systems in 1999.  Defendants argue that the claims of the class representatives are not typical

25  of class members who purchased panels and products between 1996 and 1998-1999.  Plaintiffs do not

26  specifically respond to this argument, except to assert that the claims of the named plaintiffs need not

27  be identical to those of the class members.

28    _____
        [8]  Univisions also purchased projectors in 1998.

Defendants also argue that the very length of the proposed class period defeats predominance for a variety of reasons, and they argue that plaintiffs' price-fixing claims are based principally on the "Crystal Meetings" among defendants, which allegedly began in 2001.  Defendants contend that even under plaintiffs' allegations, the alleged conspiracy involved several distinct episodes of price-fixing, as well as periods when the conspiracy broke down and prices and competition increased.  Defendants argue that plaintiffs have actually alleged the existence of multiple, separate conspiracies, and they cite comments made by the Department of Justice regarding "multiple" conspiracies, as well as defendants' plea agreements in which defendants have pled guilty to several "separate" price-fixing conspiracies. *See, e.g.*, Sharp Corp. Plea Agreement (Docket No. 750-1) 2-4.  The Court rejects defendants' attempts to recharacterize plaintiffs' allegations, as well as defendants' attempts to limit the alleged conspiracy by reference to the criminal guilty pleas and DOJ's statements.

Plaintiffs respond that defendants are improperly recharacterizing their allegations, and they argue that there is ample evidence of a price-fixing conspiracy before 2001.  The Court agrees with plaintiffs that defendants may not recast plaintiffs' allegations, and plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period.  As plaintiffs note, the Supreme Court has held that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  In addition, the scope and nature of the criminal guilty pleas are not determinative of the plaintiffs' potential claims in a civil antitrust suit.  Indeed, "[Sherman Act] civil actions may be brought in cases in which criminal prosecution would not have been justified . . . .  Thus, a civil action may succeed … [even] if the government [does] not show that the violation constituted a criminal act." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 501 n.51 (2d Cir. 1984), *rev'd on other grounds, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985).

Nevertheless, the Court does find it appropriate to shorten the proposed class period, and therefore certifies a class period of January 1, 1999 to December 31, 2006.[9]  The class representatives' earliest purchases of both panels and products occurred in 1999.  While the class representatives' claims

---

[9]   The Court extends the class period to December 31, 2006 in the interest of consistency between the direct purchaser classes and the indirect purchaser classes.

1    need not be identical to those of class members, the absence of any purchases in the early years of the

2    alleged conspiracy, coupled with the fact that the bulk of the evidence submitted in support of plaintiffs'

3    motion is from 1999 and beyond, persuades the Court that it is more prudent to certify a class period

4    of January 1, 1999 to December 31, 2006. A seven year class period is not unusually long, and courts

5    have certified antitrust classes with far longer class periods. *See, e.g.*, *In re Fine Paper Antitrust*

6    *Litigation*, 82 F.R.D. 143 (E.D. Pa. 1979) (certifying an 11 year class period); *In re Corrugated*

7    *Container Antitrust Litig.*, 80 F.R.D. 244 (S.D. Tex. 1978) (certifying an 18 year class period).

8

9                        **3.      Absence of large-volume purchasers**

10            Defendants argue that the proposed class representatives are not typical of class members who

11    purchased TFT-LCD panels and products in large volumes. Defendants argue that compared with

12    purchasers of a single TFT-LCD panel, high-volume purchasers such as Sanyo, Apple, Dell, and HP

13    have significantly more bargaining power when purchasing TFT-LCD panels, and that the lower prices

14    the high-volume purchasers paid for panels reflects that power. The top five purchasers of TFT-LCD

15    panels, "who account for nearly 50% of all sales [of six defendants], each purchased between $57

16    million and $177 million worth of panels (between October 2001- December 2006) relative to less than

17    $10,000 each for the small buyers." Ordover Decl. ¶ 58. Defendants argue that the proposed class

18    representatives' typicality is defeated by lumping together class members with such vast disparities in

19    bargaining power and purchasing quantities.

20            With an alleged price-fixing conspiracy, however, "[t]he typicality requirement does not

21    mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must

22    be the same as those of the absent class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 261;

23    *see also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D. Minn. 1995) ("Nor will differing

24    damages, resulting from varied methods of procuring and purchasing the product, defeat satisfaction of

25    Rule 23(a)(3)."). "That the proposed class representatives had different purchasing positions from

26    [other] class members does not mean that the class representatives' claims are atypical, considering that

27    all members of the proposed plaintiffs' class have alleged [a] horizontal price-fixing conspiracy." *In*

28

*re Bulk (Extruded) Graphite Products Antitrust Litig.*, No. Civ. 02-6030 (WHW), 2006 WL 891362, *6 (D.N.J. Apr. 4, 2006).

Defendants rely primarily on two cases – *Deiter v. Microsoft Corporation*, 436 F.3d 461 (4th Cir. 2006), and *In re Graphics Processing Units Antitrust Litigation*, No. C 06-7417 WHA, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*") – to support their contention that the proposed class representatives are not typical of the putative class due to the absence of large-volume purchasers. In *Deiter*, the Fourth Circuit upheld a district court's denial of class certification based on the differences between the class representatives' purchasing channel and those of absent class members, who largely purchased in bulk through individually negotiated transactions. *Deiter*, 436 F.3d at 466. However, there the plaintiffs' claims stemmed from a violation of § 2 of the Sherman Act, requiring the plaintiffs to demonstrate that the defendant possesses monopoly power in the relevant market in order to prove their claims. "As such, proof of plaintiffs' claims did not depend on whether all defendants participated in the same conspiracy, but rather on whether defendant possessed sufficient market power *in the relevant market*." *DRAM*, 2006 WL 1530166, at *5 (discussing *Deiter*) (emphasis in original). In monopolization cases, proof of market power will necessarily hinge on the particular categories of products and distribution channels at issue, "in a way that proof of participation in a § 1 conspiracy does not." *Id.* Here, plaintiffs' claims arise under §1, not § 2, of the Sherman Act.

