**United States District Court**
For the Northern District of California

1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    IN RE: TFT-LCD (FLAT PANEL) ANTITRUST          No. M 07-1827 SI
9    LITIGATION                                      MDL. No. 1827
10   _____/       **ORDER GRANTING INDIRECT**
                                                     **PURCHASER PLAINTIFFS' MOTION**
11                                                   **FOR CLASS CERTIFICATION;**
        This Order Relates to:                       **DENYING DEFENDANTS' MOTION TO**
12                                                   **STRIKE MODIFIED CLASS**
        ALL CASES                                    **DEFINITIONS; GRANTING MOTIONS**
13                                                   **TO STRIKE UNTIMELY**
                                                     **DECLARATIONS**
14   _____/

15          Now before the Court is the indirect purchaser plaintiffs' motion for class certification,

16   defendants' motion to strike the modified class definitions and declarations filed with the reply brief,

17   and plaintiffs' objections to the declaration of Shane Gregorczyk.   For the reasons set forth below, the

18   Court GRANTS the indirect purchaser plaintiffs' motion for class certification, DENIES defendants'

19   motion to strike the modified class definition, GRANTS defendants' motion to strike the declarations

20   of Chien-Ming Kuan, Yin-Hua Hsu, and Fu-Chia Hsu as untimely, and GRANTS plaintiffs' motion to

21   strike the Gregorczyk declaration as untimely.

22

23                                    **BACKGROUND**

24   **I.      The TFT-LCD market**

25          This multidistrict litigation stems from allegations of a global price-fixing conspiracy in the

26   market for Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panels.  TFT-LCD panels are

27   used in a number of products, including but not limited to computer monitors, notebook computers, and

28

televisions. TFT-LCD panels are made by sandwiching liquid crystal compound between two pieces of glass called substrates. The resulting screen contains hundreds of thousands of electrically charged dots, called pixels, which form an image. The panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a television, computer monitor, or other product.

TFT-LCD panels are sold in a variety of sizes, and vary across a number of technical dimensions. For example, larger panels used for televisions require high contrast ratios for vibrant colors and wider viewing angles, while smaller panels used in mobile phones require small size and low weight. TFT-LCD panels have no independent utility, but have value only as components of other products. When a TFT-LCD panel is incorporated into a finished product, the panel is not modified, and remains a discrete, physical object within the finished product. TFT-LCD panels are purchased by many different types and sizes of customers through different manufacturing and distribution channels. The parties dispute the complexity of the distribution chain, with defendants contending that it is multi-layered, complex, and heterogeneous, and plaintiffs asserting that the distribution chain is relatively simple and not materially different from the distribution chains in other high-tech industries.

Between 1996 and 2006, defendants collectively dominated the market for TFT-LCD panels and products, and the top six companies (Samsung, LG, Chi Mei, AU Optronics, Sharp, and Chunghwa) currently control in excess of 80% of the TFT-LCD panel market. Indirect Purchaser Plaintiffs' Second Amended Consol. Compl. ¶ 116. During this period, the TFT-LCD industry experienced significant consolidation, including the creation of defendant AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; the creation of defendant Toshiba Matsushita in 2002; Fujitsu Ltd.'s transfer of its TFT-LCD business to defendant Sharp in 2005; and the joint venture for the production of TFT-LCD panels for televisions by Hitachi, Toshiba, and Matsushita in 2004. *Id.* ¶ 117. The TFT-LCD industry is also marked by a number of cross-licensing agreements, joint ventures, and other cooperative arrangements which plaintiffs allege facilitate collusion. *Id.* ¶¶ 111-14.

Although panel prices vary according to the finished product, the panel is usually a significant cost component in finished TFT-LCD products. Plaintiffs have submitted evidence showing that a panel can constitute 50%-80% of the price of computer monitors, 33%-70% of the price of televisions (and

more for televisions exceeding 40"), and 10%-25% of the cost of a notebook computer. Necessarily, however, the price-component of a panel in a finished product varies both by product and manufacturer. Defendants cite different estimates, asserting that TFT-LCD panels reflect approximately 35 to 40% of the finished television price, and 10 to 15% of the price for notebook computers. The complaint alleges that computer monitors now comprise approximately 50% of revenues for the "large LCD products market," with TVs and notebook computers accounting for approximately 27% and 21% of revenues, respectively. *Id.* ¶ 101.

Plaintiffs allege that during the class period, defendants formed a cartel to interfere with the normal cycle of supply and demand for TFT-LCD panels. According to plaintiffs, defendants agreed on prices, agreed to limit production, and agreed to manipulate the supply of TFT-LCD panels and products so that prices remained artificially high. Plaintiffs allege that defendants executed their price-fixing scheme by participating in surreptitious group and bilateral meetings, as well as communicating with each other by telephone and e-mail. *Id.* ¶¶ 130-48.

Plaintiffs allege that some group meetings were formalized and known as "Crystal Meetings." *Id.* ¶¶ 133-35. These meetings were attended by employees at three levels of defendants' corporations, including "CEO" or "top" meetings, attended by Chief Executive Officers and/or Presidents; "commercial" or "operation" meetings, attended by management-level personnel; and working group meetings attended by lower-level sales and marketing personnel. *Id.* ¶¶ 133-41. Plaintiffs allege that at these "Crystal Meetings," as well as in other communications, participants discussed supply and demand and general market conditions for TFT-LCD products; exchanged fabrication plant and production capacity information; reached agreements on target prices, floor prices, and price ranges for TFT-LCD panels and products; planning consistent public statements on anticipated supply and demand; and disciplined new market entrants and pressured them to abide by agreed-upon pricing and production. Plaintiffs have submitted considerable evidence in the form of detailed meeting reports, e-mails and memoranda documenting numerous meetings between various defendants at which defendants shared price information and agreed on pricing and production levels. *See e.g.*, Zahid Decl. Ex. 95-103;

**United States District Court**
For the Northern District of California

*see also* Netz Errata Decl. Ex. 23 (listing meetings in which defendants met to share plans for future

prices and supply, and to agree on prices).[1]

## II.    The Department of Justice Investigation

In about 2006, the Antitrust Division of the Department of Justice began investigating a number

of the defendants' alleged participation in a global conspiracy to fix prices of TFT-LCD panels.  The

investigation is ongoing.  To date, seven corporate defendants in this action have pled guilty to Sherman

Act violations relating to suppressing and eliminating competition by fixing the prices of TFT-LCD

panels.  Those defendants are Sharp Corporation (CR 08-802 SI); LG Display Co. Ltd. and LG Display

America, Inc. (CR 08-803 SI), Chunghwa Picture Tubes, Ltd. (CR 08-804 SI); Hitachi Displays Ltd.

(CR 09-247 SI); Epson Imaging Devices Corporation (CR 09-854 SI)[2]; and Chi Mei Optoelectronics

Corporation (CR 09-1166 SI).[3]  The DOJ has also confirmed that it has signed a conditional leniency

agreement with a company in the TFT-LCD industry; price-fixing cartel participants may qualify for

amnesty under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, P.L. 108-237

("ACPERA") by providing concrete evidence of a price-fixing agreement.  *See* Lynch Decl. ¶ 6 (Docket

No. 966).

No defendant has, as part of its criminal plea,  made or promised any restitutionary payments

to entities or individuals injured by the wrongful acts.

Four of the defendants (LG Display Co., Ltd., LG Display America, Inc., Chunghwa Picture

Tubes, Ltd., and Chi Mei Optoelectronics Corporation) pled guilty to participating in a conspiracy from

2001 to 2006 among "major TFT-LCD producers, the primary purpose of which was to fix the price of

---

[1] Plaintiffs have submitted extensive evidence in support of their allegations that defendants engaged in a price-fixing conspiracy.  This evidence has all been submitted under seal, and is found at the following: Zahid Decl. 95-103; Supp. Zahid Decl. Ex. 8-15.  This list is not intended to be exhaustive, as plaintiffs have submitted well over 100 exhibits, all under seal, in support of their motion.

[2] Epson Imaging Devices Corporation is not named as a defendant in the Indirect-Purchaser Plaintiffs' Second Consolidated Amended Complaint.  This entity is  named as a defendant in the Third Amended Direct Purchaser Plaintiffs' Consolidated Complaint.  Docket No. 1416 ¶ 21.

[3] In addition, several individual executives from LG Phillips and Chunghwa Pictures Tubes, Ltd., have pled guilty to criminal violations of the Sherman Act.  *See* CR 09-44 SI, CR 09-45 SI and CR 09-437 SI.

United States District Court
For the Northern District of California

1    certain TFT-LCD sold in the United States and elsewhere." Three of the defendants (Sharp Corporation,

2    Hitachi Displays Ltd., and Epson Imaging Devices Corporation) pled guilty to participating in price-

3    fixing conspiracies with "major TFT-LCD producers" with regard to sales of specific types of products

4    to specific entities.  For example, Sharp pled guilty to participating in a conspiracy to fix prices of TFT-

5    LCD panels sold to Dell, Inc. for use in computer monitors and laptops from April 2001 to December

6    1, 2006; participating in a conspiracy to fix prices of TFT-LCD sold to Apple Computer Inc. for use in

7    iPod portable music players from September 2005 to December 2006; and for participating in a

8    conspiracy to fix prices of TFT-LCD sold to Motorola Inc. for use in Razr mobile phones from the fall

9    of 2005 to the middle of 2006.  *See* CR 08-802 SI.

