IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M 07-1827 SI<br>MDL. No. 1827 |
| This Order Relates To: | No. C 09-5840 SI |
| MOTOROLA, INC,<br>        Plaintiff,<br>  v.<br>AU OPTRONICS CORPORATION, *et al.*,<br>        Defendants. | **ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS** |

On June 23, 2010, the Court held a hearing on defendants' motion to dismiss the complaint. For the reasons set forth below, the Court GRANTS defendants' joint motion to dismiss and GRANTS plaintiff leave to amend the complaint.

**BACKGROUND**

On October 20, 2009, plaintiff Motorola, Inc. ("Motorola") filed an individual complaint in the Northern District of Illinois against numerous domestic and foreign defendants for violations of state and federal antitrust laws. Pursuant to the Judicial Panel on Multidistrict Litigation's April 20, 2007 transfer order consolidating pretrial proceedings for a number of actions and this Court's July 3, 2007 related case pretrial order #1, the case was designated as related to MDL No. 1827, M 07-1827, and transferred to this Court.

The amended complaint, filed on January 29, 2010, alleges a global price-fixing conspiracy by

suppliers of liquid crystal display (LCD) panels. Motorola is a provider of mobile wireless telecommunications services and sells mobile wireless devices and two-way radios; both of these products incorporate LCD panels. Amended Compl. ¶¶ 23, 25. Motorola brings suit based on its own purchases of LCD panels and products, as well as purchases made abroad by a number of Motorola subsidiaries that have assigned their claims to Motorola. *Id*. ¶ 24.[1] Motorola brings this action to recover its damages for purchases made during the conspiracy period (1996-2006). The amended complaint alleges that "[D]efendants' and their co-conspirators' conspiracy raised the price of LCD Panels above the price that would have prevailed in a competitive market." *Id*. ¶ 6. Motorola alleges that during the conspiracy period, hundreds of millions of its products contained LCD panels. The complaint notes that a number of defendants have pled guilty to participating in an LCD panel price-fixing conspiracy, and that in their pleas, defendants Sharp and Epson specifically identified Motorola as a customer that was overcharged for LCD panels. *Id*. ¶¶ 4-5.

The amended complaint also alleges that during the conspiracy period,

> [T]he domestic U.S. and worldwide purchasing process at Motorola was managed and overseen by a supply chain organization, including procurement and manufacturing teams, based in Motorola's northern Illinois operations. From its Illinois headquarters, Motorola directed and approved the prices and quantities of LCD Panels purchased throughout the world and incorporated into Motorola mobile wireless devices and two-way radios. These procurement and manufacturing teams based in the United States were also responsible for all phases of procurement of LCD panels, including at various times, evaluating, qualifying, and selecting LCD Panel suppliers, drafting requests for quotes for LCD Panels, negotiating agreements with LCD Panel suppliers, coordinating purchases of LCD Panels to meet worldwide production goals, overseeing quality control, and managing stocks of LCD Panels.

*Id.* ¶ 25. "Motorola also negotiated LCD Panel prices with Defendants on behalf of its ODMs and EMS[2] providers who assembled mobile devices for delivery to Motorola. The price of those LCD Panels was likewise artificially-elevated, causing damage to Motorola." *Id*. ¶ 26.

Motorola's first claim for relief seeks treble damages and injunctive relief under Section 1 of the

---

[1] The Motorola subsidiaries that have assigned their claims to Motorola Inc. are Motorola Asia Limited, Motorola (China) Investment Limited, Hangzhou Motorola Cellular Equipment Co. Ltd., Motorola (China) Electronics Limited, Motorola Electronics Pte. Ltd., and Motorola Trading Center Pte. Ltd. *Id*. ¶¶ 1, 24.

[2] The amended complaint states that "ODM" means any original design manufacturer of an LCD Product, and "EMS provider" means any electronics manufacturing services provider of an LCD Product. *Id*. ¶¶ 21-22.

2

1 Sherman Act, and Sections 4 and 16 of the Clayton Act. The second claim for relief seeks treble 2 damages under California's Cartwright Act. "In the alternative," to the federal and Cartwright Act 3 claims, the third claim for relief alleges violations of the Illinois Antitrust Act. *Id.* ¶ 179. "In the further 4 alternative" to the first three claims, the fourth claim for relief alleges claims under California's Unfair 5 Competition Law, as well as the antitrust, consumer protection, unfair trade and deceptive practices laws 6 of thirteen other states, the District of Columbia, and Puerto Rico. *Id.* ¶ 187.

