Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email:  jmurray@crowell.com

*Counsel for Plaintiff Motorola, Inc.*
[Additional counsel listed on signature page]

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email:  jhoward@crowell.com
       jmurphy@crowell.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br><br>This Document Relates to<br>Case No. 09-cv-5840-SI | MASTER FILE NO. 07-m-1827 SI<br>CASE NO. 09-cv-5840 SI<br>MDL NO. 1827 |
| MOTOROLA, INC.,<br>                    Plaintiff,<br><br>v.<br><br>AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC.; CHI MEI CORPORATION; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS CORPORATION; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO., LTD.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.,<br><br>                    Defendants. | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>(1)   VIOLATION OF THE SHERMAN ACT PURSUANT TO 15 U.S.C. § 1<br><br>(2)   VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILLINOIS CODE 10/3<br><br>(3)   BREACH OF CONTRACT<br><br>(4)   UNJUST ENRICHMENT<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ................................................................................2

II.     JURISDICTION AND VENUE ...........................................................5

III.    DEFINITIONS......................................................................................7

IV.     THE PARTIES......................................................................................8

  A. Motorola.....................................................................................8

  B. Defendants ...............................................................................10

  C. Agents and Co-Conspirators ...................................................18

V.      THE MARKET FOR LCD PANELS AND LCD PRODUCTS ....................................18

VI.     DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS IN THE UNITED STATES AND THEY PARTICIPATED IN PRICE FIXING MEETINGS OVERSEAS TO INCREASE THE PRICE OF LCD PANELS SOLD IN THE UNITED STATES................................................................20

  A. Defendants Were Well Aware That LCD Panels Sold To Motorola Would Be Imported And Sold In The United States. .....................................................20

  B. Defendants Engaged In Bilateral And Multilateral Meetings And Communications With Competitors To Inflate Prices Of LCD Panels And LCD Products.....................................................21

    1. Defendants Engaged In Illegal Communications About Pricing In The United States. .....................................................22

    2. Defendants Engaged In Illegal Communications About Pricing With Regard To Small LCD Panels.....................................................23

    3. Defendants Engaged In Illegal Bilateral And Multilateral Communications About The Pricing Of TFT-LCD Panels. ..................25

    4. Defendants Engaged In Illegal Bilateral And Multilateral Communications About The Pricing Of STN-LCD Panels..................27

  C. Defendants Have Been Charged With And Have Pled Guilty To Participating in Price-Fixing Meetings In The U.S. And For Fixing The Price Of LCD Panels And LCD Products Sold In The U.S................................30

  D. Defendants Negotiated With Motorola In The United States And Entered Into Agreements With Motorola To Sell LCD Panels At Prices Illegally Raised Through Their Conspiracy. ......................................................37

  E. Defendants Agreed To Provide Motorola LCD Panels In Compliance With Applicable Laws And Regulations. ......................................................40

  F. Defendants Concealed That The Prices Motorola Negotiated For LCD Panels And LCD Products Were Illegally Increased By The Defendants' Conspiracy. ......................................................41

VII.    EFFECT ON U.S. COMMERCE AND INJURY TO MOTOROLA ...........................44

A.    Defendants' Conduct Involved Import Trade Or Import Commerce .................44

B.    Defendants' Conduct Had A Direct, Substantial, And Reasonably
      Foreseeable Effect On U.S. Domestic And Import Trade Or Commerce
      That Gave Rise To Motorola's Antitrust Claim. ................................................48

VIII.  MARKET CONDITIONS DEMONSTRATING THE CONSPIRACY .......................52

A.    Structure Of The LCD Panel Industry. ...............................................52

B.    Pricing In The LCD Panel Market Indicates Collusion By The Defendants......54

IX.    VIOLATIONS ALLEGED ............................................................58

X.     PRAYER FOR RELIEF ..............................................................71

104606\0000001\12656768.1

Plaintiff Motorola, Inc., for its complaint against defendants AU Optronics Corporation, AU Optronics Corporation America, Inc, Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co. Ltd., Nexgen Mediatech, Inc., Nexgen Mediatech USA, Inc., Chunghwa Picture Tubes Ltd., Tatung Company of America, Inc., HannStar Display Corporation, LG Display Co. Ltd., LG Display America, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Samsung Electronics America, Inc., Sharp Corporation, Sharp Electronics Corporation, Toshiba Corporation, Toshiba America Electronics Components, Inc., Toshiba Mobile Display Co., Ltd., Toshiba America Information Systems, Inc., Epson Imaging Devices Corporation, and Epson Electronics America, Inc. hereby alleges as follows:

# I.    **INTRODUCTION**

1.      Motorola, Inc., a U.S. company based in Schaumburg, Illinois, brings this action to recover damages incurred as a result of a long-running conspiracy by suppliers of liquid crystal display panels ("LCD Panels") which occurred through bilateral and multilateral meetings held in the United States and abroad to fix the prices of LCD Panels sold to U.S. customers, including Motorola.  As set forth in detail below, the conspirators utilized their U.S. affiliates, they targeted U.S. companies and consumers, and their conduct directly involved U.S. import trade and commerce.  In addition, the conspiracy had a direct, substantial and reasonably foreseeable effect on U.S. domestic and import commerce through a consistent pattern of conspiratorial conduct in the United States to sell Motorola LCD panels at illegally inflated prices.  That effect on U.S. domestic commerce, and U.S. import trade and commerce, proximately caused injury to Motorola in the form of supra-competitive prices for LCD panels delivered to Motorola in the U.S. and abroad and it resulted in billions of dollars of damages to Motorola, damages Motorola now seeks to recover by this action.

2.      From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels.

1   Senior executives of the defendants instructed their subordinates in the United States to

2   communicate with employees of their competitors to exchange pricing and other competitive

3   information to be used in fixing prices for LCD Panels sold to U.S. companies.  The defendants'

4   employees engaged in these illegal communications in the United States and utilized that

5   information to increase the prices U.S. customers paid for LCD Panels.

6         3.     The U.S. market for LCD Panels and products containing those panels has always

7   been one of the largest and most-profitable markets for defendants and their co-conspirators, so

8   they purposely set about fixing prices to unlawfully maintain and increase their profits from sales

9   to U.S. manufacturers and consumers.  Defendants and their co-conspirators delivered LCD

10   Panels to U.S. manufacturers in the United States to be incorporated into consumer products

11   made in the United States.  Defendants and their co-conspirators also delivered LCD Panels to

12   U.S. companies that the defendants knew would incorporate those LCD Panels into consumer

13   products manufactured by U.S. companies through their subsidiaries abroad to be imported and

14   sold into the United States.  Defendants knew and intended for these sales to have an effect on

15   U.S. domestic and import commerce.

16         4.     Defendants and their co-conspirators, using their U.S. affiliates, salespeople, and

17   contacts entered into supply agreements with Motorola in Illinois to sell Motorola LCD Panels at

18   unlawfully inflated prices.  They maintained sales, service, and design offices in the United

19   States (sometimes working in Motorola's own U.S. offices) to effectuate their scheme and they

20   monitored U.S. sales of LCD Products, such as Motorola's wireless handsets, to make sure the

21   cartel was effectively exploiting the U.S. market through its sales to Motorola, and to monitor

22   compliance with the cartel's unlawful pricing and bid-rigging.

23         5.     The purchase orders issued to the defendants based on these pricing agreements

24   contained provisions requiring the defendants to comply with all applicable laws and regulations

25   in the performance of the contract.  The defendants, by their agreements to fix prices to

26   Motorola, violated those terms.

27         6.     As described more fully below, for some portion of the LCD panels it purchased

28   from defendants and their co-conspirators, Motorola, Inc., the U.S. parent corporation, directed

one or more of its foreign affiliates and facilities, through an automated scheduling system, controlled entirely by Motorola, Inc. in the United States, to take delivery of panels outside the United States, place them into mobile wireless handset and other products, then deliver them to the United States for further manufacturing, and then deliver them for sale to Motorola, Inc.'s U.S. customers.  For these purposes, those foreign affiliates and facilities acted as the representatives and agents of Motorola, Inc., and indeed as a single enterprise with Motorola, Inc., and had no discretion or power over what price, quantity, or specification of LCD Panel to purchase, or what LCD supplier to choose.  These entities manufactured and sold phones at the direction of Motorola, Inc.  Any injury suffered as a result of any delivery of LCD Panels to Motorola's foreign affiliates and facilities is ultimately an injury to Motorola, Inc., and was proximately caused by defendants' and their co-conspirators' unlawfully inflated prices for LCD Panels sold to Motorola, Inc. and other conspiratorial conduct in the United States.

7.     At least seven LCD Panel manufacturers have admitted in criminal proceedings to participating in this conspiracy and conducting illegal price-fixing operations in the United States: defendants LG Display Co. Ltd. (and its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation, and HannStar Display Corporation.  On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $565 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  On or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

8.     In their respective pleas, Sharp and Epson specifically identified Motorola as a customer that was overcharged for LCD Panels.  Sharp admitted to targeting Motorola (and other U.S. companies) and overcharging Motorola for LCD Panels it purchased.  Epson also admitted

1    to targeting Motorola and overcharging Motorola for LCD Panels it purchased.  Both Sharp and

2    Epson further admitted that acts committed in furtherance of its conspiracy were carried out in

3    the United States.

4            9.      Motorola brings this action to recover damages resulting from defendants' and

5    their co-conspirators' price-fixing conspiracy, which during and after the Conspiracy Period

6    artificially raised the price of LCD Panels above the price that would have prevailed in a

7    competitive market.  During and after the Conspiracy Period, hundreds of millions of Motorola's

8    products, including mobile wireless handsets,  two-way radios, and other products, contained

9    LCD Panels.  Motorola thus suffered damages as a result of defendants' and their co-

10   conspirators' conspiracy, and is entitled to treble damages and injunctive relief to remedy these

11   injuries.

12           10.     Motorola brings this action seeking federal injunctive relief under Section 16 of

13   the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14   Motorola also seeks to recover damages under Section 4 of the Clayton Act, and under state

15   antitrust, consumer protection, unfair trade, deceptive trade practices and contract laws.

16   Motorola also seeks to recover the costs of suit, including reasonable attorneys' fees.  These

17   damages, costs, and fees are for the injuries that Motorola suffered as a result of the defendants'

18   and their co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of LCD

19   Panels.

20   **II.      JURISDICTION AND VENUE**

21           11.     Motorola brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1,

22   and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain treble damages and

23   injunctive relief against all defendants.

24           12.     Motorola also brings this action pursuant to the Illinois Antitrust Act, 740 Illinois

25   Code 10/1 et seq, for injunctive relief and damages that Motorola sustained due to defendants'

26   and their co-conspirators' violation of Section 3 of the Illinois Antitrust Act (the "Illinois

27   Antitrust Law").  With its headquarters and substantial operations in Illinois, Motorola has a

28   significant presence in Illinois.  In addition, during and after the Conspiracy Period, Motorola

1    purchased LCD Panels and LCD Products in Illinois.  Motorola procurement teams based in

2    Illinois, evaluated, qualified, and selected all of Motorola's LCD Panel and LCD Product

3    suppliers.  U.S. procurement teams also negotiated all prices, specifications, and quantities for all

4    purchases of LCD Panels and LCD Products from Motorola offices in Illinois.  Moreover,

5    representatives from defendants' U.S. subsidiaries and affiliates negotiated and supported sales

6    to Motorola from their sales offices in Illinois and other parts of the United States.  For these

7    reasons, Motorola is entitled to the protections of the Illinois Antitrust Law.

8           13.    Motorola also brings its claims for breach of contract and unjust enrichment under

9    the law of the State of Illinois.

