1  Randall Allen (State Bar No. 264067)
   **ALSTON + BIRD LLP**
2  275 Middlefield Road, Suite 150
   Menlo Park, California  94025
3  Telephone:  650-838-2000
   Facsimile:  650-838-2001
4  Email:  randall.allen@alston.com

5  Peter Kontio (peter.kontio@alston.com)
   Valarie C. Williams (valarie.williams@alston.com)
6  B. Parker Miller (parker.miller@alston.com)
   Joann E. Johnston (joann.johnston@alston.com)
7  Lisa K. Bojko (lisa.bojko@alston.com)
   Donald M. Houser (donald.houser@alston.com)
8  **ALSTON + BIRD LLP**
   1201 West Peachtree Street
9  Atlanta, Georgia 30309
   Telephone:  404-881-7000
10 Facsimile:  404-881-7777

11 Richard W. Stimson (rick.stimson@alston.com)
   **ALSTON + BIRD LLP**
12 Chase Tower, Suite 3601
   2200 Ross Avenue
13 Dallas, Texas 75201
   Telephone:  214-922-3400
14 Facsimile:  214-922-3899

15 *Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.*

16

17

18 **UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF CALIFORNIA
   SAN FRANCISCO DIVISION**

19

20 IN RE: TFT-LCD (FLAT PANEL)
   ANTITRUST LITIGATION

21 ──────────────────────────────    CASE NO:   3:09-CV-5609
                                       MDL FILE NO.:  3:07-MD-1827-SI
22 This Documents Relates to: 3:09-CV-5609

23                                      **AMENDED COMPLAINT FOR
   NOKIA CORPORATION and                DAMAGES AND INJUNCTIVE
24 NOKIA INC.,                          RELIEF**

25                        Plaintiffs,

26 v.                                   **DEMAND FOR JURY TRIAL**

27

28

1  AU OPTRONICS CORPORATION; AU
   OPTRONICS CORPORATION
2  AMERICA, INC.; CHUNGHWA PICTURE
   TUBES, LTD.; TATUNG COMPANY;
3  TATUNG COMPANY OF AMERICA, INC.;
   SEIKO EPSON CORPORATION; EPSON
4  IMAGING DEVICES CORPORATION;
   EPSON ELECTRONICS AMERICA,
5  INC.;HITACHI, LTD.; HITACHI DISPLAYS,
   LTD.; HITACHI ELECTRONIC DEVICES
6  (USA), INC.; PHILIPS ELECTRONICS
   NORTH AMERICA CORPORATION;
7  SAMSUNG ELECTRONICS CO., LTD.;
   SAMSUNG SEMICONDUCTOR, INC.;
8  SAMSUNG ELECTRONICS AMERICA,
   INC.; SAMSUNG SDI CO., LTD.;
9  SAMSUNG SDI AMERICA, INC.; SHARP
   CORPORATION; SHARP ELECTRONICS
10 CORPORATION; TOSHIBA
   CORPORATION; TOSHIBA AMERICA
11 ELECTRONIC COMPONENTS, INC.;
   TOSHIBA MOBILE DISPLAY CO., LTD.;
12 and TOSHIBA AMERICA INFORMATION
   SYSTEMS, INC.,

13                          Defendants.

14 _____

15     Plaintiffs Nokia Corporation and Nokia Inc., for their Complaint against Defendants AU

16 Optronics Corporation; AU Optronics Corporation America, Inc.; Chunghwa Picture Tubes, Ltd.;

17 Tatung Company; Tatung Company of America, Inc.; Seiko Epson Corporation; Epson Imaging

18 Devices Corporation; Epson Electronics America, Inc.; Hitachi, Ltd.; Hitachi Displays, Ltd.;

19 Hitachi Electronic Devices (USA), Inc.; Philips Electronics North America Corporation;

20 Samsung Electronics Co., Ltd.; Samsung Semiconductor, Inc.; Samsung Electronics America,

21 Inc.; Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Sharp Corporation; Sharp Electronics

22 Corporation; Toshiba Corporation; Toshiba America Electronics Components, Inc.; Toshiba

23 Mobile Display Co., Ltd.; and Toshiba America Information Systems, Inc. (collectively

24 "Defendants"), hereby allege as follows:

25
26
27
28

**A.     INTRODUCTION**

1.      Nokia Corporation and Nokia Inc. (collectively "Nokia") bring this action to obtain injunctive relief and recover damages incurred as a result of a long-running conspiracy by suppliers of liquid crystal displays ("LCDs") and products containing LCDs ("LCD Products").

2.      From at least January 1, 1996 through at least December 11, 2006 (the "Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications, Defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCDs.  Pursuant to and in furtherance of this conspiracy, certain of these Defendants and their co-conspirators sold LCDs at unlawfully inflated prices to Nokia Corporation and Nokia Inc. in the United States.

3.      By communications and meetings in which Defendants and their co-conspirators agreed to eliminate competition and fix prices for LCDs, Defendants and their co-conspirators illegally restricted competition in the LCD market in the United States and elsewhere.   The conspiracy affected billions of dollars of the interstate and foreign commerce of the United States.

4.      Four Defendants have pleaded guilty to participating in the conspiracy to fix the prices of thin film transistor LCDs ("TFT-LCDs") in an ongoing criminal investigation by the United States Department of Justice ("DOJ"): Chunghwa Picture Tubes, Ltd.; Sharp Corporation; Hitachi Displays, Ltd.; and Epson Imaging Devices Corporation.  On or about November 10, 2008, Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about November 11, 2008, Sharp Corporation agreed to plead guilty and pay a $120 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about March 5, 2009, Hitachi Displays, Ltd. agreed to plead guilty and pay a $31 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.

5.      Four of Defendants' co-conspirators have also pleaded guilty to participating in the conspiracy to fix the prices of TFT-LCDs:  LG Display Co., Ltd.; LG Display America, Inc.; Chi Mei Optoelectronics Corporation; and HannStar Display Corporation.  On or about November 12, 2008, LG Display Co., Ltd.  and LG Display America, Inc. agreed to plead guilty and pay a $400 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On January 7, 2010, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.

6.      Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. were indicted on or about June 10, 2010, for participating in a conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCDs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, from September 2001 through December 2006.

7.      Defendants' and their co-conspirators' illegal conspiracy raised the prices of LCDs and LCD Products above the price that would have prevailed in a competitive market.  During the Conspiracy Period, Nokia Corporation and Nokia Inc. purchased TFT-LCDs and TFT-LCD Products in the interstate commerce of the United States.  Nokia Corporation and Nokia Inc. also purchased Non-TFT LCDs and Non-TFT LCD Products in the interstate commerce of the United States.  The LCDs were incorporated into Nokia mobile wireless handsets.  Nokia suffered damages as a result of Defendants' and their co-conspirators' conspiracy and is entitled to treble damages and injunctive relief to remedy these injuries.

8.      Nokia brings this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Nokia also seeks to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and the restitution, actual and/or enhanced damages allowed under the state antitrust and unfair competition laws of California, Florida, and Nevada.  Nokia further seeks to recover the costs of suit, including reasonable attorneys' fees.  The recoveries and relief sought will compensate

Nokia for the injuries suffered as a result of Defendants' and their co-conspirators' unlawful conspiracy to fix, raise, maintain, and stabilize the prices of LCDs, and deter future, similar unlawful activities by the Defendants and others.

**B.    JURISDICTION AND VENUE**

9.      Nokia brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages and injunctive relief against all Defendants.

10.     Nokia also brings this action pursuant to the Cartwright Act, Cal. Bus. & Prof. Code § 16750(a), for injunctive relief and treble damages for injury sustained as a result of Defendants' and their co-conspirators' illegal price-fixing conspiracy; pursuant to the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from and an injunction against Defendants due to their unlawful and fraudulent business acts and practices; pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.211(2), for actual damages sustained as a result of Defendants' and their co-conspirators' unfair methods of competition and unfair and deceptive acts and practices; and pursuant to the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.210, to obtain injunctive relief and treble damages for injury sustained as a result of Defendants' and their co-conspirators' illegal price-fixing conspiracy.

11.     Defendants engaged in conspiratorial conduct both within and outside the United States, with Defendants' conduct in the United States centered in California.  In their respective plea agreements, Defendants Chunghwa Picture Tubes, Ltd.; Sharp Corporation; Hitachi Displays, Ltd.; and Epson Imaging Devices Corporation, as well as co-conspirators Chi Mei Optoelectronics Corporation, HannStar Display Corporation, and LG Display Co., Ltd., each admitted that "[a]cts in furtherance of this conspiracy were carried out within the Northern District of California.  TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District." Defendants Chunghwa Picture Tubes, Ltd. and Epson Imaging Devices Corporation used California corporations with principal places of business in

Long Beach and San Jose, California (Defendants Tatung Company of America, Inc. and Epson Electronics America, Inc., respectively) as their sales agents in the United States for LCDs and LCD Products that were affected by the conspiracy. Many of the other Defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc.; Hitachi Electronic Devices (USA), Inc.; Samsung Semiconductor, Inc.; Samsung SDI America, Inc.; Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc. Communications in furtherance of the conspiracy occurred within California and between California and other states.

12.    Nokia also brings this action pursuant to the state antitrust and unfair competition laws of California, Florida, and Nevada. Nokia is entitled to the protection of the antitrust and unfair competition laws of each of these states.

13.    Pursuant to 28 U.S.C. §§ 1331 and 1337, the Court has jurisdiction over Nokia's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

14.    Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Nokia's claims under the state antitrust and unfair competition laws of California, Florida, and Nevada. These state law claims are related to Nokia's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act in that they form part of the same case or controversy.

15.    Nokia Corporation and Nokia Inc. bring this action to recover damages for their respective purchases of LCDs and LCD Products that were shipped directly from Defendants and their co-conspirators to Nokia Corporation and Nokia Inc. in the United States, including, but not limited to locations in California, Florida, and Nevada, during the Conspiracy Period. The activities of Defendants and their co-conspirators, as described herein, targeted and involved United States import trade or import commerce, as well as the trade or commerce of other nations. The Defendants' and their co-conspirators' conduct as alleged herein was intended to – and did in fact – have a substantial effect on United States commerce.

