1   JAMES B. BALDINGER (*pro hac vice*)
    jbaldinger@carltonfields.com
2   ROBERT L. CIOTTI (*pro hac vice*)
    rciotti@carltonfields.com
3   DAVID B. ESAU (*pro hac vice*)
    desau@carltonfields.com
4   **CARLTON FIELDS, P.A.**
    CityPlace Tower
5   525 Okeechobee Boulevard, Suite 1200
    West Palm Beach, FL 33401
6   Telephone: (561) 659-7070
    Facsimile: (561) 659-7368
7   *Attorneys for Plaintiff TracFone Wireless, Inc.*

8                 **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
10

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. M:07-1827 SI MDL No. 1827 |
| This Document Relates to Individual Case No. 3:10-cv-03205-SI | |
| TracFone Wireless, Inc. Plaintiff, v. AU Optronics Corporation; AU Optronics Corporation America, Inc.; Chi Mei Corporation; Chi Mei Optoelectronics Corporation; Chi Mei Optoelectronics USA, Inc.; CMO Japan Co. Ltd.; Nexgen Mediatech, Inc.; Nexgen Mediatech USA, Inc.; Epson Imaging Devices Corporation; Chunghwa Picture Tubes Ltd.; Tatung Company of America, Inc.; HannStar Display Corporation; LG Display Co. Ltd.; LG Display America Inc.; Sharp Corporation; Sharp Electronics Corporation; Toshiba Corporation; Toshiba America Electronics Components, Inc.; Toshiba Mobile Display Co., Ltd.; Toshiba America Information Systems, Inc., Defendants. | Individual Case No. 3:10-cv-03205-SI **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** **DEMAND FOR JURY TRIAL** |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff TracFone Wireless, Inc. ("TracFone") sues all the defendants named herein, and alleges as follows:

## I.   INTRODUCTION

1.      TracFone sells mobile wireless handsets and wireless telecommunications services to millions of customers throughout the United States. From 1996 to 2006 ("the Conspiracy Period"), TracFone purchased millions of dollars worth of mobile wireless handsets in the United States for resale to its customers. All of the mobile wireless handsets TracFone purchased contained liquid crystal display panels ("LCD Panels").

2.      Since 1996, TracFone maintained its corporate headquarters in Miami-Dade County, Florida where it purchased and sold mobile wireless handsets, made purchasing and sales decisions regarding mobile wireless handsets, negotiated purchasing and sales contracts for mobile wireless handsets, and made and received payments for mobile wireless handsets, among other activities.

3.      From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels, including LCD Panels included in mobile wireless handsets sold to TracFone. Because the U.S. market for LCD Panels and products containing those panels has always been one of the largest and most-profitable markets for defendants and their co-conspirators, defendants purposely fixed prices to unlawfully maintain and increase their profits from sales to customers in the U.S.

4.      During the Conspiracy Period, LCD Panels used in hand-held devices such as mobile wireless handsets included different technologies: thin film transistor panels ("TFT-LCD Panels") and super-twist nematic panels ("STN-LCD Panels"). STN-LCD Panels included both color super-twist nematic ("CSTN-LCD Panels") panels, and monochrome super-twist nematic ("MSTN- LCD Panels") panels. Defendants' conspiracy involved both TFT-LCD Panels and STN-LCD Panels. Defendants and their co-conspirators engaged in meetings, discussions and exchanges of competitive price information regarding both TFT-LCD panels and STN-LCD

Panels.                                        REDACTED

5.      TracFone, as a large wireless telecommunications provider, helped increase consumer demand in the U.S. for mobile wireless handsets during the Conspiracy Period and thus demand for LCD Panels manufactured by defendants. TracFone served as a major distribution channel for mobile wireless handsets for the U.S. market. Defendants knew that mobile wireless providers, like TracFone, were some of the most important purchasers of mobile wireless handsets containing the LCD Panels they manufactured, and that the LCD Panels they priced fixed would end up in mobile wireless handsets purchased by wireless providers in the U.S., such as TracFone.

6.      LG Electronics, Inc., one of the two founders and the largest owner of defendant LG Display, Inc., sold mobile wireless handsets and small LCD Panels used in mobile wireless handsets to customers in the United States, including TracFone. LG Electronics, Inc., through its corporate affiliates in the Untied States, negotiated supply agreements with TracFone and quoted prices to TracFone for mobile wireless handsets in the United States with the knowledge that the price of those handsets were artificially inflated as a result of defendants' conspiracy to fix the price of LCD panels in those handsets.

7.      At least seven LCD Panel manufacturers have admitted in criminal proceedings to participating in this conspiracy and carrying out this conspiracy in the United States: defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation and HannStar Display Corporation. On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels. On or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its

role in the conspiracy. And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

8.      As a result of defendants' conspiracy to fix the price of LCD Panels, the prices of mobile wireless handsets containing LCD Panels also were artificially inflated. Defendants' conspiracy also artificially inflated the price of LCD Panels incorporated into the LCD Products TracFone purchased for its own internal use during the Conspiracy Period, such as desktop computer monitors and notebook computers, and therefore artificially inflated the price of such LCD Products. TracFone thus suffered damages as a result of defendants' conspiracy, and brings this action to recover the overcharges paid for the mobile wireless handsets and other LCD Products it purchased during the Conspiracy Period.

9.      TracFone is the largest prepaid cellular phone provider in the United States with more than 14 million subscribers. TracFone sells mobile wireless handsets to its customers through more than 70,000 retailers nationwide, including in Florida, California, and elsewhere. During the Conspiracy Period, TracFone purchased more than fifty million (50,000,000) mobile wireless handsets for resale to customers.

10.     TracFone brings this action seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Florida's Deceptive and Unfair Trade Practices Act.  TracFone also seeks to recover damages under Section 4 of the Clayton Act and under Florida's Deceptive and Unfair Trade Practices Act, and to recover the costs of suit, including reasonable attorneys fees, for the injuries that TracFone suffered as a result of defendants' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

11.     All conditions precedent to filing this action have been performed, waived, or excused.

## II.     JURISDICTION AND VENUE

12.     TracFone brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain treble damages and injunctive relief against all defendants.

