Richard L. Schwartz (NY Bar No. 1821081)*
John A. Ioannou (NY Bar No. 2646909)*
OFFICE OF THE ATTORNEY GENERAL
STATE OF NEW YORK
120 Broadway, 26th Floor
New York, New York 10271
Telephone: 212-416-8282 (Richard L. Schwartz)
Telephone: 212-416-8268 (John A. Ioannou)
Facsimile:  212-416-6015
Email:  Richard.Schwartz@ag.ny.gov
          John.Ioannou@ag.ny.gov

*Automatic Pro Hac Vice Admission
Pursuant to Pretrail Order No. 1,
Dated July 3, 2007 (Waiving Civil L.R. 11-3)

Attorneys for Plaintiff State of New York

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE:  TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br><br>This Document Relates to<br>Case No. 3:11-cv-711 | MASTER FILE NO. 07-md-1827-SI<br>MDL File No. 1827<br>CASE NO. 3:11-cv-711-SI |
| STATE OF NEW YORK<br>by and through ERIC T. SCHNEIDERMAN,<br>Attorney General<br><br>          Plaintiff,<br><br>          v.<br><br>AU Optronics Corporation;<br>AU Optronics Corporation America, Inc.;<br>Chi Mei Optoelectronics Corporation;<br>Chi Mei Optoelectronics USA, Inc.;<br>CMO Japan Co., Ltd.;<br>Hitachi, Ltd.;<br>Hitachi Displays, Ltd.; | **AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Hitachi Electronic Devices (USA), Inc.;
LG Display Co., Ltd.;
LG Display America, Inc.;
Samsung Electronics Co., Ltd.;
Samsung Electronics America, Inc.;
Samsung Semiconductor, Inc.;
Sharp Corporation;
Sharp Electronics Corporation;
Toshiba Corporation;
Toshiba Matsushita Display Technology Co., Ltd.;
Toshiba America Information Systems, Inc.;
Toshiba America Electronic Components, Inc.

      Defendants.

1.     The State of New York ("State" or "New York"), brings this action pursuant to its *parens patriae* authority to recover substantial damages inflicted on New York consumers, public entities, and the State itself, by a price fixing conspiracy engineered by the major manufacturers of thin film transistor ("TFT") liquid crystal display panels ("TFT-LCD panels"), the main components of millions of televisions, computer monitors and laptop screens and other products sold in this State and throughout the world.

## PRELIMINARY STATEMENT

2.     During the last 15 years, computer, television and cell phone screens have been transformed by the widespread use of LCD technology – a method of sandwiching pixel-generating transistors between sheets of high-technology glass. The use of TFT-LCD panels has made these screens thinner, clearer and brighter. For approximately a decade, TFT-LCD panel prices have been set not by competition but by an illegal, international cartel begun in Japan, Korea and Taiwan, and which, through Defendants, sold millions of TFT-LCD panels at prices fixed by the cartel into the United States, including New York.

3.      From at least the beginning of 1996 to the end of 2006 (the "relevant period"), Defendants and their co-conspirators fixed the prices and limited the supply of TFT-LCD panels and products containing TFT-LCD panels ("TFT-LCD products") world-wide.

4.      Their methods were simple and direct.  They met regularly, in groups and one-on-one, and reached detailed and explicit agreements – many of which were documented – to set prices and price increases and to restrict output.  They enforced those agreements among themselves, singling out companies that deviated from the illegal agreements and bringing them back into line.  They carefully maintained the secrecy of these meetings and coordinated their public statements about pricing, supply, and demand to ensure that their customers, the public and the press would not discover their illegal conduct.  They knew their price fixing conspiracy was illegal and actively sought to conceal its existence.

5.      Many of the cartel members, and their executives, have already pled guilty to federal criminal antitrust violations and paid over $890 million dollars in fines.  They include Chi Mei Optoelectronics, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices, Hitachi Displays, Ltd., LG Display Co., Ltd. and its subsidiary, LG Display America, Inc. and Sharp Corporation.  AU Optronics Corporation and its subsidiary, AU Optronics Corporation America, Inc. have been indicted for the same violations.

6.      Defendants' conspiracy severely affected New York State, its public entities and its consumers.  Because Defendants' cartel held the dominant share of the TFT-LCD panel market – nearly 90% during the last year of the conspiracy – the vast majority of TFT-LCD products were sold at high prices that were illegally fixed by the conspiracy.  These panels were sold to original equipment manufacturers, including the State's vendors (e.g., Dell, IBM), and then incorporated into products such as televisions, computer monitors notebook computers,

handheld devices and other TFT-LCD products purchased by New York consumers and the State at artificially inflated prices.

7. New York consumers and New York public entities, including the State itself, local governmental entities such as counties, cities, towns and villages, public schools, the State University of New York and other state colleges, state hospitals, and public institutions such as the New York Department of Correctional Services, the New York State Department of Transportation, the Metropolitan Transit Authority, fire and police departments, and many other entities throughout the State of New York purchased hundreds of millions of dollars of TFT-LCD products with TFT-LCD panels, the high costs of which were borne by New York consumers and New York State taxpayers. Consumers in New York as well as the State purchasers on whose behalf this action is brought – and the taxpayers whose dollars financed those State purchases – have suffered substantial damages stemming from Defendants' unlawful conspiracy.

8. Accordingly, New York brings this action under federal and state laws to recover treble damages, civil penalties, costs and fees, as well as injunctive and other equitable relief for the harm inflicted on New York consumers and New York public entities by Defendants' unlawful price fixing conspiracy.

## JURISDICTION & VENUE

9. This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, N.Y. Gen. Bus. Law §§ 340 – 342-c (the "Donnelly Act"), and New York Executive Law ("N.Y. Exec. Law") § 63(12).

10. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (original jurisdiction of proceeding under an Act of

Congress regulating commerce or protecting trade and commerce against restraints), Section 4 of

the Clayton Act,  15 U.S.C. § 15 (suits by persons injured), and Section 16 of the Clayton Act,

15 U.S.C. § 26 (injunctive relief)

11.     The Court has subject matter jurisdiction over the state-law claims under 28

U.S.C. § 1367 (supplemental jurisdiction) because the state-law claims are so related to the

federal claims that they form part of the same case or controversy that would ordinarily be tried

in one judicial proceeding.

12.     Jurisdiction is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

13.     The activities of Defendants and their co-conspirators involved U.S. import trade

or commerce or were within the flow of, were intended to, and did have a direct, substantial and

reasonably foreseeable effect on U.S. domestic and import trade or commerce.  In particular, the

conspiracy directly and substantially affected the price of TFT-LCD products purchased in the

United States, including New York, thereby giving rise to the antitrust claims alleged herein.

14.     To the extent applicable, jurisdiction exists under the Foreign Trade Antitrust

Improvements Act, 15 U.S.C. § 6a, because the conduct of Defendants and their co-conspirators

had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce,

and such effect gave rise to the claims alleged herein.

15.     Venue is proper in this District and, for purposes of trial, in the United States

District Court of the Southern District of New York pursuant to Section 12 of the Clayton Act 15

U.S.C. § 22 (commerce and trade venue), and 28 U.S.C. § 1391 (general venue) because each

Defendant resides, transacts business, committed an illegal or tortious act, is licensed to do

business or  transacts business, in this District and the Southern District of New York, and/or the

claims arose in this District and in the Southern District of New York.

16.     Venue also is proper in the United States District Court of the Northern District of California for purposes of discovery because multiple actions relating to the same conduct and generally naming the same Defendants and their co-conspirators have been filed and consolidated in this District in *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, 3-07-md-01827-SI.

## PARTIES

**Plaintiff, State of New York**

17.     Plaintiff, State of New York, brings this action as a sovereign State as the primary enforcer of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340-342-c, New York Executive Law § 63(12) and the Sherman Act, 15 U.S.C. § 1 in the State of New York, and in its proprietary capacity (which includes governmental and some quasi-governmental entities) as a purchaser of TFT-LCD products through, among other things, contracts negotiated by the New York State Office of General Services ("OGS") with original equipment manufacturers ("OEMs") including Dell, Hewlett Packard, IBM, and others.  Accordingly, New York sues on behalf of:  (a) New York consumers pursuant to the State's *parens patriae* authority, (b) the State itself, including all of its branches, departments, agencies or other parts thereof; and (c) non-State public entities which purchased TFT-LCD panels as components of computer or other electronic equipment. In addition, New York asserts the claims assigned to New York by its vendors.  As set forth in more detail in Paragraphs 120 through 127 below, OGS agreements contain assignment clauses assigning certain claims to the State of New York.

