1

2

3      IN THE UNITED STATES DISTRICT COURT

4      FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6  IN RE: TFT-LCD (FLAT PANEL) ANTITRUST          No.  M 07-1827 SI
   LITIGATION
7  _____/       MDL No. 1827

8  This Order Relates To:
                                                  No. C 10-1064 SI
9

10  DELL INC. and DELL PRODUCTS L.P.,             **ORDER GRANTING IN PART AND**
                                                  **DENYING IN PART DEFENDANTS'**
11              Plaintiffs,                        **JOINT MOTION TO DISMISS THE**
                                                  **COMPLAINT**
12     v.

13  SHARP CORPORATION, *et al.*,

14              Defendants.
   _____/
15

16          On October 7, 2010, the Court held a hearing on defendants' motion to dismiss the complaint.

17  For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

18

19                               **BACKGROUND**

20          On March 12, 2010, plaintiffs Dell Inc. and Dell Products L.P. ("Dell") filed a complaint against

21  numerous domestic and foreign defendants alleging a global price-fixing conspiracy by suppliers of thin

22  film transistor-liquid crystal display ("TFT-LCD") panels.   Pursuant to the Judicial Panel on

23  Multidistrict Litigation's April 20, 2007 transfer order consolidating pretrial proceedings for a number

24  of actions and this Court's July 3, 2007 Pretrial Order #1, the case was ordered related to MDL No. 1827

25  (M 07-1827).

26          Dell is a technology company headquartered in Round Rock, Texas that offers a broad range of

27  products, including laptop and desktop personal computers.   Complaint ¶¶ 29-32.   Dell buys TFT-LCD

28  panels for use in a number of its products.  *Id.* ¶ 1.  From 1996 until the filing of Dell's complaint (the

United States District Court
For the Northern District of California

"Relevant Period"), Dell was a direct purchaser of both TFT-LCD panels and finished products that incorporate TFT-LCD panels (collectively "TFT-LCD Products"). *Id.* ¶¶ 2, 33.

The complaint alleges that defendants and their co-conspirators controlled a vast majority of the market for TFT-LCD Products during the Relevant Period. *Id.* ¶ 12. Dell alleges that defendants and their co-conspirators combined and conspired to sell TFT-LCD Products to Dell at artificially inflated prices, and did in fact sell such products to Dell at inflated prices. *Id.* ¶ 2. The complaint alleges that defendants Sharp Corporation, Hitachi Displays Ltd., and Epson Imaging Devices Corporation pled guilty in 2008 and 2009 to criminal violations of Section 1 of the Sherman Act for conspiring to fix the prices of TFT-LCD panels, and that Sharp and Hitachi admitted that they conspired to fix prices as to Dell. *Id.* ¶¶ 3, 4, 36, 114, 115, 131, 136-38, 142, 143.

Dell alleges that it was an intended victim of the price-fixing conspiracy and that the conspiracy was carried out, in part, in the United States. Dell alleges that defendants and their co-conspirators frequently held meetings with Dell at Dell's headquarters in Texas to negotiate the price and volume of TFT-LCD Products, and that "[a]s part of these negotiations, Dell identified the type of TFT-LCD Products it required, the purchase price, and other essential contract terms. From its Texas headquarters and elsewhere, Dell would continue negotiations with suppliers, including Defendants and their co-conspirators, until an agreed-upon worldwide price was established for its TFT-LCD Product purchases." *Id.* ¶ 34. Dell also negotiated TFT-LCD Product prices with defendants and their co-conspirators on behalf of its system integrators who assembled devices for delivery to Dell. *Id.* ¶ 35.

Dell entered into Master Purchase Agreements ("MPAs") with defendants Hitachi, Sharp and Toshiba that "set[] forth the terms and conditions by which Dell Products, L.P. and all of Dell's subsidiaries and corporate affiliates purchase TFT-LCD Products from" those defendants. *Id.* ¶¶ 235, 240, 245. The MPAs provided that the price of TFT-LCD Products purchased by Dell, Dell's affiliates and subsidiaries, and Dell's third-party system integrators would be negotiated with Dell's global procurement team at Dell's worldwide corporate headquarters in Austin, Texas. West Decl., Exs. 1-3 ¶¶ 1, 3.1.

