United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M 07-1827 SI |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯/ | MDL No. 1827 |
| This Order Relates To: | |
| | No. C 09-5840 SI |
| MOTOROLA, INC., | **ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED MOTOROLA COMPLAINT** |
| Plaintiff, | |
| v. | |
| AU OPTRONICS CORPORATION, *et al.*, | |
| Defendants. ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯/ | |

On November 3, 2010, the Court held a hearing on defendants' motion to dismiss Motorola's second amended complaint. For the reasons set forth below, the motion is DENIED.

**BACKGROUND**

Plaintiff Motorola, Inc. ("Motorola") is a technology company that is incorporated in Delaware with its principal place of business in Schaumburg, Illinois. Second Amended Complaint ("SAC") ¶ 24. Motorola is a leading manufacturer of mobile wireless devices. *Id.* From January 1, 1996 until December 11, 2006 (the "Relevant Period"), Motorola manufactured products that incorporated liquid crystal display panels ("LCD Panels") for sale in the United States market and abroad. *Id.* ¶¶ 2, 26.

On October 20, 2009, Motorola filed a complaint in the Northern District of Illinois against numerous domestic and foreign defendants alleging a global price-fixing conspiracy by suppliers of LCD Panels. On December 8, 2009, the case was transferred to this district by order of the Judicial

Panel on Multidistrict Litigation and, pursuant to this Court's July 3, 2007 Pretrial Order #1, was deemed related to MDL No. 1827 (M 07-1827). Motorola filed an amended complaint on January 29, 2010.

On February 23, 2010, defendants filed a joint motion to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Among other things, defendants argued that the Court lacked subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA") to the extent that Motorola's antitrust claims were based on injury suffered outside of the United States. On June 28, 2010, the Court granted defendants' motion to dismiss under the FTAIA. June 28, 2010 Order at 10.

On July 23, 2010, Motorola filed a second amended complaint ("SAC"), which included a number of new allegations. The SAC alleges that defendants and their co-conspirators "conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels." *Id.* ¶ 2. Motorola alleges that senior executives of the defendants instructed subordinates in the United States to communicate with employees of their competitors to exchange pricing and other competitive information to be used in fixing prices for LCD Panels sold to U.S. companies. *Id.* Motorola alleges that "[a]t least seven LCD Panel manufacturers have admitted in criminal proceedings to participating in this conspiracy and conducting illegal price-fixing operations in the United States," including defendants LG Display Co. Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation and HannStar Display Corporation. *Id.* ¶ 7. Motorola further alleges that defendants Sharp and Epson specifically identified Motorola as a customer which was overcharged for LCD Panels. *Id.* ¶ 8.

Motorola alleges that it was an intended victim of the price-fixing conspiracy and that the conspiracy was carried out, in part, in the United States. Motorola alleges that "[d]efendants and their co-conspirators, using their U.S. affiliates, salespeople, and contacts entered into supply agreements with Motorola in Illinois to sell Motorola LCD Panels at unlawfully inflated prices." *Id.* ¶ 4. "During and after the [Relevant Period], procurement teams at Motorola based in the U.S. negotiated the prices, conditions, and quantities that governed all Motorola purchases of LCD Panels around the world for inclusion in Motorola devices." *Id.* ¶ 129. Motorola alleges that its U.S. procurement teams negotiated

each LCD Panel purchase with defendants through a process that involved developing requests and preliminary specifications in collaboration with U.S. representatives for defendants and the final negotiation of the terms of purchase for LCD Panels. *Id.* ¶ 130. Motorola alleges that the prices set through this domestic negotiation process "directly and immediately impacted Motorola's business plans, including its most basic business choices involving the production, pricing, and sales of its own products." *Id.* ¶ 132. After the price for LCD Panels was set, Motorola's supply chain organization (also based in Illinois) used an automatic scheduling process to determine the quantity requirements for it and its subsidiaries. *Id.* ¶ 133. This process was entirely directed by Motorola from the U.S., and "[t]he foreign affiliates issued purchase orders at the price and quantity determined by Motorola in the United States." *Id.*

Motorola seeks treble damages and injunctive relief under Section 1 of the Sherman Act. Motorola also seeks relief under the antitrust laws of Illinois, the state in which it maintains its principal place of business. Finally, Motorola asserts individual claims for breach of contract and unjust enrichment against Sharp, Epson, Toshiba, Samsung and AU Optronics.

