Anne E. Schneider *(pro hac vice)*
Andrew M. Hartnett *(pro hac vice)*
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
P. O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-2041
E-mail: Anne.Schneider@ago.mo.gov
        Andrew.Hartnett@ago.mo.gov

Attorneys for the State of Missouri
(Other Counsel Listed on Signature Pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br><br>This Document Relates to Individual Case No. 3:10-cv-3619 SI | Master File No. M:07-1827 SI<br>MDL No. 1827 |
| STATE OF MISSOURI,<br>*ex rel.* Chris Koster, Attorney General;<br><br>STATE OF ARKANSAS,<br>*ex rel.* Dustin McDaniel, Attorney General;<br><br>STATE OF MICHIGAN,<br>*ex rel.* Bill Schuette, Attorney General;<br><br>STATE OF WEST VIRGINIA,<br>*ex rel.* Darrell McGraw, Attorney General;<br><br>STATE OF WISCONSIN,<br>*ex rel.* J.B. Van Hollen, Attorney General,<br><br>   Plaintiffs,<br>  v.<br><br>AU OPTRONICS CORPORATION;<br>AU OPTRONICS CORPORATION | Individual Case No. 3:10-cv-3619 SI<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION, CIVIL PENALTIES, INJUNCTIVE AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1  AMERICA;  CHIMEI INNOLUX CORP.,
   f/k/a CHI MEI OPTOELECTRONICS
2  CORP.; CHI MEI OPTOELECTRONICS
   USA, INC., f/k/a INTERNATIONAL
3  DISPLAY TECHNOLOGY USA, INC.;
   CHI MEI OPTOELECTRONICS JAPAN
4  CO., LTD;  HANNSTAR DISPLAY
   CORPORATION; HITACHI, LTD.;
5  HITACHI DISPLAYS, LTD.;
   HITACHI ELECTRONIC DEVICES,
6  USA, INC.; LG DISPLAY CO., LTD., f/k/a
   LG PHILLIPS LCD CO., LTD.;
7  LG DISPLAY AMERICA, INC., f/k/a LG
   PHILLIPS LCD AMERICA, INC.;
8  SAMSUNG ELECTRONICS, CO., LTD.;
   SAMSUNG ELECTRONICS AMERICA,
9  INC.; SAMSUNG SEMICONDUCTOR,
   INC.; SHARP CORPORATION;
10 SHARP ELECTRONICS
   CORPORATION,
11
12        Defendants.

13 _____

14

15               **COMPLAINT**

16        The States of Missouri, Arkansas, Michigan, West Virginia, and Wisconsin ("the

17 States"), by their respective Attorneys General, complain against Defendants AU Optronics

18 Corporation; AU Optronics Corporation America; Chimei Innolux Corp., f/k/a Chi Mei

19 Optoelectronics Corp.; Chi Mei Optoelectronics USA, Inc., f/k/a International Display

20 Technology USA, Inc.; Chi Mei Optoelectronics Japan Co., Ltd;  HannStar Display Corporation;

21 Hitachi, Ltd.; Hitachi Displays, Ltd.; Hitachi Electronic Devices, USA, Inc.; LG Display Co.,

22 Ltd.,  f/k/a LG Phillips LCD Co., Ltd.; LG Display America, Inc., f/k/a LG Phillips LCD

23 America, Inc.; Samsung Electronics, Co., Ltd.; Samsung Electronics America, Inc.; Samsung

24 Semiconductor, Inc.; Sharp Corporation; and Sharp Electronics Corporation  (collectively

25 "Defendants") and allege as follows:

26

27

28

**INTRODUCTION**

1)      This civil action arises out of the Defendants' long-running conspiracy to fix the prices of thin-film transistor liquid display panels ("TFT-LCD panels").

2)      TFT-LCD panels are comprised of two glass sheets (called substrates) that sandwich a layer of liquid crystal.  The resulting screen contains pixels that form an image when voltage is applied.  TFT-LCD panels are used in televisions, notebook computers, desktop monitors, mobile devices, and other applications.

3)      Defendants manufacture, market, and sell TFT-LCD panels and distribute them throughout the world.  Defendants sell TFT-LCD panels to direct purchasers, which are typically original equipment manufacturers ("OEMs") and other manufacturers or assemblers that incorporate the panels into products ("TFT-LCD products"), such as desktop monitors, notebook computers, televisions, and other applications.  TFT-LCD products are sold throughout the United States, including within the States.

4)      A conspiracy to suppress and eliminate competition among manufacturers of TFT-LCD panels by fixing prices and limiting production of the panels existed from at least 1999 through at least 2006 (the "Conspiracy Period").

5)      Pursuant to the conspiracy, Defendants sold TFT-LCD panels at illegally inflated prices to direct purchasers.  The direct purchasers, in turn, passed on the overcharges to retailers and other indirect purchasers.  The illegal overcharges were ultimately passed on to end-paying purchasers, including purchasers in the States.  The overcharges that resulted from the conspiracy allowed Defendants to collectively reap billions of dollars in illegal profits.

6)      The conspiracy included, among other things:

a)      Meetings, conversations, and communications in Japan, Taiwan, Korea, and the United States to discuss the prices of TFT-LCD panels;

b)      Agreements during those meetings, conversations, and communications to charge prices of TFT-LCD panels at certain predetermined levels;

c)      The issuance of price quotations to purchasers of TFT-LCD panels in accordance with agreements reached at the meetings; and

d)      The exchange of information on sales of TFT-LCD panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

7)      The overcharges on TFT-LCD panels to the direct purchasers as a result of the inflated prices were ultimately borne by consumers and other end-paying purchasers and caused these end-paying purchasers to pay more for TFT-LCD products than they would have in the absence of the conspiracy.

8)      In December 2006, law enforcement agencies in the United States, the European Union, South Korea, and Japan revealed the existence of a criminal investigation into anticompetitive activity among TFT-LCD panel manufacturers, including a conspiracy to suppress and eliminate competition among manufacturers.  The agencies' investigations are still ongoing.  At the present time, seven TFT-LCD panel manufacturers have pleaded guilty to participating in price-fixing activities, and multiple individuals have been charged with criminal antitrust violations.

9)      Although some of the Defendants have agreed to pay significant criminal fines as part of their guilty pleas to violations of the Sherman Act, the United States Department of Justice ("USDOJ") has not sought any restitution order to date.  USDOJ has reasoned that pending class-action lawsuits against Defendants—most of which have been consolidated in a

multi-district litigation proceeding in this Court styled *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M: 07-1827 SI, MDL No. 1827 (N.D. Cal.)—may provide "for a recovery of a multiple of actual damages." *See, e.g.*, Chunghwa Plea Agreement, Case M: 07-CV-01827 SI (Doc. 767-1) (N.D. Cal. Jan. 6, 2009), at ¶ 12.  In other words, USDOJ apparently believes that private class-action lawsuits will potentially make consumers whole.  However, the damages classes that the court has certified in the private litigation excludes all governmental purchasers, as well as non-governmental indirect purchasers that reside in several states, including certain private purchasers in the States of Arkansas and Missouri.  Therefore, this action is necessary to vindicate the rights of governmental and other purchasers within the States.

10)     The States bring this action against the Defendants under the Sherman Act and the Clayton Act and under their respective antitrust, consumer protection, and trade laws on behalf of themselves, their governmental entities, and/or other purchasers residing therein, and their general economies.

## JURISDICTION AND VENUE

11)     This Court has subject-matter jurisdiction over the States' federal antitrust claim pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Section 16 of the Clayton Act (15 U.S.C. § 26), 28 U.S.C. § Section 1331 (federal question), and 28 U.S.C. § 1337 (proceeding regulating commerce).

