Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
Heather T. Rankie (268002)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:     (415) 693-0700
Facsimile:      (415) 693-0770
fscarpulla@zelle.com

Joseph M. Alioto (42680)
Theresa D. Moore (99978)
THE ALIOTO LAW FIRM
555 California Street, 31st Floor
San Francisco, CA 94104
Telephone:     (415) 434-8900
Facsimile:      (415) 434-9200
sexton@aliotolaw.com

*Co-Lead Class Counsel for Indirect-Purchaser Plaintiffs*

(Other Counsel Listed on Signature Page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. 3:07-MD-1827 SI |
| | MDL No. 1827 |
| This Document Relates to: | CLASS ACTION |
| All Indirect-Purchaser Actions | **INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs, indirect purchasers of thin film transistor liquid crystal display ("LCD") panels as defined below, on behalf of themselves and all other similarly-situated indirect-purchasers, for their Third Consolidated Amended Complaint against all defendants named herein, demand trial by jury of all claims properly triable thereby, and complain and allege as follows:

## I.    INTRODUCTION

1.    This case arises out of a long-running conspiracy extending from at least January 1, 1999 through at least December 31, 2006, at a minimum, among defendants and their co-conspirators, the purpose and effect of which was to fix, raise, stabilize, and maintain prices for LCD panels sold indirectly to Plaintiffs and the members of the other indirect-purchaser classes defined below.

2.    Defendants and their co-conspirators formed an international cartel illegally to restrict competition in the LCD panel market, specifically targeting and severely injuring indirect-purchaser consumers and affecting billions of dollars of commerce throughout the United States. The conspiracy included communications and meetings in which defendants agreed to eliminate competition and fix the prices for LCD panels.  As a result of defendants' price fixing conspiracy, plaintiffs and the members of the indirect-purchaser classes have been injured in their business and property by paying more for LCD panels than they otherwise would have paid in the absence of defendants' conspiracy.

## II.    JURISDICTION AND VENUE

3.    This action is brought under Section 16 of the Clayton Act (15 U.S.C. 26) to secure equitable relief against the defendants due to their violations of Section 1 of the Sherman Act (15 U.S.C. 1), as well as under the antitrust and other laws of the State of California and of the other States listed herein, to obtain restitution, recover damages, and to secure other relief against the defendants for violations of those state laws.

4.    This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. 26), Section 1 of the Sherman Act (15 U.S.C.1) and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million exclusive of interest and costs, members of the indirect-purchaser plaintiff class are citizens of states different from defendants, and certain defendants are citizens or subjects of foreign states.

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1    5.    Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act

2  (15 U.S.C 22) and Title 28, United States Code, Section 1391(b), (c), and (d), because a

3  substantial part of the events giving rise to plaintiffs' claims occurred in this District, a substantial

4  portion of the affected interstate trade and commerce was carried out in this District, and one or

5  more of the defendants has an agent, maintains an office or does business in this District.

6    6.    Defendants conduct business throughout the United States, including in this

7  jurisdiction, and they have purposefully availed themselves of the laws of the United States,

8  including specifically the laws of the state of California and the individual states listed herein.

9  Defendants' products are sold in the flow of interstate commerce, and defendants' activities had a

10  direct, substantial and reasonably foreseeable effect on such commerce.

11    7.    Defendants' conspiracy to fix prices of LCD panels substantially affected

12  commerce throughout the United States and in each of the states identified herein because

13  defendants, directly and/or through their agents, engaged in activities affecting each such state.

14  Defendants have purposefully availed themselves of the laws of each of the states identified herein

15  in connection with their activities relating to the production, marketing, and sale of LCD panels.

16  Defendants produced, promoted, sold, marketed, and/or distributed LCD panels, thereby

17  purposefully profiting from access to indirect-purchaser consumers in each such state.  As a result

18  of the activities described herein, defendants:

19    a.    Caused damage to the residents of the states identified herein;

20    b.    Caused damage in each of the states identified herein by acts or

21    omissions committed outside each such state and by regularly doing

22    or soliciting business in each such state;

23    c.    Engaged in persistent courses of conduct within each such state

24    and/or derived substantial revenue from the marketing of LCD

25    panels or the products in which they are used in each such state (and

26    services relating to such marketing); and

27    d.    Committed acts or omissions that they knew or should have known

28    would cause damage (and did, in fact, cause such damage) in each

such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of LCD panels or the products in which they are used in each such state.

8.     The conspiracy described herein affected adversely every person nationwide, and, more particularly, consumers in each of the states identified in this Complaint who indirectly purchased defendants' LCD panels.  Defendants' conspiracy has resulted in an adverse monetary effect on indirect-purchasers in each state identified herein.

9.     Prices of LCD panels in each state identified in this Complaint were raised to supra-competitive levels by the defendants and their co-conspirators.  Defendants knew that commerce in LCD panels and LCD-containing products in each of the states identified herein would be adversely affected by implementing their conspiracy.

### III.     DEFINITIONS

10.     As used herein, the phrase "LCD" means the LCD display technology that involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of eclectically charged dots, called pixels, that form an image.  This panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a television, computer monitor or other product.

11.     As used herein, the term "LCD panel" refers to the particular kinds of LCD panels that are used in LCD products.

12.     As used herein, the phrase "LCD products" means the following products of which LCD panels are a component: televisions, computer monitors, and laptop computers.

13.     As used herein, the term "OEM" means any original equipment manufacturer of LCD products.

14.     As used herein, the term "ODM" means any original design manufacturer of LCD products.

15.     As used herein, the phrase "Class Period" refers to the time period January 1, 1999 through December 31, 2006.

## IV.     THE PARTIES

### A.     The Plaintiffs

16.     During the Class Period, the following named Plaintiffs indirectly purchased LCD panels contained in LCD products from one or more of the defendants named herein for end use and not for resale.

17.     Plaintiff Allan Rotman, a resident of Arizona, indirectly purchased an LCD panel when he purchased a Dell 17" computer monitor, and was injured as a result of defendants' illegal conduct.

18.     Plaintiff Joe Solo, a resident of California, indirectly purchased an LCD panel when he purchased a Sharp Aquos television, and was injured as a result of defendants' illegal conduct.

19.     Plaintiff Lisa Blackwell, a resident of California, indirectly purchased LCD panels when she purchased an Apple computer monitor and an Apple MacBook laptop, and was injured as a result of defendants' illegal conduct.

20.     Plaintiff Byron Ho, a resident of California, indirectly purchased an LCD panel when he purchased a Hyundai 17" computer monitor, and was injured as a result of defendants' illegal conduct.

21.     Plaintiff Frederick Rozo, a resident of California, indirectly purchased an LCD panel when he purchased a Dell Inspiron laptop computer, and was injured as a result of defendants' illegal conduct.

22.     Plaintiff Robert Kerson, a resident of California, indirectly purchased an LCD panel when he purchased a Sharp television, and was injured as a result of the defendants' illegal conduct.

23.     Plaintiff Steven Martel, a resident of California, indirectly purchased an LCD panel when he purchased a Sharp Aquos television, and was injured as a result of defendants' illegal conduct.

24.     Plaintiff David Walker, a resident of Washington D.C., indirectly purchased an

LCD panel when he purchased a Norcent 27" television, and was injured as a result of defendants' illegal conduct.

25.     Plaintiff Scott Eisler, a resident of Florida, indirectly purchased an LCD panel when he purchased an Acer computer monitor, and was injured as a result of defendants' illegal conduct.

26.     Plaintiff Robin Feins, a resident of Florida, indirectly purchased LCD panels when she purchased two Sharp Aquos televisions, and was injured as a result of defendants' illegal conduct.

27.     Plaintiff John Okita, a resident of Hawaii, indirectly purchased LCD panels when he purchased an HP laptop computer and a Cornea computer monitor, and was injured as a result of defendants' illegal conduct.

28.     Plaintiff Ben Northway, a resident of Iowa, indirectly purchased an LCD panel when he purchased a Dell 19" computer monitor, and was injured as a result of the defendants' illegal conduct.

29.     Plaintiff Rex Getz, a resident of Kansas, indirectly purchased an LCD panel when he purchased a Vivitek 32" television, and was injured as a result of defendants' illegal conduct.

30.     Plaintiff Kou Srimoungchanh, a resident of Kansas, indirectly purchased LCD panels when he purchased a Sony Vaio laptop, a Sony LCD TV, and a Toshiba 17" laptop, and was injured as a result of defendants' illegal conduct.

31.     Plaintiff Christopher Murphy, a resident of Massachusetts, indirectly purchased LCD panels when he purchased a Samsung 15" television and a Compaq EVO laptop computer, and was injured as a result of defendants' illegal conduct.

32.     Plaintiff Patricia Giles, a resident of Maine, indirectly purchased LCD panels when she purchased a Panasonic 17" television and a Sony 15" computer monitor, and was injured as a result of defendants' illegal conduct.

33.     Plaintiff Gladys Baker, a resident of Michigan, indirectly purchased an LCD panel when she purchased a Dell Inspiron 1100 laptop computer, and was injured as a result of defendants' illegal conduct.

34.     Plaintiff Judy Griffith, a resident of Michigan, indirectly purchased LCD panels

1  when she purchased two HP Pavilion laptop computers, and was injured as a result of the

2  defendants' illegal conduct.

3        35.    Plaintiff Ling-Hung Jou, a resident of Michigan, indirectly purchased an LCD panel

4  when he purchased a Maxent television, and was injured as a result of defendants' illegal conduct.

5        36.    Plaintiff Martha Mulvey, a resident of Minnesota, indirectly purchased an LCD

6  panel when she purchased a Sony computer monitor, and was injured as a result of defendants'

7  illegal conduct.

8        37.    Plaintiff Cynthia Saia, a resident of Mississippi, indirectly purchased an LCD panel

9  when she purchased a Dell computer monitor, and was injured as a result of defendants' illegal

10  conduct.

11        38.    Plaintiff Benjamin Larry Luber, a resident of Missouri, indirectly purchased LCD

12  panels when he purchased two Sony Vaio laptops, and was injured as a result of defendants'

13  illegal conduct.

14        39.    Plaintiff Donna Jeanne Flanagan, a resident of North Carolina, indirectly purchased

15  an LCD panel when she purchased an Apple computer monitor, and was injured as a result of

16  defendants' illegal conduct.

17        40.    Plaintiff Bob George, a resident of North Dakota, indirectly purchased LCD panels

18  when he purchased a Sylvania 15" television and a Hitachi 50" television, and was injured as a

19  result of defendants' illegal conduct.

20        41.    Plaintiff Thomas Clark, a resident of New Mexico, indirectly purchased an LCD

21  panel when he purchased a Dell Inspiron laptop computer, and was injured as a result of

22  defendants' illegal conduct.

23        42.    Plaintiff Marcia Weingarten, a resident of New Mexico, indirectly purchased LCD

24  panels when she purchased a Gem Silver 17" computer monitor and a Neovo 17" computer

25  monitor, and was injured as a result of defendants' illegal conduct.

26        43.    Plaintiff Allen Kelley, a resident of Nevada, indirectly purchased an LCD panel

27  when he purchased an HP 17" computer monitor, and was injured as a result of defendants' illegal

28  conduct.

44.     Plaintiff Tom DiMatteo, a resident of New York, indirectly purchased an LCD panel when he purchased an Apple 30" computer monitor, and was injured as a result of defendants' illegal conduct.

45.     Plaintiff Chris Ferencsik, a resident of New York, indirectly purchased an LCD panel when he purchased a Sharp 37" television, and was injured as a result of defendants' illegal conduct.

46.     Plaintiff Dr. Robert Mastronardi,  a resident of Rhode Island, indirectly purchased LCD panels when he purchased two Dell laptop computers and a Sylvania computer monitor, and was injured as a result of defendants' illegal conduct.

47.     Plaintiff Christopher Bessette, a resident of South Dakota, indirectly purchased an LCD panel when he purchased a Dell computer monitor, and was injured as a result of defendants' illegal conduct.

48.     Plaintiff Chad Hansen, a resident of South Dakota, indirectly purchased LCD panels when he purchased an LG 42" television, a Dell Inspiron laptop computer, and a Dell 20" computer monitor, and was injured as a result of defendants' illegal conduct.

49.     Plaintiff Scott Beall, a resident of Tennessee, indirectly purchased LCD panels when he purchased a Samsung 14"computer monitor and a Sony 60" television, and was injured as a result of defendants' illegal conduct.

50.     Plaintiff Dena Williams, a resident of Tennessee, indirectly purchased an LCD panel when she purchased a Dell 19" computer monitor, and was injured as a result of defendants' illegal conduct.

51.     Plaintiff Robert Watson, a resident of Vermont, indirectly purchased an LCD panel when he purchased a Gateway 14" laptop computer, and was injured as a result of defendants' illegal conduct.

52.     Plaintiff Joe Kovacevich, a resident of Wisconsin, indirectly purchased an LCD panel when he purchased a Dell 17" computer monitor, and was injured as a result of defendants' illegal conduct.

53.     Plaintiff Jai Paguirigan, a resident of Wisconsin, indirectly purchased an LCD panel

1   when he purchased a Planar 17" computer monitor, and was injured as a result of defendants'

2   illegal conduct.

3        54.    Plaintiff John Matrich, a resident of West Virginia, indirectly purchased an LCD

4   panel when he purchased a Dell 19" computer monitor, and was injured as a result of defendants'

5   illegal conduct.

6        55.    Plaintiffs and the members of the Indirect-Purchaser Class were injured in their

7   businesses or property as a result of defendants' illegal price-fixing agreement because they paid

8   more for LCD products than they would have absent such illegal conduct.

9                    **B.**    <u>**The Defendants**</u>

10        56.    AU Optronics Corporation, one of the largest manufacturers of LCD panels, with

11   its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan,

12   is hereby named as a defendant.  AU Optronics Corporation was formed by the 2001 merger of

13   Unipac Optoelectronics and Acer Display Technology Inc..  AU Optronics Corporation acquired

14   Quanta Display Inc. in 2006.  During the Class Period, said defendant manufactured, marketed,

15   sold and/or distributed LCD panels to customers throughout the United States.

16                 a.    Unipac Optoelectronics ("Unipac"), a former Taiwanese LCD panel

17                      manufacturer and an affiliate of United Microelectronics Corp.

18                      ("UMC"), was founded in November 1990.  Unipac later merged

19                      with Acer Display Technology Inc. to form defendant AU Optronics

20                      Corporation in September 2001;

21                 b.    Acer Display Technology Inc. ("ADT"), a former Taiwanese LCD

22                      panel manufacturer and an affiliate of the Acer Group, was founded

23                      in August 1996.  Acer later merged with Unipac to form defendant

24                      AU Optronics Corporation in September 2001.  ADT and Unipac

25                      shared equal partnership in AU Optronics Corporation.  ADT

26                      Chairman K.Y. (Kuen-Yao) Lee had continued in his role as

27                      Chairman and CEO of AU Optronics Corporation during the Class

28                      Period;

c.      Quanta Display Inc. ("QDI"), a former Taiwanese LCD panel
manufacturer and a subsidiary of Quanta Computer Inc., was
founded in July 1999.  QDI was absorbed into defendant AU
Optronics Corporation through merger in October 2006, with the
later assuming all rights and obligations of QDI.

57.     AU Optronics Corporation America, Inc., a wholly owned and controlled subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino, California, is hereby named as a defendant.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

58.     Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are referred to collectively herein as "AU Optronics."

59.     Chi Mei Corporation, another of the largest manufacturers of LCD panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan, is hereby named as a defendant.  During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

60.     Chimei Innolux Corporation, another of the largest manufacturers of LCD panels, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan, is hereby named as a defendant.  During the Class Period, said defendant manufacturered, marketed, sold and/or distributed LCD panels to customers throughout the United States.

a.      Chimei Innolux Corporation was formed on March 18, 2010 by a
three-way merger of Chi Mei Optoelectronics Corp., Innolux
Display Corp., and TPO Displays Corp., through exchanges of
shares.  The surviving company of the merger renamed itself
"Chimei Innolux Corporation."  TPO Display Corp. and Chi Mei
Optoelectronics Corp. were dissolved after the merger.

b.  Chi Mei Optoelectronics Corporation was a former LCD panel manufacturer, with its global headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.

c.  Innolux Display Corp. was a former LCD panel manufacturer, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan.

d.  Prior to the merger, Chi Mei Optoelectronics Corp. Innolux Display Corp., and TPO Displays Corp. manufacturered, marketed, sold and/or distributed LCD panels to customers throughout the United States.

61.  Chi Mei Optoelectronics USA, Inc., *f/k/a* International Display Technology USA, Inc., a wholly owned and controlled subsidiary of Chi Mei Corporation, with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

62.  CMO Japan Co., Ltd., *f/k/a* International Display Technology, Ltd., a subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

63.  Defendants Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., and CMO Japan Co., Ltd., are referred to collectively herein as "Chi Mei."

64.  Chunghwa Picture Tubes Ltd. ("Chunghwa"), a leading manufacturer of LCD products, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

65.     HannStar Display Corporation ("HannStar"), with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

66.     Hitachi, Ltd., with its headquarters at 6-6 marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

67.     Hitachi Displays, Ltd., with its principal place of business located at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3,Chiyoda-ku,Tokyo,101-0022, Japan, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

68.     Hitachi Electronic Devices (USA), Inc., a wholly owned and controlled subsidiary of defendant Hitachi Ltd., with its principal place of business located at 575 Mauldin Road, Greenville, South Carolina 29607, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

69.     Defendants Hitachi, Ltd., Hitachi Displays Ltd., and Hitachi Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi."

70.     LG Display Co., Ltd.,  f/k/a LG Phillips LCD Co., Ltd., a leading manufacturer of LCD panels and a joint venture created in 1999 by Philips Electronics NV and LG LCD, which maintains offices within this District in San Jose, California, and which has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-721, Republic of Korea, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

71.     LG Display America, Inc. f/k/a LGD LCD America, Inc., with its principal place of business located at 150 East Brokaw Rd., San Jose, CA 95112, is hereby named as a defendant. During the Class Period, said defendant manufactured, marketed, sold and/or distributed LCD

1    panels to customers throughout the United States.

2         72.    Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to

3    collectively herein as "LGD."

4         73.    Samsung Electronics Co., Ltd., with its principal place of business at Samsung

5    Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea, is hereby named as a

6    defendant.  During the Class Period, said defendant manufactured, marketed, sold and/or

7    distributed LCD panels to customers throughout the United States.

8         74.    Samsung Semiconductor, Inc., a wholly-owned and controlled subsidiary of

9    Samsung Electronics Co., Ltd., with its principal place of business at 3655 North First Street, San

10   Jose, California 95134, is hereby named as a defendant.  During the Class Period, said defendant

11   manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United

12   States.

13        75.    Samsung Electronics America, Inc., a wholly-owned and controlled subsidiary of

14   defendant Samsung Electronics Company, Ltd., with its principal place of business at 105

15   Challenger Road, Ridgefield Park, New Jersey, is hereby named as a defendant.  During the Class

16   Period, Sambsung Electronics America, Inc. sold and distributed LCD Products manufactured by

17   Samsung Electronics Co., Ltd. to consumers throughout the United States.

18        76.    Defendants Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., and

19   Samsung Electronics America, Inc. are referred to collectively herein as "Samsung."

20        77.    Sharp Corporation, with its principal place of business at 22-22 Nagaike-cho,

21   Abeno-ku, Osaka 545-8522, Japan, is hereby named as a defendant.  During the Class Period, said

22   defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout

23   the United States.

24        78.    Sharp Electronics Corporation, a wholly owned and controlled subsidiary of Sharp

25   Corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey, 07430, is

26   hereby named as a defendant.  During the Class Period, said defendant manufactured, marketed,

27   sold and/or distributed LCD panels to customers throughout the United States.

28        79.    Defendants Sharp Corporation and Sharp Electronics Corporation are referred to

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1    collectively herein as "Sharp."

2           80.     Toshiba Corporation, with its principal place of business at 1-1, Shibaura 1-chome,

3    Minato-ku, Tokyo, 105-8001, Japan, is hereby named as a defendant.  During the Class Period,

4    said defendant manufactured, marketed, sold and/or distributed LCD panels to customers

5    throughout the United States.

6           81.     Toshiba Matsushita Display Technology Co., Ltd., with its principal place of

7    business located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan,

8    is hereby named as a defendant.  During the Class Period, said defendant manufactured, marketed,

9    sold and/or distributed LCD panels to customers throughout the United States.

10          82.     Toshiba America Electronics Components, Inc., a wholly owned and controlled

11   subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur

12   Blvd., Ste. 400, Irvine, CA 92612, is hereby named as a defendant.  During the Class Period, said

13   defendant manufactured, marketed, sold and/or distributed LCD panels to customers throughout

14   the United States.

15          83.     Toshiba America Information Systems, Inc., a California corporation with its

16   principal place of business at 9470 Irvine Boulevard, Irvine, California, is hereby named as a

17   defendant.  Toshiba America Information Systems, Inc. is a wholly-owned and controlled

18   subsidiary of Toshiba America, Inc.  During the Class Period, Toshiba America Information

19   Systems, Inc. sold and distributed TFT-LCD Products manufactured by Toshiba Corporation to

20   customers throughout the United States.

21          84.     Defendants Toshiba Corporation, Toshiba Matsushita Display Technology Co.,

22   Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems,

23   Inc. are referred to collectively herein as "Toshiba."

24          85.     Epson Imaging Devices Corporation ("EIDC"), a Japanese Company with its

25   principal place of business in Tottori, Japan is hereby named as a defendant.  EIDC was originally

26   formed as Sanyo Epson Imaging Devices Corporation on October 1, 2004 as a joint venture co-

27   owned by Seiko Epson Corporation and Sanyo Electric Co., Ltd.  As of December 28, 2006, Sanyo

28   Epson Imaging Devices Corporation became a wholly-owned subsidiary of Seiko Epson

1   Corporation and changed its name to EIDC.  During the Class Period EIDC manufactured, sold

2   and/or distributed LCD panels to customers throughout the United States.

3       86.     Wherever in this complaint a family of defendant-corporate entities is referred to by

4   a common name, it shall be understood that plaintiffs are alleging that one or more officers or

5   employees of one or more of the named related defendant companies participated in the illegal acts

6   alleged herein on behalf of all of the related corporate family entities.

