David H. Orozco (220732)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dorozco@susmangodfrey.com

Attorneys for Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust
[additional counsel listed on signature page]

H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO., LTD.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; HITACHI, LTD.; HITACHI DISPLAYS, LTD.; AND HITACHI ELECTRONIC DEVICES (USA), INC.,<br><br>Defendants. | Case No. 10-cv-5625 SI<br><br>Master File No. 07-cv-1827 SI<br><br>MDL No. 1827 SI<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br><ins>**JURY TRIAL DEMANDED**</ins> |

Plaintiff Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), submits this First Amended Complaint against defendants AU Optronics Corporation, AU Optronics Corporation America, Inc, Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co. Ltd., Nexgen Mediatech, Inc., Nexgen Mediatech USA, Inc., Chunghwa Picture Tubes Ltd., Tatung Company of America, Inc., HannStar Display Corporation, LG Display Co. Ltd., LG Display America, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Samsung Electronics America, Inc., Sharp Corporation, Sharp Electronics Corporation, Toshiba Corporation, Toshiba America Electronics Components, Inc., Toshiba Mobile Display Co., Ltd., Toshiba America Information Systems, Inc., Epson Imaging Devices Corporation, Epson Electronics America, Inc, Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. Circuit City Trust alleges the following based on its personal knowledge, investigation by counsel, publicly available materials from the *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, 07-md-01827-SI, the related federal guilty pleas and indictments, and upon information and belief.

# I. <u>INTRODUCTION</u>

1. Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City Stores, Inc. and its affiliated companies ("Circuit City") caused by a long running and largely-admitted conspiracy among suppliers of liquid crystal display panels ("LCD Panels") and related products ("LCD Products"). The purpose of this conspiracy was to eliminate competition between the co-conspirators and thereby to fix, raise, stabilize, and maintain the prices of LCD Panels and LCD Products sold directly or indirectly to U.S. customers, including Circuit City, which purchased LCD Products both directly and indirectly from the defendants.

2. Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States. Throughout the period of the conspiracy alleged herein, Circuit City purchased LCD Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors. These purchases took place

throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received LCD Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

3.   On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1]   On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust.   Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the Circuit City Trust.   The Plan became effective on November 1, 2010.

4.   From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels and LCD Products.   To that end, senior executives of the defendants instructed their subordinates in the United States to communicate with employees of their competitors to exchange pricing and other competitive information to be used in fixing prices for LCD Panels and LCD Products sold to U.S. companies. The defendants' employees engaged in these illegal communications and information exchanges in the United States, and utilized that information to increase the prices that U.S. customers like Circuit City paid for LCD Panels and LCD Products.

5.   As a result of defendants' price fixing conspiracy, Circuit City was injured in its business by paying substantially more for LCD Products than it otherwise would have paid in the

---

[1]   *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

absence of the defendants' conspiracy. Under all of the applicable laws, the Circuit City Trust therefore seeks to recover its actual damages, any and all statutory and punitive damages, pre-judgment interest and post judgment interest, and the costs of suit, including reasonable attorneys' fees, for the injuries that Circuit City suffered as a result of the defendants' and their co-conspirators' conspiracy to fix, raise, maintain and artificially stabilize the prices of LCD Panels and LCD Products.

## II. JURISDICTION/VENUE

6.     Because Circuit City Trust brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, which gives the federal courts jurisdiction over private antitrust enforcement actions like this one, this Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337. As to Circuit City Trust's claims under the antitrust, unfair competition and consumer protection laws of the State of California and Illinois, jurisdiction exists pursuant to 28 U.S.C. § 1367.

7.     This Court also has personal jurisdiction over the defendants because each defendant is either an alien corporation, transacts business in this District, or is otherwise formed in this District, and because a substantial portion of the acts, events or omissions giving rise to these claims occurred in this State and this District, as well as many others. In fact, defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the State of California and Illinois. Defendants' products are sold in the flow of interstate commerce, and defendants' activities have had a direct, substantial and reasonably foreseeable effect on such commerce. Defendants and their coconspirators knew that price-fixed LCD Panels and LCD Products containing price-fixed LCD Panels would be sold and shipped into this District.

8.     Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

9.     The price-fixing claims asserted herein by the Circuit City Trust are related to complex multidistrict litigation that is pending in this Court. That litigation is styled *In re TFT-LCD Antitrust Litigation*, Case No. M:07-CV-1827 SI. Judge Susan Illston is the presiding judge.

As this case involves substantially the same parties, transactions, events, and requests for relief as sought by the class and opt-out plaintiffs in that multidistrict litigation, Circuit City Trust respectfully requests that this civil action be transferred to and consolidated with the multidistrict litigation before Judge Illston.

III.   **DEFINITIONS**

10.    The term "LCD Panel" means liquid crystal display panel. Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image. The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image. As used herein, "LCD Panel" refers to both liquid crystal display panels and to modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a television, computer monitor, or other product. During the Conspiracy Period, LCD Panels used in certain products included three different technologies: thin film transistor ("TFT") panels, color super-twist nematic ("CSTN") panels, and monochrome super-twist nematic ("MSTN") panels. The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products.

11.    "LCD Products" means a product in which LCD Panels are a key component, including without limitation televisions, desktop computer monitors, notebook computers, digital cameras, mobile wireless handsets, and other products.

12.    As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

IV.   **THE PARTIES**

A.     **THE PLAINTIFF**

13.    Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

4

14.   Circuit City was headquartered in Richmond, Virginia.   During the Conspiracy Period, Circuit City purchased in the United States large numbers of LCD Products manufactured by defendants, their co-conspirators, and others.   Many of Circuit City's purchases of LCD Products were made directly from defendants, their subsidiaries, or their affiliated companies. Circuit City's negotiations for the purchase of LCD Products took place in the United States; purchase orders for LCD Products were issued from the United States; and invoices for LCD Products were received by Circuit City in the United States..

**B.   THE DEFENDANTS**

**AU Optronics**

15.   Defendant AU Optronics Corporation is one of the largest manufacturers of LCD Panels. Its corporate headquarters are at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, AU Optronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

16.   Defendant AU Optronics Corporation America, Inc., is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation. Its corporate headquarters are at 9720 Cypresswood Drive, Suite 241, Houston, Texas. It also has facilities located in San Diego and Cupertino, California. During the Conspiracy Period, AU Optronics Corporation America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

17.   Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc., are referred to collectively herein as "AU Optronics." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant AU Optronics Corporation America, Inc., was a member of the conspiracy, *inter alia*, by reason of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc., regarding conspiracy activities, and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

18.     As is explained more fully below, AU Optronics Corporation, AU Optronics Corporation America, Inc., and six of their key officers have already been indicted on federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Chi Mei**

19.     Defendant Chi Mei Corporation is one of the world's largest manufacturers of LCD Panels. Its corporate headquarters are at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan. During the Conspiracy Period, Chi Mei Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

20.     Defendant Chi Mei Optoelectronics Corporation is one of the world's largest manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation. Its global headquarters are at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. During the Conspiracy Period, Chi Mei Optoelectronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

21.     Defendant Chi Mei Optoelectronics USA, Inc., formerly known as International Display Technology USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its corporate headquarters are at 101 Metro Drive, Suite 510, San Jose, California. During the Conspiracy Period, Chi Mei Optoelectronics USA, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

22.     Defendant CMO Japan Co., Ltd., formerly known as International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation. Its principal place of business is at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, CMO Japan Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

23.     Defendant Nexgen Mediatech, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, Nexgen Mediatech, Inc., marketed,

sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

24. Defendant Nexgen Mediatech USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at 16712 East Johnson Drive, City of Industry, California. During the Conspiracy Period, Nexgen Mediatech USA, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

25. Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., are referred to collectively herein as "Chi Mei." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation. Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., regarding conspiracy activities, and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

26. As is explained more fully below, Chi Mei and four of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. A fifth officer has been indicted, but his case remains pending.

**Chunghwa**

27. Defendant Chunghwa Picture Tubes Ltd. is a leading manufacturer of LCD Products. Its global headquarters are at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan. During the Conspiracy Period, Chunghwa Picture Tubes Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

28. Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California. During the Conspiracy Period, Tatung America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

29. Defendants Chunghwa Picture Tubes Ltd. and Tatung America are referred to collectively herein as "Chunghwa." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. During the Conspiracy Period, Chunghwa Picture Tubes Ltd. and Tatung America were closely affiliated, commonly owned, and commonly controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or alter egos of each other. Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.

30. As is explained more fully below, Chunghwa and three of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. Two other of its officers have been indicted for that same conduct.

**HannStar**

31. Defendant HannStar Display Corporation ("HannStar") has its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period, HannStar manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

32. As is explained more fully below, HannStar and one of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**LG Display**

33. Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and/or LCD Products. It was created in 1999 as a joint venture between Royal Philips Electronics NV and LG Electronics, Inc. LG Display Co., Ltd. has

its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. LG Display Co., Ltd. also maintains offices in San Jose, California. During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

34.   Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California. During the Conspiracy Period, LG Display America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

35.   Defendants LG Display Co., Ltd. and LG Display America, Inc., are referred to collectively herein as "LG Display." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc., was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

36.   As is explained more fully below, LG Display and two of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.  A third officer has been indicted, but has not yet been arrested and arraigned.

**Samsung**

37.   Defendant Samsung Electronics Co., Ltd. has its principal place of business at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea. During the Conspiracy Period, Samsung Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

38.   Defendant Samsung Electronics America, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd. Its principal place of business is at 105 Challenger Road, Ridgefield Park, New Jersey. During the Conspiracy Period, Samsung Electronics America,

9

Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

39. Defendant Samsung Semiconductor, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd. Its principal place of business is at 3655 North First Street, San Jose, California. During the Conspiracy Period, Samsung Semiconductor, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

40. Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., are referred to collectively herein as "Samsung." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**Sharp**

41. Defendant Sharp Corporation has its principal place of business at 22-22 Nagaikecho, Abeno-ku, Osaka 545-8522, Japan. During the Conspiracy Period, Sharp Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

42. Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation. Its principal place of business is at Sharp Plaza, Mahwah, New Jersey. During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

43. Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp." They participated in the conspiracy through the actions of their

10

respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

44. As is explained more fully below, Sharp has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Toshiba**

45. Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan. During the Conspiracy Period, Toshiba Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

46. Defendant Toshiba Mobile Display Co., Ltd., formerly known as Matsushita Display Technology Co., Ltd., has its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan. During the Conspiracy Period, Toshiba Mobile Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

47. Defendant Toshiba America Electronic Components, Inc., is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation. Its corporate headquarters are at 19900 MacArthur Blvd., Ste. 400, Irvine, California. During the Conspiracy Period, Toshiba America Electronic Components, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

48. Defendant Toshiba America Information Systems, Inc., is a wholly-owned and controlled subsidiary of Toshiba America, Inc. Its principal place of business is at 9470 Irvine Boulevard, Irvine, California. During the Conspiracy Period, Toshiba America Information Systems, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

49.   Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., are referred to collectively herein as "Toshiba." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**Epson**

50.   Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan. The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation. Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

51.   Defendant Epson Electronics America, Inc., ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation. Its principal place of business is at 2580 Orchard Parkway, San Jose, California. During the Conspiracy Period, Epson America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

52.   Defendants Epson Japan and Epson America are referred to collectively herein as "Epson." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant

Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan. Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

53.  As is explained more fully below, Epson has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Hitachi**

54.  Defendant Hitachi, Ltd is a Japanese company with its principal place of business at 6-6 Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of LCD Panels. In 2002, it spun off its LCD Panel manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Conspiracy Period, Hitachi, Ltd. manufactured, sold, and distributed LCD Products to customers in the U.S. and elsewhere.

55.  Defendant Hitachi Displays, Ltd., is a Japanese company with its principal place of business at 3300, Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays, Ltd. was formed in 20002 and acquired Defendant Hitachi, Ltd.'s LCD Panel manufacturing business. Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Conspiracy Period, Hitachi Displays, Ltd. manufactured, sold, and distributed LCD Products to customers in the U.S. and elsewhere.

56.  Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina. Its ultimate parent company is Hitachi, Ltd. During the Conspiracy Period, Hitachi Electronic Devices (USA), Inc. sold and distributed LCD Products to customers in the U.S. and elsewhere.

57.  Defendants Hitachi, Ltd, Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi."

58.  As is explained more fully below, Hitachi has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. One of Hitachi's key executives has also been indicted, but has not yet been arrested and arraigned.

13

## V.     CIRCUIT CITY'S PURCHASES OF LCD PANELS AND LCD PRODUCTS

59.     During the Conspiracy Period, Circuit City purchased over one billion dollars worth of LCD Products manufactured by defendants, at prices that were artificially high due to defendants' conspiracy. Circuit City suffered injury caused by the conspiracy when it purchased LCD Products from defendants, their affiliates and other manufacturers of LCD Products.

60.     During the Conspiracy Period, Circuit City received shipments of and took title to LCD Products at its distribution centers in Walnut, California; Livermore, California; and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint. Under Circuit City's contracts with defendants and other LCD Product vendors, Circuit City did not take title to a substantial amount of the LCD Products ordered by Circuit City until it received and accepted shipments of those LCD Products at its distribution centers in California. From its distribution centers in California and other states, Circuit City shipped LCD Products to its retail stores. Circuit City also shipped LCD Products directly to consumers from its distribution centers in California through online sales.

61.     During the Conspiracy Period, Circuit City received shipments of and took title to LCD Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois laws invoked in this Complaint. Under Circuit City's contracts with defendants and other LCD Product vendors, Circuit City did not take title to a substantial amount of the LCD Products ordered by Circuit City until it received and accepted shipments of those LCD Products at its distribution center in Illinois. From its distribution center in Illinois and other states, Circuit City shipped LCD Products to its retail stores. Circuit City also shipped LCD Products directly to consumers from its distribution center in Illinois through online sales.

## VI.     THE MARKET FOR LCD PANELS AND LCD PRODUCTS

62.    During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels and LCD Products in the United States through and into interstate and foreign commerce, including through the states of Virginia and California.

63.    During the Conspiracy Period, defendants collectively controlled the market for LCD Panels and LCD Products, both globally and in the United States.

64.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

65.    LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.

66.    LCD Panels have no independent utility, and have value only as components of other products, such as televisions, desktop computer monitors, notebook computer displays, and laptop displays. The demand for LCD Panels thus derives directly from the demand for such products. In the case of LCD Panels used in televisions, the demand for LCD Panels derives directly from the demand for televisions.

67.    The market for LCD Panels is enormous, in part because of the extraordinarily high demand for televisions and other LCD Products. Manufacturers produced approximately 48.4 million LCDs for televisions in 2006.

68.    Products using medium-size and large LCD Panels, such as televisions, desktop monitors, and computers, in 2004, made up 90% of the revenues for LCD panel makers.

69.    Purchasers, including OEMs, buy LCD Panels in order to include them as components in TVs, computer monitors, laptops, and other electronic products. The defendants unlawful conspiracy inflated the prices at which OEMs bought LCD Panels.

70.    Purchasers of LCD Products, including Circuit City, purchase LCD Products that incorporate a LCD panel. The defendants' unlawful conspiracy inflated the prices at which Circuit City bought products made with LCD Panels.   Circuit City was injured because it paid supracompetitive prices for LCD Panels contained in such products.

71.    Circuit City participated in the market for products containing LCD Panels because Circuit City purchased LCD Panels as part of  LCD products, including LCD televisions,

notebook computers, and desktop computer monitors. Defendants' unlawful conspiracy artificially inflated the prices at which Circuit City purchased LCD Products.

72. The market for LCD Panels and the market for LCD Products, like televisions, desktop computer monitors, and notebook computers, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products. The market for LCD Panels and the markets for LCD Products such as televisions, desktop computer monitors, and notebook computers are, for all intents and purposes, inseparable in that one would not exist without the other.

## VII. DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS AND LCD PRODUCTS.

73. During the Conspiracy Period, the defendants were aware that the U.S. market for LCD Products was one of the largest in the world. Defendants regularly solicited updated information from potential purchasers of LCD Panels about the type and quantity of LCD Panels needed for the manufacture of LCD Products for sale in the United States. Defendants also maintained sales offices and sales agents in the United States to market their LCD Panel manufacturing capabilities to U.S. companies and to support U.S. customers throughout the duration of the purchasing relationship.

### A. DEFENDANTS' AGREEMENTS TO SET PRICES AND LIMIT PRODUCTION

74. The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, Korea, Taiwan, and the United States. In the early years, beginning in at least 1996, representatives of the Japanese Defendants Hitachi, Sharp and Toshiba met and agreed to fix prices for LCD Panels generally, as well as to fix the LCD prices to be charged to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

75. In the early years, when the conspiracy was principally limited to the Japanese Defendants, bilateral discussions were the preferred method of communication. As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

16

76. As LCD production in Korea began to increase and become more sophisticated, the Japanese Defendants expanded their meetings to include their Korean competitors, including Defendants LG Display and Samsung, both of which also agreed to fix prices and control supply. At or about this same time, the Japanese Defendants began to partner with those Defendants located in Taiwan to trade technology and collaborate on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan. In 2001, the Korean Defendants convinced Taiwanese LCD panel manufacturers, including Defendants AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and control supply. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell LCD Panels and products to their own corporate subsidiaries and affiliates that manufactured LCD-panel containing products, thereby ensuring that LCD panel prices remained the same as between Defendants and their OEM customers, preventing the price competition on LCD Products that would have benefitted the consumers of those products.

### 1. Crystal Meetings.

77. In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information, to fix the price of LCD Panels, and to limit their production. From early 2001 through at least 2006, officials from Defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LGD, Sharp, and perhaps others met periodically in Taiwan to discuss and reach agreements on LCD panel prices, price increases, production limits, and production capacity. The group meetings these Defendants participated in were called "Crystal Meetings." Each defendant attended multiple meetings with one or more of the other Defendants during this period. The Crystal price-fixing and output-limitation meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States, on a regular basis, throughout this period.

78. The Crystal Meetings were highly organized and followed a set pattern. Meetings among Defendants' high-level executives were called "CEO" or "Top" meetings; those among

Defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

79. "CEO" meetings occurred quarterly from approximately 2001 through 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

80. The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently than "CEO" meetings, occurring on a near-monthly basis.

81. During all of these meetings, Defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

82. During these CEO/Commercial meetings, Defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreements concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

83. During these CEO/Commercial meetings, Defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of the Defendants not involved in LCD panel pricing or production. On at least one occasion of which plaintiffs are aware, top

executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such meeting.

84.  The structure of the so-called "working level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "working level" meetings was to exchange information on price, supply and demand, and production.  That information would then be transmitted up the corporate reporting chain to those individuals with pricing authority and the responsibility for giving effect to the anti-competitive agreements made at the CEO and Commercial meetings.

85.  In approximately the summer of 2006, when they began to have concerns about antitrust issues, defendants discontinued the working-level meetings in favor of one-on-one meetings to exchange pricing and supply information. The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "round robin" set of meetings until all competitors had met with each other. These "round robin" meetings took place until at least November or December of 2006. The information obtained at these meetings was transmitted up the defendants' corporate reporting chains to permit the defendants to maintain their price-fixing and production-limitation agreement.

2.  Bilateral Discussions.

86.  During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants and co-conspirators not attending these meetings.  Certain defendants were "assigned" to communicate with those defendants not in attendance, and assigned to obtain their agreement to synchronize the price and production limitations agreed to at the Crystal Meetings.  For example, it was HannStar's responsibility to contact Hitachi, and to relay the agreed-upon prices and production limitations to Hitachi.  Subsequently, the Japanese Defendants implemented the agreed-upon pricing and production limitations that had been conveyed to Hitachi by Hannstar.  This was one of the ways in which the Japanese Defendants, in particular, participated in the conspiracy to fix the prices and limit the production of LCD Panels.

87. Crystal Meetings were also supplemented by additional bilateral discussions between various defendants in which they exchanged information about pricing, shipments, and production. As is more fully alleged below, defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by Defendants during the Crystal Meetings. These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages. The information gained in these communications was then shared with supervisors, and taken into account in determining the price to be offered the defendants' OEM customers.

### 3. Defendants Participating in Price-Fixing Discussions

88. Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LGD, and Samsung attended multiple CEO, Commercial, and working-level meetings, as well as bilateral discussions during the Conspiracy Period. Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.

89. Defendant Sharp participated in multiple working-level meetings, as well as bilateral discussions with other defendants, during the Conspiracy Period. Through these discussions, Sharp agreed with the other defendants and co-conspirators named in this complaint on prices, price increases, and production limits and quotas for LCD Panels.

90. Defendant Hitachi participated in multiple bilateral discussions with defendants, including HannStar, during the Conspiracy Period. Through these discussions, Hitachi agreed on prices, price increases, and production limits and quotas for LCD Panels.

91. Defendant Toshiba participated in multiple bilateral discussions with other defendants, including Sharp, during the Conspiracy Period. Through these discussions, Toshiba agreed on prices, price increases, and production limits and quotas for LCD Panels. As pleaded below, defendant Sharp has admitted to participating in bilateral meetings, conversations, and communications in Japan and the United States with unnamed co-conspirators during which they fixed the prices of LCD Panels sold to Dell for use in computers; panels sold to Apple for use in

FIRST AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

iPods; and panels sold to Motorola for use in Razr phones during the Conspiracy Period. During this time, Toshiba was one of Sharp's principal competitors in the sale of LCD Panels to Dell for use in computers, as well as for panels sold to Apple for use in the iPod. In fact, in the small-to-medium size LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in the first half of 2005, with a 14.5 percent market share during the first quarter and a 14.1 percent market share during the second quarter. Sharp could not have successfully fixed the prices of LCD Panels sold to Dell or Apple unless Toshiba also agreed to fix prices of similar LCD Panels at supra-competitive levels to those two OEMs.

92. Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source flat panels with one or more of the defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and to fix the prices of such panels at unreasonably high levels and therefore to aid, abet, notify and facilitate the effectuation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with those other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba, Sharp, Matsushita, and Hitachi formed a joint venture to share basic LCD research costs. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April of 2002, Toshiba and Matsushita formed a joint venture, Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2004, Toshiba, Matsushita, and Hitachi formed a joint venture, IPS Alpha Technology, Ltd., which manufactures and sells LCD Panels for televisions. In 2006, Toshiba purchased a 20% stake in LG Display's LCD panel manufacturing facility in Poland. And in 2007, Toshiba and Sharp formed a joint venture in which Toshiba agreed to provide 50% of Sharp's chip needs and Sharp agreed to provide 40% of Toshiba's panel needs. The operation and management of these many different joint ventures enabled Toshiba and the other defendant-joint venture partners regular

21

opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for the LCD Panels that each defendant manufactured and sold.

**B.    MARKET CONDITIONS DEMONSTRATING THE CONSPIRACY**

93.    In addition to the guilty pleas and the evidence of the defendants' wrongdoing produced by the defendants themselves, the market for LCD Panels provides further evidence of the defendants' collusive behavior.

94.    The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships, and ease of information sharing.

95.    The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

96.    The LCD industry is characterized by high barriers to entry. New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment. Thus, new firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

97.    LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and televisions, are manufactured to a specific size, regardless of the manufacturer. The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and so to enforce their conspiracy.

98.    The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

     a.    the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;

b. the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd.;

c. the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;

d. the 2005 transfer of Fujitsu Limited's LCD business to Sharp in 2005;

e. the 2006 AU Optronics acquisition of Quanta Display.

99.  Additional opportunities for collusive activity were presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Under cover of such arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described hereinafter.

100. There were also many opportunities for defendants to discuss and exchange competitively-sensitive information through their common membership in trade associations, their interrelated business arrangements such as joint ventures, their shared national allegiances with other companies operating in the same countries, and relationships between their executives and the executives of competitor companies. Communication between the conspirators was further facilitated through meetings, telephone calls, e-mails, and instant messages.  Whatever the connections or the medium of information transfer, the defendants took advantage of these contacts to discuss and agree upon their pricing of LCD Panels and to monitor each other's compliance with their agreements.

101. Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion. Rather, the behavior in this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of unnaturally stabilizing and raising prices for LCD Panels at supra-competitive levels.

102. After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends. However, since at least 1996, the LCD Panel market has been characterized by unnatural price stability and periods of substantial upward pricing trends.

103. Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market. In a competitive market, price increases normally occur during shortage periods. Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

104. The demand for consumer electronic products and their component parts generally increases over time. As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period. For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

105. Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity. Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

106. In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity. In fact, defendants were fixing the prices.

107. LCD Panel prices began to increase in early 1996. Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

108. Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

109. 1996 also brought the advent of third generation fabs. Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops. Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

110. The supra-competitive level price of LCD Panels during the Conspiracy Period is demonstrated by, inter alia, the fact that costs decreased. One of the most significant costs in producing an LCD Panel is the cost of its component parts. Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass. During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods declining at a substantial rate. Thus, the gap between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

111. During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased. Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

112. LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

113. At the time, defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of defendants' agreements to fix, maintain, and/or stabilize the prices of LCD Panels, and defendants' false statements about supply shortages were

designed to conceal their price-fixing agreements. When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

114. These price increases occurred as production costs declined due to lower prices for parts and components, as well as improvements in manufacturing efficiency. These decreasing costs should have facilitated and resulted in lower prices and price competition among defendants. Instead, because defendants had entered into agreements to fix, raise, and maintain the prices for LCD Panels at artificially high levels, decreasing costs only resulted in extremely high profits for the conspirators. For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc., posted higher pretax profits than expected in the first quarter of 2002. AU Optronics reported revenue of NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion. Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

115. This increase in prices and revenue was unprecedented. During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc., later purchased by AU Optronics) rose 184% from the same period in 2001.

## C.    DEFENDANTS HAVE BEEN CHARGED WITH AND PLEADED GUILTY TO PRICE FIXING LCD PANELS AND LCD PRODUCTS IN THE U.S.

116. In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

117. On December 12, 2006, news reports indicated that in addition to LG Display, Defendants Samsung, Sharp and AU Optronics were also under investigation.

26

118. Throughout the remainder of December and into the new year, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.

119. At that time, it became clear that, beginning sometime in 2006, the Department of Justice had begun investigating charges that the defendants were engaged in a worldwide conspiracy for fixing the prices of LCD Panels and LCD Products.

120. That DOJ investigation has been and continues to be productive. Since late 2008, most of the defendants (and many of their officers) have pled guilty to criminal price-fixing charges. Even more have been charged with such crimes. Each of the pleas and indictments to date is noted below, and described in summary fashion.

### 1.    The AU Optronics Corporation Indictments

121. On June 10, 2010, the Department of Justice announced and filed grand jury indictments of AU Optronics Corporation, AU Optronics Corporation America, and six of AU Optronics' most senior officers including among others, Hsuan Bin Chen, AU Optronics' current President, and Hui Hsiung, AU Optronics' current Executive Vice President. Both companies and all of the officers were charged with participating in an unlawful criminal conspiracy to fix the prices of LCD Panels sold worldwide during at least the period from October 19, 2001 to December 1, 2006.[2]

122. These charges exposed each of the AU Optronics companies to $100 million plus in criminal fines and penalties, and exposed the company officers to minimum fines of $1 million and maximum imprisonments for ten years. As of the date of this Complaint, all or nearly all of the AU Optronics Defendants had appeared, been arraigned, and pled not guilty. The jury trial of the criminal charges against these AU Optronics Defendants is currently set for October 31, 2011.

### 2.    Pleas By LG Display Co., Ltd And LG Display America, Inc.[3]

---

[2]    *U.S. v. Lin, et al.*, 3:09-CR-0010-SI (4-11) (N.D. Cal. superseding indictment filed 6/10/10 and announced that same day).

[3]    *U.S. v. LG Display Co., Ltd. and LG Display America, Inc.*, No. CR 08-803-VRW (Information filed 11/12/08; plea agreement announced simultaneously but filed on 12/17/08).

FIRST AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

123. Both of the LG Display companies pled guilty to participating in a September 21, 2001 – June 1, 2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of LCD Panels sold in the United States and elsewhere. As a result of its December 2008 plea bargain, the LG Display companies agreed to pay a $400 million criminal fine, the second largest fine in Antitrust Division history.

124. In February of 2009, LG Display executive Chang Suk ("C.S.") Chung also pleaded guilty to participating in that same price-fixing conspiracy. Chung was sentenced to serve seven months in prison and pay a $25,000 criminal fine.[4] In that same month, a former LG Display executive, Duk Mo Koo, was indicted for participating in the same conspiracy.[5] A warrant has been issued for his arrest, but he has not yet been arrested, has not been arraigned, and has not entered a plea.

125. Later in April of 2009, another LG Display executive, Bock Kwon, was charged with participating in the same conspiracy. His plea agreement, filed on June 26, 2009, required him to serve one year in jail and to pay a criminal fine of $30,000.[6]

### 3. Pleas By Chi Mei Optoelectronics Corporation and Related Indictments [7]

126. In February of 2010, Chi Mei pled guilty to participating in a September 14, 2001-December 1, 2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of LCD Panels sold in the United States and elsewhere. As a result of its plea agreement, Chi Mei was obliged to pay a $220 million criminal fine.

127. Not long after Chi Mei's plea was entered, two Chi Mei executives also entered into plea agreements admitting that they had conspired with others to suppress and eliminate

---

[4] *U.S. v. Chang Suk Chung*, No. CR 09-0044-PJH (N.D. Cal. Information filed 1/15/09; plea agreement announced that same day, but filed 2/17/09).

[5] *U.S. v. Duk Mo Koo*, No. CR 09-00110-SI (N.D. Cal. Indictment filed 2/4/09; superseding indictment filed 6/10/10).

[6] *U.S. v. Bock Kwon*, No. CR 09-0437-SI-3 (N.D. Cal. Information filed 4/27/09, plea agreement filed 6/29/09).

[7] *U.S. v. Chi Mei Optoelectronics Corporation*, No. CR 09-1166-SI (N.D. Cal. Information filed 12/8/09; plea agreement filed 2/8/10). The plea agreement was announced contemporaneously with the filing of the information.

28

competition by fixing the prices of LCD Panels during the Conspiracy Period. Chi Mei's former president, Jau-Yang ("J.Y.") Ho agreed to pay a criminal fine of $50,000 and to serve 14 months in federal prison.[8] Chi Mei's former director of sales, Chu-Hsiang ("James") Yang was sentenced, per his plea agreement, to serve nine months in jail and pay a $25,000 fine.[9]

128. Later in the summer of 2010, these price-fixing guilty pleas were augmented by the guilty pleas of two other Chi Mei executives – Wen-Hung ("Amigo") Huang, Chi Mei's former director of sales, and Chen-Lung Kuo, formerly Chi Mei's Vice President for Sales. These two executives also pleaded guilty to the criminal price-fixing of LCD Panels during the Conspiracy Period. Huang agreed to serve nine months in jail and to pay a $25,000 criminal fine.[10] Kuo agreed to pay a $35,000 fine and serve nine months in jail.[11]

129. A fifth Chi Mei executive, Hsin-Tsung Wang, a former Chi Mei Vice President of Sales and Marketing was recently indicted for participating in the same price-fixing activities, during the same period as his convicted Chi Mei colleagues.[12] An arrest warrant has been issued for Wang, but as of the filing of this Complaint, he has not been arrested or arraigned, and had not entered any plea.

### 4. Pleas by Chunghwa Picture Tubes, Ltd. and Related Indictments[13]

130. Chunghwa pled guilty to participating in a 2001-2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of certain TFT-LCD [devices] sold in the United States and elsewhere. As part of its January, 2009 plea bargain, Chunghwa agreed to pay a $65 million criminal fine.

---

[8]     *U.S. v. Ho*, No. 3:10-CR-00355-SI-1 (N.D. Cal. Information filed 4/30/10; plea agreement announced that same day but filed on 6/2/10).

[9]     *U.S. v. Yang*, No. 3:10-CR-00335-SI-1 (N.D. Cal. Information filed 4/23/10; plea agreement announced on 4/30/10 but not filed until 5/6/10).

[10]    *U.S. v. Huang*, No. 3:10-CR-00579-SI-1 (N.D. Cal. Information filed 7/28/10; plea agreement announced that same day, but not filed until 8/12/10).

[11]    *U.S. v. Kuo*, No. 3:10-CR-005910-SI-2 (N.D. Cal. Information filed 8/4/10; plea agreement announced that same day, but not filed until 9/10/10).

[12]    *U.S. v. Wang*, No. 3:10-CR-00756-SI (N.D. Cal. Indictment filed 10/14/10).

[13]    *U.S. v. Chunghwa Picture Tubes, Ltd.*, No. 3:08-CR-00804-SI (N.D. Cal. Information filed 11/12/08; plea agreement filed on 1/16/09).

FIRST AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

131. In February of 2009, three former Chunghwa executives – CEO Chieng-Hon ("Frank") Lin, and sales executives Chih-Chun ("CC") Liu, and Hsueh-Lung ("Brian") Lee pleaded guilty to participating in the same conspiracy.[14] Lin was sentenced to nine months in prison and to the payment of a $50,000 criminal fine. Liu was sentenced to seven months in prison and the payment of a $30,000 criminal fine. Lee was sentenced to serve six months in prison and pay a $20,000 criminal fine.

132. New indictments were later issued against two other former Chunghwa executives, Cheng Yuan Lin a/k/a C.Y. Lin and Wen Jun Cheng a/k/a Tony Cheng.[15] Warrants have been issued for their arrest, but they had not been arrested or arraigned, and had not yet entered a plea as of the time this Complaint was filed.

### 5. Pleas By HannStar Display Corporation

133. In late June of 2010, the Department of Justice announced that HannStar had pleaded guilty to participating in a 2001-2006 conspiracy to fix the prices of LCD Panels sold worldwide. As part of its plea bargain, HannStar was obliged to pay a criminal fine of $30 million.[16]

134. Several months later, on October 27, 2010, former HannStar executive Jui Hung ("Sam") Wu pled guilty to conspiring with others to suppress and eliminate price competition in the worldwide market for LCD Panels during 2001-2006. Wu had been HannStar's Director of Global Sales and Marketing. His plea bargain required him to serve seven months in jail and pay a $20,000 criminal fine.[17]

### 6. Sharp Corporation's Plea[18]

---

[14] *U.S. v. Lin, et al.*, No. 3:09-CR-0045-MHP (N.D. Cal. Indictment filed 1/15/09; plea agreement filed 2/27/09).

[15] *U.S. v. Lin*, No. 3:09-CR-00110-SI-1 (N.D. Cal. Indictment filed 2/10/09; superseding indictment filed 6/10/10); *U.S. v. Cheng*, No. 3:09-CR-00110-SI-2 (N.D. Cal. Indictment filed 8/18/09; superseding indictment filed 6/10/10).

[16] *U.S. v. HannStar Display Corporation*, No. 3:10-CR-00498-SI (N.D. Cal. Information filed 6/29/10; plea agreement announced that same day but not filed until 8/5/10).

[17] *U.S. v. Wu*, No. 3:10-CR-00781 (N.D. Cal. Information filed 10/27/10; plea agreement announced that same day but not filed until 11/22/10).

[18] *U.S. v. Sharp Corporation*, No. 3:08-CR-802-PJH (Information filed 11/12/09; plea agreement announced simultaneously).

135. Sharp pled guilty to participating, from April 1, 2001 to December 1, 2006, in price-fixing conspiracies with other major TFT-LCD producers to fix prices of panels sold to Dell, Inc. for use in computer monitors and laptops; to participating in a conspiracy to fix the prices for IPod screens sold to Apple, Inc. between September, 2005 and December, 2006, and to participating in a conspiracy, lasting from the fall of 2005 to the middle of 2006, to fix prices for LCD Panels sold to Motorola, Inc. for use in its Razr mobile phones.

136. Sharp agreed to pay $120 million in criminal fines as a result of this December 2008 plea agreement.

### 7. **Epson Imaging Devices Corporation's Plea**[19]

137. Like Sharp and Hitachi, Epson pleaded guilty to participating in a conspiracy with major TFT-LCD producers to fix prices for specific products that were sold to specific entities. In Epson's case, the products were LCD Panels "sold to Motorola for use in Razr mobile phones, from the fall of 2005 to the middle of 2006." As a result of that plea, Epson agreed to pay a $26 million fine.

### 8. **Hitachi Displays, Ltd.'s Plea and Related Indictments**[20]

138. Like Sharp, Hitachi pleaded guilty to participating in a conspiracy with major TFT-LCD producers to fix prices for specific products that were sold to specific entities. In Hitachi's case, the products were "LCD Panels sold to Dell, Inc. or its subsidiaries for use in desktop monitors and notebook computers, from on or about April 1, 2001 to on or about March 31, 2004." As a result of that plea, Hitachi paid a $31 million dollar fine.

139. Subsequent to that plea, a senior Hitachi sales executive, Sakae Someya, was indicted for the same activity.[21] That indictment was filed on March 31, 2009, but as of the filing of this

---

[19]    *U.S. v. Epson Imaging Devices Corp.*, No. 3:09-CR-854-SI (N.D. Cal. Information filed 8/25/09; plea agreememt filed 10/23/09).

[20]    *U.S. v. Hitachi Displays, Ltd.,* No. 3:09-CR-247-SI (N.D. Cal. Indictment filed 3/10/09; plea agreement announced that same day and filed 5/22/09).

[21]    *U.S. v. Sakae Someya*, No. 3:09-CR-00329-EXE (N.D. Cal. Indictment filed 3/31/09).

31

Complaint, Someya had not yet been arrested and arraigned and the charges against him had not yet been resolved.

### 9. Related Criminal Matters

140. In her class certification opinion, Judge Illson noted that the Department of Justice had affirmed that it had signed a conditional leniency agreement with a qualified company in the TFT-LCD industry. In this context, that meant that the agreement had conferred amnesty on a participant in the TFT-LCD price-fixing conspiracy who had provided the Department of Justice with concrete evidence of that price-fixing agreement.[22]

141. As yet, that conspirator does not appear to have been identified, though the Plaintiffs have pressed the Court to disclose the informant's identity and require that conspirator to provide the cooperation it is required to give under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004.

142. The DOJ Antitrust Division's investigation of the remaining Defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other Defendants to this action.

### 10. Other Suspect Arrangements

143. In addition to the participation in the conspiracy outlined through the guilty pleas, other as yet uncharged conspirators also participated in the conspiracy. Defendant Toshiba participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the Defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.

144. During the Conspiracy Period, Toshiba also sought and formed strategic partnerships with other LCD manufacturers which allowed Toshiba to easily communicate and coordinate

---

[22] Class DE 1642 at 4.

FIRST AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, formerly known as Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.

145. The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners' regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for those LCD Panels that each defendant manufactured and sold.

146. Co-conspirator Hydis Technologies Co. Ltd. ("Hydis") participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

147. Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed, with the other co-conspirators, on prices and supply levels for LCD Panels.

148. Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed, with the other conspirators, on prices and supply levels for LCD Panels.

149. Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or discussions during the Conspiracy Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.

150. Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at these meetings. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

151. When Circuit City Trust refers to a corporate family of companies by a single name in its allegations of participation in the conspiracy, it is to be understood that Circuit City Trust is alleging that one or more employees or agents of entities within the referenced corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, each entire corporate family was represented in meetings and discussions by their agents and each was a party to the agreements reached in them.

D.     DEFENDANTS' ACTIVE CONCEALMENT

152. Circuit City and Circuit City Trust did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006, after the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contracts, combinations and/or conspiracies. Because defendants' agreements, understandings and conspiracies were kept secret, Circuit City and Circuit City Trust were

unaware of defendants' unlawful conduct alleged herein and did not know that Circuit City was paying artificially high prices for LCD Products.

153. As alleged above, defendants had secret discussions about price and output, and agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one in the so-called Round Robin meetings.

154. Moreover, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

155. There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

156. Another false rationale provided by defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated: "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

157. A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

158. Increased demand was repeatedly cited by defendants, throughout the Conspiracy Period, as the reason for high LCD Panel prices. On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an

35

executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo also stated "[w]e are seeing much stronger demand for largesize LCD televisions than expected, so LCD TV supply is likely to remain tight throughout the year."

159. Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

160. These explanations were all pretextual, and each served to cover up the conspiracy. As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Circuit City Trust's claims. Unbeknownst to Circuit City Trust, the prices Circuit City paid for LCD Products were artificially inflated as a result of the defendants' and their co-conspirators' illegal agreements to sell price-fixed LCD Panels.

## VIII. VIOLATIONS ALLEGED

**FIRST CLAIM FOR RELIEF:
VIOLATIONS OF THE SHERMAN ACT**

161. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

162. Beginning at a time presently unknown to Circuit City Trust, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Circuit City Trust, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

163. In formulating and carrying out the alleged agreements, understandings, and conspiracies, defendants and their co-conspirators unlawfully restrained trade and damaged the competitive process by engaging in the following anticompetitive acts:

A.    fixing, raising, maintaining and stabilizing the price of LCD Panels;

B.    allocating markets for LCD Panels among themselves;

C.    submitting rigged bids for the award and performance of certain LCD Panel contracts; and

D.    allocating among themselves the production of LCD Panels.

164.  The combinations and conspiracies alleged herein has had the following effects, among others:

A.    price competition in the sale of LCD Panels was restrained, suppressed, and/or eliminated throughout the United States and the world;

B.    prices for LCD Panels sold by Defendants, their co-conspirators, and others were fixed, raised, maintained and stabilized at artificially high, supracompetitive levels throughout the United States and the world;

C.    prices for LCD Products containing LCD Panels have been fixed, raised, maintained and stabilized at artificially high, suprecompetitive levels throughout the United States and the world; and

D.    those who purchased LCD Panels produced by Defendants, their coconspirators, and others and LCD Products containing such LCD Panels were deprived of the benefits of free and open competition.

165.  Circuit City was injured in its business and property by being forced to pay more for LCD Products it purchased containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of the combination and conspiracy.

166.  Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable adverse effect on U.S. domestic and import trade or commerce.  That injury to trade and commerce and to competition directly resulted in the injuries suffered by Circuit City, and so gives rise to the antitrust claims that Circuit City Trust asserts herein.  As a result, Circuit City (and so the Circuit City Trust) has suffered injury as a direct, proximate and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels.  Circuit City was injured in its business and property by paying

more for LCD Products containing price-fixed LCD Panels than it would have paid in the absence of the combination and conspiracy.

167. Because Circuit City Trust has suffered injury as a direct, proximate and foreseeable result of defendants' conspiracy to fix the price of LCD Panels, Circuit City Trust is entitled to an award of treble damages, and awards of all other relief provided by Section 4 of the Clayton Act, 15 U.S.C. § 15.

**SECOND CLAIM FOR RELIEF:**
**VIOLATIONS OF THE CALIFORNIA CARTWRIGHT ACT**

168. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169. Defendants' contracts, combinations, trusts or conspiracies were entered in, carried out, effectuated and perfected within the State of California, and defendants' conduct within California injured Circuit City.

170. During the Conspiracy Period, Circuit City conducted a substantial volume of business in California. Circuit City sold LCD Products to customers in California through its retail stores and through its website and the Internet. Circuit City also received shipments of and took title to LCD Products at artificially-inflated prices because of Defendants' price fixing conspiracy at Circuit City's distribution centers in Walnut, California, Livermore, California, and Long Beach, California, and therefore purchased the products in California. In addition, Circuit City maintained California inventories of LCD Products manufactured and sold by defendants, their co-conspirators, and others, and operated distribution centers, offices and retail stores in California. As a result of Circuit City's presence in California and the substantial business it conducts in California, Circuit City is entitled to the protection of the laws of California.

171. Defendants engaged in and participated in the conspiracy through their offices and operations in California. Defendants LG Display, Chungwa and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were carried out in California. Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and Toshiba all maintained offices in California during the Conspiracy Period. Employees at defendants'

38

locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels. Defendants also participated in the conspiracy in the United States through their California offices by providing information obtained through meetings with other defendants to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including manufacturers of LCD Products that were purchased by Circuit City in the United States. Defendants' conduct within California thus injured Circuit City in California and throughout the United States.

172. Beginning at a time currently unknown to plaintiff, but at least as early as January 1, 1996, and continuing thereafter at least up to December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce, as described above, by acting to fix, raise, stabilize, and maintain prices of, and allocate markets for, LCD Panels and LCD Products at supracompetitive levels. Such conduct violates Section 16720 of the California Business and Professions Code.

173. For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of LCD Panels; (2) allocating among themselves the production of LCD Panels and markets for LCD Panels; and (3) submitting rigged bids for the award and performance of certain LCD Panels contracts.

174. The combinations and conspiracies alleged herein have had, *inter alia*, the following effects: (a) price competition in the sale of LCD Panels and LCD Products has been restrained, suppressed, and/or eliminated in the State of California; (b) prices for LCD Panels and LCD Products sold by defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California and throughout the United States; and (c) those who purchased LCD Panels and LCD Products directly or indirectly from defendants and their coconspirators have been deprived of the benefit of free and open competition.

175. As a direct and proximate result of defendants' unlawful conduct, Circuit City was injured in its business and property in that it paid more for LCD Products than it otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Section 16720 of the California Business and Professions Code, Circuit City Trust seeks, *inter alia,* treble damages and its cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

**THIRD CLAIM FOR RELIEF:**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PROTECTION**
**AND UNFAIR COMPETITION LAWS**

176. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

177. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the California state consumer protection and unfair competition statutes listed below.

178. Defendants' business acts and practices were carried out, effectuated, and perfected within the State of California, and defendants' conduct injured Circuit City in California and elsewhere.

179. Beginning on a date unknown to Circuit City Trust, but at least as early as January 1, 1996, and continuing thereafter at least up through the filing of this Complaint, defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

180. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

181. Defendants' conduct as alleged herein clearly violated Section 17200. The acts, omissions, misrepresentations, practices and nondisclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by

40

means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

182. Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

183. Defendants' acts or practices were and are unfair to consumers of LCD Panels and LCD Products in the State of California within the meaning of Section 17200, California Business and Professions Code; and

184. Defendants' acts and practices were and are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

185. Circuit City Trust is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

186. The unlawful and unfair business practices of defendants, and each of them, as described above, caused Circuit City to pay supracompetitive and artificially-inflated prices for LCD Products. Circuit City suffered injury in fact, and lost money or property, as a result of such unfair competition.

187. The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

188. As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Circuit City Trust is accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants

41

as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

**FOURTH CLAIM FOR RELIEF:**
**UNJUST ENRICHMENT UNDER CALIFORNIA LAW**

189. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

190. Beginning on a date unknown to Circuit City Trust, but at least as early as January 1, 1996, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for LCD Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

**FIFTH CLAIM FOR RELIEF:**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILLINOIS CODE 10/1 *ET SEQ.***

191. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

192. Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of LCD Panels and LCD Products in Illinois and fixing, raising, maintaining and stabilizing LCD Panel and LCD Product prices in Illinois at artificially high, noncompetitive levels.

193. Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

194. During the Conspiracy Period, Circuit City received shipments of and took title to LCD Products at artificially-inflated prices because of Defendants' price fixing conspiracy at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois. Under Circuit City's contracts with Defendants and other vendors, Circuit City did not receive title to a substantial amount of the LCD Products ordered by Circuit City until it received and accepted shipments of those LCD Products at its Marion Illinois Distribution Center.

42

195. During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois. Circuit City sold LCD Products and other products at its retail stores in Illinois and on the Internet to Illinois customers. In addition, Circuit City maintained in Illinois inventories of LCD Products manufactured and sold by Defendants, their co-conspirators, and others. As a result of Circuit City's presence in Illinois and the substantial business it conducts in Illinois, Circuit City is entitled to the protection of the laws of Illinois; and,

196. As a direct and proximate result of Defendants' conduct, Circuit City was injured by paying more for LCD Products purchased in Illinois from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Circuit City Trust requests:

A.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

i.      A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

ii.      An unreasonable restraint of trade or commerce in violation of the California Cartwright Act, as alleged in the Complaint; and

iii.      In violation of California's Unfair Competition and Consumer Protection Laws; and

iv.      In violation of the Illinois Antitrust Act.

B.      That Circuit City Trust recover treble its actual damages, as provided by the applicable federal and state laws, and that a judgment be entered in favor of the Circuit City Trust against defendants, jointly and severally, in such amount;

C.      That Circuit City Trust obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the state of California so permit;

D.     That Circuit City Trust recovers damages and/or all other available monetary and equitable remedies available under the California Cartwright Act, California's Unfair Competition and Consumer Protection Laws, and California common law;

E.     That Circuit City Trust recovers damages and/or all other available monetary and equitable remedies available under the Illinois Antitrust Act;

F.     That Circuit City Trust be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate for the largest term permitted by law or equity;

G.     That the Circuit City Trust recover its costs of suit, including reasonable attorneys' fees, as provided by law; and,

H.     That Circuit City Trust be awarded such other, further, and different relief as law and equity may require, and that the Court may deem just and proper in these circumstances.

## X.     **JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure Rule 38(b), plaintiff Circuit City Trust hereby requests a trial by jury as to all issues so triable.


Dated: May 5, 2011

Respectfully Submitted By:


*/s/ David H. Orozco*
David H. Orozco (220732)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150
dorozco@susmangodfrey.com

H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:     (713) 651-9366
Facsimile:      (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com

44

Parker C. Folse III (*pro hac vice*)
Jordan Connors (*pro hac vice*)
Rachel Black (*pro hac vice*)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:     (206) 516-3880
Facsimile:     (206) 516-3883
pfolse@susmangodfrey.com
jconnors@susmangodfrey.com

*Attorneys for Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

45

1

## **DECLARATION OF SERVICE**

2

3       I, Jami Grounds, declare as follows:

4       I am employed in the County of King, State of Washington; I am over the age of eighteen

5 years and am not a party to this action; my business address is 1201 Third Avenue, Suite 3800,

6 Seattle, Washington, 98101, in said County and State. On May 5, 2011, I served the within:

7

## **FIRST AMENDED COMPLAINT FOR DAMAGES**

8 to all named counsel of record as follows:

9

  **X**    **BY ECF (ELECTRONIC CASE FILING)**: I e-filed the above-detailed documents

10         utilizing the United States District Court, Northern District of California's mandated
         ECF (Electronic Case Filing) service on May 5, 2011. Counsel of record are required by

11        the Court to be registered e-filers, and as such are automatically e-served with a copy of
         the documents upon confirmation of e-filing.

12

13       I certify under penalty of perjury under the laws of the United States that the foregoing is

14 true and correct.

15       Executed on May 5, 2011, at Seattle, Washington.

16

17

18                               Jami Grounds

19

20

21

22

23

24

25

26

27

28

1