ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Roman M. Silberfeld, Bar No. 62783
RMSilberfeld@rkmc.com
David Martinez, Bar No. 193183
DMartinez@rkmc.com
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:  310-552-0130
Facsimile:   310-229-5800

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Elliot S. Kaplan (*Pro Hac Vice*)
ESKaplan@rkmc.com
K. Craig Wildfang (*Pro Hac Vice*)
KCWildfang@rkmc.com
Lauren E. Wood (*Pro Hac Vice*)
LEWood@rkmc.com
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
Telephone:  612-349-8500
Facsimile:   612-339-4181

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. 07-MD-1827 SI<br>MDL No. 1827 |
| | Case No. 3:10-CV-4572 SI |
| This Document Relates to Individual Case No. 3:10-cv-4572-SI: | The Honorable Susan Y. Illston |
| BEST BUY CO., INC.; BEST BUY PURCHASING LLC; BEST BUY ENTERPRISE SERVICES, INC.; BEST BUY STORES, L.P.; BESTBUY.COM, L.L.C.; and MAGNOLIA HI-FI, INC., | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Plaintiffs,<br>v. | **1.   Violation of Section 1 of the Sherman Act** |
| AU OPTRONICS CORP.; AU OPTRONICS CORPORATION AMERICA; CHI MEI CORP.; CHI MEI OPTOELECTRONICS CORP. (N.K.A. CHIMEI INNOLUX CORPORATION); CHI MEI OPTOELECTRONICS, USA, INC.; CHUNGHWA PICTURE TUBES, LTD.; | **2.   Violation of the Minnesota Anti-Trust Act of 1971**<br><br>**[REDACTED]** |

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

CMO JAPAN CO., LTD.; EPSON
ELECTRONICS AMERICA, INC.; EPSON
IMAGING DEVICES CORPORATION;
HANNSTAR DISPLAY CORP; HITACHI
DISPLAYS, LTD.; HITACHI ELECTRONIC
DEVICES (USA), INC.; HITACHI, LTD.; LG
DISPLAY CO., LTD.; LG DISPLAY
AMERICA, INC.; NEXGEN MEDIATECH
USA, INC.; NEXGEN MEDIATECH, INC.;
SHARP CORP.; SHARP ELECTRONICS
CORP.; TATUNG COMPANY OF
AMERICA, INC.,

Defendants.

Plaintiffs Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., BestBuy.com, L.L.C. and Magnolia Hi-Fi, Inc. (collectively "Plaintiffs" or "Best Buy") bring this action under the antitrust laws of the United States and the State of Minnesota, against the Defendants, and allege as follows:

## I.  **INTRODUCTION**

1.    Plaintiffs bring this antitrust action to recover damages they incurred as a result of an extended conspiracy by manufacturers of liquid crystal display panels ("LCD Panels"). Defendants and their co-conspirators are believed to have conspired from at least January 1, 1996 until approximately December 11, 2006 ("Relevant Period") for the purpose and to the effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels and/or products containing LCD Panels.  LCD Panels are used in a number of products, including, but not limited to, computer monitors, laptop computers, televisions, and mobile phones ("LCD Products").

2.    Beginning in at least 1996, Defendants located in Japan, including but not limited to Hitachi and Sharp met or talked with at least one other Defendant in order to agree on LCD Panel prices and the volume of LCD Panels each would produce.  As production in Korea began to increase, the Japanese Defendants expanded their meetings to involve their Korean competitors, including Defendant LG Display, which also agreed to fix prices and to control supply.  In 2001, the Korean Defendants convinced Taiwanese LCD Panel manufacturers, including Defendants AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and to control product supply.  Defendants' conspiracy included agreements on the

- 2 -

FIRST AMENDED COMPLAINT
AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  prices at which Defendants would sell LCD Panels to their own corporate subsidiaries and

2  affiliates, as well as their co-conspirators, thereby ensuring LCD Panels prices remained

3  consistent among Defendants and their customers, which was an attempt to prevent any price

4  discrepancies to consumers.

5       3.    Throughout the Relevant Period, Defendants' conspiracy was effective in

6  moderating the normal downward pressures on prices for LCD Panels and LCD Products caused

7  by periods of oversupply and technological change.  Defendants' conspiracy resulted in unusually

8  long periods of high prices and high profits.  Although there were periods when prices for LCD

9  Panels temporarily declined as a result of new market entrants being assimilated, those price

10  declines were from supra-competitive levels, rather than levels set by free and open competition.

11  And prices declined less than they would have in a competitive market.  As a result of

12  Defendants' unlawful conduct, Plaintiffs paid higher prices for LCD Products than they would

13  have paid in a competitive market.

14  **II.**     **JURISDICTION AND VENUE**

15       4.    Plaintiffs brings this action to obtain injunctive relief and to recover damages,

16  including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

17  violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of Minnesota.

18       5.    This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

19  26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman

20  Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. §

21  1331, which provides this Court with original jurisdiction over actions arising under the laws of

22  the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over

23  any action arising under federal laws regulating commerce or protecting commerce against

24  restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

25  § 1332, or, alternatively, pursuant to 28 U.S.C. § 1367.

26       6.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act,

27  15 U.S.C. § 22, and Section 1391(b), (c), and (d) of Title 28 of the United States Code because a

28  substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

1    portion of the affected interstate trade and commerce was carried out in this district, and one or

2    more of the Defendants reside in this district.

3         7.      Defendants are subject to the jurisdiction of this Court by virtue of their

4    nationwide contacts and other activities, as well as their contacts with the State of California.

5    **III.**    **DEFINITIONS**

6         8.      As used herein, the term "Relevant Period" refers to the time period beginning

7    January 1, 1996 and continuing at least until December 11, 2006.

8         9.      As used above and herein, the term "LCD Panel" means liquid crystal display

9    panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an

10   image.  The technology involves sandwiching a liquid crystal compound between two glass plates

11   called "substrates."  The resulting screen contains hundreds or thousands of electrically charged

12   dots, or pixels that form an image.  During the Relevant Period, LCD Panels used in some

13   notebook computers and hand-held devices included three different technologies:  thin film

14   transistor (TFT) panels, color super-twist nematic (CSTN) panels, and monochrome super-twist

15   nematic (MSTN) panels.  The price-fixing conspiracy alleged herein had the effect of raising,

16   fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN

17   technology in LCD Products.

18        10.     As used above herein, the term "LCD Products" means any product containing an

19   LCD Panel, including without limitation LCD modules, televisions, desktop computer monitors,

20   notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other

21   hand-held devices.

22        11.     As used herein, the term "OEM" means any original equipment manufacturer of

23   LCD Products.

24   **IV.**    **PARTIES**

25        **A.**      **Plaintiffs**

26        12.     Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and

27   principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated

28   retail stores throughout the United States and sold LCD Products in those stores.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

13.     Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and principal places of business in Richfield, Minnesota.

14.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P. operates retail stores throughout the United States and sells LCD Products in those stores.

15.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

16.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for LCD Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

17.     Plaintiff Magnolia Hi-Fi, Inc. ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During the Relevant Time Period, MHF's purchasing of LCD Products took place in its headquarters in Kent Washington.

18.     During the Relevant Period, Best Buy directly purchased LCD Products from several of the vertically integrated Defendants.  For instance, Defendants Chi Mei Optoelectronics, Epson, Hitachi, LG, Philips, Sharp, and Tatung manufacture and sell laptops, monitors, and televisions to resellers, like and including Best Buy.  Best Buy suffered injury as a result of Defendants' misconduct.

19.     During the Relevant Period, Best Buy also indirectly purchased products containing LCD panels from OEMs that purchased LCD Panels from one or more of the

1   Defendants.  For instance, OEMs like Dell, Hewlett-Packard, Apple, and Gateway bought LCD

2   Panels directly and/or indirectly from Defendants for use in their computer monitors, laptops,

3   iPods, and other LCD Products.  These OEMs then sold their LCD Products to Best Buy for

4   resale in Best Buy stores.

5           20.     Plaintiffs are informed and believe Defendants knew, or should have known and

6   reasonably foreseen that those products would be sold in the United States generally and in

7   Minnesota in particular, such that those purchases involved U.S. import trade or commerce and

8   were within the flow of, were intended to, and did have a direct, substantial and reasonably

9   foreseeable effect on U.S. domestic commerce.  That is, Defendants knew, or must have known

10  and reasonably foreseen that purchasers in the United States would be required to pay an

11  excessive, supra-competitive price for LCD Products containing LCD Panels that would be, and

12  were ultimately purchased in Minnesota and the United States.

13          21.     Those products were kept as inventory and sold in Minnesota and every other state

14  where Best Buy retail stores were located, and over the internet throughout the United States.

15          22.     In addition to the conspiracy establishing globally fixed and supra-competitive

16  prices for LCD Panels and LCD Products that resulted in all of the Best Buy entities being

17  required to pay supra-competitive prices for LCD Products, Plaintiffs are informed and believe

18  and allege that the conspiracy had the direct and proximate effect of causing a separate antitrust

19  injury in that all of the Best Buy entities lost sales related to ultimate consumers who were

20  unwilling to pay the supra-competitive prices for LCD Products.  That is, the supra-competitive

21  prices for LCD Products directly caused Best Buy antitrust injury by reducing the demand for

22  such products and thereby reducing the sales of such products.

23          23.     As a result of the Best Buy entities' presence, purchases, and sales in Minnesota,

24  and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled

25  to the protection of the Sherman Act and the antitrust laws of Minnesota.

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**B.** **Japanese Defendants**

**1.** **Epson**

24.    Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 3-101 Minami-Yoshikata, Tottori-Shi, Tottori 680-8577, Japan.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the Relevant Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

25.    Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard Parkway, San Jose, California.  During the Relevant Period, Epson America sold and distributed LCD Products containing LCD Panels manufactured by Epson Japan to customers in the United States.

26.    Defendants Epson Japan and Epson America are sometimes referred to collectively herein as "Epson."  The Epson companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant Epson America was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

**2.** **Hitachi**

27.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company was one of the original producers of LCD Panels.  In 2002, it spun off its LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary.  During the Relevant Period, Hitachi, Ltd.

manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

28.    Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD manufacturing business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.  Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

29.    Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its ultimate parent company is Hitachi, Ltd.  During the Relevant Period, Hitachi Electronic Devices (USA), Inc. sold and distributed LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the United States.

30.    Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi."  The Hitachi companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Defendant Hitachi Electronic Devices (USA), Inc. was a member of the conspiracy by virtue of its status during the Relevant Time Period as the alter ego or agent of Hitachi, Ltd. and Hitachi Displays, Ltd., which dominated or controlled Hitachi Electronic Devices (USA), Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

**3.    Sharp**

31.    Defendant Sharp Corporation is a Japanese company with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  The company was one of the earliest producers of LCD Panels.  During the Relevant Period, Sharp Corporation manufactured,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

sold, and distributed LCD Products and/or LCD Panels to customers throughout the United States.

32.     Defendant Sharp Electronics Corporation is a New York corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Defendant Sharp Corporation.  During the Relevant Period, Sharp Electronics Corporation sold and distributed LCD Panels and/or LCD Products throughout the United States.

33.     Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp."  The Sharp companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Relevant Time Period as the alter ego or agent of Sharp Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### C.     Korean Defendants

#### 1.     LG Display

34.     Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and is a joint venture created in 1999 by Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. maintains offices in San Jose, California, and has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  During the Relevant Period, said Defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

35.     Defendant LG Display America, Inc., f/k/a/ LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California.  During the Relevant Period, said

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  Defendant manufactured, marketed, sold and/or distributed LCD Products and/or LCD Panels that

2  were incorporated into LCD Products sold throughout the United States.

3       36.    Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes

4  referred to collectively herein as "LG Display."  The LG Display companies were members of the

5  conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy

6  through the actions of their respective officers, employees, and representatives acting with actual

7  or apparent authority.  Alternatively, Defendant LG Display America, Inc. was a member of the

8  conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of LG

9  Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc.

10  regarding conspiracy activities and used that domination or control to cause artificially high

11  prices for LCD Panels and LCD Products.

12      **D.**    **Taiwanese Defendants**

13          **1.**    **AU Optronics**

14       37.    Defendant AU Optronics Corporation is a Taiwanese company with its principal

15  place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AU

16  Optronics Corporation was created in 2001 by the merger of Acer Display Technology, Inc. and

17  Unipac Electronics, both of which were involved in the manufacture of LCD Panels and/or LCD

18  Products.  During the Relevant Period, AU Optronics Corporation manufactured, sold, and

19  distributed LCD Panels that were incorporated into LCD Products sold throughout the United

20  States.

21       38.    Defendant AU Optronics Corporation America ("AU America") is a California

22  corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston,

23  Texas.  AU America was formerly known as Acer Display Technology America, Inc.  AU

24  America is a wholly-owned and controlled subsidiary of Defendant AU Optronics Corporation.

25  In 2006, Hsuan Bin Chen, the president and Chief Operating Officer of AU Optronics

26  Corporation, was simultaneously the Chairman of AU America.  During the Relevant Period, AU

27  America manufactured, sold and distributed LCD Panels that were incorporated into LCD

28  Products sold throughout the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

39.     Defendants AU Optronics Corporation and AU America are sometimes referred to collectively herein as "AU Optronics."  The AU Optronics companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, Defendant AU Optronics Corporation America, Inc. was a member of the conspiracy by virtue of its status during the Relevant Time Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

**2.     Chi Mei**

40.     Defendant Chi Mei Corporation ("CMC") is a Taiwanese company with its principal place of business located at No. 59-1, San Chia, Jen Te, Tainan County, Taiwan 71702. CMC is the parent company for all of the Chi Mei entities herein.  During the Relevant Period, CMC manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

41.     Defendant Chi Mei Optoelectronics Corporation (N.K.A. CHIMEI INNOLUX CORPORATION) ("CMO") is a Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.  It is a subsidiary of CMC.  CMO was formed in 1998, and has since become a major manufacturer of LCD Panels.  During the Relevant Period, CMO manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

42.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company headquartered at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.  Until approximately 2006, CMO Japan was known as International Display Technology, Ltd.  CMO Japan is a wholly-owned and controlled subsidiary of Defendant CMO.  CMO Japan has been in the LCD business since 2001.  During the Relevant Period, CMO Japan manufactured, sold, and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   distributed LCD Panels that were incorporated into LCD Products sold throughout the United

2   States.

3        43.    Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware

4   corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

5   California.  Until approximately 2006, CMO USA was known as International Display

6   Technology U.S.A., Inc.  CMO USA is a wholly-owned and controlled subsidiary of Defendant

7   CMO Japan.  The Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the

8   Chairman of CMO Japan's predecessor, and in or about 2007 became Vice President in charge of

9   sales and marketing for CMO.  Similarly, the President of CMO USA in 2006, Junichi Ishii, was

10  previously the President of CMO Japan's predecessor.  During the Relevant Period, CMO USA

11  sold and distributed LCD Products and/or LCD Panels that were incorporated into LCD Products

12  sold throughout the United States.

13       44.    Defendant Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese company with its

14  principal place of business at No. 11-2, Jen Te 4th St., en Te Village Jen Te, Tainan 717 Taiwan.

15  Nexgen is a wholly-owned and controlled subsidiary of CMC.  During the Relevant Period,

16  Nexgen sold and distributed LCD Products containing LCD Panels manufactured by CMO to

17  customers throughout the United States.

18       45.    Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a California

19  corporation with its principal place of business at 16712 East Johnson Drive, City of Industry,

20  California.  Nexgen USA is a wholly-owned and controlled subsidiary of CMC.  During the

21  Relevant Period, Nexgen USA sold and distributed LCD Products containing LCD Panels

22  manufactured by CMO to customers throughout the United States.

23       46.    Defendants CMC, CMO, CMO Japan, CMO USA, Nexgen, and Nexgen USA are

24  sometimes referred to collectively herein as "Chi Mei."  The Chi Mei companies were members

25  of the conspiracy that is the subject of this Complaint by virtue of their participation in the

26  conspiracy through the actions of their respective officers, employees, and representatives acting

27  with actual or apparent authority.  Alternatively, Defendants Chi Mei Optoelectronics

28  Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc.,

and Nexgen Mediatech USA, Inc. were members of the conspiracy by virtue of their status during the Relevant Time Period as the alter egos or agents of Chi Mei Corporation and Chi Mei Optoelectronics Corporation which dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### 3.   Chunghwa

47.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  It is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company.  During the Relevant Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

48.    Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  During the Relevant Period, Tatung America sold and distributed LCD Products containing LCD Panels manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the United States.

49.    Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes referred to collectively herein as "Chunghwa."  During the Relevant Time Period, Chunghwa and Tatung were closely affiliated, commonly owned, controlled and dominated by Tatung Company, and functioned as a single enterprise and/or alter egos.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### 4.      HannStar

50.      Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  HannStar has been in the business of manufacturing and selling LCD Panels since 1998.  During the Relevant Period, HannStar manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

## V.      AGENTS AND CO-CONSPIRATORS

51.      The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

52.      Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs, for which they are liable as co-conspirators including because of their participation in and acts in furtherance of the conspiracy.

53.      Various persons and/or firms not named as Defendants in this Complaint are believed to have participated as co-conspirators in the violations alleged herein and to have performed acts and made statements in furtherance thereof, all of the names and acts are within the exclusive knowledge of the Defendants.

54.      Co-conspirator Hydis Technologies Co., Ltd., formerly known as BOE Hydis Technology Co., Ltd. ("Hydis"), is a Korean manufacturer of LCD Panels.  The company originated in 1989 as the LCD business division of Hyundai Electronics Industries Co. ("Hyundai").  It spun-off from Hyundai in 2001, and it was subsequently acquired by the BOE Group.  On September 18, 2006, Hydis filed for Court Receivership in South Korea.  During the Relevant Period, Hydis manufactured, sold, and distributed LCD Panels and/or Products throughout the United States.

55.      Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a Japanese entity with its principal place of business at 3732 Hayano, Mobara-shi, Chiba 297-0037, Japan.  IPS Alpha was formed in January 2005 as a joint venture that included Hitachi Displays, Ltd., and

1    Panasonic Corporation to manufacture and sell LCD Panels for televisions.  During the Relevant

2    Period, IPS Alpha manufactured, sold, and distributed LCD Panels to customers throughout the

3    United States.

4           56.     Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") is a Japanese entity

5    with its principal place of business located at 2-7-3 Marunouchi, Chiyoda-ku, Tokyo 100-83 10,

6    Japan.  Mitsubishi was an early developer of LCD technology, and in 1991, it entered into a joint

7    venture with Asahi Glass Co., Ltd. to mass produce LCD Panels.  Mitsubishi owned 80 percent of

8    the joint venture, called Advanced Display Incorporated.  In September 1999, Mitsubishi

9    purchased Asahi Glass' stake in Advanced Display Incorporated, making it a wholly-owned

10   subsidiary.  During the Relevant Period, Mitsubishi manufactured, sold, and distributed LCD

11   Panels and/or LCD Products to customers throughout the United States.

12          57.     Co-conspirator Mitsui & Co., Ltd. ("Mitsui") is a Japanese entity with its principal

13   place of business at Building 2-1, Ohtemachi 1-chome, Chiyoda-ku, Tokyo 100-0004, Japan.

14   Mitsui, known as Mitsui Bussan Kabashiki Kaisha in Japanese, is a trading house for a diverse

15   group of products.  During the Relevant Period, Mitsui sold and distributed LCD Panels and/or

16   LCD Products to customers throughout the United States.

17          58.     Co-conspirator NEC LCD Technologies, Ltd. is a Japanese company with its

18   principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kangawa, 211-8666,

19   Japan.  It has been in the LCD business since 1993.  During the Relevant Period, NEC

20   manufactured, sold, and distributed LCD Panels and/or LCD Products to customers throughout

21   the United States.

22          59.     Co-conspirator NEC LCD Technologies, Ltd. is a Japanese entity with its principal

23   place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666,

24   Japan.  During the Relevant Period, either directly or indirectly through other NEC entities, NEC

25   LCD Technologies manufactured, sold and distributed LCD Panels and/or LCD Products

26   throughout the United States.

27          60.     Co-conspirator NEC Electronics America, Inc. is a wholly-owned and controlled

28   subsidiary of NEC Corporation, with its principal place of business located at 2880 Scott

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Boulevard, Santa Clara, CA 95050-2554 and its manufacturing plant in Roseville, California. During the Relevant Period, NEC Electronics America manufactured, sold and distributed LCD Panels and/or LCD Products throughout the United States.

61.    Co-conspirator Panasonic Corporation ("Panasonic"), is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.  Until approximately October 1, 2008, Panasonic was known as Matsushita Electric Industrial Co., Ltd. Panasonic holds a minority stake in two joint ventures – including IPS Alpha.  During the Relevant Period, Panasonic manufactured, sold, and distributed LCD Panels and/or LCD Products to customers throughout the United States.

62.    Co-conspirator Panasonic Corporation of North America, formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of business at 1 Panasonic Way, Secaucus, New Jersey.  Panasonic Corporation of North America is a wholly-owned and controlled subsidiary of co-conspirator Panasonic.  During the Relevant Period, Panasonic Corporation of North America sold and distributed LCD Panels and/or LCD Products manufactured by Panasonic to customers throughout the United States.

63.    Co-conspirator Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Relevant Time Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States.

64.    Co-conspirator Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of co-conspirator Samsung Electronics Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Relevant Time Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States.

65.    Co-conspirator Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of co-conspirator Samsung Electronics Co., Ltd. with its principal place of business at 3655 North First Street, San Jose, California.  During the Relevant Time Period, said co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  conspirator manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

2  Products sold throughout the United States.

3        66.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

4  and Samsung Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung."

5  The Samsung companies were members of the conspiracy that is the subject of this Complaint by

6  virtue of their participation in the conspiracy through the actions of their respective officers,

7  employees, and representatives acting with actual or apparent authority. Alternatively, co-

8  conspirators Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were

9  members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos

10  or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or

11  controlled Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. regarding

12  conspiracy activities and used that domination or control to cause artificially high prices for LCD

13  Panels and LCD Products.

14        67.     Co-conspirator Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-

15  ku, Tokyo, 105-8001, Japan. During the Relevant Time Period, said co-conspirator

16  manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout

17  the United States.

18        68.     Co-conspirator Toshiba Mobile Display Co., Ltd., f/k/a/ Toshiba Matsushita

19  Display Technology Co., Ltd., is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku,

20  Tokyo, 108-0075, Japan. During the Relevant Time Period, said co-conspirator manufactured,

21  marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United

22  States.

23        69.     Co-conspirator Toshiba America Electronic Components, Inc. is a wholly-owned

24  and controlled subsidiary of Toshiba America, Inc., which in turn is a wholly-owned and

25  controlled subsidiary of co-conspirator Toshiba Corporation, with its corporate headquarters at

26  19900 MacArthur Blvd., Ste. 400, Irvine, California. During the Relevant Time Period, said co-

27  conspirator manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold

28  throughout the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

70.     Co-conspirator Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc., which in turn is a wholly-owned and controlled subsidiary of co-conspirator Toshiba Corporation, with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Relevant Time Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

71.     Co-conspirators Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. are from time to time referred to collectively herein as "Toshiba."  The Toshiba companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, co-conspirators, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

72.     Other co-conspirators whose identities are known to Plaintiffs include the following companies with whom Plaintiffs have entered into tolling agreements:  LG Electronics, Inc and LG Electronics USA, Inc. (collectively "LG Electronics"); and Royal Philips Electronics N.V. (aka Koninklijke Philips Electronics N.V.) and Philips Electronics North America Corp. (collectively "Philips Electronics"); as well as Fujitsu Display Technologies Corporation ("FDTC").

## VI.     TRADE AND COMMERCE

73.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold LCD Panels and/or LCD Products in the United States in a continuous and uninterrupted flow of interstate and foreign commerce, including through and into this judicial district.

74.     During the Relevant Period, Defendants collectively controlled the vast majority of the market for LCD Panels, both globally and in the United States.  Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

75.     Defendants' illegal conduct also involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce directly into the United States, one of their most important markets and a major source of their revenues.  In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. retailers.

76.     The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Measured by value, Defendants and others shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Relevant Period for ultimate sale to U.S. consumers.  During the Relevant Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Relevant Period.  As a result, a substantial portion of Defendants' revenues were derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.  Most, if not all, Defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

77.     Because of the importance of the U.S. market to Defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct.  This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

78. During the Relevant Period, every Defendant shipped LCD Panels directly into the United States.

79. When high-level executives based at Defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States. Moreover, because LCD Panels are – and were throughout the Relevant Period – the most expensive and significant component of LCD Products, Defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States. Many Defendants manufactured LCD Products and sold them in the United States. In fact, Defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

80. Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because Defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels. In addition, Defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

81. Defendants have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD Products into the United States impacted U.S. import trade and import commerce.

82. Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce.

83. Further Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce in the form of higher prices for LCD Products containing price-fixed LCD Panels manufactured by defendants and their coconspirators being negotiated, charged, and paid by Plaintiffs in the United States for products imported into the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# VII.   FACTUAL ALLEGATIONS

## A.   TFT-LCD Technology

84.     The technology behind LCD Panels is not new.  In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology.  These efforts resulted in monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s, the technology advanced further with the development of LCD Panels.

85.     The basic structure of an LCD panel is two pieces of glass, called substrates, sandwiching a layer of liquid crystal compound.  The resulting screen contains hundreds of thousands of electrically charged dots, called pixels, that form an image.  The panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a television, computer monitor or one of numerous other products.  Liquid crystals change orientation under an applied electric field and can thereby block or pass light.  One glass substrate has thin chemical films that act as transistors, and the other glass substrate is coated with liquid pigments that act as color filters.  When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

86.     The term "active matrix" describes the ability to switch each pixel in a display individually.  Unlike older LCDs that have one transistor for each row and column of pixels, LCD Panels have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used interchangeably with TFT-LCD.  Active matrix displays are brighter and sharper than passive matrix displays of the same size.

87.     The glass substrates used for LCD Panels begin with a "motherglass," a sheet of glass that is cut to make multiple panels.  LCD Panels are manufactured in fabrication plants, sometimes referred to as "fabs," that are equipped to handle a particular size motherglass.

1   Technological innovations over time have allowed manufacturers to begin the manufacturing

2   process with larger and larger motherglass.  This, in turn, has resulted in the ability to fabricate

3   larger and/or more LCD Panels.  Each increase in motherglass size is described as a generation.

4   Third generation fabs in the 1998 to 1999 period typically utilized 550 millimeter ("mm") by 650

5   mm motherglass, while some current (eighth generation) fabs utilize 2160 mm by 2460 mm

6   motherglass.  The use of larger motherglass provides substantial cost savings to manufacturers.

7          88.     LCD Panels are capable of producing the same image as cathode ray tubes

8   ("CRTs"), but in a much smaller package.  LCD Panels also have lower energy requirements, are

9   generally easier to read, and do not flicker like CRTs.  LCD Panels of approximately 10 inches or

10  less in diagonal are considered "small" or "medium" displays.  They are also referred to as

11  "mobile displays."  These displays are commonly used in cell phones, personal digital assistants,

12  and cameras.

13         89.     LCD Panels of 10 inches in diagonal and larger are considered "large-area

14  displays."  Large-area displays are most commonly used for desktop computer monitors,

15  notebook computers, and televisions.  The core products during most of the Relevant Period were

16  displays for notebook computers and computer monitors.  But LCD Panels were also used in

17  many other types of products requiring a visual user interface, such as cell phones and point of

18  sale terminals.  During much of the Relevant Period, 14-inch and 15-inch notebook computers

19  and 15-inch to 17-inch computer monitors were the most popular LCD Products, representing as

20  much as 80 percent of all LCD Panels produced for notebook computers or computer monitors.

**B.      Structure of the LCD Industry**

22         90.     The LCD industry has several characteristics that facilitated a conspiracy,

23  including market concentration, ease of information sharing, the consolidation of manufacturers,

24  multiple interrelated business relationships, significant barriers to entry, heightened price

25  sensitivity to supply and demand forces, and homogeneity of products.

**1.      Market Concentration**

27         91.     The market for LCD Products is enormous.  A September 28, 2006 Reuters article

28  reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD technology –

2    are expected to reach $US 88 billion this year and $US 100 billion in 2007."

3         92.    Despite its enormous size, the LCD industry is highly concentrated, a factor that is

4    conducive to the type of collusive activity alleged by Plaintiff.  In 2005, the top five suppliers –

5    including LG Display, Sharp, AU Optronics, and Chi Mei – collectively shipped 90 percent of all

6    LCD Panels for television use.  According to estimates in late 2006 from industry analyst iSuppli

7    Corporation ("iSuppli"), LG Display had the greatest share of LCD television shipments in the

8    first quarter of 2006 (22.3%), followed by Chi Mei (18.7%), AU Optronics (16.8%), and Sharp

9    (13.9%).  These companies were four of the largest producers as measured by market share

10   during much of the Relevant Period.

**2.    Information Sharing**

12        93.    Because of Defendants' common membership in trade associations, interrelated

13   business arrangements such as joint ventures, allegiances between companies in certain countries,

14   and relationships between the executives of certain companies, there were many opportunities

15   during the Relevant Period for Defendants to discuss and exchange competitive information.

16   Defendants took advantage of these opportunities through meetings, telephone calls, e-mails, and

17   instant messaging.  Plaintiffs are informed and believe and allege that Defendants took advantage

18   of these opportunities to discuss, and agree upon, their pricing for LCD Panels as alleged below.

19        94.    Additionally, the LCD industry is analyzed by several market research firms.

20   Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs,

21   and other key indicators of market activity.  The capacity and pricing data reported by these firms

22   comes directly from manufacturers.  Manufacturers typically report historical, current, and

23   perhaps most importantly, prospective information.

24        95.    Defendants thus had access to each other's future plans for bringing new capacity

25   on line, capacity utilization, market share, pricing, and the advent of new technology.  Because so

26   few companies had to be analyzed in order to obtain this data, all competitors in the LCD market

27   had ready and timely access to reliable information about their direct competitors' pricing as well

28   as future supply and capacity decisions.  Plaintiffs are informed and believe and allege that by

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

meeting together as alleged below, as well as monitoring and analyzing this competitive

information over time, participants in the conspiracy were able to signal their respective intent,

verify that the conspiracy was working, and identify and prevent defection from the conspiracy.

### 3. Market Consolidation

96.     The LCD industry experienced significant consolidation during the Relevant

Period, including:  (a) the creation of AU Optronics in 2001 through the merger of Acer Display

and Unipac Electronics; (b) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (c) the

formation of IPS Alpha in 2005 by Hitachi and Panasonic; and (d) AU Optronics' acquisition in

2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer

of LCD Panels.

### 4. Multiple Interrelated Business Relationships

97.     The industry involves a web of cross-licensing agreements, joint ventures, and

other cooperative arrangements that facilitate collusion.  AU Optronics, for example, entered into

licensing arrangements with Sharp in 2005.  Chunghwa did the same with Sharp in December of

2006.  Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and

Hitachi.

98.     The industry is close-knit.  Multiple business relationships between supposed

competitors blur the lines of competition and provided ample opportunity for collusion.  These

relationships created a unity of interest among competitors so that the conspiracy was easier to

implement and enforce than if such interrelationships did not exist.

### 5. Significant Barriers to Market Entry Into the LCD Industry

99.     There are significant manufacturing and technological barriers to entry into the

LCD industry.  Efficient fabs are large and costly.  LCD Panels are extremely vulnerable to

technological advances, so research and development costs are substantial.  DisplaySearch, a

research firm in Austin, Texas that covers the LCD industry, reported in September 2005 that the

top LCD manufacturers collectively spend $30 million a day on property, plant, and equipment.

A January 2006 DisplaySearch report noted that a typical seventh-generation fab can cost more

than $3 billion.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    100.    During the Relevant Period, the costs of the assembly components, declined

2    overall, substantially in some periods.  Later in the conspiracy, approximately 70 percent of the

3    cost of LCD panel production was attributable to the cost of raw materials.  Pricing coordination

4    and manipulation of the output of LCD Panels allowed Defendants to keep prices above what

5    they would have been but for the conspiracy.

6                    **6.        The "Crystal Cycle"**

7    101.    In the LCD industry, the supply-and-demand cycle is known as the "crystal cycle."

8    The cycle has been described as "boom or bust," alternating between oversupply and shortages,

9    which drive prices for LCD Panels up and down.  Among other things, the perceived demand for

10   such products , whether manufacturers have correctly gauged demand in determining how much

11   capacity to build and use, and how many LCD Panels to produce, determines whether supply is

12   inadequate, optimal, or excessive.

13   102.    Another factor is the entry of new competitors into the market.  When a new

14   competitor enters a market, it brings incremental production online, thereby adding supply, and

15   prices drop until an equilibrium is reached.  In the LCD industry, however, Plaintiffs are informed

16   and believe and allege that Defendants conspired to rein in and discipline these new entrants until

17   they assimilated into the conspiracy.  This pressure on new market entrants had the effect of both

18   tempering price drops and preventing competition from creating a market equilibrium that

19   normally follows such drops.

20   103.    The conspiracy did not completely eliminate the effects of the crystal cycle in the

21   LCD industry.  There were periods when Defendants' collusive practices drove prices for LCD

22   Panels so high that demand decreased to a point where Defendants lowered prices for short

23   periods of time.  However, Defendants' efforts to stabilize prices were successful in moderating

24   the effects of the crystal cycle, including the impact on prices paid by direct and indirect

25   purchasers.  To the extent that prices for LCD Panels fell, they fell from levels that were supra-

26   competitive and had been set conspiratorially, rather than from levels set by free and open

27   competition.  Additionally, prices did not fall as low as they would have absent the conspiratorial

28   conduct.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### 7. Dominant Products

104.   Notwithstanding the various and varied applications for LCD Panels, Defendants have a consistent and uniform methodology to monitor, analyze, discipline, and enforce their conspiracy.  They can look at the predominant, or most popular, size panels and the applications for those panels that represent the highest percentage of sales.  They can look at standardized statistics used in the industry, such as the amount of glass produced and revenues per metric ton of glass.  By using these and other industry analytics, Defendants could easily monitor, analyze, discipline, and enforce their conspiracy.

105.   For example, from the fourth quarter of 1999 through mid-2003, half or more of the LCD monitor shipments were 15-inch monitors.  From mid-2003 to early 2006, 17-inch monitors were the predominant size.  As for LCD televisions, from the fourth quarter of 1999 through the fourth quarter of 2000, shipments were predominantly of 10-inch to 14-inch models.  During 2001 and much of 2002, sales of 13-inch to 15-inch models dominated.  And in 2004 and 2005, the majority of shipments were of 20-inch and 32-inch models.

### C. Pre-Conspiracy Market

106.   Until the mid-1990s, Japanese companies like Hitachi and Sharp were essentially the exclusive suppliers of LCD Panels.

107.   In early 1995, the industry faced declining LCD Panel prices, which industry analysts attributed to advances in technology and improving efficiencies.  One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry."  The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of LCD Panels, and they slowed the rate of their investments.  But this provided an opening to Korean manufacturers.

108.   In 1995, three Korean companies – including LG Electronics, Inc. and, to a lesser extent, Hyundai – entered the LCD market.  These Korean firms offered comparable products at reduced prices in an effort to quickly gain market share.  This resulted in increased industry competition in 1995, which contributed to the significant price declines seen during that timeframe.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

109.   Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines.  By mid-1995, the Japanese companies and their new Korean competitors had a total capacity to supply 14 million LCD Panels, while demand for them was only about three million.  In addition to the surges in capacity during 1995, "[costs] were also dropping as production volume increased and manufacturing methods improved."

110.   By late 1995, the effect of the entry by Korean suppliers had pushed the price of some LCD Panels down by 50 percent from the previous year.  The origin of the LCD conspiracy may be traceable to this trough in prices.

### D.   Defendants' and Co-Conspirators' Illegal Agreements

111.   Plaintiffs are informed and believe and allege that the LCD conspiracy was effectuated through a combination of group and bilateral discussions.  In the formative years, when the Japanese Defendants first entered into the conspiracy, bilateral discussions were the primary method of communication.  During this period of the conspiracy, Hitachi and Sharp met or talked to at least one other Defendant about the prices for LCD Panels, and thereby created a model for how the conspiracy would be carried out after the Korean, and later the Taiwanese Defendants joined.  These meetings among Hitachi and Sharp included the discussion of price as well as capacity utilization.  During these discussions, said Defendants also shared proprietary and confidential information.  As more manufacturers entered the conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral meetings was in place.

### 1.   "Crystal Meetings"

112.   Plaintiffs are informed and believe and allege that the group meetings among the participants in the LCD price-fixing conspiracy were referred to as "crystal meetings."  Crystal meetings were attended by employees at three general levels of the Defendants' corporations.  The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings.  The second level were management-level meetings, referred to as "commercial" or "operation" meetings.  The third level were meetings attended by lower-level sales and marketing personnel.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

113.    Plaintiffs are informed and believe and allege that in a typical crystal meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices.  Meeting participants shared information relating to all of these topics so that Defendants could agree on what price each would charge for LCD Panels to be sold in the following month.  Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for LCD Panels.  They also discussed prices of LCD Panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

114.    Plaintiffs are informed and believe and allege that each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of LCD Panels has on the cost of the finished products into which they are placed.  Defendants knew that the conspiratorially high, supra-competitive prices of LCD Panels would be reflected in the prices for finished LCD Products, and thus, there was no need to specifically discuss the prices of finished LCD Products.

115.    Plaintiffs are informed and believe and allege that the purpose of the CEO or top meetings was to stabilize or raise prices.  At the CEO meetings, the participants discussed prices and supply and demand.  The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions.  At each meeting, an individual was designated as the "chairman," and would put figures on supply and demand and price on a projector or a whiteboard for the group to review.  The attendees would discuss the figures, and take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price.

116.    Plaintiffs are informed and believe and allege that the commercial or operation meetings were attended by the Defendants' respective Vice Presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings was largely the same as the CEO meetings.  The participants discussed price, output, capacity, and general market conditions.  These meetings occurred approximately monthly and sometimes quarterly.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

117.    Plaintiffs are informed and believe and allege that the agreements reached at these meetings included:  (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; and (6) encouraging other competitors to abide by the agreed-upon pricing.  The meeting participants also agreed to maintain or lower production capacity.

118.    Plaintiffs are informed and believe and allege that the lower level meetings were less formal than the CEO and commercial meetings, and typically occurred at restaurants over lunch.  The purpose of the lower level meetings was to exchange market information that would facilitate implementation of the conspiracy and carry out the agreements made at the CEO and commercial meetings.  Participants in the lower level meetings exchanged information relating to past and future prices of LCD Panels and shipment quantities.

119.    Plaintiffs are informed and believe and allege that in the summer of 2006, Defendants discontinued the lower level meetings in favor of coordinated one-on-one meetings. The meetings were coordinated so that on the same date, two sets of competitors met one-on-one. After that meeting, each of them met one-on-one with another competitor.  This continued until all competitors met with each other.  These coordinated meetings took place until approximately November or December 2006.  Defendants' specific intent was to conceal their meetings and for these coordinated one-on-one meetings to accomplish the same purposes as the group meetings.

### 2.    Bilateral Discussions

120.    Plaintiffs are informed and believe and allege that the crystal meetings were supplemented by bilateral discussions between various Defendants.  The purpose of the bilateral discussions was to exchange information about past and future pricing, as well as information about shipments.

121.    Plaintiffs are informed and believe and allege that Defendants had bilateral discussions with each other during price negotiations with customers to ensure no Defendant was

1   persuaded by customers to cut prices.  These discussions, usually between sales and marketing

2   employees, took the form of in-person meetings, telephone calls, e-mails, and instant messages,

3   among other things.  The information gained in these communications was then shared with

4   supervisors and taken into account in determining the price to be offered.

5       122.    Plaintiffs are informed and believe and allege that bilateral discussions were also

6   used to synchronize prices with manufacturers that did not ordinarily attend the group meetings.

7   For example, HannStar was given responsibility for notifying Hitachi of the pricing agreements

8   reached at the crystal meetings.  Hitachi implemented the agreed-upon pricing as conveyed by

9   HannStar.  In this way, Hitachi participated in the conspiracy to fix the prices of LCD Panels.

10      **3.      Defendants' and Co-Conspirators' Participation in Group and**

11      **Bilateral Discussions**

12      123.    The LCD Panel conspiracy alleged herein was effectuated through a combination

13  of group and bilateral discussions that took place in Japan, South Korea, Taiwan, California, and

14  elsewhere in the United States.  As LCD Panel production in South Korea began to increase and

15  become more sophisticated, the Japanese-based Defendants expanded their meetings to include

16  their South Korean-based competitors, including Defendants LG Display and Samsung, which

17  also agreed to fix prices and control supply.  At least as early as 2001, the South Korean

18  Defendants convinced Taiwan-based LCD Panel manufacturers, including Defendants AU

19  Optronics, Chi Mei, Chunghwa and HannStar, to join the conspiracy to fix prices and control

20  supply.

21      124.    Defendants fostered a price fixing culture within their companies whereby

22  employees at every level – from the very top executive all the way to lower-level sales

23  representatives – engaged in frequent and continuous communications with the employees at

24  every level of their competitors.  Senior executives at Defendants made it clear to their

25  subordinates that they were required to engage in these illegal exchanges of supply, production,

26  and pricing information as a part of their employment.  The lower-level employees funneled the

27  competitive information up to their superiors who utilized that information – along with the

28  pricing information they, themselves, were able to collected through their own illegal competitor

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  contacts – to set prices for LCD Panels at artificially-inflated levels.  The constant

2  communications between Defendants at all levels allowed Defendants to conspire to set average

3  prices across the entire industry, as well as conspiring to fix the prices of the particular LCD

4  Panels incorporated into the LCD Products purchased by Plaintiffs.

5       125.    This culture permeated Defendants' U.S. operations and sales.  In fact, the top

6  sales executive at Defendants' Asian headquarters instructed their direct reports in the United

7  States to obtain competitive information from their counterparts at other LCD Panel suppliers in

8  the United States.  That information was ultimately used by those top sales executives to set

9  artificially-inflated prices for LCD Panels charged to U.S. customers.

10      126.    REDACTED

11

12

13

14

15

16

17      127.    REDACTED

18

19

20

21

22

23

24      128.    REDACTED

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8    129.    Co-conspirator Toshiba participated in multiple bilateral discussions with other

9    defendants, during which Toshiba reached agreements and understandings with defendants on

10   prices.  Toshiba also participated in the conspiracy by entering into joint ventures and other

11   arrangements to manufacture or source LCD Panels with one or more of the defendants that

12   attended the Crystal Meetings.  The purpose and effect of these joint ventures by Toshiba and

13   others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high

14   levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-

15   limitation agreements reached at the meetings.

16   130.    During the Conspiracy Period, Toshiba sought and formed strategic partnerships

17   with other LCD manufacturers which allowed it to easily communicate and coordinate prices and

18   production levels with other manufacturers as part of the overall conspiracy alleged herein.  For

19   instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture.  In 2001,

20   Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged

21   their LCD operations.  In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba

22   Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two

23   companies' LCD development, manufacturing, and sales operations.  In 2006, Toshiba purchased

24   a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.  The operation and

25   management of these many different joint ventures afforded Toshiba and the other defendant

26   joint-venture partners regular opportunities to communicate with each other to agree on prices,

27   price increases and production limits and quotas for LCD Panels that each defendant

28   manufactured and sold.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

131.    For OEMs in the United States, Defendants' U.S. affiliates led the LCD Panel price negotiations with those OEMs.  Pricing directions came from Asia, where Defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the Defendants' conspiracy meetings and conspiracy communications took place in the United States, involved the U.S. affiliates of the Defendants, and directly targeted U.S. import commerce and U.S. OEMs.  Defendants' conspiratorial conduct also included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, Defendants' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products.  Defendants' conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

132.    Plaintiffs are informed and believe and allege that Defendant AU Optronics participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Additionally, Quanta Display Inc., Acer Display Technology, Inc. and Unipac Electronics, which merged with AU Optronics, participated in lower level meetings.  By assuming the rights and obligations of these co-conspirators, AU Optronics is jointly liable for their anti-competitive conduct.  Through these discussions, AU Optronics agreed on prices and output levels for LCD Panels.

133.    Plaintiffs are informed and believe and allege that Defendant Chi Mei participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chi Mei agreed on prices and output levels for LCD Panels.

134.    Plaintiffs are informed and believe and allege that Defendant Chunghwa participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chunghwa agreed on prices and output levels for LCD Panels.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

135.     Plaintiffs are informed and believe and allege that Defendant HannStar participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, HannStar agreed on prices and output levels for LCD Panels.

136.     Plaintiffs are informed and believe and allege that Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and output levels for LCD Panels.

137.     Plaintiffs are informed and believe and allege that Defendant LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, LG Display agreed on prices and output levels for LCD Panels.

138.     Plaintiffs are informed and believe and allege that Defendant Sharp participated in multiple group and bilateral meetings during the Relevant Period, and agreed on prices and output levels for LCD Panels.

139.     Plaintiffs are informed and believe and allege that co-conspirator Hydis participated in multiple lower level meetings between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese Defendant at least as recently as 2005.  Through these discussions, Hydis agreed on prices and output levels for LCD Panels.

140.     Plaintiffs are informed and believe and allege that co-conspirator Mitsubishi participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, and Unipac Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and output levels for LCD Panels.

141.     Plaintiffs are informed and believe and allege that co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese Defendant in 2001.  Mitsui was acting as an agent for Defendant Epson Japan in this discussion.  Mitsui and Epson Japan agreed on prices and output levels for LCD Panels.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

142.     Plaintiffs are informed and believe and allege that co-conspirator NEC participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Panels.

143.     Plaintiffs are informed and believe and allege that co-conspirator FDTC participated in meetings and discussions during the Relevant Time Period with various Defendants including AU Optronics, Chi Mei, LGD and Sharp, which included discussions about prices for LCD Panels.

144.     Defendant Epson America is a wholly-owned and controlled subsidiary of Defendant Epson Japan and, as alleged above, Plaintiffs are informed and believe and allege that Epson Japan was represented by co-conspirator Mitsui at one of the bilateral meetings described above.  Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.  To the extent Epson America distributed LCD Products to direct and indirect purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct and indirect purchasers did not undercut the pricing agreements reached at these various meetings.  Epson America was an active, knowing participant in the alleged conspiracy.

145.     Plaintiffs are informed and believe and allege that co-conspirator IPS Alpha is a joint venture including Hitachi Displays, Ltd. and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above.  As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at them.  As explained above, the agreements at these meetings included agreements on price ranges and output restrictions.  The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

146.     When Plaintiffs refer to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are informed

1   and believe and are alleging that one or more employees or agents of entities within the corporate

2   family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the

3   individual participants in the conspiratorial meetings and discussions did not always know the

4   corporate affiliation of their counterparts, nor did they distinguish between the entities within a

5   corporate family.  Plaintiffs are informed and believe and allege that the individual participants

6   entered into agreements on behalf of, and reported these meetings and discussions to, their

7   respective corporate families.  As a result, the entire corporate family was represented in meetings

8   and discussions by their agents and were parties to the agreements reached in them.  Furthermore,

9   to the extent that subsidiaries within the corporate families distributed LCD Products to direct and

10  indirect purchasers, these subsidiaries played a significant role in the conspiracy because

11  Defendants wished to ensure that the prices for such products paid by direct and indirect

12  purchasers would not undercut the pricing agreements reached at these various meetings.  Thus,

13  all entities within the corporate families were active, knowing participants in the alleged

14  conspiracy.

15              **4.         Defendants Participation in California**

16              147.    Many Defendants and co-conspirators conducted operations in California

17  throughout the Relevant Time Period, including Defendants LG, Epson, AU Optronics, Chi Mei,

18  Chunghwa, Tatung, and NexGen Mediatech and co-conspirators Toshiba and Samsung.  Through

19  their California operations, Defendants implemented their price-fixing conspiracy in the United

20  States.  In fact, Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation,

21  Chunghwa Picture Tubes, Ltd., and Epson Japan specifically admitted during their plea hearings

22  that acts in furtherance of the conspiracy were carried out within California.  Defendants'

23  employees based in California engaged in bilateral and multilateral communications in

24  furtherance of the conspiracy.

25              148.    Defendants also used their California operations to implement their price-fixing

26  agreements in the United States.  Through their activities in California, Defendants successfully

27  increased the price of LCD Panels.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

149. REDACTED

150. REDACTED

151. REDACTED

152. REDACTED

1

2

3

4

5

153.    Other Defendants also engaged in conduct in furtherance of the conspiracy in

6

California to fix the price of small LCD Panels used in mobile wireless handsets and other

7

portable devices.  Defendant LG Display America, Inc. maintained its offices in San Jose,

8

California.  LG Display America, Inc. has admitted that it participated in the conspiracy to fix

9

prices of LCD Panels.  LG Display employees responsible for LG Display's negotiations with and

10

sales to mobile wireless handset manufacturers were located in the San Jose, California office.

11

154.    Toshiba maintained offices in San Jose, California.  Toshiba personnel in its San

12

Jose, California offices were involved in and implemented Defendants' conspiracy in the United

13

States.  REDACTED

14

15

16

17

18

19

20

21

22

23

24

155.    Sharp also maintained offices in San Jose, California.  Sharp personnel in its San

25

Jose, California were involved in and implemented Defendants' conspiracy in the United States.

26

REDACTED

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8        156.    Epson maintained offices in San Jose, California.  Epson personnel in its San Jose,

9    California office were involved in and implemented Defendants' conspiracy in the United States.

10   REDACTED

11

12

13

14

15

16

17        **E.    Conspiracy's Effect on Earlier LCD Technologies**

18        157.    During the Relevant Time Period, LCD Panels used in certain applications,

19   including notebook computers and mobile wireless handsets, included both TFT-LCD Panels and

20   STN-LCD Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.

21   Certain Defendants (including Samsung, Sharp, and Epson), their corporate affiliates, and other

22   members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels.  The

23   same individuals at the Defendants who were engaged in bilateral communications and group

24   meetings regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

25        **1.      Defendants' Bilateral Communications Regarding STN-LCD Panels**

26        158.    Defendants and their co-conspirators' conspiracy included agreements to raise fix,

27   raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.

28   Specifically, Defendants engaged in bilateral discussions in which they exchanged information

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

about STN-LCD Panel pricing, shipments, and production.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered Defendants' customers for STN-LCD Panels.

159.   REDACTED

160.   REDACTED

161.   REDACTED

162.   REDACTED

1

163.    REDACTED

2

3

4

5

6

164.    REDACTED

7

8

9

10

11

12    165.    Epson employees responsible for selling CSTN-LCD Panels to Motorola also

13    engaged in bilateral discussions with "top management" employees at Sharp.

14    166.    In 2006, Toshiba employees met with representatives of Sharp and discussed

15    Sharp's plans to sell CSTN-LCD Panels to Nokia.

16    167.    In some instances, Defendants quoted mobile wireless handset vendors a single

17    price for a LCD module that included both a TFT-LCD Panel and an STN-LCD Panel.  For

18    example, Defendants quoted Motorola a single price for LCD modules used in the Razr phone,

19    which modules included both a TFT-LCD Panel and a CSTN-LCD Panel.  Defendants Sharp and

20    Epson have admitted fixing prices for TFT-LCD panels sold to Motorola for the Razr phone.

21    Because Sharp and Epson quoted prices to Motorola for the entire Razr module, their admitted

22    agreements to fix prices for Motorola included an agreement to fix the price of the CSTN-LCD

23    Panels included in the Razr module.

24    168.    In other instances, Defendants quoted some mobile wireless handset vendors a

25    single price for a LCD module that included both a TFT-LCD Panel and a MSTN-LCD Panel.

26    For example, in 2003, SonyEricsson manufactured a phone that contained a TFT-LCD Panel in

27    the primary display and a MSTN-LCD Panel in the subdisplay, and sought a single price

28    quotation for both the TFT-LCD Panel and the MSTN-LCD Panel from Defendants.  Thus,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  Defendants' agreement to fix the price of TFT-LCD Panels included an agreement to fix the price

2  of MSTN-LCD Panels sold in the combined TFT-LCD Panel/MSTN-LCD Panel modules sold

3  for mobile wireless handset applications.

4       169.    In addition Defendants Toshiba and Samsung also engaged in communications

5  with each other and with Epson and Sharp at which agreements were reached regarding the price

6  of LCD modules sold to Motorola for the Razr phone, which included agreements to fix the price

7  of the CSTN-LCD Panels included in those modules.

8       170.    Defendants' bilateral discussions extended to other mobile wireless handset

9  manufacturers that requested a single price for LCD modules that included both a TFT-LCD

10  Panel and a STN-LCD Panel.  REDACTED

11

12

13

14       171.    Thus, because a number of mobile wireless handsets, including the Motorola Razr

15  phone, included both TFT-LCD Panels and STN-LCD Panels, and because mobile wireless

16  handset manufacturers often requested a single price for LCD modules that included both types of

17  panels, Defendants' bilateral discussions and agreements with respect to TFT-LCD panel prices

18  inevitably included and/or affected the prices of STN-LCD panels in those modules.

19       **2.**     **The Structure of the LCD Panel Market Facilitated the Inflation of**

20                **Prices of STN-LCD Panels As Well As TFT-LCD Panels**

21       172.    At certain points during the Relevant Time Period, for certain applications in LCD

22  Panel Products, TFT-LCD Panels and STN-LCD Panels were close substitutes for each other.

23  For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased

24  in significant quantities for similar uses – i.e., display purposes – in mobile wireless handsets and

25  other LCD Products that included small displays.  At other times during the Relevant Time

26  Period, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities

27  for use in notebook computers.

28       173.    At certain points during the Relevant Time Period, for certain applications in LCD

Panel Products, TFT-LCD Panels, CSTN-LCD Panels, and MSTN-LCD Panels were substitutes for each other.  At these points during the Relevant Time Period, all three panels were purchased for display applications in mobile wireless handsets and other LCD Products that included small displays.

174.    During the Relevant Time Period, purchasers of LCD Panels often switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels.  REDACTED

Because handset manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, Defendants knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of STN-LCD panels as well.  In fact, Defendants often monitored the price delta between TFT-LCD Panels and STN-LCD Panels and discussed maintaining a constant price delta between TFT-LCD Panels and STN-LCD panels.

175.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely, as seen in the chart below:



ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

176.    Defendants understood that they could profitably raise prices of STN-LCD Panels in response to increases in TFT-LCD Panel prices.  REDACTED

177.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels, were substitutes in certain LCD Products at certain points during the Relevant Time Period, and because Defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, Defendants had the incentive and ability to inflate the prices STN-LCD Panels as well as TFT-LCD Panels.  The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and vice versa.

**F.    International Government Antitrust Investigations**

178.    Defendants' conspiracy to artificially restrict the output of, and to raise the prices for, LCD Panels sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the United States Department of Justice ("DOJ" or "Antitrust Division") and others in late 2006.

179.    In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD manufacturers.  In a December 11, 2006 filing with the Securities and Exchange Commission, Defendant LG Display disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

180.    On December 12, 2006, news reports indicated that in addition to LG Display, LCD makers Sharp, Epson, and AU Optronics were also under investigation.  The JFTC stated that the probe was related to price-fixing.  On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-fixing among manufacturers of LCD Panels.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### G. United States Department of Justice Indictments and Charges

181. Beginning in late 2008, the DOJ began to announce a series of charges against and indictments of some of the Defendants related to their involvement in a conspiracy to fix prices of LCD Panels sold in the United States and elsewhere.

182. As of the date of the filing of this Amended Complaint, the DOJ had assessed more than $890 million in fines and indicted at least 10 Defendants and 22 executives, resulting in numerous guilty pleas.

### 1. November 12, 2008 DOJ Announcement: LG, Sharp, and Chunghwa Plead Guilty to Global TFT-LCD Price-Fixing Conspiracy

183. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers – LG Display Co. Ltd. (and its U.S. subsidiary, LG Display America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of LCD Panels.

### a. Defendant LG Display

184. On December 15, 2008, LG Display Co. Ltd and LG Display America Inc. pleaded guilty to "participating in a conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCD sold in the United States and elsewhere, from on or about September 21, 2001, to on or about June 1, 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" and agreed to pay a criminal fine of $400 million, at the time the second-highest criminal fine ever imposed by Antitrust Division of the U.S. Department of Justice.

185. The DOJ had charged LG Display Co., Ltd. and LG Display America Inc. with carrying out the conspiracy by:

a. participating in meetings, conversations, and communications in Taiwan, Korea and the United States to discuss the prices of LCD Panels;

b. agreeing during those meetings, conversations and communications to charge prices for LCD Panels at certain pre-determined levels;

c. issuing price quotations in accordance with the agreements reached; and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1       d.      exchanging information on sales of LCD Panels, for the purpose of monitoring and

2             enforcing adherence to the agreed-upon prices monitoring and enforcing adherence

3             to the agreed-upon prices.

4       186.      In its plea agreement, LG Display admitted that "through its officers and

5  employees, including high-level personnel of the defendant, [it] participated in a conspiracy

6  among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-

7  LCD sold in the United States and elsewhere."

8       187.      LG Display further admitted that "through its officers and employees, [it] engaged

9  in discussions and attended meetings, including group meetings commonly referred to by the

10  participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

11       188.      LG Display admitted that it was "[d]uring these discussions and meetings, [that]

12  agreements were reached to fix the price of TFT-LCD to be sold in the United States and

13  elsewhere."

14       189.      During the plea hearing, The Honorable Susan Illston, of the United States District

15  Court for the Northern District of California, asked Mr. J.T. Hong, authorized by the LG Display

16  board to accept the plea agreement, if the facts contained in the plea agreement were true.  Mr.

17  Hong stated, "Yes, true."

18       190.      The United States did not seek restitution in light of the civil cases filed against

19  LG Display in the United States District Court for the Northern District of California.

20       191.      The United States agreed not to bring further criminal charges against LG Display

21  or its current or former officers, directors, and employees (except those excluded from the plea

22  agreement) because LG Display and its executives agreed "to cooperate fully in the ongoing TFT-

23  LCD investigation."

24           **b.      Defendant Sharp Corporation**

25       192.      On December 16, 2008, Sharp Corporation pleaded guilty and agreed to pay a

26  $120 million fine for its participation in conspiracies to fix the price of LCD Panels sold to Dell,

27  Inc. from April 2001 to December 2006 for use in computer monitors and laptops; to Motorola,

28

1   Inc. from Autumn 2005 to the middle of 2006 for use in RAZR mobile phones; and to Apple

2   Computer, Inc. from September 2005 to December 2006 for use in iPod portable music players.

3       193.   The DOJ had charged Sharp Corporation with carrying out the conspiracy by:

4       a.   participating in bilateral meetings, conversations, and communications in Japan

5   and the United States to discuss the prices of LCD Panels to be sold to Dell,

6   Apple, and Motorola;

7       b.   agreeing during those bilateral meetings, conversations and communications to

8   charge prices of LCD Panels at certain pre-determined levels to Dell, Apple, and

9   Motorola;

10       c.   issuing price quotations in accordance with the agreements reached; and

11       d.   exchanging information on sales of LCD Panels to be sold to Dell, Apple, and

12   Motorola for the purpose of monitoring and enforcing adherence to the agreed-

13   upon prices.

14       194.   In its plea agreement, Sharp admitted that "through its officers and employees,

15   including high-level personnel of the defendant, [it] participated in a conspiracy among major

16   TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold" to

17   Dell, Apple, and Motorola.

18       195.   Sharp further admitted that "through its officers and employees, [it] engaged in

19   bilateral telephone discussions and attended bilateral meetings with representatives of other major

20   TFT-LCD producers."

21       196.   Sharp admitted that it was "[d]uring these discussions and meetings, [that]

22   agreements were reached to fix the price of TFT-LCD sold to" Dell, Apple, and Motorola.

23       197.   During the plea hearing, United States District Judge Illston asked Mr. Kazutoshi

24   Goto, corporate representative for the plea agreement, if the facts contained in the plea agreement

25   were true.  Mr. Kazutoshi Goto stated, "Yes, it is."

26       198.   Plaintiffs are informed and believe and allege Sharp could not have successfully

27   fixed the prices of the LCD Panels it sold to Dell and Apple unless its biggest competitors had

28   agreed not to undercut it.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### c.    Defendant Chunghwa Picture Tubes, Ltd.

199.    On January 14, 2009, Chunghwa Picture Tubes, Ltd. pleaded guilty to "participating in a conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCD sold in the United States and elsewhere, from on or about September 14, 2001, to on or about December 1, 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" and agreed to pay a criminal fine of $65 million.

200.    The DOJ had charged Chunghwa Picture Tubes, Ltd. with carrying out the conspiracy by:

a.    participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

b.    agreeing, during those meetings, conversations, and communications, to charge prices for LCD Panels at certain pre-determined levels;

c.    issuing price quotations in accordance with the agreements reached; and

d.    exchanging information on sales of LCD Panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

201.    In its plea agreement, Chunghwa admitted that "through its officers and employees, including high-level personnel of the defendant, [it] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold in the United States and elsewhere."

202.    Chunghwa further admitted that "through its officers and employees, [it] engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

203.    Chunghwa admitted that it was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere."

204.    As a result of its guilty plea, the United States and Chunghwa agreed that the "appropriate sentence in this case is a fine of $65 million."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

205.     The United States did not seek restitution in light of the civil cases filed against Chunghwa in the United States District Court for the Northern District of California.

206.     The United States agreed not to bring further criminal charges against Chunghwa or its current or former officers, directors, and employees (except those excluded from the plea agreement) because Chunghwa and its executives agreed "to cooperate fully in the ongoing TFT-LCD investigation."

**2.      January 15, 2009 DOJ Announcement:  Three Chunghwa Executives and One LG Display Executive Plead Guilty to Price-Fixing Conspiracy**

207.     On January 15, 2009, DOJ charged Chang Suk "C.S." Chung, a Korean LG Display executive, with conspiring with "unnamed employees from other panel makers to suppress and eliminate competition by fixing the prices of LCD Panels from on or about Sept. 21, 2001 to on or about June 1, 2006."  Similarly, DOJ charged Chieng-Hon "Frank" Lin, the Taiwanese former Chunghwa Chairman and Chief Executive Officer, Chih-Chun "C.C." a Taiwanese former Chunghwa Vice President of LCD Sales—and Hsueh-Lung "Brian" Lee, a Taiwanese current Chunghwa executive and former Vice President of LCD Sales, with participating in the same conspiracy at various times during the period from September 14, 2001 to on or about December 1, 2006.

208.     The DOJ charged the executives with carrying out the conspiracy by:

a.      participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCD;

b.      agreeing, during those meetings, conversations, and communications, to charge prices of TFT-LCD at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached;

d.      exchanging information on sales of TFT-LCD, for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and

e.      authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy.

209.   Chang Suk Chung, LG Display's former Vice President of Monitor Sales, pleaded guilty and agreed to serve a seven-month prison sentence in the United States and pay a $25,000 criminal fine.

210.   During Mr. Chung's plea hearing on February 17, 2009, Judge Illston asked him what he did that made him guilty of the crime. He stated the following:

> While I was in that position [VP of monitor panel sales LG Display], I met and had phone calls with the representative of competitors. And in the course of those activities or meetings, I reached an agreement or understanding with the competitors to raise or stabilize or maintain price on those panels. That's what I have done.

211.   Chieng-Hon Lin, Chunghwa's former Chairman and CEO, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $50,000 criminal fine.

212.   During Mr. Lin's plea hearing on February 20, 2009, Judge Illston asked him what he did that made him guilty of the crime. He stated the following:

> Shortly after I became Chunghwa picture tubes, the chairman and CEO, at that time I start -- I learned that the vice president for sales and marketing and other Chunghwa executives were meeting with the representative with our competitors and exchanging price information and agreed on the target prices of TFT-LCD to be charged our customers.
>
> And then, when I was -- those meetings, some of those meetings were referred to as "crystal meetings." In these meetings in conversations I continued while I was the chairman and the CEO with my knowledge and consent, and I occasionally received reports of the meetings and the prices that have been agreed with our competitors.

213.   Chih-Chun Liu, Chunghwa's former Vice President of LCD Sales, pleaded guilty and agreed to serve a seventh-month prison sentence in the United States and pay a $30,000 criminal fine.

214.   Hsueh-Lung Lee, holding various positions at Chunghwa, including Vice President of LCD Sales, pleaded guilty and agreed to serve a six-month prison sentence in the United States and pay a $20,000 criminal fine.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

3. **February 3, 2009 DOJ Announcement:  Three Different Executives at Chunghwa and LG Display Indicted In Price-Fixing Conspiracy**

215.     On February 3, 2009, a federal grand jury in San Francisco returned an indictment against two former Chunghwa executives, Cheng Yuan Lin, "C.Y." Lin, a Taiwanese former Chunghwa Chairman and Chief Executive Officer, Wen Jun  "Tony" Cheng, a Taiwanese former Assistant Vice President of Sales and Marketing for Chunghwa as well as former LG Display executive, Duk Mo Koo, a Korean former Executive Vice President and Chief Sales Officer for LG Display, "for their participation in a global conspiracy to fix prices of [TFT-LCD] panels."

216.     Lin was charged with participating in the conspiracy from Sept. 14, 2001 until April 7, 2003 as Chunghwa's Chairman and CEO.

217.     Cheng was charged with participating in the conspiracy from October 5, 2001 to September 24, 2004 as Chunghwa's Vice President of Sales and Marketing.

218.     Koo was charged with participating in the conspiracy from December 11, 2001 to December 1, 2005 as LG Display's Executive Vice President and Chief Sales Officer.

219.     The Indictment stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the Defendants, their corporate employers, and other coconspirators did those things that they combined and conspired to do, including, among other things:

    a.     attended meetings and engaged in conversations and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

    b.     agreed during those meetings, conversations, and communications to charge prices of LCD Panels at certain levels;

    c.     attended regular group meetings, commonly referred to as 'crystal meetings,' in hotel rooms in Taiwan and agreed during those meetings to charge prices for standard-sized LCD Panels at certain target levels;

    d.     exchanged TFT-LCD shipping, production, supply, demand, and pricing information for the purpose of implementing, monitoring, and enforcing adherence to the agreed-upon prices;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    e.    authorized, ordered, and consented to the participation of subordinate employees

2    in the conspiracy;

3    f.    issued price quotations in accordance with the agreements reached;

4    g.    accepted payment for the supply of LCD Panels sold at collusive, noncompetitive

5    prices to customers in the United States and elsewhere; and

6    h.    took steps to conceal the conspiracy and conspiratorial contacts through various

7    means."

8    **4.    March 10, 2009 DOJ Announcement:  Hitachi Agrees to Plead Guilty**

9    **To Price-Fixing Conspiracy**

10    220.    On March 10, 2009, the DOJ announced that Hitachi agreed to plead guilty and

11    pay $31 million criminal fine for its role in a conspiracy to fix prices in the sale of [TFT-LCD]

12    panels to Dell, Inc.

13    221.    On May 22, 2009, Hitachi admitted that "[f]rom on or about April 1, 2001 to on or

14    about March 31, 2004, the defendant, through its officers and employees, participated in a

15    conspiracy with other major TFT-LCD producers, the primary purpose of which was to fix the

16    price of TFT-LCD sold to Dell for use in notebook computers."

17    222.    Hitachi further admitted that it, "through its officers and employees, engaged in

18    telephone discussions and attended bilateral meetings with representatives of other major TFT-

19    LCD producers" and that "[d]uring these discussions and meetings, agreements were reached to

20    fix the price of TFT-LCD sold to Dell for use in notebook computers."

21    **5.    March 31, 2009 DOJ Announcement: Hitachi Executive Indicted In**

22    **Price-Fixing Conspiracy**

23    223.    On March 31, 2009, a federal grand jury in San Francisco returned an indictment

24    charging Sakae Someya, Japanese Senior Manager for Sales and Marketing at Hitachi, with

25    "enter[ing] into and engag[ing] in a combination and conspiracy to suppress and eliminate

26    competition by fixing the prices of [TFT-LCD] sold to Dell Inc. or its subsidiaries for use in

27    desktop monitors and notebook computers."

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

224. The Indictment stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the defendant, his corporate employer, and other coconspirators did those things that they combined and conspired to do, including, among other things:

    a.    attended bilateral meetings and engaged in conversations and communications in Japan, Korea, and the United States to discuss the prices of TFT-LCD sold to Dell;

    b.    agreed during those meetings, conversations, and communications to charge prices of TFT-LCD sold to Dell at certain levels;

    c.    exchanged information on sales of TFT-LCF sold to Dell, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

    d.    authorized, ordered, and consented to the participation of subordinate employees in the conspiracy;

    e.    issued price quotations in accordance with the agreements reached;

    f.    accepted payment for the supply of TFT-LCD sold at collusive, noncompetitive prices to Dell; and

    g.    took steps to conceal the conspiracy and conspiratorial contacts through various means."

**6.    April 27, 2009 DOJ Announcement:  Bock Kwon, an LG Display Executive, Pleads Guilty to Price-Fixing Conspiracy**

225. On April 27, 2009, the DOJ charged Bock Kwon, a high-level Korean executive from LG Display, with conspiring with "employees from other panel makers to suppress and eliminate competition by fixing the prices of LCD Panels from on or about Sept. 21, 2001 to on or about June 1, 2006."

226. During the period covered by the April 27, 2009 Information, Kwon held various sales and marketing positions, including Head of LG's Taiwan Subsidiary, Vice President of Notebook Sales, Vice President of Sales Planning, and Executive Vice President of Sales and Marketing.

227.    The Information states, "The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant, his corporate employer, and coconspirator, the substantial terms of which were to agree to fix the prices of TFT-LCD."

228.    The DOJ charged that "[f]or the purpose of forming and carrying out the charged combination and conspiracy, the defendant, his employer, and coconspirators did those things that they combined and conspired to do, including, among other things:

a.      participating in meetings, conversations and communications in Taiwan, Korea and the United States to discuss the prices of TFT-LCD;

b.      agreeing during these meetings, conversations and communications to charge prices of LCD Panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached;

d.      exchanging information on sales of LCD Panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and

e.      authorizing, ordering and consenting to the participation of subordinate employees in the conspiracy."

229.    On June 26, 2009, Kwon pleaded guilty and agreed to serve a sentence of twelve months and one day in the United States and pay a $30,000 criminal fine.

230.    During Mr. Kwon's plea hearing on June 24, 2009, Judge Illston asked him what he did that made him guilty of the crime.  He stated the following:

> During the relevant time period, September 21st, year 2001, through June 1st, year 2006, I headed the various position [*sic*] with LG Display, formerly LG Philips LCD.

> In year 2001, while I was head of LG's Taiwan subsidiary, with the approval of my superior at the company's head office in Seoul, I instructed a company employee to attend the regular meetings in Taiwan with the competitor who sold LG engaged in the manufacture and the sale of TFT-LCD panels.

> These meetings were known as the "crystal meetings."  On occasion I attended these meetings.  These meetings continued during the relevant time period.  I was aware that at these meetings the participant [*sic*] discussed price and other market information.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

At these meetings the participants agreed to fix or stabilize the price of TFT-LCD panels to be sold in the United States and elsewhere.

**7.     August 25, 2009 DOJ Announcement:  Epson Japan Pleads Guilty to Price-Fixing Conspiracy**

231.    On August 25, 2009, the DOJ filed an Information against Epson Japan alleging that "From in or about the fall of 2005 to in or about the middle of 2006, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') sold to Motorola Inc. ('Motorola') for use in Razr mobile phones.  The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1)."

232.    The DOJ charged Epson with carrying out the conspiracy by:

a.      "participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD to be sold to Motorola;

b.      "agreeing, during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels to be sold to Motorola at certain predetermined levels;

c.      "issuing price quotations in accordance with the agreements reached; and

d.      "exchanging information on sales of TFT-LCD sold to Motorola, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

233.    On August 25, 2009, DOJ announced that Epson had agreed to plead guilty and pay a criminal fine of $26 Million for its participation in a conspiracy covering LCD Panels sold to Motorola for use in Razr mobile phones from the Fall of 2005 to the middle of 2006.

234.    During Epson's plea hearing on October 16, 2009, Judge Illston asked Mr. Hidehiko Seki, director of Epson, what the company did that made it guilty of the crime.  He stated the following:

As written in the fourth paragraph of the plea agreement, between the fall of 2005 and the middle of 2006, our company participated in the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

conspiracy to fix the price of TFT-LCD panels sold to Motorola for use in Razr mobile phones.

### 8.   December 8, 2009 DOJ Announcement:  Chi Mei Optoelectronics Corporation Pleads Guilty to Price-Fixing Conspiracy

235.   On December 8, 2009, the DOJ filed an Information against Chi Mei Optoelectronics Corporation alleging that "[f]rom on or about September 14, 2001 to on or about December 1, 2006, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD').  The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1)."

236.   The DOJ charged that "[f]or the purpose of forming and carrying out the conspiracy, the defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

a.   participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCD;

b.   agreeing, during those meetings, conversations, and communications, to charge prices of LCD Panels at certain predetermined levels;

c.   issuing price quotations in accordance with the agreements reached; and

d.   exchanging information on sales of TFT-LCD, for the purpose of monitoring and enforcing adherence to the agreed-upon prices."

237.   On February 2, 2010, DOJ announced that Chi Mei had agreed to plead guilty and pay a criminal fine of $220 Million for its participation in a conspiracy covering LCD Panels sold worldwide from September 14, 2001 to December 1, 2006.

238.   On April 28, 2010, Chu-Hsiang "James" Yang, the Taiwanese former Director of Sales for Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $25,000 fine.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

239.    On June 2, 2010, Jau-Yang "J.Y." Ho, the Taiwanese former President of Chi Mei, pleaded guilty and agreed to serve a fourteen-month prison sentence in the United States and pay a $50,000 criminal fine.

240.    On July 28, 2010, Wen-Hung "Amigo" Huang, the Taiwanese former Director of Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $25,000 fine.

241.    On August 4, 2010, Chen-Lung Kuo, the Taiwanese former Vice President of Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $35,000 fine.

**9.    June 10, 2010 Announcement: Largest Taiwanese LCD Producer, AU Optronics Corporation, its American subsidiary and Six Executives Indicted In Price-Fixing Conspiracy**

242.    On June 10, 2010, a federal grand jury in San Francisco returned an indictment against the largest Taiwanese LCD producer, AU Optronics Corporation, its Houston-based subsidiary, AU Optronics Corporation America, and six AU executives, alleging that "[f]rom on or about September 14, 2001, until on or about December 1, 2006, ('the period covered by this Indictment'), the exact dates being unknown to the Grand Jury, the Defendants and other coconspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') in the United States and elsewhere.  The combination and conspiracy engaged in by the Defendants and other coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)."

243.    The DOJ charged that "[f]or the purpose of forming and carrying out the conspiracy, the defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

  a.    On or about September 14, 2001, representatives from four Taiwan TFT-LCD manufacturers, including defendant AU Optronics Corporation, secretly met in a hotel room in Taipei, Taiwan and entered into and engaged in a conspiracy to fix

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

the price of TFT-LCD.  At this meeting, the conspirators agreed to meet approximately once a month for the purpose of fixing the price of LCD Panels. These meetings were commonly referred to by some of the conspirators as 'Crystal Meetings.'  The four Taiwan TFT-LCD manufacturers also agreed to rotate responsibility for coordinating each of these monthly meetings.  A representative from defendant AU Optronics Corporation stated at the September 14, 2001 meeting that the participants in future Crystal Meetings should include the two major Korean TFT-LCD manufacturers to ensure the success of the conspiracy to fix the price of TFT-LCD.

b.  On or about September 21, 2001, representatives from two Korean TFT-LCD manufacturers joined representatives from the four Taiwan TFT-LCD manufacturers, including defendant AU Optronics Corporation, at a Crystal Meeting in a hotel room in Taipei, Taiwan.  At or before the September 21, 2001 Crystal Meeting, the two Korean TFT-LCD manufacturers agreed to join the conspiracy to fix the price of TFT-LCD.

c.  Employees from defendant AU Optronics Corporation attended Crystal Meetings on a regular basis between on or about September 14, 2001 until on or about December 1, 2006 with employees of other participating TFT-LCD manufacturers.

d.  Defendants Hsuan Bin Chen, Hui Hsiung, Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Cheng Yuan Lin, Wen Jun Cheng, and Duk Mo Koo attended and participated in one or more Crystal Meetings.  Defendants Hsuan Bin Chen, Hui Hsiung, Lai-Juh Chen, Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Cheng Yuan Lin, Wen Jun Cheng, and Duk Mo Koo, at times, also authorized, ordered, or consented to the attendance and participation of their subordinate employees at Crystal Meetings.

e.  During the period covered by [the] Indictment, participants in the Crystal Meetings regularly exchanged production, shipping, supply, demand, and pricing information with each other at the meetings for the purpose of agreeing to fix the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   price of TFT-LCD, as well as implementing, monitoring, and enforcing adherence

2   to the fixed prices.  Up until 2003, the participants in the Crystal Meetings reached

3   price agreements on certain sized TFT-LCD used in computer notebooks and

4   monitors.  Beginning in 2003, the price agreements reached at the Crystal

5   Meetings also included certain sized TFT-LCD used in flat screen televisions.

6   f.   The participants in the conspiracy issued price quotations in accordance with the

7        price agreements and accepted payment for the supply of LCD Panels sold at

8        collusive, noncompetitive prices to customers in the United States and elsewhere.

9   g.   From on or about September 14, 2001 until on or about May 2005, senior sales

10       executives of the defendant AU Optronics Corporation and the other participating

11       TFT-LCD manufacturers attended the Crystal Meetings.

12  h.   In or about May 2005, the participants in the Crystal Meetings discussed that one

13       or two major TFT-LCD customers may have detected the Crystal Meetings.  To

14       keep the meetings secret and avoid detection, the Crystal Meeting participants

15       decided to stop having senior-level sales executives attend the Crystal Meetings.

16       Instead, the senior-level executives instructed lower-level marketing employees to

17       continue the Crystal Meetings.  Lower-level marketing employees of defendant

18       AU Optronics Corporation and the other participating TFT-LCD manufacturers

19       continued to meet monthly as a group to exchange shipment, production, and

20       pricing information in furtherance of the conspiracy to fix the price of TFT-LCD.

21       The lower-level marketing employees met at restaurants and cafes, instead of

22       hotels, in Taipei.

23  i.   In or about the spring 2006, the participants in the Crystal Meetings became

24       further concerned about being detected after receiving news reports of an ongoing

25       price-fixing investigation by the United States Department of Justice into the

26       dynamic random access memory ("DRAM") industry and after receiving other

27       information about a possible investigation into the TFT-LCD industry.  To further

28       avoid detection and keep the meetings secret, the conspiracy members, including

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   representatives of defendant AU Optronics Corporation agreed to no longer meet

2   as a group, but instead have back-to-back, one-on-one meetings with each other on

3   a certain date each month at restaurants and cafes in Taipei, Taiwan.  Through

4   these round-robin style meetings, the participants continued to exchange shipment,

5   production, and pricing information in furtherance of the conspiracy to fix the

6   price of TFT-LCD.  These round-robin meetings continued until in or about

7   December 2006.

8   j.   During the period covered by [the] Indictment, employees of defendant AU

9   Optronics Corporation, in addition to participating in Crystal Meetings, had one-

10   on-one discussions in person or by phone with representatives of coconspirator

11   TFT-LCD manufacturers during which they reached agreements on pricing of

12   TFT-LCD sold to certain customers, including customers located in the United

13   States.  Through these one-on-one discussions, the participants also monitored

14   each other's compliance with prices agreed upon at Crystal Meetings and during

15   other discussions.  Participants in these one-on-one discussions, at certain times

16   during the conspiracy, included Hsuan Bin Chen, Hui Hsiung, Lai-Juh Chen, Shiu

17   Lung Leung, Borlong Bai, Tsannrong Lee, Wen Jun Chen, and Duk Mo Koo.

18   k.   During the period covered by [the] Indictment, senior-level employees of AU

19   Optronics Corporation regularly instructed employees of AU Optronics

20   Corporation America located in the United States to contact employees of other

21   TFT-LCD manufacturers in the United States to discuss pricing to major United

22   States TFT-LCD customers.  In response to these instructions, employees of AU

23   Optronics Corporation America located in the United States had regular contact

24   through in-person meetings and phone calls with employees of other TFT-LCD

25   manufacturers in the United States to discuss and confirm pricing, and at times

26   agree on pricing, to certain TFT-LCD customers located in the United States.

27   These AU Optronics Corporation America employees regularly reported the

28   pricing information they received from their competitor contacts in the United

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

States to senior-level executives at AU Optronics Corporation in Taiwan.  By at least early 2003, representatives of defendant AU Optronics Corporation also began sending reports of the discussions and price agreements reached at Crystal Meetings to certain employees at AU Optronics Corporation America.  These reports were used by certain employees of AU Optronics Corporation America in their price negotiations with certain TFT-LCD customers located in the United States.

l.   During the period covered by [the] Indictment, representatives of defendants AU Optronics Corporation, AU Optronics Corporation America, and other coconspirators took steps to conceal the conspiracy and conspiratorial contacts through various means:

    i.   The Crystal Meeting participants discussed the need to keep the Crystal Meetings secret and warned against revealing the existence of the meetings, even to other employees within their own companies who did not participate in the conspiracy.

    ii.   Participants in the Crystal Meetings were specifically warned to keep the meetings secret because of antitrust laws and the ongoing price-fixing investigation into the DRAM industry.

    iii.   In addition, in or about December 2006, representatives of AU Optronics Corporation America took steps to destroy evidence showing contacts with TFT-LCD competitors when they became aware of the United States Department of Justice's investigation into price-fixing in the TFT-LCD industry.

**10.   June 29, 2010 Announcement: HannStar Display Corporation Indicted and Pleads Guilty In Price-Fixing Conspiracy**

244.   On June 29, 2010, the DOJ announced that HannStar agreed to plead guilty and pay a $30 million criminal fine for its role in a conspiracy to fix prices in the sale of LCD Panels sold worldwide.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

245.    HannStar admitted that from on or about September 14, 2001, to on or about January 31, 2006, "[HannStar], through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy with major TFT-LCD producers, the primary purpose of which was to fix the price of certain TFT-LCD sold in the United States and elsewhere" in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

246.    HannStar further admitted that "[i]n furtherance of the conspiracy, the defendant, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as 'crystal meetings,' with representatives of other TFT-LCD producers.  During these discussions and meetings, agreements were reached to fix the price of certain TFT-LCD to be sold in the United States and elsewhere."

**11.    January 25, 2011 DOJ Announcement:  HannStar Display Corporation's President Indicted In Price-Fixing Conspiracy**

247.    On January 25, 2011, the DOJ announced that a federal grand jury in San Francisco returned an indictment against the current president of HannStar Display Corporation for his participation in the TFT-LCD price fixing conspiracy.  The indictment charges that Ding Hui Joe, aka David Joe, conspired to suppress and eliminate competition by fixing the prices of LCD Panels from September 14, 2011 until on or about January 31, 2006.  According to the indictment, Mr. Hui Joe participated in secret crystal meetings in hotel rooms in Taipei, Taiwan. According to the indictment, Mr. Ding and Defendants and/or co-conspirators took various steps to conceal the conspiracy and avoid detection.

248.    The hundreds of millions of dollars in fines and the long and growing list of guilty pleas demonstrate that the investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities.  Plaintiffs are informed and believe and allege, as the DOJ's representative told the U.S. District Court in San Francisco at the September 19, 2007 hearing, the DOJ's investigation into the TFT-LCD industry is premised in part on insider information that presents a detailed "road map" of the conspiracy described in *in camera* submissions made by the DOJ to U.S. District Court in San Francisco.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

**H.      Market During the Conspiracy**

2      249.    After initial introduction into a market, consumer electronics products and their

3  component parts are typically characterized by downward pricing trends.  However, since at least

4  1996, the LCD Panels market has been characterized by unnatural and sustained price stability, as

5  well as certain periods of substantial increases in prices.  Defendants achieved price stability and

6  price increases by agreeing to fix and maintain prices and to restrict supply through decreases in

7  capacity utilization and restraint in new plant investment.

8      250.    As described herein, Defendants' TFT-LCD cartel evolved over time.  Defendants

9  initiated their cartel when LCD Panels and LCD Products were in their relative infancy.  At that

10  time, Defendants balanced the desire to set prices collusively with the industry goal of

11  establishing their products in the marketplace.  As the cartel matured, new entrants were co-opted,

12  and production costs declined.  At the same time, conspirators learned how they could best

13  manage the crystal cycle by agreeing on prices and output.

14                              **1.      1996**

15      251.    By early 1996, analysts were lamenting the excess supply and drastic price cuts in

16  the TFT-LCD markets.  The downward pressure on prices, which had already fallen 40 to 50

17  percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this, TFT-

18  LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity.  In

19  reality, Plaintiffs are informed and believe and allege that Defendants were fixing the prices.

20      252.    Plaintiffs are informed and believe and allege that during this period, the Japanese

21  companies herein began to partner with Taiwanese companies to trade technology and collaborate

22  on supply.  Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped

23  to Japan.  This mutually beneficial relationship between purported competitors continued into at

24  least 1999.

25      253.    A few months into 1996, there was a reversal in the downward trend in TFT-LCD

26  Product prices and an alleged inability of manufacturers to supply enough LCD Panels to meet

27  demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display

28  purchasers are riding a roller coaster of pricing in the display market, with no clear predictability

1    anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take

2    solace that even vendors are constantly being surprised by the sudden twists and turns."

3        254.    By mid-1996, industry analysts were commenting on an unusual rise in TFT-LCD

4    panel prices that was noted to be "quite rare in the electronics industry."

5        255.    Plaintiffs are informed and believe and allege that the "rare" increase in TFT-LCD

6    panel prices was due to the agreements reached by the Japanese companies to increase prices.

7    These companies met and agreed to increase prices and control supply in order to stop any price

8    erosion as herein alleged.

9        256.    1996 also brought the advent of third generation fabs.  In order to stay current with

10   technology, manufacturers were moving quickly into third generation motherglass.  LG

11   Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai was

12   scheduled to do so by early 1998.  However, manufacturers falsely claimed to be operating at full

13   capacity and unable to meet demand, despite the millions of units of over-capacity that had

14   supposedly existed months earlier.  This resulted in surging prices.  These price increases were

15   also inconsistent with the fact that production had become more efficient and cost effective.

16       **2.    1997 – 1998**

17       257.    Plaintiffs are informed and believe and allege that by 1997, Japanese

18   manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers

19   with the most up-to-date technology.  In return, the Japanese received output from Taiwanese

20   plants.  In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese

21   manufacturer that Sharp acquired in 2005.  These arrangements between Japanese and Taiwanese

22   companies resulted in cooperative discussions between supposed competitors.  It was also

23   expected to contribute to an increase in supply of LCD Panels.

24       258.    By 1998, the TFT-LCD industry still had excess capacity, due in part to the still

25   recent entry of the Korean companies into the market.  A March 30, 1998 article in Electronic

26   News reported that Hyundai's production lines were running at only 20 to 50 percent of capacity.

27   The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying,

28   "There is plenty of inventory and capacity available to suit any shortage . . . . You have to get

Case No. 3:10-CV-4572 SI
Master Case No. 3:07-MD-1827-SI    - 64 -    FIRST AMENDED COMPLAINT
82206001.3    AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   your production up to full capacity again before you can even talk about there being a shortage

2   and I think there are plenty of under-capacity fabs right now to bear the burden."

3   Plaintiffs are informed and believe and allege that during this period, concerted efforts were made

4   to get other manufacturers in the industry to limit production.

5          259.    The effort to limit production, capacity restraints and the price-fixing agreement

6   caused decreases in prices of LCD Panels to slow and stop in late 1998.

7                          **3.      1999**

8          260.    In 1999, TFT-LCD Product prices surged during that year due to a claimed

9   "massive undersupply."  This was despite the entry of Taiwanese manufacturers and several new

10  fabs coming online.

11         261.    At the beginning of 1999, industry publications suggested that the Japanese and

12  Korean manufacturers were going to have the opportunity to recoup previous years' losses:  "The

13  AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in

14  an effort to wash away the stain left by years of red ink . . . ."

15         262.    By mid-1999, a Korean source was reporting:  "[w]ith the supply shortage for

16  LCD Panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully

17  increasing its sales targets amid a sharp price rise."  The lack of supply was a pretextual reason

18  given publicly to justify a price increase.

19         263.    Significantly, Bock Kwon, Vice President of LG Display's Sales Division was

20  quoted, in part, in the same trade publication as announcing that:

21             LG LCD will raise prices across its entire TFT-LCD portfolio by 30 to
               40 percent this year, Kwon said, although he expects that prices will
22             stabilize some time in the second half.  [D]emand for larger panels is
               reducing capacity because each display is eating up more square inches
23             per motherglass substrate.  This, combined with a stagnation in capital
               spending by many panel makers, will keep the LCD industry in a
24             period of relative shortage until 2001, Lee said.  The shortage has
               become acute, and has created an unusual market in which prices could
25             rise as much as 30% to 80% in one year according to Ross Young,
               President of DisplaySearch, a research firm in Austin, Texas.

26

27

28

264.    Also in 1999, the three major TFT-LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai.  The year 1999 also saw an additional merger when LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created Defendant LG Display.

**4.    2000 - 2001**

265.    By January of 2000, prices for LCD Panels were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors into the market, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics).  Taiwanese Defendants began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other Defendants to gain immediate market share.  However, by 2000-01, the Taiwanese Defendants had increased their market share to the point that it made sense to participate in the conspiracy, and Plaintiffs are informed and believe and allege that they then moderated the volume of their production.

266.    Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

267.    Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices.  In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

268.    In October 2000, *The Korea Herald* reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

269.    Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD Panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Similarly, industry insiders suggested that the price increases were the result of an inability to

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    meet increased demand.  However, published data for 2001 showed that several Defendants were

2    operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent

3    utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52

4    percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of

5    rising prices and supposedly tight supply, Plaintiffs are informed and believe and allege that the

6    Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict

7    supply, and that again, Defendants reacted to the price trough by conspiring to fix prices.  This

8    agreement was reached in part at the bilateral and group meetings described above.

9           270.    The rise in prices made no economic sense at this point in time and was the

10   product of Defendants' setting the price of TFT-LCD by agreement.  First, Defendants were

11   bringing new plants on line that utilized larger motherglass, which was more cost effective.

12   Second, as reported by an industry source, the variable cost of producing LCD Panels was

13   declining during the latter part of 2001 and into 2002.  With lower production costs and capacity

14   to spare, it made little economic sense for Defendants not to utilize their full capacity other than

15   because of an agreement by them not to do so.

16                          **5.    2002 – 2003**

17          271.    Prices continued to rise from the second half of 2001 through the second half of

18   2002.  Industry analysts attributed these price increases to a "larger-than-expected panel

19   shortage," despite continuing capacity expansion.  In reality, Plaintiffs are informed and believe

20   and allege that the price increases were the result of agreements reached in the crystal meetings

21   and bilateral discussions described above.

22          272.    By the second half of 2002, the cartel's success at propping up prices led to

23   lagging demand, and the cartel's response was to let prices level off and even begin to fall.  Such

24   downward price trends are not inconsistent with a monopoly or cartel.

25          273.    Throughout 2002, industry leaders shifted to fifth generation motherglass

26   production technology.

27          274.    Industry analysts took note of the unusual trends in the pricing of LCD Panels

28   and/or LCD Products.  In February 2004, CNET.com quoted an analyst from IDC, a research

1   firm, as saying that, "LCD is one of the few [markets] where things have actually gone up in

2   price."  As described above and as further detailed in Section VII below, Defendants explained

3   these price increases with false statements about market conditions in order to cover up the

4   conspiracy.

5          275.    During five consecutive quarters in 2003 and 2004, TFT-LCD Product prices rose

6   significantly.  AU Optronics reported that the price for certain of its LCD Panels increased 28

7   percent between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG

8   Display reported that its pricing increased by 21 percent over the same period.

9          276.    Plaintiffs are informed and believe and allege that these soaring prices resulted in

10  similar increases in the profits reaped by the TFT-LCD Product manufacturers.  For example, the

11  eight largest TFT-LCD Product manufacturers reported a collective profit increase of 740 percent

12  between the second quarter of 2003 and the second quarter of 2004.  These record profits resulted

13  from Defendants' collective action to fix, raise, maintain or stabilize the price of LCD Panels.

14  Again, the sharing of information about price and production, the under-utilization of capacity,

15  and restraints on output drove up the prices of LCD Panels.

16         277.    Around this time, industry analysts suggested that there were too many

17  competitors in the TFT-LCD Product marketplace.  Some industry participants went as far as

18  overtly suggesting that the industry should seek to curtail supply through mergers.  These

19  suggestions were carried out.  Significant consolidation and collaboration among competitors in

20  the TFT-LCD Product market occurred.

21         278.    While TFT-LCD Product prices were increasing in late 2003, AU Optronics, Chi

22  Mei, and HannStar decreased capacity utilization, as Plaintiffs are informed and believe and

23  allege had been agreed to in crystal meetings.

24         279.    As noted above, Panasonic's joint venture announced plans to solicit investment

25  from other companies involved in the production of LCD Panels, including device manufacturers

26  and material suppliers.  NEC formed an alliance with Casio.  In addition, Taiwanese TFT-LCD

27  manufacturers agreed to supply Panasonic with LCD Panels for use in televisions.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

280.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu Display Technology.

281.    Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of LCD Panels.  Plaintiffs are informed and believe and allege that in order to keep prices artificially high, Defendants chose not to operate at full capacity, nor to take advantage of lower variable costs.

### 6.    2004

282.    Pursuant to Defendants' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters.  Various types of crystal meetings were ongoing during this period.

283.    The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and began to decline in the second half of 2004. During this period of time, the market for TFT-LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

284.    In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

285.    Consolidation and collaboration among and between competitors continued as Sony launched a joint venture, named S-LCD Corp.

### 7.    2005

286.    Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

287.    By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant product, and the volume of 32-inch panels for televisions took off as well.  In 2005, 32-inch panels represented almost 27 percent of sales.

288.    Analysts forecast excess production capacity in 2005 because of large TFT-LCD plants including that of LG Display being brought on line.  However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent.  The shortage came as a surprise to analysts.

289.    This shortage was the result of collusion among Defendants.  Dr. Hui Hsiung, Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for LCD Panels:

> I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower.  And I think in the past we did have some problem convincing our competitors doing the same thing.  But in recent months, especially this year, actually, it did start to happen.  I think that the industry understand[s] the benefit of keeping the capacity low.  Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading.  And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs.  So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big.  So, we think the industry become more mature.  That is precisely what our competitors would do.

290.    Indeed, earlier that year, a spokesperson for LG Display had predicted that market stabilization.

291.    These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

### 8.    2006

292.    A temporary oversupply of LCD Panels occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, Defendants fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was reducing production of those products in order to avoid further price erosion.  He expressed the view that his competitors

1   should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen,

2   a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in

3   conjunction with his company's peers.  A June 13, 2006 article in *InfoWorld* noted that as a result

4   of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

5          293.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict the

6   output and increase the prices of LCD Panels.  Plaintiffs are informed and believe and allege that

7   in May of 2006, in discussions between executives of the two companies, AU Optronics

8   convinced Quanta Display, a company that it acquired in October of 2006, to reduce production

9   of LCD Panels.  By June of 2006, LG Display also announced plans to cut production of LCD

10  Panels.

11         294.    By the summer of 2006, this ongoing conspiracy was being effectuated through

12  bilateral meetings as alleged above.

13         295.    Despite the fact that certain of the Defendants may have cut back on, or

14  discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental

15  investigations described below, the impact of the conspiracy continued at least through the end of

16  that year.  This carry-over in the antitrust injury was due, in part, to the nature of the pricing

17  mechanisms in the industry, such as supply contracts.

18         **I.      The Role of Trade Associations During the Relevant Period**

19         296.    The LCD industry is served by several major trade organizations that put on

20  industry-wide meetings several times a year.  These meetings have facilitated collusion, and the

21  trade associations have themselves functioned as a means for Defendants to cooperate and discuss

22  prices.

23         297.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to

24  which AU Optronics, Chi Mei, and HannStar belong.  Founded in 2000, TTLA's self-described

25  mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various

26  activities, promoting the cooperation within competition, acting as a window for interaction with

27  international organization[s] and promoting the integrated growth to [the] whole display

28  industry."  TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD

2  affiliations to visit TTLA."  Thus, TTLA was not merely a trade association that provided an

3  opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and

4  implemented.

5  298.   South Korean manufacturers, including LG Display, had similar trade associations

6  during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research

7  Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry

8  Association).  EDIRAK's stated goal was "promoting co-activity with foreign Organizations

9  related to display industries."  Since 1996, EDIRAK has had a cooperation pact with the United

10 States Display Consortium ("USDC").  Describing the pact, Malcolm Thompson, then-Chairman

11 of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

12 299.   Japanese manufacturers of LCD Panels have a similar organization of their own.

13 The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese

14 manufacturers of LCD Panels.  Its members include Sharp, NEC, and Hitachi.  Like the

15 KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity

16 to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

17 300.   In addition to these national trade associations, the Society for Information Display

18 ("SID") put on multiple meetings each year that were attended by executives from all of the

19 major producers.  One of these meetings had been known as the SID Symposium, but was

20 renamed the "SID International Symposium and Business Conference."  SID also puts on a long-

21 running conference called the International Display Research Conference ("IRDC").

22 301.   The 2004 SID International Symposium and Business Conference ("SID 2004")

23 featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and CEO

24 of AU Optronics.  This was followed shortly by a presentation entitled "The FPD Capital

25 Equipment Investment Environment," which informed the attendees about "investments planned

26 at the major display manufacturers."  A representative of DisplaySearch also spoke about the

27 LCD market.  There were presentations by analysts from iSuppli/Stanford Resources, and other

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  industry experts.  This was all followed by a "networking reception – sponsored by LG, Philips

2  LCD," to which all conference attendees were invited to participate.

3       302.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU

4  Optronics.  This time it was called "2005:  Beyond the Crystal Gateway."  A DisplaySearch

5  representative provided "the latest outlook for flat panel displays covering pricing, demand, and

6  supply . . . and the cost and margin outlook for key FPDs will be projected."  Again, these

7  discussions about the market were followed by a "networking reception."  Among the attendees at

8  SID 2004 were Bruce Berkoff of LG Display, H.B. Chen of AU Optronics, Larry Weber of

9  Panasonic, and Joel Pollack of Sharp.  Senior executives from Sharp and Hitachi also attended.

10       303.    Plaintiffs are informed and believe and allege that the SID 2005 conference was

11  very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle.

12       304.    SID 2005 provided a prime opportunity for one of the dominant manufacturers to

13  explain to all of its key competitors how to manage supply and maximize "line-investment

14  timing."  Among the attendees at SID 2005 was Bruce Berkoff of LG Display.  SID 2005 also

15  featured presentations regarding developments in LCD technology by officials from AU

16  Optronics, Sharp, LG Display, and Hitachi.

17       305.    The conspiracy was also carried out at the annual meetings of the Global FPD

18  Partners' Conference ("GFPC"), which have been held since 2005.  The initial conference was

19  held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3,

20  2006 in Okinawa, Japan.

21       306.    Plaintiffs are informed and believe and allege that participants in the 2006 GFPC

22  noted how successful the event was in promoting information exchanges and "networking"

23  among the co-conspirators, or, as Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as

24  the flat panel display industry, it is increasingly important to build connections across the supply

25  chain and around the world . . . the GFPC plays a vital part in building those connections and

26  growing our business."

27

28

Case No. 3:10-CV-4572 SI
Master Case No. 3:07-MD-1827-SI     - 73 -     FIRST AMENDED COMPLAINT
82206001.3     AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

307.    Plaintiffs are informed and believe and allege that among the participants at GFPC 2006 were Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Nakajima of Panasonic, and Dr. Hui Hsiung of AU Optronics.

308.    As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving Defendants further opportunities to discuss prices and output.

## VIII.    FRAUDULENT CONCEALMENT

309.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until December 2006, when investigations by the DOJ and other antitrust regulators became public.  Defendants' secret conspiracy did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of LCD Panels.

310.    Plaintiffs are informed and believe and allege that the participants in the crystal meetings agreed to keep the meetings secret, that in some instances, the location of the meeting was circulated only the day before in an effort to avoid detection.  Furthermore, Plaintiffs are informed and believe and allege that the participants agreed on what pretexts they would cite when questioned about rising prices.  Plaintiffs are informed and believe and allege that the participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

311.    The affirmative acts of Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

312.    The conspirators knew their activities were illegal.  REDACTED

1

2

3

4

5

6

7    313.    Therefore, the Defendants and their co-conspirators kept their conspiracy

8    communications strictly confidential.  REDACTED

9

10

11

12

13

14

15

16    314.    By its very nature, Defendants and their co-conspirators' price-fixing conspiracy

17    was inherently self-concealing.  As alleged above, Defendants and their co-conspirators had

18    secret discussions about price and output.  Defendants agreed not to publicly discuss the existence

19    or the nature of their agreement.  During these meetings, top executives and other officials

20    attending these meetings were instructed on more than one occasion not to disclose the fact of

21    these meetings to outsiders, or even to other employees of Defendants not involved in LCD Panel

22    pricing or production.  In fact, the top executives who attended the CEO and commercial crystal

23    meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in

24    public with each other and with the express purpose and effect of keeping them secret.  Moreover,

25    when the participants in those meetings became fearful that they might be subject to antitrust

26    scrutiny, in approximately the summer of 2006, they discontinued the lower level meetings in

27    favor of one-on-one meetings to exchange pricing and supply information.  The meetings were

28    coordinated so that on the same date, each competitor met one-on-one with the other in a "Round

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 Robin" set of meetings until all competitors had met with each other.  These Round Robin

2 meetings took place until at least November or December of 2006.  The information obtained at

3 these meetings was transmitted up the corporate reporting chain to permit Defendants to maintain

4 their price-fixing and production-limitation agreement.

5      315.    In addition, Defendants and their co-conspirators repeatedly gave pretextual

6 justifications for inflated prices of LCD Panels in furtherance of the conspiracy.  Defendants have

7 used a variety of other purportedly market-based explanations for price increases in order to

8 conceal their conspiracy, including undercapitalization, supply shortage, and component part

9 availability.

10      316.    In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises

11 of early 1999 on under-capitalization:

12           Prices have dropped at a steady rate over the past couple of years to the
          point where it was difficult to continue the necessary level of

13           capitalization.  The [low prices] have starved the industry.

14      317.    Also, plaintiffs are informed and believe and thereon allege that in early 1999,

15 Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our

16 supply capability" and predicted that "prices will continue to increase until a reasonable balance

17 is achieved."

18      318.    Plaintiffs are informed and believe and thereon allege that also in 1999, Bock

19 Kwon, Vice President of LG Display's Sales Division falsely reported that price increases

20 resulted from "acute" shortages.

21      319.    On February 4, 2001, Bruce Berkoff, Executive Vice President at LG Display, was

22 quoted by News.com as saying that price increases were due to shortages.  He claimed, "demand

23 grew so fast that the supply can't keep up."

24      320.    Plaintiffs are informed and believe and thereon allege that in the latter half of

25 2001, Koo Duk-Mo, an executive at LG Display, predicted a 10 to 15 percent price increase,

26 purportedly resulting from increased demand during the holiday season.

27      321.    Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU

28 Optronics, offered another rationale for the 2001 price increase in an interview for the Taiwan

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   Economic News in October 2001.  Plaintiffs are informed and believe and allege that they blamed

2   "component shortages due to the late expansion of 5th generation production lines and new

3   demand from the replacement of traditional cathode ray tubes with LCD monitors."

4       322.   These explanations were pretextual and served to cover up the conspiracy.  Later

5   price increases were explained by industry leaders as derived from new demand for LCD

6   televisions.  Plaintiffs are informed and believe and thereon allege that in 2005, Koo Duk-Mo of

7   LG Display stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected,

8   so LCD TV supply is likely to remain tight throughout the year."

9       323.   As a result of Defendants' fraudulent concealment of their conspiracy, the running

10  of any statute of limitations has been tolled with respect to any claims of Plaintiffs arising from

11  the anticompetitive conduct alleged in this Complaint.

12  ## IX.   <u>VIOLATIONS ALLEGED</u>

13  ### First Claim for Relief

14  ### (Violation of Section 1 of the Sherman Act)

15      324.   Plaintiffs incorporate by reference all the above allegations as if fully set forth

16  herein.

17      325.   All Plaintiffs bring a claim under the Sherman Act in connection with their direct

18  purchases of LCD Products containing LCD Panels.

19      326.   Beginning at least on or around January 1, 1996, the exact date being unknown to

20  Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-

21  conspirators entered into a continuing contract, combination or conspiracy to unreasonably

22  restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

23  artificially reducing or eliminating competition in the United States.

24      327.   In particular, Defendants combined and conspired to raise, fix, maintain or

25  stabilize the prices of LCD Panels (resulting in higher-priced LCD Products) sold in the United

26  States.

27      328.   As a result of Defendants' unlawful conduct, prices for LCD Panels (and by

28  extension, LCD Products) were raised, fixed, maintained and stabilized in the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

329.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

330.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.      participating in meetings and conversations to discuss the prices and supply of LCD Panels;

b.      communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD Panels;

c.      agreeing to manipulate prices and supply of LCD Panels sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

d.      issuing price announcements and price quotations in accordance with the agreements reached;

e.      selling LCD Panels at non-competitive prices;

f.      exchanging competitively sensitive information in order to facilitate their conspiracy;

g.      agreeing to maintain or lower production capacity; and

h.      providing false statements to the public to explain increased prices for LCD Panels.

331.    As a result of Defendants' unlawful conduct, the Best Buy Plaintiffs were injured in its businesses and property in that they paid more for LCD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of LCD Products.

**Second Claim for Relief**

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq*.)**

332.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

333.    All Plaintiffs bring a claim under the Minnesota Antitrust Act of 1971 in connection with their direct purchases of LCD Products containing LCD Panels.  All Plaintiffs except MHF bring a claim under the Minnesota Antitrust Act of 1971 in connection with their indirect purchases of LCD Products containing LCD Panels.

334.    Beginning at least on or around January 1, 1996, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*.

335.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of LCD Panels (resulting in higher-priced LCD Products) sold in the United States.

336.    As a result of Defendants' unlawful conduct, prices for LCD Panels (and by extension, LCD Products) were raised, fixed, maintained and stabilized in the United States.

337.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

338.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    participating in meetings and conversations to discuss the prices and supply of LCD Panels;

b.    communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD Panels;

c.    agreeing to manipulate prices and supply of LCD Panels sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d.     issuing price announcements and price quotations in accordance with the agreements reached;

e.     selling LCD Panels at non-competitive prices;

f.     exchanging competitively sensitive information in order to facilitate their conspiracy;

g.     agreeing to maintain or lower production capacity; and

h.     providing false statements to the public to explain increased prices for LCD Panels.

339.     As a result of Defendants' unlawful conduct, Best Buy was injured in its businesses and property in that they paid more for LCD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of LCD Products.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.,* and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.     Plaintiffs shall recover damages sustained by it, as provided by the state and federal antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1    E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

2  as provided by law; and

3    F.    Plaintiffs shall recover such other and further relief as may be just and proper.

4

5  DATED: June 7, 2011                    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

6

7                                        By:    /s/ David Martinez
                                               Roman M. Silberfeld
8                                              David Martinez
                                               Attorneys For Plaintiffs
9                                              BEST BUY CO., INC.; BEST BUY PURCHASING
                                               LLC; BEST BUY ENTERPRISE SERVICES, INC.;
10                                             BEST BUY STORES, L.P.; BESTBUY.COM,
                                               L.L.C. and MAGNOLIA HI-FI, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Case No. 3:10-CV-4572 SI
Master Case No. 3:07-MD-1827-SI                    - 81 -                    FIRST AMENDED COMPLAINT
82206001.3                                                                  AND JURY DEMAND

1

## **DEMAND FOR JURY TRIAL**

2        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

3   of the claims asserted in this Complaint so triable.

4

5   DATED:  June 7, 2011               ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

6

7                                     By:    /s/ David Martinez
                                            Roman M. Silberfeld
8                                           David Martinez
                                            Attorneys For Plaintiffs
9                                           BEST BUY CO., INC.; BEST BUY PURCHASING
                                            LLC; BEST BUY ENTERPRISE SERVICES, INC.;
10                                          BEST BUY STORES, L.P.; BESTBUY.COM,
                                            L.L.C. and MAGNOLIA HI-FI, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES