Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
Ryan C. Kirkpatrick (243824) *(application for admission to be filed)*
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

Allan Diamond *(pro hac vice to be submitted)*
Jim McCarthy *(pro hac vice to be submitted)*
Jason Fulton *(pro hac vice to be submitted)*
DIAMOND McCARTHY LLP
1201 Elm St., 34th Floor
Dallas, Texas 75270
Telephone: (214) 389-5300
Facsimile: (214) 389-5399
adiamond@diamondmccarthy.com
jmccarthy@diamondmccarthy.com
jfulton@diamondmccarthy.com

Attorneys for SB Liquidation Trust
[additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SB LIQUIDATION TRUST, | Case No. 10-cv-5458 SI |
| Plaintiff, | Master File No. 07-cv-1827 SI |
| v. | MDL No. 1827 SI |
| AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO., LTD.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; HITACHI, LTD.; HITACHI DISPLAYS, LTD.; AND HITACHI ELECTRONIC DEVICES (USA), INC., | **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |
| Defendants. | |

FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiff SB Liquidation Trust (the "SB Trust"), as successor-in-interest to Syntax-Brillian Corporation, Syntax Groups Corporation, and Syntax-Brillian SPE, Inc., and acting by and through its Trustee, Geoffrey L. Berman, brings this action against Defendants AU Optronics Corporation, AU Optronics Corporation America, Inc, Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co. Ltd., Nexgen Mediatech, Inc., Nexgen Mediatech USA, Inc., Chunghwa Picture Tubes Ltd., Tatung Company of America, Inc., HannStar Display Corporation, LG Display Co. Ltd., LG Display America, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Samsung Electronics America, Inc., Sharp Corporation, Sharp Electronics Corporation, Toshiba Corporation, Toshiba America Electronics Components, Inc., Toshiba Mobile Display Co., Ltd., Toshiba America Information Systems, Inc., Epson Imaging Devices Corporation, Epson Electronics America, Inc, Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc., SB Trust alleges the following based on its personal knowledge, investigation by counsel, publicly available materials from the *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, 07-md-01827-SI, the related federal guilty pleas and indictments, and upon information and belief.

I. **INTRODUCTION.**

1.    Plaintiff SB Trust brings this action to recover those damages to Syntax-Brillian Corporation ("SBC") and its affiliate, Syntax Groups Corporation, caused by a long running and largely-admitted conspiracy among suppliers of liquid crystal display panels ("LCD Panels") and related products ("LCD Products"). The purpose of this conspiracy was to eliminate competition between the co-conspirators and thereby to fix, raise, stabilize, and maintain the prices of LCD Panels and LCD Products sold directly or indirectly to U.S. customers, including SBC and Syntax Groups, which purchased LCD Panels and LCD Products both directly and indirectly.

2.    Syntax Brillian Corporation began as Syntax Groups Corporation, a California corporation formed on April 21, 2003 to develop, market, and distribute various consumer electronics. In 2004, Syntax Groups changed its core business to focus on LCD televisions marketed under the brand name "Olevia."

3.    On July 12, 2005, Syntax Groups entered into a merger agreement with Brillian Corporation, a publicly traded Delaware corporation. Brillian's primary business was the design and development of large-screen, rear-projection HDTVs using LCoS technology, an alternative to LCD and plasma based high definition televisions. The merger closed on November 30, 2005, at which time Syntax Groups became a wholly owned subsidiary of Brillian Corporation. Brillian then changed its name to Syntax-Brillian Corporation ("SBC").

4.    SBC's Olevia brand LCD televisions were a huge success, and SBC experienced phenomenal sales growth. The company quickly penetrated the retail market by supplying high quality LCD televisions at prices that were below comparable products, largely through such major U.S. retail outlets as Circuit City, K-Mart, Sears, Office Depot, Fry's Electronics, and Target.

5.    Despite its rapid growth and quality product, SBC, Syntax Groups, and their affiliate, Syntax-Brillian SPE, Inc., (collectively the "Debtors") filed for reorganization under Chapter 11 of the Bankruptcy Code on July 8, 2008.[1] The Debtors' chronic cash shortages had ultimately resulted in their inability to pay their debts as they came due. As part of the bankruptcy, the bankruptcy court entered an order creating the SB Trust as a post confirmation trust to hold and bring actions, on behalf of the debtors, against those persons – like the Defendants herein - who had contributed to the Debtors' downfall.

6.    The Defendants' and their co-conspirators' price-fixing activities clearly did contribute to that downfall. From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, Defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels and LCD Products. To that end, senior executives of the Defendants instructed their subordinates in the United States to communicate with employees of their competitors to exchange pricing and other competitive information to be used in fixing prices for LCD Panels and LCD

---

[1]    *In re Syntax Brillian Corp., et al.*, Case No. 08-11407-BLS (Jointly Administered) (Bkr. D. Del. filed July 8, 2008).

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

Products sold to U.S. companies. The Defendants' employees engaged in these illegal communications and information exchanges in the United States and in foreign countries, and utilized that information to increase the prices that U.S. customers like SBC and Syntax Groups paid for LCD Panels and the related LCD Products.

7.    As a result of Defendants' price fixing conspiracy, SBC and Syntax Groups were injured in their business by paying substantially more for LCD Panels and LCD Products than they otherwise would have paid in the absence of the Defendants' conspiracy. Under all of the applicable laws, the SB Trust therefore seeks to recover their actual damages, any and all statutory and punitive damages, pre-judgment interest and post judgment interest, and the costs of suit, including reasonable attorneys' fees, for the injuries that SBC and Syntax Groups suffered as a result of the Defendants' and their co-conspirators' conspiracy to fix, raise, maintain and artificially stabilize the prices of LCD Panels and LCD Products.

## II.    JURISDICTION/VENUE.

8.    This Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because SB Trust brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, which gives the federal courts jurisdiction over private antitrust enforcement actions.. As to the SB Trust's claims under the antitrust, unfair competition and consumer protection laws of the State of California, jurisdiction exists pursuant to 28 U.S.C. § 1367.

9.    This Court also has personal jurisdiction over the Defendants because each Defendant is either an alien corporation, transacts business in this District, or is otherwise formed in this District, and because a substantial portion of the acts, events or omissions giving rise to these claims occurred in this State and this District, as well as many others. In fact, Defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the State of California. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities have had a direct, substantial and reasonably foreseeable effect on such commerce. Defendants and their coconspirators knew that price-fixed LCD Panels and LCD Products containing price-fixed LCD Panels would be sold and shipped into this District.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

10. Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

11. The price-fixing claims asserted herein by the SB Trust are related to long-standing complex multidistrict litigation that is pending in this Court. That litigation is styled *In re TFT-LCD Antitrust Litigation*, Case No. M:07-CV-1827 SI. Judge Susan Illston is the presiding judge. As this case involves substantially the same parties, transactions, events, and requests for relief as sought by the class and opt-out plaintiffs in that multidistrict litigation, and this Court's standing orders require that transfer, this civil action has been consolidated with the multidistrict litigation before Judge Illston.

III. **DEFINITIONS.**

12. The term "LCD Panel" means liquid crystal display panel. Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image. The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image. As used herein, "LCD Panel" refers to both liquid crystal display panels and to modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a television, computer monitor, or other product.

13. "LCD Products" means a product in which LCD Panels are a key component, *i.e.*, televisions, computer monitors, and laptop computers.

14. As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

IV. **THE PARTIES**

A. **THE PLAINTIFF.**

15. The SB Trust is a liquidating trust organized under Delaware and federal bankruptcy law. Geoffrey L. Berman, the Trustee of the Liquidation Trust, is a California citizen and resident.

16. The SB Trust was created pursuant to the Debtors' Second Amended Chapter 11 Liquidating Plan (the "Plan") and the Order Confirming Debtors' Second Amended Chapter 11

4

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

Liquidating Plan, as Modified (the "Plan Confirmation Order") entered by the bankruptcy court on July 6, 2009. The Plan and the Plan Confirmation Order expressly preserved all of the Debtors' causes of action against Defendants and vested all rights, title, and interest in such causes of action in the SB Trust. Thus, the SB Trust has standing to bring each of the causes of action alleged herein against Defendants.

**B.     THE DEFENDANTS.**

**AU Optronics**

17.    Defendant AU Optronics Corporation is one of the largest manufacturers of LCD Panels. Its corporate headquarters are at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, AU Optronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

18.    Defendant AU Optronics Corporation America, Inc., is a wholly-owned and controlled subsidiary of DefendantDefendant AU Optronics Corporation. Its corporate headquarters are at 9720 Cypresswood Drive, Suite 241, Houston, Texas. It also has facilities located in San Diego and Cupertino, California. During the Conspiracy Period, AU Optronics Corporation America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

19.    Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc., are referred to collectively herein as "AU Optronics." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, DefendantDefendant AU Optronics Corporation America, Inc., was a member of the conspiracy, *inter alia*, by reason of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc., regarding conspiracy activities, and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

1592288v1/012072

20.   As is explained more fully below, AU Optronics Corporation, AU Optronics Corporation America, Inc., and six of their key officers have already been indicted on federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Chi Mei**

21.   Defendant Chi Mei Corporation is one of the world's largest manufacturers of LCD Panels. Its corporate headquarters are at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan. During the Conspiracy Period, Chi Mei Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

22.   Defendant Chi Mei Optoelectronics Corporation (n/k/a Chimei Innolux Corporation) is one of the world's largest manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation. Its global headquarters are at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. During the Conspiracy Period, Chi Mei Optoelectronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

23.   Defendant Chi Mei Optoelectronics USA, Inc., formerly known as International Display Technology USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its corporate headquarters are at 101 Metro Drive, Suite 510, San Jose, California. The Chairman of Chi Mei Optoelectronics USA, Inc. in 2006, Chen-Lung Kuo, was previously the Chairman of CMO Japan Co., Ltd.'s predecessor, and in or about 2007 became Vice President in charge of sales and marketing for CMO. Similarly, the President of Chi Mei Optoelectronics USA, Inc. in 2006, Junichi Ishii, was previously the President of CMO Japan's predecessor. During the Conspiracy Period, Chi Mei Optoelectronics USA, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

24.   Defendant CMO Japan Co., Ltd., formerly known as International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation. Its principal place of business is at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, CMO Japan Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

25.   Defendant Nexgen Mediatech, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, Nexgen Mediatech, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

26.   Defendant Nexgen Mediatech USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at 16712 East Johnson Drive, City of Industry, California. During the Conspiracy Period, Nexgen Mediatech USA, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

27.   Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., are referred to collectively herein as "Chi Mei." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation. Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., regarding conspiracy activities, and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

28.   As is explained more fully below, Chi Mei and four of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. A fifth officer has been indicted, but his case remains pending.

7

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

**Chunghwa**

29.   Defendant Chunghwa Picture Tubes Ltd. is a leading manufacturer of LCD Products. Its global headquarters are at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan. During the Conspiracy Period, Chunghwa Picture Tubes Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

30.   Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California. Currently, Tatung Company owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. During the Conspiracy Period, Tatung America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

31.   Defendants Chunghwa Picture Tubes Ltd. and Tatung America are referred to collectively herein as "Chunghwa." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. During the Conspiracy Period, Chunghwa Picture Tubes Ltd. and Tatung America were closely affiliated, commonly owned, and commonly controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or alter egos of each other. Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.

32.   As is explained more fully below, Chunghwa and three of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. Two other of its officers have been indicted for that same conduct.

**HannStar**

33.   Defendant HannStar Display Corporation ("HannStar") has its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period, HannStar manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

FIRST AMENDED COMPLAINT FOR DAMAGES

34.    As is explained more fully below, HannStar and one of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**LG Display**

35.    Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels. It was created in 1999 as a joint venture between Royal Philips Electronics NV and LG Electronics, Inc. LG Display Co., Ltd. has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. LG Display Co., Ltd. also maintains offices in San Jose, California. During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and elsewhere.

36.    Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California. During the Conspiracy Period, LG Display America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

37.    Defendants LG Display Co., Ltd. and LG Display America, Inc., are referred to collectively herein as "LG Display." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, DefendantDefendant LG Display America, Inc., was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

38.    As is explained more fully below, LG Display and two of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. A third officer has been indicted, but has not yet been arrested and arraigned.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

**Samsung**

39.    Defendant Samsung Electronics Co., Ltd. has its principal place of business at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea. During the Conspiracy Period, Samsung Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

40.    Defendant Samsung Electronics America, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd. Its principal place of business is at 105 Challenger Road, Ridgefield Park, New Jersey. During the Conspiracy Period, Samsung Electronics America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

41.    Defendant Samsung Semiconductor, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd. Its principal place of business is at 3655 North First Street, San Jose, California. During the Conspiracy Period, Samsung Semiconductor, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

42.    Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., are referred to collectively herein as "Samsung." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**Sharp**

43.    Defendant Sharp Corporation has its principal place of business at 22-22 Nagaikecho, Abeno-ku, Osaka 545-8522, Japan. During the Conspiracy Period, Sharp Corporation

FIRST AMENDED COMPLAINT FOR DAMAGES

manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

44. Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation. It is a New York Corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey. During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

45. Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

46. As is explained more fully below, Sharp has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Toshiba**

47. Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan. During the Conspiracy Period, Toshiba Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

48. Defendant Toshiba Mobile Display Co., Ltd., formerly known as Matsushita Display Technology Co., Ltd., has its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan. During the Conspiracy Period, Toshiba Mobile Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

49.   Defendant Toshiba America Electronic Components, Inc., is a wholly-owned and controlled subsidiary of Defendant Toshiba Corporation. Its corporate headquarters are at 19900 MacArthur Blvd., Ste. 400, Irvine, California. During the Conspiracy Period, Toshiba America Electronic Components, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

50.   Defendant Toshiba America Information Systems, Inc., is a wholly-owned and controlled subsidiary of Toshiba America, Inc. Its principal place of business is at 9470 Irvine Boulevard, Irvine, California. During the Conspiracy Period, Toshiba America Information Systems, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

51.   Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., are referred to collectively herein as "Toshiba." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**Epson**

52.   Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan. The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation. Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the Conspiracy Period, Epson Japan manufactured,

1592288v1/012072

marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

53. Defendant Epson Electronics America, Inc., ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation. Its principal place of business is at 2580 Orchard Parkway, San Jose, California. During the Conspiracy Period, Epson America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

54. Defendants Epson Japan and Epson America are referred to collectively herein as "Epson." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan. Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

55. As is explained more fully below, Epson has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Hitachi**

56. Defendant Hitachi, Ltd is a Japanese company with its principal place of business at 6-6 Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of LCD Panels. In 2002, it spun off its LCD Panel manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Conspiracy Period, Hitachi, Ltd. manufactured, sold, and distributed LCD Products to customers in the U.S. and elsewhere.

57. Defendant Hitachi Displays, Ltd., is a Japanese company with its principal place of business at 3300, Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays, Ltd. was formed in 20002 and acquired Defendant Hitachi, Ltd.'s LCD Panel manufacturing business. Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Conspiracy Period, Hitachi Displays, Ltd. manufactured, sold, and distributed LCD Products to customers in the U.S. and elsewhere.

13

FIRST AMENDED COMPLAINT FOR DAMAGES

58. Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina. Its ultimate parent company is Hitachi, Ltd. During the Conspiracy Period, Hitachi Electronic Devices (USA), Inc. sold and distributed LCD Products to customers in the U.S. and elsewhere.

59. Defendants Hitachi, Ltd, Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi." The Hitachi companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant Hitachi Electronic Devices (USA), Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Hitachi, Ltd. and Hitachi Displays, Ltd., which dominated or controlled Hitachi Electronic Devices (USA), Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

60. As is explained more fully below, Hitachi has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. One of Hitachi's key executives has also been indicted, but has not yet been arrested and arraigned.

## V. <u>TRADE AND COMMERCE</u>

### A. THE MARKET FOR LCD PANELS AND LCD PRODUCTS.

61. During and after the Conspiracy Period, Defendants, or one or more of their subsidiaries, sold LCD Panels and LCD Products in the United States through and into interstate and foreign commerce, including through and into the States of Delaware and California.

62. During the Conspiracy Period, Defendants collectively controlled the market for LCD Panels and LCD Products, both globally and in the United States.

63. Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

64. LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.

65.   LCD Panels have no independent utility, and have value only as components of other products, such as televisions, desktop computer monitors, notebook computer displays, and laptop displays. The demand for LCD Panels thus derives directly from the demand for such products. In the case of LCD Panels used in televisions, the demand for LCD Panels derives directly from the demand for televisions.

66.   Direct purchasers, including SBC, buy LCD Panels in order to include them as components in TVs, computer monitors, laptops, and other electronic products. The Defendants unlawful conspiracy inflated the prices at which SBC bought its LCD Panels.

67.   Indirect purchasers, also including SBC, purchase LCD Products that incorporate a LCD panel. The Defendants' unlawful conspiracy inflated the prices at which SBC bought products made with LCD Panels, namely LCD televisions.

68.   SBC participated in the market for LCD Panels by purchasing such panels directly for inclusion in its LCD televisions. SBC also participated in the market for products containing LCD Panels because SBC indirectly purchased LCD Panels as part of an LCD product, namely LCD televisions. Defendants' unlawful conspiracy artificially inflated the prices at which SBC's suppliers sold LCD Panels and LCD televisions to SBC.

69.   The market for LCD Panels and the market for LCD Products, like televisions, desktop computer monitors, and notebook computers, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products, such as televisions. The market for LCD Panels and the markets for LCD Products such as televisions, desktop computer monitors, and notebook computers are, for all intents and purposes, inseparable.  One would not exist without the other.

70.   SBC participated in the market for LCD Panels during and after the Conspiracy Period through its purchases of LCD Panels and LCD Products. SBC paid a higher price for LCD Panels and LCD Products purchased from Defendants, their coconspirators, and others than it would have paid absent the conspiracy.

FIRST AMENDED COMPLAINT FOR DAMAGES

B.    **DEFENDANTS' CONDUCT INVOLVED IMPORT TRADE OR IMPORT COMMERCE**

71.    Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. customers.

72.    The U.S. LCD market was and is enormously important to the Defendants, and was a major focus of the conspiracy. Measured by value, Defendants and others shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Conspiracy Period for ultimate sale to U.S. consumers. During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion. Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period. As a result, a substantial portion of Defendants' revenues were derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, of the Defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

73.    Because of the importance of the U.S. market to Defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct. The Defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce that lead directly into the United States. Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States.

16

1592288v1/012072

1   This conduct by Defendants was meant to produce and did in fact produce a substantial effect in

2   the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

3        74.    During the Conspiracy Period, every Defendant shipped LCD Panels directly into the

4   United States.

5        75.    When high-level executives based at Defendants' Asian headquarters agreed on

6   prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold

7   in the United States. Moreover, because LCD Panels are – and were throughout the Conspiracy

8   Period – the most expensive and significant component of LCD Products, Defendants knew that

9   price increases for LCD Panels would necessarily result in increased prices for LCD Products sold

10  in the United States. Many Defendants manufactured LCD Products and sold them in the United

11  States. In fact, Defendants routinely monitored the effect their price-fixing had on the prices of

12  such LCD Products sold in the United States.

13       76.    Defendants also monitored the prices for LCD Products sold in the United States,

14  which they often referred to as "street prices," because Defendants were aware that the conspiracy

15  would elevate those prices in addition to the prices of LCD Panels. In addition, Defendants used

16  LCD Product pricing in the United States as a benchmark for establishing, organizing, and

17  tracking their price-fixing of LCD Panels.

18       77.    Defendants have acknowledged that their commercial activities involving

19  intentionally sending LCD Panels and LCD Products into the United States, and that those

20  activities  impacted U.S. import trade and import commerce. In a series of complaints filed with

21  the U.S. International Trade Commission over the past few years, Defendants Samsung and Sharp

22  have both alleged infringing conduct based on "[t]he importation into the United States, sale for

23  importation into the United States, and/or sale after importation in the United States of . . . LCD

24  devices" by the other (and by other entities on its behalf). *See In the Matter of Certain Liquid

25  Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631,

26  Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the

27  Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for

28  Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30,

17

FIRST AMENDED COMPLAINT FOR DAMAGES

2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

78.   Other Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce. Those Defendants have admitted that LCD Panels affected by their conspiracy were sold by one or more of the conspirators to customers in the Northern District of California.

79.   For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

80.   Defendants illegal conduct had a direct, substantial, and reasonably foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce.  That conduct resulted in higher prices for LCD Panels (and for LCD Products containing price-fixed LCD Panels) manufactured by Defendants and their coconspirators.  Those higher prices were charged to, and paid by SBC (and others) in the United States, for products imported into the United States.

## VI.   DEFENDANTS ENGAGED IN THE PRICE FIXING OF LCD PANELS AND LCD PRODUCTS.

81.   During the Conspiracy Period, the Defendants were aware that the U.S. market for LCD Products was one of the largest in the world. Defendants regularly solicited updated information from potential purchasers of LCD Panels, including SBC, about the type and quantity of LCD Panels needed for the manufacture of LCD Products for sale in the United States. Defendants also maintained sales offices and sales agents in the United States to market their LCD Panel manufacturing capabilities to U.S. companies, including SBC, and to support SBC and other U.S. customers throughout the duration of the purchasing relationship.

### A. DEFENDANTS' AGREEMENTS TO SET PRICES AND LIMIT PRODUCTION.

82.   The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, Korea, Taiwan, and the United States. In

FIRST AMENDED COMPLAINT FOR DAMAGES

the early years, beginning in at least 1996, representatives of the Japanese Defendants Hitachi, Sharp and Toshiba met and agreed to fix prices for LCD Panels generally, as well as to fix the LCD prices to be charged to specific OEMs.  They also agreed to limit the amount of LCD Panels each would produce.

83.   In the early years, when the conspiracy was principally limited to the Japanese Defendants, bilateral discussions were the preferred method of communication. As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

84.   As LCD production in Korea began to increase and become more sophisticated, the Japanese Defendants expanded their meetings to include their Korean competitors, including Defendants LG Display and Samsung, both of which also agreed to fix prices and control supply. At or about this same time, the Japanese Defendants began to partner with those Defendants located in Taiwan to trade technology and collaborate on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan. In 2001, the Korean Defendants convinced Taiwanese LCD panel manufacturers, including Defendants AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and control supply. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell LCD Panels and products to their own corporate subsidiaries and affiliates that manufactured LCD-panel containing products, thereby ensuring that LCD panel prices remained the same as between Defendants and their OEM customers, preventing the price competition on LCD Products that would have benefitted the consumers of those products.

85.   Defendants fostered a culture of corruption within their companies whereby employees from the top executive to lower-level sales representatives engaged in frequent and continuous communications with the employees at every level of their competitors. Senior executives at Defendants made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment. The lower-level employees transferred competitive information up to their superiors who utilized that information along with the pricing information they had collected through their own illegal competitor contacts to set prices for LCD Panels at artificially-inflated levels. The

FIRST AMENDED COMPLAINT FOR DAMAGES

constant communications between Defendants at all levels allowed Defendants to conspire to set average prices across the entire industry, as well as conspiring to fix the prices of the particular LCD Panels incorporated into the LCD Products purchased by SBC.

86.   The culture of corruption extended to Defendants' U.S. operations and sales. The top sales executive at Defendants' Asian headquarters instructed their direct reports in the United States to obtain competitive information from their counterparts at other LCD Panel suppliers in the United States. That information was ultimately used by those top sales executives to set artificially-inflated prices for LCD Panels charged to U.S. customers.

## 1.   **Crystal Meetings.**

87.   In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information, to fix the price of LCD Panels, and to limit their production. From early 2001 through at least 2006, officials from Defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LGD, Sharp, and perhaps others met periodically in Taiwan to discuss and reach agreements on LCD panel prices, price increases, production limits, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production. The group meetings these Defendants participated in were called "Crystal Meetings." Each Defendant attended multiple meetings with one or more of the other Defendants during this period. The Crystal price-fixing and output-limitation meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States, on a regular basis, throughout this period.

88.   The Crystal Meetings were highly organized and followed a set pattern. Meetings among Defendants' high-level executives were called "CEO" or "Top" meetings; those among Defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

89.   "CEO" meetings occurred quarterly from approximately 2001 through 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or

whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

90.   The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently than "CEO" meetings, occurring on a near-monthly basis.

91.   During all of these meetings, Defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

92.   During these CEO/Commercial meetings, Defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreements concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

93.   During these CEO/Commercial meetings, Defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of the Defendants not involved in LCD panel pricing or production. On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such meeting.

94.   The structure of the so-called "working level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "working level" meetings was to exchange information on price, supply and demand, and

1    production. That information would then be transmitted up the corporate reporting chain to those

2    individuals with pricing authority and the responsibility for giving effect to the anti-competitive

3    agreements made at the CEO and Commercial meetings.

4        95.   In approximately the summer of 2006, when they began to have concerns about

5    antitrust issues, Defendants discontinued the working-level meetings in favor of one-on-one

6    meetings to exchange pricing and supply information. The meetings were coordinated so that on

7    the same date, each competitor met one-on-one with the other in a "round robin" set of meetings

8    until all competitors had met with each other. These "round robin" meetings took place until at

9    least November or December of 2006. The information obtained at these meetings was transmitted

10   up the Defendants' corporate reporting chains to permit the Defendants to maintain their price-

11   fixing and production-limitation agreement.

12            **2.    <u>Bilateral Conspiracy Meetings.</u>**

13       96.   Throughout the Conspiracy Period, Defendants also engaged in frequent bilateral

14   discussions and meetings with each other in which they exchanged information about pricing,

15   shipments, and production. During the time when Defendants held the Crystal Meetings, they

16   continued these bilateral discussions, which supplemented the discussions and agreements reached

17   at the Crystal Meetings. Defendants had bilateral discussions with one another during pricing

18   discussions with customers in order to avoid cutting prices and to implement the fixed prices set

19   by Defendants during the Crystal Meetings.

20       97.   These bilateral discussions occurred at various levels of Defendants' sales and

21   marketing organizations. Lower-level sales and marketing employees of the Defendants engaged

22   in frequent bilateral discussions with each other in the form of telephone calls, emails and instant

23   messages. The information gained in these communications was then shared with supervisors and

24   taken into account in determining the price to be offered to Defendants' customers. At the same

25   time, higher-level managers of the Defendants participated in bilateral discussions through

26   telephone calls, emails and face-to-face meetings. These higher-level managers used the

27   information gained through these bilateral discussions to determine the price to be offered to

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

Defendants' customers and communicated this information to the lower level account managers and sales representatives who directly dealt with Defendants' customers.

98. During the Crystal Meetings, Defendants also agreed to engage in bilateral communications with those Defendants not attending the meetings. Certain Defendants were "assigned" other Defendants not in attendance and agreed to and did in fact communicate with non-attending Defendants to synchronize the price and production limitations agreed to at the Crystal Meetings. Participants at the Crystal Meetings contacted Japanese Defendants to relay the agreed-upon pricing and production limitations. Some of these bilateral meetings and communications took place in the United States and specifically targeted U.S. commerce and U.S. OEMs.

### 3.   Defendants' Participation in California

99. Many Defendants conducted operations in California throughout the Conspiracy Period, including Defendants Samsung, LG, Toshiba, Epson, AU Optronics, Chi Mei, Chunghwa, Tatung, and NexGen Mediatech. Through their California operations, Defendants implemented their price-fixing conspiracy in the United States. In fact, Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation specifically admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California. Defendants' employees based in California engaged in bilateral and multilateral communications in furtherance of the conspiracy.

100. Defendants also used their California operations to implement their price-fixing agreements in the United States. Through their activities in California, Defendants' successfully increased the price of LCD Panels.

101. For example, Samsung maintained offices in San Jose, California. Jason Yun, Samsung's senior vice president of its Mobile Display Business Team, managed Samsung's sales of LCD Panels for mobile wireless handset displays and other small panel applications in the United States. Mr. Yun was responsible for managing Samsung's customer relationship with manufacturers of mobile wireless handsets. Mr. Yun also discussed the pricing for LCD Panels in the United States with these mobile wireless handset manufacturers in the United States.

FIRST AMENDED COMPLAINT FOR DAMAGES

102. From Samsung's offices in San Jose, California, Mr. Yun actively participated in Defendants' conspiracy to fix prices of LCD Panels sold to mobile wireless handset manufacturers in the United States. Mr. Yun obtained information regarding other Defendants' prices for LCD Panels used in mobile wireless handsets from Samsung's competitors, including Sharp, Toshiba and Epson. Mr. Yun provided this information to Samsung's U.S. sales teams in the course of briefing this team on Samsung's strategy for pricing discussions with U.S. OEMs. Mr. Yun also provided this information to his counterparts in Korea, Japan, and Taiwan where it was used in the course of determining Samsung's prices for LCD Panels sold to mobile wireless handset manufacturers in the United States.

103. Mr. Yun also received information from his counterparts in Korea, Japan, and Taiwan who engaged in bilateral and multilateral communications with other Defendants, including Sharp, Toshiba, and Epson. The information Mr. Yun received in San Jose, California was then used to implement Defendants' price fixing agreement in the course of pricing discussions with mobile wireless handset manufacturers in the United States.

104. Specifically, Mr. Yun received information from Seshu Arai of Samsung, who was based in Japan, regarding Sharp and Toshiba's future prices for and planned supply of LCD Panels sold to manufacturers of mobile wireless handsets in the United States. Mr. Arai obtained information regarding Sharp's prices for and supply of LCD Panels through frequent meetings with representatives of Sharp, at which information was exchanged and agreements reached regarding pricing and supply for LCD panels sold to mobile wireless handset manufacturers. Mr. Arai obtained information regarding Toshiba's prices for and supply of LCD Panels for mobile wireless handset manufacturers through frequent meetings with representatives of Toshiba, at which information was exchanged and agreements reached regarding pricing and supply for LCD panels sold to mobile wireless handset manufacturers. Following these meetings, Mr. Arai provided the information obtained from Sharp and Toshiba to Mr. Yun in California for Mr. Yun to use in pricing discussions with mobile wireless handset manufacturers in the United States.

105. Other Defendants also engaged in conduct in furtherance of the conspiracy in California to fix the price of small LCD Panels used in mobile wireless handsets and other

portable devices. Defendant LG Display America, Inc. maintained its offices in San Jose, California. LG Display America, Inc. has admitted that it participated in the conspiracy to fix prices of LCD Panels. LG Display employees responsible for LG Display's relationships with and sales to mobile wireless handset manufacturers were located in the San Jose, California office.

106. Toshiba maintained offices in San Jose, California. Toshiba personnel in its San Jose, California offices were involved in and implemented Defendants' conspiracy in the United States. Cameron Zand, one of Toshiba's employees in San Jose, California, received information in Toshiba's California office from his counterparts in Japan regarding the prices Sharp, Epson and other Defendants planned to quote to customers for certain small panel applications. At other times, Mr. Zand received information regarding other Defendants' planned supply of small LCD Panels. Information provided to Mr. Zand in San Jose, California was obtained by Toshiba through bilateral discussions with other Defendants, including Sharp and Epson. In addition, Mr. Zand was in regular contact with Makoto Chiba and Masotoshi Tanaka and received guidance from Mr. Chiba and Mr. Tanaka regarding upcoming pricing discussions with U.S. customers. Mr. Chiba and Mr. Tanaka both had frequent discussions with H.B. Suh of Samsung, in which they discussed and reached agreements regarding LCD Panel pricing, including the prices of small LCD panels for portable electronic devices.

107. Sharp also maintained offices in San Jose, California. Sharp personnel in its San Jose, California were involved in and implemented Defendants' conspiracy in the United States. Jon Horne, a Sharp employee based in Sharp's San Jose, California office, was given information regarding the LCD Panel prices that Toshiba, Epson, and other Defendants planned to quote customers for certain small panel applications. Mr. Horne received information that was obtained by Kazuyoshi Nakayama of Sharp, who participated in frequent and regular meetings and discussions with other Defendants to fix prices for a variety of customers. Mr. Horne was provided with information Mr. Nakayama obtained from Sharp's competitors, including Toshiba and Epson, for use in upcoming pricing discussions in the United States. Mr. Horne was further instructed by Sharp personnel to destroy emails on his computer in San Jose, California describing

FIRST AMENDED COMPLAINT FOR DAMAGES

Mr. Nakayama's meetings with Sharp's competitors and pricing information obtained by Mr. Nakayama at those meetings.

108. Epson maintained offices in San Jose, California. Epson personnel in its San Jose, California office were involved in and implemented Defendants' conspiracy in the United States. Diane Stabile, an Epson employee based in Epson's San Jose, California office was provided information regarding the prices Sharp and Toshiba were planning to quote a U.S. OEM for a small panel application in upcoming meetings, as well Sharp and Toshiba's future small panel supply. Ms. Stabile was provided with this information for use in upcoming price negotiations with that U.S. OEM in the United States. The information regarding Sharp and Toshiba's price quotes was obtained through bilateral meetings and communications between Epson employees and representatives of Sharp and Toshiba.

**4.    Defendants Participating in Price-Fixing Discussions.**

109. Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LGD, and Samsung attended multiple CEO, Commercial, and working-level meetings, as well as bilateral discussions during the Conspiracy Period. Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial meetings, these Defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.

110. Defendant Sharp participated in multiple working-level meetings, as well as bilateral discussions with other Defendants, during the Conspiracy Period. Through these discussions, Sharp agreed with the other Defendants and co-conspirators named in this complaint on prices, price increases, and production limits and quotas for LCD Panels.

111. Defendant Hitachi participated in multiple bilateral discussions with Defendants, including HannStar, during the Conspiracy Period. Through these discussions, Hitachi agreed on prices, price increases, and production limits and quotas for LCD Panels.

112. Defendant Toshiba participated in multiple bilateral discussions with other Defendants, including Sharp, during the Conspiracy Period. Through these discussions, Toshiba agreed on prices, price increases, and production limits and quotas for LCD Panels. As pleaded below, Defendant Sharp has admitted to participating in bilateral meetings, conversations, and

communications in Japan and the United States with unnamed co-conspirators during which they fixed the prices of LCD Panels sold to Dell for use in computers; panels sold to Apple for use in iPods; and panels sold to Motorola for use in Razr phones during the Conspiracy Period. During this time, Toshiba was one of Sharp's principal competitors in the sale of LCD Panels to Dell for use in computers, as well as for panels sold to Apple for use in the iPod. In fact, in the small-to-medium size LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in the first half of 2005, with a 14.5 percent market share during the first quarter and a 14.1 percent market share during the second quarter. Sharp could not have successfully fixed the prices of LCD Panels sold to Dell or Apple unless Toshiba also agreed to fix prices of similar LCD Panels at supra-competitive levels to those two OEMs.

113.   Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source flat panels with one or more of the Defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and to fix the prices of such panels at unreasonably high levels and therefore to aid, abet, notify and facilitate the effectuation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with those other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba, Sharp, Matsushita, and Hitachi formed a joint venture to share basic LCD research costs. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April of 2002, Toshiba and Matsushita formed a joint venture, Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2004, Toshiba, Matsushita, and Hitachi formed a joint venture, IPS Alpha Technology, Ltd., which manufactures and sells LCD Panels for televisions. In 2006, Toshiba purchased a 20% stake in LG Display's LCD panel manufacturing facility in Poland. And in 2007, Toshiba and Sharp formed a joint venture in which Toshiba agreed to provide 50% of Sharp's chip needs and Sharp

agreed to provide 40% of Toshiba's panel needs. The operation and management of these many different joint ventures enabled Toshiba and the other Defendant-joint venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for the LCD Panels that each Defendant manufactured and sold.

## B.   MARKET CONDITIONS DEMONSTRATING THE CONSPIRACY.

114. In addition to the guilty pleas and the evidence of the Defendants' wrongdoing produced by the Defendants themselves, the market for LCD Panels provides further evidence of the Defendants' collusive behavior.

115. The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships, and ease of information sharing.

116. The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, Defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

117. The LCD industry is characterized by high barriers to entry. New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment. Thus, new firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

118. LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and televisions, are manufactured to a specific size, regardless of the manufacturer. The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and so to enforce their conspiracy.

119. The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

    a.  the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;

    b.  the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, Defendant Toshiba Mobile Display Co., Ltd.;

    c.  the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;

    d.  the 2005 transfer of Fujitsu Limited's LCD business to Sharp in 2005;

    e.  the 2006 AU Optronics acquisition of Quanta Display.

120.  Additional opportunities for collusive activity were presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry. Under cover of such arrangements, Defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described hereinafter.

121.  There were also many opportunities for Defendants to discuss and exchange competitively-sensitive information through their common membership in trade associations, their interrelated business arrangements such as joint ventures, their shared national allegiances with other companies operating in the same countries, and relationships between their executives and the executives of competitor companies. Communication between the conspirators was further facilitated through meetings, telephone calls, e-mails, and instant messages. Whatever the connections or the medium of information transfer, the Defendants took advantage of these contacts to discuss and agree upon their pricing of LCD Panels and to monitor each other's compliance with their agreements.

122.  Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion. Rather, the behavior in this market strongly evidences that Defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of unnaturally stabilizing and raising prices for LCD Panels at supra-competitive levels.

123.  After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends. However,

1    since at least 1996, the LCD Panel market has been characterized by unnatural price stability and

2    periods of substantial upward pricing trends.

3        124.  Moreover, since at least 1996, the LCD Panel market has not followed the basic laws

4    of supply and demand in a competitive market. In a competitive market, price increases normally

5    occur during shortage periods. Since at least 1996, however, there have been significant price

6    increases in the LCD Panel market during periods of both oversupply and shortage.

7        125.  The demand for consumer electronic products and their component parts generally

8    increases over time. As would be expected, demand for LCD Panels and LCD Products were

9    steadily and substantially increasing throughout the Conspiracy Period. For example, a November

10   2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow

11   66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

12       126.  Rather than competing for this increased demand, however, since at least 1996,

13   Defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels

14   and to restrict the supply of LCD Panels through, among other things, decreasing their capacity

15   utilization and refraining from expanding existing capacity. Those Defendants not already

16   manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD

17   Panels.

18       127.  In 1996, the LCD Panel market was experiencing excess supply and drastic price

19   cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping

20   due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly due

21   to insufficient production capacity. In fact, Defendants were fixing the prices.

22       128.  LCD Panel prices began to increase in early 1996. Defendants blamed the sudden

23   increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May

24   1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller

25   coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed

26   purchasers trying to keep up with the gyrating market can take solace that even vendors are

27   constantly being surprised by the sudden twists and turns."

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

129. Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

130. 1996 also brought the advent of third generation fabs. Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops. Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead, Defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

131. The supra-competitive level price of LCD Panels during the Conspiracy Period is demonstrated by, inter alia, the fact that costs decreased. One of the most significant costs in producing an LCD Panel is the cost of its component parts. Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass. During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods declining at a substantial rate. Thus, the gap between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

132. During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased. Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of Defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

133. LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

31
FIRST AMENDED COMPLAINT FOR DAMAGES

134. At the time, Defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of Defendants' agreements to fix, maintain, and/or stabilize the prices of LCD Panels, and Defendants' false statements about supply shortages were designed to conceal their price-fixing agreements. When asked why prices had increased, Defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

135. These price increases occurred as production costs declined due to lower prices for parts and components, as well as improvements in manufacturing efficiency. These decreasing costs should have facilitated and resulted in lower prices and price competition among Defendants. Instead, because Defendants had entered into agreements to fix, raise, and maintain the prices for LCD Panels at artificially high levels, decreasing costs only resulted in extremely high profits for the conspirators. For example, Defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc., posted higher pretax profits than expected in the first quarter of 2002. AU Optronics reported revenue of NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion. Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

136. This increase in prices and revenue was unprecedented. During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (Defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc., later purchased by AU Optronics) rose 184% from the same period in 2001.

## C.  DEFENDANTS HAVE BEEN CHARGED WITH AND PLEADED GUILTY TO PRICE FIXING LCD PANELS AND LCD PRODUCTS IN THE U.S.

137. In a December 11, 2006, filing with the Securities and Exchange Commission, Defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

138. On December 12, 2006, news reports indicated that in addition to LG Display, Defendants Samsung, Sharp and AU Optronics were also under investigation.

139.  Throughout the remainder of December and into the new year, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.

140.  At that time, it became clear that, beginning sometime in 2006, the Department of Justice had begun investigating charges that the Defendants were engaged in a worldwide conspiracy for fixing the prices of LCD Panels and LCD Products.

141.  That DOJ investigation has been and continues to be productive. Since late 2008, most of the Defendants (and many of their officers) have pled guilty to criminal price-fixing charges. Even more have been charged with such crimes. Each of the pleas and indictments to date is noted below, and described in summary fashion.

### 1.  The AU Optronics Corporation Indictments.

142.  On June 10, 2010, the Department of Justice announced and filed grand jury indictments of AU Optronics Corporation, AU Optronics Corporation America, and six of AU Optronics' most senior officers including among others, Hsuan Bin Chen, AU Optronics' current President, and Hui Hsiung, AU Optronics' current Executive Vice President. Both companies and all of the officers were charged with participating in an unlawful criminal conspiracy to fix the prices of LCD Panels sold worldwide during at least the period from October 19, 2001 to December 1, 2006.[2]

143.  The DOJ indictment alleged that "[f]rom on or about September 14, 2001, until on or about December 1, 2006, ('the period covered by this Indictment'), the exact dates being unknown to the Grand Jury, the Defendants and other coconspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') in the United States and elsewhere. The combination and conspiracy engaged in by the Defendants and other coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)."

---

[2]     *U.S. v. Lin, et al.*, 3:09-CR-0010-SI (4-11) (N.D. Cal. superseding indictment filed 6/10/10 and announced that same day).

144. The DOJ further alleged that: "[f]or the purpose of forming and carrying out the conspiracy, the Defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

a. On or about September 14, 2001, representatives from four Taiwan TFT-LCD manufacturers, including Defendant AU Optronics Corporation, secretly met in a hotel room in Taipei, Taiwan and entered into and engaged in a conspiracy to fix the price of TFT-LCD. At this meeting, the conspirators agreed to meet approximately once a month for the purpose of fixing the price of LCD Panels. These meetings were commonly referred to by some of the conspirators as 'Crystal Meetings.' The four Taiwan TFT-LCD manufacturers also agreed to rotate responsibility for coordinating each of these monthly meetings. A representative from Defendant AU Optronics Corporation stated at the September 14, 2001 meeting that the participants in future Crystal Meetings should include the two major Korean TFT-LCD manufacturers to ensure the success of the conspiracy to fix the price of TFT-LCD.

b. On or about September 21, 2001, representatives from two Korean TFT-LCD manufacturers joined representatives from the four Taiwan TFT-LCD manufacturers, including Defendant AU Optronics Corporation, at a Crystal Meeting in a hotel room in Taipei, Taiwan. At or before the September 21, 2001 Crystal Meeting, the two Korean TFT-LCD manufacturers agreed to join the conspiracy to fix the price of TFT-LCD.

c. Employees from Defendant AU Optronics Corporation attended Crystal Meetings on a regular basis between on or about September 14, 2001 until on or about December 1, 2006 with employees of other participating TFT-LCD manufacturers.

d. Defendants Hsuan Bin Chen, Hui Hsiung, Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Cheng Yuan Lin, Wen Jun Cheng, and Duk Mo Koo attended and participated in one or more Crystal Meetings. Defendants Hsuan Bin Chen, Hui Hsiung, Lai-Juh Chen, Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Cheng Yuan Lin, Wen Jun Cheng, and Duk Mo Koo, at times, also authorized, ordered, or consented to the attendance and participation of their subordinate employees at Crystal Meetings.

FIRST AMENDED COMPLAINT FOR DAMAGES

e. During the period covered by [the] Indictment, participants in the Crystal Meetings regularly exchanged production, shipping, supply, demand, and pricing information with each other at the meetings for the purpose of agreeing to fix the price of TFT-LCD, as well as implementing, monitoring, and enforcing adherence to the fixed prices. Up until 2003, the participants in the Crystal Meetings reached price agreements on certain sized TFT-LCD used in computer notebooks and monitors. Beginning in 2003, the price agreements reached at the Crystal Meetings also included certain sized TFT-LCD used in flat screen televisions.

f. The participants in the conspiracy issued price quotations in accordance with the price agreements and accepted payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States and elsewhere.

g. From on or about September 14, 2001 until on or about May 2005, senior sales executives of the Defendant AU Optronics Corporation and the other participating TFT-LCD manufacturers attended the Crystal Meetings.

h. In or about May 2005, the participants in the Crystal Meetings discussed that one or two major TFT-LCD customers may have detected the Crystal Meetings. To keep the meetings secret and avoid detection, the Crystal Meeting participants decided to stop having senior-level sales executives attend the Crystal Meetings. Instead, the senior-level executives instructed lower-level marketing employees to continue the Crystal Meetings. Lower-level marketing employees of Defendant AU Optronics Corporation and the other participating TFT-LCD manufacturers continued to meet monthly as a group to exchange shipment, production, and pricing information in furtherance of the conspiracy to fix the price of TFT-LCD. The lower-level marketing employees met at restaurants and cafes, instead of hotels, in Taipei.

i. In or about the spring 2006, the participants in the Crystal Meetings became further concerned about being detected after receiving news reports of an ongoing price-fixing investigation by the United States Department of Justice into the dynamic random access memory ("DRAM") industry and after receiving other information about a possible

35

FIRST AMENDED COMPLAINT FOR DAMAGES

1   investigation into the TFT-LCD industry. To further avoid detection and keep the meetings
2   secret, the conspiracy members, including representatives of Defendant AU Optronics
3   Corporation agreed to no longer meet as a group, but instead have back-to-back, one-on-
4   one meetings with each other on a certain date each month at restaurants and cafes in
5   Taipei, Taiwan. Through these round-robin style meetings, the participants continued to
6   exchange shipment, production, and pricing information in furtherance of the conspiracy to
7   fix the price of TFT-LCD. These round-robin meetings continued until in or about
8   December 2006.

9   j. During the period covered by [the] Indictment, employees of Defendant AU Optronics
10  Corporation, in addition to participating in Crystal Meetings, had one-on-one discussions
11  in person or by phone with representatives of coconspirator TFT-LCD manufacturers
12  during which they reached agreements on pricing of TFT-LCD sold to certain customers,
13  including customers located in the United States. Through these one-on-one discussions,
14  the participants also monitored each other's compliance with prices agreed upon at Crystal
15  Meetings and during other discussions. Participants in these one-on-one discussions, at
16  certain times during the conspiracy, included Hsuan Bin Chen, Hui Hsiung, Lai-Juh Chen,
17  Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Wen Jun Chen, and Duk Mo Koo.

18  k. During the period covered by [the] Indictment, senior-level employees of AU Optronics
19  Corporation regularly instructed employees of AU Optronics Corporation America located
20  in the United States to contact employees of other TFT-LCD manufacturers in the United
21  States to discuss pricing to major United States TFT-LCD customers. In response to these
22  instructions, employees of AU Optronics Corporation America located in the United States
23  had regular contact through in-person meetings and phone calls with employees of other
24  TFT-LCD manufacturers in the United States to discuss and confirm pricing, and at times
25  agree on pricing, to certain TFT-LCD customers located in the United States. These AU
26  Optronics Corporation America employees regularly reported the pricing information they
27  received from their competitor contacts in the United States to senior-level executives at
28  AU Optronics Corporation in Taiwan. By at least early 2003, representatives of Defendant

1592288v1/012072

1   AU Optronics Corporation also began sending reports of the discussions and price

2   agreements reached at Crystal Meetings to certain employees at AU Optronics Corporation

3   America. These reports were used by certain employees of AU Optronics Corporation

4   America in their pricing discussions with certain TFT-LCD customers located in the

5   United States.

6   l. During the period covered by [the] Indictment, representatives of Defendants AU

7   Optronics Corporation, AU Optronics Corporation America, and other coconspirators took

8   steps to conceal the conspiracy and conspiratorial contacts through various means:

9       i. The Crystal Meeting participants discussed the need to keep the Crystal Meetings

10       secret and warned against revealing the existence of the meetings, even to other

11       employees within their own companies who did not participate in the conspiracy.

12       ii. Participants in the Crystal Meetings were specifically warned to keep the

13       meetings secret because of antitrust laws and the ongoing price-fixing investigation

14       into the DRAM industry.

15       iii. In addition, in or about December 2006, representatives of AU Optronics

16       Corporation America took steps to destroy evidence showing contacts with TFT-

17       LCD competitors when they became aware of the United States Department of

18       Justice's investigation into price-fixing in the TFT-LCD industry.

19       145.  These charges exposed each of the AU Optronics companies to $100 million plus in

20   criminal fines and penalties, and exposed the company officers to minimum fines of $1 million

21   and maximum imprisonments for ten years. As of the date of this Complaint, all or nearly all of

22   the AU Optronics Defendants had appeared, been arraigned, and pled not guilty. The jury trial of

23   the criminal charges against these AU Optronics Defendants is currently set for the fall of 2011.

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

### 2. Pleas By LG Display Co., Ltd And LG Display America, Inc.[3]

146. Both of the LG Display companies pled guilty to participating in a September 21, 2001 – June 1, 2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of LCD Panels sold in the United States and elsewhere. As a result of its December 2008 plea bargain, the LG Display companies agreed to pay a $400 million criminal fine, the second largest fine in Antitrust Division history.

147. In its plea agreement, LG Display admitted that "through its officers and employees, including high-level personnel of the Defendant, [it] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFTLCD sold in the United States and elsewhere."

148. LG Display further admitted that "through its officers and employees, [it] engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

149. LG Display admitted that it was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere."

150. In February of 2009, LG Display executive Chang Suk ("C.S.") Chung also pleaded guilty to participating in that same price-fixing conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006. Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized,

---

[3]     *U.S. v. LG Display Co., Ltd. and LG Display America, Inc.*, No. CR 08-803-VRW (Information filed 11/12/08; plea agreement announced simultaneously but filed on 12/17/08).

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

1  ordered, and consented to the participation of subordinate employees in the conspiracy. Chung
2  was sentenced to serve seven months in prison and pay a $25,000 criminal fine.[4]

3      151.  Later in April of 2009, another LG Display executive, Bock Kwon, was charged with
4  participating in the same conspiracy to fix the prices of LCD Panels sold worldwide, including the
5  United States and California in particular, from September 2001 through June 2006. Mr. Kwon
6  admitted that he participated in meetings, conversations and communications in Taiwan, South
7  Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD
8  Panels at certain predetermined levels, issued price quotations in accordance with the agreements
9  reached, exchanged pricing and sales information for the purpose of monitoring and enforcing
10  adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of
11  subordinate employees in the conspiracy. His plea agreement, filed on June 26, 2009, required him
12  to serve one year in jail and to pay a criminal fine of $30,000.[5]

13      152.  Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG
14  Display was indicted for participating in the conspiracy to fix the prices of LCD Panels sold
15  worldwide, including the United States and California in particular, from December 2001 through
16  December 2005.[6]  Specifically, Mr. Koo has been charged with participating in meetings,
17  conversations and communications in Taiwan, South Korea and the United States to discuss the
18  prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Koo has also
19  been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing
20  price quotations in accordance with the agreements reached, exchanging pricing and sales
21  information for the purpose of monitoring and enforcing adherence to the agreed-upon prices,
22  authorizing, ordering, and consenting to the participation of subordinate employees in the
23  conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive

---

25      [4]    *U.S. v. Chang Suk Chung*, No. CR 09-0044-PJH (N.D. Cal. Information filed 1/15/09;
26  plea agreement announced that same day, but filed 2/17/09).

27      [5]    *U.S. v. Bock Kwon*, No. CR 09-0437-SI-3 (N.D. Cal. Information filed 4/27/09, plea
   agreement filed 6/29/09).

28      [6]    *U.S. v. Duk Mo Koo*, No. CR 09-00110-SI (N.D. Cal. Indictment filed 2/4/09;
   superseding indictment filed 6/10/10).

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

**3.   Pleas By Chi Mei Optoelectronics Corporation and Related Indictments**.[7]

153.  In February of 2010, Chi Mei pled guilty to participating in a September 14, 2001-December 1, 2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of LCD Panels sold in the United States and elsewhere. As a result of its plea agreement, Chi Mei was obliged to pay a $220 million criminal fine.

154.  Not long after Chi Mei's plea was entered, two Chi Mei executives also entered into plea agreements admitting that they had conspired with others to suppress and eliminate competition by fixing the prices of LCD Panels during the Conspiracy Period. Chi Mei's former president, Jau-Yang Ho ("J.Y.") Ho agreed to pay a criminal fine of $50,000 and to serve 14 months in federal prison.[8] Chi Mei's former director of sales, Chu-Hsiang ("James") Yang was sentenced, per his plea agreement, to serve nine months in jail and pay a $25,000 fine.[9]

155.  Later in the summer of 2010, these price-fixing guilty pleas were augmented by the guilty pleas of two other Chi Mei executives – Wen-Hung ("Amigo") Huang, Chi Mei's former director of sales, and Chen-Lung Kuo, formerly Chi Mei's Vice President for Sales. These two executives also pleaded guilty to the criminal price-fixing of LCD Panels during the Conspiracy Period. Huang agreed to serve nine months in jail and to pay a $25,000 criminal fine.[10] Kuo agreed to pay a $35,000 fine and serve nine months in jail.[11]

---

[7]     *U.S. v. Chi Mei Optoelectronics Corporation*, No. CR 09-1166-SI (N.D. Cal. Information filed 12/8/09; plea agreement filed 2/8/10). The plea agreement was announced contemporaneously with the filing of the information.

[8]     *U.S. v. Ho*, No. 3:10-CR-00355-SI-1 (N.D. Cal. Information filed 4/30/10; plea agreement announced that same day but filed on 6/2/10).

[9]     *U.S. v. Yang*, No. 3:10-CR-00335-SI-1 (N.D. Cal. Information filed 4/23/10; plea agreement announced on 4/30/10 but not filed until 5/6/10).

[10]     *U.S. v. Huang*, No. 3:10-CR-00579-SI-1 (N.D. Cal. Information filed 7/28/10; plea agreement announced that same day, but not filed until 8/12/10).

[11]     *U.S. v. Kuo*, No. 3:10-CR-005910-SI-2 (N.D. Cal. Information filed 8/4/10; plea agreement announced that same day, but not filed until 9/10/10).

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

156. A fifth Chi Mei executive, Hsin-Tsung Wang, a former Chi Mei Vice President of Sales and Marketing was recently indicted for participating in the same price-fixing activities, during the same period as his convicted Chi Mei colleagues.[12] An arrest warrant has been issued for Wang, but as of the filing of this Complaint, he has not been arrested or arraigned, and had not entered any plea.

### 4.   Pleas by Chunghwa Picture Tubes, Ltd. and Related Indictments.[13]

157. Chunghwa pled guilty to participating in a 2001-2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of certain TFT-LCD [devices] sold in the United States and elsewhere. As part of its January, 2009 plea bargain, Chunghwa agreed to pay a $65 million criminal fine.

158. In February of 2009, three Chunghwa executives – CEO Chieng-Hon ("Frank") Lin, and sales executives Chih-Chun ("CC") Liu, and Hsueh-Lung ("Brian") Lee pleaded guilty to participating in the same conspiracy.[14] Specifically, Messrs. Liu, Lee, and Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea, and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. Lin was sentenced to nine months in prison and to the payment of a $50,000 criminal fine. Liu was sentenced to seven months in prison and the payment of a $30,000 criminal fine. Lee was sentenced to serve six months in prison and pay a $20,000 criminal fine.

159. New indictments were later issued against two other former Chunghwa executives, Cheng Yuan Lin a/k/a C.Y. Lin and Wen Jun Cheng a/k/a Tony Cheng.[15] Specifically, Messrs. Lin

---

[12]   *U.S. v. Wang*, No. 3:10-CR-00756-SI (N.D. Cal. Indictment filed 10/14/10).

[13]   *U.S. v. Chunghwa Picture Tubes, Ltd.,* No. 3:08-CR-00804-SI (N.D. Cal. Information filed 11/12/08; plea agreement filed on 1/16/09).

[14]   *U.S. v. Lin, et al.*, No. 3:09-CR-0045-MHP (N.D. Cal. Indictment filed 1/15/09; plea agreement filed 2/27/09).

[15]   *U.S. v. Lin*, No. 3:09-CR-00110-SI-1 (N.D. Cal. Indictment filed 2/10/09; superseding indictment filed 6/10/10); *U.S. v. Cheng*, No. 3:09-CR-00110-SI-2 (N.D. Cal. Indictment filed 8/18/09; superseding indictment filed 6/10/10).

1592288v1/012072

and Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

### 5.    Pleas By HannStar Display Corporation.

160.  In late June of 2010, the Department of Justice announced that HannStar had pleaded guilty to participating in a 2001-2006 conspiracy to fix the prices of LCD Panels sold worldwide. As part of its plea bargain, HannStar was obliged to pay a criminal fine of $30 million.[16]

161.  HannStar admitted that from on or about September 14, 2001, to on or about January 31, 2006, "[HannStar], through its officers and employees, including high-level personnel of the Defendant, participated in a conspiracy with major TFT-LCD producers, the primary purpose of which was to fix the price of certain TFT-LCD sold in the United States and elsewhere" in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

162.  HannStar further admitted that "[i]n furtherance of the conspiracy, the Defendant, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as 'crystal meetings,' with representatives of other TFT-LCD producers. During these discussions and meetings, agreements were reached to fix the price of certain TFT-LCD to be sold in the United States and elsewhere."

163. Several months later, on October 27, 2010, former HannStar executive Jui Hung ("Sam") Wu pled guilty to conspiring with others to suppress and eliminate price competition in the worldwide market for LCD Panels during 2001-2006. Wu had been HannStar's Director of

---

[16]    *U.S. v. HannStar Display Corporation*, No. 3:10-CR-00498-SI (N.D. Cal. Information filed 6/29/10; plea agreement announced that same day but not filed until 8/5/10).

FIRST AMENDED COMPLAINT FOR DAMAGES

1  Global Sales and Marketing. His plea bargain required him to serve seven months in jail and pay a
2  $20,000 criminal fine.**17**

3     164.  On January 25, 2011, the DOJ announced that a federal grand jury in San Francisco
4  had returned an indictment against the current president of HannStar Display Corporation for his
5  participation in the TFT-LCD price fixing conspiracy. The indictment charges that Ding Hui Joe,
6  aka David Joe, conspired to suppress and eliminate competition by fixing the prices of LCD
7  Panels from September 14, 2011 until on or about January 31, 2006. According to the indictment,
8  Mr. Hui Joe participated in secret Crystal meetings in hotel rooms in Taipei, Taiwan. According to
9  the indictment, Mr. Ding and Defendants and/or co-conspirators took various steps to conceal the
10  conspiracy and avoid detection.

11          **6.    Sharp Corporation's Plea.**[18]

12     165.  Sharp pled guilty to participating, from April 1, 2001 to December 1, 2006, in price-
13  fixing conspiracies with other major TFT-LCD producers to fix the price of LCD Panels sold to
14  Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December
15  2006, and to Motorola from the fall of 2005 to the middle of 2006; and to participating in bilateral
16  meetings, conversations and communications in Japan and in the United States with unnamed co-
17  conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and
18  exchanging pricing and sales information for the purpose of monitoring and enforcing adherence
19  to the agreed-upon prices. Sharp admitted that acts in furtherance of the conspiracy to fix the price
20  of LCD Panels were carried out in California.

21     166.  Defendant Sharp participated in multiple Working Level meetings, as well as
22  bilateral discussions with other Defendants during which it discussed and reached agreements with
23  other Defendants on prices for LCD Panels during the Conspiracy Period.

24     167.  Defendant Sharp also participated in multiple bilateral discussions with other
25  Defendants, including Toshiba and Epson, during the Conspiracy Period. During these

26  ───────────────
27     17    *U.S. v. Wu*, No. 3:10-CR-00781 (N.D. Cal. Information filed 10/27/10; plea agreement announced that same day but not filed until 11/22/10).
28     18    *U.S. v. Sharp Corporation*, No. 3:08-CR-802-PJH (Information filed 11/12/09; plea agreement announced simultaneously).

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

1  discussions, Sharp reached agreements with other Defendants on prices, price increases,

2  production quotas, and production limits for LCD Panels.

3      168.  In its plea agreement, Sharp admitted that "through its officers and employees,

4  including high-level personnel of the Defendant, [it] participated in a conspiracy among major

5  TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold" to

6  Dell, Apple, and Motorola.

7      169.  Sharp further admitted that "through its officers and employees, [it] engaged in

8  bilateral telephone discussions and attended bilateral meetings with representatives of other major

9  TFT-LCD producers."

10     170.  Sharp admitted that it was "[d]uring these discussions and meetings, [that]

11  agreements were reached to fix the price of TFT-LCD sold to" Dell, Apple, and Motorola

12     171.  Sharp agreed to pay $120 million in criminal fines as a result of this December 2008

13  plea agreement.

### 7.    Epson Imaging Devices Corporation's Plea.[19]

14

15     172.  Defendant Epson Japan has admitted and pleaded guilty to participating in the

16  conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola and

17  agreed to pay a criminal fine of $26 million. Epson Japan has admitted to participating in the

18  conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in

19  meetings, conversations and communications in Japan and the United States to discuss the prices

20  of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales

21  information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

22     173.  Defendant Epson America is a wholly-owned and controlled subsidiary of co-

23  conspirator Epson Japan. Epson America acted as Epson Japan's agent for selling LCD Products

24  in the United States, and thus was an active, knowing participant in the alleged conspiracy. To the

25  extent Epson America sold or distributed LCD Products, it played a significant role in the

26  conspiracy because Defendants wished to ensure that the prices for LCD Products did not undercut

27

28
_____
[19]      *U.S. v. Epson Imaging Devices Corp.*, No. 3:09-CR-854-SI (N.D. Cal. Information filed 8/25/09; plea agreememt filed 10/23/09).

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

the LCD Panel pricing agreements reached at their various meetings. Epson America also engaged in bilateral discussions with other Defendants, during which it reached understandings with other Defendants regarding prices and exchanged pricing and sales information for the purpose of monitoring agreed-upon prices. In addition, at one of the bilateral meetings described above, Epson Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui"). At that meeting, Mitsui served as an agent of, and acted under the direction of, both Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.

### 8.   Hitachi Displays, Ltd.'s Plea and Related Indictments.[20]

174.  Like Sharp, Hitachi pleaded guilty to participating in a conspiracy with major TFT-LCD producers to fix prices for specific products that were sold to specific entities. In Hitachi's case, the products were "LCD Panels sold to Dell, Inc. or its subsidiaries for use in desktop monitors and notebook computers, from on or about April 1, 2001 to on or about March 31, 2004." As a result of that plea, Hitachi paid a $31 million dollar fine.

175.  Subsequent to that plea, Sakae Someya, Japanese Senior Manager for Sales and Marketing at Hitachi, was indicted for the same activity.[21] That indictment was filed on March 31, 2009, but as of the filing of this Complaint, Someya had not yet been arrested and arraigned and the charges against him had not yet been resolved.

### 9.   Related Criminal Matters.

176.  In her class certification opinion, Judge Illson noted that the Department of Justice had affirmed that it had signed a conditional leniency agreement with a qualified company in the TFT-LCD industry. In this context, that meant that the agreement had conferred amnesty on at least one participant in the TFT-LCD price-fixing conspiracy who had provided the Department of Justice with concrete evidence of that price-fixing agreement.[22]

---

[20]     *U.S. v. Hitachi Displays, Ltd.,* No. 3:09-CR-247-SI (N.D. Cal. Indictment filed 3/10/09; plea agreement announced that same day and filed 5/22/09).

[21]     *U.S. v. Sakae Someya*, No. 3:09-CR-00329-EXE (N.D. Cal. Indictment filed 3/31/09).

[22]     Class DE 1642 at 4.

177.  As yet, those conspirators do not appear to have been officially identified, though the Samsung Defendants would appear to be the first-identified amnesty recipient, and a potential source of the cooperation that amnesty recipients are required to give under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004.

178.  The DOJ Antitrust Division's investigation of the remaining Defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other Defendants to this action.

### 10.    Other Suspect Arrangements.

179.  In addition to the participation in the conspiracy outlined through the guilty pleas, other as yet uncharged conspirators also participated in the conspiracy. Defendant Toshiba participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the Defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.

180.  During the Conspiracy Period, Toshiba also sought and formed strategic partnerships with other LCD manufacturers which allowed Toshiba to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, formerly known as Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.

181.  The operation and management of these many different joint ventures afforded Toshiba and the other Defendant joint-venture partners' regular opportunities to communicate

46

1  with each other to agree on prices, price increases and production limits and quotas for those LCD

2  Panels that each Defendant manufactured and sold.

3      182.  Co-conspirator Hydis Technologies Co. Ltd. ("Hydis") participated in multiple lower

4  level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a

5  Taiwanese Defendant at least as recently as 2005. Through these discussions, Hydis agreed on

6  prices and supply levels for LCD Panels.

7      183.  Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in

8  multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac

9  Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed, with the other co-

10  conspirators, on prices and supply levels for LCD Panels.

11      184.  Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion

12  about customers and future pricing, with a Taiwanese Defendant in 2001. Mitsui was acting as an

13  agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed, with the

14  other conspirators, on prices and supply levels for LCD Panels.

15      185.  Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or

16  discussions during the Conspiracy Period with at least one other Defendant or co-conspirator,

17  which included discussions about prices for LCD Panels.

18      186.  Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among

19  Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or

20  more of the partners in this joint venture participated in the meetings described above. As a result,

21  IPS Alpha was represented at those meetings and was a party to the agreements entered into by its

22  joint venture partners at these meetings. As explained above, the agreements at these meetings

23  included agreements on price ranges and output restrictions. The joint venture partners had

24  substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint

25  ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS

26  Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

27      187.  When SB Trust refers to a corporate family of companies by a single name in its

28  allegations of participation in the conspiracy, it is to be understood that the SB Trust is alleging

47

FIRST AMENDED COMPLAINT FOR DAMAGES

that one or more employees or agents of entities within the referenced corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, each entire corporate family was represented in meetings and discussions by their agents and each was a party to the agreements reached in them.

### D.    SBC'S PURCHASES OF LCD PANELS AND LCD PRODUCTS.

188. During and after the Conspiracy period, SBC purchased LCD Panels and LCD Products. SBC worked with entities located in Taiwan and in the United States to source, design, finance, and manufacture LCD Televisions. The parties that worked with SBC included but are not limited to Taiwan Kolin Co., Ltd a/k/a Kolin Company, Ltd. ("Kolin"), DigiMedia Technology Company Limited ("DigiMedia"), and Solar Link Technologies, Inc., ("Solar Link"). Kolin was located in Taiwan and at various points in time held a substantial ownership in Syntax Groups and SBC. DigiMedia was located in Taiwan.  At certain points in time, Kolin and Syntax Groups each held ownership interests in Digimedia. Solar Link was located in Ontario, California.

189. SBC employees in the United States working from SBC's headquarters in City of Industry, California, planned the design, manufacture, marketing, financing, and sale of SBC's Olevia brand televisions. Using this information, SBC employees in California would determine SBC's demand for LCD televisions and SBC's resulting need to procure LCD Panels. SBC employees would communicate with representatives of certain LCD Panel suppliers to discuss the panels needed for SBC's LCD televisions. These communications took place by phone, email, and through in person meetings in the United States and in Asia, including many meetings at SBC's headquarters in City of Industry, California. Representatives of Kolin and Digimedia attended many of the meetings between SBC and representatives of the LCD Panel suppliers.

190.  During these meetings and phone calls, SBC and the various Defendant LCD panel suppliers would discuss: (i) the types of LCD panels that the Defendants had available to sell to

SBC; (ii) volumes and types of LCD panels that SBC wanted to buy and/or that the LCD Panel supplier would agree to make available for purchase; (ii) pricing for LCD Panels; (iii) forecasts of SBC's future demand for LCD Panels; and (iv) technical specifications, including the specific sizes and features of the LCD Panels that SBC would use in its televisions.

191.  SBC would then agree with various Defendant LCD Panel suppliers to purchase LCD Panels, including a specific quantity at a specific price. SBC maintained and exercised final authority over each panel purchase at all times. The Defendant LCD Panel suppliers always understood that SBC was the customer. As part of SBC's orders for LCD Panels, SBC directed the LCD Panel Supplier to deliver the LCD Panels to one of SBC's partners, including Kolin, Digimedia, Solar Link, or others for manufacture into an LCD television. Thus for administrative purposes of billing, invoicing, and delivery, the Defendant LCD Panel Supplier often directed invoices to Kolin, even though the terms of the order for LCD Panels were agreed to by SBC.

192.  Some of the Defendant LCD Panel Suppliers gave SBC marketing development funds in exchange for SBC ordering certain volumes of LCD panels over a period of time. As with other purchases, the Defendant LCD Panel Suppliers understood and agreed that SBC could appoint a designee to take delivery of the LCD Panels that SBC had agreed to purchase as part of a volume commitment.

193.  The Defendant LCD Panel Suppliers always required payment of cash or letter of credit prior to the shipment of any LCD Panels and would not extend payment terms. In order to pay for the LCD Panels, SBC would transfer funds from its bank account in California to Kolin as an advance. Kolin would then use these funds to pay for panels. SBC also used other mechanisms to obtain financing for LCD Panel purchases, including posting a letter of credit. In this way, SBC purchased panels from AU Optronics, Chi Mei, Samsung, Sharp, and LG Display.

194.  After receiving LCD Panels, Kolin and DigiMedia would assemble the LCD Panels and other parts and subassemblies into LCD televisions at factories in Taiwan and then ship the finished LCD televisions to SBC. The LCD TVs that SBC received from Kolin and DigiMedia were delivered to its warehouse facility in City of Industry, California. Virtually 100% of the LCD televisions manufactured by Kolin and DigiMedia were made for SBC. SBC exercised control

over Kolin and DigiMedia's production of LCD televisions (other than a trifling number of LCD Televisions that Kolin manufactured and sold in Taiwan under the Kolin brand).

195.  After receiving LCD televisions from Kolin, SBC would sell the televisions to its customers in the United States, typically large retailers that included Circuit City, K-Mart, Sears, Office Depot, Fry's Electronics, and Target.

196.  The price that SBC paid to the Defendant LCD Panel suppliers, and to Kolin for finished televisions, changed based on the supracompetitive pricing for LCD Panels caused by Defendants' conspiracy. The price of the LCD panel incorporated into a television manufactured for SBC constituted more than half of the cost of the LCD television.

197.  In addition to having LCD televisions manufactured for it by its Taiwanese partners such as Kolin, SBC also arranged for the manufacture of LCD televisions from a U.S.-based manufacturer named Solar Link Technologies, Inc. Solar Link was located in Ontario, California.

198.  Unlike Kolin, Solar Link served as a contract manufacturer, one that provided assembly services but little else.

199.  SBC itself purchased LCD panels from the Defendant LCD Panel suppliers for use by Solar Link in its manufacture of LCD TVs in the United States. The purchase discussions regarding the LCD Panels used by Solar Link included employees of the Defendant LCD Panel suppliers in the United States, and employees of LG Display based in California. SBC and the Defendant Panel suppliers entered into binding agreements on the price and quantity of LCD Panels that would be shipped to Solar Link. SBC took title in California to the LCD panels that were delivered to Solar Link for purposes of assembly of Olevia televisions. In the course of its purchasing discussions with the Defendant LCD Panel Suppliers, SBC would direct the Defendant to send certain sizes, models, and quantities of panels to Solar Link in California and others to Kolin or Digimedia in Taiwan.

200.  For instance, per agreements between SBC and LG Display for the purchase of panels for use by Solar Link, that Defendant would import LCD Panels from Asia to the United States (to LG Philips LCD America Inc., in San Jose, California). LG Display would then ship the

1592288v1/012072

1   panels to Solar Link in Ontario California, which would then verify their receipt and condition to

2   LG Philips LCD America Inc., in San Jose, California.

3        201.  For other orders, LG Display or another Defendant would import panels into the

4   United States and ship them directly to Solar Link's location in Ontario California. In some cases,

5   the LCD panels were also delivered to SBC's warehouse facility in California.

6        202.  Because SBC agreed the purchase of LCD panels for Solar Link while discussing

7   other LCD panel purchases that were destined for manufacture into LCD TVs by Kolin or

8   Digimedia, and for which it was already advancing funds, LG Display would in some cases send

9   its invoice for these LCD Panels to Kolin. This occurred for administrative purposes even though

10  SBC was the buyer. SBC owned the LCD Panels once they were delivered to Solar Link in

11  California.

12       203.  Solar Link took the LCD panels, and other parts, and assembled LCD televisions for

13  SBC. As directed by SBC, Solar Link then shipped those finished televisions to SBC warehouses

14  located in California or, at SBC's instruction, directly to SBC's customers. SBC paid Solar Link a

15  per unit charge for the cost of assembling the LCD televisions, but did not pay Solar Link for the

16  cost of the LCD Panels used in the LCD TVs because SBC was the purchaser of those LCD

17  Panels and had already paid for them.

18       204.  Although the price SBC paid for televisions including these LCD Panels was greater

19  than the competitive market price, SBC was unable to pass those supracompetitive prices through

20  to its customers. SBC was, in most instances, competing for sales with well established consumer

21  electronics companies, including LCD televisions sold by Defendants and their subsidiaries. In

22  order to obtain sales and gain a foothold in the market, SBC had to offer competitive pricing

23  terms.  In consequence, SBC often negotiated sales contracts with its customers that committed

24  SBC to selling its LCD televisions at a particular price, but did not allow SBC to increase the price

25  of its products if the prices charged by its suppliers increased. In fact, SBC's sales contracts often

26  gave its customers price protection that allowed SBC's customers to adjust the purchase price for

27  SBC televisions existing in the customer inventories downward in the event that SBC sold a

28  comparable product to another customer for less. In this way, SBC was often forced to absorb

FIRST AMENDED COMPLAINT FOR DAMAGES

price increases from the LCD Panel suppliers – yet was unable to benefit from price decreases because of the price protection clause. As such, SBC suffered injury in that it was forced to pay supracompetitive prices for LCD televisions because those televisions included LCD Panels sold at prices reflecting Defendants' price fixing scheme.

**E.     DEFENDANTS' ACTIVE CONCEALMENT.**

205. SBC did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006, after the investigations by the DOJ and other antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contracts, combinations and/or conspiracies. Because Defendants' agreements, understandings and conspiracies were kept secret, SB Trust was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for LCD Panels and the products in which they were used.

206. As alleged above, Defendants had secret discussions about price and output, and agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other, and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one in the so-called Round Robin meetings.

207. Moreover, Defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

208. There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

209. Another false rationale provided by Defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated: "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

210. A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

211. Increased demand was repeatedly cited by Defendants, throughout the conspiracy Period, as the reason for high LCD Panel prices. On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo also stated "[w]e are seeing much stronger demand for largesize LCD televisions than expected, so LCD TV supply is likely to remain tight throughout the year."

212. Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

213. These explanations were all pretextual, and each served to cover up the conspiracy. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiff's claims. Unbeknownst to SB Trust, the prices SBC paid for LCD Panels and LCD televisions were artificially inflated as a result of the Defendants' and their co-conspirators' illegal agreements to sell price-fixed LCD Panels.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

## VII.  VIOLATIONS ALLEGED.

**FIRST CLAIM FOR RELIEF:**
**VIOLATIONS OF THE SHERMAN ACT**

214.  SB Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

215.  Beginning at a time presently unknown to SB Trust, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to SB Trust, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

216.  In formulating and carrying out the alleged agreements, understandings, and conspiracies, Defendants and their co-conspirators unlawfully restrained trade and damaged the competitive process by engaging in the following anticompetitive acts:

A.  Fixing, raising, maintaining and stabilizing the price of LCD Panels;

B.  Allocating markets for LCD Panels among themselves;

C.  Submitting rigged bids for the award and performance of certain LCD Panel contracts; and

D.  Allocating among themselves the production of LCD Panels.

217.  The combinations and conspiracies alleged herein has had the following effects, among others:

A.  Price competition in the sale of LCD Panels was restrained, suppressed, and/or eliminated in the United States;

B.  Prices for LCD Panels sold by Defendants, their co-conspirators, and others were fixed, raised, maintained and stabilized at artificially high, supracompetitive levels throughout the United States; and

C.  Those who purchased LCD Panels produced by Defendants, their coconspirators, and others were deprived of the benefits of free and open competition.

1592288v1/012072

218. SBC was injured in its business and property by paying more for LCD Panels purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of the combination and conspiracy.

219. Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable adverse effect on U.S. domestic and import trade or commerce. That injury to trade and commerce and to competition directly resulted in the injuries suffered by SBC and Syntax Groups, and so gave rise to the antitrust claims that SB Trust asserts on their behalf. As a result, SBC and Syntax Groups (and so the SB Trust) have suffered injury as a direct, proximate and reasonably foreseeable result of Defendants' conspiracy to fix the price of LCD Panels. Both Syntax Groups and SBC were injured in its business and property by paying more for LCD Panels purchased from Defendants, their co-conspirators, and others than they would have paid in the absence of the combination and conspiracy.

220. Because SB Trust has suffered injury as a direct, proximate and foreseeable result of Defendants' conspiracy to fix the price of LCD Panels, SB Trust is entitled to an award of treble damages, and awards of all other relief provided by Section 4 of the Clayton Act, 15 U.S.C. § 15.

## SECOND CLAIM FOR RELIEF:
## VIOLATIONS OF THE CALIFORNIA CARTWRIGHT ACT

221. The SB Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

222. Defendants' contracts, combinations, trusts or conspiracies were entered in, carried out, effectuated and perfected mainly within the State of California, and Defendants' conduct within California injured SBC and, before it, Syntax Groups.

223. Beginning at a time currently unknown to plaintiff, but at least as early as January 1, 1996, and continuing through at least December 11, 2006, the exact dates being unknown to SB Trust,, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce, described above, by acting to fix, raise, stabilize, and

FIRST AMENDED COMPLAINT FOR DAMAGES

1   maintain prices of, and allocate markets for, LCD Panels and LCD Products at supracompetitive

2   levels. Such conduct violates Section 16720 of the California Business and Professions Code.

3   224.  For the purpose of forming and effectuating the unlawful trust, the Defendants and

4   their co-conspirators have done those things which they combined and conspired to do, including

5   but in no way limited to the acts, practices and course of conduct set forth above and the

6   following: (1) fixing, raising, stabilizing, and pegging the price of LCD Panels; and (2) allocating

7   among themselves the production of LCD Panels.

8   225.  The combinations and conspiracies alleged herein have had, *inter alia*, the following

9   effects: (a) price competition in the sale of LCD Panels and LCD Products has been restrained,

10  suppressed, and/or eliminated in the State of California; (b) prices for LCD Panels and LCD

11  Products sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and

12  pegged at artificially high, noncompetitive levels in the State of California and throughout the

13  United States; and (c) those who purchased LCD Panels and LCD Products directly or indirectly

14  from Defendants and their coconspirators have been deprived of the benefit of free and open

15  competition.

16  226.  As a direct and proximate result of Defendants' unlawful conduct, SBC was injured

17  in its business and property in that it paid more for LCD Panels and LCD Products than it

18  otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of

19  Defendants' violation of Section 16720 of the California Business and Professions Code, the SB

20  Trust seeks, *inter alia,* treble damages and its cost of suit, including a reasonable attorney's fee,

21  pursuant to Section 16750(a) of the California Business and Professions Code.

22
23  **THIRD CLAIM FOR RELIEF:**
    **VIOLATIONS OF THE CALIFORNIA CONSUMER PROTECTION**
    **AND UNFAIR COMPETITION LAWS**

24  227.  The SB Trust incorporates and realleges, as though fully set forth herein, each and

25  every allegation set forth in the preceding paragraphs of this Complaint.

26  228.  Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

27  fraudulent acts or practices in violation of the California state consumer protection and unfair

28  competition statutes listed below.

1592288v1/012072

229. Defendants' business acts and practices were centered in, carried out, effectuated, and perfected mainly within the State of California, and Defendants' conduct injured SBC in California and elsewhere.

230. Beginning on a date unknown to the Plaintiff, but at least as early as January 1, 1996, and continuing through at least December 11, 2006, the exact dates being unknown to SB Trust,, Defendants committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

231. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

232. The Defendants' conduct as alleged herein clearly violated Section 17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

233. Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

234. Defendants' acts or practices were and are unfair to consumers of LCD Panels and LCD Products in the State of California within the meaning of Section 17200, California Business and Professions Code; and

235. Defendants' acts and practices were and are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

236. The SB Trust is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

237. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

238. The unlawful and unfair business practices of Defendants, and each of them, as described above, caused SBC and Syntax Groups to pay supracompetitive and artificially-inflated prices for LCD Panels and LCD Products. SBC and Syntax Groups suffered injury in fact, and lost money or property, as a result of such unfair competition.

239. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

240. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. The SB Trust is accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

## VIII. **PRAYER FOR RELIEF.**

WHEREFORE, the SB Trust requests:

A.     That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

i.     A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

ii.     An unreasonable restraint of trade or commerce in violation of the California Cartwright Act, as alleged in the Complaint; and

iii.     In violation of California's Unfair Competition and Consumer Protection Laws.

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

B.     That the SB Trust recover treble its actual damages, as provided by the applicable federal and state laws, and that a judgment be entered in favor of the SB Trust against Defendants, jointly and severally, in such amount;

C.     That the SB Trust obtain any penalties, punitive or exemplary damages, and/or full consideration which the laws of the State of California so permit;

D.     That the SB Trust recovers damages and/or all other available monetary and equitable remedies available under the California unfair competition laws;

E.     That the SB Trust be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate for the longest term permitted by law or equity;

F.     That the SB Trust recover its costs of suit, including reasonable attorneys' fees, as provided by law; and,

G.     That the SB Trust be awarded such other, further, and different relief as law and equity may require, and that the Court may deem just and proper in these circumstances.

## IX.    <u>JURY DEMAND</u>

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiff SB Trust hereby requests a trial by jury as to all issues so triable.

Dated: June 21, 2011

Respectfully Submitted By:

/s/ Steven G. Sklaver
Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
Ryan C. Kirkpatrick (243824) *(application for admission to be filed)*
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone:     (310) 789-3100
Facsimile:     (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072

Allan Diamond *(pro hac vice to be submitted)*
Jim McCarthy *(pro hac vice to be submitted)*
Jason Fulton *(pro hac vice to be submitted)*
DIAMOND McCARTHY LLP
1201 Elm St., 34th Floor
Dallas, Texas 75270
Telephone: (214) 389-5300
Facsimile: (214) 389-5399
adiamond@diamondmccarthy.com
jmccarthy@diamondmccarthy.com
jfulton@diamondmccarthy.com

Erica W. Harris *(pro hac vice to be submitted)*
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
eharris@susmangodfrey.com

*Attorneys for SB Liquidation Trust*

60

FIRST AMENDED COMPLAINT FOR DAMAGES

1592288v1/012072