David H. Orozco (220732)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
dorozco@susmangodfrey.com

Attorneys for Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust
[additional counsel listed on signature page]

H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Case No. 10-cv-5625 SI |
| | Master File No. 07-cv-1827 SI MDL No. 1827 |
| This Document Relates to Individual Case No. 10-cv-5625 SI | The Honorable Susan Y. Illston |
| ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST, | **SECOND AMENDED COMPLAINT FOR DAMAGES** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHIMEI INNOLUX CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO., LTD.; | **[REDACTED]** |

1   TOSHIBA AMERICA INFORMATION
    SYSTEMS, INC.; HITACHI, LTD.; HITACHI
2   DISPLAYS, LTD.; AND HITACHI
    ELECTRONIC DEVICES (USA), INC.,
3
                    Defendants.
4   _____

5
          Plaintiff Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc.
6
    Liquidating Trust (the "Circuit City Trust"), submits this Second Amended Complaint against
7
    defendants AU Optronics Corporation, AU Optronics Corporation America, Inc, Chi Mei
8
    Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co.
9
    Ltd., Nexgen Mediatech, Inc., Nexgen Mediatech USA, Inc., Chunghwa Picture Tubes Ltd.,
10
    Tatung Company of America, Inc., HannStar Display Corporation, LG Display Co. Ltd., LG
11
    Display America, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Samsung
12
    Electronics America, Inc., Sharp Corporation, Sharp Electronics Corporation, Toshiba
13
    Corporation, Toshiba America Electronics Components, Inc., Toshiba Mobile Display Co., Ltd.,
14
    Toshiba America Information Systems, Inc., Epson Imaging Devices Corporation, Epson
15
    Electronics America, Inc, Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices
16
    (USA), Inc. Circuit City Trust alleges the following based on its personal knowledge,
17
    investigation by counsel, publicly available materials from the *In Re TFT-LCD (Flat Panel)*
18
    *Antitrust Litigation*, 07-md-01827-SI, the related federal guilty pleas and indictments, and upon
19
    information and belief.
20
    **I.      INTRODUCTION**
21
          1.      Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City
22
    Stores, Inc. and its affiliated companies ("Circuit City") caused by a long running and largely-
23
    admitted conspiracy among suppliers of liquid crystal display panels ("LCD Panels") and related
24
    products ("LCD Products"). The purpose of this conspiracy was to eliminate competition between
25
    the co-conspirators and thereby to fix, raise, stabilize, and maintain the prices of LCD Panels and
26
    LCD Products sold directly or indirectly to U.S. customers, including Circuit City, which
27
    purchased LCD Products both directly and indirectly from the defendants.
28

                                                      1

2.     Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States. Throughout the period of the conspiracy alleged herein, Circuit City purchased LCD Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors. These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received LCD Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

3.     On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1] On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the Circuit City Trust. The Plan became effective on November 1, 2010.

4.     From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels and LCD Products. To that end, senior executives of the defendants instructed their subordinates in the United States to communicate with employees of their competitors to exchange pricing and other competitive information to be used in fixing prices for LCD Panels and LCD Products sold to U.S. companies. The defendants' employees engaged in these illegal communications and

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

information exchanges in the United States, and utilized that information to increase the prices that U.S. customers like Circuit City paid for LCD Panels and LCD Products.

5.     As a result of defendants' price fixing conspiracy, Circuit City was injured in its business by paying substantially more for LCD Products than it otherwise would have paid in the absence of the defendants' conspiracy. Under all of the applicable laws, the Circuit City Trust therefore seeks to recover its actual damages, any and all statutory and punitive damages, pre-judgment interest and post judgment interest, and the costs of suit, including reasonable attorneys' fees, for the injuries that Circuit City suffered as a result of the defendants' and their co-conspirators' conspiracy to fix, raise, maintain and artificially stabilize the prices of LCD Panels and LCD Products.

## II.     JURISDICTION/VENUE

6.     Because Circuit City Trust brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, which gives the federal courts jurisdiction over private antitrust enforcement actions like this one, this Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337. As to Circuit City Trust's claims under the antitrust, unfair competition and consumer protection laws of the State of California and Illinois, jurisdiction exists pursuant to 28 U.S.C. § 1367.

7.     This Court also has personal jurisdiction over the defendants because each defendant is either an alien corporation, transacts business in this District, or is otherwise formed in this District, and because a substantial portion of the acts, events or omissions giving rise to these claims occurred in this State and this District, as well as many others. In fact, defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the State of California and Illinois. Defendants' products are sold in the flow of interstate commerce, and defendants' activities have had a direct, substantial and reasonably foreseeable effect on such commerce. Defendants and their coconspirators knew that price-fixed LCD Panels and LCD Products containing price-fixed LCD Panels would be sold and shipped into this District.

3

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

8.      Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

9.      The price-fixing claims asserted herein by the Circuit City Trust are related to complex multidistrict litigation that is pending in this Court. That litigation is styled *In re TFT-LCD Antitrust Litigation*, Case No. M:07-CV-1827 SI ("MDL Action"). Judge Susan Illston is the presiding judge. As this case involves substantially the same parties, transactions, events, and requests for relief as sought by the class and opt-out plaintiffs in the MDL Action, this civil action has been transferred to and consolidated with the multidistrict litigation before Judge Illston.

## III.   DEFINITIONS

10.     The term "LCD Panel" means liquid crystal display panel. Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image. The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image. As used herein, "LCD Panel" refers to both liquid crystal display panels and to modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a television, computer monitor, or other product. During the Conspiracy Period, LCD Panels used in certain products included three different technologies: thin film transistor ("TFT") panels, color super-twist nematic ("CSTN") panels, and monochrome super-twist nematic ("MSTN") panels. The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products.

11.     "LCD Products" means a product in which LCD Panels are a key component, including without limitation televisions, desktop computer monitors, notebook computers, digital cameras, mobile wireless handsets, and other products.

12.     As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

4

## IV.  THE PARTIES

### A.  THE PLAINTIFF

13.  Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

14.  Circuit City was headquartered in Richmond, Virginia. During the Conspiracy Period, Circuit City purchased in the United States large numbers of LCD Products manufactured by defendants, their co-conspirators, and others. Many of Circuit City's purchases of LCD Products were made directly from defendants, their subsidiaries, or their affiliated companies. Circuit City's negotiations for the purchase of LCD Products took place in the United States; purchase orders for LCD Products were issued from the United States; and invoices for LCD Products were received by Circuit City in the United States.

### B.  THE DEFENDANTS

#### AU Optronics

15.  Defendant AU Optronics Corporation is one of the largest manufacturers of LCD Panels. Its corporate headquarters are at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, AU Optronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

16.  Defendant AU Optronics Corporation America, Inc., is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation. Its corporate headquarters are at 9720 Cypresswood Drive, Suite 241, Houston, Texas. It also has facilities located in San Diego and Cupertino, California. During the Conspiracy Period, AU Optronics Corporation America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

17.  Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc., are referred to collectively herein as "AU Optronics." They participated in the conspiracy through

5

the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant AU Optronics Corporation America, Inc., was a member of the conspiracy, *inter alia*, by reason of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc., regarding conspiracy activities, and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

18.   As is explained more fully below, AU Optronics Corporation, AU Optronics Corporation America, Inc., and six of their key officers have already been indicted on federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Chi Mei**

19.   Defendant Chi Mei Corporation is one of the world's largest manufacturers of LCD Panels. Its corporate headquarters are at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan. During the Conspiracy Period, Chi Mei Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

20.   Defendant Chimei Innolux Corporation, formerly known as Chi Mei Optoelectronics Corporation, is one of the world's largest manufacturers of LCD Panels. Its global headquarters are at No. 160, Kesyue Road, Jhunan Science Park, Miaoli County 350, Taiwan. Chimei Innolux Corporation was formed in the March 2010 merger of Chi Mei Optoelectronics, Innolux Display Corp., and TP Displays Corp. Prior to the merger, Chi Mei Optoelectronics was a wholly-owned subsidiary of Chi Mei Corporation. During the Conspiracy Period, Chimei Innolux Corporation's predecessors, including Chi Mei Optoelectronics Corporation, manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

21.   Defendant Chi Mei Optoelectronics USA, Inc., formerly known as International Display Technology USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its corporate headquarters are at 101 Metro Drive, Suite 510, San Jose, California. During the Conspiracy Period, Chi Mei Optoelectronics USA, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

22. Defendant CMO Japan Co., Ltd., formerly known as International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation. Its principal place of business is at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, CMO Japan Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

23. Defendant Nexgen Mediatech, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, Nexgen Mediatech, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

24. Defendant Nexgen Mediatech USA, Inc., is a wholly-owned and controlled subsidiary of Chi Mei Corporation. Its principal place of business is at 16712 East Johnson Drive, City of Industry, California. During the Conspiracy Period, Nexgen Mediatech USA, Inc., marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation throughout the United States and elsewhere.

25. Defendants Chi Mei Corporation, Chimei Innolux Corporation and its predecessor Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., are referred to collectively herein as "Chi Mei." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Chimei Innolux Corporation through its predecessor Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation. Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc., regarding conspiracy activities, and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

7

26. As is explained more fully below, Chi Mei Innolux Corporation's predecessor, Chi Mei Optoelectronics Corporation, and four of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. A fifth officer has been indicted, but his case remains pending.

**Chunghwa**

27. Defendant Chunghwa Picture Tubes Ltd. is a leading manufacturer of LCD Products. Its global headquarters are at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan. During the Conspiracy Period, Chunghwa Picture Tubes Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

28. Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California. During the Conspiracy Period, Tatung America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

29. Defendants Chunghwa Picture Tubes Ltd. and Tatung America are referred to collectively herein as "Chunghwa." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. During the Conspiracy Period, Chunghwa Picture Tubes Ltd. and Tatung America were closely affiliated, commonly owned, and commonly controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or alter egos of each other. Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.

30. As is explained more fully below, Chunghwa and three of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. Two other of its officers have been indicted for that same conduct.

**HannStar**

31. Defendant HannStar Display Corporation ("HannStar") has its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period,

8

HannStar manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

32.   As is explained more fully below, HannStar and one of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**LG Display**

33.   Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and/or LCD Products. It was created in 1999 as a joint venture between Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. LG Display Co., Ltd. also maintains offices in San Jose, California. During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

34.   Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California. During the Conspiracy Period, LG Display America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

35.   Defendants LG Display Co., Ltd. and LG Display America, Inc., are referred to collectively herein as "LG Display." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc., was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

36.   As is explained more fully below, LG Display and two of its key officers have already entered guilty pleas to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. A third officer has been indicted.

9

**Samsung**

37.   Defendant Samsung Electronics Co., Ltd. has its principal place of business at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea. During the Conspiracy Period, Samsung Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

38.   Defendant Samsung Electronics America, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd.  Its principal place of business is at 105 Challenger Road, Ridgefield Park, New Jersey. During the Conspiracy Period, Samsung Electronics America, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

39.   Defendant Samsung Semiconductor, Inc., is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd.  Its principal place of business is at 3655 North First Street, San Jose, California. During the Conspiracy Period, Samsung Semiconductor, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

40.   Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., are referred to collectively herein as "Samsung." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**Sharp**

41.   Defendant Sharp Corporation has its principal place of business at 22-22 Nagaikecho, Abeno-ku, Osaka 545-8522, Japan. During the Conspiracy Period, Sharp Corporation

manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

42.   Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation. Its principal place of business is at Sharp Plaza, Mahwah, New Jersey. During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

43.   Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation. Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

44.   As is explained more fully below, Sharp has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

**Toshiba**

45.   Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan. During the Conspiracy Period, Toshiba Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

46.   Defendant Toshiba Mobile Display Co., Ltd., formerly known as Matsushita Display Technology Co., Ltd., has its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan. During the Conspiracy Period, Toshiba Mobile Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

47.   Defendant Toshiba America Electronic Components, Inc., is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation. Its corporate headquarters are at 19900 MacArthur Blvd., Ste. 400, Irvine, California. During the Conspiracy Period, Toshiba America Electronic Components, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

48.   Defendant Toshiba America Information Systems, Inc., is a wholly-owned and controlled subsidiary of Toshiba America, Inc. Its principal place of business is at 9470 Irvine Boulevard, Irvine, California. During the Conspiracy Period, Toshiba America Information Systems, Inc., manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

49.   Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., are referred to collectively herein as "Toshiba." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc., regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**Epson**

50.   Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan. The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation. Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the Conspiracy Period, Epson Japan manufactured,

1    marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States
2    and elsewhere.

3        51.   Defendant Epson Electronics America, Inc., ("Epson America") is a wholly-owned
4    and controlled subsidiary of Seiko Epson Corporation. Its principal place of business is at 2580
5    Orchard Parkway, San Jose, California. During the Conspiracy Period, Epson America
6    manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the
7    United States and elsewhere.

8        52.   Defendants Epson Japan and Epson America are referred to collectively herein as
9    "Epson." They participated in the conspiracy through the actions of their respective officers,
10   employees, and representatives acting with actual or apparent authority. Alternatively, defendant
11   Epson America was a member of the conspiracy by virtue of its status during the Conspiracy
12   Period as the alter ego or agent of Epson Japan. Epson Japan dominated or controlled Epson
13   America regarding conspiracy activities and used that domination or control to charge artificially
14   high prices for LCD Panels and/or LCD Products.

15       53.   As is explained more fully below, Epson has already entered a guilty plea to federal
16   criminal charges predicated on the same unlawful and anti-competitive conduct described herein.

17   **Hitachi**

18       54.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at
19   6-6 Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the
20   original producers of LCD Panels. In 2002, it spun off its LCD Panel manufacturing assets to
21   Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Conspiracy Period, Hitachi, Ltd.
22   manufactured, sold, and distributed LCD Products to customers in the U.S. and elsewhere.

23       55.   Defendant Hitachi Displays, Ltd., is a Japanese company with its principal place of
24   business at 3300, Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays, Ltd. was
25   formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD Panel manufacturing business.
26   Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the
27   Conspiracy Period, Hitachi Displays, Ltd. manufactured, sold, and distributed LCD Products to
28   customers in the U.S. and elsewhere.

13

56.   Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina. Its ultimate parent company is Hitachi, Ltd.  During the Conspiracy Period, Hitachi Electronic Devices (USA), Inc. sold and distributed LCD Products to customers in the U.S. and elsewhere.

57.   Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi."

58.   As is explained more fully below, Hitachi has already entered a guilty plea to federal criminal charges predicated on the same unlawful and anti-competitive conduct described herein. One of Hitachi's key executives has also been indicted.

## V.       CIRCUIT CITY'S PURCHASES OF LCD PANELS AND LCD PRODUCTS

59.   During the Conspiracy Period, Circuit City purchased over one billion dollars worth of LCD Products manufactured by defendants, at prices that were artificially high due to defendants' conspiracy. Circuit City suffered injury caused by the conspiracy when it purchased LCD Products from defendants, their affiliates and other manufacturers of LCD Products.

60.   During the Conspiracy Period, Circuit City received shipments of and took title to LCD Products at its distribution centers in Walnut, California; Livermore, California; and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint. Under Circuit City's contracts with defendants and other LCD Product vendors, Circuit City did not take title to a substantial amount of the LCD Products ordered by Circuit City until it received and accepted shipments of those LCD Products at its distribution centers in California. From its distribution centers in California and other states, Circuit City shipped LCD Products to its retail stores. Circuit City also shipped LCD Products directly to consumers from its distribution centers in California through online sales.

61.   During the Conspiracy Period, Circuit City received shipments of and took title to LCD Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois laws invoked in this Complaint. Under

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

Circuit City's contracts with defendants and other LCD Product vendors, Circuit City did not take title to a substantial amount of the LCD Products ordered by Circuit City until it received and accepted shipments of those LCD Products at its distribution center in Illinois. From its distribution center in Illinois and other states, Circuit City shipped LCD Products to its retail stores. Circuit City also shipped LCD Products directly to consumers from its distribution center in Illinois through online sales.

## VI.    THE MARKET FOR LCD PANELS AND LCD PRODUCTS

62.    During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels and LCD Products in the United States through and into interstate and foreign commerce, including through the states of Virginia and California.

63.    During the Conspiracy Period, defendants collectively controlled the market for LCD Panels and LCD Products, both globally and in the United States.

64.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

65.    LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.

66.    LCD Panels have no independent utility, and have value only as components of other products, such as televisions, desktop computer monitors, notebook computer displays, and laptop displays. The demand for LCD Panels thus derives directly from the demand for such products. In the case of LCD Panels used in televisions, the demand for LCD Panels derives directly from the demand for televisions.

67.    The market for LCD Panels is enormous, in part because of the extraordinarily high demand for televisions and other LCD Products. Manufacturers produced approximately 48.4 million LCDs for televisions in 2006.

68.    Products using medium-size and large LCD Panels, such as televisions, desktop monitors, and computers, in 2004, made up 90% of the revenues for LCD panel makers.

15

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

69.   Purchasers, including OEMs, buy LCD Panels in order to include them as components in TVs, computer monitors, laptops, and other electronic products. The defendants' unlawful conspiracy inflated the prices at which OEMs bought LCD Panels.

70.   Purchasers of LCD Products, including Circuit City, purchase LCD Products that incorporate a LCD panel. The defendants' unlawful conspiracy inflated the prices at which Circuit City bought products made with LCD Panels. Circuit City was injured because it paid supracompetitive prices for LCD Panels contained in such products.

71.   Circuit City participated in the market for products containing LCD Panels because Circuit City purchased LCD Panels as part of the LCD Products it purchased, including LCD televisions, notebook computers, and desktop computer monitors. Defendants' unlawful conspiracy artificially inflated the prices at which Circuit City purchased LCD Products.

72.   The market for LCD Panels and the market for LCD Products, like televisions, desktop computer monitors, and notebook computers, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products. The market for LCD Panels and the markets for LCD Products such as televisions, desktop computer monitors, and notebook computers are, for all intents and purposes, inseparable in that one would not exist without the other.

## VII.   DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS AND LCD PRODUCTS.

73.   During the Conspiracy Period, the defendants were aware that the U.S. market for LCD Products was one of the largest in the world. Defendants regularly solicited updated information from potential purchasers of LCD Panels about the type and quantity of LCD Panels needed for the manufacture of LCD Products for sale in the United States. Defendants also maintained sales offices and sales agents in the United States to market their LCD Panel manufacturing capabilities to U.S. companies and to support U.S. customers throughout the duration of the purchasing relationship.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

**A.     DEFENDANTS' AGREEMENTS TO SET PRICES AND**

**        LIMIT PRODUCTION**

74.   The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, Korea, Taiwan, and the United States. In the early years, beginning in at least 1996, representatives of the Japanese Defendants Hitachi, Sharp and Toshiba met and agreed to fix prices for LCD Panels generally, as well as to fix the LCD prices to be charged to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

75.   In the early years, when the conspiracy was principally limited to the Japanese Defendants, bilateral discussions were the preferred method of communication. As more manufacturers entered the conspiracy, however, group meetings became more prevalent.

76.   As LCD production in Korea began to increase and become more sophisticated, the Japanese Defendants expanded their meetings to include their Korean competitors, including Defendants LG Display and Samsung, both of which also agreed to fix prices and control supply. At or about this same time, the Japanese Defendants began to partner with those defendants located in Taiwan to trade technology and collaborate on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan. In 2001, the Korean Defendants convinced Taiwanese LCD panel manufacturers, including Defendants AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and control supply. Defendants' conspiracy included agreements on the prices at which certain defendants would sell LCD Panels and products to their own corporate subsidiaries and affiliates that manufactured LCD-panel containing products, thereby ensuring that LCD panel prices remained the same as between defendants and their OEM customers, preventing the price competition on LCD Products that would have benefitted the consumers of those products.

        1.   Crystal Meetings

77.   In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

information, to fix the price of LCD Panels, and to limit their production. From early 2001 through at least 2006, officials from Defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LGD, Sharp, and perhaps others met periodically in Taiwan to discuss and reach agreements on LCD panel prices, price increases, production limits, and production capacity. The group meetings these defendants participated in were called "Crystal Meetings." Each defendant attended multiple meetings with one or more of the other defendants during this period. The Crystal price-fixing and output-limitation meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States, on a regular basis, throughout this period.

78.    The Crystal Meetings were highly organized and followed a set pattern. Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

79.    "CEO" meetings occurred quarterly from approximately 2001 through 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

80.    The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently than "CEO" meetings, occurring on a near-monthly basis.

81.    During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

18

82.   During these CEO/Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreements concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

83.   During these CEO/Commercial meetings, defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of the defendants not involved in LCD panel pricing or production. On at least one occasion of which the Circuit City Trust is aware, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such meeting.

84.   The structure of the so-called "working level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "working level" meetings was to exchange information on price, supply and demand, and production. That information would then be transmitted up the corporate reporting chain to those individuals with pricing authority and the responsibility for giving effect to the anti-competitive agreements made at the CEO and Commercial meetings.

85.   In approximately the summer of 2006, when they began to have concerns about antitrust issues, defendants discontinued the working-level meetings in favor of one-on-one meetings to exchange pricing and supply information. The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "round robin" set of meetings until all competitors had met with each other. These "round robin" meetings took place until at least November or December of 2006. The information obtained at these meetings was transmitted up the defendants' corporate reporting chains to permit the defendants to maintain their price-fixing and production-limitation agreement.

19

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

2.   Bilateral Discussions

86.   During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants and co-conspirators not attending these meetings. Certain defendants were "assigned" to communicate with those defendants not in attendance and assigned to obtain their agreement to synchronize the price and production limitations agreed to at the Crystal Meetings. For example, it was HannStar's responsibility to contact Hitachi and to relay the agreed-upon prices and production limitations to Hitachi. Subsequently, the Japanese Defendants implemented the agreed-upon pricing and production limitations that had been conveyed to Hitachi by HannStar. This was one of the ways in which the Japanese Defendants, in particular, participated in the conspiracy to fix the prices and limit the production of LCD Panels.

87.   Crystal Meetings were also supplemented by additional bilateral discussions between various defendants, in which they exchanged information about pricing, shipments, and production. As is more fully alleged below, defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by defendants during the Crystal Meetings. These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages. The information gained in these communications was then shared with supervisors, and taken into account in determining the price to be offered the defendants' OEM customers.

3.   Defendants Participating in Price-Fixing Discussions

88.   Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LGD, and Samsung attended multiple CEO, Commercial, and working-level meetings, as well as bilateral discussions during the Conspiracy Period. Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.

89.   Defendant Sharp participated in multiple working-level meetings, as well as bilateral discussions with other defendants, during the Conspiracy Period. Through these discussions,

20

1   Sharp agreed with the other defendants and co-conspirators named in this complaint on prices,

2   price increases, and production limits and quotas for LCD Panels.

3       90.   Defendant Hitachi participated in multiple bilateral discussions with defendants,

4   including HannStar, during the Conspiracy Period. Through these discussions, Hitachi agreed on

5   prices, price increases, and production limits and quotas for LCD Panels.

6       91.   Defendant Toshiba participated in multiple bilateral discussions with other

7   defendants, including Sharp, during the Conspiracy Period. Through these discussions, Toshiba

8   agreed on prices, price increases, and production limits and quotas for LCD Panels. As pleaded

9   below, defendant Sharp has admitted to participating in bilateral meetings, conversations, and

10  communications in Japan and the United States with unnamed co-conspirators during which they

11  fixed the prices of LCD Panels sold to Dell for use in computers, panels sold to Apple for use in

12  iPods, and panels sold to Motorola for use in Razr phones during the Conspiracy Period. During

13  this time, Toshiba was one of Sharp's principal competitors in the sale of LCD Panels to Dell for

14  use in computers, as well as for panels sold to Apple for use in the iPod. In fact, in the small-to-

15  medium size LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in

16  worldwide market share in the first half of 2005, with a 14.5 percent market share during the first

17  quarter and a 14.1 percent market share during the second quarter. Sharp could not have

18  successfully fixed the prices of LCD Panels sold to Dell or Apple unless Toshiba also agreed to fix

19  prices of similar LCD Panels at supra-competitive levels to those two OEMs.

20      92.   Toshiba also participated in the conspiracy by entering into joint ventures and other

21  arrangements to manufacture or source flat panels with one or more of the defendants that

22  attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and

23  others was to limit the supply of LCD Panels and to fix the prices of such panels at unreasonably

24  high levels and therefore to aid, abet, notify and facilitate the effectuation of the price-fixing and

25  production-limitation agreements reached at the meetings.

26      93.   During the Conspiracy Period, Toshiba sought and formed strategic partnerships with

27  those other LCD manufacturers which allowed it to easily communicate and coordinate prices and

28  production levels with other manufacturers as part of the overall conspiracy alleged herein. For

21

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba, Sharp, Matsushita, and Hitachi formed a joint venture to share basic LCD research costs. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April of 2002, Toshiba and Matsushita formed a joint venture, Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2004, Toshiba, Matsushita, and Hitachi formed a joint venture, IPS Alpha Technology, Ltd., which manufactures and sells LCD Panels for televisions. In 2006, Toshiba purchased a 20% stake in LG Display's LCD panel manufacturing facility in Poland. And in 2007, Toshiba and Sharp formed a joint venture in which Toshiba agreed to provide 50% of Sharp's chip needs and Sharp agreed to provide 40% of Toshiba's panel needs. The operation and management of these many different joint ventures enabled Toshiba, and the other defendant-joint venture partners, regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for the LCD Panels that each defendant manufactured and sold.

## B.    MARKET CONDITIONS DEMONSTRATING THE CONSPIRACY

94.    In addition to the guilty pleas and the evidence of the defendants' wrongdoing produced by the defendants themselves, the market for LCD Panels provides further evidence of the defendants' collusive behavior.

95.    The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships, and ease of information sharing.

96.    The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

97.    The LCD Panel industry is characterized by high barriers to entry. New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment.

1  Thus, new firms cannot enter the market for the production and sale of LCD Panels without an

2  enormous capital investment.

3      98.  LCD Panels, whether incorporated into mobile wireless handsets or desktop

4  monitors, notebook computers and televisions, are manufactured to a specific size, regardless of

5  the manufacturer. The manufacture of standard panel sizes for products containing LCD Panels

6  across the LCD Panel industry facilitates price transparency in the market for LCD Panels and

7  enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and so to enforce

8  their conspiracy.

9      99.  After initial introduction into a market, consumer electronics products and their

10  component parts are typically characterized by downward pricing trends. However, since at least

11  1996, the LCD Panels market has been characterized by unnatural and sustained price stability, as

12  well as certain periods of substantial increases in prices. Defendants achieved price stability and

13  price increases by agreeing to fix and maintain prices and to restrict supply through decreases in

14  capacity utilization and restraint in new plant investment.

15      100. As described herein, defendants' TFT-LCD cartel evolved over time. Defendants

16  initiated their cartel when LCD Panels and LCD Products were in their relative infancy. At that

17  time, defendants balanced the desire to set prices collusively with the industry goal of establishing

18  their products in the marketplace. As the cartel matured, new entrants were co-opted, and

19  production costs declined. At the same time, conspirators learned how they could best manage the

20  crystal cycle by agreeing on prices and output.

21          1.   <u>1996</u>

22      101.  By early 1996, analysts were lamenting the excess supply and drastic price cuts in

23  the TFT-LCD markets. The downward pressure on prices, which had already fallen 40 to 50

24  percent in 1995, was projected to continue due to lower manufacturing costs. Despite this, TFT-

25  LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity. In

26  reality, the Circuit City Trust is informed and believes and alleges that defendants were fixing the

27  prices.

28

23

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

102.   The Circuit City Trust is informed and believes and alleges that during this period, the Japanese companies herein began to partner with Taiwanese companies to trade technology and collaborate on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan. This mutually beneficial relationship between purported competitors continued into at least 1999.

103.   A few months into 1996, there was a reversal in the downward trend in TFT-LCD Product prices and an alleged inability of manufacturers to supply enough LCD Panels to meet demand. By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

104.   By mid-1996, industry analysts were commenting on an unusual rise in TFT-LCD panel prices that was noted to be "quite rare in the electronics industry." The Circuit City Trust is informed and believes and alleges that the "rare" increase in TFT-LCD panel prices was due to the agreements reached by the Japanese companies to increase prices. These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

105.   1996 also brought the advent of third generation fabs. In order to stay current with technology, manufacturers were moving quickly into third generation motherglass. LG Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. However, manufacturers falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier. This resulted in surging prices. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

### 2.   1997 – 1998

106.   Circuit City Trust is informed and believes and alleges that by 1997, Japanese manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology. In return, the Japanese received output from Taiwanese plants. In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese

24

manufacturer that Sharp acquired in 2005. These arrangements between Japanese and Taiwanese companies resulted in cooperative discussions between supposed competitors. It was also expected to contribute to an increase in supply of LCD Panels.

107.    By 1998, the TFT-LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies into the market. A March 30, 1998 article in Electronic News reported that Hyundai's production lines were running at only 20 to 50 percent of capacity. The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage . . . . You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden." Circuit City Trust is informed and believes and alleges that during this period, concerted efforts were made to get other manufacturers in the industry to limit production. The effort to limit production, capacity restraints and the price-fixing agreement caused decreases in prices of LCD Panels to slow and stop in late 1998.

        3.    <u>1999</u>

108.    In 1999, TFT-LCD Product prices surged due to a claimed "massive undersupply." This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

109.    At the beginning of 1999, industry publications suggested that the Japanese and Korean manufacturers were going to have the opportunity to recoup previous years' losses: "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink . . . ."

110.    By mid-1999, a Korean source was reporting: "[w]ith the supply shortage for LCD Panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise." The lack of supply was a pretextual reason given publicly to justify a price increase.

111.    Significantly, Bock Kwon, Vice President of LG Display's Sales Division, was quoted, in part, in the same trade publication: "LG LCD will raise prices across its entire TFT-LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will

25

stabilize some time in the second half. [D]emand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate. This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said. The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas."

112. Also in 1999, the three major TFT-LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai. The year 1999 also saw an additional merger when LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created Defendant LG Display.

### 4. 2000 - 2001

113. By January of 2000, prices for LCD Panels were falling again. The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors into the market, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics). Taiwanese Defendants rapidly expanded their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other defendants to gain immediate market share. However, by 2000-01, the Taiwanese Defendants had increased their market share to the point that it made sense to participate in the conspiracy, and Circuit City Trust is informed and believes and alleges that the Taiwanese Defendants then moderated the volume of their production.

114. Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity. Two of the largest Korean firms announced plans to invest billions in Taiwanese TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

115. Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices. In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

116.  In October 2000, *The Korea Herald* reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

117.  Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD Panels stopped declining in mid-2001, and actually increased. In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."

118.  Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand. However, published data for 2001 showed that several defendants were operating their fabs significantly below capacity. For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52 percent utilization rate. Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, Circuit City Trust is informed and believes and alleges that the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply, and that again, defendants reacted to the price trough by conspiring to fix prices. This agreement was reached in part at the bilateral and group meetings described above.

119.  The rise in prices made no economic sense at this point in time and was the product of defendants' setting the price of TFT-LCD by agreement. First, defendants were bringing new plants on line that utilized larger motherglass, which was more cost effective. Second, as reported by an industry source, the variable cost of producing LCD Panels was declining during the latter part of 2001 and into 2002. With lower production costs and capacity to spare, it made little economic sense for defendants not to utilize their full capacity other than because of an agreement by them not to do so.

5.    2002 – 2003

120.  Prices continued to rise from the second half of 2001 through the second half of 2002. Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion. In reality, Circuit City Trust is informed and believes and

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1   alleges that the price increases were the result of agreements reached in the crystal meetings and

2   bilateral discussions described above.

3        121.  By the second half of 2002, the cartel's success at propping up prices led to lagging

4   demand, and the cartel's response was to let prices level off and even begin to fall. Such

5   downward price trends are not inconsistent with a monopoly or cartel.

6        122.  Throughout 2002, industry leaders shifted to fifth generation motherglass

7   production technology.

8        123.  Industry analysts took note of the unusual trends in the pricing of LCD Panels

9   and/or LCD Products. In February 2004, CNET.com quoted an analyst from IDC, a research firm,

10   as saying that, "LCD is one of the few [markets] where things have actually gone up in price." As

11   described above, and as explained in further detail below, defendants explained these price

12   increases with false statements about market conditions in order to cover up the conspiracy.

13        124.  During five consecutive quarters in 2003 and 2004, TFT-LCD Product prices rose

14   significantly. AU Optronics reported that the price for certain of its LCD Panels increased 28

15   percent between the second quarter of 2003 and the second quarter of 2004. Similarly, LG Display

16   reported that its pricing increased by 21 percent over the same period.

17        125.  Circuit City Trust is informed and believes and alleges that these soaring prices

18   resulted in similar increases in the profits reaped by the TFT-LCD Product manufacturers. For

19   example, the eight largest TFT-LCD Product manufacturers reported a collective profit increase of

20   740 percent between the second quarter of 2003 and the second quarter of 2004. These record

21   profits resulted from defendants' collective action to fix, raise, maintain or stabilize the price of

22   LCD Panels.

23        126.  Again, the sharing of information about price and production, the under-utilization

24   of capacity, and restraints on output drove up the prices of LCD Panels.

25        127.  Around this time, industry analysts suggested that there were too many competitors

26   in the TFT-LCD Product marketplace. Some industry participants went as far as overtly suggesting

27   that the industry should seek to curtail supply through mergers.  These suggestions were carried

28

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1   out. Significant consolidation and collaboration among competitors in the TFT-LCD Product

2   market occurred.

3       128. While TFT-LCD Product prices were increasing in late 2003, AU Optronics, Chi

4   Mei, and HannStar decreased capacity utilization, as Circuit City Trust is informed and believes

5   and alleges had been agreed to in crystal meetings.

6       129. Panasonic's joint venture announced plans to solicit investment from other

7   companies involved in the production of LCD Panels, including device manufacturers and material

8   suppliers. NEC formed an alliance with Casio. In addition, Taiwanese TFT-LCD manufacturers

9   agreed to supply Panasonic with LCD Panels for use in televisions.

10      130. Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT,

11  a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu

12  Display Technology.

13      131. Despite the increased efficiency and costs savings of fifth generation fabs, the

14  industry experienced higher prices in 2003, purportedly because of a shortage of the most popular

15  sizes of LCD Panels. Circuit City Trust is informed and believes and alleges that in order to keep

16  prices artificially high, defendants chose not to operate at full capacity, nor to take advantage of

17  lower variable costs.

18          6.    2004

19      132. Pursuant to defendants' agreement to fix and stabilize prices, prices continued to

20  rise during the first half of 2004. In fact, between 2003 and mid-2004, panel prices increased for

21  five consecutive quarters. Various types of crystal meetings were ongoing during this period. The

22  cartel's success at raising prices slowly dampened demand. In response, the cartel allowed prices

23  to once again level off and began to decline in the second half of 2004. During this period of time,

24  the market for TFT-LCD televisions started to grow, with the 32-inch panel representing

25  approximately 9 percent of the market.

26      133. In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-

27  driven price declines were eroding profits. AU Optronics publicly announced plans to reduce

28

29

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1  capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation
2  facility.

3      134.  Consolidation and collaboration among and between competitors continued as Sony
4  launched a joint venture, named S-LCD Corp.

5          7.    2005

6      135.  Analysts widely predicted a continuing period of oversupply and declining prices
7  throughout 2005. However, by the third quarter of 2005, it was clear that the industry was not
8  facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing,
9  panel prices.

10     136.  By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant
11  product, and the volume of 32-inch panels for televisions took off as well. In 2005, 32-inch panels
12  represented almost 27 percent of sales.

13     137.  Analysts forecast excess production capacity in 2005 because of large TFT-LCD
14  plants including that of LG Display being brought on line. However, Sharp executive director
15  Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use
16  in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent. The shortage
17  came as a surprise to analysts.

18     138.  This shortage was the result of collusion among defendants. Dr. Hui Hsiung,
19  Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his
20  company persuaded its competitors to lower the inventory for LCD Panels:

21          I think our policy, our strategy, has always been minimizing our inventory
22          and that turned out to be quite successful in past few years by keeping the
            inventory lower. And I think in the past we did have some problem
23          convincing our competitors doing the same thing. But in recent months,
            especially this year, actually, it did start to happen. I think that the industry
24          understand[s] the benefit of keeping the capacity low. Again, even if the
            scenario does happen that we have a 5% over capacity this is not the
25          drastic action to reduce about 5% of the loading. And this, coupled with
            the fact that many of the product cost structure is some 80% are actually
26          material costs. So, fixed costs at 20% if you reduced the 5%, even 10%,
            loading, that impact on cost is actually, not very big. So, we think the
27          industry become more mature. That is precisely what our competitors
            would do.
28

30

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1   Indeed, earlier that year, a spokesperson for LG Display had predicted that market stabilization.

2   These collusive actions were being perpetuated through the series of ongoing meetings as alleged

3   above.

4           8.    2006

5           139. A temporary oversupply of LCD Panels occurred in 2006, which had the effect of

6   reducing prices in the short term. Again, in the face of a price trough, defendants fixed and

7   stabilized prices through their cartel activities. On May 25, 2006, at a Taiwanese trade show, Mr.

8   Hsiung of AU Optronics stated publicly that his company was reducing production of those

9   products in order to avoid further price erosion. He expressed the view that his competitors should

10  follow suit, saying that production ought to be reduced by at least 15 percent. Eddie Chen, a

11  spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in

12  conjunction with his company's peers. A June 13, 2006 article in *InfoWorld* noted that as a result

13  of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

14          140. Chi Mei was not the only one to follow AU Optronics' invitation to restrict the

15  output and increase the prices of LCD Panels. By June of 2006, LG Display also announced plans

16  to cut production of LCD Panels.

17          141. By the summer of 2006, this ongoing conspiracy was being effectuated through

18  bilateral meetings as alleged above.

19          142. Despite the fact that certain of the defendants may have cut back on, or

20  discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental

21  investigations described below, the impact of the conspiracy continued at least through the end of

22  that year. This carry-over in the antitrust injury was due, in part, to the nature of the pricing

23  mechanisms in the industry, such as supply contracts.

24          9.    The Role of Trade Associations During the Relevant Period

25          143. The LCD industry is served by several major trade organizations that put on

26  industry-wide meetings several times a year. These meetings have facilitated collusion, and the

27  trade associations have themselves functioned as a means for defendants to cooperate and discuss

28  prices.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

144. One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] Japan and Korea TFT LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

145. South Korean manufacturers, including LG Display, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

146. Japanese manufacturers of LCD Panels have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCD Panels. Its members include Sharp, NEC, and Hitachi. Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

147. In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium, but was renamed the "SID International Symposium, Seminar and Exhibition," which was held in conjunction with the SID Business Conference. SID also puts on a long-running conference called the International Display Research Conference ("IRDC").

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

148. The 2004 SID Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and COO of AU Optronics. This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the attendees about "investments planned at the major display manufacturers." A representative of DisplaySearch also spoke about the LCD market. There were presentations by analysts from iSuppli/Stanford Resources, and other industry experts. This was all followed by a "networking reception – sponsored by LG, Philips LCD," to which all conference attendees were invited to participate.

149. SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics. This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and the cost and margin outlook for key FPDs will be projected." Again, these discussions about the market were followed by a "networking reception." Among the attendees at SID 2004 were Bruce Berkoff of LG Display, H.B. Chen of AU Optronics, Larry Weber of Panasonic, and Joel Pollack of Sharp. Senior executives from Sharp and Hitachi also attended the SID International Symposium, Seminar and Exhibition.

150. Circuit City Trust is informed and believes and alleges that the SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle.

151. SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing." Among the attendees at SID 2005 was Bruce Berkoff of LG Display. SID 2005 also featured presentations regarding developments in LCD technology by officials from AU Optronics, Sharp, LG Display, and Hitachi.

152. The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was held from February 27 to March 2, 2005, in Okinawa, Japan, and the 2006 conference was held from February 28 to March 3, 2006, also in Okinawa.

33

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

153.  Circuit City Trust is informed and believes and alleges that participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators, or, as Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . . The GFPC plays a vital part in building those connections and growing our business."

154.  Circuit City Trust is informed and believes and alleges that among the participants at GFPC 2006 were Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Nakajima of Panasonic, and Dr. Hui Hsiung of AU Optronics.

155.  As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving defendants further opportunities to discuss prices and output.

## C.    DEFENDANTS HAVE BEEN CHARGED WITH AND PLEADED GUILTY TO PRICE FIXING LCD PANELS AND LCD PRODUCTS IN THE U.S.

156.  In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

157.  On December 12, 2006, news reports indicated that in addition to LG Display, Defendants Samsung, Sharp and AU Optronics were also under investigation.

158.  Throughout the remainder of December and into the new year, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.

159.  At that time, it became clear that, beginning sometime in 2006, the Department of Justice had begun investigating charges that the defendants were engaged in a worldwide conspiracy for fixing the prices of LCD Panels and LCD Products.

160.  That DOJ investigation has been and continues to be productive. Since late 2008, most of the defendants (and many of their officers) have pled guilty to criminal price-fixing

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

charges. Even more have been charged with such crimes. Each of the pleas and indictments to date is noted below, and described in summary fashion.

### 1.    The AU Optronics Corporation Indictments

161. On June 10, 2010, the Department of Justice announced and filed grand jury indictments of AU Optronics Corporation, AU Optronics Corporation America, and six of AU Optronics' most senior officers including among others, Hsuan Bin Chen, AU Optronics' current President, and Hui Hsiung, AU Optronics' current Executive Vice President. Both companies and all of the officers were charged with participating in an unlawful criminal conspiracy to fix the prices of LCD Panels sold worldwide during at least the period from October 19, 2001 to December 1, 2006.[2]

162. These charges exposed each of the AU Optronics companies to $100 million plus in criminal fines and penalties, and exposed the company officers to minimum fines of $1 million and maximum imprisonments for ten years. As of the date of this Complaint, all or nearly all of the AU Optronics Defendants had appeared, been arraigned, and pled not guilty. The jury trial of the criminal charges against these AU Optronics Defendants is currently set for October 31, 2011.

### 2.    Pleas By LG Display Co., Ltd And LG Display America, Inc.[3]

163. Both of the LG Display companies pled guilty to participating in a September 21, 2001 – June 1, 2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of LCD Panels sold in the United States and elsewhere. As a result of its December 2008 plea bargain, the LG Display companies agreed to pay a $400 million criminal fine, the second largest fine in Antitrust Division history.

164. In February of 2009, LG Display executive Chang Suk ("C.S.") Chung also pleaded guilty to participating in that same price-fixing conspiracy. Chung was sentenced to serve seven

---

[2] *U.S. v. Lin, et al.*, 3:09-CR-0010-SI (4-11) (N.D. Cal. superseding indictment filed 6/10/10 and announced that same day).

[3] *U.S. v. LG Display Co., Ltd. and LG Display America, Inc.*, No. CR 08-803-VRW (Information filed 11/12/08; plea agreement announced simultaneously but filed on 12/17/08).

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

months in prison and pay a $25,000 criminal fine.[4] In that same month, a former LG Display executive, Duk Mo Koo, was indicted for participating in the same conspiracy.[5]

165.  Later in April of 2009, another LG Display executive, Bock Kwon, was charged with participating in the same conspiracy. His plea agreement, filed on June 26, 2009, required him to serve one year in jail and to pay a criminal fine of $30,000.[6]

### 3.   Pleas By Chi Mei Optoelectronics Corporation and Related Indictments [7]

166.  In February of 2010, Chi Mei pled guilty to participating in a September 14, 2001-December 1, 2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of LCD Panels sold in the United States and elsewhere. As a result of its plea agreement, Chi Mei was obliged to pay a $220 million criminal fine.

167.  Not long after Chi Mei's plea was entered, two Chi Mei executives also entered into plea agreements admitting that they had conspired with others to suppress and eliminate competition by fixing the prices of LCD Panels during the Conspiracy Period. Chi Mei's former president, Jau-Yang ("J.Y.") Ho agreed to pay a criminal fine of $50,000 and to serve 14 months in federal prison.[8] Chi Mei's former director of sales, Chu-Hsiang ("James") Yang was sentenced, per his plea agreement, to serve nine months in jail and pay a $25,000 fine.[9]

168.  Later in the summer of 2010, these price-fixing guilty pleas were augmented by the guilty pleas of two other Chi Mei executives – Wen-Hung ("Amigo") Huang, Chi Mei's former

---

[4]   *U.S. v. Chang Suk Chung*, No. CR 09-0044-PJH (N.D. Cal. Information filed 1/15/09; plea agreement announced that same day, but filed 2/17/09).

[5]   *U.S. v. Duk Mo Koo*, No. CR 09-00110-SI (N.D. Cal. Indictment filed 2/4/09; superseding indictment filed 6/10/10).

[6]   *U.S. v. Bock Kwon*, No. CR 09-0437-SI-3 (N.D. Cal. Information filed 4/27/09, plea agreement filed 6/29/09).

[7]   *U.S. v. Chi Mei Optoelectronics Corporation*, No. CR 09-1166-SI (N.D. Cal. Information filed 12/8/09; plea agreement filed 2/8/10).  The plea agreement was announced contemporaneously with the filing of the information.

[8]   *U.S. v. Ho*, No. 3:10-CR-00355-SI-1 (N.D. Cal. Information filed 4/30/10; plea agreement announced that same day but filed on 6/2/10).

[9]   *U.S. v. Yang*, No. 3:10-CR-00335-SI-1 (N.D. Cal. Information filed 4/23/10; plea agreement announced on 4/30/10 but not filed until 5/6/10).

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

director of sales, and Chen-Lung Kuo, formerly Chi Mei's Vice President for Sales. These two executives also pleaded guilty to the criminal price-fixing of LCD Panels during the Conspiracy Period. Huang agreed to serve nine months in jail and to pay a $25,000 criminal fine.[10] Kuo agreed to pay a $35,000 fine and serve nine months in jail.[11]

169.  A fifth Chi Mei executive, Hsin-Tsung Wang, a former Chi Mei Vice President of Sales and Marketing was recently indicted for participating in the same price-fixing activities, during the same period as his convicted Chi Mei colleagues.[12]

4.  Pleas by Chunghwa Picture Tubes, Ltd. and Related Indictments[13]

170.  Chunghwa pled guilty to participating in a 2001-2006 conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the prices of certain TFT-LCD [devices] sold in the United States and elsewhere. As part of its January, 2009 plea bargain, Chunghwa agreed to pay a $65 million criminal fine.

171.  In February of 2009, three former Chunghwa executives – CEO Chieng-Hon ("Frank") Lin, and sales executives Chih-Chun ("CC") Liu, and Hsueh-Lung ("Brian") Lee pleaded guilty to participating in the same conspiracy.[14] Lin was sentenced to nine months in prison and to the payment of a $50,000 criminal fine. Liu was sentenced to seven months in prison and the payment of a $30,000 criminal fine. Lee was sentenced to serve six months in prison and pay a $20,000 criminal fine.

---

[10]  *U.S. v. Huang*, No. 3:10-CR-00579-SI-1 (N.D. Cal. Information filed 7/28/10; plea agreement announced that same day, but not filed until 8/12/10).

[11]  *U.S. v. Kuo*, No. 3:10-CR-005910-SI-2 (N.D. Cal. Information filed 8/4/10; plea agreement announced that same day, but not filed until 9/10/10).

[12]  *U.S. v. Wang*, No. 3:10-CR-00756-SI (N.D. Cal. Indictment filed 10/14/10).

[13]  *U.S. v. Chunghwa Picture Tubes, Ltd.,* No. 3:08-CR-00804-SI (N.D. Cal. Information filed 11/12/08; plea agreement filed on 1/16/09).

[14]  *U.S. v. Lin, et al.*, No. 3:09-CR-0045-MHP (N.D. Cal. Indictment filed 1/15/09; plea agreement filed 2/27/09).

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

172. New indictments were later issued against two other former Chunghwa executives, Cheng Yuan Lin a/k/a C.Y. Lin and Wen Jun Cheng a/k/a Tony Cheng.[15]

### 5. Pleas By HannStar Display Corporation

173. In late June of 2010, the Department of Justice announced that HannStar had pleaded guilty to participating in a 2001-2006 conspiracy to fix the prices of LCD Panels sold worldwide. As part of its plea bargain, HannStar was obliged to pay a criminal fine of $30 million.[16]

174. Several months later, on October 27, 2010, former HannStar executive Jui Hung ("Sam") Wu pled guilty to conspiring with others to suppress and eliminate price competition in the worldwide market for LCD Panels during 2001-2006. Wu had been HannStar's Director of Global Sales and Marketing. His plea bargain required him to serve seven months in jail and pay a $20,000 criminal fine.[17]

### 6. Sharp Corporation's Plea[18]

175. Sharp pled guilty to participating, from April 1, 2001 to December 1, 2006, in price-fixing conspiracies with other major TFT-LCD producers to fix prices of panels sold to Dell, Inc. for use in computer monitors and laptops; to participating in a conspiracy to fix the prices for IPod screens sold to Apple, Inc. between September, 2005 and December, 2006, and to participating in a conspiracy, lasting from the fall of 2005 to the middle of 2006, to fix prices for LCD Panels sold to Motorola, Inc. for use in its Razr mobile phones.

176. Sharp agreed to pay $120 million in criminal fines as a result of this December 2008 plea agreement.

---

[15] *U.S. v. Lin*, No. 3:09-CR-00110-SI-1 (N.D. Cal. Indictment filed 2/10/09; superseding indictment filed 6/10/10); *U.S. v. Cheng*, No. 3:09-CR-00110-SI-2 (N.D. Cal. Indictment filed 8/18/09; superseding indictment filed 6/10/10).

[16] *U.S. v. HannStar Display Corporation*, No. 3:10-CR-00498-SI (N.D. Cal. Information filed 6/29/10; plea agreement announced that same day but not filed until 8/5/10).

[17] *U.S. v. Wu*, No. 3:10-CR-00781 (N.D. Cal. Information filed 10/27/10; plea agreement announced that same day but not filed until 11/22/10).

[18] *U.S. v. Sharp Corporation*, No. 3:08-CR-802-PJH (Information filed 11/12/09; plea agreement announced simultaneously).

38

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

### 7. Epson Imaging Devices Corporation's Plea[19]

177. Like Sharp and Hitachi, Epson pleaded guilty to participating in a conspiracy with major TFT-LCD producers to fix prices for specific products that were sold to specific entities. In Epson's case, the products were LCD Panels "sold to Motorola for use in Razr mobile phones, from the fall of 2005 to the middle of 2006." As a result of that plea, Epson agreed to pay a $26 million fine.

### 8. Hitachi Displays, Ltd.'s Plea and Related Indictments[20]

178. Like Sharp, Hitachi pleaded guilty to participating in a conspiracy with major TFT-LCD producers to fix prices for specific products that were sold to specific entities. In Hitachi's case, the products were "LCD Panels sold to Dell, Inc. or its subsidiaries for use in desktop monitors and notebook computers, from on or about April 1, 2001 to on or about March 31, 2004." As a result of that plea, Hitachi paid a $31 million dollar fine.

179. Subsequent to that plea, a senior Hitachi sales executive, Sakae Someya, was indicted for the same activity.[21] That indictment was filed on March 31, 2009.

### 9. Related Criminal Matters

180. In her class certification opinion, Judge Illston noted that the Department of Justice had affirmed that it had signed a conditional leniency agreement with a qualified company in the TFT-LCD industry. In this context, that meant that the agreement had conferred amnesty on a participant in the TFT-LCD price-fixing conspiracy who had provided the Department of Justice with concrete evidence of that price-fixing agreement.[22]

181. As yet, that conspirator does not appear to have been publicly identified, though plaintiffs in the MDL Action have pressed the Court to disclose the informant's identity and

---

[19] *U.S. v. Epson Imaging Devices Corp.*, No. 3:09-CR-854-SI (N.D. Cal. Information filed 8/25/09; plea agreement filed 10/23/09).

[20] *U.S. v. Hitachi Displays, Ltd.,* No. 3:09-CR-247-SI (N.D. Cal. Indictment filed 3/10/09; plea agreement announced that same day and filed 5/22/09).

[21] *U.S. v. Sakae Someya*, No. 3:09-CR-00329-EXE (N.D. Cal. Indictment filed 3/31/09).

[22] Class DE 1642 at 4.

1   require that conspirator to provide the cooperation it is required to give under the Antitrust

2   Criminal Penalty Enhancement and Reform Act of 2004.

3       182. The DOJ Antitrust Division's investigation of the remaining defendants is ongoing

4   and is expected to result in additional guilty pleas and criminal fines from the other defendants to

5   this action.

6               10.   Other Suspect Arrangements

7       183. In addition to the participation in the conspiracy outlined through the guilty pleas,

8   other as yet uncharged conspirators also participated in the conspiracy. Defendant Toshiba

9   participated in the conspiracy by entering into joint ventures and other arrangements to

10  manufacture or source LCD Panels with one or more of the defendants that attended the Crystal

11  Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the

12  supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet,

13  notify and facilitate the implementation of the price-fixing and production-limitation agreements

14  reached at the meetings.

15      184. During the Conspiracy Period, Toshiba also sought and formed strategic partnerships

16  with other LCD manufacturers which allowed Toshiba to easily communicate and coordinate

17  prices and production levels with other manufacturers as part of the overall conspiracy alleged

18  herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture.

19  In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which

20  merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture,

21  Toshiba Mobile Display, formerly known as Toshiba Matsushita Display Technology Co., Ltd.,

22  which combined the two companies' LCD development, manufacturing, and sales operations. In

23  2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in

24  Poland.

25      185. The operation and management of these many different joint ventures afforded

26  Toshiba, and the other defendant joint-venture partners, regular opportunities to communicate with

27  each other to agree on prices, price increases and production limits and quotas for those LCD

28  Panels that each defendant manufactured and sold.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1              11.   Co-Conspirators

2      186.  Co-conspirator Hydis Technologies Co. Ltd., formerly known as BOE Hydis

3  Technology Co., Ltd. ("Hydis"), is a Korean manufacturer of LCD Panels. Hydis originated in

4  1989 as the LCD business division of Hyundai Electronic Industries Co. ("Hyundai"). It spun-off

5  from Hyundai on 2001, and it was subsequently acquired by the BOE Group. On September 18,

6  2006, Hydis filed for Court Receivership in South Korea. Hydis participated in multiple lower

7  level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a

8  Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on

9  prices and supply levels for LCD Panels.

10      187.  Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") is a Japanese entity

11  with its principal place of business located at 2-7-3 Marunouchi, Chiyoda-ku, Tokyo 100-83 10,

12  Japan. Mitsubishi was an early developer of LCD technology, and in 1991, it entered into a joint

13  venture with Asahi Glass Co., Ltd. to mass produce LCD Panels. Mitsubishi owned 80 percent of

14  the joint venture, called Advance Display Incorporated. In September 1999, Mitsubishi purchased

15  Asahi Glass's stake in Advance Display Incorporated, making it a wholly-owned subsidiary.

16  Mitsubishi participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa,

17  Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi

18  agreed, with the other co-conspirators, on prices and supply levels for LCD Panels.

19      188.  Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion

20  about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an

21  agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed, with the

22  other conspirators, on prices and supply levels for LCD Panels.

23      189.  Co-conspirator NEC LCD Technologies, Ltd. ("NEC") is a Japanese company with

24  its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kangawa, 211-

25  8666, Japan. It has been in the LCD business since 1993. NEC participated in meetings or

26  discussions during the Conspiracy Period with at least one other defendant or co-conspirator,

27  which included discussions about prices for LCD Panels.

28

41

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

190. Co-Conspirator NEC Electronics America, Inc. is affiliated with and controlled by NEC, with its principal place of business located at 2880 Scott Boulevard, Santa Clara, CA 95050-2554 and its manufacturing plant in Roseville, California. During the Conspiracy Period, NEC Electronics America manufactured, sold and distributed LCD Panels and/or LCD Products throughout the United States.

191. Co-conspirator Panasonic Corporation ("Panasonic") is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Osaka 571-8501, Japan. Until approximately October 1, 2008, Panasonic was known as Matsushita Electric Industrial Co., Ltd.  Panasonic holds a minority stake in two joint ventures, including IPS Alpha. During the Conspiracy Period, Panasonic manufactured, sold and distributed LCD Panels and/or LCD Products to customers throughout the United States.

192. Co-conspirator Panasonic Corporation of North America, formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of business at 1 Panasonic Way, Secaucus, New Jersey. Panasonic Corporation of North America is a wholly-owned and controlled subsidiary of co-conspirator Panasonic. During the Conspiracy Period, Panasonic Corporation of North America sold and distributed LCD Panels and/or LCD Products manufactured by Panasonic to customers throughout the United States.

193. Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at these meetings. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

194. Co-conspirator Sanyo Consumer Electronics Co., Ltd., formerly known as Tottori Sanyo Electric Co. (also known as "Torisan"), is a Japanese company with its principal place of

42

business at 101, 7-Chome, Tachikawa-Cho, Tottori-City, Tottori, 680-0061, Japan. Prior to 2004, co-conspirator Sanyo Electric Co., Ltd., owned and operated Sanyo Consumer Electronics Co., Ltd. In October 2004, Seiko Epson Corporation and Sanyo Electric Co., Ltd. (including its subsidiary Sanyo Consumer Electronics Co., Ltd.) formed a joint venture company, Sanyo Epson Imaging Devices Corporation. This joint venture was formed from a combination of Seiko Epson's D-TFD LCD and STN LCD business and Sanyo's LTPS TFT LCD amorphous silicon TFT LCD businesses. After the Conspiracy Period, Sanyo Epson Imaging Devices Corporation became Epson Imaging Devices Corporation, which is a defendant. During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

195. During the Conspiracy Period, co-conspirator Sanyo Consumer Electronics Co., Ltd. was closely affiliated, commonly owned, controlled and dominated by co-conspirator Sanyo Electric Co., Ltd.  Sanyo Electric Co., Ltd. wholly owns co-conspirator Sanyo Consumer Electronics Co., Ltd. and the two companies functioned as a single enterprise and/or alter egos during the Conspiracy Period.

196. Other co-conspirators whose identities are known to Circuit City Trust include the following companies: LG Electronics, Inc and LG Electronics USA, Inc. (collectively "LG Electronics"); Royal Philips Electronics N.V. (aka Koninklijke Philips Electronics N.V.) and Philips Electronics North America Corp. (collectively "Philips Electronics"); and Fujitsu Display Technologies Corporation ("FDTC").

197. When Circuit City Trust refers to a corporate family of companies by a single name in its allegations of participation in the conspiracy, it is to be understood that Circuit City Trust is alleging that one or more employees or agents of entities within the referenced corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, each entire

43

1  corporate family was represented in meetings and discussions by their agents and each was a party

2  to the agreements reached in them.

3  **D.      CONSPIRACY'S EFFECT ON EARLIER LCD TECHNOLOGIES**

4  198.  During the Conspiracy Period, LCD Panels used in certain applications, including

5  notebook computers and mobile wireless handsets, included both TFT-LCD Panels and STN-LCD

6  Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.  Certain

7  defendants (including Samsung, Sharp, and Epson), their corporate affiliates, and other members

8  of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels.  The same

9  individuals at the defendants who were engaged in bilateral communications and group meetings

10  regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

11  1.      Defendants' Bilateral Communications Regarding STN-LCD Panels

12  199.  Defendants and their co-conspirators' conspiracy included agreements to fix, raise,

13  maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels. Specifically,

14  defendants engaged in bilateral discussions in which they exchanged information about STN-LCD

15  Panel pricing, shipments, and production. These discussions usually took place between sales and

16  marketing employees in the form of telephone calls, emails, and instant messages. The

17  information gained in these communications was then shared with supervisors and taken into

18  account in determining the price to be offered defendants' customers for STN-LCD Panels.

19  200.  **REDACTED**

20

21

22

23

24

25

26  201.  **REDACTED**

27

28

44

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1

2

3

4          202.  **REDACTED**

5

6

7

8

9

10         203.  **REDACTED**

11

12

13

14

15         204.  **REDACTED**

16

17

18

19

20         205.  **REDACTED**

21

22

23

24

25

26         206.  Epson employees responsible for selling CSTN-LCD Panels to Motorola also

27    engaged in bilateral discussions with "top management" employees at Sharp.

28

45

207. In 2006, Toshiba employees met with representatives of Sharp and discussed Sharp's plans to sell CSTN-LCD Panels to Nokia.

208. In some instances, defendants quoted mobile wireless handset vendors a single price for a LCD module that included both a TFT-LCD Panel and an STN-LCD Panel. For example, defendants quoted Motorola a single price for LCD modules used in the Razr phone, which modules included both a TFT-LCD Panel and a CSTN-LCD Panel. Defendants Sharp and Epson have admitted fixing prices for TFT-LCD panels sold to Motorola for the Razr phone. Because Sharp and Epson quoted prices to Motorola for the entire Razr module, their admitted agreements to fix prices for Motorola included an agreement to fix the price of the CSTN-LCD Panels included in the Razr module.

209. In other instances, defendants quoted some mobile wireless handset vendors a single price for an LCD module that included both a TFT-LCD Panel and an MSTN-LCD Panel. For example, in 2003, Sony Ericsson manufactured a phone that contained a TFT-LCD Panel in the primary display and an MSTN-LCD Panel in the subdisplay, and sought a single price quotation for both the TFT-LCD Panel and the MSTN-LCD Panel from defendants. Thus, defendants' agreement to fix the price of TFT-LCD Panels included an agreement to fix the price of MSTN-LCD Panels sold in the combined TFT-LCD Panel/MSTN-LCD Panel modules sold for mobile wireless handset applications.

210. In addition, Defendants Toshiba and Samsung also engaged in communications with each other and with Epson and Sharp at which agreements were reached regarding the price of LCD modules sold to Motorola for the Razr phone, which included agreements to fix the price of the CSTN-LCD Panels included in those modules.

211. Defendants' bilateral discussions extended to other mobile wireless handset manufacturers that requested a single price for LCD modules that included both a TFT-LCD Panel and an STN-LCD Panel. **REDACTED**

46

212. Thus, because a number of mobile wireless handsets, including the Motorola Razr phone, included both TFT-LCD Panels and STN-LCD Panels, and because mobile wireless handset manufacturers often requested a single price for LCD modules that included both types of panels, defendants' bilateral discussions and agreements with respect to TFT-LCD panel prices inevitably included and/or affected the prices of STN-LCD panels in those modules.

2.     The Structure of the LCD Panel Market Facilitated the Inflation of Prices of STN-LCD Panels As Well As TFT-LCD Panels

213. At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels and STN-LCD Panels were close substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for similar uses—i.e., display purposes—in mobile wireless handsets and other LCD Products that included small displays. At other times during the Conspiracy Period, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for use in notebook computers.

214. At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels, CSTN-LCD Panels, and MSTN-LCD Panels were substitutes for each other. At these points during the Conspiracy Period, all three panels were purchased for display applications in mobile wireless handsets and other LCD Products that included small displays.

215. During the Conspiracy Period, purchasers of LCD Panels often switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels. **REDACTED**

Because handset manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, defendants knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of

47

1   STN-LCD panels as well. In fact, defendants often monitored the price delta between TFT-LCD

2   Panels and STN-LCD Panels and discussed maintaining a constant price delta between TFT-LCD

3   Panels and STN-LCD panels.

4       216. Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and

5   purchasers of LCD panels switched purchases between the two technologies, from at least 2001

6   through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very

7   closely, as seen in the chart below:



19       217. Defendants understood that they could profitably raise prices of STN-LCD Panels

20   in response to increases in TFT-LCD Panel prices. **REDACTED**

23       218. Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD

24   Panels and MSTN-LCD Panels, were substitutes in certain LCD Products at certain points during

25   the Conspiracy Period, and because defendants collectively controlled a significant share of the

26   market for LCD panels, both globally and in the United States, defendants had the incentive and

27   ability to inflate the prices STN-LCD Panels as well as TFT-LCD Panels. The conspiracy's

28   success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and *vice versa*.

48

**E.     EFFECT ON UNITED STATES COMMERCE AND INJURY TO CIRCUIT CITY**

219. Defendants' illegal conduct involved United States import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by United States retailers.

220. The United States LCD market is enormous and was a major focus of and very important to the conspiracy. Measured by value, defendants and others shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Conspiracy Period for ultimate sale to consumers in the United States. During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion. Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period. As a result, a substantial portion of defendants' revenues were derived from the United States market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle United States customer accounts and the United States market for LCD Panels and LCD Products.

221. Because of the importance of the United States market to defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct. Defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce that lead directly into the United States. Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1   This conduct by defendants was meant to produce and did in fact produce a substantial effect in

2   the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

3        222.  During the Conspiracy Period, every defendant shipped LCD Panels directly into

4   the United States.

5        223.  When high-level executives based at defendants' Asian headquarters agreed on

6   prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold

7   in the United States. Moreover, because LCD Panels are—and were throughout the Conspiracy

8   Period—the most expensive and significant component of LCD Products, defendants knew that

9   price increases for LCD Panels would necessarily result in increased prices for LCD Products sold

10  in the United States. Many defendants manufactured LCD Products and sold them in the United

11  States. In fact, defendants routinely monitored the effect their price-fixing had on the prices of

12  such LCD Products sold in the United States.

13       224.  Defendants also monitored the prices for LCD Products sold in the United States,

14  which they often referred to as "street prices," because defendants were aware that the conspiracy

15  would elevate those prices in addition to the prices of LCD Panels. In addition, defendants used

16  LCD Product pricing in the United States as a benchmark for establishing, organizing, and

17  tracking their price-fixing of LCD Panels.

18       225.  Defendants have acknowledged that their commercial activities involving

19  intentionally sending LCD Panels and LCD Products into the United States impacted United

20  States import trade and import commerce. In a series of complaints filed with the United States

21  International Trade Commission over the past few years, Defendants Samsung and Sharp have

22  both alleged infringing conduct based on "[t]he importation into the United States, sale for

23  importation into the United States, and/or sale after importation in the United States of . . . LCD

24  devices" by the other (and by other entities on its behalf). *See in the Matter of Certain Liquid

25  Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631,

26  Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the

27  Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for

28  Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30,

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Sale*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

226.  Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce. Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

227.  For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States.

## F.    DEFENDANTS' PARTICIPATION IN CALIFORNIA

228.  Many defendants conducted operations in California throughout the Conspiracy Period, including Defendants Samsung, LG, Toshiba, Epson, AU Optronics, Chi Mei, Chunghwa, Tatung, and NexGen Mediatech. Through their California operations, defendants implemented their price-fixing conspiracy in the United States. In fact, Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation specifically admitted during their hearings that acts in furtherance of the conspiracy were carried out within California. Defendants' employees based in California engaged in bilateral and multilateral communications in furtherance of the conspiracy.

229.  Defendants also used their California operations to implement their price-fixing agreements in the United States. Through their activities in California, defendants successfully increased the price of LCD Panels.

230.  **REDACTED**

51

231. **REDACTED**

232. **REDACTED**

233. **REDACTED**

52

234. Other defendants also engaged in conduct in furtherance of the conspiracy in California to fix the price of small LCD Panels used in mobile wireless handsets and other portable devices. Defendant LG Display America, Inc. maintained its offices in San Jose, California. LG Display America, Inc. has admitted that it participated in the conspiracy to fix prices of LCD Panels. LG Display employees responsible for LG Display's negotiations with and sales to mobile wireless handset manufacturers were located in the San Jose, California office.

235. Toshiba maintained offices in San Jose, California. Toshiba personnel in its San Jose, California offices were involved in and implemented defendants' conspiracy in the United States. **REDACTED**

236. Sharp also maintained offices in San Jose, California. Sharp personnel in its San Jose, California office were involved in and implemented defendants' conspiracy in the United States. **REDACTED**

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1

2

3

4     237.  Epson maintained offices in San Jose, California. Epson personnel in its San Jose,

5  California office were involved in and implemented defendants' conspiracy in the United States.

6  **REDACTED**

7

8

9

10

11

12

13        **G.      DEFENDANTS' ACTIVE CONCEALMENT**

14        238.  Circuit City and Circuit City Trust did not discover and could not have discovered

15  through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until

16  after December 2006, after the investigations by the DOJ and other antitrust regulators became

17  public, because defendants and their co-conspirators actively and fraudulently concealed the

18  existence of their contracts, combinations and/or conspiracies. Because defendants' agreements,

19  understandings and conspiracies were kept secret, Circuit City and Circuit City Trust were

20  unaware of defendants' unlawful conduct alleged herein and did not know that Circuit City was

21  paying artificially high prices for LCD Products.

22        239.  As alleged above, defendants had secret discussions about price and output, and

23  agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top

24  executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their

25  arrivals and departures at such meetings to avoid being seen in public with each other and with the

26  express purpose and effect of keeping them secret. Moreover, when the participants in those

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

1  meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-
2  on-one in the so-called Round Robin meetings.

3      240.  Moreover, defendants repeatedly gave pretextual justifications for the inflated
4  prices of LCD Panels in furtherance of the conspiracy.

5      241.  There have been a variety of other purportedly market-based explanations for price
6  increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for
7  NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices
8  will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of
9  LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor
10  Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

11      242.  Another false rationale provided by defendants was undercapitalization. In 1999,
12  Joel Pollack, a marketing manager for Sharp, stated: "Prices have dropped at a steady rate over the
13  past couple of years to the point where it was difficult to continue the necessary level of
14  capitalization. The [low prices] have starved the industry."

15      243.  A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee,
16  CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's
17  capacity because each display used more square inches of motherglass substrate.

18      244.  Increased demand was repeatedly cited by defendants, throughout the Conspiracy
19  Period, as the reason for high LCD Panel prices. On February 4, 2001, Bruce Berkoff, Executive
20  Vice-President at LG Philips, was quoted in News.com as saying that price increases were due to
21  shortages. He claimed, "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an
22  executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to
23  increased demand for the holiday season. In 2005, Koo Duk-Mo also stated "[w]e are seeing much
24  stronger demand for largesize LCD televisions than expected, so LCD TV supply is likely to
25  remain tight throughout the year."

26      245.  Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU
27  Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan
28  Economic News in October 2001. They blamed "component shortages due to the late expansion of

55

5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

246.  These explanations were all pretextual, and each served to cover up the conspiracy. As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Circuit City Trust's claims. Unbeknownst to Circuit City and Circuit City Trust, the prices Circuit City paid for LCD Products were artificially inflated as a result of the defendants' and their co-conspirators' illegal agreements to sell price-fixed LCD Panels.

## VIII.   CIRCUIT CITY'S INJURY

247. Circuit City suffered direct, substantial, and reasonably foreseeable injuries as purchasers of LCD Products as a result of defendants' and their co-conspirators' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels. Defendants' conspiracy inflated the price of LCD Panels incorporated into LCD Products, causing Circuit City to pay higher prices than it would have in the absence of defendants' and their co-conspirators' conspiracy.

248. In some cases, Circuit City purchased LCD Products directly from defendants at prices that were artificially inflated as a result of the conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels. In other cases, Circuit City purchased LCD Products from LCD Product OEMs, which in turn purchased LCD Panels from defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of LCD Panels purchased by those OEMs, which paid higher prices for LCD Panels than they would have absent the conspiracy.

249. The LCD Product OEMs passed on to their customers, including Circuit City, overcharges caused by defendants' and their co-conspirators' conspiracy. Circuit City was not able to pass on to its customers the overcharge caused by defendants' and their co-conspirators' conspiracy. Thus, Circuit City suffered injury when it purchased LCD Products from the OEMs.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

250. Once an LCD Panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. LCD Panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of an LCD Product. Thus, LCD Panels follow a physical chain from defendants through manufacturers of LCD Products sold to Circuit City.

251. The market for LCD Panels and the market for LCD Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

252. The LCD Product OEMs' demand for LCD Panels was relatively inelastic, because there were no reasonable substitutes for LCD Panels to serve as the visual display for products such as mobile wireless handsets, desktop computer monitors, televisions, and notebook computers. The other principal flat panel display technology, plasma, is too big, consumes too much power and is too fragile to be of any practical application in such LCD Products. Other competing display technologies, such as OLED displays, were not available during the Conspiracy Period and are only today becoming widely available. In addition, throughout the Conspiracy Period, defendants and their co-conspirators controlled the market for LCD Panels. Consequently, during the Conspiracy Period, the LCD Product OEMs had no choice but to purchase LCD Panels from defendants and others at prices that were artificially inflated, fixed, and stabilized by defendants' and their co-conspirators' conspiracy.

253. As a result, Circuit City was injured in connection with its purchases of LCD Products from defendants and others during the Conspiracy Period.

IX. **VIOLATIONS ALLEGED**

**FIRST CLAIM FOR RELIEF:**
**VIOLATIONS OF THE SHERMAN ACT**

254. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255. Beginning at a time presently unknown to Circuit City Trust, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

unknown to Circuit City Trust, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

256. In formulating and carrying out the alleged agreements, understandings, and conspiracies, defendants and their co-conspirators unlawfully restrained trade and damaged the competitive process by engaging in the following anticompetitive acts:

A.      fixing, raising, maintaining and stabilizing the price of LCD Panels;

B.      allocating markets for LCD Panels among themselves;

C.      submitting rigged bids for the award and performance of certain LCD Panel contracts; and

D.      allocating among themselves the production of LCD Panels.

257. The combinations and conspiracies alleged herein has had the following effects, among others:

A.      price competition in the sale of LCD Panels was restrained, suppressed, and/or eliminated throughout the United States and the world;

B.      prices for LCD Panels sold by defendants, their co-conspirators, and others were fixed, raised, maintained and stabilized at artificially high, supracompetitive levels throughout the United States and the world;

C.      prices for LCD Products containing LCD Panels have been fixed, raised, maintained and stabilized at artificially high, supracompetitive levels throughout the United States and the world; and

D.      those who purchased LCD Panels produced by defendants, their coconspirators, and others and LCD Products containing such LCD Panels were deprived of the benefits of free and open competition.

258. Circuit City was injured in its business and property by being forced to pay more for LCD Products it purchased containing LCD Panels manufactured by defendants than it would have paid in the absence of the combination and conspiracy.

58

259. Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable adverse effect on U.S. domestic and import trade or commerce. That injury to trade and commerce and to competition directly resulted in the injuries suffered by Circuit City, and so gives rise to the antitrust claims that Circuit City Trust asserts herein. As a result, Circuit City (and so the Circuit City Trust) has suffered injury as a direct, proximate and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels. Circuit City was injured in its business and property by paying more for LCD Products containing price-fixed LCD Panels than it would have paid in the absence of the combination and conspiracy.

260. Because Circuit City Trust has suffered injury as a direct, proximate and foreseeable result of defendants' conspiracy to fix the price of LCD Panels, Circuit City Trust is entitled to an award of treble damages, and awards of all other relief provided by Section 4 of the Clayton Act, 15 U.S.C. § 15. Circuit City Trust's claim for violations of the Sherman Act relates to purchases Circuit City made directly from defendants, their co-conspirators, and defendants' and their co-conspirators' parent companies, subsidiaries, divisions, affiliates, agents, joint ventures, companies that any defendant or co-conspirator owned or controlled, and companies that owned or controlled any defendant or co-conspirator. Circuit City Trust asserts claims under the Sherman Act for those purchases that are considered direct under the circumstances of this case and not those that are considered indirect.

## SECOND CLAIM FOR RELIEF:
### VIOLATIONS OF THE CALIFORNIA CARTWRIGHT ACT

261. Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262. Defendants' contracts, combinations, trusts or conspiracies were entered in, carried out, effectuated and perfected within the State of California, and defendants' conduct within California injured Circuit City.

263. During the Conspiracy Period, Circuit City conducted a substantial volume of business in California. Circuit City sold LCD Products to customers in California through its retail

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

stores and through its website and the Internet. Circuit City also received shipments of and took title to LCD Products at artificially-inflated prices because of defendants' price fixing conspiracy at Circuit City's distribution centers in Walnut, California, Livermore, California, and Long Beach, California, and therefore purchased the products in California. In addition, Circuit City maintained California inventories of LCD Products manufactured and sold by defendants, their co-conspirators, and others, and operated distribution centers, offices and retail stores in California. As a result of Circuit City's presence in California and the substantial business it conducted in California, Circuit City Trust is entitled to the protection of the laws of California.

264.  Defendants engaged in and participated in the conspiracy through their offices and operations in California. Defendants LG Display, Chungwa and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were carried out in California. Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and Toshiba all maintained offices in California during the Conspiracy Period. Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels. Defendants also participated in the conspiracy in the United States through their California offices by providing information obtained through meetings with other defendants to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including manufacturers of LCD Products that were purchased by Circuit City in the United States. Defendants' conduct within California thus injured Circuit City in California and throughout the United States.

265.  Beginning at a time currently unknown to plaintiff, but at least as early as January 1, 1996, and continuing thereafter at least up to December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce, as described above, by acting to fix, raise, stabilize, and maintain prices of, and allocate markets for, LCD Panels and LCD Products at supracompetitive levels. Such conduct violates Section 16720 of the California Business and Professions Code.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

266.  For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of LCD Panels; (2) allocating among themselves the production of LCD Panels and markets for LCD Panels; and (3) submitting rigged bids for the award and performance of certain LCD Panels contracts.

267. The combinations and conspiracies alleged herein have had, *inter alia*, the following effects: (a) price competition in the sale of LCD Panels and LCD Products has been restrained, suppressed, and/or eliminated in the State of California; (b) prices for LCD Panels and LCD Products sold by defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California and throughout the United States; and (c) those who purchased LCD Panels and LCD Products directly or indirectly from defendants and their coconspirators have been deprived of the benefit of free and open competition.

268.  As a direct and proximate result of defendants' unlawful conduct, Circuit City was injured in its business and property in that it paid more for LCD Products than it otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Section 16720 of the California Business and Professions Code, Circuit City Trust seeks, *inter alia,* treble damages and its cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

### THIRD CLAIM FOR RELIEF:
### VIOLATIONS OF THE CALIFORNIA CONSUMER PROTECTION
### AND UNFAIR COMPETITION LAWS

269.  Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270.  Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the California state consumer protection and unfair competition statutes listed below.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

271.  Defendants' business acts and practices were carried out, effectuated, and perfected within the State of California, and defendants' conduct injured Circuit City in California and elsewhere.

272.  Beginning on a date unknown to Circuit City Trust, but at least as early as January 1, 1996, and continuing thereafter at least up through the filing of this Complaint, defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

273.  This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

274.  Defendants' conduct as alleged herein clearly violated Section 17200. The acts, omissions, misrepresentations, practices and nondisclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

275.  Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

276.  Defendants' acts or practices were and are unfair to consumers of LCD Panels and LCD Products in the State of California within the meaning of Section 17200, California Business and Professions Code; and

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

277.  Defendants' acts and practices were and are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

278.  Circuit City Trust is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

279.  The unlawful and unfair business practices of defendants, and each of them, as described above, caused Circuit City to pay supracompetitive and artificially-inflated prices for LCD Products. Circuit City suffered injury in fact, and lost money or property, as a result of such unfair competition.

280.  The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

281.  As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Circuit City Trust is accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

**FOURTH CLAIM FOR RELIEF:**
**RESTITUTION AND UNJUST ENRICHMENT UNDER CALIFORNIA LAW**

282.  Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

283.  Beginning on a date unknown to Circuit City Trust, but at least as early as January 1, 1996, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for LCD Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

**FIFTH CLAIM FOR RELIEF:**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILLINOIS CODE 10/1 *ET SEQ.***

284.  Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

285.  Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of LCD Panels and LCD Products in Illinois and fixing, raising, maintaining and stabilizing LCD Panel and LCD Product prices in Illinois at artificially high, noncompetitive levels.

286.  Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

287.  During the Conspiracy Period, Circuit City received shipments of and took title to LCD Products at artificially-inflated prices because of defendants' price fixing conspiracy at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois. Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the LCD Products ordered by Circuit City until it received and accepted shipments of those LCD Products at its Marion Illinois Distribution Center.

288.  During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois. Circuit City sold LCD Products and other products at its retail stores in Illinois and on the Internet to Illinois customers. In addition, Circuit City maintained in Illinois inventories of LCD Products manufactured and sold by defendants, their co-conspirators, and others. As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and,

289.  As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for LCD Products purchased in Illinois from defendants, their co-conspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

64

## X.     PRAYER FOR RELIEF

WHEREFORE, the Circuit City Trust requests:

A.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

    i.      A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

    ii.     An unreasonable restraint of trade or commerce in violation of the California Cartwright Act, as alleged in the Complaint; and

    iii.    In violation of California's Unfair Competition and Consumer Protection Laws; and

    iv.     In violation of the Illinois Antitrust Act.

B.      That Circuit City Trust recover treble its actual damages, as provided by the applicable federal and state laws, and that a judgment be entered in favor of the Circuit City Trust against defendants, jointly and severally, in such amount;

C.      That Circuit City Trust obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the state of California so permit;

D.      That Circuit City Trust recover damages and/or all other available monetary and equitable remedies available under the California Cartwright Act, California's Unfair Competition and Consumer Protection Laws, and California common law;

E.      That Circuit City Trust recover damages and/or all other available monetary and equitable remedies available under the Illinois Antitrust Act;

F.      That Circuit City Trust be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate for the largest term permitted by law or equity;

G.      That Circuit City Trust recover its costs of suit, including reasonable attorneys' fees, as provided by law; and,

H.      That Circuit City Trust be awarded such other, further, and different relief as law and equity may require, and that the Court may deem just and proper in these circumstances.

65

1  **XI.**     <u>**JURY DEMAND**</u>

2         Pursuant to Federal Rules of Civil Procedure Rule 38(b), plaintiff Circuit City Trust hereby

3  requests a trial by jury as to all issues so triable.

4

5  Dated: July 7, 2011

6                         Respectfully Submitted By:

7

8                         */s/ Rachel S. Black*

9                        Parker C. Folse III (*pro hac vice*)
                      Rachel Black (*pro hac vice*)

10                       Jordan Connors (*pro hac vice*)
                      SUSMAN GODFREY LLP

11                       1201 Third Avenue, Suite 3800
                      Seattle, Washington 98101-3000

12                       Telephone:     (206) 516-3880
                      Facsimile:      (206) 516-3883

13                       pfolse@susmangodfrey.com
                      jconnors@susmangodfrey.com

14

15                       H. Lee Godfrey (*pro hac vice*)
                      Kenneth S. Marks (*pro hac vice*)

16                       SUSMAN GODFREY LLP
                      1000 Louisiana Street, Suite 5100

17                       Houston, Texas 77002-5096
                      Telephone:     (713) 651-9366

18                       Facsimile:      (713) 654-6666
                      lgodfrey@susmangodfrey.com

19                       kmarks@susmangodfrey.com

20                       David H. Orozco (220732)
                      SUSMAN GODFREY LLP

21                       1901 Avenue of the Stars, Suite 950
                      Los Angeles, California 90067-6029

22                       Telephone:     (310) 789-3100
                      Facsimile:      (310) 789-3150

23                       dorozco@susmangodfrey.com

24                       *Attorneys for Alfred H. Siegel, as Trustee of*
                      *the Circuit City Stores, Inc. Liquidating Trust*

25

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES
Case No. 10-cv-5625 SI

## DECLARATION OF SERVICE

I, Jami Grounds, declare as follows:

I am employed in the County of King, State of Washington; I am over the age of eighteen years and am not a party to this action; my business address is 1201 Third Avenue, Suite 3800, Seattle, Washington, 98101, in said County and State. On July 7, 2011, I served the within:

### SECOND AMENDED COMPLAINT FOR DAMAGES [REDACTED]

to all named counsel of record as follows:

**X**    **BY ECF (ELECTRONIC CASE FILING)**: I e-filed the above-detailed documents utilizing the United States District Court, Northern District of California's mandated ECF (Electronic Case Filing) service on July 7, 2011. Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the documents upon confirmation of e-filing.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 7, 2011, at Seattle, Washington.

_____
Jami Grounds

DECLARATION OF SERVICE
Case No. 10-cv-5625 SI