Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-622-4750
Facsimile: 213-622-2690
Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile: 202-628-5116
Email:  jhoward@crowell.com
            jmurphy@crowell.com

*Counsel for Plaintiffs*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br><br>This Document Relates to<br>Case No. 09-cv-4997-SI<br><br>————————————————<br><br>AT&T MOBILITY LLC; AT&T CORP.; AT&T SERVICES, INC.; BELLSOUTH TELECOMMUNICATIONS, INC.; PACIFIC BELL TELEPHONE COMPANY; AT&T OPERATIONS, INC.; AT&T DATACOMM, INC.; SOUTHWESTERN BELL TELEPHONE COMPANY,<br><br>                Plaintiffs,<br><br>        v.<br><br>AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHIMEI INNOLUX CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.;  SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO. LTD.; SAMSUNG SDI AMERICA, | MASTER FILE No. 07-m-1827 SI<br>CASE No. 09-cv-4997 SI<br>MDL No. 1827<br><br><br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><br>**DEMAND FOR JURY TRIAL** |

1  INC.; SANYO CONSUMER ELECTRONICS
   CO. LTD.; SHARP CORPORATION; SHARP
   ELECTRONICS CORPORATION; TOSHIBA
2  CORPORATION; TOSHIBA AMERICA
   ELECTRONICS COMPONENTS, INC.;
3  TOSHIBA MOBILE DISPLAY
   TECHNOLOGY CO., LTD.; TOSHIBA
4  AMERICA INFORMATION SYSTEMS, INC.,

5                        Defendants.

6

7         Plaintiffs AT&T Mobility LLC ("AT&T Mobility"), AT&T Corp., AT&T Services, Inc.,

8  Bellsouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc.,

9  AT&T Datacomm, Inc., and Southwestern Bell Telephone Company (plaintiffs other than AT&T

10 Mobility are hereinafter referred to as "AT&T") for their Third Amended Complaint against all

11 defendants named herein, hereby allege as follows:

12 **I.       INTRODUCTION**

13        1.        AT&T Mobility sells mobile wireless handsets and wireless telecommunications

14 services to millions of customers throughout the United States.  From 1996 to 2006 ("the

15 Conspiracy Period"), AT&T Mobility purchased billions of dollars worth of mobile wireless

16 handsets in the United States for resale to its customers.  All of the mobile wireless handsets

17 AT&T purchased contained liquid crystal display panels ("LCD Panels").

18        2.        Since 2001, AT&T Mobility purchased mobile wireless handsets containing LCD

19 Panels in Memphis, Tennessee, where it maintained its central distribution center and received

20 mobile wireless handsets shipped to Tennessee by its vendors.  Before 2001, AT&T Mobility

21 purchased mobile wireless handsets containing LCD Panels at regional distribution centers

22 located in Illinois and New York, where it received mobile wireless handsets shipped to those

23 states by its vendors.

24        3.        From at least January 1, 1996 through at least December 11, 2006 ("the

25 Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other

26 communications in the United States and abroad, defendants and their co-conspirators conspired

27 with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels,

28 including LCD Panels included in mobile wireless handsets sold to AT&T Mobility.  Because

1  the U.S. market for LCD Panels and products containing those panels has always been one of the

2  largest and most-profitable markets for defendants and their co-conspirators, defendants

3  purposely fixed prices to unlawfully maintain and increase their profits from sales to customers

4  in the U.S.

5        4.    During the Conspiracy Period, LCD Panels used in hand-held devices such as

6  mobile wireless handsets included different technologies:  thin film transistor panels ("TFT-LCD

7  Panels") and super-twist nematic panels ("STN-LCD Panels").  STN-LCD Panels included both

8  color super-twist nematic ("CSTN-LCD Panels") panels, and monochrome super-twist nematic

9  ("MSTN- LCD Panels") panels.  Defendants' conspiracy involved both TFT-LCD Panels and

10  STN-LCD Panels.  Defendants engaged in meetings, discussions and exchanges of competitive

11  price information regarding both TFT-LCD panels and STN-LCD Panels.

12        REDACTED

13

14        5.    AT&T Mobility, as one of the largest wireless telecommunications providers in

15  the U.S. and one of the most significant purchasers of mobile wireless handsets, helped increase

16  consumer demand in the U.S. for mobile wireless handsets during the Conspiracy Period and

17  thus demand for LCD panels manufactured by defendants.  AT&T Mobility served as one of the

18  principal distribution channels for mobile wireless handsets for the U.S. market.  Defendants

19  knew that AT&T Mobility was among the most important purchasers of mobile wireless

20  handsets containing the LCD Panels they manufactured, and that the LCD Panels they price

21  fixed would end up in mobile wireless handsets purchased by AT&T Mobility in the U.S.

22  Defendants analyzed the impact that increases in the number of AT&T Mobility subscribers

23  would have on defendants' sales of LCD Panels for mobile wireless handsets that they knew

24  would be purchased by AT&T Mobility in the United States.  Defendants were thus aware that

25  AT&T Mobility would be affected by their conspiracy to fix the price of LCD Panels, and would

26  suffer injury in the U.S. when it purchased handsets containing defendants' LCD Panels.

27        6.    Defendant Samsung Electronics Co. Ltd ("Samsung") sold both mobile wireless

28  handsets and small LCD Panels used in mobile wireless handsets to customers in the United

1   States, including AT&T Mobility.  LG Electronics, Inc., one of the two founders and the largest

2   owner of defendant LG Display, Inc., also sold mobile wireless handsets in the United States to

3   AT&T Mobility.  Both Samsung and LG Electronics, Inc., through their corporate affiliates in

4   the United States, negotiated supply agreements with AT&T Mobility and quoted prices to

5   AT&T Mobility for mobile wireless handsets in the United States, with the knowledge that the

6   price of those handsets were artificially inflated as a result of defendants' conspiracy to fix the

7   price of LCD panels in those handsets.

8      7. At least seven LCD Panel manufacturers have admitted in criminal proceedings to

9   participating in this conspiracy and carrying out this conspiracy in the United States and

10   California: defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG

11   Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging

12   Devices Corporation, Chi Mei Optoelectronics Corporation and HannStar Display Corporation.

13   On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp

14   Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585

15   million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or

16   about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a

17   $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  On or

18   about December 9, 2009, Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics

19   Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the

20   conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead

21   guilty and pay a $30 million criminal fine for its role in the conspiracy.

22      8. Defendants engaged in conspiratorial conduct both within and outside the United

23   States.  Defendants' conduct in the United States was centered in California.  Defendants LG

24   Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd.,

25   and Epson Imaging Devices Corporation all admitted during their plea hearings that acts in

26   furtherance of the conspiracy were carried out within California.  Each agreed that: "Acts in

27   furtherance of this conspiracy were carried out within the Northern District of California.  TFT-

28   LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this

1   District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5;

2   Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4.  Defendant

3   LG Display America, Inc., which admitted to participating in the conspiracy, maintains its

4   principal place of business in San Jose, California.  Similarly, defendants Chunghwa Picture

5   Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation,

6   which also admitted to participating in the conspiracy, used California corporations with

7   principal places of business in Long Beach, California (defendants Tatung Company of America,

8   Inc., Epson Electronics America, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as

9   their sales agents in the United States for LCD Products containing LCD Panels which were

10  affected by the conspiracy.  Many of the other defendants also maintained offices and operations

11  in California during the Conspiracy Period, including AU Optronics Corporation America, Inc.,

12  Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic

13  Components, Inc., and Toshiba America Information Systems, Inc.

14         9.      Defendants engaged in and implemented their conspiracy in the U.S. through the

15  offices they maintained in California.  Defendants' employees in their California offices engaged

16  in communications and meetings with other defendants to exchange price and supply information

17  and reach agreements regarding LCD Panel prices to be charged to their customers in the U.S.

18  and elsewhere.  Defendants' employees in California also received information from their

19  counterparts elsewhere regarding the substance of defendants' agreements with respect to LCD

20  Panel prices and supply, and were instructed to use this information in the course of price

21  negotiations with customers in the United States.  Defendants' California offices were thus the

22  means through which they implemented their conspiracy in the United States.  Defendants,

23  including Samsung, used their employees in their California offices to implement their price

24  fixing agreements with respect to small LCD Panels used in mobile wireless handsets, including

25  mobile wireless handsets purchased by AT&T Mobility.

26         10.     As a result of defendants' conspiracy to fix the price of LCD Panels, the prices of

27  these handsets containing LCD Panels also were artificially inflated.  Defendants' conspiracy

28  also artificially inflated the price of LCD Panels incorporated into the LCD Products AT&T

Mobility purchased for its own internal use during the Conspiracy Period, such as desktop computer monitors and notebook computers, and therefore artificially inflated the price of such LCD Products.  AT&T Mobility thus suffered damages as a result of defendants' conspiracy, and brings this action to recover the overcharges paid for the mobile wireless handsets and other LCD Products it purchased during the Conspiracy Period.

11.     AT&T is a provider of voice and data communications services, including traditional local and long-distance voice services, internet access services, private enterprise network services, and other telecommunications services.  One of the AT&T companies which was injured as a result of the conspiracy is Pacific Bell Telephone Company, a California corporation, which has provided voice and data telecommunications services to the vast majority of the people of California for nearly a century.  During the Conspiracy Period, AT&T purchased LCD Products, such as desktop computer monitors and notebook computers, for its own internal use.  Defendants' conspiracy raised the price of the LCD Panels incorporated into these LCD Products and therefore artificially inflated the price of the LCD Products.  AT&T thus suffered damages as a result of defendants' conspiracy and brings this action to recover the overcharges paid for LCD Products during the Conspiracy Period.

12.     AT&T Mobility and AT&T bring this action seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under Section 4 of the Clayton Act, California's Cartwright Act, and other state laws identified herein, as well as to recover the costs of suit, including reasonable attorneys fees, for the injuries that AT&T Mobility and AT&T suffered as a result of defendants' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

## II.     <u>JURISDICTION AND VENUE</u>

13.     AT&T Mobility brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages for its direct purchases of LCD Panels from certain defendants.  In addition, AT&T Mobility and AT&T bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all defendants.

14.     AT&T Mobility and AT&T also bring this action pursuant to Section 47-25-101 *et seq.* of the Tennessee Code; Section 16750(a) of the California Business and Professions Code (the "Cartwright Act"); Section 44-1401 *et seq.* of the Arizona Revised Statutes; Section 28-4501 *et seq.* of the District of Columbia Code; the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*; Section 553.1 *et seq.* of the Iowa Code; Section 50-101 *et seq.* of the Kansas Statutes; Section 1101 *et seq.* of 10 Maine Rev. Stat.; Section 445.771 *et seq.* of the Michigan Compiled Laws; Section 325D.50 *et seq.* of the Minnesota Statutes; Section 75-21-1 *et seq.* of the Mississippi Code; Section 59-801 *et seq.* of the Nebraska Revised Statutes; Section 598A *et seq.* of the Nevada Revised Statutes; Section 57-1-1 *et seq.* of the New Mexico Statutes; Section 340 *et seq.* of the New York General Business Law; Section 75-1 *et seq.* of the North Carolina Gen. Stat.; Section 51-08.1-01 *et seq.* of the North Dakota Cent. Code; Section 37-1 *et seq.* of the South Dakota Codified Laws; Section 47-18-1 *et seq.* of the West Virginia Statutes; and Section 133.01 *et seq.* of the Wisconsin Statutes for injunctive relief and treble damages sustained by AT&T Mobility and AT&T as a result of their purchases of mobile wireless handsets, desktop monitors and notebook computers at artificially-inflated prices as a result of defendants' conspiracy to fix the price of LCD-Panels.  AT&T Mobility's and AT&T's claims also bring claims pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "Unfair Competition Act").

15.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over AT&T Mobility's and AT&T's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  The Court has supplemental jurisdiction over AT&T Mobility's and AT&T's claims under the laws of Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin.  AT&T Mobility's and AT&T's state law claims are so related to their claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

16.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin.  This effect gives rise to AT&T Mobility's and AT&T's antitrust claims.  During the Conspiracy Period, defendants' conspiracy affected the price of LCD Panels and LCD Products AT&T Mobility and AT&T purchased in the United States.  These LCD Products moved through, were sold in, or used in California and in each of the other states identified herein.

17.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each defendant conducts substantial business in the state of California, and a number of defendants maintain their headquarters in this District or elsewhere in California.  In addition, defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured LCD Panels and LCD Products for sale in the United States and California and several defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

18.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

19.     Because AT&T Mobility's and AT&T's action is related to the *In re TFT-LCD Antitrust Litigation* action, Case No. M:07-cv-1827 SI, the action will be assigned to the San Francisco division, Judge Susan Illston presiding.  This action concerns substantially the same parties, transactions and events as Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of defendants' conspiracy to fix the price of liquid

8

crystal display ("LCD") panels in violation of the Sherman Act and the laws of California and other states.  Pursuant to Pretrial Order #1 in M:07-cv-1827 SI, this case is automatically consolidated with M:07-cv-1827 SI for all pretrial proceedings without any further motion or order.

### III.   DEFINITIONS

20.    Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  As used herein, "LCD Panel" refers to both liquid crystal display panels and modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a mobile wireless handset, television, computer monitor, or other product.

21.    During the Conspiracy Period, LCD Panels used in hand-held devices included three different technologies:  thin film transistor panels ("TFT-LCD Panels"), color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels (collectively, "STN-LCD Panels").  The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

22.    As used herein, the term "LCD Products" means any product containing an LCD Panel, including, without limitation, mobile wireless handsets (including voice, data, and combination voice and data devices), computer monitors, notebook and laptop computers, and televisions ("TVs").

23.    As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

24.    As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

IV.     **THE PARTIES**

    A.     **Plaintiffs**

        1.     **AT&T Mobility**

        25.     AT&T Mobility is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard in Atlanta, Georgia.  AT&T Mobility is a wholly-owned subsidiary of AT&T Inc.  AT&T Mobility is one of the largest national providers of mobile wireless telecommunications services in the United States, with over 78 million subscribers and a wireless network providing nationwide wireless coverage.  Before 2007, AT&T Mobility was named Cingular Wireless LLC ("Cingular").  During the Conspiracy Period, AT&T Mobility purchased mobile wireless handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others.  As a result of defendants' conspiracy, AT&T Mobility, has been injured in its business and property because the prices it paid for such LCD Products were artificially inflated by defendants' conspiracy.

        26.     During and after the Conspiracy Period, AT&T Mobility acquired or received the stock of companies that also purchased mobile wireless handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others.  As a result of defendants' conspiracy, these companies were injured in their business and property because the prices they paid for mobile wireless handsets and other LCD Products were artificially inflated by defendants' conspiracy.  By acquiring or receiving a contribution of the stock of companies that purchased mobile wireless handsets and other LCD Products containing LCD Panels, AT&T Mobility obtained all claims and rights under federal and state laws to recover any overcharges suffered by those companies.  As used herein, "AT&T Mobility" refers to AT&T Mobility LLC, f/k/a Cingular Wireless LLC, as well as any company that purchased mobile wireless handsets during the Conspiracy Period whose stock was later acquired or obtained by AT&T Mobility LLC.

        2.     **AT&T**

        27.     AT&T Inc. is a holding company organized under the laws of Delaware and having its principal place of business in Dallas, Texas.  AT&T Inc. is the parent corporation of

the following subsidiaries and affiliates:  AT&T Corp., a corporation organized under the laws of New York and having its principal place of business in Bedminster, New Jersey; AT&T Services, Inc., f/k/a SBC Services, Inc., a corporation organized under the laws of Delaware and having its principal place of business in Dallas, Texas; BellSouth Telecommunications, Inc., a corporation organized under the laws of Georgia and having its principal place of business in Atlanta, Georgia; Pacific Bell Telephone Company, a corporation organized under the laws of California and having its principal place of business in San Francisco, California; AT&T Operations, Inc., f/k/a SBC Operations, Inc., a corporation organized under the laws of Delaware and having its principal place of business in San Antonio, Texas; AT&T DataComm, Inc. f/k/a SBC DataComm, Inc., a corporation organized under the laws of Delaware and having its principal place of business in Chicago, Illinois; and Southwestern Bell Telephone Company, a corporation organized under the laws of Missouri and having its principal place of business in Dallas, Texas.  These entities are collectively referred to as "AT&T."

28.     During the Conspiracy Period, each of the entities described in the preceding paragraph purchased LCD Products, including desktop computer monitors and notebook computers, that contained LCD Panels affected by defendants' price fixing conspiracy.

29.     During the Conspiracy Period, BellSouth Affiliates Services Corp., a corporation organized under the laws of Georgia, BellSouth Technology Group, Inc., a corporation organized under the laws of Georgia, and BellSouth Technology Services, Inc., a corporation organized under the laws of Georgia, purchased LCD Products that contained LCD Panels affected by defendants' conspiracy.  Since the end of the Conspiracy Period, plaintiff AT&T Services, Inc. has acquired all rights of each of these entities, including all rights under federal and state antitrust laws, to recover overcharges arising from purchases of LCD Products that contained LCD Panels affected by defendants' conspiracy.  Also during the Conspiracy Period, Southwestern Bell Telephone L.P., a limited partnership organized under the laws of Texas, purchased LCD Products that contained LCD Panels affected by defendants' conspiracy.  Since the end of the Conspiracy Period, plaintiff Southwestern Bell Telephone Company has acquired all rights of Southwestern Bell Telephone L.P., including all rights under federal and state

1  antitrust laws to recover overcharges arising from the purchases of LCD Products that contained

2  LCD Panels affected by defendants' conspiracy.

3        30.     Throughout the Conspiracy Period, AT&T conducted a substantial amount of

4  business in California.  Plaintiff Pacific Bell Telephone Company provided local exchange

5  telecommunications services throughout California and maintained its headquarters in San

6  Francisco for nearly 100 years.  In addition, AT&T provided various wireline

7  telecommunications services to consumers, businesses and government customers in many of the

8  other states listed herein, where AT&T employees used notebook computers and desktop

9  monitors purchased by AT&T.

10  **B.**    **Defendants**

11      **1.**    **AU Optronics**

12        31.     Defendant AU Optronics Corporation is one of the world's largest manufacturers

13  of LCD Panels, with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park,

14  Hsinchu 30078, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed,

15  sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

16        32.     Defendant AU Optronics Corporation America, Inc. is a wholly-owned and

17  controlled subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at

18  9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and

19  Cupertino, California.  During the Conspiracy Period, said defendant manufactured, marketed,

20  sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

21        33.     Defendants AU Optronics Corporation and AU Optronics Corporation America,

22  Inc. are referred to collectively herein as "AU Optronics."  The AU Optronics companies were

23  members of the conspiracy that is the subject of this Complaint by virtue of their participation in

24  the conspiracy through the actions of their respective officers, employees, and representatives

25  acting with actual or apparent authority.  Alternatively, defendant AU Optronics Corporation

26  America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy

27  Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1  dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities

2  and used that domination or control to charge artificially high prices for LCD Panels.

3            **2.    Chi Mei**

4            34.    Defendant Chi Mei Corporation is another of the world's largest manufacturers of

5  LCD Panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te,

6  Tainan 717, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed,

7  sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

8            35.    Defendant Chimei Innolux Corporation is another of the largest manufacturers of

9  LCD Panels, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site,

10  Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan..  Chimei Innolux Corporation is the survivor

11  of a three-way merger of Chi Mei Optoelectronics Corporation, Innolux Display Corporation,

12  and TPO Displays Corporation, through exchanges of shares.  TPO Display Corp. and Chi Mei

13  Optoelectronics Corporation were dissolved after the merger.  Prior to the merger, Chi Mei

14  Optoelectronics Corporation was a wholly-owned subsidiary of Chi Mei Corporation, with its

15  global headquarters at  No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih

16  Township, Tainan County, 74147 Taiwan.  Innolux Display Corporation was a former LCD

17  panel manufacturer, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan

18  Site, Hsinchu Science Park, Chu-Nan, Miao-Li, Taiwan.  During the Conspiracy Period, Chimei

19  Innolux Corporation's predecessor corporations, Chi Mei Optoelectronics Corporation, Innolux

20  Display Corporation, and TPO Displays Corporation marketed, sold, and/or distributed LCD

21  Panels and/or LCD Products throughout the United States and elsewhere.

22            36.    Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display

23  Technology USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Corporation,

24  with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California.  During the

25  Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels

26  incorporated into LCD Products sold in the United States.

27            37.    Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd. is a

28  subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu

1  Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan.  During the Conspiracy Period, said

2  defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

3  Products sold in the United States.

4      38.    Defendant Nexgen Mediatech, Inc. ("Nexgen") is a wholly-owned and controlled

5  subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St.,

6  Jen Te Village Jen Te, Tainan 717 Taiwan.  During the Conspiracy Period, said defendant

7  marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics

8  Corporation in the United States.

9      39.    Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a wholly-owned and

10  controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East

11  Johnson Drive, City of Industry, California.  During the Conspiracy Period, said defendant

12  marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics

13  Corporation in the United States.

14      40.    Defendants Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei

15  Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA are referred to

16  collectively herein as "Chi Mei."  The Chi Mei companies were members of the conspiracy that

17  is the subject of this Complaint by virtue of their participation in the conspiracy through the

18  actions of their respective officers, employees, and representatives acting with actual or apparent

19  authority.  Alternatively, defendants Chimei Innolux Corporation (through its predecessor Chi

20  Mei Optoelectronics Corporation), Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd.,

21  Nexgen, and Nexgen USA were members of the conspiracy by virtue of their status during the

22  Conspiracy Period as the alter egos or agents of Chi Mei Corporation.  Chi Mei Corporation

23  dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA,

24  Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA regarding conspiracy activities and used

25  that domination or control to charge artificially high prices for LCD Panels.

26      **3.    Epson**

27      41.    Defendant Epson Imaging Devices Corporation ("Epson Japan") has its

28  principal place of business at 4F Annex, World Trade Center Building, 2-4-1

14

Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  The company was originally

formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd.

but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December

28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.

During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or

distributed LCD Panels and/or LCD Products throughout the United States and

elsewhere.

42.    Defendant Epson Electronics America, Inc. ("Epson America") is a

wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place

of business is at 2580 Orchard Parkway, San Jose, California.  During the Conspiracy

Period, Epson America sold and distributed LCD Products containing LCD Panels

manufactured by Epson Japan to customers in the United States.

43.    Defendants Epson Japan and Epson America are referred to collectively herein as

"Epson."  The Epson companies were members of the conspiracy that is the subject of this

Complaint by virtue of their participation in the conspiracy through the actions of their respective

officers, employees, and representatives acting with actual or apparent authority.  Alternatively,

defendant Epson America was a member of the conspiracy by virtue of its status during the

Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or

controlled Epson America regarding conspiracy activities and used that domination or control to

charge artificially high prices for LCD Panels and LCD Products.

### 4.    <u>Chunghwa</u>

44.    Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa") is a leading manufacturer

of LCD Panels, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.

Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and

information technology company based in Taiwan.  Chunghwa's Board of Directors includes

representatives from Tatung Company.  The Chairman of Chunghwa, Weishan Lin, is also the

Chairman and General Manager of the Tatung Company.  During the Conspiracy Period, said

1   defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

2   Products sold in the United States.

3          45.     Defendant Tatung Company of America, Inc. ("Tatung America") is a California

4   corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

5   California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company

6   owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the

7   daughter of Tatung Company's former Chairman, T.S. Lin.  During the Conspiracy Period,

8   Tatung America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes,

9   Ltd. to customers throughout the United States.

10         46.     Defendants Chunghwa and Tatung America are referred to collectively herein as

11  "Chunghwa."  During the Conspiracy Period, Chunghwa and Tatung were closely affiliated,

12  commonly owned, controlled and dominated by Tatung Corporation, and functioned as a single

13  enterprise and/or alter egos.

14               **5.     HannStar**

15         47.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

16  with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.

17  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed

18  LCD Panels incorporated into LCD Products sold in the United States.

19               **6.     LG Display**

20         48.     Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd. is a leading

21  manufacturer of LCD Panels and is a joint venture created in 1999 by defendants Royal Philips

22  Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. maintains offices within this

23  District in San Jose, California and has its principal place of business located at 20 Yoido-dong,

24  Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  During the Conspiracy Period, said

25  defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

26  Products sold in the United States.

27         49.     Defendant LG Display America, Inc. f/k/a/ LG Philips LCD America, Inc. is

28  located at 150 East Brokaw Rd., San Jose, CA 95112.  During the Conspiracy Period, said

16

1   defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

2   Products sold in the United States.

3       50.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to

4   collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG Display America,

5   Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions

6   of their respective officers, employees, and representatives acting with actual or apparent

7   authority.  Alternatively, defendant LG Display America, Inc. was a member of the conspiracy

8   by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co.,

9   Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding

10  conspiracy activities and used that domination or control to charge artificially high prices for

11  LCD Panels.

12          **8.    <u>Samsung</u>**

13      51.     Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building,

14  250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, said

15  defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold

16  in the United States.

17      52.     Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled

18  subsidiary of defendant Samsung Electronics Company, Ltd with its principal place of business

19  at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, said

20  defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold

21  in the United States.

22      53.     Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled

23  subsidiary of Samsung Electronics Co., Ltd., with its principal place of business at 3655 North

24  First Street, San Jose, California 95134.  During the Conspiracy Period, said defendant

25  manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products

26  sold in the United States.

27      54.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

28  and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."  Defendants

1    Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung

2    Semiconductor, Inc. were members of the conspiracy that is the subject of this Complaint by

3    virtue of the actions of their respective officers, employees, and representatives acting with

4    actual or apparent authority.  Alternatively, defendants Samsung Electronics America, Inc. and

5    Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during

6    the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd.  Samsung

7    Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung

8    Semiconductor, Inc. regarding conspiracy activities and used that domination or control to

9    charge artificially high prices for LCD Panels.

10                       **9.    <u>Samsung SDI</u>**

11            55.    Defendant Samsung SDI Co., Ltd. ("Samsung SDI") has its principal place of

12   business at 673-7 Maetan-dong, Youngton-gu, Suwon, Republic of Korea.  Defendant Samsung

13   Electronics Co., Ltd. holds a controlling interest in Samsung SDI Co., Ltd.  During the

14   Conspiracy Period, Samsung SDI Co., Ltd. manufactured, marketed, sold and/or distributed LCD

15   Panels and/or LCD Products throughout the United States and elsewhere.

16            56.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a wholly-

17   owned and controlled subsidiary of Samsung SDI Co., Ltd.  Its principal place of business is 333

18   Michelin Drive, Suite 700, Irvine, California 92618.  During the Conspiracy Period, Samsung

19   SDI America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products

20   throughout the United States and elsewhere.

21            57.    Defendants Samsung SDI Co., Ltd., and Samsung SDI America, Inc. are referred

22   to collectively herein as "Samsung SDI."  They participated in the conspiracy through the actions

23   of their respective officers, employees, and representatives acting with actual or apparent

24   authority.  Alternatively, defendant Samsung SDI America, Inc. was a member of the conspiracy

25   as the alter ego or agent of Samsung SDI Co., Ltd.  Samsung SDI Co., Ltd. dominated or

26   controlled Samsung SDI America, Inc. regarding conspiracy activities and used that domination

27   or control to charge artificially high prices for LCD Panels and/or LCD Products.

28

10. **Sanyo**

58.     Defendant Sanyo Consumer Electronics Co., Ltd, formerly known as Tottori Sanyo Electric Co. (also known as "Torisan") is a Japanese company with its principal place of business at 101, 7-Chome, Tachikawa-Cho, Tottori-City, Tottori, 680-0061, Japan.  Prior to 2004, co-conspirator Sanyo Electric Co., Ltd., owned and operated Sanyo Consumer Electronics Co., Ltd.  In October 2004, Seiko Epson Corporation and Sanyo Electric Co., Ltd. (including its subsidiary Sanyo Consumer Electronics Co., Ltd.) formed a joint venture company, Sanyo Epson Imaging Devices Corporation.  This joint venture was formed from a combination of Seiko Epson's D-TFD LCD and STN LCD businesses and Sanyo's LTPS TFT LCD and amorphous silicon TFT LCD businesses.  After the Conspiracy Period, Sanyo Epson Imaging Devices Corporation became Epson Imaging Devices Corporation, also a defendant.  During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

59.     Defendants Sanyo Consumer Electronics Co., Ltd. is referred to herein as "Sanyo."  It participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority.  During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. was closely affiliated, commonly owned, controlled and dominated by co-conspirator Sanyo Electric Co., Ltd., and functioned as a single enterprise and/or alter egos.  Sanyo Consumer Electronics Co., Ltd. is a wholly-owned subsidiary of Sanyo Electric Co., Ltd., a consolidated consumer electronics and information technology company based in Japan.

11. **Sharp**

60.     Defendant Sharp Corporation, is located at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

61.     Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah,

New Jersey, 07430.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

62.     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp."  Defendants Sharp Corporation and Sharp Electronics Corporation were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 12.   <u>Toshiba</u>

63.     Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

64.     Defendant Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display Technology Co., Ltd. is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

65.     Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, CA 92612.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

66.     Defendant Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc. with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information Systems, Inc. manufactured, marketed, sold and/or distributed LCD Products in the United States.

67.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."  Defendants Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

## C.     **Co-Conspirators**

68.     The actions in this Complaint were authorized, ordered, or done by defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

69.     Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made by its parent company.

70.     Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd., NEC LCD Technologies, Ltd. ("NEC"), IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

71.     The acts charged in this Complaint have been done by defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

72.     Each defendant named herein acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels made by its parent company.

**V.      AT&T's PURCHASES OF LCD PANELS AND LCD PRODUCTS**

73.     During the Conspiracy Period, AT&T Mobility purchased billions of dollars of mobile wireless handsets that contained LCD panels manufactured by defendants.  Defendants' conspiracy artificially inflated the prices of the LCD panels contained in these mobile wireless handsets.  AT&T Mobility suffered injury caused by the conspiracy when it purchased mobile wireless handsets from defendants, their affiliates and other manufacturers of mobile wireless handsets.

74.     Beginning in 2001, AT&T Mobility purchased mobile wireless handsets, which contained LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy, in Memphis, Tennessee, where it received mobile wireless handsets shipped to its Memphis, Tennessee central distribution center by its handset vendors.  Under AT&T Mobility's contracts with its handset vendors, AT&T Mobility did not acquire title to the mobile wireless handsets ordered by AT&T Mobility until it received and accepted shipments of those handsets at its Memphis, Tennessee central distribution center. From this central distribution center, AT&T Mobility shipped mobile wireless handsets to its company-owned retail stores, authorized sales agents, and national retail chains.  It also shipped mobile wireless handsets direct to the consumer from its distribution center through online and mail-order sales

75.     Before 2001, AT&T Mobility purchased mobile wireless handsets, which contained LCD Panels manufactured by defendants and sold at artificially-inflated prices

1   because of defendants' price fixing conspiracy, at regional distribution centers in Illinois and

2   New York, where it received mobile wireless handsets shipped to those distribution centers by its

3   handset vendors.  AT&T Mobility shipped mobile wireless handsets from these regional

4   distribution centers to its company-owned retail stores, authorized sales agents, and national

5   retail chains, as well as directly to consumers.

6       76.     Throughout the Conspiracy Period, AT&T Mobility maintained in each of the

7   states where it operated company-owned retail stores and sold to authorized sales agents,

8   including in Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine,

9   Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina,

10  North Dakota, South Dakota, West Virginia, and Wisconsin inventories of mobile wireless

11  handsets that it purchased and received from the handset vendors at its distribution centers.

12  During the Conspiracy Period, AT&T Mobility's policy was to maintain mobile wireless

13  handsets amounting to at least 17 days worth of sales in each retail location.

14      77.     During the Conspiracy Period, AT&T Mobility also purchased LCD Products,

15  including notebook computers and desktop monitors containing LCD Panels manufactured by

16  defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

17  During the Conspiracy Period, AT&T Mobility purchased LCD Products at its offices and

18  facilities in Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine,

19  Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina,

20  North Dakota, South Dakota, West Virginia, and Wisconsin, where it received LCD Products

21  shipped and/or delivered by its vendors.

22      78.     During the Conspiracy Period, Plaintiff AT&T Corp. purchased LCD Products,

23  including notebook computers and desktop monitors containing LCD Panels manufactured by

24  defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

25  During the Conspiracy Period, AT&T Corp. purchased LCD Products at its offices and facilities

26  in Arizona, California, District of Columbia, Illinois, Kansas, New Mexico, New York, North

27  Carolina, and Tennessee, where it received LCD Products shipped and/or delivered by its

28  vendors.

1        79.      During the Conspiracy Period, Plaintiff AT&T Services, Inc. purchased LCD

2    Products, including notebook computers and desktop monitors containing LCD Panels

3    manufactured by defendants and sold at artificially-inflated prices because of defendants' price

4    fixing conspiracy.  During the Conspiracy Period, AT&T Services, Inc. purchased LCD Products

5    in California, Illinois, Kansas, Michigan, Nevada and Wisconsin, where AT&T Services, Inc.

6    and its affiliates received LCD Products shipped and/or delivered at their offices and facilities in

7    those states.

8        80.      During the Conspiracy Period, Plaintiff BellSouth Telecommunications, Inc.

9    purchased LCD Products, including notebook computers and desktop containing LCD Panels

10   manufactured by defendants and sold at artificially-inflated prices because of defendants' price

11   fixing conspiracy.  During the Conspiracy Period, BellSouth Telecommunications, Inc.

12   purchased LCD Products at its offices and facilities in Mississippi, North Carolina and

13   Tennessee, where it received LCD Products shipped and/or delivered by its vendors.

14       81.      During the Conspiracy Period, Plaintiff Pacific Bell Telephone Company

15   purchased LCD Products, including notebook computers and desktop monitors containing LCD

16   Panels manufactured by defendants and sold at artificially-inflated prices because of defendants'

17   price fixing conspiracy.  During the Conspiracy Period, Pacific Bell Telephone Company

18   purchased LCD Products at its offices and facilities in California and Nevada, where it received

19   LCD Products shipped and/or delivered by its vendors.

20       82.      During the Conspiracy Period, Plaintiff AT&T Operations, Inc. purchased LCD

21   Products, including notebook computers and desktop monitors containing LCD Panels

22   manufactured by defendants and sold at artificially-inflated prices because of defendants' price

23   fixing conspiracy.  During the Conspiracy Period, AT&T Operations, Inc. purchased LCD

24   Products in California, Illinois, Kansas, Michigan, Nevada and Wisconsin, where AT&T

25   Operations, Inc. and its affiliates received LCD Products shipped and/or delivered by its vendors

26   at their offices and facilities in those states.

27       83.      During the Conspiracy Period, Plaintiff AT&T DataComm, Inc. purchased LCD

28   Products, including notebook computers and desktop monitors containing LCD Panels

manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, AT&T DataComm, Inc. purchased LCD Products in California, Illinois, Kansas, Michigan, Nevada and Wisconsin, where AT&T DataComm, Inc. received LCD Products shipped and/or delivered by its vendors at its offices and facilities in those states.

84.     During the Conspiracy Period, Plaintiff Southwestern Bell Telephone Company purchased LCD Products, including notebook computers and desktop monitors containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, Southwestern Bell Telephone Company purchased LCD Products at its offices and facilities in Kansas, where it received LCD Products shipped and/or delivered by its vendors.

## VI.     THE MARKET FOR LCD PANELS AND LCD PRODUCTS

85.     During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels in the United States through and into interstate and foreign commerce, including through California, Tennessee and other states.

86.     During the Conspiracy Period, defendants collectively controlled the market for LCD Panels, both globally and in the United States.

87.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  Defendants' business activities substantially affected trade and commerce within each of the 50 states, insofar as defendants' conspiracy artificially inflated the prices of LCD Products sold in all 50 states, and so caused antitrust injury in each of those states.

88.     LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.  LCD Panels were the principal form of display screen used in desktop computer monitors, laptop computers and mobile wireless handsets during the Conspiracy Period.

89.     LCD Panels have no independent utility, and have value only as components of LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook

1  computer displays and TVs.  The demand for LCD Panels thus derives directly from the demand

2  for LCD Products.

3         90.    The market for LCD Panels is enormous, in part because of the extraordinarily

4  high demand for mobile wireless handsets and other LCD Products.  For example, demand for

5  mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide

6  shipments of mobile wireless handsets totaled approximately 100 million units.  This number

7  ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets

8  drove a similar increase in the demand for LCD Panels during the Conspiracy Period.  Shipments

9  of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in

10  2001 to over a billion panels in 2006.

11         91.    The market for LCD Panels and LCD Products, such as mobile wireless handsets,

12  desktop computer monitors, notebook computers and televisions, are inextricably linked and

13  intertwined because the LCD Panel market exists to serve the markets for LCD Products.  The

14  market for LCD Panels and for LCD Products are, for all intents and purposes, inseparable in

15  that one would not exist without the other.

16         92.    AT&T Mobility participated in the market for LCD Panels during the Conspiracy

17  Period through its purchases of mobile wireless handsets, notebook computers and desktop

18  computer monitors containing LCD Panels at artificially inflated prices caused by defendants'

19  conspiracy.

20         93.    AT&T participated in the market for LCD Panels through its purchases of desktop

21  computer monitors and notebook computers containing LCD Panels at artificially inflated prices

22  caused by defendants' conspiracy.

23  **VII.**    **DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS IN THE UNITED STATES AND THEY PARTICIPATED IN PRICE FIXING**

24              **MEETINGS OVERSEAS TO INCREASE THE PRICE OF LCD PANELS SOLD**

25              **IN THE UNITED STATES**

26         94.    During the Conspiracy Period, the United States was the world's largest consumer

27  of LCD Products and U.S. companies like Motorola, Dell, Apple and HP were among the largest

28  purchasers of LCD Panels.  Defendants were aware that AT&T Mobility, as a wireless

26

1  telecommunications provider, was one of the largest purchasers of mobile wireless handsets

2  containing LCD Panels in the U.S.  When defendants conspired to fix in the U.S. the prices of

3  LCD Panels sold to manufacturers of mobile wireless handsets, defendants knew that those

4  panels would be incorporated into mobile wireless handsets that AT&T purchased in the United

5  States.  REDACTED

6

7

8       95.      Defendants also analyzed how AT&T Mobility's and other wireless

9  telecommunications providers' purchases of mobile wireless handsets would impact the demand

10  for and supply of LCD panels.

11            REDACTED

12

13

14                                                                                    Defendants

15  thus knew that their conspiracy to fix the price of LCD Panels would affect AT&T Mobility's

16  purchases of mobile wireless handsets in the U.S.

17       96.      Samsung actively solicited AT&T Mobility's business in the United States and

18  sold mobile wireless handsets to AT&T Mobility in the United States with the knowledge that

19  the prices of mobile wireless handsets were artificially inflated by defendants' conspiracy to fix

20  the price of LCD Panels.  Samsung established sales offices and sales agents in the United States

21  for the purpose of negotiated supply agreements and marketing and selling mobile wireless

22  handsets that contained LCD Panels manufactured by Samsung and its co-conspirators.  LG

23  Electronics, one of the two founders and the largest owner of defendant LG Display, Inc., also

24  solicited AT&T Mobility's business in the United States and sold mobile wireless handsets in the

25  United States to AT&T Mobility.  Like Samsung, LG Electronics established sales offices and

26  sales agents in the United States, including sales offices focused on LG Electronics' business

27  with AT&T Mobility, for purposes of negotiated supply agreements and marketing and selling

28  mobile wireless handsets that contained LCD Panels manufactured by LG Display, Samsung and

1   their co-conspirators.  Both Samsung and LG Electronics, Inc., through their corporate affiliates

2   in the United States, quoted prices to AT&T Mobility for mobile wireless handsets in the United

3   States, with the knowledge that the price of those handsets were artificially inflated as a result of

4   defendants' conspiracy to fix the price of LCD panels in those handsets.

   A.   **Defendants Engaged in Bilateral and Multi-lateral Meetings and**
        **Communications With Competitors To Inflate Prices of LCD Panels and**
        **LCD Products**

7       97.    The defendants conspired to raise the prices of LCD Panels sold into the United

8   States.  The LCD Panel conspiracy alleged herein was effectuated through a combination of

9   group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California

10  and elsewhere in the United States.  Defendants' conspiracy included agreements to raise fix,

11  raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.

12  Defendants fostered a culture of corruption within their companies whereby employees at every

13  level—from the very top executive all the way to lower-level sales representatives—engaged in

14  frequent and continuous communications with the employees at every level of their competitors.

15  Defendants' senior executives at made it clear to their subordinates that they were required to

16  engage in these illegal exchanges of supply, production, and pricing information as a part of their

17  employment.  The lower-level employees funneled the competitive information up to their

18  superiors who utilized that information—along with the pricing information they, themselves,

19  were able to collect through their own illegal competitor contacts—to set prices for LCD Panels

20  at artificially-inflated levels.  The constant communications at all levels allowed defendants to

21  conspire to set average prices across the entire industry, as well as conspire to fix the prices of

22  the particular LCD Panels sold to specific U.S. customers, such as Motorola, Dell, Hewlett-

23  Packard, Apple, and others.

     1.   **Defendants engaged in illegal communications about pricing in the**
          **U.S.**

26      98.  REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

99. REDACTED

100. REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

101.    For OEMs in the United States, such as Motorola, SonyEricsson, Palm and other manufacturers of mobile wireless handsets, defendants' U.S. affiliates led the LCD Panel price negotiations with those OEMs.  Pricing directions came from Asia, where the defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the defendants' conspiracy meetings and conspiracy communications took place in the U.S., involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and U.S. OEMs.  Defendants' conspiratorial conduct also included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, the Defendants' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products, such as mobile wireless handsets.   The Defendants conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

**2.    Defendants engaged in illegal communications about pricing with respect to small panels**

102.    As part of the larger conspiracy to raise the price of LCD Panels, defendants engaged in bilateral communications specifically regarding prices for small LCD Panels used in mobile devices and two-way radios.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers.

103.    These bilateral communications between defendants routinely involved LCD Panels used in mobile wireless devices and other handheld products.  Examples include:

- REDACTED

1

2

3

4

5

6

7    • REDACTED

8

9

10

11

12

13    • REDACTED

14

15

16

17

18    • REDACTED

19

20

21

22    • REDACTED

23

24

25

26    • REDACTED

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1

2

3      • REDACTED

4

5

6

7           **3.      Defendants engaged in illegal bilateral and multilateral**
8           **communications about the pricing of TFT-LCD Panels and STN-LCD**
            **Panels**

9           104.    In the early years of the conspiracy, beginning in at least 1996, representatives of

10    the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix the prices for

11    LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD

12    Panels each would produce.

13          105. REDACTED

14

15

16          106.    Later in 1998, high level representatives at various LCD manufacturers, including

17    Sharp, Toshiba, Samsung, NEC, LG Electronics, and Mitsubishi, met to discuss projected sales

18    volumes.    REDACTED

19                                            The companies agreed that they needed additional meetings to

20    head off the projected higher level of competition between the companies.

21                REDACTED

22

23

24          107.    Representatives from Samsung, NEC, Sharp, Hitachi, Mitsubishi, and LG met

25    again later in 1998 to again discuss their projected sales plans to limit competition between them.

26                REDACTED

27

28

1

2

3      108.    Beginning in 1999, high level representatives of Samsung met with counterparts

4  at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.

5      109.  REDACTED

6

7

8

9

10     110. REDACTED

11

12

13

14

15

16     111. REDACTED

17

18

19     112.    By 2001, Sharp employees were engaging in bilateral discussions with

20  competitors to share price information for both TFT-LCD Panels and STN-LCD Panels used for

21  mobile wireless handset applications.

22            REDACTED

23

24     113.    Other defendants initiated similar discussions regarding the prices of STN-LCD

25  Panel in furtherance of the conspiracy.

26            REDACTED

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

114. REDACTED

115.     From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production.  The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants during this period.  The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and in California and elsewhere in the United States on a regular basis throughout this period.

116.     The Crystal Meetings were highly organized and followed a set pattern.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.  As described below, the conspiracy also included "working level" meetings and communications.

117.     The "CEO" meetings occurred quarterly from approximately 2001 to 2006.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review.  Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

118.    The structure of "Commercial" meetings was largely the same as "CEO" meetings.  These meetings took place more frequently than "CEO" meetings and occurred approximately monthly.

119.    During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and thereafter reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels.  Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

120.    During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreement concerning the amounts each would produce.  Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

121.    The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal.  The purpose of the "Working Level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority, which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

122.    Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and Samsung attended multiple CEO, Commercial and working-level meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001 and 2006.  Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings.  At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.

123.    During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings.  Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with

35

non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings.  Participants at the Crystal meetings contacted Japanese defendants (such as Sharp and Toshiba) to relay the agreed-upon pricing and production limitations.  Some of these meetings and communications took place in the U.S. and specifically targeted U.S. commerce and U.S. OEMs.

124. REDACTED

125. REDACTED

126. REDACTED

• REDACTED

• REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

B.     **Defendants' Participation in the Conspiracy in California**

127.    Many defendants conducted operations in California throughout the Conspiracy Period, including defendants Samsung, LG, Toshiba, Epson, AU Optronics, Chi Mei, Chunghwa, Tatung, and NexGen Mediatech.  Through their California operations, defendants implemented their price-fixing conspiracy in the United States.  In fact, defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation specifically admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Defendants' employees based in California engaged in bilateral and multilateral communications in furtherance of the conspiracy.

128.    Defendants also used their California operations to implement their price-fixing agreements in the United States.  Through their activities in California, defendants' successfully increased the price of LCD-Panels, including the price of LCD-Panels sold to customers in the U.S. that manufactured mobile wireless handsets, which raised the price of mobile wireless handsets purchased by AT&T Mobility.

129.  REDACTED

130.  REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

131. REDACTED

132. REDACTED

133. REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1

2

3    134. REDACTED

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    135. REDACTED

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

136.   REDACTED

C.   **Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the U.S. and for Fixing the Price of LCD Panels and LCD Products Sold in the U.S.**

137.   In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed for the first time that officials from the Korea Fair Trade Commission and Japan Fair Trade Commission visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

138.   On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

139.   At least one defendant has approached the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the Department of Justice, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in defendants' price-fixing conspiracy.  The DOJ's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from

1   the other defendants to this action.  However, a number of defendants and their executives have

2   pleaded guilty to price fixing, as alleged more fully herein.

3       140.    Defendant Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics,

4   has admitted and pleaded guilty to participating in the conspiracy from September 2001 to

5   December 2006 to fix the price of LCD Panels sold worldwide, including the United States and

6   California in particular, and to participating in meetings, conversations and communications in

7   Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and

8   exchanging pricing and sales information for the purpose of monitoring and enforcing adherence

9   to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics has agreed to

10  pay a criminal fine of $220 million.

11      141.    Defendant LG Display has admitted and pleaded guilty to participating in the

12  conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold

13  worldwide, including the United States and California in particular, and to participating in

14  meetings, conversations and communications in Taiwan, South Korea and the United States to

15  discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging

16  pricing and sales information for the purpose of monitoring and enforcing adherence to the

17  agreed-upon prices.  LG Display also admitted that acts in furtherance of the conspiracy to fix

18  the price of LCD Panels were carried out in California.  In connection with its guilty plea, LG

19  Display has agreed to pay a fine of $400 million, reported at the time as the second-highest

20  criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the

21  conspiracy.

22      142.    Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to

23  participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the

24  United States and California in particular, from September 2001 through June 2006.

25  Specifically, Mr. Chung admitted that he participated in meetings, conversations and

26  communications in Taiwan, South Korea and the United States to discuss the prices of LCD

27  Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price

28  quotations in accordance with the agreements reached, exchanged pricing and sales information

1    for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized,

2    ordered, and consented to the participation of subordinate employees in the conspiracy.  In

3    connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a

4    criminal fine of $25,000.

5        143.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in

6    the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and

7    California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon

8    admitted that he participated in meetings, conversations and communications in Taiwan, South

9    Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD

10   Panels at certain predetermined levels, issued price quotations in accordance with the agreements

11   reached, exchanged pricing and sales information for the purpose of monitoring and enforcing

12   adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation

13   of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has

14   agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

15       144.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales

16   Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of

17   LCD Panels sold worldwide, including the United States and California in particular, from

18   December 2001 through December 2005.  Specifically, Mr. Koo has been charged with

19   participating in meetings, conversations and communications in Taiwan, South Korea and the

20   United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place

21   in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at

22   certain predetermined levels, issuing price quotations in accordance with the agreements

23   reached, exchanging pricing and sales information for the purpose of monitoring and enforcing

24   adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of

25   subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold

26   at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal

27   the conspiracy and his conspiratorial contacts.

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

145.     Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  Chunghwa also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

146.     In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin also pleaded guilty to participating in the conspiracy from September 2001 through December 2006.  Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with their guilty plea, Mr. Lin has agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

147.     In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005.  Specifically, Mr. Lin and Mr. Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations

1    in accordance with the agreements reached, exchanging pricing and sales information for the

2    purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering,

3    and consenting to the participation of subordinate employees in the conspiracy, accepting

4    payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in

5    the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

6        148.    Defendant Sharp has admitted and pleaded guilty to participating in the

7    conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April

8    2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to

9    Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings,

10   conversations and communications in Japan and in the United States with unnamed co-

11   conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels,

12   agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the

13   purpose of monitoring and enforcing adherence to the agreed-upon prices.  Sharp admitted that

14   acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in

15   California.  Defendant Sharp participated in multiple Working Level meetings, as well as

16   bilateral discussions with other defendants, during which it discussed and reached agreements

17   with other defendants on prices for LCD Panels during the Conspiracy Period.  AT&T Mobility

18   purchased handsets from Motorola that contained LCD Panels for which Sharp admittedly fixed

19   the prices.

20       149.    Defendant Sharp also participated in multiple bilateral discussions with other

21   defendants, including Toshiba and Epson, during the Conspiracy Period.  Through these

22   discussions, Sharp agreed on prices, price increases, production quotas and production limits for

23   LCD Panels.  Because Toshiba and Epson were Sharp's primary competitors in the sale of LCD

24   Panels used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of

25   LCD Panels incorporated into such handsets – as Sharp admitted it did in its guilty plea – unless

26   it reached agreements with Toshiba and Epson to do the same.

27       150.    Defendant Epson Japan has admitted and pleaded guilty to participating in

28   the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to

1    Motorola and agreed to pay a criminal fine of $26 million.  Epson Japan has admitted to

2    participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels,

3    and to participating in meetings, conversations and communications in Japan and the

4    United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD

5    Panels, and exchanging pricing and sales information for the purpose of monitoring and

6    enforcing adherence to the agreed-upon prices.  During the Conspiracy Period, Motorola

7    was one of AT&T Mobility's largest suppliers of mobile wireless handsets.

8         151.    Defendant Epson America is a wholly-owned and controlled subsidiary of

9    co-conspirator Epson Japan.  At one of the bilateral meetings described above, Epson

10   Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui").  At that meeting,

11   Mitsui served as an agent of, and under the direction of, both Epson Japan and Epson

12   America.  Epson Japan and Epson America, through their agent, were parties to the

13   agreements made at those meetings and acted as co-conspirators.  In addition, to the

14   extent Epson America sold or distributed LCD Products, it played a significant role in the

15   conspiracy because defendants wished to ensure that the prices for such products did not

16   undercut the pricing agreements reached at these various meetings.  Thus, Epson America

17   was an active, knowing participant in the alleged conspiracy, and acted as Epson Japan's

18   agent for selling LCD Products in the United States.

19        152.    Defendant Toshiba also participated in the conspiracy by entering into

20   joint ventures and other arrangements to manufacture or source LCD Panels with one or

21   more defendant that attended the Crystal Meetings.  The purpose and effect of these joint

22   ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of

23   such panels at unreasonably high levels and to aid, abet, notify and facilitate the

24   implementation of the price-fixing and production-limitation agreements reached at the

25   meetings.  During the Conspiracy Period, Toshiba sought and formed strategic

26   partnerships with other LCD manufacturers that allowed it to easily communicate and

27   coordinate prices and production levels with other manufacturers as part of the overall

28   conspiracy alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a

manufacturing joint venture.  In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations.  In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations.  In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.  The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

153.    Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co., Ltd. ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005.  Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

154.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

155.    Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001.  Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan agreed on prices and supply levels for LCD Panels.

156.    Co-conspirator NEC participated in meetings or discussions during the Conspiracy Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.

157.    Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above.

1     As a result, IPS Alpha was represented at those meetings and was a party to the agreements

2     entered into by its joint venture partners at these meetings.  As explained above, the agreements

3     at these meetings included agreements on price ranges and output restrictions.  The joint venture

4     partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels

5     the joint ventures sold both to the joint venture partners and other non-affiliated companies.

6     Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

7         158.  When AT&T Mobility and AT&T refer to a corporate family or companies by a

8     single name in their allegations of participation in the conspiracy, it is to be understood that they

9     are alleging that one or more employees or agents of entities within the corporate family engaged

10    in conspiratorial meetings on behalf of every company in that family.  In fact, the individual

11    participants in the conspiratorial meetings and discussions did not always know the corporate

12    affiliation of their counterparts, nor did they distinguish between the entities within a corporate

13    family.  The individual participants entered into agreements on behalf of, and reported these

14    meetings and discussions to, their respective corporate families.  As a result, the entire corporate

15    family was represented in meetings and discussions by their agents and were parties to the

16    agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

17    families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played

18    a significant role in the conspiracy because defendants wished to ensure that the prices for such

19    products paid by direct purchasers would not undercut the pricing agreements reached at these

20    various meetings.  Thus, all entities within the corporate families were active, knowing

21    participants in the alleged conspiracy.

22         **D.**     **Market Conditions Demonstrating the Conspiracy**

23         159.  Beyond the guilty pleas and the extensive evidence of the defendants'

24    wrongdoing produced by the defendants themselves, the market for LCD Panels provides further

25    evidence of defendants' collusive behavior.

26

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1          1.       **Structure of the LCD Panel Industry**

2          160.     The LCD Panel industry has several characteristics that facilitated a conspiracy to

3    fix prices, including high concentration, significant barriers to entry, homogeneity of products,

4    consolidation, multiple interrelated business relationships and ease of information sharing.

5          161.     The LCD Panel industry is highly concentrated and thus conducive to collusion.

6    Throughout the Conspiracy Period, defendants collectively controlled a significant share of the

7    market for LCD Panels, both globally and in the United States.

8          162.     The LCD industry is characterized by high barriers to entry.  New fabrication

9    plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and

10   intellectual property requirements require constant research and development and investment.

11   Thus, firms cannot enter the market for the production and sale of LCD Panels without an

12   enormous capital investment.

13         163.     LCD Panels, whether incorporated into mobile wireless handsets or desktop

14   monitors, notebook computers and TVs, are manufactured to a specific size, regardless of

15   manufacturer.  The manufacture of standard panel sizes for products containing LCD Panels

16   across the LCD Panel industry facilitates price transparency in the market for LCD Panels and

17   enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables

18   them to enforce their conspiracy.

19         164.     The LCD Panel industry has experienced significant consolidation during the

20   Conspiracy Period, as reflected by:

21         •        the 2001 creation of AU Optronics itself through the merger of Acer Display and

22                  Unipac Electronics;

23         •        the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity,

24                  defendant Toshiba Mobile Display Co., Ltd., in 2002;

25         •        the 2004 joint venture for the production of LCD Panels for televisions by

26                  Hitachi, Toshiba, and Matsushita;

27         •        the 2005 transfer of Fujitsu Limited's LCD business to Sharp;

28         •        the 2006 AU Optronics' acquisition of Quanta Display;

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

165.    Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels with the numerous meetings described hereinafter.

166.    There were many opportunities for defendants to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

### 2.    Pricing in the LCD Panel market indicates collusion by the defendants

167.    Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion.  Rather, the behavior of this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

168.    After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends.  However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

169.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

170.     The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

171.     Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity.  Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

172.     In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs.  However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity.  In fact, defendants had begun stabilizing and raising the prices.

173.     LCD Panel prices began to increase in early 1996.  Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . .  Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

174.     Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

175.     1996 also brought the advent of third generation fabs.  Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs.  LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai

was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops. Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

176. The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, *inter alia*, the fact that costs were decreasing. One of the most significant costs in producing an LCD Panel is the cost of its component parts. Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass. During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate. Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

177. During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased. Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

178. LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

179. At the time, defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement. When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

180.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc. posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT $19.7 billion in the first quarter, with pretax profit reaching about NT $2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT $800 million on revenue of about NT $8.8 billion at the same period.

181.    This increase in prices and revenue was unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics) rose 184% from the same period in 2001.

**E.**    **The Conspiracy's Effect on Earlier LCD Technologies**

182.    During the Conspiracy Period, LCD Panels used in certain applications, including notebook PCs and mobile wireless handsets, included both TFT-LCD Panels and STN-LCD Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.  Certain defendants, their corporate affiliates, and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels, including defendants Samsung, Sharp and Epson.  The same individuals at the defendants who were engaged in bilateral communications and group meetings regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

**1.**    **Defendants' Bilateral Communications Regarding STN-LCD Panels**

183.    Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Specifically, defendants engaged in bilateral discussions in which they exchanged information about STN-LCD Panel pricing, shipments, and production.  These discussions usually took place between sales and

marketing employees in the form of telephone calls, emails and instant messages.  The

information gained in these communications was then shared with supervisors and taken into

account in determining the price to be offered defendants' customers for STN-LCD Panels.

184. REDACTED

185. REDACTED

186. REDACTED

187. REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

188. REDACTED

189. REDACTED

190. REDACTED

191. REDACTED

192. REDACTED

193. REDACTED

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

194. REDACTED

195. REDACTED

196. REDACTED

**2.** **The Structure of the LCD Panel Market Facilitated the Inflation of Prices of STN-LCD Panels As Well As TFT-LCD Panels**

197.    At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels and CSTN-LCD Panels were close substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for similar uses – i.e., display purposes – in mobile wireless handsets and other LCD Products that included small displays.  At other times during the Conspiracy Period,

1    TFT-LCD Panels and CSTN panels were both purchased in significant quantities for use in

2    notebook PCs.

3          198.    At certain points during the Conspiracy Period, for certain applications in LCD

4    Panel Products, TFT-LCD Panels, CSTN-LCD Panels and MSTN-LCD Panels were substitutes

5    for each other.  At these points during the Conspiracy period, all three panels were purchased for

6    display applications in mobile wireless handsets and other LCD Products that included small

7    displays.

8          199.    During the Conspiracy Period, purchasers of LCD Panels sometimes switched

9    their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative

10   prices of TFT-LCD Panels and STN-LCD Panels.

                              REDACTED

11

12

13                                                                              Because handset

14   manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in

15   response to higher TFT-LCD Panel prices, defendants knew that in order to effectively fix, raise

16   and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix,

17   raise and maintain prices of STN-LCD panels as well. REDACTED

18

19

20         200.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and

21   purchasers of LCD panels switched purchases between the two technologies, from at least 2001

22   through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very

23   closely, as seen in the chart below:

24

25

26

27

28



201.    The defendants understood that they could profitably raise prices of STN-LCD Panels in response to increases in TFT-LCD Panel prices. REDACTED

202.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels were substitutes in certain LCD Products at certain points during the Conspiracy Period, and because defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, defendants had the incentive and ability to inflate the prices of STN-LCD Panels as well as TFT-LCD Panels.  The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and *vice versa*.

**F.**    **Conspiracy's Effect on U.S. Commerce**

203.    Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels to the facilities of foreign manufacturers, including manufacturers of mobile wireless handsets, knowing that they would subsequently be imported into the United States, one of their most important markets and a major source of their revenues.  In this respect, defendants directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the

1    United States market and inflating the prices of mobile wireless handsets and other LCD

2    Products AT&T Mobility and AT&T purchased in the United States.  Such conduct was meant to

3    produce and did in fact produce a substantial effect in the United States in the form of higher

4    prices being paid for such products by U.S. companies like AT&T Mobility and AT&T.

5         204.    The U.S. LCD market is enormous and was a major focus of the conspiracy.

6    Measured by value, defendants and others shipped during the Conspiracy Period more than 400

7    million LCD Panels, including those incorporated into LCD Products, into the United States for

8    ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of these LCD Panels

9    imported into the United States was in excess of $50 billion.  Defendants shipped millions of

10   LCD Products worth billions of dollars into the United States each year during the Conspiracy

11   Period.  As a result, a substantial portion of defendants' revenues was derived from the U.S.

12   market.  Defendants spent hundreds of millions of dollars on advertising their products in the

13   United States.  Most, if not all, defendants had marketing, sales, and account management teams

14   specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels

15   and LCD Products.

16        205.    During the Conspiracy Period, every defendant shipped LCD Panels directly into

17   the United States.

18        206.    Because of the importance of the U.S. market to defendants and their co-

19   conspirators, LCD Panels and LCD Products intended for importation into and ultimate

20   consumption in the United States were a focus of defendants' illegal conduct.  The defendants

21   knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of

22   commerce that lead directly into the United States.  Many LCD Panels were intended for

23   incorporation into finished products specifically destined for sale and use in the United States.

24   Furthermore, this conduct by defendants was meant to produce and did in fact produce a

25   substantial effect in the United States in the form of artificially-inflated prices for LCD Panels

26   and LCD Products.

27        207.    When high-level executives based at defendants' Asian headquarters agreed on

28   prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1     sold in the United States.  Moreover, because LCD Panels are – and were throughout the

2     Conspiracy Period – the most expensive and significant component of LCD Products, defendants

3     knew that price increases for LCD Panels would necessarily result in increased prices for LCD

4     Products sold in the United States.  Many defendants manufactured LCD Products and sold them

5     in the United States.  In fact, defendants routinely monitored the effect their price-fixing had on

6     the prices of such LCD Products sold in the United States.

7           208.    Defendants also monitored the prices for LCD Products sold in the United States,

8     which they often referred to as "street prices," because defendants were aware that the

9     conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition,

10     defendants used LCD Product pricing in the United States as a benchmark for establishing,

11     organizing, and tracking their price-fixing of LCD Panels.

12           209.    Defendants have acknowledged that their commercial activities involving

13     intentionally sending LCD Panels and LCD Products into the United States impacted American

14     import trade and import commerce.  In a series of complaints filed with the U.S. International

15     Trade Commission over the past few years, defendants Samsung and Sharp have both alleged

16     infringing conduct based on "[t]he importation into the United States, sale for importation into

17     the United States, and/or sale after importation in the United States of . . . LCD devices" by the

18     other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display*

19     *Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of

20     Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586*); In the Matter of Certain*

21     *Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*,

22     Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No.

23     2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the*

24     *Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1,

25     2009) (Docket No. 2698).

26           210.    Defendants who have entered guilty pleas in connection with the LCD conspiracy

27     have acknowledged that their illegal activities impacted imports into the United States and had a

28     substantial effect on American import trade and import commerce.  Those defendants have

1   expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more

2   of the conspirators to customers in [the Northern District of California]."

3        211.    For the reasons set forth above, defendants' illegal conduct involved import trade

4   or import commerce into the United States.

5        212.    All of the above facts also demonstrate that defendants' illegal activities had a

6   direct, substantial, and reasonably foreseeable effect on U.S. commerce.

7   **VIII.   PLAINTIFFS' INJURIES**

8        213.    AT&T Mobility has suffered a direct, substantial, and reasonably foreseeable

9   injury as both a purchaser of mobile wireless handsets containing LCD Panels and as a purchaser

10  of other LCD Products as a result of defendants' conspiracy to raise, fix, stabilize, or maintain

11  the price of LCD Panels at supra-competitive levels.  Defendants' conspiracy artificially inflated

12  the price of LCD Panels incorporated into such mobile wireless handsets, causing AT&T

13  Mobility to pay higher prices than it would have in the absence of defendants' conspiracy.

14       214.    In some cases, AT&T Mobility purchased mobile wireless handsets directly from

15  defendants.  For example, during the Conspiracy Period, AT&T Mobility purchased mobile

16  wireless handsets directly from defendant Samsung and/or its wholly owned and controlled sales

17  agents in the United States.  As a result of defendants' conspiracy to fix the price of LCD panels,

18  AT&T Mobility purchased mobile "Samsung"-branded wireless handsets from Samsung at

19  artificially-inflated prices and suffered injury in the United States as a direct purchaser from

20  Samsung.

21       215.    During the Conspiracy Period, AT&T Mobility also purchased mobile wireless

22  handsets directly from LG Electronics, Inc. and its subsidiaries, affiliates or sales agents in the

23  United States (collectively, "LG Electronics").  LG Electronics owned a substantial interest in

24  and exerted control over defendant LG Display, which has already pleaded guilty to having fixed

25  the price of LCD Panels.  Defendants' conspiracy to fix the price of LCD Panels affected the

26  LCD Panels contained in the mobile wireless handsets AT&T Mobility purchased from LG

27  Electronics.  LG Electronics passed on the overcharge caused by defendants' conspiracy to

28  AT&T Mobility, and as a result, AT&T Mobility suffered injury and paid supra-competitive

1    prices for "LG"-branded mobile wireless handsets it purchased in the United States from LG

2    Electronics.

3        216.    AT&T Mobility suffered injury in the United States as a direct purchaser as a

4    result of its purchases of mobile wireless handsets from LG Electronics.  During the Conspiracy

5    Period, LG Display was the manufacturing agent and alter ego of LG Electronics, and LG

6    Electronics and LG Display constituted a single entity for purposes of AT&T Mobility's

7    purchases from LG Electronics due to their close affiliation and unity of interest.  Beginning in

8    July 1999, LG Electronics placed its LCD Panel manufacturing operations in LG Display, which

9    LG Electronics organized as a joint venture and which also received a capital contribution from

10   Royal Philips Electronics N.V.  In June 1999, LG Display began manufacturing LCD Panels at

11   the same fabs in Gumi, South Korea previously owned and operated in the name of LG

12   Electronics.  From 1999 through 2006 LG Electronics exerted control over all aspects of LG

13   Display's operations.  Boon Joon Koo, CEO of LG Display, was formerly vice president of LG

14   Electronics.  Hee Gook Lee, president of LG Electronics, served on the board of LG Display.

15       217.    In addition, due to its financial interest in and control over LG Display, LG

16   Electronics stood to reap substantial financial benefits from LG Display's participation in the

17   conspiracy to fix the price of LCD Panels.  Because LG Electronics profited from the artificially-

18   inflated prices for LCD Panels charged by LG Display, there is no realistic possibility that LG

19   Electronics will attempt to recover any overcharges for LCD Panels that LG Electronics

20   purchased from LG Display or any of LG Display's co-conspirators.

21       218.    AT&T Mobility also purchased mobile wireless handsets containing LCD Panels

22   from other handset OEMs, which in turn purchased LCD Panels from defendants and their co-

23   conspirators.  Defendants' conspiracy affected and artificially inflated the price of LCD Panels

24   purchased by these handset OEMs, which paid higher prices for LCD Panels than they would

25   have absent the conspiracy.  The conspiracy artificially inflated the prices of TFT-LCD Panels

26   included in mobile wireless handsets, as well the price of MSTN and CSTN LCD Panels

27   included in such handsets.

28

1    219.    The handset OEMs passed on to their customers, including AT&T Mobility, the

2    overcharges caused by defendants' conspiracy.  AT&T Mobility was not able to pass on to its

3    customers the overcharge caused by defendants' conspiracy.  Thus, AT&T Mobility suffered

4    injury when it purchased mobile wireless handsets containing LCD Panels from the handset

5    OEMs.

6    220.    In addition, AT&T Mobility and AT&T have suffered a direct, substantial, and

7    reasonably foreseeable injury as a result of defendants' conspiracy to raise, fix, stabilize or

8    maintain the price of LCD Panels at artificial levels as purchasers of LCD Products for their own

9    use.

10   221.    During the Conspiracy Period, a number of large computer OEMs, such as Dell,

11   IBM, and Hewlett-Packard, sold desktop computer monitors and laptop and notebook computers

12   to AT&T Mobility and AT&T.  In fact, the computer OEM with the largest share of desktop

13   computer monitor and laptop and notebook computer sales in the United States, Dell, sold

14   exclusively to end users, including AT&T Mobility and AT&T.

15   222.    Defendants' conspiracy artificially inflated the price of the LCD Panels purchased

16   by these computer OEMs for incorporation into the desktop computer monitors and laptop and

17   notebook computers sold to AT&T Mobility and AT&T.  The computer OEMs passed on these

18   artificially-inflated prices for LCD Panels to AT&T Mobility and AT&T, causing AT&T

19   Mobility and AT&T to pay higher prices for the desktop computer monitors and laptop and

20   notebook computers than they would have paid in the absence of the defendants' conspiracy.

21   223.    Once an LCD Panel leaves its place of manufacture, it remains essentially

22   unchanged as it moves through the distribution system.  LCD Panels are identifiable, discreet

23   physical objects that do not change form or become an indistinguishable part of an LCD Product.

24   Thus, LCD Panels follow a physical chain from defendants through manufacturers of LCD

25   Products sold to AT&T Mobility and to AT&T.

26   224.    The market for LCD Panels and the market for LCD Products are inextricably

27   linked and cannot be considered separately.  Defendants are well aware of this intimate

28   relationship.

225.     The LCD Product OEMs' demand for LCD Panels was relatively inelastic, because there were no reasonable substitutes for LCD Panels to serve as the visual display for products such as mobile wireless handsets, desktop computer monitors and laptop and notebook computers.  The other principal flat panel display technology, plasma, is too big, consumes too much power and is too fragile to be of any practical application in mobile wireless handsets or laptop or notebook computers.  Other competing display technologies, such as OLED displays, were not available during the Conspiracy Period and are only today becoming widely available. In addition, throughout the Conspiracy Period, defendants controlled the market for LCD Panels. Consequently, during the Conspiracy Period, the handset OEMs and computer OEMs had no choice but to purchase LCD Panels from defendants and others at prices that were artificially inflated, fixed, and stabilized by defendants' conspiracy.

226.     As a result, AT&T Mobility and AT&T were injured in connection with their purchases of LCD Products for internal use during the Conspiracy Period.

## IX.     DEFENDANTS CONCEALED THEIR CONSPIRACY TO FIX THE PRICE OF LCD PANELS

227.     AT&T Mobility and AT&T did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence of investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy.  Because defendants' agreement, understanding and conspiracy were kept secret, AT&T Mobility and AT&T were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LCD Products.

228.     The affirmative acts of defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

229.     The affirmative acts of defendants and their co-conspirators alleged herein, among others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  The conspirators knew their activities were

1    illegal.  REDACTED

2

3

4

5

6

7

8

9

10

11        230.    Therefore, the Defendants and their co-conspirators kept their conspiracy

12   communications strictly confidential.  REDACTED

13

14

15

16

17

18

19

20        231.    By its very nature, defendants' price-fixing conspiracy was inherently self-

21   concealing.  As alleged above, defendants had secret discussions about price and output.

22   Defendants agreed not to publicly discuss the existence or the nature of their agreement.  During

23   these meetings, top executives and other officials attending these meetings were instructed on

24   more than one occasion not to disclose the fact of these meetings to outsiders, or even to other

25   employees of defendants not involved in LCD Panel pricing or production.  In fact, the top

26   executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their

27   arrivals and departures at such meetings to avoid being seen in public with each other and with

28   the express purpose and effect of keeping them secret.  Moreover, when the participants in those

meetings became fearful that they might be subject to antitrust scrutiny, in approximately the summer of 2006, they discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information.  The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least November or December of 2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants to maintain their price-fixing and production-limitation agreement.

232.    In addition, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

233.    There have been a variety of other purportedly market-based explanations for price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."  Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

234.    Another false rationale provided by defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

235.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung.  He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

236.    Increased demand was repeatedly cited by defendants throughout the Conspiracy Period.  On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages.  He claimed, "demand grew so

fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

237.    Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

238.    These explanations were all pretextual and each served to cover up the conspiracy.  As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to AT&T Mobility's and AT&T's claims.

## X.    VIOLATIONS ALLEGED

### First Claim for Relief
### (Violation of Sherman Act Against All Defendants)

239.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.    Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to AT&T Mobility and AT&T, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

241.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    a.    To fix, raise, maintain and stabilize the price of LCD Panels;

b.      To allocate markets for LCD Panels among themselves;

c.      To submit rigged bids for the award and performance of certain LCD Panels contracts; and

d.      To allocate among themselves the production of LCD Panels.

242.    The combination and conspiracy alleged herein has had the following effects, among others:

a.      Price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the United States;

b.      Prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

c.      Those who purchased LCD Panels produced by defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

243.    AT&T Mobility has been injured in its business and property by being forced to pay more for the mobile wireless handsets it purchased from defendants and their co-conspirators than it would have paid in the absence of defendants' conspiracy.

244.    Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by AT&T Mobility and gave rise to AT&T Mobility's antitrust claims.  As a result, AT&T Mobility suffered injury as a direct, proximate, and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels and are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for their purchases of LCD Products containing LCD Panels sold by defendants, their coconspirators, and others.

245.    Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize

1    LCD Panel price declines, defendants' conspiracy to fix the price of LCD Panels could be easily

2    repeated and concealed from AT&T Mobility and AT&T, AT&T Mobility and AT&T both face

3    a serious risk of future injury, and are thus entitled to an injunction under Section 16 of the

4    Clayton Act, 15 U.S.C. § 26 against all defendants, preventing and restraining the violations

5    alleged herein.

6                            **Second Claim for Relief**
                  **(Violation of State Antitrust and Unfair Competition Laws)**
7

8         246.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth

9    herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

10        247.    By reason of the foregoing, defendants have entered into agreements in restraint

11   of trade in violation of the California Business and Professions Code § 16750(a), *et seq.* (the

12   "Cartwright Act"):

13        248.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

14   substantial volume of business in California.  AT&T Mobility provided wireless communication

15   services and sold mobile wireless handsets containing LCD Panels to customers in California

16   through its corporate-owned retail stores, through independent retailers located in California, and

17   through its website on the Internet.  AT&T Mobility also provided wireless communication

18   services and sold mobile wireless handsets directly to business, government and other customers

19   in California through both its own sales force and independent sales agents.  In addition, AT&T

20   Mobility maintained in California inventories of mobile wireless handsets containing LCD

21   Panels manufactured and sold by defendants, their co-conspirators, and others, and operated

22   offices and operating retail stores in California.

23        249.    AT&T, including Pacific Bell Telephone Company, provided a variety of wireline

24   telecommunications services to residents, businesses and government customers in California.

25   As a result of their presence in California and the substantial business they conduct in California,

26   AT&T Mobility and AT&T are entitled to the protection of the laws of California.

27        250.    During the Conspiracy Period, AT&T Mobility purchased in California LCD

28   Products, including desktop monitors and notebook computers, containing LCD Panels

manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, Pacific Bell Telephone Company, AT&T Operations, Inc., AT&T Services, Inc., AT&T Datacomm, Inc., and AT&T Corp. purchased in California LCD Products, including desktop monitors and notebook computers, containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

251.   Defendants engaged and participated in the conspiracy through their offices and operations in California.  Defendants LG Display, Chunghwa and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were carried out in California.  Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung, Samsung SDI, Sanyo and Toshiba all maintained offices in California during the Conspiracy Period.  Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels.  Defendants also participated in the conspiracy in the U.S. through their California offices by providing information obtained through meetings with other defendants to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including manufacturers of mobile wireless handsets that were purchased by AT&T Mobility in the United States.  Defendants' conduct within California thus injured AT&T Mobility and AT&T both in California and throughout the United States.

252.   Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

1         253.    The aforesaid violations of Section 16720, California Business and Professions

2 Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

3 defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain

4 and stabilize the prices of, and to allocate markets for, LCD Panels.

5         254.    For the purpose of forming and effectuating the unlawful trust, defendants and

6 their co-conspirators have done those things which they combined and conspired to do, including

7 but in no way limited to the acts, practices and course of conduct set forth above and the

8 following:

9             a.     to fix, raise, maintain and stabilize the price of LCD Panels;

10             b.     to allocate markets for LCD Panels amongst themselves;

11             c.     to submit rigged bids for the award and performance of certain LCD

12                     Panels contracts; and

13             d.     to allocate among themselves the production of LCD Panels.

14         255.    The combination and conspiracy alleged herein has had, inter alia, the following

15 effects:

16             a.     price competition in the sale of LCD Panels has been restrained,

17                     suppressed and/or eliminated in the State of California;

18             b.     prices for LCD Panels sold by defendants, their co-conspirators, and

19                     others have been fixed, raised, maintained and stabilized at artificially

20                     high, non-competitive levels in the State of California; and

21             c.     those who purchased LCD Panels from defendants, their co-conspirators,

22                     and others and LCD Products containing LCD Panels from defendants,

23                     their co-conspirators, and others have been deprived of the benefit of free

24                     and open competition.

25         256.    As a result of the alleged conduct of defendants, AT&T Mobility and AT&T paid

26 supra-competitive, artificially inflated prices for the LCD Products they purchased during the

27 Conspiracy Period.

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

257.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased in California from defendants, their coconspirators, and others than they would have paid in the absence of defendants' combination and conspiracy.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, AT&T Mobility, and AT&T are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

258.    By reason of the foregoing, defendants have also engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 et seq.

      a.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above;

      b.    The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

      c.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

      d.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

      e.    Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa and Sharp all admitted that acts in furtherance of the conspiracy to fix the price of LCD

71

1             Panels were carried out in California.  Defendants also maintained offices

2             in California where their employees engaged in communications, meetings

3             and other activities in furtherance of defendants' conspiracy;

4       f.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

5             substantial volume of business in California.  AT&T Mobility provided

6             wireless communication services and sold mobile wireless handsets

7             containing LCD Panels to customers in California at its corporate-owned

8             retail stores and through its website on the Internet.  AT&T Mobility also

9             sold mobile wireless handsets to independent agents and retailers located

10            in California.  AT&T Mobility also provided wireless communication

11            services and sold mobile wireless handsets directly to business,

12            government and other customers in California.  In addition, AT&T

13            Mobility maintained in California inventories of mobile wireless handsets

14            containing LCD Panels manufactured and sold by defendants, their co-

15            conspirators, and others, and operated offices and retail stores in

16            California.  Pacific Bell Telephone Company provided various wireline

17            telecommunications services to residents, businesses and government

18            customers in California, where AT&T employees used notebook

19            computers and desktop monitors purchased by AT&T.  As a result of their

20            presence in California and the substantial business they conduct in

21            California, AT&T Mobility and AT&T are entitled to the protection of the

22            laws of California; and,

23       g.    By reason of the foregoing, AT&T Mobility and AT&T are entitled to full

24            restitution and/or disgorgement of all revenues, earnings, profits,

25            compensation, and benefits that may have been obtained by defendants as

26            result of such business acts and practices described above.

27     259.    By reason of the foregoing, defendants have entered into agreements in restraint

28 of trade in violation of Tennessee Code §§ 47-25-101 *et seq.*

a.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Tennessee and fixed, raised, maintained and stabilized LCD Panel prices in Tennessee at artificially high, non-competitive levels;

b.     As a result, defendants' conspiracy substantially affected Tennessee commerce;

c.     During the Conspiracy Period, beginning in 2001, AT&T Mobility purchased mobile wireless handsets containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  AT&T Mobility purchased such handsets in Tennessee, where it received mobile wireless handsets shipped to Tennessee by AT&T Mobility's handset vendors. AT&T Mobility also purchased LCD products at its offices and facilities in Tennessee, including desktop monitors and notebook computers containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  In addition, BellSouth Telecommunications, Inc. purchased at its offices and facilities in Tennessee LCD Products, including desktop monitors and notebook computers, containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.     AT&T Mobility and AT&T conducted a substantial volume of business in Tennessee.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Tennessee at its corporate-owned retail stores and through its website on the Internet.  AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in Tennessee.  AT&T Mobility also provided wireless communication services and sold mobile wireless

1        handsets directly to business, government and other customers in

2        Tennessee.  AT&T Mobility also operated offices and retail stores in

3        Tennessee.  During the Conspiracy Period, AT&T provided various

4        wireline telecommunications services to residential customers, businesses

5        and government customers in Tennessee, where employees used notebook

6        computers and desktop monitors purchased by BellSouth

7        Telecommunications, Inc..  As a result of their presence in Tennessee and

8        the substantial business they conduct in Tennessee, AT&T Mobility and

9        AT&T are entitled to the protection of the laws of Tennessee; and,

10   e.   As a direct and proximate result of defendants' conduct, AT&T Mobility

11        and BellSouth Telecommunications, Inc. have been injured in their

12        business and property by paying more for LCD Products purchased in

13        Tennessee from defendants, their coconspirators and others than they

14        would have paid in the absence of defendants' combination and

15        conspiracy, and are entitled to relief under Tennessee Code §§ 47-25-101

16        *et seq.*

17   260.   By reason of the foregoing, defendants have entered into agreements in restraint

18   of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*:

19   a.   Defendants' conspiracy restrained, suppressed and/or eliminated

20        competition in the sale of LCD Panels in Arizona and fixed, raised,

21        maintained and stabilized LCD Panel prices in Arizona at artificially high,

22        non-competitive levels;

23   b.   As a result, defendants' conspiracy substantially affected Arizona

24        commerce;

25   c.   During the Conspiracy Period, AT&T Mobility and AT&T Corp.

26        purchased at their offices and facilities in Arizona LCD Products

27        containing LCD Panels manufactured by defendants and sold at

28        artificially-inflated prices because of defendants' price fixing conspiracy.

1          d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

2                  substantial volume of business in Arizona.  AT&T Mobility provided

3                  wireless communication services and sold mobile wireless handsets

4                  containing LCD Panels to customers in Arizona at its corporate-owned

5                  retail stores and through its website on the Internet.  AT&T Mobility also

6                  sold mobile wireless handsets to independent agents and retailers in

7                  Arizona.  AT&T Mobility also provided wireless communication services

8                  and sold mobile wireless handsets directly to business, government and

9                  other customers in Arizona.  In addition, AT&T Mobility maintained in

10                 Arizona inventories of mobile wireless handsets containing LCD Panels

11                 manufactured and sold by defendants, their co-conspirators, and others,

12                 and operated offices and retail stores in Arizona.  During the Conspiracy

13                 Period, AT&T provided various wireline telecommunications services to

14                 businesses and government customers in Arizona, where employees used

15                 notebook computers and desktop monitors purchased by AT&T Corp.  As

16                 a result of their presence in Arizona and the substantial business they

17                 conduct in Arizona, AT&T Mobility and AT&T are entitled to the

18                 protection of the laws of Arizona; and,

19          e.      As a direct and proximate result of defendants' conduct, AT&T Mobility

20                 and AT&T Corp. have been injured in their business and property by

21                 paying more for LCD Products purchased in Arizona defendants, their co-

22                 conspirators and others than they would have paid in the absence of

23                 defendants' combination and conspiracy, and are entitled to relief under

24                 Ariz. Rev. Stat. §§ 44-1401, *et seq.*

25      261.    By reason of the foregoing, defendants have entered into agreements in restraint

26  of trade in violation of District of Columbia Code Ann. §§28-4501 *et seq.*

27          a.      Defendants' conspiracy restrained, suppressed and/or eliminated

28                 competition in the sale of LCD Panels in the District of Columbia and

75

1    fixed, raised, maintained and stabilized LCD Panel prices in the District of

2    Columbia at artificially high, non-competitive levels;

3    b.    As a result, defendants' conspiracy substantially affected District of

4    Columbia commerce;

5    c.    During the Conspiracy Period, AT&T Mobility and AT&T Corp.

6    purchased at their offices and facilities in the District of Columbia LCD

7    Products containing LCD Panels manufactured by defendants and sold at

8    artificially-inflated prices because of defendants' price fixing conspiracy.

9    d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

10    substantial volume of business in the District of Columbia.  AT&T

11    Mobility provided wireless communication services and sold mobile

12    wireless handsets containing LCD Panels to customers in the District of

13    Columbia at its corporate-owned retail stores and through its website on

14    the Internet.  AT&T Mobility also sold mobile wireless handsets to

15    independent agents and retailers in the District of Columbia.  AT&T

16    Mobility also provided wireless communication services and sold mobile

17    wireless handsets directly to business, government and other customers in

18    the District of Columbia.  In addition, AT&T Mobility maintained in the

19    District of Columbia inventories of mobile wireless handsets containing

20    LCD Panels manufactured and sold by defendants, their co-conspirators,

21    and others, and operated offices and retail stores in the District of

22    Columbia.  AT&T provided various wireline telecommunications services

23    to businesses and government customers in the District of Columbia,

24    where AT&T employees used notebook computers and desktop monitors

25    purchased by AT&T.  As a result of their presence in the District of

26    Columbia and the substantial business they conduct in the District of

27    Columbia, AT&T Mobility and AT&T are entitled to the protection of the

28    laws of the District of Columbia; and,

76

1     e. As a direct and proximate result of defendants' conduct, AT&T Mobility

2      and AT&T Corp. have been injured in their business and property by

3      paying more for LCD Products purchased in the District of Columbia from

4      defendants, their coconspirators and others than they would have paid in

5      the absence of defendants' combination and conspiracy, and are entitled to

6      relief under District of Columbia Code Ann. §§ 28-4501, *et seq.*

7  262. By reason of the foregoing, defendants have entered into agreements in restraint

8 of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq*.

9     a. Defendants' conspiracy restrained, suppressed and/or eliminated

10      competition in the sale of LCD Panels in Illinois and fixed, raised,

11      maintained and stabilized LCD Panel prices in Illinois at artificially high,

12      non-competitive levels;

13     b. As a result, defendants' conspiracy substantially affected Illinois

14      commerce;

15     c. During the Conspiracy Period, AT&T Mobility purchased mobile wireless

16      handsets containing LCD Panels manufactured by defendants and sold at

17      artificially-inflated prices because of defendants' price fixing conspiracy.

18      AT&T Mobility purchased such handsets in Illinois, where it received

19      mobile wireless handsets shipped by AT&T Mobility's handset vendors.

20      AT&T Mobility, AT&T Services, Inc., AT&T Datacomm Inc., AT&T

21      Operations, Inc. and AT&T Corp. purchased at their offices and facilities

22      in Illinois LCD Products containing LCD Panels manufactured by

23      defendants and sold at artificially-inflated prices because of defendants'

24      price fixing conspiracy.

25     d. During the Conspiracy Period, AT&T Mobility and AT&T conducted a

26      substantial volume of business in Illinois.  AT&T Mobility provided

27      wireless communication services and sold mobile wireless handsets

28      containing LCD Panels to customers in Illinois at its corporate-owned

1  retail stores and through its website on the Internet. AT&T Mobility also

2  sold mobile wireless handsets to independent agents and retailers in

3  Illinois. AT&T Mobility also provided wireless communication services

4  and sold mobile wireless handsets directly to business, government and

5  other customers in Illinois. In addition, AT&T Mobility maintained in

6  Illinois inventories of mobile wireless handsets containing LCD Panels

7  manufactured and sold by defendants, their co-conspirators, and others,

8  and operated offices and retail stores in Illinois. During the Conspiracy

9  Period, AT&T provided various wireline telecommunications services to

10  residential customers as well as businesses and government customers in

11  Illinois, where AT&T employees used notebook computers and desktop

12  monitors purchased by AT&T. As a result of their presence in Illinois and

13  the substantial business they conduct in Illinois, AT&T Mobility and

14  AT&T are entitled to the protection of the laws of Illinois; and,

15  e.    As a direct and proximate result of defendants' conduct, AT&T Mobility,

16  AT&T Services, Inc., AT&T Datacomm, Inc., AT&T Operations, Inc. and

17  AT&T Corp. have been injured in their business and property by paying

18  more for LCD Products purchased in Illinois from defendants, their co-

19  conspirators and others than they would have paid in the absence of

20  defendants' combination and conspiracy, and are entitled to relief under

21  the Illinois Antitrust Act.

22  263.    By reason of the foregoing, defendants have entered into agreements in restraint

23  of trade in violation of Iowa Code §§553.1 *et seq.*

24  a.    Defendants' conspiracy restrained, suppressed and/or eliminated

25  competition in the sale of LCD Panels in Iowa and fixed, raised,

26  maintained and stabilized LCD Panel prices in Iowa at artificially high,

27  non-competitive levels;

28  b.    As a result, defendants' conspiracy substantially affected Iowa commerce;

78

c.  AT&T Mobility purchased at its offices and facilities in Iowa LCD
Products containing LCD Panels manufactured by defendants and sold at
artificially-inflated prices because of defendants' price fixing conspiracy.

d.  During the Conspiracy Period, AT&T Mobility and AT&T conducted a
substantial volume of business in Iowa.  AT&T Mobility provided
wireless communication services and sold mobile wireless handsets
containing LCD Panels to customers in Iowa through its corporate-owned
retail stores, through independent retailers located in Iowa, and through its
website on the Internet.  AT&T Mobility also provided wireless
communication services and sold mobile wireless handsets directly to
business, government and other customers in Iowa through both its own
sales force and independent sales agents.  In addition, AT&T Mobility
maintained in Iowa inventories of mobile wireless handsets containing
LCD Panels manufactured and sold by defendants, their co-conspirators,
and others, and operated offices and retail stores in Iowa.  During the
Conspiracy Period, AT&T provided various wireline telecommunications
services to businesses and government customers in Iowa, where AT&T
employees used notebook computers and desktop monitors purchased by
AT&T.  As a result of their presence in Arizona and the substantial
business they conduct in Iowa, AT&T Mobility and AT&T are entitled to
the protection of the laws of Iowa;

e.  As a direct and proximate result of defendants' conduct, AT&T Mobility
has been injured in its business and property by paying more for LCD
Products purchased from defendants, their coconspirators and others than
it would have paid in the absence of defendants' combination and
conspiracy, and is entitled to relief under Iowa Code §§ 553.1 *et seq.*

264.  By reason of the foregoing, defendants have entered into agreements in restraint
of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

79

1        a.      Defendants' conspiracy restrained, suppressed and/or eliminated

2                competition in the sale of LCD Panels in Kansas and fixed, raised,

3                maintained and stabilized LCD Panel prices in Kansas at artificially high,

4                non-competitive levels;

5        b.      As a result, defendants' conspiracy substantially affected Kansas

6                commerce;

7        c.      During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc.,

8                AT&T Datacomm, Inc., AT&T Operations, Inc., AT&T Corp., and

9                Southwestern Bell Telephone Company purchased at their offices and

10              facilities in Kansas LCD Products containing LCD Panels manufactured

11              by defendants and sold at artificially-inflated prices because of

12              defendants' price fixing conspiracy.

13        d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

14              substantial volume of business in Kansas.  AT&T Mobility provided

15              wireless communication services and sold mobile wireless handsets

16              containing LCD Panels to customers in Kansas at its corporate-owned

17              retail stores and through its website on the Internet.  AT&T Mobility also

18              sold mobile wireless handsets to independent agents and retailers in

19              Kansas.  AT&T Mobility also provided wireless communication services

20              and sold mobile wireless handsets directly to business, government and

21              other customers in Kansas.  In addition, AT&T Mobility maintained in

22              Kansas inventories of mobile wireless handsets containing LCD Panels

23              manufactured and sold by defendants, their co-conspirators, and others,

24              and operated offices and retail stores in Kansas.  During the Conspiracy

25              Period, AT&T provided various wireline telecommunications services to

26              residential customers as well as businesses and government customers in

27              Kansas, where AT&T employees used notebook computers and desktop

28              monitors purchased by AT&T.  As a result of their presence in Kansas and

1          the substantial business they conduct in Kansas, AT&T Mobility and

2          AT&T are entitled to the protection of the laws of Kansas; and,

3     e.     As a direct and proximate result of defendants' conduct, AT&T Mobility,

4          AT&T Corp., AT&T Services, Inc., AT&T Operations, Inc., AT&T

5          Datacomm, Inc., and Southwestern Bell Telephone Company have been

6          injured in their business and property by paying more for LCD Products

7          purchased in Kansas from defendants, their coconspirators and others than

8          they would have paid in the absence of defendants' combination and

9          conspiracy, and are entitled to relief under Kansas Stat. Ann. §§50-101 *et*

10         *seq.*

11    265.    By reason of the foregoing, defendants have entered into agreements in restraint

12    of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

13    a.     Defendants' conspiracy restrained, suppressed and/or eliminated

14         competition in the sale of LCD Panels in Maine and fixed, raised,

15         maintained and stabilized LCD Panel prices in Maine at artificially high,

16         non-competitive levels;

17    b.     As a result, defendants' conspiracy substantially affected Maine

18         commerce;

19    c.     AT&T Mobility purchased at its offices and facilities in Maine LCD

20         Products containing LCD Panels manufactured by defendants and sold at

21         artificially-inflated prices because of defendants' price fixing conspiracy.

22    d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

23         substantial volume of business in Maine.  AT&T Mobility provided

24         wireless communication services and sold mobile wireless handsets

25         containing LCD Panels to customers in Maine through its corporate-

26         owned retail stores, through independent retailers located in Maine, and

27         through its website on the Internet.  AT&T Mobility also provided

28         wireless communication services and sold mobile wireless handsets

81

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1      directly to business, government and other customers in Maine through

2      both its own sales force and independent sales agents.  In addition, AT&T

3      Mobility maintained in Maine inventories of mobile wireless handsets

4      containing LCD Panels manufactured and sold by defendants, their co-

5      conspirators, and others, and operated offices and retail stores in Maine.

6      During the Conspiracy Period, AT&T provided various wireline

7      telecommunications services to businesses and government customers in

8      Maine, where AT&T employees used notebook computers and desktop

9      monitors purchased by AT&T.  As a result of their presence in Maine and

10     the substantial business they conduct in Maine, AT&T Mobility and

11     AT&T are entitled to the protection of the laws of Maine; and,

12          e.      As a direct and proximate result of defendants' conduct, AT&T Mobility

13                  has been injured in its business and property by paying more for LCD

14                  Products purchased from defendants, their coconspirators and others than

15                  it would have paid in the absence of defendants' combination and

16                  conspiracy, and is entitled to relief under Maine Rev. Stat. Ann. 10,

17                  §§1101 *et seq.*

18     266.    By reason of the foregoing, defendants have entered into agreements in restraint

19  of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

20          a.      Defendants' conspiracy restrained, suppressed and/or eliminated

21                  competition in the sale of LCD Panels in Michigan and fixed, raised,

22                  maintained and stabilized LCD Panel prices in Michigan at artificially

23                  high, non-competitive levels;

24          b.      As a result, defendants' conspiracy substantially affected Michigan

25                  commerce;

26          c.      During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc.,

27                  AT&T Operations, Inc., and AT&T Datacomm, Inc. purchased at their

28                  offices and facilities in Michigan LCD Products containing LCD Panels

1          manufactured by defendants and sold at artificially-inflated prices because

2          of defendants' price fixing conspiracy.

3      d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

4          substantial volume of business in Michigan.  AT&T Mobility provided

5          wireless communication services and sold mobile wireless handsets

6          containing LCD Panels to customers in Michigan at its corporate-owned

7          retail stores and through its website on the Internet.  AT&T Mobility also

8          sold mobile wireless handsets to independent agents and retailers in

9          Michigan.  AT&T Mobility also provided wireless communication

10         services and sold mobile wireless handsets directly to business,

11         government and other customers in Michigan.  In addition, AT&T

12         Mobility maintained in Michigan inventories of mobile wireless handsets

13         containing LCD Panels manufactured and sold by defendants, their co-

14         conspirators, and others, and operated offices and retail stores in

15         Michigan.  During the Conspiracy Period, AT&T provided various

16         wireline telecommunications services to residential customers, businesses

17         and government customers in Michigan, where AT&T employees used

18         notebook computers and desktop monitors purchased by AT&T.  As a

19         result of their presence in Michigan and the substantial business they

20         conduct in Michigan, AT&T Mobility and AT&T are entitled to the

21         protection of the laws of Michigan; and,

22      e.    As a direct and proximate result of defendants' conduct, AT&T Mobility,

23         AT&T Services, Inc., AT&T Operations, Inc., and AT&T Datacomm, Inc.

24         have been injured in their business and property by paying more for LCD

25         Products purchased in Michigan from defendants, their coconspirators and

26         others than they would have paid in the absence of defendants'

27         combination and conspiracy, and are entitled to relief under Michigan

28         Comp. Laws. Ann. §§ 445.771 *et seq.*

1    267.    By reason of the foregoing, defendants have entered into agreements in restraint

2    of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.*

3          a.    Defendants' conspiracy restrained, suppressed and/or eliminated

4                 competition in the sale of LCD Panels in Minnesota and fixed, raised,

5                 maintained and stabilized LCD Panel prices in Minnesota at artificially

6                 high, non-competitive levels;

7          b.    As a result, defendants' conspiracy substantially affected Minnesota

8                 commerce;

9          c.    AT&T Mobility purchased at its offices and facilities in Minnesota LCD

10                Products containing LCD Panels manufactured by defendants and sold at

11                artificially-inflated prices because of defendants' price fixing conspiracy.

12         d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

13                substantial volume of business in Minnesota.  AT&T Mobility provided

14                wireless communication services and sold mobile wireless handsets

15                containing LCD Panels to customers in Minnesota through its corporate-

16                owned retail stores, through independent retailers located in Minnesota,

17                and through its website on the Internet.  AT&T Mobility also provided

18                wireless communication services and sold mobile wireless handsets

19                directly to business, government and other customers in Minnesota

20                through both its own sales force and independent sales agents.  In addition,

21                AT&T Mobility maintained in Minnesota inventories of mobile wireless

22                handsets containing LCD Panels manufactured and sold by defendants,

23                their co-conspirators, and others, and operated offices and retail stores in

24                Minnesota.  During the Conspiracy Period, AT&T provided various

25                wireline telecommunications services to businesses and government

26                customers in Minnesota, where AT&T employees used notebook

27                computers and desktop monitors purchased by AT&T.  As a result of their

28                presence in Minnesota and the substantial business they conduct in

1    Minnesota, AT&T Mobility and AT&T are entitled to the protection of the

2    laws of Minnesota; and,

3    e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

4    has been injured in its business and property by paying more for LCD

5    Products purchased from defendants, their coconspirators and others than

6    it would have paid in the absence of defendants' combination and

7    conspiracy, and is entitled to relief under Minnesota Stat. §§ 325D.50 *et*

8    *seq*.

9    268.    By reason of the foregoing, defendants have entered into agreements in restraint

10   of trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

11   a.    Defendants' conspiracy restrained, suppressed and/or eliminated

12   competition in the sale of LCD Panels in Mississippi and fixed, raised,

13   maintained and stabilized LCD Panel prices in Mississippi at artificially

14   high, non-competitive levels;

15   b.    As a result, defendants' conspiracy substantially affected Mississippi

16   commerce;

17   c.    During the Conspiracy Period, AT&T Mobility and BellSouth

18   Telecommunications, Inc. purchased at their offices and facilities in

19   Mississippi LCD Products containing LCD Panels manufactured by

20   defendants and sold at artificially-inflated prices because of defendants'

21   price fixing conspiracy.

22   d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

23   substantial volume of business in Mississippi.  AT&T Mobility provided

24   wireless communication services and sold mobile wireless handsets

25   containing LCD Panels to customers in Mississippi at its corporate-owned

26   retail stores and through its website on the Internet.  AT&T Mobility also

27   sold mobile wireless handsets to independent agents and retailers in

28   Mississippi.  AT&T Mobility also provided wireless communication

1    services and sold mobile wireless handsets directly to business,

2    government and other customers in Mississippi.  In addition, AT&T

3    Mobility maintained in Mississippi inventories of mobile wireless

4    handsets containing LCD Panels manufactured and sold by defendants,

5    their co-conspirators, and others, and operated offices and retail stores in

6    Mississippi.  During the Conspiracy Period, AT&T provided various

7    wireline telecommunications services to residential customers, businesses

8    and government customers in Mississippi, where AT&T employees used

9    notebook computers and desktop monitors purchased by AT&T.  As a

10   result of their presence in Mississippi and the substantial business they

11   conduct in Mississippi, AT&T Mobility and AT&T are entitled to the

12   protection of the laws of Mississippi; and,

13   e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

14   and BellSouth Telecommunications, Inc. have been injured in their

15   business and property by paying more for LCD Products purchased in

16   Mississippi from defendants, their coconspirators and others than they

17   would have paid in the absence of defendants' combination and

18   conspiracy, and are entitled to relief under Mississippi Code Ann. §§ 75-

19   21-1 *et seq.*

20   269.    By reason of the foregoing, defendants have entered into agreements in restraint

21   of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

22   a.    Defendants' conspiracy restrained, suppressed and/or eliminated

23   competition in the sale of LCD Panels in Nebraska and fixed, raised,

24   maintained and stabilized LCD Panel prices in Nebraska at artificially

25   high, non-competitive levels;

26   b.    As a result, defendants' conspiracy substantially affected Nebraska

27   commerce;

28

86

1    c.    AT&T Mobility purchased at its offices and facilities in Nebraska LCD

2          Products containing LCD Panels manufactured by defendants and sold at

3          artificially-inflated prices because of defendants' price fixing conspiracy.

4    d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

5          substantial volume of business in Nebraska.  AT&T Mobility provided

6          wireless communication services and sold mobile wireless handsets

7          containing LCD Panels to customers in Nebraska through its corporate-

8          owned retail stores, through independent retailers located in Nebraska, and

9          through its website on the Internet.  AT&T Mobility also provided

10         wireless communication services and sold mobile wireless handsets

11         directly to business, government and other customers in Nebraska through

12         both its own sales force and independent sales agents.  In addition, AT&T

13         Mobility maintained in Nebraska inventories of mobile wireless handsets

14         containing LCD Panels manufactured and sold by defendants, their co-

15         conspirators, and others, and operated offices and retail stores in

16         Nebraska.  During the Conspiracy Period, AT&T provided various

17         wireline telecommunications services to businesses and government

18         customers in Nebraska, where AT&T employees used notebook

19         computers and desktop monitors purchased by AT&T.  As a result of their

20         presence in Nebraska and the substantial business they conduct in

21         Nebraska, AT&T Mobility and AT&T are entitled to the protection of the

22         laws of Nebraska; and,

23   e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

24         has been injured in its business and property by paying more for LCD

25         Products purchased from defendants, their coconspirators and others than

26         it would have paid in the absence of defendants' combination and

27         conspiracy, and is entitled to relief under Nebraska Stat. §§ 59-801 *et seq.*

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

270.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Nevada and fixed, raised, maintained and stabilized LCD Panel prices in Nevada at artificially high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected Nevada commerce;

    c.    During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc., AT&T Operations, Inc., AT&T DataComm, Inc., and Pacific Bell Telephone Company purchased at their offices and facilities in Nevada LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

    d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Nevada.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Nevada at its corporate-owned retail stores and through its website on the Internet.  AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in Nevada.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Nevada.  In addition, AT&T Mobility maintained in Nevada inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Nevada.  During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in Nevada,

88

where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  Nevada Bell, a wholly-owned subsidiary of the AT&T companies, provided a variety of telecommunications services to a substantial portion of the population of Nevada.  As a result of their presence in Nevada and the substantial business they conduct in Nevada, AT&T Mobility and AT&T are entitled to the protection of the laws of Nevada; and,

e.      As a direct and proximate result of defendants' conduct, AT&T Mobility, AT&T Services, Inc., AT&T Operations, Inc., AT&T DataComm, Inc. and Pacific Bell Telephone Company have been injured in their business and property by paying more for LCD Products purchased in Nevada from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

271.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

a.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in New Mexico and fixed, raised, maintained and stabilized LCD Panel prices in New Mexico at artificially high, non-competitive levels;

b.      As a result, defendants' conspiracy substantially affected New Mexico commerce;

c.      During the Conspiracy Period, AT&T Mobility and AT&T Corp. purchased at their offices and facilities in New Mexico LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in New Mexico.  AT&T Mobility provided

89

wireless communication services and sold mobile wireless handsets
containing LCD Panels to customers in New Mexico at its corporate-
owned retail stores and through its website on the Internet.  AT&T
Mobility also sold mobile wireless handsets to independent agents and
retailers in New Mexico.  AT&T Mobility also provided wireless
communication services and sold mobile wireless handsets directly to
business, government and other customers in New Mexico.  In addition,
AT&T Mobility maintained in New Mexico inventories of mobile wireless
handsets containing LCD Panels manufactured and sold by defendants,
their co-conspirators, and others, and operated offices and retail stores in
New Mexico.  During the Conspiracy Period, AT&T provided various
wireline telecommunications services to businesses and government
customers in New Mexico, where AT&T employees used notebook
computers and desktop monitors purchased by AT&T.  As a result of their
presence in New Mexico and the substantial business they conduct in New
Mexico, AT&T Mobility and AT&T are entitled to the protection of the
laws of New Mexico; and,

      e.     As a direct and proximate result of defendants' conduct, AT&T Mobility
and AT&T Corp. have been injured in their business and property by
paying more for LCD Products purchased in Mew Mexico from
defendants, their coconspirators and others than they would have paid in
the absence of defendants' combination and conspiracy, and are entitled to
relief under New Mexico Stat. Ann. §§ 57-1-1 *et seq*.

272.    By reason of the foregoing, defendants have entered into agreements in restraint
of trade in violation of New York General Business Law §§ 340 *et seq*.

      a.     Defendants' conspiracy restrained, suppressed and/or eliminated
competition in the sale of LCD Panels in New York and fixed, raised,

1                    maintained and stabilized LCD Panel prices in New York at artificially

2                    high, non-competitive levels;

3       b.     As a result, defendants' conspiracy substantially affected New York

4                    commerce;

5       c.     During the Conspiracy Period, AT&T Mobility purchased mobile wireless

6                    handsets containing LCD Panels manufactured by defendants and sold at

7                    artificially-inflated prices because of defendants' price fixing conspiracy.

8                    AT&T Mobility purchased such handsets in New York, where it received

9                    mobile wireless handsets shipped by AT&T Mobility's handset vendors.

10                   AT&T Mobility and AT&T Corp. purchased at their offices and facilities

11                   in New York LCD Products containing LCD Panels manufactured by

12                   defendants and sold at artificially-inflated prices because of defendants'

13                   price-fixing conspiracy.

14      d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

15                   substantial volume of business in New York.  AT&T Mobility provided

16                   wireless communication services and sold mobile wireless handsets

17                   containing LCD Panels to customers in New York at its corporate-owned

18                   retail stores and through its website on the Internet.  AT&T Mobility also

19                   sold mobile wireless handsets to independent agents and retailers in New

20                   York.  AT&T New York also provided wireless communication services

21                   and sold mobile wireless handsets directly to business, government and

22                   other customers in New York.  In addition, AT&T Mobility maintained in

23                   New York inventories of mobile wireless handsets containing LCD Panels

24                   manufactured and sold by defendants, their co-conspirators, and others,

25                   and operated offices and retail stores in New York.  During the

26                   Conspiracy Period, AT&T provided various wireline telecommunications

27                   services to businesses and government customers in New York, where

28                   AT&T employees used notebook computers and desktop monitors

1    purchased by AT&T.  As a result of their presence in New York and the

2    substantial business they conduct in New York, AT&T Mobility and

3    AT&T are entitled to the protection of the laws of New York; and,

4    e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

5    and AT&T Corp. have been injured in their business and property by

6    paying more for LCD Products purchased in New York from defendants,

7    their coconspirators and others than they would have paid in the absence

8    of defendants' combination and conspiracy, and are entitled to relief under

9    New York General Business Law §§ 340 *et seq.*

10   273.    By reason of the foregoing, defendants have entered into agreements in restraint

11   of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

12   a.    Defendants' conspiracy restrained, suppressed and/or eliminated

13   competition in the sale of LCD Panels in North Carolina and fixed, raised,

14   maintained and stabilized LCD Panel prices in North Carolina at

15   artificially high, non-competitive levels;

16   b.    As a result, defendants' conspiracy substantially affected North Carolina

17   commerce;

18   c.    During the Conspiracy Period, AT&T Mobility, AT&T Corp. and

19   BellSouth Telecommunications Inc. purchased at their offices and

20   facilities in North Carolina LCD Products containing LCD Panels

21   manufactured by defendants and sold at artificially-inflated prices because

22   of defendants' price fixing conspiracy.

23   d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

24   substantial volume of business in North Carolina.  AT&T Mobility

25   provided wireless communication services and sold mobile wireless

26   handsets containing LCD Panels to customers in North Carolina at its

27   corporate-owned retail stores and through its website on the Internet.

28   AT&T Mobility also sold mobile wireless handsets to independent agents

92

1    and retailers in North Carolina.  AT&T Mobility also provided wireless

2    communication services and sold mobile wireless handsets directly to

3    business, government and other customers in North Carolina.  In addition,

4    AT&T Mobility maintained in North Carolina inventories of mobile

5    wireless handsets containing LCD Panels manufactured and sold by

6    defendants, their co-conspirators, and others, and operated offices and

7    retail stores in North Carolina.  During the Conspiracy Period, AT&T

8    provided various wireline telecommunications services to residential

9    customers, businesses and government customers in North Carolina,

10   where AT&T employees used notebook computers and desktop monitors

11   purchased by AT&T.  As a result of their presence in North Carolina and

12   the substantial business they conduct in North Carolina, AT&T Mobility

13   and AT&T are entitled to the protection of the laws of North Carolina;

14   and,

15        e.    As a direct and proximate result of defendants' conduct, AT&T Mobility,

16              AT&T Corp. and  BellSouth Communications, Inc. have been injured in

17              their business and property by paying more for LCD Products purchased

18              in North Carolina from defendants, their coconspirators and others than

19              they would have paid in the absence of defendants' combination and

20              conspiracy, and are entitled to relief under North Carolina Gen. Stat.

21              §§ 75-1 *et seq.*

22   274.   By reason of the foregoing, defendants have entered into agreements in restraint

23   of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

24        a.    Defendants' conspiracy restrained, suppressed and/or eliminated

25              competition in the sale of LCD Panels in North Dakota and fixed, raised,

26              maintained and stabilized LCD Panel prices in North Dakota at artificially

27              high, non-competitive levels;

28

1      b.      As a result, defendants' conspiracy substantially affected North Dakota

2              commerce;

3      c.      AT&T Mobility purchased at its offices and facilities in North Dakota

4              LCD Products containing LCD Panels manufactured by defendants and

5              sold at artificially-inflated prices because of defendants' price fixing

6              conspiracy.

7      d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

8              substantial volume of business in North Dakota.  AT&T Mobility

9              provided wireless communication services and sold mobile wireless

10             handsets containing LCD Panels to customers in North Dakota through its

11             corporate-owned retail stores, through independent retailers located in

12             North Dakota, and through its website on the Internet.  AT&T Mobility

13             also provided wireless communication services and sold mobile wireless

14             handsets directly to business, government and other customers in North

15             Dakota through both its own sales force and independent sales agents.  In

16             addition, AT&T Mobility maintained in North Dakota inventories of

17             mobile wireless handsets containing LCD Panels manufactured and sold

18             by defendants, their co-conspirators, and others, and operated offices and

19             retail stores in North Dakota.  During the Conspiracy Period, AT&T

20             provided various wireline telecommunications services to businesses and

21             government customers in North Dakota, where AT&T employees used

22             notebook computers and desktop monitors purchased by AT&T.  As a

23             result of their presence in North Dakota and the substantial business they

24             conduct in North Dakota, AT&T Mobility and AT&T are entitled to the

25             protection of the laws of North Dakota; and,

26     e.      As a direct and proximate result of defendants' conduct, AT&T Mobility

27             has been injured in its business and property by paying more for LCD

28             Products purchased from defendants, their coconspirators and others than

94

1    it would have paid in the absence of defendants' combination and

2    conspiracy, and is entitled to relief under North Dakota Cent. Code §§ 51-

3    08.1-01 *et seq.*

4    275.    By reason of the foregoing, defendants have entered into agreements in restraint

5    of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

6    a.    Defendants' conspiracy restrained, suppressed and/or eliminated

7    competition in the sale of LCD Panels in South Dakota and fixed, raised,

8    maintained and stabilized LCD Panel prices in South Dakota at artificially

9    high, non-competitive levels;

10    b.    As a result, defendants' conspiracy substantially affected South Dakota

11    commerce;

12    c.    AT&T Mobility purchased at its offices and facilities in South Dakota

13    LCD Products containing LCD Panels manufactured by defendants and

14    sold at artificially-inflated prices because of defendants' price fixing

15    conspiracy.

16    d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

17    substantial volume of business in South Dakota.  AT&T Mobility

18    provided wireless communication services and sold mobile wireless

19    handsets containing LCD Panels to customers in South Dakota through its

20    corporate-owned retail stores, through independent retailers located in

21    South Dakota, and through its website on the Internet.  AT&T Mobility

22    also provided wireless communication services and sold mobile wireless

23    handsets directly to business, government and other customers in South

24    Dakota through both its own sales force and independent sales agents.  In

25    addition, AT&T Mobility maintained in South Dakota inventories of

26    mobile wireless handsets containing LCD Panels manufactured and sold

27    by defendants, their co-conspirators, and others, and operated offices and

28    retail stores in South Dakota.  During the Conspiracy Period, AT&T

provided various wireline telecommunications services to businesses and government customers in South Dakota, where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  As a result of their presence in South Dakota and the substantial business they conduct in South Dakota, AT&T Mobility and AT&T are entitled to the protection of the laws of South Dakota; and,

e.     As a direct and proximate result of defendants' conduct, AT&T Mobility has been injured in its business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

276.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1 *et seq.*

a.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in West Virginia and fixed, raised, maintained and stabilized LCD Panel prices in West Virginia at artificially high, non-competitive levels;

b.     As a result, defendants' conspiracy substantially affected West Virginia commerce;

c.     AT&T Mobility purchased at its offices and facilities in West Virginia LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in West Virginia.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in West Virginia through its

corporate-owned retail stores, through independent retailers located in West Virginia, and through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in West Virginia through both its own sales force and independent sales agents.  In addition, AT&T Mobility maintained in West Virginia inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in West Virginia.  During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in West Virginia, where AT&T employees used notebook computers and desktop monitors purchased by AT&T.  As a result of their presence in West Virginia and the substantial business they conduct in West Virginia, AT&T Mobility and AT&T are entitled to the protection of the laws of West Virginia; and,

e.   As a direct and proximate result of defendants' conduct, AT&T Mobility has been injured in its business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under West Virginia §§ 47-18-1 *et seq*.

277.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

a.   Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Wisconsin and fixed, raised, maintained and stabilized LCD Panel prices in Wisconsin at artificially high, non-competitive levels;

b.   As a result, defendants' conspiracy substantially affected Wisconsin commerce;

1         c.       During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc.,

2                 AT&T Operations, Inc., and AT&T Datacomm, Inc. purchased at their

3                 offices and facilities in Wisconsin LCD Products containing LCD Panels

4                 manufactured by defendants and sold at artificially-inflated prices because

5                 of defendants' price fixing conspiracy.

6         d.       During the Conspiracy Period, AT&T Mobility and AT&T conducted a

7                 substantial volume of business in Wisconsin.  AT&T Mobility provided

8                 wireless communication services and sold mobile wireless handsets

9                 containing LCD Panels to customers in Wisconsin at its corporate-owned

10              retail stores and through its website on the Internet.  AT&T Mobility also

11              sold mobile wireless handsets to independent agents and retailers in

12              Wisconsin.  AT&T Mobility also provided wireless communication

13              services and sold mobile wireless handsets directly to business,

14              government and other customers in Wisconsin.  In addition, AT&T

15              Mobility maintained in Wisconsin inventories of mobile wireless handsets

16              containing LCD Panels manufactured and sold by defendants, their co-

17              conspirators, and others, and operated offices and retail stores in

18              Wisconsin.  During the Conspiracy Period, AT&T provided various

19              wireline telecommunications services to businesses and government

20              customers in Wisconsin, where AT&T employees used notebook

21              computers and desktop monitors purchased by AT&T.  As a result of their

22              presence in Wisconsin and the substantial business they conduct in

23              Wisconsin, AT&T Mobility and AT&T are entitled to the protection of the

24              laws of Wisconsin; and,

25         e.       As a direct and proximate result of defendants' conduct, AT&T Mobility,

26              AT&T Services Inc., AT&T Operations, Inc., and AT&T Datacomm, Inc.

27              have been injured in their business and property by paying more for LCD

28              Products purchased in Wisconsin from defendants, their coconspirators

1    and others than they would have paid in the absence of defendants'

2    combination and conspiracy, and are entitled to relief under Wisconsin

3    Stat. §§ 133.01 *et seq.*

4  **IX.    PRAYER FOR RELIEF**

5    WHEREFORE, AT&T Mobility and AT&T request:

6        A.    That the unlawful agreement, conduct, contract, conspiracy or

7    combination alleged herein be adjudged and decreed to be:

8            i.    A restraint of trade or commerce in violation of Section 1 of the

9                Sherman Act, as alleged in the First Claim for Relief; and

10           ii.    An unreasonable restraint of trade or commerce in violation of the

11                Cartwright Act, as alleged in the Second Claim for relief; and

12           iii.    In the alternative, an unlawful combination, trust, agreement,

13                understanding, concert of action and/or unfair, deceptive or

14                fraudulent trade practice in violation of the state antitrust and

15                unfair competition laws of Arizona, the District of Columbia,

16                Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Mississippi,

17                Nebraska, Nevada, New Mexico, New York, North Carolina,

18                North Dakota, Puerto Rico, South Dakota, Tennessee, Vermont,

19                West Virginia and Wisconsin, as well as the Unfair Competition

20                Law of California, as alleged in the Third Claim for relief.

21        B.    That AT&T Mobility and AT&T recover damages, as provided by federal

22    and state antitrust laws, and that a judgment be entered in favor of AT&T Mobility and AT&T

23    against defendants, jointly and severally, in an amount to be trebled in accordance with such

24    laws;

25        C.    That AT&T Mobility and AT&T obtain any penalties, punitive or

26    exemplary damages, and/or full consideration, where the laws of the respective states identified

27    herein so permit;

28

1           D.      That AT&T Mobility and AT&T recover damages and/or all other

2 available monetary and equitable remedies under the state unfair competition laws identified

3 above;

4           E.      That defendants, their affiliates, successors, transferees, assignees, and the

5 officers, directors, partners, agents, and employees thereof, and all other persons acting or

6 claiming to act on their behalf, be permanently enjoined and restrained from in any manner

7 continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged

8 herein, or from entering into any other conspiracy or combination having a similar purpose or

9 effect, and from adopting or following any practice, plan, program, or device having a similar

10 purpose or effect;

11           F.      That AT&T Mobility and AT&T be awarded pre- and post-judgment

12 interest, and that such interest be awarded at the highest legal rate from and after the date of

13 service of the initial Complaint in this action;

14           G.      That AT&T Mobility and AT&T recover their costs and disbursements of

15 this suit, including reasonable attorneys' fees as provided by law; and,

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1         H.    That AT&T Mobility and AT&T be awarded such other, further, and

2 different relief as the case may require and the Court may deem just and proper under the

3 circumstances.

4 **X.     JURY TRIAL DEMAND**

5         Pursuant to Federal Rules of Civil Procedure Rule 38(b), AT&T Mobility and

6 AT&T demand a trial by jury for all issues so triable.

7

8 Dated: September 9, 2011          Respectfully submitted,

9                   */s/ Jason C. Murray*

10                Jason C. Murray (CA Bar No. 169806)
               CROWELL & MORING LLP

11                515 South Flower St., 40th Floor
               Los Angeles, CA  90071

12                Telephone:  213-622-4750
               Facsimile:  213-622-2690

13                Email: jmurray@crowell.com

14                Jeffrey H. Howard (*pro hac vice*)
               Jerome A. Murphy (*pro hac vice*)

15                CROWELL & MORING LLP
               1001 Pennsylvania Avenue, N.W.

16                Washington, D.C. 20004
                Telephone:  202-624-2500

17                Facsimile:  202-628-5116
               Email:  jhoward@crowell.com

18                        jmurphy@crowell.com

19                Kenneth L. Adams (*pro hac vice*)
               R. Bruce Holcomb (*pro hac vice*)

20                Christopher T. Leonardo (*pro hac vice*)
               ADAMS HOLCOMB LLP

21                1875 Eye Street NW
               Washington, DC 20006

22                Telephone:  202-580-8822
               Email:  adams@adamsholcomb.com

23                      holcomb@adamsholcomb.com
                     leonardo@adamsholcomb.com

24

25                *Counsel for AT&T Mobility, LLC, AT&T Corp.,*
               *AT&T Services, Inc., BellSouth*

26                *Telecommunications, Inc., Pacific Bell Telephone*
               *Company, AT&T Operations, Inc., AT&T*

27                *DataComm, Inc., and Southwestern Bell Telephone*
               *Company*

DCACTIVE-15196585.4

28

THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI