Jason C. Murray (CA Bar No. 169806)
Joshua C. Stokes (CA Bar No. 220214)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-622-4750
Facsimile:  213-622-2690
Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email:  jhoward@crowell.com
          jmurphy@crowell.com

*Counsel for Plaintiffs*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

IN RE TFT-LCD (FLAT PANEL)
ANTITRUST LITIGATION

This Document Relates to
Case No. 10-cv-4945-SI

Case No. 10-cv-4945 SI

Master File No. 07-m-1827 SI

MDL No. 1827

---

TARGET CORP.; SEARS, ROEBUCK AND
CO.; KMART CORP.; OLD COMP INC.;
GOOD GUYS, INC.; RADIOSHACK CORP.;
NEWEGG INC.

                              Plaintiffs,

                    v.

AU OPTRONICS CORPORATION; AU
OPTRONICS CORPORATION AMERICA,
INC; CHI MEI CORPORATION; CHIMEI
INNOLUX CORPORATION;; CHI MEI
OPTOELECTRONICS USA, INC.; CMO
JAPAN CO. LTD.; NEXGEN MEDIATECH,
INC.; NEXGEN MEDIATECH USA, INC.;
CHUNGHWA PICTURE TUBES LTD.;
TATUNG COMPANY OF AMERICA, INC.;
EPSON IMAGING DEVICES
CORPORATION; EPSON ELECTRONICS
AMERICA, INC.; HANNSTAR DISPLAY
CORPORATION; LG DISPLAY CO. LTD.; LG
DISPLAY AMERICA, INC.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; SAMSUNG ELECTRONICS
CO., LTD.; SAMSUNG SEMICONDUCTOR,
INC.; SAMSUNG ELECTRONICS AMERICA,
INC.; SAMSUNG SDI CO., LTD.; SAMSUNG

**SECOND AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

1

2

3

4

5

6

SDI AMERICA, INC.; SANYO CONSUMER
ELECTRONICS CO., LTD.; SHARP
CORPORATION; SHARP ELECTRONICS
CORPORATION; TOSHIBA CORPORATION;
TOSHIBA AMERICA ELECTRONICS
COMPONENTS, INC.; TOSHIBA MOBILE
DISPLAY TECHNOLOGY CO., LTD.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.,

                              Defendants.

7

8

9

10

11

        Plaintiffs Target Corporation ("Target"); Sears, Roebuck and Co.; Kmart Corporation (together

with Sears, Roebuck and Co., "Sears"); Old Comp Inc. ("Old Comp"); Good Guys, Inc. ("The Good

Guys"); RadioShack Corporation ("RadioShack"); and Newegg Inc. ("Newegg," and together with

Target, Sears, Old Comp, The Good Guys, and RadioShack, the "Plaintiffs"), for their Second Amended

Complaint against all defendants named herein, allege as follows:

12

**I.      INTRODUCTION**

13

14

15

16

17

        1.       Plaintiffs bring this action to recover the damages they incurred as a result of a long-

running conspiracy by manufacturers of liquid crystal display panels ("LCD Panels").  From at least

January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), those manufacturers,

which include defendants and their co-conspirators, conspired with the purpose and effect of fixing,

raising, stabilizing, and maintaining prices for LCD Panels.

18

19

20

21

22

23

24

        2.       Plaintiffs are (or were) all large U.S. retailers that, during the Conspiracy Period, bought

finished products containing LCD Panels manufactured by defendants and their co-conspirators ("LCD

Products") both directly from defendants and from other vendors.  As a result of defendants' and their

co-conspirators' illegal conspiracy to fix the prices of LCD Panels, the prices of those LCD Products

purchased by Plaintiffs also were artificially inflated.  Thus, Plaintiffs suffered damages as a result of

defendants' and their co-conspirators' conspiracy, and bring this action to recover the overcharges paid

for the LCD Products they purchased during the Conspiracy Period.

25

26

27

        3.       Defendants and their co-conspirators formed an international cartel illegally to restrict

competition in the United States in the market for LCD Panels.  During the Conspiracy Period, the

conspiracy affected billions of dollars of commerce throughout the United States.  The conspiracy

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

included communications and meetings in which defendants agreed to eliminate competition and fix the prices of LCD Panels that were ultimately incorporated into LCD Products that they knew would be sold throughout the United States.

4.      At least seven LCD Panel manufacturers, including defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation, and HannStar Display Corporation, have admitted in criminal proceedings to participating in the conspiracy. On or about November 12, 2008, LG Display Co. Ltd. (together with LG Display America, Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy.  On or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

5.      Defendants engaged in conspiratorial conduct both within and outside the United States. Defendants' conduct in the United States was centered in California.  Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Each agreed that:  "Acts in furtherance of this conspiracy were carried out within the Northern District of California.  TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4.  Defendant LG Display America, Inc., which admitted to participating in the conspiracy, maintains its principal place of business in San Jose, California.  Similarly, defendants Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation, which also admitted to participating in the conspiracy, used California corporations with

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

principal places of business in Long Beach, California (defendants Tatung Company of America, Inc., Epson Electronics America, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as their sales agents in the United States for LCD Products containing LCD Panels which were affected by the conspiracy.  Many of the other defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc.

6.      Defendants engaged in and implemented their conspiracy in the United States through the offices they maintained in California.  Defendants' employees in their California offices engaged in communications and meetings with other defendants to exchange price and supply information and reach agreements regarding LCD Panel prices to be charged to their customers in the United States and elsewhere.  Defendants' employees in California also received information from their counterparts elsewhere regarding the substance of defendants' agreements with respect to LCD Panel prices and supply, and were instructed to use this information in the course of price negotiations with customers in the United States.  Defendants' California offices were thus the means through which they implemented their conspiracy in the United States.

7.      Plaintiffs bring this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under Section 4 of the Clayton Act, California's Cartwright Act, and the various other state antitrust and unfair competition laws identified herein, as well as to recover the costs of suit, including reasonable attorneys fees, for the injuries that Plaintiffs suffered as a result of defendants' and their co-conspirators' conspiracy to fix, raise, maintain, and stabilize the prices of LCD Panels.

## II.    <u>JURISDICTION AND VENUE</u>

8.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of LCD Products from certain defendants and for injunctive relief against all defendants.

9.      Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business

and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

10.   This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

11.   The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Conspiracy Period, defendants and their co-conspirators' conspiracy affected the prices of the LCD Products Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

12.   This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each defendant conducts substantial business in the state of California, and a number of defendants maintain their headquarters in this District or elsewhere in California.  In addition, defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured LCD Panels and LCD Products for sale in the United States and California and several defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

13.   Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

14.   Because this action is related to the *In re TFT-LCD Antitrust Litigation*, Case No. M:07-

cv-1827 SI, it will be assigned to the San Francisco division, Judge Susan Illston presiding.  This action concerns substantially the same parties, transactions, and events as Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of defendants' conspiracy to fix the price of liquid crystal display panels in violation of the Sherman Act and the laws of California and other states.  Pursuant to Pretrial Order #1 in M:07-cv-1827 SI, this case is automatically consolidated with M:07-cv-1827 SI for all pretrial proceedings without any further motion or order.

## III.   DEFINITIONS

15.   As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

16.   As used herein, the term "LCD Panel" means liquid crystal display panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  As used herein, "LCD Panel" refers to both liquid crystal display panels and modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a mobile wireless handset, television, computer monitor, or other product.  During and after the Conspiracy Period, LCD Panels used in some notebook computers and hand-held devices included three different technologies:  thin film transistor (TFT) panels, color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels.  The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products.

17.   As used herein, the term "LCD Products" means any product containing an LCD Panel, including without limitation LCD modules, televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand-held devices.

18.   As used herein, the term "OEM" means any original equipment manufacturer of LCD Products.

IV.   **THE PARTIES**

  A.   **Plaintiffs**

    1.   **Target**

19.   Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Conspiracy Period, Target purchased substantial amounts of LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased LCD Products for internal use during the Conspiracy Period.  As a result of defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such LCD Products were artificially inflated by that conspiracy.

20.   During the Conspiracy Period, Target's negotiations for the purchase of LCD Products took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for LCD Products were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to LCD Products.

21.   During the Conspiracy Period, Target also purchased LCD Products at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received LCD Products containing price-fixed LCD Panels shipped to those distribution centers.

    2.   **Sears**

22.   Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and

Kmart.com.  During the Conspiracy Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others in the United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased LCD Products for internal use during the Conspiracy Period.

23.     On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation.  During and after the Conspiracy Period, Sears, Roebuck and Co. and Kmart Corporation purchased LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others.  As a result of defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such LCD Products were artificially inflated by that conspiracy.

24.     During the Conspiracy Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of LCD Products took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan.  In addition, all purchase orders for LCD Products were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to LCD Products.

25.     During the Conspiracy Period, Sears, Roebuck and Co. also purchased LCD Products at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received LCD Products containing price-fixed LCD Panels shipped to those distribution centers.  Kmart Corporation likewise purchased LCD Products at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota, Nebraska, Nevada, and North Carolina.

### 3.   Old Comp

26.     Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas. During the Conspiracy Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was headquartered in Dallas, Texas.

27.     Old Comp owns all claims and rights under federal and state law to recover any overcharges suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings Company; (2) CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico Inc.; (5) CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.; and (9) BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA Subsidiaries").

28.     During the Conspiracy Period, CompUSA, by itself or through the CompUSA Subsidiaries, purchased substantial amounts of LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased LCD Products for internal use during the Conspiracy Period.  As a result of defendants' and their co-conspirators' conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property because the prices they paid for such LCD Products were artificially inflated by that conspiracy.

29.     During the Conspiracy Period, all of CompUSA's negotiations for the purchase of LCD Products took place in the United States and were controlled by the company's merchandising department at its Texas headquarters.  In addition, CompUSA issued all of its purchase orders for LCD Products from Texas and received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to LCD Products.

30.     During the Conspiracy Period, CompUSA also purchased LCD Products at distribution centers located in multiple states, including California and Illinois, where it received LCD Products containing price-fixed LCD Panels shipped to those distribution centers.

31.     CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

marks, and trademarks to an unrelated third party in 2008.

### 4. Good Guys

32.     Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas.  During the Conspiracy Period, The Good Guys maintained its headquarters in California and then in Texas.

33.     The Good Guys owns all claims and rights under federal and state laws to recover any overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc. and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

34.     During the Conspiracy Period, The Good Guys, by itself or through the Good Guys Subsidiaries, purchased and then resold from their respective facilities substantial amounts of LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others in the United States for resale there.  The Good Guys and the Good Guys Subsidiaries also purchased LCD Products for internal use during the Conspiracy Period.  As a result of defendants' and their co-conspirators' conspiracy, The Good Guys and the Good Guys Subsidiaries were injured in their business and property because the prices they paid for such LCD Products were artificially inflated by that conspiracy.

35.     During the Conspiracy Period, all of The Good Guys' negotiations for the purchase of LCD Products took place in the United States and were controlled by the company's merchandising department at its California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase orders for LCD Products from California, and then Texas, and received invoices for those orders in California, and then Texas.  The Good Guys' California and then Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to LCD Products.

36.     During the Conspiracy Period, The Good Guys also purchased LCD Products at a distribution center located in California, where it received LCD Products containing price-fixed LCD Panels shipped to that distribution center.

37.     The Good Guys no longer operates any stores.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

### 5.   RadioShack

38.     Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Forth Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com.  During the Conspiracy Period, RadioShack purchased and then resold from its facilities substantial amounts of LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others in the United States for resale there.  RadioShack also purchased LCD Products for internal use during the Conspiracy Period.  As a result of defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such LCD Products were artificially inflated by that conspiracy.

39.     During the Conspiracy Period, all of RadioShack's negotiations for the purchase of LCD Products took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for LCD Products were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to LCD Products.

40.     During the Conspiracy Period, RadioShack also purchased LCD Products at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received LCD Products containing price-fixed LCD Panels shipped to those distribution centers.

### 6.   Newegg

41.     Plaintiff Newegg Inc. is a Delaware corporation with its headquarters in City of Industry, California.  Newegg owns and operates an online retail website that offers a vast array of products to consumers.  During the Conspiracy Period, Newegg purchased and then resold substantial amounts of LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others in the United States for resale there.  Newegg also purchased LCD Products for internal use during the Conspiracy Period.  As a result of defendants' and their co-conspirators' conspiracy, Newegg was injured in its business and property because the prices it paid for such LCD Products were artificially

inflated by that conspiracy.

42.     During the Conspiracy Period, all of Newegg's negotiations for the purchase of LCD Products took place in the United States and were controlled by a merchandising department based at the company's California headquarters.  In addition, all Newegg purchase orders for LCD Products were issued from California and all invoices were sent to Newegg in California.  Newegg's California-based merchandising department was also responsible for selecting vendors and product lines with respect to LCD Products.

43.     During the Conspiracy Period, Newegg also purchased LCD Products at distribution centers located in California and Tennessee, where it received LCD Products containing price-fixed LCD Panels shipped to those distribution centers.

### B.     Defendants

#### 1.     AU Optronics

44.     Defendant AU Optronics Corporation is one of the world's largest manufacturers of LCD Panels with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

45.     Defendant AU Optronics Corporation America, Inc. is a wholly owned and controlled subsidiary of defendant AU Optronics Corporation with its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

46.     Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are referred to collectively herein as "AU Optronics."  The AU Optronics companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant AU Optronics Corporation America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of AU Optronics

Corporation.  AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### 2.   Chi Mei

47.     Defendant Chi Mei Corporation is another of the world's largest manufacturers of LCD Panels with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

48.     Defendant Chimei Innolux Corporation is another of the largest manufacturers of LCD Panels, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan..  Chimei Innolux Corporation is the survivor of a three-way merger of Chi Mei Optoelectronics Corporation, Innolux Display Corporation, and TPO Displays Corporation, through exchanges of shares.  TPO Display Corp. and Chi Mei Optoelectronics Corporation were dissolved after the merger.  Prior to the merger, Chi Mei Optoelectronics Corporation was a wholly-owned subsidiary of Chi Mei Corporation, with its global headquarters at  No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. Innolux Display Corporation was a former LCD panel manufacturer, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park, Chu-Nan, Miao-Li, Taiwan. During the Conspiracy Period, Chimei Innolux Corporation's predecessor corporations, Chi Mei Optoelectronics Corporation, Innolux Display Corporation, and TPO Displays Corporation marketed, sold, and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

49.     Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display Technology USA, Inc., is a wholly owned and controlled subsidiary of Chi Mei Corporation with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

50.     Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd., is a

subsidiary of Chi Mei Corporation with its principal place of business located at Nansei Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

51.     Defendant Nexgen Mediatech, Inc. is a wholly owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St., Jen Te Village Jen Te, Tainan 717, Taiwan.  During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products containing LCD Panels manufactured by Chi Mei Optoelectronics Corporation throughout the United States and the world.

52.     Defendant Nexgen Mediatech USA, Inc. is a wholly owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California.  During the Conspiracy Period, said defendant marketed, sold, and/or distributed LCD Products containing LCD Panels manufactured by Chi Mei Optoelectronics Corporation throughout the United States and the world.

53.     Defendants Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. are referred to collectively herein as "Chi Mei."  The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Chimei Innolux Corporation (through its predecessor Chi Mei Optoelectronics Corporation), Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation.  Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### 3.   Chunghwa

54.     Defendant Chunghwa Picture Tubes Ltd. is a leading manufacturer of LCD products with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.  Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa's Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the Tatung Company.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

55.     Defendant Tatung Company of America, Inc. is a wholly owned and controlled subsidiary of Chunghwa Picture Tubes Ltd. with its principal place of business at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products containing LCD Panels manufactured by Chunghwa Picture Tubes, Ltd. throughout the United States and the world.

56.     Defendants Chunghwa Picture Tubes Ltd. and Tatung Company of America, Inc. are referred to collectively herein as "Chunghwa."  During the Conspiracy Period, Chunghwa and Tatung were closely affiliated, commonly owned, controlled and dominated by Tatung Company, and functioned as a single enterprise and/or alter egos.

### 4.   Epson

57.     Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 3-101 Minami-Yoshikata, Tottori-Shi, Tottori 680-8577, Japan.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the

United States and elsewhere.

58.     Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard Parkway, San Jose, California.  During the Conspiracy Period, Epson America sold and distributed LCD Products containing LCD Panels manufactured by Epson Japan to customers in the United States.

59.     Defendants Epson Japan and Epson America are referred to collectively herein as "Epson."  The Epson companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

### 5.     HannStar

60.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

### 6.     LG Display

61.     Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and is a joint venture created in 1999 by Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. maintains offices in San Jose, California, and has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

62.     Defendant LG Display America, Inc., f/k/a/ LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California.  During the Conspiracy Period, said defendant

manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

63.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively herein as "LG Display."  The LG Display companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### 7.     Philips

64.     Defendant Philips Electronics North America Corporation is a wholly-owned subsidiary of Philips Holdings USA, Inc., which itself is a wholly-owned subsidiary of co-conspirator Koninklijke Philips Electronics N.V. ("Royal Philips").  Its principal place of business is at 3000 Minuteman Road, Andover, Massachusetts 01810.  During the Conspiracy Period, Philips Electronics North America Corporation manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

65.     In 1999, Philips Electronics North America Corporation's ultimate parent company, co-conspirator Royal Philips, created a joint venture with its competitor, LG Electronics, Inc., to form defendant LG Philips LCD Co., Ltd., which is now known as LG Display Co., Ltd.  LG Display Co., Ltd. is a leading manufacturer of LCD Panels and/or LCD Products.  LG Display Co., Ltd. pleaded guilty to participating in a global conspiracy to fix LCD prices.  Royal Philips, as one of the joint-venture owners of LG Display Co., Ltd., participated in the conspiracy through LG Display Co., Ltd. and through other actions alleged in this complaint.  Philips Electronics North America Corporation was the agent and sales and marketing representative for Royal Philips and its subsidiaries in the United States.

66.     Philips Electronics North America Corporation participated in the conspiracy through the

actions of its respective affiliates (including Royal Philips), officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Philips Electronics North America Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as an alter ego or agent of co-conspirator Royal Philips.  Royal Philips dominated or controlled Philips Electronics North America Corporation regarding conspiracy activities and used that dominion or control to charge artificially high prices for LCD Panels and/or LCD Products.  Philips Electronics North America Corporation, Royal Philips, and their affiliates, parents, subsidiaries, agents and representatives are collectively referred to herein as "Philips."

### 8.     <u>Samsung</u>

67.     Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

68.     Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

69.     Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Co., Ltd. with its principal place of business at 3655 North First Street, San Jose, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold throughout the United States and the world.

70.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."  The Samsung companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and

representatives acting with actual or apparent authority.  Alternatively, defendants Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### 9.  Samsung SDI

71.    Defendant Samsung SDI Co., Ltd. has its principal place of business at 673-7 Maetan-dong, Youngton-gu, Suwon, Republic of Korea.  Defendant Samsung Electronics Co., Ltd. holds a controlling interest in Samsung SDI Co., Ltd.  During the Conspiracy Period, Samsung SDI Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

72.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a wholly-owned and controlled subsidiary of Samsung SDI Co., Ltd.  Its principal place of business is 333 Michelin Drive, Suite 700, Irvine, California 92618.  During the Conspiracy Period, Samsung SDI America manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

73.    Defendants Samsung SDI Co., Ltd., and Samsung SDI America, Inc. are referred to collectively herein as "Samsung SDI."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant Samsung SDI America, Inc. was a member of the conspiracy as the alter ego or agent of Samsung SDI Co., Ltd.  Samsung SDI Co., Ltd. dominated or controlled Samsung SDI America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### 10.  Sanyo

74.    Defendant Sanyo Consumer Electronics Co., Ltd., formerly known as Tottori Sanyo Electric Co. (also known as "Torisan") is a Japanese company with its principal place of business at 101,

7-Chome, Tachikawa-Cho, Tottori-City, Tottori, 680-0061, Japan.  Prior to 2004, co-conspirator Sanyo Electric Co., Ltd., owned and operated Sanyo Consumer Electronics Co., Ltd.  In October 2004, Seiko Epson Corporation and Sanyo Electric Co., Ltd. (including its subsidiary Sanyo Consumer Electronics Co., Ltd.) formed a joint venture company, Sanyo Epson Imaging Devices Corporation.  This joint venture was formed from a combination of Seiko Epson's D-TFD LCD and STN LCD businesses and Sanyo's LTPS TFT LCD and amorphous silicon TFT LCD businesses.  After the Conspiracy Period, Sanyo Epson Imaging Devices Corporation became Epson Imaging Devices Corporation, also a defendant.  During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

75.     Defendant Sanyo Consumer Electronics Co., Ltd. participated in the conspiracy through the actions of its affiliates, officers, employees, and representatives acting with actual or apparent authority.  During the Conspiracy Period, Sanyo Consumer Electronics Co., Ltd. was closely affiliated, commonly owned, controlled and dominated by co-conspirator Sanyo Electric Co., Ltd., and functioned as a single enterprise and/or alter egos.  Sanyo Consumer Electronics Co., Ltd. is a wholly-owned subsidiary of Sanyo Electric Co., Ltd., a consolidated consumer electronics and information technology company based in Japan.  Sanyo Consumer Electronics Co., Ltd. and its affiliates, parents, subsidiaries, agents and representatives are referred to collectively herein as "Sanyo."

### 11.  Sharp

76.     Defendant Sharp Corporation is located at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

77.     Defendant Sharp Electronics Corporation is a wholly owned and controlled subsidiary of defendant Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey 07495.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

78.     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

collectively herein as "Sharp."  The Sharp companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### 12.   <u>Toshiba</u>

79.     Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

80.     Defendant Toshiba Mobile Display Co., Ltd., f/k/a/ Toshiba Matsushita Display Technology Co., Ltd., is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

81.     Defendant Toshiba America Electronic Components, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc., which in turn is a wholly owned and controlled subsidiary of defendant Toshiba Corporation, with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

82.     Defendant Toshiba America Information Systems, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc., which in turn is a wholly owned and controlled subsidiary of defendant Toshiba Corporation, with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

83.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America

Electronic Components, Inc., and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."  The Toshiba companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

### C.    Agents and Co-Conspirators

84.    The actions in this Complaint were authorized, ordered, or done by the defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

85.    Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products manufactured by its parent company.

86.    Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Hydis Technologies Co., Ltd., IPS Alpha Technology, Ltd., Mitsubishi Electric Corporation, Mitsui & Co., Ltd., Panasonic Corporation, and Panasonic Corporation of North America.

### V.    TRADE AND COMMERCE AFFECTED BY CONSPIRACY

### A.    LCD Panels

87.    LCD Panels are utilized in televisions, desktop computer monitors, laptop computers,

mobile wireless handsets, digital cameras, and numerous other electronic devices.  LCD Panels were the principal form of display screen used in televisions, desktop computer monitors, laptop computers, and mobile wireless handsets during the Conspiracy Period.

88.     LCD Panels use liquid crystal to control the passage of light.  More specifically, an LCD Panel is made of two glass sheets sandwiching a layer of liquid crystal.  When voltage is applied, the liquid crystal is bent, allowing light to pass through to form a pixel.  The combination of these pixels forms an image on the LCD Panel.

**B.     Structure of the LCD Panel Industry**

89.     The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships and ease of information sharing.

90.     The LCD Panel industry is highly concentrated and thus conducive to collusion.  Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

91.     The LCD Panel industry is characterized by high barriers to entry.  New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements necessitate constant research, development, and investment.  Thus, few firms can enter the market for the production and sale of LCD Panels without an enormous capital investment.

92.     LCD Panels, whether incorporated into mobile wireless handsets, desktop computer monitors, notebook computers, or televisions, are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard panel sizes for LCD Products across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

93.     The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:  (a) AU Optronics' acquisition of Quanta Display; (b) the creation in 2001 of AU Optronics itself through the merger of Acer Display and Unipac Electronics; (c) Fujitsu Limited's

transfer of its LCD business to Sharp in 2005; (d) the merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd., in 2002; and (e) the joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita in 2004.

94.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants and their co-conspirators implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described herein.

95.     There were many opportunities for defendants and their co-conspirators to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies.  Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants and their co-conspirators took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and to monitor each other's compliance with their agreement.

**D.     The Market For LCD Panels**

96.     LCD Panels have no independent utility, and have value only as components of LCD Products.  The demand for LCD Panels thus derives directly from the demand for such LCD Products.

97.     The market for LCD Panels and the markets for LCD Products are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products.  The market for LCD Panels and the markets for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

98.     Plaintiffs participated in the market for LCD Panels during the Conspiracy Period through their purchase of LCD Products, such as televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand held devices, containing LCD Panels at artificially inflated prices caused by defendants' and their co-conspirators' conspiracy.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

99.     During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels in the United States through and into interstate and foreign commerce, including through this District.  Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

**E.      Effect on U.S. Commerce and Injury to Plaintiffs**

    **1.      Defendants' Conduct Involved Import Trade or Import Commerce**

100.     Defendants' illegal conduct involved U.S. import trade or import commerce.  Defendants knowingly and intentionally sent price-fixed LCD panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States.  Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. retailers.

101.     The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Measured by value, Defendants and others shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Conspiracy Period for ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period.  As a result, a substantial portion of defendants' revenues were derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.  Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

102.     Because of the importance of the U.S. market to defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct.  The defendants knowingly and intentionally sent

price-fixed LCD Panels and LCD Products into a stream of commerce that lead directly into the United States.  Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States.  This conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

103.    During the Conspiracy Period, every defendant shipped LCD Panels directly into the United States.

104.    When high-level executives based at defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States.  Moreover, because LCD Panels are – and were throughout the Conspiracy Period – the most expensive and significant component of LCD Products, defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States.  Many defendants manufactured LCD Products and sold them in the United States.  In fact, defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

105.    Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition, defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

106.    Defendants have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD Products into the United States impacted U.S. import trade and import commerce.  In a series of complaints filed with the U.S. International Trade Commission over the past few years, defendants Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*,

Investigation No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

107.    Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce.  Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

108.    For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States.

### 2. <u>Defendants' Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' Antitrust Claims</u>

109.    Defendants illegal conduct had a direct, substantial, and reasonably foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce in the form of higher prices for LCD Products containing price-fixed LCD Panels manufactured by defendants and their co-conspirators being negotiated, charged, and paid by Plaintiffs in the United States for products imported into the United States.

## VI.    <u>VIOLATIONS ALLEGED</u>

110.    Beginning at a date as yet unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter up to and including at least December 11, 2006, defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which LCD Panels were sold directly and indirectly to Plaintiffs in the United States.

111.    Defendants, through their officers, directors and employees, effectuated a contract,

combination, trust, or conspiracy between themselves and their co-conspirators by, among other things:

      a.      participating in meetings and conversations to discuss the prices and supply of LCD Panels in the United States and elsewhere;

      b.      agreeing to fix the prices and limit the supply of LCD Panels sold in the United States and elsewhere in a manner that deprived Plaintiffs of free and open competition as direct and indirect purchasers;

      c.      issuing price announcements and quotations in accordance with the agreements reached; and

      d.      selling LCD Panels both directly and indirectly to Plaintiffs in the United States at fixed, non-competitive prices.

## A.    Defendants' Agreements To Set Prices And Limit Production

112.    The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan, California, and elsewhere in the United States.  As LCD Panel production in South Korea began to increase and become more sophisticated, the Japanese-based defendants expanded their meetings to include their South Korean-based competitors, including defendants LG Display and Samsung, which also agreed to fix prices and control supply.   At least as early as 2001, the South Korean defendants convinced Taiwan-based LCD Panel manufacturers, including defendants AU Optronics, Chi Mei, Chunghwa and HannStar, to join the conspiracy to fix prices and control supply.

113.    Defendants fostered a culture of corruption within their companies whereby employees at every level – from the very top executive all the way to lower-level sales representatives – engaged in frequent and continuous communications with the employees at every level of their competitors.  Senior executives at defendants made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees funneled the competitive information up to their superiors who utilized that information – along with the pricing information they, themselves, were able to collected through their own illegal competitor contacts – to set prices for LCD Panels at artificially-inflated levels.  The

constant communications between defendants at all levels allowed defendants to conspire to set average prices across the entire industry, as well as conspiring to fix the prices of the particular LCD Panels incorporated into the LCD Products purchased by Plaintiffs.

114.    This culture of corruption permeated defendants' U.S. operations and sales.  In fact, the top sales executive at defendants' Asian headquarters instructed their direct reports in the United States to obtain competitive information from their counterparts at other LCD Panel suppliers in the United States.  That information was ultimately used by those top sales executives to set artificially-inflated prices for LCD Panels charged to U.S. customers.

115. REDACTED

116. REDACTED

117. REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

118.    For OEMs in the United States, defendants' U.S. affiliates led the LCD Panel price negotiations with those OEMs.  Pricing directions came from Asia, where defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the defendants' conspiracy meetings and conspiracy communications took place in the United States, involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and U.S. OEMs.  Defendants' conspiratorial conduct also included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, defendants' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products. Defendants conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

### 1.    Early Conspiracy Meetings

119.    In the early years, beginning in at least 1996, representatives of the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix prices for LCD Panels generally, as well as to specific OEMs.  They also agreed to limit the amount of LCD Panels each would produce.

### 2.    Multilateral Conspiracy Meetings

120.    REDACTED

And in 1998, high-level representatives at various LCD Panel manufacturers, including Sharp, Toshiba, Samsung, NEC, LG, and Mitsubishi, met to discuss projected sales volumes. REDACTED

REDACTED                                    The companies agreed that they needed additional meetings to head off the projected higher level of competition between the companies.  The companies met again later in 1998 to again discuss their projected sales

plans to limit competition between them.  REDACTED

121.    Beginning in 1999, high level representatives of Samsung met with counterparts at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information and to fix the price of LCD Panels and limit their production.  From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp, met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production.  The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants or co-conspirators during this period.  The Crystal Meetings occurred in Taiwan.  Other similar meetings took place in South Korea, Japan, California, and elsewhere in the United States on a regular basis throughout this period.

122.    The Crystal Meetings were highly organized and followed a set pattern.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.  As described below, the conspiracy also included "Working Level" meetings and communications.

123.    The "CEO" meetings occurred quarterly from approximately 2001 to 2006.  The purpose and effect of these meetings was to stabilize or raise LCD Panel prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review.  Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD Panel fab output, production, and supply until a consensus was

reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

124.    The structure of "Commercial" meetings was largely the same as CEO meetings.  These meetings took place more frequently than CEO meetings and occurred approximately monthly.

125.    During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels.  Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

126.    During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, often reached agreement concerning the amounts each would produce.  Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized LCD Panels, and setting target production levels.

127.    During these CEO and Commercial meetings, defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so.  Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production.  On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to the meeting.

128.    The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal.  The purpose of the Working Level meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

129.     In approximately the summer of 2006, when they began to have concerns about antitrust issues, defendants discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information.  The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least November or December of 2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants and their co-conspirators to maintain their price-fixing and production-limitation agreement.

### 3.     Bilateral Conspiracy Meetings

130.     Throughout the Conspiracy Period, defendants also engaged in frequent bilateral discussions and meetings with each other in which they exchanged information about pricing, shipments, and production.  During the time when defendants held the Crystal Meetings, they continued these bilateral discussions, which supplemented the discussions and agreements reached at the Crystal Meetings.  Defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by defendants during the Crystal Meetings.

131.     These bilateral discussions occurred at various levels of defendants' sales and marketing organizations.  Lower-level sales and marketing employees of the defendants engaged in frequent bilateral discussions with each other in the form of telephone calls, emails and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers.  At the same time, higher-level managers of the defendants participated in bilateral discussions through telephone calls, emails and face-to-face meetings.  These higher-level managers used the information gained through these bilateral discussions to determine the price to be offered to defendants' customers and communicated this information to the lower level account managers and sales representatives who negotiated directly with defendants' customers.During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending the meetings.  Certain defendants were "assigned" other defendants

not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings.  Participants at the Crystal Meetings contacted Japanese defendants to relay the agreed-upon pricing and production limitations.  Some of these bilateral meetings and communications took place in the United States and specifically targeted U.S. commerce and U.S. OEMs.

132.  REDACTED

133.  REDACTED

134.  REDACTED

• REDACTED

• REDACTED

• REDACTED

1

2

3

4

5

6

7       • REDACTED

8

9

10

11

12

13

14

15      • REDACTED

16

17

18      • REDACTED

19

20

21

22

23

24

25

26          **4.      Defendants' Participation in California**

27      135.    Many defendants conducted operations in California throughout the Conspiracy Period,

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

including defendants Samsung SDI, Sanyo, LG, Toshiba, Epson, AU Optronics, Chi Mei, Chunghwa, Tatung, and NexGen Mediatech.  Through their California operations, defendants implemented their price-fixing conspiracy in the United States.  In fact, defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation specifically admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Defendants' employees based in California engaged in bilateral and multilateral communications in furtherance of the conspiracy.

136.    Defendants also used their California operations to implement their price-fixing agreements in the United States.  Through their activities in California, defendants' successfully increased the price of LCD Panels.

137.  REDACTED

138.  REDACTED

139.  REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

1

2

3      140. REDACTED

4

5

6

7

8

9

10

11

12

13

14

15      141.    Other defendants also engaged in conduct in furtherance of the conspiracy in California

16  to fix the price of small LCD Panels used in mobile wireless handsets and other portable devices.

17  Defendant LG Display America, Inc. maintained its offices in San Jose, California.  LG Display

18  America, Inc. has admitted that it participated in the conspiracy to fix prices of LCD Panels.  LG

19  Display employees responsible for LG Display's negotiations with and sales to mobile wireless handset

20  manufacturers were located in the San Jose, California office.

21      142.    Toshiba maintained offices in San Jose, California.  Toshiba personnel in its San Jose,

22  California offices were involved in and implemented defendants' conspiracy in the United States.

23              REDACTED

24

25

26

27

28

1

2

3

4

5

6   143.    Sharp also maintained offices in San Jose, California.  Sharp personnel in its San Jose,

7   California were involved in and implemented defendants' conspiracy in the United States.

8          REDACTED

9

10

11

12

13

14

15

16

17   144.    Epson maintained offices in San Jose, California.  Epson personnel in its San Jose,

18   California office were involved in and implemented defendants' conspiracy in the United States.

19          REDACTED

20

21

22

23

24

25   **B.**     **Defendants' Involvement in the Conspiracy**

26   145.    Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and Samsung

27   attended multiple CEO, Commercial, and working-level meetings, and engaged in frequent bilateral

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

discussions during the Conspiracy Period and at least between 2001 and 2006.  Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings.  At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels.  These defendants also reached agreements and understandings on prices generally and prices for particular customers in the course of their frequent bilateral communications.

146.    Defendant Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics, has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

147.    Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan, South Korea, and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  LG Display also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million (reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division) for its participation in the conspiracy.

148.    Chung Suk "C.S." Chung, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea

and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

149.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

150.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from December 2001 through December 2005.  Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to

conceal the conspiracy and his conspiratorial contacts.

151.    Defendant Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  Chunghwa also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

152.    Two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin, also pleaded guilty to participating in the conspiracy from September 2001 through December 2006.  Specifically, Messrs. Liu, Lee, and Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea, and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Lin has agreed to serve a 9-month prison term and pay a criminal fine of $50,000, Mr. Liu has agreed to serve a 7-month prison term and pay a criminal fine of $30,000, and Mr. Lee has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

153.    In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005.  Specifically, Messrs. Lin and Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels

at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

154. Defendant HannStar has admitted and pleaded guilty to participating in the conspiracy from September 2001 to January 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. HannStar also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California. In connection with its guilty plea, HannStar has agreed to pay a criminal fine of $30 million.

155. Defendant Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola and agreed to pay a criminal fine of $26 million. Epson Japan has admitted to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

156. Defendant Epson America is a wholly-owned and controlled subsidiary of co-conspirator Epson Japan. Epson America acted as Epson Japan's agent for selling LCD Products in the United States, and thus was an active, knowing participant in the alleged conspiracy. To the extent Epson America sold or distributed LCD Products, it played a significant role in the conspiracy because defendants wished to ensure that the prices for LCD Products did not undercut the LCD Panel pricing agreements reached at their various meetings. Epson America also engaged in bilateral discussions with

other defendants, during which it reached understandings with other defendants regarding prices and exchanged pricing and sales information for the purpose of monitoring agreed-upon prices.  In addition, at one of the bilateral meetings described above, Epson Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui").  At that meeting, Mitsui served as an agent of, and acted under the direction of, both Epson Japan and Epson America.  Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.

157.  REDACTED

158. REDACTED

159.    Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006; and to participating in bilateral meetings, conversations and communications in Japan and in the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  Sharp admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.

160.    Defendant Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other defendants during which it discussed and reached agreements with other defendants on prices for LCD Panels during the Conspiracy Period.

161.    Defendant Sharp also participated in multiple bilateral discussions with other defendants, including Toshiba and Epson, during the Conspiracy Period.  During these discussions, Sharp reached

agreements with other defendants on prices, price increases, production quotas, and production limits for LCD Panels.

162.    REDACTED

163.    Defendant Toshiba participated in multiple bilateral discussions with other defendants, during which Toshiba reached agreements and understandings with other defendants on prices.  Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the defendants that attended the Crystal Meetings.  The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture.  In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations.  In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations.  In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.  The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate

with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

164.     Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co., Ltd. ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005.  Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

165.     Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

166.     Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001.  Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan agreed on prices and supply levels for LCD Panels.

167.     Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or discussions during the Class Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.  REDACTED

168.     Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above.  As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at the meetings.  As explained above, the agreements at these meetings included agreements on price ranges and output restrictions.  The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners

1    and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were active, knowing participants

2    in the alleged conspiracy.

3    169.    When Plaintiffs refer to a corporate family or companies by a single name in their

4    allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or

5    more employees or agents of entities within the corporate family engaged in conspiratorial meetings on

6    behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings

7    and discussions did not always know the corporate affiliation of their counterparts, nor did they

8    distinguish between the entities within a corporate family.  The individual participants entered into

9    agreements on behalf of, and reported these meetings and discussions to, their respective corporate

10   families.  As a result, the entire corporate family was represented in meetings and discussions by their

11   agents and were parties to the agreements reached in them.  Furthermore, to the extent that subsidiaries

12   within the corporate families distributed LCD Panels or LCD Products to direct purchasers, these

13   subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the

14   prices for such products paid by direct purchasers would not undercut the pricing agreements reached at

15   these various meetings.  Thus, all entities within the corporate families were active, knowing

16   participants in the alleged conspiracy.

17   **C.    Market Conditions Demonstrating the Conspiracy**

18   170.    Since at least 1996, the LCD Panel market has not behaved as would be expected of a

19   competitive market free of collusion.  Rather, the behavior of this market strongly evidences that

20   defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing

21   and raising prices for LCD Panels at supra-competitive levels.

22   171.    After initially being introduced into a market, consumer electronics products and their

23   component parts typically are characterized by steady downward pricing trends.  However, since at least

24   1996, the LCD Panel market has been characterized by price stability and certain periods of substantial

25   upward pricing trends.

26   172.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of

27   supply and demand in a competitive market.  In a competitive market, price increases normally occur

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

during shortage periods. Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

173. The demand for consumer electronic products and their component parts generally increases over time. As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.

174. Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity. Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy after they began manufacturing LCD Panels.

175. In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity. In fact, defendants had begun raising and stabilizing the prices.

176. LCD Panel prices began to increase in early 1996. Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

177. Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

178. 1996 also brought the advent of third generation fabs. Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops. Ever-

increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly.  Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards.  These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

179.    The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, *inter alia*, the fact that costs were decreasing.  One of the most significant costs in producing an LCD Panel is the cost of its component parts.  Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

180.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, and maintain the prices of LCD Panels.

181.    LCD Panel prices increased by more than 5% in October 2001.  These price increases continued until June of 2002.

182.    At the time, defendants blamed these price increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, raise, and maintain the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD Panel prices were due to increased demand and a "supply shortage."

183.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered

into an agreement to fix, raise, and maintain prices for LCD Panels at artificially high levels, it resulted in extremely high profits. REDACTED

184.    These increases in prices and revenue were unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers, defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics), rose 184% from the same period in 2001.

### D.    Conspiracy's Effect on Earlier LCD Technologies

185.    During the Conspiracy Period, LCD Panels used in certain applications, including notebook computers and mobile wireless handsets, included both TFT-LCD Panels and STN-LCD Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.  Certain defendants (including Samsung, Sharp, and Epson), their corporate affiliates, and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels.  The same individuals at the defendants who were engaged in bilateral communications and group meetings regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

#### 1.    Defendants' Bilateral Communications Regarding STN-LCD Panels

186.    Defendants' and their co-conspirators' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Specifically, defendants engaged in bilateral discussions in which they exchanged information about STN-LCD Panel pricing, shipments, and production.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered defendants' customers for STN-LCD Panels.

187. REDACTED

188. REDACTED

189. REDACTED

190. REDACTED

191. REDACTED

192. REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

1

2

3

4

5     193.    Epson employees responsible for selling CSTN-LCD Panels to Motorola also engaged in

6    bilateral discussions with "top management" employees at Sharp.

7     194.    In 2006, Toshiba employees met with representatives of Sharp and discussed Sharp's

8    plans to sell CSTN-LCD Panels to Nokia.

9     195.    In some instances, defendants quoted mobile wireless handset vendors a single price for a

10    LCD module that included both a TFT-LCD Panel and an STN-LCD Panel.  For example, defendants

11    quoted Motorola a single price for LCD modules used in the Razr phone, which modules included both a

12    TFT-LCD Panel and an CSTN-LCD Panel.  Defendants Sharp and Epson have admitted fixing prices for

13    TFT-LCD panels sold to Motorola for the Razr phone.  Because Sharp and Epson quoted prices to

14    Motorola for the entire Razr module, their admitted agreements to fix prices for Motorola included an

15    agreement to fix the price of the CSTN-LCD Panels included in the Razr module.

16     196.    In other instances, defendants quoted some mobile wireless handset vendors a single

17    price for a LCD module that included both a TFT-LCD Panel and a MSTN-LCD Panel.  For example, in

18    2003, SonyEricsson manufactured a phone that contained a TFT-LCD Panel in the primary display and a

19    MSTN-LCD Panel in the subdisplay, and sought a single price quotation for both the TFT-LCD Panel

20    and the MSTN-LCD Panel from defendants.  Thus, defendants' agreement to fix the price of TFT-LCD

21    Panels included an agreement to fix the price of MSTN-LCD Panels sold in the combined TFT-LCD

22    Panel/MSTN-LCD Panel modules sold for mobile wireless handset applications.

23     197.    In addition defendants Toshiba and Samsung also engaged in communications with each

24    other and with Epson and Sharp at which agreements were reached regarding the price of LCD modules

25    sold to Motorola for the Razr phone, which included agreements to fix the price of the CSTN-LCD

26    Panels included in those modules.

27     198.    Defendants bilateral discussions extended to other mobile wireless handset manufacturers

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

that requested a single price for LCD modules that included both a TFT-LCD Panel and a STN-LCD

Panel. REDACTED

199.    Thus, because a number of mobile wireless handsets, including the Motorola Razr phone,

included both TFT-LCD Panels and STN-LCD Panels, and because mobile wireless handset

manufacturers often requested a single price for LCD modules that included both types of panels,

defendants' bilateral discussions and agreements with respect to TFT-LCD panel prices inevitably

included and/or affected the prices of STN-LCD panels in those modules.

        2.    **The Structure of the LCD Panel Market Facilitated the Inflation of Prices of STN-LCD Panels As Well As TFT-LCD Panels**

200.    At certain points during the Conspiracy Period, for certain applications in LCD Panel

Products, TFT-LCD Panels and STN-LCD Panels were close substitutes for each other. For example,

beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant

quantities for similar uses – i.e., display purposes – in mobile wireless handsets and other LCD Products

that included small displays.  At other times during the Conspiracy Period, TFT-LCD Panels and CSTN-

LCD Panels were both purchased in significant quantities for use in notebook computers.

201.    At certain points during the Conspiracy Period, for certain applications in LCD Panel

Products, TFT-LCD Panels, CSTN-LCD Panels, and MSTN-LCD Panels were substitutes for each

other.  At these points during the Conspiracy Period, all three panels were purchased for display

applications in mobile wireless handsets and other LCD Products that included small displays.

202.    During the Conspiracy Period, purchasers of LCD Panels often switched their purchases

from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD

Panels and STN-LCD Panels.  REDACTED

Because handset manufacturers could and sometimes did switch from TFT-

LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, defendants knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of STN-LCD panels as well.  In fact, defendants often monitored the price delta between TFT-LCD Panels and STN-LCD Panels and discussed maintaining a constant price delta between TFT-LCD Panels and STN-LCD panels.

203.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely, as seen in the chart below:



204.    Defendants understood that they could profitably raise prices of STN-LCD Panels in response to increases in TFT-LCD Panel prices. REDACTED

205.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels, were substitutes in certain LCD Products at certain points during the Conspiracy Period, and because defendants collectively controlled a significant share of the market for LCD panels,

both globally and in the United States, defendants had the incentive and ability to inflate the prices STN-LCD Panels as well as TFT-LCD Panels.  The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and *vice versa*.

## VII.   GOVERNMENT INVESTIGATIONS OF PRICE-FIXING

206.   In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed for the first time that officials from the South Korean and Japanese Fair Trade Commissions had visited the company's Seoul and Tokyo offices and that the U.S. Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

207.   On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp, and AU Optronics were also under investigation.

208.   The DOJ acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

209.   At least one defendant has approached the DOJ to enter into a leniency agreement with respect to that defendants' role in the conspiracy to fix prices of LCD Panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the DOJ, that defendant has reported the price-fixing conspiracy to the DOJ and has confessed its own participation in the price-fixing conspiracy.

210.   On or about November 12, 2008, defendants LG Display, Sharp and Chunghwa agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of LCD Panels.  On or about January 15, 2009, three current and former executives from Chunghwa – Chieng-Hon "Frank" Lin, Chih-Chun "C.C." Liu, and Hsueh-Lung "Brian" Lee – agreed to plead guilty to participating in the conspiracy from September 2001 to December 2006.  Mr. Lin agreed to serve a 9-month prison sentence and pay a $50,000 criminal fine; Mr. Liu agreed to serve a 7-month prison sentence and pay a $30,000 criminal fine; and Mr. Lee agreed to serve a 6-month prison sentence and pay a $20,000 criminal fine.  Also on or about January 15, 2009, Chang Suk "C.S." Chung, an executive

from LG Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June 2006.  Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine.  On or about February 3, 2009, former LG Display executive Duk Mo Koo, and two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng were indicted for participating in the global LCD Panel price fixing conspiracy.  On or about April 27, 2009, a high level executive of LG Display, Bock Kwon, agreed to plead guilty to a global LCD Panel price fixing conspiracy.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  On or about December 9, 2009, Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics Corporation, agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

211.    The DOJ's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas and criminal fines.

## VIII.   PLAINTIFFS' INJURY

212.    Plaintiffs have suffered direct, substantial, and reasonably foreseeable injuries as purchasers of LCD Products as a result of defendants' and their co-conspirators' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of LCD Panels incorporated into such LCD Products, causing Plaintiffs to pay higher prices than it would have in the absence of defendants' and their co-conspirators' conspiracy.

213.    In some cases, Plaintiffs purchased LCD Products directly from defendants at prices that were artificially inflated as a result of the conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels.  In other cases, Plaintiffs purchased LCD Products from LCD Product OEMs, which in turn purchased LCD Panels from defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of LCD Panels purchased by those OEMs, which paid higher prices for LCD Panels than they would have absent the conspiracy.

214.    The LCD Product OEMs passed on to their customers, including Plaintiffs, overcharges

caused by defendants' and their co-conspirators' conspiracy. Plaintiffs were not able to pass on to their customers the overcharge caused by defendants' and their co-conspirators' conspiracy. Thus, Plaintiffs suffered injury when they purchased LCD Products from the OEMs.

215.    Once an LCD Panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. LCD Panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of an LCD Product. Thus, LCD Panels follow a physical chain from defendants through manufacturers of LCD Products sold to Plaintiffs.

216.    The market for LCD Panels and the market for LCD Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

217.    The LCD Product OEMs' demand for LCD Panels was relatively inelastic, because there were no reasonable substitutes for LCD Panels to serve as the visual display for products such as mobile wireless handsets, desktop computer monitors, televisions, and notebook computers. The other principal flat panel display technology, plasma, is too big, consumes too much power and is too fragile to be of any practical application in such LCD Products. Other competing display technologies, such as OLED displays, were not available during the Conspiracy Period and are only today becoming widely available. In addition, throughout the Conspiracy Period, defendants and their co-conspirators controlled the market for LCD Panels. Consequently, during the Conspiracy Period, the LCD Product OEMs had no choice but to purchase LCD Panels from defendants and others at prices that were artificially inflated, fixed, and stabilized by defendants' and their co-conspirators' conspiracy.

218.    As a result, Plaintiffs were injured in connection with their purchases of LCD Products from defendants and others during the Conspiracy Period.

## IX.    FRAUDULENT CONCEALMENT

219.    Plaintiffs did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence of the investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination, or conspiracy. Because the conspiracy was kept secret, Plaintiffs were unaware of

defendants' and their co-conspirators' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LCD Products.

220.    The affirmative acts of defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

221.    The conspirators knew their activities were illegal. REDACTED

222.    Therefore, the Defendants and their co-conspirators kept their conspiracy communications strictly confidential. REDACTED

223.    By its very nature, defendants and their co-conspirators' price-fixing conspiracy was inherently self-concealing.  As alleged above, defendants and their co-conspirators had secret discussions about price and output.  Defendants agreed not to publicly discuss the existence or the nature of their agreement.  During these meetings, top executives and other officials attending these meetings

were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production.  In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.  Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny,, in approximately the summer of 2006, they discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information. The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least November or December of 2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants  to maintain their price-fixing and production-limitation agreement.

224.    In addition, defendants and their co-conspirators repeatedly gave pretextual justifications for inflated prices of LCD Panels in furtherance of the conspiracy.

225.    There have been a variety of other purportedly market-based explanations for price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."  Bock Kwon, Vice President of LG Display's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

226.    Another false rationale provided by defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

227.    A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung.  He claimed that the demand for larger LCD Panels was reducing the industry's capacity

because each display used more square inches of motherglass substrate.

228.    Increased demand was repeatedly cited by defendants and their co-conspirators throughout the Conspiracy Period.  On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."  Duk-Mo Koo, an executive at LG Display, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season.  In 2005, Mr. Koo stated "[w]e are seeing much stronger demand for large-size LCD televisions than expected, so LCD television supply is likely to remain tight throughout the year."

229.    Hsu Jen-Ting, a Vice-President at Chi Mei, and Shuen-Bin Chen, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

230.    These explanations were all pretextual and each served to cover up defendant and their co-conspirators' conspiracy.  As a result of defendants' fraudulent concealment of their conspiracy, the running of any relevant statutes of limitation have been tolled with respect to Plaintiffs' claims.

## X.    **VIOLATIONS ALLEGED**

### **First Claim for Relief**

### **(Violation of Sherman Act)**

231.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

232.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, and maintain prices for LCD Panels in the United States and elsewhere, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

233.    In formulating and carrying out the alleged agreement, understanding, and conspiracy,

defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

      a.    to fix, raise, maintain and stabilize the price of LCD Panels;

      b.    to allocate markets for LCD Panels among themselves;

      c.    to submit rigged bids for the award and performance of certain LCD Panel contracts; and

      d.    to allocate among themselves the production of LCD Panels.

234.    The combination and conspiracy alleged herein has had many adverse effects on competition, including without limitation, the following effects, among others:

      a.    price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated throughout the United States and the world;

      b.    prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, supra-competitive levels throughout the United States and the world;

      c.    prices for LCD Products containing those LCD Panels have been raised throughout the United States and the world; and

      d.    those who purchased LCD Panels produced by defendants, their co-conspirators, and others and LCD Products containing such LCD Panels have been deprived of the benefits of free and open competition.

235.    Plaintiffs have been injured in their business and property by being forced to pay more for the LCD Products they purchased containing LCD Panels manufactured by defendants, their co-conspirators, and others than they would have paid in the absence of defendants and their co-conspirators' price-fixing conspiracy.

236.    Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by Plaintiffs and gave rise to Plaintiffs' antitrust claims.

As a result, Plaintiffs suffered injury as a direct, proximate, and reasonably foreseeable result of defendants and their co-conspirators' conspiracy to fix, raise, stabilize, and maintain the price of LCD Panels, and are therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for their purchases of LCD Products containing price-fixed LCD Panels manufactured by defendants, their co-conspirators, and others.

237.    Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from Plaintiffs, Plaintiffs both face a serious risk of future injury, and are thus entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all defendants, preventing and restraining the violations alleged herein.

### Second Claim for Relief

### (Violation of the Cartwright Act)

238.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

239.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter at least up to and including December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the California Business and Professions Code § 16750(a), et seq. (the "Cartwright Act").  Defendants and their co-conspirators have each acted in violation of the Cartwright Act in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in California.

240.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

241.    For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of LCD Panels;

    b.    to allocate markets for LCD Panels amongst themselves;

    c.    to submit rigged bids for the award and performance of certain LCD Panels contracts; and

    d.    to allocate among themselves the production of LCD Panels.

242.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.    price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in California;

    b.    prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in California; and

    c.    those who purchased LCD Panels from defendants, their co-conspirators, and others and LCD Products containing price-fixed LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

243.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the Cartwright Act:

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in California and fixed, raised, maintained and stabilized LCD Panel prices in California at artificially high, non-competitive levels;

    b.    As a result, defendants and their co-conspirators' conspiracy substantially affected California commerce;

    c.    During the Conspiracy Period, the Plaintiffs purchased LCD Products containing

price-fixed LCD Panels in California; and

d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under California Business and Professions Code §§ 16720, *et seq*.

244.    Defendants engaged and participated in the conspiracy through their offices and operations in California.  Defendants LG Display, Chunghwa and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were carried out in California.  Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and Toshiba all maintained offices in California during the Conspiracy Period.  Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of LCD Panels.  Defendants also participated in the conspiracy in the U.S. through their California offices by providing information obtained through meetings with other defendants to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers.

245.    As a result of the alleged conduct of defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the LCD Products they purchased during the Conspiracy Period.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

246.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter at least up to and including December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and

commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

248.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

249.    For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.    to fix, raise, maintain and stabilize the price of LCD Panels;

b.    to allocate markets for LCD Panels amongst themselves;

c.    to submit rigged bids for the award and performance of certain LCD Panels contracts; and

d.    to allocate among themselves the production of LCD Panels.

250.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.    price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the states listed below;

b.    prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.    those who purchased LCD Panels from defendants, their co-conspirators, and others and LCD Products containing price-fixed LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

251.    As a result of the alleged conduct of defendants and their co-conspirators, Plaintiffs paid

supra-competitive, artificially inflated prices for the LCD Products they purchased during the Conspiracy Period.

252.   By reason of the foregoing, defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq*.

a.   Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq*., by engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above;

b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq*., including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.   Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq*.;

e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa, Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California;

f.   During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in California:  Target, Sears, Old Comp, Good Guys, RadioShack, and Newegg.  As a result, each is entitled to the protection of

1        the laws of California; and

2        g.      By reason of the foregoing, each of those Plaintiffs is entitled to full restitution

3                and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

4                that may have been obtained by defendants or their co-conspirators as result of

5                such business acts and practices.

6        253.    By reason of the foregoing, defendants and their co-conspirators also have entered into an

7    agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

8        a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

9                eliminated competition in the sale of LCD Panels in Arizona and fixed, raised,

10               maintained and stabilized LCD Panel prices in Arizona at artificially high, non-

11               competitive levels;

12       b.      As a result, defendants and their co-conspirators' conspiracy substantially affected

13               Arizona commerce;

14       c.      During the Conspiracy Period, the following Plaintiffs purchased LCD Products

15               containing price-fixed LCD Panels in Arizona:  Target and Sears.  As a result,

16               each is entitled to the protection of the laws of Arizona; and

17       d.      As a direct and proximate result of defendants' and their co-conspirators' conduct,

18               each of those Plaintiffs has been injured in its business and property by paying

19               more for LCD Products containing LCD Panels manufactured by defendants, their

20               co-conspirators, and others than it would have paid in the absence of defendants

21               and their co-conspirators' combination and conspiracy, and is therefore entitled to

22               relief under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

23       254.    By reason of the foregoing, defendants and their co-conspirators also have engaged in

24   unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

25       a.      Defendants and their co-conspirators committed acts of unfair competition by

26               engaging in a conspiracy to fix and stabilize the price of LCD Panels as described

27               above;

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.      Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f.      During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Florida:  Target and Sears.  As a result, each is entitled to the protection of the laws of Florida.

255.    By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Illinois and fixed, raised, maintained and stabilized LCD Panel prices in Illinois at artificially high, non-competitive levels;

b.      As a result, defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.      During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Illinois:  Target, Sears, and Old Comp.  As a result, each is entitled to the protection of the laws of Illinois; and

     d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

256.    By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.

     a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Iowa and fixed, raised, maintained and stabilized LCD Panel prices in Iowa at artificially high, non-competitive levels;

     b.    As a result, defendants and their co-conspirators' conspiracy substantially affected Iowa commerce;

     c.    During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Iowa:  Target.  As a result, each is entitled to the protection of the laws of Iowa; and

     d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Iowa Code §§ 553.1, *et seq*.

257.    By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.

     a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Kansas and fixed, raised,

maintained and stabilized LCD Panel prices in Kansas at artificially high, non-competitive levels;

b.    As a result, defendants and their co-conspirators' conspiracy substantially affected Kansas commerce;

c.    During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Kansas:  Target.  As a result, each is entitled to the protection of the laws of Kansas; and

d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Kansas Stat. Ann. §§ 50-101, *et seq*.

258.    By reason of the foregoing, defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq*.

a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

1   d. Defendants' and their co-conspirators' acts or practices are fraudulent or

2     deceptive;

3   e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and

4     perfected within Massachusetts; and

5   f. During the Conspiracy Period, the following Plaintiffs purchased LCD Products

6     containing price-fixed LCD Panels in Massachusetts:  Sears and RadioShack.  As

7     a result, each is entitled to the protection of the laws of Massachusetts.

8   259. By reason of the foregoing, defendants and their co-conspirators also have entered into an

9 agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

10   a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

11     eliminated competition in the sale of LCD Panels in Michigan and fixed, raised,

12     maintained and stabilized LCD Panel prices in Michigan at artificially high, non-

13     competitive levels;

14   b. As a result, defendants and their co-conspirators' conspiracy substantially affected

15     Michigan commerce;

16   c. During the Conspiracy Period, the following Plaintiffs purchased LCD Products

17     containing price-fixed LCD Panels in Michigan:  Target and Sears.  As a result,

18     each is entitled to the protection of the laws of Michigan; and

19   d. As a direct and proximate result of defendants' and their co-conspirators' conduct,

20     each of those Plaintiffs has been injured in its business and property by paying

21     more for LCD Products containing LCD Panels manufactured by defendants, their

22     co-conspirators, and others than it would have paid in the absence of defendants

23     and their co-conspirators' combination and conspiracy, and is therefore entitled to

24     relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

25   260. By reason of the foregoing, defendants and their co-conspirators also have entered into an

26 agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

27   a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

28

eliminated competition in the sale of LCD Panels in Minnesota and fixed, raised, maintained and stabilized LCD Panel prices in Minnesota at artificially high, non-competitive levels;

b.    As a result, defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

c.    During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Minnesota:  Target and Sears.  As a result, each is entitled to the protection of the laws of Minnesota; and

d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their coconspirators and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

261.    By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Mississippi and fixed, raised, maintained and stabilized LCD Panel prices in Mississippi at artificially high, non-competitive levels;

b.    As a result, defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.    During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Mississippi:  Sears and RadioShack.  As a result, each Plaintiff is entitled to the protection of the laws of Mississippi; and

d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying

more for LCD Products containing LCD Panels manufactured by defendants, their

co-conspirators, and others than it would have paid in the absence of defendants

and their co-conspirators' combination and conspiracy, and is therefore entitled to

relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

262.     By reason of the foregoing, defendants and their co-conspirators also have entered into an

agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

      a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

eliminated competition in the sale of LCD Panels in Nebraska and fixed, raised,

maintained and stabilized LCD Panel prices in Nebraska at artificially high, non-

competitive levels;

      b.     As a result, defendants and their co-conspirators' conspiracy substantially affected

Nebraska commerce;

      c.     During the Conspiracy Period, the following Plaintiffs purchased LCD Products

containing price-fixed LCD Panels in Nebraska:  Sears.  As a result, each is

entitled to the protection of the laws of Nebraska; and

      d.     As a direct and proximate result of defendants' and their co-conspirators' conduct,

each of those Plaintiffs has been injured in its business and property by paying

more for LCD Products containing LCD Panels manufactured by defendants, their

co-conspirators, and others than it would have paid in the absence of defendants

and their co-conspirators' combination and conspiracy, and is therefore entitled to

relief under Nebraska Stat. §§ 59-801, *et seq.*

263.     By reason of the foregoing, defendants and their co-conspirators also have entered into an

agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

      a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

eliminated competition in the sale of LCD Panels in Nevada and fixed, raised,

maintained and stabilized LCD Panel prices in Nevada at artificially high, non-

competitive levels;

b.     As a result, defendants and their co-conspirators' conspiracy substantially affected Nevada commerce;

c.     During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Nevada:  Sears.  As a result, each is entitled to the protection of the laws of Nevada; and

d.     As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

264.     By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in New Mexico and fixed, raised, maintained and stabilized LCD Panel prices in New Mexico at artificially high, non-competitive levels;

b.     As a result, defendants and their co-conspirators' conspiracy substantially affected New Mexico commerce;

c.     During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in New Mexico:  Sears.  As a result, each is entitled to the protection of the laws of New Mexico; and

d.     As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to

1    relief under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

2    265.    By reason of the foregoing, defendants and their co-conspirators also have entered into an

3    agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

      a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

5             eliminated competition in the sale of LCD Panels in New York and fixed, raised,

6             maintained and stabilized LCD Panel prices in New York at artificially high, non-

7             competitive levels;

8          b.    As a result, defendants and their co-conspirators' conspiracy substantially affected

9             New York commerce;

10          c.    During the Conspiracy Period, the following Plaintiffs purchased LCD Products

11             containing price-fixed LCD Panels in New York:  Target and Sears.  As a result,

12             each is entitled to the protection of the laws of New York; and

13          d.    As a direct and proximate result of defendants' and their co-conspirators' conduct,

14             each of those Plaintiffs has been injured in their business and property by paying

15             more for LCD Products containing LCD Panels manufactured by defendants, their

16             co-conspirators, and others than it would have paid in the absence of defendants

17             and their co-conspirators' combination and conspiracy, and is therefore entitled to

18             relief under New York General Business Law §§ 340, *et seq.*

19    266.    By reason of the foregoing, defendants and their co-conspirators also have entered into an

20    agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

21          a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

22             eliminated competition in the sale of LCD Panels in North Carolina and fixed,

23             raised, maintained and stabilized LCD Panel prices in North Carolina at

24             artificially high, non-competitive levels;

25          b.    As a result, defendants and their co-conspirators' conspiracy substantially affected

26             North Carolina commerce;

27          c.    During the Conspiracy Period, the following Plaintiffs purchased LCD Products

28

containing price-fixed LCD Panels in North Carolina:  Target and Sears.  As a result, each is entitled to the protection of the laws of North Carolina; and

d.   As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

267.   By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Tennessee Code §§ 47-25-101, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Tennessee and fixed, raised, maintained and stabilized LCD Panel prices in Tennessee at artificially high, non-competitive levels;

b.   As a result, defendants and their co-conspirators' conspiracy substantially affected Tennessee commerce;

c.   During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Tennessee:  Newegg.  As a result, each is entitled to the protection of the laws of Tennessee; and

d.   As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Tennessee Code §§ 47-25-101, *et seq.*

268.   By reason of the foregoing, defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Wisconsin and fixed, raised, maintained and stabilized LCD Panel prices in Wisconsin at artificially high, non-competitive levels;

b.      As a result, defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.      During the Conspiracy Period, the following Plaintiffs purchased LCD Products containing price-fixed LCD Panels in Wisconsin:  Target and Sears.  As a result, each is entitled to the protection of the laws of Wisconsin; and

d.      As a direct and proximate result of defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for LCD Products containing LCD Panels manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq*.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request:

A.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

1.      a restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

2.      a restraint of trade or commerce in violation of the Cartwright Act, as alleged in the Second Claim for Relief; and

3.      a restraint of trade or commerce and/or unfair, deceptive, or fraudulent trade practice in violation of the other state antitrust and unfair competition laws identified in the Third Claim for Relief.

B.      That Plaintiffs recover damages, as provided by federal and state antitrust laws, and that

judgments be entered in favor of Plaintiffs against defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C.      That Plaintiffs obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

D.      That Plaintiffs recover damages and/or all other available monetary and equitable remedies under the state unfair competition laws identified above;

E.      That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the illegal conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      That Plaintiffs be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.      That Plaintiffs recover their costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

1    H.    That Plaintiffs be awarded such other, further, and different relief as the case may require

2    and the Court may deem just and proper under the circumstances.

3    **XII.    <u>JURY TRIAL DEMAND</u>**

4    Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs demand a trial by jury for all

5    issues so triable.

6

7    Dated:  September 9, 2011                                Respectfully submitted,

8

9                                             _____*/s/ Jason C. Murray*_____

10                                            Jason C. Murray (CA Bar No. 169806)
                                             CROWELL & MORING LLP
                                             515 South Flower St., 40th Floor
11                                           Los Angeles, CA  90071
                                             Telephone:  213-622-4750
12                                           Facsimile:  213-622-2690
                                             Email:  jmurray@crowell.com
13

14                                           Jeffrey H. Howard (*pro hac vice*)
                                             Jerome A. Murphy (*pro hac vice*)
15                                           CROWELL & MORING LLP
                                             1001 Pennsylvania Avenue, N.W.
16                                           Washington, D.C. 20004
                                             Telephone:  202-624-2500
17                                           Facsimile:  202-628-5116
                                             Email:  jhoward@crowell.com
18                                                      jmurphy@crowell.com

19                                           Kenneth L. Adams (*pro hac vice*)
                                             R. Bruce Holcomb (*pro hac vice*)
20                                           Christopher T. Leonardo (*pro hac vice*)
                                             ADAMS HOLCOMB LLP
21                                           1875 Eye Street NW
                                             Washington, DC 20006
22                                           Telephone:  202-580-8822
                                             Email:  adams@adamsholcomb.com
23                                                      holcomb@adamsholcomb.com
                                                       leonardo@adamsholcomb.com
24
                                             *Counsel for Plaintiffs Target Corporation; Sears,*
25                                           *Roebuck and Co.; Kmart Corporation; Old Comp*
                                             *Inc.; Good Guys, Inc.; RadioShack Corporation;*
26   DCACTIVE-15312854.4                     *Newegg Inc.*

27

28
                                             ___78___
                     SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
                                   MASTER FILE NO.: M-07-1827-SI