**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION / | No. M 07-1827 SI <br> MDL. No. 1827 |
| This Order Relates to: <br><br> All Indirect-Purchaser Plaintiff Class Actions <br><br> / | **ORDER DENYING DEFENDANTS' JOINT DISPOSITIVE MOTION REGARDING INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES** |

On July 29, 2011, the Court heard argument on defendants' joint dispositive motion regarding indirect purchaser claims based on foreign sales. Having considered the moving papers and the arguments of the parties, and for good cause appearing, the Court hereby DENIES defendants' motion.

**BACKGROUND**

This antitrust class action stems from allegations of a global price-fixing conspiracy in the market for thin-film transistor liquid-crystal display ("TFT-LCD") panels. *See* Indirect Purchaser Plaintiffs' Third Consolidated Amended Complaint ("TAC") at ¶¶1-2. TFT-LCD panels are used in a number of products, such as computer monitors, notebook computers, and televisions. *See generally* Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification, Master Docket No. 1642, at 1-3 (March 28, 2010) ("Class Certification Order"); TAC at ¶¶16-54, 106 ("LCD is a type of display technology utilized in products including TVs, computer monitors, laptops, mobile phones, digital cameras, and numerous other electronic products."). The panels have no independent utility, and are not available to the average consumer. TAC at ¶128. Instead, they are incorporated into finished products as discrete, physical objects within the product. Class Certification Order at 2.

Defendants are the major global manufacturers of LCD panels and their subsidiaries. TAC at ¶121 ("[T]he top six companies (Samsung, LGD, Chi Mei, AU Optronics, Sharp and Chunghwa) currently control in excess of 80% of the LCD panels market."). Although some defendants have sales offices in the United States, their business operations are primarily located in Japan, Korea, and Taiwan. TAC at ¶¶56-86. Defendants manufacture their LCD panels overseas, at which point the panels are sold and assembled into finished products. Some defendants, through their subsidiaries, sell end-user devices directly to consumers. *See*, *e.g.*, TAC at ¶127 ("[A] number of the defendants are also computer and/or television OEMs, such as Toshiba and Samsung (computers) and Samsung, Hitachi, and Toshiba (televisions)."). The majority do not.

Plaintiffs are a class of retail consumers who purchased products containing TFT-LCD panels in the United States. *See* Class Certification Order at 35-42. Plaintiffs purchased these products "indirectly," meaning that they did not purchase the finished products from the defendants or their subsidiaries. *Id.* Instead, plaintiffs purchased products containing TFT-LCD panels from original equipment manufacturers ("OEMs") such as Dell, Hewlett Packard, or Apple, or retailers such as Best Buy or Costco. *See* TAC at ¶¶16-54.

Plaintiffs' TAC alleges that defendants conspired to fix prices of TFT-LCD panels between 1999 and 2006. According to the TAC, defendants' high-level executives held a series of secret meetings at which they discussed prices for and production levels of LCD panels. *See* TAC at ¶¶138-44. Although these meetings primarily took place in Taiwan, plaintiffs also allege that a significant amount of anticompetitive conduct took place elsewhere, including within the United States. Plaintiffs claim that the antitrust conspiracy produced artificially high prices for TFT-LCD panels, and that this overcharge was "passed through" to consumers, causing end-users to pay inflated prices in the United States for electronic items that contained LCD panels. TAC at ¶212 ("The entire overcharge for LCD panels at issue was passed on to plaintiffs and members of the indirect-purchaser class."). Plaintiffs' TAC includes a claim under the Sherman Act, as well claims brought under the antitrust, unfair competition, and unjust enrichment laws of a number of states. TAC at ¶¶270-312.

Defendants now seek to dispose of a significant portion of plaintiffs' lawsuit. Defendants argue that the majority of their panel sales took place entirely in foreign commerce. They claim that, to the

2

extent they did not sell their LCD panels directly to United States consumers or companies, they may not be held liable under either federal or state law.

## LEGAL STANDARD

For the reasons set forth below, the Court finds that defendants' motion is properly heard as a motion for summary judgment. Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

## DISCUSSION

Defendants' motion is based on the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a. Congress passed the FTAIA in an effort to limit the application of American antitrust laws to foreign anticompetitive conduct when that conduct caused no injury to consumers in the United States. *See Hartford Fire Ins. v. California*, 509 U.S. 764, 796 n.23 (1993) ("The FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy.") (citing H.R. Rep. No. 97-686, ¶¶ 2-3, 9-10 (1982)).

As has often been noted, the FTAIA operates in a peculiar fashion. It establishes a general rule that the Sherman Act does "not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations . . . ." 15 U.S.C. § 6a. It also creates what is known as the "domestic injury" exception to this general rule; foreign anticompetitive conduct is still subject to the Sherman Act when it "(1) has a direct, substantial, and reasonably foreseeable effect on domestic commerce, and (2) such effect gives rise to a Sherman Act claim." *In re DRAM Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (internal quotation marks omitted).

In their motion, defendants assert that the FTAIA bars plaintiffs' Sherman Act claim because their lawsuit concerns "trade or commerce . . . with foreign nations." They also argue that the domestic injury exception to the FTAIA does not apply to this case. Finally, defendants argue that plaintiffs' state-law claims must also be dismissed because the FTAIA operates to constrain state antitrust laws from regulating where federal law does not.

## I. Applicable Legal Standard

Before turning to the merits of this dispute, the Court must first determine the proper standard for evaluating defendants' motion. Defendants argue that courts have treated the FTAIA as a jurisdiction-stripping provision, and that their motion is therefore properly heard as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See*, *e.g.*, *United States v. LSL Biotechnologies*, 379 F.3d 672, 683 (9th Cir. 2004) ("The FTAIA provides the standard for establishing when subject matter jurisdiction exists over a foreign restraint of trade."). Under this view, plaintiffs have an affirmative obligation to establish that defendants' conduct falls outside of the

4

FTAIA's bar to suit. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 WL 2610641, at *2 (N.D. Cal., June 28, 2010) ("As the party invoking the jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.").

Plaintiffs, on the other hand, claim that the FTAIA does not affect the subject matter jurisdiction of the federal courts. Instead, plaintiffs argue that the FTAIA establishes nothing more than an additional element of a Sherman Act claim. Thus, plaintiffs claim that the FTAIA question is properly resolved under a summary-judgment standard. *See DRAM*, 546 F.3d at 985 n.3 ("It is unclear, however, whether the FTAIA is more appropriately viewed as withdrawing jurisdiction from the federal courts when a plaintiff fails to establish proximate cause or as simply establishing a limited cause of action requiring plaintiffs to prove proximate cause as an element of the claim.").

Until recently, this question was settled within the Ninth Circuit. In 2004, the Ninth Circuit treated the FTAIA as a jurisdictional provision, requiring the plaintiffs to prove by a preponderance of the evidence that subject-matter jurisdiction existed. *See LSL Biotechnologies*, 379 F.3d at 683; *see also United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 952 (7th Cir. 2003) (en banc) ("[W]e find that the district court properly treated the issue as one of subject matter jurisdiction.").

After the Ninth Circuit decided *LSL Biotechnologies*, however, the Supreme Court issued its opinion in *Arbaugh v. Y & Y Corp.*, 546 U.S. 500 (2006). The question presented by *Arbaugh* was whether Title VII's "definition of 'employer' to include only those having 'fifteen or more employees'" was a requirement for the exercise of subject matter jurisdiction or was simply an element of the plaintiff's case. *Id.* at 503. The Supreme Court first noted that courts had been imprecise in their use of the term "jurisdiction," using it to describe a variety of doctrines that operate to bar a plaintiff's suit. *Id.* at 510 ("This Court, no less than other courts, has sometimes been profligate in its use of the term."). Stating that courts have been "less than meticulous," the Court explained that "[s]ubject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief – a merits-related determination." *Id.* at 511 (quoting 2 J. Moore et al., Moore's Federal Practice § 12.30[1], p. 12-36.1 (3d ed.2005)). In concluding that the number of employees was not a jurisdictional

5

requirement for a Title VII claim, the Court expressed its desire to avoid "drive-by jurisdictional rulings" that have "no precedential effect" on the jurisdictional question. *Id.* at 511; *see also Reed Elsevier, Inc. v. Muchnick*, — U.S. —, 130 S. Ct. 1237, 1244 (2010) ("Our recent cases evince a marked desire to curtail such 'drive-by jurisdictional rulings,' which too easily can miss the 'critical difference[s]' between true jurisdictional conditions and nonjurisdictional limitations on causes of action." (citations omitted)). Establishing a "readily administrable bright line" rule, the Court set forth the following test: "If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh*, 546 U.S. at 515-16.

Since *Arbaugh*, a number of courts, including the Ninth Circuit,[1] have faced the question of what standard applies to FTAIA claims. The Third Circuit is the only appellate court to directly address the issue. In *Animal Science Products, Inc. v. China Minmetals Corp.*, — F.3d —, 2011 WL 3606995 (3d Cir., Aug. 17, 2011), the court concluded that the FTAIA did not affect a court's subject matter jurisdiction. *Id.* at *4. Instead, relying on *Arbaugh*, the court held that the FTAIA "delineate[s] the elements of a successful antitrust claim." *Id.* ("The FTAIA neither speaks in jurisdictional terms nor refers in any way to the jurisdiction of the district courts."). In the wake of *Animal Science*, the Seventh Circuit, which had previously concluded that the FTAIA created a jurisdictional bar to suit, has suggested that its holding may not survive *Arbaugh*. *See Minn-Chem, Inc. v. Agrium, Inc.*, — F.3d —, 2011 WL 4424789, at *1 (7th Cir. Sep. 23, 2011) ("[T]he dissent's approach has since prevailed in the Supreme Court . . . suggest[ing] that *United Phosphorus* may be ripe for reconsideration . . . ."); *cf. United Phosphorus*, 322 F.3d at 952 (holding that FTAIA was jurisdictional provision). Other courts in this district, however, have continued to follow *LSL Biotechnologies*, even in the wake of *Arbaugh*.

---

[1]In *DRAM*, the Ninth Circuit noted the issue but did not address the question:

> It is unclear, however, whether the FTAIA is more appropriately viewed as withdrawing jurisdiction from the federal courts when a plaintiff fails to establish proximate cause or as simply establishing a limited cause of action requiring plaintiffs to prove proximate cause as an element of the claim. . . . We decline to resolve the question . . . .

*DRAM*, 546 F.3d at 985 n.3.

1  *See*, *e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313, at *3 (N.D. Cal., Dec. 31, 2010) ("Because *Arbaugh* did not clearly overrule the Ninth Circuit's treatment of the FTAIA as a jurisdictional statute, and the Ninth Circuit has not found that it did, the Court is obliged to treat the FTAIA as jurisdictional."); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1185 (N.D. Cal. 2009) (treating FTAIA as jurisdictional).

The Court agrees with the Third Circuit that the FTAIA does not implicate the subject matter jurisdiction of the federal courts. Although the Court does not lightly disregard the Ninth Circuit's decision in *LSL Biotechnologies*, that decision cannot withstand *Arbaugh*. The Supreme Court has indicated its strong preference for a "bright-line" rule to differentiate between provisions that affect the federal courts' subject matter jurisdiction and those that do not. Under this bright-line rule, the legislature must "clearly state" that a statute is jurisdictional in character. *Arbaugh*, 546 U.S. at 515. This Court agrees with the Third Circuit that application of this "clearly states" test necessitates the finding that the FTAIA does not affect subject matter jurisdiction. *Animal Science*, 2011 WL 3606995 at *4 ("Assessed through the lens of *Arbaugh*'s 'clearly states' test, the FTAIA's language must be interpreted as imposing a substantive merits limitation rather than a jurisdictional bar.").

Accordingly, the Court concludes that the FTAIA is not jurisdictional, and therefore treats defendants' motion as one for summary judgment.

## II.     The Domestic Effects Exception to the FTAIA

As mentioned above, the FTAIA excludes foreign anticompetitive conduct from the Sherman Act's reach unless it "(1) has a direct, substantial, and reasonably foreseeable effect on domestic commerce, and (2) such effect gives rise to a Sherman Act claim." *DRAM*, 546 F.3d at 985 (internal quotation marks omitted). The question presented by defendants' motion is the degree to which defendants' foreign price-fixing activities fall within this "domestic injury" exception to the FTAIA.[2]

---

[2]The parties agree that the majority of defendants' alleged conduct "involv[ed] trade or commerce . . . with foreign nations" and that the conduct therefore falls under the FTAIA's general jurisdictional bar. The parties also agree that some of defendants' products are imported directly into the United States, either by defendants themselves or their corporate affiliates, although they reserve the precise extent of defendants' imports for another day. The primary question presented by

Defendants argue that most of the conduct at issue in plaintiffs' complaint is entirely foreign in nature, and that their conduct caused, at most, only "indirect" effects in the United States.

The facts underlying defendants' motion are largely undisputed.[3] Defendants manufacture all of their TFT-LCD panels outside of the United States. *See* Declaration of Po-Chang Hung ("Hung Decl."), ¶3 (stating that Chimei "manufactures TFT-LCD panels solely in Asia"); Declaration of Heon Seong Kim ("Kim Decl."), ¶3 (stating that Samsung "has never manufactured TFT-LCD panels in the United States"); Declaration of Davis Lee ("Lee Decl."), ¶2 ("Since its creation in 1999 to the present, LG Display has manufactured all of its TFT-LCD panels outside of the United States"); Declaration of Arthur Lu ("Lu Decl."), ¶2 (stating that HannStar "manufactures TFT-LCD panels solely in Asia"); Declaration of Samantha Knox ("Knox Decl."), Exh. 1 at 114 (testimony that Toshiba manufactured LCD panels only in Asia); Declaration of Tatsuya Sasaki ("Sasaki Decl."), ¶3 (stating that all Sharp TFT-LCD panels "are manufactured by Sharp at factories in Japan or by Sharp's affiliates outside the United States"). Once a defendant manufactures a panel, the panel may enter the United States in a number of ways. Defendants may import it as part of a finished product. Defendants may sell it directly to a U.S. company, which incorporates the panel into a finished product. Or defendants may sell the panel to a foreign company that assembles it into a final product before it is sold to a U.S. company and imported into the United States.

According to defendants, the vast majority of the LCD panels they sold during the alleged conspiracy took this final route into the United States. According to declarations submitted by current and former employees of defendants, defendants sold the majority of their LCD panels to foreign companies, either foreign original design manufacturers ("ODMs"), foreign system integrators ("SIs"),

---

defendants' motion is whether the effect of price fixing of LCD panels that are manufactured and sold abroad before they enter the United States can be considered a direct effect on United States commerce.

[3]Given that their motion seeks to resolve a high-level issue in this litigation, defendants' motion largely speaks in generalities. For example, while defendants assert that all of their LCD panels are manufactured overseas, they have not produced declarations from AUO or Hitachi to establish that fact. Similarly, defendants describe the purchasing and production chain for large OEMs such as Dell and HP, but do not provide details on the manufacturing process of every OEM they may have dealt with. Given that defendants' motion seeks guidance on this high-level issue, and that plaintiffs do not take issue with defendants' representations about the manufacturing process, the Court accepts defendants' representations as true for purposes of this motion.

8

foreign original equipment manufacturers ("OEMs"), or foreign affiliates of the U.S. company that would eventually sell the finished product. *See* Hung Decl., ¶¶5-8, 11-13 (stating that Chimei sold panels directly to foreign ODMs, HP affiliates, or Dell affiliates); Kim Decl., ¶7 (stating that "[v]irtually all of Samsung's TFT-LCD panel sales to HP, and the vast majority of Samsung's sales to Dell," were invoiced and shipped to "foreign affiliates, ODMs, or system integrators" outside the United States); Declaration of Y.R. Sohn ("Sohn Decl."), ¶¶11, 19 (stating that 85% of Samsung's panel sales to Dell, and 99.9% of its sales to HP, were to an entity based outside the United States); Sasaki Decl., ¶¶4, 8 (stating that Sharp's sales of LCD panels to third parties primarily occurred with Japanese companies or other companies in Asia); Lee Decl., ¶3 (stating that LG "sells its TFT-LCD panels to [OEMs, SIs, and ODMs], all of which were and are located outside the United States" and that "OEMs based in the United States rarely purchase panels from LG Display directly"); Lu Decl., ¶3 ("During the relevant period, HannStar had only *de minimis* transactions in which it both shipped to and invoiced TFT-LCD panels to entities in the United States.").

Once the LCD panels were sold to the foreign entities, they were then generally incorporated into finished products at foreign manufacturing facilities. *See*, *e.g.*, Knox Decl., Exh. 2 at 49-60 (testimony describing Dell manufacturing process, in which Dell affiliates in Ireland and Malaysia purchased panels and assembled notebook computers destined for United States); Knox Decl., Exh. 3 at 70-73 (HP representative testifying that, with limited exceptions, HP did not purchase or receive panels from defendants); Knox Decl., Exh. 4 at 53 (testimony that, with limited exceptions, there were no occasions where "TFT-LCD panels were shipped directly to Compaq in the United States for use in notebook computers). Only after the LCD products were assembled abroad were the finished products sold to American OEMs and imported into the United States. *See* Knox Decl., Exh. 2 at 29 (testimony that Dell takes title to notebooks outside the United States and is the importer of record). Defendants claim that "[d]uring the class period, at least 90% of Defendants' LCD panels were delivered to the buyer at a foreign location." Motion at 6.

For example, one declaration provided by Chimei's Deputy Director of Sales describes Chimei's sales of LCD panels to HP and Dell. It states that "[u]ntil approximately 2003, all of the Chimei notebook TFT-LCD panels destined for use in HP-branded products were sold by Chimei to third

9

parties, often called original design manufacturers ('ODMs'), who then assembled finished products . . . and sold those to HP." Hung Decl., ¶5. After 2003, "HP began purchasing most or all of its Chimei notebook TFT-LCD panels through its own foreign affiliates, which would typically sell the panels immediately to ODMs." Hung Decl., ¶7. During this time, "[e]xcept for a few occasions when Chimei shipped and billed . . . TFT-LCD panels to HP in the United States for service or engineering purposes, all of the purchase orders issued from outside the United States, all of the TFT-LCD panels were shipped to locations outside the United States, and all of those transactions were billed to locations outside the United States." Hung Decl., ¶6; *see also* Hung Decl., ¶8. The same is true for Chimei's sales to Dell. *See* Hung Decl., at ¶¶11-13 (stating that Chimei panels destined for Dell products were sold to foreign ODMs or Dell affiliates, most of which were located outside the United States). Many of the other defendants have produced similar declarations. *See*, *e.g.*, Sohn Decl., ¶¶6-20 (describing Samsung's sales and manufacturing processes); Kim Decl., ¶¶5-14 (same); Lu Decl., ¶¶3-11 (HannStar); Lee Decl., ¶¶3-16 (LG).

Defendants emphasize that this production chain meant that the panels were almost always sold multiple times before they entered the United States – "once when manufacturers sold panels to foreign ODMs, SIs, or OEMs, and once more when those entities sold the finished products they had assembled." Motion at 7. The panels might be sold more often, depending on how the manufacturing process was structured. *See*, *e.g.*, Knox Decl., Exh. 4 at 112. Defendants summarize this process through a description of the possible steps through which they claim most indirect purchasers obtained defendants' LCD panels:

1. Foreign LCD manufacturers – primarily Korean, Taiwanese or Japanese companies such as Defendants – manufactured LCD panels in their overseas facilities;

2. The foreign LCD manufacturers sold LCD panels to foreign ODMs or SIs (such as TPV, Compal or Wistron), either directly or via an intermediate sale, e.g. to a foreign OEM (such as a Dell or HP foreign affiliate);

3. The foreign ODMs or SIs assembled finished products (such as televisions, monitors or notebook computers) in overseas facilities using the LCD panels they purchased from the foreign LCD panel manufacturers;

4. The foreign ODMs or SIs sold the finished products to brand-name electronics companies, including foreign OEMs such as Acer, Asus and Proview and historically U.S.-based OEMs, such as Dell or HP, or their foreign affiliates;

10

5.  These domestic or foreign OEMs imported the finished products into various countries around the world, including the United States;

6.  The OEMs sold the LCD televisions, computer monitors, and notebook computers to distributors, to retailers such as Best Buy or Walmart, or directly to end consumers, e.g., via the Internet;

7.  The retailers sold the finished LCD products to end consumers in the individual states, including presumably the IPPs (or the distributors sold to retailers, that in turn sold to the end consumers).

Motion at 7-8.

Based on this description of the manufacturing process for LCD products, defendants claim that the U.S. economy cannot be said to have been "directly affected" by the alleged conspiracy. Rather, defendants assert that the only "direct" effects of the conspiracy occurred overseas, and that the effects on the U.S. economy are at most "ripple effects" radiating outward from the initial overcharge. *See*, *e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006) ("[T]he FTAIA prevents the Sherman Act from reaching such 'ripple effects.'")

Plaintiffs largely do not contest defendants' description of the complex manufacturing chain for most TFT-LCD products. Instead, they argue that defendants' conduct had a direct effect on the United States economy because the conspiracy was deliberately targeted at the United States. *See*, *e.g.*, Clayton Decl., Exh. 30 (deposition testimony of Chimei President, affirming his statement in plea agreement that the "primary purpose" of the conspiracy was to "fix the price of certain TFT-LCD sold in the United States and elsewhere"), Exh. 37 (same for Chunghwa Vice President), Exh. 45 (same for LG Vice President), Exh. 56 (testimony of LG employee that LG understood panels used in Dell products would be sold in the United States). Plaintiffs point out that the United States is the largest market for LCD products. *See*, *e.g.*, Clayton Decl., Exh. 5 (Samsung presentation noting that "[t]he United States will remain the leading geography in the marketplace, in terms of both volume and revenue"); Clayton Decl., Exh. 37 (testimony of Chunghwa Vice President that most of its panels go to the United States). Further, many defendants had American subsidiaries and U.S.-based employees that they used to market and sell their products specifically to American companies. *See*, *e.g.*, Clayton Decl., Exh. 1-3 (AUO reports documenting sales visits to American customers). In fact, one AUO trip report suggests that it leveraged its American subsidiary to help it tailor its products for its American customers. *See* Clayton

11

Decl., Exh. 4 (presentation discussing possibility of using "AUO of America" to "ensure that AUO displays are designed into new opportunities rather than competitive LCDs").

Defendants also used their American employees in furtherance of the conspiracy. *See*, *e.g.*, Clayton Decl., Exh. 10 at 16 (email directing Sharp U.S. employee to "[p]lease check on US side and let us know OUR COMPETITORS' PRICING for [APR]-JUN with your comments"), Exh. 11 (email from Hitachi U.S. employee, discussing competitors' pricing), Exh. 32 (discussing email in which Chimei U.S. employee is instructed to "talk with LG person to raise up the price before submit pricing to Apple"), Exh. 56 (deposition testimony that Samsung employee directed Samsung U.S. employee to get pricing information from competitors), Exh. 59 (Sharp employee describing emailing his superiors in Japan pricing information learned from discussions with competitors). As additional evidence that defendants' actions were targeted at the United States, plaintiffs point out that defendants monitored "street prices" of their customers' goods to inform their price-fixing strategy. Clayton Decl., Exh. 13 (discussing meeting between LG and Samsung, and noting that "[p]anel price increase is directly linked to the street price increase of the set"), Exh. 14 (email discussing decision between LG and Sharp to "collude on prices around $650 for 32W" which would "allow retail positioning of $1999 in the North American market"), Exh. 15 (declaration of Chunghwa employee that he monitored "street prices" because that information "affected the prices that Chunghwa was able to obtain for the TFT-LCD panels it sold"), Exh. 37 (deposition testimony that street prices helped determine whether or not to raise panel prices).

Further, plaintiffs emphasize the relationship defendants had with the largest U.S. OEMs, such as Dell and HP. These relationships took place in large part within the United States. *See*, *e.g.,* Clayton Decl., Exh. 44 (LG employee discussing meetings with Dell personnel in Austin), Exh. 47 (same), Exh. 72 (Dell employee discussing monthly meetings in Austin with suppliers); Declaration of Timothy Tierney, ¶5 ("The negotiations with the panel suppliers over the quantity and price of HP's purchases took place primarily or completely in the United States."); *see also* Knox Decl., Exhs. 9-12 (contracts between various defendants and HP and Dell containing U.S. choice-of-law clauses). One document produced by plaintiffs illustrates the degree to which the conspiracy was focused on American OEMs. In the document, a Hitachi U.S. employee writes: "Dell plan[s] to continually drive down the price of

12

their products to gain overall marketshare. . . . The reality is that senior mgmt at Dell will continue to drive the cost targets until the market makes them stop (until everyone says no and they have no suppliers willing to sell at requested targets.). It is that simple. I have talked with DBU, LG, SAM, and Sharp and everyone agrees with this." Clayton Decl., Exh. 6; *see also* Clayton Decl., Exh. 55 (Samsung employee describing communications with competitors during Dell's monthly electronic bidding auctions); Clayton Decl., Exh. 9 (email discussing information exchange between Chimei and AUO regarding HP price offers).

Finally, plaintiffs highlight the guilty pleas of many companies and executives involved in the price-fixing conspiracy, and to their admissions that the conspiracy was targeted at the United States. *See*, *e.g.*, Joint Sentencing Memorandum, Master Docket No. 1508 (February 2, 2010) (Chimei); Joint Sentencing Memorandum, Master Docket No. 1900 (July 22, 2010) (HannStar); Joint Sentencing Memorandum, Master Docket No. 1000 (May 20, 2009) (Hitachi); Joint Sentencing Memorandum, Master Docket No. 749 (December 8, 2008) (LG); Joint Sentencing Memorandum, Master Docket No. 750 (December 8, 2008) (Sharp). Plaintiffs also point out that many of defendants' witnesses have pleaded the Fifth – allowing for an adverse inference – and that the declarations defendants have submitted in support of their motion are largely from individuals who have admitted to price fixing.

Plaintiffs claim that the collusive activity outlined above had undeniably direct effects on the United States. They argue that the inflated prices of LCD panels were "passed through" to American consumers, regardless of how the LCD panels ultimately found their way into the United States. *See*, *e.g.*, Class Certification Order at 24-26 (discussing expert report of Dr. Janet S. Netz). They claim that this "pass through" constitutes a direct effect under the FTAIA.

The Court agrees with plaintiffs' construction of the "domestic injury" exception to the FTAIA. At bottom, defendants' proposed definition of "direct effect" is too narrow. In price-fixing cases such as this one, defendants would limit a "direct effect" to the financial harm caused by the first sale of a price-fixed product. Placing such a limit on the FTAIA's domestic injury exception would all but eviscerate the distinction between the "domestic injury" exception and "import commerce," which is not subject to the FTAIA. *Cf. Minn-Chem*, 2011 WL 4424789, at *8 ("The FTAIA differentiates between conduct that 'involves' [import] commerce, and conduct that 'directly, substantially, and

13

foreseeably' affects such commerce.").

Further, adopting a definition of "direct" under which only the first sale of a product could satisfy the standard would exclude from the Sherman Act's reach a significant amount of anticompetitive conduct that has real consequences for American consumers. As this case illustrates, modern manufacturing takes place on a global scale. The Court is skeptical that Congress intended to remove from the Sherman Act's reach anticompetitive conduct that has such a quantifiable effect on the U.S. economy. *Cf. Hartford Fire*, 509 U.S. at 796 n.23 ("The FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy."); *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) ("[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused.").

To be sure, the "direct effect" requirement places concrete limits on the ability of a plaintiff to invoke the federal antitrust laws. The Ninth Circuit has held that anticompetitive conduct has a "direct effect" on U.S. commerce only when the effect of the conduct "proceed[s] from one point to another in time or space without deviation or interruption." *LSL Biotechnologies*, 379 F.3d at 680 (quoting Webster's Third New International Dictionary 640 (1982)). The effect must "follow[] as an immediate consequence of the defendant's activity." *Id.* (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)). In the Court's view, however, an effect does not become "indirect" simply because the American OEMs use a complex manufacturing process. Where, as here, the nature of the effect does not change in any substantial way before it reaches the United States consumer, the effect is an "immediate consequence" of the defendant's anticompetitive behavior. In other words, because the effect of defendants' anticompetitive conduct did not change significantly between the beginning of the process (overcharges for LCD panels) and the end (overcharges for televisions, monitors, and notebook computers), the effect "proceeded without deviation or interruption" from the LCD manufacturer to the American retail store. No intervening events interrupted its journey.

Defendants argue that plaintiffs cannot recover for what they variously refer to as "spillover effects," "ripple effects," or "twists and turns" in the path between their foreign anticompetitive conduct

14

and its effect on the United States. *See*, *e.g.*, *Intel Corp.*, 452 F. Supp. 2d at 561 ("[T]he FTAIA prevents the Sherman Act from reaching such 'ripple effects.'"); *Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F. Supp. 920, 924 (E.D.N.Y. 1985) (holding that downstream "anticompetitive effect" on "American consumers of Caribbean tour packages" was not a direct effect); *Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F. Supp. 1102, 1106-07 (S.D.N.Y. 1984) ("spillover effect" of higher U.S. drug prices caused by price fixing and market allocation in Europe was not a direct, substantial, and reasonably foreseeable domestic effect). A review of the cases defendants rely on, however, reveals that they are qualitatively different from the case at hand. In all of defendants' cases the primary injury to the plaintiffs was foreign. Courts rightfully rejected those plaintiffs' convoluted attempts to convert their foreign injuries into some nebulous effect on American commerce.

The Seventh Circuit, for example, recently vacated a district court order denying the defendants' motion to dismiss a lawsuit on the ground that the plaintiffs' claims were barred by the FTAIA. In *Minn-Chem*, – F.3d –, 2011 WL 4424789, the Seventh Circuit considered whether the plaintiffs could maintain an antitrust action based upon allegations that the defendants had colluded to raise prices of potash, a key ingredient in fertilizer. *Id.* at *1. The defendants were all foreign companies, who mined potash abroad. *Id.* at *2. The plaintiffs claimed that the defendants fixed prices of potash in Brazil, India, and China, and that "potash sales in the United States are made . . . at prices that are set according to benchmarks established by defendants based on sales in India, China and elsewhere." *Id.* at *10. The plaintiffs' complaint explained:

> Defendants negotiate term contracts for purchases of potash throughout the world. Agreements with buyers in Brazil, India and China typically are made first, and the prices established in those markets directly influence prices in other major markets. Once defendants establish these prices, they use them to determine potash prices in other major markets, including the United States.

*Id.*

The district court denied the defendants' motion to dismiss, but certified the question for immediate interlocutory appeal. On appeal, the Seventh Circuit found that the plaintiffs had not provided adequate allegations of a "direct effect." Finding that the "chain-of-events allegation is cryptic and relies on too many intervening variables to suffice as support for application of the FTAIA's direct-effects exception," the Seventh Circuit vacated the district court's order denying the defendants'

15

motion to dismiss. *Id.* at *11 ("[T]he allegations here amount to nothing more than what courts have termed a 'ripple effect' on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such 'ripple effects.'" (internal quotation marks omitted)).

Importantly, however, the Seventh Circuit did not reject the plaintiffs' suit simply because the suit involved foreign conduct. Rather, the court implied that the plaintiffs could satisfy the FTAIA if their allegations better explained how the price of potash in Brazil, India, and China affected the price in the United States. *Id.* at *11 ("To satisfy the requirements of *Twombly* and the FTAIA, the plaintiffs needed to provide enough factual content – that is, they needed to provide some factual description of the way in which prices in China, Brazil, and India serve as a 'benchmark' for American prices . . . ."); *see also id.* (noting the "absence of specific factual content to support the asserted proposition that prices in China, India, and Brazil serve as a 'benchmark' for prices in the United States and that this benchmark, if it exists, has a strong enough relationship with the domestic potash market to raise a plausible inference that the defendants' foreign anticompetitive conduct has a 'direct, substantial, and reasonably foreseeable effect' on domestic or import commerce").

The other cases defendants rely on involved even more speculative and "cryptic" theories of causation than *Minn-Chem*. In *Intel Corp.*, for example, the court considered the plaintiff's allegations that Intel had used its influence to force its foreign customers away from buying computer chips from its rival, Advanced Micro Devices ("AMD"). *Intel Corp.*, 452 F. Supp. 2d at 556. In arguing that Intel's conduct had a domestic effect, AMD asserted that "Intel's foreign conduct 'neuters' AMD and makes it less able to compete domestically," thereby raising prices in the United States. *Id.* at 560. The Court found this chain of events too speculative to constitute a direct effect, describing the "twists and turns" of AMD's theory in this fashion:

> Thus, under AMD's logic, a deal between Intel and a German retailer to promote Intel-based systems . . . directly affects U.S. commerce because it reduces AMD's German subsidiary's sales of German-made microprocessors in Germany, which in turn affects the profitability of the U.S. AMD parent, which in turn affects the funds that AMD has for discounting to U.S. customers, which in turn affects the discounts that it offers in particular U.S. transactions, which in turn affects its competitiveness in the United States, and which in turn affects U.S. commerce.

16

*Id.* at 560.[4]

In this case, of course, there are no similar "twists and turns" in plaintiffs theory of domestic effect. Plaintiffs argue that defendants colluded to increase the prices of LCD panels, a major component in electronic products that are imported into the United States. The increased price of the components caused the prices of the finished products in the United States to increase. If this effect is not "direct," it is difficult to imagine what would be.

Similarly, in *Liamuiga Tours*, the plaintiff was a tourism company located solely in St. Kitts. *Liamuiga Tours*, 617 F. Supp. at 921. Defendant, a New York travel company that provided tourism packages to St. Kitts, terminated its relationship with plaintiff. Plaintiff sued, claiming that defendant was conspiring to monopolize the tourism business on the island. *Id.* at 922. As with *Intel*, the court found that "[t]he consequences suffered by plaintiff are limited to St. Kitts." *Id.* at 924. Plaintiff attempted argue that these consequences affected American tourists because it meant "less competition among DSO's and consequent higher costs to American travel agents, and their clients, booking tours to St. Kitts." *Id.* The court rejected this argument, finding the domestic consequences "speculative." *Id.* at 925.

Finally, in *United Phosphorous, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001), an Indian chemical manufacturing company claimed that it had been improperly excluded from manufacturing two chemicals used in the production of Ethambutol, a drug used to treat tuberculosis. As with the above cases, the Indian company attempted to convert its foreign injury into a matter of domestic concern by arguing that its exclusion from the market let to higher prices of Ethambutol in the United States. The Court found that there was no evidence linking the foreign anticompetitive conduct and its purported effect. *Id.* at 1013 ("The record indicates that there is no factual basis by which

---

[4] Defendants also rely on *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452 (D. Del. 2007), a class action brought by indirect purchasers of Intel microprocessors. The court dismissed that case based on the fact that the indirect purchasers necessarily relied on AMD's speculative theory of causation. *See id.* at 456 ("Here, Class Plaintiffs make the same allegations as AMD, and therefore, Class Plaintiffs' allegations have the same 'twists and turns' that the Court noted with respect to AMD's allegations, plus additional 'forks in the road' concerning whether the weakened condition of rivals like AMD ultimately led Intel to charge higher prices for its microprocessors, which in turn caused original equipment manufacturers ('OEMs') to charge retailers higher wholesale prices for PCs, which in turn caused retailers to pass that price increase on to consumers in the form of higher retail prices for PCs.").

1 Plaintiffs can claim that there is a link between alleged misconduct in claimed foreign AB markets and
2 the supply or price of Lederle's ethambutol in the United States."); *see also Eurim-Pharm GmbH v.*
3 *Pfizer Inc.*, 593 F. Supp. 1102 (S.D.N.Y. 1984) (rejecting German company's attempt to bring antitrust
4 suit in the United States by claiming that the monopoly that caused its foreign injury also harmed
5 consumers in the United States); *Papst Motren GmbH v. Kanematsu-Gothu (U.S.A.), Inc.*, 629 F. Supp.
6 864 (S.D.N.Y. 1986) (dismissing antitrust counterclaims based on lost sales of computer motors in
7 Japan).

8 In all of these cases, the plaintiffs' injuries occurred overseas, and only through somewhat
9 tortured theories of causation could the plaintiffs attempt to bring the anticompetitive conduct within
10 the reach of U.S. law. In this case, of course, plaintiffs have identified domestic injury that is concrete
11 and quantifiable. More importantly, the domestic injury is directly traceable back to the defendants'
12 anticompetitive conduct.[5] *See Metallgesellschaft AG v. Sumitomo Corp. of America*, 325 F.3d 836, 842
13 (7th Cir. 2003) (holding that FTAIA did not bar antitrust suit based upon allegations that the defendants
14 had illegally manipulated the price of copper contracts traded on the London Metals Exchange, in part
15 because "it would be inappropriate to ignore the presence of actual trading on copper futures in the
16 United States and the deliveries of physical copper to the California warehouse").

17 The only case that defendants have cited that involved a true domestic injury is *In re Static*
18 *Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313 (N.D. Cal., Dec. 31, 2010). The
19 court in *SRAM* faced the same question presented here: whether a group of indirect purchasers could
20 proceed with "claims for damages based on indirect purchases in the United States of SRAM or finished
21 products containing SRAM where the SRAM was originally sold by Defendants to a customer in a
22 foreign country." *Id.* at *1. Judge Wilken concluded that plaintiffs could only recover on those claims
23 to the extent that the SRAM was "specifically designed" to be sold in the United States. *Id.* at *7.

24 *SRAM* does not help defendants' argument. In fact, *SRAM*'s holding implicitly rejects

---

26 [5]Indeed, defendants' actions speak to this very point. Plaintiffs have produced materials
suggesting that defendants' employees monitored the prices of LCD products in the United States.
27 Defendants apparently used this information to inform their price-fixing strategy; knowing prices of
finished goods in the United States helped them understand the amount they could increase the prices
28 of their LCD panels. Thus, defendants' own actions confirm that an increase in the price of LCD panels
has "direct," "immediate" consequence on American prices.

18

defendants' argument that the direct effects of anticompetitive conduct cease once the first sale of a product has occurred. To the extent defendants argue that this Court should reach the same conclusion as the court in *SRAM*, the Court declines to do so. In the Court's view, the concern identified in *SRAM* is better addressed through the requirement that the anticompetitive effects of a defendants' conduct on the United States be "reasonably foreseeable." *See DRAM*, 546 F.3d at 985 (to fall under domestic injury exception to FTAIA's jurisdictional bar, anticompetitive conduct must have "a direct, substantial, and reasonably foreseeable effect on domestic commerce").

Accordingly, the Court concludes that plaintiffs have adequately established that a material question of fact exists regarding whether defendants' alleged conduct had a direct effect on United States commerce. This is sufficient to invoke the domestic effect exception to the FTAIA. Because the Court concludes that the conduct falls under the domestic effect exception to the FTAIA's jurisdictional bar, it need not reach defendants' contention that the FTAIA bars plaintiffs' state law claims. *See In re Potash Antitrust Litigation*, 667 F. Supp. 2d 907, 927-28 (N.D. Ill. 2009) (noting the potential for conflict if "state antitrust laws reached foreign commercial activity that federal laws did not" but declining to reach issue because the FTAIA did not bar the plaintiffs' claims), *vacated by Minn-Chem*, – F.3d –, 2011 WL 4424789.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' joint dispositive motion regarding indirect purchaser claims based on foreign sales. Docket Nos. 2868, 2907.

**IT IS SO ORDERED.**

Dated: October 5, 2011

SUSAN ILLSTON
United States District Judge