1
Bruce L. Simon (State Bar No. 96241)
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
2
44 Montgomery Street, Suite 2450
San Francisco, California 94104
3
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
4

5
Richard M. Heimann (State Bar No. 63607)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
6
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
7
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

8
*Co-Lead Counsel for the Direct Purchaser Plaintiffs*

9

10
**UNITED STATES DISTRICT COURT**

11
**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

12

13
IN RE: TFT-LCD (FLAT PANEL)
ANTITRUST LITIGATION

14

15
This Document Relates to:

16
ALL DIRECT PURCHASER
CLASS ACTIONS

17

18

19

20

21

22

23

24

25

26

27

28

Case No. MDL 3:07-md-1827 SI

**CLASS ACTION**

**DIRECT PURCHASER CLASS
PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND
INCENTIVE AWARDS**

Date:      December 19, 2011
Time:      4:00 p.m.
Crtrm.:   10, 19th Floor

The Honorable Susan Illston

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................... 2

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................... 2

II.    THE SETTLEMENTS COMPARE VERY FAVORABLY TO OTHER ANTITRUST CLASS ACTIONS ........................................................ 4

III.   CLASS COUNSEL FACED SIGNIFICANT LITIGATION RISKS ................... 5

     A.    Defendants Had Tremendous Resources ......................... 5

     B.    Antitrust Class Actions Are Inherently Risky.......................... 6

     C.    Counsel Faced Complex and Difficult Issues ......................... 7

IV.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY ....................... 9

     A.    Direct Purchasers Defeated Two Rounds Of Motions To Dismiss .......... 10

     B.    Discovery Was Extensive, Complex, and Combative ............................ 10

     C.    The Direct Purchasers Prevailed On The Motion For Class Certification And Defeated The Rule 23(f) Appeal................. 12

     D.    Direct Purchasers Defeated The Motion To Compel Arbitration ............. 12

     E.    There Has Been Extensive Expert Discovery ......................... 13

     F.    Direct Purchasers Opposed The Toshiba And AUO Summary Judgment Motions................................................. 13

V.    CLASS COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES ................ 14

     A.    Applicable Legal Standards ......................................... 14

     B.    An Award Of 30% Of The Common Fund Is Reasonable And Fair ........ 17

           1.    The Requested Fees Compare Well to Other Cases.................... 19

           2.    Private Contingent Fees Also Support a 30% Award ................. 20

           3.    The Result Under A Percentage-Of-The-Fund Approach Is Confirmed By A Lodestar Cross-Check ...................... 21

     C.    The Expenses Are Reasonable and Should Be Reimbursed .................. 23

VI.   PAYMENT OF INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES IS APPROPRIATE......................................... 23

VII.  CONCLUSION ................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.
  481 F.2d 1045 (2d Cir.)........................................................................... 15

Arenson v. Board of Trade,
  372 F.Supp. 1349 (N.D. Ill. 1974) ........................................................... 5

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007).................................................................................. 10

Blum v. Stenson,
  465 U.S. 886 (1984)...................................................................... 14, 16, 20

Boeing Co. v. Van Gemert,
  444 U.S. 472 (1980)............................................................................ 14, 17

Brewer v. Southern Union Co.,
  607 F.Supp. 1511 (D. Colo. 1984)............................................................. 6

Camden I Condo. Ass'n, Inc. v. Dunkle,
  946 F.2d 768 (11th Cir. 1991)................................................................... 21

Central R.R. & Banking Co. v. Pettus,
  113 U.S. 116 (1885).................................................................................. 14

Cook v. Niedert,
  142 F.3d 1004 (7th Cir. 1998)................................................................... 24

Craft v. County of San Bernardino,
  624 F. Supp.2d 1113 (N.D. Cal. 2008) ..................................................... 16

Fischel v. Equitable Life Assur. Soc'y,
  307 F.3d 997 (9th Cir. 2002)............................................................... 15, 16

Fisher Bros. v. Mueller Brass Co.,
  630 F.Supp. 493 (E.D. Pa. 1985) ............................................................... 5

Fisher Bros. v. Phelps Dodge Industries, Inc.,
  604 F.Supp. 446 (E.D. Pa. 1985) ............................................................... 4

Hanlon v. Chrysler Corp.,
  150 F.3d 1011 (9th Cir. 1998).......................................................... 15, 16, 17

Hensley v. Eckerhart,
  461 U.S. 424 (1983)............................................................................ 3, 4, 5

*In re Art Materials Antitrust Litig.*,
100 F.R.D. 367 (N.D. Ohio 1983) ........................................................................ 7

*In re Automotive Refinishing Paint Antitrust Litig.*,
MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004) ................................ 4

*In re Brand Name Prescription Drugs Antitrust Litig.*,
186 F.3d 781 (7th Cir. 1999) ................................................................................. 7

*In re Buspirone Antitrust Litig.*,
MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 265338 (S.D.N.Y. Apr. 11, 2003) ............... 20

*In re Cardizem CD Antitrust Litig.*,
No. 99-MD-1278 (E.D. Mich. Nov. 26, 2002) ...................................................... 20

*In re Cement and Concrete Antitrust Litig.*,
1981-1 Trade Cas. (CCH) ¶ 63,892 (D. Ariz. 1981)............................................. 7

*In re Citric Acid Antitrust Litig.*,
191 F.3d 1090 (9th Cir. 1999)............................................................................. 6, 7

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ............................................................................... 24

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
109 F.3d 602 (9th Cir. 1997).......................................................................... 16, 21

*In re CV Therapeutics, Inc. Securities Litig.*,
2007 WL 1033478 (N.D. Cal. April 4, 2007) ........................................... 16, 20, 24

*In Re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. M-02-1486 PJH, slip. op. (N.D. Cal. Nov. 1, 2006) ................................. 4, 15

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ............................................... 17, 20

*In re Linerboard Antitrust Litig.*,
321 F. Supp. 2d 619 (E.D. Pa. 2004) .................................................................... 4

*In re M.D.C. Holdings Sec. Litig.*,
[1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,474 (S.D. Cal. 1990)....................... 20

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000)............................................................................... 24

*In re Methionine Antitrust Litig.*,
Nos. C-00-3961, C-01-0944, C-01-2629, C-01-2759, C-01-3447, C-01-4292 (N.D. Cal. Oct. 3, 2002) ............................................................................................. 15, 19

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................... 6

*In re Pacific Enterprises Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ................................................................................... 19

*In re Plastic Tableware Antitrust Litig.,*
    No. 94-CV-3564, 1995 WL 723175 (E.D. Pa. Oct. 25, 1995) ..................................... 4

*In Re Puerto Rican Cabotage Antitrust Litig.*
    3:08-md-1960 (D.P.R. Sept. 13, 2011) .................................................................... 18

*In re Rubber Chemicals Antitrust Litigation*
    232 F.R.D. 346 (N.D. Cal. 2005) ............................................................................. 5

*In re Shopping Carts Antitrust Litig.,*
    1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ................................................................ 4

*In re Sodium Gluconate Antitrust Litig.,*
    No. C-97-4142 (N.D. Cal. 1999) ............................................................................ 16

*In re Sorbates Direct Purchaser Antitrust Litig.,*
    No. 98-4886 (N.D. Cal. Nov. 20, 2000) .................................................................. 16

*In re Superior Beverage/Glass Container Consolidated Pretrial,*
    133 F.R.D. 119 (N.D. Ill. 1990) .............................................................................. 6

*In Re TFT-LCD (Flat Panel) Antitrust Litig.,*
    267 F.R.D. 291 (N.D. Cal. 2010) ....................................................................... 2, 12

*In Re TFT-LCD (Flat Panel) Antitrust Litig.,*
    618 F. Supp. 2d 1194 (N.D. Cal. 2009) .................................................................. 8

*In re Vitamins Antitrust Litig.,*
    No. 99-197 (TFH), MDL 1285, 2001 U.S. Dist. LEXIS 25067 ............................... 20

*In re Washington Public Power Supply System Sec. Litig.,*
    19 F.3d 1291 (9th Cir. 1994) ............................................................. 14, 15, 21, 22

*Internal Imp. Fund Trustees v. Greenough,*
    105 U.S. 527 (1881) ............................................................................................. 14

*Linney v. Cellular Alaska P'ship,*
    151 F.3d 1234 (9th Cir. 1998) ................................................................................ 7

*Meijer v. Abbott Laboratories,*
    C-07-05985 (N.D. Cal. Aug. 11, 2011) ..................................................... 15, 19, 25

*Mills v. Elec. Auto-Lite Co.,*
    396 U.S. 375 (1970) ....................................................................................... 14, 23

*Muehler v. Land O' Lakes, Inc.,*
    617 F. Supp. 1370 (D. Minn. 1985) ...................................................................... 15

*Paul, Johnson, Alston & Hunt v. Graulty,*
    886 F.2d 268 (9th Cir. 1989)...................................................................... 16

*Perma Life Mufflers, Inc. v. International Parts Corp.,*
    392 U.S. 134 (1968)............................................................................... 14

*Pickett v. Tyson Fresh Meats, Inc.*
    315 F.Supp 1172 (M.D. Ala. 2004) ........................................................... 7

*Pillsbury Co. v. Conboy,*
    459 U.S. 248 (1983)............................................................................... 14

*Powers v. Eichen,*
    229 F.3d 1249 (9th Cir. 2000).................................................................. 16

*Ralston Purina Co. v. Continental Group, Inc.,*
    Civ. No. 77-4093 (E.D. Pa.)...................................................................... 7

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)............................................................................... 14

*Rodriguez v. West Publishing Corp.,*
    563 F.3d 948 (9th Cir. 2009).................................................................... 24

*Ross v. U.S. Bank Ass'n,*
    2010 WL 3833922 (N.D. Cal. Sept. 29, 2010) .................................... 16, 24

*Satchell v. Federal Express,*
    2007 WL 2343904 (N.D. Cal. Aug. 14, 2007)........................................... 16

*Six (6) Mexican Workers v. Arizona Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990).............................................................. 16, 17

*State of Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972)............................................................................... 14

*Torrisi v. Tucson Elec. Power Co.,*
    8 F.3d 1370 (9th Cir. 1993)...................................................................... 16

*Trist v. First Federal Savings & Loan Assn. of Chester,*
    89 F.R.D. 8 (E.D. Pa. 1980)....................................................................... 6

*Van Vranken v. ARCO,*
    901 F. Supp. 294 (N.D. Cal. 1995) ........................................................... 16

*Vincent v. Hughes Air West,*
    557 F.2d 759 (9th Cir. 1977)..................................................................... 23

*Vizcaino v. Microsoft,*
    142 F. Supp. 2d 1299 (W.D. Wash. 2001)................................................... 6

*Vizcaino v. Microsoft Corporation,*
    290 F.3d 1043 (9th Cir. 2002)..........................................................................passim

*Waters v. International Precious Metals Corp.,*
    190 F.3d 1291 (11th Cir. 1999)...................................................................... 17

*Williams v. MGM-Pathe Communications Co.,*
    129 F.3d 1026 (9th Cir. 1997).................................................................... 17, 16

*Wininger v. SI Management L.P.,*
    301 F.3d 1115 (9th Cir. 2002)....................................................................... 15

**STATUTES**

15 U.S.C. § 6a ........................................................................................................ 7

28 U.S.C. § 1407 .................................................................................................... 9

**OTHER AUTHORITIES**

1 A. Conte, *Attorney Fee Awards* § 9:05 (2d ed. 1993) ................................................ 19

4 William B. Rubenstein, et al., Newberg on Class Actions § 11:38 (4th ed. 2008).................. 24

Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043
    (2010) ................................................................................................................. 15

H. Newberg, *Attorney Fee Awards* § 2.19 (1986) .......................................................... 23

Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65
    Fordham L. Rev. 247 (1996) .............................................................................. 20

*Manual for Complex Litigation (Fourth)* §14.121 (2004) ............................................. 22

Robert H. Lande & Joshua P. Davis, *Benefits From Private Antitrust Enforcement: An
    Analysis of Forty Cases*, 42 U.S.F. L. Rev. 879 (2008)............................................ 4

Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action
    Settlements: 1993-2008*, 7 J. Empir. L. Stud. 248 (2010)..................................... 7, 21

Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An
    Empirical* Study, 53 U.C.L.A. L. Rev. 1303 (2006) ............................................. 24

# NOTICE OF MOTION AND MOTION

## TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE THAT** on December 19, 2011 at 4:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Susan Illston, United States District Judge of the Northern District of California, located in Courtroom 10, 19th Floor, 455 Golden Gate Avenue, San Francisco, California, Plaintiffs and Co-Lead Class Counsel will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 23(h)(1) and 54(d)(2) for an Order awarding:

1.　　Attorneys' fees to Class Counsel in the amount of $121,506,672.60 which equals 30% of the $405,022,242 settlement fund created from the settlements with the Chimei, Chunghwa, Epson, Hannstar, Hitachi, LG Display, Mitsui, Samsung, Sanyo, and Sharp Defendants.

2.　　Reimbursement of $6,055,335.31 in expenses incurred to date by Class Counsel on behalf of the Class Members.

3.　　Advancement of $1,000,000 to cover anticipated expenses through trial.

4.　　Incentive awards of $15,000 for each of the eleven court-appointed class representatives: A.M. Photo & Imaging Center, Inc.; CMP Consulting Services, Inc.; Crago, Inc.; Home Technologies Bellevue, LLC; Nathan Muchnick, Inc.; Omnis Computer Supplies, Inc.; Orion Home Systems, LLC; Royal Data Services, Inc.; Texas Digital Systems, Inc.; Univisions-Crimson Holding, Inc.; and Weber's World Company.

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Bruce L. Simon; the Declaration of Elizabeth C. Pritzker;[1] the Declaration of Richard M. Heimann; argument by counsel at the hearing before this Court; any papers filed in reply; such oral and documentary evidence as may be presented at the hearing of this motion; and all papers and records on file in this matter.

---

[1] Attached to the Declaration of Elizabeth C. Pritzker are declarations from each of the firms reporting time in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

After over four years of extensive, hard-fought litigation in this complex antitrust class action, Co-Lead Class Counsel[2] for Direct Purchaser Class Plaintiffs ("Direct Purchasers") have secured settlements totaling $405,022,242 (the "Settlement Fund") for the Class Members. Class Counsel have obtained this extraordinary relief through settlement with the Chimei, Chunghwa, Epson, HannStar, Hitachi, LG Display, Mitsui, Samsung, Sanyo, and Sharp Defendants (collectively the "Settling Defendants"). The recovery ranks at the very top of antitrust recoveries in direct purchaser cases, both in the Northern District of California and elsewhere. This result was achieved despite vigorous defenses and numerous substantive issues that made the ultimate success of the action difficult to predict. The settlements reflect the skill, expertise, and hard work of Co-Lead Class Counsel and the other plaintiffs' counsel involved (collectively, "Plaintiffs' Counsel"). The benefit to the Class Members is substantial when compared to the continued litigation risks.

Plaintiffs' Counsel have pursued this litigation on a purely contingent basis since its inception. To date, Plaintiffs' Counsel collectively have spent over 250,000 hours of uncompensated professional time litigating this case over five years, while advancing out of pocket costs of $6,055,335.31, all with the real risk of non-recovery. *See* the accompanying Declaration of Elizabeth C. Pritzker ("Pritzker Decl."), ¶¶11, 22. In addition, the eleven Court-appointed class representatives have proven invaluable to the case, expending significant time and

---

[2] As used herein, the term "Co-Lead Class Counsel" refers to Pearson, Simon, Warshaw & Penny, LLP ("PSWP"); and Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"). *See* Pretrial Order No. 3: Order Appointing Interim Lead Class Counsel; Duties of Interim Lead Class Counsel and Liaison Counsel (Doc. No. 224) (appointing PSWP and LCHB Interim Co-Lead Counsel; Girard Gibbs Interim Liaison Counsel); Order Granting In Part And Denying In Part Direct Purchaser Plaintiffs' Motion For Class Certification; Granting Defendants' Motion To Strike Untimely Declarations (appointing LCHB and PSWP Co-Lead Class Counsel). *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010).
No less than 35 other firms were involved in prosecuting this case. As set out in Direct Purchaser Plaintiffs' Separate Statement Regarding Organization of Plaintiffs' Counsel, Co-Lead Counsel organized the firms into groups for assigned tasks. Doc. No. 288. Those groups and the work they performed are more fully laid out in the accompanying Declaration of Bruce L. Simon ("Simon Decl.").

effort assisting in the prosecution.

The recovery is not only impressive in terms of absolute magnitude, but also relative to the total volume of commerce. The settlements comprise almost 15% of the total commerce (given that the Epson and Chunghwa percentages have been recalculated to account for opt-outs), an outstanding amount when compared to other settlements. *See*, *infra*, Section III(B)(2). The cooperation provided as non-cash consideration in the settlement agreement has also proven very important. As stated by the United States Supreme Court, when determining an award of attorney fees, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). This is an excellent result.

In accordance with well-established precedent, Plaintiffs' Counsel seek an award of attorneys' fees and reimbursement of out-of-pocket costs and expenses. Given the facts of this case, and the work performed to date by Plaintiffs' Counsel to obtain the Settlement Fund for Class Members, Direct Purchasers and Co-Lead Class Counsel respectfully request that the Court grant this motion and enter an order:

- Awarding to Co-Lead Class Counsel attorneys' fees in the amount of $121,506,672.60, 30% of the Settlement Fund, for distribution to Plaintiffs' Counsel;

- Reimbursing Class Counsel from the Settlement Fund for their reasonable out-of-pocket expenses of $6,055,335.31, which were necessarily incurred in connection with the prosecution of this action.

- Advancing $1,000,000.00 to cover expenses reasonably expected to be incurred in advancing this action through trial; and,

- Awarding the eleven Class Representatives, who assisted in the prosecution, incentive awards of $15,000 each.

Considering the excellent result achieved, along with the risks involved in litigating a large antitrust class action case, the sophistication of the work performed, and the complex legal issues involved, the requested fee is justified under a percentage of the fund analysis. With a historical rate lodestar of $110,825,798.18,[3] the cross-check yields a multiplier of 1.096, demonstrating that a 30% fee award is reasonable and in accord with case law. Simon Decl., ¶ 8.

---

[3] For purposes of calculating the lodestar, counsel used August 31, 2011 as the end date. Any work performed after that date, including the work opposing the non-settling Defendants' summary judgment motions, has not been included.

## II.    THE SETTLEMENTS COMPARE VERY FAVORABLY TO OTHER ANTITRUST CLASS ACTIONS

The Ninth Circuit teaches that the two most important factors in determining attorneys' fees in class action settlements are the degree of success of the litigation and the magnitude of the risk counsel undertook. *Vizcaino v. Microsoft Corporation,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002), *cert. denied sub nom. Vizcaino v. Waite*, 537 U.S. 1018 (2002); *accord Hensley*, 461 U.S. at 436. By these standards, the attorneys' fees requested here are easily justified.

Co-Lead Class Counsel have secured over $405 million in settlements where Defendants denied any wrongdoing whatsoever despite criminal indictments and guilty pleas. As noted above, the Supreme Court has held that in determining the amount of attorney's fees to award, a court should examine "the degree of success obtained." *Hensley*, 461 U.S. at 436. The Ninth Circuit has confirmed that "[e]xceptional results are a relevant circumstance" in deciding a fee award in common fund cases. *Vizcaino*, 290 F.3d at 1048 (citing *Torrisi*, 8 F.3d at 1377). Not only is the recovery here exceptional in terms of absolute magnitude, but it also stands apart in terms of recovery relative to commerce.

In terms of magnitude, the Settlements are on the high end of forty large, recent private antitrust cases. *See* Robert H. Lande & Joshua P. Davis, *Benefits From Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. Rev. 879 (2008) (*Benefits*). In terms of percentage, the recovery here compares very favorably to settlements approved in other price-fixing cases. The recovery, $405,022,242, represents almost 15% of the best estimate of the total commerce, an excellent recovery by any metric. Simon Decl. at ¶ 21. This does not consider the substantial cooperation the Settling Defendants agreed to provide.

The result significantly exceeds the recovery in other comparable antitrust cases. *See, e.g.*, *In Re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486 PJH, slip. op. (N.D. Cal. Nov. 1, 2006) (approving settlements of 10.53% to 13.96% of sales); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (recovery represented approximately 2% of sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (1.62% of sales); *In re Plastic Tableware*

*Antitrust Litig.*, Case No. 94-CV-3564, 1995 WL 723175, at *1 (E.D. Pa. Oct. 25, 1995) (3.5% of sales); *In re Shopping Carts Antitrust Litig.*, 1983 WL 1950, at *9 (S.D.N.Y. Nov. 18, 1983) (3% of sales); *Fisher Bros. v. Phelps Dodge Industries, Inc.*, 604 F.Supp. 446, 451 (E.D. Pa. 1985) (3% of sales); *Fisher Bros. v. Mueller Brass Co.*, 630 F.Supp. 493, 499 (E.D. Pa. 1985) (recoveries equal to 0.1%, 0.2%, 0.3%, 0.65%, 0.88%, and 2.4% of defendants' total sales). In fact, in *In re Rubber Chemicals Antitrust Litigation*, the court characterized a settlement representing 4% of the defendants' sales as an "excellent recovery." 232 F.R.D. 346 (N.D. Cal. 2005). By that yardstick, the "degree of success" in this case, *Hensley, supra*, strongly supports the requested fee.

### III.  CLASS COUNSEL FACED SIGNIFICANT LITIGATION RISKS

Risk is an important factor to consider in determining a fair attorney's fee award. *See Vizcaino*, 290 F.3d at 1048. The settlements here were obtained in the face of substantial risk, Simon Decl., ¶¶ 12-18, and the action itself was inherently risky for Plaintiffs' Counsel to undertake and finance. Plaintiffs' Counsel undertook to prosecute this highly complex litigation on a wholly contingent basis and expended more than 250,000 hours in professional time and substantial expenses with no guarantee of payment or reimbursement.

### A.  Defendants Had Tremendous Resources

Plaintiffs' Counsel also faced the financial resources and legal talent of very large corporations and their highly skilled and experienced counsel. That the Defendants here were represented by top law firms is a significant factor to consider in evaluating the worth of Plaintiffs' Counsel's services. *See, e.g.*, *Arenson v. Board of Trade*, 372 F.Supp. 1349, 1354 (N.D. Ill. 1974) (quality of opposing counsel is important in evaluating the quality of the work done by plaintiffs' counsel). Defendants' counsel literally are a Who's Who of the antitrust defense bar. Certain Defendants hired more than one law firm. By way of example of the resources available to the Defendants, Morgan, Lewis & Bockius (Hitachi's counsel) employs over 1,300 attorneys in 22 offices worldwide, while Cleary, Gottlieb, Steen & Hamilton (LG Display's counsel) employs over 1,100 lawyers in 14 global offices. *See* http://www.morganlewis.com; http://www.cgsh.com /about/overview/. Almost all of the defense

law firms were ranked in Vault's top 100 prestige rankings.  *See* http://www.vault.com (ranking

Defendants' counsel 8, 9, 18, 21, 23, 52, 57, 58, and 86 in overall prestige, and ranking Davis

Wright Tremaine second in the Pacific Northwest).

The resources available to the opposing parties are also an important risk factor to be

considered.  *See Brewer v. Southern Union Co.,* 607 F.Supp. 1511, 1531 (D. Colo. 1984); *Trist v.

First Federal Savings & Loan Assn. of Chester,* 89 F.R.D. 8, 13 (E.D. Pa. 1980).  The enormity of

the Defendants' resources is apparent from their publicly available financial disclosures and the

breadth of their business operations.  As an example, Samsung Corporation, parent of the

Samsung Defendants, has $294.5 *billion* in assets, and employs over 275,000 people.  *See*

http://www.samsung.com/us/aboutsamsung/corporateprofile/ourperformance/

samsungprofile.html.

In *Vizcaino*, the district court noted that class counsel's risk was greater because the

defendant was Microsoft, one of the nation's largest and most formidable companies, and was

represented by several law firms who defended the case vigorously for several years.  *See*

*Vizcaino v. Microsoft*, 142 F. Supp. 2d 1299, 1303 (W.D. Wash. 2001) (*Vizcaino II*).  The district

court also noted that a high risk factor is one reason for increasing attorneys' fee awards above

the 25% benchmark.  *Id.* at 1303-4.

**B.**     **Antitrust Class Actions Are Inherently Risky**

In reviewing Defendants' vigorous defenses, no one can claim Plaintiffs' case was without

risk.  Furthermore, as an antitrust case with foreign defendants, and both components and finished

products, this case carried more risks than non-antitrust cases.  "Antitrust litigation in general, and

class action litigation in particular, is unpredictable."  *In re NASDAQ Market-Makers Antitrust*

*Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998).  "Indeed, the history of antitrust litigation is replete

with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages,

or only negligible damages, at trial or on appeal."  *Id.* at 476.  "The 'best' case can be lost and the

'worst' case can be won, and juries may find liability but no damages.  None of these risks should

be underestimated."  *In re Superior Beverage/Glass Container Consolidated Pretrial*, 133 F.R.D.

119, 127 (N.D. Ill. 1990).

Moreover, risks are greater in class action litigation. The records of the federal courts are replete with complex cases that have been only partially successful or wholly unsuccessful. *See, e.g., In re Citric Acid Antitrust Litig.*, 191 F.3d 1090 (9th Cir. 1999), *cert. denied sub nom. Gangi Bros. Packing Co. v. Cargill, Inc.*, 529 U.S. 1037 (2000) (Ninth Circuit affirmed grant of summary judgment in favor of Cargill, the only defendant not to settle).[4] *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785-87 (7th Cir. 1999), *cert. denied*, 528 U.S. 1181 (2000) (after plaintiffs obtained a reversal of summary judgments in favor of defendant pharmaceutical companies, case went to trial and the trial court granted a directed verdict, which was largely affirmed in a second appeal); *Ralston Purina Co. v. Continental Group, Inc.*, Civ. No. 77-4093 (E.D. Pa.) (opt-out from antitrust class action settlement lost a directed verdict at trial, notwithstanding prior government criminal convictions); *Pickett v. Tyson Fresh Meats, Inc.* 315 F.Supp 2d 1172 (M.D. Ala. 2004) ($1.2 billion jury verdict overturned on renewed motion for judgment as a matter of law), *aff'd*, 420 F. 3d 1272 (11th Cir. 2005). Indeed, one recent study showed that of 564 attempted class actions brought against insurers, only 12% led to a class settlement. Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empir. L. Stud. 248, at 24 (2010) ("*Attorneys' Fees and Expenses*"). The number of settlements achieving a substantial class recovery is far lower.

### C.    Counsel Faced Complex and Difficult Issues

Multiple legal issues significantly enhanced the risk here.[5] Defendants advanced every conceivable argument about the scope and nature of the conspiracy, including denying liability altogether. They also argued that there was not one overarching conspiracy, but multiple separate and distinct conspiracies; that the statute of limitations had long since run and there was no fraudulent concealment; that the FTAIA, 15 U.S.C. § 6a, barred many of the claims; and that the

---

[4] In fact, *Citric Acid* is the centerpiece of the Toshiba Entities' Motion for Summary Judgment. *See* Doc. No. 3581 (citing *Citric Acid* repeatedly).

[5] *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1240-41 (9th Cir. 1998) (discussing risks of proving fraudulent concealment and damages); *In re Cement and Concrete Antitrust Litig.*, 1981-1 Trade Cas. (CCH) ¶ 63,892 at 75,643 (D. Ariz. 1981) ("*Cement*") (recognizing "complexity and uncertainty" of legal and factual issues in antitrust case); *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D. Ohio 1983) (recognizing difficulties of proof and likely costly trial on the merits).

TFT-LCD products were so differentiated that a common damage methodology could not apply and the class should not be certified.  Also, numerous witnesses either asserted the Fifth Amendment privilege and refused to provide testimony, or claimed to be too ill to testify, or—as foreign residents who retired—could not be compelled to testify at all; that Plaintiffs lacked standing under *Illinois Brick*; and that the class suffered no damages (in fact, one defense expert said there were negative damages). Simon Decl., ¶ 12-14, 69.  Even the amnesty applicant failed to cooperate until a settlement was reached and would not even admit its identity.  *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, 618 F. Supp. 2d 1194, 1195 n. 2 (N.D. Cal. 2009).

Each of these issues required legal research and briefing, and presented potential appellate issues. The Court need only take note of the recently filed summary judgment motions to see that the non-settling Defendants, and even some of the settling Defendants in motions filed against the Indirect Purchaser class, still assert many of these arguments and continue to expend considerable resources to avoid responsibility.  Throughout briefing on motions to dismiss, class certification, and numerous discovery matters, Co-Lead Class Counsel have faced complex and difficult issues of fact and law.  Simon Decl., ¶¶ 12-18.

As this case proceeds through summary judgment and trial against the non-settling Defendants, Co-Lead Class Counsel will be required to deal with such issues as causation and impact, as well as whether those Defendants fraudulently concealed their alleged illegal conspiracy.  A cogent example of the risks inherent in this litigation is the challenge of proving damages on a classwide basis, given Defendants' arguments that there were tens of thousands of Class Members and numerous different products sold by each Defendant at different prices.

The requested fee is justified by the risks, all of which existed when the litigation began.  *See* Simon Decl., ¶¶ 12-18.  Co-Lead Class Counsel fought a vigorous and highly-focused battle with Defendants, forcing them to turn over evidence—oftentimes page by page—in order to construct the case.  This work was neither easy nor assured of success.  The tremendous amount of work necessary to enable Co-Lead Class Counsel to achieve this excellent result is set forth below and in greater detail in the Simon Declaration at ¶¶ 26-100.

**IV.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[6]

The Court is familiar with the history of this case, having presided over five years of hotly-contested litigation, represented by thousands of docket entries.  While no single memorandum could adequately describe the details of each substantive motion, procedural matter, discovery dispute, deposition, expert analysis, interrogatory response, and other work necessary to build a case of this magnitude, the following paragraphs endeavor to provide an overview of the procedural history of the case, and the work Plaintiffs' Counsel undertook.

This multidistrict litigation arose from a conspiracy to fix the prices of Thin Film Transistor-Liquid Crystal Display ("TFT-LCD") products.  *See* Simon Decl., ¶ 26.  The first cases were filed in December 2006.  *Id.*, ¶ 13.  In April 2007, the Judicial Panel on Multidistrict Litigation granted a motion for pretrial coordination pursuant to 28 U.S.C. § 1407, and transferred all actions to this Court.  483 F. Supp. 2d 1353 (J.P.M.L. 2007).

In July 2007, the Court appointed Bruce Simon of PSWP and Richard Heimann of LCHB as Interim Co-Lead Counsel for the Direct Purchasers and set forth in a Pretrial Order all of their duties and responsibilities.  *Id.*, ¶ 28.  Because of the U.S. Department of Justice's ("DOJ") criminal investigation, this Court on September 25, 2007 partially stayed discovery.  2007 WL 2782951 (N.D. Cal. Sept. 25, 2007).  The Direct Purchasers were not allowed access to the documents the Defendants had produced to the DOJ, and were not allowed to take any depositions, exchange initial disclosures, or propound any discovery requests regarding the conspiracy's operations, participants, and effects.  The Direct Purchasers were only allowed to propound limited interrogatories to determine the amount of Defendants' sales and to identify their officers and executives.  Simon Decl., ¶ 31.

Despite the fact that there have been indictments and guilty pleas in the related criminal action, this is not a case where the Direct Purchasers could rely on what the government uncovered. The government's case is different from the Direct Purchasers' case in many significant respects, not the least of which is the conspiracy period (the certified Direct

---

[6] The procedural history and all of the work performed by Plaintiffs' Counsel justifying the granting of this motion are set forth in greater detail in the Simon Declaration.

1   Purchasers' class predates the government's conspiracy by two years), the products included in
2   the conspiracy (the Direct Purchasers' case includes panels and finished products whereas the
3   government's case focuses solely on panels), and the scope of the alleged conduct (Direct
4   Purchasers allege an overarching conspiracy with respect to all Defendants whereas the
5   government obtained guilty pleas only from certain Defendants, and often on more discrete
6   conduct). Thus, rather than simplifying the case, the government investigation provided a starting
7   point, and Co-Lead Class Counsel had to develop the Direct Purchasers' case without support
8   from the government investigation. *See* Simon Decl., ¶¶ 12-13.

9       On May 27, 2008, the Court continued the stay of merits document discovery until
10  January 9, 2009. (Doc. No. 631). Class Counsel successfully negotiated a series of pretrial
11  orders with Defendants and the DOJ to, among other things, allow civil discovery to proceed
12  without intruding on the criminal proceedings. Such negotiations were challenging and time-
13  consuming. Simon Decl., ¶¶ 32-34, 37-38.

14      **A.     Direct Purchasers Defeated Two Rounds Of Motions To Dismiss**

15      Defendants moved to dismiss the complaint, twice filing both joint and separate motions.
16  *Id.*, ¶¶ 56-67. The Court granted and denied in part the first wave of motions to dismiss. 586 F.
17  Supp. 2d 1109 (N.D. Cal. 2008). After Plaintiffs re-pleaded certain aspects of their claims, the
18  Court denied the second wave in total. 599 F. Supp. 2d 1179 (N.D. Cal. 2009).

19      On November 24, 2008, the Toshiba entities filed in the Ninth Circuit a petition for a writ
20  of mandamus. They requested a stay of all discovery directed to them until the District Court
21  found that Plaintiffs had filed a complaint that satisfied the pleading requirements set forth in *Bell*
22  *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Simon Decl., ¶ 61. The Direct Purchasers
23  opposed the motion. On December 5, 2008, this Court denied the motion to stay (Doc. No. 125),
24  and on January 28, 2009, the Ninth Circuit denied Toshiba's mandamus petition. Simon Decl.,
25  ¶ 62.

26      **B.     Discovery Was Extensive, Complex, and Combative**

27      While Defendants' motions to dismiss were briefed, argued, and under submission, Direct
28  Purchasers propounded and responded to written discovery. The Direct Purchasers also met and

conferred with each Defendant and litigated discovery motions.  Simon Decl., ¶¶ 51-53, 76-82.

Upon the expiration of the discovery stay, Defendants began producing documents that they had produced to the DOJ and/or the grand jury.  *Id.*, ¶ 39.  Defendants' document productions have taken place on a rolling basis.  *Id.*  In all, Defendants have produced 7,927,892 documents comprising 40,252,422 pages.  *Id.*  Of the nearly eight million documents produced, 1,483,701 documents were produced in Korean, Japanese, or Chinese.  *Id.*, ¶ 47  Those documents were loaded into a database, translated, and analyzed by lawyers fluent in foreign languages, who have had to determine which documents required English translations.  *Id.*, ¶¶ 46-47.

Because most Defendants refused voluntarily to provide the document translations in their possession, Co-Lead Class Counsel spent considerable time, effort, and expense to locate, prioritize, and translate selected evidentiary documents.  Co-Lead Class Counsel have paid substantial sums to third-party translation agencies for such translations, many of which have been marked as deposition exhibits.  *Id.*, ¶ 48.

During the course of discovery, numerous disputes and disagreements arose between Direct Purchasers and Defendants.  Co-Lead Class Counsel fought hard to expand discovery and compel responses from Defendants, both negotiating with defense counsel and arguing before the Special Master.  In the course of seeking discovery, Class Counsel briefed and argued disputes, prepared stipulations and proposed orders for the Special Master, responded and/or objected to some of the Special Master's reports and recommendations, moved to compel discovery and compliance with ACPERA, and appeared before the Special Master numerous times for discovery hearings.  *Id.*, ¶¶ 76-82.

On September 17, 2009, Direct Purchasers began merits depositions.  To date, more than 130 depositions have been taken, of which 50 took place in San Francisco, 40 elsewhere across the country, and 41 outside the United States.  *Id.*, ¶¶ 54-55.  Direct Purchasers have taken 113 depositions of Defendants' witnesses, and have defended 14 class representatives' depositions. *Id.*  Direct Purchasers have also deposed Defendants' experts, and have defended their own experts' depositions.  *Id.*  Many of the depositions of Defendants and their employees have taken

place in Taiwan, South Korea, and Japan, and others have taken place across the continental United States and Hawai'i. *Id.* Co-Lead Class Counsel have traveled extensively to take those depositions, often at considerable expense and requiring months of attorney time combing through mountains of documents to select a reasonable number of relevant exhibits to be used for each deposition.

A summary of the extensive written discovery is set forth in ¶¶ 51-53 of the Simon Declaration, and in Exhibits B and C thereto.

### C. The Direct Purchasers Prevailed On The Motion For Class Certification And Defeated The Rule 23(f) Appeal

The Direct Purchasers' motion for class certification, filed on April 3, 2009, involved some of the case's most extensive and contentious briefing. (Doc. No. 933). The moving papers, accompanying declarations, and proposed order comprised in excess of 1,400 pages, including 86 exhibits, most of which were obtained through depositions and/or extensive document searches. Defendants filed numerous oppositions to the class certification motion, comprising 680 pages and 87 exhibits. (Doc. Nos. 1087, 1081). Direct Purchasers replied to the oppositions, again comprising numerous pages and extensive legal argument and expert analysis. (Doc. No. 1214). After the class certification hearing, the parties filed supplemental briefing and expert reports. Simon Decl., ¶ 68.

On March 28, 2010, the Court certified two Direct Purchaser classes, one for panel purchasers and the other for finished product (televisions, notebooks, and monitors) purchasers. 267 F.R.D. 291 (N.D. Cal. 2010). Certain Defendants then appealed the class certification order pursuant to Federal Rule of Civil Procedure 23(f). After full briefing, on June 17, 2010, the Ninth Circuit denied Defendants' Rule 23(f) petition. Simon Decl., ¶ 57. Direct Purchasers issued notice to Class Members on November 5, 2010. The opt-out period ended on January 4, 2011. *Id.*, ¶ 74.

### D. Direct Purchasers Defeated The Motion To Compel Arbitration

On March 8, 2011, certain Defendants filed a Motion to Stay Direct Purchaser Plaintiffs' Claims That Are Subject Arbitration and to Dismiss Direct Purchaser Plaintiffs' Claims That Are

Subject to Litigation in a Foreign Court. (Doc. No. 2529). In their motion, Defendants argued that the entire Direct Purchaser case should be stayed, and Class Members with contracts containing arbitration provisions should be compelled to arbitrate. Direct Purchasers vigorously contested the motion, as it threatened to terminate the Direct Purchaser case after more than four years of hard-fought litigation. (Doc. No. 2597). The Court denied the motion, but found that Defendants had not waived their right to arbitrate against unnamed Class Members. (Doc. No. 2731). The Court gave Defendants until June 3, 2011 to file an omnibus motion to compel arbitration regarding each Plaintiff subject to an arbitration provision. *Id.* Defendants did not file such a motion. Nevertheless, this motion typifies the inherent risk that Co-Lead Class Counsel have faced at every turn.

**E.    There Has Been Extensive Expert Discovery**

Co-Lead Class Counsel have retained and worked with class and liability experts and consultants. They have paid substantial fees to the experts and consultants for analysis of the global TFT-LCD market, the TFT-LCD price-fixing conspiracy, and the impact of the price-fixing conspiracy on Class Members. Working with experts has entailed many hours of attorney time. Experts had to be prepared for depositions, were consulted regarding damages and liability theories, and helped Co-Lead Class Counsel to understand the TFT-LCD industry. Simon Decl., ¶ 83.

Direct Purchasers and Defendants have now completed the exchange of expert reports. In May 2011, Direct Purchasers served three reports, those of Dr. Ed Leamer, Dr. Ken Flamm, and Dr. Adam Fontecchio. Defendants deposed all three. Defendants' experts served four rebuttal reports in late July 2011. Plaintiffs deposed the Defendants' experts in August. Direct Purchasers then served their experts' reply reports, and Defendants served three sur-rebuttal reports in September 2011. *Id.,* ¶ 85.

**F.    Direct Purchasers Opposed The Toshiba And AUO Summary Judgment Motions**

On September 8, 2011, the Toshiba Defendants filed Motions for Summary Judgment in both the Indirect and Direct Purchaser actions, on the grounds that they claim not to have

participated in the conspiracy.  (Doc. No. 3581).  On September 14, 2011, the Toshiba

Defendants filed a Motion for Partial Summary Judgment Under *Illinois Brick*.  (Doc. No. 3575).

In addition, also on September 14, Toshiba and AUO filed a joint Motion for Summary Judgment

on Production and Capacity grounds.  (Doc. No. 3578).

Direct Purchasers filed oppositions on October 3, 2011.[7]  (Doc. Nos. 3792, 3800, 3803).

The oppositions included extensive briefing, declarations, and thousands of pages of exhibits,

including documents coded in the document review process.  Each opposition entailed hundreds

of hours of work by attorneys and staff.  Defendants filed reply briefs on October 24, 2011.  (Doc.

Nos. 3999, 4043, 4052).  The Court is scheduled to hear argument on the motions on

November 4, 2011.

## V.   CLASS COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

### A.    Applicable Legal Standards

Counsel who represent a class and produce a benefit for class members are entitled to

compensation.  As the Supreme Court stated, "this Court has recognized consistently that a

litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or

his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van

Gemert,* 444 U.S. 472, 478 (1980).  *See also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393

(1970); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 123 (1885).  In *Blum v. Stenson*, the

Supreme Court recognized that under the "common fund doctrine" a reasonable fee may be based

"on a percentage of the fund bestowed on the class."  465 U.S. 886, 900 n.16 (1984).  The

purpose of this doctrine is that "those who benefit from the creation of the fund should share the

wealth with the lawyers whose skill and effort helped create it."  *In re Washington Public Power

Supply System Sec. Litig.,* 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*").  The "common fund

doctrine" is firmly rooted in American case law.  *See, e.g., Internal Imp. Fund Trustees v.

Greenough,* 105 U.S. 527 (1881); *Central R.R.*, 113 U.S. at 123.

---

[7] Although the motions for summary judgment occurred after Plaintiffs' fee cut-off of August 31 for purposes of this motion, they are still germane to the risk faced.

The Supreme Court has repeatedly recognized the importance of private antitrust litigation as a necessary and desirable tool to assure the effective enforcement of the antitrust laws. *See*, *e.g.*, *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *State of Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968). Substantial fee awards in successful cases, such as this one, encourage meritorious class actions, and thereby promote private enforcement of, and compliance with, the antitrust laws. As noted by the Second Circuit in *Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*, "[i]n the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced . . . ." 481 F.2d 1045, 1050 (2d Cir.), *cert. denied*, 414 U.S. 1092 (1973).

Moreover, if counsel are not adequately compensated in successful cases, then "effective representation for plaintiffs" in these cases will not be available. As one court stated:

> The contingent fee and the class action are the 'the poor man's keys to the courthouse.' Both vehicles allow the average citizen and taxpayer to have their injuries redressed and their rights protected. Both permit persons of limited resources to obtain competent legal counsel, an essential ingredient in our adversary system of justice. And both are under constant attack.

*Muehler v. Land O' Lakes, Inc.*, 617 F. Supp. 1370, 1375 (D. Minn. 1985).

The amount of the award of reasonable attorneys' fees and expenses is within the sound discretion of the district court. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *WPPSS*, 19 F.3d at 1296. In the Ninth Circuit, the district court has discretion in a common fund case to choose either the "percentage-of-the-fund" or the "lodestar" method in calculating fees. *Fischel v. Equitable Life Assur. Soc'y*, 307 F.3d 997, 1006 (9th Cir. 2002); *Wininger v. SI Management L.P.*, 301 F.3d 1115, 1123-24 & n.9 (9th Cir. 2002); *Vizcaino,* 290 F.3d at 1047; *WPPSS*, 19 F.3d at 1296.

Modern courts exhibit a clear preference for the "percentage-of-the-fund" method.[8] Not surprisingly, virtually all of the major recent antitrust cases in the Northern District of California

---

[8] *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2052 (2010). The lodestar approach is used more often in "employment, civil rights and other injunctive relief class actions . . . because there is no way to gauge the net value of the settlement or any percentage thereof." *Hanlon*, 150 F.3d at 1029.

have applied the percentage of the fund approach.  *See, e.g., Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J.) (33⅓%); *DRAM*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.) (25%); *In re Methionine Antitrust Litig.*, Nos. C-00-3961, C-01-0944, C-01-2629, C-01-2759, C-01-3447, C-01-4292 (N.D. Cal. Oct. 3, 2002) (Breyer, J.) (22.6%); *In re Sorbates Direct Purchaser Antitrust Litig.*, No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.) (25%); *Van Vranken v. ARCO*, 901 F. Supp. 294 (N.D. Cal. 1995) (25%); *In re Sodium Gluconate Antitrust Litig.*, No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.) (30%).  This Court in particular has applied the same approach in a number of recent cases.  *See, e.g., Craft v. County of San Bernardino*, 624 F. Supp.2d 1113 (N.D. Cal. 2008) (25%) (Illston, J.); *In re CV Therapeutics, Inc. Securities Litig.*, 2007 WL 1033478 (N.D. Cal. April 4, 2007) (30%) (Illston, J.);  *Ross v. U.S. Bank Ass'n*, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010) (25%) (Illston, J.).  Often, this Court applies the percentage of the fund method with a lodestar cross check.  *See, e.g., Satchell v. Federal Express*, 2007 WL 2343904 (N.D. Cal. Aug. 14, 2007), *recon. denied*, 2010 WL 121063 at *1 (N.D. Cal. Jan. 10, 2010), *aff'd*, 2011 WL 2490599 (9th Cir. June 23, 2011) (finding fee reasonable under both the "lodestar" and the "common fund" methods); *Craft*, 624 F. Supp. 2d at 1125 (finding a 5.2 multiplier is reasonable and supported by authority).

Under the percentage approach, the district court awards as a reasonable attorneys' fee a percentage of the fund created by the attorneys' efforts.  *Blum*, 465 U.S. at 900 n.16.  Using this approach, the Ninth Circuit established 25% as a benchmark that a Court may adjust upward or downward as the circumstances of a case require.[9]  In *Vizcaino*, an employment law case, a 28% fee was upheld on the basis of five factors:  (1) the exceptional results for the class, (2) the risk for its counsel, (3) whether any individual non-monetary benefits were obtained, (4) whether the

---

[9] *See Fischel*, 307 F.3d at 1006; *Vizcaino*, 290 F.3d at 1047; *Powers v. Eichen*, 229 F.3d 1249, 1257 (9th Cir. 2000); *Hanlon*, 150 F.3d at 1029; *Williams*, 129 F.3d at 1027; *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) ("*Petroleum*"); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993), *cert. denied*, 512 U.S. 1220 (1994); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

fee is at or below market rates,[10] and (5) the burden on class counsel of prosecuting the case. 290 F.3d at 1048-50.

Plaintiffs' Counsel have prosecuted this action with no guarantee of receiving *anything*, and have advanced all costs and expenses without reimbursement. To date, Plaintiffs' Counsel have expended over 250,000 hours in professional services and incurred $6,055,335.31 in unreimbursed out-of-pocket expenses. Pritzker Decl., ¶¶ 11, 22. As a result of their efforts, Plaintiffs' Counsel have obtained over $405 million in settlements for the Class Members, with two non-settling Defendants remaining. In accordance with Ninth Circuit law, Plaintiffs and Co-Lead Class Counsel, on behalf of Plaintiffs' Counsel, seek an award equal to 30% of the value of the Settlement Fund[11] as compensation for the services rendered, as well as reimbursement of their expenses. This amount is an upward departure from the 25% benchmark, but is warranted in recognition of the extraordinary results achieved for the class, the effort expended by Plaintiffs' Counsel, the risk and expense of prosecuting the case, the skill and expertise of Plaintiffs' Counsel, the skill and expertise of defense counsel, and the length of time between the commencement of the action and its resolution.

**B.     An Award Of 30% Of The Common Fund Is Reasonable And Fair**

In considering whether an award in excess of the 25% benchmark would be fair, a number of factors may be considered, including the exceptional results for the class, the risk for its counsel, whether the fee is comparable to fees awarded in other cases, and the burden on class counsel of prosecuting the case. *Vizcaino*, 290 F.3d at 1048-50. In addition to these factors, the Court may consider other factors including: the work performed, counsel's skill and experience, the complexity of the issues faced, the reaction of the class, and counsel's lodestar. *See, e.g.*, *In re Heritage Bond Litig.*, 2005 WL 1594403, at *18-23 (C.D. Cal. June 10, 2005).

---

[10] The court in *Vizcaino* took care to note that "market rates" are a question of "lawyers' reasonable expectations, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size." 290 F.3d at 1050.

[11] The percentage-of-recovery for fee computation purposes can be based on the total amount of that fund made available, rather than the amount actually used by the Class. *Boeing*, 444 U.S. at 479-80; *Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999), *cert. denied*, 530 U.S. 1223 (2000); *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997); *Mexican Workers*, 904 F.2d at 1311.

The percentage of the fund requested (30%) is slightly in excess of the Ninth Circuit's 25% benchmark established in *Hanlon*, *Vizcaino*, and other cases. The upward adjustment is justified by the extraordinary results achieved, as well as analysis of the aforementioned factors. Moreover, such an award provides the necessary incentive for counsel to continue to bring cases such as this one. The wholly contingent expense incurred by Plaintiffs' Counsel in fees and costs alone – with no guarantee of reimbursement – is daunting for any single law firm or group of firms. Counsel bringing cases of this magnitude need to rely at least on the benchmark fee award in the Ninth Circuit to balance the risk of prosecuting such a case.

Nor does the existence of guilty pleas detract from Class Counsel's efforts. Unlike *In re Puerto Rican Cabotage Litigation*, where the DOJ's concurrent investigation made the case significantly easier and less risky for private plaintiffs, the DOJ investigation and guilty pleas did not ease Plaintiffs' burden here. *See In Re Puerto Rican Cabotage Antitrust Litig.* 3:08-md-1960 (D.P.R. Sept. 13, 2011) (Doc. No. 1019) ("*Cabotage*"). In fact, the DOJ opposed Plaintiffs taking merits discovery here for a considerable period of time. Furthermore, Defendants here used the government investigations *against* Plaintiffs in support of their motions for summary judgment and their oppositions to class certification. *See*, *e.g.*, Toshiba Entities' Motion for Summary Judgment at *22-23 (Doc. No. 3581) (arguing that the DOJ's investigation did not lead to an indictment, and therefore supports summary judgment); Defendants' Joint Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification at *35 (Doc. No. 1077) (citing temporal limits of DOJ indictments and guilty pleas, as well as statements regarding "separate conspiracies," in support of opposition). Unlike *Cabotage*, the instant case proceeded well past discovery, and Defendants fought tooth and nail every step of the way. Virtually every issue in this case was hotly contested, including multiple motions to dismiss, discovery disputes, class certification, and the motions for summary judgment presently under consideration. *See* Simon Decl., ¶¶ 13-18. Although the DOJ has aided Plaintiffs through the criminal prosecutions, Plaintiffs nonetheless had to pave their own path. In doing so, Plaintiffs have fought to establish a case that is significantly broader than the government's case. Simon Decl., ¶ 12.

## 1. The Requested Fees Compare Well to Other Cases

The fees requested here are in line with the percentage of recoveries obtained in other major class action cases, and are thus a fair "market rate." *Vizcaino*, 290 F.3d at 1050. Recent surveys of such recoveries include the following:

- The Federal Judicial Center issued a report highlighting a mean rate of 27% and a median rate of 29% for fee awards in class action settlements approved in district courts in Northern California from 1992 to 1994. T. Willging, L. Hooper & R. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, 147 (1996), cited in *Fischel*, 307 F.3d at 1009.

- A 1996 analysis of 433 shareholder class actions conducted by National Economic Research Associates ("NERA") concluded that "[r]egardless of case size, fees average approximately 32 percent of the settlement." D. Martin, V. Juneja, T. Foster, F. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*? 12-13 (NERA Nov. 1996).

- In *Vizcaino*, the Ninth Circuit surveyed 34 class action fee awards across the nation that involved use of a percentage-of-the-fund method. 290 F.3d at 1052-54. The decisions from the Ninth Circuit involved awards of 16.5-37% of the common fund. The antitrust cases cited generally ranged from 25-30%. *See In re Sorbates*, No. 98-4886 (Legge, J.) (25%: $20 million fee, $82 million fund); *Van Vranken v. ARCO*, 901 F. Supp. 294 (N.D. Cal. 1995) (25%: $19 million fee, $76 million fund); *In re Sodium Gluconate*, No. C-97-4142 (Wilken, J.) (30% fee of $4.8 million recovery).[12] The securities and other cases, meanwhile, ranged from 16.5%-37.1%. *See In re Informix Corp. Sec. Litig.*, No. 97-1289 (N.D. Cal. Nov. 23, 1999) (Breyer, J.) (30%: $40 million fee, $137 million fund); *In re IDB Communication Group, Inc. Sec. Litig.*, No. 94-3618 (C.D. Cal. Jan. 17, 1997) (Hupp, J.) (16.5%: $12 million fee, $75 million fund); *In re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995) (Brooks, M.J.) (30%: $19 million fee, $64 million fund); *In re Melridge, Inc. Sec. Litig.*, No. 87-1426 (D. Ore. Mar 1, 1992, Nov. 1, 1993 and Apr. 15, 1996) (Frye, J.) (37.1%: $20 million fee, $54 million fund).

- A 2008 study of the effectiveness of private antitrust enforcement reviewed "forty of the largest recent successful private antitrust cases." Lande & Davis, *Benefits*, 42 U.S.F. L. Rev. at 879. In addition to finding that private antitrust enforcement could "provide more than four times the deterrence of the criminal fines," the authors noted that of the nine cases with settlement amounts between $100 million and $500 million, the majority awarded fees of 30% or more, with the remainder awarding 25%. *See id.* at p. 46 (Table 7B).

---

[12] To the antitrust cases cited in *Vizcaino* may be added two more that broaden the range, from 22.6%-33.33%. *Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J. )(33⅓%: $17.33 million fee, $52 million fund); *In re Methionine Antitrust Litig.*, Nos. C-003961, C-01-0944, C-01-2629, C-01-2759, C-01-3447, C-01-4292 (N.D. Cal. Oct. 3, 2002) (Breyer, J.) (22.6%: $24 million fee, $107 million fund). Older awards in antitrust cases are collected in 1 A. Conte, *Attorney Fee Awards* § 9:05 (2d ed. 1993).

- A recent article surveying federal class action settlements from 2006 and 2007 showed that courts in the Ninth Circuit, and courts in federal antitrust class action settlements in general, awarded a mean fee of 25% in all cases. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010).

Here, the requested fee award is $121,506,672.60, 30% of the Settlement Fund. Courts in the Ninth Circuit have upheld awards of 30% or more numerous times. *See, e.g.*, *In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (upholding fee award of one-third on the basis complexity of issues faced and risks involved); *In re Heritage Bond*, 2005 WL 1594403, at *18-23 (finding award of one-third justified by result obtained, counsel's effort, experience, and skill, and the great risk assumed by counsel for the class); *In re CV Therapeutics*, 2007 WL 1033478 (30%). Other Circuits have done so as well. *See, e.g.*, *In re Buspirone Antitrust Litig.*, MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 265338, at *11 (S.D.N.Y. Apr. 11, 2003) (awarding 33.3% of a $220 million fund, with a lodestar multiplier of 8.46); *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278, Order at 18-20 (E.D. Mich. Nov. 26, 2002) (20% of $110 million fund; multiplier of 3.7); *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), MDL 1285, 2001 U.S. Dist. LEXIS 25067, at **12-13 (D.D.C. July 16, 2001) (roughly 34% of $360 million).

The instant case presents an extraordinary recovery for the class obtained through the skill and effort of Plaintiffs' Counsel. And although it could be classified as a "mega fund" because of its size, a lodestar cross-check confirms that an upward adjustment to 30% is nonetheless justified. As demonstrated below, 30% of the settlement fund amounts to a multiplier of 1.096, well within, and in fact even below, the standard range of multipliers awarded in similar cases.

## 2. Private Contingent Fees Also Support a 30% Award

As noted in *Vizcaino*, while evidence of such private agreements is not determinative, it can be "probative of the fee award's reasonableness." 290 F.3d at 1050. The requested fee is reasonable when compared to customary private contingency fee agreements. In private contracts, the typical contingency fee is between 33% and 40% of the recovery, and private cases do not face the same risks, expenses, and difficulties faced by attorneys representing a class.[13]

---

[13] *See* Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 Fordham L. Rev. 247, 248 (1996) (noting that "standard contingency fees" are "usually thirty-

*Footnote continued on next page*

Thus, the private market for contingent fee attorneys also validates the requested fee. This fact is germane to an additional applicable factor considered by some courts in determining what percentage to award – whether counsel were precluded from other employment due to the acceptance of the case, especially if that work is private contingency work that would be compensated at 33%. *See, e.g.*, *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 772 n.3 (11th Cir. 1991) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

### 3. The Result Under A Percentage-Of-The-Fund Approach Is Confirmed By A Lodestar Cross-Check

The propriety of the requested fee under a percentage-of-the-fund approach is further confirmed by a cross-check of Plaintiffs' Counsel's lodestar, as was done in *Vizcaino*, 290 F.3d at 1051.[14] As noted there, "the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted," as is the case here. *Id.* at 1050. The total reported lodestar amount in this case is $110,825,798.18 . Pritzker Decl., ¶ 11.[15] The requested fee constitutes a multiplier of approximately 1.096, well within the acceptable range of multipliers awarded in complex cases.[16]

---

*Footnote continued from previous page*
three percent to forty percent of gross recoveries") (emphasis omitted). *See also Blum*, 465 U.S. at 903 ("[i]n tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery."); *In re M.D.C. Holdings Sec. Litig.*, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,474 at 97,490 (S.D. Cal. 1990) ("[i]n private contingent litigation, fee contracts have traditionally ranged between 30% and 40% of the total recovery.").

[14] The lodestar here was obtained by multiplying the number of hours worked by personnel in each firm by a historical rate. The use of a current hourly rate for all hours billed is a permissible way to account for delay in payment. *Petroleum*, 109 F.3d at 609; *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1305 (9th Cir. 1994) ("*WPPSS*"). *See also Vizcaino*, 290 F.3d at 1051 (citing *Gates v. Deukmejian*, 987 F.2d 1392, 1406 (9th Cir. 1992)). Nonetheless, Plaintiffs' Counsel have opted to present historical rates for a cross-check.

[15] A breakdown of the aggregate lodestar by law firm is included in the Pritzker Declaration.

[16] *See, e.g.*, *Vizcaino*, 290 F.3d at 1050-51 (upholding a 28% fee award that constituted a 3.65 multiple of lodestar); *id.* at 1052-54 (noting district court cases in the Ninth Circuit using multipliers as high as 6.2, and citing only 3 of 24 decisions with multipliers below 1.4). Indeed, a recent survey of class action settlements showed that the mean multiplier in cases in the Ninth Circuit is 1.54, and the mean multiplier in antitrust cases, often considered exceedingly complex and risky, is 2.24. *Attorneys' Fees and Expenses*, *supra*, at 31. The multiplier in the instant case is significantly lower than either of those numbers, and should counsel that the requested fees are eminently reasonable.

As the Ninth Circuit noted in *WPPSS*, adding a risk multiplier to the lodestar is appropriate to "reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." 19 F.3d at 1299. The resultant increase is "a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless of whether they win or lose." *Id.* In *WPPSS*, for example, the Ninth Circuit reversed the refusal to give a risk multiplier. *Id.* at 1302.

As noted in *Vizcaino*, a multiplier is measured by the duration of the case, its complexity, and the risk in prevailing. 290 F.3d at 1051. This case, first filed in December 2006, has gone on for nearly five years, is extremely complex, and has been at risk of failure since the outset. A multiplier of 1.096 is therefore appropriate. Given the difficulties of this case, the extraordinary result justifies the modest multiplier requested here. *See WPPSS*, 19 F.3d at 1304. As a cross-check mechanism, the low lodestar multiplier confirms that the fees requested by Plaintiffs' Counsel are reasonable.

"In practice, the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation." *Manual for Complex Litigation (Fourth)* §14.121 (2004), *available at* https://public.resource.org/scribd/8763868.pdf. A lodestar cross-check is no less difficult, especially where, as here, counsel have collectively billed over 250,000 hours. In a case of this size, with over thirty-five law firms, some degree of inefficiency of work is unavoidable. However, even if as much as 20% of the lodestar compiled by firms other than Co-Lead Class Counsel comprised redundant work (e.g., reading the briefs the Co-Leads authored, reviewing the docket, etc.), a discounted lodestar of $97,447,148.40 on a 30% fee yields a multiplier of 1.25, well within the acceptable range for antitrust cases (and, indeed, below the norm according to *Attorneys' Fees and Expenses, supra*). S*ee* Pritzker Decl., ¶ 16. Co-Lead Class Counsel and Liaison Counsel have tried to eliminate billing for inefficient work and to curtail excessive billing. Co-Lead Class Counsel have followed the order of the Court regarding collection of time records (*See* Pritzker Decl., ¶¶ 7-10) and have reviewed time entries submitted by counsel on an ongoing basis to assure that work being done was necessary to the prosecution of the case. Nonetheless, because inefficiencies are to be expected in a case of this size,

Plaintiffs' Counsel have provided the court with the 20% discounted lodestar above, for purposes of a secondary cross check.

### C.     The Expenses Are Reasonable and Should Be Reimbursed

Under the common fund doctrine, Class Counsel are entitled to reimbursement of all reasonable out-of-pocket expenses and costs in prosecution of the claims and in obtaining a settlement. *Vincent v. Hughes Air West*, 557 F.2d 759, 769 (9th Cir. 1977). Reasonable reimbursable litigation expenses include: those for document production, experts and consultants, depositions, translation services, notice, and claims administration. *See*, *e.g.* H. Newberg, *Attorney Fee Awards* § 2.19 at 69 (1986); *Mills*, 396 U.S. at 391-92. Here, Plaintiffs' Counsel have advanced $6,055,335.31 in unreimbursed out-of-pocket costs and expenses, and have made use of most of the $3 million advanced by the Court after the Epson and Chunghwa settlements. *See* Pritzker Decl. at ¶¶ 5, 22. As of the cut-off date of August 31, 2011, counsel have used $2,528,450.90 of that advance, and $471,549.10 remained in the settlement and litigation funds. *See* Pritzker Decl., ¶ 6. Co-Lead Class Counsel anticipates at least an additional $1 million in expenses through trial against AUO and Toshiba, and hereby requests an advance to cover those expenses as well. Thus, Co-Lead Class Counsel requests a total of $128,562,007.91 in fees and expenses, including a $1 million advance to cover the costs to be incurred between the approval of this motion and trial.

### VI.    PAYMENT OF INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES IS APPROPRIATE

Class representatives have each devoted a great deal of time, effort, and expense in assisting Plaintiffs' Counsel's efforts to prosecute this case. Simon Decl., ¶¶ 103-114. Co-Lead Class Counsel request that the 11 Direct Purchaser class representatives receive awards of $15,000 each, for a total of $165,000. Counsel could have requested an additional award for certain Plaintiffs, including Texas Digital Systems, Inc., Univisions-Crimson Holdings, and Crago, Inc., for the time and expense incurred in assisting with the prosecution of this action. Simon Decl., ¶¶ 106, 112. However, those class representatives, despite their enormous efforts, are prepared to accept the same awards as the other class representatives in light of their potential

1   recovery through the claims process.

2         Incentive awards are fairly typical in class action cases. *See* 4 William B. Rubenstein, et

3   al., Newberg on Class Actions § 11:38 (4th ed. 2008); Theodore Eisenberg & Geoffrey P. Miller,

4   *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L. Rev. 1303

5   (2006) (finding twenty-eight percent of settled class actions between 1993 and 2002 included an

6   incentive award to class representatives).  Such awards are discretionary, *see In re Mego Fin.*

7   *Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000), and are intended to compensate class

8   representatives for work done on behalf of the class, to make up for financial or reputational risk

9   undertaken in bringing the action, and, sometimes, to recognize their willingness to act as private

10  attorneys general. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-959 (9th Cir. 2009).

11  Awards are generally sought after a settlement or verdict has been achieved. *Id.* at 959.  In *In re*

12  *Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992), the Seventh Circuit approved of

13  "incentive fees" to compensate named plaintiffs for the risks they take and their vanguard role in

14  the class action.  "Since without a named plaintiff there can be no class action, such compensation

15  as may be necessary to induce him to participate in the suit could be thought the equivalent of the

16  lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which

17  are reimbursable." *Id.*

18        Here, the class representatives collectively expended a great deal of time and effort

19  preparing for and being deposed, reviewing and responding to discovery, consulting with

20  attorneys, and reviewing briefs and pleadings for accuracy.  Simon Decl., ¶¶ 103-114.  Where

21  class representatives spend that much time working on a case, substantial incentive payments are

22  appropriate. *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving, in the

23  context of a recovery of more than $14 million, an incentive payment of $20,000 to one named

24  plaintiff who "spent hundreds of hours with his attorneys and provided them with 'an abundance

25  of information'").  Further, the Class has benefitted from this action to an extraordinary degree,

26  and the class representatives have done much to protect the interests of the class.

27        Awards of this magnitude are supported by precedent from this Court. *See, e.g.*, *In re CV*

28  *Therapeutics*, 2007 WL 1033478 (N.D. Cal. April 4, 2007) (approving $26,000 award "for

833353.2                              - 24 -

reimbursement of time and expenses incurred in representing the class"); *Ross v. US Bank Nat. Ass'n*, No. C-07-02951, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010) (slip copy) (approving $20,000 enhancement awards for each of four class representatives in recognition of "substantial contributions to the case"); *Meijer v. Abbot Labs.*, *supra*, at *5 (awarding $60,000 to each of three class representatives).

For the foregoing reasons, awards of $15,000 are appropriate incentive awards to class representatives who have been essential to the prosecution of this action.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs and Co-Lead Class Counsel request that this Court award:

1.      Attorney fees in the amount of $121,506,672.60, which constitutes 30% of the $405,022,242 settlement fund;

2.      Reimbursement of fees and expenses reasonably incurred in the prosecution of this litigation, in the amount of $6,055,335.31;

3.      An advance of anticipated trial costs in the amount of $1 million; and

4.      Incentive awards to the eleven class representatives in the amount of $15,000 each, for a total award of $165,000.

Respectfully submitted,

DATED: October 28, 2011          **PEARSON, SIMON, WARSHAW & PENNY, LLP**


By:   ___/s/___ *Bruce L. Simon*___
                  BRUCE L. SIMON

*Co-Lead Counsel for the Direct Purchaser Class Plaintiffs*

DATED: October 28, 2011          **LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**


By:   ___/s/___ *Richard M. Heimann*___
                  RICHARD M. HEIMANN

*Co-Lead Counsel for the Direct Purchaser Class Plaintiffs*