1   Robert L. Stolebarger (CA State Bar No. 230495)
    *robert.stolebarger@hro.com*
2   Richard J. Mooney (CA State Bar No. 176486)
    *richard.mooney@hro.com*
3   HOLME ROBERTS & OWEN LLP
    560 Mission Street, 25th Floor
4   San Francisco, CA  94105-2994
    Telephone:   (415) 268-2000
5   Facsimile:   (415) 268-1999
6
    Attorneys for Plaintiffs
7   Sony Electronics Inc. and Sony Computer Entertainment LLC
8
9
                    UNITED STATES DISTRICT COURT
10
               FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
12

| 13  Sony Electronics Inc. and Sony Computer Entertainment America LLC, | Case No.  3:10-cv-05616 SI |
|---|---|
| Plaintiffs, | Master File No. 3:07-md-01827-SI |
| v. | MDL No. 1827 SI |
| LG Display Co., Ltd. and LG Display America, Inc. | Amended Complaint of Sony Electronics Inc. and Sony Computer Entertainment America LLC Against LG Display Co., Ltd. and LG Display America, Inc. |
| Defendants | Jury Trial Demanded |

21

22                      **<u>PUBLIC REDACTED VERSION</u>**
23
24
25
26
27
28

1       Sony Electronics Inc. ("SEL") and Sony Computer Entertainment America LLC

2  ("SCEA") (collectively, "Plaintiffs") file this Amended Complaint (the "Complaint") against LG

3  Display Co., Ltd. and LG Display America, Inc. (collectively, "LG Display") for damages and

4  injunctive relief under the antitrust laws of the United States and under the antitrust and unfair

5  competition laws of California.  Plaintiffs allege the following based on their personal knowledge

6  and publicly available materials, including without limitation material from *In re LCD (Flat Panel)*

7  *Antitrust Litigation,* 3:07-MD-1827-SI (N.D. Cal.) (the "MDL Action"), material from the U.S.

8  Department of Justice website, information regarding related criminal proceedings, the European

9  Commission's decision in Comp/39.309-LCD-Liquid Crystal Displays, material received and

10  evaluated during the course of this litigation, and upon information and belief.

## I.   <u>Introduction</u>

12      1.    Plaintiffs bring this action to recover damages that they suffered as a result

13  of an illegal conspiracy among LG Display and various other co-conspirators that started no

14  later than January 1998 and continued until at least December 11, 2006 (the "Conspiracy

15  Period").  The object and result of the illegal conspiracy was to raise to supracompetitive levels the

16  prices charged in the United States for (1) Thin Film Transistor-Liquid Crystal Display panels

17  ("LCD Panels"), and/or (2) products containing LCD panels ("LCD Products," which include without

18  limitation computer monitors, notebook/laptop computers, televisions, video and still cameras, video

19  game systems, and other devices).  The damages suffered by Plaintiffs include but are not limited to

20  the overcharges that they  paid on both direct and indirect purchases in the United States of LCD

21  Panels and LCD Products because of the illegal conspiracy.

22      2.    As further described below, LG Display has pleaded guilty to criminal

23  violations of the U.S. antitrust laws in connection with the TFT-LCD conspiracy, admitting its

24  intentional violations directed at the United States and agreeing to pay a $400 million fine (the

25  second largest ever imposed in a U.S. antitrust case).  This admission has been corroborated by the

26  guilty pleas of two senior LG Display executives with responsibility for LCD Panel pricing, by

27  sworn testimony given by personnel from LG Display and multiple co-conspirators in the MDL

28

1

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

Action, by documents produced in the MDL Action, and by the expert testimony offered by expert witness testimony offered by Class Plaintiffs and Defendants in the MDL Action.

3.     As explained in further detail below, LCD Panels are made by sandwiching liquid crystal compound between two pieces of glass called substrates.  The resulting screen contains hundreds or thousands of electrically charged dots, called pixels, that form an image.  This panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into, for example, a television, computer monitor, notebook or laptop computer, camera, videogame system, or other device or product.

4.     LCD Panels are manufactured in fabrication plants, or "fabs" as they are known in the industry.  Fabrication plants are very expensive.  The number of panels produced has a direct and significant effect on the price of both raw LCD Panels as well as the LCD Products into which they are placed.  Although LCD Panels are used in different LCD Products, the LCD Panel production process is such that manufacturers' output and prices can be measured in a consistent and homogeneous way.  These and other conditions in the LCD industry enabled the price-fixing conspiracy detailed in this Complaint.  In particular, these conditions enabled Defendants and their co-conspirators to engage in direct discussions about the prices to be charged for LCD panels.  Additionally, these conditions made it economically feasible to maintain artificially high prices through manipulation of capacity and supply.

5.     Beginning no later than January 1998, certain companies, including but not limited to Hitachi, Sharp, and Toshiba, had meetings and other communications with the purpose and effect of reaching agreement on LCD Panel prices and the number of LCD Panels each would produce.  As production in other regions began to increase, these companies expanded their meetings to involve LG Display and Samsung, which also agreed to fix prices and to control supply.  In or about 2001, these companies convinced additional LCD Panel manufacturers, including AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and to control product supply.

6.     The conspiracy alleged herein was effective in moderating the normal downward pressures on prices for LCD Panels caused by periods of oversupply and

2

technological change.  The conspiracy resulted in unusually long periods of high prices and high profits.  Although there were periods when prices for LCD Panels temporarily declined as a result of new entrants being assimilated or breakdowns in the effectiveness of the conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition.  In addition, prices declined less than they would have in a competitive market.  As a result of the unlawful conduct of LG Display and its co-conspirators, SEL and SCEA paid higher prices for LCD Panels and/or LCD Products than they would have paid in a competitive market.

## II.     Jurisdiction, Venue, and Intradistrict Assignment

7.     SEL and SCEA bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from LG Display's violations of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*), the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*), and the California common law of unjust enrichment.

8.     This Court has subject matter jurisdiction over the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims asserted in this action under 28 U.S.C. §§ 1332(d) and 1367.  Jurisdiction is not precluded by the Foreign Trade Antitrust Improvement Act, 15 U.S.C. § 6a, because (among other things) the conduct of Defendants and their co-conspirators had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effect gave rise to Plaintiffs' claims alleged herein.

9.     LG Display is subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their extensive contacts with the State of California.

10.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the

1    affected interstate trade and commerce was carried out in this district, and one or more of the

2    Defendants reside in this district.  This action concerns substantially the same parties, transactions

3    and events as Case No. 3:07-cv-1827-SI (N.D. Cal.) insofar as it involves a suit for damages and

4    injunctive relief arising out of the conspiracy to fix the price of LCD panels in violation of the

5    Sherman Act and state law.  Pursuant to Pretrial Order #1 in 3:07-md-1827-SI, this case should

6    remain consolidated with Case No. 3:07-md-1827-SI for all pretrial proceedings without any further

7    motion or order.

### III.    Parties

**A.    Plaintiffs**

10          11.    SEL is a corporation duly organized under the laws of the State of Delaware,

11    with its principal place of business in San Diego, California.  SEL is a leading electronics company,

12    offering a broad range of consumer products, including (among others) televisions, flat-panel

13    monitors, laptop/notebook computers, video and still cameras, and other LCD Products.  During the

14    Relevant Period, SEL was a substantial direct and indirect purchaser of LCD Panels (including but

15    not limited to purchases of LCD Panels for use in televisions, monitors, and laptop/notebook

16    computers) and of LCD Products (including but not limited to televisions, monitors, and

17    laptop/notebook computers) at prices that were artificially inflated as a result of the conspiracy

18    among LG Display and its co-conspirators.

19          12.    Throughout the period of the conspiracy and thereafter, SEL's engineering

20    and manufacturing divisions, product planning and marketing divisions, and supporting finance,

21    trade, and logistics operations related to LCD Panels and LCD Products were located in California.

22    In particular, SEL operations in California included (among other things) forecasting demand for

23    LCD Panels and LCD Products; procurement of LCD Panels and LCD Products (including

24    negotiating and entering into contracts for the purchase of LCD Panels and LCD Products); making

25    payments for LCD Panels and LCD Products; manufacturing and assembling of goods containing

26    LCD Panels such as Sony VAIO® computers; maintaining facilities to refurbish and service LCD

27    Products;, and maintaining logistics, trade, and warehousing operations/facilities involved with the

28    importation and distribution of LCD Panels and LCD Products.  SEL was an importer of LCD

4

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)
#75920 v7 saf

products, all or some of which entered the U.S. through California ports.  SEL was responsible for payment of any customs duties applicable to such importation.

13.     SCEA is a Delaware limited liability company with its principal place of business and corporate headquarters in Foster City, California.  SCEA markets and distributes the PlayStation® family of computer video game console hardware, including the PlayStation Portable® computer entertainment system ("PSP"®), and peripheral accessories.  During the Conspiracy Period, SCEA was a substantial purchaser of LCD Products whose prices were artificially inflated as a result of the conspiracy among the named defendants or their subsidiaries, affiliates, or co-conspirators.

14.     Throughout the period of the conspiracy, SCEA's product planning and marketing divisions, and supporting finance, trade, and logistics operations, were located in and had extensive operations in California related to LCD Products, including, without limitation, the following: procurement of LCD Products; payments for delivered LCD Products; and logistics, trade and warehousing operations/facilities involved with the importation and distribution of LCD Products.  SCEA was an importer of LCD products, all or some of which entered the U.S. through California ports.  SCEA was responsible for payment of any customs duties applicable to such importation.

**B.     Defendants**

15.     Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a Korean entity with its principal place of business at 17th Floor, West Tower, LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-721.  LG Display Co., Ltd. was created in 1999 as a joint venture between LG Electronics, Inc. and Koninklijke Philips Electronics N.V.  In July 2004, LG Display Co., Ltd. became a public company, with LG Electronics, Inc. and Koninklijke Philips Electronics N.V. as the controlling shareholders.  LG Display Co., Ltd. describes itself as "the global leader in the development and manufacture of LCD panels for televisions, computer monitors, notebooks and emerging mobile applications."  During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

16.     Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., is a California corporation with its principal place of business at 2540 North First Street, Suite 400, San Jose, CA 95131.  LG Display America, Inc. is a wholly-owned and controlled subsidiary of LG Display Co., Ltd.  During the Conspiracy Period, LG Display America, Inc. sold and distributed LCD Panels and LCD Products manufactured by LG Display Co., Ltd. to customers throughout the United States.

17.     Defendants LG Display Co., Ltd. and LG Display America, Inc. participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant LG Display America, Inc., was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.

### IV.     Agents and Co-Conspirators

18.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

19.     Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

### V.     Factual Allegations Underlying the Unlawful Conspiracy

**A.     LCD Technology**

20.     The technology behind LCD Panels is not new.  In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology.  These efforts resulted in monochrome calculators and watches.  By the early 1990s, liquid crystal technology had been introduced in notebook computers and small, low-resolution televisions.

21.     LCD Panels have no independent utility, and have value only as components of finished goods, such as televisions, monitors, laptops/notebooks, video game systems, video and

#75920 v7 saf

still cameras, and other devices.  The demand for LCD Panels thus derives directly from the demand for such LCD Products.

22.     The basic structure of an LCD Panel is two glass substrates sandwiching a layer of liquid crystal compound.  Liquid crystals change orientation under an applied electric field and can thereby block or pass light.  One glass substrate has thin chemical films that act as transistors, and the other glass substrate is coated with liquid pigments that act as color filters.  When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

23.     The term "active matrix" describes the ability to switch each pixel in a display individually.  Unlike older LCD Panels that have one transistor for each row and column of pixels, active matrix LCDs have a transistor for each pixel.  Active matrix displays are brighter and sharper than the older "passive matrix" displays of the same size.

24.     The glass substrates used for LCD Panels begin with a "motherglass," a sheet of glass that is then cut to make multiple panels.  LCD Panels are manufactured in fabs that are equipped to handle a particular size motherglass.  Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger and larger size motherglass sheets.  This, in turn, has resulted in the ability to fabricate larger and/or more LCD Panels per motherglass sheet.  Each increase in motherglass size is described as a generation.  Third generation fabs in the 1998 to 1999 period typically utilized 550 millimeter ("mm") by 650 mm motherglass, while some eighth generation fabs utilize 2160 mm by 2460 mm motherglass.  The use of larger motherglass provides substantial cost savings to manufacturers.

25.     LCD Panels that have a diagonal measure of 10 or more inches are considered "large-area displays" or "large screen" LCD Panels.  Large-area displays are most commonly used for televisions, laptop/notebook computers, and monitors.  Smaller displays were used during the Conspiracy Period in other LCD Products, including video game systems, video and still cameras, and other devices.

7

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

1

**B.      Structure of the LCD Industry**

2        26.      The market for LCD Panels is very large.  A September 28, 2006 Reuters

3  article reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year

4  alone, up 70 percent over 2005, while flat-panel sales — most of those using LCD technology — are

5  expected to reach $US 88 billion this year and $US 100 billion in 2007."  In 2005, the top five

6  suppliers — Samsung[1], LG Display, Sharp[2], AU Optronics[3], and Chi Mei[4] — collectively shipped

7  90 per cent of all LCD Panels for television use.  According to estimates from industry analyst

8  iSuppli Corporation in late 2006, LG Display had the greatest share of LCD television shipments in

9  the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei (18.7%), AU Optronics

10  (16.8%), and Sharp (13.9%).

11        27.      There are significant manufacturing and technological barriers to entry into

12  the LCD industry.  Efficient fabs are large and costly.  LCD Panels are also subject to technological

13  advances, so that firms within the industry must spend significant capital on research and

14  development.  DisplaySearch, a research firm in Austin, Texas that covers the LCD industry,

15  reported in September 2005 that the top LCD manufacturers collectively were spending $30 million

16  a day on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical

17  seventh generation fab can cost more than $3 billion.

18        28.      During the Conspiracy Period, the costs of LCD Panel components, both as a

19  whole and individually, were generally declining, and in some periods declining at a substantial rate.

20

21  [1]      In this Complaint, "Samsung" includes (1) Samsung Electronics Company, Ltd., a Korean
22        company; (2) Samsung Electronics America, Inc., a New York company; (3) Samsung
        Semiconductor, Inc., a California company; and (4) Samsung Electronics Taiwan Co., Ltd., a
23        Taiwanese company.
24  [2]      In this Complaint, "Sharp" includes (1) Sharp Corporation, a Japanese corporation; and
        (2) Sharp Electronics Corporation, a New York company.
25  [3]      In this Complaint, "AU Optronics" includes (1) AU Optronics Corporation, a Taiwanese
26        company; and (2) AU Optronics Corporation America, a California company.
    [4]      "Chi Mei" includes (1) Chi Mei Corporation, a Taiwanese company; (2) Chi Mei
27        Optoelectronics Corporation, a Taiwanese company; (3) CMO Japan Co., Ltd., a Japanese
        company; (4) Chi Mei Optoelectronics USA, Inc., a Delaware company; (5) Nexgen
28        Mediatech, Inc., a Taiwanese company; (6) Nexgen Mediatech USA, Inc., a California
        company; and (7) Chi Mei Innolux Corporation, a Taiwanese company.

1   Later in the conspiracy, approximately 70 percent of the cost of LCD Panel production was

2   attributable to the cost of raw materials.  The combination of price discussions and manipulation of

3   the output of LCD Panels allowed LG Display and its co-conspirators to keep prices above where

4   they would have been but for the conspiracy.

5          29.     The LCD industry is subject to business cycles of supply and demand

6   commonly called the "crystal cycle."  This cycle has been described as "boom and bust" periods

7   caused by alternating periods of oversupply and shortages, which create downward and upward

8   pressures on prices for LCD Panels (and, thus, for LCD Products).

9          30.     One factor that can affect such oversupply is the perceived demand for such

10  products and whether manufacturers have adequately predicted such demand in determining how

11  much capacity to build and how many LCD Panels to produce.

12         31.     Another factor is the entry of new competitors.  Typically, when a new

13  competitor enters a market, it brings incremental production online thereby increasing supply, and

14  prices drop until an equilibrium is reached.  In the LCD industry, however, LG Display and its co-

15  conspirators conspired to rein in and discipline these new entrants until the new entrants were

16  assimilated into the conspiracy.  This had the effect of tempering price drops and preventing the

17  market for LCD Panels from reaching a competitive equilibrium.

18         32.     The conspiracy did not completely eliminate the effects of the crystal cycle in

19  the LCD industry.  However, the efforts of LG Display and its co-conspirators to stabilize prices

20  were successful in moderating the effects of the crystal cycle, including the impact on prices paid by

21  purchasers of LCD Panels and LCD Products.  To the extent that prices for LCD Panels fell, they fell

22  from levels that had been set conspiratorially, rather than from levels set by free and open

23  competition.  Additionally, prices did not fall as low as they would have absent the conspiratorial

24  conduct.

25         33.     Notwithstanding the different uses to which LCD Panels are put, there was a

26  consistent and homogeneous way for LG Display and its co-conspirators to monitor, analyze,

27  discipline, and enforce their conspiracy.  This was done by looking at the most popular size LCD

28  Panels and the LCD Products that represented the highest percentage of sales for those LCD Panels.

1    This was also accomplished by looking at standardized statistics used in the industry, such as the

2    amount of glass produced and revenues per metric ton of glass.  By using these and other industry

3    analytics, LG Display and its co-conspirators could and did monitor, analyze, discipline, and enforce

4    their price-fixing conspiracy.

5            34.    For example, from the fourth quarter of 1999 through mid-2003, half or more

6    of the LCD monitor shipments in the industry were 15-inch monitors.  From mid-2003 to early 2006,

7    17-inch monitors were the predominant size.  As for LCD televisions, from the fourth quarter of

8    1999 through the fourth quarter of 2000, industry shipments were predominantly of 10-inch to 14-

9    inch models.  During 2001 and much of 2002, industry sales of 13-inch to 15-inch models

10   dominated.  In 2004 and 2005, the majority of industry LCD shipments were of 20-inch and 32-inch

11   models.

12   **C.    Pre-Conspiracy Market**

13           35.    Until the mid-1990s, Hitachi[5], Toshiba[6], and Sharp were essentially the

14   exclusive suppliers of LCD panels.

15           36.    In early 1995, the industry faced declining LCD Panel prices, which industry

16   analysts attributed to advances in technology and improving efficiencies.  One analyst in this period

17   noted that the "flat panel display industry is following the classic cyclical business pattern of the

18   semiconductor industry."  The three manufacturers realized that the capacity growth from investing

19   in new plants was weakening the price of LCD Panels, and they slowed the rate of their investments.

20   This, however, provided an opening to other manufacturers.

21           37.    In 1995, three additional companies — Samsung, LG Electronics, Inc., and to

22   a lesser extent Hyundai — entered the market.  These firms offered comparable LCD Panels at lower

23   

24   [5]    In this Complaint, "Hitachi" means (1) Hitachi, Ltd.; a Japanese company; (2) Hitachi
25           Displays, Ltd., a Japanese company; and (3) Hitachi Electronic Devices (USA), Inc., a
             Delaware company.
26   [6]    In this Complaint, "Toshiba" means (1) Toshiba Corp., a Japanese company; (2) Toshiba
             Mobile Display Co., Ltd. (f/k/a Toshiba Matsushita Display Technology Co., Ltd.), a
27           Japanese company; (3) IPS Alpha Technology, Ltd., a Japanese company; (4) Toshiba
             America Electronic Components, Inc., a California company; and (5) Toshiba America
28           Information Systems, Inc., a California company.

1  prices in an effort to gain market share quickly.  This resulted in increased competition in 1995,

2  which contributed to the significant price declines seen during that timeframe.

3        38.    Increases in manufacturing capacity and decreases in manufacturing costs

4  seemed to assure continuing price declines.  By mid-1995, the competitors had a total capacity to

5  supply approximately 14 million LCD Panels per year, while demand existed for only approximately

6  three million LCD Panels per year.  In addition to the surges in capacity during 1995, costs were also

7  dropping as production volume increased and manufacturing methods improved.

8        39.    By late 1995, the effect of the entry by new suppliers had pushed down the

9  price of some LCD Panels by 50 percent from the previous year.  The origin of the LCD

10  conspiracy may be traceable to this trough in prices.

11  **D.  Defendants' and Co-Conspirators' Illegal Agreements**

12        40.    Beginning no later than January 1998, Hitachi, Sharp, and Toshiba (and

13  possibly others, currently unknown to Plaintiffs) communicated with each other regarding

14  capacity, production, and pricing issues related to LCD Panels, and agreed to restrict output of

15  and to fix prices for LCD Panels sold throughout the world, including the United States.  The

16  communications later expanded to include other, newer, LCD Panel manufacturers, including

17  LG Display and Samsung, each of which joined in agreements restricting output and fixing

18  prices.  Still later, in or about 2001, the conspiracy was expanded to include (to the extent they

19  were not already participating) AU Optronics, Chi Mei, Chunghwa[7], and HannStar[8], and

20  Epson,[9] each of which joined in agreements restricting output and fixing prices.

21        41.    The LCD price-fixing conspiracy was effectuated through a combination

22  of group and bilateral discussions, as further detailed herein and below.  Further, as part of this

23  process, LG Display and its co-conspirators fostered a culture of corruption within their companies

24

---

25  [7]    In this Complaint, "Chunghwa" means (1) Chunghwa Picture Tubes, Ltd. ("CPT"), a

26  Taiwanese company; and (2) Tatung Company of America, Inc. ("Tatung America"), a
California company.

27  [8]    In this Complaint, "HannStar" means HannStar Display Corporation, a Taiwanese company.

28  [9]    In this Complaint, "Epson" means (1) Epson Imaging Devices Corporation, a Japanese
company; and (2) Epson Electronics America, Inc., a California company.

whereby employees from the top executive to lower-level sales representatives engaged in frequent and continuous communications with the employees at every level of their competitors with the purpose and effect of reaching agreement on prices and production.  Senior executives instructed their subordinates to engage in these unlawful exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees transferred competitive information up to their superiors who used that information along with the pricing information they had collected through their own unlawful competitor contacts to set prices for LCD Panels at artificially-inflated levels.  The constant communications between LG Display and its co-conspirators at all levels allowed them to conspire to set average prices across the entire industry, as well as conspiring to fix the prices of particular LCD Panels.

42.     The conspiracy was effective in maintaining prices for LCD Panels at supracompetitive levels.  The supracompetitive prices of LCD Panels directly resulted in supracompetitive prices for LCD Products, the prices of which were (as LG Display and its co-conspirators recognized) directly related to the prices of LCD Panels.  As a result of this unlawful conduct, Plaintiffs paid higher prices for LCD Panels and LCD Products than they would have been required to pay in a competitive market.

1.     "Crystal Meetings"

43.     The group meetings among the participants in the LCD price-fixing conspiracy were referred to as "Crystal Meetings."  Crystal Meetings included (1) meetings attended by Chief Executive Officers or Presidents (known as "CEO" or "top" meetings), meetings attended by management-level personnel (known as "commercial" or "operation" meetings), and (3) meetings attended by sales and marketing personnel (known as "vendor" meetings).

44.     In a typical Crystal Meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices.  Meeting participants shared information relating to all of these topics so that the conspirators could agree on what price each would charge for LCD panels to be sold in the following month.  Meeting participants discussed and agreed upon target prices, floor prices and

price ranges for LCD Panels.  They also discussed prices of LCD Panels that were sold to specific customers and agreed upon target prices to be used in negotiations with large customers.

45.     The purpose and effect of the CEO meetings was to stabilize or raise prices. The CEO meetings occurred quarterly from approximately 2001 to 2006.  At the CEO meetings, the participants discussed prices and the supply and demand situation.  The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions.  Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply, demand, and price for the group to review.  The attendees would take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price.

46.     The commercial or operation meetings were attended by the Defendants' and their co-conspirators' respective Vice Presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings was largely the same as the CEO meetings.  The participants discussed price, output, capacity, and the general market situation. These meetings generally occurred at least once per quarter and at times as often as once per month.

47.     The agreements reached at these meetings included: (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; (6) coordinating reductions in output; and (7) reaching out to other competitors to encourage them to abide by the agreed-upon pricing.  The meeting participants also agreed to maintain or lower production capacity and confirmed prices actually charged to help monitor the conspiracy.

48.     During the CEO and commercial meetings, LG Display and its co-conspirators also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so.  Top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders.  On at least one occasion,

13

top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such meeting.

49.    The group Crystal Meetings described above continued until the Summer of 2006, when they were discontinued in favor of one-on-one meetings.  These meetings were coordinated so that on the same date, two sets of competitors met one-on-one.  After that meeting, each of them met one-on-one with another competitor.  This continued until all competitors met with each other.  These coordinated meetings took place until about December 2006.  LG Display and its co-conspirators specifically intended intent to conceal these meetings and for these meetings to accomplish the same purposes as the Crystal Meetings.

2.    Bilateral Discussions

50.    The Crystal Meetings were reinforced by bilateral discussions among the conspiracy participants.  The purpose of the bilateral discussions was to exchange information about past and future pricing and information about shipments, in order to effectuate the conspiracy. Certain conspirators were assigned other participants not in attendance and agreed to and did in fact communicate with non-attending participants to synchronize the price and production limitations agreed to at the crystal meetings (described above).  In particular, conspirators at the Crystal Meetings contacted Sharp, Hitachi and Toshiba to relay the agreed-upon pricing and production limitations and to ensure compliance with those agreements.

**E.    Evidence of Conspiracy Participation**

1.    LG Display's Participation

51.    The evidence of LG Display's participation (and leading role) in the LCD conspiracy is overwhelming.  A small portion of it is detailed below.

52.    *First*, in a November 12, 2008, Information, the DOJ charged LG Display with carrying out the illegal antitrust conspiracy by:

    a.    participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

    b.    agreeing during those meetings, conversations and communications to charge prices for LCD Panels at certain predetermined levels;

14

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of LCD Panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

53.      In response to the charge, LG Display agreed to plead guilty and pay a $400 million fine for its participation in a conspiracy from September 2001 to June 2006 to fix the price of LCD panels sold in the United States.  In the plea agreement, LG Display specifically admitted that:

a.      it "participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold in the United States and elsewhere."

b.      it "engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

c.      "[d]uring these discussions and meetings, agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere."

54.      The representative authorized by the LG Display Board of Directors to accept the plea agreement on behalf of LG Display confirmed in open court that the admissions contained in the plea agreement were true.

55.      The admissions contained in the plea agreement and made in open court constitute judicial admissions and therefore are established and not controvertible in this matter.

56.      *Second*, in an April 27, 2009, Information, the DOJ charged LG Display senior executive Bock Kwon (who held at various times during the Conspiracy Period the titles of Vice President of Notebook Sales, Vice President of Planning, Executive Vice President of Sales and Marketing, and President of LG Display's Taiwan subsidiary) with illegally conspiring with "employees from other panel makers to suppress and eliminate competition by fixing the prices of TFT-LCD panels from on or about September 21, 2001 to on or about June 1, 2006."  The information further alleged that "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant, his corporate employer, and coconspirator, the substantial terms of which were to agree to fix the prices of TFT-LCD" and that

15

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

1  "[f]or the purpose of forming and carrying out the charged combination and conspiracy, the

2  defendant, his employer, and coconspirators did those things that they combined and conspired to

3  do," including, among other things:

    a.      participating in meetings, conversations, and communications in Taiwan,

4

5                     Korea, and the United States to discuss the prices of LCD panels;

    b.      agreeing during those meetings, conversations and communications to charge

6

7                     prices for LCD Panels at certain predetermined levels;

8      c.      issuing price quotations in accordance with the agreements reached; and

9      d.      exchanging information on sales of LCD panels, for the purpose of monitoring

10                    and enforcing adherence to the agreed-upon prices.

11     e.      authorizing, ordering, and consenting to the participation of subordinate

12                    employees in the conspiracy.

13        57.     In response to the charge, Bock Kwon agreed to plead guilty, serve a one year

14 prison sentence, and pay a $30,000 fine for his participation in a conspiracy from September 2001 to

15 June 2006 to fix the price of LCD panels sold in the United States.  In the plea agreement, Bock

16 Kwon specifically admitted that during the period from September 2001 through June 2006, he

17 "participated in a conspiracy with other persons and entities engaged in the manufacture and sale of

18 TFT-LCD, the primary purpose of which was to fix the price of TFT-LCD sold in the United States

19 and elsewhere" and that "[i]n furtherance of the conspiracy, [he] engaged in conversations and

20 attended meetings, including group meetings commonly referred to by the participants as 'crystal

21 meetings,' with representatives of other major TFT-LCD producing firms [where] agreements were

22 reached to fix the price of TFT-LCD to be sold in the United State and elsewhere."

23        58.     During the plea hearing on June 24, 2009, in response to questioning from the

24 Court, Bock Kwon described the illegal conduct in which he had engaged as follows:

25             During the relevant time period, September 21st, year 2001, through June 1st,
            year 2006, I headed the various position with LG Display, formerly LG
26             Phillips LCD.

27             In year 2001, while I was head of LG's Taiwan subsidiary, with the approval
            of my superior at the company's head office in Seoul, I instructed a company
28             employee to attend the regular meetings in Taiwan with the competitor who
            sold LG engaged in the manufacturer and the sale of TFT-LCD panels.

These meetings were known as the "crystal meetings."  On occasion I attended these meetings.  These meetings continued during the relevant time period.  I was aware that at these meetings the participant discussed price and other market information.

At these meetings the participants agreed to fix or stabilize the price of TFT-LCD panels to be sold in the United States and elsewhere.

59.     The admissions contained in the plea agreement and made in open court constitute judicial admissions and therefore are established and not controvertible in this matter.

60.     *Third*, in a January 15, 2009, Information, the DOJ charged LG Display senior executive Chang Suk ("C.S.") Chung (who held the title Vice President of Monitor Panel Sales during the Conspiracy Period) with illegally conspiring with "employees from other panel makers to suppress and eliminate competition by fixing the prices of TFT-LCD panels from on or about September 21, 2001 to on or about June 1, 2006."  The information further charged Mr. Chung with, among other things:

a.     participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

b.     agreeing during those meetings, conversations and communications to charge prices for LCD Panels at certain predetermined levels;

c.     issuing price quotations in accordance with the agreements reached; and

d.     exchanging information on sales of LCD Panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

e.     authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy."

61.     In response to the charge, Mr. Chung agreed to plead guilty, serve a seven month prison sentence, and pay a $25,000 fine for his participation in a conspiracy from September 2001 to June 2006 to fix the price of LCD panels sold in the United States.  In the plea agreement, Mr. Chung specifically admitted that during the period from September 2001 through June 2006, he "participated in a conspiracy with other persons and entities engaged in the manufacture and sale of TFT-LCD, the primary purpose of which was to fix the price of TFT-LCD sold in the United States and elsewhere" and that "[i]n furtherance of the conspiracy, [he] engaged in conversations and

17

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)
#75920 v7 saf

attended meetings with representatives of other major TFT-LCD producing firms [during which] agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere."

62. During the plea hearing on June February 17, 2009, in response to questioning from the Court, Mr. Chung described the illegal conduct in which he had engaged as follows:

> While I was in that position [VP of Monitor Panel Sales for LG Display], I met and had phone calls with the representative of competitors. And in the course of those activities or meetings, I reached an agreement or understanding with the competitors to raise or stabilize or maintain price on those panels. That's what I have done.

63. The admissions contained in the plea agreement and made in open court constitute judicial admissions and therefore are established and not controvertible in this matter.

64. *Fourth*, on February 3, 2009, a federal grand jury in San Francisco returned an indictment against Duk Mo Koo, formerly LG Display's Executive Vice President and Chief Sales Officer, for his "participation in a global conspiracy to fix prices of [TFT-LCD] panels" during the period December 11, 2001, to December 1, 2005. The indictment further stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the Defendants [*i.e.*, Mr. Koo and two Chunghwa executives], their corporate employers, and other coconspirators did those things that they combined and conspired to do," including that they, among other things:

    a.    attended meetings and engaged in conversations and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

    b.    agreed during those meetings, conversations, and communications to charge prices of LCD Panels at certain levels;

    c.    attended regular group meetings, commonly referred to as "crystal meetings," in hotel rooms in Taiwan, and agreed during those meetings to charge prices for standard-sized LCD Panels at certain target levels;

    d.    exchanged TFT-LCD shipping, production, supply, demand, and pricing information for the purpose of implementing, monitoring, and enforcing adherence to the agreed-upon prices;

e.   authorized, ordered, and consented to the participation of subordinate employees in the conspiracy;

f.   issued price quotations in accordance with the agreements reached;

g.   accepted payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States and elsewhere; and

h.   took steps to conceal the conspiracy and conspiratorial contacts through various means.

65.   Mr. Koo's criminal trial remains pending.

66.   *Fifth*, in its March 30, 2009, Answer to Second Amended Direct Purchaser Plaintiffs' Consolidated Complaint, pending in the Action, LG Display admitted that:

a.   certain of its employees participated in meetings referred to as "crystal meetings" (Par. 107);

b.   various types of crystal meetings were ongoing during 2004 (Par. 181);

c.   participants at crystal meetings discussed price, output, capacity, and the general market situation (Par. 111); and

d.   participants in the lower level meetings exchanged information relating to past and future prices of LCD Panels and shipment quantities (Par. 113).

67.   *Sixth*, documents produced by LG Display and others in the Action confirm LG Display's wrongful conduct.  Those documents include for example:

a.   ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

b.   ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

19

#75920 v7 saf



Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

68.    *Seventh*, LG Display witnesses have admitted LG Display's participation in the conspiracy during sworn depositions in this action, each of which is admissible evidence against LG Display.  For example, C.S. Chung testified that (among other things):

a.    ██████████████████████████████████████████████████████
██████████████████████████████████████████

69.    LG Display's Kevin Choi testified similarly.  For example:

a.    ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████

b.    ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████

70.    LG Display's Bock Kwon also testified similarly.  For example:

a.    ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

b.    ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████

71.    *Eighth*, the European Commission has concluded that LG Display and at least five co-conspirators (Samsung, AUO, Chi Mei, Chunghwa, and HannStar) participated in a "single and continuous agreement and concerted practice" to fix prices and control supply "in the sector of Liquid Crystal Display panels for TV, notebook and monitor application" from at least October 2001 through February 2006.

72.    In its Decision of December 8, 2010, the European Commission concluded that there was "sufficient evidence that [LG Display] participated in cartel arrangements, engaged

21

directly and indirectly in price fixing and implemented those arrangements." (Recital 314). Among other things, the European Commission:

    a.    Found that LG Display participated in numerous "CEO/Top" management, and working level or operational meetings throughout the period of the conspiracy at which price and production information was discussed, target levels were agreed upon, and participant compliance with the conspiracy was addressed;

    b.    Found that the agreements and concerted practices had as their object the restriction of competition; (Recital 301)

    c.    Rejected LG Display's claim that there was no enforcement mechanism for the conspiracy, finding that "it has been demonstrated that implementation of the arrangements was ensured through regular meetings between participants, where the parties made attempts to control deviation;" (Recital 310)

    d.    Found that LG Display and the other members of the conspiracy "directly and indirectly fixed prices, exchanged commercially sensitive information and defined and applied a reporting line and monitoring systems to ensure implementation of the restrictive agreements;" (Recital 305)

    73.    LG Display was fined €215 million by the European Commission because of its leading role in the conspiracy.

2.    <u>Co-Conspirators' Participation in Group and Bilateral Discussions</u>

    74.    LG Display's co-conspirators also participated in group and bilateral discussions and reached agreements to fix prices and restrict output of LCD Panels.

    75.    AU Optronics participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period.  In the course of these meetings and discussions, AU Optronics agreed on prices and supply levels for LCD Panels.

    76.    On June 10, 2010, the DOJ obtained a Superseding Indictment for AU Optronics and many of its executives for engaging in price-fixing for LCD Panels.  The indictment

explains in detail the nature of the crystal meetings that took place among Defendants and their co-conspirators, including that they "regularly exchanged production, shipping, supply, demand, and pricing information with each other for the purpose of agreeing to fix the price of TFT-LCD, as well as implementing, monitoring, and enforcing adherence to the fixed prices." The criminal trial related to the Indictment is scheduled for January 2012.

77. Chi Mei participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Chi Mei agreed on prices and supply levels for LCD Panels.

78. Chi Mei agreed to plead guilty and pay a $220 million fine for its participation in the conspiracy to fix the price of LCD Panels during the Conspiracy Period by:

    a. participating in meetings, conversations, and communications in Japan and the United States to discuss the prices of LCD Panels;

    b. agreeing, during those meetings, conversations, and communications, to charge prices of LCD Panels at certain predetermined levels;

    c. issuing price quotations in accordance with the agreements reached; and

    d. exchanging information on sales of LCD Panels sold for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

79. Chunghwa participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Chunghwa agreed on prices and supply levels for LCD Panels.

80. Chunghwa agreed to plead guilty and pay a $65 million fine for its participation in the conspiracy to fix the price of LCD Panels during the Conspiracy Period by:

    a. participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD panels;

    b. agreeing during those meetings, conversations and communications to charge prices for LCD panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

81.     Epson participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Epson agreed on prices and supply levels for LCD Panels.

82.     Epson agreed to plead guilty and pay a $26 million fine for its participation in the conspiracy to fix the price of LCD Panels during the Conspiracy Period by:

a.      participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD panels;

b.      agreeing, during those meetings, conversations, and communications, to charge prices of LCD panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

83.     HannStar participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period.  In the course of these meetings and discussions, HannStar agreed on prices and supply levels for LCD Panels.

84.     HannStar agreed to plead guilty and pay a $30 million fine for its participation in the conspiracy to fix the price of LCD Panels during the Conspiracy Period by:

a.      participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD panels;

b.      agreeing, during those meetings, conversations, and communications, to charge prices of LCD panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

85.      Hitachi participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Hitachi agreed on prices and supply levels for LCD Panels.

86.      Hitachi agreed to plead guilty and pay a $31 million fine for its participation in the conspiracy to fix the price of LCD Panels during the Conspiracy Period by:

a.      participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD panels;

b.      agreeing, during those meetings, conversations, and communications, to charge prices of LCD panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

87.      Samsung participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Samsung agreed on prices and supply levels for LCD Panels.

88.      Samsung is identified as the leniency applicant in the European Commission's December 8, 2010, announcement regarding the LCD price-fixing cartel.

89.      Sharp participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Sharp agreed on prices and supply levels for LCD Panels.

90.      Sharp agreed to plead guilty and pay a $120 million fine for its participation in the conspiracy to fix the price of LCD Panels during the Conspiracy Period by:

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)
#75920 v7 saf

a.      participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of LCD panels;

b.      agreeing during those bilateral meetings, conversations and communications to charge prices of LCD panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of LCD panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

91.      Toshiba participated in the conspiracy through participation in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, during the Conspiracy Period. In the course of these meetings and discussions, Toshiba agreed on prices and supply levels for LCD Panels.

92.      Upon information and belief, Toshiba is currently under investigation by the U.S. Department of Justice related to its participation in the conspiracy.

93.      In addition to the U.S. guilty pleas detailed above, corroboration regarding the co-conspirators' participation in the illegal conspiracy is provided by the December 8, 2010, statement of the European Commission announcing the imposition of fines on Chi Mei (EUR 300m), LG Display (EUR 430m, reduced to EUR 215m through a leniency program), AU Optronics (EUR 146m, reduced to EUR 116.8m through a leniency program), Chunghwa (EUR 9.5m, reduced to EUR 9.025m through a leniency program), and HannStar (EUR 8.1m), and further noting that Samsung escaped a fine only because it was the first to confess the conspiracy to European competition authorities.

94.      On December 18, 2008, the Japanese Fair Trade Commission ("JFTC") announced that it had investigated LCD modules used for display screens and determined that Hitachi and Sharp violated Japan's Antimonopoly Act by exchanging pricing information in September and November 2006, and agreeing about the price of LCD modules.  The JFTC ordered Hitachi and Sharp to cease and desist their violations of Japan's Antimonopoly Act and fined Sharp 261 million yen (approximately $2.9 million).  Sharp requested a hearing on the fine and the JFTC announced that it would commence hearing procedures in April 2009.

26

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

95.     On August 11, 2011, South Korea's antitrust regulator, the Korea Fair Trade Commission ("KFTC"), announced that it had discovered evidence that Samsung, LG Display, and Chi Mei had participated in a price-fixing conspiracy for LCD panels.  In media reports, AU Optronics and Chunghwa confirmed they had also received notices from the KFTC.

96.     On October 31, 2011, the KFTC issued a corrective order against the price-fixing conspiracy and imposed an administrative surcharge of KRW 194 billion.  The KFTC found that the cartel participants included Samsung Electronics (including Samsung Electronic Taiwan Co., Ltd. and Japan Samsung Co., Ltd, LG Display (including LG Display Taiwan Co., Ltd. and LG Display Japan Co., Ltd.), AU Optronics, Chimei Innolux Corp., Chungwa Picture Tubes Ltd., and HannStar.

97.     After noting that the cartel participants held a combined market share of approximately 80 percent of the entire international LCD market, the KFTC found that there was collusion among the cartel participants with respect to the prices and volume of LCD Panels, including:

    a.    agreements on the minimum selling prices, prices increases, differences in produce prices, timing of price increases, and the prohibition against rebates;

    b.    agreements to suspend operations, reduce production volume, and make other adjustments to supply in order to prevent price decreases;

    c.    the exchange of key sales information and preparation of market forecasts using joint supply/demand analyses; and

    d.    the use of the media to arbitrarily adjust supply/demand by providing false information indicating that LCD products were in short supply.

98.     The KFTC further found that the cartel participants monitored compliance with their agreements, and threatened and/or sanctioned non-complying cartel members.  The KFTC also concluded that the cartel participants knew their collusion was illegal, and sought to keep the details of their meetings and their agreements confidential.

**F.      Active Concealment of the Conspiracy**

99.      As the European Commission found, LG Display and its co-conspirators were at all relevant times aware that their conduct was illegal under U.S. and European law.  LG Display and its co-conspirators therefore agreed not to publicly discuss the existence or the nature of their agreement.   In some instances, the location of the meeting was circulated only the day before in an effort to avoid detection.  On at least one occasion, top executives and other officials attending these meetings were instructed not to disclose the fact of these meetings to outsiders, or even to other employees not involved in LCD panel pricing or production.  In fact, the top executives who attended the CEO and commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

100.      Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one.  The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least November or December of 2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to permit LG Display and its co-conspirators to maintain their price-fixing and production-limitation agreement.

101.      In addition to conducting the meetings in secret, participants agreed on what pretexts they would cite when questioned about rising prices.  The participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, to create the appearance of a supply shortage.

102.      LG Display and its co-conspirators have used a variety of other deceptive and purportedly market-based explanations for price increases in order to conceal their conspiracy.

103.      In 1999, Joel Pollack, a marketing manager for Sharp, blamed the substantial price rises in early 1999 on under-capitalization: "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

28

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

104.     Also in 1999, Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, and LG Display's Bock Kwon falsely reported that price increases resulted from "acute" shortages.

105.     On February 4, 2001, Bruce Berkoff, Executive Vice President at LG Display, was quoted by News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up."

106.     In the latter half of 2001, LG Display's Duk Mo Koo predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

107.     Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU Optronics, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic News* in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

108.     In a PowerPoint shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "LCDs: Profitability recovered faster than originally expected." A question-and-answer sheet released to investors that same day offered a better clue to its participation in the ongoing conspiracy: "Q4. How are recent prices for LCDs . . .? [Answer:] They remain high."

109.     These explanations were pretextual and each served to cover up the conspiracy. Later price increases were explained by industry leaders as derived from new demand for LCD televisions. In 2005, Duk Mo Koo stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

110.     In its investigation of LG Display and other conspirators, the European Commission discovered a document that requested the participants "to take care of security/confidentiality matters and to limit written communication," reminding the participants of the investigation into the DRAM price-fixing conspiracy that started in 2002. Many LCD conspiracy participants were also participants in the DRAM price-fixing conspiracy.

111.     Because of the active efforts of LG Display and its co-conspirators described above, the conspiracy to restrict the output of and fix prices for LCD Panels  became known to Plaintiffs and others only on or after December 11, 2006, when LG Display filed with the U.S. Securities and Exchange Commission a disclosure that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the U.S. Department of Justice had issued a subpoena to its San Jose office, which was followed by December 12, 2006, news reports indicating that Samsung, Sharp, and AU Optronics were also under investigation, and that the European Commission was also investigating the conspiracy.

112.     As such, SEL and SCEA had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  SEL and SCEA did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until on or after December 11, 2006, when investigations by the DOJ and other antitrust regulators became public.  Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put SEL and/or SCEA on inquiry notice that there was a conspiracy to fix the prices of LCD panels.

113.     As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any of SEL's and SCEA's claims arising from the anticompetitive conduct alleged in this Complaint.

**G.     Market Conditions During the Price-Fixing Conspiracy**

114.     Since no later than January 1998, the market for LCD panels has been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices.  LG Display and its co-conspirators achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

115.     As described herein, LG Display and its co-conspirators' LCD cartel evolved over time.  LG Display and its co-conspirators initiated their cartel when LCD Panels were in their relative infancy.  At that time, the conspirators balanced the desire to set prices collusively with the

industry goal of establishing their products in the marketplace.  As the cartel matured, new entrants were co-opted, and production costs declined.  At the same time, conspirators learned how they could best mitigate the crystal cycle by agreeing on prices and output.

1.      1996

116.    By early 1996, analysts were lamenting the excess supply and drastic price cuts in the LCD markets.  The downward pressure on prices, which had already fallen 40 to 50 percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this, LCD Panel prices actually rose in 1996, allegedly due to insufficient production capacity.  In reality, market participants were fixing the prices.

117.    During this period, various companies began to partner among each other to collaborate on supply.  This mutually beneficial relationship between purported competitors continued into at least 1999.

118.    A few months into 1996, there was a reversal in the downward trend in LCD panel prices and an alleged inability of manufacturers to supply enough LCD panels to meet demand.  By May of 1996, an industry magazine was reporting that, "flat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon ....  Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

119.    By mid-1996, industry analysts were commenting on an unusual rise in LCD panel prices that was noted to be "quite rare in the electronics industry."

120.    The "rare" increase in LCD Panel prices was due to the agreements reached by Hitachi, Sharp, and Toshiba to increase prices.  These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

121.    1996 also brought the advent of third generation fabs.  To stay current with technology, manufacturers were moving quickly into third generation motherglass.  LG Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998.  However, manufacturers falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed

1   months earlier.  This resulted in surging prices.  These price increases were also inconsistent with the

2   fact that production had become more efficient and cost effective.

3   2.      1997-1998

4           122.    By 1997, certain manufacturers were steadily sending engineers to Taiwan to

5   provide the Taiwanese manufacturers with the most up-to-date technology.  In return, these

6   manufacturers received output from Taiwanese plants.  In 1998, Chi Mei entered into such a

7   strategic alliance with Fujitsu, a manufacturer that Sharp acquired in 2005.  These arrangements

8   resulted in cooperative discussions between supposed competitors.  It was also expected to

9   contribute to an increase in supply of LCD Panels.

10          123.    By 1998, the LCD industry still had excess capacity, due in part to the still

11  recent entry of additional companies.  A March 30, 1998 article in Electronic News reported that

12  Hyundai's production lines were running at only 20 to 50 percent of capacity.  The article quoted

13  Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of

14  inventory and capacity available to suit any shortage . . . . You have to get your production up to full

15  capacity again before you can even talk about there being a shortage and I think there are plenty of

16  under-capacity fabs right now to bear the burden."

17          124.    During this period, Samsung made a concerted effort to get other

18  manufacturers in the industry to limit production.  Yoon-Woo Lee, President and CEO of the

19  Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at the

20  Eighteenth International Display Research Conference (known as Asia Display 98).  Mr. Lee said:

21          In order to maintain the tradition of top CRT manufacturer, we need to capture
           the high end market [and] deviate from the volume production of CRTs and
22         LCDs.  Taiwan is trying to enter LCD business because it has the advantage
           of the large PC production.  To survive in this rapidly changing environment,
23         we have to revise our previous strategies and redirect our business plans.  It is
           time for fundamental shift for future decisions, time for transformation from
24         volume driven to cost driven, time for driving value added strategies.  If we
           prepare now by shifting from the traditional business approach, to value added
25         new approach, we may be able to deviate from repeating the "crystal cycle"
           again.

26

27

28

32

#75920 v7 saf

125.   Samsung's effort to limit production, capacity restraints put in place by LG Display and its co-conspirators, and the price-fixing agreements caused decreases in prices of LCD Panels to slow and stop in late 1998.

3.   1999

126.   The efforts commenced by Samsung in 1998 continued to bear fruit.  In 1999, LCD Panel prices surged during that year due to a claimed "massive undersupply."  This was despite the entry of new manufacturers and several new fabs coming online.

127.   At the beginning of 1999, industry publications suggested that the LCD manufacturers were going to have the opportunity to recoup previous years' losses: "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink . . . ."

128.   By mid-1999, a media source was reporting: "[w]ith the supply shortage for LCD panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise."  The lack of supply was a pretextual reason given publicly to justify a price increase.

129.   Significantly, Bock Kwon (a high-ranking executive with LG Display who pled guilty in the United States for his role in the global conspiracy to fix prices in the sale of LCD panels) and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the following in the same trade publication:

> LG LCD will raise prices across its entire LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize some time in the second half.   According to Samsung, demand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate.  This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said.  The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

130.   Also in 1999, the three major LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai and, LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created LG Display.

4.      2000-2001

131.     By January 2000, prices for LCD Panels were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics). Taiwanese suppliers began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other suppliers to gain immediate market share.  However, by 2000-2001, the Taiwanese suppliers had increased their market share to the point that it made sense to participate in the conspiracy, and they then moderated the volume of their production.

132.     Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices.  In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

133.     In October 2000, The Korea Herald reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

134.     Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD Panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability." Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand.  However, published data for 2001 showed that several conspirators were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52 percent utilization rate. Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the defendants and their co-conspirators had begun actively cooperating among each other to restrict supply.  Again, defendants and their co-conspirators reacted to the price trough by conspiring to fix prices.  This agreement was reached in part at the bilateral and group meetings described above.

34

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et.al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

135.    The rise in prices made no economic sense at this point in time and was the product of the conspirators' setting the price of LCD panels by agreement.  First, the conspirators were bringing new plants on line that utilized larger motherglass, which was more cost effective. Second, as reported by an industry source, the variable cost of producing LCDs was declining during the latter part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic sense for conspirators not to utilize their full capacity other than through an agreement by them not to do so.

5.    2002-2003

136.    Prices continued to rise from the second half of 2001 through the second half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion.  In reality, the price increases were the result of agreements reached in the crystal meetings and bilateral discussions described above.

137.    By the second half of 2002, the cartel's success at propping up prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall.

138.    Throughout 2002, industry leaders shifted to fifth generation motherglass production technology.  According to officials at Samsung, "[t]he new fifth-generation facilities offer panels that are 11.5 times bigger in size than those of the first-generation production line, while production cost is 20 percent lower than the fourth-generation counterpart because of the decrease in number of necessary parts."

139.    Industry analysts took note of the unusual trends in the pricing of LCD panels. In February 2004, CNET.com quoted an analyst from IDC, a market research firm, as saying that, "LCD is one of the few [markets] where things have actually gone up in price."  As described above and as further detailed below, conspirators explained these price increases with false statements about market conditions to cover up the conspiracy.

140.    During five consecutive quarters in 2003 and 2004, LCD panel prices rose significantly.  AU Optronics reported that the price for certain of its LCD panels increased 28 percent between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG Display reported that its pricing increased by 21 percent over the same period.

141.    These soaring prices resulted in similar increases in the profits reaped by the LCD panel manufacturers.  For example, the eight largest LCD panel manufacturers reported a collective profit increase of 740 percent between the second quarter of 2003 and the second quarter of 2004.  These record profits resulted from conspirators' collective action to fix, raise, maintain or stabilize the price of LCD panels.  Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of LCDs.

142.    While LCD panel prices were increasing in late 2003, AUO, Chi Mei, and HannStar decreased capacity utilization, as had been agreed to in Crystal Meetings.

143.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AUO purchased a 20 percent stake in Japan's Fujitsu Display Technology.

144.    Despite the increased efficiency and cost savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of LCD panels.  In order to keep prices artificially high, conspirators chose not to operate at full capacity, nor to take advantage of lower variable costs.

6.    2004-2005

145.    Pursuant to LG Display and its co-conspirators' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters.  Various types of Crystal Meetings were ongoing during this period.

146.    The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and then to begin to decline in the second half of 2004.  During this period of time, the market for LCD televisions started to grow, and 32-inch panels represented approximately 9 percent of the market.

147.    In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

148.     Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

149.     By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant industry product, and the volume of 32-inch panels for televisions took off as well.  In 2005, 32-inch panels represented almost 27 percent of sales.

150.     Around this time, Samsung announced its intention to increase production of 40-inch LCD panels from 20,000 units in the second quarter to 150,000 units in the fourth quarter. An immediate increase to 100,000 units occurred the very next month.  Samsung's ability to immediately increase output so drastically shows how quickly manufacturers could ramp up capacity and increase utilization.

151.     Analysts forecast excess production capacity in 2005 because of large LCD plants from Samsung and LG Display being brought on line.  However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent.  The shortage came as a surprise to analysts.  This shortage was the result of collusion among the conspirators.

7.     2006 - Present

152.     A temporary oversupply of LCD panels occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, the conspirators fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was reducing production of those products to avoid further price erosion.  He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers.  A June 13, 2006 article in Info World noted that as a result of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

1    153.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict
2  the output and increase the prices of LCD Panels.  In May of 2006, in discussions between
3  executives of the two companies, AU Optronics convinced Quanta Display, a company that it
4  acquired in October of 2006, to reduce production of LCD panels.  By June of 2006, LG Display
5  also finalized plans to cut production of LCD panels.

6    154.    By the Summer of 2006, this ongoing conspiracy was being effectuated
7  through bilateral meetings as alleged above.

8    ## VI.    Impact on U.S. Commerce

9    155.    The illegal conduct of LG Display and its co-conspirators involved United
10  States import trade or import commerce.  Defendants knowingly and intentionally sent price-fixed
11  LCD Panels and LCD Products into a stream of commerce that they knew led directly into the
12  United States, one of their most important markets and a major source of their revenues.  In this
13  respect, Defendants directed their anticompetitive conduct at imports into the United States with the
14  intent of causing price-fixed LCD Panels and LCD Products to enter the United States market and
15  inflating the prices of LCD Products destined for the United States.  Such conduct was meant to
16  produce and did in fact produce a substantial effect in the United States in the form of higher prices
17  being paid for LCD Panels and LCD Products.

18    156.    The United States LCD market is enormous and was a major focus of and
19  very important to the conspiracy.  Measured by value, LG Display and its co-conspirators shipped
20  more than 400 million LCD Panels (including those incorporated into LCD Products) into the United
21  States during the Conspiracy Period for ultimate sale to consumers in the United States.  During
22  the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50
23  billion.  Defendants and their co-conspirators shipped millions of LCD Panels and LCD Products,
24  worth billions of dollars, into the United States each year during the Conspiracy Period.  As a result,
25  a substantial portion of Defendants' and their co-conspirators' revenues were derived from the
26  United States market.  LG Display and its co-conspirators spent hundreds of millions of dollars on
27  advertising their products in the United States.  LG Display and many of its co-conspirators had

28

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

1  marketing, sales, and account management teams specifically designated to handle United States

2  customer accounts and the United States market for LCD Panels and LCD Products.

3        157.    This conduct by LG Display and its co-conspirators was meant to produce and

4  did in fact produce a substantial effect in the United States in the form of artificially inflated prices

5  for LCD Panels and LCD Products.

6        158.    During the Conspiracy Period, LG Display and its co-conspirators shipped

7  LCD Panels and/or LCD Products directly into the United States.

8        159.    When high-level executives based at Defendants' and their co-conspirators'

9  Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be sold in

10  the United States and would be incorporated into LCD Products that would be sold in the United

11  States.  Moreover, because LCD Panels are—and were throughout the Conspiracy Period—one of

12  the if not the most expensive component of LCD Products, Defendants and their co-conspirators

13  knew that price increases for LCD Panels would necessarily result in increased prices for LCD

14  Products sold in the United States.

15        160.    LG Display and its co-conspirators monitored the prices for LCD Products

16  sold in the United States, which they often referred to as "street prices," because they were aware

17  that the conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition,

18  Defendants and their co-conspirators used LCD Product pricing in the United States as a benchmark

19  for establishing, organizing, and tracking their price-fixing of LCD Panels.

20        161.    In the plea agreements of LG Display, Bock Kwon, and C.S. Chung, each

21  admitted that "the primary purpose of [the conspiracy] was to fix the price of TFT-LCD sold in the

22  United States and elsewhere."

23        162.    For the reasons set forth above, Defendants' and their co-conspirators' illegal

24  conduct involved import trade or import commerce into the United States, was targeted at the United

25  States including California, and had a direct, substantial, and reasonably foreseeable effect in the

26  United States and in California in the form of supracompetitive pricing of LCD Panels and LCD

27  Products, among other forms of competitive injury to plaintiffs.  Further, the conduct alleged herein

28  had direct, substantial and foreseeable effects on Plaintiffs in California, where SEL and SCEA are

1  headquartered and where they each purchased LCD Panels and LCD Products as more specifically

2  alleged above.

## VI.    Plaintiffs' Injury

4       163.    SEL and SCEA have suffered direct, substantial, and reasonably foreseeable

5  injuries as a direct and proximate result of the conspiracy described above to fix prices and restrict

6  output of LCD Panels.

7       164.    As an example of such injury, SEL purchased LCD Panels and LCD Products

8  directly and indirectly from LG Display and/or its co-conspirators at prices inflated by the

9  conspiracy.  SEL procured those LCD Panels and LCD Products from California and received LCD

10  Panels and LCD Products in United States locations including California.

11      165.    As a further example of such injury SCEA purchased LCD Products from

12  Original Equipment Manufacturers ("OEMs"), Original Design Manufacturers ("ODMs"), and

13  others at prices raised to supracompetitive levels because of the conspiracy among LG Display and

14  its co-conspirators.  SCEA procured those LCD Products from California and received those LCD

15  Products in California.

## VII.    Statute of Limitations

17      166.    SEL and SCEA had neither actual nor constructive knowledge of the facts

18  supporting their claims for relief despite diligence in trying to discover the pertinent facts.  SEL and

19  SCEA did not discover, and could not have discovered through the exercise of reasonable diligence,

20  the existence of the conspiracy alleged herein until on or after December 11, 2006, when

21  investigations by the DOJ and other antitrust regulators became public.  As detailed at greater length

22  above, LG Display and its co-conspirators engaged in a secret conspiracy that did not give rise to

23  facts that would put SEL and/or SCEA on inquiry notice that there was a conspiracy to fix the prices

24  of LCD Panels.  As a result of LG Display and its co-conspirators' fraudulent concealment of the

25  conspiracy, the running of any statute of limitations has been tolled with respect to all of Plaintiffs'

26  claims asserted in or related to the allegations in the Complaint.

## First Cause of Action

## Violations of the Sherman Act (15 U.S.C. § 1) (SEL only)

40

1    167.    SEL re-alleges and incorporates herein all preceding paragraphs.

2    168.    Beginning at least on or around January 1, 1998, the exact date being

3    unknown to SEL and exclusively within the knowledge of Defendants and their co-conspirators, LG

4    Display and its co-conspirators entered into a continuing contract, combination or conspiracy to

5    unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §

6    1) by artificially reducing or eliminating competition.

7    169.    In particular, LG Display and its co-conspirators combined and conspired to

8    raise, fix, maintain, or stabilize the prices of LCD Panels.

9    170.    As a result of Defendants' and their co-conspirators' unlawful conduct, prices

10   for LCD Panels were raised, fixed, maintained, and stabilized.

11   171.    The contract, combination or conspiracy among LG Display and its co-

12   conspirators consisted of a continuing agreement, understanding, and concerted action among

13   Defendants and their co-conspirators.

14   172.    For purposes of effectuating their contract, combination, or conspiracy, LG

15   Display and its co-conspirators actually did those things they contracted, combined, or conspired to

16   do, including:

17       a.    participating in meetings and conversations to discuss the prices and supply of

18            LCD Panels;

19       b.    communicating in writing and orally to fix target prices, floor prices, and price

20            ranges for LCD Panels;

21       c.    agreeing to manipulate prices and supply of LCD Panels in a manner that

22            deprived purchasers of LCD Panels, including SEL, of free and open

23            competition;

24       d.    issuing price announcements and price quotations in accordance with the

25            agreements reached;

26       e.    selling LCD Panels to customers at non-competitive prices;

27       f.    exchanging competitively sensitive information in order to facilitate their

28            conspiracy;

41

g.      agreeing to maintain or lower production capacity; and

h.      providing false statements to the public to explain increased prices for LCD Panels.

173.    As a result of Defendants' and their co-conspirators' unlawful conduct, SEL was injured in its business and property in that (among other things) it paid more for LCD Panels purchased directly from LG Display and its co-conspirators than SEL otherwise would have paid in the absence of the unlawful conduct.

## Second Cause of Action

## Violations of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq.*)

174.    SEL and SCEA re-allege and incorporate herein all preceding paragraphs.

175.    Beginning at least on or around January 1, 1998, the exact date being unknown to SEL and SCEA and exclusively within the knowledge of LG Display and its co-conspirators, LG Display and its co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

176.    As a result of LG Display and its co-conspirators' unlawful conduct, SEL was injured in its business and property in that it paid more for LCD Panels purchased directly and indirectly from LG Display and its co-conspirators than it would have paid absent the unlawful conduct.  Further, SEL and SCEA each was injured in its business and property in that each paid more for LCD Products than it would have paid absent the unlawful conduct.

## Third Cause of Action

## Violations of the Unfair Competition Act (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

177.    SEL and SCEA re-allege and incorporate herein all preceding paragraphs.

178.    Beginning at least on or around January 1, 1998, the exact date being unknown to SEL and SCEA and exclusively within the knowledge of LG Display and its co-conspirators, LG Display and its co-conspirators violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, by committing unlawful, unfair, deceptive, and fraudulent acts in their continuing contracts, combinations, or conspiracy to fix prices of LCD Panels.

179.     As a result of Defendants' and their co-conspirators' unlawful conduct, SEL was injured in its business and property in that it paid more for LCD Panels purchased directly and indirectly from LG Display and its co-conspirators than it would have paid absent the unlawful, unfair, deceptive, and fraudulent conduct.  Further, SEL and SCEA each was injured in its business and property in that each paid more for LCD Products than it would have paid absent the unlawful, unfair, deceptive, and fraudulent conduct.

### Fourth Cause of Action

### Unjust Enrichment and Disgorgement of Profits

180.     SEL and SCEA re-allege and incorporate herein all preceding paragraphs.

181.     Beginning at least on or around January 1, 1998, the exact date being unknown to SEL and SCEA and exclusively within the knowledge of Defendants and their co-conspirators, LG Display and its co-conspirators have been unjustly enriched, through direct or indirect overpayments by SEL and SCEA for purchases of LCD Panels or LCD Products, or otherwise.

182.     Under common law principles of unjust enrichment, LG Display and its co-conspirators should not be permitted to retain the benefits conferred on them by overpayments.

183.     SEL and SCEA seek disgorgement and restitution of all overpayments resulting from purchases of LCD Panels or LCD Products.

### Prayer

184.     WHEREFORE, SEL and SCEA each pray that the Court enter judgment on its behalf, adjudging and decreeing that:

a.     LG Display and its co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and SEL was injured in its business and property as a result of those violations;

b.     LG Display and its co-conspirators engaged in a contract, combination, and conspiracy in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq*.), and SEL and SCEA each was injured in its business and property as a result of those violations;

#75920 v7 saf

c.     LG Display and its co-conspirators engaged in a contract, combination, and conspiracy in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.), and SEL and SCEA each has suffered injury in fact and has lost money or property as a result of those violations.

d.     LG Display committed acts of unjust enrichment and benefitted from them at SEL's and SCEA's expense;

e.     LG Display violated federal and California antitrust and unfair competition laws;

f.     SEL is entitled to recover damages it sustained, as provided by the federal and California antitrust laws, and a joint and several judgment in favor of SEL shall be entered against LG Display in an amount to be trebled in accordance with such laws;

g.     SCEA is entitled to recover damages it sustained, as provided by the California antitrust laws, and a joint and several judgment in favor of SCEA shall be entered against LG Display in an amount to be trebled in accordance with such laws;

h.     SEL and SCEA each is entitled to recover restitution and damages it sustained, as provided by California unfair competition laws, and a joint and several judgment in favor of each of SEL and SCEA shall be entered against LG Display in an amount to be trebled in accordance with such laws;

h.     SEL and SCEA each is entitled to restitution, including disgorgement of profits obtained by LG Display as a result of the acts of LG Display and its co-conspirators of unlawful and unfair competition resulting in LG Display's unjust enrichment;

i.     LG Display, its subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on LG Display's behalf, shall be permanently

44

Amended Complaint; Demand for Jury Trial
*Sony Electronics v. LG Display Co. et al.* (Case No. 3:10-cv-05616 SI) (MDL No. 3:07-md-01827-SI)

#75920 v7 saf

enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

j.     SEL and SCEA each shall be awarded pre-judgment and post-judgment interest to the extent permitted by law;

k.     SEL and SCEA each shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

l.     SEL and SCEA shall receive such other or further relief as may be just and proper.

Dated:  December 8, 2011               HOLME ROBERTS & OWEN LLP

By:               /s/
         Richard J. Mooney
         Attorneys for Plaintiff
         Sony Electronics Inc. and
         Sony Computer Entertainment America LLC

#75920 v7 saf

1

### Demand for Jury Trial

2    Plaintiffs SEL and SCEA hereby each demand a jury trial for all issues triable to a

3 jury.

4

5 Dated: December 8, 2011     HOLME ROBERTS & OWEN LLP

6

7

8             By:         /s/

                 Richard J. Mooney

9                Attorneys for Plaintiffs

                Sony Electronics Inc. and

10              Sony Computer Entertainment America LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#75920 v7 saf