1   David J. Burman (admitted *pro hac vice*)
DBurman@perkinscoie.com
2   Cori G. Moore (admitted *pro hac vice*)
CGMoore@perkinscoie.com
3   Troy P. Sauro, Bar No. 224097
TSauro@perkinscoie.com
4   Euphemia N. Thomopulos, Bar No. 262107
EThomopulos@perkinscoie.com
5   Noah G. Purcell (admitted *pro hac vice*)
NPurcell@perkinscoie.com
6   PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
7   San Francisco, CA 94111
Telephone: 415.344.7000
8   Facsimile: 415.344.7050

9   Attorneys for Plaintiff
Costco Wholesale Corporation

10

11        UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF CALIFORNIA
12         SAN FRANCISCO DIVISION

| | |
|---|---|
| 13  IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. M:07-1827 SI MDL No. 1827 |
| 14 | |
| 15  This Document Relates to Individual Case No. 3:11-00058-SI | Individual Case No.: 3:11-cv-00058-SI |
| 16  COSTCO WHOLESALE CORPORATION, | |
| 17        Plaintiff, | **COSTCO WHOLESALE CORPORATION'S SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| 18       v. | |
| 19  AU OPTRONICS CORP.; AU OPTRONICS CORPORATION AMERICA; CHIMEI INNOLUX | |
| 20  CORP. (fka CHI MEI OPTOELECTRONICS CORP.); CHI MEI OPTOELECTRONICS, USA, INC.; | Dept.:    Courtroom 10 |
| 21  CHUNGHWA PICTURE TUBES, LTD.; CMO JAPAN CO., LTD.; EPSON ELECTRONICS | Floor:    19th Floor Judge:   Hon. Susan Illston |
| 22  AMERICA, INC.; EPSON IMAGING DEVICES CORP.; HANNSTAR DISPLAY CORP.; HITACHI, | |
| 23  LTD.; HITACHI DISPLAYS, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; LG | |
| 24  DISPLAY CO., LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO.; SAMSUNG | **REDACTED - PUBLIC VERSION** |
| 25  ELECTRONICS AMERICA, INC.; SAMSUNG SEMICONDUCTOR, INC.; SHARP CORP.; SHARP | |
| 26  ELECTRONICS CORP.; TATUNG COMPANY OF AMERICA, INC.; TOSHIBA CORP.; TOSHIBA | |
| 27  AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, | |
| 28  INC.; TOSHIBA MOBILE DISPLAY CO., | |
|         Defendants. | |

1  Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

2 relief under the antitrust laws of the United States and of the state of Washington, and preserves

3 for appeal claims that the Court has dismissed under the laws of Arizona, California, Florida, and

4 Illinois.  Costco alleges as follows based on information including (1) the pleas and prosecutions

5 of certain Defendants and their executives; (2) allegations in the complaints of the direct

6 purchaser class—which included Costco until it opted out—and of other direct action plaintiffs,

7 allegations that were tested by various motions to dismiss or for summary judgment and the class

8 certification process; and (3) the allegations in the State of Washington's parens patriae

9 complaint, pursued in part on behalf of Costco.

10           **INTRODUCTION**

11   1.  Defendants and their co-conspirators conspired from at least January 1, 1996, until

12 at least December 11, 2006 (the "Relevant Period" in terms of unlawful acts), for the purpose and

13 to the effect of raising or maintaining prices and reducing capacity and output for Liquid Crystal

14 Display (LCD) panels, and products containing such panels, sold to Costco and others.  The

15 effects of the conspiracy on prices lasted into at least 2007.  LCD panels are used in a number of

16 products, including, but not limited to, computer monitors, laptop computers, televisions, mobile

17 phones, video cameras, digital cameras, digital picture frames, and portable music players, and

18 have no meaningful economic value except as part of such products.  As used herein, LCD

19 Products refers to LCD panels and finished products containing LCD panels, but not printers.

20 Costco purchased finished products.

21   2.  The conspiracy included agreements as to the prices at which LCD Products would

22 be sold to corporate subsidiaries and affiliates and other co-conspirators, thereby ensuring that

23 LCD Product prices remained consistent among Defendants and their customers, in an attempt to

24 prevent significant price discrepancies.

25   3.  Throughout the Relevant Period, the conspiracy moderated the normal downward

26 pressure on prices for LCD Products caused by periods of oversupply, process and other

27 efficiency gains, and technological change.  The prices of LCD Products sold by producers who

28 were not members of the conspiracy were also higher as a result of the conspiracy than they

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

1    otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of high

2    prices and high profits.  Although there were periods when prices for LCD Products temporarily

3    declined as a result of new market entrants or breakdowns in the effectiveness of the conspiracy,

4    prices declined from supra-competitive levels, rather than levels set by free and open competition,

5    and prices declined less than they would have in a competitive market.  As a result of Defendants'

6    unlawful conduct, Costco paid higher prices for LCD Products from any source than it would

7    have paid in a competitive market.

8         4.    During the Relevant Period, LCD Panels used in some notebook computers and

9    hand-held devices included three different technologies: thin film transistor (TFT) panels, color

10   super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels.  The

11   conspiracy had the purpose and effect of raising or maintaining prices of LCD Products using

12   TFT technology (TFT-LCD) as well as CSTN and MSTN technology (STN-LCD).

13                                    **PARTIES**

14   **A.    Plaintiff**

15        5.    Plaintiff Costco Wholesale Corporation is now a Washington corporation with its

16   principal place of business in Issaquah, Washington.  Costco operates throughout the United

17   States and elsewhere and sells LCD Products in its warehouses and on its website, Costco.com.

18        6.    Costco Wholesale Corporation is the result of the combination of two companies:

19   Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to

20   76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in

21   Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993,

22   Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware.

23   As the new name suggested, the two companies were not fully integrated for many years, and the

24   company had two principal executive offices, in San Diego, California, and Kirkland,

25   Washington.  Many headquarters functions continued in California for years after the merger.  In

26   1999, the company changed its name to Costco Wholesale Corporation and reincorporated in

27   Washington, but complete integration did not occur until later.

28

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

7.      During the Relevant Period, Costco purchased in the United States large numbers of LCD Products whose prices were inflated by the conspiracy.  Costco purchased and sold more such LCD Products in California than in any other state during the Relevant Period.  Costco's negotiations for the purchase of LCD Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters in Washington.  Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders for LCD Products were created in and issued from, regional offices located in multiple states including Washington, California, Illinois, Texas, Virginia, and Georgia.  Costco issued more purchase orders for LCD Products from California than from any other state.  About 40% of all purchases were ordered from and received in California.  The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

8.      Costco received LCD Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida.  Costco received far more LCD Products in California than in any other state, and more than twice as many in California as in the state with the next largest amount.

9.      Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for LCD Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

**B.      Defendants**

> **a.      AU Optronics**

10.      Defendant AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AU Optronics Corporation was formerly known as Acer Display Technology, Inc., until a merger with Unipac Optoelectronics Corp.  Acer Display Technology was a subsidiary of Acer Inc., which retained an interest in AU Optronics through BenQ Corporation.  Acer Inc. owns Acer America Corp., headquartered in California, which sold finished LCD products, and acquired

1  Gateway and eMachines, whose headquarters were also in California and who also sold finished

2  LCD products.  AU Optronics Corporation acquired its competitor Quanta Display Corp. in 2006.

3  During the Relevant Period, AU Optronics Corporation and related companies manufactured,

4  sold, and distributed LCD Products to customers throughout the United States.

5          11.     Defendant AU Optronics Corporation America (AU America) is a California

6  corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston,

7  Texas, and facilities located in San Diego and Cupertino, California.  AU America was formerly

8  known as Acer Display Technology America, Inc.  AU America is a wholly owned and controlled

9  subsidiary of Defendant AU Optronics Corporation.  During the Relevant Period, AU America

10  sold and distributed LCD Products manufactured by AU Optronics Corporation to customers

11  throughout the United States.

12          12.     Defendants AU Optronics Corporation and AU America and their affiliates are

13  sometimes collectively referred to as "AU Optronics."

14                  **b.      Chi Mei**

15          13.     Defendant Chimei Innolux Corp. fka Chi Mei Optoelectronics Corporation (CMO)

16  is a Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi Road,

17  Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.  It is a

18  subsidiary of Chi Mei Corporation (CMC), a Taiwanese company.  CMO was formed in 1998,

19  and merged with Innolux Display Corp. and TPO Displays Corp. in 2010 to create Chimei

20  Innolux.  It is a major manufacturer of LCD Products.  During the Relevant Period, CMO

21  manufactured, sold, and distributed LCD Products to customers throughout the United States.

22          14.     Defendant CMO Japan Co., Ltd. (CMO Japan) is a Japanese company with its

23  principal place of business at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028,

24  Japan.  Until 2006, CMO Japan was known as International Display Technology, Ltd.  CMO

25  Japan is a wholly owned and controlled subsidiary of Defendant CMO.  CMO Japan has been in

26  the LCD business since 2001.  During the Relevant Period, CMO Japan manufactured, sold, and

27  distributed LCD Products to customers throughout the United States.

28

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

15.     Defendant Chi Mei Optoelectronics USA, Inc. (CMO USA) is a Delaware corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose, California.  Until 2006, CMO USA was known as International Display Technology U.S.A., Inc.  CMO USA is a wholly owned and controlled subsidiary of Defendant CMO Japan.  During the Relevant Period, CMO USA sold and distributed LCD Products manufactured by CMO Japan to customers throughout the United States.

16.     CMC, CMO, CMO Japan, CMO USA, Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. are sometimes referred to collectively as "Chi Mei."

### c.     Chunghwa

17.     Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan 334, Taiwan.  It is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company.  During the Relevant Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed LCD Products to customers throughout the United States.

18.     Tatung Company of America, Inc. (Tatung America) is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  During the Relevant Period, Tatung America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the United States.

19.     Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes referred to collectively as "Chunghwa."

1

### d.  Epson

2       20.     Defendant Epson Imaging Devices Corporation (Epson Japan) is a Japanese

3  company with its principal place of business at 3-101, Minami Yoshikata, Tottori-Shi, Tottori,

4  680-8577, Japan.  The company was originally formed as a joint venture between Seiko Epson

5  Corporation and Sanyo Electric Co., Ltd., but is now a wholly-owned subsidiary of Seiko Epson

6  Corporation.  Until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging

7  Devices Corporation.  During the Relevant Period, Epson Japan manufactured, marketed, sold,

8  and distributed LCD Products to customers throughout the United States.

9       21.     Defendant Epson Electronics America, Inc. (Epson America) is a California

10  corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California.

11  Epson America is a wholly owned and controlled subsidiary of Seiko Epson Corporation.  During

12  the Relevant Period, Epson America sold and distributed LCD Products manufactured by Epson

13  Imaging Devices Corporation to customers throughout the United States.

14

### e.  HannStar

15       22.     Defendant HannStar Display Corporation (HannStar) is a Taiwanese company with

16  its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114,

17  Taiwan.  HannStar has been in the business of manufacturing and selling LCD Products since

18  1998.  During the Relevant Period, HannStar manufactured, sold, and distributed LCD Products

19  to customers throughout the United States.

20

### f.  Hitachi

21       23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business

22  at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company was one of the

23  original producers of LCDs.  In 2002, it spun off its LCD manufacturing assets to Hitachi

24  Displays, Ltd., a wholly owned subsidiary.  During the Relevant Period, Hitachi, Ltd.

25  manufactured, sold, and distributed LCD Products to customers throughout the United States.

26       24.     Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of

27  business at AKS Bldg. 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi

28  Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD manufacturing

- 7 -

1    business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd.

2    During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold, and distributed LCD

3    Products to customers throughout the United States.  Hitachi Displays, Ltd. is a member of the

4    joint venture IPS Alpha Technology, Ltd.

5            25.     Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with

6    its principal place of business at 208 Fairforest Way, Greenville, South Carolina.  Its ultimate

7    parent company is Hitachi, Ltd.  Hitachi Electronic Devices (USA), Inc. sold and distributed LCD

8    Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the

9    United States.

10           26.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices

11   (USA), Inc. are sometimes referred to collectively as "Hitachi."

12                           **g.      LG Display**

13           27.     Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a

14   Korean entity with its principal place of business at 17th Floor, West Tower, LG Twin Towers

15   20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-721, and offices in San Jose, California.

16   LG Display Co., Ltd. was created in 1999 as a joint venture between LG Electronics, Inc. and

17   Koninklijke Philips Electronics N.V.  In July 2004, LG Display Co., Ltd. became a public

18   company, with LG Electronics, Inc. and Koninklijke Philips Electronics N.V. as the controlling

19   shareholders.  LG Display Co., Ltd. describes itself as "the global leader in the development and

20   manufacture of LCD panels for televisions, computer monitors, notebooks and emerging mobile

21   applications."  During the Relevant Period, LG Display Co., Ltd., LG Electronics, Koninklijke

22   Philips Electronics N.V., and affiliates, including LG Electronics USA and Philips Electronics

23   North America Corp., manufactured, sold, and distributed LCD Products to customers throughout

24   the United States.

25           28.     Defendant LG Display America, Inc., formerly known as LG Philips LCD America,

26   Inc., is a California corporation with its principal place of business at 2540 North First Street,

27   Suite 400, San Jose, CA 95131.  LG Display America, Inc. is a wholly owned and controlled

28   subsidiary of LG Display Co., Ltd.  During the Relevant Period, LG Display America, Inc. sold

1    and distributed LCD Products manufactured by LG Display Co., Ltd. to customers throughout the

2    United States.

3         29.    LG Display Co., Ltd., Koninklijke Philips Electronics N.V., LG Display America,

4    Inc., LG Electronics, LG Electronics U.S.A., Inc., and Philips Electronics North America Corp.

5    are sometimes referred to collectively as "LG Display."

6              **h.    Samsung**

7         30.    Defendant Samsung Electronics Company, Ltd. is a Korean company with its

8    principal place of business at Samsung Electronics Bldg., 1320-10, Seocho 2-dong, Seocho-gu,

9    Seoul 137-857, Korea.  It is the world's largest producer of LCD Products.  During the Relevant

10   Period, it manufactured, sold, and distributed LCD Products to customers throughout the United

11   States.

12        31.    Defendant Samsung Electronics America, Inc. (Samsung America) is a New York

13   corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New

14   Jersey 07660.  Samsung America is a wholly owned and controlled subsidiary of Defendant

15   Samsung Electronics Company, Ltd.  During the Relevant Period, Samsung America sold and

16   distributed LCD Products manufactured by Samsung Electronics Company, Ltd. to customers

17   throughout the United States.

18        32.    Samsung Semiconductor, Inc. is a California corporation with its principal place of

19   business at 3655 North First Street, San Jose, California 95134.  Samsung Semiconductor, Inc. is

20   a wholly owned and controlled subsidiary of Defendant Samsung Electronics Company, Ltd.

21   During the Relevant Period, Samsung Semiconductor, Inc. sold and distributed LCD Products

22   manufactured by Samsung Electronics Company, Ltd. to customers throughout the United States.

23        33.    Defendants Samsung Electronics Company, Ltd., Samsung America, and Samsung

24   Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung."

25              **i.    Sharp**

26        34.    Defendant Sharp Corporation is a Japanese company with its principal place of

27   business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Relevant Period,

28

- 9 -

1    Sharp Corporation manufactured, sold, and distributed LCD Products to customers throughout the

2    United States.

3          35.    Defendant Sharp Electronics Corporation is a New York corporation with its

4    principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics Corporation

5    is a wholly owned and controlled subsidiary of Defendant Sharp Corporation.  During the

6    Relevant Period, Sharp Electronics Corporation sold and distributed LCD Products manufactured

7    by Defendant Sharp Corporation to customers throughout the United States.

8          36.    Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes

9    referred to collectively herein as "Sharp."

10          **j.**    **Toshiba**

11          37.    Defendant Toshiba Corporation is a Japanese company with its principal place of

12    business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba Corporation

13    participates in two joint ventures that manufacture, sell, and distribute LCD Products: Defendant

14    Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display Technology Co., Ltd., and

15    co-conspirator IPS Alpha Technology, Ltd.  During the Relevant Period, Toshiba Corporation

16    manufactured, sold, and distributed LCD Products to customers throughout the United States.

17          38.    Defendant Toshiba America Electronic Components, Inc. is a California corporation

18    with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine, California.

19    Toshiba America Electronic Components, Inc. is a wholly owned and controlled subsidiary of

20    Toshiba America, Inc., a holding company for Defendant Toshiba Corporation.  Toshiba America

21    Electronic Components, Inc. is the United States sales and marketing representative for

22    Defendants Toshiba Corporation and Toshiba Mobile Display Co., Ltd.  During the Relevant

23    Period, Toshiba America Electronic Components, Inc. sold and distributed LCD Products

24    manufactured by Toshiba Corporation to customers throughout the United States.

25          39.    Defendant Toshiba America Information Systems, Inc. is a California corporation

26    with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  Toshiba America

27    Information Systems, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc.

28

1    During the Relevant Period, Toshiba America Information Systems, Inc. sold and distributed

2    LCD Products manufactured by Toshiba Corporation to customers throughout the United States.

3        40.    Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc.,

4    and Toshiba America Information Systems, Inc. are sometimes referred to collectively as

5    "Toshiba."

6        41.    Defendant Toshiba Mobile Display Co., Ltd. (Toshiba Mobile) is a Japanese

7    company with its principal place of business at 1-9-2, Hatara-cho, Fukaya-Shi, Saitama, 366-

8    0032, Japan.  Toshiba Mobile was created for the purpose of manufacturing LCD Products.

9    During the Relevant Period, Toshiba Mobile manufactured, sold, and distributed LCD Products to

10   customers throughout the United States.

11   **C.    AGENTS AND CO-CONSPIRATORS**

12       42.    The acts alleged against Defendants in this Complaint were authorized, ordered, or

13   done by their officers, agents, employees, or representatives while actively engaged in the

14   management and operation of Defendants' businesses or affairs.

15       43.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other

16   Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

17       44.    When Plaintiff refers to a corporate family or companies by a single name in

18   allegations of participation in the conspiracy, it is to be understood that one or more employees or

19   agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

20   every company in that family.  In fact, the individual participants in the conspiratorial meetings

21   and discussions did not always know the corporate affiliation of their counterparts, nor did they

22   distinguish between the entities within a corporate family.

23       45.    Individual participants entered into agreements on behalf of, and reported these

24   meetings and discussions to, their respective corporate families.  As a result, the entire corporate

25   families were represented in meetings and discussions by their agents and were parties to the

26   agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

27   families distributed LCD Products, these subsidiaries played a significant role in the conspiracy

28   because Defendants wished to ensure that the prices for such products would not undercut the

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

1    pricing agreements reached at these various meetings.  Thus, all entities within the corporate

2    families were active, knowing participants in the alleged conspiracy.

3            46.    Various persons or firms not named as Defendants participated as co-conspirators in

4    the alleged violations, performed acts, and made statements in furtherance of the conspiracy, and

5    manufactured, sold, and distributed LCD Products to customers in the United States.  These co-

6    conspirators include, but are not limited to, Fujitsu Limited; Fujitsu Display Technologies Corp.;

7    Hydis Technologies Co., Ltd., formerly known as BOE Hydis Technology Co., Ltd.; Innolux

8    Display Corp.; IPS Alpha Technology, Ltd.; Koninklijke Philips Electronics N.V.; LG

9    Electronics, Inc.; LG Electronics U.S.A., Inc.; Mitsubishi Electric Corporation; NEC LCD

10   Technologies, Ltd.; Philips Electronics North America Corp.; Seiko Epson Corporation; S-LCD

11   Corp.; and TPO Displays Corp.

12                              **JURISDICTION AND VENUE**

13           47.    Plaintiff brings this action to obtain injunctive relief and to recover damages,

14   including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

15   violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of Washington,

16   California, Washington, Arizona, Florida, and Illinois.

17           48.    This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

18   26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman

19   Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C.

20   § 1331, which provides this Court with original jurisdiction over actions arising under the laws of

21   the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over

22   any action arising under federal laws regulating commerce or protecting commerce against

23   restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

24   § 1332 or, alternatively, pursuant to 28 U.S.C. § 1367.

25           49.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15

26   U.S.C. § 22, and Section 1391(b), (c), and (d) of Title 28 of the United States Code because a

27   substantial part of the events giving rise to Plaintiff's claims occurred in this district and a

28   substantial portion of the affected interstate trade and commerce was carried out in this district.

50.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of Washington.

51.     Related cases are pending in MDL No. 1827 in the Northern District of California, and this matter should be consolidated there for pretrial purposes but returned to this district for trial.

## FACTS AND BACKGROUND

### A.     Trade and Commerce

52.     During the Relevant Period, each Defendant, or one or more of its subsidiaries or affiliates, sold LCD Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

53.     During the Relevant Period, Defendants collectively controlled the vast majority of the market for LCD Products, both globally and in the United States.

54.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The focus of their United States activities and impact of their illegal activities was California.

55.     Costco purchased finished products containing LCD panels from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

### B.     LCD Technology

56.     Production of LCD panels begins with "motherglass," large sheets of glass that are each cut to make multiple panels.  LCDs are manufactured in fabrication plants, sometimes referred to as "fabs," that are equipped to handle a particular size of motherglass.  Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger

and larger motherglass. This, in turn, has resulted in the ability to fabricate larger or more LCD panels. Each increase in motherglass size is described as a generation. Third-generation fabs in 1998 to 1999 typically utilized 550 by 650 mm motherglass, while eighth-generation fabs utilize 2160 by 2460 mm motherglass. The use of larger motherglass provides substantial cost savings to manufacturers.

57.     LCDs are capable of producing the same image as cathode ray tubes (CRTs), but in a much smaller package. LCDs also have lower energy requirements, are generally easier to view, and do not flicker like CRTs.

**C.     Structure of the LCD Industry**

58.     The LCD industry has several characteristics that facilitated conspiracy, including market concentration, ease of information sharing, multiple interrelated business relationships, significant barriers to entry, and homogeneity of products.

59.     Although the market for LCD products is enormous, the LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by Costco. In 2005, the top five suppliers—including LG Display, Sharp, AU Optronics, and Chi Mei— collectively shipped 90 percent of all LCD panels for television use. According to estimates from industry analyst iSuppli Corporation, LG Display had the greatest share of LCD television shipments in the first quarter of 2006 (22.3%), followed by Chi Mei (18.7%), AU Optronics (16.8%), and Sharp (13.9%). These companies were four of the largest producers as measured by market share during much of the Relevant Period.

60.     Because of Defendants' common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities during the Relevant Period for Defendants to discuss and exchange competitive information. Through meetings, telephone calls, e-mails, and instant messaging, Defendants took advantage of these opportunities to discuss, and agree upon, their pricing and output for LCD Products as alleged below.

61.     The LCD industry is analyzed by several market research firms.  These firms offer monthly market data on pricing, supply, utilization of fabs, and other indicators of market activity.  The capacity and pricing data reported by these firms come directly from manufacturers, which typically report historical, current, and expected future information.

62.     Defendants thus had access to each other's future plans for bringing new capacity online, capacity utilization, market share, pricing, and use of new technology.  Because so few companies had to be analyzed to obtain this data, all competitors in the LCD market had ready and timely access to reliable information about their competitors' pricing as well as future supply and capacity decisions.  By meeting together as alleged below, as well as monitoring and analyzing this competitive information over time, participants in the conspiracy were able to signal their respective intent, verify that the conspiracy was working, identify and prevent defection from the conspiracy, and avoid detection of the conspiracy.

63.     The LCD industry experienced significant consolidation during the Relevant Period, including: (a) the creation of AU Optronics in 2001 through the merger of Acer Display Technology, Inc. and Unipac Electronics; (b) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (c) the formation of IPS Alpha in 2005; and (d) AU Optronics' acquisition in 2006 of Quanta Display, Inc., which resulted in AU Optronics becoming the third-largest manufacturer of LCD Products.

64.     The industry involves a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that facilitate collusion.  AU Optronics, for example, entered into licensing arrangements with Sharp in 2005.  Chunghwa did the same with Sharp in December 2006.  Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar, and Hitachi.

65.     The industry is close-knit.  Multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity for collusion.  These relationships created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

66.    There are significant barriers to entry into the LCD industry.  Efficient fabs are large and costly.  LCD Products are vulnerable to technological advances, so research and development costs are substantial.

67.    During the Relevant Period, the costs of the assembly components declined overall, substantially in some periods.  Pricing coordination and manipulation of the output of LCD Products allowed Defendants to keep prices above what they would have been but for the conspiracy.

68.    In the LCD industry, the supply-and-demand cycle is known as the "crystal cycle." The crystal cycle has been described as "boom or bust," alternating between oversupply and shortages, which drive prices for LCD Products up and down.  Among other things, manufacturers' decisions about how much capacity to build and use determines whether supply is inadequate, optimal, or excessive.

69.    Another factor is the entry of new competitors into the market.  When a new competitor enters a market, it brings incremental production online, and prices drop until equilibrium is reached.  In the LCD industry, however, Defendants conspired to rein in and discipline new entrants until they assimilated into the conspiracy.  This pressure on new market entrants had the effect of tempering price drops.

70.    The conspiracy did not completely eliminate the effects of the crystal cycle in the LCD industry.  There were periods when Defendants' collusive practices drove prices for LCD Products so high that demand decreased to a point where Defendants lowered prices for short periods of time.  However, Defendants' efforts to stabilize prices were successful in moderating the effects of the crystal cycle and other aspects of normal competition and supply-and-demand forces.  To the extent that prices for LCD Products fell, they fell from levels that were supra-competitive and had been set conspiratorially, rather than from levels set by free and open competition.  Additionally, prices did not fall as low as they would have absent the conspiracy.

71.    Defendants employed various techniques to monitor, analyze, and enforce their conspiracy across the various types of LCDs and applications.  They could look at the most popular size panels and the applications for those panels that represent the highest percentage of

1   sales.  They could look at standardized statistics used in the industry, such as the amount of glass

2   produced and revenues per metric ton of glass.

3   **D.      Pre-Conspiracy Market**

4            72.      Until the mid-1990s, Japanese companies like Hitachi and Sharp were essentially

5   the exclusive suppliers of LCD panels.  In early 1995, the industry faced declining LCD panel

6   prices, which industry analysts attributed to advances in technology and greater efficiency.  One

7   analyst noted that the "flat panel display industry is following the classic cyclical business pattern

8   of the semiconductor industry."  The Japanese manufacturers realized that growth in capacity

9   from investing in new plants was weakening the price of LCDs, and they slowed the rate of their

10  investments.  But this provided an opening to Korean manufacturers.

11           73.      In 1995, Korean companies—including LG Electronics, Inc. and, to a lesser extent,

12  Hyundai—entered the LCD market.  These firms offered comparable products at reduced prices

13  in an effort to gain market share.  This resulted in increased competition, which contributed to

14  significant price declines.

15           74.      Increases in manufacturing capacity and decreases in manufacturing costs seemed

16  to ensure continuing price declines.  By mid-1995, the Japanese companies and their new Korean

17  competitors had a total capacity of 14 million LCD panels, while demand for them was only

18  about three million.  In addition to the surges in capacity during 1995, costs were also dropping.

19           75.      By late 1995, the entry by Korean suppliers had pushed the price of some LCD

20  panels down by 50 percent from the previous year.  The LCD conspiracy may have arisen in

21  reaction to this trough in prices.

22  **E.      Defendants' and Co-Conspirators' Illegal Activities**

23           76.      The LCD conspiracy operated through a combination of group, bilateral, and other

24  discussions that took place in Japan, South Korea, Taiwan, and in California and elsewhere in the

25  United States.  In the early years, bilateral discussions were the primary method of

26  communication.  During this period, Hitachi and Sharp met or talked to at least one other

27  Defendant about the prices for LCD Products, and thereby created a model for how the

28  conspiracy would be carried out after Korean and later Taiwanese companies joined.  These

1   meetings among Hitachi and Sharp included discussions of price as well as capacity utilization.

2   Defendants also shared proprietary and confidential information.  As more manufacturers entered

3   the conspiracy, group meetings became more prevalent.  By no later than 2001 a formal system of

4   multilateral meetings was in place.

5            77.    The group meetings among the participants in the LCD price-fixing conspiracy

6   were referred to as "crystal meetings."  Crystal meetings were attended by employees at three

7   levels.  The first level meetings were attended by the Chief Executive Officers or Presidents, and

8   were known as "CEO" or "top" meetings.  The second level was management-level meetings,

9   referred to as "commercial" or "operation" meetings.  The third level meetings were attended by

10  lower-level sales and marketing personnel.

11           78.    The meeting agenda for a typical crystal meeting included a discussion of the past

12  month's producer shipments, customer demand, capacity utilization, and prices.  Meeting

13  participants shared information relating to all of these topics so that Defendants could agree on

14  future prices and output.  Meeting participants discussed and agreed upon target prices, floor

15  prices, and price ranges for LCD panels.  They also discussed prices of LCD panels that were sold

16  to specific customers and agreed on target prices to be used in negotiations with large customers.

17           79.    Each of the participants in these meetings knew and discussed the significant impact

18  that the price of LCD panels has on the cost of finished products.  Defendants knew and intended

19  that the conspiratorially-high prices of LCD panels would be reflected in the prices for finished

20  LCD Products, and thus, there was often no need to discuss specifically the prices of finished

21  LCD Products.

22           80.    The purpose of the CEO or top meetings was to stabilize or raise prices.  At the

23  CEO meetings, the participants discussed prices and supply and demand.  The participants

24  discussed monthly and quarterly LCD fab output and supply figures, as well as the number of

25  production days the fabs would operate for the next month, and agreed on output restrictions.  At

26  each meeting, an individual was designated as the "chairman," and would put output and price

27  figures on a projector or a whiteboard for the group to review.  The attendees would discuss the

28

figures and take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price and output.

81.    The commercial or operation meetings were attended by Defendants' vice presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings was largely the same as the CEO meetings.  The participants discussed price, output, capacity, and market conditions.  These meetings occurred approximately monthly and sometimes quarterly.

82.    Agreements reached at these meetings included: (a) target prices, floor prices, and price ranges; (b) values for various attributes of panels, such as quality or certain technical specifications; (c) production capacity and output; (d) explanations to customers as to the reason for price increases; (e) public statements regarding anticipated supply and demand; (f) exchange of information about fabrication plant utilization and production capacity; and (g) encouraging other competitors to abide by the agreed-upon pricing.

83.    The lower-level meetings were less formal than the CEO and commercial meetings, and typically occurred at restaurants over lunch.  The purpose of the lower-level meetings was to exchange market information that would facilitate implementation of the conspiracy and carry out the agreements made at the CEO and commercial meetings.

84.    In the summer of 2006, Defendants discontinued the lower-level meetings in favor of coordinated one-on-one meetings.  The meetings were coordinated so that on the same date, two sets of competitors met one on one.  After that meeting, each of them met one on one with another competitor.  This continued until all competitors met with each other.  These coordinated meetings took place until at least November or December 2006.  Defendants' specific intent was to conceal their meetings but still accomplish the same purposes as the group meetings.

85.    The crystal meetings were supplemented by bilateral discussions between various Defendants.  The purpose of the bilateral discussions was to exchange information about past and future pricing, as well as information about shipments.

86.    Defendants had bilateral discussions with each other during price negotiations with customers to ensure that no Defendant was persuaded by customers to cut prices.  These

1    discussions were usually between sales and marketing employees.  The information gained in

2    these communications was then shared with supervisors and taken into account in determining the

3    prices to be offered.

4           87.    Bilateral discussions were also used to synchronize prices with manufacturers that

5    did not ordinarily attend the group meetings.  For example, HannStar was given responsibility for

6    notifying Hitachi of the pricing agreements reached at the crystal meetings.  Hitachi implemented

7    the agreed-upon pricing as conveyed by HannStar.

8           88.    Defendant AU Optronics participated in multiple CEO, commercial, and lower-

9    level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Additionally,

10   Quanta Display, Inc. and Unipac Electronics, which merged with AU Optronics, participated in

11   lower-level meetings.  Through these discussions, AU Optronics agreed on prices and output

12   levels for LCD Products.  On June 10, 2010, a federal grand jury in San Francisco returned an

13   indictment against AU Optronics Corporation, AU Optronics Corporation America, and six AU

14   executives, alleging that: "From on or about September 14, 2001, until on or about December 1,

15   2006, . . . the defendants and other coconspirators entered into and engaged in a combination and

16   conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid

17   crystal display panels ('TFT-LCD') in the United States and elsewhere . . . in violation of Section

18   1 of the Sherman Act (15 U.S.C. § 1)."

19          89.    Defendant Chi Mei participated in multiple CEO, commercial, and lower-level

20   meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

21   discussions, Chi Mei agreed on prices and output levels for LCD Products.  On February 2, 2010,

22   the United States announced that Chi Mei had agreed to plead guilty and pay a criminal fine of

23   $220 million for its participation in a conspiracy covering TFT-LCD panels sold worldwide from

24   September 14, 2001, to December 1, 2006.

25          90.    Defendant Chunghwa participated in multiple CEO, commercial, and lower-level

26   meetings, as well as bilateral discussions, between at least 2001 and 2006.  On January 14, 2009,

27   Chunghwa Picture Tubes, Ltd. pled guilty to "participating in a conspiracy to suppress and

28   eliminate competition by fixing the prices of TFT-LCD sold in the United States and elsewhere,

1  from on or about September 14, 2001, to on or about December 1, 2006, in violation of the

2  Sherman Antitrust Act, 15 U.S.C. § 1," and agreed to pay a criminal fine of $65 million.  In its

3  plea agreement, Chunghwa admitted that "through its officers and employees, including high-

4  level personnel of the defendant, [it] participated in a conspiracy among major TFT-LCD

5  producers, the primary purpose of which was to fix the price of TFT-LCD sold in the United

6  States and elsewhere."  Chunghwa further admitted that "through its officers and employees, [it]

7  engaged in discussions and attended meetings, including group meetings commonly referred to by

8  the participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

9  It was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of

10  TFT-LCD to be sold in the United States and elsewhere."

11        91.    Defendant Epson America is a wholly owned and controlled subsidiary of

12  Defendant Epson Japan and, as alleged above, Plaintiff is informed that Epson Japan was

13  represented by a co-conspirator in at least one of the bilateral meetings.  Epson Japan and Epson

14  America, through their agent, were parties to the agreements made at these meetings.  In addition,

15  to the extent Epson America distributed LCD Products to direct and indirect purchasers, it played

16  a significant role in the conspiracy because Defendants wished to ensure that the prices for such

17  products paid by direct and indirect purchasers did not undercut the pricing agreements reached at

18  these various meetings.  Epson America was an active, knowing participant in the alleged

19  conspiracy.  On August 25, 2009, the United States announced that Epson Japan had agreed to

20  plead guilty and pay a criminal fine of $26 million for its participation in a conspiracy covering

21  TFT-LCD panels sold to Motorola for use in Razr mobile phones from the fall of 2005 to the

22  middle of 2006.

23        92.    Defendant HannStar participated in multiple CEO, commercial, and lower-level

24  meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

25  discussions, HannStar agreed on prices and output levels for LCD Products.  On June 29, 2010,

26  the United States announced that HannStar agreed to plead guilty and pay a $30 million criminal

27  fine for its role in a conspiracy to fix prices in the sale of TFT-LCD panels sold worldwide.

28  HannStar admitted that from on or about September 14, 2001, to on or about January 31, 2006,

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

1    "through its officers and employees, including high-level personnel of the defendant, [it]

2    participated in a conspiracy with major TFT-LCD producers, the primary purpose of which was

3    to fix the price of certain TFT-LCD sold in the United States and elsewhere" in violation of the

4    Sherman Antitrust, Act, 15 U.S.C. § 1.  HannStar further admitted that "[i]n furtherance of the

5    conspiracy, the defendant, through its officers and employees, engaged in discussions and

6    attended meetings, including group meetings referred to by some of the participants as 'crystal

7    meetings,' with representatives of other TFT-LCD producers.  During these discussions and

8    meetings, agreements were reached to fix the price of certain TFT-LCD to be sold in the United

9    States and elsewhere."

10          93.     Defendant Hitachi had multiple bilateral discussions during the Relevant Period and

11   agreed on prices and output levels for LCD Products.  On March 10, 2009, the United States

12   announced that Hitachi agreed to plead guilty and pay a $31 million criminal fine for its role in a

13   conspiracy to fix prices in the sale of TFT-LCD panels to Dell, Inc.  On May 22, 2009, Hitachi

14   admitted that "[f]rom on or about April 1, 2001 to on or about March 31, 2004, the defendant,

15   through its officers and employees, participated in a conspiracy with other major TFT-LCD

16   producers, the primary purpose of which was to fix the price of TFT-LCD sold to Dell for use in

17   notebook computers."  Hitachi further admitted that, "through its officers and employees, [it]

18   engaged in telephone discussions and attended bilateral meetings with representatives of other

19   major TFT-LCD producers" and that "[d]uring these discussions and meetings, agreements were

20   reached to fix the price of TFT-LCD sold to Dell for use in notebook computers."

21          94.     Defendant LG Display participated in multiple CEO, commercial, and lower-level

22   meetings, as well as bilateral discussions.  For example, in 1998, LG Display Sales Director B.

23   Kwon described a meeting in which Hitachi solicited feedback on whether LG Display's prices

24   were too low and promised to "cooperate in maintaining the market price."  On December 15,

25   2008, LG Display Co., Ltd. and LG Display America, Inc. pleaded guilty to "participating in a

26   conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCD sold in the

27   United States and elsewhere, from on or about September 21, 2001, to on or about June 1, 2006,

28   in violation of the Sherman Antitrust Act, 15 U.S.C. § 1," and agreed to pay a criminal fine of

1   $400 million.  In its plea agreement, LG Display admitted that "through its officers and

2   employees, including high-level personnel of the defendant, [it] participated in a conspiracy

3   among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-

4   LCD sold in the United States and elsewhere."  LG Display further admitted that "through its

5   officers and employees, [it] engaged in discussions and attended meetings, including group

6   meetings commonly referred to by the participants as 'crystal meetings,' with representatives of

7   other major TFT-LCD producers."  LG Display admitted that it was "[d]uring these discussions

8   and meetings, [that] agreements were reached to fix the price of TFT-LCD to be sold in the

9   United States and elsewhere."

10       95.     Defendant Samsung participated in multiple CEO, commercial, and lower-level

11  meetings, as well as bilateral discussions.  Through these discussions, Samsung agreed on prices

12  and output levels for LCD Products.  For example, in December 1998, Reuben Chang, a Samsung

13  employee, reported meeting with Sharp and Hitachi to discuss pricing and their plans to cease

14  designs of specific products.  In 2001, a Samsung business plan intended for internal distribution

15  set forth information about future price plans and supplies for cartel members LG Display, Sharp,

16  CMO, and others.  It also set forth Samsung's wish to confirm cooperation regarding price

17  management strategies and to ensure supplier collaboration.  Throughout the Relevant Period,

18  Samsung employees gathered and conveyed information from cartel participants on competitor

19  pricing, supplies, inventories, and output, together with their plans for future pricing, supplies,

20  and output, and provided the information to senior executives at Samsung, who used the

21  information to set Samsung's prices and control output and inventory in accordance with cartel

22  agreements.

23       96.     Defendant Sharp participated in multiple group and bilateral meetings and agreed

24  on prices and output levels for LCD Products.  For example, in December 1998, Sharp met with

25  Samsung to discuss and exchange prices and product design and output.  On December 16, 2008,

26  Sharp pleaded guilty and agreed to pay a $120 million criminal fine for its participation in

27  conspiracies to fix the price of TFT-LCD panels sold to Dell, Inc. from April 2001 to December

28  2006 for use in computer monitors and laptops; to Motorola, Inc. from autumn 2005 to the middle

1   of 2006 for use in mobile phones; and to Apple Computer, Inc. from September 2005 to

2   December 2006 for use in iPod portable music players.  In its plea agreement, Sharp admitted that

3   "through its officers and employees, including high-level personnel of the defendant, [it]

4   participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was

5   to fix the price of TFT-LCD sold" to Dell, Apple, and Motorola.  Sharp further admitted that

6   "through its officers and employees, [it] engaged in bilateral telephone discussions and attended

7   bilateral meetings with representatives of other major TFT-LCD producers."  Sharp admitted that

8   it was "during these discussions and meetings, [that] agreements were reached to fix the price of

9   TFT-LCD sold to" Dell, Apple, and Motorola.

10          97.     Defendant Toshiba participated in multiple bilateral discussions with other

11  Defendants, during which Toshiba reached agreements and understandings with other Defendants

12  on prices.  Toshiba also participated in the conspiracy by entering into joint ventures and other

13  arrangements to manufacture or source LCD Panels with one or more of the Defendants that

14  attended the Crystal Meetings.  The purpose and effect of these joint ventures by Toshiba and

15  others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high

16  levels and to aid, abet, notify, and facilitate the implementation of the price-fixing and

17  production-limitation agreements reached at the meetings.  During the Relevant Period, Toshiba

18  sought and formed strategic partnerships with other LCD manufacturers, which allowed it to

19  communicate and coordinate prices and production levels with other manufacturers as part of the

20  overall conspiracy alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a

21  manufacturing joint venture.  In 2001, Toshiba and Matsushita formed a joint venture, Advanced

22  Flat Panel Displays, which merged their LCD operations.  In April 2002, Toshiba and Matsushita

23  formed a joint venture, Toshiba Matsushita Display Technology Co. Ltd., which combined the

24  two companies' LCD development, manufacturing, and sales operations.  In 2006, Toshiba

25  purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.  The

26  operation and management of these many different joint ventures afforded Toshiba and the other

27  Defendant joint venture partners regular opportunities to communicate with each other to agree

28

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

1   on prices, price increases, and production limits and quotas for LCD Panels that each Defendant

2   manufactured and sold.

3          98.    Plaintiff is informed that co-conspirator Hydis participated in multiple lower-level

4   meetings between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a

5   Taiwanese Defendant at least as recently as 2005.  Through these discussions, Hydis agreed on

6   prices and output levels for LCD Products.

7          99.    Plaintiff is informed that co-conspirator Mitsubishi participated in multiple lower-

8   level meetings in 2001 with Chi Mei, Chunghwa, and Unipac Electronics (later AU Optronics).

9   Through these meetings, Mitsubishi agreed on prices and output levels for LCD Products.

10         100.   Plaintiff is informed that co-conspirator NEC participated in meetings or

11  discussions during the Relevant Period with at least one other Defendant or co-conspirator, which

12  included discussions about prices and output levels for LCD Products.

13         101.   Plaintiff is informed that co-conspirator IPS Alpha participated directly or indirectly

14  in meetings or discussions during the Relevant Period with at least one other Defendant or co-

15  conspirator, which included discussions about prices and output levels for LCD Products.

16  **F.     Defendants' and Co-conspirators' Activities in California**

17         102.   The conspirational conduct in the United States was centered in California.

18  Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa

19  Picture Tubes, Ltd., and Epson Imaging Devices Corporation all admitted during their plea

20  hearings that acts in furtherance of the conspiracy were carried out within California.  Defendant

21  LG Display America, Inc., which admitted to participating in the conspiracy, maintains its

22  principal place of business in San Jose, California.  Similarly, defendants Chunghwa Picture

23  Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation,

24  which also admitted to participating in the conspiracy, used California corporations with principal

25  places of business in Long Beach, California (Defendants Tatung Company of America, Inc.,

26  Epson Electronics America, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as their

27  sales agents in the United States for LCD Products which were affected by the conspiracy.  Many

28  of the other Defendants and affiliates also maintained offices and operations in California during

the Relevant Period, including AU Optronics Corporation America, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc.

103.   Defendants engaged in and implemented their conspiracy in the United States through the offices they maintained in California.  Defendants' employees in their California offices engaged in communications and meetings with other defendants to exchange price and supply information and reach agreements regarding LCD Product prices to be charged to their customers in the U.S. and elsewhere.  Defendants' employees in California also received information from their counterparts elsewhere regarding the substance of Defendants' agreements with respect to LCD Product prices and supply, and were instructed to use this information in the course of price negotiations with customers in the United States.  Defendants' California offices were thus the means through which they implemented their conspiracy in the United States.

104.   For example, Samsung maintained offices in San Jose, California. █████████

105.   ████████████████████████████████████████████

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

1
2
3
4
5
6
7
8

9    106.   Other defendants also engaged in conduct in furtherance of the conspiracy in

10   California to fix the price of LCD Products. Defendant LG Display America, Inc. maintained its

11   offices in San Jose, California. LG Display America, Inc. has admitted that it participated in the

12   conspiracy to fix prices of LCD Products. LG Display employees responsible for LG Display's

13   negotiations with and sales to many customers were located in the San Jose, California office.

14    107.   Toshiba maintained offices in San Jose, California. Toshiba personnel in its San

15   Jose, California offices were involved in and implemented Defendants' conspiracy in the United

16   States.

17
18
19
20
21

22    108.

23
24
25
26
27
28

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████

4       109.   Sharp also maintained offices in San Jose, California.  Sharp personnel in its San

5 Jose, California office were involved in and implemented Defendants' conspiracy in the United

6 States. ████████████████████████████████████████

7 ██████████████████████████████████████████████████████████

8 ██████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████

15 ████████████████████████

16       110.   Epson maintained offices in San Jose, California. Epson personnel in its San Jose,

17 California office were involved in and implemented Defendants' conspiracy in the United States.

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 █████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 **G.    Conspiracy's Effect on Prices of STN-LCD Technology**

26       111.   Defendants' and their co-conspirators' conspiracy included agreements to raise and

27 maintain prices of both TFT-LCD Panels and STN-LCD Panels. Defendants engaged in bilateral

28 discussions in which they exchanged information about STN-LCD pricing, shipments, and

production.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails, and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered Defendants' customers for STN-LCD Panels.

112.   At certain points during the Relevant Period, for certain applications, TFT-LCD Panels and STN-LCD Panels were close substitutes for each other.  For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD panels were both purchased in significant quantities for similar uses in mobile wireless handsets and other LCD Products that included small displays.  At other times during the Relevant Period, TFT-LCD panels and CSTN-LCD panels were both purchased in significant quantities for use in notebook PCs.

113.   Purchasers of LCD Panels often switched their purchases from TFT-LCD panels to STN-LCD panels in response to changes in the relative prices of TFT-LCD panels and STN-LCD panels.

114.   Defendants understood that they could profitably raise prices of STN-LCD panels in response to increases in TFT-LCD panel prices.

115.   Because TFT-LCD panels and STN-LCD panels were close substitutes in certain LCD Products, and because Defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, Defendants had the incentive and ability to inflate the prices of STN-LCD panels as well as TFT-LCD panels.  The conspiracy's success in inflating TFT-LCD panel prices also inflated STN-LCD prices, and vice versa.

**H.     Government Antitrust Investigations**

116.   Defendants' conspiracy to restrict the output of and to raise the prices for LCD Products sold in the United States during the Relevant Period is demonstrated by a multinational investigation commenced by the United States Department of Justice (DOJ) and others in late 2006.  In December 2006, government authorities in Japan, Korea, the European Union, and the United States revealed an investigation into anticompetitive activity among LCD manufacturers.

117.   In a December 11, 2006, filing with the Securities and Exchange Commission, Defendant LG Display disclosed that officials from the Korea Fair Trade Commission and

1    Japanese Fair Trade Commission (JFTC) had visited the company's Seoul and Tokyo offices and

2    that DOJ had issued a subpoena to its San Jose office.  On December 12, 2006, news reports

3    indicated that in addition to LG Display, LCD makers Sharp, Epson, and AU Optronics were also

4    under investigation.  The JFTC stated that the probe was related to price-fixing.  On that same

5    date, the European Commission confirmed publicly that it was also investigating the possibility of

6    a cartel agreement and price-fixing among manufacturers of LCD Products.

7         118.   Beginning in late 2008, the United States began to announce charges against,

8    indictments of, and pleas from some Defendants and their executives related to a conspiracy to fix

9    prices of LCD panels sold in the United States and elsewhere.  On November 12, 2008,

10   defendants LG Display, Sharp, and Chunghwa agreed to plead guilty and pay a total of $585

11   million in criminal fines for their roles in the conspiracy to fix prices of LCD Panels.  On January

12   15, 2009, three current and former executives from Chunghwa—Chieng-Hon "Frank" Lin, Chih-

13   Chun "C.C." Liu, and Hsueh-Lung "Brian" Lee—agreed to plead guilty to participating in the

14   conspiracy from September 2001 to December 2006.  Also on January 15, 2009, Chang Suk

15   "C.S." Chung, an executive from LG Display, agreed to plead guilty to participating in the

16   conspiracy from September 2001 to June 2006.  On February 3, 2009, former LG Display

17   executive Duk Mo Koo and two former Chunghwa executives, Cheng Yuan Lin and Wen Jun

18   Cheng, were indicted for participating in the global LCD price fixing conspiracy.  On April 27,

19   2009, a high level executive of LG Display, Bock Kwon, agreed to plead guilty to a global LCD

20   price fixing conspiracy.  On August 25, 2009, Epson Imaging Devices Corporation agreed to

21   plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of

22   LCD Panels.  On December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty

23   and pay a $220 million criminal fine for its role in the conspiracy.  On April 28, 2010, Chu-

24   Hsiang "James" Yang, the Taiwanese former Director of Sales for Chi Mei, pleaded guilty and

25   agreed to serve a nine-month prison sentence in the United States and pay a $25,000 fine.  On

26   June 2, 2010, Jau-Yang "J.Y." Ho, the Taiwanese former President of Chi Mei, pleaded guilty

27   and agreed to serve a fourteen-month prison sentence in the United States and pay a $50,000

28   criminal fine.  On June 29, 2010, HannStar agreed to plead guilty and pay a $30 million criminal

1   fine for its role in the conspiracy.  On July 28, 2010, Wen-Hung "Amigo" Huang, the Taiwanese

2   former Director of Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison

3   sentence in the United States and pay a $25,000 fine.  On August 4, 2010, Chen-Lung Kuo, the

4   Taiwanese former Vice President of Sales of Chi Mei, pleaded guilty and agreed to serve a nine-

5   month prison sentence in the United States and pay a $35,000 fine.

6          119.   Additional charges and plea agreements are detailed above at paragraphs 88 to 96.

7          120.   The investigation by the United States is ongoing and is expected to result in

8   additional fines and pleas.

9   **I.      Market During the Conspiracy**

10          121.   After initial introduction into a market, consumer electronics products and their

11   component parts typically experience downward pricing trends.  However, since at least 1996,

12   LCD Products markets have been characterized by unnatural and sustained price stability, as well

13   as periods of substantial increases in prices.  Defendants achieved price stability and price

14   increases by agreeing to fix and maintain prices and to restrict supply through decreases in

15   capacity utilization and restraint in new plant investment.

16          122.   As described herein, Defendants' LCD cartel evolved over time.  Defendants

17   initiated their cartel when LCD Products were in their relative infancy.  At that time, Defendants

18   balanced the desire to set prices collusively with the industry goal of establishing their products in

19   the marketplace.  As the cartel matured, new entrants were co-opted, and production costs

20   declined.  At the same time, conspirators learned how they could best manage the crystal cycle by

21   agreeing on prices and output.

22                  **a.      1996**

23          123.   By early 1996, LCD markets faced excess supply and drastic price cuts.  The

24   downward pressure on prices, which had already fallen 40 to 50 percent in 1995, was projected to

25   continue due to lower manufacturing costs.  Despite this, LCD Product prices actually rose in

26   1996, allegedly due to insufficient production capacity.  In reality, Defendants were fixing the

27   prices.

28

124. A few months into 1996, there was a reversal in the downward trend in LCD Product prices and an alleged inability of manufacturers to supply enough LCD panels to meet demand. By May 1996, an industry magazine was reporting that, "flat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

125. By mid-1996, industry analysts were commenting on an unusual rise in LCD panel prices that was noted to be "quite rare in the electronics industry."

126. The rare increase in LCD panel prices was due to the agreements reached by the Japanese companies to increase prices. These companies met and agreed to increase prices and control supply in order to stop or reduce price erosion.

127. In order to stay current with technology, manufacturers in 1996 were moving into third-generation motherglass fabs. LG Electronics, Inc. was scheduled to have its third-generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. However, manufacturers falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over capacity that had had been said to exist months earlier. This resulted in surging prices. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

**b.    1997-1998**

128. By 1997, Japanese manufacturers were providing Taiwanese manufacturers with the most up-to-date technology. In return, the Japanese received output from Taiwanese plants. In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese manufacturer that Sharp acquired in 2005. These arrangements between Japanese and Taiwanese companies resulted in cooperative discussions between supposed competitors rather than an increase in supply of LCD panels.

129. By 1998, the LCD industry still had excess capacity, due in part to the entry of the Korean companies. A March 30, 1998, article in *Electronic News* reported that Hyundai's production lines were running at only 20 to 50 percent of capacity. The article quoted Rob

1   Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of

2   inventory and capacity available to suit any shortage . . . .  You have to get your production up

3   to full capacity again before you can even talk about there being a shortage and I think there are

4   plenty of under-capacity fabs right now to bear the burden."  During this period, concerted efforts

5   were made to get other manufacturers in the industry to limit production.

6          130.   The effort to limit production and the price-fixing agreement caused decreases in

7   prices of LCD Products to slow and stop in late 1998.

8                      **c.      1999**

9          131.   In 1999, LCD Product prices surged due to a claimed "massive undersupply."  This

10   was despite the entry of Taiwanese manufacturers and several new fabs coming online.

11          132.   At the beginning of 1999, industry publications suggested that the Japanese and

12   Korean manufacturers were going to have the opportunity to recoup previous years' losses:  "The

13   TFT-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in

14   an effort to wash away the stain left by years of red ink . . . ."

15          133.   By mid-1999, a Korean source was reporting: "With the supply shortage for TFT-

16   LCD panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully

17   increasing its sales targets amid a sharp price rise."  The lack of supply was a pretextual reason

18   given publicly to justify a price increase.

19          134.   Bock Kwon, Vice President of LG Display's Sales Division was quoted, in part, in

20   the same trade publication as announcing that:

21              LG LCD will raise prices across its entire TFT-LCD portfolio by 30
                to 40 percent this year, Kwon said, although he expects that prices
22              will stabilize some time in the second half.  [D]emand for larger
                panels is reducing capacity because each display is eating up more
23              square inches per motherglass substrate.  This, combined with a
                stagnation in capital spending by many panel makers, will keep the
24              LCD industry in a period of relative shortage until 2001, Lee said.
                The shortage has become acute, and has created an unusual market
25              in which prices could rise as much as 30% to 80% in one year
                according to Ross Young, President of DisplaySearch, a research
26              firm in Austin, Texas.

27

28

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

135.   Also in 1999, the three major LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai.  The year 1999 also saw an additional merger when LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created Defendant LG Display.

**d.      2000-2001**

136.   By January 2000, prices for LCD Products were falling again, in part due to entry of six new Taiwanese competitors into the market, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics).  Initially, Taiwan-based companies undercut the collusively-high prices of the other Defendants to gain immediate market share.  However, by 2000-2001 the Taiwan companies had increased their market share to the point that it made sense to participate in the conspiracy.

137.   Korean companies, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese LCD panel production and to locate manufacturing facilities in Taiwan.

138.   Newer generation fabs reduced costs and provided opportunities for additional profits at fixed prices.  In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

139.   In October 2000, *The Korea Herald* reported that: "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to boost their output."

140.   Then, despite what was billed as growing overcapacity in 2000 and early 2001, prices of LCD panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand.  However, published data for 2001 showed that several Defendants were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate, and Quanta Display, Inc. (which later merged with AU Optronics) had a 52

1   percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of

2   rising prices and supposedly tight supply, Plaintiff alleges that the Taiwanese firms had reacted to

3   the price trough by actively cooperating with Japanese and Korean incumbents to restrict supply

4   and fix prices.  This agreement was reached in part at the bilateral and group meetings described

5   above.

6          141.   The rise in prices made no economic sense and was the product of Defendants'

7   setting the price of LCD Products by agreement.  First, Defendants were bringing new plants

8   online that utilized larger motherglass, which was more cost effective.  Second, as reported by an

9   industry source, the variable cost of producing LCD panels was declining during the latter part of

10  2001 and into 2002.  With lower production costs and capacity to spare, it made little economic

11  sense for Defendants not to utilize their full capacity other than because of an agreement by them

12  not to do so.

13                         **e.     2002-2003**

14         142.   Prices continued to rise from the second half of 2001 through the second half of

15  2002.  Industry analysts attributed these price increases to a "larger-than-expected panel

16  shortage," despite continuing capacity expansion.  In reality, the price increases were the result of

17  agreements reached in the crystal meetings and bilateral discussions described above.

18         143.   By the second half of 2002, the cartel's success at propping up prices led to lagging

19  demand, and the cartel's response was to let prices level off and even begin to fall.

20         144.   Throughout 2002, industry leaders shifted to fifth-generation motherglass

21  production technology.

22         145.   Industry analysts noted the unusual trends in the pricing of LCD Products.  In

23  February 2004, CNET.com quoted an analyst from IDC, a research firm, as saying: "LCD is one

24  of the few [markets] where things have actually gone up in price."  Defendants explained these

25  price increases with false statements about market conditions in order to cover up the conspiracy.

26         146.   During five consecutive quarters in 2003 and 2004, LCD Product prices rose

27  significantly.  AU Optronics reported that the price for certain of its LCD Products increased 28

28

1  percent between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG

2  Display reported that its pricing increased by 21 percent over the same period.

3      147.   These soaring prices resulted in similar increases in the profits reaped by the LCD

4  Product manufacturers.  For example, the eight largest LCD Product manufacturers reported a

5  collective profit increase of 740 percent between the second quarter of 2003 and the second

6  quarter of 2004.  These record profits resulted from Defendants' collective action to fix, raise,

7  maintain, or stabilize the price of LCD Products.  Again, the sharing of information about price

8  and production, the under utilization of capacity, and restraints on output drove up the prices of

9  LCDs.

10      148.   Around this time, industry analysts suggested that there were too many competitors

11  in the LCD Product marketplace.  Some industry participants went as far as overtly suggesting

12  that the industry should seek to curtail supply through mergers.  These suggestions were carried

13  out.  Significant consolidation and collaboration among competitors in the LCD Product market

14  occurred.

15      149.   While LCD Product prices were increasing in late 2003, AU Optronics, Chi Mei,

16  and HannStar decreased capacity utilization, as had been agreed to in crystal meetings.

17      150.   As noted above, IPS Alpha announced plans to solicit investment from other

18  companies involved in the production of LCD panels, including device manufacturers and

19  material suppliers.  NEC formed an alliance with Casio.

20      151.   Consolidation and collaboration continued in 2003, as Chi Mei bought Japan's IDT,

21  a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu

22  Display Technology.

23      152.   Despite the increased efficiency and costs savings of fifth-generation fabs, the

24  industry experienced higher prices in 2003, purportedly because of a shortage of the most popular

25  sizes of LCD panels.  Defendants chose not to operate at full capacity, nor to take advantage of

26  lower variable costs.

27

28

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

### f.      2004

153.   Pursuant to Defendants' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  Crystal meetings were ongoing during this period.

154.   The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and to decline in the second half of 2004.  During this period of time, the market for LCD televisions started to grow.

155.   In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth-generation fabs by 30 percent and to delay a planned seventh-generation facility.

156.   Consolidation and collaboration among and between competitors continued as Sony launched a joint venture, named S-LCD Corp.

### g.      2005

157.   Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005 the industry apparently was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

158.   Analysts forecast excess production capacity in 2005 because of large LCD plants including that of LG Display being brought online.  However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent.  The shortage came as a surprise to analysts.

159.   This shortage was the result of collusion among Defendants perpetuated through the series of ongoing meetings as alleged above.

### h.      2006

160.   A temporary oversupply of LCD Products occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, Defendants fixed and stabilized prices through their cartel activities.

1    161.   In May of 2006, in discussions between executives of the two companies, AU

2    Optronics convinced Quanta Display, a company that it acquired in October of 2006, to reduce

3    production of LCD Products.  By June 2006, LG Display also announced plans to cut production

4    of LCD Products.

5    162.   By the summer of 2006, this ongoing conspiracy was being effectuated through

6    bilateral meetings as alleged above.

7    163.   Despite the fact that certain Defendants may have cut back on, or discontinued, their

8    conspiratorial conduct in 2006 due to the governmental investigations, the impact of the

9    conspiracy continued.  This carry-over in the antitrust injury was due, in part, to the nature of the

10   pricing mechanisms in the industry, such as supply contracts, and the lag between pricing

11   decisions and their appearance and impact in the marketplaces for LCD Products.

12   **J.      Trade Associations' Involvement in the Conspiracy**

13   164.   The LCD industry is served by several major trade organizations that put on

14   industry-wide meetings several times a year.  These meetings have facilitated collusion, and the

15   trade associations have themselves functioned as a means for Defendants to cooperate and discuss

16   prices.

17   165.   One such trade association is the Taiwan TFT-LCD Association (TTLA), to which

18   AU Optronics, Chi Mei, and HannStar belong.  Founded in 2000, TTLA's self-described mission

19   is to "assist[] [the] TFT-LCD industry, condensing the consensus through various activities,

20   promoting the cooperation within competition; acting as a window for interaction with

21   international organization[s] and promoting the integrated growth to [the] whole display

22   industry."  TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing

23   of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD

24   affiliations to visit TTLA."

25   166.   South Korean manufacturers, including LG Display, had similar trade associations,

26   known as "EDIRAK" (Electronic Display Industrial Research Association of Korea) and

27   "KODEMIA" (Korea Display Equipment Material Industry Association).  EDIRAK's stated goal

28   was "promoting co-activity with foreign organizations related to display industries."  Since 1996,

- 38 -

EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

167.   Japanese manufacturers of LCD Products have a similar organization.  The Semiconductor Equipment Association of Japan (SEAJ), founded in 1995, serves Japanese manufacturers of LCD Products.  Its members include Sharp, NEC, and Hitachi.  Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

168.   In addition to these national trade associations, the Society for Information Display (SID) put on multiple meetings each year that were attended by executives from all of the major producers.  One of these meetings had been known as the SID Symposium, or the "SID International Symposium and Business Conference."  SID also puts on a long-running conference called the International Display Research Conference (IDRC).

169.   The 2004 conference (SID 2004) featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and CEO of AU Optronics.  This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the attendees about "investments planned at the major display manufacturers."  A representative of DisplaySearch also spoke about the LCD market.  There were presentations by analysts from iSuppli/Stanford Resources and other industry experts.  This was all followed by a "networking reception — sponsored by LG, Philips LCD," in which all conference attendees were invited to participate.

170.   SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics.  This time it was called "2005:  Beyond the Crystal Gateway."  A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and the cost and margin outlook for key FPDs will be projected."  Again, these discussions about the market were followed by a "networking reception."

171.   The SID 2005 conference was very similar to SID 2004 but included even more discussion of the crystal cycle.  SID 2005 provided a prime opportunity for one of the dominant

1     manufacturers to explain to all of its key competitors how to manage supply and maximize "line-

2     investment timing."  SID 2005 also featured presentations regarding developments in LCD

3     technology by officials from AU Optronics, Sharp, LG Display, and Hitachi.

4           172.   The conspiracy was also carried out at the annual meetings of the Global FPD

5     Partners' Conference (GFPC), which have been held since the initial conference in March of 2005

6     in Tokyo.  The 2006 conference was held from February 28 to March 3, 2006, in Okinawa, Japan.

7     Participants in the 2006 GFPC noted how successful the event was in promoting information

8     exchanges and "networking" among the co-conspirators, or, as Dr. Hui Hsiung has said, "[i]n an

9     industry growing as rapidly as the flat panel display industry, it is increasingly important to build

10     connections across the supply chain and around the world.  The GFPC plays a vital part in

11     building those connections and growing our business."

12                          **FRAUDULENT CONCEALMENT**

13           173.   Costco had neither actual nor constructive knowledge of the facts supporting its

14     claim for relief despite diligence in trying to discover the pertinent facts.  Costco did not discover,

15     and could not have discovered through the exercise of reasonable diligence, the existence of the

16     conspiracy alleged herein until at least December 2006, when investigations by the United States

17     and other antitrust authorities became public.  Defendants' secret conspiracy did not give rise to

18     facts that would put Costco on inquiry notice that there was a conspiracy to fix the prices of LCD

19     Products.

20           174.   The participants in the crystal meetings agreed to keep the meetings secret, and in

21     some instances the location of the meeting was circulated only the day before in an effort to avoid

22     detection.  Following the meetings, minutes were often distributed to participants, typically

23     marked "Extremely confidential" and "Must NOT Distribute," indicating that the participants

24     were actively seeking to conceal their conduct.  Furthermore, the participants agreed on what

25     pretexts they would cite when questioned about rising prices.  Participants also agreed to lie to the

26     media and report that their fabs were operating at full capacity even when they were not, in order

27     to create the appearance of a supply shortage.

28

175.   For example, in 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on undercapitalization:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

176.   In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."

177.   In 1999, Bock Kwon, Vice President of LG Display's Sales Division, falsely reported that price increases resulted from "acute" shortages.

178.   On February 4, 2001, Bruce Berkoff, Executive Vice President at LG Display, was quoted as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."

179.   Plaintiff is informed that in the latter half of 2001, Koo Duk-Mo, an executive at LG Display, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

180.   Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU Optronics, offered another rationale for the 2001 price increase in an interview for the Taiwan Economic News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

181.   These explanations were pretextual and served to cover up the conspiracy.  Later price increases were explained by industry leaders as derived from new demand for LCD televisions.  For example, Koo Duk-Mo of LG Display stated that: "We are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

182.   Defendants have used a variety of other purportedly market-based or independent explanations for price increases or supply constraints in order to conceal their conspiracy.  Costco employees who visited many of the defendants, in Asia and the United States, were told that

1   increased demand had the effect of either price hikes at the LCD panel level or lack of price

2   decreases for LCD Products.  Costco also visited with manufacturers of LCD Products that

3   purchased LCD panels from Defendants, and heard the same explanations as to the LCD display,

4   a major component.  Costco reasonably believed that the customers had been told such

5   information by Defendants.

6       183.   As a result of Defendants' fraudulent concealment of their conspiracy, the running

7   of any statute of limitations has been tolled with respect to any claims of Plaintiff arising from the

8   anticompetitive conduct alleged in this Complaint.

9                          **FIRST CAUSE OF ACTION--**
                    **(Violation of Section 1 of the Sherman Act)**
10

11      184.   Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations

12   in paragraphs 1 through 183 above.

13      185.   Beginning at least on or around January 1, 1996, the exact date exclusively within

14   the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing

15   contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of

16   Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition

17   in the United States.

18      186.   In particular, Defendants combined and conspired to raise and maintain prices of

19   LCD Products sold to Costco and others in or intended for the United States.

20      187.   As a result of Defendants' unlawful conduct, prices for LCD Products were raised

21   or maintained in the United States.

22      188.   The contract, combination, or conspiracy among Defendants consisted of a

23   continuing agreement, understanding, and concerted action among Defendants and their co-

24   conspirators.

25      189.   For purposes of formulating and effectuating their contract, combination, or

26   conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

27   conspired to do, including: (a) participating in meetings and conversations to discuss the prices

28   and supply of LCD Products; (b) communicating in writing and orally to fix target prices, floor

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827

1    prices, price ranges, and capacity and output for LCD Products; (c) agreeing to manipulate prices

2    and supply of LCD Products in a manner that deprived purchasers of free and open competition;

3    (d) issuing price announcements and price quotations in accordance with the agreements reached;

4    (e) selling LCD Products to customers in the United States at noncompetitive prices; (f)

5    exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing

6    to maintain or lower production capacity; and (h) providing false statements to the public to

7    explain increased prices for LCD Products.

8            190.   As a result of Defendants' unlawful conduct, Costco was injured in its business and

9    property in that it paid more for LCD Products than it otherwise would have paid in the absence

10   of Defendants' unlawful conduct, and lost sales of LCD Products.

11                              **SECOND CAUSE OF ACTION--**
         **(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**
12

13           191.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the

14   allegations in paragraphs 1 through 190 above.

15           192.   Beginning at least on or around January 1, 1996, the exact date being unknown to

16   Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

17   conspirators entered into a continuing contract, combination, or conspiracy to unreasonably

18   restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code

19   § 16700 *et seq.*

20           193.   As a result of Defendants' unlawful conduct, Costco was injured in its business and

21   property in that it paid more for LCD Products than it otherwise would have paid in the absence

22   of Defendants' unlawful conduct, and lost sales of LCD Products.

23           194.   Even LCD Product manufacturers who were not part of the conspiracy charged

24   higher prices than they otherwise would have when they were forced to pay supra-competitive

25   prices for LCD panels due to the conspiracy.  These manufacturers passed on to their customers,

26   including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

27   Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.

28

Thus, Costco suffered injury whenever it purchased LCD Products that incorporated panels made by Defendants and their co-conspirators.

<b>THIRD CAUSE OF ACTION--</b><br>
<b>(Violation of the Washington Consumer Protection Act, RCW 19.86.030)</b>

195.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 194 above.

196.   Beginning at least on or around January 1, 1996, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

197.   As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for LCD Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of LCD Products.

198.   Even LCD Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for LCD panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased LCD Products that incorporated panels made by Defendants and their co-conspirators.

<b>FOURTH CAUSE OF ACTION--</b><br>
<b>(Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 <i>et seq.</i>)</b>

199.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 198 above.

200.   Beginning at least on or around January 1, 1996, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably

- 44 -

1    restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-

2    1401 *et seq.*

3         201.   As a result of Defendants' unlawful conduct, Costco was injured in its business and

4    property in that it paid more for LCD Products than it otherwise would have paid in the absence

5    of Defendants' unlawful conduct, and lost sales of LCD Products.

6         202.   Even LCD Product manufacturers who were not part of the conspiracy charged

7    higher prices than they otherwise would have when they were forced to pay supra-competitive

8    prices for LCD panels due to the conspiracy.  These manufacturers passed on to their customers,

9    including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

10   Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.

11   Thus, Costco suffered injury whenever it purchased LCD Products that incorporated panels made

12   by Defendants and their co-conspirators.

13                          **FIFTH CAUSE OF ACTION--**
                  **(Violation of the Florida Deceptive and Unfair Trade Practices Act,**
14                           **Florida Stat. § 501.201, *et seq.*)**

15        203.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the

16   allegations in paragraphs 1 through 202 above.

17        204.   Beginning at least on or around January 1, 1996, the exact date being unknown to

18   Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

19   conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade

20   Practices Act, Florida Stat. § 501.201, *et seq.*

21        205.   Defendants and their co-conspirators committed acts of unfair competition by

22   engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above.

23        206.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices

24   and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of

25   whether they constitute a violation of the Sherman Act.

26        207.   Defendants' and their co-conspirators' acts are fraudulent or deceptive.

27

28

1      208.   As a result of Defendants' unlawful conduct, Costco was injured in its business and

2  property in that it paid more for LCD Products than it otherwise would have paid in the absence

3  of Defendants' unlawful conduct, and lost sales of LCD Products.

4      209.   Even LCD Product manufacturers who were not part of the conspiracy charged

5  higher prices than they otherwise would have when they were forced to pay supra-competitive

6  prices for LCD panels due to the conspiracy.  These manufacturers passed on to their customers,

7  including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

8  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.

9  Thus, Costco suffered injury whenever it purchased LCD Products that incorporated panels made

10  by Defendants and their co-conspirators.

11

**SIXTH CAUSE OF ACTION--**
**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

12

13      210.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the

14  allegations in paragraphs 1 through 209 above.

15      211.   Beginning at least on or around January 1, 1996, the exact date being unknown to

16  Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

17  conspirators entered into a continuing contract, combination, or conspiracy to unreasonably

18  restrain trade and commerce in violation of the of the Illinois Antitrust Act, 740 Illinois Code

19  10/1 *et seq.*

20      212.   As a result of Defendants' unlawful conduct, Costco was injured in its business and

21  property in that it paid more for LCD Products than it otherwise would have paid in the absence

22  of Defendants' unlawful conduct, and lost sales of LCD Products.

23      213.   Even LCD Product manufacturers who were not part of the conspiracy charged

24  higher prices than they otherwise would have when they were forced to pay supra-competitive

25  prices for LCD panels due to the conspiracy.  These manufacturers passed on to their customers,

26  including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

27  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.

28

1    Thus, Costco suffered injury whenever it purchased LCD Products that incorporated panels made

2    by Defendants and their co-conspirators.

3                                               **JURY DEMAND**

4           Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all

5    issues so triable in this action.

6                                                 **RELIEF**

7           Costco requests that the Court enter judgment on its behalf that:

8           A.      Defendants engaged in a contract, combination, and conspiracy in violation of

9    Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof.

10   Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona

11   Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices

12   Act, Florida Stat. § 501.201, *et seq.,* and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*,

13   and Plaintiff was injured in its business and property as a result of Defendants' violations;

14          B.      Costco shall recover damages sustained by it, as provided by the state and federal

15   antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally

16   against each Defendant;

17          C.      Defendants, their subsidiaries, affiliates, successors, transferees, and assignees,

18   and their officers, directors, partners, agents, and employees, and all other persons acting or

19   claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and

20   maintaining the alleged combination, conspiracy, or agreement;

21          D.      Costco shall be awarded pre-judgment and post-judgment interest at the highest

22   legal rate from the date of the initial direct purchaser complaint;

23          E.      Costco shall recover its costs of this suit, including reasonable attorneys' fees as

24   provided by law; and

25   ///

26   ///

27   ///

28   ///

1         F.      Costco shall recover such other and further relief as the Court deems just.

2

3  Dated:  December 23, 2011                      /s/ David J. Burman

4                                        David J. Burman

5                                      Attorneys for Plaintiff
                                     Costco Wholesale Corp.

6 29040-0244/LEGAL22368750.3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT AND JURY DEMAND (REDACTED – PUBLIC VERSION)
Case No. 3:07-md-1827 SI, MDL No. 1827