IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br>_____ /<br>This Order Relates to:<br>All Indirect-Purchaser Plaintiff Class Actions<br>_____ / | No. M 07-1827 SI<br>MDL No. 1827<br>**ORDER DENYING DEFENDANTS' MOTION TO DECERTIFY CLASSES OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT** |

On December 9, 2011, the Court heard argument on defendants' motion to decertify classes or in the alternative for summary judgment. Having considered the moving papers and the arguments of the parties, and for good cause appearing, the Court hereby DENIES defendants' motion.

Defendants' motion to decertify[1] renews three arguments they made at the class certification phase of this case. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). First, they argue that the indirect-purchaser plaintiff ("IPP") classes are not sufficiently ascertainable. Second, they contend that plaintiffs cannot establish that every class member was impacted by the antitrust conspiracy. Third, they argue that plaintiffs' damages model is a "fluid recovery" prohibited by Ninth Circuit law.

---

[1] In the alternative to decertification, defendants request summary judgment on impact and individual damages. Defendants also request that the Court bifurcate the trial into a liability phase and an individual damages phase.

## I. Ascertainability

As their primary argument, defendants renew their contention that the class of indirect purchasers is unascertainable. Before a class may be certified, it must be both based on objective criteria and "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Wright & Miller, Federal Practice and Procedure, § 1760 (3d ed. 2004). Defendants' challenge focuses on the latter requirement. Because it is often difficult to identify the source of the LCD panel in a particular monitor, television, or notebook computer, defendants assert that the Court will be unable to determine if a given purchaser of one of these products is a member of the class.[2]

In its initial class certification order, the Court rejected this argument, finding that the class was sufficiently "objective and ascertainable" to warrant certification. *See* Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification; Denying Defendants' Motion to Strike Modified Class Definitions; Granting Motions to Strike Untimely Declarations, Master Docket No. 1642, at 9-10 (March 28, 2011) ("Class Certification Order"). This conclusion, however, was based in part upon plaintiffs' prediction that:

> Whether a class member purchased a product containing a TFT-LCD panel made by a defendant can be determined by the model number or serial number of the product. . . . [T]his determination can be made based on the model number alone because most models contain panels made by a single manufacturer. For those few models using

---

[2] On January 17, 2012, defendants requested leave to file a statement of recent decision to notify the Court of the Ninth Circuit's opinion in *Mazza v. American Honda Motor Co., Inc.*, -- F.3d --, 2012 WL 89176 (9th Cir., Jan 12, 2010). One week later, defendants filed a request to file a supplemental brief on the impact of *Mazza* on this case. The Court GRANTS these requests.

The Court, however, is not convinced that *Mazza* has the significance for this case that defendants ascribe to it. *Mazza* held, in a short discussion, that "[n]o class may be certified that contains members lacking Article III standing." *Id.* at *10 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). Defendants contend that this requires decertification of the class. They argue that plaintiffs intend to make up for the difficulty in identifying the source of a given LCD panel by treating all purchasers of LCD products as members of the class. Because this would include consumers who did not indirectly purchase defendant-made panels, consumers who would lack standing to assert price-fixing claims, defendants argue that the class must be decertified.

The Court disagrees with the premise of defendants' argument. The class in this case is not defined as all indirect purchasers of TFT-LCD panels, it is limited to those indirect purchasers who bought a panel manufactured by one of the defendants. Thus, class members, by definition, have standing. *See Degelmann v. Advanced Medical Optics, Inc.*, 659 F.3d 835, 839 (9th Cir. 2011) ("Standing requires an injury in fact, which is traceable to the defendant's acts and redressable by a court decision."). The difficulties that defendants have seized on involve matters of proof of the plaintiffs' claims. They do not equate to a lack of standing.

different panels from different manufacturers, the model number will determine class membership unless the model used panels made by defendants and non-defendants.

Class Certification Order at 9-10.

In hindsight, plaintiffs' predictions have turned out to be overly optimistic. Because TFT-LCD panels from different sources are often interchangeable, it appears that manufacturers of LCD products frequently buy panels from multiple sources. Thus, more than a "few models" incorporate panels from multiple manufacturers. In addition, ODMs and OEMs apparently do not keep detailed records about the panels used in their products. *See*, *e.g.*, Metzler Decl., ¶4 ("As we [investigated], it became apparent that the industry does not track [information on the panel brand within finished products]."). Thus, there is no "comprehensive list" of model numbers and serial numbers that provides an simple answer to the question whether a given LCD product contains a panel manufactured by a defendant.

Defendants claim that the lack of this comprehensive list is fatal to the IPP classes. They claim that nobody – not IPP counsel, not the individual plaintiffs, and not this Court – can determine whether a particular individual is a member of an IPP class.

The Court disagrees, and continues to believe that this case is suitable for class treatment. At a high level, numerous factors make this Court willing to exercise its discretion in favor of class certification. To begin with, it is undisputed that defendants held an overwhelming market share during the conspiracy period. According to plaintiffs, defendants' panels were used in 97.4% of LCD TVs, 93.2% of notebook computers, and 87.88% of desktop monitors sold during the relevant period.[3] Thus,

---

[3] These percentages refer to defendants' share of total market revenue, not their share of panel-units sold. Both parties, however, rely on market revenue as a proxy for the number of panels sold in the United States. Defendants object to plaintiffs' aggregation of this market share data, and urge the Court to evaluate the market share by year and by product. Under this view, defendants held only 60% of the market share for monitors during 1999 and 2000 and less than 90% of the market share for monitors, televisions, and notebooks during a number of conspiracy years. Defendants contend that these numbers are "not so *de minimis* that [they] relieve plaintiffs of their obligation to provide a practical method for enabling the Court and consumers to determine whether any particular consumer in that group bought a product containing a defendant-made panel." Motion at 8-9. However, plaintiffs have developed additional means of determining class membership and do not intend to rely solely on defendants' market share. *Cf. In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5071694, at *14 (N.D. Cal., Dec. 7, 2010) (finding Tennessee named plaintiff did not have sufficient proof of class membership, despite fact that defendants "held significant market share in SRAM," but finding other named plaintiffs had sufficient proof of class membership where they provided additional evidence that the product they purchased contained the defendants' SRAM). Thus, defendants' concerns are not reason to decertify the classes.

3

the conspiracy affected almost all LCD products sold in the United States.[4] Outside of a class action, it is unlikely that most of these consumers could recover for defendants' wrongdoing. It is also noteworthy that the majority of the defendants have admitted to participating in the conspiracy. Assuming liability is established for the remaining defendants at trial, it would be inappropriate to require potential class members to produce proof of class membership to an absolute certainty. *Cf. J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." (internal quotation marks omitted)); *Messner v. Northshore Univ. HealthSystem*, -- F.3d --, 2012 WL 129991, at *1 (7th Cir. Jan. 13, 2012) ("In essence, it is important not to let a quest for perfect evidence become the enemy of good evidence."). The Court is also cognizant of the fact that the government expressly declined to seek restitution from those defendants that pled guilty, leaving the compensation of American consumers to the class actions.

Even setting aside the backdrop of this case, however, the Court finds that plaintiffs have developed a sufficient methodology for identifying potential class members to satisfy the requirement of ascertainability.[5] Plaintiffs have done so by identifying the universe of "brand models" of LCD products sold in the United States. Using the information discovered from defendants, American OEMs, and overseas ODMs, plaintiffs have been able to determine the panel source for numerous products.

Plaintiffs, for example, have set forth what they refer to as the "brand-model" ("B-M") method. This method examines "data from several sources" to determine whether a given product used a defendant-made panel. Metlzer Decl., ¶6. Although not described in detail, this approach appears

---

[4] In fact, the alleged scope of the conspiracy was even greater than these numbers portray. The co-conspirators named in IPPs' complaint account for almost all of the remaining market share. *See* Zahid Decl., Exh. 20. Co-conspirator panels, however, are excluded from the class definitions.

[5] The efforts plaintiffs have made to be able to identify the manufacturers of the LCD panels used in consumers' LCD products are set out in the declaration of Jonathan Metzler. Defendants have filed a motion to strike this declaration, arguing that the testimony is inadmissible and that Metzler was not timely disclosed as a witness. The Metzler declaration, however, is not offered in connection with a summary judgment motion or other motion relevant to the merits of this case. Rather, it is only offered to rebut defendants' contention that the class is unascertainable and should be decertified. Further, plaintiffs have represented that, with the exception of material gleaned from four publicly available websites, the Metzler declaration is based entirely upon materials produced in discovery. Accordingly, the Court finds that it may properly consider the Metzler declaration and therefore DENIES defendants' motion to strike. The Court also DENIES defendants' request that the Court order Metzler's deposition.

4

relatively straightforward, directly matching products with their components. Using this method, IPPs claim to have found "5579 Brand-Models that are only observed with defendant panels and 363 that are only observed with non-defendant panels. Another 611 models are observed using both defendant and non-defendant panels." *Id.* "The B-M method, however, cannot address 3,232 models that lack any panel vendor information." *Id.*[6]

To address this shortcoming, IPPs developed a second method, the application-brand-size ("A-B-S") method. This method "traces the supply chain backwards from a given end-product to determine which panel vendors might have supplied the panel in the product." Metzler Decl., ¶7. From this supply-chain information, the A-B-S method computes the likelihood that a given product contains a defendant-manufactured panel. To use a simplified example, if a notebook computer manufacturer purchased 8 million LCD panels from a defendant and 2 million from a non-defendant, the A-B-S method would calculate an 80% chance that the owner of one of the notebooks had indirectly purchased a defendant-made panel.

Although defendants emphasize the shortcomings of the plaintiffs' methods, the Court finds that these methods make it "administratively feasible for the court to determine whether a particular individual is a member." In the Court's view, defendants' arguments do not undermine the ascertainability of the class, which remains defined by objective criteria. Instead, defendants' arguments relate to proof of class membership, a distinct concept. Numerous courts have held that a class can be certified even if its membership is unclear or overbroad. *See*, *e.g.*, *Herrera v. LCS Financial Services Corp.*, 274 F.R.D. 666, 672-76 (N.D. Cal. 2011); *In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 280 n.24 (D. Kan. 2010) ("[M]embership of the class . . . does not have to be ascertainable so that every potential class member can be identified."); *Galvan v. KDI Distribution Inc.*, 2011 WL 5116585, at *3-5 (C.D. Cal., Oct. 25, 2011).

It may be that some individuals lack sufficient proof to establish class membership, but that is not reason to decertify all of the IPP classes. Rather, the claims of those individuals can be examined once the claims period has closed. As one court has noted:

---

[6]Neither party has provided the Court with any information about the number of products these brands represent.

5

> In this case, the class definition may include individuals who did not perceive that they were short changed by [the defendants' actions], individuals who do not wish to pursue action, and individuals that have inadequate proof to go forward with the class. However, . . . , these ascertainability issues are not fatal to class certification and may be addressed later in the litigation.

*Galvan*, 2011 WL 5116585 at *5.

Finally, the Court rejects defendants' corollary argument that class notice in this case is impossible. Defendants are correct that class notice cannot feasibly include plaintiffs' list of brand-models, which number in the thousands. It is also likely that many class members will be unable, through their own inspection, to determine the manufacturer of the panels used in their televisions, monitors, or notebook computers. Notice by publication will be sufficient, however, to alert consumers who own LCD products that they might be members of the proposed classes and to inform them of the steps they must take to opt out. *Motor Fuel*, 271 F.R.D. at 280 (finding notice adequate because the class members "would have information sufficient to form an opinion as to whether they might be in the proposed settlement class and whether they would want to opt out"). Based on the information they provide, those individual plaintiffs that decide not to opt out will receive the assistance of class counsel to help them establish that they fall within the IPP class definitions.

## II. Proof of Impact

Defendants next renew their argument that plaintiffs cannot prove that all class members were impacted by the antitrust conspiracy. Before a class may be certified, plaintiffs "have the burden of demonstrating that 'there is a reasonable method for determining on a class-wide basis whether and to what extent [the] overcharge was passed on to each of the [indirect purchasers] at all levels of the distribution chain.'" Class Certification Order at 23-24 (quoting *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001)). The Court's role at the certification state is not to "weigh in on the merits of plaintiffs' substantive arguments," and the Court "must avoid engaging in a battle of expert testimony." *Id.* at 22. "Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *Id.*

In its Class Certification Order, the Court found that plaintiffs had set forth a "feasible methodology" for demonstrating classwide impact. *Id.* at 29. Having now obtained discovery on the

1 results produced by plaintiffs' methodology, defendants assert that the economic model used by
2 plaintiffs' expert, Dr. Janet Netz, fails to show classwide impact. Instead, defendants contend Dr. Netz's
3 model establishes that some plaintiffs were not subjected to any overcharge during the class period. For
4 example, in her deposition Dr. Netz testified:

> Q: [T]he annual overcharge for 2001 in negative 6.3 percent, correct?
>
> A: Correct.
>
> Q: Does that mean that the alleged conspiracy was – was ineffective during 2001?
>
> A: That's one way for this reasonable measure of damages, yes, it suggests that the cartel was effective in setting a price below the but for price, that may be due to error, it may be due to punishment strategy, but from that number alone, that's what it implies.
>
> Q: And that means that consumers weren't adversely affected during that period?
>
> A: Well, in terms of price, those consumers might not have been affected.

Berger Decl., Exh. 12 at 41-42; *see also* Berger Decl., Exh. 11 at 228-229 (testimony of Dr. Netz that a related model did not demonstrate an overcharge for "everybody who purchased in 1999"). Because of this testimony, defendants claim that injury did not occur on a classwide basis, requiring decertification of the class. *See Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.").

In the Court's view, defendants' argument goes beyond the certification question and into the merits of the case. Defendants have not challenged the reasonableness of plaintiffs' methodology for proving classwide impact. Instead, their arguments concern the application of that methodology. Such analysis, however, goes beyond the inquiry at the class certification stage. *See*, *e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) ("On a motion for class certification, the issue confronting [a district] court is whether the proof necessary to demonstrate impact as to each class member is particular to that class member, in which case individual questions concerning impact would overwhelm the common questions concerning the existence and scope of the alleged conspiracy, or whether the necessary proof of impact would be common to all class members

and sufficiently generalized that class treatment of their claims would be feasible."). Accordingly, the Court does not view this substantive dispute as justification for decertifying the class.

In the alternative, defendants' seek summary judgment on the issue of impact. They claim that plaintiffs' own data demonstrates that some class members suffered no injury, and that plaintiffs therefore will not be able to establish injury at trial. The Court, however, finds that an issue of fact remains as whether these class members were injured. Plaintiffs have set forth three analyses of the impact of the conspiracy – Dr. Netz's initial model, a revised version of her model, and the model of Dr. Comanor. Given the uncertainty inherent in such models, it is not surprising that their results vary. Dr. Netz's models show that some consumers were injured more than others. Dr. Comanor's model finds that the average overcharge for the conspiracy was 8.9% over the class period. The Court is not willing to take the results of one model as concrete proof that no injury occurred, especially where both experts have unequivocally opined that all class members were impacted by the conspiracy.

Defendants may argue their position to the jury, but the evidence is not so clear cut as to warrant summary judgment on this issue.

### III.  Fluid Recovery

Finally, defendants assert that plaintiffs' aggregate-damages approach to this case is a "fluid recovery" prohibited by the Ninth Circuit. The Court also addressed this argument in its class certification order. *See* Class Certification Order at 32 (rejecting defendants' argument that "plaintiffs' damages methodology is unworkable because it amounts to a fluid recovery model").

The only new law defendants rely on to support this argument is *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011). In that case, the Supreme Court rejected the Ninth Circuit's "Trial by Formula" approach to proving damages in a Title VII case. Under that approach:

> A sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master. The percentage of claims determined to be valid would then be applied to the entire remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings.

*Id.* The Court rejected this "novel project," holding that Wal-Mart was "entitled to litigate its statutory

defenses" to the individual claims of each member seeking backpay. *Id.*

The Court is not convinced by defendants' renewed argument. Plaintiffs in this case propose nothing as "novel" as the above. Nor are damages in the antitrust context subject to a "detailed remedial scheme" equivalent to that in Title VII. *See id.* at 2560. To the contrary, the use of aggregate damages in antitrust cases has been approved numerous times. *See*, *e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517,534 (6th Cir. 2008); *In re Static Random Access (SRAM) Antitrust Litig.*, 2008 WL 4447592, at \*6-7 (N.D. Cal., Sept. 29, 2008); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 350-51 (E.D. Mich. 2001).

Accordingly, the Court adheres to its earlier decision that defendants' "fluid recovery" argument is insufficient to defeat certification. *See*, *e.g.*, *Scrap Metal*, 527 F.3d at 534 (distinguishing fluid recovery from aggregate damages and noting that "[f]luid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class" (quoting *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 525 (S.D.N.Y.1996)). The Court also DENIES defendants' request for bifurcated proceedings.

## CONCLUSION

At base, plaintiffs and defendants disagree over the form the upcoming trial of this action will take. Plaintiffs emphasize the class aspects of this case, and focus on the aggregate effects of defendants' conduct in the United States. Defendants, in contrast, focus on the claims of each individual class member. The Court adheres to its belief that this case is susceptible to class treatment and to classwide proof of both injury and damages. Accordingly, the Court DENIES defendants' motion to decertify the indirect-purchaser classes. Docket Nos. 3492, 3946, 4588, 4598.

**IT IS SO ORDERED.**

Dated: January 26, 20112

SUSAN ILLSTON
United States District Judge

9