William A. Isaacson (admitted *pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

Philip J. Iovieno (admitted *pro hac vice*)
Anne M. Nardacci (admitted *pro hac vice*)
Luke Nikas (admitted *pro hac vice*)
Christopher V. Fenlon (admitted *pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com
        anardacci@bsfllp.com
        lnikas@bsfllp.com
        cfenlon@bsfllp.com

Counsel for Plaintiff
SCHULTZE AGENCY SERVICES, LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Case No. 3:11-cv-03856-SI (N.D. Cal.) |
| | Master File No. 3:07-md-01827-SI (N.D. Cal.) |
| This Document Relates To Individual Case No. 3:11-cv-03856-SI (N.D. Cal.) | MDL No. 1827 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC, | **SECOND AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | ***DOCUMENT FILED UNDER SEAL – HIGHLIGHTED VERSION*** |
| AU OPTRONICS CORPORATION, et al., | |
| Defendants. | |

Schultze Agency Services, LLC ("Schultze Agency Services") on behalf of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco") (collectively "Plaintiff"), for its Second Amended Complaint against all Defendants named herein, hereby alleges as follows:

## I.   **INTRODUCTION**

1.     Plaintiff brings this action to recover those damages to Tweeter Home Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long running and largely-admitted conspiracy among suppliers of Liquid Crystal Display panels ("LCD panels") and related products.  Defendants and their co-conspirators formed an international cartel that conducted a extending at a minimum from at least January 1, 1996 through at least December 11, 2006 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize, and maintain prices for LCD panels.

2.     LCD panels are used in a number of products, including, but not limited to televisions, desktop computer monitors, notebook computers, and mobile wireless handsets.  As used herein, "LCD Products" refers to all LCD panels, and all products containing LCD panels, manufactured by any of the named Defendants or their subsidiaries, affiliates, or co-conspirators.  Defendants' and their co-conspirators' price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining, and/or stabilizing the prices of LCD Products.

3.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.  The conspiracy included communications and meetings in which Defendants and their co-conspirators agreed to eliminate competition and fix the prices of LCD panels and LCD Products that they knew would be sold in the United States.

4.     Beginning in at least 1996, Defendants along with other LCD panel manufacturers (collectively, the "Existing LCD Panel Manufacturers" and individually, each an "Existing LCD Panel Manufacturer") met in person or communicated by other means to agree on LCD Product prices and the amount of LCD Products each would produce.  As new producers entered the LCD Products market, the new producers also agreed to fix prices and to control supply ("New Producers" and collectively with the Existing LCD Panel Manufacturers,

the "Conspirators"). The Conspirators' conspiracy included agreements on the prices at which the Conspirators would sell LCD Products to their own corporate subsidiaries and affiliates, as well as their co-conspirators, thereby ensuring LCD Product prices remained consistent among the Conspirators and their customers, which was an attempt to prevent any price discrepancies to consumers (the "Conspiracy").

5. Throughout the Relevant Period, the Conspiracy was effective in moderating the normal downward pressures on prices for LCD Products caused by periods of oversupply and technological change. The Conspiracy resulted in unusually long periods of high prices and high profits. Although there were periods when prices for LCD Products temporarily declined as a result of new entrants being assimilated, or breakdowns in the effectiveness of the Conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition. In addition, prices declined less than they would have in a competitive market. As a result of the Conspirators' unlawful conduct, Plaintiff paid higher prices for LCD Products than it would have paid in a competitive market.

6. Seven of the Defendants have already admitted to participating in this Conspiracy: LG Display Co., Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.); Sharp Corporation; Chunghwa Picture Tubes, Ltd.; Hitachi Displays, Ltd.; Epson Imaging Devices Corporation; Chi Mei Optoelectronics Corporation; and HannStar Display Corporation. On or about November 12, 2008, LG Display Co., Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix the prices of LCD panels. On or about May 15, 2009, Hitachi Displays, Ltd. agreed to plead guilty and pay a $31 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. And on or about February 8, 2010, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. On or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30

1  million criminal fine for its role in a conspiracy to fix the prices of LCD panels.  Two

2  executives from LG Display, three executives from Chunghwa, four executives from Chi Mei,

3  and one executive from HannStar have also pleaded guilty and have been ordered to pay

4  criminal fines and serve time in federal prison for their participation in a conspiracy to fix the

5  prices of LCD panels.  In addition, on or about June 10, 2010, the U.S. Department of Justice

6  ("DOJ") indicted AU Optronics Corporation and AU Optronics Corporation America, charging

7  them with participating in a conspiracy to fix the prices of LCD panels.  The DOJ's criminal

8  investigation is ongoing.

9      7.      During the Relevant Period, Plaintiff purchased LCD Products in the United

10  States directly from the Conspirators, including, but not limited to, Defendants, and/or

11  Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants'

12  subsidiaries and affiliates controlled and, as a result of the Conspiracy, the prices Plaintiff paid

13  for LCD Products were artificially high.  Plaintiff also purchased LCD Products indirectly from

14  OEMs and others.  Plaintiff thus suffered damages as a result of the Conspiracy, and brings this

15  action to recover the overcharges paid for the LCD Products it directly and indirectly purchased

16  during the Relevant Period.

17      **II.      JURISDICTION AND VENUE**

18      8.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the

19  Clayton Act, to recover damages, including treble damages under Section 4 of the Clayton Act,

20  costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of

21  the Sherman Act (15 U.S.C. § 1).

22      9.      Plaintiff also brings this action pursuant to Massachusetts General Laws, chapter

23  93A, for injunctive relief and damages that Plaintiff sustained due to Defendants' and their co-

24  conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq*., because Plaintiff purchased

25  LCD Products from non-defendant vendors which contained price-fixed LCD panels

26  manufactured by Defendants and their co-conspirators in Massachusetts.

27      10.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

28  Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

1   supplemental jurisdiction over Plaintiff's claims under Mass. Gen. Laws ch. 93A §§ 2 *et seq.*

2   under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in

3   this Complaint.  Plaintiff's state law claim is so related to its claims under Section 1 of the

4   Sherman Act that they form part of the same case or controversy.

5        11.     The activities of Defendants and their co-conspirators, as described herein,

6   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

7   did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

8   import trade or commerce, as well as on commerce and consumers in states including

9   Massachusetts.  This effect gives rise to Plaintiff's state law claims.  During the Relevant

10  Period, Defendants' Conspiracy affected the price of LCD Products purchased in the United

11  States.  In particular, Defendants' and their co-conspirators' Conspiracy directly and

12  substantially affected the price of LCD Products purchased in the states identified herein.

13       12.     This court has jurisdiction over each Defendant named in this action under

14  Section 12 of the Clayton Act, 15 U.S.C. § 22.  In addition, Defendants and their co-

15  conspirators purposely availed themselves of the laws of the United States as they

16  manufactured LCD panels for sale in the United States, or which were incorporated into LCD

17  Products Defendants and their co-conspirators knew would be sold to customers in the United

18  States.  Defendants' and their co-conspirators' Conspiracy affected this commerce in LCD

19  Products in the United States.  Moreover, Defendants who have entered guilty pleas in

20  connection with the Conspiracy alleged herein have acknowledged that their illegal activities

21  had a substantial effect on interstate and foreign trade and commerce.

22       13.     The activities of Defendants and their co-conspirators, as described herein,

23  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

24  did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

25  import trade or commerce, as well as on commerce and consumers in states including

26  Massachusetts.  This effect gives rise to Plaintiff's antitrust claims and the state unfair

27  competition claims.  During the Relevant Period, Defendants' Conspiracy affected the price of

28  LCD Products purchased in the United States.  In particular, Defendants' and their co-

1  conspirators' Conspiracy directly and substantially affected the price of LCD Products

2  purchased by Plaintiff.

3        14.     Venue is proper in the Eastern District of New York under Section 12 of the

4  Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

5  corporation, transacts business in this District, or is otherwise found within this District.  In

6  addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of

7  the events or omissions giving rise to this claim occurred in this District.  Defendants and their

8  co-conspirators knew that price-fixed LCD Products containing price-fixed LCD panels would

9  be sold and shipped into this District.

10  **III.   DEFINITIONS**

11        15.     As used herein, the term "Relevant Period" refers to the time period beginning

12  January 1, 1996 and continuing at least until December 11, 2006.

13        16.     As used herein, the term "LCD panel" means liquid crystal display panel.  LCD

14  panels use glass plates and a liquid crystal compound to electronically display an image.  The

15  technology involves sandwiching a liquid crystal compound between two glass plates called

16  "substrates."  The resulting screen contains hundreds or thousands of electronically charged

17  dots, or pixels, that form an image.  During the Relevant Period, LCD panels used in some

18  notebooks computers and hand-held devices included different technologies including:  thin

19  film transistor (TFT) panels, thin film diode (TFD), color super-twist nematic (CSTN) panels,

20  and monochrome super-twist nematic (MSTN) panels.  The price-fixing conspiracy alleged

21  herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD panels

22  including those using TFT, TFD, CSTN, and MSTN technology in LCD Products.

23        17.     As used herein, the term "LCD Products" means all LCD panels and any

24  product continuing an LCD panel, including without limitation televisions, desktop computer

25  monitors, notebook computers, digital cameras, digital picture frames, mobile wireless

26  handsets, and other hand-held devices.

27        18.     As used herein, the term "OEM" means any original equipment manufacturer of

28  LCD Products.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.   **PARTIES**

### A.   **Plaintiff**

19.     Through the conclusion of Defendants' and the co-conspirators' Conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of consumer electronics and operated dozens of stores in several states under the names Tweeter, Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east coast and in Texas, Arizona, and Illinois.

20.     On June 11, 2007, Tweeter commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly Administered).  On July 13, 2007, the Court entered an Order (1) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its assignees (the "Sale").  The Sale was closed on or about July13, 2007.

21.     Tweeter Newco is the sole member and owner of Tweeter Opco.  Both were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the "APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or causes of action of Sellers against third parties relating to the Purchased Assets arising out of events occurring prior to the Closing Date."

22.     On November 5, 2008, Tweeter Opco and Tweeter Newco commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly Administered).  On December 5, 2008, the Court issued an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

23.     Schultze Agency Services is the agent bank for certain lenders which provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint. Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc. and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware, Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems; Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

24.     During the Relevant Period, Tweeter purchased LCD Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased LCD Products from OEMs, as well as other suppliers, which contained LCD panels that had been purchased from Defendants and their co-conspirators.  As such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

25.     During the Relevant Period, Tweeter's negotiations for the purchase of LCD Products took place in the United States and were controlled by a department based at the company's headquarters in Massachusetts.  In addition, Tweeter's purchase orders for LCD Products were issued from Massachusetts, invoices for these LCD Products were sent to Tweeter in Massachusetts, and payments for these LCD Products were issued from Massachusetts.  Tweeter employees based in Massachusetts were also responsible for selecting vendors and product lines with respect to LCD Products.

1

### B.   **Japanese Defendants**

2

#### i.   **Epson**

3      26.      Defendant Epson Imaging Devices Corporation ("Epson Japan") is a Japanese

4  company with its principal place of business at 4F Annex, World Trade Center Building, 2-4-1

5  Hamamatsu-cho, Minato-ku, Tokyo 105-6104, Japan.  Up until December 28, 2006, Epson

6  Japan was known as Sanyo Epson Imaging Devices Corporation.  The company was originally

7  formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd., but is

8  now a wholly-owned subsidiary of Seiko Epson Corporation.  During the Relevant Period,

9  Epson Japan manufactured, sold, and distributed LCD Products to customers throughout the

10  United States and elsewhere.

11      27.      Defendant Epson Electronics America, Inc. ("Epson America") is a California

12  corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California.

13  Epson America is a wholly-owned and controlled subsidiary of Seiko Epson Corporation,

14  which is also the ultimate parent company of Defendant Epson Imaging Devices Corporation.

15  During the Relevant Period, Epson America sold and distributed LCD Products manufactured

16  by Epson Imaging Devices Corporation to customers throughout the United States and

17  elsewhere.

18      28.      Defendants Epson Japan and Epson America are referred to collectively herein

19  as "Epson."  They participated in the Conspiracy through the actions of their respective

20  officers, employees, and representatives acting with actual or apparent authority.  Further,

21  Defendant Epson benefited from the Conspiracy by receiving greater profits than it would have

22  received had the Conspiracy not existed.  Alternatively, Defendant Epson America was a

23  member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or

24  agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding

25  Conspiracy activities and used that domination or control to charge artificially high prices for

26  LCD panels.

27

28

1

           **ii.**     **Hitachi**

2         29.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

3  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company

4  was one of the original producers of LCD panels.  In 2002, it spun off its LCD manufacturing

5  assets to Hitachi Displays, Ltd., a wholly-owned subsidiary.  During the Relevant Period,

6  Hitachi, Ltd. manufactured, sold, and distributed LCD Products to customers throughout the

7  United States and elsewhere.

8         30.     Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place

9  of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.

10  Hitachi Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD

11  manufacturing business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of

12  Hitachi, Ltd.  During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and

13  distributed LCD Products to customers throughout the United States and elsewhere.  Hitachi

14  Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

15         31.     Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation

16  with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its

17  ultimate parent company is Hitachi, Ltd.  During the Relevant Period, Hitachi Electronic

18  Devices (USA), Inc. sold and distributed LCD Products manufactured by Hitachi, Ltd. and

19  Hitachi Displays, Ltd. to customers throughout the United States and elsewhere.

20         32.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices

21  (USA), Inc. are sometimes referred to collectively herein as "Hitachi."  Defendants Hitachi,

22  Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. were members of the

23  Conspiracy by virtue of the actions of their respective officers, employees and representatives

24  acting with actual or apparent authority.  Further, Defendant Hitachi benefited from the

25  Conspiracy by receiving greater profits than it would have received had the Conspiracy not

26  existed.  Alternatively, Defendants Hitachi Displays, Ltd. and Hitachi Electronic Devices

27  (USA), Inc. were members of the Conspiracy by virtue of their status during the Relevant

28  Period as the alter egos or agents of Hitachi, Ltd.  Hitachi, Ltd. dominated or controlled Hitachi

Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD Products.

### iii.  **Mitsui**

33.     Defendant Mitsui & Co. (Taiwan), Ltd. ("Mitsui Taiwan") is a Taiwanese company with its principal place of business at Tunnan Tower 21F; No. 97 Tunhua South Rd. Section 2 Taipei City, 106 Taiwan.  Mitsui Taiwan is a wholly-owned and controlled subsidiary of co-conspirator Mitsui & Co., Ltd., a Japanese corporation.

34.     Co-conspirator Mitsui & Co., Ltd. ("Mitsui Japan") is a consolidated global general trading company which conducts its business activities in collaboration with and through its overseas offices, including Mitsui Taiwan and Mitsui U.S.A.  Mitsui Japan participated in the conspiracy through its wholly-owned and controlled subsidiaries Mitsui Taiwan and Mitsui U.S.A., and through other actions alleged in this complaint.  Mitsui Taiwan and Mitsui U.S.A. were the general agents for and representatives of Mitsui Japan in Taiwan and the United States, respectively.

35.     Defendant Mitsui & Co. (U.S.A.), Inc. ("Mitsui U.S.A.") is a New York corporation with its principal place of business at 200 Park Avenue, 35th Floor, New York, New York.  Mitsui U.S.A. is a wholly-owned and controlled subsidiary of co-conspirator Mitsui & Co., Ltd.  Until 2009, Mitsui U.S.A. held an eighty percent ownership interest in Mitsui Comtek Corp. ("Mitsui Comtek"), a California corporation, with the remaining twenty percent held by co-conspirator Mitsui & Co., Ltd.  As of 2009, Mitsui Comtek merged with and into Mitsui U.S.A.  During the Relevant Period, Mitsui Comtek sold and distributed LCD Products to customers throughout the United States and elsewhere.

36.     Defendants Mitsui Taiwan and Mitsui U.S.A. and co-conspirator Mitsui Japan, are sometimes referred to collectively herein as "Mitsui."  Defendants Mitsui Taiwan and Mitsui U.S.A. and co-conspirator Mitsui Japan participated in the conspiracy through the actions of their respective affiliates, officers, employees, and representatives acting with actual or apparent authority.  Defendants Mitsui Taiwan and Mitsui U.S.A. participated in the Conspiracy during the Relevant Period and were each the alter ego or agent of Mitsui Japan in

1    Taiwan and the United States, respectively.  Mitsui benefited from the Conspiracy by receiving

2    greater profits than it would have received had the Conspiracy not existed.

3           37.     Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. participated in the Conspiracy

4    in a coordinated manner and functioned as a single integrated entity.  Mitsui Japan dominated

5    or controlled Mitsui Taiwan and Mitsui U.S.A. regarding Conspiracy activities and used that

6    domination or control to charge artificially high prices for LCD Products.  Mitsui Japan, Mitsui

7    Taiwan, and Mitsui U.S.A. were part of Mitsui's Display Products Department, U.S. & Asia

8    Team, which was managed by a Team Leader at Mitsui Japan.  The Team Leader directed the

9    activities of employees at Mitsui Taiwan and Mitsui U.S.A.  Thus, Defendants Mitsui Taiwan

10   and Mitsui U.S.A. and co-conspirator Mitsui Japan functioned as a single integrated enterprise

11   in furtherance of the Conspiracy.  Indeed, it would work fraud or injustice not to disregard

12   Mitsui Taiwan's corporate form because Mitsui Japan used Mitsui Taiwan as a mere instrument

13   in furtherance of the Conspiracy and they cannot be permitted avoid liability for their illegal

14   conduct based upon assertions of corporate separateness.  Specific evidence of Mitsui's

15   coordinated participation in the Conspiracy, including Mitsui's purposeful direction of

16   conspiratorial activities toward the United States, out of which Plaintiff's claims arise and

17   which caused Plaintiff damages, is detailed in Appendix A to this Complaint.

18          38.     Mitsui functions as a single integrated enterprise generally as well.  Mitsui

19   Japan, Mitsui Taiwan, and Mitsui U.S.A. cooperate in all areas and share all relevant business

20   information.  Moreover, the functions performed in Taiwan and the United States by Mitsui

21   Taiwan and Mitsui U.S.A., respectively, were sufficiently important such that if these Mitsui

22   subsidiaries did not undertake them, Mitsui Japan would have to perform those functions itself.

23   Defendant Mitsui Taiwan and Mitsui U.S.A. were closely affiliated, controlled, and dominated

24   by co-conspirator Mitsui Japan.  Mitsui functions as a worldwide business partnership with

25   integrated sales and distribution systems and a common marketing image.  In addition,

26   defendant Mitsui Taiwan and Mitsui U.S.A. shared common officers and directors with Mitsui

27   Japan.

28

1

####iv.    NEC

2      39.      Defendant NEC Corporation is a Japanese company with its principal place of

3 business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan.  During the

4 Relevant Period, NEC Corporation manufactured, sold and distributed LCD Products to

5 customers throughout the United States and elsewhere.

6      40.      Defendant NEC Corporation of America is a Nevada corporation with its

7 principal place of business located at 6535 North State Highway 161, Irving, Texas 75039.  It is

8 a wholly-owned and controlled subsidiary of NEC Corporation.  During the relevant period,

9 NEC Corporation of America sold and distributed LCD Products manufactured by NEC

10 Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States.

11      41.      NEC Display Solutions of America, Inc. is a Delaware corporation with its

12 principal place of business located at 500 Park Blvd., Suite 1100, Itasca, Illinois 60143.  It is a

13 wholly-owned and controlled subsidiary of NEC Corporation.  During the relevant period, NEC

14 Display Solutions of America sold and distributed LCD Products manufactured by NEC

15 Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States.

16      42.      Defendant NEC LCD Technologies, Ltd. is a Japanese company with its

17 principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa

18 211-8666, Japan.  NEC LCD Technologies, Ltd. was formed in 2003 and is a wholly-owned

19 and controlled subsidiary of NEC Corporation.  During the Relevant Period, NEC LCD

20 Technologies, Ltd. manufactured, sold and distributed LCD Products to customers throughout

21 the United States and elsewhere.

22      43.      Defendant NEC Electronics America, Inc. is a California corporation with its

23 principal place of business at 2880 Scott Boulevard, Santa Clara, CA and its manufacturing

24 plant in Roseville, California.  Its ultimate parent company is NEC Corporation.  During the

25 Relevant Period, NEC Electronics America, Inc. sold and distributed LCD Products

26 manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout

27 the United States and elsewhere.

28

44.     Defendants NEC Corporation, NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc. are sometimes referred to collectively herein as "NEC."  Defendants NEC Corporation, NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd., and NEC Electronics America, Inc. were members of the Conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority.  Further, Defendant NEC benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed.  Alternatively, Defendants NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc. were members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of NEC Corporation.  NEC Corporation dominated or controlled NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD panels and LCD Products.

**v.     Sanyo**

45.     Defendant Sanyo Consumer Electronics, Ltd. ("Sanyo Consumer") is a Japanese company with its principal place of business at 7-101, Tachikawa-cho, Tottori 680-0061, Japan. Sanyo Consumer was formerly known as Tottori Sanyo Electric Co.  Prior to October 2004, co-conspirator Sanyo Electric Co., Ltd. owned and operated Sanyo Consumer.  In 2004, co-conspirators Seiko Epson Corporation and Sanyo Electric Co., Ltd. formed a joint venture, Sanyo Epson Imaging Devices Corporation.  After the Relevant Period, Sanyo Epson Imaging Devices Corporation became Epson Imaging Devices Corporation, also a Defendant.  During the Relevant Period, Sanyo Consumer manufactured, sold and distributed LCD Products to customers throughout the United States and elsewhere.

46.     Defendant Sanyo Consumer participated in the Conspiracy through the actions of its affiliates, officers, employees, and representatives acting with actual or apparent authority.  During the Relevant Period, Sanyo Consumer was closely affiliated, commonly

1   owned, controlled and dominated by co-conspirator Sanyo Electric Co., Ltd., and functioned as

2   a single enterprise and/or alter egos.  Sanyo Consumer is a wholly-owned subsidiary of Sanyo

3   Electric Co., Ltd., a consolidated consumer electronics and information technology company

4   based in Japan.

5                 **vi.**     **<u>Sharp</u>**

6        47.     Defendant Sharp Corporation is a Japanese company with its principal place of

7   business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  The company was one of

8   the earliest producers of LCD panels.  During the Relevant Period, Sharp Corporation

9   manufactured, sold and distributed LCD Products to customers throughout the United States

10   and elsewhere.

11        48.     Defendant Sharp Electronics Corporation is a New York corporation with its

12   principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics

13   Corporation is a wholly-owned and controlled subsidiary of Defendant Sharp Corporation.

14   During the Relevant Period, Sharp Electronics Corporation sold and distributed LCD Products

15   manufactured by Defendant Sharp Corporation to customers throughout the United States and

16   elsewhere.

17        49.     Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes

18   referred to collectively herein as "Sharp."  Defendants Sharp Corporation and Sharp

19   Electronics Corporation were members of the Conspiracy by virtue of the actions of their

20   respective officers, employees and representatives acting with actual or apparent authority.

21   Alternatively, Defendant Sharp Electronics Corporation was a member of the Conspiracy by

22   virtue of its status during the Relevant Period as the alter ego or agent of Sharp Corporation.

23   Further, Defendant Sharp benefited from the Conspiracy by receiving greater profits than it

24   would have received had the Conspiracy not existed.  Sharp Corporation dominated or

25   controlled Sharp Electronics Corporation regarding Conspiracy activities and used that

26   domination or control to charge artificially high prices for LCD Products.

27

28

1

                    **vii.       Toshiba**

2          50.      Defendant Toshiba Corporation is a Japanese company with its principal place

3   of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba

4   Corporation participates in two joint ventures that manufacture, sell, and distribute LCD

5   Products – Defendant Toshiba Matsushita Display Technology Co., Ltd. and co-conspirator IPS

6   Alpha Technology, Ltd.  During the Relevant Period, Toshiba Corporation manufactured, sold,

7   and distributed LCD Products to customers throughout the United States and elsewhere.

8          51.      Defendant Toshiba Matsushita Display Technology Co., Ltd. (n/k/a Toshiba

9   Mobile Display Co., Ltd.) ("Toshiba Matsushita") is a Japanese company with its principal

10  place of business at Rivage Shinagawa, 18, Konan 4-chome, Minato-ku, Tokyo 108-0075,

11  Japan.  Toshiba Matsushita is a joint venture between Defendant Toshiba Corporation and co-

12  conspirator Panasonic Corporation (formerly known as Matsushita Electric Industrial Co.,

13  Ltd.).  Toshiba Matsushita was created for the purpose of manufacturing LCD Products.

14  During the Relevant Period, Toshiba Matsushita manufactured, sold, and distributed LCD

15  Products to customers throughout the United States and elsewhere.

16         52.      Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

17  California corporation with its principal place of business at 19900 MacArthur Boulevard,

18  Suite 400, Irvine, California.  Toshiba America Electronic Components, Inc. is a wholly-owned

19  and controlled subsidiary of Toshiba America, Inc., a holding company for Defendant Toshiba

20  Corporation.  Toshiba America Electronic Components, Inc. is the United States sales and

21  marketing representative for Defendants Toshiba Corporation and Toshiba Matsushita.  During

22  the Relevant Period, Toshiba America Electronic Components, Inc. sold and distributed LCD

23  Products manufactured by Toshiba Corporation to customers throughout the United States and

24  elsewhere.

25         53.      Defendant Toshiba America Information Systems, Inc. is a California

26  corporation with its principal place of business at 9470 Irvine Boulevard, Irvine, California.

27  Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of

28  Toshiba America, Inc.  During the Relevant Period, Toshiba America Information Systems,

1  Inc. sold and distributed LCD Products manufactured by Toshiba Corporation to customers

2  throughout the United States and elsewhere.

3          54.      Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba

4  America Information Systems, Inc. are sometimes referred to collectively herein as "Toshiba."

5  Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba America

6  Information Systems, Inc. were members of the Conspiracy by virtue of the actions of their

7  respective officers, employees and representatives acting with actual or apparent authority.

8  Further, Defendant Toshiba benefited from the Conspiracy by receiving greater profits than it

9  would have received had the Conspiracy not existed.  Alternatively, Defendants Toshiba

10  America Electronics Components, Inc., and Toshiba America Information Systems, Inc. were

11  members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos

12  or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba

13  Matsushita, Toshiba America Electronics Components, Inc., and Toshiba America Information

14  Systems, Inc. regarding Conspiracy activities and used that domination or control to charge

15  artificially high prices for LCD Products.

16          **C.      Korean Defendants**

17                  **i.      LG Display**

18          55.      Defendant LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd.,

19  is a Korean entity with its principal place of business at 20, Yeouido-dong, Yeongdeungpo-gu,

20  Seoul, Korea 150-721.  LG Display Co., Ltd. was created in July 1999 as a joint venture

21  between co-conspirators LG Electronics, Inc. and Royal Philips Electronics, N.V.  In July 2004,

22  LG Display Co., Ltd. became a public company, with LG Electronics, Inc. and Royal Philips

23  Electronics N.V. as the controlling shareholders.  LG Display Co., Ltd. describes itself as the

24  global leader in the development and manufacturer of LCD panels for televisions, computer

25  monitors, notebooks and emerging mobile applications.  During the Relevant Period, LG

26  Display Co., Ltd. manufactured, sold, and distributed LCD Products to customers throughout

27  the United States and elsewhere.

28

56.     Defendant LG Display America, Inc., formerly known as LG.Philips LCD America, Inc., is a California corporation with its principal place of business at 150 East Brokaw Road, San Jose, California. LG Display America, Inc. is a wholly-owned and controlled subsidiary of Defendant LG Display Co., Ltd.  During the Relevant Period, LG Display America, Inc. sold and distributed LCD Products manufactured by LG Display Co., Ltd. to customers throughout the United States and elsewhere.

57.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes referred to collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG Display America, Inc. were members of the Conspiracy by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Further, Defendant LG benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed.  Alternatively, Defendant LG Display America, Inc. was a member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD panels and LCD Products.

**ii.     Samsung**

58.     Defendant Samsung Electronics Co., Ltd. is a Korean company with its principal place of business at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul, Korea.  It is the world's largest producer of LCD Products.  During the Relevant Period, it manufactured, sold, and distributed LCD Products to customers throughout the United States and elsewhere.

59.     Defendant Samsung Electronics America, Inc. ("Samsung America") is a New York corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung Electronics Co., Ltd.  During the Relevant Period, Samsung America sold and distributed LCD Products manufactured by Samsung Electronics Co., Ltd. to customers throughout the United States and elsewhere.

60. Defendant Samsung Semiconductor, Inc. is a California corporation with its principal place of business at 3655 North First Street, San Jose, California. Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of Defendant Samsung Electronics Co., Ltd. During the Relevant Period, Samsung Semiconductor, Inc. sold and distributed LCD Products manufactured by Samsung Electronics Co., Ltd. throughout the United States and elsewhere.

61. Defendants Samsung Electronics Co., Ltd., Samsung America, and Samsung Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung." Defendants Samsung Electronics Co., Ltd., Samsung America, and Samsung Semiconductor, Inc. were members of the Conspiracy by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Further, Defendant Samsung benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed. Alternatively, Defendants Samsung America, and Samsung Semiconductor, Inc. were members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung America, and Samsung Semiconductor, Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD panels and LCD Products.

### D. **Taiwanese Defendants**

#### i. **AU Optronics**

62. Defendant AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. AU Optronics Corporation was created in 2001 and is the successor by merger of Acer Display Technology, Inc. ("ADT") and Unipac Optoelectronics Corporation ("Unipac"), both of which were involved in the manufacture of LCD Products. During the Relevant Period, AU Optronics Corporation manufactured, sold, and distributed LCD Products to customers throughout the United States and elsewhere.

63.     Defendant AU Optronics Corporation America ("AU America") is a California corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston, Texas.  AU America was formerly known as Acer Display Technology America, Inc. AU America is a wholly-owned and controlled subsidiary of Defendant AU Optronics Corporation.  In 2006, H.B. Chen, the president and Chief Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU America.  During the Relevant Period, AU America sold and distributed LCD Products manufactured by AU Optronics Corporation to customers throughout the United States and elsewhere.

64.     Defendants AU Optronics Corporation and AU America are sometimes collectively referred to herein as "AUO."  Defendants AU Optronics Corporation and AU America were members of the Conspiracy by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Further, Defendant AUO benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed.  Alternatively, Defendant AU America was a member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation dominated or controlled AU America regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD Products.

### ii.     Chi Mei

65.     Defendant Chi Mei Optoelectronics Corporation (n/k/a Chimei Innolux Corporation) ("CMO") is a Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.  CMO was formed in 1998, and has since become a major manufacturer of LCD Products.  During the Relevant Period, CMO manufactured, sold, and distributed LCD Products to customers throughout the United States and elsewhere.

66.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company headquartered at Nansei-Yaesu Bldg. 4-F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan. Up until 2006, CMO Japan was known as International Display Technology, Ltd.  CMO Japan

1    is a wholly-owned and controlled subsidiary of Defendant CMO.  CMO Japan has been in the

2    LCD business since 2001. During the Relevant Period, CMO Japan manufactured, sold, and

3    distributed LCD Products throughout the United States and elsewhere.

4    　　　　67.　　Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware

5    corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

6    California.  Up until 2006, CMO USA was known as International Display Technology U.S.A.,

7    Inc.  CMO USA is a wholly-owned and controlled subsidiary of Defendant CMO Japan.  The

8    Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO

9    Japan's predecessor, and in or about 2007 became Vice President in charge of sales and

10   marketing for CMO.  Similarly, the President of CMO USA in 2006, Junichi Ishii, was

11   previously the President of CMO Japan's predecessor. During the Relevant Period, CMO USA

12   sold and distributed LCD Products manufactured by CMO Japan to customers throughout the

13   United States and elsewhere.

14   　　　　68.　　Defendants CMO, CMO Japan, and CMO USA are sometimes referred to

15   collectively herein as "Chi Mei."  The Chi Mei companies were members of the Conspiracy by

16   virtue of the actions of their respective officers, employees and representatives acting with

17   actual or apparent authority.  Further, Defendant Chi Mei benefited from the Conspiracy by

18   receiving greater profits than it would have received had the Conspiracy not existed.

19   Alternatively, Defendants CMO Japan and CMO USA were members of the Conspiracy by

20   virtue of their status during the Relevant Period as the alter egos or agents of CMO.  CMO

21   dominated or controlled CMO Japan and CMO USA regarding Conspiracy activities and used

22   that domination or control to charge artificially high prices for LCD Products.

23   　　　　　　　**iii.**　　**Chunghwa**

24   　　　　69.　　Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its

25   principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  It is a

26   subsidiary of Tatung Company, a consolidated consumer electronics and information

27   technology company based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors

28   includes representatives from Tatung Company.  The Chairman of Chunghwa Picture Tubes,

1   Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company.  During the

2   Relevant Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed LCD

3   Products to customers throughout the United States and elsewhere.

4          70.     Tatung Company of America, Inc. ("Tatung America") is a California

5   corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

6   California. Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company

7   owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the

8   daughter of Tatung Company's former Chairman, T.S. Lin.  During the Relevant Period,

9   Tatung America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes,

10  Ltd. to customers throughout the United States and elsewhere.

11         71.     Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes

12  referred to collectively herein as "Chunghwa."  During the Relevant Period, Chunghwa and

13  Tatung America were closely affiliated, commonly owned, controlled and dominated by

14  Tatung Company, and functioned as a single enterprise and/or alter egos.   Defendant

15  Chunghwa benefited from the Conspiracy by receiving greater profits than it would have

16  received had the Conspiracy not existed.

17                         **iv.    HannStar**

18         72.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

19  with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei

20  114, Taiwan.  HannStar has been in the business of manufacturing and selling LCD Products

21  since 1998.  During the Relevant Period, HannStar manufactured, sold, and distributed LCD

22  Products to customers throughout the United States and elsewhere.

23  **V.     AGENTS AND CO-CONSPIRATORS**

24         73.     The acts alleged against the Defendants and their co-conspirators in this

25  Complaint were authorized, ordered, or done by their officers, agents, employees, or

26  representatives, while actively engaged in the management and operation of Defendants'

27  businesses or affairs.

28

74.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for LCD panels and/or LCD Products made by its parent company.

75.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to:  Hydis Technologies Co., Ltd. ("Hydis"); IPS Alpha Technology, Ltd. ("IPS Alpha"); LG Electronics, Inc. and LG Electronics USA, Inc. (together with LG Display, collectively "LG"); Mitsubishi Electric Corporation and Mitsubishi Electric and Electronics USA, Inc. (collectively "Mitsubishi"); Mitsui & Co., Ltd. ("Mitsui Japan"); Panasonic Corporation and Panasonic Corporation of North America (collectively "Panasonic"); Royal Philips Electronics N.V. and Philips Electronics North America Corp. (collectively "Philips"); Sanyo Electric Company, Ltd. and Sanyo North America Corporation (collectively "Sanyo"); Seiko Epson Corporation ("Seiko Epson").

76.     The acts alleged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## VI.     TRADE AND COMMERCE

77.     During the Relevant Period, each Defendant, or one or more of its affiliates or subsidiaries, sold LCD Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

78.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for LCD Products, both globally and in the United States.

79.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  Defendants'

business activities substantially affected trade and commerce within each of the 50 states, as the Conspiracy artificially inflated the prices of LCD Products sold in all 50 states, and therefore caused antitrust injury in every state including Massachusetts.  Moreover, Plaintiff purchased price-fixed goods directly and indirectly from Defendants for sale across the United States.

80.     For example, Defendants LG Display Co., Ltd. and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Each agreed that "Acts in furtherance of this conspiracy were carried out within the Northern District of California.  LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4; Case 3:09-cr-00247, Document 10-1 at 4; Case 3:09-cr-1166, Document 15-1 at 4; 3:10-cr-0498, Document 11-1 at 4.  Moreover, Defendants and their co-conspirators and/or their agents delivered a substantial amount of LCD Products to persons in Massachusetts, including Plaintiff.

81.     Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD panels to enter the United States market and inflating the prices of LCD Products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. retailers.

82.     The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy. Measured by value, Defendants and others shipped more than 400 million LCD panels, including those incorporated into LCD Products, into the United States during the Relevant Period for ultimate sale to U.S. consumers. During the Relevant Period, the value of

1    LCD panels imported into the United States was in excess of $50 billion. Defendants shipped

2    millions of LCD Products worth billions of dollars into the United States each year during the

3    Relevant Period. As a result, a substantial portion of Defendants' revenues were derived from

4    the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products

5    in the United States. Most, if not all, Defendants had marketing, sales, and account

6    management teams specifically designated to handle U.S. customer accounts and the U.S.

7    market for LCD panels and LCD Products.

8        83.    Because of the importance of the U.S. market to Defendants and their co-

9    conspirators, LCD panels and LCD Products intended for importation into and ultimate

10   consumption in the United States were a focus of Defendants' illegal conduct. Defendants

11   knowingly and intentionally sent price-fixed LCD panels and LCD Products into a stream of

12   commerce that lead directly into the United States.  Many LCD panels were intended for

13   incorporation into finished products specifically destined for sale and use in the United States.

14   This conduct by Defendants was meant to produce and did in fact produce a substantial effect

15   in the United States in the form of artificially-inflated prices for LCD panels and LCD

16   Products.

17       84.    During the Relevant Period, Defendants and co-conspirators shipped LCD

18   panels directly into the United States.

19       85.    When high-level executives based at Defendants' Asian headquarters agreed on

20   prices, they knew that their price-fixed LCD panels would be incorporated into LCD Products

21   sold in the United States. Moreover, because LCD panels are – and were throughout the

22   Relevant Period – the most expensive and significant component of LCD Products, Defendants

23   knew that price increases for LCD panels would necessarily result in increased prices for LCD

24   Products sold in the United States.

25       86.    Many Defendants manufactured LCD Products and sold them in the United

26   States.  In fact, Defendants routinely monitored the effect their price-fixing had on the prices of

27   such LCD Products sold in the United States.

28

87.     Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because Defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD panels. In addition, Defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD panels.

88.     Defendants have acknowledged that their commercial activities involving intentionally sending LCD panels and LCD Products into the United States impacted U.S. import trade and import commerce. In a series of complaints filed with the U.S. International Trade Commission over the past few years, Defendants Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf). *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

89.     For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

90.     Defendants' illegal conduct also had a direct, substantial, and reasonably foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce in the form of higher prices for LCD Products containing price-fixed LCD panels manufactured by Defendants and their coconspirators being negotiated, charged, and paid by Plaintiff in the United States for products imported into the United States.

1    **VII.    FACTUAL ALLEGATIONS**

2        **A.    LCD Technology**

3        91.    The technology behind LCD Products is not new.  In the 1950s and 1960s, RCA

4    Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power

5    display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese

6    companies took the lead in commercializing liquid crystal technology.  These efforts resulted in

7    monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology

8    was introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s,

9    the technology advanced further with the development of LCDs.

10        92.    The basic structure of an LCD panel is two glass substrates sandwiching a layer

11    of liquid crystal compound.  Liquid crystals change orientation under an applied electric field

12    and can thereby block or pass light.  One glass substrate has thin chemical films that act as

13    transistors, and the other glass substrate is coated with liquid pigments that act as color filters.

14    When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through

15    the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image,

16    and the density of pixels in a display determines the resolution.

17        93.    The term "active matrix" describes the ability to switch each pixel in a display

18    individually.  Unlike older LCDs that have one transistor for each row and column of pixels,

19    LCDs have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used

20    interchangeably with LCD.  Active matrix displays are brighter and sharper than passive matrix

21    displays of the same size.

22        94.    The glass substrates used for LCD panels begin with a "motherglass," a sheet of

23    glass that is cut to make multiple panels.  LCDs are manufactured in fabs that are equipped to

24    handle a particular size motherglass.  Technological innovations over time have allowed

25    manufacturers to begin the manufacturing process with larger and larger size motherglass

26    sheets. This, in turn, has resulted in the ability to fabricate larger and/or more LCD panels.

27    Each increase in motherglass size is described as a generation.  Third generation fabs in the

28    1998 to 1999 period typically used 550 millimeter ("mm") by 650 mm motherglass, while

1   some current (eighth generation) fabs use 2160 mm by 2460 mm motherglass.  The use of

2   larger motherglass provides substantial cost savings to manufacturers.

3          95.     LCDs are capable of producing the same image as cathode ray tubes ("CRTs"),

4   but in a much smaller package.  LCDs also have lower energy requirements, are generally

5   easier to read, and do not flicker like CRTs.  LCD panels of approximately 10 inches or less in

6   diagonal are considered "small" or "medium" displays.  They are also referred to as "mobile

7   displays."  These displays are commonly used in mobile wireless handsets, personal digital

8   assistants, and cameras.

9          96.     LCD panels have no independent utility, and have value only as components of

10  other products, such as TVs, computer monitors, notebook computers, and mobile wireless

11  handsets.  The demand for LCD panels thus directly derives from the demand for the LCD

12  Products.

13         97.     The market for LCD panels and the market for the products into which they are

14  placed are inextricably linked and intertwined because the LCD panel market exists to serve the

15  LCD Products markets. The markets for LCD panels and LCD Products are, for all intents and

16  purposes, inseparable in that one would not exist without the other.

17         98.     Plaintiff has participated in the market for LCD panels through direct purchases

18  of LCD Products from Defendants and its indirect purchases of LCD Products from non-

19  defendant OEMs, co-conspirators and others.  Defendants' unlawful Conspiracy inflated the

20  prices at which Plaintiff has bought LCD Products, and Plaintiff has been injured thereby and

21  paid supra-competitive prices for LCD Products.

22         **B.     Structure of the LCD Industry**

23         99.     The LCD industry has several characteristics that facilitated the Conspiracy,

24  including market concentration, ease of information sharing, the consolidation of

25  manufacturers, multiple interrelated business relationships, significant barriers to entry,

26  heightened price sensitivity to supply and demand forces, and homogeneity of products.

27

28

### i. **Market Concentration**

100.    The LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by Plaintiff.  Samsung, LG, Sharp, AUO, and Chi Mei were the five largest producers as measured by market share during much of the Relevant Period.

### ii. **Information Sharing**

101.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, the Conspirators had many opportunities to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  The Conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for LCD Products as alleged below.

102.    Additionally, the LCD industry is analyzed by several market research firms.  Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity.  The capacity and pricing data reported by these firms comes directly from manufacturers.  Manufacturers typically report historical, current, and perhaps most importantly, prospective information.  Thus, the Conspirators had access to each other's future plans for bringing capacity on line, capacity utilization, market share, pricing, and the advent of new technology.  Because there were very few companies that needed to be analyzed in order to obtain this data, all competitors in the LCD market had ready and timely access to reliable information about their competition's pricing as well as future supply and capacity decisions.  By meeting together as herein below alleged as well as monitoring and analyzing this information over time, the Conspirators were able to signal their respective intent, verify that the Conspiracy was working, and identify any parties and punish any parties who might be deviating from the agreements necessary to carry out the Conspiracy.

### iii. **Consolidation**

103.    The LCD industry experienced significant consolidation during the  Relevant Period, including: (a) the creation of AUO in 2001 through the merger of ADT and Unipac; (b)

1    the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to

2    Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and

3    (e) AUO's acquisition in 2006 of Quanta Display Inc. ("QDI"), which resulted in AUO

4    becoming the third-largest manufacturer of LCD Products.

5                      **iv.     Multiple Interrelated Business Relationships**

6           104.    The industry is marked by a web of cross-licensing agreements, joint ventures,

7    and other cooperative arrangements that can facilitate collusion.  AUO, for example, entered

8    into licensing arrangements with Sharp in 2005 and Samsung in 2006.  Chunghwa did likewise

9    with Sharp in December of 2006.  Chi Mei has licensing arrangements with Sharp, AUO,

10   Chunghwa, HannStar and Hitachi.

11          105.    The industry has a close-knit nature whereby multiple business relationships

12   between supposed competitors blurred the lines of competition and provided ample opportunity

13   to collude.  These business relationships also created a unity of interest among competitors so

14   that the Conspiracy was easier to implement and to enforce, including by checking each

15   Conspirator's participation in the Conspiracy, than if such interrelationships did not exist.

16                      **v.     High Costs of Entry Into the Industry**

17          106.    There are significant manufacturing and technological barriers to entry into the

18   LCD industry.  Efficient fabs are large and costly.  LCD Products are also subject to

19   technological advances, so that firms within the industry must spend significant capital on

20   research and development.  DisplaySearch, a research firm in Austin, Texas that covers the

21   LCD industry, reported in September 2005 that the top LCD manufacturers collectively spent

22   $30 million a day on property, plant, and equipment.  A January 2006 DisplaySearch report

23   noted that a typical seventh generation fab can cost more than $3 billion.

24          107.    During the Relevant Period, the costs of the assembly components, both as a

25   whole and individually, were generally declining, and, in some periods, declining at a

26   substantial rate. Later in the Conspiracy, approximately 70 percent of the cost of LCD panel

27   production was attributable to the cost of raw materials.  The combination of price discussions

28

1    and manipulation of the output of LCD Products allowed the Conspirators to keep prices above

2    where they would have been but for the Conspiracy.

3              vi.    **The "Crystal Cycle"**

4         108.    Like all markets, the LCD industry is subject to business cycles of supply and

5    demand.  In the LCD industry, this cycle is known as the "crystal cycle."  This cycle has been

6    described as "boom and bust" periods caused by alternating periods of oversupply and

7    shortages, which create downward and upward pressures on prices for LCD Products.  One fact

8    that can affect oversupply is the perceived demand for such products and whether

9    manufacturers have adequately predicted demand when determining how much capacity to

10   build and use, *i.e.*, how many LCD Products to produce.

11        109.    Another factor is the entry of new competitors.  Typically, when a new

12   competitor enters a market, it brings incremental production online thereby adding supply, and

13   prices drop until an equilibrium is reached.  In the LCD industry, however, the Conspirators

14   conspired to rein in and discipline new entrants until the new entrants were assimilated into the

15   Conspiracy.  This had the effect of tempering price drops and preventing prices from reaching a

16   competitive equilibrium.

17        110.    The Conspiracy did not completely eliminate the effects of the crystal cycle in

18   the LCD industry. There were periods when the Conspirators' collusive practices drove prices

19   for LCD Products so high that demand began to fall to the point that the Conspirators lowered

20   prices for short periods of time.  However, the Conspirators' efforts to stabilize prices were

21   successful in moderating the effects of the crystal cycle, including the impact on prices paid by

22   direct and indirect purchasers.  To the extent that prices for LCD Products fell, they fell from

23   levels that had been set conspiratorially, rather than from levels set by free and open

24   competition.  Additionally, prices did not fall as low as they would have absent the

25   conspiratorial conduct.

26        **C.    Pre-Conspiracy Market**

27        111.    Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were

28   essentially the exclusive suppliers of LCD panels.

112.     In early 1995, the industry faced declining LCD panel prices, which industry analysts attributed to advances in technology and improving efficiencies.  One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry."  The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of LCD Products, and they slowed the rate of their investments.  This, however, provided an opening to Korean manufacturers.

113.     In 1995, three Korean companies – Samsung, LG and, to a lesser extent, Hyundai – entered the market.  These Korean firms offered comparable LCD Products at reduced prices in an effort to quickly gain market share.  This resulted in increased competition in 1995, which contributed to the significant price declines seen during that timeframe.

114.     Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines.  By mid-1995, the Japanese companies and the new Korean competitors had a total capacity to supply 14 million LCD panels, while demand for them was only about three million.  In addition to the surges in capacity during 1995, "[costs] were also dropping as production volume increases and manufacturing methods improved."

115.     By late 1995, the effect of the entry of Korean suppliers had pushed down the price of some LCD panels by 50 percent from the previous year.  The origin of the Conspiracy may be traceable to this trough in prices.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

116.     The Conspiracy was effectuated through a combination of group and bilateral discussions.  In the formative years, when the Japanese Defendants first entered into the Conspiracy, bilateral discussions were the primary method of communication.  During this period of the Conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other Defendant about the prices for LCD Products, and thereby created a model for how the Conspiracy would be carried out after the Korean, and later the Taiwanese Defendants joined.  These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as capacity utilization.  As more manufacturers entered the Conspiracy, however, group meetings

became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings was in place.

### i. "Crystal Meetings"

117. The group meetings among the participants in the LCD price-fixing Conspiracy were referred to as "crystal meetings." Crystal meetings were attended by employees at three general levels of Defendants' corporations. The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings. The second level were management-level meetings, referred to as "commercial" or "operation" meetings. The third level were meetings attended by lower-level sales and marketing personnel.

118. In a typical crystal meeting of the Conspiracy, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices. Meeting participants shared information relating to all of these topics so that Defendants could agree on what price each would charge for LCD panels to be sold in the following month. Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for LCD panels. They also discussed prices of LCD panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

119. The purpose of the CEO or top meetings was to stabilize or raise prices. At the CEO meetings, the participants discussed prices and the supply and demand situation. The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions. Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply and demand and price for the group to review. The attendees would take turns making comments and adjusting the numbers. At some point during the meeting, the participants would reach an agreement on price and supply for LCD panels.

120.     The commercial or operation meetings were attended by Defendants' respective Vice Presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings were largely the same as the CEO meetings.  The participants discussed price, output, capacity, and the general market situation for LCD panels.  These meetings occurred approximately monthly and sometimes quarterly.

121.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of LCD panels has on the cost of the finished products into which they are placed.  Defendants knew that the conspiratorially high prices of LCD panels would be reflected in the prices for finished LCD Products, and thus, there was no need to specifically discuss the prices of finished LCD Products.

122.     The agreements reached at these meetings included:  (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of LCD panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; and (6) reaching out to other competitors to encourage them to abide by the agreed-upon pricing.  The meeting participants also agreed to maintain or lower production capacity.

123.     Compared to the CEO and commercial meetings, the lower level meetings were less formal, and typically occurred at restaurants over lunch.  The purpose of the lower level meetings was to exchange market information that would facilitate implementation of the Conspiracy and carry out the agreements made at the CEO and commercial meetings.  Participants in the lower level meetings exchanged information relating to past and future prices of LCD Products and shipment quantities.

124.     In the summer of 2006, Defendants discontinued the lower level meetings in favor of coordinated one-on-one meetings.  The meetings were coordinated so that on the same date, two sets of competitors met one-on-one.  After that meeting, each of them met one-on-one with another competitor.  This continued until all competitors met with each other.  These

1    coordinated meetings took place until about November or December 2006.  Defendants

2    switched the format of the meetings with the specific intent to conceal their meetings and for

3    these coordinated one-on-one meetings to accomplish the same purposes as the group meetings.

4    The information obtained at these meetings was transmitted up the corporate reporting chain to

5    permit Defendants to maintain their price-fixing and production-limitation agreements.

6                     **ii.    Bilateral Discussions**

7           125.    The crystal meetings were supplemented by bilateral discussions between

8    various Conspirators. The purpose of the bilateral discussions was to exchange information

9    about past and future pricing, as well as information about shipments.

10          126.    The Conspirators had bilateral discussions with each other during price

11   negotiations with customers to avoid being persuaded by customers to cut prices.  These

12   discussions, usually between sales and marketing employees, took the form of in-person

13   meetings, telephone calls, e-mails, and instant messages.  The information gained in these

14   communications was then shared with supervisors and taken into account in determining the

15   price to be offered.

16          127.    Bilateral discussions were also used to synchronize prices with manufacturers

17   that did not ordinarily attend the group meetings.  For example, HannStar was responsible for

18   notifying Hitachi of the pricing agreements reached at the crystal meetings.  Hitachi

19   implemented the agreed-upon pricing as conveyed by HannStar.  Therefore, Hitachi

20   participated in the Conspiracy to fix the prices of LCD Products.

21                   **iii.    Defendants' and Co-Conspirators' Participation in Group and
22                             Bilateral Discussions**

23          128.    Defendant AUO participated in multiple CEO, commercial, and lower-level

24   meetings, as well as bilateral discussions, between at least 2001 and 2006.  Additionally, QDI

25   and Unipac, which merged with AUO, participated in lower-level meetings.  Through these

26   discussions, AUO agreed on prices and supply levels for LCD Products.

27

28

129.    Defendant Chi Mei participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chi Mei agreed on prices and supply levels for LCD Products.

130.    Defendant Chunghwa participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chunghwa agreed on prices and supply levels for LCD Products.

131.    Defendant HannStar participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, HannStar agreed on prices and supply levels for LCD Products.

132.    Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and supply levels for LCD Products.

133.    Defendant LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, LG Display agreed on prices and supply levels for LCD Products.

134.    Mitsui participated in multiple bilateral meetings during the Relevant Period with LG, Samsung, Toshiba, Chunghwa, AU Optronics, Hitachi and others, and agreed on prices and supply levels for LCD Products.  Mitsui attended at least one bilateral meeting with Defendant Chunghwa during 2001, and multiple bilateral meetings with Defendant Samsung in the U.S. at which similar subjects were discussed.  At these and other meetings, Mitsui acted as an agent of Sanyo Consumer and reached agreements with other competitors about prices for LCD Products sold in the United States and elsewhere.

135.    Deposition testimony and documents confirm that Mitsui participated in the Conspiracy during the Relevant Period including meetings and communications with co-conspirators and competitors to discuss and agree on prices for LCD Products, and that Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. participated in the Conspiracy in a coordinated manner.

136.    Defendant NEC joined the Conspiracy by participating in multi-lateral meetings and bilateral meetings and discussions with, among others, Samsung, Toshiba, Hitachi, Sharp,

1    and LG to share information and reach agreement on prices for LCD Products beginning as

2    early as 1998.  In these discussions with its competitors and fellow Conspirators, NEC

3    exchanged price and supply information and also agreed on prices, price increases, and

4    production limits and quotas for LCD panels.

5            137.    Deposition testimony and documents confirm NEC's participation in the

6    conspiracy during the Relevant Period, including meetings and communications with co-

7    conspirators and competitors to discuss and agree on prices for LCD Products.  For example,

26           140.    Defendant Samsung participated in multiple CEO, commercial, and lower level

27   meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

28   discussions, Samsung agreed on prices and supply levels for LCD Products.

1

2

3

4

5

6          142.    Defendant Sanyo Consumer participated in at least one bilateral meeting through

7  an agent during the Relevant Period, and agreed on prices and supply levels for LCD Products.

8          143.    Defendant Sharp participated in multiple group and bilateral meetings during the

9  Relevant Period, and agreed on prices and supply levels for LCD Products.

10         144.    Defendant Toshiba participated in bilateral discussions during the Relevant

11  Period, and agreed on prices and supply levels for LCD Products.

12         145.    Toshiba personnel in its San Jose, California offices were involved in and

13  implemented defendants' conspiracy in the United States.

14

15

16

17

18

19

20         146.    Co-conspirator Hydis participated in multiple lower-level meetings between at

21  least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese co-

22  conspirator at least as recently as 2005.  Through these discussions, Hydis agreed on prices and

23  supply levels for LCD Products.

24         147.    Co-conspirator Mitsubishi participated in multiple lower-level meetings in 2001

25  with Chi Mei, Chunghwa, Samsung, and Unipac (later AUO).  Through these meetings,

26  Mitsubishi agreed on prices and supply levels for LCD Products.

27

28

148.     Co-conspirator Panasonic participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

149.     Co-conspirator Philips participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

150.     Co-conspirator Sanyo participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

151.     Co-conspirator Seiko Epson participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

152.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the Conspiracy, it is to be understood that the Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by its agents and a party to the agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate families distributed LCD Products to direct purchasers, these subsidiaries played a significant role in the Conspiracy because Defendants and their co-conspirators wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, all entities within the corporate families were active, knowing participants in the Conspiracy.

1        153.    Defendant Epson America is a wholly-owned and controlled subsidiary of

2    Defendant Epson Japan and, as alleged above, Epson Japan was represented by Defendant

3    Mitsui at one of the bilateral meetings described above.  Mitsui served as an agent of, and

4    under the direction of, Epson Japan and Epson America.  Epson Japan and Epson America,

5    through their agent, were parties to the agreements made at those meetings and acted as co-

6    conspirators.  In addition, to the extent Epson America distributed LCD Products, it played a

7    significant role in the Conspiracy because the Conspirators wished to ensure that the prices for

8    such products paid by direct purchasers did not undercut the pricing agreements reached at

9    these various meetings.  Epson America was an active, knowing participant in the alleged

10    Conspiracy.

11        154.    Defendant Toshiba Matsushita is a joint venture between Toshiba Corporation

12    and Panasonic Corporation, and one or more of the partners in this joint venture participated in

13    the meetings described above.  As a result, Toshiba Matsushita was represented at those

14    meetings by its agents and was a party to the agreements entered into by its joint venture

15    partners at them.  As explained above, the agreements at these meetings included agreements

16    on price ranges and output restrictions. The joint venture partners controlled Toshiba

17    Matsushita's production levels and the prices of LCD Products the joint ventures sold both to

18    the joint venture partners and other non-affiliated companies. Thus, this Defendant was an

19    active, knowing participant in the alleged Conspiracy.

20        155.    Co-conspirator IPS Alpha is a joint venture among Hitachi Displays, Ltd.,

21    Toshiba Corporation, and Panasonic Corporation, and one or more of the partners in this joint

22    venture participated in the meetings described above.  As a result, IPS Alpha was represented at

23    those meetings and was a party to the agreements entered into by its joint venture partners at

24    them.  As explained above, the agreements at these meetings included agreements on price

25    ranges and output restrictions. The joint venture partners had substantial control over IPS

26    Alpha's production levels and the prices of LCD Products the joint ventures sold both to the

27    joint venture partners and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were

28    active, knowing participants in the alleged Conspiracy.

1

**E.**     **International Government Antitrust Investigations**

2      156.    The Conspiracy to artificially restrict the output of, and to raise the prices for,

3   LCD Products sold in the United States during the Relevant Period, was shown by

4   multinational investigations commenced by the DOJ.

5      157.    In December of 2006, government authorities in Japan, Korea, the European

6   Union, and the United States revealed the existence of a comprehensive investigation into anti-

7   competitive activity among LCD panel manufacturers.  In a December 11, 2006 filing with the

8   Securities and Exchange Commission, Defendant LG Display disclosed that officials from the

9   Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the

10   company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose

11   office.

12      158.    On December 12, 2006, news reports indicated that in addition to LG Display,

13   LCD panel makers Samsung, Sharp, Epson, and AUO were also under investigation. The JFTC

14   stated that the probe was related to price-fixing.  On that same date, the European Commission

15   confirmed publicly that it as well was investigating the possibility of a cartel agreement and

16   price-fixing among manufacturers of LCD Products.

17      159.    On November 12, 2008, the DOJ announced that it had reached agreements with

18   three LCD panel manufacturers – LG Display Co., Ltd. (and its U.S. subsidiary, LG Display

19   America, Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – in which they would

20   plead guilty and pay a total of $585 million in criminal fines for their roles in a conspiracy to

21   fix prices of LCD panels.

22      160.    LG Display Co., Ltd. and LG Display America, Inc. agreed to plead guilty and

23   pay a $400 million fine for their participation in a conspiracy to fix prices of LCD panels.

24      161.    LG Display Co., Ltd. and LG Display America, Inc. admitted that from

25   September 21, 2001 to June 1, 2006, they participated in a conspiracy with other major LCD

26   panel producers, the primary purpose of which was to fix the price of LCD panels sold in the

27   United States and elsewhere.  They admitted that in furtherance of the conspiracy they, through

28   their officers and employees, engaged in discussions and attended meetings, including group

1   meetings commonly referred to by the participants as "crystal meetings," with representatives

2   of other major LCD panel producers.  During these discussions and meetings, agreements were

3   reached to fix the price of LCD panels to be sold in the United States and elsewhere.

4          162.    Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million fine

5   for its participation in a conspiracy to fix prices of LCD panels.

6          163.    Chunghwa Picture Tubes, Ltd. admitted that from September 14, 2001 to

7   December 1, 2006, it participated in a conspiracy with other major LCD panel producers, the

8   primary purpose of which was to fix the price of LCD panels sold in the United States and

9   elsewhere.  Chunghwa admitted that in furtherance of the conspiracy it, through its officers and

10  employees, engaged in discussions and attended meetings, including group meetings commonly

11  referred to by the participants as "crystal meetings," with representatives of other major LCD

12  panel producers.  During these discussions and meetings, agreements were reached to fix the

13  price of LCD panels to be sold in the United States and elsewhere.

14         164.    Sharp Corporation agreed to plead guilty and pay a $120 million fine for its

15  participation in a conspiracy to fix prices of LCD panels.

16         165.    Sharp Corporation admitted that:

17                 a.      from April 1, 2001 to December 1, 2006, it conspired with other major

18                         LCD panel producers to fix the price of LCD panels sold to Dell, Inc. for

19                         use in computer monitors and laptops;

20                 b.      from fall 2005 to the middle of 2006, it conspired with other major LCD

21                         panel producers to fix the price of LCD panels sold to Motorola, Inc. for

22                         use in Razr mobile phones; and

23                 c.      from September 1, 2005 to December 1, 2006, it conspired with other

24                         major LCD panel producers to fix the price of LCD panels sold to Apple

25                         Computer, Inc. for use in iPod portable music players.

26         Sharp admitted that in furtherance of the conspiracy it, through its officers and

27  employees, engaged in bilateral telephone discussions and attended bilateral meetings with

28

1   other major LCD panel producers.  During these discussions and meetings, agreements were

2   reached to fix the price of LCD panels.

3          166.    In May 2009, the DOJ announced that it had reached an agreement with Hitachi

4   Displays, Ltd. in which it would plead guilty and pay $31 million in criminal fines for its role

5   in a conspiracy to fix prices of LCD panels.

6          167.    Hitachi Displays, Ltd. admitted that from April 1, 2001 to March 31, 2004, it

7   conspired with other major LCD panel producers to fix the prices of LCD panels sold to Dell

8   for use in notebook computers.  Hitachi admitted that in furtherance of the conspiracy it,

9   through its officers and employees, engaged in telephone discussions and attended bilateral

10   meetings with other major LCD panel producers.  During these discussions and meetings,

11   agreements were reached to fix the price of these LCD panels sold to Dell.

12          168.    In August 2009, the DOJ reached an agreement with Epson Imaging Devices

13   Corporation in which it would plead guilty and pay a $26 million fine for its role in a

14   conspiracy to fix prices of LCD panels.

15          169.    Epson Imaging Devices Corporation admitted that from the fall of 2005 to the

16   middle of 2006, it conspired with other major LCD producers to fix the price of LCD panels

17   sold to Motorola, Inc. for use in Razr mobile phones.  Epson admitted that in furtherance of the

18   conspiracy it, through its officers and employees, engaged in bilateral telephone discussions

19   and attended bilateral meetings in Japan with representatives of other major LCD producers.

20   During these discussions and meetings, agreements were reached to fix the price of LCD panels

21   sold to Motorola.

22          170.    In December 2009, the DOJ reached an agreement with Chi Mei Optoelectronics

23   Corporation in which it would plead guilty and pay a $220 million fine for its role in a

24   conspiracy to fix prices of LCD panels.

25          171.    Chi Mei Optoelectronics Corporation admitted that from September 14, 2001 to

26   December 1, 2006, it conspired with other major LCD producers to fix the prices of LCD panels.

27   Chi Mei admitted that in furtherance of the conspiracy it, through its officers and employees,

28   engaged in discussions and attended meetings, including group meetings referred to by some of

1   the participants as "crystal meetings," with representatives of other major LCD producers.

2   During these discussions and meetings, agreements were reached to fix the price of certain

3   LCD panels to be sold in the United States and elsewhere.

4          172.   In June 2010, the DOJ reached an agreement with HannStar Display

5   Corporation in which it would plead guilty and pay a $30 million fine for its role in a

6   conspiracy to fix prices of LCD panels.

7          173.   HannStar Display Corporation admitted that from September 2001 to January

8   2006, it conspired with other major LCD panel producers to fix prices of LCD panels.

9   HannStar admitted that in furtherance of the conspiracy it, through its officers and employees,

10  engaged in discussions and attended meetings, including group meetings referred to by some of

11  the participants as "crystal meetings," with representatives of other major LCD panel

12  producers.  During these discussions and meetings, agreements were reached to fix prices of

13  LCD panels to be sold in the United States and elsewhere.

14         174.   Since January 15, 2009, the DOJ has announced ten additional agreements with

15  executives of LG Display Co. Ltd., Chunghwa Picture Tubes Ltd., Chi Mei Optoelectronics

16  Corporation, and HannStar Display Corporation who all agreed to plead guilty and serve jail

17  time in the United States for participating in the conspiracy.  The ten individuals are Chang Suk

18  "C.S." Chung and Bock Kwon (both with LG Display), Chieng-Hon "Frank" Lin, Chin-Chun

19  "C.C." Liu and Hsueh-Lung "Brian" Lee (all with Chunghwa), Chu-Hsiang "James" Yang,

20  Jau-Yang "J.Y." Ho, Wen-Hung "Amigo" Huang, and Chen-Lung Kuo (all with Chi Mei), and

21  Jui Hung "Sam" Wu of HannStar.  All ten of these individuals have now pleaded guilty and

22  been sentenced, and at their sentencing hearings, confirmed the allegations against them that

23  they participated in the global conspiracy to fix the prices of LCD panels.

24         175.   The above guilty pleas demonstrate that the Conspiracy included small LCD

25  panels for mobile wireless headsets and other mobile device applications.  For example, the

26  plea agreements of Defendants Chunghwa, Chi Mei, HannStar, and LG Display state that

27  "TFT-LCD are manufactured in a broad range of sizes and specifications for use in televisions,

28  notebook computers, desktop monitors, mobile devices and other applications."  In addition,

1   Defendants Sharp and Epson pled to reaching agreements "to fix the price of TFT-LCD sold to

2   Motorola for use in Razr mobile phones."

3       176.   These guilty pleas also demonstrate that the investigations into the LCD industry

4   are not mere information-gathering efforts by regulatory authorities.  In fact, as the DOJ's

5   representative has stated, the DOJ's investigation into the LCD industry is premised in part on

6   insider information that presents a detailed "road map" of the Conspiracy.

7       177.   The guilty plea by Sharp has significant ramifications for Toshiba.  Toshiba was

8   one of Sharp's principal competitors in the sale of LCD panels to Dell and Apple during the

9   periods set forth in the DOJ's information against Sharp.  Toshiba sold LCD panels to Dell

10  between 2000 and 2006, and it sold LCD panels for use in Apple's iPod music players between

11  2001 and 2006. In fact, Toshiba was one of Apple's largest, if not the largest, suppliers of iPod

12  screens for a substantial part of the Relevant Period.  In the small-to-medium size LCD display

13  market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in

14  the first half of 2005, holding a 15.4 percent market share during the first quarter and a 14.1

15  percent market share during the second quarter.  Toshiba's high percentage of LCD revenues

16  dictated that no conspiracy would be effective without its participation.  Sharp could not have

17  successfully fixed the prices of the LCD panels it sold to Dell and Apple unless Toshiba, one of

18  its biggest competitors, agreed not to undersell it.

19      178.   In addition, on or about June 10, 2010, the DOJ indicted Defendants AU

20  Optronics Corporation and AU Optronics Corporation America for participating in a

21  conspiracy to suppress and eliminate competition by fixing the prices of LCD panels in

22  violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, from September 2001 through

23  December 2006.

24      179.   According to the DOJ, its investigation is still ongoing.

25      **F.**   **Market During the Conspiracy**

26      180.   After initial introduction into a market, consumer electronics products and their

27  component parts are typically characterized by downward pricing trends.  Since at least 1996,

28  however, the LCD Products market has been characterized by unnatural and sustained price

1    stability, as well as certain periods of substantial increases in prices.  Defendants achieved price

2    stability and price increases by agreeing to fix and maintain prices and to restrict supply

3    through decreases in capacity utilization and restraint in new plant investment.

4    　　　181.   As described herein, Defendants' LCD cartel evolved over time.  Defendants

5    initiated their cartel when LCD Products were in their relative infancy.  At that time,

6    Defendants balanced the desire to set prices collusively with the industry goal of establishing

7    their products in the marketplace.  As the cartel matured, new entrants were co-opted, and

8    production costs declined.  At the same time, the Conspirators learned how they could best

9    mitigate the crystal cycle by agreeing on prices and output.

10   　　　**i.**　　**1996 – 1999**

11   　　　182.   By early 1996, analysts were lamenting the excess supply and drastic price cuts

12   in the LCD panel markets.  The downward pressure on prices, which had already fallen 40 to

13   50 percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this,

14   LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity.  In

15   reality, Defendants were fixing the prices and limiting supply.

16   　　　183.   During this period, the Japanese companies herein began to partner with

17   Taiwanese companies to trade technology and collaborate on supply.  Japanese engineers were

18   lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  This mutually beneficial

19   relationship between purported competitors continued into at least 1999.

20   　　　184.   A few months into 1996, there was a reversal in the downward trend in LCD

21   panel prices and an alleged inability of manufacturers to supply enough LCD panels to meet

22   demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display

23   purchasers are riding a roller coaster of pricing in the display market, with no clear

24   predictability anytime soon …. Perplexed purchasers trying to keep up with the gyrating market

25   can take solace that even vendors are constantly being surprised by the sudden twists and

26   turns."

27   　　　185.   By mid-1996, industry analysts were commenting on an unusual rise in LCD

28   panel prices that was noted to be "quite rare in the electronics industry."

186.    The "rare" increase in LCD panel prices was due to the agreements reached by the Japanese companies to increase prices.  These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

187.    By 1998, the LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies.  A March 30, 1998 article in *Electronic News* reported that Hyundai's production lines were running at only 20 to 50 percent of capacity.  The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage …. You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden."

188.    During this period, Samsung made a concerted effort to get other manufacturers in the industry to limit production.  Yoon-Woo Lee, President and CEO of the Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at the Eighteenth International Display Research Conference (known as Asia Display 98).  Mr. Lee said:

> In order to maintain the tradition of top CRT manufacturer, we need to capture the high end market [and] deviate from the volume production of CRTs and LCDs.
> Taiwan is trying to enter LCD business because it has the advantage of the large PC production.  To survive in the rapidly changing environment, we have to revise our previous strategies and redirect our business plans.  It is time for fundamental shift for future decisions, time for transformation from volume driven to cost driven, time for driving value added strategies.
> *If we prepare now by shifting from the traditional business approach, to value added new approach, we may be able to deviate from repeating the "crystal cycle" again.*

[Emphasis added].

189.    Samsung's effort to limit production, capacity restraints, and the price-fixing agreement caused decreases in prices of LCD panels to slow and stop in late 1998.

190.    The efforts commenced by Samsung in 1998 continued to bear fruit.  In 1999, LCD panel prices surged due to a claimed "massive undersupply."  This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

191.    Significantly, Bock Kwon, Vice President of LG Display's Sales Division and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the following in the same trade publication:

> LG LCD will raise prices across its entire LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize some time in the second half.  According to Samsung, demand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate.  This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said.  The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

192.    Also, in 1999, the three major LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai.  The year 1999 also saw an additional merger when LG Electronics, Inc. and Philips created Defendant LG Display.

**ii.    2000 – 2004**

193.    By January of 2000, prices for LCD panels were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and ADT (later part of AUO).  Taiwanese Defendants began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other Conspirators to gain immediate market share.  But by 2000-2001, the Taiwanese Defendants had increased their market share to the point that it made sense to participate in the Conspiracy, and they then moderated the volume of their production.

194.    Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese LCD panel production and to locate manufacturing facilities in Taiwan.

195.     Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Published data for 2001 showed that several Defendants were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and QDI (which later merged with AUO) had a 52 percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply.  Again, the Conspirators reacted to the price trough by conspiring to fix prices and limit supply.  This Conspiracy was reached in part at the bilateral and group meetings described above.

196.     The rise in prices made no economic sense at this point in time and was the product of Defendants' setting the price of LCD panels and limiting supply by agreement.  First, the Conspirators were bringing new plants on line that used larger motherglass, which was more cost effective.  Second, as reported by an industry source, the variable cost of producing LCD panels was declining during the latter part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic sense for the Conspirators not to utilize their full capacity other than agreement by them not to do so.

197.     Prices continued to rise from the second half of 2001 through the second half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion.  In reality, the price increases were the result of what the Conspirators agreed to in the crystal meetings and bilateral discussions described above.

198.     By the second half of 2002, the cartel's success at propping up LCD panel prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall.  Such downward price trends are not inconsistent with a monopoly or cartel.

199.     During five consecutive quarters in 2003 and 2004, LCD panel prices rose significantly.  AUO reported that the price for certain of its LCD panels increased 28 percent

1    between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG reported

2    that its pricing increased by 21 percent over the same period.

3          200.    These soaring prices resulted in similar increases in the profits reaped by the

4    LCD Product manufacturers.  For example, the eight largest LCD panel manufacturers reported

5    a collective profit increase of 740 percent between the second quarter of 2003 and the second

6    quarter of 2004.  These record profits resulted from the Conspirators' collective action to fix,

7    raise, maintain, or stabilize the prices of LCD panels.  Again, the sharing of information about

8    price and production, the under-utilization of capacity, and restraints on output drove up the

9    prices of LCD panels.

10         201.    Around this time, industry analysts suggested that there were too many

11   competitors in the LCD panel marketplace.  Some industry participants went as far as overtly

12   suggesting that the industry should seek to curtail supply though mergers.  These suggestions

13   were carried out in furtherance of the Conspiracy.  Significant consolidation and collaboration

14   among competitors in the LCD panel market occurred.

15         202.    As noted above, Toshiba Corporation and Panasonic Corporation merged their

16   LCD panel operations in furtherance of the Conspiracy.  The joint venture announced plans to

17   solicit investment from other companies involved in the production of LCD panels, including

18   device manufacturers and material suppliers.  NEC formed an alliance with Casio in

19   furtherance of the Conspiracy.  In addition, Taiwanese LCD manufacturers agreed to supply

20   Panasonic with LCD panels for use in televisions in furtherance of the Conspiracy.

21         203.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's

22   IDT, a former subsidiary of IBM, and AUO purchased a 20 percent stake in Japan's Fujitsu

23   Display Technology all in furtherance of the Conspiracy.

24         204.    Despite the increased efficiency and costs savings of fifth generation fabs, the

25   industry experienced higher prices in 2003, purportedly because of a shortage of the most

26   popular sizes of LCD panels.  In order to keep prices artificially high, Conspirators chose not to

27   operate at full capacity, nor to take advantage of lower variable costs.

28

### iii.    2004 – 2006

205.    Pursuant to the Conspiracy to fix and stabilize LCD panel prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, LCD panel prices increased for five consecutive quarters.  Various types of crystal meetings in furtherance of the Conspiracy were ongoing during this period.

206.    The cartel's success at raising LCD panel prices slowly dampened demand.  In response, the cartel allowed LCD panel prices to once again level off and begin to decline in the second half of 2004.  During this period of time, the market for LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

207.    Consolidation and collaboration among and between competitors in furtherance of the Conspiracy continued as Samsung and Sony launched their joint venture, named S-LCD Corp.

208.    Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the LCD panel industry was not facing oversupply, but rather was reaping the benefits of an LCD panel shortage and stable, or increasing, panel prices.

209.    These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

210.    A temporary oversupply of LCD panels occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, the Conspirators fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Dr. Hui Hsiung of AUO stated publicly that his company was reducing production of the LCD panels in order to avoid further price erosion.  He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers.  A June 13, 2006 article in *InfoWorld* noted that as a result of Dr. Hsiung's statements, "[t]he chatter is growing louder each day."

211.    Chi Mei was not the only one to follow AUO's invitation to restrict the output and increase the prices of LCD panels.  In May of 2006, in discussions between executives of the two companies, AUO, in furtherance of the Conspiracy, convinced QDI, a company that it acquired in October of 2006, to reduce production of LCD panels.  By June of 2006, LG also announced plans to cut production of LCD panels.

212.    By the summer of 2006, the Conspiracy continued through bilateral meetings as alleged above.

213.    Despite the fact that certain of the Conspirators may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the Conspiracy continued at least through the end of that year.  This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

**G.      Defendants' and their Co-Conspirators' Price-Fixing Conspiracy Included Small LCD Panels**

214.    As part of the larger Conspiracy to raise the price of LCD panels, Defendants engaged in bilateral communications specifically regarding prices for small LCD panels of various types used in mobile wireless handsets and other mobile device applications, including TFT and non-TFT technology.  These discussions took place between sales and marketing employees in the form of in-person meetings, telephone calls, emails, and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to Defendants' customers.

215.    Moreover, because all types of LCD panels were interchangeable for use in certain mobile wireless handsets and other handheld devices, and the Conspirators' customers were in competition with each other, communications among and between the Conspirators intended to raise and/or stabilize prices of small LCD panels of any specific type or for sale to any specific customer had the effect of raising and/or stabilizing prices of small LCD panels of all types and for all applications.

216. Representatives of AUO, Chi Mei, Epson, LG, Samsung, Sharp, Toshiba, and other LCD panel manufacturers engaged in these bilateral communications with the goal of reaching understandings regarding prices for small LCD panels. As part of these communications, they discussed prices, quantities, and profits on small LCD panels and agreed to fix the prices of small LCD panels. These communications began at least as early as 2001 and continued throughout the Relevant Period.

[redacted]





[redacted]

[redacted]

224. Epson employees responsible for selling CSTN-LCD panels to Motorola also engaged in bilateral discussions with "top management" employees at Sharp. [redacted]



[redacted]

231. In some instances, Defendants quoted mobile wireless handset vendors a single price for a LCD module that included both a TFT-LCD panel and an STN-LCD panel. For example, Defendants quoted Motorola a single price for LCD modules used in the Razr phone, which modules included both a TFT-LCD panel and a CSTN-LCD panel. Defendants Sharp

1    and Epson have admitted fixing prices for TFT-LCD panels sold to Motorola for the Razr

2    phone. Because Sharp and Epson quoted prices to Motorola for the entire Razr module, their

3    admitted agreements to fix prices for Motorola included an agreement to fix the price of the

4    CSTN-LCD panels included in the Razr module.

5         232.    In other instances, Defendants quoted some mobile wireless handset vendors a

6    single price for a LCD module that included both a TFT-LCD panel and a MSTN-LCD panel.

7    For example, in 2003, SonyEricsson manufactured a phone that contained a TFT-LCD panel in

8    the primary display and a MSTN-LCD panel in the subdisplay, and sought a single price

9    quotation for both the TFT-LCD panel and the MSTN-LCD panel from Defendants. Thus,

10   Defendants' agreement to fix the price of TFT-LCD panels included an agreement to fix the

11   price of MSTN-LCD panels sold in the combined TFT-LCD panel/MSTN-LCD panel modules

12   sold for mobile wireless handset applications.

13

14

15

16

17        234.    Thus, because a number of mobile wireless handsets, including the Motorola

18   Razr phone, included both TFT-LCD panels and STN-LCD panels, and because mobile

19   wireless handset manufacturers often requested a single price for LCD modules that included

20   both types of panels, Defendants' bilateral discussions and agreements with respect to TFT-

21   LCD panel prices inevitably included and/or affected the prices of STN-LCD panels in those

22   modules.

23        **H.    The Role of Trade Associations During the Relevant Period**

24        235.    The LCD industry is served by several major trade organizations that put on

25   industry-wide meetings several times a year. These meetings have facilitated collusion, and the

26   trade associations have themselves functioned as a means for the Conspirators to cooperate and

27   discuss prices.

28

236. One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AUO, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT-LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the Conspiracy was effectuated and implemented.

237. South Korean manufacturers, including LG and Samsung, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

238. Japanese manufacturers of LCD panels have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCD panels. Its members include Sharp, Toshiba, NEC, Hitachi, and a Japanese subsidiary of Samsung. Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the Conspiracy was effectuated and implemented.

239. In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium, but was

1   renamed the "SID International Symposium and Business Conference."  SID also puts on a

2   long-running conference called the International Display Research Conference ("IRDC").

3       240.    The 2004 SID International Symposium and Business Conference ("SID 2004")

4   featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and

5   CEO of AUO. This was followed shortly by a presentation entitled "The FPD Capital

6   Equipment Investment Environment," which informed the attendees about "investments

7   planned at the major display manufacturers." A representative of DisplaySearch also spoke

8   about the LCD market. There were presentations by analysts from iSuppli/Stanford Resources,

9   and other industry experts. This was all followed by a "networking reception – sponsored by

10  LG.Philips LCD," to which all conference attendees were invited to participate.

11      241.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AUO.

12  This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch representative

13  provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . .

14  and the cost and margin outlook for key FPDs will be projected."  Again, these discussions

15  about the market were followed by a "networking reception." Among the attendees at SID 2004

16  were Bruce Berkoff of LG, Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AUO,

17  Larry Weber of Panasonic, and Joel Pollack of Sharp. Senior executives from Sharp and

18  Hitachi also attended.

19      242.    The SID 2005 conference was very similar to SID 2004 but was even more

20  blatant in its discussion of the crystal cycle. Jun Souk, Executive Vice President of Samsung,

21  gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows:

22  "By reviewing what happened during the business up and down cycles of the LCD in the past,

23  we have learned lessons that will reduce the burden in future cycles. Efforts made in cost

24  reduction line-investment timing, and new market generation will be described."

25      243.    SID 2005 provided a prime opportunity for one of the dominant manufacturers

26  to explain to all of its key competitors how to manage supply and maximize "line-investment

27  timing."  Among the attendees at SID 2005 were Bruce Berkoff of LG and Sang Wan Lee, Jun

28

Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding developments in LCD technology by officials from AUO, Sharp, LG, Samsung, and Hitachi.

244.     The Conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa, Japan.

245.     Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the Conspirators. Or, as Dr. Hsiung of AUO has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

246.     Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Panasonic, and Dr. Hsiung of AUO.

247.     As indicated by the public pronouncements, these trade association meetings facilitated the Conspiracy by giving the Conspirators further opportunities to discuss prices and output.

## VIII.     PLAINTIFF'S INJURIES

248.     Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a purchaser of LCD Products as a result of the Conspiracy to raise, fix, stabilize, or maintain the price of LCD panels at supra-competitive levels.  The Conspiracy artificially inflated the prices of LCD panels incorporated into such LCD Products, causing Plaintiff to pay higher prices than it would have in the absence of the Conspiracy.

249.     In some cases, Plaintiff purchased LCD Products directly from the Defendants and their co-conspirators at prices that were artificially inflated as a result of the Conspiracy. In other cases, Plaintiff purchased LCD Products from OEMs, as well as other suppliers, which contained LCD panels that had been purchased from Defendants and their co-conspirators.  The

1    Conspiracy artificially inflated the price of LCD panels purchased by these OEMs and others,

2    which paid higher prices for LCD panels than they would have absent the Conspiracy.

3         250.    The OEMs and other suppliers passed on to their customers, including Plaintiff,

4    the overcharges caused by the Conspiracy.  Plaintiff was not able to pass on to its customers the

5    overcharges caused by the Conspiracy.  Thus, Plaintiff suffered injury when it purchased LCD

6    Products from the OEMs and other suppliers.

7         251.    Once an LCD panel leaves its place of manufacture, it remains essentially

8    unchanged as it moves through the distribution system.  LCD panels are identifiable, discrete

9    physical objects that do not change form or become an indistinguishable part of an LCD

10   Product.  Thus, LCD panels follow a physical chain from the Conspirators through

11   manufacturers of LCD Products sold to Plaintiff.

12        252.    The market for LCD panels and the market for LCD Products are inextricably

13   linked and cannot be considered separately.  In addition, the price of the LCD panel is a

14   material portion of the cost of the LCD Product.  The Conspirators are and have been well

15   aware of this intimate relationship.

16        253.    The LCD Product OEMs' demand for LCD panels was relatively inelastic,

17   because there were no reasonable substitutes for LCD panels to serve as visual displays.  Other

18   competing display technologies, such as OLED (Organic Light Emitting Diodes) displays, were

19   not available during the Relevant Period and are only today becoming widely available.  In

20   addition, throughout the Relevant Period, the Conspirators controlled the market for LCD

21   panels.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

22   LCD panels from the Conspirators and others at prices that were artificially inflated, fixed, and

23   stabilized by the Conspiracy.

24        254.    As a result, Plaintiff was injured in connection with its purchases of LCD

25   Products during the Relevant Period.

26   **IX.    FRAUDULENT CONCEALMENT & EQUITABLE TOLLING**

27        255.    Plaintiff had neither actual nor constructive knowledge of the facts supporting

28   its claims for relief despite diligence in trying to discover the pertinent facts.  Defendants

1   engaged in a secret Conspiracy that did not give rise to facts that would put Plaintiff on inquiry

2   notice that there was a conspiracy to fix the prices of LCD Products.

3        256.    The Conspirators agreed to keep the Conspiracy, the agreements reached, and

4   the meetings secret.  Participants were instructed to hide the existence of the meetings from

5   others within their own companies and to keep the meeting reports confidential.

6        257.    The Conspirators knew their activities were illegal.



17       258.    Therefore, the Defendants and their co-conspirators kept their conspiracy

18  communications strictly confidential.



23       259.    The Conspirators took other steps to conceal the Conspiracy.  In some instances,

24  the location of a meeting was circulated only the day before in an effort to avoid detection.  In

25  addition, the Conspirators frequently used telephone calls, rather than emails or letters, to

26  conceal the Conspiracy.

27       260.    By its very nature, Defendants' and their co-conspirators' price-fixing

28  conspiracy was inherently self-concealing.  As alleged above, Defendants and their co-

1   conspirators had secret discussions about price and output.  Defendants agreed not to publicly

2   discuss the existence of the nature of their agreement.  During these meetings, top executives

3   and other officials attending these meetings were instructed on more than once occasion not to

4   disclose the fact of these meetings to outsiders, or even to other employees of Defendants not

5   involved in LCD panel pricing or production.  In fact, the top executives who attended

6   conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid

7   being seen in public with each other and with the express purpose and effect of keeping them

8   secret.

9          261.    Furthermore, the participants agreed on what pretexts they would cite when

10   questioned about rising prices. The participants also agreed to lie to the media and report that

11   their fabs were operating at full capacity even when they were not, in order to create the

12   appearance of a supply shortage.

13          262.    The Conspirators have used a variety of other purportedly market-based

14   explanations for price increases in order to conceal the Conspiracy.  In 1999, Joel Pollack, a

15   marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-

16   capitalization:

17               Prices have dropped at a steady rate over the past couple of years to the point
                 where it was difficult to continue the necessary level of capitalization. The [low
18               prices] have starved the industry.

19          263.    Also, in early 1999, Omid Milani, a marketing manager for NEC, stated that

20   "demand by far is outstripping our supply capability" and predicted that "prices will continue to

21   increase until a reasonable balance is achieved."

22          264.    Also in 1999, Bock Kwon, Vice President of LG's Sales Division, and Yoon-

23   Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price

24   increases resulted from "acute" shortages.

25          265.    On February 4, 2001, Bruce Berkoff, Executive Vice President at LG, was

26   quoted by News.com as saying that price increases were due to shortages. He claimed,

27   "demand grew so fast that the supply can't keep up."

28

266.    In the latter half of 2001, Duk Mo Koo, an executive at LG, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

267.    Jen-Ting Hsu, a Vice President at Chi Mei, and H.B. Chen, President of AUO, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic News* in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

268.    In a presentation shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "*LCDs*: Profitability recovered faster than originally expected."

269.    These explanations were pretextual and served to cover up the Conspiracy. Later price increases were explained by industry leaders as derived from new demand for LCD televisions. In 2005, Duk Mo Koo of LG stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

270.    As a result of Defendants' fraudulent concealment of the Conspiracy, the running of any statute of limitations has been equitably tolled with respect to any of Plaintiff's claims arising from the anticompetitive conduct alleged in this Complaint.

271.    Also as a result of Defendants' fraudulent concealment of the Conspiracy, Defendants are equitably estopped from asserting statutes of limitations defense, and principles of equitable estoppel toll the statutes of limitations relevant to Plaintiff's claims.

272.    The statutes of limitations relevant to Plaintiff's claims for both its direct and indirect purchases of price-fixed LCD Products have also been tolled as a result of the criminal informations and guilty pleas entered as a result of the DOJ criminal investigation.

273.    The Defendants' ongoing conspiracy and unlawful conduct constitute a continuing tort, and therefore the statute of limitations cannot accrue until the last act of Defendants' violative conduct.

## X.      TOLLING

274.      The statutes of limitations relevant to Plaintiff's claims for both its direct and indirect purchases of price-fixed LCD Products have also been tolled under the tolling doctrine set forth in the decision of *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*"), as a result of the filing of class actions concerning the LCD Conspiracy against Defendants and their co-conspirators.

275.      Specifically, the statute of limitations governing Plaintiff's claim under Massachusetts General Laws Chapter 93A, §§ 2, *et seq.* was tolled under *American Pipe* by each of the indirect-purchaser class action complaints (the "indirect class action complaints") filed in 2006 and 2007 that defined their respective putative classes in such a way as to include Plaintiff, including but not limited to:  *Bates v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-10948-NG, Dkt. No. 1, ¶ 100 (D. Mass. May 18, 2007) (alleging service of demand letter under M.G.L. c. 93A § 9(3) in February 2007, which letter also tolled the statute of limitations until the complaint was filed); and *Giusti v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-11025-NMG, Dkt. No. 2 (D. Mass. May 31, 2007).  The indirect class action complaints tolled the statute of limitations governing Plaintiff's claim under Massachusetts General Laws Chapter 93A, §§ 2, *et seq.* until these cases were administratively closed in November 2009.

276.      Each of the plaintiffs named in each of the indirect class action complaints had standing to assert claims under Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*

277.      The plaintiffs in the cases captioned *Bates v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-10948-NG, and *Giusti v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-11025-NMG, alleged that they purchased LCD Products in Massachusetts.

278.      There has been no determination, by court ruling or otherwise, that any of the plaintiffs named in the indirect class action complaints lacked standing to assert claims under Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*

279.      None of the indirect class action complaints alleged any facts inconsistent with plaintiffs' purchase of LCD Products in Massachusetts.

1    280.    It was not apparent from the face of the indirect class action complaints that the

2    named plaintiffs lacked standing to sue.

3    281.    The tolling of the statute of limitations governing Plaintiff's claim under

4    Massachusetts General Laws Chapter 93A, §§ 2, *et seq.* was not ended by the filing of the

5    November 5, 2007 Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (MDL Dkt.

6    No. 367) ("IPP CAC").  Moreover, to the extent tolling had not commenced as a result of the

7    above-referenced actions, such tolling would have commenced with the filing of the IPP CAC.

8    282.    The IPP CAC asserted claims against Defendants under Massachusetts General

9    Laws Chapter 93A, §§ 2, *et seq.* with respect to Defendants' price-fixing of LCD Panels.

10    283.    In addition to a separate national class, the IPP CAC set forth 50 individual

11    "Indirect Purchaser State Classes," including a Massachusetts state class.

12    284.    The definition of the Massachusetts state class, as with every other state class

13    claim, in the IPP CAC expressly included *all* indirect purchasers, including Plaintiff, without

14    regard to whether they were end-users or resellers:

> **MASSACHUSETTS:** All persons and entities in Massachusetts who indirectly purchased LCD Panels manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Massachusetts Indirect Purchaser Class").

(IPP CAC ¶ 217(j).)

22    285.    Plaintiffs Michael Ayers and Christopher Murphy had standing to assert claims

23    under Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*

24    286.    There has been no determination by court ruling or otherwise that plaintiffs

25    Michael Ayers and Christopher Murphy lacked standing to assert claims under Massachusetts

26    General Laws Chapter 93A, §§ 2, *et seq.*

27    287.    It was not until December 5, 2008, that the Indirect Purchaser Plaintiffs

28    amended the IPP CAC to exclude resellers from their definition of the Massachusetts Indirect

1    Purchaser Class for the first time.  (*See* MDL Dkt. No. 746.)  Until that Second Consolidated

2    Amended Complaint was filed, the statute of limitations governing Plaintiff's claim under

3    Massachusetts General Laws Chapter 93A, §§ 2, *et seq.* was tolled under *American Pipe* by the

4    IPP CAC.

5         288.    The statute of limitations governing Plaintiff's claim under Massachusetts

6    General Laws Chapter 93A, §§ 2, *et seq.* was also tolled under *American Pipe* by each of the

7    indirect-purchaser class action complaints filed in 2006 and 2007 by residents of states other

8    than Massachusetts that defined their respective putative classes in such a way as to include

9    Plaintiff, including but not limited to:  *DiMatteo v. LG Philips LCD Co., Ltd., et al.*, Case No.

10   1:06-cv-15342-JGK, Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006); *Ferencsik v. LG Philips LCS Co.,*

11   *Ltd.*, *et al.*, Case No. 06-6714, Dkt. No. 1 (E.D.N.Y. Dec. 20, 2006); *Granich v. LG Philips*

12   *LCD Co., Ltd., et al.*, Case No. 2:07-cv-00296-RLH-PAL, Dkt. No. 1 (D. Nev. Feb. 16, 2007);

13   and *Jafarian v. LG Philips LCD Co., Ltd., et al.*, Case No. 3:07-cv-00994-SI, Dkt. No. 1 (N.D.

14   Cal. Feb. 16, 2007).

15        289.    It was not apparent from the face of these complaints that the named plaintiffs

16   lacked standing to assert claims under Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*

17        290.    There has been no determination, by court ruling or otherwise, that any of the

18   plaintiffs named in these complaints lacked standing to assert claims under Massachusetts

19   General Laws Chapter 93A, §§ 2, *et seq.*

20        291.    None of these complaints alleged any facts inconsistent with plaintiffs' purchase

21   of LCD Products in Massachusetts or that the plaintiffs had purchased LCD Products only in

22   the states of which they are residents.

23        292.    It was not apparent from the face of these complaints that the named plaintiffs

24   could not have amended their complaints to cure any defects in standing.

25        293.    The statute of limitations governing Plaintiff's claim under Massachusetts

26   General Laws Chapter 93A, §§ 2, *et seq.* was also tolled under the cross-jurisdictional tolling

27   doctrine by each of the direct purchaser class action complaints filed in 2006 and 2007 that

28   defined their respective putative classes in such a way as to include Plaintiff, including but not

1    limited to: the November 5, 2007 Direct Purchaser Plaintiffs' Consolidated Complaint (MDL

2    Dkt. No. 366); *Nathan Muchnick, Inc. v. Sharp Corporation et al.*; Case No. 06-6107 (E.D.N.J.

3    Dec. 19, 2006); and *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-

4    15417 (S.D.NY. Dec. 22, 2006).

5        294.    The statute of limitations governing Plaintiff's claim under the Sherman Act was

6    also tolled under *American Pipe* and the cross-jurisdictional tolling doctrine by the multiple

7    direct and indirect purchaser class action complaints filed in 2006 and 2007 that defined their

8    respective putative classes in such a way as to include Plaintiff, including but not limited to:

9    the November 5, 2007 Direct Purchaser Plaintiffs' Consolidated Complaint (MDL Dkt. No.

10   366); *Nathan Muchnick, Inc. v. Sharp Corporation et al.*; Case No. 06-6107 (E.D.N.J. Dec. 19,

11   2006); *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-15417

12   (S.D.NY. Dec. 22, 2006); *Bates v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-

13   10948-NG, Dkt. No. 1, ¶ 100 (D. Mass. May 18, 2007) (alleging service of demand letter under

14   M.G.L. c. 93A § 9(3), in February 2007, which letter also tolled the statute of limitations until

15   the complaint was filed); *DiMatteo v. LG Philips LCD Co., Ltd., et al.*, Case No. 1:06-cv-

16   15342-JGK, Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006); *Ferencsik v. LG Philips LCS Co., Ltd*., *et al*.,

17   Case No. 06-6714, Dkt. No. 1 (E.D.N.Y. Dec. 20, 2006); *Giusti v. AU Optoelectronics Co.,*

18   *Ltd., et al.*, Case No. 1:07-cv-11025-NMG, Dkt. No. 2 (D. Mass. May 31, 2007); *Granich v.*

19   *LG Philips LCD Co., Ltd., et al.*, Case No. 2:07-cv-00296-RLH-PAL, Dkt. No. 1 (D. Nev. Feb.

20   16, 2007); *Jafarian v. LG Philips LCD Co., Ltd., et al.*, Case No. 3:07-cv-00994-SI, Dkt. No. 1

21   (N.D. Cal. Feb. 16, 2007); and the IPP CAC.

22   **XI.    CLAIM FOR VIOLATIONS**

23                      **First Claim for Relief**
                **(Violation of Section 1 of the Sherman Act)**
24

25       295.    Plaintiff incorporates by reference all the above allegations as if fully set forth

26   herein.

27       296.    Beginning no later than January 1, 1996, the exact date being unknown to

28   Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

1    conspirators entered into a continuing contract, combination, or conspiracy to unreasonably

2    restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

3    artificially reducing or eliminating competition in the United States.

4         297.    In particular, Defendants and their co-conspirators combined and conspired to

5    raise, fix, maintain, or stabilize the prices of LCD Products sold in the United States.

6         298.    As a result of Defendants' unlawful conduct, prices for LCD Products were

7    raised, fixed, maintained, and stabilized in the United States.

8         299.    The contract, combination, or conspiracy among Defendants and their co-

9    conspirators consisted of a continuing agreement, understanding, and concerted action among

10   Defendants and their co-conspirators.

11        300.    For purposes of formulating and effectuating their contract, combination or

12   conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

13   conspired to do, including:

14              a.       participating in meetings and conversations to discuss the prices and

15                       supply of LCD Products;

16              b.       sharing the pricing and other discussions with other members of the LCD

17                       panel industry to further the Conspiracy;

18              c.       communicating in writing and orally to fix target prices, floor prices, and

19                       price ranges for LCD Products;

20              d.       agreeing to manipulate prices and supply of LCD Products sold in the

21                       United States in a manner that deprived direct purchasers of free and

22                       open competition;

23              e.       issuing price announcements and price quotations in accordance with the

24                       agreements reached;

25              f.       selling LCD Products to customers in the United States at

26                       noncompetitive prices;

27              g.       exchanging competitively sensitive information, including customer

28                       information, in order to facilitate their Conspiracy;

h.     agreeing to maintain or lower production capacity; and

i.     providing false statements to the public to explain increased prices for

LCD Products.

301.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business

and property in that it paid more for LCD Products than it otherwise would have paid in the

absence of Defendants' unlawful conduct.

<div align="center">

**Second Claim for Relief**
**(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)**

</div>

302.    Plaintiff incorporates and realleges, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

303.    On November 1, 2011, a written demand for relief was delivered to each

Defendant pursuant to the requirements of Mass. Gen. Laws ch. 93A, §9(3).  The demand

requirement applies only to a defendant who maintains a place of business and keeps assets in

Massachusetts.

304.    At least thirty (30) days has passed since the written demand for relief was

issued to each Defendant, and none of the Defendants has made a settlement offer in response

thereto.

305.    Beginning at a time presently unknown to Plaintiff, but at least as early as

January 1, 1996, and continuing thereafter at least up to and including December 11, 2006,

Defendants and their co-conspirators committed acts of unfair competition by engaging in a

conspiracy to fix and stabilize the price of LCD panels as described above in violation of Mass.

Gen. Laws ch. 93A, §§ 2, *et seq.*

306.    The aforesaid violations consisted, without limitation, of a continuing unlawful

trust and concert of action among Defendants and their co-conspirators, the substantial terms of

which were to fix, raise, maintain and stabilize the price of LCD panels.

307.    For the purpose of forming and effectuating the unlawful trust, Defendants and

their co-conspirators have done those things which they combined and conspired to do,

1    including, but in no way limited to, the actions, practices and course of conduct set forth above

2    and the following:

3            a.      to fix, raise, maintain and stabilize the price of LCD panels;

4            b.      to allocate the market for LCD panels amongst themselves;

5            c.      to submit rigged bids for the award and performance of certain LCD

6                    panels contracts; and

7            d.      to allocate among themselves the production of LCD panels.

8        308.    The combination and conspiracy alleged herein has had, *inter alia,* the following

9    effects:

10           a.      price competition in the sale of LCD panels has been restrained,

11                   suppressed, and/or eliminated in the states listed below;

12           b.      prices for LCD panels sold by Defendants, their co-conspirators, and

13                   others have been fixed, raised, maintained and stabilized at artificially

14                   high, non-competitive levels in the states listed below; and

15           c.      those who purchased LCD panels from Defendants, their co-

16                   conspirators and others and LCD Products containing price-fixed LCD

17                   Panels from Defendants, their co-conspirators and others have been

18                   deprived of the benefits of free and open competition.

19       309.    As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff

20   paid supra-competitive, artificially inflated prices for LCD Products it purchased during the

21   Relevant Period.

22       310.    By reason of the foregoing, Defendants and their co-conspirators have engaged

23   in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

24           a.      Defendants and their co-conspirators committed acts of unfair

25                   competition by engaging in a conspiracy to fix and stabilize the price of

26                   LCD Panels as described above;

27           b.      Defendants' and their co-conspirators' acts, omissions,

28                   misrepresentations, practices and non-disclosures, as described above,

constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.     Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f.     During the Relevant Period, Tweeter purchased LCD Products containing price-fixed LCD panels in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A § 2, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons

1   acting or claiming to act on their behalf, shall be permanently enjoined and restrained from

2   continuing and maintaining the combination, conspiracy, or agreement alleged herein;

3          D.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such

4   interest shall be awarded at the highest legal rate from and after the date of service of the initial

5   complaint in this action;

6          E.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees

7   as provided by law; and

8          F.      Plaintiff shall receive such other or further relief as may be just and proper.

9   **XIII.    JURY TRIAL DEMAND**

10         Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of

11  all the claims asserted in this Complaint so triable.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  March 16, 2012                    Respectfully Submitted,

2

3                                              _/s/ William A. Isaacson__
                                               WILLIAM A. ISAACSON
4                                              (admitted pro hac vice)
                                               BOIES, SCHILLER & FLEXNER
5                                              5301 Wisconsin Ave. NW, Suite 800
                                               Washington, DC 20015
6                                              Telephone:  (202) 237-2727
                                               Facsimile:  (202) 237-6131
7                                              Email:  wisaacson@bsfllp.com

8

9                                              PHILIP J. IOVIENO
                                               (admitted pro hac vice)
10                                             ANNE M. NARDACCI
                                               (admitted pro hac vice)
11                                             LUKE NIKAS
                                               (admitted pro hac vice)
12                                             CHRISTOPHER V. FENLON
                                               (admitted pro hac vice)
13                                             BOIES, SCHILLER & FLEXNER
                                               10 North Pearl Street, 4th Floor
14                                             Albany, NY 12207
                                               Telephone:  (518) 434-0600
15                                             Facsimile:  (518) 434-0665
                                               Email: piovieno@bsfllp.com
16                                                     anardacci@bsfllp.com
                                                       lnikas@bsllp.com
17                                                     cfenlon@bsfllp.com

18

19                                             Counsel for Schultze Agency Services, LLC

20

21

22

23

24

25

26

27

28

## Appendix A

**Specific Evidence of Mitsui Taiwan, Mitsui Japan, and Mitsui U.S.A.'s Coordinated Participation in the LCD Conspiracy**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]





[redacted]

[redacted]

Case No. 3:11-cv-03856-SI
Master File No. 3:07-md-01827-SI



[redacted]



Case No. 3:11-cv-03856-SI
Master File No. 3:07-md-01827-SI

[redacted]

[redacted]

[redacted]

TWEETER SECOND AMENDED COMPLAINT

Case No. 3:11-cv-03856-SI
Master File No. 3:07-md-01827-SI

[redacted]

