Brad D. Brian (State Bar No. 079001)
Stuart N. Senator (State Bar No. 148009)
Jonathan E. Altman (State Bar No. 170607)
Truc T. Do (State Bar No. 191845)
Hailyn J. Chen (State Bar No. 237436)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702
*Brad.Brian@mto.com*

Jerome C. Roth (State Bar No. 159483)
Hojoon Hwang (State Bar No. 184950)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077
*Hojoon.Hwang@mto.com*

*Attorneys for Defendants*

LG DISPLAY AMERICA, INC. AND LG
DISPLAY CO., LTD

*[additional parties and counsel listed in
signature block]*

Holly A. House (State Bar No. 136045)
PAUL HASTINGS LLP
55 Second Street
Twenty-Fourth Floor
San Francisco, CA 94105
Telephone:     (415) 856-7000
Facsimile:     (415) 856-7100
*hollyhouse@paulhastings.com*

Lee F. Berger (State Bar No. 222756)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:     (202) 551-1700
Facsimile:     (202) 551-1705
*leeberger@paulhastings.com*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Direct Purchaser Class Action and Indirect Purchaser Class Action* | CASE NO. 3:07-MD-1827 SI<br><br>MDL No. 1827<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANTS REGARDING TRIAL STRUCTURE AND FOR RELIEF TO AVOID DUPLICATIVE RECOVERY**<br><br>Date:      April 20, 2012<br>Time:      9:00 a.m.<br>Courtroom:  10<br>Judge:     Honorable Susan Illston |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     SUMMARY OF PENDING ACTIONS AND POTENTIAL
        FOR DUPLICATIVE AWARDS ............................................................................. 4

III.    ARGUMENT ............................................................................................................ 8

        A.      Allowing Duplicative Recovery Would Violate Defendants'
                Due Process Rights ...................................................................................... 8

        B.      Allowing Duplicative Treble Recovery Would Run Afoul of the Supreme
                Court's Punitive Damages Jurisprudence. ............................................... 10

        C.      The Court Has a Duty To Avoid Duplicative Recovery under State Laws
                Invoked by Plaintiffs .................................................................................. 13

        D.      Various Plaintiffs' Sherman Act Claims Are Also Subject To Allocation ........... 15

        E.      The Court Should Employ One or More of the Following Case Management
                Devices to Avoid Multiple Recovery ......................................................... 16

IV.     CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bains LLC v. Arco Prods. Co.,*
405 F.3d 764 (9th Cir. 2005) ................................................................................. 12

*Barr Labs., Inc. v. Abbott Labs.,*
978 F.2d 98 (3d Cir. 1992) .................................................................................... 18

*Bateman v. Am. Multi-Cinema, Inc.,*
623 F.3d 708 (9th Cir. 2010) ................................................................................. 10

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) .......................................................................... 10, 11, 12

*Bunker's Glass Co. v. Pilkington PLC,*
75 P.3d 99 (Ariz. 2003) ........................................................................................ 14

*Cal. v. ARC Am. Corp.,*
490 U.S. 93 (1989) ................................................................................................ 16

*Cities Serv. Co. v. McGrath,*
342 U.S. 330 (1952) ............................................................................................ 8, 9

*Clayworth v. Pfizer, Inc.,*
49 Cal. 4th 758 (2010) ................................................................................ 2, 14, 15

*Cory v. White,*
457 U.S. 85 (1982) ................................................................................................ 20

*Crane-McNab, LLC v. County of Merced,*
2010 WL 4024936 (E.D. Cal. Oct. 13, 2010) ...................................................... 22

*Exxon Shipping Co. v. Baker,*
554 U.S. 471 (2008) .............................................................................................. 12

*Gardner v. N. J.,*
329 U.S. 565 (1947) ........................................................................................ 20, 21

*Griffin v. Burns,*
570 F.2d 1065 (1st Cir. 1978) .............................................................................. 23

*Hanover Shoe, Inc. v. U.S. Mach. Corp.,*
392 U.S 481 (1968) ..................................................................................... 2, 15, 16

*Harris v. Balk,*
198 U.S. 215 (1905) .............................................................................................. 10

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

*Ill. Brick Co. v. Ill.*,
431 U.S. 720 (1977) ............................................................................................ 15, 16

4

*In re Ampicillin Antitrust Litig.*,
88 F.R.D. 174 (D.D.C. 1980) ................................................................................. 18

5

6

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) .................................................................... 15

7

8

*In re Master Key Antitrust Litig.*,
70 F.R.D. 23 (D.Conn. 1975), *appeal dismissed*, 528 F.2d 5 (2d Cir. 1975) ....... 18

9

*In re N. Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*,
526 F. Supp. 887 (N.D. Cal. 1981), ...................................................................... 11

10

11

*In re W. Liquid Asphalt Cases*,
487 F.2d 191 (9th Cir. 1973) ................................................................................. 10

12

13

*Johnson v. Ford Motor Co.*,
35 Cal. 4th 1191 (2005) ........................................................................................ 11

14

*Kourtis v. Cameron*,
419 F.3d 989 (9th Cir. 2005) *overruled on other grounds by Taylor*, 553 U.S. ..... 23

15

16

*Little v. V & G Welding Supply, Inc.*,
704 So.2d 1336 (Miss. 1997) ........................................................................... 21, 22

17

18

*Magnolia Marine Trans. Co. v. Okla.*,
366 F.3d 1153 (10th Cir. 2004) ............................................................................. 20

19

*Martin v. Wilks*,
490 U.S. 755 (1989) ............................................................................................... 23

20

21

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ............................................................................... 18

22

23

*McShan v. Sherrill*,
283 F.2d 462 (9th Cir. 1960) ................................................................................. 19

24

*Nat'l Wildlife Fed'n v. Gorsuch*,
744 F.2d 963 (3d Cir. 1984) .................................................................................. 23

25

26

*Provident Tradesmens Bank & Trust Co. v. Patterson*,
390 U.S. 102 (1968) ............................................................................................... 19

27

28

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

# TABLE OF AUTHORITIES

**Page(s)**

*S. Union Co. v. Irvin,*
563 F.3d 788 (9th Cir. 2009)..................................................................................... 12

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
538 U.S. 408 (2003) .................................................................................... 10, 11, 12

*Taylor v. Sturgell,*
553 U.S. 880 (2008) ............................................................................................ 21, 22

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
451 U.S. 630 (1981) ..................................................................................................... 10

*Tex. v. Fla.,*
306 U.S. 398 (1939) ..................................................................................................... 19

*Thompson v. Karastan Rug Mills,*
323 A.2d 341 (Pa. Super. Ct. 1974) ........................................................................ 22

*Union Carbide Corp. v. Superior Ct.,*
36 Cal. 3d 15 (1984) ..................................................................................................... 3

*Universal Am. Barge Corp. v. J-Chem, Inc.,*
946 F.2d 1131 (5th Cir. 1991)................................................................................... 23

*W. Union Tel. Co. v. Commonwealth of Penn.,*
368 U.S. 71 (1961) ........................................................................................ 2, 8, 9, 17

*Wash. v. Chimei Innolux Corp.,*
659 F.3d 842 (9th Cir. 2011).................................................................................... 20

## STATUTES

740 Ill. Comp. Stat. 10/7 (2) ......................................................................................... 14

15 U.S.C. § 15c(a)(1) ...................................................................................................... 13

28 U.S.C. § 1335 .............................................................................................................. 18

28 U.S.C. § 1404(a) ......................................................................................................... 17

Ark. Stat. Code Ann. § 4-75-212(b)(1)(B)................................................................... 13

Cal. Bus. & Prof. Code § 16760(a)(1) ........................................................................... 13

D.C. Code § 28-4509(b)................................................................................................... 13

D.C. Code § 28-4509(c) ............................................................................................ 14, 18

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

# TABLE OF AUTHORITIES

Page(s)

Fla. Stat. Ann. § 542.22 (2) .................................................................................................. 13

Haw. Rev. Stat. § 480-13(c)(2) ............................................................................................. 13

Haw. Rev. Stat. § 480-13(c)(5) ............................................................................................. 14

Minn. Stat. Ann. § 325D.57 .................................................................................................. 14

Miss. Code Ann. § 75-21-9 ................................................................................................... 14

N.D. Cent. Code Ann §§ 51-08.1-08(4) ............................................................................... 13

N.M. Stat. Ann. § 57-1-3(C) ................................................................................................. 13

N.Y. Gen. Bus. Law § 340(6) ..................................................................................... 2, 13, 14

Or. Rev. Stat. § 646.775(1)(b)(A) ......................................................................................... 13

R.I. Gen. Laws § 6-36-12(g) ................................................................................................. 13

S.D. Codified Laws § 37-1-25 ............................................................................................... 13

Vt. Stat. Ann. tit. 9 § 2465(b) ............................................................................................... 14

## RULES

Fed. R. Civ. P. 19(a)(1)(B)(ii) ............................................................................................... 19

Fed. R. Civ. P. 19(a)(2) ......................................................................................................... 19

Fed. R. Civ. P. 22 .................................................................................................................. 18

Fed. R. Civ. P. 42(a) .............................................................................................................. 17

## OTHER AUTHORITIES

Restatement (Second) of Judgments § 43 .............................................................................. 22

Sen. Rep. No. 94-803 (1976) ................................................................................................. 14

Wright & Miller, *18A Federal Practice & Procedure* § 4452 (3d ed. 2011) ........................ 22, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**NOTICE OF MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT on April 20, 2012 at 9:00 a.m., or as soon thereafter as

4

the matter may be heard, in Courtroom 10, 19th Floor, 450 Golden Gate Avenue, San Francisco,

5

CA 94102, before the Honorable Susan Illston, defendants LG Display, Co. Ltd. and LG Display

6

America, Inc. ("LG Display") as well as all parties reflected in the signature block below

7

("Defendants"), will move the Court for an order providing relief to avoid duplicative recovery.

8

This motion is based on this Notice of Motion and Motion; the following Memorandum of

9

Points and Authorities; the concurrently-filed declaration of Hojoon Hwang; any reply

10

memorandum as may be filed; the arguments of counsel; and such other material as the Court

11

may consider.  Across the multiple cases in this TFT-LCD flat panel multi-district litigation,

12

many plaintiffs seek the same damages from the same alleged overcharge.  For the reasons stated

13

below, the Court should – indeed must – fashion appropriate relief to protect Defendants against

14

the threat of duplicative recovery.  Among the many options discussed, Defendants suggest

15

consolidation of the damage-phase trial of all known cases for the purpose of allocating any

16

damage award among the plaintiffs at various points on the chain of distribution for TFT-LCD

17

products.

18

**STATEMENT OF ISSUES TO BE DECIDED**

19

**Issue 1(a)**:  Whether allowing duplicative recovery across the claims brought by the direct

20

purchaser class action, the indirect purchaser class action, the direct action plaintiffs, and the state

21

Attorneys General violates Defendants' due process rights and/or statutory mandates.

22

**Issue1(b)**:  Whether the current risk of duplicative recovery across the claims brought by

23

the direct purchaser class action, the indirect purchaser class action, the direct action plaintiffs,

24

and the state Attorneys General requires the Court now to adopt affirmative steps to avoid

25

duplicative recovery.

26

**Issue 2**:  What affirmative steps the Court will take to eliminate the risk of duplicative

27

recovery, including but not limited to, altering the structure of the upcoming trial of the direct and

28

indirect purchaser class actions.

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

I.        **INTRODUCTION**

Defendants bring this motion because of the enormous competing and duplicative damages claims of individuals and businesses along the distribution chain for TFT-LCD panels.

Take the example of indirect purchaser end user plaintiff ("IPP") class representative Allen Kelley, track two direct action plaintiff ("DAP") Hewlett-Packard, and track one DAP plaintiff Costco. IPP plaintiff Kelley purchased a Hewlett Packard monitor from Costco that contained a TFT-LCD panel. The TFT-LCD panel that underlies his claim is the same panel that underlies the separate and independent claims of both Hewlett-Packard and Costco. Each of these plaintiffs claims that Defendants and others entered into a conspiracy to fix the price of TFT-LCD panels, and each plaintiff claims it suffered injury in the form of an overcharge on the same TFT-LCD panel and seeks recovery of damages for that purported injury. The problem is that each of these plaintiffs claims that it absorbed the alleged overcharge: the upstream plaintiffs claim they did not pass it down the distribution chain; the downstream plaintiffs claim to the contrary that the entirety was passed down to them. As a matter of logic, they cannot all be correct. Yet, each seeks to recover the entire overcharge in separate trials before separate juries.

This conundrum is repeated across this vast litigation with potentially devastating results. In the IPP case, for example, the IPP's expert asserts $2.662 billion dollars as the end user consumers' untrebled damages and asserts that 100% of the overcharge was passed on to them. *See* accompanying Declaration of Hojoon Hwang ("Hwang Decl."), ¶ 3, Ex. B (at 121). The upstream DAPs in the first wave of opt out litigation disagree; despite their varying positions on the distribution chain, they each claim that *they* absorbed the overcharge, and identify $4.66 billion in alleged overcharges.[1] Dozens more DAPs have filed suit and more are expected. While

---

[1] AT&T identifies upwards of $335 million, *see* Hwang Decl. ¶ 32, Ex. EE (at 4-5), Hwang Decl. ¶ 33, Ex. FF (at 2); Best Buy identifies upwards of $841 million, *see* Hwang Decl. ¶ 34, Ex. GG (at 4-5), Hwang Decl. ¶ 35, Ex. HH (at 5-6); Costco identifies upwards of $120 million, *see* Hwang Decl. ¶ 10, Ex. I (at 4-5); Dell identifies upwards of $1.27 billion, *see* Hwang Decl. ¶ 36, Ex. II (at 5-6); Electrograph identifies upwards of $143 million, *see* Hwang Decl. ¶ 37, Ex. JJ (at 4-5), Hwang Decl. ¶ 38, Ex. KK (at 1-3); Kodak identifies upwards of $20.6 million, *see* Hwang Decl. ¶ 39, Ex. LL (at 10); Motorola identifies upwards of $1.18 billion, *see* Hwang Decl. ¶ 40, Ex. MM (at 4-5); Nokia identifies upwards of $104 million, *see* Hwang Decl. ¶ 41, Ex. NN (at 2-3), and the Target plaintiffs identify upwards of $643 million, *see* Hwang Decl. ¶ 29, Ex. BB (at 4-5), Hwang Decl. ¶ 42, Ex. OO (at 3-4).

they have not submitted their expert damages reports, their complaints assert they absorbed the overcharges. *See, e.g.*, P.C. Richard Am. Compl. ¶ 251 (D.I. 4075) ("Plaintiffs were not able to pass on to its [sic] customers the overcharges caused by the Conspiracy."); Schultze Agency Services, LLC First Am. Compl. ¶ 250 (D.I. 4283). While admittedly there is not a complete identity of panels implicated in each case, the reality, evident on its face, is that there is substantial overlap. Be it between the DPP and IPP cases, the IPP and DAP and Attorneys General ("AG") cases, or across the whole, many of the panels are the same. Without some mechanism to harmonize the results in each of these cases, Defendants face crippling liability that, after trebling, will be many multiples of the purported initial overcharges.

By this Motion, Defendants urge the Court to fulfill its constitutional and statutory duties to prevent duplicative treble damage awards for the same alleged overcharges on TFT-LCD panels. The Supreme Court has long held that due process protects a defendant from being "compelled to relinquish . . . [property] without assurance that he will not be held liable again in another . . . suit brought by a claimant who is not bound by the first judgment." *W. Union Tel. Co. v. Commonwealth of Penn.*, 368 U.S. 71, 75 (1961). The impending trial of the DPP and IPP claims threaten to do exactly that by subjecting Defendants to enormous and repeated treble damages claims with no assurance that they will not have to pay for the same overcharge again and again in the DAP and AG trials to follow. Moreover, because treble damage awards under the antitrust laws are punitive in nature, multiple awards for the same overcharge violate the constitutional protection against excessive punitive damages. Further still, many of the state statutes that plaintiffs across these cases invoke for indirect purchaser standing places the affirmative burden on this Court to manage the competing claims in order to avoid duplicative recovery. *See e.g.*, N.Y. Gen. Bus. Law § 340(6) ("the court *shall take all steps necessary* to avoid duplicative recovery, including but not limited to the transfer and consolidation of all related actions") (emphasis added). Any contrary rule of law, including the restrictions on the pass-on defense established in *Hanover Shoe, Inc. v. U.S. Mach. Corp.*, 392 U.S 481, 489-94 (1968), must yield to the dictates of due process. *See Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (adopting *Hanover Shoe* as a matter of state law but holding that "the bar on

1  consideration of pass-on evidence must necessarily be lifted" when faced with the prospect of

2  duplicative recovery).

3         Now is the time to act.  While Defendants have every intention of defending their case at

4  trial and believe they will prevail, their constitutional rights will not be protected without the

5  Court ruling on this motion *prior* to trial.  Put differently, this motion does not present the

6  liability question (which Defendants believe will be resolved in their favor).  It presents the risk

7  question.  Here, both the law and practicality call for action in response to that risk and call for

8  action now.  Not only does due process require assurance that there will be no double liability

9  *before* any judgment in the upcoming class trial is entered, but acting now gives the Court the

10  widest array of options to address the issue.  For example, consolidation of damages phases

11  across claims is often identified as a tool to avoid this due process violation.  Here, should any,

12  some or all of the various plaintiffs' claims survive liability determinations,  the damages issues

13  in the competing cases can and should be brought before a single trier of fact to allocate the

14  alleged damages among plaintiffs at various levels of distribution.  That device is most effectively

15  invoked before there is a judgment in favor of one plaintiff or group of plaintiffs among the many

16  claimants.  There are other procedures that the Court may choose, such as binding subsequent

17  plaintiffs to the jury's finding in the DPP/IPP trial, if any, regarding the pass-through of the

18  overcharge, as further explained below.  It is critical, however, that the Court announce *now* the

19  procedure it intends to employ to avoid duplicative recovery, so that all parties can have certainty

20  as to how their rights may be affected by the claims of others and have the opportunity to protect

21  their interests.

22         Defendants suspect that the DPPs and the IPPs will argue opposite sides of the coin in

23  contesting this motion.  They will contend that Defendants are either too late or too early.  Neither

24  view is correct.  Setting aside that a court is not free to turn a blind eye to a potential

25  constitutional violation, and that many states place the burden on the court to raise this issue,

26  cases suggest that the issue of duplicative recovery is properly raised when the cases are at a stage

27  that the evidence confirms the risk but also when a court has the ability to respond.  *See, e.g.*,

28  *Union Carbide Corp. v. Superior Ct.*, 36 Cal. 3d 15, 24 (1984).  Here, both are true.  As shown

- 3 -

1    below, the evidence across the IPP, DPP, DAP, and AG cases confirms the threat of duplicative

2    recovery.  And, as the joint pre-trial statement confirms, with the first trial looming, the time is

3    ripe for this Court to act.  Indeed, with an IPP motion before this Court already raising the

4    structure of these cases going forward, there is an open acknowledgement that now is the time for

5    court intervention.  *See* D.I. 5068.  Separate and apart from what the Court does on the IPPs'

6    motion to sever (which Defendants will oppose), this Court must act now to address the issue of

7    duplicative recovery.  The law compels it.

8    **II.    SUMMARY OF PENDING ACTIONS AND POTENTIAL FOR DUPLICATIVE**

9    **AWARDS**

10       A mere description of the cases before this Court demonstrates why the risk of duplicative

11   recovery is more than real.  Now pending before just this Court are (a) a class action which

12   includes two sub-classes of direct purchase plaintiffs, (b) a class action that includes 24 sub-

13   classes of indirect purchasers; (c) 26 individual suits, brought on behalf of 49 companies, alleging

14   a mix of direct and indirect purchase claims; and (d) five suits brought by state Attorneys

15   General.  That description does not include the three state Attorneys General actions, asserting

16   *parens patriae* claims, proceedings in state courts in Washington, Illinois, and California, nor the

17   two state attorney general actions that are currently proceeding in federal courts in Mississippi

18   and South Carolina (with motions to remand pending).  While the various cases target different

19   groups of defendants, all of the claims allege the same core theory:  that a group of companies

20   formed a cartel to fix the prices of TFT-LCD panels.  The suits span the entirety of the

21   distribution chain with each alleged level claiming that all, or nearly all, of the same alleged

22   overcharge – the product of the alleged conspiracy – was borne by them.

23       With the IPP and DPP cases proceeding quickly to trial, the risk of duplicative recovery

24   has become manifest.  To understand why that is so, it is easiest to focus on the panel and work

25   backwards from the claims of the IPPs.  While the conspiracy alleged across these cases was to

26   fix the prices of the alleged input (the TFT-LCD panel) not just panel purchasers have sued.

27   Instead, the IPP class members who bought computer monitors, notebook computers, and

28   televisions containing TFT-LCD panels over an eight-year period in 23 states and the District of

Columbia are the final link in a complicated and elongated distribution chain that brings the TFT-LCD panels from manufacturers (including the defendants in these cases) to consumers. *See, e.g.*, Order Denying Defs.' Dispositive Mot. (Oct. 5, 2011) (D.I. 3833). The chain involves anywhere from one to six intermediaries, many of which are themselves suing for the same violation and seek to recover the same overcharge. *See* Hwang Decl. ¶ 4, Ex. C (Expert Report of Edward A. Snyder ¶ 111 (Aug. 10, 2009) (D.I. 1159) ("Snyder Report")).

Adding to the risk of duplicative recovery, there is no one path that panels took in becoming the finished products the class members bought, as the chart below shows. *See id.* at ¶ 109; Hwang Decl. ¶ 5, Ex. D (Declaration of Janet S. Netz at 26 (June 2, 2009) (D.I. 1023.5) ("Netz Declaration")). The many intermediaries in the distribution chain structured their purchasing and sales operations in different ways and changed their purchasing and sales operations over time. *See* Snyder Report ¶ 109; Netz Decl. at 26-27. In most cases, the panel is first sold as a panel, usually (but not always) to a company that will incorporate it into a finished product. *See* Snyder Report ¶ 112 & Exh. 20.1-3; Netz Decl. at 26. That company might be the business under whose brand the product is sold (Dell, for example) or it may be a company operating under contract with the branded manufacturer. *See* Snyder Decl. ¶ 112 & Exh. 20.1-3; Netz Decl. at 26. In the latter case, the contracting company (variously called an "Original Design Manufacturer," "contract manufacturer," or "systems integrator") will assemble some or all of the finished product before selling it (or sometimes reselling it) to the branded company or "Original Equipment Manufacturer." *See* Snyder Decl. ¶¶ 113-14; Netz Decl. at 26-30.

With the television, notebook, or monitor assembled, the OEM has many potential sales channels. *See* Snyder Report ¶ 113; Netz Decl. at 30-31. OEMs sell some products to electronic products distributors such as DAP Tech Data, which then resell the products, often to small- and medium-sized retailers. *See* Snyder Report ¶¶ 113-14; Netz Decl. at 30-31. The OEMs sell other products to retailers such as DAPs Costco, Best Buy, and Office Depot. *Id.* They may also sell to consumers through websites or through their own retail stores. *See* Snyder Report ¶¶ 113-14; Netz Decl. at 30-31. Tech Data, Costco, Best Buy, and Office Depot have all asserted claims against Defendants. These distributors and retailers then sell their products to consumers or

- 5 -

1  businesses for their own use, many of whom are now members of the IPP classes.

2  No single path can stand in for the wide variation in distribution channels. Nonetheless,

3  consider the example of IPP class representative Allen Kelley, discussed in the introduction. Mr.

4  Kelley bought a HP monitor from Costco. Hwang Decl. ¶ 2, Ex. A (at 54:22-55:4). Hewlett-

5  Packard may have been the direct purchaser of that panel or it may have bought from a systems

6  integrator or ODM. Hwang Decl. ¶ 6, Ex. E (at 20:5-22:12). Similarly, IPP Mulvey bought a

7  Sony monitor from DAP CompUSA (now Old Comp.). Hwang Decl. ¶ 7, Ex. F (at 61:18-23). In

8  both examples, at least three separate plaintiffs in this MDL are claiming an overcharge on the

9  same panel. As Figure 1 shows, these claims can quickly add up to more than the price of the

10  original panel: for the panel in Mr. Kelley's monitor, the trebled damages exceed 140 percent of

11  the price of the panel. As an expert for the first wave of DAPs has admitted, if all are allowed to

12  collect there will be substantial duplication. Assuming that defendants hypothetically caused a $2

13  overcharge in panel prices for Mr. Kelley's or Ms. Mulvey's claim, that $2 overcharge results in

14  $6 of awards if each level of the distribution chain is allowed to claim the entirety of the

15  overcharge without allocation, and $18 when trebled. *See* Hwang Decl. ¶ 8, Ex. G (at 290-93).

16  Figure 1[2]

17

18

19

20

21

22

23

24

25



26

27  [2] HP has not yet submitted a report, so the alleged overcharge estimate provided here borrows from the direct purchaser class. *See* Hwang Decl. ¶ 9, Ex. H (at 64). The overcharge estimate for Costco is from Costco's proposed expert. Hwang Decl. ¶ 10, Ex. I (at 81). The overcharge at the

28  consumer level is that offered by Dr. Netz. Hwang Decl. ¶ 3, Ex. B at 122.

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

Mr. Kelley and Ms. Mulvey are not unique. Of the 51 products the class representatives claim to have purchased, 23 of them were made by DAPs Dell, Sony, or HP (or HP's predecessor company Compaq). Hwang Decl. ¶ 11, Ex. J (Nos. 1 & 3, at 4-10); Hwang Decl. ¶ 12, Ex. K (at 4). On the remaining 28 products, at least 11 were from a retailer already suing in the MDL. IPP representative Kou Srimoungchanh, for example, purchased his Toshiba notebook from DAP CompUSA. Hwang Decl. ¶ 13, Ex. L (at PLF-SRIMOUNGCHANH 00009).[3] Three other products were sold downstream of claims proceeding in the direct purchaser class action. Representative Chris Ferencsik, for example, purchased his Sharp television from direct purchaser class member Two Guys. Hwang Decl. ¶ 24, Ex. W (at 63:10-14).[4] Summing the duplication, the overlap is stark: more than 70% of the IPP class representatives' claims present at least one level of duplication with other upstream direct or indirect purchaser plaintiffs.

The duplication adds up to billions of dollars. The "Track One" retailer plaintiffs accounted for more than $10 billion worth of the classes' purchases of notebooks, monitors, and televisions. *See* Hwang Decl. ¶ 27, Ex. Z (Ex. 21 describing the percentage of Track 1 plaintiffs' sales that overlap with downstream plaintiffs); *id.* (Ex. 19 (identifying the volume of sales of Track 1 plaintiffs)). While the IPPs' and DAPs' experts differ slightly about the magnitude of the initial overcharge, both agree that their clients are entitled to the entirety of that overcharge.[5] For

---

[3] Plaintiff Martel purchased his Sharp television from plaintiff Good Guys. Hwang Decl. ¶ 14, Ex. M (at 75:1-2). Plaintiff Ho purchased his Hyundai monitor from plaintiff Office Depot. Hwang Decl. ¶ 15, Ex. N (at 109:18-20). Plaintiff Kerson purchased his Sharp television from plaintiff Good Guys. Hwang Decl. ¶ 16, Ex. O (at 46:7-8). Plaintiff Solo purchased his Sharp television from plaintiff Good Guys. Hwang Decl. ¶ 17, Ex. P (at 67:5-7). Plaintiff Feins purchased *both* his Sharp televisions from plaintiff Brandsmart. Hwang Decl. ¶ 18, Ex. Q (at 91:7-8; 108:19-25). Plaintiff Murphy purchased his Samsung television from plaintiff Circuit City. Hwang Decl. ¶ 19, Ex. R (at 57:18-58:10). Plaintiff Ling-Hung Jou purchased her Maxent television from plaintiff Costco. Hwang Decl. ¶ 20, Ex. S (at 31:19-21). Plaintiff Tom DiMatteo purchased his Apple monitor from plaintiff CompUSA. Hwang Decl. ¶ 21, Ex. T (at 60:7-9). Plaintiff Beall bought his Samsung monitor at Circuit City. Hwang Decl. ¶ 22, Ex. U (at 53:11-18, 54:6-9). Plaintiff Blackwell bought one of her two Apple computers from Apple and the second from a "big store[]" that may have been plaintiffs Best Buy or CompUSA. Hwang Decl. ¶ 23, Ex. V (at 54:204-59:22).

[4] Plaintiff Hensen purchased his LG Electronics television from direct purchaser class member Karl's. Hwang Decl. ¶ 25, Ex. X (at 94:25-95:1). Plaintiff Eisler purchased his Acer television from direct purchaser class member Buy.com. Hwang Decl. ¶ 26, Ex. Y (at 58:17-19).

[5] *Compare* Hwang Decl. ¶ 28, Ex. AA (Netz at 110 ("These results verify that all class members suffer common harm in the amount of at least 100% of the overcharge imposed by Defendants at the top of the distribution chain."), *with, e.g.*, Hwang Decl. ¶ 29, Ex. BB (Bernheim, at 78) ("I computed damages for individual plaintiffs by applying a 100% pass-through rate to the dollar-

- 7 -

1   every product that a IPP class member purchased from one of the DAPs, then, at least the DAP

2   and the IPPs are claiming an entitlement to the same 100 percent of the overcharge, and even

3   were the numbers otherwise (the DAP retailer claims 75 percent; the indirect purchaser claims 90

4   per cent), any situation where the combined, alleged overcharge is greater than 100 percent, there

5   is a risk of duplicative recovery.

6   **III.   ARGUMENT**

7       **A.   Allowing Duplicative Recovery Would Violate Defendants' Due Process Rights**

8           The Supreme Court has long recognized that potential for double liability raises serious

9   due process concerns that *must* be mitigated by providing assurance against subsequent repetitive

10  claims.  In *Western Union*, 368 U.S. 71, the Supreme Court considered whether the State of

11  Pennsylvania could lawfully compel a telephone company to escheat to the state certain money

12  orders that were unclaimed and unpaid.  Western Union objected on the ground that it could be

13  subject to multiple liability in subsequent actions, either from senders of money orders who

14  would not be bound by the escheat judgment or from other states seeking to escheat the same

15  funds.  368 U.S. at 73-74.  The Court agreed and held that the escheat action could not proceed

16  absent assurance of protection against double recovery.

17          The Court first noted that, under its precedents, "the holder of . . . property is deprived of

18  due process of law if he is compelled to relinquish it without assurance that he will not be held

19  liable again in another jurisdiction or in another suit brought by a claimant who is not bound by

20  the first judgment." *Id.* at 75.  Applying that principle, the Court held that "there can be *no doubt*

21  that Western Union has been denied due process by the Pennsylvania judgment here *unless* the

22  Pennsylvania courts had power to protect Western Union from any other claim." *Id.* (emphasis

23  added).  Due process required, the Court stressed, that "all interested States – along with all other

24  claimants – can be afforded a full hearing and a final, authoritative determination." *Id.* at 80.

25  Because the Pennsylvania court "cannot give such hearings" to all interested parties, the Court

26  held, it "should have dismissed the case" at the outset. *Id.  See also Cities Serv. Co. v. McGrath*,

27

28  value overcharges for LCD panels.").

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

342 U.S. 330, 334-35 (1952) (holding that the Fifth Amendment required that defendant be allowed to recoup property seized by the U.S. government if future claims from foreign governments "would effect a double recovery against" the defendant).

Likewise here, Defendants face multiple claims to recover the same pot of money, the alleged overcharge on TFT-LCD panels.  Most imminent among these claims is that of the IPPs, who claim over $2.66 billion in damages on the theory that, despite their position at the end of the multi-layered distribution chain, and despite the contrary claims and expert opinions of the DPPs, DAPs and AGs, they absorbed 100 percent of the alleged overcharge.  Due process requires "assurance" – *before* the IPP case is permitted to go to judgment – that Defendants "will not be held liable again . . . in another jurisdiction or in a suit brought by a claimant who is not bound by the first judgment," *i.e.*, in the pending actions by the DPPs, DAPs and AGs.  *Western Union*, 368 U.S. at 75.  If the IPPs paid 100% of the alleged overcharge, then an upstream retailer or an upstream distributor absorbed 0% of the alleged overcharge; it was all passed on.  Conversely, if an upstream distributor absorbed 100% of the alleged overcharge, then any downstream purchaser paid 0% of the alleged overcharge.  What cannot happen is for *both* the upstream distributor to have absorbed 100% of the alleged overcharge and the downstream purchaser to have paid 100% of the alleged overcharge.  Yet, those are the very type of inconsistent and duplicative claims Defendants now face.

While this Court may be the first to have to resolve this issue, it is not the first to have considered it.  In the *SRAM* litigation, as here, there were both direct and indirect purchaser claims, brought variously on behalf of a direct purchaser class, an indirect purchaser class, state Attorneys General, and a number of direct action plaintiffs.  Claims were brought on behalf of OEMs of finished products, including computers and consumer electronics devices, distributors of such finished products, and end consumers of devices containing SRAM chips.  Faced with these competing claims, Judge Wilken posed the following thought hypothetical in advance of trial: "Let's say there's a big verdict for the [direct purchasers] and then a verdict for the [indirect purchasers]."  Hwang Decl. ¶ 30, Ex. CC (at 8).  Having posed the question, she explained the result – "We have a double recovery." – and then the legal effect:  "It seems to me that wouldn't

1    be allowed.  There has to be some sort of method of allocating. . . . But in the end, when we come

2    down to actually writing checks, you don't get it twice, I don't think, or the defendants don't have

3    to pay it twice."  *Id.*  That same reasoning controls here; as the Supreme Court long ago

4    recognized:  "It ought to be and it is the object of courts to prevent the payment of any debt twice

5    over."  *Harris v. Balk*, 198 U.S. 215, 226 (1905).  As a matter of due process, Defendants cannot

6    be forced to write a check for the same claimed overcharge twice (or many times more).  Putting

7    them to that risk is a constitutional violation.

8
9
     **B.**       **Allowing Duplicative *Treble* Recovery Would Run Afoul of the Supreme Court's Punitive Damages Jurisprudence**

10        The risk of duplicative recovery in this case violates Defendants' due process rights for

11   the additional reason that Defendants face not only a prospect of double liability but of *multiple*

12   *treble-damages* awards for the same alleged overcharge.  That prospect implicates the

13   constitutional prohibition against excessive punitive damage awards, as the Supreme Court has

14   described in cases such as *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) and

15   *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).  Courts have long recognized that treble

16   antitrust damages serve the same punishment and deterrence goals as punitive damages.  *E.g.*,

17   *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble

18   damages [in antitrust] reveals an intent to punish past, and to deter future, unlawful conduct, not

19   to ameliorate the liability of wrongdoers."); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708,

20   715 (9th Cir. 2010) ("[T]he treble damages provisions in the Clayton and Sherman Acts act as

21   statutory punitive measures in which two thirds of the recovery is not remedial and inevitably

22   presupposes a punitive purpose." (internal quotation marks omitted)); *In re W. Liquid Asphalt*

23   *Cases*, 487 F.2d 191, 201 (9th Cir. 1973) (trebling of damages "is similar to punitive damages

24   paid by a tortfeasor whose act injures several people").  Treble damage awards are therefore

25   subject to the same due process constraints as traditional punitive damage awards.

26        *Multiple* payments of treble damages awards for the same injury clearly would violate

27   those constraints.  The Supreme Court has identified three "guideposts" for reviewing punitive

28   awards: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

1    the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the

2    difference between the punitive damages awarded by the jury and the civil penalties authorized or

3    imposed in comparable cases." *State Farm*, 538 U.S. at 418; *accord Gore*, 517 U.S. at 575.

4    Allowing every company and individual in the distribution chain to recover a treble damage

5    award based on the full overcharge cannot withstand scrutiny under *State Farm* and *Gore*.  Put

6    directly, "[c]ommon sense dictates that a defendant should not be subjected to multiple civil

7    punishment for a single act or unified course of conduct which causes injury to multiple

8    plaintiffs."  *In re N. Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*, 526 F. Supp. 887, 900

9    (N.D. Cal. 1981), *rev'd on other grounds*, 693 F.2d 847 (9th Cir. 1982); *Johnson v. Ford Motor*

10   *Co.*, 35 Cal. 4th 1191, 1209 (2005) ("repeatedly imposing punitive damages on the same

11   defendant for the same course of wrongful conduct may implicate substantive due process

12   constraints") (quoting *Owens-Corning Fiber. Corp. v. Malone*, 972 S.W.2d 35, 50 (Tex. 1998)).

13          The third *State Farm* factor weighs dispositively in favor of finding a due process

14   violation here.  Congress and state legislatures have already determined that treble damages

15   provide the appropriate sanction in antitrust cases, a determination that the Supreme Court has

16   held deserves "substantial deference."  *Gore*, 517 U.S. at 583 ("[A] reviewing court engaged in

17   determining whether an award of punitive damages is excessive should 'accord "substantial

18   deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'"

19   (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301

20   (O'Connor, J., concurring in part and dissenting in part))).  Subjecting Defendants to paying

21   repeated treble damage awards to purchasers at every level of the distribution chain for the same

22   underlying conduct would thwart these legislative determinations.

23          Duplicative treble damage awards also violate the first two *State Farm* guideposts.  First,

24   any finding of liability here would not involve the sort of reprehensibility that the Supreme Court

25   has indicated supports punitive damages.  *State Farm*, 538 U.S. at 419 (reprehensibility evaluated

26   by considering whether "the harm caused was physical as opposed to economic; the tortious

27   conduct evinced an indifference to or a reckless disregard of the health or safety of others; the

28   target of the conduct had financial vulnerability; the conduct involved repeated actions or was an

- 11 -

1   isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere

2   accident"). Any harm is economic, not physical; nothing about Defendants' alleged conduct

3   evinces any indifference to or disregard of the health or safety of others; and many of the

4   plaintiffs are large corporations, not financially vulnerable individuals. All of these factors

5   militate against a punitive award *greater* than one payment of treble damages. *See S. Union Co.*

6   *v. Irvin*, 563 F.3d 788, 791-92 (9th Cir. 2009) (concluding "most of the indicia of reprehensibility

7   do not appear" and reversing punitive damage award against public official for tortious

8   interference when harm was economic, involved no disregard of safety, and victim was a large

9   company); *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (that harm from

10  unlawful race discrimination "was economic and did not evince reckless disregard of health or

11  safety . . . . reduces reprehensibility").

12         Second, although the Supreme Court has never set a "bright line ratio which a punitive

13  damages award cannot exceed," it has held that "[w]hen compensatory damages are substantial,

14  then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of

15  the due process guarantee." *State Farm*, 538 U.S. at 425. The Court relied on this principle

16  when, as a matter of federal admiralty law, it imposed a punitive-to-compensatory ratio of 1:1 for

17  the $500 million compensatory award in the Exxon Valdez litigation. *Exxon Shipping Co. v.*

18  *Baker*, 554 U.S. 471, 515 (2008). Moreover, when considering an appropriate punitive-to-

19  compensatory ratio, the Court has found "instructive" legislative decisions to impose "double,

20  treble, or quadruple damages to deter and punish," including the treble damages remedy in

21  antitrust law. *State Farm*, 538 U.S. at 425; *Gore*, 517 U.S. at 581 & n.33. Here, where any

22  compensatory award may be substantial, and where Congress and state legislatures have

23  mandated trebling that award, multiplying that already trebled award as will happen here if

24  plaintiffs' competing demands are left unchecked would violate due process. *See also Irvin*, 563

25  F.3d at 792 (imposing a 3:1 punitive-to-compensatory ratio for economic tort where

26  compensatory damages totaled nearly $400,000).

27         To avoid these serious due process problems, this Court must take steps now to ensure any

28  treble damage award is allocated among prevailing plaintiffs according to their respective losses.

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

**C.      The Court Has a Duty To Avoid Duplicative Recovery under State Laws Invoked by Plaintiffs**

Even apart from the constitutional mandate, avoidance of duplicative liability is required as a matter of state law.  Among the states that allow indirect purchaser standing in antitrust cases, many state legislatures have prohibited duplicative recovery and suggested to their courts to take steps to avoid it.

First, numerous state legislatures have expressly authorized defendants to assert a "pass-on" defense to ensure that any damages for an overcharge are properly allocated among plaintiffs along the distribution chain.  *See* D.C. Code § 28-4509(b) ("a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); Haw. Rev. Stat. § 480-13(c)(2) (same); N.Y. Gen. Bus. Law § 340(6) (same); N.M. Stat. Ann. § 57-1-3(C) ("any defendant, as a partial or complete defense against a damage claim, may, in order to avoid duplicative liability, be entitled to prove that the plaintiff purchaser or seller in the chain of manufacture, production, or distribution who paid any overcharge . . ., passed on all or any part of such overcharge"); N.D. Cent. Code Ann. § 51-08.1-08(4); *see also* S.D. Codified Laws § 37-1-25 (generally prohibiting duplicative recovery in antitrust actions: "The court shall exclude from the amount of monetary relief awarded for such action any amount of monetary relief which duplicates amounts which have been awarded for the same injury.").[6]

---

[6]  In addition, several states have specific statutes that prohibit duplicative recovery in suits by the state Attorneys General suing as *parens patriae*.  *See* Ark. Stat. Code Ann. § 4-75-212(b)(1)(B) ("The court shall exclude from the amount of monetary  relief awarded in the action any amount which duplicates amounts that have been awarded for the same injury already"); Cal. Bus. & Prof. Code § 16760(a)(1) ("The court shall exclude from the amount of monetary relief awarded in the action any amount of monetary relief (A) which duplicates amounts which have been awarded for the same injury, or (B) which is properly allocable to (i) natural persons who have excluded their claims . . . , and (ii) any business entity."); Fla. Stat. Ann. § 542.22(2) (in parens patriae action, "[t]he court shall exclude from the amount of monetary relief awarded in such action any amount of monetary relief which: (a) [d]uplicates amounts which have been awarded for the same injury"); Or. Rev. Stat. § 646.775(1)(b)(A) (similar); R.I. Gen. Laws § 6-36-12(g) (similar).  So too does the federal government under the Hart-Scott-Rodino Act (HSRA), which, among other things, allows state Attorney Generals to pursue *parens patriae* claims on behalf of indirect purchasers under the Clayton Act.  Originally, the draft HSRA said nothing about duplicative recovery.  Before enactment, however, the Senate changed the bill, so that it now provides that "[t]he court shall exclude from the amount of monetary relief awarded in such action any amount of monetary relief . . .  which duplicates amounts which have been awarded for the same injury[.]"  15 U.S.C. § 15c(a)(1).  As the accompanying report to the HSRA explained,

1    Next, in order to effectuate the requirement to allocate damages, states have expressly

2    authorized or required their courts to exercise their case management powers to avoid duplicate

3    liability for the same antitrust injury.  For example, the New York antitrust statute, the Donnelly

4    Act, mandates that "the court shall take all steps necessary" to avoid duplicative liability

5    including consolidation.  N.Y. Gen. Bus. Law § 340(6); *see also* 740 Ill. Comp. Stat. 10/7(2)

6    ("[I]n any case in which claims are asserted against a defendant by both direct and indirect

7    purchasers, the court shall take all steps necessary to avoid duplicate liability for the same injury

8    including transfer and consolidation of all actions.").  Other statutes authorize consolidation,

9    apportionment and a "delay [in] disbursement of damages to avoid multiplicity of suits and

10   duplication of recovery of damages."  D.C. Code § 28-4509(c); *see also* Haw. Rev. Stat. § 480-

11   13(c)(5); Minn. Stat. Ann. § 325D.57 (authorizing court to "take any steps necessary to avoid

12   duplicative recovery against a defendant"); Miss. Code Ann. § 75-21-9 (authorizing antitrust suits

13   for direct and indirect injury and providing "All recoveries herein provided for may be sued for in

14   one suit"); Vt. Stat. Ann. tit. 9 § 2465(b) ("The court shall take all necessary steps to avoid

15   duplicate liability, including but not limited to the transfer or consolidation of all related

16   actions.").

17   State courts have consistently explained that duplicative recovery in indirect purchaser

18   suits should be avoided, and have endorsed various case management devices, including

19   consolidation, interpleader, and mandatory joinder, to bring the claimants together and apportion

20   damages.  For example, the California Supreme Court, while holding that the pass-on defense is

21   ordinarily inapplicable to direct or indirect purchaser claims under California's antitrust statute,

22   the Cartwright Act, nonetheless ruled that the "bar on consideration of pass-on evidence *must*

23   *necessarily be lifted*" where, as here, "multiple levels of purchasers have sued, or where a risk

24   remains they may sue" in order to avoid duplicative recovery.  *Clayworth v. Pfizer, Inc.*, 49 Cal.

25   4th 758, 787 (2010) (emphasis added); *see also Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d

26   99, 108 (Ariz. 2003) (noting "legitimate and important concern" of duplicative recovery).  The

27

28   Congress thought it important to "assure that defendants are not subjected to duplicative
     liability[.]"  Sen. Rep. No. 94-803, 2d Sess. (1976), p. 44.

- 14 -

California Supreme Court further stated that "joinder, interpleader, consolidation, and like procedural devices" should be used to "bring all claimants before the court" to allocate damages among the "various levels of injured purchasers." 49 Cal. 4th at 787.  Thus, as a matter of state law, the claims of the IPPs and the DAPs under state law must be adjudicated in a way that avoids duplication of recovery.  *See e.g.*, *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) (holding that procedural considerations in state antitrust laws apply in federal court sitting in diversity where they are bound up in the underlying right).

### D.      Various Plaintiffs' Sherman Act Claims Are Also Subject To Allocation

In *Hanover Shoe, Inc. v. U.S. Mach. Corp.*, 392 U.S. 481, 489-94 (1968), the Court restricted the use of a pass-on defense for federal direct-purchaser antitrust claims.  The Court reasoned that allowing pass-on defenses (1) would require "long and complicated proceedings" and (2) individual consumers to whom overcharges were passed would have little incentive to sue, allowing antitrust violators to "retain the fruits of their illegality." *Id.* at 494; *see Ill. Brick Co. v. Ill.*, 431 U.S. 720, 725-26 (1977) (describing dual rationale of *Hanover Shoe*). Nevertheless, the Court expressly held that the bar on pass-on defenses was not absolute:  "We recognize that there might be situations – for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged – where the considerations requiring that the passing-on defense not be permitted in this case would not be present." 392 U.S. at 494.  These cases present a situation where pass-on evidence must be permitted to permit allocation of damages.

Neither of the Supreme Court's two rationales for precluding consideration of pass-on exist here.  The complexity that the Court sought to avoid by excluding a pass-on theory is already part of this case.  Both the IPPs' damages and the indirect damages claims of certain direct action plaintiffs necessarily rise or fall on their proof of pass through.  Therefore, there is no risk that, if pass-on evidence is allowed and Defendants are found liable, they will "retain the fruits" of their illegality.  The risk is the opposite.  Without the right to assert a pass through defense against *all* plaintiffs, many plaintiffs could get windfall damages while Defendants could pay not just once but multiple times, in contravention of their due process rights.

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

That *Hanover Shoe* does not establish an absolute bar to a pass-on defense is further confirmed by *Cal. v. ARC Am. Corp.*, 490 U.S. 93 (1989), in which the Supreme Court held that state *Illinois Brick* repealer statutes were not preempted.  The Court rejected the argument that federal direct purchaser plaintiffs might have to share damages with indirect purchaser plaintiffs, explaining "*Illinois Brick* was not concerned with the risk that a plaintiff might not be able to recover its entire damages award." *Id.* at 104.  Therefore, the fact that a pass-on theory might reduce the direct purchaser damages is no reason to bar it.  The basis of *Hanover Shoe* is not to guarantee that direct purchasers collect the full overcharge even when they recouped some or all of it by passing it on; rather, the Court was concerned with avoiding a situation where a liable defendant was able to avoid paying damages *at all* by arguing that overcharges were passed on to absent parties with no claim.  This concern is plainly not implicated here.

*ARC* confirms that *Hanover Shoe*'s approach must give way when both direct and indirect purchasers have sued.  As *Illinois Brick* makes clear, a bar on pass-on defenses makes sense only in a world where *only* direct purchasers have an injury.  *Illinois Brick*, 431 U.S. at 736, 746-47.  Once indirect purchasers may bring suit, as they have done here under state law, the proscription on pass-on arguments and evidence envisioned in *Hanover Shoe* and *Illinois Brick* is untenable.

### E.   The Court Should Employ One or More of the Following Case Management Devices to Avoid Multiple Recovery

Having shown that the Court is obligated to assure that duplicative recovery does not occur, the question becomes what is the Court to do.  While recognizing that the law places the burden on the Court to resolve this question, Defendants nevertheless offer the following procedural mechanisms the Court may employ.  Rising to constitutional proportions, the threat of duplicative recovery requires an aggressive response, which Defendants' list reflects.  The list is not meant to be exhaustive, nor is any one suggestion meant to be exclusive or sufficient by itself.  Instead, the offered list recognizes the tools the Court has at its disposal, offers suggestions as to how those tools may be used (and at times interconnect), and finally offers proposed solutions to anticipated hurdles.  The duplicative recovery problem presented here is massive and requires creative thought to solve.  Defendants offer their list in an effort to help the Court fulfill its

- 16 -

1    obligation to address and to resolve this significant issue.

2         ***Bifurcate the damage issues in Class Trials and consolidate for trial with all DAP and***

3    ***AG actions***:  As discussed above, consolidation of the competing claims for the purpose of

4    allocating damages is the most straightforward means of ensuring that duplicative recovery will

5    not occur.  This is precisely what the U.S. Supreme Court held was required to protect the

6    defendant's due process rights in *Western Union*.  *See Western Union*, 368 U.S. at 79 (it is

7    "imperative" that competing claims "be settled in a forum where all [interested parties] . . . can

8    present their claims for consideration and final authoritative determination").  For those claims

9    that were initially filed in the Northern District of California, consolidation is available under

10   Federal Rules of Civil Procedure 42(a), which this Court can invoke *sua sponte*.  For the cases

11   that are before this Court only for pre-trial purposes (*e.g.*, *Tech Data Corp. v. AU Optronics*

12   *Corp.*, No. 3:11-cv-05765 (M.D. Fla.)), the Court could order defendants, with its consent, to file

13   motions seeking to transfer those actions to this Court under 28 U.S.C. § 1404(a) for subsequent

14   consolidation and trial.  Additionally, for the same cases, the Court could contact the originating

15   courts and request that *they* exercise their authority to transfer those cases and issue § 1404(a)

16   transfer orders after notice to the parties.

17        That said, consolidation will take some time.  If the Court believes that it is important to

18   try the DPP and IPP actions in the near term or under the current schedule, the Court could

19   bifurcate the class actions between liability and damages phases so that the liability phase could

20   proceed promptly.  The liability phase will identify those plaintiffs, if any, who have a right to

21   recover without determining how much they are entitled to receive.  Defendants again believe that

22   will be a null set, and that they will prevail at trial.  Should the trial prove otherwise, a similar

23   process could be implemented in the DAP and AG cases, and, should there be a need to award

24   damages to any party after that process has run, the Court could then consolidate all damages

25   phases for trial.  The benefits of this process are self-evident.  It allows the cases to continue to

26   progress; it may promote settlement if there are findings of liability; it works to ensure that

27   multiple claims brought by plaintiffs along the distribution chain will not result in the duplicative

28   recovery described above, and it gives all parties a better sense of how the Court intends to

- 17 -

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

address this important issue.

The law fully supports this approach.  Bifurcating between liability and damages phases is not uncommon in complex cases like this one.  *See, e.g.*, *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 115 (3d Cir. 1992) ("bifurcation would prove beneficial by enhancing juror comprehension of the complex issues presented"); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1167-68 (7th Cir. 1983).  Indeed, some of the very state statutes referenced above contemplate a phased approach to damages.  *See, e.g.*, D.C. Code § 28-4509(c) ("In any case in which claims are asserted by both direct purchasers and indirect purchasers, the court may . . . delay disbursement of damages to avoid multiplicity of suits and duplication of recovery of damages . . .").  Structured the right way, the process can be consistent with the Seventh Amendment, *see, e.g.*, *In re Ampicillin Antitrust Litig.*, 88 F.R.D. 174, 179 (D.D.C. 1980)*; In re Master Key Antitrust Litig.*, 70 F.R.D. 23, 29 (D.Conn. 1975), *appeal dismissed*, 528 F.2d 5 (2d Cir. 1975) ("I find the defendants' constitutional objections unpersuasive and order that separate trials be held on the issues of liability and damages"); moreover, bifurcation serves the end of judicial efficiency by having a single damages trial across many claimants.  In short, using this Court's trial management authority, bifurcation and consolidation are recognized and powerful tools this Court could use to meet its obligation to avoid duplicative recovery.[7]

***Join All Parties For Interpleader***:  A related approach may again be to bifurcate liability and damages and then order class defendants, with their consent, to join the parties in the DAP and AG cases (or known possible other parties) for interpleader under Federal Rule of Civil Procedure 22 and/or 28 U.S.C. § 1335.  If the class defendants prevail in the liability phase, there will not be a need for interpleader, but, as a procedural tool, interpleader is well suited for this type of situation.  In addition to protecting against multiple lawsuits and possibly inconsistent or multiple determinations of liability, interpleader promotes judicial economy by requiring the "rival claimants to litigate . . . the decisive issue" before a single court.  *See, e.g.*, *Tex. v. Fla.*, 306

---

[7] Defendants suggest bifurcation only if the Court orders consolidation of the damages phase of all actions to avoid duplicative recovery.  Defendants do not believe that bifurcation would be appropriate otherwise and would oppose bifurcating liability and damage phases in any particular case.

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

U.S. 398, 406-07 (1939).  Confirming the point, states, the laws of which are invoked in the IPP

case, and the Ninth Circuit recognize that interpleader may be an appropriate mechanism to

protect against the risks of duplicative liability, as noted above.

>    ***Declare the parties not before the Court in the class cases indispensible parties under***
>    ***Rule 19 and require the class plaintiffs to propose a resolution***:  Separately, given that parties

not before the Court and parties before the Court have identical or overlapping claims for

damages, Rule of Civil Procedure 19 is implicated and the Court should consider whether absent

parties are necessary.  Indeed, the Court has the authority, if not the duty, to raise the issue *sua*

*sponte*.  *See McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960) ("The absence of

indispensable parties can be raised at any time, however, even by the appellate court on its own

motion.").  Once raised, an iterative process begins.  First, the Court must determine whether the

absent parties are necessary, meaning in this case, that defendants face "a substantial risk of

incurring double, multiple, or otherwise inconsistent obligations."  Fed. R. Civ. P. 19(a)(1)(B)(ii).

That step is easily satisfied here, and indeed drives this discussion.  Next, the Court must

determine whether those parties can be joined, *see* Fed. R. Civ. P. 19(a)(2), an analysis that

repeats much of the analysis above.  If the absent parties cannot be joined to the pending class

actions, the Court then would consider, among other things, whether any steps may be taken to

eliminate the prejudice to the defendants from pursuing the class actions without those absent

parties.  *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111-12 (1968).  If

the Court determines that the prejudice to the defendants cannot be eliminated, the Court may

consider dismissing the action.  *Id.*

>    ***Consistent with consolidation, or interpleader, this Court could reach out to the state***
>    ***courts where claims are pending and coordinate the proceedings to avoid duplicative recovery***:

Bifurcation, consolidation, and interpleader will get this Court far down the road of avoiding

duplicative recovery, but it will not get the Court all of the way.  Some direct, indirect, and

*parens patriae* claims brought by state Attorneys General are now pending in state courts

throughout the country, *see, e.g.*, *People of the State of California, ex rel. Kamela D. Harris v.*

*AU Optronics Corporation, et al.*, No. CGC-10-504651 (Cal. Superior Ct.), and, at least if

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

1    brought in state courts in this Circuit, cannot currently be removed to federal court.  *See, e.g.*,

2    *Wash. v. Chimei Innolux Corp.*, 659 F.3d 842 (9th Cir. 2011).  Similarly, the Eleventh

3    Amendment may stand as a bar to defendants interpleading certain states.  *See, e.g.*, *Cory v.*

4    *White*, 457 U.S. 85, 89-90 (1982).

5          These obstacles presented by the state court actions do not eliminate or lessen this Court's

6    obligation to avoid duplicative recovery.  Instead, folding in the state Attorneys General actions

7    into a comprehensive resolution plan again invites creativity.  The California action, for example,

8    is now pending before the Superior Court of California for the County of San Francisco, Judge

9    Richard A. Kramer presiding, Case No. 10-504651.  Judge Kramer has already suggested that he

10   has experience coordinating his cases with MDL proceedings.  Hwang Decl. ¶ 31, Ex. DD (at

11   11:15-12:3) ("I had something called the automobile antitrust cases with an MDL action in the

12   state of Maine. . .[T]he federal judge [and I] …[w]e crafted an order that basically had the federal

13   action go forward with very little activity here, but still the possibility to have things happen. . . .

14   [B]asically, we both just kept on top of what was going on with the idea being that the federal

15   court, because of the supremacy clause and because he had a much bigger situation than I had,

16   was the dog and I was the tail.  That worked pretty well.").  He indicated that it already was his

17   plan to reach out to this Court in an effort to coordinate his case with the MDL.  *Id.* at 21:12-21.

18   This Court could do the converse for those cases that are now proceeding outside the MDL in

19   state court, reaching out to those courts to jointly devise a plan that ensures the avoidance of

20   duplicative recovery.

21         Such solutions are not unprecedented.  For example, while interpleader may raise

22   Eleventh Amendment immunity questions *before* liability is determined, federal courts hearing

23   admiralty claims have found that concern eliminated *after* resolving liability, allowing

24   "limitation" claims against states to proceed to ensure a just allocation of the *res*.  *See, e.g.*,

25   *Magnolia Marine Trans. Co. v. Okla.*, 366 F.3d 1153, 1160 (10th Cir. 2004) ("the State's

26   invocation of sovereign immunity stands the relationship between the parties on its head").  The

27   same has been found true in the bankruptcy setting.  *See, e.g.*, *Gardner v. N. J.*, 329 U.S. 565, 574

28   (1947) ("When the State becomes the actor and files a claim against the fund it waives any

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

1   immunity which it otherwise might have had respecting the adjudication of the claim.").

2   Assuming the affected state courts are amenable, this Court could suggest a timed approach that

3   allows all cases, state and federal, to be merged at the right time.  Thus, with careful coordination

4   and creative thought, it may be possible to bring all parties with claims before the Court at the

5   right moment if the staging is done correctly.

6          ***Either issue an order that the direct action plaintiffs and state Attorneys General will be***

7   ***estopped in their damage claims from taking any position inconsistent with any award made in***

8   ***the class trial, or issue an order that "vouches in" anyone who has a related claim, alerting all***

9   ***interested parties that their claims may be waived if they do not seek to intervene in the class***

10  ***trial***:  As creativity may help solve jurisdictional hurdles, so too may creativity solve the problem

11  of various cases proceeding in different jurisdictions and/or at different times.  Across the DPP,

12  IPP, DAP, and AG cases, certain common damages questions will be litigated perhaps to

13  differing and inconsistent results if tried separately.  As discussed above, the indirect end user

14  plaintiffs claim that the alleged amount of overcharge that was passed on to them for their TFT-

15  LCD products was high – near 100%.  The DAP retailer plaintiffs who sold to those IPPs

16  disagree.  If all the parties in the same distribution line are not before the Court when the pass-on

17  issues are resolved, some mechanism must be put in place that nevertheless ensures that those

18  issues are resolved only once.  This Court's inherent equitable powers afford it various

19  mechanisms to achieve this.

20         For example, the Supreme Court has recognized that a nonparty may still be precluded –

21  and here both issue and claim preclusion are implicated – based on "'substantive legal

22  relationship[s]' between the person to be bound and a party to the judgment[,]" or where a

23  "special statutory scheme" "'expressly foreclos[es] successive litigation by nonlitigants." *Taylor*

24  *v. Sturgell*, 553 U.S. 880, 894, 895 (2008).  Although normally applied when real property is

25  involved, "[q]ualifying relationships include, but are not limited to preceding and succeeding

26  owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.  Certain states have

27  held that parties within the "'chain of sale'" "are in privity," *see Little v. V & G Welding Supply*,

28  *Inc.*, 704 So.2d 1336, 1339 (Miss. 1997), while others have noted that "a manufacturer-supplier

- 21 -

1    of goods stands in 'vertical privity' in the 'chain of sale' to the retailer and purchaser."

2    *Thompson v. Karastan Rug Mills*, 323 A.2d 341, 345 (Pa. Super. Ct. 1974).  This Court has

3    recently reiterated its view that as to the claims for *injunctive* relief, these class cases will not

4    have preclusive effect on certain claims proceeding elsewhere.  Order re: States of Illinois and

5    Washington's Administrative Motion to Clarify January 30 Order (Feb. 27, 2012) (D.I. 4885).  As

6    to the *damages* claims, however, this Court could apply general equitable principles to preclude

7    claims or conclusively establish certain facts (alleged pass through, *etc.*) by parties within the

8    same distribution chain.

9            Defendants acknowledge that there is secondary authority that suggests that this form of

10   non-party preclusion only works down the distribution chain (a predecessor binds a successor),

11   not up (a successor cannot bind a predecessor).  *See, e.g.*, Restatement (Second) of Judgments §

12   43 cmt. e.  Yet, given the overlay of the unique federal and state antitrust statutory schemes here,

13   that concern may well be inapposite.  Regardless, even only working down the distribution

14   scheme, the Court could conclude that the damages claims of downstream buyers – IPPs and

15   DAPs alike – are precluded to the degree that the upstream claims of the DPPs have been

16   resolved, any overcharge is awarded to those upstream DPPs, and the underlying TFT-LCD panel

17   is the same.  While no court has been presented with application of this approach in the antitrust

18   direct/indirect purchaser context post *Taylor*, courts in this Circuit have applied *Taylor* to bar

19   claims brought by a downstream predecessor in interest where an upstream claim has been

20   adjudicated.  *See, e.g.*, *Crane-McNab, LLC v. County of Merced*, 2010 WL 4024936, at *4 (E.D.

21   Cal. Oct. 13, 2010) ("Plaintiffs claims are barred by the prior litigation even if they were not the

22   named-parties, because Plaintiffs are succeeding owners of the property at issue in the prior

23   litigation.").

24           A related option might be to pursue an extended form of the common law "vouching in"

25   process.  The concept recognizes that "[p]reclusion may extend to a nonparty who did not

26   participate in an action on the ground that the nonparty should have participated."  Wright &

27   Miller, 18A Federal Practice & Procedure § 4452 (3d ed. 2011).  There is not an insignificant

28   question whether the doctrine remains alive, *see id.*; *Martin v. Wilks*, 490 U.S. 755 (1989);

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

1    *Kourtis v. Cameron*, 419 F.3d 989, 998 (9th Cir. 2005) *overruled on other grounds by Taylor*,

2    553 U.S. at 904, but "[a] few cases and some commentary . . . have raised the question whether

3    some circumstances may justify preclusion for failure to intervene[,]" and particularly in places

4    where "special remedial schemes" "are designed specifically to foreclose non participants."  18A

5    Federal Practice & Procedure § 4452.  The analogy here is to bankruptcy law.  There – given the

6    specialized nature of the law – courts have held that "a party may be barred from future litigation

7    by his mere failure to intervene" after notice.  *Griffin v. Burns*, 570 F.2d 1065, 1071 n.7 (1st Cir.

8    1978).  Similarly, courts have held that in unusual circumstances, where non-parties "were

9    aware" of the previous suits, "knew that their interests were at stake," and "monitored" the

10   litigation "closely," they could be deemed bound by the result of the earlier litigation where they

11   chose not to intervene.  *Nat'l Wildlife Fed'n v. Gorsuch*, 744 F.2d 963, 971 (3d Cir. 1984).[8]

12   Related concepts would apply here.  Like in bankruptcy, the underlying premise is that if there

13   has been a wrong that resulted in alleged overcharges, that universe is not unlimited.  Instead it

14   would create a pool – the total found overcharge (if any) – against which claims could be drawn.

15   This Court could then give notice to all parties of its intent to invoke this option.  Those who then

16   chose not intervene would be bound by the upcoming trial's outcome as to found facts concerning

17   damages.  Given that at least some courts have concluded that some form of "vouching" remains

18   viable in a post-*Wilks* world, *see, e.g.*, *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d

19   1131, 1139 (5th Cir. 1991) ("This court recognizes vouching as a valid procedural device."), this

20   is a further option this Court could explore.

21        **Summation:**   The above discussion demonstrates that the Court, all parties to the pending

22   class trials, and all other claimants have an obligation to and interest in developing a resolution to

23   _____

24   [8] By virtue of the MDL procedures, all actual and potential claimants have long been on notice of
     the competing demands along the TFT-LCD supply chain for the same overcharge damages.  In
25   addition, in conjunction with this motion, Defendants are giving notice to all DAPs and AGs that
     they intend to assert damages-related preclusion based on the results of the upcoming DPP/IPP
26   trial, which notice then affords them the option to weigh in on the appropriate procedures for
     effecting this result.  Before the resolution of this motion, LG Display (and likely other
27   defendants) will also seek leave to add declaratory relief counterclaims in all pending DAP and
     AG cases on the duplicative recovery issue.  The remaining IPP and DPP Defendants would also
28   be happy to amend their answers to add a declaratory relief claim in the IPP and DPP class
     actions if the Court feels it would help.

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

1   avoid duplicative recovery and to do so in a fair and efficient manner.  Most antitrust MDLs do

2   not get this far, and, as a result, there is not abundant authority explaining what the Court is to do.

3   One thing the laws makes clear, though, is that doing nothing is not an option.  Duplicative

4   recovery must be avoided.

5       As the above analysis reflects, the remaining IPP and DPP Defendants have given

6   substantial thought to the options this Court has available to meet its burden to avoid the inequity

7   of duplicative recovery.  Defendants, however, encourage the Court to invite the class plaintiffs

8   and other interested claimants to *also* propose meaningful solutions.  Once the Court determines

9   what options it would like to explore, it may make sense to request further briefing.

10  **IV.   <u>CONCLUSION</u>**

11      For the foregoing reasons, Defendants request an order adopting the procedural

12  mechanisms to avoid multiple recovery and/or further guidance from the Court on how it will

13  advance this important and necessary end result.

14

15  DATED:  March 12, 2012                    By:  _/s/ Hojoon Hwang_____
                                                 Brad D. Brian (State Bar No. 079001)
16                                               Jerome C. Roth (State Bar No. 159483)
                                                 Hojoon Hwang, Esq. (State Bar No. 184950)
17                                               Stuart N. Senator (State Bar No. 148009)
                                                 Jonathan E. Altman (State Bar No. 170607)
18                                               Truc T. Do (State Bar No. 191845)
                                                 Hailyn J. Chen (State Bar No. 237436)
19                                               MUNGER, TOLLES & OLSON LLP
                                                 355 South Grand Avenue
20                                               Los Angeles, CA  90071-1560
                                                 Telephone:    (213) 683-9100
21                                               Facsimile:    (213) 687-3702
                                                 *Brad.Brian@mto.com*

22

23

24

25

26

27

28

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: _/s/ Holly A. House_____
Holly A. House (State Bar No. 136045)
Lee F. Berger (State Bar No. 222756)
Paul Hastings LLP
55 Second Street
Twenty-Fourth Floor
San Francisco, CA 94105
Telephone:     (415) 856-7000
Facsimile:     (415) 856-7100
*hollyhouse@paulhastings.com*
*leeberger@paulhastings.com*

*Attorneys for Defendants LG Display Co., Ltd.
and LG Display America, Inc.*

By: _/s/ Christopher A. Nedeau_____
Christopher A. Nedeau (State Bar No. 81297)
Carl L. Blumenstein (State Bar No. 124158)
James A. Nickovich (State Bar No. 244969)
Chi Soo Kim (State Bar No. 232346)
NOSSAMAN LLP
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438
cnedeau@nossaman.com
cblumenstein@nossaman.com
jnickovich@nossaman.com
ckim@nossaman.com

*Attorneys for Defendants AU Optronics
Corporation and AU Optronics Corporation
America*

By: /s/ Christopher M. Curran_____
John H. Chung (Pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200 (Phone)
(212) 354-8113 (Facsimile)
jchung@whitecase.com

Christopher M. Curran (Pro hac vice)
Kristen J. McAhren (Pro hac vice)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC
(202) 626-3600 (Phone)
(202) 639-9355 (Facsimile)
ccurran@whitecase.com
kmcahren@whitecase.com

DEFENDANTS' MOTION RE TRIAL STRUCTURE
AND DUPLICATIVE RECOVERY
CASE NO.: 3:07-MD-1827 SI

*Counsel for Defendants Toshiba Corporation,*
*Toshiba Matsushita Display Technology Co., Ltd.,*
*Toshiba America Electronic Components, Inc.,*
*and Toshiba America Information Systems, Inc.*

<u>Attestation</u>:  The filer of this document attests that the concurrence of the signatories thereto has been obtained.

LEGAL_US_W # 70746927