Robert W. Turken
Mitchell E. Widom
Scott N. Wagner
BILZIN SUMBERG BAENA PRICE &
AXELROD LLP
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
E-mail:  rturken@bilzin.com; mwidom@bilzin.com; swagner@bilzin.com

Stuart H. Singer
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email:  ssinger@bsfllp.com

*Counsel for Plaintiffs Tech Data Corporation
and Tech Data Product Management, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**(SAN FRANCISCO DIVISION)**

| | |
|---|---|
| In re: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATON | Case No. 3:11-CV-05765-SI |
| | Master File No. 3:07-md-01827-SI (N.D. Cal.) |
| TECH DATA CORPORATION; TECH DATA PRODUCT MANAGEMENT, INC., | MDL No. 1827 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| | *REDACTED – PUBLIC VERSION* |
| AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO., LTD.; CHUNGHWA PICTURE TUBES, LTD.; | |

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1
EPSON ELECTRONICS AMERICA, INC.;
EPSON IMAGING DEVICES
2
CORPORATION;
HANNSTAR DISPLAY CORPORATION;
3
HITACHI ELECTRONIC DEVICES (USA),
INC.;
4
HITACHI, LTD.;
HITACHI DISPLAYS, LTD.;
5
LG DISPLAY CO., LTD.;
LG DISPLAY AMERICA, INC.;
6
MITSUI & CO. (TAIWAN), LTD.;
7
MITSUI & CO. (USA), INC.;
NEC CORPORATION;
8
NEC ELECTRONICS AMERICA, INC.
9
NEC LCD TECHNOLOGIES, LTD.;
NEC DISPLAY SOLUTIONS OF
10
AMERICA, INC.;
SANYO CONSUMER ELECTRONICS,
11
LTD.;
SHARP CORPORATION;
12
SHARP ELECTRONICS CORPORATION;
13
TATUNG COMPANY OF AMERICA, INC.;
TOSHIBA AMERICA ELECTRONIC
14
COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
15
SYSTEMS, INC.;
16
TOSHIBA CORPORATION; and
TOSHIBA MATSUSHITA DISPLAY
17
TECHNOLOGY CO., LTD.,

18
                    Defendants.

19

20

21

22

23

24

25

26

27

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1       Plaintiffs, Tech Data Corporation and Tech Data Product Management, Inc. ("Tech

2   Data"), for their Complaint against all Defendants named herein, hereby allege as follows:

3   **I.      INTRODUCTION**

4       1.      Defendants and their co-conspirators formed an international cartel that conducted

5   a long-running conspiracy extending at a minimum from at least January 1, 1996 through at least

6   December 11, 2006 (the "Relevant Period").   The purpose and effect of this conspiracy (the

7   "Conspiracy") was to fix, raise, stabilize, and maintain prices for Liquid Crystal Display panels

8   ("LCD Panels").

9       2.      LCD Panels are used in a number of products, including, but not limited to

10  televisions, desktop computer monitors, notebook computers, and mobile wireless handsets.  As

11  used herein, "LCD Products" refers to all LCD Panels, and all products containing LCD Panels,

12  manufactured by any of the named Defendants or their subsidiaries, affiliates, or co-conspirators.

13  Defendants' and their co-conspirators' price-fixing Conspiracy alleged herein had the effect of

14  raising, fixing, maintaining, and/or stabilizing the prices of LCD Products.

15      3.      During the Relevant Period, the Conspiracy affected billions of dollars of

16  commerce throughout the United States.   The Conspiracy included communications and

17  meetings in which Defendants and their co-conspirators agreed to eliminate competition and fix

18  the prices of LCD Panels and LCD Products that they knew would be sold in the United States.

19      4.      Beginning in at least 1996, Defendants along with other LCD Panel

20  manufacturers (collectively, the "Existing LCD Panel Manufacturers" and individually, each an

21  "Existing LCD Panel Manufacturer") met in person or communicated by other means to agree on

22  LCD Product prices and the amount of LCD Products each would produce.  As new producers

23  entered the LCD Products market, the new producers also agreed to fix prices and to control

24  supply ("New Producers" and collectively with the Existing LCD Panel Manufacturers, the

25  "Conspirators").  The Conspirators' Conspiracy included agreements on the prices at which the

26  Conspirators would sell LCD Products to their own corporate subsidiaries and affiliates, as well

27  as their co-conspirators, thereby ensuring LCD Product prices remained consistent among the

28

1    Conspirators and their customers, which was an attempt to prevent any price discrepancies to

2    consumers.

3         5.    Throughout the Relevant Period, the Conspiracy was effective in moderating the

4    normal downward pressures on prices for LCD Products caused by periods of oversupply and

5    technological change.  The Conspiracy resulted in unusually long periods of high prices and high

6    profits.  Although there were periods when prices for LCD Products temporarily declined as a

7    result of new entrants being assimilated, or breakdowns in the effectiveness of the Conspiracy,

8    those price declines were from levels that had been set conspiratorially high, rather than from

9    levels set by free and open competition.  In addition, prices declined less than they would have in

10   a competitive market.  As a result of the Conspirators' unlawful conduct, Plaintiffs paid higher

11   prices for LCD Products than they would have paid in a competitive market.

12        6.    Seven of the Defendants have already admitted to participating in this

13   Conspiracy: LG Display Co., Ltd. (together with its wholly-owned subsidiary, LG Display

14   America, Inc.); Sharp Corporation; Chunghwa Picture Tubes, Ltd.; Hitachi Displays, Ltd.; Epson

15   Imaging Devices Corporation; Chi Mei Optoelectronics Corporation; and HannStar Display

16   Corporation.  On or about November 12, 2008, LG Display Co., Ltd., LG Display America, Inc.,

17   Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of

18   $585 million in criminal fines for their roles in a conspiracy to fix the prices of LCD Panels.  On

19   or about May 15, 2009, Hitachi Displays, Ltd. agreed to plead guilty and pay a $31 million

20   criminal fine for its role in a conspiracy to fix the prices of LCD Panels.  On or about August 25,

21   2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal

22   fine for its role in a conspiracy to fix the prices of LCD Panels.  And on or about February 8,

23   2010, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million

24   criminal fine for its role in a conspiracy to fix the prices of LCD Panels.  On or about June 29,

25   2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine

26   for its role in a conspiracy to fix the prices of LCD Panels.  Two executives from LG Display,

27   three executives from Chunghwa, four executives from Chi Mei, and one executive from

28   HannStar have also pleaded guilty and have been ordered to pay criminal fines and serve time in

1   federal prison for their participation in a conspiracy to fix the prices of LCD Panels.  In addition,

2   on or about June 10, 2010, the U.S. Department of Justice ("DOJ") indicted AU Optronics

3   Corporation and AU Optronics Corporation America, charging them with participating in a

4   conspiracy to fix the prices of LCD Panels.  The DOJ's criminal investigation is ongoing.

5       7.      During the Relevant Period, Plaintiffs purchased LCD Products in the United

6   States directly from the Conspirators, including, but not limited to, Defendants, and/or

7   Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries

8   and affiliates controlled and, as a result of the Conspiracy, the prices Plaintiffs paid for LCD

9   Products were artificially high.  Plaintiffs also purchased LCD Products indirectly from original

10  equipment manufacturers ("OEMs") and others.  Plaintiffs thus suffered damages as a result of

11  the Conspiracy, and bring this action to recover the overcharges paid for the LCD Products they

12  directly and indirectly purchased during the Relevant Period.

13  **II.     JURISDICTION AND VENUE**

14      8.      Plaintiffs bring this action to obtain injunctive relief under Section 16 of the

15  Clayton Act, to recover damages, including treble damages under Section 4 of the Clayton Act,

16  costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of

17  the Sherman Act (15 U.S.C. § 1).

18      9.      Plaintiffs also bring this action pursuant to various state laws listed herein because

19  Plaintiffs purchased LCD Products from both defendants and non-defendant vendors which

20  contained price-fixed LCD Panels manufactured by Defendants and their co-conspirators in

21  those states.

22      10.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

23  Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

24  supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367

25  because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs'

26  state law claims are so related to their claims under Section 1 of the Sherman Act that they form

27  part of the same case or controversy.

28

1  11. The activities of Defendants and their co-conspirators, as described herein,

2 involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

3 did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

4 import trade or commerce, as well as on commerce and consumers in states including Florida

5 and California.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant Period,

6 Defendants' Conspiracy affected the price of LCD Products purchased in the United States.  In

7 particular, Defendants' and their co-conspirators' Conspiracy directly and substantially affected

8 the price of LCD Products purchased in the states identified herein.

9  12. This court has jurisdiction over each Defendant named in this action under

10 Section 12 of the Clayton Act, 15 U.S.C. § 22.  In addition, Defendants and their co-conspirators

11 purposely availed themselves of the laws of the United States as they manufactured LCD Panels

12 for sale in the United States, or which were incorporated into LCD Products Defendants and their

13 co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

14 conspirators' Conspiracy affected commerce involving LCD Products in the United States.

15 Moreover, Defendants who have entered guilty pleas in connection with the Conspiracy alleged

16 herein have acknowledged that their illegal activities had a substantial effect on interstate and

17 foreign trade and commerce.

18  13. Venue is proper in the Middle District of Florida under Section 12 of the Clayton

19 Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is either an

20 alien corporation, transacts business in this District, or is otherwise found within this District.  In

21 addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

22 events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

23 conspirators knew that price-fixed LCD Products containing price-fixed LCD Panels would be

24 sold and shipped into this District, as well as from or into other states.

25 **III.** **DEFINITIONS**

26  14. As previously noted, the term "Relevant Period" refers to the time period

27 beginning January 1, 1996 and continuing at least until December 11, 2006.

28

15.     As used herein, the term "LCD Panel" means liquid crystal display panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electronically charged dots, or pixels, that form an image.  During the Relevant Period, LCD Panels used in some notebooks computers and hand-held devices included different technologies including:  thin film transistor (TFT) panels, thin film diode (TFD), color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels.  The price-fixing Conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels including those using TFT, TFD, CSTN, and MSTN technology in LCD Products.

16.     As used herein, the term "LCD Products" means all LCD Panels and any product containing an LCD Panel, including without limitation televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand-held devices.

17.     As used herein, the term "OEM" means any original equipment manufacturer of LCD Products.

## IV.     PARTIES

### A.     PLAINTIFFS

18.     Plaintiff Tech Data Corporation is a corporation organized under the laws of the State of Florida, with its principal place of business in Clearwater, Florida.  Tech Data Corporation is registered to do business in Florida and California.  Tech Data Product Management, Inc. is a corporation organized under the laws of the State of Florida, with is principal place of business in Clearwater, Florida.  Tech Data Product Management, Inc. is registered to do business in Florida and California.  Tech Data Corporation and Tech Data Product Management, Inc. are referred to collectively herein as "Tech Data."

19.     Tech Data is the world's second largest wholesale distributor of information technology products.  During the Relevant Period, Tech Data bought LCD Products manufactured by Defendants and their co-conspirators, directly from Defendants, their co-

conspirators, OEMS, and other vendors.  As a result of Defendants' and their co-conspirators' illegal Conspiracy to fix the prices of LCD Panels, the prices of the LCD Products purchased by Tech Data were artificially inflated.  Thus, Tech Data suffered damages as a result of Defendants' and their co-conspirators' Conspiracy, and brings this action to recover the overcharges paid for the LCD Products it purchased during the Relevant Period.

20.     During the Relevant Period, Tech Data purchased LCD Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  Tech Data also purchased LCD Products from OEMs, as well as other vendors, which contained LCD Panels that had been purchased from Defendants and their co-conspirators.  Tech Data made all of its LCD Product purchasing and pricing decisions in its offices in the United States.  Furthermore, all of Tech Data's negotiations for the purchase of LCD Products took place in the United States and were controlled at the company's headquarters in Clearwater, Florida.  In addition, all Tech Data purchase orders for LCD Products were issued in the United States and all invoices were sent to Tech Data's offices in the United States.  As a result, the prices that Tech Data paid for LCD Products purchased from certain defendants and their co-conspirators were determined within the United States.  As such, Tech Data suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

21.     All of the LCD Products that Tech Data purchased from the Defendants and their co-conspirators were delivered to one of Tech Data's U.S.-based warehouses, such as those in Ontario, California; Fontana, California; Miami, Florida; Suwanee, Georgia; Swedesboro, New Jersey; South Bend, Indiana; Fort Worth, Texas; and Frederick, Maryland.  Accordingly, the price-fixing by Defendants and their co-conspirators was the proximate cause of artificially elevated prices actually paid by Tech Data for LCD Products delivered to its offices within the United States.  As a result of Defendants' and their co-conspirators' Conspiracy, Tech Data was injured in its business and property because the prices it paid for such LCD Products were artificially inflated by the Conspiracy.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 6 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

**B.**    **JAPANESE DEFENDANTS**

    **i.**    **Epson**

22.    Defendant Epson Imaging Devices Corporation ("Epson Japan") is a Japanese company with its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104, Japan.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd., but is now a wholly-owned subsidiary of Seiko Epson Corporation.  During the Relevant Period, Epson Japan manufactured, sold, and distributed LCD Products to customers throughout the United States and elsewhere.

23.    Defendant Epson Electronics America, Inc. ("Epson America") is a California corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California. Epson America is a wholly-owned and controlled subsidiary of Seiko Epson Corporation, which is also the ultimate parent company of Defendant Epson Imaging Devices Corporation.   During the Relevant Period, Epson America sold and distributed LCD Products manufactured by Epson Imaging Devices Corporation to customers throughout the United States and elsewhere.

24.    Defendants Epson Japan and Epson America are referred to collectively herein as "Epson."  They participated in the Conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.   Further, Defendant Epson benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed.  Alternatively, Defendant Epson America was a member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

    **ii.**    **Hitachi**

25.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company was one of the original producers of LCD Panels.  In 2002, it spun off its LCD manufacturing assets to

1   Hitachi Displays, Ltd., a wholly-owned subsidiary.  During the Relevant Period, Hitachi, Ltd.
2   manufactured, sold, and distributed LCD Products to customers throughout the United States and
3   elsewhere.

4        26.    Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place
5   of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.
6   Hitachi Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD
7   manufacturing business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of
8   Hitachi, Ltd.   During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and
9   distributed LCD Products to customers throughout the United States and elsewhere.  Hitachi
10  Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

11       27.    Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with
12  its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its ultimate
13  parent company is Hitachi, Ltd.  During the Relevant Period, Hitachi Electronic Devices (USA),
14  Inc. sold and distributed LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd.
15  to customers throughout the United States and elsewhere.

16       28.    Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices
17  (USA), Inc. are sometimes referred to collectively herein as "Hitachi."  Defendants Hitachi, Ltd.,
18  Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. were members of the
19  Conspiracy by virtue of the actions of their respective officers, employees and representatives
20  acting with actual or apparent authority.   Further, Defendant Hitachi benefited from the
21  Conspiracy by receiving greater profits than it would have received had the Conspiracy not
22  existed.  Alternatively, Defendants Hitachi Displays, Ltd. and Hitachi Electronic Devices (USA),
23  Inc. were members of the Conspiracy by virtue of their status during the Relevant Period as the
24  alter egos or agents of Hitachi, Ltd.  Hitachi, Ltd. dominated or controlled Hitachi Displays, Ltd.
25  and Hitachi Electronic Devices (USA), Inc. regarding Conspiracy activities and used that
26  domination or control to charge artificially high prices for LCD Products.

27

28

### iii.    **Mitsui**

29.     Defendant Mitsui & Co. (Taiwan), Ltd. ("Mitsui Taiwan") is a Taiwanese company with its principal place of business at Tunnan Tower 21F; No. 97 Tunhua South Rd. Section 2 Taipei City, 106 Taiwan.  Mitsui Taiwan is a wholly-owned and controlled subsidiary of co-conspirator Mitsui & Co., Ltd., a Japanese corporation.

30.     Co-conspirator Mitsui & Co., Ltd. ("Mitsui Japan") is a consolidated global trading company and conducts its business activities in collaboration with and through its overseas offices, including Mitsui Taiwan and Mitsui U.S.A. Mitsui Japan participated in the Conspiracy through its wholly-owned and controlled subsidiaries Mitsui Taiwan and Mitsui U.S.A., and through other actions alleged in this complaint. Mitsui Taiwan and Mitsui U.S.A. were the general agents for and representatives of Mitsui Japan in Taiwan and the United States, respectively.

31.     Defendant Mitsui & Co. (U.S.A.), Inc. ("Mitsui U.S.A.") is a New York Corporation with its principal place of business at 200 Park Avenue, 35th Floor, New York, New York. Mitsui U.S.A. is a wholly-owned and controlled subsidiary of co-conspirator Mitsui & Co., Ltd. Until 2009, Mitsui U.S.A. held an eighty percent ownership interest in Mitsui Comtek Corp. ("Mitsui Comtek"), a California corporation, with the remaining twenty percent held by co-conspirator Mitsui & Co., Ltd. As of 2009, Mitsui Comtek merged with and into Mitsui U.S.A.  During the Relevant Period, Mitsui Comtek sold and distributed LCD Products to customers throughout the United States and elsewhere.

32.     Defendants Mitsui Taiwan and Mitsui U.S.A. and co-conspirator Mitsui Japan, are sometimes referred to collectively herein as "Mitsui."  Defendants Mitsui Taiwan and Mitsui U.S.A. and co-conspirator Mitsui Japan participated in the Conspiracy through the actions of their respective affiliates, officers, employees, and representatives acting with actual or apparent authority.  Defendants Mitsui Taiwan and Mitsui U.S.A. participated in the Conspiracy during the Relevant Period and were each the alter ego or agent of Mitsui Japan in Taiwan and the United States, respectively.  Mitsui benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 9 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

33.     Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. participated in the Conspiracy in a coordinated manner and functioned as a single integrated entity.  Mitsui Japan dominated or controlled Mitsui Taiwan and Mitsui U.S.A. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD Products.  Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. were part of Mitsui's Display Products Department, U.S. & Asia Team, which was managed by a team leader at Mitsui Japan.  The team leader directed the activities of employees at Mitsui Taiwan and Mitsui U.S.A.  Thus, Defendants Mitsui U.S.A. and Mitsui Taiwan and co-conspirator Mitsui Japan functioned as a single integrated enterprise in furtherance of the Conspiracy.  Specific evidence of Mitsui's coordinated participation in the Conspiracy is detailed in Appendix A to this Complaint.

34.     Mitsui functions as a single integrated enterprise generally as well.  Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. cooperate in all areas and share all relevant business information.  Moreover, the functions performed in Taiwan and the United States by Mitsui Taiwan and Mitsui U.S.A., respectively, were sufficiently important such that if these Mitsui subsidiaries did not undertake them, Mitsui Japan would perform those functions itself.  Defendants Mitsui Taiwan and Mitsui U.S.A. were closely affiliated, controlled and dominated by co-conspirator Mitsui Japan.  Mitsui functions as a worldwide business partnership with integrated sales and distribution systems and a common marketing image.  Defendants Mitsui Taiwan and Mitsui U.S.A. shared common officers and directors with Mitsui Japan.

### iv.    NEC

35.     Defendant NEC Corporation is a Japanese company with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan.  During the Relevant Period, NEC Corporation manufactured, sold and distributed LCD Products to customers throughout the United States and elsewhere.

36.     Defendant NEC LCD Technologies, Ltd. is a Japanese company with its principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666, Japan.  NEC LCD Technologies, Ltd. was formed in 2003 and is a wholly-owned and controlled subsidiary of NEC Corporation.  During the Relevant Period, NEC LCD Technologies, Ltd.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 10 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1    manufactured, sold and distributed LCD Products to customers throughout the United States and

2    elsewhere.  In July of 2011, NEC LCD Technologies, Ltd. became a joint venture company with

3    NEC Corp. and the AVIC International Group.

4          37.    Defendant NEC Electronics America, Inc. is a California corporation with its

5    principal place of business at 2880 Scott Boulevard, Santa Clara, CA and its manufacturing plant

6    in Roseville, California.  Its ultimate parent company is NEC Corporation.  During the Relevant

7    Period, NEC Electronics America, Inc. sold and distributed LCD Products manufactured by NEC

8    Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States and

9    elsewhere.

10         38.    Defendant NEC Display Solutions of America, Inc. is a Delaware Corporation

11   with its principal place of business located at 500 Park Blvd., Suite 1100, Itasca, Illinois 60143.

12   It is a wholly-owned and controlled subsidiary of NEC Corporation.  During the Relevant Period,

13   NEC Display Solutions of America and its predecessor sold and distributed LCD Products

14   manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout

15   the United States.

16         39.    Defendants NEC Corporation, NEC LCD Technologies, Ltd., and NEC

17   Electronics America, Inc., and NEC Display Solutions of America, Inc. are sometimes referred

18   to collectively herein as "NEC."  Defendants NEC Corporation, NEC LCD Technologies, Ltd.,

19   NEC Electronics America, Inc., and NEC Display Solutions of America, Inc. were members of

20   the Conspiracy that is the subject of this Complaint by virtue of the actions of their respective

21   officers, employees and representatives acting with actual or apparent authority.  Further,

22   Defendants NEC Corporation and NEC LCD Technologies, Ltd. benefited from the Conspiracy

23   by receiving greater profits than they would have received had the Conspiracy not existed.

24   Alternatively, Defendants NEC LCD Technologies and Ltd., NEC Electronics America, Inc., and

25   NEC Display Solutions of America, Inc. were members of the Conspiracy by virtue of their

26   status during the Relevant Period as the alter egos or agents of NEC Corporation.  NEC

27   Corporation dominated or NEC LCD Technologies, Ltd., NEC Electronics America, Inc., and

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 11 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1  NEC Display Solutions of America, Inc. regarding Conspiracy activities and used that

2  domination or control to charge artificially high prices for LCD Panels and LCD Products.

3      **v.**   **Sanyo**

4    40.   Defendant SANYO Consumer Electronics, Ltd. ("Sanyo Consumer") is a

5  Japanese company with its principal place of business at 7-101, Tachikawa-cho, Tottori 680-

6  0061, Japan. Sanyo Consumer was formerly known as Tottori Sanyo Electric Co. Prior to

7  October 2004, co-conspirator Sanyo Electric Co., Ltd. owned and operated Sanyo Consumer. In

8  2004, co-conspirators Seiko Epson Corporation and Sanyo Electric Co., Ltd. formed a joint

9  venture, Sanyo Epson Imaging Devices Corporation. After the Relevant Period, Sanyo Epson

10  Imaging Devices Corporation became Epson Imaging Devices Corporation, also a Defendant.

11  During the Relevant Period, Sanyo Consumer manufactured, sold and distributed LCD Products

12  to customers throughout the United States and elsewhere.

13    41.   Defendant Sanyo Consumer participated in the Conspiracy through the actions of

14  its affiliates, officers, employees, and representatives acting with actual or apparent authority.

15  During the Relevant Period, Sanyo Consumer was closely affiliated, commonly owned,

16  controlled and dominated by co-conspirator Sanyo Electric Co., Ltd., and functioned as a single

17  enterprise and/or alter egos. Sanyo Consumer is a wholly-owned subsidiary of Sanyo Electric

18  Co., Ltd., a consolidated consumer electronics and information technology company based in

19  Japan.

20      **vi.**   **Sharp**

21    42.   Defendant Sharp Corporation is a Japanese company with its principal place of

22  business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. The company was one of the

23  earliest producers of LCD Panels. During the Relevant Period, Sharp Corporation manufactured,

24  sold and distributed LCD Products to customers throughout the United States and elsewhere.

25    43.   Defendant Sharp Electronics Corporation is a New York corporation with its

26  principal place of business at Sharp Plaza, Mahwah, New Jersey. Sharp Electronics Corporation

27  is a wholly-owned and controlled subsidiary of Defendant Sharp Corporation. During the

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT
   - 12 -   
MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1  Relevant Period, Sharp Electronics Corporation sold and distributed LCD Products manufactured

2  by Defendant Sharp Corporation to customers throughout the United States and elsewhere.

3      44.    Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes

4  referred to collectively herein as "Sharp."  Defendants Sharp Corporation and Sharp Electronics

5  Corporation were members of the Conspiracy by virtue of the actions of their respective officers,

6  employees and representatives acting with actual or apparent authority.  Further, Sharp

7  Corporation and Sharp Electronics Corporation benefited from the Conspiracy by receiving

8  greater profits than they would have received had the Conspiracy not existed.  Alternatively,

9  Defendant Sharp Electronics Corporation was a member of the Conspiracy by virtue of its status

10  during the Relevant Period as the alter ego or agent of Sharp Corporation.    Sharp Corporation

11  dominated or controlled Sharp Electronics Corporation regarding Conspiracy activities and used

12  that domination or control to charge artificially high prices for LCD Products.

13                  **vii.**   **Toshiba**

14      45.    Defendant Toshiba Corporation is a Japanese company with its principal place of

15  business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba Corporation

16  participates in two joint ventures that manufacture, sell, and distribute LCD Products –

17  Defendant Toshiba Matsushita Display Technology Co., Ltd. and co-conspirator IPS Alpha

18  Technology, Ltd.  During the Relevant Period, Toshiba Corporation manufactured, sold, and

19  distributed LCD Products to customers throughout the United States and elsewhere.

20      46.    Defendant Toshiba Matsushita Display Technology Co., Ltd. (n/k/a Toshiba

21  Mobile Display Co., Ltd.) ("Toshiba Matsushita") is a Japanese company with its principal place

22  of business at Rivage Shinagawa, 18, Konan 4-chome, Minato-ku, Tokyo 108-0075, Japan.

23  Toshiba Matsushita is a joint venture between Defendant Toshiba Corporation and co-

24  conspirator Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.).

25  Toshiba Matsushita was created for the purpose of manufacturing LCD Products.  During the

26  Relevant Period, Toshiba Matsushita manufactured, sold, and distributed LCD Products to

27  customers throughout the United States and elsewhere.  Toshiba Matsushita participated in the

28  Conspiracy through the actions of its respective officers, employees, and representatives acting

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 13 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1   with actual or apparent authority.  Further, Toshiba Matsushita benefited from the Conspiracy by

2   receiving greater profits than it would have received had the Conspiracy not existed.

3        47.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

4   California corporation with its principal place of business at 19900 MacArthur Boulevard, Suite

5   400, Irvine, California.  Toshiba America Electronic Components, Inc. is a wholly-owned and

6   controlled subsidiary of Toshiba America, Inc., a holding company for Defendant Toshiba

7   Corporation.  Toshiba America Electronic Components, Inc. is the United States sales and

8   marketing representative for Defendants Toshiba Corporation and Toshiba Matsushita.  During

9   the Relevant Period, Toshiba America Electronic Components, Inc. sold and distributed LCD

10  Products manufactured by Toshiba Corporation to customers throughout the United States and

11  elsewhere.

12       48.    Defendant Toshiba America Information Systems, Inc. is a California corporation

13  with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  Toshiba

14  America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba

15  America, Inc.  During the Relevant Period, Toshiba America Information Systems, Inc. sold and

16  distributed LCD Products manufactured by Toshiba Corporation to customers throughout the

17  United States and elsewhere.

18       49.    Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba

19  America Information Systems, Inc. are sometimes referred to collectively herein as "Toshiba."

20  Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba America Information

21  Systems, Inc. were members of the Conspiracy by virtue of the actions of their respective

22  officers, employees and representatives acting with actual or apparent authority.  Further,

23  Defendant Toshiba benefited from the Conspiracy by receiving greater profits than it would have

24  received had the Conspiracy not existed.  Alternatively, Defendants Toshiba America Electronics

25  Components, Inc., Toshiba America Information Systems, Inc., and Toshiba Matsushita were

26  members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos

27  or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba

28  Matsushita, Toshiba America Electronics Components, Inc., and Toshiba America Information

1  Systems, Inc. regarding Conspiracy activities and used that domination or control to charge

2  artificially high prices for LCD Products.

3  **C.   KOREAN DEFENDANTS**

4  **i.   LG Display**

5  50.   Defendant LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd., is

6  a Korean entity with its principal place of business at 20, Yeouido-dong, Yeongdeungpo-gu,

7  Seoul, Korea 150-721.  LG Display Co., Ltd. was created in July 1999 as a joint venture between

8  co-conspirators LG Electronics, Inc. and Royal Philips Electronics, N.V.  In July 2004, LG

9  Display Co., Ltd. became a public company, with LG Electronics, Inc. and Royal Philips

10  Electronics N.V. as the controlling shareholders.  LG Display Co., Ltd. describes itself as the

11  global leader in the development and manufacturer of LCD Panels for televisions, computer

12  monitors, notebooks and emerging mobile applications.  During the Relevant Period, LG Display

13  Co., Ltd. manufactured, sold, and distributed LCD Products to customers throughout the United

14  States and elsewhere.

15  51.   Defendant LG Display America, Inc., formerly known as LG.Philips LCD

16  America, Inc., is a California corporation with its principal place of business at 150 East Brokaw

17  Road, San Jose, California. LG Display America, Inc. is a wholly-owned and controlled

18  subsidiary of Defendant LG Display Co., Ltd.  During the Relevant Period, LG Display America,

19  Inc. sold and distributed LCD Products manufactured by LG Display Co., Ltd. to customers

20  throughout the United States and elsewhere.

21  52.   Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes

22  referred to collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG

23  Display America, Inc. were members of the Conspiracy by virtue of the actions of their

24  respective officers, employees and representatives acting with actual or apparent authority.

25  Further, Defendant LG benefited from the Conspiracy by receiving greater profits than it would

26  have received had the Conspiracy not existed.  Alternatively, Defendant LG Display America,

27  Inc. was a member of the Conspiracy by virtue of its status during the Relevant Period as the

28  alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 15 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

Display America, Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

**D.    TAIWANESE DEFENDANTS**

**i.    AU Optronics**

53.    Defendant AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. AU Optronics Corporation was created in 2001 and is the successor by merger of Acer Display Technology, Inc. ("ADT") and Unipac Optoelectronics Corporation ("Unipac"), both of which were involved in the manufacture of LCD Products. During the Relevant Period, AU Optronics Corporation manufactured, sold, and distributed LCD Products to customers throughout the United States and elsewhere.

54.    Defendant AU Optronics Corporation America ("AU America") is a California corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston, Texas. AU America was formerly known as Acer Display Technology America, Inc. AU America is a wholly-owned and controlled subsidiary of Defendant AU Optronics Corporation. In 2006, H.B. Chen, the president and Chief Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU America. During the Relevant Period, AU America sold and distributed LCD Products manufactured by AU Optronics Corporation to customers throughout the United States and elsewhere.

55.    Defendants AU Optronics Corporation and AU America are sometimes collectively referred to herein as "AUO." Defendants AU Optronics Corporation and AU America were members of the Conspiracy by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Further, Defendant AUO benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed. Alternatively, Defendant AU America was a member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU America

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 16 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1  regarding Conspiracy activities and used that domination or control to charge artificially high
2  prices for LCD Products.

3        ii.    **Chi Mei**

4        56.    Defendant Chi Mei Optoelectronics Corporation (n/k/a Chimei Innolux
5  Corporation) ("CMO") is a Taiwanese company with its principal place of business at No. 3,
6  Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147
7  Taiwan. CMO was formed in 1998, and has since become a major manufacturer of LCD
8  Products to customers throughout the United States and elsewhere.

9        a.    Chimei Innolux Corporation was formed on March 18, 2010 by a three-way
10             merger of Chi Mei Optoelectronics Corp. ("CMO"), Innolux Display Corp., and
11             TPO Displays Corp., through exchanges of shares. The surviving company of the
12             merger renamed itself "Chimei Innolux Corporation." TPO Display Corp. and
13             CMO were dissolved after the merger.

14       b.    CMO was a Taiwanese company with its principal place of business at No. 3, Sec.
15             1, Hunashi Road, Southern Taiwan Science Park, Sinshih Township, Tainan
16             County, 74147 Taiwan. CMO was formed in 1998, and was a major manufacturer
17             of LCD Products.

18       c.    Innolux Display Corp. was a former LCD Panel manufacturer, with its principal
19             place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science
20             Park Chu-Nan, Miao-Li, Taiwan.

21       d.    Prior to the merger and during the Relevant Period, CMO, Innolux Display Corp.,
22             and TPO Displays Corp. manufactured, marketed, sold, and/or distributed LCD
23             Panels to customers throughout the United States and elsewhere.

24       57.    Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company
25  headquartered at Nansei-Yaesu Bldg. 4-F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan. Up
26  until 2006, CMO Japan was known as International Display Technology, Ltd. CMO Japan is a
27  wholly-owned and controlled subsidiary of Defendant CMO. CMO Japan has been in the LCD

28

1  business since 2001.  During the Relevant Period, CMO Japan manufactured, sold, and
2  distributed LCD Products throughout the United States and elsewhere.

3       58.  Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware
4  corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,
5  California.  Up until 2006, CMO USA was known as International Display Technology U.S.A.,
6  Inc.  CMO USA is a wholly-owned and controlled subsidiary of Defendant CMO Japan.  The
7  Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO
8  Japan's predecessor, and in or about 2007 became Vice President in charge of sales and
9  marketing for CMO.  Similarly, the President of CMO USA in 2006, Junichi Ishii, was
10  previously the President of CMO Japan's predecessor.  During the Relevant Period, CMO USA
11  sold and distributed LCD Products manufactured by CMO Japan to customers throughout the
12  United States and elsewhere.

13       59.  Defendants CMO, CMO Japan, and CMO USA are sometimes referred to
14  collectively herein as "Chi Mei."  The Chi Mei companies were members of the Conspiracy by
15  virtue of the actions of their respective officers, employees and representatives acting with actual
16  or apparent authority.  Further, Defendant Chi Mei benefited from the Conspiracy by receiving
17  greater profits than it would have received had the Conspiracy not existed.  Alternatively,
18  Defendants CMO Japan and CMO USA were members of the Conspiracy by virtue of their
19  status during the Relevant Period as the alter egos or agents of CMO.  CMO dominated or
20  controlled CMO Japan and CMO USA regarding Conspiracy activities and used that domination
21  or control to charge artificially high prices for LCD Products.

22       **iii.**  **Chunghwa**

23       60.  Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its
24  principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  It is a subsidiary
25  of Tatung Company, a consolidated consumer electronics and information technology company
26  based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives
27  from Tatung Company.  The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also
28  the Chairman and General Manager of Tatung Company.  During the Relevant Period,

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT
   - 18 -   
MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1  Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed LCD Products to customers

2  throughout the United States and elsewhere.

3      61.    Defendant Tatung Company of America, Inc. ("Tatung America") is a California

4  corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

5  California. Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company

6  owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the

7  daughter of Tatung Company's former Chairman, T.S. Lin.  During the Relevant Period, Tatung

8  America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes, Ltd. to

9  customers throughout the United States and elsewhere.

10     62.    Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes

11  referred to collectively herein as "Chunghwa."  During the Relevant Period, Chunghwa and

12  Tatung America were closely affiliated, commonly owned, controlled and dominated by Tatung

13  Company, and functioned as a single enterprise and/or alter egos.  Defendants Chunghwa Picture

14  Tubes and Tatung America were members of the Conspiracy by virtue of the actions of their

15  respective officers, employees, and representatives acting with actual or apparent authority.

16  Defendant Chunghwa benefited from the Conspiracy by receiving greater profits than it would

17  have received had the Conspiracy not existed.

18              **iv.    HannStar**

19     63.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

20  with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei

21  114, Taiwan.  HannStar has been in the business of manufacturing and selling LCD Products

22  since 1998.  During the Relevant Period, HannStar manufactured, sold, and distributed LCD

23  Products to customers throughout the United States and elsewhere.   Defendant HannStar

24  benefited from the Conspiracy by receiving greater profits than it would have received had the

25  Conspiracy not existed.

26  **V.     AGENTS AND CO-CONSPIRATORS**

27     64.    The acts alleged against the Defendants and their co-conspirators in this

28  Complaint were authorized, ordered, or done by their officers, agents, employees, or

1   representatives, while actively engaged in the management and operation of Defendants'
2   businesses or affairs.

3       65.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer
4   of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common
5   course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary
6   of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made by
7   its parent company.

8       66.    Various persons and/or firms not named as Defendants in this Complaint
9   participated as co-conspirators in the violations alleged herein and may have performed acts and
10   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants
11   include, but are not limited to:  Hydis Technologies Co., Ltd. ("Hydis"); IPS Alpha Technology,
12   Ltd. ("IPS Alpha"); LG Electronics, Inc. and LG Electronics USA, Inc. (together with LG
13   Display, collectively "LG"); Mitsubishi Electric Corporation and Mitsubishi Electric and
14   Electronics USA, Inc. (collectively "Mitsubishi"); Mitsui & Co., Ltd. ("Mitsui Japan");
15   Panasonic Corporation and Panasonic Corporation of North America (collectively "Panasonic");
16   Royal Philips Electronics N.V. and Philips Electronics North America Corp. (collectively
17   "Philips"); Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., and Samsung
18   Electronics America, Inc. (collectively, "Samsung"); Sanyo Electric Company, Ltd. and Sanyo
19   North America Corporation (collectively "Sanyo"); Seiko Epson Corporation ("Seiko Epson").

20       67.    The acts alleged in this Complaint have been done by Defendants and their co-
21   conspirators, or were authorized, ordered, or done by their respective officers, agents, employees
22   or representatives while actively engaged in the management of each Defendant's or co-
23   conspirator's business or affairs.

24   **VI.    TRADE AND COMMERCE**

25       68.    During the Relevant Period, each Defendant, or one or more of its affiliates or
26   subsidiaries, sold LCD Products in the United States in a continuous and uninterrupted flow of
27   interstate commerce and foreign commerce, including through and into this judicial district.

28

TECH DATA CORPORATION AND TECH DATA          - 20 -          MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
PRODUCT MANAGEMENT, INC.,                                   INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)
FIRST AMENDED COMPLAINT

69.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for LCD Products, both globally and in the United States.

70.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  Defendants' business activities substantially affected trade and commerce within each of the 50 states, as the Conspiracy artificially inflated the prices of LCD Products sold in all 50 states, and therefore caused antitrust injury in every state including the states identified herein.  Moreover, Plaintiffs purchased price-fixed goods directly and indirectly from Defendants for sale across the United States.

71.     For example, Defendants LG Display Co., Ltd. and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation all admitted during their plea hearings that acts in furtherance of the Conspiracy were carried out within California.  Each agreed that "[a]cts in furtherance of this conspiracy were carried out within the Northern District of California.  LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District."  Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4; Case 3:09-cr-00247, Document 10-1 at 4; Case 3:09-cr-1166, Document 15-1 at 4; 3:10-cr-0498, Document 11-1 at 4.  Moreover, Defendants and their co-conspirators and/or their agents delivered a substantial amount of LCD Products to persons in the states identified herein, including Plaintiffs.

72.     Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues.  In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States.

1    Such conduct was meant to produce and did in fact produce a substantial effect in the United

2    States in the form of higher prices being paid for such products by U.S. customers.

3        73.    The U.S. LCD market is enormous and was a major focus of and very important

4    to the Conspiracy.  Measured by value, Defendants and others shipped more than 400 million

5    LCD Panels, including those incorporated into LCD Products, into the United States during the

6    Relevant Period for ultimate sale to U.S. consumers.  During the Relevant Period, the value of

7    LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped

8    millions of LCD Products worth billions of dollars into the United States each year during the

9    Relevant Period.  As a result, a substantial portion of Defendants' revenues were derived from

10   the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products

11   in the United States.  Most, if not all, Defendants had marketing, sales, and account management

12   teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD

13   Panels and LCD Products.

14       74.    Because of the importance of the U.S. market to Defendants and their co-

15   conspirators, LCD Panels and LCD Products intended for importation into and ultimate

16   consumption in the United States were a focus of Defendants' illegal conduct.  Defendants

17   knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of

18   commerce that lead directly into the United States.  Many LCD Panels were intended for

19   incorporation into finished products specifically destined for sale and use in the United States.

20   This conduct by Defendants was meant to produce and did in fact produce a substantial effect in

21   the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

22       75.    During the Relevant Period, Defendants and co-conspirators shipped LCD Panels

23   directly into the United States.

24       76.    When high-level executives based at Defendants' Asian headquarters agreed on

25   prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products

26   sold in the United States.  Moreover, because LCD Panels are – and were throughout the

27   Relevant Period – the most expensive and significant component of LCD Products, Defendants

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 22 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1  knew that price increases for LCD Panels would necessarily result in increased prices for LCD
2  Products sold in the United States.

3      77.    Many Defendants manufactured LCD Products and sold them in the United
4  States.  In fact, Defendants routinely monitored the effect their price-fixing had on the prices of
5  such LCD Products sold in the United States.

6      78.    Defendants also monitored the prices for LCD Products sold in the United States,
7  which they often referred to as "street prices," because Defendants were aware that the
8  Conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition,
9  Defendants used LCD Product pricing in the United States as a benchmark for establishing,
10  organizing, and tracking their price-fixing of LCD Panels.

11      79.    Defendants have acknowledged that their commercial activities involving
12  intentionally sending LCD Panels and LCD Products into the United States impacted U.S. import
13  trade and import commerce.  In a series of complaints filed with the U.S. International Trade
14  Commission over the past few years, Samsung and Sharp have both alleged infringing conduct
15  based on "[t]he importation into the United States, sale for importation into the United States,
16  and/or sale after importation in the United States of . . . LCD devices" by the other (and by other
17  entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display Devices and Products*
18  *Containing the Same*, Investigation No. 337-TA-631, Complaint of Samsung Electronics Co.,
19  Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of Certain Liquid Crystal Display*
20  *Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-
21  TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter*
22  *of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No.
23  337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No.
24  2698).

25      80.    For the reasons set forth above, Defendants' illegal conduct involved import trade
26  or import commerce into the United States.

27      81.    Defendants' illegal conduct also had a direct, substantial, and reasonably
28  foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce

1   in the form of higher prices for LCD Products containing price-fixed LCD Panels manufactured

2   by Defendants and their coconspirators being negotiated, charged, and paid by Plaintiffs in the

3   United States for products imported into the United States.

4   **VII.   FACTUAL ALLEGATIONS**

5        **A.   LCD TECHNOLOGY**

6        82.    The technology behind LCD Products is not new.  In the 1950s and 1960s, RCA

7   Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power

8   display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies

9   took the lead in commercializing liquid crystal technology.  These efforts resulted in

10   monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology was

11   introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s, the

12   technology advanced further with the development of LCDs.

13        83.    The basic structure of an LCD Panel is two glass substrates sandwiching a layer

14   of liquid crystal compound.  Liquid crystals change orientation under an applied electric field

15   and can thereby block or pass light.  One glass substrate has thin chemical films that act as

16   transistors, and the other glass substrate is coated with liquid pigments that act as color filters.

17   When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through

18   the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image, and

19   the density of pixels in a display determines the resolution.

20        84.    The term "active matrix" describes the ability to switch each pixel in a display

21   individually.  Unlike older LCDs that have one transistor for each row and column of pixels,

22   LCDs have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used

23   interchangeably with LCD.  Active matrix displays are brighter and sharper than passive matrix

24   displays of the same size.

25        85.    The glass substrates used for LCD Panels begin with a "motherglass," a sheet of

26   glass that is cut to make multiple panels.  LCD Panels are manufactured in fabrication plans

27   (commonly referred to as "fabs") that are equipped to handle a particular size motherglass.

28   Technological innovations over time have allowed manufacturers to begin the manufacturing

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 24 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1    process with larger and larger size motherglass sheets.  This, in turn, has resulted in the ability to

2    fabricate larger and/or more LCD Panels.  Each increase in motherglass size is described as a

3    generation.  Third generation fabs in the 1998 to 1999 period typically used 550 millimeter

4    ("mm") by 650 mm motherglass, while some current (eighth generation) fabs use 2160 mm by

5    2460 mm motherglass.  The use of larger motherglass provides substantial cost savings to

6    manufacturers.

7        86.     LCDs are capable of producing the same image as cathode ray tubes ("CRTs"),

8    but in a much smaller package.  LCDs also have lower energy requirements, are generally easier

9    to read, and do not flicker like CRTs.  LCD Panels of approximately 10 inches or less in diagonal

10   are considered "small" or "medium" displays.  They are also referred to as "mobile displays."

11   These displays are commonly used in mobile wireless handsets, personal digital assistants, and

12   cameras.

13       87.     LCD Panels have no independent utility, and have value only as components of

14   other products, such as TVs, computer monitors, notebook computers, and mobile wireless

15   handsets.  The demand for LCD Panels thus directly derives from the demand for the LCD

16   Products.

17       88.     The market for LCD Panels and the market for the products into which they are

18   placed are inextricably linked and intertwined because the LCD Panel market exists to serve the

19   LCD Products markets.  The markets for LCD Panels and LCD Products are, for all intents and

20   purposes, inseparable in that one would not exist without the other.

21       89.     Plaintiffs have participated in the market for LCD Panels through direct purchases

22   of LCD Products from Defendants and their indirect purchases of LCD Products from non-

23   defendant OEMs, co-conspirators and others.  Defendants' unlawful Conspiracy inflated the

24   prices at which Plaintiffs bought LCD Products, and Plaintiffs have been injured thereby and

25   paid supra-competitive prices for LCD Products.

26       **B.    STRUCTURE OF THE LCD INDUSTRY**

27       90.     The LCD industry has several characteristics that facilitated the Conspiracy,

28   including market concentration, ease of information sharing, the consolidation of manufacturers,

multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

### i.     Market Concentration

91.     The LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by Plaintiffs.  Samsung, LG, Sharp, AUO, and Chi Mei were the five largest producers as measured by market share during much of the Relevant Period. Throughout the Relevant Period, Defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

92.     LCD Panels, whether incorporated into desktop computer monitors, notebook computers, digital cameras, digital picture frames, televisions, or voting and gaming machines are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard panel sizes for LCD Products across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enabled LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enabled them to enforce their Conspiracy.

93.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, Defendants and their co-conspirators implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described herein.

### ii.     Information Sharing

94.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, the Conspirators had many opportunities to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  The Conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for LCD Products as alleged below.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 26 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

95.     Additionally, the LCD industry is analyzed by several market research firms. Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity.  The capacity and pricing data reported by these firms comes directly from manufacturers.  Manufacturers typically report historical, current, and perhaps most importantly, prospective information.  Thus, the Conspirators had access to each other's future plans for bringing capacity on line, capacity utilization, market share, pricing, and the advent of new technology.  Because there were very few companies that needed to be analyzed in order to obtain this data, all competitors in the LCD market had ready and timely access to reliable information about their competition's pricing as well as future supply and capacity decisions.  By meeting together as herein below alleged as well as monitoring and analyzing this information over time, the Conspirators were able to signal their respective intent, verify that the Conspiracy was working, and identify and punish any parties who might be deviating from the agreements necessary to carry out the Conspiracy.

### iii.   Consolidation

96.     The LCD industry experienced significant consolidation during the  Relevant Period, including: (a) the creation of AUO in 2001 through the merger of ADT and Unipac; (b) the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and (e) AUO's acquisition in 2006 of Quanta Display Inc. ("QDI"), which resulted in AUO becoming the third-largest manufacturer of LCD Products.

### iv.   Multiple Interrelated Business Relationships

97.     The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.  AUO, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006.  Chunghwa did likewise with Sharp in December of 2006.  Chi Mei has licensing arrangements with Sharp, AUO, Chunghwa, HannStar and Hitachi.

98.     The industry has a close-knit nature whereby multiple business relationships between supposed competitors blurred the lines of competition and provided ample opportunity

1   to collude.  These business relationships also created a unity of interest among competitors so

2   that the Conspiracy was easier to implement and to enforce, including by checking each

3   Conspirator's participation in the Conspiracy, than if such interrelationships did not exist.

v.   **High Costs of Entry Into the Industry**

5   99.   There are significant manufacturing and technological barriers to entry into the

6   LCD industry.  Efficient fabs are large and costly.  LCD Products are also subject to

7   technological advances, so that firms within the industry must spend significant capital on

8   research and development.  DisplaySearch, a research firm in Austin, Texas that covers the LCD

9   industry, reported in September 2005 that the top LCD manufacturers collectively spent $30

10  million a day on property, plant, and equipment.  A January 2006 DisplaySearch report noted

11  that a typical seventh generation fab can cost more than $3 billion.

12  100.   During the Relevant Period, the costs of the assembly components, both as a

13  whole and individually, were generally declining, and, in some periods, declining at a substantial

14  rate. Later in the Conspiracy, approximately 70 percent of the cost of LCD Panel production was

15  attributable to the cost of raw materials.  The combination of price discussions and manipulation

16  of the output of LCD Products allowed the Conspirators to keep prices above where they would

17  have been but for the Conspiracy.

vi.   **The "Crystal Cycle"**

19  101.   Like all markets, the LCD industry is subject to business cycles of supply and

20  demand.  In the LCD industry, this cycle is known as the "crystal cycle."  This cycle has been

21  described as "boom and bust" periods caused by alternating periods of oversupply and shortages,

22  which create downward and upward pressures on prices for LCD Products.  One fact that can

23  affect oversupply is the perceived demand for such products and whether manufacturers have

24  adequately predicted demand when determining how much capacity to build and use, *i.e.*, how

25  many LCD Products to produce.

26  102.   Another factor is the entry of new competitors.  Typically, when a new competitor

27  enters a market, it brings incremental production online thereby adding supply, and prices drop

28  until an equilibrium is reached.  In the LCD industry, however, the Conspirators conspired to

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 28 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1   rein in and discipline new entrants until the new entrants were assimilated into the Conspiracy.

2   This had the effect of tempering price drops and preventing prices from reaching a competitive

3   equilibrium.

4         103.    The Conspiracy did not completely eliminate the effects of the crystal cycle in the

5   LCD industry.  There were periods when the Conspirators' collusive practices drove prices for

6   LCD Products so high that demand began to fall to the point that the Conspirators lowered prices

7   for short periods of time.  However, the Conspirators' efforts to stabilize prices were successful

8   in moderating the effects of the crystal cycle, including the impact on prices paid by direct and

9   indirect purchasers.  To the extent that prices for LCD Products fell, they fell from levels that

10  had been set conspiratorially, rather than from levels set by free and open competition.

11  Additionally, prices did not fall as low as they would have absent the conspiratorial conduct.

12  **C.**      **PRE-CONSPIRACY MARKET**

13        104.    Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were

14  essentially the exclusive suppliers of LCD Panels.

15        105.    In early 1995, the industry faced declining LCD Panel prices, which industry

16  analysts attributed to advances in technology and improving efficiencies.  One analyst in this

17  period noted that the "flat panel display industry is following the classic cyclical business pattern

18  of the semiconductor industry."  The Japanese manufacturers realized that the capacity growth

19  from investing in new plants was weakening the price of LCD Products, and they slowed the rate

20  of their investments.  This, however, provided an opening to Korean manufacturers.

21        106.    In 1995, three Korean companies – Samsung, LG and, to a lesser extent, Hyundai

22  – entered the market.  These Korean firms offered comparable LCD Products at reduced prices in

23  an effort to quickly gain market share.  This resulted in increased competition in 1995, which

24  contributed to the significant price declines seen during that timeframe.

25        107.    Increases in manufacturing capacity and decreases in manufacturing costs seemed

26  to assure continuing price declines.  By mid-1995, the Japanese companies and the new Korean

27  competitors had a total capacity to supply 14 million LCD Panels per year, while demand for

28  them was only about three million per year.  In addition to the surges in capacity during 1995,

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 29 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

"[costs] were also dropping as production volume increases and manufacturing methods improved."

108.    By late 1995, the effect of the entry of Korean suppliers had pushed down the price of some LCD Panels by 50 percent from the previous year.  The origin of the Conspiracy may be traceable to this trough in prices.

**D.    DEFENDANTS' AND CO-CONSPIRATORS' ILLEGAL AGREEMENTS**

109.    The Conspiracy was effectuated through a combination of group and bilateral discussions.   In the formative years, when the Japanese Defendants first entered into the Conspiracy, bilateral discussions were the primary method of communication.   During this period of the Conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other Defendant about the prices for LCD Products, and thereby created a model for how the Conspiracy would be carried out after the Korean, and later the Taiwanese Defendants joined.  These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as capacity utilization.  As more manufacturers entered the Conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings was in place.

**i.    "Crystal Meetings"**

110.    The group meetings among the participants in the LCD price-fixing Conspiracy were referred to as "crystal meetings."  Crystal meetings were attended by employees at three general levels of Defendants' corporations.  The first level of these meetings was attended by the Chief Executive Officers or Presidents, and was known as "CEO" or "top" meetings.   The second level was management-level meetings, referred to as "commercial" or "operation" meetings.  The third level was meetings attended by lower-level sales and marketing personnel.

111.    In a typical crystal meeting of the Conspiracy, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices.  Meeting participants shared information relating to all of these topics so that Defendants could agree on what price each would charge for LCD Panels to be sold in the following month.  Meeting participants discussed and agreed upon target prices,

floor prices, and price ranges for LCD Panels.  They also discussed prices of LCD Panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

112.   The purpose of the CEO or top meetings was to stabilize or raise prices.  At the CEO meetings, the participants discussed prices and the supply and demand situation.  The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions.  Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply and demand and price for the group to review.  The attendees would take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price and supply for LCD Panels.

113.   The commercial or operation meetings were attended by Defendants' respective vice presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings were largely the same as the CEO meetings.  The participants discussed price, output, capacity, and the general market situation for LCD Panels.  These meetings occurred approximately monthly and sometimes quarterly.

114.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of LCD Panels has on the cost of the finished products into which they are placed.  Defendants knew that the conspiratorially high prices of LCD Panels would be reflected in the prices for finished LCD Products, and thus, there was no need to specifically discuss the prices of finished LCD Products.

115.   The agreements reached at these meetings included:  (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of LCD Panels, such as quality or certain technical specifications; (3) deciding what to tell customers as the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; and (6) reaching out to other competitors to encourage them to abide by the

1   agreed-upon pricing.   The meeting participants also agreed to maintain or lower production

2   capacity.

3   116.   Compared to the CEO and commercial meetings, the lower level meetings were

4   less formal, and typically occurred at restaurants over lunch.   The purpose of the lower level

5   meetings was to exchange market information that would facilitate implementation of the

6   Conspiracy and carry out the agreements made at the CEO and commercial meetings.

7   Participants in the lower level meetings exchanged information relating to past and future prices

8   of LCD Products and shipment quantities.

9   117.   In the summer of 2006, Defendants discontinued the lower level meetings in favor

10   of coordinated one-on-one meetings.   The meetings were coordinated so that on the same date,

11   two sets of competitors met one-on-one.   After that meeting, each of them met one-on-one with

12   another competitor.   This continued until all competitors met with each other.   These coordinated

13   meetings took place until about November or December 2006.   Defendants switched the format

14   of the meetings with the specific intent to conceal their meetings and for these coordinated one-

15   on-one meetings to accomplish the same purposes as the group meetings.   The information

16   obtained at these meetings was transmitted up the corporate reporting chain to permit Defendants

17   to maintain their price-fixing and production-limitation agreements.

18   **ii.   Bilateral Discussions**

19   118.   The crystal meetings were supplemented by bilateral discussions between various

20   Conspirators.   The purpose of the bilateral discussions was to exchange information about past

21   and future pricing, as well as information about shipments.

22   119.   The Conspirators had bilateral discussions with each other during price

23   negotiations with customers to avoid being persuaded by customers to cut prices.   These

24   discussions, usually between sales and marketing employees, took the form of in-person

25   meetings, telephone calls, e-mails, and instant messages.   The information gained in these

26   communications was then shared with supervisors and taken into account in determining the

27   price to be offered.

28

120.    Bilateral discussions were also used to synchronize prices with manufacturers that did not ordinarily attend the group meetings.  For example, HannStar was responsible for notifying Hitachi of the pricing agreements reached at the crystal meetings.  Hitachi implemented the agreed-upon pricing as conveyed by HannStar.  Therefore, Hitachi participated in the Conspiracy to fix the prices of LCD Products.

iii.    **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

121.    Defendant AUO participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Additionally, QDI and Unipac, which merged with AUO, participated in lower-level meetings.  Through these discussions, AUO agreed on prices and supply levels for LCD Products.

122.    Defendant Chi Mei participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chi Mei agreed on prices and supply levels for LCD Products.

123.    Defendant Chunghwa participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chunghwa agreed on prices and supply levels for LCD Products.

124.    Defendant Epson engaged in multiple bilateral discussions.  Through these discussions, Epson agreed on prices and supply levels for LCD products.

125.    Defendant HannStar participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, HannStar agreed on prices and supply levels for LCD Products.

126.    Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and supply levels for LCD Products.

127.    Defendant LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, LG Display agreed on prices and supply levels for LCD Products.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 33 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

128.     Defendant Mitsui participated in multiple bilateral meetings during the Relevant Period with LG, Samsung, Toshiba, Chunghwa, AU Optronics, Hitachi and others, and agreed on prices and supply levels for LCD Products.  Mitsui attended at least one bilateral meeting with Defendant Chunghwa during 2001, and multiple bilateral meetings with co-conspirator Samsung in the U.S. at which similar subjects were discussed.  At these and other meetings, Mitsui acted as an agent of Sanyo Consumer and reached agreements with other competitors about prices for LCD Products sold in the United States and elsewhere.    Specific communications and meetings are detailed in Appendix A to this Complaint.

129.     Deposition testimony and documents confirm Mitsui's participation in the Conspiracy during the Relevant Period including communications with co-conspirators and competitors to discuss and agree on prices for LCD Products.  Specific examples are set forth in Appendix A to this Complaint.

130.     Defendant NEC joined the Conspiracy by participating in multi-lateral meetings and bilateral meetings and discussions with, among others, Samsung, Toshiba, Hitachi, Sharp, and LG to share information and reach agreement on prices for LCD Products beginning as early as 1998.  In these discussions with its competitors and fellow Conspirators, NEC exchanged price and supply information and also agreed on prices, price increases, and production limits and quotas for LCD Panels.

131.     Deposition testimony and documents confirm NEC's participation in the Conspiracy during the Relevant Period, including meetings and communications with co-conspirators and competitors to discuss and agree on prices for LCD Products.

132.     Later in 1998, high level representatives at various LCD manufacturers, including Sharp, Toshiba, Samsung, NEC, LG, and Mitsubishi, met to discuss projected sales volumes.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 34 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ██████████████

5      133.  ████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████

10      134.  NEC engaged in illegal bilateral and multi-lateral communications with Samsung.

11 NEC and Samsung employees met in person and by telephone to discuss LCD Panel prices and

12 reach pricing agreements.  ████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████

16      135.  Defendant Sanyo Consumer participated in at least one bilateral meeting through

17 an agent during the Relevant Period, and agreed on prices and supply levels for LCD Products.

18      136.  Defendant Sharp participated in multiple group and bilateral meetings during the

19 Relevant Period, and agreed on prices and supply levels for LCD Products.

20      137.  Defendant Toshiba participated in bilateral discussions during the Relevant

21 Period, and agreed on prices and supply levels for LCD Products.

22      138.  Toshiba personnel in its San Jose, California offices were involved in and

23 implemented Defendants' Conspiracy in the United States.  ████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,                                    - 35 -
FIRST AMENDED COMPLAINT

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████

3     139.    Co-conspirator Hydis participated in multiple lower-level meetings between at

4 least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese co-conspirator

5 at least as recently as 2005.  Through these discussions, Hydis agreed on prices and supply levels

6 for LCD Products.

7     140.    Co-conspirator Mitsubishi participated in multiple lower-level meetings in 2001

8 with Chi Mei, Chunghwa, Samsung, and Unipac (later AUO).   Through these meetings,

9 Mitsubishi agreed on prices and supply levels for LCD Products.

10     141.    Co-conspirator Philips participated in meetings or discussions during the Relevant

11 Period with at least one other Defendant or co-conspirator, which included discussions about

12 prices for LCD Products.

13     142.    Co-conspirator Samsung participated in multiple CEO, commercial, and lower

14 level meetings, as well as bilateral discussions between at least 2001 and 2006.  Through these

15 discussions, Samsung agreed on prices and supply levels for LCD Products.

16     143.    Co-conspirator Sanyo participated in meetings or discussions during the Relevant

17 Period with at least one other Defendant or co-conspirator, which included discussions about

18 prices for LCD Products.

19     144.    Co-conspirator Seiko Epson participated in meetings or discussions during the

20 Relevant Period with at least one other Defendant or co-conspirator, which included discussions

21 about prices for LCD Products.

22     145.    When Plaintiffs refer to a corporate family or companies by a single name in their

23 allegations of participation in the Conspiracy, it is to be understood that the Plaintiffs are alleging

24 that one or more employees or agents of entities within the corporate family engaged in

25 conspiratorial meetings on behalf of every company in that family.  In fact, the individual

26 participants in the conspiratorial meetings and discussions did not always know the corporate

27 affiliation of their counterparts, nor did they distinguish between the entities within a corporate

28 family.  The individual participants entered into agreements on behalf of, and reported these

1   meetings and discussions to, their respective corporate families.  As a result, the entire corporate
2   family was represented in meetings and discussions by its agents and a party to the agreements
3   reached in them.  Furthermore, to the extent that subsidiaries within the corporate families
4   distributed LCD Products to direct purchasers, these subsidiaries played a significant role in the
5   Conspiracy because Defendants and their co-conspirators wished to ensure that the prices for
6   such products paid by direct purchasers would not undercut the pricing agreements reached at
7   these various meetings.  Thus, all entities within the corporate families were active, knowing
8   participants in the Conspiracy.

9          146.   Defendant Epson America is a wholly-owned and controlled subsidiary of
10  Defendant Epson Japan.  Epson Japan and Epson America reached agreements at meetings with
11  their co-conspirators.  In addition, to the extent Epson America distributed LCD Products, it
12  played a significant role in the Conspiracy because the Conspirators wished to ensure that the
13  prices for such products paid by direct purchasers did not undercut the pricing agreements
14  reached at these various meetings.  Epson America was an active, knowing participant in the
15  alleged Conspiracy.

16         147.   Defendant Toshiba Matsushita is a joint venture between Toshiba Corporation
17  and Panasonic Corporation, and one or more of the partners in this joint venture participated in
18  the meetings described above.  As a result, Toshiba Matsushita was represented at those
19  meetings by its agents and was a party to the agreements entered into by its joint venture partners
20  at them.  As explained above, the agreements at these meetings included agreements on price
21  ranges and output restrictions.  The joint venture partners controlled Toshiba Matsushita's
22  production levels and the prices of LCD Products the joint ventures sold both to the joint venture
23  partners and other non-affiliated companies.  Thus, this Defendant was an active, knowing
24  participant in the alleged Conspiracy.

25         148.   Co-conspirator IPS Alpha is a joint venture among Hitachi Displays, Ltd.,
26  Toshiba Corporation, and Panasonic Corporation, and one or more of the partners in this joint
27  venture participated in the meetings described above.  As a result, IPS Alpha was represented at
28  those meetings and was a party to the agreements entered into by its joint venture partners at

them.   As explained above, the agreements at these meetings included agreements on price ranges and output restrictions.   The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Products the joint ventures sold both to the joint venture partners and other non-affiliated companies.   Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged Conspiracy.

## E.   INTERNATIONAL GOVERNMENT ANTITRUST INVESTIGATIONS

149.   The Conspiracy to artificially restrict the output of, and to raise the prices for, LCD Products sold in the United States during the Relevant Period, was shown by multinational investigations commenced by the DOJ.

150.   In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.   In a December 11, 2006 filing with the Securities and Exchange Commission, Defendant LG Display disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

151.   On December 12, 2006, news reports indicated that in addition to LG Display, LCD Panel makers Samsung, Sharp, Epson, and AUO were also under investigation. The JFTC stated that the probe was related to price-fixing.   On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-fixing among manufacturers of LCD Products.

152.   On November 12, 2008, the DOJ announced that it had reached agreements with three LCD Panel manufacturers – LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty for their roles in a conspiracy to fix prices of LCD Panels.

153.   LG Display Co., Ltd. and LG Display America Inc. agreed to plead guilty and pay a $400 million fine for their participation in a conspiracy to fix prices of LCD Panels.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 38 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

154.    LG Display Co., Ltd. and LG Display America Inc. admitted that from September 21, 2001 to June 1, 2006, they participated in a conspiracy with other major LCD Panel producers, the primary purpose of which was to fix the price of LCD Panels sold in the United States and elsewhere.  They admitted that in furtherance of the conspiracy they, through their officers and employees, engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as "crystal meetings," with representatives of other major LCD Panel producers.  During these discussions and meetings, agreements were reached to fix the price of LCD Panels to be sold in the United States and elsewhere.

155.    Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million fine for its participation in a conspiracy to fix prices of LCD Panels.

156.    Chunghwa Picture Tubes, Ltd. admitted that from September 14, 2001 to December 1, 2006, it participated in a conspiracy with other major LCD Panel producers, the primary purpose of which was to fix the price of LCD Panels sold in the United States and elsewhere.  Chunghwa admitted that in furtherance of the Conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as "crystal meetings," with representatives of other major LCD Panel producers.  During these discussions and meetings, agreements were reached to fix the price of LCD Panels to be sold in the United States and elsewhere.

157.    Sharp Corporation agreed to plead guilty and pay a $120 million fine for its participation in a conspiracy to fix prices of LCD Panels.

158.    Sharp Corporation admitted that:

a.      from April 1, 2001 to December 1, 2006, it conspired with other major LCD Panel producers to fix the price of LCD Panels sold to Dell, Inc. for use in computer monitors and laptops;

b.      from fall 2005 to the middle of 2006, it conspired with other major LCD Panel producers to fix the price of LCD Panels sold to Motorola, Inc. for use in Razr mobile phones; and

1    c.  from September 1, 2005 to December 1, 2006, it conspired with other

2       major LCD Panel producers to fix the price of LCD Panels sold to Apple

3       Computer, Inc. for use in iPod portable music players.

4 Sharp admitted that in furtherance of the Conspiracy it, through its officers and employees,

5 engaged in bilateral telephone discussions and attended bilateral meetings with other major LCD

6 Panel producers.  During these discussions and meetings, agreements were reached to fix the

7 price of LCD Panels.

8    159. In May 2009, the DOJ announced that it had reached an agreement with Hitachi

9 Displays, Ltd. in which it would plead guilty and pay $31 million in criminal fines for its role in

10 a conspiracy to fix prices of LCD Panels.

11    160. Hitachi Displays, Ltd. admitted that from April 1, 2001 to March 31, 2004, it

12 conspired with other major LCD Panel producers to fix the prices of LCD Panels sold to Dell for

13 use in notebook computers.  Hitachi admitted that in furtherance of the Conspiracy it, through its

14 officers and employees, engaged in telephone discussions and attended bilateral meetings with

15 other major LCD Panel producers.  During these discussions and meetings, agreements were

16 reached to fix the price of these LCD Panels sold to Dell.

17    161. In August 2009, the DOJ reached an agreement with Epson Imaging Devices

18 Corporation in which it would plead guilty and pay a $26 million fine for its role in a conspiracy

19 to fix prices of LCD Panels.

20    162. Epson Imaging Devices Corporation admitted that from the fall of 2005 to the

21 middle of 2006, it conspired with other major LCD producers to fix the price of LCD Panels sold

22 to Motorola, Inc. for use in Razr mobile phones.  Epson admitted that in furtherance of the

23 Conspiracy it, through its officers and employees, engaged in bilateral telephone discussions and

24 attended bilateral meetings in Japan with representatives of other major LCD producers.  During

25 these discussions and meetings, agreements were reached to fix the price of LCD Panels sold to

26 Motorola.

27

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 40 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

163.    In December 2009, the DOJ reached an agreement with Chi Mei Optoelectronics Corporation in which it would plead guilty and pay a $220 million fine for its role in a conspiracy to fix prices of LCD Panels.

164.    Chi Mei Optoelectronics Corporation admitted that from September 14, 2001 to December 1, 2006, it conspired with other major LCD producers to fix prices of LCD Panels. Chi Mei admitted that in furtherance of the Conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as "crystal meetings," with representatives of other major LCD producers. During these discussions and meetings, agreements were reached to fix the price of certain LCD Panels to be sold in the United States and elsewhere.

165.    In June 2010, the DOJ reached an agreement with HannStar Display Corporation in which it would plead guilty and pay a $30 million fine for its role in a conspiracy to fix prices of LCD Panels.

166.    HannStar Display Corporation admitted that from September 2001 to January 2006, it conspired with other major LCD Panel producers to fix prices of LCD Panels. HannStar admitted that in furtherance of the Conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as "crystal meetings," with representatives of other major LCD Panel producers. During these discussions and meetings, agreements were reached to fix prices of LCD Panels to be sold in the United States and elsewhere.

167.    Since January 15, 2009, the DOJ has announced ten additional agreements with executives of LG Display Co. Ltd., Chunghwa Picture Tubes Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation who all agreed to plead guilty and serve jail time in the United States for participating in the Conspiracy. The ten individuals are Chang Suk "C.S." Chung and Bock Kwon (both with LG Display), Chieng-Hon "Frank" Lin, Chin-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee (all with Chunghwa), Chu-Hsiang "James" Yang, Jau-Yang "J.Y." Ho, Wen-Hung "Amigo" Huang, and Chen-Lung Kuo (all with Chi Mei), and Jui Hung "Sam" Wu of HannStar. All ten of these individuals have now pleaded guilty and been

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 41 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1  sentenced, and at their sentencing hearings, confirmed the allegations against them that they

2  participated in the global conspiracy to fix the prices of LCD Panels.

3  168.   The above guilty pleas demonstrate that the Conspiracy included small LCD

4  Panels for mobile wireless headsets and other mobile device applications.  For example, the plea

5  agreements of Defendants Chunghwa, Chi Mei, HannStar, and LG Display state that "TFT-LCD

6  are manufactured in a broad range of sizes and specifications for use in televisions, notebook

7  computers, desktop monitors, mobile devices and other applications."  In addition, Defendants

8  Sharp and Epson pled guilty to reaching agreements "to fix the price of TFT-LCD sold to

9  Motorola for use in Razr mobile phones."

10  169.   These guilty pleas also demonstrate that the investigations into the LCD industry

11  are not mere information-gathering efforts by regulatory authorities.  In fact, as the DOJ's

12  representative has stated, the DOJ's investigation into the LCD industry is premised in part on

13  insider information that presents a detailed "road map" of the Conspiracy.

14  170.   The guilty plea by Sharp has significant ramifications for Toshiba.  Toshiba was

15  one of Sharp's principal competitors in the sale of LCD Panels to Dell and Apple during the

16  periods set forth in the DOJ's information against Sharp.  Toshiba sold LCD Panels to Dell

17  between 2000 and 2006, and it sold LCD Panels for use in Apple's iPod music players between

18  2001 and 2006. In fact, Toshiba was one of Apple's largest, if not the largest, suppliers of iPod

19  screens for a substantial part of the Relevant Period.  In the small-to-medium size LCD display

20  market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in the

21  first half of 2005, holding a 15.4 percent market share during the first quarter and a 14.1 percent

22  market share during the second quarter.  Toshiba's high percentage of LCD revenues dictated

23  that no conspiracy would be effective without its participation.  Sharp could not have

24  successfully fixed the prices of the LCD Panels it sold to Dell and Apple unless Toshiba, one of

25  its biggest competitors, agreed not to undersell it.

26  171.   In addition, on or about June 10, 2010, the DOJ indicted Defendants AU

27  Optronics Corporation and AU Optronics Corporation America for participating in a conspiracy

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 42 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1    to suppress and eliminate competition by fixing the prices of LCD Panels in violation of Section

2    1 of the Sherman Act, 15 U.S.C. § 1, from September 2001 through December 2006.

3        172.    According to the DOJ, its investigation is still ongoing.

4        **F.    MARKET DURING THE CONSPIRACY**

5        173.    After initial introduction into a market, consumer electronics products and their

6    component parts are typically characterized by downward pricing trends.  Since at least 1996,

7    however, the LCD Products market has been characterized by unnatural and sustained price

8    stability, as well as certain periods of substantial increases in prices.  Defendants achieved price

9    stability and price increases by agreeing to fix and maintain prices and to restrict supply through

10   decreases in capacity utilization and restraint in new plant investment.

11       174.    As described herein, Defendants' LCD cartel evolved over time.  Defendants

12   initiated their cartel when LCD Products were in their relative infancy.  At that time, Defendants

13   balanced the desire to set prices collusively with the industry goal of establishing their products

14   in the marketplace.  As the cartel matured, new entrants were co-opted, and production costs

15   declined.  At the same time, the Conspirators learned how they could best mitigate the crystal

16   cycle by agreeing on prices and output.

17       **i.    1996 – 1999**

18       175.    By early 1996, analysts were lamenting the excess supply and drastic price cuts in

19   the LCD Panel markets.  The downward pressure on prices, which had already fallen 40 to 50

20   percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this, LCD

21   Product prices actually rose in 1996, allegedly due to insufficient production capacity.  In reality,

22   Defendants were fixing the prices and limiting supply.

23       176.    During this period, the Japanese companies identified herein began to partner with

24   Taiwanese companies to trade technology and collaborate on supply.  Japanese engineers were

25   lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  This mutually beneficial

26   relationship between purported competitors continued into at least 1999.

27       177.    A few months into 1996, there was a reversal in the downward trend in LCD

28   Panel prices and an alleged inability of manufacturers to supply enough LCD Panels to meet

1   demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display

2   purchasers are riding a roller coaster of pricing in the display market, with no clear predictability

3   anytime soon …. Perplexed purchasers trying to keep up with the gyrating market can take

4   solace that even vendors are constantly being surprised by the sudden twists and turns."

5        178.   By mid-1996, industry analysts were commenting on an unusual rise in LCD

6   Panel prices that was noted to be "quite rare in the electronics industry."

7        179.   The "rare" increase in LCD Panel prices was due to the agreements reached by

8   the Japanese companies to increase prices.  These companies met and agreed to increase prices

9   and control supply in order to stop any price erosion as herein alleged.

10        180.   By 1998, the LCD industry still had excess capacity, due in part to the still recent

11   entry of the Korean companies.  A March 30, 1998 article in Electronic News reported that

12   Hyundai's production lines were running at only 20 to 50 percent of capacity.  The article quoted

13   Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty

14   of inventory and capacity available to suit any shortage …. You have to get your production up

15   to full capacity again before you can even talk about there being a shortage and I think there are

16   plenty of under-capacity fabs right now to bear the burden."

17        181.   During this period, Samsung made a concerted effort to get other manufacturers

18   in the industry to limit production.  Yoon-Woo Lee, President and CEO of the Semiconductor

19   Division of Samsung Electronics Co., Ltd. gave the keynote address at the Eighteenth

20   International Display Research Conference (known as Asia Display 98).  Mr. Lee said:

21            In order to maintain the tradition of top CRT manufacturer, we

22            need to capture the high end market [and] deviate from the volume

23            production of CRTs and LCDs.

24

25            Taiwan is trying to enter LCD business because it has the

26            advantage of the large PC production.  To survive in the rapidly

27            changing environment, we have to revise our previous strategies

28            and redirect our business plans.  It is time for fundamental shift for

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 44 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1   future decisions, time for transformation from volume driven to

2   cost driven, time for driving value added strategies.

3

4   *If we prepare now by shifting from the traditional business*

5   *approach, to value added new approach, we may be able to*

6   *deviate from repeating the "crystal cycle" again.*

7   [Emphasis added].

8       182.    Samsung's effort to limit production, capacity restraints, and the price-fixing

9   agreement caused decreases in prices of LCD Panels to slow and stop in late 1998.

10      183.    The efforts commenced by Samsung in 1998 continued to bear fruit.  In 1999,

11  LCD Panel prices surged due to a claimed "massive undersupply."  This was despite the entry of

12  Taiwanese manufacturers and several new fabs coming online.

13      184.    Significantly, Bock Kwon, Vice President of LG Display's Sales Division and

14  Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the

15  following in the same trade publication:

16      LG LCD will raise prices across its entire LCD portfolio by 30 to

17      40 percent this year, Kwon said, although he expects that prices

18      will stabilize some time in the second half.  According to

19      Samsung, demand for larger panels is reducing capacity because

20      each display is eating up more square inches per motherglass

21      substrate.  This, combined with a stagnation in capital spending by

22      many panel makers, will keep the LCD industry in a period of

23      relative shortage until 2001, Lee said.  The shortage has become

24      acute, and has created an unusual market in which prices could rise

25      as much as 30% to 80% in one year according to Ross Young,

26      President of DisplaySearch, a research firm in Austin, Texas.

27

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 45 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

185.    Also, in 1999, the three major LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai.  The year 1999 also saw an additional merger when LG Electronics, Inc. and Philips created Defendant LG Display.

ii.    **2000 – 2004**

186.    By January of 2000, prices for LCD Panels were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and ADT (later part of AUO).  Taiwanese Defendants began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other Conspirators to gain immediate market share.  But by 2000-2001, the Taiwanese Defendants had increased their market share to the point that it made sense to participate in the Conspiracy, and they then moderated the volume of their production.

187.    Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese LCD Panel production and to locate manufacturing facilities in Taiwan.

188.    Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD Panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Published data for 2001 showed that several Defendants were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and QDI (which later merged with AUO) had a 52 percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply.  Again, the Conspirators reacted to the price trough by conspiring to fix prices and limit supply.  This Conspiracy was reached in part at the bilateral and group meetings described above.

189.    The rise in prices made no economic sense at this point in time and was the product of Defendants' setting the price of LCD Panels and limiting supply by agreement.  First,

the Conspirators were bringing new plants on line that used larger motherglass, which was more cost effective.  Second, as reported by an industry source, the variable cost of producing LCD Panels was declining during the latter part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic sense for the Conspirators not to utilize their full capacity other than agreement by them not to do so.

190.    Prices continued to rise from the second half of 2001 through the second half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion.  In reality, the price increases were the result of what the Conspirators agreed to in the crystal meetings and bilateral discussions described herein.

191.    By the second half of 2002, the cartel's success at propping up LCD Panel prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall. Such downward price trends are not inconsistent with a monopoly or cartel.

192.    During five consecutive quarters in 2003 and 2004, LCD Panel prices rose significantly.  AUO reported that the price for certain of its LCD Panels increased 28 percent between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG reported that its pricing increased by 21 percent over the same period.

193.    These soaring prices resulted in similar increases in the profits reaped by the LCD Product manufacturers.  For example, the eight largest LCD Panel manufacturers reported a collective profit increase of 740 percent between the second quarter of 2003 and the second quarter of 2004.  These record profits resulted from the Conspirators' collective action to fix, raise, maintain, or stabilize the prices of LCD Panels.  Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of LCD Panels.

194.    Around this time, industry analysts suggested that there were too many competitors in the LCD Panel marketplace.  Some industry participants went as far as overtly suggesting that the industry should seek to curtail supply though mergers.  These suggestions

1    were carried out in furtherance of the Conspiracy.  Significant consolidation and collaboration

2    among competitors in the LCD Panel market occurred.

3        195.    As noted above, Toshiba Corporation and Panasonic Corporation merged their

4    LCD Panel operations in furtherance of the Conspiracy.  The joint venture announced plans to

5    solicit investment from other companies involved in the production of LCD Panels, including

6    device manufacturers and material suppliers.  NEC formed an alliance with Casio in furtherance

7    of the Conspiracy.  In addition, Taiwanese LCD manufacturers agreed to supply Panasonic with

8    LCD Panels for use in televisions in furtherance of the Conspiracy.

9        196.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's

10   IDT, a former subsidiary of IBM, and AUO purchased a 20 percent stake in Japan's Fujitsu

11   Display Technology all in furtherance of the Conspiracy.

12       197.    Despite the increased efficiency and costs savings of fifth generation fabs, the

13   industry experienced higher prices in 2003, purportedly because of a shortage of the most

14   popular sizes of LCD Panels.  In order to keep prices artificially high, Conspirators chose not to

15   operate at full capacity, nor to take advantage of lower variable costs.

16                          **iii.    2004 – 2006**

17       198.    Pursuant to the Conspiracy to fix and stabilize LCD Panel prices, prices continued

18   to rise during the first half of 2004.  In fact, between 2003 and mid-2004, LCD Panel prices

19   increased for five consecutive quarters.  Various types of crystal meetings in furtherance of the

20   Conspiracy were ongoing during this period.

21       199.    The cartel's success at raising LCD Panel prices slowly dampened demand.  In

22   response, the cartel allowed LCD Panel prices to once again level off and begin to decline in the

23   second half of 2004.  During this period of time, the market for LCD televisions started to grow,

24   with the 32-inch panel representing approximately 9 percent of the market.

25       200.    Consolidation and collaboration among and between competitors in furtherance of

26   the Conspiracy continued as Samsung and Sony launched their joint venture, named S-LCD

27   Corp.

28

201.    Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the LCD Panel industry was not facing oversupply, but rather was reaping the benefits of an LCD Panel shortage and stable, or increasing, panel prices.

202.    These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

203.    A temporary oversupply of LCD Panels occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, the Conspirators fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Dr. Hui Hsiung of AUO stated publicly that his company was reducing production of the LCD Panels in order to avoid further price erosion.  He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers.  A June 13, 2006 article in *InfoWorld* noted that as a result of Dr. Hsiung's statements, "[t]he chatter is growing louder each day."

204.    Chi Mei was not the only one to follow AUO's invitation to restrict the output and increase the prices of LCD Panels.  In May of 2006, in discussions between executives of the two companies, AUO, in furtherance of the Conspiracy, convinced QDI, a company that it acquired in October of 2006, to reduce production of LCD Panels.  By June of 2006, LG also announced plans to cut production of LCD Panels.

205.    By the summer of 2006, the Conspiracy continued through bilateral meetings as alleged herein.

206.    Despite the fact that certain of the Conspirators may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the Conspiracy continued at least through the end of that year.  This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 49 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

G.     DEFENDANTS' AND THEIR CO-CONSPIRATORS' PRICE-FIXING CONSPIRACY
       INCLUDED SMALL LCD PANELS

207.    As part of the larger Conspiracy to raise the price of LCD Panels, Defendants engaged in bilateral communications specifically regarding prices for small LCD Panels of various types used in mobile wireless handsets and other mobile device applications, including TFT and non-TFT technology.  These discussions took place between sales and marketing employees in the form of in-person meetings, telephone calls, emails, and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to Defendants' customers.

208.    Moreover, because all types of LCD Panels were interchangeable for use in certain mobile wireless handsets and other handheld devices, and the Conspirators' customers were in competition with each other, communications among and between the Conspirators intended to raise and/or stabilize prices of small LCD Panels of any specific type or for sale to any specific customer had the effect of raising and/or stabilizing prices of small LCD Panels of all types and for all applications.

209.    Representatives of AUO, Chi Mei, Epson, LG, Samsung, Sharp, Toshiba, and other LCD Panel manufacturers engaged in these bilateral communications with the goal of reaching understandings regarding prices for small LCD Panels.  As part of these communications, they discussed prices, quantities, and profits on small LCD Panels and agreed to fix the prices of small LCD Panels.  These communications began at least as early as 2001 and continued throughout the Relevant Period.

210.    █████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 50 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

211. 

212.

213.

214.

215.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 51 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

216. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████

217.     Epson employees responsible for selling CSTN-LCD Panels to Motorola also engaged in bilateral discussions with "top management" employees at Sharp.

218. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

219. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████

220. ████████████████████████████████████████████████
██████████████████████████████████████

221. ████████████████████████████████████████████████
██████████████████████     █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1  ████████████████████████████████████████

2  ██████████████████

3  222.  ████████████████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████████████████████████████

8  █████████████████

9  223.  ████████████████████████████████

10  ██████████████████████

11  224.   In some instances, Defendants quoted mobile wireless handset vendors a single

12  price for a LCD module that included both a TFT-LCD Panel and an STN-LCD Panel.  For

13  example, Defendants quoted Motorola a single price for LCD modules used in the Razr phone,

14  which modules included both a TFT-LCD Panel and a CSTN-LCD Panel.  Defendants Sharp and

15  Epson have admitted fixing prices for TFT-LCD Panels sold to Motorola for the Razr phone.

16  Because Sharp and Epson quoted prices to Motorola for the entire Razr module, their admitted

17  agreements to fix prices for Motorola included an agreement to fix the price of the CSTN-LCD

18  Panels included in the Razr module.

19  225.   In other instances, Defendants quoted some mobile wireless handset vendors a

20  single price for a LCD module that included both a TFT-LCD Panel and a MSTN-LCD Panel.

21  For example, in 2003, SonyEricsson manufactured a phone that contained a TFT-LCD Panel in

22  the primary display and a MSTN-LCD Panel in the subdisplay, and sought a single price

23  quotation for both the TFT-LCD Panel and the MSTN-LCD Panel from Defendants.   Thus,

24  Defendants' agreement to fix the price of TFT-LCD Panels included an agreement to fix the

25  price of MSTN-LCD Panels sold in the combined TFT-LCD Panel/MSTN-LCD Panel modules

26  sold for mobile wireless handset applications.

27  226.  ████████████████████████████████

28  ████████████████████████████████████████

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 53 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1 ████████████████████████████████████████████████████████

2 ███████████████████████████████

3      227.    Thus, because a number of mobile wireless handsets, including the Motorola Razr

phone, included both TFT-LCD Panels and STN-LCD Panels, and because mobile wireless

handset manufacturers often requested a single price for LCD modules that included both types

of panels, Defendants' bilateral discussions and agreements with respect to TFT-LCD Panel

prices inevitably included and/or affected the prices of STN-LCD Panels in those modules.

**H.     THE ROLE OF TRADE ASSOCIATIONS DURING THE RELEVANT PERIOD**

     228.    The LCD industry is served by several major trade organizations that put on

industry-wide meetings several times a year.  These meetings have facilitated collusion, and the

trade associations have themselves functioned as a means for the Conspirators to cooperate and

discuss prices.

     229.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to

which AUO, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is

to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities,

promoting the cooperation within competition, acting as a window for interaction with

international organization[s] and promoting the integrated growth to [the] whole display

industry."  TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing

of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT-LCD

affiliations to visit TTLA."  Thus, TTLA was not merely a trade association that provided an

opportunity to conspire; it was a vehicle by which the Conspiracy was effectuated and

implemented.

     230.    South Korean manufacturers, including LG and Samsung, had similar trade

associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial

Research Association of Korea) and KODEMIA (the Korea Display Equipment Material

Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign

Organizations related to display industries."  Since 1996, EDIRAK has had a cooperation pact

with the United States Display Consortium ("USDC").    Describing the pact, Malcolm

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 54 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1   Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should
2   cooperate on common issues."

3   231.   Japanese manufacturers of LCD Panels have a similar organization of their own.
4   The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves
5   Japanese manufacturers of LCD Panels.  Its members include Sharp, Toshiba, NEC, Hitachi, and
6   a Japanese subsidiary of Samsung.  Like the KODEMIA and TTLA, the SEAJ was not merely a
7   trade association that provided an opportunity to conspire; it was a vehicle by which the
8   Conspiracy was effectuated and implemented.

9   232.   In addition to these national trade associations, the Society for Information
10  Display ("SID") put on multiple meetings each year that were attended by executives from all of
11  the major producers.  One of these meetings had been known as the SID Symposium, but was
12  renamed the "SID International Symposium and Business Conference."  SID also puts on a long-
13  running conference called the International Display Research Conference ("IRDC").

14  233.   The 2004 SID International Symposium and Business Conference ("SID 2004")
15  featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and
16  CEO of AUO. This was followed shortly by a presentation entitled "The FPD Capital Equipment
17  Investment Environment," which informed the attendees about "investments planned at the
18  major display manufacturers."  A representative of DisplaySearch also spoke about the LCD
19  market.  There were presentations by analysts from iSuppli/Stanford Resources, and other
20  industry experts.  This was all followed by a "networking reception – sponsored by LG.Philips
21  LCD," to which all conference attendees were invited to participate.

22  234.   SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AUO.  This
23  time it was called "2005: Beyond the Crystal Gateway."   A DisplaySearch representative
24  provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and
25  the cost and margin outlook for key FPDs will be projected."  Again, these discussions about the
26  market were followed by a "networking reception."  Among the attendees at SID 2004 were
27  Bruce Berkoff of LG, Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AUO, Larry

28

1  Weber of Panasonic, and Joel Pollack of Sharp.  Senior executives from Sharp and Hitachi also
2  attended.

3  235.  The SID 2005 conference was very similar to SID 2004 but was even more
4  blatant in its discussion of the crystal cycle.  Jun Souk, Executive Vice President of Samsung,
5  gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows:
6  "By reviewing what happened during the business up and down cycles of the LCD in the past,
7  we have learned lessons that will reduce the burden in future cycles.  Efforts made in cost
8  reduction line-investment timing, and new market generation will be described."

9  236.  SID 2005 provided a prime opportunity for one of the dominant manufacturers to
10  explain to all of its key competitors how to manage supply and maximize "line-investment
11  timing."  Among the attendees at SID 2005 were Bruce Berkoff of LG and Sang Wan Lee, Jun
12  Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding
13  developments in LCD technology by officials from AUO, Sharp, LG, Samsung, and Hitachi.

14  237.  The Conspiracy was also carried out at the annual meetings of the Global FPD
15  Partners' Conference ("GFPC"), which have been held since 2005.  The initial conference was
16  held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3,
17  2006 in Okinawa, Japan.

18  238.  Participants in the 2006 GFPC noted how successful the event was in promoting
19  information exchanges and "networking" among the Conspirators.  Or, as Dr. Hsiung of AUO
20  has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly
21  important to build connections across the supply chain and around the world . . . the GFPC plays
22  a vital part in building those connections and growing our business."

23  239.  Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of
24  Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba
25  Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Panasonic, and Dr. Hsiung of AUO.

26  240.  As indicated by the public pronouncements, these trade association meetings
27  facilitated the Conspiracy by giving the Conspirators further opportunities to discuss prices and
28  output.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 56 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

## I.   DEFENDANTS' AND THEIR CO-CONSPIRATORS' PARTICIPATION IN CALIFORNIA

241.   Many Conspirators conducted operations in California throughout the Relevant Period, including Chi Mei, Chunghwa, Epson, LG, Mitsui, NEC, Samsung, and Toshiba. Through their California operations, the Conspirators implemented their price-fixing Conspiracy in the United States.  In fact, Defendants LG Display Co., Ltd. and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation specifically admitted during their hearings that acts in furtherance of the Conspiracy were carried out within California.  The Conspirators' employees based in California engaged in bilateral and multilateral communications in furtherance of the Conspiracy.

242.   The Conspirators also used their California operations to implement their price-fixing agreements in the United States.  Through their activities in California, the Conspirators successfully increased the price of LCD Panels.

243.   ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

244.   ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 57 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

245. █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

246. █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████
████

247.    Other Conspirators also engaged in conduct in furtherance of the Conspiracy in California to fix the price of small LCD Panels used in mobile wireless handsets and other portable devices.  Defendant LG Display America, Inc. maintained its offices in San Jose, California.  LG Display America, Inc. has admitted that it participated in the Conspiracy to fix prices of LCD Panels.  LG Display employees responsible for LG Display's negotiations with and sales to mobile wireless handset manufacturers were located in the San Jose, California office.

248.    Toshiba maintained offices in San Jose, California.  Toshiba personnel in its San Jose, California offices were involved in and implemented the Conspiracy in the United States.

████████████████████████████████████████████████

249.    Sharp also maintained offices in San Jose, California. Sharp personnel in its San Jose, California office were involved in and implemented the Conspiracy in the United States.

250.    Epson maintained offices in San Jose, California.  Epson personnel in its San Jose, California office were involved in and implemented the Conspiracy in the United States.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 59 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████

4 **VIII.   PLAINTIFFS' INJURIES**

5        251.   Plaintiffs have suffered a direct, substantial, and reasonably foreseeable injuries as

6 a purchaser of LCD Products as a result of the Conspiracy to raise, fix, stabilize, or maintain the

7 price of LCD Panels at supra-competitive levels.  The Conspiracy artificially inflated the prices

8 of LCD Panels incorporated into such LCD Products, causing Plaintiffs to pay higher prices than

9 they would have in the absence of the Conspiracy.

10        252.   In some cases, Plaintiffs purchased LCD Products directly from the Defendants

11 and their co-conspirators at prices that were artificially inflated as a result of the Conspiracy.  In

12 other cases, Plaintiffs purchased LCD Products from OEMs, as well as other vendors, which

13 contained LCD Panels that had been purchased from Defendants and their co-conspirators.  The

14 Conspiracy artificially inflated the price of LCD Panels purchased by these OEMs and others,

15 which paid higher prices for LCD Panels than they would have absent the Conspiracy.

16        253.   The LCD Product OEMs and other vendors passed on to their customers,

17 including Plaintiffs, the overcharges caused by the Conspiracy.  Plaintiffs were not able to pass

18 on to their customers the overcharges caused by the Conspiracy.  Thus, Plaintiffs suffered injury

19 when it purchased LCD Products from the OEMs and other vendors.

20        254.   Once an LCD Panel leaves its place of manufacture, it remains essentially

21 unchanged as it moves through the distribution system.  LCD Panels are identifiable, discrete

22 physical objects that do not change form or become an indistinguishable part of an LCD Product.

23 Thus, LCD Panels follow a physical chain from the Conspirators through manufacturers of LCD

24 Products sold to Plaintiffs.

25        255.   The market for LCD Panels and the market for LCD Products are inextricably

26 linked and cannot be considered separately.  In addition, the price of the LCD Panel is a material

27 portion of the cost of the LCD Product.  The Conspirators are and have been well aware of this

28 intimate relationship.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 60 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

256.    The LCD Product OEMs' demand for LCD Panels was relatively inelastic, because there were no reasonable substitutes for LCD Panels to serve as visual displays.  Other competing display technologies, such as OLED (Organic Light Emitting Diodes) displays, were not available during the Relevant Period and are only today becoming widely available.   In addition, throughout the Relevant Period, the Conspirators controlled the market for LCD Panels. Consequently, during the Relevant Period, the OEMs had no choice but to purchase LCD Panels from the Conspirators and others at prices that were artificially inflated, fixed, and stabilized by the Conspiracy.

257.    As a result, Plaintiffs were injured in connection with their purchases of LCD Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND CONTINUING TORT DOCTRINE

258.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.   Defendants engaged in a secret Conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of LCD Products.

259.    The Conspirators agreed to keep the Conspiracy, the agreements reached, and the meetings secret.  Participants were instructed to hide the existence of the meetings from others within their own companies and to keep the meeting reports confidential.

260.    The Conspirators knew their activities were illegal. ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 61 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

261.    Therefore, the Defendants and their co-conspirators kept their Conspiracy communications strictly confidential.

262.    The Conspirators took other steps to conceal the Conspiracy.  In some instances, the location of a meeting was circulated only the day before in an effort to avoid detection.  In addition, the Conspirators frequently used telephone calls, rather than emails or letters, to conceal the Conspiracy.

263.    By its very nature, Defendants' and their co-conspirators' price-fixing Conspiracy was inherently self-concealing.  As alleged above, Defendants and their co-conspirators had secret discussions about price and output.  Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in LCD Panel pricing or production.  In fact, the top executives who attended Conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

264.    Furthermore, the participants agreed on what pretexts they would cite when questioned about rising prices.  The participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

265.    The Conspirators have used a variety of other purportedly market-based explanations for price increases in order to conceal the Conspiracy.  In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization:

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 62 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

> Prices have dropped at a steady rate over the past couple of years
> to the point where it was difficult to continue the necessary level of
> capitalization. The [low prices] have starved the industry.

266. Also, in early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."

267. Also in 1999, Bock Kwon, Vice President of LG's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases resulted from "acute" shortages.

268. On February 4, 2001, Bruce Berkoff, Executive Vice President at LG, was quoted by News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up."

269. In the latter half of 2001, Duk Mo Koo, an executive at LG, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

270. Jen-Ting Hsu, a Vice President at Chi Mei, and H.B. Chen, President of AUO, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic News* in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

271. In a presentation shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "*LCDs*: Profitability recovered faster than originally expected."

272. These explanations were pretextual and served to cover up the Conspiracy. Later price increases were explained by industry leaders as derived from new demand for LCD televisions. In 2005, Duk Mo Koo of LG stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 63 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

273.     As a result of Defendants' fraudulent concealment of the Conspiracy, the running of any statute of limitations has been equitably tolled with respect to any of Plaintiffs' claims arising from the anticompetitive conduct alleged in this Complaint.

274.     The statutes of limitations relevant to Plaintiffs' claims for both their direct and indirect purchases of price-fixed LCD Products have also been tolled as a result of the criminal information and guilty pleas entered as a result of the DOJ criminal investigation.

275.     Also as a result of Defendants' fraudulent concealment of the Conspiracy, Defendants are equitably estopped from asserting statutes of limitations defense, and principles of equitable estoppel toll the statutes of limitations relevant to Plaintiffs' claims.

276.     The Defendants' ongoing Conspiracy and unlawful conduct constitute a continuing tort, and therefore the statute of limitations cannot accrue until the last act of Defendants' violative conduct.

277.     The statutes of limitation relevant to Plaintiffs' Complaint were therefore equitably tolled by the doctrine of fraudulent concealment until December 12, 2006.

## X.      TOLLING UNDER *AMERICAN PIPE* AND THE DOCTRINE OF CROSS-JURISDICTIONAL TOLLING

278.     The statutes of limitation relevant to Plaintiff's claims for both its direct and indirect purchases of price-fixed LCD Products have also been tolled under the tolling doctrine set for in the Supreme Court's decision in *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*"), and the doctrine of cross-jurisdictional tolling as a result of the filing of class actions concerning the LCD Conspiracy against Defendants and their co-conspirators.

279.     The statutes of limitation applicable to Plaintiffs' claims for their direct purchases of price-fixed LCD Products were tolled as a result of the filing in December 2006 of numerous direct purchaser class action complaints against Defendants and their co-conspirators that included Plaintiffs in their class definitions (the "Individual Direct Purchaser Class Action Complaints"), including *Nathan Muchnick, Inc. v. Sharp Corporation et al.*; Case No. 06-6107 (E.D.N.J. Dec. 19, 2006) and *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-15417 (S.D.NY. Dec. 22, 2006).

TECH DATA CORPORATION AND TECH DATA PRODUCT MANAGEMENT, INC., FIRST AMENDED COMPLAINT

- 64 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.) INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

280. The statutes of limitation applicable to Plaintiffs' claims for their direct purchases of price-fixed LCD Products also were tolled as a result of the filing of the Direct-Purchaser Plaintiffs' Consolidated Complaint (the "DPP Class Action Complaint") on November 5, 2007.

281. The Individual Direct Purchaser Class Action Complaint and the DPP Class Action Complaint tolled the statutes of limitation applicable to Plaintiffs' direct claims until January 3, 2011 when Plaintiffs opted out of the DPP Class Action. Plaintiffs' Complaint was filed on October 28, 2011, within the applicable 4 year statutes of limitations for their direct purchaser claims.

282. The statutes of limitation applicable to Plaintiffs' claims for their indirect purchases of price-fixed LCD Products were tolled as a result of the filing in 2006 and 2007 of indirect purchaser class action complaints against Defendants and their co-conspirators that included Plaintiffs in their class definitions and asserted claims under both the California Cartwright Act, California Business and Professional Code Section 16720, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* (the "Individual Indirect Purchaser Class Action Complaints"), including *Ferencsik v. LG Philips LCD Co. et al.*, Case No. 06-06714-FB-CLP (E.D.N.Y. Dec. 20, 2006); *DiMatteo v. LG Philips LCD Co., Ltd., et al.,* Case No. 06-cv-15342 (S.D.N.Y. Dec. 20, 2006); *Jafarian v. LG Philips LCD Co., Ltd., et al.*, Case No. 3:07-cv-00994-SI, Dkt. No. 1 (N.D. Cal. Feb. 16, 2007); *Eisler v. A.U. Optronics Corp., et al.*, Case. No. 07-cv-60289- CIV- COHN (S.D. Fla. March 1, 2007); and *Granich v. LG Philips LCD Co., Ltd., et al.*, Case No. 07-cv-03081 (D. Nev. March 9, 2007).

283. The statutes of limitation applicable to Plaintiffs' claims for their indirect purchases of price-fixed LCD Products also were tolled as a result of the filing of the Indirect-Purchaser Plaintiffs' Consolidated Amended Complaint against Defendants and their co-conspirators on November 5, 2007 (the "IPP Class Action Complaint", and together with the Individual Indirect Purchaser Class Action Complaints, the "Indirect Purchaser Complaints").

284. The IPP Class Action Complaint asserted claims against Defendants with respect to Defendants' price-fixing of LCD Products under both the California Cartwright Act,

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 65 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1    California Business and Professional Code Section 16720, and the Florida Deceptive and Unfair

2    Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* ("FDUTPA").

3         285.    In addition to a separate national class, the IPP Class Action Complaint set forth

4    50 individual "Indirect Purchaser State Classes," including, specifically, a Florida Class and a

5    California Class.

6         286.    The definition of the Florida Class in the IPP Class Action Complaint expressly

7    included **all** indirect purchasers without regard to whether they were end-users or resellers:

8              **FLORIDA:** All persons and entities in Florida who

9              indirectly purchased LCD Panels manufactured and/or sold by one

10             or more of the Defendants during the Class Period.  Specifically

11             excluded from this Class are the Defendants; the officers, directors

12             or employees of any Defendant; any entity in which any Defendant

13             has a controlling interest; and any affiliate, legal representative,

14             heir or assign of any Defendant.  Also excluded are any federal,

15             state or local governmental entities, any judicial officer presiding

16             over this action and the members of his/her immediate family and

17             judicial staff, and any juror assigned to this action (the "Florida

18             Indirect Purchaser Class").

19        287.    Similarly, the definition of the California Class in the IPP Class Action Complaint

20   expressly included **all** indirect purchasers without regard to whether they were end-users or

21   resellers:

22             **CALIFORNIA: A**ll persons and entities in California who

23             indirectly purchased LCD Panels manufactured and/or sold by one

24             or more of the Defendants during the Class Period.  Specifically

25             excluded from this Class are the Defendants; the officers, directors

26             or employees of any Defendant; any entities in which any

27             Defendant has a controlling interest; and any affiliate, legal

28             representative, heir or assign of any Defendant.  Also excluded are

1      any federal, state or local governmental entities, any judicial

2      officer presiding over this action and the members of his/her

3      immediate family and judicial staff, and any juror assigned to this

4      action (the "California Indirect Purchaser Class").

5      288.    Plaintiffs therefore fall within the IPP Class Action Complaint's definition of the

6      Indirect Purchaser State Classes for both California and Florida.

7      289.    On December 5, 2008, the IPP Class Action Complaint was amended to exclude

8      resellers such as Plaintiffs from the definition of "Indirect Purchaser State Classes."  As a result,

9      the Individual Indirect Purchaser Class Action Complaints and the IPP Class Action Complaint

10     tolled the statutes of limitations applicable to Plaintiffs' indirect claims until December 5, 2008.

11     Plaintiffs' Complaint was filed on October 28, 2011, within the applicable 4 year statutes of

12     limitations for their indirect purchaser claims.

13     290.    By asserting claims under FDUTPA and the California Cartwright Act the

14     plaintiffs named in each of the Indirect Purchaser Complaints alleged standing to bring these

15     claims.  There are no allegations in the Indirect Purchaser Complaints that on their face precludes

16     plaintiffs' standing to assert claims under FDUTPA and the California Cartwright Act.

17     291.    The statutes of limitation governing Plaintiffs' indirect claims under the

18     California Cartwright Act and the Florida Deceptive and Unfair Trade Practices Act were tolled

19     under *American Pipe* and the cross-jurisdictional tolling doctrine by the Individual Direct

20     Purchaser Class Action Complaints and the DPP Class Action Complaint.    Thus, again,

21     Plaintiffs' Complaint was filed within the applicable 4 year statutes of limitations for their

22     indirect purchaser claims.

23     **XI.**    **CLAIMS FOR VIOLATIONS**

24     **First Claim for Relief**

25     **(Violation of Section 1 of the Sherman Act)**

26     292.    Plaintiffs incorporate and reallege, as though fully set forth herein each and every

27     allegation set forth in the preceding paragraphs of this Complaint.

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 67 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

293.   Beginning no later than January 1, 1996, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or Conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

294.   In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of LCD Products sold in the United States.

295.   As a result of Defendants' unlawful conduct, prices for LCD Products were raised, fixed, maintained, and stabilized in the United States.

296.   The contract, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

297.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of LCD Products;

b.   sharing the pricing and other discussions with other members of the LCD Panel industry to further the Conspiracy;

c.   communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD Products;

d.   agreeing to manipulate prices and supply of LCD Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

e.   issuing price announcements and price quotations in accordance with the agreements reached;

f.   selling LCD Products to customers in the United States at noncompetitive prices;

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 68 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

g.      exchanging competitively sensitive information, including customer information, in order to facilitate their Conspiracy;

h.      agreeing to maintain or lower production capacity; and

i.      providing false statements to the public to explain increased prices for LCD Products.

298.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their business and property in that they paid more for LCD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

<u>Second Claim for Relief</u>

**(Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**

299.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

300.    During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed LCD Products in commerce in the United States, including Florida. Defendants' conduct, including, but not limited to, their violations of the Sherman Act and California's Cartwright Act as described herein, and fraudulent concealment caused injury to Plaintiffs, as both a direct and indirect purchasers, as Defendants' supra-competitive prices were passed on to Plaintiffs as purchasers.

301.    Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

302.    During the Relevant Period, Plaintiffs maintained their principal places of business in Clearwater, Florida.  They also conducted purchasing negotiations in Florida for LCD Products; made purchasing decisions in Florida regarding LCD Products; purchased LCD Products in Florida; and resold LCD Products in Florida, among other Florida-based activities. As a result of their presence in Florida, their purchases and sales in Florida, the substantial business they conduct in Florida, and the injury suffered in Florida, Plaintiffs are entitled to the protection of the laws of Florida.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 69 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

303.   In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which LCD Products were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiffs.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

304.   The conduct of the Defendants described herein - including but not limited to their violations of the Sherman Act and California's Cartwright Act - constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

305.   Defendants' unlawful conduct had the following effects: (1) LCD price competition was restrained, suppressed, and eliminated throughout Florida; (2) LCD Products prices on both direct and indirect purchases were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for LCD Products that they purchased both directly and indirectly.   During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiffs in Florida, causing financial losses.

### Third Claim for Relief

### (Violation of California Cartwright Act)

306.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

307.   During the Relevant Period, Plaintiffs conducted a substantial volume of business in California.  Plaintiffs received shipments of and took title to LCD Products at artificially-

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 70 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1    inflated prices because of Defendants' price-fixing Conspiracy at their warehouses in Ontario,

2    California and Fontana, California, and sent purchase orders and payments for LCD Products at

3    artificially-inflated prices because of Defendants' price-fixing Conspiracy to vendors in

4    California; Plaintiffs, therefore, purchased a significant volume of LCD Products in California.

5    In addition, Plaintiffs maintained California inventories of LCD Products manufactured and sold

6    by Defendants, their co-conspirators, and others, and operated warehouses in California.

7    Plaintiffs also sold LCD Products to customers in California.  As a result of Plaintiffs' business

8    operations in California they were registered to do business in the State of California during the

9    Relevant Period.

10        308.    Additionally, many of the LCD Products ultimately purchased by Plaintiffs were

11   bought by Plaintiffs' vendors in California at artificially-inflated prices because of Defendants'

12   price-fixing Conspiracy.  By way of example, Hewlett-Packard Company ("Hewlett-Packard")

13   was one of Plaintiffs' primary vendors of LCD Products during the Relevant Period.  Plaintiffs

14   purchased over $700 million worth of LCD Products from Hewlett-Packard during that time.  On

15   information and belief, during the Relevant Period, Hewlett Packard purchased and/or took

16   delivery in California of a substantial portion of the LCD Products it purchased from Defendants

17   at artificially-inflated prices because of Defendants' price-fixing Conspiracy.  As a result of

18   Plaintiffs' presence in California and the substantial business they conducted in California,

19   Plaintiffs are entitled to the protection of the laws of California.

20        309.    Defendants and their co-conspirators engaged in and participated in the

21   Conspiracy through their offices and operations in California.  Defendants LG Display Co., Ltd.

22   and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson

23   Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and

24   HannStar Display Corporation all admitted in their plea agreements that acts in furtherance of

25   their Conspiracy to fix the price of LCD Panels were carried out in California.  Defendants Chi

26   Mei, Chunghwa, Epson, LG, Mitsui, NEC, Samsung, and Toshiba all maintained offices in

27   California during the Relevant Period.  Employees at Defendants' locations in California

28   participated in meetings and engaged in bilateral communications in California and intended and

1   did carry out Defendants' anticompetitive agreement to fix the price of LCD Products.

2   Defendants' conduct within California thus injured Plaintiffs both in California and throughout

3   the United States.

4   310.   Beginning at a time presently unknown to Plaintiffs, but at least as early as

5   January 1, 1996, and continuing thereafter at least up to and including at least December 11,

6   2006, Defendants and their co-conspirators entered into and engaged in a continuing unlawful

7   trust in restraint of the trade and commerce described above in violation of the Cartwright Act,

8   California Business and Professional Code Section 16720.  Defendants have each acted in

9   violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for

10   LCD Panels at supra-competitive levels.  Defendants knew or should have known that their

11   Conspiracy to fix prices for LCD Panels would cause prices for LCD Products to rise.

12   Defendants' conduct substantially affected California commerce.

13   311.   The aforesaid violations of Section 16720, California Business and Professional

14   Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

15   Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain

16   and stabilize the prices of, and to allocate markets for, LCD Products.

17   312.   For the purpose of forming and effectuating the unlawful trust, Defendants and

18   their co-conspirators have done those things that they combined and conspired to do, including

19   but in no way limited to the acts, practices, and course of conduct set forth above and the

20   following:

21   a.   participating in meetings and conversations, in California and elsewhere,

22   to fix, raise, maintain, and/or stabilize the price of LCD Panels;

23   b.   communicating in writing, in California and elsewhere, to fix, raise,

24   maintain, and/or stabilize the price of LCD Panels;

25   c.   restricting the supply of LCD Panels in order to artificially inflate the price

26   of LCD Panels and LCD Products;

27   d.   issuing price announcements and price quotations, in California and

28   elsewhere, in accordance with illegal conspiratorial conduct;

1        e.     negotiating and entering into agreements with Plaintiffs in California to

2              sell LCD Products at artificially inflated products;

3        f.     selling LCD Products to Plaintiffs and other customers (including

4              Plaintiffs' suppliers), in California and elsewhere, at artificially inflated

5              prices;

6        g.     exchanging information, in California and elsewhere, on prices for LCD

7              Products sold to Plaintiffs and other customers for the purpose of

8              monitoring and enforcing adherence to the illegal agreements;

9        h.     providing false statements to the public, in California and elsewhere, to

10              explain increased prices for LCD Products;

11        i.     fixing, raising, maintaining, and stabilizing the price of LCD Panels and

12              LCD Products;

13        j.     allocating markets for LCD Panels and LCD Products amongst

14              themselves;

15        k.     submitting rigged bids for the award and performance of certain LCD

16              Panels and LCD Products contracts; and

17        l.     allocating among themselves the production of LCD Panels and LCD

18              Products.

19    313.    The combination and Conspiracy alleged herein has had, *inter alia*, the following

20 effects:

21        a.     price competition in the sale of LCD Panels and LCD Products has been

22              restrained, suppressed, and/or eliminated in the State of California;

23        b.     prices for LCD Panels and LCD Products sold by Defendants, their co-

24              conspirators, and others have been fixed, raised, maintained, and stabilized

25              at artificially high, non-competitive levels in the State of California; and

26        c.     those who purchased LCD Panels and LCD Products from Defendants,

27              their co-conspirators, and others and LCD Products containing price-fixed

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 73 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1          LCD Panels from Defendants, their co-conspirators, and others have been

2          deprived of the benefit of free and open competition.

3        314.    As a direct and proximate result of the alleged unlawful conduct of Defendants,

4 Plaintiffs paid supra-competitive, artificially inflated prices for the LCD Products they purchased

5 during the Relevant Period.

6        315.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been

7 injured in their business and property by paying more for LCD Products containing price-fixed

8 LCD Panels sold by Defendants, their co-conspirators, and others than they would have paid in

9 the absence of Defendants' combination and Conspiracy.  As a result of Defendants' violation of

10 Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble

11 damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a)

12 of the California Business and Professions Code.

13                    **Fourth Claim for Relief**

14        **(Violation of California Unfair Competition Law)**

15        316.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

16 allegation set forth in the preceding paragraphs of this Complaint.

17        317.    Defendants have engaged in unfair competition in violation of California's Unfair

18 Competition Law, California Business and Professional Code § 17200 *et seq*., by engaging in the

19 acts or practices specified above.

20        318.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and

21 17204 of the California Business & Professions Code, to obtain restitution from Defendants of

22 all revenues, earnings, profits compensation, and benefits which they obtained as a result of their

23 unlawful, unfair, and fraudulent conduct.

24        319.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged

25 above, injured Plaintiffs and members of the public in that Defendants' conduct restrained

26 competition, causing Plaintiffs and others to pay supra-competitive and artificially inflated prices

27 for LCD Products.

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,          - 74 -          MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
FIRST AMENDED COMPLAINT                            INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

a.  Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce.  Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of LCD Panels.

b.  Defendants' Unfair Business Practices: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of LCD Panels.

c.  Defendants' Fraudulent Business Practices: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with co-conspirators secret and making false public statements about the reasons for artificially inflated prices of LCD Products. Members of the public were likely to be deceived, and Plaintiffs were in fact deceived by Defendants' fraudulent actions.  As a result of Defendants' unfair competition, Plaintiffs suffered injury in fact and have lost money or property.

320.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

321.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 75 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

322.   Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

323.   Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display Co., Ltd. and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation all admitted that acts in furtherance of the Conspiracy to fix the price of LCD Panels were carried out in California.

324.   By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and Conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the Florida Deceptive and Unfair Trade Practices Act, the California Cartwright Act, and the California Unfair Competition Law, and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants engaged in a contract, combination, and Conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.   Plaintiffs shall recover damages sustained by them, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants;

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 76 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)

1    E.    Defendants engaged in a contract, combination, and Conspiracy in violation of the

2    California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*., and Plaintiffs were injured

3    in their business and property as a result of Defendants' violations;

4    F.    Plaintiffs shall recover damages sustained by them, as provided by California

5    Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*., and a joint and several judgment in

6    favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in

7    accordance with such laws;

8    G.    Defendants engaged in unlawful, unfair, and fraudulent business practices in

9    violation of California Business and Professions Code §§ 17200, *et seq*., and Plaintiffs were

10   injured in their business as a result of Defendants' violations;

11   H.    Defendants shall be enjoined from engaging in further acts or practices in

12   violation of and Plaintiffs shall recover damages sustained by them as a result of Defendants'

13   violations of Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

14   I.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and

15   the respective officers, directors, partners, agents, and employees thereof, and all other persons

16   acting or claiming to act on their behalf, shall be permanently enjoined and restrained from

17   continuing and maintaining the combination, Conspiracy, or agreement alleged herein;

18   J.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such

19   interest shall be awarded at the highest legal rate from and after the date of service of the initial

20   complaint in this action;

21   K.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

22   as provided by law; and

23   L.    Plaintiffs shall receive such other or further relief as may be just and proper.

24   ////

25   ////

26   ////

27   ////

28   ////

1   **XIII.   <u>JURY TRIAL DEMAND</u>**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

3   the claims asserted in this Complaint so triable.

4          Dated:  April 2, 2012

5                                             Respectfully Submitted,

6                                              /s/Scott N. Wagner
                                              ROBERT W. TURKEN
7                                             MITCHELL E. WIDOM
                                              SCOTT N. WAGNER
8                                             BILZIN SUMBERG BAENA PRICE &
                                              AXELROD LLP
9                                             1450 Brickell Ave., Suite 2300
                                              Miami, Florida 33131-3456
10                                            Telephone:  305-374-7580
                                              Facsimile:  305-374-7593
11                                            E-mail:      rturken@bilzin.com;
12                                                         mwidom@bilzin.com;
                                                           swagner@bilzin.com
13

14                                            STUART H. SINGER
                                              BOIES, SCHILLER, & FLEXNER LLP
15                                            401 East Las Olas Boulevard, Suite 1200
                                              Fort Lauderdale, Florida 33301
16                                            Telephone: (954) 356-0011
                                              Facsimile: (954) 356-0022
17                                            Email: ssinger@bsfllp.com

18                                            Of Counsel:
19
                                              WILLIAM A. ISAACSON
20                                            MELISSA WILLETT
                                              BOIES, SCHILLER & FLEXNER
21                                            5301 Wisconsin Ave. NW, Suite 800
                                              Washington, DC 20015
22                                            Telephone:  (202) 237-2727
                                              Facsimile:   (202) 237-6131
23                                            Email:  wisaacson@bsfllp.com
24
                                              PHILIP J. IOVIENO
25                                            BOIES, SCHILLER & FLEXNER
                                              10 North Pearl Street, 4th Floor
26                                            Albany, NY 12207
                                              Telephone:  (518) 434-0600
27                                            Facsimile:   (518) 434-0665
28                                            Email:  piovieno@bsfllp.com

1

2                            *Counsel for Plaintiffs Tech Data Corporation and Tech Data Product Management, Inc.*

3

4                               **<u>CERTIFICATE OF SERVICE</u>**

5        The undersigned counsel hereby certifies that a true and correct copy of the foregoing

6 document was electronically served upon the parties and counsel of record through the Court's

7 ECF system on April 2, 2012.

8

9 Dated: April 2, 2012                              /s/Scott N. Wagner

10                                     Scott N. Wagner

11                                     *Attorney for Plaintiffs Tech Data Corporation and Tech Data Product Management, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TECH DATA CORPORATION AND TECH DATA
PRODUCT MANAGEMENT, INC.,
FIRST AMENDED COMPLAINT

- 79 -

MASTER FILE NO. 3:07-MD-01827-SI (N.D. CAL.)
INDIVIDUAL CASE NO. 3:11-CV-05765-SI (N.D. CAL.)