Gary Joseph Bonas II
25794 Covala Court
Valencia, California 91355
(661) 600-5222

April 13, 2012

Clerks Office
United States District Court
Northern District of California
16th Floor
450 Golden Gate Avenue
San Francisco, California 94104

U.S. Marshal D. Singer
c/o Deputy Marshal Johanek
U.S. Marshals Service
312 N. Spring Street
Room G-23
Los Angeles, Calif. 90012

FILED
APR 16 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Re:   *In Re TFT-LCD (Flat Panel) Antitrust Litigation MDL 1827 and*
      *In Re TFT-LCD (Flat Panel) Antitrust Litigation, No. 3:07-md-01827-Sl*

Dear Honorable Judge Illston,

In the above **bad faith price-economic action**(s), the Court approved notice reads:

If you have comments about, or disagree with, any aspects of the Settlements, including the maximum attorneys' fees ..., use of the settlement funds to pay administration **costs and expenses**, payments to Class Representatives, or to finance the ongoing litigation, you may express your views to the Court by writing to the address below. The written response needs to include your name, address, telephone number, the case number (In re TFC-LCD (Flat Panel) Antitrust Litigation MDL 1827), **a brief explanation** of the reasons for objecting and your signature.

Pursuant to notice, this filing is made on behalf of the estates' of Gary Joseph Bonas and Rosemarie Bonas, among others. Both estates made the relevant purchases.

The basis of this comment/objection is based on these client memos, e.g.:

A)   04-11-12 Bonas to counsel – chain price protocol pass-on proof;
B)   04-09-12 Bonas to counsels' association – price crime epidemic;
C)   04-07-12 Bonas to price counsel - overcharge damage math;
D)   04-05-12 Bonas to counsel on the fixed one third protocol adopted; &
E)   04-12-12 Bonas to District 12's DA (P. Shess' DV, client Milberg *et al.*).

There is a developing pattern of fiduciary dodging, refusing to deal with, boycotting and/or retaliation (in concert) against the disclosure and application of simple price laws. These rules are embodied in the "**obligation of contracts**" clause - the "**supreme law of this land.**" Bonas' 04-04-12 filing is incorporated by reference.

Thank you for your independent review and consideration of the points herein.

Respectfully,

Gary Joseph Bonas II

Gary Joseph Bonas II
25794 Covala Court
Valencia, California 91355
(661) 600-5222

April 11, 2012

Fran Scarpulla                                      Richard M. Heimann
Zelle Hoffman Voelbel                               Lieff, Cabraiser
44 Montgomery St., Ste. 3400                        275 Battery Street, 29th Fl.
San Francisco, Calif. 94104                         San Francisco, CA 94111

Re:   *In Re TFT-LCD (Flat Panel) Antitrust Litigation MDL 1827 and*
      *In Re TFT-LCD (Flat Panel) Antitrust Litigation, No. 3:07-md-01827-Sl*

Dear Counsel,

To aid clients and the court in evaluating the propriety of the above settlement(s) you are attempting to secure, I have some questions about the numbers.

### I.    Background

To date notices read hat your firms arranged payment of these overcharge dollars:

A)    $388,022,242.00 million for *direct buyer clients*;[1] &
B)    $538,000,000.00 million for *indirect customer clients*.[2]

These big numbers were obtained by copying a federal economic enforcement case, which secured guilty confessions (and $860 million in fines) according to a 12-09-09 DOJ press.[3]

With the "agreement" element of this price conspiracy admitted, the legal work here centers two core questions: 1) was the admitted overcharge passed on to consumers who buy? 2) If so, what arithmetic is to be used to ascertain the dollars overcharged/stolen?

### a.    Did Chains Pass-On The Overcharge?

A lions-share of the dollar purchases on the table were made at retail chains, including:

B)    Walmart;
C)    Costco;
D)    Sams Club;
E)    Target;
F)    Fry's;
G)    Circuit City;
H)    Office Depot;
I)    Radio Shack;
J)    CompUSA;
K)    Staples; &

---

[1] Exhibit A Direct Action.
[2] Exhibit B Indirect Action Notice.
[3] Exhibit C Indirect Action Notice.

1

L)  Sears, e.g.

The record does not indicate if any discovery was taken to ascertain whether these chains employed a price protocol that passed the fixed up prices to consumers. Was any? Do you know what price protocol these chains use in the daily course of business? Specifically, do you know whether their price protocol is something *akin to a "pre-existing cost plus contract"*?

I ask because all of these chains sell to consumers on *a "take it or leave it," not negotiable contract basis*, unlike their supply contracts. This basic sales information is uniformly documented – at the wholesale and retail level: units sold, price and dollar revenues.

### a.  Chains' Price Protocol - Software

Manufacturer's triple case exposure for the same economic crime dates back to the 1977 *Brick* case.[4] That opinion references pricing policies. All price litigation reduces to pricing policies, as you know. Under oath, the regarded cartel expert (Dr. Kenneth Elzinga) explained:

> A.  If *you are ... a cartel-meister* ... you ... want ... a group of firms ... who ... *have a very similar overall pricing strategy or pricing protocol* ....[5]

I learned about price protocols in the *Barela v. Ralphs*[6] chain price-fixing case we co-counseled together. I also learned about it in one of my many cases. This certified price evidence instructs:

> A.  Some items ... pricing is ... margin [cost] based and other items the pricing is ... competitor based.[7]
>
> ...
>
> Q.  Can you explain ... why ... [only] these *two methods?*
> A.  [T]here are some items that competitors don't carry. So that is not an option.[8]

In both cases, there is always a markup over cost in pricing (sales below cost prices are illegal).

Zeroing in on this critical variable, certified pricing documents confirm big chains contract for and use computer software to manage pre-set prices. This certified proof explains:

> PMS offers ... pricing strategies ... for ... retail prices. These options include: 1) target margin (aka, cost plus pricing), [and] 2) price based on a competitor's price ....
>
> ...
>
> Q.  Are ... operating principles embodied in any documents within the company?
> A.  There are ... strategic plan documents that dictate where we are to be priced ....[9]

Was any information about implemented pricing policies used to arrive at your respective settlement numbers? How were the dollars traced? I didn't notice any evidentiary proof on this point. I've attached some computer price protocol testimony to fill in some of the gaps.

---

[4] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).
[5] Retail price Doctor Kenneth Elzinga under oath, at pages3940:26-3941:2.
[6] *Barela et al. v. Ralphs et al.*, Case No. BC070061 (Filed 12-07-92, L.A. Superior Court - $13 million coupon settlement).
[7] Ex D 07-24-98 Mark Orr Deposition, at page 75:18-20.
[8] Ex D 07-24-98 Mark Orr Deposition, at page 76:10-14.
[9] 07-29-99 Heredia under oath, at page 1937:1-4.

2

### b. The Numbers

A review of the papers does not provide any price system evidence explaining how the settlement numbers here were calculated. They seem to simply lineup with the federal fines:

    A)    Federal Total:    $860,000,000.00 (not including accrued interest)

                                  v.

    B)    Private Match:    $926,022,242.00 (Direct and Indirect together)

It would help, as a client and/or representative, if you could explain exactly how you and Lieff Cabraser arranged these respective numbers? I ask because it appears you got together, talked about these prices and agreed to close the deal around the total federal figure, then agreed to divvy up that total number between your respective cases.

About numbers, the indirect settlement figure is significantly larger that the direct number (over $150 million). What, if any, price protocol evidence (aka, pass-on proof) was secured and what *agreement was reached between you and Lieff* in this regard?

I am trying account for the lack of or missing evidence.

### II. Retail Chain Client Interests?

There is a unique client situation here. The indirect class seems to include:

    A)    Chains, like banks and gas companies, who buy and use viewing screens directly and/or indirectly, e.g.; &
    B)    Small to large consumers who buy and use viewing screens from chains, e.g.

Is this an accurate depiction of the indirect class definition? If so, is there any conflict in representing chain price protocol interests and, at the same time, asserting an overcharge was passed-on to people through chains' price protocol?

I ask because to date no one has responded to any of my case information requests, which included, e.g., your good faith fee price compliance booklet and/or proof. I also haven't noticed any written disclosure about potential pricing conflicts:

    A)    **POTENTIAL CONFLICTS OF INTEREST** – Rules 3-310(B) & 3-310(E)

            a.    *A member … shall not accept … representation without providing written disclosure* where [e.g.]:

                  i.    *Member has … business*, financial or personal *relationship with a party* or witness in the same matter;
                  ii.    Member shall not accept employment adverse to client.

Related, what price device did your experts and case mediators employ in this case?

Thank you for your courtesy response to support a reasoned evaluation.

                                                  Kind regards,

http://acebooks.yolasite.com/

                                                 Gary Joseph Bonas II

Gary Joseph Bonas II
25794 Covala Court
Valencia, California 91355

April 09, 2012

Antitrust Division                                      Jon Streeter
Main Justice Building, Room 3109                        Joanne Remke
950 Pennsylvania Ave., N.W.                             California State Bar
Washington, DC 20530                                    San Fran, CA. 94105

Re:   ***Firm Retainers to Enforce Criminal Price Economic Law***

Dear American Agents,

I write to summarize an infamous breach in large scale economic guardianship in the context of simple overcharge law.

## I.   Introduction

There is a deviant price crime epidemic of a gigantic proportion in this country. Spotting what price experts do and do not do in this regard objectively explains why:

The first sentence in ... State Bar's 1962 Minimum Fee Schedule Report states:

> "'The lawyers have slowly, but surely, been committing economic suicide as a profession.'"[1]

## II.   Firms' "Price Economic" Contract

Certain small to large firms (artificial LLP people) have and are currently entering fiduciary contracts on an enormous economic scale. The critical term of such retainer contracts is to competently and adequately advance basic price economic rules.

At base, the simple price economic laws these firms contract include:

- Correct pricing: ***measure costs*** and setting a good faith price accordingly.[2]
- In a competitive market, ***price is based on cost*** rather than on value.[3]
- In ... competitive markets price equals costs; ***each seller knows his costs***.[4]

Compliance with these universal laws is easy; it merely requires the tools everyone with an eighth grade math. A & B ($300 per unit hour, reasonable cost study proof illustrates.

To subvert these rules, rival firms must talk about the law price and talk about how to subvert it. This is why rivals may not talk about prices. Under oath, one leading price firm first counseled and then put on client testimony about this rule, verbatim:

---

[1] *Goldfarb v. Virginia State Bar* - 421 U.S. 773 (1975).
[2] *Competitive Strategy*, Michael Porter (1980 Free Press); see *Beasley v. Wells Farg*, 235 Cal.App.3d 1395 (1991).
[3] *In re HIGH FRUCTOSE CORN SYRUP ANTITRUST LITIGATION*, 295 F.3d 651 (7th Cir. 2002).
[4] Richard A. Posner, *Antitrust: An Economic Perspective*, Chapter 7, at pages 133-136 (1976).

1

A.  It just goes without saying in our company that you would not ever, ever talk to a competitor about ... price retails. You wouldn't do that. I've been with our company for 40 years and it just was engrained in us, you don't talk to the competitor, don't do it, period.[5]

The state associations of lawyers do not share these rules with others. They do not comply with or advance compliance with these rules, many of which contract to do so, like Milberg, Robbins Geller and others. They aligned with the exact economic deceit pressed by the big companies they sue (for big profit), which is plain perjury – verbatim:

There is no basis in law to suggest that we have some obligation to have cost-plus pricing policies or to base our pricing to the public solely on costs or only to charge a certain dollar amount above costs.[6]  (Exhibit C).

One would expect a Wall Street economic deviant to make such a flagrant untruth. But here exists a series of retainer contracts governed by a fiduciary standard.

### III. Firms' Price Protocol

Together, price enforcement firms adopted a concerted "match up percentage (one third) and a" matched up" hourly price protocol. See Exhibit D. The policy is effectuated by deliberate non compliance with the law summarized above.

Firms uniform departure from correct price proof in favor of their price up together and match up at one third protocol, for example, is the direct result "talks," communications and other price discussions. The rules on this point are well known:

- You can't collaborate without some type of communication....[7]
- [E]xchanges ... must remain subject to close scrutiny by anti-trust.[8]

See Exhibit E. Agreeing will opposing counsel not to brief facts detailing the criminal use of reciprocal price check exchanges (See Exhibit F). Agreeing to shift direct proof of rigged systems into indirect "price law theory" designed to confuse. See Exhibit G. Exhibit H covers just one extreme instance of what firms have done to one over "IT".

### IV. Conclusion

"Congress did not intend any sweeping "learned profession" exclusion from the ... Act ...."[9] "All [bar member] contracts in violation are declared illegal." Sherman Act. "

The first requisite of civilization is ... that a law ... not be broken in favor of an individual or group....[10]

Warm Regards,

Gary Joseph Bonas II

---

[5] 08-05-99, Munger's Chain Testimony, at page 2659:19-24.
[6] The firms' under oath, 10-15-99 trascript, page 69, LINES 5-9 (69:5-9).
[7] Dr. Ken Elzinga, under oath at trial page 3939:5-10.
[8] *U.S. v. U.S. Gypsum*, 438 U.S. 421-22 (1978) ("not to do so is wrong").
[9] *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975).
[10] Sigmund Freud's *Civilization & Its Discontents*, at page 47 (translated & edited by James Strachey (1961 W.W. Norton & Comp)).

Gary Joseph Bonas II
25794 Covala Court
Valencia, California 91355

April 07, 2012

Fran Scarpulla
Zelle Hoffman Voelbel
44 Montgomery St., Ste. 3400
San Francisco, Calif. 94104

Richard M. Heimann
Lieff, Cabraiser
275 Battery St, 29th Fl.
San Francisco, CA 94111

Re:   *In Re TFT-LCD (Flat Panel) Antitrust Litigation MDL 1827 and*
      *In Re TFT-LCD (Flat Panel) Antitrust Litigation, No. 3:07-md-01827-Sl*

Dear Counsel,

   This is to inquire about what information was used in arriving at the overcharge figures in the above referenced settlements:

   A)   $388,022,242.00 million for *direct buyer clients*;[1] &
   B)   $538.00 million for *indirect customer clients*.[2]

   I didn't notice any public information provided to any clients to aid their assessment of these numbers, which is why I ask. Proper authorities instruct:

> The measure of damages ... in price fixing cases is the overcharge multiplied by the relevant purchase quantity. Simply put, the overcharge depends on the difference between the actual price paid and the competitive price, or the price that would have been charged absent the alleged illegal agreement.[3]
>
> ...
>
> The ... difference between the price paid and the ... price that would have had to pay under natural conditions had the combination been out of the way, together with an attorney's fee.[4]
>
> ...
>
> [T]he goal is to measure the but-for price of the contract, as compared to the actual contract.[5]

   The "but-for" price is identified by conducting a "cost estimate" of the "competitive price or prices," which numbers are "subtracted from the actual prices" to determine damages.[6] It is axiomatic that this process requires a "cost analysis."[7] Indeed, case law **"*specifically requires an assessment of what the price would have been*** but for the conspiracy."[8] What is and is not included in this cost study is basic accounting

---

[1] Exhibit A Direct Action.
[2] Exhibit B Indirect Action Notice.
[3] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at page 202 (2nd Ed. 2010).
[4] *Chattanooga Foundry & Pipe Works v. Atlanta*, - 203 U.S. 390 (1906).
[5] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at page 214 (2nd Ed. 2010).
[6] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at page 215 (2nd Ed. 2010).
[7] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at page 215 (2nd Ed. 2010).
[8] ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at page 214 (2nd Ed. 2010).

1

routinely conducted in many species of overcharge cases, including liquidated damages.[9] Can you please advise what price or prices clients, both indirect and direct, would have paid but for the economic price crimes in this case? That would be helpful.

The same information would aid the fact finder in determining whether the proposed settlement can lawfully be anointed. A review of the client papers here does not include any such information. The high court has declared law in this situation:

> In such a case, ... the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and *reasonable estimate of the damage based on relevant data*, and render its verdict accordingly.[10]

This topic directly relates to price protocol. I've included a 02-06-12 price protocol business review letter recently submitted to the DOJ on this point. It provides a "but-for" analysis that might have been used in this case. This clip demonstrates:

### a.   Option A – Independent Math Pricing

I did an independent "price equals cost study" compliant with the basic law of price and arrived at $300 per unit hour. (See Exhibit A - $300). This price confers a comfortable living, provided I can create my own economic crime demand to keep me busy for forty or so unit hours a week. I'd prefer, however, to get more and work less.

### b.   Option B – Exchanging Information Pricing

I'd rather get and match up with other lawyers' prices. Others' numbers range from $500 to $1000. By using their numbers I can charge a lot more, obviously. But I'd really have to stretch my $300 per unit like cost study to reach a $500 to $1,000 per unit hour figure. In my business I create demand. One of my firm colleagues explained:

> "I have the greatest practice of law in the world, I have no clients."[11]

May I match up with one or more colleagues without being exposed to account for the reasonableness of my markup over my costs? If I intentionally choose Option "B" to engage economically, what are the Divisions enforcement intentions, if any?

[End excerpt]

If you did a "but-for" like fiduciary cost study, can you send it or post it on the client settlement website for review? If not, will you kindly explain why?

Thank you for your courtesy.

Respectfully,

http://acebooks.yolasite.com/

Gary Joseph Bonas II

---

[9] ***Beasley v. Wells Fargo Bank***, 235 Cal.App.3d 1395 (1991) (On how to fix a fee price legally – it requires a "reasonable cost study" conducted "before, not after" the billing fact).
[10] *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, at 264 (1946).
[11] http://en.wikipedia.org/wiki/William_Lerach

2

Gary Joseph Bonas II
25794 Covala Court
Valencia, California 91355
(661) 600-5222

April 05, 2012

Fran Scarpulla
Zelle Hoffman Voelbel
44 Montgomery St., Ste. 3400
San Francisco, Calif. 94104

Richard M. Heimann
Lieff, Cabraiser
275 Battery Street, 29th Fl.
San Francisco, CA 94111

Re:   *In Re TFT-LCD (Flat Panel) Antitrust Litigation MDL 1827 and*
      *In Re TFT-LCD (Flat Panel) Antitrust Litigation, No. 3:07-md-01827-Sl*

Dear Counsel,

In the context of prior fiduciary questions, this reviews counsels' contract price terms.

I noticed that rival counsel in these price cases all matched the same price term in the sale of their services to customers. For example, the court approved the lawyers' crafted notices in both sets of these copy-cat cases. Both identify exactly the same percentage price protocol:

> 20.   How will the lawyers get paid?
>
> Counsel [Zelle et al.] and the Attorneys General will ask the Court for … ***one third*** of the … Fund, ***plus*** ….[1]
>
> …
>
> 21.   How will the lawyers get paid?
>
> Counsel [Lieff *et al.*] will ask the Court … for … ***one third*** of the Fund ***plus*** ….[2]

If this were any other industry, would this indicate to you a back door industry price-fixing agreement? An Arnold & Porter expert opined on this subject under oath:

> A.   If you are … a cartel-meister … you … ***want … a group of firms that were competitors***, of course, … who *had and … continue to have a very similar* ***overall pricing strategy or pricing protocol*** ….[3]

I know the association anointed this percentage design, but does that make it lawful?[4]

To focus this question, please advise how the "one third" plan fits into this rule, which is required education in all high schools and higher learning institutions across the countrywide:

- No State [association] … shall … make[up] any … Law impairing the Obligation of Contracts …. Article 1:10!

---

[1] See Indirect Case - District Court Notice *In Re TFT-LCD (Flat Panel) Antitrust Litigation, MDL 1827*
[2] See Direct Case - 10-06-10 U.S. Court Notice *In Re TFT-LCD (Flat Panel) Antitrust Lit., No. 3:07-md-01827-Sl.*
[3] Retail price Doctor Kenneth Elzinga under oath, at pages 3940:26-3941:2.
[4] *Goldfarb v. Virginia State Bar* - 421 U.S. 773 (1975).

1

Consideration is a central obligation element in all contracts, which elements include:

A)                                              *Legal Objective;
B)   Mutual Obligations;
C)                                              **Consideration;**
D)   Competent parties; &
E)                                              **\*Good Faith**

Every firm in this field rigidly sticks to the one third price term *in lieu of* correct pricing, which is required, as opposed to elective learning:

- Correct pricing: measure costs and setting a good faith price accordingly.[5]

The percentage fix operates to erase the obligation of measuring the efficient cost of time serving customers. Stated another way, this is a "consideration obligation" inquiry. Useful time, obviously, is the main cost in the sale of services. Is your percentage of the fund price protocol an invitation to the court to over-ride a "consideration obligation assessment" of your retainer contract(s)? If so, how does this square with supreme judicial duty?

"[I]nstruction comes in terms of the mandatory "shall," which normally creates an *obligation impervious to judicial discretion.*"[6]

Are you attempting to argue that you present "original information" deserving of a percentage of the recovery? This devise has been anointed by your association - for its members - a board of governors comprised of rival firms. The percentage of the fund pricing, however, was grafted from the senate's desire to encourage whistle-blowers to bring original or concealed information pursuant to *qui tam* statutes. That standard is not met in this industry syndicate - as certified by each firm's own case resume.

It seems the state (courts), at esquires' persuasion, have made a law impairing retainer price obligation. What do make of this? I ask because Lieff was quoted in the media, verbatim:

**"[W]e** think the percentage of recovery method is a better way to pay lawyers."...[7]

I know every member does it, like Milberg-Robbins kickback racquet. But, I think Judge Walter correctly did not buy the "but everyone does it" excuse in that criminal case syndicate matter:

"[W]here the sole object . . . is merely to ... enhance or maintain prices, it would seem that there was nothing to justify or excuse it..."[8]

What's your view - in context of your reported gross tax return income between 1999 and 2011?

Thank you for your courtesy response.

Warm regards,

http://acebooks.yolasite.com/

Gary Joseph Bonas II

---

[5] *Competitive Strategy*, Michael Porter (1980 Free Press); see *Beasley v. Wells Farg*, 235 Cal.App.3d 1395 (1991).
[6] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).
[7] http://overlawyered.com/2006/11/update-cosmetics-class-action-settlement/
[8] *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282-283 (6th Cir. 1898), aff'd as modified, 175 U.S. 211 (1899).

2

Gary Joseph Bonas II<br>
25795 Covala Court<br>
Valencia, California 91355<br>
Cell 661-600-5222

April 12, 2012

Phyllis Shess, Esq.   The Honorable Louis J. Freeh
Ofc District [12] Attorney   Freeh Sporkin & Sullivan
330 W Broadway #750   3711 Kennett Pike, Suite 130
San Diego, California 92101   Wilmington, DE  19807

Re:   *Associated With and Involved In This Matter*

Dear District 12 Attorney P. Shess *et al.*,

Thank you for your 04-11-12 e-mail confirming receipt of Bonas' 04-11-12 whistle-blower briefing. See Exhibit A. Specifically, you confirmed receipt of:

- A)   04-11-12 Bonas to counsel – chain price protocol pass-on proof;
- B)   04-09-12 Bonas to counsels' association – price crime epidemic;
- C)   04-07-12 Bonas to price counsel - overcharge damage math; &
- D)   04-05-12 Bonas to counsel on the fixed one third protocol adopted.

You mistakenly wrote that you are "not associated with this matter." This reminds that you are directly involved. You are currently a client in two related cases - Mr. F. Scarpulla's team and District 12's Attorney General K. Harris. Before these *copy cat cases*, you were a United States Department of Justice client in its action against the same companies - *who criminally combined to and overcharged* their own clients, which is a *"supreme economic evil"* according to the United Supreme Court.

Moreover, the information contained in these briefings directly relates to your offensive case against Bonas, wherein you agreed to represent Milberg – Robbins Geller (LLPs' economic interests). This case remains open, as you know. See Exhibit B (03-22-12 Bonas to Governor Brown (stricken – no conviction exists). The briefing also directly relates to the information contained on Bonas' two computers (private property) that you/your office, in concert with L.A. U.S. Attorney, took and still refuse to return.

In letter dated 01-11-12 (Exhibit C), Bonas wrote you direct, respectfully asking you/your office to return his stolen property. You (this State) received the letter, *talked in house about it and agreed* not to reply or explain this conversion, which is no petty matter. How do you wish to proceed with winding up this case, which will include the state's published libel, slander and other propaganda involved? See Exhibits P, Q and R.

Thank you for not *threatening to further retaliate* (by use of your military police state punishment against speech) against a LLP economic crime whistle-blower.

Kind regards,<br>

**http://acebooks.yolasite.com/**

Gary Joseph Bonas II

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

September 28, 2011

DIVISION OF
ENFORCEMENT

Sean McKessy, Chief
Office of the Whistleblower
Fax: (703) 813-9322
McKessyS@sec.gov

Gary Joseph Bonas II
25794 Covala Court
Valencia, California 913255

Submission dated: September 11, 2011

Dear Mr. Bonas:

Thank you for your information and request to be considered for an award under the SEC's Whistleblower Program. We greatly appreciate your bringing this matter to our attention. The success of the whistleblower program depends on individuals providing the Commission with specific, timely, and credible information.

Members of the staff of the Division of Enforcement may contact you for additional assistance or information. In addition, we encourage you to submit any additional supporting information or materials that you believe will assist us in analyzing and fully understanding this matter.

On August 12, 2011 the final Whistleblower rules went into effect. It is now required that you submit a signed Form-TCR (including the declarations page) in order to be considered for a whistleblower award. You are encouraged to submit the form using our online questionnaire, which you can access at www.sec.gov/whistleblower. That website also has link to a pdf of the Form-TCR that you may also complete and sign and send to us via hard copy at Office of the Whistleblower, 100 F Street, NE, Mail Stop 5971, Washington, DC 20549 or fax it to (703) 813-9322.

Thank you again for taking the opportunity to submit your information to us. Efforts by persons such as yourself are critical to the success of this program.

Please do not hesitate to contact the Office of the Whistleblower if you have any questions or concerns.

Best regards,

Sean McKessy