William A. Isaacson (admitted *pro hac vice*)
Melissa Felder (admitted *pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com
          mfelder@bsfllp.com

Philip J. Iovieno (admitted *pro hac vice*)
Anne M. Nardacci (admitted *pro hac vice*)
Luke Nikas (admitted *pro hac vice*)
Christopher V. Fenlon (admitted *pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:  piovieno@bsfllp.com
          anardacci@bsfllp.com
          lnikas@bsfllp.com
          cfenlon@bsfllp.com

Counsel for Plaintiff
COMPUCOM SYSTEMS, INC.

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Case No. 3:11-cv-06241-SI (N.D. Cal.) |
| | Master File No. 3:07-md-01827-SI (N.D. Cal.) |
| This Document Relates To Individual Case No. 3:11-cv-06241-SI (N.D. Cal.) | MDL No. 1827 |
| COMPUCOM SYSTEMS, INC., | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| | **JURY TRIAL DEMANDED** |
| vs. | |
| AU OPTRONICS CORPORATION, et al., | ***DOCUMENT FILED UNDER SEAL – HIGHLIGHTED VERSION*** |
| Defendants. | |

1      Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its First Amended Complaint

2  against all Defendants named herein, hereby alleges as follows:

3  **I.**     **INTRODUCTION**

4      1.     Defendants and their co-conspirators formed an international cartel that

5  conducted a long-running conspiracy extending at a minimum from at least January 1, 1996

6  through at least December 11, 2006 (the "Relevant Period").  The purpose and effect of this

7  conspiracy was to fix, raise, stabilize, and maintain prices for Liquid Crystal Display panels

8  ("LCD panels").

9      2.     LCD panels are used in a number of products, including, but not limited to

10  televisions, desktop computer monitors, notebook computers, and mobile wireless handsets.

11  As used herein, "LCD Products" refers to all LCD panels, and all products containing LCD

12  panels, manufactured by any of the named Defendants or their subsidiaries, affiliates, or co-

13  conspirators.  Defendants' and their co-conspirators' price-fixing conspiracy alleged herein had

14  the effect of raising, fixing, maintaining, and/or stabilizing the prices of LCD Products.

15      3.     During the Relevant Period, the conspiracy affected billions of dollars of

16  commerce throughout the United States.  The conspiracy included communications and

17  meetings in which Defendants and their co-conspirators agreed to eliminate competition and fix

18  the prices of LCD panels and LCD Products that they knew would be sold in the United States.

19      4.     Beginning in at least 1996, Defendants along with other LCD panel

20  manufacturers (collectively, the "Existing LCD Panel Manufacturers" and individually, each an

21  "Existing LCD Panel Manufacturer") met in person or communicated by other means to agree

22  on LCD Product prices and the amount of LCD Products each would produce.  As new

23  producers entered the LCD Products market, the new producers also agreed to fix prices and to

24  control supply ("New Producers" and collectively with the Existing LCD Panel Manufacturers,

25  the "Conspirators").  The Conspirators' conspiracy included agreements on the prices at which

26  the Conspirators would sell LCD Products to their own corporate subsidiaries and affiliates, as

27  well as their co-conspirators, thereby ensuring LCD Product prices remained consistent among

28  the Conspirators and their customers, which was an attempt to prevent any price discrepancies

1   to consumers (the "Conspiracy").

2       5.      Throughout the Relevant Period, the Conspiracy was effective in moderating the

3   normal downward pressures on prices for LCD Products caused by periods of oversupply and

4   technological change.  The Conspiracy resulted in unusually long periods of high prices and

5   high profits.  Although there were periods when prices for LCD Products temporarily declined

6   as a result of new entrants being assimilated, or breakdowns in the effectiveness of the

7   Conspiracy, those price declines were from levels that had been set conspiratorially high, rather

8   than from levels set by free and open competition.  In addition, prices declined less than they

9   would have in a competitive market.  As a result of the Conspirators' unlawful conduct,

10  Plaintiff paid higher prices for LCD Products than it would have paid in a competitive market.

11      6.      Seven of the Defendants have already admitted to participating in this

12  Conspiracy: LG Display Co., Ltd. (together with its wholly-owned subsidiary, LG Display

13  America, Inc.); Sharp Corporation; Chunghwa Picture Tubes, Ltd.; Hitachi Displays, Ltd.;

14  Epson Imaging Devices Corporation; Chi Mei Optoelectronics Corporation; and HannStar

15  Display Corporation.  On or about November 12, 2008, LG Display Co., Ltd., LG Display

16  America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and

17  pay a total of $585 million in criminal fines for their roles in a conspiracy to fix the prices of

18  LCD panels.  On or about May 15, 2009, Hitachi Displays, Ltd. agreed to plead guilty and pay

19  a $31 million criminal fine for its role in a conspiracy to fix the prices of LCD panels.  On or

20  about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a

21  $26 million criminal fine for its role in a conspiracy to fix the prices of LCD panels.  And on or

22  about February 8, 2010, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a

23  $220 million criminal fine for its role in a conspiracy to fix the prices of LCD panels.  On or

24  about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30

25  million criminal fine for its role in a conspiracy to fix the prices of LCD panels.  Two

26  executives from LG Display, three executives from Chunghwa, four executives from Chi Mei,

27  and one executive from HannStar have also pleaded guilty and have been ordered to pay

28  criminal fines and serve time in federal prison for their participation in a conspiracy to fix the

1   prices of LCD panels.  In addition, on or about June 10, 2010, the U.S. Department of Justice

2   ("DOJ") indicted AU Optronics Corporation and AU Optronics Corporation America, charging

3   them with participating in a conspiracy to fix the prices of LCD panels.  The DOJ's criminal

4   investigation is ongoing.

5           7.      During the Relevant Period, Plaintiff purchased LCD Products in the United

6   States directly from the Conspirators, including, but not limited to, Defendants, and/or

7   Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants'

8   subsidiaries and affiliates controlled and, as a result of the Conspiracy, the prices Plaintiff paid

9   for LCD Products were artificially high.  Plaintiff also purchased LCD Products indirectly from

10  OEMs and others.  Plaintiff thus suffered damages as a result of the Conspiracy, and brings this

11  action to recover the overcharges paid for the LCD Products it directly and indirectly purchased

12  during the Relevant Period.

13  **II.        JURISDICTION AND VENUE**

14          8.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the

15  Clayton Act, to recover damages, including treble damages under Section 4 of the Clayton Act,

16  costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of

17  the Sherman Act (15 U.S.C. § 1).

18          9.      Plaintiff also brings this action pursuant to various state laws listed herein

19  because Plaintiff purchased LCD Products from both defendants and non-defendant vendors

20  which contained price-fixed LCD panels manufactured by Defendants and their co-conspirators

21  in those states.

22          10.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

23  Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

24  supplemental jurisdiction over Plaintiff's state antitrust laws listed herein under 28 U.S.C. §

25  1367 because they arise from the same nucleus of operative facts alleged in this First Amended

26  Complaint.  Plaintiff's state law claims are so related to their claims under Section 1 of the

27  Sherman Act that they form part of the same case or controversy.

28          11.     The activities of Defendants and their co-conspirators, as described herein,

1  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

2  did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

3  import trade or commerce, as well as on commerce and consumers in states including

4  California and New York.  This effect gives rise to Plaintiff's state law claims.  During the

5  Relevant Period, Defendants' Conspiracy affected the price of LCD Products purchased in the

6  United States.  In particular, Defendants' and their co-conspirators' Conspiracy directly and

7  substantially affected the price of LCD Products purchased in the states identified herein.

8         12.     This court has jurisdiction over each Defendant named in this action under

9  Section 12 of the Clayton Act, 15 U.S.C. § 22.  In addition, Defendants and their co-

10  conspirators purposely availed themselves of the laws of the United States as they

11  manufactured LCD panels for sale in the United States, or which were incorporated into LCD

12  Products Defendants and their co-conspirators knew would be sold to customers in the United

13  States.  Defendants' and their co-conspirators' Conspiracy affected this commerce in LCD

14  Products in the United States.  Moreover, Defendants who have entered guilty pleas in

15  connection with the Conspiracy alleged herein have acknowledged that their illegal activities

16  had a substantial effect on interstate and foreign trade and commerce.

17         13.     Venue is proper in the Northern District of Texas under Section 12 of the

18  Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is

19  either an alien corporation, transacts business in this District, or is otherwise found within this

20  District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a

21  substantial part of the events or omissions giving rise to this claim occurred in this District.

22  Defendants and their co-conspirators knew that price-fixed LCD Products containing price-

23  fixed LCD panels would be sold and shipped into this District.

24  **III.**    **DEFINITIONS**

25         14.     As used herein, the term "Relevant Period" refers to the time period beginning

26  January 1, 1996 and continuing at least until December 11, 2006.

27         15.     As used herein, the term "LCD panel" means liquid crystal display panel.  LCD

28  panels use glass plates and a liquid crystal compound to electronically display an image.  The

technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electronically charged dots, or pixels, that form an image. During the Relevant Period, LCD panels used in some notebooks computers and hand-held devices included different technologies including: thin film transistor (TFT) panels, thin film diode (TFD), color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels. The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD panels including those using TFT, TFD, CSTN, and MSTN technology in LCD Products.

16.     As used herein, the term "LCD Products" means all LCD panels and any product continuing an LCD panel, including without limitation televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand-held devices.

17.     As used herein, the term "OEM" means any original equipment manufacturer of LCD Products.

**IV.    PARTIES**

> **A.      Plaintiff**

18.     Plaintiff CompuCom is a Delaware corporation with its corporate headquarters in Dallas, Texas. Founded in 1987, CompuCom is a leading IT outsourcing company providing infrastructure management services, application services, systems integration and consulting services, as well as the procurement and management of hardware and software. In 2010, CompuCom had $1.4 billion in revenue. Through the conclusion of Defendants' and the co-conspirators' Conspiracy, CompuCom maintained operations in several states including Texas, California, New York, and Massachusetts.

19.     During the Relevant Period, CompuCom purchased LCD Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. CompuCom also purchased LCD Products from OEMs, as well as other suppliers, which contained LCD panels that had been purchased from Defendants and their co-conspirators. As such, CompuCom suffered

1   injury as a result of Defendants' and their co-conspirators' unlawful conduct.

2       20.     During the Relevant Period, CompuCom purchased LCD Products in, *inter alia*,

3   California and New York containing LCD panels manufactured and sold by Defendants and

4   their co-conspirators.  Plaintiff sent purchase orders to various LCD Product manufacturers in

5   each of these states and sent payment to these manufacturers in each of these states.  In

6   addition, Plaintiff supplied its offices in California and New York with LCD Products and

7   maintained corporate offices and inventories in these states and provided information

8   technology services to its customers in these states.

9       **B.     Japanese Defendants**

10          **i.     Epson**

11      21.     Defendant Epson Imaging Devices Corporation ("Epson Japan") is a Japanese

12  company with its principal place of business at 4F Annex, World Trade Center Building, 2-4-1

13  Hamamatsu-cho, Minato-ku, Tokyo 105-6104, Japan.  Up until December 28, 2006, Epson

14  Japan was known as Sanyo Epson Imaging Devices Corporation.  The company was originally

15  formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd., but is

16  now a wholly-owned subsidiary of Seiko Epson Corporation.  During the Relevant Period,

17  Epson Japan manufactured, sold, and distributed LCD Products to customers throughout the

18  United States and elsewhere.

19      22.     Defendant Epson Electronics America, Inc. ("Epson America") is a California

20  corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California.

21  Epson America is a wholly-owned and controlled subsidiary of Seiko Epson Corporation,

22  which is also the ultimate parent company of Defendant Epson Imaging Devices Corporation.

23  During the Relevant Period, Epson America sold and distributed LCD Products manufactured

24  by Epson Imaging Devices Corporation to customers throughout the United States and

25  elsewhere.

26      23.     Defendants Epson Japan and Epson America are referred to collectively herein

27  as "Epson."  They participated in the Conspiracy through the actions of their respective

28  officers, employees, and representatives acting with actual or apparent authority.  Further,

1    Defendant Epson benefited from the Conspiracy by receiving greater profits than it would have

2    received had the Conspiracy not existed.  Alternatively, Defendant Epson America was a

3    member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or

4    agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding

5    Conspiracy activities and used that domination or control to charge artificially high prices for

6    LCD panels.

7                    **ii.    Hitachi**

8           24.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

9    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company

10   was one of the original producers of LCD panels.  In 2002, it spun off its LCD manufacturing

11   assets to Hitachi Displays, Ltd., a wholly-owned subsidiary.  During the Relevant Period,

12   Hitachi, Ltd. manufactured, sold, and distributed LCD Products to customers throughout the

13   United States and elsewhere.

14          25.     Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place

15   of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.

16   Hitachi Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD

17   manufacturing business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of

18   Hitachi, Ltd.  During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and

19   distributed LCD Products to customers throughout the United States and elsewhere.  Hitachi

20   Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

21          26.     Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation

22   with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its

23   ultimate parent company is Hitachi, Ltd.  During the Relevant Period, Hitachi Electronic

24   Devices (USA), Inc. sold and distributed LCD Products manufactured by Hitachi, Ltd. and

25   Hitachi Displays, Ltd. to customers throughout the United States and elsewhere.

26          27.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices

27   (USA), Inc. are sometimes referred to collectively herein as "Hitachi."  Defendants Hitachi,

28   Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. were members of the

1    Conspiracy by virtue of the actions of their respective officers, employees and representatives

2    acting with actual or apparent authority.  Further, Defendant Hitachi benefited from the

3    Conspiracy by receiving greater profits than it would have received had the Conspiracy not

4    existed.  Alternatively, Defendants Hitachi Displays, Ltd. and Hitachi Electronic Devices

5    (USA), Inc. were members of the Conspiracy by virtue of their status during the Relevant

6    Period as the alter egos or agents of Hitachi, Ltd.  Hitachi, Ltd. dominated or controlled Hitachi

7    Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. regarding Conspiracy activities and

8    used that domination or control to charge artificially high prices for LCD Products.

9                            **iii.    Mitsui**

10           28.      Defendant Mitsui & Co. (Taiwan), Ltd. ("Mitsui Taiwan") is a Taiwanese

11   company with its principal place of business at Tunnan Tower 21F; No. 97 Tunhua South Rd.

12   Section 2 Taipei City, 106 Taiwan.  Mitsui Taiwan is a wholly-owned and controlled subsidiary

13   of co-conspirator Mitsui & Co., Ltd., a Japanese corporation.

14           29.      Co-conspirator Mitsui & Co., Ltd. ("Mitsui Japan") is a consolidated global

15   general trading company which conducts its business activities in collaboration with and

16   through its overseas offices, including Mitsui Taiwan and Mitsui U.S.A.  Mitsui Japan

17   participated in the conspiracy through its wholly-owned and controlled subsidiaries Mitsui

18   Taiwan and Mitsui U.S.A., and through other actions alleged in this complaint.  Mitsui Taiwan

19   and Mitsui U.S.A. were the general agents for and representatives of Mitsui Japan in Taiwan

20   and the United States, respectively.

21           30.      Defendant Mitsui & Co. (U.S.A.), Inc. ("Mitsui U.S.A.") is a New York

22   corporation with its principal place of business at 200 Park Avenue, 35th Floor, New York,

23   New York.  Mitsui U.S.A. is a wholly-owned and controlled subsidiary of co-conspirator

24   Mitsui & Co., Ltd.  Until 2009, Mitsui U.S.A. held an eighty percent ownership interest in

25   Mitsui Comtek Corp. ("Mitsui Comtek"), a California corporation, with the remaining twenty

26   percent held by co-conspirator Mitsui & Co., Ltd.  As of 2009, Mitsui Comtek merged with and

27   into Mitsui U.S.A.  During the Relevant Period, Mitsui Comtek sold and distributed LCD

28   Products to customers throughout the United States and elsewhere.

1    31.    Defendants Mitsui Taiwan and Mitsui U.S.A. and co-conspirator Mitsui Japan,

2    are sometimes referred to collectively herein as "Mitsui."  Defendants Mitsui Taiwan and

3    Mitsui U.S.A. and co-conspirator Mitsui Japan participated in the conspiracy through the

4    actions of their respective affiliates, officers, employees, and representatives acting with actual

5    or apparent authority.  Defendants Mitsui Taiwan and Mitsui U.S.A. participated in the

6    Conspiracy during the Relevant Period and were each the alter ego or agent of Mitsui Japan in

7    Taiwan and the United States, respectively.  Mitsui benefited from the Conspiracy by receiving

8    greater profits than it would have received had the Conspiracy not existed.

9    32.    Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. participated in the Conspiracy

10   in a coordinated manner and functioned as a single integrated entity.  Mitsui Japan dominated

11   or controlled Mitsui Taiwan and Mitsui U.S.A. regarding Conspiracy activities and used that

12   domination or control to charge artificially high prices for LCD Products.  Mitsui Japan, Mitsui

13   Taiwan, and Mitsui U.S.A. were part of Mitsui's Display Products Department, U.S. & Asia

14   Team, which was managed by a Team Leader at Mitsui Japan.  The Team Leader directed the

15   activities of employees at Mitsui Taiwan and Mitsui U.S.A.  Thus, Defendants Mitsui Taiwan

16   and Mitsui U.S.A. and co-conspirator Mitsui Japan functioned as a single integrated enterprise

17   in furtherance of the Conspiracy.  Indeed, it would work fraud or injustice not to disregard

18   Mitsui Taiwan's corporate form because Mitsui Japan used Mitsui Taiwan as a mere instrument

19   in furtherance of the Conspiracy and they cannot be permitted avoid liability for their illegal

20   conduct based upon assertions of corporate separateness.  Specific evidence of Mitsui's

21   coordinated participation in the Conspiracy is detailed in Appendix A to this First Amended

22   Complaint.

23   33.    Mitsui functions as a single integrated enterprise generally as well.  Mitsui

24   Japan, Mitsui Taiwan, and Mitsui U.S.A. cooperate in all areas and share all relevant business

25   information.  Moreover, the functions performed in Taiwan and the United States by Mitsui

26   Taiwan and Mitsui U.S.A., respectively, were sufficiently important such that if these Mitsui

27   subsidiaries did not undertake them, Mitsui Japan would have to perform those functions itself.

28   Defendant Mitsui Taiwan and Mitsui U.S.A. were closely affiliated, controlled, and dominated

by co-conspirator Mitsui Japan.  Mitsui functions as a worldwide business partnership with integrated sales and distribution systems and a common marketing image.  In addition, defendant Mitsui Taiwan and Mitsui U.S.A. shared common officers and directors with Mitsui Japan.

### iv.    NEC

34.     Defendant NEC Corporation is a Japanese company with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan.  During the Relevant Period, NEC Corporation manufactured, sold and distributed LCD Products to customers throughout the United States and elsewhere.

35.     Defendant NEC Corporation of America is a Nevada corporation with its principal place of business located at 6535 North State Highway 161, Irving, Texas 75039.  It is a wholly-owned and controlled subsidiary of NEC Corporation.  During the relevant period, NEC Corporation of America sold and distributed LCD Products manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States.

36.     NEC Display Solutions of America, Inc. is a Delaware corporation with its principal place of business located at 500 Park Blvd., Suite 1100, Itasca, Illinois 60143.  It is a wholly-owned and controlled subsidiary of NEC Corporation.  During the relevant period, NEC Display Solutions of America sold and distributed LCD Products manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States.

37.     Defendant NEC LCD Technologies, Ltd. is a Japanese company with its principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666, Japan.  NEC LCD Technologies, Ltd. was formed in 2003 and is a wholly-owned and controlled subsidiary of NEC Corporation.  During the Relevant Period, NEC LCD Technologies, Ltd. manufactured, sold and distributed LCD Products to customers throughout the United States and elsewhere.

38.     Defendant NEC Electronics America, Inc. is a California corporation with its principal place of business at 2880 Scott Boulevard, Santa Clara, CA and its manufacturing plant in Roseville, California.  Its ultimate parent company is NEC Corporation.  During the

1   Relevant Period, NEC Electronics America, Inc. sold and distributed LCD Products

2   manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout

3   the United States and elsewhere.

4           39.     Defendants NEC Corporation, NEC Corporation of America, NEC Display

5   Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc.

6   are sometimes referred to collectively herein as "NEC."  Defendants NEC Corporation, NEC

7   Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies,

8   Ltd., and NEC Electronics America, Inc. were members of the Conspiracy that is the subject of

9   this complaint by virtue of the actions of their respective officers, employees and

10  representatives acting with actual or apparent authority.  Further, Defendant NEC benefited

11  from the Conspiracy by receiving greater profits than it would have received had the

12  Conspiracy not existed.  Alternatively, Defendants NEC Corporation of America, NEC Display

13  Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc.

14  were members of the Conspiracy by virtue of their status during the Relevant Period as the alter

15  egos or agents of NEC Corporation.  NEC Corporation dominated or controlled NEC

16  Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies,

17  Ltd. and NEC Electronics America, Inc. regarding Conspiracy activities and used that

18  domination or control to charge artificially high prices for LCD panels and LCD Products.

19                          **v.     <u>Sanyo</u>**

20          40.     Defendant Sanyo Consumer Electronics, Ltd. ("Sanyo Consumer") is a Japanese

21  company with its principal place of business at 7-101, Tachikawa-cho, Tottori 680-0061, Japan.

22  Sanyo Consumer was formerly known as Tottori Sanyo Electric Co.  Prior to October 2004, co-

23  conspirator Sanyo Electric Co., Ltd. owned and operated Sanyo Consumer.  In 2004, co-

24  conspirators Seiko Epson Corporation and Sanyo Electric Co., Ltd. formed a joint venture,

25  Sanyo Epson Imaging Devices Corporation.  After the Relevant Period, Sanyo Epson Imaging

26  Devices Corporation became Epson Imaging Devices Corporation, also a Defendant.  During

27  the Relevant Period, Sanyo Consumer manufactured, sold and distributed LCD Products to

28  customers throughout the United States and elsewhere.

41.    Defendant Sanyo Consumer participated in the Conspiracy through the actions of its affiliates, officers, employees, and representatives acting with actual or apparent authority.  During the Relevant Period, Sanyo Consumer was closely affiliated, commonly owned, controlled and dominated by co-conspirator Sanyo Electric Co., Ltd., and functioned as a single enterprise and/or alter egos.  Sanyo Consumer is a wholly-owned subsidiary of Sanyo Electric Co., Ltd., a consolidated consumer electronics and information technology company based in Japan.

### vi.    Sharp

42.    Defendant Sharp Corporation is a Japanese company with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  The company was one of the earliest producers of LCD panels.  During the Relevant Period, Sharp Corporation manufactured, sold and distributed LCD Products to customers throughout the United States and elsewhere.

43.    Defendant Sharp Electronics Corporation is a New York corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Defendant Sharp Corporation.  During the Relevant Period, Sharp Electronics Corporation sold and distributed LCD Products manufactured by Defendant Sharp Corporation to customers throughout the United States and elsewhere.

44.    Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp."  Defendants Sharp Corporation and Sharp Electronics Corporation were members of the Conspiracy by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority.  Alternatively, Defendant Sharp Electronics Corporation was a member of the Conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Sharp Corporation.  Further, Defendant Sharp benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding Conspiracy activities and used that

1  domination or control to charge artificially high prices for LCD Products.

2            **vii.**    **Toshiba**

3       45.     Defendant Toshiba Corporation is a Japanese company with its principal place

4  of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba

5  Corporation participates in two joint ventures that manufacture, sell, and distribute LCD

6  Products – Defendant Toshiba Matsushita Display Technology Co., Ltd. and co-conspirator IPS

7  Alpha Technology, Ltd.  During the Relevant Period, Toshiba Corporation manufactured, sold,

8  and distributed LCD Products to customers throughout the United States and elsewhere.

9       46.     Defendant Toshiba Matsushita Display Technology Co., Ltd. (n/k/a Toshiba

10  Mobile Display Co., Ltd.) ("Toshiba Matsushita") is a Japanese company with its principal

11  place of business at Rivage Shinagawa, 18, Konan 4-chome, Minato-ku, Tokyo 108-0075,

12  Japan.  Toshiba Matsushita is a joint venture between Defendant Toshiba Corporation and co-

13  conspirator Panasonic Corporation (formerly known as Matsushita Electric Industrial Co.,

14  Ltd.).  Toshiba Matsushita was created for the purpose of manufacturing LCD Products.

15  During the Relevant Period, Toshiba Matsushita manufactured, sold, and distributed LCD

16  Products to customers throughout the United States and elsewhere.

17       47.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

18  California corporation with its principal place of business at 19900 MacArthur Boulevard,

19  Suite 400, Irvine, California.  Toshiba America Electronic Components, Inc. is a wholly-owned

20  and controlled subsidiary of Toshiba America, Inc., a holding company for Defendant Toshiba

21  Corporation.  Toshiba America Electronic Components, Inc. is the United States sales and

22  marketing representative for Defendants Toshiba Corporation and Toshiba Matsushita.  During

23  the Relevant Period, Toshiba America Electronic Components, Inc. sold and distributed LCD

24  Products manufactured by Toshiba Corporation to customers throughout the United States and

25  elsewhere.

26       48.     Defendant Toshiba America Information Systems, Inc. is a California

27  corporation with its principal place of business at 9470 Irvine Boulevard, Irvine, California.

28  Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of

1    Toshiba America, Inc.  During the Relevant Period, Toshiba America Information Systems,

2    Inc. sold and distributed LCD Products manufactured by Toshiba Corporation to customers

3    throughout the United States and elsewhere.

4         49.    Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba

5    America Information Systems, Inc. are sometimes referred to collectively herein as "Toshiba."

6    Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba America

7    Information Systems, Inc. were members of the Conspiracy by virtue of the actions of their

8    respective officers, employees and representatives acting with actual or apparent authority.

9    Further, Defendant Toshiba benefited from the Conspiracy by receiving greater profits than it

10   would have received had the Conspiracy not existed.  Alternatively, Defendants Toshiba

11   America Electronics Components, Inc., and Toshiba America Information Systems, Inc. were

12   members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos

13   or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba

14   Matsushita, Toshiba America Electronics Components, Inc., and Toshiba America Information

15   Systems, Inc. regarding Conspiracy activities and used that domination or control to charge

16   artificially high prices for LCD Products.

17        **C.    Korean Defendants**

18             **i.    LG Display**

19        50.    Defendant LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd.,

20   is a Korean entity with its principal place of business at 20, Yeouido-dong, Yeongdeungpo-gu,

21   Seoul, Korea 150-721.  LG Display Co., Ltd. was created in July 1999 as a joint venture

22   between co-conspirators LG Electronics, Inc. and Royal Philips Electronics, N.V.  In July

23   2004, LG Display Co., Ltd. became a public company, with LG Electronics, Inc. and Royal

24   Philips Electronics N.V. as the controlling shareholders.  LG Display Co., Ltd. describes itself

25   as the global leader in the development and manufacturer of LCD panels for televisions,

26   computer monitors, notebooks and emerging mobile applications.  During the Relevant Period,

27   LG Display Co., Ltd. manufactured, sold, and distributed LCD Products to customers

28   throughout the United States and elsewhere.

1    51.    Defendant LG Display America, Inc., formerly known as LG.Philips LCD

2    America, Inc., is a California corporation with its principal place of business at 150 East

3    Brokaw Road, San Jose, California. LG Display America, Inc. is a wholly-owned and

4    controlled subsidiary of Defendant LG Display Co., Ltd.  During the Relevant Period, LG

5    Display America, Inc. sold and distributed LCD Products manufactured by LG Display Co.,

6    Ltd. to customers throughout the United States and elsewhere.

7    52.    Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes

8    referred to collectively herein as "LG Display."  Defendants LG Display Co., Ltd. and LG

9    Display America, Inc. were members of the Conspiracy by virtue of the actions of their

10   respective officers, employees and representatives acting with actual or apparent authority.

11   Further, Defendant LG benefited from the Conspiracy by receiving greater profits than it would

12   have received had the Conspiracy not existed.  Alternatively, Defendant LG Display America,

13   Inc. was a member of the Conspiracy by virtue of its status during the Relevant Period as the

14   alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG

15   Display America, Inc. regarding Conspiracy activities and used that domination or control to

16   charge artificially high prices for LCD panels and LCD Products.

17   **D.    Taiwanese Defendants**

18   **i.    AU Optronics**

19   53.    Defendant AU Optronics Corporation is a Taiwanese company with its principal

20   place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. AU

21   Optronics Corporation was created in 2001 and is the successor by merger of Acer Display

22   Technology, Inc. ("ADT") and Unipac Optoelectronics Corporation ("Unipac"), both of which

23   were involved in the manufacture of LCD Products.  During the Relevant Period, AU Optronics

24   Corporation manufactured, sold, and distributed LCD Products to customers throughout the

25   United States and elsewhere.

26   54.    Defendant AU Optronics Corporation America ("AU America") is a California

27   corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241,

28   Houston, Texas.  AU America was formerly known as Acer Display Technology America, Inc.

1   AU America is a wholly-owned and controlled subsidiary of Defendant AU Optronics

2   Corporation.  In 2006, H.B. Chen, the president and Chief Operating Officer of AU Optronics

3   Corporation, was simultaneously the Chairman of AU America.  During the Relevant Period,

4   AU America sold and distributed LCD Products manufactured by AU Optronics Corporation to

5   customers throughout the United States and elsewhere.

6         55.     Defendants AU Optronics Corporation and AU America are sometimes

7   collectively referred to herein as "AUO."  Defendants AU Optronics Corporation and AU

8   America were members of the Conspiracy by virtue of the actions of their respective officers,

9   employees, and representatives acting with actual or apparent authority.  Further, Defendant

10  AUO benefited from the Conspiracy by receiving greater profits than it would have received

11  had the Conspiracy not existed.  Alternatively, Defendant AU America was a member of the

12  Conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of AU

13  Optronics Corporation.  AU Optronics Corporation dominated or controlled AU America

14  regarding Conspiracy activities and used that domination or control to charge artificially high

15  prices for LCD Products.

16                    **ii.    Chi Mei**

17        56.     Defendant Chi Mei Optoelectronics Corporation (n/k/a Chimei Innolux

18  Corporation) ("CMO") is a Taiwanese company with its principal place of business at No. 3,

19  Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County,

20  74147 Taiwan.  CMO was formed in 1998, and has since become a major manufacturer of LCD

21  Products.  During the Relevant Period, CMO manufactured, sold, and distributed LCD Products

22  to customers throughout the United States and elsewhere.

23        57.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company

24  headquartered at Nansei-Yaesu Bldg. 4-F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.

25  Up until 2006, CMO Japan was known as International Display Technology, Ltd.  CMO Japan

26  is a wholly-owned and controlled subsidiary of Defendant CMO.  CMO Japan has been in the

27  LCD business since 2001. During the Relevant Period, CMO Japan manufactured, sold, and

28  distributed LCD Products throughout the United States and elsewhere.

1    58.    Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware

2    corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

3    California.  Up until 2006, CMO USA was known as International Display Technology U.S.A.,

4    Inc.  CMO USA is a wholly-owned and controlled subsidiary of Defendant CMO Japan.  The

5    Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO

6    Japan's predecessor, and in or about 2007 became Vice President in charge of sales and

7    marketing for CMO.  Similarly, the President of CMO USA in 2006, Junichi Ishii, was

8    previously the President of CMO Japan's predecessor. During the Relevant Period, CMO USA

9    sold and distributed LCD Products manufactured by CMO Japan to customers throughout the

10   United States and elsewhere.

11   59.    Defendants CMO, CMO Japan, and CMO USA are sometimes referred to

12   collectively herein as "Chi Mei."  The Chi Mei companies were members of the Conspiracy by

13   virtue of the actions of their respective officers, employees and representatives acting with

14   actual or apparent authority.  Further, Defendant Chi Mei benefited from the Conspiracy by

15   receiving greater profits than it would have received had the Conspiracy not existed.

16   Alternatively, Defendants CMO Japan and CMO USA were members of the Conspiracy by

17   virtue of their status during the Relevant Period as the alter egos or agents of CMO.  CMO

18   dominated or controlled CMO Japan and CMO USA regarding Conspiracy activities and used

19   that domination or control to charge artificially high prices for LCD Products.

20   ### iii.    Chunghwa

21   60.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its

22   principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  It is a

23   subsidiary of Tatung Company, a consolidated consumer electronics and information

24   technology company based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors

25   includes representatives from Tatung Company.  The Chairman of Chunghwa Picture Tubes,

26   Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company.  During the

27   Relevant Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed LCD

28   Products to customers throughout the United States and elsewhere.

1       61.    Tatung Company of America, Inc. ("Tatung America") is a California

2  corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

3  California. Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company

4  owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the

5  daughter of Tatung Company's former Chairman, T.S. Lin.  During the Relevant Period,

6  Tatung America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes,

7  Ltd. to customers throughout the United States and elsewhere.

8       62.    Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes

9  referred to collectively herein as "Chunghwa."  During the Relevant Period, Chunghwa and

10  Tatung America were closely affiliated, commonly owned, controlled and dominated by

11  Tatung Company, and functioned as a single enterprise and/or alter egos.   Defendant

12  Chunghwa benefited from the Conspiracy by receiving greater profits than it would have

13  received had the Conspiracy not existed.

14          **iv.**    **HannStar**

15       63.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

16  with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei

17  114, Taiwan.  HannStar has been in the business of manufacturing and selling LCD Products

18  since 1998.  During the Relevant Period, HannStar manufactured, sold, and distributed LCD

19  Products to customers throughout the United States and elsewhere.

20  **V.**    **AGENTS AND CO-CONSPIRATORS**

21       64.    The acts alleged against the Defendants and their co-conspirators in this First

22  Amended Complaint were authorized, ordered, or done by their officers, agents, employees, or

23  representatives, while actively engaged in the management and operation of Defendants'

24  businesses or affairs.

25       65.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer

26  of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

27  common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

28  subsidiary of a foreign parent acts as the United States agent for LCD panels and/or LCD

1    Products made by its parent company.

2          66.    Various persons and/or firms not named as Defendants in this First Amended

3    Complaint participated as co-conspirators in the violations alleged herein and may have

4    performed acts and made statements in furtherance thereof.  These co-conspirators who are not

5    named as Defendants include, but are not limited to:  Hydis Technologies Co., Ltd. ("Hydis");

6    IPS Alpha Technology, Ltd. ("IPS Alpha"); LG Electronics, Inc. and LG Electronics USA, Inc.

7    (together with LG Display, collectively "LG"); Mitsubishi Electric Corporation and Mitsubishi

8    Electric and Electronics USA, Inc. (collectively "Mitsubishi"); Mitsui & Co., Ltd. ("Mitsui

9    Japan"); Panasonic Corporation and Panasonic Corporation of North America (collectively

10   "Panasonic"); Royal Philips Electronics N.V. and Philips Electronics North America Corp.

11   (collectively "Philips"); Samsung Electronics America, Inc., Samsung Electronics Co., Ltd.,

12   and Samsung Semiconductor, Inc. (collectively "Samsung"); Sanyo Electric Company, Ltd.

13   and Sanyo North America Corporation (collectively "Sanyo"); Seiko Epson Corporation

14   ("Seiko Epson").

15         67.    The acts alleged in this First Amended Complaint have been done by

16   Defendants and their co-conspirators, or were authorized, ordered, or done by their respective

17   officers, agents, employees or representatives while actively engaged in the management of

18   each Defendant's or co-conspirator's business or affairs.

19   **VI.    TRADE AND COMMERCE**

20         68.    During the Relevant Period, each Defendant, or one or more of its affiliates or

21   subsidiaries, sold LCD Products in the United States in a continuous and uninterrupted flow of

22   interstate commerce and foreign commerce, including through and into this judicial district.

23         69.    During the Relevant Period, Defendants collectively controlled a vast majority

24   of the market for LCD Products, both globally and in the United States.

25         70.    The business activities of Defendants substantially affected interstate trade and

26   commerce in the United States and caused antitrust injury in the United States.  Defendants'

27   business activities substantially affected trade and commerce within each of the 50 states, as the

28   Conspiracy artificially inflated the prices of LCD Products sold in all 50 states, and therefore

1  caused antitrust injury in every state including the states identified herein.  Moreover, Plaintiff

2  purchased price-fixed goods directly and indirectly from Defendants for sale across the United

3  States.

4         71.     For example, Defendants LG Display Co., Ltd. and LG Display America, Inc.,

5  Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation,

6  Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display

7  Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy

8  were carried out within California.  Each agreed that "Acts in furtherance of this conspiracy

9  were carried out within the Northern District of California.  LCD affected by this conspiracy

10  was sold by one or more of the conspirators to customers in this District."  Case 3:08-cr-00803,

11  Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document

12  10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4; Case 3:09-cr-00247, Document 10-1 at 4;

13  Case 3:09-cr-1166, Document 15-1 at 4; 3:10-cr-0498, Document 11-1 at 4.  Moreover,

14  Defendants and their co-conspirators and/or their agents delivered a substantial amount of LCD

15  Products to persons in the states identified herein, including Plaintiff.

16         72.     Defendants' illegal conduct involved U.S. import trade or import commerce.

17  Defendants knowingly and intentionally sent price-fixed LCD panels into a stream of

18  commerce that they knew led directly into the United States, one of their most important

19  markets and a major source of their revenues. In this respect, they directed their anticompetitive

20  conduct at imports into the United States with the intent of causing price-fixed LCD panels to

21  enter the United States market and inflating the prices of LCD Products destined for the United

22  States. Such conduct was meant to produce and did in fact produce a substantial effect in the

23  United States in the form of higher prices being paid for such products by U.S. retailers.

24         73.     The U.S. LCD market is enormous and was a major focus of and very important

25  to the conspiracy. Measured by value, Defendants and others shipped more than 400 million

26  LCD panels, including those incorporated into LCD Products, into the United States during the

27  Relevant Period for ultimate sale to U.S. consumers. During the Relevant Period, the value of

28  LCD panels imported into the United States was in excess of $50 billion. Defendants shipped

millions of LCD Products worth billions of dollars into the United States each year during the Relevant Period. As a result, a substantial portion of Defendants' revenues were derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, Defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD panels and LCD Products.

74. Because of the importance of the U.S. market to Defendants and their co-conspirators, LCD panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct. Defendants knowingly and intentionally sent price-fixed LCD panels and LCD Products into a stream of commerce that lead directly into the United States.  Many LCD panels were intended for incorporation into finished products specifically destined for sale and use in the United States. This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD panels and LCD Products.

75. During the Relevant Period, Defendants and co-conspirators shipped LCD panels directly into the United States.

76. When high-level executives based at Defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD panels would be incorporated into LCD Products sold in the United States. Moreover, because LCD panels are – and were throughout the Relevant Period – the most expensive and significant component of LCD Products, Defendants knew that price increases for LCD panels would necessarily result in increased prices for LCD Products sold in the United States.

77. Many Defendants manufactured LCD Products and sold them in the United States.  In fact, Defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

78. Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because Defendants were aware that the

1   conspiracy would elevate those prices in addition to the prices of LCD panels. In addition,

2   Defendants used LCD Product pricing in the United States as a benchmark for establishing,

3   organizing, and tracking their price-fixing of LCD panels.

4       79.     Defendants have acknowledged that their commercial activities involving

5   intentionally sending LCD panels and LCD Products into the United States impacted U.S.

6   import trade and import commerce. In a series of complaints filed with the U.S. International

7   Trade Commission over the past few years, Conspirators Samsung and Sharp have both alleged

8   infringing conduct based on "[t]he importation into the United States, sale for importation into

9   the United States, and/or sale after importation in the United States of . . . LCD devices" by the

10  other (and by other entities on its behalf). *See In the Matter of Certain Liquid Crystal Display*

11  *Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of

12  Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of*

13  *Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using*

14  *the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008)

15  (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products*

16  *Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co.,

17  Ltd. (December 1, 2009) (Docket No. 2698).

18      80.     For the reasons set forth above, Defendants' illegal conduct involved import

19  trade or import commerce into the United States.

20      81.     Defendants' illegal conduct also had a direct, substantial, and reasonably

21  foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce

22  in the form of higher prices for LCD Products containing price-fixed LCD panels manufactured

23  by Defendants and their coconspirators being negotiated, charged, and paid by Plaintiff in the

24  United States for products imported into the United States.

25  **VII.   FACTUAL ALLEGATIONS**

26      **A.   LCD Technology**

27      82.     The technology behind LCD Products is not new.  In the 1950s and 1960s, RCA

28  Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power

1   display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese

2   companies took the lead in commercializing liquid crystal technology.  These efforts resulted in

3   monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology

4   was introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s,

5   the technology advanced further with the development of LCDs.

6           83.     The basic structure of an LCD panel is two glass substrates sandwiching a layer

7   of liquid crystal compound.  Liquid crystals change orientation under an applied electric field

8   and can thereby block or pass light.  One glass substrate has thin chemical films that act as

9   transistors, and the other glass substrate is coated with liquid pigments that act as color filters.

10  When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through

11  the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image,

12  and the density of pixels in a display determines the resolution.

13          84.     The term "active matrix" describes the ability to switch each pixel in a display

14  individually.  Unlike older LCDs that have one transistor for each row and column of pixels,

15  LCDs have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used

16  interchangeably with LCD.  Active matrix displays are brighter and sharper than passive matrix

17  displays of the same size.

18          85.     The glass substrates used for LCD panels begin with a "motherglass," a sheet of

19  glass that is cut to make multiple panels.  LCDs are manufactured in fabs that are equipped to

20  handle a particular size motherglass.  Technological innovations over time have allowed

21  manufacturers to begin the manufacturing process with larger and larger size motherglass

22  sheets. This, in turn, has resulted in the ability to fabricate larger and/or more LCD panels.

23  Each increase in motherglass size is described as a generation.  Third generation fabs in the

24  1998 to 1999 period typically used 550 millimeter ("mm") by 650 mm motherglass, while

25  some current (eighth generation) fabs use 2160 mm by 2460 mm motherglass.  The use of

26  larger motherglass provides substantial cost savings to manufacturers.

27          86.     LCDs are capable of producing the same image as cathode ray tubes ("CRTs"),

28  but in a much smaller package.  LCDs also have lower energy requirements, are generally

1  easier to read, and do not flicker like CRTs.  LCD panels of approximately 10 inches or less in

2  diagonal are considered "small" or "medium" displays.  They are also referred to as "mobile

3  displays."  These displays are commonly used in mobile wireless handsets, personal digital

4  assistants, and cameras.

5         87.  LCD panels have no independent utility, and have value only as components of

6  other products, such as TVs, computer monitors, notebook computers, and mobile wireless

7  handsets.  The demand for LCD panels thus directly derives from the demand for the LCD

8  Products.

9         88.  The market for LCD panels and the market for the products into which they are

10  placed are inextricably linked and intertwined because the LCD panel market exists to serve the

11  LCD Products markets. The markets for LCD panels and LCD Products are, for all intents and

12  purposes, inseparable in that one would not exist without the other.

13         89.  Plaintiff has participated in the market for LCD panels through direct purchases

14  of LCD Products from Defendants and its indirect purchases of LCD Products from non-

15  defendant OEMs, co-conspirators and others.  Defendants' unlawful Conspiracy inflated the

16  prices at which Plaintiff has bought LCD Products, and Plaintiff has been injured thereby and

17  paid supra-competitive prices for LCD Products.

18      **B.**    **Structure of the LCD Industry**

19         90.  The LCD industry has several characteristics that facilitated the Conspiracy,

20  including market concentration, ease of information sharing, the consolidation of

21  manufacturers, multiple interrelated business relationships, significant barriers to entry,

22  heightened price sensitivity to supply and demand forces, and homogeneity of products.

23        **i.**    **Market Concentration**

24         91.  The LCD industry is highly concentrated, a factor that is conducive to the type

25  of collusive activity alleged by Plaintiff.  Samsung, LG, Sharp, AUO, and Chi Mei were the

26  five largest producers as measured by market share during much of the Relevant Period.

27        **ii.**    **Information Sharing**

28         92.  Because of common membership in trade associations, interrelated business

1    arrangements such as joint ventures, allegiances between companies in certain countries, and

2    relationships between the executives of certain companies, the Conspirators had many

3    opportunities to discuss and exchange competitive information.  The ease of communication

4    was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  The

5    Conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for

6    LCD Products as alleged below.

7         93.    Additionally, the LCD industry is analyzed by several market research firms.

8    Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs,

9    and other key indicators of market activity.  The capacity and pricing data reported by these

10   firms comes directly from manufacturers.  Manufacturers typically report historical, current,

11   and perhaps most importantly, prospective information.  Thus, the Conspirators had access to

12   each other's future plans for bringing capacity on line, capacity utilization, market share,

13   pricing, and the advent of new technology.  Because there were very few companies that

14   needed to be analyzed in order to obtain this data, all competitors in the LCD market had ready

15   and timely access to reliable information about their competition's pricing as well as future

16   supply and capacity decisions.  By meeting together as herein below alleged as well as

17   monitoring and analyzing this information over time, the Conspirators were able to signal their

18   respective intent, verify that the Conspiracy was working, and identify any parties and punish

19   any parties who might be deviating from the agreements necessary to carry out the Conspiracy.

20        **iii.    Consolidation**

21        94.     The LCD industry experienced significant consolidation during the  Relevant

22   Period, including: (a) the creation of AUO in 2001 through the merger of ADT and Unipac; (b)

23   the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to

24   Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and

25   (e) AUO's acquisition in 2006 of Quanta Display Inc. ("QDI"), which resulted in AUO

26   becoming the third-largest manufacturer of LCD Products.

27        **iv.    Multiple Interrelated Business Relationships**

28        95.     The industry is marked by a web of cross-licensing agreements, joint ventures,

and other cooperative arrangements that can facilitate collusion.  AUO, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006.  Chunghwa did likewise with Sharp in December of 2006.  Chi Mei has licensing arrangements with Sharp, AUO, Chunghwa, HannStar and Hitachi.

96.     The industry has a close-knit nature whereby multiple business relationships between supposed competitors blurred the lines of competition and provided ample opportunity to collude.  These business relationships also created a unity of interest among competitors so that the Conspiracy was easier to implement and to enforce, including by checking each Conspirator's participation in the Conspiracy, than if such interrelationships did not exist.

### v.     High Costs of Entry Into the Industry

97.     There are significant manufacturing and technological barriers to entry into the LCD industry.  Efficient fabs are large and costly.  LCD Products are also subject to technological advances, so that firms within the industry must spend significant capital on research and development.  DisplaySearch, a research firm in Austin, Texas that covers the LCD industry, reported in September 2005 that the top LCD manufacturers collectively spent $30 million a day on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical seventh generation fab can cost more than $3 billion.

98.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, were generally declining, and, in some periods, declining at a substantial rate. Later in the Conspiracy, approximately 70 percent of the cost of LCD panel production was attributable to the cost of raw materials.  The combination of price discussions and manipulation of the output of LCD Products allowed the Conspirators to keep prices above where they would have been but for the Conspiracy.

### vi.     The "Crystal Cycle"

99.     Like all markets, the LCD industry is subject to business cycles of supply and demand.  In the LCD industry, this cycle is known as the "crystal cycle."  This cycle has been described as "boom and bust" periods caused by alternating periods of oversupply and shortages, which create downward and upward pressures on prices for LCD Products.  One fact

that can affect oversupply is the perceived demand for such products and whether manufacturers have adequately predicted demand when determining how much capacity to build and use, *i.e.*, how many LCD Products to produce.

100.    Another factor is the entry of new competitors.  Typically, when a new competitor enters a market, it brings incremental production online thereby adding supply, and prices drop until an equilibrium is reached.  In the LCD industry, however, the Conspirators conspired to rein in and discipline new entrants until the new entrants were assimilated into the Conspiracy.  This had the effect of tempering price drops and preventing prices from reaching a competitive equilibrium.

101.    The Conspiracy did not completely eliminate the effects of the crystal cycle in the LCD industry. There were periods when the Conspirators' collusive practices drove prices for LCD Products so high that demand began to fall to the point that the Conspirators lowered prices for short periods of time.  However, the Conspirators' efforts to stabilize prices were successful in moderating the effects of the crystal cycle, including the impact on prices paid by direct and indirect purchasers.  To the extent that prices for LCD Products fell, they fell from levels that had been set conspiratorially, rather than from levels set by free and open competition.  Additionally, prices did not fall as low as they would have absent the conspiratorial conduct.

**C.**    **Pre-Conspiracy Market**

102.    Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were essentially the exclusive suppliers of LCD panels.

103.    In early 1995, the industry faced declining LCD panel prices, which industry analysts attributed to advances in technology and improving efficiencies.  One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry."  The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of LCD Products, and they slowed the rate of their investments.  This, however, provided an opening to Korean manufacturers.

1     104.    In 1995, three Korean companies – Samsung, LG and, to a lesser extent,

2     Hyundai – entered the market.  These Korean firms offered comparable LCD Products at

3     reduced prices in an effort to quickly gain market share.  This resulted in increased competition

4     in 1995, which contributed to the significant price declines seen during that timeframe.

5     105.    Increases in manufacturing capacity and decreases in manufacturing costs

6     seemed to assure continuing price declines.  By mid-1995, the Japanese companies and the new

7     Korean competitors had a total capacity to supply 14 million LCD panels, while demand for

8     them was only about three million.  In addition to the surges in capacity during 1995, "[costs]

9     were also dropping as production volume increases and manufacturing methods improved."

10     106.    By late 1995, the effect of the entry of Korean suppliers had pushed down the

11     price of some LCD panels by 50 percent from the previous year.  The origin of the Conspiracy

12     may be traceable to this trough in prices.

13        **D.    Defendants' and Co-Conspirators' Illegal Agreements**

14     107.    The Conspiracy was effectuated through a combination of group and bilateral

15     discussions.  In the formative years, when the Japanese Defendants first entered into the

16     Conspiracy, bilateral discussions were the primary method of communication.  During this

17     period of the Conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other

18     Defendant about the prices for LCD Products, and thereby created a model for how the

19     Conspiracy would be carried out after the Korean, and later the Taiwanese Defendants joined.

20     These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as

21     capacity utilization.  As more manufacturers entered the Conspiracy, however, group meetings

22     became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings

23     was in place.

24        **i.    "Crystal Meetings"**

25     108.    The group meetings among the participants in the LCD price-fixing Conspiracy

26     were referred to as "crystal meetings."  Crystal meetings were attended by employees at three

27     general levels of Defendants' corporations.  The first level of these meetings were attended by

28     the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings.  The

COMPUCOM FIRST AMENDED COMPLAINT          - 29 -          Case No. 3:11-cv-06241-SI
                                                          Master File No. 3:07-md-01827-SI

1    second level were management-level meetings, referred to as "commercial" or "operation"

2    meetings.  The third level were meetings attended by lower-level sales and marketing

3    personnel.

4         109.    In a typical crystal meeting of the Conspiracy, the participants established a

5    meeting agenda that included a discussion of the past month's producer shipments, customer

6    demand, capacity utilization, and prices.  Meeting participants shared information relating to all

7    of these topics so that Defendants could agree on what price each would charge for LCD panels

8    to be sold in the following month.  Meeting participants discussed and agreed upon target

9    prices, floor prices, and price ranges for LCD panels.  They also discussed prices of LCD

10   panels that were sold to specific customers, and agreed upon target prices to be used in

11   negotiations with large customers.

12        110.    The purpose of the CEO or top meetings was to stabilize or raise prices.  At the

13   CEO meetings, the participants discussed prices and the supply and demand situation.  The

14   participants also discussed monthly and quarterly LCD fab output and supply figures, as well as

15   the number of production days the fabs would operate for the next month, and agreed on output

16   restrictions. Each meeting had an individual designated as the "chairman" who would use a

17   projector or a whiteboard to put up figures on supply and demand and price for the group to

18   review.  The attendees would take turns making comments and adjusting the numbers.  At

19   some point during the meeting, the participants would reach an agreement on price and supply

20   for LCD panels.

21        111.    The commercial or operation meetings were attended by Defendants' respective

22   Vice Presidents of sales and marketing and other senior sales employees.  The structure and

23   content of the commercial meetings were largely the same as the CEO meetings.  The

24   participants discussed price, output, capacity, and the general market situation for LCD panels.

25   These meetings occurred approximately monthly and sometimes quarterly.

26        112.    Each of the participants in these meetings knew, and in fact discussed, the

27   significant impact that the price of LCD panels has on the cost of the finished products into

28   which they are placed.  Defendants knew that the conspiratorially high prices of LCD panels

1   would be reflected in the prices for finished LCD Products, and thus, there was no need to

2   specifically discuss the prices of finished LCD Products.

3          113.    The agreements reached at these meetings included:  (1) establishing target

4   prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of

5   LCD panels, such as quality or certain technical specifications; (3) what to tell customers as the

6   reason for price increases; (4) coordinating uniform public statements regarding anticipated

7   supply and demand; (5) exchanging information about fabrication plant utilization and

8   production capacity; and (6) reaching out to other competitors to encourage them to abide by

9   the agreed-upon pricing.  The meeting participants also agreed to maintain or lower production

10  capacity.

11         114.    Compared to the CEO and commercial meetings, the lower level meetings were

12  less formal, and typically occurred at restaurants over lunch.  The purpose of the lower level

13  meetings was to exchange market information that would facilitate implementation of the

14  Conspiracy and carry out the agreements made at the CEO and commercial meetings.

15  Participants in the lower level meetings exchanged information relating to past and future

16  prices of LCD Products and shipment quantities.

17         115.    In the summer of 2006, Defendants discontinued the lower level meetings in

18  favor of coordinated one-on-one meetings.  The meetings were coordinated so that on the same

19  date, two sets of competitors met one-on-one.  After that meeting, each of them met one-on-one

20  with another competitor.  This continued until all competitors met with each other.  These

21  coordinated meetings took place until about November or December 2006.  Defendants

22  switched the format of the meetings with the specific intent to conceal their meetings and for

23  these coordinated one-on-one meetings to accomplish the same purposes as the group meetings.

24  The information obtained at these meetings was transmitted up the corporate reporting chain to

25  permit Defendants to maintain their price-fixing and production-limitation agreements.

26         **ii.    Bilateral Discussions**

27         116.    The crystal meetings were supplemented by bilateral discussions between

28  various Conspirators. The purpose of the bilateral discussions was to exchange information

1    about past and future pricing, as well as information about shipments.

2        117.    The Conspirators had bilateral discussions with each other during price

3    negotiations with customers to avoid being persuaded by customers to cut prices.  These

4    discussions, usually between sales and marketing employees, took the form of in-person

5    meetings, telephone calls, e-mails, and instant messages.  The information gained in these

6    communications was then shared with supervisors and taken into account in determining the

7    price to be offered.

8        118.    Bilateral discussions were also used to synchronize prices with manufacturers

9    that did not ordinarily attend the group meetings.  For example, HannStar was responsible for

10   notifying Hitachi of the pricing agreements reached at the crystal meetings.  Hitachi

11   implemented the agreed-upon pricing as conveyed by HannStar.  Therefore, Hitachi

12   participated in the Conspiracy to fix the prices of LCD Products.

13           **iii.    Defendants' and Co-Conspirators' Participation in Group**

14                    **and Bilateral Discussions**

15       119.    Defendant AUO participated in multiple CEO, commercial, and lower-level

16   meetings, as well as bilateral discussions, between at least 2001 and 2006.  Additionally, QDI

17   and Unipac, which merged with AUO, participated in lower-level meetings.  Through these

18   discussions, AUO agreed on prices and supply levels for LCD Products.

19       120.    Defendant Chi Mei participated in multiple CEO, commercial, and lower-level

20   meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

21   discussions, Chi Mei agreed on prices and supply levels for LCD Products.

22       121.    Defendant Chunghwa participated in multiple CEO, commercial, and lower-

23   level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

24   discussions, Chunghwa agreed on prices and supply levels for LCD Products.

25       122.    Defendant Epson engaged in multiple bilateral discussions.  Through these

26   discussions, Epson agreed on prices and supply levels for LCD Products.

27       123.    Defendant HannStar participated in multiple CEO, commercial, and lower-level

28   meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these

discussions, HannStar agreed on prices and supply levels for LCD Products.

124.   Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and supply levels for LCD Products.

125.   Defendant LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, LG Display agreed on prices and supply levels for LCD Products.

126.   Mitsui participated in multiple bilateral meetings during the Relevant Period with LG, Samsung, Toshiba, Chunghwa, AU Optronics, Hitachi and others, and agreed on prices and supply levels for LCD Products.  Mitsui attended at least one bilateral meeting with Defendant Chunghwa during 2001, and multiple bilateral meetings with Defendant Samsung in the U.S. at which similar subjects were discussed.  At these and other meetings, Mitsui acted as an agent of Sanyo Consumer and reached agreements with other competitors about prices for LCD Products sold in the United States and elsewhere.

127.   Deposition testimony and documents confirm that Mitsui participated in the Conspiracy during the Relevant Period including meetings and communications with co-conspirators and competitors to discuss and agree on prices for LCD Products, and that Mitsui Japan, Mitsui Taiwan, and Mitsui U.S.A. participated in the Conspiracy in a coordinated manner.

128.   Defendant NEC joined the Conspiracy by participating in multi-lateral meetings and bilateral meetings and discussions with, among others, Samsung, Toshiba, Hitachi, Sharp, and LG to share information and reach agreement on prices for LCD Products beginning as early as 1998.  In these discussions with its competitors and fellow Conspirators, NEC exchanged price and supply information and also agreed on prices, price increases, and production limits and quotas for LCD panels.

█████ Deposition testimony and documents confirm NEC's participation in the conspiracy during the Relevant Period, including meetings and communications with co-conspirators and competitors to discuss and agree on prices for LCD Products.  For example, █

████████████████████████████████████████████████████████████████████████

[redacted]

132. Defendant Sanyo Consumer participated in at least one bilateral meeting through an agent during the Relevant Period, and agreed on prices and supply levels for LCD Products.

133. Defendant Sharp participated in multiple group and bilateral meetings during the Relevant Period, and agreed on prices and supply levels for LCD Products.

134. Defendant Toshiba participated in bilateral discussions during the Relevant Period, and agreed on prices and supply levels for LCD Products.

135. Toshiba personnel in its San Jose, California offices were involved in and implemented defendants' conspiracy in the United States. [redacted]

136.    Co-conspirator Hydis participated in multiple lower-level meetings between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese co-conspirator at least as recently as 2005.  Through these discussions, Hydis agreed on prices and supply levels for LCD Products.

137.    Co-conspirator Mitsubishi participated in multiple lower-level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac (later AUO).  Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Products.

138.    Co-conspirator Panasonic participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

139.    Co-conspirator Philips participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

140.    Co-conspirator Samsung participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Samsung agreed on prices and supply levels for LCD Products.

142.    Co-conspirator Sanyo participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Products.

143.    Co-conspirator Seiko Epson participated in meetings or discussions during the

1   Relevant Period with at least one other Defendant or co-conspirator, which included

2   discussions about prices for LCD Products.

3       144.    When Plaintiff refers to a corporate family or companies by a single name in

4   their allegations of participation in the Conspiracy, it is to be understood that the Plaintiff is

5   alleging that one or more employees or agents of entities within the corporate family engaged

6   in conspiratorial meetings on behalf of every company in that family.  In fact, the individual

7   participants in the conspiratorial meetings and discussions did not always know the corporate

8   affiliation of their counterparts, nor did they distinguish between the entities within a corporate

9   family.  The individual participants entered into agreements on behalf of, and reported these

10  meetings and discussions to, their respective corporate families.  As a result, the entire

11  corporate family was represented in meetings and discussions by its agents and a party to the

12  agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

13  families distributed LCD Products to direct purchasers, these subsidiaries played a significant

14  role in the Conspiracy because Defendants and their co-conspirators wished to ensure that the

15  prices for such products paid by direct purchasers would not undercut the pricing agreements

16  reached at these various meetings.  Thus, all entities within the corporate families were active,

17  knowing participants in the Conspiracy.

18      145.    Defendant Epson America is a wholly-owned and controlled subsidiary of

19  Defendant Epson Japan.  Epson Japan and Epson America reached agreements at meetings with

20  their co-conspirators.  In addition, to the extent Epson America distributed LCD Products, it

21  played a significant role in the Conspiracy because the Conspirators wished to ensure that the

22  prices for such products paid by direct purchasers did not undercut the pricing agreements

23  reached at these various meetings.  Epson America was an active, knowing participant in the

24  alleged Conspiracy, and acted as Epson Japan's agent for selling LCD Products in the United

25  States.

26      146.    Defendant Toshiba Matsushita is a joint venture between Toshiba Corporation

27  and Panasonic Corporation, and one or more of the partners in this joint venture participated in

28  the meetings described above.  As a result, Toshiba Matsushita was represented at those

1   meetings by its agents and was a party to the agreements entered into by its joint venture

2   partners at them.  As explained above, the agreements at these meetings included agreements

3   on price ranges and output restrictions. The joint venture partners controlled Toshiba

4   Matsushita's production levels and the prices of LCD Products the joint ventures sold both to

5   the joint venture partners and other non-affiliated companies. Thus, this Defendant was an

6   active, knowing participant in the alleged Conspiracy.

7        147.    Co-conspirator IPS Alpha is a joint venture among Hitachi Displays, Ltd.,

8   Toshiba Corporation, and Panasonic Corporation, and one or more of the partners in this joint

9   venture participated in the meetings described above.  As a result, IPS Alpha was represented at

10  those meetings and was a party to the agreements entered into by its joint venture partners at

11  them.  As explained above, the agreements at these meetings included agreements on price

12  ranges and output restrictions. The joint venture partners had substantial control over IPS

13  Alpha's production levels and the prices of LCD Products the joint ventures sold both to the

14  joint venture partners and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were

15  active, knowing participants in the alleged Conspiracy.

16       **E.      International Government Antitrust Investigations**

17       148.    The Conspiracy to artificially restrict the output of, and to raise the prices for,

18  LCD Products sold in the United States during the Relevant Period, was shown by

19  multinational investigations commenced by the DOJ.

20       149.    In December of 2006, government authorities in Japan, Korea, the European

21  Union, and the United States revealed the existence of a comprehensive investigation into anti-

22  competitive activity among LCD panel manufacturers.  In a December 11, 2006 filing with the

23  Securities and Exchange Commission, Defendant LG Display disclosed that officials from the

24  Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the

25  company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose

26  office.

27       150.    On December 12, 2006, news reports indicated that in addition to LG Display,

28  LCD panel makers Samsung, Sharp, Epson, and AUO were also under investigation. The JFTC

stated that the probe was related to price-fixing.  On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-fixing among manufacturers of LCD Products.

151.    On November 12, 2008, the DOJ announced that it had reached agreements with three LCD panel manufacturers – LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – in which they would plead guilty and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of LCD panels.

152.    LG Display Co., Ltd. and LG Display America Inc. agreed to plead guilty and pay a $400 million fine for their participation in a conspiracy to fix prices of LCD panels.

153.    LG Display Co., Ltd. and LG Display America Inc. admitted that from September 21, 2001 to June 1, 2006, they participated in a conspiracy with other major LCD panel producers, the primary purpose of which was to fix the price of LCD panels sold in the United States and elsewhere.  They admitted that in furtherance of the conspiracy they, through their officers and employees, engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as "crystal meetings," with representatives of other major LCD panel producers.  During these discussions and meetings, agreements were reached to fix the price of LCD panels to be sold in the United States and elsewhere.

154.    Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million fine for its participation in a conspiracy to fix prices of LCD panels.

155.    Chunghwa Picture Tubes, Ltd. admitted that from September 14, 2001 to December 1, 2006, it participated in a conspiracy with other major LCD panel producers, the primary purpose of which was to fix the price of LCD panels sold in the United States and elsewhere.  Chunghwa admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as "crystal meetings," with representatives of other major LCD panel producers.  During these discussions and meetings, agreements were reached to fix the price of LCD panels to be sold in the United States and elsewhere.

1   156.    Sharp Corporation agreed to plead guilty and pay a $120 million fine for its

2   participation in a conspiracy to fix prices of LCD panels.

3   157.    Sharp Corporation admitted that:

4   a.     from April 1, 2001 to December 1, 2006, it conspired with other major LCD

5   panel producers to fix the price of LCD panels sold to Dell, Inc. for use in computer monitors

6   and laptops;

7   b.     from fall 2005 to the middle of 2006, it conspired with other major LCD panel

8   producers to fix the price of LCD panels sold to Motorola, Inc. for use in Razr mobile phones;

9   and

10   c.     from September 1, 2005 to December 1, 2006, it conspired with other major

11   LCD panel producers to fix the price of LCD panels sold to Apple Computer, Inc. for use in

12   iPod portable music players.

13   Sharp admitted that in furtherance of the conspiracy it, through its officers and

14   employees, engaged in bilateral telephone discussions and attended bilateral meetings with

15   other major LCD panel producers.  During these discussions and meetings, agreements were

16   reached to fix the price of LCD panels.

17   158.    In May 2009, the DOJ announced that it had reached an agreement with Hitachi

18   Displays, Ltd. in which it would plead guilty and pay $31 million in criminal fines for its role

19   in a conspiracy to fix prices of LCD panels.

20   159.    Hitachi Displays, Ltd. admitted that from April 1, 2001 to March 31, 2004, it

21   conspired with other major LCD panel producers to fix the prices of LCD panels sold to Dell

22   for use in notebook computers.  Hitachi admitted that in furtherance of the conspiracy it,

23   through its officers and employees, engaged in telephone discussions and attended bilateral

24   meetings with other major LCD panel producers.  During these discussions and meetings,

25   agreements were reached to fix the price of these LCD panels sold to Dell.

26   160.    In August 2009, the DOJ reached an agreement with Epson Imaging Devices

27   Corporation in which it would plead guilty and pay a $26 million fine for its role in a

28   conspiracy to fix prices of LCD panels.

161. Epson Imaging Devices Corporation admitted that from the fall of 2005 to the middle of 2006, it conspired with other major LCD producers to fix the price of LCD panels sold to Motorola, Inc. for use in Razr mobile phones. Epson admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in bilateral telephone discussions and attended bilateral meetings in Japan with representatives of other major LCD producers. During these discussions and meetings, agreements were reached to fix the price of LCD panels sold to Motorola.

162. In December 2009, the DOJ reached an agreement with Chi Mei Optoelectronics Corporation in which it would plead guilty and pay a $220 million fine for its role in a conspiracy to fix prices of LCD panels.

163. Chi Mei Optoelectronics Corporation admitted that from September 14, 2001 to December 1, 2006, it conspired with other major LCD producers to fix prices of LCD panels. Chi Mei admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as "crystal meetings," with representatives of other major LCD producers. During these discussions and meetings, agreements were reached to fix the price of certain LCD panels to be sold in the United States and elsewhere.

164. In June 2010, the DOJ reached an agreement with HannStar Display Corporation in which it would plead guilty and pay a $30 million fine for its role in a conspiracy to fix prices of LCD panels.

165. HannStar Display Corporation admitted that from September 2001 to January 2006, it conspired with other major LCD panel producers to fix prices of LCD panels. HannStar admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as "crystal meetings," with representatives of other major LCD panel producers. During these discussions and meetings, agreements were reached to fix prices of LCD panels to be sold in the United States and elsewhere.

166. Since January 15, 2009, the DOJ has announced ten additional agreements with

1    executives of LG Display Co. Ltd., Chunghwa Picture Tubes Ltd., Chi Mei Optoelectronics

2    Corporation, and HannStar Display Corporation who all agreed to plead guilty and serve jail

3    time in the United States for participating in the conspiracy.  The ten individuals are Chang Suk

4    "C.S." Chung and Bock Kwon (both with LG Display), Chieng-Hon "Frank" Lin, Chin-Chun

5    "C.C." Liu and Hsueh-Lung "Brian" Lee (all with Chunghwa), Chu-Hsiang "James" Yang,

6    Jau-Yang "J.Y." Ho, Wen-Hung "Amigo" Huang, and Chen-Lung Kuo (all with Chi Mei), and

7    Jui Hung "Sam" Wu of HannStar.  All ten of these individuals have now pleaded guilty and

8    been sentenced, and at their sentencing hearings, confirmed the allegations against them that

9    they participated in the global conspiracy to fix the prices of LCD panels.

10           167.    The above guilty pleas demonstrate that the Conspiracy included small LCD

11   panels for mobile wireless headsets and other mobile device applications.  For example, the

12   plea agreements of Defendants Chunghwa, Chi Mei, HannStar, and LG Display state that

13   "TFT-LCD are manufactured in a broad range of sizes and specifications for use in televisions,

14   notebook computers, desktop monitors, mobile devices and other applications."  In addition,

15   Defendants Sharp and Epson pled to reaching agreements "to fix the price of TFT-LCD sold to

16   Motorola for use in Razr mobile phones."

17           168.    These guilty pleas also demonstrate that the investigations into the LCD industry

18   are not mere information-gathering efforts by regulatory authorities.  In fact, as the DOJ's

19   representative has stated, the DOJ's investigation into the LCD industry is premised in part on

20   insider information that presents a detailed "road map" of the Conspiracy.

21           169.    The guilty plea by Sharp has significant ramifications for Toshiba.  Toshiba was

22   one of Sharp's principal competitors in the sale of LCD panels to Dell and Apple during the

23   periods set forth in the DOJ's information against Sharp.  Toshiba sold LCD panels to Dell

24   between 2000 and 2006, and it sold LCD panels for use in Apple's iPod music players between

25   2001 and 2006. In fact, Toshiba was one of Apple's largest, if not the largest, suppliers of iPod

26   screens for a substantial part of the Relevant Period.  In the small-to-medium size LCD display

27   market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in

28   the first half of 2005, holding a 15.4 percent market share during the first quarter and a 14.1

1    percent market share during the second quarter.  Toshiba's high percentage of LCD revenues

2    dictated that no conspiracy would be effective without its participation.  Sharp could not have

3    successfully fixed the prices of the LCD panels it sold to Dell and Apple unless Toshiba, one of

4    its biggest competitors, agreed not to undersell it.

5           170.    In addition, on or about June 10, 2010, the DOJ indicted Defendants AU

6    Optronics Corporation and AU Optronics Corporation America for participating in a

7    conspiracy to suppress and eliminate competition by fixing the prices of LCD panels in

8    violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, from September 2001 through

9    December 2006.

10          171.    According to the DOJ, its investigation is still ongoing.

11       **F.    Market During the Conspiracy**

12          172.    After initial introduction into a market, consumer electronics products and their

13   component parts are typically characterized by downward pricing trends.  Since at least 1996,

14   however, the LCD Products market has been characterized by unnatural and sustained price

15   stability, as well as certain periods of substantial increases in prices.  Defendants achieved price

16   stability and price increases by agreeing to fix and maintain prices and to restrict supply

17   through decreases in capacity utilization and restraint in new plant investment.

18          173.    As described herein, Defendants' LCD cartel evolved over time.  Defendants

19   initiated their cartel when LCD Products were in their relative infancy.  At that time,

20   Defendants balanced the desire to set prices collusively with the industry goal of establishing

21   their products in the marketplace.  As the cartel matured, new entrants were co-opted, and

22   production costs declined.  At the same time, the Conspirators learned how they could best

23   mitigate the crystal cycle by agreeing on prices and output.

24       **i.    1996 – 1999**

25          174.    By early 1996, analysts were lamenting the excess supply and drastic price cuts

26   in the LCD panel markets.  The downward pressure on prices, which had already fallen 40 to

27   50 percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this,

28

COMPUCOM FIRST AMENDED COMPLAINT          - 42 -          Case No. 3:11-cv-06241-SI
                                                          Master File No. 3:07-md-01827-SI

LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity.  In reality, Defendants were fixing the prices and limiting supply.

175.    During this period, the Japanese companies herein began to partner with Taiwanese companies to trade technology and collaborate on supply.  Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  This mutually beneficial relationship between purported competitors continued into at least 1999.

176.    A few months into 1996, there was a reversal in the downward trend in LCD panel prices and an alleged inability of manufacturers to supply enough LCD panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon …. Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

177.    By mid-1996, industry analysts were commenting on an unusual rise in LCD panel prices that was noted to be "quite rare in the electronics industry."

178.    The "rare" increase in LCD panel prices was due to the agreements reached by the Japanese companies to increase prices.  These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

179.    By 1998, the LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies.  A March 30, 1998 article in *Electronic News* reported that Hyundai's production lines were running at only 20 to 50 percent of capacity.  The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage …. You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden."

180.    During this period, Samsung made a concerted effort to get other manufacturers in the industry to limit production.  Yoon-Woo Lee, President and CEO of the Semiconductor

Division of Samsung Electronics Co., Ltd. gave the keynote address at the Eighteenth

International Display Research Conference (known as Asia Display 98).  Mr. Lee said:

> In order to maintain the tradition of top CRT manufacturer, we need to capture the high end market [and] deviate from the volume production of CRTs and LCDs.
>
> Taiwan is trying to enter LCD business because it has the advantage of the large PC production.  To survive in the rapidly changing environment, we have to revise our previous strategies and redirect our business plans.  It is time for fundamental shift for future decisions, time for transformation from volume driven to cost driven, time for driving value added strategies.
>
> *If we prepare now by shifting from the traditional business approach, to value added new approach, we may be able to deviate from repeating the "crystal cycle" again.*

[Emphasis added].

181.    Samsung's effort to limit production, capacity restraints, and the price-fixing

agreement caused decreases in prices of LCD panels to slow and stop in late 1998.

182.    The efforts commenced by Samsung in 1998 continued to bear fruit.  In 1999,

LCD panel prices surged due to a claimed "massive undersupply."  This was despite the entry

of Taiwanese manufacturers and several new fabs coming online.

183.    Significantly, Bock Kwon, Vice President of LG Display's Sales Division and

Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the

following in the same trade publication:

LG LCD will raise prices across its entire LCD portfolio by 30 to 40 percent this year,

Kwon said, although he expects that prices will stabilize some time in the second half.

According to Samsung, demand for larger panels is reducing capacity because each display is

eating up more square inches per motherglass substrate.  This, combined with a stagnation in

capital spending by many panel makers, will keep the LCD industry in a period of relative

shortage until 2001, Lee said.  The shortage has become acute, and has created an unusual

market in which prices could rise as much as 30% to 80% in one year according to Ross

Young, President of DisplaySearch, a research firm in Austin, Texas.

184.    Also, in 1999, the three major LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai.  The year 1999 also saw an additional merger when LG Electronics, Inc. and Philips created Defendant LG Display.

### ii.    2000 – 2004

185.    By January of 2000, prices for LCD panels were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and ADT (later part of AUO).  Taiwanese Defendants began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other Conspirators to gain immediate market share.  But by 2000-2001, the Taiwanese Defendants had increased their market share to the point that it made sense to participate in the Conspiracy, and they then moderated the volume of their production.

186.    Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese LCD panel production and to locate manufacturing facilities in Taiwan.

187.    Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Published data for 2001 showed that several Defendants were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and QDI (which later merged with AUO) had a 52 percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply.  Again, the Conspirators reacted to the price trough by conspiring to fix prices and limit supply.  This Conspiracy was reached in part at the bilateral and group meetings described above.

188.    The rise in prices made no economic sense at this point in time and was the product of Defendants' setting the price of LCD panels and limiting supply by agreement.

First, the Conspirators were bringing new plants on line that used larger motherglass, which was more cost effective.  Second, as reported by an industry source, the variable cost of producing LCD panels was declining during the latter part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic sense for the Conspirators not to utilize their full capacity other than agreement by them not to do so.

189.    Prices continued to rise from the second half of 2001 through the second half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion.  In reality, the price increases were the result of what the Conspirators agreed to in the crystal meetings and bilateral discussions described above.

190.    By the second half of 2002, the cartel's success at propping up LCD panel prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall.  Such downward price trends are not inconsistent with a monopoly or cartel.

191.    During five consecutive quarters in 2003 and 2004, LCD panel prices rose significantly.  AUO reported that the price for certain of its LCD panels increased 28 percent between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG reported that its pricing increased by 21 percent over the same period.

192.    These soaring prices resulted in similar increases in the profits reaped by the LCD Product manufacturers.  For example, the eight largest LCD panel manufacturers reported a collective profit increase of 740 percent between the second quarter of 2003 and the second quarter of 2004.  These record profits resulted from the Conspirators' collective action to fix, raise, maintain, or stabilize the prices of LCD panels.  Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of LCD panels.

193.    Around this time, industry analysts suggested that there were too many competitors in the LCD panel marketplace.  Some industry participants went as far as overtly suggesting that the industry should seek to curtail supply though mergers.  These suggestions

1    were carried out in furtherance of the Conspiracy.  Significant consolidation and collaboration

2    among competitors in the LCD panel market occurred.

3         194.    As noted above, Toshiba Corporation and Panasonic Corporation merged their

4    LCD panel operations in furtherance of the Conspiracy.  The joint venture announced plans to

5    solicit investment from other companies involved in the production of LCD panels, including

6    device manufacturers and material suppliers.  NEC formed an alliance with Casio in

7    furtherance of the Conspiracy.  In addition, Taiwanese LCD manufacturers agreed to supply

8    Panasonic with LCD panels for use in televisions in furtherance of the Conspiracy.

9         195.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's

10   IDT, a former subsidiary of IBM, and AUO purchased a 20 percent stake in Japan's Fujitsu

11   Display Technology all in furtherance of the Conspiracy.

12        196.    Despite the increased efficiency and costs savings of fifth generation fabs, the

13   industry experienced higher prices in 2003, purportedly because of a shortage of the most

14   popular sizes of LCD panels.  In order to keep prices artificially high, Conspirators chose not to

15   operate at full capacity, nor to take advantage of lower variable costs.

16                        **iii.    2004 – 2006**

17        197.    Pursuant to the Conspiracy to fix and stabilize LCD panel prices, prices

18   continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, LCD panel

19   prices increased for five consecutive quarters.  Various types of crystal meetings in furtherance

20   of the Conspiracy were ongoing during this period.

21        198.    The cartel's success at raising LCD panel prices slowly dampened demand.  In

22   response, the cartel allowed LCD panel prices to once again level off and begin to decline in

23   the second half of 2004.  During this period of time, the market for LCD televisions started to

24   grow, with the 32-inch panel representing approximately 9 percent of the market.

25        199.    Consolidation and collaboration among and between competitors in furtherance

26   of the Conspiracy continued as Samsung and Sony launched their joint venture, named S-LCD

27   Corp.

28

200.    Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the LCD panel industry was not facing oversupply, but rather was reaping the benefits of an LCD panel shortage and stable, or increasing, panel prices.

201.    These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

202.    A temporary oversupply of LCD panels occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, the Conspirators fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Dr. Hui Hsiung of AUO stated publicly that his company was reducing production of the LCD panels in order to avoid further price erosion.  He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers.  A June 13, 2006 article in *InfoWorld* noted that as a result of Dr. Hsiung's statements, "[t]he chatter is growing louder each day."

203.    Chi Mei was not the only one to follow AUO's invitation to restrict the output and increase the prices of LCD panels.  In May of 2006, in discussions between executives of the two companies, AUO, in furtherance of the Conspiracy, convinced QDI, a company that it acquired in October of 2006, to reduce production of LCD panels.  By June of 2006, LG also announced plans to cut production of LCD panels.

204.    By the summer of 2006, the Conspiracy continued through bilateral meetings as alleged above.

205.    Despite the fact that certain of the Conspirators may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the Conspiracy continued at least through the end of that year.  This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

1

2

**G.      Defendants' and their Co-Conspirators' Price-Fixing Conspiracy Included Small LCD Panels**

3      206.     As part of the larger Conspiracy to raise the price of LCD panels, Defendants

4   engaged in bilateral communications specifically regarding prices for small LCD panels of

5   various types used in mobile wireless handsets and other mobile device applications, including

6   TFT and non-TFT technology.  These discussions took place between sales and marketing

7   employees in the form of in-person meetings, telephone calls, emails, and instant messages.

8   The information gained in these communications was then shared with supervisors and taken

9   into account in determining the price to be offered to Defendants' customers.

10      207.     Moreover, because all types of LCD panels were interchangeable for use in

11   certain mobile wireless handsets and other handheld devices, and the Conspirators' customers

12   were in competition with each other, communications among and between the Conspirators

13   intended to raise and/or stabilize prices of small LCD panels of any specific type or for sale to

14   any specific customer had the effect of raising and/or stabilizing prices of small LCD panels of

15   all types and for all applications.

16      208.     Representatives of AUO, Chi Mei, Epson, LG, Samsung, Sharp, Toshiba, and

17   other LCD panel manufacturers engaged in these bilateral communications with the goal of

18   reaching understandings regarding prices for small LCD panels.  As part of these

19   communications, they discussed prices, quantities, and profits on small LCD panels and agreed

20   to fix the prices of small LCD panels.  These communications began at least as early as 2001

21   and continued throughout the Relevant Period.





[redacted]

[redacted]

216. Epson employees responsible for selling CSTN-LCD panels to Motorola also engaged in bilateral discussions with "top management" employees at Sharp. [redacted]



223.    In some instances, Defendants quoted mobile wireless handset vendors a single price for a LCD module that included both a TFT-LCD panel and an STN-LCD panel.  For example, Defendants quoted Motorola a single price for LCD modules used in the Razr phone, which modules included both a TFT-LCD panel and a CSTN-LCD panel. Defendants Sharp and Epson have admitted fixing prices for TFT-LCD panels sold to Motorola for the Razr phone. Because Sharp and Epson quoted prices to Motorola for the entire Razr module, their admitted agreements to fix prices for Motorola included an agreement to fix the price of the CSTN-LCD panels included in the Razr module.

224.    In other instances, Defendants quoted some mobile wireless handset vendors a single price for a LCD module that included both a TFT-LCD panel and a MSTN-LCD panel. For example, in 2003, SonyEricsson manufactured a phone that contained a TFT-LCD panel in the primary display and a MSTN-LCD panel in the subdisplay, and sought a single price quotation for both the TFT-LCD panel and the MSTN-LCD panel from Defendants. Thus, Defendants' agreement to fix the price of TFT-LCD panels included an agreement to fix the price of MSTN-LCD panels sold in the combined TFT-LCD panel/MSTN-LCD panel modules sold for mobile wireless handset applications.

226.    Thus, because a number of mobile wireless handsets, including the Motorola Razr phone, included both TFT-LCD panels and STN-LCD panels, and because mobile wireless handset manufacturers often requested a single price for LCD modules that included both types of panels, Defendants' bilateral discussions and agreements with respect to TFT-LCD panel prices inevitably included and/or affected the prices of STN-LCD panels in those modules.

H.    **The Role of Trade Associations During the Relevant Period**

227.    The LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year. These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for the Conspirators to cooperate and discuss prices.

228.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AUO, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT-LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the Conspiracy was effectuated and implemented.

229.    South Korean manufacturers, including LG and Samsung, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact

1    with the United States Display Consortium ("USDC"). Describing the pact, Malcolm

2    Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should

3    cooperate on common issues."

4       230.    Japanese manufacturers of LCD panels have a similar organization of their own.

5    The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves

6    Japanese manufacturers of LCD panels. Its members include Sharp, Toshiba, NEC, Hitachi,

7    and a Japanese subsidiary of Samsung. Like the KODEMIA and TTLA, the SEAJ was not

8    merely a trade association that provided an opportunity to conspire; it was a vehicle by which

9    the Conspiracy was effectuated and implemented.

10       231.    In addition to these national trade associations, the Society for Information

11   Display ("SID") put on multiple meetings each year that were attended by executives from all

12   of the major producers. One of these meetings had been known as the SID Symposium, but was

13   renamed the "SID International Symposium and Business Conference."  SID also puts on a

14   long-running conference called the International Display Research Conference ("IRDC").

15       232.    The 2004 SID International Symposium and Business Conference ("SID 2004")

16   featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and

17   CEO of AUO. This was followed shortly by a presentation entitled "The FPD Capital

18   Equipment Investment Environment," which informed the attendees about "investments

19   planned at the major display manufacturers." A representative of DisplaySearch also spoke

20   about the LCD market. There were presentations by analysts from iSuppli/Stanford Resources,

21   and other industry experts. This was all followed by a "networking reception – sponsored by

22   LG.Philips LCD," to which all conference attendees were invited to participate.

23       233.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AUO.

24   This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch representative

25   provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . .

26   and the cost and margin outlook for key FPDs will be projected."  Again, these discussions

27   about the market were followed by a "networking reception." Among the attendees at SID 2004

28   were Bruce Berkoff of LG, Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AUO,

1    Larry Weber of Panasonic, and Joel Pollack of Sharp. Senior executives from Sharp and

2    Hitachi also attended.

3        234.    The SID 2005 conference was very similar to SID 2004 but was even more

4    blatant in its discussion of the crystal cycle. Jun Souk, Executive Vice President of Samsung,

5    gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows:

6    "By reviewing what happened during the business up and down cycles of the LCD in the past,

7    we have learned lessons that will reduce the burden in future cycles. Efforts made in cost

8    reduction line-investment timing, and new market generation will be described."

9        235.    SID 2005 provided a prime opportunity for one of the dominant manufacturers

10   to explain to all of its key competitors how to manage supply and maximize "line-investment

11   timing."  Among the attendees at SID 2005 were Bruce Berkoff of LG and Sang Wan Lee, Jun

12   Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding

13   developments in LCD technology by officials from AUO, Sharp, LG, Samsung, and Hitachi.

14       236.    The Conspiracy was also carried out at the annual meetings of the Global FPD

15   Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was

16   held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March

17   3, 2006 in Okinawa, Japan.

18       237.    Participants in the 2006 GFPC noted how successful the event was in promoting

19   information exchanges and "networking" among the Conspirators. Or, as Dr. Hsiung of AUO

20   has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly

21   important to build connections across the supply chain and around the world . . . the GFPC

22   plays a vital part in building those connections and growing our business."

23       238.    Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of

24   Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba

25   Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Panasonic, and Dr. Hsiung of AUO.

26       239.    As indicated by the public pronouncements, these trade association meetings

27   facilitated the Conspiracy by giving the Conspirators further opportunities to discuss prices and

28   output.

1

**I.      Defendants' and their Co-Conspirators' Participation in California**

2

240.    Many Conspirators conducted operations in California throughout the

3

Conspiracy Period, including Chi Mei, Chunghwa, Epson, LG, Mitsui, NEC, Samsung, and

4

Toshiba.  Through their California operations, the Conspirators implemented their price-fixing

5

conspiracy in the United States.  In fact, Defendants LG Display Co., Ltd. and LG Display

6

America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices

7

Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar

8

Display Corporation specifically admitted during their hearings that acts in furtherance of the

9

conspiracy were carried out within California.  The Conspirators' employees based in

10

California engaged in bilateral and multilateral communications in furtherance of the

11

conspiracy.

12

241.    The Conspirators also used their California operations to implement their price-

13

fixing agreements in the United States.  Through their activities in California, the Conspirators

14

successfully increased the price of LCD Panels.

15



16

17

18

19

20

21

22

23

24

25

26

27

28



[redacted]

246. Other Conspirators also engaged in conduct in furtherance of the conspiracy in California to fix the price of small LCD Panels used in mobile wireless handsets and other portable devices. Defendant LG Display America, Inc. maintained its offices in San Jose, California. LG Display America, Inc. has admitted that it participated in the conspiracy to fix prices of LCD Panels. LG Display employees responsible for LG Display's negotiations with and sales to mobile wireless handset manufacturers were located in the San Jose, California office.



Toshiba maintained offices in San Jose, California. Toshiba personnel in its San Jose, California offices were involved in and implemented the Conspiracy in the United States.

248.    Sharp also maintained offices in San Jose, California. Sharp personnel in its San Jose, California office were involved in and implemented the Conspiracy in the United States.

Epson maintained offices in San Jose, California. Epson personnel in its San Jose, California office were involved in and implemented the Conspiracy in the United States.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VIII.   PLAINTIFF'S INJURIES**

250.    Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a purchaser of LCD Products as a result of the Conspiracy to raise, fix, stabilize, or maintain the price of LCD panels at supra-competitive levels.  The Conspiracy artificially inflated the prices of LCD panels incorporated into such LCD Products, causing Plaintiff to pay higher prices than it would have in the absence of the Conspiracy.

251.    In some cases, Plaintiff purchased LCD Products directly from the Defendants and their co-conspirators at prices that were artificially inflated as a result of the Conspiracy. In other cases, Plaintiff purchased LCD Products from OEMs, as well as other suppliers, which contained LCD panels that had been purchased from Defendants and their co-conspirators.  The Conspiracy artificially inflated the price of LCD panels purchased by these OEMs and others, which paid higher prices for LCD panels than they would have absent the Conspiracy.

252.    The OEMs and other suppliers passed on to their customers, including Plaintiff, the overcharges caused by the Conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by the Conspiracy.  Thus, Plaintiff suffered injury when it purchased LCD Products from the OEMs and other suppliers.

253.    Once an LCD panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  LCD panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of an LCD Product.  Thus, LCD panels follow a physical chain from the Conspirators through manufacturers of LCD Products sold to Plaintiff.

254.     The market for LCD panels and the market for LCD Products are inextricably linked and cannot be considered separately.  In addition, the price of the LCD panel is a material portion of the cost of the LCD Product.  The Conspirators are and have been well aware of this intimate relationship.

255.     The LCD Product OEMs' demand for LCD panels was relatively inelastic, because there were no reasonable substitutes for LCD panels to serve as visual displays.  Other competing display technologies, such as OLED (Organic Light Emitting Diodes) displays, were not available during the Relevant Period and are only today becoming widely available.  In addition, throughout the Relevant Period, the Conspirators controlled the market for LCD panels.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase LCD panels from the Conspirators and others at prices that were artificially inflated, fixed, and stabilized by the Conspiracy.

256.     As a result, Plaintiff was injured in connection with its purchases of LCD Products during the Relevant Period.

## IX.     FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

257.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret Conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of LCD Products.

258.     The Conspirators agreed to keep the Conspiracy, the agreements reached, and the meetings secret.  Participants were instructed to hide the existence of the meetings from others within their own companies and to keep the meeting reports confidential.

259.     The Conspirators knew their activities were illegal



1

2

3

4

5

6          Therefore, the Defendants and their co-conspirators kept their conspiracy

7   communications strictly confidential.

8

9

10

11

12          261.    The Conspirators took other steps to conceal the Conspiracy.  In some instances,

13   the location of a meeting was circulated only the day before in an effort to avoid detection.  In

14   addition, the Conspirators frequently used telephone calls, rather than emails or letters, to

15   conceal the Conspiracy.

16          262.    By its very nature, Defendants' and their co-conspirators' price-fixing

17   conspiracy was inherently self-concealing.  As alleged above, Defendants and their co-

18   conspirators had secret discussions about price and output.  Defendants agreed not to publicly

19   discuss the existence of the nature of their agreement.  During these meetings, top executives

20   and other officials attending these meetings were instructed on more than once occasion not to

21   disclose the fact of these meetings to outsiders, or even to other employees of Defendants not

22   involved in LCD panel pricing or production.  In fact, the top executives who attended

23   conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid

24   being seen in public with each other and with the express purpose and effect of keeping them

25   secret.

26          263.    Furthermore, the participants agreed on what pretexts they would cite when

27   questioned about rising prices. The participants also agreed to lie to the media and report that

28

their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

264.    The Conspirators have used a variety of other purportedly market-based explanations for price increases in order to conceal the Conspiracy.  In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization:

Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry.

265.    Also, in early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."

266.    Also in 1999, Bock Kwon, Vice President of LG's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases resulted from "acute" shortages.

267.    On February 4, 2001, Bruce Berkoff, Executive Vice President at LG, was quoted by News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up."

268.    In the latter half of 2001, Duk Mo Koo, an executive at LG, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

269.    Jen-Ting Hsu, a Vice President at Chi Mei, and H.B. Chen, President of AUO, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic News* in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

270.    In a presentation shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "*LCDs*: Profitability recovered faster than originally expected."

1     271.    These explanations were pretextual and served to cover up the Conspiracy.

2   Later price increases were explained by industry leaders as derived from new demand for LCD

3   televisions. In 2005, Duk Mo Koo of LG stated "[w]e are seeing much stronger demand for

4   large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the

5   year."

6     272.    As a result of Defendants' fraudulent concealment of the Conspiracy, the

7   running of any statute of limitations has been equitably tolled with respect to any of Plaintiff's

8   claims arising from the anticompetitive conduct alleged in this First Amended Complaint.

9     273.    Also as a result of Defendants' fraudulent concealment of the Conspiracy,

10   Defendants are equitably estopped from asserting statutes of limitations defense, and principles

11   of equitable estoppel toll the statutes of limitations relevant to Plaintiff's claims.

12     274.    The statutes of limitations relevant to Plaintiff's claims for both its direct and

13   indirect purchases of price-fixed LCD Products have also been tolled as a result of the criminal

14   informations and guilty pleas entered as a result of the DOJ criminal investigation.

15     275.    The Defendants' ongoing conspiracy and unlawful conduct constitute a

16   continuing tort, and therefore the statute of limitations cannot accrue until the last act of

17   Defendants' violative conduct.

18   **X.      TOLLING**

19     276.    The statutes of limitations relevant to Plaintiff's claims for both its direct and

20   indirect purchases of price-fixed LCD Products have also been tolled under the tolling doctrine

21   set forth in the decision of *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("*American*

22   *Pipe*"), as a result of the filing of class actions concerning the LCD Conspiracy against

23   Defendants and their co-conspirators.

24     277.    Specifically, the statute of limitations governing Plaintiff's claims under the

25   California Cartwright Act and the California Unfair Competition Law were tolled under

26   *American Pipe* by each of the indirect-purchaser class action complaints (the "California

27   indirect class action complaints") filed by California residents in 2006 and 2007 that defined

28   their respective putative classes in such a way as to include Plaintiff, including but not limited

1   to:  *Hee v. LG Philips LCD Co. Ltd., et al., Cas*e No. 3:07-cv-00722-SI, Dkt. No. 1 (N.D. Cal.

2   Feb. 2, 2007); *Ho v. LG Philips LCD Co. Ltd., et al.*, Case No. 3:07-cv-00708-SI, Dkt. No. 1

3   (N.D. Cal. Feb. 2, 2007); *Martel v. Sharp Corp. et al.*, Case No. 3:06-cv-07888-SI, Dkt. No. 1

4   (N.D. Cal. Dec. 26, 2006)*; Ralik v. AU Optronics Corp., et al.*, Case No. 3:07-cv-01272-SI,

5   Dkt. No. 1 (N.D. Cal. Mar. 5, 2007); and *Wojnowski v. AU Optronics Corp., et al.*, Case No.

6   3:07-cv-01184-SI, Dkt. No. 1 (N.D. Cal. Feb. 27, 2007)*.*  The California indirect class action

7   complaints tolled the statute of limitations governing Plaintiff's claims under the California

8   Cartwright Act and the California Unfair Competition Law until these cases were

9   administratively closed in November 2009.

10      278.   Each of the plaintiffs named in each of the California indirect class action

11   complaints had standing to assert claims under California law.

12      279.   The plaintiffs in the cases captioned *Hee v. LG Philips LCD Co. Ltd., et al.,*

13   *Cas*e No. 3:07-cv-00722-SI, Dkt. No. 1 (N.D. Cal. Feb. 2, 2007); *Ho v. LG Philips LCD Co.*

14   *Ltd., et al.*, Case No. 3:07-cv-00708-SI, Dkt. No. 1 (N.D. Cal. Feb. 2, 2007); *Martel v. Sharp*

15   *Corp. et al.*, Case No. 3:06-cv-07888-SI, Dkt. No. 1 (N.D. Cal. Dec. 26, 2006); *Ralik v. AU*

16   *Optronics Corp., et al.*, Case No. 3:07-cv-01272-SI, Dkt. No. 1 (N.D. Cal. Mar. 5, 2007); and

17   *Wojnowski v. AU Optronics Corp., et al.*, Case No. 3:07-cv-01184-SI, Dkt. No. 1 (N.D. Cal.

18   Feb. 27, 2007), alleged that they purchased LCD Products in California.

19      280.   There has been no determination, by court ruling or otherwise, that any of the

20   plaintiffs named in the California indirect class action complaints lacked standing to assert

21   claims under California law.

22      281.   None of the California indirect class action complaints alleged any facts

23   inconsistent with plaintiffs' purchase of LCD Products in California.

24      282.   It was not apparent from the face of the California indirect class action

25   complaints that the named plaintiffs lacked standing to sue.

26      283.   The statute of limitations governing Plaintiff's claims under the New York

27   Donnelly Act were tolled under *American Pipe* by each of the indirect-purchaser class action

28   complaints (the "New York indirect class action complaints") filed by New York residents in

1  2006 and 2007 that defined their respective putative classes in such a way as to include

2  Plaintiff, including but not limited to:  *DiMatteo v. LG. Philips LCD Co. Ltd., et al.*, Case No.

3  1:06-cv-15342-JGK, Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006); and *Ferencsik v. LG. Philips LCD*

4  *Co. Ltd., et al.*, Case No. 1:06-cv-06714-FB-CLP, Dkt. No. 1 (E.D.N.Y. Dec. 20, 2006).  The

5  New York indirect class action complaints tolled the statute of limitations governing Plaintiff's

6  claims under the New York Donnelly Act until these cases were administratively closed in

7  November 2009.

8        284.    Each of the plaintiffs named in each of the New York indirect class action

9  complaints had standing to assert claims under New York law.

10        285.    The plaintiffs in the cases captioned *DiMatteo v. LG. Philips LCD Co. Ltd., et*

11  *al.*, Case No. 1:06-cv-15342-JGK, Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006); and *Ferencsik v. LG.*

12  *Philips LCD Co. Ltd., et al.*, Case No. 1:06-cv-06714-FB-CLP, Dkt. No. 1 (E.D.N.Y. Dec. 20,

13  2006), alleged that they purchased LCD Products in New York.

14        286.    There has been no determination, by court ruling or otherwise, that any of the

15  plaintiffs named in the New York indirect class action complaints lacked standing to assert

16  claims under New York law.

17        287.    None of the New York indirect class action complaints alleged any facts

18  inconsistent with plaintiffs' purchase of LCD Products in New York.

19        288.    It was not apparent from the face of the New York indirect class action

20  complaints that the named plaintiffs lacked standing to sue.

21        289.    The tolling of the statute of limitations governing Plaintiff's claims under

22  California and New York law was not ended by the filing of the November 5, 2007 Indirect

23  Purchaser Plaintiffs' Consolidated Amended Complaint (MDL Dkt. No. 367) ("IPP CAC").

24  Moreover, to the extent tolling had not commenced as a result of the above-referenced actions,

25  such tolling would have commenced with the filing of the IPP CAC.

26        290.    The IPP CAC asserted claims against Defendants under California and New

27  York law with respect to Defendants' price-fixing of LCD Panels.

28

291.    In addition to a separate national class, the IPP CAC set forth several individual "Indirect Purchaser State Classes," including California and New York state classes.

292.    The definition of the California state class, as with every other state class claim, in the IPP CAC expressly included *all* indirect purchasers, including Plaintiff, without regard to whether they were end-users or resellers:

> **CALIFORNIA:** All persons and entities in California who indirectly purchased LCD Panels manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Indirect Purchaser Class").
> (IPP CAC ¶ 217(c).)

293.    Plaintiffs Joe Solo, Lisa Blackwell, Byron Ho, Frederick Rozo, EMW, Inc., Robert Kerson, and Steven Martel had standing to assert claims under California law.

294.    There has been no determination by court ruling or otherwise that plaintiffs Joe Solo, Lisa Blackwell, Byron Ho, Frederick Rozo, EMW, Inc., Robert Kerson, and Steven Martel lacked standing to assert claims under California law.

295.    The definition of the New York state class expressly included *all* indirect purchasers, including Plaintiff, without regard to whether they were end-users or resellers:

> **NEW YORK:** All persons and entities in New York who indirectly purchased LCD Panels manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New York Indirect Purchaser Class").
> (IPP CAC ¶ 217(r).)

296.    Plaintiffs Erin Drew and Chris Ferencsik had standing to assert claims under New York law.

1      297.    There has been no determination by court ruling or otherwise that plaintiffs Erin

2  Drew and Chris Ferencsik lacked standing to assert claims under New York law.

3      298.    It was not until December 5, 2008, that the Indirect Purchaser Plaintiffs

4  amended the IPP CAC to exclude resellers from their definition of the California and New

5  York Indirect Purchaser Classes for the first time.  (*See* MDL Dkt. No. 746.)  Until that Second

6  Consolidated Amended Complaint was filed, the statute of limitations governing Plaintiff's

7  claims under California and New York laws was tolled under *American Pipe* by the IPP CAC.

8      299.    The statute of limitations governing Plaintiff's claim under California law was

9  also tolled under *American Pipe* by each of the indirect-purchaser class action complaints filed

10 in 2006 and 2007 by residents of states other than California that defined their respective

11 putative classes in such a way as to include Plaintiff, including but not limited to:  *Audio Video*

12 *Artistry v. Samsung Electronics Co. Ltd., et al.*, Case No. 2:06-cv-02848-SHM-dkv, Dkt. No. 1

13 (W.D. Tenn. Dec. 14, 2006); *DiMatteo v. LG. Philips LCD Co. Ltd., et al.*, Case No. 1:06-cv-

14 15342-JGK, Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006); *Ferencsik v. LG. Philips LCD Co. Ltd., et*

15 *al.*, Case No. 1:06-cv-06714-FB-CLP, Dkt. No. 1 (E.D.N.Y. Dec. 20, 2006); *Granich v. LG.*

16 *Philips LCD Co. Ltd., et al.*, Case No. 2:07-cv-00296-RLH-PAL, Dkt. No. 1 (D. Nev. Mar. 9,

17 2007); *Jafarian v. LG Philips LCD Co. Ltd.*, *et al.*, Case No. 3:07-cv-00994-SI, Dkt. No. 1

18 (N.D. Cal. Feb. 16, 2007); and *Minoli et al v. LG Philips LCD Co. Ltd., et al.*, Case No. 6:07-

19 cv-00235-MV-WDS, Dkt. No. 1 (D.N.M. Mar. 9, 2007).

20     300.    It was not apparent from the face of these complaints that the named plaintiffs

21 lacked standing to assert claims under California law.

22     301.    There has been no determination, by court ruling or otherwise, that any of the

23 plaintiffs named in these complaints lacked standing to assert claims under California law.

24     302.    None of these complaints alleged any facts inconsistent with plaintiffs' purchase

25 of LCD Products in California or that the plaintiffs had purchased LCD Products only in the

26 states of which they are residents.

27     303.    It was not apparent from the face of these complaints that the named plaintiffs

28 could not have amended their complaints to cure any defects in standing.

304.    The statute of limitations governing Plaintiff's claim under New York law was also tolled under *American Pipe* by each of the indirect-purchaser class action complaints filed in 2006 and 2007 by residents of states other than New York that defined their respective putative classes in such a way as to include Plaintiff, including but not limited to: *Audio Video Artistry v. Samsung Electronics Co. Ltd., et al.*, Case No. 2:06-cv-02848-SHM-dkv., Dkt. No. 1 (W.D. Tenn. Dec. 14, 2006); *Granich v. LG. Philips LCD Co. Ltd., et al.*, Case No. 2:07-cv-00296-RLH-PAL (D. Nev. Mar. 9, 2007); *Jafarian v. LG Philips LCD Co. Ltd., et al.*, Case No. 3:07-cv-00994-SI (N.D. Cal. Feb. 16, 2007); and *Minoli et al v. LG Philips LCD Co. Ltd., et al.*, Case No. 6:07-cv-00235-MV-WDS, Dkt. No. 1 (D.N.M. Mar. 9, 2007).

305.    It was not apparent from the face of these complaints that the named plaintiffs lacked standing to assert claims under New York law.

306.    There has been no determination, by court ruling or otherwise, that any of the plaintiffs named in these complaints lacked standing to assert claims under New York law.

307.    None of these complaints alleged any facts inconsistent with plaintiffs' purchase of LCD Products in New York or that the plaintiffs had purchased LCD Products only in the states of which they are residents.

308.    It was not apparent from the face of these complaints that the named plaintiffs could not have amended their complaints to cure any defects in standing.

309.    The statute of limitations governing Plaintiff's claims under California and New York laws was also tolled under the cross-jurisdictional tolling doctrine by each of the direct purchaser class action complaints filed in 2006 and 2007 that defined their respective putative classes in such a way as to include Plaintiff, including but not limited to: the November 5, 2007 Direct Purchaser Plaintiffs' Consolidated Complaint (MDL Dkt. No. 366); *Nathan Muchnick, Inc. v. Sharp Corporation et al.*; Case No. 06-6107 (E.D.N.J. Dec. 19, 2006); and *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-15417 (S.D.NY. Dec. 22, 2006).

310.    The statute of limitations governing Plaintiff's claim under the Sherman Act was also tolled under *American Pipe* and the cross-jurisdictional tolling doctrine by the multiple

direct and indirect purchaser class action complaints filed in 2006 and 2007 that defined their

respective putative classes in such a way as to include Plaintiff, including but not limited to:

the November 5, 2007 Direct Purchaser Plaintiffs' Consolidated Complaint (MDL Dkt. No.

366); *Nathan Muchnick, Inc. v. Sharp Corporation et al.*; Case No. 06-6107 (E.D.N.J. Dec. 19,

2006); *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-15417

(S.D.NY. Dec. 22, 2006); *Audio Video Artistry v. Samsung Electronics Co. Ltd., et al.*, Case

No. 2:06-cv-02848-SHM-dkv., Dkt. No. 1 (W.D. Tenn. Dec. 14, 2006); *DiMatteo v. LG.

Philips LCD Co. Ltd., et al.*, Case No. 1:06-cv-15342-JGK, Dkt. No. 1 (S.D.N.Y. Dec. 20,

2006); *Ferencsik v. LG. Philips LCD Co. Ltd., et al.*, Case No. 1:06-cv-06714-FB-CLP, Dkt.

No. 1 (E.D.N.Y. Dec. 20, 2006); *Granich v. LG. Philips LCD Co. Ltd., et al.*, Case No. 2:07-

cv-00296-RLH-PAL (D. Nev. Mar. 9, 2007); *Hee v. LG Philips LCD Co. Ltd., et al.*, Case No.

3:07-cv-00722-SI, Dkt. No. 1 (N.D. Cal. Feb. 2, 2007); *Ho v. LG Philips LCD Co. Ltd., et al.*,

Case No. 3:07-cv-00708-SI, Dkt. No. 1 (N.D. Cal. Feb. 2, 2007); *Jafarian v. LG Philips LCD

Co. Ltd., et al.*, Case No. 3:07-cv-00994-SI (N.D. Cal. Feb. 16, 2007); *Martel v. Sharp Corp. et

al.*, Case No. 3:06-cv-07888-SI, Dkt. No. 1 (N.D. Cal. Dec. 26, 2006); *Minoli et al v. LG

Philips LCD Co. Ltd., et al.*, Case No. 6:07-cv-00235-MV-WDS, Dkt. No. 1 (D.N.M. Mar. 9,

2007); *Ralik v. AU Optronics Corp., et al.*, Case No. 3:07-cv-01272-SI, Dkt. No. 1 (N.D. Cal.

Mar. 5, 2007); *Wojnowski v. AU Optronics Corp., et al.*, Case No. 3:07-cv-01184-SI, Dkt. No.

1 (N.D. Cal. Feb. 27, 2007); and the IPP CAC.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

311.    Plaintiff incorporates by reference all the above allegations as if fully set forth

herein.

312.    Beginning no later than January 1, 1996, the exact date being unknown to

Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

conspirators entered into a continuing contract, combination, or conspiracy to unreasonably

restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

313.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of LCD Products sold in the United States.

314.    As a result of Defendants' unlawful conduct, prices for LCD Products were raised, fixed, maintained, and stabilized in the United States.

315.    The contract, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

316.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    participating in meetings and conversations to discuss the prices and supply of LCD Products;

b.    sharing the pricing and other discussions with other members of the LCD panel industry to further the Conspiracy;

c.    communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD Products;

d.    agreeing to manipulate prices and supply of LCD Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

e.    issuing price announcements and price quotations in accordance with the agreements reached;

f.    selling LCD Products to customers in the United States at noncompetitive prices;

g.    exchanging competitively sensitive information, including customer information, in order to facilitate their Conspiracy;

h.    agreeing to maintain or lower production capacity; and

1      i.      providing false statements to the public to explain increased prices for LCD

2   Products.

3      317.      As a result of Defendants' unlawful conduct, Plaintiff was injured in its business

4   and property in that it paid more for LCD Products than it otherwise would have paid in the

5   absence of Defendants' unlawful conduct.

6                              **Second Claim for Relief**

7                    **(Violation of the California Cartwright Act)**

8      318.      Plaintiff incorporates and realleges, as though fully set forth herein, each and

9   every allegation set forth in the preceding paragraphs of this First Amended Complaint.

10      319.      During the Relevant Period, Plaintiff conducted a substantial volume of business

11   in California.  In particular, Plaintiff purchased LCD Products, which contained LCD panels

12   manufactured by Defendants and their co-conspirators and sold at artificially inflated prices

13   because of the price-fixing Conspiracy, in California.  Plaintiff prepared and sent purchase

14   orders for LCD Products to various manufacturers in California.  Plaintiff also sent payment for

15   LCD Products to these manufacturers in California.  In addition, Plaintiff sold LCD Products in

16   California containing LCD panels manufactured and sold by Defendants and their co-

17   conspirators; maintained offices and inventories in California of LCD Products containing LCD

18   panels manufactured and sold by Defendants and co-conspirators; and maintained agents and

19   representatives in California who sold LCD Products to consumers in California.  As a result of

20   its substantial contacts with California, Plaintiff is entitled to the protection of the laws of

21   California.

22      320.      Defendants and their co-conspirators engaged in and participated in the

23   conspiracy through their offices and operations in California.  Defendants LG Display Co., Ltd.

24   and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson

25   Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation,

26   and HannStar Display Corporation all admitted in their plea agreements that acts in furtherance

27   of their Conspiracy to fix the price of LCD panels were carried out in California.  Defendants

28   Chi Mei, Chunghwa, Epson, LG, Mitsui, NEC, Samsung, and Toshiba all maintained offices in

1   California during the Relevant Period.  Employees at Defendants' locations in California

2   participated in meetings and engaged in bilateral communications in California and intended

3   and did carry out Defendants' anticompetitive agreement to fix the price of LCD Products.

4   Defendants' conduct within California thus injured Plaintiff both in California and throughout

5   the United States.

6          321.    Beginning at a time presently unknown to Plaintiff, but at least as early as

7   January 1, 1996, and continuing thereafter at least up to and including at least December 11,

8   2006, Defendants and their co-conspirators entered into and engaged in a continuing unlawful

9   trust in restraint of the trade and commerce described above in violation of the Cartwright Act,

10  California Business and Professional Code Section 16720.  Defendants have each acted in

11  violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets

12  for LCD panels at supra-competitive levels.  Defendants knew or should have known that their

13  Conspiracy to fix prices for LCD panels would cause prices for LCD Products to rise.

14  Defendants' conduct substantially affected California commerce.

15         322.    The aforesaid violations of Section 16720, California Business and Professional

16  Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

17  Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain

18  and stabilize the prices of, and to allocate markets for, LCD Products.

19         323.    For the purpose of forming and effectuating the unlawful trust, Defendants and

20  their co-conspirators have done those things that they combined and conspired to do, including

21  but in no way limited to the acts, practices, and course of conduct set forth above and the

22  following:

23         a.      to fix, raise, maintain, and stabilize the price of LCD panels and LCD Products;

24         b.      to allocate markets for LCD panels and LCD Products amongst themselves;

25         c.      to submit rigged bids for the award and performance of certain LCD panels and

26  LCD Products contracts; and

27         d.      to allocate among themselves the production of LCD panels and LCD Products.

28

COMPUCOM FIRST AMENDED COMPLAINT            - 72 -            Case No. 3:11-cv-06241-SI
                                                            Master File No. 3:07-md-01827-SI

324.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.     price competition in the sale of LCD panels and LCD Products has been restrained, suppressed, and/or eliminated in the State of California;

b.     prices for LCD panels and LCD Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels in the State of California; and

c.     those who purchased LCD panels and LCD Products from Defendants, their co-conspirators, and others and LCD Products containing price-fixed LCD panels from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

325.     As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the LCD Products it purchased during the Relevant Period.

326.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for LCD Products containing price-fixed LCD panels sold by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### **Third Claim for Relief**

### **(Violation of California Unfair Competition Law)**

327.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this First Amended Complaint.

328.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

329.     Defendants committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of LCD panels and LCD Products as described above.

330.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act, and (2) violation of the Cartwright Act.

331.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

332.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

333.     Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display Co., Ltd. and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation all admitted that acts in furtherance of the Conspiracy to fix the price of LCD panels were carried out in California.

334.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### Fourth Claim for Relief

### (Violation of the New York Donnelly Act)

335.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this First Amended Complaint.

336.     During the Relevant Period, Plaintiff conducted a substantial volume of business in New York.  In particular, Plaintiff purchased LCD Products, which contained LCD panels

1  manufactured by Defendants and their co-conspirators and sold at artificially inflated prices

2  because of the price-fixing Conspiracy, in New York.  Plaintiff prepared and sent purchase

3  orders for LCD Products to various manufacturers in New York.  Plaintiff also sent payment

4  for LCD Products to these manufacturers in New York.  In addition, Plaintiff sold LCD

5  Products in New York containing LCD panels manufactured and sold by Defendants and their

6  co-conspirators; maintained offices, and inventories in New York of LCD Products containing

7  LCD panels manufactured and sold by Defendants and co-conspirators; and maintained agents

8  and representatives in New York who sold LCD Products to consumers in New York.  As a

9  result of its substantial contacts with New York, Plaintiff is entitled to the protection of the

10  laws of New York.

11          337.    Beginning at a time presently unknown to Plaintiff, but at least as early as

12  December 23, 1998, and continuing thereafter at least up to and including December 11, 2006,

13  Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in

14  restraint of the trade and commerce described above in violation of the Donnelly Act, New

15  York General Business Law §§ 340 *et seq.*

16          338.    Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in

17  the sale of LCD panels and LCD Products in New York and fixed, raised, maintained, and

18  stabilized LCD Products prices in New York at artificially high, non-competitive levels.

19          339.    As a result, Defendants' Conspiracy substantially affected New York commerce.

20          340.    As a direct and proximate result of Defendants' conduct, Plaintiff has been

21  injured in its business and property by paying more for LCD panels and LCD Products

22  purchased from Defendants, their co-conspirators and others than it would have paid in the

23  absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages

24  and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

25  **XII.    PRAYER FOR RELIEF**

26          WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging

27  and decreeing that:

28

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Plaintiff shall receive such other or further relief as may be just and proper.

## XIII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this First Amended Complaint so triable.

1    Dated:  May 8, 2012                          Respectfully Submitted,

2                                                   _/s/ William A. Isaacson_____

3                                                  William A. Isaacson (admitted *pro hac vice*)
                                                   Melissa Felder (admitted *pro hac vice*)
4                                                  BOIES, SCHILLER & FLEXNER
                                                   5301 Wisconsin Ave. NW, Suite 800
5                                                  Washington, DC 20015
                                                   Telephone:  (202) 237-2727
6                                                  Facsimile:  (202) 237-6131
                                                   Email:  wisaacson@bsfllp.com
7                                                           mfelder@bsfllp.com

8
                                                   Philip J. Iovieno (admitted *pro hac vice*)
9                                                  Anne M. Nardacci (admitted *pro hac vice*)
                                                   Luke Nikas (admitted *pro hac vice*)
10                                                 Christopher V. Fenlon (admitted *pro hac vice*)
                                                   BOIES, SCHILLER & FLEXNER
11                                                 10 North Pearl Street, 4th Floor
                                                   Albany, NY 12207
12                                                 Telephone:  (518) 434-0600
                                                   Facsimile:  (518) 434-0665
13                                                 Email: piovieno@bsfllp.com
                                                          anardacci@bsfllp.com
14                                                        lnikas@bsllp.com
                                                          cfenlon@bsfllp.com
15

16                                                 Mike McKool, Jr. (admitted *pro hac vice*)
                                                   Lewis T. LeClair (admitted *pro hac vice*)
17                                                 Scott R. Jacobs (admitted *pro hac vice*)
                                                   MCKOOL SMITH, P.C.
18                                                 300 Crescent Court, Suite 1500
                                                   Dallas, TX 75201
19                                                 Telephone: (214) 978-4000
                                                   Facsimile: (214) 978-4044
20                                                 Email: mmckool@mckoolsmith.com
                                                          lleclair@mckoolsmith.com
21                                                        srjacobs@mckoolsmith.com
22

23                                                 *Counsel for CompuCom Systems, Inc.*

24

25

26

27

28

# Appendix A

**Specific Evidence of Mitsui Taiwan, Mitsui Japan, and Mitsui U.S.A.'s Coordinated Participation in the LCD Conspiracy**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]





[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Case No. 3:11-cv-06241-SI
Master File No. 3:07-md-01827-SI