1  Martin Quinn
2  JAMS
   Two EmbarcaderoCenter, Suite 1500
3  San Francisco, CA 94111
   Telephone: (415) 982-5267
4  Fax: (415) 982-5287

5  SPECIAL MASTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATON | MDL NO. 3:07-md-01827-SI<br><br>SPECIAL MASTER'S ORDER RE DEFENDANTS' MOTION TO STRIKE MATERIAL IN MARX AND FRANKEL REBUTTAL EXPERT REPORTS (Hrg. 6/18/12) |
|---|---|
| This Order Relates to Individual Cases:<br><br>*AT&T Mobility LLC, et. al. v. AU Optronics Corp., et. al.,* No. 09-cv-4997<br><br>*Electrograph Systems, Inc., et. al. v. Epson Imaging Devices Corp., et. al.,* No. 10-cv-0117<br><br>*Best Buy Co., Inc., et. al., v. AU Optronics Corp., et. al.,* No. 10-cv-4572<br><br>*Target Corp., et. al., v. AU Optronics Corp., et. al.,* No. 10-cv-4945 | |

1

On June 18, 2012, I heard Defendants' motion to strike portions of the expert rebuttal reports submitted by Drs. Marx and Frankel on behalf of plaintiffs in the above cases. Having considered all arguments and evidence submitted, I now make the following Order.

### Factual Background

To calculate indirect purchaser damages, as well as to establish antitrust standing, plaintiffs acknowledge that they must demonstrate the volume of products they bought that contained panels made by defendants. To satisfy this burden plaintiffs presented two expert reports, among others. Dr. Leslie Marx submitted opening reports in the *Target, Electrograph* and *AT&T* cases. (Berger decl., Exh. B, C & D) Dr. Alan Frankel submitted an opening report in the *Best Buy* case. (Berger decl., Exh. E) In their opening reports[1] both experts used a Market Share approach to estimate indirect purchaser damages: they basically applied each defendant's market share of the panel market to determine how many products that each plaintiff purchased contained panels made by that defendant. (Exh.B, ¶¶ 71-73; Exh. E, ¶¶ 63-68) In addition, Dr. Frankel referred to real-world sourcing data concerning Best Buy's purchases from Apple, HP and Kodak that enabled him to link the products that Best Buy bought from these companies with the manufacturers of the panels contained in those products. (Exh.E, ¶ 66).

Defendants' damage expert, Dr. Edward Snyder, criticized the Marx and Frankel market share calculations for having double-counted some direct and indirect purchases. (Exh. F., ¶ 129)

In her rebuttal reports Dr. Marx responded to Snyder's criticism by validating her market share calculations against the real world sourcing data that is available.[2] She used the same data to criticize an assumption made by Dr. Snyder.(Exh. G, ¶¶ 59-63). Dr. Frankel also used this product-panel data in his rebuttal report as a sensitivity test to validate his market share calculations. (Exh. J, ¶105) In addition, pursuant to instructions from counsel, both experts modified the list of alleged co-conspirators on which damages are based by adding some affiliates of existing co-conspirators and removing other companies. (Exh.B, ¶4; Exh.C, ¶3; Exh.D, ¶4; Exh.E, ¶102).

Defendants contend that the experts' use of this real world data, which they term the Product-Panel Linkage approach, is improper rebuttal. First, they contend that the experts' use

---

[1] For convenience I cite only to Dr. Marx's *Target* reports, but her reports for *Electrograph* and *AT&T* are the same.
[2] Evidently data concerning the sources of panels inserted into finished products is available for only about 23% of plaintiff's product purchases during the period in question.

2

of the real world "product-panel linkage" data that is available for about 23% of the products amounts to a wholly new methodology that is not "intended solely to contradict or rebut evidence on the same subject matter identified by another [expert]." Fed. R. Civ. P. 26(a)(2)(D)(ii). Second, they contend that the addition of new alleged co-conspirators into the calculation changed the damage figures, and again was not responsive to Dr. Snyder's report.

Plaintiffs argue that the actual real-world sourcing data that is available was used precisely to validate the experts' calculations in their opening reports based on a market share analysis, and to rebut Dr. Snyder's criticism of their results as double counting.

### Analysis

For the following reasons I conclude that the analysis in the rebuttal reports is consistent with the Federal Rules.

Were the experts abandoning their market share methodology and moving to a previously-unmentioned new analysis based on actual product-panel linkage data, defendants would have a valid point. But that is not what they are doing. Both Drs. Marx and Frankel state that they intend to continue to base their opinions on the market share calculations they advanced in their opening reports. They each made use of the product-panel linkage data that is available for products from a few manufacturers simply to confirm the accuracy of their market share approach in response to Dr. Snyder's criticism that they had double-counted direct purchases. Case law confirms that it permissible in rebuttal to advance new evidence and data, and new analytic methods, if the purpose is to rebut criticism on the same subject as the report it contradicts. *Deseret Mgmt. Corp v. United States*, 97 Fed. Cl. 272, 274 (Fed. Cl. 2011) ["…an expert may introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert."]; *TC Systems Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002) ["the same subject matter" clause in Rule 26 is not equivalent to the same methodology]; *Kiraloa v. City & County of San Francisco*, Case No. C-07-3685, 2010 WL 373817, at *2 (N.D. Cal. Jan. 29, 2010) ["rebuttal disclosure is not automatically excluded solely because it includes evidence that was absent in the original expert disclosure"]. Here, Dr. Snyder criticized plaintiffs' experts for an erroneous calculation using the market share method; plaintiffs' experts rebutted this by performing a calculation using the product-panel linkage data to show that their original calculation was correct. Thus, the rebuttal analysis addressed the same subject matter as Dr. Snyder.

3

Moreover, as noted above Dr. Frankel actually mentioned and used the product-panel linkage data in his opening report to calculate Best Buy's damages on its purchases from Apple, HP and Kodak. (Exh. E, ¶ 66) Therefore, the fact that his rebuttal report contained the identical kind of data available for products from several more manufacturers should have neither surprised nor prejudiced defendants.

Nor does the addition of several affiliates of the existing alleged co-conspirators, and the deletion of some other companies from the co-conspirator list constitute improper rebuttal. Assuming the intention was to provide defendants with an updated, more accurate portrayal of their damage contentions, plaintiffs acted appropriately and well within the constraints of Rule 26.

Given my conclusion that it is not proper to strike any material from the rebuttal reports, the next question is whether defendants should be given an opportunity to submit sur-rebuttal reports. There seems no reason not to permit this. Plaintiffs do not seriously object to allowing defendants to file sur-rebuttal reports, and while defendants contend such reports will be inadequate to undo any prejudice I cannot see why that should be so.

## Order

Good cause appearing, it is ORDERED that defendants' motion to strike is DENIED, but defendants may present sur-rebuttal reports limited strictly to the use of product-panel linkage data by Drs. Marx and Frankel in their rebuttal reports, and the recalculation of damages based on the alteration of the mix of alleged co-conspirators. Such reports are to be filed within 30 days of the issuance of this Order.

Dated: June 20, 2012

/s/
Martin Quinn, Special Master

4