David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Noah G. Purcell (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
Steven D. Merriman (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:      206.359.8000
Facsimile:      206.359.9000

Joren Bass, Bar No. 208143
JBass@perkinscoie.com
**PERKINS COIE** LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:      415.344.7120
Facsimile:      415.344.7320

*Attorneys for Plaintiff*
*Costco Wholesale Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. M:07-1827 SI MDL No. 1827 |
| This Document Relates to Individual Case No. 3:11-00058-SI | Individual Case No.: 3:11-cv-00058-SI |
| COSTCO WHOLESALE CORPORATION, Plaintiff, v. AU OPTRONICS CORP., et al., Defendants. | **COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO INDIRECT PURCHASES** |

TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................... 3

III.  SUMMARY JUDGMENT STANDARD ............................................................ 3

IV.  ARGUMENT ...................................................................................................... 4

    A.  Federal Law Allows Suit Where There Is Corporate Affiliation—Ownership or Control—Between the Direct Purchaser and a Conspirator. ............................. 4

        1.  The "Ownership or Control" Test Originated in *Illinois Brick* and Is Well Established. ............................................... 5

        2.  Courts Consider Many Factors in Analyzing Ownership and Control. ...... 7

    B.  The Evidence of Corporate Entanglement Creates a Question of Material Fact as to Control and Whether the Vendors Will Pursue Antitrust Claims........ 11

        1.  Panasonic and JVC.................................................................................. 12

        2.  Acer, Gateway, and eMachines............................................................... 16

        3.  Proview ................................................................................................... 18

        4.  Sylvania .................................................................................................. 19

        5.  Envision ................................................................................................. 19

        6.  Vizio....................................................................................................... 21

        7.  Summary ................................................................................................. 22

    C.  The Remote Possibility that Some of the *Royal Printing* Vendors Might Be Default Members of the Class Does Not Defeat Costco's Claim. ........................ 22

V.  CONCLUSION.................................................................................................. 24

1

**TABLE OF AUTHORITIES**

PAGE

2

3 **CASES**

4 *Ambato Media, LLC v. Clarion Co., LTD,*
  Case No. 2:09-cv-242-JRG (E.D. Tex.) ........................................................................ 13

5

6 *Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................................................................... 4

7

8 *Arizona v. Maricopa Cnty. Med. Soc'y,*
  457 U.S. 332 (1982) ..................................................................................................... 10

9

10 *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
   620 F.2d 1360 (9th Cir. 1980) ...................................................................................... 4

11

12 *Copperweld Corp. v. Independence Tube Corp.,*
   467 U.S. 752 (1984) ..................................................................................................... 10

13

14 *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson,*
   523 F.3d 1116 (9th Cir. 2008) ...................................................................................... 7

15

16 *Fraser v. Goodale,*
   342 F.3d 1032 (9th Cir. 2003) ...................................................................................... 12

17

18 *Freeman v. San Diego Ass'n of Realtors,*
   322 F.3d 1133 (9th Cir. 2003) ................................................................................ passim

19

20 *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
   392 U.S. 481 (1968) ..................................................................................................... 11

21

22 *Ill. Brick Co. v. Illinois,*
   431 U.S. 720 (1977) ............................................................................................... passim

23

24 *In re ATM Fee Antitrust Litig.,*
   No. 10–17354, --- F.3d ---, 2012 WL 2855813 (9th Cir. July 12, 2012) .................. passim

25

26 *In re Brand Name Prescription Drugs Antitrust Litig.,*
   123 F.3d 599 (7th Cir. 1997) ......................................................................... 2, 7, 8, 22

27

28

ii

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 3:07-cv-05944-SC, Dkt. No. 1 (N.D. Cal. Nov. 26, 2007) ...................................... 15

*In re Ditropan XL Antitrust Litig.*,
2007 WL 2978329 (N.D. Cal. Oct. 11, 2007) .................................................... 7

*In re Midwest Milk Monopolization Litig.*,
730 F.2d 528 (8th Cir. 1984) ........................................................................ 7

*In re Optical Disk Drive Antitrust Litig.*,
No. 3:10-md-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ............................ 7

*In re Sugar Indus. Antitrust Litig.*,
579 F.2d 13 (3d Cir. 1978) .......................................................................... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ............................................................... 15, 16

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
407 F.3d 1027 (9th Cir. 2005) ..................................................................... 10

*Jewish Hosp. Ass'n of Louisville, Kyt., Inc. v. Stewart Mech. Enters. Inc.*,
628 F.2d 971 (6th Cir. 1980) ......................................................................... 7

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990) ................................................................................. 10

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ................................................................. 2, 6, 8

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ......................................................................... 7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................. 4

*Perkins v. Standard Oil Co.*,
395 U.S. 642, 648 (1969)) ............................................................................ 5

*Royal Printing Co. v. Kimberly-Clark Corp.*,
621 F.2d 323 (9th Cir. 1980) ................................................................. passim

iii

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
 608 F. Supp. 2d 1166 (N.D. Cal. 2009) ................................................................. passim

*Thomsen v. W. Elec. Co.*,
 680 F.2d 614 (9th Cir. 1982)........................................................................................ 10

*United States v. AU Optronics Corp., et al.*,
 No. CR-09-0110 SI, Dkt. No. 851 (N.D. Cal. Mar. 10, 2012)........................................ 17

*United States v. Valdez-Soto*,
 31 F.3d 1467 (9th Cir. 1994)........................................................................................ 12

*Vizio, Inc. v. Int'l Trade Comm'n*,
 605 F.3d 1330 (Fed. Cir. 2010)..................................................................................... 21

ACTS

 Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ................................................ 23

STATUTES

 Rev. Code Wash. § 19.86.080(3) ...................................................................................... 5

RULES

 Federal Rule of Civil Procedure 30(b)(6) ......................................................................... 14

 Federal Rule of Evidence 801(d)(2).................................................................................. 12

 Federal Rule of Evidence 803(17) .................................................................................... 12

 Federal Rule of Evidence 807 .......................................................................................... 12

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

1

**RELEVANT ORDERS**

2          Pursuant to this Court's Order of April 9, 2012 (MDL Dkt. 5430), Costco identifies three

3   orders entered in this MDL proceeding that address "substantially similar arguments as those

4   raised in [this] brief":  (1) the March 3, 2009, order denying Tatung Company of America's

5   motion to dismiss the Direct Purchaser Plaintiffs' first amended consolidated complaint (MDL

6   Dkt. 873); (2) the March 28, 2010, order denying Tatung Company of America's motion for leave

7   to file a motion for reconsideration of the March 3, 2009, order denying motion to dismiss (MDL

8   Dkt. 1643); and (3) the November 7, 2011, order denying the Toshiba entities' motion for partial

9   summary judgment under *Illinois Brick* (MDL Dkt. 4108).

10                        **I.    INTRODUCTION**

11          Defendants argue that *Illinois Brick* bars Costco's claim for overcharges on purchases it

12   made from nine vendors because Costco has not "show[n] that any of [those vendors] . . . are a

13   subsidiary or division of an alleged conspirator."  Motion for Summary Judgment ("Mot."), MDL

14   Dkt. 5979 at 2.[1]  But the "ownership *or* control" exception to *Illinois Brick*, which Defendants

15   sometimes acknowledge, Mot. at 4, 8, 9, & 11, and which the Ninth Circuit just reaffirmed,

16   permits Costco to recover for its purchases from every vendor that is owned or controlled by, or

17   owns or controls, one or more conspirators.  *In re ATM Fee Antitrust Litig.*, No. 10–17354, ---

18   F.3d ---, 2012 WL 2855813, at *6 (9th Cir. July 12, 2012) (citing *Royal Printing Co. v. Kimberly-*

19   *Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980)).  Defendants are wrong in assuming that Costco

20   relies on mere "business or contractual relationships," Mot. at 11, and the Court should deny

21   Defendants' motion because the vendors in question control or are controlled by conspirators.

22          It is not Costco but Defendants that "overreach" by advocating an unsupported

23   interpretation of the *Illinois Brick* rule, one rejected last week by the Ninth Circuit.  While

24   Defendants at times claim that *Royal Printing* allows indirect purchaser recovery only when the

25   direct purchaser is a "subsidiary or division," Mot. at 1 & 2, no court in this Circuit has ever

26

27          [1]  Defendants do not challenge Costco's right to recover with respect to purchases from
     affiliates of Mitsubishi, Phillips, Samsung, Sharp, and Toshiba.

28

1

1    interpreted the "ownership or control" test so narrowly.  The test has its roots in *Illinois Brick*

2    itself, which did not preclude claims by indirect purchasers "where the direct purchaser is owned

3    *or controlled* by its customer." *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 n.16 (1977) (emphasis

4    added).  This was recognized by a key case that Defendants rely upon, Mot. at 12:  *In re Brand*

5    *Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997), where Judge Posner

6    explained that the exception is "stated in *Illinois Brick* itself—'where the direct purchaser is

7    owned or controlled by its customer.'"

8           Case law makes clear that a plaintiff may establish "ownership or control" in several

9    ways.  One option is showing that the direct purchaser is a division or subsidiary of a conspirator,

10   as in *Royal Printing*.  But a plaintiff may also show sufficient ability to control where there is

11   minority or indirect ownership in circumstances such that "there is no realistic possibility that the

12   direct purchaser will sue its supplier over the antitrust violation." *Freeman v. San Diego Ass'n of*

13   *Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003) (citing *Royal Printing*, 621 F.2d at 326); *see*

14   *also ATM*, 2012 WL 2855813, at *13 ("[W]hether a realistic possibility of suit exists[] depends

15   on the existence of ownership or control between the direct purchaser and the seller."); *Kendall v.*

16   *Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (same).  The test looks to whether the

17   conspirator and direct purchaser have "a unity of interest," not "who owns whom in the

18   distribution chain." *Freeman*, 322 F.3d at 1146 n.12.  In conducting the ownership or control

19   analysis, courts look at factors beyond majority ownership, including "interlocking directorates,

20   minority stock ownership, loan agreements that subject the [direct purchasers] to the

21   [conspirators'] operating control, trust agreements, or other modes of control separate from

22   ownership of a majority of the [direct purchasers'] common stock." *Brand Name Drugs Litig.*,

23   123 F.3d at 605-06; *see also Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d

24   1166, 1182 (N.D. Cal. 2009) (applying the Posner factors); *ATM*, 2012 WL 2855813, at *14

25   (considering whether contractual agreements and an advisory board amounted to control).

26   Because "ownership or control" is not merely a "subsidiary or division" rule, courts must evaluate

27   these factors to decide whether the test is satisfied.  And as detailed below, the standard is plainly

28

2

1   satisfied as to Costco's vendors because their common ownership and control by the conspirators

2   eliminates the possibility they will sue.

3        Defendants are also wrong to argue that *Royal Printing* cannot apply because a few

4   vendors *might* be members of the Direct Purchaser Plaintiff Class.  Defendants admit that several

5   of the vendors are not members of the class, and after omitting the key limitation from the class

6   definition in text, Mot. at 13, they make a backhanded acknowledgement that that provision

7   excludes the remainder.  *Id*. at 13 n.10.  Moreover, even if any of these vendors might be default

8   members of the class, Defendants present no evidence that they have filed legitimate claims to

9   participate in the class settlement fund, even though the claims process is now closed.

10  Defendants cannot be allowed to rebut Costco's substantial evidence of ownership or control with

11  unsupported allegations.  The Court should deny summary judgment.

12  ## II.    STATEMENT OF FACTS

13       Costco purchased finished products containing LCD panels from many vendors.  Some of

14  the vendors were conspirators or divisions, subsidiaries, or owners of conspirators—Mitsubishi,

15  Philips, Sharp, Toshiba, and Samsung.  The remaining nine vendors at issue—Panasonic and its

16  then-subsidiary JVC; Acer and its subsidiaries eMachines and Gateway; Proview; Sylvania;

17  Envision Peripherals; and Vizio (the "*Royal Printing* vendors"[2])—do not just have arms' length

18  business relationships with the conspirators but in fact are dependent on them in terms of

19  ownership and control.  The business relationships, however, are relevant because they show the

20  extent of and motive for that interlocking control and the shared benefits from the overcharges.

21  ## III.    SUMMARY JUDGMENT STANDARD

22       Whether Costco can recover for the purchases at issue here is a question of standing that

23  may not be determined on summary judgment "if there is a genuine issue of material fact."  *ATM*,

24  2012 WL 2855813, at *4.  "Because the court (and not a jury) decides standing, the district court

25  must decide issues of fact necessary to make the standing determination."  *Id*.  In making this

26

27      [2] Costco does not seek to recover for its purchases from Princeton GS, mentioned in the

28  Motion.

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

1  inquiry before the trial that is going to occur regardless of this motion, the court must view the

2  evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v.*

3  *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be

4  believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby,*

5  *Inc.*, 477 U.S. 242, 255 (1986).  "In antitrust cases, these general standards are applied even more

6  stringently and summary judgments granted more sparingly."  *Beltz Travel Serv., Inc. v. Int'l Air*

7  *Transp. Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980).

8  ## IV.   ARGUMENT

9  ### A.   Federal Law Allows Suit Where There Is Corporate Affiliation—Ownership
   or Control—Between the Direct Purchaser and a Conspirator.

10

11  Defendants fundamentally mischaracterize a well-established exception to *Illinois Brick*.

12  Guided by the Supreme Court's reasoning, the Ninth Circuit and other courts have held that

13  indirect purchasers may pursue federal antitrust claims where a conspirator's affiliation with the

14  direct purchaser, through either ownership or control, means there is "no realistic possibility" that

15  the purchaser will sue its supplier.  *See, e.g.*, *Freeman*, 322 F.3d at 1145-46 (citing *Royal*

16  *Printing*, 621 F.2d at 326); *ATM*, 2012 WL 2855813, at *13 (no realistic possibility of suit exists

17  where there is "ownership or control between the direct purchaser and [conspirator]").  This

18  exception includes but is not limited to purchases made from a "division or subsidiary of a co-

19  conspirator."  *ATM*, 2012 WL 2855813, at *12-14.  *Illinois Brick* referred separately to "*or*

20  *control*[]."  431 U.S. at 736 n.16 (emphasis added).  And the class definition includes purchases

21  from not just subsidiaries but from "any affiliate" of a conspirator.  *See* Mot. at 13.  Thus, in

22  evaluating the "ownership or control" test, courts carefully analyze the facts as to the relationship

23  between the direct purchaser and conspirators to determine whether ownership or control exists

24  such that there is "no realistic possibility" the direct purchaser will enforce federal law.[3]

25  _____

26       [3] Costco acknowledges that the Court has dismissed its state-law claims other than under
    Washington law, and that Costco may recover under Washington law solely through the
    Washington Attorney General's case filed in state court.  Defendants are flatly incorrect,
27  however, in contending that Washington has made a "policy decision" against indirect purchaser
    recovery or failed to amend its laws to go beyond *Illinois Brick* (and the Washington case cited by

28

4

1          **1.      The "Ownership or Control" Test Originated in *Illinois Brick* and Is**
           **Well Established.**

2

3          In *Illinois Brick*, the Supreme Court held that plaintiffs a link away from the conspirators

4   in the chain of commerce, and thus "indirect" purchasers, could not bring a federal antitrust action

5   merely by showing that the "direct" purchaser had passed part of the illegal overcharge on to

6   them.  431 U.S. at 736.  The Court's decision was motivated by two concerns: (1) the difficulty of

7   apportioning damages in cases where both purchasers pursue claims against the conspirator for

8   the same price-fixed items, *id*. at 737-38, and (2) the duplicative recovery if both purchasers were

9   to prevail on their claims without such apportionment, *id*. at 730.  The Court noted, however, that

10  the rationale for limiting the cause of action to direct purchasers does not exist where "market

11  forces have been superseded."  *Id*. at 736 & n.16.  One such circumstance is "where the direct

12  purchaser is owned or controlled by its customer."  *Id.*  As an example of this exception, the

13  Court cited not a division or wholly owned subsidiary situation.  Instead, it cited *Perkins v.

14  Standard Oil Co.*, where the Court had held that the defendant could not avoid liability under the

15  Robinson-Patman Act for price discrimination by channeling its illegal activities through its 60

16  percent-owned subsidiary.  *Id.* (citing 395 U.S. 642, 648 (1969)).

17         In *Royal Printing*, the Ninth Circuit first applied the "ownership or control" rule.  There,

18  the plaintiffs sought to pursue claims against paper manufacturers that sold their products through

19  divisions or subsidiaries, rendering the plaintiffs indirect purchasers.  621 F.2d at 324.  The Ninth

20  Circuit allowed their claims, explaining that *Illinois Brick*'s normal bar on indirect purchaser

21  recovery did not govern "the situation where the direct purchaser is controlled by a co-

22  conspirator," *id.* at 327 n.8, and holding that "*Illinois Brick* does not bar an indirect purchaser's

23  suit where the direct purchaser is a division or subsidiary of a co-conspirator," *id.* at 326.  The

24  Court recognized that denying the indirect purchasers standing would "effectively immunize the

25

26  _____

27  Defendants).  *See* Motion at 2-4 & 6.  Washington amended its laws to clarify that, once the
    Attorney General brings an action, 'indirect' purchasers such as Costco may share in indirect
    recoveries.  Rev. Code Wash. § 19.86.080(3).

28

5

1   transactions here from private antitrust liability, thus thwarting a vital part of the antitrust

2   enforcement scheme and the expressed purpose of *Illinois Brick*." *Id.*

3       In *Freeman,* the Court applied the *Royal Printing* test in a situation where the direct

4   purchaser was neither a division nor a subsidiary of a conspirator.  There, eleven associations of

5   real estate agents created a joint venture—Sandicor—that managed the Multiple Listing Service

6   ("MLS") for realtors in San Diego County.  322 F.3d at 1140-41.  Several realtors sued the

7   associations, arguing that they had conspired to fix the prices for use of the MLS.  *Id.* at 1142.

8   Because the associations, as a group, exercised control over the joint venture, the Ninth Circuit

9   allowed the indirect purchaser realtors to bring their claims, holding that "indirect purchasers can

10  sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier

11  over the antitrust violation."  *Id.* at 1145-46.  Since *Freeman*, the Ninth Circuit has consistently

12  looked to the "realistic possibility of suit" standard when applying the ownership or control test.

13  *See Kendall*, 518 F.3d at 1050 ("[I]ndirect purchasers can sue for damages if there is no 'realistic

14  possibility that the direct purchaser will sue' over the antitrust violation.") (quoting *Freeman*, 322

15  F.3d at 1145-46); *ATM*, 2012 WL 2855813, at *13 ("[W]hether a realistic possibility of suit

16  exists[] depends on the existence of ownership or control between the direct purchaser and the

17  seller.").

18      Defendants assert at times that the "ownership or control" standard is limited to parent-

19  subsidiary relationships, Mot. at 9, but that is not how courts have applied the test.  This Court

20  rejected Toshiba's argument that *Royal Printing* did not apply because of the "indirect corporate

21  relationship" between the manufacturer of Toshiba panels and the vendor of Toshiba products in

22  the United States.  MDL Dkt. 4108 at 2 (Order Denying Toshiba Entities' Mot. for Summ. Jud.).

23  Citing *Freeman*, the Court explained that underlying *Royal Printing* was a concern that entities

24  affiliated with a conspirator would not file suit and thus conspirators could evade liability by

25  nominally selling goods through another entity rather than to their customers directly.  *Id.* at 3.

26  Thus, despite the indirect corporate relationship between the entities at issue, the Court held that

27  *Royal Printing* applied and denied Toshiba's motion.  *Id.*  Other courts have similarly rejected

28  Defendants' view.  *See, e.g.*, *ATM*, 2012 WL 2855813, at *14 (analyzing whether direct purchaser

6

1   controlled upstream seller notwithstanding mere 10 percent ownership interest); *Freeman*, 322

2   F.3d at 1145-46 (applying test outside the division/subsidiary context); *In re Optical Disk Drive*

3   *Antitrust Litig.*, No. 3:10-md-2143 RS, 2012 WL 1366718, at *6 (N.D. Cal. Apr. 19, 2012)

4   (holding that *Royal Printing* is satisfied where the direct purchaser and conspirator are affiliates

5   because "[w]here a price-fixing manufacturer sells through a subsidiary, *affiliate*, and/or co-

6   conspirator . . . there [is] little risk of multiple liability (since the 'middleman' in such instances is

7   unlikely to sue)") (emphasis added).

8        Defendants also miss the mark in the cases they cite, for none involved the type of control

9   that would make suit unlikely, as here.[4]  In particular, Defendants' reliance on *Delaware Valley*

10  *Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008), is misplaced.  In

11  *Delaware Valley*, there were no allegations of "ownership or control" precisely because the direct

12  purchaser was an independent, unaffiliated company.  *Id.* at 1122-23.  The *Delaware Valley* Court

13  simply refused to create a new exception to *Illinois Brick* based on the indirect purchaser's

14  contract with the conspirator.  *Id.*  Contrary to the fundamental premise of Defendants' Motion,

15  Costco is *not* relying on mere "contractual relationships" and *does* contend that these vendors are

16  "anything but independent companies."  *See* Mot. at 11.  And Costco hardly needed formal

17  discovery to marshal proof of lack of independence.

18        **2.    Courts Consider Many Factors in Analyzing Ownership and Control.**

19        As Defendants ultimately admit, Mot. at 9 ("a degree of ownership/control" can be

20  sufficient), analyzing whether a conspirator controls or is controlled by the direct purchaser does

21

22        [4] *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 321 (4th Cir. 2006) (affirmed dismissal of
    complaint because plaintiffs made no allegations that defendant "has either 'functional unity'
23  with the intermediary sellers or sufficient ownership interest in or control over the intermediary
    sellers"); *Brand Name Drugs Litig.*, 123 F.3d at 605-06 (test was not met because none of Judge
24  Posner's "control" factors were present); *In re Midwest Milk Monopolization Litig.*, 730 F.2d 528
    (8th Cir. 1984) (no allegations of either ownership or control); *Jewish Hosp. Ass'n of Louisville,*
25  *Kyt., Inc. v. Stewart Mech. Enters. Inc.*, 628 F.2d 971, 975 (6th Cir. 1980) (subcontractor's
    independence from general contractor meant no exception to *Illinois Brick*); *Sun Microsystems*,
26  608 F. Supp. 2d at 1177-79 (no allegation that external manufacturers were intertwined with
    conspirators); *In re Ditropan XL Antitrust Litig.*, 2007 WL 2978329, at *3 (N.D. Cal. Oct. 11,
27  2007) ("ASC has not alleged any facts, or even argued, that its claim falls within either of these
    two exceptions.").

28

7

1    not end with the obvious—whether the direct purchaser is a division or subsidiary of a

2    conspirator.  Such evidence is certainly sufficient, as in *Royal Printing*, but it is far from

3    necessary, as the Court indicated by discussing whether the intervening purchaser was "affiliated

4    with," not simply wholly owned by a conspirator.  *See* Mot. at 8.  As in any situation where

5    potential to control is at issue, courts examine practical realities as well as relative levels of

6    ownership.  Defendants' Motion does not even suggest why dominant but minority membership

7    is insufficient, much less address other evidence showing that it has resulted in common interests

8    and control in many situations.

9         In *Freeman*, the Ninth Circuit found sufficient ownership and control despite the absence

10   of a parent-subsidiary relationship, emphasizing that the "ownership or control" test looks to

11   whether the conspirator and direct purchaser have "a unity of interest," not "who owns whom in

12   the distribution chain."  322 F.3d at 1146 n.12.  Ultimately, the Court explained, the ownership or

13   control test applies where "there is no realistic possibility that the direct purchaser will sue its

14   supplier over the antitrust violation."  *Id.* at 1145-46 (citing *Royal Printing*, 621 F.2d at 326).

15   The Ninth Circuit reiterated and applied the same test in *Kendall*, 518 F.3d at 1050.

16        While *Freeman* did not provide a comprehensive list of factors to consider in evaluating

17   control, the Court looked in great detail at the means by which the conspirators as a group could

18   control the direct purchaser.  *See Freeman*, 322 F.3d at 1145-47.  Consistent with *Freeman,* Judge

19   Posner recognized that control may be wielded in many ways and created an oft-cited list of

20   factors to consider when analyzing whether control exists, including "interlocking directorates,

21   minority stock ownership, loan agreements that subject the [direct purchasers] to the

22   [conspirators'] operating control, trust agreements, or other modes of control separate from

23   ownership of a majority of the [direct purchasers'] common stock."  *Brand Name Drugs Litig.*,

24   123 F.3d at 605-06.  And in the Northern District of California, Judge Hamilton explicitly

25   adopted Judge Posner's factors in *Sun Microsystems*, 608 F. Supp. 2d at 1182.

26        Likewise, this Court has held that "intertwined economic interests" between direct

27   purchasers and conspirators are reason to deny Defendants' attempts to hide behind the *Illinois*

28   *Brick* wall.  MDL Dkt. 873 at 2 (Order Denying Tatung Company of America's Mot. To

8

1   Dismiss); *see also* MDL Dkt. 1643 at 2 (Order Denying Tatung Company of America's Mot. for

2   Leave to File Mot. for Reconsideration) (ties between companies relevant to determining whether

3   direct purchaser "is unlikely to sue" for antitrust claims).  In those decisions, the Court

4   acknowledged that the "ownership or control" test can be satisfied without direct majority

5   ownership.

6        The Ninth Circuit's recent decision in *ATM* similarly considered other factors for

7   establishing ownership or control.  *ATM* involved a class of credit-card holders (indirect

8   purchasers) seeking to recover for allegedly price-fixed fees set by an ATM network.  *Id.* at *1.

9   The indirect purchasers (the cardholders) argued, among other things, that the direct purchasers

10  (the bank defendants) owned or controlled the ATM network.  *Id.* at *14.  The Court defined

11  control to mean the ability to "exercise restraint or direction over or to have the power or

12  authority to guide or manage."  *Id.* at *14 (internal quotation marks and citation omitted).  Thus,

13  the bank defendants had to have either the ability to control the ATM network's (or its parent's)

14  board or have responsibility for setting the network's fees.  *Id.*  The Court found that there was no

15  control; the bank defendants did not own any stock of the ATM network and owned less than ten

16  percent of the ATM network's parent company.  *Id.*

17       Significantly, the Court in *ATM* did not narrow the factors relevant to demonstrating

18  control.  *Id.* at *12-14.  Indeed, the Court expressly considered whether a negotiated agreement

19  between the bank defendants and the ATM network or the bank defendants' participation in the

20  ATM network's advisory board could create ability to control.  *Id.* at *14.  While the Court

21  ultimately decided that they did not, its reasoning was fact-specific.  *Id.*  Nowhere did the Court

22  categorically preclude negotiated agreements or advisory boards from being relevant to control.

23  *Id.*  Properly read, *ATM* recognizes that ability to control can exist through modes other than the

24  ability to appoint a majority of the board of directors.[5]

25  _____

26       [5] *ATM* interprets *Freeman* as simply using a different formulation to describe the existing
    "ownership or control" test, rather than as creating a new test separate from ownership and
27  control focused on whether "'there is no realistic possibility that the direct purchaser will sue its
    supplier.'"  2012 WL 2855813, at *13 (quoting *Freeman*, 322 F.3d at 1145-46).  If the *ATM* panel
28  or the en banc Ninth Circuit reconsiders that ruling, Costco submits that the evidence detailed

9

1    The factual inquiry required by these cases is consistent with well-established rules for

2  evaluating the other side of the coin, whether two related companies are sufficiently independent

3  that they can conspire.  In such cases, the Supreme Court has rejected an approach that "looks to

4  the form of an enterprise's structure and ignores the reality" because "[r]ealities must dominate"

5  in applying the Sherman Act.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752,

6  772-74 (1984).  As a result, the Ninth Circuit has found that legally separate entities are

7  functionally united in cases where the entities are merely affiliates of one another, *Jack Russell*

8  *Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005); where

9  the entities are owned by a common third party, *Thomsen v. W. Elec. Co.*, 680 F.2d 614, 616-18

10  (9th Cir. 1982); and where entities "who would otherwise be competitors pool their capital" in

11  "joint ventures" or "other joint arrangements."  *Freeman*, 322 F.3d at 1148 (quoting *Arizona v.*

12  *Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 356 (1982)).  Such an assessment of realities is

13  necessary here.

14    Contrary to Defendants' suggestion, this assessment does not conflict with the Supreme

15  Court's decisions in *Illinois Brick* and *UtiliCorp*.  First, an evaluation of ownership or control

16  does not involve the sort of complicated apportionment issues that those decisions sought to

17  avoid.  431 U.S. at 724-25, 737; *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208 (1990).  The

18  risk of such complications disappears (as does the risk of "multiple liability for defendants") in

19  cases where—as here—only the indirect purchaser brings claims because the direct purchaser will

20  not sue the conspirator.  Indeed, over five years after this litigation started, there is significant

21  certainty that the *Royal Printing* vendors are not pursuing real claims against Defendants.

22    Second, denying an indirect-purchaser action in cases where the direct purchaser will not

23  sue would contravene *Illinois Brick*'s command that the antitrust laws be enforced vigorously.

24  The Court has held repeatedly that the antitrust laws must be construed so that violators do not

25  "retain the fruits of their illegality because no one was available who would bring suit against

26

27  _____

below is more than sufficient to show, irrespective of ownership or control, that there is no
realistic possibility that the *Royal Printing* vendors will sue the conspirators.

28

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

them." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *see Illinois Brick*, 431 U.S. at 725.  If the direct purchaser will not pursue its claims because it is controlled by conspirators, the indirect purchaser must be permitted to sue; ruling otherwise would "leave a gaping hole in the administration of the antitrust laws." *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978); *see also Freeman*, 322 F.3d at 1146 ("Were we to grant immunity from section 1 merely because defendants nominally sell services through another entity rather than to consumers directly, we would risk opening a major loophole . . . .").

In short, Costco seeks application of established law, not some novel theory.  And despite Defendants' assertions to the contrary, Costco does not contend that a mere business relationship satisfies that test.  Instead, Costco submits that the Court must consider the facts, including the Posner factors, to determine whether there is ownership or control between the direct purchasers and conspirators.  The contractual relationships, however, help show the power of and motives for the control affiliations.

**B.     The Evidence of Corporate Entanglement Creates a Question of Material Fact as to Control and Whether the Vendors Will Pursue Antitrust Claims.**

Whether a direct purchaser is owned or controlled by a conspirator and shares a "unity of interest" such that "there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation," *Freeman*, 322 F.3d at 1145-46 & n.12, is a factual question.  Here the facts show that "there is no realistic possibility" that the nine *Royal Printing* vendors will sue their conspiring affiliates.  *Id.* at 1145.

As detailed below and summarized in the chart on the next page, the *Royal Printing* vendors are unusually interlocked with the conspirators through majority and minority ownership interests, overlapping directorates, joint ventures, strategic alliances, cross-license agreements, and loan agreements.  The relationships in this industry are designed to streamline the process from panel manufacture to finished product sale and to stabilize upstream supply and downstream sales, and they have the effect of aligning financial interests.  Put simply, not only do these pervasive relationships give conspirators and vendors control over each other, but they also create benefits to all from the conspiracy and a strong financial disincentive to bring suit, precisely the

11

1  type of "unity of interest" the "ownership or control" approach is meant to overcome. *Freeman*,

2  322 F.3d at 1146 n.12.[6]



1.      **Panasonic and JVC**

Panasonic Corporation[7] and its former subsidiary and current affiliate JVC[8] have not

brought and will not bring suit due to Panasonic's ownership and control of entities that

participated in the conspiracy and its multiple joint ventures with other conspirators.

_____

[6] "At the summary judgment stage," the Court does "not focus on the admissibility of the evidence's form," but rather "focus[es] on the admissibility of its contents." *Fraser v. Goodale,* 342 F.3d 1032, 1036-37 (9th Cir. 2003). But should Defendants challenge the submitted evidence, it remains admissible, and may be supplemented at trial with both testimony and exhibits. Some of the statements are admissible as admissions of a party opponent. Fed. R. Evid. 801(d)(2); *see, e.g.*, Merriman Decl. Ex. 25 (AUO 20-F forms from 2002-2006). Other documents are admissible as trade publications. Fed. R. Evid. 803(17); Declaration of Geoff Shavey at ¶ 4 (stating that in purchasing electronics products for Costco he relied on the trade publications DigiTimes and This Week in Consumer Electronics ("TWICE") to keep track of changes in the electronics industry). And even if the documents are not admissible under any of the other exceptions, many fall under the residual exception. Fed. R. Evid. 807. The evidence specified below—annual reports, SEC filings, and news reports—typifies what Fed. R. Evid. 807 is for: admission of evidence that "has the requisite indicia of trustworthiness but is not otherwise admissible." *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994).

[7] Panasonic Corporation of North America is a wholly owned and controlled subsidiary of Matsushita Electric/Panasonic Corporation. Exhibit 1 to the Declaration of Steven D. Merriman ("Merriman Decl.") (Panasonic 2012 20-F at 24).

[8] There is no realistic possibility that JVC Kenwood Corporation ("JVC") will bring a suit against the conspirators—a number of which are JVC affiliates. Merriman Decl. Ex. 12 (JVC

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

First, there is no realistic possibility that Panasonic will sue the conspirators because it jointly owned and controlled one of them—Defendant Toshiba Matsushita Display Technology Co., Ltd. ("TMD"). TMD was formed in April 2002 when Panasonic and Toshiba transferred their LCD panel operations to the joint venture.[9] Thereafter, TMD functioned as the panel manufacturing division of both companies.[10] From the time TMD was formed, Panasonic had significant ownership and control over it. Panasonic owned 40 percent of TMD,[11] and as one of only two TMD shareholders, with conspirator Toshiba as the other, Panasonic exerted significant control over TMD's management and operations, including authority over TMD's pricing decisions. For example, many of TMD's directors, executives, and employees came from Panasonic. When the joint venture was formed in 2002, three of TMD's eight directors, one of its

_____

Kenwood 2011 Annual Report). During the conspiracy, JVC operated as a subsidiary of Panasonic—Panasonic owned 52.4 percent of JVC. Merriman Decl. Ex. 13 (Panasonic 2008 Annual Report). And after the conspiracy, Panasonic remained JVC's largest individual shareholder (owning 36.8 percent), *id.*, until JVC merged with Kenwood to form JVC Kenwood Holdings (now the 100 percent owner of JVC). Merriman Decl. Ex. 14 ("Report: Kenwood to Merge with JVC," TWICE, June 22, 2007); Merriman Decl. Ex. 15 (JVC Kenwood Management Policies Presentation, Oct. 1, 2008). Even after the merger, JVC Kenwood Holdings' largest shareholder remains Panasonic, which owns 19.21 percent, significantly more than the next largest shareholder (4.27 percent). Merriman Decl. Ex. 12; *see also* Merriman Decl. Ex. 1 at 22 (reporting that as of March 31, 2012, Panasonic still retains its interest in JVC Kenwood). Moreover, Panasonic has entered into significant patent license agreements with JVC, which gave JVC 3.7 billion yen in additional income for the 2011 fiscal year alone. Merriman Decl. Ex. 17 ("Notice of Posting of Extraordinary Income from Granting Patent License," JVC Kenwood, Dec. 28, 2010). Panasonic and JVC have been represented by the same counsel in a number of proceedings. *See, e.g., Ambato Media, LLC v. Clarion Co., LTD*, Case No. 2:09-cv-242-JRG (E.D. Tex.). Panasonic's connections with conspirators, discussed above, are also JVC's. A suit by JVC against the conspirators would be contrary to the interests of its affiliates and its largest shareholder, Panasonic.

[9] Toshiba acquired Panasonic's share of TMD in 2009. Merriman Decl. Ex. 1 at 11.

[10] See Merriman Decl. Ex. 2 (Panasonic 2002 20-F at 121) ("[A] new joint venture, [TMD] was established upon division of relevant business from both companies."); *id.* at 19 ("The new joint venture has succeeded to LCD operations of the two parent companies."); Merriman Decl. Ex. 57 at 2 (Division and Transfer of Liquid Crystal Display into New Company, Matsushita, Jan. 29, 2002) ("Assets, liabilities, rights and obligations involved in the business to be transferred from [Panasonic] and Toshiba, which are considered to be mandatory to operations [of TMD]"); Merriman Decl. Ex. 3 at 11 (Panasonic 2006 20-F) ("In April 2002, [Panasonic] and Toshiba . . . separated their respective [LCD] panel operations and established a joint venture company, [TMD], for the development, manufacture and sale of LCD panels and next-generation display devices.").

[11] See MDL Dkt. No. 4108 (Order Denying Toshiba Entities' Mot. for Partial Summ. J. Under *Illinois Brick*) at 2 n.2; Merriman Decl. Ex. 2 (Panasonic 2002 20-F at 12); Merriman Decl. Ex. 3 (Panasonic 2006 20-F at 127).

13

1   corporate auditors, and a significant number of its employees came from Panasonic.[12]  The

2   overlap in key Panasonic and TMD personnel continued throughout the conspiracy.[13]  Moreover,

3   Panasonic and TMD had intertwined economic interests, as TMD sold half the LCD panels it

4   manufactured to either Panasonic or Toshiba.[14]  Because of their close affiliation, Panasonic

5   consistently referred to TMD as among "the most significant" of its "associated companies."[15]

6       Panasonic's ownership and control of TMD is crucial because TMD actively participated

7   in the conspiracy, as evidenced by the recent jury verdict against it.  Even before that verdict, this

8   Court had recognized the substantial evidence of Defendant TMD's participation in the

9   conspiracy.  See MDL Dkt. 4107 (Order Denying Toshiba Entities' Mot. for Summ. J.) (noting

10   "ample evidence for a jury to find that Toshiba participated in the . . . conspiracy" including

11   testimony that Samsung representatives met with TMD representatives and "agreed on prices of

12   TFT-LCD panels"); see also MDL Dkt. 4466 (Costco's Second Amended Complaint) (naming

13   TMD as a defendant).  Despite the overwhelming evidence of TMD's role in the conspiracy,

14   Panasonic has not and will not bring suit against TMD.  Indeed, it is difficult to understand

15   Defendants' assertion that a vendor like Panasonic was not "part of the alleged conspiracy," Mot.

16   at 7 n.8, simply because its participation was through a joint venture with another conspirator.

17       Furthermore, Panasonic also owns and controls named co-conspirator IPS Alpha

18   Technology, Ltd. ("IPS Alpha," now known as Panasonic Liquid Crystal Display Co. Ltd.).[16]  IPS

19   Alpha was formed in 2004 when Panasonic teamed up with conspirators Toshiba Corporation and

20   _____

21   [12] Merriman Decl. Ex. 57 at 3, 6; see also Merriman Decl. Ex. 58 at 2 (TSB-LCD-0016881) (TMD presentation showing that four of TMD's board members were from Panasonic in 2002).

22   [13] Merriman Decl. Ex. 59 at 6 (TSB-LCD-0259651) (2003 organizational chart showing high-level TMD executives and board members affiliated with Panasonic); Merriman Decl. Ex.

23   60 at 5 (TSB-LCD-0247635) (presentation showing that four of TMD's board members were from Panasonic in 2003); Merriman Decl. Ex. 61 at 3-4 (TSB-LCD1_00468647) (same in 2005);

24   Merriman Decl. Ex. 62 at 3 (TSB-LCD1-00466261) (same in 2006).

25   [14] Merriman Decl. Ex. 63 (TMD Rule 30(b)(6) Dep. of T. Ogawa 56:7-57:17).

     [15] Merriman Decl. Ex. 4 (Panasonic 2005 20-F at 126); Merriman Decl. Ex. 3 (Panasonic

26   2006 20-F at 127).

27   [16] See Merriman Decl. Ex. 5, ("Hitachi and Matsushita Finalize Business Alliance Details," DigiTimes, Feb. 18, 2008); Merriman Decl. Ex. 6 ("Panasonic to Change Company Name of Subsidiary IPS Alpha Technology, Ltd.," Panasonic, Aug. 23, 2010).

28

                                                14

1  Hitachi Displays, Ltd.[17]  During the conspiracy period, while wholly owned and controlled by

2  Panasonic and the two named conspirators, IPS Alpha was party to pricing and output agreements

3  entered into by the conspirators.  IPS Alpha's President was Fumiaki Yonai, who also served as

4  President of Hitachi Displays.[18]  Extensive evidence establishes Mr. Yonai's participation in the

5  conspiracy.[19]  IPS Alpha's participation in the conspiracy is further confirmed by evidence that its

6  confidential panel production numbers were circulated to other cartel members.[20]

7        After the conspiracy, Panasonic acquired a 92 percent share in IPS Alpha by buying out

8  the conspirators' shares.[21]  In a display of its control, Panasonic changed IPS Alpha's name to

9  Panasonic Liquid Crystal Display Co. Ltd. and appointed a new president from its own corporate

10  ranks to lead Panasonic LCD.[22]  Because an antitrust claim by Panasonic against the conspirators

11  would necessarily implicate an entity that it owns and controls, there is no realistic possibility that

12  Panasonic will bring suit.[23]

13

---

14  [17] Merriman Decl. Ex. 7 ("Hitachi, Toshiba and Matsushita Conclude Agreement for Establishment of TV LCD Panel Joint Venture, IPS Alpha Technology," Hitachi, Oct. 29, 2004); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 296 (N.D. Cal. 2010) (noting "the formation of defendant IPS Alpha in 2005 [sic] by defendants Toshiba and Hitachi and named co-conspirator Panasonic"); *see* Merriman Decl. Ex. 8 ("IPS Alpha to Build 8G LCD Plant in Japan; Operation to Start in 2010," DigiTimes, Feb. 15, 2008) (referencing Hitachi's then 50 percent ownership share in IPS Alpha).

15

16

17

18  [18] Merriman Decl. Ex. 9 (Profile of Fumiaki Yonai, Businessweek).

19  [19] Merriman Decl. Ex. 64 (Samsung Interrogatory Responses, Annotated Samsung's Responses to Direct and Indirect Purchaser Class Plaintiffs' Witness and Contention Interrogatories to All Defendants (Annotated)) (stating that Samsung employees, including H.B. Suh, had between five and eight meetings with Fumiaki Yonai); *see also* Merriman Decl. Ex. 65 (G. Watanabe [Hitachi] Dep. 160:25-161:1) (discussing April 2001 meeting between Watanabe and Yonai from Hitachi Displays and B.J. Koo, CEO of LG Display).

20

21  [20] *See* Merriman Decl. Ex. 66 (SAML-809794) (Philips email to S. Chen [Samsung] titled "data," July 11, 2006).

22  [21] *See* Merriman Decl. Ex. 10 (Appendix to Panasonic's Notice of 2011 Shareholder Meeting).

23

24  [22] Merriman Decl. Ex. 6; Merriman Decl. Ex. 9.

25  [23] Panasonic also partnered with conspirator Toshiba on another significant joint venture that participated in a separate conspiracy to fix the prices of cathode ray tubes ("CRTs"). Merriman Decl. Ex. 68 ("Matsushita, Toshiba Advances CRT Joint Venture," TWICE, Mar. 28, 2003).  Matsushita Toshiba Picture Display Co. ("MTPD") was created in 2003 to produce CRTs. *Id.*  Panasonic owned 64.5 percent of the company and was given the right to appoint the president. *Id.*  And in 2007, MTPD became a wholly owned subsidiary of Panasonic.  MTPD is alleged to have participated in the massive CRT price-fixing conspiracy.  *See* Merriman Decl. Ex. 67 (Class Action Complaint, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-05944-

26

27

28

15

1    Given Panasonic's ownership and control of two co-conspirators and its entanglement

2    with others, it is inconceivable that members of the Panasonic corporate family will pursue

3    antitrust claims.  Moreover, the direct purchaser class definition expressly excludes "affiliates" of

4    Defendants.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 315.  This common

5    aspect of class definitions is itself recognition of the common sense proposition that an affiliate

6    will not truly pursue a claim and might well have benefited from the conspiracy.  In any event,

7    Panasonic was never in the class.  Panasonic's relationship with conspirators places it squarely

8    within the "ownership or control" exception to *Illinois Brick*.

9                    **2.      Acer, Gateway, and eMachines**

10    Acer Inc. and its wholly owned subsidiary Gateway Inc. (including eMachines, which

11    Gateway acquired in 2004)[24] are not going to sue Acer's former affiliate AU Optronics Corp.

12    ("AUO") and its fellow conspirators.

13    In 1996, Acer created Acer Display Technology, Inc. ("ADT") to manufacture LCD

14    panels for Acer and others.[25]  Three years into the conspiracy, ADT agreed to merge with Unipac

15    Optoelectronics (which was then affiliated with Matsushita/Panasonic) to form what was then the

16    third largest producer of LCD panels: AU Optronics, one of the central members of the LCD

17    price-fixing conspiracy.[26]  Prior to completion of the merger in September 2001, ADT/AUO

18    functioned as an affiliate of Acer.[27]

19    _____

20    SC, Dkt. No. 1 (N.D. Cal. Nov. 26, 2007)).  With the CRT litigation pending, Panasonic certainly
     is not going to allege that its affiliates engaged in an LCD conspiracy.

21    [24] In 2007 Acer obtained complete control over Gateway via a merger that made the
     formerly public Gateway a privately owned subsidiary of Acer with a board of directors

22    appointed entirely by Acer.  Merriman Decl. Ex. 19 ("Acer to Acquire Gateway, Strengthen its
     Position in the US Market," DigiTimes, Aug. 27, 2007).  And of Gateway's five-person Board of
     Directors, at least two have significant ties with Acer, including Emmanuel Fromont, Acer

23    Corporate Vice President and President of Acer Pan America Operations, and J.T. Wang, Acer's
     Chairman and CEO.  Merriman Decl. Ex. 27 (Gateway 2011 Annual Report).  Acer undoubtedly

24    "owns or controls" Gateway within the meaning of *Royal Printing*, and it is highly unlikely that
     Gateway could pursue antitrust claims without Acer's blessing.

25    [25] Merriman Decl. Ex. 20 ("AUO Corporate History").

26    [26] *Id.*; Merriman Decl. Ex. 21 ("AUO Prospectus of Initial Offering," May 23, 2002); *see
     also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 296 (noting "the creation of

27    defendant AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics").

      [27] Merriman Decl. Ex. 20.

28

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

1    AUO's participation in the conspiracy is no longer in dispute.  The company and its

2    executives were recently convicted on criminal charges.[28]  The evidence showed that ADT

3    participated in conspiratorial meetings between 1999 and 2001, which is to say, prior to becoming

4    AUO, *and while directly owned* by Acer.[29]  During that period, there is no apparent excuse for

5    Defendants not to treat Acer like they do Philips, Samsung, Sharp, and Toshiba.

6        Of course, AUO's participation in the conspiracy did not end after the merger and name

7    change.  And Acer and AUO remained under common control, largely through BenQ

8    Corporation.[30]  BenQ was also part of the Acer corporate family until it was spun off in 2001.[31]

9    Even after the spin off, BenQ held the largest single ownership share of AUO.  The majority of

10   directors of BenQ were either current or former executives or board members of Acer, including

11   former President and current Chairman of BenQ, K.Y. Lee, who is also the chairman of AUO.[32]

12   AUO's board also included three to four BenQ directors.[33]  Unsurprisingly, BenQ and Acer were

13   responsible for a significant portion of AUO's LCD panel sales during much of the conspiracy.[34]

14   Everyone benefited as long as the interrelationships between the panel conspirators and the

15   finished product companies assured that the overcharges were passed on to Costco and others.

16

17

18   _____

        [28] Merriman Decl. Ex. 69 (Special Verdict Form, *United States v. AU Optronics Corp., et
19   al.*, No. CR-09-0110 SI, Dkt. No. 851 (N.D. Cal. Mar. 10, 2012).
        [29] Merriman Decl. Ex. 70 (AU-MDL-03551826) (Minutes from meeting between ADT
20   and LG to discuss panel pricing and capacity, May 26, 2001); Merriman Decl. Ex. 71
     (TSB_LCD1_00311862) (Email scheduling "top management" meeting between ADT and LG
21   executives to discuss "market situation consensus,"  "co-operation," and "mutual assistance,"
     Mar. 1, 2001).
22      [30] BenQ was formerly known as Acer Peripherals, Inc. and Acer Communication &
     Multimedia, and changed its name to Qisda Corporation in 2007.  Merriman Decl. Ex. 22 ("Qisda
23   Corporate History").
        [31] Merriman Decl. Ex. 23 ("ACM Unveils New Company and Brand Name BenQ,"
24   DigiTimes, Dec. 10, 2001).
        [32] Merriman Decl. Ex. 24 (BenQ 2002-2006 Annual Reports).
25
        [33] Merriman Decl. Ex. 20; Merriman Decl. Ex. 25 (AUO 20-F forms from 2002-2006)
26   (from 2001-2006 BenQ owned 48.83 percent, 19.10 percent; 14.8 percent, 14.38 percent, 13.32
     percent, and 12.35 percent)
27      [34] From 2001-2004, BenQ and Acer accounted for 27.8 percent, 25.9 percent, 25.9
     percent, and 32.3 percent of AUO's sales.  Merriman Decl. Ex. 25.
28
                                        17

1    The entanglement between Acer and AUO makes it highly unlikely that Acer, Gateway,

2    or eMachines will sue AUO and its co-conspirators.  Thus, Costco should be permitted to pursue

3    its claims for overcharges on Acer, Gateway, and eMachines products.

### 3.    Proview

5    There is no realistic possibility that Proview Technology, Inc. ("Proview")[35] will sue its

6    significant shareholder Tatung Company, or Tatung's subsidiary (and conspirator) Chunghwa

7    Picture Tubes, Ltd. ("CPT").  In 2007, Tatung became the second largest shareholder of Proview

8    after purchasing 16.22 percent.[36]  Tatung was further able to exert control over Proview by

9    appointing three out of Proview's eight board members.[37]  The relationship is reciprocal: Proview

10   is represented on Tatung's board as well.[38]  Moreover, it appears that Proview has never sued or

11   been sued by either Tatung or Chunghwa in federal court.[39]

12   Proview is extraordinarily dependent on Tatung-controlled conspirator CPT.[40]  As soon as

13   Tatung purchased its stake in Proview, Proview began sourcing its panels from CPT.[41]  Proview

14   in turn uses the CPT panels to manufacture LCD TVs for Tatung.[42]  Between Tatung's ownership

15   interest in Proview, the entities' overlapping directorates, and their fundamentally aligned

16   interests, there is no realistic possibility that Proview will bring suit against the conspirators.

---

19   [35] Proview Technology, Inc. is a wholly owned domestic subsidiary of its parent, Proview
     International Holdings, Ltd.  Merriman Decl. Ex. 28 at 20 (Proview 2009 Annual Report).

     [36] Merriman Decl. Ex. 29 ("Tatung Officially Invests in Proview," DigiTimes, Oct. 17,
     2007); Merriman Decl. Ex. 30 (Proview 2008 Annual Report).  Proview's largest shareholder is
     ultimately an individual named Christian Laurent Tan Yang who owns 29.99 percent.  Merriman
     Decl. Ex. 28.

     [37] Merriman Decl. Ex. 29.  Currently, Tatung nominates two members to Proview's board
     of directors.  Merriman Decl. Ex. 30.

     [38] Merriman Decl. Ex. 31 (Tatung 2010 Annual Report).

     [39] Merriman Decl. Ex. 32 (Westlaw docket search for cases where Proview is adverse to
     Tatung or Chunghwa).

     [40] Merriman Decl. Ex. 33 ("CPT Aim at Breakeven by End of Year, Says Group
     Chairman," DigiTimes, June 27, 2011).  Tatung currently controls six out of the seven CPT board
     members.  Merriman Decl. Ex. 34 (Chunghwa Operation of Board of Directors).

     [41] Merriman Decl. Ex. 29.

     [42] Merriman Decl. Ex. 30.

18

1

### 4. Sylvania

2      The Sylvania brand is owned by a company called Funai, and Sylvania products are

3 distributed in the United States through Funai's subsidiary, the Funai Corporation.[43] Funai in turn

4 is interlocked with at least three conspirators.  First, Funai owns a portion of Chimei Innolux

5 Corp., previously known as Chi Mei Optoelectronics Corp.[44]  And in 2006, Funai agreed to loan

6 Chimei $400 million for investment in LCD production.[45]  Funai's investment in Chimei is one of

7 strategic importance for the company as it seeks to secure low-cost LCD panels and lower

8 production costs for Funai TVs.[46]  Indeed, Funai sources 90 percent of its panels from Chimei.[47]

9 Funai also is subject to control by conspirator Toshiba.  During the conspiracy period, the two

10 companies entered a joint venture to manufacture color picture tubes.[48]  Finally, Funai is closely

11 aligned with conspirator Philips.  In 2008, Funai and Philips signed a licensing agreement that

12 granted Funai exclusive use of the Philips brand for televisions sold in the United States.[49]

13      There are not ordinary business dealings but critical long-term relationships that eliminate

14 any realistic possibility that Funai/Sylvania will bring antitrust claims against the LCD cartel.

15      ### 5. Envision

16      Envision Peripherals, Inc., will not pursue its claims because its parent company is subject

17 to the control, albeit indirect, by the conspirators.  Envision is owned in large part (24 percent) by

18 Top Victory Investments Limited, a holding company of its parent, Top Victory Technology

19 Limited ("TPV"), which manufactures televisions and monitors.[50]  This relationship is crucial to

20

21

_____

22      [43] Merriman Decl. Ex. 35 (Funai 2011 Annual Report).

       [44] Merriman Decl. Ex. 36 ("CMO to Benefit from Funai Electric's Aggressive LCD TV
23 Plans," DigiTimes, July 7, 2006) (Funai owns 1.2 percent of CMO).

       [45] *Id.*
24      [46] *Id.*

       [47] *Id.*
25      [48] Merriman Decl. Ex. 37 ("Funai and Toshiba Announce Joint Venture to Manufacture
   Color Picture Tubes in Indonesia," Toshiba, Feb. 1, 2001).
26
       [49] Merriman Decl. Ex. 38 ("CMO to Benefit from Philips-Funai Deal, Says Paper," Apr.
27 10, 2008).

       [50] Merriman Decl. Ex. 39 (TPV 2010 Annual Report).
28

19

1   Envision:  the vertical integration with TPV allows Envision to sell high-quality products at value

2   prices.[51]

3         TPV is subject to control by the conspirators.  During the conspiracy period, Koninkijke

4   Philips Electronics N.V. (a/k/a Royal Philip Electronics or Philips) was one of TPV's largest

5   shareholders—owning15.8 percent of TPV plus a convertible bond that could increase Philips's

6   stake to 28 percent if converted—which provided Philips with the right to nominate two members

7   to TPV's thirteen person board.[52]  The financial relationship was strengthened in 2011 when

8   Philips agreed to transfer its remaining television business to a joint venture with TPV.[53]  The

9   new joint venture gives TPV the right to use the Philips brand name outside the United States.[54]

10  Moreover, Philips agreed that it would provide €185 million as investments and loans in the new

11  joint venture and in TPV.[55]

12        TPV has similar connections with conspirator Chimei.  TPV is partially owned by Chimei

13  (7.68 percent).[56]  TPV and Chimei also entered into a strategic alliance that allowed TPV a stable

14  source of LCD panels, enabling TPV to produce televisions more effectively for its affiliate

15  Envision.[57]  TPV also has joint ventures with conspirators HannStar Display Corp., AUO, and

16  Chunghwa.[58]

17

18

---

19       [51] Merriman Decl. Ex. 40 ("EPI Looks to Join Top LCD TV Ranks," TWICE, Mar. 28,
20  2006).
         [52] Merriman Decl. Ex. 41 (TPV/Philips Merger Procedure, Commission of the European
21  Communities, Aug. 5, 2005); Merriman Decl. Ex. 39.
         [53] Merriman Decl. Ex. 42 ("Philips, TPV Sign TV Joint Venture Deal," TWICE, Nov. 1,
22  2011).
         [54] *Id.*
23       [55] *Id.*
         [56] Merriman Decl. Ex. 43 ("TPV Aggressively Expands Business Tie-Ups with LCD
24  Players," DigiTimes, Sept. 28, 2007).
         [57] *Id.*
25       [58] *Id.; see also* Merriman Decl. Ex. 44 ("TPV and AUO to Establish Joint Venture for
    TFT-LCD Module Assembly and TV Set ODM in Poland," TPV Holdings, Mar. 12, 2010);
26  Merriman Decl. Ex. 45 ("To Advance into Brazil, AUO and TPV to Establish Joint Venture for
    LCD Module Plant," AUO Sept. 17, 2010); Merriman Decl. Ex. 39; Merriman Decl. Ex. 46 (TPV
27  Technology Limited Annual Results for the Fiscal Year Ended 31st December 2010).

28
---
COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

Envision, like the rest of the vendors, is part of the vertical supply chain from LCD panel manufacturer to LCD finished-product market.  Like the others, it is too dependent on and subject to control by the conspirators.

### 6.     Vizio

Vizio, Inc. is owned and controlled by companies that are affiliated with conspirators. AmTRAN owns or owned a 24 percent share of Vizio.[59]  AmTRAN manufactures on a contract basis up to 80 percent of Vizio brand televisions that Vizio markets in the United States.[60]  Vizio and AmTRAN routinely share attorneys when both are parties to a lawsuit.  *See, e.g., Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330 (Fed. Cir. 2010).

AmTRAN is closely aligned with conspirator LG Display through their multiple joint ventures.[61]  In 2010, AmTRAN and LG Display created a joint venture to develop light emitting diode ("LED") displays, a high-end flat-panel-display technology, with the understanding that it would help enhance their vertical integration.[62]  That same year, AmTRAN, LG Display, and Everlight Electronics Co. Ltd. created a new joint venture to assist in LED packaging.[63]

Vizio's other major owner and key supplier, Hon Hai Precision Co., Ltd. is better known by its trade name Foxconn.[64]  Foxconn owns a controlling stake (45 percent) in conspirator Hitachi Displays.[65]  Foxconn also has a long relationship with Chimei.  In 2007, the two companies entered a joint venture called Ampower.[66]  Foxconn is the second largest shareholder

---

[59] Merriman Decl. Ex. 47 ("Foxconn to Become Supplier of Vizio LCD TVs," DigiTimes, Mar. 1, 2007).

[60] Merriman Decl. Ex. 48 ("Vizio Sees 2012 With Optimism," DigiTimes, Nov. 2, 2011).

[61] AmTRAN also recently signed a brand license agreement with JVC that provides AmTRAN the right to distribute televisions under the JVC brand.  Merriman Decl. Ex. 49 ("Amtran Slates JVC Brand TV Relaunch," TWICE, July 5, 2011).

[62] Merriman Decl. Ex. 50 ("Amtran Signs MOU with LG Display for High End LED-Backlit Display Products," DigiTimes, July 26, 2010).

[63] Merriman Decl. Ex. 51 ("Amtran, Everlight and LG Display to Form LED Packaging JV for LCD TV Market," DigiTimes, June 4, 2010).

[64] Merriman Decl. Ex. 47.

[65] Merriman Decl. Ex. 52 ("CMI Actively Expanding LTPS Capacity," DigiTimes, Dec. 28, 2010).

[66] Merriman Decl. Ex. 53 ("CMO-Foxconn Inverter Joint Venture Starts Shipping, Reports Paper," DigiTimes, July 7, 2007).

21

of Chimei and is in the process of obtaining a greater stake in the conspirator.[67]  Chi Mei's new

chairman is from Foxconn.[68]  Additionally, Foxconn recently purchased a 10 percent stake in

conspirator Sharp.[69]

Vizio is owned and dependent on entities with significant investments in and relationships

with panel conspirators.  There is no realistic possibility that it will bring suit.

### 7.        Summary

There is abundant evidence, even before trial, demonstrating control of the *Royal Printing*

vendors by the conspirators.  Because of their "interlocking directorates, minority stock

ownership, loan agreements that subject the [direct purchasers] to the [conspirators'] operating

control, trust agreements, or other modes of control," *Brand Name Drugs Litig.*, 123 F.3d at 605-

06, the *Royal Printing* vendors share a "unity of interest" with the conspirators such that "there is

no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation,"

*Freeman*, 322 F.3d at 1145-46 & n.12.  Costco therefore should be allowed to pursue claims

based on its purchases from these vendors.

### C.        The Remote Possibility that Some of the *Royal Printing* Vendors Might Be Default Members of the Class Does Not Defeat Costco's Claim.

Defendants additionally contend that five or six of the nine *Royal Printing* vendors fall

within the definition of the direct purchaser plaintiff ("DPP") class, did not opt out by the

deadline, and thus might participate in the DPP settlements.  There are genuine factual disputes

about each of these assertions, however, and even if Defendants were correct, a vendor's passive

inclusion in the class would not insulate Defendants from Costco's claims.

First, Defendants provide no evidence to support their assertions regarding the vendors'

inclusion in the class.  Some of the *Royal Printing* vendors are unquestionably excluded from the

---

[67] Merriman Decl. Ex. 54 ("Foxconn to Subscribe to CMI New Shares," DigiTimes, Mar. 28, 2012).

[68] Merriman Decl. Ex. 55 ("Hon Hai's Tuan Elected Chimei Innolux Chairman," China Post, Mar. 18, 2012).

[69] Merriman Decl. Ex. 56 ("Sharp Sell 10% Stake to Foxconn," TWICE, Mar. 28, 2012).

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

1    class because they are "affiliates" of co-conspirators; indeed, Defendants appear to concede

2    Panasonic's exclusion from the class on this basis. Mot. at 13-14. Acer and Gateway (and thus

3    eMachines) have opted out. More importantly, the DPP class is also limited to entities that

4    purchased LCD panels or products "in the United States." *See* MDL Dkt. 1883. Consequently,

5    the class excludes entities that purchased abroad even for finished products intended for ultimate

6    sale in the United States. As the Court has previously recognized, manufacturers of finished LCD

7    products, such as the *Royal Printing* vendors at issue here, typically purchased the LCD panels

8    for their products overseas. MDL. Dkt. 3833. And contrary to Defendants' halfhearted argument

9    (presented solely in a footnote), these vendors' overseas purchases of panels does not mean that

10    Costco's claims are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a.

11    The Court has already squarely rejected Defendants' argument, holding that because the co-

12    conspirators' activities were directed at the U.S. market, nothing in the FTAIA prevents domestic

13    finished product purchasers that suffered domestic antitrust injuries from recovering for those

14    injuries, even if the panels were first purchased overseas. MDL. Dkt. 3833.

15      Moreover, even if Defendants were able to show that some of the *Royal Printing* vendors

16    fell within the class definition, it would not mean that they have pursued their claims or that

17    overcharges to them are included in the settlements. Nothing in the settlement agreements or

18    accompanying materials explains sufficiently how the volume of commerce was calculated,

19    including whether Costco's vendors were accounted for.

20      Finally, Defendants are wrong to suggest that the passive act of remaining in the class, if

21    ever in it, is tantamount to pursuit of a vendor's antitrust claims. Mot. at 13-14. Defendants cite

22    no supporting legal authority, and the one case they do cite is inapplicable. Defendants allege

23    that in *Sun Microsystems* the court granted summary judgment on indirect-purchaser claims

24    because "two intermediate [direct purchasers] were members of the direct-purchaser class." Mot.

25    at 13 (citing 608 F. Supp. 2d at 1182). This omits one crucial fact: the intermediaries were not

26    only in the class, but also had submitted claim forms to participate in the settlement. *Sun*

27    *Microsystems,* 608 F. Supp. 2d at 1182.

28

23

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827

1       That is not the case here.  Defendants have access to the information but have provided no

2  evidence that any of Costco's vendors filed a claim, even though the claims process is closed.

3  Costco has tried but has been denied access to the claim submissions.  Merriman Decl. ¶¶ 2-4.  If

4  the Court wishes to fill the void in information that Defendants have created, it can order

5  disclosure by the claims administrator.  But there is no reason to allow Defendants to escape

6  liability based on sheer speculation that a vendor might have filed a claim.

7

## V.    <u>CONCLUSION</u>

8       Federal law permits Costco's claims where its vendors are sufficiently affiliated with the

9  direct purchasers that there is no realistic possibility they will sue.  The evidence to date shows

10  that the *Royal Printing* vendors are subject to control by the conspirators through majority and

11  minority ownership interests, overlapping directorates, joint ventures, strategic alliances, cross-

12  license agreements, and loan agreements.  The Court should deny Defendants' motion.

13  Dated:  July 20, 2012          Respectfully submitted,

14

15                  */s/ David J. Burman*

David J. Burman (admitted *pro hac vice*)

PERKINS COIE LLP

16                  1201 Third Avenue, Suite 4900

Seattle, WA 98101-3099

17                  Telephone:   206.359.8000

Facsimile:   206.359.9000

18                  Email: DBurman@perkinscoie.com

19

20                  *Counsel for Plaintiff Costco Wholesale Corp.*

21

22

23

24

25

26

27

28

COSTCO'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:07-MD-1827 SI, MDL No. 1827