IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | No. M 07-1827 SI<br>MDL. No. 1827 |
| | Case No. C 09-5840 SI |
| This Order Relates to:<br><br>*Motorola Mobility, Inc. v. AU Optronics Corporation, et al.,* C 09-5840 SI | **ORDER DENYING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON MOTOROLA'S FOREIGN INJURY CLAIMS** |

On August 3, 2012, the Court heard argument on defendants' joint motion for summary judgment on Motorola Mobility, Inc.'s Sherman Act claim for injuries in foreign markets. Defendants' motion asserts that Motorola's claims based on TFT-LCD purchases in foreign markets are barred by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA").

Defendants argue that Motorola has failed to prove that its foreign injury claims were caused by any domestic effect of defendants' anticompetitive conduct. Defendants contend that although Motorola alleged that "[d]efendants and their co-conspirators . . . entered into supply agreements with Motorola in Illinois to sell Motorola LCD panels at unlawfully inflated prices," Third Amended Complaint ("TAC") ¶ 4, in fact "[d]iscovery has shown that [Motorola's] allegations concerning supposed global price agreements negotiated and entered into in Illinois are untrue." Motion at 3. Pointing to a lack of evidence demonstrating the requisite "domestic effect" proximately causing Motorola's foreign injury

claims, defendants argue that two of the three categories of claims against it[1] should not be allowed to go to trial.

The FTAIA establishes a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." 15 U.S.C. § 6a. The FTAIA then "provides an exception to this general rule, making the Sherman Act applicable if foreign conduct '(1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.''" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (quoting *Hoffmann-La Roche Ltd. v. Empagran S.A.*, 541 U.S. 155 (2004)(*Empagran I*) and 15 U.S.C. § 6a). This is known as the "domestic injury exception" of the FTAIA. *Id*. The Supreme Court has stated:

> This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*Empagran I*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a) (emphasis original). The FTAIA "sets forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts." *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 852 (7th Cir. 2012); *Animal Sci. Prods., Inc v. China Minmetals Corp*., 654 F.3d 462, 469 (3d Cir. 2011); *see also* October 5, 2011 Order Denying Defendants' Joint Dispositive Motion Regarding Indirect Purchaser Claims Based on Foreign Sales ("IPP Order") at 7, Master Docket No. 3833 (adopting *Animal Science* view that "the FTAIA does not implicate the subject matter jurisdiction of the federal courts").

The Court concludes that whether the price fixing activities alleged by Motorola in this case gave rise to direct, substantial, and reasonably foreseeable effects on domestic commerce, and whether such

---

[1] Motorola's TAC alleges antitrust claims based on three categories of purchases: "(1) LCD Panels delivered by the Defendants to Motorola in the United States; (2) LCD Panels delivered to Motorola manufacturing facilities abroad for inclusion in Motorola devices imported into the U.S. by Motorola and later sold by Motorola to customers in the United States; and (3) LCD Panels delivered to Motorola manufacturing facilities abroad for inclusion in Motorola devices sold to Motorola customers abroad." TAC ¶ 184. Defendants seek summary adjudication on the second and third categories of claims (the "foreign injury claims").

effects gave rise to a Sherman Act claim present issues of fact which must be resolved by the jury in this case.

Motorola contends, and this Court agrees, that its domestic roots and the locale of the transactions at issue distinguish this case from *Empagran I*. As this Court has previously observed, "Motorola is not a foreign company alleging injury based on wholly foreign transactions and conduct, unlike plaintiffs in *Empagran I*." March 28, 2011 Order Denying Defendants' Joint Motion to Dismiss the Second Amended Motorola Complaint (*Motorola II* Order) at 8, Master Docket No. 2602.

Motorola points to substantial evidence that defendants targeted Motorola in the United States for defendants' sales and marketing of LCD panels. *See Animal Science*, 654 F.3d at 470 (the relevant inquiry is whether the defendants' anticompetitive behavior "target[ed] import goods or services") (citing *Turicentro, S.A. v. American Airlines Inc.*, 303 F.3d 293, 313 (3d Cir. 2002)). Defendants knew that Motorola sold mobile devices in the United States and that the United States was one of the largest markets for mobile devices in the world. *See*, *e.g.*, Declaration of Joshua Stokes ("Stokes Decl."), Ex. 379 (Samsung presentation noting that Motorola had the number one market share in the U.S.); Ex. 150 (Sharp presentation noting same); Ex. 155 (indicating Toshiba's sales plan was based on strong demand from U.S. and Europe); Exs. 156, 157-160 (defendants' presentations and analyses regarding Motorola's U.S. market share). Defendants established U.S. subsidiaries to facilitate sales of LCD panels to Motorola in the United States. *See*, *e.g.*, Opposition at 15, n. 15 (listing defendants' relevant U.S. subsidiaries and affiliates); Stokes Decl., Ex. 80 (AUO email stating that its "regional strategy" for the U.S. was "direct access to Moto/Chicago and its global network"); Ex. 352 (deposition testimony of Samsung SDI employee that "[Samsung] had an office in Chicago because Motorola was in Chicago"); Ex. 345 (deposition testimony that Sharp had an office in a Chicago suburb in order to be "close to our customer . . . [f]irst of all, Motorola").

Defendants also met with Motorola on several occasions in the United States to discuss, and, at times, negotiate prices for LCD panels. *See*, *e.g.*, Exs. 251, 254, 255, 266, 314 (defendants' PowerPoint presentations to Motorola in the United States); Ex. 375 (document indicating that Samsung had several conversations in Chicago with Motorola regarding LCD panel pricing); Ex. 96 (Toshiba America Electronic Corporation ("TAEC") report indicating in-person price negotiations with Motorola in

Schaumburg, IL); Ex. 99 (email setting "Final Negotiations Meeting" in Chicago with Motorola and representatives of AUO and AUOA); Ex. 140 (Sharp email describing Motorola meeting held in U.S., where price negotiations took place). Defendants also used their employees — both U.S.-based and those stationed abroad — in furtherance of the price-fixing conspiracy. *See*, *e.g.*, Ex. 349 (deposition testimony identifying Samsung employee who was "dispatched" to the U.S. from 1999 to 2004 and given instructions "about how to gather competitive information about [Samsung's] competitors"); Ex. 167 (email requesting that Epson's U.S.-based employees "research competitor's situation" regarding a particular Motorola phone model); Ex. 168 (Toshiba informing its U.S.-based employees that competitive information had been gathered from Sanyo about projected share awards for Razr mobile phones and instructing them to "get information as much as possible").

Motorola also points to the admissions in the guilty pleas of many companies and executives involved in the LCD price-fixing conspiracy as further evidence that the conspiracy was targeted at the United States. Opposition at 26, n. 42 (listing plea agreements of LG, Sharp, Chunghwa, Hitachi, Epson, Chi Mei, and HannStar); *see also* Special Verdict Form, *United States v. AU Optronics Corp.*, Case No. 09-cr-0110 SI (N.D. Cal. Mar. 2012) (AUO convicted of participating in a conspiracy to fix prices of LCD panels sold in the United States from September 2001 to December 2006), Docket No. 85. Some defendants admitted to specifically targeting Motorola in the United States. *See* Plea Agreement, *United States v. Sharp Corp.*, Case No. 08-cr-802 SI (N.D. Cal. Dec. 8, 2008) (Sharp pled guilty to fixing the price of LCD panels sold to Motorola for use in Razr mobile phones); *United States v. Epson Imagining Devices Corp.*, Case No. 09-cr-854 SI (N.D. Cal. Oct. 23, 2009) (Epson pled guilty to fixing the price of LCD panels sold to Motorola for use in Razr mobile phones).

The parties dispute whether defendants' conduct gave rise to its Sherman Act claims. *See DRAM*, 546 F.3d at 989-90 ("[W]here a global price-fixing conspiracy is alleged to have affected prices both in the United States and abroad, courts have held that 'the give rise to language of [the FTAIA] requires a plaintiff to establish a direct or proximate causal relationship' between the alleged anticompetitive effects in the United States and the plaintiff's alleged foreign injury."). Defendants argue that, because Motorola's foreign affiliates purchased LCD panels pursuant to globally-negotiated foreign contracts (*i.e.*, purchase orders), the "domestic injury exception" is inapplicable to Motorola's

4

foreign injury claims. *See* Motion at 23-24. Defendants claim that the prices used in purchase orders Motorola used with its LCD panel suppliers were based on negotiations abroad, not in the United States. *Id*. On this basis, defendants conclude that "the effect on U.S. domestic commerce that 'gave rise to' the foreign injury claims . . . is non-existent." *Id*. at 25. The Court is not persuaded by defendants' argument. Motorola has presented admissible evidence from which a jury could infer that final decisions regarding pricing of LCD panels took place in the United States. *See*, *e.g.*, Stokes Decl., Ex. 363 (deposition testimony of Motorola's Vice President of Procurement, Janet Robinson, that it was Motorola's "practice" that senior procurement officers in the United States gave "approval to enter into an agreement on price with a display module supplier during the relevant time period . . . ."). Motorola also points to the deposition testimony of its employees to support its claim that foreign affiliates issued purchase orders at the price and quantity determined by Motorola in the United States. *See*, *e.g.*, Ex. 359 (deposition testimony of Motorola's Chief Procurement Officer, Theresa Metty, that the "decision making" regarding contract negotiations, "which would include prices," happened in Illinois); Ex. 372 (deposition testimony of Motorola's Vice President of Global Operations, E.L. Tay, that the purchasing team "basically execute[d] what was done and planned [in the United States]").

Whether, as defendants argue, Motorola's "rubber stamp approval process falls far short of what the FTAIA requires," Motion at 6, will be left up to a jury to decide, not the Court. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on motions for summary judgment."). The Court finds that a reasonable jury could find a "concrete link between defendants' price setting-conduct . . . its domestic effect, and the foreign injury suffered by Motorola and its affiliates." *See Motorola II* Order at 8.

Accordingly, the Court DENIES dependants' joint motion for summary judgment. Master Docket No. 5415; Docket No. 312 in 09-5840.

**IT IS SO ORDERED.**

Dated: August 9, 2012

SUSAN ILLSTON
United States District Judge

5