1
William A. Isaacson (admitted *pro hac vice*)
Melissa Felder (admitted *pro hac vice*)
2
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
3
Washington, D.C. 20015
Telephone: (202) 237-2727
4
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com
5
mfelder@bsfllp.com

6
Philip J. Iovieno (admitted *pro hac vice*)
Anne M. Nardacci (admitted *pro hac vice*)
7
Luke Nikas (admitted *pro hac vice*)
Christopher V. Fenlon (admitted *pro hac vice*)
8
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
9
Albany, NY 12207
Telephone: (518) 434-0600
10
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com
11
anardacci@bsfllp.com
lnikas@bsfllp.com
12
cfenlon@bsfllp.com

13
Counsel for Plaintiff Electrograph Systems, Inc. and
Electrograph Technologies Corp.
14

15
[Additional parties and counsel listed on signature page]

16
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**
17

18
In re: TFT-LCD (FLAT PANEL)
ANTITRUST LITIGATION

Master File No. 3:07-md-01827-SI (N.D. Cal.)

19
This Document Relates To:

Case Nos. 09-cv-4997; 10-cv-0117; 10-cv-1064; 10-cv-4945

20
*AT&T Mobility, LLC, et al. v. AU Optronics Corp., et al.*, No. 09-cv-4997-SI

MDL No. 1827

21

22
*Electrograph Systems, Inc., et al. v. Epson Imaging Devices Corp., et al.*,
No. 10-cv-0117-SI

**PLAINTIFFS' OPPOSITION TO TOSHIBA'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER *ILLINOIS BRICK* AND *ATM FEE***

23

24
*Dell Inc. et al. v. Sharp Corp. et al.*, No. 10-cv-1064-SI

25
*Target Corp., et al. v. AU Optronics Corp., et al.*, No. 10-cv-4945-SI

Date: October 5, 2012
Time: 9:00 a.m.
Courtroom: 10, 19th Floor
Judge: The Hon. Susan Y. Illston

26

27

28

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

Relevant Prior Orders .............................................................................................. iv

Introduction ............................................................................................................... 1

Factual Background ................................................................................................... 4

I. A Jury Verdict Has Confirmed That the Toshiba Entities Were Integral
Participants in the LCD Conspiracy ............................................................ 5

II. The Toshiba Corporate Family's LCD Operations .................................... 6

A. TSB Owns and Controls TAIS ....................................................... 7

B. TSB Owns and Controls TMD ........................................................ 8

Argument .................................................................................................................... 9

I. Summary Judgment Is Inappropriate Where, as Here, Toshiba Has Not
Satisfied Its Initial Burden of Production .................................................. 9

II. *ATM Fee* Mandates the Denial of Toshiba's Motion ............................. 10

A. *ATM Fee* Confirms That This Court's Prior Decision Was Correct ......... 10

1. Contrary to Toshiba's Argument That *Royal Printing* Is "No
Longer Supportable," *ATM Fee* Reaffirmed *Royal Printing* ........ 11

2. Toshiba Continues to Misread *Royal Printing* and Now
*ATM Fee*, as Well ............................................................................. 12

B. Under *ATM Fee* and *Royal Printing*, TSB's Ownership and Control
of TMD Is an Independent Basis on Which to Deny Toshiba's Motion .. 14

C. Plaintiffs Have Standing For Their Purchases of Toshiba Finished
Products .............................................................................................. 15

1. *Royal Printing* Applies Where a Defendant Internally
Consumes a Price-Fixed LCD Panel ............................................. 15

2. *Royal Printing* Applies to Sales of Price-Fixed Panels
Between Defendant Groups .......................................................... 16

3.    *Royal Printing* Applies Where an ODM or System Integrator Manufactures a Finished Product But Does Not Buy the Price-Fixed Panel ...................................................... 17

4.    *Royal Printing* Applies Where a Conspirator Incorporates a Price-Fixed Panel Into a Finished Product ................................. 18

III.   Plaintiffs Have Presented More Than Enough Proof of Damage to Establish Standing ......................................................................................................... 18

Conclusion ........................................................................................................................ 20

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**

4

*In Re ATM Fee Antitrust Litigation,*
    686 F.3d 741 (9th Cir. 2012) ........................................................................................... *passim*

5

*In Suk Kim v. Vilsack,*
    No. C 10-210, 2012 Wl 368477 (N.D. Cal. Feb. 3, 2012) ....................................... 9

6

7

*James River Ins. Co. v. Hebert Schenk, P.C.,*
    523 F.3d 915 (9th Cir. 2008) ..................................................................................... 9

8

9

*Knutson v. Daily Review, Inc.,*
    548 F.2d 795 (9th Cir. 1976) .................................................................................... 19

10

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,*
    210 F.3d 1099 (9th Cir. 2000) ................................................................................... 9

11

12

*Perma Life Mufflers, Inc. v. International Parts Corp.,*
    392 U.S. 134 (1968) .................................................................................................. 12

13

14

*Royal Printing Co. v. Kimberly-Clark Corp.,*
    621 F.2d 323 (9th Cir. 1990) .............................................................................. *passim*

15

16

*Zenith Radio Corp. v. Hazeltine Research Inc.,*
    395 U.S. 100 (1969) .................................................................................................. 19

17

18

19

20

21

22

23

24

25

26

27

28

**RELEVANT PRIOR ORDERS**

| Date | MDL Dkt. No. | Order and Holding |
|---|---|---|
| Mar. 3, 2009 | 873 | *Order Denying Tatung Company of America's Motion to Dismiss Direct Purchaser Plaintiffs' First Amended Complaint* (Court held that Tatung Company of America had not shown that it was not a proper defendant under *Royal Printing* and *Freeman*, but could renew its arguments upon a fuller factual record.) |
| Mar. 28, 2010 | 1643 | *Order Denying Tatung Company of America's Motion for Leave to File a Motion for Reconsideration of March 3, 2009 Order Denying Motion to Dismiss* (Court reaffirmed prior holding that Tatung Company of America was a proper defendant under *Royal Printing* and *Freeman*.) |
| July 19, 2010 | 1885 | *Order Denying Tatung Company of America's Motions to Dismiss* (in AT&T and Motorola cases) (Court again held that Tatung Company of America was a proper defendant under *Royal Printing* and *Freeman*.) |
| Nov. 7, 2011 | 4108 | *Order Denying Toshiba Entities' Motion for Partial Summary Judgment Under* Illinois Brick (Court held that Plaintiffs had standing under *Royal Printing* for purchases of Toshiba-branded LCD Products from Toshiba's exclusive distributor in the U.S.) |
| Jan. 26, 2012 | 4683 | *Order Denying Defendants' Motion to Decertify Classes or in the Alternative for Summary Judgment* (Court rejected Defendants' argument that class was not ascertainable where LCD Product manufacturers did not keep detailed records identifying the panels used in their products.) |
| Feb. 21, 2012 | 4848 | *Order Denying Defendants' Motion to Exclude Testimony of Janet S. Netz and William S. Comanor* (Court rejected Defendants' argument that Plaintiffs must provide evidence of panel-by-panel impact.) |

1      Direct Action Plaintiffs AT&T Mobility LLC, AT&T Corp., AT&T Services, Inc.,

2  Bellsouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc.,

3  AT&T Datacomm, Inc., Southwestern Bell Telephone Company, Electrograph Systems, Inc.,

4  Electrograph Technologies Corp., Dell Inc., Dell Products L.P., Target Corp., Sears, Roebuck &

5  Co., Kmart Corp., Old Comp. Inc., Good Guys, Inc., Radioshack Corp., and Newegg Inc.

6  (collectively, "Plaintiffs" or "DAPs") respectfully submit this memorandum of law in opposition

7  to the Motion for Partial Summary Judgment Under *Illinois Brick* and *In re ATM Fee* ("Motion")

8  filed by Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic

9  Components, Inc. and Toshiba America Information Systems, Inc. (collectively, "Toshiba" or the

10 "Toshiba Entities").

11                              **INTRODUCTION**

12     Toshiba's Motion does nothing more than rehash the arguments in Defendants' Joint

13 Motion for Partial Summary Judgment relating to the Ninth Circuit's decision in *In re ATM Fee*

14 *Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012).[1]  The legal and factual points set forth in

15 Plaintiffs' Opposition to Defendants' Joint Motion apply with equal force and effect to Toshiba's

16 Motion, and establish that it should be denied.  To avoid unnecessary repetition, Plaintiffs

17 incorporate all the legal and factual arguments made in their Joint Opposition, and will summarize

18 and cross-reference to those points wherever possible.[2]

19     This is the second time in this MDL that Toshiba has attempted to escape liability for its

20 well-established participation in the LCD conspiracy by distorting the clear holding in *Royal*

21 *Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1990).  Toshiba moved for summary

22 judgment in the Direct Purchaser Plaintiff ("DPP") action, claiming that the DPPs did not have

23 standing for their finished product purchases under *Royal Printing*.  This Court correctly applied

24

25 [1] All references to "Defendants' Joint Motion for Partial Summary Judgment" or "Joint Motion" refer to Defendants' Motion for Partial Summary Judgment for Lack of Standing Under *Illinois*

26 *Brick* and *ATM Fee*, Dkt. No. 6346.  All references to "Plaintiffs' Opposition to Defendants' Joint Motion" or "Joint Opposition" refer to Plaintiffs' Opposition to Defendants' Motion for Partial

27 Summary Judgment for Lack of Standing Under *Illinois Brick* and *ATM Fee*, Dkt. No. 6503.
[2] Defendants did not file their Joint Motion against Dell, but Dell nevertheless hereby adopts all

28 the arguments made in the Joint Opposition to the extent those arguments apply to its case, and specifically its opposition to Toshiba's Motion.

the *Royal Printing* standard to deny Toshiba's motion and find that the DPPs had standing.  *See*

Dkt No. 4108.  That Order also applies to the Toshiba Entities' sales to the DAPs.  Yet Toshiba

barely mentions that Order, and offers no credible reason why this Court should depart from its

prior ruling.  Nor is there any such reason, as only two things have changed since that ruling, each

of which further solidifies this Court's prior decision: (i) a jury verdict was issued rejecting all of

Toshiba's arguments on liability and categorically establishing that the Toshiba Entities, including

Toshiba Corporation ("TSB"), Toshiba Mobile Display Co., Ltd. ("TMD") and Toshiba America

Information Systems, Inc. ("TAIS"), were direct participants in the LCD conspiracy;[3] and (ii) the

Ninth Circuit issued its ruling in *ATM Fee*, which – contrary to Toshiba's blatant

mischaracterization – both reaffirmed its prior decision in *Royal Printing*, and confirmed that this

Court has correctly interpreted and applied the *Royal Printing* standard, including in denying

Toshiba's prior motion for summary judgment.

    The first simple, undisputed fact that compels the denial of Toshiba's Motion is that

Plaintiffs purchased Toshiba-branded LCD Products from a subsidiary that was wholly-owned and

controlled by TSB – *an entity that a jury verdict has confirmed was an integral participant in the*

*conspiracy*.[4]  Indeed, throughout the conspiracy period, Plaintiffs purchased Toshiba-branded

notebook computers, which contained price-fixed LCD panels, directly from TSB's exclusive

distributor in the United States, TAIS.  It is undisputed that TAIS was wholly-owned and

controlled by TSB throughout the relevant period.

    Under the controlling legal standard set forth in *Royal Printing* and *ATM Fee*, the fact that

TAIS was a wholly-owned subsidiary of TSB establishes that Plaintiffs have standing to pursue

federal antitrust claims arising from their purchases of Toshiba-branded LCD Products.   In

reaffirming its prior decision in *Royal Printing*, the Ninth Circuit in *ATM Fee* explicitly stated:

---

[3] In light of the jury's verdict against the Toshiba Entities, Dell has moved for partial summary judgment on liability issues under the doctrine of collateral estoppel.  If granted, TAIS and the other Toshiba Entities will be precluded from arguing that they did not conspire to fix the price of TFT-LCD panels.  *See* Dkt. No. 6359.  But regardless of whether the jury verdict has collateral estoppel effect, the verdict clearly demonstrates that there is sufficient evidence for a reasonable jury to find that all of the Toshiba Entities were conspirators.

[4] Dell is not pursuing claims for purchases of finished products manufactured by a Toshiba Entity; the only purchases at issue in this Motion for Dell are finished monitors Dell purchased from Samsung and LG Electronics.  *See* Declaration of Rodney J. Ganske ("Ganske Decl.") ¶  3.

1
2
3

> *Royal Printing* allowed indirect purchasers to sue "where a direct purchaser is a division or subsidiary of a co-conspirator."  *Royal Printing* created an exception when parental control existed because applying *Illinois Brick* "would eliminate the threat of private enforcement," and "close off every avenue for private enforcement."

4   *Id.* at 756 (internal citations omitted).  In other words, the operative test under *Royal Printing* is

5   met if ownership or control *between one of the conspirators and a direct purchaser* is established,

6   *id.* at 757, and such ownership or control exists here.

7       Despite this clear guidance from the Ninth Circuit, Toshiba continues to argue that

8   Plaintiffs lack standing "because the only Toshiba Entity that manufactured and sold LCD panels

9   for a majority of the relevant time period, TMD, did not own or control any finished product

10  entities, including TAIS, from which DAPs purchased their goods." (Mot. at 3.)[5]  *ATM Fee*

11  confirms that Toshiba is wrong.  In fact, given the Ninth Circuit's decision in *ATM Fee*, this

12  Court's prior application of the *Royal Printing* standard to TSB and its wholly-owned and

13  controlled subsidiary, TAIS, as set forth below, applies with even greater force now:

14
15
16
17
18
19
20

> The Ninth Circuit could not have been clearer: "We hold that *Illinois Brick* does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." *Royal Printing*, 621 F.2d at 326 . . . the Ninth Circuit's reasoning stemmed from its concern with the parent company's control over the litigation decisions of its subsidiary.  *Id.* at 326 ("Even if the pricing decisions of such a subsidiary or division are necessarily determined by market forces, its litigation decisions will usually be subject to parental control." (footnote omitted)) . . . . Due to this control, the parent company will be unlikely to allow its subsidiary to file suit, "thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*."  *Royal Printing*, 621 F.2d at 326; *see also id.* ("The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy.").

21  Dkt No. 4108 at 2-3.

22      In addition, entirely separate and distinct from the above, the undisputed fact that TSB

23  owned and exercised control over another integral participant in the conspiracy, TMD, also

24  compels the denial of Toshiba's Motion.  Prior to April 2002, TSB manufactured LCD panels and

25  its employees participated in the conspiracy to fix their prices.  In April 2002, TSB transferred its

26  panel manufacturing business to TMD, a joint venture with co-conspirator Matsushita Electric

27  Industrial Co., Ltd. ("Matsushita") (with TSB owning 60% and Matsushita owning 40%).  TMD

28  _____
[5] Toshiba conveniently ignores the fact that for much of the conspiracy period, TSB (not TMD) manufactured Toshiba's LCD panels.

took over TSB's panel manufacturing business and, through the same employees who previously worked at TSB, continued to participate in the conspiracy.  As TSB owned and controlled one of the conspirators, TMD, all of Plaintiffs' purchases from TSB, or its wholly-owned and controlled subsidiaries, like TAIS, fall squarely within the *Royal Printing* exception.

TSB's ownership and control of TMD satisfies the ownership or control inquiry just as well as TSB's ownership and control of TAIS because the ownership and control inquiry goes both up- and downstream.  *ATM Fee* expressly held that the ownership or control exception is satisfied when a conspirator-seller of price-fixed goods owns or controls the direct purchaser *or vice versa*.  In other words, the direct purchaser's ownership or control of the conspirator-seller is also sufficient to invoke the exception.  *E.g., ATM Fee*, 686 F.3d at 756 ("In our case, neither Bank Defendants nor STAR are divisions or subsidiaries of the other."); *id.* ("[W]hether a realistic possibility of suit exists[] depends on the existence of ownership or control *between* the direct purchaser and the seller.") (emphasis added); *id.* at 756-58 (analyzing whether the Bank Defendants (the direct purchasers) owned or controlled STAR (the seller)).

In sum, Plaintiffs' purchases of Toshiba-branded LCD Products from TSB's wholly-owned and controlled subsidiary, TAIS, fall squarely within the rationale of *Royal Printing* and *ATM Fee*.  TMD and TAIS are both owned and controlled by a common parent, TSB, and it has been clearly established that TSB was one of the integral participants in the conspiracy.

## FACTUAL BACKGROUND

The Direct Action Plaintiffs affected by this Motion are leading OEMs, retailers, distributors and other businesses based in the United States, which include companies such as Dell, Target, AT&T, and Sears.  As this Court is aware from Plaintiffs' Joint Opposition, Plaintiffs purchased billions of dollars of finished products containing price-fixed TFT-LCD panels ("LCD Products").  (Joint Opp. at 5) (citing Declaration of Philip J. Iovieno in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment for Lack of Standing Under *Illinois Brick* and *ATM Fee* ("Iovieno Joint Opp. Decl."), Exh. 68 at 5; Exh. 69 at 5; Exh. 70 at 5; Exh. 71 at 5; Exh. 72 at 5).  The undisputed facts from the discovery and public record show that the entities from which Plaintiffs purchased LCD Products were owned or controlled by

1   Defendants and co-conspirators.  (*Id*. at 6) (citing Iovieno Joint Opp. Decl. at ¶¶ 1-62).  In the Joint

2   Opposition, Plaintiffs meticulously addressed each of the entities in the corporate families of

3   Defendants and co-conspirators from which they purchased LCD Products to establish that the

4   entities were indisputably wholly (or majority) owned and controlled by one of the Defendants or

5   co-conspirators; or that there is evidence of an ownership or control relationship between that

6   entity (or its corporate family) and one of the Defendants or co-conspirators.  (*Id.*)

7        In this brief, Plaintiffs will focus solely on the facts relating to the Toshiba Entities, their

8   participation in the conspiracy and the fact that the Toshiba subsidiaries from which Plaintiffs

9   purchased Toshiba-branded LCD Products were indisputably owned and controlled by TSB, one

10  of the established conspirators.  For the remaining facts relevant to Plaintiffs' purchases of LCD

11  Products from Defendants and their co-conspirators, the Court is referred to the Joint Opposition,

12  and the extensive evidence cited therein.  (*See generally* Joint Opp. at 4-9.)

13  **I.    A Jury Verdict Has Confirmed That The Toshiba Entities Were Integral Participants
14         In The LCD Conspiracy.**

15       As this Court is well aware, the DPP class tried their LCD panel and finished products

16  claims against Toshiba in a five week jury trial last spring.  Each of the Toshiba Entities that is a

17  party to this Motion, including TSB, TMD and TAIS, was a defendant in the DPP action jury trial.

18  At the conclusion of the trial, the jury returned a verdict of liability against each of the Toshiba

19  Entities.   In particular, with respect to whether the Toshiba Entities participated in the LCD

20  conspiracy, the jury found the following:

21       • Did plaintiffs prove, by a preponderance of the evidence and in accordance with the
          instructions given to you, that Toshiba knowingly participated in a conspiracy to fix, raise,
22        maintain or stabilize the prices of TFT-LCD panels?

23            o Answer:  Yes.

24       • Did plaintiffs prove, by a preponderance of the evidence and in accordance with the
          instructions given to you, that members of the Finished Product Class were injured as
25        result of the conspiracy in which Toshiba knowingly participated?

26            o Answer:  Yes.

27  Dkt No. 6061 (Jury Verdict in Favor of Plaintiff and Against Toshiba, dated July 3, 2012).

28       The evidence presented at trial overwhelmingly established that from the beginning of the

conspiracy in 1998 through at least 2002, TSB was a direct and active participant in the LCD conspiracy.[6]  TSB employees were present at the very first conspiratorial meetings in which the structure and operation of the conspiracy was established.[7]  Throughout these four years, employees of TSB repeatedly met with competitors and agreed on prices for TFT-LCDs.[8]  TSB's participation in the conspiracy from 1998 through 2002 coincided with the time period in which TSB continued to manufacture and sell LCD panels.[9]  In April of 2002, TSB created TMD, a joint venture in which TSB had a 60% ownership stake.[10]  At the time TMD was created, TSB transferred all of its panel manufacturing assets to TMD (including the TSB personnel who had been participating in the conspiracy).[11]  The evidence adduced at trial established that from April of 2002 through the end of the conspiracy, TMD, and particularly the former employees of TSB who were transferred to TMD, continued to be an active participant in the LCD conspiracy.[12]

## II.      The Toshiba Corporate Family's LCD Operations.

Both TSB and TMD manufactured and sold LCD panels during the conspiracy period. TSB manufactured LCD panels from prior to the beginning of the conspiracy period until March 2002.[13]  During that time period, TSB used its wholly-owned subsidiary, Toshiba America Electronic Components, Inc. ("TAEC") as its exclusive LCD panel distributor in the United States.[14]  Since 2002, TMD has manufactured LCD panels, and has used TAEC as its exclusive distributor of LCD panels in the United States.[15]

---

[6] *See, e.g.,* Declaration of Philip J. Iovieno in Support of Plaintiffs' Opposition to Toshiba's Motion for Partial Summary Judgment Under *Illinois Brick* and *ATM Fee* ("Iovieno Decl."), Exh. 29 – 33; *see also* Dkt. No. 3843 (Declaration of Jordan Elias in Support of Direct Purchaser Plaintiffs' Opposition to Toshiba Entities' Motion for Summary Judgment, ¶¶ 10 – 201 (and evidence cited therein)) and Dkt. No. 3867 (Declaration of Daniel R. Shulman (Indirect Purchaser Plaintiffs) in Opposition to Defendant Toshiba's Motion for Summary Judgment, ¶¶ 2-122 (and evidence cited therein)).

[7] *Id.*

[8] *Id.*

[9] Iovieno Decl., Exh. 27 at 9.

[10] Iovieno Decl., Exh. 18 at TSB-LCD-0259649.

[11] Iovieno Decl., Exh. 25 at 32:10 – 32:21; 37:18 – 40:1.

[12] *See supra* note 6.

[13] *See supra* note 9.

[14] *Id.  See also* Iovieno Decl., Exh. 1 at TSB_LCD_0058277; Exh. 2 at TSB_LCD_0058334; Exh. 3 at TSB_LCD_0057781, TSB_LCD_0057804; Exh. 4 at TSB_LCD_0058006; Exh. 5 at TSB LCD_0058082; Exh. 6 at TSB_LCD_0058376; Exh. 8 at 61.

[15] Iovieno Decl., Exh. 28 at 9.

1   Throughout the conspiracy period, TSB also manufactured LCD notebooks and monitors,

2   and used its wholly owned subsidiary TAIS as its exclusive distributor of these Toshiba-branded

3   LCD Products in the United States.[16]   As such, it was TAIS, in its capacity as a wholly-owned

4   subsidiary of TSB, that sold Toshiba branded notebooks and monitors to Plaintiffs.[17]   It is

5   undisputed that TSB procured all the LCD panels, and other component parts, for all the LCD

6   Products that TAIS sold in the United States.  (Joint Opp. at 9 & n.25.)  These Toshiba-branded

7   finished products incorporated LCD panels that were manufactured by TSB (prior to April 2002)

8   and TMD (beginning in April 2002), as well as LCD panels manufactured by other Defendants

9   and co-conspirators.[18]

10   **A.   TSB Owns and Controls TAIS.**

11   At all relevant times, TAIS was a wholly-owned subsidiary of Toshiba America, Inc.

12   ("TAI"), which, in turn, was a wholly-owned subsidiary of TSB.[19]   In other words, TAIS is, via

13   TAI, a wholly-owned subsidiary of TSB.

14   As the corporate parent of a wholly-owned subsidiary, TSB unsurprisingly has exerted

15   significant control over TAIS.   For instance, from 1997 to 1999, Atsutoshi Nishida held

16   overlapping positions as a Vice President of TSB and as a Corporate Executive and Chairman of

17   the Board of Directors of TAIS.[20]   Nishida served as Director, President and Chief Executive

18   Officer of TSB from 2005 to 2009, and has served as the Chairman of the Board of Directors of

19

20

21   [16] *See* Declaration of John H. Chung in Support of Toshiba Entities' Motion for Partial Summary Judgment Under *Illinois Brick* and *In re ATM Fee* ("Chung Decl,"), Exh. 7.  *See also supra* note 14.

22   [17] *Id.*  Toshiba-branded LCD TVs were also sold in the United States during the conspiracy period. Toshiba America Consumer Products ("TACP"), another wholly-owned subsidiary of TSB, was the entity within the Toshiba corporate family that manufactured the Toshiba-branded LCD TVs

23   that were sold in the United States. *See* Iovieno Decl., Exh. 1 at TSB_LCD_0058277; Exh. 2 at TSB_LCD_0058334; Exh. 3 at TSB_LCD_0057781, TSB_LCD_0057804; Exh. 6 at

24   TSB_LCD_0058376; Exh. 8 at 61; Exh. 33 at 35:10 – 38:22; *see also supra* note 4 (Dell is not

25   pursuing claims for the purchase of any Toshiba-branded LCD Products).
[18] *See, e.g.,* Iovieno Decl., Exh. 26 at 38:23 – 41:6.

26   [19] Iovieno Decl., Exh. 1 at TSB_LCD_0058277; Exh. 2 at TSB_LCD_0058334; Exh. 3 at TSB_LCD_0057804; Exh. 4 at TSB_LCD_0058006; Exh. 5 at TSB_LCD_0058082; Exh. 6 at

27   TSB_LCD_0058376; Exh. 8 at 61; Exh. 12 at TSB-LCD-0133806; Exh. 13 at TSB-LCD-0133825; Exh. 14 at TSB-LCD- 0133847.

28   [20] Iovieno Decl., Exh. 1 at TSB_LCD_0058253; Exh. 2 at TSB_LCD_0058306; Exh. 3 at TSB LCD_0057772; Exh. 15; Exh. 16.

PLAINTIFFS' OPPOSITION TO TOSHIBA'S
MOTION FOR PSJ UNDER *ILLINOIS BRICK*          - 7 -                        Master File No. 3:07-md-01827-SI
AND *ATM FEE*

1  TSB since 2009.[21]   In addition, between April 2005 and March 2006, Hidejiro Shimomitsu

2  simultaneously served as an Executive Officer and Corporate Vice President of TSB, and as the

3  President, Chief Executive Officer, and Chairman of TAIS.[22]

4       In addition, TAIS's consolidated financial statements set forth that "[a] substantial portion

5  of the Company's products are purchased from Toshiba Corporation."[23] Further, any disruption in

6  the relationship between TAIS and TSB that would impair TAIS's ability to obtain products from

7  TSB "could have a material adverse effect on the Company's business, operating results, and

8  financial condition."[24]

9       There are also close financial connections between TAIS and TSB.  For example, in 2001,

10  TSB provided more than $54 million in expense reimbursements to TAIS.[25]   In addition, TSB

11  agreed to pay all financial obligations of TAIS in connection with the settlement of litigation in

12  which both companies were held jointly and severally liable during the fiscal year ended March

13  31, 2000.[26]

14              **B.**    **TSB Owns and Controls TMD.**

15       TMD was established in April 2002 as a joint venture between TSB and co-conspirator

16  Matsushita.[27]  At all relevant times, TSB had a majority ownership in TMD.  Between April 2002

17  and March 2009, TSB owned a 60 percent interest in TMD, and Matsushita owned a 40 percent

18  interest.[28]  In April 2009, TSB acquired Matsushita's interest, and since that time TMD has been a

19  wholly-owned subsidiary of TSB.[29]

20       At all relevant times, TSB also exerted significant control over TMD's operations.  From at

21  least June 2002 through 2006, Toshiba appointed 6 of TMD's 10 board members.[30]   During the

22

23  [21]  Iovieno Decl., Exh. 10 at 3, 32; Exh. 7 at TSB-LCD-0058454–55; Exh. 6 at TSB_LCD 0058371; Exh. 8 at  44; Exh. 9 at 44.

24  [22] Iovieno Decl., Exh. 7 at TSB-LCD-0058455; Exh. 17 at TSB-LCD-0187515.
    [23] *See, e.g.,* Iovieno Decl., Exh. 14 at TS8-LCD-0133847.

25  [24] *Id.*
    [25] Iovieno Decl., Exh. 14 at TSB-LCD-0133854.

26  [26] Iovieno Decl., Exh. 14 at TSB-LCD-0133856.
    [27] Iovieno Decl., Exh. 4 at TSB_LCD_0058000; Exh. 18 at TSB-LCD-0259649.

27  [28] *Id.*
    [29] Iovieno Decl., Exh. 11 at 27.

28  [30]  Iovieno Decl., Exh. 19 at TSB-LCD-0016882; Exh. 20, at TSB-LCD-0247635; Exh. 21, at TSB_LCD1 00468649; Exh. 22, at TSB_LCD1 00466261.

conspiracy period, TMD reported directly to the highest level executives at TSB.  For instance, one of TSB's organizational charts dated April 1, 2003 states: "TMD reports to Toshiba Corp. (Mr. Okamura and Mr. Nakagawa) directly!"[31]  Between April 2003 and March 2005, Tadashi Okamura held positions as the President, Chief Executive Officer, Director and Chairman of the Board of Directors of TSB.[32]  Between April 2003 and March 2004, Takeshi Nakagawa served as a Corporate Senior Executive Vice President and Director of TSB, and simultaneously was a member of TMD's Board of Directors.[33]  Between April 2004 and March 2005, Toshio Yonezawa served as a Corporate Executive and Vice President of TSB, while he also held the position of Representative Director of TMD.[34]

## ARGUMENT

### I.   Summary Judgment Is Inappropriate Where, as Here, Toshiba Has Not Satisfied Its Initial Burden of Production.

Plaintiffs have set forth the relevant legal standard in their Joint Opposition.  (Joint Opp. at 10.)  Just as Defendants have failed to satisfy their initial burden of production in connection with the Joint Motion, Toshiba has failed to satisfy its burden of production in connection with its Motion.

Toshiba has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  To satisfy its burden of production, Toshiba "must either produce evidence negating an essential element of the nonmoving party's claim…or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Id.*  Toshiba has done neither, so Plaintiffs "may defeat the motion for summary judgment *without producing anything*."  *Id.* at 1103 (emphasis added).  *See also id.* at 1107 ("[A] nonmoving party plaintiff has no obligation to produce anything until the moving party defendant has carried its initial burden of production."); *James River Ins. Co. v. Hebert Schenk,*

---

[31] Iovieno Decl., Exh. 18 at TSB-LCD-0259650.
[32] Iovieno Decl., Exh. 5 at TSB-LCD-0058040; Exh. 6 at TSB-LCD-0058371; Exh. 23 at TSB-LCD-0812511.
[33] Iovieno Decl., Exh. 5 at TSB-LCD-0058040; Exh. 18 at TSB-LCD-0259650–51, TSB-LCD-0259769.
[34] Iovieno Decl., Exh. 6 at TSB-LCD-0058371; Exh. 24.

1    *P.C.*, 523 F.3d 915, 923-24 (9th Cir. 2008).[35]

2        Toshiba acknowledges that TSB wholly owned TAIS and had a 60% ownership interest in

3    TMD during the conspiracy period, (Mot. at 7), and, aside from that, fails to set forth any evidence

4    whatsoever related to ownership or control.   Toshiba's Motion should be denied on this basis

5    alone.

6    **II.**     ***ATM Fee* Mandates the Denial of Toshiba's Motion.**

7              **A. *ATM Fee* Confirms That This Court's Prior Decision was Correct.**

8        Toshiba moved for summary judgment in the DPP action on the same ground that it now

9    moves in the DAP actions.   More specifically, Toshiba argued in the DPP action that because the

10   manufacturer of Toshiba LCD panels (TMD) did not own or control the exclusive distributor of

11   Toshiba LCD Products in the United States (TAIS), the *Royal Printing* exception did not apply.

12   *See* Dkt No. 4108 at 2.   This Court rejected Toshiba's interpretation of *Royal Printing* as contrary

13   to the plain language of the Ninth Circuit's decision:

14       Toshiba's argument rests on a misreading of *Royal Printing*.   That case was not
         concerned with the relationship between the manufacturer of a price-fixed product
15       and the direct purchaser; rather, it was concerned with the relationship between the
         *conspirator* and the direct purchaser.   The Ninth Circuit could not have been
16       clearer: "We hold that *Illinois Brick* does not bar an indirect purchaser's suit where
         the direct purchaser is a division or subsidiary of a co-conspirator." *Royal Printing*,
17       621 F.2d at 326.

18   *Id*. at 2.   Thus, this Court found that the relationship between TMD and TAIS was irrelevant.

19   Rather, as required by *Royal Printing*, this Court focused on the relationship between one of the

20   conspirators (TSB) and the direct purchaser (TAIS).   *Id*. at 2-3.   This Court found that there was

21   sufficient evidence for a jury to find that TSB was a conspirator and that, further, TSB owned and

22   controlled TAIS.   *Id*. at 2 n.2 & 3.   On that basis, the Court denied Toshiba's motion:

23       DPPs' evidence, set forth in its opposition to Toshiba's summary judgment motion

24       on the issue of its participation in the conspiracy, is sufficient for a jury to find that

25   ────────────────────
[35] As is clear from the Ninth Circuit's characterization of the movant's burden of production as
26   "initial" (*Nissan Fire*, 210 F.3d at 1106), Toshiba must satisfy its burden in its opening brief and
     cannot cure deficiencies on reply, *see, e.g., In Suk Kim v. Vilsack*, No. C 10-210, 2012 WL
27   368477, at *13 (N.D. Cal. Feb. 3, 2012) (denying defendant's motion for summary judgment
     where he, "as the moving party, did not meet his *initial* burden of production" "in his *opening*
28   *brief*") (emphasis added).

1    Toshiba Corporation was involved in the conspiracy.  Given this evidence that the
2    parent company participated in the conspiracy, the Court finds that the *Royal*
     *Printing* exception applies.

3    *Id*. at 3.

4          Only two things have changed since this Court issued its order denying Toshiba's motion

5    in the DPP action, each of which confirms that this Court correctly denied Toshiba's motion.

6    First, a jury has now agreed with this Court and found TSB (and the other Toshiba Entities) liable

7    for participating in the LCD conspiracy.  Dkt No. 6061.  Second, the Ninth Circuit issued its

8    opinion in *ATM Fee*, which not only reaffirmed *Royal Printing*, but also validated this Court's

9    reading of *Royal Printing* in its prior order.  Indeed, *ATM Fee* relied on the holding of *Royal*

10   *Printing* in the same manner that this Court did in its prior decision denying Toshiba's motion.

11   *Compare ATM Fee*, 686 F.3d at 756 (quoting *Royal Printing*, at 621 F.2d 326) *with* Dkt No. 4108

12   at 2 (quoting *Royal Printing*, 621 F.2d at 326).  Thus, as discussed further below, the law and the

13   undisputed facts compel the denial of Toshiba's Motion in the DAP actions, even more strongly

14   now than they did in the DPP action.

15                **1.    Contrary to Toshiba's Argument That *Royal Printing* is "No Longer
16                        Supportable," *ATM Fee* Reaffirmed *Royal Printing*.**

17         Toshiba makes the frivolous argument that "DAPs' finished product claims cannot survive

18   summary judgment because, after *ATM Fee*, the Ninth Circuit's decision in *Royal Printing* is no

19   longer supportable."  (Mot. at 14.)  Even a cursory reading of *ATM Fee* shows that Toshiba is

20   flatly wrong.  In *ATM Fee*, the Court recognized three permissible exceptions to *Illinois Brick*, one

21   of which was the ownership or control exception originally set forth by the Ninth Circuit in *Royal*

22   *Printing*.  686 F.3d at 749 (holding that "indirect purchasers may sue when a conspiring seller

23   owns or controls the direct purchaser") (citing *Royal Printing*, 621 F.2d at 326); *see also id*. at

24   756.  Thus, far from casting any doubt on *Royal Printing*, it is indisputable that *ATM Fee*

25   reaffirmed *Royal Printing*.

26         Moreover, in so doing, *ATM Fee* also reaffirmed the important public policy underlying

27   *Royal Printing*, stating:

28         *Royal Printing* allowed indirect purchasers to sue "where a direct purchaser is a
           division or subsidiary of a co-conspirator."  *Royal Printing* created an exception

1

2

when parental control existed, because applying *Illinois Brick* "would eliminate the threat of private enforcement," and "close off every avenue for private enforcement."

3

*Id.* at 756 (internal citations omitted). The Court went on to examine whether control existed in

4

the case at hand and determined that it did not. *Id*. at 757-58. In contrast with the facts presented

5

here, in *ATM Fee*, the Court found that many of the direct purchasers were net payers of the

6

allegedly price-fixed fee, and thus they would have adequate incentive to bring suit against the

7

ATM network that fixed the price of that fee such that private enforcement of the antitrust laws

8

was not foreclosed. *Id*. at 747 n.2. Thus, Toshiba's contention that "the core rationale of the

9

*Royal Printing* exception no longer carries the same urgency," (Mot. at 14), is demonstrably false.

10

The Ninth Circuit's quotation and application of this rationale demonstrates that it remains as

11

"urgent" to the enforcement of the federal antitrust laws as ever.[36]

12

Thus, Toshiba's argument that *Royal Printing* is "no longer supportable" is directly

13

contrary to the explicit holding of *ATM Fee* and deserves no serious consideration.

14

### 2. Toshiba Continues to Misread *Royal Printing* and Now *ATM Fee*, as Well.

15

Toshiba also continues to advance the same misreading of *Royal Printing* that this Court

16

rejected in its decision denying Toshiba's motion for summary judgment in the DPP action and

17

that the Ninth Circuit confirmed was incorrect in *ATM Fee*. *ATM Fee* held that the *Royal Printing*

18

exception is satisfied if ownership or control between a conspirator and a direct purchaser is

19

established. 686 F.3d at 757. In so holding, *ATM Fee* not only reaffirmed the *Royal Printing*

20

exception, but did so in a way that is consistent with this Court's prior decision denying Toshiba's

21

motion for summary judgment in the DPP action.

22

23

---

[36] Moreover, Toshiba's argument that state indirect purchaser suits can serve as adequate private enforcement in lieu of federal direct purchaser suits has no merit. (Mot. at 14-15.) As this Court has already recognized, immunizing price-fixers from federal antitrust liability would be flatly inconsistent with *Illinois Brick* and would be contrary to the well-established public policy underlying antitrust enforcement. Dkt No. 4108 at 3 (citing, *inter alia*, *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968) ("the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter any one contemplating business behavior in violation of the antitrust laws"); *Royal Printing*, 621 F.2d at 326 (noting risk of multiple recovery but accepting it because the "only alternative is to effectively immunize the transactions here from private antitrust liability, thus thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*." (footnote omitted)).

24

25

26

27

28

1    Toshiba argues that it is actually this Court that has misread *Royal Printing* and that *ATM*

2    *Fee* holds that the ownership or control exception cannot apply unless the direct purchaser is

3    owned or controlled by the seller of the price-fixed product, rather than by any one of the

4    conspirators.  (Mot. at 12-13) ("*ATM Fee* explicitly declined to extend the ownership or control

5    exception to situations where the seller . . . does not own or control the direct purchaser").  As

6    discussed at length in Plaintiffs' Joint Opposition, Toshiba's overly restrictive reading of the

7    ownership or control exception is directly contrary to both the facts and explicit holdings in *Royal*

8    *Printing* and *ATM Fee*.  (*See generally* Joint Opp. at 3-4; 15-17.)  *Royal Printing* held that "*Illinois*

9    *Brick* does not bar an indirect purchaser's suit where the direct purchaser is a division or

10   subsidiary of *a* co-conspirator." 621 F.2d at 326 (emphasis supplied).  Indeed, in *Royal Printing*,

11   the plaintiff purchased one defendant's price-fixed product from a division or subsidiary of

12   another defendant, and the Court found that the plaintiff had standing.  *Id*. at 324 and 327.  The

13   fact that there was not a linear corporate relationship between the manufacturer of the product and

14   the direct purchaser was irrelevant. The only relevant fact was that the direct purchaser was owned

15   and controlled by one of the defendants or co-conspirators.

16   Thus, this Court likewise held that *Royal Printing* "was not concerned with the relationship

17   between the manufacturer of a price-fixed product and the direct purchaser; rather, it was

18   concerned with the relationship between the *conspirator* and the direct purchaser." Dkt. No. 4108

19   at 2 (emphasis in original).[37]  *ATM Fee* reaffirmed this exact holding, specifically that *Royal*

20   *Printing* is not restricted to a pure linear corporate relationship between the conspirator and direct

21   purchaser.  686 F.3d 749 ("[I]ndirect purchasers may sue when ... *a* conspiring seller owns or

22   controls the direct purchaser.") (emphasis supplied).

23   Toshiba mischaracterizes similar language in *ATM Fee* and argues that it somehow

---

[37] In certain instances in its briefing on Toshiba's motion for summary judgment in the DPP
action, Toshiba appeared to acknowledge that this was the standard under *Royal Printing* and
argued not for a more restrictive reading of *Royal Printing*, but rather that the DPPs had not
presented adequate proof that TSB participated in the conspiracy.  *See, e.g.,* Dkt No. 3999 at 7
("[I]n order for DPPs to recover for finished product purchases from TAIS, *Royal Printing*
requires DPPs to establish ownership or control of TAIS by an entity that participated in the
alleged conspiracy.  Yet, DPPs have failed to raise a genuine issue of material fact as to TSB's
participation in a TFT-LCD panel conspiracy.").  Of course, a jury has now reached a verdict
finding that the Toshiba Entities did in fact participate in the conspiracy.

1   establishes a rule that the direct purchaser must be owned or controlled by the seller of the price-

2   fixed product, rather than one of the conspirators.  (Mot. at 11) (citing *ATM Fee*, 686 F.3d at 757)

3   ("We decline to extend the exception noted in *Royal Printing* and *Freeman* to situations where the

4   seller does not own or control the direct purchasers . . . .").  As discussed above, this is plainly

5   wrong.  Rather, in the sentence selectively quoted by Toshiba, the *ATM Fee* Court was clearly

6   stating that it would not extend the *Royal Printing/Freeman* exception to include the situation

7   presented by the facts in *ATM Fee*, where there was no ownership or control relationship between

8   the STAR Network and the Bank Defendants.

9       Toshiba further argues that this Court improperly relied on *Freeman's* "no realistic

10  possibility of suit" rationale in denying its prior motion for summary judgment in the DPP action.

11  (Mot. at 12.)  Of course, Toshiba is wrong.  In denying Toshiba's prior motion for summary

12  judgment, this Court explained that *Royal Printing* held that there is no realistic possibility of suit

13  in situations where there is parental control:

14          [T]he Ninth Circuit's reasoning [in *Royal Printing*] stemmed from its concern with
            the parent company's control over the litigation decisions of its subsidiary.  Due to
15          this control, the parent company will be unlikely to allow its subsidiary to file suit,
            thwarting a vital part of the antitrust enforcement scheme and the expressed
16          purpose of *Illinois Brick*.

17  *Id*. at 3 (internal citations and quotations omitted).  This is exactly the rationale that *ATM Fee*

18  reaffirmed.   686 F.3d at 756.  *ATM Fee* merely declined to extend this rationale outside of

19  situations in which there is ownership or control between the conspirators and the direct purchaser.

20  *Id*. at 757.  This Court expressly relied on the parental relationship between Toshiba Corporation

21  and its controlled subsidiaries in denying Toshiba's prior motion for summary judgment.  Dkt No.

22  4108 at 2-3.  "Given this evidence that the *parent company* participated in the conspiracy, the

23  Court finds that the *Royal Printing* exception applies." *Id*. at 3 (emphasis added).  Thus, this

24  Court's prior opinion is fully in line with both *Royal Printing* and *ATM Fee*.

25          **B.  Under *ATM Fee* and *Royal Printing*, TSB's Ownership and Control of TMD is
            an Independent Basis on Which to Deny Toshiba's Motion.**

26

27      Putting aside TSB's participation in the conspiracy, TMD's participation in the conspiracy

28  provides an independent basis on which to deny Toshiba's Motion.  Under *ATM Fee* and *Royal*

*Printing*, the ownership or control exception is satisfied when a conspirator owns or controls the direct purchaser, *or vice versa*. Thus, TSB's ownership and control over TMD satisfies the *Royal Printing* exception since TMD was a conspirator and Plaintiffs have standing for all of their purchases from TSB, or its wholly-owned and controlled subsidiaries, like TAIS.

In *ATM Fee*, the Ninth Circuit expressly held that the direct purchaser's ownership or control of the seller is sufficient to invoke the *Royal Printing* exception. *E.g., ATM Fee*, 686 F.3d at 756 ("In our case, neither Bank Defendants nor STAR are divisions or subsidiaries of the other."); *id.* ("[W]hether a realistic possibility of suit exists[] depends on the existence of ownership or control *between* the direct purchaser and the seller.") (emphasis added); *id.* at 756-58 (analyzing whether the Bank Defendants (the direct purchasers) owned or controlled STAR (the seller)). Moreover, if the exception did not apply where the direct purchaser owns and controls the seller, it would undercut the very policy that led to the creation of the ownership or control exception: just as a conspirator-seller would prevent its direct purchaser subsidiary from suing to reveal the seller's culpability, a direct purchaser would never sue its price-fixing subsidiary and expose the fact that its subsidiary was violating the antitrust laws, particularly given that the parent company would gain nothing by obtaining a money judgment from its own subsidiary.

The facts here demonstrate that TSB owned and controlled TMD, along with its co-conspirator Matsushita. From TMD's formation in April 2002 through March 2009, TSB owned a 60 percent interest in TMD, and Matsushita owned a 40 percent interest.[38] In April 2009, TSB acquired Matsushita's interest, and since that time TMD has been a wholly-owned subsidiary of TSB.[39] TSB also exerted significant control over TMD's operations, appointing six of TMD's ten board members from at least June 2002 through 2006 and having TMD report directly to the highest level executives at TSB.[40]

### C.  Plaintiffs Have Standing For Their Purchases of Toshiba Finished Products.

Toshiba's remaining arguments that "much of DAPs' claims" must be dismissed under

---

[38] *See supra* notes 27 and 28 and accompanying text.
[39] *See supra* note 29 and accompanying text.
[40] *See supra* notes 30-34 and accompanying text.

*ATM Fee*, (Mot. at 13), simply reiterate the arguments made by Defendants in their Joint Motion and should be rejected on the same grounds.

> **1.   *Royal Printing* Applies Where a Defendant Internally Consumes a Price-Fixed LCD Panel.**

Like the other Defendants, Toshiba does not dispute that the ownership or control exception applies where a defendant internally consumes a price-fixed LCD panel; nor could they. Under the Ninth Circuit's controlling precedents in *ATM Fee*, *Royal Printing* and *Freeman,* the ownership and control exception unquestionably applies in this scenario. *See*, *e.g*., *ATM Fee*, 686 F.3d at 749 (indirect purchasers may sue where "a conspiring seller owns or controls the direct purchaser"). Thus, DAPs have standing to pursue claims based on their purchases of Toshiba LCD Products that contain Toshiba or TMD price-fixed panels.[41]

> **2.   *Royal Printing* Applies To Sales of Price-Fixed Panels Between Defendant Groups.**

Toshiba argues that Plaintiffs lack standing for purchases of "any finished product sold by one Defendant that incorporated a panel sold by a different Defendant group."   (Mot. at 13.) However, as discussed at length in Plaintiffs' Joint Opposition, *ATM Fee* and *Royal Printing* make clear that the ownership or control exception may be applied to Plaintiffs' purchases of LCD Products from the Toshiba Entities that contain price-fixed LCD panels from another Defendant. (*See* Joint Opp. at 3-4; 15-17.)

First, many of the LCD Products that fall into this category involve the sale of a price-

---

[41] The only purchases at issue in this Motion for Dell are finished monitors Dell purchased from Samsung and LG Electronics. *See* Ganske Decl. ¶ 3. As vertically integrated entities, Samsung and LG Electronics primarily utilized internally sourced panels. *See, e.g.,* Exhibit 34 to Ganske Decl. ("Q: Do you know if the LGE monitors which Dell purchased exclusively used LGD panels?  A: It was not intended to be that way, but in reality, if I'm not wrong, it was the - in most case only LGD panel used. I don't recall precisely."); *see also* Exhibit 36 to Ganske Decl. ("Samsung as a customer wasn't buying from anybody other than Samsung as a LCD. So the integrators that made the final monitor...that division, was only using Samsung LCDs."). Therefore, Dell's purchases fall directly within the ownership or control exception as set forth by the Ninth Circuit's decision in *Royal Printing* and *In re ATM Fee*. *See In re ATM Fee*, 686 F.3d at 749. To the extent LG Electronics and Samsung sourced panels from another supplier, Dell required the integrator to use a "Dell qualified supplier", and the record shows that nearly all of Dell's qualified suppliers were active participants in the global conspiracy to fix TFT-LCD prices. *See* Exhibit 35 to Ganske Decl. Thus, the overwhelming majority of the panels used in the monitors purchased by Dell were sourced from co-conspirators. *Id.*  These facts alone establish that Dell's purchases satisfy the ownership or control exception and therefore Toshiba's Motion should be denied.

1    fixed panel by one Defendant directly to *a subsidiary or division* of another Defendant.   As

2    discussed above, these were precisely the facts upon which *Royal Printing* found standing (*i.e.*,

3    "where a direct purchaser is a division or subsidiary of a co-conspirator").   686 F.3d at 756

4    (internal quotation omitted).   Second, for the rest of the purchases in this category, which involve

5    the sale of a price-fixed panel by one Defendant directly to another Defendant, standing also exists

6    under *ATM Fee* and *Royal Printing*.   It is beyond dispute that under the legal standard articulated

7    by *ATM Fee* and *Royal Printing*, a sale from one defendant to another defendant's *division* (an

8    entity that is not legally distinct from the defendant) may satisfy the ownership or control

9    exception.   *Id.*   On the facts of this case, there is simply no basis under *ATM Fee* and *Royal*

10   *Printing* to draw a distinction between sales of a price-fixed panel from one defendant to another

11   defendant, and sales of a price-fixed panel from a defendant to a division (or subsidiary) of another

12   defendant.[42]

13         Thus, for all of the reasons stated above and described at further length in Plaintiffs' Joint

14   Opposition, (Joint Opp. at 3-4; 15-17), Plaintiffs have standing for their purchases of LCD

15   Products from the Toshiba Entities that contain price-fixed LCD panels from another Defendant.

16                     **3.   *Royal Printing* Applies Where an ODM or System Integrator**
                            **Manufactures a Finished Product But Does Not Buy the Price-Fixed**
17                          **Panel.**

18         Toshiba argues that Plaintiffs lack standing for their purchases of "every finished product

19   that was purchased or sold to a systems integrator, ODM or other third party before reaching

20   DAPs."   (Mot. at 13.)   Toshiba fails to cite *a single piece of evidence* to support the claim that

21   systems integrators or ODMs ever purchased the price-fixed LCD panels in the Toshiba LCD

22   Products purchased by Plaintiffs.   Putting aside that Defendants have failed to carry their burden of

23   demonstrating that there is any reason to believe Plaintiffs lack standing on this basis, the

24

25   [42] It is unremarkable that *ATM Fee* did not apply the ownership or control exception between the
     defendants in that case, given the unique facts it presented. In *ATM Fee*, the Court held that the
26   Bank Defendants *did not participate in the price-fixing of the interchange fee.* 686 F.3d at 745
     ("The ATM network (not the card-issuing bank nor the ATM owners) establishes the interchange
27   fee."). By contrast, the overwhelming evidence in this case establishes that TSB, TMD and all of
     the other Defendants participated in fixing the prices of the LCD panels, which they then sold to
28   others and among themselves.

1    undisputed evidence is to the contrary.

2        As set forth in Plaintiffs' Joint Opposition, the evidence shows that when a Defendant used

3    an ODM, the Defendant purchased the price-fixed LCD panel and supplied it to the ODM.  (Joint

4    Opp. at 8-9.)  The ODM's involvement was strictly limited to *assembling* the LCD Product for the

5    Defendant and returning it to the Defendant for sale to Plaintiffs under the Defendant's own brand

6    name.   Indeed, Toshiba has admitted that although "[i]n some cases, [it] used original design

7    manufacturers or system integrators to make notebooks," Toshiba "was responsible for the

8    procurement of all component parts, including TFT-LCDs."  Dkt No. 3575 at 4-5.  The record thus

9    establishes that DAPs, not the ODMs, were the direct purchasers.

10              **4.    *Royal Printing* Applies Where a Conspirator Incorporates A Price-
                        Fixed Panel Into A Finished Product.**

11

12       Toshiba offers the half-hearted argument that "recovery as a direct purchaser is prohibited

13   unless the plaintiff actually purchased the price-fixed product."  (Mot. at 14.)  Toshiba cites only

14   to an unpublished recommendation by the Special Master in the *CRT* litigation, (*see id.*), which is

15   of course not binding on this Court and which runs contrary to this Court's prior decisions.

16   Toshiba then argues that *ATM Fee* "strongly suggested" such a result.  *Id.*  Toshiba's reading of

17   *ATM Fee* is plainly wrong, because if true, the *ATM Fee* Court would not have analyzed whether

18   the Bank Defendants and the STAR Network had an ownership or control relationship, because

19   the analysis would have stopped after the Court decided that the plaintiffs had not directly paid the

20   price-fixed fee (rather they paid a fee that was allegedly inflated by the price-fixed fee).  (*See* Joint

21   Opp. at 13.)

22   **III.    Plaintiffs Have Presented More Than Enough Proof of Damage To Establish
              Standing.**

23       Toshiba also reiterates Defendants' argument in their Joint Motion that because Plaintiffs

24   cannot identify the manufacturer of every single LCD panel in every one of the millions of LCD

25   Products they purchased from Defendants, they lack standing for these purchases.  (*Compare* Mot.

26   at 7-8 *with* Joint Mot. at 21.)   As Plaintiffs set forth in their Joint Opposition, this argument

27   violates black letter law and should be rejected.  (Joint Opp. at 21-25.)

28       Toshiba first argues that Plaintiffs cannot determine whether each of the LCD Products

they purchased contained a conspirator panel or a non-conspirator panel.  (Mot. at 8.)  Plaintiffs have already thoroughly addressed this argument in their Joint Opposition.  This Court has already rejected Defendants' contention that Plaintiffs must "provide evidence of panel-by-panel impact." Dkt No. 4848 at 5; *see also* Dkt No. 4683 at 2-4.  In so holding, this Court followed established Supreme Court and Ninth Circuit precedent, which states that plaintiffs need only show a minimal quantum of injury to establish impact and, thus, standing.  *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 114 n.9 (1969) (A plaintiff's "burden of proving the fact of damage under s 4 of the Clayton Act is satisfied by its proof of *some damage* flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.") (emphasis added); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) ("Even as to this minimal quantum of injury, the standard is relaxed; otherwise, it would defeat the loose standard applied even to the amount of damages in antitrust cases.").  Here, Plaintiffs have done that, having proved with certainty that they purchased LCD Products from Defendants and having shown that, based on panel sourcing and market share data, the vast majority of the LCD panels in those finished products were price-fixed.  (*See* Joint Opp. at 24-25.)

Second, Toshiba argues that if Plaintiffs cannot identify the particular Defendants or co-conspirators that manufactured the panels in the LCD Products they purchased, they cannot "satisfy the necessary factual predicates to establish ownership or control."  (Mot. at 8.)  Plaintiffs' Joint Opposition also disposes of this argument.  Plaintiffs submitted overwhelming evidence with their Joint Opposition that Defendants owned or controlled each of the 151 entities[43] from which Plaintiffs purchased the LCD Products that form the basis for their federal claims.[44]   Thus,

---

[43] As Plaintiffs noted in their Joint Opposition, some of these entities are ambiguously or partially identified due to technical naming errors in Plaintiffs' purchasing records.  (Joint Opp. at 5 n.6) (citing Declaration of Geoff Shavey in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment for Lack of Standing Under *Illinois Brick* and *ATM Fee*, ¶¶ 5-8). Thus, there are actually far fewer entities from which Plaintiffs purchased.  Defendants know full well from which of their subsidiaries Plaintiffs purchased, regardless of Plaintiffs' clerical errors.

[44] Toshiba's contention that Plaintiffs seek damages under the federal antitrust laws for purchases from entities such as Canon, Casio, Daewoo, Lexmark and Nikon is not true.  (Mot. at 7) (citing Expert Report of Leslie M. Marx, Ph.D. Concerning Target Corp., et al. at App. C.6, incorporated as Chung Decl. Ex. 9).  Certain Plaintiffs seek damages under *the state indirect purchaser laws* for these purchases.  Even the most cursory review of the expert report to which Toshiba cites reveals that it is the report of Target's indirect damages expert, not its direct damages expert.

1   regardless of which Defendants' price-fixed panels were in the LCD Products they purchased, the

2   requisite ownership or control has been established.

3         Thus, Toshiba has done nothing more than reiterate an argument that this Court has already

4   rejected twice in the class cases and that Defendants repackaged for purposes of their Joint

5   Motion. Just like the other Defendants, Toshiba cites no authority to support this argument and, in

6   fact, it violates Supreme Court and Ninth Circuit precedent, as well as this Court's prior decisions

7   in this litigation. Thus, for all of the reasons stated above and described at further length in

8   Plaintiffs' Joint Opposition, (Joint Opp. at 21-25), Toshiba's argument should be rejected.

9   <u>**CONCLUSION**</u>

10         For all of the foregoing reasons, Plaintiffs respectfully submit that Toshiba's Motion must

11   be denied.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO TOSHIBA'S
MOTION FOR PSJ UNDER *ILLINOIS BRICK*      - 20 -      Master File No. 3:07-md-01827-SI
AND *ATM FEE*

1     DATED:  August 30, 2012       Respectfully submitted,

2

3                                   By:    /s/ William A. Isaacson
                                    William A. Isaacson (*pro hac vice*)

4                                     Melissa Felder (*pro hac vice*)
                                    BOIES, SCHILLER & FLEXNER LLP

5                                     5301 Wisconsin Ave. NW, Suite 800
                                    Washington, D.C.  20015

6                                     Telephone:  (202) 237-2727
                                    Facsimile:   (202) 237-6131

7                                     Email: wisaacson@bsfllp.com
                                             mfelder@bsfllp.com

8                                     Philip J. Iovieno (*pro hac vice*)

9                                     Anne M. Nardacci (*pro hac vice*)
                                    Luke Nikas (admitted *pro hac vice*)

10                                   Christopher V. Fenlon (*pro hac vice*)
                                  BOIES, SCHILLER & FLEXNER LLP

11                                   10 North Pearl Street, 4th Floor
                                  Albany, NY  12207

12                                   Telephone:  (518) 434-0600
                                  Facsimile:   (518) 434-0665

13                                   Email: piovieno@bsfllp.com
                                             anardacci@bsfllp.com

14                                            lnikas@bsfllp.com
                                           cfenlon@bsfllp.com

15                                   *Counsel for Plaintiffs Electrograph Systems, Inc. and*

16                                   *Electrograph Technologies Corp.*

17                                   By:    /s/ Jason C. Murray

18                                   Jason C. Murray (CA Bar No. 169806)
                                  Janet I. Levine (CA Bar No. 94255)

19                                   Joshua C. Stokes (CA Bar No. 220214)
                                  CROWELL & MORING LLP

20                                   515 South Flower St., 40th Floor
                                  Los Angeles, CA 90071

21                                   Telephone:  (213) 622-4750
                                  Facsimile:   (213) 622-2690

22                                   Email: jmurray@crowell.com

23                                              jlevine@crowell.com
                                             jstokes@crowell.com

24

25                                   Jeffrey H. Howard (*pro hac vice*)
                                  Jerome A. Murphy (*pro hac vice*)

26                                   CROWELL & MORING LLP
                                  1001 Pennsylvania Avenue, N.W.

27                                   Washington, D.C. 20004
                                  Telephone:  (202) 624-2500

28                                   Facsimile:   (202) 628-5116

Email: jhoward@crowell.com
        jmurphy@crowell.com

Kenneth L. Adams (*pro hac vice*)
R. Bruce Holcomb (*pro hac vice*)
Christopher T. Leonardo (*pro hac vice*)
ADAMS HOLCOMB LLP
1875 Eye Street NW
Washington, DC 20006
Telephone:  (202) 580-8822
Facsimile:    (202) 580-8821
Email:  adams@adamsholcomb.com
        holcomb@adamsholcomb.com
        leonardo@adamsholcomb.com

*Counsel for Plaintiffs AT&T Mobility LLC, et al. and Target Corporation, et al.*

By: /s/ Rodney J. Ganske
        Michael P. Kenny, Esq.
        Debra D. Bernstein, Esq.
        Rodney J. Ganske, Esq.
        ALSTON + BIRD LLP
        1201 West Peachtree Street
        Atlanta, Georgia 30309-3424
        Telephone: (404) 881-7000
        Facsimile:  (404) 881-7777
        mike.kenny@alston.com
        debra.bernstein@alston.com
        rod.ganske@alston.com

        Douglas R. Young
        FARELLA BRAUN + MARTEL LLP
        235 Montgomery Street
        San Francisco, California 94104
        Telephone: (415) 954-4410
        Facsimile:  (415) 954-4480
        DYoung@fbm.com

        Kimball R. Anderson, Esq.
        WINSTON & STRAWN LLP
        35 West Wacker Dr.
        Chicago, Illinois 60601-9703
        Telephone: (312) 558-5600
        Facsimile:  (312) 558-5700
        kanderson@winston.com

*Attorneys for Plaintiffs Dell Inc. and Dell Products L.P.*