1  William A. Isaacson (admitted *pro hac vice*)
   Melissa Felder (admitted *pro hac vice*)
2  BOIES, SCHILLER & FLEXNER LLP
   5301 Wisconsin Ave. NW, Suite 800
3  Washington, D.C. 20015
   Telephone:    (202) 237-2727
4  Facsimile:     (202) 237-6131
   Email: wisaacson@bsfllp.com
5         mfelder@bsfllp.com

6  Philip J. Iovieno (admitted *pro hac vice*)
   Anne M. Nardacci (admitted *pro hac vice*)
7  Luke Nikas (admitted *pro hac vice*)
   Christopher V. Fenlon (admitted *pro hac vice*)
8  BOIES, SCHILLER & FLEXNER LLP
   10 North Pearl Street, 4th Floor
9  Albany, NY 12207
   Telephone:    (518) 434-0600
10 Facsimile:     (518) 434-0665
   Email: piovieno@bsfllp.com
11        anardacci@bsfllp.com
          lnikas@bsfllp.com
12        cfenlon@bsfllp.com

13 Counsel for Plaintiff Electrograph Systems, Inc. and
   Electrograph Technologies Corp.
14
   [Additional parties and counsel listed on signature page]
15
                 UNITED STATES DISTRICT COURT
16             NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
17

| | |
|---|---|
| 18  In re: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. 3:07-md-01827-SI (N.D. Cal.) |
| 19  This Document Relates To: | Case Nos. 09-cv-4997; 10-cv-0117; 10-cv-4572; 10-cv-4945; 11-cv-00058 |
| 20  *AT&T Mobility, LLC, et al. v. AU Optronics Corp., et al.*, No. 09-cv-4997-SI | MDL No. 1827 |
| 21  *Electrograph Systems, Inc., et al. v. Epson Imaging Devices Corp., et al.*, No. 10-cv-0117-SI | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT FOR LACK OF STANDING UNDER *ILLINOIS BRICK* AND *ATM FEE*** |
| 23  *Best Buy Co., Inc., et al. v. AU Optronics Corp., et al.*, No. 10-cv-04572-SI | **DOCUMENT SUBMITTED UNDER SEAL** |
| 25  *Target Corp., et al. v. AU Optronics Corp., et al.*, No. 10-cv-4945-SI | |
| 26  *Costco Wholesale Corp. v. AU Optronics Corp., et al.*, No. 11-cv-00058-SI | **Date:      October 5, 2012**<br>**Time:      9:00 a.m.**<br>**Courtroom: 10, 19th Floor**<br>**Judge:     The Hon. Susan Y. Illston** |

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PSJ FOR LACK OF STANDING
UNDER *ILLINOIS BRICK* AND *ATM FEE*                    Master File No. 3:07-md-01827-SI

## **TABLE OF CONTENTS**

Table of Authorities ............................................................................................................. iii

Relevant Prior Orders ............................................................................................................ v

Introduction ........................................................................................................................... 1

Factual Background .............................................................................................................. 4

    I.    Plaintiffs Purchased Over $11 Billion in LCD Products Directly From
        Defendants and Their Controlled Subsidiaries, Divisions and Affiliates .............. 4

    II.   Defendants' Manufacturing and Distribution Chain for the LCD Products
        Purchased by Plaintiffs is Straightforward .......................................................... 6

        A.    Internal Panel Sourcing .............................................................................. 7

        B.    External Panel Sourcing ............................................................................. 7

        C.    Defendants Mischaracterize ODMs' Involvement in the
            Manufacturing Chain ................................................................................. 8

Argument ............................................................................................................................. 10

    I.    Summary Judgment Is Not Appropriate Where, as Here, Defendants
        Have Failed To Carry Their Initial Burden of Production ................................... 10

    II.   *ATM Fee* Mandates the Denial of Defendants' Motion ...................................... 11

        A.    In *ATM Fee*, the Ninth Circuit Reaffirmed the *Royal Printing*
            and *Freeman* Ownership or Control Exception to *Illinois Brick* .............. 11

            1.    *ATM Fee* Demonstrates That This Court's Prior Application
                of the Ownership or Control Exception Was Correct ................... 11

            2.    In *ATM Fee*, the Ninth Circuit Explicitly Held That a
                Purchaser Does Not Have to Pay the Price-Fixed Fee to
                Have Standing Under the Ownership or Control Exception ......... 13

    III.  Plaintiffs Have Standing To Pursue Federal Law Claims For Their LCD
        Product Purchases From Defendants and the Entities They Own or Control ....... 14

        A.    *Royal Printing* Applies Where a Defendant Internally Consumes a
            Price-Fixed LCD Panel ............................................................................ 14

B.    *Royal Printing* Applies Where a Defendant Sells a Price-Fixed Panel to a Subsidiary *or Division of* a Co-Defendant .......................................... 15

C.    *Royal Printing* Applies To Sales of Price-Fixed Panels Between Defendants................................................................................................. 16

D.    *Royal Printing* Applies Where an ODM or System Integrator Manufactures a Finished Product But Does Not Buy the Price-Fixed Panel ..................................................................................................... 17

IV.    The Undisputed Evidence Shows That Plaintiffs Purchased Finished Products Directly From Defendants' Controlled Subsidiaries and Affiliates ....... 18

A.    Plaintiffs Have Standing Under *ATM Fee* to Pursue Federal Antitrust Claims Based on Their Purchases From LG Electronics ........... 19

V.    Plaintiffs Need Not Present Proof of Damage on a Product-By-Product or Purchase-By-Purchase Basis To Establish Standing ........................................... 21

A.    Plaintiffs Need Only Present Proof of "Some Damage" To Establish Standing ................................................................................. 21

B.    Plaintiffs Have Presented More Than Enough Proof of Damage To Establish Standing ................................................................................. 24

C.    Comprehensive Discovery Has Established That The Defendants Chose Not To Keep Records That Would Allow Plaintiffs Prove Damage on a Product-By-Product or Purchase-By-Purchase Basis ............................... 25

1

## **TABLE OF AUTHORITIES**

2

### CASES

3

*American Ad Mgmt., Inc. v. Gen. Tel. Co. of California,*
190 F.3d 1051 (9th Cir. 1999) ............................................................................................... 21

*BCS Servs, Inc. v. Heartwood,*
637 F.3d 750 (7th Cir. 2011) ........................................................................................... 24, 25

*Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n,*
620 F.2d 1360 (9th Cir. 1980) ............................................................................................... 10

*Bigelow v. RKO Radio Pictures, Inc.,*
327 U.S. 251 (1946) ............................................................................................................... 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ............................................................................................................... 21

*Freeman v. San Diego Ass'n of Realtors,*
322 F.3d 1133 (9th Cir. 2003) ................................................................................................. 3

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) .......................................................................................................*passim*

*In re ATM Fee Antitrust Litigation,*
686 F.3d 741 (9th Cir. 2012) ..........................................................................................*passim*

*In re Linerboard Antitrust Litigation,*
305 F.3d 145 (3d Cir. 2002) .................................................................................................. 12

*In re Sugar Industry Antitrust Litigation,*
579 F.2d 13 (3d Cir. 1978) .............................................................................................*passim*

*In Suk Kim v. Vilsack,*
No. C 10-210, 2012 WL 368477 (N.D. Cal. Feb. 3, 2012) ................................................... 10

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
451 U.S. 557 (1981). ................................................................................................. 22, 23, 25

*James River Ins. Co. v. Hebert Schenk, P.C.,*
523 F.3d 915 (9th Cir. 2008) ................................................................................................. 10

*Knutson v. Daily Review, Inc.,*
548 F.2d 795 (9th Cir. 1976) ................................................................................................. 22

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................ 10

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ................................................................ 23

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ............................................................... 10

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1990) ..........................................................*passim*

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) ................................................................................ 22

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
    608 F. Supp. 2d 1166 (2009) ........................................................... 18, 23

*Texaco Inc. v. Hasbrouck*,
    496 U.S. 543 (1990) ................................................................................ 22

*Weinstein Enters., Inc. v. Orloff*,
    870 A.2d 499 (Del. 2005) ....................................................................... 18

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
    395 U.S. 100 (1969) .......................................................................... 22, 25

## STATUTES

15 U.S.C. § 15(a) ........................................................................................ 21

## RULES

Fed. R. Civ. P. 56(a) ................................................................................. 10

**RELEVANT PRIOR ORDERS**

| Date | MDL Dkt. No. | Order and Holding |
|---|---|---|
| Mar. 3, 2009 | 873 | *Order Denying Tatung Company of America's Motion to Dismiss Direct Purchaser Plaintiffs' First Amended Complaint* (Court held that Tatung Company of America had not shown that it was not a proper defendant under *Royal Printing* and *Freeman*, but could renew its arguments upon a fuller factual record.) |
| Mar. 28, 2010 | 1643 | *Order Denying Tatung Company of America's Motion for Leave to File a Motion for Reconsideration of March 3, 2009 Order Denying Motion to Dismiss* (Court reaffirmed prior holding that Tatung Company of America was a proper defendant under *Royal Printing* and *Freeman*.) |
| July 19, 2010 | 1885 | *Order Denying Tatung Company of America's Motions to Dismiss* (in AT&T and Motorola cases) (Court again held that Tatung Company of America was a proper defendant under *Royal Printing* and *Freeman*.) |
| Nov. 7, 2011 | 4108 | *Order Denying Toshiba Entities' Motion for Partial Summary Judgment Under* Illinois Brick (Court held that Plaintiffs had standing under *Royal Printing* for purchases of Toshiba-branded LCD Products from Toshiba's exclusive distributor in the U.S.) |
| Jan. 26, 2012 | 4683 | *Order Denying Defendants' Motion to Decertify Classes or in the Alternative for Summary Judgment* (Court rejected Defendants' argument that class was not ascertainable where LCD Product manufacturers did not keep detailed records identifying the panels used in their products.) |
| Feb. 21, 2012 | 4848 | *Order Denying Defendants' Motion to Exclude Testimony of Janet S. Netz and William S. Comanor* (Court rejected Defendants' argument that Plaintiffs must provide evidence of panel-by-panel impact.) |

1

**INTRODUCTION**

2  "It is undisputed that defendants held an overwhelming market share during the conspiracy

3  period…. Thus, the conspiracy affected almost all products sold in the United States." Dkt No.

4  4683 at 3-4. Defendants' Motion is their latest attempt to immunize themselves from civil liability

5  for their price-fixing conspiracy, arguably the most well-documented and detailed in history. In

6  this instance, Defendants' strategy is to grab for the Ninth Circuit's recent decision in *In re ATM*

7  *Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012), and argue that it means Plaintiffs do not

8  have standing to bring claims under the federal antitrust laws for their over $11 billion in direct

9  purchases of LCD Products. Defendants not only fundamentally misconstrue *ATM Fee*, they also

10  misconstrue the Ninth Circuit's decision in *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d

11  323 (9th Cir. 1990), which *ATM Fee* explicitly reaffirmed, as well as this Court's decisions

12  correctly applying *Royal Printing* to the facts of these cases. These precedents confirm Plaintiffs'

13  antitrust standing.

14  In *ATM Fee*, the plaintiffs alleged that the defendants had fixed the prices of "interchange

15  fees" paid by the card-issuing banks ("Bank Defendants"). 686 F.3d 746. Plaintiffs in that case

16  did not pay interchange fees. *Id.* at 749-50. Instead, plaintiffs were consumers who withdrew

17  money from banks and paid a "foreign ATM fee" to the Bank Defendants. *Id.* at 750. Plaintiffs

18  argued that the price-fixed interchange fee was "then passed on to Plaintiffs as part of the foreign

19  ATM fee" by the Bank Defendants. *Id.* at 746.

20  Under these circumstances, the Court considered the exceptions to *Illinois Brick Co. v.*

21  *Illinois*, 431 U.S. 720 (1977), and held that "indirect purchasers may sue when a conspiring seller

22  owns or controls the direct purchaser." *Id.* at 749 (citing *Royal Printing*, 621 F.2d at 326). *ATM*

23  *Fee* went on to state that:

24  > *Royal Printing* allowed indirect purchasers to sue "where a direct purchaser is a division or
25  > subsidiary of a co-conspirator." *Royal Printing* created an exception when parental control
   > existed because applying *Illinois Brick* "would eliminate the threat of private
26  > enforcement," and "close off every avenue for private enforcement."

27  *Id.* at 756 (internal citations omitted). Thus, the operative test under *Royal Printing* is met if

28  ownership or control *between a conspirator and a direct purchaser is established. Id.* at 757.

In so holding, *ATM Fee* not only reaffirmed the *Royal Printing* exception, but did so in a way that is consistent with this Court's previous decisions applying the *Royal Printing* exception to the facts of these cases. As such, *ATM Fee* simply stands for the proposition that Plaintiffs must establish the existence of ownership or control between the entities from which they purchased LCD Products and one of the conspirators. Plaintiffs have established exactly that. The overwhelming evidence from the discovery and public record submitted with this Opposition establishes that Plaintiffs bought Defendants' branded LCD Products from Defendants and their controlled subsidiaries, divisions, and affiliates. Defendants' motion attaches a chart of the 151 entities from which Plaintiffs purchased, but they conspicuously fail to set forth any evidence that these entities were not owned or controlled by a conspirator. The reason for this omission is plain: substantially all of the Defendants on this chart are vertically integrated manufacturers of LCD Products, and the entities responsible for the vast majority of sales to Plaintiffs are the Defendants *themselves* and their *own* controlled subsidiaries, divisions, and affiliates.

Defendants' motion argues that under *ATM Fee* Plaintiffs do not have standing for any of their direct purchases of LCD Products "for the mere fact that they are finished product claims." Mot. at 23. Alternatively, Defendants claim that Plaintiffs do not have standing for a subset of their direct purchases of LCD Products, *i.e.*, "finished products made by an alleged conspirator where the finished product contains a panel made by a different alleged conspirator." *Id*. at 3. Both of these claims are directly contradicted by *ATM Fee* and *Royal Printing*.

First, *ATM Fee* makes clear that the ownership or control exception set forth in *Royal Printing* may be applied when a plaintiff has not directly paid the price-fixed fee, including when a plaintiff purchases a price-fixed component in a finished product. Despite the fact that the plaintiffs in *ATM Fee* had not directly paid the price-fixed interchange fee, the Court analyzed whether sufficient ownership and control existed between the defendants to apply the exception. *ATM Fee* also approved of the result in another case involving a price-fixed component, *In re Sugar Industry Antitrust Litigation*, 579 F.2d 13 (3d Cir. 1978). In discussing *Sugar*, the Court agreed that the plaintiff had standing in that case as an indirect purchaser under the ownership and control exception. *Id*. at 755, n.7 ("*In re Sugar Industry* actually exemplifies the exception

1    allowed when an upstream violator controls or owns the direct purchaser.").[1]   Finally, the Court

2    explained that the plaintiffs in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir.

3    2003), had standing even though they did not directly pay the price-fixed fee: "In *Freeman*, the

4    court was forced to find an exception to *Illinois Brick* even though the court found price fixing by

5    setting the support fees and passing them on through MLS fees." *Id.* at 754.

6         As to the subset of Plaintiffs' direct purchases of LCD Products that were manufactured by

7    one Defendant, but contained the price-fixed LCD panel of another Defendant, *ATM Fee* and

8    *Royal Printing* make clear that the ownership or control exception may be applied to these

9    purchases.  First, many of the LCD Products that fall into this category involve the direct purchase

10   of a price-fixed panel from one Defendant by *a subsidiary or division* of another Defendant.

11   These were precisely the facts upon which *Royal Printing* found standing (*i.e.*, "where a direct

12   purchaser is a division or subsidiary of a co-conspirator").  *Id.* at 756 (internal quotation omitted).

13        For the rest of the purchases in this subset, which involve the sale of a price-fixed panel by

14   one Defendant directly to another Defendant, standing also exists under *ATM Fee* and *Royal*

15   *Printing*.  It is beyond dispute that under the legal standard articulated by *ATM Fee* and *Royal*

16   *Printing*, a sale from one defendant to another defendant's *division* (an entity that is not legally

17   distinct from the defendant) may satisfy the ownership or control exception.  *Id.*  On the facts of

18   this case, there is simply no basis under *ATM Fee* and *Royal Printing* to draw a distinction

19   between sales of a price-fixed panel from one defendant to another defendant, and sales of a price-

20   fixed panel from a defendant to a division (or subsidiary) of another defendant.  It is unremarkable

21   that *ATM Fee* did not apply the ownership or control exception between the defendants in that

22   case, given the unique facts it presented.  In *ATM Fee*, the Court held that the Bank Defendants

23   *did not participate in the price-fixing of the interchange fee.*  686 F.3d at 745 ("The ATM network

24   (not the card-issuing bank nor the ATM owners) establishes the interchange fee.").  By contrast,

25   _____

26   [1] In a footnote, *ATM Fee* declined to adopt the Third Circuit's decision in *Sugar*, and this Court's
     application of it in the LCD litigation, to the extent that those decisions found standing based
     solely on the fact that the plaintiff "'purchase[d] directly from the alleged violator.'"  *Id.* (quoting
27   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 306-07 (N.D. Cal. 2010) (quoting
     *Sugar*, 579 F.2d at 17).  The Court agreed that the plaintiff in *Sugar* had standing, but as an
28   indirect purchaser under the ownership and control exception.  *Id.*

1   the overwhelming evidence in this case establishes that all of the Defendants participated in fixing

2   the prices of the LCD panels, which they then sold to others and among themselves.

3         At bottom, Defendants ask the Court to hold that Defendants and their controlled

4   subsidiaries, divisions, and affiliates are the only entities that have standing.  Yet Defendants know

5   full well that these entities have not—and will not—sue their corporate parents and affiliates for

6   the billions of dollars of price-fixed LCD panels that were contained in the LCD Products they

7   sold to Plaintiffs.  The Ninth Circuit has long recognized that a conspirator's controlled subsidiary,

8   division, or affiliate cannot be trusted to enforce the antitrust laws against the conspirators, and

9   *ATM Fee* further reaffirmed this important public policy.

10        Defendants' Motion should thus be denied.  Defendants' claim that *ATM Fee* somehow

11  narrowed the *Royal Printing* exception recognized in this Court's prior rulings is wrong as a

12  matter of law.  Furthermore, with respect to the factual issues of ownership and control,

13  Defendants have made no showing to meet their burden of demonstrating undisputed facts

14  supporting summary judgment under *Royal Printing* and *ATM Fee*.  At the very least, the factual

15  record presented with this Opposition demonstrates that substantial, material questions of fact exist

16  concerning virtually every factual assertion Defendants make in their Motion, most significantly:

17  (i) whether the entities from which Plaintiffs purchased LCD Products were owned and controlled

18  by one of the Defendants or co-conspirators; and (ii) concerning the evidence Plaintiffs have

19  amassed linking the LCD Products they purchased to price-fixed LCD panels manufactured by

20  Defendants and their co-conspirators.

21  **FACTUAL BACKGROUND**

22  **I.    Plaintiffs Purchased Over $11 Billion in LCD Products Directly From Defendants and Their Controlled Subsidiaries, Divisions, and Affiliates.**

23

24        The Direct Action Plaintiffs are leading retailers, distributors and other businesses based in

25  the United States, which include companies such as Best Buy, Costco, Target, AT&T, and Sears

26  ("Plaintiffs" or "DAPs").  Like the Direct Purchaser Class Plaintiffs, the DAPs purchased LCD

27  finished products containing price-fixed LCD panels ("LCD Products") directly from Defendants,

28  co-conspirators, and their controlled subsidiaries, divisions, and affiliates based in the United

1    States.  During the conspiracy period, the DAPs purchased over $11 billion in LCD Products

2    directly from Defendants and co-conspirators, and, as a result, sustained overcharges of well over

3    $1 billion.[2]

4         To be clear, in each of these instances, Plaintiffs were purchasing Defendants' and co-

5    conspirators' branded LCD Products.  For example, Plaintiffs' purchases include Sharp-branded

6    TVs purchased from Sharp; Samsung-branded TVs, computer monitors and cell phones from

7    Samsung; and Toshiba-branded notebooks from Toshiba.[3]  Plaintiffs purchased most of these LCD

8    Products pursuant to contracts with Defendants and co-conspirators, and based on price lists they

9    received from Defendants and co-conspirators.[4]  Plaintiffs submitted payment for these LCD

10   Products directly to Defendants and co-conspirators, or their controlled subsidiaries, divisions, and

11   affiliates based in the United States.[5]

12        Defendants submit a chart with their Motion, which lists the 151 entities[6] from which

13   Plaintiffs purchased the LCD Products that form the basis for their federal claims.[7]  Defendants

14   then claim that Plaintiffs "provide virtually no insight into the control relationships they contend

15   entitle them to Clayton Act standing."  Mot. at 11.  Defendants, however, not Plaintiffs, have made

16   a motion for summary judgment here raising the issue of ownership and control.  On a motion for

17   summary judgment, Defendants have both the initial burden of production and the ultimate burden

18   of persuasion.  Because Defendants have failed to submit any evidence relating to any of these 151

19

20   _____

21   [2] Declaration of Philip J. Iovieno in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment for Lack of Standing Under *Illinois Brick* and *ATM Fee* ("Iovieno Decl."), Exh. 68 at 5; Exh. 69 at 5; Exh. 70 at 5; Exh. 71 at 5; Exh. 72 at 5.  The DAPs on Track 2

22   also purchased billions of dollars of LCD Products from Defendants and co-conspirators over the conspiracy period.

23   [3] *Id.*

     [4] Exh. 68 at App. B; Exh. 69 at App. B; Exh. 70 at App. B; Exh. 71 at App. B; Exh. 72 at App. B.;

24   Exh. 63 at 135:4-136:2; Exh. 65 at 180:10-183:5.
     [5] *Id.*

25   [6] Some of these entities are ambiguously or partially identified due to technical naming errors in Plaintiffs' purchasing records.  Declaration of Geoff Shavey in Support of Plaintiffs' Opposition to

26   Defendants' Motion for Partial Summary Judgment for Lack of Standing Under *Illinois Brick* and *ATM Fee*, ¶¶ 5-8.  Thus, there are actually far fewer entities from which Plaintiffs purchased.

27   Defendants know full well from which of their subsidiaries Plaintiffs purchased, regardless of Plaintiffs' clerical errors.

28   [7] Declaration of Lee Berger in Support of Defendants' Motion for Partial Summary Judgment For Lack of Standing Under Illinois Brick and ATM Fee ("Berger Decl."), Exh. X.

alleged entities, their Motion must be denied.[8]  In any event, the undisputed facts in the discovery and public record show that the entities from which Plaintiffs purchased LCD Products were owned or controlled by Defendants and co-conspirators.

In particular, each of the entities on Defendants' chart from the corporate families of Defendants and co-conspirators from which Plaintiffs purchased LCD Products was indisputably wholly (or majority) owned and controlled by one of the Defendants or co-conspirators.[9]  With respect to each of the remaining entities in Defendants' chart, there is evidence of an ownership or control relationship between that entity (or its corporate family) and one of the Defendants or co-conspirators.[10]  It is telling that Defendants' Motion fails to address any of this evidence—including the evidence that relates to the entities *in their own corporate families*.

## II.   Defendants' Manufacturing and Distribution Chain for the LCD Products Purchased by Plaintiffs is Straightforward.

The facts regarding how Defendants manufactured and sold LCD Products to Plaintiffs in the United States are straightforward.  Defendants are among the leading manufacturers of LCD panels, and it is "undisputed" that they had an "overwhelming" market share during the conspiracy period.  Dkt No. 4683 at 2.  Defendants' own experts have recognized that since many of the Defendants were "vertically integrated" manufacturers, meaning they manufactured both the LCD panel and the LCD Product that was sold directly to Plaintiffs under that Defendant's brand name, they "*often use their own LCD panels in their finished products*."[11]  The evidence cited below, including Defendants' panel sales data, confirms the fact that a large percentage of the LCD panels the vertically-integrated Defendants manufactured were internally consumed.  Defendants' experts also note that in certain situations the vertically-integrated Defendants supplemented this internal sourcing of panels with panels they purchased from other Defendants or co-conspirators (*i.e.*,

---

[8] Best Buy hereby drops its federal antitrust claims arising from its purchases from Nikon.

[9] Iovieno Decl. ¶¶ 1 to 49.

[10] Iovieno Decl. ¶¶ 50 to 62.  The facts relevant to ownership or control of the following entities are separately addressed in Costco's Opposition to Defendants' Motion for Partial Summary Judgment as to Indirect Purchases, Dkt. No. 6245:  Panasonic and JVC, Acer, Gateway, and eMachines, Proview, Sylvania, Envision, and Vizio.

[11] Exh. 67 ¶ 65 ("Some LCD panel manufacturers are vertically integrated and manufacture finished products selling them under their own brand name.  These companies include Sharp, Toshiba and Samsung.").

1  "external sourcing").[12]

2  ### A. Internal Panel Sourcing

3      A large percentage of the LCD panels manufactured by the vertically-integrated

4  Defendants were internally sourced and transferred to their subsidiaries, divisions or affiliates for

5  use in manufacturing their LCD Products. For example, Samsung manufactured LCD panels that

6  it consumed internally to create Samsung TVs and monitors, which Samsung then sold directly to

7  the DAPs in the United States through Samsung's controlled subsidiaries, divisions, and affiliates.

8  Indeed, Defendants' expert reports show that in 2004 and 2005 over 70% of the LCD panels used

9  in Samsung's LCD monitors contained a Samsung panel.[13] In addition, the report of Sharp's

10 expert in this case states that:

11         Sharp is a vertically integrated producer in the television market, with the bulk of its large
12         screen LCD display output directed to the internal production of Sharp-branded TVs.
           Roughly 80% of Sharp's TV module production is consumed internally, not only by TV
13         production facilities in Japan, but also by subsidiaries located throughout the world.[14]

14     Defendants' deposition testimony further establishes that these internal transfers were

15 typically effectuated through a simple accounting transaction between the vertically integrated

16 Defendant and its subsidiaries, divisions, and affiliates.[15]

17 ### B. External Panel Sourcing

18     Given Defendants' large LCD panel market share, it is unsurprising that in the limited

19 instances in which a vertically-integrated Defendant or co-conspirator externally sourced a panel it

20 typically came from one of the other Defendants or co-conspirators. Defendants' panel sales data

21 and expert reports illustrate that when a panel was externally sourced it was common for one of

22 the Defendant's "vertically integrated affiliates" to purchase the panel from the other Defendant.[16]

23 The purchasing entity in these instances was typically the entity within the vertically-integrated

24

25 [12] *Id.*
   [13] Exh. 67 at Exh. 4.
26 [14] Exh. 73 ¶ 29.
   [15] *See, e.g.,* Exh. 59 at 103:6-25; 109:2-110:11 ("I don't think you quantify those as purchases.
27 Those are transferred products...there's an accounting transfer price that is set and products moves
   for accounting and tax purposes...from one group to another...it is a financial transaction set up by
28 accountants to move product from one division to another.").
   [16] Exh. 67 at Exh. 20.1, 20.2, and 20.3.

1    Defendant that manufactured its LCD Products.   For instance, Toshiba America Consumer

2    Products ("TACP") was the entity within the Toshiba corporate family that manufactured its LCD

3    TVs that were sold in the United States.[17]   TACP was a wholly-owned subsidiary of Defendant

4    Toshiba Corporation.[18]   When a panel was externally sourced for a Toshiba LCD TV to be sold in

5    the United States, TACP was the direct purchaser of the panel.[19]   This fact is also confirmed by the

6    Defendants' panel sales data which shows TACP as the "bill to" and "ship to" entity for purchases

7    of TV panels that were externally sourced by Toshiba.[20]

8              Defendants' data also shows certain instances in which one Defendant externally sourced a

9    panel directly from another Defendant.   For instance, Defendant Toshiba Corporation purchased

10   panels from Defendant Samsung Electronics Co., Ltd., and Defendant Hitachi, Ltd. purchased

11   panels from HannStar Display Corporation.[21]

12        **C.  Defendants Mischaracterize ODMs' Involvement in the Manufacturing Chain.**

13             Defendants assert that original design manufacturers ("ODMs") are "often the true direct

14   purchasers, having bought panels from the manufacturers, assembled them into products, and sold

15   them to the companies who ultimately sold them to the plaintiff."  Mot. at 12.  Defendants present

16   no evidence to support the contention that the ODM was a "true direct purchaser."   Indeed, the

17   evidence Defendants produced in discovery, as well as their own expert reports, show the exact

18   opposite.  The discovery record establishes that when a vertically-integrated Defendant utilized an

19   ODM, the Defendant typically purchased the price-fixed panel and provided it to the ODM for

20   assembly of Defendant-branded LCD Products.   Thus, the ODM's involvement was limited to

21   simply *assembling* the Defendant's LCD Products, which the Defendant then sold directly to

22   Plaintiffs.  As Defendants' expert has acknowledged: "[w]hen an OEM decides to use LCD panels

23   from a particular defendant LCD panel supplier in its finished products, the OEM may purchase

24   the LCD panel from a supplier and have it shipped to its ODM or contract manufacturer for

25

26   _____
     [17] Exh. 62 at 32:11-24.
27   [18] *Id.*
     [19] *Id.* at 51:5-52:12.
28   [20] Iovieno Decl. ¶ 97.
     [21] Iovieno Decl. ¶ 98.

1    incorporation into the finished product."[22]

2           Defendants' discovery responses and panel sales data establish this fact.  For example, to

3    the extent Samsung used an ODM to manufacture Samsung brand LCD Products, Samsung was

4    the entity that purchased (or manufactured) the price-fixed LCD panels and then supplied them to

5    its ODM for assembly.  This is confirmed by records produced in discovery demonstrating that

6    when Samsung used an ODM, the LCD panel was "billed to" Samsung and "shipped to" to the

7    ODM.[23]  These facts are further confirmed by Samsung's admission that it "did not purchase any

8    TFT-LCD finished products during the relevant period," *i.e.*, the ODMs it used did not purchase

9    the panels, assemble the LCD Products, and then sell the LCD Products to Samsung for sale to

10   Plaintiffs.[24]  Thus, the undisputed evidence shows that no ODM used by Samsung to manufacture

11   a Samsung finished product was ever a "true direct purchaser."

12          The evidence with respect to Toshiba, Sharp and Hitachi is similar:

13   •   Toshiba has admitted that although "[i]n some cases, [it] used original design
         manufacturers or system integrators to make notebooks," Toshiba "was responsible for the
14       procurement of all component parts, including TFT-LCDs."[25]

15   •   Sharp's corporate representative testified that prior to 2004 it did not use any ODMs to
         manufacture any Sharp TVs that were sold in the United States.  For the remainder of the
16       conspiracy period, only approximately 10-20% of Sharp TVs were outsourced for
         manufacturing to ODMs.[26]  Moreover, data produced in this case again shows that in those
17       limited instances when Sharp used an ODM, the panel was "billed to" Sharp and "shipped
         to" the ODM.[27]
18

19   •   Defendants devote significant attention in their brief to Hitachi's use of ODMs, and claim a
         "large percentage" of the LCD monitors sold by Hitachi "were in fact *manufactured* by
20       another company."  (Mot. at 22.)  First, the data again shows that when Hitachi used an
         ODM, the panel was "billed to" Hitachi and "shipped to" the ODM.[28]   Moreover,
21       *Defendants fail to mention that of the $11 billion in direct purchases of LCD Products
         made by Plaintiffs from Defendants and their co-conspirators, only approximately $3
22       million of these purchases involved Hitachi monitors (i.e., less than .001%).*[29]

23

24

---

25   [22] Exh. 67 ¶ 64.
     [23] Iovieno Decl. ¶ 99.
26   [24] Exh. 66 at 5.
     [25] Dkt No. 3575 at 4-5.
27   [26] Exh. 61 at 18:19-20:25; 140:14-143:17; Exh. 60 at 28:13 – 29:16.
     [27] Iovieno Decl. ¶ 100.
28   [28] Iovieno Decl. ¶ 101.
     [29] *See supra* note 2.

1

## ARGUMENT

2

**I.   Summary Judgment Is Not Appropriate Where, as Here, Defendants Have Failed To Carry Their Initial Burden of Production.**

3

4           When standing is challenged on summary judgment, the Court shall not grant summary

5    judgment if there is "'a genuine dispute as to any material fact.'"  *ATM Fee*, 686 F.3d at 747

6    (quoting Fed. R. Civ. P. 56(a)).   The evidence must be viewed in the light most favorable to

     Plaintiffs.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "In

7    antitrust cases, these general standards are applied even more stringently and summary judgments

8    granted more sparingly."  *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1364

9    (9th Cir. 1980).

10          Defendants have "both the initial burden of production and the ultimate burden of

11   persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

12   *Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).   To satisfy their burden of production, Defendants

13   "must either produce evidence negating an essential element of the nonmoving party's claim…or

14   show that the nonmoving party does not have enough evidence of an essential element to carry its

15   ultimate burden of persuasion at trial."  *Id.*   Defendants have done neither, so Plaintiffs "may

16   defeat the motion for summary judgment *without producing anything*."  *Id.* at 1103 (emphasis

17   added).  *See also id.* at 1107 ("[A] nonmoving party plaintiff has no obligation to produce anything

18   until the moving party defendant has carried its initial burden of production.");  *James River Ins.*

19   *Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 923-24 (9th Cir. 2008).[30]

20          Defendants present virtually no evidence in support of their claim that Plaintiffs lack

21   standing under federal law and thus have failed to carry their initial burden of production.

22   Defendants' Motion should be denied on this basis alone.[31]

23

24
     ---
[30] As is clear from the Ninth Circuit's characterization of the movant's burden of production as
25   "initial" (*Nissan Fire*, 210 F.3d at 1106), Defendants must satisfy their burden in their opening
     brief and cannot cure deficiencies on reply, *e.g.*, *In Suk Kim v. Vilsack*, No. C 10-210, 2012 WL
26   368477, at *13 (N.D. Cal. Feb. 3, 2012) (denying defendant's motion for summary judgment
     where he, "as the moving party, did not meet his *initial* burden of production" "in his *opening*
27   *brief*") (emphasis added).
     [31] Defendants only address one entity with any specificity, LG Electronics, and as further
28   discussed below, that showing is entirely deficient, as it is based solely on conclusory statements
     unsupported by any authority or evidence.

**II.   *ATM Fee* Mandates the Denial of Defendants' Motion.**

### A. In *ATM Fee*, the Ninth Circuit Reaffirmed the *Royal Printing* and *Freeman* Ownership or Control Exception to *Illinois Brick*.

In *ATM Fee*, the Court analyzed the *Illinois Brick* direct purchaser rule and two exceptions to that rule, the co-conspirator exception and the ownership or control exception.  The Court held that plaintiffs were "indirect purchasers" because they did not pay the price-fixed fee directly. ATM Fee, 686 F.3d at 750.[32]  The Court further held that the co-conspirator exception to *Illinois Brick* only applies to grant standing under the federal antitrust laws to plaintiffs who have paid the price-fixed price. *Id.* at 750-56.

In a separate analysis, the Court went on to reaffirm that indirect purchasers may sue under the ownership or control exception to *Illinois Brick* "when a conspiring seller owns or controls the direct purchaser." *Id*. at 749 (citing *Royal Printing*, 621 F.2d at 326); *see also id*. at 756-58.  In so doing, the Court expressly reaffirmed *Royal Printing* and its application of the ownership and control exception in a case that involved a sale of the price-fixed product from one defendant to a subsidiary of another defendant, who then sold it to the Plaintiff.  *Id*. at 756 ("*Royal Printing* allowed indirect purchasers to sue 'where a direct purchaser is a division or subsidiary of a co-conspirator'") (quoting 621 F.2d at 326).  *ATM Fee* also held that the Court's prior ruling in *Freeman* should be read in accord with *Royal Printing*.  *See id*. at 756-57 ("*Freeman* did not create a new variation of the *Royal Printing* exception, because *Freeman* relied on ownership and control to find standing .... In *Royal Printing* and *Freeman*, the ownership or control of the direct purchasers by the conspiring sellers created no realistic possibility of suit").

### 1. *ATM Fee* Demonstrates That This Court's Prior Application of the Ownership or Control Exception Was Correct.

Defendants assert that *ATM Fee* is "at odds with this Court's more lenient application of the *Royal Printing* exception in [the LCD litigation] to include non-parental affiliation."  (Mot. at 2) (citing Dkt No. 666; Dkt No. 1641).  Defendants are wrong; *ATM Fee* plainly affirms this Court's analysis of *Royal Printing*.  In an attempt to somehow support their argument, Defendants

---

[32] The Ninth Circuit has called for a response to the appellants' petition for rehearing *en banc*, which contends that, among other things, the panel erred in this regard.  Case No. 10-17354, Dkt No. 61 (9th Cir. Aug. 10, 2012).

1    exclusively cite to decisions of this Court *which did not apply the ownership or control exception*

2    *at all*.[33]   By contrast, this Court's prior decisions that do apply the ownership or control exception

3    in this litigation mirror the Ninth Circuit's reasoning and analysis in *ATM Fee*.

4          This Court denied Toshiba's motion for summary judgment in the DPP class action, based

5    on the parental relationship between Toshiba Corporation, which participated in the conspiracy,

6    and its panel manufacturer and U.S. distributor—both of which were owned and controlled by

7    Toshiba Corporation. Dkt No. 4108 at 2-3.   "Given this evidence that the *parent company*

8    participated in the conspiracy, the Court finds that the *Royal Printing* exception applies." *Id*. at 3

9    (emphasis added).   Likewise, this Court denied motions to dismiss by Tatung Company of

10   America ("TUS"), holding that Plaintiffs' allegations that Tatung Taiwan owned and controlled

11   both TUS and conspirator Chunghwa were sufficient to grant Plaintiffs standing under *Royal*

12   *Printing* and *Freeman*.   Dkt No. 873 at 2-3; Dkt No. 1643 at 1-2; Dkt No. 1885 at 4-6.   This

13   Court's analysis of parental control in each of these decisions is exactly the analysis endorsed by

14   *ATM Fee*.

15         The reasoning this Court employed to explain its analysis of the ownership and control

16   exception in these cases mirrors the reasoning *ATM Fee* used in its decision.   For example, in its

17   ruling regarding Toshiba, this Court stated:

18         The Ninth Circuit could not have been clearer: "We hold that *Illinois Brick* does not bar an
19         indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-
           conspirator." *Royal Printing*, 621 F.2d at 326 …. [T]he Ninth Circuit's reasoning stemmed
20         from its concern with the parent company's control over the litigation decisions of its
           subsidiary.  *Id*. at 326 ("Even if the pricing decisions of such a subsidiary or division are
21         necessarily determined by market forces, its litigation decisions will usually be subject to
           parental control."  … Due to this control, the parent company will be unlikely to allow its
22         subsidiary to file suit, "thwarting a vital part of the antitrust enforcement scheme and the
           expressed purpose of *Illinois Brick*."  *Royal Printing*, 621 F.2d at 326; *see also id*. ("The
23         co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would
           only reveal the parent's own participation in the conspiracy.").

24   Dkt No. 4108 at 2-3.

25         Likewise, *ATM Fee* explained the ownership or control exception as follows:

26         [I]ndirect purchasers may sue when a conspiring seller owns or controls the direct
27         purchaser, *Royal Printing* created an exception when parental control existed, because

28   ---
     [33] In the two decisions cited by Defendants, the Court relied on *In re Linerboard Antitrust Litig.*,
     305 F.3d 145 (3d Cir. 2002) and *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978).

applying *Illinois Brick* "would eliminate the threat of private enforcement."   "The co-conspirator parent will forbid its subsidiary or decision to bring a lawsuit that would only reveal the parents own participation in the conspiracy."  *Id.* at 326.

686 F.3d at 749, 756 (quoting *Royal Printing*, 621 F.2d at 326-27).

Thus, this Court has understood and applied the ownership or control exception first articulated by the Ninth Circuit in *Royal Printing* in the same manner that the Ninth Circuit did in *ATM Fee*.  Defendants' contention to the contrary is wholly without merit.

> **2. In *ATM Fee*, the Ninth Circuit Explicitly Held That a Purchaser Does Not Have to Pay the Price-Fixed Fee to Have Standing Under the Ownership or Control Exception.**

Defendants assert that "[n]o Ninth Circuit case allows an indirect purchaser to sue under the Clayton Act in these circumstances—where the product purchased is different from the price-fixed good."  (Mot. at 22.)  This is flatly wrong, and it is contradicted by the Ninth Circuit's holding in *ATM Fee*, as well as its prior holding in *Freeman*.[34]

*ATM Fee* held that the plaintiffs, who paid a separate foreign ATM fee rather than the price fixed fee interchange fee, would have standing as indirect purchasers if they demonstrated that they paid the foreign ATM fee to an entity owned or controlled by a defendant or conspirator.  686 F.3d at 756-58.  Although the plaintiff did not pay the price-fixed interchange fee directly, the Court nonetheless went on to examine whether the ownership or control exception was satisfied.  *ATM Fee* thus left no doubt that the ownership or control exception applies regardless of whether a plaintiff has paid the price-fixed fee directly or the overcharge was passed on to them.[35]

Further, *ATM Fee* stated its agreement with the result in *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978), on the ground that it "exemplifies the exception allowed when an upstream violator controls or owns the direct purchaser."  686 F.3d at 755, n.7.  The plaintiff in *Sugar* purchased a finished product (candy) containing a price-fixed component (sugar) from a subsidiary of a conspirator.  Regardless, the Third Circuit found that the plaintiff had standing

---

[34] Defendants cannot seriously contend that this position has any merit, as they just filed a reply in support of their motion for summary judgment on these same grounds in the Costco action that fails to challenge, and thus concedes, that under *ATM Fee* a finished product purchaser has standing.  *See generally* Dkt. No. 6496.

[35] The Court also drew a clear distinction between the ownership or control exception and the co-conspirator exception.  Though *ATM Fee* held that the co-conspirator exception applies only where a plaintiff directly pays the price-fixed price, the Court further held that not to be the case under the ownership or control exception.  *Compare ATM Fee*, 686 F.3d at 755-56 with *id.* at 756-58.

1  under the ownership or control exception to *Illinois Brick*.  579 F.2d at 18-19.  The Court's

2  approval of *Sugar* further shows that this exception may apply to the purchase of a finished

3  product containing a price-fixed component.[36]

4      Furthermore, in discussing *Freeman*, *ATM Fee* confirmed that the ownership or control

5  exception applies where plaintiffs do not directly pay the price-fixed fee.  686 F.3d at 756-57.  In

6  *Freeman*, despite finding that plaintiffs did not pay the price-fixed fee (which was passed on them

7  in another fee), the *Freeman* Court nevertheless went on to apply the ownership or control

8  exception.  *Id.* at 754 ("Standing existed in *Freeman,* not because the associations fixed the

9  support fees for the purpose and effect of raising MLS fees, but because of the associations'

10  ownership and control of Sandicor (the direct purchaser).").  Thus, in affirming the validity of

11  *Freeman*, the Ninth Circuit confirmed in *ATM Fee* that whether a purchaser paid the price-fixed

12  fee has no bearing on the application of the ownership or control exception.

13      Thus, Defendants' argument that Plaintiffs seek a "new exception" to *Illinois Brick*, (Mot.

14  at 22), is utterly without merit.  The Ninth Circuit held in *Freeman* that the ownership or control

15  exception applies where plaintiffs do not directly pay the price-fixed fee and the Court explicitly

16  affirmed that ruling in *ATM Fee*.  Plaintiffs in this case do not seek a new exception to *Illinois*

17  *Brick*, but rather fall squarely within the existing ownership or control exception.

18  **III.  Plaintiffs Have Standing To Pursue Federal Law Claims For Their LCD Product**
19        **Purchases From Defendants and the Entities They Own or Control.**

    **A.  *Royal Printing* Applies Where a Defendant Internally Consumes a Price-Fixed**
20         **LCD Panel.**

21      Defendants purport to challenge standing for all of Plaintiffs' LCD Product purchases, but

22  fail to address the most common panel-sourcing scenario, in which the ownership and control

23  exception unquestionably applies.  As set forth above, a large percentage of all LCD Products

24  were manufactured by vertically-integrated Defendants using internally sourced panels.  Under the

25  Ninth Circuit's controlling precedents in *ATM Fee*, *Royal Printing* and *Freeman,* the ownership

26

---

27  [36] *ATM Fee* also cited with approval Areeda's endorsement of *Sugar's* application of the
ownership or control exception.  686 F.3d at 755, n.7 (citing 2A Phillip E. Areeda, et al., *Antitrust*
28  *Law* ¶ 346f & n.41).

1    and control exception unquestionably applies in this scenario.  *See*, *e.g*., *ATM Fee*, 686 F.3d at 749

2    (indirect purchasers may sue where "a conspiring seller owns or controls the direct purchaser").

3           **B.  *Royal Printing* Applies Where a Defendant Sells a Price-Fixed Panel to a**
           **Subsidiary *or Division* of a Co-Defendant.**

4

5           Defendants argue that under *ATM Fee* the ownership and control exception only applies

6    when the direct purchaser is owned or controlled by the seller of the price-fixed product, rather

7    than by any one of the conspirators.  (Mot. at 19.)  This position is directly contradicted by *Royal*

8    *Printing* and *ATM Fee*.

9           As set forth above, when an LCD panel is externally sourced, it is common for a subsidiary

10   or division of one of the vertically-integrated Defendants to purchase the panel from another

11   Defendant.[37]  This was the exact fact pattern at issue in *Royal Printing*, in which the Ninth Circuit

12   held that the plaintiff had standing: Defendant "A" sells a price-fixed product to a subsidiary or

13   division of Defendant B, and that division or subsidiary then sells the product to the plaintiff.

14   These facts are clearly set forth in the *Royal Printing* opinion:

15          The manufacturers sell their paper products at the wholesale level through their
           wholesaling divisions or wholly-owned subsidiaries, as well as through independent

16          wholesalers.  The divisions and subsidiaries wholesale the products of all manufacturers,
           not limiting themselves to in-house products …. Royal Printing made purchases from

17          Crown Zellerbach's wholesaling division.  However, Royal Printing never bought any
           Crown Zellerbach products from the Crown Zellerbach division, only products of other

18          appellee manufacturers.

19   621 F.2d at 324.

20          Based on these facts, the Court held that "*Illinois Brick* does not bar an indirect purchaser's

21   suit where the direct purchaser is a division or subsidiary of *a* co-conspirator."  *Id.* at 326

22   (emphasis supplied).  The fact that there was not a linear corporate relationship between the

23   manufacturer of the product and the direct purchaser was irrelevant.  The only relevant fact was

24   that the direct purchaser was owned and controlled by one of the defendants or co-conspirators.

25          This Court has also previously held exactly the same, *i.e., Royal Printing* "was not

26   concerned with the relationship between the manufacturer of a price-fixed product and the direct

27   purchaser; rather, it was concerned with the relationship between the *conspirator* and the direct

28
     ---
     [37] *See supra*, notes 18-21 and accompanying text.

purchaser." Dkt. No. 4108 at 2 (emphasis in original). *ATM Fee* reaffirmed this exact holding, specifically that *Royal Printing* is not restricted to a pure linear corporate relationship between the conspirator and direct purchaser ("[I]ndirect purchasers may sue when ... *a conspiring seller owns or controls the direct purchaser.*") 686 F.3d 749 (emphasis supplied).[38]

To hold otherwise would seriously jeopardize the public policy goals articulated in *Royal Printing*, *i.e.*, it would "effectively immunize the transactions here from private antitrust liability, thus thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*." 621 F.2d at 324. *See also ATM Fee*, 686 F.3d at 756; Dkt No. 4108 at 2-3 (same).

### C. *Royal Printing* Applies To Sales of Price-Fixed Panels Between Defendants.

At times, a Defendant sold a price-fixed panel directly to another Defendant, which was then incorporated into a finished product that was sold to a Plaintiff.[39] Defendants contend that *ATM Fee* "could not be more explicit" that the *Royal Printing* exception does not apply to any sale between Defendants in this case. Mot. at 19-20. Once again, Defendants are wrong and seek to misapply *ATM Fee* and *Royal Printing*.

First, the holdings of *ATM Fee* and *Royal Printing* make clear that the ownership or control exception applies when a Defendant makes a sale directly to a division of another Defendant, *i.e.*, "*Royal Printing* allowed indirect purchasers to sue where the direct purchaser is a *division*…of a co-conspirator." *ATM Fee*, 686 F.3d at 756 (quoting *Royal Printing*, 621 F.2d at 326). Thus, the sale from one defendant to another defendant's division (an entity that is in no way legally distinct from the defendant) qualifies under *Royal Printing*.

It is unremarkable that *ATM Fee* did not apply the *Royal Printing* exception between the defendants in that case, given the unique facts it presented, which are in no way analogous to this

---

[38] Defendants point to similar language in *ATM Fee* and argue that this somehow establishes a rule that the direct purchaser must be owned or controlled by the seller of the price-fixed product, rather than one of the conspirators. (Mot. at 19) ("[O]wnership or control does not extend 'to situations where the seller does not own or control the direct purchasers.'") (quoting *ATM Fee*, 686 F.3d at 757). Defendants' reading of *ATM Fee* is plainly wrong, because it is contrary to the express holding in *Royal Printing*, and as discussed above, *ATM Fee* affirmed the holding in *Royal Printing*, and did nothing to narrow the scope of the exception. Rather, in the sentence quoted by Defendants, the *ATM Fee* Court was stating that it would not extend the *Royal Printing/Freeman* exception to include the situation presented by *ATM Fee*, where there was no ownership or control relationship between STAR and the Bank Defendants.

[39] *See supra*, note 22 and accompanying text.

1    case.  Every Defendant in this case participated in setting the price of the price-fixed panels.  In

2    contrast, in *ATM Fee*, the Court found that the Bank Defendants *had not participated in the price-*

3    *fixing of the interchange fee.  ATM Fee*, 686 F.3d at 745 ("The ATM network (not the card-issuing

4    banks nor the ATM owners) establishes the interchange fee").  In an effort to draw a parallel to

5    this case, Defendants incorrectly suggest that in *ATM Fee* the "defendant banks fixed the

6    interchange fee paid by ATM owners (including some of the same defendant banks)."  (Mot. at

7    20.)  However, the court found that the opposite was true.  686 F.3d at 745.  Moreover, unlike the

8    Defendants in this case, the Bank Defendants were "net payers."  *Id*. at 747 n.2.  "Because they

9    pay more in interchange fees than they receive, the higher the interchange fee, the higher the costs.

10   Thus, there is a very real possibility that these entities (or some subset of them) would file suit to

11   challenge the fixing of interchange fees at artificially high rates."  *Id.*

12         Failing to apply the *Royal Printing* exception to this subset of Plaintiffs' purchases, as

13   Defendants argue, would create arbitrary legal distinctions that are not compelled by *ATM Fee* and

14   *Royal Printing*, and would contradict the strong public policy underpinning both cases.  It is

15   beyond dispute that the *Royal Printing* exception applies when the price-fixed panel was sold to a

16   subsidiary or division of another defendant; however, according to Defendants, *Royal Printing*

17   does not apply when the price-fixed panel was sold directly to a defendant (and not its subsidiary

18   or division).  Drawing a distinction between these sales under *Royal Printing*, especially when all

19   the Defendants in this case participated in the price-fixing, would make no sense.  For the same

20   reason the ownership or control exception applied in *Royal Printing*, it also applies here: just as a

21   defendant would never let its subsidiary file a lawsuit that would reveal the defendant's

22   participation in the conspiracy, that same defendant would never file a lawsuit that would reveal *its*

23   *own* participation.

24         **D.  *Royal Printing* Applies Where an ODM or System Integrator Manufactures a
              Finished Product But Does Not Buy the Price-Fixed Panel.**

25

26         Defendants seek summary judgment when Defendants use an ODM to assemble the

27   Defendant's LCD Products based solely on the conclusory claim that "it is undisputed that there

28   were intervening direct purchasers between the LCD panel manufacturers and the Plaintiffs."

(Mot. at 18.)  Defendants fail to cite *a single piece of evidence* to support the claim that the ODM is the "true direct purchaser."  Putting aside that Defendants have failed to carry their burden of demonstrating that there is any reason to believe Plaintiffs lack standing on this basis, the undisputed evidence is to the contrary.

As set forth above, the evidence shows that when a Defendant used an ODM, the Defendant purchased the price-fixed LCD panel and supplied it to the ODM.[40]  The ODM's involvement was strictly limited to *assembling* the LCD Product for the Defendant and returning it to the Defendant for sale to Plaintiffs under the Defendant's own brand name.  The record thus establishes that the ODM was not the "true direct purchaser" of the price-fixed LCD panels.

### IV.   The Undisputed Evidence Shows That Plaintiffs Purchased Finished Products Directly From Defendants' Controlled Subsidiaries and Affiliates.

Defendants claim that there are "direct purchasers [that] had some affiliation with a defendant or alleged co-conspirator" but the affiliation stopped short of ownership or control, (Mot. at 18), so those affiliates are the proper antitrust plaintiffs.  Defendants put forward virtually no evidence to support this broad, conclusory statement, aside from some scant evidence that purports to show a lack of ownership or control between LG Display and LG Electronics.  Defendants' failure to provide evidence is especially striking given that Defendants are in the best position to show that there are no such ownership or control relationships.  Defendants have not carried their burden because they have failed to demonstrate that there is any reason to believe Plaintiffs lack standing on this basis.

*ATM Fee* describes control as existing where a shareholder owns a majority of a corporation's stock or has actual control over the corporation's conduct.  686 F.3d at 757 (citing *Weinstein Enters., Inc. v. Orloff,* 870 A.2d 499, 506–08 (Del. 2005)); *see also Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (2009).  The undisputed evidence establishes that each of the entities from which Plaintiffs directly purchased LCD Products was wholly (or majority) owned and controlled by one of the Defendants or co-conspirators,[41] or there is an ownership or control relationship between that entity (or its corporate family) and one of the

---

[40] *See supra* notes 22-28 and accompanying text.
[41] *See supra* note 9.

1  Defendants or co-conspirators.[42]

### A. Plaintiffs Have Standing Under *ATM Fee* to Pursue Federal Antitrust Claims Based on Their Purchases From LG Electronics.

Defendants contend that Plaintiffs' claims based on their purchases from LG Electronics must be dismissed under *ATM Fee*, because "Plaintiffs offer no evidence that LG Display owned or controlled LG Electronics." (Mot. at 18.) *ATM Fee* requires no such showing. It is equally acceptable under *ATM Fee* and *Royal Printing* to establish that LG Electronics and Philips (the direct purchasers) owned or controlled LG Display (the conspirator). The undisputed evidence cited below does just that.

Defendants cite no authority in support of their unduly restrictive reading of *ATM Fee* and *Royal Printing*, and indeed the language of *ATM Fee* makes clear that Defendants are wrong. There, the Ninth Circuit expressly held that the ownership or control exception is satisfied when the seller owns or controls the direct purchaser or vice versa. In other words, the direct purchaser's ownership or control of the seller is also sufficient to invoke the exception. *E.g., ATM Fee*, 686 F.3d at 756 ("In our case, neither Bank Defendants nor STAR are divisions or subsidiaries of the other."); *id.* ("[W]hether a realistic possibility of suit exists[] depends on the existence of ownership or control *between* the direct purchaser and the seller.") (emphasis added); *id.* at 756-58 (analyzing whether the Bank Defendants (the direct purchasers) owned or controlled STAR (the seller)).

The Ninth Circuit's holding in *ATM Fee* is also entirely consistent with this Court's denying Toshiba's motion for summary judgment in the DPP action, where Toshiba also tried to impose an overly narrow reading of *Royal Printing* to insulate itself from liability. Dkt No. 4108 at 2. Defendants here also misread *Royal Printing* and *ATM Fee*, by failing to recognize that the ownership or control inquiry goes both up- and downstream. Just as the DPPs had standing for their purchases from Toshiba because Toshiba Corporation owned or controlled its panel manufacturer, Plaintiffs have standing to recover for their purchases from LG Electronics because LG Electronics and Philips owned and controlled their panel manufacturer, LG Display,

---

[42] *See supra* note 10.

throughout the relevant period.  *ATM Fee* and this Court have both made clear that the ownership or control exception applies both up- and downstream.[43]

The facts concerning LG Electronics and Philip's ownership and control over LG Display are compelling.[44]  First, the evidence establishes that both of the parent companies at issue here, LG Electronics and Philips, were participants in the conspiracy.[45]  In addition, from LG Display's formation in 1999 until the public offering of a minority stake in July 2004, they each owned 50% of LG Display.[46]  LG Electronics and Philips collectively either wholly owned or held a substantial ownership interest in LG Display throughout the relevant period.[47]

LG Electronics and Philips also controlled LG Display throughout the relevant period.  *See ATM Fee*, 686 F.3d at 758 ("Concord's board of directors has the power, authority, and responsibility to manage the corporation.  Therefore, to control STAR, the Bank Defendants must have had control of Concord's board of directors ….") (internal citation omitted).  Specifically, through their control of LG Display's board of directors, LG Electronics and Philips had "ultimate responsibility for the management of [LG Display's] business affairs."[48]  From 1999 until July 2004, *all* of LG Display's board members and high-level executives came from either LG Electronics or Philips.  Following LG Display's 2004 and 2005 offerings, LG Electronics and Philips retained control of LG Display's board of directors and executive officers (*i.e.*, LG Display's business decisions and operations).[49]

Thus, the evidence shows that contrary to Defendants' argument that LG Electronics had merely "some affiliation" with LG Display (Mot. at 18), LG Electronics and Philips owned and

---

[43] Moreover, applying the exception unidirectionally, as Defendants advocate, would undercut the very policy that led to the creation of the ownership or control exception: just as a conspirator-seller would prevent its direct purchaser subsidiary from suing to reveal the seller's culpability, a direct purchaser would never sue its price-fixing subsidiary and expose the fact that its subsidiary was violating the antitrust laws.

[44] *See* Iovieno Decl. ¶¶ 89 to 96.

[45] Plaintiffs have detailed LG Electronics' participation in the conspiracy in their opposition to Defendants' motion for summary judgment concerning non-party co-conspirators.  Dkt. No. 6490.  In addition, it is undisputed that Philips is a conspirator.  Defendants challenge a number of non-party co-conspirators named in Plaintiffs' complaints, they have not challenged Philips.  *See* Dkt. No. 6209; *see also* Dkt. No. 6489-1.

[46] *See* Exh. 75 at F-7; Exh. 78, Response No. 2; Exh. 76, §§ 2.1(c), 6.1(a)).

[47] *See* Exh. 78 Response Nos. 3-6; Exh. 79 at F-7; Exh. 80 at F-9.

[48] Exh. 75 at 107).  *See also* Exh. 78, Response Nos. 36-61.

[49] Exh. 75 at 83.  *See also* Exh. 78, Response Nos. 19, 20, 21.

1    controlled LG Display.[50]   Moreover, Defendants present absolutely no evidence to the contrary.

2    At the very least, whether LG Electronics and Philips owned or controlled LG Display presents a

3    material question of fact that can not be resolved on a motion for summary judgment.

4    **V.    Plaintiffs Need Not Present Proof of Damage on a Product-By-Product or Purchase-By-**
        **Purchase Basis To Establish Standing.**

5

6            Defendants    variously    argue    that    Plaintiffs    must    demonstrate    standing    on    a

7    "[p]roduct-[b]y-[p]roduct basis" or a "purchase-by-purchase basis."   (Mot. at 16 (emphasis

8    removed); *id.* at 21.)   Either way, Defendants are wrong as a matter of law.   Indeed, Defendants

9    have done nothing more than repackage an unsuccessful argument they have already made twice

10   in the class cases.   This Court twice rejected Defendants' argument because it is not only wholly

11   unsupported, but also violates black letter law.

12          **A.  Plaintiffs Need Only Present Proof of "Some Damage" To Establish Standing.**

13          Section 4 of the Clayton Act grants standing to private plaintiffs "injured in [their] business

14   or property by reason of anything forbidden in the antitrust laws."   15 U.S.C. § 15(a).    The

15   Supreme Court has interpreted this language in Section 4 of the Clayton Act and held that in order

16   to have standing under Section 4, a private plaintiff must demonstrate "antitrust injury, which is to

17   say injury of the type the antitrust laws were intended to prevent and that flows from that which

18   makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477,

19   489 (1977).   Likewise, the Ninth Circuit has stated that, "Parsing the Supreme Court's definition,

20   we can identify four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury

21   to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the

22   type the antitrust laws were intended to prevent."  *American Ad Mgmt., Inc. v. Gen. Tel. Co. of*

23   *California*, 190 F.3d 1051, 1055 (9th Cir. 1999).   It is the second requirement, "causing injury to

24   the plaintiff," that Defendants here erroneously assert must be shown on a product-by-product or

25   purchase-by-purchase basis.[51]

26          The Supreme Court has stated with respect to this requirement that a plaintiff's "burden of

---

27   [50] LG Display has admitted that LG Electronics and LG Display have never been adverse to each
     other in litigation or arbitration and that they have been jointly represented in litigation.  Exh. 78,
28   Response Nos. 66-71.
     [51] This second requirement is often referred to as injury, injury-in-fact, impact, or fact of damage.

proving the fact of damage under s 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 114 n.9 (1969); *see also Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) (Plaintiff must demonstrate a "minimal quantum of injury").  Once "some damage" has been established, antitrust plaintiffs may recover damages even where the precise amount of damage cannot be fixed:

> Whatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced…. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565-66 (1931) (internal citation and quotation marks omitted).[52]

Defendants argue, contrary to express Supreme Court authority, that Plaintiffs must prove that a Defendant or a co-conspirator manufactured *each* of the LCD panels contained in *each* of the millions of individual LCD Products Plaintiffs purchased from Defendants or their controlled subsidiaries, divisions and affiliates during the conspiracy period.  (Mot. at 21.)  Defendants' argument would undo decades of precedent on causation and place an impossible burden on anyone harmed by a price-fixing conspiracy.

This Court has already confronted this issue raised by Defendants and has twice concluded that the standard proposed by Defendants is unduly stringent, would violate black letter law, and would contradict fundamental precepts of antitrust law.  Most recently, Defendants moved to exclude expert testimony on impact and damages in the IPP action.  The Court rejected Defendants' argument that plaintiffs must "provide evidence of panel-by-panel impact."  Dkt No. 4848 at 4-5; *see also id.* at 5 ("Even as to this minimal quantum of injury, the standard is relaxed; otherwise, it would defeat the loose standard applied even to the amount of damages in antitrust cases." ) (quoting *Knutson*, 548 F.2d at 811.  The Court further stated:

---

[52] This holding has been an abiding tenet of antitrust law ever since.  *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 573 (1990); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264-65 (1946).

1
2
> *An individual plaintiff would not be required to meet the stringent standards defendants propose.* Rather, such a plaintiff would be entitled to rely on evidence much like the evidence plaintiffs here have set forth: evidence that defendants illegally raised the prices of their TFT-LCD panels, and that retail prices increased as a result.

3    *Id.* at 5-6 (emphasis added).

4        Likewise, this Court has also rejected Defendants' similar argument in the context of their

5    motion to decertify the IPP class. Dkt No. 4683. The Court found that although "there is no

6    'comprehensive list' of model numbers and serial numbers that provides a simple answer to the

7    question whether a given LCD product contains a panel manufactured by a defendant," the case

8    was suitable for class treatment. *Id.* at 3. The Court noted that: (i) it was undisputed that

9    Defendants held an "overwhelming" market share during the conspiracy period and thus the

10   conspiracy affected almost all LCD products sold in the U.S.; (ii) the majority of Defendants had

11   already admitted wrongdoing; and (iii) the government had expressly declined to seek restitution

12   from the Defendants that had pled guilty, leaving compensation of plaintiffs to the civil litigation.

13   *Id.* at 3-4. In those circumstances, the Court held that "it would be inappropriate to require

14   potential class members to produce proof of class membership to an absolute certainty." *Id.* at 4

15   (citing *J. Truett Payne Co.*, 451 U.S. at 566-67 ("[I]t does not come with very good grace for the

16   wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.");

17   *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 808 (7th Cir. 2012) ("In essence, it is

18   important not to let a quest for perfect evidence become the enemy of good evidence.")).[53]

19       Once again, Defendants attempt to shield themselves from liability for their price-fixing by

20   seeking to impose upon civil plaintiffs a standard that is both unprecedented, and, because of

21   Defendants' own sparse record-keeping, impossible to satisfy. Defendants conspicuously fail to

22   cite any authority that supports the heightened standard they advocate.[54] Moreover, Defendants'

23   attempt to bootstrap *ATM Fee*'s substantive discussion of *Illinois Brick* into their argument about

24   the evidentiary standard necessary to prove standing (Mot. at 21) is improper. *ATM Fee* has

25

---

26   [53] The same is true here where Plaintiffs opted out of the DPP class and chose to bring their own lawsuits. It would be incongruous and unfair to hold Plaintiffs that have opted out of the DPP

27   class to a higher standard of proof than either the DPP or IPP class.
     [54] The two cases cited by Defendants, *Royal Printing*, 621 F.2d at 327-28, and *Sun Microsystems*

28   *Inc.*, 608 F. Supp. 2d at 1180-82, say nothing about the use of a product-by-product or purchase-by-purchase standard and certainly do not support the use of such a standard.

1    changed nothing about the evidentiary standard necessary to prove Plaintiffs' standing.

2        **B.  Plaintiffs Have Presented More Than Enough Proof of Damage To Establish
              Standing.**

3

4        As Judge Posner has noted, plaintiffs may prove causation by showing "merely a

5    probability of a harm attributable to the defendant's wrongful act." *BCS Servs, Inc. v. Heartwood*,

6    637 F.3d 750, 759 (7th Cir. 2011).  Here, Plaintiffs are able to do much more than present a mere

7    probability that Defendants' illegal conspiracy caused them harm.  Plaintiffs can prove with

8    certainty that they purchased LCD Products from Defendants and have shown that, based on panel

9    sourcing and market share data, the vast majority of the LCD panels in those finished products

10   were price-fixed.  Thus, they are able to conclusively show that the cartel has caused them some

11   quantum of injury.

12       As this Court is also well aware from the extensive prior litigation on this issue, both the

13   class plaintiffs and DAPs together conducted and analyzed a massive amount of discovery from

14   Defendants, their co-conspirators and non-parties, all of which was all designed to determine if

15   any records existed that would allow the identification of *each* particular LCD panel contained in

16   *each* of the millions of different LCD Products that were sold by Defendants and co-conspirators

17   during the conspiracy period.[55]  This discovery established that, with limited exceptions,

18   Defendants and their co-conspirators did not systematically maintain this information in data or

19   otherwise.[56]  However, through this discovery effort, Plaintiffs obtained some data that identified

20   the sources of the panels contained in certain models of LCD Products sold to Plaintiffs by

21   Defendants, co-conspirators, and third parties.[57]  This data contained sourcing information for a

22   total of 3,691 of the specific brand models of LCD Products purchased by Plaintiffs during the

23   conspiracy period (approximately 25% of Plaintiffs' total purchases).

24       Using this data, one of Plaintiffs' damages experts, Dr. Leslie Marx, was able to

25   definitively establish that approximately 3,545 of these 3,691 specific brand models of LCD

26

     _____

     [55] Dkt. No. 3903 ¶¶ 3-7.

27   [56] *Id.* ¶ 8.  In addition, Plaintiffs have also established that information or records that would allow
     for systematic panel tracing was not maintained by most LCD Product manufacturers. Exhs. 49 to

28   58.
     [57] Exh. 74 ¶¶ 17-18.

     PLAINTIFFS' OPPOSITION TO DEFENDANTS'
     MOTION FOR PSJ FOR LACK OF STANDING UNDER          - 24 -              Master File No. 3:07-md-01827-SI
     *ILLINOIS BRICK* AND *ATM FEE*

Products purchased by Plaintiffs can be positively identified as using only Defendant and co-conspirator panels.[58]  In other words, of all the specific brand models of LCD Products purchased by Plaintiffs for which there exists panel sourcing data, 95.9% of these models were sourced exclusively with Defendant or co-conspirator panels.[59]

Thus, as expected, the results from Dr. Marx's study of the panel sourcing data that exists for Plaintiffs' purchases closely tracked Defendants' panel market share during the conspiracy period.  Dr. Marx testified that this fact further confirmed that the use of market share data to analyze the volume of Plaintiffs' purchases that contained Defendant panels is reasonable and reliable.[60]  This evidence is more than enough to demonstrate the fact of damage, *i.e.*, "*some damage flowing from the unlawful conspiracy.*" *Zenith*, 395 U.S. at 114 n.9 (emphasis added).[61]

### C. Comprehensive Discovery Has Established That Defendants Chose Not To Keep Records That Would Allow Plaintiffs To Prove Damage on a Product-By-Product or Purchase-By-Purchase Basis.

In this context, it is truly incredible that Defendants attempt to malign Dr. Marx's analysis based on the fact that Defendants maintained incomplete data identifying the particular panels used in each of the millions of finished products purchased by Plaintiffs.  Mot. at 21.  As this Court has already held, Defendants' attempt to hide behind their own misconduct and poor record-keeping "does not come with very good grace."  Dkt. No. 4683 at 4 (quoting *J. Truett Payne Co*, 451 U.S. at 566-67).  By necessity, a conspiracy involves secrecy and illegal dealings, and it would be patently unjust for conspirators to use that inherent uncertainty to shield themselves from justice.  Thus, contrary to Defendants' argument, it is tried-and-true, black letter law that Plaintiffs need not present perfect proof where a wrongdoer's conduct or record-keeping makes it difficult to do so.  *See, e.g., BCS Servs*, 637 F. 3d at 759 (Once causation is established, Plaintiffs then enjoy a "more relaxed burden of proof" for the amount of damages, "especially if … *the defendants' conduct has made it difficult for the plaintiff to prove the precise extent of his damages.*") (emphasis supplied).

---

[58] Iovieno Decl. ¶ 102.
[59] *Id.*
[60] Exh. 64 at 570-71.
[61] Defendants' vague suggestion that there may be intermediaries between the panel maker and the product maker in some instances (Mot. at 21-22) is entirely unsupported.

DATED:  August 20, 2012          Respectfully submitted,


By:    /s/ William A. Isaacson
William A. Isaacson (*pro hac vice*)
Melissa Felder (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:    (202) 237-6131
Email: wisaacson@bsfllp.com
          mfelder@bsfllp.com

Philip J. Iovieno (*pro hac vice*)
Anne M. Nardacci (*pro hac vice*)
Luke Nikas (admitted *pro hac vice*)
Christopher V. Fenlon (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:    (518) 434-0665
Email: piovieno@bsfllp.com
          anardacci@bsfllp.com
          lnikas@bsfllp.com
          cfenlon@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc. and
Electrograph Technologies Corp.*


By:    /s/ Roman M. Silberfeld
Roman M. Silberfeld  (CA Bar No. 62783)
David Martinez (CA Bar No. 193183)
Lauren E. Wood (CA Bar No. 280096)
ROBINS, KAPLAN, MILLER & CIRESI LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067-3208
Telephone:  (310) 552-0130
Facsimile:    (310) 229-5800
Email: RMSilberfeld@rkmc.com
          DMartinez@rkmc.com
          LEWood@rkmc.com

*Counsel for Best Buy Co., Inc.; Best Buy Purchasing LLC;
Best Buy Enterprise Service, Inc.; Best Buy Stores, L.P.;
Bestbuy.com, LLC; and Magnolia Hi-Fi, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:____/s/ Jason C. Murray_____

Jason C. Murray (CA Bar No. 169806)
Janet I. Levine (CA Bar No. 94255)
Joshua C. Stokes (CA Bar No. 220214)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:   (213) 622-4750
Facsimile:    (213) 622-2690
Email: jmurray@crowell.com
             jlevine@crowell.com
             jstokes@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:   (202) 624-2500
Facsimile:    (202) 628-5116
Email: jhoward@crowell.com
             jmurphy@crowell.com

Kenneth L. Adams (*pro hac vice*)
R. Bruce Holcomb (*pro hac vice*)
Christopher T. Leonardo (*pro hac vice*)
ADAMS HOLCOMB LLP
1875 Eye Street NW
Washington, DC 20006
Telephone:   (202) 580-8822
Facsimile:    (202) 580-8821
Email: adams@adamsholcomb.com
             holcomb@adamsholcomb.com
             leonardo@adamsholcomb.com

*Counsel for Plaintiffs AT&T Mobility LLC, et al. and
Target Corporation, et al.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  ___/s/ David J. Burman_____
David J. Burman (*pro hac vice*)
Cori G. Moore (*pro hac vice*)
Eric J. Weiss (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  (206) 359-8000
Facsimile:   (206) 359-9000
Email: DBurman@perkinscoie.com
          CMoore@perkinscoie.com
          EWeiss@perkinscoie.com

*Counsel for Plaintiff Costco Wholesale Corp.*