Janet I. Levine (CA Bar No. 94255)
Jason C. Murray (CA Bar No. 169806)
Joshua C. Stokes (CA Bar No. 220214)
Nathanial J. Wood (CA Bar No. 223547)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-622-4750
Facsimile:  213-622-2690
Email: jlevine@crowell.com
        jmurray@crowell.com
        jstokes@crowell.com
        nwood@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email:  jhoward@crowell.com
         jmurphy@crowell.com

*Counsel for Plaintiff ViewSonic Corporation*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| VIEWSONIC CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHIMEI INNOLUX CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SEMICONDUCTOR, INC.; SHARP CORPORATION; SHARP ELECTRONICS CORPORATION; TOSHIBA CORPORATION; TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO., LTD.; and TOSHIBA AMERICA INFORMATION SYSTEMS, INC.,<br><br>                    Defendants. | Case No. C 3:12-0335 SI<br><br>Master File No. 07-m-1827 SI<br><br>MDL No. 1827<br><br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ViewSonic Corporation ("ViewSonic" or "Plaintiff"), for its complaint against all defendants named herein, alleges as follows:

## I.   INTRODUCTION

1.     Plaintiff brings this action to recover the damages it incurred as a result of a long-running conspiracy by manufacturers of liquid crystal display panels ("LCD Panels").  From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other communications in the United States and abroad, those manufacturers, which include defendants and their co-conspirators, conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels.

2.     Plaintiff is a large U.S. manufacturer of televisions, computer monitors, and other consumer electronics that, during the Conspiracy Period, purchased LCD Panels and LCD Products directly from defendants and their co-conspirators.  As a result of defendants' and their co-conspirators' illegal conspiracy, Plaintiff paid artificially-inflated prices for LCD Panels and LCD Products.  Thus, Plaintiff suffered damages as a result of defendants' and their co-conspirators' conspiracy, and brings this action to recover the overcharges paid for the LCD Panels and LCD Products it purchased during the Conspiracy Period.

3.     Defendants and their co-conspirators formed an international cartel illegally to restrict competition in the United States in the market for LCD Panels.  During the Conspiracy Period, the conspiracy affected billions of dollars of commerce throughout the United States.  The conspiracy included communications and meetings in which defendants agreed to eliminate competition and fix the prices of LCD Panels that they knew would be sold throughout the United States.  Senior executives of the defendants instructed their subordinates in the United States to communicate with employees of their competitors to exchange pricing and other competitive information to be used in fixing prices for LCD Panels sold to U.S. companies.  The defendants' employees engaged in these illegal communications in the United States and utilized that information to increase the prices U.S. customers paid for LCD Panels.

4.     At least seven LCD Panel manufacturers, including defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa

Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation, and HannStar Display Corporation, have admitted in criminal proceedings to participating in the conspiracy. On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $565 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  On or about December 9, 2009, Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

5.      Plaintiff brings this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff also seeks to recover damages  for the injuries it suffered as a result of defendants' and their co-conspirators' conspiracy to fix, raise, maintain, and stabilize the prices of LCD Panels under Section 4 of the Clayton Act and under California state antitrust and unfair competition law.  Plaintiff further seeks to recover the costs of suit, including reasonable attorneys fees.

**II.      JURISDICTION AND VENUE**

6.      Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for its purchases of LCD Panels and LCD Products from certain defendants and for injunctive relief against all defendants.

7.      Plaintiff also brings this action pursuant to the California Cartwright Act and the California Unfair Competition Law for injunctive relief and damages that Plaintiff sustained as a result of defendants' and their co-conspirators' illegal conspiracy.  Plaintiff has a significant presence in California and maintains its headquarters there.  In addition, during and after the Conspiracy Period, Plaintiff purchased and paid for LCD Panels and LCD Products in California.

8.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiff's claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this

Court has supplemental jurisdiction over Plaintiff's claims arising under California's antitrust and unfair competition laws under 28 U.S.C. §1367.  Plaintiff's state law claims are so related to its claims under the federal antitrust laws that they form part of the same case or controversy.

9.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in California.  That effect gave rise to Plaintiff's antitrust claims.

10.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  The activities of defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California.  In particular, defendants' and their co-conspirators' conspiracy directly and substantially affected the price of LCD Panels and LCD Products purchased in California.  These effects also give rise to Viewsonic's antitrust claims.  Viewsonic maintained its headquarters in California during and after the Conspiracy Period.  Each defendant conducts substantial business in the state of California, and a number of defendants maintain their headquarters in this District or elsewhere in California.  In addition, defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured LCD Panels and LCD Products for sale in the United States and California and several defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

11.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

12.     Because this action is related to the *In re TFT-LCD Antitrust Litigation*, Case No. M:07-cv-1827 SI,  it is assigned to the San Francisco division, Judge Susan Illston presiding.  This action concerns substantially the same parties, transactions, and events as Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of defendants' and their

co-conspirators' conspiracy to fix the price of liquid crystal display panels in violation of the Sherman Act and the laws of California.  Pursuant to Pretrial Order #1 in M:07-cv-1827 SI, this case is automatically consolidated with M:07-cv-1827 SI for all pretrial proceedings without any further motion or order.

## III.   DEFINITIONS

13.   As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

14.   As used herein, the term "LCD Panel" means liquid crystal display panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image.  As used herein, "LCD Panel" refers to both liquid crystal display panels and modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a television, computer monitor, or other product.  During and after the Conspiracy Period, the price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels.

15.   As used herein, the term "LCD Products" means any product containing an LCD Panel, including without limitation LCD modules, televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand-held devices.

16.   As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

## IV.   THE PARTIES

### A.   Plaintiff

17.   Plaintiff ViewSonic Corporation is a Delaware corporation with its headquarters in Walnut, California.  ViewSonic is a leading manufacturer of televisions, computer monitors, and other consumer electronics containing LCD Panels.  During the Conspiracy Period, ViewSonic purchased substantial amounts of LCD Panels for inclusion in LCD Products, as well as LCD Products, from defendants, their co-conspirators, and others.  As a result of defendants' and their co-conspirators' illegal

conspiracy, ViewSonic was injured in its business and property because the prices it paid for LCD Panels were artificially inflated by that conspiracy.

18.     During the Conspiracy Period, invoices for LCD Panels and LCD Products were sent to ViewSonic in the United States, and paid by ViewSonic from the United States.

**B.     Defendants**

**1.     AU Optronics**

19.     Defendant AU Optronics Corporation is one of the world's largest manufacturers of LCD Panels with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products sold throughout the United States and the world.

20.     Defendant AU Optronics Corporation America, Inc. is a wholly owned and controlled subsidiary of defendant AU Optronics Corporation with its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

21.     Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are referred to collectively herein as "AU Optronics."  The AU Optronics companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant AU Optronics Corporation America, Inc. was a member of the conspiracy because, among other reasons, of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**2.     Chi Mei**

22.     Defendant Chi Mei Corporation is one of the world's largest manufacturers of LCD Panels with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan.

During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

23.     Defendant Chimei Innolux Corporation is another of the world's largest manufacturers of LCD Panels, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels to customers throughout the United States.

24.     Chimei Innolux Corporation was formed on March 18, 2010 by a three-way merger of Chi Mei Optoelectronics Corp., Innolux Display Corp., and TPO Displays Corp., through exchanges of shares. The surviving company of the merger renamed itself "Chimei Innolux Corporation." TPO Display Corp. and Chi Mei Optoelectronics Corp. were dissolved after the merger.

25.     Chi Mei Optoelectronics Corporation was a former LCD panel manufacturer, with its global headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.

26.     Innolux Display Corp. was a former LCD panel manufacturer, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan.

27.     Prior to the merger, Chi Mei Optoelectronics Corp. Innolux Display Corp., and TPO Displays Corp. manufactured, marketed, sold and/or distributed LCD panels to customers throughout the United States.

28.     Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display Technology USA, Inc., is a wholly owned and controlled subsidiary of Chi Mei Corporation with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

29.     Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation with its principal place of business located at Nansei Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan.  During the Conspiracy Period, said defendant

manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

30.   Defendant Nexgen Mediatech, Inc. is a wholly owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St., Jen Te Village Jen Te, Tainan 717, Taiwan.  During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products containing LCD Panels manufactured by Chi Mei Optoelectronics Corporation throughout the United States and the world.

31.   Defendant Nexgen Mediatech USA, Inc. is a wholly owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California.  During the Conspiracy Period, said defendant marketed, sold, and/or distributed LCD Products containing LCD Panels manufactured by Chi Mei Optoelectronics Corporation throughout the United States and the world.

32.   Defendants Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. are referred to collectively herein as "Chi Mei."  The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Chimei Innolux Corporation (through its predecessor Chi Mei Optoelectronics Corporation), Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation.  Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**3.   Chunghwa**

33.   Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa") is a leading manufacturer of LCD products with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.  Chunghwa is a

subsidiary of Tatung Company, a consolidated consumer electronics and information technology

company based in Taiwan.  Chunghwa's Board of Directors includes representatives from Tatung

Company.  The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the

Tatung Company.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or

distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and

the world.  Chunghwa participated in the conspiracy through the actions of its respective officers,

employees, and representatives acting with actual or apparent authority.

### 4.  Epson

34.     Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of

business at 3-101 Minami-Yoshikata, Tottori-Shi, Tottori 680-8577, Japan.  The company was originally

formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a

wholly-owned subsidiary of Seiko Epson Corporation.  Up until December 28, 2006, Epson Japan was

known as Sanyo Epson Imaging Devices Corporation.  During the Conspiracy Period, Epson Japan

manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United

States and elsewhere.

35.     Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and

controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard

Parkway, San Jose, California.  During the Conspiracy Period, Epson America sold and distributed LCD

Products containing LCD Panels manufactured by Epson Japan to customers in the United States.

36.     Defendants Epson Japan and Epson America are referred to collectively herein as "Epson."

The Epson companies were members of the conspiracy that is the subject of this Complaint by virtue of

their participation in the conspiracy through the actions of their respective officers, employees, and

representatives acting with actual or apparent authority.  Alternatively, defendant Epson America was a

member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of

Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and

used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### 5. **HannStar**

37.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

### 6. **LG Display**

38.    Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and/or LCD Products and is a joint venture created in July 1999 by Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. maintains offices in San Jose, California, and has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  LG Display Co., Ltd. also maintains offices in San Jose, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

39.    Defendant LG Display America, Inc., f/k/a/ LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

40.    Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively herein as "LG Display."  The LG Display companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

### 7.   Samsung

41.     Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and the world.

42.     Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Conspiracy period, said defendant manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and the world.

43.     Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Co., Ltd. with its principal place of business at 3655 North First Street, San Jose, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and the world.

44.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."  The Samsung companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd.  Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels.

### 8.   Sharp

45.     Defendant Sharp Corporation has its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

46.     Defendant Sharp Electronics Corporation is a wholly owned and controlled subsidiary of defendant Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey 07495.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

47.     Defendants Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp."  The Sharp companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

**9.     Toshiba**

48.     Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States and the world.

49.     Defendant Toshiba Mobile Display Co., Ltd., f/k/a/ Toshiba Matsushita Display Technology Co., Ltd., has its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products sold throughout the United States and the world.

50.     Defendant Toshiba America Electronic Components, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc., which in turn is a wholly owned and controlled subsidiary of defendant Toshiba Corporation, with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products sold throughout the United States and the world.

51.     Defendant Toshiba America Information Systems, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc., which in turn is a wholly owned and controlled subsidiary of defendant Toshiba Corporation, with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

52.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."  The Toshiba companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and/or LCD Products.

## C.     Agents and Co-Conspirators

53.     The actions in this Complaint were authorized, ordered, or done by the defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

54.     Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein.  Each defendant which is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products manufactured by its parent company.

55.     Various persons and entities, some identified and some not yet identified, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG

Electronics USA, Inc., Hitachi Hydis Technologies Co., Ltd., IPS Alpha Technology, Ltd., Mitsubishi Electric Corporation, NEC Corporation, NEC LCD Technologies, Ltd., Renesas Electronics America (collectively NEC Corporation, NEC LCD Technologies and Renesas are referred to as "NEC"), Koninklijke Philips Electronics N.V. ("Philips"), Samsung SDI Co., Ltd., Samsung SDI America, Inc. (collectively "Samsung SDI"), Sanyo Consumer Electronics Co., Ltd., Sanyo Electric Co., Ltd. (collectively "Sanyo"), Mitsui & Co., Ltd., Panasonic Corporation, and Panasonic Corporation of North America.

## V.    THE MARKET FOR LCD PANELS AND LCD PRODUCTS

56.    LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.

57.    LCD Panels use liquid crystal to control the passage of light.  More specifically, an LCD Panel is made of two glass sheets sandwiching a layer of liquid crystal.  When voltage is applied, the liquid crystal is bent, allowing light to pass through to form a pixel.  The combination of these pixels forms an image on the panel.

58.    LCD Panels have no independent utility, and have value only as components of other products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays, laptop displays, and televisions.  The demand for LCD Panels thus derives directly from the demand for such products.  In the case of LCD Panels used in mobile wireless handsets, the demand for LCD Panels derives directly from the demand for mobile wireless handsets.

59.    The market for LCD Panels is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units.  This number ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in the demand for LCD Panels during the Conspiracy period.  Shipments of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

60.     The market for LCD Panels and the market for LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products, such as mobile wireless handsets.  The market for LCD Panels and the markets for LCD Products such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions are, for all intents and purposes, inseparable in that one would not exist without the other.

61.     Plaintiff participated in the market for LCD Panels during and after the Conspiracy Period through its purchases of LCD Panels and/or LCD Products.  Plaintiff paid a higher price for LCD Panels and/or LCD Products purchased from defendants, their co-conspirators, and others than it would have absent the conspiracy.

**VI.     DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS IN THE UNITED STATES AND THEY PARTICIPATED IN PRICE FIXING MEETINGS OVERSEAS TO INCREASE THE PRICE OF LCD PANELS SOLD IN THE UNITED STATES**

62.     During the Conspiracy Period, the defendants were aware that the U.S. market for LCD Products was one of the largest in the world.  Defendants regularly solicited updated information from potential purchasers of LCD Panels about the type and quantity of LCD Panels needed for the manufacture of LCD Products for sale in the United States.  Defendants maintained sales offices and sales agents in the United States to market their LCD Panel manufacturing capabilities to U.S. companies and to support their U.S. customers throughout the duration of the purchasing relationship.

**A.     Defendants Engaged In Bilateral And Multilateral Meetings And Communications With Competitors To Inflate Prices Of LCD Panels And LCD Products.**

**1.     The Defendants Conspired To Raise The Prices Of LCD Panels Sold Into The United States.**

63.     The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions at all levels of defendants that took place in the United States, as well as in Japan, South Korea, Taiwan, and elsewhere.  Defendants' conspiracy included agreements to fix, raise, maintain and/or stabilize the prices of LCD Panels.  Defendants fostered a culture of corruption within their companies whereby employees at every level—from the very top executives all the way to lower-level sales representatives—engaged in frequent and continuous communications with employees at every level

- 15 -

of their competitors.  Senior executives at defendants made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees funneled the competitive information up to their superiors who utilized that information—along with the pricing information they, themselves, were able to collect through their own illegal competitor contacts—to set prices for LCD Panels at artificially-inflated levels.  The constant communications between defendants at all levels allowed defendants to conspire to set average prices across the entire industry, as well as conspiring to fix the prices of the particular LCD Panels sold to specific U.S. customers, such as Motorola, Dell, Hewlett-Packard, Apple, and others.

       **2.**    **Defendants Engaged In Illegal Communications About Pricing In The United States.**

64.     This culture of corruption permeated defendants' U.S. operations and sales.  In fact, the top sales executive at Samsung in Korea during the Conspiracy Period, H.S. Kim, instructed his direct reports in the United States to obtain competitive information from their counterparts at other LCD Panel suppliers in the United States.  That information was ultimately used by Mr. Kim and others at Samsung to set artificially-inflated prices for LCD Panels charged to Samsung's U.S. customers.

65.     Brian Graham of Sharp quoted LCD Panel prices to Dell, and received price quotes from a sales team at Sharp in Japan.  Members of this sales team communicated with Sharp's competitors and obtained information about competitors' prices that was shared with Mr. Graham for purposes of fixing prices for Dell.

66.     Thereafter, Michael Hanson of Samsung and Brian Graham of Sharp met in the United States and agreed to fix the prices for LCD Panels sold to various U.S.-based OEMs at that time.  In following years, both Messrs. Hanson and Graham also met and agreed to fix prices for LCD Panels with their U.S. counterparts at defendants LG Display, Toshiba, and AU Optronics, and at other LCD Panel suppliers.  They met at restaurants and bars in the United States and frequently communicated by telephone while in their offices in the United States.  Mr. Hanson alone had over 500 telephone calls with his counterparts at competitor LCD Panel suppliers.  These illegal bilateral and multilateral contacts with competitors were not limited to the U.S. sales representatives of Samsung and Sharp; Christina Hooten of

Toshiba confirmed bids with Sanyo before Toshiba would respond to a request for quotes for purchase of LCD Panels.

67.    The competitive information these individuals learned from their counterparts was passed along to their superiors—including executives in Asia—for use in setting the LCD Panel prices charged to defendants' U.S. and other customers.  Other U.S. employees and account managers at defendants had similar conversations related to various U.S. customers.  These communications in the United States were meant to advance the conspiracy's presence in and control over the U.S. market for LCD Panels and LCD Products.

68.    For OEMs in the United States, defendants' U.S. affiliates led the LCD Panel price negotiations, with pricing directions coming from Asia where the defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the defendants' conspiracy meetings and conspiracy communications took place in the U.S., involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and U.S. OEMs.  But in addition to these conspiratorial acts committed in the U.S., defendants' conspiratorial conduct included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, defendants' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products.  Defendants' conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

### 3.    Defendants Engaged In Illegal Bilateral And Multilateral Communications About The Pricing Of LCD Panels.

69.    In the early years of the conspiracy, beginning in at least 1996, representatives of the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix the prices for LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

70.    In early 1998, H.S. Kim of Samsung attended a vendor conference in 1998 in which someone suggested that LCD competitors should "get together."  According to H.S. Kim, Mr. Yamamoto of NEC was probably present when this meeting was suggested.

71.     Later in 1998, high level representatives at various LCD manufacturers, including Sharp, Toshiba, Samsung, NEC, LG, and Mitsubishi, met to discuss projected sales volumes.  H.S. Kim testified that these representatives played golf in Taipei and probably discussed the "business forecast."  The companies agreed that they needed additional meetings to head off the projected higher level of competition between the companies.  Samsung has admitted that H.S. Kim of Samsung attended a golf and lunch event in Taiwan with NEC, Sharp, Hitachi, Mitsubishi, IBM, and LG where the participants discussed projected sales volumes for the upcoming period.

72.     Representatives from Samsung, NEC, Sharp, Hitachi, Mitsubishi, and LG met again later in 1998 to discuss their projected sales plans to limit competition between them.  According to H.S. Kim, this meeting was likely attended by the same participants as the earlier 1998 meeting, including Mr. Yamamoto of NEC.  Samsung also admitted that H.S. Kim of Samsung attended a meeting in approximately May 1998 at the Holiday Inn hotel in Taipei with Mr. Yamamoto of NEC and others from Sharp, Toshiba, Hitachi, Mitsubishi, and LG.  They discussed projected sales volumes.

73.     Beginning in 1999, high level representatives of Samsung met with counterparts at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.

74.     Samsung engaged in illegal bilateral and multilateral communications with NEC. Samsung has admitted that H.B. Suh of Samsung met with Aki Nakamura of NEC on multiple occasions, and that they sometimes reached understandings about prices for LCD Panels.  At his deposition, H.B. Suh of Samsung testified that he repeatedly met and spoke by telephone with Mr. Nakamura of NEC regarding notebook panel prices.

75.     Likewise, Sanyo engaged in illegal bilateral communications with Samsung, Chunghwa, and Toshiba.  On December 15, 1999, Carl Steudle of Samsung met a Sanyo national sales manager and Sanyo pleaded with Mr. Steudle to convince Samsung management to raise its price for certain LCD Panels for the following February.  Sanyo told Samsung it "did not want to be the only guy to raise prices for Feb." and that they "feel they can get one last price increase in Q1 and Feb. will be the month."

76.     In late 2000, Hsueh-Lung (Brian) Lee of Chunghwa had face-to-face meetings with representatives of Sanyo Japan to "gain a better understanding of the market situation" regarding LCD Panels.

77.     From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production. The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants during this period.  The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States on a regular basis throughout this period.

78.     The Crystal Meetings were highly organized and reflected the culture of corruption at the defendant companies, with meetings among multiple levels of company representatives.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings; and those among lower level sales representatives were call "Working Level" meetings.

79.     The CEO meetings occurred quarterly from approximately 2001 to 2006.  The Commercial meetings occurred monthly during that same period, and the Working Level meetings occurred frequently over the same time period.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review.  Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

80.     During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and supply, demand, and production levels of LCD Panels.  The

participants reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels.  Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.  Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

81.     During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending these meetings.  Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings.  Participants at the Crystal Meetings contacted Japanese defendants (such as Sharp and Toshiba) to relay the agreed-upon pricing and production limitations.  Some of these meetings and communications took place in the U.S., and specifically targeted U.S. commerce and U.S. OEMs.

82.     For instance, H.B. Suh of Samsung met with Mr. Matsumura of Sanyo multiple times in 2002, and they agreed to fix prices for mutual customers.  H.B. Suh testified that he repeatedly met with Mr. Matsumura of Sanyo to discuss the pricing of LCD television and monitor panels to Samsung Electronics.

83.     Michael Hanson of Samsung testified that he discussed competitive information with Gordon West, an agent of Sanyo on numerous occasions and then passed this Sanyo information to Yul Rak Sohn of Samsung.

84.     As part of the larger conspiracy to raise the price of LCD Panels, Japanese defendants engaged in bilateral communications with other defendants to relay the agreed-upon pricing and production limitations.  Examples include:

- Samsung SDI engaged in illegal bilateral communications with Epson.  Mr. Imai of Epson met with Samsung SDI regularly in at least 2004 and 2005 to exchange LCD Panel pricing information.  On June 2, 2004, Takato Imai of Epson met with Mr. Shin, Mr. Eom, and Mr. Yun of Samsung SDI to discuss prices, price quotes, and volumes for LCD Panels sold

to ongoing projects for Nokia.  On October 28, 2004, Takato Imai of Epson met again with Mr. Eom and Mr. Yun of Samsung SDI to discuss price quotes and forecasts for LCD Panels sold to Nokia.

- Takato Imai of Epson met again with Mr. Shin and Mr. Eom of Samsung SDI in April 2005, and they exchanged pricing and supply information, as well as information for competitors LG Philips, Philips, Sharp, and AUO.  Mr. Imai of Epson also discussed pricing for LCD Panels with Mr. Eom in May 2005 and July 2005.

- Philips engaged in illegal bilateral communications with Epson during the Conspiracy Period.  For example, Philips communicated with Katsuyuki Furujo of Epson in 1999 regarding its production capacity.  And on June 19, 2001, Philips communicated with Mr. Furujo of Epson to exchange information on price quotes for sales of LCD Panels.  Philips talked again with Mr. Furujo of Epson in 2002 to discuss the supply volumes for Philips, Epson, Samsung SDI, and Sharp, as well as fourth quarter 2002 price quotes for ongoing projects.

- Philips engaged in illegal bilateral communications with Sharp as well.  For instance, documents produced by Defendants revealed that Philips spoke with John Franz of Sharp USA in September 2002 about Philips' bids on LCD Panels for sale to Hewlett Packard.

- Philips also engaged in illegal bilateral communications with Toshiba.  Yuichi Sato of Philips and Makoto Chiba of Toshiba would regularly communicate regarding sales prices and volumes for LCD Panels for mobile phones.  In one email where Mr. Sato shared information concerning LCD panel sales, Mr. Sato wrote, "Please do NOT tell anybody in your company and or MDS that you got this information via me."  And in 2006, Mr. Chiba sent an email to Mr. Sato of Philips with pricing information for LCD Panels for Epson and Hitachi.  Later in 2006, Mr. Chiba sent another email to Mr. Sato of Philips regarding an upcoming price reduction for LCD Panels for Apple.

**B.**   **Defendants Pled Guilty To, Been Convicted Of, And Held Civilly Liable For, Participating in Price-Fixing Meetings In The U.S. And For Fixing The Price Of LCD Panels And LCD Products Sold In The U.S.**

85.   In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

86.   On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

87.   At least one of the defendants has approached the Antitrust Division of the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the DOJ, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in defendants' price-fixing conspiracy.  The DOJ Antitrust Division's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other defendants to this action.  However, a number of defendants and their executives have pled guilty to price-fixing, as alleged more fully herein.

88.   Defendant Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics, has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics agreed to pay a criminal fine of $220 million.

89.   LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the prices of LCD Panels sold worldwide, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the

prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, LG Display agreed to pay a fine of $400 million, the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

90.    Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide from September 2001 through June 2006.  Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Chung agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

91.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

92.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from December 2001 through December 2005.  Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels,

including the Crystal Meetings that took place in Taiwan. Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

93.     Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

94.     In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin pleaded guilty to participating in the conspiracy from September 2001 through December 2006. Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. In connection with their guilty pleas, Mr. Lin agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu agreed to serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

95.     Two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December

2001 through December 2005. Specifically, Mr. Lin and Mr. Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

96.     On March 13, 2012, Defendant AUO and two of its executives, H.B. Chen and Hui Hsuing, were found guilty of conspiring to fix prices for LCD panels sold in the United States during the time September 2001 to December 2006.

97.     On July 3, 2012, Defendant Toshiba was found liable for participating in a conspiracy to fix, raise, maintain or stabilize the prices of LCD panels.

98.     Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to Apple from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings, conversations and communications in Japan and in the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. Defendant Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other defendants, during which it discussed and reached agreements with other defendants on prices for LCD Panels during the Conspiracy Period.

99.     Defendant Sharp also participated in multiple bilateral discussions with other defendants, including Samsung, Toshiba, and Epson, during the Conspiracy Period. Through these discussions, Sharp agreed on prices, price increases, production quotas, and production limits for LCD Panels. Because Samsung, Toshiba, and Epson were Sharp's primary competitors in the sale of LCD Panels used in mobile

wireless handsets, Sharp knew that it could not have fixed the prices of LCD Panels incorporated into such handsets—as Sharp admitted it did in its guilty plea—unless it reached agreements with Samsung, Toshiba, and Epson to do the same.

100.    Defendant Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Motorola.  Epson Japan has admitted and pleaded guilty to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, Epson Japan has agreed to pay a fine of $26 million.

101.    Defendant Epson America is a wholly-owned and controlled subsidiary of defendant Epson Japan and Epson Japan's predecessor, Sanyo, was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui") at one of the bilateral meetings.  Mitsui served as an agent of, and under the direction of, Sanyo. Sanyo, through its agent, were parties to the agreements made at those meetings and acted as co-conspirators.  In addition, to the extent Epson America distributed LCD Panels or LCD Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers did not undercut the pricing agreements reached at these various meetings.  Epson America was an active, knowing participant in the alleged conspiracy, and acted as Epson Japan's agent for selling LCD Products in the United States.

102.    In addition to the participation in the conspiracy outlined through the guilty pleas, other as yet uncharged conspirators also participated in the conspiracy.  Defendant Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the defendants that attended the Crystal Meetings.  The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.  During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers which allowed it to easily communicate

and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, formerly known as Toshiba Matsushita Display Technology Co., Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

103.   Co-conspirator Hydis Technologies Co. Ltd. ("Hydis") participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

104.   Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

105.   Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an agent for defendant Epson Japan's predecessor, co-conspirator Sanyo, in this discussion. Sanyo, acting through its agent Mitsui, agreed on prices and supply levels for LCD Panels.

106.   Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings or discussions during the Conspiracy Period with at least one other defendant or co-conspirator, which included discussions about prices for LCD Panels.

107.   Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha

was represented at those meetings and was a party to the agreements entered into by its joint venture

partners at these meetings.  As explained above, the agreements at these meetings included agreements on

price ranges and output restrictions.  The joint venture partners had substantial control over IPS Alpha's

production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners

and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were active, knowing participants in

the alleged conspiracy.

108.    When Plaintiff refers to a corporate family or companies by a single name in its allegations

of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more

employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf

of every company in that family.  In fact, the individual participants in the conspiratorial meetings and

discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish

between the entities within a corporate family.  The individual participants entered into agreements on

behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result,

each entire corporate family was represented in meetings and discussions by their agents and each was a

party to the agreements reached in them.

### C.    Defendants Concealed That The Prices Plaintiff Negotiated For LCD Panels And LCD Products Were Illegally Increased By The Defendants' Conspiracy.

109.    Plaintiff did not discover and could not have discovered, through the exercise of reasonable

diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence

of the investigations by the DOJ and other antitrust regulators became public, because defendants and

their co-conspirators actively and fraudulently concealed the existence of their contract, combination, or

conspiracy.  Because the conspiracy was kept secret, Plaintiff was unaware of defendants' and their

co-conspirators' unlawful conduct alleged herein and did not know that it was paying artificially high

prices for LCD Panels.

110.    The affirmative acts of defendants and their co-conspirators alleged herein, including acts

in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded

detection.  The conspirators knew their activities were illegal.  After one Crystal Meeting, Brian Lee of

Chunghwa wrote that LG Display had reminded the meeting participants to "take heed of the antitrust

law." Evan Huang of AU Optronics wrote an internal meeting report to others at AU Optronics where he reminded them that their price information exchange with other suppliers "is illegal, especially in the states. We need to be watchful!" Genichi Watanabe testified at deposition that he did not create written records of meetings discussing price with competitors because he was worried about antitrust laws. Stanley Park recorded in his notes after a conspiracy meeting that "based on the DRAM companies being sued in violation of the antitrust laws for their price fixing about two years ago, we need to pay more attention to security internally and otherwise, and must try to refrain from written communication which would leave trails."

111.    Therefore, the Defendants and their co-conspirators kept their conspiracy communications strictly confidential.  A Chunghwa conspiracy meeting attendee included in his Crystal Meeting notes that recipients should "keep it confidential" because the information "cannot be released to outside strictly!" An LG Display communication regarding a Crystal Meeting noted to recipients, "Do not reveal this meeting to outsiders, not even to colleagues; keep a low profile. To cultivate an atmosphere for price up." The conspirators also kept their meeting locations secret.  During one Crystal Meeting, it was said that the location of the next meeting would not be disclosed until the day before, so that the Defendants would prevent the meeting information from being disseminated.

112.    As alleged above, defendants had secret discussions about price and output.  Defendants agreed not to publicly discuss the existence or the nature of their agreement.  In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.  Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one for the so-called Round Robin meetings.

113.    Moreover, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

114.    There have been a variety of other purportedly market-based explanations for price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to

increase until a reasonable balance is achieved."  Bock Kwon, Vice President of LG Philips' Sales

Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely

reported in 1999 that price increases were due to "acute" shortages.

115.     Another false rationale provided by defendants was undercapitalization.  In 1999, Joel

Pollack, a marketing manager for Sharp, stated:  "Prices have dropped at a steady rate over the past couple

of years to the point where it was difficult to continue the necessary level of capitalization.  The [low

prices] have starved the industry."

116.     A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of

Samsung.  He claimed that the demand for larger panels was reducing the industry's capacity because each

display used more square inches of motherglass substrate.

117.     Increased demand was repeatedly cited by defendants throughout the Conspiracy Period.

On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as

saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't

keep up."  Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10

to 15 percent due to increased demand for the holiday season.  In 2005, Koo Duk-Mo of LG Philips stated

"[w]e are seeing much stronger demand for large-size LCD televisions than expected, so LCD TV supply

is likely to remain tight throughout the year."

118.     Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU

Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic

News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation

production lines and new demand from the replacement of traditional cathode ray tubes with LCD

monitors."

119.     These explanations were all pretextual and each served to cover up the conspiracy.  As a

result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations

has been tolled with respect to Plaintiff's claims.  The statute of limitations relevant to Plaintiff's claims

were equitably tolled by the doctrine of fraudulent concealment until December 11, 2006, the date that the

United States' investigation into the LCD price-fixing conspiracy as to certain defendants was made

public.

120.    Plaintiff's claims have further been tolled pursuant to 15 U.S.C. § 16 because the conspiracy alleged herein is based in whole or in part on matters complained of in criminal proceedings instituted by the United States to prevent, restrain and punish violations of the antitrust laws.

121.    Unbeknownst to Plaintiff, the prices its U.S. procurement teams agreed to with defendants were artificially inflated as a result of the defendants' and their co-conspirators' illegal agreements to sell price-fixed LCD Panels.

    **D.    Tolling Under *American Pipe* and the Doctrine of Cross-Jurisdictional Tolling.**

122.    As a result of the filing of class actions relating to Defendants' and their Co-Conspirators' illegal conspiracy to fix LCD Panel and/or LCD Product prices, the statutes of limitations relevant to Plaintiff's claims for both its direct and indirect purchases of price-fixed LCD Panels and/or LCD Products have also been tolled under *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("*American Pipe*"), as well as the doctrine of cross-jurisdictional tolling.

123.    The statutes of limitations applicable to Plaintiff's Cartwright Act and Unfair Competition Law claims for its indirect purchases of price-fixed LCD Panels and/or LCD Products were tolled as a result of the filing, at least as early as February 2007, of certain indirect purchaser class action complaints against Defendants and their Co-Conspirators that included Plaintiff in their class definitions and asserted claims against Defendants and their Co-Conspirators for their participation in the illegal LCD price-fixing conspiracy under California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq*., and Unfair Competition Law, California Business and Professional Code §§ 17200 *et seq*. ("the Individual Indirect Purchaser Class Action Complaints").  Examples of such Individual Indirect Purchaser Class Action Complaints include *Hee v. LG Philips LCD Co. Ltd. et al.*, Case No. 07-CV-0722-SI (Doc. #1) (N.D. Cal. Feb. 2, 2007) ("All individuals and entities who, between January 1, 1998 and December 31 [sic], 2005, indirectly purchased TFT-LCD Products in California from the defendants or their subsidiaries.  Excluded from the class are defendants and their parents, subsidiaries, affiliates, all governmental entities, and co-conspirators.") and *Selfridge v. LG Philips LCD Co. Ltd. et al.*, Case No. 07-CV-01312 (Doc. #1) (S.D. Cal. Feb. 15, 2007) ("All persons and entities residing in California who,

from January 1, 2002 to present, purchased TFT-LCD in the United States indirectly from the Defendants . . . Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities.").

124.     The statutes of limitations applicable to Plaintiff's Cartwright Act and Unfair Competition Law claims for its indirect purchases were also tolled by the filing of the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint against Defendants and their Co-Conspirators on November 5, 2007 ("the IPP Class Action Complaint," together with "the Individual Indirect Purchaser Class Action Complaints," the "Indirect Purchaser Complaints").

125.     The IPP Class Action Complaint asserted claims against Defendants and their Co-Conspirators with respect to their price-fixing of LCD Panels and/or LCD Products under both California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq*., and Unfair Competition Law, California Business and Professional Code §§ 17200 *et seq*.

126.     In addition to a separate national class, the IPP Class Action Complaint set forth individual "Indirect Purchaser State Classes," including a California Indirect Purchaser Class.

127.     The definition of the California Indirect Purchaser Class in the IPP Class Action Complaint did not exclude indirect purchasers who purchased LCD Panels for resale:  "All persons and entities in California who indirectly purchased LCD Panels manufactured and/or sold by one or more of the Defendants during the Class Period.  Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entities in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the 'California Indirect Purchaser Class')."

128.     Plaintiff therefore falls within the IPP Class Action Complaint's definition of the California Indirect Purchaser Class.

129.     On December 5, 2008, the IPP Class Action Complaint was amended to explicitly exclude resellers such as Plaintiff from the definition of "California Indirect Purchaser Class."  As a result, the Individual Indirect Purchaser Class Action Complaints and the IPP Class Action Complaint tolled the statutes of limitations applicable to Plaintiff's indirect claims until December 5, 2008.  Plaintiff's Complaint was filed on January 20, 2012, within the applicable four-year statutes of limitations for its indirect purchases.

130.     By asserting claims under the California Cartwright Act and the Unfair Competition Law, the plaintiffs named in the Indirect Purchaser Complaints alleged standing to bring these claims.  There are no allegations in the Indirect Purchaser Complaints on their face which preclude plaintiffs in those actions from having standing to assert claims under the Cartwright Act or Unfair Competition Law.

131.     The statutes of limitation applicable to Plaintiff's claims for its direct purchases of price-fixed LCD Panels were tolled by the filing in December 2006 of direct purchaser class action complaints ("the Individual Direct Purchaser Class Action Complaints") against Defendants and their Co-Conspirators.  These complaints, including *Nathan Muchnick, Inc. v. Sharp Corp. et al.*, Case No. 06-6107 (Doc. #1) (D.N.J. Dec. 19, 2006) ("all persons and entities who purchased TFT-LCD directly from the named Defendants") and *CMP Consulting Servs. v. LG Philips LCD Co. et al.*, Case No. 06-cv-15417 (Doc. #1) (S.D.N.Y. Dec. 22, 2006) ("[a]ll persons and entities who purchased TFT-LCD Products directly from one or more Defendants or any predecessor, successor, subsidiary or affiliate of any defendant or their co-conspirators in the United States from January 1, 2000 through the present (the 'Class Period').  Excluded from the class are Defendants, their co-conspirators and their respective parents, subsidiaries and affiliates, and governmental entities."), included Plaintiff in their class definitions.

132.     The statutes of limitations applicable to Plaintiff's claims for its direct purchases of price-fixed LCD Panels were also tolled by the filing of the Direct Purchaser Plaintiffs' Consolidated Complaint ("The DPP Class Action Complaint") on November 5, 2007.  Like the Individual Direct Purchaser Class Action Complaints, the Direct Purchaser Plaintiffs' Consolidated Complaint included Plaintiff in its Class Definition.  *See* No. 3:07-md-01827-SI (Doc. #366) ("all persons and entities who

directly purchased a Thin Film Transistor Liquid Crystal Display ('TFT-LCD') panel, or a product containing a TFT-LCD panel.").

133.    The Individual Direct Purchaser Class Action Complaints and the DPP Class Action Complaint tolled the statute of limitations applicable to Plaintiff's direct claims until January 4, 2011, when Plaintiff opted out of the DPP Class Action.  Plaintiff filed its Complaint on January 20, 2012, within the applicable four-year statutes of limitations for its direct purchases.

134.    The statutes of limitation governing Plaintiff's indirect claims under the Cartwright Act and Unfair Competition Law were tolled under *American Pipe* and the equitable and cross-jurisdictional tolling doctrines by the Individual Direct Purchaser Class Action Complaints and the DPP Class Action Complaint.  For this reason, as well, Plaintiff's Complaint was filed within the applicable four-year statutes of limitations for its indirect purchases.

## VII.    MARKET CONDITIONS DEMONSTRATING THE CONSPIRACY

135.    Beyond the guilty pleas and the extensive evidence of the defendants' wrongdoing produced by the defendants themselves, the market for LCD Panels provides further evidence of the defendants' collusive behavior.

### A.    Structure Of The LCD Panel Industry.

136.    The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships and ease of information sharing.

137.    The LCD Panel industry is highly concentrated and thus conducive to collusion. Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

138.    The LCD industry is characterized by high barriers to entry.  New fabrication plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements require constant research and development and investment.  Thus, firms cannot enter the market for the production and sale of LCD Panels without an enormous capital investment.

139.    LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors,

notebook computers and televisions, are manufactured to a specific size, regardless of manufacturer. The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

140.   The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

- the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;

- the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd.;

- the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;

- the 2005 transfer of Fujitsu Limited's LCD business to Sharp in 2005;

- the 2006 AU Optronics acquisition of Quanta Display.

141.   Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry. Using the otherwise legitimate cover of such arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described hereinafter.

142.   There were many opportunities for defendants to discuss and exchange competitively-sensitive information through their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

**B.     Pricing In The LCD Panel Market Indicates Collusion By The Defendants.**

143.   Since at least 1996, the LCD Panel market has not behaved as would be expected of a

competitive market free of collusion.  Rather, the behavior in this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of unnaturally stabilizing and raising prices for LCD Panels at supra-competitive levels.

144.    After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends.  However, since at least 1996, the LCD Panel market has been characterized by unnatural price stability and certain periods of substantial upward pricing trends.

145.    Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market.  In a competitive market, price increases normally occur during shortage periods.  Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

146.    The demand for consumer electronic products and their component parts generally increases over time.  As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.  For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

147.    Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity.  Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD Panels.

148.    In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts.  Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs.  However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity.  In fact, defendants were fixing the prices.

149.    LCD Panel prices began to increase in early 1996.  Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand.  By May 1996, an industry

magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . .  Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

150.    Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

151.    1996 also brought the advent of third generation fabs.  Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs.  LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998.  Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops.  Ever-increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly.  Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards.  These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

152.    The supra-competitive level price of LCD Panels during the Conspiracy Period is demonstrated by, inter alia, the fact that costs were decreasing.  One of the most significant costs in producing an LCD Panel is the cost of its component parts.  Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the gap between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

153.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize

the prices of LCD Panels.

154.    LCD Panel prices increased by more than 5% in October 2001.  These price increases continued until June of 2002.

155.    At the time, defendants blamed these price increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

156.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chimei Innolux Corporation's predecessor, Chi Mei Optoelectronics Corporation, Chunghwa Picture Tubes Ltd., and HannStar Display Inc., posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

157.    This increase in prices and revenue was unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc., later purchased by AU Optronics) rose 184% from the same period in 2001.

## VIII.   PLAINTIFF'S INJURY

158.    Plaintiff has suffered direct, substantial, and reasonably foreseeable injuries as a purchaser of LCD Panels and LCD Products as a result of defendants' and their co-conspirators' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of LCD Panels and LCD Products, causing Plaintiff to pay higher prices than

it would have in the absence of defendants' and their co-conspirators' conspiracy.

## IX.    TRADE AND COMMERCE AFFECTED BY CONSPIRACY

### A.    Defendants' Conduct Involved Import Trade or Import Commerce

159.    Defendants' illegal conduct involved U.S. import trade or import commerce.  Defendants knowingly and intentionally sent price-fixed LCD Panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States.  Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

160.    The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Measured by value, Defendants and others shipped hundreds of millions of LCD Panels, including those incorporated into finished products, into the United States during the Conspiracy Period for ultimate sale to U.S. consumers.  During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants shipped millions of LCD-containing products worth billions of dollars into the United States each year during the Conspiracy Period.  As a result, a substantial portion of defendants' revenues were derived from the U.S. market.  Defendants spent hundreds of millions of dollars on advertising their products in the United States.  Most, if not all, defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD-containing products.

161.    Because of the importance of the U.S. market to defendants and their co-conspirators, LCD Panels and LCD-containing products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct.  The defendants knowingly and intentionally sent price-fixed LCD Panels and LCD-containing products into a stream of commerce that lead directly into the United States.  Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States.  This conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated

1   prices for LCD Panels and LCD-containing products.

2          162.   During the Conspiracy Period, every defendant shipped LCD Panels directly into the

3   United States.

4          163.   When high-level executives based at defendants' Asian headquarters agreed on prices, they

5   knew that their price-fixed LCD Panels would be incorporated into LCD-containing products sold in the

6   United States.  Moreover, because LCD Panels are – and were throughout the Conspiracy Period – the

7   most expensive and significant component of LCD-containing products, defendants knew that price

8   increases for LCD Panels would necessarily result in increased prices for LCD-containing products sold in

9   the United States.  Many defendants manufactured LCD-containing products and sold them in the United

10  States.  In fact, defendants routinely monitored the effect their price-fixing had on the prices of such

11  LCD-containing products sold in the United States.

12         164.   Defendants also monitored the prices for LCD-containing products sold in the United

13  States, which they often referred to as "street prices," because defendants were aware that the conspiracy

14  would elevate those prices in addition to the prices of LCD Panels.  In addition, defendants used

15  LCD-containing product pricing in the United States as a benchmark for establishing, organizing, and

16  tracking their price-fixing of LCD Panels.

17         165.   Defendants have acknowledged that their commercial activities involving intentionally

18  sending LCD Panels and LCD Products into the United States impacted U.S. import trade and import

19  commerce.  In a series of complaints filed with the U.S. International Trade Commission over the past few

20  years, defendants Samsung and Sharp have both alleged infringing conduct based on "[t]he importation

21  into the United States, sale for importation into the United States, and/or sale after importation in the

22  United States of . . . LCD devices" by the other (and by other entities on its behalf).  *See In the Matter of*

23  *Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation

24  No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586);

25  *In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for*

26  *Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008)

27  (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the*

28

- 40 -

*Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

166.    Likewise, in a civil patent lawsuit brought in federal court, one defendant acknowledged that other defendants' commercial activities involving intentionally sending LCD Panels and LCD-containing products into the United States involved American import trade and import commerce. In the case, defendant alleged infringing conduct on the part of the other defendants stemming from their sending infringing products into "the United States . . . through established distribution channels involving various third parties, knowing that these third parties will use their respective nationwide contacts and distribution channels to import into, sell, offer for sale, and/or use these products in . . . the United States." *See LG Philips LCD Co., Ltd. v. Chi Mei Optoelectronics Corporation, et al.*, Civil Action No. 06-726-JJF (D. Del.) (Docket No. 54) ¶¶ 6, 8.  According to defendant, those distribution channels/networks are "designed to exploit the U.S. market" and are "comprised of the largest original equipment manufacturers . . . and the largest chain retail outlets in the United States."  *LG Philips*, Civil Action No. 06-726-JJF (Docket No. 57) at 2.

167.    Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce.  Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

168.    Defendants were specifically aware that when they sold LCD Panels to Plaintiff, a significant portion of those panels would be incorporated into LCD-containing products imported and sold in the United States.

169.    For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States.

**B.** **Defendants' Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's Antitrust Claims**

170.  Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce in the form of higher prices for LCD Panels and LCD Products (prices that were the product of collusion) paid by Plaintiff in the United States.  The prices reached, which were tainted by collusion, directly and immediately impacted Plaintiff's business in the United States.  Invoices reflecting those tainted prices were sent to Plaintiff in the United States, and paid by Plaintiff directly from the United States.  In this respect, the U.S. effects of defendants' illegal conduct gave rise to Plaintiff's antitrust claims and were the proximate cause of the injury suffered by Plaintiff.

## X.  VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Sherman Act Against All Defendants)

171.  Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

172.  Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Plaintiff, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, and maintain prices for LCD Panels in the United States and elsewhere, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

173.  In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

   a.    to fix, raise, maintain and stabilize the price of LCD Panels;

   b.    to allocate markets for LCD Panels among themselves;

   c.    to submit rigged bids for the award and performance of certain LCD Panel contracts; and

   d.    to allocate among themselves the production of LCD Panels.

174.    The combination and conspiracy alleged herein has had many adverse effects on competition, including without limitation, the following effects, among others:

a.      price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated throughout the United States and the world;

b.      prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, supra-competitive levels throughout the United States and the world;

c.      prices for LCD Products containing those LCD Panels have been raised throughout the United States and the world; and

d.      those who purchased LCD Panels produced by defendants, their co-conspirators, and others and LCD Products containing such LCD Panels have been deprived of the benefits of free and open competition.

175.    Plaintiff has been injured in its business and property by being forced to pay more for LCD Panels and LCD Products manufactured by defendants and their co-conspirators than they would have paid in the absence of defendants and their co-conspirators' price-fixing conspiracy.

176.    Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by Plaintiff and gave rise to Plaintiff's antitrust claims.  As a result, Plaintiff suffered injury as a direct, proximate, and foreseeable result of defendants and their co-conspirators' conspiracy to fix, raise, stabilize, and maintain the price of LCD Panels, and are therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of price-fixed LCD Panels and LCD Products manufactured by defendants and their co-conspirators, and others.

177.    Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from Plaintiff, Plaintiff faces a serious risk of future injury, and is thus entitled to an injunction under Section 16

of the Clayton Act, 15 U.S.C. § 26, against all defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

178.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179.     Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1996, and continuing thereafter at least up to and including December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the California antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in California.

180.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

181.     For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        a.     to fix, raise, maintain and stabilize the price of LCD Panels;

        b.     to allocate markets for LCD Panels amongst themselves;

        c.     to submit rigged bids for the award and performance of certain LCD Panels contracts; and

        d.     to allocate among themselves the production of LCD Panels.

182.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

        a.     price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the states listed below;

       b.    prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

       c.    those who purchased LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

183.    As a result of the alleged conduct of defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for the LCD Panels and LCD Products it purchased during the Conspiracy Period.

184.    By reason of the foregoing, defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of California's Cartwright Act, California Business and Professions Code §§ 16720, *et seq.*:

       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in California and fixed, raised, maintained and stabilized LCD Panel prices in California at artificially high, non-competitive levels;

       b.    As a result, defendants and their co-conspirators' conspiracy substantially affected California commerce;

       c.    During the Conspiracy Period, Plaintiff purchased LCD Panels and LCD Products containing price-fixed LCD Panels in California.  As a result, Plaintiff is entitled to the protection of the laws of California; and

       d.    As a direct and proximate result of defendants' and their co-conspirators' conduct, Plaintiff has been injured in its business and property by paying more for LCD Panels and LCD Products manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under California Business and Professions Code §§ 16720, *et seq.*

185.     By reason of the foregoing, defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code §§ 17200, *et seq*.

a.     Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above;

b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq*., including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.     Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq*.;

e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa, Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California;

f.     During the Conspiracy Period, Plaintiff purchased price-fixed LCD Panels in California.  As a result, Plaintiff  is entitled to the protection of the laws of California; and

g.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI

1    may have been obtained by defendants or their co-conspirators as result of such

2    business acts and practices.

3    **XI.    PRAYER FOR RELIEF**

4    WHEREFORE, Plaintiff requests:

5    A.    That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein

6    be adjudged and decreed to be:

7    1.    a restraint of trade or commerce in violation of Section 1 of the Sherman Act, as

8    alleged in the First Claim for Relief;

9    2.    an unlawful combination, trust, agreement, understanding, concert of action and/or

10    unfair, deceptive, or fraudulent trade practice in violation of the state antitrust and unfair

11    competition laws identified in the Second Claim for Relief.

12    B.    That Plaintiff recover damages, as provided by federal and state antitrust laws, and that

13    judgments be entered in favor of Plaintiff against defendants, jointly and severally, in an amount to be

14    trebled in accordance with such laws;

15    C.    That defendants, their affiliates, successors, transferees, assignees, and the officers,

16    directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their

17    behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing

18    the illegal conduct, contract, conspiracy or combination alleged herein, or from entering into any other

19    conspiracy or combination having a similar purpose or effect, and from adopting or following any

20    practice, plan, program, or device having a similar purpose or effect;

21    D.    That Plaintiff be awarded pre- and post-judgment interest, and that such interest be

22    awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

23    E.    That Plaintiff recover its costs and disbursements of this suit, including reasonable

24    attorneys' fees as provided by law; and

25    F.    That Plaintiff be awarded such other, further, and different relief as the case may require

26    and the Court may deem just and proper under the circumstances.

27

28

## XII.   JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury for all issues so triable.

Dated:  October 8, 2012

Respectfully submitted,

*/s/ Jason C. Murray*

Janet I. Levine (CA Bar No. 94255)
Jason C. Murray (CA Bar No. 169806)
Joshua C. Stokes (CA Bar No. 220214)
Nathanial Wood (CA Bar No. 223547)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA  90071
Telephone:  213-622-4750
Facsimile:  213-622-2690
Email:  jlevine@crowell.com
         jmurray@crowell.com
         jstokes@crowell.com
         nwood@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
Email:  jhoward@crowell.com
         jmurphy@crowell.com

Kenneth L. Adams (*pro hac vice*)
R. Bruce Holcomb (*pro hac vice*)
Christopher T. Leonardo (*pro hac vice*)
ADAMS HOLCOMB LLP
1875 Eye Street NW
Washington, DC 20006
Telephone:  202-580-8822
Email:  adams@adamsholcomb.com
         holcomb@adamsholcomb.com
         leonardo@adamsholcomb.com

*Counsel for Plaintiff ViewSonic Corporation*

DCACTIVE-21294475.2

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO.: M-07-1827-SI