**BAUTE CROCHETIERE & WANG LLP**
MARK D. BAUTE, ESQ. (SBN 127329)
mbaute@bautelaw.com
SEAN A. ANDRADE, ESQ. (SBN 223591)
sandrade@bautelaw.com
777 South Figueroa Street, Suite 4900
Los Angeles, California 90017
Telephone: (213) 630-5000
Facsimile: (213) 683-1225

**TOUSLEY BRAIN STEPHENS PLLC**
CHRISTOPHER I. BRAIN, ESQ. (*pro hac vice*)
cbrain@tousley.com
KIM D. STEPHENS, ESQ. (*pro hac vice*)
kstephens@tousley.com
CHASE C. ALVORD, ESQ. (*pro hac vice*)
calvord@tousley.com
1700 Seventh Ave, Ste 2200
Seattle, WA 98101
Telephone: (206) 682-5600
Facsimile: (206) 682-2992

*Attorneys for Plaintiffs*
PROVIEW TECHNOLOGY, INC., a California corporation; PROVIEW TECHNOLOGY CO., LTD.; PROVIEW GROUP LIMITED; and PROVIEW OPTRONICS CO., LTD.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

PROVIEW TECHNOLOGY, INC., a California corporation; PROVIEW TECHNOLOGY CO., LTD.; PROVIEW GROUP LIMITED; and PROVIEW OPTRONICS CO., LTD.,

Plaintiffs,

v.

AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC.; CHIMEI CORPORATION; CHIMEI

**Case No. 3:12-cv-03802-SI**

MDL No. 03:07-MD-1827 (SI)

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF;**

**JURY TRIAL DEMANDED**

INNOLUX CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; LG DISPLAY CO. LTD; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG ELECTRONICS CO. LTD; and SAMSUNG SEMICONDUCTOR, INC.

Defendants.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

Plaintiffs Proview Technology, Inc., a California corporation; Proview Technology Co., Ltd.; Proview Group Limited; and Proview Optronics Co., Ltd. (collectively "Plaintiffs") bring this action for damages and injunctive relief under the antitrust laws of the United States, under the antitrust and unfair competition laws of California, and for unjust enrichment against the defendants named herein. Plaintiffs allege the following based on personal knowledge and publicly available materials, including discovery and other materials from *In Re LCD (Flat Panel) Antitrust Litigation*, 3:07-MD-1827-SI (N.D. Cal.), the U.S. Department of Justice website, the public record of the criminal trial against AU Optronics Crop. and AU Optronics Corp. America, other information regarding related criminal proceedings, the decision of the European Commission in COMP/39.309-LCD-Liquid Crystal Displays, the findings of the Korean Fair Trade Commission, and upon information and belief.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

# I. INTRODUCTION

1. Plaintiffs bring this action to recover the damages they incurred as a result of a long-running conspiracy by manufacturers of liquid crystal display panels ("LCD Panels"). From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy Period"), those manufacturers, which include defendants and their co-conspirators, conspired with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels.

2. Plaintiffs are manufacturers of computer monitors, televisions and other consumer electronics that, during the Conspiracy Period, purchased LCD Panels, directly and indirectly, from defendants and their co-conspirators. As a result of defendants' and their co-conspirators' illegal conspiracy, Plaintiffs paid artificially-inflated prices for LCD Panels. Thus, Plaintiffs suffered damages as a result of defendants' and their co-conspirators' conspiracy, and bring this action to recover the overcharges paid for the LCD Panels it purchased during the Conspiracy Period.

3. At least six LCD Panel manufacturers, including defendant Chi Mei Optoelectronics Corporation, LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Epson Imaging Devices Corporation, and HannStar Display Corporation, have admitted in criminal proceedings to participating in the conspiracy. On or about November 12, 2008, LG Display Co. Ltd. (together with LG Display America, Inc.), and Sharp Corporation agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy. On or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy. And on

or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

4. On March 13, 2012 a jury in this District found defendants AU Optronics Corporation and, its U.S. subsidiary, AU Optronics Corporation America, Inc. guilty of criminal price fixing for its participation in the conspiracy.

## II. JURISDICTION AND VENUE

5. Plaintiffs brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for its purchases of LCD Panels and LCD Products from certain defendants and for injunctive relief against all defendants.

6. Plaintiffs also bring this action pursuant to the California Cartwright Act, the California Unfair Competition Law, and California common law for injunctive relief, damages, and restitution.

7. This Court has jurisdiction under 28 U.S.C. §§ l331 and l337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under California law under 28 U.S.C. § l367. Plaintiffs' state law claims are so related to its claims under the federal antitrust laws that they form part of the same case or controversy.

8. The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in California. That effect gave rise to Plaintiffs' antitrust claims.

9. This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10. The activities of defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

effect on commerce in California. In particular, defendants' and their co-conspirators' conspiracy directly and substantially affected the price of LCD Panels purchased by plaintiffs. These effects also give rise to plaintiffs' antitrust claims. Plaintiff Proview Technology, Inc. maintained its headquarters in California during and after the Conspiracy Period. Each defendant conducts substantial business in the state of California. Defendant Chi Mei has admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.

10. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district. Defendants and their co-conspirators knew that price-fixed LCD Panels containing price-fixed LCD Panels would be sold and shipped into this District.

11. This action concerns substantially the same parties, transactions, and events as *In re TFT-LCD Antitrust Litigation* Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of defendants' and their co-conspirators' conspiracy to fix the price of liquid crystal display panels in violation of the Sherman Act and the laws of California. Pursuant to Pretrial Order #1 in M:07-cv-1827 SI, this case should be consolidated with M:07 -cv-1827 SI for all pretrial proceedings without any further motion or order.

## III. PARTIES

### A. Plaintiffs

12. Plaintiff Proview Technology, Inc. ("PTI") is a California corporation with its headquarters in California. During the Conspiracy Period, PTI purchased substantial amounts of LCD Panels through a continuous chain

with its own affiliated Original Equipment Manufacturers ("OEMs") for resale to retailers and others throughout the United States. Through its United States-based order planning process, PTI instructed its overseas affiliated OEMs to purchase LCD Panels and manufacture these LCD products for PTI to import into the United States through California ports. As a result of Defendants' and their co-conspirators' illegal conspiracy, PTI was injured in its business and property because the prices it paid for LCD products were artificially inflated by that conspiracy.

13. Plaintiffs Proview Technology Co., Ltd. ("PTS"); Proview Group Limited ("PGL"); and Proview Optronics Co., Ltd ("POS") are PTI's affiliated OEMs. During the Conspiracy Period, PTS, PGL, and POS purchased substantial amounts of LCD Panels from defendants, their co-conspirators, and others at artificially inflated prices.

**B. <u>Defendants</u>**

**1. <u>AU Optronics</u>**

14. Defendant AU Optronics Corporation is a Taiwanese company and one of the world's largest manufacturers of LCD Panels with its corporate headquarters at No.1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, this defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD products sold throughout the United States and the world.

15. Defendant AU Optronics Corporation America, Inc. is a wholly owned and controlled subsidiary of defendant AU Optronics Corporation with its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and Cupertino, California. During the Conspiracy Period, this defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD products sold throughout the United States and the world.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

16. Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are referred to collectively herein as "AU Optronics." The AU Optronics companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant AU Optronics Corporation America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

**2. <u>Chi Mei</u>**

17. Defendant Chi Mei Corporation is another of the world's largest manufacturers of LCD Panels with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan. During the Conspiracy Period, this defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD products sold throughout the United States and the world.

18. Defendant Chimei Innolux Corporation is another of the world's largest manufacturers of LCD Panels, with its principal place of business located at No. 160 Kesyue Rd., Chu-Nan Site, Hsinchu Science Park Chu-Nan, Miao-Li, Taiwan. During the Conspiracy Period, this defendant manufactured, marketed, sold and/or distributed LCD Panels to customers throughout the United States and the world.

19. Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display Technology USA, Inc., is a wholly owned and controlled subsidiary of Chi Mei Corporation with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California. During the Conspiracy Period, said defendant

manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

20. Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd., is a subsidiary of Chi Mei Corporation with its principal place of business located at Nansei Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

21. Defendant Nexgen Mediatech, Inc. is a wholly owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St., Jen Te Village Jen Te, Tainan 717, Taiwan. During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD products containing LCD Panels manufactured by Chi Mei Optoelectronics Corporation throughout the United States and the world.

22. Defendant Nexgen Mediatech USA, Inc. is a wholly owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California. During the Conspiracy Period, said defendant marketed, sold, and/or distributed LCD California. During the Conspiracy Period, said defendant marketed, sold, and/or distributed LCD Products containing LCD Panels manufactured by Chi Mei Optoelectronics Corporation throughout the United States and the world.

23. Defendants Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. are referred to collectively herein as "Chi Mei." The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Chi Mei Optoelectronics

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation. Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

**3. LG Display**

24. Defendant LG Display Co., Ltd., f/k/a LG Phillips LCD Co., Ltd., is a leading manufacturer of LCD Panels and is a joint venture created in July 1999 by Royal Phillips Electronics NV and LG Electronics, Inc. LG Display Co., Ltd. Maintains offices in San Jose, California, and has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States and the world.

25. Defendant LG Display America, Inc., f/k/a LG Phillips LCD America, Inc. are referred to collectively herein as "LG Display." The LG Display companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

**4. <u>Samsung</u>**

26. Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea. During the Conspiracy Period, this defendant manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and the world.

27. Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey. During the Conspiracy period, said defendant manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and the world.

28. Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Co., Ltd. with its principal place of business at 3655 North First Street, San Jose, California. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels throughout the United States and the world.

29. Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. are referred to collectively herein as “Samsung.” The Samsung companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

**C. Agents and Co-Conspirators**

30. The actions in this Complaint were authorized, ordered, or done by the defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

31. Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein. Each defendant which is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products manufactured by its parent company.

32. Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd., IPS Alpha Technology, Ltd., Mitsubishi Electric Corporation, NEC Corporation, NEC LCD Technologies, Ltd., Renesas Electronics America (collectively NEC Corporation, NEC LCD Technologies and Renesas are referred to as "NEC"), Koninklijke Philips Electronics N.V. ("Philips"), Samsung SDI Co., Ltd., Samsung SDI America, Inc. (collectively "Samsung SDI"), Sanyo Consumer Electronics Co., Ltd., Sanyo Electric Co., Ltd. (collectively "Sanyo"), Mitsui & Co., Ltd., Panasonic Corporation, and Panasonic Corporation of North America.

## IV. FACTUAL ALLEGATIONS RE THE CONSPIRACY

**A. LCD Panels**

33. LCD Panels are utilized in televisions, desktop computer monitors, laptop computers, mobile wireless handsets, digital cameras, and numerous other electronic devices. LCD Panels were the principal form of display screen used in televisions, desktop computer monitors, laptop computers, and mobile wireless handsets during the Conspiracy Period.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

34. LCD Panels use liquid crystal to control the passage of light. More specifically, an LCD Panel is made of two glass sheets sandwiching a layer of liquid crystal. When voltage is applied, the liquid crystal is bent, allowing light to pass through to form a pixel. The combination of these pixels forms an image on the LCD Panel.

**B. <u>Structure of the LCD Panel Industry</u>**

35. The LCD Panel industry has several characteristics that facilitated a conspiracy to fix prices, including high concentration, significant barriers to entry, homogeneity of products, consolidation, multiple interrelated business relationships and ease of information sharing.

36. The LCD Panel industry is highly concentrated and thus conducive to collusion. Defendants are some of the top global manufacturers of LCD Panels. Throughout the Conspiracy Period, defendants and their co-conspirators collectively controlled a significant share of the market for LCD Panels, both globally and in the United States.

37. The LCD Panel industry is characterized by high barriers to entry. New fabrication ("fab") plants can cost upwards of $2 to $3 billion, and rapidly evolving technology and intellectual property requirements necessitate constant research, development, and investment. Thus, few firms can enter the market for the production and sale of LCD Panels without an enormous capital investment and the industry has experienced significant consolidation during the Conspiracy Period.

38. LCD Panels are manufactured to standard sizes, regardless of manufacturer. The manufacture of standard panel sizes for LCD products across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

39. Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry. Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants and their co-conspirators implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels through the numerous meetings described herein.

40. There were many opportunities for defendants and their co-conspirators to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants and their co-conspirators took advantage of these opportunities to discuss and agree upon their pricing of LCD Panels and to monitor each other's compliance with their agreement.

**C. <u>The Market for LCD Panels</u>**

41. LCD Panels have no independent utility, and have value only as components of LCD products. The demand for LCD Panels thus derives directly from the demand for such LCD products.

42. The market for LCD Panels and the markets for LCD products are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products. The market for LCD Panels and the markets for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

**D. <u>The Conspiracy</u>**

43. Beginning at a date as yet unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter up to and including at least

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

December 31, 2006, defendants and their co- conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which LCD Panels were sold.

44. Defendants, through their officers, directors and employees, effectuated a contract, combination, trust, or conspiracy between themselves and their co-conspirators by, among other things: participating in meetings and conversations to discuss the prices and supply of LCD Panels in the United States and elsewhere; agreeing to fix the prices and limit the supply of LCD Panels sold in the United States and elsewhere in a manner that deprived Plaintiffs of free and open competition as a direct purchaser; issuing price announcements and quotations in accordance with the agreements reached; and selling LCD Panels to Plaintiffs at fixed, non-competitive prices.

45. The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan, Europe and the United States.

46. Defendants fostered a culture of corruption within their companies whereby employees at every level - from the very top executive all the way to lower-level sales representatives - engaged in frequent and continuous communications with the employees at every level of their competitors. Senior executives at defendants made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment. The lower-level employees funneled the competitive information up to their superiors who utilized that information - along with the pricing information they, themselves, were able to collected through their own illegal competitor contacts - to set prices for LCD Panels at artificially-inflated levels. The constant communications between defendants at all levels allowed defendants to conspire to set average prices across the entire

industry, as well as conspiring to fix the prices of the particular LCD Panels purchased by Plaintiffs.

47. This culture of corruption permeated defendants' U.S. operations and sales. In fact, the top sales executive at defendants' Asian headquarters instructed their direct reports in the United States to obtain competitive information from their counterparts at other LCD Panel suppliers in the United States. That information was ultimately used by those top sales executives to set artificially-inflated prices for LCD Panels charged to U.S. customers and foreign OEMs.

**1. Early Conspiracy Meetings**

48. In the early years, beginning in at least 1996, representatives of the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix prices for LCD Panels generally, as well as to specific OEMs. They also agreed to limit the amount of LCD Panels each would produce.

49. As LCD Panel production in South Korea began to increase and become more sophisticated, the Japanese-based defendants expanded their meetings to include their South Korean- based competitors, including defendants LG Display and Samsung, which also agreed to fix prices and control supply.

50. At least as early as 2001, the South Korean defendants convinced Taiwan-based LCD Panel manufacturers, including defendants AU Optronics, Chi Mei, and HannStar, to join the conspiracy to fix prices and control supply.

**2. Multilateral Conspiracy Meetings**

51. In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information and to fix the price of LCD Panels and limit their production. From early 2001 through at least 2006, officials from Samsung, AU Optronics, Chi Mei, HannStar, LG Display, and Sharp, met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production. The group meetings these defendants participated in were called "Crystal Meetings." Each defendant attended multiple meetings with one or more of the other defendants or co-conspirators during this period. The Crystal Meetings occurred in Taiwan. Other similar meetings took place in South Korea, Japan, and the United States on a regular basis throughout this period.

52. The Crystal Meetings were highly organized and followed a set pattern. Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings. As described below, the conspiracy also included "Working Level" meetings and communications.

53. The "CEO" meetings occurred quarterly from approximately 2001 to 2006. The purpose and effect of these meetings was to stabilize or raise LCD Panel prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD Panel output, production, and supply until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

54. The structure of "Commercial" meetings was largely the same as CEO meetings. These meetings took place more frequently then CEO meetings and occurred approximately monthly.

55. During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including,

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

56. During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, often reached agreement concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized LCD Panels, and setting target production levels.

57. During these CEO and Commercial meetings, defendants also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production. On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to the meeting.

58. The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the Working Level meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO meetings and at the Commercial meetings.

59. In approximately the summer of 2006, when they began to have concerns about antitrust issues, defendants discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply

information. The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other. These Round Robin meetings took place until at least November or December of 2006. The information obtained at these meetings was transmitted up the corporate reporting chain permit defendants and their co-conspirators to maintain their price-fixing and production-limitation agreement.

**3. Bilateral Conspiracy Meetings**

60. Throughout the Conspiracy Period, defendants also engaged in frequent bilateral discussions and meetings with each other in which they exchanged information about pricing, shipments, and production. During the time when defendants held the Crystal Meetings, they continued these bilateral discussions, which supplemented the discussions and agreements reached at the Crystal Meetings. Defendants had bilateral discussions with one another during price negotiations with customers in order to avoid cutting prices and to implement the fixed prices set by defendants during the Crystal Meetings.

61. These bilateral discussions occurred at various levels of defendants' sales and marketing organizations. Lower-level sales and marketing employees of the defendants engaged in frequent bilateral discussions with each other in the form of telephone calls, emails and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers. At the same time, higher-level managers of the defendants participated in bilateral discussions through telephone calls, emails and face-to-face meetings. These higher-level managers used the information gained through these bilateral discussions to determine the price to be offered to defendants' customers and communicated this information to the lower level account managers and sales representatives who negotiated directly with defendants' customers.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

62. During the Crystal Meetings, defendants also agreed to engage in bilateral communications with those defendants not attending the meetings. Certain defendants were "assigned" other defendants not in attendance and agreed to and did in fact communicate with non-attending defendants to synchronize the price and production limitations agreed to at the Crystal Meetings. Participants at the Crystal Meetings contacted Japanese defendants or co-conspirators to relay the agreed-upon pricing and production limitations.

**4. <u>Defendants' Participation in Group and Bilateral Discussions</u>**

63. Defendants attended multiple CEO, Commercial, and working-level meetings, and engaged in frequent bilateral discussions during the Conspiracy Period and at least between 2001 and 2006. Additionally, Quanta Display and Unipac, which merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial meetings, these defendants agreed on prices, price increases, and production limits and quotas for LCD Panels. These defendants also reached agreements and understandings on prices generally and prices for particular customers in the course of their frequent bilateral communications.

64. Defendant Chimei Innolux's predecessor, Chi Mei Optoelectronics, has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

65. On March 13, 2012 a jury in this District found defendants AU Optronics Corporation and, its U.S. subsidiary, AU Optronics Corporation America, Inc. guilty of criminal price fixing for its participation in the conspiracy.

66. Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the prices of LCD Panels sold worldwide, including the United States, and to participating in meetings, conversations and communications in Taiwan, South Korea, and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. LG Display also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California. In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million (reported at the time as the second-highest criminal fine ever imposed by the U.S. Department of Justice ("DOJ") Antitrust Division) for its participation in the conspiracy. As part of the LG criminal proceedings, plaintiffs were identified as victims of the conspiracy.

67. Chung Suk "C.S." Chung, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from September 2001 through June 2006. Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

68. Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from September 2001 through June 2006. Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of$30,000.

69. In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States, from December 2001 through December 2005. Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contracts.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

70. Co-conspirator HannStar has admitted and pleaded guilty to participating in the conspiracy from September 2001 to January 2006 to fix the price of LCD Panels sold worldwide, including the United States, and to participating in meetings, conversations and communications to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices. HannStar also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California. In connection with its guilty plea, HannStar has agreed to pay a criminal fine of $30 million.

71. Co-conspirator Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola and agreed to pay a criminal fine of $26 million. Epson Japan has admitted to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

72. Co-conspirator Epson America is a wholly-owned and controlled subsidiary of co-conspirator Epson Japan. Epson America acted as Epson Japan's agent for selling LCD Products in the United States, and thus was an active, knowing participant in the alleged conspiracy. To the extent Epson America sold or distributed LCD Products, it played a significant role in the conspiracy because defendants wished to ensure that the prices for LCD Products did not undercut the LCD Panel pricing agreements reached at their various meetings. Epson America also engaged in bilateral discussions with other defendants, during which it reached understandings with other defendants regarding prices and exchanged

pricing and sales information for the purpose of monitoring agreed-upon prices. In addition, at one of the bilateral meetings described above, Epson Japan was represented by co-conspirator Mitsui. At that meeting, Mitsui served as an agent of, and acted under the direction of, both Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.

73. Co-conspirator Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006; and to participating in bilateral meetings, conversations and communications in Japan and in the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. Sharp admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.

74. Co-conspirator Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other defendants during which it discussed and reached agreements with other defendants on prices for LCD Panels during the Conspiracy Period.

75. Co-conspirator Sharp also participated in multiple bilateral discussions with other defendants, including Toshiba and Epson, during the Conspiracy Period. During these discussions, Sharp reached agreements with other defendants on prices, price increases, production quotas, and production limits for LCD Panels.

76. Co-conspirator Toshiba participated in multiple bilateral discussions with other defendants, during which Toshiba reached agreements and

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

understandings with other defendants on prices. Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

77. Co-conspirator Philips engaged in numerous communications with defendants regarding prices for LCD Panels during the Conspiracy Period.

78. Co-conspirator NEC participated in meetings or discussions during the Conspiracy Period with other defendants and co-conspirators, which included discussions about prices for LCD Panels.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

79. Co-conspirator Samsung SDI discussed pricing for LCD Panels with other defendants, and agreed to fix the price on LCD Panels for customers. Samsung SDI also worked with other defendants to encourage other companies to participate in their price-fixing scheme.

80. Co-conspirator Sanyo also engaged in numerous discussions with other defendants, which included discussions regarding prices for LCD Panels and agreements to fix prices for LCD Panels.

81. Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co., Ltd. ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

82. Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in multiple lower level meetings in 2001 with Chi Mei, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for LCD Panels.

83. Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed on prices and supply levels for LCD Panels.

84. Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"), and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

venture partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

85. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

**5. <u>Market Conditions Demonstrating the Conspiracy</u>**

86. Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion. Rather, the behavior of this market strongly evidences that the defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

87. After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends. However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

88. Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market. In a competitive market, price increases normally occur during shortage periods. Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

89. The demand for consumer electronic products and their component parts generally increases over time. As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period.

90. Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity. Those defendants not already manufacturing LCD Panels in 1996 joined this conspiracy after they began manufacturing LCD Panels.

91. In 1996, the LCD Panel market was experiencing excess supply and drastic price cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly due to insufficient production capacity. In fact, defendants had begun raising and stabilizing the prices.

92. LCD Panel prices began to increase in early 1996. Defendants blamed the sudden increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May of 1996, an industry magazine was

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon .... Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

93. Soon thereafter, industry analysts began commenting on the unusual rise in LCD Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

94. 1996 also brought the advent of third generation fabs. Since 1996, additional generations of fabs have been built, which has resulted in at least eight generations of LCD Panel fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer monitors, and laptops. Ever- increasing production capacity threatened to outstrip demand for LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead, defendants falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier, and prices surged upwards. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

95. The supra-competitive level of LCD Panel prices during the Conspiracy Period is demonstrated by, *inter alia,* the fact that costs were decreasing. One of the most significant costs in producing an LCD Panel is the cost of its component parts. Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass. During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate. Thus, the

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

margin between LCD Panel manufacturers' prices and their costs was unusually large during the Conspiracy Period.

96. During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased. Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased. This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, and maintain the prices of LCD Panels.

97. LCD Panel prices increased by more than 5% in October 2001. These price increases continued until June of 2002.

98. At the time, defendants blamed these price increases on supply shortages. In fact, these price increases were a direct result of defendants' agreement to fix, raise, and maintain the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement. When asked why prices had increased, defendants repeatedly asserted that increases in LCD Panel prices were due to increased demand and a "supply shortage."

99. These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency. These decreasing costs should have led to lower prices and competition among defendants. Instead, because defendants had entered into an agreement to fix, raise, and maintain prices for LCD Panels at artificially high levels, it resulted in extremely high profits. For example, defendants AU Optronics Inc., and Chi Mei Optoelectronics Corp., posted higher pretax profits than expected in the first quarter of2002. For example, AU Optronics reported revenue of NT$19.7 billion in the first quarter, with pretax profit reaching about NT$2 billion, and Chi Mei reported pretax earnings of NT$800 million on revenue of about NT$8.8 billion at the same period.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

100. These increases in prices and revenue were unprecedented. During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers, AU Optronics, Chi Mei, HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics), rose 184% from the same period in 2001.

**E. Government Investigations and Criminal Proceedings**

101. In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers. In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed for the first time that officials from the South Korean and Japanese Fair Trade Commissions had visited the company's Seoul and Tokyo offices and that DOJ had issued a subpoena to its San Jose office.

102. On December 12, 2006, news reports indicated that in addition to LG Display, Samsung, Sharp and AU Optronics were also under investigation.

103. The DOJ acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

104. At least one defendant has approached DOJ to enter into a leniency agreement with respect to that defendants' role in the conspiracy to fix prices of LCD Panels. In order to enter into a leniency agreement under the Corporate Leniency Policy of DOJ, that defendant has reported the price-fixing conspiracy to DOJ and has confessed its own participation in the price-fixing conspiracy.

105. On or about November 12, 2008, LG Display, and Sharp agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of LCD Panels. Also on or about January 15,2009, Chang Suk "C.S." Chung, an executive from LG Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June 2006. Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine. On or

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

about February 3, 2009, former LG Display executive Duk Mo Koo was indicted for participating in the global LCD Panel price fixing conspiracy. On or about April 27, 2009, a high level executive of LG Display, Bock Kwon, agreed to plead guilty to a global LCD Panel price fixing conspiracy. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels. On or about December 9, 2009, defendant Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy. And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

106. On March 13, 2012 a jury in this District found defendants AU Optronics Corporation and, its U.S. subsidiary, AU Optronics Corporation America, Inc. guilty of criminal price fixing for its participation in the conspiracy.

107. The DOJ's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas, convictions, and criminal fines.

**F. <u>Plaintiffs' Injuries</u>**

108. Plaintiffs have suffered direct, substantial, and reasonably foreseeable injuries as a result of defendants' and their co-conspirators' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels. Defendants' conspiracy artificially inflated the price of LCD Panels and LCD Products, causing Plaintiffs to pay higher prices than they would have in the absence of defendants' and their co-conspirators' conspiracy.

## V. TRADE AND COMMERCE AFFECTED BY CONSPIRACY

### A. Defendants' Conduct Involved Import Trade or Import Commerce

109. Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

110. The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy. Measured by value, Defendants and others shipped more than hundreds of millions of LCD Panels, including those incorporated into finished products, into the United States during the Conspiracy Period for ultimate resale to U.S. consumers. During the Conspiracy Period, the value of LCD Panels imported into the United States was in excess of $50 billion. Defendants shipped millions of LCD-containing products worth billions of dollars into the United States each year during the Conspiracy Period. As a result, a substantial portion of defendants' revenues were derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, Defendants had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD-containing products.

111. Because of the importance of the U.S. market to Defendants and their co-conspirators, LCD Panels and LCD-containing products intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct. The Defendants knowingly and intentionally sent price-fixed LCD Panels and LCD-containing products into a stream of commerce that lead directly into the United States. Many LCD Panels were intended for incorporation into finished products specifically destined for sale and use in the United States. This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD-containing products.

112. During the Conspiracy Period, every Defendant shipped LCD Panels directly into the United States.

113. When high-level executives based at Defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD-containing products sold in the United States. Moreover, because LCD Panels are - and were throughout the Conspiracy Period--the most expensive and significant component of LCD-containing products, Defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD-containing products sold in the United States. Many Defendants manufactured LCD-containing products and sold them in the United States. In fact, Defendants routinely monitored the effect their price-fixing had on the prices of such LCD-containing products sold in the United States.

114. Defendants also monitored the prices for LCD-containing products sold in the United States, which they often referred to as "street prices," because defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels. In addition, Defendants used LCD-containing product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

115. Defendants have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD products into the United States impacted U.S. import trade and import commerce. In a series of complaints filed with the U.S. International Trade Commission over the past few years, Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of ... LCD devices" by the other (and by other entities on its behalf). *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

No. 2586); *In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same; and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30,2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

116. Likewise, in a civil patent lawsuit brought in federal court, one defendant acknowledged that other defendants' commercial activities involving intentionally sending LCD Panels and LCD-containing products into the United States involved American import trade and import commerce. In that case, the defendant alleged infringing conduct on the part of the other defendants stemming from their sending infringing products into "the United States ... through established distribution channels involving various third parties, knowing that these third parties will use their respective nationwide contacts and distribution channels to import into, sell, offer for sale, and/or use these products in ... the United States." *See LG Philips LCD Co., Ltd. v. Chi Mei Optoelectronics Corporation, et al.*, Civil Action No. 06-726-JJF (D. Del.) (Docket No. 54) ¶¶ 6,8. According to the defendant, those distribution channels/networks were "designed to exploit the U.S. market" and were "comprised of the largest original equipment manufacturers ... and the largest chain retail outlets in the United States." *LG Philips*, Civil Action No. 06-726-JJF (Docket No. 57) at 2.

117. Defendants and their co-conspirators who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce. Those Defendants and their co-conspirators have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

118. Defendants were specifically aware that when they sold LCD Panels to Plaintiffs, a significant portion of those panels would be incorporated into LCD-containing products imported and sold in the United States.

119. For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

**B. Defendants' Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' Antitrust Claims**

120. With a continuous sales and supply chain operation in five different U.S. locations -- Garden Grove, California; Chicago, Illinois; Houston Texas; Miami, Florida; and Bergenfield, New Jersey -- PTI supplied LCD monitors and televisions to many of the largest retailers in the U.S. market. PTI had at least five individuals in California who exclusively handled all U.S. order planning. Through its United States-based order planning process, PTI directly instructed its overseas affiliate OEM to purchase LCD's for manufacturing.

121. Representatives of PTI and its affiliated OEM frequently met with PTI's major U.S. retailer customers and representatives of Defendants and their co-conspirators at the affiliate manufacturing plants in Asia to negotiate contract terms, pricing, and the logistics of the supply chain for the U.S. bound LCD products.

122. There were also numerous meetings in the U.S. with PTI's retailer customers and representatives of Defendants and their co-conspirators. Some of the meetings were strategically planned to coincide with industry trade shows, including but not limited to the two largest industry shows in Las Vegas, the Computer Dealers' Exhibition ("COMDEX") and the International Consumer Electronics Show ("CES").

123. Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce in the form of higher prices for LCD Panels (prices that were the product of collusion) paid by

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

Plaintiffs for use in LCD Products sold in the United States. The prices reached, which were tainted by collusion, directly and immediately impacted Plaintiffs' business in the United States. In this respect, the U.S. effects of defendants' illegal conduct gave rise to Plaintiffs' antitrust claims and were the proximate cause of the injury suffered by Plaintiffs.

## VI. FRAUDULENT CONCEALMENT

124. Plaintiffs did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence of the investigations by the DOJ and other antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination, or conspiracy. Because the conspiracy was kept secret, Plaintiffs were unaware of Defendants' and their co-conspirators' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LCD Panels and LCD Products.

125. The affirmative acts of Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

126. By its very nature, Defendants and their co-conspirators' price-fixing conspiracy was inherently self-concealing. As alleged above, Defendants and their co-conspirators had secret discussions about price and output. They agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to the one- on-one so-called "Round Robin" meetings.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

127. In addition, Defendants and their co-conspirators repeatedly gave pretextual justifications for inflated prices of LCD Panels in furtherance of the conspiracy.

128. There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved." Bock Kwon, Vice President of LG Display's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

129. Another false rationale provided by defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry.

130. A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger LCD Panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

131. Increased demand was repeatedly cited by defendants and their co-conspirators throughout the Conspiracy Period. On February 4,2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up." Duk-Mo Koo, an executive at LG Display, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Mr. Koo stated "[w]e are

seeing much stronger demand for large-size LCD televisions than expected, so LCD television supply is likely to remain tight throughout the year."

132. Hsu Jen-Ting, a Vice-President at Chi Mei, and Shuen-Bin Chen, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

133. These explanations were all pretextual and each served to cover up Defendants' and their co-conspirators' conspiracy. As a result of this fraudulent concealment of their conspiracy, the running of any relevant statutes of limitation have been tolled with respect to Plaintiffs' claims. Plaintiffs' claims have further been tolled pursuant to 15 U.S.C. § 16 because the conspiracy alleged herein is based in whole or in part on matters complained of in criminal proceedings instituted by the United States to prevent, restrain and punish violations of the antitrust laws.

## VII. TOLLING OF LIMITATIONS PERIODS

134. As a result of the filing of class actions relating to Defendants' and their Co-Conspirators' illegal conspiracy to fix LCD Panel and/or LCD Product prices, the statutes of limitation relevant to Plaintiffs' claims for both their direct and indirect purchases of price-fixed LCD Panels and/or LCD Products have also been tolled under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("*American Pipe*"), as well as the doctrine of cross-jurisdictional tolling.

135. The statutes of Limitations applicable to Plaintiffs' Cartwright Act and Unfair Competition Law claims for their indirect purchases of price-fixed LCD Panels and/or LCD Products were tolled as a result of the filing, at least as early as February 2007, of certain indirect purchaser class action complaints against Defendants and their Co-Conspirators that included Plaintiffs in their class

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

definitions and asserted claims against Defendants and their Co-Conspirators for their participation in the illegal LCD price-fixing conspiracy under California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq*., and Unfair Competition Law, California Business and Professional Code §§ 17200 *et seq*. ("the Individual Indirect Purchaser Class Action Complaints"). Examples of such Individual Indirect Purchaser Class Action Complaints include *Hee v. LG Philips LCD Co. Ltd. Et al.*, Case No. 07-CV-0722-SI (Doc. #1) (N.D. Cal. Feb. 2, 2007 ("All individuals and entities who, between January 1, 1998 and December31 [sic], 2005, indirectly purchased TFT-LCD Products in California from the defendants or their subsidiaries. Excluded from the class are defendants and their parents, subsidiaries, affiliates, all governmental entities, and co-conspirators.") and *Selfridge v. LG Philips LCD Co. Ltd. Et al.*, Case No. 07-CV-01312 (Doc. #1) (S.D. Cal. Feb. 15, 2007) ("All persons and entities residing in California who, from January 1, 2002 to present, purchased TFT-LCD in the United States indirectly from the Defendants…Specifically excluded from this class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded are any federal, state or local government entities.")

136. The statutes of limitations applicable to Plaintiffs' Cartwright Act and Unfair Competition Law claims for their indirect purchases were also tolled by the filing of the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint against Defendants and their Co-Conspirators on November 5, 2007 ("the IPP Class Action Complaint," together with "the Individual Indirect Purchaser Class Action Complaints," the "Indirect Purchaser Complaints").

137. The IPP Class Action Complaint asserted claims against Defendants and their Co-Conspirators with respect to their price-fixing of LCD Panels and/or LCD Products under both California's Cartwright Act, California Business and

Professions Code §§ 16720 *et seq*., and Unfair Competition Law, California Business and Professional Code §§ 17200 *et seq*.

138. In addition to a separate national class, the IPP Class Action Complaint set forth individual "Indirect Purchaser State Classes," including a California Indirect Purchaser Class.

139. The definition of the California Indirect Purchaser Class in the IPP Class Action Complaint did not exclude indirect purchasers who purchased LCD Panels for resale: "All persons and entities in California who indirectly purchased LCD Panels manufactured and/or sold by one or more of the Defendants during the Class Period. Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; any entities in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the 'California Indirect Purchaser Class')."

140. Plaintiffs therefore fall within the IPP Class Action Complaint's definition of the California Indirect Purchaser Class.

141. On December 5, 2008, the IPP Class Action Complaint was amended to explicitly exclude resellers such as Plaintiffs from the definition of "California Indirect Purchaser Class." As a result, the Individual Indirect Purchaser Class Action Complaints and the IPP Class Action Complaint tolled the statutes of limitations applicable to Plaintiffs' indirect claims until December 5, 2008. Plaintiffs' Complaint was filed on July 20, 2012, within the applicable four-year statutes of limitations for their indirect purchases.

142. By asserting claims under the California Cartwright Act and the Unfair Competition Law, the plaintiffs named in the Indirect Purchaser Complaints alleged standing to bring these claims. There are no allegations in the

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

Indirect Purchaser Complaints on their face which preclude plaintiffs in those actions from having standing to assert claims under the Cartwright Act or Unfair Competition Law.

## VII. VIOLATIONS ALLEGED

### First Claim for Relief

### (Violations of the Sherman Act)

143. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

144. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, and maintain prices for LCD Panels in the United States and elsewhere, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

145. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a. to fix, raise, maintain and stabilize the price of LCD Panels;

b. to allocate markets for LCD Panels among themselves;

c. to submit rigged bids for the award and performance of certain LCD Panel contracts; and

d. to allocate among themselves the production of LCD Panels.

146. The combination and conspiracy alleged herein has had many adverse effects on competition, including without limitation, the following effects, among others:

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

a. price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated throughout the United States and the world;

b. prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, supra-competitive levels throughout the United States and the world;

c. prices for LCD Products containing those LCD Panels have been raised throughout the United States and the world; and

d. those who purchased LCD Panels produced by defendants, their co-conspirators, and others and LCD Products containing such LCD Panels have been deprived of the benefits of free and open competition.

147. Plaintiffs have been injured in their business and property by being forced to pay more for LCD Panels and LCD Products manufactured by Defendants, their co-conspirators, and others than they would have paid in the absence of Defendants' and their co-conspirators' price-fixing conspiracy.

148. Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by Plaintiffs and gave rise to Plaintiffs' antitrust claims. As a result, Plaintiffs suffered injury as a direct, proximate, and foreseeable result of defendants and their co-conspirators' conspiracy to fix, raise, stabilize, and maintain the price of LCD Panels, and are therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of price-fixed LCD Panels and LCD Products manufactured by defendants, their co-conspirators, and others.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

149. Because Defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, Defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, Defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from Plaintiffs, Plaintiffs face a serious risk of future injury, and is thus entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all Defendants, preventing and restraining the violations alleged herein.

**Second Claim for Relief**
**(Violation of California Antitrust and Unfair Competition Laws)**

150. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter at least up to and including December 11, 2006, Defendants and their co- conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the California antitrust and unfair competition laws referenced below. Defendants and their co-conspirators have each acted in violation of these laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra- competitive levels. Defendants' and their co-conspirators' conduct substantially affected commerce in California.

152. The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD Panels.

153. For the purpose of forming and effectuating the unlawful trust, Defendants and their co- conspirators have done those things which they

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a. to fix, raise, maintain and stabilize the price of LCD Panels;

b. to allocate markets for LCD Panels amongst themselves;

c. to submit rigged bids for the award and performance of certain LCD Panels contracts; and

d. to allocate among themselves the production of LCD Panels.

154. The combination and conspiracy alleged herein has had, inter alia, the following effects:

a. price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the states listed below;

b. prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c. those who purchased LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

155. As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the LCD Panels and LCD Products it purchased during the Conspiracy Period.

156. By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of California's Cartwright Act, California Business and Professions Code §§ 16720, et seq.:

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in California and fixed, raised, maintained and stabilized LCD Panel prices in California at artificially high, non-competitive levels;

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected California commerce;

c. During the Conspiracy Period, Plaintiffs purchased LCD Panels and LCD Products containing price-fixed LCD Panels in California. As a result, Plaintiffs are entitled to the protection of the laws of California; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, Plaintiffs have been injured in its business and property by paying more for LCD Panels and LCD Products manufactured by defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under California Business and Professions Code §§ 16720, *et seq.*

157. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, et seq.

a. Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of LCD Panels as described above;

b. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

c. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d. Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.;*

e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California. LG Display, Co-conspirator Sharp, Defendant Chi Mei, Co-conspirator HannStar, and Co-conspirator Epson all admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California;

f. During the Conspiracy Period, Plaintiffs purchased price-fixed LCD Products imported into California. As a result, Plaintiffs are entitled to the protection of the laws of California; and

g. By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants or their co-conspirators as result of such business acts and practices.

**Third Claim for Relief**
**(Unjust Enrichment and Disgorgement of Profits)**

158. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

159. Beginning on or around January 1, 1996, the exact date being unknown to plaintiffs and within the exclusive knowledge of defendants and their co-conspirators, Defendants and their co-conspirators have been unjustly enriched by plaintiffs' overpayments for LCD Panels and LCD Products.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

160. It would be inequitable for Defendants to retain the unjustly derived benefit of these overpayments.

161. As a result, plaintiffs' seek disgorgement and restitution of all overpayments to Defendants from plaintiffs' purchases of LCD Panels and LCD Products.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A. That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

1. a restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;
2. an unlawful combination, trust, agreement, understanding, concert of action and/or unfair, deceptive, or fraudulent trade practice in violation of the state antitrust and unfair competition laws identified in the Second Claim for Relief.
3. unjust enrichment in violation of common law as identified in the Third Claim for Relief.

B. That Plaintiffs recover damages, as provided by federal and state antitrust laws, and that judgments be entered in favor of Plaintiffs against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the illegal conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from

adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. That Plaintiffs be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

E. That Plaintiffs recover their costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

F. That Plaintiffs be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

///
///
///
///
///
///
///
///
///
///
///
///
///

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225

## IX. JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs demand a trial by jury for all issues so triable.

DATED: October 17, 2012

**BAUTE CROCHETIERE & WANG LLP**

By: ***s / Mark D. Baute***

MARK D. BAUTE, ESQ.
SEAN A. ANDRADE, ESQ.
Attorneys for Plaintiffs PROVIEW TECHNOLOGY, INC., a California corporation; PROVIEW TECHNOLOGY CO., LTD.; PROVIEWGROUP LIMITED; and PROVIEW OPTRONICS CO., LTD.

**TOUSLEY BRAIN STEPHENS PLLC**
CHRISTOPHER I. BRAIN, ESQ. (*pro hac vice*)
KIM D. STEPHENS, ESQ. (*pro hac vice*)
CHASE C. ALVORD, ESQ. (*pro hac vice*)
1700 Seventh Ave, Ste 2200
Seattle, WA 98101
Attorneys for Plaintiffs PROVIEW TECHNOLOGY, INC., a California corporation; PROVIEW TECHNOLOGY CO., LTD.; PROVIEW GROUP LIMITED; and PROVIEW OPTRONICS CO., LTD.

BAUTE CROCHETIERE & WANG LLP
777 South Figueroa Street, Suite 4900, Los Angeles, CA 90017
Tel: (213)0630-5000 Fax: (213) 683-1225