STEPHEN V. BOMSE (STATE BAR NO. 40686)
sbomse@orrick.com
DAVID M. GOLDSTEIN (STATE BAR NO. 142334)
dgoldstein@orrick.com
SHANNON C. LEONG (STATE BAR NO. 268612)
sleong@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Tel.  (415) 773-5700
Fax.  (415) 773-5759

*Attorneys for Sony Electronics Inc. and*
*Sony Computer Entertainment America LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SONY ELECTRONICS INC.; SONY COMPUTER ENTERTAINMENT AMERICA LLC<br><br>                    Plaintiffs,<br><br>          v.<br><br>HANNSTAR DISPLAY CORP.,<br><br>                    Defendant. | Case No.  3:12-cv-02214 SI<br><br>MDL No. 3:07-MD-1827 SI<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA CARTWRIGHT ACT, THE CALIFORNIA UNFAIR COMPETITION LAW, UNJUST ENRICHMENT AND BREACH OF CONTRACT**<br><br>**JURY DEMAND**<br><br><br>**REDACTED PUBLIC VERSION** |

1       Sony Electronics Inc. ("SEL") and Sony Computer Entertainment America LLC

2    ("SCEA") bring this action for damages and injunctive relief under the antitrust laws of the

3    United States, under the antitrust and unfair competition laws of California, for unjust enrichment

4    and breach of contract against the defendant named herein.  SEL and SCEA allege the following

5    based on personal knowledge and publicly available materials, including discovery and other

6    materials from *In Re LCD (Flat Panel) Antitrust Litigation*, 3:07-MD-1827-SI (N.D. Cal.), the

7    U.S. Department of Justice website, the public record of the criminal trial against AU Optronics

8    Corp. and AU Optronics Corp. America, other information regarding related criminal

9    proceedings, the decision of the European Commission in COMP/39.309-LCD-Liquid Crystal

10   Displays, the findings of the Korean Fair Trade Commission, and upon information and belief.

## I.      INTRODUCTION

12       1.      SEL and SCEA bring this action to recover damages on account of the antitrust

13   injuries they sustained as the result of a long-running conspiracy to fix and raise the prices and

14   limit the output of Thin Film Transistor Liquid Crystal Display ("LCD") panels ("LCD panels").

15   These damages include, but are not limited to, overcharges which plaintiffs paid, directly or

16   indirectly, as a result of their purchases in the United States of LCD panels and products

17   containing LCD panels ("LCD products").  The damages also include, in addition or, partially, in

18   the alternative to the overcharges referred to above, profits lost on sales that were foregone as a

19   result of the conspiracy alleged herein.  Such lost sales include those resulting from a decrease in

20   the demand of consumers for the products affected by the conspiracy as well as the loss of

21   business and market share in the sale by SEL and SCEA of LCD products, including but not

22   limited to SEL's products sold in direct competition with products sold by certain members of the

23   conspiracy alleged herein.  The conspiracy among defendant and various co-conspirators raised

24   prices of LCD panels and LCD products to supracompetitive levels between no later than January

25   1998 and no earlier than December 11, 2006 (the "Conspiracy Period").  LCD panels are used in

26   a number of LCD products, including but not limited to computer monitors, notebook computers,

27   televisions, cameras, camcorders, gaming devices, and other electronic devices.

28

SEL AND SCEA SECOND AMENDED COMPLAINT
AND JURY DEMAND
CASE NO. 12-2214 SI, MDL NO. 1827 SI

2.        Defendant and its co-conspirators have admitted that they violated the United States antitrust laws in connection with the sale of LCD panels and also entered into guilty pleas with the Department of Justice.  At least 22 executives of defendant and its co-conspirators also entered into guilty pleas and agreed to serve time in prison.  AU Optronics Corp. and AU Optronics Corp. America were indicted by the Department of Justice for their role in the conspiracy but refused to accept a plea agreement.  On March 13, 2012, each company was found guilty for price fixing in violation of Section 1 of the Sherman Act, and two executives of AU Optronics Corp. and AU Optronics Corp. America were convicted of violating Section 1 of the Sherman Act.  The effects of the conspiracy were not limited to the United States.  The European Commission found that the conspiracy affected LCD panels in Europe and it imposed fines on defendant andseveral co-conspirators.  Similarly, the Korean Fair Trade Commission found that the conspiracy affected LCD panels in Korea and it also imposed administrative surcharges on defendant and several co-conspirators.

## II.    JURISDICTION

3.        SEL and SCEA bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendant's violations of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act (Cal. Bus. & Prof. Code § 16700 et seq.), the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.), unjust enrichment and breach of contract under California law.

4.        This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims asserted in this action under 28 U.S.C. §§ 1332 and 1367. Jurisdiction also exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, because defendant's and its co-conspirators' conduct had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effect gives rise to SEL's and SCEA's claims alleged herein.

SEL AND SCEA SECOND AMENDED COMPLAINT
AND JURY DEMAND
CASE NO. 12-2214 SI, MDL NO. 1827 SI

5.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d), because a substantial part of the events giving rise to plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more defendants Sony has sued reside in this district.

6.      Defendant is subject to the jurisdiction of this Court by virtue of its nationwide contacts and other activities, as well as its extensive contacts with the State of California.

## III.    INTRADISTRICT ASSIGNMENT

7.      This action concerns substantially the same defendants, unnamed co-conspirators, transactions and events that are involved in Case No. 3:07-MD-1827-SI (N.D. Cal.), insofar as it involves a suit for damages and injunctive relief arising out of the conspiracy to fix the price of LCD panels or restrain the output of LCD panels in violation of the Sherman Act and state law. Pursuant to Pretrial Order #1 in 3:07-MD-1827-SI, this case should be consolidated with Case No. 3:07-MD-1827-SI for all pretrial proceedings without any further motion or order.

## IV.    PARTIES

### A.    Plaintiffs

8.      SEL is a corporation duly organized under the laws of the State of Delaware, with its principal place of business in San Diego, California.  SEL is a leading electronics company, offering a broad range of consumer products including, among others, televisions, flat-panel monitors, laptop/notebook computers, cameras, camcorders, and other LCD products.  During the Conspiracy Period, SEL was a substantial direct and indirect purchaser of LCD panels, including but not limited to purchases of LCD panels for use in the products mentioned above, as well as finished LCD products.

9.      SEL's corporate headquarters are located in San Diego, California.  Throughout the period of the conspiracy, SEL's engineering and manufacturing divisions, product planning and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD panels and LCD products including, without limitation, the following:  the purchase of LCD panels and LCD products, which included

1  forecasting and negotiations as to prices, conditions and quantities; making payments for

2  delivered LCD panels and LCD products; manufacturing and assembling of goods containing

3  LCD panels; maintaining plants and other facilities to refurbish and service LCD panels used in

4  televisions, monitors and VAIO computers; and maintaining logistics, trade, and warehousing

5  operations/facilities involved with the importation and distribution of LCD panels and LCD

6  products.  SEL was an importer of LCD panels and LCD products all or some of which entered

7  the United States through California ports.   As the purchaser, SEL was responsible for payment

8  of any customs duties applicable to such importation.

9          10.     SCEA is a Delaware limited liability company with its principal place of business

10  and corporate headquarters in Foster City, California.  SCEA is a wholly-owned subsidiary of

11  Sony Corporation of America, a company based in New York.  SCEA markets and distributes the

12  PlayStation® family of computer video game console hardware, including the PlayStation®

13  Portable computer entertainment system, and peripheral accessories.  During the Conspiracy

14  Period, SCEA was a substantial purchaser in California of LCD products whose prices were

15  artificially inflated as a result of the conspiracy among the named defendants or their subsidiaries,

16  affiliates, or co-conspirators.

17          11.     Throughout the period of the conspiracy, SCEA's product planning and marketing

18  divisions, and supporting finance, trade, and logistics operations, were located in and had

19  extensive operations in California related to LCD products, including, without limitation, the

20  following:  purchase of LCD products; payments for delivered LCD products; and logistics, trade

21  and warehousing operations/facilities involved with the importation and distribution of LCD

22  products.  SCEA was an importer of LCD products all or some of which entered the United States

23  through California ports.  SCEA was responsible for payment of any customs duties applicable to

24  such importation.

25      **B.     Defendant**

26          **1.     HannStar Display Corporation**

27          12.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

28  with its principal place of business at 26th Floor, No. 1, Songzhi Road, Sinyi District, Taipei 110,

Taiwan.   HannStar has been in the business of manufacturing and selling LCD panels and/or

products since 1998.  During the Conspiracy Period, HannStar manufactured, marketed, sold

and/or distributed LCD panels and/or LCD products throughout the United States and elsewhere.

**V.      AGENTS AND CO-CONSPIRATORS**

13.      The acts alleged against the defendant in this Complaint were authorized, ordered,

or done by its officers, agents, employees, or representatives, while actively engaged in the

management and operation of defendant's businesses or affairs.

14.      Various persons and/or firms not named as defendants in this Complaint

participated as co-conspirators in the violations alleged herein and may have performed acts and

made statements in furtherance thereof.

**VI.     FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY**

**A.      LCD Technology**

15.      As explained in further detail below, LCD panels are made by sandwiching liquid

crystal compound between two pieces of glass called substrates.  The resulting screen contains

hundreds or thousands of electrically charged dots, called pixels, that form an image.  This panel

is then combined with a backlight unit, a driver, and other equipment to create a "module"

allowing the panel to operate and be integrated into, for example, a television, computer monitor,

notebook computer, camera, videogame system, and other devices.  LCD panels are

manufactured in fabrication plants or "fabs" as they are known in the industry.  Fabrication plants

are very expensive.  The number of panels produced has a direct and significant effect on the

price of both raw LCD panels as well as the applications or products into which they are placed.

Although LCD panels are used in different applications, the LCD panel production process is

such that manufacturers' output and prices can be measured in a consistent and homogeneous

way.  These and other conditions in the LCD industry enabled the price-fixing conspiracy detailed

in this Complaint.  In particular, these conditions enabled defendant and its co-conspirators to

engage in direct discussions about the prices to be charged for LCD panels.  Additionally, these

conditions made it economically feasible to maintain artificially high prices through manipulation

of supply both by curtailing capacity and limiting supply.

16.     The technology behind LCDs is not new.  In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology.  These efforts resulted in monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s, the technology advanced further with the development of LCDs.

17.     LCD panels have no independent utility, and have value only as components of finished goods, such as televisions, desktop computer monitors, notebook and laptop computer displays, cameras, camcorders, gaming devices, and other electronic devices.  The demand for LCD panels thus derives directly from the demand for such LCD products.

18.     The basic structure of an LCD panel is two glass substrates sandwiching a layer of liquid crystal compound.  Liquid crystals change orientation under an applied electric field and can thereby block or pass light.  One glass substrate has thin chemical films that act as transistors, and the other glass substrate is coated with liquid pigments that act as color filters.  When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

19.     The term "active matrix" describes the ability to switch each pixel in a display individually.  Unlike older LCD panels that have one transistor for each row and column of pixels, active matrix LCD panels have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used interchangeably with LCD.  Active matrix displays are brighter and sharper than the older passive matrix displays of the same size.

20.     The glass substrates used for LCD panels begin with a "motherglass," a sheet of glass that is cut to make multiple panels.  LCD panels are manufactured in fabs that are equipped to handle a particular size motherglass.  Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger and larger size motherglass sheets. This, in turn, has resulted in the ability to fabricate larger and/or more LCD panels.  Each increase

SEL AND SCEA SECOND AMENDED COMPLAINT
AND JURY DEMAND
CASE No. 12-2214 SI, MDL No. 1827 SI

1    in motherglass size is described as a generation.  Third generation fabs in the 1998 to 1999 period

2    typically utilized 550 millimeter ("mm") by 650 mm motherglass, while some eighth generation

3    fabs utilize 2160 mm by 2460 mm motherglass.  The use of larger motherglass provides

4    substantial cost savings to manufacturers.

5          21.    LCD panels of approximately 10 inches in diagonal and larger are considered

6    "large-area displays."  Large-area displays are most commonly used for desktop computer

7    monitors, notebook computers and televisions, and LCD panels during most of the Conspiracy

8    Period were used in those LCD products.  Other LCD products during the Conspiracy Period

9    included cameras, camcorders, gaming devices, and other finished goods containing LCD panels

10   smaller than 10 inches in diagonal.

11         **B.**     **Structure of the LCD Industry**

12         22.    The market for LCD panels is very large.  A September 28, 2006 Reuters article

13   reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year

14   alone, up 70 percent over 2005, while flat-panel sales — most of those using LCD technology —

15   are expected to reach $US 88 billion this year and $US 100 billion in 2007."

16         23.    The LCD industry has several characteristics that are conducive to a conspiracy to

17   fix prices, including high concentration, consolidation, significant barriers to entry, homogeneity

18   of products, and ease of information sharing.

19         24.    The LCD industry is highly concentrated and conducive to collusion.  In 2005, the

20   top five suppliers — Samsung,[1] LG Display, Sharp, AU Optronics, and Chi Mei[2] — collectively

21   shipped 90 per cent of all LCD panels for television use.  According to estimates from an industry

22   analyst, iSuppli Corporation, LG Display had the greatest share of LCD television panel

23   shipments in the first quarter of 2006 (22.2%), followed by Samsung (19.7%), Chi Mei (19.6%),

24   AU Optronics (16.6%) and Sharp (13.8%).  These companies were the five largest producers as

25   measured by market share during much of the Conspiracy Period.  For monitor panels during the

26

[1] Samsung includes Samsung Electronics Co. Ltd., Samsung Electronics America Inc., and Samsung Semiconductor, Inc.

27

28

[2] Chi Mei includes Chi Mei Corp., Chi Mei Optoelectronics Corp., CMO Japan Co., Ltd., Chi Mei Optoelectronics, USA, Inc., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc.

SEL AND SCEA SECOND AMENDED COMPLAINT
AND JURY DEMAND
CASE NO. 12-2214 SI, MDL NO. 1827 SI

1    first quarter of 2006, the percentages were Samsung (19.1%), AU Optronics (16%), LG Display

2    (14%), Chunghwa[3] (11.6%), Chi Mei (11.1%) and HannStar (9.7%).  For notebook panels during

3    that quarter, the percentages were Samsung (24.1%), LG Display (23.1%), Quanta (14%), AU

4    Optronics (13%), Chi Mei (6.9%) and Chunghwa (6.9%).  In short, defendant and its co-

5    conspirators together were dominant producers of LCD panels during much of the conspiracy

6    period.

7          25.    There are significant manufacturing and technological barriers to entry into the

8    LCD industry.  Efficient fabs are large and costly.  LCD panels are also subject to technological

9    advances, so that firms within the industry must spend significant capital on research and

10   development.  DisplaySearch, a research firm in Austin, Texas that covers the LCD industry,

11   reported in September 2005 that the top LCD manufacturers collectively spent $30 million a day

12   on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical

13   seventh generation fab can cost more than $3 billion.

14         26.    LCD panels, whether incorporated into desktop monitors, notebook computers,

15   televisions, or other devices, are manufactured to standard sizes, regardless of the manufacturer.

16   Thus, this manufacturing of standard size LCD products across the LCD panel industry facilitates

17   price transparency and allows LCD panel manufacturers to more easily track LCD panel prices,

18   further enabling defendant and its co-conspirators to enforce their price-fixing conspiracy.

19         27.    During the Conspiracy Period, the costs of the assembly components, both as a

20   whole and individually, were generally declining, and, in some periods, declining at a substantial

21   rate.  Later in the conspiracy, approximately 70 percent of the cost of LCD panel production was

22   attributable to the cost of raw materials.  The combination of price discussions and manipulation

23   of the output of LCD panels allowed defendant and its co-conspirators to keep prices above where

24   they would have been but for the conspiracy.

25         28.    The LCD industry is subject to business cycles of supply and demand known as

26   the "crystal cycle."  This cycle has been described as "boom and bust" periods caused by

27   alternating periods of oversupply and shortages, which create downward and upward pressures on

28   ---
[3] Chunghwa refers to Chunghwa Picture Tubes, Ltd.

SEL AND SCEA SECOND AMENDED COMPLAINT
AND JURY DEMAND
CASE NO. 12-2214 SI, MDL NO. 1827 SI

1    prices for LCD panels for companies that purchase them, like SEL, and with consequent effects

2    on prices for LCD products, such as those purchased by SEL and SCEA.

3         29.    One factor that can affect such oversupply is the perceived demand for such

4    products and whether manufacturers have adequately predicted such demand in determining how

5    much capacity to build and how many LCD panels to produce.

6         30.    Another factor is the entry of new competitors.  Typically, when a new competitor

7    enters a market, it brings incremental production online thereby adding supply, and prices drop

8    until equilibrium is reached.  In the LCD industry, however, defendant and its co-conspirators

9    conspired to rein in and discipline these new entrants until the new entrants were assimilated into

10   the conspiracy.  This had the effect of tempering price drops and preventing the market for LCD

11   panels from reaching a competitive equilibrium.

12        31.    The conspiracy did not completely eliminate the effects of the crystal cycle in the

13   LCD industry.  There were periods when defendant's and its co-conspirators' collusive practices

14   drove prices for LCD panels so high that demand began to fall to the point that manufacturers

15   lowered prices for short periods of time.  However, defendant's and its co-conspirators' efforts to

16   stabilize prices were successful in moderating the effects of the crystal cycle, including the impact

17   on prices paid by purchasers of LCD panels and LCD products.  To the extent that prices for LCD

18   panels fell, they fell from levels that had been set conspiratorially, rather than from levels set by

19   free and open competition.  Additionally, prices did not fall as low as they would have absent the

20   conspiratorial conduct.  This manipulation of prices for LCD panels had similar effects on the

21   prices of LCD products.

22        32.    Notwithstanding that there may be different sizes of, and applications for, LCD

23   panels, there was a consistent and homogeneous way for defendant and its co-conspirators to

24   monitor, analyze, discipline, and enforce their conspiracy across sizes and applications.  This was

25   done by looking at the predominant, or most popular, size panels and the applications for those

26   panels that represented the highest percentage of sales.  This was also accomplished by looking at

27   standardized statistics used in the industry, such as the amount of glass produced and revenues

28   per metric ton of glass.  By using these and other industry analytics, defendant and its co-

9

1    conspirators could and did monitor, analyze, discipline, and enforce their price-fixing conspiracy.

2    The conspiracy affected prices of large, medium and small LCD panels.

3          **C.**      **Pre-Conspiracy Market and Formation of the Conspiracy**

4          33.      Until the mid-1990s, Hitachi, Toshiba, and Sharp were essentially the exclusive

5    suppliers of LCD panels.

6          34.      In early 1995, the industry faced declining LCD panel prices, which industry

7    analysts attributed to advances in technology and improving efficiencies.  One analyst in this

8    period noted that the "flat panel display industry is following the classic cyclical business pattern

9    of the semiconductor industry."  The three manufacturers realized that the capacity growth from

10   investing in new plants was weakening the price of LCD panels, and they slowed the rate of their

11   investments.  This, however, provided an opening to other manufacturers.

12         35.      In 1995, additional companies entered the market.  These firms offered

13   comparable LCD panels at lower prices in an effort to quickly gain market share.  This resulted in

14   increased competition in 1995, which contributed to significant price declines seen during that

15   timeframe.

16         36.      Increases in manufacturing capacity and decreases in manufacturing costs seemed

17   to assure continuing price declines.  By mid-1995, manufacturers had a total capacity to supply 14

18   million LCD panels, while demand for them was only about three million.  In addition to the

19   surges in capacity during 1995, costs were also dropping as production volume increased and

20   manufacturing methods improved.

21         37.      By late 1995, the effect of the entry by new suppliers had pushed down the price of

22   some LCD panels by 50 percent from the previous year.  The origin of the LCD conspiracy may

23   be traceable to this trough in prices.

24         38.      Beginning no later than 1998, certain companies met or talked with other

25   manufacturers in order to agree on LCD panel prices and the number of LCD panels each would

26   produce.  As production in other regions began to increase, these companies expanded their

27   meetings to involve other companies, which also agreed to fix prices and to control supply.  In

28

1   2001, these companies convinced additional LCD panel manufacturers, including defendant

2   HannStar, to join the conspiracy to fix prices and to control product supply.

3   **D.      Defendant and Its Co-Conspirators' Illegal Agreements**

4   39.      Thus, beginning at a date as yet unknown to SEL and SCEA, but at least as early

5   as 1998, and continuing thereafter up to and including December 11, 2006, at a minimum,

6   defendant and its co-conspirators agreed, combined, and conspired to raise, maintain, and

7   stabilize at artificial levels the prices at which LCD panels have been sold throughout the world

8   and the United States, including directly and indirectly to SEL and SCEA.  Those artificially

9   increased prices further affected the prices of LCD products, including prices paid by plaintiffs

10  for such products and caused other antitrust injuries to plaintiffs as more fully alleged herein.

11  40.      Defendant and its co-conspirators, through their officers, directors and employees,

12  effectuated a price-fixing conspiracy by, among other things:

13  a.      participating in meetings and conversations to discuss the prices and supply

14  of LCD panels in the global market, including the United States;

15  b.      agreeing to fix the prices and limit the supply of LCD panels sold in the

16  global market, including the United States, in a manner that deprived SEL and SCEA of the

17  benefit of free and open competition as direct and indirect purchasers;

18  c.      issuing price announcements and quotations in accordance with the

19  agreements reached; and

20  d.      selling LCD panels and/or LCD products directly and indirectly to SEL,

21  and SCEA including in the State of California, at fixed, non-competitive prices.

22  41.      The conspiracy was effective in moderating the normal downward pressures on

23  prices for LCD panels and LCD products caused by periods of oversupply and technological

24  change.  The conspiracy resulted in unusually long periods of high prices and high profits.

25  Although there were periods when prices for LCD panels temporarily declined as a result of new

26  entrants being assimilated, or breakdowns in the effectiveness of the conspiracy, those price

27  declines were from levels that had been set conspiratorially high, rather than from levels set by

28

1    free and open competition.  In addition, prices declined less than they would have in a

2    competitive market.

3          42.     The LCD price-fixing conspiracy was effectuated through a combination of group

4    and bilateral discussions.  In the formative years, when manufacturers first entered into the price-

5    fixing conspiracy, bilateral discussions were the primary method of communication.  During this

6    period of the conspiracy, Hitachi, Sharp, and Toshiba met or talked to with other co-conspirators

7    about the prices for LCD panels, and thereby created a model for how the conspiracy would be

8    carried out after new suppliers joined the conspiracy to fix prices.  These meetings amongst

9    Hitachi, Sharp, and Toshiba included discussions about prices and output, including capacity

10   utilization.  During these discussions, Hitachi, Sharp, and Toshiba also shared proprietary and

11   confidential information for no legitimate or pro-competitive business reason.  As more

12   manufacturers entered the conspiracy, however, group meetings became more prevalent.  By

13   2001, a formal system of multilateral meetings was in place.  Defendant and its co-conspirators

14   fostered a culture of corruption within their companies whereby employees from the top

15   executive to lower-level sales representatives engaged in frequent and continuous

16   communications with the employees at every level of their competitors.  Senior executives

17   instructed their subordinates to engage in these unlawful exchanges of supply, production, and

18   pricing information as a part of their employment.  The lower-level employees transferred

19   competitive information up to their superiors who used that information along with the pricing

20   information they had collected through their own unlawful competitor contacts to set prices for

21   LCD panels at artificially-inflated levels.  The constant communications between defendant and

22   its co-conspirators at all levels allowed them to conspire to set average prices across the entire

23   industry, as well as conspiring to fix the prices of particular LCD panels.

24                    **1.      "Crystal Meetings"**

25         43.     The group meetings among the participants in the LCD price-fixing conspiracy

26   were referred to as "Crystal Meetings."  Crystal Meetings were attended by employees at three

27   general levels of defendant's or its co-conspirators' corporations.  The first level of these

28   meetings was attended by the Chief Executive Officers or Presidents, and were known as "CEO"

or "top" meetings.  The second level was management-level meetings, referred to as "commercial" or "operation" meetings.  The third level was meetings attended by sales and marketing personnel, referred to as "vendor" meetings.

44.     In a typical Crystal Meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices.  Meeting participants shared information relating to all of these topics so that the conspirators could agree on what price each would charge for LCD panels to be sold in the following month.  Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for LCD panels.  They also discussed prices of LCD panels that were sold to specific customers and agreed upon target prices to be used in negotiations with large customers.

45.     The purpose of the CEO meetings was to stabilize or raise prices.  The CEO meetings occurred regularly from approximately 2001 to 2006.  At the CEO meetings, the participants discussed prices and the supply and demand situation.  The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions. Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply, demand and price for the group to review.  The attendees would take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price.

46.     The commercial or operation meetings were attended by the defendant's and its co-conspirators' respective Vice Presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings was largely the same as the CEO meetings.  The participants discussed price, output, capacity, and the general market situation.  These meetings occurred approximately monthly and sometimes quarterly.

47.     The agreements reached at these meetings included: (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of panels, such as quality or certain technical specifications; (3) what to tell customers about the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand;

1    (5) exchanging information about fabrication plant utilization and production capacity; (6)

2    coordinating reductions in production; and (7) reaching out to other competitors to encourage

3    them to abide by the agreed-upon pricing.  The meeting participants also agreed to maintain or

4    lower production capacity and confirmed prices actually charged to help monitor the conspiracy.

5    Compared to the CEO and commercial meetings, the sales and marketing personnel meetings

6    were less formal, and typically occurred at restaurants over lunch.  The purpose of these meetings

7    was to exchange information that would facilitate implementation of the conspiracy and carry out

8    the agreements made at the CEO and commercial meetings.  Thus, as agreed upon at the CEO and

9    commercial meetings, and to effectuate the conspiracy, participants in the sales and marketing

10   personnel meetings exchanged information relating to past and future prices of LCD panels and

11   shipment quantities.

12        48.     The Crystal Meetings involved detailed discussions of price fixing of LCD panels

13   and restrictions on capacity and output.  Only by way of example, the European Commission's

14   decision and the DOJ's trial against AU Optronics and AU Optronics Corporation of America

15   provide details of dozens of Crystal Meetings such as the following:

16        a.      On September 14, 2001, at the first Crystal Meeting, HannStar's CEO, Lu-

17   Pao Hsu, and another HannStar senior executive, Ting-Hwei Chou (aka David Joe),  along with

18   CEOs of other co-conspirators, met at the Sherwood Hotel and exchanged information on

19   prospective prices for monitor and notebook panels.  The CEOs wanted to maintain prices in the

20   short run, and stabilize them in the long run.  They further agreed to keep the meeting secret and

21   discussed the possible inclusion of the Korean manufacturers.

22        b.      On October 5, 2001, a Crystal Meeting was held at the Westin Taipei Hotel

23   in Taiwan.  Attendees at the meeting included defendant HannStar and other co-conspirators.

24   Part of the agenda for the meeting was to review agreements regarding October 2001 prices that

25   had been reached at a meeting on September 21, 2001.  A memo about the meeting reports that

26   the parties stated that their planned price increase was successful:  "Although every maker has

27   faced customers' resistance against the price-hike, the price-hike has been carried out coherently

28   among makers and market demand exceeds supply, so the price level for October has reached the

original target . . . ."  And then, "the result of price-hike is quite satisfactory this month . . . every

maker is inclined to try price increase in November."  It was agreed that customers should be

notified about the increase immediately.  Further, in order to secure favorable market conditions

for the price increases, defendant and its co-conspirators considered reducing capacities: "To

achieve this target, every maker must review how to maintain an optimum loading rate, lowering

production capacity."  Although Samsung did not attend this meeting, it did submit its pricing

data showing that it kept the price line that had been agreed to at the meeting on September 21,

2001.

        c.     On November 15, 2001, a CEO or top level Crystal Meeting took place at

the Crowne Plaza Hotel in Taipei.  Defendant HannStar and other co-conspirators attended this

meeting.  At the meeting, a power-point presentation/report was distributed to all of the attendees

bearing the warning "Please do not copy and release to anyone!!!" as well as "Confidential"

designations.  The report notes that "[i]n general, we have raised price successfully" and also

refers to general suggestions to follow in order to avoid deviations from the prices agreed upon by

defendant and its co-conspirators:

> "To avoid vicious price competition, several suggestions as follows:
>
> 1) Must follow target price for new orders.
>
> 2) Use Hot Line to contact other makers in the industry, to prevent
> being tricked by customers into cutting price.
>
> 3) Even though each maker has strategic clients, internal clients and
> commitments that are exceptional case, try to gradually decrease
> these exceptional cases.
>
> 4) With the same client, makers can each control price with supply.
>
> 5) Sufficiently remind Monitor makers not to grab orders with low
> price and never support such conduct."

        d.     On February 6, 2002, a Crystal Meeting took place in the Howard Plaza

Hotel in Taipei.  Attendees at the meeting included defendant HannStar and other co-conspirators.

A note concerning the meeting contains tables presenting the prices of competitors for a number

of sizes of LCDs in February.  The table shows that the prices agreed to at the previous meeting

1   were mostly followed.  The attendees also reviewed the output levels and provided supply

2   calculations for 2002, in addition to establishing global volume percentages on a company and

3   country of origin basis.

4           e.      On April 10, 2002, a Crystal Operational Meeting took place at the Westin

5   Hotel in Taipei.  Attendees at the meeting included defendant HannStar and other co-conspirators.

6   At the meeting, they reviewed the market and the prices from the prior few months, again

7   acknowledging that recent price increases were successful.  Despite expectations of a strong

8   demand and panel shortage in the market, the parties drew attention to increasing inventories,

9   derived, in part, in preparation for additional pending price increases.

10          f.      On March 20, 2003, a Crystal Meeting took place at the Howard Plaza

11  Hotel in Taipei.  Attendees at the meeting included defendant HannStar and other co-conspirators.

12  They discussed supply and demand, production quantity and price, capacity expansion, and other

13  related topics.  A report of the meeting contains detailed tables articulating prices on various sizes

14  and sales by size and company for the first four months of 2003.  The report also notes that the

15  market environment was being carefully prepared for future price increases.

16          g.      On June 11, 2003, a Crystal Operational Meeting took place at the Crowne

17  Plaza Hotel in Taipei.  Attendees at the meeting included defendant HannStar and other co-

18  conspirators.  An email dated June 11, 2003, reported an agreement on pricing:  "General

19  Consensus – Must hold 17" JUN/JUL pricing to maintain overall pricing stability – 17" pricing is

20  most important single factor to market now – Must fix 17" pricing even if faced with customer

21  volume reduction . . . – Pricing fix until AUG equals to optimized pricing base for Q4 2003."

22  Attached to the minutes is a table presenting the competitors' prices for different sizes of LCD

23  panels for notebooks and monitors from February 2003 to July 2003 as well as capacity

24  utilization and expansion plans of the participant companies for notebook, monitor and television

25  LCD panels until July 2003.

26          h.      On December 10, 2003, a Crystal Operational Meeting took place with

27  attendees including defendant HannStar.  The minutes of the meeting state:  "General consensus

28  of Panel Pricing: increase +USD . . . for NB & MNT in Jan/04.  Maintain TV price in Dec/03."

The minutes show very detailed discussion on prices, output and capacities, capacity plans and demand level for all three applications.

i. On January 16, 2004, a Crystal Operational Meeting took place at the Howard Plaza Hotel in Taipei. Attendees at the meeting included defendant HannStar and other co-conspirators. The main topics discussed at the meeting were past and future prices and pricing trends for different types of LCD panels, the Generation 5 expansion plan for LCD panel suppliers, and shipment plans per product for each company, as well as an assessment of future demand for various LCD panel sizes.

j. In 2005, defendant and its co-conspirators became concerned that certain customers had learned of their price-fixing conspiracy. At a May 5, 2005 Crystal Meeting, the attendees agreed to minimize the Operational Crystal Meetings and to hold lower-level Crystal Meetings instead at inconspicuous locations. Internal notes from this meeting suggest that the co-conspirators also considered procuring pricing information through bilateral communications instead.

k. On September 6, 2005, a Crystal Meeting took place in the Rose Garden Café, Taipei. Attendees at the meeting included defendant HannStar and other co-conspirators. The minutes of the meeting show detailed discussion on capacity allocation, fab loading, total output and capacity, capacity expansion plans, input shortage issues, pricing, pricing intentions and expectations. The degree to which prices were micromanaged through Crystal Meetings is evident from the following passages from the meeting minutes (the asterisks denote redactions by the European Commission): "[*] Price: NB: Average price increase $[*];15.4": $[*] (Aug), try to increase $[*] in September; TV: >30" remain flat in August; <30" increase a bit [*]: Price MNT: 15": $[*], increase $[*] in August; 17": $[*], increase $[*] NB: […]12.1W: $[*]; 15.4":$[*];14"(4:3):$ [*]; 14"W:$ [*] (produce in Gen.4); 15": $[*]; TV: 32": $[*] (Gen. 4.5 & Gen. 6); Customer: [*] etc.[…] [*] PriceTV: panel price will not decline in 3Q, but in 4Q. 23":$[*] in September; 32":$[*] in September (for [*]), and project to be $[*] in year-end; 40":$[*] in September, and project to be $[*] in year-end; [*] design-in 40" of [*] panel; NB:14.1" $[*]; 14W $[*]; 15" $[*]; 17W $[*]; MNT: 17" $[*]; 19" $[*] (TN) $[*] (VA)."

1        l.        On January 6, 2006, a Crystal Operational Meeting took place at the Tsun-

2  Shue Tang Teahouse in Taipei.  Attendees at the meeting included defendant HannStar and other

3  co-conspirators.  The minutes of the meeting report on discussions on market strategy, shipment

4  plans, prices and future prices.  A table attached to the minutes shows shipping results in very

5  detailed figures for various models of television, monitor and notebooks for November,

6  December and January.  The notes show there was discussion of financial results, target prices,

7  sales targets, optimal price difference between product categories and pricing strategies.

8        49.      Meetings among defendant and its co-conspirators continued after January 2006.

9  In the summer of 2006, sales and marketing personnel meetings were discontinued in favor of

10  coordinated one-on-one meetings.  The meetings were coordinated so that on the same date, two

11  sets of competitors met one-on-one.  After that meeting, each of them met one-on-one with

12  another competitor.  This continued until all competitors met with each other.  Meetings

13  continued until December 2006.

14        50.      It was defendant's and its co-conspirators' specific intent for these coordinated

15  one-on-one meetings to accomplish the same purposes as the group meetings.

16          **2.**      **Bilateral Discussions**

17        51.      The Crystal Meetings were reinforced by bilateral discussions between the co-

18  conspirators.  The purpose of the bilateral discussions was to exchange information about past

19  and future pricing, as well as information about shipments in order to effectuate the conspiracy.

20  Certain participants were assigned other co-conspirators not in attendance and agreed to and did

21  in fact communicate with them to synchronize the price and production limitations agreed to at

22  the Crystal Meetings.  Participants at the Crystal Meetings contacted other members of the

23  conspiracy to relay the agreed-upon pricing and production limitations.

24        52.      In the bilateral discussions, various participants and their co-conspirators

25  exchanged information about pricing, shipments, and production for the purpose of effectuating

26  the previously agreed-upon conspiracy.  These discussions usually took place between sales and

27  marketing employees in the form of telephone calls, emails, and instant messages.  The

28  information gained in these communications was then shared with supervisors and taken into

1  account in determining prices to be offered to defendant's or its co-conspirators' customers.

2  Bilateral discussions also were used to synchronize prices with manufacturers that did not

3  ordinarily attend the group meetings.

4      53.    Bilateral discussions also routinely involved small LCD panels used in handheld

5  products.  Examples include:



22     54.    The regulatory authorities concluded that there were a huge number of multilateral

23  and bilateral meetings over a prolonged and sustained period.  The Korean Fair Trade

24  Commission found that, including the Crystal Meetings, the LCD panel manufacturers met at

25  least 200 times at least once a month during the period September 2001 to December 2006.  The

26  European Commission found that they engaged in multilateral and bilateral meetings and other

27  contacts in relation to information technology and television applications from before October 5,

28

2001, until at least February 1, 2006.  As noted above, these meetings in fact continued until at least December 2006.

### 3.  The Purpose and Effect of the Conspiracy

55.    According to the European Commission, and as reflected in the extensive number of documents introduced into evidence during the United States' criminal trial against AUO, the anti-competitive practices included price fixing in the form of agreements on future prices, price ranges and minimum prices, on pricing and commercial matters for specific accounts, and on future production planning and future capacity utilization.  Application of those practices was not restricted to specific geographic areas or shipment destinations.

56.    The European Commission also found that interaction amongst suppliers covered notebooks, computer monitors and TV applications of LCD panels.  It involved high, middle and lower levels of personnel.  Their interaction was regular: between October 2001 and February 2006, meetings took place once or twice a month.  Meetings took place not only in order to enter into anti-competitive practices in the future but also, as is shown by their regularity and the reporting of data of the previous month, in order to ensure compliance with the arrangements previously entered into.

57.    The European Commission found that the objective of the anti-competitive arrangements was to increase and maintain prices of LCD panels, and that the control of prices took place at two levels: (1) directly by agreeing on prices, and (2) indirectly by adopting a common understanding of the market situation and coordinating market behavior concerning parameters which determine prices such as production, capacity, shipments and demand.

58.    The Korean Fair Trade Commission ("KFTC") came to similar conclusions as a result of its investigation into price-fixing in the LCD industry.  On October 31, 2011, the KFTC issued a statement explaining it found that defendant and its co-conspirators held bilateral and multilateral meetings, which were multi-level meetings by position, at least once a month from September 2001 to December 2006.  This included 70 rounds of Crystal Meetings and at least 200 total meetings during that period.

1    59.    The KFTC stated that prices and volume of LCD panels sold in the world market

2    were agreed upon during these meetings.  The agreements included minimum selling prices,

3    agreements on prices each month based on price lists the participants shared, the degree of price

4    increases or decreases, differences in product prices by purpose and specifications, timing of price

5    increases, and the prohibition of payment of rebates and other payments for panels used in

6    computer monitors, notebooks and televisions.  It also found that agreements on prices were

7    specifically classified by product sizes and purposes, and the standards of prices agreed upon

8    became guidelines on prices for each company.

9    60.    The KFTC also found that the participants inspected compliance with the

10   agreements, and compliance was enforced through the use of a "hot-line" formed among the

11   participants.  Non-complying companies were threatened with exclusion from the meetings.

12   61.    Although the specific actions taken by defendant and each co-conspirator may

13   have varied as to time and nature, each participant joined the conspiracy with awareness of the

14   participation of the other conspirators and of the object of the conspiracy.  By doing so, each co-

15   conspirator became liable for the entirety of the conduct undertaken by each other conspirator and

16   for the effects of such conduct, including for conduct undertaken prior to its entry into the

17   conspiracy by other conspirators.  Such liability continued until the termination of the conspiracy.

18   **1.    Defendant's Participation in Group and Bilateral Discussions**

19   62.    As explained above, defendant and its co-conspirators participated in group and

20   bilateral discussions and formed agreements to fix prices and limit output of panels.

21   63.    HannStar participated in multiple CEO, commercial, and lower level Crystal

22   Meetings, as well as bilateral discussions, between at least 2001 and 2006.   Through these

23   discussions, HannStar agreed on prices and supply levels for LCD panels.

24   64.    Although the specific actions taken by each defendant and co-conspirator may

25   have varied as to time and nature, defendant joined the conspiracy with awareness of the

26   participation of the other conspirators and of the object of the conspiracy.  By doing so, defendant

27   became liable for the entirety of the conduct undertaken by each other conspirator and for the

28

SEL AND SCEA SECOND AMENDED COMPLAINT
AND JURY DEMAND
CASE NO. 12-2214 SI, MDL NO. 1827 SI

1    effects of such conduct, including for conduct undertaken prior to its entry into the conspiracy by

2    other conspirators.  Such liability continued until the termination of the conspiracy.

3    **E.    Defendant's and Its Co-Conspirators' Active Concealment**

4          65.    Defendant and its co-conspirators agreed not to publicly discuss the existence or

5    the nature of their agreement.  In some instances, the location of the meeting was circulated only

6    the day before in an effort to avoid detection.  On at least one occasion, top executives and other

7    officials attending these meetings were instructed not to disclose the fact of these meetings to

8    outsiders, or even to other employees not involved in LCD panel pricing or production.  In fact,

9    the top executives who attended the CEO and commercial Crystal Meetings agreed to stagger

10   their arrivals and departures at such meetings to avoid being seen in public with each other and

11   with the express purpose and effect of keeping them secret.  During the criminal trial against

12   AUO, individuals who attended Crystal Meetings confirmed that the participants tried to keep the

13   meetings confidential because they knew they were unlawful.

14         66.    In fact, the European Commission found that the Crystal Meeting participants

15   were aware of the illegality of cooperation from the first meetings.  The Korean Fair Trade

16   Commission found that the participants were aware of the illegality of the agreements and kept

17   secret the existence of the meetings.  In a statement dated October 31, 2011, the KFTC indicated

18   that it found documents saying:  "Do not disclose these meetings to outside persons or even

19   colleagues;" "Do not engage in any conspicuous act;" and "Never forward any details you come

20   to know to several persons with the source clarified."  When the participants in those meetings

21   became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one.

22   The meetings were coordinated so that on the same date, each competitor met one-on-one with

23   the other in a "Round Robin" set of meetings until all competitors had met with each other.

24   These Round Robin meetings, took place until at least November or December of 2006.  The

25   information obtained at these meetings was transmitted up the corporate reporting chain to permit

26   defendant and its co-conspirators to maintain their price-fixing and production-limitation

27   agreement.

28

1    67.    In addition to conducting the meetings in secret, participants agreed on what

2    pretexts they would cite when questioned about rising prices.  The participants also agreed to lie

3    to the media and report that their fabs were operating at full capacity even when they were not, to

4    create the appearance of a supply shortage.  Further, in its Grand Jury indictment, defendant AU

5    Optronics was charged with illegally destroying relevant documents related to the conspiracy.

6    68.    Defendant and its co-conspirators have used a variety of other deceptive and

7    purportedly market-based explanations for price increases in order to conceal their conspiracy.

8    69.    In 1999, Joel Pollack, a marketing manager for Sharp, blamed the substantial price

9    rises in early 1999 on under-capitalization: "Prices have dropped at a steady rate over the past

10   couple of years to the point where it was difficult to continue the necessary level of capitalization.

11   The [low prices] have starved the industry."

12   70.    Also in 1999, Yoon-Woo Lee, President and CEO of Samsung's Semiconductor

13   Division falsely reported that price increases resulted from "acute" shortages.

14   71.    Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU

15   Optronics, offered another rationale for the 2001 price increase in an interview for the *Taiwan*

16   *Economic News* in October 2001.  They blamed "component shortages due to the late expansion

17   of 5th generation production lines and new demand from the replacement of traditional cathode

18   ray tubes with LCD monitors."

19   72.



23   73.    These explanations, and others like them, were pretextual and each served to cover

24   up the conspiracy.  In its investigation, the European Commission discovered a document that

25   requested the participants "to take care of security/confidentiality matters and to limit written

26   communication," reminding the participants of the investigation into the DRAM price-fixing

27   conspiracy that started in 2002.  Some of defendant's co-conspirators were participants in the

28   DRAM price-fixing conspiracy.

**F.     Market Conditions Demonstrating the Price-Fixing Conspiracy**

74.     After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, the market for LCD panels has been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices.  Defendant and its co-conspirators achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

75.     As described herein, defendant's and its co-conspirators' LCD cartel evolved over time.  Defendant and its co-conspirators initiated their cartel when LCD panels were in their relative infancy.  At that time, the conspirators balanced the desire to set prices collusively with the industry goal of establishing their products in the marketplace.  As the cartel matured, new entrants were co-opted, and production costs declined.  At the same time, conspirators learned how they could best mitigate the crystal cycle by agreeing on prices and output.

**1.     1996**

76.     By early 1996, analysts were lamenting the excess supply and drastic price cuts in the LCD markets.  The downward pressure on prices, which had already fallen 40 to 50 percent in 1995, was projected to continue due to lower manufacturing costs.  A few months into 1996, there was a reversal in the downward trend in LCD panel prices and an alleged inability of manufacturers to supply enough LCD panels to meet demand.  By May 1996, an industry magazine was reporting that, "flat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . .  Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."  By mid-1996, industry analysts were commenting on an unusual rise in LCD panel prices that was noted to be "quite rare in the electronics industry."

**2.     1997 - 1998**

77.     By 1997, certain manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology.  In return, these manufacturers received output from Taiwanese plants.  In 1998, Chi Mei entered into such a

1   strategic alliance with Fujitsu, an LCD manufacturer that Sharp acquired in 2005.  These

2   arrangements resulted in cooperative discussions between supposed competitors.  It also was

3   expected to contribute to an increase in supply of LCD panels.

4          78.     By 1998, the LCD industry had excess capacity, due in part to the still recent entry

5   of additional companies.  A March 30, 1998 article in Electronic News reported that Hyundai's

6   production lines were running at only 20 to 50 percent of capacity.  The article quoted Rob

7   Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of

8   inventory and capacity available to suit any shortage . . . . You have to get your production up to

9   full capacity again before you can even talk about there being a shortage and I think there are

10   plenty of under-capacity fabs right now to bear the burden."

11          79.     During this period, Samsung made an effort to get other manufacturers in the

12   industry to limit production.  Yoon-Woo Lee, President and CEO of the Semiconductor Division

13   of Samsung Electronics Co., Ltd., gave the keynote address at the Eighteenth International

14   Display Research Conference (known as Asia Display 98).  Mr. Lee said:

15         In order to maintain the tradition of top CRT manufacturer, we need to

16         capture the high end market [and] deviate from the volume production of

17         CRTs and LCDs.  Taiwan is trying to enter LCD business because it has

18         the advantage of the large PC production.  To survive in this rapidly

19         changing environment, we have to revise our previous strategies and

20         redirect our business plans.  It is time for fundamental shift for future

21         decisions, time for transformation from volume driven to cost driven, time

22         for driving value added strategies.  If we prepare now by shifting from the

23         traditional business approach, to value added new approach, we may be

24         able to deviate from repeating the "crystal cycle" again.

25          80.     These efforts to limit production, capacity restraints put in place by defendant and

26   its co-conspirators, and the price-fixing agreements, caused decreases in prices of LCD panels to

27   slow and stop in late 1998.

28

**3.      1999**

81.      The efforts to control prices continued to bear fruit.  In 1999, LCD panel prices surged during that year due to a claimed "massive undersupply."  This was despite the entry of new manufacturers and several new fabs coming online.

82.      At the beginning of 1999, industry publications suggested that the LCD manufacturers were going to have the opportunity to recoup previous years' losses: "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink . . . ."

83.      By mid-1999, a media source was reporting: "[w]ith the supply shortage for LCD panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise."  The lack of supply was a pretextual reason given publicly to justify a price increase.

84.      Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the following in a trade publication:

> According to Samsung, demand for larger panels is reducing capacity
> because each display is eating up more square inches per motherglass
> substrate.  This, combined with a stagnation in capital spending by many
> panel makers, will keep the LCD industry in a period of relative shortage
> until 2001, Lee said.  The shortage has become acute, and has created an
> unusual market in which prices could rise as much as 30% to 80% in one
> year according to Ross Young, President of DisplaySearch, a research firm
> in Austin, Texas.

**4.      2000 - 2001**

85.      By January 2000, prices for LCD panels were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics).  Taiwanese suppliers began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other suppliers to gain immediate market share.

However, by 2000-2001, the Taiwanese suppliers had increased their market share to the point that it made sense to participate in the conspiracy, and they then moderated the volume of their production.

86.     Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices.  In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

87.     In October 2000, The Korea Herald reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

88.     Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD panels stopped declining in mid-2001, and actually increased.  Industry insiders suggested that the price increases were the result of an inability to meet increased demand.  However, published data for 2001 showed that several conspirators were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52 percent utilization rate. Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, defendant and its co-conspirators had begun actively cooperating among each other to restrict supply.  Again, defendant and its co-conspirators reacted to the price trough by conspiring to fix prices.  This agreement was reached in part at the bilateral and group meetings described above.

89.     The rise in prices made no economic sense at this point in time and was the product of the defendant's and its co-conspirators' setting the price of LCD panels by agreement. First, conspirators were bringing new plants on line that utilized larger motherglass, which was more cost effective.  Second, as reported by an industry source, the variable cost of producing LCDs was declining during the latter part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic for defendant and its co-conspirators not to utilize their full capacity other than through an agreement by them not to do so.

1

**5.      2002 - 2003**

2      90.     Prices continued to rise from the second half of 2001 through the second half of

3   2002.  Industry analysts attributed these price increases to a "larger-than-expected panel

4   shortage," despite continuing capacity expansion.  In reality, the price increases were the result of

5   agreements reached in the Crystal Meetings and bilateral discussions described above.

6      91.     By the second half of 2002, the cartel's success at propping up prices led to

7   lagging demand, and the cartel's response was to let prices level off and even begin to fall.

8      92.     Throughout 2002, industry leaders shifted to fifth generation motherglass

9   production technology.  According to officials at Samsung, "[t]he new fifth-generation facilities

10  offer panels that are 11.5 times bigger in size than those of the first-generation production line,

11  while production cost is 20 percent lower than the fourth-generation counterpart because of the

12  decrease in number of necessary parts."

13     93.     Industry analysts took note of the unusual trends in the pricing of LCD panels.  In

14  February 2004, CNET.com quoted an analyst from IDC, a market research firm, as saying that,

15  "LCD is one of the few [markets] where things have actually gone up in price."  As described

16  above and as further detailed below, conspirators explained these price increases with false

17  statements about market conditions to cover up the conspiracy.

18     94.     During five consecutive quarters in 2003 and 2004, LCD panel prices rose

19  significantly.  AU Optronics reported that the price for certain of its LCD panels increased 28

20  percent between the second quarter of 2003 and the second quarter of 2004.

21     95.     These soaring prices resulted in similar increases in the profits reaped by the LCD

22  panel manufacturers.  For example, the eight largest LCD panel manufacturers reported a

23  collective profit increase of 740 percent between the second quarter of 2003 and the second

24  quarter of 2004.  These record profits resulted from conspirators' collective action to fix, raise,

25  maintain or stabilize the price of LCD panels.  Again, the sharing of information about price and

26  production, the under-utilization of capacity, and restraints on output drove up the prices of

27  LCDs.

28

96.     While LCD panel prices were increasing in late 2003, AU Optronics, Chi Mei, and HannStar decreased capacity utilization, in accordance with discussions at Crystal Meetings.

97.     Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of LCD panels.  To keep prices artificially high, conspirators chose not to operate at full capacity, nor to take advantage of lower variable costs.

**6.     2004-2005**

98.     Pursuant to defendant's and its co-conspirators' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, TFT-LCD panel prices increased for five consecutive quarters.  Various types of Crystal Meetings were taking place during this period.

99.     The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and then to begin to decline in the second half of 2004.  During this period of time, the market for LCD televisions started to grow, and 32-inch panels represented approximately 9 percent of the market.

100.     In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

101.     Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

102.     By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant industry product, and the volume of 32-inch panels for televisions took off as well.  In 2005, 32-inch panels represented almost 27 percent of sales.

103.     Around this time, Samsung announced its intention to increase production of 40-inch LCD panels from 20,000 units in the second quarter to 150,000 units in the fourth quarter.

1    An immediate increase to 100,000 units occurred the very next month.  Samsung's ability to

2    immediately increase output so drastically shows how quickly manufacturers could ramp up

3    capacity and increase utilization.

4        104.    Analysts forecast excess production capacity in 2005 because of large LCD plants

5    from Samsung and others being brought on line.  However, Sharp executive director Toshishige

6    Hamano reported in October 2005 that the supply of LCD panels, particularly for use in

7    televisions larger than 32 inches, would fall short of demand by 15 to 30 percent.  The shortage

8    came as a surprise to analysts.  This shortage was the result of collusion among the conspirators.

9                                **7.    2006 - Present**

10       105.    A temporary oversupply of LCD panels occurred in 2006, which had the effect of

11   reducing prices in the short term.  Again, in the face of a price trough, the conspirators fixed and

12   stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Mr.

13   Hsiung of AU Optronics stated publicly that his company was reducing production of those

14   products to avoid further price erosion.  He expressed the view that his competitors should follow

15   suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a

16   spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in

17   conjunction with his company's peers.  A June 13, 2006 article in Info World noted that as a

18   result of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

19       106.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict the

20   output and increase the prices of LCD panels.  In May 2006, in discussions between executives of

21   the two companies, AU Optronics convinced Quanta Display, a company that it acquired in

22   October 2006, to reduce production of LCD panels.

23       107.    By the summer of 2006, this ongoing conspiracy was being effectuated through

24   bilateral meetings as alleged above.

25   **G.    Antitrust Investigations and United States Criminal Actions**

26       108.    The conspiracy to restrict artificially the output of, and to raise the prices for, LCD

27   panels during the Conspiracy Period, came to light in December 2006 as a result of a

28   multinational investigation commenced by the DOJ and other enforcement agencies.

109.    In a December 11, 2006 filing with the Securities and Exchange Commission, LG Display disclosed that officials from the Korean Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

110.    On December 12, 2006, news reports indicated that Samsung, Sharp, and AU Optronics also were under investigation.  The Japanese Fair Trade Commission stated that the probe was related to price-fixing.  On that same date, the European Commission confirmed publicly that it also was investigating the possibility of a cartel agreement and price fixing among manufacturers of LCD panels.

111.    Samsung, Toshiba and AU Optronics also revealed criminal investigations of themselves or the LCD industry in their 2007 and/or 2008 annual reports.

112.    On December 18, 2008, the Japanese Fair Trade Commission announced that it had investigated LCD modules used for display screens and determined that Sharp violated Japan's Anti-monopoly Act by exchanging pricing information in September and November 2006, and agreeing about the price of LCD modules.  The Commission ordered Sharp to cease and desist its violations of Japan's Anti-monopoly Act and fined Sharp 251 million yen (approximately $2.9 million).  Sharp requested a hearing on the fine and in March, 2009 the Commission decided to commence hearing procedures.

113.    In its 2008 annual report, AU Optronics revealed that in January 2009, the Taiwanese Fair Trade Commission visited AU Optronics's offices in Taiwan and requested information pursuant to its investigation into price fixing in the LCD industry.

114.    On August 11, 2011, South Korea's antitrust regulator, the Korean Fair Trade Commission, announced that it had discovered evidence that Samsung and Chi Mei had participated in a price-fixing conspiracy for LCD panels.  In media reports, AU Optronics and Chunghwa confirmed they had also received notices from the KFTC.

115.    As noted above, on October 31, 2011, the KFTC issued a statement in which it explained it had imposed administrative surcharges totaling approximately $174.9 million—the largest amount of any administrative surcharge the KFTC has imposed in any international cartel

1    case.  The administrative surcharges included approximately $87.7 million against Samsung-

2    related companies and approximately $25.7 million against AU Optronics.  Chi Mei, HannStar,

3    and Chunghwa also received administrative surcharges imposed by the KFTC.

4          116.    The global nature and reach of defendant's and its co-conspirators' price-fixing

5    conspiracy is reflected in the December 8, 2010 announcement by the European Commission that

6    it fined six LCD panel producers a total of roughly EUR 650 million for operating a price-fixing

7    cartel.  Among the five companies that received fines is defendant HannStar (EUR 8.1 million).

8    AU Optronics, Chi Mei, and Chunghwa also received fines.  Samsung, the leniency applicant to

9    the European Commission, was relieved of paying the highest fine of all the conspiracy

10   participants—EUR 570 million—because under applicable European leniency rules, Samsung

11   received full immunity.  The leniency program also helped AU Optronics (20%) and Chunghwa

12   (5%) to reduce their fines.

13         117.    The European Commission's investigation determined that cartel members met to

14   agree on prices, price ranges, and minimum prices.  The European Commission further found that

15   the participants were aware they were violating competition laws and took steps to conceal the

16   venue and results of the meetings.

17         118.    In the United States, Samsung was the amnesty applicant to the DOJ for its

18   investigation into price fixing of LCD panels.  As a result, it escaped paying criminal fines and its

19   employees escaped incarceration in the DOJ's investigation.  However, defendant and its co-

20   conspirators and their employees have not.

21         119.    On November 12, 2008, the DOJ announced that it had reached agreements with

22   three LCD panel manufacturers to plead guilty and pay a total of $585 million in criminal fines

23   for their roles in the conspiracy to fix prices of LCD panels.  Sharp Corporation agreed to pay a

24   $120 million fine for its participation in conspiracies to fix the price of LCD panels from April

25   2001 to December 2006.  LG Display Co. Ltd. and LG Display America Inc. agreed to plead

26   guilty and pay a $400 million fine for their participation in a conspiracy to fix the price of LCD

27   panels sold in the United States.  Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a

28

1  $65 million fine for its participation in a conspiracy from September 2001 to December 2006 to

2  fix the price of LCD panels sold in the United States.

3        120.    On March 10, 2009, the DOJ announced it reached an agreement with Hitachi

4  Displays Ltd. to plead guilty and pay a $31 million fine.  Hitachi Displays Ltd. pled to fixing

5  prices on LCD panels for use in notebook computers.

6        121.    On August 25, 2009, the DOJ announced it reached an agreement with Epson

7  Imaging to plead guilty and pay a $26 million fine for its roles in the conspiracy to fix prices of

8  LCD panels.

9        122.    On December 9, 2009, the DOJ announced it reached an agreement with Chi Mei

10  Optoelectronics to plead guilty and pay a $220 million fine for its roles in the conspiracy to fix

11  prices of LCD panels.

12        123.    On June 29, 2010, the DOJ announced that defendant HannStar agreed to plead

13  guilty and to pay a $30 million criminal fine for its role in a global conspiracy to fix the prices of

14  LCD panels sold worldwide.  HannStar was charged with:

15          a.      participating in meetings, conversations, and communications in Taiwan,

16  Korea, and the United States to discuss the prices of LCD panels;

17          b.      agreeing, during those meetings, conversations, and communications, to

18  charge prices of LCD panels at certain predetermined levels;

19          c.      issuing price quotations in accordance with the agreements reached; and

20          d.      exchanging information on sales of LCD panels, for the purpose of

21  monitoring and enforcing adherence to the agreed-upon prices.

22        124.    On June 10, 2010, the DOJ issued a Superseding Indictment for AU Optronics and

23  many of its executives for engaging in price-fixing for LCD panels.  The indictment explains in

24  detail the nature of the Crystal Meetings, including that they "regularly exchanged production,

25  shipping, supply, demand, and pricing information with each other for the purpose of agreeing to

26  fix the price of LCD, as well as implementing, monitoring, and enforcing adherence to the fixed

27  prices."  The criminal trial against AU Optronics began in January 2012, and on March 13, 2012,

28  AU Optronics Corp. and AU Optronics Corp. of America were found guilty of engaging in price

1   fixing in violation of Section 1 of the Sherman Act.  The jury in that case further determined that

2   the LCD conspiracy had resulted in gains to the conspirators of an amount in excess of $500

3   million.

4        125.    To date, as a result of the DOJ's investigation, more than $890 million in criminal

5   fines have been imposed, or agreed to, and defendant and several of its co-conspirators and at

6   least 22 individuals have pleaded guilty and some have been sentenced to serve time in prison.

7   Two employees of AUO were convicted of price-fixing LCD panels after a trial.

8        126.    These guilty pleas, and the guilty verdicts as to the AUO entities and individuals

9   employed by those companies, demonstrate substantial violations of antitrust laws.  This is

10  confirmed by the penalties and fines imposed by the European Commission and the Korean Fair

11  Trade Commission.

12  **VII.    EFFECTS ON UNITED STATES COMMERCE**

13       127.    Defendant's and its co-conspirators' illegal conduct involved United States import

14  trade or import commerce.  They knowingly and intentionally sent price-fixed LCD panels and

15  LCD products into a stream of commerce that they knew led directly into the United States, one

16  of their most important markets and a major source of their revenues.  In this respect, they

17  directed their anti-competitive conduct at imports into the United States with the intent of causing

18  price-fixed LCD panels and LCD products to enter the United States market and inflating the

19  prices of LCD products destined for the United States.  Such conduct was meant to produce and

20  did in fact produce a substantial effect in the United States in the form of higher prices being paid

21  for LCD panels and LCD products.

22       128.    The United States LCD market is enormous and was a major focus of, and very

23  important to, the conspiracy.  Measured by value, defendant and itsco-conspirators shipped more

24  than 400 million LCD panels, including those incorporated into LCD products, into the United

25  States during the Conspiracy Period for ultimate sale to consumers in the United States.  During

26  the Conspiracy Period, the value of LCD panels imported into the United States was in excess of

27  $50 billion.  Defendant and its co-conspirators shipped millions of LCD products worth billions

28  of dollars into the United States each year during the Conspiracy Period.  As a result, a substantial

1    portion of defendant's and its co-conspirators' revenues were derived from the United States

2    market.  They spent hundreds of millions of dollars on advertising their products in the United

3    States.  Most of, if not all, the participants in the conspiracy had marketing, sales, and account

4    management teams specifically designated to handle United States customer accounts and the

5    United States market for LCD panels and LCD products.

6         129.    This conduct by defendant and itsco-conspirators was meant to produce and did in

7    fact produce a substantial effect in the United States in the form of artificially inflated prices for

8    LCD panels and LCD products.

9         130.    During the Conspiracy Period, defendant and its co-conspirators shipped LCD

10   panels and/or LCD products directly into the United States.

11        131.    When high-level executives based at defendant's and its co-conspirators' Asian

12   headquarters agreed on prices, they knew that their price-fixed LCD panels would be

13   incorporated into LCD products sold in the United States.  Moreover, because LCD panels are —

14   and were throughout the Conspiracy Period — the most expensive and significant component of

15   many LCD products, defendant and itsco-conspirators knew that price increases for LCD panels

16   would necessarily result in increased prices for LCD products sold in the United States.  Many of

17   the participants in the conspiracy manufactured LCD products and sold them in the United States.

18        132.    Defendant and its co-conspirators monitored the prices for LCD products sold in

19   the United States, which they often referred to as "street prices," because they were aware that the

20   conspiracy would elevate those prices in addition to the prices of LCD panels.  In addition, they

21   used LCD product pricing in the United States as a benchmark for establishing, organizing, and

22   tracking their price-fixing of LCD panels.

23        133.    Certain co-conspirators have acknowledged that their commercial activities

24   involving intentionally sending LCD panels and LCD products into the United States affected

25   United States import trade and import commerce.  In a series of complaints filed with the United

26   States International Trade Commission over the past few years, Sharp has alleged infringing

27   conduct based on "[t]he importation into the United States, sale for importation into the United

28   States, and/or sale after importation in the United States of . . . LCD devices" by one of its co-

1   conspirators and other entities on behalf of that co-conspirator.  *See In the Matter of Certain*

2   *Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*,

3   Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No.

4   2594).

5          134.    Defendant and its co-conspirators who have entered guilty pleas in connection

6   with the LCD conspiracy have acknowledged that their illegal activities affected imports into the

7   United States and had a substantial effect on United States import trade and import commerce.

8   They have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by

9   one or more of the conspirators to customers in [the Northern District of California]."

10          135.    For the reasons set forth above, defendant's and its co-conspirators' illegal conduct

11   involved import trade or import commerce into the United States, was targeted at the United

12   States including California, and had a direct, substantial, and reasonably foreseeable effect in the

13   United States and California in the form of supracompetitive pricing of LCD panels and/or LCD

14   products, among other forms of competitive injury to plaintiffs.  Further, the conduct alleged

15   herein had direct, substantial and foreseeable effects on plaintiffs in California where they are

16   headquartered and purchased LCD panels and/or LCD products.

17   **VIII.   SEL'S AND SCEA'S INJURIES**

18          136.    As a direct and proximate result of the conduct and other facts alleged above, SEL

19   has suffered direct, substantial, and reasonably foreseeable injuries as a result of defendant's and

20   its co-conspirators' conspiracy to raise, fix, or maintain the price of LCD panels at supra-

21   competitive levels, to limit output and/or to harm firms such as SEL that compete with certain

22   defendants in the sale of finished goods containing LCD panels.  These injuries include, but are

23   not necessarily limited to, the following:

24          137.    During the Conspiracy Period, SEL purchased price-fixed LCD panels directly and

25   indirectly from defendant and its co-conspirators at prices inflated by the conspiracy.  SEL also

26   purchased price-fixed LCD panels and LCD products containing such panels from original

27   equipment manufacturers ("OEMs"), original design manufacturers ("ODMs"), and others.  SEL

28   issued purchase orders from California.

138.    During the Conspiracy Period, SCEA purchased LCD products whose prices were raised to supracompetitive levels as a result of defendant's and its co-conspirators' conspiracy. SCEA purchased LCD products from its offices in California.

139.    Although plaintiffs' investigation into the precise amount of their purchases is on-going, the best current estimates of the cost of LCD panels purchased directly and/or indirectly by them in the United States, including California, during the period of the conspiracy is approximately $3 billion.

140.    SEL incorporated supracompetitively priced LCD panels into the LCD products it manufactured and sold.  In addition, SEL and SCEA purchased LCD products manufactured by ODMs, OEMs and others whose prices were artificially inflated because the ODMs, OEMs and others paid supracompetitive prices for the LCD panels they incorporated into their LCD products.  To the extent that defendant's and its co-conspirators' illegal conduct in inflating LCD panel and product prices to SEL and SCEA forced SEL and SCEA to charge higher prices for the LCD products they offered to customers, SEL and SCEA suffered direct and foreseeable injury in the form of lost sales and profits they otherwise would have made in the absence of defendant's and its co-conspirators' illegal conspiracy.

141.    Once an LCD panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  LCD panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of an LCD product. Thus, LCD panels follow a physical chain from defendant and its co-conspirators through manufacturers of LCD products sold to SEL and SCEA.

142.    The market for LCD panels and the market for LCD products are inextricably linked and cannot be considered separately.  Defendant is well aware of this relationship.

143.    The OEMs', ODMs', and others' demand for LCD panels was relatively inelastic, because there were no reasonable substitutes for LCD panels to serve as the visual display for products such as televisions, desktop computer monitors, notebook computers, cameras, camcorders and gaming devices.  The other principal flat panel display technology, plasma, is too big, consumes too much power, and is too fragile to be of any practical application in such LCD

1   products.  Other competing display technologies, such as OLED displays, were not available

2   during the Conspiracy Period and are only today becoming widely available.  In addition,

3   throughout the Conspiracy Period, defendant and its co-conspirators controlled the market for

4   LCD panels.  Consequently, during the Conspiracy Period, the OEMs, ODMs and others had no

5   choice but to purchase LCD panels and LCD products from defendant and its co-conspirators, and

6   others at prices that were artificially inflated, fixed, and stabilized by defendant's and its co-

7   conspirators' conspiracy.

8          144.    Several members of the conspiracy not only manufactured LCD panels but also

9   manufactured and sold, directly or through other members of their corporate families, finished

10  products containing such panels.  As a result of being vertically integrated in that fashion, the

11  vertically integrated participants in the conspiracy were able to use the high prices charged to

12  competitors, such as SEL, as a means of disadvantaging their competitors in order to increase

13  their market share and the value of their brands at the expense of their competitors.  This caused

14  SEL to lose sales and market share to vertically integrated members of the conspiracy and the

15  effects of this conduct has continued to and including the present time resulting in losses to SEL

16  that are independent of, and in addition to, the overcharges and other harms suffered by SEL.

17  **IX.    FRAUDULENT CONCEALMENT AND TOLLING**

18         145.    SEL and SCEA had neither actual nor constructive knowledge of the facts

19  supporting their claims for relief, and SEL and SCEA did not discover, and could not have

20  discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged

21  herein until on or after December 11, 2006, when investigations by the DOJ and other antitrust

22  regulators became public.  As alleged above, defendant and its co-conspirators engaged in a

23  secret conspiracy that did not give rise to facts that would put SEL and SCEA on inquiry notice

24  that there was a conspiracy to fix the prices of LCD panels.  As a result of this fraudulent

25  concealment of the conspiracy, the running of any statute of limitations has been tolled with

26  respect to any of SEL's and SCEA's claims arising from the anti-competitive conduct alleged in

27  this Complaint.

28

146. Furthermore, the direct purchaser and indirect purchaser class actions in the multi-district litigation arise from the very same illegal conduct upon which SEL's and SCEA's claims rest. Defendant thus had notice of the substance of these claims. During the pendency of these actions, defendant executed tolling agreements made effective on December 10, 2010, preserving SEL's and SCEA's claims for at least one year and thereafter extended to at least the date of the filing of these actions by agreement and/or operation of law.

<div align="center">

**COUNT I**

**CLAIM FOR VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1)**

</div>

147. SEL incorporates by reference all the above allegations as if fully set forth herein.

148. Beginning no later than January 1, 1998, the exact date being unknown to SEL and exclusively within the knowledge of defendant and its co-conspirators, defendant and its co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition.

149. In particular, defendant and its co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of LCD panels.

150. As a result of defendant's and its co-conspirators' unlawful conduct, prices for LCD panels were raised, fixed, maintained, and stabilized.

151. The contract, combination, or conspiracy among defendant and its co-conspirators consisted of a continuing agreement, understanding, and concerted action among the defendant and its co-conspirators.

152. For purposes of effectuating their contract, combination, or conspiracy, defendant and its co-conspirators actually did those things they contracted, combined, or conspired to do, including:

a. participating in meetings and conversations to discuss the prices and supply of LCD panels;

b. communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD panels;

c.      agreeing to manipulate prices and supply of LCD panels in a manner that deprived purchasers of LCD panels, including SEL, of free and open competition;

d.      issuing price announcements and price quotations in accordance with the agreements reached;

e.      selling LCD panels to customers at non-competitive prices;

f.      exchanging competitively sensitive information in order to facilitate their conspiracy;

g.      agreeing to maintain or lower production capacity; and

h.      providing false statements to the public to explain increased prices for LCD panels.

153.    As a result of defendant's and its co-conspirators' unlawful conduct, SEL was injured in its business and property in that it paid more for LCD panels purchased directly from defendant and its co-conspirators than it otherwise would have paid in the absence of the unlawful conduct.  SEL suffered further injury to its business and property in that it made fewer sales and earned less or no profits during and after the conspiracy than it would have made in the absence of the unlawful conduct.

## COUNT II

## CLAIMS FOR VIOLATIONS OF CALIFORNIA'S CARTWRIGHT ACT

## (CAL. BUS. & PROF. CODE § 16700 ET SEQ.)

154.    SEL and SCEA incorporate by reference all the above allegations as if fully set forth herein.

155.    Beginning no later than January 1, 1998, the exact date being unknown to SEL and SCEA and exclusively within the knowledge of defendant and its co-conspirators, defendant and its co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq.

156.    As a result of defendant's and its co-conspirators' unlawful conduct, SEL and SCEA each was injured in its business and property in that it paid more for LCD panels

1    purchased directly and indirectly from defendant and its co-conspirators than it otherwise would

2    have paid in the absence of their unlawful conduct.  Further, SEL and SCEA each was injured in

3    its business and property in that it paid more for LCD products containing LCD panels than it

4    otherwise would have paid in the absence of defendant's and its co-conspirators' unlawful

5    conduct.  Further, SEL and SCEA each was injured in its business property in that it lost sales and

6    earned less or no profits during and after the conspiracy than it otherwise would have made in the

7    absence of defendant's and its co-conspirators' unlawful conduct.

8                                              **COUNT III**

9         **CLAIMS FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

10                      **(CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**

11           157.    SEL and SCEA incorporate by reference all the above allegations as if fully set

12    forth herein.

13           158.    Beginning no later than January 1, 1998, the exact date being unknown to SEL and

14    SCEA and exclusively within the knowledge of defendant and itsco-conspirators, defendant and

15    its co-conspirators violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §

16    17200 et seq., by committing unlawful, unfair, deceptive, and fraudulent acts in their continuing

17    contracts, combinations, or conspiracy to raise, fix, maintain or stabilize the prices of LCD

18    panels.

19           159.    As a result of defendant's and its co-conspirators' conduct, SEL and SCEA each

20    was injured in its business and property in that it paid more for LCD panels purchased directly

21    and indirectly from defendant and its co-conspirators than it otherwise would have paid in the

22    absence of their unlawful, unfair, deceptive, and fraudulent acts.  Further, SEL and  SCEA each

23    was injured in its business and property in that it paid more for LCD products containing LCD

24    panels than it otherwise would have paid in the absence of defendant's and its co-conspirators

25    unlawful, unfair, deceptive, and fraudulent acts and suffered other forms of injury as described

26    above.

27

28

160.     SEL and SCEA each suffered injury in fact and lost money or property as a result of defendant's and its co-conspirators' unfair competition.  SEL and SCEA each seeks injunctive relief and restitution pursuant to Bus. & Prof. Code § 17203.

## COUNT IV

### CLAIMS FOR UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS

161.     SEL and SCEA incorporate by reference all the above allegations as if fully set forth herein.

162.     Beginning no later than around January 1, 1998, the exact date being unknown to SEL and SCEA and exclusively within the knowledge of defendant and its co-conspirators, defendant and its co-conspirators have been unjustly enriched through overpayments by SEL and SCEA for purchases of LCD panels and/or LCD products.

163.     Under common law principles of unjust enrichment, defendant and its co-conspirators should not be permitted to retain the benefits conferred on them by overpayments.

164.     SEL and SCEA each seeks disgorgement and restitution of all overpayments resulting from purchases of LCD panels and/or LCD products.

## COUNT V

### CLAIMS FOR BREACH OF CONTRACT

165.     SEL and SCEA incorporate by reference all the above allegations as if fully set forth herein.  The amount in controversy as to this Claim exceeds $75,000 exclusive of interest and costs.

166.     In the fall of 2011, Plaintiffs offered to enter into settlement discussions with HannStar for the purpose of resolving all LCD-related claims against HannStar without the necessity of litigation.  The parties thereafter agreed to mediate their disputes with Prof. Eric Green of Resolutions LLC and authorized their respective counsel to negotiate and reach a binding agreement to resolve their disputes.

167.     On March 25, 2012, Prof. Green advised the parties in writing that "each [party] has authorized me to try a Mediator's Proposal."  Pursuant to that authorization, Prof. Green sent each party such a "Mediator's Proposal" that was either to be accepted or rejected by the close of

1   business on March 27, 2012.  Prof. Green's Mediator's Proposal further specifically recited that

2   "if both sides accept the Mediator's Proposal, I will inform you immediately that the matter is

3   settled."

4          168.    On March 27, Prof. Green advised Plaintiffs and HannStar by e-mail "that both

5   Sony and HannStar have accepted the Mediator's Proposal pursuant to my email of March 25."

6   As a result of both parties having agreed to accept the March 25 proposal, Plaintiffs' claims

7   against HannStar were settled and resolved.  The parties were directed to implement the proposal

8   forthwith.

9          169.    The parties' respective acceptances of Prof Green's March 25 Mediator's Proposal

10  included acceptance of his statement, as an express term of that proposal, that "if both sides

11  accept" the matter will be "settled."  Therefore, acceptance of Prof. Green's proposal resulted in a

12  contract that both parties expressly affirmed was intended to be enforceable and binding.  In

13  reliance on HannStar's acceptance of the proposal, SEL and SCEA agreed to release HannStar

14  from SEL's and SCEA's LCD-related claims and did not include HannStar as a defendant in the

15  complaint they filed on March 29, 2012, against AUO Optronics Corp., AU Optronics Corp.

16  America, Sharp Corp. and Sharp Electronics Corp.

17         170.    On April 6, 2012, pursuant to various exchanges of e-mails and phone

18  conversations among counsel to document and implement their mutual acceptance of the

19  Mediators' Proposal, counsel for SEL and SCEA sent HannStar's counsel a form of settlement

20  agreement memorializing the parties' agreement based on Prof. Green's Mediator's Proposal.  As

21  of April 17, 2012, HannStar's counsel had not responded.  Therefore, counsel for SEL and SCEA

22  sent them an email to follow up, but HannStar's counsel again did not respond.  On April 19,

23  2012, counsel for SEL and SCEA was unable to reach HannStar's counsel by telephone.  They

24  therefore sent another email again forwarding the agreement.  HannStar's counsel finally

25  responded by saying they would not respond until after conferring with HannStar's General

26  Counsel who, purportedly, was unavailable due to travel commitments.

27         171.    On Friday, April 20, 2012, counsel for SEL and SCEA informed HannStar's

28  counsel that if he was unable to commit to respond by noon on April 23, 2012, SEL and SCEA

would schedule a call with Prof. Green.  Later that day, HannStar's counsel responded that he could not commit to do so, and had informed Prof. Green of that fact.  On April 24, 2012, HannStar's counsel sent an email to counsel for SEL and SCEA stating that he had not received written instructions" from HannStar, but "would be in touch" as soon as those instructions were received.

172.    On Friday, April 27, 2012, HannStar's counsel called counsel for SEL and SCEA to inform them that HannStar wished to renegotiate the agreement and counsel agreed to speak again on Monday, April 30.  In that call, Hannstar's counsel stated that HannStar would not pay the amount it had agreed to pay by accepting the Mediator's Proposal, and repudiated the agreement.  Instead, counsel invited representatives of the Plaintiffs to "meet" with Hannstar to discuss a new "business" solution, which was the basis on which Hannstar previously had wanted to resolve Plaintiffs' claims, but which Plaintiffs categorically had declined to accept as a basis of settlement.  Instead, Hannstar had accepted the Mediator's Proposal.

173.    SEL and SCEA have performed all of their obligations to HannStar except those it has been excused from performing.

174.    SEL and SCEA have suffered damages legally caused by HannStar's breach of the agreement in the amount HannStar agreed to pay SEL and SCEA by accepting the mediator's proposal together with additional attorneys' fees and expenses caused by Hannstar's breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, SEL and SCEA each prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a.    defendant and its co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and SEL was injured in its business and property as a result of defendant's and its co-conspirators' violations;

b.    defendant and its co-conspirators engaged in a contract, combination, and conspiracy in violation of California's Cartwright Act (Cal. Bus. & Prof. Code § 16700 et seq.),

1    and SEL and SCEA each was injured in its business and property as a result of defendant's and its

2    co-conspirators' violations;

3            c.      defendant and its co-conspirators engaged in a contract, combination, and

4    conspiracy in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200

5    et seq.), and SEL and SCEA each has suffered injury in fact and has lost money or property as a

6    result of defendant's and its co-conspirators' violations;

7            d.      defendant and its co-conspirators violated federal and California antitrust

8    and unfair competition laws;

9            e.      defendant breached the contract it entered into by accepting the Mediator's

10   Proposal to resolve SEL's and SCEA's LCD-related claims against it;

11           f.      SEL is entitled to recover damages it sustained, as provided by the federal

12   antitrust laws, and a joint and several judgment in favor of SEL shall be entered against defendant

13   in an amount to be trebled in accordance with such laws;

14           g.      SEL and SCEA each is entitled to recover damages it sustained, as

15   provided by the California antitrust laws, and a joint and several judgment in favor of each of

16   SEL and SCEA each shall be entered against defendant in an amount to be trebled in accordance

17   with such laws;

18           h.      SEL and SCEA each is entitled to recover damages it sustained, as

19   provided by California unfair competition laws, and a joint and several judgment in favor of each

20   of SEL and SCEA shall be entered against defendant ordering restitution of amounts unlawfully

21   obtained from each of them;

22           i.      SEL and SCEA each is entitled to restitution, including disgorgement of

23   profits obtained by defendant as a result of the acts of defendant and its co-conspirators of

24   unlawful and unfair competition resulting in unjust enrichment;

25           j.      Defendant, its subsidiaries, affiliates, successors, transferees, assignees and

26   their officers, directors, partners, agents, and employees, and all other persons acting or claiming

27   to act on defendant's behalf, shall be permanently enjoined and restrained from continuing and

28   maintaining the combination, conspiracy, or agreement alleged herein;

1            k.       SEL and SCEA each is entitled to an award of compensatory damages for

2 defendant's breach of the contract it entered into by accepting the mediator's proposal;

3            l.        SEL and SCEA each shall be awarded pre-judgment and post-judgment

4 interest to the extent permitted by law;

5            m.      SEL and SCEA each shall recover its costs of this suit, including

6 reasonable attorneys' fees as provided by law; and

7            n.       SEL and SCEA each shall receive such other or further relief as may be

8 just and proper.

9 <div align="center">JURY TRIAL DEMANDED</div>

10 Pursuant to Federal Rule of Civil Procedure 38(b), SEL and SCEA each demands a trial

11 by jury of all of the claims asserted in this Complaint so triable.

12

13 Dated: October 26, 2012               ORRICK, HERRINGTON & SUTCLIFFE LLP

14

15                               By:       /s/ Stephen V. Bomse

16                                   STEPHEN V. BOMSE
                                   DAVID M. GOLDSTEIN
                                   SHANNON C. LEONG

17                              *Attorneys for Sony Electronics Inc. and Sony*
                                *Computer Entertainment America LLC*

18

19

20

21

22

23

24

25

26

27

28