1   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
    Roman M. Silberfeld, Bar No. 62783
2   RMSilberfeld@rkmc.com
    David Martinez, Bar No. 193183
3   DMartinez@rkmc.com
    Emily A. Jarvis, Bar No. 265223
4   EAJarvis@rkmc.com
    2049 Century Park East, Suite 3400
5   Los Angeles, CA  90067-3208
    Telephone:   310-552-0130
6   Facsimile:    310-229-5800

7   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
    Elliot S. Kaplan (*Pro Hac Vice*)
8   ESKaplan@rkmc.com
    K. Craig Wildfang (*Pro Hac Vice*)
9   KCWildfang@rkmc.com
    800 LaSalle Avenue
10  2800 LaSalle Plaza
    Minneapolis, MN  55402
11  Telephone:   612-349-8500
    Facsimile:    612-339-4181
12
    Attorneys for Plaintiffs
13

14              **UNITED STATES DISTRICT COURT**

15            **NORTHERN DISTRICT OF CALIFORNIA**

16

17  IN RE TFT-LCD (FLAT PANEL)          Master File No. 07-MD-1827 SI
    ANTITRUST LITIGATION                MDL No. 1827
18
                                        Case No. 3:12-CV-4114 SI
19  This Document Relates to Individual Case No.
    3:12-CV-4114 SI:                    **FIRST AMENDED COMPLAINT AND**
20                                      **JURY DEMAND**
    BEST BUY CO., INC.; BEST BUY
21  PURCHASING LLC; BEST BUY
    ENTERPRISE SERVICES, INC.; BEST BUY
22  STORES, L.P.; BESTBUY.COM, L.L.C.; and
    MAGNOLIA HI-FI, INC.,
23
                    Plaintiffs,
24           v.

25  TOSHIBA CORPORATION; TOSHIBA
    MOBILE DISPLAY CO., LTD.(F.K.A.
26  TOSHIBA MATSUSHITA DISPLAY
    TECHNOLOGY CO., LTD.); TOSHIBA
27  AMERICA ELECTRONICS COMPONENTS,
    INC.; TOSHIBA AMERICA INFORMATION
28  SYSTEMS, INC.; KONINKLIJKE PHILIPS

*left margin (vertical):* ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 | ELECTRONICS N.V. (A.K.A. ROYAL
PHILIPS ELECTRONICS N.V.); and
2 | PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION.
3
Defendants.
4

5    Plaintiffs Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services,

6 Inc., Best Buy Stores, L.P., BestBuy.com, L.L.C. and Magnolia Hi-Fi, Inc. (collectively

7 "Plaintiffs" or "Best Buy") bring this action under the antitrust laws of the United States and the

8 State of Minnesota, against the Defendants, and allege as follows:

9 **I.**      **INTRODUCTION**

10    1.    Plaintiffs bring this antitrust action to recover damages they incurred as a result of

11 an extended conspiracy by manufacturers of liquid crystal display panels ("LCD Panels").

12 Defendants and their co-conspirators are believed to have conspired from at least January 1, 1996

13 until approximately December 11, 2006 ("Relevant Period") for the purpose and to the effect of

14 fixing, raising, stabilizing, and maintaining prices for LCD Panels and/or products containing

15 LCD Panels.  LCD Panels are used in a number of products, including, but not limited to,

16 computer monitors, laptop computers, televisions, and mobile phones ("LCD Products").

17    2.    Beginning in at least 1996, Defendants and/or co-conspirators located in Japan,

18 including but not limited to Hitachi and Sharp met or talked with at least one other Defendant or

19 co-conspirator in order to agree on LCD Panel prices and the volume of LCD Panels each would

20 produce.  As production in Korea began to increase, the Japanese Defendants and co-conspirators

21 expanded their meetings to involve their Korean competitors, including co-conspirator LG

22 Display, which also agreed to fix prices and to control supply.  In 2001, the Korean co-

23 conspirators convinced Taiwanese LCD Panel manufacturers, including co-conspirators AU

24 Optronics, Chi Mei, Chunghwa, and HannStar, to join the conspiracy to fix prices and to control

25 product supply.  Defendants' conspiracy included agreements on the prices at which Defendants

26 would sell LCD Panels to their own corporate subsidiaries and affiliates, as well as their co-

27 conspirators, thereby ensuring LCD Panels prices remained consistent among Defendants and

28 their customers, which was an attempt to prevent any price discrepancies to consumers.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

3.      Throughout the Relevant Period, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for LCD Panels and LCD Products caused by periods of oversupply and technological change.  Defendants' conspiracy resulted in unusually long periods of high prices and high profits.  Although there were periods when prices for LCD Panels temporarily declined as a result of new market entrants being assimilated, those price declines were from supra-competitive levels, rather than levels set by free and open competition. And prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiffs paid higher prices for LCD Products than they would have paid in a competitive market.

## II.      JURISDICTION AND VENUE

4.      Plaintiffs brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of Minnesota.

5.      This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C. § 1332, or, alternatively, pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and Section 1391(b), (c), and (d) of Title 28 of the United States Code because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the Defendants reside in this district.

7.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### III.     DEFINITIONS

8.     As used herein, the term "Relevant Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

9.     As used above and herein, the term "LCD Panel" means liquid crystal display panel.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image.  The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates."  The resulting screen contains hundreds or thousands of electrically charged dots, or pixels that form an image.  During the Relevant Period, LCD Panels used in some early notebook computers and hand-held devices included three different technologies:  thin film transistor (TFT) panels, color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels.  The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products.  For purposes of this action, Best Buy is only asserting claims and only seeking damages arising from its purchases of products containing TFT-LCD panels, and not CSTN or MSTN LCD panels.

10.     As used above herein, the term "LCD Products" means any product containing an LCD Panel, including without limitation LCD modules, televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand-held devices.

11.     As used herein, the term "OEM" means any original equipment manufacturer of LCD Products.

### IV.     PARTIES

#### A.     Plaintiffs

12.     Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated retail stores throughout the United States and sold LCD Products in those stores.

13.     Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and principal places of business in Richfield, Minnesota.

14.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P. operates retail stores throughout the United States and sells LCD Products in those stores.

15.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

16.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for LCD Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

17.     Plaintiff Magnolia Hi-Fi, Inc. ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During the Relevant Time Period, MHF's purchasing of LCD Products took place in its headquarters in Kent Washington.

18.     During the Relevant Period, Best Buy directly purchased LCD Products from several of the vertically integrated Defendants.  For instance, Defendants Toshiba and Philips manufacture and sell laptops, monitors, and televisions to resellers, like and including Best Buy.  Best Buy suffered injury as a result of Defendants' misconduct.

19.     During the Relevant Period, Best Buy also indirectly purchased products containing LCD panels from OEMs that purchased LCD Panels from one or more of the Defendants.  For instance, OEMs like Dell, Hewlett-Packard, and Apple bought LCD Panels

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  directly and/or indirectly from Defendants for use in their computer monitors, laptops, iPods, and

2  other LCD Products.  These OEMs then sold their LCD Products to Best Buy for resale in Best

3  Buy stores.

4       20.    Plaintiffs are informed and believe Defendants knew, or should have known and

5  reasonably foreseen that those products would be sold in the United States generally and in

6  Minnesota in particular, such that those purchases involved U.S. import trade or commerce and

7  were within the flow of, were intended to, and did have a direct, substantial and reasonably

8  foreseeable effect on U.S. domestic commerce.  That is, Defendants knew, or must have known

9  and reasonably foreseen that purchasers in the United States would be required to pay an

10  excessive, supra-competitive price for LCD Products containing LCD Panels that would be, and

11  were ultimately purchased in Minnesota and the United States.

12       21.    Those products were kept as inventory and sold in Minnesota and every other state

13  where Best Buy retail stores were located, and over the internet throughout the United States.

14       22.    In addition to the conspiracy establishing globally fixed and supra-competitive

15  prices for LCD Panels and LCD Products that resulted in all of the Best Buy entities being

16  required to pay supra-competitive prices for LCD Products, Plaintiffs are informed and believe

17  and allege that the conspiracy had the direct and proximate effect of causing a separate antitrust

18  injury in that all of the Best Buy entities lost sales related to ultimate consumers who were

19  unwilling to pay the supra-competitive prices for LCD Products.  That is, the supra-competitive

20  prices for LCD Products directly caused Best Buy antitrust injury by reducing the demand for

21  such products and thereby reducing the sales of such products.

22       23.    As a result of the Best Buy entities' presence, purchases, and sales in Minnesota,

23  and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled

24  to the protection of the Sherman Act and the antitrust laws of Minnesota.

25  **B.**    **Defendants**

26      **1.**    **Toshiba**

27       24.    Defendant Toshiba Corporation is Japanese corporation with its principal place of

28  business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Relevant

1   Period, Toshiba Corporation manufactured, marketed, sold and/or distributed LCD Panels and

2   LCD Products sold throughout the United States.

3        25.    Defendant Toshiba Mobile Display Co., Ltd., f/k/a/ Toshiba Matsushita Display

4   Technology Co., Ltd., is a Japanese company with its principal place of business at Rivage

5   Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.  During the Relevant

6   Period, Toshiba Mobile Display Co., Ltd. manufactured, marketed, sold and/or distributed LCD

7   Panels and LCD Products sold throughout the United States.

8        26.    Defendant Toshiba America Electronic Components, Inc. is a wholly-owned and

9   controlled subsidiary of Toshiba America, Inc., which in turn is a wholly-owned and controlled

10  subsidiary of Defendant Toshiba Corporation, with its principal place of business at 19900

11  MacArthur Blvd., Ste. 400, Irvine, California.  During the Relevant Period, Toshiba America

12  Electronic Components, Inc. marketed, sold and/or distributed LCD Panels and LCD Products

13  sold throughout the United States.

14       27.    Defendant Toshiba America Information Systems, Inc. is a wholly-owned and

15  controlled subsidiary of Toshiba America, Inc., which in turn is a wholly-owned and controlled

16  subsidiary of Defendant Toshiba Corporation, with its principal place of business at 9740 Irvine

17  Boulevard, Irvine, California.  During the Relevant Period, Toshiba America Information

18  Systems, Inc. marketed, sold and/or distributed LCD Panels that were incorporated into LCD

19  Products sold throughout the United States.

20       28.    Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba

21  America Electronic Components, Inc., and Toshiba America Information Systems, Inc. are from

22  time to time referred to collectively herein as "Toshiba," or "the Toshiba Entities."  They

23  participated in the conspiracy through the actions of their respective officers, employees, and

24  representatives acting with actual or apparent authority.  Alternatively, Defendants Toshiba

25  Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc., and Toshiba America

26  Information Systems, Inc. were members of the conspiracy by virtue of their status during the

27  Relevant Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation

28  dominated or controlled Toshiba Mobile Display Co., Ltd., Toshiba America Electronic

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Components, Inc., and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

29.     On July 3, 2012, a federal jury in the Northern District of California unanimously found that Toshiba knowingly participated in a conspiracy to fix, raise, maintain or stabilize the prices of TFT-LCD panels and held them liable for $87,000,000 in damages caused by their anticompetitive conduct.

30.     The Toshiba Entities are an integrated group enterprise that ought to be treated as a unitary entity.  Toshiba Corporation ("TSB") is the ultimate parent of all the Toshiba Entities. TSB's Annual Report 2009 includes a letter from its Chairman and its President and Chief Executive Officer referring to the "Toshiba Group" and its "Group-wide efforts" to carry out a profitability action plan "with the key objectives of transforming the Toshiba Group into a Group with a strongly profitable business structure."  TSB's Annual Reports also include organizational charts depicting TSB's Board of Directors, President and Chief Executive Officer as exercising control and reporting authority over multiple product segments, including the Electronic Devices & Components Group and Digital Products Group which have responsibility for TFT-LCD panels and finished products.

31.     At all relevant times, Toshiba America Information Systems, Inc. ("TAIS") and Toshiba America Electronic Components, Inc. ("TAEC") were wholly-owned subsidiaries of Toshiba America, Inc. ("TAI"), which in turn was a wholly-owned subsidiary of TSB.  In other words, TAIS and TAEC are, via TAI, wholly-owned subsidiaries of TSB.

32.     According to TAIS's consolidated financial statements, "A substantial portion of the Company's products are purchased from Toshiba Corporation."  Any disruption in the relationship between TAIS and TSB that would impair TAIS's ability to obtain products from TSB "could have a material adverse effect on the Company's business, operating results, and financial condition."  TAIS is also financially beholden to TSB.  For example, in 2001, TSB provided more than $54 million in expense reimbursements to TAIS, representing more than 10 percent of TAIS's total assets.  In addition, TSB agreed to pay all financial obligations of TAIS in

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   connection with the settlement of litigation in which both companies were held jointly and

2   severally liable during the fiscal year ended March 31, 2000.

3          33.      Toshiba Matsushita Display Technology Co., Ltd., later known as Toshiba Mobile

4   Display Co. Ltd. ("TMD"), was established in April 2002 as a joint venture between TSB and

5   Matsushita Electric Industrial Co., Ltd. ("Matsushita").  At all relevant times, TSB had a majority

6   ownership in TMD.  Between April 2002 and March 2009, TSB owned a 60 percent interest in

7   TMD, and Matsushita owned a 40 percent interest.  In April 2009, TSB acquired Matsushita's

8   interest, and since that time TMD has been a wholly-owned subsidiary of TSB.  Since the

9   formation of TMD, TSB has considered TMD to be a consolidated subsidiary and has reported

10  TMD's sales as TSB's sales in its Annual Report.

11         34.      At all relevant times, TSB maintained a controlling interest in TMD.  From at least

12  June 2002 through 2006, Toshiba appointed 6 of TMD's 10 board members.  During the Relevant

13  Period, TMD reported directly to highest level executives at TSB.  Between April 2003 and

14  March 2005, Tadashi Okamura held positions as the President, Chief Executive Officer, Director

15  and Chairman of the Board of Directors of TSB.

16         35.      Between April 2003 and March 2004, Takeshi Nakagawa served as a Corporate

17  Senior Executive Vice President and Director of TSB, and simultaneously was a member of

18  TMD's Board of Directors.  Between April 2004 and March 2005, Toshio Yonezawa served as a

19  Corporate Executive and Vice President of TSB, while he also held the position of Representative

20  Director of TMD.

21         36.      The present ownership structure of the Toshiba Entities can be visually depicted as

22  follows:

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

37.     Both TSB and TMD manufactured and sold TFT-LCD panels during the Relevant Period.  TSB manufactured TFT-LCD panels until March 2002.  TMD has manufactured TFT-LCD panels since April 2002.  TAEC was TSB's exclusive distributor of TFT-LCD panels in the United States prior to April 2002.  Since that time, TAEC has been TMD's exclusive distributor of TFT-LCD panels in the United States.  TSB manufactured notebooks and monitors during the Relevant Period.  TAIS purchased TFT-LCD finished products from TSB and also manufactured TFT-LCD finished products, all of which TAIS sold in the United States under the Toshiba brand.  TSB procured TFT-LCD panels and other component parts for TAIS's finished products.  TAIS's finished products incorporated TFT-LCD panels that were manufactured by TSB (prior to April 2002) and TMD (beginning in April 2002).

38.     TAIS is the exclusive distributor of Toshiba-branded notebooks and monitors in the United States.  As such, it is TAIS, in its capacity as a subsidiary of TSB, that sold Toshiba finished products to Plaintiffs.

**2.     Philips**

39.     Defendant Koninklijke Philips Electronics N.V. ("Royal Philips") has its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.

40.     Defendant Philips Electronics North America Corporation is a wholly-owned subsidiary of Philips Holdings USA, Inc., which itself is a wholly-owned subsidiary of Defendant Royal Philips. Its principal place of business is at 3000 Minuteman Road, Andover, Massachusetts 01810. During the Relevant Period, Philips Electronics North America

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  Corporation manufactured, marketed, sold, and/or distributed LCD Panels and/or LCD Products

2  throughout the United States.

3        41.     In 1999, Defendant Philips Electronics North America Corporation's ultimate

4  parent company, Defendant Royal Philips, created a joint venture with its competitor, LG

5  Electronics, Inc. to form co-conspirator LG Philips LCD Co., Ltd., which is now known as LG

6  Display Co., Ltd. LG Display Co., Ltd. is a leading manufacturer of LCD Panels and/or LCD

7  Products. LG Display Co., Ltd. pleaded guilty to participating in a global conspiracy to fix LCD

8  prices. Royal Philips, as one of the joint-venture owners of LG Display Co., Ltd., participated in

9  the conspiracy through LG Display Co., Ltd. and through other actions alleged in this complaint.

10  Philips Electronics North America Corporation was the agent and sales and marketing

11  representative for Royal Philips and its subsidiaries in the United States.

12        42.     Philips Electronics North America Corporation participated in the conspiracy

13  through the actions of its respective affiliates (including Royal Philips), officers, employees, and

14  representatives acting with actual or apparent authority. Alternatively, Defendant Philips

15  Electronics North America Corporation was a member of the conspiracy by virtue of its status

16  during the Relevant Period as an alter ego or agent of Defendant Royal Philips. Royal Philips

17  dominated or controlled Philips Electronics North America Corporation regarding conspiracy

18  activities and used that dominion or control to charge artificially high prices for LCD Panels

19  and/or LCD Products. Philips Electronics North America Corporation, Royal Philips, and their

20  affiliates, parents, subsidiaries, agents, and representatives are from time to referred to

21  collectively herein as "Philips."

22  **V.**      **AGENTS AND CO-CONSPIRATORS**

23        43.     The acts alleged against the Defendants in this Complaint were authorized,

24  ordered, or done by their officers, agents, employees, or representatives, while actively engaged

25  in the management and operation of Defendants' businesses or affairs.

26        44.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other

27  Defendants with respect to the acts, violations, and common course of conduct alleged by

28

1    Plaintiffs, for which they are liable as co-conspirators including because of their participation in

2    and acts in furtherance of the conspiracy.

3         45.    Various persons and/or firms not named as Defendants in this Complaint are

4    believed to have participated as co-conspirators in the violations alleged herein and to have

5    performed acts and made statements in furtherance thereof, all of the names and acts are within

6    the exclusive knowledge of the Defendants. Many of these co-conspirators are named defendants

7    in the related action captioned *Best Buy Co., Inc., et al. v. AU Optronics Corp., et al.*, Case No.

8    10-cv-4572-SI.

9         46.    Co-conspirator Epson Imaging Devices Corporation ("Epson Japan") has its

10   principal place of business at 3-101 Minami-Yoshikata, Tottori-Shi, Tottori 680-8577, Japan.

11   The company was originally formed as a joint venture between Seiko Epson Corporation and

12   Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up

13   until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.

14   During the Relevant Period, Epson Japan manufactured, marketed, sold and/or distributed LCD

15   Panels and/or LCD Products throughout the United States and elsewhere.

16        47.    Co-conspirator Epson Electronics America, Inc. ("Epson America") is a wholly-

17   owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at

18   2580 Orchard Parkway, San Jose, California.  During the Relevant Period, Epson America sold

19   and distributed LCD Products containing LCD Panels manufactured by Epson Japan to customers

20   in the United States.

21        48.    Co-conspirators Epson Japan and Epson America are sometimes referred to

22   collectively herein as "Epson."  The Epson companies were members of the conspiracy that is the

23   subject of this Complaint by virtue of their participation in the conspiracy through the actions of

24   their respective officers, employees, and representatives acting with actual or apparent authority.

25   Alternatively, co-conspirator Epson America was a member of the conspiracy by virtue of its

26   status during the Relevant Period as the alter ego or agent of Epson Japan.  Epson Japan

27   dominated or controlled Epson America regarding conspiracy activities and used that domination

28   or control to charge artificially high prices for LCD Panels and LCD Products.

49.     Co-conspirator Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  The company was one of the original producers of LCD Panels.  In 2002, it spun off its LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary.  During the Relevant Period, Hitachi, Ltd. manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

50.     Co-conspirator Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was formed in 2002 and acquired co-conspirator Hitachi, Ltd.'s LCD manufacturing business.  Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.  Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

51.     Co-conspirator Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina.  Its ultimate parent company is Hitachi, Ltd.  During the Relevant Period, Hitachi Electronic Devices (USA), Inc. sold and distributed LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the United States.

52.     Co-conspirators Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi."  The Hitachi companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, co-conspirator Hitachi Electronic Devices (USA), Inc. was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Hitachi, Ltd. and Hitachi Displays, Ltd., which dominated or controlled Hitachi Electronic Devices (USA), Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

53.     Co-conspirator Sharp Corporation is a Japanese company with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  The company was one of the earliest producers of LCD Panels.  During the Relevant Period, Sharp Corporation manufactured, sold, and distributed LCD Products and/or LCD Panels to customers throughout the United States.

54.     Co-conspirator Sharp Electronics Corporation is a New York corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of co-conspirator Sharp Corporation.  During the Relevant Period, Sharp Electronics Corporation sold and distributed LCD Panels and/or LCD Products throughout the United States.

55.     Co-conspirators Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp."  The Sharp companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, co-conspirator Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Sharp Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

56.     Co-conspirator LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd., is a leading manufacturer of LCD Panels and is a joint venture created in 1999 by Royal Philips Electronics NV and LG Electronics, Inc.  LG Display Co., Ltd. maintains offices in San Jose, California, and has its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea.  During the Relevant Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

57.     Co-conspirator LG Display America, Inc., f/k/a/ LG Philips LCD America, Inc., is located at 150 East Brokaw Rd., San Jose, California.  During the Relevant Period, said co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

conspirator manufactured, marketed, sold and/or distributed LCD Products and/or LCD Panels that were incorporated into LCD Products sold throughout the United States.

58.     Co-conspirators LG Display Co., Ltd. and LG Display America, Inc. are sometimes referred to collectively herein as "LG Display."  The LG Display companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, co-conspirator LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of LG Display Co., Ltd.  LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

59.     Co-conspirator AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.  AU Optronics Corporation was created in 2001 by the merger of Acer Display Technology, Inc. and Unipac Electronics, both of which were involved in the manufacture of LCD Panels and/or LCD Products.  During the Relevant Period, AU Optronics Corporation manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

60.     Co-conspirator AU Optronics Corporation America ("AU America") is a California corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241, Houston, Texas.  AU America was formerly known as Acer Display Technology America, Inc. AU America is a wholly-owned and controlled subsidiary of co-conspirator AU Optronics Corporation.  In 2006, Hsuan Bin Chen, the president and Chief Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU America.  During the Relevant Period, AU America manufactured, sold and distributed LCD Panels that were incorporated into LCD Products sold throughout the United States.

61.     Co-conspirators AU Optronics Corporation and AU America are sometimes referred to collectively herein as "AU Optronics."  The AU Optronics companies were members

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  of the conspiracy that is the subject of this Complaint by virtue of their participation in the

2  conspiracy through the actions of their respective officers, employees, and representatives acting

3  with actual or apparent authority.  Alternatively, co-conspirator AU Optronics Corporation

4  America, Inc. was a member of the conspiracy by virtue of its status during the Relevant Period

5  as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation dominated or

6  controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that

7  domination or control to cause artificially high prices for LCD Panels and LCD Products.

8  62.    In March 2012, a federal jury in the Northern District of California found AU

9  Optronics Corporation and AU America guilty of violating the Sherman Act. The jury also found

10  AU Optronics executives Hsuan Bin "H.B." Chen and Hui Hsiung ("Kuma") guilty of violating

11  the Sherman Act.

12  63.    Co-conspirator Chi Mei Corporation ("CMC") is a Taiwanese company with its

13  principal place of business located at No. 59-1, San Chia, Jen Te, Tainan County, Taiwan 71702.

14  CMC is the parent company for all of the Chi Mei entities herein.  During the Relevant Period,

15  CMC manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products

16  sold throughout the United States.

17  64.    Co-conspirator Chi Mei Optoelectronics Corporation (N.K.A. CHIMEI

18  INNOLUX CORPORATION) ("CMO") is a Taiwanese company with its principal place of

19  business at No. 3, Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township,

20  Tainan County, 74147 Taiwan.  It is a subsidiary of CMC.  CMO was formed in 1998, and has

21  since become a major manufacturer of LCD Panels.  During the Relevant Period, CMO

22  manufactured, sold, and distributed LCD Panels that were incorporated into LCD Products sold

23  throughout the United States.

24  65.    Co-conspirator CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company

25  headquartered at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan.  Until

26  approximately 2006, CMO Japan was known as International Display Technology, Ltd.  CMO

27  Japan is a wholly-owned and controlled subsidiary of co-conspirator CMO.  CMO Japan has been

28  in the LCD business since 2001.  During the Relevant Period, CMO Japan manufactured, sold,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   and distributed LCD Panels that were incorporated into LCD Products sold throughout the United

2   States.

3       66.     Co-conspirator Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware

4   corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

5   California.  Until approximately 2006, CMO USA was known as International Display

6   Technology U.S.A., Inc.  CMO USA is a wholly-owned and controlled subsidiary of co-

7   conspirator CMO Japan.  The Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously

8   the Chairman of CMO Japan's predecessor, and in or about 2007 became Vice President in

9   charge of sales and marketing for CMO.  Similarly, the President of CMO USA in 2006, Junichi

10  Ishii, was previously the President of CMO Japan's predecessor.  During the Relevant Period,

11  CMO USA sold and distributed LCD Products and/or LCD Panels that were incorporated into

12  LCD Products sold throughout the United States.

13      67.     Co-conspirator Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese company with

14  its principal place of business at No. 11-2, Jen Te 4th St., en Te Village Jen Te, Tainan 717

15  Taiwan.  Nexgen is a wholly-owned and controlled subsidiary of CMC.  During the Relevant

16  Period, Nexgen sold and distributed LCD Products containing LCD Panels manufactured by

17  CMO to customers throughout the United States.

18      68.     Co-conspirator Nexgen Mediatech USA, Inc. ("Nexgen USA") is a California

19  corporation with its principal place of business at 16712 East Johnson Drive, City of Industry,

20  California.  Nexgen USA is a wholly-owned and controlled subsidiary of CMC.  During the

21  Relevant Period, Nexgen USA sold and distributed LCD Products containing LCD Panels

22  manufactured by CMO to customers throughout the United States.

23      69.     Co-conspirators CMC, CMO, CMO Japan, CMO USA, Nexgen, and Nexgen USA

24  are sometimes referred to collectively herein as "Chi Mei."  The Chi Mei companies were

25  members of the conspiracy that is the subject of this Complaint by virtue of their participation in

26  the conspiracy through the actions of their respective officers, employees, and representatives

27  acting with actual or apparent authority.  Alternatively, co-conspirators Chi Mei Optoelectronics

28  Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc.,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    and Nexgen Mediatech USA, Inc. were members of the conspiracy by virtue of their status during

2    the Relevant Time Period as the alter egos or agents of Chi Mei Corporation and Chi Mei

3    Optoelectronics Corporation which dominated or controlled Chi Mei Optoelectronics

4    Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc.,

5    and Nexgen Mediatech USA, Inc. regarding conspiracy activities and used that domination or

6    control to cause artificially high prices for LCD Panels and LCD Products.

7         70.    Co-conspirator Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its

8    principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  It is a subsidiary

9    of Tatung Company, a consolidated consumer electronics and information technology company

10    based in Taiwan.  Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives

11    from Tatung Company.  The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also

12    the Chairman and General Manager of Tatung Company.  During the Relevant Period, Chunghwa

13    Picture Tubes, Ltd. manufactured, sold, and distributed LCD Panels that were incorporated into

14    LCD Products sold throughout the United States.

15         71.    Co-conspirator Tatung Company of America, Inc. ("Tatung America") is a

16    California corporation with its principal place of business at 2850 El Presidio Street, Long Beach,

17    California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company

18    owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the

19    daughter of Tatung Company's former Chairman, T.S. Lin.  During the Relevant Period, Tatung

20    America sold and distributed LCD Products containing LCD Panels manufactured by Chunghwa

21    Picture Tubes, Ltd. to customers throughout the United States.

22         72.    Co-conspirators Chunghwa Picture Tubes, Ltd. and Tatung America are

23    sometimes referred to collectively herein as "Chunghwa."  During the Relevant Time Period,

24    Chunghwa and Tatung were closely affiliated, commonly owned, controlled and dominated by

25    Tatung Company, and functioned as a single enterprise and/or alter egos.

26         73.    Co-conspirator HannStar Display Corporation ("HannStar") is a Taiwanese

27    company with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu

28    Chiu, Taipei 114, Taiwan.  HannStar has been in the business of manufacturing and selling LCD

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  Panels since 1998. During the Relevant Period, HannStar manufactured, sold, and distributed

2  LCD Panels that were incorporated into LCD Products sold throughout the United States.

3  74. Co-conspirator Hydis Technologies Co., Ltd., formerly known as BOE Hydis

4  Technology Co., Ltd. ("Hydis"), is a Korean manufacturer of LCD Panels. The company

5  originated in 1989 as the LCD business division of Hyundai Electronics Industries Co.

6  ("Hyundai"). It spun-off from Hyundai in 2001, and it was subsequently acquired by the BOE

7  Group. On September 18, 2006, Hydis filed for Court Receivership in South Korea. During the

8  Relevant Period, Hydis manufactured, sold, and distributed LCD Panels and/or Products

9  throughout the United States.

10  75. Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a Japanese entity

11  with its principal place of business at 3732 Hayano, Mobara-shi, Chiba 297-0037, Japan. IPS

12  Alpha was formed in January 2005 as a joint venture that included Hitachi Displays, Ltd., and

13  Panasonic Corporation to manufacture and sell LCD Panels for televisions. During the Relevant

14  Period, IPS Alpha manufactured, sold, and distributed LCD Panels to customers throughout the

15  United States.

16  76. Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") is a Japanese entity

17  with its principal place of business located at 2-7-3 Marunouchi, Chiyoda-ku, Tokyo 100-83 10,

18  Japan. Mitsubishi was an early developer of LCD technology, and in 1991, it entered into a joint

19  venture with Asahi Glass Co., Ltd. to mass produce LCD Panels. Mitsubishi owned 80 percent of

20  the joint venture, called Advanced Display Incorporated. In September 1999, Mitsubishi

21  purchased Asahi Glass' stake in Advanced Display Incorporated, making it a wholly-owned

22  subsidiary. During the Relevant Period, Mitsubishi manufactured, sold, and distributed LCD

23  Panels and/or LCD Products to customers throughout the United States.

24  77. Co-conspirator Mitsui & Co., Ltd. ("Mitsui") is a Japanese entity with its principal

25  place of business at Building 2-1, Ohtemachi 1-chome, Chiyoda-ku, Tokyo 100-0004, Japan.

26  Mitsui, known as Mitsui Bussan Kabashiki Kaisha in Japanese, is a trading house for a diverse

27  group of products. During the Relevant Period, Mitsui sold and distributed LCD Panels and/or

28  LCD Products to customers throughout the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT
AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

78.     Co-conspirator NEC LCD Technologies, Ltd. is a Japanese company with its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kangawa, 211-8666, Japan.  It has been in the LCD business since 1993.  During the Relevant Period, NEC manufactured, sold, and distributed LCD Panels and/or LCD Products to customers throughout the United States.

79.     Co-conspirator NEC LCD Technologies, Ltd. is a Japanese entity with its principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666, Japan.  During the Relevant Period, either directly or indirectly through other NEC entities, NEC LCD Technologies manufactured, sold and distributed LCD Panels and/or LCD Products throughout the United States.

80.     Co-conspirator NEC Electronics America, Inc. is a wholly-owned and controlled subsidiary of NEC Corporation, with its principal place of business located at 2880 Scott Boulevard, Santa Clara, CA  95050-2554 and its manufacturing plant in Roseville, California.  During the Relevant Period, NEC Electronics America manufactured, sold and distributed LCD Panels and/or LCD Products throughout the United States.

81.     Co-conspirator Panasonic Corporation ("Panasonic"), is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.  Until approximately October 1, 2008, Panasonic was known as Matsushita Electric Industrial Co., Ltd.  Panasonic holds a minority stake in two joint ventures – including IPS Alpha.  During the Relevant Period, Panasonic manufactured, sold, and distributed LCD Panels and/or LCD Products to customers throughout the United States.

82.     Co-conspirator Panasonic Corporation of North America, formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of business at 1 Panasonic Way, Secaucus, New Jersey.  Panasonic Corporation of North America is a wholly-owned and controlled subsidiary of co-conspirator Panasonic.  During the Relevant Period, Panasonic Corporation of North America sold and distributed LCD Panels and/or LCD Products manufactured by Panasonic to customers throughout the United States.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

83.     Co-conspirator Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea.  During the Relevant Time Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States.

84.     Co-conspirator Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of co-conspirator Samsung Electronics Company, Ltd. with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey.  During the Relevant Time Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold throughout the United States.

85.     Co-conspirator Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of co-conspirator Samsung Electronics Co., Ltd. with its principal place of business at 3655 North First Street, San Jose, California.  During the Relevant Time Period, said co-conspirator manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold throughout the United States.

86.     Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung." The Samsung companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, co-conspirators Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD Panels and LCD Products.

87.     Other co-conspirators whose identities are known to Plaintiffs include the following companies with whom Plaintiffs have entered into tolling agreements:  LG Electronics, Inc and LG Electronics USA, Inc. (collectively "LG Electronics"); as well as Fujitsu Display

Technologies Corporation ("FDTC"); Acer Display; Advanced Displays, Inc.; Alps Electric Co., Ltd.; BOE Corp.; ID Tech; Innolux Display Corp.; LG Innotek; NEC Corp.; NEC Corp. of America; NEC Display Solutions of America; Optrex Corp.; Philips Kobe; Quanta Display Corp.; Samsung SDI; Samsung Mobile Display; Sanyo Consumer Electronics Co., Ltd.; SVA-NEC; Toppoly Optoelectronics Corp.; TPO Displays Corp.; and Unipac Electronics Corp.

## VI.    TRADE AND COMMERCE

88.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold LCD Panels and/or LCD Products in the United States in a continuous and uninterrupted flow of interstate and foreign commerce, including through and into this judicial district.

89.     During the Relevant Period, Defendants and co-conspirators collectively controlled the vast majority of the market for LCD Panels, both globally and in the United States. Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

90.     Defendants' illegal conduct also involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of commerce directly into the United States, one of their most important markets and a major source of their revenues.  In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of LCD Products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. retailers.

91.     The U.S. LCD market is enormous and was a major focus of and very important to the conspiracy.  Measured by value, Defendants and co-conspirators shipped more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States during the Relevant Period for ultimate sale to U.S. consumers.  During the Relevant Period, the value of LCD Panels imported into the United States was in excess of $50 billion.  Defendants and co-conspirators shipped millions of LCD Products worth billions of dollars into the United States each year during the Relevant Period.  As a result, a substantial portion of Defendants'

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

revenues were derived from the U.S. market.  Defendants and co-conspirators spent hundreds of millions of dollars on advertising their products in the United States.  Most, if not all, Defendants and co-conspirators had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels and LCD Products.

92.     Because of the importance of the U.S. market to Defendants and their co-conspirators, LCD Panels and LCD Products intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct.  This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD Panels and LCD Products.

93.     During the Relevant Period, every Defendant shipped LCD Panels directly into the United States.

94.     When high-level executives based at Defendants' Asian headquarters agreed on prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products sold in the United States.  Moreover, because LCD Panels are – and were throughout the Relevant Period – the most expensive and significant component of LCD Products, Defendants knew that price increases for LCD Panels would necessarily result in increased prices for LCD Products sold in the United States.  Many Defendants manufactured LCD Products and sold them in the United States.  In fact, Defendants routinely monitored the effect their price-fixing had on the prices of such LCD Products sold in the United States.

95.     Defendants also monitored the prices for LCD Products sold in the United States, which they often referred to as "street prices," because Defendants were aware that the conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition, Defendants used LCD Product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD Panels.

96.     Defendants have acknowledged that their commercial activities involving intentionally sending LCD Panels and LCD Products into the United States impacted U.S. import trade and import commerce.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

97.     Co-conspirators who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce.

98.     Further Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce in the form of higher prices for LCD Products containing price-fixed LCD Panels manufactured by defendants and their coconspirators being negotiated, charged, and paid by Plaintiffs in the United States for products imported into the United States.

## VII.     FACTUAL ALLEGATIONS

### A.     TFT-LCD Technology

99.     The technology behind LCD Panels is not new.  In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology.  In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology.  These efforts resulted in monochrome calculators and watches.  By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions.  In the mid-1990s, the technology advanced further with the development of LCD Panels.

100.     The basic structure of an LCD panel is two pieces of glass, called substrates, sandwiching a layer of liquid crystal compound.  The resulting screen contains hundreds of thousands of electrically charged dots, called pixels, that form an image.  The panel is then combined with a backlight unit, a driver, and other equipment to create a "module" allowing the panel to operate and be integrated into a television, computer monitor or one of numerous other products.  Liquid crystals change orientation under an applied electric field and can thereby block or pass light.  One glass substrate has thin chemical films that act as transistors, and the other glass substrate is coated with liquid pigments that act as color filters.  When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through the filters to create red, green, or blue pixels.  Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

101.    The term "active matrix" describes the ability to switch each pixel in a display individually.  Unlike older LCDs that have one transistor for each row and column of pixels, LCD Panels have a transistor for each pixel.  Thus, the term "active matrix LCD" is sometimes used interchangeably with TFT-LCD.  Active matrix displays are brighter and sharper than passive matrix displays of the same size.

102.    The glass substrates used for LCD Panels begin with a "motherglass," a sheet of glass that is cut to make multiple panels.  LCD Panels are manufactured in fabrication plants, sometimes referred to as "fabs," that are equipped to handle a particular size motherglass. Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger and larger motherglass.  This, in turn, has resulted in the ability to fabricate larger and/or more LCD Panels.  Each increase in motherglass size is described as a generation. Third generation fabs in the 1998 to 1999 period typically utilized 550 millimeter ("mm") by 650 mm motherglass, while some current (eighth generation) fabs utilize 2160 mm by 2460 mm motherglass.  The use of larger motherglass provides substantial cost savings to manufacturers.

103.    LCD Panels are capable of producing the same image as cathode ray tubes ("CRTs"), but in a much smaller package.  LCD Panels also have lower energy requirements, are generally easier to read, and do not flicker like CRTs.  LCD Panels of approximately 10 inches or less in diagonal are considered "small" or "medium" displays.  They are also referred to as "mobile displays."  These displays are commonly used in cell phones, personal digital assistants, and cameras.

104.    LCD Panels of 10 inches in diagonal and larger are considered "large-area displays."  Large-area displays are most commonly used for desktop computer monitors, notebook computers, and televisions.  The core products during most of the Relevant Period were displays for notebook computers and computer monitors.  But LCD Panels were also used in many other types of products requiring a visual user interface, such as cell phones and point of sale terminals.  During much of the Relevant Period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most popular LCD Products, representing as much as 80 percent of all LCD Panels produced for notebook computers or computer monitors.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

**B.** **Structure of the LCD Industry**

2      105.   The LCD industry has several characteristics that facilitated a conspiracy,

3   including market concentration, ease of information sharing, the consolidation of manufacturers,

4   multiple interrelated business relationships, significant barriers to entry, heightened price

5   sensitivity to supply and demand forces, and homogeneity of products.

6            **1.     Market Concentration**

7      106.   The market for LCD Products is enormous. A September 28, 2006 Reuters article

8   reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year

9   alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD technology –

10   are expected to reach $US 88 billion this year and $US 100 billion in 2007."

11     107.   Despite its enormous size, the LCD industry is highly concentrated, a factor that is

12   conducive to the type of collusive activity alleged by Plaintiff. In 2005, the top five suppliers –

13   including LG Display, Sharp, AU Optronics, and Chi Mei – collectively shipped 90 percent of all

14   LCD Panels for television use. According to estimates in late 2006 from industry analyst iSuppli

15   Corporation ("iSuppli"), LG Display had the greatest share of LCD television shipments in the

16   first quarter of 2006 (22.3%), followed by Chi Mei (18.7%), AU Optronics (16.8%), and Sharp

17   (13.9%). These companies were four of the largest producers as measured by market share

18   during much of the Relevant Period.

19            **2.     Information Sharing**

20     108.   Because of Defendants and co-conspirators' common membership in trade

21   associations, interrelated business arrangements such as joint ventures, allegiances between

22   companies in certain countries, and relationships between the executives of certain companies,

23   there were many opportunities during the Relevant Period for Defendants and co-conspirators to

24   discuss and exchange competitive information. Defendants and co-conspirators took advantage

25   of these opportunities through meetings, telephone calls, e-mails, and instant messaging.

26   Plaintiffs are informed and believe and allege that Defendants and co-conspirators took advantage

27   of these opportunities to discuss, and agree upon, their pricing for LCD Panels as alleged below.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

109.     Additionally, the LCD industry is analyzed by several market research firms. Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity.  The capacity and pricing data reported by these firms comes directly from manufacturers.  Manufacturers typically report historical, current, and perhaps most importantly, prospective information.

110.     Defendants and co-conspirators thus had access to each other's future plans for bringing new capacity on line, capacity utilization, market share, pricing, and the advent of new technology.  Because so few companies had to be analyzed in order to obtain this data, all competitors in the LCD market had ready and timely access to reliable information about their direct competitors' pricing as well as future supply and capacity decisions.  Plaintiffs are informed and believe and allege that by meeting together as alleged below, as well as monitoring and analyzing this competitive information over time, participants in the conspiracy were able to signal their respective intent, verify that the conspiracy was working, and identify and prevent defection from the conspiracy.

### 3.     Market Consolidation

111.     The LCD industry experienced significant consolidation during the Relevant Period, including:  (a) the creation of AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; (b) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (c) the formation of IPS Alpha in 2005 by Hitachi and Panasonic; and (d) AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of LCD Panels.

### 4.     Multiple Interrelated Business Relationships

112.     The industry involves a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that facilitate collusion.  AU Optronics, for example, entered into licensing arrangements with Sharp in 2005.  Chunghwa did the same with Sharp in December of 2006.  Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

113.     The industry is close-knit.  Multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity for collusion.  These relationships created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

**5.     Significant Barriers to Market Entry Into the LCD Industry**

114.     There are significant manufacturing and technological barriers to entry into the LCD industry.  Efficient fabs are large and costly.  LCD Panels are extremely vulnerable to technological advances, so research and development costs are substantial.  DisplaySearch, a research firm in Austin, Texas that covers the LCD industry, reported in September 2005 that the top LCD manufacturers collectively spend $30 million a day on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical seventh-generation fab can cost more than $3 billion.

115.     During the Relevant Period, the costs of the assembly components, declined overall, substantially in some periods.  Later in the conspiracy, approximately 70 percent of the cost of LCD panel production was attributable to the cost of raw materials.  Pricing coordination and manipulation of the output of LCD Panels allowed Defendants to keep prices above what they would have been but for the conspiracy.

**6.     The "Crystal Cycle"**

116.     In the LCD industry, the supply-and-demand cycle is known as the "crystal cycle."  The cycle has been described as "boom or bust," alternating between oversupply and shortages, which drive prices for LCD Panels up and down.  Among other things, the perceived demand for such products , whether manufacturers have correctly gauged demand in determining how much capacity to build and use, and how many LCD Panels to produce, determines whether supply is inadequate, optimal, or excessive.

117.     Another factor is the entry of new competitors into the market.  When a new competitor enters a market, it brings incremental production online, thereby adding supply, and prices drop until an equilibrium is reached.  In the LCD industry, however, Plaintiffs are informed and believe and allege that Defendants and co-conspirators conspired to rein in and discipline

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  these new entrants until they assimilated into the conspiracy. This pressure on new market

2  entrants had the effect of both tempering price drops and preventing competition from creating a

3  market equilibrium that normally follows such drops.

4      118.    The conspiracy did not completely eliminate the effects of the crystal cycle in the

5  LCD industry. There were periods when Defendants' and co-conspirators' collusive practices

6  drove prices for LCD Panels so high that demand decreased to a point where Defendants and co-

7  conspirators lowered prices for short periods of time. However, Defendants' and co-conspirators'

8  efforts to stabilize prices were successful in moderating the effects of the crystal cycle, including

9  the impact on prices paid by direct and indirect purchasers. To the extent that prices for LCD

10  Panels fell, they fell from levels that were supra-competitive and had been set conspiratorially,

11  rather than from levels set by free and open competition. Additionally, prices did not fall as low

12  as they would have absent the conspiratorial conduct.

13              **7.    Dominant Products**

14      119.    Notwithstanding the various and varied applications for LCD Panels, Defendants

15  and co-conspirators had a consistent and uniform methodology to monitor, analyze, discipline,

16  and enforce their conspiracy. They can look at the predominant, or most popular, size panels and

17  the applications for those panels that represent the highest percentage of sales. They can look at

18  standardized statistics used in the industry, such as the amount of glass produced and revenues

19  per metric ton of glass. By using these and other industry analytics, Defendants and co-

20  conspirators could easily monitor, analyze, discipline, and enforce their conspiracy.

21      120.    For example, from the fourth quarter of 1999 through mid-2003, half or more of

22  the LCD monitor shipments were 15-inch monitors. From mid-2003 to early 2006, 17-inch

23  monitors were the predominant size. As for LCD televisions, from the fourth quarter of 1999

24  through the fourth quarter of 2000, shipments were predominantly of 10-inch to 14-inch models.

25  During 2001 and much of 2002, sales of 13-inch to 15-inch models dominated. And in 2004 and

26  2005, the majority of shipments were of 20-inch and 32-inch models.

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

C.    **Pre-Conspiracy Market**

121.    Until the mid-1990s, Japanese companies like Hitachi and Sharp were essentially the exclusive suppliers of LCD Panels.

122.    In early 1995, the industry faced declining LCD Panel prices, which industry analysts attributed to advances in technology and improving efficiencies.  One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry."  The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of LCD Panels, and they slowed the rate of their investments.  But this provided an opening to Korean manufacturers.

123.    In 1995, three Korean companies – including LG Electronics, Inc. and, to a lesser extent, Hyundai – entered the LCD market.  These Korean firms offered comparable products at reduced prices in an effort to quickly gain market share.  This resulted in increased industry competition in 1995, which contributed to the significant price declines seen during that timeframe.

124.    Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines.  By mid-1995, the Japanese companies and their new Korean competitors had a total capacity to supply 14 million LCD Panels, while demand for them was only about three million.  In addition to the surges in capacity during 1995, "[costs] were also dropping as production volume increased and manufacturing methods improved."

125.    By late 1995, the effect of the entry by Korean suppliers had pushed the price of some LCD Panels down by 50 percent from the previous year.  The origin of the LCD conspiracy may be traceable to this trough in prices.

D.    **Defendants' and Co-Conspirators' Illegal Agreements**

126.    Plaintiffs are informed and believe and allege that the LCD conspiracy was effectuated through a combination of group and bilateral discussions.  In the formative years, when the Japanese companies first entered into the conspiracy, bilateral discussions were the primary method of communication.  During this period of the conspiracy, Hitachi and Sharp met or talked to at least one other defendant or co-conspirator about the prices for LCD Panels, and

thereby created a model for how the conspiracy would be carried out after the Korean, and later the Taiwanese companies joined. These meetings among Hitachi and Sharp included the discussion of price as well as capacity utilization. During these discussions, Defendants and co-conspirators also shared proprietary and confidential information. As more manufacturers entered the conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral meetings was in place.

### 1. "Crystal Meetings"

127. Plaintiffs are informed and believe and allege that the group meetings among the participants in the LCD price-fixing conspiracy were referred to as "crystal meetings." Crystal meetings were attended by employees at three general levels of the Defendants' and co-conspirators' corporations. The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings. The second level were management-level meetings, referred to as "commercial" or "operation" meetings. The third level were meetings attended by lower-level sales and marketing personnel.

128. Plaintiffs are informed and believe and allege that in a typical crystal meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices. Meeting participants shared information relating to all of these topics so that Defendants and co-conspirators could agree on what price each would charge for LCD Panels to be sold in the following month. Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for LCD Panels. They also discussed prices of LCD Panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

129. Plaintiffs are informed and believe and allege that each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of LCD Panels has on the cost of the finished products into which they are placed. Defendants and co-conspirators knew that the conspiratorially high, supra-competitive prices of LCD Panels would be reflected in the prices for finished LCD Products, and thus, there was no need to specifically discuss the prices of finished LCD Products.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

130.    Plaintiffs are informed and believe and allege that the purpose of the CEO or top meetings was to stabilize or raise prices.  At the CEO meetings, the participants discussed prices and supply and demand.  The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions.  At each meeting, an individual was designated as the "chairman," and would put figures on supply and demand and price on a projector or a whiteboard for the group to review.  The attendees would discuss the figures, and take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price.

131.    Plaintiffs are informed and believe and allege that the commercial or operation meetings were attended by the Defendants' and co-conspirators' respective Vice Presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings was largely the same as the CEO meetings.  The participants discussed price, output, capacity, and general market conditions.  These meetings occurred approximately monthly and sometimes quarterly.

132.    Plaintiffs are informed and believe and allege that the agreements reached at these meetings included:  (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; and (6) encouraging other competitors to abide by the agreed-upon pricing.  The meeting participants also agreed to maintain or lower production capacity.

133.    Plaintiffs are informed and believe and allege that the lower level meetings were less formal than the CEO and commercial meetings, and typically occurred at restaurants over lunch.  The purpose of the lower level meetings was to exchange market information that would facilitate implementation of the conspiracy and carry out the agreements made at the CEO and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   commercial meetings.  Participants in the lower level meetings exchanged information relating to

2   past and future prices of LCD Panels and shipment quantities.

3       134.    Plaintiffs are informed and believe and allege that in the summer of 2006,

4   Defendants and co-conspirators discontinued the lower level meetings in favor of coordinated

5   one-on-one meetings.  The meetings were coordinated so that on the same date, two sets of

6   competitors met one-on-one.  After that meeting, each of them met one-on-one with another

7   competitor.  This continued until all competitors met with each other.  These coordinated

8   meetings took place until approximately November or December 2006.  Defendants' and co-

9   conspirators' specific intent was to conceal their meetings and for these coordinated one-on-one

10  meetings to accomplish the same purposes as the group meetings.

11                    **2.    Bilateral Discussions**

12      135.    Plaintiffs are informed and believe and allege that the crystal meetings were

13  supplemented by bilateral discussions between various Defendants and co-conspirators.  The

14  purpose of the bilateral discussions was to exchange information about past and future pricing, as

15  well as information about shipments.

16      136.    Plaintiffs are informed and believe and allege that Defendants and co-conspirators

17  had bilateral discussions with each other during price negotiations with customers to ensure no

18  Defendant or co-conspirator was persuaded by customers to cut prices.  These discussions,

19  usually between sales and marketing employees, took the form of in-person meetings, telephone

20  calls, e-mails, and instant messages, among other things.  The information gained in these

21  communications was then shared with supervisors and taken into account in determining the price

22  to be offered.

23      137.    Plaintiffs are informed and believe and allege that bilateral discussions were also

24  used to synchronize prices with manufacturers that did not ordinarily attend the group meetings.

25  For example, HannStar was given responsibility for notifying Hitachi of the pricing agreements

26  reached at the crystal meetings.  Hitachi implemented the agreed-upon pricing as conveyed by

27  HannStar.  In this way, Hitachi participated in the conspiracy to fix the prices of LCD Panels.

28

1
2

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

138.    The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan, California, and elsewhere in the United States.  As LCD Panel production in South Korea began to increase and become more sophisticated, the Japanese-based Defendants and co-conspirators expanded their meetings to include their South Korean-based competitors, including co-conspirators LG Display and Samsung, which also agreed to fix prices and control supply.  At least as early as 2001, the South Korean co-conspirators convinced Taiwan-based LCD Panel manufacturers, including co-conspirators AU Optronics, Chi Mei, Chunghwa and HannStar, to join the conspiracy to fix prices and control supply.

139.    Defendants and co-conspirators fostered a price fixing culture within their companies whereby employees at every level – from the very top executive all the way to lower-level sales representatives – engaged in frequent and continuous communications with the employees at every level of their competitors.  Senior executives at Defendants and co-conspirators made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their employment.  The lower-level employees funneled the competitive information up to their superiors who utilized that information – along with the pricing information they, themselves, were able to collected through their own illegal competitor contacts – to set prices for LCD Panels at artificially-inflated levels.  The constant communications between Defendants and co-conspirators at all levels allowed Defendants to conspire to set average prices across the entire industry, as well as conspiring to fix the prices of the particular LCD Panels incorporated into the LCD Products purchased by Plaintiffs.

140.    This culture permeated Defendants' and co-conspirators' U.S. operations and sales.  In fact, the top sales executive at Defendants' and co-conspirators' Asian headquarters instructed their direct reports in the United States to obtain competitive information from their counterparts at other LCD Panel suppliers in the United States.  That information was ultimately

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

used by those top sales executives to set artificially-inflated prices for LCD Panels charged to U.S. customers.

141.    H.S. Kim, the top sales executive in Korea for Samsung during the Relevant Time Period, instructed his reports in the United States, including those in California, to obtain pricing information from competitors in the United States.  That information was ultimately used by Mr. Kim and others at Samsung to set artificially-inflated prices for LCD Panels charged to Samsung's U.S. customers.  Similarly, James Yang of Chi Mei testified that he followed the instructions of his supervisors to attend multi-lateral meetings with competitors and gather competitive information.

142.    Bilateral and multilateral discussions in the United States began at least as early as 1997.  For example, Brian Graham of Sharp communicated with representatives of Samsung regarding Sharp's STN-LCD prices for NEC as early as 1997.  By 1998, Mr. Graham was quoting both TFT-LCD Panel Prices and STN-LCD Panel prices to Dell, and receiving price quotes from a single sales team at Sharp in Japan.  Members of this sales team communicated with Sharp's competitors and obtained information about competitors' prices that was shared with Mr. Graham for purposes of fixing prices to Dell.

143.    Thereafter, Brian Graham of Sharp and Michael Hanson of Samsung met in the United States and agreed to fix the prices for LCD Panels sold to various U.S.-based OEMs at that time.  In following years, both Messrs. Hanson and Graham also met and agreed to fix prices for LCD Panels with their U.S. counterparts at Defendant Toshiba and co-conspirator LG Display and AU Optronics, and at other LCD Panel suppliers.  They met at restaurants and bars in the United States and frequently communicated by telephone at their offices in the United States. Mr. Hanson alone had over 500 telephone calls with his counterparts at competitor LCD Panel suppliers.  The competitive information these individuals obtained from their counterparts was passed along to their superiors – including executives in Asia – for use in setting the LCD Panel prices charged to Defendants' and co-conspirators' U.S. and other customers.  These communications, which took place in part within California, were meant to advance the conspiracy's presence in and control over the U.S. market for LCD Panels and LCD Products.

144. Defendant Toshiba participated in multiple bilateral discussions with other defendants and co-conspirators, during which Toshiba reached agreements and understandings with defendants and co-conspirators on prices. Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more of the defendants that attended the Crystal Meetings. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.

145. During the Relevant Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers which allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations. In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations. In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other defendant and co-conspirator joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

146. Defendant Philips participated in multiple bilateral discussions with other defendants and co-conspirators, during which Philips reached agreements and understandings with defendants and co-conspirators on prices. Philips engaged in illegal bilateral communications with Epson during the Relevant Period. For example, Philips communicated with Katsuyuki Furujo of Epson in 1999 regarding its production capacity. And on June 19, 2001, Philips communicated with Mr. Furujo of Epson to exchange information on price quotes for sales of LCD Panels. Philips talked again with Mr. Furujo of Epson in 2002 to discuss the supply

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

volumes for Philips, Epson, Samsung SDI, and Sharp, as well as fourth quarter 2002 price quotes for ongoing projects.

147.    Philips and Epson continued their illicit meetings and communications until at least 2005. In May 2003, Paul Lewis of Philips met with Katsuyuki Furujo of Epson in Frankfurt, Germany, and they discussed prices for LCD Panels. They agreed Philips and Epson would maintain second quarter prices into the third quarter. Then on February 28, 2005, Philips and Epson met to exchange pricing and supply information in Shanghai. They discussed Epson and Philips supply quantities and prices for TFT and CSTN products. Mr. Furujo of Epson encouraged Philips to "keep current conditions, as it will give SEID room for negotiating a better condition for itself."

148.    Defendant Philips engaged in bilateral communications with Sharp as well. For instance, documents produced by defendants and co-conspirators revealed that Philips spoke with John Franz of Sharp USA in September 2002 about Philips' bids on LCD Panels for sale to Hewlett Packard.

149.    Defendant Philips and Defendant Toshiba also engaged in illegal bilateral communications with each other. Yuichi Sato of Philips and Makoto Chiba of Toshiba would regularly communicate regarding sales prices and volumes for LCD Panels for mobile phones. In one email where Mr. Sato shared information concerning LCD panel sales, Mr. Sato wrote, "Please do NOT tell anybody in your company and or MDS that you got this information via me." And in 2006, Mr. Chiba sent an email to Mr. Sato of Philips with pricing information for LCD Panels for Epson and Hitachi. Later in 2006, Mr. Chiba sent another email to Mr. Sato of Philips regarding an upcoming price reduction for LCD Panels for Apple.

150.    For OEMs in the United States, Defendants' and co-conspirators' U.S. affiliates led the LCD Panel price negotiations with those OEMs.  Pricing directions came from Asia, where Defendants and co-conspirators were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the Defendants' and co-conspirators' conspiracy meetings and conspiracy communications took place in the United States, involved the U.S. affiliates of the Defendants and co-conspirators, and directly targeted U.S. import commerce and

U.S. OEMs.  Defendants' and co-conspirators' conspiratorial conduct also included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, Defendants' and co-conspirators' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products.  Defendants' and co-conspirators' conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

151.    Plaintiffs are informed and believe and allege that co-conspirator AU Optronics participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Additionally, Quanta Display Inc., Acer Display Technology, Inc. and Unipac Electronics, which merged with AU Optronics, participated in lower level meetings.  By assuming the rights and obligations of these co-conspirators, AU Optronics is jointly liable for their anti-competitive conduct.  Through these discussions, AU Optronics agreed on prices and output levels for LCD Panels.

152.    Plaintiffs are informed and believe and allege that co-conspirator Chi Mei participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chi Mei agreed on prices and output levels for LCD Panels.

153.    Plaintiffs are informed and believe and allege that co-conspirator Chunghwa participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, Chunghwa agreed on prices and output levels for LCD Panels.

154.    Plaintiffs are informed and believe and allege that co-conspirator HannStar participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, HannStar agreed on prices and output levels for LCD Panels.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

155.     Plaintiffs are informed and believe and allege that co-conspirator Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and output levels for LCD Panels.

156.     Plaintiffs are informed and believe and allege that co-conspirator LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions, LG Display agreed on prices and output levels for LCD Panels.

157.     Plaintiffs are informed and believe and allege that co-conspirator Sharp participated in multiple group and bilateral meetings during the Relevant Period, and agreed on prices and output levels for LCD Panels.

158.     Plaintiffs are informed and believe and allege that co-conspirator Hydis participated in multiple lower level meetings between at least 2002 and 2005.  In addition, Hydis had a bilateral meeting with a Taiwanese co-conspirator at least as recently as 2005.  Through these discussions, Hydis agreed on prices and output levels for LCD Panels.

159.     Plaintiffs are informed and believe and allege that co-conspirator Mitsubishi participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, and Unipac Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and output levels for LCD Panels.

160.     Plaintiffs are informed and believe and allege that co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese co-conspirator in 2001.  Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan agreed on prices and output levels for LCD Panels.

161.     Plaintiffs are informed and believe and allege that co-conspirator NEC participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD Panels.

162.     Plaintiffs are informed and believe and allege that co-conspirator FDTC participated in meetings and discussions during the Relevant Time Period with various co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  conspirators including AU Optronics, Chi Mei, LGD and Sharp, which included discussions

2  about prices for LCD Panels.

3       163.    Co-conspirator Epson America is a wholly-owned and controlled subsidiary of co-

4  conspirator Epson Japan and, as alleged above, Plaintiffs are informed and believe and allege that

5  Epson Japan was represented by co-conspirator Mitsui at one of the bilateral meetings described

6  above.  Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America.

7  Epson Japan and Epson America, through their agent, were parties to the agreements made at

8  those meetings and acted as co-conspirators.  To the extent Epson America distributed LCD

9  Products to direct and indirect purchasers, it played a significant role in the conspiracy because

10  Defendants and co-conspirators wished to ensure that the prices for such products paid by direct

11  and indirect purchasers did not undercut the pricing agreements reached at these various

12  meetings.  Epson America was an active, knowing participant in the alleged conspiracy.

13       164.    Plaintiffs are informed and believe and allege that co-conspirator IPS Alpha is a

14  joint venture including Hitachi Displays, Ltd. and Panasonic, and one or more of the partners in

15  this joint venture participated in the meetings described above.  As a result, IPS Alpha was

16  represented at those meetings and was a party to the agreements entered into by its joint venture

17  partners at them.  As explained above, the agreements at these meetings included agreements on

18  price ranges and output restrictions.  The joint venture partners had substantial control over IPS

19  Alpha's production levels and the prices of LCD Panels the joint ventures sold both to the joint

20  venture partners and other non-affiliated companies.  Thus, IPS Alpha and Panasonic were active,

21  knowing participants in the alleged conspiracy.

22       165.    When Plaintiffs refer to a corporate family or companies by a single name in its

23  allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are informed

24  and believe and are alleging that one or more employees or agents of entities within the corporate

25  family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the

26  individual participants in the conspiratorial meetings and discussions did not always know the

27  corporate affiliation of their counterparts, nor did they distinguish between the entities within a

28  corporate family.  Plaintiffs are informed and believe and allege that the individual participants

1   entered into agreements on behalf of, and reported these meetings and discussions to, their

2   respective corporate families.  As a result, the entire corporate family was represented in meetings

3   and discussions by their agents and were parties to the agreements reached in them.  Furthermore,

4   to the extent that subsidiaries within the corporate families distributed LCD Products to direct and

5   indirect purchasers, these subsidiaries played a significant role in the conspiracy because

6   Defendants and co-conspirators wished to ensure that the prices for such products paid by direct

7   and indirect purchasers would not undercut the pricing agreements reached at these various

8   meetings.  Thus, all entities within the corporate families were active, knowing participants in the

9   alleged conspiracy.

**4.      Defendants and Co-Conspirators' Participation in California**

11          166.     Many Defendants and co-conspirators conducted operations in California

12  throughout the Relevant Time Period, including Defendant Toshiba, and co-conspirators LG,

13  Epson, AU Optronics, Chi Mei, Chunghwa, Tatung, NexGen Mediatech, and Samsung.  Through

14  their California operations, Defendants and co-conspirators implemented their price-fixing

15  conspiracy in the United States.  In fact, co-conspirators LG Display Co. Ltd., LG Display

16  America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Japan specifically

17  admitted during their plea hearings that acts in furtherance of the conspiracy were carried out

18  within California.  Defendants' and co-conspirators' employees based in California engaged in

19  bilateral and multilateral communications in furtherance of the conspiracy.

20          167.     Defendants and co-conspirators also used their California operations to implement

21  their price-fixing agreements in the United States.  Through their activities in California,

22  Defendants and co-conspirators successfully increased the price of LCD Panels.

23          168.     For example, co-conspirator Samsung maintained offices in San Jose, California.

24  Jason Yun, Samsung's senior vice president of its Mobile Display Business Team, managed

25  Samsung's sales of LCD Panels for mobile wireless handset displays and other small panel

26  applications in the United States.  Mr. Yun was responsible for managing Samsung's customer

27  relationship with manufacturers of mobile wireless handsets.  Mr. Yun negotiated prices for LCD

28  Panels in the United States with these mobile wireless handset manufacturers in the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

169.    From Samsung's offices in San Jose, California, Mr. Yun actively participated in Defendants' conspiracy to fix prices of LCD Panels sold to mobile wireless handset manufacturers in the United States.  Mr. Yun obtained information regarding other Defendants' and co-conspirators prices for LCD Panels used in mobile wireless handsets from Samsung's competitors, including Sharp, Toshiba and Epson.  Mr. Yun provided this information to Samsung's U.S. sales teams in the course of briefing this team on Samsung's strategy for price negotiations with U.S. OEMs.  Mr. Yun also provided this information to his counterparts in Korea, Japan, and Taiwan where it was used in the course of determining Samsung's prices for LCD Panels sold to mobile wireless handset manufacturers in the United States.

170.    Mr. Yun also received information from his counterparts in Korea, Japan, and Taiwan who engaged in bilateral and multilateral communications with other Defendants and co-conspirators, including Sharp, Toshiba, and Epson.  The information Mr. Yun received in San Jose, California was then used to implement Defendants' and co-conspirators' price fixing agreement in the course of price negotiations with mobile wireless handset manufacturers in the United States.

171.    Specifically, Mr. Yun received information from Seshu Arai of Samsung, who was based in Japan, regarding Sharp and Toshiba's future prices for and planned supply of LCD Panels sold to manufacturers of mobile wireless handsets in the United States.  Mr. Arai obtained information regarding Sharp's prices for and supply of LCD Panels through frequent meetings with representatives of Sharp, at which information was exchanged and agreements reached regarding pricing and supply for LCD panels sold to mobile wireless handset manufacturers.  Mr. Arai obtained information regarding Toshiba's prices for and supply of LCD Panels for mobile wireless handset manufacturers through frequent meetings with representatives of Toshiba, at which information was exchanged and agreements reached regarding pricing and supply for LCD panels sold to mobile wireless handset manufacturers.  Following these meetings, Mr. Arai provided the information obtained from Sharp and Toshiba to Mr. Yun in California for Mr. Yun to use in price negotiations with mobile wireless handset manufacturers in the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    172.    Other co-conspirators also engaged in conduct in furtherance of the conspiracy in

2    California to fix the price of small LCD Panels used in mobile wireless handsets and other

3    portable devices.  Co-conspirator LG Display America, Inc. maintained its offices in San Jose,

4    California.  LG Display America, Inc. has admitted that it participated in the conspiracy to fix

5    prices of LCD Panels.  LG Display employees responsible for LG Display's negotiations with and

6    sales to mobile wireless handset manufacturers were located in the San Jose, California office.

7    173.    Defendant Toshiba maintained offices in San Jose, California.  Toshiba personnel

8    in its San Jose, California offices were involved in and implemented Defendants' conspiracy in

9    the United States.  Cameron Zand, one of Toshiba's employees in San Jose, California, received

10   information in Toshiba's California office from his counterparts in Japan regarding the prices

11   Sharp, Epson and other Defendants and co-conspirators planned to quote to customers for certain

12   small panel applications.  At other times, Mr. Zand received information regarding other

13   Defendants' and co-conspirators' planned supply of small LCD Panels.  Information provided to

14   Mr. Zand in San Jose, California was obtained by Toshiba through bilateral discussions with

15   other Defendants and co-conspirators, including Sharp and Epson.  In addition, Mr. Zand was in

16   regular contact with Makoto Chiba and Masotoshi Tanaka and received guidance from Mr. Chiba

17   and Mr. Tanaka regarding upcoming price negotiations with U.S. customers.  Mr. Chiba and Mr.

18   Tanaka both had frequent discussions with H.B. Suh of Samsung, in which they discussed and

19   reached agreements regarding LCD Panel pricing, including the prices of small LCD panels for

20   portable electronic devices.

21   174.    Co-conspirator Sharp also maintained offices in San Jose, California.  Sharp

22   personnel in its San Jose, California were involved in and implemented Defendants' and co-

23   conspirators' conspiracy in the United States.  Jon Horne, a Sharp employee based in Sharp's San

24   Jose, California office, was given information regarding the LCD Panel prices that Toshiba,

25   Epson, and other Defendants and co-conspirators planned to quote customers for certain small

26   panel applications.  Mr. Horne received information that was obtained by Kazuyoshi Nakayama

27   of Sharp, who participated in frequent and regular meetings and discussions with other

28   Defendants and co-conspirators to fix prices for a variety of customers.  Mr. Horne was provided

1    with information Mr. Nakayama obtained from Sharp's competitors, including Toshiba and

2    Epson, for use in upcoming price negotiations in the United States.  Mr. Horne was further

3    instructed by Sharp personnel to destroy emails on his computer in San Jose, California

4    describing Mr. Nakayama's meetings with Sharp's competitors and pricing information obtained

5    by Mr. Nakayama at those meetings.

6         175.    Co-conspirator Epson maintained offices in San Jose, California.  Epson personnel

7    in its San Jose, California office were involved in and implemented Defendants' and co-

8    conspirators' conspiracy in the United States.  Diane Stabile, an Epson employee based in

9    Epson's San Jose, California office was provided information regarding the prices Sharp and

10   Toshiba were planning to quote a U.S. OEM for a small panel application in upcoming

11   negotiations, as well as Sharp and Toshiba's future small panel supply.  Ms. Stabile was provided

12   with this information for use in upcoming price negotiations with that U.S. OEM in the United

13   States.  The information regarding Sharp and Toshiba's price quotes was obtained through

14   bilateral meetings and communications between Epson employees and representatives of Sharp

15   and Toshiba.

16        **E.    Conspiracy's Effect on Earlier LCD Technologies**

17        176.    During the Relevant Period, LCD Panels used in certain applications, including

18   notebook computers and mobile wireless handsets, included both TFT-LCD Panels and STN-

19   LCD Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.  Certain

20   co-conspirators and Defendants (including Samsung, Sharp, and Epson), their corporate affiliates,

21   and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels.

22   The same individuals at the Defendants and co-conspirators who were engaged in bilateral

23   communications and group meetings regarding TFT-LCD Panel prices also had pricing

24   responsibilities for STN-LCD Panels.

25        **1.    Defendants' and Co-Conspirators' Bilateral Communications**

26             **Regarding STN-LCD Panels**

27        177.    Defendants and their co-conspirators' conspiracy included agreements to raise fix,

28   raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Specifically, Defendants and co-conspirators engaged in bilateral discussions in which they

2    exchanged information about STN-LCD Panel pricing, shipments, and production.  These

3    discussions usually took place between sales and marketing employees in the form of telephone

4    calls, emails, and instant messages.  The information gained in these communications was then

5    shared with supervisors and taken into account in determining the price to be offered Defendants'

6    and co-conspirators' customers for STN-LCD Panels.

7        178.    For example, Samsung's H.B. Suh admitted that in the course of bilateral

8    discussions with Samsung's co-conspirators, including Sharp, Toshiba, Epson and others, Mr.

9    Suh discussed pricing for STN-LCD Panels.  Mr. Suh engaged in these bilateral discussions

10   regarding STN-LCD Panels as part of his broader effort to extend and implement in Japan the

11   agreements reached at the Crystal Meetings.  Mr. Suh's goal in these bilateral discussions was to

12   reach understandings with these companies regarding prices for TFT-LCD Panels and STN-LCD

13   Panels used in mobile wireless handsets.

14       179.    Specifically, Mr. Suh was asked:

15       Q.    When you spoke with competitors about pricing of mobile display panels,

16             did those discussions include, from time to time, TFD, TFT, and color

17             STN?

18       A.    Sometimes, yes.  Dep. of H.B. Suh at 286:15-286:21 (emphasis added).

19       180.    Defendants and co-conspirators began communicating regarding STN-LCD Panel

20   prices as early as 1997, when STN-LCD Panels were more common in applications such as

21   notebook computers.  Sharp's Brian Graham, participated in bilateral discussions with Defendant

22   Toshiba and co-conspirators Samsung and LG at which he exchanged pricing information prior to

23   quoting prices to Dell, also communicated with representatives of Samsung regarding Sharp's

24   STN-LCD Panel prices for NEC as early as 1997.

25       181.    By 1998, Mr. Graham was quoting both TFT-LCD Panel prices and STN-LCD

26   Panel prices to Dell, and received price quotes for both technologies from a single sales team at

27   Sharp in Japan.  Members of this sales team communicated with Sharp's competitors and

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

obtained information about competitors' prices that was shared with Mr. Graham for purposes of fixing prices for Dell.

182.     By 2001, Sharp employees were engaging in bilateral discussions with competitors to share price information for both TFT-LCD Panels and STN-LCD Panels used for mobile wireless handset applications.  For example, a March 29, 2001 email from Sharp's Masa Fukada to Ming Shi of Sharp shows Mr. Fukada communicating future "competitor price" data for both STN-LCD Panels and TFT-LCD Panels from Epson, Hitachi, Matsushita, NEC and others.

183.     Other Defendants and co-conspirators initiated similar discussions regarding the prices of STN-LCD Panels in furtherance of the conspiracy.  In November 2004, Epson's Masanobu Matsumura met with representatives of Toshiba to discuss Toshiba's price quotes for Motorola, including Toshiba's prices for CSTN-LCD Panels sold to Motorola for the Razr phone. Mr. Matsumura stated at this meeting that Epson did not want to start a price war and planned to keep prices higher than what Toshiba planned to submit.

184.     Epson employees responsible for selling CSTN-LCD Panels to Motorola also engaged in bilateral discussions with "top management" employees at Sharp.

185.     In 2006, Toshiba employees met with representatives of Sharp and discussed Sharp's plans to sell CSTN-LCD Panels to Nokia.

186.     In some instances, Defendants and co-conspirators quoted mobile wireless handset vendors a single price for a LCD module that included both a TFT-LCD Panel and an STN-LCD Panel.  For example, Defendants and co-conspirators quoted Motorola a single price for LCD modules used in the Razr phone, which modules included both a TFT-LCD Panel and a CSTN-LCD Panel.  Co-conspirators Sharp and Epson have admitted fixing prices for TFT-LCD panels sold to Motorola for the Razr phone.  Because Sharp and Epson quoted prices to Motorola for the entire Razr module, their admitted agreements to fix prices for Motorola included an agreement to fix the price of the CSTN-LCD Panels included in the Razr module.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

187.    In other instances, Defendants and co-conspirators quoted some mobile wireless handset vendors a single price for a LCD module that included both a TFT-LCD Panel and a MSTN-LCD Panel.  For example, in 2003, SonyEricsson manufactured a phone that contained a TFT-LCD Panel in the primary display and a MSTN-LCD Panel in the subdisplay, and sought a single price quotation for both the TFT-LCD Panel and the MSTN-LCD Panel from Defendants and co-conspirators.  Thus, Defendants' and co-conspirators' agreement to fix the price of TFT-LCD Panels included an agreement to fix the price of MSTN-LCD Panels sold in the combined TFT-LCD Panel/MSTN-LCD Panel modules sold for mobile wireless handset applications.

188.    In addition Defendant Toshiba and co-conspirator Samsung also engaged in communications with each other and with Epson and Sharp at which agreements were reached regarding the price of LCD modules sold to Motorola for the Razr phone, which included agreements to fix the price of the CSTN-LCD Panels included in those modules.

189.    Defendants' and co-conspirators' bilateral discussions extended to other mobile wireless handset manufacturers that requested a single price for LCD modules that included both a TFT-LCD Panel and a STN-LCD Panel.  For example, SonyEricsson requested a single price for a module that included both a TFT-LCD Panel and an STN-LCD Panel.  Epson employees were asked by management to obtain pricing information for these combined modules from other Defendants and co-conspirators for use in setting Epson's prices to SonyEricsson.

190.    Thus, because a number of mobile wireless handsets, including the Motorola Razr phone, included both TFT-LCD Panels and STN-LCD Panels, and because mobile wireless handset manufacturers often requested a single price for LCD modules that included both types of panels, Defendants' bilateral discussions and agreements with respect to TFT-LCD panel prices inevitably included and/or affected the prices of STN-LCD panels in those modules.

### 2.    The Structure of the LCD Panel Market Facilitated the Inflation of Prices of STN-LCD Panels As Well As TFT-LCD Panels

191.    At certain points during the Relevant Time Period, for certain applications in LCD Panel Products, TFT-LCD Panels and STN-LCD Panels were close substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

in significant quantities for similar uses – i.e., display purposes – in mobile wireless handsets and other LCD Products that included small displays.  At other times during the Relevant Period, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for use in notebook computers.

192.    At certain points during the Relevant Period, for certain applications in LCD Panel Products, TFT-LCD Panels, CSTN-LCD Panels, and MSTN-LCD Panels were substitutes for each other.  At these points during the Relevant Period, all three panels were purchased for display applications in mobile wireless handsets and other LCD Products that included small displays.

193.    During the Relevant Period, purchasers of LCD Panels often switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels.  For example, in 2006, Motorola informed Toshiba that it was switching from a TFT-LCD panel to a CSTN-LCD Panel because the price of TFT-LCD panels was too high.  Toshiba employees noted that other mobile wireless handset vendors had behaved similarly with respect to certain handset programs.  Because handset manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, Defendants and co-conspirators knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of STN-LCD panels as well.  In fact, Defendants and co-conspirators often monitored the price delta between TFT-LCD Panels and STN-LCD Panels and discussed maintaining a constant price delta between TFT-LCD Panels and STN-LCD panels.

194.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely, as seen in the chart below:



195.    Defendants and co-conspirators understood that they could profitably raise prices of STN-LCD Panels in response to increases in TFT-LCD Panel prices.  For example, in a 1999 internal Sharp email, Sharp's Takeuchi Tomohito justified an increase in STN-LCD panels sold to Apple because "LCD market price is going up as seen in TFT price" and "[Sharp] would like to improve the profit."

196.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels, were substitutes in certain LCD Products at certain points during the Relevant Period, and because Defendants and co-conspirators collectively controlled a significant share of the market for LCD panels, both globally and in the United States, Defendants had the incentive and ability to inflate the prices STN-LCD Panels as well as TFT-LCD Panels. The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and vice versa.

**F.    International Government Antitrust Investigations**

197.    Defendants' and co-conspirators' conspiracy to artificially restrict the output of, and to raise the prices for, LCD Panels sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the United States Department of Justice ("DOJ" or "Antitrust Division") and others in late 2006.

198.    In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

competitive activity among LCD manufacturers.  In a December 11, 2006 filing with the

Securities and Exchange Commission, co-conspirator LG Display disclosed that officials from the

Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the

company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose

office.

199.    On December 12, 2006, news reports indicated that in addition to LG Display,

LCD makers Sharp, Epson, and AU Optronics were also under investigation.  The JFTC stated

that the probe was related to price-fixing.  On that same date, the European Commission

confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-

fixing among manufacturers of LCD Panels.

### G.    United States Department of Justice Indictments and Charges

200.    Beginning in late 2008, the DOJ began to announce a series of charges against and

indictments of some of the co-conspirators related to their involvement in a conspiracy to fix

prices of LCD Panels sold in the United States and elsewhere.

201.    As of the date of the filing of this Amended Complaint, the DOJ had assessed

more than $890 million in fines and indicted at least 10 co-conspirators and 22 executives,

resulting in numerous guilty pleas.

### 1.    November 12, 2008 DOJ Announcement:  LG, Sharp, and Chunghwa Plead Guilty to Global TFT-LCD Price-Fixing Conspiracy

202.    On November 12, 2008, the DOJ announced that it had reached agreements with

three TFT-LCD manufacturers – LG Display Co. Ltd. (and its U.S. subsidiary, LG Display

America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty and pay a

total of $585 million in criminal fines for their roles in the conspiracy to fix prices of LCD Panels.

### a.    Co-Conspirator LG Display

203.    On December 15, 2008, LG Display Co. Ltd and LG Display America Inc. pleaded

guilty to "participating in a conspiracy to suppress and eliminate competition by fixing the prices

of TFT-LCD sold in the United States and elsewhere, from on or about September 21, 2001, to on

or about June 1, 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" and agreed to pay

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  a criminal fine of $400 million, at the time the second-highest criminal fine ever imposed by

2  Antitrust Division of the U.S. Department of Justice.

3      204.    The DOJ had charged LG Display Co., Ltd. and LG Display America Inc. with

4  carrying out the conspiracy by:

   a.    participating in meetings, conversations, and communications in Taiwan, Korea

5  

6         and the United States to discuss the prices of LCD Panels;

7      b.    agreeing during those meetings, conversations and communications to charge

8         prices for LCD Panels at certain pre-determined levels;

9      c.    issuing price quotations in accordance with the agreements reached; and

10     d.    exchanging information on sales of LCD Panels, for the purpose of monitoring and

11        enforcing adherence to the agreed-upon prices monitoring and enforcing adherence

12        to the agreed-upon prices.

13     205.    In its plea agreement, LG Display admitted that "through its officers and

14  employees, including high-level personnel of the defendant, [it] participated in a conspiracy

15  among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-

16  LCD sold in the United States and elsewhere."

17     206.    LG Display further admitted that "through its officers and employees, [it] engaged

18  in discussions and attended meetings, including group meetings commonly referred to by the

19  participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

20     207.    LG Display admitted that it was "[d]uring these discussions and meetings, [that]

21  agreements were reached to fix the price of TFT-LCD to be sold in the United States and

22  elsewhere."

23     208.    During the plea hearing, The Honorable Susan Illston, of the United States District

24  Court for the Northern District of California, asked Mr. J.T. Hong, authorized by the LG Display

25  board to accept the plea agreement, if the facts contained in the plea agreement were true.  Mr.

26  Hong stated, "Yes, true."

27     209.    The United States did not seek restitution in light of the civil cases filed against

28  LG Display in the United States District Court for the Northern District of California.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

210.   The United States agreed not to bring further criminal charges against LG Display or its current or former officers, directors, and employees (except those excluded from the plea agreement) because LG Display and its executives agreed "to cooperate fully in the ongoing TFT-LCD investigation."

### b.   Co-Conspirator Sharp Corporation

211.   On December 16, 2008, Sharp Corporation pleaded guilty and agreed to pay a $120 million fine for its participation in conspiracies to fix the price of LCD Panels sold to Dell, Inc. from April 2001 to December 2006 for use in computer monitors and laptops; to Motorola, Inc. from Autumn 2005 to the middle of 2006 for use in RAZR mobile phones; and to Apple Computer, Inc. from September 2005 to December 2006 for use in iPod portable music players.

212.   The DOJ had charged Sharp Corporation with carrying out the conspiracy by:

a.   participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of LCD Panels to be sold to Dell, Apple, and Motorola;

b.   agreeing during those bilateral meetings, conversations and communications to charge prices of LCD Panels at certain pre-determined levels to Dell, Apple, and Motorola;

c.   issuing price quotations in accordance with the agreements reached; and

d.   exchanging information on sales of LCD Panels to be sold to Dell, Apple, and Motorola for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

213.   In its plea agreement, Sharp admitted that "through its officers and employees, including high-level personnel of the defendant, [it] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold" to Dell, Apple, and Motorola.

214.   Sharp further admitted that "through its officers and employees, [it] engaged in bilateral telephone discussions and attended bilateral meetings with representatives of other major TFT-LCD producers."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

215.    Sharp admitted that it was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of TFT-LCD sold to" Dell, Apple, and Motorola.

216.    During the plea hearing, United States District Judge Illston asked Mr. Kazutoshi Goto, corporate representative for the plea agreement, if the facts contained in the plea agreement were true.  Mr. Kazutoshi Goto stated, "Yes, it is."

217.    Plaintiffs are informed and believe and allege Sharp could not have successfully fixed the prices of the LCD Panels it sold to Dell and Apple unless its biggest competitors had agreed not to undercut it.

**c.    Co-Conspirator Chunghwa Picture Tubes, Ltd.**

218.    On January 14, 2009, Chunghwa Picture Tubes, Ltd. pleaded guilty to "participating in a conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCD sold in the United States and elsewhere, from on or about September 14, 2001, to on or about December 1, 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" and agreed to pay a criminal fine of $65 million.

219.    The DOJ had charged Chunghwa Picture Tubes, Ltd. with carrying out the conspiracy by:

a.    participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

b.    agreeing, during those meetings, conversations, and communications, to charge prices for LCD Panels at certain pre-determined levels;

c.    issuing price quotations in accordance with the agreements reached; and

d.    exchanging information on sales of LCD Panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

220.    In its plea agreement, Chunghwa admitted that "through its officers and employees, including high-level personnel of the defendant, [it] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold in the United States and elsewhere."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

221.     Chunghwa further admitted that "through its officers and employees, [it] engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

222.     Chunghwa admitted that it was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere."

223.     As a result of its guilty plea, the United States and Chunghwa agreed that the "appropriate sentence in this case is a fine of $65 million."

224.     The United States did not seek restitution in light of the civil cases filed against Chunghwa in the United States District Court for the Northern District of California.

225.     The United States agreed not to bring further criminal charges against Chunghwa or its current or former officers, directors, and employees (except those excluded from the plea agreement) because Chunghwa and its executives agreed "to cooperate fully in the ongoing TFT-LCD investigation."

**2.     January 15, 2009 DOJ Announcement:  Three Chunghwa Executives and One LG Display Executive Plead Guilty to Price-Fixing Conspiracy**

226.     On January 15, 2009, DOJ charged Chang Suk "C.S." Chung, a Korean LG Display executive, with conspiring with "unnamed employees from other panel makers to suppress and eliminate competition by fixing the prices of LCD Panels from on or about Sept. 21, 2001 to on or about June 1, 2006.  Similarly, DOJ charged Chieng-Hon "Frank" Lin, the Taiwanese former Chunghwa Chairman and Chief Executive Officer, Chih-Chun "C.C." a Taiwanese former Chunghwa Vice President of LCD Sales—and Hsueh-Lung "Brian" Lee, a Taiwanese current Chunghwa executive and former Vice President of LCD Sales, with participating in the same conspiracy at various times during the period from September 14, 2001 to on or about December 1, 2006.

227.     The DOJ charged the executives with carrying out the conspiracy by:

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    a.    participating in meetings, conversations, and communications in Taiwan, Korea,

2          and the United States to discuss the prices of TFT-LCD;

3    b.    agreeing, during those meetings, conversations, and communications, to charge

4          prices of TFT-LCD at certain predetermined levels;

5    c.    issuing price quotations in accordance with the agreements reached;

6    d.    exchanging information on sales of TFT-LCD, for the purpose of monitoring and

7          enforcing adherence to the agreed-upon prices; and

8    e.    authorizing, ordering, and consenting to the participation of subordinate employees

9          in the conspiracy.

10   228.   Chang Suk Chung, LG Display's former Vice President of Monitor Sales, pleaded

11   guilty and agreed to serve a seven-month prison sentence in the United States and pay a $25,000

12   criminal fine.

13   229.   During Mr. Chung's plea hearing on February 17, 2009, Judge Illston asked him

14   what he did that made him guilty of the crime.  He stated the following:

15          While I was in that position [VP of monitor panel sales LG Display], I
            met and had phone calls with the representative of competitors.  And in
16          the course of those activities or meetings, I reached an agreement or
            understanding with the competitors to raise or stabilize or maintain
17          price on those panels.  That's what I have done.

18   230.   Chieng-Hon Lin, Chunghwa's former Chairman and CEO, pleaded guilty and

19   agreed to serve a nine-month prison sentence in the United States and pay a $50,000 criminal

20   fine.

21   231.   During Mr. Lin's plea hearing on February 20, 2009, Judge Illston asked him what

22   he did that made him guilty of the crime.  He stated the following:

23          Shortly after I became Chunghwa picture tubes, the chairman and CEO,
            at that time I start -- I learned that the vice president for sales and
24          marketing and other Chunghwa executives were meeting with the
            representative with our competitors and exchanging price information
25          and agreed on the target prices of TFT-LCD to be charged our
            customers.

26          And then, when I was -- those meetings, some of those meetings were
            referred to as "crystal meetings."  In these meetings in conversations I
27          continued while I was the chairman and the CEO with my knowledge
            and consent, and I occasionally received reports of the meetings and the
28          prices that have been agreed with our competitors.

232.     Chih-Chun Liu, Chunghwa's former Vice President of LCD Sales, pleaded guilty and agreed to serve a seventh-month prison sentence in the United States and pay a $30,000 criminal fine.

233.     Hsueh-Lung Lee, holding various positions at Chunghwa, including Vice President of LCD Sales, pleaded guilty and agreed to serve a six-month prison sentence in the United States and pay a $20,000 criminal fine.

**3.     February 3, 2009 DOJ Announcement:  Three Different Executives at Chunghwa and LG Display Indicted In Price-Fixing Conspiracy**

234.     On February 3, 2009, a federal grand jury in San Francisco returned an indictment against two former Chunghwa executives, Cheng Yuan Lin, "C.Y." Lin, a Taiwanese former Chunghwa Chairman and Chief Executive Officer, Wen Jun  "Tony" Cheng, a Taiwanese former Assistant Vice President of Sales and Marketing for Chunghwa as well as former LG Display executive, Duk Mo Koo, a Korean former Executive Vice President and Chief Sales Officer for LG Display, "for their participation in a global conspiracy to fix prices of [TFT-LCD] panels."

235.     Lin was charged with participating in the conspiracy from Sept. 14, 2001 until April 7, 2003 as Chunghwa's Chairman and CEO.

236.     Cheng was charged with participating in the conspiracy from October 5, 2001 to September 24, 2004 as Chunghwa's Vice President of Sales and Marketing.

237.     Koo was charged with participating in the conspiracy from December 11, 2001 to December 1, 2005 as LG Display's Executive Vice President and Chief Sales Officer.

238.     The Indictment stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the Defendants, their corporate employers, and other coconspirators did those things that they combined and conspired to do, including, among other things:

a.     attended meetings and engaged in conversations and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels;

b.     agreed during those meetings, conversations, and communications to charge prices of LCD Panels at certain levels;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

c.      attended regular group meetings, commonly referred to as 'crystal meetings,' in hotel rooms in Taiwan and agreed during those meetings to charge prices for standard-sized LCD Panels at certain target levels;

d.      exchanged TFT-LCD shipping, production, supply, demand, and pricing information for the purpose of implementing, monitoring, and enforcing adherence to the agreed-upon prices;

e.      authorized, ordered, and consented to the participation of subordinate employees in the conspiracy;

f.      issued price quotations in accordance with the agreements reached;

g.      accepted payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States and elsewhere; and

h.      took steps to conceal the conspiracy and conspiratorial contacts through various means."

### 4.      March 10, 2009 DOJ Announcement:  Hitachi Agrees to Plead Guilty To Price-Fixing Conspiracy

239.    On March 10, 2009, the DOJ announced that Hitachi agreed to plead guilty and pay $31 million criminal fine for its role in a conspiracy to fix prices in the sale of [TFT-LCD] panels to Dell, Inc.

240.    On May 22, 2009, Hitachi admitted that "[f]rom on or about April 1, 2001 to on or about March 31, 2004, the defendant, through its officers and employees, participated in a conspiracy with other major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold to Dell for use in notebook computers."

241.    Hitachi further admitted that it, "through its officers and employees, engaged in telephone discussions and attended bilateral meetings with representatives of other major TFT-LCD producers" and that "[d]uring these discussions and meetings, agreements were reached to fix the price of TFT-LCD sold to Dell for use in notebook computers."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

5.      **March 31, 2009 DOJ Announcement: Hitachi Executive Indicted In**
        **Price-Fixing Conspiracy**

242.    On March 31, 2009, a federal grand jury in San Francisco returned an indictment charging Sakae Someya, Japanese Senior Manager for Sales and Marketing at Hitachi, with "enter[ing] into and engag[ing] in a combination and conspiracy to suppress and eliminate competition by fixing the prices of [TFT-LCD] sold to Dell Inc. or its subsidiaries for use in desktop monitors and notebook computers."

243.    The Indictment stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the defendant, his corporate employer, and other coconspirators did those things that they combined and conspired to do, including, among other things:

a.      attended bilateral meetings and engaged in conversations and communications in Japan, Korea, and the United States to discuss the prices of TFT-LCD sold to Dell;

b.      agreed during those meetings, conversations, and communications to charge prices of TFT-LCD sold to Dell at certain levels;

c.      exchanged information on sales of TFT-LCF sold to Dell, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

d.      authorized, ordered, and consented to the participation of subordinate employees in the conspiracy;

e.      issued price quotations in accordance with the agreements reached;

f.      accepted payment for the supply of TFT-LCD sold at collusive, noncompetitive prices to Dell; and

g.      took steps to conceal the conspiracy and conspiratorial contacts through various means."

6.      **April 27, 2009 DOJ Announcement:  Bock Kwon, an LG Display**
        **Executive, Pleads Guilty to Price-Fixing Conspiracy**

244.    On April 27, 2009, the DOJ charged Bock Kwon, a high-level Korean executive from LG Display, with conspiring with "employees from other panel makers to suppress and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

eliminate competition by fixing the prices of LCD Panels from on or about Sept. 21, 2001 to on or about June 1, 2006."

245.    During the period covered by the April 27, 2009 Information, Kwon held various sales and marketing positions, including Head of LG's Taiwan Subsidiary, Vice President of Notebook Sales, Vice President of Sales Planning, and Executive Vice President of Sales and Marketing.

246.    The Information states, "The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant, his corporate employer, and coconspirator, the substantial terms of which were to agree to fix the prices of TFT-LCD."

247.    The DOJ charged that "[f]or the purpose of forming and carrying out the charged combination and conspiracy, the defendant, his employer, and coconspirators did those things that they combined and conspired to do, including, among other things:

a.    participating in meetings, conversations and communications in Taiwan, Korea and the United States to discuss the prices of TFT-LCD;

b.    agreeing during these meetings, conversations and communications to charge prices of LCD Panels at certain predetermined levels;

c.    issuing price quotations in accordance with the agreements reached;

d.    exchanging information on sales of LCD Panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and

e.    authorizing, ordering and consenting to the participation of subordinate employees in the conspiracy."

248.    On June 26, 2009, Kwon pleaded guilty and agreed to serve a sentence of twelve months and one day in the United States and pay a $30,000 criminal fine.

249.    During Mr. Kwon's plea hearing on June 24, 2009, Judge Illston asked him what he did that made him guilty of the crime.  He stated the following:

> During the relevant time period, September 21st, year 2001, through June 1st, year 2006, I headed the various position [*sic*] with LG Display, formerly LG Philips LCD.

In year 2001, while I was head of LG's Taiwan subsidiary, with the approval of my superior at the company's head office in Seoul, I instructed a company employee to attend the regular meetings in Taiwan with the competitor who sold LG engaged in the manufacture and the sale of TFT-LCD panels.

These meetings were known as the "crystal meetings."  On occasion I attended these meetings.  These meetings continued during the relevant time period.  I was aware that at these meetings the participant [*sic*] discussed price and other market information.

At these meetings the participants agreed to fix or stabilize the price of TFT-LCD panels to be sold in the United States and elsewhere.

**7.      August 25, 2009 DOJ Announcement:  Epson Japan Pleads Guilty to Price-Fixing Conspiracy**

250.    On August 25, 2009, the DOJ filed an Information against Epson Japan alleging that "From in or about the fall of 2005 to in or about the middle of 2006, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') sold to Motorola Inc. ('Motorola') for use in Razr mobile phones.  The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1)."

251.    The DOJ charged Epson with carrying out the conspiracy by:

a.      "participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD to be sold to Motorola;

b.      "agreeing, during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels to be sold to Motorola at certain predetermined levels;

c.      "issuing price quotations in accordance with the agreements reached; and

d.      "exchanging information on sales of TFT-LCD sold to Motorola, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

252.    On August 25, 2009, DOJ announced that Epson had agreed to plead guilty and pay a criminal fine of $26 Million for its participation in a conspiracy covering LCD Panels sold to Motorola for use in Razr mobile phones from the Fall of 2005 to the middle of 2006.

253.    During Epson's plea hearing on October 16, 2009, Judge Illston asked Mr. Hidehiko Seki, director of Epson, what the company did that made it guilty of the crime.  He stated the following:

> As written in the fourth paragraph of the plea agreement, between the fall of 2005 and the middle of 2006, our company participated in the conspiracy to fix the price of TFT-LCD panels sold to Motorola for use in Razr mobile phones.

**8.      December 8, 2009 DOJ Announcement:  Chi Mei Optoelectronics Corporation Pleads Guilty to Price-Fixing Conspiracy**

254.    On December 8, 2009, the DOJ filed an Information against Chi Mei Optoelectronics Corporation alleging that "[f]rom on or about September 14, 2001 to on or about December 1, 2006, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD').  The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1)."

255.    The DOJ charged that "[f]or the purpose of forming and carrying out the conspiracy, the defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

a.      participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCD;

b.      agreeing, during those meetings, conversations, and communications, to charge prices of LCD Panels at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of TFT-LCD, for the purpose of monitoring and

enforcing adherence to the agreed-upon prices."

256.    On February 2, 2010, DOJ announced that Chi Mei had agreed to plead guilty and

pay a criminal fine of $220 Million for its participation in a conspiracy covering LCD Panels sold

worldwide from September 14, 2001 to December 1, 2006.

257.    On April 28, 2010, Chu-Hsiang "James" Yang, the Taiwanese former Director of

Sales for Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United

States and pay a $25,000 fine.

258.    On June 2, 2010, Jau-Yang "J.Y." Ho, the Taiwanese former President of Chi Mei,

pleaded guilty and agreed to serve a fourteen-month prison sentence in the United States and pay

a $50,000 criminal fine.

259.    On July 28, 2010, Wen-Hung "Amigo" Huang, the Taiwanese former Director of

Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United

States and pay a $25,000 fine.

260.    On August 4, 2010, Chen-Lung Kuo, the Taiwanese former Vice President of

Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United

States and pay a $35,000 fine.

**9.      June 10, 2010 Announcement: Largest Taiwanese LCD Producer, AU**

**Optronics Corporation, its American subsidiary and Six Executives**

**Indicted In Price-Fixing Conspiracy**

261.    On June 10, 2010, a federal grand jury in San Francisco returned an indictment

against the largest Taiwanese LCD producer, AU Optronics Corporation, its Houston-based

subsidiary, AU Optronics Corporation America, and six AU executives, alleging that "[f]rom on

or about September 14, 2001, until on or about December 1, 2006, ('the period covered by this

Indictment'), the exact dates being unknown to the Grand Jury, the Defendants and other

coconspirators entered into and engaged in a combination and conspiracy to suppress and

eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels

('TFT-LCD') in the United States and elsewhere.  The combination and conspiracy engaged in by

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    the Defendants and other coconspirators was in unreasonable restraint of interstate and foreign

2    trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)."

3           262.     The DOJ charged that "[f]or the purpose of forming and carrying out the

4    conspiracy, the defendant and its coconspirators did those things that they combined and

5    conspired to do, including, among other things:

6         a.   On or about September 14, 2001, representatives from four Taiwan TFT-LCD

7            manufacturers, including defendant AU Optronics Corporation, secretly met in a

8            hotel room in Taipei, Taiwan and entered into and engaged in a conspiracy to fix

9            the price of TFT-LCD.  At this meeting, the conspirators agreed to meet

10          approximately once a month for the purpose of fixing the price of LCD Panels.

11          These meetings were commonly referred to by some of the conspirators as 'Crystal

12          Meetings.'  The four Taiwan TFT-LCD manufacturers also agreed to rotate

13          responsibility for coordinating each of these monthly meetings.  A representative

14          from defendant AU Optronics Corporation stated at the September 14, 2001

15          meeting that the participants in future Crystal Meetings should include the two

16          major Korean TFT-LCD manufacturers to ensure the success of the conspiracy to

17          fix the price of TFT-LCD.

18         b.   On or about September 21, 2001, representatives from two Korean TFT-LCD

19            manufacturers joined representatives from the four Taiwan TFT-LCD

20          manufacturers, including defendant AU Optronics Corporation, at a Crystal

21          Meeting in a hotel room in Taipei, Taiwan.  At or before the September 21, 2001

22          Crystal Meeting, the two Korean TFT-LCD manufacturers agreed to join the

23          conspiracy to fix the price of TFT-LCD.

24         c.   Employees from defendant AU Optronics Corporation attended Crystal Meetings

25            on a regular basis between on or about September 14, 2001 until on or about

26          December 1, 2006 with employees of other participating TFT-LCD manufacturers.

27         d.   Defendants Hsuan Bin Chen, Hui Hsiung, Shiu Lung Leung, Borlong Bai,

28            Tsannrong Lee, Cheng Yuan Lin, Wen Jun Cheng, and Duk Mo Koo attended and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  participated in one or more Crystal Meetings.  Defendants Hsuan Bin Chen, Hui

2  Hsiung, Lai-Juh Chen, Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Cheng

3  Yuan Lin, Wen Jun Cheng, and Duk Mo Koo, at times, also authorized, ordered,

4  or consented to the attendance and participation of their subordinate employees at

5  Crystal Meetings.

6  e.  During the period covered by [the] Indictment, participants in the Crystal Meetings

7  regularly exchanged production, shipping, supply, demand, and pricing

8  information with each other at the meetings for the purpose of agreeing to fix the

9  price of TFT-LCD, as well as implementing, monitoring, and enforcing adherence

10  to the fixed prices.  Up until 2003, the participants in the Crystal Meetings reached

11  price agreements on certain sized TFT-LCD used in computer notebooks and

12  monitors.  Beginning in 2003, the price agreements reached at the Crystal

13  Meetings also included certain sized TFT-LCD used in flat screen televisions.

14  f.  The participants in the conspiracy issued price quotations in accordance with the

15  price agreements and accepted payment for the supply of LCD Panels sold at

16  collusive, noncompetitive prices to customers in the United States and elsewhere.

17  g.  From on or about September 14, 2001 until on or about May 2005, senior sales

18  executives of the defendant AU Optronics Corporation and the other participating

19  TFT-LCD manufacturers attended the Crystal Meetings.

20  h.  In or about May 2005, the participants in the Crystal Meetings discussed that one

21  or two major TFT-LCD customers may have detected the Crystal Meetings.  To

22  keep the meetings secret and avoid detection, the Crystal Meeting participants

23  decided to stop having senior-level sales executives attend the Crystal Meetings.

24  Instead, the senior-level executives instructed lower-level marketing employees to

25  continue the Crystal Meetings.  Lower-level marketing employees of defendant

26  AU Optronics Corporation and the other participating TFT-LCD manufacturers

27  continued to meet monthly as a group to exchange shipment, production, and

28  pricing information in furtherance of the conspiracy to fix the price of TFT-LCD.

The lower-level marketing employees met at restaurants and cafes, instead of hotels, in Taipei.

i.   In or about the spring 2006, the participants in the Crystal Meetings became further concerned about being detected after receiving news reports of an ongoing price-fixing investigation by the United States Department of Justice into the dynamic random access memory ("DRAM") industry and after receiving other information about a possible investigation into the TFT-LCD industry.  To further avoid detection and keep the meetings secret, the conspiracy members, including representatives of defendant AU Optronics Corporation agreed to no longer meet as a group, but instead have back-to-back, one-on-one meetings with each other on a certain date each month at restaurants and cafes in Taipei, Taiwan.  Through these round-robin style meetings, the participants continued to exchange shipment, production, and pricing information in furtherance of the conspiracy to fix the price of TFT-LCD.  These round-robin meetings continued until in or about December 2006.

j.   During the period covered by [the] Indictment, employees of defendant AU Optronics Corporation, in addition to participating in Crystal Meetings, had one-on-one discussions in person or by phone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States.  Through these one-on-one discussions, the participants also monitored each other's compliance with prices agreed upon at Crystal Meetings and during other discussions.  Participants in these one-on-one discussions, at certain times during the conspiracy, included Hsuan Bin Chen, Hui Hsiung, Lai-Juh Chen, Shiu Lung Leung, Borlong Bai, Tsannrong Lee, Wen Jun Chen, and Duk Mo Koo.

k.   During the period covered by [the] Indictment, senior-level employees of AU Optronics Corporation regularly instructed employees of AU Optronics Corporation America located in the United States to contact employees of other

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

TFT-LCD manufacturers in the United States to discuss pricing to major United States TFT-LCD customers.  In response to these instructions, employees of AU Optronics Corporation America located in the United States had regular contact through in-person meetings and phone calls with employees of other TFT-LCD manufacturers in the United States to discuss and confirm pricing, and at times agree on pricing, to certain TFT-LCD customers located in the United States. These AU Optronics Corporation America employees regularly reported the pricing information they received from their competitor contacts in the United States to senior-level executives at AU Optronics Corporation in Taiwan.  By at least early 2003, representatives of defendant AU Optronics Corporation also began sending reports of the discussions and price agreements reached at Crystal Meetings to certain employees at AU Optronics Corporation America.  These reports were used by certain employees of AU Optronics Corporation America in their price negotiations with certain TFT-LCD customers located in the United States.

l.   During the period covered by [the] Indictment, representatives of defendants AU Optronics Corporation, AU Optronics Corporation America, and other coconspirators took steps to conceal the conspiracy and conspiratorial contacts through various means:

      i.   The Crystal Meeting participants discussed the need to keep the Crystal Meetings secret and warned against revealing the existence of the meetings, even to other employees within their own companies who did not participate in the conspiracy.

      ii.   Participants in the Crystal Meetings were specifically warned to keep the meetings secret because of antitrust laws and the ongoing price-fixing investigation into the DRAM industry.

      iii.   In addition, in or about December 2006, representatives of AU Optronics Corporation America took steps to destroy evidence showing contacts with

1   TFT-LCD competitors when they became aware of the United States

2   Department of Justice's investigation into price-fixing in the TFT-LCD

3   industry.

4        263.   On March 13, 2012, a federal jury in the Northern District of California found AU

5   Optronics Corporation and AU America guilty of violating the Sherman Act. The jury also found

6   AU Optronics executives Hsuan Bin "H.B." Chen and Hui Hsiung ("Kuma") guilty of violating

7   the Sherman Act.

8        **10.   June 29, 2010 Announcement: HannStar Display Corporation Indicted**

9        **and Pleads Guilty In Price-Fixing Conspiracy**

10        264.   On June 29, 2010, the DOJ announced that HannStar agreed to plead guilty and

11   pay a $30 million criminal fine for its role in a conspiracy to fix prices in the sale of LCD Panels

12   sold worldwide.

13        265.   HannStar admitted that from on or about September 14, 2001, to on or about

14   January 31, 2006, "[HannStar], through its officers and employees, including high-level personnel

15   of the defendant, participated in a conspiracy with major TFT-LCD producers, the primary

16   purpose of which was to fix the price of certain TFT-LCD sold in the United States and

17   elsewhere" in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

18        266.   HannStar further admitted that "[i]n furtherance of the conspiracy, the defendant,

19   through its officers and employees, engaged in discussions and attended meetings, including

20   group meetings referred to by some of the participants as 'crystal meetings,' with representatives

21   of other TFT-LCD producers.  During these discussions and meetings, agreements were reached

22   to fix the price of certain TFT-LCD to be sold in the United States and elsewhere."

23        **11.   January 25, 2011 DOJ Announcement:  HannStar Display**

24        **Corporation's President Indicted In Price-Fixing Conspiracy**

25        267.   On January 25, 2011, the DOJ announced that a federal grand jury in San

26   Francisco returned an indictment against the current president of HannStar Display Corporation

27   for his participation in the TFT-LCD price fixing conspiracy.  The indictment charges that Ding

28   Hui Joe, aka David Joe, conspired to suppress and eliminate competition by fixing the prices of

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

LCD Panels from September 14, 2011 until on or about January 31, 2006.  According to the indictment, Mr. Hui Joe participated in secret crystal meetings in hotel rooms in Taipei, Taiwan.  According to the indictment, Mr. Ding and Defendants and/or co-conspirators took various steps to conceal the conspiracy and avoid detection.

268.    The hundreds of millions of dollars in fines and the long and growing list of guilty pleas demonstrate that the investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities.  Plaintiffs are informed and believe and allege, as the DOJ's representative told the U.S. District Court in San Francisco at the September 19, 2007 hearing, the DOJ's investigation into the TFT-LCD industry is premised in part on insider information that presents a detailed "road map" of the conspiracy described in *in camera* submissions made by the DOJ to U.S. District Court in San Francisco.

### H.    Market During the Conspiracy

269.    After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, since at least 1996, the LCD Panels market has been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices.  Defendants and co-conspirators achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

270.    As described herein, Defendants' and co-conspirators' TFT-LCD cartel evolved over time.  Defendants and co-conspirators initiated their cartel when LCD Panels and LCD Products were in their relative infancy.  At that time, Defendants and co-conspirators balanced the desire to set prices collusively with the industry goal of establishing their products in the marketplace.  As the cartel matured, new entrants were co-opted, and production costs declined.  At the same time, conspirators learned how they could best manage the crystal cycle by agreeing on prices and output.

### 1.    1996

271.    By early 1996, analysts were lamenting the excess supply and drastic price cuts in the TFT-LCD markets.  The downward pressure on prices, which had already fallen 40 to 50

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    percent in 1995, was projected to continue due to lower manufacturing costs. Despite this, TFT-

2    LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity. In

3    reality, Plaintiffs are informed and believe and allege that Defendants and co-conspirators were

4    fixing the prices.

5            272.    Plaintiffs are informed and believe and allege that during this period, the Japanese

6    companies herein began to partner with Taiwanese companies to trade technology and collaborate

7    on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped

8    to Japan. This mutually beneficial relationship between purported competitors continued into at

9    least 1999.

10           273.    A few months into 1996, there was a reversal in the downward trend in TFT-LCD

11   Product prices and an alleged inability of manufacturers to supply enough LCD Panels to meet

12   demand. By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display

13   purchasers are riding a roller coaster of pricing in the display market, with no clear predictability

14   anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take

15   solace that even vendors are constantly being surprised by the sudden twists and turns."

16           274.    By mid-1996, industry analysts were commenting on an unusual rise in TFT-LCD

17   panel prices that was noted to be "quite rare in the electronics industry."

18           275.    Plaintiffs are informed and believe and allege that the "rare" increase in TFT-LCD

19   panel prices was due to the agreements reached by the Japanese companies to increase prices.

20   These companies met and agreed to increase prices and control supply in order to stop any price

21   erosion as herein alleged.

22           276.    1996 also brought the advent of third generation fabs. In order to stay current with

23   technology, manufacturers were moving quickly into third generation motherglass. LG

24   Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai was

25   scheduled to do so by early 1998. However, manufacturers falsely claimed to be operating at full

26   capacity and unable to meet demand, despite the millions of units of over-capacity that had

27   supposedly existed months earlier. This resulted in surging prices. These price increases were

28   also inconsistent with the fact that production had become more efficient and cost effective.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### 2.      1997 – 1998

277.    Plaintiffs are informed and believe and allege that by 1997, Japanese manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology.  In return, the Japanese received output from Taiwanese plants.  In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese manufacturer that Sharp acquired in 2005.  These arrangements between Japanese and Taiwanese companies resulted in cooperative discussions between supposed competitors.  It was also expected to contribute to an increase in supply of LCD Panels.

278.    By 1998, the TFT-LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies into the market.  A March 30, 1998 article in Electronic News reported that Hyundai's production lines were running at only 20 to 50 percent of capacity. The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage . . . . You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden." Plaintiffs are informed and believe and allege that during this period, concerted efforts were made to get other manufacturers in the industry to limit production.

279.    The effort to limit production, capacity restraints and the price-fixing agreement caused decreases in prices of LCD Panels to slow and stop in late 1998.

### 3.      1999

280.    In 1999, TFT-LCD Product prices surged during that year due to a claimed "massive undersupply."  This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

281.    At the beginning of 1999, industry publications suggested that the Japanese and Korean manufacturers were going to have the opportunity to recoup previous years' losses:  "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink . . . ."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

282.   By mid-1999, a Korean source was reporting: "[w]ith the supply shortage for LCD Panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise." The lack of supply was a pretextual reason given publicly to justify a price increase.

283.   Significantly, Bock Kwon, Vice President of LG Display's Sales Division was quoted, in part, in the same trade publication as announcing that:

> LG LCD will raise prices across its entire TFT-LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize some time in the second half. [D]emand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate. This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said. The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

284.   Also in 1999, the three major TFT-LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai. The year 1999 also saw an additional merger when LG Electronics, Inc. and Defendant Koninklijke Philips Electronics N.V. created co-conspirator LG Display.

### 4.   2000 - 2001

285.   By January of 2000, prices for LCD Panels were falling again. The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors into the market, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics). Taiwanese co-conspirators began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other Defendants and co-conspirators to gain immediate market share. However, by 2000-01, the Taiwanese co-conspirators had increased their market share to the point that it made sense to participate in the conspiracy, and Plaintiffs are informed and believe and allege that they then moderated the volume of their production.

286.   Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity. Two of the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  largest Korean firms announced plans to invest billions in Taiwanese TFT-LCD panel production

2  and to locate manufacturing facilities in Taiwan.

3         287.    Newer generation fabs reduced costs and provided opportunities for additional

4  profits at cartelized prices.  In fact, a leading industry research house indicated that LCD

5  manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the

6  amount the industry spent in the previous three years combined.

7         288.    In October 2000, *The Korea Herald* reported that, "IDC estimates that the global

8  LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year

9  as manufacturers continue to book their output."

10        289.    Then, despite what was billed as massive and growing overcapacity in 2000 and

11 early 2001, prices of LCD Panels stopped declining in mid-2001, and actually increased.  In late

12 2001, a senior official at LG Display stated that the global market faced a supply shortage, and

13 that this would "rapidly resolve the industry's oversupply and improve its profitability."

14 Similarly, industry insiders suggested that the price increases were the result of an inability to

15 meet increased demand.  However, published data for 2001 showed that several Defendants and

16 co-conspirators were operating their fabs significantly below capacity.  For example, Chunghwa

17 had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU

18 Optronics) had a 52 percent utilization rate.  Based on the data indicating reduced capacity

19 utilization during a time of rising prices and supposedly tight supply, Plaintiffs are informed and

20 believe and allege that the Taiwanese firms had begun actively cooperating with Japanese and

21 Korean incumbents to restrict supply, and that again, Defendants and co-conspirators reacted to

22 the price trough by conspiring to fix prices.  This agreement was reached in part at the bilateral

23 and group meetings described above.

24        290.    The rise in prices made no economic sense at this point in time and was the

25 product of Defendants and co-conspirators setting the price of TFT-LCD by agreement.  First,

26 Defendants and co-conspirators were bringing new plants on line that utilized larger motherglass,

27 which was more cost effective.  Second, as reported by an industry source, the variable cost of

28 producing LCD Panels was declining during the latter part of 2001 and into 2002.  With lower

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  production costs and capacity to spare, it made little economic sense for Defendants and co-

2  conspirators not to utilize their full capacity other than because of an agreement by them not to do

3  so.

4                   **5.      2002 – 2003**

5          291.    Prices continued to rise from the second half of 2001 through the second half of

6  2002.  Industry analysts attributed these price increases to a "larger-than-expected panel

7  shortage," despite continuing capacity expansion.  In reality, Plaintiffs are informed and believe

8  and allege that the price increases were the result of agreements reached in the crystal meetings

9  and bilateral discussions described above.

10         292.    By the second half of 2002, the cartel's success at propping up prices led to

11 lagging demand, and the cartel's response was to let prices level off and even begin to fall.  Such

12 downward price trends are not inconsistent with a monopoly or cartel.

13         293.    Throughout 2002, industry leaders shifted to fifth generation motherglass

14 production technology.

15         294.    Industry analysts took note of the unusual trends in the pricing of LCD Panels

16 and/or LCD Products.  In February 2004, CNET.com quoted an analyst from IDC, a research

17 firm, as saying that, "LCD is one of the few [markets] where things have actually gone up in

18 price."  As described above and as further detailed in Section VII below, Defendants and co-

19 conspirators explained these price increases with false statements about market conditions in

20 order to cover up the conspiracy.

21         295.    During five consecutive quarters in 2003 and 2004, TFT-LCD Product prices rose

22 significantly.  AU Optronics reported that the price for certain of its LCD Panels increased 28

23 percent between the second quarter of 2003 and the second quarter of 2004.  Similarly, LG

24 Display reported that its pricing increased by 21 percent over the same period.

25         296.    Plaintiffs are informed and believe and allege that these soaring prices resulted in

26 similar increases in the profits reaped by the TFT-LCD Product manufacturers.  For example, the

27 eight largest TFT-LCD Product manufacturers reported a collective profit increase of 740 percent

28 between the second quarter of 2003 and the second quarter of 2004.  These record profits resulted

from Defendants' and co-conspirators'collective action to fix, raise, maintain or stabilize the price of LCD Panels.  Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of LCD Panels.

297.    Around this time, industry analysts suggested that there were too many competitors in the TFT-LCD Product marketplace.  Some industry participants went as far as overtly suggesting that the industry should seek to curtail supply through mergers.  These suggestions were carried out.  Significant consolidation and collaboration among competitors in the TFT-LCD Product market occurred.

298.    While TFT-LCD Product prices were increasing in late 2003, AU Optronics, Chi Mei, and HannStar decreased capacity utilization, as Plaintiffs are informed and believe and allege had been agreed to in crystal meetings.

299.    As noted above, Panasonic's joint venture announced plans to solicit investment from other companies involved in the production of LCD Panels, including device manufacturers and material suppliers.  NEC formed an alliance with Casio.  In addition, Taiwanese TFT-LCD manufacturers agreed to supply Panasonic with LCD Panels for use in televisions.

300.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu Display Technology.

301.    Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of LCD Panels.  Plaintiffs are informed and believe and allege that in order to keep prices artificially high, Defendants and co-conspirators chose not to operate at full capacity, nor to take advantage of lower variable costs.

### 6.    2004

302.    Pursuant to Defendants' co-conspirators' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters.  Various types of crystal meetings were ongoing during this period.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

303.    The cartel's success at raising prices slowly dampened demand.  In response, the cartel allowed prices to once again level off and began to decline in the second half of 2004.  During this period of time, the market for TFT-LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

304.    In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits.  AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

305.    Consolidation and collaboration among and between competitors continued as Sony launched a joint venture, named S-LCD Corp.

### 7.    2005

306.    Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005.  However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

307.    By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant product, and the volume of 32-inch panels for televisions took off as well.  In 2005, 32-inch panels represented almost 27 percent of sales.

308.    Analysts forecast excess production capacity in 2005 because of large TFT-LCD plants including that of LG Display being brought on line.  However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent.  The shortage came as a surprise to analysts.

309.    This shortage was the result of collusion among Defendants and co-conspirators.  Dr. Hui Hsiung, Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for LCD Panels:

> I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower.  And I think in the past we did have some

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

problem convincing our competitors doing the same thing.  But in recent months, especially this year, actually, it did start to happen.  I think that the industry understand[s] the benefit of keeping the capacity low.  Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading.  And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs.  So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big.  So, we think the industry become more mature.  That is precisely what our competitors would do.

6

7

310.    Indeed, earlier that year, a spokesperson for LG Display had predicted that market

stabilization.

8

9

311.    These collusive actions were being perpetuated through the series of ongoing

meetings as alleged above.

10

### 8.    2006

11

12

312.    A temporary oversupply of LCD Panels occurred in 2006, which had the effect of

reducing prices in the short term.  Again, in the face of a price trough, Defendants and co-

13

14

conspirators fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a

Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was

15

16

reducing production of those products in order to avoid further price erosion.  He expressed the

view that his competitors should follow suit, saying that production ought to be reduced by at

17

18

least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show,

promised to take similar steps in conjunction with his company's peers.  A June 13, 2006 article

19

20

in *InfoWorld* noted that as a result of Mr. Hsiung's statements, "[t]he chatter is growing louder

each day."

21

22

313.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict the

output and increase the prices of LCD Panels.  Plaintiffs are informed and believe and allege that

23

24

in May of 2006, in discussions between executives of the two companies, AU Optronics

convinced Quanta Display, a company that it acquired in October of 2006, to reduce production

25

26

of LCD Panels.  By June of 2006, LG Display also announced plans to cut production of LCD

Panels.

27

28

314.    By the summer of 2006, this ongoing conspiracy was being effectuated through bilateral meetings as alleged above.

315.    Despite the fact that certain of the Defendants and co-conspirators may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the conspiracy continued at least through the end of that year.  This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

**I.      The Role of Trade Associations During the Relevant Period**

316.    The LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year.  These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for Defendants and co-conspirators to cooperate and discuss prices.

317.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong.  Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry."  TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD affiliations to visit TTLA."  Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

318.    South Korean manufacturers, including LG Display, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association).  EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK has had a cooperation pact with the United

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

States Display Consortium ("USDC").  Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

319.    Japanese manufacturers of LCD Panels have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCD Panels.  Its members include Sharp, NEC, and Hitachi.  Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

320.    In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers.  One of these meetings had been known as the SID Symposium, but was renamed the "SID International Symposium and Business Conference."  SID also puts on a long-running conference called the International Display Research Conference ("IRDC").

321.    The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and CEO of AU Optronics.  This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the attendees about "investments planned at the major display manufacturers."  A representative of DisplaySearch also spoke about the LCD market.  There were presentations by analysts from iSuppli/Stanford Resources, and other industry experts.  This was all followed by a "networking reception – sponsored by LG, Philips LCD," to which all conference attendees were invited to participate.

322.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics.  This time it was called "2005: Beyond the Crystal Gateway."  A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and the cost and margin outlook for key FPDs will be projected."  Again, these discussions about the market were followed by a "networking reception."  Among the attendees at SID 2004 were Bruce Berkoff of LG Display, H.B. Chen of AU Optronics, Larry Weber of Panasonic, and Joel Pollack of Sharp.  Senior executives from Sharp and Hitachi also attended.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

323.     Plaintiffs are informed and believe and allege that the SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle.

324.     SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing."  Among the attendees at SID 2005 was Bruce Berkoff of LG Display.  SID 2005 also featured presentations regarding developments in LCD technology by officials from AU Optronics, Sharp, LG Display, and Hitachi.

325.     The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005.  The initial conference was held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa, Japan.

326.     Plaintiffs are informed and believe and allege that participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators, or, as Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

327.     Plaintiffs are informed and believe and allege that among the participants at GFPC 2006 were Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Nakajima of Panasonic, and Dr. Hui Hsiung of AU Optronics.

328.     As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving Defendants and co-conspirators further opportunities to discuss prices and output.

## VIII.     FRAUDULENT CONCEALMENT

329.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until December 2006, when investigations by the DOJ

and other antitrust regulators became public.  Defendants' co-conspirators' secret conspiracy did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of LCD Panels.

330.    Plaintiffs are informed and believe and allege that the participants in the crystal meetings agreed to keep the meetings secret, that in some instances, the location of the meeting was circulated only the day before in an effort to avoid detection.  Furthermore, Plaintiffs are informed and believe and allege that the participants agreed on what pretexts they would cite when questioned about rising prices.  Plaintiffs are informed and believe and allege that the participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

331.    The affirmative acts of Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

332.    The conspirators knew their activities were illegal.  After one Crystal Meeting, Brian Lee of Chunghwa wrote that LG Display had reminded the meeting participants to "take heed of the antitrust law."  Even Huang of AU Optronics wrote an internal meeting report to others at AU Optronics where he reminded them that their price information exchange with other suppliers "is illegal, especially in the states.  We need to be watchful!"  Genichi Watanabe testified at deposition that he did not create written records of meetings discussing price with competitors because he was worried about antitrust laws.  Stanley Park recorded in his notes after a conspiracy meeting that "based on the DRAM companies being sued in violation of the antitrust laws for their price fixing about two years ago, we need to pay more attention to security internally and otherwise, and must try to refrain from written communication which would leave trails."

333.    Therefore, the Defendants and their co-conspirators kept their conspiracy communications strictly confidential.  A Chunghwa conspiracy meeting attendee included in his Crystal Meeting notes that recipients should "keep it confidential" because the information "cannot be released to outside strictly!"  An LG Display communication regarding a Crystal

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   Meeting noted to recipients, "Do not reveal this meeting to outsiders, not even to colleagues; keep

2   a low profile.  To cultivate an atmosphere for price up."  The conspirators also kept their meeting

3   locations secret.  During one Crystal Meeting, it was said that the location of the next meeting

4   would not be disclosed until the day before, so that the Defendants and co-conspirators would

5   prevent the meeting information from being disseminated.

6       334.    By its very nature, Defendants and their co-conspirators' price-fixing conspiracy

7   was inherently self-concealing.  As alleged above, Defendants and their co-conspirators had

8   secret discussions about price and output.  Defendants and co-conspirators agreed not to publicly

9   discuss the existence or the nature of their agreement.  During these meetings, top executives and

10  other officials attending these meetings were instructed on more than one occasion not to disclose

11  the fact of these meetings to outsiders, or even to other employees of Defendants and co-

12  conspirators not involved in LCD Panel pricing or production.  In fact, the top executives who

13  attended the CEO and commercial crystal meetings agreed to stagger their arrivals and departures

14  at such meetings to avoid being seen in public with each other and with the express purpose and

15  effect of keeping them secret.  Moreover, when the participants in those meetings became fearful

16  that they might be subject to antitrust scrutiny, in approximately the summer of 2006, they

17  discontinued the lower level meetings in favor of one-on-one meetings to exchange pricing and

18  supply information.  The meetings were coordinated so that on the same date, each competitor

19  met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met

20  with each other.  These Round Robin meetings took place until at least November or December of

21  2006.  The information obtained at these meetings was transmitted up the corporate reporting

22  chain to permit Defendants and co-conspirators to maintain their price-fixing and production-

23  limitation agreement.

24      335.    In addition, Defendants and their co-conspirators repeatedly gave pretextual

25  justifications for inflated prices of LCD Panels in furtherance of the conspiracy.  Defendants and

26  co-conspirators have used a variety of other purportedly market-based explanations for price

27  increases in order to conceal their conspiracy, including undercapitalization, supply shortage, and

28  component part availability.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

336.    In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

337.    Also, plaintiffs are informed and believe and thereon allege that in early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."

338.    Plaintiffs are informed and believe and thereon allege that also in 1999, Bock Kwon, Vice President of LG Display's Sales Division falsely reported that price increases resulted from "acute" shortages.

339.    On February 4, 2001, Bruce Berkoff, Executive Vice President at LG Display, was quoted by News.com as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."

340.    Plaintiffs are informed and believe and thereon allege that in the latter half of 2001, Koo Duk-Mo, an executive at LG Display, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

341.    Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU Optronics, offered another rationale for the 2001 price increase in an interview for the Taiwan Economic News in October 2001.  Plaintiffs are informed and believe and allege that they blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

342.    These explanations were pretextual and served to cover up the conspiracy.  Later price increases were explained by industry leaders as derived from new demand for LCD televisions.  Plaintiffs are informed and believe and thereon allege that in 2005, Koo Duk-Mo of LG Display stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

343.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of Plaintiffs arising from the anticompetitive conduct alleged in this Complaint.

## IX.    TOLLING RELATED TO TOLLING AGREEMENTS

344.    Plaintiffs and Defendants Koninklijke Philips Electronics N.V. and Philips Electronics North America Corp. entered into a Tolling and Cooperation Agreement with Best Buy, effective as of October 8, 2010, which tolled "[a]ny and all statutes of limitations, laches or any other limitations or doctrines of repose that might be applicable to any claim asserted in or related to the LCD Antitrust case."

345.    Plaintiffs and the Toshiba Defendants entered into a Tolling and Cooperation Agreement with Best Buy, effective as of May 18, 2010, which tolled "the running of any statute of limitations, laches or other limitations or repose period."

## X.    *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

346.    As discussed at length in Paragraphs 200-268 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least November 12, 2008.  Best Buy's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

347.    As shown by Best Buy's allegations in Paragraphs 1, 18 & 19 above and 352 and 360 below, Plaintiffs were members of Direct-Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Corp. v. Samsung Electronics Co.*, No. 3:06-cv-07644-SU (Dkt. No. 1) (N.D. Cal. Dec. 12, 2006); and

- Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-md-01827-SI (Dkt. No. 366) (N.D. Cal. Nov. 5, 2007)

348.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    pendency of the Direct Purchaser Class Actions asserted against Defendants, and commencing on

2    at least December 12, 2006.

3           349.    Plaintiffs were also members of Indirect-Purchaser Class Actions (for resale)

4    asserted against Defendants, including, but not limited to, the following Complaints:

5           • *Rywelski v. AU Optronics Corp.*, No. 07:cv-01393-MJD-AJB (Dkt. No. 1)

6                (D. Minn. March 2, 2007) and *Mulvey v. AU Optronics Corp.*, No. 07:cv-01425-

7                MJD-SRN (Dkt. No. 1) (D. Minn. March 6, 2007) (later becoming the Indirect

8                Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-md-01827-SI

9                (Dkt. No. 367) (N.D. Cal. Nov. 5, 2007)).

10          350.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Uta*h,

11   414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the

12   pendency of the Indirect Purchaser Class Actions asserted against Defendants, and commencing

13   on at least March 2, 2007.

14   **XI.     VIOLATIONS ALLEGED**

15                         **First Claim for Relief**

16                **(Violation of Section 1 of the Sherman Act)**

17          351.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

18   herein.

19          352.    All Plaintiffs bring a claim under the Sherman Act in connection with their direct

20   purchases of LCD Products containing LCD Panels.

21          353.    Beginning at least on or around January 1, 1996, the exact date being unknown to

22   Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-

23   conspirators entered into a continuing contract, combination or conspiracy to unreasonably

24   restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

25   artificially reducing or eliminating competition in the United States.

26          354.    In particular, Defendants combined and conspired to raise, fix, maintain or

27   stabilize the prices of LCD Panels (resulting in higher-priced LCD Products) sold in the United

28   States.

355.    As a result of Defendants' unlawful conduct, prices for LCD Panels (and by extension, LCD Products) were raised, fixed, maintained and stabilized in the United States.

356.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

357.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.      participating in meetings and conversations to discuss the prices and supply of LCD Panels;

b.      communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD Panels;

c.      agreeing to manipulate prices and supply of LCD Panels sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

d.      issuing price announcements and price quotations in accordance with the agreements reached;

e.      selling LCD Panels at non-competitive prices;

f.      exchanging competitively sensitive information in order to facilitate their conspiracy;

g.      agreeing to maintain or lower production capacity; and

h.      providing false statements to the public to explain increased prices for LCD Panels.

358.    As a result of Defendants' unlawful conduct, the Best Buy Plaintiffs were injured in its businesses and property in that they paid more for LCD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of LCD Products.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**Second Claim for Relief**

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq.*)**

359.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

360.    All Plaintiffs except MHF bring a claim under the Minnesota Antitrust Act of 1971 in connection with their direct and indirect purchases of LCD Products containing LCD Panels.

361.    Beginning at least on or around January 1, 1996, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*.

362.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of LCD Panels (resulting in higher-priced LCD Products) sold in the United States.

363.    As a result of Defendants' unlawful conduct, prices for LCD Panels (and by extension, LCD Products) were raised, fixed, maintained and stabilized in the United States.

364.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

365.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of LCD Panels;

    b.    communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD Panels;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

c.      agreeing to manipulate prices and supply of LCD Panels sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

d.      issuing price announcements and price quotations in accordance with the agreements reached;

e.      selling LCD Panels at non-competitive prices;

f.      exchanging competitively sensitive information in order to facilitate their conspiracy;

g.      agreeing to maintain or lower production capacity; and

h.      providing false statements to the public to explain increased prices for LCD Panels.

366.    As a result of Defendants' unlawful conduct, Best Buy was injured in its businesses and property in that they paid more for LCD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of LCD Products.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.,* and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by it, as provided by the state and federal antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

1    D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such

2  interest shall be awarded at the highest legal rate from and after the date of service of the initial

3  complaint in this action;

4    E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

5  as provided by law; and

6    F.    Plaintiffs shall recover such other and further relief as may be just and proper.

7

8  DATED: November 15, 2012          ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

9

10                          By:   /s/ David Martinez
                                  Roman M. Silberfeld
11                                David Martinez
                                  Attorneys For Plaintiffs
12                                BEST BUY CO., INC.; BEST BUY PURCHASING
                                  LLC; BEST BUY ENTERPRISE SERVICES, INC.;
13                                BEST BUY STORES, L.P.; BESTBUY.COM,
                                  L.L.C. and MAGNOLIA HI-FI, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES