# Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: TFT-LCD (FLAT PANEL)    )
     ANTITRUST LITIGATION           )
 5   _____ )
                                    )   Case No.
 6   THIS DOCUMENT RELATES TO:      )   M-07-1827-SI
                                    )
 7   ALL ACTIONS                    )
     _____ )
 8

 9

10

11

12                       VOLUME I

13        *** HIGHLY CONFIDENTIAL TRANSCRIPT ***

14          ***  ATTORNEYS' EYES ONLY ***

15              VIDEOTAPED DEPOSITION OF

16                DR. JAMES A. LEVINSOHN

17                MONDAY, APRIL 16, 2012

18

19

20

21

22

23

24
     REPORTED BY: RACHEL F. GARD, CSR, RPR, CLR
25              CSR No. 084-003324
```

1        THE VIDEOGRAPHER:  We are now on the record in
2   the matter of In Re:  TFT-LCD (Flat Panel)
3   Antitrust Litigation in the U.S. District Court,
4   Northern District of California, San Francisco
5   Division, Master File Number M07-1827-SI,
6   MDL No. 1827.
7        Today's date is April 16th, 2012, and the
8   time is 8:59 a.m.  This is the video recorded
9   deposition of Dr. James Levinsohn.
10        My name is Matt Seiler here on behalf of
11   Barkley Court Reporters, and the court reporter
12   today is Rachel Gard from Barkley.
13        The court reporter has noted the
14   attorneys' appearances for the record.
15        Please administer the oath.
16              (Witness sworn.)
17   WHEREUPON:
18             DR. JAMES A. LEVINSOHN,
19   called as a witness herein, having been first duly
20   sworn, was examined and testified as follows:
21                  EXAMINATION
22   BY MR. SILBERFELD:
23       Q.   Doctor, good morning.
24       A.   Good morning.
25       Q.   My name is Roman Silberfeld.  Together

1  The caption on some of the other ones, they ran
2  names until maybe they ran out of space.
3      Q.   Who pays your bills?
4      A.   I'm directly -- I get a check from Analysis
5  Group.  And they're paid by, I assume, the defense
6  group, but I don't know the details of that.
7      Q.   If you could please turn to Page 3 of your
8  report under Subsection C, Assignment, and
9  specifically Paragraph 7 says:  A major focus of
10 expert work in this matter is to evaluate whether
11 and to what extent alleged overcharges of panels
12 were passed on to the plaintiffs and whether the
13 plaintiffs in turn passed on any such overcharges to
14 their downstream customers.
15          Did you analyze whether overcharges on
16 panels were passed on to Dell in this case?
17     A.   I did not conduct any econometric
18 investigation of that.
19     Q.   Did you conduct any investigation into the
20 extent of overcharges passed on to Dell in this
21 case?
22     A.   No.  That's really an issue of
23 implementation.  And as I discussed earlier this
24 morning, my job has been to talk through the
25 economics of pass-on and what that says about the

176

1  econometrics but not to then go the next step and
2  actually estimate it.
3      Q.   If you would please turn over to Page 5,
4  and the top bullet point on Page 5 notes that as a
5  matter of economic theory, the rate of pass-on can
6  range from zero to over 100 percent.  Is it correct
7  that the pass-through in this case could be
8  100 percent?
9      MR. BENSON:  Objection to form.  Incomplete
10 reading of the sentence and asked and answered.
11 BY THE WITNESS:
12     A.   So are you asking is it possible?
13     Q.   Yes, sir.
14     A.   Yes, it is possible.
15     Q.   And that would ultimately be an empirical
16 issue?
17     A.   I think it is fundamentally an empirical
18 issue, and that's why it's important to get it right
19 when you estimate it.
20     Q.   You're not offering opinions one way or
21 another in this case about whether there was a
22 hundred percent pass-on to Dell by Samsung or LG,
23 are you, sir?
24     A.   I am not.
25     Q.   You've not attempted to calculate the

177

 1   percentage amount of overcharge to Dell of pass-on
 2   to Dell?
 3        A.   I have not.
 4        Q.   And you've not attempted to calculate the
 5   dollar amount of pass-on to Dell; is that correct?
 6        A.   That's correct.  That was not part of my
 7   assignment.
 8        Q.   And so you have no basis to conclude that
 9   Dell was not overcharged for monitors containing LCD
10   panels in the amount of approximately $360 million?
11        MR. BENSON:  Objection to form.
12   BY THE WITNESS:
13        A.   I do not have an opinion on overcharges.
14        Q.   The second bullet point on Page 5 says:
15   An econometric approach designed to estimate the
16   rate of pass-on by regressing price on cost that
17   does not control for product quality and product
18   life cycle effects can be expected to result in an
19   estimate of pass-on that is biased upward if certain
20   conditions are met.
21             This is based on economic theory, correct?
22        MR. BENSON:  Objection.  I'm sorry.  Objection
23   to form.  You didn't read the complete sentence.
24   And I think it's unclear to the question where your
25   reading of the sentence ends and where your question

178

```
 1   progress towards that.
 2           But when I really think hard about it, I
 3   think incomplete is pretty generous.
 4       Q.  Did you perform any analysis to determine
 5   whether if Dr. Rao had controlled for these
 6   so-called life cycle effects, it would have impacted
 7   his pass-on calculation?
 8       A.  No, I did not do that.  That was beyond my
 9   assignment.
10       Q.  And you did not calculate the magnitude of
11   any upward bias as a result of his failure to
12   account for life cycle effects?
13       MR. BENSON:  Objection to form.  Asked and
14   answered.
15   BY THE WITNESS:
16       A.  Yeah, I think that's the same as the last
17   question, which is, it really wasn't my assignment
18   to estimate this.
19       Q.  If you could please turn back to Page 19.
20       A.  Well, we're going in the wrong direction
21   now.
22       Q.  Don't worry.  We're still moving ahead.
23       A.  Of course.
24       Q.  You set forth this Equation 6, which
25   properly controls for product quality and life
```

183



1  to consider here.
2      Q.   What are the purpose of the theta I's in
3  this equation?
4      A.   The theta I's captures the life cycle
5  effects.  So it's a linear, in this case a linear
6  life cycle effect, and it varies in Equation 6 by
7  product.
8      Q.   And as I understood, if Dr. Rao added a
9  constant term, he would also need to drop one of the
10 theta I's in Equation 6?
11     A.   That's true.  If he had a constant term,
12 that would be equivalent to including a life cycle
13 effect and imposing that that life cycle effect is
14 common across products given the data constraints
15 that he may have faced.  That would certainly be an
16 improvement.  That sounds like a pretty good way to
17 go.  But if you do that, then you drop the theta I.
18     Q.   Okay.  And if you did that, would his
19 accounting for life cycle effects then be complete?
20     A.   So I think if you do that, you'd get rid of
21 your delta Xs because they're sort of superfluous.
22 You'd want to be careful and start to get into
23 issues around implementation.
24          But in terms of the specification, he also
25 has a lag, okay, and that again is an issue around

185

1   implementation.  But the broad idea if he had -- if
2   he was regressing a change in price appropriately, a
3   change in price on a change in cost, maybe it should
4   be contemporaneous, maybe lagged, I don't know as I
5   sit here, and you had a constant term, that would
6   look pretty good to me.
7       Q.   When estimating pass-through rate applied
8   to damages in this case, what time period of data
9   should be used?
10      MR. BENSON:  Objection to form.  Incomplete
11  hypothetical.
12  BY THE WITNESS:
13      A.   So that's really a question of
14  implementation.  And I'm talking through how one
15  estimates, what equation one would use, and I've
16  stayed clear of issues around what the right data
17  set is.  Yeah, it goes beyond my assignment.
18      Q.   When calculating pass-through, would you
19  generally use the same time period that you used to
20  calculate damages?
21      MR. BENSON:  Objection.  Beyond the scope.
22  Incomplete hypothetical.
23  BY THE WITNESS:
24      A.   Yeah, I just haven't thought about it.
25      Q.   And you don't have an opinion one way or