# Exhibit C

# REDACTED
[unredacted copy filed under seal]

Highly Confidential – Subject to Protective Order

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| IN RE: TFT-LCD (FLAT PANEL) | ) | Master File No. C07-1827 SI |
| ANTITRUST LITIGATION | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | MDL No. 1827 |
| | ) | |
| This Document Relates to: | ) | |
| | ) | |
| INDIRECT PURCHASER CLASS ACTION | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## EXPERT REPORT OF PROFESSOR DENNIS W. CARLTON

### July 28, 2011

Highly Confidential – Subject to Protective Order

# TABLE OF CONTENTS

I.    QUALIFICATIONS, ASSIGNMENT, AND SUMMARY OF
      CONCLUSIONS ..............................................................................................1

      A.   QUALIFICATIONS..................................................................................1

      B.   ASSIGNMENT .....................................................................................2

      C.   SUMMARY OF OPINIONS .....................................................................4

II.   BACKGROUND ................................................................................................6

      A.   TFT-LCD PANELS .............................................................................6

      B.   DESCRIPTION OF DEFENDANTS AND ALLEGED CO-CONSPIRATORS .............7

           1.   Defendants .................................................................................7

           2.   Alleged co-conspirators ...............................................................9

           3.   Defendants' panel sales were largely outside the United States............11

      C.   GROWTH AND EVOLUTION OF TFT-LCD INDUSTRY...................................13

      D.   BROAD RANGE OF TFT-LCD PANELS ....................................................15

      E.   DECLINING PRICES ............................................................................16

III.  THE CHARACTERISTICS OF THE TFT-LCD INDUSTRY ARE
      NOT CONDUCIVE TO A STABLE, SUCCESSFUL PRICE-FIXING
      CARTEL ..........................................................................................................19

      A.   ECONOMIC THEORY OF CARTELS .........................................................19

      B.   RAPIDLY EVOLVING TECHNOLOGY ........................................................24

      C.   TECHNOLOGICAL AND DEMAND UNCERTAINTY .......................................26

      D.   INDUSTRY DYNAMISM .........................................................................27

           1.   Entry  .......................................................................................27

           2.   Capacity and Production Growth....................................................29

      E.   UNCONCENTRATED INDUSTRY ..............................................................30

      F.   VERTICAL INTEGRATION ......................................................................31

      G.   DIFFERING DEGREES OF HORIZONTAL INTEGRATION INTO PRODUCTS
           THAT COMPETE WITH TFT-LCD PANELS AND PRODUCTS ...........................32

      H.   PANEL HETEROGENEITY AND CUSTOMIZATION .......................................33

      I.   BUYER HETEROGENEITY .....................................................................36

i

Highly Confidential – Subject to Protective Order

IV.  THE BEHAVIOR OF THE DEFENDANTS IN THE ALLEGED
     CARTEL IS INCONSISTENT WITH A STABLE, SUCCESSFUL
     PRICE-FIXING CARTEL ...........................................................................38

     A. COMBINING EVIDENCE FROM PLAINTIFF EXPERTS, TESTIMONY FROM
        DEFENDANTS, AND MARKETPLACE OUTCOMES, IT DOES NOT APPEAR
        THAT THE ALLEGED CARTEL OPERATED BY ALLOCATING CUSTOMERS,
        TERRITORIES, OR SHARES TO PARTICULAR SELLERS ....................................39

     B. COMBINING EVIDENCE FROM PLAINTIFF EXPERTS, ECONOMIC THEORY,
        AND MARKETPLACE OUTCOMES, THE ALLEGED CARTEL DOES NOT
        APPEAR TO HAVE EFFECTIVELY RESTRICTED CAPACITY EXPANSION .........43

     C. THERE IS SUBSTANTIAL EMPIRICAL EVIDENCE THAT FIRMS DID NOT
        ADHERE TO PRICES DISCUSSED AT CRYSTAL MEETINGS ............................46

        1. Transactions data show price dispersion and evidence of cheating
           or failure to charge discussed prices .......................................................47

        2. Prices reported to DisplaySearch provide evidence that Defendants
           were cheating on discussed prices ..........................................................61

     D. PLAINTIFF EXPERTS HAVE PRESENTED NO EVIDENCE OF EFFECTIVE
        PUNISHMENT IN RESPONSE TO THE FAILURE TO ADHERE TO PRICES
        DISCUSSED AT MEETINGS .......................................................................64

V.   EVEN IF THE DEFENDANTS WERE SUCCESSFUL IN
     INFLATING PRICES OF SOME PANELS, THIS DOES NOT
     IMPLY THAT PRICES OF OTHER PANELS, OR OF PANELS
     SOLD BY DIFFERENT DEFENDANTS OR IN DIFFERENT TIME
     PERIODS WERE INFLATED ...................................................................66

     A. A LARGE PERCENTAGE OF PANEL SALES DURING THE CLASS PERIOD
        WERE OF PANELS NOT DISCUSSED AT RECENT CRYSTAL MEETINGS .........67

     B. JAPANESE DEFENDANTS DID NOT PARTICIPATE IN ANY OVERALL
        PRICE-FIXING CONSPIRACY OR IN THE CRYSTAL MEETINGS......................69

        1. Department of Justice statements regarding its TFT-LCD
           investigation do not include Japanese Defendants in the same
           conspiracy as other Defendants. ..............................................................69

        2. Japanese Defendants did not participate in Crystal Meetings ..............71

     C. ECONOMIC ANALYSIS OF THE TFT-LCD INDUSTRY PROVIDES NO BASIS
        TO CONCLUDE THAT THE EXISTENCE OF AN OVERCHARGE FOR ONE SET
        OF PANELS IMPLIES OVERCHARGES FOR OTHER PANELS ............................74

        1. Economic theory does not prove that conspiratorial increases in the
           prices of particular panels will necessarily raise prices of other
           panels. ....................................................................................................76

        2. Empirical evidence does not support the idea that an increase in the
           price of one panel would necessarily affect other panels ......................77

Highly Confidential – Subject to Protective Order

(a) *Correlations in prices of different panels over time do not demonstrate any causal link between prices of different panels* ...........77

(b) *Prices of different panels do not maintain a stable ranking over time.* ...........79

(c) *Prices following Crystal Meetings do not show common movement.* ..............83

D. Given the Lack of Persuasive Evidence that Prices of Different Panels were Necessarily Linked, Plaintiffs Have No Way to Establish Impact from the Alleged Cartel on All Panel Purchases .........................................................................85

**VI.   PRICES AND QUANTITIES OBSERVED DURING AND AFTER THE ALLEGED CONSPIRACY DO NOT SUPPORT PLAINTIFF EXPERTS' FINDINGS OF A SUCCESSFUL CONSPIRACY THAT RAISED PRICES SIGNIFICANTLY** .........................................................................86

A. There is No Evidence that Prices Decreased Faster After the End of the Alleged Conspiracy Period in 2006 ....................................................87

B. Patterns of Price and Quantity Movements During the Class Period Are More Consistent with Demand Shocks than with Conspiratorial Restrictions in Supply ................................89

C. Patterns of Price Changes and Capacity Utilization During the Class Period Are More Consistent with Demand Shocks than with Conspiratorial Restrictions in Supply ............................91

**VII.  PLAINTIFF EXPERTS' ESTIMATES OF SIGNIFICANT PANEL OVERCHARGES ARE BASED ON FAULTY ECONOMIC ASSUMPTIONS AND ECONOMETRIC MODELS** ....................................................93

A. Plaintiff Experts' Models Yield an Economically Nonsensical Result: Implying a Competitive Equilibrium with Consistently Negative Economic Profits .........................................93

  1. Dr. Netz's Economic Profit Margin Calculations .................................96

  2. Alternative Economic Profit Margin Calculations .................................97

B. Dr. Netz's Finding of a 12.1% Panel Overcharge Is Based on Fundamentally Flawed Econometric Models ....................................99

  1. Description of Dr. Netz's overcharge models........................................99

  2. Dr. Netz makes basic errors in data processing, which I correct in all analyses..........................................................................102

  3. Dr. Netz's choice of explanatory variables, and the coefficient estimates on those variables, demonstrate the flaws in her model .....................103

  4. Dr. Netz's price predictions demonstrate the flaws in her model........................105

  5. The extreme sensitivity of Dr. Netz's overcharge estimates to changes in her model demonstrates that the model provides no support for significant overcharges...................................110

Highly Confidential – Subject to Protective Order

*(a) If data are restricted to sales of TFT-LCD panels to third parties, Dr. Netz's model yields negative overcharge estimates.*......................................*110*

*(b) Dr. Netz's results are extremely sensitive to minor changes in technical econometric estimation details*......................................*111*

6. Even utilizing Dr. Netz's econometric procedures and model specification, Dr. Netz's results are driven by unnecessarily dropping large numbers of transactions when estimating the model..................114

7. Adding relevant control variables to Dr. Netz's model further reduces overcharge estimates from her model......................................116

8. Dr. Netz's dummy variable model does not support significant positive overcharges......................................117

*(a) Single dummy variable model provides no support for significant positive overcharges* ......................................*118*

*(b) Using annual dummies, most annual overcharge estimates are not statistically significant, and the implied pattern of overcharges is not consistent with significant effects from the alleged cartel*......................................*119*

*(c) Adding additional controls bolsters the finding of no significant overcharge* ......................................*120*

9. Summary of Conclusions on Dr. Netz's Overcharge Estimates ......................................121

C. PROFESSOR COMANOR'S FINDING OF AN 8.9 PERCENT OVERCHARGE IS BASED ON FAULTY ECONOMETRIC MODELS ......................................122

1. Description of Professor Comanor's model......................................122

2. Correcting a minor error in Professor Comanor's estimation yields slightly lower overcharges ......................................123

3. There is no reason to rely on DisplaySearch data in estimating overcharges. ......................................123

4. Dummy variable model vs. forecast model ......................................125

5. Professor Comanor does not include adequate controls for demand and supply side determinants of TFT-LCD prices, rendering his results unreliable. ......................................126

*(a) Lack of adequate supply-side controls*......................................*127*

*(b) Lack of adequate demand-side controls* ......................................*130*

6. Introducing appropriate cost controls to Professor Comanor's control variables yields small overcharges ......................................131

**VIII.  CONCLUSION** ......................................**133**

Highly Confidential – Subject to Protective Order

# I.    QUALIFICATIONS, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS

### A.  QUALIFICATIONS

1.      I am the David McDaniel Keller Professor of Economics at the University of Chicago Booth School of Business.  I received my A.B. in Applied Mathematics and Economics from Harvard University and my M.S. in Operations Research and Ph.D. in Economics from the Massachusetts Institute of Technology.  I have served on the faculties of the Law School and the Department of Economics at the University of Chicago and the Department of Economics at the Massachusetts Institute of Technology.

2.      I specialize in the economics of industrial organization, which is the study of individual markets and includes the study of antitrust and regulatory issues.  I am co-author of the book Modern Industrial Organization, a leading text in the field of industrial organization, and I have published numerous articles in academic journals and chapters in books.  In addition, I am an editor of the Journal of Law and Economics, a leading journal that publishes research applying economic analysis to industrial organization and legal matters. I also serve, and have served, as an editor of a variety of other scholarly journals.

3.      In addition to my academic experience, I am a Senior Managing Director of Compass Lexecon, a consulting firm that specializes in the application of economics to legal and regulatory issues.  From October 2006 through January 2008, I served as Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, the most senior position in the Antitrust Division held by an economist.  I also served as a Commissioner of the Antitrust Modernization Commission, created by the U.S. Congress in 2002 to evaluate the antitrust laws. I have provided expert testimony before various state and federal courts, the U.S. Congress, a variety of state and federal regulatory agencies, and foreign authorities.  I have served as a consultant to the Department of Justice, the Federal Trade Commission, and other government agencies.  My curriculum vitae is attached as Exhibit 1.

Highly Confidential – Subject to Protective Order

###### B. ASSIGNMENT

4.      Plaintiffs allege that Defendants "formed a cartel," which "agreed on prices, agreed to limit production, and agreed to manipulate the supply of TFT-LCD panels and products so that prices remained artificially high."[1]  For purposes of evaluating these allegations, the Court certified a nationwide class and several state classes, with the state classes (certified for damages) consisting of "[a]ll persons and entities…who, from January 1, 1999 to December 31, 2006 [the 'class period']…purchased LCD panels incorporated in televisions, monitors, and/or laptop computers…indirectly from one or more of the named Defendants or Quanta Display Inc, for their own use and not for resale."[2]

5.      I have been asked by counsel for certain Defendants[3] to assess whether the alleged cartel successfully raised the prices of some or all TFT-LCD panels above what those prices would have been in the absence of the alleged cartel, that is, above the "but-for prices."  To do so, I apply standard economic theory—much of which is described in my textbook (co-authored with Jeffrey Perloff) *Modern Industrial Organization*—to the TFT-LCD industry and to the nature of the alleged cartel activities to determine whether the alleged cartel was likely to have successfully raised panel prices above their but-for levels.  I also assess whether any success by the alleged cartel in inflating the prices of particular panels sold by particular Defendants in particular time periods necessarily

---

[1]     Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification, *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, March 28, 2010 (hereinafter, *IPP Order*), at 3.  I understand that the Indirect Purchaser Plaintiffs do not allege any conspiracy as to finished products (as opposed to a conspiracy as to the panels contained in finished products).  *See,* Indirect Purchaser Plaintiffs' Responses to LGD Amended Second Set of Interrogatories, April 5, 2011, at 16-17 ("For the purpose of this litigation (MDL No. 1827), Plaintiffs do not contend that there was a separate, distinct conspiracy to fix the prices of finished products.").

[2]     *IPP Order* at 35-36.

[3]     Throughout this report, I refer to "Defendants" as the Defendants named in the Third Consolidated Amended IPP Complaint.  These Defendants are: AU Optronics Corporation ("AUO"),  Chi Mei Optoelectronics Corporation ("CMO"), Chunghwa Picture Tubes, Ltd. ("CPT"), Epson Imaging Devices Corporation ("EIDC"), HannStar, Hitachi Ltd., LG Display ("LGD"), Samsung, Sharp Corporation, and Toshiba Corporation.  (Indirect Purchaser Plaintiffs' Third Consolidated Amended Complaint, April 29, 2011 (hereinafter, *IPP Complaint*), ¶¶ 56-85.)

Highly Confidential – Subject to Protective Order

implies higher prices for different types of panels or panels sold by other Defendants or in other time periods. I assess whether available data on panel prices, quantities sold, capacity utilization, and profits earned by panel producers support a claim that the alleged cartel successfully raised TFT-LCD panel prices above their but-for levels.

6.     I also have also been asked to assess the economic models used and the conclusions reached by Plaintiffs' economic experts Dr. Janet Netz[4] and Professor William Comanor.[5]

7.     My report does not address the ultimate effects of the alleged cartel on the prices of finished televisions, monitors, or laptop computers. I understand that analysis of the effect of the alleged cartel on finished product prices is the subject of Professor Edward Snyder's expert report in this matter. My report focuses entirely on the effect of the alleged cartel on the price of TFT-LCD panels sold for use in notebook computers, computer monitors, and televisions (notebook panels, monitor panels, and television panels).

8.     To carry out this assignment, I have relied on my experience as an economist who has spent more than 35 years studying the nature of competition, including the results of attempts by competitors to form cartels to restrict output and raise prices. I (or my staff, at my direction) have also reviewed depositions taken and reports filed in this matter; documentary evidence produced in this matter; and a range of other documents including academic literature, reports produced by third parties, and government filings by Defendants and other firms. I (or my staff, at my direction) have also studied data— produced by Defendants, other firms, and third parties—on prices, profits, costs,

---

[4]     Dr. Netz's opinions are described in Expert Report of Janet S. Netz, Ph.D., *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, May 25, 2011 (hereinafter, *Netz Report*); Deposition of Dr. Janet Netz, June 29, 2011 (hereinafter *Netz Depo.*); and Declaration of Janet S. Netz, Ph.D., In Support Of Indirect-Purchaser Plaintiffs' Opposition To Defendants' Joint Motion for Summary Judgment on Plaintiff Benjamin Larry Luber's Claims, MDL. No. 1827, Docket No. 3172-1, July 22, 2011.

[5]     Professor Comanor's opinions are described in Expert Report of William S. Comanor, Ph.D., *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, May 25, 2011 (hereinafter, *Comanor Report*); Supplementary Report of William S. Comanor, Ph.D., *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, June 13, 2011 (hereinafter, *Comanor Supplementary Report*); and Deposition of William S. Comanor, July 14, 2011 (hereinafter *Comanor Depo.*).

Highly Confidential – Subject to Protective Order

capacity, production, and other economic variables.  The materials that I have relied on are listed on Exhibit 2.

9.    For my work in this matter, Compass Lexecon has billed my time at $1,250 per hour and its compensation does not depend on the outcome of this matter.  I have been assisted by staff at Compass Lexecon in the preparation of this report.  The opinions expressed here reflect the information available to me at this time.  I reserve the right to revise my opinions if additional information makes such revisions appropriate.

## C.  SUMMARY OF OPINIONS

10.    My conclusions in this matter are summarized as follows:

- Fundamental economic logic applied to the characteristics of the TFT-LCD panel industry during the class period, as well as to the nature of the alleged cartel activities, indicates that the alleged cartel was unlikely to have generated significant overcharges such as the overcharges Plaintiff Experts estimate.

- The patterns of panel prices around the time of alleged cartel meetings (Crystal Meetings) are inconsistent with significant overcharges on panels or with common impact across all or nearly all panels.

- Even if the alleged cartel were successful in inflating prices of some panels sold by particular Defendants in particular time periods, this does not imply that prices of other panels, or of panels sold by different Defendants or in different time periods, were inflated.

- A straightforward assessment of panel prices charged before and after the end of the alleged cartel, as well as patterns of price, quantity, and capacity utilization movements during the alleged cartel, supports the conclusion that the alleged cartel did not succeed in raising prices significantly above but-for levels.

- Conclusions by Plaintiff Experts that disagree with this straightforward assessment of prices, quantities, and capacity utilization—finding significant overcharges due to the alleged cartel activity—are driven by faulty econometric models.

- Dr. Netz's and Professor Comanor's econometric models are deeply flawed and thus do not provide a reliable basis from which to conclude that the alleged cartel resulted in significant positive overcharges.  However, even if one wanted to use the models advanced by Dr. Netz and Professor Comanor to estimate an overcharge, one should, at a minimum, address basic flaws in their implementation.  After addressing basic flaws (but still leaving many

Highly Confidential – Subject to Protective Order

fundamental problems unsolved), I find that Dr. Netz's and Professor Comanor's models yield overcharge estimates of 0.7 – 1.3 percent.

- This finding that Plaintiff Experts' models yield a 0.7 – 1.3 percent overcharge is not based on any conclusion that the changes make the models reliable. It is further subject to my observations that Plaintiffs' allegations of an overarching conspiracy among all Defendants are fundamentally flawed. As noted in Section V.B.2, the Japanese Defendants did not participate in the Crystal Meetings. For those Defendants, as to which only sporadic, bilateral contacts with competitors are alleged, the difficulties in raising prices would be even more acute. For those Defendants, I would expect that any overcharge would be even less. I reserve the right to conduct further analyses based on this distinction and as may be required based on developments in the case.

11.     The remainder of this Report develops the factual, theoretical, and empirical basis for these conclusions. Section II provides relevant background on the TFT-LCD industry and the Defendants in this case. Section III explains why fundamental economic logic applied to the characteristics of the TFT-LCD industry during the class period indicates that the alleged cartel was unlikely to have generated the significant overcharges that Plaintiff Experts estimate. Section IV describes why the behavior of the alleged cartel, including clear evidence of failure to adhere to prices discussed at Crystal Meetings, further demonstrates that the alleged cartel was unlikely to have generated significant overcharges.

12.     Section V explains why any success of the alleged cartel in inflating the price of particular panels sold by particular Defendants in particular time periods does not imply that there were positive overcharges for other panels or panels sold in different time periods or by different Defendants. Section VI shows that the observed panel prices and quantities do not support the existence of a successful price-fixing conspiracy prior to 2006. Section VII explains that Dr. Netz's and Professor Comanor's conclusions, which are at odds with these plain facts, result from fundamentally flawed econometric models, which do not provide reliable support for significant overcharges. This section also explains that, at an absolute minimum, if one wants to rely on these models, one should address basic flaws in their implementation. After addressing basic flaws, I find that Dr. Netz's and Professor Comanor's models yield overcharge estimates of 0.7 - 1.3 percent. I stress that this finding that Plaintiff Experts' models yield a 0.7-1.3 percent overcharge

Highly Confidential – Subject to Protective Order

is not based on any conclusion that the changes render the models reliable.  Section VIII summarizes my conclusions.

## II.    BACKGROUND

### A.  TFT-LCD PANELS

13.    The Defendants in this case manufacture and sell TFT-LCD panels.  Dr. Netz described these panels as being composed of two thin glass sheets with a layer of liquid crystals in between.  Polarizers are placed at the front and back of the panel and the TFT array (an array of transistors where each transistor corresponds to a pixel) is deposited onto the substrate.  The polarizers and the TFT array interact with the combination of chemical compounds in the layer of liquid crystal to block or allow light to pass through. A light source known as the backlight is attached to the back of the panel and filtered by the other components to construct an image.  Driver circuits are used to transmit information to the rows and columns of pixels to create images on the TFT-LCD panel. A color filter may be attached to the front, although this is not always necessary.[6]

14.    A TFT-LCD panel combined with some electronic circuitry and other components is referred to as a TFT-LCD "module."  Thus, a TFT-LCD panel may be sold as a panel, a module, or embodied in a further-finished product such as a computer monitor.  My analysis deals with sales of either panels or modules and I will refer to both of these forms of the product as "panels."

15.    A TFT-LCD panel is an intermediate good.  That is, in most instances, panel manufacturers do not sell panels directly to end consumers but instead to other manufacturers that use the panels as an intermediate input into final goods, such as televisions, notebook computers, and computer monitors, which are eventually sold to end consumers.  For transactions pertinent to this case, panel manufacturers incorporate panels into end products, sell panels to other manufacturers who incorporate them into end products, and/or sell panels to distributors or resellers who sell them to manufacturers who incorporate them into end products; these end products are ultimately sold to final consumers.

---

[6]    *Netz Report* at 5-6.

Highly Confidential – Subject to Protective Order

### B.  DESCRIPTION OF DEFENDANTS AND ALLEGED CO-CONSPIRATORS

16.     In this section I describe my understanding of the Defendants and co-conspirators named by the Plaintiffs.[7]

#### 1.     Defendants

17.     AU Optronics Corporation ("AUO") was created in 2001 by the merger of Acer Display Technology, Inc., and Unipac Electronics.  During the class period, AUO manufactured, sold, and distributed TFT-LCD panels.  AUO sold and distributed TFT-LCD panels in the United States through AU Optronics Corporation America (f/k/a Acer Display Technology America, Inc.)  AUO merged with TFT-LCD panel maker Quanta Display in October 2006.

18.     Chi Mei Optoelectronics Corporation ("CMO"), Chi Mei Corporation ("CMC"), CMO Japan (formerly International Display Technology, "ID Tech"), CMO USA (formerly International Display Technology USA), Nexgen Mediatech, Inc. ("Nexgen"), and Nexgen Mediatech USA, Inc. ("Nexgen USA") sold TFT-LCD panels and/or finished products throughout the class period.  In 2009, CMO announced that it would merge with Innolux Display Corp. and TPO Displays Corp.  The merger was completed in 2010, and Innolux, the surviving entity, was re-named Chimei Innolux Corporation.

19.     Chunghwa Picture Tubes, Ltd. ("CPT") manufactured and sold TFT-LCD panels throughout the class period.  Tatung Company ("Tatung") was the largest shareholder of CPT until 2003.  Tatung Company of America, Inc. ("Tatung America"), a separate legal entity, purchased TFT-LCD panels from CPT and other manufacturers and sold TFT-LCD finished products manufactured to customers in the United States.  Neither Tatung nor Tatung America manufactured or sold TFT-LCD panels.

20.     Epson Imaging Devices Corporation ("EIDC") was formed in October 2004 as a joint venture between Seiko Epson Corporation ("Seiko Epson") and Sanyo Electric Co., Ltd.  The joint venture was known initially as Sanyo Epson Imaging Devices Corporation.  In December 2006, Seiko Epson bought the outstanding shares from Sanyo

---

[7]     This section is based on *IPP Complaint*, ¶¶ 56-105.  Counsel for Defendants supplied facts not noted there.

Highly Confidential – Subject to Protective Order

Electric Co., Ltd. and renamed the entity EIDC. EIDC and its predecessor Sanyo Epson
Imaging Devices Corporation manufactured and sold display modules containing TFT-
LCD panels to customers in the United States, including sales through Epson Electronics
America ("EEA"), a wholly-owned, indirect subsidiary of Seiko Epson.

21.     HannStar Display Corporation ("HannStar") first commenced manufacture of a
limited number of types and sizes of TFT-LCD panels in 2000, with substantial
production beginning in 2001. During the class period, HannStar principally
manufactured and sold TFT-LCD panels for monitors and notebooks. In 2005, HannStar
also began selling limited volumes of TFT-LCD finished products, some of which were
shipped to addresses in the United States.

22.     From the beginning of the class period until October 2002, Hitachi, Ltd.
("Hitachi") manufactured, marketed, sold, and distributed TFT-LCD panels to customers
in the United States. In October 2002, Hitachi spun off its TFT-LCD panels business to
Hitachi Displays, Ltd. ("Hitachi Displays") and ceased its involvement in the
manufacture or sale of TFT-LCD panels. Hitachi Displays has manufactured and sold
TFT-LCD panels since the time of its formation in October 2002. Hitachi Electronic
Devices (USA), Inc. ("HED(US)") has never engaged in the manufacture of TFT-LCD
panels. During the class period, HED(US) sold and distributed TFT-LCD panels
manufactured by Hitachi Displays to customers inside and outside of the United States.
In 2006, Hitachi Displays combined with Panasonic Corporation (formerly known as
Matsushita Electric Industrial Co., Ltd.) and Toshiba to form IPS Alpha Technology,
Ltd., which concentrated on large TFT-LCD panels for televisions.

23.     LG Display ("LGD") was created in August 1999 together by LG Electronics,
Inc. (which included LG Electronics USA, Inc.) ("LGE") and Koninklijke Philips
Electronics N.V. ("Philips"). LGD was originally named LG.Philips LCD Co. It was
renamed LGD in March 2008. LGE and Philips each initially owned 50% interest in LG
Display. Neither Philips nor LG Electronics has ever owned more than half of LG
Display's shares. LGD sold TFT-LCD panels to customers in the United States
throughout the class period including sales from its subsidiary LG Display America (f/k/a
LG.Philips LCD America, Inc.) LGD did not sell TFT-LCD finished products.

Highly Confidential – Subject to Protective Order

24.    Samsung Electronics Co., Ltd., manufactured and sold, through its subsidiaries, Samsung Semiconductor, Inc. and Samsung Electronics America, Inc. (collectively, "Samsung"), TFT-LCD panels and TFT-LCD televisions, monitors, and notebooks, to customers in the United States during the class period.

25.    Sharp Corporation ("Sharp") of Japan manufactured and sold both TFT-LCD panels and finished products in the United States throughout the class period.  Its subsidiary, Sharp Electronics Corporation, was responsible for the sales and marketing of TFT-LCD panels and finished products in the United States.

26.    Toshiba Corporation ("Toshiba") manufactured TFT-LCD panels until March 2002 and marketed TFT-LCD panels until March 2003.  In April 2002, Toshiba and Matsushita Electric Industrial Co. Ltd. combined their TFT-LCD manufacturing assets to form Toshiba Matsushita Display Technology Co., Ltd. ("TMD").[8]  In 2006, Toshiba combined with Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.) and Hitachi Displays to form IPS Alpha Technology, which concentrated on large TFT-LCD panels for televisions and in which Toshiba held a minority interest.  During the class period, Toshiba, and then TMD, manufactured and sold TFT-LCD panels to customers in the United States exclusively through Toshiba's subsidiary Toshiba America Electronic Components, Inc. ("TAEC").  Toshiba Corporation manufactured and sold finished product monitors and notebooks throughout the class period.  These products were sold exclusively in the United States through Toshiba's subsidiary Toshiba America Information Systems ("TAIS").

### 2.    Alleged co-conspirators

27.    Fujitsu is a Japanese TFT-LCD manufacturer.  In 1999, Fujitsu entered into a TFT-LCD cooperation agreement with Chi Mei, and in June 2002 Fujitsu Display Technologies Corporation ("FDTC") was established as part of Fujitsu's LCD business reorganization.  In 2003, AUO acquired a 20 percent interest in FDTC, and in 2005 Fujitsu transferred its interest in FDTC to Sharp.

---

[8]    In 2009, TMD was renamed "Toshiba Mobile Display Co., Ltd."

Highly Confidential – Subject to Protective Order

28.    Hydis Technologies Co., Ltd., f/k/a BOE Hydis Technology, originated in 1989 as the LCD business division of Hyundai Electronics Industries Co.  Hydis was acquired by the BOE group from Hyundai in 2001.  It filed for court receivership in September 2006.  BOE Hydis manufactured and sold TFT-LCD panels and products throughout the class period.

29.    Mitsubishi Electric Corporation ("Mitsubishi") has been involved in the TFT-LCD industry throughout the class period.  In 1991, Mitsubishi entered a joint venture with Asahi Glass Co., Ltd. ("Asahi") called Advanced Display Incorporated ("ADI"), with Mitsubishi owning 80 percent of the joint venture.  Mitsubishi purchased the remaining stake in ADI in September 1999.  During the class period, Mitsubishi manufactured and sold TFT-LCD panels and products to customers.

30.    NEC LCD Technologies ("NEC") manufactured and sold TFT-LCD panels and products in the United States during the class period.  NEC also participated in joint ventures with Shanghai's SVA, forming SVA NEC in 2003, and with Mitsubishi, forming NEC/Mitsubishi in 2000.  NEC/Mitsubishi became a full subsidiary of NEC in 2005.

31.    Panasonic Corporation ("Panasonic") was known as Matsushita Electric Industrial Co., Ltd. until October 2008.  During the class period, Panasonic held a minority stake in panel manufacturer TMD and a majority stake in panel manufacturer Panasonic Liquid Crystal Display Co., Ltd. (formerly known as IPS Alpha Technology, Ltd.).  In addition, Panasonic sold TFT-LCD finished products to customers in the United States during the class period through Panasonic Corporation of North America, a wholly-owned subsidiary.

32.    Sony Corporation ("Sony") started in the TFT-LCD industry in 1997 with STLCD Corporation, a joint venture with Toyota Industries Corporation, engaging in the production of TFT-LCD panels for mobile applications.  In 2004, Sony established a joint venture with Samsung, called S-LCD Corporation, for production of large TFT-LCD television panels.  In 2005 Sony acquired CMO's wholly-owned Japanese subsidiary ID Tech. Throughout the class period Sony manufactured and sold TFT-LCD finished products in the United States.

Highly Confidential – Subject to Protective Order

### 3.    Defendants' panel sales were largely outside the United States

33.    Figure II-1 and Figure II-2 show the percentage of each Defendant's 2001-2006 TFT-LCD panel revenue made up of transactions with "ship-to" or "bill-to" locations outside of the U.S.[9]  In these figures, I do not include data from any of the Defendants' marketing affiliates (*i.e.*, Sharp Electronics, HEDUS, TAEC, and CMO USA).  Inclusion of sales from these marketing arms would likely result in double-counting, as sales from the manufacturing entity to the marketing entity are already included in the totals.

34.    As is clear from these figures, the Defendant manufacturers shipped and/or billed the vast majority of their TFT-LCD panel sales to locations outside of the U.S.[10, 11]

---

[9]    I include in these figures only those companies for which I have adequate data throughout the time period.

[10]    As discussed in Section II.D, these panels represent a broad diversity of applications. Within applications, panels are further differentiated by size, resolution, and a range of other characteristics.

[11]    Sharp Corporation's percentage of sales to ship-to entities located outside the U.S. is conservative because nearly all U.S. sales are to Sharp Electronic Corp., its U.S. marketing subsidiary, which in turn has substantial sales shipped to foreign locations.

Sharp Corporation's percentage of sales to bill-to entities located outside the U.S. is conservative in that nearly all U.S. sales are billed-to Sharp Electronics Corp., its U.S. marketing subsidiary, and some of these sales are shipped to foreign entities.  In addition, the majority of Sharp Electronics Corp. bill-to sales (product received from Sharp Corp.) are shipped to foreign locations.

Highly Confidential – Subject to Protective Order

**Figure II-1: Percentage of Panel Sales to "Ship-to" Entities Located Outside of the U.S., 2001-2006**



Notes:
Percentage of sales is based on sales expressed in U.S. dollars.
For AUO, CPT, CMO, HannStar, Hitachi Displays, LGD, Samsung, and Sharp, the location of the ship-to entity is used to identify the country to which the product was shipped. For Toshiba/TMD, the country of the ship-to entity is not available, so only sales to Toshiba America Electronic Components were counted as being shipped to the U.S.
Source: Defendants' transactions data.

**Figure II-2: Percentage of Panel Sales to "Bill-to" Entities Outside of the U.S., 2001-2006**



Notes:
Percentage of sales is based on sales expressed in U.S. dollars.
For AUO, CPT, CMO, HannStar, LGD, Samsung, and Sharp, the location of the bill-to entity is used to identify the country. For Toshiba/TMD, the country of the bill-to entity is not available, so only sales billed to Toshiba America Electronic Components were counted. Bill-to country information was not available for Hitachi Displays.
Source: Defendants' transactions data.

Highly Confidential – Subject to Protective Order

### C.  GROWTH AND EVOLUTION OF TFT-LCD INDUSTRY

35.     In the years just before and during the class period, the TFT-LCD industry underwent a number of significant changes.  In this section, I describe these changes; in Section III below, I explain more fully why a cartel is unlikely to be successful in such a dynamic industry.

36.     Since its inception in the early 1990s, the TFT-LCD industry has been characterized by "explosive market growth,"[12] and during the time period covered by the Class Period, new applications for TFT-LCD panels drove market expansion.[13]  Figure II-3 shows total annual panel sales volume and the share accounted for by different applications from 2000 - 2010.[14]  Over the 2000-2006 period, total sales of TFT-LCD panels approximately quintupled, with a compound annual growth rate of about 30 percent.  The importance of different applications shifted over time, with notebook panels, which had dominated sales in 2000, declining in relative importance, monitor panels leading the way in the middle years, and TV panels dominating the industry by the end:

> New applications for these panels keep being developed, from the original application of flat screens for notebook computers, to the rapid penetration of desktop monitors (displacing traditional cathode ray tube displays), to LCD TVs that are now invading the consumer television market, to small displays lighting up cell phones, digital still cameras, and personal digital assistants, as well as to large displays such as the light-emitting diodes that are illuminating our cities in a way never seen before.[15]

---

[12]     John A. Matthews (2005), "Strategy and the Crystal Cycle," *California Management Review,* 47(2), at 9; *see also, Comanor Report* at 13.  ("Critical features of this marketplace include the exploding demand for LCD panels and the rapid growth of new investment designed to meet this demand.")

[13]     Matthews (2005) at 19.

[14]     Figure II-3 and other figures in this report are based on DisplaySearch data.  As shown in Sections IV.C.2 and VII.C.3, when available, actual transaction data should be used. However, some of the analyses in this report require information not available from Defendants' transaction data.  For example, I use DisplaySearch for analyses that require total industry sales or capacity.

[15]     Matthews (2005) at 7.

Highly Confidential – Subject to Protective Order

**Figure II-3: Annual TFT-LCD Panel Sales, by Application, 2000-2010**



Source: DisplaySearch panels data, DISP_LCD_000001.

37.     Along with the explosive growth in TFT-LCD panel production, and the increasing breadth of applications, the locus of production has shifted.  Through 1995, production almost exclusively occurred in Japan.  In the mid-1990s, Korean firms— notably LG Display and Samsung—entered the industry.  Then in the late 1990s and early 2000s, Taiwanese firms entered, including Chi Mei, Chungwa, HannStar, and the predecessors to AU Optronics.  Figure II-4 charts the shift in capacity between different countries.[16]

---

[16]     Figure II-4 relies on a DisplaySearch presentation from November 2005, so capacity shares shown after 2005 are DisplaySearch estimates.

Highly Confidential – Subject to Protective Order

**Figure II-4: TFT-LCD Industry Capacity Shares**



Source: Hsieh, David, "Flat Panel Display Market Outlook", Shanghai Intl. Industry Fair, DisplaySearch, November 5, 2005, at p. 17.

### D. BROAD RANGE OF TFT-LCD PANELS

38.     Not only are TFT-LCD panels used in an array of applications, but within applications they are made in a broad array of sizes, resolutions, and other characteristics.

39.     Even just considering the most basic differences across panels—size and resolution—the panels at issue define a broad set.  In Defendants' transactions data (restricting attention to panels identified as notebook, monitor, and TV panels), I observe sales of panels in more than 55 different panel sizes, ranging from 10 inches to 55 inches, and over 15 different display standards, yielding over 140 unique display standard and size combinations.

40.     Differentiation across panels ranges far beyond size and resolution.  For example, Dr. Netz notes that panels vary in characteristics such as "brightness, contrast ratio, viewing angle, pin assignment, interfaces, and connectors."[17]  Other relevant dimensions of differentiation include: viewing angle, contrast, brightness, glare, color quality,

---

[17]     *Netz Report* at 6; *Netz Depo.*, 149:1-18.

Highly Confidential – Subject to Protective Order

response time, cosmetic specifications, "greenness," and thickness.[18]  Panel characteristics also vary in importance depending on the application.  For instance, relative to other applications, TFT-LCD TVs generally require higher contrast ratios, wider viewing angles, and faster response times in order to compete with other TV technologies such as cathode ray tube ("CRT").[19]  For notebook PCs, it is important that aperture rates allow for brighter displays and more energy efficient driver electronics.[20]

41.      In sum, there are a very large number of combinations of panel characteristic combinations.[21]  One illustration of the wide range of panel types available is that AUO's transactions data lists more than 450 different types of notebook, monitor, or television panels sold, of which more than 325 garnered more than $100,000 in sales each.[22]

### E.  DECLINING PRICES

42.      TFT-LCD panel prices are characterized by two separate downward trends: (1) a downward price trend of a particular panel (which is priced highest when first introduced with subsequent declines in price) and (2) a downward price trend of all panels over time (meaning new panels tend to be introduced at a lower absolute price than previous

---

[18]    *See* the general discussion of relevant characteristics in David Hsieh, "LCD Demand, Panels, Substrates All Move from Large to Larger," *DisplaySearch Trends*, Spring 2006; Richard Chu, "Sharp," ING Barings, July 26, 2001, at 13; Deposition of Scott Birnbaum (Vice President, LCD Business, Samsung Semiconductor), February 19, 2009, 195:4-23; and Deposition of Joyce Pan (Sales Manager, AU Optronics Corporation), March 9, 2009, 79:8-80:16.

[19]    *See*, *e.g.*,  http://reviews.cnet.com/4520-6449_7-6792632-1.html (July 21, 2011.)

[20]    *The DisplaySearch Monitor*, Vol. 1, No. 2, June 13, 1996, GRNE0334788-805 at 793. ("With the higher aperture rates, smaller, less power hungry backlights can be used to achieve the same level of brightness (approximately 70 cd/m$^2$ in notebook PCs).  Higher aperture rates have allowed the backlight power consumption to decrease 30% from 1.3W to 0.9W.  On the other hand, if brightness is the goal as in LCD monitors, the same backlight used in previous models will increase brightness by as much as 70% with SHA panels.  Another area where significant progress has been made is in reducing the power consumption of the driver electronics….As a result, TFTs targeting the notebook market are no longer power hogs.")

[21]    Professor Comanor noted that there are hundreds of different products in the data he used in his analysis.  (*Comanor Depo.*, 61:2-15.)

[22]    Calculations included in backup materials.  I define a unique panel in the AUO data using a combination of model number and version number; it is my understanding that both model and version number must be used to capture relevant product characteristics.

Highly Confidential – Subject to Protective Order

models).  See, for example, Figure II-5, which illustrates the downward trend in price of the 17" SXGA monitor panel.

**Figure II-5: Average Panel Price, 17" SXGA Monitor, 1999-2009**



Source: Defendants' transaction data.

43.      Declining prices have been driven in large part by investments in successive "generations" of fabs, designed to handle successively larger-sized motherglass, which allows more panels and/or panels of larger sizes to be formed from a single sheet.  For example, the third generation fabs, which were still in substantial use at the start of the class period, could handle motherglass of just over 5 square feet, while seventh generation fabs, which were well established by the end of the class period, could handle motherglass roughly 10 times larger (more than 50 square feet).  As Professor Comanor has acknowledged, the use of this larger motherglass has substantially reduced manufacturing costs.[23]

---

[23]      *IPP Complaint*, ¶ 114.  "If we turn to Page 11 in the report we see that I cite some evidence that has increased from the generations of technology that there have been increasing economies of scale.  As technology shifted from Generations 4 to 7, the costs

Highly Confidential – Subject to Protective Order

44.    In some time periods, however, the price declines appear to have been faster than declines in costs.  TFT-LCD industry analysts have noted periods when prices fell close to or below costs.  For example, an industry analyst described the 2000-2001 price decline: "[a]verage panel prices have dropped by over 30% since 4Q00.  At these levels, manufacturers are producing at negative gross margins and prices are near cash costs."[24]

45.    To be clear: I am *not* claiming that this pattern of declining prices, on its own, prove the absence of a cartel.  However, this pattern of rapidly falling prices is the backdrop against which all assertions and analyses in this case must be assessed.  For example, when evaluating Dr. Netz's and Professor Comanor's overcharge models (discussed in Section VII), one should keep in mind that the vast majority of the observed "non-cartel" sales—which are used as a benchmark for the prices that would have obtained but-for the alleged conspiracy—occur after 2006, when prices were dramatically lower than during most of the class period.  Absent sufficient controls to account for the general pattern of falling prices (perhaps including an overall time trend or a measure of the elapsed time since each type of panel was introduced, as well as other control variables), Plaintiff Experts' models are likely to find large overcharges, based simply on the fact that prices were much lower after 2006 than before.  Hence, in reviewing those models, it is critical to evaluate whether they have enough suitably powerful controls to adjust for declining prices, rather than simply attributing higher early prices to cartel effects.

46.    As discussed more fully in Section III, rapid declines in price during the period of the alleged cartel are consistent with the large body of economic literature on cartel pricing, which demonstrates that cartels often break down, leading to rapid declines in price.[25]  When cartel members cheat on a price agreement by charging a price lower than the agreed-on price, which often is in a firm's economic self-interest, prices can decline rapidly.  In addition, the economics literature is also clear that, even during the lifespan of

per glass area processed at capacity per month declined substantially, really substantially, which represented a savings of more than 60 percent" (*Comanor Depo.*, 113-114).

[24]    Nicholas Teo, "Acer Display Technology," *ING Barings*, May 23, 2001, at 7.

[25]    *See, e.g.*, Margaret E. Slade (1990), "Strategic Pricing Models and Interpretation of Price-War Data," *European Economic Review,* 34.

Highly Confidential – Subject to Protective Order

cartels, price wars can occur, during which prices fall to or below economic cost.[26] Attempts to maintain a price-fixing agreement will encourage entry which, if it occurs, also can cause the agreement to break down.[27]  I note that the rapid price declines during 2000-2001 occurred as firms from Taiwan entered the market and began to build up share.

## III.  THE CHARACTERISTICS OF THE TFT-LCD INDUSTRY ARE NOT CONDUCIVE TO A STABLE, SUCCESSFUL PRICE-FIXING CARTEL

### A.  ECONOMIC THEORY OF CARTELS

47.      The record in this matter indicates that there were numerous meetings among various subsets of the Defendants between 2001 and 2006.  Neither the fact of these meetings nor the admission of liability by some of the Defendants' executives automatically implies the existence of substantial harm to customers.  This is because an agreement among horizontal competitors to raise price may fail to raise price substantially above that which would have prevailed in the absence of the agreement.[28] Although companies may desire to form a cartel to raise industry profits, economic conditions in the industry and each firm's strong, individual incentive to maximize its own profits may prevent the firms from carrying out their joint plan.  Indeed, a large body

---

[26]     For a discussion of price wars, *see*, Margaret C. Levenstein and Valerie Y. Suslow (2004), "Studies of Cartel Stability: A Comparison of Methodological Approaches," in Peter Z. Grossman, *ed.*, *How Cartels Endure and How They Fail: Studies of Industrial Collusion*, Edward Elgar.

[27]     For the fact that attempts to maintain collusively high prices will encourage entry, *see, e.g.,* Yuliya V. Bolotova (2009), "Cartel Overcharges: An Empirical Analysis," 2009, *Journal of Economic Behavior & Organization* 70, at 331.  ("Setting a high level of cartel price is likely to attract new entrants, which would make collusive actions less profitable.")

[28]     Levenstein and Suslow (2006) note, for example, that "[t]here are cases where cartels have continued to exist on paper for many years with little sustained effect on price." (Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success*?" Journal of Economic Literature*, 44(1), at 45.)

Highly Confidential – Subject to Protective Order

of economic literature establishes that attempts by cartels to raise prices may not be successful.[29]

48.      The economic theory of cartels assumes that firms desire to maximize their profits.[30]  If firms could agree jointly to reduce industry output and raise prices, then industry profits would increase over the level of profits in a competitive industry. However, although a joint agreement to reduce output and raise price would increase industry profits, there are significant internal and external threats to such an agreement.

49.      The internal threats arise because the incentives of individual cartel members conflict with the incentives of the group.  Although firms are jointly better off if they all agree to raise price (and therefore they have a joint incentive to agree to do so), *any individual firm is better off if, having convinced other firms to raise their prices, it undercuts the agreed-upon price*.  As Stigler (1964) explained:

> It is a well-established proposition that if any member of the agreement can secretly violate it, he will gain larger profits than by conforming to it… If price is above marginal cost, marginal revenue will be only slightly less than price (and hence above marginal cost) for price cuts by this one seller.[31]

Generally, every firm that is a party to a cartel agreement has an individual incentive to undercut the agreed-upon price.  This conflict between the incentives of individual firms and the incentives of the group acting together makes it difficult to maintain cartels.

50.      The external threats to a price-fixing agreement arise if there are firms that do not participate in the cartel and that have the capacity to expand output significantly, or if entry can occur.  Either of these factors threatens the cartel because the cartel's efforts to increase prices (and therefore drive profits up) will attract additional output—either from non-participants that ramp up production in response to the higher prices or from new firms that enter the industry.  Thus even if a cartel can meet the considerable challenges

---

[29]      For a survey of the literature, *see*, Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success*?*" *Journal of Economic Literature*, 44(1).

[30]      For a discussion of the theory of cartels, *see*, Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th edition, at 122-154.

[31]      George J. Stigler (1964), "A Theory of Oligopoly," *Journal of Political Economy,* 72(1), at 46.

Highly Confidential – Subject to Protective Order

associated with controlling its own members' behavior, it may be unsuccessful in sustaining a high price if it cannot bring non-participants and new entrants into the cartel agreement.[32, 33]

51.     The extent to which the internal and external threats to cartel stability hinder the ability of attempted conspiracies to raise price depends on the specifics of the industry in question.  Hence, any analysis of the success of an alleged price-fixing conspiracy should begin with an intensive, fact-based analysis of the characteristics of the industry in question to see whether it is or is not likely to support a successful price-fixing cartel.

52.     To the contrary, Plaintiff Experts largely ignore the difficulties of forming a successful cartel, draw incorrect conclusions about the effects of industry conditions on the alleged cartel's success, or assume that the problems of maintaining cartels were solved by the Defendants, not acknowledging evidence to the contrary.

53.     Dr. Netz discusses the intent of cartel participants to raise price and indicates, properly, that firms have individual incentives to fail to comply with a cartel agreement.[34] To sustain a cartel agreement, the parties to the agreement must have the ability to detect noncompliance and to punish noncompliant firms.  Otherwise, it will be in a firm's individual interest to cheat on a cartel agreement.

---

[32]    Blum (2007) examines the East German cement cartel over the period 1997-2002.  He concludes that the cartel was not effective before 2001, and a price war erupted in 2002, due to increased imports.  "Most likely, imports from Poland and Czech Republic were dumped into the East German market, and some medium-sized producers were responsible for the cartel never working."  (Ulrich Blum (2007), "The East German Cement Cartel: Cartel Efficiency and Policy After Economic Transformation," *Eastern European Economics,* 45(6), at 5.)

[33]    Hillman (2010) discusses the international tin cartel created by a series of intergovernmental agreements beginning in the 1920s.  The International Tin Committee (1927-56) was given the power to control production. It was succeeded by the International Tin Council, which formed six agreements over the period 1956-86. Hillman attributes the eventual failure of the cartel to the stimulative effect of higher prices.  "Diagnosis of the ultimate source of the failure of the Council has pointed in the direction of price policy.  Prices were set too high, reducing consumption and stimulating outside production." (John Hillman (2010), *The International Tin Cartel*, Routledge, at 367.)

[34]    *Netz Report*, § VI.A.1.

Highly Confidential – Subject to Protective Order

54.       Professor Comanor states that cartel formation is in firms' joint interest and results in higher prices.[35]  But he does not appear to take seriously the conflict between joint and individual interests that can lead to cheating on a price-fixing agreement and the breakdown of a cartel.  He dismisses the likelihood that the Defendants cheated on a price-fixing agreement (which would have lowered prices), and states that although cheating "remains a theoretical possibility, its importance is minimal in the face of evidence on cartel overcharges."[36]  He points to empirical economic studies of other cartels indicating that cartels can be successful[37] and he describes several TFT-LCD industry characteristics that he says make it more likely that the alleged cartel would have been successful.[38]  Still, given Professor Comanor's statement regarding the lack of importance of the theoretical possibility of cheating, his opinion appears to be that it would be peculiar to fail to find a significant overcharge in this industry.  To the contrary, as I show below, the empirical evidence does not support the theory that the Defendants formed and maintained a successful cartel despite the numerous Crystal Meetings.  In this situation, the economic theory of cartels, applied to the facts of the industry, helps in understanding the Defendants' lack of success.

---

[35]       "Cartels are formed because it is in the interest of rival firms not to compete with each other. Higher prices typically result…."  (*Comanor Report* at 10.)

[36]       *Comanor Report* at 8.  Professor Comanor indicates that an instance where firms did not follow agreed-upon prices because they had excess production capacity does not qualify as "cheating," and he states that, "[t]he mere fact that a cartel agreement may not have been followed perfectly does not necessarily mean that 'cheating' occurred." (*Comanor Report* at 7.)  If a firm charges less than the agreed-upon price because it has excess production capacity that it doesn't want to hold idle, however, that is indeed "cheating" because the firm agreed to one thing in order to maximize joint profit but it acted differently in order to maximize its individual profit.  Professor Comanor's statement that the lack of perfect execution of a price-fixing agreement does not indicate that cheating occurred is true; cartels may execute imperfectly yet still raise price significantly.  What is relevant in the end is whether imperfect execution or cheating (or some combination if the two) interfered with the alleged cartel's ability successfully to raise price significantly.

[37]       *Comanor Report* at 7-10.

[38]       *Comanor Report* at 10-13.

Highly Confidential – Subject to Protective Order

55.     A careful evaluation of the TFT-LCD industry reveals that among its fundamental characteristics are precisely those that make cartel success unlikely.[39]  These characteristics include:

- the technology has evolved rapidly and is characterized by learning by doing;

- the industry is characterized by technological and demand uncertainty;

- the industry is dynamic with new entry and capacity expansion;

- the industry is unconcentrated by standard measures (including those used by Dr. Netz and Professor Comanor in their discussion of final product markets);

- many Defendants are vertically integrated into the production of finished products that make use of TFT-LCD panels;

- the Defendants differ in the extent to which they sell products that compete with TFT-LCD panels and products;

- the panels sold are heterogeneous; and

- the buyers of panels are heterogeneous.

56.      In the remainder of this section, I discuss each of these characteristics in turn. To be clear, none of the evidence presented in this section, on its own, proves that the alleged cartel failed to raise prices significantly.  Such evidence comes in Sections VI and VII of this report.  This section sets a context for those findings.  If one looks beyond superficial price correlations or counts of meetings to the deeper economic characteristics of the industry, one sees a recipe for cartel failure.  Hence, a finding of little or no effect by the alleged cartel on prices is far from surprising.  To the contrary, it is consistent with long-established economic theory.

---

[39]      Recent discussions of the factors that affect cartel success can be found in: Margaret C. Levenstein and Valerie Y. Suslow (2011), "Breaking Up Is Hard to Do: Determinants of Cartel Duration," *Journal of Law and Economics* (forthcoming); Dennis W. Carlton and Sam Peltzman (2010), "Introduction to Stigler's Theory of Oligopoly," *Competition Policy International*;  Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success?" *Journal of Economic Literature*; Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th Edition, Chapter 5; Peter Z. Grossman, *ed.,* (2004), *How Cartels Endure and How They Fail*; Marc Ivaldi, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole (2003), "The Economics of Tacit Collusion," IDEI; Alexis Jacquemin and Margaret E. Slade (1989), "Cartels, Collusion, and Horizontal Merger," in Richard Schmalensee and Robert Willig, *eds.*, *Handbook of Industrial Organization.*

Highly Confidential – Subject to Protective Order

### B.  RAPIDLY EVOLVING TECHNOLOGY

57.      The economic theory of cartels supports the idea that industries experiencing rapid technological change will find it more difficult to maintain a price-fixing agreement.  For example:

> Industries that are subject to rapid technical change find it particularly difficult to reach agreements. Technical change can introduce differences in product lines, production cost, and demand conditions.  In addition, the pace and direction of innovation is difficult to predict.[40]

58.      And, as stated in a report to the European Competition Commission:

> Innovation makes collusion on prices less easy to sustain. The reason is that innovations, particularly drastic ones, may allow one firm to gain a significant advantage over its rivals. This prospect reduces both the value of future collusion and the amount of harm that rivals will be able to inflict if the need arises…. Therefore, in both instances the same conclusion holds: The more likely innovation is, the more difficult it is to sustain collusion. Collusion is thus less of a concern for antitrust authorities in innovation-driven markets.[41]

59.      It is clear that the TFT-LCD production technology evolved dramatically over the class period and that investments in new fabs drove down production costs.  For example, the Complaint describes the reduction in costs associated with increases in the size of the glass sheets that go into the production of panels:

> Since 2000, glass substrate size for LCD panels has approximately doubled every 1.5 years. Large-generation glass offers great economies of scale: larger sheets allow display manufacturers to produce more, and larger, panels from a single substrate more efficiently. Today's eighth generation glass substrates have about four times the surface area of fourth generation substrates, which means they yield more (and larger) LCD panels. For instance, one eighth generation substrate can produce the panels needed for fifteen 32" LCD televisions. Larger sheets of glass reduce manufacturing costs. For example, panel costs were approximately

---

[40]      Alexis Jacquemin and Margaret E. Slade (1989), "Cartels, Collusion, and Horizontal Merger," in Richard Schmalensee and Robert Willig, *eds.*,  *Handbook of Industrial Organization*, at 420.

[41]      Marc Ivaldi, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole (2003), "The Economics of Tacit Collusion," *IDEI*, at 32-35.

Highly Confidential – Subject to Protective Order

$20/inch for fourth generation fabs, falling to $10/inch for fifth generation fabs, and then falling another 80% to the eighth generation.[42]

60.    This evolution also means that there will be several generations of fabs producing panels at any point in time.  Figure III-1 shows the share of industry capacity accounted for by fabs of each generation, in each quarter, 1996-2010.[43]  This phenomenon means that at the same point in time, both within and across firms, there will be a range of production technologies and therefore a range of production costs. This range of costs makes reaching and maintaining a cartel agreement more problematic.

**Figure III-1: Share of TFT-LCD Capacity by Fab Generation, 1996Q1-2010Q4**



Source: DisplaySearch capacity data, DISP_LCD_000002.

61.    Plaintiff Experts agree that the industry is characterized by rapidly changing technology.  For example, in his deposition, Professor Comanor referenced the

---

[42]    *IPP Complaint* at 113-114.   *See also, Comanor Report* at 11; *Netz Report* at 11.

[43]    To simplify the figure, multiple "sub-generations" are collapsed into generations 2, 3, and 5.

Highly Confidential – Subject to Protective Order

"technological change associated with shifting from among the different generations of technology…."[44]

62.     Dr. Netz describes the phenomenon of learning by doing as giving early investors an advantage because as firms gain experience operating new fabs their production costs fall.[45]  The practical implication of learning by doing is that firms that invest in new fabs first and set relatively low prices that enable them to capture share (and thus gain experience with those new fabs) can gain substantial competitive advantages.  Put simply, learning by doing creates incentives to invest quickly and capture share in order to push down production costs, exactly the opposite of the incentives associated with sustained commitment to inflated cartel prices and reduced supply.[46]  Learning by doing heightens the internal threats to cartel success.

63.      In sum, during the period at issue, this industry underwent fundamental and rapid technological evolution of the sort that destabilizes cartels.

### C. TECHNOLOGICAL AND DEMAND UNCERTAINTY

64.     Various forms of uncertainty weaken cartels because participants cannot distinguish between cheating behavior and the effect of exogenous shocks that depress prices.

> In a market characterised by frequent demand shocks or large uncertainty it might be difficult to understand whether poor sales are due to demand variability or to price undercutting of rivals. Accordingly, collusion might be more difficult to sustain.  By contrast, in a mature stable market it would be easier to spot deviations and punish them rendering collusion easier.[47]

---

[44]    *Comanor Depo*, p. 159:9-11.

[45]    *Netz Report* at 54.

[46]    *See* for example David Besanko, David Dranove, Mark Shanley, and Scott Schaefer (2004), *Economics of Strategy*, at 96 for a discussion of the fact that, contrary to a cartel's desire to restrict output and thus increase prices, firms facing an important learning curve may produce *more* than would otherwise be optimal in order to gain experience and drive down production costs.

[47]    Massimo Motta (2004), *Competition Policy: Theory and Practice*, Cambridge University Press, at 146.

Highly Confidential – Subject to Protective Order

When it is difficult to distinguish deviations from a cartel agreement from random demand or supply shocks that affect price, firms are more likely to deviate because they know that the chance they will be detected is small.

65.    The complex interplay of "shocks" to the demand for TFT-LCD panels (due to new applications for panels over time, from computer monitors, to mobile phones, to televisions), technological advances, and capacity expansions generates uncertainty about the rate at which TFT-LCD prices will fall (or when there will be periods of price increase).  This uncertainty has been reflected in uncertainty about the timing of the "crystal cycle"—the intermittent periods of boom and bust in TFT-LCD panel pricing.[48] It is also reflected in the unsteady pattern of price declines in Figure II-5.  The problem for cartel members is this: Are observed downturns in sales volume due to price undercutting by other firms, demand declines, or other aspects of the crystal cycle? Unable to separate these, firms may react as though there has been cheating—potentially leading to cartel breakdown—even if the original decline was due to other economic factors.[49]

### D.  INDUSTRY DYNAMISM

#### 1.    Entry

66.    The entry of new firms in an industry is disruptive to a cartel.[50]  Substantial entry occurred in the TFT-LCD industry during the class period, notably the Taiwanese suppliers, such as CPT and HannStar, that entered in 1999-2000 and grew their shares to some degree over time, as well as companies that entered throughout the time period at a small scale and remained small.

---

[48]    Frank Lee and Grace Kuo, "TFT LCD Sector (Part I)," *Deutsche Bank*, November 8, 2002, at 21.

[49]    *See,* Edward J. Green and Robert H. Porter (1984), "Noncooperative Collusion under Imperfect Price Information," *Econometrica*, 52(1).

[50]    *See*, Margaret C. Levenstein and Valerie Y. Suslow (2004), "Studies of Cartel Stability: A Comparison of Methodological Approaches," in Peter Z. Grossman, *ed.*, *How Cartels Endure and How They Fail,* Table 1.11.

Highly Confidential – Subject to Protective Order

67.     Dr. Netz describes at length barriers to entry in this industry including high capital costs, learning by doing, lags in establishing production, and R&D requirements.[51] Dr. Netz quantifies these barriers to entry by calculating the minimum viable scale (MVS) that an entrant would have to obtain in its first year of operation in order to be viable.  Dr. Netz claims that a new entrant needs to capture at least 5.5 to 8.0 percent of industry revenues in its first year of operation in order to be viable.[52]

68.     Dr. Netz's minimum viable scale calculations are belied by the facts of this case. Several manufacturers entered the TFT-LCD industry during the class period at a small scale and some maintained small shares for years after entry.  Table III-1 shows shares of industry revenues for each manufacturer for 1999-2010.[53]  In any year during this period, at least 10 suppliers had less than 5.5 percent of industry revenues.  Collectively, the small suppliers were important producers.  Overall, between 10 percent and 39 percent of total industry revenues were made by suppliers with a share of less than 5.5 percent, and up to 53 percent of total industry revenues were made by suppliers with a share of less than eight percent.  HannStar, for example, entered in 2000 and remained below 5.5 percent of industry revenues throughout the class period.

---

[51]     *Netz Report* at 45-60.

[52]     *Netz Report* at 60.

[53]     Table III-1 includes industry revenues for monitor, notebook, and TV panels, as calculated by Dr. Netz.  (*See,* file produced by Dr. Netz, "MVS Calculation and Data.xls.")

Highly Confidential – Subject to Protective Order

**Table III-1: Share of Revenues by Manufacturer - Monitor, Notebook and TV panels, 1999-2010**

| TFT-LCD Supplier | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AUO | | | | 8.94% | 11.80% | 13.16% | 13.76% | 15.95% | 19.28% | 17.24% | 15.58% | 15.72% |
| Acer | 1.95% | 3.25% | 8.46% | 3.10% | | | | | | | | |
| BOE Hydis | 1.90% | 2.69% | 3.24% | 4.00% | 3.14% | 1.93% | 2.63% | 1.96% | 1.93% | 1.43% | 1.14% | 0.95% |
| CMO | 0.12% | 2.46% | 5.32% | 7.68% | 11.02% | 11.01% | 11.64% | 11.95% | 12.66% | 14.38% | 14.67% | 3.41% |
| CPT | 2.82% | 3.27% | 4.80% | 6.45% | 6.61% | 6.78% | 5.76% | 6.45% | 5.86% | 4.31% | 1.98% | 2.00% |
| Chimei Innolux | | | | | | | | | | | | 11.08% |
| Epson | | | | | | 0.17% | 0.21% | 0.01% | | | | |
| Fujitsu | 2.95% | 2.58% | 1.50% | 0.79% | 0.50% | 0.35% | 0.04% | | | | | |
| HannStar | | 1.91% | 4.26% | 5.44% | 4.05% | 3.43% | 4.08% | 3.49% | 3.17% | 2.33% | 1.69% | 0.94% |
| Hitachi | 11.34% | 10.32% | 7.82% | 5.41% | 3.79% | 2.28% | 0.93% | 0.25% | 0.02% | 0.02% | 0.03% | 0.06% |
| IPSAlpha | | | | | | | | 0.50% | 1.57% | 2.17% | 1.89% | 0.44% |
| Infovision | | | | | | | | 0.07% | 0.67% | 0.60% | 1.06% | 1.24% |
| Innolux | | | | | | 0.00% | 0.96% | 2.04% | 1.84% | 1.33% | 1.73% | 0.60% |
| LG Display | 16.87% | 14.96% | 17.19% | 17.02% | 22.48% | 21.28% | 22.90% | 21.02% | 20.84% | 20.77% | 25.16% | 25.78% |
| Matsushita | 3.07% | 2.42% | 0.88% | 0.07% | | | | | | | | |
| Mitsubishi/ADI | 3.73% | 2.99% | 1.85% | 1.30% | 0.70% | 0.19% | 0.01% | 0.01% | | | | |
| NEC | 8.16% | 6.65% | 3.27% | 1.44% | 0.68% | 0.44% | 0.13% | 0.07% | 0.05% | 0.04% | 0.05% | 0.05% |
| Panasonic LCD | | | | | | | | | | | | 1.72% |
| Philips Kobe | 1.13% | 1.23% | 0.10% | | | | | | | | | |
| Quanta | | | 0.50% | 3.14% | 3.40% | 5.29% | 4.52% | 3.02% | | | | |
| SVA NEC | | | | | 0.00% | 1.23% | 1.59% | 1.46% | 1.20% | 0.26% | 0.00% | |
| Samsung | 20.95% | 22.01% | 21.80% | 17.86% | 20.94% | 23.21% | 22.56% | 24.61% | 23.58% | 25.83% | 28.22% | 25.88% |
| Sanyo | 4.82% | 3.74% | 2.98% | 2.72% | 2.17% | 1.07% | | | | | | |
| Sharp | 9.65% | 7.38% | 7.17% | 8.56% | 5.91% | 6.69% | 6.41% | 5.78% | 6.16% | 7.61% | 6.16% | 9.46% |
| Sony | 5.42% | 5.44% | 4.79% | 3.04% | | | 0.15% | 0.08% | 0.11% | 0.11% | | 0.07% |
| TMDisplay | | | | 2.43% | 2.74% | 2.40% | 1.50% | 0.91% | 0.75% | 0.63% | 0.36% | 0.13% |
| TPO | | | | | | | | 0.24% | 0.05% | | | |
| Tianma | | | | | | | | | | | | 0.49% |
| Toppoly | | | | | 0.07% | 0.32% | 0.56% | | | | | |
| Toshiba | 5.11% | 5.16% | 3.49% | 0.63% | | | | | | | | |
| Unipac | | 1.55% | 0.58% | | | | | | | | | |
| **Total Share of Suppliers with Less Than 5.5% Share** | **33%** | **39%** | **38%** | **33%** | **21%** | **18%** | **17%** | **14%** | **12%** | **14%** | **10%** | **12%** |
| - Number of suppliers with Less Than 5.5% Share | 11 | 13 | 14 | 13 | 10 | 13 | 13 | 14 | 12 | 11 | 10 | 14 |
| **Total Share of Suppliers with Less Than 8% Share** | **33%** | **53%** | **53%** | **48%** | **34%** | **31%** | **29%** | **26%** | **24%** | **22%** | **16%** | **12%** |
| - Number of suppliers with Less Than 8% Share | 11 | 15 | 16 | 15 | 12 | 15 | 15 | 16 | 14 | 12 | 11 | 14 |

Source: DisplaySearch panels data, DISP_LCD_000001.

## 2.    Capacity and Production Growth

69.    Capacity expansion among existing firms is also disruptive to a cartel.  As explained in a recent report to the European Competition Commission:

> [O]ften capacity choices are not a continuous phenomenon, but come in infrequent bursts, at points in times that may differ from one firm to another. Such choices then involve less frequent interactions than price decisions. As already pointed out, the infrequency of such interaction is a factor that impedes collusion. The "lumpiness" aspect of capacity building leads to pre-emption phenomena: when a market opportunity arises or simply when demand is growing, firms compete for being the first to build capacity…the capacity choice of one firm affects the market for a very long time. In this context pre-emption phenomena may be particularly acute. Indeed, when capacity decisions are fully irreversible, a firm that

Highly Confidential – Subject to Protective Order

> deviates from a collusive conduct will impose a "fait accompli" on its
> competitors, who may have no choice left other than adapting themselves
> to this new situation.[54]

70.      As discussed above (Section III.B), this race to build new capacity characterizes
the TFT-LCD industry.  As noted by one industry analyst:

> TFT LCD is a business that requires continuous capital investment
> because of the unique semiconductor process on TFT array fabrication and
> highly automated production handling process. Faced with the rapid
> migration in substrate size and technology, intensive investment is needed
> to keep up with the competition.[55]

Figure IV-5 below also documents the great increase in capacity in this industry.

### E.  UNCONCENTRATED INDUSTRY

71.      Implementing and maintaining a cartel is more difficult if the industry is
unconcentrated and there are a large number of firms participating in the cartel.  The
more firms that participate in a cartel, the more complex are the tasks of reaching
agreements and monitoring compliance with a price-fixing agreement.  In this matter, at
least a dozen separate entities, not including unnamed co-conspirators, are alleged to have
participated in the agreements.

72.      All else equal, the more firms in an industry, *i.e.*, the less concentrated is the
industry, the less likely it is that a price-fixing conspiracy will be successful.[56]  A
comprehensive survey of empirical studies of cartels observes:

> Virtually all studies of collusion include some measure of concentration.
> Concentration has been shown to be consistently and positively related to
> collusive success.[57]

73.      Using standard measures of concentration, the TFT-LCD industry is
unconcentrated.[58]  Concentration is often measured using the Herfindahl-Hirschman

---

[54]    Marc Ivaldi, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole (2003), "The
Economics of Tacit Collusion," IDEI, pp. 60-61.

[55]    UBS Warburg, "TFT-LCD Industry Update," September 16, 2002,  p. 6.

[56]    *See, Netz Report* at 91.

[57]    Margaret C. Levenstein and Valerie Y. Suslow (2004), "Studies of Cartel Stability: A
Comparison of Methodological Approaches," Chapter 1 in Peter Z. Grossman, *ed.*, *How
Cartels Endure and How They Fail,* p. 34.

Highly Confidential – Subject to Protective Order

Index (HHI), which is the calculated as sum of the squares of the individual firm's market shares. The Horizontal Merger Guidelines issued by the federal antitrust agencies characterize industries with HHI of less than 1500 as being "unconcentrated."[59] Both Dr. Netz and Professor Comanor adopt the Guidelines' HHI cutoffs when discussing final goods manufacturing.[60] Measuring concentration using sales shares, the TFT-LCD industry HHI ranged from 950 to 1253 in the years between 2001 and 2006, with an average of less than 1100.[61] These HHIs fall well within the Merger Guidelines' definition of an unconcentrated industry.

74.      Both Dr. Netz and Professor Comanor point to the combined shares of the Defendants as indicating the alleged cartel faced very limited external threats.[62] They ignore the actual concentration in the industry, which I have demonstrated to be low. As I noted above, low concentration is associated with a smaller likelihood of cartel success.

###    F.  VERTICAL INTEGRATION

75.      All cartels face the problem of how to monitor agreements. If, however, the product at issue is not only sold by cartel members as an intermediate good but also used by cartel members in the production of further finished products, *i.e.*, if at least some of the cartel members are vertically integrated, then monitoring becomes more difficult. In the present case, a vertically integrated producer of notebook computers or televisions could cheat on an agreement to fix the price of the intermediate panels either by lowering the price of the panels it sells or by not increasing the price of finished television sets

---

[58]    Concentration and its measurement are explained in U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," § 5.

[59]    U.S. Department of Justice and the Federal Trade Commission (2010), "Horizontal Merger Guidelines," § 5.3.

[60]    *Netz Report* at 75; *Comanor Report* at 25-26. (Professor Comanor uses the 1992 Merger Guidelines' definition of an "unconcentrated" industry rather than the 2010 Merger Guidelines' definition.)

[61]    The HHI in each quarter is calculated using sales reported to DisplaySearch. (Source: DisplaySearch panels data, DISP_LCD_000001.) The reported average over the 2001-2006 time period is calculated as an unweighted average of the HHI in each quarter during this time period.

[62]    I caution that Professor Comanor's calculation of shares by country of the Defendant, *e.g.*, Korean Defendants produce 40-48 percent of panels, are uninformative for the calculation of a measure of industry concentration.

Highly Confidential – Subject to Protective Order

commensurate with an agreed-upon increase in panel prices.  Since panels are but one component of the total cost of a notebook computer or television,[63] it is difficult to know if a vertically integrated firm is "passing through" the alleged cartel's panel prices in the prices of its notebook computers or televisions.  As I have noted elsewhere, a cartel agreement is easier to enforce if:

> [A]ll cartel members sell identical products at the same point in the distribution chain. … If some firms are vertically integrated … it may be difficult for the cartel to determine at what point in the distribution chain cheating occurs.[64]

76.    I understand that there is no allegation in this case that the vertically integrated Defendants attempted to fix the prices of finished goods.[65]  This lack of an alleged conspiracy in finished goods prices indicates that any vertically integrated panel manufacturer would potentially be able to vary the prices of finished goods as a way to circumvent the alleged cartel in panels.

77.    Many of the Defendants in this matter are vertically integrated.  All of the Defendants manufacture and sell TFT-LCD panels.  Many of them also sell televisions (*e.g.*, Sharp and Hitachi), computer monitors (*e.g.*, Sharp), or notebook computers (*e.g.*, Sharp and Toshiba) containing TFT-LCD panels.  Of course, not all Defendants are vertically integrated into all downstream products, but the different degrees to which the Defendants are vertically integrated create conflicting incentives and complicate the monitoring of the alleged agreements.

### G.  DIFFERING DEGREES OF HORIZONTAL INTEGRATION INTO PRODUCTS THAT COMPETE WITH TFT-LCD PANELS AND PRODUCTS

78.    Yet another source of conflicting incentives arises because, during the class period, the Defendants differed in the extent to which they made other types of panels or

---

[63]    The TFT-LCD panel represents 10-15 percent of the price of notebook computers and 35-40 percent of the price of televisions.  (Deposition of Scott Birnbaum, February 19, 2009, 249-51.)

[64]    Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th edition, at 136-139.

[65]    "Q: … My question is, you did not analyze damages caused by a cartel to fix the price of LCD finished products; is that correct? A: That wasn't the cartel. If that was -- that wasn't the cartel that was at issue here."  (*Comanor Depo*, 47:7-12).

Highly Confidential – Subject to Protective Order

finished products—including CRT monitors and CRT or plasma televisions—which compete with TFT-LCD panels and products.[66]  Those firms making only TFT-LCD panels and products clearly have a stronger interest in seeing that those panels and products are priced to capture share from other technologies than those firms who also make the other products.

79.    During the class period, Defendants differed in the extent to which they sold non-LCD finished products that competed with TFT-LCD finished products, including CRT TVs and monitors, plasma TVs, and other technologies.  For example, I understand that Samsung produced CRT monitors; Sharp, Samsung, Hitachi, and Toshiba produced CRT TVs; and Samsung produced plasma TVs.  These differences in Defendants' product portfolios would have made it difficult to sustain a price-fixing agreement because they would have created different incentives for the firms regarding TFT-LCD panel pricing.

### H.  PANEL HETEROGENEITY AND CUSTOMIZATION

80.    Products are heterogeneous if they vary along one or more dimensions.  Even when products are heterogeneous, a standard set of differentiated products may be sold. A more extreme form of heterogeneity occurs when products are not standardized but instead are customized for different customers.  Products need not be customized for specific users, however, to be heterogeneous.

81.    Economics research has demonstrated that price-fixing agreements are less successful and stable when they attempt to cover a wide variety of differentiated products.[67]  Differentiation creates several problems for a cartel.  First, the cartel must determine relative prices for a wide variety of goods with different demands and

---

[66]    Dr. Netz acknowledged that CRT technology is a substitute for TFT-LCD technology in monitors and TVs.  (*Netz Report* at 43; *Netz Depo.*, 28:8-9, 29:21-24.)  She also acknowledged that plasma is a substitute for TFT-LCD in TVs.  (*Netz Report* at 43; *Netz Depo.*, 35:17-19.)

[67]    Valerie Suslow (2005), "Cartel Contract Duration: Empirical Evidence from Inter-war International Cartels," *Industrial and Corporate Change,* 14(5), at 722; George A. Hay and Daniel Kelley (1974), "An Empirical Survey of Price Fixing Conspiracies," *Journal of Law and Economics*, 17(1);  Peter Asch and Joseph Seneca (1975), "Characteristics of Collusive Firms," *Journal of Industrial Economics*, 23(3).

Highly Confidential – Subject to Protective Order

production costs.  The more differentiation, the more difficult is this undertaking.
Second, when differentiation leads to many prices being fixed, the cartel must monitor all
of these prices.  This greatly complicates the problem of detecting cheating.  Third, when
manufacturers can alter characteristics to adjust quality, they have an easy means of
evading a cartel agreement that does not address all aspects of quality in setting price.
When products are not just differentiated but customized to the needs of particular
buyers, these problems of price setting, monitoring, and cheating are exacerbated.

82.     In Section II.D of this report, I described the broad range of applications, sizes,
and resolutions of TFT-LCD panels, and noted that differentiation across panels ranges
far beyond application, size, and resolution, to include contrast, brightness, refresh rates,
viewing angle, and thickness.[68]  In addition to great product heterogeneity at any point in
time, product characteristics such as size and resolution have changed over time.  Table
III-2 shows some of the more common levels of resolution that have existed over time for
monitor, notebook, and TV panels.  There is a wide range of pixel densities available at
any point in time, and panels have evolved over time to higher resolutions.

**Table III-2: Common Levels of Resolution**

| Display Resolution | Description | Horizontal Pixels | Vertical Pixels | Total Pixels |
|---|---|---|---|---|
| VGA | Video Graphics Array | 640 | 480 | 307,200 |
| WVGA | Wide Video Graphics Array | 800 | 480 | 384,000 |
| SVGA | Super Video Graphics Array | 800 | 600 | 480,000 |
| XGA | Extended Graphics Array | 1,024 | 768 | 786,432 |
| HD720 | High-Definition 720 | 1,280 | 720 | 921,600 |
| WXGA | Wide Extended Graphics Array | 1,280 | 768 | 983,040 |
| WXGA+ | Wide Extended Graphics Array Plus | 1,440 | 900 | 1,296,000 |
| SXGA | Super Extended Graphics Array | 1,280 | 1,024 | 1,310,720 |
| SXGA+ | Super Extended Graphics Array Plus | 1,400 | 1,050 | 1,470,000 |
| WSXGA+ | Wide Super Extended Graphics Array Plus | 1,680 | 1,050 | 1,764,000 |
| UXGA | Ultra Extended Graphics Array | 1,600 | 1,200 | 1,920,000 |
| HD1080 | High-Definition 1080 | 1,920 | 1,080 | 2,073,600 |
| WUXGA | Wide Ultra Extended Graphics Array | 1,920 | 1,200 | 2,304,000 |

Sources: Defendants' transaction data and "Display Standardization.xlsx."

---

[68]     *See*, Expert Report of Janusz A. Ordover Regarding Class Certification, July 1, 2009,  ¶¶
40-48.

Highly Confidential – Subject to Protective Order

83.      In addition to the obvious heterogeneity of panel characteristics, there is evidence in this case that many suppliers manufactured customized panels according to their customers' needs.[69]  According to LG Display, Hitachi Displays, and TAEC, most of their panels were customized.[70]  Similarly, a "significant volume" of CMO's panels were customized.[71]  Sharp "always" customized panels sold to large OEMs, but did not customize panels sold to distributors.[72]

84.      As noted above, throughout the class period, the Defendants sold more than 140 different TV, monitor, and notebook panels, based solely on the combination of size and resolution.  The wide variety of combinations of product characteristics would have made it very difficult to set and monitor prices and provided ample means for Defendants to defect from a price-fixing agreement.[73]  It appears, in fact, that no attempt was made to specify prices of all possible combinations of characteristics.  Rather, prices discussed at

---

[69]    I note that the fact that a panel is customized to the needs of a particular customer does not imply the panel is ultimately sold only to that one customer.  In some cases, customized panels were sold as replacement parts or to smaller customers with some flexibility in terms of design specifications.  However, customized models would command a price differential over non-customized panels.  (*See, e.g.*, Declaration of Kevin Yang in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, June 18, 2009, ¶ 6.)  In addition, customized panels may appear in the data as being sold to several buyers because they were sold to a single customer through several different authorized service providers and contract manufacturer OEMs.  (*See, e.g.*, Declaration of Michael Blashe in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, June 25, 2009, at 14.)

[70]    "Customized panels, meaning panels designed according to a customer's specifications, comprise over 95 percent of HDP's production and sales." (Declaration of Tadashi Yamada in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, June 25, 2009, ¶ 6.) "As a 'top tier' manufacturer, LG Display generally manufactures its LCD panels to customized specifications provided by its customers under contract…."  (Declaration of Yoong-Ki Min, April 27, 2009, ¶¶ 15-16.)  "The majority of TFT-LCD panels sold by TAEC are unique and customized to a customer's specifications."  (Declaration of Michael Blashe in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, June 25, 2009, ¶ 12.)

[71]    Declaration of Kevin Yang in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, June 18, 2009, ¶ 6.  *See also* Deposition of Kevin Yang, Vol. I, March 13, 2009, 32:11-33:22.

[72]    Declaration of Marshall Pinder in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, June 25, 2009, ¶¶ 4 and 6.

[73]    I note that the complex and evolving nature of the products also affects the calculation of average prices and the measurement of how those average prices change over time.

Highly Confidential – Subject to Protective Order

Crystal Meetings covered only a subset of panels of particular application, size, and resolution combinations, and ignored other characteristics.

85.        The economics literature is clear that when products are heterogeneous, changes to product characteristics may provide a way for firms to cheat on a price-fixing agreement, particularly when competing for important buyers.[74]  For example, even if one accepted that firms could agree to fix prices by application, size, and resolution, they could then potentially deviate from the agreement by offering improvements in other dimensions, such as a higher percentage of "A" grade panels or a better viewing angle, at the agreed-to price.  This is particularly true since, to the extent that standard industry data sources (such as DisplaySearch, among others) might be considered a means to monitor prices, these sources track prices primarily by application, size, and resolution rather than by a broad range of other relevant characteristics.[75]

## I.  BUYER HETEROGENEITY

86.        Buyers are heterogeneous when they purchase different panels (*i.e.,* panels for different applications as well as panels with different characteristics or specifications for a single application) and in different volumes.  They also are heterogeneous when they purchase on different terms (*e.g.*, different payment terms).  These differences have implications for the likelihood that a cartel could raise price significantly, as explained by Stigler (1964):

> The heterogeneity of purchase commitments (buyers), however, is surely often at least as large as that of products within an industry, and sometimes vastly larger. There is the same sort of personal differential of buyers as of sellers—ease in making sales, promptness of payment, penchant for returning goods, likelihood of

---

[74]    *See*, Dennis Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th edition, at 135.  ("It is easier for a cartel to spot cheating when all it has to examine is a single price.  It is relatively difficult to detect price cutting that is achieved by an increase in quality; a firm could increase its quality and hold its price constant if it wanted to increase sales without explicitly violating the pricing agreement.")

[75]    A sales manager at AUO testified to the limitations of pricing information supplied by third parties: "Basically, we would use [industry data sources] just for basic reference, because for Wits View or Display Search, they do not include information regarding the special requirement or quality."  (Deposition of Joyce Pan, Vol. I, March 9, 2009, 65:21-24.)

Highly Confidential – Subject to Protective Order

buying again (or buying other products). In addition there are two differences among buyers which are pervasive and well recognized in economics

1. The size of purchase, with large differences in costs of providing lots of different size.
2. The urgency of purchase, with possibly sufficient differences in elasticity of demand to invite price discrimination…

A complete profit-maximizing price structure may have almost infinitely numerous price classes: the firms will have to decide upon the number of price classes in the light of the costs and returns from tailoring prices to the diversity of transactions.[76]

87.    As Stigler makes clear, a cartel in an industry where buyers are strongly heterogeneous will face enormous problems in setting and monitoring prices charged to the different buyers, especially where buyers and sellers trade through privately-negotiated contracts containing both price terms and product specifications. The prospect of gaining a large sale will give a firm more incentive to cheat on any price-fixing agreement (assuming that the cartel could manage to agree on a price to begin with).[77] Individually negotiated contracts are especially difficult to monitor, and manufacturers may be able to give hidden discounts by adjusting non-price contractual terms that are especially opaque.

88.    The TFT-LCD industry exhibits the type and extent of buyer heterogeneity that makes maintenance of an alleged cartel difficult. Customers differ in their purchase volumes, bargaining power, and specification requirements. This results in price dispersion and makes price-fixing agreements more difficult to enforce. There is ample evidence in this case that Defendants negotiated individually with large buyers and charged different prices—including prices below those discussed at Crystal Meetings—to different customers.[78]  (See Section IV.C.1 for data showing price disparities in transaction prices.)

---

[76]    George J. Stigler (1964), "A Theory of Oligopoly," *Journal of Political Economy,* 72(1), at 45-46.

[77]    *See, e.g.,* Motta (2004) at 145.  ("Indeed, an unusually large order would give a very strong temptation to deviate: by deviating, a firm would make unusually large profits, and the perspective of losing collusive profits obtained under the typically small expected demand is not enough to deter the deviation").

[78]    "Q: So there were no set prices for any panels at any time; you just individually negotiated the prices with everybody.  Is that your – is that your position, sir?  A: Based

Highly Confidential – Subject to Protective Order

## IV.    THE BEHAVIOR OF THE DEFENDANTS IN THE ALLEGED CARTEL IS INCONSISTENT WITH A STABLE, SUCCESSFUL PRICE-FIXING CARTEL

89.    Industry characteristics alone are not dispositive for determining whether a cartel was successful in raising prices significantly.  Indeed, the economics literature has identified mechanisms that increase the chances of cartel success, namely the allocation of customers/territories/market-share to specific cartel members or, the punishment of cartel members that do not follow cartel rules.

90.    However, based on my review of testimony in this case, the claims made by Plaintiff Experts, and the empirical evidence, these mechanisms for cartel success do not appear to have been present—at least not in any consistent fashion—in the alleged TFT-LCD conspiracy.  Instead, the descriptions I have read suggest that the alleged cartel members focused on arranging meetings, discussing prices for some (but far from all) panels, and, at some Crystal Meetings, exhorting participants to stick to those prices.  Given the fundamental threats to cartel success discussed above, a cartel that simply sets prices and exhorts participants to adhere to them is likely to break down due to the firms' individual incentives to undercut the price and therefore is unlikely to raise prices to the levels Plaintiff Experts estimate.

91.    In the remainder of this section, I make the following points:

1.    Combining evidence from Plaintiff Experts, testimony from Defendants, and marketplace outcomes, it does not appear that the alleged cartel operated by allocating customers, territories, or shares to particular sellers.

2.    Combining evidence from Plaintiff Experts, economic theory, and marketplace outcomes, the alleged cartel does not appear to have effectively restricted capacity expansion.

---

on what I recall, yes, things were done on an individual basis." (Deposition of Tadashi Yamada, Vol. I, March 12, 2009, 94:16-21.);  "Most of the OEMs negotiate their volume requirements and pricing with LG Display on a monthly basis, and almost all customers negotiate prices at least every quarter."  (Declaration of Yoong Ki Min, President of LG Display America, Inc., June 29, 2010, ¶ 29.)  Prices were determined based on negotiations over a specific customer's specifications. (Deposition of Hiroyuki Morimitsu, March 13, 2009, 87:16 - 88:20.)

Highly Confidential – Subject to Protective Order

      3.   There is substantial evidence that firms did not adhere to prices discussed at Crystal Meetings.

      4.   Plaintiff Experts have presented no evidence of effective punishment in response to the failure to adhere to prices discussed at Crystal Meetings.

92.     As with Section III, none of the analysis presented in this section, on its own, proves that the alleged cartel failed to raise prices significantly. That evidence comes in Sections VI and VII of this report. What this section does is set a context for those findings. If one looks beyond superficial correlations or counts of meetings to the behavior of the alleged cartel, one sees clear evidence of cartel failure. Hence, a finding of little or no effect by the alleged cartel on prices—as seen in Sections VI and VII—is far from surprising.

    **A.  COMBINING EVIDENCE FROM PLAINTIFF EXPERTS, TESTIMONY FROM DEFENDANTS, AND MARKETPLACE OUTCOMES, IT DOES NOT APPEAR THAT THE ALLEGED CARTEL OPERATED BY ALLOCATING CUSTOMERS, TERRITORIES, OR SHARES TO PARTICULAR SELLERS**

93.     As discussed above, allocation of customers, territories, or shares among cartel participants is recognized as a particularly effective way of organizing a cartel.[79]

> Fixing market shares is probably the most efficient of all methods of combating secret price reductions. No one can profit from price-cutting if he is moving along the industry demand curve, once a maximum profit price has been chosen. With inspection of output and an appropriate formula for redistribution of gains and losses from departures from quotas, the incentive to secret price-cutting is eliminated.[80]

94.     If customers or territories are allocated, then detection of cheating is easy. The cartel might still need an effective punishment mechanism to deal with instances of cheating, but the likelihood of cheating will decline because the probability of detection has risen. For example, in the vitamins cartel,[81] participants were assigned production

---

[79]    Allocation of production quantities is more difficult than allocation of production shares in industries where demand is growing over time.

[80]    George J. Stigler (1964), "A Theory of Oligopoly," *Journal of Political Economy,* 72(1), at 46.

[81]    The vitamins cartel was a series of cartels involving many of the same participants; not every cartel had exactly the same structure. For a discussion of the structure of the

Highly Confidential – Subject to Protective Order

shares equal to their market shares prior to the cartel's formation.  Maintaining stable shares over time is a simple rule that allows for demand growth to be accommodated. The companies met periodically to exchange production records, and companies whose shares exceeded their allowance were required to sell—at cost—the excess production to another company which had produced less than its share.  Thus a firm producing in excess of its quota could not gain profit on its excess production.  In the citric acid cartel,[82] participants shared production information each year and those who had overproduced in a particular year were required to sell output, at cost, to a company that had underproduced.

95.      However, combining the evidence from Plaintiff Experts and Defendant testimony, it does not appear that the alleged TFT-LCD cartel engaged in effective customer or share allocation.   Professor Netz cites one document that mentions shifting market shares between firms,[83] but provides no indication that this specific discussion was carried out and, more generally, no documents or other evidence to indicate that the alleged cartel engaged in effective customer or share allocation.[84]  To the contrary, testimony from Defendants' employees is consistent with a lack of allocation of customers or shares at the Crystal Meetings.[85]

96.      More importantly, the available data on capacity and production shares are not consistent with successful share allocation by the alleged cartel.  An allocation of shares

---

vitamins cartel, *see*, Dennis W. Carlton and Jeffrey M. Perloff  (2005), *Modern Industrial Organization*, 4th edition, at 142-143.

[82]     Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), at 73.

[83]     This document reports that Samsung told HannStar/AUO that if HannStar/AUO maintained a price for the 14.1" XGA sold to Compaq at $180 or higher, Samsung would be willing to give away part of its market share.  (Lee, Hseuh-Lung, October 30, 2001, Commercial Meeting, CPT00004016.01E- CPT0004019.01E.  This document is cited by Dr. Netz for a different purpose.  *See, Netz Report* at 39, n. 138.)

[84]     *See,  Netz Depo*., 68:2-8.

[85]     "There was no requirement for companies to reduce their production or to allocate customers" if the company did not follow the reference price.  (Deposition of Hsing-Tsung Wang, Vol. II, March 30, 2011, 220:18-221:24.)

There was no discussion at the meetings of allocating sales to particular companies. (Deposition of Irine Chen, Vol. I, April 26, 2011, 242:11 - 242:16.)

Highly Confidential – Subject to Protective Order

would typically lead to stability in shares over time.  As seen in Figure IV-1 through Figure IV-4, neither Defendants' shares of capacity nor their shares of revenue display such stability.

97.     When considering capacity shares, I observe that, while some manufacturers grew their shares substantially over this period, other saw their shares decline.  The capacity shares of AUO, LGD, Samsung, and CMO increased over the class period, while those of Sharp, TMD, and Hitachi Displays declined.  At the beginning of the class period, Sharp had the largest share of capacity, but by the end, Sharp was only the fifth largest.  CMO was the smallest of the Defendants in 1999, but had grown to be the fourth largest by the end of the class period.

**Figure IV-1: Defendant Capacity Shares, 1999Q4-2006Q4**



98.     The same dynamics are observed when studying shares overall and within particular applications (*e.g.*, TVs, notebooks).  In particular, Figure IV-2 through Figure IV-4 show that at the application level, revenue shares were unstable.  The pictures suggest that the alleged cartel was not allocating shares.

Highly Confidential – Subject to Protective Order

**Figure IV-2: Defendant Revenue Shares, Monitors, 1999Q4-2006Q4**



Source: DisplaySearch panels data, DISP_LCD_000001.

**Figure IV-3: Revenue Shares, Notebooks, 1999Q4-2006Q4**



Source: DisplaySearch panels data, DISP_LCD_000001.

Highly Confidential – Subject to Protective Order

**Figure IV-4: Defendant Revenue Shares, TVs, 2003Q1-2006Q4**



Source: DisplaySearch panels data, DISP_LCD_000001.

### B. COMBINING EVIDENCE FROM PLAINTIFF EXPERTS, ECONOMIC THEORY, AND MARKETPLACE OUTCOMES, THE ALLEGED CARTEL DOES NOT APPEAR TO HAVE EFFECTIVELY RESTRICTED CAPACITY EXPANSION

99.     Professor Comanor asserts that the Defendants formed "a cartel whose apparent purpose was to limit the pace of capital formation sufficiently to achieve higher prices."[86] Professor Comanor also notes, however, that there was a "rapid growth of new investment"[87] in the TFT-LCD industry with many new generation fabs being built.[88]

100.     Citing to documents and deposition testimony, Dr. Netz states that Defendants "were aware" that restrictions of capacity or supply would increase prices and profits[89]

---

[86]     *Comanor Report* at 13.

[87]     *Comanor Report* at 13.

[88]     *Comanor Depo.*, 159:2-160:9.

[89]     *Netz Report* at 38.

Highly Confidential – Subject to Protective Order

and that they "discussed ways in which they could limit the supply of panels."[90]  General statements about how reductions in capacity or production or increases in price would be beneficial to all of the Crystal Meeting participants do not imply that agreements were made.  Some of the documents cited by Dr. Netz show that meeting participants expressed an understanding of the relationship between supply and prices, which does not imply that they managed to coordinate and agree on capacity restrictions to increase prices.[91]  Rather than being evidence of a successful conspiracy to restrict capacity, they can be viewed as simple statements of fact, which are unlikely to be effective means to reach an agreement.

101.    Although Dr. Netz cited documents and the testimony of company personnel, she testified that she conducted no other analytical work to determine whether capacity had been restricted.[92]  She testified that an agreement to restrict capacity "seemed to be implied" by some of the documents, but that she didn't know whether such an agreement had actually been reached or whether it had been implemented.[93]

102.    In addition to restricting capacity, Dr. Netz further claims that Defendants reallocated inputs or increased inventories to reduce the supply of specific panels.[94]  I note that, to the extent that production was shifted between panels, some customers would benefit from the increased supply (and thus lower prices, all else equal) of the panels to which inputs were reallocated.

103.    Dr. Netz correctly indicates that her analysis of the documents is insufficient to conclude that the alleged cartel made and implemented an agreement to reduce capacity.[95]  Whether or not the alleged cartel tried to make an agreement on capacity, data on

---

[90]    *Netz Report* at 38.

[91]    For example, one document cited in Dr. Netz's report states that manufacturers had excess capacity and that prices would decline unless production was reduced.  (CPT, Undated, Production Capacity Summary of Taiwan Makers [Translated], CPT00046357 - CPT00046359 at CPT00046359E (p. 4 of the translation).)

[92]    *Netz Depo.*, 76:18-21.

[93]    *Netz Depo.*, 77:6-15.

[94]    *Netz Report* at 39-40, n. 140, 141.

[95]    *Netz Depo.*, 77:6-15.

Highly Confidential – Subject to Protective Order

capacity formation in this industry do not support the idea that the rate of capacity formation slowed during the class period. To the contrary, substantial entry and capacity expansion occurred in the industry during the class period.[96] At the beginning of the class period in 1999, the industry had a total production capacity of about 212 thousand square meters of glass per month. At the end of the class period at the end of 2006, capacity had grown to almost 30 times that amount, to about 5,950 thousand square meters of glass per month.[97]  (See Figure IV-5.)

**Figure IV-5: Quarterly Industry Capacity, 1996Q1-2010Q4**



Source: DisplaySearch capacity data, DISP_LCD_000002.

104.     Moreover, there is no evidence that rate of capacity formation slowed during the class period compared to the pre-class period years. In fact, as shown in Figure IV-6, the rate of capacity growth was *higher* during the class period than either before or after the

---

[96]     Industry data showing capacity expansion is buttressed by testimony that many firms were investing in new fabs.  (*See*, Deposition of Jau-Yang Ho, Vol. II, June 17, 2011, at 270.)

[97]     Capacity is measured as the maximum square meters of panels producible per month. (Source: DisplaySearch.)  I am not claiming that just because capacity grew, there was no conspiracy to restrict capacity; for such a determination, one would have to build a model of capacity in the but-for world.

Highly Confidential – Subject to Protective Order

class period.  Capacity increased at an annual rate of 45.7 percent before the class period and 56.3 percent during the class period and 24.4 percent after the class period.[98, 99]  Dr. Netz does not provide any empirical work to confirm the theory that capacity expansion slowed during the alleged conspiracy period.

**Figure IV-6: Industry Capacity, Year-over-Year Growth Rate and CAGR
(Pre-Class, Class, and Post-Class Periods)**



Source: DisplaySearch capacity data, DISP_LCD_000002.
Note: Average growth rate in each period (pre-class, class, and post-class), calculated as the Compound Annual Growth Rate.

**C.  THERE IS SUBSTANTIAL EMPIRICAL EVIDENCE THAT FIRMS DID NOT ADHERE TO PRICES DISCUSSED AT CRYSTAL MEETINGS**

105.     At some of the Crystal Meetings, prices for specific panels in specific months were discussed.  In some cases, panel prices in a given month may have been discussed at several different Crystal Meetings leading up to that month.[100]  However, some Crystal

---

[98]     Growth calculations are compound annual growth rates from the beginning to the end of the pre-class, class, and post-class periods.

[99]     Of course, simply looking at growth rates of capacity growth in two periods does not adjust for the influences of other factors, which one would have to do for a proper test of whether there was a capacity conspiracy.

[100]     For example, the price of a 17" MT SXGA panel in June may have been discussed in January, March, and June.

Highly Confidential – Subject to Protective Order

Meeting attendees viewed the prices discussed as reference prices, with actual prices charged varying by customer.[101]  Indeed, Crystal Meeting participants acknowledged that they charged lower prices or believed that others charged lower prices.[102]

### 1. Transactions data show price dispersion and evidence of cheating or failure to charge discussed prices

106.    In addition to the documentary evidence and testimony that charging prices other than those discussed at Crystal Meetings was common, Defendants' pricing data provides clear support for the conclusion that firms did not consistently adhere to prices discussed at Crystal Meetings.  To the contrary, whatever prices were discussed for panels of particular applications, sizes, and resolutions, Defendants continued to sell panels at a wide range of prices.  There is simply no empirical evidence that the prices discussed at Crystal Meetings became a single, fixed price around which Defendants closely congregated, or an effective minimum price below which Defendants rarely went.

107.    Dr. Netz presents some calculations and exhibits about the relationship between *average* transaction prices and prices discussed at meetings.[103]  Looking at average transaction prices is plainly less informative then looking at the full distribution of transaction prices and determining how frequently the transaction prices are below the discussed prices, as I do below.[104]  Indeed, to the extent that both the prices discussed at meetings and average transaction prices reflect current marketplace realities, it is not surprising that they would be close to one another even if meeting discussions had no causal effect on prices.  Moreover, the general pattern of declining prices over time,

---

[101]    A CMO attendee indicated that the reference prices discussed were not minimum prices and the company could charge lower prices. (Deposition of Wen-Hung Huang, Vol. I, September 7, 2010, 85:19 - 85:25.)

[102]    Despite attending Crystal Meetings where prices were targeted, the CMO President testified that the most important thing was to have his fabs fully utilized and he instructed sales people to get more orders, which meant lowering prices.  (Deposition of Jau-Yang Ho, Vol. I, June 16, 2010, 40-41 and 53.)

[103]    *Netz Report* at 65-66, and Ex. 35.

[104]    This section shows that Dr. Netz's claim that transaction prices "generally went up to or very close to the target amounts" as "indirect" evidence of overcharge does not hold up to scrutiny. (*Netz Depo*, 57:13-22.)  In her report, Dr. Netz also claims, *incorrectly*, that actual transaction prices "match" cartel target prices.  (*Netz Report* at 65.)

Highly Confidential – Subject to Protective Order

described above, explains observed positive correlations between average transaction prices and meeting prices over time.

108.    Based on available evidence, many sizes of panels sold by Defendant were not discussed at Crystal Meetings.  Table IV-1 summarizes information on transaction prices and the prices discussed at Crystal Meetings for all panels where price was discussed during at least one meeting.[105, 106]  The table shows, first, that even for those panels whose prices were discussed at a Crystal Meeting, a substantial percentage of sales took place during months for which there were not price communications about the specific panel and month in question.

109.    Second, Table IV-1 shows that a very significant percentage of panel sales took place at prices below the prices discussed in Crystal Meetings.  Since the same panel-month combination may have been discussed at more than one Crystal Meeting, and different Crystal Meeting participants may have disclosed different prices for the same panel-month combination, I calculate the share of sales below each of the following two cutoffs:

- the mid-point of the highest and lowest prices discussed for a specific panel-month combination.[107]

- the lowest price discussed for a specific panel-month combination.[108]

---

[105]    For all figures and calculations, I removed outliers from the Defendants' transaction data. For each year and panel application, I removed the transactions at the top and bottom one percent of the price distribution.  This eliminated approximately 1.0 percent of monitor panel revenue, 0.6 percent of notebook panel revenue, and 1.2 percent of TV panel revenue.

[106]    To assemble a dataset of discussed prices, I used the prices compiled by both Dr. Netz and Direct-Purchaser Plaintiff Expert Professor Flamm.  Each expert identified a different set of Crystal Meeting prices.  From approximately 300 price-month combinations identified by Dr. Netz, I added over 200 price-month combinations identified by Professor Flamm that were not identified by Dr. Netz.  This approach allows for a more complete dataset of discussed prices.  In addition, the cited documents associated with each price were reviewed to ensure that the appropriate price was recorded.  Although some the price discussions may have occurred at meetings other than Crystal Meetings, for simplicity I refer to all of these prices as "Crystal Meeting prices," or using similar terminology.

[107]    In other words, I use the average of the highest and lowest price discussed for each panel-month combination.

Highly Confidential – Subject to Protective Order

On average, approximately 60 percent of panel sales were at prices below the midpoint of prices communicated in Crystal Meetings, and approximately 40 percent were at prices below the lowest price communicated by any participant.  Table IV-1 also shows that, for many panels, the majority of sales took place at prices below the lowest price discussed at the Crystal Meetings.

---

[108]     Using the lowest price discussed would tend to find less cheating.

Highly Confidential – Subject to Protective Order

**Table IV-1: Share of Industry Revenue at Transaction Prices below Midpoint or Lowest Price Communicated at Crystal Meetings, by Panel**

| Panel | Total Revenue (millions) in Transaction Data (1999-2006) | % of Total Revenue in Months with a Communicated Price | Revenue Below Midpoint Communicated Price | Revenue Below Lowest Communicated Price |
|---|---|---|---|---|
| MT 17" SXGA | $14,186 | 29.9% | 56.3% | 36.3% |
| MT 15" XGA | $9,436 | 54.4% | 60.9% | 39.0% |
| MT 19" SXGA | $8,613 | 11.9% | 65.3% | 50.6% |
| NB 14.1" XGA | $7,829 | 9.4% | 71.0% | 49.4% |
| NB 15" XGA | $7,670 | 47.8% | 59.3% | 38.6% |
| NB 15.4" WIDE | $3,257 | 7.4% | 47.7% | 34.8% |
| MT 20.1" WIDE | $1,240 | 12.9% | 15.4% | 8.6% |
| NB 12.1" XGA | $1,171 | 24.3% | 80.4% | 64.5% |
| MT 18.1" SXGA | $982 | 1.4% | 80.2% | 79.8% |
| NB 15" SXGA+ | $974 | 37.9% | 57.3% | 31.3% |
| NB 13.3" XGA | $892 | 7.5% | 38.0% | 35.8% |
| NB 14.1" SXGA+ | $734 | 2.4% | 60.4% | 60.4% |
| NB 12.1" SVGA | $607 | 0.4% | 18.1% | 18.1% |
| MT 24" WIDE | $546 | 2.8% | 77.7% | 77.7% |
| NB 14" WIDE | $520 | 0.3% | 97.0% | 97.0% |
| NB 17" WIDE | $512 | 0.6% | 84.8% | 84.7% |
| NB 15.2" WIDE | $479 | 7.5% | 8.2% | 8.2% |
| MT 19" WIDE | $446 | 0.5% | 95.4% | 0.2% |
| MT 23" WIDE | $294 | 4.7% | 99.8% | 83.6% |
| NB 15" SXGA | $221 | 1.1% | 92.6% | 92.5% |
| NB 15" UXGA | $163 | 9.3% | 52.9% | 33.8% |
| MT 21.3" UXGA | $154 | 4.0% | 0.5% | 0.5% |
| NB 14" XGA | $146 | 0.2% | 100.0% | 100.0% |
| MT 18" SXGA | $134 | 70.2% | 67.9% | 54.5% |
| MT 21" WIDE | $114 | 12.5% | 74.0% | 74.0% |
| MT 17" WIDE | $111 | 24.5% | 52.0% | 39.2% |
| **Total/Average for Panels with Display Standard Information** | **$61,431** | **26.4%** | **59.5%** | **39.5%** |
| MT 17" | $17,414 | 37.6% | 57.7% | 45.1% |
| MT 15" | $9,922 | 53.1% | 65.5% | 58.6% |
| MT 19" | $9,678 | 26.7% | 51.6% | 32.3% |
| NB 14.1" | $9,546 | 31.5% | 40.5% | 25.4% |
| NB 15" | $9,159 | 14.6% | 54.0% | 40.8% |
| NB 15.4" | $5,663 | 22.8% | 61.1% | 48.4% |
| TV 32" | $2,498 | 23.3% | 81.4% | 69.1% |
| NB 12.1" | $2,105 | 5.0% | 78.5% | 68.0% |
| NB 13.3" | $1,153 | 6.4% | 57.3% | 54.0% |
| MT 18.1" | $982 | 14.1% | 26.5% | 25.6% |
| TV 27" | $944 | 7.8% | 97.9% | 97.9% |
| TV 26" | $892 | 3.3% | 75.2% | 59.3% |
| NB 14" | $667 | 12.1% | 32.4% | 22.8% |
| NB 15.2" | $536 | 6.8% | 59.2% | 59.2% |
| MT 18" | $228 | 10.7% | 53.1% | 46.1% |
| TV 30" | $196 | 34.5% | 55.3% | 40.3% |
| TV 15" | $168 | 2.1% | 39.3% | 38.0% |
| TV 23" | $132 | 24.3% | 55.4% | 43.8% |
| NB 12" | $115 | 7.4% | 69.3% | 65.6% |
| TV 14" | $90 | 22.1% | 100.0% | 100.0% |
| MT 20" | $39 | 5.4% | 0.0% | 0.0% |
| **Total/Average for Panels Without Display Standard Information** | **$72,129** | **29.6%** | **57.1%** | **44.9%** |

Sources: Defendants' transaction data; Plaintiff experts' meeting prices and documents.

Highly Confidential – Subject to Protective Order

110.     The data also show that certain Defendants had consistently lower prices than those discussed for these panels at the Crystal Meetings.  As one example, Table IV-2 shows the percentage of revenue below meeting prices for panels sold by AUO.  The majority of AUO's sales were at prices below the lowest communicated price, and about three-quarters of AUO's sales took place at prices below the midpoint of the communicated prices.

**Table IV-2: Share of AUO Revenue at Transaction Prices below Midpoint or Lowest Price Communicated at Crystal Meetings, by Panel**

| Panel | AUO Revenue (millions) in Months with a Communicated Price | AUO Revenue Below Midpoint Communicated Price | AUO Revenue Below Lowest Communicated Price |
|---|---|---|---|
| MT 17" SXGA | $1,316 | 77.5% | 50.5% |
| MT 15" XGA | $599 | 79.8% | 57.7% |
| NB 15" XGA | $515 | 76.6% | 46.4% |
| MT 19" SXGA | $365 | 66.7% | 55.6% |
| NB 14.1" XGA | $178 | 90.5% | 75.9% |
| NB 15" SXGA+ | $132 | 88.0% | 50.0% |
| NB 15.4" WIDE | $30 | 41.5% | 33.3% |
| MT 20.1" WIDE | $25 | 56.6% | 34.8% |
| NB 13.3" XGA | $17 | 78.4% | 72.9% |
| NB 15.2" WIDE | $8 | 34.3% | 34.3% |
| MT 23" WIDE | $0 | 100.0% | 100.0% |
| NB 14" WIDE | $0 | 78.3% | 78.3% |
| NB 17" WIDE | $0 | 2.1% | 1.4% |
| **Total/Average for Panels with Display Standard Information** | **$3,186** | **77.1%** | **53.0%** |

Sources: Defendants' transaction data; Plaintiff experts' meeting prices and documents.

111.     Similar examples can be found for other Defendants.  For example, more than 60 percent of CMO sales took place at prices below the lowest price communicated in Crystal Meetings and about 80 percent of CMO sales took place at prices below the midpoint of the communicated prices.  In addition, more than half of Sharp's sales of 17" monitor panels, Toshiba/TMD's sales of 15" notebook panels, Hitachi Displays' sales of 32" TV panels, and HannStar's sales of 17" monitor panels took place at prices below the lowest price communicated in Crystal Meetings.

112.     As additional empirical evidence, the following figures compare the prices discussed at the Crystal Meetings with actual transaction prices.  The figures include the highest and lowest price discussed for a given panel in a given month at the Crystal

Highly Confidential – Subject to Protective Order

Meetings, the full set of actual transaction prices from each Defendant, and the average monthly price from all Defendants' transactions. The wide dispersion observed in transaction prices in the figures below suggests that the Crystal Meetings were not effective in setting prices that participants followed. Indeed, as seen in the figures, a large number of transactions were below the lowest price discussed and, in many instances, the average price charged by all Defendants was below the lowest price discussed at the Crystal Meetings. This is not consistent with firms consistently adhering to a price-fixing agreement.

113.    Figure IV-7 shows pricing data for the high-selling 15" monitor panel. Transaction prices show an enormous range of prices around the prices discussed in Crystal Meetings.[109] There is no evidence that all or even most prices are above the discussed prices, as would be expected if the alleged cartel participants had stuck to the price as a true price floor.

---

[109]    Note that several Crystal Meeting discussions did not convey information on the display standard or the resolution of the panels discussed. For example, several Crystal Meetings refer to "Wide" panels of a certain size, with multiple display standards that match the "Wide" aspect ratio. Also, as shown in Figure IV-7 and Figure IV-10, several Crystal Meetings refer to panels of certain size, with no reference to the display standard (in particular, display standards for TV panels were rarely discussed.) Even if a single price was discussed at the Crystal Meetings, it is not clear in these instances what price each Defendant would charge for panels of different display standards.

Highly Confidential – Subject to Protective Order

**Figure IV-7: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Monitor (No Display Information Discussed)**



114.    Figure IV-8 and Figure IV-9 show transaction prices for two other high-selling products that were discussed at Crystal Meetings, the 15" XGA notebook panel and the 19" SXGA monitor panel.  Unlike the 15" notebook panel price shown in Figure IV-7, the price discussions reflected in Figure IV-8 and Figure IV-9 referred to both size and display standard.  Even with this additional panel specificity, there remains significant dispersion in transaction prices across Defendants and across different transactions of the same Defendant.  In addition, average transaction prices were consistently below the prices discussed at the Crystal Meetings for long periods of time.

Highly Confidential – Subject to Protective Order



Figure IV-8: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Notebook (XGA)

Highly Confidential – Subject to Protective Order



**Figure IV-9: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 19" Monitor (SXGA)**

115.    Figure IV-10 shows transaction prices in 2003-2004 for the 32" TV panel (another case in which no display standard information was discussed.)  The volume of sales at the time of the price discussions is substantially smaller than for the products in the earlier figures, with only two Defendants appearing in the data as selling this panel. Still, average prices are well below the prices discussed in Crystal Meetings.

Highly Confidential – Subject to Protective Order

**Figure IV-10: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 32" TV Panel (No Display Information Discussed)**



116.    Figure IV-11 and Figure IV-12 provide a summary of discussed vs. actual prices for notebook panels.[110]  Along the 45-degree line in these figures, communicated prices are equal to actual transaction prices for different panels.  Figure IV-11 shows actual and discussed prices for all notebook panels (where different panels are shown in different colors), excluding the 15" XGA notebook panel, which is shown in Figure IV-12.  The large dispersion in transaction prices around—and frequently far below—the prices discussed in Crystal Meetings is plainly evident.

---

[110]    These figures compare prices in a similar fashion to Dr. Netz's Exhibit 35 but use transaction prices rather than averages.

Highly Confidential – Subject to Protective Order

**Figure IV-11: Prices Communicated at Crystal Meetings and Actual Transaction Prices, All Notebook Panels, Excluding 15" XGA**



Sources: Defendants' transaction data; Plaintiffs experts' meeting prices and documents.

Highly Confidential – Subject to Protective Order



Figure IV-12: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Notebook (XGA)

117.    Figure IV-13 and Figure IV-14  summarize discussed vs. actual prices for monitor panels.  These Figures use a horizontal line to show the percentage difference between the actual transaction prices and the communicated price.  Figure IV-13 shows the percentage differences for all monitor panels (colored by panel), excluding the 15" XGA monitor panel (shown in Figure IV-14.)  Again, regardless of the panel discussed, there is no evidence that Defendants congregated around the prices discussed at Crystal Meetings, or that the Crystal Meetings set an effective minimum price below which Defendants rarely went, with many transaction-specific prices and most average prices for a given panel well below those discussed at meetings.

Highly Confidential – Subject to Protective Order

**Figure IV-13: Prices Communicated at Crystal Meetings and Actual Transaction Prices,
All Monitor Panels, excluding 15" XGA**



Highly Confidential – Subject to Protective Order

**Figure IV-14: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15"**
**Monitor (XGA)**



118.    Given the clear evidence that firms were not consistently following the prices discussed at the Crystal Meetings, it is not clear how, if at all, the Crystal Meetings were affecting prices.  It appears that firms may have been responding to the strong incentives, described in Section III, above, to maximize their own profits by undercutting prices discussed at Crystal Meetings.  As I explain in Section IV.D, below, I am aware of no evidence that effective punishments were carried out in response to the prevalence of prices set below those discussed at meetings.  If the alleged cartel exchanged information on prices but no targets were set, or if price targets were set but not followed, it should not be surprising to find that the alleged cartel was unable to raise prices significantly.  In such a case, the alleged cartel was unlikely to have generated the significant overcharges that Plaintiff Experts estimate.

Highly Confidential – Subject to Protective Order

## 2. Prices reported to DisplaySearch provide evidence that Defendants were cheating on discussed prices

119.    It is noteworthy that, in some cases, prices reported to DisplaySearch were close to those discussed at Crystal Meetings, while at the same time actual transaction prices were below those discussed at Crystal Meetings.  This is consistent with Defendants claiming to agree to a price, then self-reporting the agreed-to prices to DisplaySearch to hide any cheating, but then not, in fact, charging those prices in practice.[111]  Of course there also may be other explanations that do not presuppose an agreement on price.

120.    Figure IV-15 shows the prices for 18" (SXGA) monitor panels discussed at Crystal Meetings (when the same panel-month combination was discussed at several Crystal Meetings or a price range was discussed, the figure includes the lowest and highest price discussed), as well as the average price reported to DisplaySearch and the actual average price charged by Defendants.  The average price reported by Defendants to DisplaySearch appears to track the prices discussed at the Crystal Meetings.  However, Defendants' transaction data reveal that they charged less for this panel than the prices discussed at the Crystal Meetings and reported to DisplaySearch.[112]

---

[111]    DisplaySearch relied on manufacturers' self-reported revenues and/or prices. (Deposition of Paul Semenza, May 11, 2011, 81:18-83:21, 100:17-101:5, 166:8-167:12.)

[112]    In order to calculate comparable averages, these figures include only those Defendants that appear both in the transaction data and DisplaySearch data.

Highly Confidential – Subject to Protective Order



Figure IV-15: DisplaySearch Prices and Actual Prices, 18" Monitor (SXGA)

121.    Figure IV-16 shows a similar pattern for the 15" notebook (XGA) panel, for August 2001-October 2002, a period in which this panel was discussed at many Crystal Meetings.  The prices reported to DisplaySearch tend to track prices discussed at Crystal Meetings with transaction prices generally falling below both the DisplaySearch prices and the Crystal Meeting prices.

Highly Confidential – Subject to Protective Order

**Figure IV-16: DisplaySearch Prices and Actual Prices, 15" Notebook (XGA)**



Sources: Defendants' transaction data; DisplaySearch panels data, DISP_LCD_000001; Plaintiffs experts' meeting prices and documents.

122.     Figure IV-17 provides another example, the 12.1" (XGA) notebook panel.  Once again, the Crystal Meeting prices are closer to the prices reported to DisplaySearch than to transaction prices for this panel.  Transaction prices, on average, are lower than both the prices reported to DisplaySearch and the Crystal Meeting prices.

Highly Confidential – Subject to Protective Order

Figure IV-17: DisplaySearch Prices and Actual Prices, 12.1" Notebook (XGA)



**D. PLAINTIFF EXPERTS HAVE PRESENTED NO EVIDENCE OF EFFECTIVE PUNISHMENT IN RESPONSE TO THE FAILURE TO ADHERE TO PRICES DISCUSSED AT MEETINGS**

123.     The considerable evidence of pricing below the levels discussed in the Crystal Meetings raises obvious questions regarding whether the alleged cartel participants were able to detect this cheating at the time it occurred and whether they were able to react in such a way as to deter further low prices.  An effective punishment mechanism that reduces or eliminates the profits from cheating can enhance cartel effectiveness.[113]  A common punishment mechanism is for other cartel participants to expand output and reduce price in response to perceived cheating on an agreement.  When this occurs, however, prices can rapidly decline, falling to or even below competitive levels.  The economic literature provides numerous case studies of cartels that punished cheaters by

---

[113]     Dennis W. Carlton and Jeffrey M. Perloff  (2005), *Modern Industrial Organization*, 4th edition, at 142-44

Highly Confidential – Subject to Protective Order

cutting prices or reverting to competition, *e.g.*, the diamond cartel[114] and the lysine cartel.[115]

124.    In contrast, despite documentary and data evidence presented above suggesting widespread cheating on (or inability to adhere to) Crystal Meeting prices, Plaintiff Experts offer effectively no evidence to establish the existence of relevant punishment mechanisms.[116]  Dr. Netz cites only to testimony regarding "scolding" of companies for failure to keep prices up and she indicates that instances of below-target pricing were discussed at meetings "to hold makers that deviated accountable for their actions," with no evidence that any effective punishments were ever carried out.[117]  Dr. Netz *asserts* that "[a]ttendees would force Defendants to re-negotiate prices to customers…," yet she cites no evidence that supports this assertion.[118]  Dr. Netz cites two pieces of deposition testimony to support her assertions that "[d]efendants were able to punish one another for cheating.  Defendants would sometimes retaliate by lowering the price and taking volume

---

[114]    In a study of the diamond cartel, Bergenstock, Deily, and Taylor (2006) stated that "cartel members have occasionally cheated, and De Beers has a reputation for aggressive action against anyone threatening the long-run stability of the diamond market."  They gave two examples of such punishment.  First, "in the early 1980s, De Beers is alleged to have punished Zaire for attempting to leave the cartel by flooding the market with the low-quality industrial diamonds that were Zaire's principal product."  Second,  "De Beer's greatly increased its sales of low-quality rough diamonds to Indian diamond cutters in 1996 when Argyle, an Australian company, left the cartel…" (Donna J. Bergenstock, Mary E. Deily, and Larry W. Taylor (2006), "A Cartel's Response to Cheating: An Empirical Investigation of the De Beers Diamond Empire," *Southern Economic Journal*, 73(1), at 174.)

[115]    Yuliya Bolotova, John M. Connor, and Douglas J. Miller (2008), "The Impact of Collusion on Price Behavior: Empirical Results from Two Recent Cases," 26 *International Journal of Industrial Organization*.

[116]    In her deposition, as evidence of punishment, Dr. Netz could point only to meeting minutes reporting that some Defendants were "scolded" by others.  (*Netz Depo.*, 234:4-235:14.)

[117]    *Netz Report* at 64-65.

[118]    *Netz Report* at 64-65.  Of the two pieces of evidence cited, one appears to be a report that LG Display was going to raise price to one customer; there is no mention of "forcing" this action.  (GRN000010 - GRN000021)  The other is an instance where LG Display "urged" the Taiwanese companies to participate in a price increase.  Again, this does not seem to suggest forcing renegotiation with a customer; it does suggest that firms sought to pressure one another, but there is no suggestion of punishment for failure to yield. (GRN000126 - GRN000132)  (*See*, *Netz Report*, n. 210.)

Highly Confidential – Subject to Protective Order

away from the panel maker that did not follow the agreed upon target."[119]  In fact, neither of the deposition excerpts appears to report an instance of an actual punishment being carried out in response to charging a price that is too low.  They appear to be instances where a Crystal Meeting attendee threatened to lower price[120] or interpreted a statement of another attendee as threatening to lower price.[121]

## V.    EVEN IF THE DEFENDANTS WERE SUCCESSFUL IN INFLATING PRICES OF SOME PANELS, THIS DOES NOT IMPLY THAT PRICES OF OTHER PANELS, OR OF PANELS SOLD BY DIFFERENT DEFENDANTS OR IN DIFFERENT TIME PERIODS WERE INFLATED

125.     The analysis presented thus far has developed strong reasons to doubt that the alleged cartel was successful at raising prices significantly.  The empirical analysis presented in Sections VI and VII, below, further bolsters this view and demonstrates that Plaintiff Experts' findings of significant overcharges are due to faulty econometric models.

126.     In this section, I make a distinct point: Even if one were to assume that the alleged cartel raised prices of particular panels sold by particular Defendants in particular time periods, there is no basis to say that there were overcharges on all other panels or panels sold by other Defendants in all other time periods.  Instead, there are substantial reasons to expect the effect of the alleged conspiracy on prices for different panels sold by different Defendants or in different time periods to differ.  These reasons, discussed more fully below, include:

- A large percentage of panel sales during the class period were of panels that had not been discussed at recent Crystal Meetings.

- Particular Defendants and alleged co-conspirators (notably the Japanese Defendants) were not the targets of government investigations into an overall panel conspiracy and did not participate in the Crystal Meetings.

---

[119]    *Netz Report* at 65.

[120]    Deposition of Stanley Park, Vol. II, September 18, 2009, 450:7-16.

[121]    Deposition of Brian Lee, Vol. I, July 26, 2010, 33:4-34:11.

Highly Confidential – Subject to Protective Order

- There is no theoretical or empirical support for a mechanism through which overcharges on particular panels would automatically propagate (via the forces of supply and demand) to other panels. Hence, economic analysis of the industry provides no basis to say that the existence of an overcharge for a particular panel or set of panels implies that there were overcharges for other types of panels, particularly those not discussed at recent Crystal Meetings.

### A. A LARGE PERCENTAGE OF PANEL SALES DURING THE CLASS PERIOD WERE OF PANELS NOT DISCUSSED AT RECENT CRYSTAL MEETINGS

127.    Table V-1 shows the percentage of sales of TV, monitor, and notebook panel during the class period made up of panels that recently had been discussed at a Crystal Meeting. As the table shows, less than 40 percent of TV, monitor, and notebook panel sales consisted of application/size combinations for which there had been price discussions corresponding to the month in which the panel was sold. Restricting this figure to months for which there were discussions of a panel's specific application/size/*resolution* combination would further reduce this number. Even including all sales of application/size combinations for which there had been a price discussion in the preceding *six months* yields only 60 percent of total TV, monitor, and notebook panel revenue during the class period. Put differently, at least 40 percent of TV, monitor, and notebook panel sales during the Class period consisted of panel types not discussed at any Crystal Meetings in the preceding 6 months.

Highly Confidential – Subject to Protective Order

**Table V-1: Percentage of Revenue Made up of Panels Discussed at Meetings**

| Application | Size | Revenue ($ millions) | | |
|---|---|---|---|---|
| | | Month of Discussed Price | Month of Discussed Price and the Two Months After | Month of Discussed Price and the Five Months After |
| Monitor | 15" | $6,886 | $7,856 | $8,643 |
| Monitor | 17" | $10,016 | $13,485 | $15,221 |
| Monitor | 18" | $118 | $135 | $158 |
| Monitor | 18.1" | $152 | $261 | $432 |
| Monitor | 19" | $3,510 | $5,298 | $6,820 |
| Monitor | 20" | $6 | $11 | $18 |
| Monitor | 20.1" | $219 | $429 | $620 |
| Monitor | 21" | $14 | $52 | $80 |
| Monitor | 21.3" | $6 | $8 | $15 |
| Monitor | 22" | $0 | $0 | $0 |
| Monitor | 23" | $14 | $35 | $50 |
| Monitor | 24" | $15 | $62 | $156 |
| Monitor | 30" | $0 | $0 | $1 |
| Notebook | 12" | $10 | $26 | $40 |
| Notebook | 12.1" | $337 | $505 | $589 |
| Notebook | 13.3" | $127 | $194 | $207 |
| Notebook | 14" | $81 | $214 | $382 |
| Notebook | 14.1" | $3,552 | $4,280 | $4,799 |
| Notebook | 15" | $4,572 | $5,507 | $6,472 |
| Notebook | 15.2" | $72 | $124 | $175 |
| Notebook | 15.4" | $1,749 | $2,583 | $3,499 |
| Notebook | 17" | $3 | $21 | $48 |
| Notebook | 17.1" | $21 | $29 | $69 |
| Television | 14" | $20 | $37 | $58 |
| Television | 15" | $3 | $6 | $11 |
| Television | 20" | $0 | $0 | $0 |
| Television | 23" | $32 | $77 | $93 |
| Television | 26" | $29 | $59 | $107 |
| Television | 27" | $73 | $122 | $177 |
| Television | 30" | $68 | $120 | $127 |
| Television | 32" | $582 | $938 | $1,306 |
| *Discussed Panels Total* | | *$32,290* | *$42,474* | *$50,375* |
| Other Monitors | 10.4"-30" | $22,578 | $15,902 | $11,319 |
| Other Notebooks | 10"-20.1" | $20,374 | $17,416 | $14,619 |
| Other Televisions | 10"-47" | $9,759 | $9,209 | $8,688 |
| *Non-Discussed Panels Total* | | *$52,711* | *$42,527* | *$34,626* |
| *Grand Total* | | *$85,001* | *$85,001* | *$85,001* |
| *Discussed Panels Share* | | *38%* | *50%* | *59%* |

Source: Defendants' transaction data; Plaintiffs experts' meeting prices and documents.

Highly Confidential – Subject to Protective Order

**B.   JAPANESE DEFENDANTS DID NOT PARTICIPATE IN ANY OVERALL PRICE-FIXING CONSPIRACY OR IN THE CRYSTAL MEETINGS.**

**1.   Department of Justice statements regarding its TFT-LCD investigation do not include Japanese Defendants in the same conspiracy as other Defendants.**

128.     The Complaint and the Court's orders refer to the enforcement action brought by the U.S. Department of Justice (DOJ) in this matter.[122]   The details of that enforcement action are notable in their treatment of the Japanese Defendants.

129.     In particular, five Taiwanese and Korean Defendants—AU Optronics, Chi Mei, Chunghwa, HannStar, and LG Display—are identified by the DOJ as having participated in a common cartel agreement (notably beginning not in 1999 but rather in September 2001), and Samsung was accepted into the Antitrust Division's Corporate Leniency Program for its activities in the TFT-LCD industry.[123]   But, with respect to the Japanese Defendants, DOJ documents describe three distinct agreements, all of which are explicitly limited to certain products and customers:

- Epson and Sharp pled guilty to an agreement involving the sale of specific panels sold to Motorola for use in Razr mobile phones.  That agreement is supposed to have run from the Fall of 2005 through the middle of 2006.[124]

---

[122]     *IPP Complaint*, ¶¶ 198-211; *IPP Order*, at 4-5.

[123]     *See* the following "Information" filings by the Department of Justice in the United States District Court, Northern District of California, San Francisco Division: *United States of America v. Chungwa Picture Tubes, Ltd.*, November 12, 2008; *United States of America v. LG Display Company, Ltd. and LG Display America, Inc.*, November 12, 2008; *United States of America v. Chi Mei Optoelectronics*, December 8, 2009; *United States of America v. HannStar Display Corporation*, June 29, 2010.  The participation of these Defendants is supposed to have ended at various points in 2006, ranging from January 31, 2006 through December 1, 2006.

Regarding AU Optronics, *see* the U.S. Department of Justice press release: "Largest Taiwanese LCD Producer, Houston-Based Subsidiary and Six Executives Indicted for Participating in LCD Price-Fixing Conspiracy," June 10, 2010.

Regarding Samsung, *see* Letter from Michael Scott (Antitrust Division of the Department of Justice) Re: Samsung Electronics Company Ltd., June 7, 2011, SAML-815331.

[124]     *See* the following "Information" filing by the Department of Justice in the United States District Court, Northern District of California, San Francisco Division: *United States of America v. Epson Imaging Devices Corporation*, August 25, 2009; and U.S. Department of Justice press release, "LG, Sharp, Chungwa Agree to Plead Guilty, Pay Total of $585

Highly Confidential – Subject to Protective Order

- Hitachi Displays and Sharp each pled guilty to an agreement involving the sale of specific panels sold to Dell. Both agreements are supposed to have started in April of 2001. Hitachi Display's participation in that agreement is said to have ended in March 2004; while Sharp's participation is said to have ended in December 2006.[125]

- Sharp pled guilty to an agreement involving the sale of specific panels for Apple iPod music players from September 2005 to December 2006. To my knowledge, no other Defendant has been implicated in that agreement.[126]

Thus, apart from the three customer- and product-specific agreements, the DOJ allegations and plea agreements involve no Japanese Defendants.

130.    The transcript from the Proceedings to enter Hitachi Displays' guilty plea is also telling. David Ward, speaking for the United States government, indicated that "[t]he conspiracy to which LG Display pled to and CPT pled to was a related, but separate, conspiracy that did not involve [Hitachi Displays]."[127]    When directly asked by the Court whether the government was developing proof of "many separate little conspiracies," Mr. Ward replied:

> Yes, Your Honor. We believe there was a larger conspiracy involving LG and CPT and others to fix the price of TFT-LCD sold to many manufacturers. The Government does not believe that either Hitachi or Sharp were involved in that conspiracy. We believe that Hitachi, Sharp, and other unnamed co-conspirators were involved in a separate conspiracy amongst themselves to fix the prices of TFT-LCD sold *only to Dell*.[128] [*Emphasis added*].

---

Million in Fines for Participating in LCD Price-Fixing Conspiracies," November 12, 2008 (hereinafter, *DOJ Nov. 12 Press Release*).

[125]    *See* the following "Information" filing by the Department of Justice in the United States District Court, Northern District of California, San Francisco Division: *United States of America v. Hitachi Displays Ltd.*, March 10, 2009; *DOJ Nov. 12 Press Release*.

[126]    *See*, *DOJ Nov. 12 Press Release*.

[127]    *United States of America v. Hitachi Displays Ltd.*, No. CR-09-0247 (N.D. Cal May 22, 2009), p. 15.

[128]    *United States of America v. Hitachi Displays Ltd.*, No. CR-09-0247 (N.D. Cal May 22, 2009), p. 16.

Highly Confidential – Subject to Protective Order

## 2.     Japanese Defendants did not participate in Crystal Meetings

131.     It is my understanding that the Japanese Defendants did not initiate or participate in the Crystal Meetings.[129, 130]  Lack of participation by the Japanese Defendants in the Crystal Meetings is not surprising, as the Japanese Defendants did not focus on the panels primarily discussed at Crystal Meetings (see Table V-1 for panels discussed by application/size).

132.     The following figures show the sharp contrast in product mix between Japanese and non-Japanese Defendants.  As an example, Figure V-1 shows that Japanese Defendants' share of revenues in monitor panels amongst all Defendants' revenues rapidly declined from around 40 percent at the beginning of the class period (when total sales were relatively small) to about 10 percent in 2001 and to almost zero by the end of 2006.  In contrast, Korean Defendants' share of monitor panels sales remained fairly stable and Taiwanese Defendants' share grew substantially.

---

[129]     For example, "Q. BY MR. SORENSEN: Now, you went to the very first crystal meeting, correct?  A. Yes.  Q. And those meetings started after initial consultations among the Korean and Taiwanese companies that did not include the Japanese companies, correct?...THE WITNESS: Yes.  Q. BY MR. SORENSEN: As far as you know, the Japanese companies didn't have anything to do with starting crystal meetings, correct?  A. Yes.  Q. And did you ever hear that the Japanese companies had their own crystal meetings?  A. Never heard."  (Deposition of Brian Lee, Vol. III, July 28, 2010, 414:14-415:4).

[130]     I understand that Sharp attended the lower level vendor meetings, but it is my understanding that these are not the Crystal Meetings, but rather a series of lower-level meetings that involved general discussions about the trends in the market and general volumes or prices rather than specific discussions about setting panel prices.  (Deposition of Irine Chen, Vol. I, April 26, 2010, 272:20-275:13.)  Dr. Netz includes the Vendor Meetings in her definition of Crystal Meetings.  (*Netz Report* at 32, n. 117.)

Highly Confidential – Subject to Protective Order



**Figure V-1: Share of Monitor Panel Revenues by Source Region, All Defendants, 1999Q4-2006Q4**

133.     Figure V-2 shows the product mix, by application, for Japanese and non-Japanese Defendants in 2005.  The panels most frequently discussed at Crystal Meetings, monitor and notebook panels, represented only about 11 percent of Japanese Defendants' revenues (vs. about 65 percent of non-Japanese Defendants' revenues).[131]  In contrast, products not discussed at Crystal Meetings, such as mobile panels and panels used in other applications, represented about 70 percent of Japanese Defendants' revenues.

---

[131]     This share likely overstates the importance of the monitor and notebook panels discussed at Crystal Meetings for Japanese Defendants because not all monitor and notebook panels were discussed at Crystal Meetings, and price discussions did not cover every time period. (*See* Section V.A.)

Highly Confidential – Subject to Protective Order

**Figure V-2: Share of Revenues by Application, Japanese and non-Japanese Defendants, 2005**



134.     Figure V-3 also shows that Japanese Defendants focused on panels of small size. Panels of less than 10 inches (of which I am not aware of any price discussion at Crystal Meetings) represented 63 percent of Japanese Defendants' revenues in 2005. In contrast, small panels represented less than 10 percent of non-Japanese Defendants' revenues.

**Figure V-3: Share of Revenues by Panel Size, Japanese and non-Japanese Defendants, 2005**



Highly Confidential – Subject to Protective Order

135.    Dr. Netz asserts that the Japanese manufacturers participated in the alleged cartel via meetings and communications with Crystal Meeting participants.[132]  I understand that the Japanese Defendants were sometimes informed of product prices by other Defendants, in particular, when they were customers of the Crystal Meeting participants.[133]  Of course, it is natural for a panel buyer to be given price quotes, particularly if the Crystal Meeting attendees viewed the Japanese manufacturers and the finished product divisions of Japanese companies not as participants in their agreements, but rather as customers.  In at least one instance, Crystal Meeting attendees discussed attempting to "force" Japanese manufacturers to go along with the prices attendees had selected by setting buy-back prices for the panels they sold to the Japanese manufacturers at the selected level.[134]

C.  **Economic Analysis of the TFT-LCD Industry Provides No Basis to Conclude that the Existence of an Overcharge for One Set of Panels Implies Overcharges for Other Panels**

136.    Given that many panels were not part of Crystal Meeting discussions and that many Defendants did not participate in some or all of the alleged activities, an obvious question is how Plaintiffs can establish impact on the prices of all panels.  Plaintiff Experts have not addressed this question.  That is, they have not provided evidence or analysis to indicate that a conspiratorial increase in the price of one particular panel (or one subset of panels) would necessarily propagate to other panels.

137.    Professor Comanor indicates that "[o]ften cartels do not deal with the specifics of individual products, but rather deal with price effects generally across all products."[135]  In the current case, however, Professor Comanor testified that such considerations were not

---

[132]    *Netz Report* at 32; *Netz Depo.,* 74:1-10.

[133]    For example, CMO employees met with Sharp as a customer for TV panels: "Although Sharp is our competitor, but the Sharp I am meeting is our customer.  I met Sharp because it is our customer.  So it's my obligation to provide information to my customer, including production capacity, product design and technology."  (Deposition of Jau-Yang Ho, Vol. II, June 17, 2010, 215:25 - 216:11.)

[134]    "Taiwanese maker's buy-back prices to Japan must abide by the target price and control sales volume to naturally force Japanese makers from selling at a low-price." (CPT0004020.01E-4021.02E, at 4021.01E, November 15, 2001.)

[135]    *Comanor Depo.*, 63:1-4.

Highly Confidential – Subject to Protective Order

applicable because his "understanding is that the cartel at issue here applied to all the LCD panels sold by the relevant Defendants."[136]  In other words, he assumes that the alleged cartel applied to all products and Defendants.

138.    Dr. Netz testified that her overcharge model did not establish that Defendants raised price above competitive levels on all panels.[137]  She said that her opinion that the alleged cartel members raised prices on all panels rather than raising them on some but keeping them low on others was based on "economic reality," "all the theories of economics," "years of empirical tests," and "common sense."[138]  She also appears to *assume*, however, that the alleged conspiracy affected all panels.  She testified that, "*When there is a cartel across all the panels*, the price of panels goes up."[139]  Like Professor Comanor, then, Dr. Netz has assumed the conclusion.[140]  In this phase of the case, Dr. Netz has not put forward an economic theory or empirical evidence to explain how a conspiratorial increase in the price of a subset of panels, even if successful, would cause the prices of other panels to increase.

139.    In this section, I affirmatively demonstrate that economic theory and empirical evidence do not support any necessary linkage between the prices of panels discussed at meetings and the prices of other panels.  That is, there is no economic basis to conclude that a conspiratorial increase in the price of one panel necessarily raises the prices of other panels for which there is no allegation of explicit discussions, and certainly not across the broad set of panels of different applications, sizes, resolutions, and other characteristics in this case.

---

[136]    "My understanding is that the cartel at issue here applied to all the LCD panels sold by the relevant defendants."  (*Comanor Depo.*, 65:18-20.)

[137]    *Netz Depo.*, 228:23-229:1.

[138]    *See, Netz Depo.*, 228:5-230:15.

[139]    *Netz Depo.*, 228:13-228:15 [emphasis added].

[140]    I am aware that Plaintiffs have stated that, in the Class Certification phase of this case, Dr. Netz concluded that there was a common "price structure" based on her review of materials suggesting that Defendants discussed relative prices of different panels, her analysis of correlations between prices of different panels, and her hedonic price regressions.  (Indirect-Purchaser Plaintiffs' Objections and Responses to Defendant LG Display Co., Ltd.'s Amended Second Set of Interrogatories, April 5, 2011, at 11.)  This analysis is not mentioned in Dr. Netz's report in the damages phase, and based on her testimony, she appears now to be assuming that the alleged cartel affected all panels.

Highly Confidential – Subject to Protective Order

1.    **Economic theory does not prove that conspiratorial increases in the prices of particular panels will necessarily raise prices of other panels.**

140.    As a matter of economics, for conspiratorial increases in the prices of one set of panels to cause an increase in the price of other panels, there must be demand-side or supply-side substitution linking the panels.  The relevant question is: If the price of a particular panel or subset of panels were raised by the alleged conspiracy, would demand-side or supply-side substitution necessarily cause increases in the prices of panels that were not affected directly?  The answer is no.

141.    It is certainly possible that there could be demand side substitution between similar panels, such that an increase in the price of one panel could shift some demand to similar panels, potentially putting upward pressure on the prices of those panels. However, it is equally true that the extent to which demand side substitution puts upward pressure on prices of panels that were not affected directly is limited by the degree of substitution.  And demand substitution between panels is surely quite limited in scope: a manufacturer of a large television cannot use small notebook panels any more than a manufacturer making small, lightweight notebook computers can use large television panels.  Manufacturers making high-end finished products likely need panels with good resolution, brightness, contrast, and other quality dimensions and would have limited ability to substitute to lower quality panels.

142.    At core, the extent of demand side substitution is an empirical question to which Plaintiff Experts bring no data or analysis.  Absent such analysis, even if there is some demand side substitution between some panels for some buyers, there is no basis to conclude that the price of any particular panel would have been affected by an alleged conspiratorial price increase in another panel.

143.    When one considers supply side substitution, the claim that a conspiratorial price increase (or output reduction) for one panel (or subset of panels) necessarily increases the price of other panels is even more obviously rejected.  If the alleged conspiracy raised the price/restricted the output of *particular panels,* then, if anything, supply side substitution puts *downward* pressure on the prices of other panels.  For a cartel to increase the price of a particular subset of panels, holding demand constant, the firms in the cartel must reduce

Highly Confidential – Subject to Protective Order

the quantity of that subset of panels supplied to the market.  That reduction in supply for a subset of panels necessarily frees up capacity that could be used in the production of other products which would tend to drive prices for those products down.[141]

144.     The bottom line is simple: there is no way to argue from economic theory that an alleged conspiratorial increase in the price of one panel must affect other panels.  One can point to demand-side substitution but must then verify empirically how strong it is, which Plaintiff Experts do not do.  One could try to allege, despite lack of evidence, that there was an agreement in this case to restrict the output of *all* panels, but to avoid simply assuming the desired conclusion, one would then have to turn to actual empirical evidence to see if all prices truly were moving together, both in general and after Crystal Meetings in particular.  *Any claim that a conspiratorial increase in one price must increase all other prices requires empirical verification.  In the next section, I show that the data do not support this claim.*[142]

> ## 2.   Empirical evidence does not support the idea that an increase in the price of one panel would necessarily affect other panels
>
> ### (a)   *Correlations in prices of different panels over time do not demonstrate any causal link between prices of different panels*

145.     In this section, I consider empirical evidence on the question of whether an alleged conspiratorial price increase for one panel (or subset of panels) necessarily affects other panels.  In doing so, I *do not* ask whether prices for different types of panels are correlated over time.  The answer to that question is both obvious and irrelevant.  Positive correlation between two prices simply means that the prices tend to go up and down together.  Given that TFT-LCD panels are all subject to the downward time trend discussed above, it is obvious that prices for different TFT-LCD panels are highly, positively correlated over time.  To accept this positive correlation as proof that the

---

[141]    Dr. Netz presents evidence that this shifting of production from one product to another did occur.  (*Netz Report* at 39-40.)

[142]    There is also evidence that Defendants did not set panel prices in a fixed percentage relationship across panel sizes or across different customers.  (*See* Declaration of Takashi Ogawa Regarding Pricing at Toshiba, July 21, 2011, ¶ 13.)

Highly Confidential – Subject to Protective Order

alleged conspiracy necessarily affected all panels would be to accept the rapid downward trend in prices as proof of common conspiratorial impact.

146.     Put differently, the correlation between different panel prices would only be informative if it established that a conspiratorial increase in one price caused other panel prices to rise.  But correlation is not causation.  As described above, the common downward trend in prices is driven heavily by falling production costs due to large improvements in production technology during the class period.  Such technological improvement and the associated declines in cost lead to correlation in the prices of different panels, with no implication that they were commonly affected by an alleged conspiracy.

147.     Consider a simple example.  Suppose that two different products are produced using the same inputs.  An increase in the price of the inputs would be expected to cause the prices of both of the products to rise—there would be positive price correlation— regardless of whether the products are in the same price-fixing conspiracy.  To make this example concrete, suppose that gasoline prices in different cities are positively correlated due to their common dependence on the price of crude oil; it would be illogical to conclude that, because of this positive price correlation, a conspiracy among gas station owners in New York would affect gasoline prices in Los Angeles.

148.     Hence, evidence that a conspiratorial price increase for one panel (or subset of panels) would affect other panels would need to look beyond price correlations that are driven by common costs.  Relevant evidence includes whether panel prices maintain a stable ordering relative to one another, which might suggest that an alleged conspiratorial increase in the price of one panel would affect other panels.[143]   It is also relevant to consider whether panel prices move in a common fashion following Crystal Meetings, when, according to Plaintiffs' allegations, one might expect to see price changes for discussed panels.  As shown below, an examination of these types of evidence rejects the idea that alleged conspiratorial increases in the price of one panel must increase the price of other panels.

---

[143]     However, even this evidence would not be sufficient unless one could show that the relationship between prices was not affected by the alleged conspiracy.

Highly Confidential – Subject to Protective Order

>        (b)    *Prices of different panels do not maintain a stable ranking*
>               *over time.*

149.    Figure V-4 through Figure V-6 show that average prices of panels for a
particular application but of different sizes and resolutions do not maintain a stable
hierarchical relationship and instead cross each other over time.

**Figure V-4: Average Price for Selected Panels, Monitors, 2001-2009**

Highly Confidential – Subject to Protective Order

**Figure V-5: Average Price for Selected Panels, Notebooks, 2000-2008**



**Figure V-6: Average Price for Selected Panels, TVs, 2004-2009**



Highly Confidential – Subject to Protective Order

150.    Even if one focuses on prices within a particular manufacturer and application, the lack of any stable ordering of prices is readily apparent.  Figure V-7 through Figure V-9 show that average prices of panels for a particular application and manufacturer, but of different size and resolution, do not maintain a hierarchical relationship but instead often cross.

**Figure V-7: Average Price for Selected Panels, Monitors, AUO Only, 2004-2007**



Highly Confidential – Subject to Protective Order



**Figure V-9: Average Price for Selected, Panels, TVs, CMO Only, 2005-2007**



Highly Confidential – Subject to Protective Order

                        *(c)*        *Prices following Crystal Meetings do not show common movement.*

151.     As explained above, the relevant claim to be examined is whether a *cartel-induced* overcharge on one panel affects all panels.  A clear implication of such a claim would be that if there were any price increases on any panels due to Crystal Meetings these increases should be seen for all panels.  Otherwise, if prices of panels following Crystal Meetings do not move together then either observed price changes were not caused by the meetings (but rather by panel specific changes in supply and demand factors) or there was no common impact of changes caused by the meetings.

152.     Figure V-10 and Figure V-11 illustrate the lack of common price movements after Crystal Meetings.  Aside from a common trend in declining prices, many panels whose prices were not discussed do not show any similarity in price movements with panels whose prices were discussed.  Furthermore, some panel prices cross the prices of the panels discussed at the Crystal Meetings, which shows the lack of a consistent, hierarchical relationship across panels.

Highly Confidential – Subject to Protective Order

**Figure V-10: Prices after Crystal Meetings, 19" Monitor (SXGA)**



**Figure V-11: Prices after Crystal Meetings, 15" Notebook (XGA)**



Highly Confidential – Subject to Protective Order

**D. GIVEN THE LACK OF PERSUASIVE EVIDENCE THAT PRICES OF DIFFERENT PANELS WERE NECESSARILY LINKED, PLAINTIFFS HAVE NO WAY TO ESTABLISH IMPACT FROM THE ALLEGED CARTEL ON ALL PANEL PURCHASES**

153.    The findings presented thus far in this Section indicate that it is entirely possible that, even if there were overcharges on some subset of panel purchases, others experienced no overcharge.  That is, Plaintiff Experts have presented no evidence to indicate that all types of panels sold by all Defendants to all types of buyers were affected by the alleged conspiracy.  In her deposition, Dr. Netz agreed that, based on her model, she could not conclude that all panel buyers paid positive overcharges, but that this conclusion followed from "[a]ll the theories of economics."[144]  As demonstrated through the analysis in this section and previous sections, it is clearly not the case that "all the theories of economics" imply positive damages on all panel buyers, nor does Dr. Netz's model.

154.    Indeed, the results from Plaintiff Experts' own damages models (described more fully in Section VII, below) indicate that some panel buyers were not affected by any overcharge.  For example:

> 1.  Dr. Netz's own "forecast" damages model indicates that, on average across transactions, the overcharge on Toshiba/TMD's panel sales was negative 28.9%.[145]  That is, according to her model, the prices for panels sold by Toshiba/TMD were *lower* than they would have been but-for the alleged conspiracy.
>
> 2.  According to Dr. Netz's model, other Defendants had negative overcharges for their sales during particular time periods.  For instance, according to Dr. Netz's model, HannStar had negative overcharges for the last three quarters of 2001, the fourth-quarter of 2002/first-quarter of 2003,

---

[144]    *Netz Depo.*, p. 228:5-230:6.

[145]    *See* Section VII.B for more discussion of this model.  As discussed there, Dr. Netz made errors in processing data from CMO and Samsung.  Those errors are corrected for the calculations given above, but no other changes are made to her model.

Highly Confidential – Subject to Protective Order

the second-half of 2004/first-quarter of 2005, and the last three quarters of 2006.

3.   In other cases, Dr. Netz's model predicts negative overcharges for particular applications in particular time periods.  For example, overcharges on notebook panels are shown to be negative for the second half of 2001, the first quarter of 2003, the first-half of 2005, and all of 2006.

Each of these cases is just an example.  The key point is that, as one probes more deeply into Plaintiff Experts' models, it becomes clear that they do not support a conclusion that all panel purchases were affected by the conspiracy.  In addition, as a matter of economics, it is not clear how a cartel could maintain such a complex variation of overcharges for different panels, time periods, and Defendants.  A more natural conclusion is that the alleged cartel was not consistently successful in raising the prices of all panels.

## VI.   PRICES AND QUANTITIES OBSERVED DURING AND AFTER THE ALLEGED CONSPIRACY DO NOT SUPPORT PLAINTIFF EXPERTS' FINDINGS OF A SUCCESSFUL CONSPIRACY THAT RAISED PRICES SIGNIFICANTLY

155.   My economic analysis to this point has demonstrated that, although the Crystal Meeting participants surely met many times between 2001 and 2006, the characteristics of the TFT-LCD industry, the content of discussions alleged at the Crystal Meetings, and the behavior of prices surrounding the Crystal Meetings do not appear to be consistent with a stable, successful price-fixing conspiracy that raised price significantly across all panels.

156.   A natural next step is to examine data on prices and quantities to see whether they reveal evidence of cartel success.  To the extent there were large sustained overcharges from a successful price-fixing conspiracy ending in 2006, one would expect to see clear fingerprints of this cartel in observed prices and quantities.  Most notably, the decline in prices (which occurs steadily for TFT-LCD panels) would be expected to accelerate as of the end of 2006 or soon thereafter.  In the remainder of this section, I

Highly Confidential – Subject to Protective Order

show that straightforward review of available pricing, quantity, and capacity utilization data provide no support for significant overcharges.[146]

### A. THERE IS NO EVIDENCE THAT PRICES DECREASED FASTER AFTER THE END OF THE ALLEGED CONSPIRACY PERIOD IN 2006

157.    To the extent that the alleged conspiracy was successfully increasing prices by significant amounts, as Plaintiff Experts claim, one should expect to see prices begin to fall significantly faster soon after the end of the conspiracy.  The following figures show that this was not the case in the TFT-LCD industry.

158.    Figure VI-1 – Figure VI-3 show average monthly prices for the top ten selling panels in each main application. The figures show average prices for the three years before and after the end of the alleged conspiracy (2004-2006 and 2007-2009, respectively).[147]  A vertical line shows the end of the class period (December 31, 2006).

159.    As noted above, primarily due to the significant investments in new fabs and improved technology, average prices show a general decline during the alleged conspiracy and, to some extent, after the end of the alleged conspiracy.  However, prices did not decline more rapidly after the conspiracy ended, as one would expect if the conspiracy was successful in increasing prices.  If anything, the rate of price decline appears to have slowed following the end of the alleged conspiracy, with prices for many panels *actually increasing* in 2007, after the alleged conspiracy ended.  Prices did decline again during 2008-2009, but this is not at all surprising given the global economic crisis at that time and the associated steep drop in TFT-LCD sales, illustrated in Figure II-3, above.

---

[146]    In later sections, I show how, when properly adjusted, the more complex analyses advanced by Plaintiff Experts also do not support significant overcharges.

[147]    Figure VI-1–Figure VI-3 show the ten top-selling panels for each application during the period before the end of the alleged conspiracy (2004-2006).  These panels represent approximately 95 percent of monitor panel sales, 80 percent of notebook panel sales, and 86 percent of TV panel sales.  For clarity of presentation, these figures do not show the average price in months in which less than 2,000 units of a panel were sold.

Highly Confidential – Subject to Protective Order



Figure VI-1: Average Price for Top 10 Panels, Monitors, 2004-2009



Figure VI-2: Average Price for Top 10 Panels, Notebooks, 2004-2009

Highly Confidential – Subject to Protective Order



**Figure VI-3: Average Price for Top 10 Panels, TVs, 2004-2009**

160.    To be clear, I do not claim that these graphs provide a dispositive statement on the effect of the conspiracy.  But they do raise a pertinent question: To the extent that the alleged cartel was effectively restricting forces that would have led prices to fall faster, where is the evidence of those forces when the restrictions were relaxed?  These pictures should be kept firmly in mind when evaluating claims made by Plaintiff Experts—using more complex econometric models—that overcharges were substantial.  As I show in Section VII, below, there is a simple explanation: Dr. Netz's and Professor Comanor's econometric models are fundamentally flawed and thus do not provide reliable support from which to conclude that the alleged cartel resulted in significant positive overcharges.

### B. PATTERNS OF PRICE AND QUANTITY MOVEMENTS DURING THE CLASS PERIOD ARE MORE CONSISTENT WITH DEMAND SHOCKS THAN WITH CONSPIRATORIAL RESTRICTIONS IN SUPPLY

161.    Given the lack of a clear break in pricing trends as of 2006—and thus the lack of evidence for a successful cartel running for the full class period—Plaintiffs may try to argue that the conspiracy was successful at raising prices during particular subsets of the

Highly Confidential – Subject to Protective Order

class period, such as those time periods when prices were rising.  This would represent a sharp deviation from the allegations to date, which have indicated that Plaintiffs could prove common impact for all panel purchases throughout the class period.  Nevertheless, in this section, I also explain why straightforward evaluation of pricing and quantity changes are not consistent with this explanation.

162.     As a matter of economics, a conspiratorial price increase is an example of a supply-driven price change.  That is, a conspiratorial price increase is equivalent to a shift back in the industry supply curve, which causes the industry to move up the (downward sloping) demand curve to a lower quantity/higher price combination.  Put simply, if the conspiracy raises prices, buyers will purchase less (but this will still be profitable due to higher margins).  So, all else equal, if periods of rising prices are driven by conspiratorial effects, I would expect them to be associated with declining quantities, indicating supply-driven movements along a demand curve.

163.     Even in an overall context of increasing output and declining prices, if price increases (relative to the average trend) are driven by conspiratorial effects, I would expect (all else equal) for them to be associated with periods of below-average output growth.  To the contrary, if relative price increases are caused by growth in demand, one would observe that prices increases (above the trend) are associated with periods of above-average output growth.  Hence, a natural question is: Are observed periods of higher-than-average price growth associated with lower-than-average quantity growth (suggesting supply effects, including possible conspiratorial effects) or higher-than-average quantity growth (suggesting non-conspiratorial, demand side effects).

164.     Figure VI-4, using 15" notebook and monitor panels as an example, shows a clear pattern in the relative changes in price, quantity and total revenue during the class period (shown as percentage changes over a two-quarter period).  The observed price increases are associated with periods of *above-average* growth in industry output.  Hence, this straightforward review of pricing and quantity trends is more consistent with demand-driven price changes than with any conspiratorial restriction on supply.

Highly Confidential – Subject to Protective Order

**Figure VI-4: Changes in Price, Quantity, and Revenue**



Source: Defendants' transaction data.

## C. PATTERNS OF PRICE CHANGES AND CAPACITY UTILIZATION DURING THE CLASS PERIOD ARE MORE CONSISTENT WITH DEMAND SHOCKS THAN WITH CONSPIRATORIAL RESTRICTIONS IN SUPPLY

165.    Plaintiffs have also alleged that the alleged cartel sought to reduce capacity utilization in order to reduce supply of TFT-LCD panels and drive up prices.[148]  However, an alternative, non-conspiratorial explanation for variations in capacity utilization is that fluctuations in demand for TFT-LCD panels (as part of the crystal cycle) lead to variations in utilization.

166.    As with the relationship between changes in quantity and changes in price, these two explanations for variations in capacity utilization (supply-side, alleged-cartel-induced changes versus demand-driven changes) have distinct implications for the relationship between capacity utilization and price changes.  Under the Plaintiff's story, all else equal, reductions in capacity utilization should be associated with faster rates of price increase

---

[148]    *Netz Report* at 39.

Highly Confidential – Subject to Protective Order

(or slower rates of price decline).  Under a demand-driven explanation, periods of low capacity utilization should be associated with faster rates of price decline.

167.    Figure VI-5 plots price changes and capacity utilization.  It is clear from the figure is that capacity utilization was generally quite high throughout the class period.  In addition, dips in capacity utilization tend to be associated with periods of rapidly declining prices, not periods of rising prices.  For example, the big dip in capacity utilization in 2000-2001 was associated with rapidly declining prices.  The data are more consistent with the idea that periods of high demand led to high utilization and higher prices, than with the idea that conspiracy-induced reductions in capacity utilization drove prices higher.

**Figure VI-5: Capacity Utilization vs. Panel Price Changes**



168.    Figure VI-4 and Figure VI-5 indicate a very important role for within-class period fluctuations in demand in driving observed prices.  Again, these pictures should be kept firmly in mind when evaluating Plaintiff Experts' models.  In particular, a critical question is this: Do Plaintiff Expert's models include sufficient controls for demand

Highly Confidential – Subject to Protective Order

trends and fluctuations to enable them to conclude that observed price fluctuations are truly driven by conspiratorial price fixing, as opposed to unmeasured demand shocks? As I explain in more detail in Section VII, the answer is clearly no.

## VII.  PLAINTIFF EXPERTS' ESTIMATES OF SIGNIFICANT PANEL OVERCHARGES ARE BASED ON FAULTY ECONOMIC ASSUMPTIONS AND ECONOMETRIC MODELS

169.    Despite the economic evidence presented above, indicating that the Defendants were unlikely to have engaged in a successful conspiracy that significantly raised prices, Dr. Netz and Professor Comanor claim to show large average overcharges based on their econometric models.  Given the evidence presented thus far, one should approach such results with extreme caution and demand that they are robust to reasonable sensitivity tests.  As I show below, Dr. Netz's and Professor Comanor's econometric models are deeply flawed and thus do not provide reliable support from which to conclude that the alleged cartel resulted in significant overcharges.  At an absolute minimum, if one wants to rely on these models, one should address basic flaws in their implementation.  After addressing some of those basic flaws (leaving other problems unsolved), I find that Dr. Netz's and Professor Comanor's models yield overcharge estimates of 0.7-1.3 percent.  I stress that this finding of a 0.7-1.3 percent overcharge is not based on any conclusion that the changes render the models reliable; it only applies to the extent that one decides to use these models despite the fact that they generate unreliable results.

170.    In this section, I proceed in two steps.  First, I explain why available evidence on economic profit margins, on its own, indicates that the findings of Dr. Netz and Professor Comanor are unreasonable.  Second, I explain that these unreasonable findings are driven by faulty econometric models.

### A.  PLAINTIFF EXPERTS' MODELS YIELD AN ECONOMICALLY NONSENSICAL RESULT: IMPLYING A COMPETITIVE EQUILIBRIUM WITH CONSISTENTLY NEGATIVE ECONOMIC PROFITS

171.    In her base model, Dr. Netz estimates an overcharge of 12.1 percent.[149]  Professor Comanor estimates an overcharge rate of 8.9 percent.[150]  As an initial test of these

---

[149]    *Netz Report* at 117.

Highly Confidential – Subject to Protective Order

overcharges, I ask whether the observed economic margins earned by Defendants during the alleged conspiracy period are at least as large as the overcharges put forth by Plaintiff Experts.  If not, then the implication of these experts' models is that the competitive equilibrium in the industry would have been for firms to earn *consistently negative* economic profits.[151]  Such a result would not be consistent with the substantial and ongoing capacity investments observed in this industry during the class period, as documented above.

172.     It can be difficult to estimate economic profit margins so to avoid argument I rely on Dr Netz's own calculations to demonstrate that economic profit margins in the "but-for" world would be negative if one were to accept the Plaintiff Experts' estimated price overcharges.

173.     As shown below, I find that an overcharge estimate of 8.9 percent (as presented by Professor Comanor, well below Dr. Netz's calculation) yields the unreasonable result of *substantially negative* economic profits for all Defendants throughout the alleged conspiracy period.[152]  The main conclusion to be drawn from this finding is that Plaintiff

---

[150]     *Comanor Supplementary Report* at 3.

[151]     For simplicity, the calculations in this section hold quantity sold constant.  Of course, lowering price would likely lead to more quantity sold.  However, given that overall capacity utilization was around 90 percent in most time periods (*see* Figure VI-5), the amount of output that could have been added without investing in additional facilities (and thus substantially increasing capital costs, at least partially offsetting any profit gained) is limited.

[152]     In my calculations, I interpret a percentage overcharge in the same way as Dr. Netz, *viz.*, a ten percent overcharge means that ten percent of the actual price paid is attributable to the alleged price-fixing agreement.  So, if the actual price was $100, then the but-for conspiracy price would have been $90.  (*See,* files produced by Dr. Netz, "average_overcharge.csv" and "total_damages.do.")  However, in analyzing Professor Comanor's proposed overcharge, a small adjustment is necessary.  Professor Comanor's model estimates overcharges as a percentage of the but-for price, rather than as a percentage of the actual price.  Although this approach is equally valid, it means that if the actual price was $100, then the but-for price would have been approximately $91 (that is, a ten percent overcharge over the but-for price of $91 increased the price to $100). This calculation is consistent with Professor Comanor's damages calculations. (*See,* file produced by Professor Comanor, LCD_damagesrev1.xlsx.)  As a result, Professor Comanor's proposed overcharge of 8.9 percent of the but-for price, is equivalent to an overcharge of about 8.2 percent of the actual price.  This is the percentage I use below in my profit margin calculations, which are based on actual prices.

Highly Confidential – Subject to Protective Order

Experts' overcharge models are not reasonable, as they imply a but-for world in which Defendants would have consistently earned negative economic profits. This is not consistent with economic theory, which indicates that, over time, as firms invest, firms should earn a reasonable return on their capital, meaning firms should earn economic profits of at least zero.[153]  Indeed, in her deposition, Dr. Netz herself indicated that, absent the conspiracy, panel manufacturers should have been expected to earn a "normal rate of return," which implies economic profits of at least zero.[154]

174.    One way to understand why a but-for price that yields a negative economic profit margin is unreasonable is to consider the fact, developed above, that the Defendants made substantial investment in new fabs during the alleged conspiracy period. As a matter of fundamental economics, firms will not continue to invest capital in an industry that generates negative economic returns.[155]

175.    Hence, there is no reasonable economic equilibrium in which prices would have been reduced by as much as that implied by Plaintiff Experts' overcharge estimates, yet firms would have continued to make the investments that were observed during the alleged conspiracy period. Plaintiff Experts' implicit assumption that one could hold all else fixed and simply reduce prices by the amount of their estimated overcharges is not reasonable. The negative economic profits would have led to reduced investment in new, efficient fabs—and perhaps exit from the industry—which would have put *upward pressure* on prices, a fact that Plaintiff Experts' models simply ignore.

---

[153]    Note that earning zero economic profits means that a firm is just covering the required return on its capital, or put differently, is earning a normal rate of return on capital. A negative economic profit means that the firm is earning below the normal rate of return on capital and therefore will likely find it difficult to attract funds for further investment.

[154]    "Q.  Sure. So in the but-for world, if profits fell below a reasonable hurdle rate, there would have been less investment in fab capacity, which eventually would cause prices to rebound?  A.  That story is plausible.  Q.  Do you believe that the panel manufacturers would have operated at a loss over the class period in the absence of the conspiracy?  A. I have not specifically done such analysis, but I would tend to think that but for the conspiracy they would earn a normal rate of return." (*Netz Depo.,* 52:13-53:4.)

[155]    Consistent with this logic, in explaining the concept of the minimum viable scale, Dr. Netz argued that a firm would not be willing to invest unless it could make a 10 percent return on investment (the hurdle rate). (*Netz Depo.*, 47:9-48:2.)

Highly Confidential – Subject to Protective Order

### 1.    Dr. Netz's Economic Profit Margin Calculations

176.    As a first step in my assessment of Defendants' economic profit margins during the class period—and, in particular their implications for whether Plaintiff Experts' overcharge calculations are reasonable—I rely on Dr. Netz's own profit margin calculations.  Dr. Netz's analysis of profit margins shows that overcharges of 8.9 percent (or more) would imply but-for prices under which Defendants earned substantially negative economic profits.

177.    In particular, in her calculations of the minimum viable scale, Dr. Netz estimates a total production cost of approximately 91 percent of price (based on Defendant data during the alleged conspiracy).[156]  With a nine percent profit margin (even before incorporating Dr. Netz's assumed cost of capital), the 8.9 percent overcharge proposed by Dr. Comanor implies that Defendants would barely have covered their production costs, leaving minimal return on capital.  If one accounts for the large capital outlay required for fabs,[157] using Dr. Netz's ten percent cost of capital, Defendants would have incurred economic losses of approximately five percent of price.[158, 159]  This is not an economically reasonable outcome, demonstrating the flaws in Dr. Netz's and Professor Comanor's models.

---

[156]    *Netz Report* at 59 and Ex. 33.  This includes the cost of goods sold (80 percent of price) and production and management overhead (11 percent of price).  It does not include Dr. Netz's cost of capital (shown separately as "Capital Cost of Entry" in Ex. 33).

[157]    *Netz Report* at 12.

[158]    This example relies on Dr. Netz's Scenario 1, in which the 10 percent cost of capital represents around 6 percent of sales.  (*See*, *Netz Report*, Ex. 33; Annual Fixed Cost/Minimum Viable Scale=Profit Percentage.)  In Scenario 2, the cost of capital represents around 4 percent of sales, which implies losses of approximately three percent of price under Dr. Comanor's but-for prices with 8.9 percent overcharge.  In deposition, Dr. Netz argued that the 10 percent cost of capital (or hurdle rate) is a common percentage used among businesses and not a high rate.  (*Netz Depo.*, 49:12-50:1.)

[159]    As explained above, when applying Professor Comanor's 8.9 percent overcharge to actual prices, the overcharge percentage has to be adjusted to 8.2 percent (to reflect a calculation based on actual prices).  In this example, Dr. Netz's production cost of 91 percent and cost of capital of 6 percent yields a total economic cost of 97 percent of price.  This implies a profit margin of 3 percent of observed prices.  If one reduces prices by 8.2 percent, as implied by Professor Comanor's model, the 3 percent profit margin becomes a negative 5 percent profit margin.

Highly Confidential – Subject to Protective Order

178.     It is particularly striking that Dr. Netz presented these profit calculations yet still concluded that the alleged cartel generated overcharges of over 12.1 percent.  Under Dr. Netz's alleged overcharges of 12.1 percent, Defendants would have incurred economic losses of approximately nine percent of price.[160]  The implication that, absent the alleged cartel, the Defendants' economic profits would have been substantially negative stands in direct contradiction to her deposition testimony that, absent the alleged cartel, panel manufacturers should have been expected to earn a "normal rate of return," which implies economic profits of zero or more.[161]

## 2.    Alternative Economic Profit Margin Calculations

179.     I have also performed my own profit margin calculations to confirm that, under alternative assumptions, the above conclusions based on Dr. Netz's numbers stand. They do.

180.     For my economic profit calculations, I use a definition of economic profits that accounts for the cost of capital, as regularly used in the literature.[162]  I include data for 2000-2006 for the eight Defendants with financial statements available for the business segment that includes the TFT-LCD manufacturing division.[163]

---

[160]     This example relies on Dr. Netz's actual profit margin calculation of three percent in Exhibit 33 (total production cost: 91 percent; cost of capital in Scenario 1: six percent of sales).  This implies economic losses of nine percent under Dr. Netz's proposed 12.1 percent overcharge.

[161]     *Netz Depo.*, 45:4-15.

[162]     An estimate of economic profit can be obtained from accounting data as the net operating profit after taxes (NOPAT), minus the cost of the capital invested.  This includes the after-tax profit generated by the company's core operation, excluding gains from nonoperating assets and interest payments.  In addition, economic profits take into account a cost not included in accounting statements: the cost of the capital the company has raised from investors.  The cost of capital is estimated as a hurdle rate or weighted average cost of capital (WACC), multiplied by the capital employed (calculated as the average total assets during the year, minus current liabilities).  (*See* G. Bennett Stewart, III (1991), *The Quest for Value: EVA Management Guide*, HarperCollins Publishers, Inc., Chapter 3;  Richard A. Brealey, Stewart C. Myers, and Franklin Allen (2011), *Principles of Corporate Finance*, 10th ed., McGraw-Hill Irwin, Chapters 12 and 28; and Tim Koller, Marc Goedhart, and David Wessels (2010), *Valuation: Measuring and Managing the Value of Companies*, 5th ed., McKinsey & Company, Chapters 6-7.)

[163]     In some cases, only partial data were available for the business segment that includes the TFT-LCD manufacturing division.  In these cases, I used pro-rata calculations based on

Highly Confidential – Subject to Protective Order

181.    The results are presented in Table VII-1.[164]  I consider a base case (using Dr. Netz's "reasonable rate of return on the cost of capital" of ten percent).[165]  Because of the difficulties in computing economic profit margins, I also consider several (conservative) alternative versions including a five percent cost of capital, a more conservative assumption on the amount of capital employed by each firm, and slower rates of depreciation.[166]  In each case, the conclusion is the same: Assuming Professor Comanor's 8.9 percent overcharge (which is below the level claimed by Dr. Netz), every Defendant for which I have usable data would have earned negative economic profits during the class period.

---

the consolidated financial statements (which include other company divisions).  This affected calculations of depreciation, taxes, interest payments, and current liabilities.  In addition, for AUO, CMO, LGD, Samsung and Sharp, I could not obtain financial statements with sufficient information for every year.

[164]    For ease of exposition, I divide economic profits by net sales (total sales minus discounts and returns).  In all cases, I estimate the effect of these assumptions on taxes by using the top corporate tax rates for each Defendant's country. (*See* data from Economist Intelligence Unit.)

[165]    *Netz Report* at 59-60.

[166]    In terms of the amount of capital employed, I measure assets and current liabilities as the minimum of their values at the beginning and end of the year (rather than the average for the year).  Since Defendants made substantial investments during the class period, this measure tends to use the capital invested from the beginning of the year, which can be significantly lower than the average for the year, reducing the estimated cost of capital.  For depreciation rates, the sensitivity analysis assumes that assets depreciate at half the rate used in the accounting statements.  This reduces the cost of sales and increases the profit margin.

Highly Confidential – Subject to Protective Order

**Table VII-1: Average Profit Margin after Deducting an Assumed 8.9 Percent Overcharge**

| Defendant | Base Case (10% Cost of Capital) | 5% Cost of Capital | Minimum Capital Employed | Half Depreciation Expense |
|---|---|---|---|---|
| AUO | -7.6% | -2.0% | -5.5% | -2.8% |
| CMO | -12.6% | -5.1% | -9.5% | -6.8% |
| HannStar | -28.7% | -20.2% | -26.9% | -22.8% |
| LGD | -10.2% | -5.5% | -9.1% | -6.0% |
| Hitachi* | -9.0% | -6.6% | -9.4% | -9.8% |
| Samsung* | -9.3% | -4.2% | -7.9% | -4.8% |
| Sharp* | -3.5% | -0.9% | -4.8% | -4.4% |
| Toshiba/TMD* | -5.1% | -2.5% | -6.1% | -5.7% |
| *Average* | *-9.7%* | *-4.8%* | *-8.6%* | *-6.5%* |

Notes: Based on financial statements for LCD division, where available. Assumes no change in quantity. Averages weighted by annual sales from DisplaySearch panel data.

* LCD division data based on division income statements with prorated data from consolidated financial statements on depreciation, taxes, interest expense, and current liabilities.

## B. DR. NETZ'S FINDING OF A 12.1% PANEL OVERCHARGE IS BASED ON FUNDAMENTALLY FLAWED ECONOMETRIC MODELS

### 1. Description of Dr. Netz's overcharge models

182.    Dr. Netz's panel overcharge estimates are based on an econometric "forecasting model."[167]  She proceeds as follows.  First, she estimates a regression model using only data from time periods outside the alleged cartel period—that is, before 1999 and after 2006.[168]  She interprets this regression model as providing predictions of the but-for price that would have obtained absent any alleged conspiracy.  She then estimates overcharges as the difference between actual panel prices during the alleged cartel period (1999-2006) and the predicted but-for prices based on her estimated model.

183.    The data on panel sales Dr. Netz uses are aggregated to the Defendant-application-size-resolution-quarter level.[169]  That is, she uses a panel dataset, which tracks 657 different Defendant-application-size-resolution groups across quarters.[170]

---

[167]      *Netz Report*, § VII.

[168]      *Netz Report* at 89.

[169]      *Netz Report* at 89

[170]      *Netz Report* at 90 and n. 264.

Highly Confidential – Subject to Protective Order

She estimates her forecast model using quantity-sold as weights, thereby assigning more "importance" to observations associated with higher quantities.[171]

184.     Dr. Netz's model predicts price based on the following explanatory variables:[172]

- Log of U.S. GDP;

- A measure of unit cost provided by Defendants.  For many of the observations in her sample—including all observations from Hitachi Displays, Sharp, and CPT, plus selected observations from other Defendants—this variable is not available, so Dr. Netz drops these observations in her analysis.[173]  This results in her basing her estimates on only 50 percent of the observations in the overall estimation sample;

- Country-specific "labor rates" and interest rates (*i.e.*, Korean rates are used for Korean Defendants; Japanese for Japanese Defendants; Taiwanese for Taiwanese Defendants);

- Baltic Exchange Dry Index as a measure of the cost of shipping; and

- Total installed capacity and total utilized capacity from DisplaySearch.[174]

In addition, she includes separate "indicator variables" for each "panel size group," panel resolution, panel application, and manufacturer.[175]

185.     Using her base forecast model, Dr. Netz estimates an average overcharge of 12.1 percent.[176]  Dr. Netz also conducts a series of sensitivity tests on this base forecast

---

[171]     *Netz Report* at 92.

[172]     *Netz Report* at 90-91.

[173]     *Netz Report* at n. 268.

[174]     Dr. Netz indicates that total utilized capacity (effectively total output) should capture the fact that "[a]s firms approach the designed capacity constraint of their fabs…one would expect the marginal cost of production to rise."  *(Netz Report* at 91).  However, her model includes utilized capacity separately from total capacity, meaning that the effect of an additional unit of utilized capacity is assumed to be the same no matter how much total capacity there is.  In that sense, the variable cannot measure how close any firm (or the industry as a whole) is to capacity constraints.  She provides no explanation why she doesn't enter capacity utilization as a percentage to capture the concept she describes.

[175]     *Netz Report* at 91.

Highly Confidential – Subject to Protective Order

model.[177]  First, she presents results from a dummy variable model.[178]  This is a regression model equivalent to her forecast model except that she estimates it on all data from the entire time period and measures the effect of the alleged cartel though a series of annual "indicator variables" for each year during the alleged cartel period.  According to Dr. Netz, the dummy variable model results in an average overcharge of 13.9 percent.[179]  She also estimates a series of models, each of which omits one of the control variables used in her base regression.  These sensitivity tests yield average overcharges of 10.4 percent to 17.2 percent.[180]

186.    Notably, in her robustness testing, Dr. Netz drops each of her variables one at a time, *except for the Defendant cost variable.*  In Dr. Netz's forecast model, the coefficient on the Defendant cost variable is not statistically significant and the inclusion of this variable requires Dr. Netz to drop roughly half of her estimation sample.  Hence, it would be appropriate to test the effect of dropping this variable or otherwise controlling for cost.  I return to this topic below.

187.    In addition, Dr. Netz does not show a single robustness check in which she adds any additional control variables.  As such, she has performed no checks to determine if there are any relevant variables that her model is failing to control for.  This is an important omission, as it is well known that failing to control for relevant control variables leads to biased estimates, while including irrelevant control variables does not.  In particular, if any such omitted variables both affect panel prices and vary between the alleged conspiracy and non-conspiracy periods, Dr. Netz will mistakenly attribute the

---

[176]    *Netz Report* at 93.

[177]    At her deposition, Dr. Netz agreed that "it is useful to undertake robustness or sensitivity analysis tests." *Netz Depo.*,102:18-19.

[178]    Dr. Netz describes this dummy variable model as "a corroborative technique."  (*Netz Report* at 89.)  In her deposition, Dr. Netz made it clear that her damages estimate is based on the forecast model, with the dummy variable model only used as a robustness test.  *Netz Depo.,* 13: 3-11 ("Q. Well, you had two in your report. You had the dummy model and the other one. Which – so which one are you referring to?  A. Well, I have one in my report, the forecast method. And then I do go through approximately six to eight variations to show—to test the robustness of the forecast—forecast method, but the damages I'm putting forth to testify to are based on the forecast.")

[179]    *Netz Report,* Ex. 47.

[180]    *Netz Report,* Ex. 47.

Highly Confidential – Subject to Protective Order

effect of these factors to the alleged conspiracy.  In the language of econometrics, this is the well-known problem of omitted variable bias.[181]  I also return to this topic below.

### 2.    Dr. Netz makes basic errors in data processing, which I correct in all analyses

188.    Dr. Netz committed several errors in her processing data from the Defendants. Among these, the most substantial errors are: 1) Due to an error in data processing, a substantial percentage of Samsung panels ended up with missing cost data and thus were dropped in estimating the regression model, and 2) CMO cost data was mistreated in 2009, which led Dr. Netz to exclude nearly all CMO data in that year.  I correct these data errors in all of the analyses of Dr. Netz's results.[182]

189.    Table VII-2 contains the updated regression results (comparable to Dr. Netz's Exhibit 45) after correcting her data processing errors.

---

[181]    *See* William Greene (1993), *Econometric Analysis*, Second Edition, Prentice Hall, pp. 246-247; Peter Kennedy (2003), *A Guide to Econometrics* Fifth Edition, Blackwell Publishing, pp. 397-398.

[182]    Dr. Netz also made computational errors in computing overcharge percentages, which I correct in all analyses.

Highly Confidential – Subject to Protective Order

**Table VII-2: Netz's Base Model Correcting Data Errors**

| | Dependent Variable |
|---|---|
| **Explanatory Variables** | **Price** |
| Cost | 7.72 |
| | (5.57) |
| National Labor Rate | 0.04 |
| | (0.13) |
| National Interest Rate | 7.23 |
| | (5.64) |
| log of GDP | -29.61 |
| | (271.76) |
| Shipping Cost Index | 0.002 |
| | (0.001) |
| Total Capacity | -0.02** |
| | (0.003) |
| Utilized Capacity | 0.01** |
| | (0.003) |
| log of Number of Firms | -3.56 |
| | (3.31) |
| Total Observations | 2,412 |
| R-squared | 92% |

Notes: Standard errors in parentheses
* Significant at 5% level; ** Significant at 1% level

### 3.    Dr. Netz's choice of explanatory variables, and the coefficient estimates on those variables, demonstrate the flaws in her model

190.    A review of the explanatory variables included in Dr. Netz's forecast model, as well as the implied effect of these explanatory variables on the price of TFT-LCD panels (see Table VII-2, above), reveals economically nonsensical results.  Two examples make the point.

191.    First, Dr. Netz includes only one control variable that even plausibly measures demand for TFT-LCD panels, the log of U.S. GDP.  The fact that this is the only control for demand is itself striking: As seen in Figure VI-4 and Figure VI-5, the data indicate an important role for variation in demand for TFT-LCD panels in driving TFT-LCD prices, meaning that properly controlling for demand shifters must be an important component of any model purporting to measure but-for prices.  Dr. Netz provides no indication why U.S. GDP is the most appropriate control for the demand facing Asian TFT-LCD producers and certainly no evidence that it controls for all relevant demand variation.  Her argument for not including more demand variables is that doing so would

Highly Confidential – Subject to Protective Order

introduce "a degree of multicollinearity" due to correlation between demand variables.[183] Although there would certainly be some correlation between different demand-side controls, the more relevant concern is to find a set of demand variables that collectively (even given some correlation) control for demand variation, so as to avoid mistakenly attributing demand-driven price changes to effects of the alleged conspiracy.[184]  Without full demand controls and with any variation between demand conditions during and outside the alleged cartel period, Dr. Netz's forecast model may mistakenly attribute the effect of demand variation to cartel effects.

192.    The lack of demand controls becomes even more of a concern when one notes that the log of U.S. GDP has a statistically insignificant and negative effect in Dr. Netz's regression.[185]  Although not statistically significant, according to Dr. Netz's model the most likely relationship is that higher demand yields *lower* prices.

193.    As another example, the estimated coefficient on the Defendants' cost variable is not only statistically insignificant but is also implausibly low, implying that a $100 increase in production cost would yield only a *77 cent* increase in panel prices.[186] Hence, in stark contrast to Dr. Netz's conclusion that increases in panel prices are entirely (100%) passed-through to finished product prices, her model implies pass-through from TFT-LCD panel costs to TFT-LCD panel prices at a rate below one percent, so low that it cannot be distinguished statistically from zero.  Dr. Netz provides no indication why the pass-through rate of TFT-LCD panel costs to TFT-LCD panel prices would be much lower than the pass through rate of TFT-LCD panels prices to finished product prices.

---

[183]    *Netz Report* at 90.

[184]    As noted by Peter Kennedy, multicollinearity between right hand side variables creates no bias in estimates.  (Kennedy (2003), p. 402).

[185]    *Netz Report*, Ex. 45.

[186]    In Dr. Netz's original calculations, the coefficient on cost was 6.46, but with the corrections to the Samsung and CMO data, described above, it has increased to 7.72. Note that Dr. Netz's cost variable is expressed in thousands of dollars, so the coefficient of 7.22 indicates that a $1000 cost increase would yield a $7.72 price increase or that a $100 cost increase would yield a price increase of approximately 77 cents.

Highly Confidential – Subject to Protective Order

194.    One possible explanation for the extremely low, statistically insignificant coefficient on cost is that the Defendants' cost data provide only noisy measures of actual marginal production cost.  The appropriate reaction to this would be to seek out additional, better cost controls.  I explore the effects of adding additional cost controls to Dr. Netz's model below.

195.    Another striking omission from Dr. Netz's forecast model is any control for the obvious time trend in panel prices.  As documented in Section II.E, above, the dominant feature of TFT-LCD panel prices is their steady decline.  As noted in that section, a study that relies on prices from after the cartel period to determine but-for prices (as Dr. Netz's model does, since 99.9 percent of all non-cartel panel revenue used in her model comes from the post-2006 period) needs to control for the fact that prices have declined markedly over time, else it will find that prices were higher during the alleged cartel period solely due to the steady downward trend.  Given the lack of a time trend as a control variable, it is likely that Dr. Netz has failed to capture fully the pattern of steadily declining prices and thus has effectively reached a conclusion that cartel prices were too high *because* they fell so much during the cartel period.  This is illustrated in the following section.

### 4.    Dr. Netz's price predictions demonstrate the flaws in her model

196.    A useful way to examine the reliability of a forecast model is to look at how well it does at predicting prices.  That is, if one compares the predicted prices from Dr. Netz's model to actual prices during the alleged cartel period, how well do the predicted prices track actual prices?  Of course, the model does not have to yield perfect price predictions to be useful, and indeed, Dr. Netz uses the fact that predicted prices are not exactly equal to actual prices to measure overcharges.[187]  Still, a reliable forecast model should capture basic patterns in prices including those driven by changes in costs, those driven by demand cycles, and the general trend in prices.

197.    Simple graphs of actual prices and Dr. Netz's predicted prices demonstrate that her base model fails to track even basic price patterns in the conspiracy period.  (One

---

[187]    *Netz Report* at 92-93.

Highly Confidential – Subject to Protective Order

thing these figures also stress is that Dr. Netz's model is better characterized as a "backcasting" model than a "forecasting" model, in that it generally estimates prices on post-class period data, then maps these back into predictions for the earlier class period.)

198.    As one example, Figure VII-1 plots predicted and actual prices for LG Display's 32" WXGA TV panel.  In this case, the predictions are basically flat during the conspiracy period, failing to reflect the fall in prices that is evident in the data.  Dr. Netz's model appears to overstate the impact of the conspiracy because it does not capture the patterns in price movements during the conspiracy period.

**Figure VII-1: Dr. Netz's Model: Actual and Predicted Prices**
**Panel: LG Display, TV, 32, WXGA**



199.    Figure VII-2 shows a similar pattern for LG Display's 19" SXGA monitor panel. Many other such examples can be found by looking at specific panel-types in Dr. Netz's data.

Highly Confidential – Subject to Protective Order

**Figure VII-2: Dr. Netz's Model: Actual and Predicted Prices**
**Panel: LG Display, Monitor, 19, SXGA**



200.    Furthermore, there are numerous examples of products for which Dr. Netz's model predicts prices that are not just below observed prices, but *well below costs*. Figure VII-3 and Figure VII-4 show examples of panels for which predicted prices are consistently below observed cost, which is yet another indication that Dr. Netz's model is mis-specified.  In these cases, it is clear that the Defendants' cost data track actual prices fairly well, yet Dr. Netz's price predictions do not, creating the appearance of overcharges.

Highly Confidential – Subject to Protective Order

**Figure VII-3: Dr. Netz's Model: Actual and Predicted Prices vs. COGS**
**Panel: AUO, Monitor, 17" (SXGA)**



Highly Confidential – Subject to Protective Order

**Figure VII-4: Dr. Netz's Model: Actual and Predicted Prices vs. COGS
Panel: AUO, TV 26" (WXGA)**



201.    As a further test of predictive power I examine the prices predicted by Dr. Netz's model for panel sales in the pre-1999 period.  This is a useful test of Dr. Netz's model because the allegations in this case focus on the 1999-2006 period, and Dr. Netz uses the pre-1999 period as a non-conspiratorial period.  Hence, if Dr. Netz's methodology is valid, the gap between her predicted prices and the actual prices should average approximately zero before 1999.  Instead, for the pre-1999 observations included in Dr. Netz's dataset, the average gap between actual and predicted prices is 40 percent. Hence, for the observations where I know the true overcharge (zero), the model over-predicts the overcharge by 40 percentage points, casting serious doubt on its validity for any overcharge predictions.[188]

---

[188]    Dr. Netz argues that there may have been "some degree of coordination" before 1999. (*Netz Report* at 89.)  However, she presents no evidence to support the likelihood of significant overcharges during this period.  In any case, the fact that Dr. Netz's model implies overcharges in the pre-class period that are substantially higher than in the class period demonstrates further the flaws in her model.

Highly Confidential – Subject to Protective Order

5.    **The extreme sensitivity of Dr. Netz's overcharge estimates to changes in her model demonstrates that the model provides no support for significant overcharges**

202.    My main conclusion with regard to Dr. Netz's model is that it is simply too unreliable to provide any support for a conclusion of significant positive overcharges on panel purchases.  In this section, I demonstrate the extreme fragility of Dr. Netz's findings.

(a)    *If data are restricted to sales of TFT-LCD panels to third parties, Dr. Netz's model yields negative overcharge estimates.*

203.    Dr. Netz's sample is based on transaction data that, in addition to sales to "third parties," includes sales to other Defendants/co-conspirators and internal transactions. Although I recognize that Plaintiffs have alleged that all panel sales were affected by the alleged conspiracy,[189] I see no economic basis to assume that the overcharge would be the same to these different types of buyers and certainly no basis to say that the but-for price would necessarily be the same to each type of buyer.  Importantly, if the Plaintiffs' economic theory of the case and Dr. Netz's results make sense, it should be the case that there is clear empirical evidence for significant overcharges *paid by third parties*.

204.    This proposition is testable.  One can replicate Dr. Netz's methodology using data for third parties alone, estimating her forecast model only on sales to third-parties to derive a but-for panel price.  This third-party but-for price can then be compared to the actual panel price paid by those third parties to determine the overcharge.

205.    I have implemented this approach and have found that, looking only at sales to third-parties (excluding sales to other Defendants/co-conspirators and internal sales),[190] Dr. Netz's methodology yields an overcharge estimate of *negative 7.9 percent*.  Under Dr. Netz's methodology, then, the implication is that the alleged cartel charged third parties *less* than they would have paid but-for the alleged cartel.  Hence, her model

---

[189]    *IPP Complaint, ¶ 137.*

[190]    In Dr. Netz's sample, sales to third-parties comprise approximately 60 percent of revenue with the other 40 percent made up of internal sales or sales among Defendants.

Highly Confidential – Subject to Protective Order

provides no support for a claim that the alleged cartel effectively raised panel prices to non-cartel members.

> (b) *Dr. Netz's results are extremely sensitive to minor changes in technical econometric estimation details*

206.    A common issue in time-series data—*e.g.,* looking at panel prices over time—is that the "error terms" in the regressions (meaning the aspects of price that are not captured by the explanatory variables, including demand and supply shifters) tend to be correlated over time.  Put simply, if a price is higher than the regression model predicts today, then the price will likely be higher than predicted tomorrow.  This is known as "serial correlation" or "autocorrelation."

207.    Dr. Netz implements one method of correcting for the effects of serial correlation, known as a "Prais-Winsten" estimation.[191]  This method transforms both the left-hand-side (price in Dr. Netz's case) and right-hand-side explanatory variables in a way that is designed to remove the serial correlation.  Dr. Netz's specific implementation of this estimation technique requires her to estimate separately the degree of serial correlation for every different Defendant-application-size-resolution combination in her dataset.

208.    Dr. Netz's approach to addressing the serial correlation issues is just one of many possible approaches to adjusting for serial correlation.  Many different estimation techniques are valid (in the language of econometrics, they all yield "consistent" estimates).  There may be advantages to one or another (the more sophisticated models are "more efficient"[192] if one has correctly specified the form of the serial correlation, while ordinary least squares requires no such assumptions).  Rather than look for a single "right" answer about which of these methods to use, one should check several such methods to make sure that results do not depend critically on a particular choice.  If a given result appears to be dependent on making a specific choice about which method to use, then that result is not robust.  If, using the same model and data, some

---

[191]    Dr. Netz implements the Prais-Winsten estimation procedure using the Stata procedure XTPCSE.  (*See, http://www.stata.com/help.cgi?xtpcse.*)

[192]    For a discussion of econometric efficiency, *see* Kennedy (2003), pp. 17-18.

Highly Confidential – Subject to Protective Order

econometric techniques predict positive overcharges and others predict negative overcharges, then the model provides no consistent basis from which to conclude that there were positive overcharges.

209.    *Dr. Netz's finding of positive overcharges is, in fact, entirely dependent on a specific choice of estimation technique*.  This is demonstrated by the following table which presents results from three econometrically valid alternative estimation techniques.

**Table VII-3: Sensitivity of Dr. Netz's Results to Alternative Treatment of Serial Correlation**

| Estimation Method | Overcharge % |
|---|---|
| Alternative (Tscorr) method to compute correlation | -0.2% |
| Common correlation across panels | -6.3% |
| Ordinary Least Squares (with Robust Standard Errors) | -13.3% |

210.    The first row of Table VII-3 shows what happens if one uses Dr. Netz's model but makes just one minor, technical change to the estimation procedure—maintaining all assumptions about the form of serial correlation and the basic (Prais-Winsten) estimation procedure, but changing only the details of how the magnitude of the correlation between successive error terms is calculated.[193]  This is a small, technical change and both approaches yield consistent estimates.  There is no clear reason to prefer one over the other.  Yet, when one changes from the method used by Dr. Netz to the alternative method, her estimated overcharges become -0.2 percent.  That such a minor change completely erases Dr. Netz's estimated overcharge shows that her model's predictions are simply not reliable.

---

[193]    In Dr. Netz's approach, the estimate of the degree of serial correlation is based on the regression coefficient in a regression of error terms on their once-lagged counterparts.  If the regression produces estimates of the degree of serial correlation that are larger than one, this method constrains them to equal 1.  The alternative method, known as "tscorr," proceeds by directly computing the correlation coefficient between error terms and their once lagged counterparts.  This method automatically produces measures of the degree of serial correlation that are no more than one in absolute value.  Assuming that Dr. Netz's model assumptions are correct, these methods are asymptotically equivalent.  (*See STATA Longitudinal-Data/Panel-Data Reference Manual Release 11* (2009), p. 476).

Highly Confidential – Subject to Protective Order

211.     The second row of Table VII-3 shows results when one changes Dr. Netz's assumption that the degree of serial correlation is potentially different for each different type of panel (that is, for example, different serial correlation for an LG Display 17" XGA monitor panel and a Samsung 19" XGA monitor panel) to an assumption that the degree of serial correlation is common across panels.  Although it may seem more flexible to allow serial correlation to vary by type of panel, it is odd that Dr. Netz allows for this heterogeneity while assuming that the effects of all her supply and demand shifters are common across panels.  In addition, established literature contains strong arguments indicating that the "common autocorrelation" approach is often superior, including when the time period available for study is relatively short compared to the number of different units (here, types of panels) to be studied, as is true in Dr Netz's model.[194]

212.     Again, the critical point is that results should not turn on such details: A reliable conclusion of significant positive overcharges simply cannot depend on whether or not one chooses to use panel-specific autocorrelation corrections.  But Dr. Netz's results do turn on this.  If one uses a common magnitude for the autocorrelation terms—but leaves everything else about Dr. Netz's model and methodology unchanged—the estimated overcharge percentage falls to -6.3 percent.

213.     Finally, given the disagreement between these methods for dealing with autocorrelation, a natural approach is to consider the standard, econometrically valid method of ordinary least squares with adjusted ("robust") standard errors, a method that is known to yield valid (consistent) estimates.[195]  This result is given in the third row of Table VII-3.  In this case, the estimated overcharge is -13.3 percent.

---

[194]     *See* for example, Nathaniel Beck and Jonathan N. Katz (1995), "What to do (and not to do) with Time-Series Cross-Section Data," *The American Political Science Review,* Volume 89, Issue 3, 634-647.  Beck and Katz argue strongly for estimation based on a common degree of autocorrelation across different panels, both because such estimation yields more accurate standard errors and because, with relatively short time periods for study (as Dr. Netz has, particularly since, for most panels, she bases estimation on data after 2006, yielding at most 16 quarters through 2009) estimation using a common degree of autocorrelation is more efficient.

[195]     Greene (1993), p. 361.

Highly Confidential – Subject to Protective Order

214.    The bottom line is simple: Dr. Netz's results are simply not reliable.  One can leave the substance of her model—*e.g*, her use of a forecast model, how she groups panels together, the fact that she aggregates the data to the quarterly level, her choice of explanatory variables, etc.—unchanged and simply vary the details of the econometric treatment of serial correlation between different valid methods to yield entirely different answers.  In fact, other than the approach Dr. Netz presented, the natural alternatives for the treatment of autocorrelation presented in Table VII-3 all yield *negative* overcharges, indicating that a conclusion of significant positive overcharges simply cannot be supported by Dr. Netz's approach.[196]

### 6.    Even utilizing Dr. Netz's econometric procedures and model specification, Dr. Netz's results are driven by unnecessarily dropping large numbers of transactions when estimating the model

215.    Dr. Netz controls for Defendants' costs at the manufacturer-application-size-resolution level.  Thus her regression drops any manufacturer-application-size-resolution combination for which she does not have cost data.  This results in the loss of 1,952 of 3,867 observations from the full sample available for estimation and 2,367 of 4,801 observations from the full sample available to compute damages, including all of the data for CPT, Sharp and Hitachi Displays.  The omitted data amount to approximately one-half of the data available to Dr. Netz, both in terms of number of observations and sales quantity.

216.    Dropping so much data is striking on multiple dimensions.  Most notably, all of these observations are being dropped because they are missing a single variable, unit cost, as provided by the Defendants.  It would potentially be understandable to drop some observations to preserve a variable that had a major effect on Dr. Netz's results.

---

[196]    As another example of the fragility of Dr. Netz's result, I have also estimated a version of her model using (unweighted) ordinary least squares, rather than weighting observations by quantities as Dr. Netz does.  (I also correct the errors identified in Section VII.B.2, but otherwise leave her model unchanged.)  This yields a *negative* 14.2 percent overcharge. As a general matter of econometrics, well-specified models should not yield starkly different estimates when estimated with or without weights.  (*See*, for example, Halbert White (1982), "Maximum Likelihood Estimation of Misspecified Models," Econometrica, 50(1), at 12-13.)  Hence, the extreme sensitivity of Dr. Netz's results to weighting indicates the fragility of her results and points to likely mis-specification.

Highly Confidential – Subject to Protective Order

But as noted above, the Defendants' cost variable is statistically insignificant and nearly economically irrelevant (leading to only a 77 cent increase in price for a $100 increase in cost). Hence, Dr. Netz is throwing away roughly half the available sample to preserve a variable that has almost no effect on her price predictions.

217.    In addition, it is noteworthy that Dr. Netz ends up dropping Sharp and Hitachi Displays entirely. Together, these two Defendants account for 71.6 percent of the panel revenue for Japanese firms in the full estimation sample. As discussed in Section V.B, above, the Japanese Defendants are distinct from many other Defendants: For example, they did not attend the Crystal Meetings and they produce a different mix of panel types. Hence, omitting 71.6 percent of sales by Japanese Defendants yields a decidedly non-random subset of the full sample.

218.    Dr. Netz has indicated that her standard for selecting her model included finding a model that best fits the data.[197] Such a standard is clearly not met, however, if one throws out half the data and then seeks a model that best fits only the remaining half of the data, as Dr. Netz has done.

219.    In order to make use of the full sample, I construct a measure of weighted average cost (across manufacturers) by application-size-resolution-quarter.[198] I then use this as my measure of cost in implementing Dr. Netz's forecast approach. By using this average cost number, rather than Defendant-specific cost, I can make use of nearly all the data that Dr. Netz has discarded.

220.    Before using this weighted average cost measure to re-estimate the forecast model on the full sample, I confirm that using the weighted average cost measure (in place of Defendant-specific costs) *on the restricted sample used by Dr. Netz* does not

---

[197]    *Netz Depo.,* 154:18-25.

[198]    In computing this, I use costs for the quarter in question. I use the calculated weighted average cost for a given application/size/resolution/quarter if data permits. Otherwise I compute weighted average cost based on a subset of characteristics as follows: use the weighted average cost by application/size/quarter if available, else use the weighted average cost by application/resolution/quarter if available, else use the average cost by size/resolution if available, else use the weighted average cost by size/quarter if available, else use the weighted average cost by resolution/quarter if available, else use the weighted average cost by application/quarter. Using this approach, I was unable to assign costs to just 23 observations.

Highly Confidential – Subject to Protective Order

lead to significant changes in her results. When I use this alternative cost measure on the restricted sample (but leave all other aspects of Dr. Netz's model and calculations unchanged) I find an average overcharge of 12.46 percent, nearly identical to Dr. Netz's finding of 12.1 percent. Hence, using this alternative cost measure yields a reasonable replication of Dr. Netz's findings. Knowing this, I turn to the more important question: How do Dr. Netz's results change when one uses the full sample of Defendant data?

221.    I have re-estimated Dr. Netz's forecast model making using of the average cost measure, so as to enable use of the full estimation sample. Using the full sample in this way yields an estimated overcharge of only *4.4 percent*. Although the implausibility of Dr. Netz's coefficient estimates, the striking lack of fit of her price forecasts, and the extreme fragility of her model still convince me that it cannot establish any significant overcharges, if one uses the full sample to fit the model (rather than dropping half the observations to preserve a statistically insignificant cost variable), it implies overcharges of only 4.4 percent.

### 7.    Adding relevant control variables to Dr. Netz's model further reduces overcharge estimates from her model

222.    As noted above, Dr. Netz's forecast model is missing some obvious control variables. Among these are a time-trend to capture the well-established downward trend in TFT-LCD panel prices. Also missing are additional controls to help measure the cost of producing TFT-LCD panels, particularly given that the Defendants' cost variable is not statistically significant in the regressions and may be a noisy measure of costs.

223.    Table VII-4 shows the results from the version of Dr. Netz's model discussed in Section VII.B.6 (utilizing my average cost measure so as to make use of the full estimation sample), but also adding additional controls, including a time trend, an index for the price of glass (obviously an important input into TFT-LCD panel production), as well as indexes for various commodity prices that may affect TFT-LCD panel production costs: the price of oil, the price of copper and the price of silicon.[199] Rather

---

[199]    Oil is an obvious driver of energy prices. Copper is used in integrated circuits and printed circuit boards, due to its superior electrical conductivity. Major applications of copper also include electrical wiring and industrial machinery. (*See* John Emsley (2003), *Nature's Building Blocks: An A-Z Guide to the Elements,* Oxford University Press, at

Highly Confidential – Subject to Protective Order

than make an arbitrary decision about which of these commodity prices to include or exclude, the table presents results using all combinations of the three of them.

224.    As seen in the table, using Dr. Netz's three measures of fit (mean-squared error (MSE), mean absolute deviations (MAD), and mean absolute percentage deviations (MAPD)), the models with additional control variables all yield a better fit than does the model with no additional controls. Dr. Netz indicated in her deposition her standard for selecting a model would include finding a model that best fits the data.[200]

225.    Adding a time trend, in order to capture the prevalent pattern of falling prices for TFT-LCD panels, reduces the predicted overcharge to 1.3 percent. Going beyond this to add various combinations of input cost variables yields negative overcharges in most cases (and on average), in some cases strikingly so.

**Table VII-4: Dr. Netz's Forecast Model with Additional Control Variables**

| Additional Control Variables | Overcharge | MSE | MAD | MAPD |
|---|---|---|---|---|
| No Additional Controls | 4.4% | 1,405 | 10.95 | 0.108 |
| Trend | 1.3% | 1,337 | 9.55 | 0.091 |
| Trend plus Glass | -15.3% | 1,283 | 10.49 | 0.106 |
| Trend plus Glass, Copper | 8.8% | 1,270 | 10.13 | 0.102 |
| Trend plus Glass, Silicon | 1.7% | 1,269 | 10.32 | 0.102 |
| Trend plus Glass, Oil | -4.0% | 1,250 | 9.69 | 0.090 |
| Trend plus Glass, Copper, Silicon | 13.9% | 1,264 | 9.95 | 0.099 |
| Trend plus Glass, Copper, Oil | -16.8% | 1,252 | 9.69 | 0.093 |
| Trend plus Glass, Silicon, Oil | -15.7% | 1,248 | 9.80 | 0.089 |
| Trend plus Glass, Copper, Silicon, Oil | -37.3% | 1,249 | 9.66 | 0.093 |

### 8.    Dr. Netz's dummy variable model does not support significant positive overcharges

226.    As noted above, Dr. Netz also estimates a dummy-variable form of her model— in which the model is estimated on all available data, with the effect of the alleged cartel captured through dummy variables for the alleged cartel period. She claims that this

123). Silicon is used as a key component in integrated circuits and microchips due to its semi-conductive properties. In the TFT-LCD manufacturing process, layers of silicon nitride and amorphous silicon (a-Si) are deposited onto the glass substrates. (http://www.plasma.com/classroom/fabricating_tft_lcd.htm, July 27, 2011).

[200]    *Netz Depo.*, 154:18-25.

Highly Confidential – Subject to Protective Order

model supports her conclusion of significant positive overcharges.  A closer examination of the results from such a model shows that it does not.[201]

> (a)    *Single dummy variable model provides no support for significant positive overcharges*

227.    A standard way to use a dummy variable model to assess the effect of an alleged cartel is to use a single dummy variable for all the years when the cartel is alleged to have been active (1999-2006).  As discussed below, this is the method employed by Dr. Comanor, because "[t]his procedure was specifically approved by the ABA treatise on Proving Antitrust Damages."[202]

228.    Despite the fact that this method is standard, Dr. Netz does not report results of a model that uses a single dummy variable to measure the alleged cartel's overall effect. Estimating such a model yields a clear and striking result: the cartel dummy variable is not close to being statistically significant (see Table VII-5, below).  Hence, far from corroborating Dr. Netz's findings, a standard single-dummy-variable version of Dr. Netz's model finds that, on average over the class period, the alleged cartel had no statistically significant effect on prices.  A statistically significant effect is one that can be statistically distinguished from zero, meaning (based on the standard five percent level for significance, as I use here) that the estimated effect is large enough that, after accounting for the inherent variability in the data, there is less than a five percent chance that an effect of that size would have been found at random.  So, failure to find a statistically significant effect of the alleged cartel on prices means that, based on available data, one cannot conclude (with accepted levels of statistical confidence) that the alleged cartel had any effect on prices.

---

[201]    In this section, I continue to base results on a dataset that corrects Dr. Netz's errors in processing Samsung and CMO cost data, but otherwise rely on her dataset and methods unless explicitly noted.

[202]    *Comanor Report* at 18, n. 37.  He cites to the ABA treatise, Section of Antitrust Law, American Bar Association (1996), *Proving Antitrust Damages Legal and Economic Issues*, p. 174, which argues explicitly for a single dummy variable approach as a way to measure the average overcharge due to price-fixing activity.  ("This [dummy] variable takes the value of one for observations during the conspiracy period and zero for observations outside the conspiracy period…The estimated coefficient of the dummy variable provides an estimate of the average overcharge due to the price fixing activity.")

Highly Confidential – Subject to Protective Order

> (b)   *Using annual dummies, most annual overcharge estimates are not statistically significant, and the implied pattern of overcharges is not consistent with significant effects from the alleged cartel*

229.    The results from using a single dummy variable, presented above, provide an appropriate test for whether the alleged cartel led to significant overcharges on average. However, rather than use this approach, Dr. Netz estimates a separate dummy variable for each year of the alleged cartel.  A natural reason to do so would be to test separately whether the alleged cartel had an effect in each year it was alleged to be active.  On this point, Dr. Netz's model also yields a clear message (as seen in Table VII-5 below): none of the estimated annual cartel dummies after 2001 is individually statistically significant. So the combined evidence from the single dummy and annual dummy versions of Dr. Netz's model indicates that the alleged cartel had no measurable effect on prices on average over all years and, studying years one at a time, a statistically significant effect can be found only for 1999 and 2000.

230.    Moreover, for 1999-2000, the model implies unrealistically high overcharges of at least 23 percent.

231.    Hence, to believe Dr. Netz's dummy variable model, one must believe that the alleged cartel only had a statistically measurable effect on prices in the years *before there had been a single Crystal Meeting*.  Moreover, one must believe that during those two years, the alleged cartel generated enormous overcharges, at a level that implies but-for prices that generate substantially negative economic profits.  (See the analysis presented in Section VII.A, above.)

232.    There is a much simpler and more plausible explanation for the fact that Dr. Netz's estimated overcharges are positive and statistically significant only in early years, with generally lower, statistically insignificant overcharge estimates in later years.  What Dr. Netz's "cartel dummies" are actually picking up is the decline in panel prices over time.  As noted above, absent a time-trend or other controls that capture this declining pattern of prices, one is sure to find high "overcharges" in earlier periods, declining as prices fall.  This is precisely what Dr. Netz's dummy model finds and what she attempts

Highly Confidential – Subject to Protective Order

to attribute to cartel effects.[203]  In the next section, I add a time-trend and other controls to Dr. Netz's model to demonstrate the effect on her results.

**Table VII-5: Summary of Dr. Netz's Dummy Variable Model**

| Estimation Method | Coefficient | Standard Error | Overcharge |
|---|---|---|---|
| Single Dummy Variable | 7.0 | 20.9 | 3.1% |
| Annual Dummy Variables | | | |
| 1999 | 113.2* | 48.9 | 23.4% |
| 2000 | 130.6* | 64.4 | 30.2% |
| 2001 | 10.7 | 62.8 | 4.8% |
| 2002 | 36.0 | 55.5 | 14.7% |
| 2003 | 44.9 | 47.3 | 19.4% |
| 2004 | 58.0 | 38.4 | 23.6% |
| 2005 | 20.6 | 29.5 | 10.6% |
| 2006 | 8.7 | 20.0 | 5.0% |

\* Significant at 5% level; ** Significant at 1% level

(c)    *Adding additional controls bolsters the finding of no significant overcharge*

233.    The results presented in Table VII-6 mirror those in Table VII-4, in this case adding the set of control variables (including a time trend, the glass price index, as well as various combinations of the price indexes for relevant commodities) to Dr. Netz's dummy variable model.  As noted above, including the time trend is particularly important to capture the general pattern of falling panel prices.[204]  Given the imperfections of the Defendants' cost measure, the input costs serve to bolster the set of cost controls used in predicting prices.

234.    As seen in Table VII-6, once these control variables are added, not a single annual cartel dummy variable is statistically significant.  That is, across a wide range of specifications that simply add relevant control variables to Dr. Netz's dummy variable model, there is no support for any significant overcharge.  Indeed, the overall average

---

[203]    Note that this pattern is also consistent with the fact that Dr. Netz's forecast model found *higher* gaps between actual and predicted prices in the pre-1999 period than during the alleged cartel.  In both cases, the gap between actual and but-for prices appears to be driven by the fact that the model is not accounting for the downward trend in prices, rather than by any cartel effect.  That explains why, in both cases, the highest "overcharge" amounts are in the periods before there had been any Crystal Meetings.

[204]    Not surprisingly, the time trend is negative and statistically significant in all of the models shown in Table VII-6.

Highly Confidential – Subject to Protective Order

overcharge percentage (averaging over the years in each equation, then averaging across equations) implied by these models is -5.6 percent.

**Table VII-6: Netz Dummy Model Result With Additional Controls**

| Additional Control Variables | Annual Cartel Coefficient | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Overcharge |
| Trend | 26.8 | 20.9 | -61.7 | -9.6 | 21.2 | 50.9 | 16.1 | -0.9 | 4.9% |
| | (47.7) | (62.0) | (57.1) | (49.2) | (41.9) | (33.9) | (26.2) | (17.6) | |
| Trend, Glass | -79.5 | -65.5 | -94.0 | -20.7 | -7.8 | 22.4 | -7.2 | -17.1 | -7.0% |
| | (86.5) | (78.5) | (63.6) | (52.6) | (43.5) | (34.4) | (25.4) | (16.5) | |
| Trend, Glass, Copper | -79.6 | -68.5 | -95.2 | -23.2 | -11.4 | 21.4 | -8.7 | -10.2 | -6.6% |
| | (85.0) | (76.8) | (61.8) | (51.0) | (42.0) | (32.9) | (24.1) | (15.7) | |
| Trend, Glass, Silicon | -86.7 | -71.7 | -96.0 | -20.2 | -6.2 | 24.3 | -6.6 | -17.4 | -6.9% |
| | (87.5) | (79.4) | (63.6) | (52.8) | (43.7) | (34.5) | (25.4) | (16.6) | |
| Trend, Glass, Oil | -91.3 | -75.2 | -98.6 | -22.9 | -7.9 | 21.0 | -7.1 | -16.8 | -7.5% |
| | (86.0) | (77.7) | (62.5) | (51.7) | (42.8) | (34.1) | (25.2) | (16.2) | |
| Trend, Glass, Copper, Silicon | -74.1 | -64.0 | -94.1 | -23.8 | -12.4 | 20.3 | -8.9 | -9.6 | -6.5% |
| | (86.1) | (77.6) | (61.7) | (51.1) | (42.0) | (32.9) | (23.9) | (16.0) | |
| Trend, Glass, Copper, Oil | -81.5 | -69.6 | -95.4 | -22.9 | -10.7 | 21.7 | -8.1 | -10.3 | -6.5% |
| | (85.8) | (77.3) | (61.8) | (50.9) | (41.9) | (33.0) | (24.1) | (16.0) | |
| Trend, Glass, Silicon, Oil | -85.3 | -69.8 | -98.0 | -24.8 | -10.2 | 17.9 | -7.9 | -16.3 | -7.7% |
| | (85.9) | (77.4) | (62.1) | (51.7) | (42.8) | (34.2) | (25.0) | (16.2) | |
| Trend, Glass, Copper, Silicon, Oil | -75.3 | -64.0 | -94.6 | -24.7 | -13.0 | 18.6 | -8.9 | -9.8 | -6.8% |
| | (85.7) | (77.0) | (61.3) | (50.9) | (41.9) | (33.2) | (23.9) | (16.0) | |

Notes: Standard errors in parentheses. * Significant at 5% level; ** Significant at 1% level

## 9.    Summary of Conclusions on Dr. Netz's Overcharge Estimates

235.    Dr. Netz bases her overcharge estimates on an econometric "forecasting" model. However, this model leaves out important control variables, yields economically implausible results for many of the explanatory variables that are included, fails to match basic predictions in the data, and is extremely fragile—actually yielding negative overcharge estimates when restricted to third-party data or when estimated using a range of perfectly valid econometric techniques.  In addition, the dummy variable model that Dr. Netz uses to "corroborate" her findings is similarly unreliable and actually provides no statistical support for any positive overcharges.  Hence, my main conclusion is that Dr. Netz's analysis provides no support for any significant overcharges.

236.    However, if one wanted to rely on Dr. Netz's forecast model to arrive at some estimated overcharge, one should at least use the full available sample and include a control for the obvious time trend in the data (a pattern that Dr. Netz's forecasts appear to miss in many cases).  Doing so yields an overcharge estimate of at most 1.3 percent and generally lower if additional cost controls are included.

Highly Confidential – Subject to Protective Order

### C. PROFESSOR COMANOR'S FINDING OF AN 8.9 PERCENT OVERCHARGE IS BASED ON FAULTY ECONOMETRIC MODELS

#### 1. Description of Professor Comanor's model

237.    Professor Comanor uses a panel dataset of average quarterly prices provided to him by Dr. Netz's staff.[205]  Unlike Dr. Netz's model, which uses prices of panels sold by individual Defendants (aggregated to the application-size-resolution level), Professor Comanor's model further aggregates the data, relying on average prices of panels aggregated across all Defendants.[206]  In addition to relying on Defendants' own data, Professor Comanor also uses DisplaySearch data as an alternative data source for his overcharge estimations.[207]

238.    To estimate the effect of the alleged conspiracy on prices, Professor Comanor uses a dummy variable approach. [208]  Under this approach, a single econometric model is specified to explain the natural logarithm of TFT-LCD panel prices as a function of the characteristics of the panels and other explanatory variables including factors that affect the demand for and supply of panels.  A single "dummy" or "indicator" variable is included to "flag" the time period when the alleged cartel was active (1999-2006) in order to measure the extent to which the alleged cartel inflated prices.[209]

239.    Using this method, Professor Comanor estimates an overcharge of 8.4 percent using Defendants' data and 9.5 percent using DisplaySearch data.[210, 211]  He uses the unweighted average of these two estimates to derive an average overcharge of 8.9 percent.[212, 213]

---

[205]    *Comanor Report* at 65.

[206]    *Comanor Report* at 65.

[207]    *Comanor Report* at 60.

[208]    *Comanor Report* at 17-18.

[209]    *Comanor Report* at 18-19.

[210]    *Comanor Supplementary Report* at 3.

[211]    *Comanor Report* at 20.

[212]    *Comanor Supplementary Report* at 3.

[213]    As noted above, in comparing Professor Comanor's proposed overcharge to Dr. Netz's overcharge, a small adjustment is necessary.  Professor Comanor's model estimates

Highly Confidential – Subject to Protective Order

### 2. Correcting a minor error in Professor Comanor's estimation yields slightly lower overcharges

240.    In his estimation, Professor Comanor mistakenly defined sales of 10.4 inch SVGA notebook panels during the first quarter of 1999 as not being part of the alleged cartel.  Correcting this error reduces his estimated overcharge using Defendants' data to 8.2 percent.  In all results presented in the remainder of this section, I correct this error.

### 3. There is no reason to rely on DisplaySearch data in estimating overcharges.

241.    Professor Comanor has access to the Defendants' own transaction data containing actual sales prices for TFT-LCD panels.  He describes Defendants' transactional data as "larger" than the DisplaySearch data set with "more precise product classifications" that covers "a longer period of time," and concludes that because Defendants' transactional data "has more observations than the DisplaySearch data," it is "better."[214]  To my knowledge, neither he nor anyone else in this matter has contended that Defendants' transactional data are inaccurate.  Hence, it is not clear to me why he would base one of his overcharge estimates on DisplaySearch price data.

242.    The argument against using DisplaySearch data is made clear by Figure IV-15 - Figure IV-17, which demonstrate the inaccuracy of DisplaySearch data.  As shown in the figures, during the alleged cartel, DisplaySearch's prices were often higher than actual prices and tracked much more closely with prices discussed at Crystal Meeting than did actual prices.  Given this pattern, it is not surprising that Professor Comanor finds higher overcharges with DisplaySearch data than with Defendants' transaction prices.  But this certainly provides no reason to average the two estimates together to

---

overcharges as a percentage of the but-for price, rather than as a percentage of the actual price.  Although this approach is equally valid, it means that if the actual price was $100, then the but-for price would have been approximately $91 (that is, a ten percent overcharge over the but-for price of $91 increased the price to $100).  This calculation is consistent with Professor Comanor's damages calculations (*see* file produced by Professor Comanor, "LCD_damagesrev1.xlsx.")  As a result, Professor Comanor's proposed overcharge of 8.9 percent of the but-for price is equivalent to an overcharge of about 8.2 percent of the actual price.

[214]    *Comanor Depo.*, 212:10-14; 271:19-272:1.

Highly Confidential – Subject to Protective Order

obtain an overcharge estimate: To the contrary, it provides more reason to doubt the validity of the DisplaySearch data.

243.     Even Professor Comanor's defense of DisplaySearch data says that it is based on a "survey instrument" that "[g]enerally…gets a high level of participation," and is able to verify "many of the responses to these surveys."[215]  At best, then, it may be a decent approximation to the actual Defendant price data.  In fact, a closer read of the deposition of DisplaySearch's Paul Semenza reveals many cases in which DisplaySearch cannot verify that its price information is accurate.[216]

244.     Paul Semenza, the Corporate Representative for DisplaySearch and current vice president of analyst services, described several reasons why DisplaySearch uses "estimates"[217] that may not accurately reflect actual transaction data.[218]  For example, sometimes DisplaySearch combines data for similar screen sizes to reduce the size of their database.[219]  For internal company transactions, prices from DisplaySearch may reflect the average market prices, rather than the internal transfer price.[220]  In other cases, DisplaySearch may use information that is approximate or "rounded."[221]

245.     DisplaySearch collects data on hundreds of different panels.[222]  Some companies do not respond to DisplaySearch's surveys, only provide high-level information, or provide responses with gaps in the data.[223]  For example, Sharp has historically provided

---

[215]    *Comanor Report* at 61.

[216]    *See,* Deposition of Paul Semenza, May 11, 2011 (hereinafter *Semenza Depo.*).

[217]    "Q. And it's quite common in your databases to have estimates rather than actual transaction data from the suppliers?  A. Yes…"  (*Semenza Depo.*, May 11, 2011, 168:21-24;  "Generally speaking, it's estimates of shipments and pricing by product type, not individual transaction."  (*Semenza Depo.*, May 11, 2011, 100:17:23.)

[218]    "Q. And if you wanted to have the most accurate view of a company's data or a company's sales, it would be preferable to look at the actual transaction data than to look at the estimates that you prepare at DisplaySearch; is that right?  A. Yes. Yes."  (*Semenza Depo.,* 170:5-10)

[219]    *Semenza Depo.*, 64:1-22, 189:4-11.

[220]    *Semenza Depo.*, 111:5:19.

[221]    *Semenza Depo.*, 179:22:180:20.

[222]    *Semenza Depo.*, 165:15-25.

[223]    *Semenza Depo.*, 97:11-24, 167:21-168:15, 176:11-21, 185:10-18.

Highly Confidential – Subject to Protective Order

very little information about its sales.[224]  In these cases, DisplaySearch uses other, less reliable sources of information.  DisplaySearch fills in the gaps with information from some of the company's customers and suppliers, with its own estimates, or other data sources.[225]  In particular, when DisplaySearch does not have the price for a particular supplier, it may fill in the gap with its estimated average market price.[226]

246.    Finally, Paul Semenza also testified that DisplaySearch shipment data does not capture returned items, and that estimated prices may not capture discounts, promotions and other cash incentives offered by suppliers.[227]  As such, it is not surprising that DisplaySearch prices are frequently higher than actual transaction prices, as shown in Section IV.C.2.

247.    In sum, the fact that the overcharge estimates using DisplaySearch data are higher than those using actual transactions does not provide a reason to average together the estimates and compute a higher overcharge than implied by Defendants' data.  To the contrary, it provides one more indicator of the inaccuracy of DisplaySearch data.  Hence, in what follows, I focus on the estimates from Defendants' data.

### 4.    Dummy variable model vs. forecast model

248.    As noted above, unlike Professor Comanor, Dr. Netz used a forecast model, under which a model of but-for prices is estimated *only on data from outside the alleged cartel period*, with the predictions from this model then compared to actual prices during the alleged cartel period to yield an estimated overcharge.  Dr. Netz argues that this method is "theoretically superior" to the dummy variable model, pointing to scholarly sources, which note that the dummy variable model assumes that supply and demand variables have the same effect on prices in periods with or without alleged cartel

---

[224]    *Semenza Depo.*, 206:5-13.

[225]    *Semenza Depo.*, 176:23-177:4, 103:5-12, 115:8-116:7, 182:6-20.

[226]    *Semenza Depo.*, 186:9:24.  In addition, DisplaySearch exchanges information with companies through phone conversations and other informal sources.  (*Semenza Depo.*, 98:24-99:22, 122:12-123:8.)

[227]    *Semenza Depo.*, 193:1-194:5.  Paul Semenza also mentioned other sources of database errors.  (*Semenza Depo.*, 66:6-21, 120:1-20.)

Highly Confidential – Subject to Protective Order

behavior, a restrictive assumption without economic basis.[228]  However, Dr. Netz also estimates a dummy variable model as a "corroborative technique," indicating that she was "reassured" by the similarity of the estimates from the two approaches.[229]

249.    Professor Comanor did not estimate a forecast model and did not check to see if this alternative method would corroborate his findings.  It does not.  In particular, like Dr. Netz did in checking her model with a dummy variable approach, I have taken Professor Comanor's exact model and estimated it as a forecast model, using only data from outside the cartel period.  I then use this estimated forecast model to predict but-for prices within the alleged cartel period and compute the implied percentage overcharge.

250.    The results from using Professor Comanor's model within a forecast framework definitely do not "corroborate" his dummy variable model's findings.  To the contrary, the forecast version of Professor Comanor's model yields an estimated overcharge of *negative* 45.7 percent.[230]  This is certainly implausible.  Consistent with the extreme sensitivity of Dr. Netz's findings, illustrated above, this sensitivity of Professor Comanor's results to choice of methodology demonstrates that Plaintiff Experts have not presented a reliable set of evidence from which to conclude there were significant overcharges due to the alleged cartel.

###         5.        Professor Comanor does not include adequate controls for demand and supply side determinants of TFT-LCD prices, rendering his results unreliable.

251.    At core, the dummy variable approach (like the forecast approach) proceeds as follows: It includes a set of variables to explain panel prices and then attributes any difference between observed panel prices during the alleged cartel period and prices predicted based on the explanatory variables to conspiratorial effects.  This means that the effect of *any* omitted control variable that affects prices and differs between the

---

[228]    *Netz Report* at 88-89.

[229]    *Netz Report* at 89; *Netz Depo.*, 103:13-20.

[230]    I  compute predicted prices from Professor Comanor's model without the adjustment for the mean squared residual that is commonly used to convert predictions from log price to level price.  This is conservative, as adding an adjustment would make the predicted price higher and thus the average overcharge more negative.

Highly Confidential – Subject to Protective Order

alleged conspiracy and non-conspiracy periods will mistakenly be labeled as an effect of the alleged conspiracy. This is a specific example of the general econometric issue of "omitted variable bias," discussed above, and it indicates that one should be quite sure that results are not driven by omitted control variables before attributing them to conspiracy effects.

252.    Against this backdrop, it is striking that Professor Comanor includes only two controls for demand-side drivers of TFT-LCD panel prices and two controls for supply-side drivers. Professor Comanor opines that his control variables include "appropriate demand and supply variables" to "account for changes in demand and supply factors that may have occurred."[231] Given the large number of factors that affect pricing, however, it is difficult to see how Professor Comanor's four economic variables fully capture the relevant factors that affect pricing. I discuss the specific limitations of each of Professor Comanor's variables, explaining why they do not adequately control for demand, cost, or other supply-side variation, in more detail in the remainder of this section.

(a)    *Lack of adequate supply-side controls*

253.    Most striking about Professor Comanor's model is the lack of relevant cost variables or other variables affecting the supply-side of the TFT-LCD industry. Professor Comanor includes only two supply-side variables: the number of TFT-LCD panel sellers worldwide and a price index for the cost of inputs in the manufacturing of computers in the United States.[232]

(1)    Number of TFT-LCD sellers worldwide (Nofirms)

254.    As seen in Figure VII-5, Professor Comanor's measure of the total number of TFT-LCD panel sellers worldwide exhibits almost no variation over the period studied. Indeed, except for one small dip to 15 firms around January of 2005, Professor Comanor's number of firms variable effectively just separates the pre-conspiracy period from the rest of the data. Given this limited variation over time, this variable cannot

---

[231]    *Comanor Report* at 17.

[232]    *Comanor Report* at 66-67.

Highly Confidential – Subject to Protective Order

control for the vast majority of variations in cost or market structure occurring over time.

**Figure VII-5: Chart of Professor Comanor's Number of Firms Variable**



255.    Indeed, what is most striking about Professor Comanor's number of firms variable is that it never goes below 14.  In discussing this variable, Professor Comanor pays no heed to the fact that he is alleging a successful price-fixing conspiracy in an industry with at least 14 (and generally 16) active firms throughout the alleged cartel period.  To the contrary, he attempts to explain the counterintuitive statistically significant positive coefficient on the number of firms variable[233]—meaning that his model implies that more firms imply *higher* prices—by arguing that, during an alleged cartel period, when there are more firms, the cartel needs to raise prices to generate more revenue to spread amongst more cartel participants.[234]  Not only does this argument

---

[233]        *Comanor Supplementary Report* at 8, 10.

[234]        *Comanor Depo.*, 130:5-23 ("Q You said that the number of firms is often a matter affecting prices.  How does the number of firms affect prices?  A In the absence of a

Highly Confidential – Subject to Protective Order

completely ignore the well-established literature that cartels are less likely to succeed in an industry with more firms (or lower concentration; see Section III.E, above), but if true, it invalidates a core assumption of the dummy variable model—that variables other than the cartel dummy have the same effect inside and outside the cartel period.[235]

> (2)    Price index for U.S. manufacturing sales of computer and electronic products (PINPUT)

256.    Professor Comanor's only control for cost variation is the variable PINPUT, "an implicit price deflator (a price index) for [U.S.] manufacturing sales of computer and electronic products…."[236] I have no reason to believe that a price index for U.S. manufacturing sales of computer and electronic products has any specific relationship (other than general linkage to global macroeconomic conditions) to input prices for Asian TFT-LCD panel production.

257.    Even more strikingly, this sole cost control in Professor Comanor's model has a statistically significant negative coefficient, meaning that Professor Comanor's model implies that higher panel production costs are associated with lower panel prices.[237] This result conflicts with economic theory as recognized by Professor Comanor: "[g]enerally higher costs lead to higher prices."[238] This result also conflicts with Professor

---

cartel one might expect that a larger number of rival firms would lead to lower prices. In the presence of a cartel that simple relationship disappears because cartels—because price, cartel sets the prices and it might very well be found; in fact, we did find here, that more - more firms lead to higher prices because of the—when you have more firms the aggregate of cartel profits has to be divided more ways and therefore to maintain revenues for each cartel  member which supports cartel stability you need to raise prices more than you would otherwise and that's in fact what we found. So in the context of a cartel you might find and we did find the number of firms leads to higher prices while in the absence of a cartel you might find the reverse").

[235]    In particular, Professor Comanor's model assumes that the number of firms variable has the same effect inside and outside the alleged cartel period, which contradicts the explanation given in his deposition.

[236]    *Comanor Report* at 66.

[237]    *Comanor Supplementary Report* at 8, 10.

[238]    *Comanor Depo., 21:1-2; See also Comanor Depo.*, 114:15-25 ("[Q] in this industry, and this comports with your understanding of the general economic theory, understanding that there may be exceptions, but that in this industry a lowering of costs can cause lowering prices; is that correct?  A. Lower prices -- lower costs can charge, can be associated with lower prices.  Not in every case, not in all circumstances, not -- but in this

Highly Confidential – Subject to Protective Order

Comanor's assumption of 100 percent pass-through of costs in other parts of the distribution chain, because it suggests that panel makers do not pass on any cost increase to their customers.[239]

258.    In his deposition, Professor Comanor tried to justify this negative relationship between costs and prices despite recognizing that higher costs should lead to higher prices.  He argued that the negative relationship between costs and prices follows because, by raising prices for TFT-LCD panels, the alleged cartel suppressed demand for those panels and thus suppressed demand for inputs into the production of those panels, thus putting downward pressure on the prices for inputs into the TFT-LCD panel production process.[240]  This claim makes little sense.  First, PINPUT is a price index for U.S. computer and electronic manufacturing, a sector which, if anything, uses TFT-LCD panels as inputs and in any case is highly unlikely to experience lower prices as a result of an alleged Asian TFT-LCD panel price-fixing conspiracy.  Second, even if Professor Comanor's explanation were correct, this would imply that the PINPUT variable is "endogenous"—meaning that the prices of TFT-LCD panels and PINPUT are determined simultaneously—and thus not a valid control variable.  Indeed, Professor Comanor himself acknowledged that, based on his explanation for its negative coefficient, PINPUT is an endogenous variable.[241]

*(b)    Lack of adequate demand-side controls*

259.    The only demand measures included in Professor Comanor's model are a measure of U.S. personal income and a measure of U.S. consumption expenditures on computers and peripheral equipment.  And the measure of U.S. personal income is not statistically significant in the Defendant data model.  Professor Comanor provides no indication how two U.S.-based demand indicators can control for the full set of demand shifters that influence the prices charged by Asian TFT-LCD panel producers to

---

particular situation for these costs and these prices that's indeed what seems to be occurring.")..

[239]    *Comanor Report* at 29.

[240]    *Comanor Depo.,* 141:12-142:1.

[241]    *Comanor Depo*., 144:12-14.

Highly Confidential – Subject to Protective Order

predominantly Asian purchasers, particularly given the importance of demand variation on panel prices, as illustrated by Figure VI-4 and Figure VI-5.

### 6.    Introducing appropriate cost controls to Professor Comanor's control variables yields small overcharges

260.    In this section, I explore the effects of Professor Comanor's failure to include *any* valid controls for the cost of TFT-LCD panel production.  To do so, I remove the PINPUT control—which does not measure relevant costs, obtains the wrong sign, and is (according to Professor Comanor's own testimony) endogenous and thus not a valid control.  In its place, I add more sensible cost controls, starting with the measure of shipping costs that Dr. Netz uses in her regressions and that clearly affects the cost to deliver a TFT-LCD panel.  In addition, I include specifications with the other input prices that I added as controls to Dr. Netz's models, including an index for the price of glass, as well as indices for the prices of oil, silicon, and copper.

261.    Notably, in Professor Comanor's deposition, he indicated that "input costs might be useful supply factors if they were readily available," but he "didn't have specific cost data" for these inputs.[242]  I have collected this input data from a combination of readily available public sources, Dr. Netz's backup materials, and other materials produced in this case.  It is not clear why Professor Comanor could not access this data.

262.    Results using Professor Comanor's estimation methodology but adding these cost controls are presented in Table VII-7.  Notably, for nearly all coefficient estimates in nearly all specifications, the input price effects are positive and statistically significant, as economic theory predicts.  Hence, unlike Dr. Comanor's PINPUT variable, these cost drivers appear to be working well.

263.    As Professor Comanor indicated in his deposition, it is important not to choose explanatory variables to obtain a desired result.[243]  However, that does not mean one should report *one* specification and simply assert it is the best one.  Rather, one should assess the full body of evidence.  So, I use the same approach I used in modifying Dr. Netz's model, looking at various combinations of cost variables—starting with just the

---

[242]    *Comanor Depo*., 104:8-22; 154:3-7.

[243]    *Comanor Depo*., 148: 4-15.

Highly Confidential – Subject to Protective Order

shipping cost variable that Dr. Netz used, and then adding the glass price index, and various combinations of commodity prices.  All of these results are presented in Table VII-7.  The main result of interest is given by the "cartel" coefficient, which contains the overcharge prediction for each version of the model.  Averaging across these cartel coefficients from the various specifications yields an average estimated overcharge of 0.7 percent.

**Table VII-7: Professor Comanor's Results with Cost Controls**

| Explanatory Variables | Shipping | Shipping and Glass | Shipping, Glass, and Copper | Shipping, Glass, and Silicon | Shipping, Glass, and Oil | Shipping, Glass, Copper, and Silicon | Shipping, Glass, Copper, and Oil | Shipping, Glass, Silicon, and Oil | Shipping, Glass, Copper, Silicon, and Oil |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Dependent Variable: Log of Price** | | | |
| | | | | | | **Additional Control Variables** | | | |
| **cartel** | **0.058\*\*** | **0.035\*** | **-0.024** | **0.035\*** | **0.008** | **-0.021** | **-0.022** | **0.008** | **-0.018** |
| | **(0.015)** | **(0.015)** | **(0.019)** | **(0.015)** | **(0.015)** | **(0.017)** | **(0.019)** | **(0.016)** | **(0.017)** |
| trend | -0.052\*\* | -0.033\*\* | -0.016\*\* | -0.026\*\* | -0.023\*\* | -0.013\* | -0.014\*\* | -0.018\*\* | -0.013\* |
| | (0.006) | (0.006) | (0.005) | (0.006) | (0.006) | (0.006) | (0.006) | (0.006) | (0.006) |
| trendsq | -0.000\* | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.001\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| MONITOR | 0.009 | 0.016 | 0.014 | 0.020 | 0.020 | 0.018 | 0.016 | 0.023 | 0.019 |
| | (0.032) | (0.033) | (0.026) | (0.032) | (0.034) | (0.033) | (0.026) | (0.032) | (0.033) |
| NOTEBOOK | 0.076\* | 0.080\* | 0.078\*\* | 0.080\* | 0.081\* | 0.079\* | 0.078\*\* | 0.080\* | 0.078\* |
| | (0.036) | (0.037) | (0.028) | (0.036) | (0.038) | (0.037) | (0.028) | (0.036) | (0.036) |
| PERINC | -0.000 | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* | -0.000\*\* |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| CONCOMP | 0.000\*\* | 0.000\*\* | 0.000\*\* | 0.000\*\* | 0.000\*\* | 0.000\*\* | 0.000\*\* | 0.000\*\* | 0.000\*\* |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| nofirms | 0.051\*\* | 0.047\*\* | 0.035\*\* | 0.048\*\* | 0.034\*\* | 0.035\*\* | 0.031\*\* | 0.035\*\* | 0.031\*\* |
| | (0.010) | (0.010) | (0.011) | (0.010) | (0.010) | (0.010) | (0.011) | (0.010) | (0.010) |
| lnshipping_idx | 0.069\*\* | 0.073\*\* | 0.039\*\* | 0.063\*\* | 0.034\*\* | 0.016 | 0.027\*\* | 0.027\*\* | 0.010 |
| | (0.007) | (0.007) | (0.010) | (0.009) | (0.009) | (0.011) | (0.010) | (0.010) | (0.011) |
| lnglass_pr | | 0.371\*\* | 0.455\*\* | 0.291\*\* | 0.364\*\* | 0.299\*\* | 0.426\*\* | 0.302\*\* | 0.305\*\* |
| | | (0.054) | (0.058) | (0.067) | (0.053) | (0.065) | (0.058) | (0.066) | (0.065) |
| lncopper_pr | | | 0.152\*\* | | | 0.155\*\* | 0.087\*\* | | 0.097\*\* |
| | | | (0.022) | | | (0.021) | (0.027) | | (0.026) |
| lnsilicon_pr | | | | 0.084\* | | 0.106\*\* | | 0.067 | 0.086\* |
| | | | | (0.037) | | (0.036) | | (0.036) | (0.037) |
| lnoil_pr | | | | | 0.141\*\* | | 0.109\*\* | 0.140\*\* | 0.092\*\* |
| | | | | | (0.019) | | (0.025) | (0.020) | (0.023) |
| Constant | 9.820\*\* | 8.407\*\* | 8.079\*\* | 8.288\*\* | 9.090\*\* | 8.170\*\* | 8.632\*\* | 8.970\*\* | 8.654\*\* |
| | (0.232) | (0.313) | (0.325) | (0.316) | (0.323) | (0.312) | (0.349) | (0.327) | (0.336) |
| Observations | 4,668 | 4,592 | 4,592 | 4,592 | 4,592 | 4,592 | 4,592 | 4,592 | 4,592 |

Notes: Standard errors in parentheses. * Significant at 5% level; ** Significant at 1% level

264.    Hence, although my main conclusion remains that Professor Comanor's results are simply too unreliable to be used as a basis to conclude there were significant

Highly Confidential – Subject to Protective Order

overcharges, if one uses his approach but simply adds appropriate cost controls, the conclusion would be overcharges of approximately 0.7 percent.

# VIII. CONCLUSION

265.    My conclusions in this matter are summarized as follows:

- Fundamental economic logic applied to the characteristics of the TFT-LCD panel industry during the class period, as well as to the nature of the alleged cartel activities, indicates that the alleged cartel was unlikely to have generated significant overcharges such as the overcharges Plaintiff Experts estimate.

- The patterns of panel prices around the time of alleged cartel meetings (Crystal Meetings) are inconsistent with significant overcharges on panels or with common impact across all or nearly all panels.

- Even if the alleged cartel were successful in inflating prices of some panels sold by particular Defendants in particular time periods, this does not imply that prices of other panels, or of panels sold by different Defendants or in different time periods, were inflated.

- A straightforward assessment of panel prices charged before and after the end of the alleged cartel, as well as patterns of price, quantity, and capacity utilization movements during the alleged cartel, supports the conclusion that the alleged cartel did not succeed in raising prices significantly above but-for levels.

- Conclusions by Plaintiff Experts that disagree with this straightforward assessment of prices, quantities, and capacity utilization—finding significant overcharges due to the alleged cartel activity—are driven by faulty econometric models.

- Dr. Netz's and Professor Comanor's econometric models are deeply flawed and thus do not provide a reliable basis from which to conclude that the alleged cartel resulted in significant positive overcharges. However, even if one wanted to use the models advanced by Dr. Netz and Professor Comanor to estimate an overcharge, one should, at a minimum, address basic flaws in their implementation. After addressing basic flaws (but still leaving many fundamental problems unsolved), I find that Dr. Netz's and Professor Comanor's models yield overcharge estimates of 0.7 – 1.3 percent.

- This finding that Plaintiff Experts' models yield a 0.7 – 1.3 percent overcharge is not based on any conclusion that the changes make the models reliable. It is further subject to my observations that Plaintiffs' allegations of an overarching conspiracy among all Defendants are fundamentally flawed.

Highly Confidential – Subject to Protective Order

As noted in Section V.B.2, the Japanese Defendants did not participate in the Crystal Meetings. For those Defendants, as to which only sporadic, bilateral contacts with competitors are alleged, the difficulties in raising prices would be even more acute. For those Defendants, I would expect that any overcharge would be even less. I reserve the right to conduct further analyses based on this distinction and as may be required based on developments in the case.

Highly Confidential – Subject to Protective Order

# LIST OF FIGURES

Figure II-1: Percentage of Panel Sales to "Ship-to" Entities Located Outside of the U.S., 2001-2006 ................................................................................................................ 12

Figure II-2: Percentage of Panel Sales to "Bill-to" Entities Outside of the U.S., 2001-2006 ........................................................................................................................ 12

Figure II-3: Annual TFT-LCD Panel Sales, by Application, 2000-2010 ........................ 14

Figure II-4: TFT-LCD Industry Capacity Shares ........................................................... 15

Figure II-5: Average Panel Price, 17" SXGA Monitor, 1999-2009 ............................... 17

Figure III-1: Share of TFT-LCD Capacity by Fab Generation, 1996Q1-2010Q4............ 25

Figure IV-1: Defendant Capacity Shares, 1999Q4-2006Q4........................................... 41

Figure IV-2: Defendant Revenue Shares, Monitors, 1999Q4-2006Q4 ........................... 42

Figure IV-3: Revenue Shares, Notebooks, 1999Q4-2006Q4 .......................................... 42

Figure IV-4: Defendant Revenue Shares, TVs, 2003Q1-2006Q4 ................................... 43

Figure IV-5: Quarterly Industry Capacity, 1996Q1-2010Q4 .......................................... 45

Figure IV-6: Industry Capacity, Year-over-Year Growth Rate and CAGR (Pre-Class, Class, and Post-Class Periods).......................................................................... 46

Figure IV-7: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Monitor (No Display Information Discussed) ...................................... 53

Figure IV-8: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Notebook (XGA)................................................................................ 54

Figure IV-9: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 19" Monitor (SXGA) ............................................................................... 55

Figure IV-10: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 32" TV Panel (No Display Information Discussed) ....................................... 56

Figure IV-11: Prices Communicated at Crystal Meetings and Actual Transaction Prices, All Notebook Panels, Excluding 15" XGA ................................................. 57

Figure IV-12: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Notebook (XGA)................................................................................ 58

Figure IV-13: Prices Communicated at Crystal Meetings and Actual Transaction Prices, All Monitor Panels, excluding 15" XGA..................................................... 59

Figure IV-14: Prices Communicated at Crystal Meetings and Actual Transaction Prices, 15" Monitor (XGA) .................................................................................. 60

Figure IV-15: DisplaySearch Prices and Actual Prices, 18" Monitor (SXGA)............... 62

Figure IV-16: DisplaySearch Prices and Actual Prices, 15" Notebook (XGA) .............. 63

Figure IV-17: DisplaySearch Prices and Actual Prices, 12.1" Notebook (XGA) ........... 64

Figure V-1: Share of Monitor Panel Revenues by Source Region, All Defendants, 1999Q4-2006Q4 ................................................................................................. 72

Figure V-2: Share of Revenues by Application, Japanese and non-Japanese Defendants, 2005................................................................................................ 73

Figure V-3: Share of Revenues by Panel Size, Japanese and non-Japanese Defendants, 2005................................................................................................ 73

Figure V-4: Average Price for Selected Panels, Monitors, 2001-2009 ........................... 79

Figure V-5: Average Price for Selected Panels, Notebooks, 2000-2008......................... 80

Figure V-6: Average Price for Selected Panels, TVs, 2004-2009 .................................. 80

Highly Confidential – Subject to Protective Order

Figure V-7: Average Price for Selected Panels, Monitors, AUO Only, 2004-2007......... 81
Figure V-8: Average Price for Selected Panels, Notebooks, Samsung Only, 2002-2008 82
Figure V-9: Average Price for Selected, Panels, TVs, CMO Only, 2005-2007 .............. 82
Figure V-10: Prices after Crystal Meetings, 19" Monitor (SXGA) ................................. 84
Figure V-11: Prices after Crystal Meetings, 15" Notebook (XGA) ............................... 84
Figure VI-1: Average Price for Top 10 Panels, Monitors, 2004-2009 ........................... 88
Figure VI-2: Average Price for Top 10 Panels, Notebooks, 2004-2009 ......................... 88
Figure VI-3: Average Price for Top 10 Panels, TVs, 2004-2009 .................................... 89
Figure VI-4: Changes in Price, Quantity, and Revenue.................................................... 91
Figure VI-5: Capacity Utilization vs. Panel Price Changes.............................................. 92
Figure VII-1: Dr. Netz's Model: Actual and Predicted Prices Panel: LG Display, TV, 32,
WXGA ...................................................................................................................... 106
Figure VII-2: Dr. Netz's Model: Actual and Predicted Prices Panel: LG Display, Monitor,
19, SXGA................................................................................................................... 107
Figure VII-3: Dr. Netz's Model: Actual and Predicted Prices vs. COGS Panel: AUO,
Monitor, 17" (SXGA) ................................................................................................ 108
Figure VII-4: Dr. Netz's Model: Actual and Predicted Prices vs. COGS Panel: AUO, TV
26" (WXGA)............................................................................................................... 109
Figure VII-5: Chart of Professor Comanor's Number of Firms Variable ...................... 128

Highly Confidential – Subject to Protective Order

# LIST OF TABLES

Table III-1: Share of Revenues by Manufacturer - Monitor, Notebook and TV panels, 1999-2010 ................................................................................................................... 29

Table III-2: Common Levels of Resolution ..................................................................... 34

Table IV-1: Share of Industry Revenue at Transaction Prices below Midpoint or Lowest Price Communicated at Crystal Meetings, by Panel ........................................................ 50

Table IV-2: Share of AUO Revenue at Transaction Prices below Midpoint or Lowest Price Communicated at Crystal Meetings, by Panel ........................................................ 51

Table V-1: Percentage of Revenue Made up of Panels Discussed at Meetings ............... 68

Table VII-1: Average Profit Margin after Deducting an Assumed 8.9 Percent Overcharge ................................................................................................................................................ 99

Table VII-2: Netz's Base Model Correcting Data Errors ............................................... 103

Table VII-3: Sensitivity of Dr. Netz's Results to Alternative Treatment of Serial Correlation ...................................................................................................................... 112

Table VII-4: Dr. Netz's Forecast Model with Additional Control Variables ................. 117

Table VII-5: Summary of Dr. Netz's Dummy Variable Model ...................................... 120

Table VII-6: Netz Dummy Model Result With Additional Controls ............................. 121

Table VII-7: Professor Comanor's Results with Cost Controls ..................................... 132

Highly Confidential – Subject to Protective Order

I hereby swear to the foregoing under penalty of perjury.  Executed this 28th day of July, 2011, at Norfolk, Virginia.

Dennis W. Carlton, Ph.D.