# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4  IN RE TFT-LCD (FLAT PANEL)) Master File No. C07-1827

 5  ANTITRUST LITIGATION      )   SI

 6  _____)

 7  This Document Relates to: )  MDL No. 1827

 8  All Indirect-Purchaser    )

 9  Class Actions             )

10  _____)

11

12            DEPOSITION OF KEVIN LUKE

13  Taken on behalf of Indirect-Purchaser Plaintiffs at

14  the Law Offices of Island Lawyers Doi/Luke, Pan Am

15  Building, Suite 800, 1600 Kapiolani Boulevard,

16  Honolulu, Hawaii 96814, commencing at 10:00 a.m.,

17  on December 7th, 2012, pursuant to Notice.

18

19

20

21

22

23  BEFORE:   PATRICIA ANN CAMPBELL, CSR 108

24           Certified Shorthand Reporter

25           State of Hawaii
```



 1   APPEARANCES:

 2

 3   For Indirect-Purchaser Plaintiffs:

 4            JILL M. MANNING, ESQ.

 5            Steyer Lowenthal Boodrookas Alvarez &

 6            Smith, LLP

 7            Third Floor

 8            One California Street

 9            San Francisco, California  94111

10            415.421.3400

11            jill@sartorifarms.com

12

13   For Class Member/Objector Kevin Luke:

14            KENDAL A. LUKE, ESQ.

15            Island Lawyers Doi/Luke

16            Pan Am Building, Suite 800

17            1600 Kapiolani Boulevard

18            Honolulu, Hawaii  96814

19                 - and -

20            JOHN J. PENTZ, ESQ.

21            19 Widow Rites Lane

22            Sudbury, MA 01776

23            978.261.5725

24            clasaxn@earthlink.net

25



```
 1                      I N D E X

 2

 3

 4

 5   EXAMINATION BY:                        PAGE

 6        Ms. Manning                         5

 7        Mr. Pentz                          78

 8

 9

10

11

12

13

14

15   EXHIBITS FOR IDENTIFICATION            PAGE

16   Exhibit 1:  "Indirect-                  17

17   Purchaser Plaintiffs' Notice

18   of Deposition of Objector

19   Kevin Luke"

20   Exhibit 2:  "Deposition of              19

21   Kevin Luke"

22   Exhibit 3:  Letter to K.                20

23   Luke from F. Scarpulla,

24   dated 8-29-12

25
```



```
 1   EXHIBITS FOR IDENTIFICATION              PAGE

 2   Exhibit 4:  Letter to F.                  41

 3   Scarpulla from J. Pentz,

 4   dated 11-29-12

 5   Exhibit 5:  "Notice of                    55

 6   Service of Renewed Notice of

 7   Deposition"

 8   Exhibit 6:  "Objection to                 55

 9   Settlement and Motion for

10   Attorney's Fees"

11   Exhibit 7:  "Objection to                 69

12   Report and Recommendation of

13   Special Master re Motion for

14   Attorneys' Fees and other

15   Amounts by Indirect-Purchaser

16   Class Plaintiffs"

17   Exhibit 8:  Screen shot                   74

18   Exhibit 9:  "Subpoena"                    78

19

20

21

22

23

24

25
```



```
 1                    KEVIN LUKE,
 2  called on behalf of Indirect-Purchaser Plaintiffs,
 3  was first duly sworn to tell the truth, the whole
 4  truth, and nothing but the truth, and testified as
 5  follows:
 6                    EXAMINATION
 7  BY MS. MANNING:
 8       Q.    Good morning.
 9       A.    Morning.
10       Q.    Could you please state your name for the
11  record?
12       A.    Kevin Luke.
13       Q.    And have you been known by any other
14  names?
15       A.    No.
16       Q.    What is your address?
17       A.    1619 Kamamalu Avenue, Apartment 209.
18       Q.    And how long have you lived there?
19       A.    Four years.
20       Q.    And what is your date of birth?
21       A.    April 28, 1969.
22       Q.    We were born the same year.  You are a
23  little bit older than me, though.
24             Have you ever been deposed before?
25       A.    No, no.
```



1        Q.      I should introduce myself, I apologize.

2   My name is Jill Manning, and I am one of the

3   attorneys for the indirect-purchaser plaintiffs in

4   this class action.

5              Have you ever given testimony in a court

6   of law before?

7        A.      No.

8        Q.      Have you ever given testimony in an

9   arbitration before?

10       A.      No.

11       Q.      And, Mr. Luke, do you have an

12  understanding of why you are here today?

13       A.      Yes.

14       Q.      And what is that understanding?

15       A.      I am a witness in this case.  I honestly

16  don't know a lot.  Basically, I just know I was

17  called, I got a phone call a while back from Ed

18  Cochran asking me if I had bought a computer or a

19  flat screen tv in a given period of time, and I did,

20  and he basically just said he would be in touch, and

21  he would send me paperwork, and that's pretty much

22  been the extent of my role in what's been happening

23  here.

24       Q.      Okay, and who is Ed Cochran?

25       A.      He is an attorney in Cleveland.



1    Q.    How did Mr. Cochran get your contact

2  information?

3    A.    From my brother.

4    Q.    And when did Mr. Cochran first contact

5  you?

6    A.    I'm not sure.  I might have a date.  I

7  could be wrong here, but I believe it was, let me

8  check here.  In September.  No.  Maybe even -- no,

9  I'm sorry.  April.

10    Q.    April of 2012?

11    A.    Yes.  I kept his voice mail, so I have

12  his voicemail still on.

13    Q.    Okay, excellent.  Okay, before we jump

14  into the substantive testimony, since you haven't

15  had your deposition taken before, let me give you a

16  couple of ground rules.

17    A.    Okay.

18    Q.    Even though we are here in a relatively

19  informal law office in Honolulu, you are testifying

20  under oath subject to the penalty of perjury.  Do

21  you understand that?

22    A.    Yes.

23    Q.    Okay.  The purpose of this deposition is

24  to get your best recollection.  If you don't know

25  the answer to a question, don't guess, but I am

1  entitled to your best estimate or recollection.

2       A.    Okay.

3       Q.    Does that make sense?

4       A.    Yes.

5       Q.    Okay, and if I ask a question that you

6  don't understand, just let me know, and I will do my

7  best to rephrase it.

8       A.    Okay.

9       Q.    The court reporter is transcribing

10 everything that we say, so it is really important

11 that you let me finish my question before you answer

12 so that we are not talking over each other, and she

13 will be very happy if we do that.

14      A.    Okay.

15      Q.    At the conclusion of the deposition, the

16 court reporter will prepare a transcript, and you

17 will have the opportunity to review that transcript

18 and make any changes to your testimony.  However, if

19 there is a hearing involving this matter, the class

20 attorneys will have the opportunity to comment on

21 any changes that you make to your testimony.

22      A.    Okay.

23      Q.    Does that make sense?

24      A.    Yes.

25      Q.    Okay.  Is there any reason that we can't



1  proceed with the deposition today?

2      A.    No.

3      Q.    Is there reason that you can not respond

4  accurately and truthfully to my questions?

5      A.    No.

6      Q.    Have you taken any medication or any

7  other substance that might affect your --

8      A.    No.

9      Q.    -- ability to respond truthfully to each

10 question?

11     A.    No.

12     Q.    Okay, and that was one of our ground

13 rules is that I have to finish my question.

14     A.    Okay.

15     Q.    Thank you.  Okay, let's talk a little

16 bit about your education and work history.  Can you

17 tell me about your educational background?

18     A.    I've attended college.  I actually

19 didn't graduate.  I was close, but then I came back

20 to Hawaii, and I started working in the field that I

21 went to school for, so I have been in the television

22 business for almost twenty years now.

23     Q.    Where did you go to college?

24     A.    Chapman College in Orange, California.

25     Q.    Okay, that's a nice school.  And how



1  many years did you attend college there?

2       A.      Five years.

3       Q.      Did you graduate?

4       A.      No.  I finished the course work, but my

5  GPA was a little short.  I meant to go back, but --

6       Q.      That happens.

7       A.      -- once the career started, I haven't

8  had time to go back, and I have actually done really

9  well.  I would like to eventually go back, but,

10 yeah, that's another story.

11      Q.      And what year did you start Chapman

12 College?

13      A.      In 1987.

14      Q.      And what was your course of study while

15 you were there?

16      A.      Communications and film and television

17 production.

18      Q.      Did you ever take any legal courses?

19      A.      No.

20      Q.      Have you had any legal education at all?

21      A.      None whatsoever.

22      Q.      Okay, and so it sounds like you left

23 Chapman around 1992 --

24      A.      Yeah.

25      Q.      -- is that correct?



```
 1       A.     That's correct.
 2       Q.     And what was your first job out of
 3  college?
 4       A.     At the tv station just down the street
 5  at KGMB.
 6       Q.     Okay, and that's here in Honolulu?
 7       A.     Mm-hm, yes.
 8       Q.     And what were your job duties?
 9       A.     I was a -- my official title was
10  production technician.
11       Q.     And what did you do as a production
12  technician?
13       A.     Behind the scenes jobs, newscast and
14  other production, commercials, working camera,
15  audio, a lot of technical things, more of the behind
16  the scene stuff in television.
17       Q.     Okay, and is that the position that you
18  hold today?
19       A.     Yes, and I am a producer director, and I
20  am still doing a lot of those technical things too.
21  I am an independent contractor.  I work for
22  everybody now.
23       Q.     And so does that mean that you are not
24  working for KGMB anymore?
25       A.     Not as an employee.  I still do work for
```



1  them, but, yeah, they are one of my clients --

2       Q.     Okay.

3       A.     -- that I work for.

4       Q.     And when did you leave employment with

5  KGMB?

6       A.     Oh, do we have to go through the whole

7  thing?  Because I left a few times, and I went back.

8       Q.     If you can just give me sort of a

9  summary?

10      A.     Okay, well, I kind of bounced back and

11 forth between a few tv stations.  In 2001, I left to

12 work as an independent contractor.  When the economy

13 went back, I went back to KGMB in 2009, and then I

14 left last September and have been working again as

15 an independent contractor since.

16      Q.     Okay.  So the current position that you

17 hold as a producer director --

18      A.     Slash, technician, yeah.  I am kind of

19 -- kind of like a swiss Army knife depending on the

20 client, you know, who I am working for.

21      Q.     A jack of all trades?

22      A.     Yeah, so it keeps me really busy too.

23      Q.     Good for you.  And you are

24 self-employed --

25      A.     Yes.



1      Q.     -- is that correct?

2      A.     Yes.

3      Q.     Okay, great.  So can you describe your

4   usual work schedule, if you have one?  I mean, do

5   you work Monday through Friday?

6      A.     It varies.  It depends on the clients,

7   it depends on the jobs.  Lately, the last few months

8   because it is sports season, I have been working on

9   a lot of sports broadcasts, so there's been a lot of

10  weekends, but it is never the same every week, which

11  I kind of enjoy that part too.

12     Q.     Did you know the Giants won the World

13  Series?

14     A.     Yes, yes.

15     Q.     Okay, so you are not like a nine to five

16  guy --

17     A.     No.

18     Q.     -- Monday through Friday?

19     A.     No, not at all.

20     Q.     Okay.  Is there a typical time that you

21  leave your house in the morning?

22     A.     No.  Again, it depends on the job.

23     Q.     Okay.

24     A.     This morning, for example, I directed

25  the morning show at KGMB, so I went in at three



1  o'clock this morning.  You know, I am off for the

2  next couple of days.  I am doing a cooking show for

3  a couple days next week and sports broadcast.  It

4  varies, it varies.

5       Q.    Okay.

6       A.    Yeah.

7       Q.    Did you take any vacations in late

8  August or early September?

9       A.    No.

10      Q.    Do you recall being out of town in late

11 August, early September?

12      A.    No.

13      Q.    Did you do anything to prepare for the

14 deposition today?

15      A.    No.  I was just basically told to come

16 in.  I was told to look for some documentation for

17 any products that I bought.  I have actually found a

18 couple of computers that I have bought during that

19 time period, and, yeah, that was about it.

20      Q.    Okay, and we will get into that a little

21 bit later.

22      A.    Okay.

23      Q.    Did you meet with any lawyers prior to

24 your deposition?

25      A.    No.



```
 1        Q.      Did you talk to any lawyers prior to
 2   your deposition?
 3        A.      No.
 4        Q.      You basically just showed up this
 5   morning?
 6        A.      Yes.
 7        Q.      So you are represented here today by
 8   your brother --
 9        A.      Yes.
10        Q.      -- is that correct?
11        A.      Yes.
12        Q.      And did you meet with him prior to the
13   deposition?
14        A.      I came in about nine-thirty, and we just
15   talked for a couple of minutes, and he was just kind
16   of telling me, you know, what to expect, but he
17   didn't really tell me, you know, anything else.
18   It's just we kind of went over what's happened, you
19   know, my communications with Ed, and that was about
20   it.
21        Q.      Is your brother your lawyer in this
22   matter?
23        A.      Yes.
24        Q.      Okay, and what about Mr. Cochran?
25        A.      Yes.
```



```
 1        Q.      He is also your attorney?

 2        A.      Well, he is representing them.

 3        Q.      Your brother is representing Mr.

 4   Cochran?

 5        A.      No, he's -- he's here to --

 6        Q.      We may have to swear in your brother.

 7        A.      Yeah, I'm sorry.  He is here too on

 8   behalf of them, but, yes, Ed is representing me,

 9   yes.

10        Q.      Okay, so your brother is not your

11   attorney?

12        A.      No, no.

13        Q.      Okay, that's probably a good thing.

14        A.      Yeah, yes.

15        Q.      Okay.  So is it your understanding that

16   you are represented by Mr. Cochran in this matter?

17        A.      Yes.

18        Q.      Okay, what is --

19                Okay.  Did you review any documents

20   prior to the deposition?

21        A.      No.

22        Q.      And did you bring documents with you

23   today?

24        A.      I have two computers.

25        Q.      You brought computers with you?
```



1     A.     Yes.

2     Q.     Okay, all right, we will talk about

3  those in a bit.

4            MS. MANNING:  Okay, let's start by

5  marking our first exhibit which will be Exhibit 1.

6  Okay, this is an April 25th, 2012, indirect-

7  purchaser plaintiff notice of deposition of

8  objector, Kevin Luke.

9            (Deposition Exhibit 1 was marked for

10           identification.)

11    Q.     (By Ms. Manning)  Why don't you take a

12 minute, Mr. Luke, and take a look at this document?

13    A.     Sure.  Okay.

14    Q.     Mr. Luke, have you seen Exhibit 1

15 before?

16    A.     This document?

17    Q.     Yes.

18    A.     No.  This is the first time I have seen

19 it.

20    Q.     Were you aware that there was a notice

21 requesting your deposition served in April of 2012?

22    A.     Not in April.  The first I have heard of

23 a deposition was -- I'm not sure.  Maybe sometime a

24 few weeks ago, Ed gave me a call and said that --

25 that the deposition would like to be scheduled, but



1  that was the first time I had heard.

2       Q.    Okay.  So you were not aware in April of

3  2012 that there was a desire on behalf of the

4  attorneys to take your deposition --

5       A.    No.

6       Q.    -- is that correct?

7       A.    No.

8       Q.    Do you know who Fran Scarpulla is?

9       A.    No.

10      Q.    Have you heard of the Zelle Hofmann law

11 firm?

12      A.    No.

13      Q.    Do you know who Joe Alioto is?

14      A.    No.

15      Q.    Okay.  If you would take a look at

16 Exhibit A to Exhibit 1, you will see that it

17 identifies categories of documents.  Did you review

18 any categories of documents?

19      A.    As far as -- I haven't read -- I haven't

20 seen any documents pertaining to this.

21      Q.    Okay.  Did you search for any kind of

22 documents in April of 2012?

23      A.    No.

24      Q.    Okay.  Okay, you can put that aside.

25            MS. MANNING:  Okay, we will mark the



1  next document as Exhibit 2 which is the April 25th,

2  2012, transcript of deposition of Kevin Luke.

3             (Deposition Exhibit 2 was marked for

4             identification.)

5       Q.    (By Ms. Manning)  Did you appear for

6  your deposition on April 25th, 2012?

7       A.    No.

8       Q.    Okay.  This document reflects that you

9  did not appear; is that correct?

10      A.    Yes.

11      Q.    Why did you not appear for your

12  deposition on April 25th, 2012?

13      A.    I did not know of that, that I was

14  scheduled for a deposition.

15      Q.    So nobody told you that the deposition

16  notice had been served and that you were scheduled

17  to appear?

18      A.    No.

19      Q.    You didn't make a conscious decision not

20  to appear, correct?

21      A.    No, no, I did not know about it, no.

22            MS. MANNING:  Okay, we will mark the

23  next exhibit Exhibit 3 which is an August 29th,

24  2012, letter and a subpoena to testify at a

25  deposition in a civil action.



 1              (Deposition Exhibit 3 was marked for

 2              identification.)

 3      Q.      (By Ms. Manning)  Mr. Luke, will you

 4   take a look at this document, please?

 5      A.      Sure.

 6              MR. KENDAL LUKE:  Is that it?  I'm

 7   sorry.

 8              MS. MANNING:  Oh, did I not give it to

 9   you?  It is going to be hard for you to look at if I

10   don't give it to you.

11      Q.      (By Ms. Manning)  Actually, before you

12   look at this document, let me just ask you a couple

13   of questions.  When Exhibit 1 was prepared in April

14   of 2012, at that time were you represented by Mr.

15   Cochran?

16      A.      Yes.

17      Q.      When did you decide to hire Mr. Cochran

18   as your attorney?

19      A.      I believe it happened when Mr. Cochran

20   gave me a call.

21      Q.      Okay, and you say he left a voice mail

22   for you?

23      A.      Yes.

24      Q.      And that was in April of 2012?

25      A.      Yes.



1       Q.      Do you recall the date?

2       A.      I have the date of the voice mail.  It's

3  April -- the voice mail I have is April 10th.

4       Q.      Okay, and what did Mr. Cochran say in

5  his voice mail?

6       A.      I'm not sure.  Can I play it back?

7       Q.      Sure.

8               MR. KENDAL LUKE:  Well --

9               MR. PENTZ:  Kendal, could we have a

10  break right now?  I need to speak with Kendal.

11              MS. MANNING:  Well, there's a question

12  pending.  I mean, if you are going to assert an

13  attorney client privilege, this was a voice mail.

14  They couldn't have had an attorney client

15  relationship.

16              MR. KENDAL LUKE:  You know, I am going

17  to object to that potentially on the basis that

18  there was an existing, they did have a previous

19  attorney client privilege, and in terms of what's on

20  the voice mail, there may be attorney client

21  privilege information in a different matter.

22              MS. MANNING:  Okay, well, let's explore.

23  Okay, why don't we hold off on playing the voice

24  mail and allow me to explore the beginning of his

25  attorney client relationship.  Does that work for



1  everybody?

2          MR. PENTZ:  Yes, that's fine, sure.

3      Q.    (By Ms. Manning)  Okay, all right.  So

4  it was my understanding that you first met Mr.

5  Cochran in April of 2012.  That sounds like it is

6  not correct.  When did you first meet Mr. Cochran?

7      A.    I'm not sure what the date was.  I was

8  involved in another class, another class action

9  lawsuit with him, so, yeah, I mean, that was not the

10 first time I contacted him or, I mean, he contacted

11 me.

12     Q.    Okay.

13     A.    I believe that was the first time that

14 he contact me regarding --

15     Q.    This case?

16     A.    -- this one, yeah.

17     Q.    Okay, that makes sense.  All right, so

18 when did you first meet Mr. Cochran, or when was

19 your first -- let me rephrase that.

20          When did you have your first

21 communication with Mr. Cochran?

22     A.    I believe it was 2010.

23     Q.    And what was the nature of that

24 communication?

25     A.    It was regarding the vehicle that I



1  drove.  It was -- I don't recall the details of it.

2  It was for my Honda CRV.  Again, I don't recall the

3  exact details of that case, but --

4       Q.    Did Mr. Cochran initiate contact with

5  you?

6       A.    I believe so.

7       Q.    Did he call you?

8       A.    Yes.

9       Q.    And what did he say in his initial

10  conversation?  Let me strike that.

11            Did he leave you a voice mail?

12       A.    I don't remember, I don't remember how

13  that -- how that went.  I don't know if I answered

14  the call, or he left a voice mail.  I can't recall

15  that.

16       Q.    Okay, and do you know how he got your

17  contact information?

18       A.    My brother.

19       Q.    Okay, and when did you decide to retain

20  Mr. Cochran as your attorney?

21       A.    When we -- I had a discussion with him,

22  and we figured out that my vehicle was, you know,

23  was part of -- I guess it qualified for that

24  lawsuit.  It came -- it fell under that -- that

25  lawsuit, you know?



1      Q.      Okay.

2      A.      So that's when my relationship with Mr.

3   Cochran started on that.

4      Q.      Okay.  So he initiated contact with you

5   and asked you if you wanted to be a part of the

6   lawsuit; is that correct?

7      A.      Yes.

8      Q.      Okay.  Had you had any communications

9   with Mr. Cochran prior to him contacting you about

10  the, I assume you are talking about the Canadian

11  cars lawsuit; is that correct?

12     A.      Yes.

13     Q.      Did you have any knowledge of the

14  Canadian cars lawsuit, other than the information

15  you received from Mr. Cochran?

16     A.      No.

17     Q.      So the first time you became aware that

18  there was a lawsuit involving Canadian cars was in

19  the phone call you received from Mr. Cochran?

20     A.      Yes.

21     Q.      Did you review any documents relating to

22  the Canadian cars lawsuit?

23     A.      No, none that I can recall.

24     Q.      Did you review the settlement agreement

25  in the Canadian cars lawsuit?



```
 1        A.      No.

 2        Q.      Did you file an objection in the

 3   Canadian cars lawsuit?

 4        A.      Not that I know of.

 5        Q.      Okay.  Did Mr. Cochran prepare any

 6   documents on your behalf in connection with the

 7   Canadian cars lawsuit?

 8        A.      I'm not sure.

 9        Q.      So why did you decide to hire Mr.

10   Cochran to represent you in connection with the

11   Canadian cars lawsuit?

12        A.      I'm not sure.  He called, and he just

13   asked if, you know, my vehicle qualified for it, and

14   I said, yes, and, yeah, that was about it.  I mean,

15   my brother had told me that, you know, he knew -- he

16   knew of somebody on the mainland that, you know, was

17   looking to see if he knew anybody that qualified for

18   that case, and I guess I fell into that.  You know,

19   I fell into that.  My car qualified for it,

20   basically.

21        Q.      And in what way did your car qualify?

22        A.      It was one of the vehicles listed, if I

23   remember correctly.  It was a 2002 Honda CRV.

24        Q.      And what was the nature of that Canadian

25   cars lawsuit?
```



1          A.      Honestly, I don't know.

2          Q.      And did your brother tell you anything

3    about the Canadian cars lawsuit?

4          A.      No.

5          Q.      Did you have a written attorney client

6    fee agreement with Mr. Cochran in connection with

7    the Canadian cars lawsuit?

8          A.      No.

9          Q.      Did you expect to receive any payment in

10   connection with your involvement in the Canadian

11   cars lawsuit?

12         A.      I wasn't sure.  You know, I figured I

13   would just put my name in to help out.  You know, I

14   wasn't sure what was going to come of it.   And

15   actually, I hadn't heard anything until maybe about

16   a month ago when we were talking about this case,

17   and Mr. Cochran had said that, you know, there were

18   no financial settlements --

19                 MR. KENDAL LUKE:  Well, just objecting

20   to --

21                 THE WITNESS:  Oh, sorry.

22                 MR. KENDAL LUKE:  -- attorney client

23   privilege.

24                 THE WITNESS:  Sorry.

25                 MR. KENDAL LUKE:  That's privileged



```
 1   information.
 2             THE WITNESS:  Okay.
 3        Q.    (By Ms. Manning)  Right, just so you
 4   know, once you decide to hire an attorney to
 5   represent you, generally the discussions you have
 6   with that attorney will be covered by the attorney
 7   client privilege --
 8        A.    Okay.
 9        Q.    -- and you shouldn't tell me what your
10   attorneys have said to you and your brother --
11        A.    Okay.
12        Q.    -- and Mr. Pentz possibly will raise
13   objections, but to the extent that you have had
14   discussions with non-attorneys such as your brother,
15   those matters would not be covered by the attorney
16   client privilege.
17        A.    Okay.
18        Q.    So from the time that Mr. Cochran
19   contacted you in 2012 until a month ago, have you
20   had any discussions with him about the Canadian cars
21   case?
22        A.    No.
23        Q.    No e-mails?
24        A.    No.
25        Q.    No phone calls?
```



 1      A.      No.

 2      Q.      You had no idea what happened?

 3      A.      No.

 4      Q.      So you said --

 5              I asked you earlier if you expected to

 6  receive a payment in connection with your

 7  involvement in the case, and you said you didn't

 8  know.  Am I mischaracterizing your testimony, or is

 9  that correct?

10      A.      No.

11      Q.      Okay, what was your expectation?

12      A.      Well, I had heard that there were

13  possible -- you know, I could get something possibly

14  from it, but, you know, I didn't know.  This is the

15  first time that I had agreed to do something like

16  this, so.

17      Q.      Did you think that you might get some

18  monetary benefits?

19      A.      Possibly, but, you know, I wasn't

20  expecting anything.  I was just -- it was one of --

21  it was basically, you know, agree to a couple of

22  things, you know, and I never gave it much thought.

23      Q.      Okay, so you didn't review any documents

24  in connection with the Canadian cars case; is that

25  correct?



KEVIN LUKE                                    December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                  29

```
 1        A.      Yes.
 2        Q.      Is it correct to say that the only
 3   information you had about the case was information
 4   that you learned from Mr. Cochran?
 5        A.      Yes.
 6        Q.      And did you learn anything from your
 7   brother about that case?
 8        A.      No.
 9        Q.      Okay.  Are you aware that Mr. Pentz
10   applied -- okay, strike that.
11               Let's go back to Exhibit 3.  Have you
12   had a chance to look that?  I think I interrupted
13   you while you were --
14        A.      This one here?
15        Q.      Yes.
16        A.      No.
17        Q.      Okay, why don't you take a quick look at
18   Exhibit 3?
19        A.      Okay.
20        Q.      Okay, Mr. Luke, have you seen Exhibit 3
21   before?
22        A.      No, this is the first time.
23        Q.      Okay, who was your attorney in August of
24   -- actually, let me strike that.
25               Did you consider Mr. Cochran to be your
```



1  attorney in April of 2012 in connection with the LCD

2  case?

3       A.      Yes.

4       Q.      And when did you decide that, to retain

5  Mr. Cochran in connection with the LCD case?

6       A.      I guess when I first talked to him about

7  this case.

8       Q.      Okay.  So when you received the April

9  19th notice of deposition which we marked as Exhibit

10 1, was Mr. Cochran your attorney at that point?

11      A.      Yes.

12      Q.      So in August of 2012, did you consider

13 Mr. Cochran to be your attorney?

14      A.      Yes.

15      Q.      Okay, who is John Pentz?

16      A.      He works with Mr. Cochran.

17      Q.      Do you consider Mr. Pentz to be your

18 attorney?

19      A.      As far as I know, I have just been in

20 contact with Mr. Cochran.  I have heard John's name

21 mentioned before, but I have been mainly just in

22 direct contact with Mr. Cochran.

23      Q.      Okay.  What is the nature of their

24 business relationship, if you know?  Are they law

25 partners?



```
 1        A.      I'm not sure.
 2        Q.      Okay.  Where does Mr. Cochran maintain
 3   his law practice?
 4        A.      Oh, Cleveland.
 5        Q.      Do you know where Mr. Pentz maintains
 6   his law practice?
 7        A.      No.
 8        Q.      Have you had any conversations with Mr.
 9   Pentz?
10        A.      No, I have never -- I have never talked
11   to him before.  I have only talked with Ed.
12        Q.      Okay, going back to Exhibit 3, you said
13   you haven't seen this before; is that correct?
14        A.      Yes.
15        Q.      Okay, take a look at page three, which
16   is entitled affidavit of reasonable diligence?
17        A.      Yes.
18        Q.      This document reflects four attempts to
19   serve you at 1619 Kamamalu Boulevard, Apartment 209?
20        A.      Yes.
21        Q.      Were you living at that address in late
22   August and early September of 2012?
23        A.      That is my address.  I have actually
24   been staying with my girlfriend for the last, oh,
25   since last August.  She lives about a mile away, so
```



1  I have actually kind of been using my apartment as

2  an office during the day, but, yeah, I'm not there

3  all the time anymore.

4       Q.      Okay, and what is your girlfriend's

5  address?

6       A.      1717 Mott Smith Drive.

7       Q.      And is that in Honolulu?

8       A.      Yes.

9       Q.      Okay.  So the first attempt according to

10 this document was made on August 30th at 8:20 p.m.,

11 do you see that?

12      A.      Yes.

13      Q.      Do you recall if you were home that

14 evening?

15      A.      No.  Actually, on none of these dates,

16 you know, I wasn't there because I don't recall ever

17 getting anybody coming to my door when I have been

18 there.

19      Q.      You don't recall hearing any knocking on

20 the door?

21      A.      No, no.

22      Q.      And is it -- strike that.

23              So the second attempt was made on August

24 31st at 7:55 a.m.  Do you recall being home at that

25 time?



1        A.      No.

2        Q.      And the third time was on September 4th

3   at 7:00 p.m.  Do you recall being at home at that

4   time?

5        A.      No.

6        Q.      And then the fourth attempt was made on

7   September 17th, at 9:05.  You said you did

8   occasionally use that --

9        A.      Yes.

10       Q.      -- home as your office.  Do you recall

11  being there at that time?

12       A.      No.

13       Q.      Is it your usual practice to answer the

14  door when someone knocks?

15       A.      Yes, it's a very quiet apartment.  There

16  aren't any strangers.  If somebody knocks, it's

17  usually the mailman or delivery, so.

18       Q.      Were you aware in late August and early

19  September that someone was trying to serve you --

20       A.      No.

21       Q.      -- with a deposition subpoena?

22       A.      No, not at all.

23       Q.      Did you purposely avoid being served

24  with this deposition subpoena?

25       A.      No.



1      Q.      Okay.  You testified earlier that Mr.
2   Cochran represented you in connection with the
3   Canadian cars settlement --
4      A.      Yes.
5      Q.      -- is that correct?
6      A.      Yes.
7      Q.      And that you had an initial contact in
8   2010, and then you did not hear from him again until
9   April of 2012; is that correct?
10     A.      You know, I'm not sure.  Yeah, I'm not
11  sure.  It had been a while since I had heard from
12  him prior to April, but I'm not sure, you know, if
13  there were any later communications about the
14  Canadian car case before that.
15     Q.      Okay.  Did you receive any payment in
16  connection with your involvement in the Canadian
17  cars case?
18     A.      No.
19     Q.      Do you know if Mr. Cochran received any
20  payment in connection with his representation of you
21  in the Canadian cars case?
22     A.      No.
23     Q.      I think when did you first become aware
24  of the LCD case?
25     A.      When Mr. Cochran called me about it in



 1   April of 2012.

 2       Q.    Okay, and separate from your

 3   communication with Mr. Cochran, what do you know

 4   about that LCD case?

 5       A.    Oh, not a lot.  I just know that he had

 6   asked me if I had purchased --

 7             MR. KENDAL LUKE:  Wait.

 8       Q.    (By Ms. Manning)  Yes, don't tell me --

 9       A.    Okay.

10       Q.    -- anything that you learned from your

11   attorney.

12       A.    Yeah, no.  Could you repeat the

13   question?

14       Q.    Sure.

15             MS. MANNING:  Could you repeat my

16   question?

17             (The record was read back by the court

18             reporter.)

19       A.    I just know what I was told.

20       Q.    (By Ms. Manning)  What you were told by

21   Mr. Cochran?

22       A.    Yes.

23       Q.    Okay, did you ever talk to your brother

24   about that LCD case?

25       A.    No.



KEVIN LUKE                                      December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                     36

```
 1        Q.      Did you talk to your girlfriend about
 2   the LCD case?
 3        A.      No.
 4        Q.      Did you talk to your friends at work
 5   about the LCD case?
 6        A.      No.
 7        Q.      What documents did you review to learn
 8   about that LCD case?
 9        A.      I actually did not review any documents.
10   Again, I was just going on what I had learned about
11   it.
12        Q.      Okay, you didn't read the complaint?
13        A.      No.
14        Q.      You didn't read any of the amended
15   complaints?
16        A.      No.
17        Q.      Did you read the class certification
18   motion?
19        A.      No.
20        Q.      Did you read any of the summary judgment
21   motions?
22        A.      No.
23        Q.      And did you read any of the court
24   orders?
25        A.      No.
```



KEVIN LUKE                                    December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                   37

1      Q.      Okay, so you didn't read anything about
2   the case?

3      A.      That is correct.

4      Q.      And is it correct to say your only
5   knowledge about the LCD case came from what your
6   attorney told you?

7      A.      Yes.

8      Q.      Do you recall what you first learned of
9   the settlements in the LCD case?

10     A.      Settlements?  I believe it is when Mr.
11  Cochran called me a couple of weeks ago, and, again,
12  that was just more for him telling me that I needed
13  like to show up for a deposition.

14     Q.      Okay.

15     A.      Yeah.

16     Q.      Okay, again, don't tell me what he told
17  you --

18     A.      Okay.

19     Q.      -- or your lawyer is going to get mad at
20  me.

21             What is your understanding of your role
22  in the LCD case?

23     A.      Similar to the other case, you know, I
24  basically -- my -- you know, I fit the criteria as a
25  consumer of what the case involves, so in this



1   instance in the LCD case, I purchased a couple of

2   computers within that time period, and so, yeah,

3   that's it.

4        Q.    Okay.  So do you consider yourself to be

5   a member of the class?

6        A.    Yes.

7        Q.    And do you consider yourself to be an

8   objector to the settlement?

9        A.    I'm not sure what that means.

10       Q.    Do you know what it means to object to a

11  settlement?

12       A.    Not really.

13       Q.    Okay.

14       A.    Yeah.

15       Q.    Did you read any of the settlement

16  agreements in the LCD case?

17       A.    No.

18       Q.    Do you have any understanding of the

19  substance of the settlements in the LCD case?

20       A.    No.

21       Q.    Do you know who the settling parties

22  are?

23       A.    No.

24       Q.    Do you know how much the case settled

25  for?



KEVIN LUKE                                     December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                    39

```
 1        A.        No.

 2        Q.        Do you know if it was in the thousands

 3   of dollars?

 4        A.        Yes, I don't know the exact number, but,

 5   yes, I know it was quite a big sum.

 6        Q.        Okay.  What caused you to object to the

 7   LCD settlement?

 8        A.        Honestly, I don't -- I don't know.  I

 9   was -- you know, again, I was basically just going

10   along with --

11        Q.        With what your attorney told you?

12        A.        Yes.

13        Q.        Okay.  Do you have a written

14   attorney-client agreement with Mr. Cochran in

15   connection with the LCD case?

16        A.        No.

17        Q.        What is your understanding of Mr.

18   Cochran's role as representing you in the LCD case?

19   What did you hire him for?

20        A.        I think it's just, you know, it's really

21   as simple as him making the phone calls to me, and I

22   was just going along, you know, again, because I

23   knew that, you know, I fulfilled the criteria that

24   he was looking for.

25        Q.        How many times have you spoken with Mr.
```



1   Cochran since you decided to retain him in April of

2   2012 in connection with the LCD case?

3        A.     Oh, probably three or four times.  I'm

4   not sure of the exact number.

5        Q.     Okay, and were those conversations by

6   telephone?

7        A.     Yes.

8        Q.     Have you ever met with Mr. Cochran in

9   person?

10       A.     No.

11       Q.     Do you know what he looks like?

12       A.     No.

13       Q.     Have you exchanged e-mails with Mr.

14   Cochran?

15       A.     Yes.

16       Q.     About how many?

17       A.     Maybe two or three.

18       Q.     So is it fair to say that your

19   communications with Mr. Cochran have been fairly

20   limited --

21       A.     Yes.

22       Q.     -- in connection with the LCD case?

23       A.     Yes.

24       Q.     Okay.  Other than Mr. Cochran, have you

25   spoken with any other person regarding the LCD case?



```
 1        A.      No.

 2                MS. MANNING:  Okay, I am going to mark

 3   the next document as Exhibit 4, and this document is

 4   a November 29th, 2012, letter from John Pentz to

 5   Fran Scarpulla.

 6                (Deposition Exhibit 4 was marked for

 7                identification.)

 8        Q.      (By Ms. Manning)  Mr. Luke, please take

 9   a look at Exhibit 4, and let me know if you have

10   seen it before.  Okay, the second page of Exhibit 4

11   is a -- actually, strike that.

12                This is a letter from Mr. Pentz to Mr.

13   Scarpulla enclosing your response to the

14   indirect-purchaser plaintiffs' request for

15   production of documents and agreeing to appear for

16   the deposition today; is that correct?

17        A.      Yes.

18        Q.      Okay, and did you have any discussions

19   with --

20                Did you review this letter before it was

21   sent out?

22        A.      No.

23        Q.      If you take a look at page two, this is

24   the response by Kevin Luke to indirect-purchaser

25   plaintiffs' request for production of documents.
```



KEVIN LUKE                                      December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                              42

 1      A.      Yes.

 2      Q.      Have you seen this document before?

 3      A.      No.

 4      Q.      Did you review the document before it

 5  was signed by your attorney?

 6      A.      No.

 7      Q.      Is Mr. Pentz your attorney in this case?

 8      A.      Again, I'm not sure, it could be,

 9  because my conversations have just been with Mr.

10  Cochran.

11      Q.      Okay.  You have never had a conversation

12  with Mr. Pentz --

13      A.      No.

14      Q.      -- is that correct?

15      A.      No.

16      Q.      Okay.  Do you have an understanding of

17  why he prepared this document on your behalf?

18      A.      Like I said before, in my communications

19  with Mr. Cochran, I have heard Mr. Pentz's name

20  mentioned before, so, yeah, that's the extent of my

21  knowledge of Mr. Pentz's involvement with this.

22      Q.      Okay, and did you have any discussions

23  with Mr. Pentz about whether you would produce

24  documents in this case?

25              MR. KENDAL LUKE:  Objection.



```
 1                MS. MANNING:  I'm asking yes or no.

 2                MR. KENDAL LUKE:  Yes or no.

 3                MS. MANNING:  Yes or no.

 4                MR. KENDAL LUKE:  Okay.

 5                MS. MANNING:  If you can read the

 6  question back?

 7                (The record was read back by the court

 8                reporter.)

 9       A.    No, not with Mr. Pentz.

10       Q.    (By Ms. Manning)  Okay.  Did you search

11  for responsive documents -- actually, strike that.

12  Not a good question.

13                At some point in this case, did you

14  search for documents related to your involvement in

15  the LCD case?

16       A.    Yes.

17       Q.    Okay, and what types of documents did

18  you search for?

19       A.    Oh, I --

20       Q.    Actually, let me --

21       A.    Okay.

22       Q.    Okay, you can answer that question.

23       A.    I was told to look for either receipts

24  or the actual computers, which I -- which I did

25  find.
```



1      Q.      Okay, and when did you first search for
2   the types of documents that you just mentioned?
3      A.      Actually, yesterday.  Yesterday.
4      Q.      Okay, so when this letter was sent out
5   on November 29th, you had not searched for
6   responsive documents; is that correct?
7      A.      Not at -- not at that time.
8      Q.      Do you know how Mr. Pentz prepared this
9   document?
10      A.      No.
11      Q.      Okay, let's talk about the requests.  If
12   you want to take a look back at Exhibit 3, which is
13   these documents, if you take a look at page three of
14   the requests for production.  Keep going, keep
15   going.  I think it is the second to the last page.
16   There you go, okay.
17           So the first request asks for all
18   documents supporting your objection filed in the LCD
19   antitrust litigation, including those supporting
20   your assertion that you are a member of the
21   settlement class in the LCD antitrust litigation,
22   e.g., receipts for purchase of a product containing
23   a TFT-LCD panel during the class period.
24           Do you see that?
25      A.      Yes.



1      Q.     When did you first search for documents

2    responsive to this request?

3      A.     Oh, yesterday.

4      Q.     Do you have an understanding of what a

5    TFT-LCD panel is?

6      A.     Yes.

7      Q.     And what is that?

8      A.     It's basically the computer screen on

9    the lap tops.

10     Q.     Yeah, you are a tech guy --

11     A.     Yeah.

12     Q.     -- so you know all this stuff.

13     A.     Yeah.

14     Q.     And where did you search for responsive

15   documents?

16     A.     In my apartment.  I knew I still had the

17   computers.  I had them stored away in the closet.

18   One of them was in the closet, and another one I

19   actually was using up until a few months ago.

20     Q.     Okay, and did you search for them in

21   your apartment?

22     A.     Yes.

23     Q.     Anywhere else?

24     A.     No.

25     Q.     Did you search for other documents



1 besides the actual products?

2     A.    I looked to see if I still had the

3 receipts for those, and it's been some time.  The

4 old computer I bought in 2000, so I couldn't find a

5 receipt for that, and the other computer I had also

6 bought in 2005, so I couldn't find a receipt for

7 that.

8     Q.    Okay.  For how many products did you

9 search for responsive documents in this case?

10    A.    Oh, I thought I had more initially

11 because my understanding was that the dates were up

12 to 2012, and actually, I saw a newspaper article

13 about this case that it was for computers bought up

14 to 2006, so I only had two computers that fell into

15 that category.

16    Q.    Okay, and did you have any other

17 products besides computers that fell into that

18 category?

19    A.    No, no, just two computers.

20    Q.    Okay, two computers?

21    A.    Yes.

22    Q.    Okay, and can you tell me about those

23 computers?

24    A.    Yes.  One is -- the one that I bought in

25 2000, it's an Apple ibook.  Again, I'm not sure when



1  in 2000 that I bought it, but I remember I bought --

2  I bought that particular model when it first came

3  out in 2000.

4      Q.    Okay.  And when did you purchase the

5  ibook?

6      A.    On line.  I'm not sure -- I'm not sure

7  if it was Mac mall or Mac warehouse, one of those on

8  line -- one of those on line stores.

9      Q.    Do you still have that 2000 Apple ibook?

10     A.    Yes.

11     Q.    Wow.

12     A.    Yes, it's sitting in the closet.

13     Q.    Steve Jobs would be proud.

14     A.    Yeah.

15     Q.    Okay.  Where did you live when you

16 purchased the 2000 ibook?

17     A.    In Honolulu.

18     Q.    Did you buy it with a credit card?

19     A.    Yes.

20     Q.    And did that credit card have your name

21 on it?

22     A.    Yes.

23     Q.    Do you have a receipt for that purchase?

24     A.    No.

25     Q.    Do you have a credit card statement



1  reflecting the purchase?

2       A.     No.

3       Q.     Is it your practice to keep copies of

4  your credit card statements?

5       A.     No.

6       Q.     What kind of credit card did you

7  purchase the Apple ibook on?

8       A.     A Visa.

9       Q.     Do you still have that Visa?

10      A.     No, it's a -- I have a different Visa

11  now.  It was a -- it was the United Airlines Visa

12  card at the time.  I don't have that one anymore.

13      Q.     Yeah, that's a good one.  I have that

14  one too.  You get lots of miles.

15      A.     Yeah.

16      Q.     Okay, and what was the second computer

17  that you referred to earlier?

18      A.     It was -- it's a seventeen inch Mac

19  power book, which I bought in late 2005.

20      Q.     Okay, and where did you purchase the

21  seventeen inch Mac power --

22      A.     I purchased that from the Apple store

23  here in Honolulu.

24      Q.     This is a lap top, right?

25      A.     Yes.



1       Q.      And do you still have that product?

2       A.      Yes.

3       Q.      And where did you live when you

4  purchased the Mac power book --

5       A.      In Honolulu.

6       Q.      Did you pay cash?

7       A.      No.  It was with the same credit card.

8       Q.      The same --

9       A.      The same Visa.

10      Q.      The Visa mileage --

11      A.      Yes.

12      Q.      -- the Visa United?

13      A.      Yes.

14      Q.      United Visa, okay --

15      A.      Yes.

16      Q.      -- and do you still have that credit

17  card?

18      A.      No.

19      Q.      Do you have a receipt for the purchase

20  of the seventeen inch Mac power book?

21      A.      No, I couldn't find a receipt for it?

22      Q.      Do you have a credit card statement

23  reflecting the purchase?

24      A.      No.

25      Q.      Did you purchase that product for



1  yourself?

2       A.     Yes.

3       Q.     Do you still use that product?

4       A.     No.  I -- I bought -- I bought a new

5  one, and I don't use that one anymore.

6       Q.     You know Apple recycles products?

7       A.     Yes.  That one still works, but I just

8  haven't used it for anything.

9       Q.     All right.  So going back to Exhibit 4,

10 are those the only two products for which you

11 searched for responsive documents?

12      A.     Yes.

13      Q.     And did you look anywhere besides your

14 apartment?

15      A.     No.  I knew -- I knew where they were.

16      Q.     Okay.  Okay, so you didn't find any

17 responsive documents other than the two actual

18 products; is that correct?

19      A.     Yes.

20      Q.     Okay, you didn't find any receipts?

21      A.     Yeah, I tried to find it.

22      Q.     No credit card statements?

23      A.     No.

24      Q.     All right.  If you take a look at

25 Exhibit 3 again, the third request asks for all



1    documents relating to the representation of you by

2    any person in relation to the antitrust litigation.

3            Did you search for any documents

4    responsive to this request?

5        A.     No.

6        Q.     And you testified earlier that you don't

7    have any attorney client agreements with your

8    counsel; is that correct?

9        A.     That is correct.

10       Q.     Is there any other written evidence of

11   your attorney client relationship with any attorneys

12   involved in the LCD case?

13       A.     Just the two e-mails.

14            MR. KENDAL LUKE:  I'm sorry, I just --

15            MR. PENTZ:  Privileged --

16            MS. MANNING:  It's a yes or no question.

17            MR. PENTZ:  Well, he has already

18   testified that there were some e-mails from Ed

19   Cochran, but those would be attorney client

20   privileged.

21            MS. MANNING:  Okay, I didn't see a

22   privilege log produced together with this response,

23   and I believe the special master's order

24   specifically states that any privileged documents

25   should be identified on a privilege log, so we would



1  request production of a privilege log, please, since

2  the witness has identified that there are e-mail

3  communications.

4           MR. PENTZ:  Okay, we will log those and

5  produce those.

6           MS. MANNING:  Thank you.

7           MR. PENTZ:  We will do that.

8           MS. MANNING:  Thank you.

9      Q.   (By Ms. Manning)  Okay, so other than

10  e-mail communications, is there any other written

11  evidence of your attorney-client relationship with

12  Mr. Cochran?

13      A.   No.

14      Q.   Okay.  All right, the fourth request

15  asks for all documents relating to agreements

16  between you and any other person including but not

17  limited to any other objector or attorney in

18  relation to the LCD antitrust litigation, including

19  any agreement to compensate you for acting as an

20  objector.

21           Now, is it true that you don't

22  understand your role as an objector in this case?

23      A.   Not specifically, yes.

24      Q.   Okay.  Do you have any agreements with

25  any other person --



1      A.      No.

2      Q.      -- in connection with the LCD case other

3  than your attorneys?

4      A.      Nobody else.

5      Q.      Okay.  So did you look -- so there were

6  no --

7              Is it correct that there were no

8  responsive documents?

9      A.      Yes.

10     Q.      Okay, the fifth request asks for all

11  documents relating to any objection filed in any

12  court or proceeding in the last five years by you or

13  by any attorney who is currently involved or

14  associated with the representation of you in the LCD

15  antitrust litigation.

16             Do you see that?

17     A.      Yes.

18     Q.      Are you aware of any objection filed by

19  you in any other case?

20     A.      No.

21     Q.      The next request, number six, asks for

22  all documents relating to any settlement made in

23  relation to any objection or subsequent appeal filed

24  in the last five years by you or by any attorney who

25  is currently involved or associated with the



1   representation of you in the LCD antitrust

2   litigation.

3          Did you search for documents responsive

4   to this request?

5       A.    No.

6       Q.    The next request number seven asks for

7   all documents relating to the amount of any monetary

8   compensation received by you or by any attorney who

9   is currently involved or associated with the

10  representation of you in the LCD antitrust

11  litigation for any objection within the last five

12  years.

13         Did you search for documents responsive

14  to this request?

15      A.    No.

16      Q.    And you testified earlier that you

17  haven't received any monetary compensation; is that

18  correct?

19      A.    Yes.

20      Q.    The last request number eight asks for

21  all documents relating to changes made to any

22  settlements as a result of any objection made within

23  the last five years by you or by any attorney who is

24  currently involved or associated with the

25  representation of you in the LCD antitrust



1   litigation.

2           Did you search for documents responsive

3   to this request?

4       A.    No.

5           MS. MANNING:  Okay, I am going to mark

6   the next document as Exhibit 5, which is a notice of

7   service of renewed notice of deposition dated

8   December 4th, 2012.

9           (Deposition Exhibit 5 was marked for

10           identification.)

11      Q.    (By Ms. Manning)  Have you seen this

12   document before, Mr. Luke?

13      A.    No.

14           MS. MANNING:  Okay, I am going to mark

15   the next document as Exhibit 6, which is an April

16   17th, 2012, objection to settlement and motion for

17   attorneys' fees.

18           (Deposition Exhibit 6 was marked for

19           identification.)

20      Q.    (By Ms. Manning)  Please take a look at

21   this, Mr. Luke, and tell me if you have seen this

22   before.

23      A.    No, I have not seen this before.

24      Q.    So I am guessing then -- actually,

25   strike that.



1                Did you prepare this document?

2        A.      No.

3        Q.      Did you authorize Mr. Pentz to file this

4    document on your behalf?

5        A.      I -- I did not directly authorize it,

6    again, because of my initial conversation with Mr.

7    Cochran, you know, I just knew that I fell into the

8    criteria for this --

9        Q.      Okay.  Do you know what this document

10   is?

11       A.      No.

12       Q.      Do you want to read the title and tell

13   me if that refreshes your recollection?

14       A.      Yes, I believe so.

15       Q.      Okay.  What is your refreshed

16   recollection of what this document is?

17       A.      Oh, the objection to the settlement.

18       Q.      Okay.  You testified earlier that you

19   didn't know that you had objected to the settlement;

20   is that correct?

21       A.      No.

22       Q.      No, it's not correct?

23       A.      Well, I'm sorry.  Rephrase the question

24   again.

25                MS. MANNING:  Can you read my question



 1  back?

 2              (The record was read back by the court

 3              reporter.)

 4      Q.      (By Ms. Manning)  Let me rephrase the

 5  question.

 6      A.      Okay.

 7      Q.      You testified earlier that you didn't

 8  understand that you were an objector in this case;

 9  is that correct?

10      A.      Not exactly.  You know, again, I just

11  knew what I had been told, and I guess you could say

12  the rest was being taken care of.

13      Q.      By who?

14      A.      By Mr. Cochran.

15      Q.      Okay.  Did you have any conversation

16  with Mr. Cochran about this document before it was

17  filed?

18      A.      Looking at it, just I would say about

19  the - --

20              MR. KENDAL LUKE:  Yes, I think --

21      A.      -- items that I had purchased, you know?

22      Q.      (By Ms. Manning)  Okay.

23              MR. KENDAL LUKE:  Okay, you know, Jill,

24  if you don't mind, it's been about an hour.

25              MS. MANNING:  Do you want to take a



1  break?

2              MR. KENDAL LUKE:  Yes.

3              MS. MANNING:  Let's go off the record.

4              (Recess taken 10:58 a.m. to 11:10 a.m.)

5              MS. MANNING:  Let's go back on the

6  record.

7       Q.    (By Ms. Manning)  All right, Mr. Luke,

8  before we took a quick break, we were talking about

9  Exhibit 6.  Did you have any discussions with your

10 brother during the break?

11      A.    About this?

12      Q.    About anything related --

13      A.    Yes.

14      Q.    -- to the case?

15      A.    Yes.

16      Q.    And what did he tell you?

17             MR. KENDAL LUKE:  I am going to object

18 to that in terms of --

19             MS. MANNING:  Well, he has testified

20 that you are not his attorney in this case.

21             MR. KENDAL LUKE:  I think he was a

22 little confused about that as well.

23             MS. MANNING:  Well, that's his

24 testimony.  If you want to clarify it at the end,

25 but he testified that he hasn't retained you as his



1   attorney, therefore, any discussions that you have

2   are not attorney client privileged.

3            MR. KENDAL LUKE:  Okay, well, I am going

4   to object to that and have him not discuss what was

5   said.

6            MS. MANNING:  Okay, well, if we decide

7   to file a motion to compel, and we are successful,

8   and I have to come back here for the deposition, we

9   are going to ask for costs because I think the

10  record is clear that based on his testimony, there

11  is not an attorney client relationship.

12       Q.    (By Ms. Manning)  Are you going to abide

13  by your attorney's instructions?

14           MR. PENTZ:  I think he probably meant he

15  is not his attorney in the LCD case, but he is

16  clearly his attorney there today, and he is the only

17  lawyer there.

18           MS. MANNING:  I think the record is

19  pretty clear.

20       Q.    (By Ms. Manning)  So are you going to

21  follow your brother's instruction and not answer the

22  question?

23       A.    Yes.

24       Q.    Okay.  Did anything your brother tell

25  you during the break refresh your recollection about



1  any of the matters we have been discussing today?

2      A.     As far as what we have been talking

3  about today?

4      Q.     Yes.

5      A.     No.

6      Q.     Okay.  So we were talking about Exhibit

7  6 before we took a break, and you were telling me

8  about your understanding of what the document is.

9              MS. MANNING:  Actually, what was the

10  last question I asked?

11              (The record was read back by the court

12              reporter.)

13      Q.     (By Ms. Manning)  Okay, do you have any

14  knowledge of this exhibit other than what your

15  attorney has told you?  Actually, that's a really

16  bad question.  Strike that.

17              Do you have any understanding of what

18  this document means other than what your attorney

19  has told you?  And when I say this document, I am

20  referring to Exhibit 6.

21      A.     After I read it or just what he told me,

22  yes, I do.

23      Q.     Okay, what is your understanding?

24      A.     That I am objecting to the settlement

25  for the attorneys' fees.



1    Q.    Okay, and what is your understanding of

2  what that means to object to a settlement?

3    A.    Actually, I'm not entirely clear on it.

4  Again, I was just going on the understanding of my

5  conversations with Mr. Cochran.

6    Q.    Okay, I don't want to hear anything

7  about your conversations with Mr. Cochran, so

8  separate and apart from your conversations with Mr.

9  Cochran, what is your understanding of what it means

10  to object to a settlement?

11    A.    Again, I'm not very clear on that.

12    Q.    Okay.  Do you know who Barbara Cochran

13  is?

14    A.    No.

15    Q.    Have you had any discussions with

16  Barbara Cochran?

17    A.    No.

18    Q.    Okay.  If you take a look at Exhibit 6,

19  it says Mr. Luke purchased an Apple ibook on line in

20  2000, a power book in 2002, and an ibook at the

21  Honolulu Apple store in 2005; is that correct?

22    A.    Yes.

23    Q.    Did you make those purchases?

24    A.    Yes.

25    Q.    Okay.  We talked earlier about the Apple



KEVIN LUKE                                      December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                    62

1  ibook that you purchased in 2000?

2      A.    Yes.

3      Q.    Is that the product that's referred to

4  in Exhibit 6?

5      A.    Yes.

6      Q.    And we also talked about a seventeen

7  inch Mac power book that you purchased in 2005?

8      A.    Yes.

9      Q.    Is that referred to in this document?

10     A.    It says ibook in here.  That should have

11 been a power book --

12     Q.    Okay.

13     A.    -- 2005.

14     Q.    So is it true that this document is

15 incorrect when it says you purchased an ibook at the

16 Honolulu Apple store in 2005?

17     A.    Yes.

18     Q.    You did not purchase an ibook at the

19 Honolulu Apple store in 2005; is that correct?

20     A.    I purchased a power book, yes.

21     Q.    Okay.  Is it correct that you did not

22 purchase an ibook at the Honolulu Apple store in

23 2005?

24     A.    Yes.

25     Q.    Okay.  Okay, did you purchase a power



1  book in 2002?

2      A.    Yes, I did.  But I -- I was not the

3  original purchaser of that.  Again, when I was told

4  to look for the receipts, knowing that I had not

5  been the original purchaser of that, I just, you

6  know, only knew about the -- knew that I still had

7  the ibook and the other power book that I purchased

8  in 2005.

9      Q.    Okay.  When did you purchase the power

10 book referred to in Exhibit 6?

11     A.    Oh, sometime in 2002 from a friend.

12     Q.    Okay, so you purchased it from a friend.

13 Who was the friend you purchased it from?

14     A.    Her name was May, her last name is

15 Lagua, L A G U A.

16     Q.    Okay.  You testified earlier that it is

17 your understanding that you are objecting to the

18 attorneys' fees; is that correct?

19     A.    Mm-hm.

20     Q.    Is there anything else that you are

21 objecting to in Exhibit 6?  And I am not trying to

22 make this a test.  You can feel free to read it.

23     A.    No.  Not that I know of, yes.

24           MR. PENTZ:  Objection on the form of the

25 question.  That's not what the special master has



1  permitted.  That's too open ended and broad.

2              MS. MANNING:  Are you instructing the

3  witness not to answer the question?  I am referring

4  specifically to Exhibit 6.

5              MR. PENTZ:  Right, but the form of the

6  question is other than C, is there anything else

7  that you are objecting to, which is exactly the form

8  that was criticized in the Kensell depo.

9       Q.    (By Ms. Manning)  Do you have an

10  understanding --

11             MR. PENTZ:  Why don't you read the

12  objection page by page like the Special Master Quinn

13  recommended in that case?

14             MS. MANNING:  I will be happy to do

15  that.

16             MR. PENTZ:  Thank you.

17       Q.    (By Ms. Manning)  If you take a look at

18  Exhibit 6, it refers to an objection on the grounds

19  that the statewide damages class improperly excludes

20  New Hampshire residents and includes Rhode Island

21  residents.  Do you understand that to be one of your

22  objections to the LCD settlement?

23       A.    Yes.

24       Q.    And did you review this portion of the

25  objection before it was filed?



1      A.     No, I did not.

2      Q.     Did you authorize this objection to be

3  filed on your behalf?

4      A.     Yes.

5      Q.     And who did you give that authorization

6  to?

7      A.     Mr. Cochran.

8      Q.     And do you have any understanding of the

9  nature of the objection to the settlement on behalf

10  of the New Hampshire residents and Rhode Island

11  residents, other than what you discussed with your

12  attorneys?

13      A.     Could you repeat the question again?

14             MS. MANNING:   Could you read the

15  question back?

16             (The question was read back by the court

17             reporter.)

18      A.     Yes.

19      Q.     (By Ms. Manning)  And what is that

20  understanding?

21      A.     Just what is in here, that -- that

22  that's my understanding of what's in this document.

23      Q.     Okay, and how did you formulate that

24  objection?

25      A.     I didn't -- I did not formulate that



KEVIN LUKE                                        December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                       66

 1  myself.  That came through my discussions with --
 2  with Mr. Cochran.
 3      Q.    Okay, so that's what I am trying to get
 4  at is what is your understanding of the nature of
 5  your objection, other than what you have learned
 6  from your attorneys?
 7      A.    As far as what?  What I know about it?
 8      Q.    That's correct.
 9      A.    So basically you are asking if I know --
10      Q.    Let me --
11      A.    Okay.
12      Q.    You know, let me rephrase the question
13  because I think I am confusing you.
14      A.    Okay.
15      Q.    What documents did you --
16            What did you do in preparation for
17  preparing this objection?  Actually, strike that.
18      A.    Okay.
19      Q.    Did you read the settlement agreements
20  in this case?
21      A.    No.
22      Q.    Did you read any other documents that
23  refer to the settlement agreements in this case?
24      A.    No.
25      Q.    So what is the basis for your objection



1  to the settlement agreements that they exclude the

2  New Hampshire residents and include the Rhode Island

3  residents if you did not read the settlement

4  agreements?

5       A.      I don't know.

6       Q.      Is it true that your attorney told you

7  that?

8               MR. KENDAL LUKE:  Objection.

9               MS. MANNING:  Okay, I will rephrase it.

10      Q.      (By Ms. Manning)  Is it true that the

11  basis for your objection came from your attorney?

12      A.      Yes.

13      Q.      Okay.  Okay, in Exhibit 6, you next

14  object to the settlement on the grounds that the

15  residents of California and Hawaii should receive a

16  higher percentage of the settlement fund than

17  residents of the other states, so I will ask you the

18  same question.  If you didn't read the settlement

19  agreement, is it correct that the basis for that

20  objection came from your attorney?

21      A.      Yes.

22      Q.      Okay, and in Exhibit 6, you object that

23  the attorneys failed to file a fee motion, and you

24  object to any fee in excess of 15 percent; is that

25  correct?



KEVIN LUKE                                           December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                         68

```
 1        A.      Yes.
 2        Q.      Okay.  How did you decide that any fee
 3   in excess of 15 percent would be excessive?
 4        A.      Again, that came from my attorney.
 5        Q.      Okay.  Do you know how many hours the
 6   class attorneys spent working on this case?
 7        A.      No.
 8        Q.      Do you know how many depositions they
 9   took in this case?
10        A.      No.
11        Q.      Do you know how many documents they
12   reviewed in this case?
13        A.      No.
14        Q.      Do you know how many motions the class
15   attorneys filed in the case?
16        A.      No.
17        Q.      Do you know how long the case had been
18   pending before it settled?
19        A.      No.
20        Q.      Do you know how many law firms worked on
21   this case?
22        A.      No.
23        Q.      Who chose the 15 percent figure set
24   forth in the exhibit?
25        A.      My attorney.
```



1      Q.      Okay.  Did the court rule on your

2   objection?

3      A.      I'm not sure.

4      Q.      Did you read any court ruling on the

5   objection?

6      A.      No.

7      Q.      Did you have any discussions with your

8   attorney about what happened after he filed the

9   objection?

10     A.      No.

11             MS. MANNING:  Okay, we will mark the

12   next document as Exhibit 7, and this is a November

13   19th, 2012, objection to report and recommendation

14   of special master re motion for attorneys' fees and

15   other amounts by indirect-purchaser class

16   plaintiffs.

17             (Deposition Exhibit 7 was marked for

18             identification.)

19     Q.      (By Ms. Manning)  I will let you take a

20   minute to look at this, and let me know if you have

21   seen this before.

22     A.      No, I haven't seen this before.

23     Q.      Did you assist in preparing this

24   document?

25     A.      No.



 1      Q.      Did you review it before it was filed on

 2   November 19th, 2012?

 3      A.      No.

 4      Q.      Did you authorize Mr. Pentz to file this

 5   on your behalf?

 6      A.      No.

 7      Q.      Did you authorize Mr. Cochran to file

 8   this on your behalf?

 9      A.      No.

10      Q.      Okay.  Exhibit 7 states that class

11   member Kevin Luke objects to the special master's

12   report and recommendation recommending a 28.5

13   percent fee award to the IPP class counsel.

14              Do you see that?

15      A.      Yes.

16      Q.      On what basis did you object to the 28.5

17   percent fee recommendation?

18      A.      Again, that was prepared by my

19   attorneys.

20      Q.      Did you read the class counsel's motion

21   for attorneys' fees prior to the time Exhibit 7 was

22   filed?

23              MR. PENTZ:  This is getting repetitive,

24   asked and answered.  I mean, how many times are you

25   going to ask him if he read the fee motion?



KEVIN LUKE                                    December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                 71

1  Obviously, he didn't.

2       Q.     (By Ms. Manning)  You can answer the

3  question.

4       A.     No, I haven't.

5       Q.     Okay.  Had you ever read the motion for

6  attorneys' fees in this case?

7       A.     No, I have not.

8       Q.     On page two of the objection, you

9  suggest that a lode star multiplier of 1.5 would be

10  inadequate in this case.  Do you see that?

11       A.     Excuse me, which page?

12       Q.     If you look at page two at the beginning

13  of the first paragraph, objectors do not contend

14  that class counsel is due no risk multiplier, but

15  suggests that a lode star multiplier of 1.5, and

16  I'll move on, is more than adequate in this mega

17  fund case.

18            Do you see that?

19       A.     Yes.

20       Q.     What is a lode star multiplier?

21            MR. KENDAL LUKE:  Okay, go ahead and

22  answer.

23       A.     Oh, I don't know.

24       Q.     (By Ms. Manning)  How do you determine

25  that a multiplier of 1.5 would be an adequate in



1  this case?

2            MR. PENTZ:  Objection, cumulative. He

3  has already responded.

4            MS. MANNING:  I am asking him about a

5  new document.  I didn't ask him this question

6  before.

7            MR. PENTZ:  Yes, but I mean, it is

8  cumulative.  Obviously, he didn't come up with the

9  28.5 percent or the 15 percent, and he also didn't

10  come up with the 1.5.

11            MS. MANNING:  Okay, then he should say

12  that.

13       Q.    (By Ms. Manning)  Can you please answer

14  my question?

15       A.    I did not come up with those numbers.

16       Q.    Okay, thank you.  Is it fair to say that

17  the only basis for the filing of Exhibits 6 and 7

18  was the advice of your counsel?

19       A.    Yes.

20       Q.    How much time have you spent in

21  connection with the objections you filed in the LCD

22  case?

23       A.    How much time?

24       Q.    How much time?

25       A.    Not very much.



KEVIN LUKE                                      December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                    73

1       Q.      Okay.  A day?  An hour?  Just give me

2   your best estimate.

3       A.      Probably an hour.

4       Q.      Okay.  And what do you expect to gain

5   from objecting to the LCD settlements?

6       A.      Honestly, I don't know.

7       Q.      Do you have any expectation?

8       A.      No.  I am not sure, you know, what's

9   going to come of it.

10      Q.      Are you expecting to receive a monetary

11  benefit?

12      A.      Again, I'm not sure.

13      Q.      Have you ever received any compensation

14  for appearing at your deposition here today?

15      A.      No.

16      Q.      Are you expecting to receive any

17  compensation?

18      A.      No.

19      Q.      Okay.  Do you believe that you are a

20  member of the class in this case?

21      A.      Yes.

22      Q.      Okay.  Let's mark our next exhibit as

23  Exhibit 8, and this is a screen shot, I will have to

24  represent it to you, it is a screen shot of the

25  claim that you filed in this case.



 1              (Deposition Exhibit 8 was marked for

 2              identification.)

 3      Q.      (By Ms. Manning)  Have you seen Exhibit

 4  8 before?

 5      A.      Is this from the claim form?

 6      Q.      Yes.

 7      A.      Yes.

 8      Q.      Okay, did you file a claim in this case?

 9      A.      Yes.

10      Q.      And when did you file the claim?

11      A.      Oh, a few weeks ago.

12      Q.      Would it refresh your recollection if I

13  said you filed it on or about November 15th?

14      A.      Yes.

15      Q.      Did you file this electronically?

16      A.      Yes.

17      Q.      Okay, and if you look at the claims, on

18  the right-hand side, it says two televisions, two

19  monitors, and five notebooks?

20      A.      Yes.

21      Q.      Okay.  Okay, we talked earlier about

22  your purchase of a seventeen inch Mac power book in

23  2005, correct?

24      A.      Yes.

25      Q.      Okay, is that one of the --



```
 1        A.      The notebooks.

 2        Q.      -- notebooks that you are referring to?

 3        A.      Yes.

 4        Q.      Okay, and then you testified earlier

 5   that you purchased an Apple ibook in 2000 --

 6        A.      Yes.

 7        Q.      -- is that correct?

 8        A.      Yes.

 9        Q.      And is that one of the notebooks that

10   you referred to?

11        A.      Yes.

12        Q.      Okay, and your objection included a 2002

13   power book, excuse me.

14                Your objection referred to in Exhibit 6

15   refers to a power book that you bought in 2002 --

16        A.      Yes.

17        Q.      -- is that correct?

18        A.      Yes.

19        Q.      And you testified that you purchased

20   that from a friend; is that correct?

21        A.      Yes.

22        Q.      Okay.  What are the other three

23   notebooks that you referred to in this?

24        A.      Those --

25        Q.      Excuse me, let me finish my question.
```



KEVIN LUKE                                December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                              76

1        A.      Okay.

2        Q.      What are the three other notebooks that

3   you filed a claim for in this case?

4        A.      I had purchased other computers.  I had

5   mentioned earlier today of my confusion of the

6   dates.

7        Q.      Okay.

8        A.      Some of the additional items on here

9   were purchased after 2006.  So like I said, after I

10  read the newspaper article, sometime within the last

11  week, I realized that what I had put on this claim

12  form was not -- all of these numbers didn't apply

13  because it only applied to my purchases before 2006.

14       Q.      Okay.

15       A.      So at the time that I filled this out, I

16  was mistaken on the time period because I did

17  purchase the rest of -- the numbers reflected here,

18  the more items after 2006, between 2006 and 2012.

19       Q.      Okay.  So is it your testimony that the

20  two other notebooks were purchased outside of the

21  class period?

22       A.      Yes.

23       Q.      And is it your testimony that --

24               Do you believe that you are entitled to

25  a claim for those two additional notebooks?



1      A.      No.

2      Q.      Okay.  What about the two monitors that

3  are referred to?

4      A.      Those were purchased after 2006.

5      Q.      Okay, and what about the two

6  televisions?

7      A.      That was after 2006 too.

8      Q.      Okay, so the only two products that you

9  are entitled to claim for are the Apple ibook

10 purchased in 2000 and the power book purchased in

11 2005 --

12     A.      Yes.

13     Q.      -- is that correct?

14     A.      (Witness nods head up and down.)

15             MS. MANNING:  Okay, I don't think I have

16 any further questions.  Mr. Luke, I thank you for

17 your time.

18             MR. KENDAL LUKE:  For the record, by

19 court rule, we will reserve signature.

20             MS. REPORTER:  John, are you ordering a

21 copy of this?

22             MR. PENTZ:  Yes, we are, yes.

23             (Discussion off the record.)

24             MS. MANNING:  Let's go back on the

25 record real quick.



1           I have a check for Mr. Luke in the

2    amount of $42, which is your witness fee for

3    appearing today.

4               THE WITNESS:  Okay.

5               MS. MANNING:  I have a subpoena that I

6    am hand serving on you that reflects today's

7    deposition.

8               THE WITNESS:  Okay.

9               MS. MANNING:  So it is just a formality,

10   and I will mark this as Exhibit 9.

11              (Deposition Exhibit 9 was marked for

12              identification.)

13              MS. MANNING:  Okay, and with that, I am

14   finished.

15              MR. PENTZ:  Well, I do have a question

16   for Mr. Luke, yes --

17              MS. MANNING:  Okay, go ahead.

18              MR. PENTZ:  -- to clarify some testimony

19   that I believe was pretty confusing before.

20                        EXAMINATION

21   BY MR. PENTZ:

22       Q.    Mr. Luke, you testified that Mr. Cochran

23   first contacted you in April of 2012.  Did you

24   authorize -- you testified that you weren't aware

25   that you were an objector.  Did you authorize him to



1  take steps to protect your rights in this action,

2  the LCD action?

3            MS. MANNING:  Objection,

4  mischaracterizes the witness's testimony.

5            MR. KENDAL LUKE:  You can answer.

6      A.    Well, I was -- again, I was going with

7  my understanding of what, you know, how I fit into

8  this case, and it was my understanding that Mr.

9  Cochran would -- would be acting in my best

10 interests in this case.

11     Q.    (By Mr. Pentz)  When Mr. Cochran

12 contacted you in April of 2012, was it your

13 intention at that time to make a claim in this case

14 for any monies to which you are entitled under the

15 settlement?

16     A.    I believe so, you know, because when I

17 had been asked to -- you know, I guess what my

18 feeling was is that I was helping, helping out with

19 this case, so I was agreeing to whatever, you know,

20 Mr. Cochran was going to do in this case.

21     Q.    Did you understand that Mr. Cochran was

22 going to try to help to maximize the amount that you

23 got from the case?

24     A.    I believe we had that discussion, yes.

25     Q.    And did you authorize him to take any



KEVIN LUKE                                                December 07, 2012
IN RE TFT-LCD (FLAT PANEL)                                              80

1   and all steps that Mr. Cochran felt were necessary

2   to protect your interests and maximize your recovery

3   in this case?

4        A.      Yes.

5                MR. PENTZ:  Okay, I have no further

6   questions.

7                MS. MANNING:  I have no further

8   questions.

9                (Deposition concluded at 11:38 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1        I, KEVIN LUKE, hereby certify that I have

2  read the foregoing typewritten pages 1 through 81,

3  inclusive, and corrections, if any, were noted by

4  me, and the same is now a true and correct

5  transcript of my testimony.

6        DATED:  Honolulu, Hawaii,

7  _____.

8

9

10             _____

11                    KEVIN LUKE

12

13

14  Signed before me this_____

15  day of _____, 2012.

16

17

18  _____

19

20

21

22

23

24  In re TFT-LCD, C07-1827 SI, Taken 12-7-12 by

25  Patricia Ann Campbell



```
 1              C E R T I F I C A T E

 2  STATE OF HAWAII                    )

 3                                     ) SS.

 4  CITY AND COUNTY OF HONOLULU        )

 5          I, PATRICIA ANN CAMPBELL, CSR 108, State
    of Hawaii, do hereby certify:
 6
            That on December 7th, 2012, appeared
 7  before me KEVIN LUKE, the witness whose 82 page
    deposition is contained therein; that prior to being
 8  examined he was by me duly sworn;

 9          That the deposition was taken down by me
    in machine shorthand and was thereafter reduced to
10  typewriting under my supervision; that the foregoing
    represents to the best of my ability a true and
11  correct transcript of the proceedings had in the
    foregoing matter;
12
            That pursuant to Rule 30(e) of the
13  Hawaii Rules of Civil Procedure, a request for an
    opportunity to review and makes changes to this
14  transcript was made by the deponent and/or their
    attorney prior to the completion of the deposition.
15
            I further certify that I am not an
16  attorney for any of the parties hereto, nor in any
    way concerned with the cause.
17
            DATED this 10th day of December, 2012, in
18  Honolulu, Hawaii.

19

20

21

22          PATRICIA ANN CAMPBELL, CSR 108

23          Certified Shorthand Reporter

24          State of Hawaii

25
```



```
 1   Reference No.: 490876.556417

 2

 3   Case:  IN RE TFT-LCD (FLAT PANEL)

 4

          DECLARATION UNDER PENALTY OF PERJURY

 5

          I declare under penalty of perjury that

 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the

 7   same has been read to me, and the same is
     true and accurate, save and except for

 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET

 9   hereof, with the understanding that I offer
     these changes as if still under oath.

10

11          _____

12          Kevin Luke

13

14          NOTARIZATION OF CHANGES

15               (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                        Notary Public,

24

25   in and for the State of _____
```



```
 1   Reference No.: 490876.556417

     Case:  IN RE TFT-LCD (FLAT PANEL)

 2

     Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25   Kevin Luke
```



```
 1   Reference No.: 490876.556417

     Case:  IN RE TFT-LCD (FLAT PANEL)

 2

     Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25   Kevin Luke
```

