United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION

No. M 07-1827 SI

MDL. No. 1827

This Order Relates to:

ALL INDIRECT-PURCHASER PLAINTIFF CLASS ACTIONS

**AMENDED ORDER GRANTING FINAL APPROVAL OF COMBINED CLASS, PARENS PATRIAE, AND GOVERNMENTAL ENTITY SETTLEMENTS WITH AUO, LG DISPLAY, AND TOSHIBA DEFENDANTS; ORDERING FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE; AWARD OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS**

This matter has come before the Court to determine whether there is any cause why this Court should not approve the combined class, *parens patriae*, and governmental entity settlements between, on the one hand, the Indirect Purchaser Plaintiffs ("IPPs") and the States of Arkansas, California, Florida, Michigan, Missouri, New York, West Virginia, and Wisconsin ("Settling States") (collectively, the "Settling Plaintiffs"), and, on the other hand, the AUO, LG, and Toshiba Defendants - as identified in each of the Proposed Settlements, and inclusive of named related entities (collectively the "Settling Defendants"), set forth in the Settlement Agreements ("Agreements") filed with this Court relating to the above-captioned litigation. On November 29, 2012, the Court conducted a fairness hearing addressing whether the Settlements were fair, adequate, and reasonable, and on January 31, 2013, the Court conducted a hearing to address attorneys' fees, expenses, and incentive awards. The Court, after carefully considering all papers filed and proceedings held herein and otherwise being fully informed in the premises, has determined (1) that the Settlements should be approved; (2) that attorneys' fees,

United States District Court
For the Northern District of California

1   expenses, and incentive awards should be awarded and allocated as directed by this Order, and (3) that

2   there is no just reason for delay of the entry of this final judgment approving the Agreements.  For the

3   following reasons, the Court GRANTS final approval to the Settlements.  The Court also awards

4   attorneys' fees, expenses, and awards as detailed below.

## BACKGROUND

7   This antitrust class action stems from allegations of a global price-fixing conspiracy in the market

8   for thin-film transistor liquid-crystal display panels ("TFT-LCD").  TFT-LCD panels are used in a

9   number of products, such as computer monitors, notebook computers, and televisions.  *See generally*

10  Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification (March 28, 2010), Docket

11  No. 1642, at 1-3; Indirect Purchaser Plaintiffs' Third Consolidated Amended Complaint, Docket No.

12  2694, ¶¶ 16-54.  Defendants manufacture the panels, which are then sold and assembled into finished

13  products.  The panels have no independent utility, and are not available to the average consumer.  Instead,

14  they are incorporated into finished products as discrete, physical objects within the product.

## I.      Indirect Purchaser Plaintiffs

17  Plaintiffs are a class of retail purchasers who purchased products containing TFT-LCD panels in

18  the United States.  The indirect purchaser plaintiffs filed this multidistrict antitrust class action on behalf

19  of all persons and entities who indirectly purchased TFT-LCD panels (contained in TFT-LCD products)

20  manufactured, marketed, sold and/or distributed by one or more of the defendants, for the indirect

21  purchasers' end use and not for resale. Third Consol. Amend. Compl. at ¶ 16.  Plaintiffs bought TFT-

22  LCD products containing TFT-LCD panels either from (1) TFT-LCD panel direct purchasers, such as

23  Dell, Hewlett-Packard, and Apple, which incorporate TFT-LCD panels into final, branded TFT-LCD

24  products and sell directly to the public, or (2) retailers, such as Best Buy, Wal-Mart, or Target, which

25  acquire the TFT-LCD products from TFT-LCD panel direct purchasers or distributors.

26  Plaintiffs alleged a "long-running conspiracy extending from at least January 1, 1999 through at

27  least December 31, 2006, at a minimum, among defendants and their co-conspirators, the purpose and

28  effect of which was to fix, raise, stabilize, and maintain prices for LCD panels sold indirectly to Plaintiffs

United States District Court
For the Northern District of California

and the members of the other indirect-purchaser classes . . . ." *Id.* at ¶ 1. Plaintiffs sought equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, based on alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as restitution, disgorgement, and damages under the antitrust, consumer protection, and unfair competition laws of 23 states.[1]

On March 28, 2010, the Court granted indirect purchaser plaintiffs' motion for class certification, certifying a nationwide class and twenty-three statewide classes. *See* Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification, Docket No. 1642, at 35. Additionally, in July 2011, the Court certified a Missouri monetary-relief class. Docket No. 3198.

## II. Settling States

The Settling States filed complaints in various federal and state courts beginning in mid-2010. The actions assert claims and seek various forms of relief against the defendants arising from indirect purchases made by governmental entities, and/or by consumers of TVs, notebook computers, and monitors containing LCD Panels under each Settling State's *parens patriae* authority, proprietary claims, and enforcement authority pursuant to both federal and state law. The Settling States have previously summarized some of the key events of their investigation and litigation, including motion practice and discovery work that preceded the previously-approved settlements. *See* Docket No. 4424 (motion for preliminary approval of previous settlements); Docket No. 5600 (motion for final approval of previous settlements); Docket No. 6860 (corrected motion for attorneys' fees and additional costs).

## III. Settlement Approval Process

On January 26, 2012, the Court granted preliminary approval to settlements totaling $538.6 million with the Chimei, Chunghwa, Epson, HannStar, Hitachi, Samsung, and Sharp Defendants ("Round

---

[1]The "indirect purchaser states" are Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

1 Settlements"). Docket No. 4688.[2]   The Court granted final approval to these settlements on July 11,

2012. *See* Docket No. 6130.

With respect to the remaining defendants (AUO, LG, and Toshiba), the IPPs and Settling States

engaged in arm's-length negotiations with Settling Defendants, resulting in each Proposed Settlement

("Round 2 Settlements").  The Court granted preliminary approval to these Settlements on July 12, 2012.

*See* Docket No. 6141.  Subsequent to that Order, IPPs filed a Motion for Final Approval, *see* Docket No.

7158, as well motions for attorneys' fees, expenses, and incentive awards, *see* Docket No. 5157, 6662,

and 6664.  Settling States also filed motions for attorneys' fees and expenses, *see* Docket No.5157 and

6860, and counsel for three separate objectors filed motions for attorneys fees, *see* Docket Nos.

6830/7195, 7200, and 7211.

On August 9, 2012, the Court issued an order appointing Martin Quinn as Special Master, *see*

Docket No. 6580,[3] and referred to him the task of assisting the Court by issuing reports and

recommendations on the subjects of: "(1) the reimbursement of the parties' expenses, and (2) the

appropriate amount of attorneys' fees to be awarded to the parties. See Fed. R. Civ. P. 53(e)." The Court

granted the Special Master authority to communicate *ex parte* with counsel "in order to facilitate the fair

and effective performance of his duties regarding attorneys' fees and expenses . . . "

## IV.    Terms of the Settlement

Most of the key terms of these Round 2 Settlements are substantially similar to the terms in the

Round 1 Settlements, with the exception of the payment amounts and cooperation provisions.  Notably,

---

[2]On the same date, the Court also prospectively modified the class definitions in advance of the trial against the then-remaining defendants.  *See* Docket No. 4684 (order altering statewide classes to exclude overlapping members of the direct-purchaser class action, and redefining Missouri and Rhode Island statewide classes to exclude purchases not made for personal, family, or household use). To preserve uniformity with the previously-approved settlements, the Proposed Settlements cover the persons and entities which were excluded by operation of the January 26, 2012 order prospectively modifying the classes against AUO, LG Display, and Toshiba, resulting in the proposed settlement-only classes described below.

[3]Martin Quinn was initially appointed Special Master, for various other pretrial purposes, on April 12, 2010, *see* Docket No. 1679.  He has provided the Court and counsel with invaluable assistance during his tenure as Special Master for this challenging MDL proceeding.  During the course of his work on the cases he has had an opportunity personally to deal with, observe and evaluate the work of many of the IPP counsel who now seek attorneys' fees and costs.

United States District Court
For the Northern District of California

the releases largely mirror the releases in the previously approved settlements.  The key terms are described below.

### A.    Consideration

Settling Defendants will pay a total of $571 million: $27.5 million has been paid to Settling States in resolution of their civil penalties claims, and $543.5 million represents consumer redress under the Proposed Settlements.  The breakdown of total settlement payments by Defendant is as follows: AUO - $170,000,000; LG Display - $380,000,000; Toshiba - $21,000,000.

In addition to the cash payments, AUO and LG Display agree, for a period of up to 5 years, not to engage in price-fixing, market allocation, bid rigging, or other conduct that constitutes a per se violation of Section 1 of the Sherman Act, with respect to the sale of any LCD panels, or TVs, notebook computers, or monitors containing LCD panels likely, through the reasonably anticipated stream of commerce, to be sold to end-user purchasers in the U.S.  Additionally, each settling defendant continuing to manufacture LCD panels agrees to establish an antitrust compliance program for officers and employees responsible for pricing or production capacity of LCD panels.  Each defendant will certify that it is complying with this obligation in an annual written report for the next 5 years (3 years for Toshiba).  Lastly, AUO and LG Display are obligated to provide cooperation to the IPPs and Settling States in the event that one or more of the settlements is not approved.

### B.    Release

For the class period of January 1, 1999 - December 23, 2006, the IPPs release all claims for monetary relief held by indirect-purchaser end-user consumers in the certified statewide monetary relief classes (and the proposed settlement-only classes).  They also release, for the time period January 1, 1999-February 13, 2012, all claims for injunctive relief held by indirect-purchaser end user consumers in the previously certified nationwide Sherman Act injunctive relief cases.  Docket No. 6141-2, ¶ 21.

Settling States release all claims that were asserted and all claims that could have been asserted in each Settling State's respective action, arising in any way from the sale of LCD Panels and based on any form of alleged anticompetitive conduct occurring on or before December 31, 2006, including claims

based on governmental entity purchases and applicable *parens patriae* claims, based on the facts alleged. Docket No. 6141-2, ¶ 21.

### C.   Plan of Distribution

The IPPs and the Settling States propose to compensate members of the IPP monetary relief classes according to a plan of distribution which provides that qualifying claimants will be eligible to claim an amount of money from the Settlement Fund based on the number of LCD TVs, notebook computers, and monitors each class member purchased during the class period.

The deadline to file a claim was December 6, 2012. Based on a summary of claims provided by IPP counsel to the Court on January 29, 2013, 10,429,923 LCD products were claimed by 235,808 claimants.[4] *See* Docket No. 7572. At that time, IPP counsel estimated that if the Court approved the Settlements as written and approved the amount of attorneys' fees, expenses, and incentive awards requested, claimants (including both timely and late-filed claims) would likely receive around $64 per monitor or laptop computer purchase and $128 per TV purchase. Additionally, a maximum payment amount of three times the estimated money damages per claimant will apply. Any residue of the Settlement Fund will be subject to further distribution as ordered by the Court. None of the Settlement Fund will revert to any Settling Defendant. Members of the nationwide injunctive relief class, who are not also members of any statewide monetary relief class, will not receive monetary compensation (but neither will they release monetary claims under the Proposed Settlements). IPP counsel have indicated that the Court's approval for the minimum payment will be requested when the data from the actual claim experience is available.

---

[4]These numbers include both timely and late-filed claims. IPP counsel recommend that late-filed claims be included in distribution payments, and this Court agrees. Additionally, the Court notes that these numbers do not include claims which the claims administrator has identified as being highly suspicious and likely erroneous or fraudulent. The claims administrator will be investigating these claims.

**DISCUSSION**

**I.      Final Approval of Class Action Settlements**

Final approval of a proposed class action settlement will be granted upon a finding that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2); *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.1998) (recognizing that "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness...."). To determine whether a settlement agreement meets this standard, a district court must consider a number of factors, including:

> the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026.

The Court has read, heard, and considered all the pleadings and documents submitted, and the presentations made in connection with the motions which came on for hearing on November 29, 2012, and January 31, 2013. The Court considers the terms of the Settlement as well as objections received to the fairness of the Settlement below.[5]

**A.      Objections to Plan of Distribution**

The Court received seven objections to the fairness of the Proposed Settlements, from a total of 11 objectors.  Primarily, objectors asserted objections on *cy pres* grounds to a provision in the Settlement Agreements allowing the Court to determine the disposition of any remaining residual in the settlement disbursement account after the cash distribution, complaining that potential *cy pres* recipients are not identified in the Settlement.  Objectors cite to the Ninth Circuit's opinion in *Dennis v. Kellogg Comp.*, 697 F.3d 858 (9th Cir. 2012) (*Kellogg II*),[6] which set aside a settlement which had *cy pres* components

---

[5]Objections to attorney fee awards, expenses, and incentive awards are discussed below, in Section II.

[6]Many of the objectors incorrectly rely on *Dennis v. Kellogg Company*, 687 F.3d 1149 (9th Cir. 2012) ("*Kellogg I*"), which was withdrawn and superseded by *Kellogg II*, discussed above.

United States District Court
For the Northern District of California

which neither identified the ultimate recipients of the *cy pres* awards nor set forth any limiting restriction on those recipients. *Id.* at 861.

The Court overrules these objections. There is no *cy pres* component in the Proposed Settlements or in the proposed plan of distribution. The plan aims to compensate only individual qualifying claimants with settlements on a *pro rata* basis, and none of the funds revert to the settling defendants. Motion for Final Approval, Docket No. 7158, at 12; Docket No. 7304 at 37. The only provision in the plan that would permit payment to persons other than a class member claimant is a provision that any residual funds remaining at the close of the claims process would be subject to further distribution in the Court's discretion. *Id.* Therefore, *Dennis v. Kellogg* is inapposite.

The Court also received other objections that requested more time to find out about the case or requested a claim form. To the extent these are considered proper objections, they are overruled.

## B.      Objections to Release Provisions

Illinois and Washington raise the same objections to final approval of the Round 2 IPP Settlements as they did in opposition to preliminary approval of the Round 1 Settlements. *See* Docket No. 4493. South Carolina, in an amicus brief, joins Illinois and Washington's Objection. *See* Docket No. 7250. The crux of the Illinois, Washington, and South Carolina objections is that the IPPs are risking the class members' recovery by pursuing injunctive but not monetary relief, due to potential claim preclusion and the settlements' covenants not to sue. They also argue that the IPPs do not have authority to release state-law injunctive relief claims. The States request, as they did in the Round 1 settlement process, that their consumers be removed from the class definition or, at the very least, that the Court only approve the settlements after receiving the parties' assurances that their settlements will not preclude the States' class members' monetary recovery.

With respect to these States' request that their consumers be removed from the class definition, the Court denies this request. The Court previously rejected identical requests by Illinois and Washington in connection with Round 1 Settlements, *see* Order Denying States of Illinois and Washington's Motion to Modify the IPP's Class for Injunctive Relief ("Modify Order"). *See* Docket No. 4715. The Court concluded that the IPP injunctive-relief class will not preclude future claims by Illinois

8

United States District Court
For the Northern District of California

1    and Washington residents and that modification of the class is therefore not warranted.  *Id*.  The Court

2    based its reasoning on the general rule that a class action suit seeking only declaratory and injunctive

3    relief does not bar subsequent individual suits for damages, *see Hiser v. Franklin*, 94 F.3d 1287, 1291

4    (9th Cir. 1996), as evidenced by the individualized factual showing necessary to establish monetary

5    relief, but not required to establish injunctive relief, and the limited procedural protections offered by

6    Rule 23(b)(2).[7]  For the same reasons, the States' objection to the final approval based on its request that

7    the IPP class be modified to exclude their citizens will be overruled.

8           The parties dispute what language should be included in the final approval order to  characterize

9    the release provisions in the Settlement Agreements, and each suggests language to be included.  *See*

10   Docket Nos. 7171-1 and 7321.  At the Fairness hearing, held on November 29, 2012, the parties

11   discussed the release provisions, and Settling Defendants made certain representations with respect to

12   the release provisions of Settling States.   Defendants represented that the release of the injunctive class

13   claims would not affect damages actions by states which are not within one of the defined IPP damages

14   classes, even if they are included in the nationwide injunctive relief class.  *See* Docket No. 7304 at 19.

15   Defendants further clarified that this included the *parens patriae* claims by such states not part of an IPP

16   damage class.  *Id*. at 21.  With respect to non-Settling States which are within a defined damages class,[8]

17   the issue is vigorously disputed.  IPP Counsel and Settling States urge the Court to use the same language

18   from the final approval order of the Round 1 Settlements, while Settling Defendants distinguish

19   themselves from the Round 1 Defendants in that AUO, LG, and Toshiba, unlike the Round 1 Defendants,

20   have not stipulated that their Settlement Agreements would have no preclusive effect on *any* claims

21   brought by a non-Settling State.   *See* Docket No. 7398, n.3.[9]  Although the parties agreed to discuss the

22

23          [7]The Court observed that Rule 23(b)(2) classes are mandatory and do not require that class
24   members be given notice or the ability to opt out.

25          [8]The following states are non-Settling States which are part of an IPP damages class: Arizona,
     District of Columbia, Hawaii, Iowa, Kansas, Maine, Massachusetts, Mississippi, Minnesota, Nevada,
26   New Mexico, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, and Vermont.

27          [9]In the Round 1 Settlements, the parties clarified, at the January 20, 2012 hearing, what state
     claims would and would not be released.  For example, IPP Counsel clarified that "no claims of any kind
28   for any nonsettling state, including Oregon, Washington, and Illinois, are being released for proprietary
     state claims or for injunctive relief claims or for *parens patriae* or damage claims," but class members

9

matter and present the Court with a stipulation suggesting language agreed upon by the parties, the Court has not received any such stipulation or proposed language.

The Court concludes that assurances made at the November 29, 2012 hearing resolve the issues that Illinois, Washington, and South Carolina raise in their objection, and their objections are thus overruled. The Court also finds that the language Settling Defendants propose is sufficient in light of the plain language of the Settlement Agreements. The Court makes this determination with reference to the assurances Defendants made at the November 29, 2012, hearing that monetary claims, including *parens patriae* claims, of the Settling States who were not part of a defined damages class would not be released. With respect to non-Settling States who are part of a defined damages class, as identified in this Court's class certification Order, the Court expects that the Settlement Agreements exclude from release *parens patriae* claims. To the extent Defendants take a different view, they can resolve that dispute in the courts of those states. Accordingly, the Court's characterization of release provision will reflect the language used in the Settlement Agreement, with reference to the assurances made in the November 29, 2012, hearing.

### C. Conclusion re Fairness of Settlement

Having considered both the parties' and the objectors' arguments as well as the *Hanlon* factors, with a view to the complex and voluminous nature of this MDL litigation (see discussion of factors below), as well as the excellent result, the Court concludes that the settlement is fair, reasonable and adequate, and that IPPs have satisfied the standards for final approval of a class action settlement under federal law.

## II. Attorneys' Fees

The Court next addresses the motions and objections relating to an award of attorneys' fees, expenses and incentive awards. As indicated above, the Court appointed a Special Master to aid in determining the proper awards. In the Court's Amended Order Appointing Martin Quinn as Special

were "releasing their individual claims for injunctive relief under state law." Docket No. 4659 at 9-10.

United States District Court
For the Northern District of California

Master, *see* Docket No. 6580, the Court stated it would review "findings of fact made or recommended by the Special Master for clear error" and review "*de novo* any conclusions of law made or recommended by the Special Master . . ." pursuant to Fed. R. Civ. P. 53(f)(3). In addition, "[t]he Court will set aside the Special Master's ruling on a procedural matter only for an abuse of discretion." *Id.* The Court notified parties of its intent to file an amended order appointing Martin Quinn as Special Master, and ordered all parties who objected to the Proposed Order appointing him to file objections with the Court. *See* Docket No. 6500. This Proposed Order included the same standard for legal review standard as identified in the original order appointing a special master. No objections were received.

### A. IPP Class Counsel Fees

#### 1. Total Fee Awarded - Objections

IPP class counsel seek an award of 28.5% of the settlement fund. The Special Master concluded, after an exhaustive analysis of factors to be considered in determining fee awards, that an amount of $308,225,250, representing 28.5% of the Settlement Fund, was fair and reasonable. The Court received several objections to the amount of the fee award from class members who asserted various arguments, some of which are discussed below.

The Ninth Circuit has held that in a class action, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th Cir.1999). The judge is obligated to ensure that any fee award is fair and reasonable. *Staton v. Boeing Co.*, 327 F.3d 938, 963–64 (9th Cir.2003). In common fund cases in the Ninth Circuit, the "benchmark" award is 25 percent of the recovery obtained, with 20–30% as the usual range. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). As the *Vizcaino* court noted, the 25% benchmark rate is a starting point for the analysis, and the selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case, including the result achieved, the risk involved in the litigation, the skill required and quality of work by counsel, the contingent nature of the fee, awards made in similar cases, and the lodestar crosscheck. *Id.* at 1048–50.

In this case, the Court recognizes that the ultimate result achieved by IPP counsel, a settlement

United States District Court
For the Northern District of California

of approximately $1.08 billion in cash, is exceptional.  This represents approximately 50% of the potential recovery, according to IPP's damages experts.  No amount will revert to defendants, and there is a low probability of any unclaimed funds remaining.  *Cy pres* distribution is not an issue.  Moreover, the amount that individual claimants will receive is excellent.  As discussed above, from current estimates, which will change based on the ultimate case administration costs and investigation of further claims, claimants may receive payment in the range of $64 per monitor or laptop, or $128 per TV.[10]  The Court also recognizes the not-insignificant risk involved in litigating the claims at issue.  Although some risk was lessened on account of parallel criminal price-fixing charges and guilty pleas, other factors complicated the IPP's case.  Assessment of damages involved a difficult analysis, which required taking into account the impact of and relationship between federal and state rules concerning damage analysis, as well as constitutional limitations on duplicative damages, if any.  Additionally, this case implicated provisions of the FTAIA in relatively unprecedented ways.  In grappling with these complicated issues, IPP counsel prosecuted this action for six years, advancing large amounts of money to fund the many and expensive costs of litigation, with no guarantee of payout at the end.  The Court considers all of these factors in making its assessment of whether to adjust the benchmark award.

Courts often compare an attorney's lodestar with a fee request made under the percentage of the fund method as a "cross-check" on the reasonableness of the requested fee.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1050 ("[T]he lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted [and] may provide a useful perspective on the reasonableness of a given percentage award.").  The Special Master calculated a lodestar cross-check and determined that the lodestar (total hours reduced by 20% for possible inefficiencies, adjusted to reflect reasonable blended billing rates, and subject to multipliers ranging from negative to positive based on quality of work, and averaging between 2.4-2.6) was within 1% of the requested 28.5% of the fee award.  The Court agrees with the Special Master that this independent lodestar analysis corroborates the appropriateness of a 28.5% fee award.  Accordingly, considering the factors noted above, the Court concludes that an award of 28.6% of the

---

[10]The estimates provided were based on assumed amounts of attorneys' fees and expenses which differ somewhat from the awards actually made in this Order.  A calculation based on the amounts actually awarded in this Order, however, does not materially change the amount of the expected distribution payments.

United States District Court
For the Northern District of California

1    Settlement Fund should be awarded as it represents a reasonable and fair amount[11]

2         The Court's decision takes into account all of the objections received to the fee award.  The

3    primary objection all objectors raised was that 28.5% of the settlement fund for attorneys' fees is

4    excessive.  Many objectors argued that the percentage should stay under the 25% benchmark identified

5    in *Vizcaino*, with some objectors arguing that the Court must reduce the award or use a sliding scale

6    model due to the size of the Settlement Fund and to avoid a windfall for the attorneys.  The Court has

7    specifically considered the size of the fund and whether its recommended award would inappropriately

8    provide a windfall for attorneys.  *See* Transcript of Fee Hearing, Docket No. 7614 at 39-40.  Having

9    reviewed other cases involving large Settlement Funds, the Court finds that its award is proper and fair

10   in light of the amount and quality of the work done by the attorneys in this case.  *See Allapattah Services*

11   *v. Exxon Corp.*, 454 F.Supp. 2d 1185 (S.D. Fla 2006) (awarding 31.5% of a settlement fund of $1.06

12   billion and citing fourteen cases involving settlement funds between $40-696 billion with fee awards

13   between 25-35% of the fund); *see also Craft v. County of San Bernadino*, 624 F.Supp. 1113, 1125 (C.D.

14   Cal 2008) (noting that the fee award of 25% of the fund is substantially below the average class fund fee

15   nationally).  Although the different mega-fund cases involve varying degrees of complexity and risk, the

16   Court is convinced that the complexity of this case merits the 28.6% fee award.  Some objectors

17   challenge the Special Master's finding regarding the complexity of the case as well as the degree of risk

18   assumed by counsel, given that defendants' liability had effectively been established.  However, as

19   discussed above, these cases presented issues beyond liability which were significant, complex and

20   numerous, and the risk assumed was substantial enough to justify an upward adjustment of the 25%

21   benchmark.  Moreover, the excellent result obtained through the Settlements warrants an award of 28.6%

22   of the Settlement Fund.  *See In re Bluetooth Headset Prod. Liab. Litigation,* 654 F.3d 935, 942 (9th Cir.

23   2011) ("[f]oremost among these considerations, however, is the benefit obtained for the class.").

24   Additionally, objectors challenged the Special Master's methodology in calculating the fee award.  As

25   discussed above, the Court finds that the Special Master's use of the percentage of the fund method, with

26   _____

27        [11]The Special Master ultimately recommended $308,225,250, or 28.5% of the Settlement Fund.  *See* Docket No. 7375.  Because the Court concludes that the Special Master erred in reducing the Gray Plant firm's allocation by $1.5 million, this amount will be added to the total attorney fee award.  This

28   results in an overall award of $309,725,250, which represents 28.6% of the Settlement Fund.

13

a lodestar cross-check, was proper.  Accordingly, the Court overrules all of the objections received, including those mentioned above and other various challenges.

### 2.    Allocation of Fees Among IPP Class Counsel

In addition to determining the amount of the total fee award, the Special Master was tasked with determining the allocation of the fee award among the 116 law firms that contributed to this litigation. On November 9, 2012, the Special Master issued a Report and Recommendation allocating the total fee award.  *See* Docket No. 7127.  To determine the amount of the fee award allocated to each firm, the Special Master employed the following methodology.  First, he used the lodestar analysis for each firm reduced by 20% to eliminate inefficiencies.[12]  Second, he examined the reasonableness of each firm's "lodestar - 20%" by reviewing its declaration and the spreadsheet from each firm which broke down the total hours spent by each lawyer by year and among 13 different tasks.  He considered whether the firm's blended and individual billing rates were excessive, whether the hours spent were reasonable for the tasks described in the declaration, whether the number of lawyers and paralegals for each firm was efficient, and whether each kind of task was performed by lawyers at appropriate billing rates.  He capped individual billing rates at $1,000/hr and applied a maximum of about $350/hr for document review,[13] with some leeway.  He then adjusted each firm's reported lodestar to correct for any excessive billing.  Third, he applied multipliers to the adjusted lodestar figures based on certain factors.  Factors meriting an upward adjustment include: contribution to the joint IPP effort, as opposed to work performed solely for an individual client; performing higher-skill tasks (e.g., taking depositions); paying expense assessments timely and in full; demonstrating efficiency; high quality of work as reported to the Special Master by lead and liaison counsel.  Factors meriting a downward adjustment include: excessive recorded hours; failure to submit a declaration; performing largely document review; failure to act professionally and

---

[12]IPP counsel requested an overall 20% reduction to eliminate inefficiencies for the entire group, but the Special Master did not agree that every firm's billings warranted a 20% cut.

[13]Defendants in this action were Korean, Taiwanese and Japanese companies.  Most of the original documents and records in the case were in languages which required translation for use in this court.  Similarly, many of the witnesses provided testimony in languages which required interpreters for use in this court.  Language alone posed a significant and expensive burden on prosecution of these cases.

**United States District Court**
For the Northern District of California

collaboratively to prosecute the joint IPP effort; billing for inconsequential tasks (e.g., reading ECF filing entries); paying assessments late or not at all; performing unimportant or poor quality work as reported by lead and liaison counsel. The Special Master noted that he seriously considered the confidential recommendations he received from co-lead and liaison counsel, as well as the input from other counsel and mediators.

Fifteen law firms objected to this report. The Special Master considered these objections and issued a Supplemental Report on December 18, 2012, *see* Docket No. 7375, revising his proposed allocation based on new information and perspectives gained by interviews with each of the objecting firms and consideration of additional declarations, documents, and analyses. In the Report, the Special Master declined to award a higher total fee to class counsel, he affirmed his use of lodestar and multipliers to determine allocations, and he made adjustments to his original allocation. Specifically, he noted that he (1) did not give sufficient weight in the original allocation to the amount and timing of each law firm's contribution to the litigation fund, and made appropriate adjustments, (2) he did not "adequately appreciate" that varying levels of document review that took place, and thus made adjustments based on the type of document review performed, and (3) realized it was inappropriate to reduce every firm's lodestar by 20%. On this last point, he made the following adjustments: for firms with lodestars under $100,000, he used their full lodestar and multipliers in the 1.2 to 1.3 range; for firms that performed virtually only document review, he applied multipliers in the 1.4-1.6 range, depending on the complexity of document review; for firms that performed more complex work, he applied multipliers in the 1.7-1.9 range; for core firms driving the IPP case, he applied multipliers in the 2.0-2.75 range; and for lead and liaison counsel, he applied multipliers in the 3.24-4.24 range.

Seven firms objected to the Special Master's Supplemental Report. Some arguments common to the objecting firms include challenges to the Special Master's methodology in determining the allocation, including his use of the lodestar method as well as multipliers; assertions that specific factual findings were in error; and claims that the Special Master arbitrarily decided fee awards. Additionally, the Court received requests from a few other firms to be heard in the event the Court decided to reduce their fee awards from what the Special Master had recommended. The Court first discusses these general objections and then addresses specific issues involving certain objecting firms.

United States District Court
For the Northern District of California

a.      General objections to methodology, factual findings

The Court reviews the Special Master's overall methodology for an abuse of discretion.  *See* Docket No. 6580, ¶ 18; *Cook v. Niedert,* 142 F.3d 1004, 1010 (7th Cir. 1998) (discussing district court's rejection of Special Master's method in calculating attorneys' fees and stating that the choice between the lodestar and percentage-of-fund methods is "neither a question of law nor of fact").  The Court concludes that the Special Master's overall methodology in determining the allocation of the fee awards was correct.  His use of the lodestar method, including the use of multipliers, to determine the allocation of fees among the law firms involved was entirely proper in view of the circumstances of this case.  *See In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295-97 (9th Cir. 1994) (noting that a district judge has discretion to use the lodestar or the percentage of fund method, depending on the particular circumstances of the case); *Hanlon*, 150 F.3d at 1029 (citations omitted) (courts have discretion to use the lodestar method in awarding attorney's fees).  The Ninth Circuit has long accepted the use of the lodestar method to allocate fees in class actions. *Rodriguez v. West Publ'g Corp*., 563 F.3d 948, 967 (9th Cir. 2009); *Fischel v. Equitable Life Assur. Soc'y of United States*, 307 F.3d 997, 1006–07 (9th Cir. 2002).  The fact that the percentage of the fund method may be used in other cases does not mean it is the best method available to use here.

Additionally, the Court overrules general objections to the Special Master's factual findings.  Reviewing each of these findings for clear error, including claims by many of the objecting firms, the Court concludes that the Special Master's findings were accurate and supported by the record, including the time records submitted.[14]  The Court also overrules objections that the Special Master arbitrarily awarded fees.  To the contrary, his analysis and his reasoning in allocating the fees were meticulous and purposeful.  The Court recognizes that fee awards were adjusted, after review, in his Supplemental

---

[14]The Court notes that it does not condone the practice of charging for merely attending related trials for weeks on end.  While it may be useful for counsel in one case to attend a related trial for limited periods of time or to observe key witness testimony, this does not justify merely sitting in on a trial day after day, absent specific client request.  This Court observed many counsel in court, merely observing, during the lengthy criminal trial against AUO.  Some observing counsel represented various of the co-defendants in these cases; some were IPP class counsel.  The Special Master did not reduce any hours on this basis in determining fee allocations, and neither does this Court, in light of the fact that the fee allocations were based on a rational and complex balancing of relative contribution to the outcome.  However, the practice appears to the Court to be more costly than useful.

Report.  After reviewing the Supplemental Report and the reasons why certain distributions were changed, the Court finds that fees were awarded rationally and fairly, and not arbitrarily.

### b.  Allocation to Zelle Hoffman

The Special Master's Supplemental Report recommends a fee award of $75 million to Zelle, Hoffman, Voelbel & Mason.  This is the single largest fee recommendation, almost twice as much as the next highest recommendation, and reflects the single largest multiplier.  For all the reasons set out by the Special Master in his original and supplemental reports, this Court concurs that Zelle, Hoffman contributed significantly, continuously and consistently to the prosecution and ultimately to the success of this litigation, and the Court concurs in the fee recommendation.  Zelle Hoffman objects to the Supplemental Report, which reduced the original recommendation from $80 million to $75 million, based on the Special Master's evaluation of relative contributions of and appropriate multipliers for all the 116 IPP firms.  However, this Court has reviewed and concurs with the Special Master's analysis, and therefore overrules Zelle Hoffman's objection.

### c.  Allocation to Alioto

The Special Master's Supplemental Report recommends a fee award of $47 million to The Alioto Law Firm.  This is the second largest fee recommendation.  A number of issues have been raised with respect to Alioto's recommended fee award, and the Court addresses the following issues: (1) Fee Sharing Agreement alleged by Alioto, (2) Alioto's claim that the Special Master relied on impermissible hearsay, and (3) two liens asserted against Alioto.

**Fee Sharing Agreement:**  Alioto and Francis Scarpulla of the Zelle Hoffman firm dispute the existence of a fee-splitting agreement, by which their firms would split all attorneys' fees 50/50.  After reviewing their submitted pre-hearing briefs and conducting a hearing, the Special Master concluded that Alioto had not carried his burden of demonstrating that the parties had a meeting of the minds on a definitive agreement.  *See* Docket No. 7375 at 20.  He also concluded that even if a definitive agreement had existed, it would likely be unenforceable.

Alioto objects to the Special Master's findings and contends that there is written documentation

1   confirming the existence of a formal agreement to split the fees 50/50.  Having reviewed the evidence,

2   the Court finds that Alioto has failed to demonstrate the existence of such an agreement.  At most, Alioto,

3   through the evidence submitted, has demonstrated that an agreement to split the fees and labor was

4   contemplated, but ultimately, any such agreement was to have been a fee split subject to the firms doing

5   an equal amount of work and an equal contribution to the litigation.  *See* Moore Decl., Exh. A. at 4.

6   Moreover, there is a dispute as to the terms of the agreement even within the evidence Alioto cites in his

7   Objection.  *See* Docket No. 7556-2, p. 17 ("Joe: I just read your last sentence; as I have told you at least

8   10 times before, including several emails, there was no such agreement as you have stated it and I cannot

9   and wilk [sic] not confirm anything of the sort.").  In any event, even if an agreement, as defined by

10  Alioto, existed, it would likely be unenforceable.  Both federal law and California law require that any

11  fee-allocation agreement among attorneys that are not members of the same firm be in writing and signed

12  by the clients, and be made in proportion to the services performed and responsibilities assumed.  *Agent*

13  *Orange*, 818 F.2d at 220 (citing ABA Code of Professional Responsibility, DR 2-1-7(A)); *Mark v.*

14  *Spencer*, 166 Cal.App.4th 219 (2008); *Chambers v. Kay*, 29 Cal.4th 142 (2002); Cal. Civil Code § 1624

15  (Cal. Statute of Frauds, requiring that contracts not to be performed within one year be in writing and

16  signed by the party to be charged).  Alioto notes that in a class action, it would be impractical to have all

17  class members consent to the agreement, but here no plaintiff was even informed of any fee-splitting

18  agreement.

19      The Court finds that Alioto failed to satisfy his burden of establishing that an agreement was

20  formed with sufficient particularity to be enforceable, let alone that the an agreement was formed to

21  divide fees 50/50 unconditionally.

22      **Impermissible Hearsay:** The Court rejects Alioto's claim that the Special Master relied on

23  impermissible hearsay in violation of FRE § 807.  The Special Master conferred with Alioto and other

24  IPP class counsel in determining the best and fairest procedure to collect and analyze fee information

25  from the 116 law firms, in order to allocate the fees.  Alioto does not indicate that he objected to the

26  Special Master's procedure at that time or that he had concerns with particular issues of hearsay.

27  Moreover, the Court's Amended Order appointing Martin Quinn as Special Master specifically provided

28  for the use of *ex parte* communications to facilitate the Special Master's duty in allocating the funds.

1   Alioto made no objection to the Order at that time nor did he indicate any potential concerns with issues

2   of hearsay or to the Special Master's reliance on *ex parte* communications with mediators.  Accordingly,

3   the Court overrules Alioto's hearsay objections.

4   **Lien by Alexandra Brudy:** Alexandra Brudy filed a Notice of Lien on November 29, 2012,

5   asserting a lien against Mr. Alioto  for $345,164.69, plus $59.92 per diem interest, arising from an

6   original August 28, 1991 judgment ("Original Judgment") for failure to compensate Daniel Mulligan for

7   legal work he had performed.  Mulligan assigned the rights from the Original Judgment to Brudy as part

8   of their dissolution proceedings in December of 2005.  The Original Judgment was twice renewed, once

9   by  Mulligan on August 27, 2001, and a second time by Brudy on May 18, 2011.  Alioto filed an

10  opposition to the Notice of Lien on December 31, 2012, challenging the lien on three grounds: (1) that

11  Brudy failed to prosecute the action; (2) that the statute of limitations has expired; and (3) that the Notice

12  of Lien was not filed by the original Judgment Creditor (Mr. Mulligan).  Alioto also filed a Motion to

13  Strike the lien on January 29, 2013, which was denied in a separate order.

14  The Court retains jurisdiction to enforce this money judgment under Fed. R. Civ. P. § 69(a) and

15  concludes that the lien is valid.  Alioto's arguments to the contrary are not persuasive.  First, because Ms.

16  Brudy holds a final judgment against Alioto, his assertion regarding her failure to prosecute is

17  inapplicable.  California Code of Civil Procedure section 583.130, cited by Ms. Brudy in her Reply,

18  addresses dismissal for failure to proceed with reasonable diligence only in the context of pending

19  actions, not actions for which a final judgment has been issued.  Second, Alioto's contention that the

20  statute of limitations has invalidated Ms. Brudy's judgment fails because the Original Judgment, valid

21  for 10 years following the date of entry (August 28, 1991), has been timely renewed twice, once on

22  August 27, 2001 and again on May 18, 2011.  *See*  Cal. Code Civ. Proc. § 683.020 (a money judgment

23  is enforceable for a 10-year period following the date of entry);Cal. Code Civ. Proc. § 683.120 (a

24  judgment creditor may renew the judgment by filing an application for renewal prior to the end of the

25  10-year period); *see also OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 168

26  Cal.App.4th 185, 191 (Cal. App. 2008) (the renewal does not create a new judgment or modify the

27  present judgment, but merely extends the enforceability of the judgment).  Therefore, Ms. Brudy is not

28  barred from enforcing the Original Judgment against Mr. Alioto by any statute of limitations.  Lastly, that

the Notice of Lien was not filed by the original judgment creditor, Mr. Mulligan, is irrelevant. "A judgment creditor may assign the right represented by a judgment to a third person." Cal. Civ. Code § 954; *Great Western Bank v. Kong*, 90 Cal.App.4th 28 (2001); *Fjaeran v. San Bernadino Cty. Bd. of Supervisors*, 210 Cal.App.3d 434, 440-41 (1989) (upon execution and delivery to the assignee of a written assignment of the rights represented by the judgment, the judgment is perfected and becomes enforceable against third persons). Having assigned the judgment against Alioto to Ms. Brudy through dissolution proceedings, Ms. Brudy may properly enforce the August 1991 judgment against Alioto.

Accordingly, the Court directs the Settlement Funds Administrator to distribute from Alioto's fee allocation to Alexandra Brudy at c/o Craig P. Bronstein, Esq., LANAK & HANNA, P.C., 625 The City Drive South, Ste. 190, Orange, California 92868, the amount of $345,164.69, which represents the Original Judgment amount of $100,000 plus fees, costs, and interest at 7% per annum through November 29, 2012, the date the lien was filed.

**Lien by LFG Capital**: LFG National Capital, LLC ("LFG") claims it holds a perfected first lien security interest in all assets of Alioto's firm, including any fees, costs or other amounts due to Alioto as a result of this litigation. *See* Docket No. 7568. This security interest arises out of a loan agreement between LFG and Alioto, upon which LFG asserts Alioto has defaulted numerous times. *Id*. LFG has filed a motion requesting that the Court enter an order directing that the Settlement Fund Administrator pay to LFG "all sums representing fees and costs of the Alioto Law Firm and/or Joseph M. Alioto . . . up to the amount presently due and owing under the Term Loan and Security Agreement between LFG and the Alioto Law Firm." *See* Docket No. 7671. LFG estimates this amount to be $28,264,324.93. Alioto denies that he is indebted to LFG for $28.2 million, disputes factual statements and legal claims made by LFG's counsel, and argues that the loan between LFG and his firm, and associated security interests associated with the loan, are not properly before this Court. *See* Docket Nos. 7589 and 7606.

The Court concludes that, even assuming this Court is the proper forum to adjudicate this dispute, a finding it is not ready to make, the Court is not prepared to issue a decision without further briefing and a hearing. Accordingly, in order to avoid delaying the final approval of the IPP Settlements, the Court will issue a separate Order addressing the dispute between LFG and Alioto.

20

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

####     d.        Allocation to Gray, Plant, Mooty, Mooty & Bennett

The Special Master originally awarded Gray, Plant, Mooty, Mooty & Bennett $14 million, but subsequently reduced this amount to $12.5 million by reversing the 20% lodestar discount for the firm and applying a lower multiplier of 3.73 (as opposed to the original 5.22). The Special Master reasoned that the 5.22 multiplier was "substantially in excess of any other firm" and could not be justified. *See* Docket No. 7375, at 23.

The Court is mindful of the Special Master's diligence in allocating the fee awards, but disagrees with the finding that the higher multiplier was not justified. The Court is aware of the significant contribution that the Gray Plant firm has made to this litigation and notes that its contributions were all substantive. Accordingly, the Court awards the Gray Plant firm the original fee allocation identified by the Special Master in the amount of $14 million.

####     e.        Allocation to Winters

Lingel Winters asserts that he and Thomas Girardi of the Girardi & Keese firm entered into a fee-splitting agreement by which they would split fees 50/50. The Special Master concluded that Winters and Girardi did, in fact, have an agreement, signed by their client, to split fees. However, the Special Master concluded that the agreement was not enforceable because the parties had not disclosed it to the court, at the latest, when the parties petitioned for fees. The Special Master cited *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 226 (2d. Cir. 1987), and *Wanninger v. SPNV Holdings, Inc.*, No. 85-C-2081, 1994 WL 285071 at *2 (N.D. Ill, June 24, 1994), for the proposition that lawyers who enter into fee-splitting agreements in class actions must inform the class action court of the terms of the agreement at the first opportunity after it is made, or at least at the time of filing a petition for approval of the settlement. Docket No. 7375, 17:22-18:2. In his objection, Winters asserts that the Special Master erred in finding that Winters had not disclosed the fee-splitting agreement to the Court.

The Court concludes finds that, as the Special Master concluded, Winters and Girardi did, indeed, enter into a written contract, signed by their client, to split fees. *See* Docket No. 6635-6. However, it does appear that Winters did disclose the agreement to the Court at the time a petition for fees was filed. In the IPP Counsel Compendium of Declarations filed with the IPP Attorney Fee motion, Winters

included a copy of the fee-splitting agreement.  *See* Docket No. 6635-6.  Accordingly, the fee-splitting agreement is enforceable in this Court, and the Court awards Winters, who was awarded $1 million, and the Girardi Keese firm, which was awarded $3.5 million, each $2.25 million.

### f.    Allocations to Other Firms

With respect to the remaining objections received, the Court has considered them and concludes that the Special Master was correct in his allocations for these firms.

### B.    Settling States Fee

Settling States seek an award of approximately $11.054 million as attorneys' fees.  This represents just over 1% of the Settlement amount.  In his Report and Recommendation, the Special Master concluded that this amount was fair and reasonable, and the Court has not received any objections to this amount.  The  hours spent by the Settling States were reasonable and necessary. *See* Docket No. 7127.

In consideration of the Settling States' contribution to the Settlement and their excellent work, the Court awards Settling States their requested amount of attorneys' fees in the amount of $11,054,191.01.  The Settling States provided detailed summaries of their hours worked, and their billing rate are entirely reasonable; based on these findings, the fee request is proper and will be awarded as requested.

### C.    Fees for Objectors' Counsel

Three attorneys representing separate objectors or groups of objectors seek awards of attorneys' fees for their contributions to improvement of the Settlements.  Geri Maxwell, Andrea Kane/Pridham, and the Bradley objectors each filed a motion for attorneys' fees in varying amounts.  The Special Master reviewed and denied each motion, concluding that none of these attorneys had substantially benefitted class members. *See Vizcaino*, at 1051 (to be eligible to receive attorneys' fees, counsel for objectors must "increase the fund or otherwise substantially benefit the class members.").    Maxwell, Kane/Pridham, and the Bradley objectors each objected to the Special Master's findings.   The Court reviews these objections individually.

22

United States District Court
For the Northern District of California

### 1.     Maxwell

George G. Cochran, a lawyer from Louisville, Kentucky representing Geri Maxwell,[15] seeks provisional approval of attorneys' fees on grounds that Maxwell is directly responsible for the addition of a provision making trebled damages distribution mandatory in the Round 2 Settlements.  Cochran claims that the Maxwell objectors filed an objection to any *cy pres* distribution of excess funds without trebling damages to successful claimants, that he communicated the idea to Mr. Alioto, and Mr. Alioto brought it to the attention of class counsel to be included in the Round 2 Settlement.  The Special Master denied the motion and found that (1) plaintiffs already intended to distribute 100% of the Settlement fund, something on which Mr. Alioto claims he had always insisted, and (2) plaintiffs' intent was clearly expressed in court papers.

In his objection Cochran asserts that the Special Master misinterpreted the record and applied the wrong legal standard.  He also argues that the Special Master downplayed the distinction between an explicit versus implicit treble damages clause and that this was a substantial benefit to the class, as was potentially eliminating a *cy pres* issue.

Aside from determining whether or not including the treble damage award provision provided a substantial benefit to the class, the Court, having reviewed the record, is not persuaded that Maxwell was responsible for making explicit the treble damage clause in the Round 2 settlements.  Although Cochran claims his conversation with Mr. Alioto propelled IPP counsel to insert the clause, he has failed to provide any evidence that this was what transpired, and, to the contrary, the evidence provided suggests that Mr. Alioto had pushed for an all cash settlement, with no *cy pres* distributions, from the start.  The Court finds that the Special Master's recommendation was correct, overrules Maxwell's objection, and denies this motion for provisional approval of fees.

### 2.     Pridham-Kane

Attorney Grenville Pridham, counsel for objector Andrea Pridham-Kane, seeks attorneys' fees for enhancements to the class on the ground that her objections are responsible for (1) ensuring the

---

[15]Three of the four original Maxwell objectors have withdrawn their objections. Thus, only Geri Maxwell remains as an objector.  *See* Docket No. 7112.

1    settlement would explicitly state that there would be no meaningful *cy pres* distributions, (2) correcting

2    an improper notice provision regarding the attorneys' fees motion, and (3) requiring class counsel to

3    document their expenses.  Pridham-Kane also asserts that she has benefitted the class by preserving her

4    objections to the Court's jurisdiction.  The Special Master concluded that her first reason fails for the

5    same reason as identified in his discussion of the Maxwell objection.  With respect to the other two

6    assertions, the Special Master concluded that even if Pridham-Kane were responsible for these changes,

7    which he said was "far from clear," they were minor procedural changes that did not increase the

8    settlement amount or provide a substantial benefit to the class.

9         Pridham-Kane objects that the Special Master underestimated her contributions and asserts that

10   it cannot be assumed that she was not responsible for the changes.  She thus requests an evidentiary

11   hearing to the extent there is a question about whether she benefitted the class.

12        The Court finds no clear error in the Special Master's determination that Pridham-Kane was not

13   responsible for propelling IPP counsel to explicitly state there would be no substantial *cy pres*

14   distributions.  As the Special Master noted in his report regarding the Maxwell fee motion, Mr. Alioto

15   was firm in believing that there would be no *cy pres* component from the start and insisted on an all cash

16   settlement.  Even at the November 29, 2012 fairness hearing, IPP counsel confirmed that there would be

17   no meaningful *cy pres* distribution and that this had never been a *cy pres* settlement.  *See* Docket No.

18   7304 at 37-38.  As for the other matters that Pridham-Kane asserts she is responsible, the Court finds she

19   has not met her burden in establishing that she conferred a substantial benefit to the class.  *Vizcaino*, at

20   1051 (denying objectors fee motion based objectors' argument that they caused the court to require class

21   counsel to submit time records and that they brought about minor procedural changes in the settlement

22   agreement).  Accordingly, the Court denies Pridham-Kane's request for an evidentiary hearing, overrules

23   her objection, and denies her motion for fees.

24

25                      **3.      Bradley Objectors**

26        The Bradley objectors seek fees for their arguments advanced in opposition to the Special

27   Master's Report awarding attorneys' fees.  They claim that they made several non-duplicative, novel

28   arguments to benefit the class.  The Special Master noted that their motion is based on the possibility that

24

the Court will sustain their objection, and, in any event, found that no objection they raised was novel or unique.

The Court agrees with the Special Master's conclusion. In reviewing the Bradley objections to the Special Master's Report, the Court is not persuaded that the objectors raised any novel factual or legal argument. To the contrary, the Bradley objections raised a number of similar arguments as raised in the Maxwell and other objections. That some of those objections were filed after the Bradley's objections does not detract from the fact that they were not novel. In any event, because the Court overrules the objections raised by Bradley (and others), as discussed *supra*, Bradley objectors did not benefit the class, and are not entitled to attorneys' fees.

**III.    Expenses and Incentive Awards**

**A.    IPP Counsel**

IPP counsel seek $8,743,449.42 in expenses. In his original Report, the Special Master discounted IPP counsel's requested expenses by $329,385.01 due to high charges for overlapping experts as well as AT&T charges for certain conference calls. Upon reconsideration of additional evidence regarding the need for a second expert, however, the Special Master concluded that a second expert was, in fact, necessary and beneficial to the interests of the class, and approved the $324,385.01 in expert expenses, *see* Special Master's Supplemental Report, Docket No. 7298. He declined to award the $5,000 in charges for AT&T conference calls. Subsequently, the Special Master issued another Supplemental Report on February 13, 2013, Docket No. 7608, to correct an error made in his initial Supplemental Report, Docket No. 7298. He had inadvertently awarded $2,317.99 in charges that IPP Counsel had requested be reduced due to reductions in the charges that had occurred after IPP Counsel had submitted their motion for expenses. This last report corrected that error and awarded IPP Counsel a total of $8,736,131.43, representing the total amount IPP counsel requested, less $5,000 for AT&T conference call charges and $2,317.99 in deposition transcript charges that IPP counsel confirmed had been reduced. The Court received two objections to the Special Master's original Report that reiterated arguments raised by the same objectors to the award of attorneys' fees. They assert that the Special Master erred by treating fees separate from expenses as this will increase the percentage of money awarded over

United States District Court
For the Northern District of California

28.5%, and when the Ninth Circuit calculates a 25% benchmark, it combines total fees and expenses. *See* Docket No. 7178.

The Court overrules the objections and concludes that the Special Master was correct in awarding $8,736,131.43 in expenses to IPP counsel. *See Vizcaino*, 290 F.3d 1043 (calculating the 25% benchmark for attorneys' fees only).

## B.    Settling States

Settling States seek a total of $1,206,479.48 in expenses.[16]  The Special Master concluded this amount was reasonable, and no objections were received to this amount.

The Court concludes the Settling States' requested amount of $1,206,479.48 for expenses is reasonable and will award this amount to Settling States.

## C.    Incentive Awards

IPP Counsel request a total amount of $660,000 for incentive awards.  Specifically, they seek an award of $15,000 for each of the 40 court-appointed class representatives and $7,500 for each of the eight additional named plaintiffs.  The Special Master concluded that the total amount of $660,000 was reasonable for incentive awards, and no objections were received to this amount.  Additionally, counsel for some objectors request incentive awards for their clients who appeared for depositions.

The Court approves incentive awards of $15,000 to each of the 40 court-appointed class representatives, and $7,500 for each of eight additional named plaintiffs.  The Court recognizes the contribution these class representatives and named plaintiffs made to this litigation and finds the amounts requested are reasonable in light of these contributions.  The Court declines to grant incentive awards for objectors who appeared for depositions.

---

[16]The Settling States requested this total amount in two separate motions. *See* Docket Nos. 5157 and 6860.

**CONCLUSION AND JUDGMENT**

Accordingly, the Court directs entry of Judgment which shall constitute a final adjudication of this case on the merits as to the parties to the Agreements. Good cause appearing therefore, it is:

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The capitalized terms used in this Order have the meaning ascribed to them in the Agreements.

2.      The Court has jurisdiction over the subject matter of this litigation, and all actions within this litigation and over the parties to the Agreement, including all members of the IPP Classes, the Settling Plaintiffs, and the Settling Defendants, and any person or entity claiming by, for, or through the Settling Parties as regards the Released Claims.

3.      The definitions of terms set forth in the Agreements are incorporated herein as though fully set forth in this Judgment.

4.      The Court hereby finally approves and confirms the settlements set forth in the Agreements and finds that said settlements are, in all respects, fair, reasonable, and adequate to the IPP Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure and all applicable state laws.

5.      The following class is certified for settlement purposes only, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities in Arkansas who, from January 1, 1999 to December 31, 2006, as residents of Arkansas, purchased TFT-LCD Panels incorporated in televisions, monitors, and/or laptop computers in Arkansas indirectly from one or more of the named Defendants or Quanta Display, Inc., for their own use and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant in the Actions; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and their named affiliates and coconspirators.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.

6.      The following class is certified for settlement purposes only, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities in Missouri or Rhode Island who, from January1, 1999 to December 31, 2006, as residents of Missouri or Rhode Island, respectively, purchased

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TFT-LCD Panels incorporated in televisions, monitors, and/or laptop computers in Missouri or Rhode Island, respectively, indirectly from one or more of the named Defendants or Quanta Display, Inc., primarily for business use (and not for personal, family, or household use) and not for resale. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.

7.   The following class is certified for settlement purposes only, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

All persons and entities in Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, or Wisconsin who, from January 1, 1999 to December 31, 2006, as residents of the respective state, purchased TFT-LCD Panels incorporated in televisions, monitors, and/or laptop computers in the respective state, indirectly from one or more of the named Defendants or Quanta Display, Inc., for their own use and not for resale, and whose purchases bring them within the definition of the certified direct purchaser product class in this Multidistrict Litigation No. 1827 and who did not opt-out of that class. Specifically excluded from the Class are defendants; the officers, directors, or employees of any defendant; the parent companies and subsidiaries of any defendant; the legal representatives and heirs or assigns of any defendant; and the named affiliates and co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.

8.   Pursuant to Federal Rule of Civil Procedure 23(g), Class Counsel, previously appointed by the Court (Zelle Hofmann Voelbel & Mason LLP and Alioto Law Firm), are appointed as Counsel for the IPP Classes. These firms have, and will, fairly and competently represent the interests of the IPP Classes.

9.   The Indirect-Purchaser Plaintiffs' and Settling States' Notice of Exclusions (Docket No. 7070, filed October 29, 2012) states that no persons/entities have validly requested exclusion from any of the above-referenced settlement-only classes.

10.   The Court hereby dismisses on the merits and with prejudice the individual, *parens patriae*, governmental entity, and class claims asserted by the Settling Plaintiffs against the Settling Defendants, with Settling Plaintiffs and Settling Defendants to bear their own costs and attorneys' fees except as provided for in the Agreements. The foregoing language does not apply to the related action entitled *People of the State of California et al. v. AU Optronics et al.,* San Francisco Superior Court Case

United States District Court
For the Northern District of California

No. CGC-10-504651 ("the California State Court Action"). The California State Court Action is to be dismissed with prejudice in due course as to the Settling Defendants in compliance with the Agreements, and this Court will if necessary confer with the Honorable Richard A. Kramer to coordinate such dismissals.

11.     As to each Agreement, all persons and entities who are defined as Releasors, and any person or entity acting or purporting to act on behalf of one or more Releasors, are hereby barred and enjoined from commencing, prosecuting, or continuing, either directly or indirectly, against the persons or entities who are defined as Releasees, in this or any jurisdiction, any and all claims, causes of action or lawsuits, which they had, have, or in the future may have, arising out of or related in any way to any of the Released Claims as defined in the Agreement. This permanent bar and injunction is necessary to protect and effectuate the Agreements, this Final Judgment, and this Court's authority to effectuate the Agreements, and is ordered in aid of this Court's jurisdiction and to protect its judgments.

12.     As to each Agreement, the Releasees are hereby and forever released and discharged with respect to any and all claims or causes of action which the Releasors had or have arising out of or related in any way to any of the Released Claims as defined in the Agreement.

13.     The Court approves the releases set forth in the Agreements. Those Agreements define the scope of such releases. Without limitation on the foregoing, the Court notes that (i) the IPP nationwide injunctive class released claims do not include any claims for monetary relief; and (ii) nothing in the Agreements shall release any enforcement, proprietary, or injunctive claims of any state which is not a Settling State.

14.     The Court finds that the notice given to the IPP Classes of the settlements set forth in the Agreements and the other matters set forth herein was the best notice practicable under the circumstances. The Court further finds that said notice provided due, adequate, and sufficient notice of these proceedings and of the matters set forth herein, including the proposed settlements set forth in the Agreements, and that said notice fully satisfied the requirements of due process, the Federal Rules of Civil Procedure, and all applicable state laws.

15.     The Court finds that the Settling Defendants have served upon the appropriate State, federal and other officials a notice of proposed settlement that complies with the requirements of the

1   Class Action Fairness Act, 28 U.S.C. §§ 1711-15.

2        16.    The Court grants final approval to the Plan of Distribution set forth in the IPPs' and

3   Settling States' motion for final approval.

4        17.    Attorneys' Fees, Expenses and Incentive Awards:

5             A.    IPP Class Counsel Fees and Expenses

6        The Court awards a total amount of IPP Class Counsel attorneys' fees of $309,725,250, which

7   represents 28.6% of the Settlement Fund.  The Court also awards $8,736,131.43 for expenses incurred

8   by IPP Counsel.  Except as otherwise stated, all objections to the fee allocations are overruled.  The

9   attorneys' fees are to be distributed among 116 law firms as identified in the Special Master's

10  Supplemental Report and Recommendation, *see* Docket No. 7375, with the following exceptions:

11            1) The Gray, Plant, Mooty, Mooty & Bennett firm shall be awarded $14 million as

12  opposed to the $12.5 million recommended by the Special Master.

13            2) The fee sharing agreement between Lingel Winters and the Girardi firm will be given

14  effect, and therefore, the Court will award Lingel Winters and the Girardi Keese firm each $2.25 million.

15            3) With respect to the liens asserted against Joseph M. Alioto, the amount of $345,164.69,

16  which represents a judgment amount of $100,000 plus fees, costs, and interest at 7% annum as of

17  November 28, 2012, will be paid out of Alioto's $47 million fee award and will be directed to Alexandra

18  Brudy at c/o Craig P. Bronstein, Esq., LANAK & HANNA, P.C., 625 The City Drive South, Ste. 190,

19  Orange, California 92868.  Additionally, $28.2 million of Alioto's fee award shall be set aside in a

20  separate escrow account pending a determination of the validity and enforceability of the lien asserted

21  by LFG National Capital, LLC.  The Court will address this lien in a separate order.

22            B.    Settling States Fees and Expenses

23        The Court awards Settling States $11,054,191.01 in fees and $1,206,479.48 in expenses.

24            C.    Incentive Awards

25        The Court awards $15,000 for each of the 40 court-appointed class representatives and $7,500

26  for each of the eight additional named plaintiffs.

27        18.    The Court received objections to the Proposed Settlements from approximately 25

28  objectors.  The Court has carefully reviewed and considered each objection, and concludes that none of

**United States District Court**
For the Northern District of California

30

the objections raises any grounds to deny final approval to the Proposed Settlements, and accordingly the Court hereby overrules each of the objections.

19.     Without affecting the finality of this Judgment in any way, this Court hereby retains continuing and exclusive jurisdiction over: (a) implementation of these settlements and any distribution to class members pursuant to further orders of this Court; (b) disposition of the Settlement Funds as defined in each Agreement; (c) hearing and determining applications by the Indirect Purchaser Plaintiffs (*i.e.*, class representatives) for representative plaintiff incentive awards, attorneys' fees, costs, expenses, including expert fees and costs, and interest; (d) hearing and determining applications by the States Attorneys General for attorneys fees, costs, expenses, including expert fees and costs, and interest; (e) Settling Defendants until the Final Judgment contemplated hereby has become effective and each and every act agreed to be performed by the parties has been performed pursuant to the Agreements; (f) hearing and ruling on any matters relating to the plan of allocation of settlement proceeds; and (g) all parties and Releasors for the purpose of enforcing and administering the Agreements and Exhibits thereto and the mutual releases and other documents contemplated by, or executed in connection with, the Agreements.

20.     In the event that a settlement does not become effective in accordance with the terms of the relevant Agreement, then the judgment shall be rendered null and void and shall be vacated as to that Agreement, and in such event, all orders entered and releases delivered in connection herewith shall be null and void and the parties to that Agreement shall be returned to their respective positions *ex ante*.

21.     The Court finds, pursuant to Rules 54(a) and (b) of the Federal Rules of Civil Procedure, that Final Judgment should be entered and further finds that there is no just reason for delay in the entry of Final Judgment, as a Final Judgment, as to the parties to the Agreements. Accordingly, the Clerk is hereby directed to enter the Judgment of dismissal with prejudice as to Settling Defendants, forthwith.

**IT IS SO ORDERED.**

Dated: April 1, 2013

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

31