Janet I. Levine (CA Bar No. 94255)
Jason C. Murray (CA Bar No. 169806)
Joshua C. Stokes (CA Bar No. 220214)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA  90071
Telephone: 213-622-4750
Facsimile:  213-622-2690
Email: jlevine@crowell.com
        jmurray@crowell.com
        jstokes@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile:  202-628-5116
Email: jhoward@crowell.com
        jmurphy@crowell.com

*Counsel for Plaintiffs*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | MASTER FILE No. 3:07-md-1827 SI<br><br>Case No. 10-CV-4945<br>Case No. 10-CV-4572<br>Case No. 12-CV-4114<br>Case No. 11-CV-00058<br>Case No. 10-CV-00117<br>Case No. 09-CV-5840<br>Case No. 10-CV-4945 |
| This Documents Relates To:<br><br>*AT&T Mobility LLC; et cl. v. AU Optronics Corporation, et al.,* Case No. 09-v-4997-SI<br><br>*Best Buy v. AU Optronics Corp. et al,* Case No. 10-CV-4572<br><br>*Best Buy v. Toshiba Corp. et al* | **PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM PURSUANT TO FED. R. EVID. 702**<br><br>Date:   June 12, 2013<br>Time:  9:00 a.m.<br>Judge: Hon. Susan Y. Illston |

Case No. 12-CV-4114

*Costco Wholesale Corporation v. AU Optronics Corp. et al.*, Case No. 11-CV-00058

*Electrograph Systems, Inc. v. Epson Imaging Devices Corp. et al.*, Case No. 10-CV-00117

*Motorola Mobility Inc. v. AU Optronics Corp. et al.,* Case No. 09-CV-5840

*Target Corp, et. al.*, v. *AU Optronics Corp. et al.,* Case No. 10-CV-4945

# TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................................1

II.     FACTUAL BACKGROUND...............................................................................3

    A.     Dr. Bernheim's cartel overcharge analysis. ...........................................3

    B.     Dr. Fontecchio's technical opinion on electronics component
        manufacturing. ........................................................................................6

III.    ARGUMENT.......................................................................................................7

    A.     Legal standard. .......................................................................................7

    B.     Dr. Bernheim is well qualified to perform  an econometric analysis of
        cartel overcharges. ..................................................................................9

    C.     Dr. Fontecchio is well qualified for expert opinions on similarities
        between LCD panel manufacturing and microprocessor manufacturing. ...........9

    D.     Dr. Bernheim's opinion is reliable.......................................................13

    E.     Dr. Bernheim's rebuttal analysis considered defendants' experts'
        criticisms, and confirmed his opinions. ...............................................17

IV.     CONCLUSION .................................................................................................19

PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
    709 F.3d 872 (9th Cir. 2013) ...............................................................................................8

*Avila v. Willits Envtl. Remediation Trust*,
    633 F.3d 828 (9th Cir. 2011) .........................................................................................12, 13

*Bazemore v. Friday*,
    478 U.S. 385 (1986)........................................................................................................1, 8

*Claar v. Burlington N. R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ................................................................................................11

*Daubert v. Merrell Dow Pharm.*,
    43 F.3d 1311 (9th Cir. 1995) ...............................................................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)....................................................................................................1, 7, 8

*Diviero v. Uniroyal Goodrich Tire Co.*,
    919 F. Supp. 1353 (D. Ariz. 1996) .....................................................................................12

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*,
    124 F.3d 252 (1st Cir. 1997)...............................................................................................17

*Group Health Plan, Inc. v. Philip Morris USA, Inc.*,
    344 F.3d 753 (8th Cir. 2003) ..............................................................................................16

*Haller v. AstraZeneca Pharm. LP*,
    598 F. Supp. 2d 1271 (M.D. Fla. 2009)..........................................................................12, 17

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ...........................................................................................8, 9

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
    276 F.R.D. 364 (C.D. Cal. 2011)..........................................................................................8

*In re Aluminum Phosphide Antitrust Litig.*,
    893 F. Supp. 1497 (D. Kan. 1995)...................................................................................13, 16

*In re Bausch & Lomb, Inc. Contact Lens Solution Products Liab. Litig.*,
    MDL 1785, 2009 WL 2750462 (D.S.C. Aug. 26, 2009) .................................................17, 18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]

*In re High-Tech Emp. Antitrust Litig.*,
   2013 WL 1352016 (N.D. Cal. Apr. 5, 2013) ..............................................................................9

*In Re Linerboard Antitrust Litig.*,
   497 F. Supp. 2d 666 (E.D. Pa. 2007) ......................................................................................15

*In re Polypropylene Carpet Antitrust Litig.*,
   93 F. Supp. 2d 1348 (N.D. Ga. 2000) .......................................................................................8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 U.S. Dist. LEXIS 21696 ..................................................................................................8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 WL 124347 (N.D. Cal. Jan. 8, 2013) ...............................................................................1

*In re Vitamins Antitrust Litig.*,
   2003 WL 25951599 (D.D.C. March 21, 2003) .........................................................................9

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ................................................................................................................15

*Koken v. Black & Veatch Const., Inc.*,
   426 F.3d 39 (1st Cir. 2005) .....................................................................................................16

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..................................................................................................................8

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ..............................................................................................1, 14

*Oglesby v. Gen. Motors Corp.*,
   190 F.3d 244 (4th Cir. 1999) ..................................................................................................12

*Perez v. State Farm Mut. Auto. Ins. Co.*,
   C 06-01962 JW, 2011 WL 8601203 (N.D. Cal. Dec. 7, 2011) ...............................................12

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*,
   371 Fed. App'x 719 (9th Cir. 2010) ........................................................................................12

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) .................................................................................................8, 9

*Segar v. Smith*,
   738 F.2d 1249 (D.C. Cir. 1984) ..............................................................................................17

*Shreve v. Sears, Roebuck & Co.*,
   166 F. Supp. 2d 378 (D. Md. 2001) ...................................................................................12, 13

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
   709 F. Supp. 2d 821 (C.D. Cal. 2010) ....................................................................................12

iii

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ...................................................................................................10

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ....................................................................................................10

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ...................................................................................................................................7

## PRIOR RELEVANT ORDERS

- Order on Defendants' Motion to Exclude Expert Testimony of Janet S. Netz and William S. Comanor (Dkt. No. 4848), denying motion to exclude expert testimony of class experts.
- Order Denying Parties' Motions to Exclude Expert Testimony (Dkt. No. 7456), denying motions to exclude certain expert testimony of HannStar's experts Dennis Carlton and Edward Snyder, and Dell's expert Mohan Rao.

## I.    INTRODUCTION

Rather than question the qualifications of Plaintiffs' damages expert, Dr. Douglas Bernheim, or the reliability of his methodology, Defendants choose to challenge only his choice of one of several variables in his regression model—a microprocessor price index.  But Dr. Bernheim's choice of variables in his statistical model, which may differ from what Defendants' many experts would have chosen, is a quintessential "battle of the experts" for determination at trial; both sides' experts will present their regression results – one side with the variable, one side without the variable—and the jury will determine which was the more persuasive.  *See Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005) ("[A] regression analysis does not become inadmissible simply because it does not present every variable that is quantifiable and may be relevant to the question presented."(internal citation omitted)); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (noting that the weight to be accorded to a party's expert opinion should be decided by the jury at trial after "vigorous-cross examination" and the "presentation of contrary evidence.")  Defendants' motion is a classic attempt to usurp the jury's role at trial, and should be denied.

Courts have long recognized that while reasonable experts may disagree on the proper variables for a regression model, that disagreement does not justify exclusion before trial. *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (*per curiam*) (Brennan, J. concurring in part) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Obrey*, 400 F.3d at 695-96 ("It is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions and then determine the weight to accord the study's results."); *see also, In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 124347, *1 (N.D. Cal. Jan. 8, 2013) ("The Court finds that the experts' decisions about what data to use can be the subject of cross-examination, but it does not render the experts' models unreliable.").

The only real issue presented by this motion is whether Dr. Bernheim's choice of variables for his model is reliable.  As set forth more fully below, it is, and it clearly satisfies

1

*Daubert*.  Dr. Bernheim chose his variables (including the microprocessor price index) carefully and appropriately, and he extensively tested and confirmed his regression model using standard methods and exhaustive investigation.  He further confirmed the appropriateness of the microprocessor variable, by consulting with Dr. Fontecchio, a Professor of Electrical Engineering at Drexel University whose opinions Defendants also seek to strike, *despite the fact that he has already been qualified and testified as an expert in this very litigation.*  (*See, e.g.,* Ex. A, Direct purchaser class trial transcript, May 22, 2012, 440:18-445:18.)  And finally, as detailed exhaustively in his rebuttal report and in the additional depositions which followed, Dr. Bernheim conducted still further studies and exhaustive testing in response to the fusillade of criticisms of his model offered by Defendants' army of experts and confirmed that even if he used variables preferred by Defendants' experts (including Defendants' cost data which was tainted by the conspiracy) his chosen model was superior because it remained stable, reliable, and accurate.[1]  *Daubert* requires no more.

Faced with this unassailable wall of expertise and effort, Defendants attempt to parse from this lengthy process snippets of testimony shorn of time and all context to create a world where Dr. Bernheim supposedly "cherry picked" his variables and relied solely upon Dr. Fontecchio to do it.  Defendants are attacking a straw man; worse, their attacks entirely miss the point of *Daubert*.  Dr. Bernheim's qualifications to perform regression analysis are beyond cavil and are not at issue.  He exhaustively tested the variables he chose, including the microprocessor price index variable, and the law is crystal clear that whether a particular variable in a regression is the best among others is a question that goes to weight, not admissibility.  All the rest is background noise suitable for vigorous cross-examination at trial.

---

[1] *See* Ex. B, Bernheim Motorola rebuttal report, ¶¶ 2, 3 (identifying fifteen Defendants' experts who criticized Dr. Bernheim).

Exhibits cited are all concurrently filed with this motion along with the Declaration of Jason C. Murray in Support of Plaintiffs' Opposition.

PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]

Dr. Bernheim's analysis, including his reliance on the microprocessor variable, is therefore not unreliable as a matter of law. And Dr. Fontecchio is qualified to offer the narrow technical opinions at issue here. Defendants' *Daubert* motion should be denied.

## II.     FACTUAL BACKGROUND

Defendants seek to exclude testimony relating to microprocessors by Plaintiffs' economist, Stanford University economics professor Dr. Bernheim, as well as Plaintiffs' technical expert, Drexel University electrical engineering professor Dr. Adam Fontecchio. Defendants mischaracterize both of the opinions of Plaintiffs' experts. Properly characterized, the testimony of both experts is admissible in these cases.

### A.     Dr. Bernheim's cartel overcharge analysis.

Plaintiffs tasked Dr. Bernheim with determining whether the cartel caused the prices of LCD panels to rise during the conspiracy period. To do that, Dr. Bernheim conducted an empirical analysis using regression techniques to determine the relationship between (1) LCD panel prices and (2) important supply and demand factors that were both relevant to LCD panel prices and unaffected by the global conspiracy. (*See, e.g.,* Ex. C, Bernheim Motorola report, ¶ 79.) Using this relationship based upon the competitive periods before and after the cartel, he was able to predict what prices would have been during the cartel period, but for the cartel. (*Id.*) By accounting for the relevant market factors that affect price, the differences between the predicted prices and actual prices charged during the cartel can be reliably attributed to the cartel. (*Id.*) The purpose of selecting variables for inclusion in a prediction equation is to provide economically relevant data, unaffected by the cartel, which will permit the model to accurately assess supply and demand variations that impact prices. (*See id, ¶* 100.). Information that is not relevant will likely reduce the accuracy of the prediction; information that is affected by the cartel—such as the Defendants' cost data during the cartel period—will likely understate the effect of the cartel. (*See id.* at ¶98; Ex. B, Bernheim Motorola rebuttal report, ¶ 89.)

Dr. Bernheim pulled together the information that would properly reflect the monthly impact of supply and demand absent the cartel on LCD prices. (*See* Ex. C, Bernheim Motorola

report, Section IV.A.4 "Selection of supply and demand factors.") Dr. Bernheim originally looked to Defendants' cost data, but concluded that "…the underlying data are limited, and a close inspection raised concerns as to whether they adequately reflect either the level of the defendants' true economic costs or the variation in those costs over time." (Ex. C, Bernheim Motorola report, ¶ 117.) He explored models using Defendants' cost data, but concluded that including Defendants' data, which was likely affected by the conspiracy, would bias his estimates. (*See* Ex. B, Bernheim Motorola rebuttal report, ¶ 98.) Dr. Bernheim and his team also investigated the microprocessor price data, and determined it was reflective of costs encountered in the LCD panel business. (*See* Ex. C, Bernheim Motorola report, ¶ 110.) Most of all, Dr. Bernheim's empirical work showed that it performed well in the regression analysis.[2] (*See* Ex. C, Bernheim Motorola report, ¶ 127; Ex. B, Bernheim Motorola rebuttal report, ¶¶ 82-83, 143-49.)

Dr. Bernheim chose the variables used in his preferred statistical model, not Dr. Fontecchio or anyone else. (*See, e.g.,* Ex. C, Bernheim Motorola report, ¶¶ 97-102, ¶¶ 109-110.) Dr. Bernheim confirmed his results based on hundreds of hours of his own review. (Ex. D, Dep. of B. Douglas Bernheim, Jan. 30, 2012, at 43:16-44:11.) In particular, he assessed hundreds of alternative models before determining his preferred model, which uses the most reliable predictor factors and insures that any changes in market conditions across the benchmark and conspiracy periods that might impact price have been adequately taken into account. (*See, e.g,* Ex. C, Bernheim Motorola report, ¶¶ 109-117, 129-138, Figs. 17-23.)[3] Before issuing his opinion and damages estimates, Dr. Bernheim reviewed Dr. Fontecchio's technical summaries of the similarities between LCD panel manufacturing and microprocessor manufacturing. (*Id.* at

---

[2] Later, after the defendants' expert reports were submitted, it became clear to Dr. Bernheim that even they believed that microprocessor price data was relevant to the demand for LCD panels as well. (*See* Ex. C, Bernheim Motorola rebuttal report, ¶ 75.)

[3] *See also,* Ex. C, Bernheim Motorola rebuttal report, Section II.B.2.2 ("My analysis accounts for a broad range of supply and demand variables, and my conclusions are not sensitive to the addition of variables suggested by the Defense experts.")

PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]

¶¶ 110, 112.)  Although economists routinely evaluate technological factors in deciding which cost and demand variables to include in a statistical model, Dr. Bernheim consulted Dr. Fontecchio to gain the advantage of his technical expertise.  In determining that the microprocessor index was appropriate for his regression analysis, Dr. Bernheim relied on Dr. Fontecchio's descriptions of electrical engineering concepts and practices, but also on other sources, and in particular on his exhaustive analysis of alternative econometric models.  (*Id.* at ¶¶ 109-110.)  Once he was sufficiently confident in his preferred model, Dr. Bernheim chose that model using his professional expertise in analyzing cartel overcharges.  (*See, e.g.,* Ex. D, Dep. of B. Douglas Bernheim, Jan. 30, 2012, at 160:14-161:3).  Defendants do not challenge Dr. Bernheim's expertise in this motion, and they will have ample opportunity to cross examine Dr. Bernheim on his choice of variables at trial.

The basis for Dr. Bernheim's opinions has been extensively disclosed to Defendants.  Dr. Bernheim explained the basis for his modeling decisions in his first report, and in additional reports and deposition testimony since then.  (*See, e.g.,* Ex. D, Dep. of B. Douglas Bernheim, Jan. 30, 2012, at 161:24-162:17).  Specifically, Dr. Bernheim disclosed his reliance on the microprocessor index for his preferred statistical model in his first report, as well as his reliance on Dr. Fontecchio as a technical expert.  And in their numerous opposition reports, Defendants' experts criticized Dr. Bernheim's choices of variables, including the microprocessor variable. (*See, e.g.,* Ex. E, Dennis Carlton Motorola report, pp. 173-80.)  Dr. Bernheim's rebuttal report responded to Defendants' experts' criticisms and confirmed his original conclusions, including that the microprocessor variable was an appropriate cost proxy for his statistical model.

As Dr. Bernheim explained in his rebuttal report, "I remain convinced that the MP-PPI is a highly relevant economic variable, and that its exclusion from my models would be inappropriate." (Ex. B, Bernheim Motorola rebuttal report, ¶ 74.)  He did note additional support for inclusion of the microprocessor variable—an additional demand side link between microprocessors and LCD panels noted by defense experts in their opposition reports—but only in response to Defendants' experts and in support of the *same conclusions* based on the *same*

*methodology*. (*Id.* at ¶¶ 75-79; *see also,* Ex. D, Dep. of B. Douglas Bernheim, June 14, 2012, at 991:17-993:15.) Dr. Bernheim confirmed his reliance on the microprocessor index in his rebuttal report, and Defendants know well the reasons for Dr. Bernheim's inclusion of the microprocessor index.

The reliability of Dr. Bernheim's econometric analysis has been extensively tested and confirmed, using standard methods and exhaustive investigation. He applied widely used and generally accepted statistical criteria to assess the appropriateness of including the microprocessor index, and of substituting or adding other semiconductor indexes. (*See* Ex. B, Bernheim Motorola rebuttal report, ¶ 82; *see also*, Ex. D, Dep. of B. Douglas Bernheim, June 14, 2012, at 994:11-25; Ex. F, William Greene, *Econometric Analysis*, 159-160 (Prentice Hall, 2003).) In addition, Dr. Bernheim confirmed that the variables he chose for his preferred model accurately predicted prices outside of the conspiracy period. He tested his models by starting his predictions in 1996 and running forward without interference until the end of 2009, and his predictions matched closely with the actual prices for the post-conspiracy period. (*See* Ex. C, Bernheim Motorola report, ¶ 137; Ex. B, Bernheim Motorola rebuttal report, ¶ 148.) The fact that Dr. Bernheim's model accurately predicts post-conspiracy price levels and price movements, even though the prediction was started thirteen years prior, confirms the model's reliability. (*Id*.)

**B.    <u>Dr. Fontecchio's technical opinion on electronics component manufacturing.</u>**

Dr. Fontecchio's expert opinion describes the similarities in the manufacturing processes for LCDs and microprocessors, and describes the components of LCD panels. Dr. Fontecchio has technical expertise in manufacturing processes for LCD panels and microprocessors, and *he has already testified as a technical expert in this litigation*. (*See, e.g.,* Ex. A, class trial transcript excerpt.) He earned his Ph.D. in Electrical Engineering from Brown University, and he is a Professor of Electrical Engineering at Drexel University. (*See* Ex. G, Fontecchio Report, Appendix A.) Dr. Fontecchio is also co-director of a micro-fabrication facility, where he studies electrical components. (Ex. H, Dep. of Adam Fontecchio, Feb. 9, 2012, at 16:4-13.) He is an

expert on electronic component manufacturing, and his expertise includes the technical steps for making LCDs and making microprocessors.  (*See id.* at 177:17-24.)

Dr. Fontecchio is not an economist, and he will not be offering economic or econometric testimony at trial.  Dr. Bernheim modeled overcharges using his economic expertise, and relied on Dr. Fontecchio for his explanations of technical concepts.  (Ex. C, Bernheim Motorola report, ¶ 110.)  Drawing on his expertise in electronic component manufacturing, and his own investigation of the industry and literature, Dr. Fontecchio's expert report described the similarities between LCD panel manufacturing and microprocessor manufacturing.  It was Dr. Bernheim who determined, taking into consideration Dr. Fontecchio's expertise and opinion, that the microprocessor variable was a relevant statistical proxy for modeling LCD panel prices, and that it was superior to utilizing data tainted by the conspiracy.  (*Id.*) ("After considering a wide range of economic factors, I settled on a specification that included four key variables in addition to the first and second lag of the price index.") (*see also,* Ex. B, Bernheim Motorola rebuttal report, ¶ 98 (noting Defendants' cost data likely tainted by conspiracy and therefore biased.)  There is no "chasm" between the Plaintiffs' experts in these cases.

## III.    ARGUMENT

Defendants' criticisms of the opinions of Dr. Bernheim and Dr. Fontecchio are issues for consideration at trial by the finder of fact.  Which variables to include or exclude from a regression model is an issue to be a resolved in a typical "battle of the experts" at trial after "vigorous-cross examination" and the "presentation of contrary evidence."  *See Daubert*, 509 U.S. at 596.

### A.    Legal standard.

Expert testimony is admissible if: (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  To defeat a motion to exclude under the *Daubert* standard, Plaintiffs need not prove

that Dr. Bernheim's opinions or Dr. Fontecchio's opinions are correct or even persuasive, only that the methodology underlying their testimony is "scientifically valid," and thus reliable, and can be applied to the facts at issue. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 592-93.

Reliability of the method and its application is the only test at this stage. *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*") ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."); *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 709 F.3d 872, 883 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.")  The court "must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *citing Daubert*, 509 U.S. at 591; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Multiple regression analysis is a standard method of proving antitrust injury and damages. *See, e.g., In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 367-74 (C.D. Cal. 2011) (approving regression analysis for antitrust overcharge estimation); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 U.S. Dist. LEXIS 21696, at *6-*7 (same). "Normally, failure to include variables will affect the analyses' probativeness, not its admissibility." *Bazemore*, 478 U.S. at 400.  Challenges to variables used in a regression analysis go to the weight, not the admissibility, of a damages expert's testimony.  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (affirming admission of plaintiffs' expert testimony, citing *Bazemore* and noting "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility");  *see, e.g., In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1364-65 (N.D. Ga. 2000) (denying motion to exclude damages model based on a failure to include a specific variable).  Dr. Bernheim's damages analysis uses a reliable methodology for estimating price-fixing damages.

Criticisms of expert conclusions properly take place at trial, on cross examination and with the testimony of opposing experts, not through pretrial motions such as this one. At trial, both sides will engage in "vigorous cross-examination" of each other's experts, which will allow a jury to appropriately weigh any claimed defects. *Hemmings*, 285 F.3d at 1188; *see also, Primiano*, 598 F.3d at 564 (concluding that admissible expert testimony would be attacked by "cross examination, contrary evidence, and attention to the burden of proof"); *In re High-Tech Emp. Antitrust Litig.*, 2013 WL 1352016, *33-*34 (N.D. Cal. Apr. 5, 2013) (denying *Daubert* challenges against expert economists).

**B.      Dr. Bernheim is well qualified to perform  an econometric analysis of cartel overcharges.**

Defendants do not dispute Dr. Bernheim's qualifications to provide an expert statistical estimation of price fixing damages. Nor could they, as Dr. Bernheim has testified as an expert on the economic analysis of damages in antitrust cases in several courts, Ex. C, Bernheim Motorola report, ¶ 7, including the *Vitamins* case in the Eastern District of New York, where the district court denied a motion to exclude Dr. Bernheim's regression analysis. *In re Vitamins Antitrust Litig.*, 2003 WL 25951599, *1 (D.D.C. March 21, 2003). He has his Ph.D. in economics from the Massachusetts Institute of Technology, serves as a Professor of Economics at Stanford University, and he is widely published in peer reviewed literature on economics and statistics. (*See* Ex. C, Bernheim Motorola report, Appendix A.) For all of these reasons, Defendants cannot contest Dr. Bernheim's qualifications to perform an econometric analysis of cartel overcharges.

**C.      Dr. Fontecchio is well qualified for expert opinions on similarities between LCD panel manufacturing and microprocessor manufacturing.**

Dr. Fontecchio's opinion at issue here is a narrow technical one: he describes the "similarities between LCD panel manufacturing and the manufacturing of semiconductor microprocessors." (Ex. G, Fontecchio report, ¶ 11.) Dr. Fontecchio's task was not, as Defendants argue, to select a variable for Dr. Bernheim to use in his regression analysis. It was

Dr. Bernheim who chose the variables used in his econometric model after consulting Dr. Fontecchio for technical background on the key components. (Ex. C, Bernheim Motorola report, ¶ 110.) As an economist, Dr. Bernheim sought this type of basic electrical engineering expertise for informing his selection of variables and explaining what his statistical analysis already demonstrated: that the microprocessor index was a good proxy for LCD panel production costs, which Dr. Bernheim concluded, were likely tainted by the conspiracy.

Defendants argue that because Dr. Fontecchio has not been inside a microprocessor manufacturing facility and has not conducted research or writing on microprocessors that he is not qualified to testify about microprocessors. This is nonsense. An academic expert may testify on matters within his general expertise. *See, e.g.*, *White v. Ford Motor Co.*, 312 F.3d 998, 1006 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003) (affirming inclusion of expert testimony where professor was competent to read defendants' reports and apply his own expertise); *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (expert must have "some special knowledge, skill, experience, training or education on [the] subject matter" of his opinion).

Dr. Fontecchio, an engineering professor, is exceptionally well qualified to describe engineering processes and explain them to non-engineers. His narrow microprocessor opinion is supported by many sources: his world-class training; his significant professional experience as an electrical engineering academic at a renowned university; his significant research experience studying electrical components including microprocessors; and his review of academic literature and other information. (*See, e.g.,* Ex. G, Fontecchio report, ¶¶ 127, 131-32, 140.)

Basic technical explanation is precisely the expertise of an electrical engineering professor familiar with electronic components and their manufacturing processes. And all of these sources coalesce to provide Dr. Fontecchio with the expertise to explain the manufacturing processes for microprocessors. Indeed, the manufacturing processes for electronic components, including the relative complexity, techniques, and equipment, are well within Dr. Fontecchio's expertise as an electrical engineering professor. For instance, he explained in his report that

10

"LCD panels and microprocessors are both just collections of transistors operated in a controlled fashion." (*Id.*, ¶ 127.) Dr. Fontecchio's testimony is well within his expertise.

Defendants further twist Dr. Fontecchio's opinions and analysis by accusing him of stepping into the shoes of an economic expert when he labeled the microprocessor index "a good proxy." This argument is disingenuous. Although the Defendants conveniently fail to mention this in their motion, their technical expert, Dr. Shukri Souri, selected alternative proxies that he claims Dr. Bernheim should have used—and he is no more or less qualified to do so than Dr. Fontecchio. (*See* Ex. B, Bernheim Motorola rebuttal report, ¶ 81) (responding to Dr. Souri's opinions on alternative proxy variables). If Defendants were true to their own line of reasoning, the Defendants' technical expert would not have criticized Dr. Bernheim by proposing alternative proxy variables. (*See id.*) Nevertheless, Dr. Fontecchio was not playing economic witness in his rebuttal report. Dr. Fontecchio was simply responding to the arguments raised by Defendants' technical experts that other price indices were more suitable. (Ex. I, Fontecchio rebuttal report, ¶¶ 66-69.) As a technical expert, Dr. Fontecchio was simply using his knowledge of semiconductor products to explain, given his knowledge of semiconductors, which price index contained products that are more similar to LCD panels. And it was his expert opinion that the microprocessor index was a more appropriate index than the alternatives suggested by Defendants' experts.

Defendants again misconstrue Dr. Fontecchio's charge by arguing that Dr. Fontecchio needed to consider "alternative explanations." (Motion at 17-18.) But this begs the question: alternative explanations for what? Dr. Fontecchio was not asked to select an appropriate proxy for LCD costs—that was Dr. Bernheim's job. Instead, Dr. Fontecchio's task was to describe the "similarities between LCD panel manufacturing and the manufacturing of semiconductor microprocessors." (Ex. G, Fontecchio report, ¶ 11.) Indeed, Dr. Fontecchio did survey the literature relevant to his charge, *see, e.g.,* Ex. G, Fontecchio report, ¶¶ 130, 134, 139, 140, distinguishing the cases relied upon by Defendants where the court had found that the experts had ignored the relevant literature. *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th

11

Cir. 1994); *Haller v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1271, 1277 (M.D. Fla. 2009); *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 393 (D. Md. 2001) (excluding expert opinion because expert "did not conduct a review of the literature on snow throwers").

Defendants also do not identify any opinions or conclusions offered by Dr. Fontecchio that require a visit to a factory, or a job working at one, even while they claim the lack of this industry experience disqualifies him from offering those opinions. An expert has "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," and the correctness of the expert's conclusions is a question of weight for the finder of fact. *Perez v. State Farm Mut. Auto. Ins. Co.*, C 06-01962 JW, 2011 WL 8601203 (N.D. Cal. Dec. 7, 2011) (*citing DSU Medical Corp. v. JMS Co., Ltd.*, 296 F.Supp.2d 1140, 1147 (N.D. Cal. 2003)). Dr. Fontecchio's assignment—describing and comparing manufacturing processes between two different types of electronic components—was certainly far narrower than the market definition and damages analysis opinions in the cases relied upon by Defendants. *See, e.g., Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*, 371 Fed. App'x 719, 720 (9th Cir. 2010) (market definition); *TYR Sport, Inc. v. Warnaco Swimwear, Inc.,* 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) (damages analysis). Dr. Fontecchio's training as a Ph.D. electrical engineer, combined with his academic work supervising a fabrication facility for electronic components, qualifies him as an electronics manufacturing expert. Nothing in his report is outside his expertise.

Defendants also rely on cases involving toxic tort and product defect expert opinions much broader in scope than Dr. Fontecchio's summary. *See e.g., Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 120 (2011) (toxic tort opinion on contamination from a manufacturing facility); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244 (4th Cir. 1999) (products liability opinion on defective car part); *Shreve*, 166 F. Supp. 2d at 378 (products liability opinion on snow thrower design); *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) (products liability opinion involving defective tire). Those opinions all involved the causal link between a product

defect or toxic contaminant and injuries suffered by the plaintiffs, with experts opining on multiple complex issues. *See, e.g., Avila*, 633 F.3d at 839; *Shreve*, 166 F. Supp. 2d at 393. Unlike the opinions in the cases relied upon by Defendants, Dr. Fontecchio's summary of the key characteristics of microprocessor manufacturing never entailed any forensic investigation, and never required a complex methodology. (*See, e.g.,* Ex. G, Fontecchio report, ¶ 127.)

Similarly inapplicable is the exclusion of Plaintiffs' economic expert in *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1505 (D. Kan. 1995), and his testimony on causation damages, because he did not sufficiently research the underlying economic factors. Dr. Fontecchio's opinion does not purport to engage in or rely on any kind of economic modeling, and thus avoids entirely any unsupported economic conclusions. (*See* Ex. G, Fontecchio Report, ¶ 10.)  Dr. Fontecchio's summary of certain technical aspects of LCD panel manufacturing and microprocessor manufacturing is much narrower than the expert opinions in all of the cases cited by Defendants.  Dr. Fontecchio has offered his expert comparison between LCD manufacturing and microprocessor manufacturing, based on his engineering training, his fulsome academic experience, and his reading of the relevant sources.  His opinion never exceeds a task any electrical engineering professor with his manufacturing design experience is extremely well qualified to perform.

### D.    Dr. Bernheim's opinion is reliable.

The primary question presented in Defendants' motion is whether Dr. Bernheim's choice of variables for his overcharge analysis is sound.  The answer is "yes."  Defendants have not raised any issues about the reliability of Dr. Bernheim's opinions or methodology.  They merely criticize whether Dr. Bernheim chose the right variable to proxy for LCD panel production costs. But questioning the selection of one variable is not the subject of a *Daubert* motion.  Indeed, qualified experts can and do disagree on variable choices and other modeling decisions for a regression analysis.  Ultimately, whether a better proxy exists for LCD panel production costs is a determination for the fact finder at trial, when Defendants' expert Dr. Carlton will state his opinions on appropriate proxies, and Defendants will cross examine Dr. Bernheim on his

variables. *Obrey*, 400 F.3d at 695-96. ("It is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions and then determine the weight to accord the study's results.").

Even if the inclusion of the microprocessor index as a variable in Dr. Bernheim's model is a question for the Court, which it is not, Dr. Bernheim's careful analysis clearly suffices for *Daubert* purposes. Dr. Bernheim supported all of his modeling decisions, including his inclusion of the microprocessor variable, by investigating hundreds of statistical models over years of study and confirming his model with standard methods of confirmation. (Ex. C, Bernheim Motorola report, ¶¶ 109-117, 129-138.) He studied the factors influencing prices of LCDs for more than a year, including hundreds of hours of his own, and applied his professional judgment as a professional economist. And while the Defendants failed to mention it, many of those alternative models Dr. Bernheim tested included alternative variables for LCD panel productions costs. (*See* Ex. C, Bernheim Motorola report, ¶¶ 129-138; Ex. B, Bernheim Motorola rebuttal report ¶¶ 82, 93, 101, Fig. 36.) And when Dr. Bernheim tested different models that included the alternative cost proxies that the Defendants' experts suggested, he found that their suggested variables performed statistically worse than the microprocessor index. (Ex. B, Bernheim Motorola Rebuttal, ¶ 82)

Dr. Bernheim also used standard methods to test his model's predictive performance to ensure that his model is accurate, robust, and reliable. Notably, he tested how well his model predicted prices outside the conspiracy period. When he tested his models by having them predict panel prices starting in 1996, and then run forward without interference until the end of 2009, he observed that his models' predictions matched closely with the actual prices for the post-conspiracy period. (*See* Ex. C, Bernheim Motorola report, ¶ 137; Ex. B, Bernheim Motorola rebuttal report, ¶ 148.) These results confirm that his overcharge methodology and opinions are reliable. (*Id.*)

Dr. Bernheim's use of data from the microprocessor industry as a cost proxy makes Dr. Bernheim's analysis more reliable than models using the flawed cost data provided by the

14

Defendants. *Reliably modeling LCD panel prices in the absence of the conspiracy requires using data that does not reflect the effects of the conspiracy.* As the district court in *Linerboard* determined, it is appropriate for a plaintiff's damages expert "to remove all variables that could be affected by defendants' conduct, lawful or unlawful." *In Re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 680-81 (E.D. Pa. 2007). The economics literature recognizes that to generate a reliable set of plaintiff but for prices, one should not include any factors that were themselves tainted by the conspiracy. (*See e.g.*, Ex. J, Halbert White, *Time-Series Estimation of the Effects of Natural Experiments*, 135 Journal of Econometrics 527-66 (2005); Ex. K, Joshua D. Angrist and Alan B. Krueger, *Empirical Strategies in Labor Economics*, in *Handbook of Labor Economics*, vol. 3A, 1277, 1292 (Elsevier: Amsterdam 1999).) Dr. Bernheim's opinion is that the cost data provided by the Defendants and used by the Defendants' experts are likely tainted by the effects of the conspiracy, and that using that data is likely to lead to inaccurate estimates of the effects of the conspiracy. (Ex. D, Dep. of B. Douglas Bernheim, Jan. 30, 2012, at 162:18-164:10.)

Dr. Bernheim explored models including LCD panel costs based on the available data provided by Defendants, but concluded that "…the underlying data are limited, and a close inspection raised concerns as to whether they adequately reflect either the level of the defendants' true economic costs or the variation in those costs over time." (Ex. C, Bernheim Motorola report, ¶ 117.) Defendants' experts' insistence on using data from within the LCD industry *during the Defendants' long-running price fixing conspiracy within that industry* ignores this central task for the economists in this case: modeling the industry *in the absence of Defendants' conspiracy.*[4] Dr. Bernheim's opinion is that "the inclusion of [LCD] panel cost, which was likely affected by the conspiracy, will tend to bias the estimated overcharge

---

[4] Substantive antitrust law recognizes the reality of this task. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981)( "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation…").

downward." (Ex. B, Bernheim Motorola rebuttal report, ¶ 98.)  At trial, the jury will determine the most appropriate model for the hypothetical but-for world.

Moreover, Dr. Bernheim's inclusion of the microprocessor variable is made more reliable because of his consideration of the technical expert opinion of Dr. Fontecchio.  Dr. Bernheim is not an expert in semiconductors and semiconductor manufacturing, and therefore he looked in part to Dr. Fontecchio's conclusion that there were similarities between LCD panel manufacturing and the manufacturing of semiconductor microprocessors.  Dr. Fontecchio described the similarities and Dr. Bernheim evaluated them for econometric purposes.  That additional confirmation for information outside of his expertise only bolsters Dr. Bernheim's model's reliability.  Defendants recognize as much, having relied on many sources for additional support of their expert opinions, including a technical expert, Dr. Souri.  (*See* Ex. L, Defendants' Initial Witness List, May 7, 2013 at 16) (describing testimony as including "the relationship between microprocessors and LCDs").

And finally, although the Defendants cite a litany of cases, not one is applicable here:

- The *Aluminum Phosphide* case involved defining the end of the conspiracy period.  *See* 893 F. Supp. at 1502-03.  That aspect of Dr. Bernheim's analysis is not at issue here.

- The *Koken* case involved expert opinions without explanations.  *See Koken v. Black & Veatch Const., Inc.,* 426 F.3d 39, 47 (1st Cir. 2005).  Here, Dr. Bernheim has explained his methodology at length, with hundreds of pages in his reports and five days of depositions by Defendants.

- There were no "leaps of faith" by Dr. Bernheim.  *See Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003).  He consulted a technical expert on technical aspects, and tested multiple alternative models for confirming his econometric judgments.

The appropriateness of the microprocessor index for his econometric model was a judgment squarely within Dr. Bernheim's economic expertise.  Dr. Bernheim evaluated his

16

variables using his professional judgment, and applying standard methods in a reliable way, and concluded that the microprocessor index was appropriate for the facts of this case.  There can be no doubt that his overcharge opinion is reliable, and to the extent that Defendants' disagree with Dr. Bernheim's conclusions they may challenge them at trial.

### E.    Dr. Bernheim's rebuttal analysis considered defendants' experts' criticisms, and confirmed his opinions.

Defendants bizarrely accuse Dr. Bernheim of changing his rationale for the inclusion of the microprocessor variable in his model.  The suggestion, of course, is that since Dr. Bernheim noted in his rebuttal report that the microprocessor index *also* served as proxy for LCD demand that he changed his opinions and his analysis.  This is another straw man.  Dr. Bernheim's opinion and methodology for modeling overcharges have remained the same since his original report.  (*See, e.g.,* Ex. C, Bernheim Motorola report, ¶ 110; Ex. B, Bernheim Motorola rebuttal report, ¶¶ 3, 74.)  He used the microprocessor index in his first report.  He used it in his rebuttal report.  And he will use it again at trial.  When Dr. Bernheim noted the demand side justification for the microprocessor index, he was simply responding to at least fifteen Defendants' experts' reports by providing additional justifications for the *same conclusions* and the *same model* he used in his opening report. (*See* Ex. B, Bernheim Motorola rebuttal report, Section II.E.2.)

For their part, Defendants rely on *Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984), but that court explained that "[a] coherent theory, devised prior to observation of the particular data, must be employed to select the relevant explanatory variables" in a regression analysis.[5]  *Id.* at

---

[5] Nor do the other cases cited by Defendants apply to Dr. Bernheim.

In *Haller*, for instance, the medical expert on the plaintiff's development of diabetes added an entirely new disease "to the causation mix." 598 F. Supp. 2d at 1296-97 (excluding expert who changed opinion from identifying "sole" cause to multiple causes); *see also In re Bausch & Lomb, Inc. Contact Lens Solution Products Liab. Litig.*, MDL 1785, 2009 WL 2750462, at *12-14 (D.S.C. Aug. 26, 2009)  (excluding expert opinions that "were in flux throughout this litigation," changed in her post-deposition affidavit submitted after her expert reports, and "continued to change even during the joint Frye/Daubert hearing"); *see also Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252 (1st Cir. 1997) (affirming exclusion of expert who conceded to district court that revised calculations improperly inflated valuation).

Moreover, Defendants' reliance on cases involving untimely expert opinions do not apply to Dr. Bernheim's and Dr. Fontecchio's opinions, which were filed according to the Court-ordered
(continued…)

17

1261.  Indeed, if Defendants sincerely thought a new justification for the microprocessor index was so onerous that it made "drastic changes" that rendered Dr. Bernheim's opinion "a veritable moving target," then they would have moved to strike the microprocessor index or any microprocessor index related opinions.  But they did not.  That is because Dr. Bernheim has timely disclosed his expert opinions to Defendants and Defendants' experts and he has been deposed multiples times over many days on all of them.  There can be no unfair surprise here.  At trial, both sides will be fully able to present their competing expert opinions, and vigorously cross examine the other side's experts.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

(continued)
schedule in these cases.  *See, e.g., In re Bausch & Lomb, Inc. Contact Lens Solution Products Liab. Litig.*, MDL 1785, 2009 WL 2750462, at *3-4 (excluding expert's affidavit submitted after the expert's reports, deposition, and the filing of a *Daubert* motion).

## IV.    CONCLUSION

Defendants' motion to exclude the microprocessor-related testimony of Dr. Bernheim and Dr. Fontecchio should be denied.  A disagreement about variables is a quintessential "battle of the experts" and Defendants can challenge Dr. Bernheim's choices of variables at trial.

Dated:  May 17, 2013                              Respectfully submitted,

                                                            */s/ Jason C. Murray*
                                                    Janet Levine (CA Bar No. 94225)
                                                    Jason C. Murray (CA Bar No. 169806)
                                                    Joshua C. Stokes (CA Bar No. 220214)
                                                    CROWELL & MORING LLP
                                                    515 South Flower St., 40th Floor
                                                    Los Angeles, CA 90071
                                                    Telephone:  213-622-4750
                                                    Facsimile:   213-622-2690
                                                    Email: jlevine@crowell.com
                                                           jmurray@crowell.com
                                                           jstokes@crowell.com

                                                    Jeffrey H. Howard (*pro hac vice*)
                                                    Jerome A. Murphy (*pro hac vice*)
                                                    CROWELL & MORING LLP
                                                    1001 Pennsylvania Avenue, N.W.
                                                    Washington, D.C. 20004
                                                    Telephone:  202-624-2500
                                                    Facsimile:  202-628-5116
                                                    Email:  jhoward@crowell.com
                                                            jmurphy@crowell.com

                                                    Kenneth L. Adams (*pro hac vice*)
                                                    R. Bruce Holcomb (*pro hac vice*)
                                                    Christopher T. Leonardo (*pro hac vice*)
                                                    ADAMS HOLCOMB LLP
                                                    1875 Eye Street NW
                                                    Washington, DC 20006
                                                    Telephone:  202-580-8822
                                                    Facsimile: 202-580-8821
                                                    Email:  adams@adamsholcomb.com
                                                            holcomb@adamsholcomb.com
                                                            leonardo@adamsholcomb.com

PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]

*Counsel for Plaintiffs Motorola Mobility, Inc.; AT&T Mobility, LLC; AT&T Corp.; AT&T Services, Inc.; BellSouth Telecommunications, Inc.; Pacific Bell Telephone Company; AT&T Operations, Inc.; AT&T DataComm, Inc.; Southwestern Bell Telephone Company; Target Corporation; Sears, Roebuck and Co.; Kmart Corporation; Old Comp Inc.; Good Guys, Inc.; RadioShack Corporation; Newegg Inc.*

 */s/ David Martinez*_____
Roman M. Silberfeld, Bar No. 62783
David Martinez, Bar No. 193183
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:  310-552-0130
Facsimile:  310-229-5800

Elliot S. Kaplan (*pro hac vice*)
K. Craig Wildfang (*pro hac vice*)
Laura E. Nelson, Bar No. 231856
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402
Telephone:  612-349-8500
Facsimile:  612-339-4181
Email:  ESKaplan@rkmc.com
              KCWildfang@rkmc.com

*Counsel for Plaintiffs Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P., Magnolia Hi-Fi, Inc.*

 */s/ David J. Burman*_____
David J. Burman, Esq.
PERKINS COIE LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101-3099
Telephone:     (206) 359-8000
Facsimile:      (206) 359-9000
Email: dburman@perkinscoie.com

*Counsel for Plaintiff Costco Wholesale Corp.*

PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]

_/s/ Anne M. Nardacci_____
William A. Isaacson (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C. 20015
Telephone:  202-237-2727
Facsimile:  202-237-6131
Email:  wisaacson@bsfllp.com
Philip J. Iovieno (*pro hac vice*)
Anne M. Nardacci (*pro hac vice*)
Luke Nikas (*pro hac vice*)
Christopher V. Fenlon (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  518-434-0600
Facsimile:  518-434-0665
Email:  piovieno@bsfllp.com
          anardacci@bsfllp.com
          lnikas@bsfllp.com
          cfenlon@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp.*

DCACTIVE-23270874.14

PLAINTIFFS' OPPOSITION TO DEFENDANT SHARP'S MOTION TO EXCLUDE
TESTIMONY OF ADAM K. FONTECCHIO AND B. DOUGLAS BERNHEIM
[MASTER CASE NO. 3:07-MD-1827 SI]