# EXHIBIT B

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | ) ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: Individual Case No. 3:09-cv-5840-SI | ) ) ) Master File No. 3:07-md-1827-SI |
| MOTOROLA MOBILITY, INC, | ) ) Case No. 3:09-cv-5840-SI |
| Plaintiff, | ) ) MDL No. 1827 |
| vs. | ) ) |
| AU OPTRONICS CORPORATION, et al., | ) ) ) |
| Defendants. | ) ) |

**REBUTTAL EXPERT REPORT OF B. DOUGLAS BERNHEIM, PH.D.
CONCERNING MOTOROLA MOBILITY, INC.**

**May 11, 2012**

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# Table of contents

I. Summary of opinions ...................................................................................................................1

II. My econometric analysis of overcharges is reliable and accurate ...................................................2

    II.A. My use of large and small TFT-LCD panel prices indexes is appropriate, reliable, and advantageous ...................................................................................................................2

        II.A.1. Aggregation is appropriate and advantageous ...........................................................2
        II.A.2. The Fisher price index is an appropriate and reliable method of aggregation ..............6
        II.A.3. The use of a large panel Fisher price index is appropriate and yields reliable results .................14
        II.A.4. The use of a small panel Fisher price index is appropriate and yields reliable results ................24
        II.A.5. The use of a small panel price index is appropriate and yields reliable results specifically with respect to Motorola ....................................................................34
        II.A.6. It is appropriate to use separate Fisher price indexes for large and small panels .......................37
        II.A.7. Drs. Carlton and Rubinfeld take internally inconsistent positions on the subject of aggregation........................................................................................38

    II.B. My overcharge analysis employs appropriate predictors...................................................40

        II.B.1. The microprocessor producer price index (MP-PPI) is a highly relevant economic variable, and its exclusion from my models would be inappropriate ...............41
        II.B.2. 2. My analysis accounts for a broad range of supply and demand variables, and my conclusions are not sensitive to the addition of variables suggested by the Defense experts ........45

    II.C. My analysis employs reliable data.................................................................................55

        II.C.1. My use of pre-2000 data is valid and appropriate ......................................................55
        II.C.2. My analysis employs reliable data on prices for Motorola transactions .......................57

    II.D. My analysis employs reliable statistical tools .................................................................58

        II.D.1. The prediction equation approach is more reliable that the dummy variable approach...............58
        II.D.2. Ridge Regression is reliable and generally accepted...................................................63

    II.E. My models pass appropriate tests for stability ...............................................................65

        II.E.1. The tests for stability implemented by the Defense experts are not valid ....................66
        II.E.2. Appropriate diagnostics demonstrate the stability of my prediction models ...............69
        II.E.3. Additional sensitivity analyses demonstrate the accuracy and reliability of my analysis and conclusions........................................................................................76

    II.F. The sensitivity analyses conducted by Drs. Carlton and Rubinfeld are inappropriate, and do not call the reliability of my overcharge estimates into question........................................77

        II.F.1. Removing or replacing the MP-PPI is inappropriate and not a valid test of reliability ..................77
        II.F.2. Adding a time trend is not a valid test of reliability .....................................................78
        II.F.3. Weighting by sales is inappropriate and not a valid test of reliability ...........................79
        II.F.4. The use of dummy variable models with a single cartel dummy without exploring models with multiple cartel dummies is inappropriate and not a valid test of reliability......................80
        II.F.5. Replacing lagged prices with a time trend is not a valid test of reliability.....................80

    II.G. Alternative methods corroborate my conclusions.................................................................82

III. Alternative econometric analyses of overcharges provided by Drs. Carlton and Rubinfeld are unreliable and inaccurate ....................................................................................................83

    III.A. Drs. Carlton and Rubinfeld employ less reliable tools for measuring overcharges ...............83

    III.B. Drs. Carlton and Rubinfeld have built unreliable "zero machines" .......................................84

    III.C. The analyses of Drs. Carlton and Rubinfeld depend critically upon a false premise concerning the conspiracy's effect on price .....................................................................................99

    III.D. The analyses of Drs. Carlton and Rubinfeld suffer from many other methodological deficiencies ......102

        III.D.1. Discarding pre-conspiracy data renders Dr. Carlton's analysis less reliable .............102
        III.D.2. Dr. Carlton's conclusions do not survive the implementation of methodological changes advocated by Dr. Hausman, another Defense expert upon whom Dr. Carlton explicitly relies ......103
        III.D.3. Dr. Carlton does not test correctly for his models' stability .....................................104

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 4 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

III.D.4. By focusing on long-term rather than short-term effects, Dr. Carlton's analysis leads Dr. Snyder to understate rather than overstates damages ................................................................106

III.D.5. Dr. Rubinfeld does not provide a valid large-panel model .........................................................106

III.D.6. Dr. Rubinfeld's models fail Dr. Carlton's stability tests ............................................................106

III.D.7. Including endogenous variables without making appropriate adjustments renders the analyses of Drs. Carlton and Rubinfeld less reliable ......................................................................107

III.D.8. Drs. Carlton and Rubinfeld's cost imputations call the reliability of their results into question...108

III.D.9. The models used by Drs. Carlton and Rubinfeld fail to account for interdependencies between the prices charged by different firms and/or for different types of products ....................116

III.E. Dr. Rapp's overcharge analysis is highly unreliable and inaccurate ....................................................116

III.E.1. Dr. Rapp's misinterprets his overcharge analysis.........................................................................116

III.E.2. The "logic" of Dr. Rapp's overcharge analysis self-destructs.......................................................117

III.E.3. A more reasonable interpretation of Dr. Rapp's analysis implies the existence of substantial overcharges .........................................................................................................................117

III.E.4. Dr. Rapp's overcharge analysis improperly ignores the larger LCD market ..............................118

IV. My overcharge estimates are, on their face, more reasonable than those put forward by the Defendants' economic experts.........................................................................................................................119

IV.A. My overcharge estimates are indicative of imperfect cartel....................................................................119

IV.B. The fact that the cartel was highly active over a substantial period of time proves that my overcharge estimates are more reasonable than those put forward by Drs. Carlton and Rubinfeld .....120

IV.C. The Defense experts' own statements indicate that the conspiracy had a substantial effect on price............................................................................................................................................................123

V. The Court could reasonably reach factual findings concerning the nature and extent of collusion among the Defendants that would be consistent with substantial overcharges ........................................................125

V.A. Many opinions expressed by the Defendants' economic experts concerning the nature and extent of collusion among the Defendants go beyond the scope of my testimony, and do not involve economic expertise.....................................................................................................................................125

V.B. The Defendants had incentives to fix prices.............................................................................................128

V.B.1. A "sole-source" supplier is not a monopolist and does have an incentive to fix prices ...............129

V.B.2. Defendants that purchased or distributed LCD panels had incentives to fix prices....................131

V.B.3. Small, inefficient, or otherwise disadvantaged competitors had incentives to collude................131

V.B.4. Dr. Moore is mistaken concerning Mitsui's incentives..................................................................132

V.C. Recognizing that the Defendants' efforts to hide their illegal activities renders the record of conspiratorial activity incomplete, the Court could reasonably infer broad patterns of collusive conduct from the available evidence..........................................................................................................132

V.D. The Court could reasonably conclude that communication with the object of fixing price was sufficiently widespread to create the potential for substantial overcharges ........................................134

V.D.1. My overcharge analysis does not presuppose the guilt of all Defendants .................................134

V.D.2. Guilt is not necessarily limited by the scope of pleas or indictments..........................................135

V.D.3. The Court could reasonably conclude that communications between the Defendant's were anticompetitive.................................................................................................................................136

V.E. The Court could reasonably find that the Defendants were involved in a single overarching conspiracy ...................................................................................................................................................141

V.F. The Court could reasonably find that the cartel employed mechanisms capable of sustaining substantial overcharges..............................................................................................................................142

V.G. Comparisons of apparent agreements and realizations do not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates .................144

V.H. The cartel reduced the supply of LCD-TFT panels ...............................................................................145

VI. My overcharge estimates are reasonable in light of facts concerning the LCD panel industry .....................148

VI.A. There is substantial supply-side substitution among large panel products, among small panel products, and between large and small panel products........................................................................148

VI.B. The industry is susceptible to a meaningful degree of cartelization ....................................................149

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

VII. My overcharge estimates are reasonable in light of its implications for the Defendants' profits and investments ............................................................................................................................161

  VII.A. My overcharge estimates are reasonable in light of the Defendants' *ex ante* investment incentives .161

    VII.A.1. Absent the conspiracy, the Defendants would have been no less optimistic about LCD industry fundamentals .................................................................................................161

    VII.A.2. The Defense experts' analyses of the Defendants' *ex ante* investment incentives involve a fatal logical fallacy .................................................................................................162

    VII.A.3. The Defendants' experts draw invalid conclusions from their analyses of Prof. Stowell's NPV calculations ........................................................................................164

  VII.B. My overcharge estimates are reasonable in light of the Defendants' *ex post* profitability .................168

    VII.B.1. The conclusions the Defense experts draw from their analyses of the Defendants' profitability depend critically on a false premise.............................................................168

    VII.B.2. The Defense experts' analyses of the Defendants' *ex post* profits does not reliably shed light on the *ex ante* profitability of the Defendants' investments ...................................172

  VII.C. My overcharge estimates are reasonable in light of evidence concerning operating cash flows .......174

  VII.D. My overcharge estimates are reasonable in light of evidence on changes in profitability over time ..176

  VII.E. My overcharge analysis does not presuppose that capacity investment would have been substantially higher but for the conspiracy.............................................................................177

  VII.F. The corporate structures of the defendants would have materially influenced their incentive for investment ...............................................................................................................178

VIII. My overcharge estimates are reasonable in light of facts concerning other aspects of conduct and market outcomes .......................................................................................................182

  VIII.A. Simple observations concerning price levels and movements do not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates ....182

  VIII.B. Evidence of rivalry does not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates ....................................................188

  VIII.C. In this industry, comparisons of price-cost and profit margins during the conduct period with benchmarks do not provide a reliable basis for determining the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates ....................................................189

  VIII.D. Conclusions concerning overcharges based on proper econometric analyses are far more reliable than those based on other evidence proffered by the Defendants' experts ...........................190

IX. Affected commerce.................................................................................................................192

X. Updated damage estimates......................................................................................................193

  X.A. Additional adjustments ......................................................................................................193

  X.B. Final damage estimates .....................................................................................................194

Appendix A...................................................................................................................................A-1

Appendix B...................................................................................................................................B-1

Appendix C. ..................................................................................................................................C-1

Appendix D. ..................................................................................................................................D-1

Appendix E...................................................................................................................................E-1

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

# List of figures

Figure 1: Example of product mix effects on average selling price ....................................................................7

Figure 2: Average selling price and Fisher index for TV panels ......................................................................8

Figure 3: Histogram of TV panel price changes from October to November 2003 ................................................9

Figure 4: Median price changes and Fisher index changes for TV panels ..........................................................10

Figure 5: Median price changes and average selling price changes for TV panels ..............................................10

Figure 6: Average TV panel price per unit sold versus per square inch of display area ........................................12

Figure 7: Monitor and notebook panel price indexes versus large panel price index ..........................................17

Figure 8: TV panel price index versus large panel price index ......................................................................18

Figure 9: Correlations between price indexes for large panels, by application ..................................................18

Figure 10: Monitor and notebook panel price indexes versus large panel price index, detrended ........................19

Figure 11:TV panel price index versus large panel price index, detrended ........................................................20

Figure 12: Correlations between detrended price indexes for large panels, by application ..................................20

Figure 13: Disaggregated prices indexes for notebook panels ......................................................................22

Figure 14: Disaggregated price indexes for monitor panels ..........................................................................22

Figure 15: Disaggregated price indexes for TV panels ................................................................................23

Figure 16: Samsung SEC-specific large panel price index versus large panel price index ..................................24

Figure 17: Comparison of price indexes for mobile phone panels and non-mobile phone small panels ...............26

Figure 18: Price index correlations for mobile phone panels and non-mobile phone small panels ......................26

Figure 19: Comparison of price indexes for mobile phone panels and non-mobile phone small panels, detrended ........................................................................................................................................27

Figure 20: Price index correlations for mobile phone panels and non-mobile phone small panels, detrended .....27

Figure 21: TFT and TFD small panel price indexes ....................................................................................28

Figure 22: Detrended TFT and TFD small panel price indexes ......................................................................29

Figure 23: Disaggregated prices indexes for mobile phone panels ................................................................30

Figure 24: Disaggregated prices indexes for mobile phone panels (Carlton time period) ..................................30

Figure 25: A Motorola price index versus the small panel price index ............................................................31

Figure 26: Comparison of Motorola price index, small panel price index and small panel overcharges ...............33

Figure 27: A Samsung SEC small panel price index versus the overall small panel price ..................................34

Figure 28: Change in statistical performance when dropping or replacing MP-PPI with other semiconductor indexes ........................................................................................................................................44

Figure 29: Change in statistical performance when adding other semiconductor indexes along with MP-PPI .....44

Figure 30: Comparison of estimated overcharges when adding other semiconductor indexes along with MP-PPI ........................................................................................................................................45

Figure 31: Comparison of estimated overcharges when adding variables included in Rubinfeld's econometric analysis ........................................................................................................................................50

Figure 32: Semiconductor capacity versus TFT-LCD capacity ......................................................................51

Figure 33: Dr. Carlton's worldwide mobile units ......................................................................................52

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Figure 34: Dr. Jenkins' total number of mobile subscribers....................................................53

Figure 35: Dr. Comanor's computer and electronic product price index..................................53

Figure 36: Comparison of estimated overcharges when adding variables included in other experts' econometric analysis ...............................................................................................................54

Figure 37: Dollar sales and capacity share of defendants that provided pre-2000 data........................56

Figure 38: Large panel price indexes for Defendants that provided pre-2000 data, and for those that did not .....56

Figure 39: Small panel price indexes for Defendants that provided pre-2000 data, and for those that did not .....57

Figure 40: Comparisons of predictions to actual prices with hv-block cross-validation ........................68

Figure 45: Average prediction error over pre- and post-conspiracy period: conspiracy period scenario..............72

Figure 48: Average prediction error over the post-conspiracy period: prediction initialized at the end of the pre-conspiracy period ......................................................................................................75

Figure 51: Average prediction error over the post-conspiracy period: prediction initialized at the start of the pre-conspiracy period ......................................................................................................76

Figure 52: Change in statistical performance when the two lagged dependant variables are replaced with a time trend.....................................................................................................................81

Figure 53: Quarterly weighted average prices for mobile display product 128x160 from Toshiba ........................84

Figure 54: Average notebook panel prices with simulated 20% markup through Q4 2005 .................................85

Figure 75: Dr. Carlton's models with alternative cartel dummy variables ...........................................101

Figure 76: Dr. Rubinfeld's models with alternative cartel dummy variables .......................................102

Figure 77: Dr. Carlton's overcharge estimates after applying Dr. Hausman's "methodological improvements" ..104

Figure 78: Stability test of Dr. Rubinfeld's damages models ...............................................................107

Figure 86: Dr. Carlton's analysis, fitted cost and actual cost, Samsung mobile display panels, 2.2 inch, QCIF..113

Figure 87: Dr. Carlton's imputed price-cost ratio for Mobile display panels in 2004...........................114

Figure 88: Dr. Rubinfeld's imputed price cost ratio .............................................................................115

Figure 2: Prices of 15 inch TFT-LCD monitor panels and conspiracy price targets ...........................145

Figure 90: Example supply and demand diagram...............................................................................163

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# I. Summary of opinions

(1)   On December 15, 2011, experts retained by plaintiffs in this matter submitted three expert reports relating to overcharges resulting from the conspiracy among suppliers of LCD panels and finished goods that contained LCD panels ("LCD products"). These included a report by Professor David Stowell, a report by Dr. Adam Fontecchio, and my report.

(2)   Numerous experts retained by the Defendants in this matter subsequently submitted their reports on this issue. These included reports by Dr. Dennis W. Carlton, Dr. Daniel Rubinfeld, Dr. Edward A. Snyder, Dr. Pierre-Yves Cremieux, Dr. George Foster, Dr. Barry Harris, Dr. Jerry Hausman, Dr. Lorin Hitt, Dr. James Levinsohn, Mr. Keith Mallinson, Dr. Michael Moore, Dr. Richard Rapp, Dr. Shukri Souri, Dr. Darrell Williams, and Dr. Robert Willig.

(3)   I have carefully reviewed all analyses and arguments in the defendants' experts' reports pertaining to the computation of overcharges and damages. I have formed the following overarching opinions.

- The criticisms of my approach to estimating damages set forth in the defendants' experts' reports are unfounded. In many cases, these criticisms reflect conceptual errors or a failure to understand some aspect of my analysis; in other cases they prove to be of little or no consequence.

- The overcharge and damage analyses submitted by the defendants' experts are flawed and unreliable. These flaws are demonstrably responsible for generating small overcharge and damage estimates.

- My conclusions concerning overcharges and damages are reasonable in light of facts concerning the industry, evidence concerning the operation of the cartel, considerations involving the defendants' profits and investments, and other aspects of observed conduct.

- Thus, after considering the analyses and arguments set forth by the defendants' experts, my opinions regarding the effect of the conspiracy on the prices of LCD panels and LCD products remain largely unchanged.

(4)   I have been engaged to conduct damage analyses for the following direct action plaintiffs: AT&T Mobility, ATS Claim, LLC, Best Buy Co., Inc, Costco Wholesale Corporation, Electrograph Systems, Inc., Good Guys, Inc., Kmart Corp., Motorola Mobility, Inc., Newegg Inc., Old Comp Inc., RadioShack Corp., Sears, Roebuck and Co., and Target Corp. Counsel for these plaintiffs asked me to submit a separate report for each. The majority of the sections in these reports are identical.

(5)   I understand that additional discovery regarding STN panels is occurring and reserve the right to supplement my report.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 1

# II. My econometric analysis of overcharges is reliable and accurate

## II.A. My use of large and small TFT-LCD panel prices indexes is appropriate, reliable, and advantageous

(6) My overcharge estimates are based on econometric models of the overall price levels for, separately, large TFT-LCD panels and small TFT- LCD panels.  A measure of the overall price level for a group of products is known as an *index*.  The practice of analyzing an index for a group of products, rather than the price of each product individually, is known as *aggregation*.  The Defense Experts have questioned the appropriateness of aggregation in this context, and of the particular type of index I employ (known as a Fisher price index, but also called the "ideal" price index due to its many desirable properties).  Here I address their concerns and explain why my approach to aggregation is appropriate, reliable, and advantageous.

### II.A.1. Aggregation is appropriate and advantageous

(7) Analyzing the overall price level for TFT-LCD panels is not only appropriate, but also advantageous in comparison to analyzing the prices for individual products, for the following reasons.

(8) *First,* the purpose of my analysis is to predict the total acquisition cost for large *bundles* of panels but-for the conspiracy, rather than for each particular panel or each application.  Specifically, my primary assignment was to quantify *the total overcharges for each of the plaintiffs* (if any). Therefore, I designed my analysis to measure the extent to which the total acquisition cost of the bundle of LCD products purchased by each plaintiff from the Defendants was inflated by the conspiracy.  In addition, counsel for the plaintiffs has asked me to quantify *the total overcharges associated with sales by each defendant* (if any).  Therefore, my analysis also measures the extent to which the total acquisition cost of the bundle of LCD products purchased from each defendant was inflated by the conspiracy.   Because my assignment was to measure the effects of the conspiracy on the total acquisition costs for broad bundles of TFT-LCD panel products, I appropriately focused my attention on forecasting the aggregate acquisition costs for representative bundles, rather than for each individual product.

(9) *Second*, appropriately constructed TFT-LCD price indexes reflect market fundamentals much better than the prices of individual products.  Prices for individual TFT-LCD prices were closely tied to overall market fundamentals for two reasons.

- Pertinent supply and demand factors were common to broad classes of TFT-LCD products.  As the reports of Drs. Fontecchio and Souri make clear, the production of all TFT-LCD panels relies on a

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 2

common underlying technology.[1]  While particular applications involve wrinkles on that technology, the commonalities create strong supply-side similarities that dominate the differences.   Demand-side drivers of price are also shared among broad classes of TFT-LCD products (e.g., within application, such as mobile phones, computers & monitors, and TVs).  Notably, Dr. Carlton concedes that, within this industry, where supply-side and demand-side factors are similar across products, prices can be expected to move similarly.[2]

- Prices for distinct TFT-LCD panel prices were also linked by supply-side substitution.  Because panel makers shift production from one type of panel to another to take advantage of profit opportunities, the scope for independent price movements of any consequence is limited.  I recognize that some of defense experts have questioned the degree of supply-side substitution, and I address those issues below.

(10)   The alternative to studying broad TFT-LCD panel indexes is to examine either narrow indexes, or the prices of individual products (without aggregating).  Both approaches potentially obscure the critical relationships between TFT-LCD panel prices and the factors driving market fundamentals, for the following reasons.

- The price movements for individual products, as well as for smaller groups of products, can be quite "noisy."  The observed prices of individual products can vary considerably for reasons that do not have larger implications.  For example, the price of a product may appear to change between two points in time simply because the transactions involve different buyers with different negotiating power (who would also have received different prices at the same point in time), because a change in quantity triggers volume discounts, or because of errors or inconsistencies in record-keeping.  Something as simple as a change in sales personnel can alter the outcome of a negotiation without having any larger implications for competitive dynamics.

- Data on individual TFT-LCD panel products, as well as for smaller groups of products, are often available for relatively short periods of time (because the products were not sold outside those windows).  For example, the top LCD panel for notebooks in terms of quantity (model B154EW02, 15.4″ manufactured by AUO) was sold for a period of approximately 3 years, which is fairly typical for LCD panels transacted in large quantities.  The median length of the sales period for all LCD panels used in notebooks, monitors and TVs is substantially shorter – approximately 8 months. The median sales period for mobile phone LCD panels is only slightly longer – 11 months. Aggregating LCD panels to the level of application, size, resolution, and defendant (as Dr. Carlton did for his econometric analysis) extends the median length of the sales period only modestly, to approximately 20 months for large panels and 15 months for mobile phone panels, and the duration of sales

---

[1]   See Fontecchio Report, ¶¶73-95, and Souri Report, ¶¶70-100. Mr. Mallinson's description of the manufacturing process for TFT-LCD panels is also consistent with this view. See deposition of Keith Mallinson, April 11, 2012, pp. 200-204.

[2]   Carlton (¶61): "Given that TFT and TFD panels both share some manufacturing inputs and end-uses, it would be surprising if the prices of both sets of products did not follow a similar pattern." Dr. Carlton submitted several expert reports in this matter. When I reference Dr. Carlton's expert report, I reference his ATS report. Appendix C.1 identifies the corresponding paragraph numbers between his reports.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 3

exceeded the length of the conspiracy period for only a handful of such product groups. As a result, there is little or no opportunity to study and reliably detect the relationships between their prices and the factors driving market fundamentals

■ If one employs analytic methods that permit different TFT-LCD panel products (or smaller groups of products) to have completely different market dynamics, then it is entirely possible that these methods would (as a consequence of the considerations just mentioned) imply divergent price paths for the products, when in fact the market would only accommodate more limited divergences. In other words, such approaches discard the important information that the prices of these goods must move together, at least within some tolerances. So, for example, Dr. Rubinfeld's Samsung-only models do not exploit the important fact that Samsung's prices could not stray too far from those of its competitors, Dr. Carlton's notebook-only models do not exploit the important fact that notebook prices could not stray too far from (appropriately adjusted) monitor and TV prices, and Dr. Rapp's Motorola-Razr-only models do not exploit the important fact that the prices Motorola paid for Razr panels could not stray too far from small panel prices generally.

(11)    It is important to understand that aggregation across TFT-LCD panel products does *not* presuppose that prices move in lock-step; nor does it assume an absence of underlying factors that would cause those prices to move differently. Even in settings where the underlying products are far less related and their price movements much less similar than those considered here, it is still valid – indeed commonplace within the field of economics – to build econometric models of an aggregate price index, and to use those models to predict average prices. Such a model can accurately and reliably represent the way the aggregate price index moves through time. I elaborate on this point in the next subsection.

(12)    *Third*, appropriately constructed TFT-LCD price indexes reflect the impact of the conspiracy more reliably than the prices of individual products. Significantly, the Plaintiffs have alleged a *market-wide* conspiracy affecting TFT-LCD panels. I would expect the conspiracy to have generally similar effects on the prices of different panels for the following reasons.

■ It makes no economic sense to orchestrate a conspiracy to raise prices for a subset of products if the result is to divert production and competitive activity to other products, thereby depressing their prices.[3] Given the degree of supply-side substitution, the conspirators had strong incentives to be comprehensive and target prices more uniformly.

■ Evidence concerning the conspiracy's operation indicates that the Defendants did indeed target panel prices broadly. As discussed in greater detail below, the Crystal Meetings were memorialized in greater detail than other meetings and communications among the conspirators; consequently, they provide the best (if still incomplete) window into the conspiracy's mode of operation. Notes from the

---

[3]    Dr. Carlton suggests that supply-side links could cause prices to move in different directions, as producers shifted to other types of panels (¶84). However, this is merely a theoretical possibility of no practical relevance in the current case. It would have made no economic sense to orchestrate a conspiracy that resulted in the type of substitution pattern Carlton describes, and in any case prices did generally move together (as shown in the next subsections).

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

meetings and defendant testimony indicate that the conspirators sought to set prices for a collection of important "index" products, and to maintain price spreads with other products, thereby achieving a considerable degree of uniformity. For example, the remarks of an AUO executive from a June 11, 2003 conspiracy meeting confirm a linkage between the prices of different panels when he warned that "17″ is the index item whose price can affect overall TFT sales price significantly for the second half of the year if its June/July price declines."[4] In his deposition, C. C. Liu, Vice President of Sales and Marketing at Chunghwa, explained that the conspirators reached agreements on products that were "main types at the time" and typically did not discuss "special types unless the special type's price is affecting the market price or affecting the market," but once a product "became a threat to us in the market, then we have to talk about it and indicate a premium that we should attach to the special type."[5] His testimony suggests that the conspiracy operated in a way that would considerably constrain the magnitude by which overcharges can vary across products.

(13)    Rather than study the effect of the conspiracy on broad TFT-LCD panel indexes, one could instead attempt to measure its effect on either narrow indexes or the prices of individual products (without aggregating).  However, that approach is almost certain to introduce false variation in the measured impact of the conspiracy across products or groups of products.  If, for example, the conspiracy actually raised the prices of all products by the same percentage, the presence of statistical "noise" guarantees that the estimated effects will nevertheless vary across products or groups of products (and in light of the considerations discussed in the context of my second point, they might well vary significantly).  Given the likelihood that the effects of the conspiracy were substantially similar across products, in the vast majority of cases its average effect is likely to be a more accurate and reliable measure of its effect on the prices of smaller groups of products than an estimate based on data for those products alone.

(14)    It is important to understand that aggregation across TFT-LCD panel products does *not* presuppose that the conspiracy affected all TFT-LCD prices identically.[6]  Even if the effect of the conspiracy varied across products, my analysis of broad TFT-LCD prices indexes still reliably and accurately measures the degree to which the conspiracy artificially inflated the price indexes, and hence the *average* prices of the products belonging to those bundles.  While it is conceptually legitimate for the Defendants to question whether the average price elevation for a broad bundle of panels properly represents the elevation for some particular group of products at issue in this matter (e.g., the bundle of panels purchased by a particular Plaintiff or sold by a particular Defendant), my analysis (below) shows that in practice there is no serious cause for concern.  The cartel effects that I measure are not only adequately representative, but also more accurate and reliable than the available alternatives.

(15)    It is also important to understand that differences in the movements of price indexes for two sets of TFT-LCD panel products do *not* necessarily imply that the conspiracy affected them differently.  To illustrate,

---

4    Minutes from June 6, 2003 Crystal Meeting, CPT00222415-9.

5    Deposition of C. C. Liu, April 29, 2010, pp. 100, 276-8.

6    Hence Dr. Rubinfeld is simply wrong when he says I assume "the alleged overcharge percentage is the same for all the diverse large or small panel products" (¶364).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

suppose that a buyer instituted aggressive purchasing practices as of a given date. Prior to that date, it paid the market average price; after than data, it received a 10 percent discount relative to the market average prices. If one constructs a TFT-LCD panel price index for this buyer's purchasers and compares it to the market index, one will find that it moves differently than the market index – in particular, it declines considerably faster than the market index around the date in question. However, because the buyer is assumed to pay a price that is proportional to the market price, it nevertheless incurs the same percentage overcharge when a conspiracy inflates the market price.

## II.A.2. The Fisher price index is an appropriate and reliable method of aggregation

(16)   Price indexes are the generally preferred tools for evaluating changes in the total acquisition cost for a category of goods when the prices of individual goods may follow different paths and the composition of the category changes over time.[7]  My overcharge analysis uses the Fisher price index, which is also known as the "ideal" price index because of its numerous desirable properties.[8]  The following example helps to illustrate why price indexes are more appropriate and reliable than average prices.

(17)   Suppose we are interested in the prices two products, A and B (for example, two different types of TFT-LCD panels).  As shown in the figure below, the price of product A falls by 10 percent, from $10 to $9, between January and February 2002, while the price of product B falls by 15 percent, from $20 to $17. Sales of product A are flat during this period (900 units in both January and February), while sale of product B jump from 300 units to 1500 units).  Thus, product A accounts for 75 percent of unit sales in January, while product B accounts for 62.5 percent of unit sales in February.  Notice the following.

- In January, the average selling price across products A and B was $12.50.  In February, the average selling price was $14.  Thus, the average price *rose* by 12 percent, even though the price of each of the goods *fell* by 10 percent or more.  Plainly, the average selling price provides a completely misleading picture of price dynamics in this example.  The reason is that the average is heavily affected by the shift in the composition of sales toward the more expensive product.

- To construct a Fisher price index, one in effect computes the changes in total costs of two *fixed* bundles of products (the bundle purchased in January and the one purchased in February), and then takes the (geometric) average of those changes.  In this example, the Fisher price index declines by 12.9 percent between January and February, which is far more representative of the declines in the component product prices (10 and 15 percent) than is the average price (which *rises* by 12 percent). The Fisher price index performs much better than the average price precisely because it removes the effects of the change in the composition of sales.

---

[7]   In his deposition, Dr. Carlton agreed that price indices are often used and widely accepted in economics. Deposition of Dr. Carlton on April 11, 2012, pages 318-321. See, also, Irving Fisher, *The Making of Index Numbers*. Houghton Mifflin Company, 1922.

[8]   The Fisher price index is known to satisfy at least twenty desirable properties; see Walter E. Diewert, "Fisher Ideal Output, Input and Productivity Indexes Revisited" in *Essays in Index Number Theory* vol. I, ed. W. E. Diewert and A. O. Nakamura. Elsevier Science Publishers, 1993.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 1: Example of product mix effects on average selling price**



(18)    The issues highlighted by the preceding example are of considerable practical relevance to my disagreements with Drs. Carlton and Rubinfeld, who frequently employ average prices rather than indexes.   It is well known that average price series can be very sensitive to changes in product mix.[9] Consider, for example, the prices of TV panels that Dr. Carlton claims are "effectively uncorrelated" with the prices of monitor and notebook panels (¶66). The pattern of average selling price for TV panels over time differs dramatically from the Fisher price index for TV panels, as demonstrated by the figure below.

---

[9]    "Aggregating invoice-level data up to broader average prices to infer price trends can also introduce problems of interpretation. … A regression showing a 'statistically significant' increase in average prices between the two periods may be an artifact of changes in sales mix, with no implications for competitive conduct." (Econometric Primer for Lawyers, Antitrust, summer 2011).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 2: Average selling price and Fisher index for TV panels**



(19)    As is apparent from the figure, the average selling price often moves in the opposite direction than the Fisher price index. Even when the two move in the same direction, the rate of month-to-month change is rather different. Consider, for example, the months October and November 2003, shaded blue in the figure above. The Fisher price index remained approximately unchanged from one month to the next. In contrast, the average selling price increased by approximately 20%.

(20)    Which better reflects market dynamics, the Fisher price index or the average selling price? For the moment, focus on the example of October and November 2003, when the change in the two measures was quite different. Fifty-two different models of TV panels were sold in various quantities in those two months. The figure below is a histogram of the percentage price changes for those 52 TV panel models.[10] The median price change is approximately 0%. The Fisher price index accurately reflects that median change – it is also approximately 0% . In sharp contrast, the change in average selling price, positive 20%, is not evenly remotely representative of the price changes experienced by these TV panel models; indeed, 99.7% of the units of the 52 TV panel models sold in these two months (representing 99.8% of the dollar value of sales) experienced a price change smaller than 20%.

---

[10]    The percentage price changes of the 52 TV models are weighted by the number of units sold in these two months. If the number of units sold of model A is twice as large as that of model B, the price change for model A would receive double the weight of the price change for model B.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 3: Histogram of TV panel price changes from October to November 2003**



(21)     The example of October-to-November 2003 is representative of a broader pattern. The two figures below compare how well the two measures of price dynamics – the Fisher price index and the average selling price – reflect the month-to-month changes in the prices of TV panels over the entire period January 2002 through December 2009. Each figure contains 95 markers, one for each month in the eight-year period. The location of the marker indicates how the change in the measure of price dynamics from one month to the next (depicted on the vertical axis) compares to the median price change for TV panel models that were sold in both months (depicted on the horizontal axis). The closer a marker is located to the dashed 45-degree line, the more accurately the measure of price dynamics reflects price movements for the typical product in the month represented by the marker. It is clear from the first figure that changes in the Fisher price index tend to reflect the change in the price of the typical product rather well. In contrast, the second figure demonstrates that Dr. Carlton's weighted average price reflects the change in the price of the typical product rather poorly –  there are many months in which it substantially exaggerates or understates the median price change, and thus provides a misleading picture of price dynamics.[11]

---

[11]    Visual inspection of the two figures below is confirmed by calculating the correlations. The correlation between changes in the Fisher index and median price change is 0.86, while the correlation between the change in Dr. Carlton's measure of average price and the median price change is only 0.24.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 4: Median price changes and Fisher index changes for TV panels**



**Figure 5: Median price changes and average selling price changes for TV panels**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(22)    Dr. Carlton repeatedly asserts (e.g., ¶61 and ¶305) that, by aggregating over products, I risk confounding changes in panel prices over time with changes in the composition of products; indeed, he goes so far as to opine that this risk is particularly acute *because* I use a price index (¶305).  He repeated this assertion in his deposition, further claiming that "a lot of the movement he's [i.e., Dr. Bernheim is] getting in price is reflecting underlying movements in the composition of the quantities that are being sold of the products," "even if prices were never changing over the period."[12] These bizarre claims are mathematically and factually incorrect. He provides no foundation for them and they have no legitimate basis. The pertinent scholarly literature generally acknowledges that price indexes are designed to *remove* the kinds of compositional effects that plague simple measures of average price, such as the average price measures upon which Drs. Carlton and Rubinfeld repeatedly rely in their reports.[13]  Thus, Dr. Carlton's discussion of changing product composition is a well-deserved indictment of his own report, and of Dr. Rubinfeld's, but not of mine.

(23)    Concerns arising from changes in the product mix render the use of a price index, rather than a simple average price, particularly critical when prices are compared over long periods of time.  Consider again Dr. Carlton's average price series for TV panels. The fraction of commerce in the first quarter of 2003, the first quarter in which TV panels were sold in substantial quantities, accounted for by panel models available in the last quarter of 2009 was only 12%.  Similarly, the fraction of commerce in the last quarter of 2009 accounted for by TV panel models available in the first quarter of 2003 was 0%.  Thus, over sufficiently long time spans, changes in Dr. Carlton's average price series reflect the difference in price *levels* between completely different panel models.  Such comparisons have little if any meaning.  There is also a large shift between *types* of TV panels, for example with 15″ through 30″ TV panels dominating his average in the first quarter of 2003 (accounting for 99.5% of commerce), but giving way to larger panels by the last quarter of 2009 (at which point TV panels of 30″ or less accounted for only 13% of commerce).  In large part, that shift toward more expensive products explains why Dr. Carlton's average price for TV panels, which is contaminated by changes in product mix, declines much more slowly than the Fisher price index (as seen in Figure 2).  By using the Fisher price index, I completely avoid making comparisons between the prices levels of different goods.  Rather, changes in the index between any two

---

[12]    Deposition of Dr. Carlton on April 11, 2012, pages 331.

[13]    The average price measure used by Drs. Carlton and Rubinfeld is known in the economics literature as the Drobisch price index. The Drobisch price index is generally considered an inferior measure of price changes because it "can change even if prices do not change" and "is not invariant to changes in the unit of measurement." (Peter von der Lippe and W. Erwin Deiwert, "Introduction to the Special Issue on Index Number Theory and Price Statistics," Jahrbucher fur Nationalokonomie und Statistik (Journal of Economics and Statistics), vol. 230/6, pp. 660-672). In the above example, if the prices of products A and B had remained unchanged at $10 and $20, respectively, the average selling price would have increased by 30% from $12.50 to $16.25, entirely due to the increase in purchases of the more expensive product, whereas a Fisher price index would have properly reflected the absence of any change. In his seminal book, Irving Fisher placed the index based on an average price measure within a category of "poor" price indexes (one category above "worthless" price indexes and five categories below "superlative" price indexes that include the Fisher price index) and advocated that it should be never used because of its "freakishness," Fisher's term for an index that is "especially erratic." (Irving Fisher, *The Making of Index Numbers*. Houghton Mifflin Company, 1922, pp. 207, 245, 363.)  In contrast, the Fisher price index is known to satisfy 20 desirable properties of price indexes, including (contrary to Dr. Carlton's erroneous assertion) the "identity test" that requires the price index to remain unchanged if prices in the periods under consideration remain constant, irrespective of any quantity change. See Diewert, Walter E. "Fisher Ideal Output, Input and Productivity Indexes Revisited" in *Essays in Index Number Theory* vol. I, ed. W. E. Diewert and A. O. Nakamura. Elsevier Science Publishers, 1993.

---

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

points in time appropriately reflect the average rate of change in prices for goods that were sold in the interim.

(24)    Another potentially serious problem with using measures of average price (of the sort employed by Drs. Carlton and Rubinfeld) is that an average price series changes dramatically when one simply changes the unit of measurement.[14]  The figure below illustrates this point.  In addition to Dr. Carlton's average LCD TV panel price series and my Fisher price series, the figure also displays the average price of an LCD TV panel per square inch, as opposed to per panel.  Except for this change in the unit of measurement (to price per square inch, rather than price per panel), the new average price series is constructed identically to Dr. Carlton's.  Note that the two average price series differ dramatically, and that the new one is much closer to my Fisher price index.  That result is not surprising, because a series that measures price per square inch imperfectly adjusts for the shift in production to larger panels.

**Figure 6: Average TV panel price per unit sold versus per square inch of display area**



(25)    Price indexes are well-suited for the purpose of measuring average overcharges resulting from price-fixing conspiracies affecting multiple products.[15]  To illustrate their suitability, consider the well-known Consumer Price Index (CPI), published by the U.S. Bureau of Labor Statistics.  If an event occurs that

---

[14]    Peter von der Lippe and W. Erwin Deiwert, "Introduction to the Special Issue on Index Number Theory and Price Statistics," Jahrbucher fur Nationalokonomie und Statistik, vol. 230/6, pp. 660-672.

[15]    For example, Fisher price indexes were used to measure overcharges in In re Linerboard Antitrust Litigation, In re Rubber Chemicals Antitrust Litigation, and In re: Dynamic Random Access Memory (DRAM) Antitrust Litigation.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 20 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

causes the CPI to rise by 10 percent, the generally accepted interpretation is that consumer prices are, on average, 10 percent higher. Similarly, if a conspiracy causes the price index for TFT-LCD panels to rise by 10 percent, the proper interpretation is that average TFT-LCD prices are 10 percent higher.

(26)    Dr. Carlton's criticisms of price indexes also reference the report of Dr. Jerry Hausman, another Defense expert (¶245). Dr. Hausman in turn references his own published work on "bias" in the CPI, a topic that has received much scholarly attention.[16] The referenced article actually applauds the use of Fisher price indexes for the purpose of properly accounting for potential compositional effects arising from substitution by purchasers between products over time.[17] However, it also examines possible "biases" arising from the "entry and exit of new models," as Dr. Hausman observes in his report (¶31). Dr. Rubinfeld raises the same issue (¶361): he quotes one of the sources I cited in support of using a Fisher index as saying that the "relative neglect of the new good problem has probably led to an upward bias in the measurement of inflation in most market economies." As criticisms of my report, these comments are completely misguided, and reflect a failure to think through the relevance to the task at hand of a problem that pertains to a rather different question.

- The literature on the Consumer Price Index is concerned with measuring changes in the *cost of living*; it is supposed to show how changes in prices affect the well-being of consumers. Changes in consumer well-being depend *both* on changes in the prices of existing products *and* on changes in the set of available products.[18] To illustrate, recall the simple example described in Figure 1. Suppose a new product, C, is introduced in February 2002 at a price of $5, that many people regard it as interchangeable with product A, and that 1000 units are sold. For many consumers who desire the functionalities provided by these products, the introduction of the low-price product C reduces the cost of living. However, the Fisher price index does not reflect that reduction.[19] That is the issue to which the Defense experts refer.

- None of the Defense experts offer any explanation as to why they consider that issue relevant to the task of measuring overcharges. In fact, it is not relevant. An analysis of overcharges focuses on changes in prices, *not* changes in the well-being of purchasers. The object is to reconstruct the path

---

[16]    Jerry A. Hausman, "Sources of Bias and Solutions to Bias in the Consumer Price Index," *Journal of Economic Perspectives* 17, no.1 (2003): 23-44.

[17]    "This 'constant basket' approach suffers from numerous biases and flaws as the basis for calculating a cost-of-living index. It fails to allow for substitution that occurs when consumers switch away from goods that have become relatively more expensive and toward goods that have become relatively less expensive … The substitution problem can largely be addressed by using a mathematical formula for calculating the Consumer Price Index that, instead of assuming a constant basket of goods, uses the (geometric) mean of the fixed basket approach before and after the price change. The specific formula that gives this average is the Fisher (1922) ideal index." (Hausman (2003), 23-24.)

[18]    "I conduct all my analysis in terms of a cost-of-living index (see the Appendix, where I define mathematically the cost-of-living index). A cost-of-living index is the correct theoretical tool to measure the effect on consumer welfare of price changes, quality changes and introduction of new goods, as the academic literature has long noted." (Hausman (2003), 25.)

[19]    "Many new products and services have a significant effect on consumer welfare… Even when the no longer new good eventually does enter the CPI calculation, no adjustment is made for the consumer gains it provides in relation to the earlier goods…Taking these factors as a whole, the 'invisible hand of imperfect competition' will typically lead to significant welfare gains from successful new product introduction-otherwise, firms would not find it economically rational to introduce new products. Omission of the effects of the introduction of new goods by the Bureau of Labor Statistics is likely to create substantial downward bias in the Consumer Price Index." (Hausman (2003), 25-30.)

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

that prices would have followed, not to reconstruct the path of the typical purchaser's "utility" (which is the object of the "solution to bias" that Dr. Hausman proposed in his cited article). A Fisher price index tells us precisely what we need to know for the task at hand: the average change in price for goods that were actually sold at two consecutive points in time. Because we are not trying to measure something else (unlike those who are interested in measuring consumers' standard of living), the issue of "bias" does not arise.

(27)    Dr. Carlton continues his objection to the use of price indexes by arguing that, because the prices of the underlying products do not move in lock-step, my econometric models of TFT-LCD panel price indexes are "mis-specified" (¶60). In making that argument, Dr. Carlton places himself squarely outside the mainstream of economic thought. It is completely valid, indeed commonplace, for economists to build models of price indexes, and to use those models to predict the values of those indexes, even when the components that make up the index exhibit starkly different patterns over time. Examples include studies that forecast the CPI, wages, stock market indexes, and indexes of house prices.[20] Consider, for example, the task of forecasting the CPI, which quite literally contains apples and oranges. Most of its components are unrelated to each other, and their price movements vary widely.[21] Yet economists routinely build econometric models of the CPI and use them to forecast future price levels (just as I am forecasting the TFT-LCD panel price levels that would have prevailed but-for the conspiracy). The same is true for forecasting analyses using the other types of indexes mentioned above. If Dr. Carlton is correct, all of the work in this substantial and important literature involves misspecified models, and therefore none of it is reliable. Obviously, I disagree, as do the many scholars who work with such models. Because Dr. Carlton does not explain his reasoning, it is impossible to know the source of his confusion, but given his focus on explanatory models, he is likely thinking of the types of misspecification problems that can arise in that context, rather than in the context of predictive models.

## II.A.3. The use of a large panel Fisher price index is appropriate and yields reliable results

(28)    As I have explained, my approach to measuring damages does *not* in any way depend on an assumption that the prices for the various products encompassed by each of my TFT-LCD panel price indexes moved in lock-step. On the contrary, it remains valid even if those movements were noticeably different. I have

---

[20]    See, for example, Phillips, AW, "The relation between unemployment and the rate of change of money wage rates in the United Kingdom, 1861-1957," *Economica*, Nov. 1958, pp. 283-299; Lucas, Robert E. Jr., "Some international evidence on output-inflation tradeoffs," *American Economic Review*, V. 63, June 1973, pp. 326-334; Barro, Robert J. "Unanticipated money, output, and the price level in the United States," *Journal of Political Economy*, V84:4, pp 549-580; Lo, Andrew W. and A. Craig MacKinlay, "Stock prices do not follow random walks: evidence from a simple specification test," *Review of Financial Studies*, V.1:1, Spring 1988, pp. 41-66; Barro, Robert J. "The stock market and investment", *Review of Financial Studies*, V3:1, 1990, pp. 115-131; Ding Zhuanxin, Clive W.J. Granger, and Robert F. Engle, "A long memory property of stock market returns and a new model", *Journal of Empirical Finance*, V1, 1993, pp. 83-106; Poterba, James M. "House price dynamics: the role of tax policy and demography" Brookings Papers on Economic Activity, V2, 1991, pp. 143-203; James Stock and Mark W. Watson, "Forecasting Inflation," Journal of Monetary Economics 44 (1999), pp. 293-335; Case-Shiller Home Price Index Forecasts. Moody's Analytics, Inc. 2010.

[21]    For example, among the products included in the CPI are breakfast cereal, men's shirts and sweaters, prescription drugs, college tuition, and water and sewerage charges. See http://www.bls.gov/cpi/cpifaq.htm#Question_7.

---

compared price movements across groups of products with the expectation of finding *some* substantial similarities, thereby confirming my hypothesis that these prices are influenced by a collection of shared supply and demand factors, and that differences in prices are limited (within tolerances) by supply-side substitution. I did not expect to find identical price patterns; nor did I need to find such patterns to validate my methods and conclusions. In fact, the data exhibit a high degree of similarity across products.

(29)    Dr. Carlton appears to reach different conclusions with respect to the similarities of price movements across groups of TFT-LCD panel products. However, instead of coming to grips with the true justification for my approach, his analysis instead targets the straw-man hypothesis that prices must move in lock-step. In addition, he commits a collection of conceptual errors that lead him to severely understate the degree of similarity between price movements between different products and groups of products. Similar comments apply to his analysis of small panels, which I take up in the next section.

(30)    I will begin with Dr. Carlton's analysis of large panel prices, aggregated to the level of application (notebooks, monitors, TVs). Dr. Carlton finds a high correlation between the de-trended prices of notebook and monitor panels (0.92), but a smaller correlation between those prices and the prices of panels designed for TVs (0.29). He concludes that TV panels yield distinctly different patterns than monitor and notebook panels, but his analysis is misleading for at least two reasons.

- First, within applications, Dr. Carlton examines movements in the average price level (that is, a simple quantity-weighted average) rather than a price index. As I have already noted, such averages can fluctuate considerably due to changes in the product mix. These compositional changes add a great deal of "noise" to the average price series, which reduces their measured correlations for reasons that have nothing to do with the underlying price dynamics.

- Second, Dr. Carlton is wrong to detrend these series before examining their similarities. While it is certainly true that variables may trend together for artificial reasons, the underlying economic structure of this industry implies that the common trends have common sources. By removing the common trends, Dr. Carlton dismisses out of hand, with no valid justification, the most obvious manifestations of common fundamentals. Indeed, given that Dr. Carlton has removed the effects of these important common factors from consideration, a residual correlation of 0.29 is appropriately interpreted as confirming my claim that the price processes have important commonalities.

(31)    When Dr. Carlton's conceptual errors are corrected, the picture that emerges supports my approach unequivocally. Figure 4 displays my price indexes for notebook panels, monitor panels, and all large panels (in each case applying a logarithmic transformation).[22] When comparing price indexes as in this figure, it is important to keep the following points in mind:

---

[22]    I use logarithms here because it is then a bit easier to see the relationships between price fluctuations when prices are low, and because the price paths are more geometric than linear.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI     Document 7944-3     Filed 05/17/13     Page 23 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- The absolute scale of a price index is arbitrary. One can multiply or divide it by any constant without changing its meaning. However, the *shape* of the price index series is meaningful, because it shows how prices changed over time.

- When the paths for two price indexes are roughly *parallel* (in the sense that the distance between them remains approximately constant), one can conclude that the indexes typically change by similar proportions – in other words, that their relative price movements are similar through time. Thus, for *substantive* purposes, the appropriate question to pose when comparing two price series is whether they are roughly parallel. The answer to that question does *not* depend on the scales chosen to represent the series.

- Optically, the easiest way to see whether two price index series are parallel is to adjust the scales with the object of bringing them into alignment. If it is possible to align them in this way, then they are roughly parallel, which means the series typically move together. That is what I have done in all the following figures that I use to compare price indexes.

(32)   The figure below shows that the price movements for monitor and notebook panels were extremely similar to each other, and to those of the overall large panel price index. To aid visual identification of periods during which quantities were low, I use a dotted line to mark the months that account for the first 1% of the total monitor panels sold during the entire time period. Where useful, I employ this convention in subsequent figures, also using a dotted line to mark the months that account for the last 1% of the total quantity of panels.[23] Identifying periods with low quantities is relevant both because price movements tend to be noisier when quantities are low, and because the accuracy of my analysis does not depend on the ability of my overall price indexes to capture the fundamentals that drive the prices of specific products when the quantities of those products are very low.

---

[23]   Because the unit sales of LCD monitor panels in December 2009 accounted for more than 1% of the total unit sales, the LCD monitor price index does not contain a dotted portion for the last 1% of the total quantity. That is not the case for all series.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 7: Monitor and notebook panel price indexes versus large panel price index**



(33)    The figure below compares my LCD TV panel price index to my overall large panel index. The bars in the figure also show the number of units of LCD TV panels sold in each month. As is clear from the figure, the TV panel price index tracks the overall price index quite well, particularly during the period when TV panel unit sales were substantial (i.e., when the LCD TV price index is solid).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 8: TV panel price index versus large panel price index**



(34)   The figure below displays correlations between the price indexes for large panels as a whole, notebook panels, monitor panels, and TV panels.  I separately calculate correlations with the TV panel index for high quantity months (the period April 2004 through December 2009 during which the LCD TV price index is solid in the above figure) and for all months (the period October 2000 through December 2009). These correlations provide statistical confirmation that these price index series are extremely closely related.

**Figure 9: Correlations between price indexes for large panels, by application [24]**

|  | Notebook panels | Monitor panels | TV panels (high quantity months) | TV panels (all months) |
|---|---|---|---|---|
| Large panels | 0.999 | 0.997 | 0.993 | 0.978 |
| Notebook panels | | 0.995 | 0.978 | 0.960 |
| Monitor panels | | | 0.981 | 0.981 |

(35)   As I have explained above, detrending these series inappropriately removes important similarities arising from common market fundamentals.  However, even if one properly detrends them,[25] the strong relationships between them remain self-evident, as demonstrated by the two figures below The first

---

[24]   The correlations presented in this table are based on the log-transformed price indexes shown in the figures.

[25]   Because prices are not trending in a linear fashion, removing a linear trend can produce the odd U-shaped patterns that appear in several of Dr. Carlton's figures.  Removing a linear trend from the log-transformed series mostly avoids that problem.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

compares the detrended notebook, monitor, and large panel price indexes; they lie practically on top of each other. As shown in the second figure, the TV panel price series also tracks the up-and-down movements in the large panel index quite well, particularly during the period when volumes were significant. These figures provide clear confirmation that the prices of these products are driven by shared market fundamentals.

**Figure 10: Monitor and notebook panel price indexes versus large panel price index, detrended**



Case 3:07-md-01827-SI     Document 7944-3     Filed 05/17/13     Page 27 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 11:TV panel price index versus large panel price index, detrended**



(36)     The figure below displays correlations between the detrended price indexes for large panels as a whole, notebook panels, monitor panels, and TV panels.  Once again I separately calculate the correlations with the TV panel index for high quantity months and for all months.[26]  These correlations provide statistical confirmation that the detrended price index series are closely related.   Notice in particular that, when one focuses on the time period during which the vast majority (99%) of TV panels were sold, even the detrended TV price index is especially highly correlated with the other detrended price indexes, just as the figure above suggests.

**Figure 12: Correlations between detrended price indexes for large panels, by application**

|  | Notebook panels | Monitor panels | TV panels (high quantity months) | TV panels (all months) |
|---|---|---|---|---|
| Large panels | 0.98 | 0.96 | 0.87 | 0.57 |
| Notebook panels | | 0.92 | 0.78 | 0.50 |
| Monitor panels | | | 0.84 | 0.66 |

(37)     Dr. Carlton also raises questions about the legitimacy of aggregating prices across goods within application, claiming that "the prices of panels within each category … do not maintain a stable relationship over time" (¶70).  He presents a series of figures showing price paths for selected products subcategories within each of the four major applications, as well as figures that confine attention to

---

[26]    In each case, I detrend based on the months over which the correlation is calculated.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 20

products sold by a single firm.  Once again he attacks a straw man by showing that the price paths are not identical.  Particularly when examining single products, one expects to see a fair amount of "noise" (for reasons I have already discussed), and hence the absence of what Dr. Carlton would call a "stable relationship" is unsurprising.  The noise will be greatest, and what Dr. Carlton construes as evidence of "stability" lowest, in cases where quantities are small.  Dr. Carlton exploits that fact to exaggerate the apparent differences between prices paths in two ways.  First, he does not distinguish between periods of time when the price lines reflect small quantities, and when they reflect large quantities.  Prices during the latter periods merit greater attention for this purpose because they are less noisy.  Second, in many cases, Dr. Carlton cherry-picks low-volume product subcategories for which prices are particularly noisy.

(38)    Once Dr. Carlton's conceptual errors are corrected, the picture that emerges again exhibits substantial commonalities across product subcategories, consistent with my approach to estimating damages.  Figure 10 shows price indexes for Dr. Carlton's notebook panel subcategories; Figures 11 and 12 provide similar information for, respectively, Dr. Carlton's monitor and TV panel subcategories.  For each application, I graph indexes for the most important product subcategories (generally, those accounting for more than 10 percent of the total unit volume).  I then group the remaining product subcategories into groups (by unit volume), so that each group contains roughly one-fifth of the total units, and compute price indexes for each group.  Once these lower volume product subcategories are combined into groups, the noise associated with low volumes tends to average out, and one can see the trends that relate to the market fundamentals for those products more easily.  As before, the dotted portions indicate months that account for the first 1% and last 1% of the total units sold of each product subcategory or group.

(39)    The patterns shown in the following three figures are substantially similar across subcategories. Exceptions are largely confined to periods when volumes were low (as indicated by the dashed lines).  Dr. Carlton's analysis is therefore misleading, and there is no valid reason to be concerned that prices within different product subcategories were driven by different market fundamentals.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 21

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 29 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 13: Disaggregated prices indexes for notebook panels**



**Figure 14: Disaggregated price indexes for monitor panels**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 15: Disaggregated price indexes for TV panels**



(40)    Dr. Rubinfeld raises questions about the representativeness of my analysis with respect to Samsung. These concerns plainly do not apply to large panels.  The figure below shows my large-panel price index, along with a Samsung-only large-panel price index; they are nearly identical.  Corresponding figures for other Defendants appear in Appendix E.  They show a substantial degree of similarity and are consistent with my conclusion that all of these prices are driven by common market fundamentals.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 16: Samsung SEC-specific large panel price index versus large panel price index**



## II.A.4. The use of a small panel Fisher price index is appropriate and yields reliable results

(41)    The Defense experts portray the determination of prices for small TFT-LCD panels as highly heterogeneous and idiosyncratic.  They point out that small panels were less standardized than large panels and often customized to the buyer's specifications; that the number of active suppliers of any given panel at any point in time was often limited by the buyer's "qualification" processes; that certain buyers exercised significant purchasing power; that memorialized communications between the Defendants were typically bilateral rather than multilateral; and that in many instances the memorized communication focused on a single panel or buyer (see, for example, Rubinfeld ¶¶85-91).  They hypothesize that these differences produced dissimilar price movements.  They also portray the communications among the Defendants pertaining to small panels as a collection of largely distinct "mini-conspiracies," each targeting a particular set of panels or a particular buyer, with the overall pattern of uncoordinated communication potentially yielding significantly different overcharges for different products.  Dr. Rubinfeld raises the possibility that, if that variation was systematic, my overcharge estimates might not be properly representative for the product mix associated with a particular Plaintiff or Defendant (Rubinfeld ¶364).

(42)    As with large panels, the Defense experts exaggerate the case against aggregation by ignoring important countervailing considerations.  As explained in Section II.A.1, the prices of small panels depend on

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

shared market fundamentals and are linked by supply-side substitution.  While negotiations with individual purchasers may have idiosyncratic elements, they are typically influenced by, and often benchmarked to, the market.  A powerful buyer that consistently negotiates, say, a 10 percent discount relative to the average prevailing price may pay less than other buyers, but that buyer nevertheless incurs the same percentage overcharge when a conspiracy inflates the market price.

(43)   Nor does the Defense experts' portrayal of the Defendants' communications as distinct "mini-conspiracies" targeting particular panels or buyers provide a legitimate reason for thinking that the overcharge would vary significantly across products.  In their discussions of industry conditions, Drs. Rubinfeld and Carlton both emphasize that entry can undermine collusive agreements.[27]  A TFT-LCD panel producer's ability to shift from producing one small panel to another amounts to highly effective entry; it is certainly far less costly and time-consuming than entering the TFT-LCD panel industry *de novo*, which Drs. Rubinfeld and Carlton take as sufficient to undermine collusion.  Thus, according to their own analyses, it would have been impossible for a localized conspiracy among the producers of a particular panel to sustain substantially higher overcharges than those applying to other panels.

(44)   In contrast, the Plaintiffs allege the existence of a single overarching conspiracy, orchestrated in some cases through bilateral communications, and in others through multilateral meetings.  That allegation makes economic sense for precisely the reason discussed in the previous paragraph: while localized "mini-conspiracies" are vulnerable to highly effective entry by companies producing related products, an overarching conspiracy encompasses those potential entrants.  Moreover, a single overarching cartel potentially encompassing all small (and large) panels would have had strong economic incentives to be comprehensive and target prices more uniformly, so as to avoid incentives for diversion of productive capacity to products with higher markups, as explained in Section II.A.1.

(45)   I will say more about the purported idiosyncrasies of small panels in the next subsection, and I will return to the question of whether there was a single conspiracy or multiple conspiracies in Section V.E.

(46)   As with large panels, one can gauge the importance of the Defense experts' observations by inspecting the price series for different small panel applications as I do in the four figures below.  The first figure displays price indexes for panels identified as mobile phone models in the data, panels identified as non-mobile phone models, and all small panels, while the figure that follows it lists the correlations between those indexes.  The second pair of figures repeat this analysis after detrending the indexes (despite the relevance of their common trends).  These figures provide strong confirmation that mobile phone and non-mobile phone panel prices are closely related and driven by shared market fundamentals.

---

[27]   See, e.g.: Expert Report of Professor Dennis W. Carlton relating to ATS Claim, LLC, et al., (hereafter, "Carlton ATS report") paragraph 142 ("The entry of new firms in an industry is disruptive to a cartel. The disruptive effect of entry *that occurred in the TFT-LCD industry during the damages period* is acknowledged by Plaintiffs."). Expert Report of Daniel L. Rubinfeld relating to ATS Claim, LLC, et al., (hereafter, "Rubinfeld report") paragraphs 183-184 ("Changing sales and share are due in part to periods of entry and exit and varying degrees of investments in capacity and new production technologies. These factors would tend to complicate any conspiracy by making it difficult to align incentives sufficiently to maintain agreement and sustain impact, if any, on price.").

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 17: Comparison of price indexes for mobile phone panels and non-mobile phone small panels**



**Figure 18: Price index correlations for mobile phone panels and non-mobile phone small panels**

|  | Non-mobile phone small panels | Mobile phone panels (high quantity months) | Mobile phone panels (all months) |
|---|---|---|---|
| Small panels | 0.991 | 0.997 | 0.987 |
| Non-mobile phone small panels |  | 0.996 | 0.991 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 19: Comparison of price indexes for mobile phone panels and non-mobile phone small panels, detrended**



**Figure 20: Price index correlations for mobile phone panels and non-mobile phone small panels, detrended**

| | Non-mobile phone small panels | Mobile phone panels (high quantity months) | Mobile phone panels (all months) |
|---|---|---|---|
| Small panels | 0.992 | 0.945 | 0.795 |
| Non-mobile phone small panels | | 0.929 | 0.853 |

(47)    Dr. Carlton presents an analysis which, he claims, shows that the prices for TFD-LCD panels followed "a distinctly different pattern" than TFT-LCD panels (¶¶62-64). That material is relevant to my overcharge analysis for two reasons. First, I have included TFD-LCD panels in my overcharge analysis, along with TFT-LCD panels. Second, substantial conformity between the price patterns for *two completely different types* of LCD panels would underscore the importance of shared fundamentals for TFT-LCD panels that are even more closely related to each other.

(48)    Dr. Carlton's analysis of TFT-LCD vs. TFD-LCD prices suffers from the same conceptual errors as his analysis of average prices for large panel applications, discussed in the last subsection. Given that Dr. Carlton employs a noisy average rather than an index and has removed the effects of trending common factors from consideration, his residual correlation of 0.31 is appropriately interpreted as confirming my hypothesis that the price processes have important commonalities. When Dr. Carlton's conceptual errors

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

are corrected, the picture that emerges supports my approach unequivocally.  This finding is not especially surprising given the technological commonalities between TFTs and TFDs, as well as the fact that some types of finished products can use either.[28]

(49)    The two figures below present an analysis of the patterns of TFT and TFD prices.  The first figure plots the TFT and TFD price indexes against the small panel price index. The correlation between the TFT index and the TFD index is 0.996. The correlations between the TFT and TFD indexes and the small panel price index are, respectively, 0.999 and 0.998.   The second figure below conducts the same comparison using the detrended price small panel TFT and TFD price index series.  The correlation between the detrended TFT and TFD indexes is 0.90. The correlations between the detrended TFT and TFD indexes and the detrended small panel price index are, respectively, 0.98 and 0.95.  These results provide strong confirmation that small TFT and TFD panel prices are closely related and driven by shared market fundamentals.  Dr. Carlton's analysis is once again revealed as misleading and unreliable.

**Figure 21: TFT and TFD small panel price indexes**



---

[28]    For example, in his deposition, Dr. Souri admitted that it would not surprise him to find that both TFT and TFD displays were used in digital cameras because he believes that both had sufficient image quality to be used for this application. He added that in smaller displays where the same degree of pixel control as that offered by TFTs is not necessary, TFDs would perform just fine if designed to meet the same specifications (Deposition of Shukri Souri, pp. 243, 245, and 249-50.)  Dr. Carlton himself believes that TFT and TFD panels share enough manufacturing inputs and end-uses so that "it would be surprising if the prices of both sets of products did not follow a similar pattern." (¶64) Had he appropriately controlled for product mix in his analysis of TFD panel prices, he would have found his expectations fully confirmed rather than reached erroneous conclusions about TFT and TFD panel price.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                          Page 28
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 22: Detrended TFT and TFD small panel price indexes**



(50)    As with large panels, Dr. Carlton also raises questions about the legitimacy of aggregating prices across goods within small panel applications, claiming that "the prices of panels within each category… do not maintain a stable relationship over time" (¶70).  He presents a figure showing price paths for selected small mobile panel products.  The object of this figure is to attack a straw man by showing that the price paths are not identical.  They also suffer from the same conceptual deficiencies as the associated figures depicting prices for large panel products, discussed in the last subsection.

(51)    Once Dr. Carlton's conceptual errors are corrected, the picture that emerges again exhibits substantial commonalities across product subcategories, consistent with my approach to estimating damages.  The two figures below show price indexes for Dr. Carlton's small mobile panel subcategories.  The first figure shows the entire time period 1996 through 2009, while the second figure presents the same information limited to the time period used by Dr. Carlton in his report, September 2004 through September 2008. As with large panels (and for the same reasons), I graph indexes for the most important product subcategories, and group the remaining product subcategories into groups (by unit volume), so that each group contains roughly one-fifth of the total units.   The patterns shown in the figures are substantially similar across subcategories.  Most exceptions are confined to periods when volumes were low (as indicated by the dotted lines).  While there are some discrepancies across product subcategories when volumes are high, they are not so large or frequent as to create serious concern that prices within different product subcategories were driven by different market fundamentals.  Thus, Dr. Carlton's analysis is once again misleading.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 23: Disaggregated prices indexes for mobile phone panels**



**Figure 24: Disaggregated prices indexes for mobile phone panels (Carlton time period)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 38 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(52)  I do not mean to suggest that there were no differences in price movements across small LCD panels, or that the conspiracy may not have affected different products differently, at least to some degree. To reiterate, my analysis does not assume that the prices of the products in my small panel index moved in lock-step. Rather, as explained above, I assume that the prices of these products responded to shared market fundamentals. Based on the preceding analysis, that assumption is plainly valid. Consequently, it is both appropriate and advantageous to treat all small panels together, and to measure the impact of the conspiracy on average panel prices, as I have done.

(53)  It is of course fair to enquire whether the average effect of the conspiracy on small panels prices is representative of its effect on the average prices at which a particular Plaintiff bought, or a particular Defendant sold, small panels. In my first report, I conducted such an analysis for Motorola by computing a Motorola-only index and comparing it with my overall small panel index. The figure below shows the two price series as well as the quantity of panels sold to Motorola by the defendants. As noted in my first report, the series track each other closely, which demonstrates that the representativeness of the small panel index for Motorola.

**Figure 25: A Motorola price index versus the small panel price index**



(54)  Dr. Rubinfeld takes issue with my interpretation of the version of this figure that appeared in my first report. He argues that it is "more appropriate" to normalize Motorola's price series so that it coincides with the small panel price series in the first month of Motorola's purchases (¶372). Because Motorola's prices declined more rapidly at the end of 2003 when its purchases were still very small, he thereby

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

produces an apparent gap between Motorola's prices and small panel prices, which he claims contradicts my conclusion. His reasoning is incorrect. I explained how one compares price index series in Section II.A.3, but it is worth reviewing the key points in light of Dr. Rubinfeld's confused comments.

■ The absolute scale of a price index is arbitrary. One can multiply or divide it by any constant without changing its meaning. Dr. Rubinfeld appears to recognize this key principle: he writes that price indexes "can be multiplied or divided by a constant and exhibit the same dynamic changes in prices over time" (¶371).[29] But then it necessarily follows that Dr. Rubinfeld cannot claim to have chosen a "more appropriate" scale. His statements are plainly contradictory. If the scale is arbitrary, then one scale cannot be "more appropriate" than another.

■ While the scale of a price index is not meaningful, the *shape* of the price index series is meaningful, because it shows how prices changed over time.

■ When the paths for two price indexes are roughly *parallel* (in the sense that the distance between them remains approximately constant), one can conclude that the indexes typically change by similar proportions – in other words, that their relative price movements are similar through time. Thus, for *substantive* purposes, the appropriate question to pose when comparing two price series is whether they are roughly parallel. The answer to that question does *not* depend on the scales chosen to represent the series.

■ Optically, the easiest way to see whether two price index series are parallel is to adjust the scales with the object of bringing them into alignment. If it is possible to align them in this way, then they are roughly parallel, which means the series typically move together. That is what I have done.

■ Precisely the same conclusion follows from Dr. Rubinfeld's Exhibit 60. The Motorola-only and small panel price indexes are not parallel for a short period of time during 2003, during which Motorola's purchase volume was relatively low. However, from the start of 2004 onward, the two series are roughly parallel.

■ Thus, whether one looks at Dr. Rubinfeld's Exhibit 60 or my Figure 25 there is only one valid conclusion: for a short period of time during 2003 when Motorola's purchase volumes were relatively low, the prices it paid moved somewhat differently than the small panel price index.[30] However, for the period of time during which Motorola made substantial purchases, movements in the small panel price index are highly representative of movements in Motorola's prices.

(55) A particularly notable feature of the figure above is that the Motorola price index tracks the small panel price index particularly well during the conspiracy period. Remember that overcharges vary considerably over time. If the conspiracy affected Motorola's prices to a smaller extent than small panel prices in

---

[29] Dr. Rubinfeld appears to think I have ignored this principle: he writes that my analysis "provides no basis to conclude that Motorola bought at prices at similar levels as the industry as a whole" (¶371). But I never made the claim that he is disputing.

[30] This finding is not at all surprising and raises no legitimate cause for concern. As I have explained, price movements are "noisy" when volumes are low. It is also possible that Motorola obtained progressively better terms relative to the market during the ramp-up period as its volume grew.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

general, then when overcharges were larger, small panel prices in general should have been higher relative to Motorola's prices. Likewise, when overcharges were smaller, small panel prices in general should have been lower relative to Motorola's prices. The figure below explores those possibilities by comparing the two indexes relative to my small panel overcharge estimate.[31] Because the Motorola price index closely tracks the small panel price index irrespective of the magnitude of my small panel overcharge estimate, Motorola did not find itself at an advantage relative to the general market when overcharges were high. It follows that overcharges for Motorola were the same as for small panels generally.

**Figure 26: Comparison of Motorola price index, small panel price index and small panel overcharges**



(56)   Dr. Rubinfeld also provides an analysis of Samsung's prices, but makes a similar conceptual error that invalidates his conclusions. In his Exhibits 58 and 61, he chooses to normalize Samsung's price index so that it coincides with the market index at a time when Samsung's sales were negligible. Because price movements for Samsung (like Motorola) were less similar to market price movements when Samsung's sales volumes were low, Dr. Rubinfeld produces pictures appearing to show that Samsung's prices substantially diverged from market prices. Optically, his Exhibit 61 appears to suggest that Samsung's prices were below my but-for prices, but of course that conclusion commits the error of assuming that it is meaningful to compare the absolute levels of two price indexes. Once again, the relevant substantive question is whether the two price index lines were roughly parallel during periods when Samsung's

---

[31]   The precise definitions of these variables appear in my workpapers.

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 41 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

volumes were substantial.  The answer to that question is apparent from the figure below.  From mid-2003 to the end of 2008, its prices tracked the small panel price index rather closely.  The substantial divergences observed prior to 2003 likely reflect the noisiness associated with very low volumes.  Notice that from the beginning of 2005 through the end of 2005, the Samsung-only small-panel price index tracked the overall small panel price index closely, even though the small panel overcharges fell sharply (from 37% to 21%).  Consequently, there is no reason to think that Samsung's prices were affected differently by the conspiracy than small panel prices generally.

**Figure 27: A Samsung SEC small panel price index versus the overall small panel price**



(57)   Corresponding figures for other Defendants appear in Appendix E.  They show a substantial degree of similarity and are consistent with my conclusion that all of these prices are driven by common market fundamentals.

## II.A.5. The use of a small panel price index is appropriate and yields reliable results specifically with respect to Motorola

(58)   The Defense experts point to various features of transactions with Motorola which, they assert, imply that those transactions were distinct in important ways from other transactions.  From these arguments they would draw the conclusion that it is inappropriate to mix the Motorola transactions with other transactions for the purpose of measuring overcharges.  Below, I explain why their concerns are exaggerated.  Ultimately, however, the question is an empirical one, and the Defense experts have conducted no

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 34

analyses to determine the importance of the considerations they discuss. All of their assertions must be evaluated in light of the comparisons between the Motorola-specific and small panel price indexes presented in the previous subsection and in my first report. The fact is that the prices Motorola paid tracked small panel prices generally, and the relationship between Motorola's prices and small panel prices general did not change during the conspiracy period as overcharges varied. Consequently, there is no reason to think that the allegedly distinctive characteristics of Motorola's transactions are consequential for the task at hand.

(59)    One theme in the Defense experts' reports is that Motorola was a large buyer with market power, and that large, powerful buyers may to some degree be insulated from the effects of a conspiracy (e.g., Rubinfeld ¶¶214-216, 247).[32] Though I have seen speculation to this effect in the economic literature, I am aware of no meaningful empirical confirmation; see Section VI.B. Nor is it at all clear that buyer market power would reduce the proportional effect of a conspiracy. Buyers tend to benchmark their negotiations against market prices, and the Defense experts' reports show that Motorola did precisely that (e.g., Williams ¶71). If a buyer consistently negotiates roughly the same percentage discount relative to the market, then a price-fixing conspiracy will have the same proportional effect on that buyer's price as on the market more generally. Suppose, for example, that a large buyer consistently negotiates a 10% discount relative to the market, but that a price-fixing conspiracy increases the market price from $100 to $120. Then the conspiracy will increase the buyer's discounted price from $90 to $108, also an increase of 20%.

(60)    The same principle applies even when a buyer's market power changes over time. Continuing with the last example, suppose the buyer switches its negotiating tactics partway through the conspiracy, and succeeds in negotiating a discount relative to the market of 20% rather than 10%. The price it pays will not track the market price: if the market price stays constant at $120, the buyer's price will fall from $108 to $96. However, but-for the conspiracy, the buyer would instead pay $90 during the early portion of the conspiracy (a 10% discount on the but-for price of $100), and $80 dollars during the later portion (a 20% discount on the but-for price of $100); note that the cartel markup is 20% in both cases ($108 vs. $90, and $96 vs. $80), the same as for the overall market.

(61)    A number of the defense experts observe that Motorola adopted new negotiating tools in 2005 for purchases in 2006 (see, e.g., Rapp, ¶¶64, 80-83, Mallinson, ¶96, Carlton, ¶¶149-152, Rubinfeld ¶247). These tools included the Rapid Sourcing Initiative (RSI), which awarded long-term contracts to low bidders. Dr. Rapp says that the RSI was significant because it allowed Motorola to play suppliers off against each other (¶¶80-83), but his own discussion shows that Motorola was doing so before the RSI (e.g., ¶60). He and Dr. Mallinson also quote Motorola sources indicating their belief in the effectiveness of the RSI (Rapp, ¶¶95-96, Mallinson ¶96). But market prices for small panels were declining generally at this point in time, in part (as my analysis shows) as a result of the collapse of the conspiracy. Motorola personnel and/or consultants may have attributed the price decline to its new negotiating tactics simply because it was unaware of the conspiracy's existence and collapse. In any case, as discussed in the

---

[32]    Contrary to Dr. Williams' puzzling assertion (¶40), I do not assume that Motorola was a price taker.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

previous paragraph, a change in negotiating strategy does not decouple prices from the broader market, even if it is successful.

(62)   The defense experts have emphasized that Motorola's new negotiating tactics under the RSI included "clean-sheet pricing," which represented an attempt to work up prices from suppliers' costs (see, e.g., Rapp ¶82 , Mallinson ¶95, and Carlton, ¶149, Williams ¶¶40, 70, Rubinfeld ¶¶214-216).  Some of these experts seem to suggest that Motorola switched to a posture of negotiating based on a cost benchmark rather than a market benchmark, so that a price fixing conspiracy impacting market prices would not affect Motorola.  However, Motorola obtained the cost information from the suppliers, who naturally were interested in justifying higher price quotes, in line with the prices charged other buyers.  Dr. Mallinson concedes this point, but quotes Motorola sources as saying they would disregard those numbers if they were "wildly different" from other estimates (¶96).  He does not, however, offer any reason to believe that a difference on the magnitude of my estimated overcharges would have been regarded as "wildly different."  In addition, Motorola's attempt to gather and use supplier cost data did not start with the RSI (Rubinfeld ¶102).

(63)   In Figure 25, the Motorola price index tracks the small panel price index equally well in 2005 and 2006, before and after the RSI took effect.  If one looks very closely, one can see that the Motorola index moves from just above the small panel index at the end of 2005 to being approximately equal to it in 2006. (Remember that this is properly interpreted as a relative price movement – the absolute levels of the indexes are not meaningful.)  Possibly this movement was a consequence of the RSI.  But if so, it is plain that the RSI did not break the relationship between Motorola's prices and market prices.

(64)   The defense experts' reports contain references to a number of other considerations which, in their views, made Motorola's transactions distinctive.  These include the fact that Motorola qualified a relatively limited number of suppliers (Rubinfeld ¶225), and that it used various techniques to keep prices secret and hence hard to monitor (Rapp ¶64), for example through "price masking" strategies (e.g., Mallinson ¶100, Rapp ¶72).  But Motorola solicited bids from suppliers even before qualifying them, and used those bids for bargaining leverage with qualified suppliers; hence the number of qualified suppliers is of limited relevance for the competitive outcome.  Moreover, the Defense experts neither argue, investigate, nor prove that Motorola's practices was distinctive compared with the rest of the industry, or relevant to the impact of the conspiracy.  Their importance is merely asserted.  The fact is that Motorola's prices nevertheless moved in parallel with the market.

(65)   Dr. Rapp claims that, based on these features of the EID-Motorola transactions, one can only estimate the effect of the conspiracy for EID using Razr TFT acquisition prices.  He asserts that my analysis homogenizes Motorola EID or EEA transactions with other panel transactions, so that the "distinctive patterns" for the Motorola EID-EEA transactions are lost (¶34).  But for all of this rhetoric, he never actually bothers to actually compare price patterns, and determine whether Motorola's prices in fact exhibited a distinctive pattern.  They were not distinctive.

## II.A.6. It is appropriate to use separate Fisher price indexes for large and small panels

(66)    The overcharge analysis presented in my first report involves the estimation of separate models for large and small TFT-LCD panel price indexes.  My decision to estimate separate models, rather than a single all-panel model, involved the following considerations: the large/small panel distinction is one that is widely emphasized by industry participants, including DisplaySearch and the Defendants in their own documents;[33] the sets of conspirators were somewhat different (though certainly overlapping), with Japanese firms playing a larger role for small panels; the mode of communication among conspirators differed; data on large and small panels were sufficiently plentiful in each instance to capture market fundamentals, so that the advantages of further aggregation were reduced; supply-side substitution was likely more straightforward among large panels and among small panels than between large and small panels; the large and small panel price indexes exhibit different movements over a long period of time during which data were plentiful for both; and part of my charge was to estimate damages for parties that only purchased small panels, rather than a more representative mix of large and small panels.

(67)    In commenting on my analysis, Dr. Carlton quotes a passage from my first report in which I say that "I estimate separate models for large and small panels rather than a single model because the characteristic price patterns for these two groups of products are identifiably different" (¶328).  Dr. Carlton then suggests that I have been inconsistent, in that the price movements for smaller groups of TFT-LCD products are also identifiably different.  He takes this as an indication that I should have disaggregated further and accuses me of "violating by own standard" (¶329).  The statement from my first report is literally correct in the following sense: if I had found that the price movements for large and small panels were identical, I would not have seen a reason to distinguish between small and large panels for the purpose of my econometric models.  What Dr. Carlton misses, however, is that the statement he quotes was made against the backdrop of the rest of my report, and that the identifiably different price patterns led me to prefer disaggregation in light of other important considerations, which I have summarized above. I have never taken the position that identifiably different price movements *by themselves* necessitate disaggregation, nor does such a statement accurately reflect my opinion.[34]

(68)    Dr. Carlton is also incorrect in saying I agreed that it is "*necessary* to analyze large and small panels separately" (¶69, emphasis added).  On the contrary, it is entirely possible that one could develop a reliable estimate of average overcharges for all TFT-LCD panels by modeling an all-panel price index.  My opinion is that, with respect to large versus small panels, disaggregation yields a *better* model; in other words, it is *preferable*.  Some of the considerations that lead me to disaggregate between large and small panels, including identifiable differences in price patterns, can also be used to draw distinctions between different types of large or small panels, but to a much smaller degree.  Because aggregation

---

[33]    It is also acknowledged by many of the defense experts.  See, e.g., Williams ¶19, Rubinfeld ¶40, and Cremieux ¶17 and ¶29).

[34]    To put the matter more precisely, Dr. Carlton is interpreting my statement about identifiably different price patterns as a necessary and sufficient condition for preferring disaggregation, whereas I intended it, in context, to be a necessary but not sufficient condition.

involves potential advantages and disadvantages, the decision to aggregate (or not) is one that inherently involves expert judgment.

(69)    Finally, in saying that the price patterns for large and small TFT-LCD panels are identifiably different, I do not mean to suggest that they are entirely unrelated. Because large and small panel prices respond to many of the same market fundamentals, and because there is substantial supply-side substitution between these two sets of products (see Section **Error! Reference source not found.**), I would expect to find ome systematic relationship between their prices. Dr. Carlton claims to find very little relationship (¶66), but his analysis suffers from the same conceptual errors discussed in Section II.A.3 with respect to the differences between large panel applications. Even after detrending (which removes important common factors from the mix), Dr. Carlton's estimate of the residual correlation between these series is non-trivial (0.19), and in no way inconsistent with the opinions I have expressed.

## II.A.7. Drs. Carlton and Rubinfeld take internally inconsistent positions on the subject of aggregation

(70)    Drs. Carlton and Rubinfeld both express the view that, instead of aggregating, it is better to analyze prices at a highly disaggregated level, using econometric specifications with product-type fixed effects. Yet portions of their analyses assume or imply that a high level of aggregation is equally if not more appropriate. Examples include the following:

- To support his claim that changes in TFT-LCD panel prices are largely driven by changes in cost, Dr. Rubinfeld estimates two econometric models describing, respectively, the average price for *all* of Samsung's large TFT-LCD panels, and the average price for *all* of Samsung's small TFT-LCD panels, as functions of various cost components.[35] This is the same level of aggregation that I employ in my overcharge analysis; Dr. Rubinfeld's method of aggregation is plainly less reliable because he uses the average unit price, which is much more susceptible to changes in product mix than a price index. Dr. Rubinfeld cannot consistently rely on his analysis of these models, as his report says he does, unless he concedes the legitimacy of aggregating prices to the level of *all small panels* and *all large panels* prior to studying their determinants.

- Dr. Carlton aggregates sales data to the application level in his Figures II-4 through II-14. He aggregates prices to the level of all small TFT-LCD panels (and all TFD-LCD) panels in his Figure III-1. He aggregates prices to the application level in Figure III-3 and for the correlation analysis in

---

[35]    Rubinfeld report, Exhibits 43 and 44 ("The price per unit for Samsung large panels is calculated as the average unit price for monitor, notebook and TV panels with sizes 10″ and larger… The price per unit for Samsung small mobile panels is calculated as the average unit price for all mobile device panels less than 10″. The quarterly cost data begins in 2002."). To be clear, this analysis, with average price calculated at the same level of aggregation, also appeared in Dr. Rubinfeld's expert report related to the litigation involving the indirect class. See Expert Report of Daniel L. Rubinfeld relating to the Indirect Purchaser Class Action, submitted on July 28, 2011, Exhibit 21 ("The price per unit for Samsung panels is calculated as the average unit price for all (internal and external) monitor, notebook and television panels 10″ or more in size.") That report was filed by Dr. Rubinfeld several months before I submitted my report. Moreover, the econometric specifications in question are not designed to measure overcharges. Thus, Dr. Rubinfeld cannot legitimately claim to have made this modeling decision to "minimize differences with Dr. Bernheim's analysis."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Table III-1.  Plainly, none of the conclusions he draws from these analyses can be valid unless he concedes the validity of aggregation, at least to these levels.  In all cases, he aggregates price by computing the average unit price, which is much more susceptible to changes in product mix than an index.  Thus, he cannot rely on these price analyses unless he assumes that the changes in product mix, which he claims plague my analysis, are unimportant.

■ Surprisingly, after criticizing my analysis on the grounds that it measures a single average percentage overcharge for all the products the model encompasses, *Drs. Carlton and Rubinfeld do precisely that*. In particular, their models include a single cartel dummy variable, and one must interpret the coefficient of this variable either as the percentage overcharge for all products subsumed by the model, or as the average overcharge for those products.  More specifically, Dr. Carlton measures single overcharge percentages for all notebook panels and all mobile panels, while Dr. Rubinfeld measures single overcharge percentages for all Samsung small mobile panels and all defendants' small panels. This is internally inconsistent, because Dr. Carlton objects to aggregation within application categories (see his Section III.C), while Dr. Rubinfeld objects to aggregation over panel products, applications, customers, and manufacturers (¶364).   To make matters worse, Drs. Carlton and Rubinfeld go further, and in each case estimate a single overcharge percentage for the entire conduct period.  Taken literally, their models say that the overcharge percentage was the same for every product subsumed by the model at all points in time throughout the conduct period.

■ Though the econometric models Drs. Carlton and Rubinfeld use to measure overcharges are estimated using fairly disaggregated data, their specifications imply that higher level aggregation is valid – in Dr. Carlton's case, at least to the application level, and in Dr. Rubinfeld's case across all small panels from all defendants. In particular, each of these models assumes that all supply and demand factors have precisely the same proportional effects on the prices of all the products that the model subsumes. Under that assumption, an aggregate price index will track these factors in precisely the same way as disaggregated prices, on average.

■ While Dr. Carlton conducts his econometric overcharge analysis at the application level (i.e., for mobile, notebook, monitor, and TV panels), he ultimately takes his results for notebook panels as sufficiently representative to offer an opinion concerning the level of overcharges for all large panels based on notebook overcharges, and he takes his results for mobile phones as sufficiently representative to offer an opinion concerning the level of overcharges for all small panels based on mobile overcharges, based on the flimsiest of reasoning with no supporting data analysis whatsoever (¶282).  His analysis therefore presupposes (and treats as presumptively reasonable) a high degree of comparability and generalizability across applications.[36]  At a minimum, Dr. Carlton apparently believes he is entitled to assume that adequate similarities between applications exist whenever he feels the need to call upon them for the purpose of his own analysis.

---

[36]  Briefly, Dr. Carlton argues that, because certain simple conditions differed between applications, the damages for monitor, TV, and other small panels must be smaller than those estimated for notebook and mobile panels.  This argument is predicated on the unstated premise that, apart from those simple conditions, the applications are in fact comparable (so that if those few differences were absent, the effect of the conspiracy would have been the same).

■ Even ignoring the considerations discussed above, both Dr. Carlton and Dr. Rubinfeld average prices over groups of panels defined by defendant-application-size-resolution combinations in their overcharge analyses. While these are certainly much narrower categories than, say, application, neither Dr. Carlton nor Dr. Rubinfeld present any data analysis to demonstrate that this level of aggregation remedies any of the problems with which they are concerned.

## II.B. My overcharge analysis employs appropriate predictors

(71) My econometric analysis of overcharges involves a collection of econometrics models that I use to predict the prices that would have prevailed based on various combinations of a large assortment of supply and demand factors. These factors include:

■ Total industrial production for the G7 countries (Canada, France, Italy, Japan, United Kingdom, United States, and West Germany);

■ Total industrial production for South Korea;

■ Producer price index for microprocessors;

■ Capital investment in South Korea;

■ Total industrial production for Japan and Taiwan;

■ Capital investment in Japan and Taiwan;

■ The prices of copper and oil;

■ General labor costs for Japan, South Korea, and Taiwan;

■ Shipping costs;

■ Exchange rates for the United States and Europe with respect to Japan, South Korea, and Taiwan;

■ LCD panel production capacity;

■ Large panel Fisher cost index and small panel Fisher cost index;

■ South Korea cathode ray tube (CRT) prices.

(72) All of my specifications include the first four key variables plus first and second lags of the price index; as I explained in my first report, those variables turn out to parsimoniously capture the key economic factors influencing the prices of LCD panels, but my analysis is in no way limited to them.

(73) Here I address two criticisms discussed by the Defense experts: first, that the inclusion of the microprocessor producer price index (MP-PPI) variable is inappropriate; second, that I should have examined variables measuring other aspects of supply and demand.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 40

### II.B.1. The microprocessor producer price index (MP-PPI) is a highly relevant economic variable, and its exclusion from my models would be inappropriate

(74)    Based on Dr. Fontecchio's first report, I concluded that the MP-PPI is a reasonable proxy for a collection of technological factors influencing LCD panel production costs.  Several Defense experts dispute Dr. Fontecchio's conclusions.  Having reviewed their reports, and having discussed them with Dr. Fontecchio, I remain convinced that the MP-PPI is a highly relevant economic variable, and that its exclusion from my models would be inappropriate.  Indeed, for the reasons discussed below, the reports submitted by Dr. Souri and Mr. Mallinson have strengthened my confidence in that opinion.  They prove not only that the MP-PPI is a highly relevant economic variable, but also that there is no adequate substitute for this variable.

(75)    As Dr. Souri, Mr. Mallinson, and others have emphasized, the explosive growth in the demand for, and production of, products that use TFT-LCD panels has been driven by the rapid progress in microprocessor technology.

- In a section titled "Cellular Revolution Contributors," Mr. Mallinson wrote as follows: "Mobile phones are small computers that have improved substantially over the last decade or so as computing power (in absolute terms and per unit cost) in phones has increased enormously including digital communications and graphics processing, as it has in microprocessors."[37]

- Mr. Mallinson elaborated on this theme in his deposition, as follows: "Mobile phones are like computers. Certainly today's smartphones are. And so the technology that goes into them, the brain of a mobile phone is called a communications brain , is called a baseband processor. It has quite a bit of commonality with the microprocessor that goes into a computer."  "When we're talking about microprocessors, we think of these chips going into the PCs. These kind of devices also go into mobile phones. Sometimes they call them application processors rather than microprocessors, but they're effectively the same thing."  "There's a lot of developments that are occurring related to mobile phones … lots of developments there in terms of the baseband processors … they've moved on in leaps and bounds in terms of capabilities, the performance that they can achieve, if you like, data pumps."[38]

(76)    The rate of progress in microprocessors is most succinctly summarized by a phenomenon known as "Moore's Law."   Mr. Mallinson describes Moore's Law as "[t]he well-known and widely accepted (in the electronic industry)… phenomenon – that processing power per dollar (as determined by cost reduction, performance increase or a combination of the two) doubles every couple of years…" (¶120). He further observes that "[t]he 'Moore's Law' phenomenon significantly impacts microprocessor manufacturing, costs, and prices…" (¶127).  As far as I know, these statements are also generally accepted and uncontroversial.

---

[37]    Expert Report of Keith Mallinson relating to Costco et al. (hereafter, "Mallinson report"), ¶35.
[38]    Deposition of Keith Mallinson, pp. 26, 187, 75-76.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(77)    In light of these observations, the MP-PPI is highly relevant to the determination of TFT-LCD panel prices because it captures the technological developments that drove the explosion of demand for, and production of, products that use those panels.  Mr. Mallinson closes the loop by opining as follows:

- "…the annual decline over this period in the index Dr. Bernstein [sic] selects is *uncannily close* to what Moore's Law predicts over this period" (¶132, emphasis added).

- The Moore's Law phenomenon "is *unique* to silicon chip devices including microprocessors, memory and digital camera imaging devices" (¶120, emphasis added).

(78)    Note in particular Mr. Mallinson's use of the word "unique" – on its face, his statement plainly implies that the MP-PPI plays a critical role in my models that cannot be performed by any other variables under consideration, none of which capture the developments in microprocessor technology that have driven the capabilities of, and hence demand for and production of, products containing LCD panels.  My understanding is that Dr. Fontecchio concurs with Mr. Mallinson's view of these issues, and their opinions comport with my reading of the industry literature. Finally, in his report Dr. Rubinfeld agreed that "all LCD applications (including smartphones, televisions, notebooks, and computer monitors) contain microprocessors and/or other semiconductors, and so one would tend to expect similar demand and supply forces to affect these industries."[39] Accordingly, there is a compelling economic justification for including the MP-PPI in all of my models.

(79)    I now turn to the question of whether, in addition, the MP-PPI serves as a reasonable proxy for a collection of factors influencing LCD panel production costs.  Having reviewed the reports of Dr. Souri and Mr. Mallinson, and having discussed them with Dr. Fontecchio, I remain convinced that it does.  Dr. Souri and Mr. Mallinson point out that some of the variation in LCD panel production costs is unrelated to microprocessor costs.  They also note that some of the variation in microprocessor costs has relatively little to do with LCD panel production costs.  Both of these observations are largely beside the point.  The relevant question is whether there are significant sources of variation in microprocessor production costs that are strongly related to significant sources of variation in LCD panel production costs.  That is the question which Dr. Fontecchio addressed in his first report; he concluded that such sources of variation are indeed present.  Dr. Souri and Mr. Mallinson actually concede this point to varying degrees:

- Mr. Mallinson acknowledges that TFT-LCD panels and semiconductor devices "have some manufacturing process commonality…" (¶117), and that the electronic parts in LCD panels are "somewhat subject to Moore's Law…" (¶126)

- Likewise, Dr. Souri writes that the process "used to produce an array of thin-film transistors or thin-film diodes on one motherglass…" is "akin to semiconductor device manufacturing" (¶ 60).

---

[39]    Rubinfeld report, ¶253(d).

■    In his deposition, Mr. Mallinson described the manufacturing process for microprocessors and agreed that similar techniques are used in the manufacturing of TFT-LCD arrays. These techniques include photomasking, etching, and doping processes.[40]

(80)    Though they acknowledge these commonalities, the Defendants' experts argue that a large share of LCD production costs are not affected by factors of relevance to both LCD and microprocessor manufacturing.[41]  However, they overlook the fact that the impact of an enormous decline in some moderately important component of LCD production costs is potentially much more consequential for those costs than a small change in all other components combined.  Instead, they leap from the observation that, because the MP-PPI declined much faster than LCD production costs, it must be a poor proxy for those costs (see, e.g., Carlton ¶322, and Mallinson ¶130).  But that leap is not justified.  The implication of Dr. Fontecchio's testimony is that various technological developments of relevance to LCD and microprocessor production led to significant process improvements and cost reduction in both, *not* that those developments led to the same (or even a similar) proportional reduction in production costs for both.  If any lesson is to be drawn from the steep decline in the MP-PPI, it is that the factors driving this decline were so powerful that they likely had a significant impact through shared technology on LCD production costs, despite other important differences between the two manufacturing processes.  Whether the MP-PPI and LCD production cost series declined by similar amounts is entirely beside the point.

(81)    Accordingly, the opinions of Drs. Fontecchio, Mr. Mallinson, and Dr. Souri are collectively consistent with the view that the MP-PPI is an appropriate proxy for an important component of the variation over time in LCD production costs.  Dr. Souri raises the possibility that some other semiconductor index might serve as a better proxy.  I understand that Dr. Fontecchio has concluded, on the contrary, that it is the advancements in microprocessor production technology that have important technological spillovers for other sectors of the semiconductor industry.  In order to shed some additional light on this matter, I computed correlations between my TFT-LCD panel production cost indexes and the various semiconductor indexes at issue here.  The MP-PPI is slightly more correlated with costs than the alternatives for large panels, and slightly less correlated with costs than the alternatives for small panels.  Accordingly, I find no evidence that Dr. Souri is correct.  Given the superiority of MP-PPI in capturing the developments in microprocessor technology that drove the capabilities of (and hence demand for) products that use TFT-LCD panels, the MP-PPI clearly emerges as the preferred variable on economic grounds. The inclusion of the MP-PPI is also clearly preferred based on statistical criteria.

(82)    One can also assess the appropriateness of including the MP-PPI, and of substituting or adding other semiconductor indexes, by applying statistical criteria.  In particular, I employ the Akaike Information Criterion (AIC) and the Bayesian Information Criterion (BIC), which are both widely used and generally accepted for this purpose. [42] Results appear in Figure 28 and Figure 29 below. As these tables show, the

---

[40]    Deposition of Keith Mallinson, April 11, 2012, pp. 202-8.

[41]    See, for example, Mallinson Report, ¶126.

[42]    See William Greene, *Econometric Analysis*, 5th ed. (Prentice Hall, 2003), pp. 159-160.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                    Page 43
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

models that include the MP-PPI perform better than the models that substitute one of the other semiconductor indexes proposed by Dr. Souri, as well as (in almost all cases) better than models that add the other semiconductor indexes to the specification without removing the MP-PPI.

**Figure 28: Change in statistical performance when dropping or replacing MP-PPI with other semiconductor indexes**

|  | Statistical criteria | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|---|
| Large TFT panels | AIC | Drop MP-PPI | Worse | Worse |
|  |  | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Worse | Worse |
|  |  | Other semiconductor devices | Worse | Worse |
|  | BIC | Drop MP-PPI | Worse | Worse |
|  |  | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Worse | Worse |
|  |  | Other semiconductor devices | Worse | Worse |
| Small TFT panels | AIC | Drop MP-PPI | Worse | Worse |
|  |  | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Worse | Worse |
|  |  | Other semiconductor devices | Worse | Worse |
|  | BIC | Drop MP-PPI | Worse | Worse |
|  |  | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Worse | Worse |
|  |  | Other semiconductor devices | Worse | Worse |

**Figure 29: Change in statistical performance when adding other semiconductor indexes along with MP-PPI**

|  | Statistical criteria | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|---|
| Large TFT panels | AIC | Semiconductors and related devices | Better | Worse |
|  |  | Integrated microcircuits | Better | Worse |
|  |  | Other semiconductor devices | Worse | Worse |
|  | BIC | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Worse | Worse |
|  |  | Other semiconductor devices | Worse | Worse |
| Small TFT panels | AIC | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Better | Worse |
|  |  | Other semiconductor devices | Worse | Worse |
|  | BIC | Semiconductors and related devices | Worse | Worse |
|  |  | Integrated microcircuits | Worse | Worse |
|  |  | Other semiconductor devices | Worse | Worse |

(83)    Accordingly, based on both economic and statistical considerations, there is a compelling case for including the MP-PPI in my econometric models. There is perhaps a weak argument for including the

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

other semiconductor indexes in my models *on top of* the MP-PPI, but not for replacing it. The estimated overcharges for such corroborating analysis are shown in Figure 30.[43]

**Figure 30: Comparison of estimated overcharges when adding other semiconductor indexes along with MP-PPI**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Parsimonious model | 18.9% | 17.8% |
|  | Add semiconductors and related devices | 24.7% | 20.5% |
|  | Add integrated microcircuits | 26.0% | 21.8% |
|  | Add other semiconductor devices | 16.9% | 17.5% |
| Small TFT panels | Parsimonious model | 25.5% | 18.8% |
|  | Add semiconductors and related devices | 28.6% | 15.8% |
|  | Add integrated microcircuits | 31.1% | 21.3% |
|  | Add other semiconductor devices | 24.8% | 17.0% |

(84)  Dr. Mallinson also criticizes the MP-PPI on other grounds (¶135). He asserts that changes in the MP-PPI have been "quite erratic" but he provides no evidence or analysis to suggest that it is poorly related to underlying fundamentals. He speculates about possible problems with the way the Bureau of Labor Statistics constructed the index, but he conducts no investigation to determine whether his speculations are either correct or, if correct, consequential. Yet, based on nothing more than these unsubstantiated speculations, he leaps to the conclusion that the index is "inherently unreliable" for my purposes. His conclusion is entirely unsupported. It is also flatly inconsistent with my finding that the use of this variable significantly improves predictive performance according to standard statistical measures, inasmuch as an erratic data series that bore little relationship to fundamentals would have no meaningful predictive power.

### II.B.2. 2. My analysis accounts for a broad range of supply and demand variables, and my conclusions are not sensitive to the addition of variables suggested by the Defense experts

(85)  Several of the Defense experts focus attention on what I termed my parsimonious model, which included only the four key variables discussed at the outset of this section, plus the first and second lags of the panel price. For example, Dr. Carlton argues that it is unreasonable to think that the four variables in my parsimonious model capture the key economic factors driving prices in the LCD industry (¶286), and he goes on to assert that the model does not control for the basic economic factors driving price (¶291). Likewise, Dr. Rubinfeld writes that "Dr. Bernheim excludes from his model nearly every variable that can

---

[43]  In his footnote 291 Carlton states that in my calculation of overcharges I have neglected to account for the cumulative effect of the adjustment factor for predicted prices generated from a regression in logarithms. However, because the adjustment factor is very close to one, it does not make any substantial difference whether one accounts for the cumulative effect of the adjustment factor or not. Carlton agrees that the correction he proposes only "slightly reduces" my estimated overcharges. To put things in prospective, for my parsimonious model, the alternative calculation proposed by Carlton produces overcharges that at most are half of a percent lower. Therefore, I did not deem it necessary to adjustment my overcharge calculations.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

explain pricing in the LCD industry.  As a result, it is not surprising that his model has poor predictive power for the LCD industry" (¶337).

(86)    These criticisms overlook the fact that my analysis consists of a collection of econometric models, rather than a single model.  My analysis is certainly not limited to the parsimonious model, and statements to the contrary misrepresent my opinions.  Dr. Rubinfeld's references to my "model" (singular), and his subsequent repeated statements concerning the factors that my "model" (singular) excludes, reflect a refusal to consider the many alternative approaches set forth in my report.  In fact, I examined a large collection of models incorporating a wide range of supply and demand factors, and I have considered additional models incorporating other since reviewing the Defense experts' reports.  Taken as a whole, my analysis involves a careful and thorough investigation of the relationships between TFT-LCD prices and all of the following factors:

- Capital investment in South Korea;

- Total industrial production for Japan and Taiwan;

- Capital investment in Japan and Taiwan;

- The prices of copper and oil;

- General labor costs for Japan, South Korea, and Taiwan;

- Shipping costs;

- Exchange rates for the United States and Europe with respect to Japan, South Korea, and Taiwan;

- LCD panel production capacity;

- Large panel Fisher cost index and small panel Fisher cost index;

- South Korea cathode ray tube (CRT) prices;

- Carlton's semiconductors and related devices;

- Carlton's integrated microcircuits;

- Carlton's other semiconductor devices;

- Carlton's worldwide mobile units;

- Carlton's US expenditure on computers;

- Rubinfeld's number of codefendant suppliers;

- Rubinfeld's average panel size;

- Rubifeld's number of mobile cellular subscriptions;

- Rubinfeld's monthly retail sales at electronics and computer stores;

- Rubinfeld's semiconductor fab wafer capacity and capacity utilization;

- Rapp's year over year growth in electronics and appliance stores sales;

- Jenskins' total number of mobile subscribers;

- Comanor's computer and electronic product price index.

(87)    When my parsimonious model is properly considered within the context of my broader econometric analysis, its predictions are revealed to be reliable, accurate, and on the whole conservative. In particular:

- The range of models presented in my original report, plus the additional models described in Section II.G below, demonstrate that the predictions results obtained with my parsimonious model are representative of results obtained with models that include a wide variety of other supply and demand factors; if anything, they imply somewhat conservative overcharges.  Accordingly, there is no reason to think that the parsimonious model provides an inadequate account of LCD price movements.

- The plots in my original report (of actual and predicted prices) show that the parsimonious model does a very good job in practice of capturing the actual price movements in the LCD industry; I provide further detail and corroboration of this point in my discussion of model stability (Section II.E) below.

- Dr. Rubinfeld's statement, quoted above, that my "model has poor predictive power for the LCD industry" (¶337), is nothing more than an unsupported assertion for which his report offers absolutely no statistical support, and my analysis reveals it to be false.

(88)    Unlike Drs. Carlton and Rubinfeld, I do not find the strong performance of the parsimonious model surprising, for the following reasons.

- First, the four factors included in my parsimonious specification are all critical drivers of the supply and demand for TFT-LCD panels.  I simply do not agree with Dr. Carlton's or Dr. Rubinfeld's apparent belief that market-specific micro-variables are necessarily better predictors of prices than macroeconomic factors, which in many contexts are the most important first-order determinants of an industry's activity.

- Second, even if some other supply or demand factor could *potentially* play an important role in determining TFT-LCD panel prices, it need not be powerful or even useful predictor of TFT-LCD panel prices. In addition to a variable's potential effect on price, its value as a predictor also depends on the degree to which it varies, and the similarity of variance to that of other included variables.  If a variable does not exhibit much useful variation, or if it exhibits variation that is similar to that of other variables, it will not be a useful predictor, even if it is what Dr. Carlton would call a "basic economic factor" affecting price.

- Third, in many cases, the "basic economic factors" discussed by Dr. Carlton and others display little variation aside from a trend, and therefore hold out little hope for improving the quality of TFT-LCD panel price forecasts, let alone explaining the periods of artificial price elevation identified in my analysis.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(89)   Because Dr. Rubinfeld focuses excessively on my parsimonious model, he chastises me for failing to examine a number of variables (TFT-LCD production costs, the costs of substitute products, and LCD capacity) that actually appeared prominently in my econometric analysis (¶¶343-355). While he ultimately mentions the specifications that included these variables, his discussion references only unrepresentative examples from the results I reported, to create the highly misleading impression that my estimated overcharges decline systematically; in fact they do not. As shown in my opening report, these variables almost always result in *higher* overcharges for large panels, not lower.[44] In addition, because those variables are potentially endogenous,[45] specifications that include them are likely to understate the effect of the conspiracy on price.[46]

(90)   After opining that I should have included various supply and demand factors in my models, Dr. Rubinfeld baldly asserts that "[o]nce those omitted factors are included, estimated overcharges are substantially reduced" (¶377).[47] Unless he was misled by his own biased selection of cited results, he cannot have meant any of the factors mentioned in the previous paragraph, and no other sensitivity analyses involving additional variables appear in the body of his report. In his deposition, Dr. Rubinfeld admitted that nothing in the body of his report supports his claim.[48] He asserted that he was referring to variables used in his own econometric analysis that I did not use in mine, and he said he thought the pertinent statistical analyses were contained in his backup materials.[49] Members of my support staff have carefully searched through his backup materials, and they assure me that they are unable to find any analyses matching this description. Consequently, it appears that either Dr. Rubinfeld has no basis for his opinion, or he has failed to disclose it.

---

[44]   For TFT-LCD production costs, he mentions that my plea-period overcharge estimate for small panels falls from 18.8% to 13.0%, but he does not mention that the conspiracy period estimate declines only slightly, from 25.5% to 24.6%, or that both overcharge estimates for large panels rise. (Rubinfeld report ¶345, Bernheim Costco report ¶133) For CRT prices, he mentions that my conspiracy-period overcharge estimate for small panels falls from 25.5% to 18.6%, but fails to mention that the overcharge estimate for large panels rises for the conspiracy period and remains roughly constant for the plea period; nor does he acknowledge that CRT prices are primarily relevant for large TFT-LCD panels. (Rubinfeld report ¶353, Bernheim Costco report ¶133) For LCD capacity, he mentions that my plea-period overcharge estimate for small panels falls from 18.8% to 13.2%, but fails to mention that the decline is smaller for the conspiracy period, and that both overcharge estimates rise for large panels. (Rubinfeld report ¶354, Bernheim Costco report ¶133)

[45]   Dr. Carlton disputes my observation that TFT-LCD production costs were likely affected by the conspiracy. I address that issue in Section VII.

[46]   Because an endogenous variable is influenced by the conspiracy, a prediction that is conditioned upon such a variable retains part of the conspiracy's effect.

[47]   At his deposition, Dr. Rubinfeld confirmed his belief in this assertion although he did concede that "it may be that you can find versions where overcharges go up." Rubinfeld deposition on April 17, 2012, page 193.

[48]   Rubinfeld deposition on April 17, 2012, page 195. "Q. And do you report anywhere where you take the variables of 49 and put them into Professor Bernheim's model and show that the overcharges go down? A. Give me a second to finish. Q. All right. I'll -- I didn't mean to interrupt you. A. I hear you. I got your question in mind. You know, I don't see -- I think you're asking me whether there's a table or a paragraph that spells specifically what the results would be when I do that exercise, and I don't see that here…It just didn't include an exhibit."

[49]   Rubinfeld deposition on April 17, 2012, pages 194-195 of rough transcript. "Q. So you're -- so this Paragraph 377, does it mean that if you take the variables that you've included in your Exhibit 49 and add them into Professor Bernheim's preferred -- what you call his preferred parsimonious specification, that that will reduce the overcharges in his specification? A. I would say generally that's true… Q. And do you report anywhere where you take the variables of 49 and put them into Professor Bernheim's mod and he will show that the overcharges go down? … A. … I am virtually certain it should be in my backup because we did do that exercise."

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(91)   To investigate whether there is in fact some basis for Dr. Rubinfeld's assertion, I directed my staff to identify the variables that were included in his econometric models (as reported in his Exhibit 49) but not in the specifications presented in my first report, and, where feasible, and estimate versions of my parsimonious model that incorporate them.  The additional variables include:[50]

- Number of codefendant suppliers, defined as "the number of defendant firms selling each product application as a measure of the market structure of that product segment;"

- Average panel size manufactured by the defendants, to capture the effect of a "crystal cycle;"

- Number of mobile cellular subscriptions, estimated annually by the International Telecommunication Union, as a measure of demand;

- Monthly sales at electronics and computer stores contained in the US Census monthly survey of retail trade, also as a measure of demand;

- Semiconductor fab wafer capacity and capacity utilization, in place of similar data from the LCD industry that "are potentially tainted by collusion."

(92)   Of the other variables appearing in Dr. Rubinfeld's model, I already studied two (panel costs and shipping costs) in my first report, and will not repeat that analysis here.  In addition to all of the aforementioned variables, Dr. Rubinfeld's models also include panel fixed effects and a measure of panel age.  When one estimates models of aggregate price, there is no need for product fixed effects, nor any way to use them. Product age may help Dr. Rubinfeld's model to account for the cross-sectional variation in prices across panels, but there is neither an obvious way nor a good reason to include some version of it in a model of aggregate price.

(93)   Figure 31 shows the levels of overcharges implied by models that include the six new variables listed above when they are added to my analysis individually and in combinations.  For the reasons discussed below, some of these combinations exclude semiconductor fab wafer capacity and/or wafer capacity utilization.

---

[50]   Rubinfeld report, Exhibit 49 and ¶ 253.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 57 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 31: Comparison of estimated overcharges when adding variables included in Rubinfeld's econometric analysis**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Parsimonious model | 18.9% | 17.8% |
|  | Add average panel size [1] | 17.4% | 21.6% |
|  | Add mobile cellular subscriptions [2] | 18.6% | 18.7% |
|  | Add retail sales at electronics stores [3] | 22.3% | 18.2% |
|  | Add number of codefendant suppliers of large panels [4] | 17.9% | 17.8% |
|  | Add semiconductor fab wafer capacity [5] | 15.4% | 11.1% |
|  | Add semiconductor fab wafer capacity utilization [6] | 18.5% | 16.9% |
|  | Add [1] through [6] | 22.1% | 17.9% |
|  | Add [1] through [6], shipping costs, and defendant cost index | 22.9% | 10.4% |
| Small TFT panels | Parsimonious model | 25.5% | 18.8% |
|  | Add average panel size [1] | 25.3% | 25.0% |
|  | Add mobile cellular subscriptions [2] | 24.7% | 16.2% |
|  | Add retail sales at electronics stores [3] | 24.0% | 18.4% |
|  | Add number of codefendant suppliers of small panels [4] | 25.7% | 20.1% |
|  | Add semiconductor fab wafer capacity [5] | 26.2% | 10.2% |
|  | Add semiconductor fab wafer capacity utilization [6] | 23.9% | 17.9% |
|  | Add [1] through [6] | 29.0% | 18.7% |
|  | Add [1] through [6], shipping costs, and defendant cost index | 28.2% | 20.3% |

(94)    In almost all cases, the overcharge estimates either rise or decline by small amounts; overall the range of estimates is consistent with the results from my first report.  Significantly, adding all six variables together increases my overcharge estimates for the conspiracy period by more than three percentage points for both large and small panels, and leaves my overcharge estimates for the plea period essentially unchanged in both cases.  Certainly, Dr. Rubinfeld cannot reasonably claim that the addition of these variables systematically reduces my overcharge estimates.

(95)    I note that, for the plea period, the addition of semiconductor fab wafer capacity by itself reduces my overcharge estimates somewhat below the lower end of the range spanned by my other estimates.  I am not troubled by that finding for two reasons.

(96)    First, the reliability of the variable is suspect.  As noted above, Dr. Rubinfeld intends it as a proxy for LCD production capacity.[51]  However, the figure below shows that it is *negatively* related to LCD capacity during the post-conspiracy period.  I find it distinctly odd that this series would show declining capacity during a period when the semiconductor industry was expanding.  I asked my staff to investigate the source of the semiconductor fab wafer capacity data used by Dr. Rubinfeld – the Semiconductor International Capacity Statistics (SICAS) report. My staff found that the information in this publication is based on voluntary reporting by members of several regional semiconductor associations. The membership in these associations as well as member reporting of semiconductor statistic have declined

---

[51]    See Rubinfeld Report, ¶253.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

over time, and led to the eventual discontinuation of the SICAS report.[52] There have been concerns in the industry that, due to changes in membership, "meaningful comparisons with previous quarters are not possible."[53] Dr. Rubinfeld does not appear to have investigated whether the series is a comprehensive and reliable measure of semiconductor capacity. Based on my investigation, I have not satisfied myself that the SICAS-based data series used by Dr. Rubinfeld reflects, with sufficient reliability, actual change in semiconductor capacity rather than changes in the composition of SICAS member base.

(97) Second, as shown in the figure above, when semiconductor fab wafer capacity is included along with Dr. Rubinfelds' other variables, it does not depress my overcharge estimates (in fact, for the conspiracy period scenario, they rise).

**Figure 32: Semiconductor capacity versus TFT-LCD capacity**



(98) Though I strongly believe that adding too many variables violates the guiding principle of parsimony and likely reduces predictive performance, I have also examined the effects of adding all six of the aforementioned variables, plus shipping costs and panel costs, to my basic model at the same time,

---

[52] For example, an August 2005 presentation by The Nobleman Group indicates that 42 companies participated in the SICAS program. Listing 19 companies, the last SICAS report from Q1 2011 states that "[d]ue to significant changes in the SICAS program participation base in 2011, the quarterly SICAS capacity and utilization report will be discontinued, effective Quarter 1 2012." It appears that Intel's and AMD's withdrawal from World Semiconductor Trade Statistics contributed to SICAS' demise (see, "SICAS is dead (and WSTS isn't feeling too good)" at http://www.semiconductorintelligence.com/?p=513).

[53] See, "Updated: foundries opt out of chip manufacturing stats", *EE Times*, October 21, 2011 (http://www.eetimes.com/electronics-news/4229948/Foundries-opt-out-of-chip-manufacturing-stats)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Page 51

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 59 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

thereby producing a model that encompasses all the relevant factors Dr. Rubinfeld included in his models, plus the ones in my parsimonious model. The estimates for the "kitchen sink" models are even higher than those for the parsimonious models for both large and small panels for the conspiracy period scenario and for small panels for the plea period scenario; the only decline is for large panels in the plea scenario. It is important the bear in mind that the inclusion of panel cost, which was likely affected by the conspiracy, will tend to bias the estimated overcharge downward.

(99)    Accordingly, I conclude that Dr. Rubinfeld is simply wrong about the effects of including the additional supply and demand factors he mentions. In fact, my conclusions are demonstrably robust.

(100)   Dr. Carlton and other experts have also proposed additional supply and demand factors. In many cases, these variables display little variation aside from a trend, and therefore hold out little hope for improving the quality of TFT-LCD panel price forecasts, let alone explaining the periods of artificial price elevation identified in my analysis. For examples, consider Figure 33 through Figure 35 below.

**Figure 33: Dr. Carlton's worldwide mobile units**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 52

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 34: Dr. Jenkins' total number of mobile subscribers**



**Figure 35: Dr. Comanor's computer and electronic product price index**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(101)   I have culled through the economic factors considered by other experts with the object of identifying ones that are worth considering and not otherwise subsumed in the analyses described above and in my first report.  Because I have considered an adequately wide range of cost factors, I focused on demand-side variables, and arrived at the following list:

- Carlton's US expenditure on computers;

- Jenskins' total number of mobile subscribers;

- Comanor's computer and electronic product price index;

- Rapp's year over year growth in electronics and appliance stores sales.

**Figure 36: Comparison of estimated overcharges when adding variables included in other experts' econometric analysis**

| | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Parsimonious model | 18.9% | 17.8% |
| | Carlton's worldwide mobile units | NA | 20.6% |
| | Carlton's US expenditure on computers | 23.7% | 20.4% |
| | Jenskins' total number of mobile subscribers | NA | 17.3% |
| | Comanor's computer and electronic product price index | 16.3% | 19.0% |
| | Rapp's year over year growth in electronics and appliance stores sales | 19.1% | 15.6% |
| Small TFT panels | Parsimonious model | 25.5% | 18.8% |
| | Carlton's worldwide mobile units | NA | 16.0% |
| | Carlton's US expenditure on computers | 28.7% | 19.4% |
| | Jenskins' total number of mobile subscribers | NA | 19.0% |
| | Comanor's computer and electronic product price index | 28.5% | 19.5% |
| | Rapp's year over year growth in electronics and appliance stores sales | 24.9% | 18.9% |

(102)   The above figure shows the levels of overcharges implied by models that include the additional variables listed above.  Once again, the overall the range of estimates is consistent with the results from my first report.[54]  There is simply no basis for the claim that the exclusion of these variables from the models described in my first report systematically reduced my overcharge estimates.

(103)   It would not be surprising if, with additional time and effort, the Defendants' experts could identify an alternative specification including some combination of variables that, purely by chance, would spuriously predict elevated prices during the conspiracy period.  However, at this point, such a finding would not cast serious doubt on the accuracy or reliability of my conclusions.  I have explored the effects of including a wide range of variables suggested by the Defendants' experts, and my conclusions have proven remarkably robust.  However, there must be a limit.  It is simply not scientifically legitimate to turn a prediction exercise into a fishing expedition for a desired result.  As I emphasized in my first report,

---

[54]   Some of the additional variables used by other experts did not span over sufficient time to be included in models for the conspiracy period scenario.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Page 54

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 62 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

"The number of time series variables one could consider including in a prediction equation is virtually unlimited. Consequently, there is a substantial likelihood that some irrelevant (or modestly relevant) variables were highly correlated with LCD price movements during the relevant time period simply by chance. Using such variables as predictors may produce models that appear to fit the data beautifully, but that perform miserably when used to make bona fide out-of-sample forecasts (because the apparent relationships between the variables do not reflect real economic processes). Thus, unless one limits consideration to highly relevant economic variables, one is likely to obtain spurious 'explanations' for price movements."[55]

## II.C. My analysis employs reliable data

### II.C.1. My use of pre-2000 data is valid and appropriate

(104) I estimate my statistical models using data on TFT-LCD prices from both before and after the conduct period. The pre-conduct data start in January 1996 and run through either July 1998 (for the conspiracy-period estimates) or August 2001 (for the plea-period estimates).

(105) Dr. Carlton claims that the pre-2000 data used in my analysis are "unreliable" (¶¶351-353). Noting that "the pre-2000 Defendant data are dominated by a few firms," he claims that "the pre-2000 data on which Dr. Bernheim relies is not representative of the mix of suppliers both at the time and during the conduct period" (¶352).[56] That position is untenable for the following reasons.

- First, there is absolutely no reason to believe that the pre-2000 data provided by the Defendants is in any way *unreliable*. On the contrary, I have seen nothing in the record – nor has Dr. Carlton cited anything – suggesting that those data are anything other than reliable and accurate memorializations of the transactions that actually took place.

- Second, the pre-2000 data represent a substantial quantity of commerce, both in absolute terms and relative to the LCD market at the time. As shown in the figure below, sales by the Defendants who provided pre-2000 data – Hitachi, NEC, Samsung, Sharp, and Toshiba – are on the order of at least hundreds of millions of dollars in every year, and average more than $1 billion per year. In addition, those five defendants accounted for approximately half of TFT-LCD industry capacity before 2000.

---

[55] See my first report, IV.A.4.a.

[56] Dr. Rubinfeld says that the use of pre-Q4-2001 data renders my estimates "less conservative" (¶¶437-439). I have never claimed that the use of this early data makes my analysis conservative; the conservatism of my estimates flows from other considerations. I use these data because they render my estimates more accurate, not more conservative.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 37: Dollar sales and capacity share of defendants that provided pre-2000 data**

| Year | Sales (millions of U.S. dollars) | TFT-LCD capacity share |
|------|----------------------------------|------------------------|
| 1996 | 284 | 57% |
| 1997 | 521 | 49% |
| 1998 | 965 | 53% |
| 1999 | 2,779 | 47% |

- Third, the data show that the prices quoted by the firms that provided data for the pre-plea period are representative of the market as a whole.  Figure 38 below compares the large panel price indexes for the defendants that provided pre-2000 data (in blue) and those that did not (in red) with my large panel price index (in black). As evident from the figure, the price indexes track each other quite closely during the period of time when data from all defendants are available. Figure 39 shows that a similar conclusion holds for small panels.  I find it astonishing that Dr. Carlton threw out all of this pre-2000 data for his stated reasons without bothering to conduct and report any similar data analysis.

**Figure 38: Large panel price indexes for Defendants that provided pre-2000 data, and for those that did not**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 56

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 64 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 39: Small panel price indexes for Defendants that provided pre-2000 data, and for those that did not**



- Fourth, if Dr. Carlton were correct in claiming that the pre-2000 data are unreliable, then my model would likely not exhibit the stability documented in Section II.E.2.

(106)    In short, the pre-2000 data are valid and representative. As discussed in Section II.E, they also play an appropriately important role in my analysis. Excluding the information they contain from my analysis would therefore be contrary to good econometric practice. As a general matter, there is a strong presumption in econometrics that all valid data should be used.

## II.C.2. My analysis employs reliable data on prices for Motorola transactions

(107)    Dr. Foster claims that Motorola did not employ the proper accounting conventions when recording rebates totaling $26 million from Samsung, Sharp, and Wintek negotiated in 2005. He claims that Motorola incorrectly recorded the rebates as lump sums in September 2005 whereas it should have allocated them across transactions during an appropriate time period (¶¶128-134).[57] From this observation he concludes that if I had included the Samsung and Sharp rebates in my analysis in the way he proposes, my actual small panel price index in 2006, and therefore the percentage overcharges in 2006, would have been reduced, all else equal (¶136).[58] Dr. Foster's concern is unjustified for the following reasons:

---

[57]    Dr. Foster submitted several expert reports in this matter. When I reference Dr. Foster's expert report, I reference his Target et al. report. Appendix C.3 identifies the corresponding paragraph numbers between his reports.

[58]    Because data from the conspiracy period, which includes 2005 and 2006, are not used to estimate my econometric models,

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- First, I understand that the appropriateness of the accounting method Motorola used to record these rebates is a subject of factual dispute, that there is Motorola and defendant witness testimony that contradicts Dr. Foster's claims, and that Motorola intends to prove at trial that the method it used to record these rebates was in fact appropriate.

- Second, his concern is of no practical significance. By Dr. Foster's own calculations, Samsung and Sharp accounted for less than a quarter of the rebates – $6 million out of the $26 million total.  This amount corresponds to 0.079 percent of defendant small panel sales in 2006, and 0.2 percent of defendant small panel sales to Motorola in 2006.  A change of this tiny magnitude would have no discernible consequence for my Motorola overcharge calculation for 2006.

- Third, by focusing on 2006, Dr. Foster ignores the fact that the effect of his adjustment on my overcharge calculations would *not* be limited to 2006.  If rebates are shifted from 2005 to 2006, then the implied overcharge percentage for 2005 will rise slightly, while the overcharge percentage for 2006 will fall slightly.  The effects would largely offset each other.

(108)  Dr. Foster also claims that I should have included purchases from Wintek in my small panel price index, and made similar accounting adjustments pertaining to the $20 million Wintek rebate (¶138). He is wrong. The objective of the econometric analysis described in my first report was to quantity overcharges on Plaintiff purchases from Defendants. Wintek is not a Defendant.  Reliable Defendant data for small panels are available for 2005 through 2008, the period for which Wintek data is also available. There is therefore no need to use Wintek data.

## II.D. My analysis employs reliable statistical tools

### II.D.1. The prediction equation approach is more reliable that the dummy variable approach

(109)  In my first report, I explained that economists typically use one of two approaches to measure the effects of price-fixing conspiracies on prices: the *prediction equation approach* and the *dummy variable approach*.  Under the latter approach, the economist specifies a model with either a single cartel dummy variable, or multiple cartel dummy variables for distinct portions of the conduct period.  I also explained that the prediction equation approach is more reliable than the dummy variable approach.  Because the Drs. Carlton and Rubinfeld express disagreement with that opinion, I will now explain the advantages of the prediction equation approach more thoroughly and identify the errors in their reasoning.

(110)  To justify the use of a model with a single cartel dummy variable, an economist must assume that the overcharge for any particular transaction equals the average overcharge for the entire cartel period, plus statistical "noise" (specifically, a deviation that is unrelated to any of the other supply and demand factors included in the model).  While this key assumption does not rule out the possibility that the effect of the

my projected but-for prices would be unaffected by Dr. Foster's adjustment.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 58

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 66 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

cartel varied from year to year, it does rule out the possibility that the variation over time in size of the overcharge was correlated with any of the supply and demand factors included in the model. That assumption is, on its face, implausible, because the effectiveness of a cartel will in general depend on the same set of supply and demand conditions that influence price in the absence of collusion.

(111)   Nevertheless, provided the key assumption is satisfied so that the dummy variable model is well-specified, then an otherwise identical model with multiple cartel dummy variables is also well-specified. One can construct such a model by dividing the conduct period into multiple sub-periods, and introducing a separate dummy variable for each of the subperiods. Because the effect of the conspiracy can vary over time without violating the key assumption (provided its variation is unrelated to other supply and demand factors included in the model), so can the estimated coefficients of the cartel dummies. However, if the key assumption holds, both models are well-specified, and the multiple-dummy and single-dummy models will yield essentially the same average overcharges for the entire conduct period (subject to statistical noise). Dr. Rubinfeld appears to agree with this point when he writes as follows: "[i]n a well-specified regression model with adequate data and sufficient degrees of freedom, the coefficients on yearly dummies can be expected to average about the same as the coefficient on a single conspiracy dummy, measured over the same period of time" (¶389).[59]

(112)   It necessarily follows from the preceding that, if the single-dummy and multiple-dummy models yield significantly different average overcharges, then the key assumption that justifies the single-dummy model is not satisfied; it is misspecified, and does not yield a reliable overcharge estimate. However, it may still be the case that the multiple-dummy model is well-specified. Thus, when the two models differ significantly with respect to the average overcharges they imply, the multiple-dummy model must be regarded as more reliable.

(113)   Dr. Rubinfeld apparently disagrees with this reasoning. When the multiple-dummy and single-dummy models yield significantly different estimates of average overcharges, he prefers the single-dummy model because "a substantial portion of the variation in price… can be erroneously 'explained' by the yearly conspiracy dummies, rather than properly attributed to demand and supply factors" (¶390). His statement presupposes that the multiple-dummy model is misspecified. But if that is the case, then the key assumption cannot be satisfied, and hence the single-dummy model is also misspecified. Consequently, his argument cannot justify discarding the multiple-dummy model *in favor* of the single-dummy model. It simply raises the possibility that the multiple-dummy model might also be unreliable.

(114)   Significantly, Dr. Hausman, another Defense expert upon whom Dr. Carlton explicitly relies for econometric expertise (Carlton ATS report, ¶¶ 24 and numerous citations in Sections VIII and IX), evidently concurs with me on this issue. In criticizing the report of Dr. Jenkins, an expert for Nokia, Dr. Hausman writes as follows: "Dr. Jenkins specification does not reliably estimate the effect of the cartel, if

---

[59]   For support, Dr. Rubinfeld cited a textbook by Paul Ruud, but in his deposition was unable to point to the portion of the chapter that addressed the issue, and attributed the citation to his staff. Consequently, it is not possible to confirm the meaning of the passage quoted above. Rubinfeld deposition on April 17, 2012, pp 196-202.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

any, when I test for the stability of an estimated cartel effect. To illustrate this point, instead of using one dummy variable for the cartel period, as Dr. Jenkins does, I use two variables: one variable covers the first half of the cartel period… and the other variable covers the second half…" (¶29). Dr. Hausman proceeds to reject Dr. Jenkins results on the grounds that the one-dummy and two-dummy models yield significantly different average overcharges.

(115)    Notably, the same principles continue to apply as one subdivides the conduct period into smaller and smaller segments, introducing a dummy variable for each. If a model based on a further subdivision of the conduct period significantly changes the estimate of average overcharges, the model with the coarser subdivision is misspecified, whereas the model with finer subdivision may be properly specified.

(116)    The prediction equation approach is equivalent to using a multiple-dummy model for which the cartel is subdivided as finely as possible – or, to put it another way, a separate dummy variable is included for every unit of time within the conduct period, so that the coefficients of the supply and demand factors depend only on data from outside the conduct period, just as with the prediction approach. Consequently, it necessarily follows from the preceding that, when a prediction model and an otherwise identical dummy variable model (single or multiple) yield significantly different average overcharges, the dummy variable model – not the prediction model – is necessarily misspecified. That is why the prediction approach must be regarded as more reliable than the dummy-variable approach whenever the two yield divergent results.

(117)    Dr. Rubinfeld writes that he disagrees with the preceding statement (footnote 427), but he provides no explanation – only the cryptic assertion that "a forecast model will yield the same damages as a dummy variable model with a complete set of interaction terms when the quantity of sales is uniform over time." In the interests of deciphering Dr. Rubinfeld's meaning, I located an unpublished working paper he coauthored that appears to clarify his point. [60]  No one in this case is using a "dummy variable model with a complete set of interaction terms" as he defines it in that paper, so the conditions under which that approach is equivalent to the prediction approach are entirely beside the point. Nothing in that paper disputes my statement that the prediction approach is equivalent to a multiple-dummy model with a dummy for every unit of time within the conduct period, and it is from this statement that my conclusions concerning the superiority of the prediction method follow.

(118)    Why then would one ever use a dummy variable model, rather than the prediction equation approach? If one runs a multiple-dummy-variable model with separate dummies in every period, it is possible that one will not reject the hypothesis that the coefficients of the dummies are all identical. In that case, the data do not reject constancy of the overcharge. If in addition one has other reasons to be confident that the overcharge is constant, then by imposing the associated parameter restriction one can gain "statistical efficiency" (which means that, although the estimates won't be expected to change, the coefficients will be estimated more precisely, with small statistical errors). Accordingly, there may be reason to use a

---

[60]    McCrary, J. and D. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," October 2009.

single-dummy-variable model in a setting where the assumption of a constant overcharge is not rejected, and the facts point to a time-invariant cartel effect, in order to gain precision.

(119)    Economists also employ dummy variable models when, like Dr. Carlton, they wish to endow all the estimated coefficients with structural, causal interpretations. Many additional assumptions are required to validate such interpretations, some of which are typically untestable.[61] In contrast, because the coefficients in prediction equations are not interpreted as causal effects, such issues do not arise, and one does not need to make such a broad array of assumptions.

(120)    The Defendants' experts make a number of incorrect assertions concerning purported advantages of the single-dummy-variable approach and disadvantages of the prediction approach.

(121)    *First,* Dr. Carlton asserts that the single-dummy-variable approach makes it possible to test for the model's stability, which he says is not possible for the prediction equation approach (¶236). Dr. Carlton then flatly contradicts himself by offering what he calls a test for stability for the latter approach (see his Section IX.B.2). Though Dr. Carlton's tests are not valid (see Section II.E.1, below), it is certainly possible to evaluate stability in the context of the prediction equation approach (Section II.E.2), contrary to his assertion.

(122)    Neither is Dr. Carlton correct concerning the single-dummy-variable approach. As I explain below (Section III.D), Dr. Carlton does not actually implement a meaningful test of stability for his models, and it is not clear that the deficiencies in his test are fixable (due to a well-known statistical issue called the *incidental parameter problem*). Even if such a test could be performed properly, the result would be predicated on the validity of other maintained assumptions, including ones that are tested and rejected (specifically, the constancy of the cartel effect, which Dr. Carlton says he assumes),[62] as well as others that are untestable (see above). Failing to reject under a restriction under a false maintained hypothesis does not mean that the restriction is valid.

---

[61]    For example, endogenous regressors can cause inconsistent coefficient estimates. Although the instrumental variables estimator provides a way to nonetheless obtain consistent parameter estimates, it is conceptually difficult and easily misused. See Cameron and Trivedi, Microeconometrics: Methods and Applications, (Cambridge University Press, 2005), p.95.

[62]    Deposition of Dr. Carlton on April 10, 2012, pps 267, 278, 279. "Q.  Thank you. Now, under this model, are you opining that those overcharge estimates would have applied in every month during the time period?    A.    The model I have estimated is asking the question if there is a cartel effect that is the same over the period in which I am estimating it, the period indicated in the chart, what is it? Q.  Does it matter to your model and your analysis whether or not the cartel effect was the same during the time period?    A.  I am not sure what you mean, does it matter if there's a different question I am asked, for example if someone says, "Can you estimate a cartel effect for a different time period or if the cartel only applied during this time period or its effect is different in this time period versus that time period," I could certainly do an analysis to answer that question.  Q.  But you haven't done it so far, right?    A.  What is in my report and what I expect to testify to, I am not expecting to testify to that. If someone asks me a question about that, I could give an answer, but I, you know, am tending to stay with my report.    Q.  Is it your opinion that the cartel had the same effect at each point in time during the entire period 2000 to 2006?    A.  I have not done a detailed investigation of that question.  If that's a relevant question, I -- if someone is alleging, which I did not understand any of the other experts to be alleging, that the overcharge, for example, in the people who did the dummy variable model, that it was different.  They had one dummy variable, that's what I'm estimating. I mean, that's what I'm doing in my -- what's called a dummy variable model.  If there's a different question to investigate, I can do that."

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI     Document 7944-3     Filed 05/17/13     Page 69 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(123)    In addition, "failures to reject instability" based on the types of tests Dr. Carlton proposes may be virtually uninformative if the tests lack statistical power. Indeed, Dr. Carlton fails to reject structural changes (using his flawed test) only because the coefficient estimates of his model are imprecise. If one looks at the economic differences between the pertinent coefficients rather than the statistical differences, the model turns out to be rather unstable – and Dr. Carlton's test cannot rule out the possibility that these large economic differences are in fact real (see Section III.D, below). By celebrating his "failure to reject," Dr. Carlton is simply trying to disguise a deficiency – a high degree of imprecision that stops him from rejecting a wide range of possibilities, including those with enormous degrees of instability – as a virtue.

(124)    **Second,** Dr. Carlton claims that the dummy variable approach employs more data than the prediction approach (¶241). Once again he is mistaken. Noting the equivalence between the prediction equation approach and a multiple-dummy-variable model that employs a separate dummy for every time interval within the conduct period, it is more accurate to say that the two approaches employ the same amount of data, but the dummy variable approach also imposes more restrictions on the model, so that there are more statistical degrees of freedom. As I mentioned above, the increase in degrees of freedom yields a possible advantage in terms of statistical efficiency, but only if the restrictions are correct.

(125)    Dr. Carlton asserts that this second advantage is particularly important in settings where data from outside the conduct period are too thin to permit reliable estimation of a prediction model.[63] But when those data are in fact as thin as Carlton hypothesizes, the estimates of the prediction model (equivalently, the every-time-interval-dummy-variable model) tend to be very imprecise, and one is therefore unlikely to reject the key assumption behind the single-dummy-variable model. However, in cases where one *does* reject that assumption, the data are obviously sufficiently rich to draw reliable statistical conclusions.

(126)    **Third,** Dr. Carlton claims that the dummy variable approach deals more easily with lagged prices because it doesn't need "clean" price from earlier periods.[64] Of course, Dr. Carlton manufacturers the problem that his use of the dummy variable approach is then intended to solve: in this case, pre-conduct data are in fact available, but he discards it for invalid reasons (see Section II.C). The contrived nature of this problem aside, Dr. Carlton's argument is simply incorrect. He simply ignores the issue by focusing on measuring the "long-run effect" of the conspiracy. Were he to use his model to estimate the implied time path of the cartel effect, he would need to initialize his calculations using earlier data that are untainted by the conspiracy.

(127)    **Fourth,** Dr. Carlton suggests that the prediction approach involves a purely statistical exercise that fails to account for economic structure.[65] Once again he is wrong. As I explained in my first report, variable selection should be driven in large part by judgments concerning economic relevance, based on an

---

[63]   Carlton ATS report, ¶¶241-242.

[64]   Carlton ATS report, ¶244.

[65]   Deposition of Dr. Carlton on April 11, 2012, page 370. "Dr. Bernheim explains he has a statistical model rather than a model based on underlying economic forces."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                                    Page 62
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

understanding of the underlying economic structure.[66]  These are the same considerations that go into formulating a dummy variable model.

(128)   *Fifth,* Dr. Rubinfeld says that a disadvantage of the prediction approach is "that it presumes that the effects of non-collusive demand and cost variables will be the same in conspiratorial and non-conspiratorial periods" (¶319).  Dr. Rubinfeld is not correct about the prediction approach; see the discussion in Section II.E, below.  However, the types of dummy variable models that are used in this case *do* impose the restriction that Dr. Rubinfeld criticizes in the quoted paragraph.  In suggesting that this consideration represents a potential advantage for the dummy variable approach, he apparently has in mind the type of dummy variable model considered in the unpublished working paper mentioned above – one with "a complete set of interaction terms."[67]

## II.D.2. Ridge Regression is reliable and generally accepted

(129)   The featured results in my original report employ a statistical technique known as Ridge Regression.  For my sensitivity analyses, I also employ Ordinary Least Squares (OLS).  Dr. Carlton calls Ridge Regression a "highly non-standard methodology" and quotes an econometric textbook by G.S. Maddala saying that its use is "not recommended;" he also notes that it is not mentioned in a well-known ABA treatise on Antitrust Damages (Carlton, footnote 289).  Dr. Rubinfeld offers no substantive criticisms of Ridge Regression, but says that it is "rarely employed in scholarly economics articles" (¶379).  These criticisms are without merit, for the following reasons.

- First, Ridge Regression is a standard, widely used, and generally accepted statistical procedure. It is a member of a class of regression estimators, known as shrinkage estimators, that were introduced over 50 years ago.[68] Ridge itself has been around for more than 40 years, and the original article that introduced it has accumulated more than 3,000 Google Scholar citations, which is extremely high for a scholarly paper.[69] Additionally, it spawned an even larger and growing literature on other shrinkage estimators such as Tibshirani's LASSO procedure, as well as Zou and Hastie's Elastic Net.[70]

---

[66]   Bernheim Costco report, ¶98. Thus, Dr. Carlton is simply incorrect when he says that I have view my analysis as a purely statistical exercise that fails to account for economic structure.

[67]   Nor am I persuaded that a dummy variable model with a complete set of interaction terms would offer the advantage Dr. Rubinfeld claims.  The analysis in his unpublished working paper appears to be predicated on the extremely problematic assumption: that the effects of observed supply and demand variables on price can change during the cartel period, but the effects of unobserved supply and demand variables (i.e., those in the statistical disturbance term) cannot.  Nor does Dr. Rubinfeld explain how this alternative dummy variable approach allows one to distinguish changes in coefficients that coincide with the conspiracy (the source of his concern in ¶319 and ¶325) with changes in coefficients that are caused by the conspiracy.

[68]   James, W., and C. Stein (1960), "Estimation with quadratic loss," Proceedings of the Fourth Berkeley Symposium on Mathematical Statistics and Probability 1:361-379.

[69]   Hoerl, Arthur E. and Robert W. Kennard, "Ridge regression: applications to nonorthogonal problems," Technometrics, Vol. 12, No. 1. (Feb., 1970), pp. 69-82. The principle of regression shrinkage is introduced in, James, W., and C. Stein (1960), "Estimation with quadratic loss," Proceedings of the Fourth Berkeley Symposium on Mathematical Statistics and Probability 1:361-379.

[70]   Tibshirani, Robert, "Regression shrinkage and selection via the Lasso," Journal of the Royal Statistical Society, Series B (Metholodlogical), Vol. 58:1 (1996), pp. 267-288; Hui Zou and Trevor Hastie, "Regularization and variable selection via the

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Shrinkage estimators are regularly used in economic forecasting contexts.[71] The number of citations actually understates the influence Ridge Regression has had in econometric forecasting because, like other standard statistical techniques, it is often used without citation in applied work. As Francis Diebold notes in his text on forecasting:

> The parsimony principle is related to, but distinct from the *shrinkage principle*, which codifies the idea that imposing restrictions on forecasting models often improves forecast performance. The name *shrinkage* comes from the notion of coaxing, or "shrinking," forecasts in certain directions by imposing restrictions of various sorts on the models used to produce the forecasts. The reasoning behind the shrinkage principle is subtle, but it permeates forecasting. By the time you've completed this book, you'll have a firm grasp of it."[72]

- Second, the potential superiority of Ridge Regression to OLS for the purpose of estimating prediction equations in settings with relatively small data sets has been rigorously established through scholarly research.[73]
- Third, I and others have used Ridge Regression in the context of measuring overcharges in price fixing cases, and courts have accepted these opinions. [74]
- Fourth, the ABA document which Dr. Carlton cites is targeted at attorneys, not economists, and is not intended to be a treatise on all reliable econometric techniques that an economist might use to answer an empirical question.[75] If Dr. Carlton believes a mention in this document is an important criterion for assessing reliability, then he would also agree that his use of the Arellano-Bond procedure is equally flawed since, using his own words, it also "is not mentioned once in the ABA treatise 'Proving Antitrust Damages: Legal and Economic Issues,' despite an entire chapter on regression analysis."[76] Neither does this treatise mention the procedures he uses to impute missing data.
- Fifth, Dr. Carlton quotes Maddala's textbook completely out of context. That textbook only discusses the use of ridge regression to address what is known as the "multicolinearity problem," and

---

elastic net" J. R. Statist. Soc. B (2005) 67, Part 2, pp. 301–320.

71 See, e.g., Bańbura, M., D. Giannone, and L. Reichlin, "Large bayesian vector auto regressions," Journal of Applied Econometrics 25 (2010), 71-92; De Mol, C., D. Giannone, and Reichlin, "Forecasting a large number of predictors: is bayesian regression a valid alternative to principal components?" Journal of Econometrics, Vol. 146 (2008), No. 2, 318-328; Litterman, Robert B. "Forecasting with bayesian vector autoregressions: five years of experience," Journal of Business & Economic Statistics, Vol. 4, No. 1 (Jan., 1986), pp. 25-38.

72 Diebold, Francis X., Elements of Forecasting, Thomson South-Western, 4th ed. (2007), p. 46 (note: footnote in original text omitted).

73 See, e.g., Vinod, Hrishikesh D. "A Survey of Ridge Regression and Related Techniques for Improvements over Ordinary Least Squares." The Review of Economics and Statistics 60, no. 1 (1978): 121–31; and Guber, Marvin H. J., Regression estimators: a comparative study, 2nd Ed. Johns Hopkins University Press, 2010.

74 See, e.g., Halbert White, DRAM report (page 72) "Ridge regression includes as a special case the method of ordinary least squares (OLS). The 'parameter shrinkage' permitted by this method has been shown to result in more accurate predictions." The Linerboard Daubert ruling admitting Halbert White's testimony cites to the fact that he used Ridge (page 7).

75 "Like its predecessor, the second edition is designed to be an accessible introduction to the legal and economic concepts of antitrust damages for us by counsel who may be new to the area. In addition, this edition has been expanded and updated to serve more experienced counsel as an authoritative and comprehensive resource." American Bar Association (2010), *Proving Antitrust Damages: Legal and Economic Issues*, Second Edition, p. xi.

76 Carlton ATS report, footnote 289 on page 201.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827
Page 64

Case 3:07-md-01827-SI   Document 7944-3   Filed 05/17/13   Page 72 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

does not make any recommendation whatsoever concerning its use to improve predictive performance in settings with relatively small estimation samples (which is my purpose in using it here). Dr. Carlton misleadingly edits out the portion of the quoted sentence that limits the scope of Maddala's negative recommendation. The complete sentence is: "Because of the deficiencies of ridge regression discussed above, the method is not recommended *as a general solution to the multicollinearity problem.*"[77] (Emphasis added to the portion of the sentence omitted by Dr. Carlton.) Neither Dr. Carlton or Dr. Rubinfeld have offered any reference that contains any criticism of ridge regression in a context that is relevant to my analysis.

- Sixth, in this instance, results based on OLS and Ridge Regression are virtually identical. Because Drs. Carlton and Rubinfeld have no objection to OLS (indeed, Dr. Rubinfeld uses OLS), their concerns about Ridge Regression have no practical implications.

## II.E. My models pass appropriate tests for stability

(130) Dr. Carlton notes that the TFT-LCD industry changed considerably over time (see, e.g., his Section II.E and IX.B). He describes significant changes in the product mix, the composition of firms, and the types of panels produced, as well as improvements in the technology used to produce them. In Dr. Carlton's opinion, these changes are so large that they likely invalidate the predictive methods I employ (¶290; see also Rubinfeld ¶325).

(131) It is not at all obvious, however, that the changes Dr. Carlton mentioned would fundamentally alter the price process. Suppose five firms compete to sell 15 inch TFT-LCD monitor panels. I see no fundamental reason to think that competition would play out in a significantly different way in any of the following alternative scenarios: (1) The same five firms compete to sell 17 inch TFT-LCD notebook panels of the same generation. (2) The same five firms compete to sell 15 inch TFT-LCD monitor panels of a later generation. (3) The same five firms compete to sell the original 15 inch TFT-LCD monitor panels, but costs are lower due to process improvements. (4) A somewhat different (possibly overlapping) set of five firms, equipped with essentially the same production technologies as the original five, compete to sell the original 15 inch TFT-LC monitor panels. Thus, there is nothing inherent about changes in product mix, the composition of firms, the types of panels produced, or technological progress that inherently alters the price process in a way that would justify Dr. Carlton's concern.[78]

(132) In addition, even if the industry has evolved over time, that does not mean the predictive methods I employ will necessarily perform unreliably or inaccurately. On the contrary, it is possible for a prediction model to capture the dynamics of a gradually evolving underlying process. Dr. Carlton is confused on this point because he appears to be thinking of my analysis in the context of the kinds of structural,

---

[77] G.S. Maddala (1988), Introduction to Econometrics, Macmillan Publishing Company, page 236.

[78] I have not listed a scenario in which the number of firms changes. As explained in my first report, the number of firms is determined endogenously. Because its evolution is part of the price process, it cannot be said to change the price process or to create problematic instabilities.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 73 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

explanatory models he presents in his own report, which very much require a stable underlying structure if one intends (as does Carlton) to interpret the estimated coefficients as causal effects. In contrast, in prediction models, coefficients are not given structural interpretations.

(133)    Dr. Carlton offers an interesting analogy that is at least somewhat illuminating, though not in the way he intends: he says that one cannot reliably predict the weights of sumo wrestlers, based on their heights, from the relationship between weight and height for NBA players (¶¶238-239). However, one could probably predict, with considerable accuracy, the weights of NBA players between 6' 4" and 6' 8", based on their heights, from the relationship between weight and height for NBA players over 6' 8" and under 6' 4". While the latter example only vaguely resembles the analysis I presented in my first report, it is a much closer analogy than Dr. Carlton's.

## II.E.1. The tests for stability implemented by the Defense experts are not valid

(134)    Dr. Carlton proposes and implements two different types of tests for the stability of my prediction model. First, he computes correlations between various supply and demand factors during and outside of the plea period. He asserts that the constancy of those correlations is an "implicit assumption" behind my overcharge analysis. He finds that the correlations changed, and concludes (relying at least in part on Dr. Hausman) that the models cannot be used to make valid predictions (see his Section IX.B.2).[79] Second, he claims that my parsimonious model performs poorly when used to make what he apparently considers "bona fide out-of-sample predictions" (see his Section IX.F). Neither test is valid.

(135)    The first test proposed by Dr. Carlton, which focuses on the stability of correlations between various supply and demand factors during and outside of the plea period, is not valid for the following reasons.

- Dr. Carlton is wrong as a matter of econometric principles. The legitimacy of a predictive model does not require stability of the correlations among the explanatory variables that Dr. Carlton examines. In support of his stability test, Dr. Carlton cites a passage from Dr. Hausman's report, but none of the references ultimately provided by Dr. Hausman mention a stability requirement or test of the sort implemented by Dr. Carlton.[80] This is not surprising, as this requirement is certainly not standard. On the contrary, the Manski article provided by Dr. Hausman contradicts the validity of Dr. Carlton's test:

---

[79]    Carlton report, page 172.

[80]    In his report, Dr. Hausman states: "At a minimum, if the prediction method is used, one should test whether the variables used to predict damages have a similar correlation (or "variance-covariance" (VC)) structure during the damage period and outside the damage period. If the VC structure is different, the (unbiased) linear prediction feature of the model will fail, and the damage estimates will be biased and unreliable." Hausman report, p. 14. After his deposition, Dr. Hausman provided the following literature in support of this section of his report: Manski, Charles F., "Regression", Journal of Economic Literature, V29 (March 1991) pp. 34-50; Angrist, Joshua D. and Jorn-Steffen Pischke, Mostly harmless econometrics: an empiricist's companion, Princeton University Press, 2009, pp. 34-41; Wooldridge, Jefferey M., Econometric analysis of cross section and panel data, MIT Press, 2002, pp. 13-34.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

> *Prediction Following a Change in the Distribution of x. A* common economic problem is
> to predict *y* following a policy or environmental change that alters the distribution of *x*
> but, for each value of *x*, leaves unchanged the distribution of *y* conditional on *x*.
> Regressions of *y* on *x*, being features of the latter conditional distribution, are unaffected
> by such a change. Hence a best predictor of *y* ex ante remains a best predictor ex post.[81]

What Dr. Manski succinctly states here is a well-known property of optimal predictions of *y* given *x*. Contrary to Dr. Carlton's assertions, stability of the explanatory variable distribution is *not* a requirement for reliable forecasts, and thus the correlations that Dr. Carlton examines are irrelevant for testing the reliability of a predictive model. I note moreover, that in a time series setting with non-stationary variables (such as we have here), the simple tests for equality of correlations that Dr. Carlton computes are neither applicable nor statistically valid.[82]

■ In any case, the type of test Dr. Carlton aims to implement cannot establish whether the putative failure of stability is quantitatively important, in terms of its implications for the accuracy of predictions. To illustrate, consider Dr. Carlton's analysis of correlations involving shipping costs (¶318). Though he finds that the correlations between shipping costs and the variables in my parsimonious specification change between the plea and non-plea periods, the addition of shipping cost to my model has very little effect on estimated overcharges. The same is true of other variables he considers. The analysis I conducted in my first report is much more informative than Dr. Carlton's because it directly addresses the quantitative importance of possible instabilities.

(136)    Dr. Carlton's second test involves what he characterizes as "bona fide out-of-sample predictions" (see his section IX.F). The procedure he uses is related to a statistical method known as "cross-validation," which is the standard approach to evaluating models based on bona fide out-of-sample predictions. In a typical application of cross-validation one repeatedly withholds data for some portion of the estimation sample, reestimates the model with the smaller sample, and uses the reestimated model to make predictions for the withheld observations. Cross-validation techniques are recognized as a legitimate tool for assessing the performance of prediction models *if they are applied properly*.

(137)    Dr. Carlton analysis does not involve a proper application of cross-validation techniques. For time series models, a leading approach recommended in the literature is known as *hv-block cross-validation*.[83] The term "hv-block" refers to the procedures governing the selection of the withheld observations (e.g., they are always consecutive). The process of withholding observations, reestimating the model, and constructing predictions for the withheld observations is repeated many times. To evaluate the validity of

---

[81]    Charles F. Manski, "Regression," *Journal of Economic Literature* V29 (1991), p. 38.

[82]    In his deposition, Dr. Carlton said that he derived his test from statements I made in my first report (Carlton deposition, pp. 370-375 and 381-384), but he appears to have in mind a simple illustration that I provided for pedagogical purposes in ¶¶104-108 of my first report (¶¶101-105 of my first ATT report that Carlton uses in the deposition), which was never intended to encompass all applicable econometric principles.

[83]    Racine, Jeff. "A Consistent Cross-Validatory Method for Dependent Data: hv-Block Cross Validation." Journal of Econometrics 99, no. 1 (2000): 39–61. Also see In re Linerboard Antitrust Litigation (2007 U.S. Dist. LEXIS 55330 (EDPA 2007)).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                                    Page 67
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Dr. Carlton's conclusions, I have performed hv-block cross-validation for my parsimonious model, for both large and small panels and for both the conspiracy and plea periods.[84] Figure 40 graphs the predictions against the actual realizations. For a model that makes perfect predictions, the points on the graph would all lie along the 45 degree line. The fact that they are close to the 45 degree line is a very good indication that the model performs quite well.

**Figure 40: Comparisons of predictions to actual prices with hv-block cross-validation**



(138)    Instead of adopting a generally accepted method of cross-validation that is recommended in the literature, Dr. Carlton contrives his exercise in a way designed to do maximum violence to the model. Specifically, he withholds all pre-plea data, estimates the model only with post-conspiracy data, and uses the estimated model to "back-cast" the pre-plea prices. Because the pre-plea data play an important role in properly

---

[84]   The values for $h$ and $v$ were set as a function of the number of observations used for the model. For both large and small panels, for the conspiracy period scenario $h$ was set to 1 and $v$ was set to 3, and for the plea-period scenario $h$ was set to 2, and $v$ was set to 5. This implies that for the conspiracy period scenario seven ($2*v+1=2*3+1=7$) observations at a time were held aside for out-of-sample prediction, and the observation preceding and the observation following the hold-out sample were neither used for estimation nor for out-of-sample prediction. Similarly, for the plea period scenario, eleven ($2*v+1=2*5+1=11$) observations at a time were held aside for out-of-sample prediction, and two observations before and two observations after the hold-out sample were neither used for estimation nor for out-of-sample prediction.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

calibrating the model, it is not at all surprising that their removal undermines the model's predictive accuracy.

(139)   To understand the important role of the pre-plea data, one has only to re-read Dr. Carlton's reasons for questioning the stability of my predictive model.  As Dr. Carlton has emphasized, the industry was indeed evolving; what he fails to appreciate is that a good prediction model can accommodate such evolution, particularly if it is estimated with a data sample spanning a sufficient period of time. Here, the conduct period was arguably a time of evolutionary transition between the pre-conduct and post-conduct periods. Including both pre-conduct and post-conduct data permits the model to generate predictions for the conduct period that reflect a properly blended and evolving version of the pre-conduct and post-conduct environments.  Therefore, estimating the model with *only* the post-conduct data inherently imposes a severe handicap.[85]  There is no reason to question the reliability of a model estimated with both pre-conduct and post-conduct data merely because the model would perform poorly if estimated with identifiably inadequate data.  To put the matter another way, Dr. Carlton's analysis at most illustrates problems that arise with back-casting (i.e., forecasting earlier observations based on models estimated only with later observations), which is a prediction method that I do not employ. Dr. Carlton himself opines that back-casting is not a reasonable approach in this context because there is too little post-conspiracy data (¶242).  Consequently, he is well aware that he has not performed a reasonable test.

(140)   Dr. Rubinfeld asserts that my "model" (again, singular) is unstable because it "implausibly yields different estimates for plea and conspiracy periods" (¶¶380-382).  His discussion of this point reflects serious confusion.  The comparison he makes actually involves two distinct models, both with the same specification, but one estimated with data outside of the conspiracy period, and the other estimated with data outside of the plea period.  The plea-period version of the model yields higher but-for prices for an obvious reason: some of the observations used for estimation lie in the pre-plea portion of the conspiracy period, and therefore likely include conspiratorial markups, which cause the predicted prices to be higher. The fact that these two predictions differ actually corroborates the existence of successful conspiratorial activity in the pre-plea portion of the conduct period.

## II.E.2. Appropriate diagnostics demonstrate the stability of my prediction models

(141)   Dr. Carlton claims that I performed no test to see if my predictive models are stable over time (¶¶288, 291, 293).  Indeed, in some cases he asserts that the stability of the models is untestable, even though he elsewhere contradicts himself by claiming to test it (Section IX.B.2).  Contrary to Dr. Carlton's assertion, I provided analyses in my first report that exhibited the stability of my models; here I expand on those analyses.

---

[85]   Even with this severe handicap, the model is not wrong in a statistical sense.  Using a bootstrap procedure, I tested the hypothesis that the pre-plea predictions generated using Dr. Carlton's version of my model (estimated only with post-conduct data) coincide with actual pre-plea prices.  Despite the very large differences between actual and predicted prices, one cannot reject the hypothesis that the two are equal.  Thus, even in this extremely unfavorable case, the statistical statements that emerge from prediction methods prove reliable.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI     Document 7944-3     Filed 05/17/13     Page 77 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(142)   My object is to determine whether any instability of my models over the pertinent time period meaningfully reduces predictive accuracy. I accomplish this objective by looking for manifestations of reduced accuracy; finding none, I conclude that the models are sufficiently stable to be confident of their reliability. Problematic instabilities will manifest themselves in several ways.

(143)   First, if the process governing price changes between the pre-conduct period and the post-conduct period in a way that is consequential for predictions (as Dr. Carlton asserts), the model's predictions will not be able to track the actual evolution of prices in both periods. Rather, because the estimated process will reflect a blend between the pre-conduct and post-conduct processes, predicted prices for the pre-conduct period (initialized at the start of the pre-conduct period) will not track pre-conduct period prices, and predicted prices for the post-conduct period (initialized at the start of the post-conduct period) will not track post-conduct period prices.

(144)   I have conducted the analysis described in the previous paragraph, and it demonstrates the model tracks the evolution of prices well in both periods; see the next four figures, which pertain to the conspiracy-period scenario.[86]

**Figure 41: Prediction of pre-conspiracy large panel prices initialized at the beginning of the pre-conspiracy period**



---

[86]   Results for the plea-period scenario are similar and appear in my work papers.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 42: Prediction of post-conspiracy large panel prices initialized at the beginning of the post-conspiracy period**



**Figure 43: Prediction of pre-conspiracy small panel prices initialized at the beginning of the pre-conspiracy period**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 44: Prediction of post-conspiracy small panel prices initialized at the beginning of the post-conspiracy period**



(145) In all of the four preceding figures, the model predicts the price level just about right on average throughout the pertinent period. Figure 45 reports the average prediction error for the pre-conspiracy and post-conspiracy predictions. Note that the predictions are generally about right on average. I have also tested statistically whether the prediction errors are zero outside of the conspiracy period. The statistical significance results reported in Figure 45 confirm my hypothesis.

**Figure 45: Average prediction error over pre- and post-conspiracy period: conspiracy period scenario**

| | | Average prediction error | Statistical significance |
|---|---|---|---|
| Large TFT panels | Pre-conspiracy period | 0.2% | 0.37 |
| | Post-conspiracy period | 0.0% | 0.34 |
| Small TFT panels | Pre-conspiracy period | 0.0% | 0.56 |
| | Post-conspiracy period | 0.1% | 0.37 |

(146) The cross-validation analysis reported in the last subsection corroborates these conclusions. In Figure 40 there are two clusters of points on the graph; the northeast cluster represents the pre-conduct observations, while the southwest cluster represents the post-conduct observations. Notice that the points within each cluster lines up along the 45 degree line, which indicates that the model accurately matches price dynamics within both periods, rather than merely across the two periods.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 80 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(147)   Second, even if the underlying process is effectively stable between the pre-conspiracy and post-conspiracy periods (as the preceding analysis demonstrates), it may still differ during the conspiracy period for reasons unrelated to the conspiracy.  On its face, that possibility strikes me as far-fetched: it requires us to believe that the process changed, and then changed back, even though the evolution of the industry did not reverse itself.   That said, if such changes occurred, and if they were problematic for our purposes, then one would not expect that a predicted price path initialized before the conspiracy would line up with prices in the post-conspiracy period.  The reason is that the true but-for path during the conspiracy period would look very different from the estimated but-for path during the conspiracy period, and hence only by sheer coincidence would the two lines meet up with each other at the end of the conspiracy period.

(148)   I have conducted the analysis described in the previous paragraph, and it demonstrates the stability of my results. Figure 46 through Figure 48 show that, when initialized at the end of the pre-conspiracy period, my models generate predictions that are just about right on average for the post-conspiracy period. Figure 49 through Figure 51 show that this property continues to hold even when the models are initialized at the start of the pre-conspiracy period, which is a more challenging hurdle.

**Figure 46: Prediction of post-conspiracy large panel prices: prediction initialized at the end of the pre-conspiracy period**



Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 47: Prediction of post-conspiracy small panel prices: prediction initialized at the end of the pre-conspiracy period**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 48: Average prediction error over the post-conspiracy period: prediction initialized at the end of the pre-conspiracy period**

| | | Average prediction error | Statistical significance |
|---|---|---|---|
| Large TFT panels | Post-conspiracy period | -0.4% | 0.32 |
| Small TFT panels | Post-conspiracy period | 0.1% | 0.35 |

**Figure 49: Prediction of post-conspiracy large panel prices: prediction initialized at the beginning of the pre-conspiracy period**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 75

**Figure 50: Prediction of post-conspiracy small panel prices: prediction initialized at the beginning of the pre-conspiracy period**



**Figure 51: Average prediction error over the post-conspiracy period: prediction initialized at the start of the pre-conspiracy period**

|  |  | Average prediction error | Statistical significance |
|---|---|---|---|
| Large TFT panels | Post-conspiracy period | -0.4% | 0.32 |
| Small TFT panels | Post-conspiracy period | 0.1% | 0.35 |

(149)   Based on these analyses, I see no reason to be concerned that my models suffer from instabilities that might reduce predictive accuracy.

## II.E.3. Additional sensitivity analyses demonstrate the accuracy and reliability of my analysis and conclusions

(150)   Dr. Carlton expresses the concern that my small panel index contains very few mobile panels during the pre-conduct period, but is dominated by mobile panels after the conduct period.[87]  He therefore believes that the problem of instability is particularly acute for my small panel model.  I have already demonstrated that price movements for mobile and non-mobile small TFT-LCD panels were very similar (Section II.A.4).  I have also shown in the previous subsection that the small TFT-LCD panel model passes appropriate tests of stability.  Notably, when initialized at the start of the pre-conduct period, its

---

[87]   Carlton ATS report, ¶311.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

predictions match realization quite well throughout the pre-conduct period (during which non-mobile panels were dominant), and when initialized at the start of the post-conduct period, its predictions match realizations quite well throughout the post-conduct period (during which mobile panels were dominant). It is hard to imagine how the model would achieve this success in both periods if the shift from non-mobile to mobile panels rendered it inaccurate.

(151)    Still, in deference to Dr. Carlton's concern, I conducted an analysis of mobile phone panel overcharges based on models describing the evolution of a mobile phone panel index. Because TFT LCD panels for mobile phones came into use during the conduct period, there is no pre-conduct data; hence, these are back-casting models. As such, they are less reliable than my small panel models, and I view them simply as an additional robustness check. All of the models I considered were static. To make predictions using dynamic models, one must know the value of initial prices. But if the initial date falls within the conduct period, those values are unknown (because the historical prices are inflated by the conspiracy). While the use of static models is indeed a limitation, I am at least somewhat encouraged by the fact that static and dynamic versions of my models have generated similar overcharge estimates (though overcharges based on the static models tend to be slightly higher). Generally, these models yield larger overcharges than my small panel models. The details are provided in my backup materials.

## II.F. The sensitivity analyses conducted by Drs. Carlton and Rubinfeld are inappropriate, and do not call the reliability of my overcharge estimates into question

(152)    Drs. Carlton and Rubinfeld estimate several alternative specifications of my models, and claim that the high sensitivity of the resulting overcharge estimates shows that my approach is unreliable (see, e.g., Section IX.G of Carlton and Section IX.B of Rubinfeld). To put their "sensitivity analyses" in perspective, it is helpful to have in mind the following analogy. Though the Toyota Camry is widely rated as a highly reliable car, a person is not convinced and decides to test it. He buys a Camry, drains the oil from the engine, swaps the Firestones for bicycle tires, drives the car off-road at 90 mph. When it breaks down, he declares it unreliable. The point of the analogy, of course, is that any machine can be broken if it is sufficiently abused; thus, showing that one can break a machine through abuse does not prove that it is unreliable.

### II.F.1. Removing or replacing the MP-PPI is inappropriate and not a valid test of reliability

(153)    The vast majority of Dr. Carlton's sensitivity analysis – indeed, all of those in his Tables IX-7 and IX-9 – remove the MP-PPI from the specification. For the reasons discussed in Section II.B.1, this is entirely inappropriate on both economic and statistical grounds. The only other sensitivity analyses Dr. Carlton presents all involve the addition of a time trend (his Table IX-8).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Page 77

## II.F.2. Adding a time trend is not a valid test of reliability

(154)   Dr. Carlton argues that it is important to include a time trend because the downward trend is the data's most notable feature (¶348). He asserts that, as a result, I have not controlled adequately for trending factors (¶365). Dr. Carlton is wrong on a number of counts.

(155)   First, my models adequately account for trending factors in a number of economically meaningful ways. The most obvious is through the inclusion of a lagged endogenous variable. To illustrate, if an equation indicates that the price index in a given month is equal to 0.99 times the price index in the previous month, then the implication is that the price index declines on average at the rate of one percent each month. In addition, some of my predictors, such as the MP-PPI, exhibit strong trends. Moreover, as a practical matter, my models obviously have adequate controls for trending factors, because they do an excellent job of predicting the price trend to which Dr. Carlton refers. Consequently, there is no valid reason to believe that my analysis inadequately accounts for trends. Including a time trend is therefore contrary to the principle, enunciated in my first report, of parsimony.

(156)   Second, Dr. Carlton has not provided a valid economic justification for including a simple time trend. Time does not cause price movements. Rather, time is correlated with economic variables that in turn cause price movements. It behooves the careful economist who is concerned about trends to search out their likely causes, and to include variables that substantively capture those causes. That is what I have done. The Defense experts have suggested a variety of additional supply and demand factors, a number of which also exhibit trends, and I have incorporated those into my analysis as well. Dr. Carlton has not even so much as suggested a possible source of the trend that is not connected to at least one of the variables now subsumed by my analysis. Including a linear time trend under these conditions is contrary to the principle, enunciated in my first report and explicitly endorsed by Dr. Rubinfeld, that predictors must be highly economically relevant.[88]

(157)   Rather than reference the scholarly literature, Dr. Carlton turns for support on this issue to an econometrics textbook written for undergraduates, which he quotes as saying that "…'it is common practice to introduce the time trend variable' to account for basic variables that change slowly over time, but are hard to observe directly" (¶348). Notice that, in this passage, Dr. Carlton refers to "basic variables" that are "hard to observe directly," thereby explicitly acknowledging what I have written in the previous paragraph.

(158)   Other economists have likewise emphasized that deterministic time trends are, at best, intended to stand in for the economic factors that are actually responsible for price movements, and that their use is therefore suspect. For example, Drs. James Stock and Mark Watson, Economics professors at Harvard and Princeton respectively, have written as follows in their textbook on econometrics:

---

[88]   "Professor Bernheim states that three basic 'principles' guided his choice of explanatory variables: 'The first principle is the factors included in the model must be economically relevant for LCD panel prices'….Professor Bernheim and I agree with respect to the first two principles." Rubinfeld report, ¶¶334-335.

> Like many econometricians, we think it is more appropriate to model economic time
> series as having stochastic rather than deterministic trends. Economics is complicated
> stuff. It is hard to reconcile the predictability implied by a deterministic trend with the
> complications and surprises faced year after year by workers, businesses, and
> governments.[89]

(159)   Echoing this sentiment in a paper examining the adverse consequences of using trends to predict cigarette demand, co-authors, Lynne Schneider, Benjamin Klein, and Kevin M. Murphy state that explicitly entering a time trend variable into the regression equation "…implies an explicit recognition of ignorance (that is, some left-out variable correlated with time), since there is nothing in demand theory that suggests that time per se should influence consumption."[90]

(160)   Because the use of a trend is a confession of ignorance concerning the factors driving changes in price, there is no way to know whether any particular trend variable captures those factors appropriately (e.g., whether one should use a linear trend, a quadratic trend, a geometric trend, or some other possibility). Using the wrong specification for the trend can generate misleading results (see, e.g., my discussion of Dr. Carlton's detrended price series in Section VIII.A).

(161)   Inspection of Carlton's Table IX-8 reveals that the addition of a time trend reduces my basic large-panel plea period overcharge estimate from 15.1 percent to 14.5 percent – a rather modest effect in light of Dr. Carlton's rhetoric.[91]  The small-panel plea period overcharge estimate falls somewhat more, from 18.6 percent to 8.1 percent, but remains substantial.[92]  Dr. Carlton arrives at much lower overcharge estimates – 2.8 percent for large panels and -0.3 percent for small panels – by averaging the aforementioned figures with estimates obtained from even more inappropriate specifications, to which I now turn.

## II.F.3. Weighting by sales is inappropriate and not a valid test of reliability

(162)   Half of the sensitivity analyses Dr. Carlton presents, including two of the four in Table IX-8, employ an estimator that weights observations by sales.  This is nonsensical. Weighting observations is a technique that can be used in some contexts to improve the statistical efficiency of econometric estimates (that is, to reduce their variance).  Dr. Carlton's sales weights are not specified in this way, and the problem at hand does not resemble the contexts in which such benefits are thought to exist.[93]  Certainly Dr. Carlton has not justified his weighted regressions in this way. Other justifications for the application of weights in a

---

[89]   Stock, James H., and Mark W. Watson, Introduction to Econometrics, 2nd Ed. (2007), Pearson Education, Inc., page 555.

[90]   Lynne Schneider, Benjamin Klein, Kevin M. Murphy (1981): "Governmental Regulation of Cigarette Health Information," *Journal of Law and Economics* 24: 575-612, page 583.

[91]   Carlton reported overcharges without accounting for the lingering effect period, performed OLS instead of ridge, and used a different logarithm regression factor adjustment. Therefore, the overcharges for my parsimonious models reported in this paragraph were computed in a way that makes them comparable to the overcharges reported by Carlton in his Table IX-8.

[92]   For the conspiracy period, the addition of a time trend reduces the large panel overcharge estimate from 17.1 percent to 15.2 percent and reduces small-panel overcharge estimate from 25.7 percent to 16.5 percent.

[93]   See, for example, James H., and Mark W. Watson, Introduction to Econometrics, 2nd Ed. (2007), Pearson Education, Inc., pp. 691-696 for a treatment of weighted least squares in the standard context.

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 87 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

regression setting are also not applicable here – for example, applying population weights in a stratified sampling context. Moreover, I am not aware of any justification in the literature for using arbitrary weights of the type that Dr. Carlton uses as a general test of specification, and their use is likely to reduce the precision of the resulting estimates in any event. Consequently, Dr. Carlton's use of a weighted estimator is, at best, odd.

(163)    In this context, weighting is actually pernicious. Because quantities increased dramatically over time, Dr. Carlton's weighting scheme attaches very little importance to the pre-conduct period, and even to earlier parts of the post-conduct period. In this sense, it may be a more extreme "test" than simply dropping the pre-conduct data from estimation. As I have explained at some length in Section II.E, the pre-plea data play an essential role in my analysis. It is no more appropriate to discount the pre-plea data dramatically, as Dr. Carlton's weighting procedure does, than it is to drop them entirely.

## II.F.4. The use of dummy variable models with a single cartel dummy without exploring models with multiple cartel dummies is inappropriate and not a valid test of reliability

(164)    Half of Dr. Carlton's sensitivity analyses employ dummy variable models with a single cartel dummy variable. As I explained in my first report, and as I reiterate below (in Sections II.G and III.A), such models are in this case highly problematic, in that they impose a very strong assumption that is plainly contrary to the evidence (as well as contrary to the opinions expressed by Drs. Carlton and Rubinfeld, as explained below). When single-dummy-variable models yield results that depart significantly from those obtained through the prediction method, it is generally the case that the data reject the strong assumption on which the dummy variable models are predicated. In my opinion it is therefore entirely inappropriate to consider models with a single cartel dummy variable without also systematically exploring the implications of models that allow the effect of the cartel to vary through time.

(165)    In Table IX-8, Dr. Carlton obtains extreme results by combining the last three objectionable procedures: he adds a simple time trend, weights by sales, and estimates a model with a single cartel dummy variable. Not surprisingly, the results he obtains are completely nonsensical: the estimated overcharge is *negative* 19.8 percent for small panels and *negative* 14.6 percent for large panels. Similarly, in Table IX-9, this combination yields an estimated overcharge for small panels of *negative* 196.8 percent (which means prices would have been negative). Dr. Carlton then averages the overcharge estimates over all of the sensitivity analyses for large and small panels in each of these tables – a procedure for which there is no valid statistical justification. Obviously, the nonsensical figures have a large influence on these averages.

## II.F.5. Replacing lagged prices with a time trend is not a valid test of reliability

(166)    Dr. Rubinfeld presents sensitivity analyses in which he replaces my lagged price variables with a time trend. He finds that the overcharge estimate is much reduced, and claims that this alternative model

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

exhibits better statistical performance (¶¶327-332). In fact, this "sensitivity analysis" lacks both a valid economic justification and a valid statistical justification.

(167)   I will begin with economic considerations. As I explained in my first report, variable selection should be driven in large part by judgments concerning economic relevance, based on an understanding of the underlying economic structure.[94] I also explained that lagged prices embody important economic factors. Current prices depend on recent prices as the result of contracts (e.g., that specify prices for a fixed term), negotiations, and processes related to market equilibriation (see, e.g., Carlton, ¶¶252-254). In contrast, as I explained in II.F.2, the use of a time trend constitutes an admission of ignorance. The trend itself plays no economic role; it simply stands in for other factors that the analyst has not measured, and there might be no way to know whether any particular trend variable captures those factors appropriately (e.g., whether one should use a linear trend, a quadratic trend, a geometric trend, or some other possibility), or whether it captures something spurious. Given the obvious economic relevance of lagged prices, replacing them with something of no direct economic relevance, such as a time trend, has no economic justification.

(168)   Dr. Rubinfeld compares the performance of his alternative specification to that of my basic specification using an unusual cross-validation technique for which he offers no support or citation, and which seems particularly ill-suited to the current problem (¶386 and footnote 496). For example, the exercise appears to use data from the conduct period, which is entirely inappropriate. I have evaluated the two models using much more standard and appropriate statistical criteria: the AIC and the BIC; see the figure below. In all cases, my basic model outperforms Dr. Rubinfeld's alternative by a wide margin. Because Dr. Rubinfeld advocates a cross-validation procedure, I also employ hv-block cross-validation (a more standard and generally accepted approach), and again find that the performance of Dr. Rubinfeld's proposed alternative is inferior. Accordingly, Dr. Rubinfeld's "sensitivity" analysis lacks a valid statistical justification.

**Figure 52: Change in statistical performance when the two lagged dependant variables are replaced with a time trend**

|  | Statistical Criteria | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|---|
| Large TFT panels | AIC | Replace two lags with trend | Worse | Worse |
|  | BIC | Replace two lags with trend | Worse | Worse |
| Small TFT panels | AIC | Replace two lags with trend | Worse | Worse |
|  | BIC | Replace two lags with trend | Worse | Worse |

---

[94] Thus, Dr. Carlton is simply incorrect when he says that I view my analysis as a purely statistical exercise that fails to account for economic structure. Carlton deposition, April 11, 2012, pp. 370-375.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## II.G. Alternative methods corroborate my conclusions

(169)    In my first report, I corroborated my conclusions by employing a variety of alternative methods.  These included the use of a different estimation technique (OLS instead of Ridge Regression), the estimation of static rather than dynamic models, and the use of models with cartel dummy variables (both dynamic and static).  For the dummy variable approach, I estimated models with a single cartel dummy variable, yearly dummies, and quarterly dummies.  The use of yearly and quarterly dummies allows the estimated effects of the conduct to vary over the conduct period.

(170)    Dr. Rubinfeld criticizes my dummy variable models on the grounds that they omit important determinants of TFT-LCD panel prices (¶388).  To explore the importance of this objection, I have estimated additional dummy variable models.  With the most reliable dummy variable approach (quarterly dummies), the implied overcharge estimates are highly robust and generally similar to those obtained with my prediction models.  Robustness declines modestly overall when one uses models with annual cartel dummies, and more significantly when one uses models with a single cartel dummy, but that finding is not surprising or troubling in light of the discussion in Section II.D.1.  Results appear in my work papers.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

# III. Alternative econometric analyses of overcharges provided by Drs. Carlton and Rubinfeld are unreliable and inaccurate

## III.A. Drs. Carlton and Rubinfeld employ less reliable tools for measuring overcharges

(171)    Drs. Carlton and Rubinfeld both estimate "dummy variable models" with a single cartel dummy variable that is turned "on" for all TFT-LCD panels sold during the conduct period. As I have explained in Section II.D.1, this approach is less reliable than the prediction equation approach. Moreover, as I will show below, many of the severe problems that render their analyses demonstrably unreliable in practice flow directly from their use of dummy variable models in this context.

(172)    The econometric models presented by Drs. Carlton and Rubinfeld purport to explain TFT-LCD panel prices at the level of product categories, which are narrower than applications but broader than individual products (e.g., as identified by part number). They aggregate the prices within these categories using quantity-weighted averages. In Section II.A.2, I explained that unit averages are less reliable than price indexes, and gave an example involving Dr. Carlton's average price series for TV panels, which he used in his analysis of aggregation. Though his econometric analysis uses average prices for much smaller product categories, the same problem can arise.

(173)    Figure 53 illustrates this point by depicting the underlying data for a particular mobile phone display product category. The blue line represents Dr. Carlton's quantity-weighted average price for the category. The figure also shows transaction prices for the models within that category, using a different color for each model. Notice that Dr. Carlton's average price series moves erratically between Q1 2004 and Q1 2005, even though none of the model-specific prices display such a pattern. Dr. Carlton's average price leaps from around $15 in Q1 2004 to around $27 in Q2 2004 simply because some low-cost products that were sold in Q1 disappear in Q2. Only one product is sold in both of those periods, and its price actually declines slightly. The price index then dives downward to around $8 in Q3, apparently due to the reappearance of one of the low-cost products, presumably at very high volume. The price of the high-cost product sold in both Q2 and Q3 does decline, but not nearly as fast as the market average. In Q4, the market average leaps upward again, this time to around $18 despite the fact that the price of the only product sold in both Q3 and Q4 declines; this is due to the disappearance of the low cost product; it then dives downward again in Q1 2005, to around $6, due to the reappearance of several low-cost products. Even without changes in the set of products sold, movements in Dr. Carlton's average price sometimes bear no relationship to those of the underlying products. For example, the average price falls from around $30 in Q1 2003, to around $26 in Q2, to around $15 in Q3 – a decline of roughly 50% -- even though the prices of the underlying products are either roughly flat or increasing (presumably due to a shift in volume). Finally, notice that, in some cases, there is no overlap between the sets of goods sold

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

at two distinct points in time, even when they are quite close together (e.g., Q4 2004 and Q2 2005), so that the change in the average price between those two dates reflects a comparison between the price levels of different products.  Fisher price indexes do not make such comparisons.

**Figure 53: Quarterly weighted average prices for mobile display product 128x160 from Toshiba**



# III.B. Drs. Carlton and Rubinfeld have built unreliable "zero machines"

(174)   Drs. Carlton and Rubinfeld claim that their econometric models accurately measure the effects of the conspiracy on the prices paid for TFT-LCD panels.  There is an easy way to determine whether they are right: one simply asks whether their models would have detected larger overcharges if indeed the conspiracy had been more successful at raising prices.  To answer that question, one takes the actual price data, increases the prices during the conduct period to reflect more effective collusion, and then runs the modified data through their estimation procedures.  So, for example, if we increase all prices during the conduct period by 20 percent (to simulate what the world would have looked like if the cartel had succeeded in raising prices by another 20 percent), and if we then run the modified data through their procedures, their models should show that prices were increased by 20 percent – at least, that is what would happen if their procedures were at all reliable.

(175)   It is absolutely critical that the estimation procedures used by Drs. Carlton and Rubinfeld pass simple tests of this kind.  They cannot reasonably claim that their estimation procedures fortuitously happened to

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 92 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

work properly given the actual overcharges imposed by the cartel, while conceding that these same procedures would not have worked properly had the cartel achieved a different outcome. After all, an objective expert who is asked to measure overcharges must adopt a procedure that can be expected to deliver the right answer regardless of what the truth turns out to be.

(176) To start, consider what Drs. Carlton and Rubinfeld would have concluded, based on their econometric models, had the cartel succeeded in raising all prices by another 20 percent from the start of the conduct period through the end of 2005. (I will subsequently ask what they would have concluded if prices had been higher in 2006, the last year of the conspiracy – the difference will be highly instructive.) Accordingly, I take the actual price data, increase all prices during the aforementioned period by 20 percent to reflect more effective collusion, and then run the modified data through their estimation procedures. (The effect on average prices is shown graphically in Figure 54.)

**Figure 54: Average notebook panel prices with simulated 20% markup through Q4 2005**



(177) The figure below shows the results of conducting this experiment with Dr. Carlton's basic models, simulating an extra cartel markup of 20 percent through the end of 2005. The figures show two bars for each of his models. One is the extra overcharge during the conspiracy period; it is less than 20 percent because the 20 percentage price elevation implies about 17% overcharge and the markup does not apply to panels sold in 2006. The other bar shows the amount by which Dr. Carlton's estimate of the cartel's price impact changes when the extra markup is added. If his model reliably measures average markups during the conspiracy period, the second bar should be roughly the same height as the first. Notice that in

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 85

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 93 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

all three cases it is much smaller.  This is the case for both versions of Dr. Carlton's notebook panel models. For Dr. Carlton's mobile display model, the estimated cartel effect actually *falls* when the extra cartel markup is added.[95]

**Figure 55: Overcharge estimate implied by Dr. Carlton's baseline models with simulated extra overcharge (20% markup through Q4 2005)**



(178)    The next set of figures show the results of related experiments.  Figure 56 also pertains to Dr. Carlton's basic model; it shows the effect of simulating an extra cartel markup of 50 percent through the end of 2005.[96]  Figure 57 and Figure 58 pertain to the versions of Dr. Carlton's model that include measures of panel age; they show the effect of simulating extra cartel markups of 20 percent and 50 percent, respectively.  Figure 59 and Figure 60 do the same for Dr. Rubinfeld's models.  In no case do the models come remotely close to detecting the effect of the extra cartel markup.  Indeed, in many cases, as the extra markup grows *larger*, the estimated cartel effect grows *smaller*.  Thus, *the procedures used by Drs. Carlton and Rubinfeld have essentially no ability to detect overcharges prior to 2006*.  With respect to measuring those overcharges, they are *unreliable in the extreme*.

---

[95]    In principle, had the cartel managed to add an extra markup through the end of 2005, Dr. Carlton might have rejected his models based on his Wald tests, thereby avoiding the models' false implications.  However, this is not generally the case. For the experiments in Figure 55, Dr. Carlton's Wald test would have failed to detect any instability.

[96]    Even with price increase of 50%, Dr. Carlton's Wald test does not detect any instability for his notebook panel model, estimated over 2000-2008.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 56: Overcharge estimate implied by Dr. Carlton's baseline models with simulated extra overcharge (50% markup through Q4 2005)**



**Figure 57: Overcharge estimate implied by Dr. Carlton's models including panel age with simulated extra overcharge (20% markup through Q4 2005)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 58: Overcharge estimate implied by Dr. Carlton's models including panel age with simulated extra overcharge (50% markup through Q4 2005)**



**Figure 59: Overcharge estimates implied by Dr. Rubinfeld's models with simulated extra overcharge (20% markup through Q4 2005)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 60: Overcharge estimates implied by Dr. Rubinfeld's model with simulated extra overcharge (50% markup through Q4 2005)**



(179)    Now let's ask what Drs. Carlton and Rubinfeld would have concluded, based on their econometric models, had the cartel succeeded in raising all prices by the same range of percentages *during 2006 alone*. Results appear in Figure 61 through Figure 66, each of which has a counterpart in the preceding set. For reasons that will become clear momentarily, I have added a third bar to each set of results; it simply shows the size of the extra cartel overcharge I am simulating (20% or 50%). Generally, these figures demonstrate that the models used by Drs. Carlton and Rubinfeld would detect an average incremental cartel effect far *larger* than the cartel's extra price impact (simulated), averaged over all transactions. Indeed, the increase in the estimated cartel effect is generally much closer to the cartel's extra price impact (simulated) in 2006 alone – i.e., 20% or 50%, depending on the experiment. Thus, the models used by Drs. Carlton and Rubinfeld actually yield rough approximations of the extent to which the conspiracy raised the prices of TFT-LCD panel products in 2006, rather than during the conspiracy period as a whole.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 89

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 61: Overcharge estimate implied by Dr. Carlton's baseline models with simulated extra overcharge (20% markup in 2006)**



**Figure 62: Overcharge estimate implied by Dr. Carlton's baseline models with simulated extra overcharge (50% markup in 2006)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 63: Overcharge estimate implied by Dr. Carlton's models including panel age with simulated extra overcharge (20% markup in 2006)**



**Figure 64: Overcharge estimate implied by Dr. Carlton's models including panel age with simulated extra overcharge (50% markup in 2006)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 65: Overcharge estimate implied by Dr. Rubinfeld's models with simulated extra overcharge (20% markup in 2006)**



**Figure 66: Overcharge estimate implied by Dr. Rubinfeld's models with simulated extra overcharge (50% markup in 2006)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 100 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(180)    Next I investigate whether the cartel effects estimated by Drs. Carlton and Rubinfeld are particularly sensitive to the size of markups in some particular portion of 2006. Each of Figure 67 through Figure 74 corresponds to one of their models and shows results for a series of experiments.[97] In each experiment, I simulate the effects of an extra cartel markup of 20% from the beginning of the conduct period through a specified date, starting with year-end 2003. I then increment that date by one year at a time until I reach year-end 2005, and then increment it by one quarter at a time until I reach year-end 2007, in each case checking to see how well the model detects the extra markup. The figures show, for each such experiment, the average incremental cartel effect detected by the model, expressed as a percentage of the cartel's extra price impact (simulated). When that percentage is 100%, the model correctly detects the average extra impact of the cartel; when it is less than 100%, the model detects only a fraction of that impact. All of the models perform reasonably well when the extra cartel markup is applied for a period of time that coincides *exactly* with the conspiracy period. However, in the case of Dr. Carlton's models, the markup in the fourth quarter of 2006 is doing almost all of the work. His models have very little if any ability to detect an extra cartel markup that runs through Q3 2006; it is the extra markup in Q4 2006 that his models detect. Though some of the results for Dr. Rubinfeld's models are not quite as extreme, the cartel effects he measures are also disproportionately influenced by markups in the second half of 2006. The figures also show that the models do a bad job of detecting the average effect during the conspiracy period of an extra cartel markup that persists beyond the end of 2006.

**Figure 67: Dr. Carlton's Notebook panel model, 2000-2008, with simulated extra overcharge through indicated date  (20% markup)**



───────────────────────────

[97]    Additional results pertaining to other variations of their models are provided in my backup material.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 68: Dr. Carlton's Notebook panel model, 2000-2008, with simulated extra overcharge through indicated date (50% markup)**



■ Ratio of estimated incremental overcharge to actual incremental overcharge

**Figure 69: Dr. Carlton's mobile display panel model, 2003-2008, with simulated extra overcharge through indicated date (20% markup)**



■ Ratio of estimated incremental overcharge to actual incremental overcharge

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 70: Dr. Carlton's mobile display panel model, 2003-2008, with simulated extra overcharge through indicated date (50% markup)**



**Figure 71: Dr. Rubinfeld's all-defendant small panel model, conspiracy period scenario, with simulated extra overcharge through indicated date (20% markup)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 72:  Dr. Rubinfeld's all-defendant small panel model, plea period scenario, with simulated extra overcharge through indicated date (20% markup)**



**Figure 73: Dr. Rubinfeld's Samsung mobile display panel model, conspiracy period scenario, with simulated extra overcharge through indicated date (20% markup)**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 74: Dr. Rubinfeld's Samsung mobile display panel model, plea period scenario, with simulated extra overcharge through indicated date (20% markup)**



(181)    I have shown that the econometric models used by Drs. Carlton and Rubinfeld do not generally detect, let alone reliably measure, overcharges prior to the start of 2006, but instead yield a rough measure of overcharges during the later portions of 2006.  Given that finding, it is now easy to understand why they obtain such low overcharge estimates.  Dr. Rubinfeld and I both agree that the cartel had largely unraveled by the start of 2006:

- In my first report, I noted that the possible defection of Samsung in the first quarter of 2006 (when Samsung began cooperating with the U.S. government) may have undermined the cartel's ability to operate effectively (¶125).  Moreover, I estimate declining overcharges during the second half of 2005, and my total overcharges for 2006, averaged over all sales during that year, and especially during the latter portions of that year, were relatively low.

- Dr. Rubinfeld describes the conspiracy as entering "…a 'wind down phase' in the latter part of 2005…" (¶80). He notes that "Samsung also informed the DOJ of the conduct at issue in this litigation and began cooperating with the DOJ in January 2006…I also understand that prior to informing the DOJ of the conduct at issue, Samsung took steps to end its participation." (¶237) At his deposition, he explained that "as a general matter, it would be much more difficult to sustain a conspiracy if Samsung were not participating.…for me it's more difficult to imagine an effective conspiracy without Samsung having participated."[98]

---

[98]    Rubinfeld deposition, page 73, lines 5-7 and page 298, lines 16-18.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(182)    Since the procedures used by Drs. Carlton and Rubinfeld do not generally detect or reliably measure overcharges prior to the start of 2006, but instead roughly measure overcharges during 2006, and since there is no reason to think the cartel raised prices much in 2006, these procedures are practically guaranteed to yield overcharge estimates near zero. *Thus, Drs. Carlton and Rubinfeld have built unreliable models that are constructed to generate zero overcharges regardless of the facts prior to 2006.*

(183)    I have traced these demonstrable failures of the models used by Drs. Carlton and Rubinfeld to three sources, all of which are consequences of the dummy variable approach.

- First, in a dummy variable model with a significant number of supply and demand factors, it is quite likely that, when the effect of the conspiracy varies during the conduct period (as it does in most of the experiments reported above), one or more of the supply and demand factors will be correlated with that variation. Consequently, those variables will falsely "explain" the price elevation caused by the cartel. Indeed, the estimated coefficients of those factors often change noticeably when I perform the experiments described above. Dr. Carlton's Wald test is supposed to detect those changes so that he can declare the model unstable and discard it. However, his test has low power and does not reject stability in my experiments unless the extra cartel markup is sufficiently extreme.

- Second, by using a dummy variable model and a fixed-effects specification in combination, Dr. Rubinfeld renders the price levels for products sold entirely inside the conspiracy, or entirely outside the conspiracy, entirely irrelevant. For any such product, one can increase or decrease all of its prices by any given factor – 2, 3, or even a factor of 4 - and there will be no change in the estimated cartel effect (because the elevation is entirely picked up by the product fixed effect). Thus, as a simple matter of mathematics, Dr. Rubinfeld's models have no ability whatsoever to detect any effect of the conspiracy on products that were only sold during the conduct period. In his models, the cartel effect is entirely identified by prices for products that bridged either the end or the beginning of the conspiracy period. The sales of those products are considerably more concentrated toward the end of the conduct period than conduct period transactions generally. Dr. Carlton's approach suffers from the same problem, but matters are a bit more complex due to his use of instrumental variables and the Arellano-Bond procedure. While a change in the price of all products sold entirely within the conspiracy period does not leave his estimated cartel effect unchanged, the impact is minimal.

- Third, the Arellano-Bond procedure, which Dr. Carlton uses, is a first-difference estimator. That is, it studies the relationship between the change in price and the changes in the model's other variables, including the cartel dummy. Because the cartel dummy equals 1 during the conduct period and 0 after the conduct period, its value changes only once: between Q4 2006 and Q1 2007 (Dr. Carlton uses no pre-conspiracy data). Consequently, Dr. Carlton's procedure identifies the effect of the cartel primarily from the difference in price between Q4 2006 and Q1 2007. That appears to be a large part of the reason why his procedure is so very unsuccessful at detecting price elevation that runs through Q3 2006, but not Q4 2006.[99] It is also why his procedure is fundamentally unsuited for measuring the

---

[99] It appears to be somewhat more successfully at detecting price elevation that lasts into early 2007 because it includes lagged prices.

effects of a cartel when there is good reason to think that those effects changed gradually rather than suddenly at a single known point in time.

(184)   Having subjected the procedures used by Drs. Carlton and Rubinfeld to these reasonable and straightforward tests, it is only fair to do the same with my approach.  Let's ask what I would have concluded, based on my econometric models, had the cartel succeeded in raising all prices by a larger (or smaller amount) during all or part of the conspiracy period.  The answer is that *my approach will always yield the correct answer, regardless of the amount or pattern of the extra overcharges*.  The reason is simple: because I do not use data from the conduct period to estimate my econometric models, my estimates will be unchanged, and consequently my but-for prices will be unchanged.  Therefore, each dollar of "extra overcharge" translates directly into one more dollar of estimated overcharge.  One of the great advantages of the prediction approach is that it always passes this simple and important test.

## III.C. The analyses of Drs. Carlton and Rubinfeld depend critically upon a false premise concerning the conspiracy's effect on price

(185)   As I explained in Section II.D.1, models with a single cartel dummy (of the type Drs. Carlton and Rubinfeld employ) assume that the overcharge for any particular transaction equals the average overcharge for the entire cartel period, plus statistical "noise" (specifically, a deviation that is unrelated to any of the other supply and demand factors included in the model).

(186)   The reports of Drs. Carlton and Rubinfeld cast serious doubt on the validity of this key assumption.  Dr. Rubinfeld states explicitly that the effectiveness of the cartel varied over time, and Dr. Carlton's analysis has the same implication.

- ■   Dr. Rubinfeld describes the conduct as falling into phases – a "pre-Crystal Meetings phase" prior to September 2001, a "top meetings phase" from September 2001 through July 2002, a "price-collapse phase" from August through December 2002, a "price-sharing phase" from January 2003 through May 2004, a "price-war phase" from June 2004 through March 2005, and a "wind down phase" in the latter part of 2005…" (¶80).  He also writes that, "[i]n evaluating the likely impact of an effort to collude, it is important to account for the fact that collusion may result in a temporary elevation of prices" (¶311).

- ■   Dr. Carlton devotes an entire section of his report (Section V) – some thirty pages – to a discussion of the various factors which he believes affects a cartel's ability to raise price.  Virtually all of the factors he mentions varied over time.  Dr. Carlton cannot simultaneously maintain that those factors were indeed important determinants of the cartel's influence on price without simultaneously admitting the possibility that overcharges varied over time (unless, in formulating his model, he assumes his conclusion – that the conspiracy had little or no effect).  Oddly, in his deposition, Dr. Carlton testified that he was instructed to assume the cartel overcharge was constant throughout the

conduct period, and that he designed his analysis based on that assumption, which is quite surprising given that his analysis has the opposite implication.[100]

(187)    It is highly unlikely that the variation over time in the magnitude of the overcharge would be unrelated to other supply and demand factors, as the key assumption requires.  On the contrary, as I explained in my first report (¶89), there are good economic reasons to think that variations in demand and supply factors through time influence the effectiveness of a conspiracy.  For example, during a period of high demand or low cost, the temptation to defect from any given agreement may rise.[101]  Accordingly, the "deviation" between the average overcharge and the overcharge for transactions at any given point in time is likely correlated with other variables in the model, which renders the model misspecified and potentially unreliable.

(188)    Fortunately, there is no need to speculate about the validity of the key assumptions; rather, one can test it directly, and in doing so shed light on the reliability of the econometric models upon which Drs. Carlton and Rubinfeld rely.  As I explained above in Section II.D.1, one implements the test by estimating models with multiple cartel dummy variables, where the conduct period is divided into multiple sub-periods, and a separate dummy variable is introduced for each of the subperiods.  If the single-dummy and multiple-dummy models yield significantly different average overcharges, then the assumptions that justify the single-dummy model are not satisfied; it is misspecified, and does not yield a reliable estimate of average overcharges.[102]  I reiterate that Dr. Hausman, another Defense expert upon whom Dr. Carlton explicitly relies for econometric expertise (Carlton ¶¶ 229, 230, 234, 238, 240, 245, 267, 268, 277, 283, 300, 303), evidently concurs with me on this issue, and rejects the reliability of a damage estimate for Nokia provided by Dr. Jenkins on the basis of precisely this test (Hausman ¶29).

(189)    Dr. Hausman's versions of the aforementioned test involved replacing the single dummy variable with two dummy variables, each of which spans half of the conduct period. Figure 75 shows what Dr. Carlton would have found if he had followed Dr. Hausman's advice here as elsewhere and performed the same check. For Dr. Carlton's notebook panel model, estimated over 2000-2008, the estimated overcharges are -27% during the first half of the conduct period and -8% during the second half of the conduct period. In

---

[100]    Carlton deposition, April 10, 2012 pps 278-279:

"Q.  Does it matter to your model and your analysis whether or not the cartel effect was the same during the time period?

A.  I am not sure what you mean, does it matter if it -- if there's a different question I am asked, for example, if someone says, "Can you estimate a cartel effect for a different time period or if the cartel only applied during this time period or its effect is different in this time period versus that time period," I could certainly do an analysis to answer that question.

Q.  But you haven't done it so far, right?

A.  What is in my report and what I expect to testify to, I am not expecting to testify to that. If someone asks me a question about that, I could give an answer, but I, you know, am intending to stay with my report.

Q.  Is it your opinion that the cartel had the same effect at each point in time during the entire period 2000 to 2006?

A.  I have not done a detailed investigation of that question…If there's a different question to investigate, I could do that."

[101]    For an illustration, see, e.g., Rotemberg and Saloner, A Supergame-Theoretic Model of Price Wars during Booms, *The American Economic Review*, pp. 390-407, Vol. 76, No. 3, Jun., 1986.

[102]    Dr. Carlton's stability test can be construed as another approach to evaluating the validity of the key assumptions, but it is not adequate for this purpose; see Section III.D.3.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

other words, Dr. Carlton's model would imply a significant "undercharge" during the period when companies attempted to price fix. For Dr. Carlton's mobile display model, the estimated overcharges are 21% and 7% during the two time periods.  Recall that Dr. Carlton's single dummy variable model yields statistically insignificant overcharges estimates of 0% for notebook panels and 1.8% for mobile display panels (Carlton Table VIII-3). The second panel in Figure 75 shows the effect of using a set of annual cartel dummy variables.  The yearly-cartel-dummy version of Dr. Carlton's model yields overcharges that range as high as 40%, while for yearly-cartel-dummy version of his mobile display panels yields negative overcharges in all years.  Thus, results derived from models with either two cartel dummies or annual cartel dummies are highly inconsistent with the estimates Dr. Carlton reported, and the high sensitivity of the results to the specification of the cartel dummies shows that his approach is unreliable.

**Figure 75: Dr. Carlton's models with alternative cartel dummy variables**

| Model | Time period | Notebook, 2000-2008 | Mobile display, 2003-2008 | Notebook 2000-2008, with panel age | Mobile display, 2003-2008, with panel age |
|---|---|---|---|---|---|
| Two dummy variable model[a] | First | -27% | 21% | -13% | 19% |
| | Second | -8% | 7% | -4% | 6% |
| Annual dummy variable model | 2000 | 40% | | 18% | |
| | 2001 | 5% | | 7% | |
| | 2002 | 21% | | 26% | |
| | 2003 | 18% | -3% | 26% | -4% |
| | 2004 | 21% | -2% | 23% | -2% |
| | 2005 | 9% | -10% | 8% | -9% |
| | 2006 | 1% | -2% | 1% | -2% |

[a] For Notebook panels, the first dummy variable spans Q1/1999- Q2/2003 and the second dummy variable spans Q3/2003-Q4/2006; for mobile display panels, the first dummy variable spans Q1/2001-Q4/2004 and the second dummy variable spans Q1/2005-Q4/2006

(190)    Figure 76 presents the same robustness checks for Dr. Rubinfeld's models. The findings are similar in spirit. For example, focusing on the conspiracy period scenario, Dr. Rubinfeld's mobile panel models with annual cartel dummies imply substantial overcharges ranging as high as 22% in 2000 for the all-defendant version, and as high as 48% in 2001 for the Samsung version. Again, these results are inconsistent with Dr. Rubinfeld's single dummy variable model.  The high sensitivity of the results to the specification of the cartel dummies shows that Dr. Rubinfeld's approach, like Dr. Carlton's is unreliable.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 76: Dr. Rubinfeld's models with alternative cartel dummy variables**

| Model | Time period | All Defendants, conspiracy period | All Defendants, plea period | Samsung, conspiracy period | Samsung, plea period |
|---|---|---|---|---|---|
| Two dummy variable model[a] | First | 2% | -5% | -19% | -20% |
| | Second | 3% | 2% | 1% | 2% |
| Annual dummy variable model | 1998[b] | -5% | | | |
| | 1999 | 17% | | | |
| | 2000 | 22% | | | |
| | 2001[c] | 4% | -6% | 48% | 0.4% |
| | 2002 | 4% | -2% | 43% | 12% |
| | 2003 | 7% | 4% | 14% | -18% |
| | 2004 | 17% | 15% | 21% | 2% |
| | 2005 | 8% | 7% | 13% | 1% |
| | 2006 | 3% | 2% | 6% | 0.3% |

[a] For the plea period scenario, the first dummy variable spans September 2001–April 2003 for both Dr. Rubinfeld's Samsung only and all-defendant models. For the conspiracy period scenario, the first dummy variable spans June 2001-March 2004 and the second dummy variable spans April 2004–December 2006 for the Samsung-only model. For the all-defendant model, the first dummy variable spans August 1998–October 2002 and the second dummy variable spans November 2002–December 2006. [b] August 1998–Dec 1998. [c] September 2001–December 2001 for the plea period scenario for the all defendant model; June 2001-December 2001 for the conspiracy period scenario for the Samsung only model.

# III.D. The analyses of Drs. Carlton and Rubinfeld suffer from many other methodological deficiencies

## III.D.1. Discarding pre-conspiracy data renders Dr. Carlton's analysis less reliable

(191)    As I explained in Section II.C, the pre-2000 data that I used in my analysis are valid and representative. My analysis also demonstrates that, even though the industry evolved considerably between 1996 and 2009, the underlying process governing the evolution of prices was sufficiently stable to reliably incorporate those data into my analysis (Section II.E.2).

(192)    In contrast, Dr. Carlton has discarded much if not all of the pre-conspiracy data on the grounds that the industry changed significantly, but he conducts no actual analysis to determine whether that presumption concerning the irrelevance of those data is justified. His practice is contrary to the general presumption in applied econometrics that all pertinent data should be used. It is also arbitrary, *because the* industry *did not stop changing after 2000* (when the estimation period for his notebook panel model begins) Dr. Carlton implicitly assumes, for example, that transactions in 2008 are more relevant with respect to determining non-conspiratorial prices in 2000 than are transactions in 1999, even though the former are eight years distant from the prices in question, while the latter are only one year distant.

(193)    Without the pre-conduct data, an econometric analysis of overcharges effectively becomes an exercise in back-casting. A back-casting exercise is inherently less reliable than one that uses data to anchor prices appropriately on both ends of the conspiracy period. With an anchor at only one end, it is more likely that a model will produce results that drift away from true market fundamentals at the other end.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 102

### III.D.2. Dr. Carlton's conclusions do not survive the implementation of methodological changes advocated by Dr. Hausman, another Defense expert upon whom Dr. Carlton explicitly relies

(194)    In his rebuttal report, Dr. Hausman implemented various "methodological improvements" to the damage model put forth by Nokia's expert, Dr. Jenkins. Dr. Hausman opined that if these alternative methods generate different damages estimates, Dr. Jenkins' model is unreliable. Because Dr. Jenkins' model is very similar to the models estimated by Dr. Carlton, and because Dr. Carlton has explicitly relied upon Dr. Hausman for his econometrics expertise, it is reasonable to check whether Dr. Carlton's models pass the tests advocated by Dr. Hausman, and surprising that Dr. Carlton did not do so.

(195)    Figure 77 shows the overcharge estimates implied by Dr. Carlton's basic models (estimated over 2000-2008 for notebook panels and 2003-2008 for mobile display panels) when I implement the following alternative methods advocated by Dr. Hausman: (1) use of longer lags of prices as instrumental variables, (2) addition of more lags of costs, and (3) use of an n-step estimation procedure (corresponding to "n-step" under "GMM options" in Figure 77).  To perform this exercise, my staff adapted Dr. Hausman's Eviews commands to Dr. Carlton's models.  Results appearing in the rows labeled "Baseline" and "two-step" are replications of Dr. Carlton's models using Eviews. As is evident, with Dr. Hausman's alternative methods, Dr. Carlton's models generate a wide range of overcharge estimates.  Consider for example the notebook model without panel age: the estimates range from negative 3.3% to a statistically significant significant 22.7%. In fact, merely using longer lags of prices as the instrumental variables raises the overcharge estimate from 2.2% to 8%. For mobile panels, the estimates range as high as 9.7% without panel age, and 12.5% with panel age.  As discussed in the previous subsection, Dr. Carlton's models also fail another important test advocated by Dr. Hausman involving the use of two cartel dummy variables.  Thus, according to the criteria set forth by Dr. Hausman (upon whom Dr. Carlton relies), Dr. Carlton's models are not reliable.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 77: Dr. Carlton's overcharge estimates after applying Dr. Hausman's "methodological improvements"**

| Models | GMM options | Overcharge estimate | Overcharge estimate, with panel age |
|---|---|---|---|
| **Notebook, 2000-2008** | | | |
| Baseline | two-step | 2.2% | 0.9% |
| Baseline | iterated n-step | -3.3% | 8.3% |
| Use longer lags as IV | two-step | 8.0% | 6.1% |
| Use longer lags as IV | iterated n-step | not feasible | not feasible |
| Add (contem +3 lags) costs as regressors | two-step | 1.4% | 0.6% |
| Add (contem +3 lags) costs as regressors | iterated n-step | -0.9% | not feasible |
| Use longer lags as IV and add (contemp +3 lags) costs as regressors | two-step | 7.2% | 5.9% |
| Use longer lags as IV and add (contemp +3 lags) costs as regressors | iterated n-step | 22.7% | not feasible |
| **Mobile display, 2003-2008** | | | |
| Baseline | two-step | 1.9% | 2.1% |
| Baseline | iterated n-step | 7.2% | 6.5% |
| Use longer lags as IV | two-step | 0.0% | 1.4% |
| Use longer lags as IV | iterated n-step | not feasible | 7.3% |
| Add (contem +3 lags) costs as regressors | two-step | -1.1% | 1.4% |
| Add (contem +3 lags) costs as regressors | iterated n-step | 9.7% | 12.5% |
| Use longer lags as IV and add (contemp +3 lags) costs as regressors | two-step | 0.0% | 1.6% |
| Use longer lags as IV and add (contemp +3 lags) costs as regressors | iterated n-step | not feasible | not feasible |

Note: GMM options (two-step and n-step) refer to the estimation procedure implemented by Eviews, see Eviews 7 user manual.

### III.D.3. Dr. Carlton does not test correctly for his models' stability

(196)    Dr. Carlton makes it clear that he views structural stability of coefficients as a litmus test for the reliability of a dummy variable model.  In fact, he goes so far as to say that if a dummy variable model fails his test for structural stability, then it is unreliable and should not be used (¶233).  Moreover, he rejects the results of three of his models (TV, monitor, and non-mobile small panels) on the grounds that they fail his test for structural stability.

(197)    It is therefore a factor that makes his model highly unreliable that Dr. Carlton does not perform a sufficiently comprehensive test of structural stability. In words, the object of his test is to determine whether the relationship between price and the various supply and demand factors included in the analysis is the same during and after the conspiracy period.  But he has neglected the fact that his product-category fixed effects stand in for the set of unmeasured supply and demand factors affecting price for a given product.  His Wald test examines the stability of the effects of his supply and demand factors, but it does not examine the stability of the product-specific fixed effects.[103]  Yet the only difference between the supply and demand factors that Dr. Carlton measures and includes in his model, and the ones for which the product-specific fixed effects stand in, is that Dr. Carlton employs direct measures for the first, and proxy variables (the product fixed effects) for the second.  If the coefficients of the product fixed effects

---

[103]    The relevant hypothesis to test would be that the difference between the product fixed effects for any pair of products is the same during and outside of the conduct period.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 112 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

are unstable, Dr. Carlton's dummy variable model is misspecified, and he cannot claim to have produced a reliable estimate of average overcharges. Thus, despite the fact that Dr. Carlton views valid confirmation of model stability as necessary to demonstrate the reliability, and justify the use, of results based on a dummy variable model, he has actually provided no such validation.[104]

(198)   Conceptually, one can correct Dr. Carlton's error by testing for the stability of both the product-specific fixed effects and the coefficients of the other variables simultaneously. But there is a problem: the product fixed effects are what is known in statistical parlance as *incidental parameters*.[105] Under Dr. Carlton's modeling framework, one cannot make consistent statistical inferences involving incidental parameters. Thus, practically speaking, there is no straightforward and standard way to correct Dr. Carlton's test. Accordingly, Dr. Carlton cannot correctly claim (as he does in ¶236) that the assumption of stability – upon which his dummy variable approach depends – is testable.

(199)   Even ignoring the preceding considerations, Dr. Carlton's Wald tests fail to provide any real assurance that his model actually has the stability property he says he requires it to have to be convinced of its reliability. There are indications that he fails to reject structural changes (using his flawed test) only because the coefficient estimates of his model are imprecise. An inspection of the regression output that provides the basis for his tests reveals that the coefficients of supply and demand factors often differ considerably (in terms of their economic implications) between the two sub-periods; sometimes they even change sign. Furthermore, my analysis in Section III.B shows that Dr. Carlton's Wald test fails to detect problems associated with instabilities of highly consequential magnitudes. By celebrating his "failure to reject" the hypothesis of stability, Dr. Carlton is simply trying to disguise a deficiency – a high degree of imprecision that stops him from rejecting a wide range of possibilities, including those with problematic degrees of instability – as a virtue.

(200)   Dr. Carlton also errs in testing the stability of his notebook, monitor, and TV panel models independently, as if each application could have its own completely separate price dynamic. In fact, the prices for different TFT-LCD products are driven by shared fundamentals, as well as linked by supply-side substitution. Particularly given the extremely close relationship between notebook and monitor panel prices that he himself documents (¶66), Dr. Carlton should have understood that his rejection of stability for his monitor panel model has critical implications for his notebook panel model. Because the market will only tolerate limited divergences between the prices of notebook and monitor panels, instability of the price process for monitor panels implies instability of the price process for notebook panels, and proves that Dr. Carlton's "failure to reject" stability for notebook panels is simply a reflection of low statistical power, as suggested above. Accordingly, Dr. Carlton should have rejected stability for his notebook panel model as well and, in keeping with his own standards, discarded it.

---

[104]   To be clear, Dr. Carlton employs an incomplete test for stability. Therefore, his rejections of stability for monitor, TV, and non-mobile panels do establish that those models are unstable.

[105]   Cheng, Hsiao (2003), *Analysis of Panel Data*, Econometric Society Monographs, Cambridge University Press.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

## III.D.4. By focusing on long-term rather than short-term effects, Dr. Carlton's analysis leads Dr. Snyder to understate rather than overstates damages

(201)   Dr. Carlton asserts that, in measuring the "long-run" effect of the conspiracy, he is being conservative (¶278). His logic is that, by applying the long-run effect throughout, he overstates the impact on prices over the period during which the effect was growing to its full strength. But, of course, his model also implies that the effect on price would have dissipated gradually rather than immediately once the conspiracy ended. In other words, the very same adjustment process that leads him to overestimate damages at the start of the conspiracy implies that overcharges would have persisted into 2007, and Dr. Snyder failed to count those lingering effects. Because volumes and revenues were growing over time, the effect Dr. Carlton ignores is almost certainly larger than the one for which he and Dr. Snyder account. Thus, their analyses together likely understate the effect of the cartel.

## III.D.5. Dr. Rubinfeld does not provide a valid large-panel model

(202)   Neither Dr. Rubinfeld's report nor his backup materials contains an econometric analysis of overcharges for large TFT-LCD panels. He does, however, briefly mention the report he filed in the class action phase of this litigation, and says that the analysis contained therein, which includes an econometric model for large panels, led him to conclude that "2.3 percent was a reasonable upper bound on the direct purchaser overcharges on Samsung's large panel sales during the class period" (¶251). Yet a reading of his report and subsequent testimony reveals that his econometric analysis of large panels was to offer criticism, and not to be constructive; that is, he took the econometric analyses of other experts (Drs. Netz and Comanor) as a starting point, and performed analyses showing (in his opinion) the fragility and unreliability of their conclusions. He dismissed their larger overcharge estimates on that basis, but said explicitly that he did not view his analysis as having resulted in a reliable model.[106]

(203)   Because Dr. Rubinfeld has not offered his large-panel model as affirmatively supporting a reliable estimate of overcharges, I have not analyzed it. His clear statements on the record would not appear to permit any equivocation on this score. In any case, given its similarities to his small-panel model, it suffers from most if not all of the same deficiencies.

## III.D.6. Dr. Rubinfeld's models fail Dr. Carlton's stability tests

(204)   Dr. Carlton insists that it is essential to evaluate the structural stability of a dummy variable model before reaching a conclusion as to its reliability. In his view, a dummy variable model that fails his test for structural stability is unreliable and should not be used (¶233). He rejects the results of three of his models (TV, monitor, and non-mobile small panels) on the grounds that they fail his test for structural stability. I agree that the condition for which Dr. Carlton tests is *necessary* for the validity of the dummy

---

[106]   Deposition of Dr. Rubinfeld on April 17, 2012, pp 45-46.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

variable approach (though certainly not sufficient, as I noted in Section III.D.3); when it fails, what I called the "key assumption" in Section II.D.1 cannot hold.

(205)    Dr. Rubinfeld makes no mention of structural stability in the context of his dummy variable models, and does not test for it.  Applying Dr. Carlton's Wald test to Dr. Rubinfeld's models, I find that stability is rejected with nearly 100% statistical confidence in all cases; see Figure 78.[107]

**Figure 78: Stability test of Dr. Rubinfeld's damages models**

| Model | Test for model stability |
|---|---|
| Samsung, conspiracy* | rejected, p value < 0.01 |
| Samsung, plea* | rejected, p value < 0.01 |
| All Defendants, conspiracy | rejected, p value < 0.01 |
| All Defendants, plea | rejected, p value < 0.01 |

 *Interaction with the number of defendants is excluded due to colinearity

(206)    In his deposition, when asked about Dr. Carlton's stability test, Dr. Rubinfeld said that he does not like to rely entirely on "yes" or "no" answer to a statistical test.[108]  However, he provided no reason to think the test is invalid or inappropriate.

## III.D.7. Including endogenous variables without making appropriate adjustments renders the analyses of Drs. Carlton and Rubinfeld less reliable

(207)    In my first report, I argued that, when formulating econometric models for the purpose of measuring overcharges, one should exclude supply and demand variables that were potentially affected by the price-fixing conspiracy.  But-for prices estimates that are conditioned on the values of such variables will retain part of the conspiracy's effect, thereby typically understating the effect of the conspiracy, unless those values are themselves replaced with but-for counterparts.  Dr. Rubinfeld explicitly states that he agrees with this principle (¶334-335).  And yet the specifications used by Drs. Rubinfeld and Carlton include a number of variables that were likely influenced by the conspiracy, such as panel costs (Dr. Carlton and Dr. Rubinfeld), number of codefendant suppliers for particular panels (Dr. Rubinfeld), and average panel size (Dr. Rubinfeld). Because they do not address the endogeneity issue for these variables, their equations are misspecified and their results are potentially unreliable.

---

[107]  To be consistent with Dr. Rubinfeld's analysis, I used his approach to statistical testing, and not Dr. Carlton's bootstrap procedure.

[108]  Rubinfeld deposition, page 175:

"Q: And could you perform a statistical test to determine whether, in this hypothetical, the coefficients vary in a statistical way?

A: There is such a test, yes.

Q: And what is that test?

A: Well, it would be – it would be a variant on what people used to call a Chow test….But I just want to add in answer to your question, for me, it is not simply what the result of such a test tells you, it is what the qualitative implications are of doing that exercise. In other words, I don't like to rely entirely on a "yes" or "no" answer to a statistical test."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

### III.D.8. Drs. Carlton and Rubinfeld's cost imputations call the reliability of their results into question

(208)   The models used by Drs. Carlton and Rubinfeld include measures of TFT-LCD panel production costs. When cost data are available for some but not all of the models within a product category, they ignore the missing data problem and simply use the average cost over models for which costs are known.  However, when no cost data are available for any model within a product category, they impute the average cost.

(209)   A substantial portion of their cost data is imputed: in Dr. Carlton's case, 51% of the cost data used in his mobile display model and 27% of the cost data used in his notebook model; Dr. Rubinfeld's case, 48% of the cost data used in his small panel model and 23% of the cost data used in his Samsung-specific mobile display model.

(210)   The use of imputed data, while common, can nevertheless raise concerns when estimating explanatory models in which coefficients are given causal interpretations if certain red flags are present.  The issue merits close attention when the data are missing systematically, rather than at random.  In this instance, the patterns of missing data are definitely systematic in at least two respects.  First, several of the Defendants, including Chunghwa, Hitachi, Epson, and Sharp, did not provide usable cost data and their costs are hence treated as missing by Drs. Carlton and Rubinfeld in their analyses.  That is a potential concern because costs differed systematically across Defendants.  Second, the frequency of missing data is higher for older transactions; see Exhibits 52 through 55.  For example, all of 2001 cost observations that Dr. Rubinfeld uses in his Samsung mobile display panel model are imputed.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 79: Dr. Carlton's cost imputations for mobile display panels**



**Figure 80: Dr. Carlton's cost imputations for notebook panels**

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 109

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 117 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 81: Dr. Rubinfeld's cost imputations for all small panels**



**Figure 82: Dr. Rubinfeld's cost imputations for Samsung mobile display panels**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(211)   Drs. Carlton and Rubinfeld both use what is known as regression imputation, a special case of "single imputation procedures," meaning that one and only one imputed value is assigned for each missing observation.  There are many ways to make such imputations, and neither Dr. Carlton nor Dr. Rubinfeld has explained why the one they chose is more reasonable than the alternatives.  In fact, they use different imputation procedures, and Dr. Carlton's appears to be different from the one he used in his report relating to the Indirect Purchaser Class Action.[109].

(212)   As the academic literature has made clear, for such methods to produce reliable results, the absence of cost information must not be correlated with the values of the missing costs. Neither Dr. Carlton nor Dr. Rubinfeld mentioned this crucial assumption, let alone provided any justification for it, and the systematic patterns noted in the previous paragraph cast serious doubt on its validity.   In his deposition, Dr. Rubinfeld said only that he expects his imputation procedure to produce unbiased cost estimates.[110] While I agree that unbiasedness is a desirable property, it is well-known that unbiasedness does not automatically imply reliability. For example, replacing missing values by a sample average is an old imputation procedure. Under some conditions, sample average is an unbiased estimate of the missing values. But the modern imputation literature has made it clear that such an imputation procedure "cannot be generally recommended" due to its unreliable performance.[111]

(213)   One simple way to evaluate the reasonableness of imputed costs is to check whether they are close to actual costs when the latter are present in the data. Stark discrepancies, where fitted and actual costs differ by a factor of two or three, or where they move systematically in opposite directions, are in fact present for some of the product categories; see Figures 56 through 59.  Such cases are worrisome.

---

[109]   Expert Report of Professor Dennis W. Carlton relating to the Indirect Purchaser Class Action, submitted on July 28, 2011, ¶219.

[110]   Rubinfeld deposition, pages 155-156

"Q. Why do economists use imputation or use that method?

A. I assume your question is in the context of running regressions of this type?

Q. Yes.

A. Otherwise we are going to get into a discussion I don't think you want to have.

Q. Let's limit it.

A. Which I'd be happy to have, but I don't think you want to fill up the deposition.... So you do the imputation because you think that the imputed cost will be an unbiased estimate of cost and it will more accurately characterize that allow you to characterize that firm's pricing in your analysis, the overall pricing behavior....Because the missing observation you impute, if you use a reasonable procedure, will be unbiased, and the only cost of doing it will be that you'll add some noise.

[111]   Little, R. J. A. (1992). Regression with missing X's: A review, Journal of the American Statistical Association, Vol. 87, No. 420, 1227-1237.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 83: Dr. Rubinfeld's analysis, fitted costs and actual costs – AUO Small panel 128x160 1-90**



**Figure 84: Dr. Rubinfeld's analysis, fitted cost and actual cost – AUO small panel 176x220 2-00**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 85: Dr. Carlton's analysis, fitted cost and actual cost, TMD mobile display panels, 2.0 inch, QVGA**



**Figure 86: Dr. Carlton's analysis, fitted cost and actual cost, Samsung mobile display panels, 2.2 inch, QCIF**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(214)    Another simple way to evaluate the reasonableness of cost imputations is to examine the distribution of actual price-cost ratios for products with known costs, and the distribution of imputed price-cost ratios for products with unknown costs.  If the cost data are missing at random, these two distributions should be quite similar.  They are not.  Figure 87, which pertains to Dr. Carlton's analysis, shows that the imputed price-cost margins for products with unknown costs is systematically higher than the distribution of actual price-cost margins for products with known costs.  Figure 88 show the same phenomenon for Dr. Rubinfeld's imputations.  These patterns reinforce my concerns that the absence of cost data is systematic and potentially problematic for the types of models that Drs. Carlton and Rubinfeld estimate.

**Figure 87: Dr. Carlton's imputed price-cost ratio for Mobile display panels in 2004**



Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 122 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 88: Dr. Rubinfeld's imputed price cost ratio**



(215)    A third simple way to assess the reasonableness of imputations is to compare results obtained when observations with missing values are dropped. This method is known as "complete-case analysis" in the academic literature. In the context of a linear regression, a complete-case analysis gives unbiased estimates even when the likelihood of missing data depends on the missing values themselves. Under the same condition, however, the regression imputation method of Drs. Carlton and Rubinfeld are no longer valid.[112] Therefore, a complete-case analysis is a reasonable alternative approach to and a robustness check on their method, under their own assumptions.[113] In the case of Dr. Carlton's basic model for notebook panels, a complete case analysis yields a statistically significant overcharge of 6%, rather than the statistically insignificant effect of 0.04% that Dr. Carlton reports (Carlton rebuttal report, Table VIII-3). The estimates are closer, however, in other cases.

(216)    It is important to emphasize that, for the types of models Drs. Carlton and Rubinfeld estimate, a complete-case analysis also relies on assumptions about the pattern of missing data that strike me as implausible, particularly given the second simple test described above. Therefore, the problems that render their analyses unreliable are not easily remedied.

---

[112]    See section 5.4 in Little, R. J. A., Regression with missing X's: A review, Journal of the American Statistical Association, Vol. 87, No. 420, 1227-1237

[113]    I note that the modern literature on imputation has been advocating the use of methods such as maximum likelihood and multiple imputation, none of which was reported by Drs. Carlton or Rubinfeld. While the complete-case analysis is also not the most state-of-the-art technique, it serves as a good benchmark for the purpose of highlighting the effect of the single imputation methods that Drs. Carlton or Rubinfeld used.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

### III.D.9. The models used by Drs. Carlton and Rubinfeld fail to account for interdependencies between the prices charged by different firms and/or for different types of products

(217)  As discussed in Section II.A.1, the prices for different TFT-LCD products are driven by shared fundamentals, as well as linked by supply-side substitution.  Also, the prices charged by different companies for similar products are tied together by competitive dynamics.

(218)  Dr. Rubinfeld's Samsung-only models are deficient because they do not exploit the important fact that Samsung's prices cannot stray too far from those of its competitors.  Likewise, Dr. Carlton's application-specific models do not exploit the important fact that, for example, notebook panel prices cannot stray too far from (appropriately adjusted) monitor and TV panel prices.  These models discard the important information that the prices of these goods must move together, at least within some tolerances.

## III.E. Dr. Rapp's overcharge analysis is highly unreliable and inaccurate

### III.E.1. Dr. Rapp's misinterprets his overcharge analysis

(219)  For his EID-Motorola model, Dr. Rapp uses as a benchmark the period of time during which EID was Motorola's sole supplier (¶109).  His reasoning is apparently that the EID-Motorola prices could not have been affected by the conspiracy during that period.  But taking his analysis at face value, this choice is illogical and renders the entire analysis incapable of shedding light on the question of interest.  According to Dr. Rapp, EID was a *monopolist* toward Motorola during his benchmark period.  Therefore, under Dr. Rapp's hypothesis, when the "Plea 1" and "Plea 2 and Post Plea" dummy are zero, it indicates that prices are *at the monopoly level*.  A competitor who participates in an imperfect cartel cannot hope to raise prices to the monopoly level, and hence even if the cartel was effective during either the "Plea1" or "Plea 2" and Post Plea periods, the coefficient for the associated dummy would be *negative*, given Dr. Rapp's foundational hypotheses.  Moreover, there would be no way to judge the impact of the conspiracy from the size of the negative coefficient; that depends on where the normal competitive standard lies, which the model does not tell us.

(220)  Dr. Rapp interprets the apparent overcharges from his model in late 2005 as coming from the change in EID's bargaining position.  For the reasons described in Section V, that claim strikes me as implausible; it is also illogical because Sharp's presence could not have *increased* EID's bargaining power.  On the contrary, Dr. Rapp's analysis implicitly identifies the conspiracy as the source of the price increase: he writes that Sharp lied to EID in Q4 2005 (¶89), which induced EID to quote a higher price, and thus reduced competitive pressure on Sharp.

(221)  Similar comments apply to Dr. Rapp's all-panel model; in that case, the benchmark period is a blend between a period which he regards as monopolized, and a period starting December 2006.  Comparisons

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 116

Case 3:07-md-01827-SI     Document 7944-3     FILED 05/17/13     Page 124 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

with that blended result tell us nothing about the relationship between prices and a meaningful but-for benchmark.

### III.E.2. The "logic" of Dr. Rapp's overcharge analysis self-destructs

(222)     Dr. Rapp obtains a positive coefficient for his Plea 1 dummy, which, given his foundational hypothesis, implies that the Plea 1 price was above the monopoly price – a completely nonsensical conclusion, even if one credits Dr. Rapp's argument that EID retained most of its monopoly power during this period. The obvious explanation is that EID was not in fact a monopolist for Motorola during the benchmark period. But if that is the case, then Dr. Rapp's rationale for using that period as a benchmark – which requires EID's prices to Motorola during that period to be insulated from the broader market by virtue of its monopoly position – collapses. Thus, Dr. Rapp's overcharge analysis logically self-destructs. Indeed, he conceded in his deposition that he would not interpret his analysis as yielding an overcharge estimate. In fact, Dr. Rapp conceded that his econometric models are completely uninformative about overcharges, and had no bearing on his opinion. [114]

### III.E.3.  A more reasonable interpretation of Dr. Rapp's analysis implies the existence of substantial overcharges

(223)     Dr. Rapp and I agree that the conspiracy had largely played out by relatively early in 2006 (¶114). It is therefore much more reasonable to interpret his Plea 2 and Post-Plea period as the natural benchmark. In that case, his analysis shows that the conspiracy elevated EID's prices by 12.9% prior to the Plea 1 period, and by 23.1% during the Plea 1 period. In contrast, one cannot give a reasonable interpretation to

---

[114]   Rapp deposition, page 70-71:

"Q: …, Let me offer a new hypothetical. Let's say that your all-suppliers regression found a price elevation of five percent in 2005.

A: Okay. I'm with you.

Q: Would that change your opinion that the higher prices were due to price information exchange as opposed to bargaining power?

A: No.

Q: Now, a new hypothetical.  Let's say that the all-suppliers regression found a price elevation of 25 percent in 2005.  Would that change your opinion that the higher prices were due to price information exchanges as opposed to bargaining power?

A: All else equal, it would not….

Q: Sitting here today, do you have any opinion about how much higher the price elevation estimated from your all-suppliers model would have to be before you changed your opinion as to the relative effect of bargaining power versus price information exchanges?

A: My answer is that there is no number that, so far as I can tell sitting here and thinking about it, would lead me to change my opinion, . . ."

Rapp deposition, page 73:

"Q: --Your opinion is that we're not able to disentangle whether an elevation of prices was due to competitors communication or due to supplier bargaining power; isn't that right?

A: Yes.

Q: Is there any way that a statistical model could have been constructed that would allow us to distinguish between the effects of the price information exchanges and of the bargaining power?

A: Not in this setting…."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Dr. Rapp's "all Motorola" model, because he combines the post-November 2006 period with the pre-Q4 2005 period into a single benchmark.

### III.E.4. Dr. Rapp's overcharge analysis improperly ignores the larger LCD market

(224)   Dr. Rapp estimates overcharges on EID-Motorola transactions using models with data only for EID-Motorola or all Motorola transactions.  He quotes me as saying in my deposition that I "probably would have used a model that was Motorola specific," if there was a separate conspiracy,[115] apparently with the objective of suggesting that, conditional upon the Court finding a separate conspiracy, I would endorse his approach.  On the contrary, I do not endorse it.  The fact that, in some circumstances, it would be appropriate to build a separate model for Motorola transactions does not imply that such a model should have no connection to the larger LCD panel market, as is the case with Dr. Rapp's models.  There is no valid justification for proceeding as if Motorola's prices (or the prices for Motorola-EID transactions) can follow some process that is independent of the one governing the rest of the market, as does Dr. Rapp.

---

[115] Expert report of Dr. Richard T. Rapp relating to TFT-LCD (Flat Panel) antitrust litigation, ¶17.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

# IV. My overcharge estimates are, on their face, more reasonable than those put forward by the Defendants' economic experts

## IV.A. My overcharge estimates are indicative of imperfect cartel

(225)   The Defendants' experts devote a tremendous amount of attention to aspects of the cartel and the TFT-LCD industry which they see as likely reducing the effectiveness of collusion. For the reasons detailed in Sections V and VI, their concerns are greatly exaggerated. Even so, I readily agree that TFT-LCD industry conditions were not perfectly conducive to collusion, and that the Defendants did not operate a perfect cartel. It does not follow, however, that overcharges were then likely in the range of zero to two percent, rather than 15 to 25 percent, as the Defendants' experts appear to suggest. In the real world, even highly imperfect cartels can impose substantial overcharges. I offer the following two benchmarks as useful guides for evaluating whether a given percentage overcharge corresponds to a highly effective or only modestly effective cartel.

(226)   The first useful benchmark is monopolization. When a monopolist maximizes profits, it sets price so that its variable profit margin satisfies the following formula:

$$\frac{P - MC}{MC} = \frac{1}{1 - \varepsilon}$$

where $P$ is price, $MC$ is marginal cost, and $\varepsilon$ is the price elasticity of demand. Thus, with an elasticity of 1.5, the monopoly markup would be 200 percent of marginal cost, and with an elasticity of 1.25, it would be 400 percent of marginal cost. As discussed in Section VII.E, the elasticity of demand for LCD panels as a category is likely very small, and hence the monopoly markup over cost is likely several hundred percent.[116] In comparison, an overcharge of 25 percent (over and above marginal cost pricing) implies a markup of 33 percent. Thus the monopoly markup on LCD panels is plausibly more than ten times the average markup implied by my overcharge estimates. It follows that, according to my overcharge analysis, the Defendants' conduct resembled perfect competition *much* more closely than it resembled a perfect cartel. Because my overcharge estimates imply that the cartel achieved only a small fraction of the gains available to a perfect cartel, they are entirely consistent with any evidence offered by the Defendants purporting to establish that collusion was difficult to orchestrate, and/or that the cartel itself was highly imperfect.

---

[116]   In fact, the elasticity is likely significantly less than one. If it were less than one and constant, the optimal monopoly price would be infinite (because an increase in price would increase revenue while decreasing quantity and hence cost). One therefore expects that the elasticity of demand would begin to rise at very high prices, until some profit-maximizing price is reached at which the optimal markup formula is satisfied. Unless the elasticity changes rapidly as price increases, that monopoly price would be very high.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(227)    A second useful benchmark is the performance of other cartels. Estimates of cartel overcharges range as high as several hundred percent, and literature surveys place the typical overcharge in the neighborhood of 25 to 40 percent with relatively higher overcharges for cartels involving Asian companies.[117] Thus, my overcharge estimates imply that the LCD cartel was significantly less effective than the typical cartel. The Defendants' experts have not claimed, nor have they attempted to demonstrate, that the LCD industry was more difficult to cartelize than the typical collusive industry, or that the cartel was less well orchestrated. The conditions to which the Defendants' experts point are shared by many other cartelized industries, and indeed the types of arguments the Defendants' experts make in this matter are routinely advanced by defendants in other price fixing cases. That said, it is worth emphasizing that my overcharge estimates are completely consistent with the possibility that the LCD cartel encountered more obstacles and was more poorly organized than the typical cartel. In contrast, the overcharge analyses of Drs. Carlton and Rubinfeld imply that the typical cartel was at least seven to 20 times more effective that the LCD conspiracy. Because I have seen nothing that would lead me to suspect that the cartel problem was orders of magnitude more difficult in the LCD industry than in other industries where collusion has been observed, such low estimates strike me as suspect.

## IV.B. The fact that the cartel was highly active over a substantial period of time proves that my overcharge estimates are more reasonable than those put forward by Drs. Carlton and Rubinfeld

(228)    In my first report, I made the following critical observation:

> "The conspiracy is notable for the fact that it involved numerous documented meetings, including at least 74 Crystal Meetings with participation by executives at high levels of the defendant companies, over a period of 6 years (and many more bilateral meetings and communications over a period spanning 9 years). All but one of the defendants have admitted to conspiring at these meetings. It defies common sense that the defendants would have arranged and attended these numerous meetings, knowingly breaking the law through a systematic pattern of conduct spanning many years, unless they themselves were convinced that the cartel was effective (indeed, sufficiently so to justify the investment of time and manpower as well as the substantial legal risks)" (Section III.C.)

(229)    In his undergraduate textbook on Industrial Organization, Dr. Carlton has also emphasized that firms will not choose to belong to cartels unless they expect significant benefits:

---

[117]    See, e.g., Antitrust Modernization Committee Report and Recommendation, April 2, 2007, p. 301 and 307; Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), page 80; John M. Connor & Robert H. Lande, *How High Do Cartels Raise Prices? Implications for Optimal Cartel Fines*, 80 TUL. L. REV. 513, 540–41 (2005); Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*, 4th Edition, (Addison Wesley, 2005), 143.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                Page 120

"Only if a cartel price is expected to raise the price above the noncartel price and keep it high do firms join. If the noncartel price is close to the cartel price, then firms may not believe that joining the cartel is profitable given the legal liability they potentially face from belonging to a cartel".[118]

(230)    In the current matter, the Defendants' experts conspicuously avoid saying much about the obvious implications that can be drawn from the fact that the cartel was stable, durable, and active. Dr. Harris actually concedes these implications by quoting from a research paper that makes the following point: "Without establishing effective mechanisms for monitoring, control, or self-policing, defections by cartel members will be observed *and result in a shorter-lived cartel*" (¶68, emphasis added). The fact that the LCD cartel was in fact long-lived is therefore strong evidence that it did establish effective "effective mechanisms for monitoring, control, [and] self-policing."

(231)    An important survey article on cartels by Professors Margaret Levenstein and Valerie Suslow that is cited by a number of the Defendants' experts highlights this same point. A theme of their survey is that cartels tend to fall into two categories: some are ineffective and fall apart quickly, while others are durable and effective because they find ways to overcome the usual hindrances to cooperation. Specifically, they write:

> "While the average duration of cartels across a range of studies is about five years, many cartels break up very quickly (i.e., in less than a year). But there are many others that last between five and ten years, and some that last decades… Cartels break up occasionally because of cheating or lack of effective monitoring, but the biggest challenges cartels face are entry and adjustment of the collusive agreement in response to changing economic conditions. Cartels that develop organizational structures that allow them the flexibility to respond to these changing conditions are more likely to survive."[119]

> "Cartels do face challenges…Overcoming these challenges is easier in some industries than others. For example, industry concentration makes collusion easier, both by simplifying the coordination issues and by increasing firms' gains from collusion. But successful cartels have operated in a wide variety of industries by developing organizations that can overcome these challenges."[120]

I note that the LCD cartel did indeed develop at least one organizational structure (the Crystal Meetings) in response to changing market conditions (entry by Taiwanese firms).

(232)    Among the Defendant's experts, only Dr. Carlton explicitly engages on this issue. Ignoring his own published statement (above), he reproduces the following quotation from the Levenstein-Suslow paper:

---

[118]  Carlton and Perloff (2005), 131 and footnote 9.

[119]  Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?" Journal of Economic Literature 44, March 2006, 43-95 (quoting the abstract, page 43).

[120]  Levenstein and Suslow (2006), page 44.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                                    Page 121
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

"[t]here are cases where cartels have continued to exist on paper for many years with little sustained effect on price." In interpreting that sentence, it is important to bear in mind that much of the evidence described in the survey article concerns *legal* cartels. Thus, when Levenstein and Suslow refer to cartels that have "continued to exist on paper for many years," they are likely speaking of those that were legally authorized to operate, but were not in fact *active*. The experience of such cartels is obviously of no relevance with respect to an *illegal* cartel such as the one at issue here, that existed unofficially and not "on paper," and that remained *active* for a span of many years.

(233)    Dr. Carlton's remarks on these telling facts (including the aforementioned quotation) are limited to a single paragraph (¶80) and one sentence in a footnote (footnote 89). They are correspondingly superficial and do not stand up to close examination.

(234)    First, he argues that "the frequent meetings may have reflected the reality that panel prices continued to fall and panel makers continued to struggle for ways to stop or slow that process, perhaps unsuccessfully" (¶80). But that possibility is not responsive to the very point that Dr. Carlton himself makes in his textbook, quoted above. Here, Dr. Carlton is simply pointing out that the Defendants had a continuing *motive* to form a cartel. The existence of a motive is not in question; competitors almost always have that motive. What Dr. Carlton recognized in the passage from his textbook is that motive is not enough: given the enormous legal risks to the companies and the individuals involved, *there must be substantial prospects for success*. By Dr. Carlton's own reasoning, it simply defies economic logic and simple common sense that the Defendants would continue to meet actively over a period of many years, exposing themselves to tremendous risks, despite learning over and over again, month after month, that their efforts were ineffectual, irrespective of the magnitude of the unattainable gains. In his expert report (but not in his textbook), Dr. Carlton is noticeably silent on that point.[121]

(235)    Second, Dr. Carlton argues that "even a very small overcharge percentage corresponds to a large amount of revenue…" (¶80). Note that this response concedes the economic logic behind my argument; here Dr. Carlton is simply disputing amounts. It is of course entirely proper to do so; indeed, I agree that even this set of facts is qualitative, and hence it cannot nail down the overcharge percentage with any precision. Still, Dr. Carlton overlooks several important considerations.

■    First, for companies contemplating involvement in an illegal cartel, the risks rise roughly proportionately with the amount of affected business. For example, all else equal, in an industry with twice as much affected revenue, conspirators are likely to face much larger fines, settlements, and judgments. Dr. Carlton has simply ignored the fact that, in an industry with a large amount of revenue, both the benefits and the costs of conspiring are proportionately larger. Indeed, if

---

[121]    Dr. Carlton has also explained that "moral grounds" may also be part of the costs that potential conspirators would consider. "Would you join a cartel if all the other firms in your market were forming one? Such behavior is usually illegal in the United States and many other capitalist countries, so, no doubt, you would refuse on moral and legal grounds. Suppose it was not a moral person like you who was being asked this question—suppose it was your slightly shady cousin. Would your cousin join an illegal cartel conspiracy?" Carlton and Perloff (2005) at 126.

competition authorities more closely scrutinize larger industries, as seems likely, the costs may well be more than proportionately higher.

- Second, to justify the risks associated with their illegal activities, the cartel members must have *confidence* that a benefit exists. Even using complex analytic methods in the context of his econometric models, Dr. Carlton cannot statistically distinguish between an overcharge of zero percent and two percent.[122] It stands to reason that the actual overcharge would have had to be considerably larger for the cartel members to both detect benefits and be confident of their existence. Surely Dr. Carlton does not seriously mean to suggest that the cartel members would have even noticed a 0.1% overcharge, which is one of the figures he used in his Table IV-1 to make his point.

- Third, the evidence cited in Section IV.A tells us that the typical cartel achieves overcharges in the range of 25 to 40 percent. If companies were willing to engage in illegal activities to achieve much smaller percentage gains, there would be many more minimally successful cartels, and this average would be much lower.

(236)   Though Dr. Rubinfeld does not address the durability of the cartel explicitly, he does observe that "talk is cheap," from which he concludes that collusive discussions need not be effective (¶304). But his premise is false: as Dr. Carlton observes in the quoted passage from his textbook, talk of this type is *not* cheap. On the contrary, it exposes the parties to enormous legal risks.[123] Conceivably, firms may experiment with collusive communication to determine whether they can influence price, but when such communication is not effective they have enormous incentives to terminate those discussions, rather than continue them for a span of many years. Similarly, according to Dr. Rubinfeld, "the fact that company representatives attended meetings with the objective of fixing prices does not mean their intentions were achieved" (¶312). But Dr. Rubinfeld ignores the fact that the firms *continued* to meet over a period of many years despite serious legal exposure, and would not have done so had their meetings not had their intended effect.

## IV.C. The Defense experts' own statements indicate that the conspiracy had a substantial effect on price

(237)   In a number of instances, the testimony of the Defendants' experts renders implausible their claim that the conspiracy had no substantial impact on price. In particular:

- Dr. Rubinfeld writes that, "[i]n the Summer of 2002, large LCD panel prices began declining *sharply*, and documents from the late summer and fall of 2002 reflect breakdowns in cooperation among

---

[122]  Dr. Carlton's standard errors were much larger than his overcharge estimates. His model yields an overcharge prediction of approximately 0.4 percent for notebook computers compared to standard errors of 2.3 to 3.2 percent. His model yields an overcharge prediction of approximately 1.9 percent for mobile phones compared to standard errors of 4.1 to 4.3 percent.

[123]  In fact, in the U.S. alone several of the conspirators have pled guilty and have been fined over $890 million for conspiring to fix TFT-LCD prices. AUO chose not to plead guilty, was recently convicted by a federal jury, and will also be assessed a fine. In addition, other jurisdictions, including the EC and Korea, have issued fines for TFT-LCD price-fixing total hundreds of millions of dollars. In addition, 10 executives of these companies have been sentenced to a total of over 2,500 days in jail.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 123

meeting participants" (¶70, emphasis added). Plainly, breakdowns in cooperation cannot produce a *sharp* decline in price unless the initial price elevation was substantial. Dr. Rubinfeld continues by describing the relationship between cartel activities and price movements: "Around February or March 2003, large LCD panel prices began rising again, and operational Crystal Meeting attendees resumed more frequent price-related discussions" (¶71). In addition, he notes that "[p]rices for large LCD panels began declining in approximately June 2004, and documents from this period refer to a 'price war'" (¶73). As is evident from Figure 7 from my first report, the decline in price resulting from the breakdown in cooperation that precipitated the price war was substantial; hence, the initial overcharges must have been considerable.

- According to Dr. Carlton, "…rapid declines in price during the alleged cartel period are consistent with the large body of economic literature on cartel pricing, which demonstrates that cartels often break down, leading to rapid declines in price… Attempts to maintain a price-fixing agreement will encourage entry which, if it occurs, also can cause the agreement to break down. I note that the rapid price declines during 2000-2001 occurred as firms from Taiwan entered the market and began to build up market share" (¶56). Plainly, breakdowns in cooperation cannot produce "rapid price declines" unless the initial price elevation was substantial. (I note that cartel members subsequently dealt with the entry of Taiwanese firms by organizing the Crystal Meetings.)

- According to Dr. Rapp, during the third quarter of 2005, "…Sharp lowered its Razr Q4 bid to $29.90… after a Sharp representative advised EID that Sharp was not going to lower its initial bid. The Sharp representative testified at his deposition that he had lied to EID in order for Sharp to secure the Razr business" (¶89). In other words, by offering (insincerely) to collude with EID, Sharp induced EID to set a higher price, thereby reducing competitive pressure on Sharp and enabling Sharp to secure Motorola's business with greater certainty at a higher price.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# V. The Court could reasonably reach factual findings concerning the nature and extent of collusion among the Defendants that would be consistent with substantial overcharges

## V.A. Many opinions expressed by the Defendants' economic experts concerning the nature and extent of collusion among the Defendants go beyond the scope of my testimony, and do not involve economic expertise

(238)   As specified in my first report, I was asked to develop an expert opinion concerning overcharges that resulted from a conspiracy among suppliers of LCD panels and finished goods that contained LCD panels.[124] I was instructed to make assumptions about the nature and extent of the conspiracy, but was not asked to assume that it was effective.  I expressed my expert opinions regarding the effectiveness of the conspiracy and the overcharges that plaintiffs sustained as a result of the conspiracy in my first report. I was not asked to develop an expert opinion concerning the complicity and liability of particular defendants. I have offered no such expert opinions in my report or deposition for any of the Defendants, nor do I intend to.

(239)   As part of my assignment, I have reviewed much – but certainly not all – of the evidence concerning the defendants' collusive activities. The objective of my review was to better understand the facts that the Plaintiffs expect to prove at trial through documentary evidence and testimony. Also, I satisfied myself at a general level that their claims have a reasonable foundation and a Court could reasonably reach factual findings concerning the nature and extent of the collusion among the defendants that would be consistent with my overcharge estimates.  I have not reviewed the record with the objective of offering opinions about liability, nor have I claimed that one can infer the magnitude of overcharges directly from that evidence. I do not presume, however, to interpret the evidence that I reviewed for the Court.  My analysis is conditional: if the Court agrees with the critical aspects of the Plaintiffs' interpretation of the factual record, then I am offering my opinion as an economist that my analysis provides reasonable and accurate measures of damages.

(240)   A number of the defense experts mistakenly think that my report contains opinions concerning the complicity and liability of particular Defendants. For example:

- Dr. Moore writes, "In reaching his opinions regarding liability, Professor Bernheim mentions neither Tottori Sanyo nor Mitsui" (¶37)

- Dr. Williams criticizes my analysis because it doesn't provide evidence of Samsung SDI's involvement, and because I "offer no economic basis to support such an expert opinion" (¶65)

---

[124]   See section I.B of my first report.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- Dr. Harris writes, "Professor Bernheim has not undertaken any analysis sufficient to provide an economic basis to conclude that such a conspiracy existed – let alone to demonstrate that Toshiba took part in such a conspiracy" (¶10), and claims that "Professor Bernheim also alleges that Toshiba engaged in collusion with Sharp related to the Triplets phone" (¶59).

(241)    These experts misunderstood my first report, which did not mention the evaluation of liability for particular Defendants either under the scope of my assignment or under the summary of my opinions, and does not contain such opinions. My understanding is that the Plaintiffs intend to prove their allegations at trial on the basis of documentary evidence and testimony concerning the nature of collusion and cooperation among the Defendants.

(242)    Several of the Defense experts point out that my first report contains limited evidence concerning the complicity of particular Defendants, and they infer that the case against those Defendants is weak. For example:

- Dr. Cremieux criticizes my report on the grounds that it "presented limited documentary evidence regarding alleged collusive agreements for small LCD panels in their reports" (¶26)

- Dr. Williams argues that I did not identify documents showing communications in which Samsung SDI discussed the price of LCD modules sold to Motorola with a competitor, and that there are "few, if any" such documents (¶94)

- Dr. Hitt criticizes my discussion of supply restriction because I "have not presented any evidence that Sharp attended any of the alleged meetings related to this event and nowhere is Sharp mentioned in Professor Bernheim's discussion of capacity restriction." (¶8)

- Dr. Rapp argues that the evidence concerning Epson's communications that I discussed in my first report was limited and vague compared to the evidence on the Crystal Meetings (¶¶31-33)

(243)    Any inferences about the strength of the case against any given Defendant based on my first report are not justified, because the purpose of that report was not to prove complicity and liability for each of the Defendants.  First, the evidence I cited was for the purpose of providing a general characterization of the types of facts the Plaintiffs expect to prove at trial, and not to provide an exhaustive catalog of all the evidence that bears on the question of liability. Because the Defense experts mistakenly view my first report as addressing the liability of particular Defendants, they respond to it as if it contains *all* the evidence concerning each Defendant's complicity that will be set forth for the Court's consideration at trial, which it does not do, and was never intended to do. Second, the defense experts ignore the obvious and highly pertinent possibility that the difference in scope and specificity of communications may reflect the cautiousness of the parties and how they chose to memorialize the meetings, rather than what they actually discussed. Third, it is not my role as an economist to sponsor or evaluate that evidence.  I am aware that the Plaintiffs plan to offer other evidence concerning the Defendants' conduct beyond the

evidence I discuss in my first report, and it will be up to the Court, not the defense experts, to evaluate that evidence.[125]

(244)    Many of the Defense experts have offered opinions concerning the nature and extent of collusion among particular Defendants, rather than overcharges.[126] Their opinions appear to be based exclusively on readings of documents and testimony.  They often involve explicit judgments about credibility, intent, and interpretation (e.g., whether an "understanding" is an agreement, whether an exchange of information is innocuous or part of an agreement).  Thus, in addition to being outside the scope of my testimony, they are outside the scope of economic expertise to begin with. As far as I can determine, nothing about any individual's training or experience as an economist renders them more qualified than a judge or jury to reach these types of factual conclusions.[127]  My primary occupation over the last 30 years has been the education and training of Ph.D. economists, and I can state unequivocally that nothing in our training particularly equips us to reach such conclusions.[128] Resolving factual ambiguities in documents and testimony inherently involves judgment calls, which are the appropriate domain of the Court and not economic experts. Examples of the Defense experts crossing the line into testifying about the meaning and credibility of documents include:

■    Dr. Cremieux writes that "… the documentary evidence that I have reviewed on this topic is far from conclusive in demonstrating any meaningful involvement by LG Display in conspiratorial actions regarding small LCD panels" (¶26) and offers the opinion that documentary evidence of LG Display's involvement in small-panel price-fixing is "ambiguous" (¶87).  These statements involve judgments of the credibility and meaning of documents.  Notably in describing the communications as "ambiguous," he concedes his uncertainty as to what they were meant to accomplish.

■    Dr. Rubinfeld says he is aware of no "credible evidence" that Samsung agreed to reduce capacity or production (¶186). But it is not his role to evaluate credibility of evidence.

■    Regarding an email message between Sharp and Toshiba related to the Triplet phone that I cited in my first report,  Dr. Harris dismisses that email based on deposition testimony (¶59).  Likewise, he dismisses other evidence based on the interpretation of the word "understanding," citing Samsung's responses to interrogatories in a related matter (¶60).  This is yet another example of a defense expert attempting to go well beyond his expertise as an economist and usurp the Court's role as the finder of

---

[125] For example, I am aware that plaintiffs plan to present evidence regarding the involvement of Japanese LCD panel manufacturers in the conspiracy, inclusion of small panels in the conspiracy, and conspiratorial discussions dating prior to the time periods to which individual defendants pled guilty.

[126] Indeed, I have been surprised by the frequency with which the defense experts offer expert opinions concerning what they regard as the proper interpretation of the factual record.

[127] I am not alone in this view. In the context of drawing conclusive proofs of economic behavior based on review of documents, the late Nobel laureate George Stigler argued that an economist "would have no professional basis for reaching such a conclusion; he has no special skill in reading documents and relating them to actual behavior. In particular his skill in document interpretation is on average inferior to that of a lawyer." (George J. Stigler, "What Does an Economist Know?" *Journal of Legal Education* 33 (1983): 311-313).

[128] This does not mean that documents and testimony do not play a role in an economic analysis. An economist could, for example, examine whether an apparent agreement memorialized in a document was followed by some sort of economic impact.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

fact. Conspirators are, by definition, not always honest. It is up to the Court to weigh the original documents and testimony to form a view as to the credibility of specific statements, and to reach a judgment as to what the certain documents actually meant. It simply is not up to Dr. Harris to conclude, based on his personal interpretation of documents, that the allegations are "vague and unsupported" (¶61).

■ In his discussion of Nokia documents mentioned by Dr. Jenkins, Dr. Williams seems to testify about what the documents mean, and does not adequately explain the portion Dr. Jenkins emphasizes (¶¶94-105). He also characterizes several documents cited by plaintiffs as describing "legitimate communications between SDI and its panel suppliers" (¶110) despite one of the documents suggesting that discussion between Samsung SDI and Toshiba may have involved price fixing with respect to Motorola.[129]

■ Dr. Rapp opines that the evidence he has seen does not "support Dr. Bernheim's assumption that a conspiracy targeting Motorola was part of the same market-wide conspiracy that involved 'Crystal Meetings,' or that EID or EEA were part of such a market wide conspiracy" (¶33).

■ Dr. Hitt concludes that "there is minimal evidence that LCD television modules were part of the alleged conspiracy and no evidence as to LCD televisions" and "Sharp did not participate in the 'crystal meetings', where prices were allegedly discussed" (¶6)

(245)    To the extent the Defense experts intend and are allowed to offer testimony concerning liability based on a reading and interpretation of the record, it behooves them to familiarize themselves with all relevant aspects of the record. From their depositions, it is not clear that they did so, in which case the opinions they offer concerning liability are unreliable. For example, Dr. Hitt testified that his "investigation focused on what they [i.e., plaintiff economic experts] did – this is – there's a huge amount of materials in this case, so I limited my – my analysis to things they put forward as evidence, especially if it related to Sharp in some way."[130]

## V.B. The Defendants had incentives to fix prices

(246)    Some of the arguments made by the Defense experts concern the question of whether particular Defendants had incentives to fix the prices of LCD panels. This question goes beyond a reading of the record and is one that an economist is equipped to address. I have therefore reviewed their arguments. For the reasons discussed below, in my opinion, the Defense experts are incorrect concerning the Defendants' incentives. However, it is important to emphasize that an evaluation of incentives is usually a very weak basis for determining whether a firm was involved in price fixing. Incentives can be very

---

[129]  An email describing a meeting between Samsung SDI and Toshiba cited by Dr. Williams (¶110) says that "Samsung SDI and TMD would exchange information related to supplying A-Si [modules] to Motorola in order to avoid head-on confrontation since TMD would directly supply to Motorola." (TSB_LCD1_00359732-44)

[130]  Deposition of Lorin Hitt, April 13, 2012, 51-2.

complex.  If evidence of behavior is inconsistent with the Defense experts' understanding of incentives, then it is likely that their understanding is incorrect.

## V.B.1. A "sole-source" supplier is not a monopolist and does have an incentive to fix prices

(247)    Several Defense experts have argued that a sole-source supplier is a monopolist, and thus has no incentive to collude.  In characterizing sole-sourcing as monopoly, they are not only ignoring basic economic principles, but also exhibiting a lack of common sense. The critical characteristic of sole-sourcing as a procurement practice is that it is *voluntary* – a customer chooses to purchase from a single supplier rather than multiple suppliers based on an assessment of the relative costs and benefits of the various procurement strategies. It would not make any economic sense for a customer to engage in sole-sourcing if, as a result of the practice, the customer would pay monopoly prices. In contrast, a customer supplied by a monopolist accepts "sole-sourcing" *involuntarily* – by definition, there are no other suppliers of functionally similar substitute products.

(248)    Dr. Rapp argues that EID was a "pure monopolist" for Motorola through September 2005, when it was Motorola's sole supplier for Razr panels (¶13).  He further argues that EID's bargaining position with Motorola was not eroded much during the last portion of 2005 due to Sharp's production difficulties.  Based on these opinions, he concludes that EID had no incentive to involve itself in a price-fixing cartel during this period (¶13).  Virtually all of his analysis is predicted on this view.  Yet he is plainly mistaken, for the following four reasons.

(249)    First, as a matter of economic principles, the notion that EID was a "pure monopolist" for Motorola – or nearly so – prior to 2006, and even prior to Q4 2005, is completely inaccurate and unreliable.  Negotiations with sole suppliers are forward-looking, and occur against the backdrop of a larger market.  Opportunistic behavior is held in check because the supplier knows it can lose the longer-term benefits of a potentially profitable relationship.  Motorola may not have had another source in the very short term, but it did have the ability to create alternatives by encouraging and qualifying other suppliers.  Dr. Rapp admits that Motorola constantly used these tactics (¶51, ¶67 suggests it dated back to 2004, ¶69 describes explicitly how Motorola used this as a bargaining tool, ¶70 admits it's a tactic to lower price and that Motorola says they used it that way, ¶89 says that it was used in Q4 2005), admits the logic of why these tactics work (¶82; EID was afraid of losing Razr), and admits that EID responded by lowering its prices (¶71 says the tactic was taken seriously at EID, quotes EID as saying they have to dramatically reduce cost to retain share; ¶90 says that in Q4 2005 EID reduced its price from $35.60 to $33.10 because of this threat), and by failing to lower them once it knew it had lost.[131]  Dr. Rapp's assertion that EID became less accommodating to Motorola in Q4 2005 because it knew it no longer had a future with Motorola

---

[131]    See, also, MOTOLCD-00829166-73, an email chain from November 2004 discussing Motorola's strategy to secure a second source of Razr panels that were sole-sourced from Sanyo-Epson at the time. Motorola obtained price quotes from Sharp, Toshiba, and Samsung with the objective to achieve "cost improvement" (i.e., to either put pricing pressure on Sanyo-Epson or potentially switch to a less expensive supplier, as early as the last quarter of 2004).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                    Page 129
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(¶86) is an acknowledgement of the fact that Motorola had significant bargaining leverage (due to EID's concerns about the future) even during the period of sole-sourcing.[132]

(250)    Second, Dr. Rapp's own tables and arguments prove that his position concerning EID's "pure monopoly" power is pure nonsense.  Standard formulas show that, for a product with an inelastic demand such as this one, monopoly markups should be enormous; see Section IV.A.  Yet the data in Dr. Rapp's Table 1 show that EID's profit margins on Razr sales were negative through July 2005, and tiny in comparison to monopoly margins in subsequent months, despite the fact that Dr. Rapp says EID was a Razr panel monopolist during this period.  Dr. Rapp says that a monopolist wouldn't set price at or below cost (in ¶36, he says that price less than cost would make "no economic sense" for a monopolist, and he calls this the "teachings of elementary economics;" see also his ¶58), but that is precisely what his own data say EDI actually did (¶36).  Hence, by his own arguments and data, EID could not possibly have been acting as a monopolist towards Motorola.  On the contrary, EID's margins were clearly held in check to a large degree by competitive pressure.

(251)    Third, with respect to Q4 2005, Dr. Rapp's position concerning EID's purported monopoly power is inconsistent with his own observation that the EID plea covers a period of time starting in the fall of 2005.  If he is correct, then he has no way to explain why EID would have been willing to engage in price-fixing discussions, breaking the law and risking prosecution, given that it could not possibly gain from collusion.

(252)    Dr. Harris notes that Toshiba was a single-source supplier to Motorola for many of the parts they supplied, and infers that there is consequently "no sound economic basis to allege price fixing for Toshiba's single-sourced panel sales to Motorola" (¶53, also ¶87).  His argument is essentially the same as that made by Dr. Rapp concerning EID, and it is wrong for the same reasons.  Indeed, Harris concedes that "a sole-source supplier may have competed to obtain its sole-source status," but he is demonstrably wrong in asserting that "it does not compete on price during the period it is designated as the sole-source supplier" (¶12), as Dr. Rapp's discussion of Motorola negotiations proves.

(253)    Dr. Harris also notes that Toshiba did not sell panels for the original RAZR phone, and opines that "Toshiba could not be fixing prices of a product it was not selling" (56).  As a matter of elementary economic principles, Dr. Harris is obviously wrong.  According to Dr. Harris's logic, as long as conspirators cleanly divide up a market, so that there is no overlap, none of them could possibly be fixing price.  Similar observations apply to Dr. Harris's observation that Samsung and Toshiba communicated about the Triplet phone, but they didn't sell Motorola the same panels.

---

[132]    Indeed, Dr. Rapp's view that EID had no future with Motorola as of Q4 2005 is directly contradicted by his own Figure 2c, which shows significant EID sales to Motorola through October 2006.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

## V.B.2. Defendants that purchased or distributed LCD panels had incentives to fix prices

(254)    Dr. Rubinfeld argues that, to the extent the Defendants bought as well as sold LCD panels, they might not have had an incentive to collude (¶205).  He ignores the obvious fact that, as long as their net sales (including finished products) were positive, they unambiguously benefited from a higher price.

(255)    Dr. Williams opines that SDI had no incentive to participate in the conspiracy because it did not produce TFT LCD panels (¶¶45, 49).  There are two problems with his argument.  First, SDI did produce STNs, which the conspiracy encompassed, and which Dr. Williams conveniently ignores when making his argument.  Second, SDI might well have expected to benefit from higher priced SDI panels.  Certainly, SDI would not have conspired to raise its own price while the price paid by competitors remained unchanged.  However, if the pass-through rate exceeded 100%, SDI could expect to benefit from a *general* increase in the cost of an input.

(256)    Dr. Williams anticipates this second argument, and says that one cannot "rescue" the theory through a pass-through argument because of buyer market power (¶¶50, 66).  Elsewhere in this report, I explain that buyer market power did not protect Motorola from overcharges.  Perhaps even more importantly, Dr. Williams' own analysis establishes that the pass-through rate for sales to large buyers such as Motorola was likely greater than 100%.  Specifically, in his discussion of Nokia, he notes that Nokia's negotiating position was to allow for the recovery of cost plus a profit margin, defined as a percent of costs – specifically, 10-30% (¶63).  Cost-plus-margin implies a pass-through rate greater than 100%.  For example, cost-plus-15% implies a pass-through rate of 115%.  Notably, Dr. Williams says that Motorola's procurement strategy was similar to Nokia's (¶69), and Dr. Rubinfeld (¶126) observes that Motorola tried to price based on costs "assuming a fair margin for suppliers," which he says was "set at 7 percent."

## V.B.3. Small, inefficient, or otherwise disadvantaged competitors had incentives to collude

(257)    The Defendants' experts describe some of the Defendants as small, struggling, and/or inefficient "fringe competitors," in some cases with declining market shares (Williams, ¶¶45-55, Cremieux ¶¶63, 77, Harris ¶28).  They claim that such firms have diminished incentives to participate in cartels, but there is no reason to think that such incentives were lacking.  First, in a market with differentiated products (a characteristic of this market which many of the defense experts emphasize), even a small firm can have a large presence in a market niche, and hence, essentially similar incentives to collude as a large firm in a large market.  Dr. Harris concedes, for example that Toshiba focused on specialized LTPS panels (¶¶32-34), and on niches for large panels (particular types of notebook panels, ¶38).  Second, cartels allow inefficient firms to survive, or at least to recoup more of their investment before exiting.  Third, all firms, large or small, efficient or inefficient, benefit from encouraging collusion, which they cannot do unless they are part of the conspiracy.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 139 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(258)    In any case, the distinction the Defense experts draw is a matter of degree and not of kind, and they have not quantified the degree. They have simply cited a factor that may have a directional effect on incentives, without showing that the effect is large enough to have materially affected particular Defendants' incentives with respect to small panels.

(259)    In the case of LGD, Dr. Cremieux ignores the implications of the fact that LGD had a substantial presence in large panels. To the extent the Plaintiffs' allegation concerning the existence of a single conspiracy is correct, Dr. Cremieux must acknowledge that LGD had a strong incentive to join the cartel, irrespective of the effects of being small.

### V.B.4. Dr. Moore is mistaken concerning Mitsui's incentives

(260)    Dr. Moore claims Mitsui had no incentive to participate in the conspiracy (¶¶85-87). He explains that Mitsui was paid a commission rate of 1% to 3%, which created an incentive for it to maximize revenue. He then asserts that the elasticity of demand for the panels sold through Mitsui was high, quoting documents suggesting large responses to small price changes. He concludes that the elasticity of demand for these panels was likely greater than unity, which implies that an increase in price would reduce revenue. Consequently, he infers that it was in Mitsui's interest to lower prices, not to raise them.

(261)    Dr. Moore's argument involves an elementary conceptual error. The evidence Dr. Moore cites speak to what is known as an "own-price elasticity" – the change in sales resulting from a change a firm's own price, holding all other prices fixed. However, Mitsui's incentives to participate in the cartel were not driven by its own-price elasticity, for obvious reasons: the cartel did not increase the prices of the panels Mitsui sold, leaving all other prices fixed; rather, it increased the prices of Mitsui's panels *along with the prices of the substitutes for Mitsui's panels*. As I have discussed elsewhere in my first report and in this report, the overall elasticity of demand for panels was likely very low – certainly far less than one. Consequently, once Dr. Moore's conceptual error is corrected, his analysis shows precisely the opposite of what he claims. In particular, with an overall elasticity of demand for panels less than one, a broad increase in panel prices necessarily increases revenue, thus increasing Mitsui's total commissions. Accordingly, based on economic principles, Mitsui had an obvious and potentially strong incentive to participate in the cartel.

## V.C. Recognizing that the Defendants' efforts to hide their illegal activities renders the record of conspiratorial activity incomplete, the Court could reasonably infer broad patterns of collusive conduct from the available evidence

(262)    As I explained in my first report, the evidence concerning the manner in which the conspiracy operated is likely incomplete and ambiguous. The available documents may be the 'tip of the iceberg,' and the murkiness of the record may reflect the defendants' efforts to cover up or obscure their most serious

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

transgressions.[133]  Dr. Carlton agrees with me (¶77). The fact that participants generally knew that their conduct was illegal and had every reason to avoid leaving a detailed paper trail is one of the main reasons it is inappropriate for an economic expert to usurp the role of the Court in reaching conclusions about the actual extent and nature of collusive activities.[134]  It is the role of the Court as fact finder to "fill in the blanks" based on reasonable inferences from available evidence.

(263)    Many of the defense experts have simply ignored this point. Some of them essentially take the position that if there is no documentation or testimony concerning a particular transaction or set of transactions, then the conspiracy cannot be assumed to have affected those transactions, or at least to have affected them to the same degree as the transactions for which there is an abundance of evidence. For example:

■    Dr. Rubinfeld opines that "aside from the Crystal Meetings, during the period of conduct alleged by the plaintiffs, most of the price discussions among competitors were episodic and irregular, generally reflecting sharing of information rather than broad, effective coordination on prices" (¶308).  From this he concludes that if the Defendants "entered into price-fixing arrangements outside of the Crystal Meetings, those arrangements were likely to be more limited …" However, Dr. Rubinfeld cannot possibly state his premise as a known fact because he does not know it.   If the parties were taking steps to keep their meetings and discussions outside the scope of Crystal Meetings secret, the record cannot be taken as a legitimate basis for saying that the Crystal Meetings would have had a larger effect on price than other types of Defendant contacts and coordination.

■    Dr. Rapp says that "Motorola meetings were separate from, and occurred sporadically over a much shorter period of time than, the alleged conspiracy that involved 'Crystal Meetings'…" (¶18), but this inference is based on the assumption that the record is equally complete in both cases.  He also argues that the evidence concerning Epson's communications that I discussed in my first report was limited and vague compared to the evidence on the Crystal Meetings (¶¶ 31-33).  The systematic memorialization of the Crystal Meetings (through meeting minutes) may create the appearance that the Crystal Meetings were more frequent or extensive, but Dr. Rapp has no way of knowing whether that is in fact what occurred.  What actually happened as a matter of fact is for the court, and not Dr. Rapp, to decide.

(264)    Conclusions that are predicated on the untenable assumption that the record of evidence is complete, or even that it is equally incomplete for all Defendants and forms of communication, are inherently unreliable.

---

[133]    See Section III.B of my first report.
[134]    George J. Stigler, "What Does an Economist Know?" *Journal of Legal Education* 33 (1983): 311-313.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## V.D. The Court could reasonably conclude that communication with the object of fixing price was sufficiently widespread to create the potential for substantial overcharges

(265)    Various Defendants' experts spent substantial time characterizing the available evidence of communication among Defendants. It is up to the Court to determine what interpretation to provide such evidence and whether the purpose of such communication was to facilitate price-fixing. It is also up to the Court to determine what weight to put on this evidence. However, it is important to note that the evidence is extensive.  In my own review, I have seen extensive evidence of communication both within the Crystal Meetings and outside them.

### V.D.1. My overcharge analysis does not presuppose the guilt of all Defendants

(266)    The Plaintiffs expect to prove that all of the Defendants participated in a price-fixing conspiracy, and asked me to assume that for the purpose of my analysis.  It is therefore important to emphasize that the validity of my overcharge analysis does not presuppose that the Court would find all the Defendants guilty; rather, it presupposes that participation in the conspiracy was widespread.  Effective price-fixing requires coordination among a critical mass of competitors, but it does not require universal participation.

(267)    LCD manufacturers that did not participate in the cartel benefited from its existence because the set prices under its elevated umbrella.  Therefore, their prices were elevated as well, irrespective of their innocence, and my overcharge analysis measures the associated elevation.  However, in that case, it is my understanding that, as a legal matter, there would be no liability associated with the sales of a Defendant if the Court finds it innocent.  In contrast, if the Court finds that certain Defendants did conspire, then it is my understanding that, under the applicable legal standard, they are liable for the full amount of the overcharges associated with sales by members of the cartel, and not merely the portion incrementally caused by their own communications.

(268)    Consequently, if an inquiry about the role and conspiratorial activity of a single Defendant is focused on determining whether that party is liable, it is beyond the scope of my charge.[135] Likewise, if such an inquiry into a single Defendant's activity is designed to assess the reasonableness of overcharges resulting from that activity, then it is wrong as a matter of economics. It necessarily ignores the effects of the rest of the conspiracy, which is properly added in when determining the damages attributable to a particular Defendant for its participation in the conspiracy.

---

[135]  Such an inquiry is also outside the expertise of economists. Economists can evaluate the effectiveness of a conspiracy, but they have no particular expertise at determining whether an individual firm reached agreement as part of an illegal conspiracy.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

### V.D.2. Guilt is not necessarily limited by the scope of pleas or indictments

(269)  In my first report, I cited the defendant guilty pleas by Chi Mei, Chunghwa, Epson, HannStar, Hitachi, LG Display, Samsung, and Sharp in which they admitted to having price fixed TFT-LCD panels.[136]  In responding to my report, a number of the Defense experts vigorously emphasize that certain Defendants did not enter pleas, and that others entered pleas that were narrower than the Plaintiffs' allegations.[137]  In doing so, they misconstrue the relevance of a plea to an economic expert engaged in the assessment of damages.

(270)   As I explained above, my objective in reviewing evidence of the cartel is not to tell the Court what happened as a matter of fact, but to assess what the Court might reasonably conclude as a matter of fact, so that my analysis could properly take into account those potential findings.  I take the existence of a Defendant's plea as a clear indication that a Court could reasonably find the Defendant to have engaged in price fixing during the period and for all the products to which its plea refers.  However, I see no reason why the *absence* or *limited scope* of a plea should be taken as an indication that such a finding would be *unreasonable*.  Criminals who refuse to admit their crimes are frequently found guilty nevertheless.  Indeed, in this very case, AUO did not enter a plea, but was nevertheless found guilty at trial.[138]  The Plaintiffs intend to prove their broader allegations at trial based on evidence rather than pleas, just as the U.S. government successfully proved its case against AUO.

(271)  Similar comments apply to the observations of some Defense experts concerning the absence of indictments against specific Defendants.[139]  The absence of a criminal indictment shows that the DOJ chose not to pursue a criminal case against a particular Defendant.  It does not rule out the possibility that the Court in this matter could reasonably find that Defendant to have engaged in price fixing.  We do not know, for example, whether in making its decisions, the DOJ thoroughly examined all of the evidence that the Plaintiffs plan to present at trial to prove their allegations.  I also understand that the burden of proof is higher in criminal than in civil cases, which could well account for the DOJ's reluctance to move forward against certain parties.

(272)  On the other hand, in instances where there are pleas covering certain Defendants, products, and time periods, I take that as an unambiguous indication that the Court could reasonably conclude that the plea is a reliable indication of liability.

(273)  So, for example, Dr. Cremieux (¶26) writes: "… the documentary evidence that I have reviewed on this topic is far from conclusive in demonstrating any meaningful involvement by LG Display in

---

[136]  See section III.A.

[137]  See, for example, Harris Report ¶18, emphasizing that Toshiba has not been indicted nor pleaded guilty, Willig Report ¶13, emphasizing that Sharp pleaded guilty to specific time periods and products, and Rapp Report ¶¶20-21, emphasizing that Epson's guilty plea was also limited to specific products and time periods.

[138]  "Do you find that defendant AU Optronics Corporation violated the Sherman Act, as charged? Yes. Guilty." (Transcript of Proceedings of United States of America vs. AU Optronics Corporation et. al., March 13, 2012, p. 5404.)

[139]  For example, Harris Report ¶18 emphases the absence of an indictment against Toshiba, and Moore Report ¶42 against Tottori Sanyo.

conspiratorial actions regarding small LCD panels." He also offers the opinion that documentary evidence of LG Display's involvement in small-panel price-fixing is "ambiguous" (¶87). But LG Display pled guilty to "participat[ing] in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD," which the guilty plea defines as "glass panels composed of an array of tiny pixels … manufactured in broad range of sizes and specifications for use in televisions, notebook computers, desktop monitors, mobile devices and other applications." Dr. Cremieux actually acknowledges that the LG Display plea did not draw a distinction between large and small panels (¶48).[140] Companies have every incentive to narrow their pleas, and other companies in this case did so. The plain and broad language of LG Display's plea appears to me to encompass small panels, but of course that is a matter of judgment for the Court.

### V.D.3. The Court could reasonably conclude that communications between the Defendant's were anticompetitive

(274)    The Defendants' experts attempt to explain away communications between the Defendants as innocuous or pro-competitive. For instance, Dr. Willig writes at some length about the potential advantages of information sharing among competitors.[141] Likewise, Dr. Harris opines that, in some situations, "information exchanges can improve efficiency by allowing firms to make more informed investment and production decisions."[142] Dr. Rubinfeld titles a section of his report, "Communications Among Competitors Need Not Have Anticompetitive Effects."[143]

(275)    As an initial matter, the Plaintiffs have not alleged, and I have not argued, that all information exchanges between competitors are anticompetitive.[144] Rather, the Plaintiffs in this matter expect the Court to interpret the evidence concerning communication among the Defendants as involving explicit agreements and/or implicit understandings concerning prices, quantities, and capacities, as well as discussions of future prices, quantities, and capacities that enabled the Defendants to coordinate their expectations concerning future collusive outcomes. Communication of that type is unambiguously anticompetitive. Plaintiffs allege only that *some* communication between Defendants was anticompetitive.

(276)    Dr. Rubinfeld concedes that "information sharing among competitors can have anti-competitive effects."[145] However, he argues that price information can make markets work more efficiently. He discusses the efficiency of open auctions – but of course open auctions do not involve discussions among

---

[140]  Dr. Cremieux writes "[t]he plea did not make reference to any particular panel size, panel application, or downstream customer." (¶48)

[141]  Willig report, ¶ 18-32. Dr. Willig submitted several expert reports in this matter. When I reference Dr. Willig's expert report, I reference his AT&T report. Appendix C identifies the corresponding paragraph numbers between his reports.

[142]  Harris report, ¶ 62. Dr. Harris further develops his point at ¶ 63-65.

[143]  Rubinfeld report, Section IV.C.

[144]  Thus, when Dr. Willig writes, "A simplified analysis that merely condemns all communication between competitors as anticompetitive may misidentify pro-competitive conduct as anticompetitive", he is attacking a straw man. Willig report, ¶ 34.

[145]  Rubinfeld report, ¶ 148.

bidders to coordinate expectations of future prices and quantities.[146]  He ultimately concedes the point that "[t]he exchange of pricing and production information among competitors can serve an anticompetitive purpose by fostering a collusive arrangement."[147]

(277)  Because communication between competitors can be either pro-competitive or anti-competitive, it is important that such communications occur in a transparent and open way.  Trade associations are often formed for this purpose; the association can establish rules consistent with antitrust laws, limiting exchanges to allowable topics, and can provide a window for outsiders to observe and monitor the interaction.[148]  Exchanges through a third party, such a a data vendor, can also play this role. In the case of the LCD panel market, DisplaySearch serves this function.[149]

(278)  In evaluating the Defense experts' statements concerning the potentially pro-competitive role of communication, it is important to keep in mind that the Plaintiffs allegations concern evidence that: (1) Defendants understood that certain communications were illegal and had to be hidden, (2) some of the Defendants' communications reflect agreements to fix prices, (3) some of the Defendants' communications involved expressions of intent to fix prices, and (4) many of the Defendants admit to communicating with the intent to fix prices.

(279)  Regarding the first category of evidence, surreptitious meetings invite abuse, and an insistence on secrecy often arises because the parties know they are engaged in illegal conduct.  Indeed, in this case, there is considerable evidence that the parties not only knew that their activities were proscribed under the antitrust laws, but that they insisted on secrecy to cover them up. I highlighted evidence of this sort in my first report.[150]  I can see no pro-competitive rational for allowing competitors to communicate outside of a formal structure that provides adequate transparency and safeguards against abuse.  The Defendants' experts do not take the surreptitious nature of the information exchange in the LCD panel industry into account when reaching their conclusions.

(280)  Dr. Rubinfeld claims that the cartel members had other sources of information available to them. These included information from DisplaySearch, customers, and input suppliers.[151]  But if the information exchanged in meetings was redundant, the cartel members would not have had the meetings.  Moreover, Dr. Willig has taken the position that the defendants held the meetings in order to exchange more accurate

---

[146]  Rubinfeld report, ¶ 150.

[147]  Rubinfeld report, ¶ 151.

[148]  This is not to say that trade associations always behave in a pro-competitive way, but at least this mechanism is less prone to abuse than secret meetings.

[149]  Dr. Willig notes that data exchange through data vendors has some drawbacks, including time delays and aggregation. Willig report, ¶ 25.  Dr. Willig has done no analysis to determine whether those factors preclude efficient information exchange through DisplaySearch in the LCD panel industry. He therefore fails to establish an essential premise for his argument.

Dr. Willig also notes that information provided to data vendors may not be truthful.  However, the same issue arises with respect to direct information exchange. Willig report, ¶ 25.

[150]  See ¶ 41-44 of my ATS report.

[151]  Rubinfeld report, ¶ 154-157.

information.[152] The Defendants cannot have it both ways.  And, of course, there are critical differences between (a) exchanging information on current prices versus coordinating expectations and reaching agreements concerning future prices, (b) communicating directly versus communicating through a third party with no stake in supporting collusion, and (c) communicating in the light of day versus doing so surreptitiously.

(281)   Dr. Rapp claims that Epson's communications lack discussion of "output restriction or coordinating activities such as compensation," leading him to characterize the discussions as "cheap talk."[153] But the fact is that we do not know the full scope of communications; we only know what has been memorialized, acknowledged, and made available in this litigation.  As I explained above and in my first report, the Defendants knew their conduct was illegal and went to great lengths to hide it.[154]  The full extent and nature of the communication that actually occurred between any set of parties is for the Court to judge. We know that Epson Imaging Devices Corporation pled guilty to fixing prices from the fall of 1995 through mid-2006, so they have admitted that their discussions were not confined to innocuous topics. Additionally, as I have noted above, it is my understanding that, if the Court finds that Epson did participate in Defendants' conspiracy, then under the applicable legal standard, they are liable for the full amount of the overcharges and not merely the portion incrementally caused by their own communications.  Critically, Dr. Rapp has not disputed the general effectiveness of the conspiracy.

(282)   Similarly, Dr. Moore discusses various communications between Mitsui and others.[155] Dr. Moore concludes that the "overall picture conveyed by these communications is most objectively viewed as pro-competitive or ambiguous…In many instances, it is simply not clear what the communications seek to accomplish."[156]  The proper factual interpretation of these documents is a matter for the Court to decide; it is certainly not something that an economic expert is particularly qualified to evaluate.  When Dr. Moore describes the communications as "ambiguous," he concedes his uncertainty as to what they were meant to accomplish.  Resolving factual ambiguities about documents and testimony inherently involves judgment calls, which are the appropriate domain of the Court and not economists.

(283)   Ultimately, the Court will decide the interpretation and weight to give to the evidence. While as an economist I have no special expertise at interpreting documents, I am comfortable proceeding with my analysis on the assumption that the Court could reasonably interpret the evidence as proof of anti-competitive conduct. Moreover, AUO's experts in its criminal trial advanced arguments that the evidence indicated that AUO did not participate in the conspiracy. From January through March 2012, the Court heard evidence from both the governments' witnesses and from AUO's witnesses. The Court rejected

---

[152]   Willig report, ¶ 26-27.

[153]   Rapp report, ¶ 55. Dr. Rapp does concede "Some of these communications included the exchange of information about prices that had been charged to Motorola for TFT panels and, at times, about prices that would be offered to Motorola for TFT panels." Rapp report, ¶ 44.

[154]   See ¶ 41-44 of my ATS report.

[155]   Moore report, ¶ 81-84.

[156]   Moore report, ¶ 84.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

AUO's arguments and found AUO guilty. It is important to note that because AUO faced a criminal trial, the burden of proof was greater than in the present civil matter. In light of the above, while it is the Court's role to decide the interpretation and weight to give to the evidence, for the purpose of my damage analysis I have concluded that the Court could reasonably find a broad pattern of anti-competitive communication.

(284)    Dr. Willig offers the Court a set of criteria for assessing whether communications are potentially anticompetitive.[157]  He then applies those criteria to evaluate the scope of Sharp's price-fixing activities. Sharp pled guilty to fixing the prices of TFT-LCD panels sold to Motorola from the fall of 2005 to the middle of 2006 for use in Razr phones. Yet applying his criteria, Dr. Willig finds only one instance in which Sharp even potentially acted to fix prices, and that occurred in March 2006.[158]  He concludes that Sharp's price-fixing activities were limited to this one instance.  There are, of course, two other possibilities: the record is incomplete (e.g., because other instances were not memorialized, the memorializations were not retained, or they did not emerge during discovery), or there is something wrong with Dr. Willig's criteria or interpretation of the evidence.  Given Sharp's much broader guilty plea, as well as its strong incentive to limit its guilty plea to actual periods of price-fixing, those alternative possibilities strike me as far more plausible. It was illogical for Dr. Willig not to entertain either of them.

(285)    Additionally, Dr. Willig's criteria for document selection raise a variety of conceptual problems and involve the types of judgment calls that are properly the domain of the Court and not economic experts. For example:

- Dr. Willig requires that the firms must be "significant suppliers of the products to Motorola."[159]  This criterion rules out communications through which parties agree not to compete for each others' customers.

- Dr. Willig requires that there must be "some plausible interpretation of the content of the communication that is consistent with an agreement to fix prices or allocate output."[160] Dr. Willig also requires that the "language of the communication and documents must be indicative of a possible agreement to fix prices between the firms engaged in the communications."[161]  These criteria inherently involve judgments regarding the meaning of and intent motivating the communication. Such judgments are appropriately the domain of the Court and not economic experts.

- Dr. Willig requires that the "information exchanged between competitors must not be intentionally false."[162]  To understand why this restriction is inappropriate, consider the following example.

---

[157]  Willig report, ¶ 41.

[158]  Willig report, ¶ 42.

[159]  Willig report, ¶ 41.

[160]  Willig report, ¶ 41.

[161]  Willig report, ¶ 41.

[162]  Willig report, ¶ 41.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Suppose normal competitive interaction between two firms would yield a price of $10. The firms communicate with the object of fixing price at $15. Both lie about their intent to charge $15 in order to take advantage of the other. One quotes a price of $14, while the other quotes a price of $13. The buyer purchases the product for $13. Dr. Willig would say that this interaction does not involve price fixing because the information exchanged was, in both cases, intentionally false. But in this example, even the disingenuous attempt to engage in price fixing results in the buyer paying a higher price ($13 rather than $10) – each induces the other to raise price with the intent of undercutting them.[163]

(286)    As an illustration of the inappropriate restrictiveness of Dr. Willig's criteria, consider his discussion of the communication between Sharp and Sanyo Epson in September 2005.[164] Dr. Willig explains that a Sharp employee lied to a Sanyo Epson employee about Sharp's intention to lower its price, with the intention of undercutting Sanyo Epson. According to Dr. Willig, this example "demonstrates the notion that discussion about price need not preclude competitors from undercutting each other in order to win a greater share of sales." But Dr. Willig misses the important point: had Sharp not lulled Sanyo Epson into a false sense of security, it would likely have expected Sanyo Epson to quote a more aggressive price, and would thus have felt compelled to lower its own price still further. This episode resembles the simple example I discussed above, in which two firms disingenuously agree to charge $15 rather than the normal competitive price of $10, and the buyer ends up paying $13; the communication is not innocuous simply because the information exchanged was false.[165]

(287)    Based on his application of these conceptually flawed and ambiguous criteria, Dr. Willig concludes as follows: "it is apparent than any instances of agreements during the plea period between Sharp and other suppliers of TFT-LCD panels to fix prices of the panels sold to Motorola (to the extent any such agreements existed) must have been sporadic, limited in scope, and limited in duration."[166] In reaching this conclusion, Dr. Willig not only rules out the possibility that any communication not meeting his conceptually flawed and ambiguous criteria could have anticompetitive effects, but also ignores the possibilities that (1) recorded instances of communication may be incompletely memorialized because the parties were attempting to keep their illicit activities secret, and (2) some illicit communications may not have been memorialized at all. As I noted above and in my first report, the record almost certainly provides an incomplete memorialization of the cartel's activities, because the Defendants were aware they were breaking the law and took steps to avoid discovery.[167] Dr. Willig reaches his conclusion only by treating the record as if it were exhaustive, which it almost certainly is not.

---

[163]   Dr. Harris makes the related, and also inappropriate, claim, "An exchange of information has to be generally accurate to be of value to a cartel or firms attempting to fix prices." Harris report, ¶ 66.

[164]   Willig report, ¶ 53.

[165]   Dr. Rubinfeld discusses a similar episode. "One Samsung document also indicates that Sharp asked Samsung to fix prices for the Triplet project, but that Samsung declined this invitation. Samsung witness testimony and contemporaneous documents indicate that some of the competitive price information was inaccurate, and that after exchanging price information with Sharp, Samsung undercut Sharp's pricing to Motorola." Rubinfeld report, ¶ 116. This is consistent with anticompetitive effect as my simple example shows.

[166]   Willig report, ¶ 40.

[167]   See ¶ 41-44 of my ATS report.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(288)  For the single instance of anticompetitive communication that Dr. Willig identifies, he also attempts to examine the effect of the communication on price.[168]  He finds no evidence of a significant increase in price after the communication, but acknowledges that the stated purpose of Sharp's communication was to persuade Samsung not to lower their prices any more than Samsung already had.[169]  Because Dr. Willig conducts no analysis to determine how far prices would have fallen in the absence of the communication, his discussion sheds no useful light on its impact.

(289)  Particularly in light of the fact that Sharp pled guilty to fixing the prices of LCD panels sold to Motorola from fall 2005 through mid 2006, to Dell from April 2001 to December 2006, and to Apple from September 2005 to December 2006, it seems to me that a Court could reasonably conclude, based on the incomplete record of communication between Sharp and other defendants, that Sharp engaged in a pattern of anticompetitive conduct consistent with the Plaintiffs' allegations.

## V.E. The Court could reasonably find that the Defendants were involved in a single overarching conspiracy

(290)  Many of the Defense experts take the view that the LCD industry was characterized by a number of separate conspiracies, rather than a single overarching conspiracy.  Many of them, for example, portray the Crystal Meetings as a self-contained conspiracy, and emphasize that certain Defendants did not take part in them.  Ultimately, it is up to the Court to judge whether there was one conspiracy or many.  As an economist, I consider the Plaintiffs' allegation of a single conspiracy plausible for the following reasons.

(291)  First, as I explained in Section II.A, the Defendants had strong incentives to orchestrate a broad conspiracy that encompassed most if not all panel products due to both supply-side and demand-side substitution.  As the Defense experts have observed, entry can be very disruptive to a cartel, and entry by companies producing highly similar products is a particularly potent threat.   Price elevation is also less beneficial to conspirators when it simply chases demand to neighboring products.  And while demand-side substitution does not occur between panels of significantly different sizes, it would always drain profits from a more narrowly focused cartel around at the boundaries of the cartel's scope.

(292)  Second, as I discuss in Section VI.B, there is considerable theoretical and empirical support for the proposition that multimarket contact facilitates collusion.  Generally, there is more scope for effective collusion when conspirators take advantage of the fact that they compete with each other to sell many different types of products, rather than focusing on single products or small groups of products in isolation.  Dr. Cremieux appears unaware of this important point.  He devotes a substantial portion of his report to the question of whether large panels and small panels belong to the same antitrust market.  He concludes that they do, and he draws the following implication: "Plaintiffs' claims of elevated prices for

---

[168]  Willig report, ¶ 47-48.

[169]  Willig report, ¶ 48.

both types of panels must entail separate and distinct sets of coordinated actions for small LCD panels and large TFT-LCD panels" (¶9) – in short, separate and distinct conspiracies. Yet there are a variety of conditions under which a single conspiracy spanning several markets (in which the producers and conspiracy participants may differ) can achieve greater profits than separate conspiracies within each of the markets, and there are numerous documented incidents of conspiracies spanning multiple markets (such as the Vitamins conspiracy). Thus, Dr. Cremieux is wrong as a matter of both economic theory and practice.[170]

(293)    Third, the record appears to show a network of communication channels between the Defendants that is not easily divided into distinct parts. It is not the case, for example, that one group of Defendants communicated exclusively amongst themselves concerning large panels, while another communicated amongst themselves concerning small panels.

(294)    Dr. Willig asserts that, my overcharge calculations "attribute all the overcharges to a single worldwide conspiracy to fix prices of TFT-LCD panels, [my] analysis is unable to calculate any overcharges of prices paid by Motorola that are attributable to any other narrower conspiracy to fix prices…" Dr. Willig is mistaken. I was indeed asked to assume the existence of a single conspiracy; however, my overcharge analysis does not rely on that assumption. It remains valid even if there were multiple conspiracies, inasmuch as it still measures the overcharges resulting from conspiratorial actions.

## V.F. The Court could reasonably find that the cartel employed mechanisms capable of sustaining substantial overcharges

(295)    As I explained in my first report, cartel agreements can be sustained with imperfect but simple methods.[171] This is true even when cartel members cannot observe each others' actions. Cartel members observe their own prices and sales. If a cartel firm's own prices and sales are what it expects, it is a sign others are complying with the agreement. So modern economic theory has shown that cartels can sustain elevated prices even without much, if any, direct monitoring. Coordinated expectations about prices and sales can sustain an explicit agreement absent any monitoring beyond ones own prices and sales.

(296)    It is important to stress how simple a mechanism this is, and how little information it requires. If a cartel has coordinated its member's expectations by reaching agreement on what it expects each member to do, and members' prices and sales are in accordance with their expectations, nothing needs to be done – the conspiracy is functioning as expected. Conversely, if a member's prices and sales are below its expectations, that member will know it is possible someone has not adhered to the agreement. It may then perform some additional investigation into what happened to cause its prices and sales to be below

---

[170]    His analysis of market definition is also incomplete, inadequately supported, and ultimately inconclusive. However, because my analysis does not depend on whether large and small LCD panels belong to the same market, I see no point in discussing it here.

[171]    ¶ 70 of my ATS report.

Case 3:07-md-01827-SI     Document 7944-3     Filed 05/17/13     Page 150 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

expectations.  Notably, the mechanism works well even where some firms are vertically integrated into downstream markets (because downstream defections have consequences for competitors' upstream sales), and thus is well-suited for the LCD industry.

(297)   Dr. Carlton acknowledges the legitimacy of the cartel mechanism I mention, noting that "[a] common punishment mechanism is for other cartel participants to expand output and reduce price in response to perceived cheating on an agreement."[172]  However, he adds that "the theoretical models that support this claim also note that a firm's own sales can be a highly imperfect signal for whether other firms are cheating…  Thus a cartel's efforts to raise price could actually degrade into price wars because of perceived, even if not actual, cheating."[173]  To be clear, the underlying theory has no particular implication about the frequency of price wars.  Moreover, the LCD conspiracy did employ some elements of direct monitoring (albeit imperfect in nature) to supplement the basic mechanism, and certain critical decisions, such as capacity, were relatively easy to monitor.  The Defendants also discussed apparent defections in their meetings, which gave them opportunities to stabilize their agreements and thereby possibly stave off price wars.  Still, consistent with the underlying theory, my overcharge analysis does in fact reveal that the effectiveness of the cartel varied substantially through time.  Indeed, as Dr. Rubinfeld noted in his report, there were indeed periods of "price wars" during which the overcharges fell sharply, particularly for large panels.

(298)   While Dr. Carlton acknowledges the legitimacy of the cartel mechanism I describe, Dr. Hitt claims it does not apply.[174] Dr. Hitt claims that a paper I cite in support of the mechanism is inapplicable. He bases his claim in part on the existence of product differentiation in LCD TVs on a part of the paper that states the model assumes "firms should not be able to engage in product differentiation", but he ignores the statement that the assumption was made "for expositional ease". An environment in which firms monitored their own market share, which imperfectly reflected the price choices of other firms, would be more in the spirit of Stigler's paradigm."[175] What is relevant here is the paper's discussion of the general monitoring mechanism and the insights generated by the authors' analysis (which was elaborated upon and generalized in the subsequent literature), not the narrow structure of the simple model that was originally used to develop these insights.  Dr. Hitt makes other claims regarding the details of the paper's model that are equally irrelevant, such as the assertion that the industry lacks "temporal stability." Temporal stability is in these types of exercises to render models analytically tractable, and are not essential for the general mechanism the paper describes.[176]

---

[172]  Carlton report, ¶ 102.

[173]  Carlton report, ¶ 103.

[174]  Carlton cites the paper in footnote 98 of his report.

[175]  Green, Edward and Robert Porter, "Noncooperative Collusion under Imperfect Price Information," *Econometrica*, 52:1, (January, 1984), page 91.

[176]  Dr. Hitt also claims that "Given Sharp's vertically integrated position in the TV market and the fact that they did not participate in the 'crystal meetings,' it is not clear that direct monitoring is possible." The discussion in this section demonstrates why The Court could reasonably find that the cartel employed indirect methods of monitoring and enforcement to sustain substantial overcharges.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 151 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(299) The vast majority of the Defense experts' other comments concerning the cartel mechanisms presuppose that the cartel operated in a way that depended upon direct and accurate monitoring of conspirators competitive activities. For example, the notion that a cartel cannot be effective if the conspirators exchange misleading information presupposes that the information they exchange is necessary for the conspiracy to be effective. That type of information exchange simply isn't required for the basic, simple mechanism that was likely at the core of the LCD price-fixing conspiracy.

## V.G. Comparisons of apparent agreements and realizations do not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates

(300) Dr. Carlton presents an analysis in Section IV of his report showing that a significant portion of transactions ended up occurring at prices significantly below those discussed at the Crystal meetings. This analysis does not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates for the following reasons.

(301) First, the evidence from the Crystal Meetings indicates that the cartel targeted average prices rather than price variation. It did not function by requiring conformance with a single price. Rather, it was an attempt to shift the distribution in a direction more favorable to the Defendants.[177] I have explained in my first report how such a cartel can function. I further elaborated on this point in my deposition.[178] Thus, there is nothing of interest to be learned from the fact that some prices ended up below the agreements.

(302) Second, a deviation between the agreement and the average price simply shows that the agreement was not perfectly effective. It does not follow that the agreement had no effect on price. If the defendants were shooting for 30% price elevation but achieved 15%, they still raised price. By focusing on the difference between 30% and 15%, rather than the difference between 15% and zero, this analysis answers the wrong question, and inherently cannot answer the right one.

(303) Third, when mistakes in Dr. Carlton's Crystal Meeting price data are corrected and the analysis is properly performed, the analysis actually shows a very close correspondence between agreements and average prices. Dr. Carlton's Crystal Meeting price data suffer from errors introduced by hand-entering information from documents memorializing discussions in Crystal Meetings. For example, Dr. Carlton's Figure IV-4 shows that the average of actual prices in December was approximately 20% below the Crystal Meeting communicated price for December 2003. The discrepancy is caused by an erroneous entry of a high $250 Crystal Meeting price for that month, which consequently makes nearly all transaction prices lie below the communicated price normalized at 100%. The Crystal Meeting document cited by Dr. Carlton, AU-MDL-05596812, mentions the number "250" twice: Samsung disclosing its

---

[177] See, for example, the minutes from a February 21, 2002 Crystal Meeting (GRN000029) showing different defendants charging different prices, but concluding that "the consensus is to only increase $5 from the December price."

[178] See deposition of B. Douglas Bernheim, March 9, 2012, pp. 896-8.

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 152 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

shipments of "250k" 15″ XGA monitor panels in November 2003 and HannStar suggesting to its co-conspirators that the price of 15″ XGA *notebook* panels be increased to $240-$250 in December 2003.

(304)    Additionally, Dr. Carlton's Crystal Meeting price data do not differentiate between contemporaneous prices merely mentioned by meeting attendees and future prices that are suggestive of price targets and agreements. For many Crystal Meetings, Dr. Carlton's price data includes the former but not the latter, perhaps because the latter was not communicated in terms of a price level (e.g., "in March, everyone will increase prices by $10", "the consensus is to maintain November prices in December"). I have adjusted Dr. Carlton's analysis to better reflect information from Crystal Meetings that could be interpreted as price targets. The figure below presents the results of my adjustments. Clearly, there is a high degree of conformance between targets and realizations.

**Figure 89: Prices of 15 inch TFT-LCD monitor panels and conspiracy price targets**



## V.H. The cartel reduced the supply of LCD-TFT panels

(305)    As a basic principle of economics, increasing price requires decreasing quantity. This does not mean that Defendants had to agree explicitly to capacity or production restrictions. As I stated in my deposition, as long as conspirators understood this basic economic fact and formed mutual expectations about what would have to occur with quantity in order to achieve their desired prices, reduced supply would

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

inevitably accompany any increases in price.[179]. In most instances, the Defendants appear to have relied on coordinating expectations in this way. The Defense experts have focused instead on explicit agreements concerning quantity and capacity. The conspiracy may well have employed such agreements, and there is some evidence to that effect, but it was certainly possible for the Defendants to collude successfully in other ways, and there are clear indications that they did.

(306)    As described in my first report, there is evidence in the documentary record indicating that the Defendants regularly discussed quantities, and there are in some cases explicit references to agreements concerning capacities and/or quantities. Those observations are not in dispute. Additionally, in my first report, I identified several episodes during which the Defendants discussed supply restrictions, and described in detail one such episode where Defendants subsequently implemented parallel reductions in supply, as an illustration that the evidence is consistent with explicit restrictions on production or capacity being part of the conspiracy mechanism.[180]

(307)    In response to this analysis, Dr. Carlton argued that parallel action may result from individual self-interest (¶ 79). While that simple proposition is indisputable, its application to the current setting ignores the fact that the parallel action was preceded by discussions to undertake parallel action. Moreover, the analyst reports that Dr. Carlton references for alternative explanations can be read in many ways; for example, a passage he quotes from a Bear Stearns report appears to reflect information obtained from the Defendants, rather than independent sources of market information.

(308)    Dr. Hitt claims that I found a supply restriction for Samsung and AUO because I did not combine data for all of the production lines (¶8-9). When he adds data for other production lines, the dip in Samsung and AUO's production seems to disappear. However, this effect is simply a consequence of the fact that the scale of his figure is many times larger than mine. There was no offsetting change in production on the other lines Dr. Hitt considers; rather, he simply adds them in to dilute the effect shown in my figure by comparing the change to a large base.

(309)    A number of the experts point out that the Defendants added a great deal of capacity during the conspiracy period, but contrary to their assertions this fact is consistent with supply restrictions and effective cartelization (Cremieux ¶92, Hitt ¶¶16-17, 20-25, Rubinfeld ¶186, Williams ¶146). In a market with strong growth in demand, even a monopolist will steadily expand capacity; thus, regardless of whether a cartel more closely resembles monopoly or competition, it will do the same.[181] One would not expect a cartel to restrict capacity in a market with rapidly growing demand by *reducing* capacity; rather the cartel merely needs to *delay capacity expansion* and/or lower capacity utilization.

---

[179] See deposition of B. Douglas Bernheim, March 9, 2012, pp. 896-8.

[180] See section III.B.3 of my first report.

[181] Dr. Hitt's discussion refers not only to investment in capacity, but also to investment in new technology and product innovation (Hitt ¶¶16-17, 20-25). Even a monopolist invests in new technology and product innovation, and in any case, as I emphasized at the outset of this section, the magnitude of my overcharge estimates implies that the industry was closer the competitive benchmark than to monopoly.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(310)   Dr. Cremieux also notes that LGD's capacity utilization rate did not rise after the conspiracy, and suggests that this too indicates the absence of collusive activity (¶¶79, 89). Dr. Cremieux is mistaken as a matter of economic principle. As I have explained in my first report, it is likely that the conspiracy reduced capacity either directly (through agreement), or indirectly (because companies scaled back their planned output, and hence planned for less capacity). In either case, high capacity utilization is consistent with a reduction in quantity relative to what would have occurred in the absence of a cartel, and the existence of the cartel has no particular implication concerning the change in capacity utilization once the conspiracy ended.

(311)   Dr. Cremieux's analysis of capacity utilization suffers from two other debilitating flaws. First, even taking capacity as fixed, a capacity utilization in the range of 85-95% does not imply that "LG Display did not systematically restrict output at these fabs" (¶79). Dr. Cremieux's Exhibit 11 shows that, throughout most the conspiracy period, LG Display's capacity utilization remained at least a few percentage points below its peak. Even if we construe the peak as a practical limit on capacity utilization (which it likely was not), LG Display could have increased its production at these plants significantly throughout the conspiracy period.[182] Given the low elasticity of demand for panels, even a small percentage increase in overall output would have reduced price substantially; see Section VII.E. Second, Dr. Cremieux's comparisons of capacity utilization rates over time fail to control for any time-varying factors that may have affected production. Without appropriate controls or corroborating econometric analysis, such comparisons are suspect.

(312)   Dr. Carlton also disputes the existence of effective supply restrictions by noting that average capacity growth was not lower during the conduct period than outside it (¶148; see also Hitt ¶18). This analysis is predicated on a conceptual error. My overcharge analysis does not imply that capacity would have ended up lower at the end of the conduct period but for the conspiracy. Indeed, because there is little or no difference between the historical and but-for price by the end of 2006, one would expect but-for capacity to coincide with historical capacity at that date. A necessary implication is that the conspiracy did not affect overall capacity growth during the conduct period. Rather, it redistributed that growth over time. That possibility is consistent Dr. Carlton's figure, which shows capacity periodically slowing and accelerating (though I course recognize that this cyclical pattern may have other causes).

---

[182]  Separately, Dr. Cremieux argues that, with high capacity utilization, LG Display had a limited ability to punish deviators from the collusive agreement. In particular, he says that a 5% increase in LG Display's output would have resulted in only a one percent increase in total industry output, which he says would have had only a "modest" effect on panel prices. Once again Dr. Cremieux's reasoning defies economic logic. A breakdown of cooperation resulting from some competitor's defection would result in an increase in production by all (or at least most of) the conspirators; I know of no theory in which a single cartel member, such as LG Display, would be responsible for punishing deviators all by itself. Given the highly inelastic nature of demand for LCD panels, a 5% increase in output for all conspirators would have had an enormous effect on price (and an even larger proportional effect on profit margins), and hence would have served as an extremely effective punishment. Indeed, given these considerations, even a 1% increase in output for all conspirators would have a much larger impact that Dr. Cremieux thinks.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

# VI. My overcharge estimates are reasonable in light of facts concerning the LCD panel industry

## VI.A. There is substantial supply-side substitution among large panel products, among small panel products, and between large and small panel products

(313)    In my first report, I explained that: "Any given fab can be configured to manufacture panels with a variety of characteristics…Manufacturers regularly shifted production capacity across different types of panels in response to customer demand, relative profitability, and other factors" (Section II). I also explained in my first report that there was some similarity in the movements of the large and small LCD panel price indexes due, in part, to the "manufacturers' ability to shift production capacity between large and small panels" (Section II).

(314)    Defendants' experts claim that there are costs associated with switching production among various types of panels, and therefore that substitution is unlikely. For example, Dr. Cremieux states that supply-side substitution between large and small panels is costly (¶¶35-36).  Dr. Rubinfeld explains that "with additional investment…capacity can be used to manufacture small or large panels" but also claims that this investment is costly and there are still "substantial production constraints" (¶¶45-47). However, Defendants' experts overstate the significance of the difficulties associates with supply-side substitution.

(315)    First, the existence of costs does not mean that there is no substitution. Defendants' experts provide no useful quantification of those costs nor do they demonstrate what the presence and magnitude of those costs imply for the degree of supply-side substitution. The evidence available in this case demonstrates that LCD manufacturers are willing to bear these costs. For example:

- Dr. Fontecchio explained in his first report "that the defendants manufactured panels of various sizes and for various applications in the same fab, using the same equipment." (pp. 28-29).

- Dr. Rubinfeld's backup materials include notes from a private interview with a Samsung employee, whom Dr. Rubinfeld described as reliable. These notes explain that once a fab is converted to be able to produce both large and small panels, "converting one size to another is potentially easy," that the switch can be made in "less than an hour," and "with standardized product design, unit process conditions and parts, switching the production line is not very difficult."[183]  Dr. Rubinfeld did not mention this statement in his discussion of supply-side substitution.

---

[183]    Interview notes contained in file "HIGHLY CONFIDENTIAL capacity questions_2011 12 02(MW).docx" provided in backup material to Rubinfeld report.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- Dr. Carlton implicitly acknowledges the importance of supply-side substitution by defining a single measure of capacity for all TFT-LCD panels, without distinguishing between the types of panels (see his Figure II-15). Indeed, I understand this to be the general convention in the industry, prevailing because the distinction between different types of capacity is not regarded as meaningful or significant.

- Dr. Cremieux's own report shows that a number of manufacturers, including many of the conspirators, produce both large and small panels (Exhibit 4).

(316) Second, defendants' experts confuse the extent of substitution that was *feasible* with the extent of substitution that occurred in practice. Dr. Hitt says that there was "minimal supply substitution" between televisions and other products at Sharp, because Sharp "devoted essentially all of the capacity in the fabs for LCDs for TVs, such as Kameyama 1 and 2, to the production of LCDs for TVs and information displays" (¶30). However, using existing capacity to manufacture LCD panels of particular sizes and for particular applications does not imply that the capacity could not have been used (perhaps with some conversion costs) to manufacture LCD panels of different sizes and for different applications. In other words, the evidence offered by Dr. Hitt shows at most that Sharp did not substitute across a broader range of panels, not that it could not have substituted in that manner. He performs no analysis to show that the costs of conversion and substitution would have been so high as to insulate TV panels from market forces affecting the prices of related products such as notebook and monitor panels. It is potential substitution, rather than actual substitution, that is the key for tying prices together. My analysis of price patterns above demonstrates that, in fact, the prices of LCD panels for different applications were closely connected.

## VI.B. The industry is susceptible to a meaningful degree of cartelization

(317) The Defendants' experts contradict each other and even themselves concerning the extent to which they believe the conditions of the TFT-LCD industry and the mechanics of communication can shed light on the level of overcharges. For example, with reference to the conclusions that can be reached based on industry conditions, Dr. Carlton writes that "…the actual success or failure of the alleged cartel is an open question that needs to be resolved empirically…" (¶96), and with reference to the conclusions that can be reached based on facts about the conspiracy, he writes that "an empirical study of but-for prices is required to determine the magnitude of the overcharge" (¶78). And yet he subsequently devotes more than 30 pages to an analysis of LCD industry conditions, asserting that they are "known to hinder attempts by cartels to elevate prices," and then cites that analysis as a central pillar in proving, without econometric evidence, that "the alleged TFT-LCD cartel was not successful in raising TFT-LCD panel prices significantly above the levels that would have held absent the alleged cartel" (¶198). Dr. Carlton is plainly trying to have it both ways.

(318) In my first report, I included relatively little discussion of industry conditions because I agree with the first quote from Dr. Carlton, above (¶96). As detailed below, an objective evaluation of those conditions,

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 149

conducted in light of the activities of the cartel and against the backdrop of the pertinent scholarly literature, does not offer a reliable basis for concluding that any overcharge estimate appearing in the record to date is more or less reasonable than any other. Given my remarks in Section V, neither do most types of evidence concerning the cartel's operation.

(319)    It is important to bear in mind that, in the context of evaluating damage estimates in this case, the purpose of analyzing industry conditions or cartel practices is to determine whether an overcharge estimate in the range of, say, 15 to 25 percent (which covers my estimates) is more or less reasonable than one in the range of, say, zero to 2 percent (which covers Dr. Carlton's estimates). In other words, the objective is to make a quantitative determination. And yet, the discussions of these issues appearing in the Defendants' experts' reports are entirely qualitative and merely directional. Even taken at face value, all they tell us is whether collusion might be "harder" in one industry than another, or "more effective" with one form of communication than another. They do not tell us, however, how much harder or how much more effective, nor do they shed any light on the amount by which a given condition that "hinders collusion" reduces likely overcharges. Indeed, in most cases, the purported relationships between factual conditions and the likely effectiveness of collusion are predicated on theoretical and conceptual arguments for which there is no empirical confirmation in the pertinent literature. When empirical evidence is available, it is often mixed, and in no case does it provide a basis for making a quantitative statement about overcharges, particularly in the context of a cartel that remained stable and active for a period of many years. That is why the level of overcharges must be evaluated primarily on the basis of econometric analysis.

(320)    In fact, the economic literature, including the papers specifically cited by the defendants' experts, makes it clear that a review of industry characteristics does not provide a reliable basis for inferring that certain overcharges are more or less reasonable than others. For example:

■    "We find that there is no simple deterministic relationship between cartel structure, market structure and cartel behavior. Cartels with strikingly different organizational characteristics can be failures or successes. This study illustrates that cartels can and do operate in a variety of industry and market conditions."[184]

■    "Thus, there are remarkably few rigorously established generalizations that we can make about cartel behavior or success. We know that cartels do occur, and we know that they do break down. There seem to be certain industries where cartels or cartel attempts appear to recur. Beyond this, our empirical generalizations are qualified and cautious…But there is still enormous variation in industry conduct and in cartel success, even controlling for industry structure…Thus, there is substantial variation in the duration of cartels both within a single industry and across industries."[185]

---

[184]    Valerie Suslow (2005), "Cartel Contract Duration: Empirical Evidence from Inter-war International Cartels," Industrial and Corporate Change, 14(5), page 735.

[185]    Margaret C. Levenstein and Valerie Y. Suslow (2004), "Studies of Cartel Stability: A Comparison of Methodological Approaches," Chapter 1 in Peter Z. Grossman, ed., How Cartels Endure and How They Fail  Levenstein and Suslow (2004), pages 10, 19, 31.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- "Why one cartel fails and another endures is a question that as empirical researchers often note can never be definitively answered. It is by no means clear in the literature exactly which industry characteristics are more or less likely to lead to cartel success, or which will guarantee failure. There are no categorical sufficient or even necessary conditions for cartel success…But that these questions arise, shows anew the difficulty of determining the causes of cartel endurance or of any other measure of cartel success."[186]

- "What impact do cartels have? They appear to increase prices and profits…One thing that all such research should be prepared to explain is the multiple possible outcomes of any attempt at collusion.[187]

- "In spite of the difficulties faced by firms, however, we do observe successful collusion."[188]

- "While economic theory provides many insights on the nature of tacitly collusive conducts, it says little on how a particular industry will or will not coordinate on a collusive equilibrium, or on which one…Theory points to the possible equilibria of an industry, including collusive ones, but so far it does not predict which of these equilibria will emerge."[189]

(321)  Despite the preceding, Dr. Snyder asserts that the industry conditions are more consistent with Carlton's overcharge estimate than mine (¶57)[190], even though Dr. Carlton himself at several junctures disavows the possibility of reaching a conclusion concerning magnitudes without empirical analysis (¶78, 96). Critically, Dr. Snyder offers no scientific basis for his quantitative opinion, nor do any of the scholarly papers he cites provide anything resembling an empirical foundation.  Dr. Snyder's judgment is simply an unsubstantiated assertion.

(322)  Like Dr. Snyder, Dr. Cremieux criticizes my analysis on the grounds that I did not include a detailed discussion of industry features (¶56). Dr. Cremieux includes a "condensed overview" of these issues, but largely defers to Dr. Carlton whom, he says, treated these issues "in depth."  Dr. Cremieux then claims that "an analysis of the specific industry characteristics of small LCD panels suggests that the alleged collusive actions would likely have been ineffective" (¶70). It is unclear why Dr. Cremieux believes this to be true since, contrary to Dr. Carlton's caveat and to the economic literature cited in their reports, Dr. Cremieux's conclusion was reached without the "required" "empirical study of but-for prices."

(323)  Dr. Rubinfeld's report contains a section titled "Conditions Were Not *Fully* Supportive of an Effective Conspiracy" (emphasis added) (Section IV.B, page 45).  But I am not claiming that conditions were *fully*

---

[186]  Peter Z. Grossman, ed., (2004), How Cartels Endure and How They Fail, Edward Elgar Publishing, pages 117, 127.

[187]  Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success?"  Journal of Economic Literature, 44(1), page 86.

[188]  Alexis Jacquemin and Margaret E. Slade (1989), "Cartels, Collusion, and Horizontal Merger," in Richard Schmalensee and Robert Willig, eds., Handbook of Industrial Organization., page 417.

[189]  Marc Ivaldi, Bruno Jullien, Patrick Rey, Paul Seabright, and Jean Tirole (2003), "The Economics of Tacit Collusion," IDEI, page 6.

[190]  Dr. Snyder submitted several expert reports in this matter. When I reference Dr. Snyder's expert report, I reference his AT&T report. Appendix C.4 identifies the corresponding  paragraph numbers between his reports.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

supportive of collusion – that would have enabled the Defendants to achieve the monopoly outcome. Instead, my overcharge estimates are consistent with conditions being only very imperfectly supportive of an effective conspiracy. It is plain from the discussion that follows this section heading in Dr. Rubinfeld's report that his word choice is not simply incidental; he actually focuses on the wrong question. For example, he writes that changes in demand or costs "will cause changes in the *optimal* collusive price and output, requiring the participants to readjust consensus prices repeatedly" (¶161, emphasis added). Such adjustments may be needed for the cartel to perform "optimally," but they are not required for a imperfect cartel to exert an influence on price consistent with the size of the overcharges I measure in this case. The distinction between an optimal cartel and an effective cartel is explicitly recognized in the literature cited by the defendants' experts: "These schemes may not lead firms to the profit-possibility frontier but may enable prices to remain above noncooperative levels."[191]

(324)    Several of the defendants' experts discuss specific industry characteristics and make claims regarding their potential implications. Dr. Carlton discusses a total of eleven TFT-LCD industry characteristics which, he claims, hinder collusion (Sections V.B through V.J). Dr. Snyder provides a more superficial discussion of a shorter but largely overlapping list of characteristics (Section V). Dr. Rubinfeld discusses various industry characteristics that he claims cause the "incentive to cheat" to be "particularly acute" (Section IV). Dr. Harris (¶72-73), Dr. Hitt (¶24, 32), and Dr. Rapp (¶77-80) also include relatively terse discussions of this issue. The conclusions they draw from their analyses of industry structure are unreliable for the following nine reasons.

(325)    **First**, it is not possible to determine the importance or, in many cases, even the direction of an industry condition's effect on collusion through theoretical arguments, either formal or informal. The theory of cartels is complex, with individual factors having multifaceted effects on collusion. As explained in the economic literature relied upon by the defendants' experts, "[t]heory cannot tell us, a priori, which effect will dominate: whether or when cartels succeed is thus an empirical question."[192] As another article explained, "[o]ne problem with utilizing this literature is that it does not always reach unambiguous conclusions about the importance of some of these factors."[193] It is recognized that industry characteristics may, as a matter of theory, have complicated effects that in part hinder and in part help collusion. Dr. Carlton appears to agree, saying in his report that "[t]he analysis to this point has established that neither the documentary record nor economic theory can determine whether the alleged cartel activities had a significant effect on TFT-LCD prices." (¶168)

(326)    To take an example, the Defendants' experts argue that the LCDs industry encompasses a wide variety of differentiated products, and that "[e]conomic research has demonstrated that price-fixing agreements are less successful and stable" with product heterogeneity (Carlton ¶127). Though greater product heterogeneity may make collusion more difficult in some ways, it enhances the ability to collude in other

---

[191]  Jacquemin and Slade (1989), page 420.

[192]  Levenstein and Suslow (2006), page 43.

[193]  Grossman (2004), page 119.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO                                    Page 152
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

ways. As explained in the literature cited by the defendants' experts: "Similarly, product homogeneity seems likely to increase cartel success because measurement and monitoring standards and costs will be lower. At the same time, some differentiation means that the opportunity for cheating may be reduced since products within the cartel are not perfect substitutes for one another. Moreover, demand elasticities will be lower where products are differentiated meaning that small instances of cheating will have limited impact and so are unlikely to be destabilizing."[194] "Overall, the impact of horizontal differentiation appears quite ambiguous."[195]

(327)   In addition, the economic literature recognizes that the factors that may affect the potential collusion are often interconnected, making their individual effects difficult to unravel. An article cited by the defendants' experts concluded: "Part of the difficulty in studying cartel success is that it depends on a wide variety of variables, and these variables are often not independent of one another…It is easy to see that none of these variables functions independently."[196]

(328)   As a further example of these complications, consider the theoretical effect of a growing market on collusion. An article in the economic literature relied upon by Dr. Carlton concludes that "collusion is easier to sustain in growing markets, where today's profits are small compared with tomorrow's ones."[197] On this point, the Defendants' experts have done nothing more than to mention some potential countervailing effects or, in the case of Dr. Rapp, make assertions that are actually contrary to theory:

- It is often the case that rapid growth in an industry is accompanied by technological change. According to Dr. Carlton, the "economic theory of cartels supports the idea that industries experiencing rapid technological change will find it more difficult to maintain price-fixing agreement" (¶121).

- Growing markets are likely to experience corresponding increases in capacity, and Dr. Carlton argues that "[c]apacity expansion among existing firms is also disruptive to a cartel." (¶145).[198]

- Dr. Rapp asserts that market growth "would likely have undermined any attempt to inflate the prices" (¶78), that "'rapid industry growth and unexpected demand fluctuations in demand' tend to 'undermine well-working cartels'" (¶77), and that "the incentives for each supplier to undercut its competitors' prices…would have increased" as "demand…increased dramatically" (¶79). On the contrary, because demand growth increases the importance of the future (where consequences are experienced) relative to the present (where defections occur), it is generally thought to facilitate collusion.

---

[194]   Grossman (2004), page 120.

[195]   Ivaldi et al. (2003), page 47.

[196]   Levenstein and Suslow (2004), page 43.

[197]   Ivaldi et al. (2003), page 27.

[198]   As explained by Dr. Carlton in his report, "'when a market opportunity arises or simply when demand is growing, firms compete for being the first to build capacity.'" (¶145, quoting Ivaldi et al. (2003) at 60-61.)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(329)    More generally, factors that make firms more competitive with each other tend to be associated with greater temptation to cheat, but also with more severe outcomes if collusion falls apart, which is why theory tends to be ambiguous.

(330)    **Second**, despite agreeing with me explicitly on the first point, Dr. Carlton ultimately relies on theory and speculation, without providing any empirical foundation, to establish the critical proposition that most of his eleven factors hinder collusion.

- To conclude that "rapid technological change" will hinder collusion, Dr. Carlton references only the "economic theory of cartels" and a theoretical discussion in two articles (¶121).

- To conclude that "learning by doing" has "exactly the opposite of the incentives associated with a sustained commitment to inflated cartel prices and reduced supply," Dr. Carlton only references a discussion in a theoretical article regarding how firms that face a learning curve may view their production costs (¶126). Notably, not only does this discussion not include any empirical study of the effect on collusion, it does not even mention collusion at all.

- Dr. Carlton offers no adequate empirical support for his "surprise" when he asserts that "[g]iven the large number of different mobile panels, and the extent to which new panels were introduced each year, it would be surprising if the alleged cartel was successful in raising price significantly" (¶141).

- Dr. Carlton references a single theoretical paper on tacit (rather than explicit) collusion for his conclusion that the "massive increase in capacity…would increase the difficulty for a cartel to succeed in raising price significantly" (¶147).

- When concluding that the "difficulty in maintaining a successful cartel is increased when shares of the cartel members change over time," Dr. Carlton references only theoretical discussions in two articles (¶150-152).

- When claiming that vertical integration makes collusion more difficult, he references only similar assertions made in his textbook, which cites no empirical support (¶158).

- To support his claim that buyer heterogeneity will cause "problems" for a cartel, Dr. Carlton references a single theoretical paper (¶161).

- Finally, Dr. Carlton references only a single theoretical paper to support his claim that "[p]owerful buyers undermine a cartel agreement" (¶165).

(331)    Similarly, Dr. Cremieux discusses various factors in Section VI of his report that he claims "make it relatively more difficult…for a cartel to operate effectively." None of the economic articles he cites in support of his position contain any empirical evidence that the factors in fact have the claimed effect.

(332)    **Third**, where empirical evidence exists concerning the effects on collusion of the factors the Defendants' experts mention, it is often mixed.  The Defendants' experts overlook findings that are contrary to their

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

expressed opinions, even when those findings appear in the same articles they cite to support those positions. For example:

■ With respect to the number of firms participating in a conspiracy, Suslow (2005) finds that "the relationship between cartel duration and number of participants is weak…previous empirical analyses of the relationship between the existence of collusion, not duration, and number of firms (or market concentration) have produced mixed results. For those studies able to measure cartel duration, the evidence is also mixed."[199] Levenstein and Suslow (2010) add: "As has been the case in every cross-sectional study of cartel duration in every era, we find no effect of the number of cartel members on the probability of cartel breakup."[200] In contrast, Dr. Carlton claims that "[i]mplementing and maintaining a cartel is more difficult when there are a large number of firms participating in the cartel" (¶155).

■ With respect to industry concentration, Levenstein and Suslow (2006) conclude that "[t]here is no simple relationship between industry concentration and the likelihood of collusion."  Indeed, they go on to offer various explanations for "the lack of a clear empirical relationship between industry concentration and cartel prevalence."[201] In contrast, Dr. Cremieux asserts that "[g]iven the large number of firms and lack of concentration, effective collusion for small LCD panels would have been unlikely" (¶75).

■ With respect to the role of large buyers, Levenstein and Suslow (2006) note that "…successful collusion is possible in industries with large customers" (p. 61), quoting Kolasky's (2002) conclusion that "the ability of large sophisticated buyers to defeat cartel activity may be overrated." They also observe that "… the impact of large customers on cartel stability may be more complex than Stigler expected."[202] In contrast, Dr. Carlton claims that "[a]n alleged cartel is less likely to succeed in reaching and maintaining elevated prices when selling to large, powerful buyers" (¶165) and Dr. Cremieux asserts that "[a] cartel is more likely to be successful when buyers are small and diffuse" (¶67).

■ With respect to macroeconomic effects, Levenstein and Suslow (2010) find that "[n]either common knowledge measures of business cycles nor measures of unexpected shocks to demand appear to have any significant effect on cartel stability…This contrasts with Suslow (2005) and Dick (1996) where macroeconomic shocks were very important."[203] Dr. Rubinfeld fails to acknowledge this ambiguity, claiming instead that "substantial changes in market conditions can limit the ability of the conspirators to reach and maintain consensus" (¶158); similarly Dr. Harris claims that "[c]hanges in

---

[199] Suslow (2005), page 724.

[200] Margaret C. Levenstein and Valerie Y. Suslow (2010), "Breaking Up Is Hard to Do: Determinants of Cartel Duration," Journal of Law and Economics (forthcoming), page 28.

[201] Levenstein and Suslow (2006), page 58. Note that the passage quoted by Dr. Carlton in support of his claim with respect to industry concentration is from an earlier paper by these same authors.

[202] Levenstein and Suslow (2006), pages 61-62.

[203] Levenstein and Suslow (2010), pages 30-31.

market conditions also can greatly complicate effective monitoring and the enforcement of cartel agreements."

(333)   **Fourth**, where empirical evidence exists concerning the effects on collusion of the factors the defendants' experts mention, it is only directional and does not provide a foundation for making statements about the likelihood of particular overcharges.  Thus, the discussions by the defendants' experts ultimately reduce to a great deal of speculation about directional and unquantified effects.  They never ask "how much" or explain how to perform a calculation based on what is known to draw any useful quantitative conclusion about the current case.  The same is of course true of Dr. Snyder's more superficial discussion; nothing he writes or cites actually provides anything close to a scientific basis for his bald assertion that, in light of the industry conditions, Dr. Carlton's overcharge estimate is more reasonable than mine.

(334)   **Fifth**, where empirical evidence exists concerning the effects on collusion of the factors Dr. Carlton and others mention, it is not applicable to the current matter.  Here we know that a cartel existed, and that it was stable, durable, and active for a span of many years.  As emphasized in Levenstein and Suslow's (2006) survey article, the stable cartels are generally those that found ways to deal with the challenges that price fixing poses.[204]  Consequently, one cannot take other industries as providing reasonable benchmarks for overcharges in the LCD panel industry unless the industries in question are also known to have cartels that were stable, durable, and active for similar periods of time.  As far as I can determine, the literature contains no study that offers such a comparison.

(335)   Notably, the evidence in this case provides a striking example of the LCD cartel's ability to adjust in response to changing conditions and new challenges, which Levenstein and Suslow cite as the hallmark of successful price-fixing conspiracies. As explained by Dr. Carlton: "The entry of new firms in an industry is disruptive to a cartel. The disruptive effect of entry that occurred in the TFT-LCD industry during the damages period is acknowledged by Plaintiffs... some Taiwanese suppliers (e.g., AUO) entered in the 1999-2010 period and grew their shares over time" (¶142).   But the threat posed by the Taiwanese entrants, and the subsequent coordination between the Taiwanese suppliers and the others conspirators, is referenced in notes from conspiracy meetings.[205] Thus, the LCD cartel's reaction to entry exemplifies the type of organizational response to a new challenge referenced by Levenstein and Suslow (2006) .  Accordingly, it would be improper to draw inferences about the likely level of overcharges in the LCD cartel by looking at other industries with similar entry patterns, but where there is no evidence that a cartel adjusted to encompass the entrants.

(336)   **Sixth**, Dr. Carlton acknowledges that other conspiracies were effective, even though they had many of the features he lists.  For example, regarding the vitamins conspiracy, he explains that "[a]lthough the exact amounts by which the cartel raised prices are subject to dispute, the increases during the cartel period

---

[204]  "But successful cartels have operated in a wide variety of industries by developing organizations that can overcome these challenges." Levenstein and Suslow (2006), page 44.

[205]  See, e.g., CPT0004004.02E (English translation), February 9, 2001. "prices continue to fall towards the bottom… To ensure an orderly TFT-LCD market, Director Lee hopes that the Taiwanese TFT-LCD makers can coordinate with one another to take concerted actions. SEC is willing to make necessary accommodations to help maintain an orderly market."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

were sizable. For example, the average price for vitamin A rose by 40 percent and that of vitamin E increased over 60 percent."[206] At a minimum, the vitamins conspiracy was characterized by several factors that make effective collusion unlikely according to the Defendants' experts, including (1) a large number of conspiracy participants,[207] (2) vertically integrated suppliers,[208] (3) suppliers with different product mixes,[209] (4) powerful buyers,[210] (5) product numerosity and heterogeneity,[211] (6) shifting market shares,[212] and (7) entry during the conspiracy period.[213]

(337)  **Seventh**, a large portion of the defendants' experts' discussions do not pertain to the cartel mechanism that appears to be central to the LCD conspiracy.  As I explained in Section III.C of my initial report and in Section V above, it appears that, through the cartel, the conspirators coordinated their expectations about future prices and quantities, and then reacted if their expectations concerning their own results were not met.  With that mechanism, the detection of cheating occurs indirectly (through a conspirators own results), rather than through direct monitoring of each others' prices and quantities.  And yet, most of the Defense experts' arguments concern the potential difficulties associated with direct monitoring.  The LCD conspiracy does appear to have involved some direct (albeit imperfect) monitoring of prices, quantities, and capacities, and the Defendants did confront each other at the cartel meetings based on market intelligence, but it appears that those activities merely supplemented the basic mechanism.  Therefore, even if one credited the Defense experts' claims about the difficulty of direct monitoring, there would be no basis for concluding that the cartel was likely ineffective.

(338)  For example, Dr. Cremieux opines that an increase in the number of participants necessarily increases the complexity of a conspiracy, because it multiples the number of pertinent relationships (¶63). It appears that in his view, each participant must monitor and punish every other participant.  But that concern is specific to certain types of cartel mechanisms.  The one I have emphasized does not require pair-wise

---

[206]  Carlton ATS report at ¶152, and *Carlton and Perloff* (2005) at 142-143.

[207]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶1. Note that EC decision lists 12 participants in the vitamins conspiracy, while Dr. Carlton notes that "[i]n this matter, at least a dozen separate entities, not including co-conspirators, are alleged to have participated in the agreements" (¶155).

[208]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶20-21. "Besides selling individual feed grade vitamins in bulk, much of this to 'pre-mixers' which combine vitamins with other nutrients to form a package in powder or liquid form…the two major producers Roche and BASF are both forward-integrated and have their own operations producing pre-mixes, as does Rhone-Poulenc. A substantial proportion of their 'feed grade' vitamin production is not sold on the 'free' market but is employed internally in the manufacture of their 'pre-mixes'…Vitamin producers which do not themselves produce particular vitamins may buy in their requirements from other vitamin producers."

[209]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶2.

[210]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶407. "One of the largest customers worldwide was Coca Cola…For this major account, which received special treatment."

[211]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶7-11. "Bulk vitamins are sold in different forms according to the product and the application: crystalline, in oil, with a protective coating or in a powder matrix…The products with which this decision is concerned …belong to the following groups of vitamins and closely related products: A, E, B1, B2, B5, B6, C, D3, biotin (H), folic acid (M), beta-carotene and carotinoids…Roche and BASF each produce a wide range of vitamins for both animal nutrition and for human usage, pharmaceutical and food."

[212]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶528. "Initially BASF was to be allowed a 4% market share…which would rise in a series of 'steps' to 20%."

[213]  See, e.g., EC Commission Decision regarding the Vitamins conspiracy, November 2001, ¶27. "Chinese producers have slowly increased their aggregate share from less than 1% in 1989 to 7% by the end of the 1990s."

monitoring and punishment.  It is also possible to reduce complexity by centralizing monitoring, which appears to have been one function of the Crystal Meetings.

(339)    **Eighth**, the Defendants' experts ignore numerous factors that are discussed in the economic literature, including in the very same papers that they cite, that may *increase* the ability of firms to collude successfully. If an assessment of industry characteristics is an important part of an overcharge analysis, as Defendants' experts claim, then it is essential to consider *all* relevant factors, and not just those that support one particular conclusion. Examples of such factors include the following:

- **Inelastic demand**. As I explained in my initial report, when the demand for a good is inelastic (i.e., relatively insensitive to its price), even modest production restrictions substantially elevate prices. Defendants' experts agree that the demand for LCD panels is inelastic.[214] According to the article that Dr. Carlton described as a "comprehensive survey of empirical studies of cartels" (¶156), demand elasticity is one of the "basic factors influencing cartel success."[215] As explained by Dr. Carlton in his textbook, "[t]he more inelastic the demand curve facing a cartel, the higher the price the cartel can set and the greater its profits."[216] Another article relied upon by the Defendants' experts explained that "collusion can be more profitable when demand elasticity is low…The profitability of collusion can in turn influence the firms' willingness to design and implement practices that facilitate the implementation of a collusive action…The potential harm to consumers is thus the larger, the less elastic is the demand."[217] Dr. Hitt agreed at his deposition that he could not know if the cartel could inflate prices "without knowing what the price elasticity is."[218]

- **Multi-market contact.** The LCD conspirators encountered each other in the markets for numerous products (in addition to LCD panels). The economic literature, including some of my own academic research, shows multi-market contact can facilitate collusion.[219] An article relied upon by the defendants' experts confirms this principle: "It is well recognised that firms can sustain collusion more easily when they are present on several markets… multi-market contact may allow the firms to sustain collusion in markets where the industry characteristics alone would not allow such collusion… Overall, multi-market contacts facilitates collusion"[220] Another articles explains that "multimarket contact is one factor that has shown much more robust results generally" by

---

[214]  For example: Dr. Carlton explained that "my understanding is the demand for these products is relatively inelastic" (Carlton deposition transcript, pages 568-569); Cremieux report, ¶100.

[215]  Levenstein and Suslow (2004), page 11. "As demand is more elastic, the potential for increasing profits decreases and so does the incentive to create a cartel (Pindyck, 1979). Where tested, this fairly intuitive result is borne out in the cross-sectional studies discussed above." (page 37)

[216]  Carlton and Perloff (2005), page 131.

[217]  Ivaldi et al. (2003), pages 50-52.

[218]  Hitt deposition, 72:9-21: "Q. Is it possible in this industry to make more money by doing what I'm suggesting Sharp did, which is participate in a cartel to inflate prices. It is possible to do that in this industry?    MR. RUSSO: Objection. Calls for speculation.    A. And think that -- it is speculative. Without knowing what the price elasticity is, what the existing commitments in the plant are, and what the opportunity costs of shrinking production might be, I don't know either way."

[219]  See, e.g., Bernheim, D. and M. Whinston (1990), "Multimarket Contact and Collusive Behavior," *Rand Journal of Economics*, 21:1-26,

[220]  Ivaldi et al. (2003), pages 48-50.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

"increas[ing] the opportunity to punish cheating" and "lower[ing] the cost of monitoring other firms' behavior."[221]

- **Barriers to entry.** There were significant barriers to entering into the LCD panel industry. As explained by Dr. Rubinfeld, "billions of dollars in ongoing investments will be required in order to continue to compete in the TFT-LCD market," there are several aspects to "barriers to entry, including returns to scale, learning economics, and intellectual property portfolios," and "such capabilities and resources are normally costly and difficult to obtain and maintain."[222] As explained in a paper relied upon by the Defendants' experts, "[h]igh barriers to entry may facilitate agreements by permitting collusive groups relatively wide freedom to appease the often-conflicting demands of participants…Where barriers to entry are substantial, a relatively high incidence of collusive activity is therefore expected."[223]

- **Frequent interaction among suppliers.** The suppliers of LCD panels are involved in frequent negotiations and transactions involving many different purchasers, many individual products, and frequent opportunities for prices to change. This frequency of interaction in the marketplace is discussed in the literature as a factor that increases the ability of firms to collude. As explained in an article relied upon by the defendants' experts, "firms will find it easier to sustain collusion when they interact more frequently."[224]

(340)  **Finally**, even if defendants' experts were correct that the characteristics of the LCD industry shed light on the difficulty of colluding, the admitted extent and duration of the conspiratorial activity would then prove that the conspirators likely overcame the challenges these characteristics presented, and were *successful* in raising prices. As explained in the economic literature relied upon by the defendants' experts, "Cartels do face challenges…Overcoming these challenges is easier in some industries than others…But successful cartels have operated in a wide variety of industries by developing organizations that can overcome these challenges."[225]

(341)  It is important to note that, as discussed above, the economic literature typically does not study the effect of industry characteristics on the extent to which a conspiracy was able to increase prices. Instead, the literature cited by the defendants' experts discusses the effect of industry characteristics on (a) the likelihood that a conspiracy will form in the first place and (b) on the length of time that the conspiracy will continue.[226] There is no dispute that a conspiracy did in fact form in this industry, and there is no

---

[221] Grossman (2004), page 120.

[222] Rubinfeld report, ¶¶401-402.

[223] Peter Asch and Joseph Seneca (1975), "Characteristics of Collusive Firms," Journal of Industrial Economics, 23(3) Asch and Seneca (1975), page 224.

[224] Ivaldi et al. (2003), pages 19.

[225] Levenstein and Suslow (2006), page 44.

[226] See, e.g.: Ivaldi et al. (2003), page 6: "The multiplicity of retaliation and collusive mechanisms creates a potential for collusion in many industries. The main issue is how large is this potential, that is, how credible are the collusive mechanisms and to what extent is collusion likely to emerge." Grossman (2004), page 111. "Generally, this chapter will use the effective duration of cartel contracts as the measure of success." Levenstein and Suslow (2006), page 50: "Most cartel scholars use duration to measure cartel success, well aware that duration is a highly imperfect proxy for performance."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

reasonable dispute that the conspiracy remained active for numerous years.[227,228] If the characteristics of the LCDs industry make conspiring relatively difficult, and if the conspiracy was successful by the standards of the economic literature, then it follows that the conspiracy likely developed the means by which to overcome those difficulties. Thus there is no valid reason to believe, based on industry characteristics, that the conspiracy would have been unable to increase prices to some significant extent above non-collusive levels.

---

[227] For purposes of my analysis, I was asked, in part, to assume that this conspiracy existed from 1998 through 2006, a period of more than eight years. However, even considering only the plea period of 2001 through 2006 during which defendants have admitted the conspiracy existed, this conspiracy still lasted as long as or longer than the average conspiracy in the literature cited by defendants' experts. See, e.g., Levenstein and Suslow (2006), page 43. "While the average duration of cartels across a range of studies is about five years, many cartels break up very quickly (i.e., in less than a year)"

[228] Dr. Carlton has quoted Levenstein and Suslow (2006) saying that "There are cases where cartels have continued to exist on paper for many years with little sustained effect on price." However, it is not reasonable to claim that the LCDs conspiracy existed only "on paper," given the enormous number of active meetings, discussions, information exchanges, and agreements that are documented and admitted to in the record of this case.

# VII. My overcharge estimates are reasonable in light of its implications for the Defendants' profits and investments

## VII.A. My overcharge estimates are reasonable in light of the Defendants' *ex ante* investment incentives

(342)    In my first report, I considered whether the lower price levels implied by my analyses are consistent with the levels of investment and production required to satisfy demand at those prices (Section IV.D).  As I emphasized, the important consideration in evaluating the Defendants' investment incentives but for the conspiracy is not whether their investments *actually* would have turned out to be profitable at the lower prices, but rather whether the conspirators would have *expected* them to be profitable when evaluated *ex ante* over a suitably long time frame (¶140).  The Defense experts do not dispute the economic principle that the *ex ante* perspective is the relevant one.[229]  And yet, significantly, the vast bulk of their comments concerning but-for investment incentives concern *ex post* realizations rather than *ex ante* expectations.[230]  In this subsection, I address their limited comments on the critical issue of *ex ante* incentives; Sections VII.B and VII.C address their inherently less pertinent observations concerning *ex post* realizations.

### VII.A.1. Absent the conspiracy, the Defendants would have been no less optimistic about LCD industry fundamentals

(343)    The Defense experts claim that, had LCD prices been significantly lower during the conspiracy period (as my overcharge analysis indicates), the Defendants would have had less optimistic expectations about the future.  Dr. Carlton calls this an "obvious fact" which he says Professor Stowell and I have ignored (¶192).  Far from being an "obvious fact," the claim is at best misleading.  Dr. Carlton ignores another equally obvious fact: *the Defendants were engaged in price fixing, and knew it*.  They no doubt recognized that prices contained a component reflecting non-collusive market fundamentals, as well as a component reflecting overcharges.  It is completely illogical for Dr. Carlton to suggest that the Defendants' expectations concerning the non-collusive fundamental component of prices would have been affected positively by past overcharges.  Surely the Defendants would have realized that the overcharge component was not reflective of favorable non-collusive supply and demand conditions that might be expected to persist.  Thus, absent the conspiracy, there is no reason to think the Defendants would have been any less optimistic about the trajectory of the industry, in terms of non-collusive fundamentals, despite observing significantly lower prices.

---

[229]  Deposition of George Foster (Rough) at 37:10-15, Apr. 16, 2012.

[230]  In contrast, the Stowell Report (¶¶14–23) and the Stowell Rebuttal (Section II) discusses the investment incentives for the Defendants due to the future growth expectations in the LCD industry.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(344)   If Dr. Carlton instead means that the absence of collusive overcharges would have made the Defendants less optimistic about the prospects for future collusion (rather than about non-collusive fundamentals), and hence about the size of future overcharges, then I agree. However, for the reasons discussed next, the expectation of a collusive outcome requires mutual restraint and *lower* investment, not higher investment. Hence, without those collusive expectations, investment would have been higher, not lower.

### VII.A.2. The Defense experts' analyses of the Defendants' *ex ante* investment incentives involve a fatal logical fallacy

(345)   A number of the reports submitted by the Defense experts include versions of the following simplistic argument. The Defendants invested billions of dollars during the conduct period with the expectation of earning a return sufficient to justify those investments. Had my estimated but-for prices prevailed, the Defendants would have expected lower future prices, and it is therefore unreasonable to suppose that they would have invested as much as they actually did at historical prices. Accordingly, my but-for price estimates, which presuppose no reduction in capacity investment, must be unreasonable. For example, according to Dr. Rubinfeld, "[i]t is not plausible to expect that investment flows will be insensitive to the returns that result from those investments" (¶418(f)).[231] Likewise, Dr. Carlton says it "defies economic logic to assert that the participants would have had similar expectations and would have started the same investments in 2004 if, following Dr. Bernheim's overcharges, but-for prices had been 38 percent lower" (¶192). Here as elsewhere, Dr. Carlton's "economic logic" is distinctly illogical.

(346)   There is plainly something very wrong with the simplistic argument recounted in the previous paragraph, because it implies that positive overcharges are *always* unreasonable. A conspiracy cannot raise price unless it reduces quantity. Therefore, in any successful price-fixing conspiracy, quantity must be lower with the higher collusive price than it would have been with the lower non-collusive price. But the simplistic argument asserts that this possibility is on its face unreasonable: because capacity investment and production are less attractive at lower prices, both would necessarily have been lower, not higher, without the conspiracy's overcharges.

(347)   In fact, the Defense experts have perpetrated an elementary logical fallacy of the type economics professors routinely admonish undergraduates to avoid. Their argument is easily debunked using the types of simple supply-and-demand diagrams taught in introductory economics courses; see the Figure 90 below. The figure shows an upward sloping supply curve and a downward sloping demand curve intersecting at point A, the market equilibrium without collusion. Without a cartel, firms would initiate investments in capacity sufficient to produce, in total, $Q_1$ units of the product, to be sold in the future at price $P_1$. With an effective cartel, the firms expect to exercise mutual restraint, and initiate investments in capacity sufficient to produce, in total, only $Q_2$ units of the product, with the expectation that the future price will be $P_2$ (so that the market ends up at point B). Given the expectation that the price $P_2$ will

---

[231]   Dr. Rubinfeld also writes that he would expect firms earning negative returns "to revise downward their expectations as to the profitability of investments in the industry, and to reduce capital investments accordingly…" (Rubinfeld Report, ¶402.)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

prevail, each firm would like to invest in enough capacity to produce more than its expected share of $Q_2$, and if they all acted on those unilateral incentives, total capacity would be sufficient to produce $Q_3$, which is more than purchasers are willing to buy at the collusive price. That is why the conspiracy requires mutual restraint. Henceforth, I will refer to $Q_1$ as the non-collusive capacity, and to $Q_2$ as the collusive capacity (meaning in each case the capacity required to produce those quantities).

(348) In effect, the Defense experts point out that the investment each company makes in capacity to produce its expected share of the collusive capacity, $Q_2$, would look less attractive – indeed, potentially *much* less attractive – if the firms expected the non-collusive price, $P_1$, to prevail in the future, rather than the higher collusive price, $P_2$. That statement is obviously correct. But it is equally obvious that the collusive capacity, $Q_2$, would remain attractive even if the firms had non-collusive expectations concerning price (that is, if they expected $P_1$ to prevail in the future). The reason is that the collusive capacity, $Q_2$, is *less* than the non-collusive capacity, $Q_1$, which the companies are willing to build when they expect the non-collusive price, $P_1$, to prevail in the future. Accordingly, without the conspiracy, the expected price of the good would indeed be lower (making incremental investment less attractive starting from any given level), but investment in capacity would nevertheless be higher.

**Figure 91: Example supply and demand diagram**



(349) In making the simplistic argument, the Defense experts have ignored the critical fact that, when investing with the collusive expectation of selling *only* $Q_2$ units at the price $P_2$, the firms are exercising mutual restraint. These experts err because they confuse $Q_2$ with $Q_3$; they write as if $Q_3$ were the collusive capacity, which it is not. Clearly, if the conspirators expected the non-collusive price, $P_1$, to prevail in the

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 171 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

future, rather than the higher collusive price, $P_2$, they would no longer wish (unilaterally) to undertake total investments in capacity sufficient to produce $Q_3$. But the collusive capacity that *actually* prevails during the conspiracy is $Q_2$, not $Q_3$, and creating the capacity to produce $Q_2$ remains attractive with non-collusive price expectations, even if creating the capacity to produce $Q_3$ does not.

(350)   Thus, when the Defense experts argue that a lower price would on its face have caused the Defendants to invest less in capacity, they are ignoring the fact that the actual level of capacity investment during the conduct period reflected the exercise of mutual restraint. Without that mutual restraint, capacity investment would have been higher, even with lower non-collusive price expectations.

### VII.A.3. The Defendants' experts draw invalid conclusions from their analyses of Prof. Stowell's NPV calculations

(351)   In his first report, Prof. Stowell used two AUO documents in an attempt to reconstruct part of the *ex ante* rational for LCD capacity investment decisions. I understand that one of those documents has proven not to be an actual internal AUO investment analysis, so I will confine my comments to the portions of Prof. Stowell's two reports that pertain to the other document. In my opinion, Prof. Stowell's analysis of that document significantly understates the incentives AUO would have had, but for the conspiracy, to invest in the pertinent fab. My reasons for this opinion are as follows.

- My first reason pertains to the price forecasts used in Prof. Stowell's analysis. As I noted above, AUO and other Defendants no doubt recognized that prices contained a component reflecting non-collusive market fundamentals, as well as a component reflecting overcharges. AUO's price forecasts necessarily encompassed both components. To conduct a but-for NPV analysis, one must remove the forecast of the overcharge from the price forecast. Not surprisingly, AUO did not indicate the size of the predicted overcharge embedded in its price forecast. Prof. Stowell has assumed that AUO's price forecasts included overcharges equal to those computed in my first report. While that is a relatively neutral assumption, in my opinion the resulting adjustment is likely too large. All of the Defendants, including AUO, watched the effectiveness of the conspiracy wax and wane (see the discussion in Section III.C, above, as well as my overcharge estimates), and there are clear indications that they appreciated the transience of other price-fixing conspiracies, such as the one impacting the DRAM industry (see my first report, ¶45). Given those circumstances, it is more likely that AUO and the other Defendants erred on the side of caution, and conducted their investment analyses without assuming significant future overcharges. If that is the case, then Prof. Stowell's calculations render AUO's investment absent the conspiracy substantially less attractive than it would have been. Indeed, it is possible that AUO's analysis conservatively assumed no future overcharges, in which case its investment analysis would have been unchanged absent the conspiracy.

- Second, AUO's analysis considered only seven years of projected cash flows from the G5 investment,[232] and hence excludes the benefits of projected cash flows beyond seven years and the

---

[232]   AU-MDL-03536493.

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 172 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

substantial but difficult-to-quantify strategic benefits that LCD makers hoped to achieve further in the future by virtue of moving down the learning curve or securing leadership positions in the industry.[233] Prof. Stowell's report properly emphasizes the importance of these hard-to-quantify strategic benefits to the Defendants. It is therefore unlikely that this analysis, and other NPV analysis Defendants may have performed, were used as anything more than a starting point for decision making regarding the fab in question.

(352)    A number of the Defense experts criticize Prof. Stowell's NPV analysis, yet their discussions entirely miss what I take to be perhaps the most remarkable aspect of their exchange with him: *the record provides scant indication that the Defendants actually relied, to any significant extent, on quantitative and economically valid tools (such as NPV analysis) when making decisions concerning investments in LCD fabs during the Conspiracy Period.*[234] I understand that the Plaintiffs requested all such analyses, and were informed by certain Defendants that the documents produced during discovery properly encompassed that request.[235] Furthermore, among the documents Defendants specifically identified as being responsive to the requests, none appear to be formal investment analysis with investment criterion such as hurdle rates for fab investments made during the Conspiracy Period. I also understand that Prof. Stowell's staff has combed the relevant portion of the document production for fab investment analyses performed during the Conspiracy Period reflecting the application of investment criteria in decision making, but was able to find only limited analyses, and that most of these analyses were far less rigorous than what would have been expected given the magnitude of Defendants' investments. I have seen no such analyses referenced in any of the Defense experts reports (though it would have been incumbent upon them to bring such documents to light in the context of evaluating Prof. Stowell's report), and I note that certain Defense experts explicitly stated in their depositions that they knew of no other contemporaneous NPV calculations. The lack of such rigorous analyses is especially remarkable in light of the fact that the Defendants collectively built 44 fabs between Q3 1998 and Q4 2006 at a total cost of approximately $43 billion.[236] Thus, it appears safe to conclude that Defendants' investment decision were not driven by short-term cash flow projections but rather by long term focus and expectations of future profits.

(353)    Dr. Rubinfeld implies that Samsung performed and relied upon formal quantitative analyses of fab investments using a hurdle rate of 25 percent (e.g., in ¶418(e)). For support, he cites "Interview with DK Lee, January 4, 2012" (footnote 549). I find this citation curious, for several reasons. First, Mr. Lee submitted a three page statement in August 31, 2011, which covered issues related to Samsung's

---

[233]  In many cases, the useful life of these investments is far greater than seven years (See, for example, L.G. Display Corp., Annual Report (Form 20-F), at 35-36, (Dec. 31, 2010)).

[234]  Dr. Foster, for example, completely misses this important point. He criticizes Prof. Stowell for analyzing investments by only one Defendant and two fabs (¶¶52-56) without acknowledging the reason for the limited scope of Prof. Stowell's investigation – i.e., that formal, quantitative analyses of LCD fab investments using economically sensible tools were apparently the exception rather than the rule.

[235]  *See* Defendants' responses to interrogatories 12–23 in their Responses to Joint Set of Interrogatories to Certain Defendants dated December 5, 2001.

[236]  Foster Report, Exhibit 1.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

investment decisions. His statement makes no mention of hurdle rates. Instead, he wrote that the company has "used the same decision-making process for planning the construction and capacity of new TFT-LCD fabs throughout the period 1991 to the present" and that it first "forecast[s] the market demand and then determines how much investment would be required to meet the expected demand."[237] Second, Mr. Lee was deposed in the Class case on June 30, 2011. In various pages of deposition testimony, much of which covered Samsung's investment decisions, he once again made no mention of hurdle rates.[238] Instead, he testified that they projected the profit to be "under 10 percent" and the profit of the whole LCD business was over 10 percent only in certain years (1999, 2000, 2004, 2007 and 2008).[239] Third, I understand that Prof. Stowell's staff has searched through Samsung's document production for quantitative fab investment analyses employing 25 percent hurdle rates, and have found none. Fourth, Prof. Rubinfeld testified at his deposition that he himself had seen no documents memorializing quantitative analyses of fab investments where Samsung had employed a 25 percent hurdle rate.[240] Fifth, Dr. Rubinfeld's interview with Mr. Lee occurred roughly six years after Samsung informed the DOJ of its involvement in the conspiracy and entered the Corporate Leniency Program. In light of these observations, it is difficult to know what to make of the comments Mr. Lee apparently made to Dr. Rubinfeld on January 4 of this year.

(354)    When reliable quantification of costs and benefits is difficult, investment decisions are commonly made "by the gut" rather than by attempting to quantify the benefits numbers.[241] The apparent dearth of rigorous, formal, quantitative investment analyses for firms in the LCD industry over the pertinent period is therefore further indication that, as Prof. Stowell observes, the Defendants' investment decisions were primarily influenced by the long-term, difficult-to-quantify strategic benefits of leadership in a critical emerging industry, rather than by short term numbers such as current or recent prices or profits. Other evidence corroborates this inference. For example, Nobuyuki Sugano, a Sharp executive, stated "[w]e need to take a longer-term view … [i]f other companies slow down spending, we can stay ahead."[242] It is therefore unlikely that the Defendants would have reduced their fab investments in the absence of transient collusive overcharges.

(355)    With respect to the specifics of Prof. Stowell's NPV analysis, I have reviewed the Defense experts' technical criticisms, as well as Prof. Stowell's responses. Overall, I find no reason to doubt Prof. Stowell's original conclusions. To avoid unnecessary duplication, I will avoid repeating what Prof. Stowell has written in his rebuttal report. However, I will weigh in on one particular issue, because it pertains to some of my statements at the outset of this subsection.

---

[237]  Declaration of D. K. Lee, August 31, 2001.

[238]  Deposition of D. K. Lee at 16:17–16:22, 21:9–44:11, June 30, 2001.

[239]  Deposition of D. K. Lee at 24:10–26:5, June 30, 2001.

[240]  Deposition of Daniel Rubinfeld, April 17, 2012, at 240:7–242:10.

[241]  Foster (Rough) at 47:1-9, Apr. 16, 2012.

[242]  Martin Fackler, "Japanese Companies still Invest in Themselves," The New York Times, December 12, 2008.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(356)   According to Dr. Foster, Prof. Stowell's AUO but-for NPV analysis "implies that AUO could foresee the outcome of the alleged conspiracy and is therefore unreasonable" (¶36). Dr. Foster suggests that it is more reasonable to assume that AUO would have forecasted that prices would have declined at the same rate, but starting from a lower level, but-for the conspiracy. I cannot imagine even a remotely plausible justification for that assumption. As I pointed out in Section VII.B.1, the Defendants (including AUO) would have been no less optimistic about LCD industry fundamentals absent the conspiracy. Consequently, there is only one possible justification for assuming (as does Dr. Foster) that, at any given point in time during the conspiracy, AUO would have forecasted higher prices into the indefinite future with the conspiracy than without it: Dr. Foster must believe that AUO expected the effectiveness of the conspiracy to remain undiminished *forever*. Yet as I have noted, the Defendants had every reason to believe the conspiracy was transient. Notably, Dr. Foster's conclusions depend heavily on the fact that he has made the most extreme possible assumption concerning AUO's beliefs about the duration of the conspiracy's effects.

(357)   Economists frequently wrestle with the challenges arising from the need to draw conclusions about behavior when expectations are not directly observable. A standard and widely employed approach to this problem is to assume that people are right about the future on average – a supposition known in the literature as "rational expectations."[243] In addition to having an impressive scholarly pedigree, the rational expectations assumption has the advantage of being neutral – it is neither optimistic nor pessimistic relative to what actually occurred. While Mr. Stowell employs the neutral assumption of rational expectations with respect to AUO's beliefs concerning future collusive overcharges, Dr. Foster chooses an extreme one.

(358)   Dr. Foster asserts that his assumption concerning AUO's price expectations but-for the conspiracy is more sensible than Mr. Stowell's because the price trajectories implied by Prof. Stowell's calculations are less smooth and consequently (Dr. Foster believes) implausible (¶49). I disagree, in large part because I do not see this as a reasonable criterion for judging between the assumptions. Dr. Foster's criticism is based on an inappropriately literalistic interpretation of the but-for AUO price forecasts. The fact is that there is considerable uncertainty as to what price path AUO would have forecast but for the conspiracy. Prof. Stowell's position, as I interpret it, is not that AUO would have forecast the specific price path used in his analysis, but rather that AUO's beliefs concerning the future effects of the conspiracy were neither optimistic nor pessimistic relative to what the conspiracy actually accomplished. Interpreted as a rational expectations benchmark, Mr. Stowell's assumption concerning AUO's but-for price forecasts is plainly superior to, and far more reasonable than, Dr. Foster's, which I regard as unreasonable and unreliable. Indeed, for the reasons articulated at the outset of this subsection, I believe Prof. Stowell's analysis significantly understates the incentives AUO would have had, but for the conspiracy, to invest in the pertinent fab.

---

[243]   In 1995, Robert Lucas was awarded the Nobel Prize in Economics "for having developed and applied the hypothesis of rational expectations, and thereby having transformed macroeconomic analysis and deepened our understanding of economic policy." http://www.nobelprize.org/nobel_prizes/economics/laureates/1995/press.html, accessed May 8, 2012.

## VII.B. My overcharge estimates are reasonable in light of the Defendants' *ex post* profitability

(359)    A central theme in a number of the Defense experts' reports is that, at my but-for prices, the Defendants would have lost money throughout most of the conspiracy period (in the sense that some inclusive measure of current costs plus an allocated portion of past capital costs would have consistently exceeded current revenues).  The same experts claim that, as a result, it would have been "economically irrational" for the Defendants to invest in new capacity while experiencing and/or anticipating such losses (see, e.g., Carlton ¶184, Rubinfeld ¶¶399, 402, Rapp ¶¶34-42, Moore ¶¶53; see also Williams ¶151, concerning Dr. Jenkins' overcharge estimates).[244]  Consequently, they infer that my overcharge estimates are unreasonably large.

(360)    As I explain in Section VII.B.1, the central premise of the Defense experts' argument is incorrect, both as a matter of economic theory and as a matter of practice.  Industries can and do pass through periods in which firms continue to invest while incurring losses over substantial periods of time.  Indeed, the mutual desire to stem those losses can be a powerful motive for collusion.  Accordingly, there is nothing unreasonable about the implication that the Defendants would have consistently lost money during the conduct period absent the conspiracy.  On the contrary, the Defendants may well have conspired in large part to avoid that outcome.  In addition, as I explain in Section VII.B.2, the Defense experts base their opinions on unreliable measures of the profitability of the Defendants' investments.

### VII.B.1. The conclusions the Defense experts draw from their analyses of the Defendants' profitability depend critically on a false premise

(361)    Economists have long been aware that industries sometimes pass through lengthy periods during which firms continue to invest despite incurring losses (in the sense defined above).  More than 80 years ago, Lloyd Reynolds observed that industries can experience "subnormal earnings over a considerable period," an outcome that he called "cutthroat competition."[245]  Dr. Stowell has detailed a number of prominent recent examples in his rebuttal report.  I have reviewed the supporting materials for his analysis, and would summarize the central facts as follows.

■    In the late 1990s and early 2000s, companies in the U.S. telecommunications held highly optimistic expectations about future industry growth potential, which incentivized many of the companies operating in this industry to sustain substantial losses for multiple years, while making significant investments in capital equipment.  Furthermore, they were able to access funding from the capital markets to pay for these investments.[246] For example, XO Holdings, Inc., a provider of local and long

---

[244]    Drs. Rubinfeld and Williams are careful to say that firms will not invest and remain in business if they lose money *over the long-run* (Rubinfeld ¶399, Williams ¶151).  Such statements are entirely consistent with the possibility that the Defendants would have remained in business and continued to invest despite negative profit margins during all or part of the conduct period, for the reasons outlined below.

[245]    Lloyd G. Reynolds, "Cutthroat Competition," *American Economic Review* 30(4), December 1940, 736-747.

[246]    Stowell Rebuttal, Tables 1-6.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 168

distance telecommunication services to businesses and larger enterprises, recorded capital expenditures of $4.3 billion while at the same time recording net losses of $4.7 billion and negative operating cash flow of $1.8 billion during 1995–2003.[247]

- It is not uncommon for companies in the U.S. biotech industry to spend hundreds of millions of dollars on R&D efforts, sometimes over several decades, to develop marketable products while sustaining substantial negative operating cash flows. They do so with the expectation that these products will generate future profits to investors.[248] For example, from 1996 through 2006, Sepacor, a developer of the well-known pharmaceutical products Lunesta and Allegra, recorded cumulative net losses of over $1 billion and cumulative negative operating cash flows of negative $921 million.[249] Despite these losses, as a result of the optimistic expectations for the future, the company recorded cash flows from financing activities of $1.7 billion.[250]

- Amazon, a company well-known for having a long term planning horizon, invested over $500 million dollars in capital infrastructure from 1995 through 2001 while sustaining negative operating cash flows of $309 million.[251]  During the period of greatest losses, many in the investment community thought that Amazon would prove to be a highly profitable investment.[252]

(362)   It is no accident that these examples pertain to high-tech industries during periods of rapid innovation and technological change.  When critical new technologies are launched commercially, it is reasonably common for industry participants to lose money for a sustained period of time.  Two separate strands of the applicable scholarly literature explain why such industries are particularly susceptible to experiencing periods during which firms incur substantial and persistent losses while continuing to invest.

(363)   The first pertinent branch of the literature concerns competition in industries where learning-by-doing plays an important role.  It is well-known that the prospect of significant learning-by-doing can induce companies to incur losses in the expectation of achieving future competitive advantage. The point is intuitive: the foregone profits associated with increasing quantity beyond the point that maximizes current profits constitutes a beneficial investment in future cost reduction.  In an industry with sufficient rivalry (where profits would be low in the absence of learning-by-doing), this consideration can drive equilibrium profits negative until companies have moved well down the learning curve.[253]  The impact of

---

[247]   Source: S&P Compustat.

[248]   Stowell Rebuttal Report, Tables 7–11.

[249]   Sunovion Pharmaceuticals Inc., "Our Heritage," accessed March 15, 2012, at http://www.sunovion.com/aboutSunovion/our-heritage.html; News-Medical.Net, "Sepracor to be acquired by Dainippon Sumitomo Pharma for $2.6 billion," accessed April 27, 2012 at http://www.news-medical.net/news/20090903/Sepracor-to-be-acquired-by-Dainippon-Sumitomo-Pharma-for-2426-billion.aspx.

[250]   Sunovion Pharmaceuticals Inc., "Our Heritage," accessed March 15, 2012, at http://www.sunovion.com/aboutSunovion/our-heritage.html; News-Medical.Net, "Sepracor to be acquired by Dainippon Sumitomo Pharma for $2.6 billion," accessed April 27, 2012 at http://www.news-medical.net/news/20090903/Sepracor-to-be-acquired-by-Dainippon-Sumitomo-Pharma-for-2426-billion.aspx.

[251]   Stowell Rebuttal Report, Table 11.

[252]   Stowell Rebuttal Report, Section III.D. Example of Amazon.com

[253]   See E. Petrakis, E. Rasmusen, and S. Roy, "The Learning Curve in a Competitive Industry," *RAND Journal of Economics* 28(2), 1997, 248-268, proposition 1, part 3.  See also D. Fudenberg and J. Tirole, "Learning-by-Doing and Market

---

this effect is particularly great when the learning curve is steep, and when demand is growing rapidly; because both factors magnify future competitive gains, they render companies more willing to invest in achieving those gains by foregoing near-term profits. If firms must climb a steep learning curve with successive rounds of innovation, and/or if demand grows explosively over an extended time interval, the period of sub-normal or even negative profits can be protracted.

(364)   The second pertinent branch of the literature concerns what are called "wars of attrition."[254] In the canonical war of attrition, a group of firms compete for a collection of "prizes" which, for the purpose of this discussion, one can think of as the benefits from securing positions of strategic leadership in an industry. In equilibrium, the firms incur losses until the contest is resolved. They are willing to sustain those losses because they hope to prevail and claim one of the leadership positions, along with its associated benefits; the larger the benefits of success, the more protracted the losses. According to Professors Jeremy Bulow and Paul Klemperer, "[b]attles to control new technologies often resemble wars of attrition."[255]

(365)   The relevance of these theories to the LCD industry is readily apparent. The Defense experts themselves repeatedly emphasize the importance of learning-by-doing for LCD production.[256] Moreover, documents cited in Dr. Stowell's rebuttal report show that the Defendants regarded their rivalry as a long-run contest for positions of strategic leadership. For example:

- The Defendants themselves say that they were "…in a race to develop new capacity the fastest."[257]

- In the LG Phillips Board of Directors meeting of February 13, 2001, while discussing P4 investment upgrade decision, "Mr. Bon Joon Koo commented that the critical issue is that we have blocked the capacity of some major equipment from the top tier suppliers. If we announce delay, those capacities would go to Samsung and thus we might lose the leading position in G5 fab."[258]

- D. K. Lee (Director of AMLCD Strategic Planning at Samsung Electronics Co. ("SEC") in Seoul, Korea.), stated that "SEC has strived to be the *largest* producer of TFT-LCD panels" (emphasis added).[259]

- Nobuyuki Sugano, a Sharp executive, said "[w]e need to take a longer-term view … [i]f other companies slow down spending, we can stay ahead."[260]

---

Performance," *Bell Journal of Economics* 14, 1983, 522-530.

[254] See, e.g., Jean Tirole, *The Theory of Industrial Organization,* MIT Press, 1990, pp. 311-314 and 380-384, Drew Fudenberg and Jean Tirole, *Dynamic Models of Oligopoly*, Routledge, 2001, Section 6c, Drew Fudenberg and Jean Tirole, "A Theory of Exit in Duopoly," *Econometrica* 54(4), 943-960, and Jeremy Bulow and Paul Klemperer, "The Generalized War of Attrition," *American Economic Review* 89(1), March 1989, 175-189.

[255] Bulow and Klemperer, op. cit., p. 175. As Bulow and Klemperer observe, the phenomenon often arises in the context of standards setting, but is in no way limited to that context.

[256] Hitt Report, paragraph 14; Carlton Report, paragraph 126.

[257] Defendants' Joint Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment Regarding Production and Capacity.

[258] LG Phillips Board of Directors Meeting minutes, February 13, 2001. (GRNE0406011).

[259] Declaration of D. K. Lee August 30, 2011.

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 178 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

■ A Sanyo Electric spokeswoman stated "[u]nless our sales dry up completely, we have to continue investing. … If we stop, our rivals and competitors will quickly catch up."[261]

(366) Accordingly, it is not even remotely surprising that unfettered competition in this industry would produce a protracted period during which firms incurred losses, and it is precisely this eventuality that may have impelled the Defendants to collude. In light of the preceding, it is particularly difficult to fathom Dr. Carlton's assertion that there is "no reasonable economic equilibrium" in which companies within an industry would lose money over an extended period of time (¶ 184). On the contrary, the applicable scholarly literature provides valid reasons to anticipate that outcome with some regularity in high-tech industries with steep learning curves and explosive demand growth, especially if positions of leadership offer significant long-term strategic advantages. Dr. Carlton's comment reflects a surprising lack of familiarity with the pertinent scholarly research.

(367) The notion that it would be "economically irrational" for firms to invest while enduring sustained periods of poor financial performance is directly contradicted by Dr. Foster's account of actual historical experience in the LCD industry. Dr. Foster observes that "…several pure play Defendants failed to generate positive operating income and experience considerable variation in operating cash flows during several years of the period at issue, while engaging in significant and mostly increasing capital expenditures ('CAPEX')" (¶12). His Table 1 shows that HannStar Display's total operating income for the nine year period starting in 1998 and ending in 2006 was *negative* $464 million. Its yearly operating income was negative in six of those nine years, the exceptions being 2002 through 2004, during which its *total* operating income was substantially less than its loss in *either* 2001 *or* 2005. And yet, Dr. Foster's Table 3 shows that HannStar invested more than $3 billion in new fabs between 2000 and 2006. Drs. Carlton, Rubinfeld, and Williams effectively deny the possibility that HannStar could have done what Dr. Foster's analysis shows it actually did.

(368) Likewise, while Dr. Rapp presents a series of exhibits purporting to show that EID would have lost money on Razr panels had my estimated but-for prices prevailed (his Exhibits 1b through 1j), he neglects to mention the fact that, according to his own calculations, EID's total operating profit on Razr panels between October 2004 and November 2006 was roughly *negative* $3.5 million. According to Dr. Rapp's reasoning, EID would never have made Razr panels in the first place.

(369) Notably, Dr. Rubinfeld acknowledges that the actual prices for large LCD panels "fell to levels below most manufacturers' costs" following what he characterizes as a "price war" starting around June 2004 (¶73). Thus, based on Dr. Rubinfeld's own characterization, that episode provides insight concerning the likely outcome of rivalry between the Defendants absent effective collusion, and thereby corroborates the reasonableness of but-for prices comparable to those presented in my first report.

---

[260] Martin Fackler, "Japanese Companies still Invest in Themselves," The New York Times, December 12, 2008.

[261] Martin Fackler, "Japanese Companies still Invest in Themselves," The New York Times, December 12, 2008.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 179 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(370) Dr. Rubinfeld suggests that my views concerning the willingness of LCD producers to incur short-term losses in order to achieve long-term benefits is somehow inconsistent with my views concerning the rate at which manufacturers of finished LCD products passed through their costs to purchasers (¶¶423-424). There is no inconsistency, for two reasons. First, any given rate of pass-through is equally consistent with firms earning short-term profits or incurring short-term losses. Dr. Rubinfeld's argument is therefore a non sequitur. Second, the pertinent characteristics of the LCD panel industry (discussed above) are very different from those of the LCD panel product industries, and consequently there is no reason to expect short-term competition to play out in the same way.

### VII.B.2. The Defense experts' analyses of the Defendants' *ex post* profits does not reliably shed light on the *ex ante* profitability of the Defendants' investments

(371) According the Defense experts' calculations, the Defendants' *ex post* profit margins and/or price-cost margins would have been negative on average during the conspiracy period, absent the cartel (Carlton ¶¶180-183, Rubinfeld ¶¶397-398, Rapp ¶¶34-42).[262] Such findings do not reliably shed light on the *ex ante* profitability of the Defendants investments, for the following reasons.

(372) First, as I have already emphasized, investment depends on *ex ante* expectations, not on *ex post* realizations. No company is guaranteed profitability *ex post*. The world is risky; companies make their decisions and take their chances. Investments that appear highly profitable *ex ante* may turn out to be highly unprofitable *ex post*. Therefore, one cannot reliably judge whether a company would have made an investment by evaluating whether the investment would have turned out to be profitable in light of subsequent developments.[263]

(373) Second, the true economic profitability of an investment can be evaluated only by taking into account all costs and benefits over the course of its life, as well as any lasting benefits (such as strategic advantages) that persist beyond its life. No snapshot of a company's flow profits from the investment at a point in time, or even multiple snapshots at different points in time that fail to span the full time interval over which benefits are derived, can reveal whether the investment was in fact profitable.[264] A company's total flow profits are even less helpful, as they blend the profit flows from multiple investments of different vintages. Particularly for a rapidly growing firm, negative profit margins do not imply that the firm's investments have negative NPV.

(374) Third, as Dr. Carlton himself acknowledges, "[a]ll of these calculations are based, in whole or in part, on Defendants' accounting cost data. It is well known that accounting cost data are at best imperfect measures of true economic costs" (¶172). Different accounting measures match up with their economic

---

[262] In addition, Dr. Moore analyzes a single Motorola RFQ, and concludes that my but-for price was below the cost of components. However, he offers no evidence that the RFQ in question is representative, or that his analysis generalizes.

[263] For example, EID likely did not anticipate the events which caused it to lose most of Motorola's Razr business, as described by Dr. Rapp (¶¶89-91).

[264] Dr. Rapp tabulates financial results over all EID's sales of Razr panels (¶41), but that is not the same as tabulating results over the life a fab.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 180 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

counterparts to greater or lesser degrees, and therefore one must use appropriate discretion. For example, for materials used in production, accounting costs are generally thought to match up with true economic costs reasonably well. However, accounting measures that include allocations of capital costs (upon which the Defense experts rely heavily) are inherently more problematic, and there are no accounting counterparts for hard-to-quantify economic benefits flowing from certain investments, such as the long-term strategic benefits of securing a position of leadership within an important emerging industry. In light of these concerns, a great deal of what the Defense experts offer concerning profitability must be taken with a large grain of salt.

(375)    As an example, consider Dr. Rapp's Exhibit 1a, which tabulates EID's recorded gross and operating margins from October 2004 through November 2006. According to Dr. Rapp, EID was a monopolist with respect to the sale of Razr panels to Motorola through at least the middle of 2005. Yet Dr. Rapp's own figures show that EID's operating profit margins were consistently negative throughout that period (with a single exception in March 2005). Dr. Rapp plainly cannot be correct both about EID's alleged monopoly power during that period, and about the reliability of conclusions concerning profitability based on EID's accounting data. Dr. Rapp both acknowledges and attempts to address some of the limitations of these data by presenting separate calculations based on EID's variable manufacturing costs (¶40).[265] Yet he himself concedes that his "examination of EID's actual prices and costs reveal that the actual prices for Razr panels were very nearly at EID's cost and sometimes below its manufacturing cost alone" (¶36), and he apparently fails to notice that, at actual historical prices, EID's percentage markup over variable manufacturing costs averaged only 3.2% between October 2004 and June 2005. As discussed in Section V.B.1, such markups are not even remotely consistent with Dr. Rapp's central premise that EID had monopoly power over Motorola during that period. Thus, Dr. Rapp must either abandon the central premise of his report, or concede that EID's accounting data are entirely unsuited for the purpose of evaluating the profitability of EDI's Razr operations.

(376)    Fourth, the Defense experts' analyses of profit margins assume that costs would have been the same but for the conspiracy. They fail to consider the likelihood, noted in my first report, that costs would have been lower absent the conspiracy. Companies may have reduced costs in response to greater competitive pressure, and production likely would have shifted to more efficient firms (inasmuch as cartels tend to protect inefficient rivals).[266] Thus, for example, in arguing that EID would not have sold Razr panels at my estimated but-for prices (¶¶34-42), Dr. Rapp fails to consider the plausible alternative that a more efficient producer would have secured that business and made those sales at non-collusive prices.[267] Dr. Rapp's conceptual error is particularly notable in light of the fact that his own analysis identifies EID as a relatively inefficient producer (see, e.g., the "clean sheet" prices for various manufacturers in his Table 1, ¶88). Neither do the Defense experts consider the likelihood, discussed at some length in Dr. Stowell's

---

[265]  The Rapp Report describes variable costs as including materials and the variable portion of production costs (Rapp Report, paragraph 40).

[266]  Scherer, F.M. and David Ross (1990), *Industrial Market Structure and Economic Performance*, Houghton Mifflin, page 668.

[267]  I understand that, as a matter of law, a conspirator is liable for damages regardless of whether that conspirator would have made the same sales absent the conspiracy.

report, that the Defendants' costs would have been defrayed to some extent by government assistance in light of their poorer performance. Because the Defense experts have not attempted to determine the level of costs absent the conspiracy, they cannot reliably opine on what profit margins would have been.

(377)    A final word is in order concerning operating margins, particularly those presented by Dr. Rubinfeld (¶¶397-398, Exhibits 66 and 67). Operating margins are mathematical ratios of operating profits and revenues. These ratios can be highly volatile, particularly for companies with a high degree of sales volatility and operating leverage (i.e., the amount of assets used to produce a given level of revenue).[268] Operating leverage exacerbates changes in operating profit for a given change in sales.[269] Given the level of fixed assets required to produce LCD panels and the volatility of LCD prices and volumes, it is not surprising that Dr. Rubinfeld's but-for operating margins exhibit a high degree of volatility across the years of his analysis, and in some instances are not only negative but also substantial.

## VII.C. My overcharge estimates are reasonable in light of evidence concerning operating cash flows

(378)    Several Defense experts observe that, according to Prof. Stowell's calculations, the Defendants would have had low and in some cases negative operating cash flows between 2000 and 2006 (see, e.g., Carlton ¶¶176-179, Rubinfeld ¶¶410-411, Cremieux ¶¶96-98). Apart from its implications for profitability (which I have already addressed), the potential significance of this observation is that reduced cash flow would have limited the ability of each Defendant to finance its LCD fab investments using the proceeds derived from its LCD operations. The Defense experts suggest that, as a result, these firms would have either invested less or discontinued their operations, contrary to the implications of my overcharge analysis.

(379)    Notice that the logic of the Defense experts' argument implies that positive overcharges are *always* unreasonable. Conspiracies generally improve cash flow. Thus, according to the Defense experts, capacity investment, and hence output, must always be lower in the absence of collusion, rather than higher as economic logic requires. Their conceptual error here involves the same logical fallacy discussed in Section VII.A.1: they ignore the fact that the Defendants exercised mutual restraint during the conspiracy, at times investing later than they would have had they acted on their own unilateral incentives. Without that mutual restraint, the Defendants would have invested sooner despite any dampening of their unilateral incentives resulting from lower prices and/or cash flows.

(380)    There is, in any case, little reason for concern about the effects of reduced cash flows. Firms can both survive and continue to invest even when operating cash flow is low or negative for an extended time

---

[268]   The Analysis and Use of Financial Statements, Second Edition, Gerald I. White, Ashwinpaul C. Sondhi, and Dov Fried, pg. 989.

[269]   The Analysis and Use of Financial Statements, Second Edition, Gerald I. White, Ashwinpaul C. Sondhi, and Dov Fried, pg. 989.

period; Prof. Stowell provides numerous examples in his rebuttal report.  Moreover, there is no reason to expect that a firm's operating cash flow would limit its investment, provided the firm has positive economic value and can raise external capital (through debt or equity).[270]  There is in fact a scholarly literature that examines both the relationship between a firm's cash flow and its level of investment, and the underlying economic causes of that relationship.[271]  The relevant conclusion I draw from that literature is that cash flow does not, by itself, constrain investment by established enterprises with relatively easy access to financial markets.[272]  I note that many of the Defendants raised funds from external capital markets during the conspiracy period.[273]  In light of Prof. Stowell's observations concerning government backing of the LCD industry in Korea, Taiwan, and Japan, there is every reason to think that their access to external capital would have been undiminished absent the conspiracy, and hence that their investments would have been unimpeded by limited cash flow.[274]

(381)    The possibility of exit due to limited or negative cash flow is also untroubling.  A firm with negative cash flow but positive economic value is an attractive acquisition target for a mature firm with surplus cash flow.  There is no reason to think that the productive capacity of an exiting firm would have disappeared from the market simply because of cash flow constraints.

(382)    Dr. Rubinfeld argues that Prof. Stowell's analysis of operating cash flow should focus on 2000 through 2005 rather than 2000 through 2006.  He claims that "including the year 2006 leads to a biased evaluation because non-conspiratorial pricing prevailing during most of the year" (¶408).  His argument makes no sense.  The purpose of Prof. Stowell's calculation is to show what the Defendants' cash flows would have been had they never colluded.  Their cash flows in 2006 (and beyond) logically belong in that scenario.  It is unreasonable to think that the Defendants' investment decisions absent the conspiracy would have been made with a horizon of year-end 2005, as Dr. Rubinfeld's reasoning implies.  Rather, one must evaluate any negative cash flows in light of the subsequent positive cash flows that justify early losses, consistent with my analysis in Section VII.B.1.

(383)    Even though I do not credit Dr. Rubinfeld's arguments concerning the significance of the period 2000-2005, in an abundance of conservatism I have re-estimated overcharges using the cash flows from Prof.

---

[270]    The fact that a firm finances investment "in part" from cash flow, as Dr. Cremieux says of LG Display (¶98), does not imply that its investment *requires* that cash flow.

[271]    See for example, Fazzari, Hubbard, and Petersen, "Financing Constraints and Corporate Investment," BPEA 1988; Steven N. Kaplan and Luigi Zingales, "Do Investment-Cash Flow Sensitivities Provide Useful Measures of Financing Constraints?" *The Quarterly Journal of Economics* (1997); and  Steven N. Kaplan and Luigi Zingales, "Investment-Cash Flow Sensitivities Are Not Valid Measures of Financing Constraints," *The Quarterly Journal of Economics* (2000).

[272]    The systematic and quantitative evidence presented in that literature is far more reliable and telling than the kinds of vague and generic statements from financial disclosure documents that Dr. Cremieux quotes in his report (¶98), as well as Dr. Rubinfeld's discussion of the historical relationship between Samsung's cash flow and investment (¶415 and Exhibit 70). The latter is based on nothing more than a simple graph of the two data series, and entirely ignores the many possible sources of spurious correlation between them that are discussed in the applicable literature; e.g., that good investment opportunities are serially correlated, so that high cash flow (derived from past investments) tends to coincide with high current investment.

[273]    GRNE-B-0325995 at Slide 6, "Taiwan TFT LCD makers' funding plan in 2003."

[274]    Stowell Report, Section IV.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 175

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 183 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Stowell's original report[275] under the assumption that Defendants' cumulative but-for operating cash flow for this period could not have been negative due to operating cash flow constraints. This assumption results in an average overcharge of 21.8% as oppose to the actual average overcharge for the Conspiracy Period of 24.5%.

## VII.D. My overcharge estimates are reasonable in light of evidence on changes in profitability over time

(384)   Dr. Carlton claims that, given my but-for price estimates, price-cost margins would have been lower during the conspiracy period than after.[276] Dr. Rubinfeld reaches a similar conclusion concerning Samsung's profitability, and describes that outcome as "implausible" (¶400). Even taking their calculations at face value, there is nothing unreasonable about that implication.

(385)   The Defense experts' thinking on this topic is apparently predicated on the unstated and false assumption that, during this time period, the LCD panel industry was mature; only then would it be reasonable to expect that margins would be similar during and after the conduct period, absent the conspiracy. Yet Dr. Carlton has himself emphasized that the industry changed considerably and developed rapidly during this period (¶ 45), while Dr. Rubinfeld explicitly states that it "matured" (¶¶164-168). As I explained in Section VII.B.1, there is every reason to expect that firms in industries with characteristics such as this one will anticipate losing substantial sums of money for extended periods of time, in the hope of establishing positions that allow them to earn substantial profits once the industry begins to mature. Thus, it is likely that the appropriate non-collusive benchmark has the feature that price-cost margins are low (even negative) during the industry's explosive growth stage, but rise once it reaches sufficient size and maturity. According to Dr. Carlton, that is precisely what the but-for prices implied by my estimated overcharges imply. There is absolutely no basis in economics for dismissing that pattern as "unreasonable."

(386)   In addition, the Defense experts' analyses of changes in profitability over time assume that costs would have been the same but for the conspiracy. They fail to consider the likelihood, noted in my first report and revisited above in Section VII.B.2, that costs would have been lower. Because neither Dr. Carlton nor Dr. Rubinfeld has attempted to determine the level of costs absent the conspiracy, they cannot reliably opine on what price-cost margins or profit margins would have been.

(387)   Finally, Dr. Carlton examines measures of profitability that net out capital costs, including depreciation.[277] Accounting conventions allocate capital costs over time according to formulas that often

---

[275]   These calculations were made using the data from Table 6 of the Stowell Report. I understand that Dr. Stowell updated his operating cash flow data in his rebuttal report using Compustat data. The operating cash flows from the Compusat data are slightly higher than those in the Stowell Report making these estimates conservative.

[276]   Carlton Report, Section VII-A at 125–127.

[277]   Carlton Report, Table VII-1.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

bear little or no relationship to economic realities. The time paths of accounting costs, upon which Drs. Carlton and Rubinfeld both rely for their conclusions, are therefore inherently unreliable.

## VII.E. My overcharge analysis does not presuppose that capacity investment would have been substantially higher but for the conspiracy

(388) According to Dr. Cremieux, my analysis implies that the Defendants would have invested substantially more in capacity absent the conspiracy than they did historically – not merely the same amount or slightly more. His calculations allegedly show that an increase in quantity supplied on the order of 12 percent would have been needed to satisfy demand at my estimated but-for prices during certain portions of the conspiracy (¶101). However, Dr. Cremieux's analysis suffers from using unreliable estimates of elasticity.

(389) Dr. Cremieux's calculations require estimates of the price elasticities of demand for finished products containing LCD panels. A higher elasticity implies that demand is more sensitive to price. Thus, if the elasticities Dr. Cremieux uses as a basis for his opinion are too high, he necessarily overstates the additional capacity required to satisfy demand absent the conspiracy.

(390) Dr. Cremieux cites two estimates of elasticity, both from an unpublished working paper.[278] Dr. Cremieux's elasticity of -1.42 comes from a particular model in the paper. That particular model fails a standard statistical test used to assess the validity of some assumptions of the model.[279] The paper's author appropriately concludes that the data reject the assumptions and therefore the model is likely "not valid."[280] Dr. Cremieux's alternative estimate of elasticity of -5.69, coming from a different model, is unreasonably high. Dr. Cremieux translated the finished product's elasticity of -5.69 to an elasticity for LCD panels of -2.55.[281] An elasticity of -2.55 is far too elastic to be reasonable. It also conflicts with the opinion of Dr. Carlton, who opined that the demand for LCD panels is "relatively inelastic."[282,283]

(391) Regardless of these problems, the elasticities in the paper are fundamentally irrelevant. Dr. Cremieux assumed without foundation that these elasticities apply to TVs and other LCD finished products, not just

---

[278] Cremieux Report, ¶100 ("I started by reviewing the literature for an estimate of the industry elasticity of demand for LCD finished products. I find this elasticity to be -1.42.") and ¶102 ("I present a sensitivity analysis of this calculation in Exhibit 14.B that uses an alternative estimate of the industry elasticity of demand for LCD finished products (i.e., -5.69)."

[279] Christos Genakos, "Differential Merger Effects: The Case of the Personal Computer Industry," 2004, Table 6, Column 4.

[280] "[T]he Hansen-Sargan overidentification test is rejected, suggesting that the identifying assumptions are not valid." Christos Genakos, "Differential Merger Effects: The Case of the Personal Computer Industry," 2004, page 13.

[281] Cremieux Report, Exhibit 14.B.

[282] Deposition of Dennis Carlton, April 12, 2012, 698.

[283] Dr. Genakos also notes that the models underlying Dr. Cremieux's elasticities show the "surprising result" of "a small negative coefficient for monitor size." Christos Genakos, "Differential Merger Effects: The Case of the Personal Computer Industry," 2004, page 14. Dr. Genakos explicitly claims his model coefficients can be given structural, *ceteris paribus* interpretations (page 13). The negative coefficient on monitor size suggests that the models fail to properly measure the higher value customers place on a larger monitor. Hence, the models are unlikely to estimate the elasticity of demand correctly.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

computers. Moreover, these estimated elasticities are based on computer purchase data in which 78.9% of computers purchased are desktop computers.[284] While desktop computers may be sold in combination with monitors, the paper does not report whether that frequency is high or low. If it is low, Dr. Cremieux would essentially be interpreting the elasticity of demand for desktop computers sold without monitors as the elasticity of demand for TVs, monitors, notebooks, and other LCD finished products. For these reasons, Dr. Cremieux lacks any foundation to interpret these estimates as estimates of the "elasticity of demand for LCD finished products."[285]

(392)    If, as is likely, Dr. Cremieux has overstated the elasticity of demand, the impact on his conclusion is dramatic. If the elasticity of finished goods equaled only -0.7, Dr. Cremieux would calculate that an increase in quantity supplied on the order of only 6 percent would have been needed to meet LCD panel demand at my estimated but-for prices during certain portions of the conspiracy. As Dr. Cremieux estimates that LG Display had approximately 4 percent available capacity, only an additional 2 percent in new capacity would be needed to supply this additional quantity. This 2 percent is within the range that could be satisfied by reconfiguring existing fabs; it would not require the Defendants to have invested substantially more in capacity absent the conspiracy, as Dr. Cremieux claims.

## VII.F. The corporate structures of the defendants would have materially influenced their incentive for investment

(393)    The defense experts' remarks on profitability and investment behavior are premised on the notion that these defendant firms actively sought to maximize shareholder value (profits) and were beholden to the external capital markets. Many of my responses to their comments (described earlier in this section) take that premise as given. However, a growing body of academic literature regarding ownership structure, corporate governance practices, and controlling owner incentives of Asian companies with pyramidal or cross-holding ownership structures[286] suggests that this premise is not necessarily valid.[287]

(394)    In contrast to most US-based companies, which tend to be widely-held and typically have close alignment of voting shares and economic interests, Asians firms often exhibit corporate structures where the controlling owner has a disproportionately low economic ownership stake relative to their control position.[288] This division of interests leads to several corporate governance problems akin to the principal-agent problems that economists have long studied.[289] In situations where economics interests

---

[284]  Christos Genakos, "Differential Merger Effects: The Case of the Personal Computer Industry," 2004, Table 2.

[285]  Cremieux Report, ¶100 and ¶102.

[286]  In Korea, corporate groups with these ownership features are referred to as Chaebols, while the Japanese version is referred to as Keiretsu.

[287]  Stijn Claessens and Joseph P. H. Fan, "Corporate Governance in Asia: A Survey," International Review of Finance 3:2, 2002, at 74 and 81.

[288]  Rafael La Porta, Florencio Lopez-de-Silanes, and Andrei Shleifer, "Corporate Ownership around the World," Journal of Finance, April 1999, Vol. LIV (2), at 500; Stijn Claessens and Joseph P. H. Fan, "Corporate Governance in Asia: A Survey," International Review of Finance 3:2, 2002, at 74.

[289]  Michael C. Jensen and Williams H. Meckling. "Theory of the Firm: Managerial Behavior, Agency Costs and Ownership

---

are not aligned with control, the controlling party has incentives to extract private benefits for themselves to the detriment of the non-controlling investors.[290] Furthermore, if the controlling owner of a corporate group has sufficient control over the conglomerate and minority shareholder rights are weak, then the owner is free to pursue his own objectives without the fear of takeover, shareholder reprisal, or ouster.[291]

(395)   In particular, the corporate governance literature regarding Asian firms notes several areas where incentives differ from those in widely-held firms for which control is less concentrated and more proportional to economic interests.[292]  First, controlling owners, because of the private benefits they can extract, tend to misallocate resources as they divert corporate resources to pursue their own agendas.  In fact, a study of the top-30 Korea Chaebols (which include LG and Samsung) found that these firms' share prices declined upon announcement of investments, while the share prices of other Korean non-top 30 firms increased upon investment announcements.[293]

(396)   Chaebol-affiliated firms in Korea may act in ways that are suboptimal.[294] This behavior sometimes stems from the fact that Chaebols are owned and managed by individuals with close family relationships.[295] Family control of corporations is not limited to Korea. In 2000, the management of 80% of Taiwanese listed firms comes from controlling families."[296]

(397)   In addition, pyramidal control structures and super voting rights among a limited number of shareholders, which are common throughout the world, can often lead to suboptimal behavior. [297] As an example, family-controlled Chaebols in Korea have been known to engage in excessive capital investment.[298]

---

Structure," Journal of Financial Economics, 1976 (3), at 308-9.

[290]   Stijn Claessens and Joseph P. H. Fan, "Corporate Governance in Asia: A Survey," International Review of Finance 3:2, 2002, at 76.

[291]   Stijn Claessens and Joseph P. H. Fan, "Corporate Governance in Asia: A Survey," International Review of Finance 3:2, 2002, at 81 and 83.

[292]   Randall Morck, Daniel Wolfenzon, and Bernard Yeung, "Corporate Governance, Economic Entrenchment and Growth,"Journal of Economic Literature, Vol. XLIII, September 2005, at 677-688.

[293]   Wi Saeng Kim, Esmeralda Lyn, Tae-Jun Park, and Edward Zychowicz, "The Wealth Effects of Capital Investment Decisions: An Empirical Comparison of Korean Chaebol and Non-Chaebol Firms," *Journal of Business Finance & Accounting* 32, no. 5–6 (2005) at 959-61.

[294]   Wi Saeng Kim, Esmeralda Lyn, Tae-Jun Park, and Edward Zychowicz, "The Wealth Effects of Capital Investment Decisions: An Empirical Comparison of Korean Chaebol and Non-Chaebol Firms," *Journal of Business Finance & Accounting* 32, no. 5–6 (2005) at 969.

[295]   Wi Saeng Kim, Esmeralda Lyn, Tae-Jun Park, and Edward Zychowicz, "The Wealth Effects of Capital Investment Decisions: An Empirical Comparison of Korean Chaebol and Non-Chaebol Firms," *Journal of Business Finance & Accounting* 32, no. 5–6 (2005) at 947.

[296]   Yin-Hua Yeh, Tsun-siou Lee, and Tracie L. Woidtke, "Family Control and Corporate Governance: Evidence from Taiwan," *International Review of Finance* 2, no. 1–2 (2001) at 26.

[297]   Randall Morck, Daniel Wolfenzon, and Bernard Yeung, "Corporate Governance, Economic Entrenchment and Growth,"Journal of Economic Literature, Vol. XLIII, September 2005, at 1.

[298]   Wi Saeng Kim, Esmeralda Lyn, Tae-Jun Park, and Edward Zychowicz, "The Wealth Effects of Capital Investment Decisions: An Empirical Comparison of Korean Chaebol and Non-Chaebol Firms," *Journal of Business Finance & Accounting* 32, 5–6 (2005) at 949.

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Another example of this impact is found in the underpricing of IPOs of Taiwanese companies.  The under pricing is believed to stem from the effect of potential expropriation by entrenched large shareholders.[299]

(398)   Japanese firms are organized into groups called Keiretsu, in which firms with no controlling shareholders each hold small stakes in one another that collectively amount to control blocks.[300]  In addition, 68% of the firms in that country are family controlled.[301] Furthermore, in Japan, corporate-level decisions are often driven more by broader social concerns than by profit considerations, and more established companies have little market pressure to change. The social commitments of these companies to employees and suppliers prevent them from adapting to changing economic circumstances by laying-off employees, outsourcing offshore, and abandoning suppliers, even though it may be optimal to do so from a profit maximizing perspective.[302]

(399)   Studies have shown that "tunneling" tends to occur in firms with pyramidal or cross-ownership control structures.[303]  "Tunneling" refers a practice whereby the controlling owner diverts corporate resources from one part of the conglomerate to another part, frequently to advance his own agenda, and typically to the disadvantage of various minority shareholders.[304]  This practice allows the controlling owner to pursue pet projects or suboptimal investments.[305]

(400)   Finally, because of the controlling owner's ability to extract private benefits, economists have found that entrenchment becomes an important objective for the owner.[306]  Entrenchment in Asian-based companies is facilitated by weak corporate governance practices and limited minority shareholder protection laws.[307]  While entrenchment strategies can take many forms, some scholars suggest that controlling owners of large, powerful corporate groups actively seek to influence the political process and defeat reform movements that would enhance corporate governance practices or minority shareholder rights.[308] Korea

---

[299]  Yin-Hua Yeh, Pei-Gi Shu and Re-Jin Guo, "Ownership Structure and IPO Valuation: Evidence from Taiwan," *Financial Management* 37, no. 1 (2008) at 141–46.

[300]  Berglof, Erik and Enrico Perotti.  1994.  "The Governance Structure of the Japanese Financial Keiretsu," Journal of Financial Economics 36:2, pp. 259-284.

[301]  Claessens, Stijn, Simeon Djankov, Larry H.P. Lang. 2000. "The Separation of Ownership and Control in East Asian Corporation," Journal of Financial Economics 58:1-2, pp.81-121.

[302]  Chandler and Business History in Japan, 2008, pg. 5

[303]  Stijn Claessens and Joseph P. H. Fan, "Corporate Governance in Asia: A Survey," International Review of Finance 3:2, 2002, at 81 and 88; Marianne Bertrand, Paras Mehta, Sendhil Mullainathan, "Ferreting Out Tunneling: An Application to Indian Business Groups," Quarterly Journal of Economics, 2002, 117(1), at 121-2 and 140.

[304]  Simon Johnson, Rafael La Porta, Florencio Lopez-de-Salines, and Andrei Shleifer, "Tunneling," American Economic Review, 90(2), at 22-3; Kee-Hong Bae, Jun-Koo Kang, and Jin-Mo Kim, "Tunneling or Value Added?  Evidence from Mergers by Korean Business Groups," The Journal of Finance, Vol. LVII, No. 6, December 2002, at 2697.

[305]  Woonghee Lee and Nam S. Lee, "Understanding Samsung's Diversification Strategy: The Case of Samsung Motors Inc.," Long Range Planning, 2007 (40), at 494; Charlotte Marguerite Powers, "The Changing Role of Chaebol," Stanford Journal of East Asian Affairs, Summer 2010, Vol.10 (2), at 111.

[306]  Randall Morck, Daniel Wolfenzon, and Bernard Yeung, "Corporate Governance, Economic Entrenchment and Growth,"Journal of Economic Literature, Vol. XLIII, September 2005, at 683.

[307]  Randall Morck, Daniel Wolfenzon, and Bernard Yeung, "Corporate Governance, Economic Entrenchment and Growth,"Journal of Economic Literature, Vol. XLIII, September 2005, at 685-6.

[308]  Randall Morck, Daniel Wolfenzon, and Bernard Yeung, "Corporate Governance, Economic Entrenchment and Growth,"Journal of Economic Literature, Vol. XLIII, September 2005, at 701.

in particular has seen several instances where the large Chaebols sought to limit reform movements.[309] As political influence is a function of size and control of economic resources,[310] the LCD manufactures likely had further motivation to maintain and expand their leadership positions in industries critical to their countries' economic objectives.

(401)    To be clear, for the reasons discussed in the rest of this section, the Defense experts' claims concerning the effect of lower profitability and cash flow would not be correct even if the Defendants maximized shareholder value.  The point of this section is to underscore the fact that the presumptions concerning corporate decision making that lie behind the Defense experts' arguments about profitability and cash flow have not been shown to apply to the Defendants, despite an active literature that calls the applicability of those premises into question.

---

[309]  Sook Jong Lee. "The Politics of Chaebol Reform in Korea" Journal of Contemporary Asia, Vol.38, No. 3, August 2008, at 446; Anna Fifield, "S Korea acts to curb power of Chaebol" Financial Times, Dec. 2, 2004. Accessed May 2, 2012. <http://www.ft.com/intl/cms/s/0/b76dead0-4491-11d9-9f6a-00000e2511c8.html#axzz1tj5DZBwx>; Song Jung-a, "Seoul to ease restrictions on Chaebol" Financial Times, Mar. 4, 2008. Accessed May 2, 2012. http://www.ft.com/cms/s/0/006630a8-e976-11dc-8365-0000779fd2ac.html#axzz1tj5DZBwx>

[310]  Randall Morck, Daniel Wolfenzon, and Bernard Yeung, "Corporate Governance, Economic Entrenchment and Growth,"Journal of Economic Literature, Vol. XLIII, September 2005, at 701.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

# VIII. My overcharge estimates are reasonable in light of facts concerning other aspects of conduct and market outcomes

(402) In addition to providing inaccurate and unreliable econometric measures of overcharges, the Defense experts collectively point to a variety of patterns which, they claim, imply that the conspiracy must have been largely ineffective. However, because their analyses of those patterns are simplistic and superficial, the conclusions they draw concerning the likely magnitude of overcharges are unreliable.

(403) In considering any evidence of the Defendants' conduct, one must keep in mind that the conspiracy at issue was imperfect. Any imperfect conspiracy involves a blend of conspiratorial and competitive conduct. To put the matter in proper perspective, recall from Section IV that, with a demand elasticity of 1.5, a monopolist would charge a 200 percent markup over cost, and with an elasticity of 1.25, the monopoly markup would be 400 percent. Because the category-wide demand elasticities for all the product categories at issue in this case are likely very low (see Section VII.E), a conspiratorial markup in the range of 20 to 30 percent is only a very small fraction of the monopoly markup. With an outcome that is far closer to the competitive end of the spectrum than to the monopoly end, one should hardly be surprised to find considerable evidence of competitive conduct. Therefore, pointing to evidence of such conduct cannot possibly prove that collusion was ineffective, or that overcharges in the range of 20 to 30 percent are unreasonable.

## VIII.A. Simple observations concerning price levels and movements do not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates

(404) The Defendants' experts make a collection of simple observations concerning price levels and movements which, they claim, are inconsistent with the existence of substantial overcharges. On the contrary, all of their observations are entirely consistent with effective collusion and substantial overcharges. In each case, the reasoning used by the Defendants' experts does not reflect the application of sound economic principles, and hence their conclusions are unreliable.

(405) *1. Falling prices during the conspiracy period*. Dr. Williams points to SDI's falling prices as evidence that SDI was not colluding (¶119). He ignores the obvious fact (acknowledged by essentially all economic experts testifying in this matter) that production costs were declining sharply during this period. Even the monopoly price declines with cost. Hence, Dr. Williams' observation is inherently incapable of distinguishing between competition and collusion.

(406) *2. Relative rate of decline in prices during and after the conspiracy.* According to Dr. Williams, the rate of price decline did not accelerate after the conspiracy ended (¶120). Dr. Rubinfeld makes a similar point

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 182

(¶239). Both assert that this finding is inconsistent with effective collusion, but they are incorrect, for two reasons.

(407)   First, their analyses are not reliable because they do not control for other time-varying factors that likely affected the rate of decline in prices. Economists generally acknowledge the importance of introducing such controls through statistical modeling. In my first report and in Section II above, I conducted an exhaustive econometric examination of TFT-LCD panel prices that accounted for a variety of other factors, and demonstrated that those prices would in fact have been significantly lower but for the conspiracy. Dr. Williams apparently believes that such analyses are "pure speculation" (¶117), but in expressing that opinion he places himself squarely outside the mainstream of economic thought.

(408)   A simple comparison of the rate of price change during and after the conspiracy cannot shed light on the question of interest unless nothing else of importance changed between those two periods. Notably, Dr. Rubinfeld himself explains why those periods are not comparable: he devotes an entire section to the observation that the industry "matured" over this time frame (¶¶164-168). It is hardly surprising that the rate of decline in price might slow considerably as a high-tech industry matures. Consequently, Dr. Rubinfeld's own analysis proves that his comparison (and Dr. Williams') is invalid.

(409)   Second, there is no reason to expect that a conspiracy would cause prices to decline more slowly while it is in effect. On the contrary, collusion would primarily affect the price *level* rather than the general rate of change in prices. Furthermore, because the cartel effectively unraveled *during* the conspiracy period (as my analysis demonstrates is the case for TFT-LCDs, and as Dr. Rubinfeld agrees[311]), so that actual prices and but-for prices coincided at both the beginning and end of the conspiracy period, the conspiracy necessarily had no effect on the average rate of price decline for the entire conspiracy period. Indeed, the fact that the rate of decline accelerated before the end of the conspiracy (during the unraveling period) may explain why prices appear to have declined at a slower rate in the post-conspiracy period.

(410)   ***3. Movements in detrended prices***. According to Dr. Carlton, prices were low during the conspiracy period relative to what one would predict based on a simple linear trend (¶68). In suggesting that this observation is pertinent to the task of evaluating overcharges, Dr. Carlton in effect endorses the use of a econometric models for average LCD panel prices that contain no supply-side or demand-side variables, apart from a simple linear trend. That position is internally inconsistent, given that he criticizes my parsimonious model as including too few controls for market conditions (¶291). A model with nothing more than a linear trend is plainly unreliable for this purpose.

(411)   In any case, there is no good economic reason to think that the underlying trend would be linear. Indeed, if it were linear, prices would eventually fall below zero. A more plausible possibility is that the

---

[311]   Rubinfeld deposition on April 17, 2012, page 71. Q. And I think you say elsewhere in your report that prior to January 2006, Samsung took some steps to start withdrawing from the conspiracy; is that fair to say? A. Yes. … Q. When did Samsung take those steps? A. It would have been—it would have been in the early part of 2005 and when—I think a memo was sent out to key Samsung personnel telling them not to participate in any way in—not only in attending meetings, but also in any bilateral conduct with competitors.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

underlying trend arising from evolving market fundamentals was geometric. In that case, the estimation of linear trend would create the false appearance that price was abnormally low during the conspiracy period (because detrended prices would then appear to be U-shaped, as in a number of Dr. Carlton's exhibits). Fitting a geometric trend necessarily yields an entirely different result, and other functional forms for the trend effect yield still different results, as shown in Section II.A. Because Dr. Carlton has no basis for believing that the trend takes any particular form out of the innumerable possibilities, he cannot legitimately draw any conclusions from this type of analysis. Any conclusions he claims to draw are unscientific and highly unreliable.

(412)   *4. Hump-shaped price patterns.* Dr. Rubinfeld dismisses the possibility of overcharges to Motorola because he sees no "humps" in the price patterns for those panels (¶249). The data in question pertain to a short time period at the end of the conspiracy. The period covered is simply too short for one to detect a hump-shaped pattern. However, as shown in Section II.A Motorola's prices were declining in parallel with other small panel prices and, over a somewhat longer period of time, those small panel prices did exhibit a distinct hump-shaped pattern, which my econometric analysis correctly attributes to the cartel.

(413)   *5. The change in price at the end of the cartel.* Dr. Carlton observes that LCD panel prices did not jump downward or decline faster at the end of the alleged cartel period—i.e., the end of 2006 (¶176). From this observation he makes a breathtaking and entirely illogical leap to the conclusion that the conspiracy could not have elevated prices significantly.

(414)   Just like Dr. Carlton's unreliable econometric model, this argument is predicated on the untenable assumption that the effect of the conspiracy on price was essentially constant for its entire existence (so that prices were fully elevated, or nearly so, in mid-2006, and not elevated at all, or nearly so, by around mid-2007). Without that assumption, a comparison between prices in 2006 and 2007 reveals nothing concerning the effects of the conspiracy in earlier years.

(415)   In fact, there are very good reasons to believe that the effectiveness of the conspiracy waxed and waned over time, and that its effectiveness declined considerably between 2004 and 2006. According to Dr. Rubinfeld, the industry entered a "price-war phase" from June 2004 through March 2005, followed by a "wind down phase" in the latter part of 2005…" (¶80); he opines that the conspiracy was effectively over by the start of 2006 (¶426). My own econometric analysis shows that overcharges declined quickly at the start of 2006, and had vanished entirely by May 2006 for large panels. Accordingly, the substantial effect of collusion on earlier prices implied by my analysis is entirely consistent with the absence of what Dr. Carlton calls "a discrete jump downward in prices nor even an acceleration in the rate of price decline" before and after the end of 2006 (¶176). Focusing on the last few years of the conspiracy, the acceleration of the decline in price that Dr. Carlton expects to see as the cartel unravels is manifestly evident in mid-to-late 2004, and again in late 2005 and early 2006 for large panels, and from 2004 to mid-2006 for small panels, precisely during the periods when my econometric analyses show declining overcharges.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

(416)    In addition, Dr. Carlton's informal comparison of price movements in 2006 and 2007 fails to make any allowance for other factors that may have changed over that period. The purpose of using an econometric model to assess overcharges, rather than relying on a simple eye-ball comparison, is to take those factors into account. Dr. Carlton mentions this objection, but says that absent a "clear economic explanation" of the factors that might have offset the effects of the conspiracy's hypothesized collapse at the end of 2006, "one should give little credence to such speculation" (¶175). And yet, Dr. Carlton gives a great deal of credence to exactly that kind of speculation in another context. In the context of discussing comparisons between actual prices and prices discussed at the Crystal Meetings, Dr. Carlton writes as follows:

> "Even in the absence of any cartel success, prices fluctuate from month to month…, and hence there will likely be some months in which competitive prices are relatively close to the prices that had been discussed previously by Defendants. As such, the mere fact that prices came close to targets in certain months does not prove the existence of large overcharges; *an empirical study of but-for prices is required to determine the magnitude of those overcharges*" (¶81, emphasis in original).

(417)    Thus, Dr. Carlton argues in one context that one should not be persuaded by the equality of two prices because an unspecified random fluctuation could offset an underlying difference (and instead one should conduct an empirical study), but in a separate context says that "one should give little credence" to the same kind of argument. Dr. Carlton's methodological standards are evidently context-specific.

(418)    *6. Co-movements of prices and quantities.* Dr. Carlton attempts to detect collusion by examining co-movements of price and quantity. His investigation is motivated by the observation that a cartel increases price by restricting supply, so that price and quantity move in opposite directions. He claims that, on the contrary, LCD prices and quantities historically moved in the same direction, which is what one would expect to see as a result of fluctuations in demand (¶¶185-189). From that observation, he leaps to the conclusion that the conspiracy must not have been effective. Dr. Carlton's leap is not scientifically valid, and his conclusion is therefore unreliable (see also Hitt ¶10).

(419)    No one disputes the existence of fluctuations in demand or their importance for market equilibrium—in fact, the econometric models used by experts in this case generally include controls for demand-side factors precisely because those factors are important. Consequently, it is hardly surprising to see price and quantity moving in the same direction. As Dr. Hitt agreed in his deposition, even a monopolist would respond to changes in demand in a way that would cause prices and quantities move in the same direction.[312] Adding a conspiracy of variable effectiveness to the mix might create some countervailing effects for the reason Dr. Carlton notes, but there is no reason to think that those effects would necessarily be so large as to reverse the underlying pattern produced by demand shocks. Thus, one cannot validly test for the existence of an effective conspiracy by examining the raw correlation between price changes and quantity changes.

---

[312]  Deposition of Lorin Hitt, April 13, 2012, 200-2.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 185

(420)  Dr. Carlton also graphically examines the raw correlation between price changes and capacity utilization rates (¶¶190-193). The significance of that analysis is even less clear. To the extent capacity utilization stands in for quantity, I have the same fundamental objection described in the previous paragraph. But there is another possibility: high capacity utilization reflects a conspiratorial restriction on capacity. Indeed, the patterns Dr. Carlton documents for price changes, quantity changes, and capacity utilization are consistent with the possibility that the Defendants moderated the growth of capacity when demand was strong, thereby somewhat muting the increase in quantity that would otherwise have been observed. As a result, one would observe periods of high quantity, high price, and high capacity utilization, just as in Dr. Carlton's figures.

(421)  Dr. Moore provides an even more simplistic and equally problematic analysis of co-movements between prices and quantities: he points out that Tottori Sanyo's prices were generally falling over time while its output was rising, and he asserts this is inconsistent with anticompetitive supply restrictions (¶¶55-58). But falling costs coupled with increasing demand could cause prices to fall and output to rise over time regardless of whether the industry were competitive or cartelized. Thus, Dr. Moore's analysis focuses on the wrong comparison. The question is not how prices and quantities changed from one quarter to the next, but rather how they compared to the levels that would have prevailed but-for the cartel. His analysis does not speak to that question.

(422)  *7. Prices relative to various targets.* According to Dr. Williams, SDI's price decreases were consistent with meeting Nokia's cost-reduction targets (¶¶122-125); he takes that observation as evidence that SDI's prices could not have been inflated by significant overcharges. He is wrong for at least two reasons. First, as explained earlier in this section, there is no reason to think that the conspiracy would have slowed the rate of price decline over the relevant period; indeed, it may have had the opposite effect (as the conspiracy unraveled). Panel price declines may have matched or exceeded Nokia's cost-reduction targets even though the overall price level was inflated, particularly if the conspiracy was unraveling during the period in question (so that prices were declining even faster than they would have absent the conspiracy). Second, there is no reason to think that Nokia's cost-reduction targets were formulated based on an appropriate competitive benchmark. On the contrary, Nokia formed its expectations about costs while observing cartelized prices.

(423)  Dr. Moore notes that Electrograph set "target prices" for suppliers. He suggests that my overcharge estimates "may be overstated" based on a single example in which my but-for price was below Electrograph's target price (¶92). His conclusion does not follow for two reasons. First, one cherry-picked example does not constitute serious economic analysis. Dr. Moore has made no attempt to show that his example represents a systematic pattern rather than an exception. Second, and more importantly, Electrograph's targets were almost certainly influenced by market prices, and hence by the cartel's overcharges. There is no reason to think that Electrograph's targets would have been above my estimated but-for prices if the conspiracy had not inflated prices to begin with.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 186

(424)    Dr. Moore acknowledges the logic of this second point, but responds that the particular target he examined was set at a time when, according to my analysis, overcharges were roughly zero (i.e., in October 2001 for December 2001). But this response cannot rescue his analysis. There is no reason to think that Electrograph's targets were influenced only by *current* market prices; they may have been based on past prices over a considerably longer time period. In addition, Dr. Moore ignores the fact that other market conditions may have changed between October 2001 and December 2001. Had it correctly anticipated market conditions affecting prices for December 2001, Electrograph might have set a different target. Because he focuses on a single event, Dr. Moore has no way to average out such random fluctuations.

(425)    *8. Price declines were similar for conspirators and non-conspirators.* According to Dr. Williams, SDI's price decreases were similar to those of non-conspirators; he takes this observation as an indication that SDI prices must not have been inflated by significant overcharges. Dr. Williams' conclusion is contrary to basic economic principles. One generally expects the prices charged by non-conspirators in move in parallel with the prices charged by conspirators; after all, conspirators and non-conspirators offer substitutable products, and non-conspirators set their prices under the umbrella of the conspiracy. Indeed, several of the Defendants' experts acknowledge this point when discussing the notion of a "competitive fringe" (see, e.g. Moore ¶39 and Harris ¶40). Thus, the similarity between prices charged by conspirators and non-conspirators proves nothing about the effectiveness of the conspiracy.

(426)    *9. Prices were strongly related to costs.* Dr. Rubinfeld's report includes a section titled "Changes in Costs of Panel Components Account for Much of the Variation in Panel Prices" (Section VI.C). The basic premise of that section is not in dispute. Prices fell dramatically over the period in question, and declining costs contributed to that trend. However, that observation does not distinguish between competition and collusion. One expects prices to bear a strong relationship to costs regardless of whether an industry is competitive, cartelized, or monopolized.[313]

---

[313]    Dr. Rubinfeld regresses average prices for large and small panels on cost components, obtaining an R-squared of 0.90 for large panels and 0.91 for small panels. He concludes that costs "explain a large percentage of the changes in the large panel price index" (¶). However, there is no reason to think these regressions describe valid causal relationships, contrary to Dr. Rubinfeld's apparent belief. The regressions include no variables other than costs—e.g., no demand factors. The cost variables therefore proxy for the effects of all left-out variables, many of which have similar trends and fluctuations. Not surprisingly, a number of the coefficients are negative, contrary to any reasonable causal interpretation. Consequently, Dr. Rubinfeld cannot legitimately conclude that costs causally account for 90 percent or more of the variation in prices.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 195 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## VIII.B. Evidence of rivalry does not provide a reliable basis for inferring the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates

(427)   Several of the Defendants' experts opine that the cartel must have been ineffective because market shares changed considerably during the conspiracy period (see, e.g., Williams ¶¶134-135, Hitt ¶27).[314] They are wrong for several reasons.

- First, as I have emphasized, my overcharge estimates imply that the industry did not suppress all rivalry; indeed, it was closer to the competitive end of the spectrum than to the monopoly end. Even if one believed that volatile market shares were indicative of competition, one should not be at all surprise to find significant volatility during such a modestly effective conspiracy, particularly given that the effectiveness of the conspiracy waxed and waned over time.

- Second, volatility in market shares is not a distinctive hallmark of competition. A cartel strives to emulate a multiplant monopolist. As supply conditions change, such a monopolist would reallocate the distribution of production across plants. Keeping that distribution fixed would be inefficient. Thus, an efficient cartel does not suppress all market share volatility. While it is certainly true that an effective cartel would stabilize market shares if the cartel members explicitly agreed to do so, I have seen no evidence that the LCD cartel attempted to operate in that manner.

- Third, in a dynamic market with evolving technology, the negotiating positions of cartel members change over time, so one would naturally expect their shares to change. A firm that would lose market share absent collusion is willing to accept a lower share (contrary to Dr. Hitt's assertion in ¶27) because it would fare even worse with open rivalry. Such firms may have especially powerful reasons to collude because cartels tend to protect inefficient firms.

(428)   Several of the Defendants' experts point to specific instances of rivalry, calling them inconsistent with collusion. Such episodes may be inconsistent with *perfect* collusion, but one expects to see evidence of considerable rivalry in an imperfect cartel that only succeeds in attaining a small fraction of the monopoly markup. Dr. Hitt claims that Sharp's investments were disruptive and contributed to declines in price, yet he provides only a single example (from January 2001), wherein Hitachi and Samsung executives attributed a price decline to Sharp's capacity expansion (¶28). He has conducted no independent analysis to verify whether those impressions were correct, or to determine whether the episode was typical or atypical. In any case, in an imperfect cartel, conspirators sometimes make disruptive investments.

---

[314]   In addition to making this general point, Dr. Williams also notes that non-conspirators gained larger shares of Nokia's global purchases after the conspiracy ended than during the conspiracy (his Exhibits 14.A through 14.C). He sees that pattern as contrary to the hypothesis that the cartel restricted the Defendants' output. This evidence is of no great significance because it pertains only to Nokia. Moreover, Dr. Williams fails to control for any other time-varying factor that may have affected the growth of sales by companies not involved in the conspiracy. As Dr. Williams' exhibits show, non-conspirators started with little or no share, and hence the pattern to which he points may reflect the natural evolution and maturation of their relationships with Nokia.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 188

Evidence of such episodes is in no way inconsistent with the hypothesis that, as a general matter, the cartel significantly raised price. Dr. Rubinfeld claims that Samsung won significant portions of Motorola's business by pricing below competitors (¶230), but he neglects the fact that the lowest bidder tends to prevail even when suppliers collude; thus, merely pointing to the fact that a company sometimes secured business by quoting the lowest price does not imply that the price was unaffected by a degree of mutual forbearance amongst the conspirators.

## VIII.C. In this industry, comparisons of price-cost and profit margins during the conduct period with benchmarks do not provide a reliable basis for determining the effectiveness of the cartel or evaluating the reasonableness of overcharge estimates

(429)    Dr. Carlton observes that LCD price-cost margins were, on average, approximately the same in 2005 and 2006 as in 2007 and 2008 (¶¶179-182). Likewise, according to Dr. Rubinfeld, Samsung's operating profit margins were the same or higher during the conspiracy period than after (¶¶244-246).[315] From these observations they conclude that the conspiracy could not have elevated prices significantly. Once again, their analyses are naïve and their conclusions unsupportable.[316]

(430)    First, the inferences that Drs. Carlton and Rubinfeld attempt draw from these inter-temporal comparisons of price-cost margins depend critically on the premise that the LCD panel industry was mature throughout this period, so that the correct non-conspiratorial benchmark is an unchanging margin. As I explained in Section VII.D, that premise is simply false. Dr. Carlton has himself emphasized that the industry changed considerably and developed rapidly during this period (¶44-45), while Dr. Rubinfeld explicitly states that it "matured" (¶¶164-168). As I explained in Section VII.B.1, there is every reason to expect that firms in industries with characteristics such as this one will anticipate losing substantial sums of money for extended periods of time, in the hope of establishing positions that allow them to earn substantial profits once the industry begins to mature. Thus, it is likely that the appropriate non-collusive benchmark has the feature that price-cost margins are low (even negative) during the industry's explosive growth stage, but rise once it reaches sufficient size and maturity. Notably, neither Dr. Carlton nor Dr. Rubinfeld makes any attempt to control for the many factors (including but not limited to industry maturity) that may have changed over the pertinent time period.

(431)    Second, Drs. Carlton and Rubinfeld both examine measures of margins that net out capital costs, including depreciation. Accounting conventions allocate capital costs over time according to formulas

---

[315]    Notably, for this purpose (and in contrast to how he formulated his econometric model), Dr. Rubinfeld classified 2006 as falling into the post-conspiracy period. His calculations are somewhat sensitive to that questionable classification.

[316]    Notably, Dr. Carlton's analysis of price-cost margins employs measures of prices and costs aggregated to the level of applications (notebook, monitor, TV, and mobile). Yet elsewhere, he claims that conclusions based on such highly aggregate price series are unreliable (¶70). Plainly, he cannot have it both ways.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI   Document 7944-3   Filed 05/17/13   Page 197 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

that often bear little or no relationship to economic realities. The time paths of accounting costs, upon which Drs. Carlton and Rubinfeld both rely for their conclusions, are therefore inherently suspect.

(432)   The Defendants' experts also compare profit margins during the conspiracy to other benchmarks. Dr. Rubinfeld states that Motorola regarded 7% as a "fair" margin, and he quotes a Motorola employee as saying that he would have expected panel vendors to earn profits "of approximately 5 to 10 percent" (¶250). He then notes that Samsung earned average operating profits of 9.0 percent on sales to Motorola during this period. According to Dr. Williams, "[t]he range of reasonable operating margins identified by Nokia deponents is from 10% to 30%, with 15% being described as 'on the low end'…" (¶126). Dr. Williams places SDI's operating margin as a percent of sales revenue at 14.6% (¶128). Drs. Rubinfeld and Williams both suggest that these comparisons show the absence of overcharges. However, neither of them has any legitimate scientific basis for believing that Nokia's or Motorola's notion of a "fair" or "reasonable" operating profit margin coincides with an appropriate benchmark, or was even shared by others. Indeed, Motorola's notion of a "fair" margin falls outside Nokia's "reasonable" range. Particularly inasmuch Motorola's and Nokia's views of "fair" and "reasonable" margins were shaped by experience in a cartelized environment, these comparisons are of no significance, and the conclusions that Drs. Rubinfeld and Williams draw from them are unreliable.

## VIII.D. Conclusions concerning overcharges based on proper econometric analyses are far more reliable than those based on other evidence proffered by the Defendants' experts

(433)   According to Dr. Carlton, the incremental value of an econometric model of overcharges is, in this case, "fairly limited" (¶224). Partly, this view reflects his unfounded reservations concerning my overcharge analysis, which I have refuted (Section II), as well as his apparent lack of confidence in the validity of his own econometric analysis, which I agree is entirely warranted (Section III). However, it also reflects his view that other simple patterns provide a reliable foundation for the conclusion that overcharges were small. Nothing could be further from the truth.

(434)   The patterns upon which Dr. Carlton would rely in preference to econometric modeling are set forth at the start of the section of his report that presents his econometric analysis (¶222). They are: (1) "the TFT-LCD industry conditions include many factors known to hinder attempts by cartels to elevate prices;" (2) "no drop in prices was evident at the end of the alleged cartel;" (3) "the price-cost margins were approximately the same (and certainly no higher) during the alleged cartel as after;" and (4) "Plaintiff Experts' claim that prices would have been much lower (with no corresponding reduction in investments) during the alleged cartel implies that Defendants should have earned negative economic profits throughout the alleged cartel period." In other sections of this report, I have demonstrated that each of these four pillars of Dr. Carlton's opinion supports no legitimate inference concerning the magnitude of overcharges (see, respectively, Section VI, Section VIII.A, Section VIII.D, and Section VII). Dr.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 190

Carlton's reference to industry conditions in this context is rather astonishing given his own admission that one can infer very little about overcharges from them (¶109).

(435)    Dr. Carlton's preference for simple during-and-after comparisons involving prices and margin over rigorous econometric evidence not only places him well outside the mainstream of economic thought and practice, but is also inconsistent with the opinions he expresses elsewhere in his report. It is generally acknowledged that in-depth analysis is required to demonstrate that a given simple pattern reliably depicts the effect of interest and is not attributable to other spurious factors. Dr. Carlton explicitly acknowledges this point when, in another context, he cautions against drawing inferences from the absence of differences in prices on the grounds that other factors may have varied in ways that obscured the effect of interest, emphasizing that "*an empirical study of but-for prices is required to determine the magnitude of those overcharges*" (¶81, emphasis in original).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 191

# IX. Affected commerce

(436)    The Defendant Experts have offered a small number of criticisms related to the relevant volume of commerce. I address those criticisms below.

(437)    Dr. Rubinfeld claims that "Samsung's damages end no later than January 2006" because "Samsung took affirmative steps to end its participation in the anticompetitive conduct in 2005" and "received a marker from the Department of Justice (DOJ) for entry into the Corporate Leniency Program in January 2006" (¶¶426-427). If Dr. Rubinfeld intends this to mean that, as a result of these alleged actions, Samsung is not legally liable for any overcharges on its sales after January 2006, then this is a legal issue and I am offering no expert opinion in this regard.

(438)    However, if Dr. Rubinfeld instead is claiming that Samsung's sales of panels and finished goods after January 2006 occurred at competitive price levels that were unaffected by the conspiracy, then I disagree. First, as discussed above and in my initial report, my analysis demonstrates that market prices were elevated as a result of the conspiracy and remained elevated to some degree after January 2006. Second, Dr. Rubinfeld appears to be relying on some evidence related to two specific Samsung employees, but he does not offer any conclusive evidence that Samsung immediately stopped its conspiratorial activity in a comprehensive way. Third, Samsung's prices would have been elevated along with other prices in the market from the continued anticompetitive activity of the other conspirators after January 2006, even if Samsung itself had stopped. Fourth, even if Samsung was no longer actively conspiring by January 2006, the effects of their previous activities would likely have had effects that persisted for some time.

(439)    Dr. Williams states that I "use[d] all Motorola purchases, not just those with TFT modules." (¶ 68). He is clearly wrong by simply reviewing my initial report (Section I.D.) and backup materials.

(440)    The transaction purchase data provided by Motorola identifies approximately $340 million in purchases from Sanyo after Sanyo transferred its LCD-related divisions to its new joint venture with Epson. Based on instruction from counsel, I now treat Epson as the supplier for these purchases. This adjustment results in no change to the total affected commerce for Motorola.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# X. Updated damage estimates

## X.A. Additional adjustments

(441)   Dr. Rubinfeld notes that my but-for large panel price index is above the actual large panel price index for some months in 2006, and claims that these should be interpreted as "negative overcharges" (¶392). He then claims that "[n]ormally such negative overcharges are taken as an offset, or subtracted from the damages total" and that my analysis therefore "unreasonably overstates the appropriate damages total" (¶393). I disagree.

- First, while Dr. Rubinfeld claims that this is what is "normally" done, he provides no justification for this claim and no explanation as to why he believes it is appropriate in this case. I have seen this issue handled both ways; it is a point on which experts can and do disagree.

- Second, Dr. Rubinfeld has described this portion of 2006 as subsequent to both the "wind down phase" of the cartel, and to the point in time when he believes "Samsung's damages" ended as a result of taking "affirmative steps to end its participation" in the conspiracy (¶80, ¶426). It is unclear why Dr. Rubinfeld believes that Samsung's damages during the conspiracy period should be adjusted downward based on predicted but-for prices for a different time period during which we both agree the conspiracy was not effective.

- Third, my understanding is that, as a matter of law, the defendants are not permitted to deduct from their damages the aggregate effect of the cartel on prices for transactions for which overcharges may have been negative.

- Fourth, Dr. Rubinfeld's argument seems to suggest that the exclusion of negative overcharges creates a statistical bias. However, he has provided no reason to believe that my procedure for determining the end of the damage period is systematically biased in favor of terminating overcharges either too soon or too late.

- Fifth, to the extent that my but-for prices exceed actual prices at the end of the conspiracy period, if anything this indicates that my estimated but-for prices are in fact conservative, as I discussed in my initial report.

(442)   Dr. Rubinfeld claims that because Samsung had very little small panel sales before 2002 and was a net buyer of small panels until around 2002, its damages should be based on the plea period scenario rather than the conspiracy period scenario (¶383). That is completely illogical and is based on an apparent misunderstanding of my analysis. Either the anticompetitive behavior was limited to the plea period or it occurred during the longer conspiracy period. In either case, my analysis of but-for prices indicates how market-level prices would have evolved. Given the nature of the industry, market prices would not have evolved in one manner for Samsung and in another manner for all other firms. Even a firm joining the

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page 193

conspiracy for the first time after 2002 would be joining the conspiracy in progress at whatever price prevailed. Dr. Rubinfeld's argument is equivalent to claiming that a person's feet will not get wet when walking in a puddle simply because that person was not outside at the time when it was raining.

(443)    Dr. Moore claims that some of Motorola's purchases are "modules" that "included subcomponents not found in TFT-LCD panels" (¶69). He then suggests that this may have caused Motorola's damages to be overstated if I applied "a panel overcharge to the purchase of modules" (¶70). I disagree with Dr. Moore's concern. First, Dr. Moore's claim is only an unproven hypothetical and is based entirely on speculation. At his deposition, Dr. Moore agreed that he is not offering the opinion that the damages are overstated, just instead that he had "some questions". [317] He admitted that his "job was not to – it was not to prove that it was wrong," that determining whether or not his speculation was correct "would have been beyond the scope of [his] assignment," and that he had no estimate on the potential size of the hypothetical overstatement.[318] Second, Dr. Moore seems to misunderstand that my analysis of Motorola's pricing is based on the products that it actually purchased and therefore accounts for Dr. Moore's hypothetical concern.

(444)    Dr. Moore also notes that Motorola's true prices were masked in some instances, in the sense that component suppliers charged the module makers an artificial premium, and then Motorola rebated the premium back to the component suppliers (¶75). He claims that the inflated portion of cost should be subtracted before applying the overcharge percentage. However, his argument is also implicitly based on an unproven premise: that the rebates from Motorola to the component supplier would have been proportionately smaller but-for the overcharges on modules. I can think of no economic reason why Motorola would have required a higher degree of price masking with the cartel than without. Because Dr. Moore offers neither proof nor economic argument to explain why the rebates associated with price masking would have been different but for the conspiracy, there is no basis either for concluding that my analysis is inaccurate or for making an adjustment.

## X.B. Final damage estimates

(445)    I continue to believe that my panel overcharges provide the best measure of overcharges suffered by plaintiffs in this matter, and have therefore made no changes to my estimates of overcharges suffered by Motorola, with one exception: I have reallocated purchases and damages from Sanyo to Epson as described in Section X above.[319]

---

[317]  Moore deposition, pages 252:7-10 and 273:24-275:1.

[318]  Moore deposition, pages 273:24-275:1, 276:22-277:13, and 285:14-286:20.

[319]  In his Appendix I, Dr. Carlton estimated the share of Motorola's global purchases that were purchased outside the United States and used in mobile phones that were later sold in the United States ("Category 2"). He reported two different estimates – the first was based on purchase values reported in Motorola's complaint and the second was based on actual data produced by Motorola. The second method provides a more appropriate estimate. I applied Dr. Carlton's method to my purchase and overcharge estimates and find that 42% of total purchases and 41% of total damages were associated with Category 2 panels. Details are provided in the backup materials provided along with this report.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

_____          May 11, 2012
B. Douglas Bernheim, PhD                          Date

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# Appendix A. CV

## B. Douglas Bernheim

## A.1. Summary of experience

Douglas Bernheim is the Edward Ames Edmunds Professor of Economics at Stanford University. He works with Bates White professionals and clients to provide intellectual leadership in antitrust litigation, mergers and acquisitions, and telecommunications. Dr. Bernheim has more than 25 years of experience and is a recognized leader in the academic community for his many contributions in the areas of industrial organization, public finance, applied econometrics, and microeconomic theory.

Dr. Bernheim regularly consults with attorneys on the economic aspects of antitrust litigation. He provides expert testimony in high profile litigation, mergers, and regulatory matters on such topics as market definition, competitive impact, countervailing efficiencies, monopolization, antitrust liability, and damages. He has authored numerous expert reports and assessed liability or damages for industries including microprocessors, healthcare and pharmaceuticals, vitamins, financial markets, telecommunications, railroads, airlines and aerospace, and manufactured products.

Dr. Bernheim is the author of more than 112 publications, including 59 peer-reviewed journal articles, four books, and many other professional and academic publications. He holds multiple distinctions, including John Simon Guggenheim Memorial Foundation Fellowship, Center for Advanced Study in the Behavioral Sciences Fellow, American Academy of Arts and Sciences Fellow, and Econometric Society Fellow.

## A.2. Areas of expertise

- Antitrust damages

- Antitrust liability

- Industrial organization and game theory

- Mergers and acquisitions

- Public finance

- Statistics and econometrics

- Telecommunications

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## A.3. Testimony

My sworn testimony over the last four years is as follows:

- *In re TFT-LCD (Flat Panel) Antitrust Litigation,* United States District Court for the Northern District of California. Expert report and deposition testimony: 2011–2012.

- *Adelphia Recovery Trust V. Bank of America, N.A.,* United States Bankruptcy Court for the Southern District of New York. Expert report and deposition testimony: 2010.

- *Adelphia Communications Corporation v. Motorola, Inc.,* United States Bankruptcy Court for the Southern District of New York. Expert report and deposition testimony: 2009.

- *Advanced Micro Devices, Inc. v. Intel Corporation,* United States District Court for the District of Delaware. Expert report: 2009.

- *Amgen, Inc. v. F. Hoffman-La Roche Ltd.,* United States District Court for the District of Massachusetts. Expert report, deposition testimony, and hearing testimony: 2007.

- *Enron Creditors Recovery Corp. v. Citigroup Inc.*, United States Bankruptcy Court for the Southern District of New York. Expert report and deposition testimony: 2007.

## A.4. Education

- PhD, Massachusetts Institute of Technology

- AB, Harvard University, *summa cum laude*

## A.5. Editorial boards

- *Handbook of Behavioral Economics* (Elsevier, in progress)

- *American Economic Review*, Co-editor 2002–2005, Associate Editor 2005–2006

- *Journal of Public Economics*, Associate Editor 1998–2002

- *Journal of Financial Intermediation*, Co-editor, 1989–1993

- *Econometrica*, Associate Editor, 1987–1990

- *Quarterly Journal of Economics*, Associate Editor, 1984–1990

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## A.6. Selected publications

### A.6.a. Research papers in academic journals

- "Do Real Estate Brokers Add Value When Listing Services are Unbundled?" *Economic Inquiry*, forthcoming (with Jonathan Meer).

- "100 Years of the *American Economic Review*: The Top 20 Articles," *American Economic Review* 101, no. 1 (2011): 1–8 (with Kenneth Arrow, Martin Feldstein, Daniel McFadden, James Poterba, and Robert Solo).

- "Behavioral Welfare Economics, "Panoeconomicus 57, no. 2 (2010): 123–51.

- "Emmanuel Saez: 2009 John Bates Clark Medalist," *Journal of Economic Perspectives* 24, no. 3 (2010): 183–206.

- "A Solution Concept for Majority Rule in Dynamic Settings," *Review of Economic Studie*s 76, no. 1 (2009): 33–62 (with Sita Nataraj).

- "Behavioral Welfare Economics," *Journal of the European Economic Association* 7, no. 2–3 (2009): 267–319.

- "Beyond Revealed Preference: Choice-Theoretic Foundations for Behavioral Welfare Economics," *Quarterly Journal of Economics* 124, no. 1 (2009): 51–104 (with Antonio Rangel).

- "Neuroeconomics: A Sober (but Hopeful) Appraisal," *AEJ: Microeconomics* 1, no. 2 (2009): 1–41.

- "Social Image and the 50-50 Norm: A Theoretical and Experimental Analysis of Audience Effects," *Econometrica* 77, no. 5 (2009): 1607–36 (with James Andreoni).

- "The Effects of Financial Education in the Workplace: Evidence from a Survey of Employers," *Economic Inquiry* 47, no. 4 (2009): 605–24 (with Patrick Bayer and John Karl Scholz).

- "Toward Choice-Theoretic Foundations for Behavioral Welfare Economics," *American Economic Review Papers and Proceedings* 97, no. 2 (2007): 464–70 (with Antonio Rangel).

- "From Neuroscience to Public Policy: A New Economic View of Addiction," *Swedish Economic Policy Review* 12 (2006): 11–46 (with Antonio Rangel).

- "Saving and Life Insurance Holdings at Boston University—a Unique Case Study," *National Institute Economic Review* 198 (2006): 75–96 (with Solange Berstein, Jagadeesh Gokhale, and Laurence J. Kotlikoff).

- "The Power of the Last Word in Legislative Policy Making," *Econometrica*, 74, no. 5 (2006): 1161–90 (with Antonio Rangel and Luis Rayo).

---

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- "How Do Residents Manage Personal Finances?" *American Journal of Surgery* 189, no. 2 (2005): 134–39 (with Joel Teichman, Patricia Cecconi, Neva Kerbeshian, Manoj Monga, Debra DaRosa, and Martin Resnick).

- "Memory and Anticipation," *Economic Journal* 115 (2005) 271–304 (with Raphael Thomadsen).

- "Addiction and Cue-Triggered Decision Processes," *American Economic Review* 94, no. 5 (2004): 1558–90 (with Antonio Rangel).

  ▫ Reprinted in *The Economics of Health Behaviours*, eds. John H. Cawley and Donald S. Kenkel, Ch. 9 (London: Edward Elgar Publishing Ltd, 2008).

  ▫ Reprinted in *The New Behavioral Economics*, ed. Elias L. Khalil, 404–36 (London: Edward Elgar Publishing, Ltd., 2009).

- "Do Estate and Gift Taxes Affect the Timing of Private Transfers?" *Journal of Public Economics* 88, no. 12 (2004): 2617–34 (with Robert Lemke and John Karl Scholz).

- "Are Life Insurance Holdings Related to Financial Vulnerabilities?" *Economic Inquiry* 41, no. 4 (2003): 531–54 (with Katherine Carman, Jagadeesh Gokhale, and Laurence Kotlikoff).

- "Bequests as Signals: An Explanation for the Equal Division Puzzle," *Journal of Political Economy* 111, no. 4 (2003): 733–64 (with Sergei Severinov).

- "The Effects of Financial Education in the Workplace: Evidence from a Survey of Households," *Journal of Public Economics* 87, no. 7–8 (2003): 1487–1519 (with Daniel M. Garrett).

- "The Mismatch Between Life Insurance and Financial Vulnerabilities: Evidence from the Health and Retirement Survey," *American Economic Review* 93(1), March 2003, 354–365 (with Lorenzo Forni, Jagadeesh Gokhale, and Laurence Kotlikoff).

- "Education and Saving: The Long-Term Effects of High School Financial Curriculum Mandates," *Journal of Public Economics*, 80, no. 3 (2001): 435–65 (with Daniel M. Garrett and Dean Maki).

- "How Do Urology Residents Manage Personal Finances?" *Urology* 57, no. 5 (2001): 866–71 (with Joel Teichman, Eric Espinosa, Patricia Parker, Joana Meyer, Margaret Pearle, Glenn Preminger, and Raymond Leveille).

- "Optimal Money Burning: Theory and Application to Corporate Dividend Policy," *Journal of Economics and Management Science* 10, no. 4 (2001): 463–507 (with Lee Redding).

- "What Accounts for the Variation in Retirement Saving Across US Households?" *American Economic Review* 91, no. 4 (2001): 832–57 (with Jonathan Skinner and Steven Weinberg).

- "How Much Should Americans be Saving for Retirement?" *American Economic Review Papers and Proceedings* 90, no. 2 (2000): 288–92.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- "Exclusive Dealing," *Journal of Political Economy* 106, no. 1 (1998): 64–103 (with Michael Whinston).

- "Incomplete Contracts and Strategic Ambiguity," *American Economic Review* 88, no. 4 (1998): 902–32 (with Michael Whinston).

   □ Reprinted in *Economic Approaches to Law*, ed. Pablo T. Spiller (Cheltenham, UK: Edward Elgar Publishing Ltd., forthcoming).

- "Rational Strategic Choice Revisited," *Scandinavian Journal of Economics* 100, no. 2 (1998): 537–41.

- "Veblen Effects in a Theory of Conspicuous Consumption," *American Economic Review* 86, no. 3 (1996): 349–73 (with Laurie Simon Bagwell).

- "A Tax-Based Test of the Dividend Signaling Hypothesis," *American Economic Review* 85, no. 3 (1995): 532–51 (with Adam Wantz).

- "Repeated Games with Asymptotically Finite Horizons," *Journal of Economic Theory* 67, no. 1 (1995): 129–52 (with Aniruddha Dasgupta).

- "A Theory of Conformity," *Journal of Political Economy* 102, no. 5 (1994): 841–77.

- "Private Saving and Public Policy," *Tax Policy and the Economy* 7 (1993): 73–110 (with John Karl Scholz).

- "Fiscal Policy with Impure Intergenerational Altruism," *Econometrica* 59, no. 6 (1991): 1687–1712 (with Andrew Abel).

- "How Strong are Bequest Motives? Evidence Based on Estimates of the Demand for Life Insurance and Annuities," *Journal of Political Economy* 99, no. 5 (1991): 899–927.

- "Tax Policy and the Dividend Puzzle," *Rand Journal of Economics* 22, no. 4 (1991): 455–76.

   □ Reprinted in *The Economics of Taxation*, ed. James Alm, (Cheltenham, UK: Edward Elgar Publishing Ltd., forthcoming).

- "Multimarket Contact and Collusive Behavior," *Rand Journal of Economics* 21, no. 1 (1990): 1–26 (with Michael Whinston).

   □ Reprinted in *Readings in Industrial Organization*, ed. Luis Cabral, 71–102 (Oxford, UK: Blackwell, 2000).

   □ Reprinted in *Cartels*, eds. Margaret C. Levenstein and Stephen W. Salant , Ch. 24 (Cheltenham, UK: Edward Elgar Publishing Ltd., 2007).

- "A Neoclassical Perspective on Budget Deficits," *Journal of Economic Perspectives* 3 (Spring 1989): 55–72.

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

       □   Reprinted in *Debt and Deficits*, vol. 3, *Debt Neutrality and the Theory of Fiscal Policy, 1970s to 1990s*, eds. Lakis C. Kaounides and Geoffrey E. Wood, 431–48 (London: Edward Elgar Publishing Ltd., 1992).

       □   Translated into Italian and reprinted in *Rassegna di lavori dell' ISCO*, ed. Giuseppe. Eusepi (ISCO: Rome, 1993).

■   "Collective Dynamic Consistency in Repeated Games," *Games and Economic Behavior* 1, no. 4 (1989): 295–326 (with Debraj Ray).

■   "Intergenerational Altruism, Dynastic Equilibria and Social Welfare," *Review of Economic Studies* 56 (January 1989): 119–28.

■   "Markov Perfect Equilibria in Altruistic Growth Economies with Production Uncertainty," *Journal of Economic Theory* 47 (February 1989): 195–202 (with Debraj Ray).

■   "Social Security and Saving: An Analysis of Expectations," *American Economic Review* 79, no. 2 (1989): 97–102 (with Lawrence Levin).

■   "Altruism within the Family Reconsidered: Do Nice Guys Finish Last?" *American Economic Review* 78, no. 5 (1988): 1034–45 (with Oded Stark).

       □   Reprinted in *The Economics of Altruism*, ed. Steven Zamagni, ch. 22 (London: Edward Elgar Publishing Ltd., 1993).

■   "Is Everything Neutral?" *Journal of Political Economy* 96, no. 2 (1988): 308–38 (with Kyle Bagwell).

       □   Reprinted in *The New Classical Macroeconomics*, ed. K.D. Hoover, 166–207 (London: Edward Elgar Publishing Ltd., 1992).

■   "Coalition Proof Nash Equilibria I: Concepts," *Journal of Economic Theory* 42, no. 1 (1987): 1–12 (with Bezalel Peleg and Michael Whinston).

■   "Coalition Proof Nash Equilibria II: Applications," *Journal of Economic Theory* 42, no. 1 (1987): 13–29 (with Michael Whinston).

■   "Economic Growth with Intergenerational Altruism," *Review of Economic Studies* 54, no. 2 (1987): 227–42 (with Debraj Ray).

■   "Ricardian Equivalence: An Evaluation of Theory and Evidence," *NBER Macro Annual* 2 (1987): 263–304.

       □   Reprinted in *Debt and Deficits,* vol. 3, *Debt Neutrality and the Theory of Fiscal Policy, 1970s to 1990s*, eds. Lakis C. Kaounides and Geoffrey E. Wood, 263–304 (London: Edward Elgar Publishing Ltd., 1992).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Case 3:07-md-01827-SI    Document 7944-3    Filed 05/17/13    Page 209 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- "The Economic Effects of Social Security: Towards a Reconciliation of Theory and Measurement," *Journal of Public Economics* 33, no. 3 (1987): 273–304.

- "Axiomatic Characterizations of Rational Choice in Strategic Environments," *Scandinavian Journal of Economics* 88, no. 3 (1986): 473–88.

- "Common Agency," *Econometrica* 54, no. 4 (1986): 923–42 (with Michael Whinston).

- "Menu Auctions, Resource Allocation, and Economic Influence," *Quarterly Journal of Economics* 101, no. 1 (1986): 1–31 (with Michael Whinston).

  □ Reprinted in *The Economics of Contracts*, ed. Patrick Bolton, article 6 (London: Edward Elgar Publishing Ltd., 2009).

- "On the Existence of Markov-Consistent Plans Under Production Uncertainty," *Review of Economic Studies* 53, no. 5 (1986): 877–82 (with Debraj Ray).

- "On the Voluntary and Involuntary Provision of Public Goods," *American Economic Review* 76, no. 4 (1986): 789–93.

- "Common Marketing Agency as a Device for Facilitating Collusion," *Rand Journal of Economics* 16, no. 2 (1985): 269–81 (with Michael Whinston).

  □ Reprinted in *Cartels*, vol. 2, eds. Margaret C. Levenstein and Stephen W. Salant, article 7 (Cheltenham, UK: Edward Elgar Publishing Ltd., 2007).

- "The Strategic Bequest Motive," *Journal of Political Economy* 93, no. 6 (1985): 1045–76 (with Andrei Shleifer and Lawrence Summers).

  □ Reprinted in *The Economics of the Family*, ed. Nancy Folbre (Cheltenham, UK: Edward Elgar Publishing Ltd., 1996).

- "Rationalizable Strategic Behavior," *Econometrica* 52, no. 4 (1984): 1007–28.

  □ Reprinted in *Recent Developments in Game Theory*, ed. Eric Maskin, article 11 (Cheltenham, UK: Edward Elgar Publishing Ltd., 1999).

- "Strategic Deterrence of Sequential Entry into an Industry," *Rand Journal of Economics* 15, no. 1 (1984): 1–11.

- "A Note on Dynamic Tax Incidence," *Quarterly Journal of Economics* 96, no. 4 (1981): 705–23.

  □ Reprinted in *The Distribution of Tax Burdens*, eds. Don Fullerton and Gilbert E. Metcalfe, article 23 (London: Edward Elgar Publishing Ltd., 2003).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page A-7

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## A.6.b. Research papers published in books and conference volumes

■ "Choice-Theoretic Foundations for Behavioral Welfare Economics," in *The Foundations of Positive and Normative Economics*, eds. Andrew Caplin and Andrew Schotter, (Oxford: Oxford University Press, 2008) (with Antonio Rangel).

■ "The Psychology and Neurobiology of Judgment and Decision-Making: What's in it for Economists?" in *Neuroeconomics: Decision Making and the Brain*, Paul W. Glimcher, Colin F. Camerer, Ernst Fehr, and Russell A. Poldrack (eds.), 115–25 (New York: Elsevier, 2008).

■ "Behavioral Public Economics: Welfare and Policy Analysis with Fallible Decision-Makers," in *Behavioral Economics and its Applications*, eds. Peter Diamond and Hannu Vartianen, 7–77 (Princeton University Press, 2007) (with Antonio Rangel).

  □ Translated into Chinese and reprinted in the *Nanjing Business Review*, forthcoming.

■ "An Economic Approach to Setting Retirement Saving Goals," in *Innovations in Financing Retirement*, eds. Olivia Mitchell, Zvi Bodie, Brett Hammond, and Steven Zeldes, 77–105 (Philadelphia: University of Pennsylvania Press, 2002) (with Lorenzo Forni, Jagadeesh Gokhale, and Laurence Kotlikoff).

■ "Taxation and Saving," in *Handbook of Public Economics*, vol. 3, eds. Alan J. Auerbach and Martin S. Feldstein, 1173–1249 (Amsterdam: Elsevier, 2002).

■ "Household Financial Planning and Financial Literacy: The Need for New Tools," in *Essays on Saving, Bequests, Altruism, and Life-Cycle Planning*, ed. Laurence J. Kotlikoff, 427–77 (Cambridge, MA: MIT Press, 2001).

■ "Financial Illiteracy, Education, and Retirement Saving," in *Living with Defined Contribution Pensions,* eds. Olivia S. Mitchell and Sylvester J. Schieber, 38–68 (Philadelphia: University of Pennsylvania Press, 1998).

■ "Rethinking Saving Incentives," in A. Auerbach (ed.), *Fiscal Policy: Lessons from Economic Research*, MIT Press: Cambridge, MA, 1997, 259–311.

■ "Taxation and Saving: A Behavioral Perspective," in *Proceedings of the Eighty-Ninth Annual Conference on Taxation*, National Tax Association, 28–36 (Washington, DC: 1997).

■ "The Adequacy of Personal Retirement Saving: Issues and Options," in *Facing the Age Wave*, ed. David Wise, 30–56 (Stanford: Hoover Institution Press, 1997).

■ "Do Households Appreciate Their Financial Vulnerabilities? An Analysis of Actions, Perceptions, and Public Policy," in *Tax Policy and Economic Growth*, 1–30 (Washington, DC: American Council for Capital Formation, 1995).

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- "Personal Saving, Information, and Economic Literacy: New Directions for Public Policy," in *Tax Policy for Economic Growth in the 1990s*, 53–78 (Washington, DC: American Council for Capital Formation, 1994).

- "Comparing the Cost of Capital in the United States and Japan," in *Technology and the Wealth of Nations*, eds. Nathan Rosenberg, Ralph Landau, and David C. Mowery, 151–74 (Stanford University Press: 1992).

- "Consumption Taxation in a General Equilibrium Model: How Reliable are Simulation Results?" in *National Saving and Economic Performance*, eds. B. Douglas Bernheim and John B. Shoven, 131–58 (University of Chicago Press, 1991) (with John Karl Scholz and John B. Shoven).

- "How do the Elderly Form Expectations? An Analysis of Responses to New Information," in *Issues in the Economics of Aging*, ed. David Wise, 259–83 (University of Chicago Press: 1990).

- "Incentive Effects of the Corporate Alternative Minimum Tax," in *Tax Policy and the Economy*, vol. 3, ed. Lawrence H. Summers, 69–96 (Cambridge, MA: MIT Press, 1989).

- "The Crisis in Deposit Insurance: Issues and Options," in *Capital Issues in Banking*, ed. Stuart I. Greenbaum, 160–97 (Washington, DC: Association of Reserve City Bankers, 1989).

- "The Timing of Retirement: A Comparison of Expectations and Realizations," in *The Economics of Aging*, ed. David Wise, 335–55 (University of Chicago Press: 1989).

- "Budget Deficits and the Balance of Trade," in *Tax Policy and the Economy*, vol. 2, ed. Lawrence H. Summers, 1–32 (Cambridge, MA: MIT Press, 1988).

- "Comparable Worth in a General Equilibrium Model of the US Economy," in *Research in Labor Economics*, vol. 9, ed. Ronald G. Ehrenberg, 1–52 (Greenwich, CT: JAI Press, 1988) (with Perry Beider, Victor Fuchs, and John B. Shoven).

- "Pension Funding and Saving," in *Pensions in the US Economy*, eds. Zvi Bodie, John B. Shoven, and David A. Wise, 85–111 (University of Chicago Press: 1988) (with John B. Shoven).

  - Reprinted in *Cases and Materials on Employee Benefits Law*, eds. Maria O'Brien Hylton and Lorraine A. Schmall (Eagan, MN: West Publishing Co., 1998).

- "Social Security Benefits: An Empirical Study of Expectations and Realizations," in *Issues in Contemporary Retirement*, eds. Edward Lazear and Rita Ricardo-Campbell, 312–45 (Stanford: Hoover Institution Press, 1988).

- "Dissaving After Retirement: Testing the Pure Life Cycle Hypothesis," in *Issues in Pension Economics*, eds. Zvi Bodie, John B. Shoven, and David A. Wise, 237–82 (University of Chicago Press: 1987).

- "Does the Estate Tax Raise Revenue?" in *Tax Policy and the Economy*, ed. Lawrence H. Summers, 113–38 (Cambridge, MA: MIT Press, 1987).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page A-9

☐ Reprinted in *Federal Transfer Tax Anthology*, eds. Paul L. Caron, Grayson M.P. McCouch, and Karen C. Burke (Cincinnati: Anderson Publishing Co., 1998).

■ "Taxation and the Cost of Capital: An International Comparison," in *The Consumption Tax: A Better Alternative?* eds. Charles E. Walker and Mark A. Bloomfield (Pensacola: Ballinger Publishing Co., 1987) (with John B. Shoven).

☐ Translated into French and reprinted in *Annales d'Economie et de Statistique* 11 (1988): 93–116.

## Reviews and comments

■ Comment on "Family Bargaining and Retirement Behavior," in *Behavioral Economics and Retirement Policy*, ed. Henry J. Aaron, 273–81 (Washington, DC: Brookings Institution Press, 1999).

■ Comment on "Measuring Poverty Among the Elderly," in *Inquiries in the Economics of Aging*, ed. David A. Wise, 200–04 (University of Chicago Press, 1998).

■ Comment on "The Effects of Fundamental Tax Reform on Saving," in *Economic Effects of Fundamental Tax Reform*, eds. Henry J. Aaron and William G. Gale, 112–17 (Washington, DC: Brookings Institution, 1996).

■ Comment on "401(k) Plans and Tax Deferred Saving" and "Some Thoughts on Saving," in *Studies in the Economics of Aging,* ed. David A. Wise, 171–79 (University of Chicago Press, 1994).

■ Comment on "Do Saving Incentives Work?" *Brookings Papers on Economic Activity* 1 (1994): 152–66.

■ Comment on "Optimal Fiscal and Monetary Policy: Some Recent Results," *Journal of Money, Credit, and Banking* 23, no. 3 (1991): 540–42.

■ Comment on "Repackaging Ownership Rights and Multinational Taxation: The Case of Withholding Taxes," *Journal of Accounting, Auditing and Finance* 6, no. 4 (1991): 533–36.

■ "Pondering Pensions," review of *Pensions, Economics, and Public Policy*, by Richard Ippolito, *Regulation*, November/December 1986, 53–55.

## A.6.c. Books

■ *Microeconomics* (New York: McGraw-Hill, December 2007) (with Michael Whinston).

☐ *Intermediate Microeconomics*, pre-published ed. (McGraw-Hill, September 2007) (with Michael Whinston).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Case 3:07-md-01827-SI     Document 7944-3     Filed 05/17/13     Page 213 of 241

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- *Anticompetitive Exclusion and Foreclosure through Vertical Agreements*, CORE Lecture Series, Center for Operations Research and Econometrics, (Université Catholique de Louvain, 1999) (with Michael Whinston).

- *National Saving and Economic Performance* (University of Chicago Press, 1991) (co-editor, with John B. Shoven).

- *The Vanishing Nest Egg: Reflections on Saving in America* (New York: Twentieth Century Fund/Priority Press, 1991).

## A.6.d. Editorials

- "A Country Without a Nest Egg," *Los Angeles Herald Examiner*, October 25, 1987, F1–F4.

- "Despite Recent Fixes, Social Security Still Faces Day of Reckoning," *Los Angeles Herald Examiner*, August 9, 1987, F3–F6.

- "The Wages of Haste in the Comparable Worth Debate," *Los Angeles Herald Examiner*, June 28, 1987, F1–F4.

- "Are the Deficit Worries Overblown?" *Los Angeles Herald Examiner*, April 12, 1987, F1–F4.

- "Tax Reform Will Force California to Rethink Goals," *Los Angeles Herald Examiner*, January 11, 1987, F1–F4.

- "Boesky Affair No Reason to Pass New Laws," *Los Angeles Herald Examiner*, December 7, 1986, F1–F4.

- "Congress Has Painted Itself into a Corner with Tax Reform," *Los Angeles Herald Examiner*, September 4, 1986, F1–F4.

## A.6.e. Other publications

- "Behavioral Public Economics," with Antonio Rangel, in *New Palgrave Dictionary of Economics*, vol. 1, 2nd ed., eds. Steven N. Durlauf and Lawrence E. Blume (New York: MacMillan, 2008).

- "Taxes and Saving," in *Encyclopedia of Taxation and Tax Policy*, eds. Joseph J. Cordes, Robert D. Ebel, and Jane G. Gravelle, 353–56 (Washington, DC: Urban Institute Press, 1999).

- *The Economic Role of Annuities* (Washington, DC: Catalyst Institute, 1998) (with Patrick J. Bayer and Michael J. Boskin).

- "Who Will Pay for Retirement in the 21st Century," *NAVA Outlook* 4, no. 3 (1995): 1–3.

- "The Adequacy of Saving for Retirement and the Role of Economic Literacy," in *Retirement in the 21st Century: Ready or Not?* 73–81 (Washington, DC: Employee Benefit Research Institute, 1994).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Page A-11

- "Do Americans Save Too Little?" *Federal Reserve Bank of Philadelphia Business Review,* September/October 1993, 3–20 (with John Karl Scholz).

- "Is the Baby Boom Generation Saving Adequately for Retirement?" *Summary Report*, New York: Merrill Lynch, January 1993, with updates for 1994, 1995, 1996, and 1997 (with John Karl Scholz).

- "Premium Saving Accounts: A Proposal to Improve Tax Incentives for Saving," *La Follette Policy Report* 5, no. 1 (1992): 1–2, 22–23.

## A.6.f. Unpublished research papers

- "Do Consumers Exploit Precommitment Opportunities? Evidence from Natural Experiments Involving Liquor Consumption," January 2012 (with Jonathan Meer and Neva K. Novarro).

- "Candidates, Character, and Corruption," January 15, 2012 (with Navin Kartik, formerly titled "Of Candidates and Character" and "Special Interest Politics and the Quality of Governance").

- "The Welfare Economics of Default Options: A Theoretical and Empirical Analysis of 401(k) Plans," May 20, 2011 (with Andrey Fradkin and Igor Popov).

- "Poverty and Self-Control," February 2, 2011 (with Debraj Ray and Sevin Yeltekin).

- "Does Neural Activity Reveal Preferences Without Choice?" February 2011 (with Alec Smith, Colin Camerer, and Antonio Rangel).

- "Predictability and Power in Legislative Bargaining," November 18, 2010 (with Xiaochen Fan and Nageeb Ali).

- "Precommitment and Power in Agenda Setting," August 2006 (with Silvia Console Battilana).

- "Emotions, Cognition, and Savings." Mimeo, Stanford University, 2004 (with Antonio Rangel).

- "Self-Enforcing Cooperation with Graduated Punishments," July 2004 (with Dilip Abreu and Avinash Dixit).

- "Income Redistribution with Majoritarian Politics," May 2004 (with Sita Nataraj).

- "Cognition, Evaluation, and Hedonics: A Brain Processes Model of Decision-Making." Mimeo, Stanford University, 2002 (with Antonio Rangel).

- "Democratic Policy Making with Real-Time Agenda Setting: Part 1," June 2002 (with Antonio Rangel and Luis Rayo).

- "The Adequacy of Life Insurance: Evidence from the Health and Retirement Survey," Working Paper 9914, Federal Reserve Bank of Cleveland, November 1999 (with Lorenzo Forni, Jagadeesh Gokhale, and Laurence J. Kotlikoff).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- "Self Control, Saving, and the Low Asset Trap." Mimeo, Stanford University, May 1999 (with Debraj Ray and Sevin Yeltekin).

- "US Household Savings in the 1980s: Evidence from the Surveys of Consumer Finance." Working paper, University of Wisconsin, November 1995 (with John Karl Scholz).

- "Does the Propensity to Consume Increase with Age?" Mimeo, 1991 (with Andrew Abel and Laurence J. Kotlikoff).

- "Dividends versus Share Repurchases as Signals of Profitability," Stanford University, 1988.

- "Annuities, Bequests, and Private Wealth." Mimeo, Stanford University, 1984.

## A.6.g. Work in progress

- "Are Preferences Identified?" (with Debraj Ray).

- "Behavioral Public Economics" (for the Handbook of Public Economics)

- "Do Subjective Responses Reveal Preferences Without Choice?" (with Dan Bjorkegren, Jeffrey Naecker, Antonio Rangel, and Irina Weisbrott)

- "Do Subjective Responses Predict Choices Better than Structural Models? The Case of Choice Under Uncertainty" (with Christine Exley, Antonio Rangel, Charles Sprenger, and Ning Yu)

- "On the Limitations of Happiness Data" (with James Andreoni)

- "Are Preferences Recoverable?" (with Debraj Ray and Halbert White)

- "Strategic Reasoning in Circular Guessing Games" (with Miguel Costa-Gomes and Vicent Crawford)

- "Cheating within Imperfect Cartels."

- "A Theory of Decisive Leadership" (with Aaron Bodoh-Creed).

- "Conspicuous Consumption in the Laboratory" (with James Andreoni, Christine Exley, Jeffrey Naecker, and Paul Wong).

- "We Aim to Please: Work Effort and the Desire to Meet Stated Expectations" (with Christine Exley, Blake Barton, and Deniz Aydin).

- "Fairness and Time Inconsistency" (with Deniz Aydin, Blake Barton, Jeffrey Naecker, and Irina Weissbrott).

- "Subtle Social Signaling" (with Sandro Ambuehl, Blake Barton, and Isaac Opper).

- "Social Image and Truthfulness" (with James Andreoni, Jeffrey Naecker, Ning Yu, and Isaac Opper).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

- "Raising Funds by Raising Consciousness: A Theory of Attentiveness to Charitable Causes" (with Sandro Ambuehl and Paul Wong).

- "Identifying Choice Correspondences with Neural Evidence" (with Antonio Rangel and Colin Camerer).

- "Memory and Re-experienced Utility" (with Peter Coles).

- "Power and Predictability in Legislative Bargaining."

- "Multidirectional Signaling" (with Sergei Severinov).

- "Reinforcement Learning and Intertemporal Choice" (with Antonio Rangel).

- "Saving and Cue-Triggered Decision Processes" (with Antonio Rangel).

- "The Effects of Marital Status Transitions on Living Standards" (with Laurence Kotlikoff, Katherine Carman, and Neva Kerbeshian).

- "A Theory of Dividend Smoothing" (with Laurie Hodrick and Sergei Severinov).

## A.7. Honors and awards

- 2009 Best Article Award, *Economic Inquiry*, for "The Effects of Financial Education in the Workplace: Evidence from a Survey of Employers"

- Global Competition Review's *International Who's Who of Competition Economists*, 2007–2012

- Fellow, Center for Advanced Study in the Behavioral Sciences, 2001–2002

- John Simon Guggenheim Memorial Foundation Fellowship, 2001–2002

- Fellow of the American Academy of Arts and Sciences, 1997

- ACCF Center for Policy Research Fellowship, 1994

- Fellow of the Econometric Society, 1991

- Alfred P. Sloan Foundation Research Fellow, 1987–1989

- NBER-Olin Research Fellow, 1985–1986

- Awarded Hoover National Fellowship, 1985–1986 (declined to accept NBER-Olin)

- National Science Foundation Graduate Fellowship, 1979–1982

- John H. Williams Prize, 1979 (first ranked graduate in Economics)

- Edward Whitaker Memorial Scholarship, 1978 (outstanding public speaker of college class)

- Phi Beta Kappa, 1978

- College Freshman National Debate Champion, 1976

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# Appendix B. Materials relied upon and data or documents considered in forming my opinions

I incorporate by reference all materials cited in my rebuttal report and continue to rely upon materials listed and cited in my original report in this matter. Additional materials are cited below.

| Group | File name |
|---|---|
| Expert reports | Expert report and back-up materials of Adam K. Fontecchio, May 2012 |
| Expert reports | Expert report and back-up materials of David P. Stowell, May 2012 |
| Expert reports | Expert report and back-up materials of Dr. Richard T. Rapp, February 23, 2012 |
| Expert reports | Expert report, associated errata, and back-up materials of Barry C. Harris, Ph.D., February 23, 2012 |
| Expert reports | Expert report, associated errata, and back-up materials of Dr. Darrell L. Williams, Febraruy 23, 2012 |
| Expert reports | Expert report, associated errata, and back-up materials of Michael J. Moore, Ph.D., February 23, 2012 |
| Expert reports | Expert report, associated errata, and back-up materials of Professor Jerry A. Hausman,March 5, 2012 |
| Expert reports | Expert reports and back-up materials of Edward A. Snyder, Ph.D., February - March, 2012 |
| Expert reports | Expert reports and back-up materials of George Foster, Ph.D.., February - March, 2012 |
| Expert reports | Expert reports and back-up materials of James A. Levinsohn, Ph.D., February - March, 2012 |
| Expert reports | Expert reports and back-up materials of Lorin M. Hitt, Ph.D., February - March, 2012 |
| Expert reports | Expert reports and back-up materials of Pierre-Yves Cremieux, February 23, 2012 |
| Expert reports | Expert reports and back-up materials of Shukri Souri, Ph.D., February - March 5, 2012 |
| Expert reports | Expert reports, associated errata, and back-up materials of Adam K. Fontecchio, December 2011 |
| Expert reports | Expert reports, associated errata, and back-up materials of B. Douglas Bernheim, December 2011 |
| Expert reports | Expert reports, associated errata, and back-up materials of Daniel L. Rubinfeld, February, 2012 |
| Expert reports | Expert reports, associated errata, and back-up materials of David P. Stowell, December 2011 |
| Expert reports | Expert reports, associated errata, and back-up materials of Keith Mallinson, February - March, 2012 |
| Expert reports | Expert reports, associated errata, and back-up materials of Professor Dennis W. Carlton, February 23, 2012 |
| Expert reports | Expert reports, associated errata, and back-up materials of Professor Robert Willig, February - March, 2012 |
| Depositions | Deposition of Adam K. Fontecchio, February 9, 2012 |
| Depositions | Deposition of B. Douglas Bernheim, Volumes I - III, January 30 - February 1, 2012 |
| Depositions | Deposition of Barry Harris, Ph.D., April 12, 2012 |
| Depositions | Deposition of Daniel L. Rubinfeld, April 17, 2012 |
| Depositions | Deposition of David P. Stowell, February 8, 2012 |
| Depositions | Deposition of Dr. Darrell L. Williams, April 23, 2012 |
| Depositions | Deposition of Edward A. Snyder, Ph.D., Volumes I & II, April 4 & 5, 2012 |
| Depositions | Deposition of George Foster, Ph.D., April 16, 2012 |
| Depositions | Deposition of James A. Levinsohn, Ph.D., April 16, 2012 |
| Depositions | Deposition of Keith Mallinson, April 11, 2012 |
| Depositions | Deposition of Lorin M. Hitt, Ph.D., April 13, 2012 |
| Depositions | Deposition of Michael J. Moore, Ph.D., April 13, 2012 |
| Depositions | Deposition of Pierre-Yves Cremieux, April 13, 2012 |
| Depositions | Deposition of Professor Dennis W. Carlton, Volumes I - III, April 10 - 12, 2012 |
| Depositions | Deposition of Professor Jerry A. Hausman, April 6, 2012 |
| Depositions | Deposition of Professor Robert Willing, April 18, 2012 |
| Depositions | Deposition of Dr. Richard T. Rapp, April 26, 2012 |
| Depositions | Deposition of Shukri Souri, Ph.D., April 3, 2012 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

| Group | File name |
|---|---|
| General | I rely on all materials cited in my report |
| Third-party data | AU-MDL-01477004-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-03189581-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-03189582-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-03200103-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-03203138-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-032223[27-38]-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-032223[40-63]-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-03222339-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-03288301-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-03290018-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | AU-MDL-03310400-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-03321668-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-05071168-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-05071169-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-05109834-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-05169227-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-051897[74-84]-HIGHLY_CONFIDENTIAL(1).xls |
| Third-party data | AU-MDL-05322534-HIGHLY_CONFIDENTIAL.xls |
| Third-party data | CMOCIV-2250715.xlsm |
| Third-party data | CONFIDENTIAL_-_CMP0030174(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0031197(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0031199(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0033159(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0033160(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0034479(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0034480(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0034482(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0034484(1).xls |
| Third-party data | CONFIDENTIAL_-_CMP0034485(1).xls |
| Third-party data | GRNE-B-0133779.xlsm |
| Third-party data | Highly_Confidential_-_CMOCIV-0299674.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250693(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250698.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250699.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250700.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250702.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250704.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250717(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2250718.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-26512[80-86](1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-2651290.xls |
| Third-party data | Highly_Confidential_-_CMOCIV-28830[75-81](1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3137194(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3141107(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3141108(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3141110(1).xls |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

| Group | File name |
|---|---|
| Third-party data | Highly_Confidential_-_CMOCIV-3141112(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3141113(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3165728(1).xls |
| Third-party data | Highly_Confidential_-_CMOCIV-3165779(1).xls |
| Apple | AUO--Apple Retail by State.xls |
| Apple | LCD Part Numbers_8-9-11.xlsx |
| Apple | TFT-LCD Purchase Data-AU Subpoena-Highly Confidential.xls |
| HP | HIGHLY CONFIDENTIAL HP-00071140 (LCD Notebooks).xls |
| HP | HIGHLY CONFIDENTIAL HP-00071141 (LCD Monitors).xls |
| HP | HIGHLY CONFIDENTIAL HP-00099053 (LCD Notebooks)-c.xls |
| LG Electronics | Cell Phones--Module Purchases U.S- Bound 2005-2008.xls |
| LG Electronics | Notebooks--Panel + Module Purchases Worldwide 2004-2008.xls |
| LG Electronics | TVs + Monitors--Worldwide Panel Purchases_Product and Inch.xls |
| Motorola | Iden Where Used report- MOTOLCD01247785- Highly Confidentia.xlsx |
| Motorola | Where Used with Market Names-MOTOLCD01247784- Highly Confid.xlsx |
| Nokia | US Module to Handset Correlation Table.xlsx |
| Samsung | SAML-815135_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-815136_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-815137_Highly Confidential - Subject to Protective Order.xlsx |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# Appendix C. Crosswalks for paragraphs in opposing experts' reports

The tables below link paragraphs between the different iterations of reports submitted by defendants' experts.

## C.1. Crosswalk for paragraphs in Professor Carlton's Motorola and ATS et al. reports

| Motorola | ATS et al. | Motorola | ATS et al. | Motorola | ATS et al. |
|---|---|---|---|---|---|
| 1 | 1 | 33 | 36 | 68 | 71 |
| 2 | 2 | 34 | 37 | 69 | 72 |
| 3 | 3 | 35 | 38 | 70 | 73 |
| 4 | 4 | 36 | 39 | 71 | 74 |
| 5 | 5 | 37 | 40 | 72 | 75 |
| 6 | 6 | 38 | 41 | 73 | 76 |
| 7 | 7 | 39 | 42 | 74 | 77 |
| 8 | 8 | 40 | 43 | 75 | 78 |
| 9 | 9 | 41 | 44 | 76 | 79 |
| 16 | 10 | 42 | 45 | 77 | 80 |
| 10 | 11 | 43 | 46 | 78 | 81 |
|  | 12 | 44 | 47 | 79 | 82 |
| 11 | 13 | 45 | 48 | 80 | 83 |
|  | 14 | 46 | 49 | 81 | 84 |
| 12 | 15 | 47 | 50 | 82 | 85 |
|  | 16 | 48 | 51 | 83 |  |
| 15 | 17 | 49 | 52 |  | 86 |
| 13 | 18 | 50 | 53 | 84 | 87 |
| 14 | 19 | 51 | 54 |  | 88 |
| 17 | 20 | 52 | 55 | 85 | 89 |
| 18 | 21 | 53 | 56 | 86 | 90 |
| 19 | 22 | 54 | 57 | 87 | 91 |
| 20 | 23 | 55 | 58 | 88 |  |
| 21 | 24 | 56 | 59 |  | 92 |
| 22 | 25 | 57 | 60 | 89 | 97 |
| 23 | 26 | 58 | 61 |  | 93 |
| 24 | 27 | 59 | 62 |  | 94 |
| 25 | 28 | 60 | 63 | 90 | 98 |
| 26 | 29 | 61 | 64 | 91 | 101 |
| 27 | 30 | 62 | 65 |  | 95 |
| 28 | 31 | 63 | 66 |  | 96 |
| 29 | 32 | 64 | 67 |  | 99 |
| 30 | 33 | 65 | 68 |  | 100 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Page C-2

| Motorola | ATS et al. | Motorola | ATS et al. | Motorola | ATS et al. |
|---|---|---|---|---|---|
| 31 | 34 | 66 | 69 | 92 | 102 |
| 32 | 35 | 67 | 70 | | 103 |
| | 104 | 135 | 151 | 171 | 195 |
| | 105 | 136 | 152 | 172 | 196 |
| 93 | 106 | 137 | | 173 | 197 |
| 94 | 107 | 138 | 153 | 174 | 198 |
| 95 | 108 | 139 | 154 | 175 | 199 |
| 96 | 109 | 140 | 155 | 176 | 200 |
| 98 | 111 | 141 | 156 | 177 | 201 |
| 99 | 112 | 142 | 157 | 178 | 202 |
| 100 | 113 | 143 | 158 | 179 | 203 |
| 101 | 114 | 144 | 159 | 180 | 204 |
| 102 | 115 | 145 | 160 | 181 | 205 |
| 103 | 116 | 146 | 161 | 182 | 206 |
| | 117 | 147 | 162 | 183 | 207 |
| 104 | 118 | 148 | 163 | 184 | 208 |
| 105 | 119 | 149 | 164 | 185 | 209 |
| 106 | 120 | 150 | 165 | 186 | 210 |
| 107 | 121 | 151 | 166 | 187 | 211 |
| 108 | 122 | 152 | | 188 | 212 |
| 109 | 123 | | 167 | 189 | 213 |
| 110 | 124 | 153 | 168 | 190 | 214 |
| 111 | 125 | 154 | 169 | 191 | 215 |
| 112 | 126 | 155 | 170 | 192 | 216 |
| 113 | 127 | 156 | 171 | 193 | 217 |
| 114 | 128 | 157 | 172 | 194 | 218 |
| 115 | 129 | 158 | 173 | 195 | 219 |
| 116 | 130 | 159 | 174 | 196 | 220 |
| | 131 | | 175 | 197 | 221 |
| | 132 | 160 | 176 | 198 | 222 |
| 117 | | 161 | 177 | 199 | 223 |
| 118 | 133 | 162 | 178 | 200 | 224 |
| 119 | 134 | 163 | | 201 | 225 |
| 120 | 135 | 164 | 179 | 202 | 226 |
| 121 | 136 | 165 | 180 | 203 | 227 |
| 122 | 137 | 166 | 181 | 204 | 228 |
| 123 | 138 | 167 | 182 | 205 | 229 |
| | 139 | 168 | 183 | 206 | 230 |
| 124 | 140 | 169 | 184 | 207 | 231 |
| 125 | 141 | | 185 | 208 | 232 |
| 126 | 142 | | 186 | 209 | 233 |
| 127 | 143 | | 187 | 210 | 234 |
| 128 | 144 | | 188 | 211 | 235 |
| 129 | 145 | | 189 | 212 | 236 |
| 130 | 146 | | 190 | 213 | 237 |
| 131 | 147 | | 191 | 214 | 238 |
| 132 | 148 | | 192 | 215 | 239 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

| Motorola | ATS et al. | Motorola | ATS et al. | Motorola | ATS et al. |
|----------|-----------|----------|-----------|----------|-----------|
| 133 | 149 |     | 193 | 216 | 240 |
| 134 | 150 | 170 | 194 | 217 | 241 |
| 218 | 242 | 262 | 286 | 306 | 330 |
| 219 | 243 | 263 | 287 | 307 | 331 |
| 220 | 244 | 264 | 288 | 308 | 332 |
| 221 | 245 | 265 | 289 | 309 | 333 |
| 222 | 246 | 266 | 290 | 310 | 334 |
| 223 | 247 | 267 | 291 | 311 | 335 |
| 224 | 248 | 268 | 292 | 312 | 336 |
| 225 | 249 | 269 | 293 | 313 | 337 |
| 226 | 250 | 270 | 294 | 314 | 338 |
| 227 | 251 | 271 | 295 | 315 | 339 |
| 228 | 252 | 272 | 296 | 316 | 340 |
| 229 | 253 | 273 | 297 | 317 | 341 |
| 230 | 254 | 274 | 298 | 318 | 342 |
| 231 | 255 | 275 | 299 | 319 | 343 |
| 232 | 256 | 276 | 300 | 320 | 344 |
| 233 | 257 | 277 | 301 | 321 | 345 |
| 234 | 258 | 278 | 302 | 322 | 346 |
| 235 | 259 | 279 | 303 | 323 | 347 |
| 236 | 260 | 280 | 304 | 324 | 348 |
| 237 | 261 | 281 | 305 | 325 | 349 |
| 238 | 262 | 282 | 306 | 326 | 350 |
| 239 | 263 | 283 | 307 | 327 | 351 |
| 240 | 264 | 284 | 308 | 328 | 352 |
| 241 | 265 | 285 | 309 | 329 | 353 |
| 242 | 266 | 286 | 310 | 330 | 354 |
| 243 | 267 | 287 | 311 | 331 | 355 |
| 244 | 268 | 288 | 312 | 332 | 356 |
| 245 | 269 | 289 | 313 | 333 | 357 |
| 246 | 270 | 290 | 314 | 334 | 358 |
| 247 | 271 | 291 | 315 | 335 | 359 |
| 248 | 272 | 292 | 316 | 336 | 360 |
| 249 | 273 | 293 | 317 | 337 | 361 |
| 250 | 274 | 294 | 318 | 338 | 362 |
| 251 | 275 | 295 | 319 | 339 | 363 |
| 252 | 276 | 296 | 320 | 340 | 364 |
| 253 | 277 | 297 | 321 | 341 | 365 |
| 254 | 278 | 298 | 322 | 342 | 366 |
| 255 | 279 | 299 | 323 | 343 | 367 |
| 256 | 280 | 300 | 324 | 344 | 368 |
| 257 | 281 | 301 | 325 | 345 | 369 |
| 258 | 282 | 302 | 326 | 346 | 370 |
| 259 | 283 | 303 | 327 | 347 | 371 |
| 260 | 284 | 304 | 328 |     |     |
| 261 | 285 | 305 | 329 |     |     |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

## C.2. Crosswalk for paragraphs in Professor Willig's Motorola and Best Buy reports

| Motorola | Best Buy |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | |
| | 4 |
| | 5 |
| 5 | 6 |
| 6 | 7 |
| 7 | 8 |
| 8 | 9 |
| 9 | 10 |
| 10 | 11 |
| 11 | 12 |
| 12 | 13 |
| 13 | 14 |
| 14 | 15 |
| 15 | 16 |
| 16 | 17 |

| Motorola | Best Buy |
|---|---|
| | 18 |
| | 19 |
| 17 | 20 |
| 18 | 21 |
| 19 | 22 |
| 20 | 23 |
| 21 | 24 |
| 22 | 25 |
| 23 | 26 |
| 24 | 27 |
| 25 | 28 |
| 26 | 29 |
| 27 | 30 |
| 28 | 31 |
| 29 | 32 |
| 30 | 33 |
| 31 | 34 |
| 32 | 35 |

| Motorola | Best Buy |
|---|---|
| 33 | 36 |
| 34 | 37 |
| 35 | 38 |
| 36 | 39 |
| 37 | 40 |
| 38 | 41 |
| 39 | 42 |
| 40 | 43 |
| 41 | 44 |
| 42 | 45 |
| 43 | 46 |
| 44 | 47 |
| 45 | 48 |
| 46 | 49 |
| 47 | 50 |
| 48 | 51 |
| 49 | 52 |

## C.3. Crosswalk for paragraphs in Professor Foster's Best Buy and Target et al. reports

| Best Buy | Target et al. |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |

| Best Buy | Target et al. |
|---|---|
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| 26 | 26 |
| 27 | 27 |
| 28 | 28 |
| 29 | 29 |
| 30 | 30 |
| 31 | 31 |
| 32 | 32 |
| 33 | 33 |
| 34 | 34 |
| 35 | 35 |
| 36 | 36 |
| 37 | 37 |
| 38 | 38 |

| Best Buy | Target et al. |
|---|---|
| 39 | 39 |
| 40 | 40 |
| 41 | 41 |
| 42 | 42 |
| 43 | 43 |
| 44 | 44 |
| 45 | 45 |
| 46 | 46 |
| 47 | 47 |
| 48 | 48 |
| 49 | 49 |
| 50 | 50 |
| 51 | 51 |
| 52 | 52 |
| 53 | 53 |
| 54 | 54 |
| 55 | 55 |
| 56 | 56 |
| 57 | 57 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

| Best Buy | Target et al. | Best Buy | Target et al. | Best Buy | Target et al. |
|---|---|---|---|---|---|
| 58 | 58 | 92 | 92 | 118 | 108 |
| 59 | 59 | 93 | 93 | 119 | 109 |
| 60 | 60 | 94 | 94 | 120 | 110 |
| 61 | 61 | 95 | 95 | 121 | 111 |
| 62 | 62 | 96 | 96 | | 112 |
| 63 | 63 | 97 | 97 | 122 | 113 |
| 64 | 64 | 98 | 98 | | 114 |
| 65 | 65 | 99 | | | 115 |
| 66 | 66 | | 99 | | 116 |
| 67 | 67 | 100 | 100 | 123 | 117 |
| 68 | 68 | 101 | | 124 | 118 |
| 69 | 69 | 102 | | 125 | 119 |
| 70 | 70 | 103 | | 126 | 120 |
| 71 | 71 | 104 | | 127 | 121 |
| 72 | 72 | 105 | | 128 | 122 |
| 73 | 73 | 106 | | 129 | 123 |
| 74 | 74 | 107 | | 130 | 124 |
| 75 | 75 | 108 | | 131 | 125 |
| 76 | 76 | 109 | | 132 | 126 |
| 77 | 77 | 110 | | 133 | 127 |
| 78 | 78 | 111 | | 134 | 128 |
| 79 | 79 | 112 | | 135 | 129 |
| 80 | 80 | 113 | | 136 | 130 |
| 81 | 81 | 114 | | 137 | 131 |
| 82 | 82 | 115 | | 138 | 132 |
| 83 | 83 | 116 | | 139 | 133 |
| 84 | 84 | 117 | | 140 | 134 |
| 85 | 85 | | 101 | 141 | 135 |
| 86 | 86 | | 102 | 142 | 136 |
| 87 | 87 | | 103 | 143 | 137 |
| 88 | 88 | | 104 | 144 | 138 |
| 89 | 89 | | 105 | 145 | 139 |
| 90 | 90 | | 106 | 146 | 140 |
| 91 | 91 | | 107 | | |

## C.4. Crosswalk for paragraphs in Professor Snyder's Best Buy and AT&T et al. reports

| Best Buy | AT&T et al. | Best Buy | AT&T et al. | Best Buy | AT&T et al. |
|---|---|---|---|---|---|
| 1 | 1 | 8 | 8 | 15 | 15 |
| 2 | 2 | 9 | 9 | 16 | 16 |
| 3 | 3 | 10 | 10 | 17 | 17 |
| 4 | 4 | 11 | 11 | 18 | 18 |
| 5 | 5 | 12 | 12 | 19 | 19 |
| 6 | 6 | 13 | 13 | 20 | 20 |
| 7 | 7 | 14 | 14 | 21 | 21 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

| Best Buy | AT&T et al. | Best Buy | AT&T et al. | Best Buy | AT&T et al. |
|---|---|---|---|---|---|
| 22 | 22 | 69 | 67 | 115 | 111 |
| 23 | 23 | 70 | 68 | 116 | 112 |
| 24 |  | 71 | 69 | 117 | 113 |
| 25 | 24 | 72 | 70 | 118 |  |
| 26 | 25 | 73 | 71 | 119 | 114 |
| 27 | 26 | 74 | 72 | 120 | 115 |
| 28 | 27 | 75 | 73 |  | 116 |
| 29 | 28 | 76 | 74 |  | 117 |
| 30 | 29 | 77 | 75 |  | 118 |
| 31 | 30 | 78 | 76 |  | 119 |
| 32 | 31 | 79 | 77 |  | 120 |
| 33 | 32 | 80 | 78 |  | 121 |
| 34 | 33 | 81 | 79 |  | 122 |
| 35 | 34 | 82 | 80 | 121 |  |
| 36 | 35 | 83 | 81 | 122 |  |
| 37 |  | 84 | 82 | 123 |  |
| 38 | 36 | 85 | 83 | 124 |  |
| 39 | 37 | 86 | 84 |  | 123 |
| 40 | 38 | 87 | 85 |  | 124 |
| 41 | 39 | 88 | 86 |  | 125 |
| 42 | 40 | 89 | 87 |  | 126 |
| 43 | 41 | 90 | 88 |  | 127 |
| 44 | 42 | 91 | 89 | 125 | 128 |
| 45 | 43 | 92 | 90 | 126 |  |
| 46 | 44 | 93 | 91 | 127 |  |
| 47 | 45 | 94 | 92 |  | 129 |
| 48 | 46 | 95 | 93 | 128 |  |
| 49 | 47 | 96 | 94 |  | 130 |
| 50 | 48 | 97 | 95 | 129 | 131 |
| 51 | 49 | 98 | 96 | 130 | 132 |
| 52 | 50 | 99 | 97 | 131 | 133 |
| 53 | 51 | 100 | 98 | 132 | 134 |
| 54 | 52 | 101 | 99 | 133 | 135 |
| 55 | 53 |  | 100 | 134 | 136 |
| 56 | 54 | 102 |  | 135 | 137 |
| 57 | 55 | 103 |  | 136 | 138 |
| 58 | 56 | 104 |  | 137 | 139 |
| 59 | 57 | 105 | 101 | 138 | 140 |
| 60 | 58 | 106 | 102 | 139 | 141 |
| 61 | 59 | 107 | 103 | 140 | 142 |
| 62 | 60 | 108 | 104 | 141 | 143 |
| 63 | 61 | 109 | 105 | 142 | 144 |
| 64 | 62 | 110 | 106 | 143 | 145 |
| 65 | 63 | 111 | 107 | 144 | 146 |
| 66 | 64 | 112 | 108 |  | 147 |
| 67 | 65 | 113 | 109 | 145 | 148 |
| 68 | 66 | 114 | 110 | 146 | 149 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

| Best Buy | AT&T et al. |
|---|---|
|  | 150 |
| 147 | 151 |
| 148 | 152 |
| 149 | 153 |
| 150 | 154 |
|  | 155 |
|  | 156 |

| Best Buy | AT&T et al. |
|---|---|
|  | 157 |
| 151 |  |
| 152 |  |
| 153 | 158 |
| 154 | 159 |
| 155 | 160 |
| 156 | 161 |

| Best Buy | AT&T et al. |
|---|---|
| 157 | 162 |
| 158 | 163 |
| 159 | 164 |
| 160 | 165 |
| 161 | 166 |
| 162 | 167 |
| 163 | 168 |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Exhibit 1: Summary of Motorola's purchases from conspirators

| Supplier | Conspiracy period purchases | Plea period purchases |
|---|---|---|
| AUO | $ 355,060,000 | $ 355,060,000 |
| EPSON | $ 1,246,720,000 | $ 1,246,720,000 |
| HITACHI | $ 2,500 | $ 2,500 |
| PHILIPS | $ 4,660,000 | $ 4,660,000 |
| SAMSUNG SDI | $ 724,220,000 | $ 724,220,000 |
| SAMSUNG SEC | $ 1,189,010,000 | $ 1,189,010,000 |
| SANYO | $ 114,810,000 | $ 114,810,000 |
| SHARP | $ 1,368,350,000 | $ 1,368,340,000 |
| TOSHIBA | $ 382,390,000 | $ 382,390,000 |
| **Total** | **$ 5,385,232,500** | **$ 5,385,222,500** |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Exhibit 2: Summary of Motorola's overcharges under the Conspiracy Period Scenario

| Supplier | Conspiracy period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 23.9% | $ 84,850,000 | $ 254,550,000 |
| EPSON | $ 1,246,720,000 | 24.5% | $ 305,320,000 | $ 915,960,000 |
| HITACHI | $ 2,500 | 4.0% | $ 100 | $ 300 |
| PHILIPS | $ 4,660,000 | 39.1% | $ 1,820,000 | $ 5,460,000 |
| SAMSUNG SDI | $ 724,220,000 | 15.9% | $ 114,850,000 | $ 344,550,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 24.6% | $ 292,910,000 | $ 878,730,000 |
| SANYO | $ 114,810,000 | 38.0% | $ 43,610,000 | $ 130,830,000 |
| SHARP | $ 1,368,350,000 | 19.0% | $ 259,550,000 | $ 778,650,000 |
| TOSHIBA | $ 382,390,000 | 19.2% | $ 73,290,000 | $ 219,870,000 |
| **Grand Total** | **$ 5,385,232,500** | **21.8%** | **$ 1,176,190,100** | **$ 3,528,570,300** |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Exhibit 3: Summary of Motorola's overcharges under the Plea Period Scenario

| Supplier | Plea period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 18.3% | $ 65,150,000 | $ 195,450,000 |
| EPSON | $ 1,246,720,000 | 18.9% | $ 235,340,000 | $ 706,020,000 |
| HITACHI | $ 2,500 | 0.0% | $ - | $ - |
| PHILIPS | $ 4,660,000 | 30.9% | $ 1,440,000 | $ 4,320,000 |
| SAMSUNG SDI | $ 724,220,000 | 10.9% | $ 79,150,000 | $ 237,450,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 18.5% | $ 220,330,000 | $ 660,990,000 |
| SANYO | $ 114,810,000 | 29.4% | $ 33,700,000 | $ 101,100,000 |
| SHARP | $ 1,368,340,000 | 13.5% | $ 184,550,000 | $ 553,650,000 |
| TOSHIBA | $ 382,390,000 | 13.6% | $ 52,010,000 | $ 156,030,000 |
| **Grand Total** | **$ 5,385,222,500** | **16.2%** | **$ 871,670,000** | **$ 2,615,010,000** |

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Exhibit 4: Summary of Motorola's overcharges under the Conspiracy Period Scenario associated with its claims for breach of contract and unjust enrichment

| Supplier | Conspiracy period purchases | Overcharge percentage | Overcharges |
|---|---|---|---|
| AUO | $ 355,060,000 | 23.9% | $ 84,850,000 |
| EPSON | $ 1,246,720,000 | 24.5% | $ 305,320,000 |
| PHILIPS | $ 4,660,000 | 39.1% | $ 1,820,000 |
| SAMSUNG SDI | $ 724,220,000 | 15.9% | $ 114,850,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 24.6% | $ 292,910,000 |
| SANYO | $ 114,810,000 | 38.0% | $ 43,610,000 |
| SHARP | $ 1,368,350,000 | 19.0% | $ 259,550,000 |
| TOSHIBA | $ 382,390,000 | 19.2% | $ 73,290,000 |
| **Grand Total** | **$ 5,385,230,000** | **21.8%** | **$ 1,176,190,000** |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

Exhibit 5: Summary of Motorola's overcharges under the Plea Period Scenario associated with its claims for breach of contract and unjust enrichment

| Supplier | Plea period purchases | Overcharge percentage | Overcharges |
|---|---|---|---|
| AUO | $ 355,060,000 | 18.3% | $ 65,150,000 |
| EPSON | $ 1,246,720,000 | 18.9% | $ 235,340,000 |
| PHILIPS | $ 4,660,000 | 30.9% | $ 1,440,000 |
| SAMSUNG SDI | $ 724,220,000 | 10.9% | $ 79,150,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 18.5% | $ 220,330,000 |
| SANYO | $ 114,810,000 | 29.4% | $ 33,700,000 |
| SHARP | $ 1,368,340,000 | 13.5% | $ 184,550,000 |
| TOSHIBA | $ 382,390,000 | 13.6% | $ 52,010,000 |
| **Grand Total** | **$ 5,385,220,000** | **16.2%** | **$ 871,670,000** |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

# Appendix E. Defendant-specific Fisher indices

**Figure 1: An AUO large panel price index versus the overall large panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 2: A Chunghwa large panel price index versus the overall large panel price**



**Figure 3: A Chi Mei large panel price index versus the overall large panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 4: An Epson large panel price index versus the overall large panel price**



**Figure 5: A HannStar large panel price index versus the overall large panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 6: A Hitachi large panel price index versus the overall large panel price**



**Figure 7: A LG Display large panel price index versus the overall large panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 8: A Samsung SEC large panel price index versus the overall large panel price**



**Figure 9: A Sharp large panel price index versus the overall large panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 10: A Toshiba large panel price index versus the overall large panel price**



**Figure 11: An AUO small panel price index versus the overall small panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 12: A Chunghwa small panel price index versus the overall small panel price**



**Figure 13: An Epson small panel price index versus the overall small panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 14: A HannStar small panel price index versus the overall small panel price**



**Figure 15: A Hitachi small panel price index versus the overall small panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 16: A LG Display small panel price index versus the overall small panel price**



**Figure 17: A Samsung SDI small panel price index versus the overall small panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Rebuttal Expert Report of B. Douglas Bernheim, PhD Concerning Motorola Mobility, Inc.

**Figure 18: A Sharp small panel price index versus the overall small panel price**



**Figure 19: A Toshiba small panel price index versus the overall small panel price**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827