# EXHIBIT C

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: Individual Case No. 09-cv-5840-SI<br><br>MOTOROLA MOBILITY, INC,<br><br>Plaintiff,<br><br>vs.<br><br>AU OPTRONICS CORPORATION, et al,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Master File No. 07-m-1827-SI<br><br>Case No. 09-cv-5840 SI<br><br>MDL No. 1827 |

**EXPERT REPORT OF B. DOUGLAS BERNHEIM, PHD**
**CONCERNING MOTOROLA MOBILITY, INC.**

**December 15, 2011**

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# Table of contents

I. Introduction ...................................................................................................................................1

    I.A. Qualifications and experience ..............................................................................................1

    I.B. Assignment..........................................................................................................................2

    I.C. Materials relied upon ..........................................................................................................4

    I.D. Summary of opinions...........................................................................................................4

II. Background concerning the LCD panel industry .........................................................................7

III. The conspiracy...........................................................................................................................12

    III.A. Goals of the conspiracy ...................................................................................................12

    III.B. Overview of the operation of the conspiracy....................................................................15

        III.B.1. Agreements concerning prices......................................................................................24

        III.B.2. Customer business allocation........................................................................................27

        III.B.3. Supply restrictions .........................................................................................................27

    III.C. Discussion .......................................................................................................................33

IV. Overcharges on LCD panels .....................................................................................................39

    IV.A. Methods for computing overcharges ...............................................................................39

        IV.A.1. The use of price indices ................................................................................................39

        IV.A.2. Prediction equations versus "dummy variable" models...............................................40

        IV.A.3. Dynamic versus static models.......................................................................................43

        IV.A.4. Selection of supply and demand factors .......................................................................44

        IV.A.5. Choice of the conduct and benchmark periods ............................................................52

        IV.A.6. Method of estimation......................................................................................................53

        IV.A.7. Calculation of overcharges............................................................................................54

    IV.B. Overcharges implied by the statistical models .................................................................54

    IV.C. Corroborating analyses....................................................................................................60

        IV.C.1. Estimation technique (OLS vs. ridge) ...........................................................................60

        IV.C.2. Static prediction model ..................................................................................................60

        IV.C.3. Dynamic dummy variable approach...............................................................................61

        IV.C.4. Static dummy variable approach....................................................................................61

    IV.D. Conspirators' investment and production decisions at non-conspiratorial pricing levels ......................62

V. Damages ....................................................................................................................................64

Appendix A. CV............................................................................................................................. A-1

Appendix B. Plaintiff summary ...................................................................................................... B-1

Appendix C. Materials relied upon ................................................................................................ C-1

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# List of figures

Figure 1: Summary of Motorola's overcharges under the conspiracy period scenario............................................5

Figure 2: Summary of Motorola's overcharges under the plea period scenario .....................................................5

Figure 3: Summary of Motorola's overcharges under the conspiracy period scenario associated with its claims for breach of contract and unjust enrichment..................................................................................................6

Figure 4: Summary of Motorola's overcharges under the plea period scenario associated with its claims for breach of contract and unjust enrichment ...............................................................................................................6

Figure 5: Defendant share of TFT LCD capacity.....................................................................................................9

Figure 6: TFT LCD capacity shares by country......................................................................................................10

Figure 7: LCD panel price indices ..........................................................................................................................11

Figure 8: Overview of guilty pleas and indictments ...............................................................................................13

Figure 9: Known instances of Crystal Meetings .....................................................................................................20

Figure 10: Example of a spreadsheet memorializing production figures obtained at cartel meetings ...................22

Figure 11: Example of a spreadsheet memorializing prices discussed at cartel meetings....................................22

Figure 12: Revisions to defendant capacity plans following summer 2004 downturn ...........................................31

Figure 13: Samsung and AUO motherglass consumption .....................................................................................32

Figure 14: But-for price index for the dynamic prediction model—large panels ....................................................56

Figure 15: But-for price index for the dynamic prediction model—small panels....................................................56

Figure 16: Summary of weighted average overcharges from parsimonious model................................................57

Figure 17: Comparison of estimated overcharges using potential additional and alternative predictors ..............58

Figure 18: Comparison of estimated overcharges using combinations of additional variables .............................59

Figure 19: Comparison of estimated overcharges when variables affected by conspiracy are included..............59

Figure 20: Comparison of estimated overcharges using ridge regression versus OLS........................................60

Figure 21: Comparison of estimated overcharges using a dynamic prediction model versus a static prediction model.....................................................................................................................................................60

Figure 22: Comparison of estimated overcharges using a dynamic prediction model versus a dynamic dummy variable model.............................................................................................................................................61

Figure 23: Comparison of estimated overcharges using a dynamic prediction model versus a static dummy variable model.............................................................................................................................................62

Figure 24: Summary of Motorola's purchases from conspirators ...........................................................................64

Figure 25: Comparison of the Motorola price index to the small panel market price index ...................................65

Figure 26: Summary of Motorola's overcharges under the conspiracy period scenario........................................66

Figure 27: Summary of Motorola's overcharges under the plea period scenario ..................................................66

Figure 28: Summary of Motorola's overcharges under the conspiracy period scenario associated with its claims for breach of contract and unjust enrichment................................................................................................67

Figure 29: Summary of Motorola's overcharges under the plea period scenario associated with its claims for breach of contract and unjust enrichment ...............................................................................................................67

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# I. Introduction

## I.A. Qualifications and experience

(1)    I am the Edward Ames Edmunds Professor of Economics at Stanford University. I am also Co-Director of the Tax and Budget Policy Program at the Stanford Institute for Economic Policy Research (SIEPR), a Senior Fellow of SIEPR, and a Partner with Bates White, LLC.

(2)    I received my PhD in Economics from the Massachusetts Institute of Technology in September 1982 and my A.B. from Harvard University, summa cum laude, in June 1979. My previous academic appointments include an endowed chair in Economics and Business Policy at Princeton University, where I was also Co-Director of the Center for Economic Policy Studies, and an endowed chair in Insurance and Risk Management at Northwestern University's J.L. Kellogg Graduate School of Management, Department of Finance. I have also served as the Director of the Stanford Institute for Theoretical Economics.

(3)    I have taught courses in Microeconomic Theory (PhD level and undergraduate level), Game Theory (PhD level), Public Finance and Public Economics (PhD level and undergraduate level), Industrial Organization (PhD level), Behavioral and Experimental Economics (PhD level), and Insurance (Masters level). My PhD-level teaching covers both theoretical issues and applied econometrics (data analysis).

(4)    I have published extensively in peer-reviewed academic journals and elsewhere on topics concerning public policy, strategic behavior and competitive strategy, microeconomic theory, industrial organization, personal, corporate, and public finance, and other areas. Many of my academic studies entail detailed analysis of microeconomic data using econometric and statistical methods.

(5)    I have served on the editorial boards of several professional journals, including *Econometrica*, the *Quarterly Journal of Economics*, the *Journal of Public Economics*, and the *Journal of Financial Intermediation*. I have also served as a Co-Editor of the *American Economic Review*, which is the journal of the American Economics Association and the profession's most widely read periodical.

(6)    I have received a number of awards and professional recognitions, including election as a Fellow of the American Academy of Arts and Sciences, election as a Fellow of the Econometric Society, a Guggenheim Fellowship, appointment as a Fellow of the Center for Advanced Studies in the Behavioral Sciences, an Alfred P. Sloan Foundation Research Fellowship, and an NBER-Olin Research Fellowship.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(7)    I have been retained as a consultant or expert witness in numerous matters. I have conducted detailed studies of market conditions in a variety of industries, including computers and computer components, health care, pharmaceuticals, financial markets, telecommunications, railroads, airlines, aerospace, and a number of manufactured products. I have assessed damages in a variety of matters involving goods and services such as vitamins, pharmaceutical products, insurance, securities brokerage services, and thermal fax paper. I have sponsored testimony concerning these studies before various government agencies and judicial bodies. A copy of my curriculum vita, including my publications and a list of cases in which I have testified as an expert witness at any time during the past four years, is attached as Appendix A.

(8)    For my work in this matter, Bates White has billed my time at $850 per hour and its compensation does not depend on the outcome of this matter.

## I.B. Assignment

(9)    I have been engaged by counsel for the direct action plaintiff Motorola Mobility, Inc. ("Motorola Mobility") to determine the extent, if any, to which it was overcharged as a result of a conspiracy among suppliers of LCD panels and finished goods that contained LCD panels ("LCD Products"). LCD Products include televisions, computer monitors, notebook computers, mobile phones, DVD players, camcorders, digital cameras, etc.

(10)    Counsel instructed me to assume that the conspiracy was intended, *inter alia*, to restrain trade and elevate the prices of LCD panels, and provided me with two alternative assumptions regarding the duration of the conspiracy:  (1) from at least August 1998 through December 2006 (the "Conspiracy Period"); and (2) from at least September 2001 through December 2006 (the "Plea Period"). In this report, I will refer to the two alternative assumptions regarding the duration of the conspiracy as the "Conspiracy Period scenario" and the "Plea Period scenario."

(11)    Counsel instructed me to assume that the participants in the conspiracy included, at a minimum, the following corporate entities:

■    AU Optronics Corporation and AU Optronics Corporation America (collectively, "AUO")

■    Chi Mei Corporation, Chimei Innolux Corporation (f/k/a Chi Mei Optoelectronics Corporation, CMO Japan Co., Ltd., CMO USA, Inc.,  and Nexgen Mediatech, Inc. and Nexgen Mediatech USA, Inc. (collectively, "Nexgen") (all these entities are referred to collectively as "Chi Mei")

■    Chunghwa Picture Tubes, Ltd. and Tatung Company of America, Inc. ("Tatung") (collectively, "Chunghwa")

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- Epson Electronics America, Inc. and Epson Imaging Devices Corporation (f/k/a Sanyo Epson Imaging Devices Corporation) (collectively, "Epson")

- HannStar Display Corporation ("HannStar")

- Hitachi Ltd., Hitachi Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. (collectively, "Hitachi")

- LG Display Co., Ltd. (f/k/a LG Philips LCD Co.) and LG Display America, Inc. (f/k/a LG Philips LCD America, Inc.) (collectively, "LG Display")

- Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. (collectively, "Samsung SEC")

- Sharp Corporation and Sharp Electronics Corporation (collectively, "Sharp")

- Toshiba Corporation, Toshiba America Electronic Components, Inc., Toshiba America Information Systems, Inc. and Toshiba Mobile Display Co., Ltd. (f/k/a Toshiba Matsushita Display Technology Co., Ltd. (collectively, "Toshiba")

(12)   Counsel asked me to calculate overcharges on purchases by Motorola Mobility and its predecessors-in-interest of LCD panels from the following entities and their sales agents:  AUO; Epson (including Seiko Epson Corporation ("Seiko")); Hitachi Ltd., Hitachi Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. (collectively, "Hitachi"); Philips Electronics North America Corp ( "Philips"); Samsung SDI Co., Ltd. and Samsung SDI America (collectively, "Samsung SDI"); Samsung SEC; Sanyo Consumer Electronics Co., Ltd. (f/k/a Tottori Sanyo Electric Co. ("Sanyo"); Sharp; and Toshiba.

(13)   Counsel instructed me to calculate the overcharge on any particular transaction as the amount purchased times the difference between the price actually paid and the estimated price that would have been paid but for the conspiracy.

(14)   Counsel also instructed me to calculate overcharges on purchases affected by certain defendants' alleged breaches and wrongful conduct.[1] I have been instructed to calculate the amount purchased times the difference at the time and place of acceptance between the value of the LCD panels accepted and the value they would have had if the defendants had not breached their contracts with Motorola Mobility by engaging in a price-fixing conspiracy. In light of counsel's instruction, I consider this difference to be equal to the overcharges resulting from the defendants' conspiracy and equal to the amount of these defendants' gains from their wrongful conduct affecting their sales to Motorola Mobility.

---

[1]    These defendants are identified in Figure 3 below.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(15)    I have been engaged to conduct damage analyses for the following direct action plaintiffs: ATS Claim, LLC, Best Buy Co., Inc, Costco Wholesale Corporation, Electrograph Systems, Inc., Good Guys, Inc., Kmart Corp., Motorola Mobility, Inc., Newegg Inc., Old Comp Inc., RadioShack Corp., Sears, Roebuck and Co., and Target Corp. Counsel for these plaintiffs asked me to submit a separate report for each. These reports are identical with the following exceptions: all damage figures (such as those appearing in my Summary of Opinions, Section I.D., and in the tables of Section V) are plaintiff-specific; in the cases of Motorola and ATS Claim, the report includes a short section on overcharges for LCD panel purchases and omits my analysis of overcharges for finished goods.

## I.C. Materials relied upon

(16)    In preparing this report, I was assisted by a staff of expert economists and economic analysts at the consulting firm of Bates White, LLC. While engaged in this matter, I directed the activities of the team, made all final decisions concerning the analytic methods and its implementation, and prepared this report.

(17)    In preparing this report, I was provided with access to documents and materials produced by the plaintiffs and defendants in this matter and by other parties, transcripts of depositions taken in this matter, and pertinent publicly available information sources. I instructed my research support team to identify information pertaining to the pricing of LCD panels and finished products, the factors that influenced the pricing of LCD panels and finished products, and the activities of the cartel. In providing these instructions, I stressed the importance of identifying for my subsequent review important documents bearing on the appropriate computation of damages in this case, irrespective of whether they were favorable to the positions of the plaintiffs or defendants. My support team requested pertinent documents and materials from the plaintiffs, assisted counsel with the formulation of requests for information from the defendants, and conducted searches of publicly available information sources. I consider myself to have relied upon—in addition to my training and experience—the materials cited in this report. I reserve the right to incorporate new materials or data into my analysis, if and when they become available.

## I.D. Summary of opinions

(18)    My analysis of overcharges and damages employs generally accepted statistical methods to reconstruct the prices of LCD panels that would have prevailed but for the illegal activities of the cartel. Based on that analysis, I have concluded that the prices of LCD panels were substantially higher as a direct consequence of defendants' conspiracy to restrain trade and control prices. The impact of the conspiracy on LCD panel prices affected U.S. purchasers from 1998 to 2006. The observed elevation of prices during this time period is not attributable to competitive market factors.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(19)   Figure 1 and Figure 2 below show Motorola's overcharges on its purchases of TFT-LCD panels.

**Figure 1: Summary of Motorola's overcharges under the conspiracy period scenario**

| Supplier | Conspiracy period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 23.9% | $ 84,850,000 | $ 254,550,000 |
| EPSON | $ 903,920,000 | 21.0% | $ 190,220,000 | $ 570,660,000 |
| HITACHI | $ 2,500 | 4.0% | $ 100 | $ 300 |
| PHILIPS | $ 4,660,000 | 39.1% | $ 1,820,000 | $ 5,460,000 |
| SAMSUNG SDI | $ 724,220,000 | 15.9% | $ 114,850,000 | $ 344,550,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 24.6% | $ 292,910,000 | $ 878,730,000 |
| SANYO | $ 457,620,000 | 34.7% | $ 158,700,000 | $ 476,100,000 |
| SHARP | $ 1,368,350,000 | 19.0% | $ 259,550,000 | $ 778,650,000 |
| TOSHIBA | $ 382,390,000 | 19.2% | $ 73,290,000 | $ 219,870,000 |
| **Grand Total** | **$ 5,385,232,500** | **21.8%** | **$ 1,176,190,100** | **$ 3,528,570,300** |

**Figure 2: Summary of Motorola's overcharges under the plea period scenario**

| Supplier | Plea period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 18.3% | $ 65,150,000 | $ 195,450,000 |
| EPSON | $ 903,920,000 | 15.7% | $ 142,120,000 | $ 426,360,000 |
| HITACHI | $ 2,500 | 0.0% | $ - | $ - |
| PHILIPS | $ 4,660,000 | 30.9% | $ 1,440,000 | $ 4,320,000 |
| SAMSUNG SDI | $ 724,220,000 | 10.9% | $ 79,150,000 | $ 237,450,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 18.5% | $ 220,330,000 | $ 660,990,000 |
| SANYO | $ 457,620,000 | 27.7% | $ 126,920,000 | $ 380,760,000 |
| SHARP | $ 1,368,340,000 | 13.5% | $ 184,550,000 | $ 553,650,000 |
| TOSHIBA | $ 382,390,000 | 13.6% | $ 52,010,000 | $ 156,030,000 |
| **Grand Total** | **$ 5,385,222,500** | **16.2%** | **$ 871,670,000** | **$ 2,615,010,000** |

(20)   Based on methodological principles and extensive sensitivity analyses, I conclude that my damages estimates are reliable and, if anything, conservative. My estimated overcharges are also consistent with the results of alternative analyses, providing further indication of their reliability.

(21)   I was also asked to estimate Motorola's overcharges associated with its claims for breach of contract and unjust enrichment. For the relevant defendants, the calculations involved in this are identical to those discussed above, and hence the resulting overcharges are identical to those provided in the above tables.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 3: Summary of Motorola's overcharges under the conspiracy period scenario associated with its claims for breach of contract and unjust enrichment**

| Supplier | Conspiracy period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 23.9% | $ 84,850,000 | $ 254,550,000 |
| EPSON | $ 903,920,000 | 21.0% | $ 190,220,000 | $ 570,660,000 |
| PHILIPS | $ 4,660,000 | 39.1% | $ 1,820,000 | $ 5,460,000 |
| SAMSUNG SDI | $ 724,220,000 | 15.9% | $ 114,850,000 | $ 344,550,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 24.6% | $ 292,910,000 | $ 878,730,000 |
| SANYO | $ 457,620,000 | 34.7% | $ 158,700,000 | $ 476,100,000 |
| SHARP | $ 1,368,350,000 | 19.0% | $ 259,550,000 | $ 778,650,000 |
| TOSHIBA | $ 382,390,000 | 19.2% | $ 73,290,000 | $ 219,870,000 |
| **Grand Total** | **$ 5,385,230,000** | **21.8%** | **$ 1,176,190,000** | **$ 3,528,570,000** |

**Figure 4: Summary of Motorola's overcharges under the plea period scenario associated with its claims for breach of contract and unjust enrichment**

| Supplier | Plea period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 18.3% | $ 65,150,000 | $ 195,450,000 |
| EPSON | $ 903,920,000 | 15.7% | $ 142,120,000 | $ 426,360,000 |
| PHILIPS | $ 4,660,000 | 30.9% | $ 1,440,000 | $ 4,320,000 |
| SAMSUNG SDI | $ 724,220,000 | 10.9% | $ 79,150,000 | $ 237,450,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 18.5% | $ 220,330,000 | $ 660,990,000 |
| SANYO | $ 457,620,000 | 27.7% | $ 126,920,000 | $ 380,760,000 |
| SHARP | $ 1,368,340,000 | 13.5% | $ 184,550,000 | $ 553,650,000 |
| TOSHIBA | $ 382,390,000 | 13.6% | $ 52,010,000 | $ 156,030,000 |
| **Grand Total** | **$ 5,385,220,000** | **16.2%** | **$ 871,670,000** | **$ 2,615,010,000** |

(22)     I was also asked to estimate overcharges on Motorola's purchases of STN panels. Based on the evidence available in this matter, my understanding of the substitutability between some STN and TFT panels, and my analysis of the effectiveness of the conspiracy with respect to TFT panels, I believe it is likely that the prices paid by Motorola for some STN panels were also elevated as a result of the conspiracy. However, I was unable to perform an empirical analysis of the extent of these overcharges. The vast majority of relevant STN data has only been recently available to me, including corrected data from Samsung SDI made available December 2 and supplemental data from Sanyo produced on December 14, the day before my report was due. As a result, the remainder of this report primarily discusses TFT panels.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# II. Background concerning the LCD panel industry

(23)    Typically, the characteristics of an industry, ranging from the nature of the product to the conditions affecting supply and demand, play important roles in economic analyses of conspiratorial conduct. For example, knowledge of such characteristics helps an economist identify important economic factors that may have influenced prices during the time period affected by a conspiracy. Accordingly, as part of my research, I conducted a detailed investigation of the LCD panel industry, drawing on published materials, industry experts, testimony, and documents produced in the course of this litigation. Among other sources, I have studied the report submitted in this matter by Dr. Fontecchio, which describes the industry at considerable length. Because there is little value in covering much of the same ground as Dr. Fontecchio, I will instead provide only a brief industry overview, highlighting some of the features that are important from the perspective of my analysis.

(24)    LCD panels are devices that use liquid crystals to display images (either graphics or text). They are used in a wide variety of electronic products. In terms of units or revenues, the most important uses include notebook computers, computer monitors, televisions, and mobile phones. The demand for LCD panels is what economists call a *derived demand*, in that it is driven by the demand for the finished products in which the panels are used. In most applications, potential substitutes for LCD panels are limited, imperfect, or simply absent.[2] There are however exceptions. Plasma TVs and CRTs TVs and monitors were potential substitutes for LCD panels for some sizes and during some periods.

(25)    The basic component of an LCD panel is commonly called a "cell." An LCD cell is composed of two glass substrates surrounding a layer of liquid crystals, all of which is contained between two polarizers and a color filter. By applying an electric voltage, the liquid crystals can be manipulated to either block light or allow it to pass-through to varying degrees, forming individual picture elements called pixels. An image can then be formed by arranging a particular combination of pixels using different colors and different levels of brightness. LCD modules are formed by combining the cells with backlights and other electronic components.[3] Following industry convention, in this report I use the term "LCD panels" to refer generally to both cells and modules.

(26)    Individual LCD panels differ along a number of dimensions. Generally, the most important dimensions are size, resolution, intended application, and addressing type.[4]

---

[2]    For example, in applications requiring displays of light weight, low energy consumption, and small footprint, LCD panels do not have effective substitutes.

[3]    Expert Report of Adam Fontecchio, Section IV. See also, e.g., LG.Philips LCD Co., Ltd. Form 20-F for the fiscal year ended December 31, 2004, p. 27.

[4]    I do not mean to suggest that these are the only significant dimensions; Dr. Fontecchio's expert report discusses others.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- *Size* is typically defined as the diagonal distance across the screen.[5]  LCD panels are often divided into categories according to their size. Industry participants typically distinguish between large and small panels, where a large panel is one with a diagonal measurement of 10 inches or greater.[6]

- *Application* refers to the type of finished product in which an LCD panel is used. Large panels are primarily used in notebook computers, computer monitors, and televisions. Small panels (less than 10 inches) are used in a variety of other applications such as mobile phones, digital cameras, digital camcorders, mp3 music players, and portable DVD players. [7]

- *Resolution* refers to the numbers of rows and columns of pixels (individual elements of the image). For example, a display with a resolution of 1024 x 768 has 1024 columns and 768 rows of pixels.

- *Addressing type* refers to the technology used to control individual pixels in an LCD panel. The primary types include passive matrix addressing and active matrix addressing. Most panels with passive matrix addressing use Super Twisted Neumatic or "STN" liquid crystals. Panels with active matrix addressing are often referred to as Thin Film Transistor or "TFT" panels. Passive matrix panels typically offer lower visual performance and have lower prices than active matrix panels.

(27)   LCD cells are manufactured in fabrication plants, also called "fabs." Modern fabs are multi-billion dollar facilities containing sophisticated production equipment. It generally takes about 18 months to construct a new fab and begin production.[8]

(28)   One key step in the production process of LCD cells involves the fabrication of an array of transistors that control the individual pixels. Employing the same technology used to create microprocessors and other semiconductor chips, the transistors are fabricated on a glass sheet called a "mother glass." Fabs have capacities that define the number of mother glass sheets that can be fabricated in a given period of time.

(29)   As LCD cell production technology improved over time, producers built new generations of fabs. Industry participants typically reference these using numbers, running from generation 1 to generation 8.5. The major difference between generations is the size of the mother glass. As that size has increased, it has become feasible to produce larger panels, as well as to make smaller panels at lower cost. These developments have paralleled trends in the semiconductor industry.

---

[5]   Expert Report of Adam Fontecchio, ¶21.

[6]   Expert Report of Adam Fontecchio, ¶21.

[7]   Expert Report of Adam Fontecchio, ¶23. See also, e.g., LG.Philips LCD Co., Ltd. Form 20-F for the fiscal year ended December 31, 2004, p. 27.

[8]   See, for example, June 30, 2011 Deposition of Dongkoo Lee, p. 81.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

(30)    Any given fab can be configured to manufacture panels with a variety of characteristics. Manufacturers tended to produce panels of multiple sizes for multiple applications within the same fab during the same month. It was generally more efficient to produce the larger and higher quality panels using the newer generation fabs. Manufacturers regularly shifted production capacity across different types of panels in response to customer demand, relative profitability, and other factors.

(31)    The major producers of LCD panels during the relevant time period include LG Display/LG Philips (sometimes abbreviated as LG or LPL), Samsung Electronics (sometimes abbreviated as SEC), AU Optronics (sometimes abbreviated as AUO), Chi Mei (sometimes abbreviated as CMO), Sharp Electronics, Chunghwa Picture Tube (sometimes abbreviated as CPT), HannStar (sometimes abbreviated as HS), Hitachi, and Toshiba, all of which have been named as defendants in this matter. The defendants accounted for the majority of the TFT LCD panel production capacity over the course of the conspiracy. Their share of capacity was at least 83% throughout the conspiracy, and over 90% in the last three years, as shown in Figure 5.

**Figure 5: Defendant share of TFT LCD capacity**



Source: DisplaySearch

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(32)    The majority of TFT LCD manufacturing occurred in Japan, South Korea, and Taiwan. As TFT LCD capacity increased over time, the relative capacity shares of these three countries evolved as shown in Figure 6.

**Figure 6: TFT LCD capacity shares by country**



Source: DisplaySearch

(33)    LCD panels were sold to companies that manufactured finished goods, such as Apple, Dell, Nokia, and Westinghouse. In addition, a number of the conspirators were vertically integrated in the sense that they too produced finished goods containing LCD panels; those companies include Samsung, Sharp, and Toshiba. However, the conspirators accounted for a much smaller share of LCD products than LCD panels.

(34)    LCD panels represent varying amounts of the overall cost of producing different LCD products. For some products, such as televisions and monitors, the panel is easily the most costly single component. Other products, such as notebooks and mobile phones, contain other relatively costly components (such as microprocessors, memory, and batteries). As a result, the panel accounts for a larger portion of the cost of some LCD products (e.g., televisions and monitors) than others (e.g., notebooks, mobile phones).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                              Page 10

(35)     Figure 7 shows how indices measuring average prices for large and small LCD panels have evolved over time. (I explain the nature and construction of these price indices at length in Section IV.A.1 below). Not surprisingly, prices for both large and small LCD panels declined steeply over the relevant time period. The movements in the two indices are also generally similar though plainly not identical. The similarity is likely attributable to the shared technology, manufacturers' ability to shift production capacity between large and small panels, and to common (or related) drivers of demand. The large LCD panel price index is visibly elevated relative to its trend in three separate time periods: late 1999 through early 2000, mid-2002, and the end of 2003 through mid-2004. The small LCD panel price index is visibly elevated relative to its trend in two somewhat longer time periods, with one peak in 2000 and the other in 2004. In both cases, the first episode of price elevation follows on the heels of the Asian financial crisis, which likely restricted capacity expansion, at least to some extent.

**Figure 7: LCD panel price indices**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                     Page 11

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# III. The conspiracy

## III.A. Goals of the conspiracy

(36)    There is abundant evidence that the defendants conspired and that the purpose of their conspiracy was to raise the prices of LCD panels above the levels that would otherwise have prevailed. A number of LCD panel producers have pled guilty to conspiring over a period spanning many years with the objective of fixing of LCD prices. In their plea agreements, Chi Mei, Chunghwa, and HannStar, three Taiwanese LCD panel manufacturers, admitted that "from on or about September 21, 2001 to on or about December 1, 2006, [they] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold in the United States and elsewhere."[9] LG Display, one of the two major Korean LCD panel manufacturers, stipulated to the same objective of the conspiracy and admitted that it participated in the conspiracy for almost five years, from approximately September 21, 2001 to approximately June 1, 2006.[10] According to the plea agreements from Sharp, Hitachi, and Epson, three Japanese LCD panel manufacturers, the conspiracy lasted almost six years and involved fixing prices to specific buyers of LCD panels. In particular, Sharp admitted to participating in a conspiracy for almost six years, from approximately April 1, 2001 to approximately December 1, 2006, with the objective to fix prices to Dell, Apple, and Motorola.[11] Hitachi and Epson admitted to fixing prices to Dell and Motorola, respectively.[12]

(37)    The time periods and products affected by the conspiracy to which defendants pled guilty or for which they were indicted, the volume of commerce subject to the defendants' guilty pleas or indictments, and the fines and number of indicted executives are summarized in Figure 8 below. Naturally, the actual conspiracy may have been of greater scope and of longer duration than the conduct to which the parties have admitted, and indeed other evidence points to a broader conspiracy.

---

[9]    Chi Mei, Chunghwa, and HannStar Plea Agreements.

[10]    LG Display Plea Agreement.

[11]    Sharp Plea Agreement.

[12]    Hitachi and Epson Plea Agreements.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 8: Overview of guilty pleas and indictments**

| Company | Legal status | Time period | Products or customers affected | Affected commerce ($ millions) | Fine ($ millions) | Executives indicted |
|---|---|---|---|---|---|---|
| AUO | Indicted | Sep 2001 – Dec 2006 | TFT LCDs | TBD | TBD | 6 |
| Chi Mei | Guilty plea | Sep 2001 – Dec 2006 | TFT LCDs | $985 | $220 | 5 |
| Chunghwa | Guilty plea | Sep 2001 – Dec 2006 | TFT LCDs | $358 | $65 | 5 |
| Epson | Guilty plea | Fall 2005 – Mid 2006 | Motorola (Razr phones) | $110 | $26 | 0 |
| HannStar | Guilty plea | Sep 2001 – Jan 2006 | TFT LCDs | $107 | $30 | 2 |
| Hitachi | Guilty plea | Apr 2001 – Mar 2004 | Dell (monitors, laptops) | $130 | $31 | 1 |
| LG Display | Guilty plea | Sep 2001 – Jun 2006 | TFT LCDs | $2,500 | $400 | 3 |
| Samsung | Amnesty | N/A | N/A | N/A | N/A | N/A |
| Sharp | Guilty plea | Apr 2001 – Dec 2006 Sep 2005 – Dec 2006 Fall 2005 – Mid 2006 | Dell (monitors, laptops) Apple (iPod players) Motorola (Razr phones) | $511 | $120 | 0 |

Source: Defendant Plea Agreements

(38)   Evidence from the defendants' documents corroborates their admissions that the objective of the conspiracy was to raise the prices of LCD panels above the levels that would otherwise have prevailed. For example, in the fall of 2001 when the conspirators began engaging in multilateral meetings at the senior executive level (the so called Crystal Meetings, described in more detail below), they described the purpose of those meetings as ensuring that "orderly pricing can be maintained for the short term, and production capacity and demand balance can be achieved for the mid to long term, thus prices can be stabilized."[13] Defendant senior executives also confirmed the objective of the conspiracy in their depositions. When asked whether the purpose of the meetings was to reach agreements on prices, Brian Lee, President of Sales and Marketing for Chunghwa, answered affirmatively.[14] Stanley Park, Vice President of Sales and Marketing at LG Display, testified that talking about the prices of major products and agreeing to charge specific prices was a regular part of the meetings among co-conspirators.[15] Many documents memorializing meetings among the defendants reflect apparent agreements concerning LCD panel prices.[16]

(39)   It is important to understand that the conspiracy's objective was to achieve prices that were higher than those that would have prevailed under normal competitive conditions. At times they attempted to accomplish this objective by raising prices, and at other times by slowing the rate at which prices

[13]   Meeting minutes from a September 14, 2001 meeting of senior executives from AUO, Chi Mei, Chunghwa, and HannStar. CPT00004008-11, Exhibit 14.

[14]   Deposition of Brian Lee, July 28, 2010, p. 353.

[15]   Deposition of Stanley Park, September 17, 2009, p.43.

[16]   See Section III.B.1.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

were declining. For example, when prices began to drop in the summer of 2004, cartel members met to "discuss and come up with measures to prevent excessive decline in price."[17] In the spring of 2002 when cartel members began anticipating a period of "oversupply" and deep price cuts, they contemplated steps to make a "preparatory response or pre-control production capacity in order to react to the next oversupply."[18]

(40)    Because different manufacturers produce closely substitutable LCD panels, raising market prices above their normal competitive level was not something a single LCD panel maker could have accomplished unilaterally. The conspirators understood that some coordinated suppression of competitive rivalry was required to achieve that goal. For example, in a January 14, 2000 meeting between Sharp and LG, Sharp's General Manager of LCD Marketing and Administration warned that prices would rapidly decline "if we just blindly follow the market's demand" and emphasized the "need for some mutual cooperation among the businesses for healthy operation of LCD industry market."[19] He also pointed out that any such cooperation would require the participation of not only Japanese LCD manufacturers but also Korean LCD manufacturers, which by late 1999 accounted for approximately 30% of TFT LCD capacity.[20]

(41)    Similarly, in a September 14, 2001 meeting of AUO, Chi Mei, Chunghwa, and HannStar at which price stabilization was discussed, AUO stressed that the companies "must take action together with the Korean makers in order to reap success."[21] It called for coordination of capacity expansion in China to avoid the risk of declining prices, and for restraints on pursuing customer business through price cutting.[22] In a March 13, 2002 meeting attended by top executives from all four Taiwanese and both Korean LCD makers, AUO proposed that "to prolong the current shortage cycle, we need to: push demand for larger panels, esp. TVs; moderate capacity expansion." In a June 26, 2003 bilateral meeting between LG and Sharp, an LG executive said that in response to Taiwanese LCD manufacturers lowering the prices of 17 inch monitor panels, "we [i.e., LG] visited the TWN companies and asked them to stop the price drop." Regarding LCD TVs that began making inroads

---

[17]    Meeting minutes from a July 21, 2004 meeting between AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung. GRN000100-2, Exhibit 332E.

[18]    Meeting minutes from a March 13, 2002 meeting attended by top executives from AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung. CPT0004043-5, Exhibit 315.

[19]    LG "Report on the Business Meeting with Sharp" on January 14, 2000 by Jung Kwang Lee, Senior Manager and Leader of the TV Sales Team at LG Display. GRNE-Q-0001666-71.

[20]    Specifically, the document reads, "Japanese businesses have a display part within the JEIDA thus have an opportunity to discuss mutual opinions but now the reality is that it is not meaningful or effective without including Korean businesses." GRNE-Q-0001669. The capacity share was calculated using DisplaySearch data.

[21]    Meeting minutes from a September 14, 2001 meeting of top executives from AUO, Chi Mei, Chunghwa, and HannStar. CPT00004008-11, Exhibit 14. By the fall of 2001, the four Taiwanese LCD makers accounted for approximately 25% of TFT LCD capacity.

[22]    CPT00004008, Exhibit 14. In his July 26, 2010 deposition, Brian Lee, President of Sales and Marketing of Chunghwa, explained that "with intense industry competition in a situation where there were cut pricing, stealing orders, these were considered dangerous situations we should use the yellow flag system to negotiate and come to a resolution regarding to any issues that we may have."

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                    Page 14

against CRT and plasma TVs in 2003, he noted that "the price drop was noticeable as the competition among the set makers is getting that much more fierce … I think we need to control the situation to prevent any further price decrease." He concluded that "with regard to [notebooks and monitors], there is an informational exchange and consensus formed as to price, etc with [Samsung, AUO] and others." He proposed that "[f]or TV, learning from the situation where [plasma] is lowering the price due to lack of cooperating relationship, we [i.e., LG] propose forming a friendly cooperating system, not collusion, with Sharp and possibly also including [Samsung]."[23]

## III.B. Overview of the operation of the conspiracy

(42)    It is usually difficult to obtain detailed evidence concerning the operation and mechanics of a cartel, even when its existence is admitted or proven. The participants generally know that their conduct is illegal, and thus have every reason to avoid leaving a detailed paper trail. Instead, they typically communicate verbally, sometimes in face-to-face meetings. Documents that do memorialize a cartel's activities may be intentionally incomplete, oblique, and/or apparently self-contradictory (e.g., from the passage quoted above, "a friendly cooperating system, not collusion"), particularly with respect to matters that are more legally sensitive. There is in addition no guarantee that such documents will survive until an investigation is opened or a lawsuit is filed, or that they will all surface during the course of discovery.

(43)    Thus, in considering evidence concerning the manner in which an admitted or proven cartel operated, one must bear in mind that the available documents may be the "tip of the iceberg," and that the murkiness of the record may reflect the defendants' efforts to cover up or obscure their most serious transgressions. Though a review of the record can provide some insight concerning the practices in which a cartel did engage, it provides much less clarity concerning the practices in which the cartel did not engage. The absence of pervasive evidence of a particular practice cannot be taken as proof that the practice was not a pervasive part of the conspiracy. From the record, we may see only bits and pieces of the mechanisms through which the cartel orchestrated price-fixing.

(44)    Notably, the defendants apparently understood that their actions were illegal and that detection could lead to severe punishment. For example, in an internal email from Stanley Park, Vice President of Sales and Marketing at LG Display to other LG executives, Park described a July 21, 2004 meeting between AUO, Chunghwa, Chi Mei, LG, and Samsung, and cautioned against leaving a paper trail that might reveal their conspiratorial activities:

---

23    LG Display internal memo from June 26, 2003 titled "Minutes from the information exchange meeting with Sharp's LCD operation division" whose objective was to "secure system for mutual assistance regarding TV and request mutual cooperation to maintain price." GRNE-B-0120160-3, Exhibit 728-AE.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                              Page 15

> "Based on the DRAM companies being sued in violation of the antitrust laws for their price fixing about two years ago, we need to pay more attention to security internally and otherwise, and must try to refrain from written communication which would leave trails."[24]

Park's message highlights the difficulties one faces when attempting to reconstruct the detailed mechanics of a cartel's operation. Other evidence in the record points to a broad awareness of the same issues. For instance, in a January 2000 meeting between Sharp and LG, Sharp's General Manager of LCD Marketing and Administration expressed the view that "there is a need for some mutual cooperation among the businesses for healthy operation of LCD industry market (Even though we should avoid even an unoffical cartel problem)."[25] In a December 2001 meeting of senior executives from AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung in which the companies agreed to raise prices by $10 in January 2002, an LG executive "remind[ed] those executives in attendance to pay attention to anti-trust law" before acknowledging that LG "agrees with the price increase in January."[26] In another internal email in which he informed other LG executives of the resolution of an August 11, 2004 cartel meeting between AUO, Chunghwa, Chi Mei, HannStar, LG, and Samsung, LG's Stanley Park wrote, "[i]t is time to call a Top Management Meeting to acquire more binding and effective measures (but, Anti-Trust?)"[27]

(45)     Further evidence on this point is found in the depositions of the defendants' employees. Stanley Park, Vice President of Sales and Marketing at LG Display confirmed in his deposition that he understood and discussed the illegality of the cartel's activities with other co-conspirators, and reminded them to be careful because agreeing on prices for LCD panels was against the law.[28] Michael Hanson, Samsung's Manager for the Dell account, testified that he had known it was illegal to exchange pricing information with Brian Graham, Regional Director at Sharp, and believed that Graham knew that as well.[29] Other Samsung executives testified to the same effect.[30] Hong Bum Suh, Senior

---

[24]     GRN000100-02, Exhibit 332E.

[25]     LG "Report on the Business Meeting with Sharp" on January 18, 2000 by Jung Kwang Lee, Senior Manager and Leader of the TV Sales Team at LG Display. GRNE-Q-0001669.

[26]     CTP0004035-40, Exhibit 310.

[27]     Minutes from August 11, 2004 Crystal Meeting, GRN000106-7, Exhibit 2323E.

[28]     Deposition of Stanley Park, Vice President of Sales and Marketing at LG Display, September 17, 2009, pp. 77-8 and 239. "Q. When you had the agreements with your competitors about the prices that would be charged for your products did you understand or did you have an understanding or a belief that that was against the law? A. Yes. Q. To your knowledge, did you ever advise anybody in these meetings that you believed that this activity of agreeing on the prices that would be charged for these panels was against the law? A. Yes. (pp. 77-8)." "Q. Yes. If you were going to be telling people to be careful in what way were they supposed to be careful? A. Ah, if I say that then in the, in the meeting, just that you do not tell everybody that this kind of meeting is existing or you are attending that kind of meeting. Q. You keep it secret? A. Secret. (p. 239)."

[29]     Deposition of Michael Hanson, Senior Manager of Sales at Samsung, March 23, 2010, pp. 77-8. "Q: At the time that you're [exchanging pricing information] with Mr. Graham, did you believe that this exchange was illegal? A. Yes, sir. Q. Do you know whether he did? A: I have to believe he also knew that it was wrong or illegal, because he was in the industry for a fair amount of time."

[30]     Deposition of Hong Bum Suh, Senior Manager of Samsung's Strategy and Marketing Team, March 9, 2010, p. 106;

Manager of Samsung's Strategy and Marketing Team testified that when he met with his co-conspirators from Toshiba to discuss and agree on prices for customers such as Dell, Compaq, IBM, Motorola, or Apple, his co-conspirators preferred to keep those meetings secret because "because everyone knows that this is illegal."[31]

(46)    Knowing that their activities were illegal, the defendants went to great lengths to avoid detection, in part by restricting the set of people with knowledge of their conspiratorial conduct. For example, notes from a September 14, 2001 meeting for senior executives of the four Taiwanese defendants concluded "[d]o not reveal this meeting to outsiders, not even to colleagues; keep a low profile. To cultivate an atmosphere for price up, if journalists shall conduct interviews, reveal that the production capacity is at full load."[32] The minutes from a cartel meeting on April 2, 2004, disseminated through an internal email from Steven Leung (Sales Director of AUO's IT Display Group) to other AUO executives, began: "Extremely Confidential  - Must NOT Distribute." Leung cautioned the email's recipients as follows: "Dear Nero/Roger/Rebecca/Tony, Do not forward and do not share. I will kill you if I find out."[33] A PowerPoint presentation that included information on prices, quantities, and capacity expansion, and that was discussed by executives from AUO, Chi Mei, Chunghwa, HannStar, and LG at their February 6, 2002 conspiracy meeting, contained a footer that read "Please do not copy and release to anyone."[34]

(47)    Additional evidence is found in the depositions of the defendants' executives. Chih-Chun Liu, Vice President of Sales and Marketing at Chunghwa, testified that he "went to great length to conceal the existence of these meetings," and everyone who attended the conspiracy meetings took precautions to protect the secrecy of those meetings; e.g.: "participants should only be a few; not too many," and "after the meeting, we avoid going out the front door all together with all the TFT makers."[35] Stanley Park, Vice President of Sales and Marketing at LG Display, testified that the conspirators discussed

---

deposition of Heon Seong Kim, a Vice President of Sales at Samsung, July 14, 2010, p. 57

[31]    Deposition of Hong Bum Suh, Senior Manager of Samsung's Strategy and Marketing Team, March 9, 2010, pp. 98-9 and 106. "Q. Yes. When you met with them, did you understand that they did not want anyone else to know about your meetings? A. Yes. Q. What led you to have that understanding? A. Well, whenever you meet someone, you have this understanding as of such, because everyone knows that this is illegal. (p. 106)"

[32]    CPT0004008-10, Exhibit 14. At his June 17, 2010 deposition Jau-Yang Ho, President of Chi Mei, elaborated on the September 14, 2001 meeting, saying that he "told the participants at the meeting that we need to keep confidential to the media … and to our employees. Because it happened before. Our people talked to the media, and in the end, the media knew." (pp. 206-7)

[33]    AU-MDL-03367666-7. For other examples of conspiracy meeting minutes authored by AUO employees that contain an "Extremely Confidential  - Must NOT Distribute" disclaimer, see AU-MDL-02915727 (February 13, 2003), AU-MDL-03356471 (April 11, 2003),  AU-MDL-02893950 (June 11, 2003), AU-MDL-02958573 (September 4, 2003), AU-MDL-04513061 (February 5, 2004), AU-MDL-04428114 (July 8, 2004).

[34]    GRN000031-7.

[35]    Deposition of Chih-Chun Liu, Vice President of Sales and Marketing at Chunghwa, April 28, 2010, pp. 96-7, and April 29, 2010, p. 314. "Q. Did you ever tell anyone from Dell that you were having these group meetings? A. That's not possible. Q. In fact, you went to great length to conceal the existence of these meetings? A. Of course. Q. Did any other competitor tell you that they told Dell about the existence of these group meetings? A. No, I don't think there will be any person as stupid as that in the world. (p. 314)"

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                    Page 17

practices for concealing their meetings and price agreements: "[j]ust do not tell the existence of the meeting to others. I mean, even in the company. And then keep the meeting reports confidential."[36] Another practice was to hold conspiracy meetings far from the defendants' places of business and those of their customers.[37] When asked how he exchanged information with competitors over the course of seven years, Michael Hanson, Senior Manager of Sales for Samsung, replied that "for me the emails were almost nonexistent, but there were lots of phone calls … well over 300 phone calls."[38]

(48)    Though the defendants plainly understood (and often strove to avoid) the risks of written communication, they nevertheless documented portions of the cartel's activities. The record reveals that bilateral and possibly multilateral meetings and discussions among conspirators took place at least as far back as 1998. The co-conspirators' activities were more poorly documented prior to the fall of 2001, and the regularity and frequency of meetings during that period is unclear from the record. However, available documents suggest that the meetings may have occurred regularly and that discussions covered at least the exchange of information concerning prices and production, as well as agreements concerning prices.[39]

(49)    It appears that the bilateral meetings were later supplemented (not replaced) by the so called "Crystal Meetings" and "vendor conferences" beginning in the fall of 2001.[40] Meeting notes and summaries

---

[36]    Deposition of Stanley Park, Vice President of Sales and Marketing at LG Display, September 17, 2009, 77-8.

[37]    Deposition of Brian Lee, President of Sales and Marketing of Chunghwa, July 26, 2010. "Q. Was it unusual to have the meeting at the hotel as opposed to your place of business? A. Only for meetings that are more sensitive. Q. And [the conspiracy meeting on February 9, 2001] was one of those? A. Yes. Q. So one of the concerns was keeping the [conspiracy] meeting secret, correct? A. Yes. (p. 69.)" Deposition of Michael Hanson, Senior Manager of Sales for Samsung, March 23, 2010. "Q. When you used to meet with your competitors, did you intentionally choose places that were far away from Dell? A. Yes, sir. Q. And why was that? A. Because we did not want Dell to see -- see us together. (p. 65)."

[38]    Deposition of Michael Hanson, Senior Manager of Sales for Samsung, March 24, 2010, p. 392.

[39]    For example, the minutes from what appears to be a multilateral meeting on June 27, 2000, titled "1st LCD vender [sic] conference," note that "It has been a long time that we did not have a chance to meet together to discuss the marketing information. By this chance, I hope we can start such an un-official meeting with open-mind base and periodically." The minutes report notebook and monitor panel production by panel size for Japanese, Korean, and Taiwanese LCD manufacturers, with instructions, "pls do prepare [your real shipping quantity] before your coming. We cannot provide final data to whom do not provide the material. It means that you will not be invited next time if you can not [sic] or don't want to provide actual data this time." CMOCIV-0267442-6, Exhibit 1625.

    In an internal memorandum summarizing a bilateral meeting between Samsung and Chunghwa, Brian Lee, President of Sales and Marketing of Chunghwa, reported that "[i]n order to ensure an orderly TFT-LCD market," Samsung Director Cheng-Chien Lee "hopes that the TFT-LCD industry can integrate into consistent action" Lee also said that "Samsung Electronics is willing to cooperate to maintain order.." CPT0004004, Exhibit 2125. In his July 26, 2010 deposition, Brian Lee explained that this "cooperation" included "first, they [i.e., Samsung] can follow the market price in Taiwan, or have the same price as Taiwanese makers. Second, they will not actively lower price to steal orders. And third, they can even give [Chunghwa] the orders so that [Chunghwa] can increase [its] utilization rate. (p. 68)"

[40]    See, for example, minutes from September 14, 2001 Crystal Meeting, CPT0004008, Exhibit 14. As an example of conspiratorial communications outside the scope of Crystal Meetings, consider the testimony of Harry Cho, Vice President and Samsung Sales Manager in Taiwan: "Q. Now, I believe you said that you spoke with Kuma [AUO] approximately once a quarter; is that correct? A. Yes, approximately once or twice. Q. A quarter? A Yes. … Q. How many times did you communicate with Mr. H.T. Wang [Chi Mei]? A. I believe about once every month, approximately. Q Over what period? A For two, three years, I believe. … Q. How frequently did you communicate with Mr. Brian Lee

---

from numerous participants have surfaced during discovery. They show that, with the exception of Q3 2006, the Crystal Meetings occurred at least twice a quarter and often several times a quarter (see Figure 7), and included CEOs, senior executives, sales and marketing managers, and account managers. Most meetings took place in Taiwan, with the participation of the Taiwanese and Korean LCD manufacturers. Japanese LCD manufacturers also participated in the conspiracy through meetings and email communications with conspirators.[41] The notes from the Crystal Meetings, discussed in more detail below, show that they encompassed at least the following:

- Exchange of pricing and production information. This typically occurred in meetings involving sales and marketing managers and vice presidents

- Overall pricing agreements. These were typically, but not exclusively, reached in meetings among CEOs and senior executives

- Pricing agreements regarding specific customers, as well as allocation customer business of among producers. These were typically discussed in meetings among account managers

- Supply restrictions. These were typically discussed in meetings among CEOs and senior executives

(50)   The conspirators consistently exchanged, monitored, and discussed pricing and production information, including LCD capacity. There was no legitimate pro-competitive rationale for such communications. These informational exchanges typically took place in meetings involving sales and marketing managers and vice presidents.[42] The price and production information exchanged in those meeting differed from information the conspirators could have obtained elsewhere in at least two respects. First, contemporaneous production and prices were discussed in these (monthly and sometimes more frequent) meetings whereas DisplaySearch, a well-known consulting company in the LCD industry, published production and pricing reports with a delay.[43] Second, the evidence also shows that conspirators exchanged and discussed *future* production and pricing plans.[44]

---

outside of the Crystal Meetings? A. About once every two months for about two year." Deposition of Harry Cho, November 17, 2010, 138, 146-7, and 149.

[41]   See, for example, minutes from a January 14, 2000 bilateral meeting between LG Display and Sharp in which Sharp's prices, production, and investment plans were discussed (GRNE-Q-0001666); an August 8, 2003 email communication from Chi Mei's Account Manager Irine Chen planning a meeting with co-conspirators including Sharp, whose objective was to exchange market information (CMOCIV-1492574-5, Exhibit 1612); a December 3, 2003 email from George Chao, Sharp Sales and Marketing, in which he apologized for not having been able to attend a cartel meeting but still provided his co-conspirators with Sharp's shipment data (CMOCIV-1525911). In his October 21, 2010 deposition, Tim Wang testified that defendant employees exchanged shipments data with co-conspirators in monthly meetings like the one that Chao could not attend. (pp. 114-6)

[42]   For example, at the September 14, 2001 conspiracy meeting attended by the senior executives of the four Taiwanese defendants concluded with "Commercial meetings shall be set by vice presidents of sales each month to discuss practical methods to stabilize prices and exchange necessary supply and demand information." CPT0004008-10, Exhibit 14.

[43]   See, for example, Quarterly TFT Supply/Demand report (e.g., CMOCIV-2953561) or Quarterly Large-Area Shipment Report (e.g., GRNE-H-0042135) that include the type of information the conspirators exchanged. As the title of the

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                      Page 19

**Figure 9: Known instances of Crystal Meetings**



Source: Defendant documents

(51)     The cartel members maintained spreadsheets containing detailed records of production, capacity, and prices for their co-conspirators. In the early Crystal Meetings, information was entered in the spreadsheets during the meeting as it was discussed among the participants. Later on, information on production, capacity, and prices was discussed at the meetings and it was incumbent on each supplier to maintain its own records.[45] Numerous spreadsheets containing information shared at these

reports suggest, the information is reported quarterly. Also see The DisplaySearch Monitor (e.g., AU-MDL-03862023).

[44]   See, for, example CPT0004020-8, Exhibit 307.

[45]   For example, in her August 18, 2010 deposition, Sonia Chen, Manager of Samsung's LCD Marketing Division, testified "[a]t the beginning few times with the projector, the host company will be the one to responsible to take the notes and then put in the shipment data in the computer and project it on the projector." (p. 53) According to her testimony, the host company would go around the room and the representative from each conspirator would disclose his or her company's specific information. Once the information was complete, it was shared on a thumb drive (pp. 53-4). As time progressed, the conspirators stopped using a projector, at which point Chen "just wrote it down." (p. 54).

In his July 26, 2010 deposition, Brian Lee, Vice President of Sales and Marketing for Chunghwa, explained how prices were shared at cartel meetings as follows: "Q. So how did it happen in the room? You were in a hotel room; you were at a table, like we're sitting here? Did each of the representatives of the participants in the meeting say their price opinion verbally and you wrote it down; is that how it happened? A. The final prices were projected through a projector, and each maker were to check to make sure that they agree with the prices that's on the screen. Q. Okay. And did they agree

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                 Page 20

meetings, often titled "crystal meeting.xls", were turned over by defendants during the process of discovery.[46] These documents include copies of identical spreadsheets obtained from multiple defendants.[47] Price and production information from these spreadsheets was also sometimes included in the minutes of the Crystal Meetings.[48] A number of the spreadsheets show that defendants were actively tracking the cartel members' prices, production, and capacities through time.[49] Figure 10 presents an example of a spreadsheet memorializing monthly panel production by manufacturer, panel size, resolution, and application obtained from AUO and LG. An example of a spreadsheet memorializing monthly prices by panel size, resolution, and manufacturer (obtained from AUO) appears in Figure 11.

to the prices on the screen? A. Yes, they did. Q. Who led the part of the meeting where the prices were given? Who asked for the price from each person? A. I forgot. Q. Do you remember how it was decided who would give their price first? A. Usually the larger maker will suggest their opinion first about pricing. Q. And 'the larger maker' in this case would be Samsung? A. The largest being Samsung; the second largest, LG; and the third, AUO." (pp. 120-1)

[46] See, for example, GRNE-Q-0000737, CMOCIV-0250334, GRNE0035199, AU-MDL-03546161, AU-MDL-03356434, AU-MDL-03356467, GRNE0250529, AU-MDL-03345646, AU-MDL-03345646, GRNE0253505, AU-MDL-03356472, GRNE0035204, AU-MDL-03356452, GRNE0035206, AU-MDL-08431928, GRNE0035208, GRNE0035207, AU-MDL- 03356447, AU-MDL-06270035, GRNE0035703, GRNE0035210, AU-MDL-04707487, GRNE0035781, AU-MDL-05101960, GRNE-P-0014385, CMOCIV-1586598, CMOCIV-1585742, GRNE0137951, GRNE0035715, CMOCIV-1461279, GRNE0035727, GRNE0035782, GRNE0035725, AU-MDL-03324631, GRNE0035767, GRNE0035739, AU-MDL-03322335, GRNE0035738, AU-MDL-03320852, GRNE0035720, GRNE0035724, AU-MDL-05075484, AU-MDL-05075481, GRNE0035728, CMOCIV-0348163, GRNE0035717, GRNE0035737, GRNE0035779, CMOCIV-0423505, AU-MDL-05075482, AU-MDL-05075483, CMOCIV-0307368, CMOCIV-1409507, CMOCIV-0423410, AU-MDL-05600772, GRNE0187793, CMOCIV-0324654, GRNE0035773, CMOCIV-0369224, GRNE0219420, AU-MDL-03291227, GRNE0218108, CMOCIV-1459034, AU-MDL-05600253, GRNE0225380, AU-MDL-03314243, GRNE0035780, GRNE0035788, CMOCIV-0386636, AU-MDL-03314079, AU-MDL-03184381, CMOCIV-0415503, CMOCIV-0323655, AU-MDL-03184377, AU-MDL-03313484, AU-MDL-03184382, AU-MDL, 03184380, CMOCIV-0415706, AU-MDL-03184490, AU-MDL-03184379, AU-MDL-03184378, AU-MDL-03184385, AU-MDL-03184384, AU-MDL-03184383, and CMOCIV-1451844.

[47] For example CMOCIV-1585742 (Chi Mei files) and GRNE0137951 (LG files).

[48] For example, the information from a spreadsheet found in LG files (GRNE0035208) was included in AUO's highlights of Crystal Operation Meeting that took place on June 11, 2003 (AU-MDL-02893950).

[49] For example, spreadsheet GRNE0035767 (showing actual production through August 2004 and target production for September 2004), spreadsheet GRNE0035739 (showing actual production through September 2004 and target production for October 2004), and spreadsheet GRNE0035738 (showing actual production through October 2004 and target production for November 2004); or spreadsheet AU-MDL-03356467 (showing actual prices through February 2003 and target prices for  March 2003), spreadsheet AU-MDL-03345646 (showing actual prices through March 2003 and target prices for April 2003), and spreadsheet AU-MDL-03356472 (showing actual prices through April 2003 and target prices for May 2003).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.   III. The conspiracy

**Figure 10: Example of a spreadsheet memorializing production figures obtained at cartel meetings**

| Breakdown | Jan | Feb | Mar | Q1 | Apr | May | Jun | Q2 | Jul | Aug | Sep | Q3 | Oct (R) | Nov (R ) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | | | | New | | 七月會議 | | 八月會議 | 九月會議 | 十月會議 | | | 12月會議 |
| **Total 6 TFT Vendors** | 7,891 | 7,832 | 8,454 | 24,177 | 8,558 | 8,740 | 8,726 | 26,024 | 8,245 | 8,114 | 8,642 | 25,001 | 9,702 | 10,544 |
| **AUO Total(Kpcs)** | 1,200 | 1,332 | 1,440 | 3,972 | 1,454 | 1,548 | 1,500 | 4,502 | 1,530 | 1,270 | 1,510 | 4,310 | 1,690 | 1,890 |
| NB Total | 320 | 340 | 360 | 1,020 | 395 | 420 | 390 | 1,205 | 400 | 390 | 410 | 1,200 | 440 | 495 |
| 14" XGA | 90 | 100 | 100 | 290 | 130 | 130 | 100 | 360 | 100 | 100 | 120 | 320 | 130 | 160 |
| 15" XGA | 175 | 170 | 170 | 515 | 180 | 180 | 165 | 525 | 160 | 170 | 180 | 510 | 180 | 180 |
| 15" SXGA+ | 25 | 35 | 35 | 95 | 30 | 50 | 50 | 130 | 25 | 20 | 20 | 65 | 20 | 20 |
| 15.4 " WXGA | | | | - | | 5 | 15 | 20 | 35 | 50 | 20 | 105 | 50 | 65 |
| Others (8"/10"/12"/15.2") | 30 | 35 | 55 | 120 | 55 | 55 | 60 | 170 | 80 | 50 | 70 | 200 | 60 | 70 |
| MNT Total | 820 | 880 | 950 | 2,650 | 968 | 1,020 | 1,015 | 3,003 | 1,015 | 795 | 950 | 2,760 | 1,050 | 1,210 |
| 15" | 190 | 180 | 210 | 580 | 225 | 240 | 240 | 705 | 280 | 190 | 190 | 660 | 150 | 170 |
| 17" | 500 | 500 | 500 | 1,500 | 510 | 530 | 560 | 1,600 | 575 | 490 | 580 | 1,645 | 660 | 730 |
| 19" | 130 | 200 | 210 | 540 | 210 | 220 | 210 | 640 | 155 | 110 | 170 | 435 | 210 | 275 |
| others | | | 30 | 30 | 23 | 30 | 5 | 58 | 5 | 5 | 10 | 20 | 30 | 35 |
| TV Total | 60 | 112 | 130 | 302 | 91 | 108 | 95 | 294 | 115 | 85 | 150 | 350 | 200 | 185 |
| TV 20" | 45 | 70 | 88 | 203 | 45 | 45 | 35 | 125 | 30 | 30 | 55 | 115 | 80 | 70 |
| TV 14"/15"/17" | 15 | 28 | 28 | 71 | 35 | 45 | 40 | 120 | 65 | 45 | 75 | 185 | 90 | 80 |
| TV 26" | | 8 | 8 | 16 | 8 | 10 | 7 | 25 | 10 | 5 | 15 | 30 | 20 | 20 |
| TV 30" | | 6 | 6 | 12 | 3 | 8 | 13 | 24 | 10 | 5 | 5 | 20 | 10 | 15 |
| TV 32" | | | | | | | | | | | | | | |
| TV 37" | | | | | | | | | | | | | | |
| **CMO Total** | 994 | 991 | 1,194 | 3,179 | 1,219 | 1,238 | 1,195 | 3,652 | 1,041 | 1,131 | 1,155 | 3,327 | 1,270 | 1,323 |
| NB Total | 409 | 360 | 422 | 1,191 | 389 | 436 | 375 | 1,200 | 288 | 323 | 294 | 905 | 343 | 345 |
| 12"+12"W | | | | | | | | | | | | | | |
| 14" XGA | 97 | 110 | 104 | 311 | 97 | 152 | 120 | 369 | 54 | 46 | 82 | 182 | 68 | 74 |
| 15" XGA | 78 | 71 | 110 | 259 | 117 | 115 | 110 | 342 | 101 | 124 | 54 | 279 | 97 | 107 |
| 15" SXGA+ | - | - | - | - | - | - | - | - | - | - | - | - | | |
| 15.4" Wide | 14 | 4 | 26 | 44 | 8 | 11 | 15 | 34 | 3 | - | 18 | 21 | 30 | 24 |
| 17"W | | | | | | | | | | | | | | |
| IDT | 220 | 175 | 182 | 577 | 167 | 158 | 130 | 455 | 130 | 153 | 140 | 423 | 148 | 140 |
| MNT Total | 512 | 544 | 655 | 1,711 | 688 | 657 | 666 | 2,011 | 603 | 618 | 696 | 1,917 | 726 | 727 |
| 15" | 143 | 161 | 178 | 482 | 178 | 191 | 165 | 534 | 106 | 155 | 106 | 367 | 108 | 60 |
| 17" | 235 | 250 | 327 | 812 | 387 | 331 | 360 | 1,078 | 411 | 396 | 480 | 1,287 | 568 | 554 |
| 18" | - | - | - | - | - | - | - | - | - | - | | | | |
| 19" | 128 | 127 | 150 | 405 | 123 | 135 | 125 | 383 | 86 | 67 | 110 | 263 | 50 | 113 |
| 20" | 6 | 6 | - | 12 | - | - | 16 | 16 | - | - | | | | |
| TV Total | 73 | 87 | 117 | 277 | 142 | 145 | 154 | 441 | 150 | 190 | 165 | 505 | 201 | 251 |
| TV 20" | 48 | 54 | 57 | 159 | 66 | 87 | 76 | 229 | 76 | 82 | 55 | 213 | 65 | 80 |
| TV 23" | | | | - | | | | - | | | | - | | 70 |
| TV 27" | 12 | 15 | 26 | 53 | 22 | 33 | 31 | 86 | 28 | 53 | 30 | 111 | 43 | |
| TV 30" | 13 | 18 | 34 | 65 | 29 | 25 | 22 | 76 | 21 | 23 | 35 | 79 | 40 | 60 |
| TV 32" | | | | - | | | | - | | | | - | | 40 |
| TV Others ( small ) | | | | - | 25 | - | 25 | 50 | 25 | 32 | 45 | 102 | 53 | 1 |
| >32" | | | | | | | | | | | | | | |
| **CPT Total** | 807 | 901 | 906 | 2,614 | 912 | 915 | 916 | 2,743 | 782 | 756 | 858 | 2,396 | 920 | 927 |

Source: AU-MDL-05600253, GRNE0035207

**Figure 11: Example of a spreadsheet memorializing prices discussed at cartel meetings**

| Display Size | Vendor | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|
| | | **2004** | | | | Date : 2004/5/? |
| 15" XGA | CPT | 220-225 | 220-225 | 225-230 | 230-235 | 230-235 |
| | AUO | 220-225 | 220-225 | 230 | 230-235 | 230-235 |
| | CMO | 220 | 225 | 225-230 | 230-235 | 230-235 |
| | HSD | 230-235 | 230-235 | 245 | 250 | 255 |
| | SEC | 220 | 220 | 220 | 230 | 235 |
| | LGP | 210-215 | 210-215 | 220 | 230 | 233-235 |
| 17" SXGA | AUO/TN | 285-290 | 290 | 290 | 293-298 | 295-300 |
| | CMO/TN | 285-290 | 285-290 | 290 | 290-295 | 290-295 |
| | CPT | 285-290 | 285-290 | 285-290 | 300 | 300 |
| | LGP | 288-292 | 288-292 | 292-310 | 295-310 | 295-310 |
| | SEC/TN | 310 | 310 | 290 | 310 | 310 |
| | HSD | | | | | 295 |
| | QDI | | | | | |
| 18"SXGA | CMO/MVA | | | | | |
| | LGP/IPS | 340 | 350 | EOL | EOL | |
| 19" SXGA | CMO | 415-420 | 415-420 | 415-420 | 415-420 | 415-420 |
| | AUO | 415 | 415 | 415-420 | 415-420 | 415-420 |
| | SEC | 415 | 415 | 415 | 415 | 415 |
| | LGP | 410 | 410 | 410 | 410 | 410 |
| 19" TN | LPL | 390 | | 390 | 390 | 390 |
| 17" Wide | LGP | 300 | 300 | 290-300 | 310-320 | 320-330 |
| | SEC | 340 | 340 | 340 | 330 | 330 |
| 20" UXGA | AUO | 570 | 570 | 570 | 570 | 550 |
| | LPL | 575 | 570 | 570 | 560 | 510-530 |
| | SEC (21") | 620 | 620 | 650 | 650 | 650 |
| | CMO | 570 | 570 | 570 | 570 | 545 |
| 20" TV | CMO | 420-430 | 420-430 | 400 | 390-400 | 390-400 |
| | LGP | 420 | 420 | 420 | 410 | 400 |
| | AUO | 420 | 420 | 410 | 405 | 400 |
| 22" TV | SEC | 850? | 800 | 800 | 800 | 650 |
| 23" TV | CMO | | | | | 700 |
| | HSD | | 670 | 670 | 650-670 | 650 |
| | LPL | 710 | 710 | 710 | 690-700 | 680-690 |
| 26" TV | SEC | 1000 | 1000 | 1000 | 900 | 800 |
| | LPL | | | 810 | 800 | 790 |
| | AUO | 800 | 800 | 780 | 750-780 | 700 |

Source: AU-MDL-03356452

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(52)    The conspirators frequently and consistently exchanged their plans for LCD panel prices. Many spreadsheets memorializing prices discussed at cartel meetings include planned future prices.[50] Such information was also shared at supplementary meetings and through other channels throughout the conspiracy. In a November 30, 1998 email, Reuben Chang of Samsung wrote to his colleagues: "I spoke with the Sharp representative today. He confirmed that they will begin raising prices this week…I briefly spoke with the Hitachi Rep. They also will increase prices starting this week."[51] Minutes of a February 6, 2002 cartel meeting contain charts showing March prices by defendants for 14.1″, 15″, 17″, and 18″ panels.[52] In an April 2, 2004 cartel meeting, Samsung disclosed that they "Plan to maintain/keep ASP, even need to comprise [sic] in shipment."[53]

(53)    The conspirators also shared plans for the prices they intended to charge specific customers. In a June 11, 2003 cartel meeting, LG disclosed to co-conspirators that it "[p]lan[ed] to increase US$5 MNT+NB pricing to HP in JUL."[54] Hong Bum Suh, Senior Manager of Samsung's Strategy and Marketing Team, testified about his conspiratorial communications with Epson's Ito concerning Motorola prices as follows: "Q. Now, did you talk with Mr. Ito about prices for panels? A. Yes. Q. And did you talk to him about pricing of panels for Motorola? A: Yes. Q. Did you reach any understandings with him about pricing for panels to Motorola? A: Sometimes. Q. Okay. What understandings did you reach with him about pricing of panels to Motorola? A: Well, the quote would be made accordingly with each other's cost ability and each other's ability. So maybe we may have to take separate paths. Q. Did you discuss with Mr. Ito the prices that Samsung would quote to Motorola? A: Yes. Q. And did he discuss with you the prices that SEID would quote to Motorola? A: Yes. Q. Okay. So at the end of these conversations, you had an understanding as what -- as to what his price would be? A. Yes. With that information, I would make a report. Q. To your bosses? A. Yes. Q. And you gave him information so that he could understand what your price would be? A. Yes"[55] Suh also had similar conspiratorial communications concerning prices for Motorola and other customers with Toshiba's Section Manager Mr. Chiba.[56] Seisyu Arai, Samsung Sales Manager in Japan, provided similar testimony on the same topic.[57] Mr. Arai's colleague, Ik Soo Kim, Samsung's

---

50    See, for example, spreadsheet AU-MDL-03356434 (June 2002), sheet "MNT Price Trend;" or spreadsheet AU-MDL-03356467 (February 2003), sheet "NB Price Trend."

51    SAML-381443.

52    GRN000031.

53    AU-MDL-03367666.

54    AU-MDL-02893950-1, Exhibit 556.

55    Deposition of Hong Bum Suh, Senior Manager of Samsung's Strategy and Marketing Team, March 9, 2010, pp. 112-3.

56    Deposition of Hong Bum Suh, Senior Manager of Samsung's Strategy and Marketing Team, March 9, 2010, pp. 98-9. "Q. Okay. And so did you discuss with [Mr. Chiba] the pricing for notebook panels for customers for the panels? A. Yes. Q. And those customers, did they include Dell? A. Yes. Q. And Compaq? A. Yes. Q. IBM? A. Yes. Q. Toshiba? A. Yes. Q. NEC? A. Yes. Q. Okay. Now, later in your meetings, did he have -- did Mr. Chiba have responsibility for small- and medium-size panels? A. Yes. Q. So did you talk with him about pricing for panels for Motorola? A. Yes. Q. Apple? A. Yes. Q. The RAZR phone? A. Yes. Motorola. Q. The triplet phone? A. So all those are Motorola's products, right? Q. Yes. Okay. And did you talk with him about panels for iPods? A. That's my recollection.

57    Deposition of Seisyu Arai, Samsung Sales Manager in Japan, July 13, 2011, p. 31. "Q. How often did you speak with Mr. Chiba? A. Sometimes once a month, sometimes I didn't have any conversation for two month or longer. Q. Did you

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

Account Manager for Motorola, described the sharing of confidential price information as follows: "Q. Did you ask Mr. Suh to obtain information from Sharp regarding Sharp's prices to Motorola? A. Yes … Q. How often did you have phone calls with Mr. Suh in which Mr. Suh provided you with information he obtained from Sharp? A. It was around the time when we were coming up with the prices. So maybe once or twice in a half a year."[58] Thus the testimony of Samsung employees is consistent with a pattern of anticompetitive practices targeting Motorola.

(54)    As discussed below, the conspirators understood the influence of supply on price. Accordingly, they also frequently exchanged specific future plans for capacity and production. Spreadsheets with production figures discussed at cartel meetings often included columns with production and capacity forecasts.[59] There is direct evidence that defendants also disclosed their capacity expansion plans to their co-conspirators in cartel meetings. In a November 15, 2001 cartel meeting, senior executives from AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung, "reconfirmed … next year's production plans are as follows [referencing a table with units by manufacturer and each quarter of 2002]."[60] In a July 8, 2004 cartel meeting, Samsung reported on the status of its fabs as follows: "New Fab Status : -G5: 100k (July) … also consider addition +20k in Aug. -G7 : civil work now, MP schedule ~ APR '05. Pull in 1 month. 2k -> 60k."[61]

## III.B.1. Agreements concerning prices

(55)    The cartel members did not merely exchange pricing information. Documents obtained from the defendants identify numerous instances of explicit agreements concerning LCD prices. In a September 14, 2001 cartel meeting attended by senior executives from the four Taiwanese defendants "it was decided to maintain prices in October first (except for those already promised which would not be within this limit), and in November, try to raise prices again. Lowest prices are resolved as follows [referencing a table with prices for different panel sizes and resolutions]."[62] In an October 19, 2001 cartel meeting attended by senior executives from AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung, "[t]here was an agreement that in November, Min $175 for 14″, $220 for 15″ (M). In December, it was agreed, Min $180 for 14″, $225 for $15 (M)."[63] In a November 15, 2001 cartel meeting attended by senior executives from the same six companies, the participants confirmed that "[g]enerally speaking, November market price has successfully risen $10-15," and "[a]fter discussion,

---

-- did you talk to Mr. Chiba about the Motorola account? A. Yes. Q. Did you discuss -- did you discuss prices that Samsung and TMD were planning on charging Motorola in the future? … A: Yes."

[58]    Deposition of Ik Soo Kim, Samsung's Account Manager for Motorola, August 24, 2011, pp. 57 and 59.

[59]    See, for example, spreadsheet AU-MDL-03356472 (April 2003), sheet "Capacity Plan" or spreadsheet CMOCIV-0348163 (April 2005).

[60]    Minutes from November 15, 2001 Crystal Meeting, CPT0004020-7, Exhibit 307.

[61]    Minutes from July 9, 2004 Crystal Meeting, AU-MDL-04428114.

[62]    Meeting minutes from September 14, 2001 Crystal Meeting, CPT0004008-11, Exhibit 14.

[63]    Meeting minutes from October 19, 2001 Crystal Meeting, GRN000005, Exhibit 509E.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

target prices [for December and 2002] were as follows [referencing a table with prices for different panel sizes and resolutions]."[64] Senior executives from the same six companies met again on December 11, 2001. They discussed price differentials between panels of various sizes and resolutions and "it [was] decided that NBPC: 15″ XGA = 14.1″ XGA+$45; NBPC: 15″ SXGA+ = 15″ XGA+$30; NBPC: 15″XGA = Monitor 15″ XGA+$15. … We decide to raise $10 price in January."[65]

(56)    Agreements on price targets and floors were not limited to meetings between senior executives (for this purpose defined to include CEOs, Presidents, and board members). In an October 5, 2001 cartel meeting attended by AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung vice presidents and sales directors (that preceded the October 19 meeting of senior executives), "[i]t was agreed the minimums will be 14″ $180, 15″ (M) $220 in November."[66] In a February 6, 2002 meeting of vice presidents and sales directors from AUO, Chi Mei, Chunghwa, HannStar, and LG, it was noted that "A[UO] and L[G]  will attempt to slowly increase the [monitor] price, the price of NB will be significantly raise, and CN [Chi Mei] has agreed."[67]

(57)    Evidence of these explicit pricing agreements spans several years. In a March 13, 2002 meeting between senior executives of AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung, the cartel members reconfirmed March and April price targets for notebook and desktop monitor panels of various sizes and resolutions, and agreed that "17″ SXGA is resolved to quickly rise to $380 in April; May target $390."[68] In another meeting between senior executives occurring four months later, on July 4, 2002, when the conspirators perceived demand to be weak, the "common understanding in general [was] that June price would be kept through July; wait until the meeting on 7/25 to make corresponding price adjustment based on market conditions. If necessary, lower price to appropriate level all at once in order to stimulate demands."[69] In an internal communication to AUO executives, Steven Leung, Sales Director of AUO's IT Display Group, summarized the "General Consensus" of a June 11, 2003 cartel meeting among the four Taiwanese and two Korean manufacturers as follows: "Must hold 17″ JUN/JUL pricing to maintain overall pricing stability. 17″ pricing is most important single factor to market now. Must fix 17″ pricing even if faced with customer volume reduction. Big risk to adjust 17″ pricing in order to reach internal volume targets. Allowing for 17″ price collapse will also impact 15″ pricing. Pricing fix until AUG equals optimized pricing base for Q4 2003."[70] In an email describing an August 5, 2003 conspiracy meeting between AUO, Chi Mei, Chunghwa,

---

64    Meeting minutes from November 15, 2001 Crystal Meeting, CPT0004020-27, Exhibit 307.

65    Meeting minutes from December 11, 2001 Crystal Meeting, CPT0004035-40, Exhibit 310.

66    Meeting minutes from October 5, 2001 Crystal Meeting, GRN000001, Exhibit 305-EE.

67    Meeting minutes from February 6, 2002 Crystal Meeting, GRN000039-41, Exhibit 311-EE.

68    Meeting minutes from March 13, 2002 Crystal Meeting, CPT0004043-5, Exhibit 315.

69    Meeting minutes from July 4, 2002 Crystal Meeting, CPT0004057-8, Exhibit 1042E.

70    Internal email from Steven Leung, Sales Director of AUO's IT Display Group, dated June 11, 2003, AU-MDL-02893950-1, Exhibit 556, and attachment.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

HannStar, LG, and Samsung, Stanley Park, Vice President of Sales and Marketing at LG Display, reported to other LG executives that "[t]he group leaned toward maintaining July price for 15″ monitors in August and increase the price in September. For 17″/19″ Monitors they wanted the price to stay. For notebooks, they suggested the August price of $175-180 to be increased to $180 level or stay the current level. For 15″ notebook, all wanted August price to be $5 higher than July and about $3-5 more in September."[71] Stanley Park described the atmosphere at a November 4, 2004 conspiracy meeting between AUO, Chi Mei, Chunghwa, LG, and Samsung, at a time when LCD prices were declining, as follows: "[t]here are a lot of rumors about LPL pricing in the market, and they tend to blame a price drop to LPL even though Oct is a high demand month. Everybody feels the sales price of 17″ should be kept above $170."[72]

(58)    Cartel members often used the general price agreements as benchmarks for prices quoted to specific customers. For example, in his deposition, Chih-Chun Liu, Vice President of Sales and Marketing at Chunghwa, explained that he used the information obtained in conspiracy meetings to determine prices for Dell because "[t]he results from group meeting is a very good reference to decide our price. The price that we give to all our customers do not differ -- do not differ that much. Dell is a major customer of CPT. Of course this price is used on Dell."[73]

(59)    In some instances, however, cartel members also reached explicit agreements concerning the prices paid by particular customers. For example, in the minutes memorializing a September 21, 2001 cartel meeting, Brian Lee, Vice President of Sales and Marketing of Chunghwa, wrote as follows: "[a]fter a private discussion with AU, it was decided that we will increase the prices for Compal/HP to $160 in Oct simultaneously."[74] In a November 4, 2004 conspiracy meeting of vice presidents and sales managers for AUO, Chi Mei, Chunghwa, LG, and Samsung, Samsung entreated its co-conspirators as follows: "[w]e need to avoid lose-lose game and need to focus on holding onto the $170 line. They

---

[71]    Internal email from Stanley Park, Vice President of Sales and Marketing at LG Display, dated August 5, 2003, GRNE0267128-30, Exhibit 484E (plaintiffs' uncertified summary). The email included an attachment with prices by size. For the attachment, see, for example, AU-MDL-02721358 (an Excel spreadsheet attached to minutes of the same meeting taken by AUO's Sales Director of IT Display Group, Steven Leung.)

[72]    November 5, 2004 internal email from Stanley Park, Vice President of Sales and Marketing at LG Display, to other LG executives describing discussion at a November 4 Crystal Meeting, GRN000111-2, Exhibit 2323E.

[73]    Deposition of Chih-Chun Liu, Vice President of Sales and Marketing at Chunghwa, April 29, 2010, p. 310.

[74]    Minutes from a September 21, 2001 Crystal Meeting, CPT0004012-4, Exhibit 304-E. In his July 26, 2010 deposition, Brian Lee, Vice President of Sales and Marketing of Chunghwa, confirmed that Chunghwa indeed reached an agreement with AUO concerning prices to Compal/HP: "Q. There's an indication under Item 4 that there's a private discussion with AUO. Was that a discussion about a particular customer? A. Yes. Q. And was a private agreement made between AUO and CPT? A. Yes. Q. And that agreement was that you would simultaneously increase the price for Compal/HP to $160 in October, correct? A. Yes." (p. 122)

[Samsung] are saying no to Dell's request for $165. Samsung asks for the other's cooperation."[75]  The defendants also reached agreements concerning pricing for other customers, including Motorola.[76]

## III.B.2. Customer business allocation

(60)    In some cartels, price-fixing strategies include agreements to allocate customers and/or products across suppliers. The evidence in this case indicates that the defendants sometimes employed these devices. An example of this practice is described in a November 9, 2004 internal email communication to Epson employees titled "History Lesson," in which John Capp, Manager of Display Sales at Epson and a member of the business support team for Motorola, summarized price fixing and customer business allocation agreements among Sharp, Samsung, and Toshiba concerning Motorola's "triplet" family of mobile phones.[77] Capp wrote that, initially, Motorola "decided that SS [Samsung] be the supplier for only V500 and they use [transmissive modules]. SH [Sharp] and TMD [Toshiba] were to share the V300 and V600 business with the same [transflective module] specification." He explained that "[o]f course, SH and TMD collaborated on price and we can [sic] in very close with quotes," and that "SH and SS had a 'gentleman's agreement' that SS would stay away from [transflective modules] if SH would stay away from [transmissive] modules." Notably, Capp worked as an Account Manager at Sharp for a number of years and joined Epson in October 2004, one month prior to authoring his "History Lesson" email.[78] While at Sharp, Motorola was Capp's primary customer.[79]

## III.B.3. Supply restrictions

(61)    Defendants understood that they could raise prices above competitive levels by reducing the quantity of LCD panels supplied to the market. Strategies included delaying investment in new capacity, slowing ramp-up schedules of new production lines, and reducing production on existing lines. For example, a February 13, 2001 LG presentation that analyzed the balance of supply and demand concluded that fab delays would result in potentially long periods of "[o]verdemand (shortage)" and that "price[s] trend up with shortage."[80] The defendants also understood that agreements to reduce production can keep prices elevated during periods when there is a downward pressure on prices. In a September 13, 2002 conspiracy meeting attended by vice presidents and managers of sales from

---

[75]    November 5, 2004 internal email from Stanley Park, Vice President of Sales and Marketing at LG Display, to other LG executives describing discussion at a November 4 Crystal Meeting, GRN000111-2, Exhibit 2323E.

[76]    See, for example, Epson and Sharp Plea Agreements, evidence discussed in Section III.B.1, and deposition of Hong Bum Suh, Senior Manager of Samsung's Strategy and Marketing Team, March 9, 2010, pp. 98-9.

[77]    EEADOC 00290200. For Capp's title within Epson, see deposition of John Capp, October 20, 2011, p. 113.

[78]    Deposition of John Capp, October 20, 2011, pp. 21-2. This also explains why he referred to Sharp as "we" when he described the closeness of the Sharp and Toshiba price quotes.

[79]    Deposition of John Capp, October 20, 2011, pp. 27-8.

[80]    February 13, 2001 LG presentation titled "Market Outlook," pp. 12-4 and 29-30, GRNE0063498.

AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung, in which they apparently had difficulties deciding on a "price rule" to stop prices from falling, they called for "a CEO meeting be quickly convened to examine whether or not to reduce production or use another method to stabilize this dilemma."[81] Similarly, in a July 8, 2004 cartel meeting at which cartel members perceived weakening demand, Samsung described the strategy for desktop monitors to be "[c]apacity decrease to keep the price going down in 17″/19″." Minutes from other cartel meetings show that the defendants sometimes considered combinations of production reductions and price floors. In an August 11, 2004 cartel meeting (a month after the July 8 2004 cartel meeting), Samsung reminded others that, due to high inventory, "any increase in demand won't result in production recovery. The only alternative is for every one to take part in maintaining the Sept prices at the same level as in Aug., with Aug. being the bottom price, by reducing production and holding up the price."[82] Whether the defendants turned to price agreements or production restrictions at any given point in time appears to have depended on market conditions. In a September 21, 2001 cartel meeting, vice presidents and managers of sales for the two Korean and four Taiwanese defendants concluded as follows: "[i]f supply cannot satisfy demand (shortage), then all makers shall increase the price of TFT in October. On the other hand, if supply exceeds demand (oversupply), then reduce production to decrease output in order to maintain the common goal of keeping the market supply and demand balanced and maintaining the stability of prices."[83]

(62)    When the demand for a good is relatively insensitive to its price (i.e., when its *price elasticity of demand* is low), even modest production restrictions substantially elevate prices. Notably, the defendants apparently believed that the price elasticity of demand for LCD products was very low. According to the statements of a Chunghwa executive at a July 4, 2002 cartel meeting between senior executives of the four Taiwanese defendants, "[e]ven if the price were lowered by $5 ~10, the impact it would bring to the market demand is very limited. There has to be a huge price differential in order to stimulate demand."[84] This view of the price elasticity of demand for LCD products is entirely reasonable. LCD panels are intermediate inputs, not finished goods; they are used to make finished products. The demand for LCD panels is therefore what economists call a *derived demand*, in the sense that it results from the demand for the finished goods. When the producers of an intermediate good have limited ability to substitute away from an input (as is the case for most LCD panel applications), the price elasticity of demand for the input tends to be much smaller than the price elasticity of demand for the finished good in which it is used. For example, if the price of an input represents 20% of the cost of a finished good, and if all costs are passed through to those who

---

[81]    Meeting minutes from September 13, 2002 Crystal Meeting, CPT0004059-60, Exhibit 1044.

[82]    Meeting minutes from August 11, 2004 Crystal Meeting, GRN000106-8, Exhibit 2323E.

[83]    Meeting minutes from September 21, 2001 Crystal Meeting, CPT0004012-4, Exhibit 304-E. In the same meeting, Brian Lee, Vice President of Sales and Marketing of Chunghwa, presented an analysis of supply and demand balance showing a shortage of panels in October 2001. In his deposition, Lee testified as follows: "Q. So did [the expectation of shortage] lead you to the conclusion that you could raise prices? A. Yes." (Deposition of Brian Lee, July 26, 2010, p. 119)

[84]    Minutes of July 4, 2002 Crystal Meeting, CPT0004057-8, Exhibit 1042E.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                    Page 28

purchase the finished good, then a 10% increase in the input's price leads to a 2% increase in the price of the finished good. If the elasticity of demand for the finished good is 1, the elasticity of the derived demand for the input will then be only 0.2. Notably, for most LCD panel products, the LCD price represents a relatively small share of total costs. For example, according to my calculations, that share averages approximately 15% for laptop computers and approximately 10% for mobile phones. The exceptions are televisions and computer monitors, for which the corresponding shares are approximately 50% and approximately 55%, respectively. However, because monitors are generally purchased with computers, the ratio of panel costs to the price of a computer system is likely the more relevant consideration, and that figure is much lower.

(63)    In reviewing the record, I have noticed several instances where it appears the defendants contemplated, discussed, and then implemented parallel supply restrictions. For example, such an episode occurred during the summer of 2004. After an unusually long period of rising LCD panel prices between early 2003 and roughly July 2004, prices began falling, raising concerns and prompting discussion among the cartel members.[85] For example, at the July 21, 2004 cartel meeting between executives from AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung, Hui Hsiung, Executive Vice President for Strategic Planning and Business Unit Operations of AUO, summarized the objective of the meeting as follows: "[t]he market has suddenly turned and the price has plummeted over the 2 weeks, so if we don't do anything, it will be very difficult to recover, and that is why we called for a meeting. In other words, the purpose of this meeting is to discuss and come up with measures to prevent excessive decline in price."[86]

(64)    The conspirators discussed and evaluated potential strategies to stop the price decline, including setting price floors, reducing production, and slowing down the growth of new capacity. Stanley Park, Vice President of Sales and Marketing at LG Display, described the atmosphere of the July 21, 2004 cartel meeting as follows: "Everyone seemed to be shaken by the unexpectedly steep decline in price but kept their cool overall. The group seemed to be thinking that the worst case scenario came to be, and basically agreed to setting a bottom price and reducing production."[87] According to Park, the conspirators "Agreed to autonomously adjust [loading rate] based on the individual situation of each company."[88] As prices continued to decline, some conspirators proposed to forestall further price erosion through production restrictions.[89] Pressure was brought to bear on those who were reluctant to

---

[85]    For example, before prices began falling, Stanley Park, Vice President of Sales and Marketing at LG Display, described the mood in a June 4, 2004 Crystal Meeting as follows: "While concerned about the low TV sales, everyone seemed to be not too concerned about the market status with stable supply and demand of IT products, confidence about an increased demand during the later half of this year, together with the low inventory level." (GRN000742-4, Exhibit 2348E)

[86]    LG meeting minutes from a July 21, 2004 Crystal Meeting, GRN000100-2, Exhibit 332E.

[87]    LG meeting minutes from a July 21, 2004 Crystal Meeting, GRN000100-2, Exhibit 332E.

[88]    GRN000100-1, Exhibit 332E.

[89]    For example, in an August 11, 2004 conspiracy meeting, Chunghwa maintained that "[s]olution [to stop the price decline] is to reduce production" and Samsung suggested that " everyone [needs] to take part in maintaining the Sept prices at the same level as in Aug., with Aug. being the bottom price, by reducing production and holding up the price."

go along with this proposal. In an August 12, 2004 email from Stanley Park, Vice President of Sales and Marketing at LG Display, to other LG executives, Park explained: "LPL clearly stated to Taiwanese makers that we do not plan to reduce our production, but Samsung and Taiwanese makers are continuously asking for our participation in the production reduction. They seemed to have concluded that realistically, there is no other way to overcome the current situation without production reduction."[90] At the same time, cartel members shared information concerning plans for capacity expansion and associated delays. For example, in an August 11, 2004 conspiracy meeting, HannStar disclosed that its sixth generation fab was scheduled to move-in during the second quarter of 2005 and to begin mass production in the fourth quarter of 2005, but that there was a strong possibility of a delay depending on the market.[91] Some cartel members explicitly proposed stabilizing prices by reducing the rate of capacity expansion. For example, according to a September 6, 2004 presentation by LG Taiwan, which summarizes new fab investments (and delays) among Taiwanese LCD manufacturers: "AUO urges to reduce output capacity, in order to brake dropping panel price."[92]

(65)    Shortly after these discussions took place, the conspirators implemented parallel reductions in capacity. In some cases they delayed new fabs or production lines, and in others they reduced the target capacity of existing or planned fabs or production lines. For example, an LG presentation from September 6, 2004 reported that "CMO is slowing down its Gen. 5 ramp up schedule. HSD is considering to delay Gen. 6 schedule, once demand fail to increase in 4Q of 2004."[93] In an October 1, 2004 meeting between AUO, BenQ, and LG , an LG executive warned attendees to "[b]e alert for *Anti-trust* taking the example of the semi-conductors industry. The penalty amount is enormous. Looking at the market conditions next year, the extent of *Over supply* doesn't seem to be as much as expected.  That's because SS' Ramp-up has been delayed longer than 6 months and Phase 2 from other Panel Makers will be delayed as well."[94] According to an October 29, 2004 Samsung internal report, AUO planned to delay the second phase of its 6th generation fab by two quarters until 2006, while Chi Mei planned to stagger the ramp up its Gen. 5 fab by producing 70,000 sheets per month by the end of 2004, and an additional 20,000 sheets per month by the first quarter 2005, with the remaining 30,000 units of capacity depending "on the market situation to ramp up." According to the report, Chi Mei also decided to delay its Gen. 7.5 fab, HannStar's "Gen. 5 will not ramp up as scheduled (around 60K/M by the end of this year), and now will ramp up around 30-40K by the end of this year," and "due to market oversupply and short of investment capital, HannStar decided to

---

(GRN000106-7, Exhibit 2323E)

[90]    GRN000103, Exhibit 332E.

[91]    LG meeting minutes from an August 11, 2004 Crystal Meeting, GRN000106-10, Exhibit 2323E.

[92]    LG Display presentation from September 6, 2004, titled "W.W. Sales Conference," appendix "New FAB" p. 39 (GRNE-B-0252721).

[93]    LG Display presentation from September 6, 2004, titled "W.W. Sales Conference," appendix "New FAB" p. 39 (GRNE-B-0252721).

[94]    Minutes from an October 1, 2004 meeting of AUO, BenQ and LG, GRNE0076816 (translation).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

delay Gen. 6 plan to 2006."[95] According to an LG presentation from January 17, 2005, "Capa. Plan of G5.5/6 was reduced or transferred to G5 due to Over-Supply in the second half of '04. Also many G7 plans were cancelled or indefinitely delayed."[96] The same presentation also compares the target capacity for Taiwanese LCD manufacturers as planned at the end of 2004 against the target capacity as it was originally planned in the first half of 2004. That comparison appears in Figure 12 (with reductions in planned capacity and delays shown in red).

**Figure 12: Revisions to defendant capacity plans following summer 2004 downturn**

| Maker | Fab | Gen | Plan as of first half of 2004 | | Plan as of December 2004 | |
|---|---|---|---|---|---|---|
| | | | Target capacity | Target mass production date | Target capacity | Target mass production date |
| AUO | Taichung L10 | 6 | 90 | 2005-1Q | 60 | Apr 2005 |
| | Taichung L8C | 5 | 0 | N/A | 60 | 2005-4Q |
| CMO | Tainan Fab3 | 5 | 120 | 2004-4Q | 120 | 2005-1Q |
| | Tainan Fab4 | 5.5 | 120 | 2005-1Q | 90 | Mar 2005 |
| CPT | Lungtan Fab2A | 4.5 | 75 | Jan 2005 | 75 | Mar 2005 |
| | Lungtan Fab 2B | 6 | 90 | 2005-1Q | 60 | Jul 2005 |
| HSD | Tainan Fab3 | 5 | 120 | 2004-1Q | 120 | 2004-4Q? |
| | Tainan Fab4 | 6 | 90 | 2005-2Q | 90 | Pending |
| QDI | Lungtan Fab 3 | 6 | 45 | 2005-3Q | 45 | Dec 2005 |

Source: LG Display presentation from January 17, 2005, titled "W.W. Sales Conference," table "Variance of Capacity (1H.04 vs End of '04)," p. 23 (GRNE-B-0093700, translation). Red highlighting was added to aid visual comparison.

Note: Page 24 of GRNE-B-0093700 suggests that Taichung L8C fab was originally scheduled to be generation 7 (i.e., larger motherglass), and AUO decided to make it generation 5 (i.e., smaller motherglass).

(66)    In addition, Samsung and the Taiwanese manufacturers, who were urging restrictions on production, indeed implemented parallel reductions. Stanley Park, Vice President of Sales and Marketing at LG Display, summarized a discussion of LCD panel production at an August 11, 2004 cartel meeting as follows: "the four Taiwanese makers' total sales have reduced from 4,156k [units] in June to 3,903 in July by about 6%." In particular, according to Park's meeting minutes, Chi Mei reduced its production from June to July 2004 by 13%, Chunghwa by 15%, and HannStar by 3%. An LG presentation from March 8, 2005 reported that most LCD makers were operating with fab utilization rates "below 80%" in the second half of 2004 before returning to 85~90% utilization by March 2005.[97] The defendants' data corroborate the existence of a parallel reduction in production at this

---

[95]    Samsung internal document titled "Current Market Update – Oct. 29," October 29, 2004, found in the files of Sonia Chen, Manager of Samsung's LCD Marketing Division, SAML-814484. Sonia Chen testified that she attended meetings at which conspirators exchanged production information (see deposition of Sonia Chen, August 18, 2010, pp. 36-7)

[96]    LG Display presentation from January 17, 2004, titled "W.W. Sales Conference," page 23 titled "New Fab Capa. Plan," GRNE-B-0093700 (translation).

[97]    LG Display presentation from March 8, 2005, titled "Current LCD Market Update," page 8 titled "Current Status of LCD makers – Capa & Utilization," GRNE0073246. The table on page 8 shows that the glass input for each of

time. In particular, Figure 13 shows how motherglass quantities (a proxy for LCD panel production levels) used by Samsung and AUO varied over time, and highlights the parallel dip in production during the period in question.

**Figure 13: Samsung and AUO motherglass consumption**



Source: Samsung and AUO production data

(67)    The record contains other examples of episodes in which the defendants at a minimum contemplated and discussed parallel supply restrictions, some of which I have cited previously. In response to the 2000 downturn, conspirators decided in a September 21, 2001 cartel meeting that "[i]f supply cannot satisfy demand (shortage), then all makers shall increase the price of TFT in October. On the other hand, if supply exceeds demand (oversupply), then reduce production to decrease output in order to maintain the common goal of keeping the market supply and demand balanced and the stability of prices."[98] In an internal memorandum memorializing an October 5, 2001 cartel meeting, Stanley Park, Vice President of Sales and Marketing at LG Display, explained that the conspirators "agreed that there will be an oversupply next December and 1Q [of 2002], and it was agreed to adjust loading rate (more of less 20%) → was agreed that a decision will be made when at the top meeting on October 19. (It was suggested that there be an 8 day [shutdown] during the holidays next year.)" and that

---

Samsung, AUO, Chi Mei, Chunghwa, and HannStar was lower in the fourth quarter of 2004 than the first quarter of 2005.

[98]    Minutes from a September 21, 2001 Crystal Meeting, CPT0004012, Exhibit 304-E.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

"LGPL should have a CEO or somebody with the authority over the loading rate attend [the upcoming CEO meeting]."

## III.C. Discussion

(68)    In principle, the existence of an agreement to fix prices or restrict quantities does not *necessarily* imply that the agreement was effective. However, in practice, when evaluating whether the evidence presented above is consistent with the existence of an *effective* conspiracy, it is important for an economist to take the following considerations into account.

1. The conspiracy is notable for the fact that it involved numerous documented meetings, including at least 74 Crystal Meetings with participation by executives at high levels of the defendant companies, over a period of 6 years (and many more bilateral meetings and communications over a period spanning 9 years). All but one of the defendants have admitted to conspiring at these meetings. It defies common sense that the defendants would have arranged and attended these numerous meetings, knowingly breaking the law through a systematic pattern of conduct spanning many years, unless they themselves were convinced that the cartel was effective (indeed, sufficiently so to justify the investment of time and manpower as well as the substantial legal risks).[99]

2. The defendants' documents and sworn statements confirm that they believed the cartel to have been effective at raising prices. For example, a presentation reviewed by senior executives from AUO, Chi Mei, Chunghwa, HannStar, LG, and Samsung at a November 15, 2001 cartel meeting states: "In general, we have raised price successfully, but there's still exceptional cases."[100] Chih-Chun Liu, Vice President of Sales and Marketing at Chunghwa, testified that conspiracy meetings helped the

---

[99]  A widely used undergraduate industrial organization textbook supports this inference by noting, "Only if a cartel price is expected to raise the price above the noncartel price and keep it high do firms join. If the noncartel price is close to the cartel price, then firms may not believe that joining the cartel is profitable given the legal liability they potentially face from belonging to a cartel." Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*, 4th Edition, (Addison Wesley, 2005), 131 and footnote 9.

[100]  CPT0004020-27, Exhibit 307. According to the notes of the Chunghwa executive who attended the meeting, the conspirators discussed the cases where prices did not increase in accordance with their November 2001 price targets. They suggested that "even though each maker has strategic clients, internal clients or *exceptional cases* resulting from commitments already made, each maker must try to gradually reduce such exception cases" and that LCD makers "[u]se a *Hot Line* to contact other makers in the industry, to avoid being tricked by customers into cutting price. (CPT0004020, Exhibit 307)." It appears that the conspirators promptly took measures to eliminate those "exceptional cases." For example, the conspirators considered LG to be the company that "strayed away most from the target price. At about $205~220 (CPT0004020, Exhibit 307)" In an email from Brian Lee, President of Sales and Marketing of Chunghwa, to his co-conspirators dated November 16, 2001 (i.e., the day after the conspiracy meeting), Lee wrote, "[b]ased on LG.P Mr. Stanley's final confirmation this morning, LG.P now is trying to raise 15″ TFT for Monitor with Quanta/Gateway and the target will be $220 in Nov.. It's really good news!!" (GRN000018-9, HSTAR_0210004-5).

conspirators raise prices faster than they otherwise would have been able to in periods of shortage, and also helped keep prices from falling as much as they would have in times of "oversupply."[101] Michael Hanson, Senior Manager of Sales for Samsung, testified that he believed the information he collected through more than 300 phone calls with his co-conspirators over a seven year period was used to set the prices for LCD panels.[102] In a June 13, 2002 bilateral meeting between AUO and LG, a senior LG executive remarked that LG "is keeping their promise to the Taiwan Company (i.e., AUO) and that is why they raised their price a bit even though it was in the July – August season when business is flat."[103]

3. Econometric analysis of market outcomes (below) also confirms that the cartel was effective at raising prices.

4. The evidence on the cartel's operations likely shows us the tip of the iceberg. As discussed above, the conspirators were aware that their conduct was illegal and took steps to conceal it, in part by restricting the set of people with knowledge of the conspiracy and consciously (though imperfectly) avoiding the creation of paper trails documenting their activities. It would therefore not be sensible to form an opinion of the cartel's likely effectiveness based on the assumption that we have a complete picture of its operations. In fact, in light of the preceding discussion, even if little or no evidence on the mechanics of the cartel agreement were available (beyond the fact of frequent meetings to fix prices), the proper conclusion would be that the mechanisms – whatever they might have been – were almost certainly viable. It would not be sensible to conclude that the cartel failed to use a viable mechanism, and therefore could not have had the effects that it demonstrably had and was believed by the conspirators to have had, simply because the conspirators successfully covered some of their tracks (as they admit to doing), thereby leaving an incomplete picture of the cartel mechanism.

That said, in my view the available evidence on the cartel's operation is entirely consistent with the existence of an effective price-fixing conspiracy.

---

[101] Deposition of Chih-Chun Liu, Vice President of Sales and Marketing at Chunghwa, April 29, 2010, pp. 312-3. "Q. Would you agree that the problem of oversupply would have been worse but for these group meetings? A. Group meeting has some positive influence on oversupply situation. Q. In times of oversupply, the meetings helped keep prices from falling as much as they would have? A. To some extent, it helped. Q. And when there was a shortage, the group meetings allowed you to raise prices faster than you otherwise would have been able to? A. Yes, to some certain extent it helped."

[102] Deposition of Michael Hanson, Senior Manager of Sales for Samsung, March 24, 2010, pp. 392-4.

[103] Meeting minutes from June 13, 2002 meeting between AUO and LG, GRN000061-3, Exhibit 330EE.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(69)    It is important to understand at the outset that effective cartel agreements can take many forms. Consequently, the absence of any given characteristic sometimes associated with cartels in no way implies that a given cartel was ineffective. For example, some cartels operate by dividing up customers, either by assigning customers to cartel members or by allocating geographic territories. However, cartels can operate quite well without such agreements, and often do.

(70)    A successful cartel requires three components: first, an agreement or agreements concerning some set of competitive decisions that influence prices; second, some (potentially imperfect) ability of the cartel members to infer whether others are complying with the agreement; third, an understanding that non-compliance will increase the likelihood of undesirable consequences. I will consider each of these components in turn.

(71)    With respect to the first component of a successful cartel, there is abundant evidence that the members of this cartel reached agreements concerning an assortment of competitive decisions that influence price. As discussed in Sections III.B.1 and III.B.2 above, there were documented agreements concerning (at least) market-wide prices for LCD panels and allocations of customers. The evidence in Section III.B.3 shows that cartel members also attempted to reach agreements concerning production levels and capacity expansion, and subsequently undertook largely parallel actions. The pattern of conduct suggests that, instead of relying on a single collusive strategy, the cartel employed an assortment of tools, turning to whichever one was necessary to achieve the cartel's objectives at any given point in time.

(72)    Because the cartel's conduct may well have included quantity and capacity restrictions, it is worth emphasizing that such agreements can raise price even with no explicit agreements concerning price itself. The resulting price may be somewhat less predictable (and therefore perhaps less in line with targets envisioned by the conspirators), but it will be elevated nonetheless. In a regime with hard capacity constraints and full capacity utilization, quantity restrictions can be achieved merely by delaying or reducing the size of new production facilities. Agreeing to restrict capacity is one of the simplest ways to achieve price elevation, as it will accomplish the desired objective without any further agreements concerning prices, customers, or products, and works well even in industries with highly heterogeneous goods. Furthermore, when the demand for the product in question is relatively inelastic (as in the current case), even small reductions in capacity can produce substantial and sustained price elevation.

(73)    Now consider the second component of a successful cartel – some (potentially imperfect) ability of the cartel members to infer whether others are complying with the agreement. It is of course easier to assess compliance if competitors' actions are easily observable. But modern economic theory allows us to understand how cartel agreements can be sustained even when cartel members cannot observe each others' actions. Collusion is feasible in such circumstances because the second component of a successful cartel requires only an *imperfect ability to infer* whether others are complying with the

agreement. It goes without saying that every company can observe its own prices and sales. But that ability by itself implies an imperfect ability to infer compliance by others. Why? If others are not complying, the company's sales will be lower than if they are complying. Hence, higher sales can be taken as indicating a higher likelihood of compliance by others. Modern economic theory has shown that cartels can in fact sustain elevated prices through such indirect inferences concerning compliance.[104]

(74)   The members of the LCD cartel plainly had at least an imperfect ability to monitor compliance via the mechanism described in the preceding paragraph. In addition, they took steps to monitor each others' prices, production, and capacity directly, as the records of their meetings so clearly demonstrate. While these monitoring procedures may have been imperfect, there is every reason to believe that they were nevertheless of considerable value, particularly inasmuch as the cartel members consistently risked prosecution under the antitrust laws by systematically collecting and sharing this information over a span of many years. Accordingly, the second component of a successful cartel is very much in evidence.[105]

(75)   Finally, consider the third component of a successful cartel – an understanding that non-compliance will increase the likelihood of undesirable consequences. Economists sometimes loosely refer to these consequences as "punishments," but it is important to be clear that our use of this term differs somewhat from its meaning to the typical non-specialist. In particular, economists do not necessarily have in mind *directed* punishments, which cartel members might inflict on the misbehaving party. To economists, directed punishment and its close cousin, retaliation, are *examples* of potential undesirable consequences for non-compliance, but they are certainly not the only possibilities. Indeed, in many economic models of cartels, the "punishment" is simply a period of time during which prices are no longer elevated: when a single cartel member fails to comply with the agreement, the risk is that all the cartel members will bear the brunt of the punishment.[106] Such mechanisms are particularly useful when non-compliance is difficult to observe directly. In effect, when the cartel does not know the culprit, it can still inflict punishment by, in effect, treating everyone as the culprit. This simple principle is familiar to every elementary school child whose teacher has held an entire class in from recess because some unidentified student has committed a transgression; though the

---

[104]   See, for example, E. Green and R. Porter, "Noncooperative Collusion under Imperfect Price Information," *Econometrica* 52, no. 1 (1984): 87-100 and Jean Tirole, *The Theory of Industrial Organization*, (MIT Press, 1988), 252. Tirole's widely used graduate industrial organization textbook explains that, "if its rival's price is unobservable, a firm must rely on the observation of its own realized market share or demand to detect any price undercutting by the rival. If a firm observes a low profit, it charges a low price for some period of time. The increase in the probability of reversion to a punishment phase makes price cutting unprofitable for the firms." (p. 252.)

[105]   For example, in an internal email to other LG executives, Stanley Park, Vice President of Sales and Marketing at LG Display, assessed the production numbers shared by cartel members at a Crystal Meeting he attended on the previous day, and noted that "[b]ased on [his] experience, the numbers are 90-95% accurate." GRN000103, Exhibit 332E.

[106]   See, for example, E. Green and R. Porter, "Noncooperative Collusion under Imperfect Price Information," *Econometrica* 52, no. 1 (1984): 87-100, Jean Tirole, *The Theory of Industrial Organization*, (MIT Press, 1988), 252, and Andreu Mas-Colell, Michael Whinston, and Jerry Green, *Microeconomic Theory*, (Oxford University press, 1995), 417-420.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

practice seems unfair, it may nevertheless effectively discourage transgressions, even if it is not as focused as a directed punishment when the perpetrator is known.

(76)   Intuitively, there is nothing surprising, mysterious, or complicated about the use and effectiveness of non-directed punishments in settings where the compliance of other cartel members is not directly observable (despite the mathematical complexity of some theoretical formulations). The parties agree to either prices, quantities, or both. If they agree to one, they have clear expectations concerning the other. For example, if they agree to prices, then they each have expectations concerning their own sales, assuming that others also comply. Moving forward, if their sales satisfy their expectations, they assume others have likely complied and that the agreement is still in force. However, if their sales do not satisfy their expectations, they assume (in the absence of some other extenuating explanation) that others have likely not complied and that the agreement has collapsed (at least for the time being). As a result, they start cutting prices, and the collapse snowballs. After entering such an agreement, each cartel member knows that it can generate extra profits in the short run by cutting price and stealing business, but it is also aware that such action will likely lead other cartel members to infer that others are not complying, and hence cause the agreement to collapse, resulting in the loss of future profits for everyone. That undesirable consequence keeps the cartel members in line, even though there is no directed punishment or retaliation for transgressions.[107]

(77)   Note that for such a cartel to be effective in practice, a sophisticated understanding of consequences is not required. A cartel member simply needs to believe that stealing business will increase the likelihood that others will start cutting their prices, and that as a result prices will fall and all the cartel members will be worse off. The evidence in this case indicates that, indeed, the conspirators understood these consequences. For example, in an internal email from Stanley Park, Vice President of Sales and Marketing at LG Display, to other senior executives of LG Display summarizing a July 22, 2002 conspiracy meeting he attended, Park mentioned that he "warned that we (LG) do not want to lower the price for the 4Q which is a high volume season, but if other companies cheat and lower the price, we will also take appropriate measures."[108] In a July 4, 2002 conspiracy meeting attended by AUO, Chi Mei, Chunghwa, and HannStar, a HannStar executive expressed similar understanding when he "call[ed] for stabilizing prices," urging his co-conspirators to "not be divided and allow it to be developed into a price-slashing war as before."[109] It appears the conspirators also understood that

---

[107]   See, for, example, E. Green and R. Porter, "Noncooperative Collusion under Imperfect Price Information," *Econometrica* 52, no. 1 (1984): 87-100, J. Rotemberg and G. Saloner, "A Supergame-Theoretic Model of Price Wars During Booms," *American Economic Review* 76, no. 3 (1986): 390-407, and D. Abreu, D. Pearce & E. Stacchetti, "Optimal Cartel Equilibria with Imperfect Monitoring," *Journal of Economic Theory* 39 (1986): 251-269.

[108]   GRNE0233006-7, Exhibit 489E.

[109]   CPT0004057-8, Exhibit 1042E. In the same meeting, Chunghwa's President, Chieng-Yuan Lin, commented in the context of customer expectations and timing of purchases that "TFT lower pricing > crash > no demand – will form a domino effect, which will be unstoppable" and urged "absolutely do not consent to any disguised forms of price lowering requests from OEM customers." His comments suggests that price cutting may have had second-order effects where customers would strategically delay orders in anticipation of further price reductions, and that the conspirators were aware of these demand dynamics.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

similar principles applied to capacity expansion – i.e., that expansion by one conspirator would increase the likelihood of expansion by others. For example, in a September 14, 2001 cartel meeting, prior to which LCD panel prices had been declining for roughly a year and half, a senior executive from Chunghwa suggested that "Korean makers postpone their investment in fifth generation production line, which may cause the Taiwanese makers to follow suit thus start something similar to an armament race."[110]

(78)    Accordingly, I conclude that the available evidence concerning the cartel's operation is consistent with the existence of an effective conspiracy to raise prices.

---

[110]  Meeting minutes from September 14, 2001 Crystal Meeting, CPT0004008-11, Exhibit 14.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                    Page 38

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# IV. Overcharges on LCD panels

## IV.A. Methods for computing overcharges

(79)    This section describes the econometric methods I used to estimate the effect of the defendants' conspiracy on the overall price level for LCD panels purchased by plaintiffs and other parties. I employed standard statistical tools to model the evolution of LCD prices through time as functions of variables measuring important aspects of supply and demand. I then used the models to determine the paths prices would have followed in the absence of the conspiracy (i.e., the "but-for" prices). The differences between the actual and but-for prices reflect the extent (if any) to which the conspiracy elevated prices, and therefore measures average overcharges. In the following subsections, I summarize the methods and procedures used to specify the models, estimate them, and compute overcharges.

### IV.A.1. The use of price indices

(80)    There are many distinct varieties of LCD panels. For example, they differ according to size, resolution, and intended end use. LCD products also change over time as a result of technological progress. Many products are sold for less than a year before being replaced by newer models. Because the product mix can change dramatically over time, changes in average LCD panel prices may bear little relation to the changes in panel-specific prices. For example, when demand shifts to more expensive products, the average price of LCD panels can rise even when every panel-specific price falls.

(81)    A standard and effective technique for handling the issues mentioned in the previous paragraph is to analyze price indices rather than average prices. For simple price indices, one assesses the change in prices between two points in time by computing the change in the cost of some designated bundle of products, all of which were available for purchase at both dates. That calculation renders the index unaffected by any change in the product mix. In my analysis, I employ *chained Fisher price indices*. A Fisher price index, also known as an *ideal price index*, employs the geometric average of the change in the cost of two bundles: the one purchased in the first of the two consecutive periods, and the one purchased in the second of those periods.[111] A *chained price index* computes the value of the index at any point in time by establishing a base period (for which the index is set to one) and appropriately combining the changes in the index between all intervening pairs of consecutive dates.

---

[111]    International Labor Organization. "Consumer Price Index Manual: Theory and Practice." (2004): par. 1.42, http://www.ilo.org/public/english/bureau/stat/download/cpi/ch1.pdf.; Diewert, Walter, E. *Essays in Index Number Theory volume I*, ed. W.E. Diewert and A.O. Nakamura. Elsevier Science Publishers, 1993. Also available at http://www.econ.ubc.ca/diewert/indexch1.pdf

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

For example, if the base period is January 2001, and if the price changes calculated from January to February and from February to March are, respectively, 10% and 20%, then the index is set equal to 1 in January 2001, 1.1 in February 2001, and 1.32 in March 2001 (which equals 1.1 times 1.20). Chained Fisher price indices are generally accepted and widely employed by economists; the Personal Consumption Expenditures index published by the U.S. Department of Commerce is one well-known example.[112] I have also previously used them to assess overcharges resulting from price-fixing conspiracies, and I am aware of price-fixing cases in which others have used them.

(82)    My analysis employs two separate price indices, one for large TFT-LCD panels (ten inches and over), and one for small TFT-LCD panels (under ten inches).[113] In drawing this distinction between large panels and small panels (and in using 10 inches as the dividing line), I follow established industry convention, as reflected by DisplaySearch data, the defendants' internal documents, and the report of Dr. Fontecchio.[114] I estimate separate models for large and small panels rather than a single model because the characteristic price patterns for these two groups of products are identifiably different.

### IV.A.2. Prediction equations versus "dummy variable" models

(83)    To calculate the prices that would have prevailed in the absence of the defendants' price-fixing conspiracy, I employ statistical models of the LCD price indices. A statistical model is an equation that describes a mathematical relationship between a collection of variables. As an example, consider the following equation:  $Y = 15 + 4X - 7Z + \varepsilon$. This equation relates one observable variable, Y, to two other observable variables, X and Z, as well as a third (unobserved) random variable, $\varepsilon$, also known as a "statistical disturbance" term. The numbers in this equation (15, 4, and -7) are called "coefficients."  "Statistical estimation" refers to the process of using data (here, concerning Y, X, and Z) to determine the numerical values of the model's coefficients (here, 15, 4 and -7), as well as the statistical distribution of $\varepsilon$.

(84)    Economists routinely use statistical models to infer the effects of price-fixing conspiracies on prices. Generally accepted methods include the *prediction equation approach* and the *dummy variable approach*. For both approaches, the economist begins by identifying a collection of variables

---

[112]  See, e.g., http://www.bea.gov/faq/index.cfm?faq_id=521

[113]  In constructing these indices, I excluded observations for which a product's quantity changed by more than a factor of 100 between adjacent months. In such cases the associated price changes are often extremely large and unrepresentative of market-wide forces.

[114]  See, for example, DisplaySearch 2003-Q3 Quarterly Large-Area TFT LCD Shipment Report (CMOCIV-0419285-579, p. 1 ) or DisplaySearch 2002-Q1 Quarterly TFT LCD Supply/Demand and Capital Spending Report (CMOCIV-2953352-418, p. 35). See, also, Expert Report of Adam Fontecchio, p. 14, and Samsung's production data (SAML-816315) that classify panels larger than 10 inches as TV, monitor or notebook, and panels smaller than 10 inches as mobile.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

measuring supply or demand conditions for the product or products in question.[115]  The manner in which he or she uses those variables depends on which approach is taken.

(85)    For the prediction equation approach, the economist uses data from *outside* the conduct period to estimate a statistical model relating the price level to the supply and demand variables, treating the latter as *predictors*. Such a model describes how prices evolve conditional on the levels of the supply and demand variables when no conspiracy is in force. For example, if we interpret the equation $Y = 15 + 4X – 7Z + \varepsilon$ as a prediction model, it tells us that, in periods when the variable X takes a value of 5 and the variable Z takes a value of 2, on average the value of the variable Y will be 21 (that is 15 + 4x5 – 7x2). Using the estimated model along with the values of the supply and demand variables *within* the conduct period, the economist can then predict the prices that would most likely have prevailed had the sellers not conspired.

(86)    For the dummy variable approach, the economist uses data from both the conspiratorial and non-conspiratorial periods to estimate a statistical model relating the price level to the supply and demand variables plus one or more "cartel dummy variables" indicating when the conspiracy was in force. The coefficients of the conspiracy dummy variables are taken to measure the impact of the conspiracy on the price level. The simplest versions of such models employ a single cartel dummy variable that takes a value of one during the entire conduct period and a value of zero outside that period. Alternatively, separate dummy variables can be used for different portions of the conduct period to allow for the possibility that the intensity of the cartel varied over time.

(87)    The dummy variable approach imposes a strong and artificial assumption: that the effect of the cartel on price did not vary during the conduct period in a manner that was correlated with the various supply and demand factors included in the model.[116]  That assumption is usually unjustified, and the effect of imposing it is often pernicious. In particular, when the assumption is violated, the coefficient of the cartel dummy variable usually does *not* properly measure the average effect of the conspiracy over the associated time period.

(88)    There are in fact good economic reasons to think that, contrary to the assumption upon which the dummy variable approach is built, variations in demand and supply factors through time influence the effectiveness of a conspiracy. For example, during a period of high demand or low cost, the temptation to defect from any given agreement may rise.[117]  In addition, spurious correlations between supply and demand factors and the degree of price elevation can arise purely by chance as a

---

[115]  For reasons discussed below, only variables thought to be unaffected by the conspiracy are usually considered.

[116]  In a model with more than one cartel dummy variable, the assumption is that, for each cartel dummy, the effect of the cartel on price did not vary within any period corresponding to one of the cartel dummies in a manner that was correlated with the various supply and demand factors included in the model.

[117]  For an illustration, see, e.g., Rotermberg and Saloner, A Supergame-Theoretic Model of Price Wars during Booms, *The American Economic Review*, pp. 390-407, Vol. 76, No. 3, Jun., 1986.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                          Page 41

result of a phenomenon known as "overfitting,"[118] particularly when the number of factors included in the model is relatively large. In such cases, supply and demand factors typically fit the movements in prices during the conduct period better than a single dummy variable (or a small number of such variables). As a result, the price movements during the conspiracy are given spurious causal "explanations," and the impact of the conspiracy is typically understated. In effect, the practitioner of this approach potentially forces the model to identify false "non-conspiratorial causes" of price elevation by artificially limiting the types of price movements that can be attributed to the cartel's activities.

(89)     To illustrate this point, imagine that the actual effect of a cartel gradually intensified and then gradually declined. If, by chance, some other variable (or linear combination of variables) happened to exhibit a "hump" shape similar to the actual pattern of collusive intensity, then that variable, and not the cartel dummy, will tend to pick up the cartel's effect on price. In that case, the estimated coefficient of the cartel dummy variable would be small, even though the cartel had a large impact on price. Consequently, in this illustration, the dummy variable approach would underestimate the effect of the cartel.

(90)     One can somewhat mitigate the aforementioned problems within the dummy variable framework by using multiple cartel dummy variables, with each one referencing some smaller portion of the cartel period, to allow for the possibility that the efficacy of the conspiracy varied through time (possibly along with supply and demand factors). For example, one might use annual dummies rather than a single cartel dummy, or quarterly dummies rather than annual dummies. Normally, when the results of these procedures materially diverge, one should give preference to the model that employs cartel dummies covering narrower time periods, because the alternative model (with fewer cartel dummies) imposes additional assumptions that the data in effect disprove.

(91)     The least restrictive version of the dummy variable model would include a separate dummy variable for every observation during the cartel period. But that procedure is mathematically equivalent to excluding the conspiracy period from the estimation sample, which is the essence of the forecasting approach. Thus, the forecasting approach corresponds to the least restrictive version of the dummy variable approach; it is simply where one ends up when the problematic assumption identified above is completely removed from the latter. Indeed, the prediction equation approach generally identifies overcharges that vary through time along with the supply and demand factors.

(92)     In my opinion and experience, the prediction equation approach is therefore typically more reliable than the dummy variable approach. Because the prediction approach is a more flexible and robust version of the dummy variable approach, the two can yield different results only when historical price

---

[118]   See, e.g., Svetlozar Rachev, Stefan Mittnik, Frank Fabozzi, Sergio Focardi, and Teo Jašić, *Financial econometrics: from basics to advanced modeling techniques*, (John Wiley & Sons, Inc., 2007), 251.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

movements are inconsistent with the restrictions imposed when specializing from the prediction model to the dummy variable model. It follows that, whenever results based on the two approaches diverge significantly, those differences are directly attributable to the fact that the dummy variable approach imposes arbitrary assumptions concerning the cartel's effects on price that are inconsistent with the data.[119]

(93)    Because the prediction equation approach and the dummy variable approach are both generally accepted,[120] I provide estimates of overcharges based on both approaches. Though economic principles lead me to conclude that the prediction equation approach is more reliable in this application, I show that my results are robust with respect to the choice of method, provided the method is implemented in a reasonable way.

### IV.A.3. Dynamic versus static models

(94)    Regardless of whether one employs the prediction equation approach or the dummy variable approach, one must settle on an econometric specification relating the price index to variables measuring features of supply and demand. One important issue is whether that specification will be *static* or *dynamic*. A static equation relates prices to supply and demand factors measured at a single point in time. Such equations are often used to assess the effects of price-fixing cartels, but they are not ideal. In a static model, the full effect of any change in a supply or demand factor is immediate. Yet there are good reasons to think that the effects of such changes will be gradual and cumulative. For example, manufacturers may incur costs when reallocating capacity (or creating new capacity) to accommodate the associated changes in production, competitive strategies may evolve as inventories accumulate or dissipate, expectations may change more slowly than market conditions, and prices for specific purchasers may be fixed in the short term through quarterly or annual contracts, so that average prices change gradually as old contracts expire. A *dynamic* model captures this type of gradualism mathematically. The simplest method of introducing dynamics is to include what is known as a *lagged endogenous variable* into the model: the price index is regressed not only on supply and demand factors, but also on the value of the price index in a previous time period (or perhaps several such periods). This permits the model to generate a wide range of dynamic patterns, such as gradual adjustment from one price level to another. It also allows for the possibility that a temporary development might have persistent (but dissipating) effects on prices that outlast the event itself. A dynamic model does not rule out the possibility that adjustments are instantaneous; it simply allows the data to resolve this issue.

---

[119]    When results based on the two approaches do not diverge significantly and the data are consistent with the restrictions implied by the dummy variable model, the use of the dummy variable approach does have the potential advantage of yielding estimates that achieve greater statistical efficiency (that is, lower variance).

[120]    See, for example, *Proving Antitrust Damages: Legal and Economic Issues, 2nd Edition*, American Bar Association, April 10, 2010 at 202-206.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(95)    Including lagged prices is common practice in the time series forecasting literature. A leading textbook on forecasting states the following: "A multivariate model (in this case, a regression model) should relate the current value *y* [here, price] to its own past and to the past of *x* [here, the supply and demand variables]...we never want to eliminate from the outset the possibility that lagged dependent variables play a role."[121] The textbook explains that "Lagged dependent variables …can *dramatically* enhance forecasting performance."[122]

(96)    Thus, in my opinion, a dynamic but-for price model is generally more reliable than a static one. However, because in my experience both static and dynamic models are used for this purpose, I provide estimates of overcharges based on both approaches. Though I prefer the dynamic model, I show below that my conclusions are robust with respect to the choice of specification.

## IV.A.4. Selection of supply and demand factors

### IV.A.4.a. Principles for selecting supply and demand factors

(97)    In selecting the set of supply and demand factors included in my model, I was guided by three main principles.

(98)    The first principle is that the factors included in the model must be economically relevant for LCD panel prices. In principle, the number of time series variables one could consider including in a prediction equation is virtually unlimited. Consequently, there is a substantial likelihood that some irrelevant (or modestly relevant) variables were highly correlated with LCD price movements during the relevant time period simply by chance. Using such variables as predictors may produce models that appear to fit the data beautifully, but that perform miserably when used to make bona fide out-of-sample forecasts (because the apparent relationships between the variables do not reflect real economic processes). Thus, unless one limits consideration to highly relevant economic variables, one is likely to obtain spurious "explanations" for price movements.

(99)    The second principle is that one should only include supply and demand variables that were likely unaffected by the Defendants' price-fixing conspiracy. That dictum reflects a well-known principle from the field of econometrics,[123] and has been recognized by federal courts.[124]  Using such variables

---

[121]    Francis X. Diebold, *Elements of Forecasting,* 4th ed. (Mason, OH: South-Western College Publishing, 2007) at 225.

[122]    Francis X. Diebold, *Elements of Forecasting,* 4th ed. (Mason, OH: South-Western College Publishing, 2007) at 225-26 (emphasis in original).

[123]    A literature review is provided in H. White, "Time-Series Estimation of the Effects of Natural Experiments," 135 *Journal of Econometrics* 527-66 (2005). This insight also is developed in a body of statistical and econometric research commonly referred to as the "treatment effects" literature. J. Angrist and A. Krueger, "Empirical Strategies in Labor Economics," in *Handbook of Labor Economics*, vol. 3A, 1277–368 (Elsevier: Amsterdam, 1999); P. Rosenbaum and D. Rubin, "The Central Role of the Propensity Score in Observational Studies for Causal Effects," *Biometrika* 70 (1983): 41–55; D. Rubin, "Estimating Causal Effects of Treatments in Randomized and Non-Randomized Studies," *Journal of Educational Psychology* 66, (1975): 688–701.

[124]    See, e.g., *In re Linerboard Antitrust Litigation,* 497 F.Supp.2d 666 (E.D.P.A. 2007) and *In Re DRAM Antitrust*

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

as predictors is obviously problematic. To take a simple illustration, imagine including the quantity sold of an LCD panel product as a price predictor. Estimating the model with data from outside the cartel period, one would not be surprised to find a strong relationship between price and quantity. One cannot, however, use that relationship along with data on actual quantities to predict but-for average prices. To do so would be to assume that the cartel had absolutely no effect on quantities, in which case it could not have affected prices. As a result, if one were to use the quantity sold as a predictor, one would likely obscure the effect of the conspiracy on price.

(100)    One practical implication of this second principle is that the prediction model should not include variables measuring industry capacity. Although capacity (like quantity) affects price, it is potentially influenced by the cartel both directly (through agreements) and indirectly (through effects on expectations concerning future prices and market conditions). If one included capacity in the model, one would then need a separate model to explain how capacity would have been different in the absence of the conspiracy. A better approach is simply to omit capacity from the model, and instead include market conditions that likely influenced capacity decisions. For similar reasons, it is generally inappropriate to include variables measuring the number of sellers, entry or exit, market concentration, or the prices of close substitutes for the cartelized goods: even though those factors may affect prices, the conspiracy may well have influenced their values.

(101)    For the reasons described in the preceding paragraphs, it is generally preferable to exclude from the model all variables that are controlled or influenced by the cartel and to rely on an equation that describes the market equilibrium as a function of exogenous factors. There is, however, one important exception. As mentioned in the previous subsection, prices do not appear to adjust instantaneously to changes in market conditions. A standard and appropriate modeling strategy in this situation is to capture price dynamics by including lagged prices (prices from previous time periods) as predictors. Obviously, these variables are under the control of the cartel. Consequently, when constructing but-for prices from the estimated relationship, it is important to use lagged but-for prices rather than lagged actual prices.[125] In this way, one avoids making forecasts that are spuriously contaminated by conspiratorial behavior.

(102)    The third principle is that the model should be parsimonious – i.e., it should include a relatively small number of important supply and demand factors. When using the prediction approach to construct but-for prices, it is typically inappropriate to include all the factors that may have influenced supply and demand. On the one hand, the addition of a predictive variable adds potentially useful information, but on the other hand it consumes a statistical "degree of freedom" and increases the risk of overfitting. Predictive accuracy rises only if the new variable contains sufficient incremental

---

*Litigation,* 608 F.Supp.2d 1166 (N. D. Cal. 2009).

[125]   In contrast to a variable such as capacity, one does not require a second model to forecast the but-for values of lagged prices; they are obtained from the same prediction model.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                          Page 45

information to justify the use of a degree of freedom, and if its correlations with other variables reflect reliable statistical patterns rather than coincidence. For that reason, it is usually important to avoid redundancy (i.e., the use of two or more variables that largely reflect the same economic factors). It is well understood in the economics literature that, in general, parsimonious models tend to provide the most accurate predictions.[126] A practical implication of this principle is that, instead of adding all potentially relevant variables, one must exercise judgment based on sound economic principles when selecting the variables to include in a forecasting model.

(103)   The use of a parsimonious prediction equation sometimes creates confusion concerning a statistical phenomenon known as *omitted variable bias*. To clarify this issue, I need to distinguish predictive models of the type I use here from *explanatory models*. An explanatory model purports to provide direct causal explanations for movements in the dependent variable. In contrast, a predictive model simply provides a basis for forecasting the value of the dependent variable based on observable information. In the context of an explanatory model, the coefficient of each explanatory variable is intended to measure a particular causal effect (specifically, the impact of an intervention that changes that variable and nothing else). For example, if we were to interpret the equation

$$Y = 15 + 4X - 7Z + \varepsilon \qquad (1)$$

as an explanatory model, we would think of X and Z as "explanatory variables," and we would conclude that a one unit increase in the variable X with all other factors held fixed causes Y to rise by four units (because the coefficient of X is 4). In contrast, in the context of a predictive model, the coefficients are interpreted as associations rather than causal effects. Indeed, each coefficient may reflect a complex blend of effects. If we were to interpret the same equation as a predictive model, we would instead think of X and Z as "predictors." The equation then describes the statistical relationship between Y, X, and Z that emerges during the natural course of events (rather than as a consequence of some hypothetical intervention). It tells us, for example, that in comparing two naturally occurring circumstances for which Z is the same and the value of X differs by one unit, on average the value of Y will differ by four units. However, simply because Z is the same in these two circumstances, it does not follow that all else is the same, and hence one cannot interpret the four unit change in Y as a causal consequence of the change in X; nor can one conclude that a similar effect would follow from an artificial intervention that changed X by a unit. However, for the purpose of prediction, it is not important to know whether the change in X causes the change in Y, or is simply correlated with something else that causes the change in Y. In either case, when we observe in the natural course of

---

[126]  "We've stressed that a variety of forecasting applications use a small set of common tools and models. You might guess that those models are tremendously complex, because of the obvious complexity of the real-world phenomena that we seek to forecast. Fortunately, such is not the case. In fact, decades of professional experience suggest just the opposite: Simple, parsimonious models tend to be best for out-of-sample forecasting in business, finance, and economics. Hence, the *parsimony principle:* Other things being the same, simple models are usually preferable to complex models." Francis X. Diebold, *Elements of Forecasting,* 4th ed. (Mason, OH: South-Western College Publishing, 2007) at 46.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

events that X is higher by one unit and Z is unchanged, we predict that pertinent conditions – whatever they are – will cause Y to rise (on average) by four units.

(104)    When evaluating estimates of statistical models, whether predictive or explanatory, economists and statisticians often discuss the notion of "bias." The technical meaning of that term differs from its colloquial usage. An unbiased estimation procedure is one that gets an answer right on average; a biased procedure is one that does not. Economists and statisticians generally regard the absence of bias as a desirable property (though certainly not the only such property). When evaluating an explanatory model, we often ask whether the coefficients are unbiased; in other words, we want to know whether the procedure used to estimate the model measures the direct causal effects of the explanatory variables correctly on average. In contrast, when evaluating a predictive model, it is not important to know whether the predictors' coefficients are unbiased estimates of their direct causal effects. Indeed, a prediction may be accurate precisely because each coefficient reflects a complex blend of associations and causal effects. Instead, we may wish to know whether the *prediction* is unbiased (as well as how precise it is), but that is a very different question.

(105)    To estimate prediction models, economists often use a common statistical procedure known as "ordinary least squares regression analysis." Practitioners often refer to the procedure by its abbreviation, OLS, or as "regression analysis;" they sometimes speak of "regressing" the dependent variable on other variables. When used to estimate explanatory models, OLS yields unbiased estimates of coefficients only under restrictive conditions. Various well known problems, such as the omission of important explanatory variables or the presence of reverse causation between the dependent variable and one or more of the explanatory variables ("endogeneity"), can cause the direct causal effects of included explanatory variables to be measured incorrectly. In contrast, when used to estimate predictive models, OLS generally yields unbiased predictions.[127] That statement remains true even if the coefficients of the predictors are "biased" in the sense that they have little or nothing to do with their causal effects on the dependent variable, whether due to omitted variables, endogeneity, or other conditions that would be problematic in an explanatory setting.

(106)    A simple example helps to illustrate this important point. For the moment, let's interpret the equation

$$Y = 15 + 4X - 7Z + \varepsilon \qquad (2)$$

---

[127]    See, for example, Davidson and MacKinnon (1993), p 211 – "that least squares estimates of $\beta$ will be biased and inconsistent…Note that inconsistency of $\hat{\beta}$ is a problem only if we care about the parameter $\beta$. If, on the contrary, we were simply interested in finding the mean of y conditional on x, estimating equation (7.05) by least squares is precisely what we would want to do." Dufour (1984) (Dufour, Jean Marie (1984), Unbiasedness of predictions from estimated autoregressions when the true order is unknown, *Econometrica*, 52, 209-215) also shows that under weak conditions, any autoregressive model estimated by ordinary least squares yields unbiased forecasts even though the OLS coefficients are generally biased.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

as an explanatory model. If $\varepsilon$ is uncorrelated with X and Z, then OLS will yield unbiased estimates of their coefficients. But suppose that instead of regressing Y on X and Z, we regress Y on X alone. In that case, if we still wish to interpret the abbreviated equation as an explanatory model, we potentially confront *omitted variable bias*. In particular, if X and Z are correlated, the estimated coefficient of X will not reflect its direct causal effect on Y. To take a simple case, imagine that Z equals X plus a small amount of random noise that is unrelated to the other variables in the equation. If we estimate the abbreviated equation using OLS, we will obtain the following equation:

$$Y = 15 - 3X + \varepsilon. \tag{3}$$

The coefficient of X, -3, is simply the sum of the coefficients on X and Z from the original equation. Clearly, the causal effect of X on Y is mismeasured; in fact, the coefficient has the "wrong sign." One might even be tempted to reject equation (2) on the grounds that the estimated "effect" of X is "implausible." And yet, as a predictive model, equation (2) is every bit as valid as equation (1). From an explanatory perspective, the coefficient of X in equation (2) is contaminated by the correlation between X and the omitted variable Z, but from a predictive perspective, that "contamination" is beneficial: if we want to predict Y using information on X alone, we need to account for the effects on Y of variables like Z that are correlated with X. That is precisely what the OLS regression accomplishes.

(107)    To illustrate, let's substitute some numerical values. Suppose that X = 2. Given the assumed relationship between X and Z, we can infer that Z is also (approximately) equal to 2. Inserting those values into equation (1), we see that Y = 15 + 4×2 – 7×2 = 9 (on average). Using equation (2), we would correctly forecast that Y = 15 – 3×2 = 9. Now suppose we observe a naturally occurring circumstance in which the value of X is one unit greater – i.e., 3, rather than 2. Because of the statistical relationship between X and Z, we can infer that Z also (approximately) equals 3. Inserting those values into equation (1), we see that Y = 15 + 4×3 – 7×3 = 6 (on average). Using equation (2), we would correctly forecast that Y = 15 – 3×3 = 6. Thus, using equation (2), we correctly predict that Y tends to be lower by three units (6 rather than 9) when, in the course of naturally occurring circumstances, the value of X turns out to be 3 rather than 2 (even though the separate causal effect of the increase in X would be to increase Y by four units).

(108)    In short, because the prediction equation approach does not require us to interpret regression coefficients as measuring causal effects, classical omitted variable bias is not a concern. For the same reason, it is usually inappropriate to discard a prediction equation simply because the magnitudes or signs of certain regression coefficients do not reflect "plausible" causal effects.[128]

---

[128]  To underscore why regression coefficients are largely uninteresting in prediction models, suppose we interpret equation (1) as a prediction model rather than as an explanatory model, but again assume that Z equals X plus a small amount of random noise. As I have explained previously, the coefficient of X tells us that in comparing two naturally occurring circumstances for which Z is the same and the value of X differs by one unit, on average the value of Y will differ by

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(109)    In selecting the specification for my prediction equation, I also examined standard diagnostic statistics. Finally, after considering a large number of specifications, I focused on ones that were generally representative of reasonable models and, if anything, somewhat conservative relative to that group.

### IV.A.4.b. Factors included in the models

(110)    After considering a wide range of economic factors, I settled on a specification that included four key variables in addition to the first and second lag of the price index. Together, the levels of these variables parsimoniously capture the key economic factors influencing the price levels of LCD panels. They are:

- *Total industrial production for the G7 countries* (Canada, France, Italy, Japan, United Kingdom, United States, and West Germany). This variable serves primarily as a proxy for demand, inasmuch as it captures the general state of economic activity in the countries that account for the bulk of LCD purchases.[129] Unlike alternatives such as personal income, it reflects the factors that influence demand for LCD panels by both businesses and households. It also exhibits considerable variation over the business cycle, and thereby stands in for other cyclical factors.

- *Total industrial production for South Korea*. Measures of economic activity in the countries that produced LCD panels proxy for common factors (such as exchange rates) affecting the demand for the goods produced by those countries, as well as for general economic conditions affecting business activity and hence supply. I use industrial production for a single country rather than separate variables for all three LCD-producing countries in the interests of parsimony; due to the similarity and linkages between these economies, controlling for one such variable likely captures key economic conditions for all three. I chose South Korea because, unlike Japan and Taiwan, its status as a leading source of LCD panels was relatively stable throughout the relevant time period. In addition, industrial production for Japan already appears in the specification as part of industrial production for the G7.

- *Producer price index for microprocessors*. According to Dr. Fontecchio, there are significant similarities between LCD panel manufacturing and the manufacturing of semiconductor microprocessors.[130] As a result, this variable is a reasonable proxy for total LCD panel production costs. Though microprocessors are not inputs for LCD panels, Dr. Fontecchio notes that:

  □ "At a fundamental level, the manufacturing of LCD panels and microprocessors are both built upon semiconductor fabrication."

---

four units. But such circumstances almost never materialize; thus, the economic significance of the coefficient of X, taken by itself, is confined to some highly improbable naturally occurring event, and not an intervention that increases X while holding other factors constant.

[129]  See, e.g., DISP_LCD_000128.

[130]  Expert Report of Adam Fontecchio, Section VIII.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION

▫ "The industries share suppliers for fabrication equipment, and advances in technologies such as photolithography, substrate processing, etching, and thin film coating are applied to both industries to reduce production cost while increasing manufacturing yield, which in turn increases the profitability of both industries."

▫ "A good example is Applied Materials, one of the largest suppliers of semiconductor processing equipment in the world. … In their own words:…'The manufacturing process for thin film transistor liquid crystal displays (TFT-LCDs), commonly used in notebook computers, desktop monitors and televisions is similar to that employed for integrated circuits for semiconductors.'"[131]

As discussed below, other possible cost measures proxy only for small shares of production costs, or are of dubious quality for this purpose.

■ *Capital investment in South Korea, lagged 18 months*. Capital investment is the leading determinant of subsequent capacity. Capacity is more directly connected to capital investment than to interest rates. Indeed, as Prof. Stowell explains in his report, prevailing general interest rates provide rather poor proxies for the cost of capital faced by LCD producers during the relevant time frame.[132] I lag capital investment 18 months to account for the time required to construct and/or expand fabrication plants. As with industrial capacity for LCD-producing countries, in the interest of parsimony I include capital investment for one country rather than all three. I chose South Korea for the same reasons mentioned above, and because Korea was more heavily impacted by the Asian financial crisis than Japan or Taiwan.[133] Note that by including this variable in the model, I account for any effects of the Asian financial crisis on subsequent LCD capacity, and hence prices.

(111)  I have confidence in the accuracy of the predictions generated by my parsimonious model in large part because I have examined the sensitivity of its predictions to the inclusion of other variables that may have played some role in determining LCD prices. As emphasized above, it would be inappropriate to include all of these variables in a single non-parsimonious model; such an approach would almost surely lead to overfitting and, consequently, would generate less reliable predictions. However, I have explored the effects of adding variables individually, as well as in groups.

(112)  First, I have considered a variety of specifications that add measures of underlying resource and production costs. After considering the report of Dr. Fontecchio as well as variables used and suggestions made by experts who previously submitted reports related to this matter, I focused on specifications employing the following variables:

---

[131]  Expert Report of Adam Fontecchio, Section VIII; http://appliedmaterials.com/technologies/display (accessed on December 13, 2011)

[132]  Expert Report of David Stowell, Section IV.B.

[133]  See, for example, GRNE0334976; W. Greene, "Korea's Foreign Exchange Crisis," *Industry, Trade, and Technology Review* 2 (March 1999).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- The price of copper, a raw material used in the production of LCD panels;

- The price of oil, a determinant of shipping costs and energy costs;

- General labor costs for Japan, South Korea, and Taiwan;

- A measure of shipping costs.

(113)    The inclusion of these variables does not necessarily render the prediction model more reliable. My understanding is that raw materials such as copper, oil, and other materials not included in the preceding list account for rather small fractions of LCD panel production costs. Consequently, one would not expect to find much of a relation between these variables and LCD prices based on their direct causal roles. Rather, the coefficients of these variables will tend to reflect other economic conditions with which they are correlated. Because better proxies for the most pertinent economic conditions are available, these variables are best omitted from the specification in the interests of parsimony. Similar comments apply to the costs of labor and shipping. In addition, the labor cost series exhibit a high degree of seasonal variation that is driven by institutional arrangements in Asian labor markets, and likely unrelated to conditions affecting LCD panel prices.

(114)    Second, I have explored a variety of specifications that include measures of pertinent exchange rates. Exchange rates are potentially relevant because they (1) influence international demand for a country's products, (2) affect the real cost of production in the purchaser's home currency, and (3) reflect a variety of current economic conditions of potential importance. More specifically, the specifications reported below employ:

- Exchange rates for the United States with respect to Europe, Japan, South Korea, and Taiwan;

- Effective exchanges rates, using trade weights from the Bank for International Settlements, for the United States and the European Union with respect to Japan, South Korea, and Taiwan;

- Effective exchanges rates, alternatively using weights based on TFT production capacity, for the United States and the European Union with respect to Japan, South Korea, and Taiwan.

(115)    With respect to the variables included in my parsimonious model, I report below results based on the following alternatives:

- Add capital investment for Japan and Taiwan, lagged 18 months;

- Add industrial production for Japan and Taiwan;

- Lag capital investment for South Korea 21 months instead of 18 months (to explore the consequences of assuming longer construction lags);

- Lag capital investment for South Korea 15 months instead of 18 months (to explore the consequences of assuming shorter construction lags).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(116)   I also examined the effects of adding variables that are plainly relevant for LCD prices, but were likely affected in an important way by the activities of the cartel. While I believe the inclusion of these variables renders the prediction model less reliable, I take comfort in the robustness of the results reported below. These variables include:

- The price of CRTs, a demand-side substitute for large LCD panels;

- LCD panel production capacity for the defendant firms.

(117)   Finally, I also explored specifications that include an LCD panel cost index based on the available data provided by defendants. In principle, this index encompasses a large share of the pertinent costs. However, the underlying data are limited, and a close inspection raised concerns as to whether they adequately reflect either the level of the defendants' true economic costs or the variation in those costs over time.

## IV.A.5. Choice of the conduct and benchmark periods

(118)   As discussed above, both the prediction approach and the dummy variable approach involve the use of available data from the period during which the conspiracy was not in force, which serves as a non-conspiratorial benchmark. As a practical matter, careful consideration must be given to selecting a benchmark period that is untainted by the conspiracy. Otherwise, the use of data from a time period when the conspiracy was actually in effect can cause the model to underestimate the impact of the conspiracy on price. This point has been widely recognized.[134]

(119)   I have been asked to determine the extent to which these direct action plaintiffs were overcharged as a result of defendants' conduct during two time periods -- the period August 1998 through December 2006 (the "conspiracy period") and the period September  2001 through December 2006 (the "plea period"). I have used the same data, methods, and models to analyze both periods. For convenience, I refer to either of these as the "conduct period" when specifically identifying one or the other is not important to the discussion.

(120)   Generally, I used all available data before and after the conduct period to estimate the price index model. As noted above, Counsel asked me to calculate overcharges based on two distinct conduct

---

[134]   The before-and-after method "is premised on the assumption that prices before and after, but not during, the period were set free of any illegal cartelization." *Proving Antitrust Damages: Legal and Economic Issues, 2nd Edition*, American Bar Association, April 10, 2010 at 202. See also 210 ("Because the designation of the beginning and ending dates of the conspiracy is so important, courts have been careful to ensure that they are chosen based on the evidence or well-established economic theory.")

In *In re: Linerboard Antitrust Litigation*, United States District Court Judge DuBois concluded that "if there was in fact collusion during the benchmark period, [the expert's] but-for price estimate would be too high, causing his estimate of the overcharge (the difference between actual prices and but-for prices) to be too low." *In re Linerboard Antitrust Litigation,* 497 F.Supp.2d 666 (E.D.P.A. 2007).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

periods. As both of these periods end in December 2006, both benchmark periods include January 2007 through December 2009. When I take the conduct period to coincide with the alleged conspiracy period, I also include data from January 1996 through July 1998 in the benchmark period. When I take the conduct period to coincide with the plea period, I instead include data from January 1996 through August 2001 in the benchmark period. Note that, in the latter case, the benchmark period includes roughly three years during which the defendants are alleged to have conspired (August 1998 through August 2001); accordingly, the associated estimates of overcharges are likely conservative.

## IV.A.6. Method of estimation

(121)    Regardless of which approach or specification one uses, one must settle on a statistical procedure for estimating the price index model. A variety of procedures are available. One common technique is Ordinary Least Squares (OLS). While OLS has many desirable features (as mentioned in Section IV.A.4.a), it can sometimes perform poorly in the context of analyses involving prediction because of its susceptibility to overfitting. The overfitting problem arises because, with small samples (and especially with many predictors), there is a substantial likelihood that some predictor will be highly correlated (within sample) with the outcome variable purely by chance. While the OLS estimates will still yield statistically unbiased predictions, the variance of the prediction error can be extremely high, and hence the predictions can prove inaccurate. The most obvious case occurs when the number of predictors equals the number of observations. In that case, the predictors will yield a perfect fit within sample, but the resulting model will generally perform very poorly out of sample.[135]

(122)    Various techniques have been developed to address the overfitting problem. *Shrinkage estimators* compensate for overfitting by shrinking the overall size of the estimated coefficient vector. Such estimators can attenuate the sensitivity of predictions to changes in the predictors, and hence reduce variance, thereby improving the overall accuracy of out-of-sample predictive performance according to measures such as mean-squared prediction error (a commonly used statistic that encompasses both the bias and the precision of a prediction). I address the overfitting issue using a shrinkage estimator known as *ridge regression*. This procedure is generally accepted, and is widely used throughout economics, as well as in other fields.[136] However, because OLS is also a common technique, I show below that my conclusions are robust with respect to the choice of estimation technique.

---

[135]    See, for example, Svetlozar Rachev, Stefan Mittnik, Frank Fabozzi, Sergio Focardi, and Teo Jašić, *Financial econometrics: from basics to advanced modeling techniques*, (John Wiley & Sons, Inc., 2007), 251.

[136]    See, e.g.: Amemiya, Takeshi, 1985, Advanced Econometrics, Harvard University Press; A. E. Hoerl and R. W. Kennard (1970): "Ridge Regression: Biased Estimation for Nonorthogonal Problems," *Technometrics*, 12, 55-67.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

### IV.A.7. Calculation of overcharges

(123)    Once one obtains an estimated price index model, the next step is to compute the but-for price index. This is done somewhat differently depending on whether one is following the prediction equation approach or the dummy variable approach, and whether one is using a dynamic model or a static one. For my preferred dynamic prediction equation approach, I proceeded as follows (using the conspiracy period for the example). First I used the model to predict the but-for price index for August 1998 based on the actual values of the price index for June and July 1998, as well as the actual values of all other supply and demand variables. I then used the model to predict the but-for price index for September 1998 based on the actual value of the price index for July 1998, the but-for price index for August 1998, and the actual values of all other supply and demand variables. Starting with October 1998, I predicted the but-for prices for each month consecutively based on the predicted but-for prices from the previous two months and the actual values of the supply and demand variables. I repeated this calculation month by month, rolling forward the predictions of but-for prices through the entire conduct period and beyond. Consequently, the predicted but-for prices embody the processes governing the evolution of LCD panel prices during the benchmark period, while accounting for differences in supply and demand conditions between the benchmark and conduct periods.

(124)    I note that Samsung began cooperating with the U.S. government's investigation of LCD pricing during the first quarter of 2006 and contends that it withdrew from the conspiracy at that time, which I understand is disputed by plaintiffs. The possible defection of this major player would have undermined the cartel's ability to operate effectively. Accordingly, I separately compute damages for two time periods. The first represents the period in which the cartel was fully operational (the "functioning cartel period") – either August 1998 through March 2006 or September 2001 through March 2006, depending on the scenario considered. The second, beginning April 2006, represents the period during which the cartel was no longer fully operational but may have had lingering effects (the "lingering effects period"). For the functioning cartel period, I aggregated estimated overcharges over all pertinent transactions, including any for which predicted but-for prices exceeded actual prices. Because I net out negative overcharges during the functioning cartel period, my damage estimates are conservative. For the lingering effects period, I include overcharges only up to the point in time at which predicted but-for prices at first match or exceed actual prices.

## IV.B. Overcharges implied by the statistical models

(125)    Figure 14 shows the but-for price index for large panels, and Figure 15 below shows the but-for price index for small panels, in both cases based on the preferred parsimonious model. Two patterns pertaining to the performance of the models merit notice.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(126)    First, both of the conspiracy period models predict substantial price elevation (though less than the amount actually observed) during the pre-plea portion of the conspiracy period. This feature is particularly notable because the predicted price increases follow a period of steeply declining prices. I find this pattern reassuring because it corresponds to my economic intuition concerning the effects of the Asian financial crisis (which likely restricted previous investment in capacity). The models do not simply project the continuation of a trend; rather, they capture important economic conditions that drove LCD prices.

(127)    Second, the predicted prices match up well with actual prices after the end of the conspiracy. Recall that I generate the but-for prices by initializing the models at the start of the conduct period (based on actual prices), and then "take my hands off the wheel" by allowing them to run forward in time without intervening course corrections, with each monthly forecast contributing to the next, until the end of 2009. Although these predictions span more than eleven years in the context of the conspiracy period scenario and roughly eight years in the context of the plea period scenario, they are nevertheless remarkably accurate during the post-conspiracy period.[137]  Because the model is dynamic (in the sense that each month's price depends on the previous month's price), that property is *not* guaranteed. On the contrary, for a poorly performing model, errors in the forecast for each month can compound as they are fed into the equations for successive months. Thus, the fact that the model accurately predicts post-conspiracy price levels and price movements based on pre-conspiracy price levels provides an indication of its accuracy and reliability.

---

[137]  Indeed, even when I initialize the models at the start of 1996 and allow them to run forward, without interference, until the end of 2009, their predictions for the post-conspiracy period remain remarkably accurate.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 14: But-for price index for the dynamic prediction model—large panels**



**Figure 15: But-for price index for the dynamic prediction model—small panels**



CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

(128)    For both the large panel and small panel price indices, I calculated the percentage overcharge in each month as the difference between the but-for and actual price indices, relative to the value of the actual price index. I also calculated weighted average overcharges over the relevant conduct period (distinguishing between the functioning cartel period and the lingering effects period as discussed previously), using as weights the total sales reflected in the defendants' data. These weighted average overcharges are summarized in the table below.[138]

**Figure 16: Summary of weighted average overcharges from parsimonious model**

|  | Conspiracy period | Plea period |
|---|---|---|
| Large TFT panels | 18.9% | 17.8% |
| Small TFT panels | 25.5% | 18.8% |

(129)    The table below lists overcharge estimates for variants of the basic model that include the additional or alternative variables listed in Section IV.A.4.a.

---

[138]    I also used bootstrap methods to test the hypothesis that weighted average overcharges were 0%. In all four cases, one can reject the hypothesis that the pertinent weighted average overcharge was zero with 99% confidence.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 17: Comparison of estimated overcharges using potential additional and alternative predictors**

| | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Parsimonious model | 18.9% | 17.8% |
| | Cap. inv. for S. Korea lagged 15 months | 24.5% | 18.9% |
| | Cap. inv. for S. Korea lagged 21 months | 19.2% | 16.8% |
| | With cap. inv. for Japan and Taiwan | 17.2% | 20.8% |
| | With industrial production for Japan and Taiwan | 16.6% | 21.2% |
| | With copper price | 18.0% | 16.2% |
| | With oil price | 17.1% | 17.4% |
| | With shipping costs | 20.0% | 17.8% |
| | With labor costs for Japan, S. Korea, and Taiwan | 18.7% | 18.5% |
| | With individual exchange rates | 26.9% | 17.2% |
| | With effective exchange rates (trade weights) | 16.2% | 17.6% |
| | With effective exchange rates (capacity weights) | 17.8% | 17.5% |
| Small TFT panels | Parsimonious model | 25.5% | 18.8% |
| | Cap. inv. for S. Korea lagged 15 months | 28.8% | 19.5% |
| | Cap. inv. for S. Korea lagged 21 months | 26.1% | 18.6% |
| | With cap. inv. for Japan and Taiwan | 24.9% | 22.8% |
| | With industrial production for Japan and Taiwan | 25.0% | 22.1% |
| | With copper price | 22.1% | 17.0% |
| | With oil price | 24.2% | 17.5% |
| | With shipping costs | 25.4% | 19.3% |
| | With labor costs for Japan, S. Korea, and Taiwan | 24.5% | 20.5% |
| | With individual exchange rates | 22.7% | 19.5% |
| | With effective exchange rates (trade weights) | 23.1% | 20.1% |
| | With effective exchange rates (capacity weights) | 22.7% | 22.0% |

(130)    For the conspiracy period scenario, the estimates range from 16.2% to 26.9% for large panels, and from 22.1% to 28.8% for small panels. For the plea period scenario, they range from 16.2% to 21.2% for large panels, and from 17.0% to 22.8% for small panels. In every case, my preferred parsimonious model yields a weighted average percentage overcharge estimate either at the middle or the lower end of the pertinent range. Predicted but-for price paths in general appear qualitatively similar to those generated from the parsimonious model. Thus, I conclude that my analysis and conclusions are robust with respect to specification uncertainty, and that my preferred estimates are, if anything, conservative.

(131)    I have also examined whether including various combinations of these additional supply and demand factors has a meaningful effect on the estimated overcharges (despite the fact that this is potentially contrary to the parsimony principle). Because the parsimonious model already includes measures of industrial production, investment, and a broad cost proxy, I focus here on combinations involving exchange rates and resource costs. In particular, Figure 18 reports results for the following combinations:

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- Combination #1: U.S. effective exchange rate, EU effective exchange rate, and copper prices;

- Combination #2: U.S. effective exchange rate, EU effective exchange rate, and oil prices;

- Combination #3: U.S. effective exchange rate, EU effective exchange rate, copper prices, and oil prices.

**Figure 18: Comparison of estimated overcharges using combinations of additional variables**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Parsimonious model | 18.9% | 17.8% |
|  | With combination #1 | 16.8% | 16.2% |
|  | With combination #2 | 20.6% | 17.5% |
|  | With combination #3 | 22.0% | 17.1% |
| Small TFT panels | Parsimonious model | 25.5% | 18.8% |
|  | With combination #1 | 19.8% | 17.5% |
|  | With combination #2 | 27.4% | 18.2% |
|  | With combination #3 | 24.8% | 17.1% |

(132)    While the new estimates for the plea period are slightly lower than for the parsimonious model, overall these results provide further corroboration that my analysis and conclusions are robust with respect to specification uncertainty.

(133)    As mentioned in Section IV.A.4.b, I also examined the effect of including variables corresponding to conspirators' panel cost data, LCD panel production capacity, and CRT prices. I reiterate that I regard the inclusion of these variables as inappropriate inasmuch as the first is of dubious quality for this purpose, and the second two were likely influenced significantly by the conspiracy. For large panels, including them tends to increase estimated overcharges (in one instance leaving them largely unaffected). For small panels, the addition of these variables somewhat reduces the overcharge estimates for both scenarios.

**Figure 19: Comparison of estimated overcharges when variables affected by conspiracy are included**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Parsimonious model | 18.9% | 17.8% |
|  | With capacity | 26.5% | 19.8% |
|  | With CRT prices | 22.4% | 17.3% |
|  | With defendant cost index | 24.1% | 23.3% |
| Small TFT panels | Parsimonious model | 25.5% | 18.8% |
|  | With capacity | 21.8% | 13.2% |
|  | With CRT prices | 18.6% | 15.4% |
|  | With defendant cost index | 24.6% | 13.0% |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

# IV.C. Corroborating analyses

(134)   This section examines the sensitivity of the preceding results to alternative econometric specifications and procedures. It provides further corroboration that my conclusions are robust and, if anything, conservative.

## IV.C.1. Estimation technique (OLS vs. ridge)

(135)   As discussed above, I estimated the coefficients of the various models using ridge regression, a well-known shrinkage estimator. Because OLS is also widely employed, I explored whether its use might alter my results. On the contrary, the table below shows that the weighted average overcharge estimates change by trivial amounts for my preferred parsimonious specification.

**Figure 20: Comparison of estimated overcharges using ridge regression versus OLS**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Ridge regression | 18.9% | 17.8% |
|  | OLS | 19.0% | 17.8% |
| Small TFT panels | Ridge regression | 25.5% | 18.8% |
|  | OLS | 25.8% | 18.8% |

## IV.C.2. Static prediction model

(136)   As I have emphasized, it is generally advisable to use dynamic prediction models that include lagged prices. However, because the use of static models is not uncommon, I explored their implications.[139] As shown in the next figure, static models generally yield similar overcharge estimates for my preferred specification – a bit larger in the case of large panels, and a bit smaller in the case of small panels.

**Figure 21: Comparison of estimated overcharges using a dynamic prediction model versus a static prediction model**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Dynamic prediction | 18.9% | 17.8% |
|  | Static prediction | 21.9% | 18.4% |
| Small TFT panels | Dynamic prediction | 25.5% | 18.8% |
|  | Static prediction | 22.1% | 18.0% |

---

[139]   The but-for price index is determined similarly for the static prediction equation approach. The difference is that the but-for price index is computed using the actual values of the supply and demand variables, but without using the values of the price index in the preceding months.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                          Page 60

### IV.C.3. Dynamic dummy variable approach

(137)    I have explained that the prediction equation approach is generally more reliable than the dummy variable approach. However, because both approaches are generally accepted, I also explored the implications of models with cartel dummies. The table below compares the estimated overcharges derived from both approaches for my preferred specification.[140]  I estimated three distinct dummy variable specifications, differentiated according to whether the model included (1) a separate dummy variable for each quarter during the conduct period, (2) a separate dummy variable for each year during the conduct period, and (3) a single dummy variable for the entire conduct period. Although I prefer the prediction equation approach, these results show that my conclusions are robust with respect to this alternative method. For small panels, the use of a single cartel dummy variable leads to the greatest reduction in the overcharge estimates, but for the reasons discussed in Section IV.A.2, it is also the most problematic of these approaches.

**Figure 22: Comparison of estimated overcharges using a dynamic prediction model versus a dynamic dummy variable model**

|  | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Dynamic prediction | 18.9% | 17.8% |
|  | Dummy variable: quarterly | 19.0% | 18.1% |
|  | Dummy variable: annual | 19.8% | 16.6% |
|  | Dummy variable: single | 17.7% | 15.5% |
| Small TFT panels | Dynamic prediction | 25.5% | 18.8% |
|  | Dummy variable: quarterly | 25.0% | 19.2% |
|  | Dummy variable: annual | 26.8% | 19.3% |
|  | Dummy variable: single | 25.2% | 14.9% |

### IV.C.4. Static dummy variable approach

(138)    I have also examined static versions of the same dummy variable models. The table below compares the resulting overcharge estimates to those based on the dynamic prediction model for my preferred specification.[141] Although I strongly prefer the latter approach, these results show that my conclusions are again robust with respect to the choice of method.

---

[140]    For the dynamic dummy variable approach, the but-for price index is computed using the actual values of the supply and demand variables, the values of the but-for price index in the preceding months,  and the estimated value of the statistical disturbance term, but with the dummy variable(s) set  to have a value of zero during the conduct period.

[141]    The calculation is the same as with the dynamic dummy variable approach except that the values of the but-for price index in the preceding months are not included in the model.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 23: Comparison of estimated overcharges using a dynamic prediction model versus a static dummy variable model**

| | Model alternative | Conspiracy period | Plea period |
|---|---|---|---|
| Large TFT panels | Dynamic prediction | 18.9% | 17.8% |
| | Dummy variable: quarterly | 21.6% | 18.5% |
| | Dummy variable: annual | 20.1% | 17.1% |
| | Dummy variable: single | 17.0% | 18.1% |
| Small TFT panels | Dynamic prediction | 25.5% | 18.8% |
| | Dummy variable: quarterly | 22.1% | 18.2% |
| | Dummy variable: annual | 24.1% | 18.2% |
| | Dummy variable: single | 19.1% | 17.6% |

## IV.D. Conspirators' investment and production decisions at non-conspiratorial pricing levels

(139)    In reaching my opinions, I considered whether the lower price levels implied by my analyses are consistent with the levels of investment and production required to satisfy demand at those prices. In making this evaluation, it is important to bear two considerations in mind. First, as I have explained previously, the price elasticity of the derived demand for LCD products is likely quite low. As a result, lower prices for LCD panels would not have generated a sharp increase in demand. Second, the conspirators would not have had the benefit of 20-20 hindsight. The important consideration is not whether the investments actually would have turned out to be profitable at the lower prices, but rather whether the conspirators would have expected them to be profitable. To make that evaluation, it is appropriate to consider the information, methods, and criteria that were actually used by the relevant decision makers at the relevant points in time.

(140)    I have reviewed the analyses performed by Prof. Stowell, who addressed the issue of anticipated profitability and reached the following conclusions:

> "Defendants had high expectations during the Conspiracy Period regarding the future growth potential and profitability of the LCD panel market. Defendants' investment activity during the Conspiracy Period reflects their high growth expectations. It is my opinion that, even if the but-for prices included in the Bernheim Report were applicable during the Conspiracy Period, Defendants would have proceeded with the fab investments that they committed to. This is because, even with but-for pricing, the Defendants expectations regarding investments would have been sufficient to encourage these investments. Furthermore, government involvement in making investment capital readily available to LCD manufacturers, combined with positive operating cash flows for the industry as a whole, would have ensured that investment capital was readily available to fund those investments. It is therefore my opinion that

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

operating with but-for prices throughout the Conspiracy Period would not have caused Defendants to curtail investments in fabs or to shut down operations as a result of operating cash flow constraints."[142]

(141)    In my opinion, Prof. Stowell's analysis is sound and he has made a compelling case for his conclusions. Consequently, I see no reason to think that the lower price levels implied by my analyses are in any way inconsistent with the levels of investment and production required to meet demand at those prices.

---

[142]  Expert Report of David Stowell, paragraph 7.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# V. Damages

(142)    The next step in my analysis was to estimate the damages associated with overcharges on Motorola's purchases from the defendants. In principle, two distinct approaches are available: one can either infer overcharges for Motorola based on the conspiracy's market-wide effects (i.e., the analysis of Section 4), or estimate an entirely separate model of prices for Motorola. In my judgment, the first approach leads to more reliable conclusions for three reasons. First, data on Motorola's transactions cover a narrow time period, and in particular there are no pre-conspiracy purchases. As a result, stand-alone models of price dynamics for Motorola are considerably less robust. Second, as I show below, a Motorola price index tracks my small panel price index extremely closely for the period of time during which both are available. Thus there is no reason to think that Motorola's pricing followed a substantially different process. Third, any purchaser-specific price index is necessarily "noisier" (e.g., more susceptible to measurement error and isolated, unrepresentative events) than an industry-wide index, which likely does a better job of capturing patterns driven by the market-wide conspiracy. Thus, when a purchaser-specific and market-wide index differ, the latter is likely more representative of the factors driving the evolution of the purchaser's prices.

(143)    The table below summarizes Motorola's purchases of small LCD panels from conspirators.

**Figure 24: Summary of Motorola's purchases from conspirators**

| Supplier | Conspiracy period purchases | Plea period purchases |
|---|---|---|
| AUO | $ 355,060,000 | $ 355,060,000 |
| EPSON | $ 903,920,000 | $ 903,920,000 |
| HITACHI | $ 2,500 | $ 2,500 |
| PHILIPS | $ 4,660,000 | $ 4,660,000 |
| SAMSUNG SDI | $ 724,220,000 | $ 724,220,000 |
| SAMSUNG SEC | $ 1,189,010,000 | $ 1,189,010,000 |
| SANYO | $ 457,620,000 | $ 457,620,000 |
| SHARP | $ 1,368,350,000 | $ 1,368,340,000 |
| TOSHIBA | $ 382,390,000 | $ 382,390,000 |
| **Total** | **$ 5,385,232,500** | **$ 5,385,222,500** |

(144)    Using the approach discussed in Section IV.A.1, I created a Fisher price index for Motorola's purchases of LCD panels from defendants. The index shows how the prices paid by Motorola evolved over time, accounting for changes in the composition of products purchased.

(145)    The Motorola price index is depicted in the figure below, along with the small panel price index from Section IV.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, Ph.D.                                                              V. Damages

**Figure 25: Comparison of the Motorola price index to the small panel market price index**



(146)   As the figure shows, Motorola's prices evolved through time in a manner that tracked the industry-wide small panel index extremely closely.

(147)   I also examined the statistical relationship between these two price indices. In a regression of Motorola's price index on the small panel market price index over the conspiracy period, the estimated coefficient of the latter was 1.0, indicating that the co-movements of these variables are essentially one for one. Accordingly, it is appropriate to take the market-wide index as representative of Motorola.

(148)   To compute overcharges on Motorola's purchases, I multiplied the small panel percentage overcharge for a given month by the total amount Motorola paid for small panels during that month, and then summed over months. The tables below show the resulting overcharge estimates.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, Ph.D.                                                    V. Damages

**Figure 26: Summary of Motorola's overcharges under the conspiracy period scenario**

| Supplier | Conspiracy period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 23.9% | $ 84,850,000 | $ 254,550,000 |
| EPSON | $ 903,920,000 | 21.0% | $ 190,220,000 | $ 570,660,000 |
| HITACHI | $ 2,500 | 4.0% | $ 100 | $ 300 |
| PHILIPS | $ 4,660,000 | 39.1% | $ 1,820,000 | $ 5,460,000 |
| SAMSUNG SDI | $ 724,220,000 | 15.9% | $ 114,850,000 | $ 344,550,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 24.6% | $ 292,910,000 | $ 878,730,000 |
| SANYO | $ 457,620,000 | 34.7% | $ 158,700,000 | $ 476,100,000 |
| SHARP | $ 1,368,350,000 | 19.0% | $ 259,550,000 | $ 778,650,000 |
| TOSHIBA | $ 382,390,000 | 19.2% | $ 73,290,000 | $ 219,870,000 |
| **Grand Total** | **$ 5,385,232,500** | **21.8%** | **$ 1,176,190,100** | **$ 3,528,570,300** |

**Figure 27: Summary of Motorola's overcharges under the plea period scenario**

| Supplier | Plea period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 18.3% | $ 65,150,000 | $ 195,450,000 |
| EPSON | $ 903,920,000 | 15.7% | $ 142,120,000 | $ 426,360,000 |
| HITACHI | $ 2,500 | 0.0% | $ - | $ - |
| PHILIPS | $ 4,660,000 | 30.9% | $ 1,440,000 | $ 4,320,000 |
| SAMSUNG SDI | $ 724,220,000 | 10.9% | $ 79,150,000 | $ 237,450,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 18.5% | $ 220,330,000 | $ 660,990,000 |
| SANYO | $ 457,620,000 | 27.7% | $ 126,920,000 | $ 380,760,000 |
| SHARP | $ 1,368,340,000 | 13.5% | $ 184,550,000 | $ 553,650,000 |
| TOSHIBA | $ 382,390,000 | 13.6% | $ 52,010,000 | $ 156,030,000 |
| **Grand Total** | **$ 5,385,222,500** | **16.2%** | **$ 871,670,000** | **$ 2,615,010,000** |

(149)    Based on economic and statistical principles, extensive sensitivity analyses, and corroborating methods, I am of the opinion that my damages estimates are reliable and, if anything, conservative.

(150)    I was also asked to estimate Motorola's overcharges associated with its claims for breach of contract and unjust enrichment. For the relevant defendants, the calculations involved in this are identical to those discussed above, and hence the resulting overcharges are identical to those provided in the above tables.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, Ph.D.                                    V. Damages

**Figure 28: Summary of Motorola's overcharges under the conspiracy period scenario associated with its claims for breach of contract and unjust enrichment**

| Supplier | Conspiracy period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 23.9% | $ 84,850,000 | $ 254,550,000 |
| EPSON | $ 903,920,000 | 21.0% | $ 190,220,000 | $ 570,660,000 |
| PHILIPS | $ 4,660,000 | 39.1% | $ 1,820,000 | $ 5,460,000 |
| SAMSUNG SDI | $ 724,220,000 | 15.9% | $ 114,850,000 | $ 344,550,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 24.6% | $ 292,910,000 | $ 878,730,000 |
| SANYO | $ 457,620,000 | 34.7% | $ 158,700,000 | $ 476,100,000 |
| SHARP | $ 1,368,350,000 | 19.0% | $ 259,550,000 | $ 778,650,000 |
| TOSHIBA | $ 382,390,000 | 19.2% | $ 73,290,000 | $ 219,870,000 |
| **Grand Total** | **$ 5,385,230,000** | **21.8%** | **$ 1,176,190,000** | **$ 3,528,570,000** |

**Figure 29: Summary of Motorola's overcharges under the plea period scenario associated with its claims for breach of contract and unjust enrichment**

| Supplier | Plea period purchases | Overcharge percentage | Overcharges | Treble overcharges |
|---|---|---|---|---|
| AUO | $ 355,060,000 | 18.3% | $ 65,150,000 | $ 195,450,000 |
| EPSON | $ 903,920,000 | 15.7% | $ 142,120,000 | $ 426,360,000 |
| PHILIPS | $ 4,660,000 | 30.9% | $ 1,440,000 | $ 4,320,000 |
| SAMSUNG SDI | $ 724,220,000 | 10.9% | $ 79,150,000 | $ 237,450,000 |
| SAMSUNG SEC | $ 1,189,010,000 | 18.5% | $ 220,330,000 | $ 660,990,000 |
| SANYO | $ 457,620,000 | 27.7% | $ 126,920,000 | $ 380,760,000 |
| SHARP | $ 1,368,340,000 | 13.5% | $ 184,550,000 | $ 553,650,000 |
| TOSHIBA | $ 382,390,000 | 13.6% | $ 52,010,000 | $ 156,030,000 |
| **Grand Total** | **$ 5,385,220,000** | **16.2%** | **$ 871,670,000** | **$ 2,615,010,000** |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.


_____                    December 15, 2011
                                                   _____

B. Douglas Bernheim, PhD                           Date


CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                           Page 68

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# Appendix A. CV

## B. Douglas Bernheim

## A.1. Summary of experience

Douglas Bernheim is the Edward Ames Edmunds Professor of Economics at Stanford University. He works with Bates White professionals and clients to provide intellectual leadership in antitrust litigation, mergers and acquisitions, and telecommunications. Dr. Bernheim has more than 25 years of experience and is a recognized leader in the academic community for his many contributions in the areas of industrial organization, public finance, applied econometrics, and microeconomic theory.

Dr. Bernheim regularly consults with attorneys on the economic aspects of antitrust litigation. He provides expert testimony in high profile litigation, mergers, and regulatory matters on such topics as market definition, competitive impact, countervailing efficiencies, monopolization, antitrust liability, and damages. He has authored numerous expert reports and assessed liability or damages for industries including microprocessors, healthcare and pharmaceuticals, vitamins, financial markets, telecommunications, railroads, airlines and aerospace, and manufactured products.

Dr. Bernheim is the author of more than 125 publications, including 60 peer-reviewed journal articles, four books, and many other professional and academic publications. He holds multiple distinctions, including John Simon Guggenheim Memorial Foundation Fellowship, Center for Advanced Study in the Behavioral Sciences Fellow, American Academy of Arts and Sciences Fellow, and Econometric Society Fellow.

## A.2. Areas of expertise

- Antitrust damages
- Antitrust liability
- Industrial organization and game theory
- Mergers and acquisitions
- Public finance
- Statistics and econometrics
- Telecommunications

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

## A.3. Testimony

My sworn testimony over the last four years is as follows:

- *Adelphia Recovery Trust V. Bank of America, N.A.,* United States Bankruptcy Court for the Southern District of New York. Expert report and deposition testimony 2010.

- *Adelphia Communications Corporation v. Motorola, Inc.,* United States Bankruptcy Court for the Southern District of New York. Expert report and deposition testimony: 2009.

- *Advanced Micro Devices, Inc. et al v. Intel Corporation et al.,* United States District Court for the District of Delaware. Expert report: 2009.

- *Amgen, Inc. v. F. Hoffman-La Roche Ltd..,* United States District Court for the District of Massachusetts. Expert report, deposition testimony, and hearing testimony: 2007.

- *Enron Creditors Recovery Corp. v. Citigroup Inc.*, United States Bankruptcy Court for the Southern District of New York. Expert report and deposition testimony: 2007.

## A.4. Education

- PhD, Massachusetts Institute of Technology

- AB, Harvard University, *Summa Cum Laude*

## A.5. Editorial boards

- *American Economic Review*, Co-editor 2002–2005, Associate Editor 2005–2006

- *Journal of Public Economics*, Associate Editor 1998–2002

- *Journal of Financial Intermediation*, Co-editor, 1989–1993

- *Econometrica*, Associate Editor, 1987–1990

- *Quarterly Journal of Economics*, Associate Editor, 1984–1990

## A.6. Selected publications

### A.6.a. Research papers in academic journals

- "A Solution Concept for Majority Rule in Dynamic Settings," *Review of Economic Studie*s, 76(1), January 2009, 33-62 (with Sita Nataraj).

- "On the Potential of Neuroeconomics: A Critical (but Hopeful) Appraisal," *AEJ: Microeconomics*, 1(2), August 2009, 1-41.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- "The Effects of Financial Education in the Workplace: Evidence from a Survey of Employers," *Economic Inquiry*, 47(4), October 2009, 605-624 (with Patrick Bayer and John Karl Scholz).

- "Behavioral Welfare Economics," *Journal of the European Economic Association*, 7(2-3), April 2009, 267–319.

- "Beyond Revealed Preference: Choice-Theoretic Foundations for Behavioral Welfare Economics," *Quarterly Journal of Economics*, 124(1), February 2009, 51–104 (with Antonio Rangel).

- "Social Image and the 50-50 Norm: A Theoretical and Experimental Analysis of Audience Effects," *Econometrica*, 77, no. 5(2009): 1607–36 (with James Andreoni).

- "Toward Choice-Theoretic Foundations for Behavioral Welfare Economics," *American Economic Review Papers and Proceedings*, 97(2), May 2007, 464–470 (with Antonio Rangel).

- "From Neuroscience to Public Policy: A New Economic View of Addiction," *Swedish Economic Policy Review*, 2006 (with Antonio Rangel).

- "Saving and Life Insurance Holdings at Boston University—a Unique Case Study," *National Institute Economic Review*, 198, Oct 2006, 75–96 (with Solange Berstein, Jagadeesh Gokhale, and Laurence J. Kotlikoff).

- "The Power of the Last Word in Legislative Policy Making," *Econometrica*, 74(5), September 2006, 1161–90 (with Antonio Rangel and Luis Rayo).

- "How Do Residents Manage Personal Finances?" *American Journal of Surgery*, 189(2), February 2005, 134–139 (with Joel Teichman, Patricia Cecconi, Neva Kerbeshian, Manoj Monga, Debra DaRosa, and Martin Resnick).

- "Memory and Anticipation," *Economic Journal*, 115, April 2005, 271–304 (with Raphael Thomadsen).

- "Addiction and Cue-Triggered Decision Processes," *American Economic Review*, 94(5), December 2004, 1558–1590 (with Antonio Rangel).

  - Reprinted in *The Economics of Health Behaviours*, John H. Cawley and Donald S. Kenkel (eds.), Edward Elgar Publishing Ltd.: London, 2008.

  - Reprinted in *The New Behavioral Economics*, Elias L. Khalil (ed.), Edward Elgar Publishing, Ltd.: London, 2009.

- "Do Estate and Gift Taxes Affect the Timing of Private Transfers?" *Journal of Public Economics*, 88(12), December 2004, 2617–2634 (with Robert Lemke and John Karl Scholz).

- "Are Life Insurance Holdings Related to Financial Vulnerabilities?" *Economic Inquiry* 41(4), October 2003, 531–54 (with Katherine Carman, Jagadeesh Gokhale, and Laurence Kotlikoff).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                    Page A-3

- "Bequests as Signals: An Explanation for the Equal Division Puzzle," *Journal of Political Economy* 111(4), August 2003, 733–764 (with Sergei Severinov).

- "The Effects of Financial Education in the Workplace: Evidence from a Survey of Households," *Journal of Public Economics* 87(7–8), August 2003, 1487–1519 (with Daniel M. Garrett).

- "The Mismatch Between Life Insurance and Financial Vulnerabilities: Evidence from the Health and Retirement Survey," *American Economic Review* 93(1), March 2003, 354–365 (with Lorenzo Forni, Jagadeesh Gokhale, and Laurence Kotlikoff).

- "Education and Saving: The Long-Term Effects of High School Financial Curriculum Mandates," *Journal of Public Economics*, 80(3), June 2001, 435–465 (with Daniel M. Garrett and Dean Maki).

- "How Do Urology Residents Manage Personal Finances?" *Urology*, 57(5), 2001, 866–871 (with Joel Teichman, Eric Espinosa, Patricia Parker, Joana Meyer, Margaret Pearle, Glenn Preminger, and Raymond Leveille).

- "Optimal Money Burning: Theory and Application to Corporate Dividend Policy," *Journal of Economics and Management Science* 10(4), Winter 2001, 463–507 (with Lee Redding).

- "What Accounts for the Variation in Retirement Saving Across U.S. Households?" *American Economic Review*, 91(4), September 2001, 832–857 (with Jonathan Skinner and Steven Weinberg).

- "How Much Should Americans be Saving for Retirement?" *American Economic Review Papers and Proceedings*, 90(2), May 2000, 288–292.

- "Exclusive Dealing," *Journal of Political Economy*, 106(1), February 1998, 64–103 (with Michael Whinston).

- "Incomplete Contracts and Strategic Ambiguity," *American Economic Review*, 88(4), September 1998, 902–932 (with Michael Whinston).

- "Rational Strategic Choice Revisited," *Scandinavian Journal of Economics* 100, no. 2 (1998): 537–541.

- "Veblen Effects in a Theory of Conspicuous Consumption," *American Economic Review*, 86(3), June 1996, 349–373 (with Laurie Simon Bagwell).

- "A Tax-Based Test of the Dividend Signaling Hypothesis," *American Economic Review*, 85(3), June 1995, 532–551 (with Adam Wantz).

- "Repeated Games with Asymptotically Finite Horizons," *Journal of Economic Theory*, 67(1), October 1995, 129–152 (with Aniruddha Dasgupta).

- "A Theory of Conformity," *Journal of Political Economy* 102(5), October 1994, 841–877.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

■ "Private Saving and Public Policy," *Tax Policy and the Economy* 7, 1993, 73–110 (with J. Karl Scholz).

■ "Fiscal Policy with Impure Intergenerational Altruism," *Econometrica* 59 (6), November 1991, 1687–1712 (with Andrew Abel).

■ "How Strong are Bequest Motives? Evidence Based on Estimates of the Demand for Life Insurance and Annuities," *Journal of Political Economy* 99 (5), October 1991, 899–927.

■ "Tax Policy and the Dividend Puzzle," *Rand Journal of Economics* 22 (4), Winter 1991, 455–476.

■ "Multimarket Contact and Collusive Behavior," *Rand Journal of Economics* 21 (1), Spring 1990, 1–26 (with Michael Whinston).

  ☐ Reprinted in L. Cabral (ed.), *Readings in Industrial Organization*, Oxford: Blackwell, 2000, 71–102.

  ☐ Reprinted in S. Salant and M. Levenstein (eds.), *Cartels*, Edward Elgar Publishing Ltd.: Cheltenham, 2007.

■ "A Neoclassical Perspective on Budget Deficits," *Journal of Economic Perspectives* 3, Spring 1989, 55–72.

  ☐ Reprinted in G. Wood and L. Kaounides (eds.), *Debt and Deficits, Vol. 3: Debt Neutrality and the Theory of Fiscal Policy, 1970s to 1990s*, Edward Elgar Publishing Ltd.: London, 1992, 431–48.

  ☐ Translated into Italian and reprinted in G. Eusepi (ed.), Rassegna di lavori dell' ISCO, ISCO: Rome, 1993.

■ "Collective Dynamic Consistency in Repeated Games," *Games and Economic Behavior* 1 (4), December 1989, 295–326 (with Debraj Ray).

■ "Incentive Effects of the Corporate Alternative Minimum Tax," *Tax Policy and the Economy* 3, 1989, 69–96.

■ "Intergenerational Altruism, Dynastic Equilibria and Social Welfare," *Review of Economic Studies* 56, January 1989, 119–128.

■ "Markov Perfect Equilibria in Altruistic Growth Economies with Production Uncertainty," *Journal of Economic Theory* 47, February 1989, 195–202 (with Debraj Ray).

■ "Social Security and Saving: An Analysis of Expectations," *American Economic Review*, Papers and Proceedings 79, May 1989, 97–102 (with Lawrence Levin).

■ "Altruism within the Family Reconsidered: Do Nice Guys Finish Last?" *American Economic Review* 78, December 1988, 1034–1045 (with Oded Stark).

- □ Reprinted in Steven Zamagni (ed.), *The Economics of Altruism*, Edward Elgar Publishing Ltd: London, 1993.

- "Budget Deficits and the Balance of Trade," *Tax Policy and the Economy* 2, 1988, 1–32.

- "Comparable Worth in a General Equilibrium Model of the U.S. Economy," *Research in Labor Economics* 9, 1988, 1–52 (with Perry Beider, Victor Fuchs, and John Shoven).

- "Is Everything Neutral?" *Journal of Political Economy* 96 (2), 1988, 308–338 (with Kyle Bagwell).

  - □ Reprinted in K.D. Hoover (ed.), *The New Classical Macroeconomics*, Edward Elgar Publishing Ltd: London, 1992, 166–207.

- "Coalition Proof Nash Equilibria I: Concepts," *Journal of Economic Theory* 42 (1), June 1987, 1–12 (with Bezalel Peleg and Michael Whinston).

- "Coalition Proof Nash Equilibria II: Applications," *Journal of Economic Theory* 42 (1), June 1987, 13–29 (with Michael Whinston).

- "Does the Estate Tax Raise Revenue?" *Tax Policy and the Economy* 1, 1987, 113–138.

  - □ Reprinted in P. Caron, K. Burke and G. McCouch (eds.), *Federal Transfer Tax Anthology*, Anderson Publishing Company, 1998.

- "Economic Growth with Intergenerational Altruism," *Review of Economic Studies* 54 (2), April 1987, 227–242 (with Debraj Ray).

- "Ricardian Equivalence: An Evaluation of Theory and Evidence," *NBER Macro Annual* 2, 1987, 263–304.

  - □ Reprinted in G. Wood and L. Kaounides (ed.), *Debt and Deficits, Vol. 3: Debt Neutrality and the Theory of Fiscal Policy, 1970s to 1990s*, Edward Elgar Publishing Ltd.: London, 1992.

- "The Economic Effects of Social Security: Towards a Reconciliation of Theory and Measurement," *Journal of Public Economics* 33 (3), August 1987, 273–304.

- "Axiomatic Characterizations of Rational Choice in Strategic Environments," *Scandinavian Journal of Economics* 88 (3), 1986, 473–488.

- "Common Agency," *Econometrica* 54 (4), July 1986, 923–942 (with Michael Whinston).

- "Menu Auctions, Resource Allocation, and Economic Influence," *Quarterly Journal of Economics* 101 (1), February 1986, 1–31 (with Michael Whinston).

  - □ Reprinted in P. Bolton (ed.), *The Economics of Contracts*, International Library of Critical Writings in Economics, Edward Elgar Publishing Ltd.: London, 2009.

- "On the Existence of Markov-Consistent Plans Under Production Uncertainty," *Review of Economic Studies* 53 (5), October 1986, 877–882 (with Debraj Ray).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- "On the Voluntary and Involuntary Provision of Public Goods," *American Economic Review* 76 (4), September 1986, 789–793.

- "Common Marketing Agency as a Device for Facilitating Collusion," *Rand Journal of Economics* 16 (2), Summer 1985, 269–281 (with Michael Whinston).

  □ Reprinted in S. Salant and M. Levenstein (eds.), *Cartels*, Edward Elgar Publishing Ltd: London, 2007.

- "The Strategic Bequest Motive," *Journal of Political Economy* 93 (6), December 1985, 1045–1076 (with Andrei Shleifer and Lawrence Summers).

  □ Reprinted in Nancy Folbre (ed.), *The Economics of the Family*, International Library of Critical Writings in Economics, Edward Elgar, 1996.

- "Rationalizable Strategic Behavior," *Econometrica* 52 (4), July 1984, 1007–1028.

  □ Reprinted in Eric Maskin (ed.), *Recent Developments in Game Theory*, International Library of Critical Writings in Economics, Edward Elgar, 1999.

- "Strategic Deterrence of Sequential Entry into an Industry," *Rand Journal of Economics* 15 (1), Spring 1984, 1–11.

- "A Note on Dynamic Tax Incidence," *Quarterly Journal of Economics* 96 (4), November 1981, 705–23.

  □ Reprinted in Don Fullerton and Gilbert Metcalf (eds.), *The Distribution of Tax Burdens*, International Library of Critical Writings in Economics, Edward Elgar Publishing Ltd: London, 2003.

## A.6.b. Research papers published in books and conference volumes

- "The Psychology and Nuerobiology of Judgment and Decision-Making: What's in it for Economists?" in P. W. Glimcher, E. Fehr, C. F. Camerer, and R. A. Poldrack (eds.), *Neuroeconomics: Decision Making and the Brain*, New York: Elsevier, 2008, pp. 115–125.

- "Choice-Theoretic Foundations for Behavioral Welfare Economics," in Andrew Caplin and Andrew Schotter (eds.), *The Foundations of Positive and Normative Economics*, Oxford: Oxford University Press, 2008 (with Antonio Rangel).

- "Behavioral Public Economics: Welfare and Policy Analysis with Fallible Decision-Makers," in Peter Diamond and Hannu Vartianen (eds.) *Behavioral Economics and its Applications,* Princeton University Press, 2007 (with Antonio Rangel).

  □ Translated into Chinese and reprinted in the *Nanjing Business Review*, forthcoming.

- "An Economic Approach to Setting Retirement Saving Goals," in Olivia Mitchell, Zvi Bodie, Brett Hammond, and Steven Zeldes (eds.), *Innovations in Financing Retirement*, University of

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Pennsylvania Press, Pension Reserach Council, the Wharton School, University of Pennsylvania, 2002, pp. 77–105 (with Lorenzo Forni, Jagadeesh Gokhale, and Laurence Kotlikoff).

- "Taxation and Saving," in Alan Auerbach and Martin Feldstein (eds.), *Handbook of Public Economics*, Volume 3, North-Holland, 2002, 1173–1249.

- "Household Financial Planning and Financial Literacy: The Need for New Tools," in Laurence J. Kotlikoff (ed.), *Essays on Saving, Bequests, Altruism, and Life-Cycle Planning*, MIT Press: Cambridge, 2001, 427–77.

- "Financial Illiteracy, Education, and Retirement Saving," in Olivia S. Mitchell and Sylvester J. Schieber (eds.), *Living with Defined Contribution Pensions,* University of Pennsylvania Press, Pension Research Council, the Wharton School, University of Pennsylvania, 1998, 38–68.

- "Taxation and Saving: A Behavioral Perspective," 1996 *Proceedings of the Eighty-Ninth Annual Conference on Taxation*, National Tax Association, Washington, DC, 1997, 28–36.

- "The Adequacy of Personal Retirement Saving: Issues and Options," in David Wise (ed.), *Facing the Age Wave*, Hoover Institution Press: Stanford, CA, 1997, 30–56.

- "Rethinking Saving Incentives," in A. Auerbach (ed.), *Fiscal Policy: Lessons From Economic Research*, MIT Press: Cambridge, MA, 1997, 259–311.

- "Do Households Appreciate Their Financial Vulnerabilities? An Analysis of Actions, Perceptions, and Public Policy," *Tax Policy and Economic Growth*, Washington, DC: American Council for Capital Formation, 1995, 1–30.

- "Personal Saving, Information, and Economic Literacy: New Directions for Public Policy," in *Tax Policy for Economic Growth in the 1990s*, Washington, DC: American Council for Capital Formation, 1994, 53–78.

- "Comparing the Cost of Capital in the United States and Japan," in N. Rosenberg, R. Landau, and D. Mowery (eds.), *Technology and the Wealth of Nations*, Stanford University Press: Stanford, CA, 1992, 151–174.

- "Consumption Taxation in a General Equilibrium Model: How Reliable are Simulation Results?" in B.D. Bernheim and J.B. Shoven (eds.), *National Saving and Economic Performance*, NBER University of Chicago Press: Chicago, 1991, 131–158 (with J. Karl Scholz and John Shoven).

- "How do the Elderly Form Expectations? An Analysis of Responses to New Information," in D. Wise (ed.), *Issues in the Economics of Aging*, NBER-University of Chicago Press: Chicago, 1990, 259–283.

- "The Crisis in Deposit Insurance: Issues and Options," in S. Greenbaum (ed.), *Capital Issues in Banking*, Association of Reserve City Bankers, 1989, 160–197.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- "The Timing of Retirement: A Comparison of Expectations and Realizations," in D. Wise (ed.), *The Economics of Aging*, NBER-University of Chicago Press: Chicago, 1989, 335–355.

- "Social Security Benefits: An Empirical Study of Expectations and Realizations," in E. Lazear and R. Ricardo-Campbell (eds.), *Issues in Contemporary Retirement*, Hoover Institution Press: Stanford, 1988, 312–345.

- "Pension Funding and Saving," in Z. Bodie, J. Shoven and D. Wise (eds.), *Pensions in the U.S. Economy*, NBER-University of Chicago Press: Chicago, 1988, 85–111 (with John Shoven).

  - Reprinted in Maria O'Brien Hylton (ed.), *Cases and Materials on Employee BenefitsLaw*, West Publishing Company.

- "Taxation and the Cost of Capital: An International Comparison," in Walker and Bloomfield (eds.), *The Consumption Tax: A Better Alternative?* Ballinger Publishing Co., 1987 (with John Shoven).

  - Translated into French and reprinted in *Annales d'Economie et de Statistique* 11, 1988, 93–116.

- "Dissaving After Retirement: Testing the Pure Life Cycle Hypothesis," in Z. Bodie, J. Shoven and D. Wise (eds.), *Issues in Pension Economics*, NBER-University of Chicago Press: Chicago, 1987, 237–282.

## A.6.c. Reviews and comments

- Comment on "Family Bargaining and Retirement Behavior," in Henry Aaron (ed.), *Behavioral Economics and Retirement Policy*, Brookings Institution, Press, 1999, 273–281.

- Comment on "Measuring Poverty Among the Elderly," in David A. Wise (ed.), *Inquiries in the Economics of Aging*, NBER-University of Chicago Press, 1998, 200–204.

- Comment on "The Effects of Fundamental Tax Reform on Saving," in Henry J. Aaron and William G. Gale (eds.), *Economic Effects of Fundamental Tax Reform*, Brookings Institution: Washington, D.C., 1996, 112–117.

- Comment on "Do Saving Incentives Work?" *Brookings Papers on Economic Activity* (1), 1994, 152–166.

- Comment on "401(k) Plans and Tax Deferred Saving" and "Some Thoughts on Saving," in D. Wise (ed.), *Studies in the Economics of Aging*, NBER-University of Chicago Press, 1994, 171–179.

- Comment on "Repackaging Ownership Rights and Multinational Taxation: The Case of Withholding Taxes," *Journal of Accounting, Auditing and Finance* 6 (4), Fall 1991, 533–536.

- Comment on "Optimal Fiscal and Monetary Policy: Some Recent Results," *Journal of Money, Credit, and Banking* 23 (3), August 1991, 540–542.

- "Pondering Pensions," review of *Pensions, Economics, and Public Policy*, by Richard Ippolito, Regulation, November/December 1986, 53–55.

## A.6.d. Books

- *Intermediate Microeconomics*, McGraw-Hill, December 2007 (with Michael Whinston).

- *Anticompetitive Exclusion and Foreclosure through Vertical Agreements*, CORE Lecture Series, Center for Operations Research and Econometrics, Université Catholique de Louvain, 1999 (with Michael Whinston).

- *National Saving and Economic Performance*, NBER-University of Chicago Press: Chicago, 1991 (co-editor, with J.B. Shoven).

- *The Vanishing Nest Egg: Reflections on Saving in America*, Twentieth Century Fund/Priority Press: New York, 1991.

## A.6.e. Editorials

- "A Country Without a Nest Egg," *Los Angeles Herald Examiner*, October 25, 1987, F1–F4.

- "Despite Recent Fixes, Social Security Still Faces Day of Reckoning," *Los Angeles Herald Examiner*, August 9, 1987, F3–F6.

- "The Wages of Haste in the Comparable Worth Debate," *Los Angeles Herald Examiner*, June 28, 1987, F1–F4.

- "Are the Deficit Worries Overblown?" *Los Angeles Herald Examiner*, April 12, 1987, F1–F4.

- "Tax Reform Will Force California to Rethink Goals," *Los Angeles Herald Examiner*, January 11, 1987, F1–F4.

- "Boesky Affair No Reason to Pass New Laws," *Los Angeles Herald Examiner*, December 7, 1986, F1–F4.

- "Congress Has Painted Itself into a Corner with Tax Reform," *Los Angeles Herald Examiner*, September 4, 1986, F1–F4.

## A.6.f. Other publications

- "Behavioral Public Economics," with Antonio Rangel, in the *New Palgrave Dictionary of Economics*, vol. 1, 2nd ed., eds. Steven N. Durlauf and Lawrence E. Blume (New York: MacMillan, 2008).

- "Taxes and Saving," in J. J. Cordes, R. D. Ebel, and J. G. Gravelle (eds.), *Encyclopedia of Taxation and Tax Policy*, Urban Institute Press: Washington D.C., 1999.

- *The Economic Role of Annuities,* Catalyst Institute, 1998 (with Patrick J. Bayer and Michael J. Boskin).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

- "Who Will Pay for Retirement in the 21st Century," NAVA Outlook, May/June 1995, 4(3), 1–3. "The Adequacy of Saving for Retirement and the Role of Economic Literacy," *Retirement in the 21st Century: Ready or Not?* Employee Benefit Research Institute, 1994, 73–81.

- "Do Americans Save Too Little?" *Federal Reserve Bank of Philadelphia Business Review,* September/October 1993, 3–20 (with J. Karl Scholz).

- *Is the Baby Boom Generation Saving Adequately for Retirement? Summary Report*, New York: Merrill Lynch, Pierce, Fenner & Smith Inc., January 1993, with updates for 1994, 1995, 1996, and 1997.

- "Premium Saving Accounts: A Proposal to Improve Tax Incentives for Saving," *LaFollette Policy Report* 5(1), Fall 1992, 1–2, 22–23.

## A.6.g. Unpublished research papers

- "Do Precommitment Opportunities Reduce Liquor Consumption? Evidence on the Effects of Blue Laws," January 2007 (with Jonathan Meer and Neva Novarro).

- "How Much Value Do Real Estate Brokers Add? A Case Study," July 2007, under review at the *American Economic Review* (with Jonathan Meer).

- "Precommitment and Power in Agenda Setting," August 2006 (with Silvia Console Battilana).

- "Self-Enforcing Cooperation with Graduated Punishments," July 2004 (with Dilip Abreu and Avinash Dixit).

- "Special Interest Politics and the Quality of Governance," October 2007 (with Navin Kartik).

- "Income Redistribution with Majoritarian Politics," May 2004 (with Sita Nataraj).

- "Self Control, Saving, and the Low Asset Trap." Mimeo, Stanford University, May 1999 (with Debraj Ray and Sevin Yeltekin).

## A.6.h. Work in progress

- "Are Preferences Identified?" (with Debraj Ray).

- "Identifying Choice Correspondences with Neural Evidence" (with Antonio Rangel and Colin Camerer).

- "Cheating within Imperfect Cartels."

- "Saving and Cue-Triggered Decision Processes" (with Antonio Rangel).

- "Memory and Re-experienced Utility" (with Peter Coles).

- "Power and Predictability in Legislative Bargaining."

- "The Effects of Marital Status Transitions on Living Standards" (with Laurence Kotlikoff, Katherine Carman, and Neva Kerbeshian).

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.                    Appendix A. CV

- "Multidirectional Signaling" (with Sergei Severinov).

- "Reinforcement Learning and Intertemporal Choice" (with Antonio Rangel).

## A.7. Honors and awards

- Global Competition Review's International Who's Who of Competition Economists, 2007–2010

- John Simon Guggenheim Memorial Foundation Fellowship, 2001–2002

- Fellow, Center for Advanced Study in the Behavioral Sciences, 2001–2002

- Fellow of the American Academy of Arts and Sciences, elected 1997

- Fellow of the Econometric Society, elected 1991

- ACCF Center for Policy Research Fellowship, 1994

- Alfred P. Sloan Foundation Research Fellow, 1987–1989

- NBER-Olin Research Fellow, 1985–1986

- Awarded Hoover National Fellowship, 1985–1986 (declined to accept NBER-Olin)

- National Science Foundation Graduate Fellowship, 1979–1982

- John H. Williams Prize, 1979 (first ranked graduate in Economics)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# Appendix B. Plaintiff summary

## B.1. Motorola Mobility

### B.1.a. Company Background

Motorola Mobility, Inc. ("Motorola Mobility"), a Delaware corporation with its principal place of business in Libertyville, Illinois, is a leading manufacturer of mobile wireless devices. Motorola Mobility substitutes for Motorola, Inc. as the plaintiff in this action. Motorola Mobility is asserting claims on behalf of itself and its affiliates, including the former affiliates of Motorola, Inc. which assigned their claims in this litigation to Motorola, Inc.:  Motorola Asia Limited, Motorola (China) Investment Limited, Hangzhou Motorola Cellular Equipment Co. Ltd., Motorola (China) Electronics Limited, Motorola Electronics Pte. Ltd., Motorola Trading Center Pte. Ltd., Motorola Asia Pacific Limited, Motorola Technology Sdn. Bhd., Motorola Limited, General Instrument of Taiwan, Ltd., Motorola GmbH, Motorola India Private Limited, Hangzhou Eastcom Cellular Phone Co., Ltd., Motorola Industrial Ltda., Motorola de Mexico, S.A., Motorola Korea, Inc., and Motorola de Nogales, S.A. de C.V. These entities were established to operate Motorola's Inc.'s manufacturing facilities throughout the world, or to distribute LCD Panels to Motorola's EMS providers.

### B.1.b. Procurement Background

At all relevant times, the Motorola global procurement teams based in Northern Illinois were responsible for selecting vendors of LCD panels, and for negotiating for the purchase of LCD products. These negotiations took place in the U.S. and around the world, with final approval on supplier selection and share awards always coming from the U.S.[143] Motorola purchased directly from LCD panel manufacturers.

Motorola employed a standard procurement process for its components, including LCD panels, which did not change much during or after the conspiracy period. From the beginning of the relevant period until approximately 2004, the Motorola unit responsible for negotiating price and quantity with mobile devices component suppliers was the Motorola Mobile Device Procurement team, part of Motorola's Mobile Device Supply Chain organization based and headquartered in Northern Illinois.[144] Other Motorola business units, such as the business unit serving government customers, had parallel Supply Chain organizations with global procurement teams, and those teams were also based and headquartered in Northern Illinois. These Motorola supply chain organizations forecasted

---

[143]  See e.g., Dep. of Theresa Metty at 76-77; 99-100; 259; Dep. of Janet Robinson at 117-120, 122; Motorola Deposition Exhibit 265.

[144]  See e.g., Motorola Deposition Exhibit 268, Motorola Deposition Exhibit 183.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

demand on a yearly basis and on a part-by-part basis, and the procurement teams issued requests for quotes for a particular display, usually on a yearly basis. For each request for quotes, a displays category manager from the mobile devices global procurement team based in Illinois would hold face-to-face meetings and telephone conferences with potential suppliers.[145]  These negotiations took place in the U.S. and around the world, with final approval on supplier selection and share awards from the U.S.[146]  The procurement team would notify suppliers of selection and certain share amounts to suppliers, typically via email or other correspondence and then a Motorola Supply Chain organization based in Illinois directed an automatic scheduling process translating the product demand for Motorola devices into the quantities of LCD panels necessary. These quantities were communicated to suppliers via a schedule-sharing process and resulting purchase orders.

Beginning in 2004, Motorola implemented a Global Supply Chain organization by consolidating its Supply Chain teams from the Mobile Devices, government, and other business units into a single Global Supply Chain organization.[147] The same structure was then in place across the different business units. In the Global Supply Chain, the Motorola unit responsible for negotiating price and quantity with display suppliers was the Motorola Procurement group, part of Motorola's Global Supply Chain organization and headquartered in Northern Illinois. As before, Motorola's procurement teams were based in Northern Illinois, and as before, a displays category manager from the global procurement team based in Illinois would hold meet with potential suppliers in the U.S. and around the world, with final approval on supplier selection and share awards from the U.S. The procurement team would notify suppliers of selection and certain share amounts to suppliers, typically via email or other correspondence. Then, as before, the Motorola Supply Chain organization based in Illinois would direct the automatic scheduling process for determining the quantities of LCD panels necessary and communicating those quantities to suppliers via a schedule-sharing process and resulting purchase orders.

Also during this time frame, primarily in 2005, Motorola undertook a Rapid Sourcing Initiative for improving its process for purchasing displays and imagers. This RSI team included members of the Motorola procurement team as well as Motorola engineering staff and outside consultants. The RSI process was comprised of multiple phases.[148] First, the Motorola global procurement team developed a single request for quotes for all LCD panels required across Motorola. Second, the team drafted requests for quotes and solicited responses, including detailed background on how each supplier arrived at its quoted prices, and held meetings with suppliers.[149] Third, the Motorola global procurement team in Illinois made the final decisions on share awards for the next two years and

---

[145]  See, e.g., Motorola Deposition Exhibit 12.

[146]  See e.g., Motorola Deposition Exhibit 265.

[147]  See e.g., Motorola Deposition Exhibit 267.

[148]  See Motorola Deposition Exhibit 101.

[149]  See, e.g., Motorola Deposition Exhibit 122.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

notified suppliers of these awards by email. As with the rest of the relevant period, final approval on supplier selection and share awards was issued by Motorola Supply Chain personnel in the U.S.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827                                                                                 Page B-3

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.

# Appendix C. Materials relied upon

I incorporate by reference all materials cited in my expert report. Additional materials are cited below.

| Group | File name |
|---|---|
| Complaints | Amended Complaint, Costco Wholesale Corporation v. AU Optronics Corp., et al., September 29, 2011 |
| Complaints | Complaint, Electrograph Systems Inc., Electrograph Technologies Corp. v. Epson Imaging Devices Corporation, et al., November 6, 2009 |
| Complaints | First Amended Complaint, ATS Claim, LLC v. Epson Electronics America, Inc., et al., October 14, 2009 |
| Complaints | First Amended Complaint, Best Buy Co., Inc. et al. v. AU Optronics Corp., et al., June 7, 2011 |
| Complaints | Second Amended Complaint, Target Corp., Sears Roebuck and Co., Kmart Corp., Old Comp Inc., Good Guys, Inc., RadioShack Corp., Newegg Inc. v. AU Optronics Corporation, et al., September 9, 2011 |
| Complaints | Third Amended Complaint, Motorola Mobility, Inc. v. AU Optronics Corporation, et al., July 22, 2011 |
| Expert reports | Expert report of Adam K. Fontecchio, December 15, 2011 |
| Expert reports | Expert report of David P. Stowell, December 15, 2011 |
| Plea agreements | Plea Agreement, United States of America v. Chi Mei Optoelectronics, February 2, 2010 |
| Plea agreements | Plea Agreement, United States of America v. Chunghwa Picture Tubes, Ltd., November 10, 2008 |
| Plea agreements | Plea Agreement, United States of America v. Epson Imaging Devices Corporation, October 23, 2009 |
| Plea agreements | Plea Agreement, United States of America v. HannStar Display Corporation, June 29, 2010 |
| Plea agreements | Plea Agreement, United States of America v. Hitachi Displays Ltd., May 17, 2009 |
| Plea agreements | Plea Agreement, United States of America v. LG Display Company, Ltd. and LG Display America, Inc., December 8, 2008 |
| Plea agreements | Plea Agreement, United States of America v. Sharp, December 8, 2008 |
| General | Foreign Exchange Rates, Board of Governors of the Federal Reserve System |
| General | Glossary of Statistical Terms, OECD, 2007 |
| General | I rely on all materials cited in my report |
| General | Product specification sheets are included in the backup folders to the report |
| General | The new BIS effective exchange rate indicies, BIS Quarterly Review, March 2006 |
| Third-party data | BDI_daily.dta |
| Third-party data | BIS weights. http://www.bis.org/statistics/eer/index.htm |
| Third-party data | Copper & Oil Prices_Monthly_1995-2010.xlsx |
| Third-party data | CRT TV price series of Korea, Korean Economic Statistics System |
| Third-party data | DISP_LCD_000001 |
| Third-party data | DISP_LCD_000002 |
| Third-party data | Gross Fixed Capital Formation of Japan and Korea, OECD |
| Third-party data | Gross Fixed Capital Formation-Quarterly, DGBAS |
| Third-party data | Industrial production index, OECD |
| Third-party data | Producer price index of Microprocessor, BLS |
| Third-party data | Taiwan Industrial production index, National Statistics |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.          Appendix C. Materials relied upon

| Group | File name |
|-------|-----------|
| Third-party data | Taiwan labor costs.csv |
| Third-party data | Unit labor cost for Japan and Korea, OECD |
| Acer | AAC00001 - HIGHLY CONFIDENTIAL - ship2004.xls |
| Acer | AAC00002 - HIGHLY CONFIDENTIAL - ship2005.xls |
| Acer | AAC00003 - HIGHLY CONFIDENTIAL - ship2006Jan-Jun.xls |
| Acer | AAC00004 - HIGHLY CONFIDENTIAL - ship2006July-Dec.xls |
| Acer | AAC00005 - HIGHLY CONFIDENTIAL - shipJan-Jun.xls |
| Acer | AAC00006 - HIGHLY CONFIDENTIAL - shipJuly-Dec.xls |
| Acer | AAC00007 - HIGHLY CONFIDENTIAL - ship2007bundle.xls |
| Apple | LCD_List of Products_Std Cost_9-26-11.xlsx |
| Apple | SFI_648190_1_AUO Subpoena LCD Containing Sales_CPUs_Displays_Reseller.XLS |
| AT&T | 2011.10.6 Letter to E. Smart re AT&T transactional data_1-c.pdf |
| AT&T | 2011.11.17 (sent) Letter to Davidson re ATTM Data-c-c-c.pdf |
| AT&T | 2011.12.06 (sent) 16884689_Letter to Smart re ATT data.12.6-c-c.pdf |
| AT&T | 2011.7.26 Letter to E. Smart re AT&T data_1-c.pdf |
| AT&T | ATT00000001 - 10_7POlines - Highly confidential.ppe |
| AT&T | ATT00000002 - 10_7rcv_receipts - Highly confidential.ppe |
| AT&T | ATT00000003 - cingpolines - Highly confidential.ppe |
| AT&T | ATT00000004 - cingReceiptswithsite - Highly confidential.ppe |
| AT&T | ATT00000005 - bluePOlines - Highly confidential.ppe |
| AT&T | ATT00000006 - bluercv_receipts - Highly confidential.ppe |
| AT&T | ATT00000007 - 10_7HR_Locations_all - Highly confidential.ppe |
| AT&T | ATT00000008 - 10_7mtl_categories - Highly confidential.ppe |
| AT&T | ATT00000009 - cinghr_locations - Highly confidential.ppe |
| AT&T | ATT00000010 - cingcategoriesalll - Highly confidential.ppe |
| AT&T | ATT00000011 - blueHR_Locations_all - Highly confidential.ppe |
| AT&T | ATT00000012 - blueCategories - Highly confidential.ppe |
| AU Optronics | AUO model numbers - 1480_001-c.pdf |
| AU Optronics | AUO Transaction Data 2001-2008 Parts 1-4 APR11.xls |
| AU Optronics | AUO Transaction Data 2001-2008 Parts 5-8 APR11.xls |
| AU Optronics | AUO Transaction Data 2001-2008 Parts 9-10 APR11.xls |
| AU Optronics | AUO-MDL-00016180.xls |
| AU Optronics | AUO-MDL-00050426.txt |
| AU Optronics | AUO-MDL-00051444-531.pdf |
| AU Optronics | Ltr_Healy_to Glackin_RE AUO Trans. Data Questions.pdf |
| AU Optronics | Response to plaintiff questions - 1479_001-c.pdf |
| Best Buy | (82199171)_(1)_Replacement Attachment A.PDF |
| Best Buy | BBYLCD000000[3-9]_CONFIDENTIAL.DAT |
| Best Buy | BBYLCD0000001_CONFIDENTIAL.xls |
| Chi Mei | CMO Data Prep.sas |
| Chi Mei | CMOCIV-3435630.xls |
| Chi Mei | CMOCIV-3435952.xls |
| Chi Mei | Customer Names to Translate - CMO (Translated).xls |
| Chi Mei | CustomerNames.txt |
| Chi Mei | Highly Confidential - CMOCIV-21838[59-63].xls |
| Chi Mei | Highly Confidential - CMOCIV-2183865.xls |
| Chi Mei | Highly Confidential - CMOCIV-3427114.Xls |
| Chi Mei | Highly Confidential - CMOCIV-3427117.Xls |
| Chunghwa | 2009.07.23 Chunghwa_20090624 letter_Answers.doc |
| Chunghwa | 2010.12.29 ApplEcon notes on CPT data call.doc |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

| Group | File name |
| --- | --- |
| Chunghwa | CPT02314069_2007.xls |
| Chunghwa | CPT02314070_2008.xls |
| Chunghwa | CPT02314071_2009.xls |
| Chunghwa | CWA00000001_Eng Translation.xls |
| Chunghwa | CWA00000002.xls |
| Chunghwa | CWA00000003.xls |
| Chunghwa | CWA00000004 [Customer Records].xls |
| Chunghwa | CWA00967963_2007~2009_____(1).xls |
| Chunghwa | CWA00967964_____2010(1).xls |
| Chunghwa | CWA00967965.xls |
| Chunghwa | CWA00967966_CPTL Transactional Data.xls |
| Chunghwa | CWA00967967.xls |
| CompUSA | 11.19.11 Letter to Mr. Metzler re OldComp Data-c-c.pdf |
| CompUSA | 9-13-11 Letter to Mr. Metzler re Old Comp Data.pdf |
| CompUSA | Attachment 1.pdf |
| CompUSA | Attachment 2.pdf |
| CompUSA | Attachment 3.xlsx |
| CompUSA | COMP00000001 - LCD_Purchase_Data - Highly confidential.mdf |
| CompUSA | COMP00000002 - LCD_Sales_Data - Highly confidential.mdf |
| CompUSA | COMP00000003 - LCD_SKU_Table - Highly confidential.mdf |
| CompUSA | Old Comp Attachment 1-c-c.pdf |
| Costco | 2011 11 23 Unknown item and vendor numbers.xlsx |
| Costco | Categories.xls |
| Costco | CategoryItems.xls |
| Costco | CostcoLCD 0000001.xls |
| Costco | COSTCO-LCD 000002.xls |
| Costco | Costco-LCD vendor data.msg |
| Costco | D24CatMAreceivingsTransactions060196to053108.csv |
| Costco | D24CatMAskuItemList.xlsx |
| Costco | DateFieldXref.csv |
| Costco | Dept_24Receive.xls |
| Costco | LCDitems.xlsx |
| Costco | LCDreceivingsTransactions060196to053108.csv |
| Costco | RebateVendorList062508WithVendorNames.csv |
| Costco | Report_Acer_ADDL-DATA.xlsx |
| Costco | Report_Akai_ADDL-DATA.xlsx |
| Costco | Report_Compaq_ADDL-DATA.xlsx |
| Costco | Report_HP_ADDL-DATA.xlsx |
| Costco | Report_ItemDescriptions.xls |
| Costco | Report_JVC_ADDL-DATA.xlsx |
| Costco | Report_Mitsubishi-ADDL-DATA.xlsx |
| Costco | Report_Panasonic-ADDL-DATA.xlsx |
| Costco | Report_Philips_ADDL-DATA.xlsx |
| Costco | Report_Proview_ADDL-DATA.xlsx |
| Costco | Report_ReceivingsDetail_[1996-2008].csv |
| Costco | Report_Samsung_ADDL-DATA.xlsx |
| Costco | Report_Sharp_ADDL-DATA.xlsx |
| Costco | Report_Sony_ADDLS-DATA.xlsx |
| Costco | Report_Toshiba_ADDL-DATA.xlsx |
| Dell | DELL-00202704 HIGHLY CONFIDENTIAL.txt |
| Dell | June 13, 2011 Letter.pdf |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

| Group | File name |
|---|---|
| Dell | LCD Sku Sales Details US.xlsx |
| Electrograph | Electrograph - SHARP LCD PURCHASES (PRODUCTION FILE) ESI00000071.xls |
| Electrograph | ELECTROGRAPH & SUBS - DIRECT LCD PURCHASES - AP RECORDS (PRODUCTION FILE - MASTER).xls |
| Electrograph | ELECTROGRAPH & SUBS - INDIRECT LCD PURCHASES - AP RECORDS (PRODUCTION FILE - MASTER).xls |
| Electrograph | ESI - AG NEOVO LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003671.xls |
| Electrograph | ESI - AOC LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003668.xls |
| Electrograph | ESI - BENQ LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003663.xls |
| Electrograph | ESI - EIZO NANAO LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003672.xls |
| Electrograph | ESI - ELO TOUCHSYSTEMS LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003664.xls |
| Electrograph | ESI - EPSON LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00003446.xls |
| Electrograph | ESI - HITACHI LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00003266.xls |
| Electrograph | ESI - INFOCUS LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003673.xls |
| Electrograph | ESI - KDS LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003669.xls |
| Electrograph | ESI - LG ELECTRONICS LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00000070.xls |
| Electrograph | ESI - MITSUBISHI LCD PRODUCTS (PRODUCTION FILE - MASTER AS400)_ESI00003660.xls |
| Electrograph | ESI - NEC LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00003655.xls |
| Electrograph | ESI - PANASONIC LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003661.xls |
| Electrograph | ESI - PHILIPS LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00003656.xls |
| Electrograph | ESI - PLANAR LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003667.xls |
| Electrograph | ESI - PRINCETON DIGITAL LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003665.xls |
| Electrograph | ESI - SANYO LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00003267.xls |
| Electrograph | ESI - SILICON GRAPHICS LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003670.xls |
| Electrograph | ESI - SONY LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003662.xls |
| Electrograph | ESI - VIEWSONIC LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003666.xls |
| Electrograph | ESI & ICG - SAMSUNG LCD PRODUCTS (PRODUCTION FILE)_ESI00000069.xls |
| Electrograph | ESI & ICG - TOSHIBA LCD PRODUCTS (PRODUCTION FILE - MASTER)_ESI00003659.xls |
| Electrograph | ESI00095[395-407].xls |
| Electrograph | ESI00099283.xls |
| Electrograph | ESI00099301.xls |
| Electrograph | ICG - MITSUBISHI LCD PRODUCTS (PRODUCTION FILE - MASTER) |

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.          Appendix C. Materials relied upon

| Group | File name |
|---|---|
| | ESI00003657.xls |
| Electrograph | ICG - PANASONIC LCD PRODUCTS (PRODUCTION FILE - MASTER) ESI00003658.xls |
| Electrograph | ICG Inventory Reports (2005-2006).xls |
| Electrograph | ICG Inventory Reports (Aug 2002-Dec 2004).xls |
| Electrograph | LCD PRODUCTS - BW (UNKNOWN CATEGORY - PRODUCT TYPE).xlsx |
| Epson | 2009.07.20 Letter from Kevin McCann to Brendan Glackin re Epson Data_20090720.pdf |
| Epson | 2010.11.22 Correspondence with Judith Zahid.pdf |
| Epson | 2011.11.22. Foran ltr to McNary re Epson data.pdf |
| Epson | EEADOC 00000021 - EEA TFT-LCD Transaction Data.xls |
| Epson | EEADOC00816982_HIGHLY_CONFIDENTIAL.xls |
| Epson | EIDDOC006119[66-71]_HIGHLY_CONFIDENTIAL.XLS |
| Epson | Japan's Prefectures and their Capital Cities.pdf |
| Epson | SECDOC00060470_HIGHLY_CONFIDENTIAL.xls |
| HannStar | 2011.03.18 HannStar 031811 Updated.pdf |
| HannStar | Description Translation.txt |
| HannStar | HSTAR_7000008_HannStar Customer List.xls |
| HannStar | HSTAR_900000[2-6]_Updated_HannStar_Sales_Data_-_200[4-8].xlsx |
| HannStar | HSTAR_9000001_Updated_HannStar_Sales_Data_-_2000-2003.xlsx |
| HannStar | HSTAR_9000007_R_HannStar Sales Data.xls |
| HannStar | HSTAR_9000008_HannStar_Sales_Data_-_2009.xlsx |
| HannStar | HSTAR_9000009_Updated_HannStar_Product_List_-_2000-2009.xlsx |
| HannStar | InvoiceNo.txt |
| HannStar | Names.txt |
| HannStar | PT Translation.txt |
| Hitachi | 21105856_1_HDP.xls |
| Hitachi | cntry_code.xls |
| Hitachi | E-mail from Michelle Kim to Judith Zahid re Hitachi Data_20090508.pdf |
| Hitachi | hdp_cust_name_rise.txt |
| Hitachi | HDP00001[160-252].xlsx |
| Hitachi | HDP00015[287-300].xls |
| Hitachi | HDP04106030_-_HDP04106030.xlsx |
| Hitachi | HDP04106031_-_HDP04106031.xlsx |
| Hitachi | HEDUS01385764 - HEDUS01385764.xlsx |
| Kmart | 15461601_Letter to Andrew Lanphere re Kmart data.PDF |
| Kmart | KMRT00000001 - DEPT12 LCD Y2009 - Highly confidential.txt |
| Kmart | KMRT00000002 - DEPT12 LCD Y2010 - Highly confidential.txt |
| Kmart | KMRT00000003 - DEPT17 LCD Y2008 - Highly confidential.txt |
| Kmart | KMRT00000004 - DEPT17 LCD Y2009 - Highly confidential.txt |
| Kmart | KMRT00000005 - DEPT17 LCD Y2010 - Highly confidential.txt |
| Kmart | KMRT00000006 - DEPT18 LCD Y2004 - Highly confidential.txt |
| Kmart | KMRT00000007 - DEPT18 LCD Y2005 - Highly confidential.txt |
| Kmart | KMRT00000008 - DEPT18 LCD Y2006 - Highly confidential.txt |
| Kmart | KMRT00000009 - DEPT18 LCD Y2007 - Highly confidential.txt |
| Kmart | KMRT00000010 - DEPT18 LCD Y2008 - Highly confidential.txt |
| Kmart | KMRT00000011 - DEPT18 LCD Y2009 - Highly confidential.txt |
| Kmart | KMRT00000012 - DEPT18 LCD Y2010 - Highly confidential.txt |
| Kmart | KMRT00000013 - DEPT20 LCD Y2006 - Highly confidential.txt |
| Kmart | KMRT00000014 - DEPT20 LCD Y2007 - Highly confidential.txt |
| Kmart | KMRT00000015 - DEPT20 LCD Y2008 - Highly confidential.txt |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.          Appendix C. Materials relied upon

| Group | File name |
|---|---|
| Kmart | KMRT00000016 - DEPT20 LCD Y2009 - Highly confidential.txt |
| Kmart | KMRT00000017 - DEPT20 LCD Y2010 - Highly confidential.txt |
| Kmart | KMRT00000018 - LCD Record Layout - Highly confidential.txt |
| Kmart | KMRT00000019 - LCD 2003 - Highly confidential.xls |
| Kmart | KMRT00000020 - LCD 2004 - Highly confidential.xls |
| Kmart | KMRT00000021 - LCD 2005 - Highly confidential.xls |
| Kmart | KMRT00000022 - LCD 2006 - Highly confidential.xls |
| Kmart | KMRT00000023 - LCD 2007 - Highly confidential.xls |
| Kmart | KMRT00000024 - LCD 2008 - Highly confidential.xls |
| Kmart | KMRT00000025 - LCD 2009 - Highly confidential.xls |
| Kodak | 10-14-11 Letter from Blaire Russell re Kodak.pdf |
| Kodak | EKC002724[1-5].xls |
| Kodak | EKC0027247.xls |
| Kodak | EKC0027248.xls |
| Kodak | Purchases.pdf |
| Kodak | Sales.pdf |
| LG Display | 2008 Cust Name Translations.txt |
| LG Display | 2008.12.08 - data answers - 6652.pdf |
| LG Display | 3-19-09 Letter to George W Sampson Esq and Judith Zahid Esq.pdf |
| LG Display | Bill To Translations.txt |
| LG Display | GRNE0322452-54.pdf |
| LG Display | GRNE0322455 - Highly Confidential.xls |
| LG Display | GRNE0322457 - Highly Confidential.xls |
| LG Display | GRNE0405980_2008 Sales_HIGHLY CONFIDENTIAL.xls |
| LG Display | GRNE0406255 - HIGHLY CONFIDENTIAL.xls |
| LG Display | GRNE0406256 - HIGHLY CONFIDENTIAL.xls |
| LG Display | GRNE0406313_LGD Global Sales (FY 2009)_HIGHLY CONFIDENTIAL.xls |
| LG Display | Korean Translations.txt |
| LG Display | Ship To Translations.txt |
| LG Electronics | (200[1-7]) MU Phone Sales Subledger.xls |
| LG Electronics | (2000) MU Phone Sales (MAS90).xls |
| LG Electronics | Cell Phones--Module Purchases U.S- Bound 2005-2008.xls |
| LG Electronics | LGEUS_LCD_[1999-2007]F.xls |
| LG Electronics | LGEUS_LCD_2008.xlsx |
| LG Electronics | LGEUSOCTOBER201100015.xlsx |
| Motorola | 16838046_Amended Display Rebate Report.pdf.PDF |
| Motorola | 2002-2008 Cellular By Product Financials MOTOLCD-01247781 Highly Confidential.xls |
| Motorola | 2002-2008 COGS by Product -MOTOLCD-01247782 Highly Confidential - Copy.xls |
| Motorola | 2011 11 11 - Stokes Letter to Foran re Motorola data-c.pdf |
| Motorola | 2011.11.11 - Stokes Letter to Foran re Motorola data-c.pdf |
| Motorola | Derek Foran Dec 14 2011 Ltr in further response to Epson's Questions re Moto's data production-c.pdf |
| Motorola | Indirect Purchases-MOTO0047373-Highly Confidential.xlsx |
| Motorola | Letter to D. Foran dated 28 Nov 11 re Epson responses-c.pdf |
| Motorola | Moto0140324 Highly Confidential-c.pdf |
| Motorola | MOTOLCD01250122.pdf |
| Motorola | Motorola Purchase data- MOTO00003984A- Highly Confidential.xlsx |
| Motorola | Symbol Purchase Data - Moto00474366 - Highly Confidential.xls |
| NEC | NECELAM Notebook PC Sales Data.XLS |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

| Group | File name |
|---|---|
| NewEgg | 2011-06-29 Letter from N. Wood to K. Shannon-c.pdf |
| NewEgg | NEGG00000001 - PO database 2011_02_02 - Highly confidential.accdb |
| NewEgg | PO-Update.mdb |
| Philips | 05-05-11 Letter from Philips Counsel.pdf |
| Philips | 1__KPETOLL-0001_--_KPETOLL-002.XLS |
| Philips | 2__KEPTOLL-0003_--_KPETOLL-0010.XLS |
| Philips | 3__KPETOLL-0011_--_KPETOLL-0014.XLS |
| Philips | 4__KPETOLL-0015_--_KPETOLL-0020.XLS |
| Philips | Copy of Invoice_data_for_LCD_models_2007.xls |
| Philips | Copy of Invoice_data_for_LCD_models_2008.xls |
| Philips | KPE0000[6992-7003].xls |
| Philips | KPETOLL-0202 (2001).xlsx |
| Philips | KPETOLL-0203 (2002).xlsx |
| Philips | KPETOLL-0204 (2003).xlsx |
| Philips | KPETOLL-0205 (2004).xlsx |
| Philips | KPETOLL-0206 (2005).xlsx |
| Philips | KPETOLL-0207 (2006).xlsx |
| Philips | KPETOLL-0208.xlsx |
| Philips | Letter from Matthew Fitzwater dated July 21, 2011 re Tolling Agreement.pdf |
| RadioShack | 7-1-11 Letter to Mr. Wyant re RadioShack Data-c.pdf |
| RadioShack | RadioShack Attachment 1-c.pdf |
| RadioShack | RADS00000001 - Large LCD Panel SKU Request - Highly confidential.xls |
| RadioShack | RADS00000313 - LArge_LCD_SKU_Request_2007_2009 - Highly confidential.xls |
| RadioShack | RADS00000314 - 20110602 distribution center addresses - Highly confidential.xls |
| RadioShack | RADS00000315 - 20110602 Product Hierarchy - Highly confidential.xls |
| Samsung | 2009.08.04 Letter re SAML-814302.pdf |
| Samsung | SAML-000044-SAML-000048.pdf |
| Samsung | SAML-000067-76.pdf |
| Samsung | SAML-110886.xls |
| Samsung | SAML-8151[11-28]_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-815109_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-815129_Highly Confidential - Subject to Protective Order.xls |
| Samsung | SAML-815130_Highly Confidential - Subject to Protective Order.xls |
| Samsung | SAML-815138_Highly Confidential - Subject to Protective Order.xls |
| Samsung | SAML-815315_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-815332_Highly Confidential - Subject to Protective Order.xls |
| Samsung | SAML-816313_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-816314_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-816316_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-816345_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-816346_Highly Confidential - Subject to Protective Order.xlsx |
| Samsung | SAML-816347_Highly Confidential - Subject to Protective Order-c.xlsx |
| Samsung SDI | SDI-Nokia-062524 - Highly Confidential.XLSX |
| Samsung SDI | SDI-Nokia-062525 - Highly Confidential.XLSX |
| Sears | 15461455_Letter to Vinayagamoorthy re Sears data (2).PDF |
| Sears | SEAR000000[11-15] – LCDSLS[00-04] - Highly confidential.DAT |
| Sears | SEAR000000[17-19] – LCDSLS[05-07] - Highly confidential.DAT |
| Sears | SEAR00000001 - LCD1 - Highly confidential.TXT |
| Sears | SEAR00000002 - LCD2 - Highly confidential.TXT |
| Sears | SEAR00000003 - LCD3A - Highly confidential.TXT |
| Sears | SEAR00000004 - LCD3B - Highly confidential.TXT |

| Group | File name |
|-------|-----------|
| Sears | SEAR00000005 - LCD4 - Highly confidential.TXT |
| Sears | SEAR00000006 - loc - Highly confidential.txt |
| Sears | SEAR00000007 - HIER - Highly confidential.TXT |
| Sears | SEAR00000008 - LCD2001 - Highly confidential.TXT |
| Sears | SEAR00000009 - LCD2002 - Highly confidential.TXT |
| Sears | SEAR00000010 - LCD2003 - Highly confidential.TXT |
| Sears | SEAR00000016 - LCDSLS99 - Highly confidential.DAT |
| Sears | SEAR00000020 -LCDSLS08 -  Highly confidential.DAT |
| Sears | SEAR00000021 - Data dictionary - Highly confidential.xlsx |
| Sears | SEAR00000022 - calendar_LCD - Highly confidential.xls |
| Sharp | 2011.9.7 -  Sharp Production Cover Letter.pdf |
| Sharp | Japanese Customer Name Translations.xls |
| Sharp | SC Application Data (SCm01522874-77).pdf |
| Sharp | SC SALES TFT2_200204_200303-HIGHLYCONFIDENTIAL-SCm00244120.xls |
| Sharp | SC SALES TFT2_200304_200403-HIGHLYCONFIDENTIAL-SCm00244121.xls |
| Sharp | SC SALES TFT2_200404_200503-HIGHLYCONFIDENTIAL-SCm00244122.xls |
| Sharp | SC SALES TFT2_200504_200603-HIGHLYCONFIDENTIAL-SCm00244123.xls |
| Sharp | SC SALES TFT2_200604_200703-HIGHLYCONFIDENTIAL-SCm00244124.xls |
| Sharp | SC SALES TFT2_200704_200803-HIGHLYCONFIDENTIAL-SCm00244125.xls |
| Sharp | SC SALES TFT2_200804_200806-HIGHLYCONFIDENTIAL-SCm00244126.xls |
| Sharp | SC TFT-LCD PANEL SALES 2000-2004-HIGHLYCONFIDENTIAL-SCm00244117.XLS |
| Sharp | SC TFT-LCD PANEL SALES 2005-2006-HIGHLYCONFIDENTIAL-SCm00244118.XLS |
| Sharp | SC TFT-LCD PANEL SALES 2007-2008-HIGHLYCONFIDENTIAL-SCm00244119.XLS |
| Sharp | SC_Customer_Names.txt |
| Sharp | SCm00060126.pdf |
| Sharp | SCm00060126E.pdf |
| Sharp | SCm00244084-116.pdf |
| Sharp | SCM00978464.pdf |
| Sharp | SCm00990075HIGHLY_CONFIDENTIAL(1).xlsx |
| Sharp | SCm01000029HIGHLY_CONFIDENTIAL(1).xlsx |
| Sharp | SCm01039361_Internal Transfer Data-HIGHLY CONFIDENTIAL.xls |
| Sharp | SCm01294992.xls |
| Sharp | SCm01295079_SC_SALES_TFT2_200204-200303_200807-200912-HIGHLYCONFIDENTIAL.xlsx |
| Sharp | SCm01521733_SC SALES STN_200204_200912-HIGHLYCONFIDENTIAL.XLS |
| Sharp | SCm01521734_SC STN-LCD PANEL SALES Apr 2000 - Dec 2009_Updated - HIGHLY CONFIDENTIAL.xls |
| Sharp | SCm01536464_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536465_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536466_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536467_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536468_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536469_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536470_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536471_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536472_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536473_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536474_HIGHLY_CONFIDENTIAL.xls |

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.          Appendix C. Materials relied upon

| Group | File name |
|-------|-----------|
| Sharp | SCm01536475_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SCm01536476_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SEC Application Data (SECm01167141-47).pdf |
| Sharp | SEC TFT-LCD Finished Goods Purchase Data - HIGHLY CONFIDENTIAL - SECm00111975.xls |
| Sharp | SEC TFT-LCD Finished Goods Purchase Data - HIGHLY CONFIDENTIAL - SECm00111976.xls |
| Sharp | SEC TFT-LCD Finished Goods Sales Data - Details 2005 - HIGHLY CONFIDENTIAL - SECm00111969.xls |
| Sharp | SEC TFT-LCD Finished Goods Sales Data - Details 2006 - HIGHLY CONFIDENTIAL - SECm00111970.xls |
| Sharp | SEC TFT-LCD Finished Goods Sales Data - Details 2007 - HIGHLY CONFIDENTIAL - SECm00111971.xls |
| Sharp | SEC TFT-LCD Finished Goods Sales Data - Details 2008 - HIGHLY CONFIDENTIAL - SECm00111972.xls |
| Sharp | SEC TFT-LCD Finished Goods Sales Data - Summary 1998-2001 - HIGHLY CONFIDENTIAL - SECm00111967.xls |
| Sharp | SEC TFT-LCD Finished Goods Sales Data - Summary 2001-2005 - HIGHLY CONFIDENTIAL - SECm00111968.xls |
| Sharp | SEC TFT-LCD-Panel Sales Data [1996-2008] - HIGHLY  CONFIDENTIAL - SECm001119[54-66].xls |
| Sharp | SECm00111946-51.pdf |
| Sharp | SECm01062876_Legal_-_TFT-LCD_-_SEC_Details_Dec_2008_-_Dec_2009_-_HIGHLY_CONFIDENTIAL.xls |
| Sharp | SECm01062877_Legal_-_TFT-LCD_-_SMA_Details_Oct_2008_-_Dec_2009_-_HIGHLY_CONFIDENTIAL(1).xlsx |
| Sharp | SECm011654[40-50]_HIGHLY_CONFIDENTIAL_SMA STN-LCD Sales Data [1996-2006] - HIGHLY CONFIDENTIAL.xls |
| Sharp | SECm01165439_HIGHLY_CONFIDENTIAL_TFT-LCD with Panels - Summary Data 2001-2005.xls |
| Sharp | SECm01167148_HIGHLY_CONFIDENTIAL_SEC TFT-LCD Jaco Panel Sales Data 1996-2009.xls |
| Sharp | Sharp Data Call 20090427.doc, ApplEcon call notes |
| Target | TARG000000[01-11] - Dept 8 class [00-10] invoice list - Highly confidential.xls |
| Target | TARG00000012 - Dept 56 invoice list - Highly confidential.xls |
| Target | TARG00000013 - Dept 57 invoice list - Highly confidential.xls |
| Target | TARG00000014 - Dept 80 invoice list - Highly confidential.xls |
| Target | TARG00000015 - Dept 8 item list - Highly confidential.xls |
| Target | TARG00000016 - Dept 56 item list - Highly confidential.xls |
| Target | TARG00000017 - Dept 57 class 00 item list - Highly confidential.xls |
| Target | TARG00000018 - Dept 57 class 01 item list - Highly confidential.xls |
| Target | TARG00000019 - Dept 57 class 02 item list - Highly confidential.xls |
| Target | TARG00000020 - Dept 57 class 03 item list - Highly confidential.xls |
| Target | TARG00000021 - Dept 57 class 04 item list - Highly confidential.xls |
| Target | TARG00000022 - Dept 80 item list - Highly confidential.xls |
| Target | TARG00000023 - 2004 Dept 8 - Highly confidential.xls |
| Target | TARG00000024 - 2004 Dept 56 - Highly confidential.xls |
| Target | TARG00000025 - 2004 Dept 57 - Highly confidential.xls |
| Target | TARG00000026 - 2004 Dept 80 - Highly confidential.xls |
| Target | TARG00000027 - 2005 Dept 8 - Highly confidential.xls |
| Target | TARG00000028 - 2005 Dept 56 - Highly confidential.xls |

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.          Appendix C. Materials relied upon

| Group | File name |
|-------|-----------|
| Target | TARG00000029 - 2005 Dept 57 - Highly confidential.xls |
| Target | TARG00000030 - 2005 Dept 80 - Highly confidential.xls |
| Target | TARG00000031 - 2006 Dept 8 - Highly confidential.xls |
| Target | TARG00000032 - 2006 Dept 56 - Highly confidential.xls |
| Target | TARG00000033 - 2006 Dept 57 - Highly confidential.xls |
| Target | TARG00000034 - 2006 Dept 80 - Highly confidential.xls |
| Target | TARG00000035 - 2007 Dept 8 - Highly confidential.xls |
| Target | TARG00000036 - 2007 Dept 56 - Highly confidential.xls |
| Target | TARG00000037 - 2007 Dept 57 - Highly confidential.xls |
| Target | TARG00000038 - 2007 Dept 80 - Highly confidential.xls |
| Target | TARG00000039 - 2008 Dept 8 - Highly confidential.xls |
| Target | TARG00000040 - 2008 Dept 56 - Highly confidential.xls |
| Target | TARG00000041 - 2008 Dept 57 - Highly confidential.xls |
| Target | TARG00000042 - 2008 Dept 80 - Highly confidential.xls |
| Target | TARG00000043 - 2009 Dept 8 - Highly confidential.xls |
| Target | TARG00000044 - 2009 Dept 56 - Highly confidential.xls |
| Target | TARG00000045 - 2009 Dept 57 - Highly confidential.xls |
| Target | TARG00000046 - 2009 Dept 80 - Highly confidential.xls |
| Target | TARG00000047 - 2010 Dept 8 - Highly confidential.xls |
| Target | TARG00000048 - 2010 Dept 56 - Highly confidential.xls |
| Target | TARG00000049 - 2010 Dept 57 - Highly confidential.xls |
| Target | TARG00000050 - 2010 Dept 80 - Highly confidential.xls |
| Target | TARG00000051 - LCD_ALL_09042009 - Highly confidential.xlsx |
| Toshiba | Data_Export.txt |
| Toshiba | E-mail from Kristen McAhren to Judith Zahid re Toshiba Data_20090716.pdf |
| Toshiba | LCD_Device_e_200810.pdf |
| Toshiba | LCD_Product_Identification.XLS |
| Toshiba | manufacturing cost_2002 apr-sep.xls |
| Toshiba | manufacturing cost_2002 oct-2003 mar.xls |
| Toshiba | manufacturing cost_2003 apr-sep.xls |
| Toshiba | manufacturing cost_2004 apr-sep.xlsx |
| Toshiba | manufacturing cost_2004 oct - 2005 mar.xlsx |
| Toshiba | manufacturing cost_2005 apr-sep.xls |
| Toshiba | manufacturing cost_2005 oct-2006 mar.xlsx |
| Toshiba | manufacturing cost_2006 apr-sep_rev.xls |
| Toshiba | manufacturing cost_2006 oct-2007 mar_rev.xls |
| Toshiba | manufacturing cost_2007 Apr-Jun.xlsx |
| Toshiba | manufacturing cost_2007 jul-dec.xlsx |
| Toshiba | manufacturing cost_2008 jan-jun.xlsx |
| Toshiba | manufacturing cost_2008 Jul-dec.xlsx |
| Toshiba | McNary Letter 11-29-11.pdf |
| Toshiba | Models.xls |
| Toshiba | Product specifications.xls |
| Toshiba | TMD - CUSTOMER NAMES TRANSLATIONS UPDATED.xls |
| Toshiba | TMD Transactional Data Field Descriptions.pdf |
| Toshiba | TSB-LCD-00601[80-94].xls |
| Toshiba | TSB-LCD-0186510.csv |
| Toshiba | TSB-LCD-0186512.xls |
| Toshiba | TSB-LCD-0742166.xlsx |
| Toshiba | TSB-LCD-0742167.xlsx |
| Toshiba | TSB-LCD-07534[58-62].xlsx |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

Expert Report of B. Douglas Bernheim, PhD concerning Motorola Mobility, Inc.    Appendix C. Materials relied upon

| Group | File name |
|---|---|
| Toshiba | TSB-LCD-0831599.xlsx |
| Toshiba | TSB-LCD-08316[02-47].xls |
| Westinghouse | 2003_Sales_Recap_by_Item(1).xls |
| Westinghouse | Sales recap by Sku 2004.xls |
| Westinghouse | Sales Recap by SKU 2005.xls |
| Westinghouse | sales recap by sku thru 7-2006.xls |

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827