# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE:  TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION, | ) Master File No.: ) ) M:07-1827 SI |
| _____ | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| Motorola Mobility, Inc. v. AU Optronics Corporation, et al., No. 3:09-cv-5840 SI | ) (Case No.: ) ) 3:09-cv-05840 SI) ) |
| AT&T Mobility LLC, et al., v. AU Optronics Corporation, et al, No. 3:09-cv-4997 SI | ) ) ) ) |
| Target Corporation, et al., v. AU Optronics Corporation, et al, No. 3:10-cv-4945 SI | ) ) ) |
| _____ | ) |

*** HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF

B. DOUGLAS BERNHEIM, PH.D., VOLUME I

Held at Bingham McCutchen

Three Embarcadero Center, 28th Floor

San Francisco, California

Monday, January 30, 2012

9:01 a.m. – 5:46 p.m.

REPORTED BY:  JAMES BEASLEY, RPR, CA CSR No. 12807

Draft Copy

of the defense or experts that they retain -- of course, my work on that isn't complete because I don't know what those criticisms might be and I haven't had a chance to evaluate them.

With that exception, I would say at this point it's complete.

BY MR. VERWOLF:

Q.   Okay.  Are you currently undertaking any further studies with regard to the opinions you've already expressed?

MR. HOWARD:  Don't disclose any preliminary work, drafts, notes, communications with counsel, other experts, or staff.

THE WITNESS:  At this moment, no.

BY MR. VERWOLF:

Q.   Okay.  How many hours do you estimate that you've spent on the -- on this project?

MR. HOWARD:  "This project" means?

BY MR. VERWOLF:

Q.   Well, if you can break them down, let's start with the Motorola case, how many hours?

A.   I -- let me say at the outset, I don't think I can break it down.  I didn't keep track of what was attributable to which case, and I have no way of doing that.

Draft Copy

Page 44

Q.   Okay.  In total, then, how many hours would you estimate?

A.   I haven't totalled it up.  I believe that it's probably in the neighborhood of 4- to 500 hours.

Q.   And you've been assisted by the staff at Baker White?

MR. HOWARD:  Bates White.

BY MR. VERWOLF:

Q.   Or Bates White, I'm sorry.  Bates White?

A.   Yes.  Yes.

Q.   Okay.  Has there been a primary person on the staff at Bates White that you've relied upon?

A.   I rely on different people for different portions or the analysis.  I suppose there's an individual who I tend to use as my point person. I'm not sure whether that's what you mean.

Q.   That would be one.

A.   Okay.  Yes.

Q.   Who is that?

A.   That would be Steve Schulenberg.

Q.   Schulenberg, is it S-c-h --

A.   S-c-h-u-l-e-n-b-e-r-g, I hope I got that right.

Q.   And what's his position with Bates?

Draft Copy

Page 160

of bubble gum, and find out that it happens to

correlate with things and give strange predictions.

So the first principle is critical to guard

against that sort of misleading or overfitting

problem.

Q.   Okay.  You mentioned that -- did you say

the producer price index for semiconductors, right?

A.   Let me, again, go to the exact statement of

what it is.  The producer price index for

microprocessors.

Q.   Microprocessors?

A.   Which I believe is a Bureau of Labor

Statistics series.

Q.   How did you determine which producer price

index for microprocessors to use?

A.   There was some discussion between my staff

and Professor Fontecchio about what would constitute

a good proxy for the costs and technological

improvements in the LCD-TFT panel industry.

And it was from those conversations that --

that my staff arrived at this -- at this particular

suggestion for a variable to be included into my

model.

I reviewed the evidence with them and

agreed that it is certain -- it is certainly an

economically relevant variable that captures important economic factors that are bearing on the price.

Q. There are actually a number of different producer price indexes for microprocessors depending on the microprocessor being indexed, aren't there?

A. There are some related indices. I, to tell you the truth, have not -- don't remember the range for this particular variable.

Q. Wasn't the one that you chose the one with the greatest incidence of price index?

A. I'm sorry, I don't know what that means.

Q. The greatest difference between periods?

MR. HOWARD: Object to form.

THE WITNESS: I don't know. And because I don't know, that couldn't have been a reason why it was selected.

BY MR. VERWOLF:

Q. Maybe -- I guess you'd refer to it as the price index declined, didn't the one you used have the greatest incidence of price index decline?

A. Again, that wasn't the criteria that I used to evaluate the variables, so I didn't look at that.

Q. You said that Fontecchio was one of your sources for what to use?

Draft Copy

A.    Fontecchio was consulted in the process of arriving at a good proxy for -- for this particular cost element.

Q.    And how did you use it as a proxy?

A.    By including it in my model.

Q.    As a -- as a replacement for cost?

A.    As a predictor for prices, which means that to some significant extent it's capturing the effects of changes in costs on prices.

Now, of course, I also explored the -- the sensitivity of that by including other cost measures in my model as well.  So I don't mean to suggest that this is the only cost variable that I included.

This is a variable that I included to capture some significant portion of what was happening to the costs of producing TFT panels during the period.

Q.    Is the actual cost of production and sale of something -- and sale something one would expect to be a factor in pricing of LCD panels or modules?

A.    I'm sorry, by "the actual cost," you mean what?

Q.    The actual cost of components, labor, sales, overhead, the actual cost?

A.    Yes.  And that's why I included, as part of

Draft Copy

my sensitivity analysis, various measures of costs, including the unit cost measures that were produced by the defendants.

However, as I explained in my report, using variables that are very closely -- well, there are a couple of issues with that.

One is concern that those measures are noisy, because they reflect accounting conventions as opposed to true economic costs.

But the other issue is that those variables may also have been affected by the conspiracy, and they may have been affected by the conspiracy in at least two separate ways.

One is that that conspiracy, to the extent, as we discussed before lunch, may have delayed the deployment of new capacity, new fabs, the conspiracy would have slowed the migration of production to newer fabs, which were more efficient and consequently had lower costs.

And the other is that, you know, oftentimes firms will respond to competitive pressures by becoming more efficient and engaging in cost-cutting.

So for both of those reasons, the cost variables, if you actually measure the actual costs,

Draft Copy

may be sensitive to the conspiracy.

And consequently, by putting them in the model, one may be removing some of the effects of the conspiracy and obtaining a less reliable estimate of the conspiracy's effects.

So as I used proxies for costs that were not under the direct influence of the conspiracy, and then I tested the robustness of my conclusions by adding measures of costs that were obtained from defendants and that were LCD-TFT-panel-specific.

Q.   And how many defendants did you obtain costs from?

A.   Well, let's see.  Not all of the defendants turned over usable cost information.  I think that there were four or five -- four, I think, that provided information that was sufficient for this purpose.

For this purpose I needed to have cost data on the level of the transaction so that I could construct a cost index that was -- that made an apples-to-apples comparison to the price index; that is, it was also a Fisher index that removed the same compositional effects.

Q.   Did you -- did you consider in evaluating the costs that you did have and the prices that were

Draft Copy

Page 333

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF SAN FRANCISCO )


        I, JAMES BEASLEY , hereby certify:

        I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 12807 issued by the Court Reporters Board of California and which is in full force and effect.  (Fed. R. Civ. P. 28(a)).

        I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me.  (Fed. R. Civ. P. 28(a), 30(f)(1)).

        I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action.  (Fed. R. Civ. P. 28).

        I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

                         / / /

Draft Copy

of the testimony given by the witness.  (Fed. R. Civ. P. 30(f)(1)).

Before completion of the deposition, review of the transcript [XX] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

Dated: FEBRUARY 10, 2012

_____

Draft Copy

Page 963

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE:  TFT-LCD (FLAT PANEL)<br>ANTITRUST LITIGATION,<br>_____)<br> | ) <br>) <br>) |
| THIS DOCUMENT RELATES TO: | ) Case No.: |
| ATS Claim, LLC v. Epson<br>Electronics America, Inc., et<br>al., 09-cv-1115 SI | ) 3:07-MD-1827-SI<br>)<br>) |
| AT&T Mobility LLC, et al., v. AU<br>Optronics Corporation, et al,<br>09-cv-4997 SI | )<br>) MDL No.:<br>)<br>) 1827 |
| Motorola Mobility, Inc., v. AU<br>Optronics Corporation, et al.,<br>09-cv-5840 SI | )<br>)<br>) |
| Nokia Corporation and Nokia Inc.,<br>v. AU Optronics Corporation, et<br>al., 09-cv-5609 SI | )<br>)<br>) |
| Target Corp., et al., v. AU<br>Optronics Corporation, et al.,<br>10-cv-04945 SI<br>_____) | )<br>)<br>) |

*** HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF
B. DOUGLAS BERNHEIM, Ph.D., VOLUME V

Held at Covington & Burling, LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California

Thursday, June 14, 2012
9:05 a.m. - 5:53 p.m.

REPORTED BY:  JAMES BEASLEY, RPR, CA CSR No. 12807

don't recall.

Q.   Did you rely on any of those conversations, whether direct or indirect?

A.   Well, all of those conversations took the same form.  The purpose of them was to try and understand the opinions that he was developing so that I would know what was going to be in his final report, which is what I was going to rely on.

So ultimately what I relied on was what was in his final report.

Q.   Exclusive of any oral conversations?

A.   I can't think of anything in any oral conversations that I've had with the other experts, either direct or indirect, where there's something in those conversations that I relied on that wasn't in their final reports.

Q.   Do you now believe that the MP PPI served some other important purpose, other than as a proxy for panel production costs?

A.   Yes, I do.

Q.   Okay.  What additional purpose is that variable serving?

A.   Well, the -- on this point I think my attention was drawn to it because of the reports of Dr. Souri and Mr. Mallinson.

Develops -- developments in microprocessor technology have driven invasions in, and, therefore, demand for products that use LCD panels.  The panels, clearly they are -- they are displays.  This is display technology.

And it has value because of the thing that is being displayed.  And the value of the thing that's being displayed depends upon the device that's generating that information.

It's usually some sort of computer or computer-related device.  And the quality of the information that is displayed, the usefulness of it depends upon the power of that device, which is inherently determined by the microprocessor.

And, therefore, the developments in microprocessor technology have had a fundamental effect on the evolution of the value of, and, therefore, the demand for devices that display the information that's generated by the microprocessors.

So the microprocessor evolution, the increasing power, falling costs of microprocessor power becomes an extremely important determinant of the demand for LCD panels.

Q.   So you're now viewing MP PPI as a predictor of demand for LCD panels; do I understand that

correctly?

A.    What I -- I think that that's -- there's a better way to say it, which is that I'm viewing it as a predictor of the price for LCD panels.  And I've always viewed it as a predictor of the price for LCD panels.

And this discussion about its role in driving demand is simply a reflection of the fact that the evolution of my thinking about this has gone in the direction of realizing that one of the reasons that it is such an important and powerful predictor of price is that it is playing a role not only in capturing elements that were going on in the supply side of this industry, but also on the demand side.

Q.    I want to -- I want to make sure I understand all the reasons why you think the MP PPI is a good predictor of price.  One is you think it's -- it's a -- it's a predictor of demand and, therefore, of price; is that right?

A.    I would have said that it's a driver of demand and, therefore, a predictor of price.

Q.    Okay.  So reason number one is a driver of demand and, therefore, a predictor of price, correct?

A.    Yes.

Q.    Okay.  Reason number two is that it is relevant, you believe, to LCD panel production costs, correct?

A.    Well, relying on Dr. Fontecchio, I believe that it is a driver of some significant component or it is related to things that are drivers of significant components of LCD panel production costs, and, therefore, for that reason as well, is a useful predictor of price.

Q.    Okay.  Other than those two reasons we've just discussed, driver of demand, relevant to cost, are there any other reasons you think it's a good predictor of price?

A.    Well, the final reason, which I discussed in my rebuttal report, is that the proof is in the pudding.

There are statistical criteria that can be used to evaluate whether, indeed, it is a good predictor and how it compares as a predictor with the other alternatives.  And I believe I discuss that in the rebuttal report.

So in my view the case is clear because the economics speak to its essential role, and the statistical analysis confirms that.

Page 995

Q.   And you were referring just then to your AIC and BIC criterion?

A.   Yes.

Q.   Okay.  And do we now have all the reasons why you regard it as a good predictor of price?

A.   I think so, but let me review this portion of my rebuttal report briefly just to make sure I'm not leaving anything out.

Q.   Okay.  As long as you don't take up too much of my limited time, or if Mr. Howard will extend my time, then you can take as much time as you want?

A.   It won't take but a few moments.

Q.   Okay.  If you want to be looking in the nature of pages 42?

A.   Yes, I have it.  Yeah, I think that's it.

Q.   Okay.  Can you please direct your attention to Paragraph 77 of your Motorola rebuttal report. It's on page 42.

MR. HOWARD:  That's the same report you've got, Motorola.

THE WITNESS:  Yes.

BY MR. WICK:

Q.   Okay.  You see the reference to:

"In light of these observations"?

                    DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF SAN FRANCISCO )



          I, JAMES BEASLEY , hereby certify:

          I am a duly qualified Certified Shorthand

Reporter in the State of California, holder of

Certificate Number CSR 12807 issued by the Court

Reporters Board of California and which is in full force

and effect.  (Fed. R. Civ. P. 28(a)).

          I am authorized to administer oaths or

affirmations pursuant to California Code of Civil

Procedure, Section 2093(b) and prior to being examined,

the witness was first duly sworn by me.  (Fed. R. Civ.

P. 28(a), 30(f)(1)).

          I am not a relative or employee or attorney or

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, nor am I

financially interested in this action.  (Fed. R. Civ. P.

28).

          I am the deposition officer that

stenographically recorded the testimony in the foregoing

deposition and the foregoing transcript is a true record

                         / / /

of the testimony given by the witness.  (Fed. R. Civ. P. 30(f)(1)).

Before completion of the deposition, review of the transcript [XX] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

Dated: JUNE 21, 2012

_____