JAMES B. BALDINGER (*pro hac vice*)
jbaldinger@carltonfields.com
DAVID B. ESAU (*pro hac vice*)
desau@carltonfields.com
**CARLTON FIELDS, P.A.**
CityPlace Tower
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, FL 33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368

HSIANG "JAMES" H. LIN (SBN 241472)
jlin@techknowledgelaw.com
**TECHKNOWLEDGE LAW GROUP LLP**
1521 Diamond Street
San Francisco, CA 94131
Telephone: (415) 816-9525

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | Master File No. M:07-1827 SI<br>MDL No. 1827 |
| Acer America Corporation; Gateway, Inc.; and Gateway U.S. Retail, Inc., f/k/a eMachines, Inc.,<br><br>    Plaintiffs,<br><br>v.<br><br>Hitachi, Ltd.; Hitachi Displays, Ltd.; Hitachi Electronic Devices (USA), Inc.; NEC Corporation; NEC Corporation of America; NEC Display Solutions of America, Inc.; NEC LCD Technologies, Ltd.; NEC Electronics America, Inc.; Toshiba Corporation; Toshiba Matsushita Display Technology Co., Ltd. (n/k/a Toshiba Mobile Display Co., Ltd.); Toshiba America Electronic Components, Inc.; Toshiba America Information Systems, Inc.; LG Display Co., Ltd.; LG Display America, Inc.; and HannStar Display Corporation,<br><br>    Defendants. | Individual Case No. 3:13-cv-03349-SI<br><br>**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

AMENDED COMPLAINT

Plaintiffs Acer America Corporation ("Acer America"), Gateway, Inc. ("Gateway"), and Gateway U.S. Retail, Inc. ("Gateway U.S. Retail") (all plaintiffs are collectively referred to as "Acer" or "Plaintiffs") sue all the defendants named herein, and allege as follows:

## I. **INTRODUCTION**

1.      Plaintiffs bring this action to recover those damages caused by a long running and largely-admitted conspiracy among suppliers of Liquid Crystal Display panels ("LCD panels") and related products ("LCD products"). LCD panels are used in a number of products, including but not limited to televisions, desktop computer monitors, notebook computers, and mobile wireless handsets. Defendants and their co-conspirators formed an international cartel that extended at a minimum from at least January 1, 1996 through at least December 11, 2006 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix, raise, stabilize, and maintain prices for LCD panels and LCD products sold directly or indirectly to U.S. customers, including Plaintiffs, who purchased LCD panels and LCD products both directly and indirectly from Defendants and their co-conspirators.

2.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States. The conspiracy included communications and meetings in which Defendants and their co-conspirators agreed to eliminate competition and fix the prices of LCD panels and LCD products that they knew would be sold in the United States.

3.      Beginning in at least 1996, Defendants along with other LCD panel manufacturers (collectively, the "Existing LCD Panel Manufacturers" and individually, each an "Existing LCD Panel Manufacturer") met in person or communicated by other means to agree on LCD panel prices, and the amount of LCD panels each would produce. As new producers entered the LCD panel market, the new producers also agreed to fix prices and to control supply ("New Producers" and collectively with the Existing LCD Panel Manufacturers, the "Conspirators"). The Conspirators' conspiracy included agreements on the prices at which the Conspirators would sell LCD panels and LCD products to their own corporate subsidiaries and affiliates, as well as their co-conspirators, thereby ensuring LCD panel and LCD product prices remained consistent among

AMENDED COMPLAINT

the Conspirators and their customers, which was an attempt to prevent any price discrepancies to consumers (the "Conspiracy").

4.      Throughout the Relevant Period, the Conspiracy was effective in moderating the normal downward pressures on prices for LCD panels and LCD products caused by periods of oversupply and technological change. The Conspiracy resulted in unusually long periods of high prices and high profits. Although there were periods when prices for LCD panels and LCD products temporarily declined as a result of new entrants being assimilated, or breakdowns in the effectiveness of the Conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition. In addition, prices declined less than they would have in a competitive market. As a result of the Conspirators' unlawful conduct, Plaintiffs paid higher prices for LCD panels and LCD products than they would have paid in a competitive market.

5.      Many of the Defendants and their co-conspirators have admitted to participating in this Conspiracy.  On or about November 12, 2008, LG Display Co., Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix the prices of LCD panels. On or about May 15, 2009, Defendant Hitachi Displays, Ltd. agreed to plead guilty and pay a $31 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. On or about February 8, 2010, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay $220 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. On or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in a conspiracy to fix the prices of LCD panels. Two executives from LG Display, three executives from Chunghwa, four executives from Chi Mei, and one executive from HannStar have also pleaded guilty and have been ordered to pay criminal fines and serve time in federal prison for their participation in a conspiracy to fix the prices of LCD panels.

6.      In addition, AU Optronics Corporation was charged with, and found guilty at trial of participating in the conspiracy to fix the prices of LCD panels, and was fined $500 million. Two AUO executives were also found guilty, and were sentenced to three years in prison and fined $200,000 each.

7.      On July 2, 2012, a jury found Defendant Toshiba Corporation liable for $87 million in damages to two groups of LCD panel purchasers for conspiring to fix the price of LCD panels.

8.      During the Relevant Period, Acer America purchased LCD panels and LCD products in the United States indirectly from the Conspirators, including but not limited to Defendants and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  During the Relevant Period, Gateway and eMachines, Inc. ("eMachines") purchased LCD panels and LCD products in the United States directly and indirectly from the Conspirators, including but not limited to Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As a result of the Conspiracy, the prices Plaintiffs paid for LCD panels and LCD products were artificially high. Plaintiffs thus suffered damages as a result of the Conspiracy, and bring this action to recover the overcharges paid for the LCD panels and LCD products they directly and indirectly purchased during the Relevant Period.

II.     **JURISDICTION AND VENUE**

9.      Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act, to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

10.     Plaintiffs also bring this action under the California Cartwright Act, Cal. Bus. & Profs. Code §§ 16720 *et seq*., and California Unfair Competition Law, Cal. Bus. Profs. Code §§ 17200 *et seq.* (collectively, the "California State Law Claims").

11.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Plaintiffs' claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. The Court has supplemental jurisdiction over Plaintiffs' California State Law Claims, and those claims are so

4

related to Plaintiffs' claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

12.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in California. This effect gives rise to Plaintiffs' claims. During the Relevant Period, Defendants' and their co-conspirators' conspiracy affected the price of LCD panels and LCD products that Plaintiffs purchased in the United States.  These LCD panels and LCD products moved through, or were purchased, sold in, or used in California.

13.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act, 15 U.S.C. § 22. In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured LCD panels for sale in the United States, or which were incorporated into LCD products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' Conspiracy affected this commerce in LCD panels and LCD products in the United States. Moreover, Defendants and their co-conspirators who have entered guilty pleas in connection with the Conspiracy alleged herein have acknowledged that their illegal activities had a substantial effect on interstate and foreign trade and commerce.

14.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce and consumers in states including California. This effect gives rise to Plaintiffs' antitrust claims and the California State Law Claims. During the Relevant Period, Defendants' and their co-conspirators' Conspiracy affected the price of LCD panels and LCD products purchased in the United States. In particular, Defendants' and their co-conspirators' Conspiracy directly and substantially affected the price of LCD panels and LCD products purchased by Plaintiffs.

15.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that price-fixed LCD panels and LCD products would be sold and shipped into this District.

16.     This action concerns substantially the same parties, transactions and events as *In re TFT-LCD Antitrust Litigation*, Case No. M:07-cv-1827 SI, pending in this District, Judge Susan Illston presiding, insofar as it involves a suit for damages and injunctive relief arising out of Defendants' and their co-conspirators' conspiracy to fix the price of liquid crystal display panels in violation of the Sherman Act and the laws of California.

### III.     DEFINITIONS

17.     As used herein, the term "Relevant Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

18.     As used herein, the term "LCD panel" means liquid crystal display panel. LCD panels use glass plates and a liquid crystal compound to electronically display an image. The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electronically charged dots, or pixels, that form an image. During the Relevant Period, LCD panels used in certain products included different technologies including but not limited to: thin film transistor (TFT) panels, thin film diode (TFD), color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels. The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD panels including but not limited to those using TFT, TFD, CSTN, and MSTN technology.

19.     As used herein, the term "LCD products" means a product continuing an LCD panel, including without limitation televisions, desktop computer monitors, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and other hand-held devices.

20.     As used herein, the term "ODM" means any original design manufacturer of LCD products.

## IV.     THE PARTIES

### A.     Plaintiffs

21.     Plaintiff Acer America is a California corporation, with its principal place of business in San Jose, California.  During the Relevant Period, all or a significant portion of Acer America's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD products.  During the Relevant Period, Acer America sold numerous products in the United States that incorporate LCD panels, including without limitation desktop monitors and notebook computers. Acer America is an indirect subsidiary of Acer Inc., which is a Taiwanese multi-national corporation. During the Relevant Period, Acer America purchased LCD panels and LCD products indirectly from the Defendants and their co-conspirators.

22.     Plaintiff Gateway is a Delaware corporation with its principal place of business in Irvine, California.  Gateway is now an indirect subsidiary of Acer Inc.  During the Relevant Period, all or a significant portion of Gateway's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD panels and LCD products.  During the Relevant Period, Gateway and its affiliates sold numerous products in the United States that incorporate LCD panels, including without limitation desktop monitors, notebook computers, and televisions.  During the Relevant Period, Gateway purchased LCD panels and LCD products directly and indirectly from the Defendants and their co-conspirators.

23.     Plaintiff Gateway U.S. Retail is a Delaware corporation with its principal place of business in Irvine, California, and is the successor-in-interest to eMachines.  Gateway U.S. Retail is a wholly-owned subsidiary of Gateway, Inc.  Prior to its acquisition in 2004, eMachines had its principal place of business in Irvine, California, and sold numerous products in the United States that incorporate LCD panels, including without limitation desktop monitors and notebook computers.  During the Relevant Period, all or a significant portion of eMachines' product

development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD panels and LCD products.  As the successor-in-interest to eMachines, Gateway U.S. Retail brings this action to recover overcharges based on eMachines' purchases of LCD panels and LCD products, which eMachines purchased directly and indirectly from Defendants and their co-conspirators during the Relevant Period.

24.     Throughout the Relevant period, Plaintiffs purchased LCD panels and LCD products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, Plaintiffs have been injured in their business and property because the prices they paid for such LCD panels and LCD products were artificially inflated by Defendants' and their co-conspirators' conspiracy. Defendants' and their co-conspirators' price-fixing was the proximate cause of Plaintiffs paying artificially-elevated prices for the LCD panels and LCD products that were purchased and delivered in California.

25.     During the Relevant Period, Acer America's negotiations for the purchase of LCD products took place in California, purchase orders for LCD products were issued in California, payments for the purchases of LCD products were issued in California, Acer America took possession of LCD products in California, invoices for LCD products sold to Acer America's customers were issued from California to Acer America's customers, payments for LCD products sold to Acer America's customers were received in California, and LCD products were distributed to Acer America's customers from California.

26.     During the Relevant Period, Gateway's negotiations for the purchase of LCD panels and LCD products took place in California, purchase orders for LCD panels and LCD products were issued in California, payments for the purchases of LCD panels and LCD products were issued in California, Gateway took possession of LCD products in California, invoices for LCD products sold to Gateway's customers were issued from California to Gateway's customers, payments for LCD products sold to Gateway's customers were received in California, and LCD products were distributed to Gateway's customers from California.

27.     During the Relevant Period, eMachines' negotiations for the purchase of LCD

AMENDED COMPLAINT

panels and LCD products took place in California, purchase orders for LCD panels and LCD products were issued in California, payments for the purchases of LCD panels and LCD products were issued in California, eMachines took possession of LCD products in California, invoices for LCD products sold to eMachines' customers were issued from California to eMachines' customers, payments for LCD products sold to eMachines' customers were received in California, and LCD products were distributed to eMachines' customers from California.

### B.  Defendants

#### 1.  Hitachi

28.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of LCD panels. In 2002, it spun off its LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Relevant Period, Hitachi, Ltd. manufactured, sold, and distributed LCD panels and LCD products to customers throughout the United States, including in California.

29.     Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD manufacturing business. Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and distributed LCD panels and LCD products to customers throughout the United States, including in California.  Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

30.     Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina. Its ultimate parent company is Hitachi, Ltd. During the Relevant Period, Hitachi Electronic Devices (USA), Inc. sold and distributed LCD panels and LCD products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the United States, including in California.

31.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi." Defendants Hitachi, Ltd.,

Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. were members of the Conspiracy by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Further, Defendant Hitachi benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed. Alternatively, Defendants Hitachi Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. were members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of Hitachi, Ltd. Hitachi, Ltd. dominated or controlled Hitachi Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD panels.

## 2.  NEC

32.     Defendant NEC Corporation is a Japanese company with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan. During the Relevant Period, NEC Corporation manufactured, sold and distributed LCD panels and LCD products to customers throughout the United States, including in California.

33.     Defendant NEC Corporation of America is a Nevada corporation with its principal place of business located at 6535 North State Highway 161, Irving, Texas 75039. It is a wholly-owned and controlled subsidiary of NEC Corporation. During the relevant period, NEC Corporation of America sold and distributed LCD panels and LCD products manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States, including in California.

34.     NEC Display Solutions of America, Inc. is a Delaware corporation with its principal place of business located at 500 Park Blvd., Suite 1100, Itasca, Illinois 60143. It is a wholly-owned and controlled subsidiary of NEC Corporation. During the relevant period, NEC Display Solutions of America, Inc. sold and distributed LCD panels and LCD products manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States, including in California.

35.     Defendant NEC LCD Technologies, Ltd. is a Japanese company with its principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666,

Japan. NEC LCD Technologies, Ltd. was formed in 2003 and is a wholly-owned and controlled subsidiary of NEC Corporation. During the Relevant Period, NEC LCD Technologies, Ltd. manufactured, sold and distributed LCD panels and LCD products to customers throughout the United States, including in California.

36.     Defendant NEC Electronics America, Inc. is a California corporation with its principal place of business at 2880 Scott Boulevard, Santa Clara, CA and its manufacturing plant in Roseville, California. Its ultimate parent company is NEC Corporation. During the Relevant Period, NEC Electronics America, Inc. sold and distributed LCD panels and LCD products manufactured by NEC Corporation and NEC LCD Technologies, Ltd. to customers throughout the United States, including in California.

37.     Defendants NEC Corporation, NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc. are sometimes referred to collectively herein as "NEC." Defendants NEC Corporation, NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd., and NEC Electronics America, Inc. were members of the Conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Further, Defendant NEC benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed. Alternatively, Defendants NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc. were members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of NEC Corporation. NEC Corporation dominated or controlled NEC Corporation of America, NEC Display Solutions of America, Inc., NEC LCD Technologies, Ltd. and NEC Electronics America, Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD panels and LCD products.

### 3.     Toshiba

38.     Defendant Toshiba Corporation is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. Toshiba Corporation

participates in two joint ventures that manufacture, sell, and distribute LCD panels and LCD products – Defendant Toshiba Matsushita Display Technology Co., Ltd. and co-conspirator IPS Alpha Technology, Ltd.  During the Relevant Period, Toshiba Corporation manufactured, sold, and distributed LCD panels and LCD products to customers throughout the United States, including in California.

39.    Defendant Toshiba Matsushita Display Technology Co., Ltd. (n/k/a Toshiba Mobile Display Co., Ltd.) ("Toshiba Matsushita") is a Japanese company with its principal place of business at Rivage Shinagawa, 18, Konan 4-chome, Minato-ku, Tokyo 108-0075, Japan. Toshiba Matsushita is a joint venture between Defendant Toshiba Corporation and co-conspirator Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.). Toshiba Matsushita was created for the purpose of manufacturing LCD panels and LCD products.  During the Relevant Period, Toshiba Matsushita manufactured, sold, and distributed LCD panels and LCD products to customers throughout the United States, including in California.

40.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine, California. TAEC is a wholly-owned and controlled subsidiary of Toshiba America, Inc., a holding company for Defendant Toshiba Corporation. TAEC is the United States sales and marketing representative for Defendants Toshiba Corporation and Toshiba Matsushita. During the Relevant Period, TAEC sold and distributed LCD panels and LCD products manufactured by Toshiba Corporation and/or Toshiba Matsushita to customers throughout the United States, including in California.

41.    Defendant Toshiba America Information Systems, Inc. is a California corporation with its principal place of business at 9470 Irvine Boulevard, Irvine, California. Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc., a holding company for Defendant Toshiba Corporation. During the Relevant Period, Toshiba America Information Systems, Inc. sold and distributed LCD panels and LCD products manufactured by Toshiba Corporation and/or Toshiba Matsushita to customers throughout the United States, including in California.

42.     Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba America Information Systems, Inc. are sometimes referred to collectively herein as "Toshiba." Defendants Toshiba Corporation, Toshiba Matsushita, TAEC, and Toshiba America Information Systems, Inc. were members of the Conspiracy by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Further, Toshiba benefited from the Conspiracy by receiving greater profits than it would have received had the Conspiracy not existed. Alternatively, Defendants Toshiba Matsushita, TAEC and Toshiba America Information Systems, Inc. were members of the Conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of Toshiba Corporation. Toshiba Corporation dominated or controlled Toshiba Matsushita, TAEC, and Toshiba America Information Systems, Inc. regarding Conspiracy activities and used that domination or control to charge artificially high prices for LCD panels and LCD products.

43.     Toshiba maintained offices in San Jose, California. Toshiba personnel in its San Jose, California offices were involved in and implemented Defendants' and their co-conspirators' conspiracy in the United States. Cameron Zand, one of Toshiba's employees in San Jose, California, received information in Toshiba's California office from his counterparts in Japan regarding the prices Sharp, Epson and other Conspirators planned to quote to customers for certain panel applications. At other times, Mr. Zand received information regarding other Defendants' and co-conspirators' planned supply of LCD panels. Information provided to Mr. Zand in San Jose, California was obtained by Toshiba through bilateral discussions with other Defendants and co-conspirators, including Sharp and Epson. In addition, Mr. Zand was in regular contact with Makoto Chiba and Masotoshi Tanaka and received guidance from Mr. Chiba and Mr. Tanaka regarding upcoming price negotiations with U.S. customers. Mr. Chiba and Mr. Tanaka both had frequent discussions with H.B. Suh of Samsung, in which they discussed and reached agreements regarding LCD panel pricing.

### 4.     LG Display

44.     Defendant LG Display Co., Ltd., f/k/a LG Phillips LCD Co., Ltd., is a leading manufacturer of LCD Panels and is a joint venture created in July 1999 by Royal Phillips

Electronics NV and LG Electronics, Inc. LG Display Co., Ltd. maintains offices in San Jose, California, and has its principal place of business at 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD panels that were incorporated into LCD products sold throughout the United States and the world.

45.     Defendant LG Display America, Inc., f/k/a LG Phillips LCD America, Inc., is located at 2540 N. First St., Ste. 400, San Jose, California. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD panels that were incorporated into LCD products sold throughout the United States and the world.

46.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to collectively herein as "LG Display." The LG Display companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to cause artificially high prices for LCD panels and LCD products.

### 5.    HannStar

47.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD panels incorporated into LCD products sold in the United States.

### C.    Co-Conspirators

48.     The actions in this Complaint were authorized, ordered, or done by Defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

49.     Each Defendant acted as the agent or joint venturer of or for the other Defendants

with respect to the acts, violations and common course of conduct alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD panels and/or LCD products made by its parent company.

50.     Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These co-conspirators are believed to include, without limitation, AU Optronics Corporation and AU Optronics Corporation America, Inc. ("AUO"), Chi Mei Corporation, Chi Mei Innolux Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., and Nexgen Mediatech USA, Inc. ("Chi Mei"), Chunghwa Picture Tubes, Ltd. and Tatung Company of America, Inc. ("Chunghwa"), Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Samsung Electronics America, Inc., and Samsung Electronics Company, Ltd. ("Samsung"), Sharp Corporation and Sharp Electronics Corporation ("Sharp"), Epson Imaging Devices Corporation and Epson Electronics America, Inc. ("Epson"), LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd. ("Hydis"), Royal Philips Electronics N.V. and Philips Electronics North America Corp., Ltd. ("Philips"), IPS Alpha Technology, Ltd. ("IPS Alpha"), Mitsui & Co., Ltd. ("Mitsui"), Mitsubishi Electric Corporation ("Mitsubishi"), Panasonic Corporation and Panasonic Corporation of North America ("Panasonic"), Seiko Epson Corporation ("Seiko Epson"), and Sanyo Consumer Electronics Co., Ltd. and Sanyo Electric Co., Ltd. ("Sanyo").

51.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

52.     Each Defendant named herein acted as the agent or joint venturer of or for the other Defendants and/or co-conspirators with respect to the acts, violations and common course of conduct alleged herein. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD panels and LCD products made by its parent company.

V.     <u>**TRADE AND COMMERCE**</u>

53.     During the Relevant Period, each Defendant or co-conspirator, or one or more of its affiliates or subsidiaries, sold LCD panels and LCD products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

54.     During the Relevant Period, Defendants and their co-conspirators collectively controlled a vast majority of the market for LCD panels and LCD products, both globally and in the United States.

55.     The business activities of Defendants and their co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. Defendants' and their co-conspirators' business activities substantially affected trade and commerce within each of the 50 states, as the Conspiracy artificially inflated the prices of LCD panels and LCD products sold in all 50 states, and therefore caused antitrust injury in every state, including California. Moreover, Plaintiffs purchased price-fixed goods directly and indirectly from Defendants and some of their co-conspirators for sale across the United States, including in California.

56.     For example, LG Display Co., Ltd. and LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Hitachi Displays, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California. Each agreed that "[a]cts in furtherance of this conspiracy were carried out within the Northern District of California. LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District." Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4; Case 3:09-cr-00247, Document 10-1 at 4; Case 3:09-cr-1166, Document 15-1 at 4; 3:10-cr-0498, Document 11-1 at 4. Moreover, Defendants and their co-conspirators and/or their agents delivered a substantial amount of LCD panels and LCD products to persons in California, including Plaintiffs.

AMENDED COMPLAINT

57.     Defendants' and their co-conspirators' illegal conduct involved U.S. import trade or import commerce. Defendants and their co-conspirators knowingly and intentionally sent price-fixed LCD panels and LCD products into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD panels and LCD products to enter the United States market and inflating the prices of LCD panels and LCD products destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. retailers and by Plaintiffs.

58.     The U.S. LCD market is enormous and was a major focus of and very important to the Conspiracy. Measured by value, Defendants, their co-conspirators and others shipped more than 400 million LCD panels, including those incorporated into LCD products, into the United States during the Relevant Period for ultimate sale to U.S. consumers. During the Relevant Period, the value of LCD panels imported into the United States was in excess of $50 billion. Defendants and their co-conspirators shipped millions of LCD panels and LCD products worth billions of dollars into the United States each year during the Relevant Period. As a result, a substantial portion of Defendants' and their co-conspirators' revenues were derived from the U.S. market. Defendants and their co-conspirators spent hundreds of millions of dollars on advertising their products in the United States. Many of the Defendants and their co-conspirators had marketing, sales, and account management teams specifically designated to handle U.S. customer accounts and the U.S. market for LCD panels and LCD products.

59.     Because of the importance of the U.S. market to Defendants and their co-conspirators, LCD panels and LCD products intended for importation into and ultimate consumption in the United States were a focus of Defendants' and their co-conspirators' illegal conduct. Defendants and their co-conspirators knowingly and intentionally sent price-fixed LCD panels and LCD products into a stream of commerce that led directly into the United States. Many LCD panels were intended for incorporation into finished products specifically destined for sale and use in the United States.  This conduct by Defendants and their co-conspirators was meant to

produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for LCD panels and LCD products.

60.     During the Relevant Period, Defendants and their co-conspirators shipped LCD panels and LCD products directly into the United States, including to Plaintiffs.

61.     When high-level executives based at Defendants' and their co-conspirators' Asian and other foreign headquarters agreed on prices, they knew that their price-fixed LCD panels would be sold in the United States. Moreover, because LCD panels are – and were throughout the Relevant Period – the most expensive and significant component of LCD products, Defendants and their co-conspirators knew that price increases for LCD panels would necessarily result in increased prices for LCD products sold in the United States.

62.     In addition to manufacturing LCD panels, many Defendants and co-conspirators also manufactured LCD products and sold them in the United States. In fact, Defendants and their co-conspirators routinely monitored the effect their price-fixing had on the prices of such LCD products sold in the United States.

63.     Defendants and their co-conspirators also monitored the prices for LCD products sold in the United States, which they often referred to as "street prices," because Defendants and their co-conspirators were aware that the conspiracy would elevate those prices in addition to the prices of LCD panels. In addition, Defendants and their co-conspirators used LCD product pricing in the United States as a benchmark for establishing, organizing, and tracking their price-fixing of LCD panels.

64.     Defendants' co-conspirators have acknowledged that their commercial activities involving intentionally sending LCD panels and LCD products into the United States impacted U.S. import trade and import commerce. In a series of complaints filed with the U.S. International Trade Commission over the past few years, Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf). *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of Samsung Electronics

Co., Ltd. (December 21, 2007) (Docket No. 2586); *In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

65.     For the reasons set forth above, Defendants' and their co-conspirators' illegal conduct involved import trade or import commerce into the United States.

66.     Defendants' and their co-conspirators' illegal conduct also had a direct, substantial, and reasonably foreseeable effect on both U.S. domestic trade or commerce and U.S. import trade or commerce in the form of higher prices for LCD panels and LCD products manufactured by Defendants and their co-conspirators being negotiated, charged, and paid by Plaintiffs in the United States for products imported into the United States.

## VI.     FACTUAL ALLEGATIONS

### A.     LCD Technology

67.     The technology behind LCD panels is not new. In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology. In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology. These efforts resulted in monochrome calculators and watches. By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions. In the mid-1990s, the technology advanced further with the development of LCDs.

68.     The basic structure of an LCD panel is two glass substrates sandwiching a layer of liquid crystal compound. Liquid crystals change orientation under an applied electric field and can thereby block or pass light. One glass substrate has thin chemical films that act as transistors, and the other glass substrate is coated with liquid pigments that act as color filters.  When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through the filters to create

red, green, or blue pixels. Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

69.     The term "active matrix" describes the ability to switch each pixel in a display individually. Unlike older LCDs that have one transistor for each row and column of pixels, LCDs have a transistor for each pixel. Thus, the term "active matrix LCD" is sometimes used interchangeably with LCD. Active matrix displays are brighter and sharper than passive matrix displays of the same size.

70.     The glass substrates used for LCD panels begin with a "motherglass," a sheet of glass that is cut to make multiple panels. LCDs are manufactured in fabs that are equipped to handle a particular size motherglass. Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger and larger size motherglass sheets. This, in turn, has resulted in the ability to fabricate larger and/or more LCD panels. Each increase in motherglass size is described as a generation. Third generation fabs in the 1998 to 1999 period typically used 550 millimeter ("mm") by 650 mm motherglass, while some current (eighth generation) fabs use 2160 mm by 2460 mm motherglass. The use of larger motherglass provides substantial cost savings to manufacturers.

71.     LCDs are capable of producing the same image as cathode ray tubes ("CRTs"), but in a much smaller package. LCDs also have lower energy requirements, are generally easier to read, and do not flicker like CRTs. LCD panels of approximately 10 inches or less in diagonal are considered "small" or "medium" displays. They are also referred to as "mobile displays." These displays are commonly used in mobile wireless handsets, personal digital assistants, and cameras.

72.     LCD panels have no independent utility, and have value only as components of other products, such as TVs, computer monitors, notebook computers, and mobile wireless handsets. The demand for LCD panels thus directly derives from the demand for LCD products.

73.     The market for LCD panels and the market for the products into which they are placed are inextricably linked and intertwined because the LCD panel market exists to serve the LCD products markets. The markets for LCD panels and LCD products are, for all intents and purposes, inseparable in that one would not exist without the other.

AMENDED COMPLAINT

74.     Plaintiffs have participated in the market for LCD panels and LCD products through direct and indirect purchases of LCD panels and LCD products from Defendants and some of their co-conspirators.

75.     Defendants' and their co-conspirators' unlawful Conspiracy inflated the prices at which Plaintiffs bought LCD panels and LCD products, and Plaintiffs have been injured thereby and paid supra-competitive prices for LCD panels and LCD products.

**B.**     **Structure of the LCD Industry**

76.     The LCD industry has several characteristics that facilitated the Conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**i.     Market Concentration**

77.     The LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by Plaintiffs.  Samsung, LG, Sharp, AUO, and Chi Mei were the five largest producers as measured by market share during much of the Relevant Period.

**ii.     Information Sharing**

78.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, the Conspirators had many opportunities to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. The Conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for LCD panels as alleged below.

79.     Additionally, the LCD industry is analyzed by several market research firms. Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity. The capacity and pricing data reported by these firms comes directly from manufacturers. Manufacturers typically report historical, current, and perhaps most importantly, prospective information. Thus, the Conspirators had access to each other's

AMENDED COMPLAINT

future plans for bringing capacity on line, capacity utilization, market share, pricing, and the advent of new technology. Because there were very few companies that needed to be analyzed in order to obtain this data, all competitors in the LCD market had ready and timely access to reliable information about their competition's pricing as well as future supply and capacity decisions. By meeting together as herein below alleged as well as monitoring and analyzing this information over time, the Conspirators were able to signal their respective intent, verify that the Conspiracy was working, and identify any parties and punish any parties who might be deviating from the agreements necessary to carry out the Conspiracy.

### iii.    Consolidation

80.      The LCD industry experienced significant consolidation during the Relevant Period, including: (a) the creation of AUO in 2001; (b) the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and (e) AUO's acquisition in 2006 of Quanta Display Inc. ("QDI"), which resulted in AUO becoming the third-largest manufacturer of LCD Products.

### iv.    Multiple Interrelated Business Relationships

81.      The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion. AUO, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006. Chunghwa did likewise with Sharp in December of 2006. Chi Mei has licensing arrangements with Sharp, AUO, Chunghwa, HannStar and Hitachi.

82.      The industry has a close-knit nature whereby multiple business relationships between supposed competitors blurred the lines of competition and provided ample opportunity to collude. These business relationships also created a unity of interest among competitors so that the Conspiracy was easier to implement and to enforce, including by checking each Conspirator's participation in the Conspiracy, than if such interrelationships did not exist.

### v.    High Costs of Entry Into the Industry

AMENDED COMPLAINT

83.     There are significant manufacturing and technological barriers to entry into the LCD industry. Efficient fabs are large and costly. LCD panels are also subject to technological advances, so that firms within the industry must spend significant capital on research and development. DisplaySearch, a research firm in Austin, Texas that covers the LCD industry, reported in September 2005 that the top LCD manufacturers collectively spent $30 million a day on property, plant, and equipment. A January 2006 DisplaySearch report noted that a typical seventh generation fab can cost more than $3 billion.

84.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, were generally declining, and, in some periods, declining at a substantial rate. Later in the Conspiracy, approximately 70 percent of the cost of LCD panel production was attributable to the cost of raw materials. The combination of price discussions and manipulation of the output of LCD panels and LCD products allowed the Conspirators to keep prices above where they would have been but for the Conspiracy.

### vi.     The "Crystal Cycle"

85.     Like all markets, the LCD industry is subject to business cycles of supply and demand. In the LCD industry, this cycle is known as the "crystal cycle." This cycle has been described as "boom and bust" periods caused by alternating periods of oversupply and shortages, which create downward and upward pressures on prices for LCD panels and LCD products. One fact that can affect oversupply is the perceived demand for such products and whether manufacturers have adequately predicted demand when determining how much capacity to build and use, *i.e.*, how many LCD panels and LCD products to produce.

86.     Another factor is the entry of new competitors. Typically, when a new competitor enters a market, it brings incremental production on line thereby adding supply, and prices drop until an equilibrium is reached. In the LCD industry, however, the Conspirators conspired to rein in and discipline new entrants until the new entrants were assimilated into the Conspiracy. This had the effect of tempering price drops and preventing prices from reaching a competitive equilibrium. The Conspiracy did not completely eliminate the effects of the crystal cycle in the LCD industry. There were periods when the Conspirators' collusive practices drove prices for

LCD panels and LCD products so high that demand began to fall to the point that the Conspirators lowered prices for short periods of time. However, the Conspirators' efforts to stabilize prices were successful in moderating the effects of the crystal cycle, including the impact on prices paid by direct and indirect purchasers. To the extent that prices for LCD panels and LCD products fell, they fell from levels that had been set conspiratorially, rather than from levels set by free and open competition. Additionally, prices did not fall as low as they would have absent the conspiratorial conduct.

### C.      Pre-Conspiracy Market

87.      Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were essentially the exclusive suppliers of LCD panels.

88.      In early 1995, the industry faced declining LCD panel prices, which industry analysts attributed to advances in technology and improving efficiencies. One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry." The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of LCD panels, and they slowed the rate of their investments. This, however, provided an opening to Korean manufacturers.

89.      In 1995, three Korean companies – Samsung, LG and, to a lesser extent, Hyundai – entered the market. These Korean firms offered comparable LCD panels at reduced prices in an effort to quickly gain market share. This resulted in increased competition in 1995, which contributed to the significant price declines seen during that timeframe.

90.      Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines. By mid-1995, the Japanese companies and the new Korean competitors had a total capacity to supply 14 million LCD panels, while demand for them was only about three million. In addition to the surges in capacity during 1995, "[costs] were also dropping as production volume increase[d] and manufacturing methods improved."

91.      By late 1995, the effect of the entry of Korean suppliers had pushed down the price of some LCD panels by 50 percent from the previous year. The origin of the Conspiracy may be traceable to this trough in prices.

**D.        Defendants' and Co-Conspirators' Illegal Agreements**

92.        The Conspiracy was effectuated through a combination of group and bilateral discussions. In the formative years, bilateral discussions were the primary method of communication. During this period of the Conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other Defendant or co-conspirator about the prices for LCD panels, and thereby created a model for how the Conspiracy would be carried out after the Korean, and later the Taiwanese co-conspirators joined. These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as capacity utilization. As more manufacturers entered the Conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings was in place.

**i.        "Crystal Meetings"**

93.        The group meetings among the participants in the LCD price-fixing Conspiracy were referred to as "crystal meetings." Crystal meetings were attended by employees at three general levels. The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings. The second level were management-level meetings, referred to as "commercial" or "operation" meetings. The third level were meetings attended by lower-level sales and marketing personnel.

94.        In a typical crystal meeting of the Conspiracy, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices. Meeting participants shared information relating to all of these topics so that Defendants and their co-conspirators could agree on what price each would charge for LCD panels to be sold in the following month. Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for LCD panels. They also discussed prices of LCD panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

95.        The purpose of the CEO or top meetings was to stabilize or raise prices. At the CEO meetings, the participants discussed prices and the supply and demand situation. The participants also discussed monthly and quarterly LCD fab output and supply figures, as well as

the number of production days the fabs would operate for the next month, and agreed on output restrictions. Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply and demand and price for the group to review. The attendees would take turns making comments and adjusting the numbers. At some point during the meeting, the participants would reach an agreement on price and supply for LCD panels.

96.     The commercial or operation meetings were attended by Defendants' respective Vice Presidents of sales and marketing and other senior sales employees. The structure and content of the commercial meetings were largely the same as the CEO meetings. The participants discussed price, output, capacity, and the general market situation for LCD panels. These meetings occurred approximately monthly and sometimes quarterly.

97.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of LCD panels has on the cost of the finished products into which they are placed. Defendants and their co-conspirators knew that the conspiratorially high prices of LCD panels would be reflected in the prices for finished LCD products, and thus, there was no need to specifically discuss the prices of finished LCD products.

98.     The agreements reached at these meetings included: (1) establishing target prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of LCD panels, such as quality or certain technical specifications; (3) what to tell customers as the reason for price increases; (4) coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging information about fabrication plant utilization and production capacity; and (6) reaching out to other competitors to encourage them to abide by the agreed-upon pricing. The meeting participants also agreed to maintain or lower production capacity.

99.     Compared to the CEO and commercial meetings, the lower level meetings were less formal, and typically occurred at restaurants over lunch. The purpose of the lower level meetings was to exchange market information that would facilitate implementation of the Conspiracy and carry out the agreements made at the CEO and commercial meetings. Participants

in the lower level meetings exchanged information relating to past and future prices of LCD panels and LCD products and shipment quantities.

100.     In the summer of 2006, Defendants and their co-conspirators discontinued the lower level meetings in favor of coordinated one-on-one meetings. The meetings were coordinated so that on the same date, two sets of competitors met one-on-one. After that meeting, each of them met one-on-one with another competitor. This continued until all competitors met with each other. These coordinated meetings took place until about November or December 2006. Defendants and their co-conspirators switched the format of the meetings with the specific intent to conceal their meetings and for these coordinated one-on-one meetings to accomplish the same purposes as the group meetings. The information obtained at these meetings was transmitted up the corporate reporting chain to permit Defendants and their co-conspirators to maintain their price-fixing and production-limitation agreements.

### ii.     Bilateral Discussions

101.     The crystal meetings were supplemented by bilateral discussions between various Conspirators. The purpose of the bilateral discussions was to exchange information about past and future pricing, as well as information about shipments.

102.     The Conspirators had bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone calls, e-mails, and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

103.     Bilateral discussions were also used to synchronize prices with manufacturers that did not ordinarily attend the group meetings. For example, HannStar was responsible for notifying Hitachi of the pricing agreements reached at the crystal meetings. Hitachi implemented the agreed-upon pricing as conveyed by HannStar. Therefore, Hitachi and HannStar participated in the Conspiracy to fix the prices of LCD panels.

### iii.     The Conspirators' Participation in Group and Bilateral Discussions

AMENDED COMPLAINT

104.    AUO participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006. Additionally, QDI and Unipac Optoelectronics Corporation, which merged with AUO, participated in lower-level meetings. Through these discussions, AUO agreed on prices and supply levels for LCD panels.

105.    Chi Mei participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chi Mei agreed on prices and supply levels for LCD panels.

106.    Chunghwa participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chunghwa agreed on prices and supply levels for LCD panels.

107.    Defendant HannStar participated in multiple CEO, commercial, and lower-level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, HannStar agreed on prices and supply levels for LCD panels.

108.    Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and supply levels for LCD panels.

109.    Defendant LG participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, LG agreed on prices and supply levels for LCD panels.

110.    Defendant NEC joined the Conspiracy by participating in multi-lateral meetings and bilateral meetings and discussions with, among others, Samsung, Toshiba, Hitachi, Sharp, and LG to share information and reach agreement on prices for LCD panels beginning as early as 1998. In these discussions with its competitors and fellow Conspirators, NEC exchanged price and supply information and also agreed on prices, price increases, and production limits and quotas for LCD panels.

111.    Deposition testimony and documents confirm NEC's participation in the conspiracy during the Relevant Period, including meetings and communications with co-conspirators and competitors to discuss and agree on prices for LCD panels.

112.     Samsung participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Samsung agreed on prices and supply levels for LCD panels.

113.     Sanyo participated in at least one bilateral meeting through an agent during the Relevant Period, and agreed on prices and supply levels for LCD panels.

114.     Sharp participated in multiple group and bilateral meetings during the Relevant Period, and agreed on prices and supply levels for LCD panels.

115.     Defendant Toshiba participated in bilateral discussions during the Relevant Period, and agreed on prices and supply levels for LCD panels. Toshiba personnel in its San Jose, California offices were involved in and implemented Defendants' conspiracy in the United States.

116.     Hydis participated in multiple lower-level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese co-conspirator at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for LCD panels.

117.     Mitsubishi participated in multiple lower-level meetings in 2001 with Chi Mei, Chunghwa, and Samsung. Through these meetings, Mitsubishi agreed on prices and supply levels for LCD panels.

118.     Panasonic participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD panels.

119.     Philips participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD panels.

120.     Sanyo participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD panels.

AMENDED COMPLAINT

121.     Seiko Epson participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for LCD panels.

122.     Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Epson Imaging Devices Corporation ("Epson Japan").    Up until December, 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd., but is now a wholly-owned and controlled subsidiary of Seiko Epson Corporation. Epson Japan was represented by co-conspirator Mitsui at one of the bilateral meetings.  Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America.  Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.  In addition, to the extent Epson America distributed LCD panels, it played a significant role in the Conspiracy because the Conspirators wished to ensure that the prices for such products paid by direct purchasers did not undercut the pricing agreements reached at these various meetings. Epson America was an active, knowing participant in the alleged Conspiracy.

123.     Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese co-conspirator in 2001.  As discussed above, Mitsui was also acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan agreed on prices and supply levels for LCD panels.

124.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the Conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate

family was represented in meetings and discussions by its agents and a party to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed LCD panels or LCD products to direct purchasers, these subsidiaries played a significant role in the Conspiracy because Defendants and their co-conspirators wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the Conspiracy.

125.     Defendant Toshiba Matsushita is a joint venture between Toshiba Corporation and Panasonic Corporation, and one or more of the partners in this joint venture participated in the meetings described above. As a result, Toshiba Matsushita was represented at those meetings by its agents and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners controlled Toshiba Matsushita's production levels and the prices of LCD panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, this Defendant was an active, knowing participant in the alleged Conspiracy.

126.     IPS Alpha is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation, and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of LCD panels the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged Conspiracy.

**E.       International Government Antitrust Investigation**

127.     The Conspiracy to artificially restrict the output of, and to raise the prices for, LCD panels and LCD products sold in the United States during the Relevant Period was shown by multinational investigations commenced by the DOJ.

128.     In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anticompetitive activity among LCD panel manufacturers. In a December 11, 2006 filing with the Securities and Exchange Commission, Defendant LG Display disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

129.     On December 12, 2006, news reports indicated that in addition to LG Display, LCD panel makers Samsung, Sharp, Epson, and AUO were also under investigation. The JFTC stated that the probe was related to price-fixing. On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement and price-fixing among manufacturers of LCD panels.

130.     On November 12, 2008, the DOJ announced that it had reached agreements with three LCD panel manufacturers – LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – in which they would plead guilty and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of LCD panels.

131.     LG Display Co., Ltd. and LG Display America, Inc. agreed to plead guilty and pay a $400 million fine for their participation in a conspiracy to fix prices of LCD panels.  LG Display Co., Ltd. and LG Display America, Inc. admitted that from September 21, 2001 to June 1, 2006, they participated in a conspiracy with other major LCD panel producers, the primary purpose of which was to fix the price of LCD panels sold in the United States and elsewhere. They admitted that in furtherance of the conspiracy they, through their officers and employees, engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as "crystal meetings," with representatives of other major LCD panel producers.

During these discussions and meetings, agreements were reached to fix the price of LCD panels to be sold in the United States and elsewhere.

132. Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million fine for its participation in a conspiracy to fix prices of LCD panels. Chunghwa Picture Tubes, Ltd. admitted that from September 14, 2001 to December 1, 2006, it participated in a conspiracy with other major LCD panel producers, the primary purpose of which was to fix the price of LCD panels sold in the United States and elsewhere. Chunghwa admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as "crystal meetings," with representatives of other major LCD panel producers. During these discussions and meetings, agreements were reached to fix the price of LCD panels to be sold in the United States and elsewhere.

133. Sharp Corporation agreed to plead guilty and pay a $120 million fine for its participation in a conspiracy to fix prices of LCD panels. Sharp Corporation admitted that:

        A.      from April 1, 2001 to December 1, 2006, it conspired with other major LCD panel producers to fix the price of LCD panels sold to Dell Inc. for use in computer monitors and laptops;

        B.      from fall 2005 to the middle of 2006, it conspired with other major LCD panel producers to fix the price of LCD panels sold to Motorola, Inc. for use in Razr mobile phones; and

        C.      from September 1, 2005 to December 1, 2006, it conspired with other major LCD panel producers to fix the price of LCD panels sold to Apple Computer, Inc. for use in iPod portable music players. Sharp admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in bilateral telephone discussions and attended bilateral meetings with other major LCD panel producers. During these discussions and meetings, agreements were reached to fix the price of LCD panels.

AMENDED COMPLAINT

134.     In May 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, Ltd. in which it would plead guilty and pay $31 million in criminal fines for its role in a conspiracy to fix prices of LCD panels.  Hitachi Displays, Ltd. admitted that from April 1, 2001 to March 31, 2004, it conspired with other major LCD panel producers to fix the prices of LCD panels sold to Dell for use in notebook computers.  Hitachi admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in telephone discussions and attended bilateral meetings with other major LCD panel producers. During these discussions and meetings, agreements were reached to fix the price of these LCD panels sold to Dell.

135.     In August 2009, the DOJ reached an agreement with Epson Imaging Devices Corporation in which it would plead guilty and pay a $26 million fine for its role in a conspiracy to fix prices of LCD panels.  Epson Imaging Devices Corporation admitted that from the fall of 2005 to the middle of 2006, it conspired with other major LCD producers to fix the price of LCD panels sold to Motorola, Inc. for use in Razr mobile phones. Epson admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in bilateral telephone discussions and attended bilateral meetings in Japan with representatives of other major LCD producers. During these discussions and meetings, agreements were reached to fix the price of LCD panels sold to Motorola.

136.     In December 2009, the DOJ reached an agreement with Chi Mei Optoelectronics Corporation in which it would plead guilty and pay a $220 million fine for its role in a conspiracy to fix prices of LCD panels.  Chi Mei Optoelectronics Corporation admitted that from September 14, 2001 to December 1, 2006, it conspired with other major LCD producers to fix the prices of LCD panels. Chi Mei admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as "crystal meetings," with representatives of other major LCD producers. During these discussions and meetings, agreements were reached to fix the price of certain LCD panels to be sold in the United States and elsewhere.

137.     In June 2010, the DOJ reached an agreement with HannStar Display Corporation in which it would plead guilty and pay a $30 million fine for its role in a conspiracy to fix prices of

LCD panels.  HannStar Display Corporation admitted that from September 2001 to January 2006, it conspired with other major LCD panel producers to fix prices of LCD panels. HannStar admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as "crystal meetings," with representatives of other major LCD panel producers. During these discussions and meetings, agreements were reached to fix prices of LCD panels to be sold in the United States and elsewhere.

138.     Since January 15, 2009, the DOJ has announced ten additional agreements with executives of LG Display Co. Ltd., Chunghwa Picture Tubes Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation who all agreed to plead guilty and serve jail time in the United States for participating in the conspiracy. The ten individuals are Chang Suk "C.S." Chung and Bock Kwon (both with LG Display), Chieng-Hon "Frank" Lin, Chin-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee (all with Chunghwa), Chu-Hsiang "James" Yang, Jau-Yang "J.Y." Ho, Wen-Hung "Amigo" Huang, and Chen-Lung Kuo (all with Chi Mei), and Jiu Hung "Sam" Wu of HannStar. All ten of these individuals have now pleaded guilty and been sentenced, and at their sentencing hearings, confirmed the allegations against them that they participated in the global conspiracy to fix the prices of LCD panels.

139.     These guilty pleas demonstrate that the investigations into the LCD industry are not mere information-gathering efforts by regulatory authorities. In fact, as the DOJ's representative has stated, the DOJ's investigation into the LCD industry is premised in part on insider information that presents a detailed "road map" of the Conspiracy.

140.     The guilty plea by Sharp has significant ramifications for Defendant Toshiba. Toshiba was one of Sharp's principal competitors in the sale of LCD panels to Dell and Apple during the periods set forth in the DOJ's information against Sharp. Toshiba sold LCD panels to Dell between 2000 and 2006, and it sold LCD panels for use in Apple's iPod music players between 2001 and 2006. In fact, Toshiba was one of Apple's largest, if not the largest, suppliers of iPod screens for a substantial part of the Relevant Period. In the small-to-medium size LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share

in the first half of 2005, holding a 15.4 percent market share during the first quarter and a 14.1 percent market share during the second quarter. Toshiba's high percentage of LCD revenues dictated that no conspiracy would be effective without its participation. Sharp could not have successfully fixed the prices of LCD panels unless Toshiba, one of its biggest competitors, agreed not to undersell it.

141.    In addition, AU Optronics Corporation was charged with, and found guilty at trial of participating in the conspiracy to fix the prices of LCD panels, and was fined $500 million. Two AUO executives were also found guilty, and were sentenced to three years in prison and fined $200,000 each.

142.    On July 2, 2012, a jury found Defendant Toshiba Corporation liable for $87 million in damages to two groups of LCD panel purchasers for conspiring to fix the price of LCD panels.

**F.**       **Market During the Conspiracy**

143.    After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends. Since at least 1996, however, the LCD panel and LCD product markets have been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices. Defendants and their co-conspirators achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

144.    As described herein, Defendants' and their co-conspirators' LCD cartel evolved over time. Defendants and their co-conspirators initiated their cartel when LCD panels were in their relative infancy. At that time, Defendants and their co-conspirators balanced the desire to set prices collusively with the industry goal of establishing their products in the marketplace. As the cartel matured, new entrants were co-opted, and production costs declined. At the same time, the Conspirators learned how they could best mitigate the crystal cycle by agreeing on prices and output.

**i.       1996 – 1999**

145.     By early 1996, analysts were lamenting the excess supply and drastic price cuts in the LCD panel markets. The downward pressure on prices, which had already fallen 40 to 50 percent in 1995, was projected to continue due to lower manufacturing costs. Despite this, LCD panel prices actually rose in 1996, allegedly due to insufficient production capacity. In reality, Defendants and their co-conspirators were fixing the prices and limiting supply.

146.     During this period, the Japanese companies began to partner with Taiwanese companies to trade technology and collaborate on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan. This mutually beneficial relationship between purported competitors continued into at least 1999.

147.     A few months into 1996, there was a reversal in the downward trend in LCD panel prices and an alleged inability of manufacturers to supply enough LCD panels to meet demand. By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon …. Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

148.     By mid-1996, industry analysts were commenting on an unusual rise in LCD panel prices that was noted to be "quite rare in the electronics industry."

149.     The "rare" increase in LCD panel prices was due to the agreements reached by the Japanese companies to increase prices. These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

150.     By 1998, the LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies. A March 30, 1998 article in *Electronic News* reported that Hyundai's production lines were running at only 20 to 50 percent of capacity. The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage …. You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden."

AMENDED COMPLAINT

151.    During this period, Samsung made a concerted effort to get other manufacturers in the industry to limit production. Yoon-Woo Lee, President and CEO of the Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at the Eighteenth International Display Research Conference (known as Asia Display 98). Mr. Lee said: "In order to maintain the tradition of top CRT manufacturer, we need to capture the high end market [and] deviate from the volume production of CRTs and LCDs. Taiwan is trying to enter LCD business because it has the advantage of the large PC production. To survive in the rapidly changing environment, we have to revise our previous strategies and redirect our business plans. It is time for fundamental shift for future decisions, time for transformation from volume driven to cost driven, time for driving value added strategies. *If we prepare now by shifting from the traditional business approach, to value added new approach, we may be able to deviate from repeating the 'crystal cycle' again."* (Emphasis added).

152.    Samsung's effort to limit production, capacity restraints, and the price-fixing agreement caused decreases in prices of LCD panels to slow and stop in late 1998.

153.    The efforts commenced by Samsung in 1998 continued to bear fruit. In 1999, LCD panel prices surged due to a claimed "massive undersupply." This was despite the entry of Taiwanese manufacturers and several new fabs coming on line.

154.    Significantly, Bock Kwon, Vice President of LG Display's Sales Division and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the following in the same trade publication: LG LCD will raise prices across its entire LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize sometime in the second half. According to Samsung, demand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate. This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said. The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

155.     Also, in 1999, the three major LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai. The year 1999 also saw an additional merger when LG Electronics, Inc. and Philips created LG Display.

ii.     **2000 – 2004**

156.     By January of 2000, prices for LCD panels were falling again. The price decline in this period was substantially influenced by the entry of new Taiwanese competitors, including Chi Mei, Chunghwa, and HannStar. Taiwanese Conspirators began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other Conspirators to gain immediate market share. But by 2000-2001, the Taiwanese Conspirators had increased their market share to the point that it made sense to participate in the Conspiracy, and they then moderated the volume of their production.

157.     Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity. Two of the largest Korean firms announced plans to invest billions in Taiwanese LCD panel production and to locate manufacturing facilities in Taiwan.

158.     Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of LCD panels stopped declining in mid-2001, and actually increased. In late 2001, a senior official at LG stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability." Published data for 2001 showed that several Defendants and their co-conspirators were operating their fabs significantly below capacity. For example, Chunghwa had a 75.3 percent utilization rate and QDI (which later merged with AUO) had a 52 percent utilization rate. Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply.  Again, the Conspirators reacted to the price trough by conspiring to fix prices and limit supply. This Conspiracy was reached in part at the bilateral and group meetings described above.

159.     The rise in prices made no economic sense at this point in time and was the product of Defendants' and their co-conspirators' setting the price of LCD panels and limiting supply by

agreement. First, the Conspirators were bringing new plants on line that used larger motherglass, which was more cost effective. Second, as reported by an industry source, the variable cost of producing LCD panels was declining during the latter part of 2001 and into 2002. With lower production costs and capacity to spare, it made little economic sense for the Conspirators not to utilize their full capacity other than agreement by them not to do so.

160.    Prices continued to rise from the second half of 2001 through the second half of 2002. Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion. In reality, the price increases were the result of what the Conspirators agreed to in the crystal meetings and bilateral discussions described above.

161.    By the second half of 2002, the cartel's success at propping up LCD panel prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall. Such downward price trends are not inconsistent with a monopoly or cartel.

162.    During five consecutive quarters in 2003 and 2004, LCD panel prices rose significantly. AUO reported that the price for certain of its LCD panels increased 28 percent between the second quarter of 2003 and the second quarter of 2004. Similarly, LG reported that its pricing increased by 21 percent over the same period.

163.    These soaring prices resulted in similar increases in the profits reaped by the LCD panel manufacturers. For example, the eight largest LCD panel manufacturers reported a collective profit increase of 740 percent between the second quarter of 2003 and the second quarter of 2004. These record profits resulted from the Conspirators' collective action to fix, raise, maintain, or stabilize the prices of LCD panels. Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of LCD panels.

164.    Around this time, industry analysts suggested that there were too many competitors in the LCD panel marketplace. Some industry participants went as far as overtly suggesting that the industry should seek to curtail supply though mergers. These suggestions were carried out in furtherance of the Conspiracy. Significant consolidation and collaboration among competitors in the LCD panel market occurred.

AMENDED COMPLAINT

165.     As noted above, Toshiba Corporation and Panasonic Corporation merged their LCD panel operations in furtherance of the Conspiracy. The joint venture announced plans to solicit investment from other companies involved in the production of LCD panels, including device manufacturers and material suppliers. NEC formed an alliance with Casio in furtherance of the Conspiracy. In addition, Taiwanese LCD manufacturers agreed to supply Panasonic with LCD panels for use in televisions in furtherance of the Conspiracy.

166.     Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AUO purchased a 20 percent stake in Japan's Fujitsu Display Technology, all in furtherance of the Conspiracy.  Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of LCD panels. In order to keep prices artificially high, Conspirators chose not to operate at full capacity, nor to take advantage of lower variable costs.

### iii.     2004 – 2006

167.     Pursuant to the Conspiracy to fix and stabilize LCD panel prices, prices continued to rise during the first half of 2004. In fact, between 2003 and mid-2004, LCD panel prices increased for five consecutive quarters. Various types of crystal meetings in furtherance of the Conspiracy were ongoing during this period.

168.     The cartel's success at raising LCD panel prices slowly dampened demand. In response, the cartel allowed LCD panel prices to once again level off and begin to decline in the second half of 2004. During this period of time, the market for LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

169.     Consolidation and collaboration among and between competitors in furtherance of the Conspiracy continued as Samsung and Sony launched their joint venture, named S-LCD Corp.

170.     Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005. However, by the third quarter of 2005, it was clear that the LCD panel industry was not facing oversupply, but rather was reaping the benefits of an LCD panel shortage and stable, or increasing, LCD panel prices.

AMENDED COMPLAINT

171.     These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

172.     A temporary oversupply of LCD panels occurred in 2006, which had the effect of reducing prices in the short term. Again, in the face of a price trough, the Conspirators fixed and stabilized prices through their cartel activities. On May 25, 2006, at a Taiwanese trade show, Dr. Hui Hsiung of AUO stated publicly that his company was reducing production of the LCD panels in order to avoid further price erosion. He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent. Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers. A June 13, 2006 article in *InfoWorld* noted that as a result of Dr. Hsiung's statements, "[t]he chatter is growing louder each day."

173.     Chi Mei was not the only one to follow AUO's invitation to restrict the output and increase the prices of LCD panels. In May of 2006, in discussions between executives of the two companies, AUO, in furtherance of the Conspiracy, convinced QDI, a company that it acquired in October of 2006, to reduce production of LCD panels. By June of 2006, LG also announced plans to cut production of LCD panels.

174.     By the summer of 2006, the Conspiracy continued through bilateral meetings as alleged above.

175.     Despite the fact that certain of the Conspirators may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the Conspiracy continued at least through the end of that year. This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

### G.     The Role of Trade Associations During the Relevant Period

176.     The LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year. These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for the Conspirators to cooperate and discuss prices.

177.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AUO, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFTLCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the Conspiracy was effectuated and implemented.

178.    South Korean manufacturers, including LG and Samsung, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

179.    Japanese manufacturers of LCD panels have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCD panels. Its members include Sharp, Toshiba, NEC, Hitachi, and a Japanese subsidiary of Samsung. Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the Conspiracy was effectuated and implemented.

180.    In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium, but was renamed the "SID International Symposium and Business Conference." SID also puts on a long-running conference called the International Display Research Conference ("IRDC").

181.     The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and CEO of AUO. This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the attendees about "investments planned at the major display manufacturers." A representative of DisplaySearch also spoke about the LCD market. There were presentations by analysts from iSuppli/Stanford Resources, and other industry experts. This was all followed by a "networking reception – sponsored by LG.Philips LCD," to which all conference attendees were invited to participate.

182.     SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AUO. This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and the cost and margin outlook for key FPDs will be projected." Again, these discussions about the market were followed by a "networking reception." Among the attendees at SID 2004 were Bruce Berkoff of LG, Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AUO, Larry Weber of Panasonic, and Joel Pollack of Sharp. Senior executives from Sharp and Hitachi also attended.

183.     The SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle. Jun Souk, Executive Vice President of Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows: "By reviewing what happened during the business up and down cycles of the LCD in the past, we have learned lessons that will reduce the burden in future cycles. Efforts made in cost reduction line-investment timing, and new market generation will be described."

184.     SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing." Among the attendees at SID 2005 were Bruce Berkoff of LG and Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding developments in LCD technology by officials from AUO, Sharp, LG, Samsung, and Hitachi.

185.     The Conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was

held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa, Japan. Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the Conspirators. Or, as Dr. Hsiung of AUO has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

186.     Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Panasonic, and Dr. Hsiung of AUO.

187.     As indicated by the public pronouncements, these trade association meetings facilitated the Conspiracy by giving the Conspirators further opportunities to discuss prices and output.

## VII.     PLAINTIFFS' INJURIES

188.     Plaintiffs have suffered a direct, substantial, and reasonably foreseeable injury as direct and indirect purchasers of LCD panels and LCD products as a result of the Conspiracy to raise, fix, stabilize, or maintain the price of LCD panels and LCD products at supra-competitive levels.  During the Relevant Period, Acer America purchased LCD panels and LCD products indirectly from the Defendants and their co-conspirators, Gateway purchased LCD panels and LCD products directly and indirectly from the Defendants and their co-conspirators, and eMachines purchased LCD panels and LCD products directly and indirectly from the Defendants and their co-conspirators.

189.     Once an LCD panel leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. LCD panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of an LCD product.

190.     The market for LCD panels and the market for LCD products are inextricably linked and cannot be considered separately. In addition, the price of the LCD panel is a material portion of the cost of the LCD product. The Conspirators are and have been well aware of this intimate relationship.

AMENDED COMPLAINT

191.     Plaintiffs' and the ODMs' demand for LCD panels and LCD products was relatively inelastic because there were no reasonable substitutes for LCD panels to serve as visual displays. Other competing display technologies, such as OLED (Organic Light Emitting Diodes) displays, were not available during the Relevant Period and are only today becoming widely available. In addition, throughout the Relevant Period, the Conspirators controlled the market for LCD panels. Consequently, during the Relevant Period, Plaintiffs had no choice but to purchase LCD panels and LCD products from the Conspirators and others at prices that were artificially inflated, fixed, and stabilized by the Conspiracy.

192.     As a result, Plaintiffs were injured in connection with their purchases of LCD panels and LCD products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

193.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Defendants and their co-conspirators engaged in a secret Conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of LCD panels that were sold to Plaintiffs.

194.     The Conspirators agreed to keep the Conspiracy, the agreements reached, and the meetings secret. Participants were instructed to hide the existence of the meetings from others within their own companies and to keep the meeting reports confidential.

195.     The Conspirators knew their activities were illegal, they kept their conspiracy communications strictly confidential, and they took other steps to conceal the Conspiracy. In some instances, the location of a meeting was circulated only the day before in an effort to avoid detection. In addition, the Conspirators frequently used telephone calls, rather than emails or letters, to conceal the Conspiracy.

196.     By its very nature, Defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing. As alleged above, Defendants and their co- conspirators had secret discussions about price and output. Defendants and their co-conspirators agreed not to publicly discuss the existence of the nature of their agreement. During these meetings, top executives and

other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants and their co-conspirators not involved in LCD panel pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.   Furthermore, the participants agreed on what pretexts they would cite when questioned about rising prices. The participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

197.     The Conspirators have used a variety of other purportedly market-based explanations for price increases in order to conceal the Conspiracy. In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on undercapitalization: "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

198.     Also, in early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."

199.     Also in 1999, Bock Kwon, Vice President of LG's Sales Division, and Yoon- Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases resulted from "acute" shortages.

200.     On February 4, 2001, Bruce Berkoff, Executive Vice President at LG, was quoted by News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up."

201.     In the latter half of 2001, Duk Mo Koo, an executive at LG, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

202.     Jen-Ting Hsu, a Vice President at Chi Mei, and H.B. Chen, President of AUO, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic*

47

*News* in October 2001. They blamed "component shortages due to the late expansion of 5[th] generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

203.     In a presentation shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "*LCDs*: Profitability recovered faster than originally expected."

204.     These explanations were pretextual and served to cover up the Conspiracy. Later price increases were explained by industry leaders as derived from new demand for LCD televisions. In 2005, Duk Mo Koo of LG stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

205.     As a result of Defendants' and their co-conspirators' fraudulent concealment of the Conspiracy, the running of any statute of limitations has been equitably tolled with respect to any of Plaintiffs' claims arising from the anticompetitive conduct alleged in this Complaint.

206.     Also as a result of Defendants' and their co-conspirators' fraudulent concealment of the Conspiracy, Defendants are equitably estopped from asserting statutes of limitations defense, and principles of equitable estoppel toll the statutes of limitations relevant to Plaintiffs' claims.

207.     The statutes of limitations relevant to Plaintiffs' claims have also been tolled as a result of the criminal information and guilty pleas entered as a result of the DOJ criminal investigation.

208.     The Defendants' and their co-conspirators' ongoing conspiracy and unlawful conduct constitute a continuing tort, and therefore the statute of limitations cannot accrue until the last act of Defendants' and their co-conspirators' violative conduct.

IX.     **TOLLING**

209.     The statutes of limitations relevant to Plaintiffs' claims have also been tolled under the tolling doctrine set forth in the decision of *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*"), as a result of the filing of class actions concerning the LCD Conspiracy against Defendants and their co-conspirators.

210.     Specifically, the statute of limitations governing Plaintiffs' California State Law Claims was tolled under *American Pipe* by each of the indirect-purchaser class action complaints filed in 2006 and 2007 that defined their respective putative classes in such a way as to include Plaintiffs, including but not limited to: *Burt v. LG et al.*, Case No. 06-cv-7831, Dkt. No. 1 (N.D. Cal. December 21, 2006); *Eliav v. LG et al.*, Case No. 06-cv-7931, Dkt. No. 1 (N.D. Cal. December 28, 2006); *Juetten v. LG et al.*, Case No. 07-cv-0009, Dkt. No. 1 (N.D. Cal. January 3, 2007); *Rowlette v. LG et al.*, Case No. 07-cv-0039, Dkt. No. 1 (N.D. Cal. January 4, 2007); *Hee v. LG et al.*, Case No. 07-cv-722, Dkt. No. 1 (N.D. Cal. February 2, 2007); *Ho v. LG et al.*, Case No. 07-cv-708, Dkt. No. 1 (N.D. Cal. February 2, 2007); *Selfridge v. LG et al.*, Case No. 07-cv-312, Dkt. No. 1 (S.D. Cal. February 15, 2007); *Wojnowski v. AUO et al.*, Case No. 07-cv-1184, Dkt. No. 1 (N.D. Cal. February 27, 2007); *Ferencsik v. LG et al.*, Case No. 06-cv-6714, Dkt. No. 1 (E.D.N.Y. December 20, 2006); *DiMatteo v. LG et al.*, Case No. 06-cv-15342, Dkt. No. 1 (S.D.N.Y. December 20, 2006); *Audio Video Artistry v. Samsung et al.*, Case No. 2:06-cv-2848, Dkt. No. 1 (W.D. Tenn. December 14, 2006); *Minoli v. LG et al.*, Case No. 07-cv-235, Dkt. No. 1 (D.N.M. March 9, 2007); *Bates v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv- 10948-NG, Dkt. No. 1, ¶ 100 (D. Mass. May 18, 2007) (alleging service of demand letter under M.G.L. c. 93A § 9(3), in February 2007, which letter also tolled the statute of limitations until the complaint was filed); *Giusti v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-11025-NMG, Dkt. No. 1 (D. Mass. May 31, 2007); *Granich v. LG Philips LCD Co., Ltd., et al.*, Case No. 2:07-cv-00296-RLH-PAL, Dkt. No. 1 (D. Nev. Feb. 16, 2007); *Jafarian v. LG Philips LCD Co., Ltd., et al.*, Case No. 3:07-cv-00994-SI, Dkt. No. 1 (N.D. Cal. Feb. 16, 2007); *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-15417, Dkt. No. 1 (S.D.N.Y. Dec. 22, 2006); the Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (MDL Dkt. No. 367) filed on November 5, 2007 ("IPP CAC"). It was not apparent from the face of certain indirect class action complaints that the named plaintiffs lacked standing to sue.  The tolling of the statute of limitations governing Plaintiffs' claim under their California State Law Claims was not ended by the filing of the November 5, 2007 IPP CAC. Moreover, to the extent tolling had not

commenced as a result of the above-referenced actions, such tolling would have commenced with the filing of the IPP CAC.

211.     The statute of limitations governing Plaintiffs' claim under the Sherman Act was also tolled under *American Pipe* and the cross-jurisdictional tolling doctrine by the multiple direct and indirect purchaser class action complaints filed in 2006 and 2007 that defined their respective putative classes in such a way as to include Plaintiffs, including but not limited to: the November 5, 2007 Direct Purchaser Plaintiffs' Consolidated Complaint (MDL Dkt. No. 366); *Burt v. LG et al.*, Case No. 06-cv-7831, Dkt. No. 1 (N.D. Cal. December 21, 2006); *Eliav v. LG et al.*, Case No. 06-cv-7931, Dkt. No. 1 (N.D. Cal. December 28, 2006); *Juetten v. LG et al.*, Case No. 07-cv-0009, Dkt. No. 1 (N.D. Cal. January 3, 2007); *Rowlette v. LG et al.*, Case No. 07-cv-0039, Dkt. No. 1 (N.D. Cal. January 4, 2007); *Selfridge v. LG et al.*, Case No. 07-cv-312, Dkt. No. 1 (S.D. Cal. February 15, 2007); *Wojnowski v. AUO et al.*, Case No. 07-cv-1184, Dkt. No. 1 (N.D. Cal. February 27, 2007); *Minoli v. LG et al.*, Case No. 07-cv-235, Dkt. No. 1 (D.N.M. March 9, 2007); *Crago Corp. v. Samsung et al.*, Case No. 06-cv-7644, Dkt. No. 1 (N.D. Cal. December 13, 2006); *Muchnick, Inv. v. Sharp et al.*, Case No. 06-cv-6107, Dkt. No. 1 (D.N.J. December 19, 2006); *Markham v. LG et al.*, Case No. 06-cv-6191, Dkt. No. 1 (D.N.J. December 22, 2006); *Figone v. LG et al.*, Case No. 07-cv-42, Dkt. No. 1 (N.D. Cal. January 4, 2007); *Orion Home Systems v. Samsung et al.*, Case No. 07-cv-45, Dkt. No. 1 (N.D. Cal. January 4, 2007); *Computer World Solution, Inc. v. LG et al.*, Case No. 07-cv-123, Dkt. No. 1 (N.D. Cal. January 9, 2007); *Industrial Computing Inc. v. LG et al.*, Case No. 07-cv-184, Dkt. No. 1 (N.D. Cal. January 10, 2007); *AJAX Philadelphia, Inc. v. Sharp et al.*, Case No. 07-cv-287, Dkt. No. 1 (D.N.J. January 18, 2007); *Art's TV & Appliance v. LG et al.*, Case No. 07-cv-393, Dkt. No. 1 (N.D. Cal. January 19, 2007); *Custom Audio Video v. Sharp et al.*, Case No. 07-cv-963, Dkt. No. 1 (D.N.J. February 28, 2007); *CMP Consulting Services v. LG Philips LCD Co., et al*; Case No. 06-cv-15417, Dkt. No. 1 (S.D.NY. Dec. 22, 2006); *Bates v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv- 10948-NG, Dkt. No. 1, ¶ 100 (D. Mass. May 18, 2007) (alleging service of demand letter under M.G.L. c. 93A § 9(3), in February 2007, which letter also tolled the statute of limitations until the complaint was filed); *DiMatteo v. LG Philips LCD Co., Ltd., et al.*, Case No. 1:06-cv-15342-JGK,

Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006); *Ferencsik v. LG Philips LCS Co., Ltd.*, *et al.*, Case No. 06-6714, Dkt. No. 1 (E.D.N.Y. Dec. 20, 2006); *Audio Video Artistry v. Samsung et al.*, Case No. 2:06-cv-2848, Dkt. No. 1 (W.D. Tenn. December 14, 2006); *Giusti v. AU Optoelectronics Co., Ltd., et al.*, Case No. 1:07-cv-11025-NMG, Dkt. No. 1 (D. Mass. May 31, 2007); *Granich v. LG Philips LCD Co., Ltd., et al.*, Case No. 2:07-cv-00296-RLH-PAL, Dkt. No. 1 (D. Nev. Feb. 16, 2007); *Jafarian v. LG Philips LCD Co., Ltd., et al.*, Case No. 3:07-cv-00994-SI, Dkt. No. 1 (N.D. Cal. Feb. 16, 2007); and the IPP CAC.  Acer America and Gateway (on behalf of Gateway itself and Gateway U.S. Retail) opted out of the Direct Purchaser Plaintiff Action on December 22, 2010.

212.    Other reasons for tolling the statutes of limitations also exist.

## X.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

213.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

214.    Beginning no later than January 1, 1996, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

215.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of LCD panels and LCD products sold in the United States.

216.    As a result of Defendants' unlawful conduct, prices for LCD panels and LCD products were raised, fixed, maintained, and stabilized in the United States.

217.    The contract, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

218.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      A.      participating in meetings and conversations to discuss the prices and supply of LCD panels and LCD products;

      B.      sharing the pricing and other discussions with other members of the LCD panel and LCD product industry to further the Conspiracy;

      C.      communicating in writing and orally to fix target prices, floor prices, and price ranges for LCD panels and LCD products;

      D.      agreeing to manipulate prices and supply of LCD panels and LCD products sold in the United States in a manner that deprived direct purchasers of free and open competition;

      E.      issuing price announcements and price quotations in accordance with the agreements reached;

      F.      selling LCD panels and LCD products to customers in the United States at noncompetitive prices;

      G.      exchanging competitively sensitive information, including customer information, in order to facilitate their Conspiracy;

      H.      agreeing to maintain or lower production capacity; and

      I.      providing false statements to the public to explain increased prices for LCD panels and LCD products.

219.     As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs were injured in their business and property in that they paid more for LCD panels and LCD products than they otherwise would have paid in the absence of Defendants' and their co-conspirators' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

220.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

221.     During the Relevant Period, Plaintiffs conducted a substantial volume of business in California.  During the Relevant Period, all or a significant portion of Acer America's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD products. During the Relevant Period, Acer America's negotiations for the purchase of LCD products took place in California, purchase orders for LCD products were issued in California, payments for the purchases of LCD products were issued in California, Acer America took possession of LCD products in California, invoices for LCD products sold to Acer America's customers were issued from California to Acer America's customers, payments for LCD products sold to Acer America's customers were received in California, and LCD products were distributed to Acer America's customers from California.

222.     During the Relevant Period, all or a significant portion of Gateway's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD panels and LCD products. During the Relevant Period, Gateway's negotiations for the purchase of LCD panels and LCD products took place in California, purchase orders for LCD panels and LCD products were issued in California, payments for the purchases of LCD panels and LCD products were issued in California, Gateway took possession of LCD products in California, invoices for LCD products sold to Gateway's customers were issued from California to Gateway's customers, payments for LCD products sold to Gateway's were received in California, and LCD products were distributed to Gateway's customers from California.

223.     During the Relevant Period, all or a significant portion of eMachines' product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD

panels and LCD products. eMachines' negotiations for the purchase of LCD panels and LCD products took place in California, purchase orders for LCD panels and LCD products were issued in California, payments for the purchases of LCD panels and LCD products were issued in California, eMachines took possession of LCD products in California, invoices for LCD products sold to eMachines' customers were issued from California to eMachines' customers, payments for LCD products sold to eMachines' were received in California, and LCD products were distributed to eMachines' customers from California.

224.    Defendants and their co-conspirators engaged and participated in the conspiracy through their offices and operations in California.  LG Display, Chi Mei, HannStar, Epson, Chunghwa, Hitachi and Sharp all admitted that acts in furtherance of the conspiracy to fix the price of LCD panels and LCD products were carried out in California.  AUO, Chi Mei, Epson, LG Display, Samsung and Defendant Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' and their co-conspirators' locations in California participated in meetings and engaged in bilateral communications in California and intended to and did carry out Defendants' and their co-conspirators' anticompetitive agreement to fix the price of LCD panels and LCD products.  Defendants and their co-conspirators also participated in the conspiracy in the U.S. through their California offices by providing information obtained through meetings with other defendants and co-conspirators to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including Plaintiffs.  Defendants' and their co-conspirators' conduct within California thus injured Plaintiffs both in California and throughout the United States.

225.    Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants and their co-conspirators have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate

markets for, LCD panels and LCD products at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected California commerce.

226.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, LCD panels and LCD products.

227.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    A.    to fix, raise, maintain and stabilize the price of LCD panels and LCD products;

    B.    to allocate markets for LCD panels and LCD products amongst themselves;

    C.    to submit rigged bids for the award and performance of certain LCD panels  and LCD products contracts; and

    D.    to allocate among themselves the production of LCD panels and LCD products.

228.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

    A.    price competition in the sale of LCD panels and LCD products has been restrained, suppressed and/or eliminated in the State of California;

    B.    prices for LCD panels and LCD products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    C.    those who purchased LCD panels and LCD products from

AMENDED COMPLAINT

Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

229.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the LCD panels and LCD products they purchased during the Relevant Period.

230.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Plaintiffs have been injured in their business and property by paying more for LCD panels and LCD products sold by Defendants, their co-conspirators, and others than they would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy.  As a result of Defendants' and their co-conspirators' violation of Section 16720 of the California Business and Professions Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law, Cal. Bus. Profs. Code §§ 17200 *et seq.*)

231.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

232.    Plaintiffs believe and assert that all of their purchases of LCD panels and LCD products are actionable pursuant to the federal and California law as alleged above.  In addition, Plaintiffs allege this Third Claim for Relief under the California Unfair Competition Law.

233.    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 et seq.

234.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of LCD panels and LCD products as described above.

235.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants and their co-conspirators, as described above, constitute a common, continuous and

continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

236.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

237.     Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*

238.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.

239.     During the Relevant Period, Plaintiffs conducted a substantial volume of business in California.  During the Relevant Period, all or a significant portion of Acer America's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD products. During the Relevant Period, Acer America's negotiations for the purchase of LCD products took place in California, purchase orders for LCD products were issued in California, payments for the purchases of LCD products were issued in California, Acer America took possession of LCD products in California, invoices for LCD products sold to Acer America's customers were issued from California to Acer America's customers, payments for LCD products sold to Acer America's customers were received in California, and LCD products were distributed to Acer America's customers from California.

240.     During the Relevant Period, all or a significant portion of Gateway's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD panels and LCD products. During the Relevant Period, Gateway's negotiations for the purchase of LCD panels and LCD products took place in California, purchase orders for LCD panels and LCD products were issued in California, payments for the purchases of LCD panels and LCD products were issued in California, Gateway took possession of LCD products in California, invoices for

AMENDED COMPLAINT

LCD products sold to Gateway's customers were issued from California to Gateway's customers, payments for LCD products sold to Gateway's customers were received in California, and LCD products were distributed to Gateway's customers from California.

241.    During the Relevant Period, all or a significant portion of eMachines' product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to LCD panels and LCD products. During the Relevant Period, eMachines' negotiations for the purchase of LCD panels and LCD products took place in California, purchase orders for LCD panels and LCD products were issued in California, payments for the purchases of LCD panels and LCD products were issued in California, eMachines took possession of LCD products in California, invoices for LCD products sold to eMachines' customers were issued from California to eMachines' customers, payments for LCD products sold to eMachines' customers were received in California, and LCD products were distributed to eMachines' customers from California.

242.    Defendants and their co-conspirators engaged and participated in the conspiracy through their offices and operations in California. LG Display, Chi Mei, HannStar, Epson, Chunghwa, Hitachi and Sharp all admitted that acts in furtherance of the conspiracy to fix the price of LCD panels and LCD products were carried out in California. AUO, Chi Mei, Epson, LG Display, Samsung and Defendant Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' and their co-conspirators' locations in California participated in meetings and engaged in bilateral communications in California and intended to and did carry out Defendants' and their co-conspirators' anticompetitive agreement to fix the price of LCD panels and LCD products.  Defendants and their co-conspirators also participated in the conspiracy in the U.S. through their California offices by providing information obtained through meetings with other defendants and co-conspirators to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including Plaintiffs.  Defendants' and their co-conspirators' conduct within California thus injured Plaintiffs both in California and throughout the United States.

243.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or

AMENDED COMPLAINT

disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants and their co-conspirators as result of such business acts and practices described above.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.     That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

      i.     A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

      ii.    An unreasonable restraint of trade or commerce in violation of the Cartwright Act, as alleged in the Second Claim for Relief above;

      iii.   Unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, in violation of California Unfair Competition Law, Cal. Bus. Profs. Code Section 17200, *et seq.*, as alleged in the Third Claim for Relief above;

B.     That Plaintiffs recover damages, as provided by federal and state laws, and that a judgment be entered in favor of Plaintiffs against Defendants, jointly and severally, in an amount to be trebled if in accordance with such laws;

C.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Plaintiffs be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

AMENDED COMPLAINT

E.      That Plaintiffs recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and,

F.      That Plaintiffs be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.    <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated: November 20, 2013          Respectfully submitted,

**CARLTON FIELDS, P.A.**
CityPlace Tower – Suite 1200
525 Okeechobee Boulevard
West Palm Beach, Florida 33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368

James B. Baldinger (*pro hac vice*)
Florida Bar No.: 869899
jbaldinger@carltonfields.com
David B. Esau (*pro hac vice*)
Florida Bar No.: 650331
desau@carltonfields.com

**TECHKNOWLEDGE LAW GROUP LLP**

By: _____

HSIANG ("JAMES") H. LIN (SBN 241472)
jlin@techknowledgelaw.com
1521 Diamond Street
San Francisco, CA 94131
Telephone: (415) 816-9525

*Counsel for Plaintiffs*

AMENDED COMPLAINT