G. Patrick Watson, Georgia Bar No. 741226
patrick.watson@bryancave.com
C. Scott Greene, California Bar No. 277445
scott.greene@bryancave.com
Lindsay J. Sklar, Georgia Bar No. 648391
lindsay.sklar@bryancave.com
BRYAN CAVE LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone:    (415) 268-2000
Facsimile:    (415) 268-1999

Attorneys for Plaintiff

HOME DEPOT U.S.A., INC.

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOME DEPOT U.S.A., INC.<br><br>Plaintiff,<br><br>v.<br><br>AU OPTRONICS CORPORATION and<br>AU OPTRONICS CORPORATION AMERICA,<br><br>Defendants. | Case No. 3:13-cv-06001<br><br>**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Home Depot U.S.A., Inc. ("Home Depot" or "Plaintiff"), in accordance with this Court's Order on June 4, 2014, files this Amended Complaint against AU Optronics Corporation ("AUO") and AU Optronics Corporation America ("AUOA") (collectively, "Defendants") for injunctive relief and damages and alleges as follows:

## NATURE OF THE ACTION

1.      This action is brought under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable relief against Defendants due to their violations of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as under the antitrust and other laws of the State of California to obtain

restitution, recover damages, and to secure other relief against Defendants for violations of those state laws.

2.    Defendants and their co-conspirators are believed to have conspired from at least January 1, 1996 until at least December 11, 2006 ("Conspiracy Period") for the purpose and to the effect of fixing, raising, stabilizing, and maintaining prices for LCD panels.  LCD panels ("LCD Panels") are used in a number of products, including, but not limited to various types of computer monitors and screens, laptop computers, televisions, mobile phones, and related devices.  LCD Panels use glass plates and a liquid crystal compound to electronically display an image. Specifically, a liquid crystal compound is sandwiched in between two glass plates called "substrates," and the resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image when current is applied.

3.    As used in this Amended Complaint, "LCD Products" means any product containing an LCD Panel, including without limitation LCD modules, televisions, computer monitors and screens, notebook computers, digital cameras, digital picture frames, mobile wireless handsets, and any other devices utilizing LCD panels.

4.    In March 2012, Defendants AUO and AUOA were tried by a federal court jury in the Northern District of California and found guilty of the crimes described herein.  Three of AUO's executives also were convicted.  Pursuant to Section 5(a) of the Clayton Act, the guilty verdicts against AUO and AUOA are *prima facie* evidence of their liability in this civil action.

5.    Home Depot purchased over $150 million of LCD Products indirectly from Defendants and their co-conspirators during the Conspiracy Period.  The LCD Products purchased by Home Depot were for its own use and not for resale.  Home Depot paid supra-competitive prices for those products and was harmed as a result of the conduct of Defendants and their co-conspirators.

## PARTIES

6.    Plaintiff Home Depot U.S.A., Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Home Depot is a home improvement retailer.  Home Depot is registered to do business in California, does business in California, and is taxed as a California

Bryan Cave LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105

1   resident.  Home Depot operates over 2,200 retail stores, including over 230 stores and other

2   facilities throughout California.

3       7.    Defendant AU Optronics Corporation is located at No. l, Li-Hsin Rd. 2, Hsinchu

4   Science Park, Hsinchu 30078, Taiwan.  AUO manufactured, marketed, sold and/or distributed

5   LCD panels that were incorporated into LCD Products sold throughout the United States,

6   including California.

7       8.    Defendant AU Optronics Corporation America, is a wholly owned and controlled

8   subsidiary of Defendant AUO, with its corporate headquarters at 9720 Cypresswood Drive, Suite

9   241, Houston, Texas and facilities located in San Diego and Cupertino, California. AUOA

10  manufactured, marketed, sold and/or distributed LCD panels that were incorporated into LCD

11  Products sold throughout the United States, including California.

12      9.    Defendants AUO and AUOA are collectively referred to herein as "AU Optronics."

13  **CO-CONSPIRATORS**

14      10.   Various persons and entities participated as co-conspirators in the violations alleged

15  herein and performed acts and made statements in furtherance thereof.  These co-conspirators

16  include, but are not limited to, the following companies:  Chi Mei Corporation, Chimei Innolux

17  Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc.,

18  and Nexgen Mediatech USA, Inc. (collectively, "Chi Mei"); Chunghwa Picture Tubes Ltd.

19  ("Chunghwa"); Epson Electronics America, Inc. and Epson Imaging Devices Corporation

20  (collectively, "Epson"); HannStar Display Corporation ("HannStar"); LG Electronics, Inc. and LG

21  Electronics USA, Inc. (collectively, "LG"); Hitachi Displays, Ltd., Hitachi Electronic Devices

22  (USA), Inc., and Hitachi, Ltd. (collectively, "Hitachi"); Hydis Technologies Co., Ltd., f/k/a BOE

23  Hydis Technology Co. Ltd.; Mitsubishi Electric Corp. and Mitsubishi Electric Electronics USA,

24  Inc. (collectively "Mitsubishi"); NEC Corp., NEC LCD Technologies, Ltd., and NEC Electronics

25  America, Inc. (collectively, "NEC"); Panasonic Corp. and Panasonic Corp. of North America

26  (collectively, "Panasonic"); Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., and

27  Samsung Electronics America, Inc. (collectively, "Samsung"); Sharp Corporation and Sharp

28  Electronics Corporation (collectively, "Sharp").

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

## JURISDICTION, VENUE AND INTRADISTRICT STATEMENT

11. Home Depot brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable relief against the Defendants due to their violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

12. Home Depot also brings this action pursuant to the California Cartwright Act, California Business and Professions Code §§ 16720 *et seq*., for injunctive relief and damages.

13. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Home Depot's claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. In addition, this Court has supplemental jurisdiction over Home Depot's claims arising under state laws under 28 U.S.C. § 1367. Home Depot's state law claims are so related to its claims under the federal antitrust laws that they form part of the same case or controversy.

14. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and it arises between citizens of different states and between a citizen of a state and a foreign citizen.

15. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in California. That effect gave rise to Home Depot's antitrust claims.

16. This Court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of LCD Panels purchased by Home Depot in and for use in California. These effects also give rise to Home Depot's antitrust claims.

17. Each Defendant conducts substantial business in the state of California.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

18.   In addition, Defendants purposefully availed themselves of the laws of the United States and California by manufacturing LCD Panels for sale in the United States and California.

19.   Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), and because a substantial part of the events giving rise to Home Depot's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants has an agent, maintains an office or does business in this District.

20.   Assignment to the San Francisco Division is appropriate pursuant to Civil L.R. 3-2(e) because a substantial part of the events that give rise to Home Depot's claims occurred in San Francisco County, California, among other places in this District.

21.   This action concerns substantially the same parties, transactions, and events as In re TFT-LCD Antitrust Litigation Case No. 3:07-md-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of Defendants' and their co-conspirators' conspiracy to fix the price of LCD Panels in violation of the Sherman Act and the laws of California.  Pursuant to Pretrial Order #1 in 3:07-md-01827-SI (Dkt. 180), this case has been consolidated with MDL 1827 for all pretrial proceedings.

## GENERAL ALLEGATIONS

### LCD Panels – Product and Market

22.   LCD Panels are commonly used to provide displays in televisions, computer monitors and screens, laptop computers, mobile wireless handsets, digital cameras, and numerous other electronic devices.  LCD Panels have numerous advantages over other types of display technology, including less bulk, low power requirements and low heat emissions.

23.   Because LCD Panels are only valuable as components of LCD Products, the demand for LCD Panels is based upon the demand for LCD Products that incorporate them.  The market for LCD Panels and the market for LCD Products are, for all intents and purposes, inseparable.

24.   The LCD Panels industry has high barriers to entry for new competitors.  A fabrication plant can cost in excess of $2 billion, and companies producing LCD Panels must invest in ongoing research and development.

25.   During the Conspiracy Period, the LCD Panel market has demonstrated characteristics of anti-competitive behavior since at least 1996, indicating that Defendants engaged in a concerted effort to manipulate the prices for LCD Panels to supra-competitive levels, including but not limited to: significant price-stability and price increases for LCD Panels over time in contrast to well-established industry trends favoring price decreases over time; and significant price increases during periods of oversupply.

26.   The LCD Panels industry has experienced significant consolidation during the Conspiracy Period, including but not limited to:

- AU Optronics' acquisition of Quanta Display Inc.;
- the creation in 2001 of AUO through the merger of ADT and Unipac;
- in 2002, the merger of the LCD operations of Toshiba and Matsushita into one entity, Toshiba Matsushita Display Co., Ltd, in 2002;
- in 2004, the joint venture for the production of LCD panels for televisions by Hitachi, Toshiba, and Matsushita; and
- in 2005, Fujitsu Display Technologies Corporation's transfer of its LCD business to Sharp.

27.   In other closely-related industries, including dynamic access memory ("DRAM"), static random access memory ("SRAM") and flash memory computer chips, certain Defendants and/or co-conspirators and/or their corporate parents or subsidiaries, including Samsung, Hitachi, Sharp, and Toshiba, have either pleaded guilty to, or are currently being investigated by the U.S. Department of Justice for entering into one or more price-fixing agreements.

28.   Home Depot participates in the market for LCD panels through its purchases of products containing such panels.  The Defendants' unlawful conspiracy has inflated the prices at which Home Depot bought products made with LCD panels, and Home Depot has been injured by paying supra-competitive prices for LCD panels contained in such products.

### Conspiracy Affecting the LCD Products Market

29.   Beginning at a date as yet unknown to Home Depot, but at least as early as January 1, 1996, and continuing thereafter up to and including at least December 31, 2006, Defendants and

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which LCD Panels were sold.

30.   Defendants, through their officers, directors and employees, effectuated a contract, combination, trust, or conspiracy between themselves and their co-conspirators by, among other things:

- participating in meetings and conversations to discuss the prices and supply of LCD Panels in California, other parts of the United States and elsewhere;
- agreeing to fix the prices and limit the supply of LCD Panels sold in the United States and elsewhere in a manner that deprived Home Depot and others of free and open competition as purchasers;
- issuing price announcements and quotations in accordance with the agreements reached; and
- selling LCD Panels at fixed, non-competitive prices.

31.   The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in the United States (mostly California), Japan, South Korea, and Taiwan.

32.   In the early years of the conspiracy, beginning in at least 1996, representatives of certain Japanese-based co-conspirators met and agreed to fix prices for LCD Panels generally, as well as to specific customers.  They also reached an agreement to restrict the production of LCD Panels.

33.   Eventually, LCD Panel production in South Korea increased and became more sophisticated.  As a result, the Japanese-based co-conspirators began including the South Korean-based companies, including LG and Samsung, who also agreed to fix prices and control supply.

34.   In early 2001, high-level employees of at least two large manufacturers of LCD Panels met in person and agreed to engage in periodic meetings to exchange sensitive competitive information and fix the price of LCD Panels and limit their production.  From early 2001 through at least 2006, officials from AU Optronics and co-conspirators HannStar, Samsung, Chi Mei, LG, and Sharp met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production.  The group meetings these Defendants and co-conspirators participated in were called "Crystal Meetings."  The Crystal Meetings occurred in Taiwan.  Other similar meetings took place in South Korea, Japan, and the United States on a regular basis throughout this period.

35.    The Crystal Meetings were highly organized and followed a set pattern.  Meetings among Defendants and/or co-conspirators' high-level executives were called "CEO" or "Top" meetings, while those among Defendants' and/or co-conspirators' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

36.    AU Optronics and co-conspirators LG, Chi Mei, Chunghwa, HannStar and Samsung attended multiple CEO, Commercial, and working-level meetings, as well as bilateral discussions during the Conspiracy Period.  Additionally, QDI and Unipac, which merged with AUO, participated in working-level meetings.  At the CEO and Commercial meetings, these Defendants and co-conspirators agreed on prices, price increases, and production limits and quotas for LCD panels.

37.    Co-conspirator Sharp participated in multiple working-level meetings, as well as bilateral discussions with other Defendants and/or co-conspirators, during the Conspiracy Period.  Through these discussions, Sharp agreed with the other Defendants and/or co-conspirators on prices, price increases, and production limits and quotas for LCD panels.

38.    "CEO" meetings occurred quarterly from approximately 2001 to at least 2006.  The purpose and effect of these meetings was to stabilize or raise prices.  Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCD Panels for the group to review.  Those attending the meetings would take turns sharing information concerning prices, and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

39.   The structure of "Commercial" meetings was largely the same as CEO meetings. These meetings took place more frequently than CEO meetings and occurred approximately monthly.

40.   During all of these meetings, Defendants and/or co-conspirators exchanged information about current and anticipated prices for their LCD Panels and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD panels.  Defendants and/or co-conspirators set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

41.   During these CEO or Commercial meetings, Defendants and/or their co-conspirators also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, often reached agreement concerning the amounts each would produce.  Defendants and/or their co-conspirators limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

42.   The structure of the so-called "working level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal.  The purpose of the "working level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to those individuals with pricing authority which facilitated implementation of the conspiracy and effectuated the agreements made at the CEO and at the Commercial meetings.

43.   During the Crystal Meetings, Defendants and/or their co-conspirators also agreed to engage in bilateral communications with those not attending these meetings.  Certain conspirators were "assigned" others not in attendance and agreed to, and did in fact, communicate with non-attending Defendants and/or their co-conspirators regarding the price and production limitations decided at the Crystal Meetings.  For example, HannStar contacted Hitachi, to relay the agreed-upon prices and production limitations.  Subsequently, the Japanese companies implemented the agreed-upon pricing and production limitations that had been conveyed to Hitachi by HannStar.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

This is one of the ways in which Japanese co-conspirators participated in the conspiracy to fix the prices and limit the production of LCD panels.

**Acts in Furtherance of the Conspiracy in this District**

44. In the United States, California was primary location where Defendants and/or their co-conspirators effectuated the conspiracy. Defendant AUO and/or co-conspirators used their domestic subsidiaries to effectuate the conspiracy.

45. Defendant AUO and/or co-conspirators would provide competitive information and direction to their California-based subsidiaries who then marketed and sold the price-fixed products to major U.S. companies, a number of which are also based in California.

46. For example, Defendant AUOA employees Michael Wong and Evan Huang, based in California, routinely emailed other AU Optronics' employees about their communications with competitors and transmitted collusive prices to AU Optronics' customers. After California-based employee Evan Huang reported the pricing and other competitive information he gathered from a "CMO Sales person," AUOA's Alice Ho asked Huang to "kindly check" CMO's price quote for a different LCD Panel.

47. Samsung provided California-based Samsung Semiconductor Inc. employee Jason Yun with information regarding Sharp's Motorola prices, and then requested that Yun check with LG Display regarding their commitment status.

48. Chi Mei Corporation's Edward Hung directed California-based Chi Mei Optoelectronics USA, Inc. employee Eric Raymond to "approach LG guy" in part to "talk with LG person to raise up the price before submit pricing to [a customer] Apple." Also, on or about March 5, 2004, Hung emailed California-based Eric Raymond informing him that LG Display told Chi Mei its price quote for Apple and that they "Need to align with CMO/IDTech and DO NOT quote lower." Hung then suggested that Raymond use the same bottom price as LG Display's price quote.

49. Messrs. Yun, Raymond, and Huang followed their directives, and exchanged information with competitors through in-person meetings and other communications. These

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

California-based employees then reported that competitive information to their superiors back in Asia.

50.   Defendants' and/or co-conspirators' employees stationed outside of California – in other parts of the United States and abroad – also transmitted similar information learned from competitors to their California-based employees to help further the goals of the conspiracy.

51.   Aside from the collection of competitor information, Defendants' and co-conspirators' California-based employees submitted price quotes tainted by their unlawful conspiracy to customers located in California and elsewhere.

<u>**GOVERNMENT INVESTIGATIONS**</u>

52.    In December 2006, authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anticompetitive activity among manufacturers of LCD Panels.  In a December 11, 2006 filing with the Securities and Exchange Commission, LG disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the United States Department of Justice had issued a subpoena to its San Jose office.

53.   On December 12, 2006, news reports indicated that in addition to LG, Samsung, Sharp, Epson Imaging Devices Corporation, and AU Optronics were also under investigation.

54.   The U.S. Department of Justice acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

55.   At least one of the co-conspirators approached the Antitrust Division of the Department of Justice to enter into a leniency agreement with respect to the Defendants' conspiracy to fix prices of LCD panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the Department of Justice, this co-conspirator reported the Defendants' price-fixing conspiracy to the Department of Justice and has confessed its own participation in the price-fixing conspiracy at issue.

56.   As a result of the Department's investigation, seven companies have pleaded guilty and have been sentenced to pay criminal fines totaling more than $890 million.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

57.   On or about December 15, 2008, LG agreed to plead guilty and pay a $400 million criminal fine, the second-highest criminal fine ever imposed by the Department's Antitrust Division.  LG admitted to participating in a conspiracy from September 2001 to June 2006 to fix the price of LCD panels sold worldwide, and to participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

58.   On or about December 16, 2008, Sharp agreed to plead guilty and pay a $120 million criminal fine.  Sharp admitted to participating in a conspiracy with unnamed conspirators to fix the price of LCD panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from fall 2005 to December 2006, and to participating in bilateral meetings, conversations, and communications in Japan and the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

59.   On or about January 14, 2009, Chunghwa agreed to plead guilty and pay a $65 million criminal fine.  Chunghwa admitted to participating in a conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD panels, agreeing to fix the prices of LCD panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices and sales information.

60.   On or about January 15, 2009, Chang Suk "C.S." Chung, an executive from LG Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June 2006.  Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine.  On or about February 3, 2009, former LG Display executive Duk Mo Koo was indicted for participating in the global LCD Panel price-fixing conspiracy.  On or about April 27, 2009, a high level executive of LG, Bock Kwon, agreed to plead guilty to the global LCD Panel price-fixing conspiracy.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

61.    On or about March 10, 2009, Hitachi agreed to plead guilty and pay a $31 million criminal fine.  Hitachi admitted to engaging in telephone discussions and bilateral meetings with representatives of other major LCD producers to fix the prices of LCD Panels sold to Dell Inc., during a period from at least April 2001 to March 2004.

62.    On or about December 9, 2009, Chi Mei agreed to plead guilty and pay a $220 million criminal fine.  Chi Mei admitted to participating in meetings, conversations and communications with other major LCD producers to fix prices of LCD Panels and exchanging information on sales of LCD Panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

63.    And on or about June 29, 2010, HannStar agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

64.    Defendant AUO elected not to plead guilty and on June 10, 2010, a federal grand jury returned an indictment against AUO and its subsidiary, Defendant AUOA for engaging in a combination and conspiracy to suppress and eliminate competition by fixing the prices of LCD Panels in the United States and elsewhere.  Specifically, the indictment charged that AUO participated in the worldwide price-fixing conspiracy from September 14, 2001, to December 1, 2006, and that its subsidiary joined the conspiracy as early as spring 2003.

65.    Following an eight-week jury trial in this District, on or about March 13, 2012, a jury found AUO, AUOA, and two of its executives guilty of price-fixing.

66.    On September 20, 2012, AUO was sentenced to a $500 million fine for its involvement in the conspiracy.  AUOA was placed on probation for three years and required to adopt an antitrust compliance program with an appointed independent compliance monitor.  AUO Vice Chairman Hsuan Bin Chen, also former president, was sentenced to three years in prison and a $200,000 fine.  Hui Hsiung, AUO's executive vice president during the conspiracy, was also sentenced to three years in prison and ordered to pay a $200,000 fine.

67.    On April 29, 2013, Shiu Lung Leung, AUO's former senior manager in its Desktop Display Business Group, was sentenced to 24 months in prison and a $50,000 fine for his involvement in the conspiracy on behalf of AUO.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

## HOME DEPOT'S PURCHASES & INJURIES IN CALIFORNIA

68.    During the Conspiracy Period, Home Depot purchased for its own use millions of dollars of LCD Products incorporating LCD Panels made by Defendants and their co-conspirators. Because of the conduct of the Defendants and their co-conspirators, Home Depot paid supra-competitive prices for LCD Products.

69.    Specifically, Home Depot purchased over $150 million of LCD Products during the Conspiracy Period, including millions of dollars of purchases made in California and/or for use in Home Depot's California retail store locations and other operations.

## FRAUDULENT CONCEALMENT

70.    Home Depot did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006, when the existence of the investigations by the U.S. Department of Justice and other antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination, or conspiracy.  Because the conspiracy was kept secret, Home Depot was not aware of Defendants' and their co-conspirators' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LCD Products.

71.    The affirmative acts of Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.   After one Crystal Meeting, Brian Lee of Chunghwa wrote that LG Display had reminded the meeting participants to "take heed of the antitrust law."  Evan Huang of AUO wrote an internal meeting report to others at AUO where he reminded them that their price information exchange with other suppliers "is illegal, especially in the states. We need to be watchful!"  Genichi Watanabe testified at deposition that he did not create written records of meetings discussing price with competitors because he was worried about antitrust laws.  Stanley Park recorded in his notes after a conspiracy meeting that "based on the DRAM companies being sued in violation of the antitrust laws for their price fixing about two years ago, we need to pay

more attention to security internally and otherwise, and must try to refrain from written communication which would leave trails."

72. By its very nature, Defendants and their co-conspirators' price-fixing conspiracy was inherently self-concealing. As alleged above, Defendants and their co-conspirators had secret discussions about price and output. They agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to the one-on-one so-called "Round Robin" meetings.

73. In addition, Defendants and their co-conspirators repeatedly gave pretextual justifications for inflated prices of LCD Panels in furtherance of the conspiracy herein, including acts in furtherance of the conspiracy which were wrongfully concealed and carried out in a manner that precluded detection. The Defendants and their co-conspirators knew their activities were illegal.

## TOLLING OF STATUTE OF LIMITATIONS

74. The statute of limitations relevant to Home Depot's claims was tolled by the doctrine of fraudulent concealment until December 11, 2006, the date that the United States's investigation into the LCD price-fixing conspiracy as to certain Defendants and/or its co-conspirators was made public.

75. Home Depot's claims have further been tolled by the doctrine of equitable tolling.

76. As a result of the filing of class actions relating to Defendants' and their co-conspirators' illegal conspiracy to fix LCD Panel and/or LCD Product prices, the statute of limitations relevant to Home Depot's purchases of price-fixed LCD Panels and/or LCD Products has also been tolled under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).

77. The statute of limitations applicable to Home Depot's Cartwright Act claims for its indirect purchases of price-fixed LCD Panels and/or LCD Products was tolled as a result of the filing of pre-consolidation indirect purchaser class action complaints against Defendants and their

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

co-conspirators that included Home Depot in their class definitions and asserted claims against Defendants and their co-conspirators for their participation in the illegal LCD price-fixing conspiracy under California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq*.

78.   Specifically, Home Depot relies on the filing of *Ferencsik v. LG Philips LCD Co., LTD. et al.*, Case No. 06-6714, Dkt. No 1 (E.D.N.Y. Dec. 20, 2006) and *DiMatteo v. LG Philips LCD Co., LTD. et al*., 1:06-cv-15342, Dkt. No. 1 (S.D.N.Y. Dec. 20, 2006) to toll the statute of limitations from December 20, 2006 until at least February 2, 2007 since both complaints asserted claims on behalf of, in relevant part: "All persons or entities in a Class Jurisdiction who indirectly purchased TFT-LCDs that was manufactured or distributed by any of defendants from 2002 to the present."

79.   The statute of limitations further was tolled by virtue of the class complaints in *Hee v. LG Philips LCD Co. LTD, et. al.*, 3:07-cv-00722-SI, Dkt. No. 1 (N.D. Cal. Feb. 2, 2007) and *Selfridge v. LG Philips LCD Co., LTD, et. al.*, 3:07-cv-02915-SI, Dkt. No. 1-1 (S.D. Cal. Feb. 15, 2007) from February 2, 2007 through at least November 5, 2007 since the *Hee* class included, in relevant part: "All individuals and entities who, between January 1, 1998 and December 31, 2005, indirectly purchased TFT-LCD Products in California from the defendants or their subsidiaries" and the *Selfridge* class included: "All persons and entities residing in California who, from January 1, 2002 to present, purchased TFT-LCD in the United States indirectly from the Defendants."

80.   The statute of limitations applicable to Home Depot's Cartwright Act claims for its indirect purchases was also tolled by the filing of indirect purchaser consolidated class action complaints against Defendants and their co-conspirators that included Home Depot in their class definitions and asserted claims against Defendants and their co-conspirators for their participation in the illegal LCD price-fixing conspiracy under California's Cartwright Act, California Business and Professions Code §§ 16720 *et seq*.

81.   Specifically, Home Depot relies on the filing of Indirect-Purchaser Plaintiffs' Consolidated Complaint in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 3:07-md-1827, Dkt. No.

Bryan Cave LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105

367 (N.D. Cal. Nov. 5, 2007) to toll the statute of limitations from November 5, 2007 to December 5, 2008 since the Consolidated Complaint asserted claims on behalf of, in relevant part, "All persons and entities in California who indirectly purchased LCD Panels manufactured and/or sold by one or more of the Defendants during the Class Period . . . ."

82.    Home Depot also relies on the filing of the Second Consolidated Amended Complaint in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 3:07-md-1827, Dkt. No. 746 (N.D. Cal. Dec. 5, 2008) to toll the statute of limitations from December 5, 2008 to April 29, 2011 since the Second Consolidated Amended Complaint asserted claims on behalf of, in relevant part: "All natural persons and entities residing in California who indirectly purchased in California for their own use and not for resale LCD panels manufactured and/or sold by one or more of the defendants during the Class Period . . . ."

83.    Home Depot further relies on the filing of the Third Consolidated Amended Complaint in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 3:07-md-1827, Dkt No. 2694 (N.D. Cal. April 29, 2011) to toll the statute of limitations from April 29, 2011 to April 10, 2012 since the Third Consolidated Amended Complaint asserted claims on behalf of, in relevant part: "All persons and entities in California, who, from January 1, 1999 to December 31, 2006, as residents of California, purchased LCD panels incorporated in televisions, monitors, and/or laptop computers in California indirectly from one or more of the named Defendants or Quanta Display Inc., for their own use and not for resale . . . . "

84.    The Consolidated Complaint, Second Consolidated Amended Complaint, and Third Consolidated Amended Complaint also asserted claims against Defendants and their co-conspirators on behalf of a nationwide class of indirect purchaser plaintiffs that included Home Depot in the class definitions.

85.    Home Depot remained in the classes of indirect purchasers as defined in the Third Consolidated Amended Complaint until April 10, 2012.  At that time, Home Depot timely filed notice of its exclusion from the indirect purchaser classes.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

86.   Home Depot also entered into a tolling agreement with AU Optronics effective as of March 18, 2013 which, by virtue of an extension, continued until at least October 14, 2013. During the pendency of that agreement, the applicable statute of limitations was tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Claim for Injunction to Prevent Further Violations of Sherman Act)

87.   Home Depot incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Amended Complaint.

88.   Beginning at a time presently unknown to Home Depot, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Home Depot, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, and maintain prices for LCD Panels in the United States and elsewhere, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

89.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to, the following acts and practices:  (1) fix, raise, maintain and stabilize the price of LCD Panels; and (2) allocate markets for LCD Panels among themselves.

90.   Home Depot has been injured in its business and property by being forced to pay more for LCD Panels and LCD Products manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' price-fixing conspiracy.

91.   Without an injunction, Home Depot will continue to be injured in its business and property by being forced to pay more for LCD Panels and LCD Products manufactured by Defendants, their co-conspirators, and others than it would in the absence of Defendants' and their co-conspirators' price-fixing conspiracy.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

92.     Home Depot is therefore entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**<u>Second Claim for Relief</u>**

**<u>(Violation of the California Cartwright Act)</u>**

93.     Home Depot incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Amended Complaint.

94.     Beginning at a time presently unknown to Home Depot, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to Home Depot, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, and maintain prices for LCD Panels in the United States and elsewhere, in violation of California antitrust laws.  Defendants and their co-conspirators have each acted in violation of these laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, LCD Panels at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in California.

95.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to, the following acts and practices:  (1) fix, raise, maintain and stabilize the price of LCD Panels; and (2) allocate markets for LCD Panels among themselves.

96.     By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*

> a.     Defendants and their co-conspirator's conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in California and fixed, raised, maintained and stabilized LCD Panel prices in California at artificially high, non-competitive levels;
>
> b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected California commerce;

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

c.   During the Conspiracy Period, Home Depot purchased LCD Products containing price-fixed LCD Panels in California and elsewhere and for use in Home Depot's retail stores and other locations in California.  As a result, Home Depot is entitled to the protection of the laws of California; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, Home Depot has been injured in its business by paying more for LCD Products containing LCD Panels manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Cal. Bus. & Prof. Code §§ 16720, *et seq.*

## **PRAYER**

WHEREFORE, Home Depot prays:

A.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

1.   A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

2.   An unlawful combination, trust, agreement, understanding, concert of action in violation of the California antitrust laws identified in the Second Claim for Relief.

B.      That Home Depot recovers damages and/or other monetary relief, as provided by California law, and that judgments be entered in favor of Home Depot against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C.      That Home Depot obtains any penalties, punitive or exemplary damages, and/or full consideration, where the laws of California identified herein so permit;

D.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the illegal conduct, contract, conspiracy or combination

alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

      E.         That Home Depot be awarded pre-and post-judgment interest, and that such interest be awarded at the highest legal rate as permitted by applicable law;

      F.         That Home Depot recovers its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

      G.         That Home Depot be awarded such other further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Home Depot demands a jury trial.

Dated:  July 1, 2014.                BRYAN CAVE LLP

                                      By:   /s/ Lindsay J. Sklar
                                          G. Patrick Watson
                                        C. Scott Greene
                                        Lindsay J. Sklar

                                          Attorneys for Plaintiff
                                          HOME DEPOT U.S.A., INC.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105