In *GPU*, the plaintiffs sought certification of a class of direct purchasers of computer graphics chips and cards in an alleged price-fixing action against two defendants, Nvidia and ATI Technologies. *GPU*, 253 F.R.D. at 480. Similar to the TFT-LCD panels and finished products in this case, graphics chips were sold directly to purchasers and were also used as an input in graphics cards, and the graphics cards were also sold to purchasers. There, the proposed direct purchaser class included purchasers of graphics chips and graphics cards, yet the proposed class representatives each purchased only a single graphics card directly from ATI. *Id.* at 489. The other defendant, Nvidia, did not sell directly to individual consumers at all. *Id.* Direct sales of graphics cards to individual consumers – an admittedly unusual practice in the market in question – accounted for only .5% of defendants' sales, while wholesale purchasers of chips and cards accounted for the remaining 99.5% of defendants' business. *Id.* at 490. In denying a broad class certification, the *GPU* court held that "[t]he atypicality and

detachment of the named plaintiffs' claims from those of the remaining [wholesale purchaser] class obstruct their ability to adequately pursue and prove the claims of the absent class members." *Id.* The court certified a more limited class of individuals who had purchased graphics cards directly from defendants online.

The purchases of the proposed class representatives in this case are not comparable to the atypicality of the purchases of the class representatives in *GPU*. At most, defendants have shown that the defendants' top 20 customers represented 87.2% of total U.S. panel sales and that various purchasing practices – non-negotiable, "spot" purchasing of TFT-LCD products and individually-negotiated purchases of customizable products – existed in the market for TFT-LCD products. *See* Ordover Decl. Ex. 11. However, all other sales – that is, panel sales to customers outside of defendants' largest 20 customers – account for 12.8% of sales, and when aggregated, these sales represent defendants' second-largest source of panel sales. *See* Ordover Dec. Ex. 11. In contrast, in *GPU*, the proposed class representatives' method of purchasing accounted for .5% of defendants' sales. *See GPU*, 253 F.R.D. at 480.

"[T]here is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members with respect to pricing, products, and/or methods of purchasing products." *DRAM*, 2006 WL 1530166, at *5; *see also SRAM*, 2008 WL 4447592, at *3 (rejecting argument that named plaintiff who purchased "fast SRAM" was not typical of class members who purchased "slow SRAM"); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260-61; *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351; *In re Bulk (Extruded) Graphite Prod. Antitrust Litig.*, 2006 WL 891362, at *6. "These cases recognize that, in conspiracy cases, plaintiffs' claims are typical of the class because proof of their section 1 claim will depend on proof of violation *by defendants*, and not on the individual positioning of the plaintiff." *DRAM*, 2006 WL 1530166, at *5 (emphasis in original). Here, even if large-volume purchasers interacted with and purchased from defendants in different ways than the proposed class representatives, because of the alleged price-fixing scheme, prices paid for *all* TFT-LCD panels and products were artificially inflated and supracompetitive. Because plaintiffs allege a horizontal price-fixing conspiracy, the claims of any class representative will necessarily be typical of other purchasers – regardless of the

1   volume or distribution channel of the purchaser. All claims will substantially hinge on proving that

2   defendants conspired to fix prices for TFT-LCD panels and products. The Court finds that the named

3   plaintiffs' claims are "reasonably co-extensive with those of absent class members; they need not be

4   substantially identical." *Hanlon*, 150 F.3d at 1020.

5

6           **4.      Inclusion of purchasers of TFT-LCD panels and products within
                      the same class**

7

8           The proposed class representatives include both purchasers of TFT-LCD panels and purchasers

9   of TFT-LCD products that incorporate a panel. Defendants contend that named plaintiffs who

10  purchased TFT-LCD products cannot represent class members who purchased TFT-LCD panels, and

11  vice versa, because purchasers of products will have to prove antitrust impact and calculate damages

12  in markets that are one or two steps removed from the panel markets where the alleged price-fixing

13  occurred. Although the Court is not persuaded that the differences between the two groups are as

14  meaningful as defendants contend, the Court finds it appropriate to certify separate classes of direct

15  purchasers of TFT-LCD panels and direct purchasers of TFT-LCD products. The Court addresses

16  defendants' arguments about the differences between different sizes and types of panels *infra* in

17  connection with the parties' arguments about predominance of common issues.

18          Defendants also argue that purchasers of TFT-LCD products cannot be included within the same

19  class because of the variety of TFT-LCD products. Defendants note that all of the named plaintiffs who

20  purchased products purchased televisions, computer monitors, or notebook computers, and that none

21  of the named plaintiffs purchased cell phones, PDAs, other mobile devices, or a number of other TFT-

22  LCD products such as digital cameras and refrigerators.[10] Defendants also argue that every TFT-LCD

23  product has a separate market, and thus purchasers of different types of finished products are not typical

24  of each other.

25          While the named plaintiffs' claims need only be "reasonably co-extensive" with those of absent

26  class members, the Court finds that it is appropriate for a number of reasons to limit the class of direct

27  purchasers who purchased TFT-LCD products to those who purchased televisions, computer monitors,

28  ───────────────
            [10]    The sole exception appears to be Univisions-Crimson Holdings, Inc., which also purchased
    projectors.

and notebook computers.  The Court reaches this conclusion in part due to typicality concerns because the named plaintiffs' purchases are almost exclusively of these three products.  In addition, the Court is persuaded that by limiting the class to class members who purchased these three types of products, issues of liability and damages will be more susceptible to common proof.  Plaintiffs have submitted considerable evidence showing that TFT-LCD panels for televisions, computer monitors and notebook computers were standardized and interchangeable; that defendants set base prices for various panel sizes used in these three products; and TFT-LCD panels are the main cost component in TFT-LCD televisions, monitors and notebook computers.  The record contains much less evidence about standardization and setting of base prices for panels used in other products, and while the panels are a significant cost component in other TFT-LCD products, they are not the main cost component.  For example, defendants have submitted evidence showing that TFT-LCD panels comprise approximately 5-10% of the price of cell phones.

To the extent defendants contend that there are typicality problems posed by having class representatives who purchased televisions represent class members who purchased different types of televisions (as just one example), the Court disagrees.  As noted above, there is no requirement that the claims of the named plaintiffs be identical to the claims of the class members, only that they be "reasonably co-extensive."  There is ample support in the antitrust case law for certifying classes in which there are some variations between products, customers, marketing and distribution channels.  *See, e.g.*, *SRAM*, 2008 WL 4447592 (certifying class alleging price-fixing conspiracy for both "fast" and "slow" SRAM); *see also SRAM*, 2009 WL 4263524, at *9 (certifying class of indirect purchaser plaintiffs where "SRAM is but one component of an end-product and that it was sold to indirect purchasers as a stand-alone product but to others bundled with other products."); *DRAM*, 2006 WL 1530166 (certifying class alleging price-fixing scheme for DRAM, which defendants primarily produced in "two forms, component and module, both of which c[a]me in different densities, speeds, and frequencies (e.g. 16, 64, 128, 256 Mb)"); *In re Citric Acid Antitrust Litig.*, No. C 95-1092 FMS, 95-2963 FMS, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996) (certifying class alleging price-fixing of citric acid, which "comes in a variety of forms, including crystal, powder, and liquid"); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 475 (certifying class alleging conspiracy to fix prices for flat glass and all products

18

created from flat glass, where the "purpose and effect of defendants' conspiracy was to fix, raise and stabilize artificially the price of *all* flat glass products, both primary and fabricated."); *In re Fine Paper Antitrust Litigation*, 82 F.R.D. 143 (certifying a class alleging conspiracy in the market for "all printing and writing papers and all paper products into which such papers are converted"); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244 (certifying class that purchased corrugated sheets and highly-customizable corrugated containers, in which corrugated sheets are an input).

### 5.  *Illinois Brick*

Next, defendants assert that purchasers of finished products face unique *Illinois Brick* defenses, thus rendering those plaintiffs atypical.  In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the [Clayton Act]." *Id.* at 729.  Defendants argue, as they did in the motion to dismiss the complaint, that plaintiffs who purchased TFT-LCD products directly from defendants are actually indirect purchasers because the alleged price-fixing conspiracy existed only with regard to TFT-LCD panels, and not finished products.        However, contrary to defendants' assertions, *Illinois Brick* does not address nor place limitations on direct purchaser antitrust suits.  Defendants do not cite any case holding that a plaintiff who purchases directly from an alleged cartel does not have standing.  In contrast, courts have found antitrust standing where plaintiffs purchased downstream goods directly from a cartel of manufacturers who made, and fixed the price of, a component of those goods.  *See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159-60 (3d Cir. 2002) ("*Linerboard I*") (holding *Illinois Brick* does not bar a suit by a plaintiff who purchases directly from the alleged offender, but buys a product (corrugated sheets and boxes) which incorporates the price-fixed product (linerboard) as one of its ingredients).

*Illinois Brick*'s prohibition against suits by indirect purchasers extends only to the indirect purchaser plaintiff, not to the price-fixed product itself if incorporated into another product.  *See id.*; *see also In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978).  If the case were otherwise, producers would be free to fix the price of component prices, provided those components were later incorporated into another finished product: under this scenario, any purchaser of a finished product

United States District Court

For the Northern District of California

1   containing a price-fixed component would automatically become an indirect purchaser and, thus, barred

2   from suit. *See id.* ("But just as the [price-fixed] sugar sweetened the candy, the price-fixing enhanced

3   the profits of the candy manufacturers [who were also sugar refiners]. The situation is the same as if

4   the general contractor which sold the building to the plaintiff in *Illinois Brick* were the manufacturer of

5   the concrete block which went into the structure. In that situation, the concern which the Supreme Court

6   expressed about the proration of overcharge among a number of entities in the chain would not have

7   been present.").

8       While "there will be some additional complications underlying the damage claims" because the

9   prices of TFT-LCD finished products were not, themselves, fixed, "this must not be allowed to obscure

10  the fact that the plaintiff[s] did purchase directly from the alleged violator[s]." *Id.* at 17. The plaintiffs

11  here are "direct purchaser[s] and, therefore, entitled to recover the full extent of the overcharge." *Id.*

12  at 18; *see also In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 480 (holding *Illinois Brick* "does not

13  preclude a suit by a plaintiff who purchases directly from the alleged offender. . . but buys a product

14  which incorporates the price-fixed product as one of its ingredients").

15

16          **6.     FTAIA**

17      Defendants also contend that some purchasers of finished TFT-LCD products would face a

18  jurisdictional defense under the Foreign Trade Antitrust Improvement Act ("FTAIA"), 15 U.S.C. §6(a),

19  that some purchasers of TFT-LCD panels would not face, thus presenting typicality problems.

20      The FTAIA "excludes from the Sherman Act's reach much anticompetitive conduct that causes

21  only foreign injury." *F. Hoffmann-LaRoche*, *Ltd. v. Empagran S.A. (Empagran I)*, 542 U.S. 155, 158

22  (2004). "It does so by setting forth a general rule stating that the Sherman Act 'shall not apply to

23  conduct involving trade or commerce . . . with foreign nations.' 96 Stat. 1246, 15 U.S.C. § 6a. It then

24  creates exceptions to the general rule, applicable where (roughly speaking) that conduct significantly

25  harms imports, domestic commerce, or American exporters." *Id.*

26      Defendants argue that most of the TFT-LCD products purchased directly from defendants were

27  manufactured outside the United States using TFT-LCD panels that were manufactured and sourced in

28  Asia. Defendants argue that the alleged price-fixing, and the antitrust injury, occurred in the foreign

20

United States District Court
For the Northern District of California

markets for TFT-LCD panels, not in the United States, and thus that the FTAIA bars claims arising from purchases of finished products.

Plaintiffs argue that because TFT-LCD products purchased by direct purchasers are "imports," the FTAIA does not apply.  The plain language of the FTAIA exempts "import trade or import commerce" from the statute, and plaintiffs' proposed class consists of purchasers of TFT-LCD products who purchased "in the United States." Compl. ¶ 66. Plaintiffs argue that *Empagran I* demonstrates that their claims are not barred. *Empagran I* involved vitamin sellers around the world that agreed to fix prices, leading to higher vitamin prices in the United States and independently leading to higher vitamin prices in other countries such as Ecuador. *Empagran I*, 542 U.S. at 159.  The Supreme Court held that "a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm." *Id.* "[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *Id.* at 165 (emphasis in original).  Plaintiffs argue that because the class seeks recovery for their purchases of imports purchased in the United States, the FTAIA creates no unique defenses that could affect certification.

Defendants rely primarily on two cases, *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004), and *United Phosphorus, LTD. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001). Neither case involved imports into the United States, and in both cases the courts lacked jurisdiction over the antitrust claims because the alleged domestic antitrust injury was speculative.  In *LSL Biotechnologies*, as a result of foreign litigation between an American company and an Israeli company, the companies entered into a restrictive agreement which prohibited the Israeli company from selling certain types of as-yet undeveloped tomato seeds in North America. *Id.*  The United States filed an antitrust complaint against the American company, alleging that the exclusion of the Israeli company from the North American market excluded "one of the few firms with the experience, track record and know-how likely to develop seeds that will allow United States and other North American farmers to grow better fresh-market tomatoes for United States consumers during winter months." *LSL*

United States District Court
For the Northern District of California

*Biotechnologies*, 379 F.3d at 676.  The government also alleged that the "Restrictive Clause may also allow defendants to charge more for their seeds . . . than they otherwise would." *Id*.  The district court dismissed the claims as they related to conduct in the United States for failure to state a claim, and dismissed the claims as they related to the sale of seeds in Mexico for lack of jurisdiction.  The Ninth Circuit affirmed and held that there was no jurisdiction, since the alleged anticompetitive effects did not constitute a "direct, substantial and reasonably foreseeable effect" on domestic commerce because the government's claims were speculative: the government had not shown that the Israeli company could even produce a similar genetically modified tomato seed, let alone that their participation in the Mexican market would lower the price of tomatoes eventually imported to the United States.  *Id*. at 680-82.

Similarly, in *United Phosphorus Ltd. v. Angus Chemical Company*, 131 F. Supp. 2d 1003, 1013 (N.D. Ill. 2001), the court dismissed an action brought by foreign plaintiffs for lack of subject matter jurisdiction.  The foreign plaintiffs were prospective manufacturers of a drug (AB) used in the manufacture of tuberculosis medication (ethambutol), and they alleged Sherman Act monopolization claims against an American company that had brought a trade secret action in state court against the foreign plaintiffs to prevent its employee from disclosing technology needed to manufacture AB.  After reviewing an extensive factual record, the court dismissed the antitrust claims, finding that the foreign plaintiffs had no intent or ability to sell AB in the United States.  *Id*. at 1013.  The court also held that the foreign plaintiffs could not claim domestic injury by supposing that their exclusion from the foreign AB market had an effect on domestic sales of ethambutol, because there was no evidence of a link between alleged misconduct in the foreign AB market and the supply or price of ethambutol in the United States.  *Id*.  There was also no evidence that the foreign plaintiffs intended to make ethambutol, or that they were prevented from making a single sale of ethambutol.  *Id*.  *United Phosphorus* is both procedurally distinguishable in that it was decided upon a full factual record, and factually distinguishable in that it did not involve imports.

The Court finds that the possibility of an FTAIA defense does not bar class certification.  The applicability, if any, of the FTAIA will be resolved with common evidence of defendants' conduct.  *See Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir. 2002) (the FTAIA "clearly reveals that its

focus is not on the plaintiff's injury but on the defendant's conduct"), *abrogated on other grounds by Empagran I*, 542 U.S. 155.

**E.    Adequacy**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Defendants do not challenge the qualifications of plaintiffs' counsel, and the Court finds that the plaintiffs' counsel is qualified and able to litigate this case.

Defendants argue that proposed class representative Texas Digital Systems ("TDS") is an inadequate class representative because TDS' industrial application ("IA") panel purchases are so unusual that they preclude TDS from representing the class. Defendants' argument about the atypicality of TDS' IA panel purchases – that IA panels are generally purchased in "spot" markets and are structurally different from those panels used in PC monitors, television, cell phones, and notebook computers – is essentially a reprise of the typicality argument discussed *supra*.

Defendants also challenge TDS' adequacy because they assert that TDS was "recruited" as a class representative by David Holmes, plaintiffs' expert consultant and a former vice-president of TDS. However, the deposition testimony submitted by defendants does not support this assertion. Mr. Holmes testified that he was contacted by one of plaintiffs' counsel, Daniel Owen, in July or August of 2008 when Mr. Owen had been searching for an expert. Mr. Owen located Mr. Holmes after he came across a declaration that Mr. Holmes had provided in another TFT-LCD case. Holmes Depo. at 142:20-145:11 (Supp. Fastiff Decl. Ex. T). Mr. Holmes testified that Mr. Owen did not ask him to contact TDS, and that he provided Mr. Owen's contact information to TDS on his own behalf. *Id*. at 146:21-147:1. When

23

asked if anyone has given him anything of value for passing Mr. Owen's contact information to TDS, Mr. Holmes replied "no." *Id.* at 147:12-14.[11]

Defendants' reliance on *Bodner v. Oreck Direct LLC*, C 06-4756 MHP, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007), is unavailing.  In that case, Judge Patel denied a motion for class certification as a result of "plaintiff's undeniable and overwhelming ignorance regarding the nature of the action" and because "plaintiff's counsel constructed [the] lawsuit before it had a plaintiff." *Id.* at *3.  In *Bodner*, not only did counsel place an advertisement in a local newspaper soliciting plaintiffs for the proposed class action, but the proposed representative plaintiff never read the complaint and only first met his counsel the day before his deposition.  *Id.*  Moreover, the plaintiff's counsel had already attempted, and failed, to bring the action in another district: the case was "nothing more than [plaintiff's counsel] bringing its show to the Northern District and continuing its practice of selecting stand-in plaintiffs, even ones who are inappropriate." *Id.*  Judge Patel denied certification, finding that "the conduct in this action does not look good, does not sound good, and does not smell good. In fact, it reeks. The court will not participate in this scheme by certifying a class." *Id.*  In contrast, there is nothing in the record to suggest that TDS was "recruited" by plaintiffs through Mr. Holmes, or that there is any other impropriety connected to TDS and Mr. Holmes.  The Court finds that proposed class representatives satisfy Rule 24(a)(4)'s adequacy requirement.

## II.     Rule 23(b)(3)

Plaintiffs seek certification pursuant to Rule 23(b)(3).  "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3)).  "When common questions present a significant aspect of the case and they can be resolved for all members of

---

[11]   Defendants suggest that Mr. Holmes was paid to recruit TDS by claiming that Mr. Holmes "has received $20,000 - $30,000 for services he cannot clearly describe."  Opposition at 23:6-7. However, a review of the deposition excerpts shows that Mr. Holmes answered the questions put to him, and defendants did not ask Mr. Holmes to describe the services for which he had been paid. *See* Holmes Depo. at 164:15-165:9.

**United States District Court**
For the Northern District of California

the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotations omitted).

Defendants contend that plaintiffs cannot show that "questions of law or fact common to class members predominate over any questions affecting only individual members," as required by Rule 23(b)(3). To determine whether the predominance requirement is satisfied, the Court must identify the issues involved in the case, and determine which are subject to common proof and which are subject to individualized proof. "There are three key elements of plaintiffs' section 1 claim for which plaintiffs must establish the predominance of common issues: (1) whether there was a conspiracy to fix prices in violation of the antitrust laws; (2) the fact of plaintiffs' antitrust injury, or 'impact' of defendants' unlawful activity; and (3) the amount of damages sustained as a result of the antitrust violations." *DRAM*, 2006 WL 1530166, at *7 (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 257).

### A.   Class period

As an initial matter, defendants contend that the length of the proposed class period defeats predominance. In part, defendants' objections are addressed by the Court's certification of a shorter class period than that proposed by plaintiffs. To the extent that defendants' arguments are based on their recharacterization of plaintiffs' complaint as alleging multiple, separate conspiracies, the Court rejects those contentions for the reasons stated *supra*. Moreover, "[w]hether the proof ultimately adduced will establish the existence of a national conspiracy among the defendants is not in issue here; it is not the court's function to weigh this evidence for its truth but merely to ascertain whether it is of a type suitable for classwide use." *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. at 250.

Defendants also contend that individual issues predominate with respect to whether fraudulent concealment tolls the statute of limitations on pre-December 2002 claims. Plaintiffs allege that claims arising prior to December 13, 2002 are timely due to defendants' fraudulent concealment. A plaintiff asserting fraudulent concealment must prove that defendant "actively misled him, [and] that he had neither actual nor constructive knowledge of the facts constituting his claim for relief despite his diligence in trying to discover the pertinent facts." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249-50 (9th Cir. 1978). Defendants argue that these are fact-intensive inquiries that do not

United States District Court
For the Northern District of California

25

lend themselves to class adjudication.

While there may be some differences between class members regarding the statute of limitations and tolling, "the issue of the fact of concealment is the predominating question, . . . because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did, rather than what plaintiffs did." *In re Flat Glass*, 191 F.R.D. at 488.  As the Third Circuit has explained, "[k]ey questions will not revolve around whether Appellees knew that the prices paid were higher than they should have been or whether Appellees knew of the alleged conspiracy among Appellants.  Instead, the critical inquiry will be whether defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members in each class." *In re Linerboard Antitrust Litig.*, 305 F.3d at 163 (internal quotations and citation omitted); *see also In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 452 (D. Kan. 2006).  The Court believes that common issues will predominate the fraudulent concealment question.  To the extent there are individualized issues, they can be adjudicated in a later phase.  *See id.*; *see also In re Fine Paper Antitrust Litig.*, 82 F.R.D. at 154-55 ("[I]f the predominating elements of the question of fraudulent concealment do not prove susceptible to generalized proof," the court can bifurcate the trial into liability and damages phases).

### B.    Antitrust violation

The parties appear to agree that common issues predominate with respect to the first element of plaintiffs' section 1 claim, namely the existence of a price-fixing conspiracy.  Courts have frequently found that whether a price-fixing conspiracy exists is a common question that predominates over other issues because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members.  *See e.g.*, *DRAM*, 2006 WL 1530166, at *7; *In re Bulk (Extruded) Graphite Prod. Antitrust Litig.*, 2006 WL 891362, at *9; *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 484.  Here, plaintiffs allege that defendants conspired to raise, fix, maintain and stabilize the prices of TFT-LCD panels through group and bilateral meetings, as well as telephone and e-mail communications.  This claim requires proof common to all class members, and thus common issues predominate as to the element of antitrust violation.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

**C.      Antitrust impact**

The second element of plaintiffs' section 1 claim is antitrust impact, which is the injury that results from a violation of the antitrust laws. For this element, "[p]laintiff[s] must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anti-competitive conduct." *SRAM*, 2008 WL 4447592, at *5. However, as courts have stated,

> [D]uring the class certification stage, the court must simply determine whether plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate. The court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony. Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis.

*DRAM*, 2006 WL 1530166, at *9; *see also SRAM*, 2008 WL 4447592, at *5; *In re Bulk (Extruded) Graphite Prod. Antitrust Litig.*, 2006 WL 891362, at *14; *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996). The Ninth Circuit recently emphasized that "[a]lthough certification inquiries such as commonality, typicality and predominance might properly call for some substantive inquiry, the court may not go so far . . . as to judge the validity of these claims." *United Steel*, 593 F.3d at 808 (holding district court abused discretion in denying certification based on court's assessment of validity of plaintiffs' claims).

Plaintiffs have submitted the expert report of Dr. Kenneth Flamm, an economist and professor in International Affairs at the University of Texas at Austin. Dr. Flamm specializes in applied microeconomics, and has conducted extensive research on the economics of trade, technology and industrial competition in the computer, communications and electronics industries. Dr. Flamm has studied the TFT-LCD industry for over 15 years. Dr. Flamm was previously a Senior Fellow at the Brookings Institution doing research in these same areas. Dr. Flamm also worked as a senior official in the U.S. Department of Defense where he supervised a federal interagency task force that issued a report examining the flat panel industry.

Dr. Flamm has examined the TFT-LCD industry and market to determine if plaintiffs would

United States District Court
For the Northern District of California

have suffered impact as a result of the alleged price-fixing conspiracy.  Dr. Flamm's report[12] assumes that there was a conspiracy among TFT-LCD manufacturers as plaintiffs have alleged.  Dr. Flamm's report asserts that there are a number of characteristics that make the TFT-LCD industry highly susceptible to cartelization and price-fixing, including (1) costly manufacturing facilities that raise significant barriers against new entrants; (2) a concentrated market dominated by a small number of producers; (3) industry-wide practices of cross-licensing and partnerships between supposed competitors; (4) a boom-bust "crystal cycle" that makes demand unpredictable and supports compliance with the conspiracy; (5) an industry-wide, standardized hierarchy of product specifications that allowed defendants to agree on base prices and then easily derive prices for TFT-LCD panels with different or better features; (6) an industry-wide practice of reference pricing and most-favored-nation pricing arrangements; and (7) widely-available public information about price, capacity, production and costs.

Dr. Flamm also conducted quantitative analyses of price relationships in the TFT-LCD market, and concludes based on these analyses that plaintiffs can prove class-wide impact and damages through common evidence and  methodologies.  Dr. Flamm states that the TFT-LCD industry is characterized by a "price ladder," which means that a "price fixed increase in the minimum price for the low end of some applications and sizes of display would have induced a wave of price increases for higher quality displays and substitute displays of different sizes."  Flamm Report ¶ 47.  Dr. Flamm conducted two types of quantitative analyses – hedonic regression analysis and "matched model" price-index analyses – and concludes that prices for all TFT-LCD panels and products were highly correlated across all defendants, with prices moving together in similar amounts and at similar times during the class period. Dr. Flamm performed a hedonic regression analysis using individual sales transaction data from three defendants for monitors, televisions, notebook computers, and mobile devices.  Dr. Flamm's analysis demonstrates common price effects across products, manufacturers, and time.  *See also* Flamm Report ¶¶ 77-84; Flamm Reply Report ¶¶ 110-113 (expanded hedonic regression analysis).  For the "matched model" price index analysis, Dr. Flamm analyzed the pricing of those defendants that had not yet produced data sufficient for a hedonic price regression analysis.  Dr. Flamm found that "[d]espite the weakness [of matched model prices indexes], common instances where all defendants' prices rise and

---

[12]  Dr. Flamm has submitted several reports in connection with the class certification motion.

1    fall together are clearly discernable in all defendants' transaction data."  Flamm Report ¶ 81.

2          Dr. Flamm also concludes that there are five possible methodologies for demonstrating class-

3    wide impact as well as the amount of overcharge caused by the conspiracy (the "cost-based," "structural

4    supply and demand," "reduced form, " "before and after," and "benchmark" methods).[13]  Dr. Flamm

5    bases his analyses and conclusions on defendants' transactional data, industry data, discovery and

6    depositions in this case, the structure and market characteristics of the TFT-LCD industry, articles and

7    publicly available documents related to the industry, and defendants' economic performance over the

8    period of the alleged collusion.

9          Defendants, through their own expert Dr. Janusz Ordover, attack Dr. Flamm's analyses and

10   conclusions.  Dr. Ordover is a Professor of Economics at New York University, and former Deputy

11   Assistant Attorney General for Economic at the Antitrust Division of the DOJ.  Defendants contend that

12   the complexity and heterogeneity of the TFT-LCD market makes common proof of impact impossible.

13   To an extent, defendants' objections have been addressed by the shortened class period, the certification

14   of separate classes for purchasers of panels and purchasers of products, and the limitation of the

15   purchasers of products to purchasers of televisions, monitors, and notebook computers.  Still, even with

16   these limitations, many of defendants' objections remain because defendants essentially contend that

17   there are a virtually infinite number of distinct markets for every type of panel and type of product, and

18   corresponding different type of purchaser.  Defendants emphasize the variations among the different

19   types of panels and products (e.g., customized panels versus non-customized panels), variations among

20   customers (e.g., large volume purchasers versus small volume purchasers), variations in the industry

21   over time, and variations in the methods of purchasing TFT-LCD panels and products (e.g., spot market

22   transactions versus negotiated contract prices).  Dr. Ordover, asserts that "the heterogeneity in the TFT-

23   LCD industry means that individuated analyses are required to determine how the study [of antitrust

24   impact] should be designed for each time period, panel, finished product, or buyer, and what (if

25   anything) the results reveal about impact and damages for any particular sub-group within the putative

26

27          ──────────────
     [13]  Dr. Flamm states that he did not attempt to undertake the "before and after" or "benchmark"
     analyses given current limitations in the produced data, but that these methods "should logically be
28   available in this case."  Flamm Report ¶¶ 22, 92.

United States District Court
For the Northern District of California

class." Ordover Report ¶ 15.[14]  Dr. Ordover critiques Dr. Flamm's economic analyses, and performs his own analyses, including hedonic regression analyses, and reaches conclusions diametrically opposed to those of Dr. Flamm.

At the class certification stage, the Court's inquiry is limited to determining "whether plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate." *DRAM*, 2006 WL 1530166, at *9.  "[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact."  *In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV 1580, 2001 WL 619305, at *4 (S.D.N.Y. June 1, 2001); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002) (in certified direct purchaser class case, reversing grant of summary judgment in favor of defendants and holding that expert battle over regression variables was an issue for trial: "[t]he defendants presented a competing regression analysis done by one of their economic experts, who added a couple of variables to the analysis of the plaintiffs' expert and, presto, the [key] variable ceased to be statistically significant."[15]);  *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intern., Ltd.*, 247 F.R.D. 253, 270 (D. Mass. 2008) ("To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology.").

The Court concludes that plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis.  Dr. Flamm's report is supported by defendants' transactional data as well as industry data, and courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis. *See, e.g.*, *SRAM*, 2008 WL 4447592, at *6 (correlation analysis); *DRAM*, 2006 WL 1530166, at *9 (correlation analysis); *In re (Extruded) Bulk Graphite Prod. Antitrust Litig.*, 2006 WL 891362, at *13 (multiple regression analysis); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 149 & n.15 (S.D.N.Y. 2006) (hedonic regression analysis).  Dr. Flamm supports his analyses with evidence – disputed by defendants – that pricing in the

---

[14]  As with Dr. Flamm, Dr. Ordover has submitted a report, a reply report, and a sur-reply report.
[15]  Judge Posner might have, but did not, refer to President Truman's desire for a one handed economist.

1   industry is characterized by a "price ladder."  Defendants' challenges to plaintiffs' evidence and Dr.

2   Flamm's analyses go to the merits of plaintiffs' claims, and will be resolved by the trier of fact.  *See In*

3   *re Commercial Tissue Products*, 183 F.R.D. 589, 595 (N.D. Fla. 1998) (certifying direct purchaser class

4   and stating that "even if there is considerable individual variety in pricing because of individual price

5   negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum

6   baseline for beginning negotiations, or the range of prices which resulted from negotiation, was

7   artificially raised (or slowed in its descent) by the collusive actions of defendants.").

8       The Court also finds that the cases relied on by defendants are distinguishable.  In *In re Medical*

9   *Waste Services Antitrust Litigation*, No. 2:03MD1546 DAK, 2006 WL 538927 (D. Utah Mar. 3, 2006),

10   the "Plaintiffs instructed their expert to ignore issues of liability and causation, and thus to assume

11   impact for all their causes of action." *Id*. at *7.  Here, Dr. Flamm has specified the methods by which

12   plaintiffs can prove class-wide impact and damages using common evidence.  In *GPU*, the court held

13   that the direct purchaser plaintiffs' expert failed to use the certain regression variables necessary to show

14   common impact, such as variables relating to product attributes, and accounting for variations in type

15   of customer. *GPU*, 253 F.R.D. at 496.  Notably, the expert failed to include individual customers who

16   purchased graphics cards online even though all the representative plaintiffs were within that very small

17   percentage of customers who purchased graphics cards that way. *Id*.  Here, Dr. Flamm's analyses have

18   accounted for product variables such as application, size, resolution, and contrast ratio, and he has

19   accounted for variations in type of customer and purchasing volume.

20       Defendants also rely on Judge Hamilton's decision not to certify a class of indirect purchasers

21   in *California v. Infineon Technologies, AG*, No. C 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept.

22   5, 2008), in which Dr. Flamm was the plaintiffs' expert.  However, the relevance of *Infineon* to the

23   instant motion is limited because Judge Hamilton denied certification largely because she concluded that

24   there was an insufficient showing that overcharges paid by direct purchasers were passed through to

25   indirect purchasers. *Id*. at *10-11.  In addition, the specific methodological concerns identified by Judge

26   Hamilton are not present here.  Judge Hamilton found that Dr. Flamm's analyses in *Infineon* were

27   largely theoretical, and that he did not provide a sufficiently detailed explanation as to how he proposed

28   to apply any particular methodology to the specific facts or data of the case. *Id*. at *9 ("[W]hile

31

Appendix C contains a good explanation for a hypothetical equation applicable to the relationship between personal computers, input costs, and price, there is no indication that the information contained in Appendix C is tethered in any way to concrete data or information relevant to the actual personal computers purchased by potential members of the class in this case."). Here, in contrast, Dr. Flamm has conducted an extensive analysis of the discovery produced in this case, including defendants' transactional data and data from industry sources. Although defendants disagree with Dr. Flamm's interpretation of the data, Dr. Flamm's report in this case is "tethered to concrete data and information."

### C.      Proof of Damages

In price-fixing cases, "[p]laintiffs are not required to supply a precise damage formula at the certification stage." *SRAM*, 2008 WL 4447592, at *6. Plaintiffs need only demonstrate a proposed method for determining damages that is "not so insubstantial as to amount to no method at all." *DRAM,* 2006 WL 1530166, *10; *see also Yokoyama v. Midland Nat. Life Ins. Co.*,*Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("[D]amage calculations alone cannot defeat certification. '[T]he amount of damages is invariably an individual question and does not defeat class action treatment.'") (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)); *see also In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351.

The Court finds that plaintiffs have met their burden to show that damages can be established using common proof. Dr. Flamm has submitted a number of commonly-used methodologies, any one of which he asserts can be used to determine damages. The parties' arguments on this point are largely similar to those discussed *supra*, with defendants contending that the variability and heterogeneity in the TFT-LCD market prevents the methodologies from working on a class-wide basis. For the reasons discussed above, the Court finds that plaintiffs have met their burden and that defendants' arguments are directed to the merits of plaintiffs' claims and Dr. Flamm's analyses. However, the validity of those methods "will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996). Moreover, courts have approved these same methodologies at the class certification stage in similar cases. *See, e.g.*, *id.* at 521-22 (collecting cases); *SRAM*, 2008 WL

United States District Court
For the Northern District of California

1    4447592, at *8 (benchmark, before-and-after, and structured cost methodologies for damages); *DRAM*,

2    2006 WL 1530166, at *10 (before-and-after and benchmark methods); *In re Rubber Chem. Antitrust*

3    *Litig.*, 232 F.R.D. at 353; *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D. Pa. 2001).

4

5    **D.    Superiority**

6    Rule 23(b)(3) also requires that a class action be superior to other methods of adjudication.  "[I]f

7    common questions are found to predominate in an antitrust action, . . . courts generally have ruled that

8    the superiority prerequisite of Rule 23(b)(3) is satisfied." Wright, Miller & Kane, *Federal Practice and*

9    *Procedure: Civil Procedure* § 1781, at 254-55 (3d ed. 2004).  The *SRAM* court's analysis of this issue

10   applies here: "In antitrust cases such as this, . . . damages . . . are likely to be too small to justify

11   litigation, but a class action would offer those with small claims the opportunity for meaningful redress."

12   *SRAM*, 2008 WL 4447592, at *7.  The Court finds that a class action is superior to other available

13   methods of adjudication.

14

15   **III.    Objections**

16   Defendants' objections to Dr. Flamm's reply report have been addressed by the filing of Dr.

17   Ordover's sur-reply.

18   Defendants also object to the reply declarations of David Holmes, Yin-Hua Hsu and Fu-Chia

19   Hsu on numerous grounds, including the fact that defendants have not had the opportunity to depose

20   Yin-Hua Hsu and Fu-Chia Hsu.  The Court finds that Mr. Holmes' declaration is responsive to matters

21   raised in defendants' opposition regarding Texas Digital Systems, and DENIES defendants' motion to

22   strike that declaration. However, the Court agrees with defendants that the declarations of Yin-Hua Hsu

23   and Fu-Chia Hsu are untimely, and STRIKES those declarations on that ground.

24   Finally, defendants raise several objections to the supplemental declarations filed by the class

25   representatives.   To the extent defendants object that the named plaintiffs have not properly

26   authenticated the "inventory lists" attached to their declarations, those objections are overruled.  The

27   named plaintiffs have sufficiently provided a description of the products purchased. Similarly, the Court

28   overrules defendants' objections to Mr. Northrup's statements in the Univisions' declaration.

1    Defendants may probe the accuracy of Mr. Northrup's statements about panel purchases in discovery.

2    Defendants also object to some named plaintiffs using the terms "affiliate" and "co-conspirator" when

3    describing their purchases. While the Court agrees that from the face of the declarations there is nothing

4    to suggest that the declarants have personal knowledge about defendants' affiliations or the scope of the

5    alleged conspiracy, the declarations and/or the purchase orders sufficiently identify the proposed class

6    representatives' purchases. Lastly, defendants' objection that Home Technologies Bellevue LLC did

7    not disclose earlier that it filed for Chapter 7 bankruptcy relief on July 7, 2009 is not an evidentiary

8    objection.

9

10                                          **CONCLUSION**

11          For the foregoing reasons, plaintiffs' motion for class certification is GRANTED IN PART and

12   DENIED IN PART. (Docket Nos. 933, 939). The Court previously GRANTED defendants' request

13   to file the sur-reply report of Dr. Ordover. (Docket No. 1261). Defendants' motion to strike the

14   declarations filed with plaintiffs' reply is GRANTED in part and DENIED in part. (Docket No. 1261).

15   The Court ORDERS:

16         1.     The following Classes are certified for purposes of litigation and trial:[16]

17                All persons and entities who, between January 1, 1999 and December 31,
18                2006, directly purchased a TFT-LCD panel from any defendant or any
                  subsidiary thereof, or any named affiliate or any named co-conspirator.
19                Specifically excluded from the Class are defendants; the officers,
                  directors, or employees of any defendant; the parent companies and
20                subsidiaries of any defendant; the legal representatives and heirs or
                  assigns of any defendant; and the named affiliates and co-conspirators.
21                Also excluded are any federal, state or local governmental entities, any
                  judicial officer presiding over this action and the members of his/her
22                immediate family and judicial staff, and any juror assigned to this action.

23                All persons and entities who, between January 1, 1999 and December 31,
                  2006, directly purchased a television, computer monitor, or notebook
24                computer containing a TFT-LCD panel, from any defendant or any
                  subsidiary thereof, or any named affiliate or any named co-conspirator.
25                Specifically excluded from the Class are defendants; the officers,
                  directors, or employees of any defendant; the parent companies and
26                subsidiaries of any defendant; the legal representatives and heirs or
                  assigns of any defendant; and the named affiliates and co-conspirators.
27                Also excluded are any federal, state or local governmental entities, any

28         [16] The Court has modified the class definitions with respect to exclusions to be consistent with
     the indirect purchaser class definitions.

                                                  34

judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

2. Representative plaintiffs A.M. Photo & Imaging Center, Inc., CMP Consulting Services, Inc., Crago, Inc., Home Technologies Bellevue LLC, Nathan Muchnick, Inc., Omnis Computer Supplies, Inc., Orion Home Systems, LLC, Royal Data Services, Inc., Texas Digital Systems, Inc., Univisions-Crimson Holding, Inc., and Weber's World Company are designated and appointed as representatives for the Class on all claims asserted on behalf of the Class.

3. The following law firms are designated and appointed as Class Counsel for the direct purchaser plaintiffs: Lieff, Cabraser, Heimann & Bernstein, LLP and Pearson, Simon, Warshaw & Penny LLP.

4. As soon as practicable after the entry of this Order, all parties shall meet and confer to develop a plan for dissemination of notice to the Class.

**IT IS SO ORDERED.**

Dated: March 28, 2010

_____

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

35