10

11   **III.    This litigation**

12         The indirect purchaser plaintiffs filed this multidistrict antitrust class action on behalf of all

13   persons and entities who indirectly purchased TFT-LCD panels (contained in TFT-LCD products)

14   manufactured, marketed, sold and/or distributed by one or more of the defendants, for the indirect

15   purchasers' end use and not for resale.  Second Amended Consol. Compl. ¶ 16.  The indirect purchaser

16   plaintiffs bought TFT-LCD products containing TFT-LCD panels either from (1) TFT-LCD panel direct

17   purchasers, such as Dell, Hewlett-Packard, and Apple, that incorporate TFT-LCD panels into final,

18   branded TFT-LCD products and sell directly to the public, or (2) retailers, such as Best Buy, Wal-Mart,

19   or Target, that acquire the TFT-LCD products from TFT-LCD panel direct purchasers or distributors.

20   Defendants argue that there can be many intermediaries between defendants and the final indirect

21   purchasers, including *inter alia*, Original Equipment Manufacturers ("OEMs"), Original Design

22   Manufacturers ("ODMs"), system integrators, contract manufacturers, electronic parts distributors,

23   resellers, and retailers.  Defendants argue that each intermediary may add value by, among other things,

24   combining a TFT-LCD panel with other components to make a finished product.

25         The indirect purchaser plaintiffs allege a "long-running conspiracy extending from at least

26   January 1, 1996 through at least December 11, 2006, at a minimum, among defendants and their co-

27   conspirators, the purpose and effect of which was to fix, raise, stabilize, and maintain prices for LCD

28   panels sold indirectly to Plaintiffs and the members of the other indirect-purchaser classes defined

below." *Id*. ¶ 1. The indirect purchaser plaintiffs seek equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, based on alleged violations of Section 1of the Sherman Act, 15 U.S.C. § 1, as well as restitution, disgorgement, and damages under the antitrust, consumer protection, and unfair competition laws of 23 states.[4]

The indirect purchaser plaintiffs seek certification of the following classes:

(1)  A nationwide class for injunctive relief under Rule 23(b)(2):

All persons and entities residing in the United States as of the date notice is first published, who indirectly purchased in the United States between January 1, 1999 and the present, LCD panels incorporated in televisions, monitors and/or laptop computers, from one or more of the named Defendants, for their own use and not for resale. Specifically excluded from this Class are the named Defendants; the officers, directors, or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and members of their immediate families and judicial staffs, and any juror assigned to this action.

(2)  Separate indirect-purchaser state-wide classes for equitable relief (restitution and disgorgement) under Rule 23(b)(2) and damages under Rule 23(b)(3), in accordance with the laws of 23 states, with the following definitions:

All persons and entities in [Indirect Purchaser State] who, from January 1, 1999 to December 31, 2006, as residents of [Indirect Purchaser State], purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in [Indirect Purchaser State] indirectly from one or more of the named Defendants for their own use and not for resale. Specifically excluded from this Class are the named Defendants; the officers, directors, or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and members of their immediate families and judicial staffs, and any juror assigned to this action.

In the course of briefing the class certification motion, the indirect plaintiffs modified the class definition in two ways to address standing objections raised by defendants: (1) the end of the class period was extended from December 11, 2006 to December 31, 2006 to account for two indirect purchaser plaintiffs who purchased TFT-LCD products between December 12, 2006 and December 31, 2006, and (2) the class definition was modified from "all entities and persons residing in [the indirect

---

[4]  The "indirect purchaser states" are Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

purchaser state] as of the date notice is published . . ." to "all entities and persons who, [during class period], as residents of [indirect purchaser state], purchased . . ." to account for plaintiffs who purchased LCD products in an indirect purchaser state during the class period but who have since moved out of the indirect purchaser state.

Defendants have moved to strike the proposed modifications to the class definitions on the ground that plaintiffs should be required to seek leave of Court and/or the consent of defendants in order to modify the class definition. Defendants rely on this Court's decision in *Jordan v. Paul Financial LLC*, No. C 09-4496 SI, 2009 WL 192888 (N.D. Cal. Jan. 27, 2009), in which the Court denied the plaintiff's request, made at the class certification hearing, to withdraw the pending class certification motion in order to substantively redefine the class and conduct additional discovery. However, *Jordan* is distinguishable in that there the proposed redefinition of the class was significant, and would have required additional discovery. Here, the proposed modifications are minor, require no additional discovery, and cause no prejudice to defendants. The Court DENIES defendants' motion to strike the modified class definitions.

## LEGAL STANDARD

Plaintiffs bear the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended*, 273 F.3d 1266 (9th Cir. 2001). A district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The court must also find that one of the requirements of Rule 23(b) has been satisfied. Plaintiffs contend the class should be certified pursuant to Rule 23(b)(3), which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

United States District Court
For the Northern District of California

7

The Ninth Circuit has recently reaffirmed the principle that "'[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met' and 'nothing in either the language or history of Rule 23 . . . gives the court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhilips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-79 (1974)); *see also Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003). "Although certification inquiries such as commonality, typicality, and predominance might properly call for some substantive inquiry, the court may not go so far as to judge the validity of these claims." *United Steel*, 593 F.3d at 808 (internal quotations omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). However, although the Court may not require preliminary proof of the claim, it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements. Courts may also consider the legal and factual issues presented by plaintiff's complaint." 2 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, 7.26 (4th ed. 2005). Sufficient information must be provided to form a reasonable and informed judgment on each of the requirements of Rule 23. *See Blackie*, 524 F.2d at 901 n.17. In order to safeguard due process interests and the judicial process, the Court conducts an analysis that is as rigorous as necessary to determine whether class certification is appropriate. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005); *see also Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

The Supreme Court has long recognized that class actions play an important role in antitrust enforcement. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262, 266 (1972). "Accordingly, when courts are in doubt as to whether certification is warranted, courts tend to favor class certification." *In re Static Random Access (SRAM) Antitrust Litig.*, C 07-1819 CW, 2008 WL 4447592, at *2 (Sept. 29, 2008) ("*SRAM*") (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 258 (D.D.C. 2002), and *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 238 (E.D.N.Y. 1998)). "Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law

1   where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified

2   consumers." *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (internal

3   quotations and citation omitted).

4

5                                    **DISCUSSION**

6   **I.       Rule 23(a)**

7            **A.       Ascertainability**

8            Defendants contend that the proposed classes are not ascertainable because the classes include

9   indirect purchasers who bought TFT-LCD products incorporating panels manufactured by "one or more

10  of the named Defendants."  Defendants assert that in most instances, the parties will not be able to

11  determine whether a particular TFT-LCD product contains a panel manufactured by a defendant, as

12  opposed to a third-party manufacturer.  Defendants argue that "there is no way to determine who

13  manufactured the panel contained in a finished product by looking at the product, and defendants are

14  not aware of any sources of information available to end users that consistently identify the

15  manufacturer of the LCD panel contained in a finished product."  Opposition at 51:17-52:2.

16           A class definition is sufficient if the description of the class is "definite enough so that it is

17  administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v.*

18  *Boeing North American Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  "The identity of class members

19  must be ascertainable by reference to objective criteria." 5 James W. Moore, *Moore's Federal Practice*,

20  § 23.21[1].

21           The Court finds that the class definition is objective and ascertainable.  Class members must live

22  in one of the listed states, must have made a purchase during the class period, the purchase must have

23  been for the class member's own use and not resale, and the product must contain a TFT-LCD panel

24  made by one of the defendants.  These are objective criteria.  Whether a class member purchased a

25  product containing an TFT-LCD panel made by a defendant can be determined by the model number

26  or serial number of the product.  Plaintiffs have submitted evidence showing that typically this

27  determination can be made based on the model number alone because most models contain panels made

28  by a single manufacturer.  For those few models using different panels from different manufacturers,

the model number will determine class membership unless the model used panels made by defendants and non-defendants. Plaintiffs have submitted evidence showing that during the class period, defendants made 89.7% to 96.3% of the panels used in televisions, computer monitors, and notebook computers, *see* Netz Rebuttal Report at 88 n. 356, and thus the universe of products containing non-defendant panels is very small. Further, plaintiffs state that they will obtain information from the OEMs identifying models using LCD panels made by non-defendants and the serial numbers of units with panels made by non-defendants for the rare models that used panels from both defendants and non-defendants.

The fact that class members will be required to submit some information in order to determine whether they are members of the class does not render the class definition unascertainable. Courts have rejected arguments similar to those advanced by defendants. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, __ F.R.D. __, 2009 WL 4263524, at *4 (N.D. Cal. Nov. 25, 2009) ("*SRAM*") ("Plaintiffs will be able to identify all products that contain Defendants' SRAM by analyzing Defendants' documents, testimony from Defendants' personnel, third party transactional data, third party discovery responses that state whether their products contain SRAM, [Bill of Materials] from OEMs and contract manufacturers, and publicly available information."); *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003) (fact that class membership could be determined through "slow and burdensome" manual review of files did not defeat ascertainability); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996) (certifying antitrust class of "investors who transacted through non-Defendant owned brokers where those brokers did not function as a distinct economic entity in the chain of purchase or sale" and stating that this determination would require evidentiary submissions).

**B.     Numerosity**

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs assert there are thousands of class members in each of the state-wide classes and hundreds of thousands of nationwide class members who purchased TFT-LCD products during the class period. Given the nature of the TFT-LCD market and the international

10

scope of the alleged conspiracy, common sense dictates that joinder would be impracticable. Defendants do not contest numerosity, and the Court finds that this requirement is met.

### C.    Commonality

For a proposed class to be certified, Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2)  "Where an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'"  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("*DRAM*") (citing *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351).  Plaintiffs assert that questions of law and fact common to the class include (1) whether defendants shared confidential pricing and production information regarding TFT-LCD panels; (2) whether defendants through meetings and communications reached agreements on pricing and production of TFT-LCD panels; (3) whether defendants developed and implemented measures to monitor each member's compliance with their unlawful agreements; (4) whether defendants' agreements resulted in an unlawful overcharge on the price of TFT-LCD panels; (5) whether the unlawful overcharge on the price of TFT-LCD panels was passed-through to the indirect purchasers of TFT-LCD products; (6) whether the overcharge to indirect purchasers can be calculated using a common, formulaic method; and (7) whether there is an ongoing threat of injury to the members of the class as a result of defendants' unlawful conduct.  Defendants do not dispute that there are some common issues of law and fact, and instead contend that plaintiffs cannot demonstrate the Rule 23(b)(3) requirement that common issues predominate over individualized questions.  The Court finds that plaintiffs have established commonality, and addresses the issue of predominance *infra*.

### D.    Typicality

The typicality requirement of Rule 23(a)(3) is fulfilled when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Generally, the class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156.  Questions of class typicality focus on

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

"The typicality requirement does not mandate that the products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 261 (D.D.C. 2002). Instead, "[t]he overarching scheme is the linchpin of plaintiffs'. . . complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999).

Defendants challenge the typicality of named plaintiffs Kou Srimoungchanh, William Fisher, Judy Griffith, Chad Hansen, Gladys Baker, Ling-Hung Jou, and Jai Paguirigan. To the extent defendants contend that certain plaintiffs (Judy Griffith and Chad Hansen) lack typicality because their purchases occurred between December 12, 2006 and December 31, 2006, or that other plaintiffs (Gladys Baker, Ling-Hung Jou, and Jai Paguirigan) do not fulfill the residency requirement of the class definition, those arguments have been addressed *supra* in connection with the modified class definition.[5]

Defendants challenge Mr. Srimoungchanh on the ground that he did not personally purchase the product on which he bases his claim, but rather the product was purchased by First Secure Data, which defendants assert is a limited liability corporation owned by Mr. Srimoungchanh. However, plaintiffs have submitted the deposition testimony of Mr. Srimoungchanh, in which he states that First Secure

---

[5] Plaintiffs concede that Mr. Fisher lacks standing because his February 10, 2007 purchase is outside the redefined class period. Mr. Fisher is a resident of North Carolina. Second Amd. Consol. Compl. ¶ 45. There is an additional named plaintiff from North Carolina, Donna Jeanne Flanagan, whose adequacy and typicality defendants do not challenge.

Data is a sole proprietorship, and thus he owns the TFT-LCD products purchased by First Secure Data. *See* Srimoungchanh Depo. at 74:20-25 (Supp. Zahid Decl., Ex. 53). Accordingly, defendants' objection to Mr. Srimoungchanh's standing lacks merit.

Defendants contend that Gladys Baker is not typical because she purchased a Dell monitor containing a panel manufactured by Quanta Display, a non-defendant. Quanta was an independent company until defendant AU Optronics acquired it in late 2006. Plaintiffs contend that Quanta Display is a co-conspirator, and they cite to documents showing that Quanta attended multiple group and bilateral meetings with defendants. Although plaintiffs are correct that case law holds that a conspirator is jointly liable for everything done during the period of the conspiracy's existence, the proposed class definition does not encompass purchases from co-conspirators, named or unnamed. Plaintiffs request permission to revise the class definition to include "LCD panels incorporated in televisions, monitors, and/or notebook computers, from one or more named Defendants and Quanta Display, Inc." Plaintiffs also argue that Ms. Baker's purchase is a qualifying purchase because as the surviving company, AU Optronics assumed all rights and obligations of Quanta, including Quanta's liability for illegal overcharges. The Court finds that Ms. Baker's purchase does not render her atypical in light of the allegations that Quanta participated the alleged price-fixing conspiracy and AU Optronics' acquisition of Quanta. The Court also finds it appropriate to amend the class definition as proposed by plaintiffs.

### E. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. The Ninth Circuit "does not favor denial of class certification on the basis of speculative conflicts." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003).

Defendants do not challenge the qualifications of plaintiffs' counsel, and the Court finds that the plaintiffs' counsel is qualified and able to litigate this case.

Defendants challenge the adequacy of plaintiffs Christopher Murphy, Martha Mulvey, Ben

13

Northway, and Robert Watson on the ground that these plaintiffs' business and family relationships with counsel compromise their ability to represent the class. Mr. Murphy and Ms. Mulvey are represented by family members, Mr. Northway is employed by his counsel, and Mr. Watson's counsel is a customer of Mr. Watson's landscaping business. However, "[a]s the courts routinely observe, a named plaintiff will not be disqualified simply because of a close or familial relationship with one of the attorneys representing the class." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 337 (E.D. Mich. 2001); *see also Lewis v. Goldsmith*, 95 F.R.D. 15, 20 (D.N.J. 1982) (observing that "it would seem a bit anomalous that an individual whose uncle has developed a reputation as a competent securities lawyer should be prohibited from turning to his uncle for assistance if he has a legitimate claim"). "Rather, there must be some evidence that the relationship at issue is likely to create a conflict of interest or otherwise compromise the ability to vigorously prosecute the action on behalf of the class. The concern is that the financial interests of the class representative may conflict with those of the class; *e.g.*, he may seek a settlement that is not good for the class as a whole." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 337.

Here, defendants have not shown how any of these relationships have created a conflict. Plaintiffs assert that none of these plaintiffs or their counsel have any strategic or settlement authority, as none of the four challenged class representatives have any relationship with lead counsel in this case. The mere fact of the plaintiffs' familial and business relationships does not create a *per se* presumption of impropriety or conflict. In addition, there are over 30 other named plaintiffs, each represented by their own individual counsel. On this record, the Court finds that the named plaintiffs are adequate representatives, and the asserted conflicts are merely speculative.

Finally, defendants challenge certain plaintiffs' level of participation and knowledge about this litigation. For example, defendants state that Ms. Baker and Mr. Paguirigan could not recall whether they had read the initial complaints before they were filed, and they argue that Ms. Mulvey is inadequate because she could not define terms such as "class action," "class representative," or "overcharge." "While class representatives must be familiar with the basics of, and understand the gravamen of, their claims, it is not necessary that they be intimately familiar with every factual and legal issue in the case." *SRAM*, 2009 WL 4263524, at *6 (internal quotations and citation omitted). Here, the plaintiffs have

searched for products and documents, provided answers to written discovery, given deposition testimony, and followed the progress of this litigation through communication with counsel, and have demonstrated their ability to serve as class representatives. *See* Supp. Zahid Decl. Ex. 55-58. The Court is satisfied that these plaintiffs can serve as adequate class representatives.

## II. Rule 23(b)(2)

### A. Nationwide injunctive relief class

Plaintiffs seek certification of the following nationwide class for injunctive relief under Rule 23(b)(2):

> All persons and entities residing in the United States as of the date notice is first published, who indirectly purchased in the United States between January 1, 1999 and the present, LCD panels incorporated in televisions, monitors and/or laptop computers, from one of more of the named Defendants, for their own use and not for resale. Specifically excluded from this Class are the named Defendants; the officers, directors, or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and members of their immediate families and judicial staffs, and any juror assigned to this action.

Plaintiffs "seek to enjoin Defendants' collusive practices and policies that violate Section 1 of the Sherman Act (15 U.S.C. § 1), and operate to artificially inflate LCD panel prices in the U.S." Motion at 13:14-17. "[I]ndirect purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers." *Lucas Auto. Eng'g Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998).

Rule 23(b)(2) provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief if appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs argue that certification of a nationwide class under Rule 23(b)(2) is appropriate because defendants' collusive conduct was market-wide and not specific to individual customers. "It is possible to certify the injunctive aspects of the suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damages aspects." *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898

(7th Cir. 1999); *see also SRAM*, 2009 WL 4263524, at *6-7 (certifying nationwide injunctive relief class under Rule 23(b)(2) and 27 statewide classes for monetary relief, including disgorgement, under Rule 23(b)(3)).

Defendants contend that plaintiffs lack standing to obtain injunctive relief because they do not, and cannot, allege a threat of future injury from the alleged conspiracy. Defendants argue that plaintiffs have not shown an "imminent threat of irreparable injury" because the "plaintiffs, their expert, and the government agree that there has been no anticompetitive conduct since 2006." Opposition at 55:2-3. Defendants note that the complaint does not contain substantive allegations of anticompetitive conduct after December 2006, and that plaintiff's expert, Dr. Netz uses the time period of 2007 to the present as a "competitive period" for the purpose of her "before and after" price regression. Defendants also emphasize that none of the criminal plea agreements on which plaintiffs rely mentions anticompetitive conduct occurring after 2006. Finally, defendants argue that it is particularly improbable that any anticompetitive conduct continued after the government's antitrust investigation became public in December 2006.

The Court finds that at this stage of the litigation, the indirect purchaser plaintiffs have alleged facts sufficient to establish standing to seek injunctive relief. Contrary to defendants' assertions, plaintiffs need not show an "imminent threat of irreparable injury," to be entitled to injunctive relief under the Sherman Act. Section 16 of the Clayton Act provides, "Any person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . under the same conditions and principles . . . [usually employed by] courts of equity." 15 U.S.C. § 26; *see also Lucas Auto. Eng'g*, 140 F.3d at 1235 ("[A]n antitrust plaintiff seeking injunctive relief need only show a threatened injury, not an actual one.").

Plaintiffs have alleged a multi-company cartel that operates in a market with high barriers to entry, and that engaged in frequent clandestine meetings and employed sophisticated monitoring devices to ensure compliance. The complaint alleges that beginning in 1996 and continuing through the filing of the second amended complaint, defendants and their co-conspirators entered into a "continuing agreement, understanding and conspiracy in restraint of trade artificially to fix, raise, stability and peg prices for LCD panels and LCD products in the United States, in violation of Section 1 of the Sherman

Act (15 U.S.C. § 1)." Second Amended Consol. Compl. ¶ 251. Plaintiffs assert that they will be able to show at trial that defendants could very quickly resume their unlawful pricing activities, even on short notice.

Courts have found similar allegations sufficient to establish standing for a nationwide class seeking injunctive relief. In *SRAM*, the plaintiffs sought to certify a nationwide injunctive class from November 1, 1996 through December 31, 2006. The defendants contended that the plaintiffs had impliedly alleged that the conspiracy ended in 2006, and thus that the plaintiffs lacked standing to seek injunctive relief. Judge Wilken rejected that argument and certified a nationwide injunctive class:

> IP Plaintiffs allege that the same market conditions that facilitated the conspiracy from 1996 to 2006 continue today. They allege that Defendants' price-fixing resulted from a systematic, repeated pattern of sharing sensitive competitive information which was greatly facilitated by the cross-competitor business relationships that still exist. Thus, there is alleged a significant risk that the conspiracy will persist or reform in the future.

*SRAM*, 2009 WL 4263524, at *7; *cf. In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) (class did not have standing for injunctive relief where the record showed that the "'perfect storm' that allegedly precipitated massive arbitrage opportunities for selling Canadian cars in the United States ceased long ago.").

Neither the fact that plaintiffs' expert assumed that the conspiracy ended in 2006 for the purpose of her regression analysis, nor the fact that the time periods covered by the criminal pleas do not extend past 2006 means that plaintiffs do not have standing to seek injunctive relief. As plaintiffs' expert explained in her report, she chose 2007 to the present as the "after" period for her "before and after" analysis on the assumption that defendants' price-fixing ended after the DOJ announced its criminal investigation. She did not determine the "after" period based on any affirmative evidence of the absence of a price-fixing conspiracy during that time period. Similarly, the fact that various defendants have pled guilty to Sherman Act violations into 2006 does not obviate the threat that a conspiracy will persist or resume in the future.

Accordingly, the Court certifies a nationwide injunctive class under Rule 23(b)(2).

**B.    Statewide classes for equitable restitutionary claims**

Plaintiffs also seek certification under Rule 23(b)(2) of 23 statewide classes for equitable relief,

17

namely disgorgement and restitution under state law.  Plaintiffs assert, without citation to authority, that because these remedies are equitable, certification is appropriate under Rule 23(b)(2).  "The distinction made in Rule 23(b)(2), however, is not one between equitable remedies and compensatory damages; rather, it is between "final injunctive relief or corresponding declaratory relief with respect to the class as a whole" and all other forms of relief.  Therefore, Plaintiffs' claim for restitution must be merely incidental to the claim for injunctive or declaratory relief." *In re Paxil Litig.*, 218 F.R.D. 242, 247 (C.D. Cal. 2003) (denying certification under Rule 23(b)(2) where restitution was predominant relief sought) (internal citation omitted); *see also In re School Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986) (upholding district court denial of certification under Rule 23(b)(2) when class sought restitution).

Here, the Rule 23(b)(2) statewide classes would be seeking solely disgorgement and restitution, and not injunctive or declaratory relief.  Thus, certification under Rule 23(b)(2) is inappropriate.  Rather, plaintiffs' claims for disgorgement and restitution are properly considered claims for monetary relief, and thus the Court will consider certification of these claims under Rule 23(b)(3).

### III.    Rule 23(b)(3)

Plaintiffs seek certification of 23 statewide classes for money damages pursuant to Rule 23(b)(3).  "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3)).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotations omitted).

Defendants contend that plaintiffs cannot show that "questions of law or fact common to class members predominate over any questions affecting only individual members," as required by Rule 23(b)(3).  Specifically, defendants contend that individual issues predominate because (1) some if not all class members are subject to a jurisdictional defense under the Foreign Trade Antitrust Improvements

18

Act; (2) plaintiffs cannot show antitrust impact on a class-wide basis due to complex distribution channels, wide variations in purchasers' market power and negotiation abilities, changes in the TFT-LCD market over time, variation in panel specifications, and the value added to TFT-LCD products as they move through the supply chain; and (3) the evidence and criminal pleas show that there were multiple separate conspiracies, not a single overarching conspiracy.

### A.    Subject matter jurisdiction/FTAIA

Defendants contend that the Court lacks subject matter jurisdiction over most, if not all, of the indirect purchaser plaintiffs' claims because the alleged anticompetitive conduct occurred overseas.  The Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), amends the Sherman Act and "excludes from [its] reach much anti-competitive conduct that causes only foreign injury."  *F. Hoffman-LaRoche, Ltd. v. Empagran (Empagran I)*, 542 U.S. 155, 158 (2004).  The FTAIA establishes a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations."  15 U.S.C. § 6a.  The FTAIA then "provides an exception to this general rule, making the Sherman Act applicable if foreign conduct '(1) has a direct, substantial, and reasonably foreseeable effect on domestic commerce, and (2) such effect gives rise to a [Sherman Act] claim.'"  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (quoting *Empagran I* and 15 U.S.C. § 6a).  This exception is known as the "domestic injury exception" of the FTAIA.  *Id.*  The Supreme Court has explained that the FTAIA,

> initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach.  It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Empagran I*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a, emphasis in original).

Defendants argue that the indirect purchaser plaintiffs fall into two groups, those who allegedly bought (1) foreign-panel products (finished products incorporating panels where the panels were initially sold by defendants overseas); and (2) domestic-panel products (finished products incorporating panels where the panels were initially sold directly into the United States).  Defendants argue that those

19

United States District Court

For the Northern District of California

who purchased "foreign-panel products" account for the vast majority of the indirect purchaser class, and that those class members' claims are barred by the FTAIA because the alleged antitrust injury occurred overseas and is too attenuated from the ultimate sale in the United States to have a "direct, substantial and reasonably foreseeable effect" on American commerce.  In contrast, defendants argue, the FTAIA would not apply to claims based on domestic-panel products because there the defendant's conduct involved import commerce, *i.e.*, a defendant shipped the panel directly into the United States from abroad, or domestic commerce, *i.e.*, a defendant's U.S. subsidiary shipped the panel to a U.S. customer.  Defendants argue that individual issues of fact and law predominate over common ones with respect to the applicability of the FTAIA because plaintiffs have not offered a class-wide means for sorting the purported class members into foreign-panel product purchasers and domestic-panel product purchasers.

Plaintiffs respond that the applicability, if any, of the FTAIA will be resolved with common evidence of defendants' conduct, and that defendants never explain *why* application of the FTAIA to the claims of the indirect purchaser class would involve individualized questions of fact or law. Plaintiffs note that defendants' own chart purportedly listing the percentage of panels sold from 2001-2006 shows that almost all of the class members' purchases of LCD products would be subject to the threatened FTAIA defense.  Thus, plaintiffs argue, even accepting defendants' argument that the FTAIA bars claims by purchasers of foreign-panel products, the applicability of the FTAIA can be decided for all such class members.  *See Kruman v. Christie's Int'l*, 284 F.3d 384, 398 (2d Cir. 2002), *abrogated on other grounds by Empagran I*, 542 U.S. 155, (the FTAIA "clearly reveals that its focus is not on the plaintiff's injury but on the defendant's conduct").  Plaintiffs also argue that defendants' FTAIA defense lacks merit.  Plaintiffs argue that the plain language of the FTAIA states that the Sherman Act does not apply to "conduct involving trade or commerce *(other than import trade or import commerce)* with foreign nations . . . .", and that here all of the defendants shipped some panels directly to the United States.  Further, plaintiffs argue that even if the claims in the indirect purchaser classes were found to be subject to the FTAIA's "domestic effects" test, this case would meet that standard.

The Court concludes that the FTAIA defense can be resolved on a class basis, and thus the possibility of this defense does not provide a basis for denying certification.  Courts have emphasized

United States District Court

For the Northern District of California

that the FTAIA analysis focuses on the defendants' conduct. *See Kruman*, 284 F.3d at 398; *see also Carpet Group Int'l Oriental Rug Importers Ass'n Inc.*, 227 F.3d 62, 71 (3d Cir. 2000). The Court will be required to determine whether defendants import goods, whether defendants' conduct is "foreign" and outside the scope of the Sherman Act, and, if foreign conduct is involved, whether that foreign conduct sufficiently affects domestic commerce: these questions that can be decided on a class-wide basis.

The cases cited by defendants do not address the FTAIA in the context of class certification, and are also factually distinguishable. For example, in *United Phosphorus Ltd. v. Angus Chemical Company*, 131 F. Supp. 2d 1003, 1013 (N.D. Ill. 2001), the court dismissed an action brought by foreign plaintiffs for lack of subject matter jurisdiction. The foreign plaintiffs were prospective manufacturers of a drug (AB) used in the manufacture of tuberculosis medication (ethambutol), and they alleged Sherman Act monopolization claims against an American company that had brought a trade secret action in state court against the foreign plaintiffs to prevent its employee from disclosing technology needed to manufacture AB. After reviewing an extensive factual record, the court dismissed the antitrust claims, finding that the foreign plaintiffs had no intent or ability to sell AB in the United States. *Id.* at 1013. The court also held that the foreign plaintiffs could not claim domestic injury by supposing that their exclusion from the foreign AB market had an effect on domestic sales of ethambutol because there was no evidence of a link between alleged misconduct in the foreign AB market and the supply or price of ethambutol in the United States. *Id.* There was also no evidence that the foreign plaintiffs intended to make ethambutol, or that they were prevented from making a single sale of ethambutol. *Id. United Phosphorus* is distinguishable in that it was decided upon a full factual record, did not involve imports, and the court found no effect in the domestic market. Here, merits discovery is underway, imports are at issue, and plaintiffs have alleged an anticompetitive effect in the United States.

The other cases cited by defendants are similarly inapposite. *See In re DRAM*, 546 F.3d at 988-89 (affirming dismissal of complaint by foreign consumer that made its purchases entirely outside of the United States and that alleged that super-competitive prices in the United States may have affected prices in foreign markets where plaintiff purchased); *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 559 (D. Del. 2006) (dismissing AMD's claims based on AMD's lost sales of

21

German-made microprocessors to foreign customers); *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 456-57 (D. Del. 2007) (dismissing class plaintiffs' claims to the extent they were derivative of AMD's dismissed foreign-based claims); *Papst Motoren GMBH v. Kanematsu-Goshu (U.S.A.), Inc.*, 629 F. Supp. 864, 869 (S.D.N.Y. 1986) (dismissing Section 2 claim by Japanese corporation where all lost sales occurred in Japan).[6]

### B.        Antitrust impact

To determine whether the predominance requirement is satisfied, the Court must identify the issues involved in the case, and determine which are subject to common proof and which are subject to individualized proof.  "Liability in an antitrust case is based on: (1) whether there was a conspiracy to fix prices in violation of the antitrust laws; (2) whether the plaintiffs sustained an antitrust injury, or the 'impact' of the defendants' unlawful activity; and (3) the amount of damages sustained as the result of the antitrust violations." *SRAM*, 2009 WL 4263524, at *7.  Defendants primarily challenge the second element of plaintiffs' antitrust claim, and they contend that plaintiffs have failed to demonstrate that common proof can be used to establish class-wide impact.

As the *DRAM* court stated,

> [D]uring the class certification stage, the court must simply determine whether plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate.  The court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony. Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis.

*DRAM*, 2006 WL 1530166, at *9; *see also SRAM*, 2009 WL 4263524, at *8; *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, No. Civ. 02-6030 (WHW), 2006 WL 891362, at *14 (D.N.J. Apr. 4, 2006); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996).  The Ninth Circuit recently emphasized that "[a]lthough certification inquiries such as commonality, typicality and predominance might properly call for some substantive inquiry, the court may not go so far . . . as to

---

[6]  The parties also dispute whether the FTAIA must be interpreted consistently with state law such that state law could not reach conduct that is barred by the FTAIA.  These legal questions can be decided after, or in conjunction with, determinations about the applicability of the FTAIA to plaintiffs' claims.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

judge the validity of these claims." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhilips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (holding district court abused discretion in denying certification based on court's assessment of validity of plaintiffs' claims).

Plaintiffs argue that they are entitled to a presumption of class-wide antitrust impact with regard to three of the proposed state classes: California, Minnesota and Florida. As a threshold matter, the parties dispute whether the inference of impact is procedural or substantive. "Rules governing presumptions and burdens of proof are generally regarded as substantive for purposes of *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)." *Johnston v. Pierce Packing Co.*, 550 F.2d 474, 476 n.1 (9th Cir. 1977). Defendants do not cite any authority holding that the existence of a presumption of antitrust impact is a matter of procedural law, and indeed a number of courts have held that such a presumption is substantive. *See SRAM*, 2009 WL 4263524, at *9 n.5.; *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 235 F.R.D. 127, 133 (D. Me. 2006), *rev'd on other grounds*, 522 F.3d 6 (1st Cir. 2008); *see also Computer Econ., Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 990 (S.D. Cal. 1999) ("State rules that define the elements of a cause of action, affirmative defenses, presumptions, burdens of proof, and rules that create or preclude liability are so obviously substantive that their application in diversity actions is required.").

"California courts routinely recognize a presumption of class-wide impact for indirect purchaser antitrust price-fixing claims." *SRAM*, 2009 WL 4263524, at *8. "[W]hen a conspiracy to fix prices has been proven and plaintiffs have established they purchased the price-fixed goods or services, the jury can infer plaintiffs were damaged." *B.W.I. Custom Kitchen v. Owens-Illinois Inc.*, 191 Cal. App. 3d 1341, 1351 (1987); *see also In re Cipro Cases I and II*, 121 Cal. App. 4th 402, 413 (2004) ("Petitioners assert that the trial court erred in finding that injury to the class may be assumed when a horizontal market-wide restraint of trade is alleged. However, this is ordinarily a permissible assumption in cases where consumers have purchased products in an anticompetitive market, even if some consumers did not actually have to pay the overcharge because of their individual circumstances.").

However, regardless of whether certain state laws permit an inference of antitrust impact, plaintiffs still have the burden of demonstrating that "there is a reasonable method for determining on

23

a class-wide basis whether and to what extent that overcharge was passed on to each of the [indirect purchasers] at all levels of the distribution chain." *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001) ("*Methionine I*").

In support of their argument that antitrust impact can be proven on a class-wide basis, plaintiffs have submitted the expert report of economist Dr. Janet S. Netz.  Dr. Netz has examined the TFT-LCD industry and market to determine if the indirect purchaser plaintiffs would have suffered impact as a result of the alleged price-fixing conspiracy.  Dr. Netz assumes that there was a conspiracy among TFT-LCD manufacturers as plaintiffs have alleged, and her report asserts that there are a number of characteristics that make the TFT-LCD industry highly susceptible to cartelization and price-fixing, including (1) the lack of an alternative source of supply of TFT-LCD panels and the lack of an alternative technology; (2) the existence of barriers to entry; (3) regular meetings and interactions that allowed defendants to exchange information, come to agreements, and police cheating; and (4) difficulty in cheating due to the use of most-favored customer clauses.  Netz Errata Decl. at 3.  Dr. Netz's report examines the price targets set by the cartel and actual market prices, and finds that these prices match well.  Based on these analyses, Dr. Netz concludes that the cartel was successful in increasing prices. *Id.* at 33-60.

Next, Dr. Netz considered the commonality of the impact on direct purchasers. *Id.* at 61-70.  Dr. Netz examined the pricing strategies used by defendants, including the use of most-favored customer clauses, the centralization of pricing decisions, and price negotiations starting from a common basis. Dr. Netz also analyzed the prices for TFT-LCD panels to determine whether the prices are related by market forces, and concludes that there is a common pricing structure for TFT-LCD panel prices. *Id.* at 67-71.  In reaching this conclusion, she examined the correlation between panel prices, and found that 76% of panel price correlations (approximately 50,000 of 66,000 correlations) are positive and statistically significant. *Id.* at 70 & Ex. 32, 33.  Dr. Netz then used regression analysis to examine the determinants of panel prices, and found that 77% of price variation is determined by five variables that describe the panel characteristics (panel size, resolution, volume, application, and time-period). *Id.* at 68 & Ex. 30; Netz Rebuttal Decl. at 31-35.  Based on these analyses, Dr. Netz concludes that most of the variation in transaction prices is driven by common factors rather than individual ones, and that these

**United States District Court**
For the Northern District of California

1    common influences on price are susceptible to being estimated using a formula.

2         Finally, Dr. Netz considered whether the higher price imposed on direct purchasers translates

3    into higher prices – the pass-through – to indirect purchasers. Dr. Netz discusses the economic theory

4    of pass-through, and states that it is the shape of the demand curve and the degree of competition that

5    determines the pass-through rate. When an industry is perfectly competitive,[7] the pass-through rate of

6    an industry-wide cost is positive, and when the industry also displays constant costs,[8] the pass-through

7    rate is 100%. Netz Errata Decl. at 73. Dr. Netz states that even with imperfect competition, the pass-

8    through rate is positive, and "it may be less than 100%, 100%, or greater than 100% depending on the

9    shape of the demand curve." *Id.* at 74. The more competitive the industry, the closer the pass-through

10   rate is to 100%. *Id.* at 74-75.

11        Dr. Netz evaluated documentary evidence and industry information, and concludes that the pass-

12   through can be calculated through the multiple levels of the TFT-LCD distribution channel. "The more

13   competitive each of these levels is, the closer the pass-through rate at each level is 100%, and thus the

14   more likely the channel-length pass-through rate is 100%. Each of the distribution levels for monitors,

15   notebooks and TVs – panel distributors, product manufacturers, product distributors, and retailers – is

16   highly competitive." *Id.* at 76-77; *see id.* at 77-80 (discussing competitive features of TFT-LCD

17   distribution channel).[9]

18        Dr. Netz proposes three types of regression models that will establish that antitrust impact to

19   direct purchasers can be shown on a class-wide basis using common proof: the before-and-after

20   approach, the structural model of supply approach, and the conjectural variations approach. *Id.* at 91-

21

22        [7] According to Dr. Netz, a perfectly competitive market "is one in which there are many buyers
     and sellers, such that no individual buyer or seller can affect prices in any significant manner; there is
23   a homogenous good; there is perfect information; and there is free entry and exit." Netz Errata Decl.
     at 73 n.210.

24        [8] Dr. Netz states that "constant costs" means that the industry can grow to any size without
25   driving up the costs of inputs. Netz Errata Decl. at 73.

26        [9] Dr. Netz also states, "That the LCD product manufacturing industry is highly competitive is
     not inconsistent with Plaintiffs' claims that Defendants fixed the price of LCD panels and LCD
27   products. By fixing the price of panels, the Defendants in effect are fixing the price of products because
     product prices are a function of panel prices; an increase in the price of LCD panels leads to an increase
28   in the price of LCD products, as discussed in Section VI.D [of the Errata Declaration]." *Id.* at 77 n.224.

102.[10]   The before-and-after method involves identifying two similar periods in which the only significant difference in factors affecting supply and demand is the alleged collusive activity, and comparing the two periods to determine the "but-for" price.  *Id.* at 91-95 (describing before-and-after approach).  Dr. Netz describes the structural model as follows:

> The first step is to determine the oligopoly model that reasonably approximates the characteristics of the LCD industry.  The model is then used to derive the supply equations that describe the firms' conduct when competing independently, rather than colluding.  I can then use data from the actual world – the world in which there was an LCD cartel – to calculate the response of demand to changes in price, and derive the parameters of a demand function for the products at issue.  These parameters can be used in conjunction with the structural model to calculate the but-for price; the but-for price is a result of the interaction implied by the model of demand and supply.  The but-for price is then compared to the actual price in order to calculate overcharges.

*Id.* at 95; *see id.* at 95-100 (describing structural model).  The third method, the conjectural variations approach, "estimate[s] firm conduct and use[s] these estimates to model what prices would be if firms set prices and quantities independently, rather than collusively."  *Id.* at 100; *see id.* at 100-01 (describing conjectural variations approach).

Dr. Netz then describes the common method that can be used to measure the pass-through of the overcharges to indirect purchasers.  *Id.* at 102-07.  "In order to estimate the pass-through rate, I regress the price of the product at the bottom of the channel (the amount the end customer pays) on its cost at the top of the distribution channel (the amount Defendants charge direct customers)."  *Id.* at 102.  Dr. Netz proposes two different regression approaches to measuring pass-through over the entire distribution channel, the "top and bottom" approach and the "top to bottom" approach.  *Id.* at 108-12.  The choice of approach depends on the data available.  *Id.*

Dr. Netz conducted 53 pass-through studies: 5 complete pass-through studies that measure pass-through from defendants down the distribution channels to the end user, and 48 partial pass-through studies that measure pass-through in different segments of the distribution channel. Rebuttal Netz. Decl. at 70-86.  Dr. Netz ran separate regression analyses for each of the three TFT-LCD products at issue, which took into account panel size, panel manufacturer and resolution, when that data was available.  Errata Decl. at 102-114.  To conduct these analyses, Dr. Netz used transaction data produced by some

---

[10] In a separate order, the Court has certified a class of direct purchaser plaintiffs, and found that the direct purchaser plaintiffs have demonstrated, through their expert, plausible methodologies for proving antitrust impact on the direct purchaser class.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

defendants, as well as (separately) price data from DisplaySearch, a third-party market research firm.

Defendants raise a number of challenges to Dr. Netz's analyses and conclusions, and have submitted the expert report of Dr. Edward Snyder. Dr. Snyder is the dean and a professor of economics at the University of Chicago Booth School of Business. Defendants contend that the complexity and heterogeneity of the TFT-LCD market makes common proof of impact impossible. Dr. Snyder states that determining impact involves an individualized analysis because the alleged overcharges paid by direct purchasers are not common due to a number of factors, including the industry growth during the class period, the customized nature of some TFT-LCD panels, the significant competition with non-LCD technologies in particular applications, and the recent history of major entry and substantial shifts in shares among manufacturers. *See* Snyder Decl. ¶ 25. Dr. Snyder also states that pass-through decisions differ by customer, model, stage of distribution, and over time, and he emphasizes that "[t]he distribution chains that move LCD panels from the defendant manufacturers to products that are purchased by individual end users are extraordinarily complex and varied. While some simple distribution chains may involve only one pass-on decision, more complex chains . . . may involve six-pass on decisions by intermediaries." *Id*. ¶ 28. Dr. Snyder critiques Dr. Netz's economic analyses, and performs his own regression analyses, reaching conclusions diametrically opposed to those of Dr. Netz.

Numerous courts have held that variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end purchasers. In *SRAM*, the indirect purchaser plaintiffs alleged a ten year price-fixing conspiracy in the market for Static Random Access Memory, a type of memory device. Similar to the industry here, there are multiple types of SRAM, and SRAM is used in a variety of product markets, including the communications market in cell phones and Voice Over Internet Protocol technology, the computer market in, *inter alia*, servers, mainframes, and high-end computer workstations, and the networking communications market in, *inter alia*, routers, modems and firewalls. *SRAM*, 2009 WL 4263524, at *1 (listing additional SRAM products). Also similar to this case, the defendants in *SRAM* sold to various customers, large and small, through a variety of distribution paths. "SRAM manufactured by Defendants can be purchased by an SRAM distributor and resold to an original equipment manufacturer (OEM) or purchased by a contract manufacturer. Contract manufacturers create individual SRAM components and finished products containing SRAM

27

for OEMs.  Thus, OEMs purchase SRAM directly from SRAM manufacturers, distributors and contract manufacturers.  OEMs then sell SRAM directly to consumers or to consumers through a reseller, distributor or retailer." *Id.*  The *SRAM* defendants argued that the distribution chain was too complex to discern evidence of pass-through.  The court rejected that argument, finding that the "divergent pricing and sales practices are not necessarily an impediment to measuring pass-through" and that "many other markets have the same features as the markets at issue here, and those markets are routinely tested for relationships among variables of interest."  *Id.* at *11.

Also instructive are the numerous antitrust cases filed against Microsoft in which Microsoft argued that injury could not be proven on a class-wide basis due to the complexity and changing nature of the software industry and the multi-layered and variable distribution chain.  For example, in opposing certification of two California classes of indirect purchasers, Microsoft argued "Because the software represents only a small percentage of the cost of the computer, and because there are many other factors which may inhibit passing on price changes . . . whether, and the extent to which, any given OEM passed on the excess will differ from case to case.  The amount passed through by distributors or retailers purchasing from the OEMs, or purchasing directly from Microsoft, may also vary, so the fact, much less the amount, of any overcharge reaching a consumer will be a function of so many variables . . . that the impact of any violation cannot possibly considered collectively."  *Microsoft I-V Cases*, 2002-2 Trade Cas. (CCH) ¶ 73,013 at 88,561 (Cal. Sup. Ct. Aug. 29, 2000) (Docket No. 1024-10, Ex. 9).  Judge Pollak rejected that argument, finding that the plaintiffs' expert described one method for estimating the "but for" price to direct purchasers, and two methods for measuring pass-through to indirect purchasers.  *Id.* at 88,562.  Judge Pollak recognized the complexities posed by multiple products, multiple distribution channels, and the "extraordinary rate at which changes ha[d] occurred in the relevant markets over the six year class period," but held that "the court is not persuaded that a comprehensive analysis of the issues cannot be made within the context of properly managed trial proceedings."  *Id.* at 88,563; *see also In re Florida Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, at *13-15 (Fla. Cir. Ct. Aug. 26, 2002); *Gordon v. Microsoft Corp.*, No. MC 00-5594, 2001 WL 366432, at *12 (Minn. Dist. Ct. Mar. 30, 2001); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 499, 523 (certifying a direct purchaser class where plaintiffs accused 33 defendants

of conspiring through Nasdaq market-makers, making markets in 5,393 stocks with "11 market-makers for each Nasdaq stock" because "neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally.").

The Court is satisfied that, for class certification purposes, plaintiffs have put forth a feasible methodology to show that the channel-length pass-through rate can be measured, regardless of the path or the number of steps the panel went through from defendants to class members. As other courts have recognized, "the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact] through generalized proof." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009). Plaintiffs are not required to "prove the merits of their case-in-chief at the class certification stage. They need not demonstrate that their multiple regression analysis captures all the proper variables and thus reaches the 'right' answer, as the defendants would require them to. . . . It is unnecessary to delve further into the merits by going point-by-point through each expert's theory to decide who has designed the 'better' multiple regression equation." *Id.* at 101.

The cases relied on by defendants are distinguishable. In *Somers v. Apple, Inc.*, 258 F.R.D. 354 (N.D. Cal. 2009), the plaintiffs' expert "ha[d] not yet developed a model or worked with any data in the context of this case," and had presented "nothing more than a vague five-paragraph long collection of proposals for accomplishing what the Court sees as a daunting task." *Id.* at 360. *Methionine I* involved a proposed class "that includes all methionine indirect purchasers in Wisconsin at all levels of the distribution chain. The class includes those indirect purchasers who purchased methionine from a direct purchaser in the same form as the direct purchaser bought the methionine from a defendant; those who purchased methionine from another indirect purchaser who in turn may have purchased the methionine from a direct or indirect purchaser; and those who purchased from a direct or indirect purchaser any one or more of dozens of different products that contain methionine and are ultimately incorporated into feed for a variety of livestock and pets. The class also includes indirect purchasers who are resellers at various levels in the distribution chain and indirect purchasers who are ultimate consumers." *Methionine I*, 204 F.R.D. at 162. The court denied certification, finding that the plaintiffs' expert did

29

United States District Court
For the Northern District of California

1    not point to any evidence in the record to support his proposed formula for measuring pass-through, and

2    that the expert had not advanced any methodology for determining how resellers (who were included

3    in the class) were injured.  *Id.* at 165.  The court subsequently certified a much narrower class of indirect

4    purchasers.   In *Methionine II*, the court decertified that class because the plaintiffs' expert's

5    methodology, which had changed, no longer took into account any of the complexity of the market at

6    issue.  *In re Methionine Antitrust Litig.*, No. 00-1311 CRB, 2003 WL 22048232, at *5 (N.D. Cal. Aug.

7    23, 2006).

8         *In re Graphics Processing Units (GPUs) Antitrust Litigation*, 253 F.R.D. 478 (N.D. Cal. 2008),

9    is also distinguishable.  In that case, "[h]undreds if not thousands of GPU products were sold during the

10   limitations period [and] each graphics product varied not only as to performance level but also as to its

11   ultimate application.  Many of the graphics products sold were particularly customized to the needs of

12   a specific purchaser, meaning they could not be interchanged with any other GPU product sold by

13   defendants. . . . In short, these products were *not* fungible commodities."  *GPU*, 253 F.R.D. at 49

14   (emphasis in original).  Here, plaintiffs have submitted considerable evidence – disputed by defendants

15   – that TFT-LCD panels are fungible, interchangeable, and largely homogenous.  The *GPU* court also

16   distinguished the Microsoft cases, noting that while in Microsoft, the prior government litigation against

17   Microsoft consisted "extrinsic evidence of harm," in *GPU* the DOJ had ended its criminal investigation

18   without returning any indictments.  *Id.* at 500.  Here, seven defendants have pled guilty to Sherman Act

19   violations, there is an amnesty applicant, and the DOJ's investigation is ongoing.

20        Defendants also criticize Dr. Netz for using average prices and third party data from a market

21   research company in her analyses, rather than disaggregated "more precise" transactional data.

22   Defendants argue that such data masks relevant differences in the individual transaction data.  As an

23   initial matter, however, defendants' arguments are undercut by the fact that Dr. Snyder uses average data

24   in his own analyses.  More importantly, a number of courts have held that averaged and aggregated data

25   may be used to demonstrate pass-through.  In *Gordon v. Microsoft Corporation*, a Minnesota court

26   certified two classes of indirect purchasers in an antitrust suit against Microsoft.  The court denied

27   Microsoft's motion to decertify the classes, and rejected Microsoft's arguments, similar to those made

28   by defendants here, about the use of average and aggregate data:

> The damages question for trial is presumably not about whether a specific Microsoft price increase found its way through the distribution chain and resulted in an increase in the price paid by a specific class member. Rather, the question is how a series of Microsoft price increases, and/or a series of Microsoft failures to reduce prices, impacted the price each consumer paid. The question of what would have happened but for Microsoft's monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about what actually happened, but must often be answered by general principles about what generally tends to happen. Thus, average pass through rates appear reasonable and even necessary to prove damages here.

*Gordon*, 2003 WL 23105550, at *3; *see also SRAM*, 2009 WL 4263524, at *11 (rejecting the defendants' criticism that the indirect purchaser plaintiffs' use of average and aggregated data in their structural model could yield "false-positive pass-through"); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 523; *In re Commercial Tissue Products*, 183 F.R.D. 589, 595 (N.D. Fla. 1998) ("[E]ven if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving class-wide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of defendants.").[11]

Defendants also challenge Dr. Netz's use of competitive benchmarks in the "before and after" method. Defendants argue that Dr. Netz's selection of 1996-1998 and 2007 to the present as competitive benchmarks is inconsistent with the allegations of the second amended complaint and undercuts the reliability of her regression analyses. Plaintiffs respond that Dr. Netz's selection of these periods as "competitive" is empirically sound because the evidence indicates that defendants' price-fixing agreement may not have begun to affect prices until 1999, and the DOJ's investigation into LCD price-fixing became public at the end of 2006, which should have had a chilling affect on defendants' illegal activities. In addition, Dr. Netz states that to the extent that either of these possible benchmarks was not competitive, this would mean that the prices in those periods were actually higher than competitive prices would have been, and thus Dr. Netz's overcharge estimates would understate (to defendants' benefit) the overcharges that actually occurred. The Court agrees that there is nothing improper or necessarily inconsistent about Dr. Netz's use of the post-2006 time period as a competitive

---

[11] With regard to the use of third party data from DisplaySearch, plaintiffs have submitted evidence that defendants regularly rely on DisplaySearch data in the normal course of business. In addition, plaintiffs state that Dr. Netz used DisplaySearch data in large part because of defendants' failure to provide plaintiffs with timely answers to data interpretation questions.

benchmark.

In sum, the Court concludes that plaintiffs have presented plausible methodologies for demonstrating class-wide impact. Dr. Netz's report is supported by defendants' transactional data as well as industry data, and courts have accepted multiple regression analyses as means of proving antitrust injury and damages on a class-wide basis. Defendants' challenges to plaintiffs' evidence and Dr. Netz's analyses go to the merits of plaintiffs' claims, and will be resolved by the trier of fact.

### C.      Damages

In price-fixing cases, "[p]laintiffs are not required to supply a precise damage formula at the certification stage." *SRAM*, 2008 WL 4447592, at *6. Plaintiffs need only demonstrate a proposed method for determining damages that is "not so insubstantial as to amount to no method at all." *DRAM,* 2006 WL 1530166, *10; *see also Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("[D]amage calculations alone cannot defeat certification. '[T]he amount of damages is invariably an individual question and does not defeat class action treatment.'") (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)); *see also In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351.

Dr. Netz states that damages can be determined by multiplying the relevant revenues by the overcharge rate. The overcharge rate, in turn, is determined by the regression analyses discussed *supra*. To a large degree, defendants' arguments on this point are largely similar to those discussed *supra*, with defendants contending that the variability and heterogeneity in the TFT-LCD market prevents any calculation of pass-through and damages. Defendants also contend that plaintiffs' damages methodology is unworkable because it amounts to a fluid recovery model because it does not provide any way to calculate actual damages to the members of each subgroup. However, Dr. Netz states that the overcharge amount would be calculated for the different panel types, which would also have different revenue rates, and thus differentiated damages figures could be calculated for class members. Rebuttal Netz Decl. at 87.

Defendants have not shown that the methods are "so insubstantial as to amount to no method at all." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995). The validity of plaintiffs' methods "will be adjudicated at trial based upon economic theory, data sources, and statistical

32

techniques that are entirely common to the class." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 521. The Court finds that plaintiffs have met their burden to show that damages can be established using common proof.

> ### D. Single conspiracy vs. many separate conspiracies

Defendants also argue that individual issues predominate because "plaintiffs present no evidence that shows the existence of a single conspiracy involving all defendants." Opposition at 45:16. Defendants argue that while plaintiffs' complaint contains "conclusory" allegations of a single, overarching conspiracy, plaintiffs' more specific allegations, certain defendants' guilty pleas, statements by the government, and the nature and history of the LCD panel industry all contradict the notion of a single overarching conspiracy. For example, defendants emphasize that Chunghwa's and LG Display's plea agreements cover panels sold in the United States and elsewhere from September 2001 to June 2006 and December 2006, respectively, while Sharp's plea covers specific products sold only to Dell, Motorola and Apple during segmented times. Defendants also place great weight on the government's statements that its investigation has revealed that certain defendants (such as Hitachi and Sharp) were involved in a "separate" conspiracy that was "related" to, but distinct from, the "larger" conspiracy to fix prices in the LCD market. Relying on *Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978), defendants argue that to the extent plaintiffs may have been harmed by different, unconnected alleged agreements, common issues of fact regarding liability do not predominate. In *Blue Bird*, the Fifth Circuit reversed the certification of a single nationwide class where it "appear[ed] from the limited record before us that the plaintiffs plan to proceed state by state and prove by varying evidence fifty different price-fixing conspiracies." *Id.* at 323.

Plaintiffs respond that, unlike the plaintiffs in *Blue Bird*, here there is considerable evidence of a single conspiracy in which defendants and their co-conspirators formed an international illegal cartel to restrict competition and fix prices in the LCD market. Further, plaintiffs argue that proof of an antitrust price-fixing conspiracy is a class-wide issue because it is defendants' conduct that defines the alleged conspiracy. *See, e.g.*, *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 250 (S.D. Tex. 1978) ("Whether the proof ultimately adduced will establish the existence of a national conspiracy

1   among the defendants is not in issue here; it is not the court's function to weigh this evidence for its

2   truth but merely to ascertain whether it is of a type suitable for class-wide use.  The court is persuaded

3   that the conspiracy issue . . . is susceptible of generalized proof, since it deals primarily with what the

4   defendants themselves did and said."); *see also SRAM*, 2008 WL 4447592, at *5 ("[W]hether a

5   conspiracy exists is a common question that predominates over other issues in this case and has the

6   effect of satisfying the first prerequisite of FRCP 23(b)(3).").

7   Plaintiffs also argue that defendants have not provided any evidence that is inconsistent with,

8   or that forecloses the possibility of, a single conspiracy, and that the Court should reject defendants'

9   attempt to divide the alleged conspiracy into smaller pieces.  With regard to the criminal pleas, plaintiffs

10  emphasize that several defendants have made binding admissions before this Court that, at least since

11  2001, they violated United States antitrust laws by fixing LCD panel prices.  Plaintiffs also argue that

12  the specific details of the criminal convictions cannot be used to defeat or narrow civil liability.  *See In*

13  *re Vitamins Antitrust Litig*., No. Misc. 99-197, 2000 WL 1475707, at *18 (D.D.C. May 9, 2000) ("the

14  criminal guilty pleas do not establish boundaries for this civil litigation").

15  The Court rejects defendants' attempts to recharacterize plaintiffs' allegations, as well as

16  defendants' attempts to limit the alleged conspiracy by reference to the criminal guilty pleas and DOJ's

17  statements.  The Court agrees with plaintiffs that defendants may not recast plaintiffs' allegations, and

18  plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period.  As

19  plaintiffs note, the Supreme Court has held that "[t]he character and effect of a conspiracy are not to be

20  judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."

21  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  In addition, the

22  scope and nature of the criminal guilty pleas are not determinative of the plaintiffs' potential claims in

23  a civil antitrust suit.  Indeed, "[Sherman Act] civil actions may be brought in cases in which criminal

24  prosecution would not have been justified . . . . Thus, a civil action may succeed … [even] if the

25  government [does] not show that the violation constituted a criminal act."  *Sedima, S.P.R.L. v. Imrex*

26  *Co., Inc.*, 741 F.2d 482, 501 n.51 (2d Cir. 1984), *rev'd on other grounds, Sedima, S.P.R.L. v. Imrex Co.,*

27  *Inc.*, 473 U.S. 479 (1985).

28

34

**E.    Superiority**

Rule 23(b)(3) also requires that a class action be superior to other methods of adjudication. "[I]f common questions are found to predominate in an antitrust action, . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied." Wright, Miller & Kane, *Federal Practice and Procedure: Civil Procedure* § 1781, at 254-55 (3d ed. 2004). The *SRAM* court's analysis of this issue applies here: "In antitrust cases such as this, . . . damages . . . are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress." *SRAM*, 2008 WL 4447592, at *7. The Court finds that a class action is superior to other available methods of adjudication.

**IV.    Objections**

Defendants object to the declarations of Chien-Ming Kuan, Yin-Hua Hsu and Fu-Chia Hsu on numerous grounds, including the fact that these declarations were filed in connection with plaintiffs' reply and that defendants have not had the opportunity to depose the declarants. Conversely, five months after the close of briefing on the class certification motion, defendants filed the declaration of Shane Gregorczyk, a Dell employee. Plaintiffs object to Mr. Gregorczyk's declaration on numerous grounds, including the fact that plaintiffs have not had the opportunity to depose Mr. Gregorczyk.

The Court finds that all four of the declarations are untimely, and STRIKES them on that ground.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS plaintiffs' motion for class certification. (Docket No. 1023). The Court DENIES defendants' motion to strike the modified class definition, and GRANTS defendants' motion to strike the declarations of Chien-Ming Kuan, Yin-Hua Hsu and Fu-Chia Hsu . (Docket No. 1326). The Court also GRANTS plaintiffs' motion to strike the Gregorczyk declaration. (Docket No. 1583). The Court ORDERS as follows:

1.    The following nationwide class is hereby certified pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) for injunctive and declaratory relief:

All persons and entities residing in the United States as of the date notice

is first published, who indirectly purchased in the United States between January 1, 1999 and the present TFT-LCD panels incorporated in televisions, monitors, and/or notebook computers, from one or more of the named defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

2.      In addition, the following state classes are hereby certified for damages pursuant to

Federal Rule of Civil Procedure 23(a) and 23(b)(3):

ARIZONA:

All persons and entities in Arizona who, from January 1, 1999 to December 31, 2006, as residents of Arizona, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Arizona indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

CALIFORNIA:

All persons and entities in California who, from January 1, 1999 to December 31, 2006, as residents of California, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in California indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

DISTRICT OF COLUMBIA:

All persons and entities in the District of Columbia who, from January 1, 1999 to December 31, 2006, as residents of the District of Columbia, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in the District of Columbia indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies

and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

FLORIDA:

All persons and entities in Florida who, from January 1, 1999 to December 31, 2006, as residents of Florida, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Florida indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

HAWAII:

All persons and entities in Hawaii who, from January 1, 1999 to December 31, 2006, as residents of Hawaii, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Hawaii indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

IOWA:

All persons and entities in Iowa who, from January 1, 1999 to December 31, 2006, as residents of Iowa, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Iowa indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

KANSAS:

All persons and entities in Kansas who, from January 1, 1999 to December 31, 2006, as residents of Kansas, purchased LCD panels

United States District Court
For the Northern District of California

incorporated in televisions, monitors, and/or laptop computers in Kansas indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

MAINE:

All persons and entities in Maine who, from January 1, 1999 to December 31, 2006, as residents of Maine, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Maine indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

MASSACHUSETTS:

All persons and entities in Massachusetts who, from January 1, 1999 to December 31, 2006, as residents of Massachusetts, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Massachusetts indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

MICHIGAN:

All persons and entities in Michigan who, from January 1, 1999 to December 31, 2006, as residents of Michigan, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Michigan indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

MINNESOTA:

All persons and entities in Minnesota who, from January 1, 1999 to December 31, 2006, as residents of Minnesota, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Minnesota indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

MISSISSIPPI:

All persons and entities in Mississippi who, from January 1, 1999 to December 31, 2006, as residents of Mississippi, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Mississippi indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

NEVADA:

All persons and entities in Nevada who, from January 1, 1999 to December 31, 2006, as residents of Nevada, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Nevada indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

NEW MEXICO:

All persons and entities in New Mexico who, from January 1, 1999 to December 31, 2006, as residents of New Mexico, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in New Mexico indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the

named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

NEW YORK:

All persons and entities in New York who, from January 1, 1999 to December 31, 2006, as residents of New York, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in New York indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

NORTH CAROLINA:

All persons and entities in North Carolina who, from January 1, 1999 to December 31, 2006, as residents of North Carolina, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in North Carolina indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

NORTH DAKOTA:

All persons and entities in North Dakota who, from January 1, 1999 to December 31, 2006, as residents of North Dakota, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in North Dakota indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

RHODE ISLAND:

All persons and entities in Rhode Island who, from January 1, 1999 to December 31, 2006, as residents of Rhode Island, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Rhode

United States District Court
For the Northern District of California

Island indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

SOUTH DAKOTA:

All persons and entities in South Dakota who, from January 1, 1999 to December 31, 2006, as residents of South Dakota, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in South Dakota indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

TENNESSEE:

All persons and entities in Tennessee who, from January 1, 1999 to December 31, 2006, as residents of Tennessee, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Tennessee indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

VERMONT:

All persons and entities in Vermont who, from January 1, 1999 to December 31, 2006, as residents of Vermont, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Vermont indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale.  Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

WEST VIRGINIA:

   All persons and entities in West Virginia who, from January 1, 1999 to December 31, 2006, as residents of West Virginia, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in West Virginia indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

WISCONSIN:

   All persons and entities in Wisconsin who, from January 1, 1999 to December 31, 2006, as residents of Wisconsin, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Wisconsin indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.


The following individuals and entities are hereby named as class representatives:

| State | Plaintiff |
| --- | --- |
| Arizona | Allan Rotman |
| California | Frederick Rozo, Steven Martel, Robert Kerson, Byron Ho, Joe Solo, Lisa Blackwell |
| D.C. | David Walker |
| Florida | Robert Feins, Scott Eisler |
| Hawaii | John Okita |
| Iowa | Ben Northway |
| Kansas | Rex Getz, Kou Srimoungchanh |
| Maine | Patricia Giles |
| Massachusetts | Christopher Murphy |

| | |
|---|---|
| Michigan | Gladys Baker, Judy Griffith, Ling-Hung Jou |
| Minnesota | Martha Mulvey |
| Mississippi | Cynthia Saia |
| Nevada | Allen Kelley |
| New Mexico | Thomas Clark, Marcia Weingarten |
| New York | Tom DiMatteo, Chris Ferencsik |
| North Carolina | Donna Jeanne Flanagan |
| North Dakota | Bob George |
| Rhode Island | Dr. Robert Mastronardi |
| South Dakota | Christopher Bessette, Chad Hansen |
| Tennessee | Dena Williams, Scott Beall |
| Vermont | Robert Watson |
| West Virginia | John Matrich |
| Wisconsin | Joe Kovacevich, Jai Paguirigan |

3.    The following law firms are designated and appointed as Class Counsel for the indirect purchaser plaintiffs: Zelle Hoffman Voelbel & Mason LLP, and The Alioto Law Firm.

4.    As soon as practicable after the entry of this Order, all parties shall meet and confer to develop a plan for dissemination of notice to the Class.

**IT IS SO ORDERED.**

Dated: March 28, 2010

_____
SUSAN ILLSTON
United States District Judge