## LEGAL STANDARDS

### I.  Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint. As the party invoking the jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 376-78 (1994) (citation omitted). A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack federal jurisdiction either "facially" or "factually." *Thornhill Publishing Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). When the complaint is challenged for lack of subject matter jurisdiction on its face, all material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Indus. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

### II.  Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative

3

1 level." *Twombly*, 550 U.S. at 544, 555.

2 In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court
3 must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the
4 plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the
5 court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions
6 of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

7 If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The
8 Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request
9 to amend the pleading was made, unless it determines that the pleading could not possibly be cured by
10 the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal
11 quotation marks omitted).

## DISCUSSION

### I.   Foreign Trade Antitrust Improvements Act (FTAIA)

Defendants contend that the Court lacks subject matter jurisdiction over Motorola's claims to the extent they are based on foreign purchases of LCD panels and products. Motorola concedes that it cannot assert any claims based on the sale of LCD panels to Motorola subsidiaries abroad if the panels never entered the United States. What is in dispute is whether Motorola can seek to recover based on foreign-sold panels that were subsequently incorporated into Motorola products that Motorola and others – but not defendants – shipped to and sold in the United States.

The Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), enacted in 1982, amends the Sherman Act and "excludes from [its] reach much anti-competitive conduct that causes only foreign injury." *F. Hoffman-LaRoche, Ltd. v. Empagran (Empagran I)*, 542 U.S. 155, 158 (2004). The FTAIA establishes a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. § 6a. The FTAIA then "provides an exception to this general rule, making the Sherman Act applicable if foreign conduct '(1) has a direct, substantial, and reasonably foreseeable effect on domestic commerce, and (2) such effect gives rise to a [Sherman Act] claim.'" *In re Dynamic Random Access Memory (DRAM)*

4

*Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (quoting *Empagran I* and 15 U.S.C. § 6a). This exception is known as the "domestic injury exception" of the FTAIA. *Id*. The Supreme Court has explained that the FTAIA,

> initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Empagran I*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a, emphasis in original).

*Empagran I* involved vitamin sellers around the world that agreed to fix prices, leading to higher vitamin prices in the United States and independently leading to higher vitamin prices in other countries such as Ecuador. *Empagran I*, 542 U.S. at 159. The Supreme Court held that "a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm." *Id*. "[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive injury has caused." *Id*. at 165 (emphasis in original).

### A.   Imports

Motorola first asserts that the products at issue are "imports" that are not subject to the FTAIA. The FTAIA establishes a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. § 6a. In other words, Sherman Act claims based on "imports" are not barred by the FTAIA. "The Foreign Trade Antitrust Improvements Act does not define the term 'import,' but the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad." *Turicentro, S.A. v. American Airlines Inc.*, 303 F.3d 293, 303 (3d Cir. 2002).

Motorola contends that the relevant inquiry to determine whether something is an "import" is not whether defendants directly imported price-fixed goods into the United States, but "whether

5

Defendants' price-fixed goods were imported into the United States as they intended." Opposition at 12:15-16. Motorola primarily relies on *In re Air Cargo Shipping Services Antitrust Litigation*, Case No. 06-cv-1775(JG) (VVP), 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) (Report and Recommendation). In that case, the plaintiffs alleged that domestic and foreign airlines conspired to price-fix airfreight shipping services. In analyzing whether the plaintiffs' price-fixing claims were permitted under the Sherman Act, the *Air Cargo* court first identified the relevant conduct. *Id.* at *12-13. Noting that "'[t]he relevant inquiry is whether the conduct of the defendants – not the plaintiffs – involves import trade or commerce,'" the court found that the relevant conduct was "defendants' global conspiracy to fix the prices charged for the service of transporting air cargo from abroad into the United States." *Id.* at *13 (quoting *Kruman v. Christie's Intern. PLC*, 284 F.3d 384, 395 (2d Cir. 2002)). Second, the court concluded that the relevant conduct constituted "import commerce" because "the conspiracy alleged targeted the transportation of goods by airfreight, a primary vehicle of modern import commerce. . . . It follows that conduct directed at fixing the cost of airfreight necessarily affects the commerce in the goods transported by airfreight. The inseparable connection between airfreight and the commerce in imported goods is sufficient to draw the conclusion that the defendants' price-fixing conduct targeting such a primary channel of import trade and commerce 'involves import trade or import commerce' within the meaning of the FTAIA." *Id.* at *14.

Here, the relevant conduct is defendants' alleged price-fixing of LCD panels, which were sold both in the United States and abroad. Unlike *Air Cargo*, however, there is no "inseparable connection" between foreign-purchased LCD panels or products containing LCD panels, and import commerce. A number of courts have held that the FTAIA's "import commerce" exclusion applies only where the defendants are directly involved in the importation of goods or services into the United States. In *Turicentro*, foreign travel agent plaintiffs sued an airline trade association and United States airline members, alleging that the defendants conspired to lower their sales commissions. The plaintiffs argued that the defendants "imported" their travel agent services for the purposes of selling airline tickets. *Turicentro*, 303 F.3d at 303. The Third Circuit held that the defendants' conduct did not involve "import commerce" because "Defendants did not directly bring items or services into the United States." *Id.*

6

The court reasoned:

> The alleged conspiracy in this case was directed at commission rates paid to foreign travel agents based outside the United States. That some of the services plaintiffs offered were purchased by United States customers is not dispositive under this inquiry. Defendants were allegedly involved only in unlawfully setting extra-territorial commission rates. Their actions did not directly increase or reduce imports into the United States.

*Id.*

Similarly, in *Animal Science Products, Inc. v. China National Metals & Minerals Import & Export Corporation*, __ F. Supp. 2d __, No. CIV. 05-4376 (GEB), 2010 WL 1324918 (D.N.J. Apr. 1, 2010), a third party intermediary purchased the defendants' goods overseas, resold them to the plaintiffs in the United States, and assigned its rights to the plaintiffs. *Id.* at *27-28. In analyzing the plaintiffs' argument that the goods were "imports," the court stated that "the term 'importer' employed in the introductory language of the FTAIA would be best read as referring to the 'main force' behind the physical movement of goods to the United States; such inquiry is, by definition, unamenable to any hard-and-fast rule and must be resolved on a case-by-case basis." *Id.* at *33. The court held that if the defendants were not the importers, and the actual importers were various intermediaries and end-consumers, the goods were not "imports" under the FTAIA. *Id.* at *36.[3]

"The dispositive inquiry is whether the conduct of the defendants, not plaintiffs, involves 'import trade or commerce.'" *Turicentro*, 303 F.3d at 303. Motorola does not allege that the foreign-purchased products were imported into the United States by defendants; to the contrary, the complaint alleges that the foreign-purchased products were brought to the United States by Motorola affiliates. Although Motorola argues that defendants "intended" for the foreign-purchased LCD panels and products to be brought to the United States, Motorola has not cited any authority adopting such an expansive definition of "import." In the Court's view, a definition that depends on intent would be difficult to apply. Moreover, given the global nature of the economy, defining "imports" as goods that foreign companies "intended" to ultimately make their way into the United States for resale would potentially sweep in much conduct excluded by the FTAIA.

---

[3] In *Air Cargo*, there was a factual question as to whether some of the defendants were the actual importers of the goods, and thus the court granted the plaintiffs leave to amend the complaint. *Id.* at *42.

7

Motorola also relies on the definition of "import trade" contained in the Tariff Act of 1930. That statute defines "import trade" as including "[t]he importation into the United States, the sale for importation [into the United States], or the sale within the United States after importation" of infringing products. 19 U.S.C. § 1337(a)(1)(B)-(E). In addition, Motorola argues that various defendants in this case have embraced a broad definition of "importation" in civil patent lawsuits brought in federal court. However, neither the Tariff Act's definition of "import trade" nor positions that defendants have taken in unrelated litigation arising under different statutes is relevant to evaluating whether a good is an "import" under the FTAIA.

Motorola has not made factual allegations sufficient to claim that its foreign purchases represent "imports" excepted from the FTAIA.

### B. Domestic injury exception

Alternatively, Motorola argues that its foreign purchases fall under the "domestic injury" exception to the FTAIA. Under this exception, foreign conduct is actionable if it "(1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'" *Empagran I*, 542 U.S. at 159 (quoting § 6a) (alteration in *Empagran I*). In situations like this one, where a global price-fixing conspiracy is alleged to have affected prices both in the United States and abroad, courts have held that "the 'gives rise to' language of § 6a . . . requires a plaintiff to establish a direct or proximate causal relationship" between the alleged anticompetitive effects in the United States and the plaintiff's alleged foreign injury. *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 987-88 (9th Cir. 2008) (relying on *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd. (Empagran II)*, 417 F.3d 1267, 1271 n.5 (D.C. Cir. 2005)).

Motorola argues that defendants' conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce because defendants sold millions of price-fixed LCD panels to Motorola, knowing and intending that a significant portion of those panels would be incorporated into Motorola mobile wireless devices destined for import into, and sale and use in, the United States. Motorola relies on allegations such as the following: "The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended

8

to, and did have a direct, substantial and reasonably foreseeable effect on U.S. domestic and import trade or commerce. In particular, defendants' and their co-conspirators' conspiracy directly and substantially affected the price of LCD Panels and products which contained LCD Panels ('LCD Products') purchased in the United States. These effects give rise to Motorola's antitrust claims." Amended Compl. ¶ 15.

While defendants dispute whether Motorola's allegations meet the first prong of the "domestic injury" exception, they also argue that the Court need not even address that question because Motorola has failed to plead facts sufficient to show, under the second prong of the exception, that any such domestic effects "gave rise to" Motorola's Sherman Act claims based on foreign purchases. The Ninth Circuit has held that the "gives rise to" language of § 6a of the FTAIA requires a plaintiff to establish proximate cause between the alleged anticompetitive effects in the United States and the plaintiff's foreign injury, where foreign purchases are alleged. *DRAM*, 546 F.3d at 987-88. In *DRAM*, a British computer manufacturer, Centerprise, sued American and foreign manufacturers and sellers of DRAM. Centerprise claimed that the domestic effect of the defendants' anti-competitive behavior – higher DRAM prices in the United States – gave rise to its foreign injury of having to pay higher DRAM prices abroad because the defendants could not have raised prices worldwide and maintained their global price-fixing arrangement without fixing the DRAM prices in the United States. *Id*. at 984. The district court held that Centerprise had sufficiently alleged that the defendants' conduct had a "direct, substantial and reasonably foreseeable" effect on U.S. domestic commerce, but had not sufficiently alleged that such domestic effect gave rise to Centerprise's foreign injury. The Ninth Circuit affirmed:

> The defendants' conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain higher prices globally, but Centerprise has not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad. Other actors or forces may have affected the foreign prices. In particular, that the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad.

*Id*. at 988. The Ninth Circuit also held that a "direct correlation between prices does not establish a sufficient causal relationship." *Id*. at 989-90 (citing *Empagran II* at 1271 n.5, and *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 539-40 (8th Cir. 2007), for proposition that proximate cause is not met by allegations that "there was a single global price kept in equipoise by the maintenance of

9

super-competitive prices in the U.S. market").

Defendants argue that Motorola has not alleged how any domestic effects caused its foreign injuries. Defendants also argue that the alleged effects on import commerce could not have proximately caused the alleged foreign injuries as a matter of law. Defendants contend that Motorola's foreign injuries occurred when the panels were purchased abroad, before Motorola imported those panels (as contained in finished products) into the United States. Defendants argue that no foreign injury could be caused by something that occurred after that injury was allegedly suffered. *See In re Hydrogen Peroxide Antitrust Litig.*, __ F. Supp. 2d __, Civil Action No. 05-666,, MDL Docket No. 1682, 2010 WL 1388183, at *3 (E.D. Pa. Mar. 31, 2010) (the "FTAIA imposes a two-step dance, first with one foot (the domestic effects) and then with the other (the foreign antitrust injury). We hold that under the FTAIA the domestic effects must occur first and then proximately cause the foreign antitrust claim.").

The Court agrees with defendants that the amended complaint does not allege any facts showing how Motorola's foreign injuries were proximately caused by any domestic effects of defendants' conduct.[4] Similar to the complaint in DRAM, Motorola's complaint generally alleges that defendants engaged in a "global conspiracy" that impacted "global prices" and that Motorola's foreign affiliates "suffered injury as a result of defendants' antitrust violations." Amended Compl. ¶¶ 2, 24, 27. Under *DRAM*, these allegations fall far short of alleging that the domestic effect of defendants' conduct gave rise to Motorola's foreign injuries. Motorola also relies on defendants' criminal pleas; however, these criminal pleas, which admit to criminal antitrust violations in the Northern District, have no bearing on whether the domestic effects of defendants' conduct *caused* Motorola's foreign injuries. Accordingly, the Court GRANTS defendants' motion to dismiss Motorola's foreign injury claims, with leave to amend.[5]

---

[4] The Court finds it unnecessary to resolve whether Motorola has sufficiently alleged a domestic effect. In addition, in light of the dismissal of the federal claims based on foreign-sold products, the Court does not address the parties' arguments about whether Motorola's claims based on foreign-sold panels contained in finished products that it purchased from intermediary non-party manufacturers should be dismissed because they are barred by the indirect purchaser standing doctrine.

[5] In light of the Court's dismissal of the federal claims based on foreign purchases, as well as the dismissal of the state claims for failure to plead contacts sufficient to meet Due Process, the Court does not separately address defendants' arguments that the Court lacks jurisdiction over Motorola's

## II.     Contacts with states/due process

Defendants move to dismiss all of Motorola's state law claims on the ground that the complaint does not allege sufficient contacts between the respective states and Motorola's claims to satisfy Due Process. In particular, defendants argue that Motorola's failure to allege that it bought the products at issue in California, or in any of the other states whose laws it seeks to invoke, requires dismissal of the state law claims. Defendants rely on several cases in which courts have dismissed state antitrust claims, either for lack of standing or on due process grounds, where the plaintiffs did not allege that they purchased price-fixed products in those states. *See, e.g., Pecover v. Electronic Arts Inc.*, 633 F. Supp. 2d 976, 984 (N.D. Cal. 2009) (dismissing antitrust claims under laws of 18 states in which plaintiffs did not purchase products); *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 527 F. Supp. 2d 1011, 1027-29 (N.D. Cal. 2007) (dismissing for lack of standing antitrust claims under laws of states in which plaintiffs did not purchase products, and striking all references to a nationwide class under California law because extraterritorial application of California law would violate due process). Defendants also argue that Motorola does not explain why or under what circumstances the Court would apply, "in the alternative" to federal law and the Cartwright Act, the Illinois statute, or "in the further alternative," the laws of the numerous other states.

To decide whether the application of a particular State's law comports with the Due Process Clause, the Court must examine "the contacts of the State, whose law [is to be] applied, with the parties and with the occurrence or transaction giving rise to the litigation." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981) (emphasis added); *see also Phillips Petroleum v. Shutts*, 472 U.S. 797, 821-22 (1985) (Due Process requires a "significant contact or significant aggregation of contacts" between the plaintiff's claims and the state at issue). In a price-fixing case, the relevant "occurrence or transaction" is the plaintiff's purchase of an allegedly price-fixed good. *See GPU*, 527 F. Supp. 2d at 1028-29.

With regard to California, Motorola contends[6] that the application of California law comports

---

foreign injury claims under state law.

[6] Motorola incorporates by reference the arguments made by AT&T in opposition to defendants' motion to dismiss AT&T's state law claims on the same Due Process grounds. Accordingly, this order discusses AT&T's arguments as if they were advanced by Motorola in the first instance. However, as

11

with Due Process because defendants did business in California, and certain defendants maintained offices and/or sales agents in California. However, these allegations do not provide a link between Motorola's claims that it purchased price-fixed products and California. Motorola also relies on various defendants' plea agreements, which state that "acts in furtherance of this conspiracy were carried out in the Northern District of California." The plea agreements state that the "acts in furtherance" of the conspiracy were sales of TFT-LCD panels and products to customers within the Northern District. *See, e.g.*, Plea Agreement at 4, *United States v. LG Display Co.*, (Docket No. 14 in CR 08-803). However, the fact that some defendants have admitted to selling price-fixed goods to customers in this District does not establish the requisite connection with California because those plea agreements do not state, nor has Motorola alleged, that any defendants sold products to *Motorola* in California.

In addition, Motorola argues that there is a sufficient nexus between its claims and all of the various state laws because it conducts a substantial amount of business in each of the states. Again, however, the fact that Motorola has a presence in the various states does not establish a link between Motorola's antitrust claims and the States. Motorola also argues that it expects that defendants will assert, as a defense under the various state laws, that Motorola passed-on the alleged overcharges when it sold the finished products to end consumers. Motorola does not cite any authority for the proposition that Due Process can be satisfied by the location of a plaintiff's resale of a product.

The Court agrees that in order to invoke the various state laws at issue, Motorola must be able to allege that "the occurrence or transaction giving rise to the litigation" – which is Motorola's purchase of allegedly price-fixed goods – occurred in the various states. *Allstate Ins. Co.*, 449 U.S. at 308. The Court GRANTS defendants' motion to dismiss all of the state law claims and GRANTS Motorola leave to amend the complaint to allege contacts with each State – here, purchases of price-fixed goods – in order to satisfy Due Process. In addition, if Motorola decides to plead claims "in the alternative" or "further alternative" in the amended complaint, Motorola shall explain under what circumstances Motorola would pursue the alternative claims.

---

defendants' note, some of AT&T's arguments – such as the fact that one of the AT&T plaintiffs is headquartered in California – do not apply to Motorola.

### III. Allegations regarding non-TFT technology

The amended complaint alleges that the conspiracy had the effect of "raising, fixing, maintaining, and/or stabilizing the prices of" LCD panels that utilized three different technologies: TFT panels, color super-twist nematic ("CSTN") panels, and monochrome super-twist nematic ("MSTN") panels. Amended Compl. ¶¶ 19. The amended complaint's factual allegations regarding a price-fixing conspiracy all relate to TFT-LCD panels, and there are no allegations specifically regarding price-fixing CSTN-LCD or MSTN-LCD panels.

Defendants contend that Motorola has not alleged any facts to support its assertion that the alleged conspiracy encompassed LCD panels using CSTN or MSTN technology. These two super-twist nematic panel technologies (also referred to as "STN" or "passive matrix") are older technologies with slower response times than TFT-LCD panels (referred to as "active matrix"). Defendants contend that Motorola does not support its broader conspiracy claims with any factual allegations that are separately and specifically directed to STN panels. Defendants also note that neither the class cases nor the DOJ's investigation into the LCD industry have alleged any price-fixing conspiracy related to STN LCD panels.

In response, Motorola adopts the entire argument set forth by AT&T in its opposition to defendants' joint motion to dismiss the same allegations of a broader conspiracy in AT&T's amended complaint. Opposition at 22:6-9. As such, Motorola responds that the complaint satisfies *Twombly* because in light of the admitted conspiracy to fix the price of TFT-LCD panels, it is plausible that defendants also conspired to fix the prices of STN-LCD panels because these panels are close substitutes for TFT-LCD panels. Motorola also cites information, not contained in the complaint, in support of its assertion that STN-LCD panels are close substitutes for TFT-LCD panels. *See* Docket No. 51 in 09-4997 (Murray Decl. Ex. 7). In reviewing a motion to dismiss, however, the Court cannot consider information that is not contained in the complaint. *See Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993).

Motorola also relies on cases in which courts have held that an admitted conspiracy to fix the price of one product makes plausible the allegation that the same defendants also conspired to fix the price of a related product. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661

(7th Cir. 2002); *In re SRAM Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008); *In re Chocolate Confectionary Antitrust Litig.* 602 F. Supp. 2d 538, 576-77 (M.D. Pa. 2009). However, as defendants note, in these cases there were specific factual allegations to support the conspiracy claims with respect to the specific products or markets at issue, in addition to allegations concerning guilty pleas with respect to the other products or markets. For example, in *SRAM* the complaint contained allegations about the susceptibility of the SRAM market to collusion, as well as specific communications between the defendants about the price and demand for SRAM. 580 F. Supp. 2d at 902. Judge Wilken held that the plaintiffs could rely on the guilty pleas entered by numerous defendants in the DRAM litigation because "the same actors associated with certain Defendants were responsible for marketing both SRAM and DRAM." *Id*. at 903. However, Judge Wilken also noted that "[a]lthough the allegations regarding the DRAM guilty pleas are not sufficient to support Plaintiffs' claims standing on their own, they do support an inference of a conspiracy in the SRAM industry." *Id*.; *see also In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d at 661 (reversing summary judgment in favor of defendants where plaintiffs adduced evidence of agreement to fix prices of high fructose corn syrup, as well as admission by one defendant that it fixed prices on two related products during overlapping time period); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 551-52, 557 (allegations of price-fixing in Canadian chocolate market supported allegations of price-fixing in U.S. chocolate market where plaintiffs alleged specific anticompetitive conduct in U.S. as well as integration of the two markets).

"To state a claim under Section 1 of the Sherman Act, . . . claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which if true, will prove" a conspiracy. *Kendall v. VISA U.S.A. Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008). Here, the amended complaint does not contain any specific factual allegations that defendants conspired to fix prices of STN-LCD panels, and the Court cannot infer the existence of such an expanded conspiracy based solely on allegations of price-fixing in the TFT-LCD market. The Court GRANTS defendants' motion to dismiss and GRANTS plaintiff leave to amend.

**CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS defendants' joint motion to dismiss and GRANTS Motorola leave to amend the complaint. (Docket No. 26 in C 09-5840 SI, and Docket No. 1560 in M 07-1827 SI). The amended complaint shall be filed no later than **July 23, 2010.**

**IT IS SO ORDERED.**

Dated: June 28, 2010

SUSAN ILLSTON
United States District Judge