10          14.    Pursuant to 28 U.S.C. §§ 1331 and 1337, the Court has jurisdiction over

11   Motorola's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

12          15.    Pursuant to 28 U.S.C. §1367, the Court has supplemental jurisdiction over

13   Motorola's claims under the Illinois Antitrust Law, as well as its claims for breach of contract

14   and unjust enrichment.  These state law claims are so related to Motorola's claims under Section

15   1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same

16   case or controversy.

17          16.    The activities of defendants and their co-conspirators, as described herein, directly

18   involved U.S. import trade or commerce.  In addition, the activities of the defendants and their

19   co-conspirators were within the flow of, were intended to, and did have a direct, substantial, and

20   reasonably foreseeable effect on U.S. domestic and import trade or commerce.  In particular,

21   defendants' and their co-conspirators' conspiracy directly and substantially affected the price of

22   LCD Panels and products which contained LCD Panels ("LCD Products") purchased in the

23   United States.  These effects give rise to Motorola's antitrust claims.

24          17.    The activities of defendants and their co-conspirators, as described herein, were

25   within the flow of, were intended to, and did have a direct and substantial effect on commerce in

26   Illinois.  In particular, defendants' and their co-conspirators' conspiracy directly and

27   substantially affected the price of LCD Panels and LCD Products purchased in Illinois.  These

28

1    effects also give rise to Motorola's antitrust claims.  Motorola maintained its headquarters,

2    including its global procurement team, in Illinois during and after the Conspiracy Period.

3        18.    This court has jurisdiction over each defendant named in this action under both

4    Section 12 of the Clayton Act, 15 U.S.C. § 22, and section 2-209 of the Illinois Code of Civil

5    Procedure, 735 Illinois Code 5/2-209.  Each defendant conducts substantial business in Illinois.

6    In addition, defendants and their co-conspirators purposely availed themselves of the laws of the

7    United States and Illinois insofar as they manufactured LCD Panels for sale in the United States,

8    including Illinois, or which were incorporated into LCD Products defendants and their co-

9    conspirators knew would be sold to customers in the United States and Illinois.  Defendants' and

10   their co-conspirators' conspiracy affected this commerce in LCD Panels and LCD Products in

11   the United States and in Illinois.

12       19.    Venue is proper in the Northern District of Illinois under Section 12 of the

13   Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each defendant is either an alien

14   corporation, transacts business in this District, or is otherwise found within this District.  In

15   addition, venue is proper in this District under 28 U.S. §1391 because a substantial part of the

16   events or omissions giving rise to this claim occurred in this district.  Defendants and their co-

17   conspirators knew that price-fixed LCD Panels and LCD Products containing price-fixed LCD

18   Panels would be sold and shipped into this District.

19   **III.    DEFINITIONS**

20       20.    "LCD Panel" means liquid crystal display panel.  Liquid crystal display panels

21   use glass plates and a liquid crystal compound to electronically display an image.  The

22   technology involves sandwiching a liquid crystal compound between two glass plates called

23   "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or

24   pixels, that form an image.  As used herein, "LCD Panel" refers to both liquid crystal display

25   panels and modules consisting of liquid crystal display panels combined with a backlight unit, a

26   driver, and other equipment that allow the panel to operate and be integrated into a mobile

27   wireless handset, television, computer monitor, or other product.  During and after the

28   Conspiracy Period, LCD Panels used in handheld devices included three different technologies:

thin film transistor panels ("TFT panels"), color super-twist nematic panels ("CSTN panels"), and monochrome super-twist nematic panels ("MSTN panels").  The defendants' and their co-conspirators' price fixing conspiracy alleged herein had the effect of raising, fixing, maintaining, and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

21.     As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

22.     As used herein, the term "ODM" means any original design manufacturer of an LCD Product.

23.     As used herein, the term "EMS provider" means any electronics manufacturing services provider of an LCD Product.

## IV.     THE PARTIES

### A.     Motorola

24.     Motorola, Inc. is a Delaware corporation with its principal place of business in Schaumburg, Illinois.  Motorola is a leading manufacturer of mobile wireless devices, creating the first commercial handheld cellular phone in 1983.

25.     Motorola, Inc. brings this action on behalf of itself and its affiliates, including Motorola Asia Limited, Motorola (China) Investment Limited, Hangzhou Motorola Cellular Equipment Co. Ltd., Motorola (China) Electronics Limited, Motorola Electronics Pte. Ltd., and Motorola Trading Center Pte. Ltd. (collectively "Motorola").  Each of these affiliates has assigned to Motorola, Inc., all of its rights, title, and interest in and to all claims, demands, and causes of action arising out of or relating to the conduct and transactions that are the subject of this action.  Motorola, Inc. has accepted these assignments and assumed all of the rights and liabilities related to these assigned claims.  Motorola, Inc. created these affiliated entities in accordance with local laws in China and Singapore requiring U.S. companies to create separate subsidiaries when doing business in those countries.  The entities were established to operate Motorola Inc.'s manufacturing facilities in Tianjin, China; Hangzhou, China; and Singapore, and

to distribute LCD Panels to Motorola's EMS providers.  To the extent such claims are not already in the possession of Motorola, Inc., Motorola is in the process of securing assignments of claims from its affiliates in Germany, Ireland, Brazil, Mexico, and the United Kingdom.

26.     During and after the Conspiracy Period, Motorola, Inc. manufactured LCD Products for the U.S. market at its own facilities in Illinois, Florida, New York, as well as its foreign facilities located in Tianjin, China; Hangzhou, China; and Singapore.  A substantial portion of the LCD Products manufactured at the Tianjin, Hangzhou, and Singapore facilities were for Motorola's largest U.S. customers, including U.S. mobile carriers such as Sprint, AT&T, Verizon, and T-Mobile.  Motorola, Inc. also manufactured LCD Products for other markets in China, Singapore, Brazil, Germany, Ireland, Mexico, and the United Kingdom.

27.     Motorola, Inc. has the following ownership interests in each of the above affiliate entities and related manufacturing facilities:

- Motorola's manufacturing facility in Tianjin, China is operated by Motorola Asia Limited, Motorola (China) Investment Limited, and Motorola (China) Electronics Limited.  Motorola, Inc. owns 99.99% of Motorola Asia Limited.  The only reason Motorola, Inc. does not own 100% of Motorola Asia Limited is because Chinese law requires at least some portion of a Chinese corporation to be Chinese owned.  In turn, Motorola Asia Limited owns 100% of Motorola (China) Investment Limited, and Motorola (China) Investment Limited owns 100% of Motorola (China) Electronics Limited.

- Until it closed in December 2008, Motorola's manufacturing facility in Singapore was operated by Motorola Electronics Pte. Ltd.  Motorola, Inc. owns 100% of Motorola Electronics Pte. Ltd.

- Motorola's manufacturing facility in Hangzhou, China is operated as a joint venture with a Chinese company, Eastern Communications, Co.  Motorola owns 50% of the facility through its ownership interests in two joint ventures that together own the Hangzhou facility.  Motorola's interests in those joint ventures

1    are owned by Motorola (China) Investment Limited, which is in turn wholly

2    owned by Motorola Asia Limited.

3    •    In November 2003, Motorola, Inc. began purchasing LCD Panels for use by its

4    EMS providers in building products on behalf of Motorola through its wholly-

5    owned Singapore subsidiary, Motorola Trading Center Pte. Ltd.

6    28.    As is described in more detail below, during and after the Conspiracy Period

7    Motorola paid artificially-inflated prices for the LCD Panels that it purchased.  Those inflated

8    prices were the direct result of defendants' and their co-conspirators' illegal price-fixing

9    conspiracy.

10    **B.    Defendants**

11    **1.    AU Optronics**

12    29.    Defendant AU Optronics Corporation is one of the largest manufacturers of LCD

13    Panels.  Its corporate headquarters are at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu

14    30078, Taiwan.  During the Conspiracy Period, AU Optronics Corporation manufactured,

15    marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States

16    and elsewhere.

17    30.    Defendant AU Optronics Corporation America, Inc., is a wholly-owned and

18    controlled subsidiary of defendant AU Optronics Corporation.  Its corporate headquarters are at

19    9720 Cypresswood Drive, Suite 241, Houston, Texas.  It also has facilities located in San Diego

20    and Cupertino, California.  During the Conspiracy Period, AU Optronics Corporation America,

21    Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products

22    throughout the United States and elsewhere.

23    31.    Defendants AU Optronics Corporation and AU Optronics Corporation America,

24    Inc., are referred to collectively herein as "AU Optronics."  They participated in the conspiracy

25    through the actions of their respective officers, employees, and representatives acting with actual

26    or apparent authority.  Alternatively, defendant AU Optronics Corporation America, Inc., was a

27    member of the conspiracy because, among other reasons, of its status during the Conspiracy

28

Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### 2.    Chi Mei

32.    Defendant Chi Mei Corporation is one of the world's largest manufacturers of LCD Panels.  Its corporate headquarters are at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan.  During the Conspiracy Period, Chi Mei Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

33.    Defendant Chi Mei Optoelectronics Corporation is one of the world's largest manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation.  Its global headquarters are at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.  During the Conspiracy Period, Chi Mei Optoelectronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

34.    Defendant Chi Mei Optoelectronics USA, Inc., formerly known as International Display Technology USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation.  Its corporate headquarters are at 101 Metro Drive Suite 510, San Jose, California.  During the Conspiracy Period, Chi Mei Optoelectronics USA, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

35.    Defendant CMO Japan Co., Ltd., formerly known as International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation.  Its principal place of business is at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan.  During the Conspiracy Period, CMO Japan Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

36.     Defendant Nexgen Mediatech, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation.  Its principal place of business is at No. 11-2, Jen Te 4th St., Jen Te Village Jen Te, Tainan 717 Taiwan.  During the Conspiracy Period, Nexgen Mediatech, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

37.     Defendant Nexgen Mediatech USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation.  Its principal place of business is at 16712 East Johnson Drive, City of Industry.  During the Conspiracy Period, Nexgen Mediatech USA, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the world.

38.     Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., are referred to collectively herein as "Chi Mei."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation.  Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### 3.     Chunghwa

39.     Defendant Chunghwa Picture Tubes Ltd. is a leading manufacturer of LCD Products.  Its global headquarters are at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.  During the Conspiracy Period, Chunghwa Picture Tubes Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

40.     Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.  During the Conspiracy Period, Tatung America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

41.     Defendants Chunghwa Picture Tubes Ltd. and Tatung America are referred to collectively herein as "Chunghwa."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  During the Conspiracy Period, Chunghwa Picture Tubes Ltd. and Tatung America were closely affiliated, commonly owned, controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or alter egos.  Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa's Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the Tatung Company.  Tatung America is also a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.

**4.     HannStar**

42.     Defendant HannStar Display Corporation ("HannStar") has its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  During the Conspiracy Period, HannStar manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

**5.** **LG Display**

43.     Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and/or LCD Products.  It was created in 1999 as a joint venture by Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  LG Display Co., Ltd. also maintains offices in San Jose, California.  During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

44.     Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California.  During the Conspiracy Period, LG Display America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

45.     Defendants LG Display Co., Ltd. and LG Display America, Inc., are referred to collectively herein as "LG Display."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc., was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**6.** **Samsung**

46.     Defendant Samsung Electronics Co., Ltd. has its principal place of business at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, Samsung Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

47.     Defendant Samsung Electronics America, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd.  Its principal place of business is at 105 Challenger

14

1   Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, Samsung Electronics

2   America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD

3   Products throughout the United States and elsewhere.

4         48.    Defendant Samsung Semiconductor, Inc., is a wholly-owned and controlled

5   subsidiary of Samsung Electronics Co., Ltd.  Its principal place of business is at 3655 North First

6   Street, San Jose, California.  During the Conspiracy Period, Samsung Semiconductor, Inc.,

7   manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout

8   the United States and elsewhere.

9         49.    Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

10  and Samsung Semiconductor, Inc., are referred to collectively herein as "Samsung."  They

11  participated in the conspiracy through the actions of their respective officers, employees, and

12  representatives acting with actual or apparent authority.  Alternatively, defendants Samsung

13  Electronics America, Inc., and Samsung Semiconductor, Inc., were members of the conspiracy

14  by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung

15  Electronics Co., Ltd.  Samsung Electronics Co., Ltd. dominated or controlled Samsung

16  Electronics America, Inc., and Samsung Semiconductor, Inc., regarding conspiracy activities and

17  used that domination or control to charge artificially high prices for LCD Panels and/or LCD

18  Products.

19        **7.**    **Sharp**

20        50.    Defendant Sharp Corporation has its principal place of business at 22-22 Nagaike-

21  cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, Sharp Corporation

22  manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout

23  the United States and elsewhere.

24        51.    Defendant Sharp Electronics Corporation is a wholly-owned and controlled

25  subsidiary of Sharp Corporation.  Its principal place of business is at Sharp Plaza, Mahwah, New

26  Jersey.  During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed,

27  sold and/or distributed LCD Panels and/or LCD Products throughout the United States and

28  elsewhere.

52.     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**8.     Toshiba**

53.     Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, Toshiba Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

54.     Defendant Toshiba Mobile Display Co., Ltd., formerly known as Matsushita Display Technology Co., Ltd., has its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the Conspiracy Period, Toshiba Mobile Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

55.     Defendant Toshiba America Electronic Components, Inc., is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation.  Its corporate headquarters are at 19900 MacArthur Blvd., Ste. 400, Irvine, California.  During the Conspiracy Period, Toshiba America Electronic Components, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

56.     Defendant Toshiba America Information Systems, Inc., is a wholly-owned and controlled subsidiary of Toshiba America, Inc.  Its principal place of business is at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information Systems, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

57.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., are referred to collectively herein as "Toshiba."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

## 9.     Epson

58.     Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

59.     Defendant Epson Electronics America, Inc., ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard Parkway, San Jose, California.  During the Conspiracy Period, Epson America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

60.     Defendants Epson Japan and Epson America are referred to collectively herein as "Epson."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant

Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### C.   Agents and Co-Conspirators

61.     The actions in this Complaint were authorized, ordered, or done by the defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

62.     Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made by its parent company.

63.     Various persons and entities, some identified and some not yet identified, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  When Motorola establishes the identities of such co-conspirators, Motorola will seek leave to amend this complaint to add such co-conspirators as defendants.  These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Philips Electronics North America Corp., Ltd., IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

## V.   THE MARKET FOR LCD PANELS AND LCD PRODUCTS

64.     During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels in the United States through and into interstate and foreign commerce, including through the Northern District of Illinois.

65.     During the Conspiracy Period, defendants collectively controlled the market for LCD Panels, both globally and in the United States.

66.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

67.     LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.  LCD Panels were the principal form of display screen used in mobile wireless handsets and two-way radios manufactured during and after the Conspiracy Period.

68.     LCD Panels use liquid crystal to control the passage of light.  More specifically, an LCD Panel is made of two glass sheets sandwiching a layer of liquid crystal.  When voltage is applied, the liquid crystal is bent, allowing light to pass through to form a pixel.  The combination of these pixels forms an image on the panel.

69.     LCD Panels have no independent utility, and have value only as components of other products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays, laptop displays, and televisions.  The demand for LCD Panels thus derives directly from the demand for such products.  In the case of LCD Panels used in mobile wireless handsets, the demand for LCD Panels derives directly from the demand for mobile wireless handsets.

70.     The market for LCD Panels is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units.  This number ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in the demand for LCD Panels during the Conspiracy period.  Shipments of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

71.     The market for LCD Panels and the market for LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products, such as mobile wireless handsets.  The market for LCD Panels and the markets

19

for LCD Products such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions are, for all intents and purposes, inseparable in that one would not exist without the other.

72.     Motorola participated in the market for LCD Panels during and after the Conspiracy Period through its purchases of LCD Panels and LCD Products.  Motorola paid a higher price for LCD Panels and LCD Products purchased from defendants, their co-conspirators, and others than it would have absent the conspiracy.

**VI.     DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS IN THE UNITED STATES AND THEY PARTICIPATED IN PRICE FIXING MEETINGS OVERSEAS TO INCREASE THE PRICE OF LCD PANELS SOLD IN THE UNITED STATES**

73.     During the Conspiracy Period, the defendants were aware that the U.S. market for LCD Products was one of the largest in the world.  Defendants regularly solicited updated information from potential purchasers of LCD Panels, including Motorola, about the type and quantity of LCD Panels needed for the manufacture of LCD Products for sale in the United States.  Defendants maintained sales offices and sales agents in the United States to market their LCD Panel manufacturing capabilities to U.S. companies, including Motorola, and to support Motorola and other U.S. customers throughout the duration of the purchasing relationship.

**A.     Defendants Were Well Aware That LCD Panels Sold To Motorola Would Be Imported And Sold In The United States.**

74.     During the Conspiracy Period, defendants helped Motorola design, plan, and execute development programs for Motorola devices containing LCD Panels for the U.S. market and, therefore, knew that such devices would be imported into the United States.  For example, Samsung employees worked in Illinois and throughout the U.S.—often in Motorola facilities—on the design and engineering of Motorola devices sold in the U.S. market.  Samsung's offices in Illinois provided design and engineering support to Motorola, including weekly phone calls between Samsung engineers in the U.S. and Motorola engineers in the U.S., and regular Samsung visits to Motorola offices in Illinois.  In addition, Samsung engineers collaborated with Motorola engineers on quality issues relating to Motorola devices sold in the U.S. market.

REDACTED

75.                          REDACTED

76.                          REDACTED

77.     As a result of these and other activities, defendants knew that when they sold LCD Panels to Motorola, they were likely to be imported into the U.S., and the prices would have an effect on U.S. commerce.

**B.     Defendants Engaged In Bilateral And Multilateral Meetings And Communications With Competitors To Inflate Prices Of LCD Panels And LCD Products.**

78.     The defendants conspired to raise the prices of LCD Panels sold into the United States.  The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions at all levels of defendants that took place in the United States, as well as in Japan, South Korea, Taiwan, and elsewhere.  Defendants' conspiracy included agreements to fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Defendants fostered a culture of corruption within their companies whereby employees at every level—from the very top executives all the way to lower-level sales representatives—engaged in frequent and continuous communications with employees at every level of their competitors.  Senior executives at defendants made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees funneled the competitive

1   information up to their superiors who utilized that information—along with the pricing

2   information they, themselves, were able to collect through their own illegal competitor

3   contacts—to set prices for LCD Panels at artificially-inflated levels.  The constant

4   communications between defendants at all levels allowed defendants to conspire to set average

5   prices across the entire industry, as well as conspiring to fix the prices of the particular LCD

6   Panels sold to specific U.S. customers, such as Motorola, Dell, Hewlett-Packard, Apple, and

7   others.

8           **1.      Defendants Engaged In Illegal Communications About Pricing
                        In The United States.**

9

10      79.                              REDACTED

11

12

13

14

15

16      80.                              REDACTED

17

18

19

20

21

22

23

24      81.                              REDACTED

25

26

27

28

REDACTED

82.     For OEMs in the United States, such as Motorola, defendants' U.S. affiliates led the LCD Panel price negotiations, with pricing directions coming from Asia where the defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the defendants' conspiracy meetings and conspiracy communications took place in the U.S., involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and U.S. OEMs.  But in addition to these conspiratorial acts committed in the U.S., defendants' conspiratorial conduct included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, defendants' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products, such as mobile wireless handsets.   Defendants' conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

### 2.     Defendants Engaged In Illegal Communications About Pricing With Regard To Small LCD Panels.

83.     As part of the larger conspiracy to raise the price of LCD Panels, defendants engaged in bilateral communications specifically regarding prices for small LCD Panels used in mobile devices and two-way radios.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The

information gained in these communications was then shared with supervisors and used to determine the price to be offered the defendants' customers.

84.    These bilateral communications between defendants routinely involved LCD Panels used in mobile wireless devices and other handheld products.  Examples include:

- REDACTED

- REDACTED

- REDACTED

- REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

1    •                    REDACTED

2

3

4

5    •                    REDACTED

6

7

8

9

10   •                    REDACTED

11

12

13

14

15        **3.    Defendants Engaged In Illegal Bilateral And Multilateral**
          **Communications About The Pricing Of TFT-LCD Panels.**
16

17        85.    In the early years of the conspiracy, beginning in at least 1996, representatives of

18   the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix the prices for

     LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD
19

     Panels each would produce.
20

21        86.    In early 1998, high level representatives at various LCD manufacturers, including

22   Sharp, Toshiba, Samsung, NEC, LG, and Mitsubishi, met to discuss projected sales volumes.

23   The companies agreed that they needed additional meetings to head off the projected higher level

24   of competition between the companies.  The companies met again later in 1998 to discuss their

     projected sales plans to limit competition between them.
25

26        87.    Beginning in 1999, high level representatives of Samsung met with counterparts

27   at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

88.     From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp, met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production.  The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants during this period.  The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States on a regular basis throughout this period.

89.     The Crystal Meetings were highly organized and reflected the culture of corruption at the defendant companies, with meetings among multiple levels of company representatives.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings; and those among lower level sales representatives were call "Working Level" meetings.

90.     The CEO meetings occurred quarterly from approximately 2001 to 2006.  The Commercial meetings occurred monthly during that same period, and the Working Level meetings occurred frequently over the same time period.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

91.     During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and supply, demand, and production levels of LCD Panels.  The participants reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels.  Defendants set these prices in various ways,

including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.  Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

92.    During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings.  Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings.  Participants at the Crystal Meetings contacted Japanese defendants (such as Sharp and Toshiba) to relay the agreed-upon pricing and production limitations.  Some of these meetings and communications took place in the U.S., and specifically targeted U.S. commerce and U.S. OEMs.

### 4.    Defendants Engaged In Illegal Bilateral And Multilateral Communications About The Pricing Of STN-LCD Panels.

93.    During the Conspiracy Period, LCD Panels used in certain applications, including notebook PCs and mobile wireless handsets, included both TFT-LCD Panels and STN-LCD Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.  Certain defendants, their corporate affiliates, and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels, including defendants Samsung, Sharp and Epson.  The same individuals at the defendants who were engaged in bilateral communications and group meetings regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

94.    Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Specifically, defendants engaged in bilateral discussions in which they exchanged information about STN-LCD Panel pricing, shipments, and production.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The

1    information gained in these communications was then shared with supervisors and taken into

2    account in determining the price to be offered defendants' customers for STN-LCD Panels.

3         95.                    REDACTED

4

5

6

7

8

9

10        96.        REDACTED

11

12

13

14

15        97.                  REDACTED

16

17

18

19

20

21        98.                  REDACTED

22

23

24

25

26        99.                  REDACTED

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

1

2

3

REDACTED

4

100.

REDACTED

5

6

7

8

9

10

11

12

13

101.

REDACTED

14

15

16

17

18

19

20

21

102.

REDACTED

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

103.                          REDACTED


104.                          REDACTED


105.    Thus, because a number of mobile wireless handsets, including the Motorola Razr phone, included both TFT-LCD Panels and STN-LCD Panels, and because mobile wireless handset manufacturers often requested a single price for LCD modules that included both types of panels, defendants' bilateral discussions and agreements with respect to TFT-LCD panel prices inevitably included and/or affected the prices of STN-LCD panels in those modules.

**C.      Defendants Have Been Charged With And Have Pled Guilty To Participating in Price-Fixing Meetings In The U.S. And For Fixing The Price Of LCD Panels And LCD Products Sold In The U.S.**

106.    In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

107.    On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

108.    At least one of the defendants has approached the Antitrust Division of the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the DOJ, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in defendants' price-fixing conspiracy.  The DOJ Antitrust Division's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other defendants to this action.  However, a number of defendants and their executives have pled guilty to price-fixing, as alleged more fully herein.

109.    Defendant Chi Mei Optoelectronics has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

110.    LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the prices of LCD Panels sold worldwide, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

111.    Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide from September 2001 through June 2006.  Specifically, Mr. Chung admitted that he participated in meetings,

1   conversations and communications in Taiwan, South Korea and the United States to discuss the

2   prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels,

3   issued price quotations in accordance with the agreements reached, exchanged pricing and sales

4   information for the purpose of monitoring and enforcing adherence to the agreed-upon prices,

5   and authorized, ordered, and consented to the participation of subordinate employees in the

6   conspiracy.  In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison

7   term and pay a criminal fine of $25,000.

8       112.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in

9   the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and

10  California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon

11  admitted that he participated in meetings, conversations and communications in Taiwan, South

12  Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD

13  Panels at certain predetermined levels, issued price quotations in accordance with the agreements

14  reached, exchanged pricing and sales information for the purpose of monitoring and enforcing

15  adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation

16  of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has

17  agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

18      113.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales

19  Officer from LG Display, has been indicted for participating in the conspiracy to fix the prices of

20  LCD Panels sold worldwide, including the United States and California in particular, from

21  December 2001 through December 2005.  Specifically, Mr. Koo has been charged with

22  participating in meetings, conversations and communications in Taiwan, South Korea and the

23  United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place

24  in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at

25  certain predetermined levels, issuing price quotations in accordance with the agreements

26  reached, exchanging pricing and sales information for the purpose of monitoring and enforcing

27  adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of

28  subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold

at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

114.    Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

115.    In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin pleaded guilty to participating in the conspiracy from September 2001 through December 2006. Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with their guilty pleas, Mr. Lin has agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

116.    In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005.  Specifically, Mr. Lin and Mr. Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations

1   in accordance with the agreements reached, exchanging pricing and sales information for the

2   purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering,

3   and consenting to the participation of subordinate employees in the conspiracy, accepting

4   payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in

5   the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

6        117.    Defendant Sharp has admitted and pleaded guilty to participating in the

7   conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Dell from April

8   2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to

9   Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings,

10  conversations and communications in Japan and in the United States with unnamed co-

11  conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and

12  exchanging pricing and sales information for the purpose of monitoring and enforcing adherence

13  to the agreed-upon prices.  Defendant Sharp participated in multiple Working Level meetings, as

14  well as bilateral discussions with other defendants, during which it discussed and reached

15  agreements with other defendants on prices for LCD Panels during the Conspiracy Period.

16       118.    Defendant Sharp also participated in multiple bilateral discussions with other

17  defendants, including Samsung, Toshiba, and Epson, during the Conspiracy Period.  Through

18  these discussions, Sharp agreed on prices, price increases, production quotas, and production

19  limits for LCD Panels.  Because Samsung, Toshiba, and Epson were Sharp's primary

20  competitors in the sale of LCD Panels used in mobile wireless handsets, Sharp knew that it could

21  not have fixed the prices of LCD Panels incorporated into such handsets—as Sharp admitted it

22  did in its guilty plea—unless it reached agreements with Samsung, Toshiba, and Epson to do the

23  same.

24       119.    Defendant Epson Japan has admitted and pleaded guilty to participating in the

25  conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Motorola.  Epson

26  Japan has admitted and pleaded guilty to participating in the conspiracy from 2005 through 2006

27  to fix the prices of LCD Panels, and to participating in meetings, conversations and

28  communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to

34

fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, Epson Japan has agreed to pay a fine of $26 million.

120.     Defendant Epson America is a wholly-owned and controlled subsidiary of defendant Epson Japan and Epson Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui") at one of the bilateral meetings.  Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.  In addition, to the extent Epson America distributed LCD Panels or LCD Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers did not undercut the pricing agreements reached at these various meetings.  Epson America was an active, knowing participant in the alleged conspiracy, and acted as Epson Japan's agent for selling LCD Products in the United States.

121.     In addition to the participation in the conspiracy outlined through the guilty pleas, other as yet uncharged conspirators also participated in the conspiracy.  Defendant Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the defendants that attended the Crystal Meetings.  The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.  During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture.  In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations.  In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, formerly known as Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing,

1    and sales operations.  In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel

2    manufacturing facility in Poland.  The operation and management of these many different joint

3    ventures afforded Toshiba and the other defendant joint-venture partners' regular opportunities

4    to communicate with each other to agree on prices, price increases and production limits and

5    quotas for LCD Panels that each defendant manufactured and sold.

6        122.    Co-conspirator Hydis Technologies Co. Ltd. ("Hydis") participated in multiple

7    lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting

8    with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed

9    on prices and supply levels for LCD Panels.

10       123.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in

11   multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac

12   Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and

13   supply levels for LCD Panels.

14       124.    Co-conspirator Mitsui had at least one bilateral meeting, which included a

15   discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was

16   acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan

17   agreed on prices and supply levels for LCD Panels.

18       125.    Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings

19   or discussions during the Conspiracy Period with at least one other defendant or co-conspirator,

20   which included discussions about prices for LCD Panels.

21       126.    Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture

22   among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"),

23   and one or more of the partners in this joint venture participated in the meetings described above.

24   As a result, IPS Alpha was represented at those meetings and was a party to the agreements

25   entered into by its joint venture partners at these meetings.  As explained above, the agreements

26   at these meetings included agreements on price ranges and output restrictions.  The joint venture

27   partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

127.    When Motorola refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that Motorola is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, each entire corporate family was represented in meetings and discussions by their agents and each was a party to the agreements reached in them.

**D.    Defendants Negotiated With Motorola In The United States And Entered Into Agreements With Motorola To Sell LCD Panels At Prices Illegally Raised Through Their Conspiracy.**

128.    During and after the Conspiracy Period, Motorola purchased LCD Panels directly from the defendants.  Motorola used those LCD Panels to manufacture a number of different types of LCD Products, including mobile wireless handsets, two-way radios, and other products ("Motorola devices").  Defendants' illegal conspiracy increased the prices of LCD Panels that the defendants shipped directly to Motorola in the United States as well as the prices for LCD Panels Motorola purchased through its manufacturing subsidiaries.  The illegally-inflated prices the defendants charged Motorola for these LCD Panels affected the costs of each LCD Product Motorola manufactured.  As described more fully herein, those inflated LCD Panel costs affected both the price at which Motorola sold its products and the number of products it could sell, which drove down Motorola's profits.

129.    During and after the Conspiracy Period, procurement teams at Motorola based in the U.S. negotiated the prices, conditions, and quantities that governed all Motorola purchases of LCD Panels around the world for inclusion in Motorola devices.  Motorola's U.S. procurement

teams evaluated, qualified, and selected the LCD Panel suppliers that serviced Motorola around the world; drafted all requests for quotes for LCD Panels that would be purchased by Motorola facilities worldwide; reviewed the responses to the requests for quotes; selected which LCD Panel suppliers would supply each part to Motorola; and awarded each LCD Panel supplier a specific share of Motorola's overall business.

130.    Motorola's U.S. procurement teams negotiated the terms of each such purchase with U.S.-based and foreign-based employees of LCD Panel suppliers.  It did so as follows:

- At the initiation of a potential order, Motorola's U.S. procurement teams contacted the U.S.-based employee of the LCD Panel suppliers regarding the new opportunity.  The teams provided the potential supplier's U.S. representative with preliminary specifications, such as the display size, volumes, and expected dates.

- Motorola's U.S. procurement teams developed the requests and preliminary specifications for LCD Panels in collaboration with U.S. representatives of the LCD Panel suppliers.

- Managers on Motorola's U.S. procurement teams, through face-to-face meetings and by correspondence, negotiated the terms of purchases for LCD Panels with the U.S. representatives of the LCD Panel suppliers and awarded the share amounts to the selected LCD Panel suppliers.

131.    The purchase order contracts between Motorola and the LCD Panel suppliers in for the purchase of LCD Panels contain provisions required the defendants to comply with all laws and regulations in the performance of the contract.

132.    The prices Motorola's U.S. procurement teams agreed upon with employees of the LCD Panel suppliers directly and immediately impacted Motorola's business plans, including its most basic business choices involving the production, pricing, and sales of its own products. Based in part on those LCD Panel prices, Motorola set its contracts with its own customers, made purchasing decisions for other components incorporated into Motorola devices, and planned product development and sales opportunities.

133.    After the prices for LCD Panels were negotiated and agreed upon between Motorola's U.S. procurement teams and the U.S.-based employees of LCD Panel suppliers, a supply chain organization at Motorola based in Illinois directed an automatic scheduling process that translated the product demand for Motorola devices in the United States into the quantity requirements for the LCD Panels that would be incorporated into such devices.  The quantity requirements were based on orders made to Motorola's U.S. business operations teams in the United States by Motorola's U.S. customers.  This schedule-sharing process was entirely directed by Motorola, Inc. from the U.S.  In addition to price, Motorola, Inc. also controlled the amount and timing of LCD Panel orders by its foreign affiliates and subsidiaries. Motorola's foreign affiliates and facilities were not authorized to negotiate the price of LCD Panels, nor did they determine the total quantity of LCD Panels ordered.  The foreign affiliates issued purchase orders at the price and quantity determined by Motorola in the United States.

134.    In this respect, during and after the Conspiracy Period, Motorola, Inc. and its foreign affiliates and facilities operated as a single enterprise for the purpose of procuring LCD Panels.  Motorola, Inc. directed all aspects of the purchase of LCD Panels for inclusion in Motorola devices by its foreign affiliates and facilities.  The foreign affiliates and facilities acted as Motorola, Inc.'s agents for the purpose of transmitting purchase orders for LCD Panels to the LCD Panel suppliers at prices and for quantities that were determined by Motorola in the United States and in manufacturing Motorola devices on behalf of Motorola, Inc.  These are actions that Motorola Inc. could have and would have otherwise conducted itself.  At all relevant times, Motorola, Inc. controlled the price, quantity, and specifications at which its foreign affiliates purchased LCD panels, and Motorola, Inc. also controlled the timing of the purchases and the purposes for which they were used.  The Motorola U.S. pricing teams and the U.S. procurement managers were responsible for final approval on pricing, conditions, and projected quantities for purchase of LCD Panels.  The purchasing process at Motorola for the components of LCD Products for the U.S. market was managed and overseen by the supply chain organization and the procurement teams based in Motorola's U.S. operations.

135.     After Motorola, Inc.'s foreign affiliates and facilities completed the manufacture of Motorola devices at the request of Motorola, Inc. for sale in the United States, those devices were imported into the United States by Motorola, Inc.

136.     As part of the manufacturing process, Motorola's mobile devices were shipped to Fort Worth, Texas for final assembly and packaging.

137.     Motorola suffered the entire injury resulting from these artificially-inflated prices, and the injury from the purchase of these price-fixed panels is ultimately borne by Motorola, Inc. in the United States.

**E.     Defendants Agreed To Provide Motorola LCD Panels In Compliance With Applicable Laws And Regulations.**

138.     During and after the Conspiracy Period, Motorola and its LCD suppliers, including Epson, Samsung, Sharp, and Toshiba, entered into contracts for the sale of LCD Panels and/or LCD Products by which the LCD suppliers agreed to deliver LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay the LCD suppliers a price negotiated by Motorola and each LCD supplier.  These contracts between Motorola and its LCD suppliers included purchase orders issued by Motorola to its LCD suppliers.

139.     Pursuant to each of these contracts, Motorola's LCD suppliers agreed on behalf of itself and its suppliers and subcontractors that all LCD Panels provided to Motorola would be produced, manufactured and supplied, and services rendered, in compliance with all applicable laws, rules, regulations, and standards.  A specific provision confirming this term was included in many of the individual purchase orders, for example:

- REDACTED
- REDACTED
- REDACTED
- REDACTED
- REDACTED
- REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

140.     Motorola has performed all of the obligations, conditions, and agreements required of Motorola under its contracts with its LCD suppliers.  Motorola paid its LCD suppliers, including Epson, Samsung, Sharp, and Toshiba, for all LCD Panels and/or LCD Products delivered to Motorola.

141.     As set forth in the above allegations, Epson, Samsung, Sharp, and Toshiba did not comply with the terms of their contracts with Motorola, including the provision assuring compliance with all applicable laws in providing LCD Panels and/or LCD Products to Motorola.

**F.     Defendants Concealed That The Prices Motorola Negotiated For LCD Panels And LCD Products Were Illegally Increased By The Defendants' Conspiracy.**

142.     Motorola did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006, after the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy.  Because defendants' agreement, understanding and conspiracy were kept secret, Motorola was unaware of defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for LCD Panels and the products in which they were used.

143.                     REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

1

REDACTED

2

3

4          144.                    REDACTED

5

6

7

8

9

10

11

12

13          145.    As alleged above, defendants had secret discussions about price and output.

14    Defendants agreed not to publicly discuss the existence or the nature of their agreement.  In fact,

15    the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger

16    their arrivals and departures at such meetings to avoid being seen in public with each other and

17    with the express purpose and effect of keeping them secret.  Moreover, when the participants in

18    those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to

19    meet one-on-one for the so-called Round Robin meetings.

20          146.    Moreover, defendants repeatedly gave pretextual justifications for the inflated

21    prices of LCD Panels in furtherance of the conspiracy.

22          147.    There have been a variety of other purportedly market-based explanations for

23    price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing

24    manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted

25    that "prices will continue to increase until a reasonable balance is achieved."  Bock Kwon, Vice

26    President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's

27    Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute"

28    shortages.

148.    Another false rationale provided by defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated:  "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry."

149.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung.  He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

150.    Increased demand was repeatedly cited by defendants throughout the Conspiracy Period.  On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."  Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-size LCD televisions than expected, so LCD TV supply is likely to remain tight throughout the year."

151.    Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

152.    These explanations were all pretextual and each served to cover up the conspiracy.  As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiff's claims. Unbeknownst to Motorola, the prices Motorola's U.S. procurement teams agreed to with U.S.-based employees at the U.S. affiliates at LCD Panel suppliers were artificially inflated as a result of the defendants' and their co-conspirators' illegal agreements to sell price-fixed LCD Panels. Defendants fixed those prices despite the fact that Motorola specified in its purchase orders for

LCD Panels that LCD Panel suppliers were required to comply with all laws and regulations in providing the LCD Panels to Motorola.

## VII.   EFFECT ON U.S. COMMERCE AND INJURY TO MOTOROLA

### A.   Defendants' Conduct Involved Import Trade Or Import Commerce

153.   Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants intentionally sent price-fixed LCD Panels to Motorola's foreign facilities knowing that they would subsequently be imported into the United States, one of their most important markets and a major source of their revenues.  In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of Motorola devices destined for the United States.  Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. companies, U.S. consumers, and Motorola, Inc. itself.

154.   The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Defendants and others shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Conspiracy Period for ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period.  As a result, a substantial portion of defendants' revenues was derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.  Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.  During the Conspiracy Period, every defendant shipped LCD Panels directly into the United States.

155.   Because of the importance of the U.S. market to defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate

1    consumption in the United States were a focus of defendants' illegal conduct.  The defendants

2    knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of

3    commerce that lead immediately and directly into the United States.  Many LCD Panels were

4    intended for incorporation into finished products specifically destined for sale and use in the

5    United States.  Furthermore, this conduct by defendants was meant to produce and did in fact

6    produce a substantial effect in the United States in the form of artificially-inflated prices for LCD

7    Panels and LCD Products.

8          156.    When high-level executives based at defendants' Asian headquarters agreed on

9    prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products

10   sold in the United States.  The defendants knew and intended that a significant portion of the

11   products they sold to Motorola would be imported directly into the United States and thus would

12   cause harm to Motorola and, ultimately, U.S. consumers.  At all times, defendants were fully

13   aware that the artificially-inflated prices they set would govern the deliveries of LCD Panels to

14   Motorola's manufacturing facilities abroad and that a large percentage of those LCD Panels

15   would be incorporated into Motorola devices and immediately shipped into the United States for

16   sale and ultimate consumption in the United States.          REDACTED

17

18          •                    REDACTED

19

20

21          •                    REDACTED

22

23

24          •                    REDACTED

25

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

-     REDACTED

-     REDACTED

-     REDACTED

157.    Specifically, defendants were aware that Motorola's facilities in Tianjin, China; Hangzhou, China; and Singapore manufactured LCD Products for the U.S. market.  Therefore, when defendants delivered LCD Panels to those facilities, they knew, intended, and expected that the LCD Panels would be incorporated into Motorola devices intended to be sold in the United States.

158.    Further, defendants knew that the U.S. market was Motorola's primary market for Motorola devices.  Defendants also knew that Razr phones were one of Motorola's most successful products and, therefore, a large number of Razr phones manufactured by Motorola would be sold in the United States.  In fact, Motorola sold 40% of its Razr phones during the Conspiracy Period in the United States.  Thus, defendants knew and intended that, when they sold LCD Panels for inclusion in Razr phones, a large number of those phones would be sold in the U.S. market.  In fact, defendants Epson and Sharp have both admitted to price-fixing in the United States specifically with respect to LCD Panels sold to Motorola for incorporation into Motorola Razr phones.

159.    Moreover, because LCD Panels are—and were throughout the Conspiracy Period—the most expensive and significant component of LCD Products, defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States.  Many defendants manufactured LCD Products and sold them in the United States.  In fact, defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

160.    Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition, defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

161.    Defendants have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD Products into the United States involved American import trade and import commerce.  In a series of complaints filed with the U.S. International Trade Commission over the past few years, defendants Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

162.    Likewise, in a civil patent lawsuit brought in federal court, one Defendant acknowledged that other defendants' commercial activities involving intentionally sending LCD Panels and LCD Products into the United States involved American import trade and import commerce.  In the case, defendant alleged infringing conduct on the part of the other defendants stemming from their sending infringing products into "the United States . . . through established distribution channels involving various third parties, knowing that these third parties will use their respective nationwide contacts and distribution channels to import into, sell, offer for sale, and/or use these products in . . . the United States."  *See LG Philips LCD Co., Ltd. v. Chi Mei Optoelectronics Corporation, et al.*, Civil Action No. 06-726-JJF (D. Del.) (Docket No. 54) ¶¶ 6,

8.  According to defendant, those distribution channels/networks are "designed to exploit the U.S. market" and are "comprised of the largest original equipment manufacturers . . . and the largest chain retail outlets in the United States."  *LG Philips*, Civil Action No. 06-726-JJF (Docket No. 57) at 2.

163.   Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce.  Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

**B.    Defendants' Conduct Had A Direct, Substantial, And Reasonably Foreseeable Effect On U.S. Domestic And Import Trade Or Commerce That Gave Rise To Motorola's Antitrust Claim.**

164.   Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce in the form of higher prices for LCD Panels (prices that were the product of collusion) being negotiated and agreed to between defendants and Motorola, Inc. in the United States.  The prices reached, which were tainted by collusion, directly and immediately impacted Motorola's business in the United States.  These same negotiations and agreements in the United States resulted in the delivery of LCD Panels to Motorola's foreign affiliates and facilities at the higher prices determined in the United States, thereby causing overcharges to be incurred and directly giving rise to antitrust claims.

165.   Defendants and their co-conspirators delivered the LCD Panels and LCD Products to Motorola at prices and to locations specified in the agreements negotiated between the parties. Motorola's purchases of LCD Panels at issue in this case fall into three categories:  (1) LCD Panels delivered by the Defendants to Motorola in the United States;  (2) LCD Panels delivered to Motorola manufacturing facilities abroad for inclusion in Motorola devices imported into the U.S. by Motorola and later sold by Motorola to customers in the United States; and (3) LCD Panels delivered to Motorola manufacturing facilities abroad for inclusion in Motorola devices sold to Motorola customers abroad.  Motorola is entitled to recover the overcharges incurred on

1    all these purchases of LCD Panels in U.S. courts, as well as on purchases made after the

2    Conspiracy Period to the extent that defendants' and their co-conspirators' conspiracy caused a

3    lingering artificial inflation of prices.

4         166.    First, the defendants and their co-conspirators delivered LCD Panels directly to

5    Motorola facilities in the United States.  Motorola then incorporated those LCD Panels into LCD

6    Products in the United States that were then sold to U.S. customers.  The approximate total

7    volume of those purchases during the conspiracy period is $61 million.

8         167.    Second, Motorola also directed the defendants and their co-conspirators to deliver

9    LCD Panels to Motorola's manufacturing facilities in Tianjin, China; Hangzhou, China; and

10   Singapore for incorporation into LCD Products that were manufactured for importation and sale

11   in the United States.   The approximate total volume of those purchases during the conspiracy

12   period is $ 1.75 billion.

13        168.    Third, Motorola also directed the defendants and their co-conspirators to deliver

14   LCD Panels and LCD Products to Motorola's facilities abroad for manufacture and sale in

15   foreign markets.  As alleged above, Motorola's U.S. procurement teams negotiated the prices,

16   chose the vendors, and determined the quantities for all these purchases of LCD Panels.  The

17   approximate total volume of those purchases during the conspiracy period is $4.37 billion.

18        169.    The purchases falling into the first two categories above are what the guilty pleas

19   entered by defendants are premised upon.  As the DOJ and defendant LG Display's counsel

20   explained at the plea allocution of LG Display, and as this Court accepted, for purposes of

21   determining the volume of commerce affected in assessing the criminal fine against LG Display,

22   the DOJ considered three categories of conduct:  (1) LCD sales that were directly shipped into

23   the United States; (2) LCD sales that were directly billed to a company located in the United

24   States; and (3) LCD sales to a company based in the United States through its foreign affiliates

25   that ended up in finished products that were sold into the United States.

26        170.    In fact, these are the same categories of purchases for which defendants have

27   promised—both in their guilty pleas and during sworn allocutions before this Court at their

28   sentencing hearings—to compensate U.S. victims of their illegal activities in related civil

1    actions.  That promise was the reason why the U.S. government did not seek restitution for such

2    purchases and why this Court accepted defendants' guilty pleas without requiring restitution to

3    be paid.

4         171.    In addition, the affected commerce at issue in defendant Epson's guilty plea

5    appears to have been calculated using the first two categories listed above.  Epson pleaded guilty

6    specifically to fixing the prices of LCD Panels incorporated into Motorola Razr phones between

7    the fall of 2005 and the middle of 2006.  During that time period, Motorola purchased

8    approximately $100-130 million worth of LCD Panels from Epson for delivery in the United

9    States or for delivery abroad for inclusion in Razr phones that were then sold in the United

10   States.  The volume of affected commerce covered by Epson's plea is $110 million.  Similar

11   purchases appear to have been considered when determining the affected commerce at issue in

12   defendant Sharp's guilty plea.  Like Epson, Sharp also admitted to fixing the price of LCD

13   Panels incorporated into Motorola Razr phones.

14        172.    Motorola is entitled to recover all purchases falling in all three categories because

15   the artificially inflated prices of these purchases were set in negotiations between Motorola and

16   the defendants at Motorola's headquarters in the United States, and other locations, and were

17   ordered by Motorola's subsidiaries at Motorola's direction.

18        173.    Moreover, Motorola, Inc. was injured by the increased price paid for price-fixed

19   LCD Panels that were included in Motorola devices brought into the United States for sale to

20   U.S. companies and consumers.  In fact, the entire injury caused to Motorola by defendants'

21   price-fixing of such LCD Panels is ultimately borne in the United States by Motorola, Inc.  Thus,

22   any injury suffered as a result of the delivery of price-fixed products to Motorola's foreign

23   affiliates or subsidiaries at prices negotiated by Motorola, Inc. in the United States for

24   incorporation into Motorola devices sent to the United States resulted in an injury to Motorola,

25   Inc. that was proximately caused by those very same unlawfully inflated prices.

26        174.    Motorola was also the entity forced to pay higher prices for panels delivered by

27   defendants and their co-conspirators to Motorola's foreign affiliates for manufacture and sale in

28   foreign markets.  In fact, the injury caused to Motorola by defendants' price-fixing of such LCD

Panels is ultimately borne by Motorola, Inc.  Thus, any injury suffered as a result of the delivery of price-fixed products to Motorola's foreign affiliates or subsidiaries at prices negotiated by Motorola, Inc. in the United States for incorporation into Motorola devices sold abroad results in an injury to Motorola, Inc. that was proximately caused by those very same unlawfully inflated prices.

175.    Motorola has suffered a direct, substantial, and reasonably foreseeable injury as a result of defendants' and their co-conspirators' conspiracy to raise, fix, or maintain the price of LCD Panels at artificial levels.

176.    During and after the Conspiracy Period, defendants' and their co-conspirators' conspiracy artificially inflated the price of LCD Panels shipped directly to Motorola in the United States, causing Motorola to pay higher prices for LCD Panels than it would have in the absence of the conspiracy.

177.    Defendants' and their co-conspirators' conspiracy also artificially inflated the price that Motorola and defendants agreed upon in the United States for LCD Panels that defendants shipped to Motorola's foreign manufacturing facilities.  Because Motorola, Inc. and its foreign manufacturing facilities functioned as a single enterprise for the purposes of purchasing LCD Panels, the injury resulting from all such deliveries is ultimately suffered by Motorola, Inc.  Alternatively, defendants' and their co-conspirators' conspiracy artificially inflated the price that Motorola's foreign manufacturing facilities paid for the LCD Panels, and those claims have been or are in the process of being assigned by Motorola's foreign affiliates to Motorola, Inc.

178.    Because defendants' and their co-conspirators' conspiracy artificially inflated the price of these LCD Panels purchased by Motorola, the conspiracy also artificially inflated Motorola's costs for manufacturing LCD Products and diminished Motorola's ability to compete in markets for LCD Products against suppliers, including defendants LG and Samsung.  As a result, Motorola suffered losses of sales and profits.

179.    The conspiracy artificially inflated the prices of LCD Panels using TFT, CSTN, and MSTN technology purchased by Motorola.  The conspiracy also inflated the prices of LCD

1    Products purchased by Motorola for use in the ordinary course of its business, such as computer

2    monitors, laptop computers, and television sets.

3          180.    Moreover, defendants' and their co-conspirators' conspiracy caused artificially-

4    inflated prices for LCD Panels to be offered to Motorola's single, global procurement process

5    based at its headquarters in Illinois, which led Motorola to pay higher prices for LCD Panels

6    around the world that were incorporated into Motorola devices intended for sale both in the

7    United States and abroad.  Thus, Motorola's claims based on deliveries of LCD Panels both in

8    the United States and abroad arise from the same facts and illegal practices directed at Motorola,

9    Inc. in the United States.  As a result, these claims should be heard and adjudged by this Court

10   because they rise from the same nucleus of intertwined facts.

11   **VIII.   <u>MARKET CONDITIONS DEMONSTRATING THE CONSPIRACY</u>**

12         181.    Beyond the guilty pleas and the extensive evidence of the defendants'

13   wrongdoing produced by the defendants themselves, the market for LCD Panels provides further

14   evidence of the defendants' collusive behavior.

15         **A.    Structure Of The LCD Panel Industry.**

16         182.    The LCD Panel industry has several characteristics that facilitated a conspiracy to

17   fix prices, including high concentration, significant barriers to entry, homogeneity of products,

18   consolidation, multiple interrelated business relationships and ease of information sharing.

19         183.    The LCD Panel industry is highly concentrated and thus conducive to collusion.

20   Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a

21   significant share of the market for LCD Panels, both globally and in the United States.

22         184.    The LCD industry is characterized by high barriers to entry.  New fabrication

23   plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and

24   intellectual property requirements require constant research and development and investment.

25   Thus, firms cannot enter the market for the production and sale of LCD Panels without an

26   enormous capital investment.

27

28

185.    LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and televisions, are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

186.    The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

- the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;

- the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd.;

- the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;

- the 2005 transfer of Fujitsu Limited's LCD business to Sharp in 2005;

- the 2006 AU Optronics acquisition of Quanta Display.

187.    Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of such arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described hereinafter.

188.    There were many opportunities for defendants to discuss and exchange competitively-sensitive information through their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and

agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

**B.      Pricing In The LCD Panel Market Indicates Collusion By The Defendants.**

189.    Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion.  Rather, the behavior in this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of unnaturally stabilizing and raising prices for LCD Panels at supra-competitive levels.

190.    After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends.  However, since at least 1996, the LCD Panel market has been characterized by unnatural price stability and certain periods of substantial upward pricing trends.

191.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

192.    The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

193.    Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity.  Those defendants not already

1    manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD

2    Panels.

3          194.    In 1996, the LCD Panel market was experiencing excess supply and drastic price

4    cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping

5    due to lower manufacturing costs.  However, LCD Panel prices began rising in 1996, allegedly

6    due to insufficient production capacity.  In fact, defendants were fixing the prices.

7          195.    LCD Panel prices began to increase in early 1996.  Defendants blamed the sudden

8    increase in prices on an alleged inability to supply enough LCD Panels to meet demand.  By May

9    1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller

10   coaster of pricing in the display market, with no clear predictability anytime soon . . . .

11   Perplexed purchasers trying to keep up with the gyrating market can take solace that even

12   vendors are constantly being surprised by the sudden twists and turns."

13         196.    Soon thereafter, industry analysts began commenting on the unusual rise in LCD

14   Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

15         197.    1996 also brought the advent of third generation fabs.  Since 1996, additional

16   generations of fabs have been built, which has resulted in at least eight generations of LCD Panel

17   fabs.  LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai

18   was scheduled to do so by early 1998.  Each new LCD Panel generation was produced from ever

19   larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer

20   monitors, and laptops.  Ever-increasing production capacity threatened to outstrip demand for

21   LCD Panels, with the result that prices of LCD Panels should have decreased rapidly.  Instead,

22   defendants falsely claimed to be operating at full capacity and unable to meet demand, despite

23   the millions of units of over-capacity that had supposedly existed months earlier, and prices

24   surged upwards.  These price increases were also inconsistent with the fact that production had

25   become more efficient and cost effective.

26         198.    The supra-competitive level price of LCD Panels during the Conspiracy Period is

27   demonstrated by, inter alia, the fact that costs were decreasing.  One of the most significant costs

28   in producing an LCD Panel is the cost of its component parts.  Some of the major component

parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the gap between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

199.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

200.    LCD Panel prices increased by more than 5% in October 2001.  These price increases continued until June of 2002.

201.    At the time, defendants blamed these price increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

202.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc., posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

203. This increase in prices and revenue was unprecedented. During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc., later purchased by AU Optronics) rose 184% from the same period in 2001.

204. The market structure of the LCD Panel market demonstrates collusion on TFT-LCD Panels and STN-LCD Panels. At certain points during and after the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels and STN-LCD Panels were substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN panels were both purchased in significant quantities for similar uses—i.e., display purposes—in mobile wireless handsets and other LCD Products that included small displays. At other times during the Conspiracy Period, TFT-LCD Panels and CSTN panels were both purchased in significant quantities for use in notebook PCs.

205.                           REDACTED

206. Because TFT-LCD Panels and STN-LCD Panels were substitutes, and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely, as seen in the chart below:

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

207.        REDACTED

208.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes for certain LCD Products, and because defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, defendants had the incentive and ability to inflate the prices STN-LCD Panels as well as TFT-LCD Panels.  The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and vice versa.

IX.    **VIOLATIONS ALLEGED**

**FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:**

**VIOLATION OF SHERMAN ACT**

209.    Motorola incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

210.    Beginning at a time presently unknown to Motorola, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Motorola, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or

1   stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman

2   Act, 15 U.S.C. §1.

3         211.    In formulating and carrying out the alleged agreement, understanding, and

4   conspiracy, defendants and their co-conspirators did those things that they combined and

5   conspired to do, including but not limited to the acts, practices, and course of conduct set forth

6   above, and the following, among others:

7               A.  To fix, raise, maintain and stabilize the price of LCD Panels;

8               B.  To allocate markets for LCD Panels among themselves;

9               C.  To submit rigged bids for the award and performance of certain LCD Panels

10                  contracts; and

11              D.  To allocate among themselves the production of LCD Panels.

12        212.    The combination and conspiracy alleged herein has had the following effects,

13  among others:

14              A.  Price competition in the sale of LCD Panels has been restrained, suppressed,

15                  and/or eliminated in the United States;

16              B.  Prices for LCD Panels sold by defendants, their co-conspirators, and others

17                  have been fixed, raised, maintained and stabilized at artificially high, supra-

18                  competitive levels throughout the United States; and

19              C.  Those who purchased LCD Panels produced by defendants, their co-

20                  conspirators, and others have been deprived of the benefits of free and open

21                  competition.

22        213.    Motorola has been injured in its business and property by paying more for LCD

23  Panels purchased from defendants, their co-conspirators, and others than it would have paid and

24  will pay in the absence of the combination and conspiracy.

25        214.    Defendants' and their co-conspirators' conduct involved U.S. import trade or

26  commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic

27  and import trade or commerce that resulted in the injuries suffered by Motorola and gave rise to

28  Motorola's antitrust claims.  As a result, Motorola has suffered injury as a direct, proximate and

1    reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels.  Motorola

2    has been injured and will continue to be injured in its business and property by paying more for

3    LCD Panels purchased from defendants, their co-conspirators, and others than it would have paid

4    and will pay in the absence of the combination and conspiracy.

5         215.    Because Motorola has suffered injury as a direct, proximate and foreseeable result

6    of defendants' conspiracy to fix the price of LCD Panels, Motorola is entitled to damages under

7    Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of LCD Panels produced by

8    defendants, their co-conspirators, and others.

9         216.    Because Motorola faces a serious risk of future injury, Motorola is entitled to an

10   injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all defendants,

11   preventing and restraining the violations alleged herein.  Defendants all continue to manufacture

12   LCD Panels, and the market for production and sale of LCD Panels remains highly concentrated

13   and susceptible to collusion.  Defendants continue to have the incentive to collude to increase

14   LCD Panel prices or stabilize LCD Panel price declines, and defendants' conspiracy to fix the

15   price of LCD Panels could be easily repeated and concealed from Motorola.

16               **SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:**

17                    **VIOLATION OF ILLINOIS ANTITRUST ACT**

18        217.    Motorola incorporates and realleges, as though fully set forth herein, each and

19   every allegation set forth in the preceding paragraphs of this Complaint.

20        218.    Motorola believes and asserts that all of its purchases of LCD Panels and Products

21   are actionable pursuant to the federal antitrust laws as alleged in the First and Second Claims For

22   Relief.  For its indirect purchases of LCD Products not actionable under the federal antitrust

23   laws, Motorola alleges this Third Claim for Relief under the Illinois Antitrust Act.

24        219.    During and after the Conspiracy Period, Motorola purchased LCD Panels and

25   LCD Products from Illinois.  During that same period, it conducted a substantial volume of

26   business in Illinois, including selling in Illinois mobile wireless handsets and other LCD

27   Products that contained LCD Panels manufactured and sold by defendants and others.  Motorola

28   also maintained inventories of LCD Products in Illinois and maintained offices in Illinois.  As a

1    result of its presence in Illinois and the substantial business it conducts in Illinois, Motorola is

2    entitled to the protection of the laws of Illinois.

3         220.    Beginning at a time presently unknown to Motorola but at least as early as

4    January 1, 1996, and continuing thereafter at least up to and including at least December 11,

5    2006, defendants and their co-conspirators entered into and engaged in a continuing conspiracy

6    for the unreasonable restraint of trade or commerce, in violation of the Illinois Antitrust Law.

7         221.    The aforesaid violations of the Illinois Antitrust Law consisted, without

8    limitation, of a continuing unlawful conspiracy among defendants and their co-conspirators, the

9    substantial terms of which were to fix, control and maintain the prices of, and to allocate markets

10   for, LCD Panels.

11        222.    For the purpose of forming and effectuating the unlawful conspiracy, the

12   defendants and their co-conspirators have done those things which they combined and conspired

13   to do, including but in no way limited to the acts, practices and course of conduct set forth above

14   and the following:

      A.  to fix, raise, maintain and stabilize the price of LCD Panels;

      B.  to allocate markets for LCD Panels amongst themselves;

      C.  to submit rigged bids for the award and performance of certain LCD Panels

         contracts; and

      D.  to allocate among themselves the production of LCD Panels.

20        223.    The combination and conspiracy alleged herein has had, *inter alia*, the following

21   effects:

      A.  price competition in the sale of LCD Panels has been restrained, suppressed

         and/or eliminated in the State of Illinois and throughout the United States;

      B.  prices for LCD Panels have been fixed, raised, maintained and stabilized at

         artificially high, non-competitive levels in the State of Illinois and throughout

         the United States; and

      C.  those who purchased LCD Panels have been deprived of the benefit of free

         and open competition.

D.   As a direct and proximate result of defendants' conduct, Motorola has been
injured in its business and property by paying more for LCD Panels and LCD
Products than they would have paid in the absence of defendants' combination
and conspiracy.  As a result of defendants' violation of the Illinois Antitrust
Law, Motorola is entitled to damages and the costs of suit, including
reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF AGAINST SHARP:**

**BREACH OF CONTRACT**

224.    Motorola incorporates and realleges, as though fully set forth herein, each and
every allegation set forth in the preceding paragraphs of this Complaint.

225.    During and after the Conspiracy Period, Motorola and Sharp entered into multiple
contracts for the sale of LCD Panels and/or LCD Products by which Sharp agreed to deliver
LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay Sharp a price
negotiated by Motorola and Sharp.  These contracts between Motorola and Sharp include
purchase orders issued by Motorola to Sharp.

226.    Pursuant to these contracts, Sharp agreed on behalf of itself and its suppliers and
subcontractors that all LCD Panels and/or LCD Products provided to Motorola would be
produced, manufactured and supplied, and services rendered, in compliance with all applicable
laws, rules, regulations, and standards.

227.    Motorola has performed all of the obligations, conditions, and agreements
required of Motorola under the contracts with Sharp.  Motorola paid Sharp for all LCD Panels
and/or LCD Products delivered to Motorola by Sharp.

228.    As set forth in the above allegations, Sharp did not comply with the terms of its
contracts with Motorola, including the provision assuring compliance with all applicable laws in
providing LCD Panels and/or LCD Products to Motorola.  Accordingly, Sharp repeatedly
breached Sharp's contracts with Motorola.

229.    Furthermore, in agreeing with the defendants to fix the prices of LCD Panels sold
to Motorola, Sharp breached its covenant of good faith and fair dealing by depriving Motorola of

1    the benefits to which it was entitled under the contract, and Sharp did so arbitrarily, capriciously,

2    and in a manner inconsistent with Motorola's reasonable expectations.

3         230.    Due to the acts of Sharp, and as a direct result of Sharp's breaches of Sharp's

4    contracts, Motorola suffered damages.  Motorola is entitled to damages for Sharp's breaches,

5    including the amount that Motorola paid for LCD Panels and/or LCD Products purchased from

6    Sharp over and above what it would have paid in the absence of the combination and conspiracy

7    in an amount to be proved at trial.

8                        **FOURTH CLAIM FOR RELIEF AGAINST SHARP:**

9                                    **UNJUST ENRICHMENT**

10        231.    Motorola incorporates and realleges, as though fully set forth herein, each and

11   every allegation set forth in the preceding paragraphs of this Complaint.

12        232.    During and after the Conspiracy Period, Motorola purchased LCD Panels and/or

13   LCD Products from Sharp at what it believed were competitive prices.  Motorola paid Sharp for

14   all LCD Panels and/or LCD Products delivered to Motorola by Sharp.

15        233.    As set forth in the above allegations, as a direct result of the defendants' illegal

16   agreements to increase the prices of LCD Panels, Motorola paid more for LCD Panels and LCD

17   Products than it would have paid in the absence of defendants' combination and conspiracy to

18   fix, control and maintain the prices of, and to allocate markets for, LCD Panels.  For each of

19   Motorola's purchases, the reasonable value of these LCD Panels and/or LCD Products was

20   inflated by the amount of overcharge caused by the defendants' combination and conspiracy.

21        234.    Sharp was unjustly enriched by the amount Motorola paid in excess of what the

22   price would have been but for the defendants' illegal actions.  Sharp's retention of these monies

23   violates the fundamental principles of justice, equity, and good conscience.  Sharp should be

24   required to disgorge the amount of that unjust enrichment at least in the amount in excess of the

25   reasonable value Motorola would have paid in the absence of defendants' combination and

26   conspiracy.

27

28

1

2

## FIFTH CLAIM FOR RELIEF AGAINST EPSON:

## BREACH OF CONTRACT

3      235.    Motorola incorporates and realleges, as though fully set forth herein, each and

4   every allegation set forth in the preceding paragraphs of this Complaint.

5      236.    During and after the Conspiracy Period, Motorola and Epson entered into multiple

6   contracts for the sale of LCD Panels and/or LCD Products by which Epson agreed to deliver

7   LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay Epson a price

8   negotiated by Motorola and Epson.  These contracts between Motorola and Epson include

9   purchase orders issued by Motorola to Epson.

10      237.    Pursuant to these contracts, Epson agreed on behalf of itself and its suppliers and

11   subcontractors that all LCD Panels and/or LCD Products provided to Motorola would be

12   produced, manufactured and supplied, and services rendered, in compliance with all applicable

13   laws, rules, regulations, and standards.  A specific provision confirming this term was included

14   in many of the individual purchase orders.

15      238.    Motorola has performed all of the obligations, conditions, and agreements

16   required of Motorola under the contracts with Epson.  Motorola paid Epson for all LCD Panels

17   and/or LCD Products delivered to Motorola by Epson.

18      239.    As set forth in the above allegations, Epson did not comply with the terms of its

19   contracts with Motorola, including the provision assuring compliance with all applicable laws in

20   providing LCD Panels and/or LCD Products to Motorola.  Accordingly, Epson repeatedly

21   breached Epson's contracts with Motorola.

22      240.    Furthermore, in agreeing with the defendants to fix the prices of LCD Panels sold

23   to Motorola, Epson breached its covenant of good faith and fair dealing by depriving Motorola of

24   the benefits to which it was entitled under the contract, and Epson did so arbitrarily, capriciously,

25   and in a manner inconsistent with Motorola's reasonable expectations.

26      241.    Due to the acts of Epson, and as a direct result of Epson's breaches of Epson's

27   contracts, Motorola suffered damages.  Motorola is entitled to damages for Epson's breaches,

28   including the amount that Motorola paid for LCD Panels and/or LCD Products purchased from

1  Epson over and above what it would have paid in the absence of the combination and conspiracy

2  in an amount to be proved at trial.

3  <u>**SIXTH CLAIM FOR RELIEF AGAINST EPSON:**</u>

4  <u>**UNJUST ENRICHMENT**</u>

5  242.    Motorola incorporates and realleges, as though fully set forth herein, each and

6  every allegation set forth in the preceding paragraphs of this Complaint.

7  243.    During and after the Conspiracy Period, Motorola purchased LCD Panels and/or

8  LCD Products from Epson at what it believed were competitive prices.  Motorola paid Epson for

9  all LCD Panels and/or LCD Products delivered to Motorola by Epson.

10  244.    As set forth in the above allegations, as a direct result of the defendants' illegal

11  agreements to increase the prices of LCD Panels, Motorola paid more for LCD Panels and LCD

12  Products than it would have paid in the absence of defendants' combination and conspiracy to

13  fix, control and maintain the prices of, and to allocate markets for, LCD Panels.  For each of

14  Motorola's purchases, the reasonable value of these LCD Panels and/or LCD Products was

15  inflated by the amount of overcharge caused by the defendants' combination and conspiracy.

16  245.    Epson was unjustly enriched by the amount Motorola paid in excess of what the

17  price would have been but for the defendants' illegal actions.  Epson's retention of these monies

18  violates the fundamental principles of justice, equity, and good conscience.  Epson should be

19  required to disgorge the amount of that unjust enrichment at least in the amount in excess of the

20  reasonable value Motorola would have paid in the absence of defendants' combination and

21  conspiracy.

22  <u>**SEVENTH CLAIM FOR RELIEF AGAINST TOSHIBA:**</u>

23  <u>**BREACH OF CONTRACT**</u>

24  246.    Motorola incorporates and realleges, as though fully set forth herein, each and

25  every allegation set forth in the preceding paragraphs of this Complaint.

26  247.    During and after the Conspiracy Period, Motorola and Toshiba entered into

27  multiple contracts for the sale of LCD Panels and/or LCD Products by which Toshiba agreed to

28  deliver LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay Toshiba a

1  price negotiated by Motorola and Toshiba.  These contracts between Motorola and Toshiba

2  include purchase orders issued by Motorola to Toshiba.

3      248.   Pursuant to each of these contracts, Toshiba agreed on behalf of itself and its

4  suppliers and subcontractors that all LCD Panels and/or LCD Products provided to Motorola

5  would be produced, manufactured and supplied, and services rendered, in compliance with all

6  applicable laws, rules, regulations, and standards.  A specific provision confirming this term was

7  included in many of the individual purchase orders.

8      249.   Motorola has performed all of the obligations, conditions, and agreements

9  required of Motorola under the contracts with Toshiba.  Motorola paid Toshiba for all LCD

10  Panels and/or LCD Products delivered to Motorola by Toshiba.

11      250.   As set forth in the above allegations, Toshiba did not comply with the terms of its

12  contracts with Motorola, including the provision assuring compliance with all applicable laws in

13  providing LCD Panels and/or LCD Products to Motorola.  Accordingly, Toshiba repeatedly

14  breached Toshiba's contracts with Motorola.

15      251.   Furthermore, in agreeing with the defendants to fix the prices of LCD Panels sold

16  to Motorola, Toshiba breached its covenant of good faith and fair dealing by depriving Motorola

17  of the benefits to which it was entitled under the contract, and Toshiba did so arbitrarily,

18  capriciously, and in a manner inconsistent with Motorola's reasonable expectations.

19      252.   Due to the acts of Toshiba, and as a direct result of Toshiba's breaches of

20  Toshiba's contracts, Motorola suffered damages.  Motorola is entitled to damages for Toshiba's

21  breaches, including the amount that Motorola paid for LCD Panels and/or LCD Products

22  purchased from Toshiba over and above what it would have paid in the absence of the

23  combination and conspiracy in an amount to be proved at trial.

## EIGHTH CLAIM FOR RELIEF AGAINST TOSHIBA:

## UNJUST ENRICHMENT

26      253.   Motorola incorporates and realleges, as though fully set forth herein, each and

27  every allegation set forth in the preceding paragraphs of this Complaint.

28

254.     During and after the Conspiracy Period, Motorola purchased LCD Panels and/or LCD Products from Toshiba at what it believed were competitive prices.  Motorola paid Toshiba for all LCD Panels and/or LCD Products delivered to Motorola by Toshiba.

255.     As set forth in the above allegations, as a direct result of the defendants' illegal agreements to increase the prices of LCD Panels, Motorola paid more for LCD Panels and LCD Products than it would have paid in the absence of defendants' combination and conspiracy to fix, control and maintain the prices of, and to allocate markets for, LCD Panels.  For each of Motorola's purchases, the reasonable value of these LCD Panels and/or LCD Products was inflated by the amount of overcharge caused by the defendants' combination and conspiracy.

256.     Toshiba was unjustly enriched by the amount Motorola paid in excess of what the price would have been but for the defendants' illegal actions.  Toshiba's retention of these monies violates the fundamental principles of justice, equity, and good conscience.  Toshiba should be required to disgorge the amount of that unjust enrichment at least in the amount in excess of the reasonable value Motorola would have paid in the absence of defendants' combination and conspiracy.

### NINTH CLAIM FOR RELIEF AGAINST SAMSUNG:

### BREACH OF CONTRACT

257.     Motorola incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.     During and after the Conspiracy Period, Motorola and Samsung entered into multiple contracts for the sale of LCD Panels and/or LCD Products by which Samsung agreed to deliver LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay Samsung a price negotiated by Motorola and Samsung.  These contracts between Motorola and Samsung include purchase orders issued by Motorola to Samsung.

259.     Pursuant to each of these contracts, Samsung agreed on behalf of itself and its suppliers and subcontractors that all LCD Panels and/or LCD Products provided to Motorola would be produced, manufactured and supplied, and services rendered, in compliance with all

1   applicable laws, rules, regulations, and standards.  A specific provision confirming this term was

2   included in many of the individual purchase orders.

3       260.    Motorola has performed all of the obligations, conditions, and agreements

4   required of Motorola under the contracts with Samsung.  Motorola paid Samsung for all LCD

5   Panels and/or LCD Products delivered to Motorola by Samsung.

6       261.    As set forth in the above allegations, Samsung did not comply with the terms of

7   its contracts with Motorola, including the provision assuring compliance with all applicable laws

8   in providing LCD Panels and/or LCD Products to Motorola.  Accordingly, Samsung repeatedly

9   breached Samsung's contracts with Motorola.

10      262.    Furthermore, in agreeing with the defendants to fix the prices of LCD Panels sold

11  to Motorola, Samsung breached its covenant of good faith and fair dealing by depriving

12  Motorola of the benefits to which it was entitled under the contract, and Samsung did so

13  arbitrarily, capriciously, and in a manner inconsistent with Motorola's reasonable expectations.

14      263.    Due to the acts of Samsung, and as a direct result of Samsung's breaches of

15  Samsung's contracts, Motorola suffered damages.  Motorola is entitled to damages for

16  Samsung's breaches, including the amount that Motorola paid for LCD Panels and/or LCD

17  Products purchased from Samsung over and above what it would have paid in the absence of the

18  combination and conspiracy in an amount to be proved at trial.

19              **TENTH CLAIM FOR RELIEF AGAINST SAMSUNG:**

20                          **UNJUST ENRICHMENT**

21      264.    Motorola incorporates and realleges, as though fully set forth herein, each and

22  every allegation set forth in the preceding paragraphs of this Complaint.

23      265.    During and after the Conspiracy Period, Motorola purchased LCD Panels and/or

24  LCD Products from Samsung at what it believed were competitive prices.  Motorola paid

25  Samsung for all LCD Panels and/or LCD Products delivered to Motorola by Samsung.

26      266.    As set forth in the above allegations, as a direct result of the defendants' illegal

27  agreements to increase the prices of LCD Panels, Motorola paid more for LCD Panels and LCD

28  Products than it would have paid in the absence of defendants' combination and conspiracy to

1   fix, control and maintain the prices of, and to allocate markets for, LCD Panels.  For each of

2   Motorola's purchases, the reasonable value of these LCD Panels and/or LCD Products was

3   inflated by the amount of overcharge caused by the defendants' combination and conspiracy.

4       267.    Samsung was unjustly enriched by the amount Motorola paid in excess of what

5   the price would have been but for the defendants' illegal actions.  Samsung's retention of these

6   monies violates the fundamental principles of justice, equity, and good conscience.  Samsung

7   should be required to disgorge the amount of that unjust enrichment at least in the amount in

8   excess of the reasonable value Motorola would have paid in the absence of defendants'

9   combination and conspiracy.

10   **ELEVENTH CLAIM FOR RELIEF AGAINST AU OPTRONICS:**

11   **BREACH OF CONTRACT**

12       268.    Motorola incorporates and realleges, as though fully set forth herein, each and

13   every allegation set forth in the preceding paragraphs of this Complaint.

14       269.    During and after the Conspiracy Period, Motorola and AU Optronics entered into

15   multiple contracts for the sale of LCD Panels and/or LCD Products by which AU Optronics

16   agreed to deliver LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay AU

17   Optronics a price negotiated by Motorola and AU Optronics.  These contracts between Motorola

18   and AU Optronics include purchase orders issued by Motorola to AU Optronics.

19       270.    Pursuant to each of these contracts, AU Optronics agreed on behalf of itself and

20   its suppliers and subcontractors that all LCD Panels and/or LCD Products provided to Motorola

21   would be produced, manufactured and supplied, and services rendered, in compliance with all

22   applicable laws, rules, regulations, and standards.  A specific provision confirming this term was

23   included in many of the individual purchase orders.

24       271.    Motorola has performed all of the obligations, conditions, and agreements

25   required of Motorola under the contracts with AU Optronics.  Motorola paid AU Optronics for

26   all LCD Panels and/or LCD Products delivered to Motorola by AU Optronics.

27       272.    As set forth in the above allegations, AU Optronics did not comply with the terms

28   of its contracts with Motorola, including the provision assuring compliance with all applicable

1    laws in providing LCD Panels and/or LCD Products to Motorola.  Accordingly, AU Optronics

2    repeatedly breached AU Optronics' contracts with Motorola.

3           273.    Furthermore, in agreeing with the defendants to fix the prices of LCD Panels sold

4    to Motorola, AU Optronics breached its covenant of good faith and fair dealing by depriving

5    Motorola of the benefits to which it was entitled under the contract, and AU Optronics did so

6    arbitrarily, capriciously, and in a manner inconsistent with Motorola's reasonable expectations.

7           274.    Due to the acts of AU Optronics, and as a direct result of AU Optronics' breaches

8    of AU Optronics' contracts, Motorola suffered damages.  Motorola is entitled to damages for AU

9    Optronics' breaches, including the amount that Motorola paid for LCD Panels and/or LCD

10   Products purchased from AU Optronics over and above what it would have paid in the absence

11   of the combination and conspiracy in an amount to be proved at trial.

12                 **TWELFTH CLAIM FOR RELIEF AGAINST AU OPTRONICS:**

13                               **UNJUST ENRICHMENT**

14          275.    Motorola incorporates and realleges, as though fully set forth herein, each and

15   every allegation set forth in the preceding paragraphs of this Complaint.

16          276.    During and after the Conspiracy Period, Motorola purchased LCD Panels and/or

17   LCD Products from AU Optronics at what it believed were competitive prices.  Motorola paid

18   AU Optronics for all LCD Panels and/or LCD Products delivered to Motorola by AU Optronics.

19          277.    As set forth in the above allegations, as a direct result of the defendants' illegal

20   agreements to increase the prices of LCD Panels, Motorola paid more for LCD Panels and LCD

21   Products than it would have paid in the absence of defendants' combination and conspiracy to

22   fix, control and maintain the prices of, and to allocate markets for, LCD Panels.  For each of

23   Motorola's purchases, the reasonable value of these LCD Panels and/or LCD Products was

24   inflated by the amount of overcharge caused by the defendants' combination and conspiracy.

25          278.    AU Optronics was unjustly enriched by the amount Motorola paid in excess of

26   what the price would have been but for the defendants' illegal actions.  AU Optronics' retention

27   of these monies violates the fundamental principles of justice, equity, and good conscience.  AU

28   Optronics should be required to disgorge the amount of that unjust enrichment at least in the

amount in excess of the reasonable value Motorola would have paid in the absence of defendants' combination and conspiracy.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Motorola requests:

A.    That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

        i.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

        ii.    An unreasonable restraint of trade or commerce in violation of the Illinois Antitrust Act, as alleged in the Second Claim for relief.

B.    That Motorola recover damages, as provided by federal and state antitrust laws, and that a judgment be entered in favor of Motorola against defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C.    That Motorola obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

D.    That Motorola recover damages and/or all other available monetary and equitable remedies under the state unfair competition laws identified above;

E.    That Motorola recover damages and/or all other available monetary and equitable remedies pursuant to its claims for breach of contract and unjust enrichment;

F.    That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

1    G.    That Motorola be awarded pre- and post-judgment interest, and that such interest

2    be awarded at the highest legal rate from and after the date of service of the initial complaint in

3    this action;

4    H.    That Motorola recover its costs and disbursements of this suit, including

5    reasonable attorneys' fees as provided by law; and,

6    I.    That Motorola be awarded such other, further, and different relief as the case may

7    require and the Court may deem just and proper under the circumstances.

8    / / /

9    / / /

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI

1

### JURY TRIAL DEMAND

2        Pursuant to Federal Rules of Civil Procedure Rule 38(b), Motorola demands a trial by

3   jury for all issues so triable.

4

5   Dated:  July 23, 2010                    Respectfully submitted,

6                                            */s/ Jason C. Murray*

7                                            Jason C. Murray (CA Bar No. 169806)
8                                            CROWELL & MORING LLP
                                             515 South Flower St., 40th Floor
9                                            Los Angeles, CA  90071
                                             Telephone:  213-443-5582
10                                           Facsimile:  213-622-2690
                                             Email: jmurray@crowell.com
11

12                                           Jeffrey H. Howard (*pro hac vice*)
                                             Jerome A. Murphy (*pro hac vice*)
13                                           CROWELL & MORING LLP
                                             1001 Pennsylvania Avenue, N.W.
14                                           Washington, D.C. 20004
                                             Telephone:  202-624-2500
15                                           Facsimile:  202-628-5116
                                             Email:  jhoward@crowell.com
16                                                      jmurphy@crowell.com

17                                           Kenneth L. Adams (*pro hac vice*)
18                                           R. Bruce Holcomb (*pro hac vice*)
                                             Christopher T. Leonardo (*pro hac vice*)
19                                           Christopher H. Wood (*pro hac vice*)
                                             ADAMS HOLCOMB LLP
20                                           1875 Eye Street NW
                                             Washington, DC 20006
21                                           Telephone:  202-580-8822
22                                           Email:  adams@adamsholcomb.com
                                                      holcomb@adamsholcomb.com
23                                                     leonardo@adamsholcomb.com
                                                       wood@adamsholcomb.com
24

25

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-5840 SI