16.    To the extent applicable, jurisdiction exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, in that Defendants' and their co-conspirators' conduct had a

direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effect gave rise to Nokia's claims alleged herein.

17.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on United States commerce, including commerce in California, Florida, and Nevada.   During the Conspiracy Period, Nokia Corporation and Nokia Inc. purchased LCDs and LCD Products that were shipped directly from Defendants and their co-conspirators to Nokia Corporation and Nokia Inc. in the United States, including to locations in California, Florida, and Nevada.   Nokia Inc. also sold products to customers and/or maintained operations in these states during the Conspiracy Period.

18.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22, and Cal. Civ. Proc. § 410.10.   Each of the Defendants and/or its subsidiaries, agents, or affiliates conduct substantial business in California, and a number of the Defendants maintain their headquarters in the Northern District of California and elsewhere in the state.   In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured LCDs and LCD Products for sale in the United States, including in California, Florida, and Nevada.

19.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Nokia's claims occurred in this District.   Nokia purchased LCDs and LCD Products from Defendants that were shipped by Defendants directly to California during the Conspiracy Period. Defendants and their co-conspirators also knew that price-fixed LCDs and LCD Products would be sold and shipped into this District.

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE        7        MASTER FILE NO. 3:07-MD-1827-SI
RELIEF                                                                              CASE NO. 3:09-CV-5609

20.     Assignment to the San Francisco Division is appropriate under Local Rule 3-2(c), N.D. Cal., because a substantial part of the events or omissions giving rise to Nokia's claims occurred in this Division.

21.     Because Nokia's action is related to the case captioned *In re TFT-LCD (Flat Panel) Antitrust Litigation*, Case No. 3:07-MD-1827-SII (the "MDL"), this action was assigned to the San Francisco Division, Judge Susan Illston presiding.  This action concerns substantially the same parties, transactions, and events as Case No. 3:07-MD-1827-SII insofar as it involves a suit for damages and injunctive relief arising out of Defendants' conspiracy to fix the prices of LCDs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the antitrust and unfair competition laws of California, Florida, and Nevada.  Pursuant to Pretrial Order No. 1 in 3:07-MD-1827-SII, this case was automatically consolidated with 3:07-MD-1827-SII for all pretrial proceedings without any motion or order.

## C.   DEFINITIONS

22.     "LCD" means any liquid crystal display. LCDs are comprised of LCD panels and other components that allow the panel to operate.  LCD panels use glass plates and a liquid crystal compound to electronically display an image for a variety of applications, including the display screens of mobile wireless handsets.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  LCD manufacturers then combine the LCD panels with a backlight unit, driver, and other equipment to create what some manufacturers describe as an LCD module. The LCD module is then sold to manufacturers of finished electronic devices, such as mobile wireless handsets, televisions, desktop monitors, and notebook or laptop computers.  The LCDs sold to companies like Nokia are commonly referred to as LCDs, LCD panels, and/or LCD modules.

23.     "LCD Product" means any nearly-finished or finished product containing an LCD, including without limitation, a mobile wireless engine or assembly, mobile wireless handset

(including a voice, data, or combined voice and data device), desktop monitor, notebook or laptop computer, or television.

24.    During the Conspiracy Period, LCDs used in mobile wireless handsets included at least five different types of active and passive matrix technologies: TFT-LCD, thin film diode ("TFD"), color super-twist nematic ("CSTN"), film super-twist nematic ("FSTN"), and monochrome super-twist nematic ("MSTN").  Defendants' and their co-conspirators' price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining, and/or stabilizing the prices of TFT-LCDs as well as non-TFT LCDs, including TFD, CSTN, FSTN, and MSTN LCDs.

25.    "TFT-LCD" means any thin film transistor liquid crystal display.

26.    "TFT-LCD Product" means any nearly-finished or finished product containing a TFT-LCD, including without limitation, a mobile wireless engine or assembly, mobile wireless handset (including a voice, data, or combined voice and data device), desktop monitor, notebook or laptop computer, or television.

27.     "Non-TFT LCD" means any LCD other than a TFT-LCD, including but not limited to a TFD, CSTN, FSTN, or MSTN LCD.

28.    "Non-TFT LCD Product" means any nearly-finished or finished product containing a Non-TFT LCD, including without limitation, a mobile wireless engine or assembly, mobile wireless handset (including a voice, data, or combined voice and data device), computer monitor, notebook or laptop computer, or televisions.

29.    The term "OM" means any outsourced manufacturer of LCD Products and includes any original equipment manufacturer, original design manufacturer, or contract engine manufacturer of LCDs and/or LCD Products.

**D.    THE PARTIES**

**1.    Nokia**

30.    Nokia Corporation is a global leader in the design, manufacture, and supply of mobile wireless handsets.  Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

31.     Nokia Inc. is incorporated under the laws of the State of Delaware and has its principal place of business at 102 Corporate Park Drive, White Plains, New York, 10604.  Nokia Inc. is a wholly-owned subsidiary of Nokia Corporation.

32.     Throughout the Conspiracy Period, Nokia Corporation contracted with various Defendants regarding the prices and volumes of LCDs that Nokia Corporation and Nokia Inc. purchased in the United States and elsewhere.

33.     Throughout the Conspiracy Period, Nokia Corporation and Nokia Inc. each purchased LCDs and LCD Products that were shipped to Nokia Corporation and Nokia Inc. in the United States directly from Defendants and their co-conspirators located in the United States.

34.     Throughout the Conspiracy Period, Nokia Corporation and Nokia Inc. each purchased LCDs and LCD Products that were shipped to Nokia Corporation and Nokia Inc. in the United States directly from Defendants and their co-conspirators located abroad.

35.     Nokia Corporation and Nokia Inc. used the LCDs and LCD Products that they purchased from Defendants and their co-conspirators to assemble and repair finished mobile wireless handsets in the United States.

36.     Furthermore, Nokia Corporation and Nokia Inc. transported a certain portion of the LCDs and LCD Products that were originally shipped to them in the United States to Nokia Mexico, S.A. de C.V. ("Nokia Mexico").  Nokia Mexico assembled these LCDs and LCD Products, as well as other components, into finished mobile wireless handsets that were returned to the United States for sale by Nokia Inc.

37.     Throughout the Conspiracy Period, Nokia Corporation and Nokia Inc. purchased LCDs and LCD Products that were shipped directly to Nokia Corporation and Nokia Inc. in California, Florida, and Nevada from Defendants and their co-conspirators located in the United States and abroad.

38.     Defendants' and their co-conspirators' price fixing was the proximate cause of Nokia Corporation and Nokia Inc. paying artificially high prices for LCDs and LCD Products purchased during the Conspiracy Period.

### 2.   Defendants

#### a.   AU Optronics

39.     Defendant AU Optronics Corporation is one of the largest manufacturers of LCDs. Its corporate headquarters is at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AU Optronics Corporation was created in 2001 and is the successor by merger of Acer Display Technology, Inc. and Unipac Electronics, both of which were involved in the manufacture of LCDs and LCD Products.  As alleged herein, AU Optronics Corporation includes AU Optronics Corporation and its two predecessor corporations identified above, whose liabilities AU Optronics Corporation has assumed via the merger agreement or by operation of law.  During the Conspiracy Period, Nokia purchased TFT-LCDs and LCD Products that were shipped directly from AU Optronics Corporation or its subsidiaries to Nokia in the United States. AU Optronics Corporation also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

40.     Defendant AU Optronics Corporation America, Inc. ("AU Optronics America") is a wholly-owned and controlled subsidiary of AU Optronics Corporation.   Its corporate headquarters is at 9720 Cypresswood Drive, Suite 241, Houston, Texas 77070.  It also has facilities located in San Diego and Cupertino, California.  During the Conspiracy Period, AU Optronics Corporation America, Inc. manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

41.     Defendants AU Optronics Corporation and AU Optronics America are sometimes referred to collectively herein as "AU Optronics."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.   Alternatively, Defendant AU Optronics America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation.   AU Optronics Corporation dominated or controlled AU Optronics

America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

### b. Chunghwa

42. Defendant Chunghwa Picture Tubes, Ltd. ("CPT") is a leading manufacturer of LCDs. Its global headquarters is at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan 334 R.O.C. The parent company of CPT is Tatung Company, which controls CPT by virtue of its shareholding in, and affiliations with, CPT. In addition, CPT's Board of Directors includes representatives from Tatung Company. The Chairman of CPT, Weishan Lin, is also the Chairman and General Manager of Tatung Company. During the Conspiracy Period, CPT manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

43. Defendant Tatung Company is a consolidated consumer electronics and information technology company based in Taiwan. Its principal place of business is at 22, Sec. 3, Chung-Shan N. Rd., Taipei City 104, Taiwan. Tatung Company is the parent company of CPT and Tatung Company of America, Inc. During the Conspiracy Period, Tatung Company manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

44. Defendant Tatung Company of America, Inc. ("Tatung America") is a subsidiary of Tatung Company with its principal place of business at 2850 El Presidio Street, Long Beach, California 90810. Currently, Tatung Company owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. During the Conspiracy Period, Tatung America manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

45. Defendants CPT, Tatung Company, and Tatung America are sometimes referred to collectively herein as "Chunghwa." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.

46.     Alternatively, Defendants CPT and Tatung America were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Tatung Company.  Tatung Company dominated and controlled Tatung America through its close affiliation and 50% ownership interest.  ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████  Tatung Company used its domination and control over both Tatung America and CPT to charge artificially high prices for LCDs and LCD Products.

### c.     Epson

47.     Defendant Seiko Epson Corporation ("Seiko Epson") is a Japanese company with its principal place of business at 2-4-1, Nishi-Shinjuku-ku, Tokyo, Japan.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped directly from Seiko Epson or its subsidiaries to Nokia in the United States.  Seiko Epson also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere.

48.     Defendant Epson Imaging Devices Corporation ("Epson Imaging") is a wholly-owned and controlled subsidiary of Seiko Epson.  Its principal place of business is at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6 104, Japan.  Epson Imaging was originally formed as a joint venture between Seiko Epson and Sanyo Electric

Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson.  Up until December 28, 2006, Epson Imaging was known as Sanyo Epson Imaging Devices Corporation.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped directly from Epson Imaging to Nokia in the United States.  Epson Imaging also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

49.    Defendant Epson Electronics America, Inc. ("Epson America") is a California corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California 95131.  Its ultimate parent company is Seiko Epson Corporation.  During the Conspiracy Period, Epson America manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

50.    Defendants Seiko Epson, Epson Imaging, and Epson America are sometimes referred to collectively herein as "Epson."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Defendants Epson Imaging and Epson America were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Seiko Epson.  Seiko Epson dominated or controlled Epson Imaging and Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

### d.    Hitachi

51.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  It was one of the original producers of LCDs.  In 2002, it spun off its LCD business to Hitachi Displays, Ltd., which was a wholly-owned subsidiary of Hitachi, Ltd. throughout the remainder of the Conspiracy Period. Hitachi, Ltd. manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere during the Conspiracy Period.

52.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") was a wholly-owned subsidiary of Hitachi, Ltd. during the Conspiracy Period and is presently a majority-owned subsidiary of Hitachi, Ltd.  Its principal place of business is AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD business.  During the Conspiracy Period, Hitachi Displays manufactured, marketed, sold, and/or distributed LCDs and LCD Products to customers throughout the United States and elsewhere.

53.     Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina 29607.  Its ultimate parent company is Hitachi, Ltd.  During the Conspiracy Period, Hitachi Electronic Devices (USA), Inc. manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

54.     Defendants Hitachi, Ltd.; Hitachi Displays; and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Defendants Hitachi Displays and Hitachi Electronics Devices (USA), Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Hitachi, Ltd.  Hitachi, Ltd. dominated or controlled Hitachi Displays and Hitachi Electronics Devices (USA), Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

### e.     Philips

55.     Defendant Philips Electronics North America Corporation ("Philips") is a Delaware Corporation and has its principal place of business at 3000 Minuteman Road, Andover, Massachusetts 01810.  Philips is a wholly-owned subsidiary of Philips Holdings USA, Inc., which in turn is a wholly-owned subsidiary of Koninklijke Philips Electronics N.V. ("Royal Philips").  During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped

directly from Philips and Royal Philips or its divisions or subsidiaries to locations in the United States.  Philips also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

56.     Philips' ultimate parent company Royal Philips entered into a joint venture with its competitor, LG Electronics, Inc. in 1999 to form LG.Philips LCD Co., Ltd., now known as LG Display Co., Ltd.  LG Display Co., Ltd. was one of the leading manufacturers of LCDs during the Conspiracy Period.  ███████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
LG Display has admitted participation in a global conspiracy to fix LCD prices, and Royal Philips, as a player in that global market and a joint-venture owner of LG Display, participated in the conspiracy through LG Display and through other actions hereinafter alleged.  LG Display and Royal Philips were co-conspirators in the conspiracy alleged in the Amended Complaint, and Philips was the agent and the sales and marketing representative for Royal Philips and its divisions and subsidiaries in the United States.

57.     Philips participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Philips was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of co-conspirator Royal Philips.  Royal Philips dominated or controlled Philips regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

1

f.    **Samsung**

2      58.    Defendant Samsung Electronics Co., Ltd. ("Samsung Electronics") has its

3   principal place of business at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul,

4   Republic of Korea.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products

5   that were shipped directly from Samsung Electronics or its subsidiaries to Nokia in the United

6   States.  Samsung Electronics also manufactured, marketed, sold, and/or distributed LCDs and

7   LCD Products to other purchasers throughout the United States and elsewhere during the

8   Conspiracy Period.

9      59.    Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled

10   subsidiary of Samsung Electronics.  Its principal place of business is at 105 Challenger Road,

11   Ridgefield Park, New Jersey 92612.  During the Conspiracy Period, Samsung Electronics

12   America, Inc. manufactured, marketed, sold, and/or distributed LCDs and LCD Products

13   throughout the United States and elsewhere.

14      60.    Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled

15   subsidiary of Samsung Electronics.  Its principal place of business is at 3655 North First Street,

16   San Jose, California 95134.  During the Conspiracy Period, Samsung Semiconductor, Inc.

17   manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United

18   States and elsewhere.

19      61.    Defendant Samsung SDI Co., Ltd. has its principal place of business at 673-7

20   Maetan-dong, Youngton-gu, Suwon, Republic of Korea.  Samsung Electronics holds a controlling

21   interest in Samsung SDI Co., Ltd.  During the Conspiracy Period, Nokia purchased LCDs and

22   LCD Products that were shipped directly from Samsung SDI Co., Ltd. or its subsidiaries to Nokia

23   in the United States.  Samsung SDI Co., Ltd. also manufactured, marketed, sold, and/or

24   distributed LCDs and LCD Products to other purchasers throughout the United States and

25   elsewhere during the Conspiracy Period.

26      62.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a wholly-

27   owned subsidiary of Samsung SDI Co., Ltd.  Its principal place of business is 3333 Michelin

28

Drive, Suite 700, Irvine, California 92618.   During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped directly from Samsung SDI America within the United States.   Samsung SDI America also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

63.   On information and belief, Samsung Electronics is the amnesty applicant in the DOJ's investigation of the LCD price-fixing conspiracy.   Samsung Electronics retained Sheppard Mullin Richter & Hampton LLP ("Sheppard Mullin") as counsel with respect to its leniency application as well as the MDL.   Sheppard Mullin, apparently on loan from Samsung Electronics, appeared as counsel for Samsung SDI Co., Ltd. and Samsung SDI America (collectively "Samsung SDI") in the MDL after Nokia filed this direct action.   Sheppard Mullin continued to represent all of the Samsung-related Defendants in the MDL until recently, when it withdrew as counsel of record for Samsung Electronics, Samsung Electronics America, Inc., and Samsung Semiconductor, Inc.   This sharing of common counsel and later reassignment of Samsung Electronics' primary counsel to Samsung SDI is reflective of the coordinated and common enterprise of the Samsung-related Defendants with respect to the conspiracy alleged herein.

64.   During the Conspiracy Period, Samsung SDI coordinated its conduct and shared confidential competitive information with Samsung Electronics and its subsidiaries and affiliates. Samsung SDI bought components for its LCDs and LCD Products from likely amnesty applicant and Samsung SDI's largest shareholder, Samsung Electronics, as well as Toshiba and admitted conspirator Hitachi.   Employees of Samsung SDI responsible for marketing and selling LCDs and LCD Products during the Conspiracy Period ignored corporate formalities and held themselves out as employees and agents of Samsung Electronics as well as Samsung SDI.   Employees of the Samsung Defendants who were primarily responsible for sales and marketing to Nokia used and displayed both Samsung Electronics and Samsung SDI email addresses.   Samsung SDI shared booths at LCD-related trade shows with Samsung Electronics, and both companies emphasized

the "synergies" between Samsung SDI and Samsung Electronics in marketing and selling LCDs and LCD Products during the Conspiracy Period.

65.     The net effect of the coordination and overlap of the Samsung Electronics and Samsung SDI's sales and marketing function was to leave purchasers, such as Nokia, with the impression that its daily dealings were with "Samsung" when it came to considering and purchasing LCDs and LCD Products.

66.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ Samsung SDI is currently being investigated by competition authorities in the European Union, Hungary, Japan, and South Korea for participating in a global conspiracy to fix the prices of CRTs during that same period.

67.     Defendants Samsung Electronics; Samsung Electronics America, Inc.; Samsung Semiconductor, Inc.; Samsung SDI Co., Ltd.; and Samsung SDI America are sometimes referred to collectively herein as "Samsung."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Samsung Electronics America, Inc.; Samsung Semiconductor, Inc.; Samsung SDI Co., Ltd.; and Samsung SDI America were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics. Samsung Electronics dominated or controlled Samsung Electronics America, Inc.; Samsung Semiconductor, Inc.; Samsung SDI Co., Ltd.; and Samsung SDI America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

### g.     Sharp

68.     Defendant Sharp Corporation has its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped directly from Sharp Corporation and its subsidiaries to Nokia in the United States.  Sharp Corporation also manufactured, marketed, sold, and/or

distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

69.     Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation.  Its principal place of business is at Sharp Plaza, Mahwah, New Jersey 07430.  During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

70.     Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.    Alternatively, Defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation.    Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

### h.     Toshiba

71.     Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped directly from Toshiba Corporation or its subsidiaries to Nokia in the United States.  Toshiba Corporation also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

72.     Defendant Toshiba Mobile Display Co., Ltd., formerly known as Toshiba Matsushita Display Technology Co., Ltd., is a wholly-owned subsidiary of Toshiba Corporation. Its principal place of business is Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.    During the Conspiracy Period, Toshiba Mobile Display Co., Ltd.

manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

73.     Defendant Toshiba America Electronic Components, Inc. is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc., a holding company of Toshiba Corporation. During the Conspiracy Period, Nokia purchased LCDs and LCD Products that were shipped directly from Toshiba America Electronic Components, Inc. to Nokia in the United States. Toshiba America Electronic Components, Inc. also manufactured, marketed, sold, and/or distributed LCDs and LCD Products to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

74.     Defendant Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc.  Its principal place of business is at 9470 Irvine Boulevard, Irvine, California 92618.   During the Conspiracy Period, Toshiba America Information Systems, Inc. manufactured, marketed, sold, and/or distributed LCDs and LCD Products throughout the United States and elsewhere.

75.     Defendants Toshiba Corporation; Toshiba Mobile Display Co., Ltd.; Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.   Alternatively, Defendants Toshiba Mobile Display Co., Ltd.; Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Mobile Display Co., Ltd.; Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs and LCD Products.

### 3. Agents and Co-Conspirators

76.    The actions described in this Complaint were authorized, ordered, or done by Defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' business or affairs.  Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  Each domestic Defendant that was a subsidiary of a foreign parent acted as the United States agent for LCDs and LCD Products made and sold by its parent company.

77.    Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These co-conspirators include, without limitation, Chi Mei Optoelectronics Corporation and Chi Mei Optoelectronics USA, Inc. (collectively "Chi Mei"); HannStar Display Corporation ("HannStar"); LG Display Co., Ltd. and LG Display America, Inc. (collectively "LG Display"); LG Electronics, Inc. and LG Electronics USA, Inc. (collectively "LG Electronics"); and Royal Philips.

### E.    TRADE AND COMMERCE AFFECTED BY THE CONSPIRACY

78.    During the Conspiracy Period, Defendants, or one or more of their subsidiaries, sold LCDs and/or LCD Products in the United States through and into interstate and foreign commerce, including through the Northern District of California.

79.    During the Conspiracy Period, Defendants collectively controlled the market for LCDs, both globally and in the United States.

80.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

### 1. LCDs

81.    LCDs are utilized in televisions, computer monitors, notebook and laptop computers, mobile wireless handsets, digital cameras, and numerous other electronic products. LCDs were the principal form of display screen used in mobile wireless handsets manufactured during the Conspiracy Period.

82.    LCDs use liquid crystal to control the passage of light.  More specifically, LCDs are made of two glass sheets sandwiching a layer of liquid crystal and combined with electronic components such as a backlight and IC Driver.  When voltage is applied by the electronic components, the liquid crystal is bent, allowing light to pass through to form a pixel.  The combination of these pixels forms an image on the LCD.

83.    Once an LCD leaves a manufacturing plant, it remains essentially unchanged as it moves through the distribution channel to purchasers of LCDs and LCD Products.  LCDs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of the LCD Products, such as mobile wireless handsets, computer monitors, notebook and laptop computers, or televisions, in which the LCDs are contained.

84.    As a result, LCDs follow a traceable physical chain from Defendants and their co-conspirators to consumer electronic device manufacturers such as Nokia.

## 2.    Structure of the LCD Industry

85.    The LCD industry has several characteristics that facilitated the conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships, and ease of information sharing.

86.    The LCD industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, Defendants and their co-conspirators collectively controlled a significant share of the market for LCDs, both globally and in the United States.

87.    The LCD industry is also characterized by high barriers to entry.  New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements necessitate constant research, development, and investment. Thus, firms cannot enter the market for the production and sale of LCDs without an enormous capital investment.

88.    LCDs, whether incorporated into mobile wireless handsets, computer monitors, notebook and laptop computers, or televisions, are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard sizes for LCD Products across the LCD industry

facilitates price transparency in the market for LCDs and enables LCD manufacturers to monitor and analyze LCD prices, thereby enabling Defendants and their co-conspirators to enforce their conspiracy.

89.     The LCD industry experienced significant consolidation during the Conspiracy Period, as reflected by:

- The formation of LG.Philips LCD Co., Ltd., now known as LG Display Co., Ltd., through a joint venture between LG Electronics and Royal Philips in 1999;

- The 2001 creation of AU Optronics through the merger of Acer Display and Unipac Electronics, whose liabilities AU Optronics assumed via the merger agreement or by operation of law;

- The creation of Toshiba Matsushita Display Technology Co., Ltd., now known as Toshiba Mobile Display Co., Ltd., by Toshiba and Panasonic Corporation in 2002;

- The 2005 transfer of Fujitsu Limited's LCD business to Sharp;

- The formation of IPS Alpha Technology, Ltd. in 2005 by Hitachi, Toshiba, and Panasonic Corporation; and

- The 2006 AU Optronics acquisition of Quanta Display, Inc., whose liabilities AU Optronics assumed via the merger agreement or by operation of law.

90.     Additional opportunities for collusive activity were presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD industry.  Using the otherwise legitimate cover of such arrangements, Defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCDs through the numerous meetings described hereinafter.

91.     There were many opportunities for Defendants and their co-conspirators to discuss and exchange competitively-sensitive information through their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between

companies in certain countries, and relationships between the executives of certain companies. Communication among the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCDs and monitor each other's compliance with those agreements.

### 3.    The Market For LCDs and LCD Products

92.    LCDs have no independent utility and have value only as components of LCD Products such as mobile wireless handsets, computer monitors, notebook and laptop computers, and televisions.  The demand for LCDs is thus derived directly from the demand for LCD Products.

93.    The market for LCDs is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile wireless handsets grew dramatically during the Conspiracy Period.  In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units.  This number increased to over one billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in the demand for LCDs during the Conspiracy Period.  Shipments of LCDs for mobile wireless handsets grew from approximately 400 million panels in 2001 to over one billion panels in 2006.

94.    The market for LCDs and the market for LCD Products are inextricably linked and intertwined because the LCD market exists to serve the market for LCD Products.  The market for LCDs and the market for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

### 4.    The Market for TFT-LCDs and Non-TFT LCDs

95.    The structure of the LCD market demonstrated collusion on TFT-LCDs and Non-TFT LCDs.  At various times during the Conspiracy Period, TFT-LCDs and Non-TFT LCDs were close substitutes for each other in mobile wireless handsets.  Non-TFT LCDs predominated in mobile wireless handsets until approximately 2000, when manufacturers began to replace those technologies with TFT-LCDs in higher-end handsets.  As the proportion of TFT-LCDs

incorporated into mobile wireless handsets increased, the number of Non-TFT LCDs decreased. For example, in 2001, TFT-LCDs constituted nearly 50% of the LCDs used in mobile wireless handsets.  By 2006, the percentage increased to 78%.

96.     The price movements of TFT-LCDs and Non-TFT LCDs tracked each other closely for substantial periods of time during the Conspiracy Period.  For example, in the majority of quarters during the period 2002 through 2006, the prices for CSTN-LCDs and TFT-LCDs moved in the same directions and by a comparable magnitudes.

97.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████

98.     During the Conspiracy Period, TFT-LCDs and Non-TFT LCDs were also incorporated into single mobile wireless handsets. Defendants would often sell the TFT-LCD and Non-TFT LCD together and quote one combined price.  Indeed, Defendants Epson and Sharp have specifically pleaded guilty to fixing the prices of the TFT-LCDs that were combined with Non-TFT LCDs into certain Motorola mobile wireless handsets.  Because mobile wireless handset manufacturers often requested a single price for LCDs that included both a TFT-LCD and Non-TFT LCD, Defendants' illegal price-fixing agreements relating to TFT-LCDs inevitably included the prices of Non-TFT LCDs incorporated into the same handsets.

99.     Defendants had the incentive and ability to inflate the prices of Non-TFT LCDs as well as TFT-LCDs because Non-TFT LCDs and TFT-LCDs were close substitutes for each other for certain LCD Products and they controlled a significant share of the market for Non-TFT LCDs and TFT-LCDs.  The conspiracy's success in inflating TFT-LCD prices facilitated the conspiracy's success in inflating Non-TFT LCD prices, and vice versa.

**F.      VIOLATIONS ALLEGED**

100.    Beginning at a date as yet unknown to Nokia, but at least as early as January 1, 1996, and continuing thereafter up to and including December 11, 2006, at a minimum, Defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which LCDs have been sold in the United States and throughout the world, including sales directly and indirectly to Nokia in the United States.

101.    Defendants, through their officers, directors, and employees, effectuated a contract, combination, trust, cartel, or conspiracy between themselves and their co-conspirators by, among other things:

- Participating in meetings and conversations to discuss the prices and supply of TFT-LCDs and Non-TFT LCDs in the global market, including the United States;

- Agreeing to fix the prices and limit the supply of TFT-LCDs and Non-TFT LCDs sold in the global market, including the United States, in a manner that deprived Nokia of free and open competition as a direct and indirect purchaser;

- Issuing price announcements and quotations in accordance with the agreements reached;

- Agreeing to allocate markets and customers for TFT-LCDs and Non-TFT LCDs; and

- Selling TFT-LCDs and Non-TFT LCDs to Nokia in the United States at fixed, non-competitive prices.

**1.      Defendants' and their Co-Conspirators' Agreements to Set Prices and Limit Production**

102.    The LCD conspiracy alleged herein was effectuated through a combination of group and bilateral discussions at multiple levels of Defendants and their co-conspirators that took place in the United States, as well as in Japan, South Korea, Taiwan, and elsewhere.  Defendants' conspiracy included agreements to fix, raise, maintain, and/or stabilize the prices of both TFT-LCD and Non-

TFT LCDs.  Defendants fostered a culture of corruption within their companies whereby employees at various levels – from the very top executives all the way to lower-level sales representatives – engaged in frequent and continuous communications with employees at corresponding levels of their competitors.  Senior executives at Defendants made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees funneled the competitive information up to their superiors, who utilized that information – along with the pricing information they were able to collect through their own illegal competitor contacts – to set prices for LCDs at artificially-inflated levels.  The constant communications at all levels allowed Defendants to conspire to set average prices across the entire industry, as well as conspire to fix the prices of the particular LCDs sold to specific customers, including Nokia, Motorola, Dell, Hewlett-Packard, Apple, and others.

103.    The LCD conspiracy alleged herein was effectuated through a combination of multilateral and bilateral discussions that took place in Japan, South Korea, and Taiwan, as well as in California and elsewhere in the United States. ██████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

104.    When the conspiracy was principally limited to the Japanese Defendants, bilateral discussions were the preferred method of communication.  As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

105.    As LCD production in South Korea began to increase and become more sophisticated, the Japanese Defendants expanded their meetings to include their South Korean competitors, including Defendant Samsung and co-conspirator LG Display, which also agreed to fix prices and control supply.

106.    ████████████████████████████████

██████████████████████████████████

██████████████████████████████████

1　██████████████████████████████████████████████████

2　███████████████████████████████████ The likely result, if

3　Defendants and their co-conspirators attempted to meet these projected sales volumes, would be

4　fierce competition. █████████████████████████████

5　　　107.　████████████████████████████████████

6　██████████████████████████████████████████████████

7　██████████████████████████████████████████████████

8　██████████████████████████████████████████████████

9　██████████████████████████████████████████████████

10　██████████████████████████████████████████████████

11　██████████████████████████████████████████████████

12　██████████████████████████████████████████████████

13　████████████████████████████████████████████

14　　　　　a.　**"Crystal Meetings"**

15　　　108.　In early 2001, high-level employees of at least two large manufacturers of LCDs

16　met in person and agreed to engage in periodic meetings to exchange sensitive competitive

17　information and to fix the price of LCDs and limit their production. █████████████

18　██████████████████████████████████████████████████

19　██████████████████████████████████████████████████

20　██████████████████████████████████████████████████

21　████████████████████████████████ The group meetings that

22　these Defendants participated in were called "Crystal Meetings."  Defendants attended multiple

23　meetings with one or more of the other Defendants during this period.  The Crystal Meetings

24　occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United

25　States on a regular basis throughout the Conspiracy Period.

26　　　109.　The Crystal Meetings were highly organized and followed a set pattern.  Meetings

27　among Defendants' high-level executives were called "CEO" or "Top" meetings; those among

Defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

110.    The CEO meetings occurred quarterly from approximately 2001 to 2006.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCDs for the group to review.  Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply until a consensus was reached concerning the participants' prices and production levels of LCDs in the coming months or quarter.

111.    The structure of Commercial meetings was largely the same as CEO meetings.  These meetings took place more frequently than CEO meetings and occurred approximately monthly.

112.    During all of these meetings, Defendants exchanged information about current and future prices for their LCDs and, thereafter, reached agreements concerning the specific prices to be charged in the coming weeks and months for LCDs.  Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCDs.

113.    During these CEO and Commercial meetings, Defendants also exchanged information about supply, demand, and their production of LCDs and, thereafter, reached agreement concerning the amounts that each would produce.  Defendants limited the production of LCDs in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production among different-sized LCDs, and setting target production levels.

114.    During these CEO and Commercial meetings, Defendants also agreed to conceal the fact and substance of the meetings and, in fact, took various steps to do so.  Top executives and other officials attending these meetings were instructed on more than one occasion to not

disclose the fact of these meetings to outsiders or even to other employees of Defendants not involved in LCD pricing or production.  On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to that meeting.

115.    During these CEO and Commercial meetings, discussions included large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

116.    The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings and often occurred at restaurants over meals.  The purpose of the Working Level meetings was to exchange information on LCD prices, supply, demand, and production, which then would be transmitted up the corporate reporting chain to those individuals with pricing authority, which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

117.    In approximately the Summer of 2006, when Defendants began to have concerns about antitrust issues, they discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information.  The meetings were coordinated so that on the same date, each competitor met one-on-one in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least

November or December of 2006. The information obtained at these meetings was transmitted up the corporate reporting chain to permit Defendants to maintain their LCD price-fixing and production limitation agreements.

### b.     Bilateral and Multilateral Communications

118.    During the Crystal Meetings, Defendants also agreed to engage in bilateral or multilateral communications with those Defendants not attending these meetings. Certain Defendants were "assigned" other Defendants not in attendance and agreed to and did in fact communicate with non-attending Defendants to synchronize the LCD price and production limitations agreed to at the Crystal Meetings. Participants at the Crystal Meetings contacted the Japanese Defendants to relay the agreed-upon pricing and production limitations. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████

119.    The Crystal Meetings were also supplemented by additional communications between various Defendants during which they exchanged information about LCD pricing, shipments, and production. As is more fully alleged below, Defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the prices set during the Crystal Meetings. These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to Defendants' customers.

### c.     Defendants' Participation in the LCD Price-Fixing Conspiracy.

120.    Defendant AU Optronics participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001 and 2006. Additionally, Quanta Display, Inc. and Unipac Electronics, which merged with AU Optronics, participated in Commercial and Working Level meetings. At the CEO and Commercial meetings, AU Optronics entered into agreements with Defendants on

prices, and production limits and quotas for LCDs. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

121.    AU Optronics' illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices. ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

122.    AU Optronics Corporation and AU Optronics America were indicted on or about June 10, 2010, for participating in the conspiracy to fix the prices of TFT-LCDs sold for use in computer monitors and notebook computers from September 2001 through December 2006 and for participating in meetings, conversations, and communications in Taiwan and the United States to discuss the prices of TFT-LCDs; agreeing to fix the prices of TFT-LCDs; issuing price quotations in accordance with the agreements reached; and exchanging information on the sales of TFT-LCDs for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

123.    In addition, six AU Optronics executives, Hsuan Bin Chen, Hui Hsiung, Lai-Juh Chen, Shiu Lung Leung, Borlong Bai, and Tsannrong Lee, were indicted for participating in the conspiracy to fix the prices of TFT-LCDs sold worldwide and participating in meetings,

conversations, and communications in Taiwan and the United States to discuss the prices of TFT-LCDs, including the Crystal Meetings that took place in Taiwan; authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; agreeing to fix the prices of TFT-LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; and monitoring co-conspirators' compliance with the agreed-upon prices. These executives have been indicted for their participation in the conspiracy over the following time periods:  Mr. Hsuan Chen for his participation from October 2001 through December 2006; Mr. Hsiung for his participation from October 2001 through December 2006;  Mr. Lai-Juh Chen for his participation from at least February 2003 through November 2005; Mr. Leung for his participation from May 2002 to December 2006; Mr. Bai for his participation from March 2003 through December 2006; and Mr. Lee for his participation from January 2002 through December 2006.

124.    Defendant Chunghwa participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001 and 2006.   At the CEO and Commercial meetings, Chunghwa entered into agreements with Defendants on prices, price increases, and production limits and quotas for LCDs.

125.    Chunghwa's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.

126.    CPT has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the prices of TFT-LCDs sold worldwide and to

participating in meetings, conversations, and communications in Taiwan to discuss the prices of TFT-LCDs; agreeing to fix the prices of TFT-LCDs; and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.   In connection with its guilty plea, CPT has agreed to pay a criminal fine of $65 million.

127.    In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin, pleaded guilty to participating in the conspiracy, including by participating in meetings, conversations, and communications in Taiwan, South Korea, and the United States to discuss the prices of TFT-LCDs; agreeing to fix the prices of TFT-LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy.  Mr. Chieng-Hon Lin pleaded guilty to participating in the conspiracy from June 2003 through December 2006 and has agreed to serve a 9-month prison term and pay a criminal fine of $50,000.  Mr. Liu pleaded guilty to participating in the conspiracy from September 2001 through July 2005 and has agreed to serve a 7-month prison term and pay a criminal fine of $30,000.  Mr. Lee pleaded guilty to participating in the conspiracy from September 2001 through December 2006 and has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

128.    In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the prices of TFT-LCDs sold worldwide, including by participating in meetings, conversations, and communications in Taiwan, South Korea, and the United States to discuss the prices of TFT-LCDs, including the Crystal Meetings that took place in Taiwan; agreeing to fix the prices of TFT-LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; accepting payment for the supply of TFT-LCDs sold at

collusive, noncompetitive prices to customers in the United States; and taking steps to conceal the conspiracy and their conspiratorial contacts.   Cheng Yuan Lin has been indicted for his participation from September 2001 through April 2003.  Mr. Cheng has been indicted for his participation from October 2001 through September 2004.

129.   Defendant Epson participated in multiple bilateral discussions with Defendants throughout the Conspiracy Period during which it entered into agreements with Defendants on prices and supply levels for LCDs. ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

130.   Epson's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices.  Indeed, Epson has admitted that its participation in the LCD price-fixing conspiracy involved TFT-LCDs that it sold to Motorola for mobile wireless handsets. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

131.   Epson Imaging has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the prices of TFT-LCDs sold to Motorola for use in mobile wireless handsets from 2005 through 2006 and to participating in meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCDs; agreeing to fix the prices of TFT-LCDs; and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, Epson Imaging has agreed to pay a fine of $26 million.

132.   Defendant Hitachi participated in multiple bilateral discussions with Defendants throughout the Conspiracy Period during which it entered into agreements with Defendants on the

prices and supply levels for LCDs. ████████████████████████████
████████████████████████████████████████

133. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

134.    Hitachi's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices. ██████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███

135.    Hitachi Displays has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the prices of TFT-LCDs sold to Dell from April 2001 to March 2004 and to participating in meetings, conversations, and communications in Japan, South Korea, and the United States to discuss the prices of TFT-LCDs; agreeing to fix the prices of TFT-LCDs; issuing price quotations in accordance with the agreements reached; and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon

prices.  In connection with its guilty plea, Hitachi Displays has agreed to pay a fine of $31 million.

136.    In addition, a former Hitachi executive, Sakae Someya, has been indicted for participating in the conspiracy to fix the prices of TFT-LCDs sold to Dell from January 2001 to December 2004.  Specifically, Mr. Someya has been charged with participating in meetings, conversations, and communications to discuss the prices of TFT-LCDs.  Mr. Someya has also been charged with agreeing to fix the prices of TFT-LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; accepting payment for the supply of TFT-LCDs sold at collusive, noncompetitive prices; and taking steps to conceal the conspiracy and their conspiratorial contacts.

137.    Defendant Philips participated in the conspiracy by marketing and distributing LCDs manufactured by Royal Philips and its subsidiaries in the United States.  Royal Philips ensured that the prices for such LCDs did not undercut the prices established pursuant to the conspiracy with Defendants and other co-conspirators.  Royal Philips exercised its dominion and control over Philips to make certain that Philips sold LCDs at those established, supra-competitive prices. Philips was an active, knowing participant in the conspiracy and acted as Royal Philips' agent for selling LCDs in the United States at supra-competitive prices.

138.    During the Conspiracy Period, Philips was also continually and intimately involved in the worldwide LCD market, including the manufacturing and selling of small, medium, and large-sized LCDs.  Through this involvement, Philips communicated regularly with known conspirators and discussed LCD pricing, costs, and market trends.  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

139.    Co-conspirator Royal Philips, who has received Statements of Objections from the European Commission regarding both CRTs and LCDs, participated in the LCD conspiracy directly and through its joint venture, LG Display, who has already pleaded guilty for its participation in the LCD price-fixing conspiracy. ████████████████████████████

████████████████████████████████████████████████████████████

████████ Former sales and marketing managers for Royal Philips, such as Bruce Berkoff, acted as a bridge between their former employers and their current employer LG Display.  These employees held key positions in sales and marketing at LG Display to facilitate the communication and coordination of acts in furtherance of the conspiracy.  Royal Philips had motive and opportunity to collude, and did collude, to enhance the effectiveness of the global cartel to fix the prices of LCDs.

140.    Defendant Samsung participated in multiple CEO, Commercial, and Working Level meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001 and 2006.   At the CEO and Commercial meetings, Samsung entered into agreements with Defendants on prices, price increases, and production limits and quotas for LCDs. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████

141.    Samsung's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices. ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

1

2

3

4    142.   In addition, throughout the Conspiracy Period, Defendant Samsung SDI

5 specifically participated in the conspiracy by marketing and distributing LCDs containing LCD

6 panels manufactured by Samsung Electronics in the United States.  Samsung Electronics ensured

7 that the prices for LCDs did not undercut the pricing agreements that it reached with Defendants

8 and their other co-conspirators.  Samsung Electronics exercised its dominion and control over

9 Samsung SDI to make certain that Samsung SDI sold LCDs at prices consistent with agreements

10 reached by Samsung Electronics.  Accordingly, Samsung SDI was an active, knowing participant

11 in the conspiracy and acted as Samsung Electronics' agent for selling LCDs in the United States

12 at supra-competitive prices.

13    143.   Defendant Sharp participated in multiple Working Level meetings, as well as

14 bilateral discussions with other Defendants throughout the Conspiracy Period during which it

15 reached agreements with Defendants on the prices and supply for LCDs.

16

17

18    144.

19

20

21

22

23

24

25    145.   Sharp's illegal communications with its competitors concerned large-sized LCDs

26 used in televisions, desktop monitors, and notebook and laptop computers, as well as small and

27 medium-sized LCDs used in mobile wireless handsets and similar devices.  Indeed, Sharp has

28

admitted that its participation in the LCD price-fixing conspiracy involved LCDs that it sold to Apple for iPod portable music players and Motorola for mobile wireless handsets. █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

146.    Sharp Corporation has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the prices of TFT-LCDs sold to Dell from April 2001 to December 2006 for use in computer monitors and notebook computers, to Apple Computer from September 2005 to December 2006 for use in iPod portable music players, and to Motorola from the fall of 2005 to the middle of 2006 for use in mobile wireless handsets, and to participating in bilateral meetings, conversations, and communications in Japan and the United States with unnamed co-conspirators to discuss the prices of TFT-LCDs; agreeing to fix the prices of TFT-LCDs; and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.   In connection with its guilty plea, Sharp Corporation has agreed to pay a fine of $120 million.

147.    █████████████████████████████████████████

Because Epson and Toshiba were Sharp's primary competitors in the sale of LCDs used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of LCDs incorporated into such handsets – as Sharp admitted doing in its guilty plea – unless it reached agreements with Epson and Toshiba to do the same.

148.    Defendant Toshiba participated in multiple bilateral discussions with Defendants throughout the Conspiracy Period during which it agreed upon prices and supply levels for LCDs.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

149.    Toshiba's illegal communications with its competitors concerned large-sized LCDs used in televisions, desktop monitors, and notebook and laptop computers, as well as small and medium-sized LCDs used in mobile wireless handsets and similar devices. ████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████

150.    Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCDs with one or more of Defendants.  The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCDs and to fix prices of LCDs at unreasonably high levels and to aid, abet, notify, and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.  During the Conspiracy Period, Toshiba sought and formed strategic partnerships with Defendants and other LCD manufacturers that allowed them to easily communicate and coordinate prices and production levels as part of the overall conspiracy alleged herein.  The operation and management of these many different joint ventures afforded Toshiba and its joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases, and production limits and quotas for LCDs that each Defendant manufactured and sold.

151.     Whenever Nokia refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Nokia is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their employees and agents and was a party to the illegal agreements reached in them.

    **d.**  **Defendants' Conspiracy to Fix the Prices of LCDs Included Non-TFT LCDs.**

152.     During the Conspiracy Period, Defendants and their co-conspirators entered into illegal agreements to raise fix, raise, maintain, and/or stabilize the prices of both TFT-LCDs and Non-TFT LCDs.  Several of the same Defendants who pleaded guilty to price-fixing TFT-LCDs also produced Non-TFT LCDs and Non-TFT LCD Products during the Conspiracy Period.  For example, during that time, Defendants that have admitted participating in the LCD price-fixing conspiracy (Chunghwa, Epson, Hitachi, and Sharp) manufactured, sold, and/or distributed both TFT-LCDs and Non-TFT LCDs for incorporation into mobile wireless handsets.

153.     Throughout the Conspiracy Period, many of Defendants' employees were responsible for the sale and marketing of both TFT-LCDs and Non-TFT LCDs.

154.     Defendants and their co-conspirators engaged in bilateral discussions that included exchanges of information about the pricing, shipments, and production of Non-TFT LCDs during the Conspiracy Period.  These discussions usually took place between Defendants' sales and

marketing employees through telephone calls, emails, and instant messages.  The information that these employees gained about Non-TFT LCDs was then shared with supervisors and taken into account in determining the prices at which Defendants and their co-conspirators would sell TFT-LCDs and Non-TFT LCDs.

155.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

156.  Defendants began communicating regarding Non-TFT LCD prices as early as 1997, when Non-TFT LCDs were more common in applications such as notebook and laptop computers.  ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████

157.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████

158.  Defendants and their co-conspirators initiated similar discussions regarding the prices of Non-TFT LCDs used specifically in mobile wireless handsets.  ████████████████████
████████████████████████████████████████████████████████

159.     Some of these illegal competitor communications specifically involved Non-TFT LCDs sold to Nokia during the Conspiracy Period. ████████████████

**2.      The Role of Trade Associations During the Conspiracy Period**

160.     The LCD industry is served by several major trade associations that put on industry-wide meetings several times a year.  These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for Defendants to cooperate and discuss prices.

161.     One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong.  Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various

activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] Japan and Korea TFT-LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

162. South Korean manufacturers had similar trade associations during the Conspiracy Period, the Electronic Display Industrial Research Association of Korea ("EDIRAK") and the Korea Display Equipment Material Industry Association ("KODEMIA"). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

163. Japanese manufacturers of LCDs had a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCDs. Its members include Sharp, Toshiba, Hitachi, and a Japanese subsidiary of Samsung. Like KODEMIA and TTLA, SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

164. In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major LCD producers. One of these meetings had been known as the SID Symposium but was renamed the "SID International Symposium and Business Conference." SID also put on a long-running conference called the International Display Research Conference.

165. The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen (currently under

indictment), President and CEO of AU Optronics.  This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the conference attendees about "investments planned at the major display manufacturers."   Philips Mobile Display's Chief Technology Officer Dr. Johan van de Ven delivered a keynote address.  His speech was followed by a speech by Dong-Hun Lee ███████████████████████████████ ███████████████████████████████████████████████████████████████████.  A representative of DisplaySearch also spoke about the LCD market.  There were presentations by analysts from iSuppli/Stanford Resources and other industry experts.  This was all followed by a "networking reception – sponsored by LG Display," to which all conference attendees were invited to participate.   In addition to attendees from AU Optronics and LG Display, representatives from both Samsung and Samsung SDI as well as Chunghwa, Epson, Hitachi, Sharp, and Toshiba were in attendance at SID 2004.

166.   SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics.   This time it was called "2005: Beyond the Crystal Gateway."  A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply" and "the cost and margin outlook for key FPDs . . . ."  Again, these discussions about the LCD market were followed by a "networking reception."  Among the attendees at SID 2004 were Bruce Berkoff of LG Display (and former employee of Royal Philips), Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AU Optronics, and Joel Pollack of Sharp.  Senior executives from Sharp, Hitachi, and Royal Philips (through Philips Mobile Display) also attended.

167.   The SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the LCD crystal cycle.  Jun H. Souk, Executive Vice President of Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows: "By reviewing what happened during the business up and down cycles of the LCD in the past, we have learned lessons that will reduce the burden in future cycles.  Efforts made in cost reduction, line-investment timing, and new market generation will be described."

168.     SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing."  Among the attendees at SID 2005 were Bruce Berkoff of LG Display as well as Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung.  SID 2005 featured presentations regarding developments in LCD technology by officials from Samsung and Samsung SDI as well as AU Optronics, Sharp, LG Display, and Hitachi.

169.     The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005 in Okinawa, Japan.  The initial conference was held from February 27 to March 2, 2005, and the 2006 conference was held from February 28 to March 3, 2006.

170.     At the 2006 GFPC, executives from AU Optronics, Samsung SDI, Royal Philips (through Philips Mobile Display), and Toshiba gave addresses about the flat panel display industry in Taiwan, South Korea, Europe, and Japan, respectively.  Shigeaki Mizushima of Sharp gave the keynote address, and Mr. Souk of Samsung moderated a panel discussing the expansion of the flat panel display business.

171.     Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators.  As Dr. Hui Hsiung of AU Optronics (currently under indictment) has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

172.     Among the participants at GFPC 2006 were Ho Kyoon Chung of Samsung SDI, Shigeaki Mizushima of Sharp, Yoshihide Fuji and Mitsugi Ogura of Toshiba, Dr. Hui Hsiung of AU Optronics, Harold Hoskens of Royal Philips (through Philips Mobile Display), and Shoichi Iino of Epson.

173.     As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving Defendants further opportunities to discuss prices and output.

G.     **GOVERNMENT INVESTIGATIONS OF PRICE-FIXING**

1.     **Investigations of Defendants' LCD Price-Fixing Conspiracy**

174.     In December 2006, authorities in the United States, the European Union, Japan, and South Korea revealed the existence of a comprehensive investigation into anticompetitive activity among LCD manufacturers.

175.     In a December 11, 2006 filing with the United States Securities and Exchange Commission, co-conspirator LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose, California office.  Later, LG Display disclosed that it was under similar investigations by the European Commission, the Canadian Competition Bureau, and the Taiwan Fair Trade Commission.

176.     On December 12, 2006, news reports indicated that Samsung, Sharp, AU Optronics, and LG Display were under investigation.  At or around the same time, the DOJ acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

177.     At least one of the Defendants has approached the Antitrust Division of the DOJ to enter into a leniency agreement with respect to Defendants' and their co-conspirators' conspiracy to fix prices of LCDs.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the DOJ, this Defendant would have reported Defendants' LCD price-fixing conspiracy to the DOJ and would have confessed its own participation in the conspiracy.

178.     On or about November 10, 2008, CPT agreed to plead guilty and pay a $65 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about February 3, 2009, former LG Display executive Duk Mo Koo and two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, were indicted for participating in the global TFT-LCD price-fixing conspiracy.  On or about November 11, 2008, Sharp Corporation agreed to plead guilty and pay a $120 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about March 5, 2009, Hitachi Displays agreed to plead guilty and pay a $31 million

criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about August 25, 2009, Epson Imaging agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the prices of TFT-LCDs.  On or about June 10, 2010, AU Optronics Corporation and AUO Optronics Corporation America were indicted for their role in the conspiracy to fix the prices of TFT-LCDs.

179.    The DOJ Antitrust Division's investigation of the remaining Defendants is ongoing and is expected to result in additional guilty pleas and criminal fines.

180.    On July 13, 2009, the European Commission issued a press release confirming that in May 2009, it sent Statements of Objections to various LCD manufacturers concerning their participation in a conspiracy in violation of Article 81 of the EC Treaty (subsequently recodified as Article 101) and Article 53 of the Agreement on the European Economic Area.  Defendants AU Optronics and well as  co-conspirators Chi Mei, LG Display, and Royal Philips have acknowledged receiving the Statements of Objections, while Chunghwa, Epson, Hitachi, Samsung, Sharp, and Toshiba have admitted being under investigation by the European Commission.

181.    Defendants are also being investigated by the Offices of the Attorneys General of Illinois, Missouri, Oregon, and Washington.  The Washington Attorney General has issued civil investigative demands ("CIDs") to Philips and AU Optronics America, seeking information related to the sale of TFT-LCDs and TFT-LCD Products, as well as all documents produced by Defendants in the MDL.  Philips and AU Optronics America also received subpoenas from the Illinois Attorney General's Office requesting all documents produced in the MDL.  In addition, the Missouri Attorney General's Office issued a CID to Philips on March 18, 2009, for similar information and documents.  Moreover, citing their investigations into the LCD price-fixing conspiracy, the Attorneys General of Illinois, Oregon, and Washington have intervened in the MDL to object to the settlement of indirect purchaser claims against Epson arising from purchases of LCD Products by citizens of those states.

## 2.    Investigations Into Other Price-Fixing Conspiracies.

182.    Defendants have a history of anticompetitive behavior in the electronics industry that stretches beyond their conspiracy to fix the prices of LCDs.

183.    Several Defendants are also currently under investigation by authorities in the United States, the European Union, Japan, South Korea, Hungary, and Slovakia for participating in a global conspiracy to fix the prices of CRTs.  Like LCDs, CRTs are used in displays for televisions and computer monitors.

184.    The evolution of display technologies used in mobile wireless handsets progressed over time from passive matrix displays, such as CSTN and MSTN-LCDs, to TFT-LCDs, and recently, more advanced display technologies.  Some of the intermediate technologies, like MSTN, were not suitable for large screen applications and have not been the focus of the antitrust enforcement investigations.  The reality is that many of the same Defendants' employees who began their careers price-fixing CRTs moved to later-evolving technologies, including the various types of LCDs used for mobile displays, and continued the Defendants' price-fixing with respect to these evolving display products for mobile wireless handsets.

185.    On November 8, 2007, antitrust authorities in the European Union, Japan, and South Korea raided the offices of CRT manufacturers as part of an international investigation into CRT price-fixing.  Among those companies raided was Defendant Samsung SDI.  In a press release issued that day, the European Commission stated that it had "reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets, or exchanging market information."

186.    On November 21, 2007, co-conspirator Royal Philips disclosed that it was the subject of one or more investigations into anticompetitive conduct in the CRT industry.  Royal Philips subsequently acknowledged that it had received the Statements of Objections from the European Commission relating to allegations of CRT price-fixing.  Chunghwa, Samsung, and Toshiba, as well as European subsidiaries of Hitachi, Ltd., have also admitted that their CRT businesses are being investigated by the European Commission.

187.    In its 2008 Annual Report, Defendant Toshiba stated it was "also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."   Defendants Chunghwa, Hitachi, and Toshiba have publicly acknowledged in their Annual Reports that the DOJ's Antitrust Division is investigating the conspiracy to fix the prices of CRTs.

188.    On May 6, 2008, the Hungarian Competition Authority (the "HCA") announced its own investigation into the CRT price-fixing conspiracy involving, among others, Defendants Samsung SDI and CPT.  The HCA described a scheme similar to Defendants' LCD price-fixing conspiracy, stating that the "anti-competitive [behavior] may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation."

189.    On February 10, 2009, the DOJ announced that a federal grand jury had indicted the former Chairman and Chief Executive Officer of CPT, Cheng Yuan Lin, for participating in a conspiracy to fix the prices of CRTs used in computer monitors and televisions from March 1997 through April 2003.   Mr. Lin has also been indicted for his role in the LCD price-fixing conspiracy.  Similarly, after having been indicted for his involvement with the LCD price-fixing conspiracy, CPT executive Wen Jun Cheng was indicted on August 9, 2009, for participating in a conspiracy to fix CRT prices from January 1999 through September 2004.  On March 30, 2010, CPT executive Chung Cheng Yeh was also indicted for conspiring to fix the prices of CRTs in the United States and elsewhere from May 1999 through March 2002.

190.    Similarly, in association with a DOJ investigation of anticompetitive conduct in the dynamic random access memory ("DRAM") industry, Defendant Samsung has admitted and pleaded guilty to participating in a conspiracy to fix the prices of DRAM and agreed to pay a fine of $300 million.  Defendants Samsung, Hitachi, and Toshiba also agreed in May 2010 to settle an

investigation of DRAM price-fixing by the European Commission and pay fines of €145.7 million, €2.1 million, and €17.6 million, respectively.

191.    On October 26, 2009, news sources reported that Defendants Toshiba, Hitachi, and Samsung had received subpoenas from the DOJ's Antitrust Division in association with its investigation of anticompetitive pricing of optical disk drives.  According to one news article, the DOJ was "investigating disk-drive makers for possible price-fixing, bid-rigging, and allocation of markets."  Royal Philips subsequently disclosed in its 2009 Annual Report that two of its subsidiaries are being investigated by the DOJ and other unidentified foreign authorities for antitrust violations relating to the optical disk drive industry.

192.    Defendants and their co-conspirators have implemented widespread, systematic, global conspiracies to raise, maintain, and/or stabilize the prices of a wide range of products, including LCDs and LCD Products sold to Nokia in the United States.

## H.    PLAINTIFF'S INJURY

193.    Nokia has suffered injury as a result of Defendants' and their co-conspirators' conspiracy to raise, fix, stabilize, and/or maintain the prices of LCDs at artificial levels.

194.    Nokia has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' and their co-conspirators' agreement to raise, fix, and/or maintain the prices of LCDs at artificial levels.  During the Conspiracy Period, Defendants' and their co-conspirators' price-fixing agreement artificially inflated the price of LCDs purchased by Nokia, causing Nokia to pay higher prices for those LCDs than it would have in the absence of the conspiracy.  The conspiracy also artificially inflated the prices of LCD Products, including mobile wireless handsets, that Nokia purchased during the Conspiracy Period.

## I.    FRAUDULENT CONCEALMENT

195.    Nokia did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006,

when the investigations by antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination, or conspiracy.  Because Defendants' agreement, understanding, and conspiracy were kept secret, Nokia was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for LCDs and LCD Products.

196.    The affirmative acts of Defendants and their co-conspirators alleged herein, including, among other things, acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

197.    By its very nature, the conspiracy was self-concealing.  As alleged above, Defendants had secret discussions about price, output, and other competitively sensitive topics. Defendants agreed not to discuss publicly the existence or the nature of their agreements.  The top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

198.

199.    Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one through Round Robin meetings. Defendants also repeatedly gave pretextual justifications for the inflated prices of LCDs in an effort to both further and conceal the conspiracy.

200.    There have been a variety of other purportedly market-based explanations from various Defendants for price increases.  The first explanation and obfuscation was supply and

demand.   For example, in early 1999, Bock Kwon, Vice President of LG Display's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases were due to acute shortages.

201.    Another false rationale provided by Defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated that "[p]rices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry."

202.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung.  He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

203.    Increased demand was repeatedly cited by Defendants throughout the Conspiracy Period to justify prices and other effects of the conspiracy.  On January 14, 2002, Bruce Berkoff, Executive Vice-President at LG Displays was quoted in CNET News as saying that price increases were due to shortages.  He claimed that "demand grew so fast that the supply can't keep up."  Koo Duk-Mo, an executive at LG Displays, similarly predicted in 1999 that prices would rise 10 to 15% due to increased demand for the holiday season.   In 2005, Duke Koo of LG Displays stated that "[w]e are seeing much stronger demand for large-size LCD televisions than expected, so LCD TV supply is likely to remain tight throughout next year."

204.    Hsu Jen-Ting, a vice president at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001.  They blamed component shortages due to the delayed expansion of fifth generation production lines and new demand from the replacement of CRTs with LCDs.

205.    These explanations were all pretextual and each served to cover up the conspiracy. As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Nokia's claims.

**J.      VIOLATIONS ALLEGED**

**First Claim for Relief: Violation of Sherman Act**

206.    Nokia incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.    Beginning at a time presently unknown to Nokia, but at least as early as January 1, 1996, and continuing through at least December 11, 2006, the exact dates being unknown to Nokia, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for TFT-LCDs and Non-TFT LCDs in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

208.    In formulating and carrying out the agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    A.      To fix, raise, maintain, and stabilize the prices of LCDs;

    B.      To allocate markets for LCDs among themselves; and

    C.      To allocate among themselves the production of LCDs.

209.    The combination and conspiracy alleged herein has had the following effects, among others:

    A.      Price competition in the sale of LCDs has been restrained, suppressed and/or eliminated in the United States;

    B.      Prices for LCDs and LCD Products sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, supra-competitive levels throughout the United States; and

    C.      Those who purchased LCDs and LCD Products produced by Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

210. Nokia has been injured in its business and property by paying more for LCDs and LCD Products that were shipped directly from Defendants and their co-conspirators to Nokia in the United States than it would have paid and will pay in the absence of the combination and conspiracy.

211. Defendants' and their co-conspirators' conduct involved United States import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce that resulted in the injuries suffered by Nokia and gave rise to Nokia's antitrust claims.

212. As a result, Nokia has suffered injury as a direct, proximate, and reasonably foreseeable result of Defendants' conspiracy to fix the prices of LCDs. Nokia has been injured and will continue to be injured in its business and property by paying more for LCDs and LCD Products that were shipped directly from Defendants and their co-conspirators to Nokia in the United States than it would have paid and will pay in the absence of the combination and conspiracy.

213. Because Nokia has suffered injury as a direct, proximate, and foreseeable result of Defendants' conspiracy to fix the prices of LCDs, Nokia is entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of LCDs and LCD Products that were shipped directly from Defendants and their co-conspirators to Nokia in the United States.

214. Because Nokia faces a serious risk of future injury, Nokia is entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all Defendants, preventing and restraining the violations alleged herein. Some of the Defendants continue to manufacture, market, sell, and/or distribute LCDs throughout the United States and elsewhere, and the market for LCDs remains highly concentrated and susceptible to collusion. Defendants continue to have the incentive to collude to increase LCD prices or stabilize LCD price declines, and Defendants' conspiracy to fix the prices of LCDs could be easily repeated and concealed from Nokia.

**Second Claim for Relief: Violation of State Antitrust and Unfair Competition Laws**

215. Nokia incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

216. By reason of the foregoing, Defendants have engaged in a continuing unlawful trust in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*

      A.    Defendants entered into and engaged in a continuing unlawful trust in restraint of trade and commerce, as defined by California Bus. & Prof. Code §§ 16700 *et seq.*, by engaging in a conspiracy to fix, raise, stabilize, and maintain prices of, and allocate markets for, TFT-LCDs and Non-TFT LCDs at supra-competitive levels;

      B.    Defendants' conduct was carried out, effectuated, and perfected within the State of California. Defendants CPT, Epson Imaging, Hitachi Displays, and Sharp Corporation, as well as co-conspirators Chi Mei Optoelectronics Corporation, HannStar, and LG Display Co., Ltd., all admitted in their plea agreements that acts in furtherance of the conspiracy to fix the prices of LCDs were carried out in California. Defendants AU Optronics, Chunghwa, Epson, Hitachi, Samsung, and Toshiba all maintained offices in California during the Conspiracy Period. Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the prices of LCDs. Defendants' conduct within California thus injured Nokia both in California and throughout the United States. As a result, Defendants' conspiracy substantially affected California commerce;

      C.    During the Conspiracy Period, Nokia purchased LCDs and LCD Products in California. Nokia also conducted a substantial volume of business in California. Nokia sold mobile wireless handsets and other LCD Products

to retailers and other customers in California. Nokia has a research and development facility as well as a number of corporate development and marketing offices throughout California. During the Conspiracy Period, Nokia invested a substantial amount of money in California through various entertainment venues as well as business development and marketing enterprises. Accordingly, Nokia is entitled to the protection of the laws of California;

D.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following:

(i)     To fix, raise, maintain, and stabilize the prices of LCDs;

(ii)    To allocate markets for LCDs amongst themselves; and

(iii)   To allocate among themselves the production of LCDs.

E.     The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

(i)     Price competition in the sale of LCDs has been restrained, suppressed, and/or eliminated in the State of California;

(ii)    Prices for LCDs sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels in the State of California; and

(iii)   Those who purchased LCDs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

F.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCDs and LCD

Products shipped directly from Defendants and their co-conspirators to California than it would have paid in the absence of Defendants' combination and conspiracy; and

G.    As a result of Defendants' violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, Nokia is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to § 16750(a).

217.    By reason of the foregoing, Defendants have engaged in unfair competition in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

A.    Defendants committed acts of unfair competition, as defined by Cal. Bus. & Prof. Code §§ 17200, *et seq.,* by engaging in a conspiracy to fix and stabilize the prices of TFT-LCDs and Non-TFT LCDs as described above;

B.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.,* including, but not limited to violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*;

C.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independent of whether they constitute a violation of the Sherman Act and/or the Cartwright Act;

D.    Defendants' acts or practices are fraudulent or deceptive within the meaning of California Bus. & Prof. Code §§ 17200 *et seq.*;

E.    Defendants' conduct was carried out, effectuated, and perfected within the State of California.  Defendants CPT, Epson Imaging, Hitachi Displays, and Sharp Corporation, as well as co-conspirators Chi Mei Optoelectronics

Corporation, HannStar, and LG Display Co., Ltd., all admitted that acts in furtherance of the conspiracy to fix the prices of LCDs were carried out in California. AU Optronics, Chunghwa, Epson, Hitachi, Samsung, and Toshiba all maintained offices in California during the Conspiracy Period. Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the prices of LCDs;

F.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products in California. Nokia also conducted a substantial volume of business in California. Nokia sold mobile wireless handsets and other LCD Products to retailers and other customers in California. Nokia had a research and development facility in San Diego, California, as well as corporate offices located throughout California. During the Conspiracy Period, Nokia invested a substantial amount of money in California through various entertainment venues as well as business development and marketing enterprises. Accordingly, Nokia is entitled to the protection of the laws of California; and

G.  As a result of Defendants' violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Nokia is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

218.  By reason of the foregoing, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. Ann. §§ 501.201, *et seq.*

A.  Defendants committed acts of unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices

in the conduct of any trade or commerce, as defined by Florida Stat. Ann. §§ 501.201 *et seq*., by engaging in a conspiracy to fix and stabilize the prices of TFT-LCDs and Non-TFT LCDs as described above;

B.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products in Florida.  Nokia also conducted a substantial volume of business in Florida.  Nokia sold LCD Products to retailers and/or other customers in Florida and maintained corporate offices in Florida.  As a result of its presence in Florida and the substantial business it conducts in Florida, Nokia is entitled to the protection of the laws of Florida;

C.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, substantially affected Florida commerce and consumers; and

D.  As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants and their co-conspirators than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Florida Stat. Ann. §§501.201 *et seq.*

219.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

A.  Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Nevada and fixed, raised, maintained, and stabilized TFT-LCDs and Non-TFT LCDs prices in Nevada at artificially high, non-competitive levels;

B.  As a result, Defendants' conspiracy substantially affected Nevada commerce;

C.  During the Conspiracy Period, Nokia purchased LCDs and LCD Products in Nevada.  Nokia also conducted a substantial volume of business in

Nevada.  Nokia sold LCD Products to retailers and/or other customers in Nevada.  As a result of its presence in Nevada and the substantial business it conducts in Nevada, Nokia is entitled to the protection of the laws of Nevada; and

D.      As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCDs and LCD Products shipped directly from Defendants to Nevada than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

## K.      PRAYER FOR RELIEF

WHEREFORE, Nokia requests:

A.      That Defendants' unlawful agreement, conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed to be:

i.      A restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in the First Claim for Relief; and

ii.      An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition laws of California, Florida, and Nevada, as alleged in the Second Claim for relief.

B.      That Nokia recover damages, as provided by federal and state antitrust laws, and that a judgment be entered in favor of Nokia against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C.      That Nokia obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

D.      That Nokia recover damages and/or all other available monetary and equitable remedies under the state unfair competition laws identified above;

E.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or

claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      That Nokia be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

G.      That Nokia recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

H.      That Nokia be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.


[SEE SIGNATURE ON NEXT PAGE]

1   Date:  July 23, 2010.

2   Respectfully submitted,

3                           /s/ B. Parker Miller

4                           Randall Allen (State Bar No. 264067)
                            **ALSTON + BIRD LLP**
5                           275 Middlefield Road, Suite 150
                            Menlo Park, California  94025
6                           Telephone:  650-838-2000
                            Facsimile:   650-838-2001
7                           Email:  randall.allen@alston.com

8                           Peter Kontio (peter.kontio@alston.com)
                            Valarie C. Williams (valarie.williams@alston.com)
9                           B. Parker Miller (parker.miller@alston.com)
                            Joann E. Johnston (joann.johnston@alston.com)
10                          Lisa K. Bojko (lisa.bojko@alston.com)
                            Donald M. Houser (donald.houser@alston.com)
11                          **ALSTON + BIRD LLP**
                            1201 West Peachtree Street
12                          Atlanta, Georgia 30309
                            Telephone:  404-881-7000
13                          Facsimile:   404-881-7777

14                          Richard W. Stimson (rick.stimson@alston.com)
                            **ALSTON + BIRD LLP**
15                          Chase Tower, Suite 3601
                            2200 Ross Avenue
16                          Dallas, Texas 75201
                            Telephone:  214-922-3400
17                          Facsimile:  214-922-3899

18                          ***Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.***

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs Nokia Corporation and Nokia Inc. hereby demand a jury trial for all issues so triable.

Dated:  July 23, 2010

Respectfully submitted,

/s/ B. Parker Miller

Randall Allen (State Bar No. 264067)
**ALSTON + BIRD LLP**
275 Middlefield Road, Suite 150
Menlo Park, California  94025
Telephone:  650-838-2000
Facsimile:  650-838-2001
Email:  randall.allen@alston.com

Peter Kontio (peter.kontio@alston.com)
Valarie C. Williams (valarie.williams@alston.com)
B. Parker Miller (parker.miller@alston.com)
Joann E. Johnston (joann.johnston@alston.com)
Lisa K. Bojko (lisa.bojko@alston.com)
Donald M. Houser (donald.houser@alston.com)
**ALSTON + BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone:  404-881-7000
Facsimile:  404-881-7777

Richard W. Stimson (rick.stimson@alston.com)
**ALSTON + BIRD LLP**
Chase Tower, Suite 3601
2200 Ross Avenue
Dallas, Texas 75201
Telephone:  214-922-3400
Facsimile:  214-922-3899

***Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.***

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

IN RE: TFT-LCD (FLAT PANEL)
ANTITRUST LITIGATION

This Document Relates to:  ALL ACTIONS

CASE NO:  3:09-CV-5609

MDL FILE NO:  3:07-MD-1827-SI

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2010, I electronically filed the foregoing **AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** with the Clerk of Court using the CM/ECF system, which will automatically send email notification to the parties and counsel of record.

This 23rd day of July, 2010.

By:     /s/ B. Parker Miller
        B. Parker Miller (parker.miller@alston.com)
        **ALSTON + BIRD LLP**
        Georgia Bar No. 506218
        1201 West Peachtree Street
        Atlanta, Georgia 30309
        Telephone:  404-881-7000
        Facsimile:   404-881-7777