13.     TracFone also brings this action pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Section 501.201 *et seq.* ("FDUTPA") for damages and injunctive relief.

14.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over TracFone's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. The Court has supplemental jurisdiction over TracFone's FDUTPA claim, and TracFone's FDUTPA claim is so related to its claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

15.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in Florida. This effect gives rise to TracFone's claims. During the Conspiracy Period, defendants' conspiracy affected the price of LCD Panels and LCD Products TracFone purchased in the United States. These LCD Products moved through, or were purchased, sold in, or used in Florida.

16.     The United States District Court for the Southern District of Florida has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and pursuant to Fla. Stat. §§ 48.193(1)(a), 48.193(1)(b), and 48.193(2) because they have conducted, engaged in, and carried out business ventures in the State of Florida, committed tortious acts within the State of Florida, and because they have engaged in substantial and not isolated activity with the State of Florida.   In addition, defendants and their co-conspirators purposefully availed themselves of the laws of the United States, including Florida, insofar as they manufactured LCD Panels and LCD Products for sale in the United States, including in Florida, or items that were incorporated into LCD Panels and LCD Products that defendants and their co-conspirators knew would be sold to customers in the United States, including in Florida. Defendants and their co-conspirators' conspiracy affected this commerce in LCD Panels and LCD Products in the United States, including in Florida.

17.     Venue is proper in the United States District Court for the Southern District of Florida under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in the Southern District of Florida.  Defendants and their co-conspirators knew or should have known that price-fixed LCD Panels and LCD Products containing price fixed LCD Panels would be sold and shipped into, and moved through, the Southern District of Florida.

18.     This action concerns substantially the same parties, transactions and events as *In re TFT-LCD Antitrust Litigation*, Case No. M:07-cv-1827 SI, pending in the Northern District of California, San Francisco Division, Jude Susan Illston presiding, insofar as it involves a suit for damages and injunctive relief arising out of defendants' conspiracy to fix the price of liquid crystal display ("LCD") panels in violation of the Sherman Act and the laws of Florida and other states.

III.     **DEFINITIONS**

19.     Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image. The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image. As used herein, "LCD Panel" refers to both liquid crystal display panels and modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a mobile wireless handset, television, computer monitor, or other product.

20.     During the Conspiracy Period, LCD Panels used in hand-held devices included three different technologies: thin film transistor panels ("TFT-LCD Panels"), color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels (collectively, "STN-LCD Panels"). The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

21.     As used herein, the term "LCD Products" means any product containing an LCD Panel, including, without limitation, mobile wireless handsets (including voice, data, and combination voice and data devices), computer monitors, notebook and laptop computers, and televisions.

22.     As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

23.     As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

IV.     **THE PARTIES**

A.     **Plaintiff**

1.     **TracFone**

24.     TracFone is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.  TracFone is the largest provider of prepaid wireless telephone service in the United States, and markets its service under the TracFone, NET10, SafeLink and Straight Talk brands.

25.     Throughout the Conspiracy Period, TracFone purchased mobile wireless handsets and other LCD Products containing price-fixed LCD Panels manufactured and sold by defendants, their co-conspirators, and others.  As a result of defendants' conspiracy, TracFone has been injured in its business and property because the prices it paid for such LCD Products were artificially inflated by defendants' conspiracy.  Defendants' and their co-conspirators' price-fixing was the proximate cause of TracFone paying artificially-elevated prices for the LCD Panels purchased and delivered in Florida and throughout the United States.

26.     Throughout the Conspiracy Period, TracFone conducted a substantial amount of business in Florida by purchasing mobile wireless handsets containing LCD Panels in Florida, selling mobile wireless handsets containing LCD Panels to customers in Florida through major national retailers such as Wal-Mart, Target, and Sam's Club, and providing wireless communication services in those states.

B.    **Defendants**

1.    **AU Optronics**

27.    Defendant AU Optronics Corporation is one of the world's largest manufacturers of LCD Panels, with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

28.    Defendant AU Optronics Corporation America, Inc. is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino, California. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

29.    Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are referred to collectively herein as "AU Optronics." The AU Optronics companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant AU Optronics Corporation America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

2.    **Chi Mei**

30.    Defendant Chi Mei Corporation is another of the world's largest manufacturers of LCD Panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

31.    Defendant Chi Mei Optoelectronics Corporation is another of the largest manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation, with its global headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih

Township, Tainan County, 74147 Taiwan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

32.     Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display Technology USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Corporation, with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

33.     Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd. is a subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

34.     Defendant Nexgen Mediatech, Inc. ("Nexgen") is a wholly-owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St., Jen Te Village Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United States.

35.     Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a wholly-owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California. During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United States.

36.     Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA are referred to collectively herein as "Chi Mei." The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent

1   authority. Alternatively, defendants Chi Mei Optoelectronics Corporation, Chi Mei

2   Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA were members of

3   the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of

4   Chi Mei Corporation. Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics

5   Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen

6   USA regarding conspiracy activities and used that domination or control to charge artificially

7   high prices for LCD Panels.

8                    **3.    Epson**

9          37.    Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal

10   place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku,

11   Tokyo 105-6104 Japan. The company was originally formed as a joint venture between Seiko

12   Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko

13   Epson Corporation. Up until December 28, 2006, Epson Japan was known as Sanyo Epson

14   Imaging Devices Corporation. During the Conspiracy Period, Epson Japan manufactured,

15   marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States

16   and elsewhere.

17         38.    Defendant Epson Japan and co-conspirator Epson America are referred to

18   collectively herein as "Epson." The Epson companies were members of the conspiracy that is the

19   subject of this Complaint by virtue of their participation in the conspiracy through the actions of

20   their respective officers, employees, and representatives acting with actual or apparent authority.

21                    **4.    Chunghwa**

22         39.    Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa") is a leading manufacturer

23   of LCD Panels, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.

24   Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and

25   information technology company based in Taiwan. Chunghwa's Board of Directors includes

26   representatives from Tatung Company. The Chairman of Chunghwa, Weishan Lin, is also the

27   Chairman and General Manager of the Tatung Company. During the Conspiracy Period, said

28

1   defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

2   Products sold in the United States.

3       40.     Defendant Tatung Company of America, Inc. ("Tatung America") is a California

4   corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

5   California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company

6   owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the

7   daughter of Tatung Company's former Chairman, T.S. Lin. During the Conspiracy Period, Tatung

8   America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes, Ltd. to

9   customers throughout the United States.

10      41.     Defendants Chunghwa and Tatung America are referred to collectively herein as

11  "Chunghwa." During the Conspiracy Period, Chunghwa and Tatung were closely affiliated,

12  commonly owned, controlled and dominated by Tatung Corporation, and functioned as a single

13  enterprise and/or alter egos.

### 5.   HannStar

14

15      42.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

16  with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.

17  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed

18  LCD Panels incorporated into LCD Products sold in the United States.

### 6.   LG Display

19

20      43.     Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd. is a leading

21  manufacturer of LCD Panels and is a joint venture created in 1999 by defendants Royal Philips

22  Electronics NV and LG Electronics, Inc.. LG Display Co., Ltd. maintains offices within this

23  District in San Jose, California and has its principal place of business located at 20 Yoido-dong,

24  Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. During the Conspiracy Period, said

25  defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

26  Products sold in the United States.

27      44.     Defendant LG Display America, Inc. f/k/a/ LG Philips LCD America, Inc. is

28  located at 150 East Brokaw Rd., San Jose, CA 95112. During the Conspiracy Period, said

1  defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

2  Products sold in the United States.

3      45.    Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to

4  collectively herein as "LG Display." Defendants LG Display Co., Ltd. and LG Display America,

5  Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions

6  of their respective officers, employees, and representatives acting with actual or apparent

7  authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by

8  virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.

9  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy

10  activities and used that domination or control to charge artificially high prices for LCD Panels.

### 7.    Sharp

12      46.    Defendant Sharp Corporation, is located at 22-22 Nagaike-cho, Abeno-ku, Osaka

13  545-8522, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold

14  and/or distributed LCD Panels and LCD Products sold in the United States.

15      47.    Defendant Sharp Electronics Corporation is a wholly-owned and controlled

16  subsidiary of Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah,

17  New Jersey, 07430. During the Conspiracy Period, said defendant manufactured, marketed, sold

18  and/or distributed LCD Panels and LCD Products sold in the United States.

19      48.    Defendants Sharp Corporation and Sharp Electronics Corporation are referred to

20  collectively herein as "Sharp." Defendants Sharp Corporation and Sharp Electronics Corporation

21  were members of the conspiracy that is the subject of this Complaint by virtue of the actions of

22  their respective officers, employees, and representatives acting with actual or apparent authority.

23  Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue

24  of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp

25  Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy

26  activities and used that domination or control to charge artificially high prices for LCD Panels.

27

28

8.     <u>Toshiba</u>

49.     Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

50.     Defendant Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display Technology Co., Ltd. is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

51.     Defendant Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, CA 92612. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

52.     Defendant Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc. with its principal place of business at 9470 Irvine Boulevard, Irvine, California. During the Conspiracy Period, Toshiba America Information Systems, Inc. manufactured, marketed, sold and/or distributed LCD Products in the United States.

53.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba." Defendants Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America

1   Electronic Components, Inc. and Toshiba America Information Systems, Inc. regarding

2   conspiracy activities and used that domination or control to charge artificially high prices for

3   LCD Panels.

4       C.    Co-Conspirators

5       54.    The actions in this Complaint were authorized, ordered, or done by defendants'

6   respective officers, agents, employees, or representatives while actively engaged in the

7   management of each defendant's business or affairs.

8       55.    Each defendant acted as the agent or joint venturer of or for the other defendants

9   with respect to the acts, violations and common course of conduct alleged herein. Each defendant

10  that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD

11  Products made by its parent company.

12      56.    Various persons and entities participated as co-conspirators in the violations

13  alleged herein and performed acts and made statements in furtherance thereof. These co-

14  conspirators are believed to include, without limitation, Samsung Electronics Co., Ltd., Samsung

15  Semiconductor, Inc., Samsung Electronics America, Inc. (collectively "Samsung"), Epson

16  Electronics America, Inc., LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies

17  Co., Ltd., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Philips Electronics

18  North America Corp., Ltd., IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi Electric

19  Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

20      57.    The acts charged in this Complaint have been done by defendants and their co-

21  conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,

22  or representatives while actively engaged in the management of each defendant's business or

23  affairs.

24      58.    Each defendant named herein acted as the agent or joint venturer of or for the other

25  defendants with respect to the acts, violations and common course of conduct alleged herein.

26  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD

27  Panels made by its parent company.

28

## V.   TRACFONE'S PURCHASES OF LCD PANELS AND LCD PRODUCTS

59.   During the Conspiracy Period, TracFone purchased millions of dollars worth of mobile wireless handsets that contained LCD Panels manufactured by defendants. Defendants' conspiracy artificially inflated the prices of the LCD Panels contained in these mobile wireless handsets. TracFone suffered injury caused by the conspiracy when it purchased mobile wireless handsets from defendants, their affiliates and other manufacturers of mobile wireless handsets.

60.   During the Conspiracy Period, TracFone purchased mobile wireless handsets, which contained LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy, at its corporate headquarters in Miami-Dade County, Florida.

61.   During the Conspiracy Period, TracFone also purchased LCD Products, including notebook computers and desktop monitors containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy. During the Conspiracy Period, TracFone purchased LCD Products at its offices and facilities in Miami-Dade County, Florida, where it received LCD Products shipped and/or delivered by its vendors.

## VI.   THE MARKET FOR LCD PANELS AND LCD PRODUCTS

62.   During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels in the United States through and into interstate and foreign commerce, including through Florida and other states.

63.   During the Conspiracy Period, defendants collectively controlled the market for LCD Panels, both globally and in the United States.

64.   Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. Defendants' business activities substantially affected trade and commerce within each of the 50 states insofar as defendants' conspiracy artificially inflated the prices of LCD Products sold in all 50 states, and so caused antitrust injury in each of those states.

65.   LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products. LCD Panels

were the principal form of display screen used in desktop computer monitors, laptop computers and mobile wireless handsets during the Conspiracy Period.

66.     LCD Panels have no independent utility, and have value only as components of LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays and TVs. The demand for LCD Panels thus derives directly from the demand for LCD Products.

67.     The market for LCD Panels is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products. For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period. In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units. This number ballooned to over one billion units by 2006. This increased demand for mobile wireless handsets drove a similar increase in the demand for LCD Panels during the Conspiracy Period. Shipments of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

68.     The market for LCD Panels and LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products. The market for LCD Panels and for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

69.     TracFone participated in the market for LCD Panels during the Conspiracy Period through its purchases of mobile wireless handsets, notebook computers and desktop computer monitors containing LCD Panels at artificially inflated prices caused by defendants' conspiracy.

**VII.   DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS IN THE UNITED STATES AND THEY PARTICIPATED IN PRICE FIXING MEETINGS OVERSEAS TO INCREASE THE PRICE OF LCD PANELS SOLD IN THE UNITED STATES**

70.     During the Conspiracy Period, the United States was the world's largest consumer of LCD Products and U.S. companies like Motorola, Dell, Apple and HP were among the largest purchasers of LCD Panels. Defendants were aware that TracFone, as a wireless

telecommunications provider, was a large purchaser of mobile wireless handsets containing LCD Panels. When defendants conspired to fix in the United States the prices of LCD Panels sold to manufacturers of mobile wireless handsets, defendants and their co-conspirators knew that those panels would be incorporated into mobile wireless handsets that would be purchased by companies such as TracFone in the United States.

71.     Defendants also analyzed how wireless telecommunications providers' purchases of mobile wireless handsets would impact the demand for and supply of LCD Panels.

REDACTED

72.     LG Electronics, Inc., one of the two founders and the largest owner of defendant LG Display, Inc., also solicited TracFone's business in the United States and sold mobile wireless handsets in the United States to TracFone. LG Electronics established sales offices and sales agents in the United States for purposes of negotiating supply agreements and marketing and selling mobile wireless handsets that contained LCD Panels manufactured by LG Display, Samsung and their co-conspirators. LG Electronics, Inc., through their corporate affiliates in the United States, quoted prices to TracFone for mobile wireless handsets in the United States, with the knowledge that the price of those handsets were artificially inflated as a result of defendants' conspiracy to fix the price of LCD Panels in those handsets.

A.     **Defendants Engaged in Bilateral and Multi-lateral Meetings and Communications With Competitors To Inflate Prices of LCD Panels and LCD Products**

73.     The defendants conspired to raise the prices of LCD Panels sold into the United States. The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California and

elsewhere in the United States. Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels. Defendants fostered a culture of corruption within their companies whereby employees at every level—from the very top executive all the way to lower-level sales representatives—engaged in frequent and continuous communications with the employees at every level of their competitors. Defendants' senior executives made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment. The lower-level employees funneled the competitive information up to their superiors who utilized that information—along with the pricing information they, themselves, were able to collect through their own illegal competitor contacts—to set prices for LCD Panels at artificially-inflated levels. The constant communications at all levels allowed defendants to conspire to set average prices across the entire industry, as well as conspire to fix the prices of the particular LCD Panels sold to specific U.S. customers, such as Motorola, Dell, Hewlett-Packard, Apple, and others.

1.   Defendants' engaged in illegal communications about pricing in the U.S.

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

REDACTED

15

16    77.    For OEMs in the United States, such as Motorola, SonyEricsson, Palm and other

17    manufacturers of mobile wireless handsets, defendants' U.S. affiliates led the LCD Panel price

18    negotiations with those OEMs. Pricing directions came from Asia, where the defendants were

19    also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products. Many of

20    the defendants' conspiracy meetings and conspiracy communications took place in the U.S.,

21    involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and

22    U.S. OEMs. Defendants' conspiratorial conduct also included discussions in Japan, South Korea,

23    and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United

24    States and around the world. And, the Defendants' conspiracy included discussions regarding the

25    retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that

26    manufactured LCD Products, such as mobile wireless handsets. The Defendants conspiratorial

27    acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD

28    Panels and LCD Products in the U.S. market.

2. **Defendants engaged in illegal communications about pricing with respect to small panels**

78.     As part of the larger conspiracy to raise the price of LCD Panels, defendants and their co-conspirators engaged in bilateral communications specifically regarding prices for small LCD Panels used in mobile wireless devices and two-way radios. These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers.

79.     These bilateral communications between defendants and their co-conspirators routinely involved LCD Panels used in mobile wireless devices and other handheld products. Examples include:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**REDACTED**

    3.     <u>Defendants engaged in illegal bilateral and multilateral communications about the pricing of TFT-LCD Panels and STN-LCD Panels</u>

    80.     In the early years of the conspiracy, beginning in at least 1996, representatives of the Japanese-based defendants and co-conspirators, such as Sharp and Toshiba, met and agreed to

fix the prices for LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

81.     In early 1998, high level representatives at various LCD manufacturers, including Sharp, Toshiba, Samsung, NEC, LG Electronics, and Mitsubishi, met to discuss projected sales volumes. The companies agreed that they needed additional meetings to head off the projected higher level of competition between the companies. The companies met again later in 1998 to again discuss their projected sales plans to limit competition between them.

82.     Beginning in 1999, high level representatives of Samsung met with counterparts at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.

83.     By 2001, Sharp employees were engaging in bilateral discussions with competitors to share price information for both TFT-LCD Panels and STN-LCD Panels used for mobile wireless handset applications.

REDACTED

84.     Other defendants initiated similar discussions regarding the prices of STN-LCD Panel in furtherance of the conspiracy.

REDACTED

85.

86.     From early 2001 through at least 2006, officials from Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production. The group meetings these defendants participated in were called "Crystal Meetings." Each defendant attended multiple meetings with one or more of the other defendants during this period. The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and in California and elsewhere in the United States on a regular basis throughout this period.

87.     The Crystal Meetings were highly organized and followed a set pattern. Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings. As described below, the conspiracy also included "working level" meetings and communications.

88.     The "CEO" meetings occurred quarterly from approximately 2001 to 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

89.     The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently than "CEO" meetings and occurred approximately monthly.

90.     During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and thereafter reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices

in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

91.    During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreement concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

92.    The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "Working Level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority, which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

93.    AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and Samsung attended multiple CEO, Commercial and working-level meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001 and 2006. Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.

94.    During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings. Certain conspirators were "assigned" other conspirators not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings. Participants at the Crystal Meetings contacted Japanese defendants (such as Sharp and Toshiba) to relay the agreed-upon pricing and production limitations. Some of these meetings and communications took place in the U.S. and specifically targeted U.S. commerce and U.S. OEMs.

1       B.    <u>Defendants' Additional Participation in the Conspiracy in the U.S.</u>

2       95.    Many defendants and co-conspirators conducted operations in California

3   throughout the Conspiracy Period, including LG, Toshiba, Epson, AU Optronics, Chi Mei,

4   Chunghwa, Tatung, Samsung, and NexGen Mediatech. Through their California operations,

5   defendants and their co-conspirators implemented their price-fixing conspiracy in the United

6   States. In fact, defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation,

7   Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation specifically admitted

8   during their plea hearings that acts in furtherance of the conspiracy were carried out within

9   California. Defendants' employees based in California engaged in bilateral and multilateral

10   communications in furtherance of the conspiracy.

11       96.    Defendants also used their California operations to implement their price-fixing

12   agreements in the United States. Through their activities in California, defendants' successfully

13   increased the price of LCD-Panels, including the price of LCD-Panels sold to customers in the

14   U.S. that manufactured mobile wireless handsets, which raised the price of mobile wireless

15   handsets purchased by TracFone.

16

17

18

19

20

21

22   **REDACTED**

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REDACTED

REDACTED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REDACTED

104.

# REDACTED

C.  **Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the U.S. and for Fixing the Price of LCD Panels and LCD Products Sold in the U.S.**

105.  In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers. In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed for the first time that officials from the Korea Fair Trade Commission and Japan Fair Trade Commission visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

106.  On December 12, 2006, news reports indicated that in addition to LG Display, Samsung, Sharp and AU Optronics were also under investigation.

107.  At least one co-conspirator has approached the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels. In order to enter into a leniency agreement under the Corporate Leniency Policy of the Department of Justice, this co-conspirator has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in the price-fixing conspiracy. The DOJ's investigation of the defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other

defendants to this action. However, a number of defendants and their executives have pleaded guilty to price fixing, as alleged more fully herein.

108.   Defendant Chi Mei Optoelectronics has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

109.   Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, including the United States, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

110.   Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from September 2001 through June 2006. Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of

subordinate employees in the conspiracy. In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

111.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from September 2001 through June 2006. Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

112.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide, including the United States, from December 2001 through December 2005. Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

113.    Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and

communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

114.    In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin also pleaded guilty to participating in the conspiracy from September 2001 through December 2006. Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. In connection with their guilty plea, Mr. Lin has agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

115.    In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005. Specifically, Mr. Lin and Mr. Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting

payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

116.     Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings, conversations and communications in Japan and in the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. Defendant Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other defendants, during which it discussed and reached agreements with other defendants on prices for LCD Panels during the Conspiracy Period. TracFone purchased handsets from Motorola that contained LCD Panels for which Sharp admittedly fixed the prices.

117.     Defendant Sharp also participated in multiple bilateral discussions with other defendants, including Toshiba and Epson, during the Conspiracy Period. Through these discussions, Sharp agreed on prices, price increases, production quotas and production limits for LCD Panels. Because Toshiba and Epson were Sharp's primary competitors in the sale of LCD Panels used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of LCD Panels incorporated into such handsets - as Sharp admitted it did in its guilty plea - unless it reached agreements with Toshiba and Epson to do the same.

118.     Defendant Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola and agreed to pay a criminal fine of $26 million. Epson Japan has admitted to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

During the Conspiracy Period, Motorola was one of TracFone's largest suppliers of mobile wireless handsets.

119.   Co-conspirator Epson America is a wholly-owned and controlled subsidiary of co-conspirator Epson Japan. At one of the bilateral meetings described above, Epson Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui"). At that meeting, Mitsui served as an agent of, and under the direction of, both Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators. In addition, to the extent Epson America sold or distributed LCD Products, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products did not undercut the pricing agreements reached at these various meetings.

120.   Defendant Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more defendant that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers that allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture

partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

121.    Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co., Ltd. ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

122.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

123.    Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed on prices and supply levels for LCD Panels.

124.    Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or discussions during the Class Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.

125.    Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at these meetings. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

126.    When TracFone refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that they are alleging that

one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

**D.**     **Market Conditions Demonstrating the Conspiracy**

127.    Beyond the guilty pleas and the extensive evidence of the defendants' wrongdoing produced by the defendants themselves, the market for LCD Panels provides further evidence of defendants' collusive behavior.

**1.**     **Structure of the LCD Panel Industry**

128.    The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships and ease of information sharing.

129.    The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

130.    The LCD industry is characterized by high barriers to entry. New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment.

Thus, firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

131.    LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and TVs, are manufactured to a specific size, regardless of manufacturer. The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

132.    The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

- the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;

- the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd., in 2002;

- the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;

- the 2005 transfer of Fujitsu Limited's LCD business to Sharp;

- the 2006 AU Optronics' acquisition of Quanta Display;

133.    Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry. Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels with the numerous meetings described hereinafter.

134.    There were many opportunities for defendants to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and

instant messages. Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

2.    Pricing in the LCD Panel market indicates collusion by the defendants

135.    Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion. Rather, the behavior of this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

136.    After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends. However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

137.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market. In a competitive market, price increases normally occur during shortage periods. Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

138.    The demand for consumer electronic products and their component parts generally increases over time. As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period. For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

139.    Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity. Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

140.    In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity. In fact, defendants had begun stabilizing and raising the prices.

141.    LCD Panel prices began to increase in early 1996. Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

142.    Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

143.    1996 also brought the advent of third generation fabs. Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops. Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

144.    The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, inter alia, the fact that costs were decreasing. One of the most significant costs in producing an LCD Panel is the cost of its component parts. Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass. During the

Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate. Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

145.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased. Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

146.    LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

147.    At the time, defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement. When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

148.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency. These decreasing costs should have led to lower prices and competition among defendants. Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits. For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc. posted higher pretax profits than expected in the first quarter of 2002. AU Optronics reported revenue of NT $19.7 billion in the first quarter, with pretax profit reaching about NT $2 billion. Chi Mei Optoelectronics reported pretax earnings of NT $800 million on revenue of about NT $8.8 billion at the same period.

149.    This increase in prices and revenue was unprecedented. During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics,

Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics) rose 184% from the same period in 2001.

      E.      **The Conspiracy's Effect on Earlier LCD Technologies**

      150.     During the Conspiracy Period, LCD Panels used in certain applications, including notebook PCs and mobile wireless handsets, included both TFT-LCD Panels and STN-LCD Panels. STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels. Certain defendants, their corporate affiliates, and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels, including Sharp, Epson, and Samsung. The same individuals at the defendants who were engaged in bilateral communications and group meetings regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

      1.      **Defendants' Bilateral Communications Regarding STN-LCD Panels**

      151.     Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels. Specifically, defendants and their co-conspirators engaged in bilateral discussions in which they exchanged information about STN-LCD Panel pricing, shipments, and production. These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered defendants' customers for STN-LCD Panels.

      152.

# REDACTED

REDACTED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REDACTED

REDACTED

2.    The Structure of the LCD Panel Market Facilitated the
Inflation of Prices of STN-LCD Panels As Well As TFT-LCD
Panels

165.    At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels and CSTN-LCD Panels were close substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for similar uses - i.e., display purposes - in mobile wireless handsets and other LCD Products that included small displays. At other times during the Conspiracy Period, TFT-LCD Panels and CSTN panels were both purchased in significant quantities for use in notebook PCs.

166.    At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels, CSTN-LCD Panels and MSTN-LCD Panels were substitutes for each other. At these points during the Conspiracy period, all three panels were purchased for display applications in mobile wireless handsets and other LCD Products that included small displays.

167.    During the Conspiracy Period, purchasers of LCD Panels sometimes switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels.

REDACTED

REDACTED

Because handset manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, defendants knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of STN-LCD panels as well.

REDACTED

168.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely.

169.    The defendants understood that they could profitably raise prices of STN-LCD Panels in response to increases in TFT-LCD Panel prices.

REDACTED

170.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels were substitutes in certain LCD Products at certain points during the Conspiracy Period, and because defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, defendants had the incentive and ability to inflate the prices of STN-LCD Panels as well as TFT-LCD Panels. The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and vice versa.

F.    **Conspiracy's Effect on U.S. Commerce**

171.    Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels to the facilities of foreign manufacturers, including manufacturers of mobile wireless handsets, knowing that they would subsequently be imported into the United States, one of their most important markets and a major source of their revenues. In this respect, defendants directed their anticompetitive conduct at

imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of mobile wireless handsets and other LCD Products TracFone purchased in the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. companies like TracFone.

172.    The U.S. LCD market is enormous and was a major focus of the conspiracy. Measured by value, defendants and others shipped during the Conspiracy Period more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States for ultimate sale to U.S. consumers. During the Conspiracy Period, the value of these LCD Panels imported into the United States was in excess of $50 billion. Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period. As a result, a substantial portion of defendants' revenues was derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

173.    During the Conspiracy Period, every defendant shipped LCD Panels directly into the United States.

174.    Because of the importance of the U.S. market to defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct. The defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce that lead directly into the United States. Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States. Furthermore, this conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

175.     When high-level executives based at defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States. Moreover, because LCD Panels are - and were throughout the Conspiracy Period - the most expensive and significant component of LCD Products, defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States. Many defendants manufactured LCD Products and sold them in the United States. In fact, defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

176.     Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels. In addition, defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

177.     Defendants and their co-conspirators have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD Products into the United States impacted U.S. import trade and import commerce. In a series of complaints filed with the U.S. International Trade Commission over the past few years, Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf). See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same, Investigation No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

178.     Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce. Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

179.     For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States.

180.     All of the above facts also demonstrate that defendants' illegal activities had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.

## VIII.   PLAINTIFF'S INJURIES

181.     TracFone has suffered a direct, substantial, and reasonably foreseeable injury as both a purchaser of mobile wireless handsets containing LCD Panels and as a purchaser of other LCD Products as a result of defendants' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels. Defendants' conspiracy artificially inflated the price of LCD Panels incorporated into such mobile wireless handsets, causing TracFone to pay higher prices than it would have in the absence of defendants' conspiracy.

182.     In some cases, TracFone purchased mobile wireless handsets directly from defendants. For example, during the Conspiracy Period, TracFone purchased mobile wireless handsets directly from LG Electronics, Inc. and its subsidiaries, affiliates or sales agents in the United States (collectively, "LG Electronics"). LG Electronics owned a substantial interest in and exerted control over defendant LG Display, which has already pleaded guilty to having fixed the price of LCD Panels. Defendants' conspiracy to fix the price of LCD Panels affected the LCD Panels contained in the mobile wireless handsets TracFone purchased from LG Electronics. LG Electronics passed on the overcharge caused by defendants' conspiracy to TracFone, and as a result, TracFone suffered injury and paid supra-competitive prices for "LG"-branded mobile wireless handsets it purchased in the United States from LG Electronics.

183.     TracFone suffered injury in the United States as a direct purchaser as a result of its purchases of mobile wireless handsets from LG Electronics. During the Conspiracy Period, LG

Display was the manufacturing agent and alter ego of LG Electronics, and LG Electronics and LG Display constituted a single entity for purposes of TracFone's purchases from LG Electronics due to their close affiliation and unity of interest. Beginning in July 1999, LG Electronics placed its LCD Panel manufacturing operations in LG Display, which LG Electronics organized as a joint venture and which also received a capital contribution from Royal Philips Electronics N.V. In June 1999, LG Display began manufacturing LCD Panels at the same fabs in Gumi, South Korea previously owned and operated in the name of LG Electronics. From 1999 through 2006 LG Electronics exerted control over all aspects of LG Display's operations. Boon Joon Koo, CEO of LG Display, was formerly vice president of LG Electronics. Hee Gook Lee, president of LG Electronics, served on the board of LG Display.

184.   In addition, due to its financial interest in and control over LG Display, LG Electronics stood to reap substantial financial benefits from LG Display's participation in the conspiracy to fix the price of LCD Panels. Because LG Electronics profited from the artificially-inflated prices for LCD Panels charged by LG Display, there is no realistic possibility that LG Electronics will attempt to recover any overcharges for LCD Panels that LG Electronics purchased from LG Display or any of LG Display's co-conspirators.

185.   During the Conspiracy Period, TracFone also purchased mobile wireless handsets containing LCD Panels from other handset OEMs (such as Motorola and Nokia), which in turn purchased LCD Panels from defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of LCD Panels purchased by these handset OEMs, which paid higher prices for LCD Panels than they would have absent the conspiracy. The conspiracy artificially inflated the prices of TFT-LCD Panels included in mobile wireless handsets, as well the price of MSTN and CSTN LCD Panels included in such handsets.

186.   The handset OEMs passed on to their customers, including TracFone, the overcharges caused by defendants' conspiracy. TracFone was not able to pass on to its customers the overcharge caused by defendants' conspiracy. Thus, TracFone suffered injury when it purchased mobile wireless handsets containing LCD Panels from the handset OEMs.

187.     In addition, TracFone has suffered a direct, substantial, and reasonably foreseeable injury as a result of defendants' conspiracy to raise, fix, stabilize or maintain the price of LCD Panels at artificial levels as purchasers of LCD Products for their own use.

188.     During the Conspiracy Period, a number of large computer OEMs sold desktop computer monitors and laptop and notebook computers to TracFone.

189.     Defendants' conspiracy artificially inflated the price of the LCD Panels purchased by these computer OEMs for incorporation into the desktop computer monitors and laptop and notebook computers sold to TracFone. The computer OEMs passed on these artificially inflated prices for LCD Panels to TracFone, causing TracFone to pay higher prices for the desktop computer monitors and laptop and notebook computers than they would have paid in the absence of the defendants' conspiracy.

190.     Once an LCD Panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. LCD Panels are identifiable, discreet physical objects that do not change form or become an indistinguishable part of an LCD Product. Thus, LCD Panels follow a physical chain from defendants through manufacturers of LCD Products sold to TracFone.

191.     The market for LCD Panels and the market for LCD Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

192.     The LCD Product OEMs' demand for LCD Panels was relatively inelastic, because there were no reasonable substitutes for LCD Panels to serve as the visual display for products such as mobile wireless handsets, desktop computer monitors and laptop and notebook computers. The other principal flat panel display technology, plasma, is too big, consumes too much power and is too fragile to be of any practical application in mobile wireless handsets or laptop or notebook computers. Other competing display technologies, such as OLED displays, were not available during the Conspiracy Period and are only today becoming widely available. In addition, throughout the Conspiracy Period, defendants controlled the market for LCD Panels. Consequently, during the Conspiracy Period, the handset OEMs and computer OEMs had no

1    choice but to purchase LCD Panels from defendants and others at prices that were artificially

2    inflated, fixed, and stabilized by defendants' conspiracy.

3         193.    As a result, TracFone was injured in connection with its purchases of LCD

4    Products for internal use during the Conspiracy Period.

5    **IX.    DEFENDANTS CONCEALED THEIR CONSPIRACY TO FIX THE PRICE OF**

6         **LCD PANELS**

7         194.    TracFone did not discover and could not have discovered, through the exercise of

8    reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006,

9    when the existence of investigations by the DOJ and other antitrust regulators became public,

10   because defendants and their co-conspirators actively and fraudulently concealed the existence of

11   their contract, combination or conspiracy. Because defendants' agreement, understanding and

12   conspiracy were kept secret, TracFone was unaware of defendants' unlawful conduct alleged

13   herein and did not know that it was paying artificially high prices for LCD Products.

14        195.    The affirmative acts of defendants alleged herein, including acts in furtherance of

15   the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

16        196.    The affirmative acts of defendants and their co-conspirators alleged herein, among

17   others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out

18   in a manner that precluded detection. The conspirators knew their activities were illegal.

19

20

21

22

23

24   **REDACTED**

25

26

27

28

197.     Therefore, the Defendants and their co-conspirators kept their conspiracy communications strictly confidential.

REDACTED

198.     By its very nature, defendants' price-fixing conspiracy was inherently self-concealing. As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement. During these meetings, top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, in approximately the summer of 2006, they discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information. The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other. These Round Robin meetings took place until at least November or December of 2006. The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants to maintain their price-fixing and production-limitation agreement.

199.     In addition, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

200.     There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

201.     Another false rationale provided by defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated: "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

202.     A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

203.     Increased demand was repeatedly cited by defendants throughout the Conspiracy Period. On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

204.     Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

205.     These explanations were all pretextual and each served to cover up the conspiracy. As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to TracFone's claims.

X.    VIOLATIONS ALLEGED

First Claim for Relief
(Violation of Sherman Act Against All Defendants)

206.    TracFone incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.    Beginning at a time presently unknown to TracFone, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to TracFone, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

208.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.    To fix, raise, maintain and stabilize the price of LCD Panels;

b.    To allocate markets for LCD Panels among themselves;

c.    To submit rigged bids for the award and performance of certain LCD Panels contracts; and

d.    To allocate among themselves the production of LCD Panels.

209.    The combination and conspiracy alleged herein has had the following effects, among others:

e.    Price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the United States;

f.    Prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

g.  Those who purchased LCD Panels produced by defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

210.  TracFone has been injured in its business and property by being forced to pay more for the mobile wireless handsets containing LCD Panels it purchased from defendants and their co-conspirators than it would have paid in the absence of defendants' conspiracy.

211.  Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by TracFone and gave rise to TracFone's antitrust claims. As a result, TracFone suffered injury as a direct, proximate, and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels, and is entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of LCD Products containing LCD Panels sold by defendants, their co-conspirators, and others. TracFone has been injured and will continue to be injured in its business and property by paying more for LCD Products purchased from defendants, their co-conspirators, and others, than it would have paid and will pay in the absence of the combination and conspiracy.

212.  Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion. Defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, and defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from Tracfone. As a result, TracFone faces a serious risk of future injury, and is thus entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26 against all defendants, preventing and restraining the violations alleged herein.

Second Claim for Relief
(Violation of the Florida Deceptive and Unfair Trade Practices Act)

213.    TracFone incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

214.    By reason of the foregoing, defendants have engaged in unfair competition or unfair or deceptive acts in violation of Florida Stat. §§ 501.201 *et seq.*

215.    During the Conspiracy Period, TracFone maintained its principal place of business and executive offices in Miami-Dade County, Florida.  During the Conspiracy Period, TracFone: conducted purchasing negotiations in Florida for mobile wireless handsets containing LCD Panels; made purchasing decisions in Florida regarding mobile wireless handsets containing LCD Panels; purchased in Florida millions of mobile wireless handsets containing LCD Panels; resold in Florida millions of mobile wireless handsets containing LCD Panels through independent retailers located in Florida and elsewhere; purchased in Florida desktop monitors and notebook computers containing LCD Panels manufactured by defendants; and provided wireless communication services to millions of customers in Florida, among other Florida-based activities. As a result of its presence in Florida, its purchases and sales in Florida, and the substantial business it conducts in Florida, TracFone is entitled to the protection of the laws of Florida.

216.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, substantially affected Florida commerce and consumers.

217.    Beginning at a time presently unknown to TracFone, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators engaged in unlawful unfair methods of competition and unfair or deceptive trade practices by fixing prices at artificially inflated levels, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Section 501.204.  Defendants have each acted in violation of Section 501.204 by acting in concert to fix, raise, stabilize, and maintain prices of, and allocate markets for, LCD Panels at artificially inflated levels. Defendants' conduct substantially affected Florida commerce and proximately caused injury to TracFone.

218.     For the purpose of forming and effectuating the unlawful methods of competition, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        A.     to fix, raise, maintain and stabilize the price of LCD Panels;

        B.     to allocate markets for LCD Panels amongst themselves;

        C.     to submit rigged bids for the award and performance of certain LCD Panels contracts; and

        D.     to allocate among themselves the production of LCD Panels.

219.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

        A.     price competition in the sale of LCD Panels has been restrained, suppressed and/or eliminated in the State of Florida;

        B.     prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of Florida; and

        C.     those who purchased LCD Panels from defendants, their co-conspirators, and others and LCD Products containing price-fixed LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

220.     As a result of the conduct of defendants and their co-conspirators, TracFone paid supra-competitive, artificially inflated prices for the LCD Products they purchased during the Conspiracy Period.

221.     As a direct and proximate result of defendants' conduct, TracFone has been injured in its business and property by paying more for LCD Products containing price-fixed LCD Panels sold by the defendants, their coconspirators, and others than it would have paid in the absence of defendants' unfair methods of competition.  As a result of defendants' violation of Fla. Stat. Section 501.204, TracFone is entitled to actual damages and reasonable attorneys' fees and costs, pursuant to Fla. Stat. Sections 501.211 and 501.2105, and is entitled to an injunction under

1   Fla. Stat. Section 501.211 against all defendants, preventing and restraining the violations alleged

2   herein.

3   **XI.    PRAYER FOR RELIEF**

4        WHEREFORE, TracFone requests:

5        A.    That the unlawful agreement, conduct, contract, conspiracy or combination alleged

6   herein be adjudged and decreed to be:

7              i.    A restraint of trade or commerce in violation of Section 1 of the Sherman

8                    Act, as alleged in the First Claim for Relief; and

9              ii.   An unfair or deceptive trade act or practice in violation of the Florida

10                   Deceptive and Unfair Trade Practices Act, as alleged in the Second Claim

11                   for Relief above;

12       B.    That TracFone recover damages, as provided by federal and state laws, and that a

13  judgment be entered in favor of TracFone against defendants, jointly and severally, in an amount

14  to be trebled if in accordance with such laws;

15       C.    That defendants, their affiliates, successors, transferees, assignees, and the officers,

16  directors, partners, agents, and employees thereof, and all other persons acting or claiming to act

17  on their behalf, be permanently enjoined and restrained from in any manner continuing,

18  maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from

19  entering into any other conspiracy or combination having a similar purpose or effect, and from

20  adopting or following any practice, plan, program, or device having a similar purpose or effect;

21       D.    That TracFone be awarded pre- and post-judgment interest, and that such interest

22  be awarded at the highest legal rate from and after the date of service of the initial Complaint in

23  this action;

24       E.    That TracFone recover its costs and disbursements of this suit, including

25  reasonable attorneys' fees as provided by law; and,

26       F.    That TracFone be awarded such other, further, and different relief as the case may

27  require and the Court may deem just and proper under the circumstances.

28

FIRST AMENDED COMPLAINT - CASE NO. M: 07-1827                                              57

## XII.    JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), TracFone demands a trial by jury for all issues so triable.


Dated: November 9, 2010

Respectfully submitted,

**CARLTON FIELDS, P.A.**
CityPlace Tower – Suite 1200
525 Okeechobee Boulevard
West Palm Beach, Florida 33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368


By: *ls/ David B. Esau*
James B. Baldinger
Florida Bar No.: 869899
jbaldinger@carltonfields.com
Robert L. Ciotti
Florida Bar No.: 333141
rciotti@carltonfields.com
David B. Esau
Florida Bar No.: 650331
desau@carltonfields.com

*Counsel for TracFone Wireless, Inc.*