**Defendants – Taiwan**

18.     Defendant AU Optronics Corporation ("AUO") maintains a corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AUO is

the result of a merger between Acer Display Technology Inc. ("Acer") and Unipac Optoelectronics ("Unipac") in 2001.  Prior to 2001, Acer and Unipac separately manufactured TFT-LCD panels.  AUO merged with Quanta Display, a manufacturer of TFT-LCD panels, in 2006.  During the relevant period, AUO manufactured, marketed, sold and/or distributed TFT-LCD panels in New York and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

19.     Defendant AU Optronics Corporation America, Inc. ("AUOA") maintains a corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas, is a wholly-owned subsidiary of AUO, and is incorporated in the State of California.  During the relevant period, AUOA sold and/or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by AUO.

20.     On June 10, 2010, a federal grand jury returned a superseding indictment against AUO, AUOA and six AUO executives for participating in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels.  The indictment charges that AUO participated in the conspiracy from September 14, 2001, through on or about December 1, 2006, and that its American subsidiary, AUOA, participated in the conspiracy from at least as early as the Spring of 2003 and continuing at least until December 1, 2006.

21.     Defendants AUO and AUOA are referred to collectively herein as "AU Optronics."

22.     Chi Mei Corporation ("CMC") maintains a corporate headquarters at No. 59-1, San Chia, Jen Te, Tainan County, 71702, Taiwan.  CMC is the parent company of Defendant Chi Mei Optoelectronics Corporation.  During the relevant period, CMC manufactured, marketed,

sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

23.     Defendant Chi Mei Optoelectronics Corporation ("CMO") is a wholly owned subsidiary of CMC.  CMO maintains a corporate headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County 74147, Taiwan.  During the relevant period, CMO manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

24.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a subsidiary of Chi Mei Corporation, and maintains a corporate headquarters at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo, ku, Tokyo 104-0028, Japan.  CMO Japan was formerly known as International Display Technology ("ID Tech").  During the relevant period, CMO Japan manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

25.     Defendant Chi Mei Optoelectronics USA, Inc. ("CMO-USA") is a wholly owned and controlled subsidiary of Chi Mei Corporation.  It maintains a corporate headquarters at 101 Metro Drive Suite 510, San Jose, California, 95110 and is incorporated in the State of Delaware. During the relevant period, CMO-USA sold and/or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by CMO Japan.

26.     On or about January 6, 2010, Chi Mei Optoelectronics Corporation pleaded guilty and agreed to pay a $220 million criminal fine for its participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels, for the time period on or

about beginning September 14, 2001, through on or about December 1, 2006.  On February 8,
2010, the United States District Court for the Northern District of California entered judgment of
the guilty plea and a fine against Chi Mei for $220 million.

27.     On or about June 2, 2010, Jau-Yang Ho, former President of Chi Mei
Optoelectronics Corporation, agreed to plead guilty for his participation in Defendants'
conspiracy to fix the prices of TFT-LCD panels.  Mr. Ho joined and participated in Defendants'
conspiracy on or about September 14, 2001, through on or about December 1, 2006.  Under his
plea agreement, Mr. Ho agreed to a recommended sentence of fourteen months imprisonment
and a $50,000 criminal fine.

28.     On or about May 6, 2010, Chu-Hsiang Yang, former Director of Sales of Chi Mei
Optoelectronics Corporation, agreed to plead guilty for his participation in Defendants'
conspiracy to fix the prices of TFT-LCD panels.  Mr. Yang joined and participated in
Defendants' conspiracy on or about September 14, 2001, through on or about December 1, 2006.
Under his plea agreement, Mr. Yang agreed to a recommended sentence of nine months
imprisonment and a $25,000 criminal fine.

29.     On or about July 28, 2010, Wen-Hung Huang, a former Director of Sales of Chi
Mei Optoelectronics Corporation, agreed to plead guilty for his participation in Defendants'
conspiracy to fix the prices of TFT-LCD panels.  Mr. Huang joined and participated in
Defendants' conspiracy on or about September 14, 2001, through on or about December 1, 2006.
Under his plea agreement, Mr. Huang agreed to a recommended sentence of nine months
imprisonment and a $25,000 criminal fine.

30.     On or about August 4, 2010, Chen-Lung Kuo, a former Vice President of Sales of
Chi Mei Optoelectronics agreed to plead guilty for his participation in Defendants' conspiracy to

fix the prices of TFT-LCD panels.  Mr. Kuo joined and participated in Defendants' conspiracy as early as April 2004, through on or about December 1, 2006.  Under his plea agreement, Mr. Kuo agreed to a recommended sentence of nine months imprisonment and a $35,000 fine.

31.     On or about October 14, 2010, Hsin-Tsung Wang, former Vice President of Sales and Marketing of Chi Mei Optoelectronics Corporation, was indicted by a federal grand jury in the United States District Court in San Francisco for participating in Defendants' conspiracy to fix the prices of TFT-LCD panels.  Mr. Wang was charged with participating in the conspiracy from at least as early as September 14, 2001, and continuing at least until December 1, 2006.

32.     Defendants Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., and CMO Japan Co., Ltd., are referred to collectively herein as "Chi Mei."

**Defendants – Japan**

33.     Defendant Hitachi, Ltd. maintains a corporate headquarters at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan.  During the relevant period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

34.     Defendant Hitachi Displays, Ltd. maintains a corporate headquarters at 3300, Hayano, Mobara-shi, Chiba-ken 297-8622, Japan.  Prior to 2002, Hitachi Displays, Ltd. was a division of Hitachi, Ltd.  During the relevant period, Hitachi Displays, Ltd. manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

35.     Defendant Hitachi Electronic Devices (USA), Inc. is incorporated in Delaware and is a wholly owned subsidiary of Hitachi, Ltd.  It maintains a corporate headquarters at 208 Fairforest Way, Greenville, South Carolina.  During the relevant period, Hitachi Electronics Devices (USA), Inc. sold and/or distributed in the United States, including New York TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by Hitachi Displays, Ltd. and Hitachi, Ltd.

36.     On or about March 5, 2009, Hitachi Displays, Ltd. pleaded guilty and agreed to pay a $31 million criminal fine for its participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels sold to Dell for use in notebook computers, for the time period beginning on or about April 1, 2001, through on or about March 31, 2004.  On May 22, 2009, the United States District Court for the Northern District of California accepted the guilty plea and imposed a sentence with a fine of $31 million against Hitachi Displays, Ltd.

37.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc., are referred to herein as "Hitachi."

38.     Defendant Sharp Corporation maintains a corporate headquarters at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the relevant period, Sharp Corporation manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

39.     Defendant Sharp Electronics Corporation is incorporated in Florida and is a wholly-owned subsidiary of Sharp Corporation.  It maintains a corporate headquarters at Sharp Plaza, Mahwah, New Jersey, 07430.  During the relevant period, Sharp Electronics Corporation

marketed, sold and/or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products by Sharp Corporation.

40.     On or about November 11, 2008, Sharp Corporation pleaded guilty and agreed to pay a $120 million criminal fine for its participation in Defendants' conspiracy to fix the prices of TFT-LCD panels sold to Dell for use in computer monitors and laptops, Apple for use in iPods, and Motorola for use in Razr mobile telephones for the time periods beginning on or about April 1, 2001 through December 1, 2006, September 1, 2005 through December 1, 2006, and the Fall of 2005 through the middle of 2006 respectively.  On December 16, 2008, the United States District Court for the Northern District of California accepted the guilty plea and imposed a sentence with a fine of $120 million against Sharp.

41.     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively as "Sharp."

42.     Defendant Toshiba Corporation maintains a corporate headquarters at 1-1 Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba manufactured TFT-LCD panels during the relevant period through its joint venture with IBM Display Technologies, Inc. until 2001.  Toshiba also manufactured TFT-LCD panels through its joint venture, IPS Alpha Technology.  During the relevant period, Toshiba Corporation manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

43.     Defendant Toshiba Matsushita Display Technology Co., Ltd. ("Toshiba Matsushita") maintains a corporate headquarters at Rivagae Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo 108-0075, Japan.  Toshiba Matsushita is a joint venture between Matsushita Corporation and Toshiba, and has manufactured TFT-LCD panels since 2002 for notebook

computers and televisions.  During the relevant period, Toshiba Matsushita manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

44.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is incorporated in California and is a wholly owned and controlled subsidiary of Toshiba Corporation.  It maintains a corporate headquarters at 9740 Irvine Boulevard, Irvine, California.  During the relevant period, TAIS marketed, sold or distributed TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products manufactured by Toshiba Corporation.

45.     Defendant Toshiba America Electronics Components, Inc. ("TAEC") is incorporated in California and is a wholly owned and controlled subsidiary of Toshiba Corporation.  It maintains a corporate headquarters at 19900 MacArthur Boulevard, Suite 400, Irvine, California.  During the relevant period, TAEC marketed, sold or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products manufactured by Toshiba Corporation.

46.     Defendants Toshiba Corporation, Toshiba Matsushita, TAIS and TAEC are referred to collectively herein "Toshiba."

**Defendants – Korea**

47.     Defendant LG Display Co., Ltd. maintains a corporate headquarters at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-721, Republic of Korea.  LG Display Co., Ltd. was formerly known as LG Philips TFT-LCD Co., Ltd., a joint venture between LG Electronics and Philips Electronics.  During the relevant period, LG Display Co., Ltd. manufactured, marketed, sold

and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

48.     Defendant LG Display America, Inc. is a California corporation that maintains a corporate headquarters at 150 East Brokaw Road, San Jose, California.  LG Display America, Inc. was formerly known as LG Philips TFT-LCD America, Inc.  During the relevant period, LG Display America, Inc. sold and/or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by LG Display Co., Ltd.

49.     On or about November 12, 2008, LG Display Co., Ltd. and LG Display America, Inc. pleaded guilty and agreed to pay a $400 million criminal fine for their participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels, for the time period beginning on or about September 21, 2001, through on or about June 1, 2006. On December 15, 2008, the United States District Court for the Northern District of California accepted the guilty plea and entered judgment against LG Display Co., Ltd. and LG Display America, Inc. to pay a fine of $400 million.

50.     Chang Suk Chung, Vice President of Monitor Sales at LG Philips, and Bock Kwon who held various positions at LG Philips including President of the Taiwan Office, Vice President of Notebook Sales, Head of Sales Planning, Executive Vice President and Chief Marketing and Sales Officer, each pleaded guilty for their participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels.  Both Mr. Chung and Mr. Kwon's pleas cover the time period beginning on or about September 21, 2001, through on or about June 1, 2006.  Mr. Chung agreed to a recommended sentence of seven months imprisonment and a $25,000 fine.  On February 17, 2009, the United States District

Court for the Northern District of California accepted the guilty plea of Mr. Chung and imposed the agreed upon sentence and fine.  Mr. Kwon agreed to a recommended sentence of imprisonment for twelve months and one day and payment of a $30,000 fine.  On June 24, 2009, the United States District Court for the Northern District of California accepted the guilty plea of Mr. Kwon and imposed the agreed upon sentence and fine.

51.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively as "LG Display."

52.     Defendant Samsung Electronics Co., Ltd. ("SEC") maintains executive offices at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul, Korea.  During the relevant period, SEC manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

53.     Defendant Samsung Electronics America, Inc. ("SEA") is incorporated in New Jersey and is a wholly owned and controlled subsidiary of SEC.  It maintains offices at 105 Challenger Road, Ridgefield Park, New Jersey, 07660.  During the relevant period, SEA marketed, sold and/or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by SEC.

54.     Defendant Samsung Semiconductor, Inc. ("SSI") is incorporated in California and is a wholly owned and controlled subsidiary of SEC.  SSI is headquartered at 3655 North First Street, San Jose, California, 95134 and has sales offices throughout the United States, including at 300 Westage Business Center, Fishkill, New York 12524-2260.  During the relevant period, SSI marketed, sold and/or distributed in the United States, including New York, TFT-LCD

panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by SEC.

55.     Defendants SEC, SEA, and SSI are referred to collectively as "Samsung."

**Co-Conspirators**

56.     Chunghwa Picture Tubes Ltd. ("Chunghwa") maintains a corporate headquarters at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  Chunghwa manufactures desktop monitors and televisions under the brand name Tatung.  During the relevant period, Chunghwa manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

57.     On or about November 10, 2008, Chunghwa pleaded guilty and agreed to pay a $65 million criminal fine for its participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels, for the time period beginning on or about September 14, 2001, to on or about December 1, 2006.  On January 14, 2009, the United States District Court for the Northern District of California imposed the agreed upon sentence with a fine against Chunghwa for $65 million.

58.     Chieng-Hon "Frank" Lin, Chairman and CEO of Chunghwa, Chih-Chun "C.C." Liu, Vice President of TFT-LCD sales at Chunghwa, and Hsueh-Lung "Brian" Lee who held various sales positions including Vice President of TFT-LCD Sales at Chunghwa, each pleaded guilty for their participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels.  Mr. Lin's plea covers the time period beginning on or about June 11, 2003, through on or about December 1, 2006.  Mr. Liu and Mr. Lee's pleas each cover the time period beginning on or about September 14, 2001, through on or about July 8, 2005.  The

United States District Court for the Northern District of California accepted the guilty pleas of Mssrs. Lin, Liu and Lee, and on February 27, 2009, entered judgments against Mssrs. Lin, Liu and Lee.

59.     Epson Imaging Devices Corporation ("Epson Japan") maintains a corporate headquarters at 3-101, Minami-Yoshikata, Tottori-Shi, Tottori, 680-8577, Japan.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Through December 21, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the relevant period, Epson Japan manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

60.     Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard Parkway, San Jose, California and it is incorporated in the State of California.  During the relevant period, Epson America marketed, sold and/or distributed in the United States, including New York, TFT-LCD panels and/or TFT-LCD panels incorporated into TFT-LCD products that were manufactured by Epson Japan.

61.     On or about August 25, 2009, Epson Japan pleaded guilty and agreed to pay a $26 million criminal fine for its participation in Defendants' conspiracy, the primary purpose of which was to fix the prices of TFT-LCD panels sold to Motorola for use in Razr mobile phones, for the time period beginning on or about the Fall of 2005, through on or about the middle of 2006.  On October 16, 2009, the United States District Court for the Northern District of California imposed the agreed upon sentence with a fine against Epson for $26 million.

62.     Epson Japan and Epson America are referred to collectively herein as "Epson."

63.     HannStar Display Corporation ("HannStar") maintains a corporate headquarters at No. 480 Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  HannStar sells desktop monitors under the brand name Hanns.G and televisions under the brand name HANNspree.  LG Display owns part of HannStar.  During the relevant period, HannStar manufactured, marketed, sold and/or distributed TFT-LCD panels in the United States, including New York, and/or TFT-LCD panels incorporated into TFT-LCD products sold in the United States, including New York.

64.     In addition, various persons and entities, whose identities are unknown to Plaintiff at this time, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

65.     Throughout the relevant period, Defendants did not distinguish among their parent corporations and subsidiaries within a particular corporate family when referring to the members of the conspiracy.  The conspiracy was carried out by subsidiaries and divisions within a corporate family, and individual participants and employees of Defendants entered into, and benefited from, an ongoing agreement on behalf of all Defendants to fix the prices of TFT-LCD panels during the relevant period.

66.     Defendants and their co-conspirators controlled a vast majority of the market for TFT-LCD products both globally and in the United States.  They shipped millions of price-fixed TFT-LCD products into the United States, including New York, throughout the relevant period.  As a result, they derived substantial revenue from the U.S. market, including the New York market.  The object of Defendants' conspiracy was to sell TFT-LCD products into the U.S. market, including New York, at artificially inflated prices.  In fact, Defendants Chi Mei Optoelectronics Corporation, Hitachi Displays, Ltd., LG Display Co., Ltd., LG Display America,

Inc., and Sharp Corporation, and their co-conspirators, Chunghwa Picture Tubes, Ltd., Epson

Imaging Devices Corporation, and HannStar Display Corporation, admitted in their plea

agreements that they "participated in a conspiracy" . . . "the primary purpose of which was to fix

the prices of TFT-LCD sold in the United States and elsewhere."

<u>**FACTS**</u>

**A.    Relevant Market and Industry Background**

67.    TFT-LCD panels are made by sandwiching a liquid crystal compound between

two pieces of glass called "substrates" which display an image when electricity is passed through

the crystal.  The resulting screen contains hundreds of thousands of electrically charged dots (i.e.

pixels) which form an image.  The panel is then combined with a backlight unit, a driver, and

other equipment to create a module that is integrated into a TFT-LCD product, such as a desktop

monitor, a notebook computer, television, or handheld device such as a cellular telephone or

iPod.

68.    There are no viable substitutes for TFT-LCD panels because other screen

technologies are inferior in terms of both performance and consumer demand.  TFT-LCD panels

are superior to older technology using cathode ray tubes ("CRT") because TFT-LCD panels are

smaller, lighter and consume less power.  This makes them useful not only for televisions, but

also for desktop monitors, notebook computers, and mobile devices.  Aside from TFT-LCDs, the

other major liquid crystal display technology is passive matrix LCD ("PM-LCD").  However,

because PM-LCDs have a slower response time than TFT-LCDs, the use of PM-LCDs has been

declining since the late 1990s.  *See* Hirohisa Kawamoto, April 2002, The History of Liquid-

Crystal Displays, Proceedings of the IEEE, Vol. 90(4).  Thus, PM-LCD panels, once used in

notebook computers, are no longer the favored technology.

69. The structure of the TFT-LCD panel market has made it susceptible to collusion among competing TFT-LCD panel manufacturers. Currently, and during the relevant period, the industry has been characterized by (a) product homogeneity, (b) ease of information sharing, (c) high barriers to entry, and (d) high concentration, i.e., market power held by relatively few manufacturers that produce the majority of TFT-LCD panels.

70. Because TFT-LCD panels are manufactured to standard sizes and for particular end uses, TFT-LCD panel manufacturers could and did easily observe and compare each other's products, costs and pricing. Most of the glass for LCD panels is sourced from the same supplier, Corning, Inc. (headquartered in Corning, New York), and TFT-LCD panel manufacturers use the same standard sizes for their products. During the relevant period, this product homogeneity enabled Defendants and their co-conspirators to monitor and analyze the supply and pricing of each other's TFT-LCD panels and take necessary actions to ensure adherence to the conspiracy.

71. In addition, Defendants and their co-conspirators had ample opportunity to and did exchange competitively sensitive information. During the relevant period, Defendants and their co-conspirators often engaged in joint business arrangements such as joint ventures, cross-licensing, and cross-purchasing agreements which helped effectuate their unlawful goals. Significantly, Defendants and their co-conspirators sold TFT-LCD panels among themselves. These business relationships provided ongoing opportunities to exchange price and output information that should not be exchanged among competitors and provided both a forum and attempted cover for Defendants' and co-conspirators' collusion.

72. Moreover, Defendants and their co-conspirators were often members of the same trade associations. These associations provided another venue for joint action to fix and stabilize prices and/or limit the supply of TFT-LCD panels.

73.     Communications among Defendants and their co-conspirators also took the form of group and bilateral meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing and supply of TFT-LCD panels and to monitor each other's compliance with their unlawful agreements.

74.     The TFT-LCD panel business is both costly and difficult to enter.  Manufacturing TFT-LCD panels requires access to patented technology and substantial capital investment.  New fabrication plants, or "fabs," cost billions of dollars to build and must have sufficient scale to produce panels on a cost efficient basis.  In addition, fabs must be continually upgraded to meet advances in manufacturing technology, as well as to meet customer specifications. Manufacturers must also engage in continual research and development and must be prepared to expend resources on obtaining licenses, patents and other intellectual property protections for their processes, inventions and products.  As a result of these entry barriers, less than a dozen firms worldwide manufactured TFT-LCD panels to any significant scale during the relevant period, and these collectively dominant firms became – rather than genuine competitors – members of the illegal cartel.  There were a few smaller firms in this industry during the relevant period, but they did not have the manufacturing scale or cost efficiencies to compete with Defendants and their co-conspirators or to supply large OEMs such as Dell, Hewlett Packard, IBM, and Apple.

75.     Throughout the relevant period, Defendants and their co-conspirators collectively controlled a significant share of the market for TFT-LCD panels, both globally and throughout the United States.  The top six TFT-LCD panel manufacturers (Samsung, LG Display, Chi Mei, AU Optronics, Sharp, and Chunghwa) – all members of the conspiracy – sold the vast majority of TFT-LCD panels worldwide during the relevant period, and by the end of the conspiracy, had

close to 90% of the market.  Accordingly, Defendants' conspiracy to fix the prices of TFT-LCD panels substantially affected trade and commerce in the sale of the vast majority of TFT-LCD products into the United States, as well as the vast majority of TFT-LCD products sold in New York.

76.     Under these market conditions, Defendants and their co-conspirators had ample opportunity to collude and conspire, and, as set forth below, they did collude and conspire in order to achieve unlawfully higher prices for TFT-LCD panels during the relevant period.

**B.     Defendants' Conspiracy to Fix TFT-LCD Panel Prices**

77.     Beginning at least on January 1, 1996, and continuing at least until December 31, 2006, Defendants and their co-conspirators entered into an ongoing actual, express agreement to artificially inflate the price, and limit the production of, TFT-LCD panels.  The conspiracy was carried out through various forms of communication, including bilateral discussions and group meetings.

78.     In the early years representatives of Hitachi, Sharp, and Toshiba met and agreed to limit the amount of TFT-LCD panels each company would produce.  During these early years, these Defendants preferred to communicate bilaterally to carry out their conspiracy.  Over time, group meetings became more prevalent as more manufacturers joined the conspiracy.  Once TFT-LCD panel production in Korea began to increase, the conspirators expanded their meetings and bilateral contacts to include their Korean competitors, including Defendants LG Display and Samsung.  Later, companies in Taiwan began manufacturing TFT-LCD panels, and Japanese manufacturers began to partner with Defendants located in Taiwan by licensing TFT-LCD technology to them and collaborating with them on manufacture and supply.  Japanese firms lent their engineers to Taiwanese firms, and the Taiwanese firms, which were able to produce TFT-

LCD panels at lower cost, began manufacturing TFT-LCD panels for Japanese companies.  At that time, Defendants and their co-conspirators produced the majority of TFT-LCD panels for TFT-LCD products sold into the United States and New York.

### 1.    *Crystal Meetings*

79.    By 2001, Korean TFT-LCD panel manufacturers had convinced their counterparts in Taiwan to join the conspiracy to fix the prices of TFT-LCD panels.  For example, high level executives of Samsung met with their counterparts at Chunghwa, then a relatively new entrant to the industry, in February of 2001 and again in April of 2001.  The purpose of these meetings was to exchange information and to agree to coordinate their respective pricing of TFT-LCD panels for the world-wide and U.S. markets.  At the February 2001 meeting, when discussing "market prices," Samsung Director Cheng-Chien Lee "hope[d] that the Taiwanese TFT-LCD makers can coordinate with one another to take concerted actions.  SEC [i.e., Samsung] is willing to make necessary accommodations to help maintain an orderly market."

80.    From 2001 through at least 2006, Defendants continued to effectuate the conspiracy by participating in regularly scheduled and highly organized group meetings and bilateral communications in which they explicitly exchanged proprietary pricing, output and capacity information and agreed to fix and/or stabilize the prices of TFT-LCD panels and/or limit their supply.  These actions affected global sales of TFT-LCD products, including sales in and to the United States and New York.  The group meetings of Defendants and their co-conspirators ranged from meetings among CEOs of the Defendants and their co-conspirators to meetings among marketing employees of the same companies.  Defendants and their co-conspirators referred to these meetings as "Crystal Meetings."

81.     Defendants held three types of Crystal Meetings:  (1) "top-level" or "CEO" meetings (hereinafter referred to as "CEO Crystal Meetings") that included the CEOs and other top level executives of the Defendants and their co-conspirators, (2) management level meetings referred to by Defendants as "commercial" or "operation" meetings (hereinafter referred to as "Commercial Crystal Meetings"), and (3) "working level" meetings among marketing employees of the co-conspirators that were held initially to exchange proprietary output and pricing information, and later to help implement the agreements entered into by Defendants during the CEO and Commercial Crystal Meetings.

82.     CEO and Commercial Crystal Meetings were well organized and followed a set pattern, with written agendas prepared in advance.  At a typical meeting, representatives of Defendants and their co-conspirators would exchange information on shipment levels, demand, capacity utilization and prices, and then come to an agreement on pricing, and at times, on production and shipment levels.  The meeting participants discussed prices at both specific and general levels, including targeted prices, floor prices, and target price ranges.  This information was exchanged in a manner which enabled each meeting participant to agree on the future prices for each size of TFT-LCD panel and for each end use, i.e., computer monitor, notebook computer, and television.

83.     During both the CEO and Commercial Crystal Meetings, Defendants and their co-conspirators agreed to set floor prices and price ranges for higher grade TFT-LCD panels for the month or months following the meeting.  At some meetings, they also agreed to set prices on lower grade panels and prices for specific customers.   At some meetings, participants agreed to production levels.  These supposed competitors also coordinated the level, timing and

announcement of price increases and agreed to coordinate their statements to the public about anticipated supply and demand.

84.     CEO Crystal Meetings initially occurred on a monthly and then a quarterly basis and followed the same general pattern.  Each of these meetings had a rotating designated "chairman" who would use a projector or whiteboard to display figures relating to the supply, demand, production, and prices of TFT-LCD panels for the group to review.  Those attending would take turns sharing information on prices, output, and supply until a consensus was reached on prices and production levels of TFT-LCD panels to be adhered to for the coming month(s) or quarter.  Enforcement of the price fixing agreements was carried out at the Crystal Meetings by singling out the companies that had not followed the pricing agreement and bringing group pressure to bear on such firms to follow the fixed prices going forward.

85.     As the conspiracy became more routinized, Defendants felt it was unnecessary for the CEOs to meet on as frequent a basis.  At a December 11, 2001 meeting it was determined that the CEO meeting "no longer be held on a monthly basis.  It will only be scheduled if any specific issues occur.  As a basic principle, it will be held every quarter.  (Green Meeting is okay)."  The term "Green Meeting" was commonly used to refer to a meeting or discussion held while golfing.

86.     Both the structure and content of Commercial Crystal Meetings were largely the same as in the CEO Crystal Meetings.  Representatives of Defendants and their co-conspirators discussed prices, output, capacity and general market conditions and then reached a consensus on future pricing and/or output levels.  These meetings took place monthly and sometimes quarterly.

87.     Significantly, Crystal Meeting participants took steps to keep their unlawful price-fixing activities hidden from their customers, the public, the press, and most of their own

employees.  CEO and Commercial Crystal Meetings were held in secret, often at hotels. Meeting participants arrived and left the hotel separately to prevent detection by customers. Only a limited number of executives and employees of Defendants and their co-conspirators were made aware of, and attended, the Crystal Meetings.  Defendants and their co-conspirators kept their meetings secret because they knew their actions were illegal and would cause harm to their customers.

88.     Working level Crystal Meetings were an extension of bilateral, in-person meetings between marketing employees that took place as early as 2000.  By at least early 2001, representatives of Defendants and their co-conspirators began to meet in groups of at least three or four on a monthly basis.  Working level Crystal Meetings were less formal than CEO or Commercial Crystal Meetings but fully implemented the agreement of the conspiracy.  A typical working level meeting was held in a coffee shop or restaurant, and attendees typically had a meal, talked socially, and exchanged proprietary shipment and pricing information.  This information was then passed on by the participants to their respective companies, and some attendees recorded this information in meeting reports and minutes.  From 2001 to 2006, working level Crystal Meetings helped implement the price fixing agreements reached at the CEO and Commercial Crystal Meetings.

89.     Crystal Meetings occurred on a regular basis, typically monthly, through 2004 and on a periodic basis from 2005 through 2006.  After 2004, as the conspirators became more practiced, they occurred on a less frequent basis and bilateral communications and working level meetings predominated.

90.     During the 2001 to 2006 time period, regular attendees and participants at Crystal Meetings included AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display, Samsung, and

Sharp.  Attendees of the Crystal Meetings also had bilateral discussions with other Defendants

and co-conspirators who had not attended the Crystal Meetings, such as Hitachi and Sanyo

Epson, in order to exchange information and set prices.

91.     Following each CEO and Commercial Crystal Meeting, reports of the meetings

were prepared by some attendees (typically by employees who attended the meetings with higher

level executives) and circulated to the executives of their respective companies who were

involved in the conspiracy.  These reports clearly and unequivocally set forth the scope and

intent of the illegal price fixing agreements of the Defendants and their co-conspirators.  For

example, on September 14, 2001, the CEOs of four major Taiwanese TFT-LCD panel makers,

Chi Mei, AU Optronics, HannStar and Chunghwa, held a meeting to exchange production and

pricing information and to agree to certain pricing levels for the months of October and

November of 2001.  The following executives attended the meeting:  Hsing-Chien Tuan,

President, and Shou-Jen Wang from AU Optronics; Chao-Yang Ho, President, Hsing-Tsung

Wang and Wen-Hung Huang from Chi Mei; C.Y. Lin, President and C.C. Liu, Vice President,

and Hsueh-Lung Lee of Chunghwa; and Lu-Pao Hsu and Ting-Hwei Chou from HannStar.

92.     The objective of the September 14, 2001 meeting was set forth in a written

summary: "Through this exchange session, makers are hoping that an orderly pricing can be

maintained for the short term, and production capacity and demand balance can be achieved for

the mid to long term, thus prices can be stabilized in order to ensure profitability in the TFT

industry."  According to this summary, an attendee from each TFT-LCD manufacturer took turns

communicating the status of the firm's production, capacity utilization, sales, and pricing.  As a

result of this discussion, "it was decided to maintain prices in October first (except for those

already promised which would not be within this limit), and in November, to try to raise the

prices."  Floor prices (i.e., the lowest prices) were agreed to for specific sizes of TFT-LCD

panels.  For example, the prices to be charged in November were: "15" XGA [TFT-LCD panel]:

$200; 14" XGA: $170; 17" SXGA: $335; 18" SXGA: undecided."  The "[p]rinciple for pricing"

was that "the list prices are net selling prices (net price).  Each maker may adjust according to

respective situation, but the prices cannot be lower than these prices."  The next meeting for

"Top management" was set for October 19, 2001, and the agenda for that meeting included

"Discussion of price, supply and demand for next year…[and] discuss whether to invite Korean

makers and Quanta Display, Inc. to join this meeting."

93.     Similar meeting reports exist for Crystal Meetings from 2001 through 2004.

Thereafter, from 2005 through 2006, Defendants were able to carry out their conspiracy through

intermittent Crystal Meetings as well as through bilateral communications.   The following are

illustrative examples of the specific agreements to fix prices reached during the course of Crystal

Meetings held during the relevant period:

- On September 21, 2001, representatives of AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display and Samsung attended a Commercial Crystal Meeting in which the participants discussed prospective supply and demand for TFT-LCD panels for the fourth quarter of 2001 and first quarter of 2002.  At this meeting it "was resolved to increase the price to: 15" XGA (Monitor) – October:  +$10, November: +$10; 14.1" XGA (NBPC) – October:  +$5~10, November: +$10."

- On October 19, 2001, representatives from AU Optronics, Chunghwa, Chi Mei, HannStar, and LG Display attended a Commercial Crystal Meeting in which the participants agreed to charge $170-180 for 14" panels, and quote $206-215 for 15" panels.  The attendees agreed that they would obtain the participation of their Japanese competitors in the conspiracy by informing them of the results of their meetings rather than trying to persuade them to attend the meetings.

- At a December 11, 2001 CEO Crystal Meeting, AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and Samsung "agreed not to have any rebate starting from January next year."

- On May 15, 2002, employees of AU Optronics, HannStar, Chi Mei, LG Display, Samsung, and Chunghwa attended a Commercial Crystal Meeting in which they agreed to set TFT-LCD panel prices for June 2002. According to a summary of this meeting, "[a]fter discussions, the principle for pricing in June [is as follows]: the price of 15"/17" for monitor use will slightly rise $5 (except for Samsung whose headquarters decided on no price increase.) The price of 18" remains unchanged in order to narrow its price difference with 17". The range for NBPC price increase for different makers will be around $5~$15."

- Employees of AU Optronics, Chi Mei, HannStar, LG Display, Samsung, and Chunghwa attended a June 5, 2002 Commercial Crystal Meeting in which TFT-LCD panel pricing for July 2002 was set. Under the heading, "Pricing for July," a summary of the meeting states, "To prevent prices from dropping, causing a chain reaction, at least the current June selling price must be maintained. In addition, wait for the arrival of the peak season and then handle prices accordingly."

- At a June 11, 2003, Commercial Crystal Meeting, attendees agreed to maintain the June and July pricing of 17" screens at then current levels. Attendees of this meeting agreed to fix the pricing of 17" screens even if the fixed price resulted in lower volumes of orders by customers.

- At a July 4, 2002, CEO Meeting attended by top executives of AU Optronics, Chi Mei, HannStar, and Chunghwa, President Lin of Chunghwa stated to the attendees, "Absolutely do not consent to any disguised forms of price lowering requests from OEM customers." At this meeting, the attendees' "[c]ommon understanding in general is that [the] June price would be kept through July."

- On August, 5, 2003, executives of AU Optronics, Chi Mei, HannStar, LG Display, Samsung and Chunghwa participated in a Commercial Crystal Meeting in which the attendees exchanged production and demand information, and set forth a "Capacity, Utilization & Expansion Plan" from January 2003 through September 2003, with specific capacity and production levels. The attendees also agreed to a "price trend" for monitor and television TFT-LCD panels through September of 2003.

- In a November 17, 2003 Crystal Meeting, employees of HannStar, Chi Mei, Samsung, and AU Optronics exchanged pricing for December 2003: "CMO will increase by $5; SEC [Samsung] by $10/pc; LPL [LG Display] = monitor price will kept the same and NB [notebook] use will increase by $15; AUO=M17" will be kept the same, the highest price for M15" is limited at $210 and NB-use will increase by $5~10."

- In a July 7, 2005 meeting attended by representatives from AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display, and Samsung, the participants exchanged current and expected sales information, production plans and pricing, and reached consensus on pricing for 15", 17" and 19" TFT-LCD panels for flat panel monitors and 12", 14", 15", and 15.4" for notebook computers.

94.    Written reports of Crystal Meetings also evidence the exchange and fixing of future pricing with regard to specific customers.  For example, at a March 8, 2002 Commercial Crystal Meeting attended by representatives of AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display and Samsung, LG Display and Samsung agreed on specific prices to be charged to Dell and Compaq.  According to the minutes of this meeting, Samsung reported the prices it planned to charge notebook makers Dell and Compaq, who were "already notified of [a] price increase in April."  The representative from Samsung stated that "Dell's prices are: 12.1"/$190, 14.1" X/$244, 14.1" S+/$266, 15" X/$289, 15" S+$317; Compaq prices are: 12.1"/$192, 14.1" X/$245, 14.1" S+/$275, 15" X/$290, 15" S+/$315."  LG Display stated that it "[w]ill announce April prices to major vendors such as Dell/Compaq after making an agreement with Samsung. The principle is for 14.1", LGP would be $1~2 higher than Samsung in 14.1" and 15" LGP would be $1~2 lower than Samsung."

95.    Additional examples of Defendants' explicit agreements regarding the pricing for specific customers include:

- In a May 15, 2002 Commercial Crystal Meeting that included AU Optronics, Chi Mei, LG Display, Samsung, Chunghwa, HannStar, and Samsung, Samsung stated that it will propose to Dell and the Hewlett-Packard "the price increase of TFT used in NBPC [notebook personal computers].  The price of 14.1" will rise approximately $5 while the price of 15" XGA/SXGA+ will rise $15."

- In an October 30, 2001 Commercial Crystal Meeting, the participants agreed on the allocation of Hewlett Packard's demand to Samsung. According to a summary of the meeting, for "[t]he case of Compal/HP:  In November, AU/HS/CPT all quoted more than $185 to Compal."

- In a January 6, 2006 meeting, attended by representatives of Samsung, LG Display, AU Optronics, Chi Mei and others, the meeting report noted that "AMLCD/LPL's [LG Display's] price to HP for January had yet to be discussed. Will first make the delivery using price of December, and then will adjust the amount back to make up for the price differences at the end of the month."

- A February 10, 2006 meeting was specifically held to discuss the pricing to Hewlett Packard. In attendance was an AU Optronics sales representative in charge of the Hewlett Packard account and his counterparts at Chi Mei and Chunghwa. The "current quotations" of Chunghwa, AU Optronics, Chi Mei and LG Display were set out in a chart by size of panel, and the attendees discussed Hewlett Packard's purchasing volumes and delivery levels.

96.     What is more, Defendants and their co-conspirators enforced their agreements to fix prices during the Crystal Meetings by singling out firms that tried to cheat on the conspiracy and pressuring them to comply with the agreed prices in the future. For example, at an October 5, 2001 Commercial Crystal Meeting attended by executives from AU Optronics, Chunghwa, Chi Mei, HannStar and LG Display, a meeting report reveals that AU Optronics and HannStar did not intend to fully implement an agreed upon price increase until October 15, 2001. Both AU Optronics and HannStar listed the status of their price increase as "partially effective on October 15" while the price increases of Chi Mei, LG Display, Samsung, and Chunghwa were effective on October 1, 2001. The report states that "[w]e have contacted these two makers informing them 'partially effective on Oct[sic] 15' is extremely inappropriate; improvement has been generally implemented."

97.     At another meeting, AU Optronics and HannStar were questioned about their pricing for October 2001. According to a meeting report from a Commercial Meeting held on October 30, 2001, "Samsung questioned AU/Hannstar whether its 14.1" XGA quotation in October was lower than $170 in the Compaq case, causing Samsung to receive no orders when

quoting the price of $185.  Hannstar/AU clarified their price status and vowed to have kept the old sales price of at least over $180.  Samsung said as long as the price was kept over $180, it would be willing to give away a part of its market share.  In Taiwan's 14.1" market, AU's production capacity is the biggest.  Anything it does will affect the price here.  AU was asked to definitely maintain price."

98.     In a November 15, 2001, CEO Crystal Meeting, attendees were admonished to follow the target prices agreed to by the group for November 2001.  The report of the meeting states:

> "Only Samsung and CPT have completely followed the originally-set target sales price.  To avoid vicious price competition again, several suggestions were made as follows:  1) From now on, new orders must follow the target price.  2) Use the Hot Line to contact other makers in the industry, to avoid being tricked by customers into cutting price.  3) Even though each maker has strategic clients, internal clients or exceptional clients resulting from commitments already made, each maker must try to gradually reduce such exceptional situations.  4) For the same client makers can control price by controlling the supply quantities.  5) Appropriately remind monitor makers not to snatch orders with low price and never support such conduct."

99.     Defendants and their co-conspirators also were increasingly aware that their conduct was subject to, and violated, U.S. antitrust laws.  By July of 2006, Defendants and their co-conspirators determined that they should no longer have group meetings due to concerns about being caught violating the antitrust laws.  Defendants and their co-conspirators discontinued the Crystal Meetings, but instead, participated in monthly "round robin" style bilateral meetings that were held in coffee shops and restaurants.  The meetings were scheduled and coordinated so that on the same day, representatives of Samsung, LG Display, AU Optronics, Chi Mei, HannStar and Chunghwa met with each other one-on-one until all competitors had met with each other.  These bilateral meetings took place until at least November or December of 2006.

## 2.     *Bilateral Communications*

100.     In addition to the Crystal Meetings described above, Defendants and their co-conspirators carried out their price fixing conspiracy through bilateral communications.  These communications began in 1996 and continued throughout the relevant period and took the form of in-person meetings, telephone calls, e-mails, and instant messages.

101.     Bilateral communications allowed Defendants to easily relay sensitive business information regarding future pricing, shipments, and output and took place throughout the relevant period.  For example, on December 17, 1998, a manager at Matsushita (which later merged with Toshiba) met with a manager of Chunghwa to exchange proprietary information regarding Matsushita's plans for production and pricing.  According to a summary of the meeting, "Matsushita indicated that there was still a gap in quality with the mainstream market brand, so was not able follow price increases."

102.     In another example, on or about November 30, 1998, a manager for Samsung, Reuben Chang, spoke with a representative from Sharp.  Sharp confirmed it would raise the price of TFT-LCD panels after seeing a 25% price increase for the Japanese TFT-LCD manufacturers as reported in the Nikkei Industrial Daily (now the Nikkei Business Daily), an industry newspaper.  Mr. Chang also spoke with a representative from Hitachi around the same time period.  Hitachi communicated information to Samsung relating to pricing and model designs for its TFT-LCD panels.  Hitachi agreed it would increase prices on TFT-LCD panels starting the week of November 30, 1998.  Mr. Chang conveyed both agreements directly to at least one high-level executive of Samsung in Korea.  Samsung implemented these agreements by raising prices throughout 1999.

103. On December 1, 1998, Mr. Chang confirmed the above bilateral communications between Samsung and Sharp by reporting to various co-workers at Samsung that he had spoken with a Sharp representative who confirmed that Sharp would begin raising prices that week. According to Mr. Chang, the Sharp representative confirmed seeing the Japanese TFT makers' 25% price increase in the Nikkei Industrial Daily. Mr. Chang also reported that he had spoken with a representative of Hitachi, and that Hitachi also planned to increase prices starting the week of November 30, 1998 and had stopped all new designs of 12.1" and 13.3" screens.

104. Samsung and Chunghwa also met to fix prices. For example, on April 17, 2001, Samsung President Jun-Yu Lee "proposed" to Chunghwa executives that Samsung and Chunghwa "[d]uring the earlier stage, maintain the price of 15" TFT at $250 and then gradually increase the price to $280 (CPT target)/$300 (SEC target)." According to a report of the meeting, "[T]he parties agreed to try to implement the proposal."

105. During the 2001 through 2006 time period when the Crystal Meetings took place, attendees of the Crystal Meetings agreed to engage in bilateral communications with those Defendants who did not attend the meetings. For example, the pricing of Samsung was reviewed with Hitachi in a bilateral meeting between Hitachi and Chunghwa in May of 2001. During that meeting, a senior engineer of Hitachi also provided Hitachi's shipment information for the month of April 2001.

106. HannStar notified Hitachi of pricing arrangements and production limitations reached at the Crystal Meetings and also reported Hitachi's prices to attendees of the meetings. For example, in an April 10, 2002 Commercial Crystal Meeting, HannStar reported to the attendees that "Hitachi will increase NBPC [notebook PC]-related models by $15 in May, while monitor models will increase $5."

107.     Defendants and their co-conspirators communicated bilaterally to carry out their price fixing conspiracy throughout the relevant period.  These communications were the primary form of exchanging information and agreeing on pricing from 1996 through 2001, they supplemented the Crystal Meetings from 2001 through 2006, and once Defendants and their co-conspirators decided to end the Crystal Meetings in approximately July of 2006, these bilateral communications again became the primary form of exchanging information and fixing prices through at least the end of 2006.

### 3.     Concealment of the Conspiracy

108.     Throughout the relevant period, Defendants and their co-conspirators repeatedly sought to conceal and did conceal the existence of the conspiracy alleged in this Complaint.  For example, it was "suggested" at the outset of a September 14, 2001 Crystal Meeting that the meeting be kept confidential "from outsiders (news media) and from internal colleagues."  According to a report of this meeting, participants were instructed to "not reveal this meeting to outsiders, not even to colleagues; keep a low profile.  To cultivate an atmosphere for price up, if journalists shall conduct interviews, reveal that the production capacity is at full load."

109.     Indeed, Defendants and their co-conspirators manipulated media announcements to disguise the conspiracy and its effects.  For example, at an October 19, 2001 Commercial Crystal Meeting, they agreed to suppress information concerning a planned capacity increase.  Instead, they agreed to message a demand increase for TFT-LCD panels, conveying the misleading impression to the public that price increases were the result of increased demand.

110.     A similar agreement to coordinate their messages to the public was made at an October 5, 2001 Commercial Crystal Meeting in which AU Optronics, Chunghwa, Chi Mei, HannStar and LG Display agreed that "[e]ach maker will eventually increase its production

capacity more or less in the future, in order to avoid giving customers and the media a wrong impression that oversupply will continue, the common understanding amongst all is to announce more frequently to customers and the media that global TFT demands far exceed production increase."

111.    Defendants concealed the conspiracy because they knew their conduct was illegal. For example, during a December 11, 2001 CEO Crystal Meeting that included high level executives of AU Optronics, Chungwa, Chi Mei, HannStar, LG Display, and Samsung, the participants were reminded to "take heed of the antitrust law."  Similarly, a representative of LG Display noted in a July 21, 2004 cartel meeting that DRAM suppliers had been sued for violating the antitrust laws two years previously, and he reminded the other participants to be careful and refrain from written communications evidencing the conspiracy.

112.    Defendants and their co-conspirators affirmatively concealed the existence of the conspiracy by, among other things, secretly discussing and meeting with other Defendants and co-conspirators to set pricing and output of TFT-LCD panels, agreeing to conceal the conspiracy, agreeing to set forth numerous false and pretextual reasons for the inflated prices of TFT-LCD products such as rapid demand growth, confining the existence and information about the conspiracy to a small number of key officers and employees of the Defendants and their co-conspirators, and engaging in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

113.    Defendants engaged in active, intentional and fraudulent concealment of their unlawful conspiracy.  The State of New York did not discover the existence of the claims alleged in this Complaint until after the first of the TFT-LCD manufacturers' guilty pleas to federal antitrust charges.

**C.     Supra-Competitive Prices Charged for TFT-LCD Panels were Passed On to New York State Purchasers of Products Containing TFT-LCD Panels**

114.     During the relevant period, New York consumers and New York State and its public entities bought hundreds of millions of dollars worth of TFT-LCD products.  TFT-LCD panels comprise a large percentage of the retail price of TFT-LCD products, such as computer monitors.

115.     TFT-LCD panels have no independent use, and the demand for TFT-LCD panels is solely dependent upon the demand for TFT-LCD products.   TFT-LCD panels never lose their independent characteristics and are readily separable and identifiable as a distinct component of any TFT-LCD product.  A TFT-LCD panel can be replaced without adversely affecting the TFT-LCD product.

116.     TFT-LCD panels are manufactured for use in desktop computer monitors, notebook computers, televisions, and handheld devices.  During the relevant period, commercial purchasers of TFT-LCD panels, such as OEMs like Dell, IBM, Hewlett Packard, and Apple, sold TFT-LCD products either directly to end users, including Plaintiff, or through intermediary distributors and retailers.

117.     New York State and its public entities purchased numerous TFT-LCD products (computer monitors, notebook computers, and other products) from Dell, Hewlett-Packard, IBM, Apple, Lenovo, Fujitsu America, Inc., Seneca Data, Great Lakes and numerous other vendors during the relevant period.  New York's purchases of TFT-LCD products from these vendors contained TFT-LCD panels that were priced at inflated levels fixed by the unlawful conspiracy.  These artificially high prices were passed on to Plaintiff and can be traced through the relatively short distribution chain.  TFT-LCD panels account for the bulk of the total retail price of

televisions and computer monitors and a smaller percentage of the retail cost of notebook computers.

118.   New York consumers purchased numerous TFT-LCD products (computer monitors, notebook computers, televisions, handheld devices and other products) from various sources during the relevant period.  Purchases of TFT-LCD products by New York consumers contained TFT-LCD panels that were priced at inflated levels fixed by the unlawful conspiracy.  These artificially high prices were passed on to New York consumers and can be traced through the relatively short distribution chain.  TFT-LCD panels account for the bulk of the total retail price of televisions and computer monitors and a smaller percentage of the retail cost of notebook computers, handheld devices and other TFT-LCD products.

119.   Accordingly, the price fixing agreements effectuated by Defendants and their co-conspirators during the relevant period had reasonably foreseeable and direct effects on New York consumers and the New York public entities represented by Plaintiff in this action.

## ASSIGNMENT OF DIRECT AND INDIRECT CLAIMS TO THE STATE OF NEW YORK

120.   During the relevant period, both New York State and non-State public entities – such as towns, cities, villages and counties, the State University of New York and other state colleges, state hospitals, public institutions such as the New York Department of Correctional Services, the New York State Department of Transportation, the Metropolitan Transit Authority, fire and police departments, and many other public entities throughout the State – made substantial purchases of TFT-LCD products.

121.   The State and many non-State public entities made their purchases from OEMs largely pursuant to contracts entered into by New York State's procurement agency, the Office of General Services ("OGS"), with the OEMs (the "Centralized Contracts").  As set forth below,

all purchases of TFT-LCD panel-containing products made pursuant to the Centralized Contracts give rise to direct and / or indirect claims for damages that the OEMs assigned to the State, whether those purchases were made by the State or by non-State public entities.

122.   The Centralized Contracts contain generally applicable terms and conditions, which were incorporated by reference into individual contract awards that OGS made with the OEMs.  The Centralized Contracts were in effect for the entire period relevant to this action.

123.   The Centralized Contract provides in pertinent part (the "Assignment Clause") as follows:

> ASSIGNMENT OF CLAIM. Contractor hereby assigns to the State any and all of its claims for overcharges associated with this contract which may arise under the antitrust laws of the United States, 15 U.S.C. Section 1, et seq. and the antitrust laws of the State of New York, G.B.L. Section 340, et seq.

124.   Following the issuance of the Centralized Contract, individual contracts subject to its terms were made between OGS and numerous OEMs that manufacture TFT-LCD products. Dell, Hewlett-Packard, IBM, Apple, Lenovo, Fujitsu America, Inc., Seneca Data and Great Lakes are among those OEMs that entered into the Centralized Contract with OGS.

125.   The Centralized Contract terms were available not only to the State but also to non-State public entities, which were authorized to make purchases pursuant to the Centralized Contracts in their dealings with OEMs, and which did so.  These non-State public entities include political subdivisions, such as counties, cities, towns, and villages, and school districts, hospitals, and universities as well as public authorities and public benefit corporations.

126.   With the Centralized Contract as a framework, procurement procedures during the relevant period allowed the purchasing entity to deal directly with the OEM contractors. Generally, the OEM "hosted" its individual contract on a website accessible to the State and to

non-State public entities, and there quoted the contractually agreed-upon prices for its products. The State or non-State public entity, as the case may be, desiring a particular product, transmitted purchase orders to the OEM, or its authorized resellers.

127.    Pursuant to the Assignment Clause, the State stands in the shoes of the OEMs and other direct and indirect purchasers of price-fixed TFT-LCD products and panels for purposes of alleging antitrust claims against Defendants.  As the language of the Assignment Clause provides, it is the "Contractor" (generally an OEM that has purchased a TFT-LCD panel and made it a component of a computer monitor or other product containing TFT-LCD panels) that assigns to "the State" the Contractor's antitrust claims against the TFT-LCD panel manufacturer "for overcharges associated with" the contract (the "Assigned Claims").  The State, accordingly, owns the Assigned Claims and is entitled to assert them.  The scope of the claims that the OEM assigned is determined by the extent of the purchases of TFT-LCD products made under the Centralized Contract by both the State and the non-State public entities.

### CLAIMS FOR RELIEF

**First Claim (Assigned Direct Purchaser Claims)
Violation of § 1 of the Sherman Act, 15 U.S.C. § 1**

128.    The State of New York realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

129.    From at least January 1, 1996, through at least December 31, 2006, Defendants and their co-conspirators engaged in a contract, agreement, arrangement and combination in an unreasonable restraint of business, trade and commerce in violation of  Section 1 of the Sherman Act, 15 U.S.C. §1.

130.    The contract, combination, agreement and arrangement consisted of, among other things, an agreement and conspiracy by the Defendants to secretly fix, coordinate, stabilize and raise their TFT-LCD panel prices, including controlling and/or limiting the production and supply of TFT-LCD panels through explicit agreements and through the exchange of TFT-LCD panels prices and output levels, during the relevant period.

131.    This unlawful cartel had the following effects, among others:

    a.    price competition in the sale of TFT-LCD panels was suppressed and/or eliminated;

    b.    prices for TFT-LCD panels sold by Defendants and their co-conspirators were fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

    c.    purchasers of TFT-LCD panels and TFT-LCD products were deprived of the benefits of free and open competition, and paid artificially high, supra-competitive prices for TFT-LCD panels and TFT-LCD products.

132.    The conduct set forth above is a per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

133.    As a result of this conspiracy, the customers of Defendants and their co-conspirators, that is, OEMs and other direct purchasers, were injured in their business and property.  They paid higher prices for TFT-LCD panels than they otherwise would have paid in a competitive market.

134.    Under Section 1 of the Sherman Act, 15 U.S.C. §1, the State of New York, as an owner of direct Assigned Claims, is entitled to recover treble damages, based on the injury suffered directly by the State's Assignors as a result of Defendants' illegal conduct.

**Second Claim (Assigned Direct and Indirect Purchaser Claims)**
**Violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.***

135.   The State of New York realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

136.   From at least January 1, 1996, through at least December 31, 2006, Defendants and their co-conspirators engaged in a contract, agreement, arrangement and combination in an unreasonable restraint of business, trade and commerce in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*

137.   The contract, combination, agreement and arrangement consisted of, among other things, an agreement and conspiracy by the Defendants to secretly fix, coordinate, stabilize and raise their TFT-LCD panel prices, including controlling and/or limiting the production and supply of TFT-LCD panels through explicit agreements and through the exchange of TFT-LCD panels prices and output levels, during the relevant period.

138.   This unlawful cartel had the following effects, among others:

   a.   price competition in the sale of TFT-LCD panels was suppressed and/or eliminated;

   b.   prices for TFT-LCD panels sold by Defendants and their co-conspirators were fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

   c.   purchasers of TFT-LCD panels and TFT-LCD products were deprived of the benefits of free and open competition, and paid artificially high, supra-competitive prices for TFT-LCD panels and TFT-LCD products.

139.   The conduct set forth above is a per se violation of the Donnelly Act.

140.    As a result of this conspiracy, the customers of Defendants and their co-conspirators, that is, OEMs and other direct purchasers, as well as OEMs that purchased indirectly from Defendants, were injured in their business and property.  They paid higher prices for TFT-LCD panels than they otherwise would have paid in a competitive market.

141.    Under § 340(1), (5) and (6) of the New York General Business Law, the State, as an owner of direct and / or indirect Assigned Claims, is entitled to recover treble damages, based on the injury suffered directly or indirectly by the State's Assignors as a result of Defendants' illegal conduct.  The State is also entitled to attorneys' fees and to enjoin Defendants from engaging in similar illegal conduct in the future, as well as such other equitable relief as may be appropriate.

142.    Further, the State, in its sovereign capacity, is entitled to recover civil penalties under N.Y. Gen. Bus. L. §§ 341 and 342-a in the amount of $1,000,000 from each Defendant for each actual or attempted contract, agreement, arrangement or combination in violation of § 340(1) and (5) of the New York General Business Law.

### Third Claim
### (Indirect Purchaser Claims on Behalf of New York Consumers, New York State, and New York Public Entities ): Violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.*

143.    The State of New York realleges and incorporates by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

144.    From at least January 1, 1996, through at least December 31, 2006, Defendants and their co-conspirators engaged in a contract, agreement, arrangement and combination in an unreasonable restraint of business, trade and commerce in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*

145.     The contract, combination, agreement and arrangement consisted of, among other things, an agreement and conspiracy by the Defendants to secretly fix, coordinate, stabilize and raise their TFT-LCD panel prices, including controlling and/or limiting the production and supply of TFT-LCD panels through explicit agreements and through the exchange of TFT-LCD panels prices and production and inventory levels, during the relevant period.

146.     This unlawful cartel had the following effects, among others:

    a.     price competition in the sale of TFT-LCD panels was suppressed and/or eliminated;

    b.     prices for TFT-LCD panels sold by Defendants and their co-conspirators were fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

    c.     purchasers of TFT-LCD panels and TFT-LCD products were deprived of the benefits of free and open competition, and paid artificially high, supra-competitive prices for TFT-LCD panels and TFT-LCD products.

147.     The conduct set forth above is a per se violation of the Donnelly Act.

148.     As a result of the conspiracy, New York consumers, the State, non-State public entities which purchased TFT-LCD panels indirectly from Defendants and their co-conspirators, were injured in their business and property.  They paid higher prices for TFT-LCD products than they otherwise would have paid in a competitive market.

149.     Under § 340(1), (5) and (6) of the New York General Business Law, New York consumers, the State, and non-State public entities, have sustained damages based on the injury suffered indirectly by them as a result of Defendants' illegal conduct.

150.    Under § 340(1), (5) and (6) of the New York General Business Law, the State, on its own behalf, and on behalf of non-State public entities and New York consumers, pursuant to its *parens patriae* authority under the Donnelly Act, is entitled to recover treble damages as a result of Defendants' illegal conduct.  The State is also entitled to attorneys' fees and to enjoin Defendants from engaging in similar illegal conduct in the future, as well as such other equitable relief as may be appropriate.

151.    Further, the State, in its sovereign capacity, is entitled to recover civil penalties under N.Y. Gen. Bus. L. §§ 341 and 342-a in the amount of $1,000,000 from each Defendant for each actual or attempted contract, agreement, arrangement or combination in violation of § 340(1) and (5) of the New York General Business Law.

**Fourth Claim:  Violation of New York Executive Law § 63(12)**

152.    The State of New York incorporates by reference and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153.    From approximately January 1, 1996 through approximately December 31, 2006, Defendants engaged in repeated and persistent fraudulent and illegal acts, in the conduct of their businesses, by illegally conspiring to fix, coordinate, and raise their TFT-LCD panel prices. Defendants' acts have caused injury in New York.

154.    Defendants' conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.,* and as a consequence, constitutes a violation of N.Y. Exec. Law § 63(12).

155.    The State of New York is entitled to recover damages, as well as restitution, sustained as a result of injury caused by Defendants' violations of N.Y. Exec. L. § 63(12) on

behalf of New York consumers, the State, and non-State public entities.  The State further is entitled to enjoin Defendants from engaging in similar illegal conduct in the future, as well as to such other equitable relief as may be appropriate.

**PRAYER FOR RELIEF**

Accordingly, New York requests judgment as follows:

a.    Adjudging and decreeing that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. §1;

b.    Adjudging and decreeing that Defendants have engaged in conduct in violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.* and N.Y. Exec. L. § 63(12);

c.    Awarding damages against Defendants, jointly and severally, to the State of New York on behalf of itself and other New York public entities, and New York consumers, in an amount equal to three times the damages sustained, for purchases of TFT-LCD panels and/or TFT-LCD products, from Defendants' unlawful conduct in violation of federal and New York law;

d.    Awarding disgorgement, restitution, and such other equitable relief as may be appropriate against Defendants, jointly and severally, for violations of  federal and New York law;

e.    Awarding the State of New York civil penalties against each Defendant individually, pursuant to N.Y. Gen. Bus. Law §§ 341 and 342-a, in the amount of $1,000,000 per violation;

f.    Enjoining and restraining the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, and their officers, directors, partners, agents, representatives and employees, and all other persons acting or claiming to act on

their behalf or in concert with them, pursuant to Section 16 of the Clayton Act (15

U.S.C. §26) and New York law, from engaging in any conduct, contract,

combination or conspiracy, and from adopting or following any practice, plan,

program or device having a purpose or effect similar to the anti-competitive

actions set forth above;

g.      Awarding the State of New York the costs of this action, including reasonable

attorneys' fees and expert fees; and

h.      Granting such other and further relief as may be just and proper.

### DEMAND FOR TRIAL BY JURY

156.    Pursuant to Fed. R. Civ. P. 38(b), New York demands trial by jury of all issues so

triable under law.

1

Dated: New York, New York
March 15, 2011

2

Respectfully submitted,

3

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

4

5

6

By: Richard L. Schwartz*
Acting Bureau Chief, Antitrust Bureau

7

John A. Ioannou*
Assistant Attorney General

8

Attorneys for Plaintiff
120 Broadway, 26th Floor

9

New York, New York 10271

10

(212) 416-8282 (voice)
(212) 416-6015 (fax)

11

Richard.Schwartz.@ag.ny.gov

12

Attorneys for Plaintiff State of New York

13

*Automatic Pro Hac Vice Admission

14

Pursuant to Pretrail Order No. 1,
Dated July 3, 2007 (Waiving Civil L.R. 11-3)

15

16

17

Of Counsel:

18

Geralyn J. Trujillo, Acting Deputy Bureau Chief, Antitrust Bureau

19

20

21

22

23

24

25

26

27

28