Dell seeks treble damages and injunctive relief under Section 1 of the Sherman Act. The complaint also seeks relief under the antitrust and/or unfair competition laws of North Carolina, Nevada

and Tennessee, which Dell alleges are the states where it received TFT-LCD Products purchased from defendants.  Complaint ¶ 23.  Dell also asserts a claim for unjust enrichment, but does not specify which state's unjust enrichment laws are invoked.  Finally, the complaint alleges breach of contract claims against Sharp, Hitachi and Toshiba for violations of their obligation under the MPAs to "comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over [their] activities in connection with the provision of TFT-LCD Products to Dell."  *Id*. ¶¶ 284, 286, 289, 291, 294, 296.

## LEGAL STANDARDS

### I.       Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint.  As the party invoking the jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.  *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack federal jurisdiction either "facially" or "factually."  *Thornhill Publishing Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  In evaluating a facial attack to jurisdiction, the court must accept the factual allegations in plaintiff's complaint as true.  *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).  In evaluating a factual attack, the court may consider extrinsic evidence.  *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

### II.      Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  While courts do not require "heightened fact pleading

3

1   of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative

2   level." *Twombly*, 550 U.S. at 555.

3       In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court

4   must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the

5   plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the

6   court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions

7   of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

8       If the court dismisses the complaint, it must then decide whether to grant leave to amend. The

9   Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request

10  to amend the pleading was made, unless it determines that the pleading could not possibly be cured by

11  the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal

12  quotation marks omitted).

13

14                                      **DISCUSSION**

15  **I.    Foreign Trade Antitrust Improvements Act (15 U.S.C. § 6a)**

16      Defendants argue that the Court lacks subject matter jurisdiction over certain of Dell's federal

17  and state antitrust claims under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a

18  ("FTAIA"), which amends the Sherman Act and "excludes from [its] reach much anti-competitive

19  conduct that causes only foreign injury." *F. Hoffman-LaRoche, Ltd. v. Empagran S.A. (Empagran I)*,

20  542 U.S. 155, 158 (2004).  According to defendants, the complaint asserts various claims based on the

21  MPAs between Dell and certain of the defendants, the terms of which make clear that the transactions

22  at issue include foreign transactions between defendants and certain of Dell's foreign affiliates. Motion,

23  Dkt. 1881, at 10:6-10.  Defendants do not dispute that the Court has jurisdiction over claims based on

24  products that defendants imported into the United States, but argue that, under the FTAIA, the Court

25  lacks jurisdiction over any claim based on a transaction that occurred outside the United States.  Motion,

26  Dkt. 1881 at 10, n.3.

27      The FTAIA establishes a general rule that the Sherman Act "shall not apply to conduct involving

28  trade or commerce (other than import trade or import commerce) with foreign nations."  15 U.S.C. §

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

6a. The FTAIA then "provides an exception to this general rule, making the Sherman Act applicable if foreign conduct '(1) "has a direct, substantial, and reasonably foreseeable effect on domestic commerce," and (2) "such effect gives rise to a [Sherman Act] claim."'" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (quoting *Empagran I* and 15 U.S.C. § 6a). This is known as the "domestic injury exception" of the FTAIA. *Id.* The Supreme Court has stated:

> This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Empagran I*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a, emphasis in original). In order to establish that a domestic effect "gives rise to" a Sherman Act claim, the complaint must allege facts sufficient to show that the domestic effects proximately caused the plaintiff's foreign injury. *DRAM*, 546 F.3d at 987-88.

Defendants argue that — as to any foreign transactions — Dell has not alleged sufficient facts to establish that its foreign injury (paying higher prices abroad) was proximately caused by any domestic effect of the alleged conspiracy. Motion, Dkt. 1881 at 22. In support of this argument, defendants cite several cases for the proposition that "[i]t is not. . . enough to allege that U.S. and foreign prices were both impacted by the same alleged worldwide conspiracy or that both U.S. and foreign prices were a single 'worldwide price.'" *Id.*

*Empagran I* is the leading case on the domestic injury exception. 542 U.S. 155 (2004). In *Empagran I*, the plaintiffs filed a class action on behalf of purchasers of vitamins and alleged that foreign and domestic vitamin manufacturers and distributors had conspired to fix the price of vitamin products in the United States and abroad. At issue were claims brought by foreign vitamin distributors who bought vitamins for delivery outside the United States. *Id.* at 160. The Court held that where "the adverse foreign effect is independent of any adverse domestic effect," the FTAIA domestic effect exception does not apply. *Id.* at 164, 175. The Court noted that it "assumed that the anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury." *Id.* at 175.

United States District Court
For the Northern District of California

On remand in *Empagran S.A.v. F. Hoffman-La Roche, Ltd. (Empagran II)*, 417 F.3d 1267 (D.C. Cir. 2005), the plaintiffs relied on an "arbitrage" theory to argue that there was a causal link between the domestic effects of the conspiracy and the plaintiffs' foreign injury.  Plaintiffs argued that "because vitamins are fungible and readily transportable, without an adverse domestic effect (i.e., higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury." *Id.* at 1269.  Rejecting this as a basis for the domestic injury exception, the D.C. Circuit held that such an arbitrage theory alleges, at best, a "but-for" relationship that fails to satisfy the proximate causation requirement of the FTAIA. *Id.* at 1270-71.

The Eighth Circuit addressed a similar argument in *In re Monosodium Glutamate Antitrust Litigation*, 477 F.3d 535 (8th Cir. 2007).  The plaintiffs alleged that the defendants had engaged in a global conspiracy to fix the prices of MSG and that the plaintiffs were injured by higher prices charged outside the United States. *Id.* at 536.  The plaintiffs argued that their allegations satisfied the domestic injury exception to the FTAIA because the "United States market was included within the scheme because the fungible nature and worldwide flow of these products made the domestic and foreign markets interconnected, such that super-competitive prices abroad could be sustained only by maintaining super-competitive prices in the United States." *Id.* at 536-37.  Following *Empagran II*, the Eighth Circuit held that

> The domestic effects of the price fixing scheme (increased U.S. prices) were not the direct cause of the appellants' injuries. Rather, it was the foreign effects of the price fixing scheme (increased prices abroad). Although United States prices may have been a necessary part of the appellees' plan, they were not significant enough to constitute the direct cause of the appellants' injuries, as they constituted merely one link in the causal chain. The theory proffered by the appellants therefore establishes at best only an indirect connection between the domestic prices and the prices paid by the appellants.

*Id.* at 539-40.

The Ninth Circuit addressed similar allegations in *DRAM*, 546 F.3d 981 (9th Cir. 2008).  In *DRAM*, a British computer manufacturer, Centerprise, alleged that the defendant domestic and foreign manufacturers and sellers of dynamic random access memory ("DRAM") "engaged in a global conspiracy to fix DRAM prices, raising the price of DRAM to customers in both the United States and foreign countries." *Id.* at 984.  Centerprise claimed that it satisfied the domestic injury exception to the FTAIA because the defendants could not have maintained the artificially inflated foreign prices without

**United States District Court**
For the Northern District of California

1   also fixing DRAM prices in the United States. *Id.* The Ninth Circuit held that such allegations were

2   insufficient to establish that the domestic effects "gave rise to" Centerprise's foreign injury.

> The defendants' conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain higher prices globally, but Centerprise has not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad. Other actors or forces may have affected the foreign prices. In particular, that the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad.

7   *Id.* at 988. The court also rejected allegations of "a direct correlation between the U.S. price and the

8   prices abroad" and that "the Defendants' activities resulted in the U.S. prices directly setting the

9   worldwide price." *Id.* at 989. The court ruled that "a direct correlation between prices does not

10  establish a sufficient causal relationship" where the complaint does not "set forth a theory with any

11  specificity of how this price-setting occurred or how it shows a direct causal relationship." *See id.* at

12  989-90.

13          Various district courts have similarly rejected the arbitrage theory of causation on the ground

14  that it does not establish a proximate link between the domestic effects of the anticompetitive conduct

15  and the foreign injury incurred. *See In re Rubber Chemicals Antitrust Litigation*, 504 F. Supp. 2d 777,

16  786 (N.D. Cal. 2007) (Jenkins, J.) (ruling that the domestic injury exception did not apply where

17  plaintiffs alleged that defendants "conspired to bring about a 'single worldwide price increase'" and

18  "expressly allege[d] an arbitrage theory"); *Emerson Electric Co. v. Le Carbone Lorraine, S.A.*, 500 F.

19  Supp. 2d 437, 447 (D.N.J. 2007) (holding that "[b]ecause Plaintiffs in this case merely allege that

20  tenuous connection, the arbitrage theory, the Court does not have jurisdiction over claims arising out

21  of Plaintiffs' foreign purchases").

22          The allegations at issue here differ significantly from the cases described above. Unlike

23  *Empagran I*, Dell is not a foreign company alleging injury based on wholly foreign transactions and

24  conduct. Instead, Dell is a Delaware corporation with its principal place of business in Texas and

25  alleges a conspiracy between defendants that involved both domestic and foreign conduct. Complaint

26  ¶¶ 4, 17, 29-30. As a result, many of the comity concerns regarding "interference with the sovereign

27  authority of other nations" identified in *Empagran I* are less applicable here. Furthermore, Dell does

28  not rely on an arbitrage theory to establish the domestic injury exception to the FTAIA. Instead, Dell

United States District Court
For the Northern District of California

alleges that defendants engaged in anticompetitive conduct both inside and outside the United States. Opposition at 11; Complaint ¶¶ 4, 17, 19, 97. Dell alleges that an important domestic effect of the conspiracy was the setting of a global price for all TFT-LCD Products purchased from defendants, which was negotiated at Dell's Texas headquarters. The MPAs between Dell and Toshiba, Sharp and Hitachi stated that unit prices would be reviewed each month and that worldwide prices would be negotiated at Dell's corporate headquarters in Austin, Texas. West Decl., Exs. 1-3 ¶ 3.1. The negotiated worldwide price applied to all TFT-LCD Products, wherever purchased, and was binding on Dell and its subsidiaries. Complaint ¶¶ 34, 236, 241, 246. These allegations establish a concrete link between defendants' conduct, its domestic effect and Dell's foreign injury that is far stronger than the tenuous arbitrage theory rejected in the cases above. Dell alleges not only that the inflated foreign price was caused or set by the inflated domestic price, but that the two prices were one and the same and were the product of negotiations that took place within the United States. These allegations cure the problem identified by the Ninth Circuit in *DRAM* by setting forth with specificity how prices for TFT-LCD Products were set and a direct causal relationship between the anticompetitive conduct, the domestic negotiations and the single global price for TFT-LCD Products.[1]

Defendants point to *Sun Microsystems Inc. v. Hynix Semiconductor Inc. (Sun II)*, 534 F. Supp. 2d 1101 (N.D. Cal. 2007) (Hamilton, J.) and *Rubber Chemicals*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) (Jenkins, J.) for the proposition that even if the negotiation of the MPAs and the setting of a global price was a "domestic effect" of the anticompetitive conduct, that domestic effect was merely a "but-for" and not a proximate cause of Dell's foreign injury. In *Sun II*, the district court ruled that, although the act of negotiating an inflated global price might be a "domestic effect" of the anticompetitive conspiracy, such negotiation did not proximately cause the payment of higher prices abroad because, on the record before that court, it was "difficult to determine whether the higher prices set and established in the U.S. proximately caused the foreign entities associated with plaintiffs to pay higher prices abroad." *Sun II*,

---

[1] These allegations also set this case apart from this Court's previous order in *Motorola, Inc. v. Au Optronics Corp., et al.*, 2010 WL 2610641 (N.D. Cal. June 28, 2010). Whereas the plaintiff in *Motorola* alleged only "that defendants engaged in a 'global conspiracy' that impacted 'global prices' and that Motorola's foreign affiliates 'suffered injury as a result of defendants' antitrust violations," *id.* at *7, Dell alleges that a domestically negotiated contract set the framework for the global pricing of all of Dell's TFT-LCD Product purchases from defendants worldwide.

United States District Court
For the Northern District of California

534 F. Supp. 2d at 1115.  The court found that there were "a number of  significant intervening steps between the negotiation of the purchase price and plaintiffs' injuries," including the direction to purchase product, the issuance of purchase orders to the defendants, the delivery of the product, the issuance of an invoice, and the payment of the invoice.  *Id.*  As a result, the court ruled that the domestic effects exception had not been established.  *Id.*

In *Rubber Chemicals*, after rejecting the plaintiffs' arbitrage theory, the court denied leave to amend to add "more specific allegations that Defendants. . . treated each Plaintiff as a global customer, setting a collusively-established price as the product of a single pricing relationship."  *Rubber Chemicals*, 504 F. Supp. 2d at 787.  The court ruled that such allegations did not "substantively change Plaintiffs' theory of recovery regarding foreign injury — namely, that plaintiffs' foreign injury was caused by a global price-fixing conspiracy with the purpose and effect of raising U.S. prices."  *Id.*  The court therefore denied leave to amend on the ground that it would be futile.  *Id.*

This Court is not bound by the decisions in *Sun II* and *Rubber Chemicals*, which are at most persuasive authority.  Moreover, this Court does not agree with defendants' argument that, as a general matter, the negotiation within the United States of a contract setting a global, super-competitive price can never satisfy the requirements of the domestic injury exception.  Although the "intervening steps" between the negotiation and signing of a contract and a plaintiffs' actual expenditure of funds on the product at issue may, in some cases, destroy the proximal link required under the FTAIA, based on the allegations in the complaint[2] this is not such a case.  It does not appear from the complaint that Dell's purchase of TFT-LCD Products (and therefore its payment of allegedly anticompetitive prices) was in any way uncertain at the time that the parties negotiated the MPAs or set the price for TFT-LCD Products.  To the contrary, Dell alleges that as part of its negotiations with defendants, "Dell identified the type of TFT-LCD Products it required, the purchase price, and other essential contract terms."  Complaint ¶ 34.  Dell alleges that, pursuant to the negotiations, a single worldwide price was established that was binding on Dell, its subsidiaries and system integrators who assembled finished TFT-LCD Products for Dell.  *Id.* ¶¶ 34, 220.  Dell further alleges that it and its affiliates then purchased products

---

[2] The allegations in plaintiff's complaint must be accepted as true for these purposes.  *See Miranda v. Reno*, 238 F.3d at 1157, n.1.

United States District Court
For the Northern District of California

1  domestically and abroad pursuant to the MPAs and that "both Dell and [defendants] treated the [MPAs]

2  as applicable to all TFT-LCD Products purchased by Dell Inc., and any of its affiliates and subsidiaries."

3  *Id.* ¶¶ 236, 241, 246.   Taking these allegations as true, the Court concludes that Dell has pleaded

4  sufficient facts to establish that the MPAs and subsequent price negotiations were a domestic effect of

5  defendants' anticompetitive conspiracy that proximately caused Dell's foreign injury.   Accordingly,

6  defendants' motion to dismiss the Sherman Act claim under the FTAIA is DENIED.[3]

## II.  State antitrust and unfair competition claims against Sharp, Toshiba and Hitachi

Defendants argue that Dell's state antitrust and unfair competition claims against Sharp, Toshiba
and Hitachi should be dismissed because they are barred by contractual choice-of-law clauses in the
parties' MPAs.   The Sharp and Hitachi MPAs provide that the agreement will be governed and
construed in accordance with the laws of the State of New York.   West Decl., Ex. 2 ¶ 18.9, Ex. 3
¶ 18.10.   The Toshiba MPA provides that it will be governed by the laws of the state of Texas.   *Id.*, Ex.
1 ¶ 15.10.   Defendants argue that pursuant to these choice-of-law clauses, if Dell wishes to allege state
antitrust and unfair competition claims against Sharp, Hitachi and Toshiba, Dell must do so under New
York law for Sharp and Hitachi and Texas law for Toshiba.   Dell contends that the choice-of-law
provisions in the MPAs only apply to claims arising under those MPAs and that state antitrust and unfair
competition claims are not within the scope of those clauses.[4]

As an initial matter, the parties dispute what law the Court should apply to interpret the scope
of the choice-of-law clauses.   Defendants contend that the Court should apply California law to
determine whether the clauses encompass the state antitrust and unfair competition claims, while Dell
contends that the clauses must be construed under either New York or Texas law, the law designated
in the respective agreements.   When selecting the correct choice-of-law rule, "[a] federal district court
must apply the state law that would be applied by the state court of the state in which it sits.   This is true

---

[3] Because the Court finds that it has jurisdiction over Dell's antitrust causes of action under the
FTAIA, it need not reach defendants' argument based on the Supremacy Clause that the Court does not
have jurisdiction over Dell's state antitrust causes of action.

[4] Neither party disputes the enforceability of the choice-of-law provisions, and the Court
therefore assumes without deciding that each of the clauses is enforceable.

1   whether the basis for subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332 or

2   federal question under 28 U.S.C. § 1331." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th

3   Cir. 2001); *see also Hatfield v. Halifax PLC*, 564 F.3d 1177, 1183-84 (9th Cir. 2009) (applying

4   California law to determine scope of choice-of-law clause).  The sole case cited by Dell to support its

5   argument that the law of New York or Texas should apply, *Klaxon Co. v. Stentor Electric*

6   *Manufacturing Co.*, 313 U.S. 487 (1941), does not hold otherwise.  *See Klaxon*, 313 U.S. at 496 (stating

7   that "[t]he conflict of laws rules to be applied by the federal court in Delaware must conform to those

8   prevailing in Delaware's state courts").  This Court therefore applies California's choice-of-law rules

9   to interpret the scope of the choice-of-law clauses in the MPAs.

10          California law recognizes "strong policy considerations favoring the enforcement of freely

11   negotiated choice-of-law clauses."  *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 462 (1992).

12   Here, each MPA states that the agreement will be "governed by" either the law of Texas or New York.

13   The MPAs therefore appear to reflect a clear intention by both parties that all claims related to the

14   MPAs be governed by the law specified in the contract.

15          Dell argues that its state antitrust and unfair competition claims are beyond the scope of the

16   choice-of-law provisions because "the specific choice-of-law clauses at issue are not overly broad and

17   provide only that the 'Agreement' will be governed by the laws of Texas (for Toshiba) or New York

18   (for Sharp and Hitachi)."  Opposition, Dkt. 1967 at 28.  Courts do not interpret clauses like those at issue

19   in this case in such a limited fashion.  In *Nedlloyd*, 3 Cal.4th 459 (1992), the California Supreme Court

20   held that "a valid choice-of-law clause, which provides that a specific body of law 'governs' the

21   'agreement' between the parties, encompasses all causes of action arising from or related to that

22   agreement, regardless of how they are characterized, including tortious breaches of duties emanating

23   from the agreement or the legal relationships it creates."  *Id*. at 470.  Other courts have similarly

24   interpreted such language to encompass causes of action beyond the contract at issue.  *See Stewart*

25   *Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070-71 (11th Cir. 1987) (finding that a forum

26   selection provision in a standard contract embraced "all causes of action arising directly or indirectly

27   from the business relationship evidenced by the contract," including breach of warranty, fraud and

28   antitrust claims).

United States District Court
For the Northern District of California

Like *Nedlloyd*, the choice-of-law clauses here broadly provide that either New York or Texas law shall "govern" the agreement and encompasses all causes of action arising from or related to the MPAs. *Nedlloyd*, 3 Cal. 4th at 470. Dell itself alleges that the MPAs form the basis of its purchase of the allegedly price-inflated TFT-LCD Products and that the state antitrust and unfair competition claims arose out of such purchases. *See* Complaint ¶¶ 235, 240, 245, 261-82. Indeed, the entire thrust of the complaint relates to the allegedly anticompetitive prices that were put in place pursuant to the MPAs. The state antitrust and unfair competition claims, therefore, fall within the ambit of the choice-of-law provisions contained in the MPAs.

Accordingly, the Court GRANTS defendants' motion to dismiss the state antitrust and unfair competition claims against Sharp, Hitachi and Toshiba to the extent that those claims are based on purchases from those defendants. The Court GRANTS Dell leave to amend the complaint to allege state antitrust and unfair competition claims against Sharp and Hitachi under New York law and against Toshiba under Texas law.

## III.    Unjust enrichment

The complaint alleges that defendants have been unjustly enriched by Dell's overpayment for TFT-LCD Products, and that "[u]nder common law principles of unjust enrichment, Defendants and their co-conspirators should not be permitted to retain the benefits conferred on them by overpayments." Complaint ¶ 259. Defendants argue that Dell's unjust enrichment claims should be dismissed because the complaint does not specify which state's unjust enrichment laws are invoked. Dell responds that the complaint need not specify the states under which Dell brings its unjust enrichment claims because the elements of an unjust enrichment claim are the same under the laws of each state in which Dell purchased TFT-LCD Products and the laws of the states specified in the choice-of-law provisions of the MPAs.

The Court agrees with defendants that Dell must specify the state laws under which it is asserting claims for unjust enrichment. Even if the basic elements of an unjust enrichment claim are similar in many states, there may be (and very likely are) differences from state to state regarding issues such as the applicable statute of limitations and various equitable defenses. Several other courts in this district

12

have similarly held that a plaintiff must specify the state under which it brings an unjust enrichment claim. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 910 (N.D. Cal. 2008) (dismissing an unjust enrichment claim because "until Plaintiffs indicate which States' laws support their claim, the Court cannot assess whether the claim has been adequately [pled]"); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007) ("[Plaintiff's] ability to plead a claim for unjust enrichment may vary from state to state, and unless and until Direct Purchaser Plaintiff clarifies under what state law it is moving, neither Defendants nor the Court can address whether the claim or claims have been adequately [pled].").

Defendants also argue that the unjust enrichment claims against Sharp, Hitachi and Toshiba should be dismissed because no unjust enrichment claim lies under the law of New York and Texas where a written contract is alleged to govern the subject matter of an unjust enrichment claim. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."). Dell does not dispute defendants' interpretation of New York and Texas law, but argues that it may plead causes of action in the alternative.

The Court agrees with Dell. Federal Rule of Civil Procedure 8(d)(2) states that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Rule 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Rule 8(a) does not require a plaintiff explicitly to designate alternative claims "as long as it can be reasonably inferred that this is what [the plaintiff was] doing." *Coleman v. Standard Life Ins. Co.*, 288 F. Supp. 2d 1116, 1120 (E.D. Cal. 2003). At this early stage of the litigation, and given the "general purpose of the [Federal Rules of Civil Procedure] to minimize technical obstacles to a determination of the controversy on its merits," *United States ex rel. Atkins v. Reiten*, 313 F.2d 673, 675 (9th Cir. 1963), it would be imprudent to force Dell to choose between the alternative theories currently expressed in its complaint.

United States District Court

For the Northern District of California

1      Accordingly, defendants' motion to dismiss the unjust enrichment claims is GRANTED. Dell

2   is granted leave to amend the complaint to state the particular state law under which it asserts its unjust

3   enrichment claim.

4

5   **IV.      Breach of contract**

6      The complaint alleges that Sharp, Hitachi and Toshiba violated a provision in their respective

7   MPAs that obligated them to "comply with all applicable laws, orders and regulations of any

8   governmental authority with jurisdiction over [their] activities in connection with the provision of TFT-

9   LCD Products to Dell." Complaint ¶¶ 284, 286, 289, 291, 294, 296. Defendants argue that the breach

10  of contract claims should be dismissed because the complaint fails to allege proximate cause.

11  Defendants argue that unlike an antitrust conspiracy claim in which each conspirator is jointly and

12  severally liable for injuries caused by their co-conspirators' acts, a defendant in a breach of contract

13  claim is liable only for the injury that its individual breach caused. Thus, according to defendants, to

14  plead proximate cause for purposes of the breach of contract claims Dell must allege that each breach

15  by each specific defendant proximately caused it to pay an overcharge.

16      Dell contends that the complaint pleads facts sufficient to prove proximate causation.

17  Specifically, Dell alleges that Sharp, Hitachi and Toshiba violated United States antitrust law—thereby

18  breaching the MPAs' requirement to "comply with all applicable laws"—and that "as a result of

19  Defendants' and their co-conspirators' unlawful conduct, Dell paid higher prices for TFT-LCD Products

20  than it would have paid in a competitive market." Complaint ¶¶ 8, 287, 292, 297. Dell further alleges

21  that "[a]s a direct and proximate result of Defendants' and their co-conspirators' unlawful conduct, Dell

22  has been injured in its business and property and is threatened with further injury." *Id*. ¶¶ 264, 269, 281.

23  Read as a whole, these allegations are sufficient to establish that the alleged breach of the MPAs was

24  the proximate cause of Dell's injury. Accordingly, the Court DENIES defendant's motion to dismiss

25  the breach of contract claims.

26

27

28  ///

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint is GRANTED IN PART and DENIED IN PART.  (No. M 07-1827 SI, Dkt. 1881, 1893, 1911; No. C 10-1064 SI, Dkt. 19, 22). If Dell wishes to file an amended complaint, the amended complaint must be filed no later than **April 8, 2011**.

**IT IS SO ORDERED.**

Dated: March 16, 2011

_____

SUSAN ILLSTON
United States District Judge