## LEGAL STANDARDS

### I.     Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint. As the party invoking the jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack federal jurisdiction either "facially" or "factually." *Thornhill Publishing Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). In evaluating a facial attack to jurisdiction, the court must accept the factual allegations in plaintiff's complaint as true. *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001). In evaluating a factual attack, the court may consider extrinsic evidence. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

**II.     Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**DISCUSSION**

**I.     Foreign Trade Antitrust Improvements Act (15 U.S.C. § 6a)**

Defendants argue that the Court lacks subject matter jurisdiction over certain of Motorola's federal antitrust claims under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), which amends the Sherman Act and "excludes from [its] reach much anti-competitive conduct that causes only foreign injury." *F. Hoffman-LaRoche, Ltd. v. Empagran S.A. (Empagran I)*, 542 U.S. 155, 158 (2004). The SAC alleges three types of purchases: (1) purchases that were delivered directly to

4

Motorola facilities in the United States and were sold to United States customers; (2) purchases that were delivered to Motorola's foreign manufacturing facilities for importation to the United States; and (3) purchases that were delivered to Motorola's foreign facilities for manufacture and sale in foreign markets. SAC ¶¶ 166-68. Defendants argue that the court lacks jurisdiction under the FTAIA over the latter two categories of purchases and that the SAC simply re-pleads allegations that the Court has already rejected. Motion at 15-17, 20.

The FTAIA establishes a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. § 6a. The FTAIA then "provides an exception to this general rule, making the Sherman Act applicable if foreign conduct '(1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.''" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (quoting *Empagran I* and 15 U.S.C. § 6a). This is known as the "domestic injury exception" of the FTAIA. *Id*. The Supreme Court has stated:

> This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Empagran I*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a, emphasis in original). In order to establish that a domestic effect "gives rise to" a Sherman Act claim, the complaint must allege facts sufficient to show that the domestic effects proximately caused the plaintiff's foreign injury. *DRAM*, 546 F.3d at 987-88.

Defendants argue that — as to any purchase that occurred outside the United States — Motorola has not alleged sufficient facts to establish that its foreign injury and the injury of its foreign affiliates (paying higher prices abroad) was proximately caused by any domestic effect of the alleged conspiracy. Motion at 20-23. Defendants argue that it is insufficient to allege that Motorola "directed that purchases be made abroad by its foreign affiliates and third-party EMS providers." *Id.* at 21. As a result, defendants contend that Motorola has failed to allege sufficient facts to bring its foreign antitrust claims within the domestic injury exception to the FTAIA.

5

*Empagran I* is the leading case on the domestic injury exception. 542 U.S. 155 (2004). In *Empagran I*, the plaintiffs filed a class action on behalf of purchasers of vitamins and alleged that foreign and domestic vitamin manufacturers and distributors had conspired to fix the price of vitamin products in the United States and abroad. At issue were claims brought by foreign vitamin distributors who bought vitamins for delivery outside the United States. *Id.* at 159-60. The Court held that where "the adverse foreign effect is independent of any adverse domestic effect," the FTAIA domestic effect exception does not apply. *Id.* at 164, 175. The Court noted that it "assumed that the anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury." *Id.* at 175.

On remand in *Empagran S.A. v. F. Hoffman-La Roche, Ltd. (Empagran II)*, 417 F.3d 1267 (D.C. Cir. 2005), the plaintiffs relied on an "arbitrage" theory to argue that there was a causal link between the domestic effects of the conspiracy and the plaintiffs' foreign injury. Plaintiffs argued that "because vitamins are fungible and readily transportable, without an adverse domestic effect (i.e., higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury." *Id.* at 1269. Rejecting this as a basis for the domestic injury exception, the D.C. Circuit held that such an arbitrage theory alleges, at best, a "but-for" relationship that fails to satisfy the proximate causation requirement of the FTAIA. *Id.* at 1270-71.

The Eighth Circuit addressed a similar argument in *In re Monosodium Glutamate Antitrust Litigation*, 477 F.3d 535 (8th Cir. 2007). The plaintiffs alleged that the defendants engaged in a global conspiracy to fix the prices of MSG and that the plaintiffs were injured by higher prices charged outside the United States. *Id.* at 536. The plaintiffs argued that their allegations satisfied the domestic injury exception to the FTAIA because the "United States market was included within the scheme because the fungible nature and worldwide flow of these products made the domestic and foreign markets interconnected, such that super-competitive prices abroad could be sustained only by maintaining super-competitive prices in the United States." *Id.* at 536-37. Following *Empagran II*, the Eighth Circuit held that

> The domestic effects of the price fixing scheme (increased U.S. prices) were not the direct cause of the appellants' injuries. Rather, it was the foreign effects of the price fixing scheme (increased prices abroad). Although United States prices may have been

6

> a necessary part of the appellees' plan, they were not significant enough to constitute the direct cause of the appellants' injuries, as they constituted merely one link in the causal chain. The theory proffered by the appellants therefore establishes at best only an indirect connection between the domestic prices and the prices paid by the appellants.

*Id*. at 539-40.

The Ninth Circuit addressed similar allegations in *DRAM*, 546 F.3d 981 (9th Cir. 2008). In *DRAM*, a British computer manufacturer, Centerprise, alleged that the defendant domestic and foreign manufacturers and sellers of dynamic random access memory ("DRAM") "engaged in a global conspiracy to fix DRAM prices, raising the price of DRAM to customers in both the United States and foreign countries." *Id.* at 984. Centerprise claimed that it satisfied the domestic injury exception to the FTAIA because the defendants could not have maintained the artificially inflated foreign prices without also fixing DRAM prices in the United States. *Id*. The Ninth Circuit held that such allegations were insufficient to establish that the domestic effects "gave rise to" Centerprise's foreign injury.

> The defendants' conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain higher prices globally, but Centerprise has not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad. Other actors or forces may have affected the foreign prices. In particular, that the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad.

*Id*. at 988. The court also rejected allegations of "a direct correlation between the U.S. price and the prices abroad" and that "the Defendants' activities resulted in the U.S. prices directly setting the worldwide price." *Id.* at 989. The court ruled that "a direct correlation between prices does not establish a sufficient causal relationship" where the complaint does not "set forth a theory with any specificity of how this price-setting occurred or how it shows a direct causal relationship." *See id.* at 989-90.

Various district courts have similarly rejected the arbitrage theory of causation on the ground that it does not establish a proximate link between the domestic effects of the anticompetitive conduct and the foreign injury incurred. *See In re Rubber Chemicals Antitrust Litigation*, 504 F. Supp. 2d 777, 786 (N.D. Cal. 2007) (Jenkins, J.) (ruling that the domestic injury exception did not apply where plaintiffs alleged that defendants "conspired to bring about a 'single worldwide price increase'" and "expressly allege[d] an arbitrage theory"); *Emerson Electric Co. v. Le Carbone Lorraine, S.A.*, 500 F.

7

Supp. 2d 437, 447 (D.N.J. 2007) (holding that "[b]ecause Plaintiffs in this case merely allege that tenuous connection, the arbitrage theory, the Court does not have jurisdiction over claims arising out of Plaintiffs' foreign purchases").

This case is significantly different from the cases described above. Motorola is not a foreign company alleging injury based on wholly foreign transactions and conduct, unlike the plaintiffs in *Empagran I*. Motorola is a Delaware corporation with its principal place of business in Illinois and alleges a conspiracy between defendants that involved both domestic and foreign conduct. SAC ¶¶ 1-8, 24. Many of the comity concerns regarding interference with the sovereign authority of other nations identified in *Empagran I* are therefore less applicable. Perhaps more importantly, Motorola does not rely on an arbitrage theory to establish the domestic injury exception. Motorola instead alleges that an important domestic effect of the anticompetitive conspiracy was the setting of a global price for all LCD Panel purchases around the world. *Id.* ¶ 129. As the Court views these new allegations, the SAC alleges that the price and other terms of purchase were negotiated exclusively by Motorola's procurement teams within the United States and applied worldwide, without regard to where the product was ultimately delivered. *Id.* ¶¶ 129-33. Moreover, Motorola's foreign affiliates were bound by these negotiations and were not permitted to negotiate the price of LCD Panels nor alter the total quantity ordered. *Id.* ¶ 133. These allegations establish a concrete link between defendants' price-setting conduct (the collusion between the defendants to establish an artificially high price for LCD Panels), its domestic effect (the negotiations between Motorola and defendants that resulted in the setting of a global, anticompetitive price for all LCD Panels sold to Motorola) and the foreign injury suffered by Motorola and its affiliates (payment of higher prices abroad). These allegations are far stronger than the arbitrage theory rejected in the cases above and cure the problem identified by the Ninth Circuit in *DRAM* by setting forth with specificity a direct causal relationship between the anticompetitive conduct, the domestic negotiations and Motorola's foreign injury.

Defendants point to *Sun Microsystems Inc. v. Hynix Semiconductor Inc. (Sun III)*, 608 F. Supp. 2d 1166 (N.D. Cal. 2009) (Hamilton, J.) for the proposition that "a 'single enterprise theory [based] in part on a global procurement strategy' has 'already been discredited' and is 'not a viable legal theory.'" Motion at 21. The statements in *Sun III* are not controlling here. The court in *Sun III* faced a subtly

8

different question: whether proof that a domestic company and its foreign subsidiaries form a "single entity," by itself, can satisfy the domestic injury exception where the plaintiff cannot otherwise establish a proximate link between any domestic effect of the anticompetitive conduct and the foreign injury. *Sun III*, 608 F. Supp. 2d at 1185-86. The court had previously ruled that the plaintiff failed to demonstrate that the higher prices set and established in the United States proximately caused the foreign entities associated with the plaintiffs to pay higher prices abroad. *Sun Microsystems Inc. v. Hynix Semiconductor Inc. (Sun II)*, 534 F. Supp. 2d 1101, 1115 (N.D. Cal. 2007) (Hamilton, J.). The question presented here, however, is not whether the mere existence of a "single entity" relationship is sufficient, but whether Motorola's allegations establish proximate causation between the domestically determined global price and Motorola's foreign injury — in other words, the question presented in *Sun II*. As discussed above, the Court finds that Motorola has done so.[1]

The Court also disagrees with the *Sun III* court's reading of the Ninth Circuit's opinion in *DRAM*, 546 F.3d at 989-90. Citing *DRAM*, the *Sun III* court stated that "[b]oth this court and the Ninth Circuit have held that, to the extent plaintiff's proximate causation theory rests on proof of a global procurement strategy, this is not a viable legal theory." *Sun III*, 608 F. Supp. 2d at 1186. In this Court's view, however, the holding in *DRAM* did not go so far. It is true that, in *DRAM*, the Ninth Circuit held that allegations of "a direct correlation between the U.S. price and the prices abroad" and that "the Defendants' activities resulted in the U.S. prices directly setting the worldwide price" were not sufficient for purposes of the domestic injury exception. *DRAM*, 546 F.3d at 989. However, the court based its holding on a determination that the plaintiff failed to "set forth a theory with any specificity of how this price-setting occurred or how it shows a direct causal relationship." *Id.* The court focused on particular allegations in the complaint that it found to be insufficient; the Ninth Circuit in *DRAM* stated:

---

[1] In making this determination, the Court departs from the ruling in *Sun II* that, although the act of negotiating an inflated global price might be a "domestic effect" of the conspiracy, such effect cannot proximately cause the payment of higher prices abroad. *Sun II*, 534 F. Supp. 2d at 1115. Based on the allegations in the SAC, Motorola has alleged facts that would establish that the domestically negotiated price was identical for purchases both inside and outside the United States. This is sufficient to establish the necessary proximate link between the domestic effects of the conspiracy and Motorola's foreign injury.

9

Most notably, paragraph 75 of its complaint alleges:

> Memory purchases are a 24 hour global business, dependent in large part on United States events. For example, Plaintiff and many Class members start their days with communications to Defendants in Taiwan and Korea to understand what pricing is available for DRAM, and as the day goes on follow sales in the United States. Plaintiff and Class members were required to track the DRAM prices in dollars, which was the only available measure due to Defendants' sales and distribution practices, then work on dollar exchange rates in order to buy the DRAM at the best available price worldwide. The United States prices were the source of, and substantially affected the worldwide DRAM prices.

*Id.* at 990 n.10. The court found that "[t]he significance of these assertions . . . is not self-evident and Centerprise has not elaborated on how any of its asserted facts show that the higher U.S. DRAM prices proximately caused the excessive DRAM prices that Centerprise paid." *Id.* The allegations in this case offer far more detail than the allegations in *DRAM*. As discussed above, the SAC describes the method by which global prices were negotiated and set by Motorola's procurement team in Illinois and the connection to Motorola's foreign injury. According to the SAC, a single global price was effective worldwide, no matter where delivery of the product occurred. SAC ¶¶ 129-33. The U.S. prices therefore were not simply "the source of" the foreign prices; both the domestic and foreign prices were one and the same. These allegations address the problem identified in *DRAM* by alleging with specificity how the prices paid abroad were caused by the contractual terms negotiated inside the United States. Of course, whether this Court ultimately has jurisdiction over Motorola's foreign injury claims will turn on whether Motorola can, in fact, prove such allegations. At this stage, however, Motorola has met its burden to allege facts that bring its claims within the domestic injury exception to the FTAIA. Accordingly, defendants' motion to dismiss the Sherman Act claim under the FTAIA is DENIED.[2]

## II.    Illinois Antitrust Act

Defendants also move to dismiss Motorola's claim under the Illinois Antitrust Act, which has explicitly adopted the territorial limitations of the FTAIA. 740 Ill. Comp. Stat. 10/5(14). Section 10/5(14) of the Illinois Antitrust Act uses language that is essentially identical to the FTAIA and does

---

[2] Because the Court finds that it has jurisdiction over Motorola's antitrust causes of action under the FTAIA, it need not reach defendants' argument based on the Supremacy Clause that the Court does not have jurisdiction over Motorola's state law causes of action.

10

not permit claims based on foreign injury unless the challenged conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce and such effect "gives rise to a claim" under the Illinois Antitrust Act. *Id.* Section 10/11 of the Illinois Antitrust Act states that "[w]hen the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act." 740 Ill. Comp. Stat. 10/11.

Because the Court finds that the allegations in the Second Amended Complaint satisfy the domestic injury exception of the FTAIA, the Court also concludes that Motorola's allegations satisfy the analogous provision of the Illinois Antitrust Act. Accordingly, defendants' motion to dismiss Motorola's claims under the Illinois Antitrust Act is DENIED.

### III. Due Process

Defendants move to dismiss Motorola's claims under the Illinois Antitrust Act and for breach of contract and unjust enrichment because they do not comport with due process. Motion at 26-27. Defendants specifically argue that the SAC asserts state law claims on behalf of foreign affiliates of Motorola and other foreign manufacturers who do not allege that they purchased any relevant product in Illinois.

To determine whether the application of a particular state's law comports with the Due Process Clause, the Court must examine "the contacts of the State, whose law [is to be] applied, with the parties and with the occurrence or transaction giving rise to the litigation." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981). Courts have invalidated the application of a state's law where the state "had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Id.* Such is not the case here. Each of the claims targeted by defendants is asserted under Illinois state law, the state in which Motorola alleges that it maintains its corporate headquarters and runs substantial operations. SAC ¶ 12. Motorola also alleges that "during and after the Conspiracy Period, Motorola purchased LCD Panels and LCD Products in Illinois" and that its procurement team "negotiated all prices, specifications, and quantities for all purchases of LCD Panels and LCD Products from Motorola offices in Illinois." *Id.* Motorola alleges that the negotiations by its

11

Illinois-based procurement team "governed all Motorola purchases of LCD Panels around the world for inclusion in Motorola devices." *Id.* ¶ 129. These contacts establish significant ties between Illinois and the parties and claims in this litigation, and the application of Illinois law does not, therefore, violate due process.

Defendants' argument appears to turn on the way in which the SAC defines the term "Motorola," which includes certain foreign manufacturers and affiliates of Motorola that defendants maintain did not purchase any products in Illinois. Motion at 27; SAC ¶ 25. Contrary to defendants' argument, however, the SAC alleges clearly that "Motorola" (including the foreign manufacturers and affiliates) purchased LCD Panels and LCD Products in Illinois. SAC ¶ 12. Reading the SAC as a whole, therefore, Motorola does allege that it and each the foreign entities on whose behalf it brings this action purchased product in Illinois. Moreover, even if certain of the foreign entities or manufacturers did not make such purchases, Motorola alleges that the terms of every purchase — including price and quantity — were negotiated by its procurement team in Motorola's Illinois offices. By virtue of this Illinois-based negotiation process, even purchases that were consummated outside the United States by Motorola's foreign affiliates have a clear and substantial tie to Illinois.

For the reasons stated above, defendants' motion to dismiss Motorola's state law claims under the due process clause is DENIED.

## IV. Breach of contract

Defendants assert that Motorola's state breach of contract claims are impermissibly vague because the SAC does not allege which contracts were supposedly breached or the terms of those contracts. Motion at 27-29. Defendants argue that "because the SAC does not specifically aver which contracts were allegedly breached, it is impossible to assess which transactions are the subject of the alleged breach of contract claims or what laws Defendants supposedly violated." *Id.* at 29. Motorola responds that its allegations identify Motorola's general supply agreements with each of the defendants as well as individual purchase orders as the contracts at issue. Opposition at 40. Motorola argues that these allegations are sufficient to put defendants on notice of its claims and that any further specificity is properly gained through discovery. *Id.* at 40-41.

Defendants contend — and Motorola does not dispute — that Illinois law applies to Motorola's breach of contract claims. In Illinois, the elements of a claim for breach of contract are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Village of South Elgin v. Waste Management of Illinois, Inc.*, 810 N.E. 2d 658, 669 (Ill. App. Ct. 2004).

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleading must state a claim that is "plausible on its face" and that contains factual allegations that are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. Federal courts "must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993).

Motorola's breach of contract claims against Sharp, Epson, Toshiba, Samsung and AU Optronics are set forth in claims Three, Five, Seven, Nine and Eleven of the SAC. These claims allege that Motorola and each defendant "entered into multiple contracts for the sale of LCD Panels and/or LCD Products by which [defendant] agreed to deliver LCD Panels and/or LCD Products to Motorola and Motorola agreed to pay [defendant] a price negotiated by Motorola and [defendant]." SAC ¶¶ 225, 236, 247, 258, 269. Motorola alleges that "[t]hese contracts between Motorola and [defendant] include purchase orders issued by Motorola to [defendant]." *Id.* Motorola further alleges that "[p]ursuant to each of these contracts, [defendant] agreed on behalf of it and its suppliers and subcontractors that all LCD Panels and/or LCD Products provided to Motorola would be produced, manufactured and supplied, and services rendered, in compliance with all applicable laws, rules, regulations, and standards." *Id.* ¶¶ 226, 237, 248, 259, 270. Motorola alleges that each defendant violated this provision and the covenant of good faith and fair dealing by agreeing to fix the price of LCD Panels sold to Motorola. *Id.* ¶¶ 228-29, 239-40, 250-51, 261-62, 272-73. Motorola further alleges that it performed all of its obligations under the contracts and that, as a result of defendants' breach of the contracts, Motorola suffered damages. *Id.* ¶¶ 230, 241, 252, 263, 274.

The SAC alleges sufficient facts to establish a claim for breach of contract under Illinois law. A plain reading of the SAC sets forth Motorola's theory of relief in clear terms; that is, that each of the

13

contracting defendants breached its contractual obligation to comply with the "applicable laws, rules, regulations, and standards" — along with the implied covenant of good faith and fair dealing — by engaging in a widespread price-fixing conspiracy. Motorola also alleges facts sufficient to establish each of the other elements of its claims, including offer and acceptance, consideration, Motorola's performance and damages. For purposes of the pleading stage, these allegations are sufficient. Defendants correctly identify a number of ambiguities in Motorola's claims, including the precise terms of the contracts at issue, which purchase orders are alleged to have been violated, and which "laws, rules, regulations, and standards" govern each of the contracts that Motorola is asserting. Motion at 28-29. Ambiguities of this type are properly explored in discovery.

Accordingly, defendants' motion to dismiss Motorola's breach of contract claims is DENIED.

## V.   Unjust Enrichment Claims

Defendants argue that Motorola's unjust enrichment claims must be dismissed because no unjust enrichment claim lies under Illinois law where, as here, there is a contract that allegedly governs the subject matter of the dispute. Motion at 30. Motorola argues that it is permitted to plead claims in the alternative. Opposition at 41 n.22.

The Court agrees with Motorola. Federal Rule of Civil Procedure 8(d)(2) states that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Rule 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Rule 8(a) does not require a plaintiff explicitly to designate alternative claims "as long as it can be reasonably inferred that this is what [the plaintiff was] doing." *Coleman v. Standard Life Ins. Co.*, 288 F. Supp. 2d 1116, 1120 (E.D. Cal. 2003). At this early stage of the litigation, and given the "general purpose of the [Federal Rules of Civil Procedure] to minimize technical obstacles to a determination of the controversy on its merits," *United States ex rel. Atkins v. Reiten*, 313 F.2d 673, 675 (9th Cir. 1963), it would be imprudent to force Motorola to choose between the alternative theories currently expressed in the SAC. Accordingly, defendants' motion to dismiss the unjust enrichment claim is DENIED.

14

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss the second amended complaint is DENIED. (No. M 07-1827 SI, Dkt. 1989; No. C 09-5840 SI, Dkt. 54, 57).

**IT IS SO ORDERED.**

Dated: March 28, 2010

SUSAN ILLSTON
United States District Judge