12)     This Court has subject-matter jurisdiction over the States' state-law claims under 28 U.S.C. § 1367 (supplemental jurisdiction) because the state-law claims are so related to the federal claims that they form part of the same case or controversy that would ordinarily be tried in one judicial proceeding.  The exercise of supplemental jurisdiction avoids unnecessary

duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

13)     Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22 (commerce and trade venue), and 28 U.S.C. § 1391 (general venue) because each Defendant is an alien corporation or resides, transacts business, committed an illegal act, or otherwise is found in this district, and a substantial part of the events giving rise to the States' claims occurred in this district.

14)     This Court is also an appropriate forum because multiple actions relating to the same conduct and generally naming the same Defendants and their co-conspirators have been filed and consolidated in this district in *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, M: 07-1827 SI.  Additionally, multiple criminal cases have been filed against several of the Defendants and their agents relating to the conduct at issue in this Court.  Several of the Defendants have pleaded guilty to price-fixing and admitted that acts in furtherance of the Conspiracy occurred in this district.

## PARTIES

### Plaintiffs

15)     Arkansas Attorney General Dustin McDaniel brings this civil action in the name of the State of Arkansas, as parens patriae on behalf of natural persons residing in Arkansas, to secure monetary relief for injuries directly or indirectly sustained by those persons because of Defendants' conspiracy to fix the prices of TFT-LCD panels.  The State of Arkansas also seeks injunctive relief, civil penalties, restitution, costs, and attorneys' fees to the extent permitted by Section 16 of the Clayton Act (15 U.S.C. § 26) and the Arkansas Unfair Practices Act.

16)     Michigan Attorney General Bill Schuette brings this civil action in the name of the State of Michigan, as parens patriae on behalf of natural persons residing in Michigan, and on behalf of itself and its State Agencies.  The Michigan Attorney General is authorized to bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26), MICH. COMP. LAWS § 14.28, and MICH. COMP. LAWS § 445.777.  Under Michigan law, the Attorney General may obtain injunctive relief, be awarded treble damages or restitution for injury incurred by virtue of overcharges paid by the State of Michigan, its State agencies, and natural persons, be awarded civil penalties arising from any violations of Michigan law, and obtain other equitable and statutory relief.

17)     Missouri Attorney General Chris Koster brings this civil action in the name of the State of Missouri, as parens patriae on behalf of natural persons residing in Missouri to enforce federal and state antitrust laws, and in the name of the State of Missouri as the chief law enforcement official under his statutory authority to enforce Missouri's Merchandising Practices Act.  The Missouri Attorney General is authorized to bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26), Section 416.061, MO. REV. STAT. (2010 Cum. Supp.), and Section 407.100, MO. REV. STAT. (2010 Cum. Supp.).  Under Missouri law, the Attorney General may obtain injunctive relief, recover restitution of all ascertainable losses suffered by indirect purchasers by virtue of the unlawful conduct, and be awarded civil penalties arising from violations of Missouri law and other equitable and statutory relief.

18)     West Virginia Attorney General Darrell McGraw brings this action to enforce federal and state antitrust laws in the name of the State of West Virginia on behalf of its state government entities and school districts which purchased TFT-LCD products under state contracts.  The West Virginia Attorney General is authorized to bring this action under Section

16 of the Clayton Act, (15 U.S.C. § 26), and the West Virginia Antitrust Act, W.VA. CODE §§ 47-18-6, -8, and -9. The State of West Virginia seeks injunctive relief, treble damages, maximum civil penalties, all equitable remedies, and costs and attorneys' fees, to the extent permitted by law.

19)     Wisconsin Attorney General J.B. Van Hollen brings this action in the name of the State of Wisconsin on behalf of its state government entities to secure relief for injuries sustained directly, indirectly, and by assignment, by the entities as a result of Defendants' conspiracy to fix prices of TFT-LCD panels.  The Wisconsin Attorney General is authorized to bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) and WIS. STATS. §§133.03, 133.17, 133.18, and 165.25(1m).  The State of Wisconsin seeks injunctive relief, civil penalties, restitution, costs, and attorneys' fees and treble damages for all overcharges paid by the State of Wisconsin to the extent permitted by the Sherman Act and WIS. STATS. §133.03 and §133.18.

**Defendants**

20)     Defendants are American and foreign companies that manufactured, sold, and/or distributed TFT-LCD panels and/or TFT-LCD products to customers throughout the United States during the Conspiracy Period.  Each Defendant participated in the conspiracy during all or part of the Conspiracy Period.

**AUO**

21)     AU Optronics Corporation ("AUOC") is a Taiwanese corporation that maintains its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AUOC was formed as a result of a merger between TFT-LCD panel manufacturers Acer Display Technology Inc. ("Acer") and Unipac Optoelectronics ("Unipac") in 2001.  AUOC

merged with Quanta Display, another manufacturer of TFT-LCD panels, in 2006.  All conduct of Acer, Unipac, and Quanta is attributable to AUOC.

22)      AU Optronics Corporation America ("AUOA") is a Texas corporation that maintains its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas 77070 and is a wholly-owned subsidiary of AUOC.   AUOA acted as the agent of AUOC and sold or distributed TFT-LCD panels or TFT-LCD products manufactured by AUOC to customers in the United States during the Conspiracy Period.

23)      Defendants AUOC and AUOA are referred to collectively herein as "AUO."

### CMO

24)      Chimei Innolux Corp. ("Chi Mei"), formerly known as Chi Mei Optoelectronics Corporation, is a Taiwanese corporation that maintains its corporate headquarters at No. 160 Kesyue Road, Chu-Nan, Hsinchu Science Park, Chu-Nan, Miao-Li, Taiwan. Prior to 2009, both Chi Mei and Innolux Display Corp. were manufacturers of TFT-LCD panels.  All conduct of Chi Mei Optoelectronics Corporation is attributable to Chi Mei.

25)      Chi Mei Optoelectronics Japan Co., Ltd. ("CMO Japan") is a Japanese corporation and a subsidiary corporation of Chimei Innolux that maintains its corporate headquarters at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.  CMO Japan was formerly known as International Display Technology ("IDTech").

26)      Chi Mei Optoelectronics USA, Inc., ("CMO-USA") is a California corporation and subsidiary corporation of Chimei Innolux that maintains its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California 95110.

27)      Defendants Chi Mei, CMO Japan, and CMO-USA are referred to collectively herein as "CMO."

**HannStar**

28)     HannStar Display Corporation ("HannStar") is a Taiwanese company that maintains its corporate headquarters at No. 480 Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  HannStar manufactures TFT-LCD panels and TFT-LCD products and often sells them under the brand names Hanns.G (monitors) and Hannspree (televisions).  LG Display holds an ownership interest in HannStar.

**Hitachi**

29)     Hitachi, Ltd. is a Japanese company that maintains its corporate headquarters at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan.  In 2002, Hitachi, Ltd. spun off its manufacturing assets to a wholly-owned subsidiary, Hitachi Displays, Ltd.

30)     Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company that maintains its corporate headquarters at 3300, Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.

31)     Hitachi Electronic Devices (USA), Inc., is a Delaware corporation and subsidiary of Hitachi, Ltd., that maintains its corporate headquarters at 208 Fairforest Way, Greenville, South Carolina 29607.

32)     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices, (USA), Inc., are referred to collectively herein as "Hitachi."

**LG Display**

33)     LG Display Co., Ltd. is a Korean corporation that maintains its corporate headquarters at 20, Yeouido-dong, Yeoungdeungpo-gu, Seoul, 150-721, Republic of Korea.  LG Display Co., Ltd. was formerly known as LG Philips LCD Co., Ltd., a joint venture between LG Electronics and Philips Electronics.  All conduct of LG Philips LCD Co., Ltd. is attributable to LG Display Co., Ltd.

34)     LG Display America, Inc., is a California corporation and a corporate affiliate of LG Display Co., Ltd., that maintains its corporate headquarters at 150 East Brokaw Road, San Jose, California 95112.  LG Display America, Inc., was formerly known as LG Philips LCD America, Inc.

35)     LG Display Co., Ltd. and LG Display America, Inc., are referred to collectively herein as ("LG Display").

**Samsung**

36)     Samsung Electronics Co., Ltd. ("SEC") is a Korean corporation that maintains its executive offices at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul, Korea.

37)     Samsung Electronics America, Inc., ("SEA") is a New Jersey corporation and a corporate subsidiary of SEC that maintains offices at 105 Challenger Road, Ridgefield Park, New Jersey 07660.  SEA is a wholly-owned subsidiary of SEC.

38)     Samsung Semiconductor, Inc., ("SSI") is a California corporation and a corporate subsidiary of SEC that maintains offices at 3655 North First Street, San Jose, California 95134. SSI is a wholly-owned subsidiary of SEC.

39)     SEC, SEA and SSI are referred to collectively herein as "Samsung."

**Sharp**

40)     Sharp Corporation is a Japanese company that maintains its corporate headquarters at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.

41)     Sharp Electronics Corporation is a New York corporation and a corporate subsidiary of Sharp Corporation that maintains its corporate headquarters at Sharp Plaza, Mahwah, New Jersey 07430.

42)     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp."

## AGENTS AND CO-CONSPIRATORS

43)     Various other persons and entities, some of which are presently unknown to the States, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint.  These co-conspirators include, but are not limited to, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Epson Electronics America, Inc., Hydis Technologies Co., Ltd., f/k/a BOE Hydis Technology Co., Ltd., Quanta Display Inc. ("QDI"), prior to its acquisition by AUO, Mitsubishi Electric Corporation and its subsidiary, Mitsubishi Electric & Electronics USA, Inc., a wholly owned subsidiary of Mitsubishi Electric Corp, NEC LCD Technologies, Ltd., Toshiba Corporation, Toshiba Mobile Display Company, Ltd., f/k/a Toshiba-Matsushita Display Technology Co., Ltd., Toshiba America Information Systems, Inc., and Toshiba America Electronic Components, Inc.

44)     The acts charged in this Complaint have been performed by Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.  In the case of related corporations, each acted as an agent of the other(s).  In the case of parent corporations and subsidiaries, the parent sufficiently dominated and controlled the subsidiary such that the two companies effectively operated as alter egos with regard to all TFT-LCD panels and/or TFT-LCD products made by a subsidiary of the parent company.  Additionally, each of the Defendants herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**TRADE AND COMMERCE**

45)     The price-fixing activities of Defendants and their co-conspirators involved United States import trade or commerce.

46)     Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on domestic interstate commerce within the United States, including the States.  These effects proximately caused the domestic injuries alleged in this complaint in that governmental purchasers, consumers, and other end-paying purchasers paid more for TFT-LCD products than they would have absent the conspiracy.  Accordingly, these effects give rise to the claims asserted in this complaint.

47)     Defendants' conspiracy specifically targeted the United States market. The United States has been and remains one of Defendants' most important markets for the ultimate consumption of TFT-LCD panels, typically in the form of TFT-LCD products, and accounts for a significant portion of Defendants' revenue.

48)     Most of the Defendants and/or their affiliates maintained corporate offices in the United States.  Most of the Defendants had marketing, sales, and account management personnel specifically designated to handle United States customer accounts and the United States market for TFT-LCD panels and products.  For example, most of the Defendants, if not all, sponsored advertising within and directed to the United States for the purpose of maintaining and increasing their TFT-LCD product sales and providing other marketing support.

49)     Defendants sold billions of dollars of price-fixed TFT-LCD panels to United States-based OEMs and other manufacturers and to manufacturers that sold millions of TFT-LCD products directly into the United States.  Defendants also sold billions of dollars in price-fixed TFT-LCD panels to their own affiliated OEMs (intra-company sales) and to OEMs

affiliated with their co-conspirators (inter-company sales) that manufactured millions of TFT-LCD products destined for sale in the United States.

50)     In furtherance of the conspiracy, Defendants regularly monitored United States "street prices" or retail prices of TFT-LCD products to ensure that the cartel had set profit-maximizing prices for TFT-LCD panels.  Defendants knew that, because TFT-LCD panels are often the most expensive and significant component of products containing such panels, price increases for the panels necessarily resulted in increased prices for TFT-LCD products sold in the United States.

51)     Thus, Defendants' price-fixing activities directly and substantially affected the price of TFT-LCD panels and TFT-LCD products purchased in the United States, including the States.  Defendants intentionally sent price-fixed TFT-LCD panels into a stream of commerce destined for the United States with the expectation of producing a substantial adverse effect in the United States, and within the States, in the form of inflated prices for TFT-LCD panels and TFT-LCD products.  The artificial inflation of prices for TFT-LCD products was a foreseeable and immediate consequence of Defendants' illegal activities.  Accordingly, Defendants' unlawful conduct directly and substantially affected the price of TFT-LCD products purchased within the United States and unreasonably restrained commerce within the United States.

## FACTUAL BACKGROUND

### TFT-LCD Panels

52)     TFT-LCD panels are made by sandwiching liquid crystal compound between two pieces of glass called substrates.  The resulting screen contains hundreds of thousands of electrically charged dots, called pixels, which form an image.  The panel is then combined with a

backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a TFT-LCD product.

53)     TFT-LCD panels are manufactured in facilities frequently referred to as "fabs." Fabs are divided into categories, called generations, depending on the size of the glass substrate they process.  The substrate processed by early-generation fabs is typically smaller than the substrate processed by late-generation fabs.

54)     TFT-LCD panels are only used as components of TFT-LCD products. TFT-LCD panels often account for a significant portion of the cost of finished TFT-LCD products and are often the most expensive component.  For example, TFT-LCD panels account for between 50% and 80% of the cost of finished desktop monitors.

55)     TFT-LCD panels have no independent utility; the only value for TFT-LCD panels is as the main component of TFT-LCD products.  Therefore, the markets for TFT-LCD panels and TFT-LCD products are inseparable.

56)     The Defendants expected the price of finished TFT-LCD products to reflect the price of their TFT-LCD panels. Accordingly, the demand for TFT-LCD panels is directly correlated to the demand for TFT-LCD products.

**Market Structure and Concentration**

57)     The market for TFT-LCD products is enormous, and it grew significantly during the Conspiracy Period.  In 2006, when DOJ and international competition authorities first publicly disclosed their investigations, the worldwide market for TFT-LCD products was approximately $70 billion.

58)     The TFT-LCD panel industry has several characteristics that are conducive to collusion:

a)      The TFT-LCD panel industry is characterized by high barriers to entry. New fabs cost billions of dollars to build, and rapidly evolving technology and intellectual property requirements require constant research, development, and investment.  Thus, firms cannot enter the market for the production and sale of TFT-LCD panels without enormous capital investments.

b)      Standardization in the size of TFT-LCD panels creates homogeneity in those products:  TFT-LCD panels, regardless of which product they will be used for, are manufactured to a specific size regardless of manufacturer. The manufacture of standard panel sizes for TFT-LCD products across the industry facilitates price transparency in the market for TFT-LCD panels.  This panel homogeneity enables manufacturers to monitor and analyze TFT-LCD panel prices.

c)      The TFT-LCD panel industry has experienced significant consolidation in the past decade.  Throughout the Conspiracy Period, many individual Defendants and their co-conspirators grew through acquisitions.  The TFT-LCD panel industry has been and remains highly concentrated, and Defendants control a significant share of the global market for TFT-LCD panels.

d)      The TFT-LCD panel industry offers considerable opportunities for collusive activity through joint ventures, cross-licenses,  and other cooperative arrangements, as well as through participation in various industry associations.  For example, Defendant HannStar was incorporated in 1998, following an agreement between its parent company, Walsin Lihwa Corporation, and Toshiba Corporation, which provided LCD technology. HannStar later entered into a technology transfer agreement with Defendant Hitachi in 2002 relating to the manufacture of TFT-LCD panels and allowing both

companies "to step forward in future market cooperation, including OEM/ODM supply of LCD-TV panels from HannStar to Hitachi."  Two years later, Defendant Hitachi and Toshiba joined with Matsushita to form IPS Alpha Technology, Inc., a manufacturer and seller of TFT-LCD panels for televisions.  Such overlapping business arrangements created a unity of interest among the Defendants and their co-conspirators which facilitated the enforcement of the conspiracy's objectives.

e)      The TFT-LCD panel manufacturers were highly aware of the close relationship between their production volume and their ability to maintain a higher price for TFT-LCD panels.

**Distribution of LCD Panels**

59)      Defendants sold TFT-LCD panels to OEMs (including OEMs affiliated with Defendants and their co-conspirators and OEMs based in the United States such as Dell, Gateway, Hewlett-Packard, Motorola, and Apple) and other manufacturers, such as original design manufacturers and electronics manufacturing services providers, for insertion into TFT-LCD products.  These manufacturers paid supra-competitive prices for TFT-LCD panels as result of the Defendants' unlawful conduct.

60)      The distribution chain for TFT-LCD panels is relatively short.  OEMs and other manufacturers sell TFT-LCD products to end users directly or through intermediaries.

61)      Because TFT-LCD panels are significant and distinguishable components of TFT-LCD products, TFT-LCD panels can be traced through the distribution chain.

62)      Changes in the price of TFT-LCD panels impact prices paid by consumers and other end-paying purchasers of TFT-LCD products. Inflated prices for TFT-LCD panels are

passed along through the sale of TFT-LCD products.  Accordingly, overcharges for TFT-LCD panels are traceable in prices paid for TFT-LCD products.

63)     The States and their agencies, divisions and units, governmental entities, and resident end-paying purchasers have purchased hundreds of millions of dollars worth of TFT-LCD products during the Conspiracy Period.

### THE CONSPIRACY

64)     Beginning at a date as yet unknown to the States but at least as early as January 1999, and continuing through at least December 2006, the Defendants and their co-conspirators, at various times, participated in a conspiracy to fix the prices of TFT-LCD panels sold in the United States and elsewhere.

65)     Beginning sometime prior to 1999, representatives of the Japanese TFT-LCD manufacturers Sharp and Hitachi, along with other co-conspirators, including Samsung, shared internal pricing plans and agreed to fix the prices and limit the supply of TFT-LCD panels.  As TFT-LCD production in South Korea and Taiwan began to increase, the conspiracy expanded to include LG Display of South Korea and Taiwanese manufacturers, AUO, CMO, Chunghwa Picture Tubes, Ltd., and HannStar.

66)     The conspiracy was organized at the highest level of the Defendant organizations and carried out by both executives and subordinate employees of their parent and subsidiary companies.  Individual participants entered into an ongoing agreement on behalf of the Defendant organizations.

67)     In furtherance of the conspiracy, Defendants' officers and employees engaged in discussions and attended meetings with representatives of other major TFT-LCD producers.

During these discussions and meetings, Defendants reached agreements to fix the price of TFT-LCD panels sold to buyers in the United States and elsewhere.

68)     As the number of conspirators expanded, some of the members of the conspiracy began to participate in frequent multilateral meetings and communications, in addition to bilateral meetings.  Representatives of six corporate families—namely, AUO, Chunghwa Picture Tubes, Ltd., CMO, HannStar, LG Display, and Samsung —held dozens of multilateral meetings from 2001 through 2006, taking turns hosting the meetings.  These companies comprised the substantial majority of the TFT-LCD panel market.

69)     The attending Defendants sometimes referred to the meetings as "Crystal Meetings." Crystal Meetings involving high-level executives were often referred to as "CEO" or "Top" meetings. The Crystal Meetings involving vice-presidents and other executive or management level employees were referred to as "Commercial Meetings" or "Operational Meetings." Numerous additional meetings were held among lower-level employees of the Defendants that tended to focus more on implementation of agreements reached during the Crystal Meetings.

70)     During the Crystal Meetings, the attending Defendants typically exchanged sensitive business information regarding TFT-LCD panel prices, customer demand, supply information, fab production, and shipments of TFT-LCD panels.  The participating Defendants typically discussed how to raise prices and reached agreements on target prices, floor prices, and/or price ranges for TFT-LCD panel sales.  They also discussed their pricing regarding specific customers and reached agreements as to how to deal with customers' requests for discounts.  The participating Defendants also typically reached agreements to limit the

1   production of TFT-LCD panels by setting target production levels, delaying capacity expansion,

2   slowing assembly line volume ("loading rates"), and other mechanisms.

3       71)     For purposes of illustration, at the November 15, 2001 Crystal Meeting attended

4   by high-ranking executives of AUO, Chunghwa Picture Tubes, Ltd., CMO, HannStar, LG

5   Display, and Samsung, the status of their efforts to raise prices in November was discussed and

6   suggestions as to how "[t]o avoid vicious price competition" were shared. The attending

7   companies also shared their respective production plans for 2002, discussed their forecasts for

8   supply and demand, and agreed upon pricing targets for 2002 sales of TFT-LCD panels.

9       72)     The Defendants in attendance at the Crystal Meetings were concerned with how

10  to keep non-attending Defendants abreast of the events that transpired.   One such concern was

11  how the companies from Taiwan and South Korea could better collaborate with the Japanese

12  manufacturers on pricing practices.  To facilitate cooperation without the Japanese manufacturers

13  attending Crystal Meetings in person, it was agreed that the meeting attendees would contact the

14  Japanese manufacturers, such as Hitachi, to persuade them to "synchronize" their pricing.

15      73)     There were bi-lateral contacts and meetings between Defendants and co-

16  conspirators who attended a Crystal Meeting and Defendants or co-conspirators who did not, the

17  purpose of which was to exchange company sales and market information and/or to convey,

18  clarify, or reinforce the agreements reached at the Crystal Meeting.  Illustrating such bilateral

19  communications are the following exchanges:

20      a)      In a Crystal Meeting in April 2002, HannStar reported that Hitachi would increase

21              its prices for TFT-LCD panels consistent with the agreement reached at the meeting,

22              reflecting bi-lateral communications about pricing between HannStar and Hitachi.

b)      In February 2003, Sharp's LCD Business Unit noted in an internal presentation that Samsung had delayed completion of a new fabrication facility and hired a Hitachi design team, that LG Display was losing money, and that within the industry there was a "[c]oncerted effort to raise monitor and notebook prices now underway," reflecting bi-lateral communications.

c)      In February 2005, senior management-level employees from LG Display's Korea headquarters traveled to Japan and met with Hitachi management-level employees to discuss market conditions and their outlook for the 2005 market for TFT-LCD panels. Along with production and pricing trends, they discussed a concern that the 32" TFT-LCD panels being used for televisions would drop below $600.

d)      In June 2006, management-level employees of LG Display and Hitachi met in LG Display's Japan office and discussed prospective prices on TFT-LCD panels between spring 2006 through spring 2007 by LG, AUO, CMO, and Sharp.

74)      In addition to the Crystal Meetings and meetings between attendees and non-attendees, there were also numerous other bilateral contacts and meetings between Defendants and/or co-conspirators.  For example:

a)      In late 1998, a manager of SSI, received pricing information and confirmation of future pricing plans from representatives of both Sharp and Hitachi to the effect that those competitors were raising their prices on TFT-LCD panels.

b)      In late 1999, representatives of Samsung and Sanyo Electric (an earlier manufacturer of TFT-LCD panels) shared TFT-LCD panel production plans over lunch, and Sanyo Electric urged Samsung to raise their price of TFT-LCD panels for bids to customers such as Dell.

c)       In April 2001, representatives of Samsung and Hitachi discussed with each other their respective pricing plans in coordination of their responses to Dell.

d)       In spring 2001, Korean companies Samsung and LG Display discussed their future pricing strategy for the following month.  To ensure that the price-fixing of TFT-LCD panels was successful with regard to certain purchasers of TFT-LCD panels, Samsung obtained and confirmed cooperation of the price-fixing agreement with LG Display.

e)       Also in April 2001, Samsung and Chunghwa Picture Tubes, Ltd. agreed on target prices for certain TFT-LCD panels.

f)       In a private discussion in fall 2001, LG Display and Chunghwa Picture Tubes, Ltd. agreed to simultaneously increase their prices to be offered to a particular customer.

g)       LG Display and AUO agreed to fix the price of TFT-LCD panels for 32" televisions over a 2005 breakfast meeting between representatives of those two co-conspirators.

h)       In February 2006, AUO, CMO, and Chunghwa Picture Tubes, Ltd. met and discussed the prices being quoted by them and other TFT-LCD manufacturers to Hewlett Packard, a purchaser of TFT-LCD panels.

75)       The participants in the conspiracy also communicated through means other than the multilateral Crystal Meetings and bilateral meetings, including through frequent meetings among lower-level employees, meetings between fewer of the co-conspirators, telephone calls, e-mails, and other communications.

76)       In addition to the meetings and other direct communications, the Defendants attended numerous industry-oriented consortia and trade shows and utilized other sources of

available information about their competing manufacturers of TFT-LCD panels, including trade publications, reports from marketing research firms, and information from mutual customers, all of which facilitated their having timely and reliable information about competitors and compliance with the agreements they had reached.

77) There were further efforts by the Defendants to facilitate communication among co-conspirators, such as efforts to establish a telephone hotline that would assist a co-conspirator in confirming an agreed-upon price when negotiating the sale of TFT-LCD panels to a customer OEM or other manufacturer.

78) The participants in the conspiracy closely monitored the pricing of TFT-LCD panels by discussing with customers the prices offered by their co-conspirators and utilizing most-favored customer clauses in contracts with their customers; they used their meetings and other communications with their co-conspirators to discuss the reports they had received and to persuade corrective action by the co-conspirator as needed.

79) While the exact date of the cessation of the more formal multilateral Crystal Meetings is unknown to the States, upon information, Defendants may have ceased attending these larger meetings in 2006. The Defendants continued other communications at least until shortly before the USDOJ's investigation into Defendants' conduct became public. However, TFT-LCD panels sold into the channel of distribution during the latter portion of the conspiracy may not have reached the purchasing public for many months thereafter.

80) The conspiracy was effective throughout the Conspiracy Period. At various times during the Conspiracy Period, the price of TFT-LCD panels increased or remained steady despite improvements and efficiencies in the production process that resulted in declining costs to Defendants, contrary to what would have occurred in a competitive market.

**Additional Evidence of Conspiracy**

81)    The market for consumer electronics products and their components is typically characterized by falling prices.  Under normal circumstances, the market for TFT-LCD panels would have been no exception, and prices would have continued to fall, as was projected.  For example, in 1995, the prices for TFT-LCD panels fell 40-50%, and prices were projected to continue falling due to lower manufacturing costs.  Instead, the TFT-LCD market has been characterized by unnatural price stability and upward pricing trends which evidences the existence of anticompetitive influences. Between the mid-1990s and the end of 2006, there were several episodes of rising and flattening prices that did not coincide with increasing costs or other justifying factors.

82)    In addition to market conditions facilitating cartel behavior as described above, additional actions were taken by Defendants to strengthen and maintain the conspiracy as well as to prevent its discovery.  For example:

a)    Throughout the Conspiracy Period, Defendants agreed among themselves to give pretextual reasons for increasing the price or output restrictions of TFT-LCD panels, such as by attributing prices to higher supply or input costs.

b)    Throughout the Conspiracy Period, Defendants collected information about and reported on their compliance with target prices for particular sizes of TFT-LCD panels, discussing instances when it was unclear if the members of the conspiracy had met the target price set by the cartel.

c)    Throughout the Conspiracy Period, Defendants also shared with each other their production data and plans, including shipment information as well as forecasts relating to production.  Their regular meetings and other communications and reports emphasized

the need to avoid competition with each other and facilitated efforts to thwart attempts to undercut the agreed-upon price by customer OEMs and other manufacturers.

d)      Defendants also provided assurances to each other and to other co-conspirators of their commitment to the price fixing agreements they had entered.

## Criminal Convictions, Indictments, and On-Going Investigations into the TFT-LCD Panel Price-Fixing Conspiracy

83)     Despite the efforts of Defendants and other co-conspirators to prevent discovery of their conspiracy, in December 2006, government authorities in the United States and in other countries, including Japan and South Korea, revealed the existence of an extensive investigation into the anticompetitive activity among TFT-LCD panel manufacturers.  In a December 11, 2006, filing with the U.S. Securities and Exchange Commission, Defendant LG Display disclosed that its Seoul and Tokyo offices had been visited by the Korea Fair Trade Commission and the Japanese Fair Trade Commission, respectively, and that USDOJ had issued a subpoena to LG Display's San Jose office.  The following day, news reports revealed that Defendants Samsung, Sharp, and AUO were also under investigation in relation to price-fixing agreements. Over the following three years, additional Defendants revealed that they were the subject of criminal investigations.

84)     To date, several of the Defendants and co-conspirators have entered guilty pleas pursuant to plea agreements reached with USDOJ relating to their participation in a TFT-LCD price-fixing conspiracy and others have either been indicted or are anticipating such charges:

a)      LG Display Co., Ltd., and its wholly-owned subsidiary, LG Display America, Inc. pleaded guilty to participating in a price-fixing conspiracy relating to TFT-LCD panels from September 2001 through June 2006 and were assessed a criminal fine of $400

million—the second largest fine in the history of USDOJ's Antitrust Division. Additionally, one executive pleaded guilty to participating in a price-fixing conspiracy.

b)      Co-Conspirator Chunghwa Picture Tubes, Ltd. pleaded guilty to participating in a price-fixing conspiracy relating to TFT-LCD panels from September 2001 through December 2006 and was assessed a criminal fine of $65 million. Additionally, three Chunghwa executives have pleaded guilty to participating in a price-fixing conspiracy.

c)      Chi Mei Optoelectronics Corporation pleaded guilty to participating in a price-fixing conspiracy relating to TFT-LCD panels from September 2001 through December 2006 and was assessed a criminal fine of $220 million. Additionally four Chi Mei executives have pleaded guilty to participating in a price-fixing conspiracy.

d)      HannStar pleaded guilty to participating in a price-fixing conspiracy relating to TFT-LCD panels from September 2001 to January 2006 and was assessed a criminal fine of $30 million.

e)      Hitachi Displays, Ltd. pleaded guilty to participating in a price-fixing conspiracy relating to TFT-LCD panels sold to Dell from at least April 2001 through at least March 2004 and was assessed a criminal fine of $31 million.

f)      Sharp Corporation pleaded guilty to, among other things, participating in a price-fixing conspiracy relating to TFT-LCD panels sold to Dell from April 2001 through December 2006 for use in computer monitors and notebooks.  Sharp was assessed a criminal fine of $120 million.

g)      Co-conspirator Epson Imaging Devices Corporation pleaded guilty to participating in a price-fixing conspiracy relating to TFT-LCD panels sold to Motorola,

Inc., from the fall 2005 to the middle 2006 for use in Razr mobile phones. Epson was assessed a criminal fine of $26 million.

85)     To date, more than $890 million in criminal fines have been imposed for criminal violations of the Sherman Antitrust Act by Defendants.

86)     In June 2010, a federal grand jury returned an indictment against AU Optronics Corporation and AU Optronics Corporation America.  Several executive-level employees with AUO, LG Display, Chunghwa Picture Tubes, Ltd., and Hitachi have been indicted for similar conduct, most of whom have pleaded guilty to such charges.

87)     While their guilty pleas may reference specific conduct for which they admit to criminal culpability, the States assert that Defendants' participation in a price-fixing conspiracy is greater in scope.

## PROXIMATE CAUSE AND ANTITRUST INJURY

88)     The conspiracy was effective at raising the price of TFT-LCD panels.  But for Defendants' agreement to raise prices and reduce output, the price of TFT-LCD panels would have been significantly lower than the price that prevailed in the marketplace.

89)     OEMs and other direct purchasers paid artificially high prices for TFT-LCD panels, which increased their production costs and caused the price of finished TFT-LCD products to increase throughout the United States.  As TFT-LCD panels comprise a significant portion of the costs of the completed TFT-LCD product, the effect of the TFT-LCD panel price on the selling price of TFT-LCD products was substantial.

90)     The overcharge caused by Defendants' conduct was passed on to the States and resident end-paying purchasers.  Defendants themselves understood and anticipated that pass-through effect when they monitored the "street price" of TFT-LCD products and discussed such

information during the Crystal Meetings.  The States and their resident purchasers likely paid the full amount – and possibly more – of the overcharges caused by the conspiracy.  Thus, Defendants' anticompetitive conduct (1) caused the States and resident purchasers to sustain antitrust injury and (2) was the proximate cause of the damages sustained by the same.

## FRAUDULENT CONCEALMENT

91)     Defendants have fraudulently concealed the existence of the conspiracy alleged in this Complaint.

92)     Defendants effectively, affirmatively, and fraudulently concealed their conduct so as to not put the States or their resident purchasers on inquiry notice of the antitrust violations alleged below through the following actions, among others:

a)     By engaging in secret discussions and meetings regarding pricing and output for TFT-LCD panels and even by warning each other to "take heed of the antitrust law."

b)     By adopting conventions intended to thwart discovery of such meetings, such as by not disclosing meeting locations until the day before the meeting, urging participants to stagger their arrivals, choosing to obtain the information "through personal contact" with other participants in lieu of attending meetings, or not inviting a smaller competitor to a Crystal Meeting because of reservations about their maintaining confidentiality.

c)     By agreeing not to publicly discuss the nature of their price-fixing agreement.  For example, minutes and summaries of the Crystal Meetings typically contained reminders not to disclose the content of those documents, e.g., "Extremely confidential – Must NOT Distribute"; "for reference, but not disclosure. keep you eye only, no talking"[sic], and "Please do not copy and release to anyone!!!"

d)      By encouraging other participants and agreeing to increase security and limit written communication regarding their ongoing price-fixing agreement to avoid detection and prosecution under the antitrust laws.

e)      By agreeing to disseminate pretextual reasons for the inflated prices of TFT-LCD panels, such as increased demand, undercapitalization leading to insufficient capacity, undersupply due to demand for larger panels, shortages due to late expansion of production lines, and rapid demand growth.

f)      By avoiding reference to the conspiracy in written communications and confining information concerning the conspiracy to a small number of key officers and employees of the Defendants for the purpose of avoiding detection and prosecution under antitrust and fair trade laws.  For example, representatives of AUO, Chunghwa Picture Tubes, Ltd., CMO, and HannStar agreed that, with regard to an upcoming Top Meeting in December 2001, "security issue regarding Fair Trade Law violation should be discussed," even though it had been discussed in an earlier meeting.  Similarly, the members of the cartel were urged to "be more careful about security and to refrain from written communication."

g)      By engaging in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

93)      The States have exercised due diligence to learn of their legal rights and claims and, despite such diligence, failed to uncover the existence of the violations alleged below until the investigation by USDOJ was first disclosed publicly in December 2006, when some Defendants reported receiving subpoenas.  Even as the investigation was being disclosed, the scope and extent of the conspiracy remained unknown for many more months.

94)     The States have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy to the extent permitted by law.

## BASIS FOR INJUNCTIVE RELIEF

95)     While many Defendants have pleaded guilty to participating in a price-fixing conspiracy, none of the Defendants have been the subject of a court order enjoining them from future participation in a conspiracy to fix prices of TFT-LCD panels or other similarly unlawful conduct.  Moreover, as to those Defendants that have pleaded guilty, their unlawful conduct extends beyond the terms of their guilty pleas.

96)     The structure and characteristics of the TFT-LCD panel market have not substantially changed since the first discovery of the conspiracy alleged herein.  The industry remains conducive to agreements among TFT-LCD panel manufacturers to fix price and restrict output.  For example, two competitors that had entered the market during the course of the conspiracy have since been acquired by certain Defendants.

97)     Additionally, the participants in the conspiracy alleged herein continued with their unlawful conduct even after learning that their own companies, or other companies with which they were familiar, were being indicted, pleading guilty, and were otherwise implicated in the international Dynamic Random Access Memory (DRAM) price-fixing investigation commenced by USDOJ as early as June 15, 2002.  Nevertheless, Defendants were not then dissuaded from continuing their conspiracy to fix prices of TFT-LCD panels.

98)     Unless permanently restrained and enjoined, Defendants will continue to engage in conduct that restrains competition for TFT-LCD panels and products and cause higher prices to the continued detriment and injury of the States and the purchasers residing therein.

# VIOLATIONS ALLEGED

## COUNT I

### Violation of Section 1 of the Sherman Act Pursuant to 15 U.S.C. § 26

99)    Plaintiff States incorporate each of the preceding allegations by reference.

100)    The States bring this claim both on behalf of themselves and their governmental entities, and as parens patriae as to natural persons, to enforce public rights and to protect their residents against the violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

101)    Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and peg prices for TFT-LCD panels in violation of Section 1 of the Sherman Act (15 U.S.C.§ 1).

102)    The combination and conspiracy alleged herein has had the following effects, among others in the United States, including within the States:

a)    Prices for TFT-LCD panels sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels;

b)    Price competition in the sale of TFT-LCD panels and TFT-LCD products has been restrained, suppressed, and/or eliminated, and

c)    Those who purchased TFT-LCD products containing TFT-LCD panels from Defendants and their co-conspirators have been deprived of the benefits of free and open competition, including competitive prices.

103)    The States, their agencies and governmental units, their resident purchasers, and their general economies have been injured and will continue to be injured in their businesses and property by paying more for TFT-LCD panels purchased indirectly from the Defendants and

their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

104)     Plaintiff States are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein and to other equitable relief under federal law.

## COUNT II:

### Claim for Damages and Other Relief Under the Arkansas Unfair Practices Act

105)     The State of Arkansas incorporates each of the preceding allegations by reference.

106)     Each Defendant in this case created, entered into, or became a member of (or a party to) a pool, trust, agreement, combination, confederation, or understanding with one or more corporations, partnerships, individuals, persons, or associations of persons to regulate or fix the price of TFT-LCD panels or to fix or limit the amount or quantity of TFT-LCD panels.

107)     Under ARK. CODE ANN. § 4-75-309, each Defendant shall be deemed and adjudged guilty of a conspiracy to defraud.

108)     Defendants' actions injured Arkansas consumers and caused them to sustain injury.  But for Defendants' actions, Arkansas consumers would have paid significantly less for TFT-LCD products.

109)     The Arkansas Attorney General did not have actual knowledge of the events described in this complaint at any time prior to the enactment of ARK. CODE ANN. § 4-75-320.

110)     The Arkansas Attorney General, acting as parens patriae on behalf of natural persons residing in Arkansas, hereby seeks damages or restitution for losses incurred directly or indirectly.  *See* Ark. Code Ann. § 4-75-315(b)(1).

111)     The Attorney General also seeks injunctive relief, civil penalties to the maximum extent permitted by Arkansas law, expenses, investigative costs, and attorneys' fees.

# COUNT III

## Violation of Michigan Antitrust Reform Act

112)    The State of Michigan incorporates each of the preceding allegations by reference.

113)    The State of Michigan brings this action both on behalf of itself, its State Agencies, and as parens patriae on behalf of natural persons, to enforce public rights and to protect residents and its general economy against violations of the Michigan Antitrust Reform Act, MICH. COMP. LAWS ANN. § 445.771, *et seq.*

114)    In formulating and carrying out the aforementioned contracts, combinations, and conspiracies, the Defendants and their co-conspirators did those things that they combined and conspired to do in flagrant violation of the Michigan Antitrust Reform Act, MICH. COMP. LAWS ANN. § 445.771, *et seq.*

115)    The State of Michigan, its Agencies, and its natural persons have been injured and will continue to be injured in their businesses and property by paying more for TFT-LCD panels purchased from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the aforementioned contracts, combinations, and conspiracies, including paying more for TVs, laptops, computer monitors and other TFT-LCD products as a result of higher prices paid for TFT-LCD panels by the direct purchasers of such panels.

116)    Accordingly, the State of Michigan, its State Agencies, and natural persons that directly or indirectly purchased TFT-LCD products are entitled to actual or treble damages and other equitable relief, including restitution, pursuant to the Michigan Antitrust Reform Act,

MICH. COMP. LAWS ANN. § 445.771, *et seq.*, for losses incurred directly or indirectly as a result of Defendants' conduct alleged herein.[1]

### COUNT IV:

### Violation of Missouri Antitrust Act

117)    The State of Missouri incorporates each of the preceding allegations by reference.

118)    The State of Missouri represents itself pursuant to MO. REV. STAT. § 416.061.3 (Cum. Supp. 2010), and, as parens patriae, all natural persons, to enforce public rights and to protect residents and its general economy against violations of the Missouri Antitrust Law, specifically, MO. REV. STAT. § 416.031 (Cum. Supp. 2010).

119)    Each Defendant in this case created, entered into, or became a member of (or a party to) a contract, combination or conspiracy in restraint of trade or commerce involving or relating to TFT-LCD panels in violation of MO. REV. STAT. § 416.031.1.

---

[1] Restitution is available to the Michigan Attorney General in this case. Although the Michigan Antitrust Reform Act ("MARA") provides that "courts shall give due deference to interpretations given by federal courts to comparable antitrust statutes," MICH. COMP. LAWS ANN. § 445.784(2), federal law has no statute comparable to MARA where MARA gives the antitrust enforcer equitable remedies without regard to whether the harm or loss is threatened or has already occurred. Section 777 of MARA allows the Attorney General to bring an action for "appropriate injunctive or other relief." In contrast, MARA Section 778(2) allows a person to "bring an action for appropriate injunctive or other equitable relief *against immediate irreparable harm*." Under the doctrine of *expressio unius est exclusion alterius* "the mention in a statute of one thing implies the exclusion of other similar things." *Bradley v. Saranac Board of Education*, 455 Mich. 285; 656 N.W.2d 650, 656 (1997). By not including "against immediate irreparable harm" in § 777, while including it in § 778(2), the Legislature has made plain its intention to provide the Attorney General with retrospective equitable relief, including restitution. Michigan's claim for restitution was upheld in *Federal Trade Commission v. Mylan Laboratories*, 62 F. Supp. 2d 25, 48 (D.D.C. 1999), *reconsidered in part on other grounds*, 99 F. Supp. 2d 1 (D.D.C. 1999) ("Restitution and/or disgorgement on behalf of direct and indirect purchasers will be allowed under the Michigan Antitrust Reform Act which states that the State as well as directly or indirectly injured purchasers may receive injunctive or "other equitable relief." MICH. COMP. LAWS ANN. § 445.778(1), 445.778(2)."

120)     The State of Missouri and its residents have been injured and will continue to be injured in their businesses and property.

121)     Plaintiff State of Missouri is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, and to other relief pursuant to MO. REV. STAT. § 416.071 and § 416.121.

## COUNT V:

## Violation of Missouri Merchandising Practices Act

122)     The State of Missouri incorporates each of the preceding allegations of Paragraphs 1 through 104 and 117 through 121 by reference.

123)     The State of Missouri brings this action in its sovereign capacity to enforce the Missouri Merchandising Practices Act ("MMPA") and to obtain the relief available pursuant to MO. REV. STAT. §§ 407.100, 407.130, and 407.140, (Cum. Supp. 2010), which relief is exclusive to the Attorney General, including injunctions, restitution, the assessment of civil penalties for each unlawful practice, the assessment of additional recoveries to the Merchandising Practices Revolving Fund, and the recovery of all costs of the Attorney General's investigation and litigation.

124)     Section 407.020 of the MMPA provides, in pertinent part:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice.

125)     Section 407.100 of the MMPA provides for injunctions prohibiting the continuation of unlawful methods, acts, uses or practices and the doing of anything to further their continuation or recurrence, an order of restitution, payable to the state, as may be necessary to restore to any person who has suffered any ascertainable loss, including but not limited to, any

moneys or property, real or personal, which may have been acquired by means of unlawful conduct, and an award of civil penalties per each violation.

126)     Defendants' TFT-LCD panels and the finished TFT-LCD products constitute "merchandise" within the meaning of Mo. Rev. Stat. § 407.010(4).

127)     Pursuant to authority granted in Mo. Rev. Stat. § 407.145, the Attorney General has promulgated rules explaining and defining terms utilized in § 407.020. The rules are contained in the Missouri Code of State Regulations (hereinafter "CSR"). The rules relevant to the Merchandising Practices Act allegations herein include the provisions of 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq*. These rules are adopted and incorporated by reference as if fully set forth herein.

128)     From at least 1999 until the present, Defendants, individually and collectively, and through their agents, employees, and others acting on their behalf or at their direction, have engaged in unlawful practices in connection with the advertisement, offering for sale, and sale of merchandise, all in violation of Mo. Rev. Stat. § 407.100, to-wit:

a)     Engaging in deception, as defined by 15 CSR 60-9.020, by using methods, acts and practices that had the tendency or capacity to mislead or deceive, or that tended to create false impressions as to the value, pricing, and cost of TFT-LCD panels, and the resulting TFT-LCD products, and that such price was established by a free and fair market, among purchasers of the TFT-LCD products within the State of Missouri;

b)     Engaging in misrepresentation as defined by 15 CSR 60-9.070(1) by stating as reasons for price increases and the absence of price reductions in TFT-LCD panels assertions that were not in accord with the facts;

c)       Engaging in concealment, suppression or omission of material facts, as defined by 15 CSR 60-9.110 and 15 CSR 60.9-010(1)(C), relating to their agreements to limit the supply of TFT-LCD panels, to not compete against each other on the pricing of TFT-LCD panels, and to establish minimum prices for TFT-LCD panels, which facts would have been important to persons within the State of Missouri in connection with their purchase of TFT-LCD products;

d)       Engaging in unfair practices as defined by 15 CSR 60-8.020(1) by participating in agreements to restrain trade, including agreements to limit the supply of TFT-LCD panels, not to compete against each other on the pricing and sale of TFT-LCD panels, and to establish minimum prices for TFT-LCD panels, which agreements offend public policy as it has been established by the Missouri Antitrust Act, § 416.031.1, Section 1 of the federal Sherman Antitrust Act (15 U.S.C. § 1) and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 5), which agreements are unethical, oppressive,  and unscrupulous and which have caused substantial injury to purchasers of the TFT-LCD products within the State of Missouri;

e)       Engaging in unfair practices as defined by 15 CSR 60-8.090 by participating in agreements to restrain trade, including agreements to limit the supply of TFT-LCD panels, not to compete against each other on the pricing and sale of TFT-LCD panels, and to establish minimum prices for TFT-LCD panels, which agreements violate the Missouri Antitrust Act, § 416.031.1, Section 1 of the federal Sherman Antitrust Act (15 U.S.C. § 1) and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 5), said laws being intended to protect the public against higher prices and limited supplies caused by

agreements intended to restrain competition, and which practices have caused substantial injury to purchasers of the TFT-LCD products within the State of Missouri; and

f)      Engaging in unfair practices as defined by 15 CSR 60-8.040 and 15 CSR 60-8.010 by violating the duty of good faith by failing to adhere to honesty in fact and observing reasonable commercial standards of fair dealing in connection with the sale of TFT-LCD panels and products to purchasers within the State of Missouri, which practices have caused substantial injury to purchasers of the TFT-LCD products within the State of Missouri.

129)    The Defendants' engaging in the foregoing acts and practices resulted in the State of Missouri and resident purchasers suffering ascertainable loss by paying supra-competitive, artificially inflated prices for TFT-LCD products and being deprived of free, open and fair competition in the sale of TFT-LCD panels.

130)    The State has no adequate remedy at law.

## COUNT VI

### Violation of West Virginia Antitrust Act

131)    The State of West Virginia incorporates each of the preceding allegations by reference.

132)    The aforementioned acts by Defendants were in violation of the West Virginia Antitrust Act, W.VA. CODE § 47-18-1, *et seq*. These violations substantially affected the State of West Virginia and had impacts within the State of West Virginia. The acts of the Defendants and the resulting injury were reasonably foreseeable. The State of West Virginia, its state agencies, and public schools, were indirectly injured by the Defendants' acts, and thus, are entitled to relief under the West Virginia Antitrust Act.

**COUNT VI:**

**Violation of Wisconsin Statutes Chapter 133**

133)     Plaintiff State of Wisconsin incorporates each of the preceding allegations by reference.

134)     Defendants acts were violations of the Wisconsin antitrust statute, Wis. Stat. § 133.03.  These violations substantially affected the State of Wisconsin and had impacts within the State of Wisconsin.  Plaintiff State of Wisconsin, on behalf of its state government entities, who were indirect purchasers of TFT-LCD panels, is entitled to relief for these violations under WIS. STAT. §§ 133.14, 133.16, 133.17, and 133.18.

**PRAYER FOR RELIEF**

135)     The States pray for the following relief:

a)     That the Defendants' conduct, contract, conspiracy, or combination, and related acts and practices alleged in this complaint be adjudged and decreed to be a violation of Section 1 of the Sherman Act (15 U.S.C.  § 1); the Arkansas Unfair Practices Act (ARK. CODE ANN. §§ 4-75-309 and 4-75-315); the Michigan Antitrust Reform Act (MICH. COMP. LAWS § 445.772); the Missouri Antitrust Law (§ 416.031, MO. REV. STAT. (Cum. Supp. 2010)); the Missouri Merchandising Practices Act (§ 407.020, MO. REV. STAT. (Cum. Supp. 2010)); the West Virginia Antitrust Act, W.VA. CODE § 47-18-1, *et seq.*; and the Wisconsin Antitrust Act (WIS. STAT. §133.03);

b)     That Defendants be permanently enjoined pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26) and the respective States' laws from further continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination and engaging in the other unlawful conduct alleged in this complaint;

c)      That Defendants be ordered to cease all cooperative agreements, joint ventures, cross-license agreements, or other arrangements used to facilitate the conspiracy alleged in this complaint and that the same be adjudged rescinded or dissolved;

d)      That Defendants be found jointly and severally liable for and ordered to pay to the States damages, including treble damages, or restitution, for the overcharges paid by end-paying purchasers to the maximum extent permitted by the respective States' laws;

e)      That Defendants be found jointly and severally liable for and ordered to pay civil penalties, as directed by the laws of the several States, by reason of Defendants' violations of such laws to the maximum extent permitted;

f)      That the States be awarded such additional amounts as provided by their respective state laws;

g)      That the States be awarded pre- and post-judgment interest at the highest legal rate;

h)      That the States be awarded all costs of investigation, costs of litigation, including court costs and reasonable attorneys' fees; and

i)      That the Court order such other relief as it may deem just and proper under the circumstances.

**Jury Trial Demanded**

136)      The States demand a trial by jury of all issues so triable in this action.

1   Dated:  April 29, 2011                    Respectfully Submitted,

2

3   CHRIS KOSTER
    Attorney General of Missouri

4

5   By:   /s/Anne E. Schneider
    ANNE E. SCHNEIDER *(pro hac vice)*
6   Assistant Attorney General/Antitrust Counsel

7
    P. O. Box 899
8   Jefferson City, MO 65102
    Phone:  (573) 751-3321
9   Fax:  (573) 751-2041
    E-mail: Anne.Schneider@ago.mo.gov
10

11  ANDREW M. HARTNETT *(pro hac vice)*
    Assistant Attorney General
12  E-mail:  Andrew.Hartnett@ago.mo.gov

13  *Attorneys for the State of Missouri*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DUSTIN McDANIEL
Attorney General of Arkansas

2

3

By:   /s/David A. Curran

4

DAVID A. CURRAN *(pro hac vice)*
Assistant Attorney General

5

6

323 Center Street, Suite 500
Little Rock, AR  72201

7

Phone:  (501) 682-2007
Fax:  (501) 682-8118

8

E-mail: david.curran@arkansasag.gov

9

*Attorneys for the State of Arkansas*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

BILL SCHUETTE
Attorney General of Michigan

3
4
5

By:  /s/M. Elizabeth Lippitt
M. ELIZABETH LIPPITT *(pro hac vice)*
Assistant Attorney General

6
7
8
9
10

Corporate Oversight Division
525 West Ottawa Street, 6th Floor
Lansing, MI 48933
Phone:  (517) 373-1160
Fax:  (517) 335-1935
E-Mail:  Lippitte@michigan.gov

*Attorneys for the State of Michigan*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    DARRELL McGRAW
      Attorney General of West Virginia
2

3
      By:   /s/Douglas L. Davis
4     DOUGLAS L. DAVIS *(pro hac vice)*
      Assistant Attorney General
5
      812 Quarrier St., First Floor
6     Charleston, WV  25301
      Phone: (304) 558-8986
7     Fax:  (304) 558-0184
      E-mail: doug.davis@wvago.gov
8

9     *Attorneys for the State of West Virginia*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   J.B. VAN HOLLEN
    Attorney General of Wisconsin
2

3   By:   /s/Gwendolyn J. Cooley
4   GWENDOLYN J. COOLEY *(pro hac vice)*
    Assistant Attorney General
5   Wisconsin Department of Justice
    PO Box 7857
6   Madison, WI 53707
    Phone:  (608) 261-5810
7   Fax:  (608) 267-2778
    E-mail:  cooleygj@doj.state.wi.us
8

9   *Attorneys for the State of Wisconsin*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28