7               **C.    Co-Conspirators**

8       87.     Various persons and entities  participated as co-conspirators in the violations

9   alleged herein and performed acts and made statements in furtherance thereof.  These co-

10  conspirators include, but are no limited to, the companies listed in the following paragraphs.

11      88.     Co-conspirator Fujitsu  Display Technologies Corporation ("FDTC") is a Japanese

12  entity with its principal place of business at 4-1-1, Kamikodanaka, Nakahara-Ku, Japan.  FDTC

13  was established in June 2002 by a merger between Fujitsu Ltd.'s LCD business unit and Yonago

14  Fujitsu, a wholly-owned subsidiary of Fujitsu Ltd.  During the Class Period, FDTC manufactured,

15  sold and distributed LCD panels to customers throughout the United States.

16      89.     Co-conspirator Hydis Technologies Co., Ltd., f/k/a BOE Hydis Technology Co.,

17  Ltd., is a Korean entity with its principal place of business located at San 136-1, Ami-ri, Bubal-

18  eub, Icheon-si, Gyeonggi-do 467-866, South Korea.  BOE-Hydis is a Chinese entity formed when

19  BOE Group, China, took over Korean chipmaker Hynix Semiconductor's TFT-LCD business in

20  January 2003.  BOE-Hydis then established BOE OT in June of 2003, a division that began mass

21  production of a 5G TFT-LCD fab in 2005.  Both BOE Hydis and BOE OT are affiliates of the

22  BOE Group, which is also the main shareholder of TPV Technology, one of the world's largest

23  monitor manufacturers.  During the Class Period, Hydis Technologies Co., Ltd., f/k/a BOE Hydis

24  Technology Co., Ltd., BOE OT, and BOE Group manufactured, sold and distributed LCD panels

25  to customers throughout the United States.

26      90.     Co-conspirator Mitsubishi Electric Corporation, is a Japanese entity with its

27  principal place of business located at Tokyo Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-

28  8310, Japan.  Mitsubishi Electric Corporation began mass production of TFT-LCD panels in

December of 1995.  It also founded a partnership with Asahi Glass Company to form Advanced Display Inc. (ADI), which developed and manufactured mainly large-area TFT-LCD panels at the Shisui fab and began LCD production in spring of 1996.  In September 1999, Mitsubishi Electric Corporation purchased Asahi Glass Company's stake in ADI, making it a wholly-owned subsidiary.  During the Class Period,  Mitsubishi Electric Corporation manufactured, sold and distributed LCD panels to customers throughout the United States.

91.     Co-conspirator Mitsubishi Electric & Electronics USA, Inc., is a wholly owned subsidiary of Mitsubishi Electric Corporation, with its principal place of business located at 5665 Plaza Drive, Cypress, California 90630-0007.  During the Class Period, Mitsubishi Electric & Electronics USA, Inc. manufactured, sold and distributed LCD panels to customers throughout the United States.

92.     Co-conspirators Mitsubishi Electric Corporation and Mitsubishi Electric & Electronics USA, Inc. are referred to collectively herein as "Mitsubishi."

93.     Co-conspirator NEC Corporation, is a Japanese entity with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan.  During the Class Period, either directly or indirectly through wholly-owned and controlled subsidiaries or through combinations with other defendants, NEC Corporation manufactured, sold and distributed LCD panels to customers throughout the United States.

94.     Co-conspirator NEC LCD Technologies, Ltd. is a Japanese entity with its principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666, Japan.  During the Class Period, either directly or indirectly through other NEC entities, NEC LCD Technologies manufactured, sold and distributed LCD panels to customers throughout the United States.

95.     Co-conspirator NEC Electronics America, Inc. is a wholly-owned and controlled subsidiary of NEC Corporation, with its principal place of business located at 2880 Scott Boulevard, Santa Clara, CA 95050-2554 and its manufacturing plant in Roseville, California. During the Class Period, NEC Electronics America manufactured, sold and distributed LCD panels to customers throughout the United States.

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

96.     Co-conspirators NEC Corporation, NEC LCD Technologies, Ltd., and NEC Electronics America, Inc. are referred to collectively herein as "NEC."

97.     Co-conspirator Panasonic Corporation, is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.   Up until October 1, 2008, Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd.  In April 2002, Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.) and Toshiba Corporation combined their respective LCD panel operations and established the joint venture company Toshiba Matsushita Display Technology Co., Ltd.  During the Class Period, either directly or indirectly through wholly-owned and controlled subsidiaries or through combination with other defendants, Panasonic Corporation manufactured, sold and distributed LCD panels to customers throughout the United States.

98.     Co-conspirator Panasonic Corporation of North America, formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of business located at 1 Panasonic Way, Secaucus, New Jersey.  Panasonic Corporation of North America is a wholly-owned and controlled subsidiary of co-conspirator Panasonic Corporation. During the Class Period, Panasonic Corporation of North America sold and distributed LCD products manufactured by Panasonic Corporation to customers throughout the United States.

99.     Co-conspirators Panasonic Corporation and Panasonic Corporation of North America are referred to collectively herein as "Panasonic."

100.    Co-conspirator Sony Corporation ("Sony") is a Japanese entity with its principal place of business at 1-7-1 Konan, Minato-ku, Tokyo 108-0075, Japan.  During the Class Period, either directly or indirectly through wholly-owned and controlled subsidiaries or through combinations with other defendants, Sony manufactured, sold and distributed LCD panels to customers throughout the United States.

101.    Co-conspirator S-LCD Corporation ("S-LCD") is a Korean entity with its principal place of business at Tangjung, Asan-City, ChungCheongMan-Do, Korea.  S-LCD is a joint venture owned 50 percent plus one share by Samsung and 50 percent minus one share by Sony.  During

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1   the Class Period, S-LCD directly or indirectly manufactured, sold and distributed LCD panels to

2   customers throughout the United States.

3          102.    Other co-conspirators whose identities are known to plaintiffs include the following

4   companies with whom Plaintiffs have entered into tolling agreements:  LG Electronics, Inc. and

5   LG Electronics USA, Inc. ("LG Electronics"); and Royal Philips Electronics N.V. and Philips

6   Electronics North America Corp. ("Philips Electronics").

7          103.    Various other persons, firms and corporations, not named as defendants herein, and

8   presently unknown to plaintiffs, have participated as co-conspirators with defendants and have

9   performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the

10  anticompetitive, unfair or deceptive conduct.  Plaintiffs reserve the right to add some or all of them

11  as named defendants at a later date.

12         104.    The acts charged in this Complaint have been done by defendants and their co-

13  conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,

14  or representatives while actively engaged in the management of each defendant's business or

15  affairs.

16         105.    Each of the defendants named herein acted as the agent or joint venturer of or for

17  the other defendants with respect to the acts, violations and common course of conduct alleged

18  herein.  Each defendant that is a wholly-owned subsidiary of a foreign parent is the United States

19  agent for its parent company.

20                  **V.      NATURE OF TRADE AND COMMERCE**

21                  **A.      LCD Panels.**

22         106.    LCD is a type of display technology utilized in products including TVs, computer

23  monitors, laptops, mobile phones, digital cameras, and numerous other electronic products.  LCD

24  panels are the dominant form of display screen in the TV, computer monitor, and laptop industries.

25   Computer monitors now comprise approximately 50% of revenues for the large LCD products

26  market, with TVs and laptop computers accounting for approximately 27% and 21% of revenues,

27  respectively.  All other LCD products combined accounted for between 2-5% of LCD panel

28  revenues during the Class Period.

107.    LCD technology offers benefits over both traditional cathode-ray tube (CRT) technology and the other flat screen technology, commonly called "plasma."  LCD is thin and light and uses low power.  Thus, unlike CRTs, which are heavy and bulky, LCD panels can fit into a laptop and permit mobility.  Because a CRT is so bulky, CRTs have never been used in laptop computers.  For TVs and monitors, LCD panels use less space than traditional CRT technology, can be mounted on a wall because of their light weight, and offer superior viewing angles.

108.    The other flat panel technology, plasma, is not practical for use in laptops.  Because plasma has a high power requirement, it "runs hot" and cannot be operated by battery power.  In addition, because of problems called "burn-in" and the fragility of the plasma panel itself, plasma has not been used in the laptop market.  Thus, normally only LCD panels are used to make laptops.

109.    LCD technology dominates the flat panel market.  It has virtually 100% market share for laptops and flat panel computer monitors, and at least 80% market share for flat panel TVs.

**B.    Manufacturing An LCD Panel.**

110.    The technology behind LCDs is not new.  In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for lightweight, low-power display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology.  These efforts resulted in monochrome calculators and watches.  By the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s, the technology advanced further with the development of LCDs.

111.    LCD uses liquid crystal to control the passage of light.  More specifically, an LCD panel is made of two glass sheets sandwiching a layer of liquid crystal.  The front glass sheet is fitted with a color filter, while the back glass substrate has transistors fabricated on it.  When voltage is applied to a transistor, the liquid crystal is bent, allowing light to pass through to form a pixel.  The front glass sheet contains a color filter, which gives each pixel its own color.  The combination of these pixels in different colors forms the image on the panel.

112.     There are significant manufacturing and technological barriers to entry in the LCD products market.  A state-of-the-art fabrication plant (called "fabs" in the industry) can cost upwards of $2 billion, and changing technology requires constant investments in research and development.  The most expensive material used to make an LCD panel is the glass.  In industry language, glass sizes advance in what are called "generations." These generation sizes have developed at a rapid pace, continuing to expand in size.

113.     Since 2000, glass substrate size for LCD panels has approximately doubled every 1.5 years. Large-generation glass offers great economies of scale: larger sheets allow display manufacturers to produce more, and larger, panels from a single substrate more efficiently.

114.     Today's eighth generation glass substrates have about four times the surface area of fourth generation substrates, which means they yield more (and larger) LCD panels. For instance, one eighth generation substrate can produce the panels needed for fifteen 32" LCD televisions. Larger sheets of glass reduce manufacturing costs.  For example, panel costs were approximately $20/inch for fourth generation fabs, falling to $10/inch for fifth generation fabs, and then falling another 80% to the eighth generation.

115.     There have been at least eight generations of LCD fabs, each requiring significant new investment.  Because building a new fabrication line or retrofitting the old line, is very expensive, and because the glass is nearly all sourced from the same supplier, Corning Incorporated, LCD panel manufacturers use standard sizes for their products.  Thus, for the major input cost, each has the same supplier.  A fab line that works with one size glass cannot switch over to another size without substantial retrofitting.

116.     Additionally, because the fabrication plants are most efficient when they cut standard sizes for panels, different manufacturers with different generation fabs seek to make only the most efficient size panels for that fab.  For example, a fab that makes 730 mm x 920mm glass sheets can cut that sheet to make exactly six 17" LCD panels.  A fab that uses 680mm x 880mm glass can cut exactly six 15" panels from that glass.  But a 730 mm x 920mm glass sheet can only yield two 17" panels, with the rest of the glass as waste.  Thus, when defendants need other panel sizes not efficiently made by their fabs, they cross-purchase from each other.  For example,

defendant LGD supplies certain size panels to other defendants, and, in turn, buys other size panels from Chunghwa, Chi Mei, and AU Optronics.  HannStar and Chunghwa have an agreement whereby Chunghwa supplies 17" panels to HannStar and HannStar supplies 19" panels to Chunghwa.  Samsung has a joint venture with Sony to supply each other with LCD panels, but Samsung also purchases panels from AU Optronics and HannStar.  HannStar makes panels for Hitachi.  Chunghwa makes panels for AU Optronics, and Chi Mei makes panels for Sharp and Toshiba, as well as EIDC.

117.    These cross-licensing and cross-purchasing agreements provide opportunities for collusion and coordination among members, as well as a means of checking, agreeing on, and controlling prices and output, not only *a priori*, but *a posteriori* in order to detect cheating on agreements to limit output and fix prices.  Antitrust risk is also particularly acute when there are cooperative efforts to develop, design, implement, and license certain technologies, as exist in the LCD products market.

118.    There is a great deal of cross-licensing and there are many cooperative arrangements in the LCD products market, all of which create additional opportunities for collusive activity.  The various joint ventures, cross licenses, and other cooperative arrangements among the defendants have provided a means of implementing and policing the agreements to fix prices and limit output for LCD panels that defendants have entered into at numerous meetings described hereafter.  For example, defendants Samsung, and LGD recently agreed to an unprecedented level of cooperation in conducting their flat-panel display businesses. In addition, with respect to LCD products:

- Defendant Chi Mei has licensing arrangements with defendants Sharp, AU Optronics, Chunghwa, HannStar, and Hitachi.

- Defendant AU Optronics has licensing agreements with defendants Sharp and Samsung.

- Defendant Hitachi has a joint venture with, *inter alia,* Toshiba called IPS Alpha.

- Defendant Sharp makes LCD panels for defendant Toshiba.

- Defendants Samsung and Sharp have cross licenses for the sharing of LCD panel

technology and intellectual property.

119.    These combinations are between significantly large rivals and not trivial.  The effects of these combinations substantially lessen competition and/or tend to create a monopoly, and were used as part and parcel of the conspiracy alleged herein and in furtherance of it.

C.    **The Size And Structure Of The Markets For LCD Panels And LCD Products.**

120.    The market for LCD panels is huge.  Manufacturers produced approximately 48.4 million LCDs for televisions in 2006, and flat-panel sales – most of those using LCD technology – reached approximately $US 88 billion in 2006 and $US 100 billion in 2007.

121.    The market for the manufacture and sale of LCD panels is conducive to the type of collusive activity alleged herein.  Throughout the Class Period, defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States.  Specifically, the top six companies (Samsung, LGD, Chi Mei, AU Optronics, Sharp and Chunghwa) currently control in excess of 80% of the LCD panels market.  As such, the defendants' conspiracy to fix the price of LCD panels substantially affected interstate trade and commerce in the LCD products market.

122.    The LCD panels industry has experienced significant consolidation during the Class Period, as reflected by AU Optronics' acquisition of QDI, the creation in 2001 of AU Optronics itself through the merger of ADT and Unipac, FDTC's  transfer of its LCD business to Sharp in 2005, the merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Matsushita Display Co., Ltd., in 2002, and the joint venture for the production of LCD panels for televisions by Hitachi, Toshiba, and Matsushita in 2004.

123.    A number of the defendants and/or their corporate parents or subsidiaries, including Samsung, Hitachi, EIDC, Sharp, and Toshiba, have either pled guilty to, or are currently being investigated by the U.S. Department of Justice for entering into one or more price-fixing agreements in other closely-related industries similar to that alleged herein.  Such industries include dynamic random access memory ("DRAM") computer chips, static random access memory ("SRAM") computer chips, and NAND chips or flash memory ("Flash").  The DRAM,

SRAM, and Flash industries are oligopoly industries dominated by many of the same defendants as in the LCD panel industry, which has a similar oligopoly structure.  The defendants' entry into express price-fixing agreements in other computer electronics markets demonstrates that the oligopoly structure of those industries has not in itself been sufficient to achieve price uniformity and output controls, but that agreement among the market participants has been required to achieve price uniformity and output controls.  Such evidence tends to exclude the possibility that price uniformity in the LCD panel industry, which is similar to the DRAM, SRAM, and Flash industries and includes some of the same defendants is merely a result of normal market forces, rather than express agreement.

124.    Notably, LCD panels are the largest product by revenue for many of these defendants.  For example, in 2005, the LCD panel industry was nearly double the size of the DRAM market.

125.    Products using medium-size and large LCD panels, such as televisions, desktop monitors, and computers, in 2004, made up 90% of the revenues for LCD panel makers.

126.    Direct purchasers buy LCD panels in order to include them as components in TVs, computer monitors, laptops, and other electronic products.

127.    The largest direct purchasers of LCD panels are computer OEMs such as Dell, HP, Apple, and Gateway.  Significantly, a number of the defendants are also computer and/or television OEMs, such as Toshiba and Samsung (computers) and Samsung, Hitachi, and Toshiba (televisions).

128.    LCD panels have no independent utility, and have value only as components of other products, such as TVs, computer monitors, and laptops.  The demand for LCD panels thus directly derives from the demand for such products.

129.    The market for LCD panels and the market for the products into which they are placed are inextricably linked and intertwined because the LCD panel market exists to serve the LCD products markets.  The market for LCD panels and the markets for the products in which LCD panels are placed are, for all intents and purposes, inseparable in that one would not exist without the other.

130.    Plaintiffs and the indirect purchaser class members have participated in the market for LCD panels through their purchases of products containing such panels.  The defendants' unlawful conspiracy has inflated the prices at which plaintiffs and other indirect purchasers have bought products made with LCD panels, and plaintiffs and the members of the indirect-purchaser classes alleged herein have been injured thereby and paid supracompetitive prices for LCD panels contained in such products.

131.    Plaintiffs and the indirect-purchaser class members participate in the market for products containing LCD panels.  To the extent plaintiffs and indirect purchasers bought LCD panels as part of an LCD product, defendants' unlawful conspiracy inflated the prices at which OEMs resold LCD panels in these products.

132.    Consumers, including plaintiffs, are injured by paying supracompetitive prices for products containing LCD panels.

## VI.    VIOLATIONS ALLEGED

133.    Beginning at a date as yet unknown to the Plaintiffs, but at least as early as January 1, 1999 and continuing thereafter up to and including December 31, 2006 at a minimum, defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which LCD panels have been sold directly and indirectly in the United States.

134.    Defendants, through their officers, directors and employees, effectuated a contract, combination, trust, or conspiracy between themselves and their co-conspirators by, among other things:

    a.    Participating in meetings and conversations to discuss the prices and supply of LCD panels in the United States;

    b.    Agreeing to fix the prices and limit the supply of LCD panels sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

    c.    Issuing price announcements and quotations in accordance with the agreements reached;

d.     Selling LCD panels to various customers in the United States at fixed, non-competitive prices; and

e.     Invoicing customers in the United States at the agreed-upon fixed prices for LCD panels and transmitting such invoices via U.S. mail and other interstate means of delivery.

**A.     Defendants' Agreements To Set Prices And Limit Production**

135.    The LCD panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, Korea, Taiwan, and the United States.  In the early years, beginning in at least 1999, representatives of the Japanese defendants Hitachi, Sharp and Toshiba met and agreed to fix prices for LCD panels generally, as well as to specific OEMs; they also  agreed to limit the amount of LCD panels each would produce.

136.    In the early years, when the conspiracy was principally limited to the Japanese defendants, bilateral discussions were the preferred method of communication.  As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

137.    As LCD production in Korea began to increase and become more sophisticated, the Japanese defendants expanded their meetings to include their Korean competitors, including defendants LGD and Samsung, both of which also agreed to fix prices and control supply.  At or about this same time, the Japanese defendants began to partner with those defendants located in Taiwan to trade technology and collaborate on supply.  Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  In 2001, the Korean defendants convinced Taiwanese LCD panel manufacturers, including defendants AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and control supply.  Defendants' conspiracy included agreements on the prices at which certain defendants would sell LCD panels and products to their own corporate subsidiaries and affiliates that manufactured LCD-panel containing products, thereby ensuring that LCD panel prices remained the same as between defendants and their OEM customers, preventing any price competition on LCD products to consumers.

**1.     "Crystal Meetings"**

138.    In early 2001, high-level employees of at least two large manufacturers of LCD panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information and to fix the price of LCD panels and limit their production.  From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LGD, and Sharp, met periodically in Taiwan to discuss and reach agreements on LCD panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD panel prices and limiting their production.  The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants during this period. The Crystal price-fixing and output-limitation meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States on a regular basis throughout this period.

139.    The Crystal Meetings were highly organized and followed a set pattern.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

140.    "CEO" meetings occurred quarterly from approximately 2001 to 2006.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD panels for the group to review.  Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD panels in the coming months or quarter.

141.    The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently then "CEO" meetings and occurred approximately monthly.

142.    During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD panels, and, thereafter, reached agreement concerning the specific

1   prices to be charged in the coming weeks and months for LCD panels.  Defendants set these prices

2   in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price

3   range or differential between different sizes and types of LCD panels.

4          143.    During these CEO/Commercial meetings, defendants also exchanged information

5   about supply, demand, and their production of LCD panels, and, thereafter, often reached

6   agreement concerning the amounts each would produce.  Defendants limited the production of

7   LCD panels in various ways, including, but not limited to, line slowdowns, delaying capacity

8   expansion, shifting their production to different-sized panels, and setting target production levels.

9          144.    During these CEO/Commercial meetings, defendants also agreed to conceal the fact

10  and substance of the meetings, and, in fact, took various steps to do so.  Top executives and other

11  officials attending these meetings were instructed on more than one occasion to not disclose the

12  fact of these meetings to outsiders, or even to other employees of the defendants not involved in

13  LCD panel pricing or production.  On at least one occasion of which plaintiffs are aware, top

14  executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they

15  would not be seen in the company of each other coming or going to such meeting.

16         145.    The structure of the so-called "working level" meetings was less formal than the

17  CEO or Commercial meetings, and often occurred at restaurants over a meal.  The purpose of the

18  "working level" meetings was to exchange information on price, supply and demand, and

19  production information which then would be transmitted up the corporate reporting chain to those

20  individuals with pricing authority which facilitated implantation of the conspiracy and effectuated

21  the agreements made at the CEO and at the Commercial meetings.

22         146.    In approximately the summer of 2006, when they began to have concerns about

23  antitrust issues, defendants discontinued the working-level meetings in favor of one-on-one

24  meetings to exchange pricing and supply information.  The meetings were coordinated so that on

25  the same date, each competitor met one-on-one with the other in a "round robin" set of meetings

26  until all competitors had met with each other.  These "round robin" meetings took place until at

27  least November or December of 2006.  The information obtained at these meetings was

28  transmitted up the corporate reporting chain to permit the defendants to maintain their price-fixing

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

and production-limitation agreement.

### 2. Bilateral Discussions

147.    During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings.  Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings.  For example, HannStar contacted Hitachi, to relay the agreed-upon prices and production limitations.  Subsequently, the Japanese defendants implemented the agreed-upon pricing and production limitations that had been conveyed to Hitachi by Hannstar.  This is one of the ways in which the Japanese defendants participated in the conspiracy to fix the prices and limit the production of LCD panels.

148.    Crystal Meetings were also supplemented by additional bilateral discussions between various defendants in which they exchanged information about pricing, shipments, and production.  As is more fully alleged below, defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by defendants during the Crystal Meetings.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered the defendants' OEM customers.

### 3. Defendants' Participation In Group And Bilateral Discussions

149.    Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LGD, and Samsung attended multiple CEO, Commercial, and working-level meetings, as well as bilateral discussions during the Class Period.  Additionally, QDI and Unipac, which merged with AU Optronics, participated in working-level meetings.  At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD panels.

150.    Defendant Sharp participated in multiple working-level meetings, as well as bilateral discussions with other defendants, during the Class Period.  Through these discussions, Sharp agreed with the other defendants and co-conspirators named in this complaint on prices,

1    price increases, and production limits and quotas for LCD panels.

2        151.    Defendant Hitachi participated in multiple bilateral discussions with defendants,

3    including HannStar, during the Class Period.  Through these discussions, Hitachi agreed on prices,

4    price increases, and production limits and quotas for LCD panels.

5        152.    Defendant Toshiba participated in multiple bilateral discussions with other

6    defendants, including Sharp, during the Class Period.  Through these discussions, Toshiba agreed

7    on prices, price increases, and production limits and quotas for LCD panels.  As pleaded below,

8    defendant Sharp admitted to participating in bilateral meetings, conversations, and

9    communications in Japan and the United States with unnamed co-conspirators during which they

10   fixed the prices of LCD panels sold to Dell for use in computers; panels sold to Apple for use in

11   iPods; and panels sold to Motorola for use in Razr phones during the Class Period.  During this

12   time, Toshiba was one of Sharp's principal competitors in the sale of LCD panels to Dell for use in

13   computers, as well as for panels sold to Apple for use in the iPod.  In fact, in the small-to-medium

14   size LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide

15   market share in the first half of 2005, with a 14.5 percent market share during the first quarter and

16   a 14.1 percent market share during the second quarter.  Sharp could not have successfully fixed the

17   prices of LCD panels sold to Dell or Apple unless Toshiba agreed to fix prices of similar LCD

18   panels at supra-competitive levels to those two OEMs.

19       153.    Toshiba also participated in the conspiracy by entering into joint ventures and other

20   arrangements to manufacture or source flat panels with one or more of the defendants that attended

21   the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to

22   limit the supply of LCD panels and fix prices of such panels at unreasonably high levels and to

23   aid, abet, notify and facilitate the effectuation of the price-fixing and production-limitation

24   agreements reached at the meetings.  During the Class Period, Toshiba sought and formed strategic

25   partnerships with other LCD manufacturers which allowed it to easily communicate and

26   coordinate prices and production levels with other manufacturers as part of the overall conspiracy

27   alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint

28   venture.  In 2001, Toshiba, Sharp, Matsushita, and Hitachi formed a joint venture to share basic

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

LCD research costs.  In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations.  In April of 2002, Toshiba and Matsushita formed a joint venture, Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations.  In 2004, Toshiba, Matsushita, and Hitachi formed a joint venture, IPS Alpha Technology, Ltd., which manufactures and sells LCD panels for televisions.  In 2006, Toshiba purchased a 20% stake in LGD' LCD panel manufacturing facility in Poland.  And in 2007, Toshiba and Sharp formed a joint venture in which Toshiba agreed to provide 50% of Sharp's chip needs and Sharp agreed to provide 40% of Toshiba's panel needs.  The operation and management of these many different joint ventures enabled Toshiba and the other defendant-joint venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD panels that each defendant manufactured and sold.

154.    Each of the defendants and co-conspirators named herein acted as the agent or joint venturer of or for the other defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein. Each defendant and/or co-conspiratror which is a subsidiary of a foreign parent acts as the sole United States agent for LCD panels made by its parent company.

155.    Defendants and co-conspirators named herein are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

156.    The three predecessor companies of AU Optronics, Unipac, QDI, and ADT participated as co-conspirators in the conspiracy.  AU Optronics, by assuming all rights and obligations of these co-conspirators, is jointly liable for their anticompetitive conduct.

    a.    Before ADT's merger with Unipac to form AU Optronics Corporation, it had a bilateral discussion with LGD in at least March 2001, in which they exchanged market, supply and demand information.

    b.    Before the merger, Unipac attended several working level meetings with defendants Chunghwa, Chi Mei, Samsung, Sharp, and

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Mitusbishi and exchanged market, shipment, and pricing information with these competitors.

    c.    Before it was merged into AU Optronics, QDI had anticompetitive contacts with defendants AU Optronics, Chunghwa, Chi Mei, HannStar, Samsung, Sharp, LGD, Toshiba and Hitachi dated at least as far back as 2001.

157.    The three predecessor companies of Chimei Innolux, Chi Mei Optoelectronics, Innolux, and TPO participated as co-conspirators in the conspiracy.  Prior to the merger, Innolux and TPO had multiple bilateral discussions with AU Optronics, Chi Mei Optoelectronics, Chunghwa, LGD, and Toshiba Matsushita Display between at least 2003 and 2006.  Chimei Innolux, by assuming all rights and obligations of these co-conspirators, is jointly liable for their anticompetitive conduct.

158.    Co-conspirator FDTC participated in meetings or discussions during the Class Period with various defendants including AU Optronics, Chi Mei, LGD, and Sharp, which included discussions about prices for LCD panels.  For example, a January 22, 2003 email from Mac (Makoto) Kaneta of Chi Mei to Amigo Huang and Tim Wang of Chi Mei indicates that conversation between Chi Mei and FDTC occurred regarding 2003 Q1 pricing.  Meeting notes of the October 5, 2001 working level meeting involving AU Optronics, Chunghwa, Chi Mei, HannStar, Samsung and LGD also mention cooperation from Japanese companies FDTC, Toshiba, Mitsubishi, and EIDC on LCD panel prices.

159.    Co-conspirator Hydis participated in multiple working level meetings with AUO, Chunghwa, Chi Mei, HannStar, Samsung, and Sharp and at least one biatleral meeting between at least 2002 and 2005.  Through these discussions, Hydis agreed on prices, price increases, and production limits and quotas for LCD panels.

160.    Co-conspirator Mitsubishi participated in multiple working level meetings in 2001 with Chi Mei, Chunghwa, Samsung, HannStar, and Unipac.  For example, an April 28, 2001 internal email of AU Optronics reflects that a "consensus" among LGD, Samsung, Chunghwa, Mitsubishi and HannStar had been reached regarding pricing for 15" panels. Through these

1   discussions, Mitsubishi agreed on prices, price increases, and production limits and quotas for

2   LCD panels.  Mitsubishi also colluded with LG, Samsung, Chunghwa, and Hannstar in at least

3   2001 to reach consensus on pricing for LCD panels.

4          161.    During the period 1998 through 2000, NEC manufactured, sold, and distributed

5   LCD panels to computer manufacturers in the U.S., including Hewlett-Packard, for sale to the U.S.

6   consumers.  NEC participated in multiple group meetings and bilateral discussions with Samsung,

7   Toshiba, Hitachi, Sharp, and LGD beginning in as early as 1998.  Through these discussions, NEC

8   agreed on prices, price increases, and production limits and quotas for LCD panels.  A few

9   examples are given below.

            a.    One of the earliest multi-lateral meetings which NEC attended

10                occurred on March 26, 1998, at the Oriental Golf Country Club near

11                Taipei, Taiwan.  Branch managers from NEC, Samsung, Toshiba,

12                Hitachi, Sharp, Mitsubishi, LGD and IBM attended this meeting.

13                Attendees discussed the size of the market and future pricing trends.

14          b.    The March 26 meeting was followed up by a second meeting in

15                April or May 1998 at the Holiday Inn Hotel in downtown Taipei.

16                Same attendees from the previous meeting were present.  The

17                participants discussed sales volumes.

18          c.    NEC's Mr. Nakamura met with Samsung's H.B. Suh during the

19                class period and reached consensus on what they would charge to

20                their Japanese customers.

22          162.    Panasonic participated in group meetings and bilateral discussions with other

23   competitors in the market involving cathode ray tubes ("CRT"), an older display technology

24   predating TFT-LCD.  The CRT conspiracy is being investigated by U.S. Department of Justice,

25   and by several other international competition authorities. The key players in the CRT conspiracy

26   were also active participants in the LCD conspiracy, including LGD, Samsung, Toshiba, Hitachi,

27   and Chunghwa.  Panasonic participated in the LCD conspiracy through its joint venture with

28   Toshiba, Toshiba Matsushita Display Technology Co., Ltd.  Panasonic also had bilateral contacts

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1   with at least AU Optronics and LGD during the class period, during which topics such as US LCD

2   TV market outlook, sales and price trends of LCD TV were discussed.

3        163.    Sony participated in the LCD conspiracy through its joint venture with Samsung.

4   S-LCD Corporation acted as an agent of defendant Samsung with respect to the acts, violations

5   and common course of conduct alleged herein.

6             **B.**       **Market Conditions Demonstrating The Conspiracy**

7        164.    Since at least 1996, the LCD panel market has not behaved as would be expected of

8   a competitive market free of collusion.  Rather, the behavior in this market strongly evidences that

9   the defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of

10   stabilizing and raising prices for LCD panels at supra-competitive levels.

11        165.    After initially being introduced into a market, consumer electronics products and

12   their component parts typically are characterized by steady downward pricing trends.  However,

13   since at least 1996, the LCD panel market has been characterized by unnatural price stability and

14   certain periods of substantial upward pricing trends.

15        166.    Moreover, since at least 1996, the LCD panel market has not followed the basic

16   laws of supply and demand in a competitive market.  In a competitive market, price increases

17   normally occur during shortage periods.  Since at least 1996, however, there have been significant

18   price increases in the LCD panel market during periods of both oversupply and shortage.

19        167.    It is generally acknowledged that demand for consumer electronic products and

20   their component parts increases steadily over time.  As would be expected, demand for LCD

21   panels and products made with them were steadily and substantially increasing throughout the

22   Class Period.  For instance, a June 2006 forecast indicated that 2006 shipments of LCD panels

23   used in televisions would reach 46.7 million units, a 74 % increase from 2005.  By 2009, sales of

24   LCD televisions are expected to surpass sales of CRT televisions for the first time; and by 2010,

25   LCD televisions will account for a majority of all televisions sold worldwide.

26        168.    Rather than competing for this increased demand, however, since at least 1996,

27   defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels

28   and to restrict the supply of LCD panels through, among other things, decreasing their capacity

1    utilization and refraining from expanding existing capacity.  Those defendants which were not

2    already manufacturing LCD panels in 1996 joined this conspiracy when they began manufacturing

3    LCD panels.

4           169.    In 1996, the LCD panel market was experiencing excess supply and drastic price

5    cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping

6    due to lower manufacturing costs.  However, LCD panel prices began rising in 1996, allegedly due

7    to insufficient production capacity.  In fact, defendants were fixing the prices.

8           170.    The reverse in the downward spiral of LCD panel prices began in early 1996.

9    Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD

10   panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-

11   display purchasers are riding a roller coaster of pricing in the display market, with no clear

12   predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market

13   can take solace that even vendors are constantly being surprised by the sudden twists and turns."

14          171.    Soon thereafter, industry analysts began commenting on the unusual rise in TFT-

15   LCD panel prices, noting that this rise in prices was "quite rare in the electronics industry."

16          172.    The year 1996 also brought the advent of third generation fabrication plants.  Since

17   1996, as defendants entered the LCD panel market, they have updated their production facilities

18   for LCD panels in order to keep pace with developing technology, which has resulted ultimately in

19   at least eight generations of LCD panels.  LGD was scheduled to have its third generation fab

20   online by 1997, and Hyundai was scheduled to do so by early 1998.  Each new LCD panel

21   generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens

22   used in televisions, computer monitors, and laptops.  Ever-increasing production capacity

23   threatened to outstrip demand for LCD panels, with the result that prices of LCD panels should

24   have decreased rapidly.  Instead, defendants falsely claimed to be operating at full capacity and

25   unable to meet demand, despite the millions of units of over-capacity that had supposedly existed

26   months earlier, and prices surged upwards.  These price increases were also inconsistent with the

27   fact that production had become more efficient and cost effective.

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

173.    The artificially high costs of LCD panels during the Class Period are demonstrated by, *inter alia*, the fact that costs were decreasing.  One of the most significant costs in producing an LCD panel is the cost of its component parts.  Some of the major component parts for an LCD panel include the backlight, color filter, PCB polarizer, and glass.  Indeed, for large area LCD panels, the costs of these components comprise over two-thirds of the total cost of production.  During the Class Period, the costs of these components collectively and individually have been generally declining, and in some periods at a substantial rate.  Thus, the gap between LCD panel manufacturers' prices and their costs was unusually high during the Class Period.

174.    During the end of 2001 and 2002, LCD panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004, LCD panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD panels.

175.    LCD panel prices increased by more than 5% for the first time in 2001 in October of that year.  These price increases continued until June of 2002, resulting in an approximately 35% increase in the average selling price of 15-inch LCD panels.  Defendants were essentially able to raise the prices of LCD panels by at least US$60 from October of 2001 through May 2002.

176.    At the time, defendants blamed these costs increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly explained that the increases in LCD prices were due to increased demand and a "supply shortage."

177.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  While the price of 15-inch LCD panels, for instance, shot up from US$190-200 in the third quarter of 2001 to US$250 in the first quarter of this year, current production costs remained at approximately US$200.  These decreasing costs should have led to lower prices and competition among

1  defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain

2  LCD panels at artificially high levels, it resulted in extremely high profits.  For example,

3  defendants AU Optronics Corp., Chi Mei Optoelectronics Corp., Chunghwa, and HannStar posted

4  higher pretax profits than expected in the first quarter of 2002. AU Optronics reported revenue of

5  NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion. Chi Mei

6  Optoelectronics Corp. reported pretax earnings of NT$800 million on revenue of about NT$8.8

7  billion at the same period.

8      178.    This increase in prices and revenue was unprecedented.  During the first six months

9  of 2002, revenue for Taiwan's five major LCD panel manufacturers (defendants AU Optronics,

10  Chi Mei, Chunghwa, HannStar, and QDI rose 184% from the same period in 2001.

11              **C.    Public Statements Reflecting The Conspiracy**

12      179.    Additionally, defendants made repeated public statements admitting to or

13  referencing their agreement to fix LCD panel prices through supply manipulation.

14      180.    On or about January 20, 2003, Hsu Wen-lung, defendant Chi Mei's Chairman,

15  stated that "both Taiwanese and South Korean TFT-LCD panel makers should avoid the fierce

16  price competition and build a money-making environment.  To this end, both sides are

17  recommended to exchange market information periodically."

18      181.    Again, on January 29, 2003, K.Y. Lee, the Chairman of defendants AU Optronics

19  publicly stated that "the local TFT-LCD industry should move to set up a reasonable and healthy

20  pricing strategy thus avoiding the price fluctuations."

21      182.    Soon after these public statements were made, LCD panel prices increased for five

22  consecutive quarters in 2003 and 2004, the direct result of the CEO, Commercial and working-

23  group meetings identified above and which took place on a regular basis over this period of time.

24  LCD panels used in laptops and computer monitors increased by as much as 28% during this time

25  period as reported by defendant AU Optronics.  Similarly, defendant LGD reported similar price

26  increases over the same period.

27      183.    This price-fixing scheme resulted in substantial increases in the profits reaped by

28  the defendant LCD panel manufacturers.  For example, the eight largest LCD panel manufacturers

reported a collective profit increase of 740% between the second quarter of 2003 and the second quarter of 2004.  These record profits resulted from defendants' agreement to fix, raise, maintain or stabilize the price of LCD panels.

184.    Although the price increases were the direct result of defendants' agreement to fix, raise, and maintain the price of LCD panels, they repeatedly made public statements blaming these price increases on other factors.  For example, at an August 2003 flat panel industry conference sponsored by DisplaySearch, Dr. Hui Hsiung, executive vice president of defendant AU Optronics, explained the recent increases in the price of LCD panels was due to increased demand and supply shortage.  In March of 2004, Liu Chih-chun, Chungwa's vice president blamed the high prices on an inadequate supply of key parts from upstream suppliers.

185.    In fact, while LCD panel prices were increasing in late 2003 and the first half of 2004, defendants AU Optronics, Chi Mei, and HannStar were decreasing capacity utilization.  AU Optronics delayed construction of a new generation plant to help prices increase.  Similarly, while LCD panel prices were increasing in 2003 and 2004, LCD panel manufacturers' capacity growth rate was decelerating.  Defendants' artificial supply restriction had the purposeful effect of fixing, raising, maintaining, or stabilizing LCD panel prices at artificially high levels.

186.    Reducing production capacity is not something an LCD panel manufacturer would do unless its competitors were doing so as well.  As AU Optronics executive Hsu Hsiung himself would later note when discussing defendants' cuts in production capacity in public statements made at a May 2006 annual international conference on Taiwan's flat panel display industry, reducing production capacity pushes an LCD panel manufacturer's fixed production costs up, and is not effective in fixing or maintaining the price of LCD panels unless the other defendants do so as well.  Yet, as Mr. Hsiung himself noted in those public statements, an increase of 2 to 3 percent of AU Optronics' fixed production costs was preferable to a drop of 15 to 20 percent in LCD panel price.

187.    Defendants' public statements admitting to their agreement to fix, maintain, and stabilize LCD panel prices continued.  In late 2004, panel makers in Taiwan were reported to "agree the ultimate solution" to keep supply and demand in their favor was to "involve closer

cooperation." For example, Chi Mei's Chairman, C.H. Lin, noted that mergers were not likely because of the large size of the companies in the industry, but he encouraged "a new era of mutual cooperation." He noted that the Japanese companies Toshiba and Panasonic had done so, as had Samsung and Sony.

188. These public statements referenced an agreement among defendants to fix prices, and resulted in, among other things, a temporary halt in the expansion of production capacity among defendants. Because of this illegal agreement to fix, raise, and maintain LCD panel prices, defendants were able to maintain LCD panel prices at artificially high levels in 2005.

189. On a November 25, 2005 conference call with investors, Dr. Hui Hsiung, executive vice president of defendant AU Optronics, admitted to conspiring with other LCD panel manufacturers to artificially increase the LCD panel prices. Discussing the "undersupply/ oversupply" of LCD panels, he noted "there's various actions we can take such as slightly reduce the capacity loading or shift the product mix," but predicted that, with respect to supply levels, "we will see some parity among different panel suppliers in 2006." In response to a question about what AU Optronics would do if demand turned out to be weaker than expected, Dr. Hsiung stated:

> Our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in the past few years by keeping the inventory lower. *And I think in the past we did have some problem convincing our competitors doing the same thing. But in recent months, especially this year, actually, it did start to happen.* I think that the industry understand [sic] the benefit of keeping capacity low. Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading. . . . . So, we think the industry become [sic] more mature. That is precisely what our competitors would do.

190. Similarly, a November 3, 2005, Samsung presentation, available on its website, stated that "it was possible to secure a reasonable amount of profit while following industry leaders" during the Class Period. This too constituted a public signal and invitation to the other defendants to fix prices by restricting output.

191. Thereafter, in the spring of 2006, at a conference of manufacturers of LCD panels in Taiwan, Mr. Hsiung publicly stated that the defendants should collectively look at cutting back on production from 100 percent to at least 85 percent. Otherwise, Mr. Hsiung said, if supply

1    outpaced demand, manufacturers would be forced to cut prices.  This was an express invitation to

2    reduce output in order to raise, fix, stabilize, and peg the prices of LCD panels and LCD products.

3    192.    In June of 2006, Mr. Hsiung told the *Wall Street Journal* that AU Optronics had cut

4    production of LCD panels because of bloated inventories, a move that could bring more stability to

5    LCD panel prices by the third quarter if other companies followed suit.  Mr. Hsiung also told the

6    *Wall Street Journal*, "You have to have discipline every month to adjust inventory.  If others

7    follow, that will help prices stabilize by the third quarter."  Mr. Hsiung further said that buildup of

8    LCD panel inventories led to a bigger than expected decline in prices recently.  He urged other

9    LCD panel makers to stop building up inventory during periods of oversupply.  "Supply and

10   demand balance can be maintained during a period of overcapacity if 'fab' loading is reduced by

11   only 5 percent to 10 percent," he said, adding that a slight reduction would increase unit fixed

12   costs by only 2 percent to 3 percent.  Mr. Hsiung stated that AU Optronics was making efforts to

13   cut manufacturing costs to prevent margin erosion.  He added that further mergers and acquisitions

14   were needed in the LCD panels industry to help stabilize prices.  The foregoing statements were

15   reported by the *Wall Street Journal* on June 15, 2006, in an article entitled "AU Optronics Cuts

16   LCD Output in Bid to Stabilize Falling Prices."  When Mr. Hsiung made these statements to the

17   *Wall Street Journal*, he knew and intended that they would be publicly reported and would become

18   known to all of the defendants; and, in making these statement, he intended to send a signal and an

19   invitation to the other defendants to cut production in order to raise, fix, stabilize, and peg prices

20   of LCD panels and LCD products.

21   193.    Mr. Hsiung made his comments to the *Wall Street Journal* after defendant LGD

22   LCD publicly announced that it was lowering its outlook for the second quarter because of high

23   inventories of LCD panels.  The President of defendant LGD LCD, Ron Wirahadiraksa, publicly

24   stated on June 12, 2006, that the company would review its capacity plans for 2006.  These

25   statements were also signals and an invitation to the other defendants to curtail production of LCD

26   panels and LCD products and thereby raise, fix, stabilize, and peg prices for LCD panels and LCD

27   products.

28   194.    Thereafter, defendants announced plans to cut back production.  In the second half

1   of 2006, LGD announced plans to cut its capacity expansion by two thirds; AU Optronics

2   announced plans to cut capital expanse by 30% to 40%; Chi Mei announced plans to delay the

3   mass-production date of its newest production plant; and HannStar adopted a "build to order"

4   mode.  These public statements and actions allowed defendants to continue to fix, maintain, and

5   stabilize the price of LCD panels at artificially high levels.

6          195.    Defendants had ample opportunities for collusion when they met and discussed

7   pricing at various industry trade shows where all major participants in the LCD products industry

8   were present.  For example, on June 20 and June 21, 2001, a Market Seminar meeting was held at

9   National Chiao Tung University, Hsinchu, Taiwan.  The meeting was co-sponsored by

10  DisplaySearch and the industry trade group, Semiconductor Equipment and Materials Institute

11  ("SEMI").  The agenda stated that "this year's seminar will be expanded to two days and cover all

12  major FPD [flat panel display] applications including notebook PCs, desktop monitors, LCD TVs,

13  mobile phones, PDAs and internet appliances.  Also covered will be the TFT LCD supply and

14  demand, pricing, component shortages and the TFT LCD equipment and materials markets.  In

15  addition to DisplaySearch analysts, leading executives from FPD producers, OEMs, brands and

16  equipment and materials suppliers are expected to be present."

17         196.    Most, if not all, of the defendants were represented at this seminar at which

18  discussions regarding LCD panel supply and pricing were held.

19         197.    The express invitations to collude referred to hereinabove were in fact accepted,

20  agreed to, and acted upon by the defendants, who, during the Class Period, repeatedly and

21  continuously jointly and collusively limited output of LCD panels in order to raise, fix, and

22  stabilize prices of LCD panels and LCD products, each defendant knowing and understanding that

23  the other defendants had agreed to do likewise and were doing likewise.

24                 **VII.   THE GOVERNMENT INVESTIGATIONS OF PRICE-FIXING**

25         198.    In December 2006, authorities in Japan, Korea, the European Union, and the United

26  States revealed the existence of a comprehensive investigation into anti-competitive activity

27  among LCD panel manufacturers.  In a December 11, 2006, filing with the Securities and

28  Exchange Commission, defendant LGD disclosed that officials from the Korea Fair Trade

1    Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo

2    offices and that the United States Department of Justice had issued a subpoena to its San Jose

3    office.

4         199.    On December 12, 2006, news reports indicated that in addition to LGD, defendants

5    Samsung, Sharp, EIDC and AU Optronics were also under investigation.

6         200.    The U.S. Department of Justice ("DOJ") acknowledged that it was "investigating

7    the possibility of anticompetitive practices and is cooperating with foreign authorities."

8         201.    At least one of the defendants has approached the Antitrust Division of the DOJ to

9    enter into a leniency agreement with respect to the defendants' conspiracy to fix prices of LCD

10   panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the

11   Department of Justice, this defendant has reported the defendants' price-fixing conspiracy to the

12   Department of Justice and has confessed its own participation in the defendants' price-fixing

13   conspiracy.

14        202.    As a result of the DOJ's investigation, seven defendant companies have pleaded

15   guilty and have been sentenced to pay criminal fines totaling more than $890 million.  One

16   defendant company has been indicted for participation in the price-fixing conspiracy.

17   Additionally, 22 executives have been charged to date in the DOJ's ongoing investigation.

18        203.    On or about November 12, 2008, defendants LGD, Sharp, and Chunghwa agreed to

19   plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix

20   prices in the sale of LCD panels.

21        204.    LGD pleaded guilty and paid $400 million, the second-highest criminal fine ever

22   imposed by the DOJ's Antitrust Division.  LGD admitted to participating in a conspiracy from

23   September 2001 to June 2006 to fix the price of LCD panels sold worldwide, and to participating

24   in meetings, conversations, and communications in Taiwan, Korea, and the United States to

25   discuss the prices of LCD panels, agreeing to fix the prices of LCD panels, and exchanging pricing

26   and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon

27   prices.

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

205.     Chunghwa pleaded guilty and paid a $65 million criminal fine.  Chungwa admitted to participating in a conspiracy from September 2001 to December 2006 to fix the price of LCD panels sold worldwide and to participating in meetings, conversations and communications in Taiwan to discus the prices of LCD panels, agreeing to fix the prices of LCD panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.

206.     Sharp pleaded guilty and paid a $120 million criminal fine.  Sharp admitted to participating in a conspiracy with unnamed conspirators to fix the price of LCD panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from fall 2005 to December 2006, and to participating in bilateral meetings, conversations, and communications in Japan and the United States with unnamed co-conspirators to discuss the prices of LCD panels, agreeing to fix the prices of LCD panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

207.     On or about March 10, 2009, Hitachi agreed to plead guilty and pay a $31 million criminal fine.  Hitachi admitted to engaging in telephone discussions and bilateral meetings with representatives of other major TFT-LCD producers to fix the prices of TFT-LCD panels sold to Dell Inc., during a period from at least April 2001 to March 2004.

208.     On August 25, 2009, EIDC agreed to plead guilty and pay a $26 million criminal fine.  EIDC admitted to participating in bilateral discussions and meetings in Japan with representatitves of other major TFT-LCD producers to fix the prices TFT-LCD panels sold in the United States for use in Motorala Razr mobile phones.

209.     On or about December 9, 2009, Chi Mei agreed to plead guilty and pay a $220 million in criminal fine.  Chi Mei admitted to participating in meetings, conversations and communications with other major TFT-LCD producers to fix prices of TFT-LCD panels and exchanging information on sales of TFT-LCD panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

210.    On June 10, 2010, a federal grand jury returned an indictment against AU Optronics Corp. and its Houston-based subsidiary, AU Optronics Corporation America for engaging in a combination and conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCD panels in the United States and elsewhere.

211.    On June 29, 2010, HannStar agreed to plead guilty and pay a $30 million criminal fine for its role in the global conspiracy to fix the prices of TFT-LCD panels.

## VIII.   THE PASS-THROUGH OF THE OVERCHARGES TO CONSUMERS

212.    Defendants' conspiracy to raise, fix, or maintain the price of LCD panels at artificial levels resulted in harm to Plaintiffs and the indirect-purchaser consumer class alleged herein because it resulted in their paying higher prices for products containing LCD panels than they would have in the absence of defendants' conspiracy.  The entire overcharge for LCD panels at issue was passed on to plaintiffs and members of the indirect-purchaser class.  As the DOJ acknowledged in announcing the agreements to plead guilty by defendants LGD, Sharp, and Chunghwa, "These price-fixing conspiracies affected millions of American consumers who use computers, cell phones, and numerous other household electronics every day."

213.    The defendants identified above as having attended CEO, Commercial, and/or working-group meetings made sure that so-called "street-prices" (*i.e.*, consumer retail prices) of LCD products were monitored on a regular basis.  The purpose and effect of investigating such retail market data was at least two-fold.  First, it permitted defendants, such as Chungwa, which did not manufacture LCD products, the way defendant Samsung did, to police the price-fixing agreement to be sure that intra-defendant LCD panel sales were kept at supra-competitive levels.  Secondly, it permitted all defendants to police their price-fixing argument to independent OEMs who would reduce prices for furnished goods if there was a corresponding reduction in LCD panel prices from a defendant.  As a result of street-pricing monitoring, defendants assured that 100% of the supra-competitive over-charges for LCD panels were passed on to indirect-purchaser consumers.

1   **A.      LCD Panels Make Up A High Percentage Of The Cost Of Products**
2   **Containing Such Panels.**

3   214.    When an LCD panel leaves a defendant's manufacturing plant, it requires minimal

4   additional labor or materials to make it into a TV or a computer monitor, or to install it into a

5   laptop computer.  The LCD panel itself typically accounts for 60-70% of the total retail price of a

6   TV (even more for panels exceeding 40"), while comprising between 70-80% of the retail price of

7   computer monitors.  LCD panels typically comprise roughly 10% of the retail cost of a laptop

8   computer.

9   215.    The only differences between a computer monitor and a TV are the other materials

10  added to make the finished products.  For example, an LCD TV will have internal speakers and a

11  TV tuner.  There is no technological difference between a computer monitor's LCD panel and the

12  LCD panel in a laptop.

13  216.    To turn an LCD panel into an LCD monitor, an assembler fits the panel with a

14  backlight, plastic framing around the screen, and a power source.  It is then branded by the OEM

15  as its monitor, and sold to the end user—either directly from the OEM's store (like Gateway or

16  Apple), on its website (like Dell or Hewlett-Packard), in an electronics store (like Best Buy or

17  Circuit City), or through a mass merchandiser (like Wal-Mart or Target).

18  217.    To turn an LCD panel into an LCD TV, an assembler fits the panel with a TV tuner,

19  speakers, and a power source.

20  218.    To turn an LCD panel into a laptop, the panel is incorporated into a plastic frame,

21  and a computer motherboard with its components is fitted into the bottom half of the frame.  This

22  is essentially the same process for iPods, which are essentially portable computers dedicated to

23  media processing.

24  219.    LCD panels are commodity products, with functionally equivalent products

25  available from the defendants, who manufacture LCD panels pursuant to standard specifications

26  and sizes.

27

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

**B.** **The Price Of Products Containing LCD Panels Was Directly Dependent On The Price Of The Panels.**

220.   The indirect-purchaser consumer buys products containing LCD panels through one of two distribution chains: either from the direct-purchaser OEM, such as Dell, or through a reseller such as Best Buy.

221.   Computer and TV OEMs are not "manufacturers" at all, but assemblers of components and purveyors of brand names.  For example, for computers, a company like HP or Apple does not make any of the parts that go into making an LCD monitor or laptop.  Rather, such companies purchase LCD panels from defendants, and hire contract assemblers to turn the panels into the finished products.  On information and belief, computer and TV OEMs price their end-products on a "cost-plus" basis.  Thus, changes in the cost of LCDs have immediate effects on the cost of the finished products.

222.   On information and belief, there are two methods by which OEMs sell their branded LCD products to the retailer. The first method is to obtain pre-orders.  These OEMs obtain prior orders for their products before they have them manufactured.  Under this method, the TV or computer OEM obtains orders for its TVs, laptops, or computer monitors before it orders any of the parts for those products.  It negotiates with retailers prices and quantities at which it will sell its finalized products to the retailers.  The OEM will base its sales price on the current prices of the other components, the assembly costs, delivery costs, and a profit margin.

223.   OEMs also sell their branded products to retailers by estimating the retail market for LCD products, and purchasing the LCD panels before the orders for the end product are obtained.  Because the OEM is not locked in to an agreed-upon price for its product, it can pass through the entire overcharge unencumbered by downstream contracts.

224.   In either case, because of the breadth of the price fixing conspiracy, the OEM is also not constrained by its competitors from passing on the overcharge.  Because each OEM's end-product competitors are also buying LCD panels at supracompetitive prices from conspiracy members, no OEM faces end-product price competition from an OEM who is not paying

1    supracompetitive prices for its LCD panel inputs.  Neither prior price commitments nor end-

2    product price competition interferes with the overcharge being passed on down the supply chain.

3         225.   All supracompetitive overcharges are always passed through to the indirect-

4    purchaser, end-user consumer plaintiff class members, which pay more for a product containing

5    LCD panels than in a competitive market place.

6         226.   The price of products containing LCD panels is directly correlated to the price of

7    LCD panels.  The margins for OEMs are sufficiently thin that price increases of LCD panels force

8    OEMs to increase the prices of their products.

9         227.   OEMs and retailers of products containing LCD panels are all subject to vigorous

10   price competition, whether selling TVs, computer monitors, or laptops.  The demand for LCD

11   panels is ultimately determined by purchasers of products containing such panels.  The market for

12   LCD panels and the market for products containing these panels are therefore inextricably linked

13   and cannot be considered separately.  Defendants are well aware of this intimate relationship, and

14   use forecasts of TVs, laptops, and computer monitors to predict sales of LCD panels.

15        228.   Because OEMs have thin net margins, they must pass on any increase in component

16   costs, such that increases in the price of LCD panels lead to quick corresponding price increases at

17   the OEM level for products containing such panels.

18        229.   LCD panels are one of the most expensive components in products in which they

19   are incorporated.  As noted, the cost of an LCD panel in an LCD TV is 60-70% of the retail price;

20   in a laptop is 10% of the retail price; and in a computer monitor is 70-80% of the retail price.

21        230.   The computer industry is highly competitive.  Computers are commodities, with

22   little or no brand loyalty, such that aggressive pricing causes consumers to switch preferences to

23   different brands.  Computer prices are closely based on production costs, which are in turn directly

24   determined by component costs, as assembly costs are minimal.  OEMs accordingly use

25   component costs, like the cost of LCD panels, as the starting point for all price calculations.  Thus,

26   computer prices closely track increases and decreases in component costs.

27        231.   The close relationship between the price of LCD panels and products was

28   recognized by the defendants during the conspiracy.  Defendants monitored the prices of LCD

products and the demand for LCD products during the Class Period.  During several "Crystal" meetings referenced above, Defendants specifically discussed "street" prices of LCD products and evinced concern that LCD panel increases would cause the price of LCD products to increase to such a degree that demand for LCD products would be affected.

232.    Finally, many of the defendants and/or co-conspirators themselves have been and are manufacturers of TVs, monitors, and/or laptops containing LCD panels.  Such manufacturers include, for example, Samsung, Sharp,  Hitachi, LGD, Philips Electronics, S-LCD, EIDC, and Toshiba.  Having agreed to fix the prices for LCD panels, the major component of the end products they were manufacturing, these defendants intended to pass on the full cost of this component in their finished products, and in fact did so.  They agreed to fix prices of the major component of their TVs, monitors, and laptops with the understanding and expectation that the full cost of the LCD panels would be passed on to their customers in the prices of TVs, monitors, and laptops.  To have agreed or to have done otherwise would have defeated the very purpose of the defendants' conspiracy.  They did not agree to eliminate price competition at one level of production in order to implement it at another level.

**C.    The Effect Of The Price Of LCD Panels On The Price Of Products Is Discernable On A Classwide Basis.**

233.    Once an LCD panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. LCD panels are identifiable, discreet physical objects that do not change form or become an indistinguishable part of the TVs, computer monitors, laptops, or other products in which they are contained.  And a given LCD product contains one and only one LCD panel.

234.    Thus, LCD panels follow a traceable physical chain from the defendants to the OEMs to the purchasers of the finished products incorporating LCD panels.

235.    Moreover, just as LCD panels can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of LCD panels affect prices paid by indirect purchasers of products containing LCD panels.

236.    Because defendants control the market for LCD panels, there are virtually no

1    choices for persons and businesses that require products containing such panels other than buying

2    such products manufactured by a direct purchaser that paid supracompetitive prices for LCD

3    panels to defendants because of defendants' conspiracy alleged herein.

4          237.    When distribution markets are highly competitive, as they are in the case of

5    products containing LCD panels as components, all of the overcharge will be passed through to

6    ultimate consumers, such as the indirect-purchaser plaintiffs and class members.  In addition, as

7    set forth in paragraph 210, *supra*, many of the defendants themselves manufacture, market, and

8    distribute products including LCD panels, such as televisions (e.g., Samsung and Sharp) and

9    computer monitors (e.g. Samsung) and laptops (e.g., Toshiba).  This means that these defendants

10   have passed through and will continue to pass through to their customers 100% of the

11   supracompetitive price increases that resulted from the defendants' conspiracy, combination, and

12   agreement to fix, increase, and stabilize the prices for LCD panels.

13         238.    Hence, the inflated prices of products containing LCD panels resulting from

14   defendants' price-fixing conspiracy have been passed on to plaintiffs and the other class members

15   by direct-purchaser manufacturers, distributors, and retailers.

16         239.    During the Class Period, a number of large OEMs sold their products containing

17   LCD panels directly to end-buyers.  The OEM with the largest share of computer monitor and

18   laptop sales in the United States market, Dell, sold exclusively to end-buyers, as did Gateway.

19   During the Class Period, Compaq and Apple also sold large portions of their laptops and computer

20   monitors directly to the end-buyer.  Dell has a 35.4% market share for LCD monitors.

21         240.    Computer models sold by other OEMs to retailers were generally updated several

22   times a year, and the price was changed for each new model.  For example, for one large retailer,

23   more than 90 percent of the computers sold during 2000 were either new models or were sold at a

24   different price from the price in the previous month.  OEMs, retailers and distributors often use a

25   "standard markup" method to set prices, meaning that they add a standard percentage to their own

26   costs to determine selling prices.  Thus, changes in the price of LCD panels were passed on rapidly

27   rather than absorbed.

28         241.    In retailing, it is common to use a "markup rule".  The retail price is set as the

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit.  This system guarantees that increases in costs to the retailer will be passed on to end buyers.  For example, CDW, a  large seller of LCD monitors and laptops, uses such a system, and a declaration in the DRAM case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices.  The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW… adds a series of positive markups to the cost to CDW to acquire a given product.  These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

242.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component.  As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITITON AND ITS PRACTICE (1994) at 624:

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below.  For example if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum.  In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers.  The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers.  Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.
>
> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

243.    Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

244.    As Professor Jeffrey K. McKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases

involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.  When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…  Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

245.   Quantitative correlation analysis strongly suggest that the market for products containing LCD panels is inextricably linked to the market for LCD panels by virtue of the strong correlation between the price of LCD panels and the price of LCD monitors, TVs, and laptop computers.

246.   The purpose of the conspiratorial conduct of the defendants was to raise, fix or stabilize the price of LCD panels and, as a direct and foreseeable result, products containing such panels.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in dependent variable are explained by changes in a multitude of variables--- when all such variables may be changing simultaneously.  That analysis-called regression analysis- is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of LCD panels on prices for products containing such panels even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of LCD panels affects changes in the price of products containing such panels.  In such models, rather than being treated as the dependent variable, the price of LCD panels is treated as an independent or explanatory variable.  The model can isolate how changes in the price of LCD panels impact the price of products containing such panels while holding controlling for the impact of other price-determining factors.

247.   Economic and legal literature recognizes that the more pricing decisions are based on cost, the easer it is to determine the pass-through rate.  The directness of affected costs refers to whether an overcharge affects a direct (*i.e.* variable) cost or an indirect (*i.e.*, overhead) cost.

1    Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct

2    costs.  Here LCD panels are a direct (and substantial) cost of products containing such panels.

3           248.    Other factors that lead to the pass-through of overcharges include: (i) whether price

4    changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether pricing

5    decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to overhead,

6    costs; (v) whether the resellers' production technology is uniform; (vi) whether the reseller supply

7    curve exhibits a high degree of elasticity; and (vii) whether the demand of the resellers is inelastic.

8     All of these factors were present in the LCD market during the Class Period.  The precise amount

9    of such an impact on the prices of products containing LCD panels can be measured and

10   quantified.  Commonly used and well-accepted economic models can be used to measure both the

11   extent and the amount of the supracompetitive charge passed-through the chain of distribution.

12          249.    Plaintiffs and other indirect purchasers have been forced to pay supracompetitive

13   prices for products containing LCD panels.  These inflated prices have been passed on to them by

14   direct purchaser manufacturers, distributors, and retailers.  Those overcharges have unjustly

15   enriched defendants.

16                          IX.    **CLASS ACTION ALLEGATIONS**

17          250.    Plaintiffs bring this action on their own behalf and as a class action pursuant to

18   Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class

19   (the "Nationwide Class"):

20              All persons and entities currently residing in the United States who
                indirectly purchased in the United States between January 1, 1999
21              and the present TFT-LCD panels incorporated in the televisions,
                monitors, and/or notebook computers, from one or more of the
22              named defendants or Quanta Display Inc., for their own use and not
                for resale.  Specifically excluded from this Class are the defendants;
23              the officers, directors or employees of any defendant; the parent
                companies and subsidiaries of any defendant; the legal
24              representatives andheirs or assigns of any defendant; and the named
                affiliates and co-conspirators.  Also excluded are any federal, state
25              or local governmental entities, any judicial officer presiding over
                this action and the members of his/her immediate family and judicial
26              staff, and any juror assigned to this action.

27          251.    Plaintiffs also bring this action on their own behalf and as a class action pursuant to

28   Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

     members of the following classes (collectively, the "Indirect Purchaser State Classes"):

                                                    51

a.   **ARIZONA:** All persons and entities who, from January 1, 1999 to December 31, 2006, as residents of Arizona, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Arizona indirectly from one or more of the named defendants or Quanta Display Inc. for their own use and not for resale.  Specifically excluded from this Class are the defendants; the officers, directors or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives andheirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Arizona Indirect Purchaser Class").

b.   **CALIFORNIA:** All persons and entities in California who, from January 1, 1999 to December 31, 2006, as residents of California, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in California indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Indirect Purchaser Class").

c.   **DISTRICT OF COLUMBIA:** All persons and entities in the District of Columbia who, from January 1, 1999 to December 31, 2006, as residents of the District of Columbia, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in the District of Columbia indirectly

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1    from one or more of the named Defendants or Quanta Display Inc., for their

2    own use and not for resale. Specifically excluded from the Class are

3    defendants; the officers, directors, or employees of any defendant; the

4    parent companies and subsidiaries of any defendant; the legal

5    representatives and heirs or assigns of any defendant; and the named

6    affiliates and co-conspirators. Also excluded are any federal, state or local

7    governmental entities, any judicial officer presiding over this action and the

8    members of his/her immediate family and judicial staff, and any juror

9    assigned to this action (the "District of Columbia Indirect Purchaser Class").

10   d.    **FLORIDA**: All persons and entities in Florida who, from January 1, 1999

11   to December 31, 2006, as residents of Florida, purchased LCD panels

12   incorporated in televisions, monitors, and/or laptop computers in Florida

13   indirectly from one or more of the named Defendants or Quanta Display

14   Inc., for their own use and not for resale. Specifically excluded from the

15   Class are defendants; the officers, directors, or employees of any defendant;

16   the parent companies and subsidiaries of any defendant; the legal

17   representatives and heirs or assigns of any defendant; and the named

18   affiliates and co-conspirators. Also excluded are any federal, state or local

19   governmental entities, any judicial officer presiding over this action and the

20   members of his/her immediate family and judicial staff, and any juror

21   assigned to this action (the "Florida Indirect Purchaser Class").

22   e.    **HAWAII:** All persons and entities in Hawaii who, from January 1, 1999 to

23   December 31, 2006, as residents of Hawaii, purchased LCD panels

24   incorporated in televisions, monitors, and/or laptop computers in Hawaii

25   indirectly from one or more of the named Defendants or Quanta Display

26   Inc., for their own use and not for resale. Specifically excluded from the

27   Class are defendants; the officers, directors, or employees of any defendant;

28   the parent companies and subsidiaries of any defendant; the legal

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

representatives and heirs or assigns of any defendant; and the named
affiliates and co-conspirators. Also excluded are any federal, state or local
governmental entities, any judicial officer presiding over this action and the
members of his/her immediate family and judicial staff, and any juror
assigned to this action (the "Hawaii Indirect Purchaser Class").

  f.  **IOWA:** All persons and entities in Iowa who, from January 1, 1999 to
December 31, 2006, as residents of Iowa, purchased LCD panels
incorporated in televisions, monitors, and/or laptop computers in Iowa
indirectly from one or more of the named Defendants or Quanta Display
Inc., for their own use and not for resale. Specifically excluded from the
Class are defendants; the officers, directors, or employees of any defendant;
the parent companies and subsidiaries of any defendant; the legal
representatives and heirs or assigns of any defendant; and the named
affiliates and co-conspirators. Also excluded are any federal, state or local
governmental entities, any judicial officer presiding over this action and the
members of his/her immediate family and judicial staff, and any juror
assigned to this action (the "Iowa Indirect Purchaser Class").

  g.  **KANSAS:** All persons and entities in Kansas who, from January 1, 1999 to
December 31, 2006, as residents of Kansas, purchased LCD panels
incorporated in televisions, monitors, and/or laptop computers in Kansas
indirectly from one or more of the named Defendants or Quanta Display
Inc., for their own use and not for resale. Specifically excluded from the
Class are defendants; the officers, directors, or employees of any defendant;
the parent companies and subsidiaries of any defendant; the legal
representatives and heirs or assigns of any defendant; and the named
affiliates and co-conspirators. Also excluded are any federal, state or local
governmental entities, any judicial officer presiding over this action and the

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

members of his/her immediate family and judicial staff, and any juror

assigned to this action (the "Kansas Indirect Purchaser Class").

h.   **MAINE:** All persons and entities in Maine who, from January 1, 1999 to

December 31, 2006, as residents of Maine, purchased LCD panels

incorporated in televisions, monitors, and/or laptop computers in Maine

indirectly from one or more of the named Defendants or Quanta Display

Inc., for their own use and not for resale. Specifically excluded from the

Class are defendants; the officers, directors, or employees of any defendant;

the parent companies and subsidiaries of any defendant; the legal

representatives and heirs or assigns of any defendant; and the named

affiliates and co-conspirators. Also excluded are any federal, state or local

governmental entities, any judicial officer presiding over this action and the

members of his/her immediate family and judicial staff, and any juror

assigned to this action (the "Maine Indirect Purchaser Class").

i.   **MASSACHUSETTS:** All persons and entities in Massachusetts who, from

January 1, 1999 to December 31, 2006, as residents of Massachusetts,

purchased LCD panels incorporated in televisions, monitors, and/or laptop

computers in Massachusetts indirectly from one or more of the named

Defendants or Quanta Display Inc., for their own use and not for resale.

Specifically excluded from the Class are defendants; the officers, directors,

or employees of any defendant; the parent companies and subsidiaries of

any defendant; the legal representatives and heirs or assigns of any

defendant; and the named affiliates and co-conspirators. Also excluded are

any federal, state or local governmental entities, any judicial officer

presiding over this action and the members of his/her immediate family and

judicial staff, and any juror assigned to this action (the "Massachusetts

Indirect Purchaser Class").

j.   **MICHIGAN:** All persons and entities in Michigan who, from January 1, 1999 to December 31, 2006, as residents of Michigan, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Michigan indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Michigan Indirect Purchaser Class").

k.   **MINNESOTA:** All persons and entities in Minnesota who, from January 1, 1999 to December 31, 2006, as residents of Minnesota, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Minnesota indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Minnesota Indirect Purchaser Class").

l.   **MISSOURI**:  All persons and entities who, from January 1, 1999 to December 31, 2006, as residents of Missouri, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Missouri indirectly from one or more of the named defendants or Quanta Display Inc.

for their own use and not for resale.  Specifically excluded from this Class are the defendants; the officers, directors or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Missouri Indirect Purchaser Class").

m.   **MISSISSIPPI:** All persons and entities in Mississippi who, from January 1, 1999 to December 31, 2006, as residents of Mississippi, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Mississippi indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Mississippi Indirect Purchaser Class").

n.   **NEVADA:** All persons and entities in Nevada who, from January 1, 1999 to December 31, 2006, as residents of Nevada, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Nevada indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named

affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nevada Indirect Purchaser Class").

o.   **NEW MEXICO:** All persons and entities in New Mexico who, from January 1, 1999 to December 31, 2006, as residents of New Mexico, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in New Mexico indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Mexico Indirect Purchaser Class").

p.   **NEW YORK:** All persons and entities in New York who, from January 1, 1999 to December 31, 2006, as residents of New York, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in New York indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the

1      members of his/her immediate family and judicial staff, and any juror

2      assigned to this action (the "New York Indirect Purchaser Class").

3          q.    **NORTH CAROLINA:** All persons and entities in North Carolina who,

4          from January 1, 1999 to December 31, 2006, as residents of North Carolina,

5          purchased LCD panels incorporated in televisions, monitors, and/or laptop

6          computers in North Carolina indirectly from one or more of the named

7          Defendants or Quanta Display Inc., for their own use and not for resale.

8          Specifically excluded from the Class are defendants; the officers, directors,

9          or employees of any defendant; the parent companies and subsidiaries of

10         any defendant; the legal representatives and heirs or assigns of any

11         defendant; and the named affiliates and co-conspirators. Also excluded are

12         any federal, state or local governmental entities, any judicial officer

13         presiding over this action and the members of his/her immediate family and

14         judicial staff, and any juror assigned to this action (the "North Carolina

15         Indirect Purchaser Class").

16         r.    **NORTH DAKOTA:** All persons and entities in North Dakota who, from

17         January 1, 1999 to December 31, 2006, as residents of North Dakota,

18         purchased LCD panels incorporated in televisions, monitors, and/or laptop

19         computers in North Dakota indirectly from one or more of the named

20         Defendants or Quanta Display Inc., for their own use and not for resale.

21         Specifically excluded from the Class are defendants; the officers, directors,

22         or employees of any defendant; the parent companies and subsidiaries of

23         any defendant; the legal representatives and heirs or assigns of any

24         defendant; and the named affiliates and co-conspirators. Also excluded are

25         any federal, state or local governmental entities, any judicial officer

26         presiding over this action and the members of his/her immediate family and

27         judicial staff, and any juror assigned to this action (the "North Dakota

28         Indirect Purchaser Class").

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1        s.    **RHODE ISLAND:** All persons and entities in Rhode Island who, from

2                 January 1, 1999 to December 31, 2006, as residents of Rhode Island,

3                 purchased LCD panels incorporated in televisions, monitors, and/or laptop

4                 computers in Rhode Island indirectly from one or more of the named

5                 Defendants or Quanta Display Inc., for their own use and not for resale.

6                 Specifically excluded from the Class are defendants; the officers, directors,

7                 or employees of any defendant; the parent companies and subsidiaries of

8                 any defendant; the legal representatives and heirs or assigns of any

9                 defendant; and the named affiliates and co-conspirators. Also excluded are

10                any federal, state or local governmental entities, any judicial officer

11                presiding over this action and the members of his/her immediate family and

12                judicial staff, and any juror assigned to this action (the "Rhode Island

13                Indirect Purchaser Class").

14       t.    **SOUTH DAKOTA:** All persons and entities in South Dakota who, from

15                January 1, 1999 to December 31, 2006, as residents of South Dakota,

16                purchased LCD panels incorporated in televisions, monitors, and/or laptop

17                computers in South Dakota indirectly from one or more of the named

18                Defendants or Quanta Display Inc., for their own use and not for resale.

19                Specifically excluded from the Class are defendants; the officers, directors,

20                or employees of any defendant; the parent companies and subsidiaries of

21                any defendant; the legal representatives and heirs or assigns of any

22                defendant; and the named affiliates and co-conspirators. Also excluded are

23                any federal, state or local governmental entities, any judicial officer

24                presiding over this action and the members of his/her immediate family and

25                judicial staff, and any juror assigned to this action (the "South Dakota

26                Indirect Purchaser Class").

27       u.    **TENNESSEE:** All persons and entities in Tennessee who, from January 1,

28                1999 to December 31, 2006, as residents of Tennessee, purchased LCD

1    panels incorporated in televisions, monitors, and/or laptop computers in

2    Tennessee indirectly from one or more of the named Defendants or Quanta

3    Display Inc., for their own use and not for resale. Specifically excluded

4    from the Class are defendants; the officers, directors, or employees of any

5    defendant; the parent companies and subsidiaries of any defendant; the legal

6    representatives and heirs or assigns of any defendant; and the named

7    affiliates and co-conspirators. Also excluded are any federal, state or local

8    governmental entities, any judicial officer presiding over this action and the

9    members of his/her immediate family and judicial staff, and any juror

10   assigned to this action (the "Tennessee Indirect Purchaser Class").

11   v.   **VERMONT:** All persons and entities in Vermont who, from January 1,

12   1999 to December 31, 2006, as residents of Vermont, purchased LCD

13   panels incorporated in televisions, monitors, and/or laptop computers in

14   Vermont indirectly from one or more of the named Defendants or Quanta

15   Display Inc., for their own use and not for resale. Specifically excluded

16   from the Class are defendants; the officers, directors, or employees of any

17   defendant; the parent companies and subsidiaries of any defendant; the legal

18   representatives and heirs or assigns of any defendant; and the named

19   affiliates and co-conspirators. Also excluded are any federal, state or local

20   governmental entities, any judicial officer presiding over this action and the

21   members of his/her immediate family and judicial staff, and any juror

22   assigned to this action (the "Vermont Indirect Purchaser Class").

23   w.   **WEST VIRGINIA:** All persons and entities in West Virginia who, from

24   January 1, 1999 to December 31, 2006, as residents of West Virginia,

25   purchased LCD panels incorporated in televisions, monitors, and/or laptop

26   computers in West Virginia indirectly from one or more of the named

27   Defendants or Quanta Display Inc., for their own use and not for resale.

28   Specifically excluded from the Class are defendants; the officers, directors,

or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "West Virginia Indirect Purchaser Class").

        x.    **WISCONSIN:** All persons and entities in Wisconsin who, from January 1, 1999 to December 31, 2006, as residents of Wisconsin, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in Wisconsin indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Wisconsin Indirect Purchaser Class").

252.    Plaintiffs do not know the exact size of the Classes at the present time.  However, Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least thousands in each separate state class, and hundreds of thousands of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

253.    Plaintiffs' claims are typical of the claims of their respective Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of their respective Classes.  Plaintiffs have

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1    retained competent counsel experienced in class action and complex antitrust and consumer

2    protection litigation.

3          254.    Common questions of law and fact exist, including:

4                              i.      Whether defendants and their co-conspirators engaged in a

5                                      contract, combination or conspiracy among themselves to fix,

6                                      raise, maintain or stabilize the process of, or allocate the

7                                      market of LCD panels sold in the United States;

8                              ii.     The duration and extent of the contract, combination or

9                                      conspiracy;

10                             iii.    Whether the defendants and their co-conspirators were

11                                     participants in the contracts, combinations or conspiracies

12                                     alleged herein;

13                             iv.     Whether defendants and their co-conspirators engaged in

14                                     conduct that violated Section 1 of the Sherman act;

15                             v.      Whether defendants and their co-conspirators engaged in

16                                     unlawful, unfair or deceptive contracts, combinations or

17                                     conspiracies among themselves, express or implied, to fix,

18                                     raise, maintain, or stabilize prices of LCD panels sold in

19                                     and/or distributed in the United States;

20                             vi.     Whether the defendants and their co-conspirators engaged in

21                                     conduct in violation of the antitrust, consumer protection,

22                                     unfair trade, and/or deceptive trade practices laws of the

23                                     various Indirect Purchaser States as alleged below;

24                             vii.    Whether the anticompetitive conduct of the defendants and

25                                     their co-conspirators caused prices of LCD panels to be

26                                     artificially inflated to non-competitive levels;

27

28

|     |     |                                                                                                             |
| --- | --- | ----------------------------------------------------------------------------------------------------------- |
|     | viii. | Whether the defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Classes; |
|     | ix. | Whether defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct; |
|     | x.  | Whether Plaintiffs and the Classes are entitled to injunctive relief; and |
|     | xi. | Whether Plaintiffs and other members of the Indirect Purchaser Classes were injured by the conduct of defendants and, if so, the appropriate measure of damages for each of the Classes. |

255.   These and other questions of law and fact are common to the Classes and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages, and restitution.

256.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

      a.   It will avoid a multiplicity of suits and consequent burden on the courts and defendants;

      b.   It would be virtually impossible for all members of the Classes to intervene as parties-plaintiff in this action;

      c.   It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

      d.   It is appropriate for treatment on a fluid recovery basis, which obviate any manageability problems; and

      e.   It will provide court oversight of the claims process, once defendants' liability is adjudicated.

257.   The named plaintiffs will fairly and adequately protect the interests of the Class in

1   that the named plaintiffs have no interests antagonistic to the interests of the other members of the

2   Class and have retained counsel competent and experienced in the prosecution of class actions and

3   antitrust cases to represent themselves and the Class.

4       258.    This case is also appropriate for certification as a class action because the

5   defendants have acted and refused to act on grounds generally applicable to the Class, so that final

6   injunctive relief will be appropriate with respect to the Class as a whole.

7       259.    The claims asserted herein are also appropriate for class certification under the laws

8   of the state of California and of each of the other states under which claims are asserted.

9                 **X.**      **ACTIVE CONCEALMENT**

10       260.    Plaintiffs and members of the Classes alleged herein did not discover and could not

11   have discovered, through the exercise of reasonable diligence, the existence of the conspiracy

12   alleged herein until after December of 2006, after the investigations by the DOJ and other antitrust

13   regulators became public, because defendants and their co-conspirators actively and fraudulently

14   concealed the existence of their contract, combination or conspiracy.  Because defendants'

15   agreement, understanding and conspiracy were kept secret, plaintiffs and members of the indirect-

16   purchaser classes were unaware of defendants' unlawful conduct alleged herein and did not know

17   that they were paying artificially high prices for LCD panels and the products in which they were

18   used.

19       261.    The affirmative acts of the defendants alleged herein, including acts in furtherance

20   of the conspiracy, were actively concealed and carried out in a manner that precluded detection.

21       262.    By its very nature, defendants' price-fixing conspiracy was inherently self-

22   concealing.  As alleged above, defendants had secret discussions about price and output.

23   Defendants agreed not to publicly discuss the existence or the nature of their agreement.  In fact,

24   the top executives who attended the CEO and/or Commercial Meetings agreed to stagger their

25   arrivals and departures at such meetings to avoid being seen in public with each other and with the

26   express purpose and effect of keeping them secret.  Moreover, when the participants in those

27   meetings became fearful that they might be subject to antitrust scrutiny, they agreed to the one-on-

28   one so-called "round robin" meetings described above to avoid detection.

263.    Moreover, defendants repeatedly gave pretextual justifications for the inflated prices of LCD panels in furtherance of the conspiracy.

264.    There have been a variety of other purportedly market-based explanations for price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."  Boch Kwon, Vice President of LGD' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

265.    Another false rationale provided by defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

266.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung.  He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

267.    Increased demand was repeatedly cited by defendants throughout the Class Period.  On February 4, 2001, Bruce Berkoff, Executive Vice-President at LGD was quoted in News.com as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."  Duk-Mo Koo, an executive at LGD, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season.  In 2005, Duk-Mo Koo of LGD stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

268.    Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

269.    These explanations were all pretextual and each served to cover up the conspiracy. As a result of defendants' active concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this Complaint

## XI.    VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

270.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.    Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 1999, and continuing through the filing of this Second Amended Complaint, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for LCD panels and LCD products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. 1).

272.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.    Fixing, raising, stabilizing, and pegging the price of LCD panels; and

b.    Allocating among themselves and collusively reducing the production of LCD panels.

273.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of LCD panels has been restrained, suppressed, and/or eliminated in the United States;

b.     Prices for LCD panels sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.     Those who purchased LCD panels directly or indirectly from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

274.    Plaintiffs and other Nationwide Class members have been injured and will continue to be injured in their businesses and property by paying more for LCD panels purchased indirectly from the defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for TVs, laptops, and computer monitors, in which LCD panels are included, as a result of higher prices paid for LCD panels by the direct purchasers of such panels.

275.    Plaintiffs and the Nationwide Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

276.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

277.    Defendants have been unjustly enriched through overpayments by plaintiffs and class members and the resulting profits.

278.    Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and class members in the following states: Arizona, California, District of Columbia, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Mexico, New York, North Carolina, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

279.   Plaintiffs and class members in each of the states listed hereinabove seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiffs and class members may seek restitution.

### Third Claim for Relief

### (Violation of State Antitrust Laws)

280.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

281.   Plaintiff Allan Rotman ("Arizona Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.   Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Arizona; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Arizona Plaintiff and members of the Arizona Indirect Purchaser Class were deprived of free and open competition; and (4) Arizona Plaintiff and members of the Arizona Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b.   During the Class Period, defendants' illegal conduct substantially affected Arizona commerce.

c.   As a direct and proximate result of defendants' unlawful conduct, Arizona Plaintiff and members of the Arizona Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Arizona Plaintiff and the members of the Arizona Indirect Purchaser Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

1    282.    Plaintiffs Lisa Blackwell, Byron Ho, Robert Kerson, Steven Martel, Frederick

2    Rozo, and Joe Solo, (collectively "California plaintiffs") incorporate and reallege, as though fully

3    set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

4        a.    Defendants' contract, combination, trust or conspiracy was entered

5    in, carried out, effectuated and perfected mainly within the State of

6    California, and defendants' conduct within California injured all

7    members of the Class throughout the United States.  Therefore, this

8    claim for relief under California law is brought on behalf of the

9    California Indirect Purchaser Class.

10        b.    Beginning at a time currently unknown to California plaintiffs, but at

11    least as early as January 1, 1999, and continuing thereafter at least

12    up to the filing of this Second Consolidated Amended Complaint,

13    defendants and their co-conspirators entered into and engaged in a

14    continuing unlawful trust in restraint of the trade and commerce

15    described above in violation of Section 16720, California Business

16    and Professions Code.  Defendants, and each of them, have acted in

17    violation of Section 16720 to fix, raise, stabilize, and maintain prices

18    of, and allocate markets for, LCD panels and LCD products at

19    supracompetitive levels.

20        c.    The aforesaid violations of Section 16720, California Business and

21    Professions Code, consisted, without limitation, of a continuing

22    unlawful trust and concert of action among the defendants and their

23    co-conspirators, the substantial terms of which were to fix, raise,

24    maintain, and stabilize the prices of, and to allocate markets for,

25    LCD panels and LCD products.

26        d.    For the purpose of forming and effectuating the unlawful trust, the

27    defendants and their co-conspirators have done those things which

28    they combined and conspired to do, including but in any way limited

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1    to the acts, practices and course of conduct set forth above and the

2    following:  (1) Fixing, raising, stabilizing, and pegging the price of

3    LCD panels; and (2) Allocating among themselves the production of

4    LCD panels.

5         e.    The combination and conspiracy alleged herein has had, *inter alia*,

6    the following effects:  (1) Price competition in the sale of LCD

7    panels and LCD products has been restrained, suppressed, and/or

8    eliminated in the State of California; (2) Prices for LCD panels and

9    LCD products sold by defendants and their co-conspirators have

10   been fixed, raised, stabilized, and pegged at artificially high, non-

11   competitive levels in the State of California and throughout the

12   United States; and (3) Those who purchased LCD panels and LCD

13   products directly or indirectly from defendants and their co-

14   conspirators have been deprived of the benefit of free and open

15   competition.

16        f.    As a direct and proximate result of defendants' unlawful conduct,

17   California plaintiffs and the members of the California Indirect

18   Purchaser Class have been injured in their business and property in

19   that they paid more for LCD products than they otherwise would

20   have paid in the absence of defendants' unlawful conduct.  As a

21   result of defendants' violation of Section 16720 of the California

22   Business and Professions Code, California plaintiffs and the

23   California Indirect Purchaser Class seek treble damages and their

24   cost of suit, including a reasonable attorney's fee, pursuant to

25   Section 16750(a) of the California Business and Professions Code.

26   283.    Plaintiff David Walker ("DC Plaintiff") incorporates and realleges each and every

27   allegation set forth in the preceding paragraphs of this Complaint.

28

a. Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff Walker and members of the District of Columbia Indirect Purchaser Class were deprived of free and open competition; and (4) Plaintiff Walker and members of the District of Columbia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b. During the Class Period, defendants' illegal conduct substantially affected District of Columbia commerce.

c. As a direct and proximate result of defendants' unlawful conduct, Plaintiff Walker and members of the District of Columbia Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502, *et seq.* Accordingly, Plaintiff Walker and the members of the District of Columbia Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4503, *et seq.*

284. Plaintiff Ben Northway ("Iowa Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a. Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Iowa; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff Northway and members of the Iowa Indirect Purchaser

1    Class were deprived of free and open competition; and (4) Plaintiff

2    Northway and members of the Iowa Indirect Purchaser Class paid

3    supracompetitive, artificially inflated prices for LCD.

4    b.    During the Class Period, defendants' illegal conduct substantially

5    affected Iowa commerce.

6    c.    As a direct and proximate result of defendants' unlawful conduct,

7    Plaintiff Northway and members of the Iowa Indirect Purchaser

8    Class have been injured in their business and property and are

9    threatened with further injury.

10    d.    By reason of the foregoing, defendants have entered into agreements

11    in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*

12    Accordingly, Plaintiff Northway and the members of the Iowa

13    Indirect Purchaser Class seek all forms of relief available under Iowa

14    Code §§ 553.1.

15    285.    Plaintiffs Rex Getz and Kou Srimoungchanh ("Kansas Plaintiffs") incorporate and

16    reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

17    a.    Defendants' combinations or conspiracies had the following effects:

18    (1) LCD price competition was restrained, suppressed, and

19    eliminated throughout Kansas; (2) LCD prices were raised, fixed,

20    maintained and stabilized at artificially high levels throughout

21    Kansas; (3) Kansas Plaintiffs and members of the Kansas Indirect

22    Purchaser Class were deprived of free and open competition; and (4)

23    Kansas Plaintiffs and members of the Kansas Indirect Purchaser

24    Class paid supracompetitive, artificially inflated prices for LCD.

25    b.    During the Class Period, defendants' illegal conduct substantially

26    affected Kansas commerce.

27    c.    As a direct and proximate result of defendants' unlawful conduct,

28    Kansas Plaintiffs and members of the Kansas Indirect Purchaser

1    Class have been injured in their business and property and are

2    threatened with further injury.

3    d.    By reason of the foregoing, defendants have entered into agreements

4    in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et*

5    *seq.*  Accordingly, Kansas Plaintiffs and the members of the Kansas

6    Indirect Purchaser Class seek all forms of relief available under

7    Kansas Stat. Ann. §§ 50-101, *et seq.*

8    286.    Plaintiff Patricia Giles ("Maine Plaintiff") incorporates and realleges each and

9    every allegation set forth in the preceding paragraphs of this Complaint.

10    a.    Defendants' combinations or conspiracies had the following effects:

11    (1) LCD price competition was restrained, suppressed, and

12    eliminated throughout Maine; (2) LCD prices were raised, fixed,

13    maintained and stabilized at artificially high levels throughout

14    Maine; (3) Plaintiff Giles and members of the Maine Indirect

15    Purchaser Class were deprived of free and open competition; and (4)

16    Plaintiff Giles and members of the Maine Indirect Purchaser Class

17    paid supracompetitive, artificially inflated prices for LCD.

18    b.    During the Class Period, defendants' illegal conduct substantially

19    affected Maine commerce.

20    c.    As a direct and proximate result of defendants' unlawful conduct,

21    Plaintiff Giles and members of the Maine Indirect Purchaser Class

22    have been injured in their business and property and are threatened

23    with further injury.

24    d.    By reason of the foregoing, defendants have entered into agreements

25    in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§

26    1101, *et seq.*  Accordingly, Plaintiff Giles and the members of the

27    Maine Indirect Purchaser Class seek all relief available under Maine

28    Rev. Stat. Ann. 10, §§ 1101, *et seq.*

287.    Plaintiffs Gladys Baker, Judy Griffith, and Ling-Hung Jou ("Michigan Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.    Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Michigan; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class were deprived of free and open competition; and (4) Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

    b.    During the Class Period, defendants' illegal conduct substantially affected Michigan commerce.

    c.    As a direct and proximate result of defendants' unlawful conduct, Michigan Plaintiffs and members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Michigan Plaintiffs and the members of the Michigan Indirect Purchaser Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.73, *et seq.*

288.    Plaintiff Martha Mulvey ("Minnesota Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.    Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) LCD prices were raised, fixed,

maintained and stabilized at artificially high levels throughout

Minnesota; (3) Plaintiff Mulvey and members of the Minnesota

Indirect Purchaser Class were deprived of free and open

competition; and (4) Plaintiff Mulvey and members of the Minnesota

Indirect Purchaser Class paid supracompetitive, artificially inflated

prices for LCD.

       b.     During the Class Period, defendants' illegal conduct substantially

affected Minnesota commerce.

       c.     As a direct and proximate result of defendants' unlawful conduct,

Plaintiff Mulvey and members of the Minnesota Indirect Purchaser

Class have been injured in their business and property and are

threatened with further injury.

       d.     By reason of the foregoing, defendants have entered into agreements

in restraint of trade in violation of Minnesota Stat. §§ 325D.52, *et*

*seq.*  Accordingly, Plaintiff Mulvey and the members of the

Minnesota Indirect Purchaser Class seek all relief available under

Minnesota Stat. §§ 325D.502, *et seq.*

289.    Plaintiff Cynthia Saia ("Mississippi Plaintiff") incorporates and realleges each and

every allegation set forth in the preceding paragraphs of this Complaint.

       a.     Defendants' combinations or conspiracies had the following effects:

(1) LCD price competition was restrained, suppressed, and

eliminated throughout Mississippi; (2) LCD prices were raised,

fixed, maintained and stabilized at artificially high levels throughout

Mississippi; (3) Plaintiff Saia and members of the Mississippi

Indirect Purchaser Class were deprived of free and open

competition; and (4) Plaintiff Saia and members of the Mississippi

Indirect Purchaser Class paid supracompetitive, artificially inflated

prices for LCD.

b.    During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce.

c.    As a direct and proximate result of defendants' unlawful conduct, Plaintiff Saia and members of the Mississippi Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiff Saia and all members of the Mississippi Indirect Purchaser Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

290.    Plaintiff Allen Kelley ("Nevada Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.    Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Nevada; (2)LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Nevada Plaintiff and members of the Nevada Indirect Purchaser Class were deprived of free and open competition; and (4) Nevada Plaintiff and members of the Nevada Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b.    During the Class Period, defendants' illegal conduct substantially affected Nevada commerce.

c.    As a direct and proximate result of defendants' unlawful conduct, Nevada Plaintiff and members of the Nevada Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

1          d.      By reason of the foregoing, defendants have entered into agreements

2                  in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A,

3                  *et seq.*  Accordingly, Nevada Plaintiff and all members of the

4                  Nevada Indirect Purchaser Class seek all relief available under

5                  Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

6     291.    Plaintiffs Thomas Clark and Marcia Weingarten ("New Mexico Plaintiffs")

7  incorporate and reallege each and every allegation set forth in the preceding paragraphs of this

8  Complaint.

9          a.      Defendants' combinations or conspiracies had the following effects:  (1)

10                 LCD price competition was restrained, suppressed, and eliminated

11                 throughout New Mexico; (2) LCD prices were raised, fixed, maintained and

12                 stabilized at artificially high levels throughout New Mexico; (3) New

13                 Mexico Plaintiffs and members of the New Mexico Indirect Purchaser Class

14                 were deprived of free and open competition; and (4) New Mexico Plaintiffs

15                 and members of the New Mexico Indirect Purchaser Class paid

16                 supracompetitive, artificially inflated prices for LCD.

17         b.      During the Class Period, defendants' illegal conduct substantially

18                 affected New Mexico commerce.

19         c.      As a direct and proximate result of defendants' unlawful conduct,

20                 New Mexico Plaintiffs and members of the New Mexico Indirect

21                 Purchaser Class have been injured in their business and property and

22                 are threatened with further injury.

23         d.      By reason of the foregoing, defendants have entered into agreements

24                 in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-

25                 1, *et seq.*  Accordingly, New Mexico Plaintiffs and all members of

26                 the New Mexico Indirect Purchaser Class seek all relief available

27                 under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

28    292.    Plaintiffs Tom DiMatteo and Chris Ferencsik ("New York Plaintiffs") incorporate

1   and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

2            a.   Defendants' combinations or conspiracies had the following effects:

3            (1) LCD price competition was restrained, suppressed, and

4            eliminated throughout New York; (2) LCD prices were raised, fixed,

5            maintained and stabilized at artificially high levels throughout New

6            York; (3) New York Plaintiffs and members of the New York

7            Indirect Purchaser Class were deprived of free and open

8            competition; and (4) New York Plaintiffs and members of the New

9            York Indirect Purchaser Class paid supracompetitive, artificially

10           inflated prices for LCD when they purchased the products containing

11           LCD, or purchased products that were otherwise of lower quality,

12           than would have been absent the conspirators illegal acts, or were

13           unable to purchase products that they would have otherwise have

14           purchased absent the illegal conduct.

15           b.   During the Class Period, defendants' illegal conduct substantially

16           affected New York commerce.

17           c.   As a direct and proximate result of defendants' unlawful conduct,

18           New York Plaintiffs and members of the New York Indirect

19           Purchaser Class have been injured in their business and property and

20           are threatened with further injury.

21           d.   By reason of the foregoing, defendants have entered into agreements

22           in restraint of trade in violation of the New York Donnelly Act, §§

23           340, *et seq*.  The conduct set forth above is a per se violation of the

24           Act.  Accordingly, New York Plaintiffs and all members of the New

25           York Indirect Purchaser Class seek all relief available under New

26           York Gen. Bus. Law §§ 340, *et seq*.

27   293.   Plaintiff Donna Jeanne Flanagan, ("North Carolina Plaintiff") incorporates and

28   realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.      Defendants' combinations or conspiracies had the following effects:

(1) LCD price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b.      During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of defendants' unlawful conduct, North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly, North Carolina Plaintiff and all members of the North Carolina Indirect Purchaser Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

294.    Plaintiff Bob George ("North Dakota Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.      Defendants' combinations or conspiracies had the following effects:

(1) LCD price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff George and members of the North Dakota Indirect Purchaser Class were deprived of free and open

competition; and (4) Plaintiff George and members of the North

Dakota Indirect Purchaser Class paid supracompetitive, artificially

inflated prices for LCD.

b.    During the Class Period, defendants' illegal conduct had a

substantial effect on North Dakota commerce.

c.    As a direct and proximate result of defendants' unlawful conduct,

Plaintiff George and members of the North Dakota Indirect

Purchaser Class have been injured in their business and property and

are threatened with further injury.

d.    By reason of the foregoing, defendants have entered into agreements

in restraint of trade in violation of North Dakota Cent. Code §§ 51-

08.1-01, *et seq.*  Accordingly, Plaintiff Bob George and all members

of the North Dakota Indirect Purchaser Class seek all relief available

under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

295.    Plaintiffs Christopher Bessette and Chad Hansen ("South Dakota Plaintiffs")

incorporate and reallege each and every allegation set forth in the preceding paragraphs of this

Complaint.

a.    Defendants' combinations or conspiracies had the following effects:

(1) LCD price competition was restrained, suppressed, and

eliminated throughout South Dakota; (2) LCD prices were raised,

fixed, maintained and stabilized at artificially high levels throughout

South Dakota; (3) South Dakota Plaintiffs and members of the South

Dakota Indirect Purchaser Class were deprived of free and open

competition; and (4) South Dakota Plaintiffs and members of the

South Dakota Indirect Purchaser Class paid supracompetitive,

artificially inflated prices for LCD.

b.    During the Class Period, defendants' illegal conduct had a

substantial effect on South Dakota commerce.

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

c.    As a direct and proximate result of defendants' unlawful conduct, South Dakota Plaintiffs and members of the South Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, South Dakota Plaintiffs and all members of the South Dakota Indirect Purchaser Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

296.    Plaintiffs Scott Beall and Dena Williams ("Tennessee Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.    Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class were deprived of free and open competition; and (4) Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b.    During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as products containing LCD were sold in Tennessee.

c.    As a direct and proximate result of defendants' unlawful conduct, Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Tennessee Plaintiffs and all members of the Tennessee Indirect Purchaser Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

297.   Plaintiff Robert Watson ("Vermont Plaintiff") and members of the Vermont Indirect Purchaser Class incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.   Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Vermont; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff Watson and members of the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) Plaintiff Watson and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b.   During the Class Period, defendants' illegal conduct had a substantial effect on Vermont commerce.

c.   As a direct and proximate result of defendants' unlawful conduct, Plaintiff Watson and members of the Vermont Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiff Watson and all members of the Vermont Indirect Purchaser Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

298.    Plaintiffs John Matrich ("West Virginia Plaintiff") and members of the West Virginia Indirect Purchaser Class incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.    Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) LCD prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff Matrich and members of the West Virginia Indirect Purchaser Class were deprived of free and open competition; and (4) Plaintiff Matrich  and members of the West Virginia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

    b.    During the Class Period, defendants' illegal conduct had a substantial effect on West Virginia commerce.

    c.    As a direct and proximate result of defendants' unlawful conduct, Plaintiff Matrich and members of the West Virginia Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiff Matrich and all members of the West Virginia Indirect Purchaser Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

299.    Plaintiffs Joe Kovacevich, and Jai Paguirigan ("Wisconsin Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.    Defendants' combinations or conspiracies had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) LCD prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin Plaintiffs and members of the Wisconsin Indirect Purchaser Class were deprived of free and open competition; and (4) Wisconsin Plaintiffs and members of the Wisconsin Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

   b.   During the Class Period, defendants' illegal conduct had a substantial effect on Wisconsin commerce.

   c.   As a direct and proximate result of defendants' unlawful conduct, Wisconsin Plaintiffs and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

   d.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Wisconsin Plaintiffs and all members of the Wisconsin Indirect Purchaser Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

## **Fourth Claim for Relief**

### **(Violation of State Consumer Protection And Unfair Competition Laws)**

300.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

301.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

302.   California plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

   a.   Defendants' business acts and practices were centered in, carried out, effectuated, and perfected mainly within the State of California,

1    and defendants' conduct injured all members of the California

2    Indirect Purchaser Class.  Therefore, this claim for relief under

3    California law is brought on behalf of the California Indirect

4    Purchaser Class.

5    b.    Beginning on a date unknown to California plaintiffs, but at least as

6    early as January 1, 1999, and continuing thereafter at least up

7    through the filing of this Second Consolidated Amended Complaint,

8    defendants committed and continue to commit acts of unfair

9    competition, as defined by Sections 17200, *et seq.* of the California

10   Business and Professions Code, by engaging in the acts and

11   practices specified above.

12   c.    This claim is instituted pursuant to Sections 17203 and 17204 of the

13   California Business and Professions Code, to obtain restitution from

14   these defendants for acts, as alleged herein, that violated Section

15   17200 of the California Business and Professions Code, commonly

16   known as the Unfair Competition Law.

17   d.    The defendants' conduct as alleged herein violated Section 17200.

18   The acts, omissions, misrepresentations, practices and non-

19   disclosures of defendants, as alleged herein, constituted a common,

20   continuous, and continuing course of conduct of unfair competition

21   by means of unfair, unlawful, and/or fraudulent business acts or

22   practices within the meaning of California Business and Professions

23   Code, Section 17200, *et seq.*, including, but not limited to, the

24   following:  (1) the violations of Section 1 of the Sherman Act, as set

25   forth above; (2) the violations of Section 16720, *et seq.*, of the

26   California Business and Professions Code, set forth above;

27   e.    Defendants' acts, omissions, misrepresentations, practices, an non-

28   disclosures, as described above, whether or not in violation of

Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.    Defendants' acts or practices are unfair to consumers of LCD products in the State of California within the meaning of Section 17200, California Business and Professions Code; and

g.    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

h.    California plaintiffs and each of the California Indirect Purchaser Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

i.    The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

j.    The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the California Class to pay supracompetitive and artificially-inflated prices for LCD products. California plaintiffs and the members of the California Indirect Purchaser Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.    The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

l.    As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and

by defendants' unfair competition.  California plaintiffs and the members of the California Indirect Purchaser Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

303.    Plaintiff David Walker incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which LCD was sold, distributed or obtained in the District of Columbia.

b.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

c.    Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff Walker and members of the District of Columbia Indirect Purchaser Class were deprived of free and open competition; and (4) Plaintiff Walker and members of the District of Columbia Indirect Purchaser Class paid supra-competitive, artificially inflated prices for LCD.

d.    As a direct and proximate result of the defendants' conduct, Plaintiff Walker and members of the District of Columbia Indirect Purchaser Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff Walker and all members of the District of Columbia Indirect Purchaser Class seek all relief available under that statute.

304.    Plaintiffs Scott Eisler and Robin Feins ("Florida Plaintiffs") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.    Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated throughout Florida; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida Plaintiffs and members of the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) Florida Plaintiffs and members of the Florida Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

b.    During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers.

c.    As a direct and proximate result of defendants' unlawful conduct, Florida Plaintiffs and members of the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Florida Plaintiffs and all members of the Florida Indirect Purchaser Class seek all relief available under that statute.

305.    Plaintiff John Okita ("Hawaii Plaintiff") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.    Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated

throughout Hawaii; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supracompetitive, artificially inflated prices for LCD.

    b.    During the Class Period, defendants' illegal conduct substantially affected Hawaii commerce and consumers.

    c.    As a direct and proximate result of defendants' unlawful conduct, Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured and are threatened with further injury.

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.,* and, accordingly, Hawaii Plaintiff and all members of the Hawaii Indirect Purchaser Class seek all relief available under that statute.

306.    Plaintiff Christopher Murphy ("Massachusetts Plaintiff") and members of the Massachusetts Indirect Purchaser Class incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

    b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which LCD was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class.

c.   Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class were deprived of free and open competition; and (4) Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class paid supra-competitive, artificially inflated prices for LCD.

d.   As a direct and proximate result of defendants' unlawful conduct, Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class were injured and are threatened with further injury.

e.   Each of the defendants has been served with a demand letter in accordance with G.L. c. 93A, § 9, or such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each defendant served has failed to make a reasonable settlement offer.

f.   By reason of the foregoing, defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling the Massachusett Plaintiffs and members of the Massachusetts Indirect Purchaser Class to multiple damages.

307.   Plaintiff Benjamin Larry Luber ("Missouri Plaintiff") and members of the Missouri Indirect Purchaser Class incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.  Plaintiff Luber and members of the Missouri Indirect Purchaser Class purchased LCD panels for personal, family, or household purposes.

b.  Defendants engaged in the conduct described herein in connection with the sale of LCD in trade or commerce in a market that includes Missouri.

c.  Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which LCD was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff Luber and the members of the Missouri Indirect Purchaser Class.

d.  Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff Luber and the members of the Missouri Indirect Purchaser Class concerning defendants' unlawful activities and artificially inflated prices for LCD.  The concealed, suppressed, and omitted facts would have been important to Plaintiff Luber and the members of the Missouri Indirect Purchaser Class as they related to the cost of LCD they purchased.

e.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in LCD panels by making public statements that were not in accord with the facts.

f.  Defendants' statements and conduct concerning the price of LCD were deceptive as they had the tendency or capacity to mislead Plaintiff Luber and the members of the Missouri Indirect Purchaser Class to believe that they were purchasing LCD at prices established by a free and fair market.

g.      Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated throughout Missouri; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff Luber and members of the Missouri Indirect Purchaser Class were deprived of free and open competition; and (4) Plaintiff Luber and members of the Missouri Indirect Purchaser Class paid supra-competitive, artificially inflated prices for LCD.

h.      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

i.      As a direct and proximate result of the above-described unlawful practices, Plaintiff Luber and members of the Missouri Indirect Purchaser Class suffered ascertainable loss of money or property.

j.      Accordingly, Plaintiff Luber and members of the Missouri Indirect Purchaser Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

308.    New Mexico Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at

1          non-competitive and artificially inflated levels, the prices at which

2          LCD was sold, distributed or obtained in New Mexico and took

3          efforts to conceal their agreements from New Mexico Plaintiffs and

4          members of the New Mexico Indirect Purchaser Class.

5      b.     The aforementioned conduct on the part of the defendants

6          constituted "unconscionable trade practices," in violation of

7          N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in

8          a gross disparity between the value received by New Mexico

9          Plaintiffs and the members of the New Mexico Indirect Purchaser

10         Class and the prices paid by them for LCD as set forth in N.M.S.A.,

11         § 57-12-2E.

12     c.     Defendants' unlawful conduct had the following effects:  (1) LCD

13         price competition was restrained, suppressed, and eliminated

14         throughout New Mexico; (2) LCD prices were raised, fixed,

15         maintained, and stabilized at artificially high levels throughout New

16         Mexico; (3) New Mexico Plaintiffs and members of the New

17         Mexico Indirect Purchaser Class were deprived of free and open

18         competition; and (4) New Mexico Plaintiffs and members of the

19         New Mexico Indirect  Purchaser Class paid supra-competitive,

20         artificially inflated prices for LCD.

21     d.     During the Class Period, defendants' illegal conduct substantially

22         affected New Mexico commerce and consumers.

23     e.     As a direct and proximate result of the unlawful conduct of the

24         defendants, New Mexico Plaintiffs and members of the New Mexico

25         Indirect Purchaser Class have been injured and are threatened with

26         further injury.

27     f.     Defendants have engaged in unfair competition or unfair or

28         deceptive acts or practices in violation of New Mexico Stat. § 57-12-

1, *et seq.,* and, accordingly, New Mexico plaintiffs and all members of the New Mexico Indirect Purchaser Class seek all relief available under that statute.

309.   New York Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.   Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which LCD was sold, distributed or obtained in New York and took efforts to conceal their agreements from New York Plaintiffs and the New York Indirect Purchaser Class.

b.   The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c.   Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated throughout New York; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York Plaintiffs and members of the New York Indirect Purchaser Class were deprived of free and open competition; and (4) New York Plaintiffs and members of the New York Indirect Purchaser Class paid supra-competitive, artificially inflated prices for LCD.

d.   During the Class Period, defendants' illegal conduct substantially affected New York commerce and consumers.

e.   During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed LCD in New York.

f.   New York Plaintiffs and members of the New York Indirect Purchaser Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

310.   North Carolina Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

a.   Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which LCD was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and the North Carolina Indirect Purchaser Class.

b.   The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

c.   Defendants' unlawful conduct had the following effects:  (1) LCD price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) LCD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) North Carolina Plaintiff and members of

the North Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for LCD.

    d.    During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce and consumers.

    e.    During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed LCD in North Carolina.

    f.    North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.,* and, accordingly, North Carolina Plaintiff and all members of the North Carolina Indirect Purchaser Class seek all relief available under that statute.

311.    Plaintiff Dr. Robert Mastronardi and the members of the Rhode Island Indirect Purchaser Class incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

    a.    Plaintiff Mastronardi and members of the Rhode Island Indirect Purchaser Class purchased LCD for personal, family, or household purposes.

    b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which LCD was sold, distributed, or obtained in Rhode Island.

1    c. Defendants deliberately failed to disclose material facts to Plaintiff

2      Mastronardi and the members of the Rhode Island Indirect Purchaser

3      Class concerning defendants' unlawful activities and artificially

4      inflated prices for LCD. Defendants owed a duty to disclose such

5      facts, and considering the relative lack of sophistication of the

6      average, non-business consumer, defendants breached that duty by

7      their silence. Defendants misrepresented to all consumers during the

8      Class Period that defendants' LCD prices were competitive and fair.

9    d. Defendants' unlawful conduct had the following effects:  (1) LCD

10      price  competition was restrained, suppressed, and eliminated

11      throughout Rhode Island; (2) LCD prices were raised, fixed,

12      maintained, and stabilized at artificially high levels throughout

13      Rhode Island; (3) Plaintiff Mastronardi and members of the Rhode

14      Island Indirect Purchaser Class were deprived of free and open

15      competition; and (4) Plaintiff Mastronardi and members of the

16      Rhode Island Indirect Purchaser Class paid supra-competitive,

17      artificially inflated prices for LCD.

18    e. As a direct and proximate result of the defendants' violations of law,

19      Plaintiff Mastronardi and members of the Rhode Island Indirect

20      Purchaser Class suffered an ascertainable loss of money or property

21      as a result of defendants' use or employment of unconscionable and

22      deceptive commercial practices as set forth above. That loss was

23      caused by defendants' willful and deceptive conduct, as described

24      herein.

25    f. Defendants' deception, including its affirmative misrepresentations

26      and omissions concerning the price of LCD, likely misled all

27      consumers acting reasonably under the circumstances to believe that

28      they were purchasing LCD at prices born by a free and fair market.

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff Mastronardi and the members of the Rhode Island Indirect Purchaser Class as they related to the cost of LCD they purchased.

g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.,* and, accordingly, Plaintiff Mastronardi and all members of the Rhode Island Indirect Purchaser Class seek all relief available under that statute.

312.  Plaintiff Watson and the members of the Vermont Indirect Purchaser Class incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which LCD was sold, distributed, or obtained in Vermont.

b.  Defendants deliberately failed to disclose material facts to Plaintiff Watson and the members of the Vermont Indirect Purchaser Class concerning defendants' unlawful activities and artificially inflated prices for LCD. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' LCD prices were competitive and fair.

c.  Defendants' unlawful conduct had the following effects:  (1) LCD price  competition was restrained, suppressed, and eliminated throughout Vermont; (2) LCD prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout Vermont; (3)
Plaintiff Watson and all members of the Vermont Indirect Purchaser
Class were deprived of free and open competition; and (4) Plaintiff
Watson and members of the Vermont Indirect Purchaser Class paid
supra-competitive, artificially inflated prices for LCD.

d.   As a direct and proximate result of the defendants' violations of law,
Plaintiff Watson and members of the Vermont Indirect Purchaser
Class suffered an ascertainable loss of money or property as a result
of defendants' use or employment of unconscionable and deceptive
commercial practices as set forth above. That loss was caused by
defendants' willful and deceptive conduct, as described herein.

e.   Defendants' deception, including its affirmative misrepresentations
and omissions concerning the price of LCD, likely misled all
consumers acting reasonably under the circumstances to believe that
they were purchasing LCD at prices born by a free and fair market.
Defendants' misleading conduct and unconscionable activities
constitutes unfair competition or unfair or deceptive acts or practices
in violation of 9 Vermont § 2451, *et seq.,* and, accordingly, Plaintiff
Watson and all members of the Vermont Indirect Purchaser Class
seek all relief available under that statute.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray:

A.   That the Court determine that the Sherman Act, state antitrust law, and state
consumer protection and unfair competition law claims alleged herein may be maintained as class
actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed
by the respective state class action laws.

B.   That the unlawful conduct, contract, conspiracy or combination alleged
herein be adjudged and decreed to be:

1.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

2.    Acts of unjust enrichment as set forth in the Second Claim for Relief herein;

3.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws identified in the Third Claim for Relief herein; and

4.    Violations of the state consumer protection and unfair competition laws identified in the Fourth Claim for Relief herein.

C.    That the plaintiffs and the Classes alleged herein recover damages, to the maximum extent allowed under such laws as provided by state antitrust laws, and that a joint and several judgment in favor of plaintiffs and the Class be entered against the defendants in an amount to be trebled to the extent permitted by such laws;

D.    That the plaintiffs and the Classes alleged herein recover damages, to the maximum extent allowed by state consumer protection laws, except that plaintiffs and the New York Indirect Purchaser Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law Sec. 349(h).

E.    That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.    That the Court enter an order of divestiture requiring defendants to rescind and/or dissolve the cooperation agreements, joint ventures and/or cross-license agreements alleged herein between and among them used to facilitate the conspiracy alleged herein;

1    G.    That plaintiffs and members of the Class be awarded restitution, including

2  disgorgement of profits obtained by defendants as a result of their acts of unfair competition and

3  acts of unjust enrichment;

4    H.    That plaintiffs and members of the Class be awarded pre- and post-judgment

5  interest as provided by law, and that such interest be awarded at the highest legal rate from and

6  after the date of service of the initial complaint in this action;

7    I.    That plaintiffs and members of the Class recover their costs of suit,

8  including a reasonable attorney's fee, as provided by law; and

9    J.    That plaintiffs and members of the Class have such other, further, and

10  different relief as the case may require and the Court may deem just and proper under the

11  circumstances.

12  Dated:  April 29, 2011

*/s/ Francis O. Scarpulla*
Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
Heather T. Rankie (268002)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:     (415) 693-0700
Facsimile:      (415) 693-0770
fscarpulla@zelle.com

*/s/Joseph M. Alioto*
Joseph M. Alioto (42680)
Theresa D. Moore (99978)
ALIOTO LAW FIRM
555 California Street, Suite 3160
San Francisco, CA 94104
Telephone:     (415) 434-8900
Facsimile:      (415-434-9200
josephalioto@mac.com
esexton@alioto.law.com

*Co-Lead Class Counsel for Indirect-Purchaser Plaintiffs*

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1   Daniel R. Shulman                        Christopher Lovell
    Jeremy L. Johnson                        Imtiaz A. Siddiqui
2   Gray Plant Mooty Mooty & Bennett, PA     Lovell Stewart Halebian LLP
    500 IDS Center                           61 Broadway, Suite 501
3   80 South Eighth Street                   New York, NY  10006
    Minneapolis, MN  55402                   Telephone:      (212) 608-1900
4   Telephone:      (612) 632-3335           Facsimile:      (212) 719-4775
    Facsimile:      (612) 632-4335           clovell@lshllp.com
5   daniel.shulman@gpmlaw.com
    jeremy.johnson@gpmlaw.com
6
    Thomas V. Girardi                        Josef D. Cooper
7   Girardi & Keese                          Tracy R. Kirkham
    1126 Wilshire Boulevard                  Cooper & Kirkham, P.C.
8   Los Angeles, CA  90017-1904              357 Tehama Street, Second Floor
    Telephone:      (213) 977-0211           San Francisco, CA 94103
9   Facsimile:      (213) 481-1554           Telephone:      (415) 788-3030
    tgirardi@girardikeese.com                Facsimile:      (415) 882-7040
10                                           jdc@coopkirk.com

11  Daniel E. Gustafson                      Jack W. Lee
    Renae D. Steiner                         B. Mark Fong
12  Brian Williams                           Brad Yamauchi
    Jason S. Kilene                          Derek G. Howard
13  Gustafson Gluek PLLC                     Minami Tamaki, LLP
    650 Northstar East                       360 Post Street, 8th Floor
14  608 Second Avenue South                  San Francisco, CA  94108-4903
    Minneapolis, MN 55402                    Telephone:      (415) 788-9000
15  Telephone:      (612) 333-8844           Facsimile:      (415) 398-3887
    Facsimile:      (612) 339-6622           jlee@minamitamaki.com
16  dgustafson@gustafsongluek.com            mfong@minamitamaki.com
    rsteiner@gustafsongluek.com
17
    Allan Steyer                             Mark J. Schirmer
18  Jill Manning                             Straus & Boies, LLP
    Bryan M. Kreft                           1661 International Place Drive, Suite 400
19  Steyer Lowenthal Boodrookas Alvarez &    Memphis, TN 38120
    Smith, LLP                               Telephone:      (901) 818-3146
20  One California Street, Third Floor       Facsimile:      (901) 818-3147
    San Francisco, CA  94111                 mschirmer@straus-boies.com
21  Telephone:      (415) 421-3400
    Facsimile:      (415) 421-2234
22  asteyer@steyerlaw.com
    jmanning@steyerlaw.com
23

24

25

26

27

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

David Boies, III
Timothy D. Battin
Ian Otto
Nate Cihlar
Straus & Boies, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
Telephone:      (703) 764-8700
Facsimile:      (703) 764-8704
dboies@straus-boies.com
tbattin@straus-boies.com
iotto@straus-boies.com
ncihlar@straus-boies.com

Gordon Ball
Ball & Scott
Suite 750, Bank of America Center
550 Main Street
Knoxville, TN 37902
Telephone:      (865) 525-7028
Facsimile:      (865) 525-4679
gball@ballandscott.com

C. Donald Amamgbo
Amamgbo & Associates, PLC
7901 Oakport Street, Suite 4900
Oakland, CA  94621
Telephone:      (510) 615-6000
Facsimile:      (510) 615-6025
donald@amamgbolaw.com

Brian Barry, Esq.
Law Offices of Brian Barry
1801 Avenue of the Stars, Suite 307
Los Angeles, CA  90067
Telephone:      (310) 788-0831
Facsimile:      (310) 788-0841
bribarry1@yahoo.com

Neil Overholtz
Douglass Kreis
Justin Witkin
Aylstock, Witkin, Kreis & Overholtz, PLC
4400 Bayou Boulevard, Suite 58
Pensacola, FL 32503
Telephone:      (850) 916-7450
Facsimile:      (850) 916-7449
noverholtz@awr.law.com

John H. Boone
Law Offices of John H. Boone
555 California Street, Suite 3160
San Francisco, CA  94104
Telephone:      (415) 434-8900
Facsimile:      (415) 434-9200
jboone@dc.rr.com

Eric J. Pickar
Gregory J. Erlandson
Bangs McCullen Butler Foye
     & Simmons, LLP
333 West Boulevard, Suite 400
P.O. Box 2670
Rapid City, SD 57709-2670
Telephone:      (605) 343-1040
Facsimile:      (605) 343-1503
gerlandson@bangsmccullen.com

Michael L. Belancio
Bower Belancio, LLC
800 West 47th Street, Suite 215
Kansas City, MO 64112
Telephone:      (816) 960-4911
Facsimile:      (816) 960-3711
mbelancio@bblawkc.com

Michael S. Bearse
Law Offices of Michael S. Bearse, PC
226 South Main Street
Providence, RI  02930
Telephone:      (401) 331-7720
Facsimile:      (401) 453-2549
msbearse@comcast.net

Thomas H. Brill
Law Office of Thomas H. Brill
6552 Sagamore Road
Mission Hills, KS 66208
Telephone:      (913) 677-2004
Facsimile:      (913) 677-2152
brillkc@aol.com

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Andrew S. Friedman
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone:     (602) 274-1100
Facsimile:     (602) 274-1199
afriedman@bffb.com

Michael J. Flannery
James J. Rosemergy
Carey & Danis, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis, MO  63105
Telephone:     (314) 725-7700
Facsimile:     (314) 721-0905
mflannery@careydanis.com

C. Dewey Branstetter, Jr.
J. Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue North
Nashville, TN 37201
Telephone:     (615) 254-8801
Facsimile:     (615) 250-3937
cdbjr@braanstetterlaw.com
gstranch@branstetterlaw.com

Steven N. Berk
Chavez & Gertler, LLP
1225 15th Street, NW
Washington, D.C.  20005
Telephone:     (202) 232-7550
Facsimile:     (202) 232-7556
steven@chavezgertler.com

Louis F. Burke
Louis F. Burke, PC
460 Park Avenue, 21st Floor
New York, NY 10022
Telephone:     (212) 682-1700
Facsimile:     (212) 808-4280
lburke@lfblaw.com

Richard L. Coffman
The Coffman Law Firm
1240 Orleans Street, Suite 200
Beaumont, TX 77701
Telephone:     (409) 832-4767
Facsimile:     (866) 835-8250
rc@cofflaw.com

John M. Dillon
Caruso & Dillon PC
100 Mamaroneck Avenue
Mamaroneck, NY 10543
Telephone:     (914) 698-6392
Facsimile:     (914) 698-2038
john.dillon@dillonlaw.com

Joseph M. Weiler
Darin M. Conklin
Alderson Alderson Weiler Conklin
    Burghart & Crow, L.L.C.
2101 SW 21st Street
Topeka, KS 66604
Telephone:     (785) 232-0753
Facsimile:     (785) 232-1866
jweiler@aldersonlaw.com
dconklin@aldersonlaw.com

Joseph G. Sauder
Benjamin F. Johns
James R. Malone, Jr.
Chimicles & Tikellis, LLP
361 West Lancaster Avenue
Haverford, PA  19041
Telephone:     (610) 642-8500
bfj@chimicles.com
jamesmalone@chimicles.com

Dario De Ghetaldi
Corey Luzaich Pliska deGhetaldi Nastari LLP
700 El Camino Real
P.O. Box 669
Millbrae, CA 94030
Telephone:     (650) 871-5666
Facsimile:     (650) 871-4144
deg@coreylaw.com

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1

Irwin B. Levin
Scott D. Gilchrist
2    Cohen & Malad, LLP
One Indiana Square, Suite 1400
3    Indianapolis, IN 46204
Telephone:      (317) 636-6481
4    Facsimile:      (317) 636-2593
ilevin@cohenandmalad.com
5

Joseph F. Devereux, Jr.
Devereux Murphy LLC
The Plaza at Clayton
190 Carondelet, Suite 1100
St. Louis, MO 63105
Telephone:      (314) 721-1516
Facsimile:      (314) 721-4434
jfdevereuxjr@devereuxmurphy.com

6

7    Roger M. Schrimp
Clinton P. Walker
8    Fred Silva
Kathy Lee Monday
9    Damrell Nelson Schrimp Pallios
      Pacher & Silva
10   1601 I Street, Fifth Floor
Modesto, CA  95354
11   Telephone:      (209) 526-3500
Facsimile:      (209) 526-3534
12   rschrimp@damrell.com
cwalker@damrell.com

Wyatt B. Durrette, Jr.
Christopher G. Hill
Christine A. Williams
Edward J. Westlow
DurretteBradshaw, PLC
600 East Main Street, 20th Floor
Richmond, VA 23219-2430
Telephone:      (804) 775-6900
Facsimile:      (804) 775-6911
wdurrette@durrettebradshaw.com
chill@durrettebradshaw.com
cwilliams@durrettebradshaw.com
ewestlow@durrettebradshaw.com

13   Clint Sargent
Danforth & Meierhenry
14   315 South Phillips Avenue
Sioux Falls, SD 57104
15   Telephone:      (605) 336-3075
Facsimile:      (605) 336-2593
16   clint@meierhenrylaw.com

17

Scott E. Poynter
Christopher D. Jennings
Emerson Poynter, LLP
The Museum Center
500 President Clinton Avenue, Suite 305
Little Rock, AR  72201
Telephone:      (501) 907-2555
Facsimile:      (501) 907-2556
spoynter@emersonpoynter.com

18   James M. Dombrowski
Attorney at Law
19   P.O. Box 751027
Petaluma, CA  94975
20   Telephone:      (707) 762-7807
Facsimile:      (707) 769-0419
21   jdomski@aol.com

22

Gregg Vance Fallick
Attorney at Law
Albuquerque Plaza, Suite 1560
201 Third Street, N.W.
Albuquerque, NM 87102
Telephone:      (505) 842-6000
Facsimile:      (505) 842-6001
gvf@fallicklaw.com

23   Chief Nnamdi A. Ekenna
The Ekenna Law Firm, *apc*.
24   4311 Wilshire Boulevard, Suite 612-B
Los Angeles, CA 90010-3717
25   Telephone:      (323) 954-1000
Facsimile:      (323) 954-1001
chiefekenna@aol.com

Russell F. Brasso
Foreman & Brasso
930 Montgomery Street, Suite 600
San Francisco, CA 94133
Telephone:      (415) 433-3475
Facsimile:      (415) 781-8030
brasso@foremanandbrasso.com

26

27

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

John G. Emerson
Emerson Poynter, LLP
830 Apollo Lane
Houston, TX  77058
Telephone:      (281) 488-8854
Facsimile:      (281) 488-8867
gemerson@emersonpoynter.com

Adam Stein
Ferguson Stein Chambers Gresham
    & Sumter, PA
312 West Franklin Street
Chapel Hill, NC 27516
Telephone:      (919) 933-5300
Facsimile:      (919) 933-6182
astein@fergusonstein.com

William F. Patterson, Jr.
Forman Rossabi Black, P.A.
3623 North Elm Street, Suite 200
Greensboro, NC 27455
Telephone:      (336) 378-1899
Facsimile:      (336) 378-1850
wfp@frb-law.com

Paul M. Weiss
William M. Sweetnam
Freed & Weiss, LLC
111 West Washington Street, Suite 1331
Chicago, IL   60602
Telephone:      (312) 220-0000
Facsimile:      (312) 220-7777
paul@freedweiss.com

Carl L. Solomon
Gergel, Nickles & Solomon, P.A
P.O. Box 1866
1519 Richland Street
Columbia, SC 29202-1866
Telephone:      (803) 779-8080
Facsimile:          (803) 256-1816
csolomon@gnslaw.com

Michael G. Simon
M. Eric Frankovitch
Frankovitch Anetakis Colantonio & Simon
337 Penco Road
Weirton, WV  26062
Telephone:      (304) 723-4400
Facsimile:      (304) 723-5892
msimon@facslaw.com

Daniel A. Freedman
Joseph Goldberg
Matthew L. Garcia
Freedman Boyd Daniels Hollander
    Goldberg & Ives, PA
20 First Plaza, Suite 700
Albuquerque, NM  87102
Telephone:      (505) 842-9960
Facsimile:      (505) 842-0761
jg@fbdlaw.com

Charles R. Watkins
John R. Wylie
Futterman Howard Watkins Wylie
    & Ashley, Chtd.
122 South Michigan Avenue, Suite 1850
Chicago, IL   60603
Telephone:      (312) 427-3600
Facsimile:      (312) 427-1850
cwatkins@futtermanhoward.com
jwylie@futtermanhoward.com

Robert J. Gralewski
Gergosian & Gralewski, LLP
750 B Street, Suite 1250
San Diego, CA  92101
Telephone:      (619) 237-9500
Facsimile:      (619) 237-9555
bob@gralewski.com

B.J. Wade
Glassman Edwards Wade & Wyatt, PC
26 North Second Street
Memphis, TN  38103
Telephone:      (901) 527-4675
Facsimile:      (901) 521-0940
bwade@gewwlaw.com

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| | |
|---|---|
| Kenneth G. Gilman | Mark Goldman |
| Daniel D'Angelo | Daniel K. Karon |
| Gilman and Pastor, LLP | Goldman Scarlato & Karon |
| 225 Franklin Street, 16th Floor | 101 W. Elm Street, Suite 360 |
| Boston, MA 02110 | Conschohocken, PA 19428 |
| Telephone: (617) 742-9700 | Telephone: (484) 342-0700 |
| Facsimile: (617) 742-9701 | Facsimile: (484) 342-0701 |
| kgilman@gilmanpastor.com | karon@gsk-law.com |

Susan G. Kupfer
Sylvie K. Kern
Glancy Binkow & Goldberg, LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166
skupfer@glancylaw.com
skern@glancylaw.com

Robert S. Green
Elizabeth C. Guarnieri
Brian S. Umpierre
Green Welling, LLP
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
rsg@classcounsel.com
ecg@classcounsel.com

Steven E. Grubb
Goldberg Katzman, P.C.
320 Market Street, P.O. Box 1268
Harrisburg, PA 17108-1268
Telephone: (717) 234-4161
Facsimile: (717) 234-6808
seg@goldbergkatzman.com

Jeffrey A. Bartos
Soye Kim
Guerrieri Edmond Clayman & Bartos, P.C.
1625 Massachusetts Avenue, NW, Suite 700
Washington, DC 20036
Telephone: (202) 624-7400
Facsimile: (202) 624-7420
jbartos@geclaw.com
skim@geclaw.com

Terry Gross
Adam Belsky
Gross & Belsky, LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94104
Telephone: (415) 544-0200
Facsimile: (415) 544-0201
terry@grossbelsky.com
adam@grossbelsky.com

J. Robert Keena
Barton C. Gernander
Hellmuth & Johnson, PLLC
10400 Viking Drive, Suite 500
Eden Prairie, MN 55344
Telephone: (952) 941-4005
Facsimile: (952) 941-2337
jkeena@jhlawfirm.com
bgernander@hjlawfirm.com

Steven K. Hisaka
Gail Y. Cosgrove
Kunio Kuwabe
Hisaka Yoshida & Cosgrove
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 3000
Honolulu, HI 96813
Telephone: (808) 523-0451
Facsimile: (808) 524-0422
shisaka@objectionsustained.com
gcosgrove@objectionsustained.com
kkuwabe@objectionsustained.com

Glenn Carl James
James Law Offices
PMB 501, 1353 Rd. 19
Guaynabo, PR 00966-2700
Telephone: (787) 763-2888
Facsimile: (787) 763-2881
jameslawoffices@centennialpr.net

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Dennis J. Stewart
Jennifer A. Kagan
Hulett Harper Stewart LLP
550 West C Street, Suite 1600
San Diego, CA 92101
Telephone:      (619) 338-1133
Facsimile:      (619) 338-1139
dstewart@hulettharper.com
jenni@hulettharper.com

Edward Bearman
JG Law Firm
780 Ridge Lake Boulevard, Suite 202
Memphis, TN 38120
Telephone:      (901) 682-3450
Facsimile:      (901) 682-3590
ebearman@jglawfirm.com

Steven C. Lausell
Jose R. Gonzalez
Jimenez, Graffam & Lausell
P.O. Box 366104
San Juan, PR 00936-6104
Telephone:      (787) 767-1030
Facsimile:      (787) 751-4068
slausell@jgl.com
jgonzalez@jgl.com
manager@jgl.com

Dennis J. Johnson
Johnson & Perkinson
1690 Williston Road
P.O. Box 2305
South Burlington, VT  05403
Telephone:      (802) 862-0030
Facsimile:      (802) 862-0060
djohnson@jpclasslaw.com
email@jpclasslaw.com

Kelly Kenny
Attorney at Law
P.O. Box 528
San Mateo, CA 94401
Telephone:      (650) 558-9041
Facsimile:      (650) 558-9041
kellykenny2@sbcglobal.net

Daniel J. Mulligan
Larry W. Gabriel
Jenkins Mulligan & Gabriel, LLP
660 Market Street, 3rd Floor
San Francisco, CA 94104
Telephone:      (415) 982-8500
Facsimile:      (415) 982-8515
dan@jmglawoffices.com
lgabriel@jmglawoffices.com

Michael Stoker
Brian Weber
Johns Flaherty & Collins, SC
Exchange Building, Suite 600
205 Fifth Avenue, South
LaCrosse, WI  54602
Telephone:      (608) 784-5678
Facsimile:      (608) 785-0557
michael@johnsflaherty.com
brian@johnsflaherty.com

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone:      (206) 623-1900
Facsimile:      (206) 623-3384
lsarko@kellerrohrback.com
mgriffin@kellerrohrback.com
jbright@kellerrohrback.com
rfarrow@kellerrohrback.com

Thomas D. Kershaw, Jr.
Thomas D. Kershaw, Jr., PC
184 Gooding Street, West
P.O. Box 2497
Twin Falls, ID 83303
Telephone:      (208) 734-9622
Facsimile:      (208) 734-6944
tkershaw@sunvalley.net

Mary G. Kirkpatrick
Kirkpatrick & Goldsborough, PLLC
1233 Shelburne Road, Suite E-1
South Burlington, VT 05403
Telephone:      (802) 651-0960
Facsimile:      (802) 651-0964
mkirkpatrick@vtlawfirm.com

Daniel Hume
David E. Kovel
Beverly Tse
Kirby McInerney & Squire, LLP
830 Third Avenue, 16th Floor
New York, NY  10022
Telephone:      (212) 371-6600
Facsimile:      (212) 751-2540
dhume@kmslaw.com

Kevin J. O'Connor
Adam C. Briggs
LaFollette Godfrey & Kahn, SC
One East Main Street
P.O. Box 2719
Madison, WI 53701-2719
Telephone:      (608) 284-2600
koconnor@gklaw.com

Susan LaCava
Susan LaCava, SC
23 North Pinckney Street
Madison, WI  53703
Telephone:      (608) 258-1335
Facsimile:      (608) 258-1669
sl@susanlacava.com

Samuel W. Lanham, Jr.
Lanham & Blackwell, P.A.
470 Evergreen Woods
Bangor, ME 04401
Telephone:      (207) 942-2898
Facsimile:      (207) 941-8818
slanham@lanhamblackwell.com

Gregory W. Landry
LaMarca & Landry, PC
1820 NW 118th Street, Suite 200
Des Moines, IA 50325
Telephone:      (515) 225-2600
Facsimile:      (515) 225-8581
justin@lamarcalandry.com

Angela K. Drake
Lowther Johnson
901 St. Louis Street, 20th Floor
Springfield, MO 65806
Telephone:      (417) 866-7777
Facsimile:      (417) 866-1752
adrake@lowtherjohnson.com

Jayne A. Goldstein
Shepherd, Finkelman, Miller & Shah, LLP
1640 Town Center Circle, Suite 216
Weston, FL  33326
Telephone:      (954) 515-0123
Facsimile:      (954) 515-0124
jgoldstein@sfmslaw.com

Lee Albert
Amir Stark
Mager & Goldstein, LLP
1818 Market Street, Suite 3710
Philadelphia, PA  19103
Telephone:      (215) 640-3280
Facsimile:      (215) 640-3281
lalbert@magergoldstein.com
astark@magergoldstein.com

Stanley S. Mallison
Hector R. Martinez
Law Offices of Mallison & Martinez
1042 Brown Avenue, Suite A
Lafayette, CA  94549
Telephone:      (925) 283-3842
Facsimile:      (925) 283-3426
hectorm@mallisonlaw.com

Donna F. Solen
Gary E. Mason
The Mason Law Firm, LLP
1225 19th Street, NW, Suite 500
Washington, DC 20036
Telephone:      (202) 429-2290
Facsimile:      (202) 429-2294
dsolen@masonlawfirmdc.com

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| | |
|---|---|
| Gary D. McAllister | Robert G. Methvin, Jr. |
| Eric I. Unrein | Philip W. McCallum |
| Jamie Goldstein | James Terrell |
| Thomas A. Kelliher | McCallum, Methvin & Terrell, P.C. |
| Gary D. McAllister & Associates, LLC | The Highland Building |
| 120 North LaSalle Street, Suite 2800 | 2201 Arlington Avenue South |
| Chicago, IL  60602 | Birmingham, AL 35205 |
| Telephone:      (312) 345-0611 | Telephone:      (205) 939-3006 |
| Facsimile:      (312) 345-0612 | Facsimile:      (205) 939-0399 |
| gdm@gdmlawfirm.com | rgm@mmlaw.net |
| | pwm@mmlaw.net |
| | jterrell@mmlaw.net |
| | |
| John Gressette Felder, Jr. | James McManis |
| Chad A. McGowan | Colleen Duffy Smith |
| McGowan Hood Felder and Johnson | Marwa Elzankaly |
| 1405 Calhoun Street | McManis Faulkner & Morgan |
| Columbia, SC 29201 | 50 West San Fernando Street, 10th Floor |
| Telephone:      (803) 779-0100 | San Jose, CA 95113 |
| Facsimile:      (803) 787-0750 | Telephone:      (408) 279-8700 |
| cmcgowan@mcgowanhood.com | Facsimile:      (408) 279-3244 |
| | jmcmanis@mfmlaw.com |
| | melzankaly@mfmlaw.com |
| | |
| Floyd M. Melton, III | Gil D. Messina |
| Melton Law Firm | Messina Law Firm, PC |
| 107½ East Market | 961 Holmdel Road |
| P.O. Box 534 | Holmdel, NJ  07733 |
| Greenwood, MS 38935-0534 | Telephone:      (732) 332-9300 |
| Telephone:      (662) 453-8016 | Facsimile:      (732) 332-9301 |
| Facsimile:      (662) 453-0145 | gmessina@messinalawfirm.com |
| fmmiii@bellsouth.net | |
| | |
| Pete S. Michaels | Greg A. Lewen |
| Deborah G. Evans | James Fox Miller |
| Jennifer R. Seltenrich | Miller, Schwartz & Miller, P.A. |
| Michaels & Ward, LLP | 2435 Hollywood Boulevard |
| 12 Post Office Square, 4th Floor | Hollywood, FL 33020 |
| Boston, MA 02109 | Telephone:      (954) 924-0300 |
| Telephone:      (617) 350-4040 | Facsimile:      (954) 924-0311 |
| Facsimile:      (617) 350-4050 | glewen@msmlawyers.com |
| psm@michaelsward.com | jmiller@msmlawyers.com |
| dge@michaelsward.com | |
| jrs@michaelsward.com | |
| | |
| Daniel J. Mogin | Michael S. Montgomery |
| Chad M. McManamy | Montgomery Goff & Bullis, P.C. |
| Noah D. Sacks | 4802 Amber Valley Parkway |
| Brian A. Barnhorst | P.O. Box 9199 |
| The Mogin Law Firm, PC | Fargo, ND 58106-9199 |
| 110 Juniper Street | Telephone:      (701) 281-8001 |
| San Deigo, CA  92101 | Facsimile:      (701) 281-8007 |
| Telephone:      (619) 687-6611 | mike@bullislaw.com |
| Facsimile:      (619) 687-6610 | |
| dan@moginlaw.com | |

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| | |
|---|---|
| 1 | Rodney C. Olsen |
| | Morrison, Frost, Olsen & Irvine, LLP |
| 2 | 323 Poyntz, Suite 204 |
| | Manhattan, KS 66502 |

1   Rodney C. Olsen
    Morrison, Frost, Olsen & Irvine, LLP
2   323 Poyntz, Suite 204
    Manhattan, KS 66502
3   Telephone:    (785) 776-9208
    Facsimile:    (785) 776-9212
4   olsen@mfoilaw.com

5

6   Krishna B. Narine
    Law Offices of Krishna B. Narine
    7893 Montgomery Avenue, Suite 300
7   Elkins Park, PA 19027
    Telephone:    (215) 782-3240
8   Facsimile:    (215) 782-3241
    knarine@kbnlaw.com
9

10  Lawrence D. Nwajei
    Law Offices of Lawrence D. Nwajei
11  5850 Canoga Avenue, Suite 400
    Woodland Hills, CA  91367
12  Telephone:    (818) 710-2775
    Facsimile:    (818) 914-4851
13  ldnwajei@aol.com

14  William H. Parish
    Parish & Small
15  1919 Grand Canal Boulevard, Suite A-5
    Stockton, CA  95207-8114
16  Telephone:    (209) 952-1992
    Facsimile:    (209) 952-0250
17  whparish@parishsmall.com

18  Jeffery Kenneth Perkins
    Law Offices of Jeffery K. Perkins
19  1275 Columbus Avenue, Suite 208
    San Francisco, CA  94133
20  Telephone:    (415) 474-3833
    jefferykperkins@aol.com
21

22

23  Michael L. Roberts
    Richard Quintus
    Roberts Law Firm, PA
24  20 Rahling Circle
    P.O. Box 241790
25  Little Rock, AR 72223
    Telephone:    (501) 821-5575
26  Facsimile:    (501) 821-4474
    robertslawfirm@aristotle.net
27

28

Gilmur R. Murray
Murray & Howard, LLP
760 Market Street, Suite 1068
San Francisco, CA 94102
Telephone:    (415) 461-3200
Facsimile:    (415) 461-3208
gmurray@murrayhowardlaw.com
dhoward@murrayhowardlaw.com

Andrew C. Skinner
Nichols & Skinner, LC
115 East Washington Street
P.O. Box 487
Charles Town, WV  25414-0487
Telephone:    (304) 725-7029
Facsimile:    (304) 725-4082
ac@nicholsandskinner.com

Lawrence G. Papale
Law Offices of Lawrence G. Papale
1308 Main Street, Suite 117
St. Helena, CA  94574
Telephone:    (707) 963-1704
Facsimile:    (707) 963-0706
lgpapale@papalelaw.com

Joseph M. Patane
Law Office of Joseph M. Patane
2280 Union Street
San Francisco, CA  94123
Telephone:    (415) 563-7200
Facsimile:    (415) 346-0679
jpatane@tatp.com

Garrett D. Blanchfield, Jr.
Reinhardt Wendorf & Blanchfield
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:    (651) 287-2100
Facsimile:    (651) 287-2103
g.blanchfield@rwblawfirm.com

Dianne M. Nast
Rodanast, PC
801 Estelle Drive
Lancaster, PA  17601
Telephone:    (717) 892-3000
Facsimile:    (717) 892-1200
dnast@rodanast.com

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| | |
|---|---|
| 1 | Cory M. Jones |
| | Royal Jones Miles Dunkley & Wilson |
| 2 | 2920 North Green Valley Parkway, Suite 424 |
| | Henderson, NV 89014 |
| 3 | Telephone:    (702) 471-6777 |
| | Facsimile:    (702) 531-6777 |
| 4 | cjones@royaljoneslaw.com |

1    Cory M. Jones
Royal Jones Miles Dunkley & Wilson
2    2920 North Green Valley Parkway, Suite 424
Henderson, NV 89014
3    Telephone:    (702) 471-6777
Facsimile:    (702) 531-6777
4    cjones@royaljoneslaw.com

Andrew A. Nickelhoff
Marshall J. Widick
Sachs Waldman, PC
1000 Farmer Street
Detroit, MI  48226
Telephone:    (313) 965-3464
(313) 965-4602
anickelhoff@sachswaldman.com

5

6    Terry Rose Saunders
Thomas A. Doyle
Saunders & Doyle
7    20 South Clark Street, Suite 1728
Chicago, IL  60603
8    Telephone:    (312) 551-0051
Facsimile:    (312) 551-4467

Alexander M. Schack
Law Offices of Alexander M. Schack
11440 West Bernardo Court, Suite 300
San Diego, CA  92127
Telephone:    (858) 485-6535
Facsimile:    (858) 485-0608
amslawoffice@aol.com

9

10    Robert C. Schubert
Willem F. Jonckheer
Miranda P. Kolbe
11    Schubert Jonckheer & Kolbe LLP
Three Embarcadero Center, Suite 1650
12    San Francisco, CA 94111
Telephone:    (415) 788-4220
13    Facsimile:    (415) 788-0161
rschubert@schubert-reed.com
14    wjonckheer@schubert-reed.com

Jonathan Shub
Seeger Weiss LLP
1515 Market Street, Suite 1380
Philadelphia, PA  19102
Telephone:    (215) 564-2300
Facsimile:    (215) 851-8029
jshub@seegerweiss.com

15    Christopher A. Seeger
TerriAnne Benedetto
16    Seeger Weiss LLP
One William Street
17    New York, NY  10004
Telephone:    (212) 584-0700
18    Facsimile:    (212) 584-0799
cseeger@seegerweiss.com
19    tbenedetto@seegerweiss.com

Steven J. Serratore
Scott Ames
Serratore Ames LLP
9595 Wilshire Boulevard, Suite 201
Beverly Hills, CA 90212
Telephone:    (310) 205-2460
Facsimile:    (310) 205-2464
steve@serratoreames.com

20    Isaac L. Diel
Sharp McQueen
21    6900 College Boulevard, Suite 285
Overland Park, KS 66211
22    Telephone:    (913) 661-9931
Facsimile:    (913) 661-9935
23    dslawkc@aol.com

Glenn J. Shaull
The Highland Building
2201 Arlington Avenue, South
Birmingham, AL  35205
Telephone:    (205) 933-8501
Facsimile:    (205) 933-8560
gjslaw@bellsouth.net

24    Douglas P. Dehler
Shepherd Finkelman Miller & Shah, LLC
25    111 East Wisconsin Avenue, Suite 1750
Milwaukee, WI  53202
26    Telephone:    (415) 226-9900
Facsimile:    (415) 226-9905
27    ddehler@classactioncounsel.com

Natalie Finkelman Bennett
Nathan Zipperian
Shepherd Finkelman Miller & Shah, LLC
35 East State Street
Media, PA  19063
Telephone:    (610) 891-9880
Facsimile:    (610) 891-9883

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| | |
|---|---|
| Jordan M. Lewis | W.H. Bundy, Jr. |
| Siegel Brill Greupner Duffy & Foster, P.A. | Smith Bundy Bybee & Barnett, P.C. |
| 1300 Washington Square | Building F, Suite 100 |
| 100 Washington Avenue South | 1037 Chuck Dawley Boulevard |
| Minneapolis, MN 55401 | Mount Pleasant, SC 29464 |
| Telephone:    (612) 337-6100 | Telephone:    (843) 881-1623 |
| Facsimile:    (612) 339-6591 | Facsimile:    (843) 881-4406 |
| jordanlewis@sbgdf.com | whbesq@s3blaw.com |

| | |
|---|---|
| Bruce Spiva | Jared Stamell |
| Kathleen Hartnett | Stamell & Schager, LLP |
| Spiva & Hartnett, LLP | One Liberty Plaza, 35th Floor |
| 1776 Massachusetts Avenue, NW, Suite 600 | New, NY  10006 |
| Washington, D.C.  20036 | Telephone:    (212) 566-4047 |
| Telephone:    (202) 785-0601 | |
| Facsimile:    (202) 785-0697 | |
| bspiva@spivahartnett.com | |
| khartnett@spivahartnett.com | |

| | |
|---|---|
| G. Mark Albright | Lori E. Andrus |
| Albright Stoddard Warnick & Albright | Jennie Lee Anderson |
| Quail Park I, Building D-4 | Andrus Anderson LLP |
| 801 South Rancho Drive | 155 Montgomery Street, Suite 900 |
| Las Vegas, NV 89106-3854 | San Francisco, CA 94104 |
| Telephone:    (702) 384-7111 | Telephone:    (415) 986-1440 |
| Facsimile:    (702) 384-0605 | Facsimile:    (415) 986-1474 |
| gma@albrightstoddard.com | lori@libertylaw.com |

| | |
|---|---|
| Kenneth G. Walsh | Shawn A. Taylor |
| Straus & Boies, LLP | Taylor Law Firm, PLLC |
| Two Depot Plaza | 120 Capitol Street |
| Bedford Hills, NY  10507 | P.O. Box 2132 |
| Telephone:    (914) 244-3200 | Charleston, WV 25328 |
| Facsimile:    (914) 244-3260 | Telephone:    (304) 345-5959 |
| kwalsh@straus-boies.com | Facsimile:    (304) 345-0270 |
| | judge@shawtaylor.com |

| | |
|---|---|
| J. Preston Strom, Jr. | Jason J. Thompson |
| Mario A. Pacella | J. Thompson & Associates PLC |
| Strom Law Firm, LLC | 26000 West 12 Mile Road |
| 2110 Beltline Boulevard, Suite A | Southfield, MI 48034 |
| Columbia, SC 29204 | Telephone:    (248) 436-8448 |
| Telephone:    (803) 252-4800 | Facsimile:    (248) 436-8453 |
| Facsimile:    (803) 252-4801 | jthompson@jta-law.com |
| petestrom@stromlaw.com | |
| mpacella@stromlaw.com | |

| | |
|---|---|
| Reginald Terrell | Thomas E. Towe |
| The Terrell Law Group | Towe Ball Enright Mackey & Sommerfeld |
| 223 25th Street | P.O. Box 30457 |
| Richmond, CA  94804 | Billings, MT 59107 |
| Telephone:    (510) 237-9700 | Telephone:    (406) 248-7337 |
| Facsimile:    (510) 237-4616 | Facsimile:    (406) 248-2647 |
| reggiet2@aol.com | towe@tbems.com |

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| | |
|---|---|
| LeRoy D. Percy | Kenneth Leo Valinoti |
| Grady F. Tollison, Jr. | Valinoti & Dito LLP |
| Tollison Law Firm, P.A. | 180 Montgomery Street, Suite 940 |
| 100 Courthouse Square | San Francisco, CA 94104-4223 |
| P.O. Box 1216 | Telephone:    (415) 986-1338 |
| Oxford, MS 38655 | Facsimile:    (415) 986-1231 |
| Telephone:    (662) 234-7070 | kvalinoti@valinoti-dito.com |
| Facsimile:    (662) 234-7095 | |
| gray@tollisonlaw.com | |
| roy@tollisonlaw.com | |
| | |
| Mario N. Alioto | George O. West, III |
| Lauren C. Russell | Law Offices of George O. West, III |
| Trump Alioto Trump & Prescott, LLP | 6787 West Tropicana Avenue, Suite 263 |
| 2280 Union Street | Las Vegas, NV 89103 |
| San Francisco, CA  94123 | Telephone:    (702) 248-1076 |
| Telephone:    (415) 563-7200 | Facsimile:    (702) 953-2286 |
| Facsimile:    (415) 346-0679 | gowesq@cox.net |
| malioto@tatp.com | |
| laurenrussell@tatp.com | |
| | |
| S. Thomas Wienner | Joe R. Whatley, Jr. |
| Wienner & Gould, P.C. | Whatley Drake & Kallas |
| 950 West University Drive, Suite 350 | 1540 Broadway, 37th Floor |
| Rochester, MI 48307 | New York, NY 10036 |
| Telephone:    (248) 841-9400 | Telephone:    (212) 447-7070 |
| Facsimile:    (248) 652-2729 | Facsimile:    (212) 447-7077 |
| twienner@wiennergould.com | jwhatley@whatleydrake.com |
| | |
| Kenneth A. Wexler | Marc Aaron Wites |
| Wexler Toriseva Wallace, LLP | Wites & Kapetan |
| 55 West Monroe Street, Suite 3300 | 4400 North Federal Highway |
| Chicago, IL  60603 | Lighthouse Point, FL 33064 |
| (312) 346-2222 | Telephone:    (954) 570-8989 |
| (312) 346-0022 | Facsimile:    (954) 354-0205 |
| kaw@wtwlaw.com | mwites@wklawyers.com |
| | |
| Lingel H. Winters, Esq. | Patrick D. Allen |
| Law Offices of Lingel H. Winters, APC | Michael S. Jahner |
| The Alcoa Building, Suite 400 | Yenson, Lynn, Allen & Wosick, P.C. |
| One Maritime Plaza | 4908 Alameda Boulevard NE |
| San Francisco, CA 94111 | Albuquerque, NM 87113-1736 |
| Telephone:    (415) 398-2941 | Telephone:    (505) 266-3995 |
| Facsimile:    (415) 393-9887 | Facsimile:    (505) 268-6694 |
| sawmill2@aol.com | pallen@ylawfirm.com |
| | mjahner@ylawfirm.com |
| | |
| James F. Wyatt, III | Micha Star Liberty |
| Wyatt & Blake, LLP | Liberty Law Office |
| 435 East Morehead Street | 414 13th Street, 17th Floor |
| Charlotte, NC  28202-2609 | Oakland, CA 94612 |
| Telephone:    (704) 331-0767 | Telephone:    (510) 645-1000 |
| Facsimile:    (704) 331-0773 | Facsimile:    (888) 645-2008 |
| jwyatt@wyattlaw.net | |

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1

Timothy J. Becker                          Kimberly A. Kralowec
Brian C. Gudmundson                        The Kralowec Law Group

2

Zimmerman Reed                             188 The Embarcadero, Suite 800
651 Nicollet Mall, Suite 501               San Francisco, CA 94105

3

Minneapolis, MN 55402                      Telephone:     (415) 546-6800
Telephone:     (612) 341-0400              Facsimile:     (415) 546-6801

4

tjb@zimmreed.com                           kkralowec@kraloweclaw.com
bcg@zimmreed.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1

## JURY TRIAL DEMAND

2

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by

3

jury for all issues so triable.

4

Dated:  April 29, 2011

5

6

7

8

9

10

11

*/s/Francis O. Scarpulla*

Francis O. Scarpulla (41059)
Craig C. Corbitt (83251)
Judith A. Zahid (215418)
Patrick B. Clayton (240191)
Qianwei Fu (242669)
Heather T. Rankie (268002)
ZELLE HOFMANN VOELBEL & MASON
LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:      (415) 693-0700
Facsimile:      (415) 693-0770
fscarpulla@zelle.com

12

13

14

15

16

17

*/s/Joseph M. Alioto*

Joseph M. Alioto (42680)
Theresa D. Moore (99978)
ALIOTO LAW FIRM
555 California Street, Suite 3160
San Francisco, CA 94104
Telephone:      (415) 434-8900
Facsimile:      (415-434-9200
josephalioto@mac.com
esexton@alioto.law.com

18

19

*Co-Lead Class Counsel for Indirect-Purchaser Plaintiffs*

20

21

#3224373v3

22

23

24

25

26

27

28

INDIRECT-PURCHASER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT